**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, | § | |
| *Armstrong*, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' POST-TRIAL BRIEF
AND MEMORANDUM OF LAW**

# TABLE OF CONTENTS

BULLET POINT OUTLINE OF MAJOR ARGUMENTS ................................................................................. v

INTRODUCTION ................................................................................................................................... 1

  I.   EBIA Floodwall Design and Construction ................................................................................ 4

  II.   IHNC Lock Replacement Project and Task Order 26 ............................................................... 9

  III.  Applicable Geotechnical Engineering Principles For Analyzing the EBIA Floodwall Failures ............... 12
      A.  The EBIA is Comprised of Predominantly Clay Soils ........................................................ 14

      B.  Permeability ..................................................................................................................... 19

      C.  Steady State/Steady Flow vs. Transient Flow Conditions and the Impact of Compressibility, or Volume Change on Pressure and Flow Transmission ...................................................... 21

      D.  Drained or Undrained: Proper Stability Analysis for Shear Failures .................................. 25

  IV.  Applying Soil and Fluid Mechanics to the EBIA Clay Soils Demonstrates that Underseepage and Landside Hydraulic Uplift Pressures Were Not Contributing Factors to Either the North or South Breach ........................................................................................................................ 31

  V.   The North Breach: Stability Failure and Structural Deficiencies ........................................... 37
      A.  Initiation of Lateral Instability at the North Breach ........................................................ 37

      B.  Structural Deficiencies at the North Breach .................................................................... 41

  VI.  South Breach: Overtopping and Overturning ...................................................................... 46

  VII. Plaintiffs' Methodology and Analysis Is Not Credible or Valid ............................................ 56
      A.  Permeability ..................................................................................................................... 57

      B.  Dr. Bea's "Eureka" Moment ............................................................................................ 58

      C.  Incompressible soil .......................................................................................................... 64

      D.  Changed boundary conditions ......................................................................................... 67

      E.  Dr. Bea's "Near Breach" McDonough Marine Analysis was NOT a control. ..................... 68

      F.  Idealized excavations ...................................................................................................... 71

      G.  "Smoking Guns" .............................................................................................................. 73

LAW AND ARGUMENT .......................................................................................................................... 75

  I.   Plaintiffs' Claims are Barred by the Flood Control Act ......................................................... 75
      A.  The United States is immune because Plaintiffs' damages were caused by alleged negligence primarily or substantially related to flood control activity ............................................... 77

B.  The United States is immune because Plaintiffs' flood damages were caused by deficiencies in the original design and construction ................................................................................................... 82

II.  The Discretionary Function Exception Bars Plaintiffs' Claims that the Corps's Conduct in Designing or Failing to Re-Assess the Design of the EBIA Floodwall was Negligent ........................................... 85

III.  Plaintiffs Failed to Prove that WGI's Activities were a Cause-In-Fact of the EBIA Floodwall Failures or that the Corps's was Negligent in Approving WGI'S Work ................................................................ 97

A.  Plaintiffs failed to prove that WGI's work was a necessary antecedent of the EBIA floodwall failures ................................................................................................................................................. 99

B.  The Corps was not negligent in approving WGI's work. ........................................................... 106

1.  The Corps's Evaluation Process for Work Within 300 feet of a floodwall and Permits ............... 107

2.  The Corps's approval of WGI's work was based on good engineering judgment that the EBIA floodwall would  not be placed at increased risk of seepage, uplift pressures, or instability .... 110

DAMAGES ................................................................................................................................................. 118

CONCLUSION ........................................................................................................................................... 120

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ............................................ 74

*Central Green Co. v. United States*, 531 U.S. 425 (2001) ........................................................ 76

*Dalehite v. United States*, 346 U.S. 15 (1953) ........................................................................... 91

*Freeman v. United States*, 556 F.3d 326 (5th Cir. 2009) ..........................................86, 88, 91

*In re Katrina Canal Breaches Consol. Cases,*
    533 F. Supp. 2d 615 (E.D. La. 2008) .........................................................................13, 91, 92

*In re Katrina Canal Breaches Consol. Litig.,* 647 F. Supp. 2d 644 (E.D. La. 2009)
    *rev'd* 696 F. 3d 436 (5th Cir. 2012) ........................................................................................... 66

*In re Katrina Canal Breaches Consol. Litig.,*
    696 F. 3d 436 (5th Cir. 2012) ............................................................................................. passim

*National Union Fire Insurance v. United States,*
    115 F.3d 1415 (9th Cir. 1997) ........................................................................................93, 94, 95

*Robinson v. United States*, 647 F. Supp. 2d 644 (E.D. La. 2009) ......................................... 87

*Spotts v. United States*, 613 F.3d 559 (5th Cir. 2010) ................................................................ 86

*United States v. James*, 478 U.S. 597 (1986) ............................................................................. 76

*United States v. Gaubert*, 499 U.S. 315 (1991) .....................................................................86, 87

*United States v. Varig Airlines*, 467 U.S. 797 (1984) ................................................................ 86

*Westchester Fire Ins. Co. v. Haspel-Kansas Inv. Partnership,*
    342 F.3d 416 (5th Cir. 2003) ...................................................................................................... 98

### STATE CASES

*Adams v. Traina*, 830 So. 2d 526 (La. Ct. App. 2002) ............................................................... 98

*Boteler v. Rivera*, 700 So. 2d 913 (La. Ct. App. 1997) ....................................................... 99, 105

*Bridgefield Cas. Ins. Co. v. J.E.S., Inc.*, 29 So. 3d 570 (La. Ct. App. 2009) ........................106

*Brooks v. United States*, 337 U.S. 49, 53 (1949) ........................................................119

*Caldwell v. Let The Good Times Roll Festival*, 717 So. 2d 1263 (La. Ct. App. 1998)...105

*Daniels v. USAgencies Cas. Ins. Co.*, 92 So. 3d 1049 (La. Ct. App. 2012)...........................98

*Dixie Drive It Yourself Sys. v. Amer. Bev. Co.*, 137 So. 2d 298 (La. 1962) .........................99

*Dumas v. State*, 828 So. 2d 530 (La. 2002) ........................................................119

*Larkin v. U.S. Fidelity and Guaranty Co., et al.*, 258 So. 2d 132 (La. Ct. App. 1972)....106

*Lasyone v. Kansas City Southern R.R.*, 786 So. 2d 682 (La. 2001).......................................98

*Straley v. Calongne Drayage & Storage, Inc.*, 346 So. 2d 171 (La. 1977) .......................98

*Theriot v. Lasseigne*, 640 So. 2d 1305 (La. 1994).......................................................98

## FEDERAL STATUTES

Pub. L. No. 89-268, 79 Stat. 1073 (1965)........................................................ 4, 54, 90

33 C.F.R. §208.10(a)........................................................108

41 U.S.C. § 702c........................................................2, 119

33 U.S.C. 702c ........................................................ 2, 75, 76, 119

28 U.S.C. § 2680(a) ........................................................ 85

28 U.S.C. § 1346(b)(1), 2674 ........................................................ 97

## STATE STATUTE

La. Civ. Code Ann. art. 2324(1996) ........................................................119

## CONGRESSIONAL REPORTS

H.R. Doc. No. 89-231 (1964)........................................................4, 91

## BULLET POINT OUTLINE OF MAJOR ARGUMENTS

- The EBIA is predominantly comprised of clay soils. The EBIA floodwall was designed and constructed on a foundation of these clay soils, and geotechnical evaluations were made to ensure the stability and seepage resistance of the floodwall and its foundation under the authorized design conditions.

- The geotechnical properties of the clay soils and the laws of soil and fluid mechanics govern how these soils will behave under a 30-hour storm surge event. The EBIA clay soils were extensively tested and measured to determine their geotechnical properties. Those properties formed the basis of the numerical modeling used to understand why the EBIA floodwall failed.

- Neither underseepage nor hydraulic uplift pressures were contributing factors to the EBIA floodwall failures. The measured properties of the clay soils at the EBIA simply could not have transmitted underseepage flows or hydraulic uplift pressures to the landside levee toe during Katrina's 30-hour storm surge event.

- The north breach likely resulted from a combination of global instability, structural deficiencies, and scour erosion of the landside soils. Overturning was the likely mode of failure. WGI's excavations did not cause or contribute to this mode of failure.

- The south breach likely resulted from overturning caused by overtopping and scour erosion of the landside soils. WGI's excavations did not cause or contribute to this mode of failure. Dr. Bea's sworn testimony in a prior case agreed with this mode of failure before he recanted that testimony for purposes of this trial.

- Plaintiffs' theory of failure is untenable. Their methodology and analysis was contrary to accepted principles of soil and fluid mechanics, contrary to the measured geotechnical properties of the EBIA soils, and was based on assumptions that lacked evidentiary foundation.

- Plaintiffs' claims are barred by § 702c of the Flood Control Act and the FTCA's discretionary function exception.

- Plaintiffs failed to prove that WGI's remediation activities were a cause-in-fact or substantial contributing factor of either the north or south breach.

- The Corps was not negligent in approving WGI's work because no competent engineer would have concluded that WGI's canal-side remediation activities posed any risk of compromising the EBIA floodwall's stability or resistance to underseepage or landside uplift pressures.

## INTRODUCTION

Throughout this litigation, the United States has maintained that Plaintiffs could not carry their burden of proving any negligence on the part of the United States Army Corps of Engineers ("the Corps") in approving the work of its contractor, Washington Group International, Inc. ("WGI") in the East Bank Industrial Area ("EBIA") of New Orleans prior to Hurricane Katrina's landfall and unprecedented storm surge on August 29, 2005.[1]  The United States has further maintained that Plaintiffs also would be unable to prove their theory of causation (*i.e.*, that WGI's work somehow allowed underseepage to occur or subterranean pressure to be transmitted to the landside of the EBIA floodwall when Hurricane Katrina's storm surge entered the area, thereby causing the floodwall to fail in two places).[2]  Plaintiffs' theory of causation, which changed several times up to and during trial, had no support in the empirically verified and measured soil properties at the EBIA or in the laws of soil and fluid mechanics.  Evidence adduced at trial unequivocally demonstrated that Plaintiffs' allegations were baseless:  WGI's excavations and backfilling activities did not cause or contribute in any way to the EBIA floodwall failures, and the Corps was not negligent in approving that work.

It is now clear that the EBIA floodwall failures could only have been prevented by some combination of deeper sheet piles to increase the floodwall's stability, landside erosion protection, higher levee toes, or taller wall elevations.  Decisions concerning each

---

[1] The EBIA is bounded on one side by the east bank of the Inner Harbor Navigation Canal ("IHNC") and on the other by a floodwall protecting neighborhoods of New Orleans' Lower Ninth Ward.  For ease of reference, this floodwall, which is part of the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV"), is referred to as the "EBIA floodwall."
[2] The two breaches were referred to throughout trial as the "north breach" and the "south breach."  The "north breach" occurred toward the north end of the EBIA, adjacent the parcel known as Boland Marine.  The "south breach" occurred toward the south end of the EBIA, adjacent the parcel known as "Saucer Marine."

of these remedial measures pertain to the flood protection system itself.  These decisions are covered by both § 702c of the Flood Control Act and the Federal Tort Claims Act's ("FTCA") discretionary function exception.  Whatever else may be said about the Corps's EBIA floodwall design, that design was part of a statutorily authorized flood control project, and the United States retains immunity under the Flood Control Act and the discretionary function exception for any deficiencies, real or perceived, in the floodwall's design.

Immunity aside, understanding how and why the EBIA floodwall failed requires straightforward application of well-understood and accepted principles of soil mechanics—how soils behave under certain loading conditions based on their known, empirically verifiable and measured properties, such as permeability, shear strength, and coefficient of volume change.  And simply put, the clay soils found at the EBIA and in the foundation and on the landside of the EBIA floodwall at the time of Hurricane Katrina could not have behaved in the manner that Plaintiffs claim during a 30-hour storm surge event.

There is nothing magical or mysterious about the behavior of EBIA clays or organic clays.  These soils were extensively sampled, tested, and classified according to the site specific properties that would govern their behavior during a storm surge event.  Renowned geotechnical experts in this case applied universally accepted principles of soil and fluid mechanics and the laws of physics to the known, empirically verified and measured properties of the clay soils found at the EBIA.  Their results demonstrated that no excavations dug by WGI contributed in any way to the failures at the EBIA floodwall during Hurricane Katrina's historic surge event.

Against the clear, credible geotechnical evidence and explanation for how the north and south breaches developed (and contrary to his own prior testimony in the *Barge*

2

litigation with respect to the south breach), Plaintiffs' expert, Dr. Robert Bea, hypothesized an altogether different scenario, a scenario that occurred to him in a "eureka" moment and a scenario that differed from his own previous explanations of these very same breaches. Dr. Bea's theory was so at odds with both the site conditions and accepted geotechnical methods of analyzing soil and fluid mechanics that some of the best geotechnical engineers in the country struggled to understand his theory at all. Indeed, they concluded that if Dr. Bea's theory was correct, textbooks on soil mechanics would have to be re-written.

Only by attempting to reverse engineer Plaintiffs' explanation for the mode of failure were Defendants' geotechnical engineers able to determine that Dr. Bea's computer models, run by graduate students with little professional experience running the programs, contained fundamental errors that rendered the outputs and conclusions invalid. The cumulative effect of these errors inexorably led to an incorrect model of the geotechnical conditions and an incorrect and untenable conclusion about what caused the EBIA floodwall to fail.

In the end, neither the science nor the known, verifiable facts about the soils at the EBIA and the actual on-site work performed by WGI provided any support for Plaintiffs' allegations in this case. The Corps exercised due care in allowing WGI's work to proceed because no competent engineer would have concluded that WGI's work posed any risk of compromising the EBIA floodwall's stability and resistance to underseepage. Furthermore, the evidence convincingly demonstrated that WGI's remediation activities did not cause or contribute in any way to the floodwall failures at the EBIA on August 29, 2005.

### I.      EBIA Floodwall Design and Construction

Plaintiffs' allegations in this case centered on two failures of the EBIA floodwall, located adjacent the IHNC and designed and constructed in the late 1960's to protect the Lower Ninth Ward against a hypothetical 13-foot storm surge.  Critical to understanding why Plaintiffs' allegations of negligence against the Corps are unfounded, and why those allegations ultimately trigger the United States' immunity under the Flood Control Act and the discretionary function exception, is an understanding of the design and construction of that floodwall and levee.

In 1966, the Corps, as part of the Congressionally-authorized Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP" or "LPV"), designed a levee and floodwall adjacent to the EBIA.  (*See generally* JX 0004-0097).  Congress gave the Corps's Chief of Engineers discretion to determine the extent of protection as long as it was substantially in accordance with the Chief's recommendation report to Congress.  Pub. L. No. 89-268, 79 Stat. 1073, 1077 (1965); *see generally* Chief's Report, H.R. Doc. 231, 89th Cong., 1st Sess. (1964).

The "EBIA floodwall," so-called for ease of reference, was designed to protect the Lower Ninth Ward against a hypothetical 13-foot storm surge propagated into the IHNC, or Industrial Canal, a storm surge projected as part of the "Standard Project Hurricane" that formed the basis for all levees and floodwalls designed and constructed by the Corps pursuant to the LPVHPP.  Waves were not considered to be a factor in the IHNC at the time of design, and only one foot of freeboard was added to the wall elevation, resulting in a final proposed net elevation of 14 feet mean sea level.  (JX 0004-0104).

To achieve the authorized protection, the Corps designed the EBIA floodwall to be constructed to an elevation of 15 feet, anticipating that settlement of one foot over time would achieve the net 14-foot design elevation. (*Id.* 0115). Construction of the floodwall was completed in 1969 and consisted of 19.5-foot long sheet piles driven through the levee and foundation soils to an elevation of -8 feet NGVD, embedding the sheet pile in a layer of fat clays above soft organic clays.[3] The top several feet of the sheet pile were capped with concrete, forming an "I-Wall" on top of the existing levee, which itself consisted of clay soils. No erosion protection was authorized, designed, or constructed to protect the landside (protected side or backside) of the levee in the event that storm surge waters overtopped the floodwall. (Silva Tr. 3697-98; DX-DM-0015-0018).

As part of the Corps's design process, geotechnical evaluations and analyses were performed to ensure the I-Wall's stability during the critical loading condition, *i.e.*, a 13-foot storm surge, and an assessment was performed to evaluate the risk that seepage-induced erosion or uplift pressures would undermine the floodwall's integrity during the anticipated short-term storm surge loading condition. To undertake these analyses the Corps reviewed the geologic history of the area and drilled geotechnical soil borings to understand the properties of the materials they would be building upon. As shown in Plate 28 of General Design Memorandum Number 3, the stratigraphy of the EBIA between the IHNC lock and Florida Avenue showed predominantly clay to a depth of almost -50 feet. (JX 0004, Plate 28). Plaintiffs in this case focused on the layer of organic clay found at approximately -10 feet. Although this layer of soils is labeled using the geologic term "Marsh" in recognition of its depositional environment—meaning that the pre-historic

---

[3] Using the current datum, NAVD88 (2004.65), the bottom elevation would be -10.5.

precursor to this layer's eventual formation was marsh—its classification for geotechnical engineering properties is clearly shown as "Clay with organic matter." (*Id.*).  From the standpoint of the properties this soil would be expected to exhibit for geotechnical engineering purposes, this classification meant that the soil is predominantly clay and should be treated as having the permeability, strength, and compressibility characteristics of clay.  It does not mean that this layer of soil was, in physical description or behavior, a "Marsh."[4]

Given the short-term duration of the anticipated storm surge and the low-permeability clay soils that dominated the levee foundation, the landside of the floodwall, and the EBIA area generally, the Corps's geotechnical engineers determined that neither seepage nor uplift pressure would pose a risk to the floodwall along this reach.  (JX 0004-0114).

Following standard geotechnical engineering practices, the Corps's stability analysis utilized undrained shear strengths to calculate the resisting force of the clay soils against the anticipated 13-foot storm surge that would rapidly load against the face of the floodwall.  (Lucia Tr. 2950-51).  Undrained shear strengths are universally used by geotechnical engineers—even today—for clay soils subjected to short-term loading conditions.  (*Id.*; Marr Tr. 1899).

Consistent with sound geotechnical engineering principles of stability analysis, the Corps also calculated a minimum control line—a boundary line defining the critical area where disturbing soils could potentially undermine the stability of the floodwall during a storm surge loading condition.  (Lucia Tr. 2944-45; JX 0004, Plate 38).  That control line ran

---

[4] In fact, "Marsh" is not a geotechnical engineering classification.

roughly 15 to 20 feet from the center line of the floodwall.  (Lucia Tr. 2946).  Disturbing soils within this critical area could make it more likely that the floodwall would lose the resisting force necessary to maintain stability against the driving force of the projected storm surge—the force that the floodwall was designed to withstand—thereby increasing the likelihood the floodwall could destabilize and be toppled into the Lower Ninth Ward.  (DX-DM-1005-0036-39; Lucia Tr. 2944-45, 47; JX-1777-0066).

Lastly, the Corps considered the forces that could lead to "overturning moments" when the design flood condition reached the top of the wall, evaluating various sheet pile depths for stability against overturning forces.  The final penetration depth was chosen based on the Corps's determination that the floodwall would retain stability against shear and overturning forces with floodwaters at the top of the wall.  (JX 0004-114; Plates 37, 38, 39, 45).  Importantly, this determination did not include the possibility that a storm surge would exceed the authorized design elevation, leading to overtopping and erosion of the soil that provides resistance on the landside of the floodwall.

Construction of the EBIA floodwall was completed in 1969.  Although settlement and subsidence were anticipated along the entire reach of floodwall between the IHNC lock and Florida Avenue, that subsidence exceeded the Corps's projections as documented in several surveys taken of the floodwall by the Orleans Levee District ("OLD").[5]  No action

---

[5] Mr. John Stephen King, who has worked with Orleans Levee District since 1970, testified that OLD surveyed the EBIA floodwall three times prior to Hurricane Katrina, in 1991, 1996, and 1999.  (Tr. 2657-60; JX-1924, 1925, 1926).  Those surveys showed a constant decline in the floodwall's top-of-wall elevation, with some areas subsiding more than others.  (Tr. 2660).  Dr. Marr used this data to create a demonstrative aid profiling this decline over time.  (DX-DM-1006-0039). As his graph demonstrated, the floodwall was lowest at the north and south breach sites.  Note that the last documented survey occurred in 1999, before WGI ever mobilized on site.  The subsidence of the wall pre-dated WGI's activities in the EBIA.

was ever taken to raise the levee and floodwall back to its original design height.  As Dr. Francisco Silva-Tulla testified, the subsidence of the wall, combined with the failure to account for waves and wave-overtopping, rendered the top of the floodwall roughly four feet lower than necessary to contain Katrina's peak surge levels in the IHNC.  (Silva Tr. 3695-96).  Given this substantial deficiency, Dr. Silva testified that "it is not a surprise that the performance [of the floodwall] was not satisfactory." (*Id.* 3696).

In addition, at the north breach site, post-failure investigations revealed that the toe of the levee on the protected side was constructed roughly four feet lower than called for in the original design.  (Brandon Tr. 3187-88).  This change in geometry from the original design had the effect of reducing the shear strengths and resisting capacity of the soils on the protected side.  (*Id.*). In addition, a critical component of the north breach failure—the formation of a gap between the floodwall and the canal-side levee, caused when the floodwall deflects toward the landside leaving a void between the I-Wall and canal-side levee soils—was not an anticipated or known cause of failure in 1966.  The EBIA floodwall design did not account for this critical failure mechanism in its stability analysis.

The EBIA floodwall, running north from the IHNC lock to just south of Florida Avenue, was replaced in 1982 just north of where the north breach occurred, at a location near Florida Avenue.  The replacement of the old sheet pile and floodwall with the newer sheet pile and floodwall was part of the 1980 design for the Florida Avenue Complex, which necessitated a "tie-in" to the existing 1969 floodwall and the construction of a new floodwall running in an "east-west" direction to a location north of Florida Avenue.  (JX 0006-0025).  The 1980 design also included installation of structures at Florida Avenue and a ramp over the new floodwall at Surekote Road.  (*Id.*). Notably, the 1980 floodwall was

designed to a net grade one foot higher than the 1966 design, the result of an updated tidal hydraulic study. (*Id.*).

In contrast to the 1969 floodwall construction, the newer floodwall was constructed with longer sheet piles, approximately 34.5 feet long. These longer sheet piles were driven deeper into the ground, providing the newer floodwall more stability than the old floodwall against storm surge loading conditions.[6] In addition, after running for approximately 30 feet north from the older floodwall, the newer floodwall turned to the west at a right angle, providing an anchoring force that served to restrain the lateral movement of the newer floodwall under storm surge conditions. As Dr. Allen Marr explained, the construction and design of the new floodwall differed from the old floodwall, creating a problematic intersection point that concentrated forces on the older floodwall in a manner likely to lead to structural problems. (Marr Tr. 1847-48). Dr. Silva further testified that this intersection point was undesirable and should have been remedied by use of a step connection. (Silva Tr. 3759).

## II.    IHNC Lock Replacement Project and Task Order 26

In 1997, the Corps completed a New Lock and Connecting Channels Evaluation Report, documenting its plan for completing the complex undertaking of replacing the existing IHNC lock, connecting the IHNC to the Mississippi River, with a new, bigger lock

---

[6] The deeper sheet pile depth at this location was a function of two factors: First, the soil stratigraphy for the Florida Avenue design—a separate location from the 1966 EBIA design—differed from the reach between the IHNC lock and Florida Avenue, showing a thin but appreciable layer of silt that the Corps determined should be cut-off to prevent the threat of underseepage. (JX-0006-0029-30, 0137, Plate 73; Marr Tr. 2189-96, 2206-07). Second, a deep-seated stability analysis indicated a need for a deeper depth based on the critical surface for failure. (JX-0006-0029-30, Plates 76, 77, 78, 81, 82, 84). In addition, a T-Wall construction was used for the east-west section, since the height of the wall above the ground level rendered use of an I-Wall construction impractical. (JX-0006-26).

and flood protection structures.[7]  (JX-0022-0001-08).  To avoid shutting down all

navigation between the Mississippi River and the IHNC while the new lock was

constructed, a temporary, two-way by-pass channel was authorized.  (*Id.* 0006; *see also* JX-

1777-0012-13).  This by-pass channel would run through nearly two-thirds of the EBIA.

But after a long period of industrial use, the EBIA was littered with structures,

contaminants, and debris that had to be removed and remediated before the by-pass

channel could be dredged.  (JX-1777-0014).

     To complete the necessary remediation work, the Corps issued WGI, with whom it

already had a broad, indefinite delivery contract known as a Total Environmental

Restoration Contract ("TERC"), a statement of work known as Task Order 26.  This contract

was funded through New Lock project funds.  In short, Task Order 26 required WGI to draft

a recommendations report and work plans describing the work that needed to be

performed to remove structures and contaminants and remediate the site in compliance

with Louisiana Department of Environmental Quality ("LDEQ") standards.  (*See generally*

JX-1777-0025-36).  This work would entail substantial excavations throughout the EBIA

site.  WGI mobilized on site beginning in February 2001.  (Guillory Tr. 2309).  WGI's work

was accepted as complete as of May 26, 2005.  (*Id.* 2458).

---

[7] The complexity of the New Lock Replacement Project is underscored by the number of
Congressional authorizations implicated in the project's scope.  Those authorizations
included (1) the original authorization from the 1956 Rivers and Harbors Act; (2) the
Water Resources Development Acts of 1976, 1986, and 1996, respectively; and (3) the
Energy and Water Development Appropriations Bill, dated June 13, 1990.  (*See* JX-0022-
0016-18).  The scope of the project also implicated a host of prior studies, reports, and
existing water projects, including the original 1965 LPVHPP, portions of which would
either be reconstructed to accommodate the location of the new lock or tied-in to the new
lock to maintain the integrity of the hurricane protection system.  (*Id.* 0021-25).

