UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * * | CIVIL ACTION<br><br>NO. 05-4182 |
| PERTAINS TO:  MRGO | * * * * * * | SECTION "K" (2)<br><br>JUDGE DUVAL<br><br>MAGISTRATE WILKINSON |
| * * * * * * * * * * * * * * * * * * * * * * * * * | * |  |

## WASHINGTON GROUP INTERNATIONAL, INC.'S POST-TRIAL BRIEF

William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
Maggie A. Broussard, 33033
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:  (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher N. Thatch
Julia L. Cronin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

*Attorneys for Washington Group International, Inc.*

**<u>TABLE OF CONTENTS</u>**                                              **Page**

WASHINGTON GROUP INTERNATIONAL, INC.'S POST-TRIAL BRIEF............................ i

INTRODUCTION ........................................................................................................... 1

I.      BACKGROUND FACTS REGARDING WGI'S WORK IN THE EBIA ............ 3

    A.    The Corps Designed and Engineered the Lock Replacement Project ........ 3

        1.    The Corps designed the proposed bypass channel through the EBIA ..........................................................................................3

        2.    The Corps evaluated the project's impact on existing flood control structures........................................................................4

        3.    The Corps hired WGI to clear and remediate the EBIA under the supervision of its own engineers........................................5

    B.    Throughout the Project, the Corps Maintained Control of Engineering Decisions Relating to the Levee/Floodwall ................................................ 8

        1.    The Corps instructed WGI regarding levee/floodwall precautions ........................................................................................8

        2.    Mr. Guillory sought geotechnical engineering advice, when needed, from the Corps' experts, not from WGI .............................8

II.     WGI DID NOT BREACH ANY DUTY OWED TO PLAINTIFFS FOR THE HARM AT ISSUE (**Question 6.b.**)............................................................... 9

    A.    WGI Had No Duty to Plaintiffs With Respect to the Unknown and Attenuated Risks That Allegedly Caused Their Harm. ........................... 11

    B.    WGI Had No Duty to Perform a Geotechnical Engineering Analysis. .... 14

    C.    WGI Did Not Breach the Applicable Duty of Care Pursuant to its Contract With the Corps ............................................................................................ 18

    D.    Failure to Obtain an OLD Permit Cannot Supply the Missing Link ........ 22

    E.    WGI Is Immune from Liability Pursuant to the Government Contractor Defense ....................................................................................................... 22

    F.    WGI Is Immune From Liability Pursuant to La. R.S. 9:2771.................. 23

    G.    WGI's Percentage of Fault, If Any, Is Minimal. ..................................... 24

III.    Causation: WGI's Excavations Were NOT a Substantial Cause of the EBIA Breaches.................................................................................................... 25

    A.    The Actual Soil Properties in the EBIA *Prevented* the Failure Modes Plaintiffs Claim. ....................................................................................... 26

        1.    Dr. Bea's use of an incompressible soil skeleton violates soil mechanics fundamentals (Question 6.d.C.6)). .......................27

        2.    Consequential uplift pressure would not be possible without flow through the soils in the EBIA levee and under its floodwall. (Question 6.d.C.10)). ...............................................33

        3.    The actual properties of the soil units in the EBIA precluded consequential pore pressures from being transmitted laterally. (Question 6.d.C.7)) ......................................35

        4.    Hydraulic conductivity and/or resulting uplift pressure did not contribute to either the North or South Breach. (Questions 6.d.C.1) & 6.d.D.1)). ...................................................38

5.     The soil units were properly analyzed by defense experts in an undrained condition. (Question 6.d.C.3))....................................46

6.     The post-Katrina piezometer readings do not bolster Dr. Bea's flawed hydraulic conductivity theories. (Question 6.d.C.9)) .....................................................................................50

B.    The Actual Excavations That WGI Performed in the EBIA Do Not Match Critical Assumptions In Dr. Bea's Flawed Flow and Stability Analyses and Opinions. ........................................................................................ 53

1.     WGI's excavations – whether they reached the organic clay layer or not – had no impact on the failures in the EBIA. (Questions 6.d.C.4) & 6.d.C.11))....................................................53

2.     Dr. Bea's flow and stability analyses are wholly unreliable because he modeled features and geometry at the EBIA that did not exist. (Question 6.d.C.5))....................................................55

IV.    Defendants Have Shown The Far More Likely Causes for the EBIA Floodwall Failures.............................................................................................................. 72

A.    The Massive Katrina Storm Surge Exceeded the Design Criteria for the Floodwalls at the EBIA........................................................................... 72

B.    The Formation of a Tension Gap on the Canal Side of the EBIA Floodwall Protection Structure Contributed to the North and South Breach............ 76

C.    Overtopping and Resulting Scour Erosion Was a Substantial Cause of the EBIA Breaches.  (Question 6.d.A.)........................................................... 81

1.     Background ...........................................................................82

2.     Wave propagation in the IHNC ...........................................83

3.     Principles of wave overtopping ...........................................86

4.     Waves in the IHNC during Hurricane Katrina ..............................87

5.     Floodwall failures at the north and south EBIA breaches.......90

D.    Structural Defects at the Connection Between the 1960s and 1980s Flood Protection Systems at Boland Marine Contributed to the North Breach (Question 6.d.B.1)) ...................................................................................... 99

1.     Differing sheetpile lengths and faulty transition design ...............99

2.     Faulty weld...........................................................................102

V.    DAMAGES (Question 6.e.)............................................................................104

A.    Plaintiffs Have the Burden of Proving the Damages Attributable to WGI. .................................................................................................................. 105

B.    The Plaintiffs Failed to Segregate Damage Due to IHNC Floodwaters from Other Causes. .................................................................................. 105

1.     Because he failed to isolate IHNC-related damage, Mr. Taylor's estimates exaggerate Plaintiffs' repair and replacement damages............................................................107

2.     Defendants' expert properly calculated Plaintiffs' damages attributable to IHNC floodwaters.................................................109

C.    Diminution in Value Rather than Replacement Cost Is the Appropriate Measure of Damage to Plaintiffs' Residences. ....................................... 110

1.     Louisiana law does not allow recovery of repair or replacement costs for property already sold. ...............................111

      2.     Ability to pay for repairs does not determine recovery. ..............112

      3.     Plaintiffs' expert failed to consider value diminution for Plaintiffs Armstrong, Holmes, and Livers. ..................................113

D.     Plaintiffs Overvalue the Lost Contents of their Dwellings.................... 115

      1.     Mr. Taylor failed adequately to verify Plaintiffs' lists of contents. ....................................................................................115

      2.     Plaintiffs fail to account for depreciation....................................117

E.     Plaintiffs Overestimate Additional Living Expenses............................. 118

F.     Plaintiffs Failed to Prove Claims for Inconvenience. ............................ 120

## <u>TABLE OF AUTHORITIES</u>

**Page**

C<span style="font-variant:small-caps">ASES</span>

*ACORN v. U.S. Army Corps of Eng'rs*,
No. Civ. A. 00-108, 2000 WL 43332 .................................................................................3

*Barabay Property Holding Corp. v. Boh Bros. Constr. Co*,
991 So. 2d 74 (La. Ct. App. 1 Cir. 2008)..........................................................................23

*Black v. Gorman-Rupp*,
791 So.2d 793 (La. Ct. App. 4 Cir. 2001)....................................................................15, 16

*Borden, Inc. v. Howard Trucking Co.*,
454 So. 2d 1081 (La. 1983) ............................................................................................105

*Boyle v. United Tech. Corp.*,
487 U.S. 500 (1988).........................................................................................................22

*Bradley v. Allstate Ins. Co.*,
620 F.3d 509 (5th Cir. 2010) .........................................................................................118

*Brown v. Williams*,
850 So.2d 1116 (La. Ct. App. 2 Cir. 2003)..............................................................117, 118

*City of Alexandria v. Ratcliffe Contsr. Co.*,
95 So. 3d 1076, 1079 (La. Ct. App. 3 Cir. 2012)..............................................................18

*Cleco Corp. v. Johnson*,
795 So.2d 302 (La. 2001) ................................................................................................12

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*,
833 F.2d 65 (5th Cir. 1987) ......................................................................................11, 13

*Crockett v. Cardona*,
713 So. 2d 802 (La. Ct. App. 4 Cir. 1998)........................................................................25

*Dumas & Assocs., Inc. v. Lewis Enterprises*,
704 So2d 433 (La. Ct. App. 2 Cir. 1997)..........................................................................18

*Fredericks v. Daiquiris & Creams of Mandeville, L.L.C.*,
906 So.2d 636 (La. Ct. App. 1 Cir. 2005).........................................................................12

*Gavagan v. United States*,
955 F.2d 1016 (5th Cir. 1992) ...................................................................................10, 11

*Gleason v. City of Shreveport*,
393 So. 2d 827 (La. Ct. App. 2 Cir. 1981)........................................................................26

*Gray v. Security Storage & Van Co.*,
    26 So. 2d 399 (La. Ct. App. Orleans 1946) ......................................................117

*Hanks v. Entergy Corp.*,
    944 So. 2d 564 (La. 2006) ...................................................................................25

*Hanna-Abbington-Alexandria, Inc. v. Budd Constr. Co.*,
    487 So.2d 743 (La. Ct. App. 3 Cir. 1986) ...........................................................21

*Harrell v. Genco*,
    671 So. 2d 530 (La. Ct. App. 1 Cir. 1996) ...........................................................25

*Harris v. Williams*,
    679 So. 2d 990 (La. Ct. App. 2 Cir. 1996) ...........................................................21

*Hornsby v. Bayou Jack Logging*,
    902 So. 2d 361 (La. 2005) .................................................................................111

*In re Capco Energy, Inc.*,
    669 F.3d 274 (5th Cir. 2012) .............................................................................15

*In re Great Lakes Dredge & Dock Co.*,
    624 F.3d 201 (5th Cir. 2010) .............................................................................13

*In Re Katrina Canal Breaches Consol. Litig.*,
    647 F. Supp. 2d 644 (E.D. La. 2009) ................................................................117

*In re Signal Int'l, LLC*,
    579 F.3d 478 (5th Cir. 2009) ................................................................11, 12, 13

*Istre v. Fidelity Fire & Cas. Ins. Co.*,
    628 So.2d 1229 (La. Ct. App. 3 Cir. 1993) .........................................................12

*Jarreau v. Hirschey*,
    650 So. 2d 1189 (La. Ct. App. 1 Cir. 1994) .......................................................110

*Jones v. Lawrence*,
    940 So.2d 34 (La. Ct. App. 2 Cir. 2006) .............................................................22

*Khalimsky v. Liberty Mut. Fire Ins. Co.*,
    No. 07-8959, 2009 WL 982641 (E.D. La. Apr. 13, 2009) ...................................118

*Lacombe v. Greathouse*,
    407 So.2d 1346 (La. Ct. App. 3 Cir. 1981) .........................................................18

*Lake D'Arbonne Props., L.L.C. v. Digco Util. Constr., Inc.*,
    949 So.2d. 590 (La. Ct. App. 2 Cir. 2007) ..........................................................21

*Loupe v. Circle, Inc.*,
　514 So. 2d 269 (La. Ct. App. 5 Cir. 1987).............................................................26

*Maloney v. Oak Builders, Inc.*,
　224 So.2d 161 (La. Ct. App. 4 Cir. 1969)..............................................................21

*Maryland Cas. Co. v. Rittiner*,
　133 So. 2d 172 (La. Ct. App. 4 Cir. 1961)...........................................................112

*McDonald v. Illinois Central Gulf R.R. Co.*,
　546 So. 2d 1287 (La. Ct. App. 4 Cir. 1989).........................................................120

*McGill v. Republic Fire & Cas. Ins. Co.*,
　No. 07-4025 2008 WL 4792720 (E.D. La. Oct. 28, 2008) ....................................118

*Melerine v. Avondale Shipyards, Inc.*,
　659 F.2d 706 (5th Cir. 1981) ................................................................................22

*Miller v. Keal*,
　694 So.2d 569 (La. Ct. App. 2 Cir. 1997).............................................................22

*Mitchell v. Eureka Chem.*,
　No. 07-510, 2008 WL 2597907 (E.D. La. June 25, 2008)......................................22

*Moffitt v. Sewerage & Water Bd. of New Orleans*,
　40 So. 3d 336, 344 (La. Ct. App. 4 Cir. 2010).....................................................22

*Mossy Motors, Inc. v. Sewerage & Water Bd. of the City of New Orleans*,
　753 So. 2d 269 (La. Ct. App. 4 Cir. 1999)..........................................................111

*Napolitano v. F.S.P., Inc.*,
　797 So.2d 111 (La. Ct. App. 4 Cir. 2001)............................................................120

*New Orleans Unity Soc. of Practical Christianity v. Standard Roofing Co.*,
　224 So. 2d 60 (La. Ct. App. 4 Cir. 1969).............................................................24

*Norfleet v. Lifeguard Transportation Service*,
　934 So.2d 846 (La. App. 4 Cir. 2006) ..................................................................24

*Pearce v. L.J. Earnest, Inc.*,
　411 So. 2d 1276 (La. Ct. App. 3 Cir. 1982).........................................................23

*Perkins v. Entergy Corp.*,
　782 So. 2d 606 (La. 2001) ..............................................................................25, 26

*Pinsonneault v. Merchants & Farmers Bank & Trust Co.*,
　816 So.2d 270 (La. 2002) ...................................................................................10

*Prunty v. Arkansas Freightways, Inc.*,
  16 F. 3d 649 (5th Cir. 1994) .......................................................................105

*Rando v. Anco Insulations Inc.*,
  16 So. 3d 1065, 1086 (La. 2009) .............................................................11, 25

*Roberts v. Benoit*,
  605 So.2d 1032 (La. 1991) ................................................................ *passim*

*Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co.*
  618 So. 2d 874 (La. 1993) .................................................................111, 113

*Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*,
  135 F.3d 984 (5th Cir. 1998) .....................................................................105

*Tex-La Properties v. South State Ins. Co.*,
  514 So. 2d 707 (La. Ct. App. 2 Cir. 1987)...................................................24

*Toston v. Pardon*,
  874 So. 2d 791 (La. 2004) ...........................................................................25

*Weill Construction Co. v. Thibodeaux*,
  491 So.2d 166 (La. Ct. App. 3 Cir. 1986)..............................................15, 16

*Yocum v. City of Minden*,
  649 So.2d 129 (La. Ct. App. 2 Cir. 1995)...................................................15

## STATUTES

La. R.S. 9:2771 ..............................................................................................23, 24

Louisiana Civil Code Article 2315 ......................................................................9

Article 2323 of the Louisiana Civil Code ..........................................................24

River and Harbor Act of 1956, Pub. L. No. 84-455, 70 Stat. 65 ........................3

Water Resources Development Act of 1986, Pub. L. No. 99-662, § 844(a)-(b), 100 Stat.
  4082, 4177...................................................................................................3

## OTHER AUTHORITIES

Wex S. Malone, Ruminations on Cause-In-Fact, 9 Stan. L. Rev. 60, 73 (1956)...........13

Restatement (Second) of Torts §929, cmt. b......................................................111

Dan B. Dobbs, The Law of Torts §§ 170-176 (West 2000) .............................110

## <u>INTRODUCTION</u>

As this Court has previously recognized, Washington Group International, Inc. ("WGI") worked at the East Bank Industrial Area ("EBIA") site under the close oversight of the Army Corps of Engineers and pursuant to detailed Corps-approved specifications. The Corps had spent years studying the Lock Replacement Project before it hired WGI, and throughout the process it applied its own well-recognized geotechnical expertise when issues arose regarding the integrity or stability of the nearby levees. Simply put, the Corps hired WGI to do a job – demolition and environmental remediation in the EBIA site – and WGI did not thereby become a guarantor for the aging levee system that the Corps had designed, built, and maintained for decades. Testimony during this three-week trial showed that WGI did its work carefully and completely to the Corps' satisfaction. While Plaintiffs' experts may now second-guess what WGI did, there is no competent evidence that WGI's work was substandard or that any contractor in WGI's position would have done anything differently. Indeed, the extensively detailed and technical expert testimony on both sides belies any notion that a contractor in WGI's position, working pursuant to Corps-approved specifications, could have foreseen the attenuated chain of underseepage, hydraulic conductivity, uplift pressure and mis-applied geotechnical engineering theories that Plaintiffs' causation expert has, at various times, claimed might have led to the levee and floodwall breaches Plaintiffs blame for their damages.

In fact, the testimony at trial from no less than four eminent geotechnical engineers persuasively demonstrated that WGI's work *did not* cause those breaches. Plaintiffs' expert testimony is complicated, not least because it has changed at every turn, but primarily because it is loaded with violations of the basic principles of geotechnical engineering and soil mechanics. Application of these basic principles leads to the inescapable conclusion that WGI's work could not and did not cause the levees and floodwalls to fail. As detailed at length below, Plaintiffs' theory

relies on numerous counterfactual assumptions and faulty result-driven analyses. The faithful application of these basic principles shows that the soil characteristics of the EBIA actually prevented the failure modes Plaintiffs theorize. A storm surge beyond the design criteria for the floodwall coupled with key design flaws, and not WGI's work, caused the levees tragically to fail. The Court has made clear that proper scientific theory is what will decide the causation issues in this case,[1] and it can be seen through Plaintiffs' cross examination of Defense experts that Plaintiffs' case does not rely on proper scientific theory.

That the Plaintiffs suffered damage as the consequence of two breaches in the 1966-era floodwall – though not to the extent postulated by their damages expert – is of course true. But there is no factual or legal basis to hold WGI responsible, simply for the unfortunate coincidence that it worked near the floodwalls in the years prior to Hurricane Katrina. For these reasons, judgment should be granted in favor of WGI.

This post-trial brief, submitted in accordance with the Court's order of October 5, 2012, (Doc. 21090), hereinafter referred to as the "Briefing Order," addresses the issues raised in the Briefing Order[2] and others touching on WGI's defenses as follows. Section I provides a brief statement of background facts. Most of the pertinent facts, however, are set out in the argument to which they relate. Section II addresses the scope of WGI's duty of care, and whether WGI breached that duty. It also addresses the government contractor defense, statutory immunity, and comparative fault. Section III addresses the numerous flaws in Plaintiffs' causation theory. Section IV explains the best scientific explanation for the levee/floodwall failures. Finally, Section V addresses damages. Also attached as Exhibit A are a set of correlation tables, one for each defense expert, that will assist the Court to cross reference the Defendants' expert witness summary direct Power Point presentations to the testimony at trial.

---

[1] Silva Tr. at 3886:12-18.
[2] For ease of reference, WGI has identified the questions from the Briefing Order in the corresponding headings.

# I.    BACKGROUND FACTS REGARDING WGI'S WORK IN THE EBIA

## A.    The Corps Designed and Engineered the Lock Replacement Project

### 1.    The Corps designed the proposed bypass channel through the EBIA

Congress twice authorized the U.S. Army Corps of Engineers ("Corps" or "USACE"), in 1956 and again in 1986, to construct a new navigation lock to replace the original IHNC lock, built in 1923.[3]    Congress gave the Corps discretion to determine both when construction would be "economically justified" and what the "type, dimensions, and cost estimates" of the project should be, as well as the precise location and design of the lock project.[4]    By March 1997, the Corps compiled its recommendations and analysis in a nine-volume Final Evaluation Report ("1997 Evaluation Report"), which included analysis of the alternatives considered, an Environmental Impact Statement, a Community Impact Plan, Engineering Investigations, and other assessments.[5] The Secretary of the Army ultimately approved the Lock Replacement Project in 1998, after which Congress appropriated funds for construction.[6]

Because construction would shut down a vital link to the GIWW for at least five years, the Corps planned to dredge a temporary two-way bypass channel in a 32-acre industrial area between Claiborne and Florida Avenues, west of the floodwall located between Surekote Road and Jourdan Avenue, and east of the IHNC (the "East Bank Industrial Area" or "EBIA").[7]    The Corps proposed two 110-feet wide channels separated by a nine-foot wide sloped area, which together would occupy – and submerge – about two-thirds of the EBIA.[8]    Before dredging could begin, however,

---

[3]    Joint Pretrial Order (Doc. 20920), Uncontested Fact Nos. 22-27 (hereinafter "Uncontested Facts").

[4]    River and Harbor Act of 1956, Pub. L. No. 84-455, 70 Stat. 65; Water Resources Development Act of 1986, Pub. L. No. 99-662, §844(a)-(b), 100 Stat. 4082, 4177; *see* Uncontested Fact Nos. 25-27, 51.

[5]    *ACORN v. U.S. Army Corps of Eng'rs*, No. Civ. A. 00-108, 2000 WL 43332, at *7; JX-0022-003 to -0011 (1997 Eval. Report, Vol. 1).  Mr. Gerald Dicharry, Senior Project Manager for the Lock Replacement Project, supervised the Corps' preparation of the 1997 Evaluation Report.  Uncontested Facts Nos. 29, 52.

[6]    Uncontested Fact No. 56; JX-1226 (Record of Decision).

[7]    *See* Uncontested Fact No. 32.

[8]    JX-1672-0024 (Silva Rep. at 13); Guillory Tr. at 2364:5-7.

the Corps needed to clear and remediate the EBIA, which, after decades of commercial use, was littered with abandoned wharfs, structures, foundations, buried utilities, contaminants, and debris.[9]

### 2.    The Corps evaluated the project's impact on existing flood control structures

In preparation for constructing the bypass channel, the Corps did "an extensive amount of preliminary site investigations" at the EBIA.[10]  Years before, in 1966, the Corps analyzed the global stability and seepage potential of the levee and floodwalls in the Corps 1966 Design Memorandum for the Lake Pontchartrain and Vicinity Hurricane Protection Project.[11]  The Corps concluded that "based on the soil conditions along this part of the project and the short duration of hurricane floods, hazardous seepage or hydrostatic uplift on the protected side is not anticipated."[12]  Regarding stability, the Corps' evaluation implied a 15 to 20 foot minimum control line, which meant that construction more than 15 to 20 feet from the floodwall (on the canal side) was unlikely to have any impact on the wall's stability during the type of hurricane for which the Corps planned.[13]  Ultimately, the Corps determined that dredging the proposed bypass channel would not impact the existing flood protection structures bordering the EBIA.[14]

The Corps undertook and commissioned additional analyses as needed.  Thus, in 1996, it completed a Hazardous Toxic Radioactive Waste ("HTRW") Remedial Investigation Report, which included an overview of some of the EBIA's known soil properties, hydrogeology and groundwater characteristics as they relate to remediation.[15]  In 1998, the Corps hired Waldemar S. Nelson, Inc.,

---

[9]   Uncontested Fact No. 33.  For planning purposes, the Corps divided the EBIA up into six facilities, each named for its most recent tenant.  From south to north, the sites were International Tank Terminal (ITT), Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine, and Boland Marine.  Uncontested Fact No. 34.

[10]  PX-4673-0017 to -0018 (Guillory 30(b)(6) Dep. at 47:12-48:11).

[11]  Guillory Tr. at 2348:20-2349:3; JX-1777-0015 to -0019 (Lucia Rep. at 14-18); JX-0004-0114, -0203 (1966 USACE Design Mem. No. 3, ¶¶ 30-31 & Plate 38 (1966)).

[12]  JX-0004-0114 (1966 USACE Design Mem. No. 3, ¶ 31); Lucia Tr. at 2945:10-2946:15.

[13]  JX-1777-0024, -0065 to -0069 (Lucia Rep. at 23, 64-68); Lucia Tr. at 2945:10-2946:15.

[14]  See DX-02675-0018 (Dicharry Dep. at 31:17-22).  There was no significant change in the characteristics of the soil at the EBIA between 1966 and the time WGI began its site-remediation efforts at the EBIA in 2000.  Rogers Tr. at 631:9-632:14; Lucia Tr. at 2916:16-20.

[15]  See Guillory Tr. at 2393:15-2394:22; JX-0032 (Sampling and Analysis Report Phase II HTRW Investigation).

and Dames & Moore, Inc. to preliminarily assess the demolition and site preparation necessary for construction of the new lock and bypass channel.[16]

WGI, which had not yet been hired to work on the project, had no involvement in any of these analyses. In particular, it played no role in, nor was it ever provided a copy of, the Corps' 1966 Design Memorandum.[17] As the Corps' Contracting Officer Representative ("COR") and Construction Manager testified: "[Because] the Government had been designing the Lock Replacement Contract for many years," information about the impact WGI's site clearing and remediation work might have on the levee and floodwall "had already been discussed *and addressed*" internally within the Corps.[18]

### 3. The Corps hired WGI to clear and remediate the EBIA under the supervision of its own engineers

On July 12, 1999, the USACE formally contracted with WGI to demolish the existing structures in the EBIA and remediate the site in accordance with the Louisiana Department of Environmental Quality's ("LDEQ") standards.[19] This project became known as "Task Order 26."[20] The Corps placed Lee Guillory, a licensed Professional Engineer in its Construction Division, in

---

[16] The contractors reported their findings in an 8-volume Design Documentation Report (DDR) No. 1, submitted to the Corps in early 1999. *See, e.g.*, JX-0010 (DDR No. 1 Site Preparation and Demolition, Vol. 2) (Feb. 1999).

[17] Guillory Tr. at 2361:12-15; Sykora Tr. at 3078:5-3079:18.

[18] Guillory Tr. at 2358:20-2359:9 (emphasis added). WGI also was not privy to the Corps' later Design Documentation Reports involving the Lock Replacement Project. In DDR No. 3, for example, the Corps evaluated the "stability of the existing east bank, bypass channel and laying channel during lock construction." JX-0019-0009, -0010, -0063 (DDR No. 3, Lock Foundation Report, May 2002, at 3-4 & Plate 29); Sykora Tr. at 3079:3-13.

[19] JX-1364-0029C to -0031C (Technical Completion Rep., Aug. 2005 at 13-14); JX-0049 (Delivery Order 0026, July 12, 1999 (Task Order 26)).

[20] Roe Tr. at 2294:22-2295:4. Task Order 26 was performed under the auspices of an "umbrella" contract, also known as a Total Environmental Restoration Contract ("TERC"), entered into between WGI's predecessor, Morrison Knudsen Corporation and the Corps' Tulsa District in 1994. The TERC covered remediation of various HTRW sites in the southwest region. Uncontested Fact No. 35. It provided general requirements and procedures for all of WGI's anticipated work in the region, although the Corps would prepare specific Statements of Work ("SOW") for each individual Delivery Order (or "Task Order") it later issued. Uncontested Fact No. 58. The TERC requires each Task Order to: (1) include the "specific requirements" for "architect-engineering services in support of remedial action" to be performed by the contractor, JX-0048-0012, and (2) "specifically identif[y]" the requirements for both on-site and off-site personnel from the contractor. JX-0048-0015. In the case of Task Order 26, the first Statement of Work ("SOW") was dated June 1, 1999 (Uncontested Fact No. 59; Roe Tr. at 2295:5-15) although the contract included subsequent SOWs and WGI proposals that the Corps accepted, as well as the applicable terms of the TERC itself. *See, e.g.*, JX-0050 (Contract Mod. 1, Nov. 23, 1999 at 1-12); JX-0058 (Contract Mod. 10, Sept. 25, 2001 at 2).

charge of the work as the COR and Construction Manager for Task Order 26.[21]   It was Mr. Guillory's responsibility to verify that WGI "performed all technical requirements of the contract in accordance with the approved work plans, the project execution plans, and especially, the Quality Control Plan."[22]   Accordingly, Mr. Guillory maintained daily communications with WGI and performed on-site inspections of its work at least one to three times a week.[23]   He and his staff also reviewed, commented on and ultimately approved all of WGI's work plans and specifications, including the Recommendation Report, the Project Work Plans, RECAP Reports and various subcontractor scopes of work.[24]   When Mr. Guillory thought that any of WGI's proposed excavations would pose a threat to the nearby flood control structures he could seek (and on occasion did seek) input from the geotechnical engineers at the Corps.[25]

To assist Mr. Guillory, the Corps assigned James Montegut, a Project Engineer in its Construction Division, to serve as on-site COR beginning in early 2001.[26]   Mr. Montegut had 26 years of experience working in and around levees and floodwalls in the Greater New Orleans area.[27]   He met daily with WGI's on-site personnel, managed the Corps' on-site Quality Assurance Inspectors, reviewed and approved work plans and expenses, and monitored the physical progress of work on a day-to-day basis.[28]   To the extent Mr. Montegut or his Quality Assurance Inspectors "noticed any inconsistencies or anything that we were not 100 percent pleased with, we brought that

---

[21]   See JX-1231-0005 (Ltr. from A. Smith, Aug. 18, 1999).   Prior to Task Order 26, Mr. Guillory had "extensive experience of six years of being a project engineer on the ground in two different area offices, supervising, monitoring and administering construction contracts for earthen levees, hurricane protection levees . . . and major navigational structures." PX-4673-0007 (Guillory 30(b)(6) Dep. at 18:21-19:5).

[22]   Guillory Tr. at 2351:24-2352:3, 2352:15-2354:4; JX-1231-0005 (Ltr. from A. Smith, Aug. 18, 1999).

[23]   Guillory Tr. at 2352:5-7, 2353:18-23.

[24]   See, e.g., Rogers Tr. at 711:17-20; Guillory Tr. at 2459:22-2460:12, 2516:3-6.

[25]   Guillory Tr. at 2510:9-19; DX-02662-0017 (Grieshaber 30(b)(6) Dep. at 28:6-19); DX-02663-0007 (Grieshaber 30(b)(6) Dep. at 11:16-12:9); see infra, Section II.B.2.

[26]   PX-4685-0015 (Montegut Dep. at 26:11-24).

[27]   PX-4685-0007 (Montegut Dep. at 10:20-11:3).

[28]   PX-4685-0016 to -0017, -0022 to -0025, -0033 to -0037, -0040 (Montegut Dep. at 30-31, 42-46, 62-66, 68, 73-74).

to the attention of Washington Group on-site staff, and asked them to correct that non-conforming work."[29]

The Corps also kept one or more Quality Assurance Inspectors on-site at all times to monitor WGI's work and to ensure compliance with the contract and the Corps-approved plans and specifications.[30]  The inspectors documented their results in daily Quality Assurance Reports ("QAR") addressed to Mr. Guillory and initialed by Mr. Montegut.[31]  Mr. Guillory testified that he reviewed every QAR submitted to him.[32]

WGI's team on-site was led by Dennis O'Conner, WGI's Project Manager on Task Order 26 from its inception until June 2004.[33]  Mr. O'Conner holds an undergraduate degree in geology and geography but is not an engineer.[34]  He supervised performance as well as "project cost, schedule, safety, and overall quality and technical management."[35]  Under him was Phillip Staggs, WGI's on-site Construction Manager from July 2000 to March 2005.[36]  Mr. Staggs has extensive construction experience, but he also is not an engineer.  He supervised all WGI and subcontractor site activities related to demolition, remediation and site restoration.  He also reviewed daily subcontractor reports and coordinated field activities with the Corps.[37]

---

[29]  PX-4685-0040 (Montegut Dep. at 73:21-74:15).

[30]  PX-4689-0007 (Clouatre Dep. at 29); PX-4677-0086 to -0087 (Staggs Dep. at 223-224).

[31]  Guillory Tr. at 2351:20-2352:23; PX-4685-0037 (Montegut Dep. at 69-70).

[32]  Guillory Tr. at 2486:21-23.

[33]  Uncontested Fact No. 41.  Mr. O'Conner worked under the ultimate supervision of Steven Roe, who from mid-1997 until May 2001 served as WGI's Program Manager for the entire TERC (which, as mentioned above, covered numerous projects in the southwest region).  Uncontested Fact No. 40.  Mr. Roe drafted and negotiated WGI's initial proposal on Task Order 26 (Roe Tr. at 2285:25-2286:6) but he had no role on-site.  Roe Tr. at 2275:22-2276:9.

[34]  DX-02665-0009 (O'Conner Dep. at 16:15-24).

[35]  JX-1252-0019 (PWP at 19).

[36]  Uncontested Fact No. 42.

[37]  JX-1252-0019 (PWP at 19).

**B.**     **Throughout the Project, the Corps Maintained Control of Engineering Decisions Relating to the Levee/Floodwall**

    **1.**     **The Corps instructed WGI regarding levee/floodwall precautions**

Field work on the EBIA was guided by a Project Work Plan.  Although "developed jointly between WGI and the Corps,"[38] it was the Corps that specifically instructed WGI that all soil remediation and associated excavations must be confined to "the area 15-feet west of the floodwall."[39]   This boundary served to safeguard the floodwalls.   Mr. Guillory testified that contractors were instructed "not [to] place any moving equipment, heavy equipment, within 15 feet of the floodwall face . . . because it has the possibility of the equipment impacting the floodwall."[40] Mr. Guillory developed the 15-foot guideline based on a "consensus of opinion between myself and the rest of the small HTRW team" at the Corps, which included members of the Corps Engineering Division but no one from WGI.[41]

    **2.**     **Mr. Guillory sought geotechnical engineering advice, when needed, from the Corps' experts, not from WGI**

The Corps determined in the early planning stages of Task Order 26 that to the extent possible, excavations at the EBIA should be backfilled with native clay from an on-site "borrow pit" rather than with imported material.[42]   The McDonough Marine site ultimately was chosen for the borrow pit because of its relative lack of obstructions and contamination.[43]   By late 2001, however, remediation work had increased the need for backfill material, so WGI proposed

---

[38]   PX-4672-0032 (Guillory 30(b)(6) Dep. at 78:12-79:2).

[39]   JX-1252-0055 (PWP at 55).

[40]   PX-4672-0074 (Guillory 30(b)(6) Dep. at 159:21-160:5); Guillory Tr. at 2379:13-23.

[41]   PX-4673-0285 (Guillory 30(b)(6) Dep. at 83:2-7); Guillory Tr. at 2380:17-24; 2381:25-2382:14; 2530:4-14 (noting that his HTRW team included George Bacuta, Jean Spadaro, Rueben Mabry and Gary Brouse from the Engineering Division).   The guideline is consistent with the implied minimum control line found in the USACE's 1966 evaluation of the global stability of the floodwall bordering the EBIA. JX-1777-0024, -0075 (Lucia Rep. at 23, 74).

[42]   *See* JX-1252-0026 (PWP at 26); Guillory Tr. at 2400:7-11.

[43]   JX-0108-0008 (RECAP Submittal).   The borrow pit contained "predominately cohesive-clayey soils" (JX-1389-0046 (Bea Rep., ¶ 47); Bea Tr. at 1051:3-5), which were similar to the clayey soils existing across the entire EBIA. Guillory Tr. at 2399:14-21.

expanding the area of the borrow pit.[44]  When Mr. Guillory and his HTRW team reviewed the initial

proposal, they raised questions about the potential impact on the "structural integrity of the adjacent

levee/floodwall."[45]  Mr. Guillory therefore sought expert help "to evaluate the structural stability"

of the proposed 16-foot deep borrow pit on the nearby levee and floodwall – not from WGI, but

from engineers in the Corps' Geotechnical Branch.[46]  The Engineering Division did not raise any

concerns regarding underseepage but did provide Mr. Guillory with some options to address any

stability issues posed by the borrow pit.[47]  After receiving its written response and meeting with a

Corps geotechnical engineer, Mr. Guillory incorporated its recommendations into a "design

template" for WGI to use in excavating the extended borrow pit.[48]  Having done its own

geotechnical engineering analysis, the Corps did not expect WGI to do anything other than

"implement what [the Corps] recommended." [49]

## II.    WGI DID NOT BREACH ANY DUTY OWED TO PLAINTIFFS FOR THE HARM AT ISSUE (Question 6.b.)

Plaintiffs have not met their burden to show that WGI breached any duty that it owed them.

A claim for negligence under Louisiana Civil Code article 2315 requires the Plaintiffs to prove five

elements:

> (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element);

> (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element);

---

[44]  Guillory Tr. at 2399:22-2401:2; JX-1280-0002 to -0003, -0010 to -0011 (Borrow Pit Extension App. at 2-3, 10-11).

[45]  JX-1282-0003 to -0004 (Transmittal and Cmts., Borrow Pit Ext. App.); Guillory Tr. at 2401:12- 2404:25.  Mr. Guillory was not concerned about seepage because he "felt sure that that issue had been adequately addressed and covered by the Corps of Engineers" in prior designs and reports, including the 1997 Evaluation Report; and he knew the area was composed predominantly of clay material.  Guillory Tr. at 2651:11-2652:4.

[46]  JX-1285-0002 (Memo. for Eng'g Div., Geotech. Stability Analysis, Apr. 15, 2002 at 2); Guillory Tr. at 2404:20-25.

[47]  Guillory Tr. at 2409:6-2411:9.