The EBIA floodwall and the newer east-west Florida Avenue floodwall were in place, as designed and constructed, at the time the Corps began evaluating the replacement of the IHNC lock, at the time WGI carried out Task Order 26, and at the time Hurricane Katrina hit New Orleans on August 29, 2005.  The stability and seepage analyses performed in the 1966 design of the EBIA floodwall remained valid and applicable throughout the life of Task Order 26.  (Lucia Tr. 2916).  As Dr. Lucia explained, the soil conditions governing the engineering analyses for seepage and stability—in particular the soils on the protected side of the floodwall—had not changed.  (*Id.* 3025-27).  If anything, the settlement of those soils over time had decreased the void ratios, serving to increase the strength and stability of the soils and decrease the likelihood of underseepage.  (*Id.* 3027).  The undisputed evidence demonstrated that not a single WGI excavation either compromised the minimum control line for stability established in 1966 or altered the foundation conditions that formed the basis for the Corps's seepage assessment.  (JX-1777-0076-77).

As part of the IHNC Lock Replacement Project, the Corps completed several Design Documentation Reports ("DDR").  These DDRs included the geotechnical evaluations and design considerations for the new lock, as well as for new flood protection structures that would be built.  (*See generally* JX-19: DDR No.3, New Lock Foundation Report; JX-18: DDR No.2, Levees, Floodwalls, and Channels).  To the south of the new lock, these flood protection structures would be built to Mississippi River and Tributaries protection levels.  To the north, the new flood protection would be built to the LPV hurricane protection levels and tied-in to the existing hurricane protection—the EBIA floodwall—at a location near the Saucer Marine site.  (DX-DM-1005-14, 25; JX-19-0059).  Because the soil and design conditions of the EBIA floodwall were unchanged, the analyses from the 1966 EBIA

floodwall design continued to apply and no new DDR was required, initiated, or contemplated. (Lucia Tr. 3025-27).

Beginning on August 28, 2005, Katrina's storm surge began propagating into the IHNC. The surge developed over a period of approximately 30 hours, reaching its peak elevation of +14.2 feet at approximately 9:00 a.m. on August 29, 2005. (*See* DX-DM-0015-0058; JX-1672-0069). At the north breach site, where the wall elevation was +11.3 feet, the surge reached the top of wall by approximately 6:00 a.m. (*Id.*). At the south breach site, where the wall elevation was +12.1 feet, surge waters reached the top of wall by approximately 7:00 a.m. (*Id.*). Both failures occurred within the 30 hours it took for Katrina's surge to reach its peak. (Silva Tr. 3749-50).

### III. Applicable Geotechnical Engineering Principles For Analyzing the EBIA Floodwall Failures

Understanding how and why the EBIA floodwall failed at the north and south breaches—and why WGI's work on Task Order 26 did not contribute to those failures—begins and ends with an understanding of the basic fundamentals of soil mechanics. Soil mechanics, in short, describe and explain the physical properties of soils and how those physical properties affect the ability of soil to bear weight and resist water. In the context of levees and floodwalls, geotechnical engineers rely on soil mechanics to assess how soils will behave under hydraulic loading conditions. Soil mechanics govern how geotechnical engineers design structures to prevent failures under specified conditions, and when a failure occurs, soil mechanics are how geotechnical engineers investigate and explain what went wrong.

This Court heard extensive testimony from some of the finest geotechnical engineers in the country, Dr. Allen Marr, Dr. Timothy Stark, Dr. Tom Brandon and Dr.

Francisco Silva-Tulla, each of whom explained the principles of soil mechanics that applied to appropriately analyze the EBIA floodwall failures in this case.[8]  Their methodology and analyses relied on site-specific conditions and properties of the soils, as empirically verified through scientific methods.  By contrast, Plaintiffs' expert, Dr. Bea, who is not presently licensed to practice civil or geotechnical engineering,[9] applied a methodology so unorthodox and divorced from the known, site-specific conditions, that by his own admission he was "working a different problem" than Defendants' well-qualified geotechnical engineers.

As the Defendants previously suggested, only one methodology actually "fits" the facts and the site specific conditions and soil properties of this case.  Only one methodology comports with generally accepted geotechnical engineering principles.  To understand how geotechnical engineers approach the problems of slope stability and seepage with levees

---

[8] The Court also heard testimony from Dr. Patrick Lucia, another well-qualified geotechnical engineer.  Dr. Lucia explained many of the same principles, although the scope of Dr. Lucia's testimony was limited to the Corps's standard of care at the time Task Order 26 was carried out.  He did not analyze or offer an opinion on causation of either breach, although he did opine about the foreseeability of the type of failure Plaintiffs' alleged occurred and whether the Corps should have anticipated such a failure mode would occur as a result of WGI's work.

[9] *See* Bea Tr. 828-31.  Dr. Bea's licensing status, according to his testimony, is "retired."  (*Id.* 828, 4096).  The California Board for Professional Engineers, Land Surveyors, and Geologists reports on its website that Dr. Bea's Geotechnical and Civil Engineering Licenses were cancelled as of June 30, 2001.  *Id.* 829-30.  *See also* http://www2.dca.ca.gov/pls/wllpub/WLLQRYNA$LCEV2.QueryView?P_LICENSE_NUMBER=126&P_LTE_ID=748; http://www2.dca.ca.gov/pls/wllpub/WLLQRYNA$LCEV2.QueryView?P_LICENSE_NUMBER=15707&P_LTE_ID=741 This Court may take judicial notice of the information contained on this governmental website.  *See In re Katrina Canal Breaches Consol. Cases*, 533 F. Supp. 2d 615, 633 (E.D. La. 2008) (collecting Fifth Circuit and other cases endorsing judicial notice of governmental websites).  Notwithstanding that his license to practice has lapsed, Defendants agreed that Dr. Bea, by virtue of experience, met the requirement of Federal Rule of Evidence 702 to offer opinions as a retired professor in civil engineering.  (Bea Tr. 831-32).

and floodwalls—the two primary issues that the experts have grappled with in this case—one must first understand how the properties of soil, particularly the soils found at the EBIA, guide the analysis. Once these principles are understood, it is clear why the top geotechnical engineers in the country could not comprehend Dr. Bea's explanations for modeling the problem as he did: the science simply does not support his methodology or conclusions. If Dr. Bea's theory were correct, geotechnical textbooks would have to be rewritten.

### A. The EBIA is Comprised of Predominantly Clay Soils

As Dr. Silva explained, soils are a porous medium consisting of solid particles—the grains of soil themselves—combined with void spaces or pores between the particles that can be filled with fluid, such as water, or gas, like air. (Silva Tr. 3700). The combination and interaction of the soil particles and the voids, or pore spaces, comprises what geotechnical engineers commonly refer to as the soil skeleton. (*Id.* 3701). The volume of water or gas in the voids of soils is what geotechnical engineers refer to as the degree of saturation. (*Id.* 3703). If the composition of the soil consists of fluid and soil solids with no appreciable gas (or air) that soil is considered saturated. (*Id.* 3704; DX-DM-0015-0024-25). Importantly, a fully saturated soil is not incapable of holding more water. (Silva Tr. 3704). If pressure in the pore water increases, the soil skeleton expands because the volume of the voids increases, allowing more water to be stored. (*Id.* 3704-05). When a load is imposed on the soil skeleton, whether it be from a structure, like a building, or from a mass of water, like a storm surge or flood, soil mechanics are how geotechnical engineers understand and explain the behavior of that soil.

To understand how soil will behave, geotechnical engineers must first identify the kind of soil they are working with.  Different soils exhibit different properties and, unsurprisingly, most soils found in their natural depositional environment are not uniform or homogenous.  In any given sample of soil taken from beneath the ground surface, a geologist or geotechnical engineer is likely to encounter a variety of soil types.  Geologists and geotechnical engineers have, over time, developed a comprehensive classification system to identify and describe soils.  The Uniform Soils Classification System ("USCS"), for example, includes a variety of classifications that account for varying quantities of sand, silt, or clay, just to name a few.  Today, geotechnical engineers rely on the ASTM International standards, which rely on several empirical measures to classify soils according to their predominant properties.[10]  These properties are what geotechnical engineers rely on to understand how a soil is likely to behave under a loading condition.

As this Court heard, geotechnical engineering, perhaps more than any other engineering discipline, is an empirical science that relies on engineering judgment and the local knowledge that engineers gain from working in an environment over many years. (Lucia Tr. 2905-06).  Geotechnical engineers frequently see only a small percentage of the soils that they will be working with, and knowledge of the geology and experience with the behavior of local soils is of critical importance.  (*Id.*).  As Dr. David Rogers, Plaintiffs' expert put it, "geotechnical engineer[ing] is the one sub-discipline of civil engineering that probably requires more judgment than any of the other sub-disciplines, with a possible exception of geological engineering."  (Rogers Tr. 636).

---

[10] ASTM formerly was known as the "American Society of Testing and Materials."  It is now called ASTM International and is globally recognized as the standard-bearer for materials testing in a wide variety of industries, including geotechnical engineering.

This Court heard a great deal of testimony about the local geology and classification of soils found at the EBIA.  Foremost, the Court heard from Dr. Joseph Dunbar, a geologist and expert on the history of the Mississippi Deltaic Plain and the impact of the Mississippi River on the geology of the New Orleans area.  (Dunbar Tr. 1750-52).  Dr. Dunbar described for this Court in great detail how the Mississippi Delta and its distributary channels have contributed to a variety of geologic conditions in the New Orleans area.  In some locations, such as London Avenue, those conditions involved deposits of beach sand.  At the EBIA, however, those channels rapidly deposited a high sediment load that developed into swamp during prehistoric times.  Over time those swamps became the foundational soils that exist today.  And as Dr. Dunbar explained, those foundational soils are, without question, clay soils.  (*Id.* 1754-64; DX-DM-1004-0006-07).

It is not uncommon, however, for some of these clays to be mixed with other material.  Beginning some 60 years ago, the Corps, in an effort to better classify the engineering properties of the soils throughout the diverse New Orleans geology, began mapping the lower alluvial valley and Mississippi River deltaic plain.  (Dunbar Tr. 1753).  This was necessary because, as Dr. Dunbar explained, there is a relationship between different depositional environments and the engineering properties of the soils upon which the Corps might have to build flood control structures.  (*Id.* 1757).  Dr. Dunbar spearheaded the effort to compile the Corps's mapping efforts into a public repository that was extensively used by investigative teams following Hurricane Katrina, including the ILIT and IPET teams.  (*Id.*).  Dr. Dunbar himself has participated in investigations of numerous levee failures along the Mississippi River and has looked at thousands of borings in an effort to understand the depositional environments and how those environments correlated to the

engineering properties of the soils that are so crucial to the work of geotechnical engineers. (*Id.* 1752).

The Corps, through its extensive mapping efforts, recognized that the New Orleans area contained soft, organic soils, and in an effort to better differentiate the engineering properties of those soils, expanded upon the existing USCS classification scale. (*Id.* 1760-61). That classification scale was in use when the Corps explored the EBIA and designed the EBIA floodwall in 1966. As Dr. Dunbar explained, the soil borings taken from the EBIA confirmed what the geologic history suggested: the EBIA is comprised almost entirely of clay soils, including at both the north and south breach sites and the areas in between. (*Id.* 1762-64; DX-DM-1004-0025-30). This is not to say that the EBIA is uniformly clay—indeed the "stick logs" showing the soil classifications at various depths of the same locations bear out that the predominant soil is clay, but it is not uncommon to find some "lenses" of other material, whether they be silts or organic matter. Without question, however, the *dominant* soil, the soil that governs the engineering properties and mechanics of seepage and stability as geotechnical engineers apply them, are clays.[11]

Post-Katrina photographs taken by Dr. Dunbar visually confirmed what the geologic conditions and borings suggested. At the north breach, on the land side of the floodwall, photos clearly show massive scour trenches in clay soils that were in the foundation of the levee. (*Id.* 1768-70; DX-DM-1004-0017, 0032-36, 38, 47). The same held true at the south breach site, where large scour trenches left at the site demonstrated clay soils throughout the foundation conditions that remained. (Dunbar Tr. 1778, DX-DM-1004-0053-54). As Dr. Dunbar showed, the depositional environment at the EBIA suggested that impermeable

---

[11] Plaintiffs' expert, Dr. Rogers, agreed that the dominant material at the EBIA was fine-grained, low permeability materials, *i.e.*, clays. (Rogers Tr. 606, 655).

clay soils would dominate both the north and south breach sites, and both the borings and photographs confirmed it.  (Dunbar Tr. 1779).  The geology of the EBIA simply does not support the conclusion that there existed any permeable soils that would render seepage or landside hydraulic uplift pressure a likely mode of failure during Hurricane Katrina.

In an effort to further develop a comprehensive understanding of the soils at the EBIA—a necessary task to accurately understand the soil mechanics at the site—the parties jointly developed a soils exploration program that took place over several months in the summer of 2011.  Geotechnical engineers retained by all the parties in this case developed the testing protocol and the locations where soil would be tested.  Drs. Marr, Silva, Stark, and Brandon were all participants in this program.  Dr. Bea was not.  However, Dr. Rogers, who wrote an extensive site characterization report and testified in this trial, participated for the Plaintiffs.  (*See* Bea Tr. 1067).

The testing program confirmed that the EBIA is predominantly clay.  More importantly, the testing program permitted the parties to determine the permeability, the shear strength, and the coefficient of volume change, or compressibility, for each critical soil layer.  Approximately 40 soil borings were drilled, and hundreds of soil samples were tested in the laboratory.  Field tests, including cone penetration tests and vane shear tests, were also conducted, providing the parties with the empirical understanding of the soil stratigraphy at the site and the properties of each critical layer.  (Stark Tr. 3411-12).  The properties of the soils formed the basis for the numerical modeling efforts that were used to understand how the north and south breaches developed.

### B. Permeability

One of the crucial properties tested was permeability.  Synonymous with permeability is the term "hydraulic conductivity."  Permeability is the ability of a porous material, such as soil, to allow the passage of liquid, such as water.  (Silva Tr. 3715).  A soil's ability to pass water is related to the size of the particles of soil and the size of the pores, or voids.  The larger the soil particles, the larger the voids and the easier it is for water to pass.  Accordingly, gravels and sands allow fluid to pass easily while materials such as clay, with much smaller void spaces between grains, greatly restrict flow.  (*Id.*).

Geotechnical engineers and hydrogeologists use shorthand equations to describe how long it takes water to move through a given soil.  Permeabilities are expressed on a spectrum, with $10^{-1}$ cm/sec representing high permeability and $10^{-9}$ cm/sec representing extremely low permeability.  The differences between soils are, as the equations demonstrate, exponential, and the difference between, for example, $10^{-2}$ cm/sec and $10^{-5}$ cm/sec is enormous—$10^{-5}$ cm/sec is 10,000 times less permeable.

Dr. Silva explained the differences among soil permeabilities with the help of a demonstrative aid.  (DX-DM-0015-0033).  If one assumes a foot of soil or other porous media in a rigid container, and half a foot of water is applied directly on top of that soil, that water will flow through faster or slower depending on the permeability of the media.  In the case of gravels, it takes a mere three seconds.  In the case of sands, with a permeability of approximately $10^{-2}$ cm/sec, it takes about 10 minutes.  If silts, with a permeability of approximately $10^{-4}$ cm/sec, it takes 21 hours.  With clays, which have a permeability of approximately $10^{-6}$ cm/sec, it would take that same water 90 days, or almost three months, to pass through the container.  (Silva Tr. 3716-17).

19

Confirming just how impermeable the EBIA clays are, Dr. Stark illustrated first-hand the site-specific permeability of the organic clay soil at the EBIA, showing this Court a video of an actual pump test during the 2011 soil exploration program.  In short, it would take one minute to generate even four teaspoons of water flow through the organic clay.  (*Id.* 3413-14).  As a result of the soils exploration program, the parties agreed to stipulate that the EBIA lower organic clay had a permeability on the order of $10^{-5}$ cm/sec.  (*See* Doc. 20920, p. 38 ¶ 87).

A soil's permeability is important to understanding flow, but other factors are important as well, in particular the concept of "head."  Flow takes place between an area of high total head to an area of low total head.  (*Id.* 3717-18; DX-DM-0015-0035).  Total head measures two things: (1) the elevation head, which is the vertical distance between the point of higher elevation to the point of lower elevation that water is likely to travel; and (2) pressure head, which is the height of the water that is exerting a pressure as a result of gravity.  (Silva Tr. 3717-18).  Importantly, high pressure does not, by itself, indicate flow. Indeed, it is possible for water to exert high pressures with no flow at all, and this condition is referred to as "hydrostatic" because flow is static or zero even though the weight of water is exerting a measurable force, or pressure to the soil.  (*Id.* 3718).

In measuring flow potential, geotechnical engineers refer to "exit gradients."  A gradient is essentially the change in total head from one point to another divided by the length over which that change in head occurs.  (*Id.* 3720).  If the gradients are high enough, subsurface flow and pressure can pose a problem.

### C.   Steady State/Steady Flow vs. Transient Flow Conditions and the Impact of Compressibility, or Volume Change on Pressure and Flow Transmission

Among the determinations that geotechnical engineers must make when modeling flow conditions through soil is whether or not the site-specific conditions require a steady state or transient modeling scenario.  There are profound differences between the two, and one of the primary differences involves the soil skeleton's compressibility, or more accurately, the ability of the soil skeleton to undergo changes under specific hydraulic loading conditions.[12]  These changes include changes in volume, saturation, and void ratio. To account for these changes during hydraulic loading, a SEEP/W[13] user inputs the appropriate seepage parameters, including saturation and compressibility, or coefficient of volume change, for each soil layer to accurately represent the site conditions and obtain a reliable flow model.  As a result of the soils testing program, the parties were able to determine the site-specific parameters, including saturation and coefficient of volume change for the lower organic clay to accurately model flow in SEEP/W and other programs.

A steady state condition describes a condition where no further soil changes, including volume and saturation, can or will occur in the porous media through which water will flow.  As Dr. Silva noted, the total head, or energy, a function of both the water elevation and the change in pressures, does not change over time in a steady state condition.  (*See* JX-01672-0037).  In some media, such as porous rock or sandstone, which do not expand, volume changes cease to occur nearly instantaneously.  These materials are described as nearly incompressible and achieve steady state rapidly during hydraulic

---

[12] The soil skeleton refers to the framework of the soil particles and the pore spaces.
[13] SEEP/W is a computer program used for modeling groundwater seepage and excess pore-water pressure dissipation problems within porous materials, such as soil and rock. SEEP/W was the principal program used by Dr. Bea to evaluate seepage in this case.

loading.  When no further expansion of the soil skeleton can occur, pore pressures within the soil skeleton reach equilibrium, and water flows steadily at the rate governed by total head and the permeability of the soil.

In contrast, a compressible media, like the organic clays found at the EBIA—one that changes in volume and saturation as pores expand with the introduction of water—takes time to achieve this "steady state" condition.  Reflective of the fact that changes in volume and pore pressure are occurring during the hydraulic loading event, this condition is called a "transient" condition.  If enough time passes, and if the hydraulic loading condition persists for long enough, changes in compressible soils will eventually reach equilibrium and a steady state will be achieved.  Until steady state is achieved, the amount of flow and pressure generated through a compressible system is gradual.

The difference between compressible soils and incompressible soils under hydraulic loading conditions comes down to the pore spaces in the soil itself.  When water is loaded on compressible soils, the pores can expand or contract as a result of the change in pore water pressure, changing the volume of the soil skeleton until a new equilibrium is achieved.  When water is loaded on incompressible soils, the soil skeleton does not contract or expand—pore pressures are equalized, or stop changing, almost immediately.  This equilibrium is what permits geotechnical engineers to calculate pore pressures from the steady state flow equation: pressure and flow are inextricably linked.  (Brandon Tr. 3284).  Indeed, Plaintiffs' expert, Dr. Rogers, testified that when solving either a steady or transient flow analysis, you get *both* flow and pressure.  (Rogers Tr. 729).  SEEP/W, as Dr. Marr explained, intimately couples pressure and flow.  (DX-DM-1006-0101).

Dr. Silva demonstrated the differences between transient and steady states with his "Flow Simulator." (*See generally* Tr. 3723-39; Video, DX-2723). To visually illustrate how steady flow and transient flow differ, and the significance of this difference in modeling flow problems, Dr. Silva assembled a device consisting of two separate cylindrical containers, each with four chambers to represent pore spaces in soil. One of these containers consisted of rigid plexiglass pipe, representative of a rigid or incompressible soil skeleton. The plexiglass pipe, because it cannot change in volume over time, was designed to be representative of the steady state or steady flow condition or incompressible soil skeleton subscribed to by Dr. Bea in this case.

The second container, by contrast, was constructed with flexible latex membranes inside of a plexiglass pipe of the same diameter and volume as the first container. The flexible latex was inserted to be representative of the pores in a compressible soil—these pores can expand, changing the volume of the soil skeleton as water is loaded into the system.

In each model, water was pre-loaded into the containers and the latex to represent a saturated soil. Each of the four chambers in each of the models was connected by an orifice of equal size that served to represent the permeability. Attached to each chamber was a pressure gauge. Through a single valve connected to both cylinders, water was pumped into the chambers simultaneously and pressurized to provide enough total head to induce flow.

In the rigid plexiglass system, pressures in each of the four chambers equalized almost immediately, owing to the fact that the simulated "pores" were incapable of further volume changes. The system was, in effect, in steady state or steady flow, and water began

flowing almost immediately through all four chambers and into a collection bucket on the other end.  Pressure in each chamber, as measured by the gauges, was equal.

In the flexible latex system, however, water entering the first chamber caused the latex membrane to expand, just as the pores in a compressible soil, like organic clay, would expand during the introduction of a storm surge load.  The first chamber, or pore, expanded in volume until the pressure reached a point that the water could be transmitted through the orifice and into the second chamber.  Pressure changes in each of these chambers, or pores, was gradual, as each pore expanded in volume before passing water through to the next chamber.  This gradual volume change is, in essence, the defining feature of a transient flow condition.  Given enough time—in this simulation only ten minutes or so—the compressible system eventually reached steady state, with all chambers fully expanded and pressures equalized throughout the system.

As Dr. Silva explained, the organic clay soils at the EBIA comprised millions and millions of pore spaces, each of which would undergo volume change before water and pressures could be fully transmitted through the system.  Thus, it would take months to years of a full storm surge load for the soils at the EBIA to achieve steady state conditions, not minutes as posited by Dr. Bea.  The duration of Katrina's storm was only 30 hours, meaning that the full water load gradually reached its top elevation and then dissipated, providing only a few hours of maximum total head for flows to develop.  (Silva Tr. 3749-50, 3757-58).  This is why every geotechnical engineer to offer an opinion on the likelihood of

underseepage-induced failures, with the exception of Dr. Bea, modeled flow conditions at the EBIA as transient flow through compressible soil.[14]

Revealingly, Plaintiffs' expert, Dr. Rogers, who was competent to perform seepage analyses but whom Plaintiffs never asked, conceded on cross examination that transient flow analysis was the appropriate method for modeling Katrina's storm surge event. (Rogers Tr. 695-96, 699). To do a transient seepage analysis correctly requires knowledge of the site specific storage coefficient, or coefficient of volume change, and as Dr. Rogers testified, the EBIA clay soils are a compressible media. (*Id.* 701-02). Dr. Bea conceded that a site specific storage coefficient had been calculated by Dr. Rogers for the EBIA (Bea Tr. 1068-70), but for reasons addressed later in this memorandum, Dr. Bea chose to ignore this value and instead chose a value *30,000 times lower* than the site-specific, empirically measured compressibility value.  (DX-DM-1006-0105). Dr. Bea conceded, however, that had the site-specific value been used, the pore pressures produced in Mr. Cobos-Roa's SEEP/W analyses would have been lower and the uplift pressures generated would have been insufficient to endanger the floodwall.  (Bea Tr. 931-34).

### D.  Drained or Undrained: Proper Stability Analysis for Shear Failures

In addition to determining whether underseepage-induced flows and pressures could have contributed to the EBIA floodwall failures, geotechnical engineers in this case also evaluated the slope stability of the floodwall and levee at both the north and south breach as surge waters began rising in the IHNC.

---

[14] The experts also ran comparative steady state conditions to determine whether Dr. Bea's hypothesized scenario was valid.  Simply put, a steady state condition was not achievable in 30 hours based on the site-specific properties.

As this Court heard several times, "for slope stability analyses to be useful, they must represent the correct problem, correctly formulated." (*See* Tr. 1131; JX-1949, at 19). On this point, even Dr. Bea agreed. (Bea Tr. 1131). But a point of contention between Dr. Bea and the other geotechnical experts in the case was what type of stability analysis was required to appropriately model the field conditions.

As Dr. Tom Brandon, one of this country's foremost experts in slope stability analysis explained, shear failures, also known as lateral stability or translational stability failures, are controlled by the shear strength of soils—the ability of soils to resist the weight or load being imposed upon them. (Brandon Tr. 3159). To geotechnical engineers, correctly formulating a slope stability problem begins with an understanding of the type of soil involved and the loading condition that the soil will be expected to withstand. And the reason is this: for a stability analysis to have any validity at all, the shear strength of any given soil must reflect the field loading condition, *i.e.*, whether or not the soil will be able to "drain" or "dissipate" pore pressures induced by the load imposed on that soil. The loading condition and the soil type determines whether or not a "drained" or "undrained" condition exists in the field and whether a "drained" or an "undrained" stability analysis should be performed.

Although the concepts of drained and undrained sound esoteric, the difference between the two is best understood by conceptualizing the size of the spaces, or pores or voids, between the grains of soils. As previously discussed, soils are basically a porous media, consisting of solid grains and pores, or void spaces, between each grain. In coarse materials, such as sands, the size of the pore spaces between each individual particle is much larger than in clays. With clays, the size of the pores between each grain is much,

much smaller than those found in sand.  This, in part, explains why sands are more

pervious, or porous, than clays: the size of the pore spaces between each grain of sand

permits water to flow easily, while the small pore spaces between clays greatly constrict

water's ability to pass.  To this end, whether to use drained or undrained strengths

correlates with the soil's permeability, and the clay soils at the EBIA were decidedly low

permeability soils.  (DX-DM-1006-0080; Brandon Tr. 3170).

So if one imagined a box of sand and a box of clay side by side, each filled with water

to equal saturation, and an equal load was imposed on each box, the behavior of the soils in

these boxes is quite different.  As Dr. Brandon illustrated, when a load or stress is exerted

on sands, the large pore spaces permit water in between those pore spaces to flow, or

drain, rather easily.  With this drainage, excess pore pressures between grains are quickly

dissipated.  (DX-DM-1008-0009).