[48]  PX-4673-0065 (Guillory 30(b)(6) Dep. at 160:18-161:2); PX-4672-0082 (Guillory 30(b)(6) Dep. at 172:24-173:18); *see also* JX-1286-0002 to -0003 (Fax from J. Montegut, June 10, 2002 at 2-3).

[49]  PX-4673-0063 to -0064 (Guillory 30(b)(6) Dep. at 157:17-158:2).

(3) the defendant's substandard conduct was a cause-in-fact of the Plaintiff's injuries (the cause-in-fact element);

(4) the defendant's substandard conduct was a legal cause of the Plaintiff's injuries (the scope of protection element); and

(5) actual damages (the damage element).

*Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 816 So. 2d 270, 275-76 (La. 2002) (citing, *inter alia*, *Roberts v. Benoit*, 605 So. 2d 1032, 1051 (La. 1991)).   The elements of a negligence action, and in particular the scope of duty and legal cause, "have frequently been conflated or confused," *Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir. 1992), but "[t]he threshold question in any duty-risk analysis is whether the defendant owed a duty to the plaintiff." *Pinsonneault*, 816 So. 2d at 276.   That issue in turn depends on the "more difficult" question of the scope of protection, that is, "whether the injury the plaintiff suffered is one of the risks encompassed by the rule of law that imposed the duty."   *Roberts*, 605 So. 2d at 1044.   Only after assessing those issues may this Court determine whether WGI breached any duty it owed to Plaintiffs.

As set out below, the evidence shows that WGI did not.   *First*, WGI owed no duty to Plaintiffs with respect to the type of harm they suffered – flood damage allegedly caused by underseepage and/or uplift pressures.   Such a risk is not sufficiently foreseeable and related to WGI's remediation activities to meet the "ease of association" requirement.   *Second*, WGI had no duty to perform a geotechnical engineering analysis of the impact its excavation work might have on the levees and floodwalls bordering the EBIA, which the contract reserved to the Corps.   *Third*, WGI did not breach its duty because it performed the contract in full compliance with the Corps' requirements and in accordance with the standard of care of a reasonable contractor providing such excavation and remediation services in the area.   There is no legal or evidentiary basis to impose on WGI a duty to conduct a geotechnical analysis that the Corps did not request, the contract did not

require, and no contractor in WGI's position would do. *Finally*, Plaintiffs cannot establish negligence *per se* based on the technical failure to obtain an OLD permit because that failure had no causal relationship to the Plaintiffs' harm.

> **A.    WGI Had No Duty to Plaintiffs With Respect to the Unknown and Attenuated Risks That Allegedly Caused Their Harm.**

The Louisiana Supreme Court has stressed that there is no hard and fast "rule" for determining the scope of the duty owed: "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls with the scope of the duty." *Roberts*, 605 So. 2d at 1044; *see also id.* at 1052. Louisiana courts answer that question through what they refer to as "ease of association": "we have found the proper inquiry to be how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced." *Id.* at 1045. This question in turn depends largely but not exclusively on the foreseeability of the harm alleged. *See id.* (noting that "ease of association encompasses the idea of foreseeability, [but] it is not based on foreseeability alone"); *accord Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) (holding that scope of duty depends on a variety of factors, "most notably the foreseeability of the harm suffered by the complaining party"). "Duty, in other words, is measured by the scope of the risk that negligent conduct foreseeably entails." *Gavagan*, 955 F.2d at 1020 (citation omitted); *accord Roberts*, 605 So. 2d at 1045 (finding no ease of association because "we find foreseeability lacking").[50]

The question, therefore, is not whether WGI owed a duty to Plaintiffs *per se*. The cases reflect the "almost universal duty on the part of the defendant in a negligence action to use reasonable care to avoid injury to another." *Rando v. Anco Insulations Inc.*, 16 So. 3d 1065, 1086 (La. 2009). Rather, the question is whether WGI owed them a duty regarding the particular type of

---

[50]    Of course, foreseeability also matters with respect to causation. Indeed, the Fifth Circuit has "historically considered foreseeability relevant to both the duty and proximate cause determinations." *In re Signal Int'l, LLC*, 579 F.3d 478, 490 n.12 (5th Cir. 2009).

harm alleged, which "depends on whether [the defendant] knew or should have known of the dangers." *Id.* at 1087; *see also Fredericks v. Daiquiris & Creams of Mandeville, L.L.C.*, 906 So. 2d 636, 639 (La. Ct. App. 1 Cir. 2005) ("The imposition of liability under general negligence principles requires proof that the defendant had actual or constructive knowledge of the risks and failed to take corrective action within a reasonable time.").

WGI doubtless had a duty with respect to some harms, just as one who works near power lines owes a duty to some of those injured as a result of its negligent contact with them. *See Istre v. Fidelity Fire & Cas. Ins. Co.*, 628 So. 2d 1229, 1232 (La. Ct. App. 3 Cir. 1993) (holding that backhoe operator who came in contact with power lines, causing an outage that knocked out a traffic light, owed a duty to a driver injured in an accident at that light). Such risks are readily apparent, and therefore the harm is foreseeable and easily associated with the defendant's conduct. *See Cleco Corp. v. Johnson*, 795 So. 2d 302, 306-07 (La. 2001) (citing *Istre* and holding that defendant whose employee negligently backed into a utility pole, triggering a power surge that damaged the plaintiff's electrical equipment, owed a duty to the plaintiff because a trier of fact could conclude that the harm was foreseeable). Here, the evidence shows that WGI exercised appropriate care regarding such risks by, for example, keeping heavy equipment clear of the floodwall and grading the site to drain away from the levee, and Plaintiffs do not claim otherwise.[51]

A contractor does not, however, thereby incur a duty to prevent any possible future injury, no matter how unforeseen and attenuated, that might be traced to its work. The Fifth Circuit has decided two cases in the context of Hurricane Katrina that illustrate the distinction. In *In re Signal International, LLC*, 579 F.3d 478 (5th Cir. 2009), the Fifth Circuit found that a defendant had a duty of care, which it breached, to the owner of a bridge miles away after the defendant's negligently moored barge broke free during the hurricane and allided with the bridge. The court reasoned that

---

[51]   *See, e.g.,* Guillory Tr. at 2451:3-2452:16 (WGI sloped the backfilled and dressed area to "avoid standing water adjacent to the levee"); JX-0846-0011 (QAR 688).

the risk of a runaway barge was well known, and that "the topology of the Pascagoula River basin combined with the anticipated height of the surge made it foreseeable to a reasonably thoughtful person that the barges could reach" the bridge in question. *Id.* at 494. In contrast, in *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201 (5th Cir. 2010), the Fifth Circuit, affirming this Court, found that dredgers had no duty to plaintiffs who were allegedly harmed indirectly by the impact that the dredging activities had on the integrity of the levees and floodwalls. The court concluded that the chain of effects on which the plaintiffs premised liability – "the amplification of the storm surge during Hurricane Katrina, the failure of the levee systems, and the subsequent flooding of Orleans and St. Bernard Parishes" – was too attenuated to place their harm within the scope of risk. *Id.* at 211. The supposed impact on the levees and the ensuing consequences were "'beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers.'" *Id.* at 213 (quoting *Consolidated Alum.*, 833 F.2d at 68).[52]

The defendant in *Signal* owed a duty of care while the defendants in *Great Lakes Dredge* did not due to the difference in the nature of the harm and the foreseeability of the risk. As the Fifth Circuit explained:

> Whereas in *Signal*, the negligent barge-owner anticipated Hurricane Katrina's approach and failed to secure the barges to withstand the expected storm surge, the [defendants] in this case had no knowledge of an immediate and pending natural disaster that would affect how they conducted their dredging operations. Furthermore, it cannot be said that any dredger could have foreseen that performing its dredging activities negligently – as opposed to in conformity with the Corps of Engineers' specifications – would probably result in the series of events culminating in the catastrophic damages that occurred during Hurricane Katrina.

*Great Lakes Dredge*, 624 F.3d at 213. Here, Plaintiffs have to go even one step further. Not only

---

[52] In both cases the Fifth Circuit was applying maritime common law rather than Louisiana law, but the two are substantively the same. Indeed, in explaining that the respective negligence rules "'are designed to protect *some* persons under *some* circumstances against *some* risks'" and that "'[s]eldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury,'" both the Louisiana Supreme Court and the Fifth Circuit authoritatively quoted identical language from the same commentary. *Roberts*, 605 So. 2d at 1044, and *Consolidated Aluminum Corp*, 833 F.2d at 67 (both quoting Wex S. Malone, Ruminations on Cause-In-Fact, 9 Stan. L. Rev. 60, 73 (1956)).

must they show that WGI could have foreseen the indirect, geotechnical consequences of their activity on the levees, but unlike in *Great Lakes* they must show that WGI could have foreseen that even excavating and backfilling ***in conformity with the Corps-approved plans and specifications*** would lead to those consequences.

Here, there is no reason to believe – and no evidence adduced at trial to suggest – that the alleged risk of uplift pressures and consequent damage to the levee system, which in turn could allegedly lead to catastrophic failure in a major hurricane, was something that a reasonably careful contractor in WGI's position could have foreseen.   The voluminous and highly-technical geotechnical analyses presented at trial by renowned engineers suggest just the opposite.   There is no evidence in the record to show that WGI knew of this risk,[53] and no credible testimony that an excavation and remediation contractor in WGI's position should have known of it.[54]   Accordingly, because Plaintiffs have not shown that WGI could have or did foresee the asserted impact on the levees, their injury falls outside the relevant "scope of protection" and WGI owed them no duty.

## B.   WGI Had No Duty to Perform a Geotechnical Engineering Analysis.

To fill the void between WGI's general duty to exercise reasonable care and the harm claimed here, Plaintiffs have argued that WGI had a duty to perform geotechnical engineering services that might have identified additional risks.   WGI had no duty to do so because scope of duty incurred by a professional person or organization hired to perform a particular task is defined by contract.   Both the contract itself and the circumstances surrounding it show that WGI had no responsibility for geotechnical engineering analysis.

---

[53]   PX-4677-0037 to -0038 (Staggs Dep. at 98:15-99:16); PX-4681-0083 to -0084 (O'Conner Dep. at 206:10-208:20).

[54]   Sykora Tr. at 3099:21-3100:7 (opining that after "look[ing] at the work that [WGI] did and the excavations they made, the submittals that they made for the deep excavations and their understanding of what was being submitted to the geotechnical branch for review . . .  there is no reason to believe that they should have notified the Corps about any situation that was out there" relating to the integrity of the levee and floodwall").

The contract determines the scope of the services WGI was obligated to perform.  "In determining the duty owed" by a professional firm engaged in a large-scale project, "the court must consider the express provisions of the contract between the parties."  *Yocum v. City of Minden*, 649 So. 2d 129, 132 (La. Ct. App. 2 Cir. 1995); *see also In re Capco Energy, Inc.*, 669 F.3d 274, 282-83 (5th Cir. 2012) (declaring, under similar Texas law, that "the specific nature of the professional relationship" determines duty owed by geological consulting firm, and holding that "[a]bsent evidence demonstrating a meeting of the minds between [two companies] specifically establishing a duty," the appellant company could not establish that appellee owed a duty beyond that for which it contracted).

Two Louisiana decisions are particularly instructive.  In *Black v. Gorman-Rupp*, 791 So. 2d 793 (La. Ct. App. 4 Cir. 2001), the court faced claims arising from a construction accident that were brought against a firm hired "as consulting engineers" on the project.  The court noted that "[t]he only way a legal duty to act can arise from the facts before this Court, is if the contract . . . lead to the conclusion that [the engineer] was responsible for performing those activities that appellant alleges that [it] failed to perform."  *Id.* at 795.  The court concluded that it did not and emphasized:

> The mere fact that [the engineer] was involved in the construction process and had contractual duties to the [the agency] does not create an all encompassing duty to protect everyone from every risk which could be encountered during the course of the project.

*Id.* at 795-96.  Therefore, the engineer "cannot be held liable for failing to perform activities, which it had no responsibility or authority to undertake."  *Id.* at 796.

Similarly, in *Weill Construction Co. v. Thibodeaux*, 491 So. 2d 166, 171 (La. Ct. App. 3 Cir. 1986), the court also rejected a claim against an architect for failing adequately to supervise construction by looking to the contract.  The architect's "limited duty" under the contract was "clear and [wa]s supported by the testimony."  *Id.*  The court noted that the additional work the claiming party asserted the architect should have done "would have required the payment of a higher fee to

- 15 -

[the architect], an apparently unattractive, and certainly unelected, option to [the contracting party]." *Id.* Therefore, the fact that the architect could have provided those additional services if requested is beside the point.

WGI is on trial, like the engineers in *Black*, "for failing to perform activities which it had no responsibility or authority to undertake," *see Black*, 791 So. 2d at 796, and, like the architect in *Weill*, was consciously not paid to undertake. WGI entered into a contract with the Corps to perform demolition, removal, excavation, and environmental remediation services in the EBIA. Nothing in Task Order 26 or in any of the accompanying contract documents and specifications required or even authorized WGI to conduct a geotechnical engineering analysis of levee and floodwall, a point Plaintiffs' standard-of-care expert, Dr. Rogers, conceded.[55] As described above, the contract governing Task Order 26 is devoid of any language suggesting that either WGI or the Corps contemplated that WGI would provide geotechnical engineering services of any kind on Task Order 26 relating to the levees and floodwalls in the EBIA. The scope of that contract determined the scope of WGI's duty. The mere fact that WGI was involved in the Lock Replacement Project and had some contractual duties as a part of that project did not create an all-encompassing duty to conduct analyses expressly outside its duties under the contract. Moreover, the fact that the initial Statement of Work for Task Order 26 directed WGI to provide "all engineering services . . ., as required, in connection with the technical review of site documents . . . associated with the demolition and remediation" of the EBIA does not impose a broader duty.[56] The drafter of that document, Mr. Guillory, testified that "all engineering services" did not include any services relating to the levee and the floodwall along the eastern boundary of the EBIA. The levee and

---

[55] *See* Rogers Tr. at 707:20-25; *see also* Roe Tr. 2288:23-2289:24; Guillory Tr. at 2367:14-19, 2368:12-2369:11.

[56] JX-0049-0003 to -0004 (SOW No. 1 attached to Task Order 26 at 3-4).

floodwall simply were not part of WGI's scope of work.[57]  In arguing the contrary, Plaintiffs take out of context a reference to "data gaps that may need to [be] filled by sampling or other investigations."[58]  Mr. Guillory testified, however, that "data gaps" referred to unknowns that WGI would need to uncover through grid trenching, geophysical surveying and soil sampling.[59]  WGI was not expected to identify "data gaps" relating to subsurface impact its work might have on the levee and floodwall.[60]  The Corps never provided WGI drawings of the nearby levee and floodwall to review and never indicated to WGI that it had any geotechnical engineering concerns.[61]  Plaintiffs controverted none of that testimony.

If the contract left any doubt, however, the circumstances surrounding the contract confirm that WGI had no duty to provide geotechnical engineering services.  It is undisputed that WGI had no geotechnical engineers staffed on Task Order 26, and indeed that its on-site managers were not engineers at all.  The Corps, on the other hand, oversaw the project with professional engineers like Mr. Guillory, supplemented as necessary by geotechnical engineers from the Corps' Engineering Division.  When concerns arose, that an excavation could possibly undermine the floodwall, Mr. Guillory could – and did – refer those concerns to *the Corps'* Engineering Division.[62]  Therefore, the parties' staffing decisions and course of conduct confirm:  "It was not within Washington Group's responsibility to do anything" in that regard.[63]

---

[57]  Guillory Tr. at 2355:2-10, 2361:20-2362:2, 2367:14-19.  WGI had the same understanding of its responsibility on Task Order 26.  Roe Tr. at 2288:23-2289:4, 2289:17-24.

[58]  JX-0049-0004 (SOW No. 1 at 4).

[59]  Guillory Tr. at 2357:22-2358:19.

[60]  Guillory Tr. at 2358:20-23; Roe Tr. at 2301:12-22.

[61]  JX-0049-0004 to -0005 (SOW No. 1 at 4-5); Guillory Tr. at 2361:23-15; Roe Tr. at 2291:7-10, 2311:17-2312:2.

[62]  Guillory Tr. at 2510:9-19.

[63]  Guillory Tr. at 2529:4-18.  It is for this reason that, to the extent there is fault in this case, comparative fault falls on the Corps.  *See infra*, Section II.G.  It had both the staff on the project and the background with the floodwalls to understand the risks better than anyone.

**C.     WGI Did Not Breach the Applicable Duty of Care Pursuant to its Contract With the Corps**

For the foregoing reasons, WGI must be judged against the standard of care applicable to a contractor performing demolition, removal, excavation, and environmental remediation services. Although WGI had a duty to backfill and compact excavations on Task Order 26 with due care, the Plaintiffs failed to prove WGI breached that duty.   In negligence actions, the duty of care is generally that of "reasonable care."  *Roberts*, 605 So. 2d at 1043-44.  "The determinative issue on the question of [a] contractor's negligence is one of reasonableness, i.e., conformity of his conduct to the standard of care that would be exercised by a reasonable man in the same or similar circumstances."  *Lacombe v. Greathouse*, 407 So. 2d 1346, 1350 (La. Ct. App. 3 Cir. 1981). Plaintiffs unquestionably bear the burden of proving that standard in any particular case, typically through the use of expert testimony.  *See City of Alexandria v. Ratcliffe Contsr. Co*., 95 So. 3d 1076, 1079 (La. Ct. App. 3 Cir. 2012).  "Unless lay persons can infer negligence by applying [a] common sense standard," a plaintiff must present expert testimony to prove the requisite standard of care.  *Id*.  For professionals, the reasonableness standard as applied to work done by professionals requires a professional to exercise "the standard of ordinary care and reasonable skill is that same care and skill required by others engaged in the same profession in the same locality."  *Dumas & Assocs., Inc. v. Lewis Enterprises*, 704 So. 2d 433, 439 (La. Ct. App. 2 Cir. 1997) (addressing standard of care for engineering services).[64]

Here, a Corps geotechnical engineer recommended to Mr. Guillory at the outset of Task Order 26 that "[s]oil used to backfill any of the excavations shall be compacted to the density of the existing soil."[65]  Plaintiffs' standard-of-care expert agrees that this is the appropriate standard for backfilling excavations on an environmental remediation project such as Task Order 26, where you

---

[64]   It is for this reason, among others, that the Kansas City Guidelines, which were not applicable to the New Orleans district, have no bearing as a matter of law on the standard of care applicable to WGI's EBIA work.

[65]   JX-1238-0001 (Sept. 13, 2000 Email to Guillory re:  Geotech input); Guillory Tr. at 2385:4-10.

are simply "trying to limit seepage infiltration to what it was like before you remediated it.  You
don't want to make it worse."[66]  Moreover, since the EBIA is composed mostly of dredge spoils, the
existing density of the soil is not very high.[67]  Indeed, Dr. Rogers testified that the density of the
EBIA soils might even be as low as a 69 percent Proctor,[68] which does not require any mechanical
compaction to achieve at all.  "If you take a dump truck of material and dump it on the ground,
that's 69 percent."[69]

In any event, WGI developed backfill and compaction specifications for specific features of
work on Task Order 26 with input from and approval by the Corps.[70]  Their intent was to achieve a
degree of compaction equivalent "to the density of the adjacent soil so there were no depressions or
subsidence, so that additional heavy equipment can operate over the compacted area."[71]  The Corps
had ultimate responsibility for assuring that the mechanical means that WGI and subcontractors
used to compact the soil (either bucket-tamping the soil in lifts and/or track-walking with a dozer)
complied with the contract specifications.[72]  Rather than requiring compaction (or Proctor) testing
to make this judgment,[73] the Corps made a reasoned and reasonable choice to rely on the visual

---

[66]  Rogers Tr. at 749:5-13; *id.* at 714:5-18 (90 percent Proctor is not usually required on environmental remediation sites; instead "we typically try to just get it back to what it was, to the density that's there").  *See* Bea Tr. at 1189:9-16 (compacting soils back to existing density is "good engineering practice").

[67]  Rogers Tr. at 749:18-19, 757:21-22; Sykora Tr. at 3087:8-3088:5 ("[T]he dry densities of the soil that are out there at the site" are "very, very low, which is not surprising, given the nature and how those soils were placed 80 years ago," the subsequent development of the industrial area, and the "uncontrolled backfill and dumping" on the site that preceded WGI's work).

[68]  Rogers Tr. at 749:18-19.

[69]  Sykora Tr. at 3098:22-23.

[70]  *See, e.g.*, JX-1302-0006 & -0013; Guillory Tr. at 2459:14-2461:9; PX-4672-0066 to -0067 (Guillory 30(b)(6) Dep. at 145:2-11, 146:9-14).

[71]  Guillory Tr. at 2468:10-16, 2388:11-18; *see also, e.g.*, DX-02716-0024 (scope of work for excavating concrete foundations) (subcontractor shall compact soils to a "degree that subsidence does not subsequently occur and equipment is capable of traversing the backfilled excavations"); JX-1266-0028 (scope of work for grid trenching) ("Backfill shall be put in place and compacted in such a manner that traffic may move across the backfilled areas without experiencing subsidence.").

[72]  *See* PX-4675-0036 to -0037 (Grieshaber Dep. 30(b)(6) at 84:10-85:15); Guillory Tr. at 2385:4-22; Rogers Tr. at 715:7-16.

[73]  A Proctor test is one way of "verify[ing] that compaction has been achieved to the owner or regulator's desire density."  Rogers Tr. at 714:20-23.  It typically is used by the owner or Construction Manager to keep "the contractor honest and make him do as good a job as he can do compacting. . .  Because how else are you going to

observations of its highly experienced Quality Assurance Inspectors and project engineers.[74]  As the

Corps Project Engineer, Mr. Montegut, explained:

> [A]s far as the backfill . . . what my thought process was is that a Proctor is good,
> you know, it proves something, it shows that compaction was achieved.  But I didn't
> need a Proctor [on this project], I had other things in my favor here that didn't make
> it necessary to spend our taxpayers' money on a Proctor. . . .  *I had the luxury of time
> on my side because . . . [w]e were still going to be on site for another two to three
> years.  Washington wasn't going anywhere.  I had them under contract, under a cost
> reimbursable contract.*  And if we had a problem with any of these backfill
> operations . . . it would have been quite simple for me to direct them, as contracting
> officer's representative, to correct . . . .  And it would have been very easy to notice
> if there was a problem . . . *if it were not compacted properly, the area that was
> excavated would have subsided and there would have been a depression or a hole in
> the ground at that site.*  It would have been very simple to notice that and to direct
> [WGI] to go back and fix it.  So that was my thought process at the time.[75]

The Plaintiffs do not dispute that WGI backfilled and compacted the excavations on Task

Order 26 to the Corps' satisfaction.[76]  Instead, their experts claim that WGI breached its duty of care

by failing to conduct compaction testing both before and after excavating the soil in a particular

area of the EBIA to conclusively prove that the soil's "existing density" had been achieved.[77]

Plaintiffs' argument is baseless.  Messrs. Guillory and Montegut (both of whom have spent decades

administering construction and environmental remediation projects, including TERC projects, in the

Greater New Orleans area) determined that compaction testing on Task Order 26 was not necessary.

---

ensure that the contractor is doing high quality work unless you have some benchmark that you're grading him by."
Rogers Tr. at 714:24-715:6.

[74]  Guillory Tr. at 2385:18-2386:21.

[75]  PX-4685-0039 to -0042 (Montegut Dep. at 72:15-77:16) (emphasis added).  Dr. Rogers opined that Mr. Montegut's
method for evaluating WGI's compaction work on Task Order 26 was inappropriate because once you observe a
backfilled excavation "sinking and settling differentially, it's too late to do much about it without going out and
getting another contractor [to] go back to fix it."  Rogers Tr. at 755:25-756:8.  But Dr. Rogers missed the point of
Mr. Montegut's testimony.  Most of the excavations about which Plaintiffs complain occurred between 2001 and
2004.  WGI and the Corps, however, were on-site in the EBIA through the end of May 2005.  If at any time over that
extended period, the Corps QA staff noticed subsidence or depressions in backfilled areas, they could direct WGI to
fix it.  PX-4685-0039 to -0042 (Montegut  at 73:12-77:15); Guillory Tr. at 2386:22-2387:16 (noting the fact that
Task Order 26 was a long-term project played a role in the Corps' decision not to require compaction testing).  Of
course, the Corps never observed any subsidence or depressions that needed correcting.  Guillory Tr. at 2436:17-
2437:18; Sykora Tr. at 3098:11-16.

[76]  Rogers Tr. at 762:8-17; Bea Tr. at 1055:5-11.

[77]  Rogers Tr. at 583:9-22, 749:20-750:16; Bea Tr. at 1189:17-23, 1190:24-1191:8.

Ms. Jean Spadaro, a "key member" of Mr. Guillory's HTRW team[78] and someone who Dr. Bea admits had a "good geotechnical engineering background,"[79] did not require compaction testing either.[80]

Plaintiffs have failed to carry their burden to show that WGI's compliance with the Corps' specifications violated the standard of care of a reasonable excavation/remediation company on a project such as this. Whether Plaintiffs' experts – who never worked on a TERC project in New Orleans (or anywhere else) – would have made a different decision does not carry their burden of proof. *See Harris v. Williams*, 679 So. 2d 990 (La. Ct. App. 2 Cir. 1996) (the testimony of homebuilder and engineer who were present at the site during construction and did not observe any problematic soil conditions had more weight than that of expert who was not present during construction); *Maloney v. Oak Builders, Inc.*, 224 So. 2d 161, 169 (La. Ct. App. 4 Cir. 1969) (testimony regarding the requisite standard of care must be predicated on "community wide" or "local prevailing standards," not on an expert's views as to "deviations from his own personal standards"). Plaintiffs have presented no credible evidence that WGI's failure to conduct scientific testing that the Corps did not request or authorize breached its duty, and ample precedent shows that the failure to conduct such confirmatory tests does not. *See, e.g.*, *Lake D'Arbonne Props., L.L.C. v. Digco Util. Constr., Inc.*, 949 So. 2d. 590 (La. Ct. App. 2 Cir. 2007) (subcontractor not liable for damage to roadbed caused by compaction method where general contractor did not require that an alternate method of compaction be used); *Hanna-Abbington-Alexandria, Inc. v. Budd Constr. Co.*, 487 So. 2d 743 (La. Ct. App. 3 Cir. 1986) (contractor not liable for failure to perform laboratory

---

[78]   Guillory Tr. at 2381:11-2382:14.

[79]   Bea Tr. at 1189:15-16

[80]   JX-1238-0001. The Corps' Engineer Manual 1110-2-1913 also does not require proctor tests (or compaction of any kind) for "pit fills" beyond the toe of a levee, such as the excavations at issue in this case. JX-0046-0054 (EM-1110-2-1913); Rogers Tr. at 718:20-721:17, 722:25-723:2; Sykora Tr. at 3094:16-3096-3, 3097:15-3098:16. By track walking or bucket tamping the backfilled soil to visually achieve its "existing density," WGI actually exceeded this Corps' manual's guidance. Sykora Tr. at 3097:23-3098:1; Rogers Tr. at 722:3-24.

tests to ensure sufficient compaction when owner neither requested the tests nor relied on contractor's expertise regarding necessity of tests).

### D.     Failure to Obtain an OLD Permit Cannot Supply the Missing Link

While violation of a statute, or ordinance, may be negligence *per se*, "to be actionable the negligence must also be a legal cause of the accident." *Miller v. Keal*, 694 So. 2d 569, 572 (La. Ct. App. 2 Cir. 1997). Legal cause in turn "requires that the alleged negligent act have a substantial relationship to the harm incurred." *Jones v. Lawrence*, 940 So. 2d 34, 39 (La. Ct. App. 2 Cir. 2006). To show that connection, a plaintiff must at a minimum "prove 'th(e) violation of a statute which is intended to protect the class of persons to which the plaintiff belongs against the risk of the type of harm which has in fact occurred.'" *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 709-10 (5th Cir. 1981) (citation omitted); *see also Mitchell v. Eureka Chem.*, No. 07-510, 2008 WL 2597907, at *3 (E.D. La. June 25, 2008). Here, Plaintiffs can do nothing of the kind. The OLD permit process imposed no substantive requirements on WGI's work, nor is there any evidence that it would have addressed any of the factors that led to the harm Plaintiffs claim here.[81] *Cf. Moffitt v. Sewerage & Water Bd. of New Orleans*, 40 So. 3d 336, 344 (La. Ct. App. 4 Cir. 2010) (finding that a motorcycle rider's failure to obtain a motorcycle endorsement on his driver's license did not constitute negligence *per se* in an accident when he struck an object in an poorly marked construction zone).

### E.     WGI Is Immune from Liability Pursuant to the Government Contractor Defense

In any event, WGI is immune from liability because its work at the EBIA satisfies all three elements of the test set forth in *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988). WGI hereby adopts the arguments and authorities set forth in its Motion for Summary Judgment (Doc. 15861),

---

[81] The OLD does not perform independent engineering investigations of any kind in connection with a third-party applicant's request to perform subsurface work on or near a flood control structure. Rather, the applicants' work plans are directed to the USACE for technical review and approval. Spencer Tr. at 447:12-448:2, 481:18-21.

Reply Brief in Support of Summary Judgment (Doc. 16303), and Motion for Summary Judgment and Entry of Rule 54(b) Judgment with Respect to Certain Individual Actions (Doc. 16871) as if set forth herein in their entirety.  Additionally, at trial, WGI established that, *first*, the Corps and WGI collaborated in developing work plans, including specifications for backfill and compaction, for all of the features of work on Task Order 26 about which Plaintiffs complain.[82]  Although the backfill and compaction specifications often were "method specifications" as opposed to the more commonly used "performance specifications," they nevertheless were reasonably precise.[83]  *Second*, WGI's work conformed to Corps-approved plans and specifications for all excavations about which the Plaintiffs now complain.[84]  *Finally*, WGI had no actual knowledge that any of its work, which the Corps approved and monitored daily, could harm the nearby flood control structures.[85]

###   F.        WGI Is Immune From Liability Pursuant to La. R.S. 9:2771

WGI is also immune from liability pursuant to La. R.S. 9:2771, which provides that contractors like WGI that perform demolition and remediation work in advance of planned construction shall not be liable for defects if their work conforms to plans and specifications furnished to them.  *See, e.g.*, *Pearce v. L.J. Earnest, Inc.*, 411 So. 2d 1276 (La. Ct. App. 3 Cir. 1982) (contractor who cleared trees in advance of road project was immune from liability in suit alleging trespass and destruction of property); *but see Barabay Property Holding Corp. v. Boh Bros. Constr. Co*, 991 So. 2d 74, 80 (La. Ct. App. 1 Cir. 2008) (soil excavation does not constitute "work" for purposes of 9:2771).  As noted at Section I.A.3. *supra*, the Corps, in its capacity as engineer-of-record, was out in the field with WGI on a daily basis monitoring and approving its work, and therefore bears all responsibility for the plans and specifications, including defects if any.  *See Tex-*

---

[82]   *See, e.g.,* Sykora Tr. at 3088:6-3099:1; DX DM-0008-0032 to -0045 (Sykora Dem.).

[83]   Sykora Tr. at 3088:6-3089:1.

[84]   *See* Sykora Tr. at 3100:10-3105:12; DX DM-0008-0056 to -0072 (Sykora Dem.)

[85]   PX-4681-0083 to -0084 (O'Conner Dep. at 206:10-208:20); PX-4677-0037 to -0038 (Staggs 30(b)(6) Dep. at 98:15-99:16).

*La Properties v. South State Ins. Co.*, 514 So. 2d 707, 709 (La. Ct. App. 2 Cir. 1987) (liability is not imposed on the subcontractor where owner-contractor and the subcontractor held relatively equal positions, both were engaged in construction, and both "actively engaged" in the design specifications); *but see New Orleans Unity Soc. of Practical Christianity v. Standard Roofing Co*., 224 So. 2d 60, 63 (La. Ct. App. 4 Cir. 1969) (rejecting contractor's contention that Section 9:2771 should absolve it from liability when contractor was "an active and interested party" in the development of the plans and specifications).  Because WGI had no reason to believe its conformity with the Corps-approved plans and specifications would (or, in fact, did) create a hazardous situation, it enjoys immunity pursuant to La. R.S. 9:2771.

## G.  WGI's Percentage of Fault, If Any, Is Minimal.

In the event that the Court determines that Plaintiffs have proved WGI at fault in causing any of Plaintiffs' damages, a finding that WGI believes would not be supported by the evidence, the Court must allocate fault between WGI and the United States.  "After the factfinder establishes negligence, the amount of liability of each tortfeasor relies upon the doctrine of comparative fault when litigation involves multiple tortfeasors."  *Norfleet v. Lifeguard Transportation Service*, 934 So. 2d 846, 852 (La. App. 4 Cir. 2006) (citing Art. 2323 of the Louisiana Civil Code).  Based on the evidence, the Court should allocate an overwhelmingly predominant percentage of fault to the United States as the entity that served as the engineer-of-record on the project, and commissioned, supervised, and approved WGI's performance.  Under Louisiana law, the Court must allocate fault to the United States even in the event that it is found to enjoy immunity for its work at the EBIA. La. Civ. Code Civ. art. 2323 (fault of a party shall be determined "regardless…of immunity by statute").

### III.   CAUSATION: WGI'S EXCAVATIONS WERE NOT A SUBSTANTIAL CAUSE OF THE EBIA BREACHES.

The causation issue in this case is whether or not WGI's environmental remediation work in the EBIA "was a substantial cause of the North and South Breaches of the floodwalls that ran adjacent to that area" during Hurricane Katrina.[86]   Plaintiffs bear the burden of proving by a preponderance of the evidence that WGI's alleged conduct is the proximate or legal cause of their alleged damages.   *See Toston v. Pardon*, 874 So. 2d 791, 799 (La. 2004); *Rando*, 16 So. 3d at 1092-93; *Hanks v. Entergy Corp.*, 944 So. 2d 564, 578 (La. 2006) ("In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence.").   To do so Plaintiffs must prove that there exists a substantial relationship between WGI's conduct and Plaintiffs' damages.   *Harrell v. Genco*, 671 So. 2d 530, 533 (La. Ct. App. 1 Cir. 1996) (city's failure to enforce closing ordinance did not bear a substantial relationship to the death of man shot outside of bar); *Crockett v. Cardona*, 713 So. 2d 802, 805 (La. Ct. App. 4 Cir. 1998) (negligent driver who caused a car accident that delayed a groom's arrival to his own wedding was not liable for the bride's emotional distress, as risk was not foreseeable).

Plaintiffs also must prove by a preponderance of the evidence that WGI's conduct was a cause-in-fact or "substantial factor" in their alleged damages.   *See Roberts*, 605 So. 2d at 1051 (alleged conduct must be "substantial factor" or "cause in fact" of the harm suffered).   In other words, Plaintiffs must prove (1) their damages would not have occurred absent WGI's conduct; (2) WGI's conduct played so important a role in producing Plaintiffs' damages that responsibility should be imposed on WGI even if Plaintiffs cannot demonstrate that the damages would have occurred but for WGI's conduct; or (3) WGI's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm.   *Perkins v. Entergy Corp.*, 782 So. 2d

---

[86]   Minute Entry, Mar. 17, 2011, Doc. 20200, at 1.

606, 612 (La. 2001).   Plaintiffs cannot prevail simply by establishing that WGI's conduct is a "possible" cause of their damages; rather, they must prove that it was more likely than not that WGI's conduct was in fact a substantial cause of their damages.  *Id.* at 618; *see also Gleason v. City of Shreveport*, 393 So. 2d 827, 829 (La. Ct. App. 2 Cir. 1981) (plaintiff did not establish that city's failure to maintain drainage was a substantial factor in flooding); *Loupe v. Circle, Inc.*, 514 So. 2d 269, 271 (La. Ct. App. 5 Cir. 1987) (explosion was not a cause-in-fact of back injury incurred during clean-up of explosion site 30 days later).

In their attempt to meet their significant evidentiary burden, Plaintiffs rely on the thin and insubstantial reed that is the opinion testimony provided by their sole causation expert, Dr. Robert Glenn Bea.   Dr. Bea's opinions rest on counterfactual assumptions and unscientific analysis. Whether or not the Court decides to exclude Dr. Bea's opinions,[87] Plaintiffs' case falls far short of establishing the causation requirement as the Court has properly framed it, for the following reasons.

A.      **The Actual Soil Properties in the EBIA *Prevented* the Failure Modes Plaintiffs Claim.**

This Court's directions regarding issues to be discussed with respect to causation, primarily involve fundamental matters of soil mechanics.[88]   Section III.A. addresses those soil mechanics fundamentals in what WGI believes to be the appropriate order of importance: Briefing Order paragraphs 6.d.C.6), 6.d.C.2), 6.d.C.10), 6.d.C.7), 6.d.C.1), 6.d.D.1), 6.d.C.3), and 6.d.C.9).   Issues related to the specific excavations or other work performed, or not, by WGI in the EBIA, will be addressed in Section III.B, *infra*.