With clays, however, the miniscule pore spaces impede the flow of water,

preventing that water from "draining" out of the pore spaces.  The effect of impeding flow is

that pressures build in the pore spaces as the water seeks to find a pathway or exit point.

Consequently, in the box of clay, once a load is imposed the water trapped in the pore

spaces exerts pressures in every direction because the water cannot flow, or drain, out of

the pores and dissipate those pressures.  (*Id.*).  Because it takes a significant amount of time

for the pressures in these pore spaces to dissipate, the strength of the soil skeleton is

referred to as "undrained," owing to the fact that pore fluid cannot drain and pressure

cannot dissipate out of the soil during the time in which the loading event occurs.  This is

why geotechnical engineers frequently posit that the fundamental difference between

drained and undrained conditions is time.

The practical importance is that in undrained soils the water, or pore fluid, is actually carrying the stress imposed by the load, not the soil skeleton itself.  The shear strength of an undrained soil, therefore, accounts for the pressures generated in the pores and determines the failure, or shearing point, with these pressures already in place.  (Silva Tr. 3700-01, 3705-08).  Because the pressures cannot dissipate, the strength of the soil does not change during the time in which the load is imposed.  (Marr Tr. 1931).

In sand, because the water drains easily, the force exerted against the load requires a different calculation.  The fact that water can drain easily through the pores, however, does not mean that the soil skeleton itself or the pores between soil particles are fully drained of all fluid.  (Silva Tr. 3786).  It simply means that excess pore pressures induced by the applied load are dissipated rapidly because the fluid itself can flow more freely through the soil.  (*Id.*).  Pore pressures, therefore, must be addressed differently for soils in a drained condition because, among other things, the strength of a drained soil decreases during a loading condition as uplift pore pressures increase and effective stresses decrease. (Marr Tr. 1895-98, 1946).

For trained geotechnical engineers, choosing the appropriate shear strength for modeling and analyzing slope stability problems is based on engineering judgment about the known physical properties of the soils and the duration of the loading condition: when working with low permeability clays under a short-term load, pore fluids drain slowly and an undrained shear strength is appropriate, and when working with sands, pore fluids drain quickly and a drained shear strength is used.  At the EBIA, where the foundation soils of the levee and floodwall are all clays, undrained shear strengths are required to accurately model field conditions.  But as Dr. Brandon testified, empirical testing of the

soils supports that conclusion as well.[15]  (*Id.* 3169-75).  Indeed, as Dr. Allen Marr testified,

when the parties in this case established the 2011 supplemental soils exploration program,

geotechnical engineers from both sides had the opportunity to request the type of shear

strength tests to be performed for providing site-specific soil properties.  Not a single

geotechnical engineer involved requested drained strengths—it was understood by trained

geotechnical engineers that undrained strengths would control the stability analysis at the

EBIA because clays, and only clays, were involved.  (Marr Tr. 1899).  Without question,

undrained strength is the appropriate strength to use for short term loading on clays and

represents the state of geotechnical engineering practice in New Orleans.  (DM-DX-1006-

0086).

To geotechnical engineers, this difference has several important consequences.  In

an undrained analysis, the pore pressures between each particle cannot be accurately

predicted, but the laboratory testing process simply accounts for the effect of these pore

pressures on the shear strength by applying a force against the soil skeleton, trapping all

the liquid in the testing device so it cannot drain, and determining the stress point at which

the soil shears (fails under the load).  (Lucia Tr. 2950-51).  A seepage analysis is not

necessary to calculate these pore pressures—they are automatically accounted for in the

equations used to calculate the strength of the soil because those pore pressures will not

dissipate during the time that the load is imposed.  (Brandon Tr. 3220, 3228-30; DX-DM-

1008-0022).

---

[15] As Dr. Brandon explained, engineers perform consolidation tests on soils to understand
how those soils react to applied forces or stresses.  (Brandon Tr. 3170-71).  Using a chart,
Dr. Brandon plotted the results of consolidation tests at the EBIA, showing that those
results clearly called for use of undrained, not drained strengths.  (*Id.* 3171-72; DX-DM-
1008-0021).

In a drained strength analysis, because the dissipation of pressure occurs very quickly relative to the time the load is imposed, the pore pressures must be taken into account, and a seepage analysis is the way they are incorporated.  The drained strength is calculated by subtracting the pore pressures, obtained from a seepage analysis, from the total stress acting on the failure plane.   This is a fundamental difference between drained and undrained slope stability analysis.[16]

And choosing the wrong strength has consequences.  As Dr. Marr explained, in the case of the EBIA, where the loading condition arises far more quickly than the water trapped in the clay can drain, or dissipate the pore pressures, the undrained strengths are greater and do not change.  (Marr Tr. 1895, 1944).  If given enough time—and in the case of clay soils, that time would be substantial—the water in the soils would begin draining through, bringing into play the uplift pressures that Dr. Bea hypothesized would lower the shear strength.  Only then would choosing a drained strength be appropriate to accommodate the decreasing shear strength as a result of uplift pressures.  (*Id.* 1895-96). When Dr. Bea chose to model the lower organic clay as drained, and subtracted pore pressures obtained from his flawed SEEP/W model, he violated fundamental principles of soil mechanics and the geotechnical standards of practice for proper stability analysis. (DX-DM-1006-0107; Marr Tr. 1946).

---

[16] Geotechnical engineers frequently refer to "undrained" strengths as a calculation of "total stress" resistance and "drained" strengths as a calculation of "effective" stress resistance. In an undrained analysis, the pore pressures are not expressly calculated, but are included in the undrained strength parameters.  In a drained strength, by contrast, the pore pressures are calculated, then subtracted from the total stress, providing the "effective" resisting force of the soil only, a force that changes over time as the hydraulic load increases.

Without question, the storm surge loading condition—lasting a mere 30 hours—was not of sufficient duration for pore pressures to begin draining, or dissipating, from the clay soils.  This is why undrained strengths were the only correct choice for modeling slope stability at the EBIA floodwall.  Using drained strengths, simply put, would represent an incorrect problem, incorrectly formulated, rendering the analysis unreliable and inappropriate for the task at hand.

IV.   **Applying Soil and Fluid Mechanics to the EBIA Clay Soils Demonstrates that Underseepage and Landside Hydraulic Uplift Pressures Were Not Contributing Factors to Either the North or South Breach**

Plaintiffs' original theory concerning the EBIA floodwall failures, a theory espoused by Dr. Bea and the ILIT investigation team for many years preceding the trial in this case, was that WGI's excavations, backfilled with pervious sands, penetrated a highly permeable layer of soil—the lower organic clay extending below floodwall sheet pile tip depth—that permitted massive and pervasive underseepage flows to undermine the floodwall.  The premise of this theory rested on the assumption that the lower organic clay was significantly more permeable that the Corps originally believed when the floodwall was designed in 1966.

But geotechnical engineering is an empirically-based science, and a thorough investigation and testing of the EBIA soils, including the organic clay, unequivocally established that no high permeability soils ever existed, either in the foundation of the floodwall or in the soils around it.  Dr. Dunbar's testimony was clear on this point, and the joint soils investigation confirmed it.  The parties stipulated that the lower organic clay had a permeability of $10^{-5}$ cm/sec, *i.e.*, was highly impervious.  Given how difficult it is to pass

water through low permeability soils, it is not surprising that the Corps's 1966 design

assessment anticipated that seepage would not pose a problem.

As Dr. Brandon explained, in some cases, where pervious soils are present at

shallow depths of a levee or floodwall foundation, seepage analyses can play a role in

evaluating a floodwall's stability.  (Brandon Tr. 3159-61; DX-DM-1008-0022, 23.1-12).

This is because the forces generated by seepage flows and pressures through pervious

layers can reduce the resisting strength of soils.  But the soils in the vicinities of the EBIA

north and south breach have never included a shallow pervious soil layer, in the foundation

or elsewhere, and erosion, heave, piping, and blowout were not—indeed could not have

been—contributing factors at either breach.  In order for seepage to contribute to failure,

shallow pervious layers *must* exist, permitting a sufficient quantity of water to *flow* through

the foundation soils and under the floodwall.  When these flows emerge beneath an

impervious clay layer on the landside/protected side, this flow of water, and the pressure it

generates, literally "heaves" the clay layer upward, causing fissures within the clay that

weaken the strength and resisting force of those soils.  (Brandon Tr. 3160, 3164-65).  As Dr.

Brandon and Dr. Marr testified, the soil stratigraphy at the EBIA simply does not contain

the pervious layer(s) required for these failure mechanisms to occur.  (Brandon Tr. 3168;

Marr Tr. 1919; DX-DM-1006-0072).  Visual evidence at the site provided proof: there

simply was not any evidence of seepage-related failures at the north or south breach sites.

(Dunbar Tr. 1777-79).

But rather than rest on mere hypothesis, Dr. Brandon, although the site conditions

would not ordinarily call for it, performed a seepage analysis of the north and south breach

failure zones.  As Dr. Brandon explained, seepage is not a new phenomenon, and it has been

empirically studied in geotechnical engineering for many years.  Engineers, in fact, have

created charts to evaluate the flows of water required for seepage to pose a problem in and

around levees, and Dr. Brandon presented one such chart to the court.  (Brandon Tr. 3165-

67; DX-DM-1008-0014).

Using this chart as his comparison point, Dr. Brandon explained how he performed

his seepage analyses, deliberately choosing parameters or conditions for the EBIA to

maximize potential flow, whether the site-specific conditions warranted them or not.  He

did this intentionally to discover whether or not sufficient flow of water could be achieved

for seepage to even be considered a possible failure mechanism as indicated in the chart.

(*Id.* 3166).  For starters, Dr. Brandon assumed that a steady state condition existed, even

though, as previously discussed, Katrina's storm surge could not have created steady state

conditions in 30 hours, and he further assumed that the full height of Katrina's surge

appeared instantaneously against the face of the floodwall, another condition that did not

occur on August 29, 2005.  (*Id.*).  He assumed that all soils were completely saturated at the

beginning of the event, even those soils above the groundwater surface where full

saturation was unlikely, and he assumed that a gap between the I-Wall and the levee

existed before surge waters ever arrived.  (*Id.*).  All of these assumptions are contrary to the

site-specific conditions reasonably believed to exist at the EBIA as Hurricane Katrina's

storm surge began to rise in the IHNC.

Using the absolutely most conservative conditions that could be assumed for the

clay soils at the EBIA, conditions deliberately chosen to maximize flow and seepage-

induced uplift pressures, Dr. Brandon generated only .002-.003 gallons per minute per 100

feet of floodwall, an amount that is so clearly beneath the range of flows required for

seepage to present an issue that seepage could definitively be rule out as a contributor to the failures.  (DX-DM-1008-0014).  Dr. Brandon further demonstrated that the soils at the EBIA were not erodible, using Lane's Weighted Creep Ratio, another empirically sound measure.  (Brandon Tr. 3167-68).

The upshot of Dr. Brandon's analysis is this: if a potential seepage pathway is identified, seepage analyses are used to determine uplift pressures, the very pressures that Dr. Bea claims to rely upon to show what caused the failures at both the north and south breaches.  An engineer cannot determine what the uplift or pore pressures are during a loading event without performing a seepage analysis.  (*Id.* 3169, 3174-75).  As Dr. Brandon showed, however, seepage analyses at the EBIA, in addition to being unnecessary given the soil conditions, produce almost no flow, and consequently, no seepage-related failure mechanisms of any kind.

Dr. Silva reached a similar conclusion about the likelihood of seepage posing a threat along the EBIA floodwall.  By way of example, Dr. Silva modeled the McDonough Marine borrow pit, a large water-filled excavation within 75 feet of the floodwall. Applying the change in total head from a 33-hour storm surge event, Dr. Silva showed that the low permeability clays at the EBIA would permit water to penetrate no more than 10-15 feet in the direction of the EBIA floodwall.  (Silva Tr. 3755).  None of WGI's excavations were within 10-15 feet of the floodwall.

Indeed, as Dr. Silva explained, using site specific permeabilities and coefficients of volume change for the clay soils found at the north breach site, the furthest that water or pore pressures could have penetrated in the direction of the floodwall during a 30-hour storm surge event was approximately 9 to 16 feet.  (DX-DM-0015-0082).  Accordingly, no

water flow or pore pressure increase could reach the protected side through any of WGI's excavations, and in the absence of appreciable flow, no hydraulic pressures could build either.  (Silva Tr. 3755-58).

Dr. Silva's and Dr. Brandon's results were corroborated by Dr. Marr and Dr. Stark, who reached identical conclusions: seepage flows were *de minimis* and significant uplift pressures could not have developed or been sustained in the absence of appreciable flow. (Marr Tr. 1918-20; Stark Tr. 3415-17; DX-DM-1006-0072-75).  Indeed, as Dr. Marr showed, running SEEP/W with site-specific values for permeability and compressibility and modeling water at the top of the floodwall with a gap already in place, it would take 50 to 100 days to develop enough flow for uplift pressures to begin developing on the landside. (DX-DM-1006-0081-83; Marr Tr. 1930-31).

Absent appreciable *flow* under the floodwall from the canal side to the landside, it is simply not possible to generate appreciable hydraulic pressures of the sort that Dr. Bea hypothesized in this case.  As Dr. Brandon explained, flow and seepage are part of the same equation.  (Brandon Tr. 3284).  Plaintiffs' own expert, Dr. Rogers, fully agreed that the equations for analyzing transient or steady flows include both flows and pressure.  (Rogers Tr. 729).  Thus, when Drs. Brandon, Stark, Marr, and Silva conducted transient seepage analyses and generated little to no flow, they were also generating little to no hydraulic uplift pressure on the landside.

As Drs. Marr, Silva, and Brandon all testified, for the EBIA clays to generate flow and pressure to the landside would take a significant amount of time—far more than 30 hours. This is because, as Dr. Silva demonstrated, the EBIA clays are very compressible—the pores between each particle take time to expand with the introduction of a hydraulic loading

event.  Until a steady state is achieved, which would take months, not hours, neither flows nor pressure could be transmitted in appreciable quantity to the landside.

Drawing an analogy from roasting marshmallows, Dr. Brandon explained how seepage analyses function much like the flow of heat.  (Brandon Tr. 3208).  In seepage analyses, geotechnical engineers apply Darcy's law, evaluating water flowing from an area of high total head to low total head, governed by the hydraulic conductivity, or permeability, of the soil, and the distance the water must travel.  (*Id.*).  Heat flows in similar fashion, according to Fourier's law, from an area of high temperature to low temperature dependent on the thermal conductivity of the material and the distance traveled.  (*Id.*). Applying the analogy, if one puts a marshmallow on the end of a metal rod and places it over a fire, the end over the fire heats up while the end being held in hand remains cool.  If the rod is held over the fire for long enough, heat eventually travels from the fire end to the hand end until it's too hot to hold.  (*Id.* 3209).  The propagation of heat from one end to the other takes time, just as the propagation of pore pressures in a seepage analysis takes time. In the case of the EBIA, that time is on the order of the months.  (*Id.*).  It would not, under any circumstance, be instantaneous.  (*Id.* 3209-10).

Thus, Drs. Marr, Silva, Brandon, and Stark all reached the same conclusion: applying site specific permeabilities, the known hydraulic load from Katrina's surge, and an appropriate transient flow analysis based on the site specific compressibility of the organic clays, underseepage flows and uplift pressures simply could not have contributed to the failures at either the north or south breach.  Tellingly, Dr. Marr modeled seepage conditions assuming steady state conditions—a condition never achieved during Katrina—with excavations within 50 feet of the floodwall.  He also modeled seepage conditions with the

entire canal side excavated out and replaced with pervious backfill.  What he showed was that, even assuming such unrealistic conditions, not a single excavation would have made any appreciable difference in the seepage conditions during Katrina. (*See* DX-DM-1006-0071-75; *see also* DX-DM-0015-0082 (describing maximum flow and pressure penetration distance as 9 to 16 feet from any WGI excavation).

With underseepage flows and pressures definitively ruled out as a contributing factor at either breach site, Drs. Brandon, Silva, and Marr applied their considerable engineering expertise to evaluate the likely mechanism of failure at both breaches.  WGI's work, as the evidence showed, played no role in either breach.

## V.      The North Breach: Stability Failure and Structural Deficiencies

No novel methods or pseudo-scientific theories of soil mechanics are required to explain the mechanism of failure at the north breach.  (Brandon Tr. 3158).  Applying conventional soil mechanics, it is clear that the north breach was not caused by underseepage or by contributions from any work WGI performed on the canal side.  Rather, the north breach is readily explained by a combination of low global stability against shear failure and a structural failure in the connection of the older, shorter sheet pile from the original 1969 construction to the newer, longer sheet pile installed during the 1982 construction of the Florida Avenue Complex and associated flood protection.

### A.  Initiation of Lateral Instability at the North Breach

As Dr. Brandon explained, shear failures, also known as lateral stability or translational stability failures, deal with the shear strength of the soil.  (*Id.* 3159).  It is the interaction of the particles of soil and the material in the void spaces, or pores, that provides soil its resisting forces against an imposed load.

Dr. Brandon illustrated the ways geotechnical engineers approach slope stability problems by showing the Court various cross-sections from levee failures that occurred throughout the New Orleans area during Hurricane Katrina.  For example, the soil stratigraphy at 17th Street showed sands more than 30 feet below the ground surface.  (*Id.* 3176-77; DX-DM-1008-0023.2).  The clay soils above that sand layer govern the analysis that needs to performed: because undrained strengths are used to calculate the stability of the clay soils that would be involved in a potential slope failure, a seepage analysis is unnecessary to understand or analyze the shear strength and stability of the soils against failure because the pore pressures are already captured in the undrained shear strengths.  Shear strengths are the important parameter in stability failures, and as Dr. Brandon explained, clay soils, while being impervious to water, can have low shear strengths.  (*Id.* 3177).

When water is imposed on the wall, imposing stress on the soils, the shear strengths are the critical issue—the potential displacement soils on the protected side during the imposed force are the difference between failure and non-failure.  (*Id.* 3176-77).  If the shear strengths are too low, meaning that the soils themselves cannot provide sufficient resisting forces against displacement, the common solution is to drive the sheet pile of the I-Wall deeper into the ground.  (*Id.* 3177).  Another would be to mix soils with cement to increase the native strength of the soils themselves.  (*Id.*).

Importantly, shear strengths of similarly classified soils can vary—not all clays, for example, have the same shear strengths.  Shear strength can be affected by age or from consolidation from loads having been imposed on the soils over time.  It is for this reason that geotechnical engineers run laboratory and field tests to determine the shear strengths.

(*Id.* 3179).  Only by knowing what the shear strengths of these soils are can geotechnical engineers ensure that the appropriate factor of safety against failure is achieved in the design process, whether by driving sheet piles deeper into the ground or mixing soils, if necessary.  (*Id.*).

At the EBIA, Dr. Brandon identified clay soils as the predominant soils, with a sand layer occurring too deep to play a role in the failure analysis of either breach.  (*Id.* 3182). Based on that stratigraphy, a seepage analysis was unnecessary and a stability analysis using undrained strengths was sufficient to understand the failure mechanisms.  To perform a valid stability analysis using undrained strengths requires only accurate calculation of the shear strengths, and Dr. Brandon explained the values he used after assessing numerous field and laboratory tests.  (DX-DM-1008-0028).

Since different clays have different shear strengths, it should not be surprising that the different layers of clay at the EBIA were assigned different strengths based on their unique characteristics.  For the layer of most importance at the north breach, the organic clay layer located under the levee and floodwall, Dr. Brandon assigned different strengths based on his review of all available data: for the upper organic clay layer, he used 650 psf under the crest of the levee and 500 psf under the landside levee toe and beyond.  For the weaker, lower organic clays, shear strengths were lower: 325 psf under the crest of the levee and 225 psf under the landside levee toe and beyond.  (Brandon Tr. 3183).

In contrast, Dr. Bea assigned *drained* shear strengths to the lower organic clay layer, essentially treating this clay as a layer of sand, one of the foremost reasons Dr. Bea's analysis and conclusion was flawed and differed so greatly from the results reached by every other expert.  (*Id.* 3183).  For reasons already explained, geotechnical engineers

simply do not use drained strengths for clay soils subjected to short-term loading conditions.

A second important component in Dr. Brandon's analysis, one which figured importantly in the other experts' analyses, including Dr. Bea's, was the formation of a "gap" between the canal side levee soils and the sheet pile. As Dr. Brandon explained, a "gap" formed at the north breach when surge waters began to rise on the canal side, deflecting the top of the sheet pile toward the landside and allowing water to fill in the void left between sheet pile and soil on the canal side. (*Id.* 3185-86). The gap, in essence, had the effect of splitting the levee in two, all but eliminating the ability of soils on the canal side to provide stability. As a result of the gap, the failure plane—the surface of soil that begins to destabilize and move under loading—began at the sheet pile tip and moved toward the protected side. Thus, only the strength of the landside soils—soils that were never touched by WGI—mattered in the analysis. (*Id.* 3186-87; *see* DX-DM-1008-0030).

Using the undrained shear strengths appropriate for the site-specific EBIA clays and organic clays, Dr. Brandon performed computer modeling using the slope stability software called SLIDE, searching for both circular and non-circular failure surfaces with and without the gap formation. What the modeling showed was that the gap was critical to the failure and that once the water elevation at the north breach reached 10 to 10.5 feet on the face of the floodwall, the factor of safety, or ratio of resisting forces to driving forces, reduced to unity (1), making a shear failure imminent.[17] (*Id.* 3187-88). Based on an accurate model and search for the failure plane in the computer models, which requires an experienced

---

[17] The Corps designed the floodwall to have a factor of safety of 1.3 with water at the top of the wall. (Lucia Tr. 2945; JX-0004, DX-DM-1005-0038-39). This means, in essence, that the floodwall was designed with a reserve strength against stability failure of at least 30%. (Marr Tr. 1901).

user, it is clear that the failure of the north breach most likely began before water reached the top elevation of the wall resulting from the force of the loading condition on the wall exceeding the shear strength of the clay soils on the protected side.  (*Id.* 3188).  WGI's activities had no effect and made no difference whatsoever in the north breach stability analysis.

Importantly, Dr. Brandon explained to the Court that one of the contributing factors to the low shear strength at the north breach was that the levee toe on the landside was built nearly four feet below the design elevation.  (*Id.*).  The reduction in elevation meant less soil to provide resisting or buttressing force for purposes of stability.  The levee toe at the south breach site, by contrast, was constructed to the design elevation, contributing to its greater stability.  Dr. Marr confirmed that one of the primary differences between the shear strengths of the organic clay layer at the north and south breach was the lower elevation of the landside levee toe at the north breach.  (Marr Tr. 1900-01).  The other factor was slightly lower shear strengths for the organic clay at the north breach as compared to the south.  (*Id.* 1901).

### B.  Structural Deficiencies at the North Breach

In addition to the low landside levee toe and gap formation, the floodwall at the north breach had an additional, problematic structural anomaly that did not exist anywhere else along the EBIA floodwall.  As discussed by Drs. Marr and Dr. Silva, the floodwall at the north breach consisted of two distinct floodwalls connected only by a joint and a field weld: the original 1969 I-Wall with 19.5 foot sheet piles was connected directly to the 1982 I-Wall with 34.5 foot sheet piles with no transition.  (Silva Tr. 3759-60).  The connection between these two sheet piles of different lengths was an "undesirable design

feature" that made structural failure, caused by increased stress concentrations at the connection point, more likely during a storm surge event. (*Id.* 3759; Marr Tr. 1847-48). Dr. Silva, in fact, testified that a "step connection" should have been used to transition between the shorter and longer sheet piles.[18]  (Silva Tr. 3759-60).

These increased stresses manifested themselves in several different ways at the north breach.  To begin with, it was learned, post-failure, that the connection point between the old and new sheet pile included a repair weld that tore apart during the surge load on the face of the floodwall.  (*Id.* 3767; DX-DM-0015-0072; DX-DM-1006-0058-59).  As the hydraulic load increased, the shorter sheet pile and floodwall deformed, or moved laterally toward the landside, owing to the low shear strength of the landside soils.  As the concrete on the floodwall began to crack under this deformation, and the tension gap began to form on the canal side, allowing water to impose hydrostatic force directly to the sheet pile tip, the weld was subjected to increased stresses.  Eventually the weld gave way, transferring the weight of the load and causing the sheet pile connection to, in effect, unzip from the bottom of the sheet pile connection to the top.  The entire hydraulic load at that point concentrated on the bottom of the shorter sheet pile, overwhelming the floodwall's resisting capacity.  (Silva Tr. 3767-68).  At that point, the shorter sheet pile and floodwall catastrophically failed.  (*Id.*).

Dr. Marr reached a similar conclusion.  In Dr. Marr's analysis, the low shear strengths and structural anomalies combined to create a global stability problem at the

---

[18] A "step connection" would have gradually transitioned from the shorter sheet pile to the longer sheet pile with incrementally longer sheet piles, as opposed to the sudden change from 19.5 to 34.5 foot sheet piles.  Had a gradual step connection been used, applied stresses from a storm surge would have been spread across the transition instead of immediately concentrating on the abrupt connection point between the shorter and longer sheet piles.

north breach.  Global stability refers generally to the ratio of resisting forces attempting to hold the floodwall in place against the full driving forces trying to push the floodwall toward the landside.  (Marr Tr. 1892).  Dr. Marr analyzed the shear strengths of the organic clay soils at the north breach and confirmed that the undrained strengths were weaker than those at the south breach and that the levee itself was several feet lower than intended.  (Tr. 1901).  Running a different computer program than Dr. Brandon, called Plaxis, Dr. Marr identified a factor of safety of only 1.13 with a gap at the north breach. (*Id.*). This factor of safety indicated that the soils were likely to deform, or begin moving, under the stress of the load being applied on the face of the floodwall before surge waters reached the top of the wall.  (*Id.* 1902).  And that is, in fact, what likely occurred.