---

[87]   During the trial of this case, from September 12 through October 5, 2012, all of the arguments made in support of WGI's Motion to Exclude the testimony of Dr. Bea have been proven.  *See* Mem. in Support of Motion to Exclude, Doc. 20822-1.

[88]   Briefing Order at 4.

1.    **Dr. Bea's use of an incompressible soil skeleton violates soil mechanics fundamentals (Question 6.d.C.6)).**

Dr. Bea's use of $m_v$ values of **zero** and **1 x 10$^{-9}$ 1/psf** in his SEEP/W transient flow analyses to characterize any of the clays, organic or otherwise, in the EBIA has no scientific basis and completely distorts those analyses, rendering any pore pressures realized from those analyses simply wrong.  It then follows that Dr. Bea's use of the resulting pore pressures in his SLOPE/W stability analyses to demonstrate computed failure of the floodwall at the North and South Breaches is also wrong.

a.    **The actual, measured soil skeleton compressibility in the EBIA was far higher than Dr. Bea assumed.**

There is no dispute that the actual, site-specific, soil skeleton compressibility for the ***fully saturated*** soils in the EBIA measured between **2 x 10$^{-5}$ 1/psf** (the figure computed from the pumping tests run by Plaintiffs' experts in the South EBIA site during the 2011 joint soils investigation)[89] and **4 x 10$^{-5}$ 1/psf to 3 x 10$^{-4}$ 1/psf** (the values computed from the pumping tests run by Defendants' experts in their EBIA sites during the same joint soils investigation).  These figures were corroborated by numerous 1-D consolidation tests performed both by Plaintiffs and Defendants.[90]  For Dr. Bea to use, in the face of that data, a compressibility that is ***10,000 times lower*** than the site-specific measured compressibility values defies logic.  In fact, Dr. Bea's fictitious compressibility cannot be found for any soil anywhere.  Only sound rock such as the Berea Sandstone used as a demonstrative in court approaches that level.[91]

---

[89]  Bea Tr. at 925:10-20 ("Q: That actual $m_v$ derived from Dr. Rogers' and Kevin Pope's work on the South EBIA site is 2 times 10 to the minus 5, 1 over PSF; isn't that right?  A: Correct, sir."); JX-1672-0078 (Silva Expert Rep. at 67, indicating that the storativity values obtained by Dr. Rogers and Mr. Pope from Plaintiffs' pumping tests produced an $m_v$ value of **2 x 10$^{-5}$ 1/psf**).

[90]  *See* JX-1672-0078 (Silva Rep., Table VII-2); JX-1676-0069 to -0070 (Silva Rep., App. D, Tables D-24 & D-25).

[91]  Silva Tr. at 3805:8-3806:9.  The Berea Sandstone has an $m_v$ value of **1 x 10$^{-9}$ 1/psf** and a permeability value of **1 x 10$^{-5}$ cm/sec** – the precise values that Dr. Bea used in his flow analyses.  *Id.*  As such, the sandstone is an accurate reflection of how Dr. Bea alleges the organic clay layer at the EBIA appeared during Katrina.

**b.      Dr. Bea's *post-hoc* rationalization for his incompressibility assumption has no scientific basis.**

When confronted with this unreasonable factual foundation for his transient flow analyses, Dr. Bea offered two rationalizations.  First, he claimed that he always intended to manipulate the compressibility of the EBIA soils to metamorphose transient flow analyses into steady state (or steady flow) analyses.[92]  Second, he claimed that in fully saturated soils, the soil skeleton takes on a compressibility at least ***twenty times lower*** than that of water.[93]   Neither of these withstands scrutiny, and both are flawed afterthoughts.  Despite admitting, as he must, that compressibility ($m_v$) is a "crucial parameter" in his analysis, Dr. Bea did not mention it once in his original expert report in this case, nor do his litigation reports or publications regarding the EBIA floodwall failures ever mention it.[94]

**(1)      Flows from Katrina's storm surge were not steady state/flow conditions. (Question 6.d.C.2))**

Dr. Bea rationalized his approach by saying that he was actually conducting a steady state, or steady flow, analysis.[95]   Yet using that method rather than a transient flow analysis ignores

---

[92]   *See* Bea Tr. at 922:18-923:12 ("We were not focused, actually, on $m_v$, but rather on an analytical process that would appropriately model steady flow conditions that met an incompressible soil and an incompressible fluid.").

[93]   *See* Bea Tr. at 935:21-936:9; 937:8-943:3; Silva Tr. at 3801:20-3802:18; DX DM-0015-00100 (Silva Dem.).  There has been no explanation why Dr. Bea, claiming to rely on the compressibility of water for his faulty analyses, has used a compressibility more than one order of magnitude less (twenty times less) than the actual compressibility of water.  Dr. Bea admits that his compressibility value is not equal to the compressibility of water.  Bea Tr. at 940:17-21.

[94]   Bea Tr. at 921:21-23, 922:8-17.  Silva Tr. at 3798:23-3799:10.  ("The first six years of Dr. Bea's work with this EBIA failure, $m_v$ is not mentioned anywhere.  I couldn't find a single mention of $m_v$ in any professional paper, or court documents, or reports.  Maybe there's one somewhere, but I haven't seen it.  Now, a comprehensive review of his work is impossible without information about $m_v$.  Dr. Bea, himself, recognizes that $m_v$ is a critical parameter to analyze transient flow. . . .  Nevertheless, no mention of $m_v$ in any of the work for six years.  And in terms of the published papers, I don't know how the reviewers were able to review his work without that key piece of information.").  Similarly, the "dilatational wave theory" that Dr. Bea cites as support for treating fully saturated soils as fully compressible was not mentioned in any of his expert reports submitted during or before this case.  Bea Tr. at 936:15-937:7; *see also* Bea Tr. at 935:21-936:9.

[95]   JX-01414-0018 (Bea Rebuttal Rep. at 17: "These hydraulic conductivity analyses have been and were based on '*Steady Flow*' conditions for the soils below the phreatic surface (initial water surface elevation in the soils.).") (emphasis in original).  Dr. Bea made this claim even though Mr. Cobos-Roa thought he was conducting a transient flow analysis.  DX-02674-0092 to -0093 (Cobos-Roa Dep. at 202:3-203:22).  It is undisputed that Mr. Cobos-Roa also used the SEEP/W software to conduct transient flow analyses in connection with Dr. Bea's testimony in the *Barge* litigation, Dr. Bea's testimony in the *Robinson* case, and all of the papers that Dr. Bea and Mr. Cobos-Roa prepared in 2008 regarding the EBIA failures.  Bea Tr. at 912:16-913:2.

Katrina's realities.  Other than Dr. Bea, all the other expert opinion testimony in this case has rejected the use of steady state/flow (or steady flow) analysis as a proper basis to evaluate the cause of failure, or to calculate actual conditions during the Katrina storm surge.[96]  Of course there is a time in geotechnical analysis related to levees and/or dams to use steady state/flow analysis – and that time is when there actually exist, or the design expects there to exist, steady state/flow conditions in the subterranean aquifers underlying those structures.  That was not the case at the EBIA during the Katrina storm surge.[97]  Plaintiffs, and Dr. Bea, have "muddied the water" by references to the USACE's common use of steady state/flow (steady flow) analysis in the ***design*** of levees and floodwalls.[98]  But until an aquifer (or in this case an aquitard) actually achieves steady state conditions after the imposition of obviously changing (transient) storm surge conditions, it is unheard of to artificially impose steady state/flow analysis to forensically determine the actual flow and resulting pore pressure transmission to diagnose a levee or floodwall failure.[99]  Indeed, even Dr. Bea himself performed all of his SEEP/W analyses as transient flow, not steady state/flow, despite the fact that the software gave him the option to choose steady state/flow analysis.[100]

Notably, one of the Government's geotechnical experts, Dr. Tim Stark, ran a steady state/flow analysis of the EBIA using the SEEP/W program, but only to establish an upper bound range of uplift pressures to compare with the results of his transient seepage analysis.[101]  Dr. Stark qualified the use of the steady state/flow analysis by stating that it "assumes the seepage has sufficient time to flow the distance it desires based on the applied total head which accelerates the

---

[96]  Marr Tr. at 1927:21-1931:11 (discussing DX DM-1006-0081 to -0083, Marr Dem.); Brandon Tr. at 3206:16-3211:6 (discussing DX DM-1008-0053 to -0054, Brandon Dem.); Stark Tr. at 3416:4-3417:14 (discussing DX DM-1009 to -0021, Stark Dem.); Silva Tr. at 3756:17-3759:8 (discussing DX DM-0015-0061 to -0062, Silva Dem.).

[97]  *See* Silva Tr. at 3843:17-3844:9.

[98]  *See, e.g.*, Bea Tr. at 1316:16-1317:10.

[99]  Marr Tr. at 1939:23-1940:14 (discussing DX DM-1006-0100 to -0101, Marr Dem.); Brandon Tr. at 3203:19-3204:8; Silva Tr. at 3809:4-16.

[100]  DX-02674-0092 to -0093, -0098 to -0099, -0118 to -0119 (Cobos-Roa Dep. at 202:3-203:22, 213:6-21, 262:17-263:11).

[101]  JX-01780-0232 to -0236 (Stark Rep. at 232-36).

solution because the solution is no longer a function of time."[102]   Interestingly, according to Dr. Stark's findings, in which the SEEP/W program was run in steady state mode using the correct permeability values, the resulting uplift pressures, though elevated over the transient results, did not exceed the overburden stress of the soils on the landside of the EBIA levee.[103]   This further disproves the validity of Dr. Bea's idea that a steady state/flow analysis would show failure because when a **proper** steady state/flow analysis is done in SEEP/W it does not, even as a design tool, predict failure.[104]

One must conclude that Dr. Bea's "explanation" for use of non-existent soil properties, **$m_v$** values of **zero** and **1 x 10$^{-9}$ 1/psf,** were only arrived at when Dr. Bea realized he could not replicate his pre-determined pore pressure results using standard geotechnical methods.  In fact, Mr. Cobos-Roa testified to the results-oriented approach that led to Dr. Bea's assumed compressibility:

> Geoestudios interacted with Dr. Bea in the selection of this – of this parameter.  Dr. Bea asked Geoestudios to – to find a way how we can model this – I'm sorry, incompressible response of the soils.  So Geoestudios essentially looked for a number that was representative of this condition and that's how – when we came back to Dr. Bea and said, 'Hey, if we use this value of 10 to the minus 9, it seems like we get this response.'  He accepted it and that's why we went to those values.[105]

### **(2)    Fully saturated clays are not incompressible.**

Dr. Bea's second rationalization for using a compressibility that no soil has fares no better. He claimed he used that figure because the organic clay layer he was analyzing was under the water table (phreatic surface) and was therefore completely saturated.[106]   That fact, however, provides no support for his assumption:  each of the Defense experts modeled the organic clay for their analyses

---

[102] *Id*. at -0233.

[103] *Id*. at -0235 to -0236 (Fig. 8-18(a)).

[104] *Id*.

[105] Bea Tr. at 923:23-924:10.  DX-02674-0090 to -0091 (Cobos-Roa Dep. at 198:21-199:22).  While Cobos-Roa only *explained* how he came to use **1 x 10$^{-9}$ 1/psf,** it is uncontroverted he also used **zero** for some soil units.  Bea Tr. at 926:6-15.  This makes Dr. Bea's explanation for why he purportedly didn't simply use **zero** for all the soils inexplicable--he testified he didn't intend to use **zero** because he thought it would cause "instability" in the results. Bea Tr. at 923:23-924:10.

[106] *See* Bea Tr. at 961:8-14.

based on a fully saturated clay layer.[107]   Moreover, Dr. Bea's own SEEP/W analysis, and the GeoStudio suite of software programs, requires an input as to whether or not the soil is fully saturated and therefore is specifically designed to account for the fully saturated nature of the organic clay layer of soils.[108]   There is no scientific basis, and none was referenced by Dr. Bea, for the argument that a fully saturated soil unit is automatically a soil unit as incompressible as water, or (in Dr. Bea's analysis) at least twenty times ***more incompressible*** than water.[109]   Similarly there is no scientific basis whatsoever to treat some soil layers in the EBIA as having a compressibility even less – a compressibility of *zero* – which the SEEP/W software translates as **$1 \times 10^{-20}$ 1/psf.**[110] Such manipulation of input data has no foundation in fundamental soil mechanics.[111]

At trial, Dr. Silva demonstrated the fallacies inherent in both of Dr. Bea's rationalizations for assuming incompressibility of the clay soils involved in the EBIA and the levee protecting the Lower Ninth Ward.  The Court will recall that Dr. Silva illustrated the difference between steady state/flow and transient flow, as well as the concept of flow into and through an incompressible system and a compressible (expandable) system, using a mechanical device consisting of two sets of four chambers each, with three small metal orifices connecting each chamber in each set – treating each set of four chambers as a separate system – one system being an incompressible system (made

---

[107] Marr Tr. at 2116:3-13; Brandon Tr. at 3276:23-3277:18; Stark Tr. at 3495:7-11; Silva Tr. at 3703:16-3705:22; *see* Bea Tr. at 965:5-9 ("Q: You were aware, were you not, that the digital flow analysis software programs used by other experts in this case that you have examined all treated the organic clay layer as fully saturated, don't you?  A: Correct.").

[108] Bea Tr. at 965:10-13 ("Q: You were also aware that the SEEP/W software programs used by Mr. Cobos-Roa for you took account of fully saturated conditions; isn't that correct?  A: That's correct."); DX-02674-0123 (Cobos-Roa Dep. at 272:17-24: "Q: In Dr. Bea's rebuttal report he states that the seepage analyses were modeled for saturated only conditions, and I think that's one of the options in the SEEP/W, you can either do saturated only or saturated or unsaturated.  Is that a correct description of your SEEP/W analyses?  A: For the swamp layer, yes.").

[109] *See* Silva Tr. at 3705:2-5 ("Saturation certainly does not mean incompressible.  If you have a saturated soil, if you put a load, it will contract, it will compress.  If you increase the pore pressure, it will expand.").  The uncontroverted testimony is that the compressibility of water is **$1 \times 10\text{-}8$ 1/psf**.  Bea Tr. at 942:23-943:3.

[110] *See* Bea Tr. at 926:6-15 ("Q: . . . I think you learned this perhaps during your deposition . . . [Mr. Cobos-Roa] used zero at times for some of the soil stratum, did he not?  A: Yes.").

[111] Marr Tr. at 1943:12-1944:3; Silva Tr. at 3818:8-19.

of Plexiglas), and the other being a compressible system (made of latex rubber).[112]  Both of the four

chamber systems were full of water to begin the demonstration.[113]  Each of the four chambers on

both systems was equipped with a pressure gauge to read the pore pressure of the water in each

chamber.  Each of the chambers was representative of a single cell of soil, and Dr. Silva explained,

of course, that there were millions of cells of soil in the EBIA that water would need to flow

through, with its attendant pressure, to progress towards the landside of the floodwall.  In the case

of the rigid Plexiglas system, the pressure increased immediately when pressure was applied to the

fully saturated cells, despite the small orifices that connected each chamber (cell).  In the case of the

rubber latex system, the pressure took significant time to provide increasing pressure, cell by cell,

because of the compressibility of the fully saturated rubber latex cells -- they had to expand and

store more water in each cell before the pressure would begin to increase, first in one cell, then in

the next.

This simple, but elegant demonstration, explains in terms that are understandable, the effect

of Dr. Bea's use of his totally erroneous compressibility, $m_v$, in his transient flow analyses.  By

using this erroneous, but crucial, value, he distorted the results of his flow analyses to provide

highly erroneous pore pressure values that he then inserted into his lateral stability analyses to

predict failure of the floodwall by underseepage – or as he now prefers to denominate it – pressure

transmission.  This demonstration illustrated how the compressible clays in the EBIA would take

many months to achieve steady state/flow.  The fact that the cells (chambers) were fully saturated

did not make them incompressible, as Dr. Bea's novel theory would require.  Additionally, one can

clearly see that pressure must have its correlative, flow, in any proper flow analysis.

---

[112] Silva Tr. at 3723:8-3740:5; DX DM-02723 (Video Dem. of Flow Simulator); DX DM-0015-0036 (Silva Dem.).

[113] Although Dr. Bea was present for the demonstration, and the testimony related to the demonstration, he
misrepresented the facts of the device during his rebuttal case.  Dr. Bea erroneously testified that: "Yesterday, in the
demonstration in the hall, the tube that was closest to you had bags of soil.  As water entered one end, it didn't come
out immediately at the other end because the bags were expanded, and as they expanded, water continued to come
through and, finally, a few drops came out."  Bea Tr. at 3940:17-23.  Of course there were no "bags of soil" – the
four chambers in each system was full of pure New Orleans water to begin with.

### 2. Consequential uplift pressure would not be possible without flow through the soils in the EBIA levee and under its floodwall. (Question 6.d.C.10)).

One of the Court's questions asks the parties, in addressing whether there can be uplift pressure without flow, to assume incompressibility of the soil skeleton. WGI respectfully submits that such an assumption is inconsistent with soil mechanics. Fully saturated soils, as has been explained above, are not incompressible. They have a site-specific measured compressibility of at least **2 x 10$^{-5}$ 1/psf**, as determined by the Plaintiffs' own EBIA pumping tests.[114] The water in the soil pores is relatively incompressible – but even that water is twenty times more compressible than Dr. Bea assumes in his SEEP/W analyses, and infinitely more compressible compared to his assumption of an $m_v$ of **zero**.[115] As a scientific matter, the only pressures caused by Katrina's thirty-hour storm surge that could generate uplift pressures on the landside of the floodwall to destabilize the levee and floodwalls of the EBIA would have to be the result of flow that would have required months to develop and simply could not take place during the short storm surge. Those flows simply did not occur through these impermeable, but very compressible soils. Moreover, if the fully saturated soil units had been incompressible, as postulated by Dr. Bea's analyses, those soil units would have been rigid enough to withstand the resulting flows and uplift pressures. Such incompressible materials, even when steady state conditions would have been achieved, would literally have been structurally as sound as the Berea Sandstone that Dr. Silva presented to the Court.[116] The resulting pore pressures, hence uplift pressures, would not have been consequential to the stability of the levee and floodwall.

---

[114] Bea Tr. at 925:10-20 ("Q: That actual $m_v$ derived from Dr. Rogers' and Kevin Pope's work on the South EBIA site is 2 times 10 to the minus 5, 1 over PSF; isn't that right?  A: Correct, sir."); JX-1672-0078 (Silva Rep. at 67, indicating that the storativity values obtained by Dr. Rogers and Mr. Pope from Plaintiffs' pumping tests produced an $m_v$ value of **2 x 10$^{-5}$ 1/psf**).

[115] Silva Tr. at 3801:20-3802:18; DX DM-0015-00100 (Silva Dem.).

[116] Silva Tr. at 3806:13-3807:11.

Standard transient flow analyses through *fully saturated soils* require the input of three basic hydrogeological parameters: permeability, porosity, and compressibility.[117]   It is essential to note that all experts agree that their analyses assume *fully saturated soils*.   That is, the fact that the soils are fully saturated does not eliminate the absolute requirement that site-specific compressibility ($m_v$) be input to the equations that are used, in standard geotechnical practice, to *determine* transient flow and pressure.   Fully saturated soils do not result in discarding compressibility from the transient flow equation.   Dr. Bea's novel theory would mean that when soil units are fully saturated one must alter the compressibility to an unrealistic value that is twenty times less compressible even than the water in the pores of the soil unit.   Such an approach is not just novel, it is unheard of, and unscientific.

The Court's question C.10. also asks whether "the speed that sound travels through water relate to a saturated soil skeleton *which is incompressible*."   That question highlights two very important flaws in Plaintiffs' causation case.   *First*, the speed of sound through water is approximately 5,055 feet per second, while the speed of sound through a material with Dr. Bea's compressibility of **1 x 10$^{-9}$ 1/psf**, would be approximately **20,530** feet per second.[118]   *Second*, relatively instantaneous transmission of pressure to the landside toe would have had to come from a high energy event such as a large blast or an earthquake;[119] otherwise, such a relatively instantaneous transmission of pressure would do no damage to the levee or floodwall without corresponding flows of water.   Such a pressure wave would pass into infinity with a jolt, but with

---

[117] Rogers Tr. at 698:1-699:11; Silva Tr. at 3756:21-25; JX-01404-0004 (Freeze & Cherry, *Groundwater*, 1979, at 65).

[118] Bea Tr. at 938:8-939:10.  This is further evidence of the *post-hoc* nature of Dr. Bea's explanation for his invention of pressure transmission without flow to explain his previously undisclosed, unnatural $m_v$.  If Dr. Bea's selection of an unreal $m_v$ had not been determined after the fact he would have used the compressibility of water – which is **1 x 10$^{-8}$ 1/psf**, twenty times more compressible.

[119] Marr Tr. at 1936:24-1937:4.  Dr. Bea himself admits that his "dilatational wave velocity" estimate of 5,055 feet per second is "a very important parameter in the propagation of *earthquake waves* in soil."  Bea Tr. at 938:8-15 (emphasis added).  *See also* Marr Tr. at 1938:6-1938:12 ("No geotechnical or geohydrology textbook teaches pressure wave theory for seepage issues in soils.  No Corps of Engineers manual even addresses pressure wave or mentions it for transmission of pore pressure through soil from rising flood water.")

no resulting damage to the levee or floodwall.[120]  *Third*, and the direct answer to the question posed by the Court, it is a well known fact to geotechnical engineers that the speed that sound travels through water does not provide useful information regarding the stiffness of the mineral skeleton of a saturated soil but rather reflects the compressibility of the pore fluid (water).[121]  Dr. Bea seemed to understand this well known fact when he expressed that the $m_v$ he used does not correspond to the $m_v$ of the soil skeleton or frame at the EBIA.[122]  In order to cause uplift, and therefore damage, the pressure would have to be accompanied by the flow of water to displace and "lift up" the overburden of heavy clay soils on the landside of the levee and floodwall.  This phenomenon is called heave, and is accompanied by flow through the soils underlying the levee on the landside.[123] The evidence is clear that there was no heave or piping on the landside of the levee and floodwall adjacent to the EBIA after Katrina.[124]   Without such phenomena there would have been no consequential pressure transmission – even if such transmission occurred – and it did not.  Even if one accepts Dr. Bea's unrealistic rigid system, the slightest heave in the absence of flow would cause the transmitted pore pressure to immediately decrease, thus resulting in a mechanism that could do no harm.[125]

> ### 3.   The actual properties of the soil units in the EBIA precluded consequential pore pressures from being transmitted laterally. (Question 6.d.C.7))

As explained above, consequential pore pressure transmission at the EBIA required consequential flow of water through the actual soil units in the EBIA and the adjacent levee on the

---

[120] *See* Marr Tr. at 1937:5-12 ("That pressure wave would increase stresses in the ground, both total stress and pore pressure.  There would be no change in strength, though, that happens from that.  It's an instantaneous pulse that lasts for milliseconds that occurs in pressure wave transmission theory.  There is no flow of water [that] occurs. There is no change in soil volume, which means there can be no change in soil strength.  Inertial terms are involved.").

[121] Bea Tr. at 937:23-938:7.

[122] *Id*. at 943:4-7.

[123] *See* Brandon Tr. at 3159:23-3160:13.

[124] Marr Tr. at 1919:4-25; Brandon Tr. at 3229:6-11; Stark Tr. at 3416:17-23, 3426:14-20; Silva Tr. at 3772:21-3773:22.

[125] Silva Tr. at 3821:9-3822-2.

landside of the floodwall, and such pressures and flows could not occur during the thirty-hour storm surge created by Hurricane Katrina.  The actual, measured, physical properties of the soil units dictate this response.  The mixture of lean clay, fat clay, silts and organic clays in the levee supporting the floodwall were too impermeable to allow this pressure and flow transmission.[126]

With that background, it is important to understand that pressures ***can be*** relatively instantaneously transmitted laterally through fully saturated material if that material is as incompressible or ***more*** incompressible than water.  As was carefully explained by Dr. Silva, compressibility of a given material is really another word for the Coefficient of Volume Change, and it is directly related to the storage coefficient or storativity of that material.[127]  The more compressible a material is, the larger its storage coefficient or storativity.  And it follows that the greater the volume of fluid (here water) that can be taken into storage in a material (here organic clay or clay), the slower the transmission of pore pressure and flow will be.  In the materials found in and under the EBIA levee, both the canal side and the landside, there was a much larger storage coefficient or storativity, than would have existed in the Berea Sandstone that was given as an example of a material possessing a much lower coefficient of volume change ($\mathbf{m_v}$).  With such an unreasonably incompressible material (**1 x 10$^{-9}$ 1/psf** or even **zero**), there is at least 20,000 times less capacity for deformation or water storage.  Therefore pore pressure transmission through fully saturated sandstone would occur almost instantaneously.  On the other hand, with the actual compressible clays and silts in the EBIA, achieving that transmission would take many months, as the actual soils deformed, and stored water.  However, it should also be noted that with the sandstone's incompressibility would come a structural soundness that would prevent significant

---

[126] *See, e.g.*, Marr Tr. at 1946:16-18.  It is instructive to remember that Dr. Bea's original analyses treated these soils with the same permeability as the sand layer that was found at the 17th Street Canal – that is **1 x 10$^{-2}$ cm/sec**.  That pervious sand layer did not exist at any meaningful location or level in the EBIA, or in the levee protecting the Lower Ninth Ward.  *See* Bea 690:13-692:4.

[127] Silva Tr. at 3714:3-3715:3.

structural deformation.  That is, the flow of water and transmission of pressure would occur, but the floodwall would remain standing if the levee consisted of Berea Sandstone, since the floodwall would be imbedded in a rock, not in clay.  As Dr. Silva explained, what Dr. Bea's novel theory would mean is that the high pore pressures created by the mis-begotten SEEP/W analysis (using sandstone values) would be transmitted into soft clays by inserting those mis-begotten pore pressures into a lateral stability analysis that assumed clay, not solid sandstone.[128]

The Court's question regarding lateral pressure transmission through porous rock versus clay or silt relates indirectly to the issue of anisotropy – the ratio between vertical and horizontal (or lateral) permeability.  Although it makes virtually no difference to the analysis of the problem in the EBIA, the facial impression is given by Dr. Rogers and Dr. Bea that it is important to use a 1 to 10 ratio (vertical to horizontal).[129]  That translates to an anisotropy of 10.  However, the true ratio measured for the soils in the EBIA levee was almost unity, actually 1 to 1.36 (vertical to horizontal).[130]  Again, the source cited by Dr. Rogers for his erroneous ratio was actually a study performed by Dr. Timothy Stark in Wisconsin, in a peat bog – a material known as Middleton peat.[131]  A review of the published study exposes the vast difference, even to a lay person, between the organic clay materials in the EBIA and the fibrous peats that were tested in Wisconsin with anisotropy of 1 to 10.  Although this error would not affect the results showing horizontal permeability in the joint soils investigation, of **1 x $10^{-5}$ cm/sec,** it illustrates the lack of coherence and care in Dr. Bea's analyses.  Given the stipulated horizontal permeability of the EBIA organic clays[132] the vertical permeability would be mis-calculated by about 10 times, with no advantage to Dr. Bea's novel theory, since the resulting smaller vertical permeability would further impede the

---

[128] Silva Tr. at 3806:21-3807:8.
[129] Stark Tr. at 3453:3-5.
[130] *Id*. at 3453:10-3454:15.
[131] *Id*. at 3516:2-11.
[132] Uncontested Fact No. 87.

flow of water downward.  Pragmatically, this change would not alter the horizontal flow analyses in any significant way since the subsurface flow through clays during the short Katrina storm surge was negligible.

### 4. Hydraulic conductivity and/or resulting uplift pressure did not contribute to either the North or South Breach. (Questions 6.d.C.1) & 6.d.D.1)).

Because of the actual site-specific soil properties existing in the levee protecting the Lower Ninth Ward prior to Hurricane Katrina, flow and pressure transmission did not contribute to the failure of this critical structure.  More importantly, none of the environmental remediation work accomplished by WGI did anything to contribute in any way to the levee/floodwall failures at the North and South Breaches of that important structure.  This involves two separate but related conclusions supported by the overwhelming expert opinion evidence in this case:  (1) the excavations and other work accomplished by WGI did not exacerbate any underseepage or subterranean flow of water and pressure that had any deleterious effect on the levee/floodwall; and, (2) there was no meaningful underseepage or subterranean flow of water and pressures that contributed to the failure of the levee/floodwall.[133]

The Court will note that the word "underseepage" has been largely missing from the parlance of Plaintiffs' case during this trial.  The avoidance of the use of "underseepage" as a causation theory relates to the shifting theory finally settled upon by Plaintiffs and their only supporting expert on causation, Dr. Bea.  As WGI has demonstrated above, there can be no pore pressure transmission of any consequence towards the landside toe of the levee without corresponding flow of water through the subterranean soils.  Once Dr. Bea realized that the real measure of hydraulic conductivity (permeability) of the relevant soils in the EBIA and in the landside of the EBIA floodwall was *not* the pervious **1 x 10$^{-2}$ cm/sec** that he originally conceived,

---

[133] Marr Tr. at 1831:6-15, 1831:25-1832:4, 1945:25-1946:6-7; Brandon Tr. at 3230:10-21, 3284:2-14; Stark Tr. at 3410:11-16; Silva Tr. at 3825:21-3826:19, 3755:13-3756:16.

eliminating "underseepage" from his lexicon and separating flow from pressure was required to support a causation theory that would implicate WGI's work. But hydraulic conductivity (flow of water through porous media) cannot be separated from pore pressure transmission in the facts of this case, or, more importantly, as a matter of fundamental scientific principles, in the type of analysis (a flow analysis) he incorrectly selected to model pressure transmission during the initial, undrained phase of the loading.

Although the Court's question in the Briefing Order at 5, paragraph 6.d.D.1), might more logically be considered in the section of this memorandum addressing the likely causes of failure of the levee/floodwall protecting the Lower Ninth Ward (*see* Section IV, *infra*), we will provide our understanding of each expert's testimony as it relates to pore pressure below.

### a.   Dr. Francisco Silva-Tulla regarding the role of pore pressure.

Dr. Silva explained that pore pressures from underseepage had no effect on the failures. Pore pressures increased in the pore water in the soils on the canal side of the floodwall as the depth, and therefore weight, of the flood water increased over the EBIA with the rising storm surge. However, given the relatively impervious properties of those soils, and the relatively short duration of the surge, the pore pressures and the flow through those soils could not advance more than a maximum of about 16 feet from the face of any open excavation in the time before the breaches occurred.[134] Shortly after the breaches the total stress on the landside from flood waters caused an equalization of the pore pressures, since the weight and depth of the water on either side of the floodwall equalized. Simply stated, the damage to the floodwall happened at or near the surface as the wall was destabilized from a combination of back scour and weight and pressure of the water against the wall from the canal side. This will be further addressed in Section IV *infra*.

---

[134] Silva Tr. at 3754:21-3756:25.

The two sources of pore pressure that were at work in the EBIA during the Katrina storm surge were explained to the Court by Dr. Silva in response to the Court's questions.[135]  One source of pore pressure increase was increased total stress from the accumulation of water against the floodwall during the storm surge.[136]  The other source of pore pressure increase was from water flow through the canal side soils.[137]  In the case of total stress increase from water load, the resulting pressures begin to decay as the weight approaches the floodwall, and "you move away a few feet from the floodwall and you don't feel it."[138]  In the case of the pressure from water flow, Dr. Silva testified, in response to the Court's question:

> The Court: So you're saying without flow, there's no pressure on the land side; is that –
> The Witness: Without flow, there's no – well, if there's no flow, there's no *increase* in pressure due to flow, yes.  The land side has pore pressures. These are conditions, and they might have pore pressures increase from other sources, like water that accumulates[s] (sic.) in the land side will increase the pore pressures just like it did on the canal side but – it would take months in order for the pressures due to the flow from the floodwaters on the canal side to be felt on the land side.
> The Court: And the pressure coming from the water side, is it my understanding that you're testifying that pressure from the water, assuming no overflow, would only be felt if the water ultimately flowed through to the other – to the land side from the protected (sic.) [canal] side?
> The Witness: That is correct. And eventually it would. If we kept the water level there and wait a year, you would feel those pressures.[139]

In addressing Dr. Bea's novel theories regarding pore pressure increases on the landside of the floodwall without flow – and, incidentally, without the weight of floodwaters on the landside of the floodwall – Dr. Silva raised the question directly:

> So [pursuant to Dr. Bea's theories] we're not talking about underseepage, it is pressure, and then we have to figure out, well, if it is pressure, how does the pressure

---

[135] Silva Tr. at 3750:14-3759:3.

[136] *Id*. at 3750:16-3751:1.

[137] *Id*. at 3754:21-3755:6.

[138] *Id*. at 3754:7-13; *see id*. at 3751:2-12.

[139] *Id*. at 3757:17-3758:12 (emphasis added).

get from the canal side to the landside to really affect the performance of the soils so that the flood protection system fails?[140]

Dr. Silva continued by pointing out the absurdity of that notion (pressure without flow for steady flow or transient flow) based on Dr. Bea's own analyses, the only analyses Dr. Bea did to quantify pore pressures:

> Dr. Bea used SEEP/W. SEEP/W is a flow modeling program, and he used SEEP/W to determine the pressures transmitted to the landside. He performed a transient flow analysis using SEEP/W….[141]

And, as has been pointed out earlier, the only way that these pore pressures could be transmitted from the canal side to the landside in Dr. Bea's flow analyses was by manipulating his model by altering the actual compressibility of the clays – ***all of the clays***, not just the organic clays – on both sides of the floodwall and then using those artificial pore pressures to "uplift" clay, not Berea Sandstone, on the landside of the floodwall.[142]

> **b.      Dr. Allen Marr regarding the role of pore pressure.**

Dr. Marr also correctly identified the flaws in Dr. Bea's pressure wave transmission theory by pointing out that his choice of modeling tool, SEEP/W, highlights the error of his novel theory. As Dr. Marr testified:

> SEEP/W intimately couples pressure and flow. Professor Bea talked about separating -- pressure occurs separately from flow. They are intimately coupled. You cannot separate them. In order to get flow, you must have a pressure change. In order to get flow to develop, you must have a pressure change.[143]

But, as Dr. Marr testified from his vast 43 years of experience, Dr. Bea's pressure wave transmission theory applies to a situation in which a shock wave results from an explosion on the canal side – or a large wave in the North Sea impacting an offshore structure – not a storm surge

---

[140] Silva Tr. at 3798:6-10.
[141] *Id.* at 3798:10-13.
[142] *See id.* at 3806:21-3807:11.
[143] Marr Tr. at 1940:15-20.

- 41 -

that occurred over 30 hours.[144]  As Dr. Marr pointed out in his explanation of the pressure wave transmission posited by Dr. Bea, if "no flow of water occurs[] [t]here is no change in soil volume, which means there can be no change in soil strength."[145]

### c.      Dr. Patrick Lucia regarding the role of pore pressure.

Responding to Mr. Gregory's direct question, Dr. Lucia clearly answered the Court's question regarding the role of pore pressure as it relates to any explanation of failure:

> Q. … In doing the seepage evaluation, are you – did you consider transmitting pressure, or the transmission of pressure, without water?
> A. I don't think you can transmit pressures without water.[146]

Of all the expert testimony, Dr. Bea alone has testified that one can have instantaneous pressure transmission to the landside toe through fully saturated organic clay – and that this pressure transmission can occur during the storm surge without any underseepage, without any flow.[147]

### d.      Dr. Timothy Stark regarding the role of pore pressure.

Dr. Stark, during cross examination about Dr. Bea's modeling effort using SEEP/W, also stated the basic fundamental opinion that water cannot transmit pressure without flow or movement of the water:

> Q: But what he's [Dr. Bea] modeling is the flow of water, correct, the movement of water?
> A:  Yes, and it is pressure, hydraulic pressure transmission.
> Q: And so when you're talking about hydraulic pressure transmission, you're talking about the pressure that is generated by the flow of water: correct?
> A:  That's the only thing that transmits the pressure, is the flow of water.
> Q: So you're saying there cannot be pressure in the water without it moving?
> A:  It cannot transmit the pressure without moving.[148]

Although Plaintiffs' counsel inquired about pore pressure in the water lines leading to a faucet in his

---

[144] Marr Tr. at 1936:24-1939:5.

[145]  *Id.* at 1937:10-12.

[146] Lucia Tr. at 3002:24-3003:2.