But Dr. Marr's analysis also looked at the structural failure that occurred when the older, shorter sheet pile broke free from the newer, longer sheet pile.  The results confirmed that the older floodwall experienced forces well beyond its design capacity. First, the sheet piles themselves had been stretched 13 inches longer than their initial construction, deforming under the weight of the surge while still retaining a connection to the newer sheet piles.  (*Id.* 1906; DX-DM-1006-0062).  Second, the connection point itself, a joint that consisted of a socket and a ball, had also deformed and stretched to a point that the interlock could no longer hold.  (Marr Tr. 1906; DX-DM-1006-0060).

In Dr. Marr's analysis, the newer floodwall, having much greater stability than the older floodwall, stayed put while the older floodwall began to deform as a result of global instability and low shear strengths of the soils on the protected side.  (*Id.* 1908).  Though connected to the older floodwall, the newer sheet pile did not deform because it was driven deeper, providing it more stability than the older, shorter floodwall.  This caused the older

floodwall, enduring stresses that it was not designed to withstand, to stretch, elongating or flattening the sheet pile itself and causing the concrete on top to break and crack under the tension, fully exposing the rebar beneath.  (*Id.* 1908-10; DX-DM-1006-0063).  The forces generated to stretch the sheet pile were extreme—nearly 500,000 pounds of force over the course of Katrina's surge event—and the inelastic concrete on top of the sheet pile simply came apart.  (Marr Tr. 1909-10).

    As Dr. Marr explained, floodwalls are not designed to have one section deforming and stretching horizontally while another section retains its anchoring stability, but this is what occurred at the north breach between the older and newer floodwall sections.  (Marr Tr. 1908).  The differential between sheet pile lengths exacerbated the forces generated on the shorter sheet pile—the sheet pile that ultimately failed—and the computer analyses run by Dr. Marr confirmed that the deformation of the shorter sheet pile section was greater than that experienced at the newer, longer sheet pile.  (*Id.* 1912-13).

    When the older sheet pile finally began pulling away from the newer sheet pile, large quantities of water began gushing through the opening between the two, quickly scouring away the levee soils on the protected side, soils that already had begun to scour as a result of wave overtopping.  (*Id.* 1913; Dalyrmple Tr. 2747-49).  Soon after, the tear between the sheet piles occurred, transferring all of the force to the base of the sheet pile and causing the interlock connection to literally unzip from bottom to top.  (Marr Tr. 1914).  As more water rushed through, overturning was inevitable, and indeed, that is what likely occurred, with the wall toppling from north to south.  (*Id.*; *see also* DX-DM-1006-0066).

    Importantly, Dr. Marr and Dr. Silva both testified that, based on survey data, the wall at the north breach was at a lower elevation than any other point along the entire EBIA

reach.  In Dr. Marr's opinion, even if the floodwall there had not failed in the manner it did, before surge waters exceeded the wall height, an overturning failure was all but inevitable. Simply put, even if the wall had not failed due to its low shear strength and structural problems, surge waters would have overtopped the wall and scoured out the protected side soils until the wall overturned.  (JX-1864-0085).

Taking the analyses of Dr. Marr, Dr. Silva, and Dr. Brandon separately and together, it is clear that what occurred at the north breach had nothing to do with WGI's work. Instead, the stability and resisting forces on the landside at the north breach were less than the intended design, making it more likely that the wall would begin to deform before surge waters reached the top elevation.  A gap initiated between the levee and floodwall on the canal side, concentrating additional lateral force at the sheet pile tip and increasing the likelihood of lateral failure.  As the floodwall deformed and the stability decreased, the structural failures came into play, as the newer, longer sheet pile remained rigid while the older, shorter sheet pile attempted to pull away under the increased stress.  Eventually, the connection between the two sections of floodwall failed, and the inrushing waters quickly scoured away the landside soils, soils that had already begun to erode from wave overtopping, leading to a quick and catastrophic overturning failure.

It is worth emphasizing that the sequence of events that unfolded at the north breach, particularly with the structural failure, likely occurred very rapidly.  (*See* JX-1672-0065; Marr Tr. 1914).  Some events may even have occurred parallel to one another.  (Marr Tr. 1914).  And although Dr. Marr did not believe a geotechnical analysis could be used to predict with certainty the time of failure at the north breach, it is not disputed that the

north breach likely occurred around 6:00 or 6:10 a.m.[19]  (Marr Tr. 1889, 2250-51, 2253-54; *see also* JX-1672-0067).

Nowhere in the events leading to the north breach did seepage or hydraulic uplift forces play any role.  Simply put, WGI's excavations and backfilling did not make the north breach failure more likely.  The structural defects and low shear strength that combined to cause the north breach were unrelated to any work performed during Task Order 26.

## VI.    South Breach: Overtopping and Overturning

Like with the north breach, the south breach failure is readily explained by basic, fundamental geotechnical principles.  As previously explained, the EBIA clay soils simply were not susceptible to underseepage or underseepage-induced pressures during Katrina's surge.  *See* Section IV, pp. 30-36).  Instead, as Drs. Marr and Silva both convincingly testified, the conditions that mattered at the south breach were on the landside of the floodwall.  Soils on the landside are necessary to support the stability of the floodwall. When these soils are removed, the stability of the floodwall is jeopardized.  At the south breach, rising surge waters and waves began overtopping the floodwall in a manner not contemplated in the original design.  Eventually, the force of water overtopping the floodwall and falling some seven feet onto the levee soils below scoured the soils on the landside to the point where the floodwall's stability was compromised, causing it to move landward and fail by overturning.[20]

---

[19] Dr. Robert Dalrymple, WGI's hydrology expert, approximated the time of failure for the north breach as 6:00 a.m.  (Dalrymple Tr. 2751).  Dr. Dalyrmple is a Professor of Civil Engineering at Johns Hopkins University, with a focus on Coastal Engineering and Water Wave Mechanics.  (*Id.* 2692).  Dr. Silva relied on Dr. Dalrymple for his time of failure.  (Silva Tr. 3834; JX-1672-0067).

[20] Dr. Brandon did not specifically analyze the cause of failure at the south breach. However, Dr. Brandon's analyses ruled out both seepage and shear failure prior to waters

As Dr. Marr explained, the EBIA floodwall was constructed as an I-Wall, driving a sheet pile through soft clays and placing a concrete cap on top of the sheeting.  (Marr Tr. 1835).  For the I-Wall to remain in place and stable during a rising storm surge, the foundation soils on the landside must also remain in place, providing a resisting force and restraint against the force of the water on the wall.  (*Id.* 1835-36; DX-DM-1006-0005).  The phenomenon of I-Wall overturning is similar to what occurs when a post driven into the ground topples with the removal of soil from one of its sides.  (Marr Tr. 1836).

Photographic evidence persuasively demonstrated that the I-Wall at the south breach showed tell-tale signs of a rotational, overturning failure.  Aerial images show that the south breach involved an 820-foot section of floodwall, consisting of several 30-foot sections, splayed horizontally with significant portions of the concrete cap removed, and stretched to a length of 944 feet.  (*See* JX-1868-0003, Fig. D-2).  Dr. Marr more closely examined the 30-foot segments of sheeting involved in the south breach failure and identified several clues about how the wall failed, showing the Court how the floodwall began rotating toward the landside, stretching the concrete caps horizontally and causing the concrete to spall, or crack, exposing the rebar underneath.  (Marr Tr. 1841).  Moving progressively from the north to south, Dr. Marr showed that the rotation of the floodwall became greater, with added spalling of the concrete cap consistent with the horizontal stretching of the sheeting that occurs during overturning.  (*Id.* 1841-42; *see also* DX-DM-1006-0008-0011).

But the most compelling evidence showing how and why the floodwall overturned from the landside soil erosion was Dr. Marr's pictorial tour of the scour trench that

reaching the top of the floodwall, suggesting that the failure occurred after overtopping took place.  (Brandon Tr. 3159).

developed along the EBIA floodwall's protected side.  Using photographs, computer-aided design software, LiDAR measurements, and floodwall elevation survey data, Dr. Marr walked the Court from an area just south of the Claiborne Avenue Bridge to the southernmost end of the south breach, showing the estimated scour trench depths relative to the top of the floodwall at several locations.  (*See* DX-DM-1006-0021-29; Marr Tr. 1850-54).  Near Claiborne Avenue, where the floodwall was approximately +13.4 feet, the scour trench depth was minimal.  (DX-DM-1006-0021).  But as the elevation of the floodwall decreased, the depth of the scour trench increased, reaching an estimated -4.5 to -5 feet at the location nearest the southernmost segment of the floodwall.  (*Id.* 0022-29; Marr Tr. 1852-54).

Dr. Marr continued his tour just north of the south breach, and the photos were consistent, showing variable scour depths that were deeper where the floodwall elevation was lower and shallower depths where the floodwall elevation was higher.  (DX-DM-1006-0030-36).  Importantly, the two places where failures occurred represented the two lowest floodwall elevations across the entire EBIA floodwall, as documented by OLD surveys of the floodwall in 1991, 1996, and 1999.[21]  (*Id.* 0039; Marr Tr. 1862).  Notably, the last recorded survey data was taken in 1999, before WGI ever mobilized on site.

The survey data showed that although the EBIA floodwall was built to a certain height, the compressible soils in the foundation consolidated at different rates, causing the floodwall elevation to vary by as much as one to two feet below the intended design.  (*Id.* 1862).  At the south breach, the top-of-wall elevation was approximately +12.1, feet, or 1.5 feet below design.  (*Id.* 1864).  As a result of the lower elevation, more scour and deeper

---

[21] This survey data was not used by either the IPET or ILIT teams when they performed their investigations into the EBIA floodwall failures.  (Marr Tr. 1861).

scour would likely occur at that point than at points where the wall elevation was higher. (*Id.* 1861). Understandably, for the lowest spots on the wall, there simply was no data or evidence of precisely how deep the scour trenches reached because those sections of the wall failed. (Marr Tr. 1883).

Dr. Marr's pictorial tour was not intended to provide precise scour trench depths, but rather to provide the Court an approximation of the scour depths at a variety of locations along the EBIA floodwall. (*Id.* 1854). Precision modeling of scour trench depths is not possible since scour trench development involves many variables, including, among other things, soil conditions, grass cover, degree of compaction, composition of the levee, and root penetration. (*Id.* 1851). But the key point is this: the photographic evidence showed a clear correlation between the elevation of the floodwall and the depth of the scour trenches along the EBIA floodwall. (DX-DM-1006-0037). This result comports with common sense because as water rose in the IHNC it would have overtopped the lowest parts of the wall first, causing more scour earlier. (Marr Tr. 1861).

To confirm how scour likely developed along the EBIA floodwall, Dr. Marr plotted depth of scour at several locations along the EBIA as a function of the top-of-wall elevation assuming three different types of low-plasticity clays of varying erodibility. (DX-DM-1006-0043). The purpose was to see how deep the scour trenches might be expected to reach if no failure occurred. (Marr Tr. 1865). What the model showed was that, assuming a more erodible low plasticity clay, scour depths would likely reach a depth of 5 feet with a wall elevation of +12.1, the elevation of the wall at the south breach. (DX-DM-1006-0043). When Dr. Marr plotted the actual observed scour depths along the EBIA floodwall against the elevation of the floodwall at the measured datum points onto this model, those plots

correlated with the expected scour depths for a more erodible low plasticity clay.  (*Id.* 0044).  Thus, although the failure at the south breach destroyed or eliminated actual evidence of the scour trench that developed there, it could reasonably be concluded, based on the elevation of the floodwall at that location, that scour would have reached approximately 5 feet or more.  This was entirely consistent with visual observations.[22]

Based on the observed scour depths along the EBIA, Dr. Marr calculated the conditions that would likely initiate overturning without considering the effects of waves. His calculations and computer modeling showed that when surge waters in the IHNC reached +14.2 feet, the scour trench was likely to be 4.7 feet deep.  In addition, a gap, or tension crack, like what developed at the north breach, reached a depth of 12.9 feet on the canal side.  Even with 8 feet of tailwater, or landside floodwaters, helping support the floodwall on the landside, the factor of safety against overturning fell below unity (1), indicating failure.[23]  (DX-DM-1006-0045; Marr Tr. 1883-84).

Dr. Marr pointed out that, in his original report, he did not assume any waves overtopping the floodwall.  (Marr Tr. 1884; JX-01864-0101).  With that caveat, he stated in his report that "[s]ince the floodwalls at the EBIA site experienced wave overtopping during Hurricane Katrina, it can be assumed that omission of wave overtopping scour in our study would result in lower predicted scour depths than what actually developed at the floodwalls during the hurricane."  (*Id.*).

---

[22] Dr. Marr unequivocally testified that his plot model was not critical to his opinions and served only to provide additional understanding about the process of scour trench development and the impact of landside floodwaters on the scour process.  (Marr Tr. 1868, 2092).

[23] Synonymous with "tailwater" is landside floodwaters.  (Marr Tr. 2227).  Dr. Marr explained that when writing his expert report, he attempted to use the term landside floodwaters because tailwater is a term ordinarily used in reference to dams and not levee design.  (*Id.*).

Subsequent to producing his expert report, Dr. Marr learned that Dr. Dalrymple—the only qualified expert in this case to analyze wave conditions in the EBIA during Hurricane Katrina—had determined that the south breach site experienced significant wave overtopping resulting from waves with a significant wave height of 3 feet. (Marr Tr. 1884; DX-DM-1006-0046). Adding waves to the analysis would result in earlier overtopping and quicker scour trench development. (JX-1864-0101; Marr Tr. 1884-85). Thus, Dr. Marr re-worked his calculations to more accurately reflect wave conditions. His calculations showed that the conditions necessary to reduce the factor of safety against overturning to 1, indicating imminent failure, occurred with scour trenches 3.5 feet deep and IHNC surge waters at +13 feet. (Marr Tr. 1885-86; DX-DM-1006-0049). Accordingly, Dr. Marr concluded that scour depths of 3.5 to 4 feet with surge waters at +13 feet were conditions sufficient to cause overturning. (Marr Tr. 1887).

Dr. Silva concluded, as Dr. Marr did, that the south breach was caused by overturning due to overtopping and scour erosion. (Silva Tr. 3769, 3827). Only some form of backside erosion protection, such as reinforced concrete, would have prevented the scour. (*Id.* 3829). Like Dr. Marr, Dr. Silva determined that a scour trench depth of about four feet reduced the factor of safety against overturning to unity (1), representing imminent failure. (*Id.* 3901).

Although Dr. Silva's scour modeling differed from Dr. Marr's, the efforts shared the same purpose: to confirm that the size of the trenches observed at the EBIA were deep enough to affect the performance of the floodwall. (*Id.* 3904). Based on decades of combined geotechnical engineering experience and perspective evaluating levees, both Dr. Marr and Dr. Silva were able to confirm what their field observations suggested: the south

breach was an overturning failure caused by overtopping and scour erosion of the landside soils.  WGI's work had no role in this failure.

Significantly, Dr. Bea's own hand calculations confirmed the accuracy of both Dr. Marr's and Dr. Silva's opinions.  As Dr. Marr showed, Dr. Bea determined that the floodwall at the south breach had a factor of safety less than 1 against overturning with surge waters at +12.5 feet and 3 feet scour on the landside.  (DX-DM-1006-0050-51; Marr Tr. 1887-89). Notably, Dr. Bea did not conduct any scour depth analysis with a floodwall elevation less than 12.5 feet, the top-of-wall height assumed in both the ILIT and IPET investigations. (Bea Tr. 1428).  Had he used the most recent survey data, showing that the top-of-wall was only 12.1 feet, Dr. Bea's calculations would have shown a deeper scour trench with conditions supporting overturning even earlier.

That Dr. Bea's hand calculations confirmed that scour and overturning was the likely mode of failure at the south breach should come as no surprise to this Court.  Despite Dr. Bea's attempt to abandon overtopping as the mechanism of failure for purposes of this case, Dr. Bea previously testified before this Court in the *Barge* litigation that wave overtopping would likely have started well before the still-water level reached the top of the floodwall at the south breach.  Specifically, Dr. Bea testified to "large amounts of water . . . coming over the top of the wall," leading to "early development of erosion trenches on the protected side."  (Bea Tr. 1422).  Dr. Bea used a demonstrative photograph in the *Barge* trial to support his testimony, clearly showing massive quantities of wave overtopping flowing over the IHNC west bank floodwall during Hurricane Gustav.  (*Id.* 1424; DX-1589-0070).  Although Dr. Bea claimed in *this trial* that the purpose of that photograph was not to illustrate overtopping conditions at the EBIA, his use of this photograph during his

testimony in the *Barge* trial to describe the conditions that led to the EBIA south breach failure speaks for itself.  As this Court is aware, Dr. Bea testified in the *Barge* trial that development of the scour trench was the "second key mode of failure" that combined with lateral instability general to the floodwall levee system to cause the south breach.  (Bea Tr. 1425).  Contrary to his opinions in *Barge*, Dr. Bea now posits that hydraulic uplift pressures caused the south breach before overtopping could substantially contribute.  (*Id.* 1444).  His prior sworn testimony cannot be squared with the opinions he has given in this case.

An additional component to understanding the varied scour trench development was the effect of "tailwater" or landside floodwaters.  Tailwater refers to the waters that rose on the landside, first as a result of overtopping or rainwater, and later as the result of large quantities of water channeled through the breaches.  As Dr. Marr testified, tailwater has two primary impacts on scour and overturning.  First, as water rises on the landside of the floodwall it acts as an additional resisting force, providing additional stability for the floodwall against the hydraulic load being imposed on the canal side.  (Marr Tr. 2221).  Second, as tailwater fills the scour trench, it blunts the impact of waters cascading over the top of the floodwall.  (*Id.*).  This water, in effect, cushions the force and slows the scour rate that otherwise would obtain.  (*Id.* 1867; *see also* DX-DM-1006-0041; JX-1882-0006)).  As Dr. Marr concisely testified, after the breaches occurred, water quickly filled the landside, rising over the top of the earthen levee embankment and slowing the scour rate.  (Marr Tr. 1864).  Thus, "a wall that hasn't failed by the time this water comes up is probably not going to fail because . . . the scour's not going to continu[e] to go deeper."  (*Id.*; DX-DM-1006-0041; *see also* Marr Tr. 2131 ("once the water started building up in the Lower Ninth

Ward and got above the top of the earthen embankment, it would slow down . . . and eventually stop scour.").

Understanding the tailwater effects helped explain why the scour trenches at other locations did not continue to develop deeper and why the floodwall at other locations, such as the location adjacent McDonough Marine where the floodwall had subsided to 12.3 feet, did not fail. As Dr. Marr explained in his report, he analyzed a section of floodwall at elevation +12.7 feet, located to the south of where the north breach occurred. (*See* JX 1864-0109). What his analysis revealed was that, despite a pronounced scour trench, rising tailwater on the landside increased the stability of the floodwall and prevented this section from failing, even after surge waters reached a peak of +14.2 feet. (*Id.* 0109-10; JX-1883-0001-0010). Had tailwaters not risen on the landside, preventing additional scour, Dr. Marr concluded that this section undoubtedly would have failed. (*Id.* 0010). The same undoubtedly held true across the roughly 3,000 feet of floodwall that remained standing following the north and south breaches.

But in addition to the tailwater impact, a further factor helps explain why scour trenches ceased developing in locations nearest the breaches. Dr. Silva testified that after a breach occurs, the water elevations from 100 to 150 feet away from the breach site decrease substantially, owing to the channeling effect of water rushing through the opening in the floodwall. (Silva Tr. 3763, 3921). In effect, the water levels depress at the location of the breach, which focuses the flow within the canal toward the breach area, and the effect is to prevent further scour trench development within roughly 100 to 150 feet of the breach. (*Id.* 3763). This depression effect explains why scour trenches at locations

immediately adjacent both the north and south breaches ceased developing immediately after the breaches occurred.

This Court requested, in its October 5, 2012 order, Doc. 21090, a determination of the approximate times when the breaches occurred.  On this point, the Court heard testimony and was provided evidence that gave a plausible range of times for the south breach failure.  Dr. Bea, for example, posited that the south breach initiated sometime between 7:00 a.m. and 7:15 a.m.  (Bea Tr. 1283).  Dr. Dalrymple, WGI's hydrologic expert, opined that the south breach initiated around 6:45 a.m. and was fully developed by 7:00 a.m.  Dr. Silva, who relied upon Dr. Dalrymple, roughly approximated the time of failure as around 7:00 a.m.  (JX-1672-0067; Silva Tr. 3834).

Dr. Marr, by contrast, was never asked and did not attempt to determine the time of failure for the south breach.  (Marr Tr. 1967).  He was asked only to determine why the floodwall failed.  (*Id.* 1969).  In both his report and at his deposition, Dr. Marr offered no opinion about the timing of the south breach.  (*Id.* 1974).  Nevertheless, his understanding, based on the work of others, was that the south breach failed between 7:00 a.m. and 9:00 a.m.  (*Id.*).  As he told this Court, after the effects of waves were included in his calculations, scour developed much earlier, before tailwater could buttress the landside stability, leading to an earlier failure.  (*Id.* 2169, 2244).  Most importantly, Dr. Marr specifically testified that his opinion that the south breach was caused by overtopping, scour, and overturning was not affected in the event that failure initiated at 7:00 a.m.  (*Id.* 2254-55).

This Court also asked for the depth of the scour trench at the south breach at the time of failure, as well as the time that the scour trench immediately north of the south breach would have reached its maximum depth as a result of rising landside floodwaters.

(Doc. 21090, at 3).  But as Drs. Marr and Silva explained, scour trench and tailwater models cannot be used to predict accurate depths and times.  (Silva Tr. 3762-63, 3913-14; Marr Tr. 1868, 2092).  The models served merely to confirm what field observations and decades of geotechnical experience evaluating levee failures suggested: that the south breach failed by overturning, and the mechanism of failure was overtopping and scour.  The undisputed photographic evidence and field observations convincingly demonstrated that scour occurred, that scour would have been greatest at the south breach owing to its lower top-of-wall elevation than other floodwall locations, and that overturning was the mode of failure.  And as Dr. Silva explained, once the breaches occurred, water levels immediately adjacent the breach sites depressed, preventing further scour trench development within 100 to 150 feet.

Thus, regardless of the specific time of failure and the variables that contributed to scour trench depths, the important point, not to be lost, is that Plaintiffs altogether failed to prove that underseepage could have been a mode of failure at the south breach. Considering that Dr. Bea himself agreed in his hand calculations and prior testimony that the south breach was caused by overtopping and overturning, Plaintiffs simply failed to prove that WGI's work contributed in any way to the south breach failure.

## VII.    Plaintiffs' Methodology and Analysis Is Not Credible or Valid

As the foregoing discussion made clear, Drs. Marr, Silva, and Brandon, applying conservative, generally accepted geotechnical principles of soil and fluid mechanics, compellingly explained the likely cause of failure at both the north and south breaches. Using site-specific properties for the EBIA clays, including undrained shear strengths, low permeabilities, and the empirically verified coefficient of volume change, or

compressibility, these renowned geotechnical engineers convincingly demonstrated that underseepage flows and hydraulic pressures could not have contributed to the floodwall failures at either breach.  WGI's excavations and backfilling played no role in either failure. Their conclusions were well supported by field observations, the scientific principles governing soil and fluid mechanics, the properties of the soil, and the site geology.

Plaintiffs, by contrast, ignored the site-specific properties of the soil and conducted an analysis unhinged from the facts.  Dr. Bea's conclusion that underseepage-induced uplift pressures contributed to both breaches, exacerbated by WGI's activities on the canal side of the EBIA floodwall, is untenable and supported only by a series of contrived explanations that lack any foundation in the empirically measured soil properties and site conditions that developed during Katrina's storm surge.

A.      **Permeability.**  As this Court heard, Dr. Bea, for several years beginning with the ILIT investigation, believed that the foundation of the EBIA floodwall consisted of high permeability soil layers that propagated massive quantities of seepage flow (and with that flow, hydraulic pressures), undermining the EBIA floodwalls.  As an example, Dr. Bea and ILIT cited to the "crevasse splay" at the south breach site as "clear and uncompromising evidence" of these high permeability soils, and Dr. Bea even testified in an earlier round of Katrina-related litigation that the EBIA soils were so permeable that the process of driving sampling tubes into the ground at the site caused water to gush out of nearby holes.  (Bea Tr. 1403; JX-2032-242, Figure 6.45; Bea Tr. 1403-06; Bea Tr. 4133 (describing Barge testimony that water squirted out of nearby boreholes).  Indeed, Dr. Bea testified in earlier litigation that underseepage occurred at the EBIA independent of WGI's work.  (Bea Tr. 898-99).

The parties' joint soils testing program established that Dr. Bea's assumptions about the permeability of the EBIA soils were wrong.   As a result of the extensive soils testing program, the parties stipulated to the permeability of the lower organic clay soil layer located beneath the sheet pile tip of the EBIA floodwall, assigning it a permeability of $10^{-5}$ cm/sec, consistent with a clay soil with low permeability.  (Doc. 20920, p. 38 ¶ 87).  It was this layer of soil that formed the basis for Dr. Bea's theory of failure.

Despite conclusive evidence that the EBIA soils were low permeability and not susceptible to seepage, Dr. Bea continued to conclude, as he had since ILIT, that underseepage was a contributing mode of failure, claiming that the lower organic clay, even in the absence of flow, instantaneously propagated hydraulic uplift pressures to the landside levee toe destabilizing the floodwall.  In the process, Dr. Bea disavowed his previous testimony about the high permeability soils at the EBIA, in fact claiming that the "crevasse splay" photograph was *now* indicative of subterranean water attempting to drain through an on-site ditch backfilled with pervious material as opposed to high permeability soils that he once believed native to the EBIA.  (Bea Tr. 1219-20, 1223-24).  In Dr. Bea's opinion in *this* litigation, he now claims that the mode of failure at the EBIA, and the seepage analyses he performed to reach that failure, is "insensitive" to permeability. (Bea Tr. 887).