[147] It is less than clear whether Dr. Bea actually takes this position.  The Court was understandably uncertain of Dr. Bea's position regarding pressure transmission without flow.  During Dr. Lucia's testimony the Court stated: "I *think* I may have misstated Dr. Bea's opinion, which I *think* did require some underseepage in order to get the upward pressure."  Lucia Tr. at 2955:1-3 (emphasis added).

[148] Stark Tr. at 3492:20-3493:5.

sink, presumably with the valve closed, and Dr. Stark admitted the faucet held pressure without

moving, that situation corresponds to water surrounded by an incompressible medium (the rigid

pipe).  That simple exchange only highlights the proposition that without movement/flow of the

water there can be no disruption of the soil and no alteration of the strength of that soil.

> ### e.      Dr. Tom Brandon regarding the role of pore pressure.

Dr. Brandon also made clear that, fundamentally, the pore pressure transmission modeled by

Dr. Bea cannot occur without flow:

> Q:  And it is also your opinion . . . that "no significant flow could have traveled
> through the soil deposits during the brief time between the onset of storm surge
> loading and a floodwall failure"?
> A:  Yes.
> Q:  "Flow volumes were far too small to have cause[d] a blowout, or even heaving,
> on the eastern side of the floodwall."  Is that your opinion here today?
> A:  That is my opinion.
> Q:  Dr. Brandon, when you used the term "flow" there, are you distinguishing
> between the movement of volumes of fluid through the soil and pressure
> transmission?
> A:  ***They're inextricably linked*** in the equations for flow, but in particular, in terms
> of volumes, I'm looking at cubic centimeters of water.[149]

As this Court correctly inquired, and as Dr. Brandon confirmed:

> Q: [The Court]. . . [Y]ou have to do the seepage analysis first before you can
> determine what the uplift pressures are to quantify the uplift pressures?
> A:  Yes, sir.[150]

Put simply, then, "[t]he uplift pressures are determined from a seepage analysis."[151]  In the

real world, pressures transmitted away from the loaded area (e.g., to the landside toe of the EBIA

levee during Katrina) cannot be separated from the flow mechanism required to make them reach

that far.

---

[149] Brandon Tr. at 3284:9-24 (emphasis added).
[150] *Id*. at 3169:11-15.
[151] *Id*. at 3169:7-10.

     **f.**     **Dr. Robert Glenn Bea regarding the role of pore pressure.**

As the Court recognized,[152] it is difficult to determine Dr. Bea's position regarding whether or not pore pressure transmission can occur without significant flow of water.  Left with relatively impermeable soils, and no physical evidence of piping, heave, or sand boils, Dr. Bea now falls back on varying theories – dilatational modulus; pressure wave transmission at 4 times the speed of sound through saturated clays; and, Newton's cradle – to explain how one can have pressure transmission without flow.  Tracing Dr. Bea's opinions, and the reasoning behind them, is difficult and confusing, but there are some fundamental propositions that cut through the clutter.

Dr. Bea chose as his only tool to determine actual pore pressure transmission in the EBIA a software program known as SEEP/W which computes flow and pressure based on basic inputs of soil properties and geometry.  Dr. Bea chose the option, transient flow, in his utilization of SEEP/W to compute pore pressure transmission.  The pore pressures computed by Dr. Bea's use of SEEP/W were distorted by his choice, or his approval of a student's choice (depending on whose testimony one relies upon), to input a completely unrealistic value for coefficient of volume change (compressibility) notated as $m_v$, because that unrealistic value was necessary to cause SEEP/W to compute high enough pore pressures, ***transmitted by the flow of water*** according to the SEEP/W model, to predict the failure of the EBIA floodwall at the North and South Breach areas.

This unrealistic value for the compressibility of the soils in the levee, both sides, was hidden from view in all of Dr. Bea's previous writings and testimony about the failures of the EBIA floodwalls.[153]  When WGI first asked for Dr. Bea's value for $m_v$, Plaintiffs represented it to be the default value for the SEEP/W program, or **$4.8 \times 10^{-7}$ 1/psf.**[154]  However, it was then discovered, by

---

[152] Lucia Tr. at 2955:1-3.

[153] Bea Tr. at 922:8-923:12.

[154] JX-1406-0009 (Email from Thomas Sims, Feb. 23, 2012); *see* DX DM-0015-0097 (Silva Dem.).   Plaintiffs' counsel's response to WGI's request clearly stated that the $m_v$ related to the soil skeleton -- a correct proposition that Dr. Bea now disputes.

looking at Dr. Bea's computer files, that indeed the values used for $m_v$ were variously **1 x 10$^{-9}$ 1/psf** or **zero**. This use of unrealistic values for what Dr. Bea admits is a "crucial parameter" for doing a transient flow analysis has resulted in Dr. Bea's admission, in response to the Court's question, that it was not common to insert such "pressures" into a lateral stability analysis:

> The Court: … Prior to your eureka moment, and we'll state, was it common to compute the pressures we've discussed into a lateral stability analysis?
> The Witness: No, it wasn't.[155]

The telling point in this exchange is that **Dr. Bea did not take pressures from piezometers at the 17th Street Canal and insert them into his lateral stability analysis, SLOPE/W.  Instead he manipulated the crucial parameter, $m_v$, in his SEEP/W analysis to produce the effect he wanted – an incompressible response.**[156]  If the piezometers and the Corps of Engineers safe water level investigation at the 17[th] Street Canal caused Dr. Bea to select a pore pressure to insert into his SLOPE/W lateral stability analysis, there would have been no reason to manipulate the $m_v$ in his SEEP/W transient flow analysis.  It was the pore pressures produced by this manipulation of the SEEP/W software's transient flow analyses that manufactured the unreasonable pore pressures, not some eureka moment at the 17[th] Street Canal.

In an exchange that followed during Dr. Bea's cross examination, the Court asked, as it relates to uplift pressures, whether the Court correctly understood Dr. Bea's testimony to be that "storage capacity" [$m_v$] "was not particularly significant", to which Dr. Bea answered: "You're correct."[157]  That raises a further question that demands an answer.  The question is why, if $m_v$ was not particularly significant, did Dr. Bea's *only* failure analysis rely on pore pressures that were determined by manipulating that crucial parameter in his SEEP/W analysis?  The answer was given by Mr. Cobos-Roa when he said: "we selected this 10 to the minus 9 to represent a response on the

---

[155] Bea Tr. at 1089:22-1090:1; *see id.* at 1087:6-1088:2 (Dr. Bea's description of his "eureka moment," which led to the Court's question).
[156] DX-02674-0090 to -0091 (Cobos-Roa Dep. at 198:21-199:22).
[157] Bea Tr. at 1091:8-12.

soils within the profiles we were analyzing as it's described in Dr. Bea's report of incompressible soils skeleton."[158]   When asked "instead of using site specific $m_v$ values you tweaked it and put an incompressible site sub v value into the program intentionally to get a certain response?"  Mr. Cobos-Roa answered simply: "Yes."[159]  Dr. Bea determined "[t]hat the $m_v$ value *needed* to be very small, close to zero."[160]  Dr. Bea's decision to use an unrealistic, non-site-specific value for this crucial $m_v$ parameter was a result-driven decision.

5.     **The soil units were properly analyzed by defense experts in an undrained condition. (Question 6.d.C.3)).**

The expert testimony demonstrates that the EBIA soils should be analyzed in an undrained condition.  The following discussion of drained and undrained conditions applies to 100% saturated soils such as the clays at the EBIA (including the Organic Clay).  At the outset, however, it is important to clarify the terminology.  To a geotechnical engineer, "drained" conditions are not those where all of the pores of the soil unit in question have been drained of fluid (here water).[161]  Similarly, having the pores of the soil unit in question completely full of fluid (here water) is *not* sufficient to ensure "undrained" conditions.[162]   Instead, "drained strength" simply refers to a strength measurement taken of a soil unit when loaded under "drained" conditions.  Similarly, when the term "undrained strength" is used, that simply refers to a strength measurement taken of a soil unit when loaded under "undrained" conditions,[163] which refers to the loading of a soil unit that is short in time compared to the time it would take for the excess (additional) pore pressures resulting

---

[158]  DX-02674-0090 (Cobos-Roa Dep. at 198:5-9).

[159]  *Id*. at -0099 (Cobos-Roa Dep. at 214:22-215:2).

[160]  Bea Tr. at 923:23-924:1(emphasis added).

[161]  Silva Tr. at 3785:23-3786:9, 3789:12-14.

[162]  *Id*. at 3785:23-3789:25.   Dr. Silva's testimony contains a detailed explanation of the meaning of "drained" conditions and "undrained" conditions.  It should be noted here that the Court reporter failed to hear and transcribe the "ed" at the end of each of these terms both when Dr. Silva was using them and at times when the Court was using those same terms.

[163]  *See* Marr Tr. at 1895:6-14.

from that loading to dissipate from that unit of soil.[164]   Dissipation time will be affected by the properties of that soil unit.[165]   In Katrina it is clear that the load imposed on the EBIA soils during the storm surge (approximately 30 hours) was short compared to the time (many months) required to dissipate excess pore pressures from the clay soils found in the EBIA based on the site-specific properties determined during the Joint Soils Exploration Program ordered by this Court.[166]   If one would postulate that the EBIA's clay soils were in a drained condition during the load or stress created in those soils by the storm surge, it would mean that the excess (additional) pore pressures could dissipate from these clay soils as rapidly as they increased[167] – a condition that clearly did not exist during the thirty hours of the Katrina storm surge.

Loading of clay soils generally occurs under undrained conditions because of the length of time it takes pressures to dissipate from an applied stress.[168]   Since the EBIA soils were experiencing undrained loading during the Katrina storm surge, and were therefore in an undrained condition, the relevant strength to measure would be the undrained strength of those soils.[169]   The clay soils in the EBIA during the Katrina storm surge were being loaded in a manner such that excess (additional) pore pressures were developing within the clay soil units beneath the water load, because the properties of those clay soils would not allow dissipation of those excess pore pressures during the short duration of the loading.[170]   Those properties included, most importantly, the permeability, the compressibility, and the porosity.

The Court's inquiry regarding Dr. Bea's opinion about the role of using these conditions in the failure analyses related to the floodwalls, we presume, relates to Dr. Bea's attempted defense of

---

[164] Silva Tr. at 3787:10-18.

[165] *Id*. at 3789:1-7.

[166] JX-1672-0059 (Silva Rep. at 48); Marr Tr. at 1895:15-20.

[167] Silva Tr. at 3787:19-3788:4; Brandon Tr. at 3206:16-23.

[168] Brandon Tr. at 3164:5-10.

[169]  *Id*. at 3229:19-23; Marr Tr. at 1898:18-22.

[170] Brandon Tr. at 3205:19-3206:3; Marr Tr. at 1946:8-24.

his unexplained change of approach, in this case, from all of his prior work analyzing these failures. In all the prior analyses documented by Dr. Bea in the *Electronic Journal of Geotechnical Engineering*, in the *Robinson* case, and in the *Barge* case, Dr. Bea treated the EBIA soils during Katrina correctly as being in an "undrained" condition.[171]   However, in this case Dr. Bea, without explanation, in his original expert report for this case treated the organic clay layer as being in a "drained" condition.[172]   Doing so effectively treats the organic clay layer at the EBIA as sand.[173] Apparently Dr. Bea realized, prior to his original report in this case, that since he was trying to mimic (improperly) a steady state or steady flow condition in his flow analyses, he should be treating the relevant soil units as being in a "drained" condition.   One mistake leads to the other. Once a soil unit reaches a steady state or steady flow condition after the application of a load, it is also in a "drained" condition.   The problem here, however, is not a steady state/flow problem, and the conditions here (during the Katrina storm surge) were not drained conditions.   Attempting to analyze these soil units as being in a "drained" condition, when they are not, produces the same wrong results as attempting to treat the EBIA soil units during the Katrina storm surge as being in a steady state/flow condition when they were not.

Having been caught in another scientific error, Dr. Bea spent several pages in both his Rebuttal[174] and his Ongoing Analysis Report[175] (that included hand calculations), attempting to demonstrate to the Court that his prior use of "effective stress" analyses and his "total stress" analyses, used in this case, provided similar factors of safety for the landside levee adjacent to the EBIA.[176]   However, the way these "similar factors of safety" were achieved in Dr. Bea's

---

171   *See, e.g.,* JX-1379-0069, -0080 (Bea *Robinson* Dec., July 11, 2008, at 68, 79); JX-1401-00026, -0033 Bea & Cobos-Roa, "Failure of the I-Wall Protection Structures at the New Orleans Lower 9th Ward During Katrina," at 26, 33).

172   JX-1392-0028 (Bea Rep., App. C at 28); *see* Brandon Tr. at 3183:12-16.

173   Brandon Tr. at 3183:19-22.

174   JX-1414-0102 to -0104 (Bea's Rebuttal Rep. at 101-105).

175   DX-2679-0005 to -0006,- 0020 to -0023 (Bea Ongoing Analysis Rep. at 5-6 & App. B).

176   Bea Tr. at 1108:4-15.

"calculations" was to use significantly different shear strengths input from one calculation to the other.[177]   Dr. Bea employed a shear strength of 300 psf in his hand calculations and employed a shear strength of 442 psf in his expert report.[178]   The calculations designed to demonstrate that the same results would obtain using either methodology (effective stresses or total stresses) should have used the same shear strengths for both methods.

Dr. Marr demonstrated this unscientific approach in his testimony, testimony that was never responded to by Dr. Bea in his rebuttal testimony.[179]   As Dr. Marr pointed out, if Dr. Bea had used the same shear strengths in his hand calculations as he did in his report, his hand calculations for undrained conditions would have produced a Factor-of-Safety of 1.6 instead of 1.1.[180]   Therefore, Dr. Bea's "validation" is no validation that his analyses for drained and undrained conditions are in agreement.[181]   Such a "validation" simply demonstrates that one can make the calculations produce the desired results by varying the inputs.  This lack of scientific veracity is similar to Dr. Bea's use of a totally unrealistic and non-existent $m_v$ to manipulate his transient flow analyses in a manner to produce pore pressures high enough to predict floodwall failure when input to his lateral stability analyses.

Regarding Dr. Bea's belated treatment of the EBIA soils as if they were in a "drained" condition during the Hurricane Katrina storm surge, Dr. Marr tellingly testified as follows:

[W]hen we [are] talking about clays here in New Orleans, geotechnical engineers look at the characteristics of these clays, and know immediately that the -- for storm loading, the controlling strength is going to be the undrained shear strength.  I think

---

[177]   *Compare* DX-2679-0006, -0022 to -0023  (Bea Ongoing Analysis Rep. at 5 & App. B) *with* JX-1392-0028 Bea Rep., App. C, at 28).   Dr. Bea used a shear strength of 300 psf for his "'Total Stress' ('Undrained'…) … 'hand calculations' . . ." in Appendix B of his Ongoing Analysis Report dated April 11, 2012,  producing a safety factor of 1.1, whereas he used a shear strength of 442 psf for the "'Effective Stress' ('Drained')" calculations in his Original Report, producing a Factor of Safety of 0.99.  Dr. Bea then declared that "[t]he two different treatments of the shear strength result in very comparable IHNC surge elevations at 'failure' (implied to be defined with a Factor-of-Safety of FS = 1.0)." JX-1414-0104 (Bea Rebuttal Rep. at 103).

[178]   JX-1392-0034 (Bea Rep. at 34); JX-1402-0028; Bea Tr. at 4122:25-4125:23.

[179]   Marr Tr. at 1932:19-1935:8; DX DM-1006-0087 to -0091 (Marr Dem.).

[180]   Marr Tr. at 1932:20-1934:10; DX DM-1006-0088 to -0089 (Marr Dem.).

[181]   Marr Tr. at 1934:15-5:8.

the illustration of that is as simple as when we were setting up the 2011 supplemental site investigation at which all those geotechnical engineers had an opportunity to determine or to tell us which type of shear test to run, there was not a single request for a drained shear strength test.  All the requests were for measurements to get the undrained shear strength of the soil.  We had nine Ph.D.'s with backgrounds in geotechnical engineering.  Not a single request for drain[ed] strength.[182]

And one of those engineers was Dr. Bea.  Curiously, despite the lack of a simple request for a drained condition shear strength test by Dr. Bea or other Plaintiffs' experts during the 2011 Joint Soils Investigation, Dr. Bea now goes to great length to create a "drained test" result, while commenting that "[t]o our knowledge no drained tests were ever performed on samples from the swamp-marsh deposits…."[183]  Since Dr. Bea never explained why he went to such great lengths to come up with "drained tests" results, when the conditions at the EBIA were clearly undrained conditions, one can only wonder.

### 6. The post-Katrina piezometer readings do not bolster Dr. Bea's flawed hydraulic conductivity theories. (Question 6.d.C.9))

A piezometer is a "pressure meter" that "measures total head from which you can compute pore pressure…."[184]  The EBIA piezometers that Dr. Bea cites, PZ-3, PZ-6, and PZ-2, were all installed after Katrina by the Corps of Engineers, with two of these piezometers located on the canal side of the floodwall and one of them located on the landside of the floodwall.[185]  Dr. Bea graphed the increases in pore pressure at those piezometer sites during two storm events after Katrina.  He then related those increases in pore pressure to hydrographs showing rising and falling water elevations in the IHNC.  From these piezometer readings, and the fact that the landside piezometer reading did not increase during these subsequent storm loading events in the IHNC, Dr. Bea concluded that the fact that the piezometer readings rose to some extent, when the waters in the

---

[182] Marr Tr. at 1899:2-15.

[183] JX-1414-01043 (Bea Rebuttal Rep. at 102).

[184] DX-02715-0264 (Lambe & Whitman, *Soil Mechanics*, 1969 at 253).  Dr. Silva also provided a description of the types of piezometers and how they function.  *See* Silva Tr. at 3710:25-3713:11.

[185] Bea Tr. at 1312:3-5, 1314:4-8. 1339:1-11.  PZ-3 and PX-6 were installed on the canal side of the floodwall.  PZ-2 was the only piezometer of the three that was installed on the landside.

canal rose, to some extent, showed that there was an immediate pore pressure response on the canal side of the floodwall.  Dr. Bea dismissed the lack of a pore pressure response on the landside of the levee, in the landside piezometer, on the speculative theory that this was because of the longer post-Katrina sheetpile in the floodwall.[186]

Dr. Bea's arguments related to the piezometers are without scientific foundation.  Dr. Bea admitted that the response of the canal side piezometers was due to a parameter of C of about 1, the total stress of the load of water above the land surface, and the water table, during the storm surges.[187]  That same admission, of course, explains why the piezometer readings on the landside of the floodwall during these post-Katrina storm surges did not follow the canal hydrographs up – there was no additional total stress from rising canal waters on the landside of the floodwall.  As Dr. Silva testified:

> What we see here is the increase in pore pressure due to the increase in vertical stress.  And these two quantities are related by the pore pressure parameter C, which for saturated clays should be one.  So if we have placed the piezometers under -- in the center of the EBIA, the expectation would be that this pore pressure would have reached the peak here.  It would be -- the pore pressure would have been the same as increasing the total head.  As the piezometer is installed near the edge of the load, it doesn't go all the way up, but it goes up.  And all of this is very well explained by the soil mechanics from the engineers used day in and day out.  The piezometer response really is due to total stress increase from the water load, not to a rigid hydraulic connection of any kind.  In fact, if it was because we had a rigid connection with the canal, it would take a long, long time for that water to flow, and we now know that you have to have flow of water in the piezometer in order to register the reading.[188]

Under Plaintiffs' counsel cross examination regarding the issue of Dr. Bea's use of these post-Katrina piezometers, Dr. Marr indicated that he came to quite a different conclusion than Dr. Bea, and that this was not just a matter of professional engineering judgment, but rather a matter

---

[186] Bea Tr. at 1310:4-1315:11.

[187] *Id*., at 889:9-890:9; s*ee* Silva Tr. at 3822:5-3823:25 (Dr. Silva states this basic soil mechanics principle, with which Dr. Bea agreed in his deposition of March 27, 2012 at 203:20-205:9).

[188] Silva Tr. at 3822:25-3823:17; *see id*. at 3822:5-3823:25; DX DM-0015-0128 to -0131 (Silva Dem.).

involving the basic fundamentals of how water and water pressure work in soils.[189]  When pressed,

Dr. Marr stated unequivocally:

> If we go to basic fundamentals of soil mechanics, when I increase pressure – when I
> put water over the top of a body of soil that's saturated, the pore pressure
> immediately goes up, and that's what a piezometer reflects.[190]

Perhaps the most telling exchange regarding the lack of any causation implication from

these post-Katrina piezometer readings comes from Dr. Bea himself when he failed to respond to a

question by the Court regarding the piezometers.  The Court simply asked:  "Assuming these

piezometers were accurate, what did they have to do with your theory of causation?  If you can,

give me that in a nutshell."[191]  Dr. Bea answered by describing piezometer readings at the 17th

Street and London Avenue Canals, neither of which had anything to do with the conditions at the

EBIA.[192]  The actual post-Katrina piezometer readings at the EBIA did ***not*** show pressure

transmission of any kind from one side of the floodwall to the other.  Any undrained (no flow)

pressure transmission, a stress distribution phenomenon, in the clay soils of the EBIA towards the

landside of the floodwall were limited by the actual properties (compressibility) of those soils and

the geometry of the applied water load.  As Dr. Silva demonstrated at trial,[193] these transmitted pore

pressures do not reach much beyond the area beneath the water load (i.e., the floodwall, which

served to limit the extent of the water load).  Any pressure transmission in the clay soils of the

EBIA towards the landside toe of the levee would have required water flow but were limited by the

actual properties (permeability and compressibility) of those soils and the geometry of the applied

water load.  There was simply not enough time for this water flow to take place during the thirty-

hour Katrina storm surge in the low permeability EBIA clays.

---

[189] Marr Tr. at 2179:9-2180:10.

[190] *Id.* at 2180:14-17.

[191] Bea Tr. at 4041:13-16.

[192] *Id.* at 4041:17-4042:14.

[193] DX DM-0015-0059 (Silva Dem.).

**B.** **The Actual Excavations That WGI Performed in the EBIA Do Not Match Critical Assumptions In Dr. Bea's Flawed Flow and Stability Analyses and Opinions.**

In addition to Dr. Bea's fundamental soil mechanics errors, his assumptions regarding WGI's work at the site, the geometry at the site, and the location and dimensions of the excavations included as assumptions in his analyses render his opinions untenable. Among the issues addressed in this section will be WGI's responses to the Court's list of issues that relate to excavations, and that relate to Dr. Bea's so-called "smoking gun" exhibits. These issues are addressed pursuant to the Briefing Order, paragraphs 6.d.C.4), 6.d.C.5), 6.d.C.8), 6.d.C.11), and paragraph 8.C.

**1.** **WGI's excavations – whether they reached the organic clay layer or not – had no impact on the failures in the EBIA. (Questions 6.d.C.4) & 6.d.C.11))**

Any discussion of the specific excavations WGI performed on Task Order 26 must be understood in the context of the following soil mechanics fundamentals that Dr. Silva-Tulla testified about at trial.

*First*, as discussed above, due to the fine-grained, low-permeability soils in the EBIA, flow (or pore pressures due to flow) could not have traveled very far during Katrina's thirty-hour storm surge.[194] Indeed, the most any meaningful increase in pore pressures due to flow could have traveled from the face of an ***open*** excavation in the EBIA was about 16 feet.[195] Of course, with the exception of a handful of very shallow, painstakingly backfilled utility-line excavations,[196] there is no evidence that WGI performed ***any*** excavations closer than 16 feet to the floodwall in the EBIA.

*Second*, whether any of the other excavations that WGI performed were deep enough to reach the organic clay layer is irrelevant. "[T]here's nothing magical about the organic clay [layer];" it in fact has only a slightly higher permeability than the clay layers above and below it.[197] Indeed, Dr. Bea models flow through all the clay layers above and below the organic clay. The

---

[194] Silva Tr. at 3755:10-3758:18; DX DM-0015-0060 (Silva Dem.).

[195] Silva Tr. at 3755:15-25, 3790:8-3792:24, 3893:20-3894:6.

[196] Guillory Tr. at 2380:6-16, 2473:14-2477:5; JX-0846-0009 to -0013 (QAR 688).

[197] Silva Tr. at 3792:25-3793:4.

focus on whether excavations reached the organic clay layer simply is a relic of Dr. Bea's initial opinion that the organic clay layer had a permeability of **1 x 10$^{-2}$ cm/sec**, and thereby served as a "conduit of flow."[198]  But now that the parties agree[199] based on actual field tests that the organic clay layer's permeability is actually 1,000 times lower at **1 x 10$^{-5}$ cm/sec**, the organic clay layer no longer matters – it simply "can no longer carry a lot of flow."[200]  Nevertheless, in response to the Court's request at paragraph 6.d.C.11) of the Briefing Order, attached as Exhibit B is a table detailing the excavations that reached the organic clay layer during Task Order 26.

*Third*, even if the organic clay layer was permeable enough to transmit pressure as Dr. Bea alleges, WGI and its subcontractors promptly backfilled the complained-of excavations – mostly with native soil from the borrow pit[201] to at least their preexisting condition.[202]  Thus, for purposes of performance during the Katrina storm surge, it is as if these excavations never existed in the first place.  *Fourth,* the locations of the deepest excavations in the EBIA do not correlate with the breach locations.[203]  The wedding cake for example, was located 590 feet from the south end of the North Breach, the sewer lift station was 193 feet from the north end of the South Breach, and the open borrow pit on McDonough Marine was just **53** feet from a floodwall that did not fail.[204]

*Finally,* and perhaps even more tellingly, is the fact that the largest and deepest open excavation in the EBIA is the canal itself.  If one accepts Dr. Bea's instantaneous pressure transmission as valid during the Katrina storm surge, then, by Dr. Bea's own admission, the pore pressures would be capable of traveling hundreds of feet, if not to infinity, through the organic clay

---

[198] Silva Tr. at 3795:19-3797:12; Rogers Tr. at 690:13-692:4 (testifying that ILIT based its permeability of **1 x 10$^{-2}$ cm/sec** in the EBIA on observations made at the 17th Street Canal).

[199] Uncontested Fact No. 87.

[200] Silva Tr. at 3797:1-4.

[201] Bea Tr. at 1050:24-1051:5 ("large majority of volume of excavations" were backfilled with material from borrow pit).

[202] Silva Tr. at 3893:14-19, 3744:8-12, 3792:7-10; DM DX-0015-0050 (Silva Dem.); *see supra* Section II.C.

[203] Silva Tr. at 3747:4-3748:24; DX DM-0015-0052 to -0055 (Silva Dem.).

[204] JX-1674-0006, -0010, -0016 (Silva Rep., App. B).

layer.[205]   As a result, the canal, which was no more than 350 feet from the floodwall in the vicinity of the North Breach,[206] would cause Dr. Bea's high uplift pressures to fail the levee and floodwall *irrespective* of any smaller excavations WGI may have performed in the EBIA.[207]

>    **2.    Dr. Bea's flow and stability analyses are wholly unreliable because he modeled features and geometry at the EBIA that did not exist.  (Question 6.d.C.5))**

The Case 1 and Case 2 cross-sections described in Dr. Bea's February 2012 Report are the bases for the computerized flow and stability models that Dr. Bea used to form his causation opinions in this case.[208]  Dr. Bea maintains that these cross-sections are "reasonable representations of the geotechnical and floodwall conditions" that existed in the EBIA before Katrina[209] even though he now concedes that the excavations found in the cross-sections were "idealized."[210]   In other words, they do not "represent or recreate or mimic" the precise dimensions or locations of WGI's pre-Katrina excavations.[211]   In fact, as explained below, they are not even close to the dimensions of any excavations that WGI actually performed before Katrina in the vicinity of the North or South Breaches.  Because these so-called "idealized" – or more accurately, "non-existent" excavations – are the *only* excavations that Dr. Bea analyzed in SEEP/W and SLOPE/W to support his pressure transmission opinion,[212] Dr. Bea's entire causation analysis is unreliable on its face.[213]

---

[205] DM DX-0015-00120 to -00121 (Silva Dem.); Silva Tr. at 3817:5-3718:6.

[206] Morris Tr. at 106:25-109:18 (testifying that by 2005, the canal was even closer to the floodwall than 350 feet in the vicinity of the North Breach); JX-1576-0006, -0016 (C. Morris Rep., Figs. 3-1, 4-1).

[207] Silva Tr. at 3817:18-3818:6.  Dr. Bea attempted to rebut this opinion at trial by testifying that the "canal walls are coated *over a long period of time, in fact, since it was constructed*, by a constant rainfall of silt and clays that are in the canal waters.  It forms an impervious skin on the walls of that canal that provides an impermeable boundary separating the organic clays from the Industrial Canal waters."   Bea Tr. at 4035:11-24 (emphasis added); *id.*, 4050:8-15 (agreeing that the sediments forming the so-called impervious "skin" on the canal bank would have "accumulated over years and years and years").  But when reminded of the fact that WGI removed the canal bank along Saucer Marine and Boland Marine, Dr. Bea suddenly reversed course and testified that he actually has "available information" that "indicates these skins form quickly, and that's because of the high suspended sediment content in the water."  Bea Tr. at 4051:12-15, *see* Guillory Tr. at 2425:3-14, 2531:2-2532:19 (regarding removal of canal bank).  In any case, Dr. Bea provided absolutely no evidence to support his new, ever-changing opinion.

[208] Bea Tr. at 972:2-11.

[209] *Id.* at 972:12-17; JX-1389-0068 (Bea Rep.).

[210] *Id.* at 1021:10-12.

[211] *Id.* at 1133:4-8.

[212] *Id.* at 1027:2-5, 1026:14-21.

### a.   North Breach Case 1 and South Breach Case 1 and 2 cross-sections.

Dr. Bea's Case 1 cross-sections for the North Breach contain a "deep backfilled rectangular" excavation that is located about 60 feet from the sheetpile in the vicinity of the North Breach.[214] The alleged excavation is 25-feet wide (perpendicular to the levee alignment), 100-feet long, 14-feet deep, and backfilled with river sand.[215]   The Case 1 cross-sections for the South Breach similarly contain a large backfilled excavation, but this one is located on the canal side of Saucer Marine at the toe of the levee.[216]   The alleged Case 1 excavation at the South Breach is rectangular-shaped, 20 to 25 feet wide (direction perpendicular to levee alignment), 50 feet long, 16-20 feet deep, and backfilled with river sand.[217]   Finally, the South Breach Case 2 cross-sections contain a narrow, 99-foot long (perpendicular to the floodwall), backfilled trench adjacent to the floodwall with a maximum depth near the sheetpile of about 10 feet below ground surface.[218]

Dr. Bea concedes that he has found no pre-Katrina evidence – despite combing thousands of photographs, daily reports, work plans and deposition transcripts detailing WGI's work in the EBIA – that these large, deep excavations ever existed.[219]   Instead, he claims that the idealized excavations that Mr. Cobos-Roa ultimately modeled for him in SEEP/W and SLOPE/W were a result of "inductive analysis."[220]   Dr. Bea examined post-Katrina aerial and ground photographs

---

[213] DX-02674-0064, -0115 (Cobos-Roa Dep. at 144:2-16, 255:2-23) (the outputs from SEEP/W and SLOPE/W are valid only if the site geometry is correctly defined).

[214] Bea Tr. at 974:24-975:2; JX-1391-0008 & -0013 to -0015 (Bea Rep., App. B).

[215] Bea Tr. at 975:3-6, 980:18-24; JX-1391-0008 to -0014 (Bea Rep., App. B).

[216] Bea Tr. at 991:18-992:6; JX-1391-0040, -0042 (Bea Rep., App. B).

[217] JX-1391-0035 (Bea Rep., App. B); Bea Tr. at 992:7-11, 992:19-993:19.

[218] JX-1389-0100 (Bea Rep. at 99); JX-1391-0046 to -0047 (Bea Rep., App. B).

[219] *See, e.g.*, Bea Tr. at 981:18-982:3 ("I don't have a complete enough record to trace it."); Bea Tr. at 993:25-994:21 ("The document trail went cold.").   Plaintiffs' "site characterization" and standard-of-care expert, Dr. Rogers, similarly admitted that he does not "know anything about that, the backfilled excavation" in Dr. Bea's Case 1 cross-sections.   Rogers Tr. at 725:18-726:2, *see also* DX-02674-0063 to -0064, -0068, -0078 (Cobos-Roa Dep. at 142:20-144:1, 144:17-145:7, 152:12-15, 178:18-25) (admitting that he has no evidence that an excavation of the dimensions he modeled was performed in the EBIA).

[220] Bea Tr. at 981:2-10.

purportedly showing "unusual holes" near the breaches,[221] and "began to trace back through the record to determine how you could explain that hole's presence."[222]  While he never found evidence that the "holes" he ultimately modeled existed pre-Katrina (or that such holes were excavated by WGI), he did find several so-called "smoking gun" documents evidencing *other* WGI excavations – with different geometries than he modeled – in the same general areas.  As described below, none of these "smoking guns" individually, collectively, or combined with other evidence, justify the imaginary features that Dr. Bea input into his flow and stability models.

> **b.**      **The so-called "smoking gun" documents relating to grid trenching. (Question 8.C)**

The first set of Plaintiffs' "smoking gun" documents deal with grid trenching.  After completing building demolition (and before starting RECAP excavations), WGI conducted geophysical surveying and grid trenching operations across all six sites in the EBIA.[223]  Obviously, the floodwall did not fail at four of the six sites where grid trenching occurred.  The goal of grid trenching was to systematically excavate a 2-foot wide by 5-foot deep trench on a grid system to locate and remove near-surface obstructions, such as utilities, electrical conduits, debris, and underground storage tanks.[224]  If WGI encountered contaminated soil or other items that required excavation deeper than five feet during grid trenching, such areas typically were flagged for excavation at a later date, and the trench was backfilled with native material and compacted.[225]  All grid trenches were backfilled and compacted to existing density and were approved on a daily basis

---

[221] The photographs of the unusual holes are contained in Dr. Bea's expert report.  *See* JX-1389-0026, JX-01391-0008 (North Breach); *id.* at -0035 to -0036 (South Breach).

[222] Bea Tr. at 981:11-15.  Of course, the post-Katrina photographs themselves are not evidence that WGI did anything pre-Katrina, let alone excavate and backfill a 15 foot deep, 100 foot long hole within 60 feet of the floodwall.  Indeed, Dr. Bea presented absolutely no evidence at trial as to how he determined the dimensions of the so-called "unusual holes" seen in the post-Katrina photographs.  Moreover, the survey and mapping expert upon whom Dr. Bea relied, testified that you "can't tell from any aerial photo the depth of excavations."  Morris Tr. at 203:5-16; *id.* at 90:16-19 (referring to Mr. Morris's experience with photogrammetry).

[223] Guillory Tr. at 2479:9-25.

[224] *Id.*

[225] Bea Tr. at 1207:15-24; Guillory Tr. at 2490:2491:1; JX-1266-0028 to -0029 (scope of work for grid trenching).

by the Corps' QA inspectors.[226]  WGI did **not** perform any grid trenching east of Surekote Road.[227] The distance between the floodwall and the western edge of Surekote Road was approximately 40 feet.[228]

At trial Dr. Bea speculated that although specified at five feet below ground surface, certain grid trenches, particularly in the vicinity of the North and South Breaches, went deeper than five feet to remove obstructions or contamination.[229]  Thus, he opined, these trenches may be related to the "mysterious" deep hole that he identified in the post-Katrina photographs and purportedly modeled in SEEP/W and SLOPE/W.[230]  Although Dr. Bea concedes that he did not find any evidence that grid trenches reached 14 feet below ground surface as shown in his North Breach Case 1 cross-sections for example, he nevertheless insists that as long as the trenches reach the organic clay layer, their precise depth is irrelevant.[231]  Dr. Bea's best estimate of the top-of-ground elevation near the North and South Breaches is +3 feet NAVD88(2004.65), and his  best estimate of the top of the organic clay layer in the same areas is between -5 and -4 feet NAVD88(2004.65).[232] As a result, a trench near either of the breaches would have had to have been at least seven to eight feet deep (from ground surface) to reach the organic clay layer.[233]

There is **no** credible evidence that any of the grid trenches in the vicinity of the North or South Breach reached the organic clay layer.[234]  First, Dr. Bea points to a September 18, 2001

---

[226]  *See* Guillory Tr. at 2497:23-2498:1; Silva Tr. at 3745:9-15 (generally when you remove the debris from the trenches and backfill with native soils, the permeability of the backfilled trench be "at least an equivalent permeability as the surrounding soil and maybe even less, because you're going to remove all of the large obstructions that provide large voids").

[227]  Bea Tr. at 988:2-5.

[228]  *Id*. 1213:21-23.

[229]  *Id*. at 983:17-985:16.

[230]  *See, e.g.*, *id.* at 1204:17-1205:4.