**B.    Dr. Bea's "Eureka" Moment.**  According to Dr. Bea, his conclusion that underseepage contributed to the EBIA failures notwithstanding the stipulated evidence of low permeability soils and a short-term storm surge event was the product of a "eureka" moment that occurred to him after thousands of hours of invested geotechnical analyses into the levee failures across New Orleans.  Unable to make sense of pore pressure readings

in a post-Katrina piezometer study, Dr. Bea asked Mr. Cobos-Roa whether he had incorporated pore pressures shown in that study into his stability analyses at the 17th Street Canal breach.  (*See* Bea Tr. 1073, 1085-87).  Mr. Cobos-Roa had not—stability analyses at the 17th Street Canal were conducted using undrained shear strengths for clays, and undrained shear strengths already incorporate pore pressures.[24]  But Dr. Bea, taking guidance from "god herself," directed Mr. Cobos-Roa to add these pore pressures to his analysis, essentially double-counting those pore pressures in the process.  (*Id.* 1087-88).  Dr. Bea admitted that adding pore pressures to a stability analysis in this way was "uncommon."  (*Id.* 1089-90).  This was one of Dr. Bea's "eureka" moments:  applying an "uncommon" stability analysis contrary to standard geotechnical engineering practice, Dr. Bea added pore pressures in a novel way, reducing the shear strengths of undrained clays during a hydraulic loading event contrary to fundamental soil mechanics, and decided to import this theory to the EBIA.[25]

   As Dr. Brandon explained, Dr. Bea's entire premise for running a seepage analysis in the first place stemmed from his unsupportable decision to employ drained strengths for

---

[24] ILIT applied undrained shear strengths to the clay layers at 17th Street and concluded that the failure there was a shear failure resulting from a design error in miscalculating the shear strength, the presence of a very low-strength clay seam, and the formation of a gap. (JX-02032-0303-04, 0313, 0318; *see also id.* 0384 (showing cross-section and undrained strength parameters used for conventional stability analysis at 17th Street Breach section). No seepage-induced phenomena, whether flows or uplift pressures, were required to explain the failure.

[25] Dr. Bea used the words "eureka moment" to describe two discoveries that occurred to him while studying the 17th Street breaches.  The first "eureka" moment was in discovering that pore pressures could be obtained instantaneously by applying a compressibility value of $1 \times 10^{-9}$ ft²/lb.  (*See* Bea Tr. 1072-73 (describing the discovery that a low $m_v$, or coefficient of compressibility, provided an "immediate pressure response" as a "eureka moment," like "the light went on suddenly.").  The second "eureka moment" occurred when he asked Mr. Cobos-Roa to add pore pressures to his lateral stability analysis.  (Bea Tr. 1088-89) (describing the combination of the pore pressure data from the 17th Street piezometer to Mr. Cobos-Roa's stability analysis as "the eureka moment.").

the lower organic clay—and only the lower organic clay—in his stability analysis. (Brandon Tr. 3230).  Had the correct undrained analysis been used, pore pressures would not need to be calculated or imported—a seepage analysis would have been unnecessary from inception.  Indeed, Dr. Bea admitted that *prior to this litigation* he used total stress, or undrained strengths, to evaluate the shear strength of the organic clay.  (Bea Tr. 1130-31; Brandon Tr. 3183).  In other words, for *this litigation*, Dr. Bea modeled the organic clay in a way he had never before modeled it.[26]

In addition to being a departure from his own previous approach, Dr. Bea's decision to model the lower organic clay as if it were sand was contrary to standard engineering practice, contrary to what the soil conditions called for, and contrary to the measured soil properties obtained through the parties' soil exploration program.  As Dr. Stark succinctly put it, Dr. Bea's uplift pressures, if they existed, could influence the drained strength of soils, but not the undrained strength.  (Stark Tr. 3501).  Dr. Marr was even more emphatic, testifying that Dr. Bea's stability analysis violated a basic concept of soil mechanics by decreasing the shear strength of clays during the short duration of the storm surge when basic soil mechanics, using undrained analyses, indicate that those shear strengths would have remained constant.  (Marr Tr. 1946; DX-DM-1006-0107).  The import of Plaintiffs' contrivance is clear: because the empirical evidence showed that the lower organic clay was impermeable and not susceptible to underseepage, the only way Plaintiffs could justify

---

[26] Dr. Bea attempted to show, through hand calculations, that employing drained strengths instead of undrained strengths did not result in disparate factors of safety.  Dr. Brandon and Dr. Marr, however, thoroughly discredited Dr. Bea's hand calculations.  (*See* DX-DM-1008-0058-66; Brandon Tr. 3213, 3217-22; DX-DM-1006-0087-91; Marr Tr. 1932-35). That the factors of safety would be different is unsurprising, since undrained and drained strengths are functions of different measures.  (DX-DM-1008-0066; Brandon Tr. 3217-22). Predictably, using correct calculations Dr. Bea's drained and undrained strengths did not agree within any reasonable bounds.  (DX-DM-1006-0091).

running a seepage analysis was to assume the organic clay was in a drained condition, import the pore pressures generated from that unwarranted seepage analysis into their stability analysis, and use the results to suggest that the strength of the organic clay decreased during Katrina's 30-hour storm surge event.  If this hypothesis were correct, geotechnical textbooks and the principles of soil mechanics would have to be rewritten.

Moreover, the entire premise of Dr. Bea's "eureka" moment—the piezometric data at the 17th Street Canal—did not require any new or novel scientific approach to soil mechanics.  As Dr. Brandon testified, he was involved in the safe water elevation work at 17th Street, and the 17th Street piezometric data that Dr. Bea suggested was indicative of instantaneous pore pressure transmission was fully analyzed by URS Corporation and Black and Veatch Consultants.  (Brandon Tr. 3280).  The data was readily explained by site-specific soil properties without resort to unorthodox or novel theories.  (*Id.* 3282).  There was no need to assign incompressibility values to the soil, and steady state conditions were not achieved instantaneously—it took fully six months to achieve such a condition.  (*Id.*).  Moreover, Dr. Brandon showed that Dr. Bea's *use* of that data was invalid, as Dr. Bea miscalculated the forces involved and erroneously concluded that hydraulic uplift forces affected the undrained strength and factor of safety.  (Brandon Tr. 3221-22; DX-DM-1008-0067).

Dr. Bea's reliance on piezometer data from the EBIA was equally flawed.  Dr. Bea claimed that two piezometers installed at the EBIA by the Corps post-Katrina, known as PZ-3 and PZ-6, were proof of a "direct hydraulic connection" between the IHNC and the "buried swamp-marsh soils."  As Dr. Marr explained, Dr. Bea's nomenclature, *i.e.*, "direct hydraulic connection," is misleading on its face, as *all* soils in the vicinity of the EBIA are, in

reality, in direct hydraulic contact with the IHNC.  (JX-1872-0016).  At most, what the piezometer data from the EBIA showed was that when water in the canal rose to +3.5 feet or higher, as it did during Hurricanes Gustav and Ike, the piezometers registered an immediate hydraulic response.  (*Id.* 0016-17).  Notably, as Dr. Marr pointed out, the piezometers did *not* register immediate hydraulic responses to minor fluctuations in the canal, directly contradicting Dr. Bea's primary contentions about the "direct hydraulic connection" between the IHNC and the lower organic clay.  (*Id.* 0017-18).

During hurricane conditions, however, the piezometers registered changes, not because of some immediate connection between the canal and the lower organic clay, but rather because the weight of the hydraulic load rising upon the ground surface in and around the piezometer produces an immediate change in pore pressures in all of the affected soils under the load, or weight, of the water.  (*Id.* 0018).  This is a basic principle of soil mechanics—when a load of water rises on saturated soils, pore pressures immediately rise, and that is what a piezometer measures.  (*Id.*; Marr Tr. 2181).  It in no way suggests, as Dr. Bea asserted, that the organic clay was, at all times, susceptible to immediate hydraulic responses to changes in water level in the IHNC.  (JX-1872-0018).

As Drs. Marr, Brandon, Stark, and Silva showed, using site specific values of permeability and compressibility for the EBIA soils and the short-term hydraulic load from Katrina's surge, seepage analyses provided negligible, *de minimis* underseepage and landside uplift pressures.  As Dr. Stark testified and showed the Court, the baseline seepage conditions and uplift pressures at the EBIA, resulting from the head differential between the groundwater surface on the canal side and landside, were not exacerbated or influenced in any material way when Katrina's surge was imposed on the canal side.  (Stark

Tr. 3500).  Dr. Marr testified that seepage quantities would have been on the order of one drop of water per second per foot of wall, far beneath the quantity required to cause erosion or heave of the landside toe or sustain high pore or uplift pressures.  (Marr Tr. 1946).

In the face of conclusive evidence that their original assumptions about the permeability of the EBIA soils were wrong, Plaintiffs nevertheless continued to posit that seepage-induced pressures developed almost instantaneously on the landside when Katrina's surge waters hit the EBIA.  Adherence to this misguided theory resulted in a number of further errors.

One critical flaw, as Drs. Brandon, Marr, and Silva all testified, was that Dr. Bea's seepage models included the "gap" formation before any surge waters even reached the face of the floodwall.  (Brandon Tr. 3225-28; DX-DM-1008-0069-0080; Marr Tr. 1917-21; DX-DM-1006-0069-0075; Silva Tr. 3811-13; DX-DM-0015-0109-14).  Once this gap is in place, any WGI excavation on the canal side, idealized or real, becomes irrelevant to the seepage analysis.  (See Marr Tr. 1920, 1944).  Simple application of Darcy's law demonstrates that once the gap is in place any seepage flows generated under the floodwall initiate from that gap and not a single excavation further from the floodwall could have impacted or added to that seepage.  In essence, once a gap forms, it acts as an open excavation immediately adjacent the floodwall.  (JX-01672-0059).  Accordingly, Dr. Bea's claim that WGI's excavations exacerbated or contributed to seepage flows and pressures violated Darcy's law, a fundamental canon of fluid mechanics.  More important still, because the gap is the only excavation that matters for purposes of seepage flows and pressures, Dr. Bea's analyses served only to reinforce that WGI's excavations would have

played no role in exacerbating seepage or landside uplift pressures had they manifested during Katrina's surge—which they did not.

But in addition to violating Darcy's law, Dr. Bea's stability and seepage analyses, conducted by Mr. Cobos-Roa at his direction, did not use the empirically measured, site-specific properties of the EBIA clays and employed contrived boundary conditions to artificially generate uplift gradients at both the north and south breach.  The simple truth is that Plaintiffs' explanation for the EBIA floodwall failures did not fit the facts or match the field conditions.

C.     **Incompressible soil.**  As was pointed out numerous times during trial, Dr. Bea chose to model the EBIA organic clay as an incompressible media contrary to the known, measured site-specific compressibility value obtained from laboratory testing.  Dr. Silva detailed for this Court the evolution of Dr. Bea's compressibility value, noting that for the first six years of Dr. Bea's involvement, both with ILIT and in litigation, Dr. Bea's analyses never mentioned this "critical parameter."  (DX-DM-0015-95).  Instead, Mr. Cobos-Roa, the graduate student that Dr. Bea hired to run the computer modeling, candidly testified that Dr. Bea asked him to determine how to obtain near-instantaneous pore pressure responses in SEEP/W.  (JX-1551-0050, 197:16-199:22; *see also id.* 0070, 278:18-24).  Mr. Cobos-Roa discovered an instantaneous response was possible if compressibility was inputted at $10^{-9}$ ft$^2$/lb, reflective of an incompressible media.  Mr. Cobos-Roa testified that when he informed Dr. Bea that this value would generate the required pore pressures to support Dr. Bea's conclusions, Dr. Bea immediately approved the value.[27]  The compressibility selected, far from reflecting the highly compressible organic clays at the

---

[27] Mr. Cobos-Roa also candidly admitted that he knew of no soil in the universe with a comparable compressibility.  (JX-1551-0055-56, 220:21-221:2).

EBIA, essentially transformed that layer into porous rock, such as the Berea Sandstone that

Dr. Silva presented to the Court.  Having been presented actual soil samples taken of this

organic clay, this Court needs no further evidence to know that the lower organic clay did

not resemble, in form or substance, a rock.

Confronted with Mr. Cobos-Roa's testimony, implying that the value was contrived

out of thin air to support an otherwise untenable conclusion, Dr. Bea did his best to justify

selecting this "crucial" input parameter, first testifying that the value was derived from the

"dilatational modulus" for saturated marine clays.  (DX-DM-0015-100).  As Dr. Marr

explained, the "dilatation modulus" is used to solve pressure wave problems, an entirely

different phenomenon than the seepage problem geotechnical engineers evaluate for a

storm surge-induced levee failure.  (Tr. 1942).  Pressure wave transmission applies to

shock waves caused by explosions and has no impact on water flows, no impact on soil

strength, no impact on soil volume.  (*Id.* 1937).  As Dr. Marr aptly summed, no geotechnical

or geohydrology textbook teaches pressure wave theory for seepage issues in soils or pore

pressure transmission from rising flood waters.  (*Id.* 1938).

Dr. Bea later tweaked his explanation further, suggesting that the value was derived

from "parametric studies"—studies that supposedly were lost, stolen, or damaged beyond

repair, preventing any geotechnical engineer from replicating or evaluating the validity of

these studies.  (Bea Tr. 946-47; *see also* DX-DM-0015-0102-03).  Finally, Dr. Bea testified at

trial that the incompressibility value was based on the fact that *water itself* is

incompressible.  Dr. Bea suggested that the organic clay layer at the EBIA was fluid,

meaning that its compressibility characteristics were based on the incompressibility of

water itself.  (*See, e.g.*, Bea Tr. 1148-51, 1157-59, 1166, 1301, 1431-33, 1440; DX-DM-0015-0104).

None of Dr. Bea's explanations provide a defensible scientific basis for an otherwise empirically invalid input parameter.  There is no geologic or geotechnical validity to Dr. Bea's repeated attempts to characterize the organic clays at the EBIA as exhibiting the physical properties of a literal fluid swamp or marsh that changes its character from inch to inch.[28]  (*E.g.* Tr. 1136-37).  There is no basis, scientific or otherwise, for believing that the organic clay layer ten feet beneath the surface suddenly transformed from clay into a layer of thin pancake batter.  (*Id.* 1137, 1157-59).  As Dr. Silva pointed out, it is common sense that the Corps could not have constructed a levee and floodwall on a liquid layer of soil that behaved like pancake batter.  (*See* DX-DM-0015-0104).  Moreover, if Dr. Bea's characterization of the soil were correct, the entire layer would have been squeezed out into the Industrial Canal, since the weight of the levee and floodwall would have forced the soils to displace.[29]

---

[28] Throughout trial, Plaintiffs insisted on referring to the lower organic clay as a "buried swamp marsh layer," implying that this layer of soil was akin to a hidden, mysterious, and undiscovered world, a literal fluid swamp or marsh hidden from public view.  (*See, e.g.,* Bea Tr. 880, 890, 959, 961 (testifying that the fully saturated "buried swamp marsh layer" was incompressible for purposes of evaluating flow); *id.* 1301 (describing pressure transmission through the "confined fluid swamp marsh deposit.").  The ASTM International classification for this layer of soil, based on empirical properties testing, is organic clay.  The Court viewed a sample of this soil, taken directly from the EBIA, with 157% moisture content.  (Marr Tr. 1925, 2181).  Whatever else may be said about this soil, it was not fluid.
[29] Indeed, Dr. Bea provided testimony to this Court in *Robinson* concerning the "lateral displacement" effect that the weight of a levee can have on soft, fat clay soils beneath its foundation.  Notably, those soils were never described as resembling pancake batter or fluid.  In *Robinson*, Dr. Bea explained the displacement effect as similar to squeezing a tube of toothpaste, with the soft clays being sloughed into the water.  *See In re Katrina Canal Breaches Consol. Litigation*, 647 F. Supp. 2d 644, 653-54 (E.D. La. 2009) *rev'd* 696 F.3d 436 (5th Cir. 2012).  Dr. Timothy D. Stark testified in this case that the organic clays found at the EBIA contained liquid limits that classify them as fat clays.  (Tr. 3468-69, 3471; PX-4767-

In the face of empirical evidence proving that the organic clays were compressible soils that would change in volume during a hydraulic loading event, Dr. Bea's deliberate decision to model those clays as an incompressible media is indefensible.  Simply put, in order to support his conclusion that landside hydraulic uplift pressures developed nearly instantaneously, a condition that any qualified geotechnical engineer knows would not ordinarily manifest in low permeability clays subjected to a short-term load, Dr. Bea had no choice but to select an unrealistic value for compressibility.  This was the only way for Dr. Bea to neutralize the fact that the low permeability clays were incapable of transmitting flow and pressures to the landside during a 30-hour hydraulic loading event such as a storm surge.  By artificially modeling the site conditions to achieve near-instantaneous steady-state conditions, Dr. Bea modeled a condition that did not exist in the real world scenario that developed at the EBIA during Hurricane Katrina.  (Marr Tr. 1943).  Had he modeled it using site-specific values, Dr. Bea, by his own admission, would not have generated the landside uplift pressures needed to support his hypothesis about the mode of failure.  (Bea Tr. 931-34).

**D.     Changed boundary conditions.**  Unrealistic assumptions plagued other important aspects of Plaintiffs' analysis.  As Dr. Stark testified, he reviewed Dr. Bea's computer input files and discovered that Dr. Bea had chosen to model the levee fill on the landside as an incompressible material as well.  (Stark Tr. 3418, 3420-21).  This was an unrealistic assumption because the landside levee fill, located above the groundwater surface, was likely partially saturated, allowing the air present in the voids to be easily compressed.  In fact, by Dr. Bea's own testimony, the levee fill was above the groundwater

0027).  Dr. Bea's testimony concerning the behavior of these organic fat clays in this case does not comport with empirically available evidence.

surface, would not have been saturated, and should not have been modeled as incompressible. (*Id.* 3420; Bea Tr. 1019).  When Dr. Stark changed *just this one parameter*, applying a site-specific compressibility value for just the levee fill and leaving all other parameters from Dr. Bea's analysis the same, including his demonstrably wrong incompressible organic clay, the landside uplift pressures in Dr. Bea's model dissipated almost entirely.  (Tr. 3422-23; DX-DM-1009-0024-28).  By simply changing the levee fill on the protected side to a site-specific, empirically verifiable value, the landside uplift pressures generated in Dr. Bea's models were all but eliminated.  (Tr. 3424).

### E.    Dr. Bea's "Near Breach" McDonough Marine Analysis was NOT a control.

This Court specifically asked Dr. Bea whether or not he had modeled his north and south breach scenarios without any of WGI's excavations to determine whether or not those excavations had any impact on the uplift pressures that Dr. Bea claimed undermined the EBIA floodwall.  (Bea Tr. 1292-94).  Dr. Bea stated, under oath, that his "control" scenario—the one without any excavation penetrating the lower organic clay layer—was his "near breach" scenario at McDonough Marine.  (*Id.*).  He testified that the only difference between his breach scenarios and the "near breach" scenario was that the McDonough Marine borrow pit did not penetrate the lower organic clay.  All other parameters for his "near breach" scenario were, in Dr. Bea's sworn testimony, the same.  (*Id.* 1292-94, 1297, 1447).

This testimony was not accurate.

As Dr. Stark explained, the McDonough borrow pit did pierce the lower organic clay. (Tr. 3428).  During his rebuttal testimony, Dr. Bea himself agreed that photos taken of the borrow pit indicated that the lower organic clay was reached at that site and, in fact, he so

testified in the *Barge* litigation before this same Court, an assertion repeated in published journals bearing his name.  (*Id.* 4131-32, 4134-35).  For this reason alone, Dr. Bea's "near breach" analysis could not be a control scenario.

But Dr. Bea's testimony that the "near breach" model was a control scenario contained other inaccuracies as well.  Dr. Bea's models used different initial gradients at the north and south breach sites than at the McDonough Marine site.  When modeling pore pressures for seepage analyses, it is necessary to take account of the pre-surge groundwater flow conditions.  (JX-01864-0043-44).  Dr. Marr's flow analyses did this, indicating minimal flow gradients at both sites as a result of the groundwater table being at a higher elevation on the canal side than the landside.  (*Id.*; JX-01876-0007; JX-01877-0008).  Very little change occurred with the transient introduction of Katrina's storm surge.  (*Id.*).  Dr. Stark's seepage analyses showed the same.  (Stark Tr. 3419, 3451-52).  Simply put, there was not enough time for surge waters to propagate seepage flows from the canal side to the landside.  (*Id.* 3252).

The major point, however, is this:  while a minimal flow condition naturally existed at the EBIA site before Katrina struck, that flow condition should have been the same across the length of the EBIA and the same in the north breach, south breach, and near breach models.  As Mr. Cobos-Roa testified, he modeled "initial conditions" prior to running the transient analyses through incompressible soils.  (JX-1551-0066, 262:24-263:7).  Dr. Bea's analyses, however, assumed much higher initial gradients at the north and south breaches than at his "control" McDonough Marine "near breach" without any justification, particularly since the McDonough Marine site contained a large, water-filled excavation in closer proximity to the floodwall than the IHNC's location relative to the north and south

breaches.  If any location at the EBIA was susceptible to a higher initial seepage gradient, it would have been at McDonough Marine.  (Stark Tr. 3431; Silva Tr. 3747).

When Dr. Stark attempted to find out why Dr. Bea's models differed so greatly, he discovered that Dr. Bea, in his McDonough Marine "near breach" analysis, had changed the parameters of the boundary conditions and the hydraulic conductivity at the Jourdan Avenue box culvert.  (Stark Tr. 3433-34).  Dr. Bea himself provided or approved all of the boundary conditions in his seepage analyses.  (Bea Tr. 4105; Cobos-Roa Dep., JX-1551-0064, 255:24-256:10).  Dr. Bea also testified that there should not be any difference in the way the Jourdan Avenue canal box culvert was modeled in his various scenarios.  (*Id.* 4113-16).

But as Dr. Stark demonstrated, by simply changing the boundary conditions at McDonough Marine to match the conditions used to model the north breach, the gradients at McDonough Marine substantially increased.  (*Id.* 3429-30, 3433-35; DX-DM-1009-0045).  In addition, Dr. Stark discovered that the hydraulic conductivity of the Jourdan Avenue box culvert and floodside clays differed, without explanation or justification.  When Dr. Stark applied the same parameters used at Dr. Bea's breach scenarios to the McDonough Marine site, the landside uplift gradients in his near breach model mirrored those at the north and south breach.  (*Id.* 3434-35).  The effects speak for themselves: had Dr. Bea truly modeled his "near breach" scenario the same as his breach scenarios, the "near breach" should have been a breach.  (*Id.* 3435-36).  More importantly, had Dr. Bea modeled his breach scenarios using the same parameters and conditions as his "near breach," neither the north nor south breach would have occurred in the manner he concluded.

In short, the "control" scenario Dr. Bea highlighted to this Court was in no way a reliable basis for comparing the potential impact of WGI's excavation work.  Factual inaccuracies aside, the manner in which Dr. Bea modeled his "near breach" site ensured that it would not be.

**F.    Idealized excavations.**  Dr. Bea conceded that the cross-sections that were used by Mr. Cobos-Roa to model the EBIA failures were "idealized" and not based on any specific excavation that penetrated the organic clay layer.  (Bea Tr. 1026-27; 4021, 4060-61).  The most Dr. Bea could say about the cross-sections in his report were that his hypothesized excavations were "approximated" or "simplifications of the actual excavations."  (*Id.* 4021).  In fact, Dr. Bea was never able to identify a single excavation that fit the dimensions or location claimed in his reports.  (*Id.* 4060-61).

Instead, Dr. Bea had Mr. Cobos-Roa base his computer runs in SEEP/W and SLOPE/W on these "idealized excavations."  (*Id.* 1026-27).  Mr. Cobos-Roa admitted that the outputs of these programs are only valid for the site geometry provided by the user.  (JX-1551-0064,254:13-255:23).  In other words, if the cross-sections themselves are not valid, because they do not represent the actual site geometry, then the results of the computer modeling are also invalid.  Dr. Bea's "idealized" cross-sections, therefore, could generate only "idealized" results not reflective of the actual site conditions.

Seeking to avoid the obvious—that Mr. Cobos-Roa's computer models, based on cross-sections with excavations that did not exist, were not relevant or probative because they were not based on competent evidence of any real excavation—Plaintiffs, through Dr. Bea, simply posited that *any* excavation that penetrated through to the organic clay layer was sufficient to support his mode of failure.  And because Dr. Bea himself could not

identify any specific excavation, Plaintiffs sought to meet their evidentiary burden at trial by introducing a series of "Summary Evidence" charts, over Defendants' objections, claiming to "summarize" the excavations that took place on site, including "max depths."

The United States re-urges its objection to the admissibility of Plaintiffs' "Summary Evidence" chart. Federal Rule of Evidence 1006, which permits the contents of voluminous writings to be presented in the form of a chart, contemplates that the summary will be admitted *instead of*, not *in addition to*, the documents that it summarizes. *See United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997). Plaintiffs' chart purports to "summarize" documents already admitted as evidence. Moreover, it was not prepared by a witness available for cross-examination, as required by the rule, *see id.*, but rather by the Plaintiffs' lawyers trying the case. Plaintiffs' chart is nothing more than a summation by counsel suggesting that this Court need only pick one of the excavations shaded in red to make their case for them. Such "written arguments" are not a permissible use of Rule 1006. *Id.*

Moreover, it was clear from testimony at trial that such a chart is useless in the absence of expert testimony or someone with personal knowledge of the excavations themselves. This is because the "depths" of excavations listed in QARs and other documents require a reference point to determine exactly how deep beneath the ground surface they actually reached. (*See, e.g.* Dunbar Tr. 1771-72 (describing how elevation above ground surface and depth of boring must be compared to know how deep below ground surface a boring reached); Stark Tr. 3481-82 (describing need to compare height of spoil pile and depth of excavation to depth of organic clay at any given point to know whether an excavation reached the organic clay layer). Some excavations began well above

ground level, others below.  Further, the depth of the lower organic clay below ground surface was not uniform across the entire EBIA site, varying with the elevation from north to south.  Without a competent witness to testify about the chart and about the excavations that mattered for purposes of Plaintiffs' theory, the chart proves nothing by itself.  Plaintiffs themselves admitted that Dr. Bea was not competent to make these determinations and hoped that their "summary exhibit" would suffice.  (Bea Tr. 1411).