[231]  *See id*. at 1186:16-1187:2.

[232]  *Id*. at 1142:14-1143:21.

[233]  *Id*. at 1143:10-1144:1.

[234]  *See* Silva Tr. at 3744:15-22; DX DM-0015-0049 (Silva Dem.); Guillory Tr. at 2490:8-12 (as get closer to Surekote Road less obstructions found within the trenches that would warrant contractor going deeper than five feet).

photograph of "debris piles" from grid trenching and geophysical surveying at Saucer Marine, PX-3393-215, and claims that this is an example of a photograph that led him to conclude that grid trenches resulted in excavations that were greater than five feet deep.[235]   Of course, the record clearly demonstrates that Dr. Bea's conclusion is unfounded.   The QAR for September 18, 2001 indicates that WGI did not conduct grid trenching operations on Saucer Marine that day.   Rather, its subcontractors simply were loading out "debris stockpiled" from previous geophysical and grid trenching operations on Saucer Marine.[236]   The QARs from the two days before the photograph was taken indicate that all of the debris stockpiled on Saucer Marine during grid trenching operations was found at depths of ***five feet or less***.[237]

Dr. Bea similarly claims that an April 25, 2002 QAR (JX-506) is a "smoking gun" because it shows "grid trenching happening immediately adjacent to the Surekote Road overpass" in the same area where "the two unusual holes that we found at the center of the North Breach" existed post-Katrina.[238]   But of course, given the 8-foot high security fence that cut across the northeast corner of the Boland site and the USACE and WGI trailers sitting just ***west*** of Surekote Road in this general area,[239] the trenches could not have been "adjacent" to the road as Dr. Bea imagined.[240]   Even more importantly, however, all of the evidence shows that these grid trenches did ***not*** exceed five feet in depth,[241] and therefore did not even reach the organic clay layer.[242]   Moreover, they were backfilled with native "spoil," compacted with a D6 dozer and then graded to drain toward the

---

[235] Bea Tr. at 1199:4-10.

[236] JX-0341-0002 & -0003 (QAR 183).

[237] JX-0339-0008 to -0010 (QAR 181) (indicating that grid trenches on Saucer Marine were 5 feet deep, and that all debris encountered was five feet deep or less); JX-0340-0002 (referring to excavation of subsurface debris – two to three feet deep – located during grid trenching at Saucer Marine).

[238] Bea Tr. at 1208:7-19.

[239] *See* DM DX-0002 (Guillory Dem. aerial photo dated Jan. 7, 2003).

[240] Guillory Tr. at 2437:19-2438:16; 2494:6-14.

[241] The Corps QA Inspector reported:   "Assured PC220 is excavating 5' deep, on 25' grids . . . .   Obstructions encountered in trenches were concrete and piping."   JX-0406-002 (QAR 248).   Similarly, Ms. Alvey, reported on behalf of WGI:   "Grid trenches were measured at 5' deep."   *Id.* at -004.

[242] Bea Tr. at 1143:10-1144:1 (excavation needs to be 7 to 8 feet deep to reach organic clay).

canal.[243]  The same is true for the east-west grid trenches performed the following day, which Dr. Bea also referred to in his testimony.[244]  Thus, these 2-foot wide trenches, with bottom elevations at -2 ft NAVD88 (2004.65) bear absolutely no resemblance to the idealized, 14-foot deep, sand-filled excavation that Dr. Bea used in his flow and stability models to prove the cause of failure of the North Breach.[245]

Dr. Bea next claims that two QARs from December 2001 are "smoking guns" because they show that there were grid trenches in the same area as the "mysterious" and "unusually deep" post-Katrina hole that he identified at the north central end of the South Breach.[246]  Once again, Dr. Bea's contention is factually baseless.

*First*, there is no credible evidence that any of the Saucer Marine grid trenches excavated on December 18 or December 21 extended deeper than five feet.  To the contrary, the Corps' QA inspector contemporaneously reported in the QARs that he "assured" that the contractor excavated (and then measured) 2-feet wide, 5-feet deep north-south grid trenches.[247]  Moreover, there would have been no reason for the contractor to excavate trenches deeper than the 5 feet specified in the contract because the "minimal amounts of subsurface obstructions" encountered in the trenches in this location, including cables, wires, hoses, trash, and timber, were shallow.[248]  Thus, just like the grid trenches discussed in the vicinity of the North Breach, the 5-feet deep, 2-feet wide grid

---

[243]  JX-0506-002 (QAR 348).

[244]  Bea Tr. 1210:7-19; JX-0507-002 (QAR 349).

[245]  Also reported in the April 25, 2002 QAR (JX-0506) is the removal of an Underground Storage Tank on Boland, which WGI discovered several days earlier during grid trenching operations.  JX-0506-0004 (QAR 348); Guillory Tr. at 2491:22-2493:5.  The excavation was 10 feet x 16 x 7 feet, and contrary to Dr. Bea's unsupported testimony (Tr. at 1208), there is no evidence that the UST was "positioned on pilings."  JX-0506-0004, -0014 to -0015.  In any event, the UST was located in the middle of the Boland site, at least 250 feet from the floodwall and more than 400 feet from the south end of the North Breach.  JX-0501-0004, -0014 (QAR 343); Guillory Tr. at 2494:20-2496:8.

[246]  Bea Tr. at 1199:24-1200:3, 1202:14-20 (referring to JX-0406); Bea Tr. at 1203:10-14, 1205:2-4 (referring to JX-0409).

[247]  JX-0406-0002 (QAR 248); Guillory Tr. at 2485:13-2486:23; JX-0409-0002 (QAR 251).

[248]  *See* JX-0406-0004 (QAR 248); Guillory Tr. at 2488:18-2490:12 (discussing map (on JX-0406-0010) that indicates the locations and depths of all obstructions found that day); *see also* JX-0409-0002, -0004, & -0010 (QAR 251).

trenches closest to the South Breach had a bottom elevation of just -2 feet NAVD88(2004.65), and did not reach the organic clay layer.

*Second,* Dr. Bea's South Breach Case 1 cross-sections show a deep excavation located at the toe of the levee, and his Case 2 cross-sections show a deep trench adjacent to the floodwall.[249]  But as exhibits JX-406 and JX-409 prove, in fact none of the grid trenches in the vicinity of the South Breach were that close to the floodwall.  The nearest grid trenches began ***west*** of the drainage ditch paralleling Surekote Road, and thus, were at least 60 to 75 feet away from the floodwall.[250]

*Finally,* WGI's subcontractor promptly backfilled the grid trenches with "spoil" material taken out of the trench, and mechanically compacted the backfill to a condition similar to that of the surrounding soils with an excavator bucket and/or the tracks of a D6 bulldozer.[251]  Thus, in effect, the excavation "did not exist when the floodwaters came over the EBIA,"[252] the soil should have the same permeability, if not a lower permeability, than before WGI began its work.[253]

### c.    Dr. Bea's smoking gun relating to the drainage ditch along Surekote Road. (Question 8.C)

The next "smoking gun" document that Dr. Bea presented at trial dealt with the pre-existing drainage ditch that ran parallel to Surekote Road from the north end of McDonough Marine to the south end of Saucer Marine.[254]  It was situated roughly 20 feet west of Surekote Road and about 60 feet west of the floodwall.[255]  At trial, Dr. Bea contended that not only was this drainage ditch deep enough to reach the organic clay layer, but also that WGI improperly backfilled it with highly-

---

[249] *See supra,* Section III.B.2.a.

[250] *See* Guillory Tr. at 2487:1-13; JX-0406-0010 (QAR 248); JX-0409-0008 (QAR 251); *see also* Bea Tr. at 1215:17-19 (drainage ditch along Saucer Marine was about 60 feet away from the floodwall).

[251] PX-3393-176 (grid trenching photos); Guillory Tr. at 2480:1-2481:7; JX-0501-0013 (QAR 343), JX-0506-002, -004 (QAR 348).

[252] Silva Tr. at 3792:2-10.

[253] *See* Silva Tr. at 3745:9-15.

[254] Guillory Tr. at 2429:16-2430:6 (at the south end of Saucer Marine, the ditch made a right hand turn to the west and emptied into the canal); Bea Tr. at 1214:2-5.

[255] Bea Tr. at 1213:21-23, 1215:17-19.

pervious milled asphalt.[256]   Of course, as described below, neither of these allegations are true. And, thus, the backfilled drainage ditch that *actually* existed in the EBIA before Hurricane Katrina bears no reasonable resemblance to the "idealized" South Breach Case 1 or Case 2 excavations that Dr. Bea modeled in SEEP/W or SLOPE/W.[257]

In November 2000, before WGI mobilized to the site, Mr. Guillory testified that the drainage ditch was about 2.5 to 3 feet deep, 2 to 3 feet wide at the bottom, and 4 to 6 feet wide at the top.[258]   Because the drainage ditch had not been maintained for some time prior to WGI's arrival, one of WGI's early tasks was to muck out the overgrown vegetation and debris.[259]   The ditch then became an integral part of WGI's Corps-approved Storm Water Pollution Prevention Plan ("SWPPP"), which described how surface water accumulating on site would be drained during the course of remediation activities.[260]   In accordance with the SWPPP, WGI installed hay bales and silt fences about every 200 feet along the ditch to trap turbidity as storm water flowed through it and discharged into the canal.[261]   The maintenance of these hay bales and silt fences was required under a Louisiana state discharge permit issued to both WGI and the Corps; thus, it became one of Mr. Guillory's "pet peeves."[262]   Mr. Guillory frequently monitored the condition of the ditch, and reminded WGI when hay bales and silt fences needed to be replaced after rain events in compliance with state law.[263]

On cross-examination, Dr. Bea admitted that as of June 14, 2002, the drainage ditch along Saucer Marine on the south end (where the ditch makes a right-hand turn toward the canal)

---

[256]  Bea Tr. at 1214:2-1215:13, 1215:20-1216:25.

[257]  DX DM-0015-0089 to -0090 (Silva Dem.); Silva Tr. at 3794:18-3795:18.

[258]  Guillory Tr. at 2430:13-18.   Mr. Guillory visited the EBIA for planning purposes at least five times before WGI actually began field work on the site in January 2001.   *Id.* at 2419:15-23.

[259]  *Id.* at 2430:19-2431:1.

[260]  *Id.* at 2431:22-2432:10.

[261]  *Id.*

[262]  *Id.* at 2433:11-2434:3.

[263]  *Id.* at 2432:21-2434:3.

probably was roughly 3 feet deep.[264]  Yet on re-direct, for the first time he opined that a photograph taken less than four months later, on October 8, 2002, showed that the drainage ditch along Saucer Marine was inexplicably 7 feet deeper, i.e., it reached a depth of 10 feet below ground surface.[265]  But of course, Dr. Bea never visited the site pre-Katrina.  Mr. Guillory, on the other hand, actually inspected the EBIA site following the storms that are referenced in the photograph's caption.[266]  He testified from his personal knowledge about the precise type of crane mat, hay bales, t-posts and stone weir that are shown in the photograph, and concluded, consistent with his recollection, that the drainage ditch at Saucer Marine (as of October 2002) was no more than 4 to 4.5 feet deep.[267]  Given an approximate ground surface elevation of +3 feet NAVD88 (2004.65),[268] the bottom of the ditch was only between -1 and -1.5 feet NAVD88 (2004.65), which is well above the organic clay layer at the South Breach.[269]

　　　　Plaintiffs also did not prove that WGI backfilled the drainage ditch improperly, let alone with milled asphalt as Dr. Bea alleged.  In 2004, after finishing most of the RECAP excavations, WGI began dewatering the drainage ditch and backfilling it with clean clay material from the McDonough Marine borrow pit.[270]  By this point, the drainage ditch was, "at most," 4 to 6 feet deep (or -1 to -3 feet NAVD88 (2004.65)).[271]  WGI began backfilling the ditch along the Saucer Marine site on August 24, 2004, and completed it during the following week.[272]  On August 31, Mr. Brogna, the Corps' Quality Assurance Inspector, stated that he "[o]bserved the PC-220 excavator

---

[264] Bea Tr. at 1046:20-22; PX-3404-385 (bottom photo:  "Saucer – Hay bales replaced in ditch in accordance with SWPPP").

[265] PX-3404-508 (top photo: "Stormwater Protection Program being maintained after Tropical Storm/Hurricane (Saucer)"); Bea Tr. at 1214:23-24 ("when I found this photograph, I got literally sick to my stomach").

[266] Guillory Tr. at 2448:6-17.

[267] *Id*. at 2448:18-2450:18.

[268] Bea Tr. at 1142:14-18.

[269] *Id*. at 1142:21-1143:1 (top of organic clay layer in South Breach area is about -4 to -5 feet NAVD88(2004.65)).

[270] Guillory Tr. at 2444:15-23, 2450:19-2451:22.

[271] *Id*. at 2431:2-17.

[272] JX-1069-0002 (QAR dated Aug. 24, 2004); JX-1071-0002 (QAR dated Aug. 26, 2004); JX-1073-0002 (QAR dated Aug. 31, 2004).

and D41p dozer placing semi-compacted backfill into the drainage system that parallels Surekote Road and rough grading the adjacent area.  Assured dressed area sloped to naturally drain to the canal to avoid standing water adjacent to the levee."[273]   On the same day, WGI's Quality Control Manager reported that the backfilling of the drainage ditch along Saucer Marine was complete.[274]

Dr. Bea claims that a QAR from August 30, 2004 (JX-01087) – nearly a month **after** WGI finished backfilling the drainage ditch along Saucer Marine with semi-compacted clay – is a "smoking gun" because it shows that WGI permanently backfilled the drainage ditch along Saucer Marine with milled asphalt.[275]   But the otherwise undisputed fact testimony at trial proves Dr. Bea is mistaken.[276]   In September 2004, Hurricane Ivan impacted the Greater New Orleans area, pushing the tides above normal and flooding the entire EBIA.[277]   On September 29, after WGI returned to the site, Mr. Brogna reported that WGI personnel "continue restoring the site after Hurricane Ivan. . . . Cleanup and total restoration shall take several more days."[278]   Mr. Guillory recalled that part of the restoration activities at this time involved WGI using previously-stockpiled milled asphalt from Surekote Road to construct 12-foot wide **temporary** driveways and haul roads across the muddy/flooded **former** ditch line at Saucer Marine and the still existing drainage ditch to the north (at either Indian Towing or Mayer Yacht) so that dump trucks could back onto the site and load out concrete debris for recycling.[279]   According to Mr. Guillory, who was on the site during the relevant time period, WGI never used milled asphalt as **permanent** fill for the drainage ditch on Saucer

---

[273] JX-1073-0002 (QAR 915); Guillory Tr. at 2451:3-2452:1 (testifying that "semi-compacted" in this context means placing clay backfill in 12-inch lifts and compacting it by tamping with it a bucket of an excavator or with multiple passes of a dozer).

[274] JX-1073-0004 (QAR 915) (Saucer Marine: "bucket dressing [the] *former* ditch line after backfill" with a PC-220 excavator) (emphasis added); Guillory Tr. at 2453:7-10.

[275] Bea Tr. at 1216:6-25 (citing JX-1087-0002 (QAR 929)).

[276] Guillory Tr. at 2646:20-2647:3.

[277] *Id*. at 2454:20-21, 2455:3-2456:3.

[278] JX-1087-0002 (QAR 929).

[279] Guillory Tr. at 2455:3-2456:17, 2621:24-2624:1.

Marine, or for the drainage ditch along any other site in the EBIA.[280]  Plaintiffs have therefore not proven that WGI permanently backfilled the shallow ditch, which did not reach the organic clay layer in any event, with milled asphalt.[281]

        **d.**       **Dr. Bea did not model the lift station, sewer line or manhole excavations.**

Dr. Bea next pointed, for the very first time at trial, to the sanitary sewer line that ran from the north and south ends of the EBIA to "an approximate 15-foot depth at a concrete manhole (the low point) adjacent to the sewer lift station" on Saucer Marine. [282]  The sewer line was about 75 to 80 feet from the floodwall, and according to Dr. Bea, "bisects" the "idealized excavation" in his South Breach cross-section.[283]  However, when one plots to scale the locations of the sewer line/manhole excavation on Dr. Bea's South Breach Case 1 and 2 cross-sections, it is readily apparent that Dr. Bea did not model the sewer line (or even a reasonable approximation of the sewer line) at all.[284]  As was the drainage ditch, the sewer line is significantly further away from the floodwall than Dr. Bea posits in his cross-sections.  Moreover, Dr. Bea modeled the backfilled

---

[280] Guillory Tr. at 2458:8-11, 2646:20-2647:13.  Although the QARs do not explicitly mention that the milled asphalt was removed, there are multiple references in the days after the milled asphalt was placed on the site to the fact that WGI was continuing to perform "housekeeping and site maintenance" on Saucer Marine and that it was using a D41 dozer and PC220 excavator to "backfill[] the paralleling drainage ditch to tie into the toe of the floodside levee" with semi-compacted material.  JX-1090-0002 (QAR dated Oct. 5, 2004); JX-1091-0002 (QAR dated Oct. 6, 2004).

[281] Dr. Bea also claimed for the first time during this trial that the use of milled asphalt combined with other generally "improper" methods used to backfill the pre-existing drainage ditch, Bea Tr. at 1217:11-1218:5, resulted in the ultimate formation of a crevasse splay at the South Breach site.  *Id.* at 1222:18-1224:10.  Crevasse splays are "radiating tensile cracks" that can form in a levee.  JX-2032-0122 (ILIT Report).  According to Dr. Bea, the crevasse splay at the South Breach indicates that the storm water ditch was "telling us silently it's still try to drain."  Bea Tr. at 1124:6-10.  However, in the ILIT Report and in the *Robinson* trial, Dr. Bea had a totally different explanation for the crevasse splay.  *Id.* at 1402:24-1404:5, 1405:7-1406:1.  There Dr. Bea concluded that the crevasse splay was "clear and uncompromising evidence of the high lateral permeability" of the swamp-marsh deposits along the site.  JX-2032-201 (stating that the crevasse splay "resulted from reverse underseepage through these same highly pervious marsh deposits as the ponded floodwaters drained out from the Lower Ninth Ward after the hurricane passed"); Bea Tr. at 1403:23-1404:5, 1405:7-22 (same theory in *Robinson*).  He further explained in the ILIT Report that "crevasse-splays often occur at the same locations repeatedly."  JX-2032-0122.  Indeed, "[t]his same section of the IHNC levee failed in 1965 during Hurricane Betsy."  JX-2032-0172.

[282] JX-1261-0023 (Hamp's Dem. Work Plan); *see* DX-02720 (sewer line as-builts).  Dr. Bea admittedly did not model the sewer lift station in SEEP/W or SLOPE/W.  Bea Tr. at 1033:12-1034:5.

[283] Bea Tr. at 1233:1-6; *id.* at 1212:2-5 (the sewer line excavation forms the "western extent of this mysterious deep hole that I identified at the South Breach big bow area."); *id.* at 1225:9-17 (the drainage ditch and the sewer line excavation "perfectly define the two borders of that unusual deep hole at the South Breach").

[284] DX DM-0015-0089 to -0090 (Silva Dem.); Silva Tr. at 3794:18-3795:18.

excavations in his cross-sections with sand and shell.[285]  But as Mr. Guillory described, the deeper excavations of the sewer line and manholes were backfilled with clay in lifts and compacted with the bucket of the backhoe and the tracks of a bulldozer.[286]  Finally, the excavations of the manholes do not correlate with the failure locations.  After factoring in the ground surface elevation, only four of the nine manhole excavations  reached the organic clay layer.[287]  Three of those manholes, plus the lift station, were at least 190 feet or more away from the northern end of the South Breach.[288]  Two were not even on the Saucer Marine site.[289]

> **e.      WGI's excavations did not "move" the phreatic surface to the toe of the levee.**

Dr. Bea next alleges that even some of the excavations that did not penetrate the organic clay layer, such as the shallow ACM/Transite excavations at the North end of Boland,[290] contributed to the breaches because they caused the phreatic surface (or groundwater table) to be brought to the levee toe, which "facilitat[ed] the seepage hydraulic effects going on subsurface" and "markedly influenc[ed] the hydraulic activity" close to the ground surface.[291]  This notion is absurd.  First and most importantly, as Dr. Silva testified, there has always been groundwater at the levee toe; WGI's excavations did not change that fact.[292]  "The levee, in fact, is designed to have water against it.  That's the whole purpose of this structure."[293]

---

[285] JX-1389-0096 to -0097 (Bea Rep. Figs. 63 and 64).

[286] Guillory Tr. at 2468:17-2469:4.

[287] *See* Ex. B (attached) (referring to MH4, MH5, MH6, MH7).

[288] *Id*.; DX DM-0015-0051 (Silva Dem.).

[289]  DX DM-0015-0051 (Silva Dem.) MH4 was on Indian Towing and MH5 was on Mayer Yacht.

[290] Guillory Tr. at 2463:5-16 (the ACM excavations on Boland varied in depth between 18 inches and 4-6 feet below ground surface; near Surekote Road, the excavations were only 18 to 24 inches deep).

[291] Bea Tr. at 1133:18-1134:14, 1253:10-1255:20; *see* JX-1299-0027 (WGI Groundwater Characterization/Monitoring Report).

[292] Silva Tr. at 3818:23-3819:3; DX DM-0015-00124 (Silva Dem.).

[293] Silva Tr. at 3819:8-24.

Second, even if Dr. Bea's allegation had scientific basis, Dr. Bea improperly modeled the soil profile at the levee (i.e., the North Breach Case 2 cross-sections) in an attempt to prove that this shallow groundwater somehow contributed to "seepage hydraulic effects" at the North Breach. Dr. Bea's North Breach Case 2 cross-sections show a deep, highly-permeable, "sand and shell fill" layer that abuts the floodwall at the North Breach location where the 1966 sheetpile wall connects to the deeper 1980s sheetpile wall.[294] Dr. Bea claims the thickness of the so-called "shell fill" is about 18 feet from the top of Surekote Road down to the tip of the sheetpile.[295] But in fact this "shell fill" layer never existed at the North Breach. Dr. Bea's only evidence of it comes from MMG boring 81A. As established during trial, boring 81A was about 40 feet northwest of the North Breach, and thus, not representative of pre-Katrina conditions at the breach location.[296] Moreover, the boring was taken from the top of the Surekote Road overpass at an elevation of at least +11.5 feet NAVD88(2004.65).[297] As a result, any alleged permeable "shell fill" did not even reach the bottom of the 1966 sheetpile, but rather ended at about elevation -4.5 feet NAVD88(2004.65) with shell as the main constituent or no more than -6 feet elevation for any shell in the fill.[298]

### f.   Dr. Bea's 'Near Breach' analysis is incorrect. (Question 6.d.C.8))

In paragraph 6.d.C.8) of the Briefing Order, the Court asks the parties to explain why Dr. Bea's analysis of the Near Breach was correct or incorrect. Dr. Bea's Near Breach site corresponds

---

[294] JX-1391-0016, -0031 (Bea Rep., App. B).

[295] *Id.* at -0016 (Bea Rep., App. B).

[296] JX-0353-0027 (QAR 195 MMG Geologist, S. Calloway reports:  "81A is situated 37'W of the N-S floodwall and 19'S of the eastern E-W floodwall, about 2' East of Surekote Road"); Dunbar Tr. at 1770:21-1771:9; DX-DM-1004-0040 (Dunbar Dem. showing correct location of 81A based on Ms. Calloway's notes); Guillory Tr. at 2499:6-2505:19; JX-0116-0482 (RECAP Plan) (noting that the location of 81A was adjusted from the location originally plotted).

[297] Dunbar Tr. at 1771:10-1772:18; DX-DM-1004-0042 (Dunbar Dem.).

[298] JX-00116-0632 to -0634 (RECAP Submittal Rep. Boland).  The boring log, which shows depths, not elevations, shows "fill, shell and silty sand…" to a depth of 16 feet, and "silty sand, brown, few shells" to a depth of 17.7 feet. As of the last OLD survey in 1999, the sheetpile tip was at elevation  11.7 feet NAVD88(2004.65), and the top of the bore hole was at +11.5, and even assuming borehole 81A represented conditions at the floodwall near the North Breach, the sheetpile tip was 7.2 feet below the predominant shell (with silty sand) fill and the sheetpile tip was 5.5 feet below *any* shell in the fill.

with the borrow pit excavated at the McDonough Marine site. The borrow pit has always presented a challenge to Dr. Bea's theories regarding seepage and/or pressure transmission. After all, why did the levee adjacent to the borrow pit not fail? The borrow pit was an excavation 2.4 acres in size, which was not backfilled and instead was breached to allow the canal waters into the excavation.[299] It was excavated to a depth below surface of 14.8 feet, resulting in a bottom elevation of approximately -11.4 feet NAVD88(2004.65).[300]

Dr. Bea initially testified that the borrow pit excavation did not penetrate the organic clay layer or "swamp marsh" layer, as Dr. Bea refers to it.[301] Consequently, he modeled the borrow pit as not reaching the organic clay layer.[302] Dr. Bea, therefore, opined that the marsh layer was isolated from the Katrina surge at the borrow pit site and that was the reason why the section of the floodwall adjacent to the borrow pit did not fail.[303] In addition, Dr. Bea testified that the only difference between his Near Breach model and his models for the North and South Breaches was that the "excavation of the near breach site does not reach that swamp marsh layer."[304]

In contrast to Dr. Bea's initial testimony, both Drs. Stark and Silva testified that the borrow pit, and related work, did penetrate the organic clay layer.[305] Further, upon cross-examination of Dr. Bea during his rebuttal testimony, it was revealed that he had previously testified before this Court in the *Barge* trial and documented in a journal article that the borrow pit itself was an example of an excavation that reached the organic clay (swamp marsh) layer of soil.[306] The photograph of the McDonough Marine borrow pit – used by Dr. Bea in both his article and *Barge*

---

[299] Guillory Tr. at 2398:18-21, 2401:3-7.

[300] JX-1674-0016 (Silva Rep. App. B).

[301] Bea Tr. at 1144:8-23, 1297:6-10; 1319:17-20, 4048:25-4049:2, 4076:3-8.

[302] JX-1389-0092 (Bea Rep.). Dr. Bea's cross-sections of the Near Breach show no communication between the borrow pit and organic clay layer.

[303] Bea Tr. at 1296:20-1297:10, 1298:9-23, 4048:23-4049:2.

[304] *Id*. at 1319:17-20.

[305] Stark Tr. at 3428:23-3429:5; Silva Tr. at 3747:9-17; *see* Ex. B (attached)

[306] Bea Tr. at 4131:20-4132:8, 4134:3-4135:22; JX-1401-0017 (I-Wall Report).

trial testimony and marked as Exhibit DX-1589-0031 – depicts the existence of cypress stumps common to the organic clay layer.[307]   The photograph, the testimony of Mr. Guillory, Dr. Stark, Dr. Silva and Dr. Bea himself prove that the borrow pit did, in fact, reach the organic clay layer, contrary to Dr. Bea's model.   The preceding sequence of testimonial and documentary evidence undermines the validity of Dr. Bea's reference to the borrow pit as an example of a "near" breach that did not occur because of the isolation of the Katrina surge from the organic clay layer.

Dr. Bea compounded his error regarding the borrow pit in a particularly startling answer given to a question put to him by the Court.   The Court, referring to the North and South Breaches, asked Dr. Bea directly whether he had "done any modeling that would show what the uplift pressures would be without those excavations."[308]   In other words, had Dr. Bea determined the magnitude of the contribution, if any, of the WGI excavations to the seepage and/or pressure transmission effects that he claimed he detected in his North and South Breach models?   Dr. Bea answered that he had[309] because his Near Breach analysis was just such a model in that "the [borrow pit] excavation is not in contact with the buried swamp marsh deposit that is transmitting these uplift pressure forces."[310]   The Court followed up by asking Dr. Bea again whether he had done any studies "which calculate the uplift pressures without the excavations,"[311] and Dr. Bea again answered in the affirmative that the analysis associated with the Near Breach was the model that did so.[312]   The Court inquired whether it would be required to use inductive reasoning to determine

---

[307] JX-1780-0107 (Stark Rep. at 107).
[308] Bea Tr. at 1292:14-16.
[309] *Id*. at 1292:17.
[310] *Id*. at 1292:23-1293:3.
[311] *Id*. at 1294:23-25.
[312] *Id*. at 1294:1-7.

what a model without excavations would prove,[313] Dr. Bea answered "no", but then failed to give a coherent answer as to why that is not the case.[314]

Dr. Tim Stark carefully analyzed Dr. Bea's model of the Near Breach case in comparison to Dr. Bea's model of the North Breach case.[315]   In his testimony and presentation, Dr. Stark conclusively demonstrated that Dr. Bea's Near Breach model differed from the North Breach model in several material respects, quite apart from the absence of a deep excavation on the canal side.[316] In fact, Dr. Stark testified that Dr. Bea altered the permeability and boundary conditions of the Jourdan Avenue Canal in the Near Breach model, so that the conditions modeled in the Near Breach analysis do not at all correspond to the conditions of the North Breach model analysis.[317]   For example, Dr. Bea used a backfill that was 10 times more permeable at the Jourdan Avenue Canal in the Near Breach model.[318]   Dr. Bea admitted that doing so would have been a "significant error."[319] Although Dr. Bea did not concede that he made such an error, the testimony of Dr. Stark and the Jourdan Avenue computer model files for the Near Breach prove otherwise.[320]   By varying the permeability of the Jourdan Avenue Canal backfill by a factor of ten,[321] Dr. Bea decreased the resulting exit gradient in his Near Breach model from 0.2 to 0.05.[322]

---

[313] *Id*. at 1293:4-9.

[314] *Id*. at 1293:10-20.  ("No.  In fact, you don't.  One of the things that came from the study was, particularly at the North Breach, we end up with the same answer.  And, at the South Breach, it's the inductive technique that clearly explains the failure. The deductive one is close behind it, meaning, if I define failure as 1.0 for the South Breach, the deductive   technique would have a factor of safety of 1.1.  So they are different.  But if you consider the uncertainties associated with what we're doing, they are the same.  So the two techniques actually done in different ways by different people go to the same answers.")

[315] Stark Tr. at 3429:7-3436:2.

[316] *Id*. at 3434:15-3435:22.

[317] Stark Tr. at 3433:14-3434:19.

[318] DX DM-1009-0044 (Stark Dem.); DX-02737 (Bea SEEP-W Runs).

[319] Bea Tr. at 4077:18-25.

[320] Stark Tr. at 3433:14-3434:19; DX-02737 (Bea SEEP-W Runs).

[321] DX-02737 (Bea SEEP-W Runs).

[322] Stark Tr. at 3434:8-14; DX DM-1009-0044 (Stark Dem.).  The exit gradient is the uplift pressure divided by the thickness of the soil above it.  Stark Tr. at 3432:14-15.

Dr. Stark also demonstrated that the initial gradient at the Near Breach site in Dr. Bea's model is significantly lower than the initial gradient used in the North Breach model.[323]  Dr. Bea attributed this to the fact that the borrow pit did not penetrate the organic clay layer.[324]  But as proven by the testimony and evidence, the borrow pit did penetrate the organic clay layer.[325]  Dr. Bea ultimately admitted that his failure to correctly model the depth of the borrow pit affected the exit gradients throughout the model run.[326]  Therefore, because the Near Breach model (1) incorrectly assumes an excavation that does not penetrate the organic clay layer, (2) incorrectly assumes a permeability for the Jourdan Avenue Canal fill that is too high, and (3) incorrectly assumes an initial gradient that is too low, the exit gradients and resulting factor of safety calculated by Dr. Bea at the Near Breach site necessarily are incorrect.

If the preceding elements are "corrected" in the Near Breach model to match the conditions used in Dr. Bea's model of the North Breach, Dr. Bea's analysis of the Near Breach would be similar to that of the North Breach.[327]  The model would produce similar exit gradients and logically would produce a similar factor of safety, predicting failure of the levee at the Near Breach site.[328]

Dr. Bea never did produce a model of either the North or South Breach that did not include an excavation.  In fact, he was asked the direct question, as to each breach area (North and South) "[d]id you do any computer modeling analyses with no excavations?" his answer was simply "[n]o".[329]  And as indicated above, the Near Breach analysis he performed does not conform to the facts established at trial.  He has not produced any report or analysis that would allow the Court to

---

[323] Stark Tr. at 3431:4-12; DX DM-1009-0041 (Stark Dem.).
[324] Bea Tr. at 4048:23-4049:2.
[325] Stark Tr. at 3428:23-3429:5; Silva Tr. at 3747:9-17.
[326] Bea Tr. at 4048:23-4049:2.
[327] Stark Tr. at 3435:11-3436:2.
[328] *Id.*
[329] Bea Tr. at 1337:5-10.

determine what the uplift pressures would have been, based on the soil properties he employed, if no excavations had been made on the EBIA site.

In summary, Dr. Bea's reference to his Near Breach scenario undermines the very purpose for which he offers it. The soil properties of the McDonough Marine site were no different from the soil properties in the North and South Breach areas, with or without excavations.[330]

## IV. DEFENDANTS HAVE SHOWN THE FAR MORE LIKELY CAUSES FOR THE EBIA FLOODWALL FAILURES.

Unlike Dr. Bea's unsupported and unscientific theories, the Defense experts provided considerable evidence at trial to demonstrate how and why the North and South Breach likely occurred. Several of the Defense's causes are based on facts that are not in dispute. Other of the causes have been adopted by Dr. Bea himself. *All* of these more likely causes are wholly unconnected to WGI's work at the EBIA.

### A. The Massive Katrina Storm Surge Exceeded the Design Criteria for the Floodwalls at the EBIA.

The failures at the East Bank Industrial Area during Katrina were attributable in large part to the fact that the Katrina storm surge simply overwhelmed the Inner Harbor Navigation Canal flood protection system.[331] The devastation left by Katrina was not isolated to a particular location; well over 50 and possibly as many as 250 flood protection failures occurred throughout New Orleans as a result of the storm, including the North and South Breaches.[332] This level of destruction is indicative of the fact that, for a variety of reasons, the levee and floodwall structure at the EBIA was not equipped – either by design or as it existed in 2005 – to withstand a storm of Katrina's size and strength.

---

[330] *See* JX-1389-0092 (Bea Rep.). Dr. Bea utilized MMG boring 71G, to support the stratigraphy in his 'Near Breach' cross-sections. 71G was actually located in the middle of the Boland Marine site but is similar to borings taken at McDonough Marine; JX-1780-0101 (Stark Rep. at 101, "… an examination of the soil borings, cone penetration soundings, vane shear test, and other evidence reveals that the native soils in the MM parcel are not materially different from those elsewhere in the EBIA.").

[331] Silva Tr. at 3693:14-24.

[332] *Id*. at 3694:18-3695:7; DX DM-0015-0010, -0011 (Silva Dem.).

*First*, the hydraulic loading from Katrina's storm surge exceeded the maximum design storm surge that was developed for the EBIA flood protection structure.[333]   As the Court is aware, the Standard Project Hurricane ("SPH") was the original model created to determine the specifications for the levees and floodwalls necessary to protect the New Orleans area during hurricane activity.[334] The SPH design for the IHNC levees and floodwalls utilized a maximum storm surge elevation of 11.43 to 11.53 feet NAVD88 (2004.65)[335]   By contrast, the maximum Katrina storm surge elevation at the EBIA was 14.2 feet NADV88 (2004.65), almost ***three feet higher*** than the maximum design surge elevation at the IHNC floodwalls.[336]   These discrepancies in surge elevation make clear that the SPH design underestimated the magnitude of the potential storm surge at the EBIA.[337]   Drs. Douglas Woolley and Leonard Shabman expressed as much in their 2008 report to the U.S. Army Corps of Engineers regarding the Lake Pontchartrain & Vicinity Hurricane Protection Project that was in place when Katrina made landfall in August 2005:

> [T]he Advanced Circulation (ADCIRC) surge model . . . reinforced the 1980s-era WIFM modeling finding that the 1962-era surge estimates may have … underestimated the SPH [Standard Project Hurricane] surge along the GIWW and IHNC corridors ….[338]

As a result, and in the opinion of Dr. Silva, the ultimate hydraulic loading from the Katrina surge "was more than what the structure could bear."[339]

*Second*, not only was the EBIA flood protection structure not designed to withstand the Katrina storm surge, but the levees and floodwalls at the time of Katrina did not meet the design

---

[333] Silva Tr. at 3693:17-20.

[334] PX-0422-0009 (Woolley & Shabman, "Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project," Final Report for the USACE, March 2008, at ES-6).

[335] Silva Tr. at 3695:8-19; DX DM-0015-0013, -0015, -0016 (Silva Dem., citing JX-2033-1109, IPET Vol. III, at 46, Table 6).