Irrespective of Plaintiffs' attempt to impermissibly use a chart as a substitute for expert or other competent testimony, the purpose for offering it—to try and demonstrate that certain excavations likely penetrated through to the lower organic clay—does not prove anything because there is no truth to Plaintiffs' claim that the organic clay served as a conduit of seepage flows or landside uplift pressures.  The McDonough Marine borrow pit, the largest excavation in the entire EBIA, penetrated the organic clay, was filled with water prior to Hurricane Katrina, and no breach occurred at that site.  As Defendants' geotechnical engineers made clear, even assuming excavations reached the lower organic clay and *remained open*, there is nothing mysterious or magical about the lower organic clay.  Not a single excavation anywhere on site could have conveyed flow or uplift pressure through the organic clay to the landside during Hurricane Katrina's 30-hour storm surge.

**G.**      **"Smoking Guns."**  Notwithstanding that Dr. Bea was unable, in any report or deposition prior to trial, to identify any evidence of an excavation that would have propagated uplift pressures to the landside, Dr. Bea claimed at trial, for the first time, that he had discovered several "smoking guns" in Quality Assurance Reports ("QARs") showing that grid trenching had likely reached the lower organic clay.

As Defendants' experts showed, not a single excavation on the canal side could have transmitted uplift pressures to the landside.  Thus, Dr. Bea's "smoking guns," even if they showed what he claimed they showed, were irrelevant to what caused the EBIA floodwall to fail.

But Dr. Bea's claims about these "smoking guns" served only to demonstrate that Dr. Bea was unable to competently testify about the work WGI performed on the site.  Dr. Bea's tender as an expert did not qualify him to speculate about WGI's work on site and could not substitute for actual, first-hand knowledge of the work itself.  Dr. Bea's attempt to offer speculative and conjectural testimony concerning the work performed on the site should be excluded or ignored.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) ("Admission of expert testimony based on speculative assumptions is an abuse of discretion.").

For example, Dr. Bea claimed that QARs and photographs showed grid trenching at Saucer Marine and Boland Marine clearly exceeding depths of five feet.  (Bea Tr. 1199-1200).  But Lee Guillory, the Corps's Construction Manager who was intimately familiar with the work and the QARs, and who was on site numerous times during the life of Task Order 26, clearly testified that Dr. Bea was mistaken in his claims.  The grid trenches to which Dr. Bea referred were, as Mr. Guillory explained, 2 feet wide by 5 feet deep and set out on a grid roughly 25 feet by 25 feet running north, south, east, and west across all the sites.  (Guillory Tr. 2479).  These trenches were backfilled on the same day they were excavated in order to prevent any rainwater or other contamination from entering the excavation.  (*Id.* 2480-81).  Moreover, the trenches were dug by subcontractors on the site, whose specific instructions were to excavate only five feet—additional excavation would

cost the subcontractor time and money beyond the scope of their contract. (*Id.* 2488). Dr. Bea's attempt to characterize the work differently was inaccurate, was not based on first-hand knowledge, and cannot be resuscitated under the guise of "expertise."

The same holds true of Dr. Bea's other claimed "smoking guns." Dr. Bea claimed, for example, that he came across photos of hay bales in a trench, indicating to him an excavation of at least 10 feet below ground surface that made him "sick to his stomach." (Bea Tr. 1214-15). But Mr. Guillory viewed the same photo, PX-3404-508, knew precisely what the photograph showed from having been on site around the time the photo was taken, and clearly testified how and why Dr. Bea was mistaken. (Guillory Tr. 2448-50).

In sum, because WGI's work on the canal side could not have contributed to the EBIA floodwall failures, there are no "smoking guns" as Dr. Bea claims. All Dr. Bea's "smoking guns" proved was that his opinions in this case rested on speculation and assumptions that were demonstrably untrue. Dr. Bea may be a competent expert on other matters, but his testimony in this case was riddled with unreliable and unsupportable assumptions and methodologies that rendered his conclusions untenable and invalid.

## LAW AND ARGUMENT[30]

### I.   Plaintiffs' Claims are Barred by the Flood Control Act

The Flood Control Act provides in sweeping terms that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. The United States respectfully submits that Plaintiffs'

---

[30] The United States previously has briefed and argued that Plaintiffs failed to properly exhaust their administrative remedies under the FTCA prior to filing suit, and that the FTCA's contractor exclusion precludes imputing any negligence on the part of WGI to the United States. The United States respectfully incorporates by reference its prior briefing on these issues.

damages in this case, which indisputably were caused by flood waters that a federal project could not control, are clearly encompassed within the text of § 702 as it has been construed by the Supreme Court in both *Central Green Co. v. United States*, 531 U.S. 425 (2001), and *United States v. James*, 478 U.S. 597 (1986).  *See Central Green*, 531 U.S. at 431 ("In *James*, we held that the phrase 'floods and floodwaters' in not narrowly confined to those waters that a federal project is unable to control . . . ."); *id.* at 437 ("[W]e . . . hold . . . that it is the text of § 702c, as informed by our holding in *James*, rather than the broad dictum in that opinion, that governs the scope of the immunity from liability for damage caused 'by flood or flood waters.'"); *cf. In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 444 (5th Cir. 2012) (recognizing that "the text of Section 702c could not more broadly preserve immunity").

But even if the reading of § 702c advocated by the United States is not adopted, the construction of § 702c recently adopted by the Fifth Circuit still covers Plaintiffs' damages in this case.  Although it declined to adopt the United States' proffered reading of § 702c, the Fifth Circuit also rejected the construction of the statute which previously had been adopted by this Court.  *See In re Katrina Canal Breaches Litig.*, 696 F.3d at 447 ("Instead of [the district court's] categorical approach, which would have immunity attach only where a flood was caused by a project that had the purpose of flood control, we recognize immunity for any flood control activity engaged in by the Government, even in the context of a project that was not primarily or substantially related to flood control."). [31]

---

[31] In arguing that Plaintiffs' claims in this action are barred under the construction of § 702c recently endorsed by the Fifth Circuit, the United States does not abandon its own proffered reading of § 702c, nor does it endorse or adopt the Fifth Circuit's narrower reading.  Indeed, it is the view of the United States that, because the Fifth Circuit went on to reverse the judgments which this Court had entered against the United States in *Robinson* on the grounds that Plaintiffs' claims were barred by the FTCA's discretionary function exception, the Court of Appeals' discussion of § 702c, including its rejection of the

Applying the Fifth Circuit's formulation, Plaintiffs' claims clearly fall within the ambit of § 702c.  What Plaintiffs have alleged in this case amounts to negligence arising out of flood control activity even if Task Order 26 itself (or the Lock Replacement Project, of which it was a part) was not primarily or substantially related to flood control.  Indeed, the existing IHNC lock was, and still is, part of an integrated system with the LPV floodwalls to its north on both banks of the IHNC.  The IHNC lock joins with the Mississippi River flood protection to its south, and in fact serves as a dam or barricade with its gates closed in some flood control situations.  Furthermore, the New Lock project would involve demolition of the existing lock and portions of that existing flood protection, all to be reconstructed to provide a seamless and integrated flood protection and navigation system.  The south breach, in fact, occurred at an area where the new lock and flood protection would be relocated.  Task Order 26 was an integral part of the New Lock project, which on its face involved flood control activity.  The evidence adduced at trial confirmed that flood control activity was at the core of Plaintiffs' allegations.

### A. The United States is immune because Plaintiffs' damages were caused by alleged negligence primarily or substantially related to flood control activity

Plaintiffs' primary allegation against the Corps was that it failed to perform required geotechnical evaluations of the potential impact WGI's excavations and backfilling might have on the adjacent EBIA floodwall.  Plaintiffs' entire theory is that WGI's activities in the EBIA undermined the ability of the EBIA floodwall to withstand the storm surge that it was designed to withstand.  Had the Corps performed the required geotechnical evaluations, the theory goes, these impacts would have been known and could have been prevented.

Government's proffered reading of the statutory language, was entirely unnecessary to its disposition of the case, and therefore constitutes non-binding dictum.

Explicit in Plaintiffs' allegations is that the Corps's geotechnical evaluations were required precisely because WGI's work was taking place adjacent to the EBIA floodwall, a flood control project structure.  Plaintiffs have repeatedly cited the Corps's policy of evaluating excavations within a certain distance of a floodwall and claimed that the Corps's negligence arose from ignoring this policy when it came to WGI's work on Task Order 26.

But Plaintiffs ignore the very reason the Corps conducts geotechnical assessments of work near a floodwall in the first place.  As Plaintiffs' expert Dr. Rogers testified, the *reason* the Corps's geotechnical branch evaluates excavations near a floodwall at all is to "maintain the integrity of that flood protection system."  (Rogers Tr. 573-74).  The Kansas City Guidelines, which Plaintiffs repeatedly cited to, and upon which Dr. Rogers relied in his report and testimony, specifically state that the reason the Corps performs engineering review of work near a flood control project is to "ensure that any work within or near the flood control unit does not reduce the level of protection and to assure the continued integrity of the flood control system."  (PX-2712-3).

While the Kansas City Guidelines do not apply to the New Orleans District, the Corps's New Orleans District personnel confirmed that geotechnical assessments of work near a hurricane protection floodwall are done for the purpose of ensuring that the floodwall does not lose its surge-fighting capacity.  Indeed, Dr. Grieshaber specifically and *repeatedly* explained that geotechnical evaluations of work near a floodwall are done to ensure that none of the work will adversely affect the ability of the floodwall to withstand the flood condition it was designed to withstand.[32]  In essence, the very activity Plaintiffs

---

[32] *See, e.g.,* Deposition Designations for Dr. John Grieshaber, Corps's 30(b)(6) Representative, DX-02662-0030, 53:07-53:12 ("The way we would evaluate an excavation near the floodwall is to verify that the excavation does not jeopardize the integrity of the

claim the Corps should have engaged in was activity to ensure the integrity of the EBIA

floodwall.   If the Corps failed to do what Plaintiffs allege was required, that failure was

primarily related to flood control activities—the integrity of the floodwall, not WGI's

remediation work—and Section 702c immunity applies.

The same holds true of Plaintiffs' insistence that the Corps should have completed a

new Design Documentation Report, or DDR, to account for any modifications that arose

during the scope of WGI's work on Task Order 26.  The geotechnical evaluations that

Plaintiffs claim should have been in such a DDR—assuming that one was even required for

Task Order 26, which it was not—were geotechnical evaluations showing whether or not

floodwall."); *Id.* 0031-32, 54:07-13, 55:06-08, 10-17 ("We have a process – if we want to talk specifically to walls, we have a process and procedure by which these walls are designed, and when we make that evaluation we make sure that we do not compromise the stability of the walls, which means we do have a procedure we're checking. . . . And we check to make sure that the excavation does not reduce the ability of the wall to carry that loading. . . . So we go back to the design of the wall – and use excavation in the design and see if it in fact impacts the stability of the wall.  So we have -- in order to determine whether or not the excavation is impacting the wall, we have to look at the wall design."); *Id.* 0032, 56:01-06 ("Obviously I'm not making myself clear.  We go back to the design.  The design is based on certain conditions.  We modify those conditions consistent with what that excavation would be and see if in fact that violates the minimum factor of safety of design."); *Id.* 0034-35, 61:01-14 (Q: . . . . "how do you guys know what to do when you evaluate proposed work that's in the vicinity of a floodwall? A: We take the proposed work . . . and see what the impact of the proposed work is on the design . . . The impact of the proposed work on the design of the wall."); *Id.* 0035, 61:21-62:06 ("Q. So it's almost like you're redesigning the wall.  A. You're revisiting the design of the wall.  That's correct.  Q. Right.  Because you designed the wall with certain things in place back when you built it, and now you've got this person who wants to do this work so you're basically reevaluating the design with this new work in place; is that fair enough? A. That's correct.  Correct."); *Id.* 0037, 70:08-14 (Q. " . . . What proposed work would be the kind of work that you guys believe you would need to evaluate to determine whether there's a potential for damage to the flood control structure? A. Anything that would change the loading on the wall."); *Id.* 0047-48, 91:02-10 (Q. "What would the Corps have done to review the impact [of a hole on a flood protection structure]? A. The Corps would have looked at the impact of that hole . . . on the design of that floodwall."); *Id.* 0050, 94:21-95:11 ("Q. And so just walk me through the process . . . . How do you determine whether or not there's no impact on the structure? . . . A. [Y]ou would run the exact same designs that you spoke of earlier. . .  You'd do wall stability . . . and you would check seepage . . . and you would check global stability.").

WGI's work might have an impact on the floodwall.  In other words, Plaintiffs claim that the Corps should have analyzed whether the floodwall that it designed and constructed was being adversely impacted in such a way that it would no longer be able to perform its flood control function.  Any negligence on the Corps's part, whether that negligence is framed as performing the assessment incorrectly or failing to perform the assessment at all, is negligence arising from the Corps's flood control activities and responsibilities.

Notably, the very methods that the Corps uses to perform geotechnical assessments of work near a floodwall are the very same methods that the Corps uses to design floodwalls themselves.  As Dr. Lucia and Dr. Grieshaber testified, the Corps's geotechnical evaluations focus on stability and seepage.  To perform those evaluations, the Corps consults the design documents for the floodwall and analyzes whether the proposed work will have an impact on the design.  To do that, the Corps evaluates whether the work will violate the minimum control line for stability and whether the Lane's Weighted Creep Ratio for factor of safety against seepage and uplift pressure has been adversely impacted.  In other words, the geotechnical evaluations that Plaintiffs claim should have been done did not arise in a vacuum—Plaintiffs have never claimed that WGI's remediation work, had it been performed far from any Corps-designed floodwall, would have required geotechnical evaluations.  The need arises solely because the Corps designed a floodwall near where the work was to be performed.

If the Corps was negligent, that negligence arose out of the Corps's responsibility for ensuring the integrity of the floodwall itself.  Under the Fifth Circuit's construction of 702c, any such negligence is immunized as primarily or substantially related to flood control.

Finally, the work performed under Task Order 26 was a preliminary and necessary component of the Corps's IHNC Lock Replacement Project. (Sykora Tr. 3077; Guillory Tr. 2349-50, 2363-64; Lucia Tr. 2916; JX-1777-0010-15). Remediation of the EBIA was required so that the Corps could dredge by-pass channels enabling ship traffic to pass through the old lock while the new lock and associated flood protection was constructed. (Guillory Tr. 2363-64; JX-1777-0010-15).

The New Lock project, without question, entailed flood control activity. As Mr. Guillory testified, an integral part of constructing the new lock was tying in the existing hurricane protection to the new hurricane protection system of the lock gateway, as well as raising floodwalls south of the new lock to Mississippi River and Tributary flood design parameters. (Guillory Tr. 2349). As part of the New Lock project, the Corps completed detailed DDRs showing how the New Lock would be constructed and how new floodwalls and levees would be constructed. Dr. Lucia explained how the new floodwalls and levees would be constructed and tied-in to the New Lock, showing how the Corps evaluated stability and seepage using the same generally accepted practices and geotechnical principles for evaluating flood control structures as existed in 1966. (DDR No. 3, DDR No. 2, Lucia DX-DM-1005-0014). The New Lock project clearly included flood control, and the Corps's DDRs make clear that the Corps engaged in "flood control activity" during the design process.

Though the Corps's "flood control activity" in DDRs No. 2 and No. 3 is not disputed, Plaintiffs' complaint is that no DDR specifically *re*-evaluated the existing EBIA floodwall to account for WGI's remediation activities as part of the New Lock design and evaluation process. In other words, the Corps's flood control activities during the New Lock project

81

design and evaluation did not go far enough—Plaintiffs allege they should have gone further.  But claiming that the Corps's DDR process did not go far enough cannot meaningfully divorce their allegations against the Corps from flood control activity.  The geotechnical evaluations they claim should have been performed to reevaluate the EBIA floodwall—stability and seepage—are the same flood control activities the Corps regularly undertakes when designing and constructing new flood control projects or evaluating old projects.[33]  Nowhere is the relationship between Plaintiffs' allegations and flood control activity clearer than in Plaintiffs' attempts to use the Corps's post-Katrina reconstruction of the EBIA floodwall, in which sheet piles were driven deeper than originally designed in 1966, to claim that the sheet pile at the EBIA floodwall should have been driven deeper all along.  (*See* Marr Tr. 2208-11).  Section 702c, including the Fifth Circuit's recent interpretation, bars these claims.

### B.  The United States is immune because Plaintiffs' flood damages were caused by deficiencies in the original design and construction

Under any construction of the Flood Control Act, the United States is immune for negligence or deficiencies in the design or construction of the EBIA floodwall itself.  Whether viewed as negligence that resulted in damages from floods or flood waters or damages resulting from flood waters released due to negligence in flood control activities,

---

[33] Plaintiffs claim that a new DDR was required is meritless because the geotechnical evaluations for stability and seepage contained in the 1966 Design Memorandum for the EBIA floodwall were still valid at the time of Task Order 26, and no new evaluation was required.  (Lucia Tr. 2916, 3026).  More importantly, the evidence and testimony clearly showed that none of WGI's activities would have altered or impacted the design assessments for the existing EBIA floodwall.  *See infra* at pp. 100-08.  Tellingly, this conclusion was reached by applying the Corps's methodology for evaluating the integrity of floodwalls for stability and seepage, or the very "flood control activity" Plaintiffs claim the Corps should have engaged in all along.

if the evidence demonstrates that deficiencies in the original design and construction of the

EBIA floodwall caused Plaintiffs' damages, the United States is immune under Section 702c.

Plaintiffs attempted to frame their case throughout this litigation to avoid any

allegation or implication that the EBIA floodwall itself was negligently or deficiently

designed. But the evidence brought forth at this trial conclusively demonstrated that the

EBIA floodwall, in its authorized design, suffered from deficiencies that contributed to its

demise under Katrina's unprecedented storm surge. Indeed, Plaintiffs' own expert, Dr. Bea,

testified that the entire design of the EBIA floodwall was beneath the standard of care from

its very inception.

At the north breach, Dr. Brandon explained that the as-constructed height of the

levee toe was lower than originally designed. This error resulted in lower shear strengths

on the protected side of the levee and directly contributed to a shear failure that initiated

the north breach. Dr. Marr and Dr. Silva confirmed this to be the case. Dr. Brandon and Dr.

Silva further testified that the EBIA design did not contemplate the development of a gap

between the sheet pile and the canal-side levee. Although gap formation was not

understood as a failure mechanism at the time of design, the formation of the gap

indisputably factored heavily in the breach mechanism. Only had the sheet pile been

driven deeper would the floodwall have maintained the stability necessary to resist the

incoming surge after a gap had formed.

Dr. Marr and Dr. Silva further identified a structural defect in the design and

construction of the intersection between the shorter 1969 sheet pile and the longer 1982

sheet pile, which was driven deeper into the ground. This undesirable design flaw placed

far greater stresses on the older, shorter sheet pile than were accounted for in the original

design.  Unsurprisingly, the north breach occurred at this flawed connection point.

At the south breach, this Court heard testimony that only backside erosion

protection or a deeper sheet pile would have provided the stability necessary to prevent

the overturning failure that occurred there.  The original authorized design contemplated

neither, but had these measures been in place, the floodwall might have withstood

Katrina's unprecedented surge.

In addition, the entire floodwall had subsided beneath its design elevation.  No

corrective measures were ever taken to raise the floodwall and levee back to its authorized

design height.  Testimony established that the floodwall failed at the two lowest elevation

points along the EBIA, the two points at which backside scour was likely greatest and

where overturning was all but inevitable as the floodwall lost the resisting force on the

protected side.  Even correcting for the design and construction deficiencies at the north

breach, the subsidence of the floodwall below design elevation combined with a storm

surge that exceeded the standard project hurricane projections would have resulted in

overtopping and failure of the EBIA floodwall.  (Silva Tr. 3697).  Without scour protection

on the landside, failure of the EBIA floodwall was inevitable once water began overtopping

the wall and eroding the resisting soils.  (*Id.*).

Lastly, and perhaps most telling, Plaintiffs' own expert, Dr. Bea, testified that the

EBIA floodwall was negligently designed from its very inception.  He testified that the

failure to drive the sheet pile deeper—to cut off the organic clay layer seen on Design Plate

28—was a negligent act that continued from the time of design through the time that WGI

performed work at the EBIA.  (Tr. 4135-36, 4146; JX-0004, Plate 28).  In fact, Dr. Bea

admitted that the very conduct that he believes the Corps of Engineers should have undertaken in connection with the work performed by WGI—driving a deeper sheet pile to cut off the lower organic clay layer—is the very same conduct that he believes was negligently undertaken during the design of the EBIA floodwall and levee itself.  (*Id.* 4146). This is one of the few points on which Dr. Bea, by his own admission, has been consistent. (*Id.*).  Whether that negligence is framed as negligence in the design or, as Dr. Bea attempted to explain it, negligence in the operation and maintenance of the floodwall through the time WGI performed its work, that negligence is directly related to flood control activity.  (*Id.*).

In short, regardless of how Plaintiffs framed their allegations, there is no escaping that their own expert believes that the Corps's negligence in this case was directly related to the design, operation, and maintenance of the EBIA floodwall itself.  Without question, the immunity conferred on the United States through Section 702c applies to these alleged acts of negligence.

## II.   The Discretionary Function Exception Bars Plaintiffs' Claims that the Corps's Conduct in Designing or Failing to Re-Assess the Design of the EBIA Floodwall was Negligent

Even if § 702c did not bar Plaintiffs' claims, the FTCA's discretionary function exception bars them.

The FTCA specifically preserves the government's immunity for:

> Any claim . . . based upon the exercise or performance or the failure to perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  The discretionary function exception preserves the government's immunity under circumstances where, even though a government employee's actions or

Daneilomissions might be actionable under state tort law, those actions or omissions were within the discretion afforded to the employee by federal statute, regulation, or policy. *See v. United States*, 613 F.3d 559, 566 (5th Cir. 2010).

"The Supreme Court has developed a two-part test for determining whether the federal government's conduct qualifies as a discretionary function or duty." *Freeman v. United States*, 556 F.3d 326, 336-37 (5th Cir. 2009).  First, the conduct must involve "an element of judgment or choice." *Id.* at 337 (*quoting Untied States v. Gaubert*, 499 U.S. 315, 322 (1991)).  "If a statute, regulation, or policy leaves it to a federal agency or employee to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary." *Freeman*, 556 F.3d at 337.

Second, if the challenged conduct involves an element of judgment or choice, a court must determine whether that judgment or choice "is of the kind that the discretionary function exception was designed to shield." *Id.*; *Gaubert*, 499 U.S. at 322-23.  The purpose of the discretionary function exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Gaubert*, 499 U.S. at 323 (*quoting United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).  Therefore, "where there is room for policy judgment and decision, there is discretion of the sort protected by Section 2680(a)." *Id.* Because the exception protects governmental actions and decisions based on considerations of public policy, the Supreme Court has held that the "focus of [this] inquiry is not the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Freeman*, 556 F.3d at 337; *Gaubert*, 499 U.S. at 324-25.

Recently, the Fifth Circuit reversed this Court's decision in *Robinson v. United States*, 647 F. Supp. 2d 644 (E.D. La. 2009), holding that the FTCA's discretionary function exception applied to Plaintiffs' claim that the Corps was negligent in delaying construction of foreshore protection to the banks of the Mississippi River Gulf Outlet ("MRGO").  *In re Katrina Canal Breaches Litig.*, 696 F.3d at 451.  In so holding, the Fifth Circuit squarely rejected Plaintiffs' argument—and this Court's prior ruling—that the Corps's conduct and decisions concerning the timing and construction of foreshore protection involved nothing more than erroneous application of scientific principles, taking that conduct outside the scope of the discretionary function exception.  *Id.*

Instead, the Fifth Circuit, correctly relying on the Supreme Court's guidance in *Gaubert*, re-affirmed that if the government's discretion is grounded in the policy of the regulatory regime, decisions made in the exercise of that discretion are immune, *even if* those decisions may also entail application of scientific principles.  *Id.*  The very existence of a law or regulation allowing a government employee discretion "creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  *Id.*; *Gaubert*, 499 U.S. at 324.  Application of the discretionary function does not turn on whether the actor actually considered any policy implications.  *Id.*  If the decision or conduct is susceptible to policy analysis, the exception applies.  *Id.*

Just as in *Robinson*, Plaintiffs here ask this Court to ignore the discretionary, policy-based considerations that the Corps necessarily must weigh in determining how best to prosecute its Congressionally-authorized civil works and flood control responsibilities.  They ask this Court to focus only on the engineering and scientific principles that

necessarily play a role in determining when and to what extent underseepage might threaten a floodwall, and when and how to prevent underseepage if it poses a risk. But as the Fifth Circuit has now made clear, neither Plaintiffs nor this Court can circumvent the discretionary function exception simply because scientific judgments are involved in the decision-making process. Where the Corps's exercise of discretion is grounded in the policy of the statutory and regulatory regime, as it clearly is in the realm of its flood control responsibilities, its decisions, even when sub-optimal in hindsight, are protected by the discretionary function exception. *In re Katrina Canal Breaches Litig.*, 696 F.3d at 451.

As a threshold matter, it is crucial to identify the governmental conduct that Plaintiffs allege caused their damages. *Freeman*, 556 F.3d at 337 ("it is the nature of the conduct . . . that governs whether the exception applies."). As noted above, Plaintiffs' main allegation is that the Corps failed to perform geotechnical evaluations that would have disclosed that "subsurface deposits supporting the adjacent floodwall" had become "hydraulically connected" to the IHNC, thereby increasing the risk that underseepage and uplift pressures would undermine the EBIA floodwall during a storm surge. (*See* Pls. Pre-Trial Brief, Doc. 20945, pp. 1, 15-16). In other words, the Corps failed to conduct or document an appropriate underseepage evaluation for the foundation soils of the EBIA floodwall, an evaluation that is specifically tied to the Corps's floodwall design.