[336] Silva Tr. at 3695:8-19; DX DM-0015-0013, -0015, -0016 (Silva Dem.).

[337] Silva Tr. at 3693:17-21, 3694:15-17.

[338] PX-0422-0050 (Woolley & Shabman, "Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project," Final Report for the USACE, March 2008, at 2-15).

[339] Silva Tr. at 3695:10-11.

criteria developed for the IHNC flood protection system.[340]   The floodwalls at the EBIA were

originally designed to reach a maximum elevation of 12.53 feet NAVD88 (2004.65).[341]   However,

when Katrina made landfall in 2005, the condition of the floodwall protection structure had

deteriorated, due mainly to subsidence.[342]   As a result, the top of the floodwalls and the land crest

elevation of the levees were lower than they should have been at the EBIA.[343]   This includes the

floodwall heights at the North and South Breaches; in fact, and as explained in more detail *infra*,[344]

the lowest floodwall elevation point at the EBIA at the time of Katrina, 11.3 feet NAVD88

(2004.65), existed at the North Breach, and the second-lowest elevation point, 12.1 feet NAVD88

(2004.65), existed at the South Breach.[345]

As explained by Dr. Silva, the significance of these structural deficiencies is evident when

measured against the 14.2 feet NADV88 (2004.65) maximum Katrina storm surge elevation.   With

an elevation of only 11.3 feet NAVD88 (2004.65), the top of the floodwall at the North Breach was

a full 2.9 feet lower than the surge during Katrina.[346]   What is more, because the design criteria for

the structure contemplated the existence of a one-foot freeboard (i.e., the design assumed a one-foot

difference between the top of the floodwall and the storm surge, such that floodwaters would never

come within more than a foot from the top of the wall), the difference between the surge height and

---

[340]  Silva Tr. at 3695:24-3696:6.

[341]  Silva Tr. at 3695:24-3696:6; DX DM-0015-0013, -0015, -0016 (Silva Dem.); JX-2033-1109 (IPET Vol. III, at 46, Table 6).

[342]  King Tr. at 2659:24-2660:18 ("Q: Would you please look at the section of those notebooks that . . . recorded the survey elevations between the – of the IHNC east levee floodwall between Claiborne Avenue to the south and Florida Avenue to the north. . . .   So those three surveys, '91, '96 and '99, show a constant decline in the floodwall's elevation at each survey station location in that period?  A: Yes, sir."); Marr Tr. at 1862:4-14; Silva Tr. at 3694:4-9, 3759:9-13; DX DM-1006-0039, -0040 (Marr Dem.).

[343]  Silva Tr. at 3694:4-9; DX DM-0015-0008 (Silva Dem.); PX-0422-0132 (Woolley & Shabman, "Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project," Final Report for the USACE, March 2008, at 3-40).

[344]  *See infra*, Section IV.C.4.

[345]  King Tr. at 2667:17-2669:1; Dalrymple Tr. at 2732:24-2724:4; DX DM-0006-0020 (Dalrymple Dem. comparing IHNC water surface elevation to lowest points on EBIA floodwall); JX-1924-0004, -0006 (1996 OLD Survey of EBIA Floodwall); DX DM-0015-0075 (Silva Dem.); JX-1672-0068 (Silva Rep. at 57).   Unless otherwise noted, all elevations (including water surface elevations in the IHNC) will be given relative to the NAVD88 (2004.65) reference datum.

[346]  Silva Tr. at 3696:7-9; DX DM-0015-0016 (Silva Dem.); JX-2033-1109 (IPET Vol. III, at 46, Table 6).

the floodwall elevation was closer to four feet.[347]   Given these differences, "it is no surprise that the

performance [of the EBIA flood protection structure] was not satisfactory."[348]

   *Third*, the SPH design for the IHNC levees and floodwalls did not consider the potential

effect of waves on the structure.[349]   During Katrina, the waves that impacted the flood protection

structure at the North Breach were measured as high as 3.2 feet at 4:00 AM.[350]   Although the water

level at that time was only 9.3 feet, the addition of waves as high or higher than three feet was

enough to overtop the 11.3-foot high floodwall and begin eroding the support provided by the

earthen levee on the landside of the structure.[351]   Overtopping and erosion intensified at 5:00 A.M.,

with waves as high as 4.6 feet and a water level of 10.3 feet, and again at 6:00 AM, with waves as

high as 5.6 feet and a water level of 11.3 feet.[352]   None of these waves – indeed, ***no*** waves – were

accounted for in the design of the flood protection structure at the EBIA.

   *Finally*, and further evidence that the EBIA flood protection structure was not capable of

withstanding the Katrina storm surge, the earthen levees at the EBIA were constructed without

armored scour protection.[353]   Tragically, the floodwall designers determined that armored scour

protection was not necessary because, in their view, the floodwalls were unlikely to be

overtopped.[354]   As a result, when the floodwaters began pouring over the floodwalls at the North

and South Breach during Katrina, the earthen levees were unable to resist the erosion, and the

---

[347] Silva Tr. at 3696:10-15, 3832:8-16.
[348] *Id*. at 3696:10-21.
[349] *Id*. at 3695:20-23; DX DM-0015-0013, -0015, -0016 (Silva Dem.).
[350] Dalrymple Tr. at 2747:17-2749:23; DX DM-0006-0032 (Dalrymple Dem.); *see infra*, Section IV.C.4.
[351] *Id*.
[352] Dalrymple Tr. at 2748:16-2749:7; DX DM-0006-0033, -0034 (Dalrymple Dem.); *see infra*, Section IV.C.4.
[353] Silva Tr. at 3697:14-22.
[354] *Id*. at 3697:14-3698:12.

levees were steadily destabilized during the storm.[355]  The lack of armored scour protection "proved to be a major deficiency" in the design of the EBIA flood protection structure.[356]

When considered as a whole, the impact of all of these deficiencies on the EBIA flood protection system during Katrina cannot be overstated.  In connection with the IPET Report, the Army Corps of Engineers conducted a simulation to determine what would have happened if all of the floodwalls in New Orleans that were breached as a result of foundational failures remained intact during the storm.[357]  While there would have been no failures at the 17th Street or London Canals, the simulation determined that the floodwalls at the EBIA still would have failed "since the surge and waves overtopped the walls, exceeding the design and resulting in breaches."[358]  This serves as a "telling indication of the nature of the problem" at the EBIA.[359]  Namely, that the flood protection structure at that location was overwhelmed by the Katrina surge, leading to the failures at the North and South Breaches.

### B.    The Formation of a Tension Gap on the Canal Side of the EBIA Floodwall Protection Structure Contributed to the North and South Breach.

Another important factor in the development of the North and South Breaches was the formation of a tension crack or gap on the canal side of the EBIA flood protection structure during Katrina.[360]  Similar to the deficiencies discussed in the previous pages[361], the gap was not considered in any of the floodwall designs at the IHNC prior to the storm – yet because of its contribution to floodwall failures during Katrina, it is now considered in all current floodwall

---

[355] Silva Tr. at 3697:14-22, 3698:15-20; *see infra*, Section IV.C.5.

[356] Silva Tr. at 3698:15-20.

[357] JX-2033-4283 to -4285 (IPET Vol. VI, at VI-3 to VI-5); Silva Tr. at 3696:22-3697:6; DX DM-0015-0017 (Silva Dem.).

[358] JX-2033-4283 to -4285 (IPET Vol. VI, at VI-3 to VI-5); Silva Tr. at 3697:7-13.

[359] Silva Tr. at 3697:7-13.

[360] Bea Tr. at 857:15-24, 875:9-14, 1280:5-9, 1291:2-12; Marr Tr. at 1913:20-24; Brandon Tr. at 3183:23-3184:6; Stark Tr. at 3425:15-18, 3511:11-13; Silva Tr. at 3698:21-3699:2.

[361] *See supra* Section IV.A.

designs.[362]  The evidence is undisputed – indeed, Plaintiffs' expert Dr. Bea agrees – that the gap was a significant contributor to the North and South Breaches.

The tension gap did not result from any work that WGI performed at the EBIA.  Rather, the gap formed as the Katrina floodwaters pushed against the floodwall and forced it landward (in the direction of the Lower Ninth Ward), which created an opening in the soil between the floodwall and the levee that extended to the tip of the original sheetpile at the North and South Breaches.[363]  When the gap opened, water rushed into it and placed additional force on the structure, thus increasing the lateral loading on the floodwall and the sheetpile and causing horizontal deformations that led to cracks in the wall.[364]  The gap also reduced the level of stability in the floodwall foundation at the North and South Breach.[365]  The impact of these forces, together with the loss of support due to scour erosion on the land side of the structure, facilitated the EBIA failures.[366]

All of the geotechnical experts who testified in this case, including the Plaintiffs' expert, agree that the tension gap was an important contributor to the North and South Breach.[367]  Dr. Bea testified that the gap resulted "in a significant increase in the lateral loading the wall experiences" and "provide[d] a seepage connection that is important."[368]  To be sure, his opinion regarding the significant role that the gap played in causing the EBIA failures is not disputed:

> Q. . . . So you agree that if a gap forms at the floodwall breaches at those sites on the canal side, as you have postulated under your theories, and the gap goes all the way down to the tip of the sheetpile, that would be an important part of the destabilization of the floodwall; isn't that right?

---

[362]  Brandon Tr. at 3184:7-9; DX DM-1008-0029 (Brandon Dem., citing JX-2032 (Team Louisiana Report (ILIT) and JX-2033 (IPET Report)).

[363]  Bea Tr. at 857:14-18; Marr Tr. at 1883:19-24; Stark Tr. at 3511:6-13; Silva Tr. at 3698:21-25; DX DM-1006-0045, 0049 (Marr Dem.); DX DM-0015-0067 (Silva Dem., photo of gap by Sills & Vroman, 10/26/05, 10:20 AM).

[364]  Bea Tr. at 857:14-18, 1280:5-9; Marr. Tr. at 1913:20-24; Silva Tr. at 3698:21-3699:2; DX DM-0015-0065 (Silva Dem.).

[365]  Silva Tr. at 3698:21-3699:2; DX DM-0015-0065 (Silva Dem.).

[366]  Bea Tr. at 875:9-17, 1280:5-10; Marr Tr. at 1883:12-1884:5, 1913:17-24; Silva Tr. at 3760:4-25.

[367]  Bea Tr. at 857:15-24, 875:9-17, 1280:5-10, 1291:2-12; Marr Tr. at 1913:20-24; Brandon Tr. at 3183:23-3184:6; Stark Tr. at 3425:15-18, 3511:11-13; Silva Tr. at 3698:21-3699:2.

[368]  Bea Tr. at 1280:5-10.

A:  Yes, sir.
Q: In fact, you testified that the gap would be a dominant part of the destabilization
of the floodwall; isn't that right?
A:  It's an important part, yes.[369]

Yet while Dr. Bea correctly determined that the gap contributed to the North and South
Breach, his opinion that the gap and WGI's excavations ***collectively*** produced pore pressures that
impacted the EBIA floodwall, as conveyed in the hand calculations from his supplemental expert
report, is flat wrong.  Dr. Bea's hand calculations were allegedly performed "to evaluate the
hydraulic conductivity effects of multiple poorly backfilled excavations on the EBIA."[370]  Those
hand calculations purport to show by percentage the extent to which the gap and three hypothetical,
unbackfilled excavations on the canal side of the floodwall contributed "to the total pressure head
(reflecting the hydraulic pressures) developed on the protected side of the floodwall" during
Katrina.[371]  According to Dr. Bea, the gap contributed 48% of the total, an excavation located 50
feet from the floodwall contributed 24%, an excavation 100 feet from the floodwall contributed
16%, and an excavation 150 feet from the floodwall contributed 12%.[372]  Dr. Bea's hand
calculations are flawed for several reasons.

*First*, Dr. Bea's hand calculations are based on hypothetical excavations that did not exist
during Katrina.  Unlike the gap, which was in fact an open space directly adjacent to the floodwall,
the vast majority of the excavations that WGI performed ***were*** backfilled with native EBIA soils or
a combination of native soils and river sand, and ***were*** compacted.[373]  The three hypothetical

---

[369] Bea Tr. at 875:9-17.

[370] DX-01625-0012, -0044, -0045 (Bea Ongoing Analyses, 4/11/12).

[371] *Id.* at -0013 (Bea Ongoing Analyses, 4/11/12).

[372] *Id.* at -0013, -0044, -0045 (Bea Ongoing Analyses, 4/11/12).

[373] Silva Tr. at 3744:8-14 ("And nearly all the excavations were backfilled, and most of them with native materials.
Some of them were the combination of native material and river sand.  Typically, these were the shallower
excavations that had the river sand.  Many – most of these were near the northern part of the EBIA.  The excavations
were graded, compacted, as specified, and seeded with native grass."); Bea Tr. at 1050:24-1051:5 ("Q: Now, you do
know, do you not, that a large majority of the volume of excavations during Task Order 26 were backfilled with
material from the borrow pit; isn't that right?  A: Yes.  Q: And you agree that the borrow pit contains predominately
cohesive clay soils; isn't that correct?  A: That's correct."); Guillory Tr. at 2365:5-15 ("Q. . . [W]ere you able to

excavations in Dr. Bea's hand calculations, by contrast, are open excavations that provide a conduit for unimpeded water flow.[374]  Only two such excavations existed during Katrina: the borrow pit at McDonough Marine and an open excavation at Indian Towing, both of which were constantly filled with water during the months just before Hurricane Katrina.[375]  The EBIA floodwall did not fail at those locations.

Taking into account the uncontroverted evidence in this case regarding the backfilling and compaction of WGI's excavations, along with the site-specific soil properties at the EBIA and the short duration of the Katrina surge, all of the geotechnical experts for the Defense agree that the flow and resulting pore pressures generated from the canal side of the EBIA to the land side during the storm were *de minimis* and had no impact on the breaches.[376]  Dr. Bea's opinion that significant pore pressures were transmitted immediately from the excavations to the land side of the floodwall when Katrina made landfall requires that the EBIA soils were nearly incompressible – like solid rock – which they were not.[377]  The actual compressibility values for the EBIA soils were determined by both parties' during the 2011 joint soils investigation and are undisputed.[378]  Dr. Bea simply ignored these values.[379]

*Second*, Dr. Bea's hand calculations violate fundamental principles of soil mechanics and therefore cannot be true.  As this Court is aware, and as Dr. Bea concedes, Darcy's Law holds that

---

accommodate all your backfill needs with material from the EBIA sites?  A: No.  Once we depleted the McDonough Marine on-site borrow area, we did have to import a small amount of imported river sand for backfill."); Guillory Tr. at 2388:22-23 ("All excavations were compacted to some extent."); *see supra* Section II.C.

[374] DX-01625-0044 (Bea Ongoing Analyses, 4/11/12).

[375] Guillory Tr. at 2441:25-2443:12.

[376] Marr Tr. at 1917:17-1919:25, 1929:22-1930:5, 1943:18-1944:3, 1945:25-1946:7; Brandon Tr. at 3166:8-3168:24, 3207:15-24, 3224:9-3228:13; Stark Tr. at 3410:11-19, 3451:19-3452:5, 3485:20-25; Silva Tr. at 3754:21-3756:12, 3790:8-25, 3792:21-3793:11, 3811:8-3813:13

[377] Marr Tr. at 1929:22-1930:16; Stark Tr. at 3495:18-3496:4; Silva Tr. at 3805:8-3807:11.

[378] Bea Tr. at 925:12-20 (testifying that Plaintiffs obtained an $m_v$ value of **2 x 10<sup>-5</sup> 1/psf** from their pumping tests); JX-1672-0078 (Silva Rep., showing an $m_v$ range of **4 x 10<sup>-5</sup> 1/psf to 3 x 10<sup>-4</sup> 1/psf**).

[379] Bea Tr. at 925:12-25 ("Q: But you did not use that site-specific $m_v$ in the SEEP/W flow analyses that Mr. Cobos-Roa performed for you in this case; isn't that correct?  A: That's correct.").

the quantity of flow is proportional to the total head difference that drives the flow.[380]  Put another way, the larger the total head difference, the larger the quantity of flow.[381]  Because the total head remained constant between the hypothetical open excavations and the floodwall in Dr. Bea's hand calculations, there was in fact no change in total head and therefore ***no*** flow between any of those excavations and the floodwall.[382]  Even when each of the three hypothetical excavations is removed from the analysis, leaving only the gap, the flow is the same as if all of the excavations were considered together.[383]  In reality, then, and contrary to his ultimate conclusions, Dr. Bea's hand calculations demonstrate that no flow originated from or occurred between any of the hypothetical excavations, and therefore no pressure was transmitted from the excavations to the land side of the levee.[384]  As summarized by the Government's geotechnical expert, Dr. Tom Brandon, Dr. Bea's opinions regarding "the hydraulic conductivity effects of multiple poorly backfilled excavations on the EBIA," based on his flawed hand calculations, violate Darcy's Law, and are therefore completely invalid:

> And so the reason for these errors, his calculations are wrong.  These excavations do not contribute to flow underneath the levee.  They certainly don't contribute to pressure underneath the toe.  And he misapplied Darcy's Law in his calculations.[385]

Moreover, and importantly, Dr. Bea's hand calculations demonstrate that, because the only change in total head occurred between the gap and the landside of the floodwall, any and all flow and correlative pore pressures from the canal side to the landside originated in the gap.[386]  As a result, once the gap formed on the canal side of the floodwall, the hypothetical open excavations had "no role in the flow that occur[ed] under the wall or the uplift pressures that develop[ed] on the

---

[380] Bea Tr. at 884:6-14.

[381] *Id*. at 884:15-20.

[382] Silva Tr. at 3811:15-3813:13.

[383] Marr Tr. at 1920:15-18.

[384] *Id*. at 1916:21-1918:24; Brandon Tr. at 3224:9-3228:16; Silva Tr. at 3811:8-3813:13.

[385] Brandon Tr. at 3228:9-13.

[386] Silva Tr. at 3811:15-3813:13.

land side of the wall."[387]   This is also true with respect to the actual excavations that were performed by WGI in connection with Task Order 26.  It was "the flow at the gap" that was "controlling what seepage and uplift [was] generated on the land side" of the EBIA during Katrina, not the backfilled excavations on the canal side of the levee,[388] and that flow, while insignificant with respect to the overall stability of the earthen levee, did impact the local stability of the floodwall foundation at the North and South Breach.[389]  In fact, even in a most extreme hypothetical situation where all of the material on the canal side of the EBIA was excavated and backfilled with sand, if a gap formed right next to the floodwall, as it did during Katrina, "what really drives both the quantity of flow and the development of uplift pressure is the opening that's closest to the floodwall, which, if the gap is present, that's the opening."[390]

Despite Dr. Bea's flawed analysis, the evidence is undisputed that a tension gap developed on the canal side of the EBIA floodwall during Katrina.  The evidence is also undisputed that the gap – while not connected in any way to WGI's work during Task Order 26 – was an important contributor to the North and South Breaches.

C.    **Overtopping and Resulting Scour Erosion Was a Substantial Cause of the EBIA Breaches.  (Question 6.d.A.)**

The evidence at trial also illustrated that the floodwall failures at the EBIA occurred as a result of overtopping and resultant scour erosion brought on by Katrina's overwhelming storm surge.  WGI's hydrology expert, Dr. Robert A. Dalrymple, a professor of civil engineering at Johns Hopkins University with more than four decades' experience in the field of coastal engineering, was the ***only*** trial witness qualified to testify regarding the storm surge, waves, and water in the IHNC,

---

[387] Marr Tr. at 1920:19-22; *see* DX DM-1006-0069 to -0074 (Marr Dem.); DX DM-1008-0068 - 0080 (Brandon Dem.); DX DM-0015-00109 to -00114 (Silva Dem.).

[388] Stark Tr. at 3425:15-18; *see* DX DM-0015-00114 (Silva Dem.).

[389] Bea Tr. at 875:9-14; *see* Bea Tr. at 1280:5-10 (testifying that the gap "provides a seepage connection that is important").  Silva Tr. at 3761:1-11.

[390] Marr Tr. at 1922:5-11; *see* DX DM-0015-00114 (Silva Dem.).

and their effect on the EBIA floodwalls during Hurricane Katrina.[391]   As his testimony clearly demonstrated, overtopping was a substantial cause of the failures at the EBIA North and South Breaches.

      **1.**      **Background**

     This Court heard testimony from Dr. Dalrymple regarding the two types of overtopping that occurred at the EBIA – and indeed at levees and floodwalls throughout New Orleans – during Hurricane Katrina.  The first category, "wave overtopping" occurs when the water level in the canal is lower than the crest of the floodwall, but the waves that hit the floodwall are high enough that some, or all, of the wave is able to pass over the top of the floodwall to the landside.[392]  On a rising water level – such as that which occurred in the IHNC during Hurricane Katrina's storm surge in the early morning hours of August 29 – the amount of water that passes over the top of the floodwall to the landside increases over time as the difference between the water level and the top of the floodwall diminishes and more and more of the waves are able to overtop the floodwall.[393] This wave overtopping persists until the water level in the canal has risen to equal or exceed the heights of the floodwall.[394]  Once the water level equals or exceeds the height of the floodwall, wave overtopping is augmented by "flow overtopping," which occurs as the water steadily pours over the top of the floodwall and into the protected area.[395]

     Dr. Dalrymple explained that when waves – which in open water are measured from the bottom of the trough (below the water surface) to the top of the crest (above the water surface) –

---

[391]  *See* Dalrymple Tr. at 2717:1-3 (tendering Dr. Dalrymple as an expert in "civil and coastal engineering, including storm surge, waves, water flow, overtopping and tides"); *see also id.* at 2717:8-9 (Plaintiffs' counsel registers "no objection to [Dr. Dalrymple's] expertise").  As will be set forth below, during his trial testimony, Dr. Bea made several statements relating to waves and overtopping at the EBIA.  Dr. Bea, however, was neither offered nor received as an expert in coastal engineering, waves, or overtopping.  Bea Tr. at 810:7-8 (tendering Dr. Bea as an expert in "geotechnical and forensic engineering" only).

[392]  Dalrymple Tr. at 2733:5-11.

[393]  *See* DX DM-0006-0031 to -0034 (Dalrymple Dem, illustrating principle).

[394]  Dalrymple Tr. at 2733:11-14.

[395]  *Id.* at 2733:11-14.  During Dr. Bea's testimony, flow overtopping was referred as "surge overtopping."  Bea Tr. at 852:1-4, 858:15-17; *see* Dalrymple Tr. at 2733:14.

impact a vertical wall, the height of the wave doubles.[396]  Thus, a two-foot wave (i.e., a wave whose crest measures one foot above the water surface, with the trough one foot below), when it comes in contact with a vertical floodwall, doubles in height, such that the crest of the wave is two feet above the water surface.[397]

### 2.      Wave propagation in the IHNC

In the early hours of August 29, Hurricane Katrina's winds increased over time.[398]  These winds generated waves in the Gulf Intracoastal Waterway (GIWW) and the north reach of the IHNC, from Lake Pontchartrain to its juncture with the IHNC north of the Florida Avenue Bridge, and the south reach of the IHNC to the lock to the Mississippi River.[399]

The IPET report conducted extensive efforts to model the waves in the IHNC during Hurricane Katrina.[400]  As Dr. Dalrymple testified, these models, by considering the two canals in isolation, tended to underestimate the height of the waves by roughly 0.5 feet from each source at the juncture of the north branch of the IHNC and the GIWW.[401]  In the hours before 5:30 a.m., the most intense wave growth occurred in the GIWW, as wind-generated waves made their way to the confluence with the IHNC.  By 5:30 a.m. the significant wave height at the intersection of the IHNC and GIWW was about four feet.[402]

These wind-generated waves traveled from the confluence of the IHNC and the GIWW and propagated down toward the Florida Avenue Bridge, the EBIA, and the IHNC Lock.[403]  Hurricane Katrina's increasing winds continued to add energy to the existing waves.  On the morning of

---

[396] Dalrymple Tr. at 2744:22-2745:2.

[397] *Id.*

[398] Uncontested Fact Nos. 5, 8, 11, 14, 17, at 30-31.

[399] Dalrymple Tr. at 2733:17-2738:4.

[400] *See, e.g.*, JX-2033-1813 to -1815 (IPET Report).

[401] Dalrymple Tr. at 2735:19-2736:7; DX DM-0006-0023 (Dalrymple Dem.).

[402] Dalrymple Tr. at 2737:11-2738:14; *accord* DX DM-0006-0022 (Dalrymple Dem.); JX-2033-1813 to -1815 (IPET Report).

[403] Dalrymple Tr. at 2740:21-2741:5.

August 29, the Florida Avenue Bridge, which crosses the IHNC just north of the EBIA, was down.[404]  The lowered bridge, however, would have little effect on the wave propagation from the confluence of the IHNC and the GIWW to the lower IHNC.[405]  As Dr. Dalrymple testified, the structure of the bridge is quite porous because "the trusses that make up the bridges [*sic*] are widely spaced, so they don't block much of the cross section."[406]  The bridge has a grated roadbed which also acts to lessen any impact that the bridge would have on the passage of wave energy.[407]  Unlike a floodwall the bridge minimally obstructs wave energy:

> [Y]ou have the depth of the canal, and you've got that freeboard of the bridge that you add to the depth of the canal, [and] when you have the storm surge, there is an immense amount of water that is available for wave energy to pass.  The wave energy does not just travel at the surface.  It travels through the water column.  So a lot of the wave energy would pass under the bridge.[408]

Once the waters in the IHNC rose to the level of the Florida Avenue Bridge roadway, the bridge would not block passage of waves down the canal.[409]  Instead, "the bridge is relatively transparent to the waves, and only the very, very short waves would be [d]amped out by the bridge."[410]

The Florida Avenue Bridge did, however, have an effect on the ***direction*** of wave propagation down the IHNC.  As the waves in the IHNC approached the Florida Avenue Bridge from the north, the width of the IHNC narrowed, then widened considerably immediately below the bridge.[411]  As a result, waves emerging to the south of the Florida Avenue Bridge would undergo diffraction.[412]  The diffraction process caused the waves emerging south of the bridge to radiate in

---

[404]  O'Dowd Tr. at 769:20-23; Dalrymple Tr. at 2742:25-2743:1.

[405]  Dalrymple Tr. at 2743:1-18.

[406]  *Id*. at 2743:5-7; *accord* DX DM-0006-0028 (Dalrymple Dem., aerial view of Florida Avenue Bridge).

[407]  DX DM-0006-0028 (Dalrymple Dem.); *see also* Dalrymple Tr. at 2743:9-11 (discussing DX DM-0006-0028 and noting that it is possible to "see right through [the roadbed] to the wake of the ship below the bridge").

[408]  Dalrymple Tr. at 2870:2-9; *id*. at 2869:18-21 (noting that "most of the wave energy would be traveling under the bridge and not directly at the surface," indicating that "a lot of wave energy would pass unhindered by the bridge, particularly long waves").

[409]  Dalrymple Tr. at 2473:12-18.

[410]  *Id*. at 2743:12-18.

[411]  *Id*. at 2740:24-2741:11.

[412]  *Id*. at 2741:12-2742:24; *accord* DX DM-0005 (King Dem.).

many different directions, "as if you dropped a rock in a pond."[413]   As the waves radiated outward

from the Florida Avenue Bridge, many of them impacted the floodwalls along the banks of the

canal and were reflected back across the canal.[414]

The prevailing winds until about 7:00 a.m. on the morning of August 29 were out of the

north-northeast.[415]  This does not mean that all of the waves in the IHNC were traveling in the same

direction.[416]  An observer, such as Lockmaster O'Dowd, might see waves following the direction of

the wind, but this view is superficial.[417]   Foam and spray – as well as very small wind-generated

waves – **would** follow the direction of the wind.[418]  However, the processes of reflection and

diffraction caused the waves in the IHNC to propagate in all directions.[419]   The effect is very

different from standing on a beach observing waves rolling in toward the shore:   "[a]t a beach, you

have the beach where all the waves are breaking," whereas the IHNC during Hurricane Katrina was

a "reflective container and the waves are bouncing every which way."[420]

The only qualified expert testimony made clear that during Hurricane Katrina, waves in the

lower IHNC traveled in myriad directions.   The radial diffraction that occurred at the Florida

Avenue Bridge and the high degree of reflection from the western IHNC floodwalls meant that the

EBIA floodwalls were subjected to large wave action during Hurricane Katrina.[421]

---

[413]  Dalrymple Tr. at 2742:7-9; *see also* DX DM-0006-0027 (illustrating principle).

[414]  Dalrymple Tr. at 2744:4-7 ("During the storm surge, the water level is very high.  We have vertical floodwalls on both sides that are a hundred percent reflective, and so [the waves] are bouncing back and forth."); JX-2033-1814 to -1815 (IPET Report) (noting that "the primary source of wave energy incident upon the floodwalls along the Lower Ninth Ward came from waves reflected back to the east side of the canal from the west side").

[415]  Uncontested Fact Nos. 6, 9, 12, 15, 18.

[416]  Dalrymple Tr. at 2790:6-12.

[417]  *Compare* O'Dowd Tr. at 770:15-18

[418]  Dalrymple Tr. at 2816:4-14, 2817:1-2.

[419]  *Id*. at 2816:8-24 ("If I had a basin of water and shook it and had waves going every which way and blew a wind across it in one direction, you would say that [the waves] went in the direction of the wind," when in reality "it would be going in all different directions.").

[420]  *Id*. at 2817:13-18.

[421]  *Id*. at 2743:19-2744:3.

### 3.    Principles of wave overtopping

Katrina's winds increased, the storm surge rose, the height of the waves in the IHNC increased, and they were high enough to begin overtopping the EBIA floodwalls between 3 a.m. and 4 a.m. on August 29.  This was the hour that the first waves appeared whose height at the EBIA floodwall was greater than the difference between the water level and the top of the wall.  The first step in determining the beginning of wave overtopping is determining the significant wave height ("$H_{m0}$") over time in the IHNC during Hurricane Katrina.  "Significant wave height" is a descriptive for the **average** of the topmost 1/3 of waves in a particular sea state.[422]

As an average, there necessarily exist waves both smaller and larger than the "significant" wave height.  Given the method by which the significant wave height is calculated, for any significant wave height it is possible to determine the maximum wave height ("$H_{max}$") that would occur during an hour of those conditions.[423]  As Dr. Dalrymple explained, a "mathematical relationship" exists between the significant wave heights that occurred during Hurricane Katrina and the corresponding maximum wave height.[424]  Dr. Bea was Plaintiffs' only witness to purportedly address this issue, and although he was not qualified as an expert on these grounds, he agreed with Dr. Dalrymple:

> [I]f I had a significant wave height of 2 feet and approximately an hour of that sea state, I would have a maximum wave height of about 1.7 times that significant wave height. And that would be – 3.4 would be the maximum wave height that would be in this particular sea state.[425]

The relationship between significant wave height and maximum wave height makes it possible to determine roughly when wave overtopping would begin at the EBIA floodwalls.  As Dr. Dalrymple testified, "[a]s the time goes by[,] and the winds increase[,] and the water level rises,

---

[422] Dalrymple Tr. at 2739:23-2740:2.
[423] *See* Dalrymple Tr. at 2872:23-2873:3 (noting that "[a]ssociated with the significant wave height is [an] implicit underlying distribution of wave height[s]"); *see also* DX DM-0006-0030 (Dalrymple Dem.).
[424] Dalrymple Tr. at 2877:2-5.
[425] Bea Tr. at 1269:6-10.

eventually the $H_{max}$ reaches the top of the floodwall, so that would be the first wave that goes over the top."[426]    Because waves doubled in height when they hit the floodwall, when the $H_{max}$ was larger than the distance between the water's surface and the top of the floodwall, the first waves overtopped the wall.

### 4.    Waves in the IHNC during Hurricane Katrina

The waves in the IHNC began to overtop the lowest points of the EBIA floodwalls between 3:00 a.m. and 4:00 a.m. on the morning of August 29.[427]    Stephen King, the Orleans Levee District survey party chief, provided the last OLD pre-Katrina survey of the EBIA floodwalls.    Those surveys show that the North Breach occurred at the lowest point of the EBIA floodwall, which had an elevation of 11.3 feet (NAVD88 (2004.65)) as of 1999.[428]    The next-lowest point of the EBIA floodwall – with an elevation of 12.1 feet – was the eventual site of the South Breach.[429]    Based on these surveyed floodwall heights (and without taking into account subsidence from 1999 to August 29, 2005), it is clear that waves from Katrina's increasing winds and rising storm surge began to splash over the floodwalls sometime shortly after 3:00 a.m.    Additionally, and as explained in more detail below,  Dr. Dalrymple concluded that overtopping began at the EBIA sometime between 3:00 and 4:00 a.m.  Dr. Bea's statements on the matter reinforce Dr. Dalrymple's expert conclusions.

*At 3:00 a.m.* the water level in the IHNC was at 8.1 feet.  The lowest elevation along the EBIA floodwall (at the site of the eventual North Breach) was no more than 11.3 feet.    Dr.

---

[426]  Dalrymple Tr. at 2877:20-23.

[427]  The trial testimony of Michael O'Dowd, the lockmaster at the IHNC Lock who rode out Hurricane Katrina at the lock complex, is of little value in addressing this question, since he was unable to see anything in the IHNC north of the Claiborne Avenue Bridge until well after the EBIA North and South Breaches had already occurred.   O'Dowd Tr. at 783:19-24.

[428]  King Tr. at 2667:17-2668:7; Dalrymple Tr. at 2732:24-2734:4; DX DM-0006-0020 (Dalrymple Dem. comparing IHNC water surface elevation to lowest points on EBIA floodwall); JX-1924-0004, -0006 (1996 OLD Survey of EBIA Floodwall).  Unless otherwise noted, all elevations (including water surface elevations in the IHNC) will be given relative to the NAVD88 (2004.65) reference datum.

[429]  King Tr. at 2668:16-2669:1; Dalrymple Tr. at 2732:24-2734:4; DX DM-0006-0020 (Dalrymple Dem. comparing IHNC water surface elevation to lowest points on EBIA floodwall); JX-01924-0004, -0006 (1996 OLD Survey of EBIA Floodwall).

Dalrymple calculated that the significant wave height in the IHNC at this time was 1.13 feet, which implies a maximum wave height of 2.1 feet.[430]  Dr. Bea stated that the significant wave height in the IHNC at this time was between 1 and 2 feet.[431]  When the maximum wave impacted the floodwall, it would double in height so that the crest of the wave would be 2.1 feet above the water surface.[432]  Based on the 1999 floodwall height, the maximum-height wave would not yet be high enough to overtop the EBIA floodwall, but you could begin to see some spray.[433]

 **At 4:00 a.m.**, the water level in the IHNC had risen to 9.3 feet.  According to Dr. Dalrymple, the significant wave height had risen to 1.7 feet, which produced a maximum height of 3.2 feet.[434]  Again, Dr. Bea's statements are in substantial agreement:  he admits that the significant wave height was between 1 and 2 feet at this time.[435]  At 4 a.m. the maximum wave height, 3.2 feet, was more than sufficient to overtop the 11.3-foot floodwall at the eventual site of the North Breach.  In fact, the 1.7-foot significant waves are almost high enough to do so, implying that a large number of waves could have overtopped the floodwall during this hour.[436]  At the next-lowest point along the EBIA floodwall – what became the South Breach – the maximum waves began to overtop the floodwall.  Similarly, many of the waves at 4 a.m. were high enough to overtop the 12.1-foot floodwall at the eventual site of the South Breach.

 **At 5:00 a.m.**, the water level in the IHNC had risen to 10.3 feet, and the significant wave height in the canal has increased to 2.5 feet according to Dr. Dalrymple.[437]  Dr. Bea agreed that the

---

[430]  Dalrymple Tr. at 2747:8-13; DX DM-0006-0031 (Dalrymple Dem.).

[431]  JX-1389-0023 (Bea Rep.).

[432]  Dalrymple Tr. at 2747:5-13; 2744:22-2745:2.

[433]  *Id.* at 2747:14-16 (noting that at 3:00 a.m. "even with wave reflection against the wall, you do not overtop the wall, although you might see some spray").

[434]  *Id.* at 2747:17-22; DX DM-0006-0032 (Dalrymple Dem.).

[435]  JX-1389-0023 (Bea Rep.).

[436]  Dalrymple Tr. at 2748:19-20; *see also* DX-02667-0023 (Villavasso Dep. at 57:6-17) (noting that after 3:00 a.m., "water splashing over the levees" evident, including the floodwall at the eventual site of the North Breach).

[437]  Dalrymple Tr. at 2733:19-24, 2748:16-20; DX DM-0006-0033; *accord* JX-2033-1815 (IPET Report) (noting that by 5:30 a.m. there were 2-3 foot waves incident on the IHNC floodwalls by 5:30 a.m.).

significant wave height at this time was between 2 and 3 feet.[438]  The maximum wave height given a 2.5-foot significant wave was 4.6 feet, and it is clear that at 5:00 a.m. even waves significantly *smaller* than the significant wave height are high enough to overtop the floodwall at the site of the North and South Breaches.