More transparently, Plaintiffs allege that the Corps's conduct—failing to detect underseepage—was negligent because "[i]f conditions previously understood to exist change because of some project modification, some new, unforeseen discovery, or other event, (*e.g.*, different field conditions are found relative to the *initial design conditions*), a reasonably prudent engineer must *re-evaluate his design* and determine whether these

changed conditions will have an impact on the surrounding environment." (*Id.* 13) (emphasis supplied).  The thrust of Plaintiffs' allegation is crystal clear:  the complained-of conduct is the Corps's failure to properly prosecute its flood control design and maintenance responsibilities by accounting for allegedly new, changed conditions at the EBIA site.  This, indeed, is precisely what Dr. Bea claimed on the last day of trial, candidly opining that the Corps's negligence with respect to WGI's work was the same negligence the Corps should be charged with when they designed the EBIA floodwall: failure to drive a deeper sheet pile to cut-off potential underseepage from the organic clay layer.  (Bea Tr. 4146).  Dr. Rogers agreed that if the Corps erred in evaluating seepage when it designed the EBIA floodwall, that error inhered in the design itself.  (Rogers Tr. 652-53).

Plaintiffs claimed, prior to trial, that several Engineering Manuals cabined the Corps's discretion and required that underseepage be evaluated, rendering the discretionary function exception inapplicable under the first part of the test.  Contrary to Plaintiffs' assertions, their own expert, Dr. Rogers, testified that these manuals provide guidance only, to be considered and used together with the exercise of engineering judgment and discretion.  They do not mandate or require particular methods of evaluation, but merely provide considerations that engineers can use based on the site-specific conditions they encounter.  As Dr. Rogers concisely testified, "All the manuals provide *guidance* for engineering analyses and decisions." (*Id.* 654) (emphasis supplied).  There is no prescribed manner, method, time, place or extent of the underseepage considerations referenced in these manuals.  The Corps's engineers instead must exercise discretion and judgment in determining when and to what extent underseepage might pose

a threat and continue exercising that judgment and discretion in determining whether and

how to prevent that threat if it exists.

But Plaintiffs' reliance on these manuals, misguided though it was for the purpose of

vitiating the Corps's discretion in when and how to evaluate underseepage conditions,

speaks volumes about the true nature of their allegation of negligence against the Corps.

Every manual Plaintiffs relied upon, including those that, on their face, are inapplicable to

hurricane protection levees or floodwalls (such as the manual on dams), addressed

evaluations of seepage in *design*.[34]  Failure to re-assess the EBIA floodwall design is the

conduct at the heart of Plaintiffs' allegations, and the discretionary function exception

clearly applies to such conduct.

Plaintiffs have pointed to no statute or regulation that mandated the Corps to

reassess the design of the EBIA floodwall or, assuming such an assessment were

performed, to reconstruct the floodwall with a deeper sheet pile.  That is because none

exists.  The authorizing legislation for the EBIA floodwall plainly conferred upon the Corps

discretion in how to achieve the authorized level of protection so long as it was

substantially in accordance with the Chief's recommendations to Congress.  Pub. L. No. 89-

---

[34] *See* JX-0046-0001, EM 1110-2-1913: Design and Construction of Levees ("This manual is
intended as a guide for *designing and constructing levees* and not intended to replace the
judgment of the design engineer on a particular project."); JX-0040-003, EM 1110-2-2502:
Engineering and Design, Retaining and Flood Walls ("This manual provides guidance for
the *safe design and economical construction of retaining and flood walls*."); JX-0042-0003:
Engineering and Design, Design of Sheet Pile Walls ("This manual provides information on .
. . *design procedures, and construction consideration* for the selection, design, and
installation of sheet pile walls."): JX-0041-0004, EM 1110-2-1901: Seepage Analysis and
Control for Dams ("This manual presents the fundamental *design principles and guidance*
concerning seepage considerations for design of new dams . . . ."); JX-0038-0007,
Engineering and Design, Confined Disposal of Dredged Material ("This manual provides
guidance for *planning, designing, constructing, operating, and managing*, confined dredged
disposal areas.").

268, 79 Stat. 1073, 1077 (1965).  Consistent with that authorization, the Corps's design for

the EBIA floodwall required balancing the costs, feasibility, and effectiveness of a variety of

possible options with a view toward "preventing loss of lives and damages to property by

hurricanes."  *See generally* Chief's Report, H.R. Doc. 231, 89th Cong. 1st Sess., at 1 (1964).

Such a broad, general goal clearly satisfies the first prong of the discretionary function

exception.  *Freeman*, 556 F.3d at 338 (citations omitted).

 The Chief of Engineers's recommendation was ultimately approved and authorized,

although several modifications were made over time, including modifications to design

elevations as a result of Hurricane Betsy.  *See In re Katrina Canal Breaches Consol. Litig.*, 533

F. Supp. 615, 620-21 (E.D. La. 2008); PX-0422-0009-10.  The design features, including the

sheet pile depth and the decision that no additional underseepage evaluation or protection

was warranted, clearly were authorized policy decisions that the discretionary function

exception was designed to shield.  *Cf. Dalehite v. United States*, 346 U.S. 15, 30 (1953)

(noting that the legislative history of the FTCA's discretionary function exception was

intended to "preclude any possibility that [the FTCA] might be construed to authorize suit

for damages against the Government growing out of authorized activity, such as a flood

control or irrigation project. . . ."); *id.* at 27 (noting that the FTCA's discretionary function

exception was intended to prevent the propriety of discretionary administrative acts from

being tested through the medium of a damage suit for tort and that the same holds true

even for actions not specifically regulatory in nature, such as expenditure of federal funds

or execution of a federal project).

 But the decisions when and to what extent any remedial measures should be taken

in light of changed circumstances that may have rendered the design inadequate are

equally protected by the discretionary function exception.  Dr. Rogers agreed, testifying without reservation that the Corps retained "discretion to do whatever they feel they need to do to maintain the integrity of that flood protection system." (*Id.* 574:10-11).

This Court is well aware of the tortured history surrounding the authorization, planning, development, design, and construction of the LPV system as a whole.  *See In re Katrina Canal Breaches Consol. Litig.*, 533 F. Supp. 2d at 619-628 (discussing the myriad events and circumstances that impacted the decision-making with respect to the outfall canals and finding that the United States was entitled to 702c immunity for breaches of outfall canals and that discretionary function exception barred Plaintiffs' claims of negligence in issuing dredging permits for 17th Street Canal), *aff'd* 696 F.3d 436 (5th Cir. 2012).

The report entitled "Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project," drafted by Douglas Woolley and Leonard Shabman and extensively referenced in this Court's outfall canal decision, lays bare the many "difficult decisions" the Corps was required to make about how best to accommodate new, relevant information into ongoing project design and construction.  *Id.*; *see also* PX-0422-0012-13.  "Concerns about further delaying project completion and for escalating project costs in a budget-constrained environment were significant considerations that played a role in how the District responded to new information."  PX-0422-0013.  Indeed, the LPV project was not even complete at the time Hurricane Katrina struck New Orleans, not to mention that many *completed* reaches of the project, including the EBIA floodwall, were below design grades due to regional subsidence over time since construction.  *Id.* 0011. Faced with growing project costs and a static federal budget spread among competing civil

works projects nationally, the Corps was faced with the unenviable, and indeed, likely

impossible task of deciding what problems to address and how to address them in an

efficient way without compromising engineering reliability.  *See id.* 0013-14.

New, relevant information suggesting the inadequacy of the original project design

streamed in throughout the life of the project, but as the LPV Decision-Making Report

explained:

> [T]he accommodation of new information in project design and construction
> would have required adjustments to ongoing construction activities as well
> as retrofitting project features that had already been constructed. Such
> changes would have significantly increased project costs and implementation
> delays at a time when local concerns about project costs and urgency for
> project protection were paramount, and a stagnant Corps construction
> general budget had to be spread among competing priorities.  It was in the
> context of a history of local sponsors' frustrations over project delays and
> costs, federal and local budget limits, and increasing scrutiny of water project
> investment proposals at the Washington, DC level, that new information
> suggesting the need for project reevaluation and redesign that might take
> years to analyze and get approved was either put aside for later
> consideration . . . or subjected to further study . . . .

*Id.* 0019-20; *see also id.* 0127 (discussing the need for new authorization or post-

authorization change approval to significantly redesign portions of the LPV and decision by

the Corps to await testing of more sophisticated surge modeling before recommending

project design changes).  For the discretionary function exception to apply, the

discretionary policy decisions need only be *susceptible* to policy considerations.  But as the

foregoing makes plain, actual policy considerations abounded in deciding how best to

proceed with all aspects of the LPV project.  In hindsight, a different course of action may

have proved optimal, but an abuse of discretion, no matter how brazen, is still immunized

by the discretionary function exception.

In *National Union Fire Insurance v. United States*, the Ninth Circuit held that the discretionary function exception barred Plaintiffs' claims that the Corps was negligent in failing to discover and correct the subsidence of a breakwater that proved inadequate to the task of protecting Plaintiffs' properties against storm-induced waves at Redondo Beach, California. 115 F.3d 1415, 1418, 1421-22 (9th Cir. 1997). There, the Corps had constructed a 14-foot breakwater in 1958 to keep waves from damaging boats in King Harbor. The design proved inadequate, and the Corps responded by raising portions of the breakwater from 14 to 22 feet. In 1985, the Corps discovered that it made a mistake in its calculations, owing to outdated equipment, and that the 14-foot breakwater portions were two feet below design elevation. Confronted with a choice of raising the subsided portions back to 14 feet—the design elevation—or raising the entire breakwater in one large project to 22 feet, a major engineering project, the Corps left the breakwater as it was and investigated how to accomplish a more substantial improvement. *Id.* at 1417. As the Ninth Circuit put it, the Corps gambled on the weather and lost when a huge storm hit Redondo Beach, causing 21-foot waves to sweep over the breakwater causing significant damage. *Id.*

Plaintiffs' theory of the case in *National Union*, similar to Plaintiffs here, was that the Corps "was negligent in failing to discover the subsidence and in failing to do something about it." *Id.* The United States contended that the discretionary function exception applied. The Ninth Circuit assumed that (1) the Corps should have discovered the error in the breakwater design sooner, (2) the decision to put off curing the defect was a mistake in judgment, and (3) had the breakwater been raised back to 14 feet, Plaintiffs' damages would have been far less. *Id.* at 1418. Assuming all of these things were true, the discretionary function exception still barred Plaintiffs' claims.

94

The Ninth Circuit noted at the outset that the Corps was vested with considerable statutory discretion in determining when and how to commence improvements and projects, such as the breakwater. *Id.* at 1419.  After canvassing the Supreme Court's discretionary function jurisprudence, the Ninth Circuit concluded that no regulation or policy required the Corps to do something that it failed to do.  Moreover, the Corps necessarily engaged in discretionary public policy judgment, including budgetary considerations, when deciding how to address the breakwater, judgments grounded in the statutory regime itself for rivers and harbors improvements. *Id.* at 1421-22.  It was no answer that the government built the breakwater and was, therefore, under a duty to maintain it in a safe condition.  As the Ninth Circuit pointed out, while that may be a correct statement of general tort principles, it has no bearing on the applicability of the discretionary function exception.  Where no statute, regulation, or policy required the Corps to act and the applicable statute conferred discretion on the Corps about whether to do so, the discretionary function applies, regardless of whether the discretionary decision was an abuse of that discretion. *Id.* at 1422.

Like in *National Union Fire Insurance*, Plaintiffs here can cite no statute, regulation, or policy requiring the Corps to act in a particular way to investigate or address the alleged inadequacies in the EBIA floodwall design, regardless of when those alleged inadequacies should have been discovered or fixed.  Like in *National Union Fire Insurance*, the Corps here was, and is, afforded broad statutory authority in how to design floodwalls and how and when to reassess the design of those floodwalls once completed.  Like in *National Union Fire Insurance*, the discretionary function exception immunizes the United States from Plaintiffs' allegations of negligence.

95

Plaintiffs rely on ER 1110-2-1150, Engineering and Design-Engineering and Design for Civil Works Projects, to claim that the Corps was required to complete a new DDR and undertake a new geotechnical evaluation and design of the EBIA floodwall in light of WGI's work on Task Order 26.  But ER 1110-2-1150 on its face "provides policy *guidance* to be used with professional engineering judgement [sic] in the development of engineering products."  (JX-0044-0004). (emphasis supplied); (*see also* Lucia Tr. 2989 ("the preface to this whole document is that this needs to be used in conjunction with engineering judgment").  Indeed, Plaintiffs ignore that the EBIA floodwall was itself already a completed design, set forth in a General Design Memorandum that contained all the relevant engineering evaluations and considerations.  (*See* Colletti Tr. 288).  That design was the product of the discretion Congress afforded the Corps in determining how to achieve the authorized level of flood protection.  The DDR process set forth in ER 1110-2-1150 was intended to *replace* the process previously used by the Corps to develop its engineering products and designs.  (JX-0044-0005).  To even suggest that ER 1110-2-1150 somehow required the Corps to complete a new DDR for the existing floodwall—which is precisely what Plaintiffs suggest was required—is to claim that the Corps was negligent in continuing to rely on the existing design that was the product of its statutory discretion to determine how best to achieve the authorized protection.

No statute, regulation, or policy compelled the Corps to undertake a new assessment of the existing EBIA flood control structure.  No statute, regulation, or policy prescribed when a new underseepage evaluation was required, and no statute, regulation, or policy prescribed how that underseepage evaluation needed to be conducted.  Most importantly, no statute, regulation, or policy mandated that the Corps commit time and resources to

redesigning the flood protection that it had already expended time and resources designing

and constructing pursuant to Congress's direction and with Congress's approval.  Even

assuming that Plaintiffs had shown that site conditions had changed, rendering the existing

design inadequate, no statute, regulation, or policy mandated how or when the Corps

should address the changed conditions.  The design or redesign of flood control structures,

without question, requires a balancing of competing policy considerations.  As the Fifth

Circuit recently held, the fact that redesigning and reconstructing the floodwall to cut off a

potential seepage pathway would have involved application of scientific principles does not

matter where the government's discretion is grounded in the policy of the regulatory

regime.  *In re Katrina Canal Breaches Litig.*, 696 F.3d at 451.  The Corps's prosecution of

flood control, including the EBIA floodwall, which itself was the product of discretionary

decisions authorized by Congress, involves the balancing of many competing policy goals

and how best to achieve them, not just application of scientific principles.  Even if Plaintiffs

are correct—that redesigning the floodwall would have been, in hindsight, the optimal

decision—the Corps's failure to undertake such a project is clearly protected by the

discretionary function exception.  *Id.*

### III.    Plaintiffs Failed to Prove that WGI's Activities were a Cause-In-Fact of the EBIA Floodwall Failures or that the Corps's was Negligent in Approving WGI'S Work

Under the FTCA, the United States may only be held liable if, under the law of the

place where the alleged act or omission occurred, a private party would be held liable

under like circumstances.  28 U.S.C. §§ 1346(b)(1), 2674.  Here, Louisiana law governs.

For liability to be imposed for negligence, Plaintiffs must prove five separate

elements of Louisiana's "duty-risk" analysis: "(1) the defendant had a duty to conform her

conduct to a specific standard of care (the duty element); (2) the defendant failed to

conform her conduct to the appropriate standard of care (the breach of duty element); (3)

the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the

cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the

plaintiff's injuries (the scope of protection element); and (5) the actual damages (the

damage element)." *Daniels v. USAgencies Cas. Ins. Co.*, 92 So. 3d 1049, 1055 (La. Ct. App.

2012) (citation omitted).  "A negative answer to any of the elements of the duty-risk

analysis prompts a no-liability determination." *Id.*

     "The initial inquiry to determine if a party may be liable under the duty-risk analysis

is cause-in-fact." *Lasyone v. Kansas City Southern R.R.*, 786 So. 2d 682, 690 (La. 2001).  "A

finding of no cause-in-fact ends the inquiry into liability." *Theriot v. Lasseigne*, 640 So. 2d

1305, 1310 (La. 1994).  "Cause-in-fact" is usually a "but for" inquiry, testing whether or not

the injury would have occurred "but for" the defendant's alleged substandard conduct.  *Id.*

Where concurrent causes are alleged or implicated, however, Louisiana courts do not

strictly apply the "but for" test, asking instead whether the conduct in question was a

"substantial factor" in bringing about the harm or injury.  *See Westchester Fire Ins. Co. v.

Haspel-Kansas Inv. Partnership*, 342 F.3d 416, 420 (5th Cir. 2003); *Adams v. Traina*, 830 So.

2d 526, 532 (La. Ct. App. 2002).  Under the "substantial factor" test, a party's conduct does

not have to be the *sole* cause of the harm, but it must be a "necessary antecedent" for

liability to attach.  *Adams*, 830 So. 2d at 533.

     Put differently, a Plaintiff meets his burden of proof if it is demonstrated that he

probably would not have suffered injury absent the defendant's conduct.  *Straley v.

Calongne Drayage & Storage, Inc.*, 346 So. 2d 171, 175 (La. 1977).  If Plaintiffs' harm "would

have occurred irrespective of the negligence of the [defendant], then his negligence was not

a substantial factor or cause-in-fact." *See Dixie Drive It Yourself Sys. v. Amer. Bev. Co.*, 137 So.

2d 298, 302 (La. 1962).  In conducting this analysis, counter-factual hypotheses are useful:

"assuming that the conduct of the [alleged] tortfeasor was 'corrected', is it probable that the

plaintiff would still have sustained the damages complained of." *Boteler v. Rivera*, 700 So.

2d 913, 916 (La. Ct. App. 1997).  If the answer is yes, then the defendant's alleged sub-

standard conduct was not a cause-in-fact.  *Id.*

### A. Plaintiffs failed to prove that WGI's work was a necessary antecedent of the EBIA floodwall failures.

Plaintiffs failed to meet their burden of proof that WGI's remediation work, or the

Corps's approval of that remediation work, was a cause-in-fact of either EBIA floodwall

failure.  As the evidence made clear, the mechanism of failure at both the north and south

breaches resulted from factors and conditions entirely separate and unrelated to any work

WGI performed.  In fact and in law, WGI's work was not a necessary antecedent to either

failure.

Indeed, it must be remembered that Plaintiffs' original theory, and the theory

espoused by Dr. Bea and the ILIT team for many years preceding this litigation, was that

WGI's excavations, backfilled with pervious sands, penetrated a highly permeable layer of

soil that permitted massive and pervasive underseepage to destabilize the floodwall.

Geotechnical engineering, however, is an empirically-based science, and thorough

investigations and testing of the soils at the EBIA unequivocally established that no such

permeable soil layers ever existed.  The EBIA instead consists of highly impermeable clays.

This includes the lower organic clay that Plaintiffs focused on throughout trial.

Extensive geotechnical expert testimony established that seepage and underseepage-induced factors were simply not plausible contributors to the EBIA floodwall failures.  Even if WGI had left its excavations *open*, those excavations were bounded by impermeable clays in all directions, preventing any flows or pressures from reaching the EBIA floodwall during the short duration of Katrina's surge.[35]  In the absence of a permeable pathway or sufficient time for a steady state to be achieved between the canal side and landside, no seepage flows and no seepage-induced uplift pressures could have developed on the landside of the floodwall with sufficient force to contribute to the floodwall's demise.  Dr. Bea's premise—that hydraulic pressures from seepage can be modeled independent of flows—does not comport with the laws of soil or fluid mechanics.  Every licensed, practicing geotechnical engineer to testify in this case agreed: seepage flows and pressures are inextricably linked in soil and fluid mechanics.

Despite the overwhelming geotechnical evidence to the contrary, Dr. Bea nevertheless hewed to his conclusion that, in the absence of appreciable flow, the lower organic clay layer transmitted hydraulic pressures to the landside with sufficient force to destabilize the EBIA floodwall.  But as this Court heard, to support his conclusion Dr. Bea had to contrive a seepage analysis divorced from the site-specific, empirically tested and measured properties of the soils at the EBIA.  He had to assume that the organic clay behaved like porous rock, eliminating the volume changes that ordinarily would take many months to occur.  He had to artificially change boundary conditions on the landside, trapping the pressures that resulted from his erroneous incompressible parameters,

---

[35] For example, the McDonough Marine borrow pit was a large excavation within 75 feet of the floodwall.  That excavation penetrated the lower organic clay and was not even backfilled, but rather filled with water.  The floodwall did not fail adjacent McDonough Marine.

artificially creating potentially dangerous gradients that would not have existed had he modeled the problem correctly.  He had to assume that the organic clay behaved like a sand, assigning it an invalid drained strength parameter that, in turn, required a calculation of seepage-induced pore pressures that were both unnecessary and uncalled for had the correct, undrained stability analysis been employed.

As this Court heard, Dr. Bea, for the first time at trial, attempted to justify his analysis by claiming that the organic clay layer was in a fluid state that would behave like water, not soil.  But this Court viewed samples of soils taken from the EBIA, including samples of this organic clay layer.  Not a scintilla of evidence backed Dr. Bea's assertions that the organic clay was either rock-like or fluid.  It was his *ipse dixit* and nothing more. Dr. Bea would have this Court believe that the organic clay layer resembled a hydraulic brake system, where pressure applied to a pedal on one side instantly transmits through the system to the other.  Notwithstanding that such a mechanism requires *some* flow of fluid to generate pressure, it is common sense that a hydraulic brake system is not made of compressible soils.  But as Dr. Silva also pointed out, if there truly is no flow, as Dr. Bea suggested, any uplift pressure translated into upward movement on the landside would reduce uplift pressures to zero.   (Silva Tr. 3821).  In other words, the system would be self-healing in the absence of continuous flows generating continuous uplift pressures.  (*Id.* 3821-22).  Lastly, if there were any merit to Dr. Bea's claims at all, this system would have deployed many times before Hurricane Katrina, as the organic clay layer extends all the way to the Industrial Canal.  Dr. Bea's explanation for why this did not occur is as incredible as his theory for the EBIA floodwall failure:  an impenetrable "skin" of clay sediments

formed over time in the bank of the channel, preventing this hydraulic connection from activating. (Bea Tr. 4035-36).

Moreover, Dr. Bea altogether failed to provide for this Court a true counter-factual situation, or control condition, to demonstrate that WGI's excavations had any appreciable impact on the floodwall. Dr. Bea admitted that he did not analyze and did not model his north and south breach scenarios without WGI's excavations penetrating the organic clay layer that was the *sine qua non* of his failure scenarios. Without such a counter-factual, it is impossible to prove that WGI's work was, in fact, a necessary antecedent to either breach.

Unbowed, Dr. Bea claimed that his "near breach" analysis at the McDonough Marine site was his "control," claiming that he modeled that scenario exactly the same as the north and south breach sites with one crucial exception: WGI's primary excavation at the McDonough Marine site—the borrow pit—was not in direct contact with the critical lower organic clay layer.

But this claim, like many others Dr. Bea made, was untrue. The McDonough Marine borrow pit did penetrate the lower organic clay—in several places. Dr. Bea, in fact, specifically used the borrow pit as an *example* of WGI's work penetrating the lower organic clay in other studies and reports. For this reason alone, the McDonough Marine near-breach site cannot be considered Dr. Bea's counter-factual control scenario.

Dr. Bea's near-breach site, however, was also modeled using different parameters and boundary conditions than his north and south breach failure scenarios. As Dr. Stark testified, he took Dr. Bea's SEEP/W computer input files and meticulously reviewed them to find out how Dr. Bea was able to generate seepage gradients at the north and south breach sites but no appreciable seepage gradient at McDonough Marine. What Dr. Stark

discovered was that Dr. Bea inputted different parameters for his McDonough Marine model that drastically changed the output of the seepage gradients.[36]  Had Dr. Bea modeled his north and south breaches the way he modeled his "near breach" scenario, inputting the same parameters, no uplift pressures would have developed and no breach would have occurred.

In contrast to Dr. Bea's incredible explanation, geotechnical experts for the United States and WGI clearly explained how both the north and south breaches likely developed using well-known, empirically sound, and universally accepted geotechnical analyses. Their testimony and analyses, and the compelling evidence supporting their opinions and conclusions, demonstrated that the EBIA floodwalls likely failed for reasons unconnected to any work WGI performed.  Because WGI's excavations did not cause or contribute to the EBIA floodwall failures, Plaintiffs cannot prove that WGI's work was a "cause-in-fact" or substantial contributing factor to their damages.

At the south breach, neither seepage nor lateral stability was a likely failure mode. Instead, surge waters and waves overtopped the floodwall, which had subsided beneath its design elevation.  Soils on the protected side scoured out, reducing the resisting forces required to keep the wall stable against the weight of the water on the floodwall's face. When the force of the water became greater than the resisting forces, the floodwall and sheet pile overturned.  Only some combination of backside erosion protection or a deeper

---

[36] Dr. Bea, in his rebuttal testimony, was shown screenshots from the SEEP/W modeling performed by Mr. Cobos Roa, and claimed that he had never seen them.  (*See, e.g.* Bea Tr. 4081, 4105).  Later, he attempted to testify about what these screenshots showed and didn't show.  (*Id.* 4152-53). Because Dr. Bea didn't know what these screenshots showed when he was first presented them, his attempt to explain them an hour later strains credulity.

sheet pile to increase stability against overturning would have prevented this failure. WGI's work had no role in this failure.

At the north breach, seepage again was not a factor.  Instead, low lateral resistance on the landside, caused by a construction error that reduced the height of the levee toe from its original design, and the initiation of a "gap" on the canal side, which focused water pressures on the sheet pile tip, caused the floodwall to deform before surge waters reached the top of the wall.  Combined with a structural defect in the connection of the shorter 1969 sheet pile to the longer 1982 sheet pile, the stresses placed upon the 1969 sheet pile and floodwall far exceeded the design condition.  As lateral stability began to fail, the older sheet pile began to pull away from the newer, stronger, more stable sheet pile.  Surge waters eventually broke through, breaking the sheet pile connection and overturning the floodwall.  Even if this failure had not occurred how and when it did, the top of wall at the north breach was lower than any other point along the EBIA.  As Dr. Marr opined, surge waters would have overtopped this section of wall earliest, scouring out resisting soils, and an overturning failure was inevitable.