At *6:00 a.m.*, the water level in the canal reached 11.3 feet – even with the lowest point along the EBIA floodwall, which indicates that all of the wave energy impacting the floodwall at this point would begin overtopping.[439]  Both Dr. Bea and Dr. Dalrymple agree that the significant wave height in the canal was roughly 3 feet, which indicates a maximum wave height of 5.6 feet.[440] At the site of the eventual South Breach, as well, these waves are more than sufficient to produce significant wave overtopping.

In short, the testimony of Dr. Dalrymple demonstrates that wave overtopping at the location of the North and South IHNC Breaches began between 3:00 a.m. and 4:00 a.m. on August 29.  Not only are Dr. Bea's statements regarding wave heights in the IHNC in substantial agreement with Dr. Dalrymple's expert conclusions, but where they disagree, Dr. Bea's significant wave heights are usually *higher* than those presented by Dr. Dalrymple.[441]

---

[438] JX-1389-0023 (Bea Rep.).

[439] Dalrymple Tr. at 2748:22 -2749:1 (at 6:00 a.m. "everything is going over the wall" at the site of the eventual North Breach, given that "we've got the water level in the canal at the top of the wall . . . we've got waves that are much higher than the wall . . . we've got maximum wave height far higher than the wall.").

[440] DX DM-0006-0034 (Dalrymple Dem.); JX-1389-0023 (Bea Rep.)

[441] In his rebuttal testimony on the final day of trial, Dr. Bea attempted to disavow his prior statements regarding the significant wave height as set forth in his expert report.  Specifically, Dr. Bea claimed that the waves he described in his report were traveling with the wind, and were not impacting the EBIA floodwalls.  Bea Tr. at 4156:18-24.  This Court, of course, must ultimately decide the appropriate weight to assign to this late and self-serving testimony by Plaintiffs' expert, particularly in light of the fact that the table in which Dr. Bea set forth his conclusions regarding significant wave heights purports to describe a "Time-based summary of developments at the Lower 9th Ward during Hurricane Katrina."  JX-1389-0023 (Bea Rep.).  Moreover, as set forth above, the only expert witness qualified to offer opinions on the interaction of waves and wind explained that during Hurricane Katrina waves in the IHNC would not have traveled only in the direction of the prevailing winds.  Dalrymple Tr. at 2816:8-24.

| Time on Aug. 29 | Water Level in IHNC | Sig. Wave Height (Bea) | Sig. Wave Height (Dalrymple) | Max. Wave Height | Wave Overtopping at North Breach? | Wave Overtopping at South Breach? |
|---|---|---|---|---|---|---|
| 3:00 a.m. | 8.1 feet | 1 – 2 feet | 1.13 feet | 2.1 feet | No | No |
| 4:00 a.m. | 9.3 feet | 1 – 2 feet | 1.17 feet | 3.2 feet | Yes | Yes |
| 5:00 a.m. | 10.3 feet | 2 – 3 feet | 2.5 feet | 4.6 feet | Yes | Yes |
| 6:00 a.m. | 11.3 feet | 2 – 3 feet | 3.1 feet | 5.6 feet | Yes | Yes |

**5.      Floodwall failures at the north and south EBIA breaches.**

**a.      Timing of the North and South Breaches (Question 6.d.A.2))**

By using the FLOW-3D model in concert with the IHNC water levels observed at the lock, as well as the stopped-clock and other data obtained during the IPET investigation, Dr. Dalrymple was able to provide a reasoned estimate of when the breaches occurred.[442]

**The North Breach occurred at roughly 6:00 a.m.**  Relying on the FLOW-3D model, Dr. Dalrymple concluded that the North Breach occurred within 15 or 20 minutes of 6:00 a.m., after more than two hours of increasing wave overtopping, and at roughly the point when flow overtopping began to occur.[443]  The breach took roughly 30 minutes to fully form.[444]  The 6:00 a.m. start time agrees with the data collected in the IPET report, with the testimony of William Villavasso and with the Sewerage and Water Board's official central control records.  Pump Station No. 5 (which lay just to the north of the North Breach) was shut down at 6:10 a.m.[445]

**The South Breach occurred at roughly 7:00 a.m.**  Dr. Dalrymple was also able, through the FLOW-3D model, to develop a reasoned estimate of the timing of the South Breach, which likely began within 15-20 minutes of 6:45 a.m.[446]  At the time the South Breach occurred, it had

---

[442] Dalrymple Tr. at 2749:8-2752:7; DX DM-0006-0039 (Dalrymple Dem.); *see also* JX-1713-0059 to -0065 (Dalrymple Rep.).

[443] Dalrymple Tr. at 2866:9-11; DX DM-0006-0039 (Dalrymple Dem.); *see also* JX-1713-0059 to -0065 (Dalrymple Rep.).

[444] *Id.*

[445] DX-02667-0049 to -0050 (Villavasso Dep. at 148:7-18); DX-02603-0004 (SWB Central Control Records).

[446] Dalrymple Tr. at 2750:8-11; *id.* at 2868:17-2869:3.

been subject to at least 3 hours of increasing wave overtopping, as well as nascent flow overtopping as IHNC water levels began to exceed the height of the floodwall.  As with the timing of the North Breach, Dr. Dalrymple's conclusion is an estimate of the breach time, but there is a "fairly high confidence" that the breach occurred in this window.[447]  Dr. Dalrymple also concluded that the South Breach took less time to form than the smaller North Breach.  This was because the resulting damage in the immediate vicinity of the breach was quite similar to damage Dr. Dalrymple had seen in connection in his study of the 2004 Indian Ocean tsunami.[448]

  **b.     Scour depth at the breaches (Questions 6.d.A.2) and 6.d.A.3))**

The sites of the eventual North and South Breaches, and the entire EBIA floodwall system, were subjected to several hours of intensifying wave overtopping beginning after 3:00 a.m.  As water flowed over the EBIA floodwall system with increasing volume, it eroded a scour trench of varying depths and widths along the length of the landside of the floodwall.  No photographs depict the scour trenches at the site of the North and South Breaches, because the overturning floodwall and inrushing and outflowing waters obscured that trench.  Drs. Silva and Marr explained in their testimony it is not possible to determine with absolute precision the depths of the scour trenches at the site of North and South Breaches.[449]  As Dr. Silva made clear:

> We don't know exactly where the scour trench levels were at the failures [*i.e.*, the North and South Breach].  But it is important to see that scour trench depth is really very variable.  It is very difficult to predict exactly, hour by hour, what is the depth and width of the scour trench.  ***I, frankly, think it's futile to do that, and I didn't try to do that.***"[450]

---

[447]  Dalrymple Tr. at 2869:3; *see also id*. at 2751:14-18 ("[W]e have a lot of confidence in the South Breach because if you change [the timing] much in either direction, earlier or later, you get wide errors of arrival of floodwaters" at corresponding IPET data points).

[448]  *Id*. at 2750:12-24; JX-1713-0008 (Dalrymple Rep.).

[449]  Silva Tr. at 3679:20-23 ("[T]here's no attempt anywhere in my work . . . to calculate by the minute how deep the scour trench was . . . . I mean, I don't think anyone can do that."); Marr Tr. at 1851:4-24 (explaining the "complexity of trying to accurately forecast depth of scour"); *id*. at 1854:15-18 (noting that the result of underlying analysis cannot give "a real precise number but a rough indicator to a foot or so" of depth of scour).

[450]  Silva Tr. at 3762:18-23 (emphasis added).

However, there is clear, observable evidence – including the personal observations of Dr. Silva, who visited the EBIA shortly after Katrina[451] – that the depth of the scour trench in the vicinity of the North and South Breaches was roughly three and a half to five feet.[452]  This evidence includes several photographs of the scour trench presented at trial by Dr. Marr, as well as an aerial photograph of the EBIA scour trench from Dr. Silva's trial presentation[453], as noted by the Court in the Briefing Order.[454]

As Dr. Silva testified at trial – and as is clearly visible in the aerial photograph accompanying his testimony – the scour trenches in the vicinity of the breach locations serve as a reliable measure of the depth of the scour trenches at the breach sites.  Once there was a breach, the water levels in the IHNC within roughly 100 to 150 feet of the breach would be significantly *lower* than the lock hydrograph as a result of the downhill flows of water through the breaches.  This depression of the water surface at those locations effectively neutralized the overtopping.[455]  In other words, "while it is true that there was further overtopping of these walls . . . after the failure occurred, near the failure there would have been no more overtopping for about 100 feet."[456]  As a result, the scour depths in the vicinity of the two breaches provide the best empirical evidence for the ultimate scour depths at the breach sites themselves.

The fact that erosion due to overtopping is essentially neutralized within 100 to 150 feet of the breaches themselves (after those breaches occur) directly bears on an issue raised by the Court.

---

[451] Silva Tr. at 3917:8-14 ("I knew from my personal observations that there had been a scour trench that had developed on the landside.  I knew what the approximate dimensions of that scour trench was, and I determined from analyses that scour trenches of that, those dimensions were sufficient to compromise the stability of the wall.").

[452] Marr Tr. at 1849:9-1856:23; DX DM-1006-0021 to -0036 (Marr Dem., showing photographs of post-Katrina scour trench depths across the entire EBIA floodwall); Silva Tr. at 3761:22-3762:18; DX DM-0015-0068 to -0071 (Silva Dem., illustrating scour trenches and referenced in cited testimony); *see also* Marr Tr. at 1854:15-18 ("So, you see, Your Honor, the point of the photographs is not to give you a real precise number but a rough indicator to a foot for [sic] so of what the scour depth could have been.").

[453] DX DM-0015-0069 (Silva Dem.).

[454] Briefing Order at 5.

[455] Silva Tr. at 3763:6-25.

[456] *Id*. at 3763:19-23.

In the Briefing Order, the Court requested that the parties address at what time the scour trench "at the point immediately north of the failed section of the South Breach" would have reached its maximum depth, at which point it would have been "neutralized by the tailwater."[457]  The answer to the Court's question is that the depth of the protected-side tailwater does not determine when the erosive force of the overtopping waters immediately north of the South Breach would have been neutralized.  Instead, the scour trench immediately north of the failed section of the South Breach reached its maximum depth – *i.e.*, the erosive force of the overtopping waters was neutralized and the scour trench was not eroded further – was at **roughly 7:00 a.m.**, when the South Breach opened.  Once the South Breach opened, the IHNC water levels in the immediate vicinity of the breach were significantly lower than elsewhere in the canal, neutralizing the flow overtopping occurring within 100 to 150 feet of the breaches after those breaches occurred.  The same phenomena similarly neutralized further scour immediately south of the North Breach after that breach opened.

For sections of the EBIA floodwall that did *not* breach (and were not within 100 to 150 feet of those breaches), however, the rising landside tailwater did ultimately act to neutralize the erosive force of overtopping water, at which point the scour trench in those areas reached its maximum depth.  The evidence at trial clearly demonstrated that the tailwater reached a depth sufficient to neutralize further erosion of the scour trench in these areas at roughly **8:00 a.m.**  As Dr. Marr testified, the rising water level on the land side of the EBIA floodwalls eventually rose to a level that began to dissipate the erosive energy of overtopping waters.[458]  In response to a question from the Court, Dr. Marr explained this process:

> The Court: How far does the tail water have to come up until there's no further scour?
> The Witness: It's about – **roughly about elevation plus 6, which is, you know, a foot or so over the top of the landside levee** –
> The Court: Got it. Thank you.

[457] Briefing Order at 3, ¶ 6.d.A.3).
[458] Marr Tr. at 2044:14-16.

The Witness: -- Embankment.
The Court: Thank you.[459]

Dr. Dalrymple's presentation illustrated that after the South Breaches opened, the water level in the Lower Ninth Ward began to rise rapidly.[460]   The hydrographs for the Washington, Coats and Livers properties – all of which are located in the Lower Ninth Ward – show that the water level in the Lower Ninth Ward reached an elevation of +6.0 feet (NAVD88 (2004.65)) at roughly 8:00 a.m.[461] This agrees with Dr. Marr's conclusion that between 8:00 and 9:00, the depth of the land-side tailwater became significant enough to prevent further erosion of the scour trench.[462]

### c.   Overtopping-induced scour contributed to the failures

Based on the observed scour depths at the EBIA following Katrina, and using accepted geotechnical analyses for determining floodwall stability[463], the Defense experts concluded that the overtopping-induced erosion of the levee on the landside of the floodwall at the North and South Breach contributed to both failures.  Specifically, Dr. Silva calculated "how much scour it would take to destabilize the floodwall,"[464] and he testified that a scour trench depth of 4 feet would have been enough to contribute to the failures at the breach locations.[465]   Dr. Marr conducted similar analyses and concluded that, when the scour trench at the South Breach reached 3 to 3.5 to 4 feet in depth, the floodwall was compromised and it overturned.[466]   Dr. Marr also concluded that overtopping-induced scour erosion contributed to the failure at the North Breach.[467]   The scour

---

[459] Marr Tr. at 2242:8-15 (emphasis added).

[460] *See generally* DX DM-0006-0043 to -0047 (Dalrymple Dem.).

[461] DX DM-0006-0043 to -0045.

[462] Marr Tr. at 2044:19-2045:3.

[463] Silva Tr. at 3915:19-21; *see* Marr Tr. at 1886:9-21

[464] Silva Tr. at 3749:14-16; *see id.* at 3679:24-3680:2 (noting that his analysis calculated depth of scour "where we would expect the structure to [exhibit] an unsatisfactory performance.")

[465] Silva Tr. at 3766:10-22.

[466] Marr Tr. at 1887:1-19; DX DM-1006-0049 (Marr Dem.).

[467] Marr Tr. at 1831:16-1832:4, 1914:25-1915:10.

depths required to compromise wall stability are consistent with the scour depths observed at the EBIA shortly after Katrina.[468]

Notably, the Defense experts also testified about two undisputed features that affected the overtopping/overturning-related failure mechanisms at the North and South Breach.  First, the evidence at trial showed that the ground surface elevation on the landside of the North Breach was: (1) lower than the ground surface elevation on the canal side of that same breach; ***and*** (2) lower than the ground surface elevation on the landside of the South Breach.[469]  As a result, there was less soil at the levee crown and therefore less resistance to lateral forces on the landside of the North Breach, which created a destabilizing effect.[470]  Second, the evidence at trial demonstrated that the shear strengths of the soils at the North Breach varied significantly and were lower than the shear strengths at the South Breach; put another way, the soils at the North Breach were weaker than those at the South Breach.[471]  This, along with the lower ground surface elevations at the North Breach, created a lower level of stability at the North Breach as compared to the South Breach.[472] These features also likely explain why a much larger section of the floodwall had to fail before the South Breach developed.[473]

As explained by the Defense experts, once the crown of the levee was eroded to the depths identified in their analyses, the levee could no longer resist the pressure of the water pushing the floodwall toward the landside.[474]  Without enough lateral restraint to hold the floodwall in place, the wall eventually rotated landward, toward the scour trench, resulting in massive amounts of water

---

[468]  Marr Tr. at 1849:9-1856:23; DX DM-1006-0021 to -0036 (Marr Dem., showing photographs of post-Katrina scour trench depths across the entire EBIA floodwall); Silva Tr. at 3761:22-3762:18; DX DM-0015-0068 to -0071 (Silva Dem., illustrating scour trenches and referenced in cited testimony).

[469]  Marr. Tr. at 1900:20-1901:10; Silva Tr. at 3769:13-17.

[470]  Marr. Tr. at 1900:20-1901:10; Silva Tr. at 3769:13-17.

[471]  Marr Tr. at 1893:17-1895:5, 1900:20-1902:4; DX DM-1006-0056, -0057 (Marr Dem.).

[472]  Marr Tr. at 1893:17-1895:5, 1900:20-1902:4; Silva Tr. at 3769:9-12.

[473]  Silva Tr. at 3769:9-23.

[474]  Marr Tr. at 1836:12-1837:12; DX DM-1006-0005 (Marr Dem.); Silva Tr. at 3774:10-17.

rushing over, flattening, and eventually dragging the wall several hundred feet in the direction of the Lower Ninth Ward.[475]

This overtopping/overturning-related failure mechanism at the EBIA is not new to Dr. Bea. In fact, Dr. Bea testified before this very Court in the *Barge* trial that "the development of the erosional trench on the protected side of the floodwall" was "***the second key mode of failure***" at the South Breach.[476]  Despite his efforts to parse language and undermine overtopping-induced scour as a contributor to the breaches in the instant case, he cannot escape the fact that, when testifying in a prior case where the overtopping failure mode was advantageous for his client, he came to the same conclusion.

Nor was the overtopping/overturning-related failure unique to the EBIA breaches during Katrina.  In fact, on the west bank of the IHNC, just across the canal from the EBIA, Dr. Bea concluded in a 2007 paper that the failure of a portion of the Orleans Levee District floodwall "was caused by overtopping of a concrete sheetpile wall section, with the overtopping flow scouring a trench at the rear side of the floodwall and its supporting sheetpile curtain."[477]  As the undisputed evidence from OLD survey party chief Stephen King demonstrated at trial, the floodwall at this west bank failure was between 1 to 2 feet ***higher*** than the floodwall at the North and South Breaches.[478]  In addition, and significantly, the failed OLD floodwall was located more than 800 feet west of a Port of New Orleans floodwall that protected the failed OLD floodwall from the

---

[475] Marr Tr. at 1836:12-1837:12; DX DM-1006-0005 (Marr Dem.); Silva Tr. at 3774:10-17.

[476] DX-01590-0018 to 0019 (Bea *Barge* Tr. at 2617:11-2618:4); *see* Bea Tr. at 1425:2-1426:2.

[477] DX-02580-0012 (Seed, Bea et al., "Investigation of Levee Performance in Hurricane Katrina: The Inner Harbor Navigation Channel," 2007).

[478] Mr. King's contemporaneous field notes from a March 2003 survey of the IHNC west bank floodwall demonstrate that, at the location of the west bank failure, the top-of-wall elevation was between 13.03 and 12.88 feet NAVD88 (2004.65).  King Tr. at 2677:3-17; PX-3546 (Notes from 2003 Survey of Floodwall Elevations at IHNC West Bank); *see also* DX DM-0004-0001 (King Dem.).  The top-of-wall elevation at the North Breach was 11.3 feet NAVD88 (2004.65) and 12.1 feet NAVD88 (2004.65) at the South Breach.  King Tr. at 2667:17-2668:7; Dalrymple Tr. at 2732:24-2734:4; DX DM-0006-0020 (Dalrymple Dem. comparing IHNC water surface elevation to lowest points on EBIA floodwall); JX-1924-0004, -0006 (1996 OLD Survey of EBIA Floodwall).

IHNC.[479]   The Port of New Orleans floodwall was approximately two feet higher than the failed

OLD floodwall behind it – and therefore between three to four feet higher than the wall at the North

and South Breach.[480]   Given its height and its location between the canal and the OLD wall, the Port

of New Orleans wall would have tempered the magnitude of the floodwaters that impacted the west

bank during Katrina.[481]   And yet, as Dr. Bea concluded, the OLD wall still failed due to

overtopping-induced scour.

In describing the overtopping/overturning-related failure on the west bank of the IHNC, Dr.

Bea and his co-authors emphasized that:

> This was one of a number of concrete floodwalls (I-wall sections) that <u>did</u> fail due to
> overtopping and consequent scour at the inboard side.  The USACE has already
> undertaken a system-wide effort to either replace I-wall sections with the more
> robust 'T-wall' sections (with the supporting battered structural piles providing
> higher levels of lateral and rotational wall stability, and which have intrinsic inboard
> toe erosion protection due to the concrete leg of their inverted 'T' shape) or to install
> concrete 'splash pads' at the inboard sides of these I-walls to prevent this type of
> erosion in the event of overtopping in the future.[482]

These design modifications noted by Dr. Bea demonstrate the extent to which the IHNC flood

protection structure was not equipped to withstand the Katrina surge.[483]

> **d.    Impact of differences in the height of the EBIA floodwall (Question 6.d.A.1))**

The Court has inquired as to what evidence supports that a difference in the height of the

EBIA floodwall could contribute to the North and South Breach.[484]   The simple answer is that the

floodwall failed at the two lowest points in the flood protection system.[485]   This provides evidence

---

[479]  King Tr. at 2675:24-2677:2; DX DM-0004-0001 (King Dem.); DX DM-0005-0001 (King Dem.).

[480]  King Tr. at 2677:3-2679:5; DX DM-0004-0001 (King Dem.).

[481]  Silva Tr. at 3775:13-3776:1.

[482]  DX-02580-0014 to -0015 (Seed, Bea et al., "Investigation of Levee Performance in Hurricane Katrina: The Inner
Harbor Navigation Channel," 2007).

[483]  *See supra*, Section IV.A.

[484]  Briefing Order at 3, ¶ 6.d.A.1).

[485]  King Tr. at 2667:17-2668:7, 2668:16-2669:1; JX-1924 (1996 OLD Survey of EBIA Floodwall); JX-1925 (1999
OLD Survey of EBIA Floodwall); JX-1926 (1991 OLD Survey of EBIA Floodwall); Dalrymple Tr. at 2732:24-
2734:4; DX DM-0006-0020 (Dalrymple presentation comparing IHNC water surface elevation to lowest points on
EBIA floodwall).

that the lowest top-of-wall elevation at the North Beach and the second-lowest top-of-wall elevation at the South Breach were factors that influenced the EBIA failures.

Additionally, Drs. Marr and Silva both testified that the low elevations at the North and South Breach contributed to the floodwall failures.[486]  That is because overtopping began first at the locations where the floodwall was at its lowest, thus creating more scour erosion at the North and South Breach as compared to the remainder of the flood protection system.[487]  Dr. Silva's post-Katrina aerial photo of the breaches is instructive on this point, as he explained at trial.[488]  The aerial photo shows two particularly wide scour trenches at the EBIA.[489]  Without coincidence, one of the wide trenches is in the general vicinity of the North Breach at the lowest top-of-wall elevation.[490]  The other wide scour trench is just north of the borrow pit at McDonough Marine, where the *third* lowest top-of-wall elevation existed during Katrina.[491]

Although the scour trench in the vicinity of the South Breach is not visible in Dr. Silva's aerial photo, the vast majority of the trench along the entire length of the floodwall is much narrower than the wide areas at the North Breach and McDonough Marine, and the wall did not fail at any of those narrower points.[492]  Further, Dr. Marr demonstrated at trial based on post-Katrina photos of the EBIA scour trenches, that deeper trenches were found in locations where the top-of-wall elevation was lower, whereas shallower trenches were typically found at points where the top-of-wall elevation was higher.[493]  These correlations indicate that the lower elevations at the North and South Breach did in fact impact the floodwall failures.

---

[486]  Marr Tr. at 1945:17-22, 2018:11-16; Silva Tr. at 3769:24-3770:7, 3827:11-16.
[487]  Marr Tr. at 1861:2-6, 1945:17-22, 2018:11-16; Silva Tr. at 3769:24-3770:7, 3827:11-16.
[488]  DX DM-0015-0069 (Silva Dem., post-Katrina aerial photo of EBIA); Silva Tr. at 3761:22-3766:25.
[489]  DX DM-0015-0069 (Silva Dem., post-Katrina aerial photo of EBIA); Silva Tr. at 3765:14-3766:25.
[490]  DX DM-0015-0069 (Silva Dem., post-Katrina aerial photo of EBIA); Silva Tr. at 3765:14-3766:25.
[491]  DX DM-0015-0069 (Silva Dem., post-Katrina aerial photo of EBIA); Silva Tr. at 3765:14-3766:25.
[492]  DX DM-0015-0069 (Silva Dem., post-Katrina aerial photo of EBIA); Silva Tr. at 3765:14-3766:25.
[493]  DX DM-1006-0037 (Marr Dem.).

Of course, as Drs. Silva and Marr emphasized at trial, there are several variables that contributed to the varying scour depths and widths on the land side of the EBIA floodwall, including soil type and strength, ground vegetation, and others.[494] Those variables are impossible to quantify with precision. The locations of the lowest top-of-wall elevations at the EBIA during Katrina, however, are not variable – they are confirmed and undisputed. These lower top-of-wall elevations contributed to the North and South Breach.

**D.      Structural Defects at the Connection Between the 1960s and 1980s Flood Protection Systems at Boland Marine Contributed to the North Breach (Question 6.d.B.1))**

Along with the causative elements described in the preceding pages, the North Breach was also impacted by two regrettable design and construction related features at the connection between the original 1960s flood control structure and a more recent structure installed in the 1980s. The two features are best described as: (1) the difference in sheetpile length and absence of a proper transition at the connection between the original sheetpiles and the newer – and significantly longer – sheetpiles; and (2) a faulty weld near the connection between the original sheetpiles and the newer, longer sheetpiles. Neither of these features related in any way to WGI's work during Task Order 26, and both made important contributions to the North Breach.

**1.      Differing sheetpile lengths and faulty transition design**

As this Court is aware, and as the undisputed evidence shows, there were in fact two vintages of the flood protection structure in the vicinity of the North Breach. The significant difference in sheetpile length and the lack of a proper transition between the two sheetpile systems were implicated in causing the failure adjacent to the Boland Marine site.

The original floodwall bounding the EBIA was constructed in the mid to late 1960s, with sheetpiles that were approximately 19.5-19.7 feet long from top to bottom, and a concrete cap

---

[494] Marr Tr. at 1850:24-1851:20; Silva Tr. at 3765:14-25.

poured over the top of the sheetpiles.[495]   Several years later, in the early to mid-1980s, a portion of the floodwall was demolished and rebuilt as part of a project known as the Florida Avenue Complex Project, at the north end of the EBIA.  This section of the old floodwall was removed and replaced with new sheetpiles and a new concrete cap.[496]   The new sheetpiles were approximately 34 feet long, almost 15 feet longer than the original sheetpiles, and they were connected directly to the shorter sheetpiles at the edge of the original wall by driving the socket portion of the new, longer sheetpile over the ball of the next adjacent sheetpile.[497]   The new portion of floodwall extended from that connection approximately 20-30 feet north and then turned west at a 90 degree angle toward the IHNC.[498]

Because the 1980s sheetpiles were longer than the 1960s sheetpiles, and because of the 90 degree turn of the new wall, the new structure was more rigid than the old structure, providing more resistance to horizontal forces during the Katrina surge.[499]   As a result of these structural differences, there was a concentration of force at the connection between the two structures.[500]

The effect of this force or stress concentration was demonstrated by three sheetpiles taken from the intersection of the 1960s and 1980s structures that were preserved for inspection.[501]   Two of the piles were from the shorter, 1960s sheeting; the third was a longer 1980s pile that was connected to the shorter 1960s piles.[502]   The 1980s pile retained its original Z-shape during and after

---

[495] DX DM-0015-0063 (Silva Dem.); JX-1672-0020, -0021 (Silva Rep.); DX-DX DM-1006-0019 (Marr Dem., citing JX-1864, Fig. 2-4, Marr Rep.); JX-0004 (USACE Design Memo No. 3, 1966).

[496] JX-1672-0020, -0021 (Silva Rep.); JX-0007 (OLD Florida Ave. Complex Project, 1982).

[497] DM-0015-0063 (Silva Dem.); DX-DX DM-1006-0019, -0060 (Marr Dem., citing JX-1864 (Marr Rep., Fig. 2-4) and JX-1881 (Marr Rep., App. Q, Fig. Q-4)); JX-0007 (OLD Florida Ave. Complex Project, 1982).

[498] Marr Tr. at 1847:9-16; JX-1672-0020, -0021 (Silva Rep.); DX-DX DM-1006-0019 (Marr Dem., citing JX-1864, Fig. 2-4, Marr Rep.); JX-0007 (OLB Florida Ave. Complex Project, 1982).

[499] Marr Tr. at 1847:9-1848:2, 1907:21-1908:13.

[500] *Id.* at 1848:3-9, 1908:1-13, 1912:4-1913:4.

[501] *Id.* at 1902:5-17.

[502] *Id.* at 1902:5-17.

Katrina.[503]   The shorter 1960s piles, however, were stretched considerably – in fact, almost completely flattened – from a width of 36 inches to a width of 49 inches.[504]   Experts retained specifically to examine the forces that impacted these piles concluded that it took approximately 500,000 pounds of force (or 25,000 pounds per lineal foot) along the entire length of each 19.5 foot pile to result in this deformation.[505]   A significant concentration of force developed at the junction, due to the relative lack of resistance between the shorter piles and the longer 1980s piles, and resulted in the horizontal stretching of the shorter piles.[506]

Dr. Silva testified that the difference in the ability of the 1960s and the 1980s sheetpiles to resist horizontal forces, and the stress concentration so caused, was a design deficiency that could have been avoided.[507]   In fact, Dr. Silva testified that the connection between the 1960s and 1980s sheetpiles did not comply with accepted practice for floodwall design.[508]   A more appropriate design would have included a transition that began at the tip of the 1980s sheetpile wall and extended at an upward angle in multiple steps to the shorter 1960s sheet, creating a brace between the 1960s and 1980s sheetpile systems, decreasing the difference in length between connecting piles.[509]   No such transition or similar brace feature existed at the Boland Marine flood protection structure.[510]   The 1960s and 1980s sheetpiles were connected without any transition, creating an

---

[503] DX DM-1006-0058, -0059 (Marr Dem., photos of three recovered sheets, citing JX-1864 (Marr Rep., Photo 5-1) and JX-1881 (Marr Rep., App. Q, Photo Q-1)).

[504] Marr Tr. at 1905:11-1906:2, 1907:11-19; DX DM-1006-0062 (Marr Dem, citing JX-1881 (Marr Rep., App. Q, Fig. Q-5)).

[505] Marr Tr. at 1908:21-1909:11.

[506] Id. at 1908:1-13, 1912:4-18.

[507] Dr. Silva is a registered professional engineer with over 41 years of experience, including experience evaluating the safety of constructed facilities and analyzing numerous earth structure (or water retention structure failures) around the world.  Silva Tr. at 3667:22-3668:13.

[508] Silva Tr. at 3759:17-3760:3, 3826:20-3827:5.

[509] Id. at 3759:17-3760:3.

[510] DX DM-0015-0063 (Silva Dem.); DX-DX DM-1006-0019 (Marr Dem., citing JX-1864, Fig. 2-4, Marr Rep.); JX-0007 (OLD Florida Ave. Complex Project, 1982).

abrupt change in piling length.[511]   According to Dr. Marr, had the 1980s and 1960s sheetpiles been

similar lengths, the unacceptable concentration of force would not have developed during Katrina:

> The Court:  Was 25,000 pounds per foot that you described, was that a condition
> relating to the water level that would be that amount regardless, or was it exacerbated
> by the difference in the length of the sheetpiles?
> The Witness:  It was both.  It was the water levels were creating more forces in this
> area, and we had this 25,000 pounds of force was being developed because of the
> different lengths of sheets and the different thicknesses.
> The Court:  Thank you.
> The Witness:   Had they been similar, this force would have – should not have
> developed.[512]

Ultimately, the significant difference in lengths between the 1960s and 1980s sheetpiles and

the lack of a transition resulted in stress concentrations at their connection that contributed to the

catastrophic results in the Lower Ninth Ward.[513]

## 2.     Faulty weld

In addition to the faulty transition design, there also existed a faulty weld near the

connection between the 1960s and 1980s structures that, when affected by the stress concentrations

from the Katrina surge, played a significant role in causing the North Breach.

Inspection of the three sheetpiles retrieved from the North Breach after Katrina revealed a

12-foot vertical tear at the top of the first short 1960s piling that was connected to the first longer

pile.[514]   The top 17 inches of that tear had been welded together at some point before Katrina,

before the concrete cap was poured at the top of the wall, presumably during the construction of the

Florida Avenue Complex Project.[515]   Although the precise timing and circumstances of the weld are

unknown, Defense experts who examined the sheetpile determined that it likely ripped during

---

[511] DX DM-0015-0063 (Silva Dem.); DX-DX DM-1006-0019 (Marr Dem., citing JX-1864, Fig. 2-4, Marr Rep.); JX-0007 (OLD Florida Ave. Complex Project, 1982); Silva Tr. at 3759:17-20.

[512] Marr Tr. at 1912:19-1913:4.

[513] *Id.* at 1847:6-24; Silva Tr. at 3759:17-3760:3.

[514] Marr Tr. at 1902:12-23; Silva Tr. at 3767:14-21; DX DM-1006-0058, -0059 (Marr Dem., photos of three recovered sheets, citing JX-1864 (Marr Rep., Photo 5-1) and JX-1881 (Marr Rep., App. Q, Photo Q-1)).

[515] Silva Tr. at 3767:1-8; JX-01864-0076 (Marr Rep. at 76).

construction, or installation, and was repaired in the field.[516]  Evidence demonstrates that the torn portion of the sheetpile was improperly repaired, resulting in a "very crude field weld" that, according to Dr. Silva, "would have had very, very low resistance to tear" during Katrina.[517]

As the horizontal stress concentration developed at the connection between the 1960s and 1980s sheetpile systems and the piles were stretched, considerable tension was placed on the concrete portion of the floodwall that capped the piles, causing the concrete to crack and fall away at the connection between the shorter and longer piles.[518]  This crack in the floodwall was evident from post-Katrina photographs showing major distress in the wall at the North Breach where the concrete broke off and the rebar from the wall was fully exposed.[519]  Notably, the stronger 1980s floodwall directly adjacent to the breach had no cracks in its concrete cap; it remained intact.[520]

Once the concrete broke away, the horizontal force became strong enough to cause the faulty weld to fail and reinitiate the original 17-inch tear – the weakest point in the 1960s sheetpile. The failed weld then continued to rip toward the bottom of the sheetpile, creating the 12-foot vertical tear that was found in the pile after the storm.[521]  When the 12-foot tear developed, the pile length was in effect cut in half, and the stresses could no longer be carried across the entire sheetpile system.[522]  As a result, and in rapid fashion, the forces at the top of the sheetpile system were transferred to and concentrated at the bottom of the system.[523]  The concentration of stress at the bottom of the system caused the separation of the interlock connection between two of the short

---

[516] Silva Tr. at 3767:1-8; JX-01864-0076 (Marr Rep. at 76).

[517] Silva Tr. at 3767:1-13.

[518] Marr Tr. at 1909:14-1910:24; Silva Tr. at 3767:14-21; DX DM-1006-0063, -0064 (Marr Dem., citing JX-1864, Marr Rep., Fig. 5-11 and photo of cracked concrete from IPET website).

[519] Marr Tr. at 1910:3-7; DX DM-1006-0016, -0017 (Marr Dem., citing 10/2005 photos of North Breach by Dr. Joseph Dunbar).

[520] Marr Tr. at 1907:11-14; DX DM-1006-0016, -0017 (Marr Dem., citing 10/2005 photos of North Breach by Dr. Joseph Dunbar).

[521] Marr Tr. at 1902:18-23, 1909:14-1910:24, 1911:1-9; Silva Tr. at 3767:14-21; DX DM-1006-0063, -0064 (Marr Dem., citing JX-1864, Marr Rep., Fig. 5-11 and photo of cracked concrete from IPET website).

[522] Marr Tr. at 1913:23-1914:14; Silva Tr. at 3767:22-3768:8.

[523] Marr Tr. at 1913:23-1914:14; Silva Tr. at 3767:22-3768:8.

sheetpiles.[524]  This was evident from the three sheetpiles retrieved at the North Breach.  Typically the ball and socket that make up a sheetpile interlock connection leave a 0.5-inch gap when fitted together.  However, the gap in the socket from the sheetpile where the connection separated at the North Breach was measured at 0.9 inches, indicating that the metal deformed enough during Katrina for the ball to pull out of the socket and fail the interlock connection.[525]

When the interlock connection failed, the sheetpiles were separated in a rapid "unzipping" from the bottom of the sheetpile system to its top.[526]  This rapid separation of the sheetpiles, along with the causative elements described *supra*, led to the failure of the entire system, like the opening of a large door.[527]  The failure of the concrete in tension created the explosive sound that was reported by Mr. Villavasso.[528]  The complete failure of the wall then caused the rush of water that Mr. Villavasso observed from the pump station during the storm.[529]

The Defense experts are in agreement, and the evidence is clear, that these design and construction-related features at the North Breach – the lack of transition between the 1960s and much longer 1980s sheetpiles, and the faulty weld – contributed to the floodwall failure at Boland Marine.  These features pre-existed WGI's work at the EBIA and were in no way a result of Task Order 26.  These features were instrumental in causing the North Breach.