In fact, the inevitability of failure at the north breach applied equally to the south breach and the EBIA floodwall as a whole.  As this Court heard, the failures at the north and south breach propagated large quantities of water that quickly filled in the landside of the floodwall, creating a tailwater effect that served to provide additional stability to the portions of the floodwall that remained standing, as well as to prevent further deepening of the scour trenches that had been developing at other locations.  Had those breaches not occurred, however, the testimony of Dr. Marr and Dr. Silva established that the subsidence of the wall, combined with Katrina's peak surge elevation, would have resulted in massive

overtopping at various locations along the EBIA floodwall.  The scour trenches formed by this pervasive overtopping easily would have reached depths likely to induce overturning. In other words, even if the north and south breaches had not occurred when they did, *some* portion of the EBIA floodwall was bound to fail, probably at more than one location.  As both Drs. Silva and Marr opined, the only thing that prevented failure of the floodwall at the McDonough Marine site, which happened to be the third lowest elevation along the EBIA floodwall, was the fact that the north and south breaches occurred earlier.

Under Louisiana law, a Plaintiff fails to prove cause-in-fact if he probably would have suffered the same damages even after the alleged tortfeasor's conduct is corrected. *Boteler*, 700 So. 2d at 916.   The EBIA floodwall indisputably failed at its two lowest points. Even assuming that WGI's excavations propagated some minimal hydraulic uplift pressures that hastened the demise of the EBIA floodwall at the north and south breaches, because the EBIA floodwall lacked scour protection on the landside, overtopping and scour erosion would have doomed these locations to failure even if no hydraulic uplift pressures ever developed.  (Silva Tr. 3697-98).  Moreover, if the north and south breaches had not occurred, failure was inevitable at other locations.  In other words, Plaintiffs' damages from floodwaters would have occurred whether WGI's excavations played a role or not.  Under this counter-factual scenario, Plaintiffs' damages were inevitable—the result of a storm surge that far exceeded the surge-resisting capabilities of the floodwall.  (Silva Tr. 3693-3700). Louisiana law does not impose liability on a tortfeasor when that torfeasor's conduct causes no more injury than the *force majeure*, such as a severe weather event, would have caused in its own right.  *See Caldwell v. Let The Good Times Roll Festival*, 717 So. 2d 1263, 1272 (La. Ct. App. 1998).  Because the EBIA floodwall was destined to fail from

overtopping during Katrina's unprecedented surge, Defendants' conduct did not cause any additional harm and liability cannot be imposed.  *Id.*

In sum, applying sound geotechnical principles and analysis, it is clear that WGI's canal side activities were not a necessary antecedent to either the north or south breach. The conditions that contributed to the EBIA failures were conditions independent from any work WGI performed.  Importantly, the conditions that mattered were all inherent in the floodwall design itself or in the soils on the land side of the floodwall, soils that WGI did not disturb during Task Order 26.  Plaintiffs have not met their burden of proving that WGI's work was a "cause-in-fact" of either breach.

## B.  The Corps was not negligent in approving WGI's work.

Under Louisiana law, it is "well settled that a person cannot be held responsible on the theory of negligence for an injury from an act or omission on his part unless it appears that he had knowledge, or reasonably was chargeable with knowledge, that the act or omission involved danger to another."  *Larkin v. U.S. Fidelity and Guaranty Co., et al.*, 258 So. 2d 132, 137 (La. Ct. App. 1972) (citations omitted).  Thus, negligence is defined in Louisiana as "the failure to use such care as is necessary to avoid a danger which should have been anticipated, by reason of which the plaintiff has suffered injury."  *Id.* (citations omitted). Crucially:

> Negligence . . . cannot be predicated upon an act of commission or upon a failure to act where there is no reason to anticipate that injury of any kind might result.  Consequently, it may not be said that reasonable anticipation of injury or danger is required where the injury or danger is unlikely, improbable, impossible, or would occur only under exceptional, unusual, or abnormal circumstances.

*Id.*  "Negligence requires the risk be both unreasonable and foreseeable."  *Bridgefield Cas. Ins. Co. v. J.E.S., Inc.*, 29 So. 3d 570, 573 (La. Ct. App. 2009) (citation omitted).

Plaintiffs' allegations of negligence against the Corps are straightforward—and demonstrably unfounded because they are predicated on acts or omissions where there was no reason to anticipate or foresee the injury.  In essence, Plaintiffs alleged that the Corps, when approving WGI's remediation work under Task Order 26, failed to perform required geotechnical assessments of WGI's excavations and backfilling activities to determine whether or not those activities might undermine the ability of the EBIA floodwall to withstand the storm surge for which it was designed.  Plaintiffs contend that had such an assessment been performed, the Corps, or any other reasonably prudent geotechnical engineer, would have known that the EBIA floodwall's surge resisting capability—specifically its stability and resistance to underseepage—had been compromised by WGI's work, and remedial measures could have been taken to prevent the floodwall's failure during Hurricane Katrina.

Plaintiffs' allegations of negligence fail because the unrebutted expert testimony and evidence presented at trial clearly demonstrated that the Corps exercised reasonable engineering judgment in approving WGI's work.  The EBIA floodwall was not placed at a foreseeably higher risk of failure due to instability or underseepage as a result of WGI's work, and there was no evidence put forth at trial to suggest otherwise.

### 1.   The Corps's Evaluation Process for Work Within 300 feet of a floodwall and Permits

Mr. Gerard Colletti, Assistant Chief of the Corps's New Orleans Operations Division, testified that the Corps's practice and policy is to perform evaluations of excavation work proposed within 300 feet of a floodwall.  (Colletti Tr. 302-03).  If the work is performed by an entity other than the Corps or a Corps contractor, such as WGI, those evaluations are done as part of the Corps's involvement in a permitting process.

As Mr. Colletti explained, the EBIA floodwall was a "completed work" at the time Task Order 26 was carried out and when Katrina struck.  (*Id.* 288).  As a completed project, Orleans Levee District ("OLD") was primarily responsible for its operation and maintenance.  (*Id.* 288, 355).  Pursuant to the Code of Federal Regulations, however, the Corps retains responsibility for evaluating work within 300 feet of the centerline of a levee or floodwall to ensure that the work will not adversely impact the structure.  (*Id.* 346); 33 C.F.R. § 208.10(a)(4), (5) (2005).  To carry out that function, the Corps receives and evaluates permit requests, submitted through OLD, sending the permit request and the proposed work to the appropriate engineering division for review.  If the Corps determines the work to be safe as proposed, a letter of no objection is issued to the Levee District.  If more information is needed, the Corps requests additional information.  (Colletti Tr. 348). Ultimately, however, it is OLD's responsibility to issue a permit.  (*Id.* 352).

But if the Corps itself is to perform the work, or a Corps contractor is hired to do work on the Corps's behalf, the permit process is not implicated.  The evaluation process is similar, but the formality of a permit is not required.  (*Id.* 309, 353).  This is because when the Corps performs work near a floodwall that it designed, those engineering evaluations are completed as part of the process for developing plans and specifications for the work. (*Id.* 353).  As the Corps's representative Dr. John Grieshaber repeatedly testified, the Corps's process for reviewing excavations near a floodwall is to evaluate the potential impact of those excavations against the original design of the floodwall to determine whether those excavations have altered the assessments made in the original design.  *See* supra n.32.  Dr. Grieshaber assumed that someone at the Corps had made such an evaluation of WGI's work, and further testified that the Corps, as an institution, possesses

great institutional knowledge about the geologic and foundational conditions in the New

Orleans area.  (DX-2663-0039-30, 67:06-25, 69:04-09).  Dr. Grieshaber was not, however,

involved in any aspect of Task Order 26.  Although he was familiar with the Corps's process

for evaluating work near a floodwall, and he was willing to assume that WGI's work was

evaluated, he could not say for certain what documentation existed showing that such an

evaluation took place.  (DX-2662-0057, 106:04-18; *id.* 0059, 109:23-110:01, 110:05-13; *id.*

0067, 123:12-124:07).

   The evidence at trial showed that, in fact, a member of Lee Guillory's project team

submitted WGI's proposed work plans to the Corps's engineering division at the outset of

Task Order 26 to obtain geotechnical input.  (Guillory Tr. 2381).  In response to the request,

the engineering division made eight recommendations.  (*Id.* 2381-91; JX-1238).  This was,

in essence, the same review process that would have been undertaken had a permit been

required.

   Nevertheless, the evidence also showed that, although a permit was *not* required,

WGI submitted, through OLD, a permit application that was forwarded to the Corps for

consideration.  (Colletti Tr. 347-48; JX-1260-0012-13).  This letter was forwarded to both

the geotechnical and structural branches of the Corps's engineering division for evaluation.

(Colletti Tr. 348; JX-1260-0006).  Records indicate that Mark Gonski, of the structures

branch, and Jim Richardson, of the geotechnical branch, each spent approximately one hour

reviewing WGI's permit application.  (Colletti Tr. 348-49; JX-1260-0007).  Based upon that

review, the engineering division had minor comments and requested additional

information concerning the utility crossings.  (Colletti Tr. 349-50; JX-1260-0005).  WGI

supplied the requested information, and upon receipt, the engineering division reported no

adverse comments regarding the permit request.  (Colletti Tr. 351; JX-1260-0003).

Accordingly, the Corps issued a letter of no objection to the permit request based upon the

engineering division's review and approval of WGI's plans.  (JX-1260-0001-02).  After the

Corps's review was complete, it was ultimately OLD's decision whether to issue the permit.

(Colletti Tr. 352).

Notably, Mr. Colletti testified that a permit was unnecessary for WGI's work due to

the Corps's involvement in the project, and he did not know why the request was

submitted.[37]  (*Id.* 353).  It is not disputed that OLD did not issue, and WGI did not execute, a

permit for the work performed on Task Order 26.  Nevertheless, the Corps completed the

required review and had no objection to WGI's work, consistent with the Corps's prior

approval of WGI's work plans.  The more relevant issue is whether the Corps's approval of

WGI's work comported with good engineering judgment.  Without question, it did.

### 2. The Corps's approval of WGI's work was based on good engineering judgment that the EBIA floodwall would  not be placed at increased risk of seepage, uplift pressures, or instability

To prove that the Corps exercised good engineering judgment consistent with

applicable geotechnical standards of care in approving WGI's work, the United States

offered the testimony of Dr. Patrick Lucia, a licensed and registered civil and geotechnical

engineer who for the past 20 years has served as Principal and Chairman Emeritus for

Geosyntec Consultants, a geotechnical consulting firm that performs work all across the

world.  (Lucia Tr. 2892-93; *see also* JX-01777-0088-97).

---

[37] Tellingly, Mr. Stevan Spencer, OLD's Chief Engineer for more than a decade before Katrina, testified that he had never, prior to receiving WGI's permit request, received a permit request from the Corps or a Corps contractor for work near a levee or floodwall operated and maintained by OLD.  (Spencer Tr. 482-83).

Dr. Lucia brought his extensive geotechnical experience to bear in reviewing whether or not the Corps's actions in approving WGI's excavations and backfilling activities fell beneath the geotechnical standard of care.  Critical to his evaluation of the standard of care was the failure that Plaintiffs alleged should have been anticipated or would have been prevented had a geotechnical assessment been made.  (Lucia Tr. 2912-15).  Only if the failure itself, whether by seepage or stability, was a failure that geotechnical engineers failed to properly anticipate, assess, or prevent based on the information available to them at the time WGI's work was done would the standard of care have been breached and negligence implicated.  (*Id.* 2915).

As this Court heard, there is evidence that the Corps's engineering division reviewed WGI's work plans, first at the outset of the project and again through the unnecessary permit request. Nevertheless, the most troubling omission in the factual record is that, short of two written communications between the Corps's Engineering Division and the Construction Division, no documentation was ever identified to confirm or refute that the Corps performed a thorough geotechnical assessment of each and every excavation performed by WGI.[38]  More accurately, there was no documentation showing *how* the Corps evaluated WGI's work to ensure that it would not adversely impact the integrity of the EBIA floodwall design.  Plaintiffs' expert, Dr. David Rogers, pointed out this omission. (Rogers Tr. 739).  But only the United States' expert, Dr. Lucia, took the additional and necessary step of asking whether the absence of any documentation showing how these evaluations were performed constituted negligence by reviewing the Corps's approval of

---

[38] These documents were (1) JX-1238, showing the geotechnical branch's recommendations at the outset of the project, and (2) DX-2260, showing the geotechnical branch's response to the Construction Division's request for input for excavations at the borrow pit and under Surekote Road at the McDonough Marine site.

WGI's work and performing the assessment that would have been done had it appeared in writing.  (Lucia Tr. 2908).

There is no dispute that the Corps approved WGI's work plans.  Implicit in the Corps's approval of WGI's work is that the Corps exercised judgment that the work would not compromise the EBIA floodwall.  As Dr. Lucia testified, given that the Corps exercised judgment in approving WGI's work, the relevant question is whether the Corps's exercise of judgment was reasonable under the circumstances, regardless of whether the basis for this judgment was documented or not.  Only if that judgment was exercised negligently—by failing to account for a foreseeable risk that could negatively impact the floodwall's ability to withstand its design condition—would the failure to have documented the assessments be a negligent act.  (*Id.* 2952-53, 3008).  In other words, documentation of the judgment is really a red herring—a well-documented negligent judgment would still be negligent; an undocumented exercise of good, reasonable judgment, by contrast, does not lose its good and reasonable character simply because it was undocumented.  (*Id.* 3008-09).

As Dr. Lucia concisely testified, the Corps's judgment in approving WGI's work, whether the reasons for that judgment were documented or not, never fell below the standard of care.  Employing the same methodology that the Corps itself would have used to evaluate the impact of WGI's excavations on the EBIA floodwall, Dr. Lucia turned to the Corps's design memorandum, which contained all of the original design evaluations and analyses for the EBIA floodwall.   Dr. Lucia looked at every excavation and evaluated whether any of those excavations would have foreseeably impacted the integrity of the floodwall.

Dr. Lucia identified the minimum control line from the 1966 design of the EBIA floodwall, a component of the stability analysis that governed the EBIA floodwall at the time WGI performed its work.  (*Id.* 2944-45; DM-DX-1005-0037-39).  The minimum control line separated the areas where excavations might reduce the stability of the floodwall from areas where excavations would likely pose no impact.  That minimum control line was never compromised.  When WGI's work came close to the line, such as the excavations under Surekote Road at McDonough Marine, the geotechnical branch was consulted and recommendations were issued and followed.  (*Id.* 2919-20).  The Construction Division's request for geotechnical input on those excavations was a reasonable and appropriate exercise of judgment.  Plaintiffs' expert, Dr. Rogers, agreed.  (Rogers Tr. 760-62).  All other excavations were too far away to impact the stability of the floodwall during the design flood condition, or, as in the case of the "wedding cake" and the "sewer lift station" removals, were braced cofferdam excavations, designed by registered engineers, and the floodwall, in effect, would not have even known an excavation was taking place.  (Lucia Tr. 2918-19, 2945-49; DX-DM-1005-0016-20).  Dr. Lucia's opinion that WGI's work would not have foreseeably impacted the stability of the EBIA floodwall, as designed, was never challenged by any expert.

With respect to seepage or underseepage, the Corps exercised reasonable engineering judgment when designing the floodwall, and that same judgment applied at the time of Task Order 26: based on the known soil conditions and the short-term duration of storm surge flood events, seepage was unlikely to pose a threat to the EBIA floodwall and levee.  (*Id.* 2921; JX 0004-0114).  This judgment reflected what the Corps knew about the geologic history of the region—that high rates of Mississippi river sedimentation were

likely to lead to clay deposits throughout the area.  Geotechnical soil borings, both those taken at the time of design in 1966 and in 2011 as part of the joint soils exploration program, confirmed that the soils located in the EBIA, particularly in the foundation soils and on the landside of the floodwall, were and are predominantly impervious clay soils to a depth of almost -50 feet.  Seepage and underseepage require a potential permeable pathway to pose a threat to a levee or floodwall.  The EBIA floodwall, simply put, was built on a clay foundation through which no known permeable pathways existed or should have been identified based on the geologic history and stratigraphy of the area.  (Tr. 2921-23).

Indeed, seepage assessments, and the need for seepage cut-offs, are highly site specific.  As Dr. Grieshaber testified, and as Dr. Lucia confirmed, the Corps's methodology for evaluating potential seepage pathways under floodwalls or other water retaining structures is to perform a Lane's Weighted Creep Ratio if a potential permeable pathway is identified.  (Tr. 2925-26; DX-2662-0051, 96:06-15).   Plaintiffs' expert, Dr. Rogers, explained that Lane's Weighted Creep Ratio is a generally accepted method for evaluating a length of levee or floodwall and determining whether a seepage condition is likely to materialize.  (Rogers Tr. 633-34).  As he put it, a Lane's Weighted Creep Ratio allows a geotechnical engineer to categorize levees into two bins: the "okay" bin and the "we need to take another look" bin.  (*Id.* 634).  This method, in fact, is used by the Corps to design floodwalls and sheet pile cut-offs through permeable layers, as evidenced by both the 1980 Florida Avenue design running east to west from the north end of the EBIA, which identified a potential pathway through a continuous silty layer, as well as by the 2002 design for the new floodwall to be constructed on top of a layer of sand used in the construction of the new lock itself.  In both of these cases, the Lane's Weighted Creep Ratio

114

calculation appears on design plates, showing the depth that sheet piles should be driven to cut off the identifiable potential permeable pathways for seepage.

But the 1966 design for the EBIA floodwall showed no such permeable pathways to cut-off. The foundation and landside soils where seepage paths would exit were all impervious clay soils. To prove the point, Dr. Lucia performed the Lane's Weighted Creep Ratio for the EBIA floodwall, using the same geometry, flood condition, and foundation soils used in the design. He confirmed that seepage would not be anticipated to pose a problem based on the 1966 design document: the EBIA floodwall design fit easily into the "okay" bin. (Tr. 2931-32; DX-DM-1005-0032-33).

Using Lane's Weighted Creep Ratio, an empirically-based, generally accepted methodology—the same methodology that is used by the Corps to evaluate potential seepage and uplift conditions when designing floodwalls—Dr. Lucia computed the ratio for each WGI excavation at Saucer and Boland Marine sites. Not a single excavation would have been anticipated to increase the risk of seepage or hydraulic uplift pressure on the landside levee or the floodwall. (DX-DM-1005-0033). In fact, the further away each excavation was located from the floodwall, the less likely seepage would pose a risk. Dr. Lucia's testimony on this was clear, credible, and unchallenged by any expert.

Most importantly, Dr. Lucia testified that the only way WGI could have increased the seepage risk at the EBIA floodwall would be to disturb the clay soils in the foundation and on the protected side. (Lucia Tr. 2927, 2932-34, 2974-75). Those soils are the only ones that matter when performing a Lane's Weighted Creep Ratio analysis. No soils on the landside were ever disturbed by WGI—all work was confined on the canal side, and the Corps knew that too. Tellingly, when the Construction Division sought geotechnical advice

on stability issues relating to the McDonough Marine Borrow pit, a deep, open excavation within 75 feet of the floodwall, trained geotechnical engineers did not even bother to include to a separate seepage assessment.  This was because none was needed—to a trained geotechnical engineer familiar with the clay soils and geology of the EBIA, it was intuitive that seepage did not need to be analyzed because it was unlikely to pose a threat.[39]  (*Id.* 2939-40, 3007, 3009-10).  Dr. Brandon further confirmed this point when he demonstrated various cross-sections throughout the New Orleans area, showing why deep clay foundations without appreciable sand layers near the surface can be analyzed without seepage analyses of any kind.  (Tr. 3174-81; DM-DX-1008-0022-23.12).

Moreover, any seepage pathways would have or should have been identified in the floodwall design process and cut off.  Lee Guillory, the Corps' Construction Division Manager on the Task Order 26 project, testified that he relied upon the expertise and experience of his colleagues in designing the floodwall and assumed that any permeable layers in the EBIA had been cut off.  (Guillory Tr. 2651-52).  Tellingly, throughout all of the excavations that took place during Task Order 26, Mr. Guillory did not recall ever encountering a sandy or otherwise permeable layer of soil that would have given him pause.  (*Id.* 2653).  To his knowledge, the EBIA consisted mainly of clay soils, and Dr. George Bacuta, a Corps geologist who played an integral role in the project, confirmed Mr. Guillory's understanding, testifying that the EBIA is, in essence, a huge clay area.  (*See* Guillory Tr. 2396, 2652-53; Bacuta Dep., DX 02666-0020, 42:08 (testifying that the EBIA is a "huge clay area.")).

---

[39] Dr. Rogers agreed, testifying that the Engineering Division would have looked at both seepage and stability, but that it would have been a judgment call whether to evaluate seepage further.  (Rogers Tr. 761).

Finally, Dr. Lucia testified that none of WGI's work would have been anticipated to change the EBIA floodwall's ability to resist landside uplift or pore pressures. As previously discussed, some uplift pressures are generated by underseepage, but these uplift pressures clearly were not likely to pose a foreseeable threat in the absence of permeable layers or flow potential. The only pressures left to account for in Plaintiffs' allegations are pore pressures that occur when a mass or load is exerted on the soils forming the resisting force and holding the floodwall upright during a storm surge event.

But these pressures are explicitly accounted for in the design of the levee and floodwall. (Lucia Tr. 2950-51). In the case of the clay soils that formed the levee and held the EBIA floodwall in place, the Corps used undrained shear strengths. This is standard geotechnical practice for clay soils subjected to short-term loading conditions, both in 1966 and today. To account for these pressures, clay soils are tested for strength in a manner that prevents water from exiting the soil structure during lodaing, and the combined ability of the soil and water pressures in the pores to resist shearing is calculated. (*Id.*). Engineers then use that undrained shear strength to calculate the resisting force that the clays will provide against the anticipated hydraulic load. WGI's work did not change the clay soils on the land side of the floodwall and did not change the undrained shear strength of those soils. The shear strength, in fact, likely was higher at the time Hurricane Katrina struck than it was when the floodwall was constructed due to consolidation of those soils over time. (*Id.* 3027). There is simply no merit to any suggestion that the Corps negligently failed to assess the risk that WGI's excavations would change the ability of the EBIA levee and floodwall to resist uplift or pore pressure changes because the design of the floodwall already accounted for that risk.

Indeed, taking Dr. Bea at his word, the standard, generally accepted, and commonly applied geotechnical analyses would not and *could* not have been used to foresee or anticipate the type of failure that he claims occurred.  By his own admission, Dr. Bea's methodology for analyzing the cause of failures in this case was decidedly "uncommon" and contrary to the way geotechnical engineers would have analyzed the problem at the time Task Order 26 was carried out.  By his own admission, Dr. Bea's analysis was a "eureka" moment, a once-in-a-lifetime kind of discovery that geotechnical engineers would never have considered until that moment had occurred.  Since that moment did not occur until 2008, it simply could not have been the established standard of care in geotechnical practice at the time the work in this case was carried out.

In sum, WGI's work in the EBIA posed no foreseeable risk of destabilizing the integrity of the EBIA floodwall as designed, either due to seepage or stability, at the time that work was carried out.  The Corps's approval of WGI's work, therefore, cannot be deemed negligent under Louisiana law.

## DAMAGES

For the foregoing reasons, the United States is immune from suit and Plaintiffs are not entitled to damages.  Even if the United States were not immune, Plaintiffs are not entitled to damages from the United States because they failed to prove either causation or negligence.  Nevertheless, pursuant to this Court's October 5, 2012 order, Doc. 21090, the United States herein incorporates and adopts by reference Defendant WGI's Post-Trial briefing on the appropriate calculation of Plaintiffs' damages based on Louisiana law and the evidence presented at trial.

Three additional legal points, however, warrant mention.  First, the United States is not, under any circumstance, responsible for any of Plaintiffs' damages caused by flood waters emanating from levee breaches along the MRGO, also known as Reach 2 of the LPV, during Hurricane Katrina.  *See In re Katrina Canal Breaches Consol. Litig.*, 696 F.3d 436 (5th Cir. 2012).  Second, should this Court impose liability, Louisiana law recognizes only several liability in awarding damages.  Accordingly, the United States may only be held liable for damages proportionate to its percentage of fault and is not jointly liable for damages attributed to the fault of another, including fault attributable to non-parties.  *See* La. Civ. Code Ann. art. 2324(A)-(B) (1996); *Dumas v. State*, 828 So. 2d 530, 537 (La. 2002).

Lastly, the United States re-urges, through its prior briefing to the Court, that any award Plaintiffs receive in this action must be off-set by the dollar amounts identified in the below chart that they received from the Federal Emergency Management Agency ("FEMA") and the Louisiana Road Home Program ("LRHP") for their alleged damages sustained during Hurricane Katrina.  *See* Doc. 21001.[40]  Failure to credit the United States for an off-set based on federal monies already received for the damages claimed by Plaintiffs in this tort action would result in the United States paying twice for the same injury, contrary to the Supreme Court's direction in *Brooks v. United States*, 337 U.S. 49, 53 (1949).

---

[40] The United States recognizes that the Court previously ruled "[t]hat the defendants are not entitled an offset for the assistance Plaintiffs received from charitable, government or insurance proceeds recovered unless the funds are insurance funds for damages other than the flood damages claimed herein."  Doc. 21021, p. 7.  The United States wishes to preserve this argument for further review, if necessary, with the evidence now established per the offer of proof at trial.  *See* United States' Offer of Proof No. 1 (Tr. 3653:4).  That evidence establishes the following total off-sets for each Plaintiff as follows.  Ethel Mae Coats: $85,712.79; Kenneth & Jeannine Armstrong: $85,263.89; Fred Holmes: $38,966.18; Alvin Livers: $147,991.52; Clifford Washington: $150,000.

**CONCLUSION**

For the reasons set forth above, the United States is immune under both § 702c of the Flood Control Act and the FTCA's discretionary function exception, requiring that Plaintiffs' complaint be dismissed for lack of jurisdiction.  Alternatively, for the reasons set forth above and incorporated herein, the Plaintiffs failed to prove that the Corps committed any negligence in allowing WGI's work on Task Order 26 to proceed and additionally failed to prove that WGI's work caused or contributed in any way to the EBIA floodwall failures on August 29, 2005.  Judgment must be entered against Plaintiffs and in favor of the United States.

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

/s/ Conor Kells_____
CONOR KELLS
Trial Attorney, Torts Branch
ROBIN DOYLE SMITH
RUPERT MITSCH
Senior Trial Counsel, Torts Branch
JOHN A. WOODCOCK
JAMES F. MCCONNON, JR.
Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
Conor.Kells@usdoj.gov

Attorneys for the United States

120

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served upon all counsel of record by ECF.


/s/  Conor Kells