## V.    DAMAGES (QUESTION 6.E.)

Plaintiffs have failed to prove their damages in several distinct ways.  *First*, Louisiana allocates damages based on comparative fault, but the evidence at trial supports allocating any fault

---

[524]  Marr Tr. at 1913:23-1914:14; Silva Tr. at 3767:22-3768:8.

[525]  Marr Tr. at 1906:3-11; DX DM-1006-0060 (Marr Dem, citing JX-1881 (Marr Rep., App. Q, Fig. Q-4).

[526]  Marr Tr. at 1913:23-1914:14; Silva Tr. at 3767:22-3768:8.

[527]  Marr Tr. at 2176:5-14; Silva Tr. at 3768:9-13.

[528]  Marr Tr. at 2176:5-14; Silva Tr. at 3768:9-13; *see* DX-02667-0030 (Villavasso Dep. at 70:2-13: "Q. . . You said you heard what sounded like an explosion and you say there's water.  A: Right.   Q: What's the sequence or the connection in terms of time between the explosion and the water?  A: Well, I heard the boom first.  It sounded like an explosion, a big boom.  Well, gee, when I heard the boom, the walls tumble and that was it.").

[529]  Marr Tr. at 2176:5-14; Silva Tr. at 3768:9-13.

substantially if not entirely to the Corps, which was the engineer-of-record and supervised and approved WGI's performance according to the Corps' specifications.[530]   *Second*, this Court has already held that damages are limited to those flowing from the EBIA remediation project, yet Plaintiffs' expert failed to distinguish damages caused by IHNC flooding from those caused by wind and rain or MRGO flooding.   *Third*, Plaintiffs and their expert exaggerated or simply failed to prove their damages in numerous other ways.

### A.      Plaintiffs Have the Burden of Proving the Damages Attributable to WGI.

Plaintiffs must prove the damages to which they claim they are entitled by a preponderance of the evidence.   *Prunty v. Arkansas Freightways, Inc.*, 16 F. 3d 649, 652 (5th Cir. 1994); *Borden, Inc. v. Howard Trucking Co.*, 454 So. 2d 1081, 1092 (La. 1983).   They must prove all of the damages they seek from WGI are in fact attributable to the conduct of WGI.   *See Servicios-Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 995 (5th Cir. 1998).

### B.      The Plaintiffs Failed to Segregate Damage Due to IHNC Floodwaters from Other Causes.

There can be no doubt that as catastrophic as Hurricane Katrina was, Plaintiffs may recover, from the Defendants here, only the damages caused by their conduct.   "[W]here the damages that are legally recoverable are less than the total amount sustained, the injured party cannot simply show the total amount, but must prove that portion to which it is legally entitled."   *Servicios-Expoarma,* 135 F.3d at 995.   Accordingly, this Court has acknowledged that "[a]ny judgment rendered for any plaintiff will be limited to damages caused by the EBIA remediation project" and that Plaintiffs cannot recover from WGI damages that resulted from MRGO or wind and rain.   *Id*. Yet Plaintiffs expert, Mr. Taylor, simply assumed that *all* of Plaintiffs damages were due to the EBIA project.

---

[530] *See supra,* Section II.G.

The Plaintiffs' and Defendants' experts reached the same general conclusions regarding the level of water in each of the Plaintiffs' residences in either an all causes scenario or an IHNC-only scenario.[531]  For Plaintiffs Coats, Livers, and Washington, the IHNC-only scenario would have resulted in less floodwater, and consequently, less damage to the residence.[532]  In the event that WGI is found responsible for only the North or South Breach of the IHNC, the damages attributable to those floodwaters are even less.[533]  Mr. Taylor, however, admitted that his estimates assume that the IHNC breaches alone caused *all* of the damage to each Plaintiff's residence.[534]  Similarly, each of the Plaintiffs' residences was undeniably affected by wind, rain and floodwaters from the MRGO, in addition to floodwaters from the IHNC.[535]  Yet, Mr. Taylor fails to attribute *any* damages to those other factors.[536]

Unlike Mr. Taylor, Defendants' experts Mr. Danner, Mr. Du Plessis, and Mr. Schneider accounted for and separated damages related to IHNC floodwaters from wind and rain and the MRGO floodwaters.  Mr. Danner used hydrographs and wind reports to determine the scope of IHNC-related damage to each residence.[537]  Mr. Du Plessis then applied the scope provided by Mr. Danner to determine the cost of those elements of each residence damaged by IHNC floodwaters.[538]  Similarly, Mr. Schneider used the reports of Mr. Danner and evidence concerning Plaintiffs' recoveries under their homeowners policies to distinguish contents and additional living

---

[531]  Dalrymple Tr. at 2774:15-2776:2, 2779:4-9.

[532]  Danner Tr. at 3340:22-3343:14; JX-1743-0002 to -0003 (Danner Sup. Rpt. Re: Coats); JX-1735-0002 (Danner Sup. Rpt. Re: Livers); JX-1739-0002 to -0003 (Danner Sup. Rpt. Re: Washington).

[533]  Crawford Tr. at 1490:14–1495:9, 1495:24–1501:17.

[534]  Taylor Tr. at 1539:4-8.

[535]  Danner Tr. at 3320:12-25.

[536]  Taylor Tr. at 1541:24–1542:14, 1545:16-20.

[537]  JX-1730 (Danner Rpt. Re: Armstrong); JX-1743 (Danner Sup. Rpt. Re: Coats); JX-1733 (Danner Sup. Rpt. Re: Holmes); JX-1735 (Danner Sup. Rpt. Re: Livers); JX-1739 (Danner Sup. Rpt Re: Washington); Danner Tr. at 3319:2-25.

[538]  Du Plessis Tr. at 3543:9-22, 3544:14-24.

expenses for which the Plaintiffs had previously recovered as damages caused by wind and rain.[539] Because the Defendants' experts segregated the sources of damage to the Plaintiffs' property, their estimates are a more accurate representation of damages caused by IHNC floodwaters.

>    **1.    Because he failed to isolate IHNC-related damage, Mr. Taylor's estimates exaggerate Plaintiffs' repair and replacement damages.**

Each of the Plaintiffs' residences could have been repaired.[540]   Post-Katrina photographs of the Armstrong and Holmes residences, in particular, disclose salvageable and repairable structural elements such as foundation slabs and brick exterior walls.[541]   Demolition and removal of those elements were unnecessary, and complete replacement would have been very costly.[542]   Mr. Taylor fails to account for this, however, because he ignored, contrary to Plaintiffs' own evidence, other causes of damage.  Plaintiffs' construction engineering expert, Mr. Crawford, recognized that not all elements of damage would have resulted in the event of flooding from only the IHNC breaches.  In the case of the Livers residence, for example, Mr. Crawford, testified that the second floor was not damaged by IHNC flooding.[543]   Nevertheless, Mr. Taylor's damage estimate included replacement of the drywall, carpet, ceilings, and electrical components of the entire second floor of the residence.[544]   Mr. Taylor's damage estimates also included replacement of the components of the upper and lower attics of the residence,[545] despite Mr. Crawford's report and testimony indicating that such repairs would be unnecessary.[546]   In his presentation, Mr. Danner showed the Court

---

[539] Schneider Tr. at 3597:8–3599:21, 3616:2–3618:1.

[540] Danner Tr. at 3321:12-3323:12, 3323:23-3325:10; DX DM-0007-0008 (Danner Dem.).

[541] *Id.*; DX DM-0007-0018 to -0022 (Danner Dem. Re: Armstrong residence); DX DM-0007-0037, -0043 to -0045 (Danner Dem Re: Holmes residence).

[542] Danner Tr. at 3321:12-3323:12, 3324:11-3325:10.

[543] Crawford Tr. at 1500:17-1501:4.

[544] PX-4736-0016 to -0020 (Taylor Rep.).

[545] *Id.* at -0020 to -0021.

[546] PX-1217-0003 (Crawford Rebuttal Rep. Re: Livers); Crawford Tr. at 1483:6-24.

pictures of the Livers residence that clearly demonstrated that extensive damages were not sustained on the second floor at all, much less from the IHNC breaches.[547]

It is particularly telling that none of Mr. Taylor's repair estimates changed after he learned of the lower floodwater levels in an IHNC-only scenario.[548]  As a result of this failure, his damage estimates for Armstrong, Coats, Livers, and Washington include repairs related to flood damage resulting from the floodwaters of the MRGO.

Mr. Taylor's reports also fail to account for any wind or rain damage to the residences.[549] For example, his estimate replaces the entire roof for each Plaintiff without deducting any cost of repairs associated with wind damage.[550]   Nor does he account for the fact that each Plaintiff recovered for wind and rain damage from their homeowners insurer.  His report for Ms. Coats does not take into consideration at all the fact that she received approximately $1,700 from her insurer for roof damage and testified that her roof did not need to be and was not replaced after Katrina.[551] Nor does Mr. Taylor account for the Armstrongs' receipt of approximately $35,000,[552] Mr. Livers' receipt of over $13,000,[553] and Mr. Washington's receipt of over $35,000 from each of their respective homeowners policy insurers for wind and rain damage to the structure.[554]   The amounts that the Plaintiffs received for wind and rain damage from the homeowners insurers are not collateral sources for the damages caused by IHNC floodwaters.[555]

---

[547] DX DM-0007-0053 to -0055 (Danner Dem.); DX-02703 (Danner Photos – Armstrong).

[548] Taylor Tr. at 1539:4-8.

[549] *Id.* at 1545:16-20.

[550] *See* JX-1605-0004 to -0005 (Taylor Rev. Rep. Re: Armstrong); JX-1609-0005 to -0006 (Taylor Rev. Rep. Re: Coats); JX-1607-0020 to -0021 (Taylor Rev. Rep. Re: Holmes); JX-1611- 0004 to -0005 (Taylor Rev. Rep. Re: Livers); and JX-1613-0017 (Taylor Rev. Rep. Re: Washington).

[551] DX-02676-0020 to -0021, -0028 (Coats Dep. at 38:23-39:8, 39:15-39:23, 40:08-40:09, 40:17-40:21, 59:05-60:01).

[552] Armstrong Tr. at 1649:11-19; JX-1549-0234 (Armstrong Ins. Payment).

[553] Livers Tr. at 43:11-24.

[554] Washington Tr. at 496:20-499:2.

[555] Livers Tr. at 47:24-48:2

2.      **Defendants' expert properly calculated Plaintiffs' damages attributable to IHNC floodwaters.**

In contrast to Mr. Taylor's excessive damage estimates, the defense expert, Mr. Du Plessis, calculated the degree of damage (expressed in dollars) attributable to IHNC floodwaters, MRGO floodwaters, and wind and rain.[556]  His reports segregated the source of damage and costs associated with the repairs according to the scope of repairs provided by Mr. Danner, independent of Plaintiffs' receipts from their homeowners policies for wind and rain damage.   Based on Mr. Danner's conclusions that each of the residences could have been repaired, Mr. Du Plessis then estimated the cost of repairs associated with floodwaters from the IHNC for each Plaintiff.[557]  In doing so, he determined the cost of repairs attributable to IHNC floodwaters (excluding repairs attributable to wind, rain, and MRGO floodwaters) which are set out to in the chart below.[558]  No reduction for Plaintiffs' recovery for wind and rain damage is required because repairs resulting from wind and rain damage have been excluded from these estimates. [559]

| Coats | Holmes | Livers | Washington |
|-------|--------|--------|------------|
| $59,713.54 | $106,537.28 | $108,320.88 | $84,705.04 |

---

[556] Du Plessis Tr. at 3552:25–3557:1.

[557] *Id*. at 3543:15–3544:21.

[558] DX-02652-0004 to -0005 (Du Plessis Sup. Repair Cost Est. Coats); JX-1749-0035 to -0036 (Du Plessis Repair Cost Est. Holmes); DX-02654-004 to -0005 (Du Plesses Sup. Repair Cost Est. Livers); DX-02656-0004 to -0005 (Du Plessis Sup. Repair Cost Est. Washington).

[559] As an alternative to his repair cost estimates, Mr. Du Plessis also calculated replacement costs for the Armstrong, Holmes and Washington residences – residences which the Plaintiffs claim required demolition.  Du Plessis Tr. at 3552:25-3553:8 (Armstrong), 3555:4-6 (Holmes), 3556:11-13 (Washington); JX-1747 (Du Plessis Replace Cost Est. re: Armstrong); JX-1750 (Du Plessis Replace Cost Est. re: Holmes); DX-02657 (Du Plessis Sup. Replace Cost Est. re: Washington).  In doing so, he separated replacement costs that would be associated with wind, rain, and MRGO floodwaters.  Du Plessis Tr. at 3543:15-22.  In making his estimates of replacement costs attributable to IHNC floodwaters, Mr. Du Plessis reduced the total replacement cost calculated by him by elements and portions of elements in the original structures that were damaged by wind, rain and MRGO floodwaters.  Notwithstanding the testimony and evidence that all of the residences could have been repaired, in the event that the Court should find that the Holmes and Washington residences required total replacement, the cost of replacement of the elements damaged by IHNC floodwaters as calculated by Mr. Du Plessis is $200,886.84 for Holmes and $90,516.84 for Washington.  JX-1750-0002 (Du Plessis Replace Cost Est. re: Holmes) (the total replacement cost less wind and rain); DX-02657-0004 to -0005 (Du Plessis Sup. Replacement Cost Est. re: Washington).  Mr. Du Plessis also calculated a replacement cost attributable to all sources of flooding for the Armstrong residence in the amount of $174,177.53.  JX-1747-0004 to -0005, -0036 to -0037 (Du Plessis Replace Cost Est. re: Armstrong) (total replacement cost less wind & rain).  As discussed below, this amount should be reduced to $87,088.77 in accordance with the comparative fault doctrine.

In the case of the Armstrong residence, Mr. Danner testified that floodwaters from the MRGO and IHNC arrived at the Armstrong location very nearly simultaneously.[560]  He based his conclusion on his review of the hydrographs of both Dr. Vrijling and Dr. Dalrymple.[561]  Based on the timing of the arrival of the floodwaters, Mr. Danner concluded that the IHNC and MRGO floodwaters contributed equally to the damages at the residence.[562]

Under Louisiana law, when multiple causes contribute to damage or injury and the question of damage attributable to each cause cannot be separately determined, courts assign a percentage of fault to each of the multiple causes of damage.  *See Jarreau v. Hirschey*, 650 So. 2d 1189, 1194 (La. Ct. App. 1 Cir. 1994); Dan B. Dobbs, The Law of Torts §§ 170-176 (West 2000).  Accordingly, because the IHNC and MRGO floodwaters contributed approximately equally, the Court should find that the IHNC floodwaters are responsible for only fifty percent of the flood damages to the Armstrong residence.  Mr. Du Plessis's estimate for the full repair costs attributable to the flooding of the Armstrong residence as well as the adjusted amount to deduct damages attributable to MRGO floodwaters, are set out in the following chart:[563]

| Armstrong All Sources | Armstrong IHNC Only |
|---|---|
| $90,442.51 | $45,221.26 |

### C.    Diminution in Value Rather than Replacement Cost Is the Appropriate Measure of Damage to Plaintiffs' Residences.

Plaintiffs, Armstrong, Holmes, and Livers chose to sell rather than to repair their residences. They should not be entitled to recover the cost of repairs or rebuilding structures that they will never, in fact, repair or rebuild.

---

[560] Danner Tr. at 3331:13-21; JX-1730-0002 to -0003 (Danner Rep. re: Armstrong); DX-DM-0007-0009, -0017 (Danner Dem.).

[561] Danner Tr. at 3331:22-3332:3.

[562] JX-1730-0002 to -0003 (Danner Rep. re: Armstrong).

[563] JX-1746-0046 to -0047 (Du Plessis Repair Cost Est. re: Armstrong).

1.     **Louisiana law does not allow recovery of repair or replacement costs for property already sold.**

In *Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co.* 618 So. 2d 874 (La. 1993), the Louisiana Supreme Court considered the circumstances under which it is appropriate to allow a plaintiff to recover the cost of repair when the repair cost exceeded the value of the property prior to the damage.

> If . . . the cost of restoring the property in its original condition is disproportionate to the value of the property . . ., unless there is a reason personal to the owner *for restoring the original condition* or there is a reason to believe that the plaintiff *will, in fact, make the repairs*, damages are measured only by the difference between the value of the property before and after the harm.

*Id.* at 879-80 (emphasis added).  Even in the former case, it is implicit that the plaintiff still owns the building and intends to make repairs.  Restatement (Second) of Torts §929, cmt. b (quoted with approval in *Roman Catholic Church* at 878).  Accordingly, there is no reported case that has allowed a plaintiff who no longer owns the immovable property to recover repair costs on the basis of a personal reason.  In any event, self-serving testimony regarding personal reasons for restoration of the property is not sufficient to support recovery costs in excess of property value.  *See Hornsby v. Bayou Jack Logging*, 902 So. 2d 361, 368 (La. 2005).  This is particularly true where the owner has sold the property and cannot credibly maintain that he has "personal" reasons to make repairs that he cannot possibly make.

If Plaintiffs are entitled to damages, they should be placed in the same position as before the property damage, but not in a superior position. *Mossy Motors, Inc. v. Sewerage & Water Bd. of the City of New Orleans*, 753 So. 2d 269, 280 (La. Ct. App. 4 Cir. 1999).  To allow Plaintiffs to recover the value of hypothetical repairs that they have neither the intention, nor the ability, to make would place Plaintiffs in a superior position, contrary to a basic principle of tort recovery.  It is inappropriate to award a plaintiff the cost of repair or restoration if he has already sold the property

in an unrepaired condition. *See Maryland Cas. Co. v. Rittiner*, 133 So. 2d 172, 174-175 (La. Ct. App. 4 Cir. 1961). "[I]t is important to know how the land is used and what interest in it is asserted, so that the measure can be adopted that will afford compensation for any legitimate use the plaintiff makes of his land. This, of course, means that if the plaintiff is unlikely to repair for any reason and is likely instead to sell, then diminution in value rather than repair costs would be a more appropriate measure." DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES 317 (1973).

### 2.  Ability to pay for repairs does not determine recovery.

In the reported cases, a court has never considered whether a plaintiff could afford to rebuild when determining whether diminution in value is the appropriate measure of damages. However, Plaintiffs Armstrong, Holmes, and Livers had sufficient resources to repair their residences. The Armstrongs received over $152,000 from the Road Home, their flood insurer, and homeowners insurer for structural damages to their residence.[564]  Mr. Holmes received over $72,000 from the Road Home and his flood insurer for structural damages to his residence.[565]  He could have received an additional $50,000 if he had chosen to rebuild on Perrin Drive or within the state of Louisiana, for a total of $122,000 to use in rebuilding the structure.[566]  Mr. Livers received over $137,000 from the Road Home and his homeowners insurer for damages to the structure of his residence.[567]  In assessing whether the Plaintiffs had sufficient funds to rebuild their residences, it must be noted that damages to Plaintiffs' immovable property are not solely attributable to IHNC floodwaters, and that WGI is not responsible for additional losses resulting from MRGO floodwaters, wind, and rain.

---

[564] DX-01777-0035 (receipt of $42,100 from flood insurer); DX-01771-0183 (receipt of $75,370.80 from the Road Home); JX-1549-0234 (receipt of $35,202.03 for wind and rain damage).

[565] DX-01773-0117 (sale to Road Home for $34,608.18); JX-1548-0470 to -0472 (reflecting receipt of $37,400 from flood insurer); Holmes Tr. at 254:12-15.

[566] DX-01773-0144 to -0145.

[567] DX-01774-0025 (receipt of $123,791.52 from the Road Home); Livers Tr. at 43:11-24 (indicating total receipt of $13,660.82 for wind and rain damage to the structure).

Even if it is appropriate to determine whether a plaintiff could afford to make repairs at the time they chose to sell, each plaintiff should be required to prove that the cost of repair formed the basis of his decision.  None of the Plaintiffs actually obtained repair estimates, and none could have known whether they could have afforded to repair the residences before they sold them.[568]  Each testified as to other reasons they chose not to rebuild the property at issue in this litigation.[569]  Plaintiffs cannot claim at this date that cost was the impediment to rebuild, when each had resources and other motives to move.

The purpose behind *Roman Catholic Church* is to allow a plaintiff to rebuild his damaged property even if the cost of repair exceeds the value of the residence.  But in this instance, three of the Plaintiffs have disabled themselves from doing so by selling their residences.  As a result, of their own actions, the nature of their economic injury resulting from Katrina consists of the lost value of their property.  A repair or rebuild estimate bears no relation to the injury that they have, in fact, sustained.  It would be inequitable to find the Defendants liable for more damages than were actually incurred by the Plaintiffs.  If the Plaintiffs did not incur repair costs and will not incur costs with respect to their residences in this litigation, the Defendants should not be liable for repair costs that exceed the values of their residences.

3.    **Plaintiffs' expert failed to consider value diminution for Plaintiffs Armstrong, Holmes, and Livers.**

Mr. Taylor's reports do not consider the value of the subject immovable property prior to or following the damage occurring on August 29, 2005.[570]  In contrast, Mr. Truax's reports provide a

---

[568] Armstrong Tr. at 1673:11-14; Holmes Tr. at 244:9-11; Livers Tr. at 57:21–58:1.  Mr. Armstrong did obtain estimates from contractors related to wind and rain damage, but did not obtain an estimate for repairs to the entire residence.  Armstrong Tr. at 1645:6-9.

[569] Armstrong Tr. at 1650:14-1651:1; Holmes Tr. at 236:9-11, 268:9-11, 236:25-237:4; Livers Tr. at 41:08-43:10.

[570] JX-1605-0001 to -0002 (Rev. Taylor. Rep. Re: Armstrong); JX-1607-0001 to -0002 (Rev. Taylor Rep. Re: Holmes); JX-1611-0001 to -0002 (Rev. Taylor Rep. Re: Livers).

pre-Katrina appraisal and two post-Katrina appraisals for each of the properties.[571]   The chart below

gives the diminution in value of each of the Plaintiffs' properties, for which this measure of damage

may be appropriate, making two possible assumptions.  (1) The first provides the diminution (or

difference) in value between the pre-Katrina value of the residence and the post-Katrina value of the

remaining structure and the land.  (2) The second provides the diminution (or difference) in value

between the pre-Katrina value of the residence and the post-Katrina value of an empty lot, which

assumes that the Katrina-damaged structure added no value to the land.[572]

|  | Holmes | Livers |
|---|---|---|
| **Diminished Value of the Property with Structure** | $85,000 | $94,000 |
| **Diminished Value of the Property (Land only)** | $104,000 | $133,000 |

As discussed above, the damages to the Armstrong residence should be apportioned equally

between the floodwaters of the IHNC and the MRGO.  Accordingly, in the event that liability is

determined, the Defendants are liable in this litigation only for the damages attributable to the

IHNC, even if the diminution in value measure is applied to the Armstrong residence.

| Armstrong | Full Diminished Value | Diminished Value Attributable to IHNC |
|---|---|---|
| **Diminished Value of the Property with Structure** | $116,000 | $58,000 |
| **Diminished Value of the Property (Land only)** | $135,000 | $67,500 |

---

[571]   *See* JX-1761 (Truax Pre-Katrina Appraisal re; Holmes); JX-1762 (Truax Post-Katrina Appraisal re: Holmes); JX-1763 (Truax Pre-Katrina Appraisal re: Armstrong); JX-1764 (Truax Post-Katrina Appraisal re: Armstrong); JX-1765 (Truax Pre-Katrina Appraisal re: Livers); JX-1766 (Truax Post-Katrina Appraisal re: Livers).

[572]   For calculations of diminution in value, *see* DX-02721-0004 (Exhibit to Truax Stipulation).

D.      **Plaintiffs Overvalue the Lost Contents of their Dwellings**

1.      **Mr. Taylor failed adequately to verify Plaintiffs' lists of contents.**

Each of the Plaintiffs provided Mr. Taylor with a list of the contents they lost as a result of Hurricane Katrina.[573]   However, Mr. Taylor performed only "limited spot checks" to verify the accuracy of the Plaintiffs' lists and relied on the pricing and vague descriptions supplied by the Plaintiffs.[574]   With the exception of Mr. Livers, none of the Plaintiffs provided the ages of their contents.[575]   Because Mr. Taylor failed to verify the accuracy of the contents lists, he failed to identify duplicate items, items belonging to others, structural items, and items for which the Plaintiffs had previously recovered under their respective homeowners policies due to wind and rain damage.[576]

For example, at the time of Hurricane Katrina, Kenneth Armstrong, Jr. – the son of Plaintiffs Kenneth and Jeannine Armstrong – had reached the age of majority.[577]   However, Mr. Taylor included damages for property belonging to Kenneth Jr. in the contents damages estimate, including two guns, autographed baseballs, a baseball card collection, and 40 pairs of shoes.[578]   These items alone amount to over $14,000 of the value of the Armstrong contents list.[579]

Similarly, when Hurricane Katrina made landfall, Ethel Coats' fiancé Nathan Morgan, her adult child Lintoi Franklin, and the minor children of Ms. Franklin resided with her at 1020 Charbonnet Street.[580]   Certain movable property in the residence belonged to Mr. Morgan, Ms. Franklin, and Ms. Franklin's children.[581]   Yet, Mr. Taylor included these items within the

---

[573] Taylor Tr. at 1598:1-6.
[574] *Id*. at 1598:21–1599:15.
[575] Schneider Tr. at 3612:2-4.
[576] *Id*. at 3608:22–3609:3.
[577] Armstrong Tr. at 1663:14-16.
[578] *Id*. at 1662:1–1663:10; JX-1605-0046, -0051, -0054 (Rev. Taylor Rep. Re: Armstrong).
[579] JX-1605-0046, -0051, -0054 (Rev. Taylor Rep. Re: Armstrong).
[580] DX-02677 at 0013 (Morgan Dep. at 28:05-28:13, 29:12-29:17).
[581] *Id*. at -0054 to -0056, -0068 to -0069 (138:14-141:21, 155:15-156:16).

contents estimate prepared on behalf of Ms. Coats.[582]   The contents list also included structural items for which Ms. Coats was also compensated in Mr. Taylor's estimate of repair damages.[583] Mr. Morgan made it clear that these items had already been installed in the residence prior to August 29, 2005.[584]

In the case of the Armstrongs and Mr. Holmes, Mr. Taylor's estimate includes items for which they had previously recovered under their homeowners policy for wind and rain damage.[585] In the case of Mr. Livers, the contents estimate includes items on the second floor that were damaged by wind and rain, or that Mr. Livers was able to salvage.[586]   Mr. Taylor's failure to verify the contents lists led to an incorrect estimate of the Plaintiffs' losses resulting from the flooding of the residences.

In contrast, Mr. Schneider reviewed the Plaintiffs' depositions, photographs, and insurance files to verify the items lost.[587]   He removed items from each list that were duplicated, belonged to others, structural items, and items damaged by wind and rain.[588]   Mr. Schneider calculated the replacement cost based on the lists provided by the Plaintiffs to Mr. Taylor and his review of the appropriate documentation.[589]   Accordingly, Mr. Schneider's estimates are a more accurate reflection of the Plaintiffs' movable property losses resulting from floodwaters.   His correct assessments of damages to contents from floodwaters are noted below.

---

[582] JX-1609-0064 to -0085 (Rev. Taylor Rep. re: Coats).

[583] *Compare* JX-1609-0010, -0012, -0014, -0021 to -0022 with JX-1609-0064, -0066, -0067, -0069 to -0070 (Rev. Taylor Rep. Re: Coats) (replacing interior doors, windows, and floors in the structure and contents estimates).

[584] DX-02677-0042 to -0043, -0052 (Morgan Dep. at 114:14-116:05).

[585] Armstrong Tr. at 1651:9–1652:20; *compare* JX-1456 (Armstrong Ins. Proof of Loss) with JX-1605 (Rev. Taylor Rep. re: Armstrong) (Armstrong contents lists including items for which Armstrongs recovered under their homeowners policy for wind and rain damage); JX-1758-0009 to -0012 (Schneider Rep. re: Holmes) (Holmes claim for items damaged by wind and rain for which they received a settlement).

[586] Livers Tr. at 45:4-16; JX-1757-0018 to -0019 (Schneider Rep. re: Livers).

[587] Schneider Tr. at 3597:8-18.

[588] *Id*. at 3608:22–3609:3.

[589] *Id*. at 3597:8-18, 3602:24-3603:14, 3608:22-3609:3.

### 2.      Plaintiffs fail to account for depreciation.

A proper determination of damages owed for contents loss also takes depreciation into account. *See In Re Katrina Canal Breaches Consol. Litig*., 647 F. Supp. 2d 644, 736 n. 57 (E.D. La. 2009) (Duval, J.); *accord Brown v. Williams*, 850 So. 2d 1116, 1125 (La. Ct. App. 2 Cir. 2003) (the value of the household item lost is the fair market value of the item – replacement cost less depreciation).   The reason for this approach is obvious: "ordinary household effects which depreciate immediately upon becoming used and, because of ordinary wear and tear, are worth much less after several years than when originally purchased." *Gray v. Security Storage & Van Co.*, 26 So. 2d 399, 402 (La. Ct. App. Orleans 1946).

The Plaintiffs' estimates of contents losses, as reported by Mr. Taylor, fail to account for any depreciation of the items.[590]   Under Louisiana law, Mr. Taylor's estimates exceed the value of what the Plaintiffs may recover for the loss of their household items.  However, Defendants' expert, Mr. Schneider, did account for depreciation in his estimate.[591]  He provides the Court with both the replacement cost value and the actual (depreciated) cash value of each item on the Plaintiffs' contents lists, as noted in the chart below.[592]   Accordingly, Mr. Schneider's reports provide the appropriate method of measuring damages to contents under Louisiana law.

Furthermore, Mr. Schneider's use of a fifty percent depreciation rate is appropriate under the circumstances.  Mr. Taylor failed to elicit the age and quality of the items included in the Plaintiffs' content lists – information which would have allowed Mr. Schneider or the Court to apply a specific depreciation rate to each individual item.[593]  Mr. Schneider was able to apply a specific depreciation

---

[590] Taylor Tr. at 1607:15-18.

[591] Schneider Tr. at 3605:21–3606:17.

[592] JX-1756-0013 (Schneider Rep. Re: Armstrong); JX-1759-0013 (Schneider Rep. Re: Coats); JX-1758-0013, -0015 (Schneider Rep. Re: Holmes); JX-1757-0013 (Schneider Rep. Re: Livers).

[593] Schneider Tr. at 3606:14-17; 3607:12-15.

rate for the items in the Livers contents list, because the list at least included the alleged ages of the items.[594]

Louisiana law does not specify a particular depreciation to be applied to movable property, but it does require that depreciation be applied. *See Brown*, 850 So. 2d at 1125.  Mr. Schneider's application of depreciation to the Plaintiffs' movables is reasonable.  His estimate of damages related to movable property complies with Louisiana law requiring the application of depreciation.

|  | Armstrong | Coats | Holmes | Livers |
|---|---|---|---|---|
| **Replacement Value** | $107,289.11 | $127,841.20 | $80,306.52 | $38,756.28 |
| **Depreciated Cash Value** | $53,644.56 | $63,920.60 | $40,153.26<br><br>+5,641.98 for vehicle | $29,287.44[595] |

### E.     Plaintiffs Overestimate Additional Living Expenses.

Additional living expenses are defined as actual expenses incurred over and above normal monthly expenses.[596]  In order to recover additional living expenses in this litigation, Plaintiffs were required to provide evidence of their pre-Katrina living expenses and their post-Katrina living expenses in order to demonstrate that their living expenses increased. *McGill v. Republic Fire & Cas. Ins. Co*., No. 07-4025, 2008 WL 4792720, at *3 (E.D. La. Oct. 28, 2008)*; see also Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527-28 (5th Cir. 2010).  Evidence of additional living expenses may include receipts, credit card statements, or affidavits from any person they paid after Hurricane Katrina. *Khalimsky v. Liberty Mut. Fire Ins. Co.*, No. 07-8959, 2009 WL 982641, at *4 (E.D. La. Apr. 13, 2009).

---

[594] Schneider Tr. at 3611:22–3612:4.

[595] Reflects the Actual Cash Value of the Liverses' contents, after the application of specific depreciation rates to individual items based on their age.

[596] *See* DX DM 0011-0010 (Schneider Dem.); *see also McGill v. Republic Fire & Cas. Ins. Co*., No. 07-4025 2008 WL 4792720, at *3 (E.D. La. Oct. 28, 2008).

Mr. Taylor did not use any of the Plaintiffs' receipts or deposition testimony to estimate the additional living expenses each incurred after Hurricane Katrina.[597]  He instead used an arbitrary calculation based upon a percentage of the Plaintiffs' total immovable property repair costs,[598] a totally inappropriate measure of additional living expenses, with no legal foundation.

Mr. Taylor made no attempt to verify whether his flat percentage calculation bore any resemblance to each Plaintiff's reasonable and actual living expenses.[599]  For example, no evidence was submitted at trial that would support that Ms. Coats incurred *any* additional living expenses, much less the $43,599.88 calculated by Mr. Taylor.[600]  Mr. Taylor was also unaware of amounts that Plaintiffs had previously received from their homeowners insurance, which would have resulted from wind and rain coverage, and he did not deduct any amount for additional living expenses attributable to wind and rain damage.[601]

Mr. Schneider, however, estimated the Plaintiffs' actual damages pursuant to the Plaintiffs' documents and deposition testimony.[602]  The chart below provides the total amount of additional living expenses for which the Plaintiffs have provided evidence.   Although Mr. Schneider's estimates may not include all amounts expended by the Plaintiffs, it includes all amounts for which they have met their burden of proof.  The Plaintiffs have not met their burden of proof to establish that they incurred the amount of additional living expenses above their normal monthly expenses calculated in Mr. Taylor's reports.

| Armstrong | Coats | Holmes | Livers |
|-----------|-------|--------|--------|
| $1,215.01 | N/A | $6,550.00 | $5,396.89 |

---

[597] Taylor Tr. at 1585:15-25.

[598] *Id*. at 1584:25–1585:4.

[599] *Id*. at 1586:6–1587:15.

[600] JX-1609-0002 (Rev. Taylor Rep. Re: Coats).

[601] *See, e.g.,* Taylor Tr. at 1593:21-1594:7 (Taylor unaware whether the Armstrongs received compensation from their homeowners insurer for additional living expenses related to wind and rain).

[602] Schneider Tr. at 3617:4-11; *see also* JX-1756-0013 to -0015 (Schneider Rep. Re: Armstrong); JX-1759-0013 to -0014 (Schneider Rep. Re: Coats); JX-1758-0013 to -0015 (Schneider Rep. Re: Holmes); and JX-1757-0013 to -0014 (Schneider Rep. Re: Livers).

Mr. Schneider's calculation of additional living expenses are fair and reasonable based on the evidence presented at trial and should be accepted as the correct measure of damages.

**F.**     **Plaintiffs Failed to Prove Claims for Inconvenience.**

Plaintiffs' counsel did not elicit any testimony or introduce any evidence at trial related to the Plaintiffs' claims for inconvenience.  Therefore, the claims for inconvenience must be denied. "Inconvenience" has a specific meaning under Louisiana law, which is distinct from the word's common, everyday usage.  In order to recover for inconvenience as a result of damage to property, a plaintiff must demonstrate that he or she was present or situated nearby at the time of the damage to the property for which they are making a claim. *Napolitano v. F.S.P., Inc.*, 797 So. 2d 111, 114-15 (La. Ct. App. 4 Cir. 2001); *McDonald v. Illinois Central Gulf R.R. Co.*, 546 So. 2d 1287, 1292 (La. Ct. App. 4 Cir. 1989).  None of the Plaintiffs testified at trial that they were present at the residence when it was damaged – the essential element for a claim of inconvenience under Louisiana law. Therefore, the Plaintiffs have failed to meet their burden of proof regarding their claims for inconvenience.

Dated: December 12, 2012                                  Respectfully submitted,

| | |
|---|---|
| */s/Heather S. Lonian*<br>William D. Treeby, 12901<br>James C. Gulotta, Jr., 6590<br>Heather S. Lonian, 29956<br>Maggie A. Broussard, 33033<br>        Of<br>STONE PIGMAN WALTHER WITTMANN L.L.C.<br>546 Carondelet Street<br>New Orleans, Louisiana  70130<br>Telephone:  (504) 581-3200<br>Facsimile:   (504) 581-3361<br><br>and | Adrian Wager-Zito<br>Debra S. Clayman<br>Christopher Thatch<br>Julia L. Cronin<br>JONES DAY<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001-2113<br>Telephone:  (202) 879-3891<br>Facsimile:  (202) 626-1700<br><br>Attorneys for Washington Group<br>International, Inc., a division of URS<br>Corporation |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Post-Trial Brief on behalf of Washington Group International, Inc. has been served on all counsel of record by electronic notice via the Court's CM/ECF system this 12th day of December, 2012.

*/s/Heather S. Lonian*