```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA

 3    ********************************************************

 4    IN RE:  KATRINA CANAL BREACHES
      CONSOLIDATED LITIGATION            DOCKET NO. 05-CV-4182
 5                                       NEW ORLEANS, LOUISIANA
      PERTAINS TO:  MRGO                 WEDNESDAY, SEPTEMBER 12, 2012
 6            ARMSTRONG NO. 10-CV-866

 7    ********************************************************

 8
                          DAY 1 - MORNING SESSION
 9                    TRANSCRIPT OF TRIAL PROCEEDINGS
             HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
10                    UNITED STATES DISTRICT JUDGE

11
      APPEARANCES:
12
      FOR THE PLAINTIFF:              BRUNO & BRUNO
13                                    BY:  JOSEPH M. BRUNO, ESQ.
                                      855 BARONNE STREET
14                                    NEW ORLEANS, LA 70113

15

16    FOR THE DEFENDANT WASHINGTON
      GROUP INTERNATIONAL, INC.:      STONE PIGMAN WALTHER WITTMANN
17                                    BY:  WILLIAM D. TREEBY, ESQ.
                                           JAMES C. GULOTTA, JR., ESQ.
18                                         HEATHER S. LONIAN, ESQ
                                           MAGGIE A. BROUSSARD, ESQ.
19                                    546 CARONDELET STREET
                                      NEW ORLEANS, LA 70130
20
                                              - AND -
21
                                      JONES DAY
22                                    BY:  ADRIAN WAGER-ZITO, ESQ.
                                           DEBRA S. CLAYMAN, ESQ.
23                                         CHRISTOPHER N. THATCH, ESQ.
                                           CHRISTOPHER R. FARRELL, ESQ.
24                                         JULIA CRONIN, ESQ.
                                           BRIAN KERWIN, ESQ.
25                                    51 LOUISIANA AVENUE, N.W.
                                      WASHINGTON, D.C. 20001
```

```
 1

 2

 3   FOR THE DEFENDANT UNITED
     STATES OF AMERICA:              U.S. DEPARTMENT OF JUSTICE
 4                                   CIVIL DIVISION, TORTS BRANCH
                                     BY:  ROBIN D. SMITH, ESQ.
 5                                        JAMES F. MCCONNON, JR., ESQ.
                                          RUPERT MITSCH, ESQ.
 6                                        CONOR KELLS, ESQ.
                                          JOHN A. WOODCOCK, ESQ.
 7                                   BENJAMIN FRANKLIN STATION
                                     P.O. BOX 888
 8                                   WASHINGTON, D.C. 20044

 9

10   OFFICIAL COURT REPORTER:        KAREN A. IBOS, CCR, RPR, CRR, RMR
                                     500 POYDRAS STREET, ROOM HB-406
11                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7776
12

13

14        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY COMPUTER.
15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3     <u>WITNESSES FOR THE PLAINTIFFS</u>:              <u>PAGE/LINE</u>:

4

5     <u>ALVIN LIVERS</u>

6       DIRECT EXAMINATION BY MR. JERALD ANDRY, JR.      18/11

7       CROSS-EXAMINATION BY MR. FARRELL                 44/7

8       REDIRECT EXAMINATION BY MR. JERALD ANDRY, JR.    62/10

9

10    <u>CHAD A. MORRIS</u>

11      VOIR DIRE EXAMINATION BY MR. STEVENS             80/3

12      TRAVERSE EXAMINATION BY MS. WAGER-ZITO           94/13

13      DIRECT EXAMINATION BY MR. STEVENS                99/13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2                  (WEDNESDAY, SEPTEMBER 12, 2012)

 3                       (MORNING SESSION)

 4

 5       (OPEN COURT.)

 6             THE COURT:  GOOD MORNING.  I ASSUME ALL CELL PHONES -- I

 7    DON'T PROHIBIT CELL PHONES IN THE COURTROOM, BUT I DO PROHIBIT THEM

 8    FROM -- I WOULD LIKE TO BE ABLE TO PROHIBIT THEM FROM GOING OFF.

 9    MY RULE IS THEY SHOULD BE TURNED OFF.  IT'S VERY DISTRACTING.

10             WITH THAT SAID, THE PARTIES -- THE COURT KNOWS THAT THE

11    PARTIES HAVE WORKED LONG AND HARD TO GET TO THIS MOMENT, AS HAS THE

12    COURT, AND SO WE ARE READY TO GO.  ARE THE PARTIES READY TO

13    PROCEED?

14             MR. BRUNO:  YES, YOUR HONOR.

15             MR. TREEBY:  WE ARE, YOUR HONOR.

16             MR. SMITH:  YES, YOUR HONOR.

17             THE COURT:  AND SHOULD WE, JUST FOR THE RECORD, GET YOUR

18    APPEARANCES FOR THE RECORD.

19             MR. BRUNO:  YOUR HONOR, MY NAME IS JOSEPH BRUNO.  I AM

20    COURT APPOINTED PLAINTIFF'S LIAISON COUNSEL APPEARING FOR THE

21    PLAINTIFFS, AND WE'LL JUST START GOING AROUND THE TABLE.

22             MR. JERALD ANDRY:  GOOD MORNING, YOUR HONOR.  JERALD

23    ANDRY, JR.  I'M GOING TO BE CALLING THE FIRST WITNESS, MR. ALVIN

24    LIVERS, FOR THE PLAINTIFFS.

25             MR. JONATHAN ANDRY:  GOOD MORNING, YOUR HONOR.  JONATHAN
```

```
 1    ANDRY ON BEHALF OF THE PLAINTIFFS IN THE MRGO PLAINTIFF STEERING

 2    COMMITTEE.

 3            MS. PURCHNER:  GOOD MORNING, YOUR HONOR.  MICHELLE

 4    PURCHNER FOR THE PLAINTIFFS.

 5            MS. KENDRICK:  GOOD MORNING, YOUR HONOR.  BONNIE KENDRICK

 6    ON BEHALF OF THE PLAINTIFFS.

 7            MR. JOANEN:  GOOD MORNING, YOUR HONOR, SCOTT JOANEN ON

 8    BEHALF OF THE PLAINTIFFS.

 9            MR. SCHULTZ:  GOOD MORNING, YOUR HONOR, MATT SCHULTZ WITH

10    THE LEVIN, PAPANTONIO FIRM OUT OF PENSACOLA ON BEHALF OF THE

11    PLAINTIFFS.

12            MR. FAYARD:  GOOD MORNING, YOUR HONOR, CALVIN FAYARD ON

13    BEHALF OF THE PLAINTIFFS.

14            MR. GREGORY:  GOOD MORNING, YOUR HONOR, PHILLIP GREGORY

15    ON BEHALF OF THE PLAINTIFFS.

16            MR. PALMINTIER:  GOOD MORNING, JUDGE.  MIKE PALMINTIER OF

17    DEGRAVELLE, PALMINTIER, HOLTHAUS, AND FRUGE FOR THE PLAINTIFFS.

18            MR. JOSH PALMINTIER:  GOOD MORNING, YOUR HONOR.  JOSH

19    PALMINTIER ON BEHALF OF THE PLAINTIFFS.

20            MR. DUDENHEFER:  YOUR HONOR, GOOD MORNING.  FRANK

21    DUDENHEFER ON BEHALF OF THE PLAINTIFFS.

22            MR. OWEN:  GOOD MORNING, YOUR HONOR.  ANDREW OWEN ON

23    BEHALF OF THE PLAINTIFFS.

24            MR. SMITH:  GOOD MORNING, YOUR HONOR.  ROBIN SMITH FOR

25    THE UNITED STATES.
```

```
 1              MR. MITSCH:  RUPERT MITSCH FOR THE UNITED STATES, YOUR

 2     HONOR.

 3              MR. KELLS:  CONOR KELLS FOR THE UNITED STATES, YOUR

 4     HONOR.

 5              MR. MCCONNON:  JIM MCCONNON FOR THE UNITED STATES, YOUR

 6     HONOR.

 7              MR. WOODCOCK:  JACK WOODCOCK FOR THE UNITED STATES, YOUR

 8     HONOR.

 9              MR. TREEBY:  YOUR HONOR, PLEASE, WILLIAM TREEBY, STONE,

10     PIGMAN, WALTHER, WITTMANN FOR THE WASHINGTON GROUP INTERNATIONAL.

11              MS. WAGER-ZITO:  ADRIAN WAGER-ZITO, JONES DAY, ON BEHALF

12     OF WASHINGTON GROUP.

13              MR. GULOTTA:  JAY GULOTTA, STONE PIGMAN, ON BEHALF OF THE

14     WASHINGTON GROUP.

15              MR. FARRELL:  CHRISTOPHER FARRELL, JONES DAY, ON BEHALF

16     OF THE WASHINGTON GROUP.

17              MS. LONIAN:  HEATHER LONIAN, STONE, PIGMAN, ON BEHALF OF

18     THE WASHINGTON GROUP.

19              MS. CRONIN:  JULIA CRONIN, JONES DAY, ON BEHALF OF THE

20     WASHINGTON GROUP.

21              MS. CLAYMAN:  DEBRA CLAYMAN, JONES DAY, ON BEHALF OF THE

22     WASHINGTON GROUP.

23              MS. BROUSSARD:  MAGGIE BROUSSARD, STONE PIGMAN, ON BEHALF

24     OF THE WASHINGTON GROUP.

25              MR. KERWIN:  GOOD MORNING, YOUR HONOR.  BRIAN KERWIN,
```

```
 1    JONES DAY ON BEHALF OF THE WASHINGTON GROUP.

 2              MR. THATCH:  GOOD MORNING, YOUR HONOR.  CHRIS THATCH,

 3    JONES DAY, ON BEHALF OF THE WASHINGTON GROUP.

 4              THE COURT:  THANK YOU.  WELL, WE SEEM TO HAVE ENOUGH

 5    LEGAL TALENT.  I'M SORRY THERE'S ONLY ONE OF ME FRANKLY, AND YOU

 6    MAY BE TOO, BUT NONETHELESS, WE ARE PREPARED TO START.  MR. BRUNO,

 7    YOU HAVE YOUR FIRST WITNESS?

 8              MR. BRUNO:  YOUR HONOR, YES.

 9              THE COURT:  YOU HAVE SOME PRELIMINARY THINGS YOU'D LIKE

10    TO --

11              MR. BRUNO:  YES.  THE FIRST THING WE WOULD LIKE TO DO,

12    YOUR HONOR, AS I INDICATED IN THE -- IN OUR CONFERENCE IS TO ASK

13    THE COURT TO REQUEST THAT THE DEFENDANTS PRODUCE ANY JOINT DEFENSE

14    AGREEMENT, IF ANY, THEY HAVE.  AS WE'VE INDICATED TO YOU, OUR

15    CONCERN IS THAT THERE HAS BEEN SOME CHANGE IN TESTIMONY BOTH BY

16    EXPERTS AND IN EXPERT REPORTS THAT THE SUGGESTION OF A CHANGE OF

17    TESTIMONY WITH REGARD TO LAYMENS, AND OUR CONCERN IS THAT WHEN WE

18    CROSS-EXAMINE A LAY WITNESS ON THE STAND AND WE ASK THEM ABOUT THE

19    POTENTIAL OF A BASIS FOR THE CHANGE OF TESTIMONY, WE'RE GOING TO BE

20    MET WITH A LAWYER'S WORK PRODUCT PRIVILEGE OR A PRIVILEGE THAT MAY

21    ARISE FROM THIS DOCUMENT WHICH, OF COURSE, WE WILL NOT SEE.  SO WE

22    JUST THINK THAT IT WOULD -- IT WOULD AID THE COURT AND JUST MAKE

23    THE REQUEST THAT YOU REQUIRE THE DEFENDANTS TO ALLOW YOU TO EXAMINE

24    THIS DOCUMENT IN CAMERA.

25              THE COURT:  THANK YOU, SIR.
```

1          MR. BRUNO:  AND THEY MAY HAVE A RESPONSE.

2          THE COURT:  MR. TREEBY?

3          MR. TREEBY:  IF YOUR HONOR, PLEASE, WHEN AND IF THIS

4    COMES UP, WE WILL TRY TO BE PREPARED BY THEN TO ARGUE.  WE DON'T

5    FIND ANY BASIS FOR IT, DON'T KNOW OF ANY BASIS FOR IT, SO WE

6    WOULD -- IF YOUR HONOR IS INCLINED TO REQUIRE PRODUCTION OF THE

7    JOINT DEFENSE AGREEMENT, WE WOULD LIKE AN OPPORTUNITY TO AT LEAST

8    LOOK AT THE LAW AND GIVE YOUR HONOR A MINUTE OR TWO ON IT.

9          THE COURT:  YES, AND THANK YOU VERY MUCH.  I AM GOING TO

10   DEFER A RULING AT THIS TIME.  I THINK IT WOULD ONLY COME UP IN THE

11   EVENT, IN THE COURT'S MIND, SOMEONE, A WITNESS, SOME PRIVILEGE IS

12   INVOKED AND THEN, AT THAT POINT, I WOULD LOOK AT IT RATHER THAN

13   ASKING THE QUESTION IF SOME PRIVILEGE IS INVOKED, SO I AM GOING TO

14   DEFER RULING.  I WOULD CERTAINLY GIVE BOTH OF YOU TIME, ESPECIALLY

15   YOU, MR. TREEBY, TO LOOK AT THE LAW.

16         MR. BRUNO:  JUDGE, THE NEXT THING WE WOULD LIKE TO DO IS

17   MOVE CERTAIN EXHIBITS INTO EVIDENCE.  YOUR HONOR KNOWS WE HAD A

18   LONG, DRAWN OUT PROCESS WHEREBY WE IDENTIFIED EXHIBITS, IDENTIFIED

19   OBJECTIONS, AND SO FORTH.  SO THE ONLY EXHIBITS THAT WE'RE GOING TO

20   MOVE INTO EVIDENCE --

21         THE COURT:  BEFORE YOU DO THAT, LET ME MAKE THE POINT

22   THAT ALL OBJECTIONS LODGED IN THE MOTIONS IN LIMINE ARE PRESERVED

23   FOR THE RECORD BY BOTH PARTIES, SO YOU DON'T HAVE TO CONTINUE TO

24   OBJECT.  THOSE OBJECTIONS ARE PRESERVED BY YOUR FILING OF YOUR

25   MOTION IN LIMINE.  IF FOR SOME REASON YOU WANT TO AUGMENT THE

1   OBJECTION, OF COURSE YOU MAY, BUT THAT'S GOING TO BE PRESERVED.

2   THOSE OBJECTIONS ARE PRESERVED.

3        NOW, I KNOW THAT -- IT'S BEEN POINTED OUT TO ME THAT IN

4   SOME OF THE DEPOSITION CUTS -- I RULED ON ALL OF THE OBJECTIONS

5   THAT WERE GIVEN TO ME IN THE SENSE THAT -- TO WHICH THERE WAS AN

6   OPPOSITION.  IF THERE WASN'T AN OPPOSITION, I DIDN'T RULE ON AN

7   OBJECTION MADE IN A DEPOSITION.  SO WE WILL CLEAR THAT UP AT SOME

8   POINT IN TIME; HOPEFULLY, AS QUICKLY AS POSSIBLE.

9        MR. BRUNO:  YES.

10        THE COURT:  GO AHEAD, SIR.

11        MR. BRUNO:  TO BE CLEAR AS TO WHAT WE'RE OFFERING AS A

12   SUBSET OF A TOTAL LIST, I WANT TO MAKE THAT CLEAR, WE ARE NOT JUST

13   SIMPLY OFFERING THE WHOLE LIST.  AND THE EXHIBITS THAT WE ARE

14   MOVING INTO EVIDENCE ARE ONE, THOSE EXHIBITS TO WHICH THERE WAS NO

15   OBJECTION BY EITHER DEFENDANT AND THE DEFENDANT HAD AN OPPORTUNITY

16   TO REVIEW THE ACTUAL IMAGE OF THE DOCUMENT.  THE SECOND CATEGORY --

17        THE COURT:  YOU HAVE A LIST OF THOSE?

18        MR. BRUNO:  YES.  AND THE SECOND -- THAT WAS ACTUALLY A

19   QUESTION TO ME.

20        THE SECOND CATEGORY IS WHERE THERE IS A ONE, AND YOU

21   RECALL THAT'S THE CONDITIONAL RELEVANCE WHEREIN THE DEFENDANTS WILL

22   RESERVE AT THE END OF TRIAL AN OPPORTUNITY TO SUGGEST THAT THEY ARE

23   NOT RELEVANT.

24        NOW, THE QUESTION TO YOU, JUDGE, IT'S LONG, IT'S GOING TO

25   TAKE SOME TIME.  WE HAVE A LIST, WE CAN OFFER THE LIST OF THE

```
1   EXHIBITS AS AN EXHIBIT, OR WE CAN READ THEM INTO THE RECORD WHICH

2   WILL TAKE WAY TOO MUCH OF YOUR TIME.

3           THE COURT:  YOU DON'T NEED TO READ THEM UNLESS THERE IS

4   SOME OBJECTION.

5           MR. SMITH:  YOUR HONOR, WE DO HAVE AN OBJECTION, AND OUR

6   OBJECTION IS THAT WE WERE JUST HANDED THIS LIST -- YOU CAN SEE HOW

7   THICK IT IS, THESE ARE DOUBLE-SIDED PAGES -- AFTER WE CAME OUT OF

8   CHAMBERS THIS MORNING BY THE PLAINTIFFS' COUNSEL.  WE HAVE NOT HAD

9   A CHANCE TO REVIEW THIS LIST.  AND WE DIDN'T MENTION THIS EARLIER

10  THIS MORNING, BUT AS OF YESTERDAY, WE HAD STILL HAD NOT RECEIVED

11  OVER 200 OF THE PLAINTIFFS' EXHIBITS.  AND SO WE CAN'T -- WE'RE NOT

12  PREPARED TO -- WE DON'T KNOW WHETHER TO OBJECT OR NOT BECAUSE WE

13  DON'T KNOW WHAT ALL OF THESE EXHIBITS ARE.  WE DON'T KNOW IF THEY

14  RECEIVED THEM ALL YET OR NOT.  AND SO WE'D LIKE AN OPPORTUNITY TO

15  REVIEW THIS BEFORE YOUR HONOR ENTERTAINS THIS MOTION.

16          MR. BRUNO:  JUDGE, THAT'S DEEPLY TROUBLING TO ME.  AS I

17  SAID TO YOU, NO. 1, THIS IS THE EXHIBIT LIST PREPARED PURSUANT TO

18  THE COURT'S ORDERS.  THE COURT ORDERED THE PARTIES TO PREPARE A

19  LIST AND TO PROVIDE THOSE EXHIBITS TO THE DEFENDANTS.  THE

20  DEFENDANTS REGISTERED NO OBJECTION TO THESE EXHIBITS, OR REGISTERED

21  A CONDITIONAL RELEVANCE OBJECTION.

22          NOW, IF THEY WANT TO CHECK ME OUT TO MAKE CERTAIN I AM

23  NOT LYING TO YOU, I HAVE NO PROBLEM WITH THAT.  BUT THE NOTION THAT

24  AS OF THE DAY OF TRIAL THEY HAVE -- THEY'RE TELLING THE COURT --

25          THE COURT:  NO, WAIT, WAIT.  LET ME MAKE IT CLEAR.  IF I
```

```
1    HAVE -- IF THERE'S BEEN NO MOTION IN LIMINE FILED THAT WOULD COVER
2    AND NO RULING -- THE RULINGS I MADE IN THE MOTION IN LIMINE ARE
3    DONE AND WE'RE NOT GOING TO HAVE ANYMORE OBJECTIONS ON THAT BASIS
4    UNLESS THERE'S SOMETHING NEW.  BUT -- AND I ASSUME MR. SMITH, IF
5    WHAT'S ON THE DOCUMENT -- MAKE SURE I UNDERSTAND IT BECAUSE --
6              BY THE WAY, THIS IS GOING AGAINST BOTH OF YOUR TIME, SO
7    UNDERSTAND THAT.  THE CLOCK'S TICKING.  I'M GOING TO ENFORCE THIS
8    ONE TO THE SECOND.  EVERYBODY UNDERSTAND THAT.
9              MR. BRUNO:  YES, YOUR HONOR.
10             THE COURT:  AND THIS IS GOING TO BE -- TELL THE COURT
11   REPORTER, THIS IS GOING TO BE EQUALLY DIVIDED AMONG OR BETWEEN
12   REALLY.  JUST UNDERSTAND THAT.  THE CLOCK IS TICKING.  I ASSUME
13   THAT YOUR OBJECTION -- IF THESE ARE, INDEED, EXHIBITS THAT YOU HAVE
14   SEEN TO WHICH THERE IS NO OBJECTION, YOU DON'T HAVE A PROBLEM.  YOU
15   JUST WANT TO LOOK AT THE LIST?
16             MR. SMITH:  CORRECT, YOUR HONOR, THAT'S CORRECT.
17             THE COURT:  LET'S JUST LEAVE IT LIKE THAT AND HOPEFULLY
18   YOU CAN DO THAT EXPEDITIOUSLY AND WE CAN GET THAT RESOLVED FAIRLY
19   SOON.  IS THAT FAIR ENOUGH?
20             MR. BRUNO:  THAT'S FAIR ENOUGH, JUDGE.  SO WHAT WE WILL
21   DO, SCOTT, IF WE MAY, WE'LL OFFER THE LIST SO IT'S OF RECORD AND
22   THEN WE WILL -- I GUESS WE'LL GIVE THEM SOME PERIOD OF TIME,
23   WHATEVER IS CONVENIENT TO THE COURT AND OPPOSING COUNSEL.
24             THE COURT:  HOW MUCH TIME WOULD COUNSEL LIKE?
25             MR. TREEBY:  IF YOUR HONOR PLEASE, FROM MY STANDPOINT,
```

1   THE LAWYERS WHO NEED TO CHECK THIS ARE GOING TO BE BUSY TODAY

2   HANDLING WITNESSES, SO I WOULD PROPOSE THAT WE WILL TRY OUR BEST TO

3   LOOK AT THIS TONIGHT AND NOTE ANY THAT WE HAVEN'T SEEN.  THAT'S THE

4   ONLY ISSUE WE HAVE.  THE ONLY ISSUE WE HAVE IS WHETHER OR NOT THIS

5   LIST ACCURATELY REFLECTS WHAT MR. BRUNO SAID.  IT'S NOT THAT WE

6   DON'T TRUST MR. BRUNO, BUT THERE ARE A LOT OF HANDS THAT HAVE BEEN

7   IN THIS PIE AND WE JUST NEED TO CHECK IT TO DO OUR DUE DILIGENCE.

8   WE SHOULD BE ABLE TO DO THAT BY TOMORROW MORNING.

9          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, MR. TREEBY.

10  I AM GOING TO ALLOW THE OFFERING OF THE LIST, AND I WILL DEFER

11  RULING ON IT UNTIL THE DEFENDANTS GIVE ME A REPLY.

12         MR. BRUNO:  JUST SO YOU KNOW, JUDGE, BECAUSE WE WILL BE

13  PUBLISHING SOME OF THESE DOCUMENTS TODAY IN FAIRNESS SO EVERYBODY

14  KNOWS AND YOUR HONOR KNOWS.  THANK YOU, JUDGE.

15         THE COURT:  HOPEFULLY YOU WILL ONLY BE PUBLISHING

16  DOCUMENTS THAT YOU KNOW THEY'VE SEEN.

17         MR. BRUNO:  AS I'VE SAID, THAT IS WHAT -- BEFORE I GOT UP

18  I WASN'T ABOUT TO OFFER DOCUMENTS THAT I KNOW THEY HADN'T SEEN.  I

19  HOPE THE COURT WILL GIVE ME THAT MUCH CREDIT.

20         THE COURT:  YES.

21         MR. JOANEN:  GOOD MORNING, YOUR HONOR, SCOTT JOANEN ON

22  BEHALF OF THE PLAINTIFFS.  AS WE JUST DISCUSSED, WE HAVE A LISTING

23  THAT WAS CULLED FROM THE MASTER LIST WHICH HAS EXHIBITS THAT WERE

24  EITHER NOT OBJECTED TO OR HAD JUST THE CONDITIONAL RELEVANCE

25  EXHIBITS, AND WE OFFER TO FILE THEM INTO EVIDENCE.  WE HAVE THE

1    LIST THAT WE CAN HAVE, WHICH IS AN EXEMPLAR OF THE THINGS THAT WE

2    CAN DO.  IF THE COURT WOULD PREFER, I CAN READ THROUGH THE LIST --

3            THE COURT:  UNLESS YOU WANT THAT TO GO TO YOUR TIME.

4            MR. JOANEN:  NO, SIR.

5            THE COURT:  THE COURT WOULD NOT PREFER IT.  IT WOULD BE

6    RATHER MEANINGLESS.

7            MR. JOANEN:  IF THE COURT WOULD LIKE, I HAVE A COURTESY

8    COPY FOR THE COURT AND WE WILL PROVIDE THAT TO THE COURT NOW.

9            THE COURT:  AND THE COURT WILL ALLOW TO THIS TO BE

10   OFFERED AND WILL ACCEPT IT INTO EVIDENCE AFTER THE DEFENDANTS HAVE

11   LOOKED AT IT.  I ASSUME YOU HAVE NOT LOOKED AT THIS LIST EITHER.

12   OKAY.

13           MR. JOANEN:  AND JUST FOR CLARIFICATION TO THE COURT, ON

14   THE TOP OF THE DOCUMENT DOES HAVE THE DATE THAT THE LIST WAS -- THE

15   MASTER LIST WAS TAKEN FROM THIS WAS CULLED.

16           THE COURT:  SO AS I UNDERSTAND IT, WE HAVE TWO LISTS.

17   THE FIRST LIST, EXHIBITS TO WHICH THERE WAS NO OBJECTION.

18           MR. JOANEN:  YES, SIR.

19           THE COURT:  THE SECOND LIST, EXHIBITS TO WHICH THE ONLY

20   OBJECTION WAS CONDITIONAL RELEVANCE TO BE RULED UPON AFTER TRIAL.

21           MR. JOANEN:  YES, SIR.  AND THIS LIST IS BROKEN DOWN BY

22   THE JX NUMBERS, WHICH IS JOINT EXHIBITS; THE PX NUMBERS, WHICH ARE

23   THE PLAINTIFFS' EXHIBITS; AND THE DX NUMBERS WHICH ARE THE

24   DEFENDANTS' EXHIBITS.  AND YOU SHOULD SEE THAT THERE IS ON THE FAR

25   EDGE OF THE SPREADSHEET THERE WOULD BE EITHER A BLANK SPACE WHERE

```
 1    THERE IS NO OBJECTION LODGED OR THE NO. 1 WHICH IS INDICATIVE OF

 2    THE CONDITIONAL RELEVANCE OBJECTION.

 3              THE COURT:  ALL RIGHT.

 4              MR. JOANEN:  THANK YOU, YOUR HONOR.

 5              THE COURT:  SO LET ME MAKE SURE I UNDERSTAND.  IS THERE A

 6    MASTER OF ALL OF THAT?  IS THERE ONLY ONE FOLDER BEING PROVIDED TO

 7    THE COURT AND IT'S BOTH LISTS MERGED, IN ESSENCE, THE NO OBJECTION

 8    LIST AND THE CONDITIONAL?

 9              MR. JOANEN:  YES, SIR.

10              THE COURT:  OKAY, I UNDERSTAND.

11              MR. JOANEN:  WE CAN BREAK IT OUT HOWEVER --

12              THE COURT:  YOU DON'T NEED TO BREAK IT OUT, I JUST WANT

13    TO MAKE SURE THAT I UNDERSTOOD.

14              MR. BRUNO:  I APOLOGIZE, JUDGE.  OUR REAL TIME IS NOT

15    FUNCTIONING.  CAN WE JUST HAVE TWO SECONDS?

16              THE COURT:  YES.  IT'S HARD TO COMMUNICATE SOTTO VOCE IN

17    OUR NEWLY WIRED COURTROOM BECAUSE THE SOUND SYSTEM IS VERY GOOD, SO

18    KEEP THAT IN MIND IF YOU DO WANT TO HAVE A COMMENT THAT'S NOT

19    OVERHEARD BY THE TOUT LE MONDE, EVERYBODY.  TRY TO FIND A NICE

20    PLACE WHERE YOU CAN TALK WHERE YOU HAVE SOME PRIVACY.

21              AND ALWAYS REMIND THE LAWYERS THAT THE MICS ARE ON IN OUR

22    CHAMBERS, AND I WON'T TAKE UMBRAGE BECAUSE I'M SURE I DID IT --

23    WELL, I KNOW I DID IT SEVERAL TIMES, REMONSTRATING A JUDGE FOR HIS

24    OR HER LACK OF WISDOM.  I WON'T TAKE IT PERSONALLY, BUT JUST BE

25    CAREFUL.  I UNDERSTAND THE NEED TO VENT.  GO AHEAD.
```

1          MR. JERALD ANDRY:  I THINK WE ARE WAITING FOR THE REAL

2    TIME, IF IT PLEASE THE COURT.  IS THAT RIGHT?

3          MR. BRUNO:  GO AHEAD.  WE WILL TAKE A BREAK.  I AM NOT

4    SURE WHY IT'S NOT WORKING.

5          THE COURT:  THE REAL TIME IS -- WHAT IS THE PROBLEM?

6          MR. BRUNO:  OUR REAL TIME IS NOT FUNCTIONING, BUT I DON'T

7    WANT TO HOLD UP THE COURT.  LET'S JUST PROCEED.

8          THE COURT:  DID WE GET AN EXPLANATION ON WHY IT'S NOT

9    WORKING SINCE YOU TESTED IT?

10          MR. BRUNO:  THE TEST CAME THROUGH.  BUT I DON'T WANT TO

11    HOLD UP ANYBODY, SO LET'S JUST PROCEED.

12          THE COURT:  IS THE DEFENSE -- IS THE DEFENSE REAL TIME

13    WORKING OVER THERE?

14          MR. TREEBY:  YES.

15          THE COURT:  OBVIOUSLY, WE'VE ISOLATED THE PROBLEM.

16          MR. BRUNO:  YES, WE HAVE.

17          MR. JERALD ANDRY:  MAY IT PLEASE THE COURT, JERALD ANDRY,

18    JR., AGAIN, YOUR HONOR, ON BEHALF OF -- INDIVIDUALLY TODAY MR. AND

19    MRS. ALVIN LIVERS, AND WE WOULD LIKE TO CALL MR. ALVIN LIVERS TO

20    THE STAND.

21          THE COURT:  YOU MAY.  MR. LIVERS.

22          MR. JERALD ANDRY:  YOUR HONOR, FOR CLARITY, WE'VE GIVEN

23    COPIES OF THE DEMONSTRATIVES TO THE COURT THIS MORNING, AS WELL AS

24    TO DEFENSE COUNSEL, AND A COPY OF ALL OF THE EXHIBITS THAT I PLAN

25    TO USE WITH MR. LIVERS.

```
 1            THE COURT:  THANK YOU, COUNSEL.

 2            THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

 3   HAND?

 4       (WHEREUPON, ALVIN LIVERS, WAS SWORN IN AND TESTIFIED AS

 5       FOLLOWS:)

 6            THE DEPUTY CLERK:  WOULD YOU PLEASE STATE YOUR NAME AND

 7   SPELL IT FOR THE RECORD?

 8            THE WITNESS:  MY NAME IS ALVIN LIVERS.  IT'S SPELLED --

 9   MY FIRST NAME IS SPELLED A-L-V-I-N, MY LAST NAME IS SPELLED

10   L-I-V-E-R-S.

11            MR. JERALD ANDRY:  YOUR HONOR, AM I CORRECT THAT YOU

12   WOULD LIKE US TO DO A BRIEF SUMMARY OF THE WITNESS'S TESTIMONY,

13   WHAT HE'S GOING TO BE TESTIFYING ABOUT?

14            THE COURT:  IN MOST INSTANCES, YOU CAN DO THAT.  MAKE IT

15   BRIEF SINCE IT'S --

16            MR. JERALD ANDRY:  IT'S VERY BRIEF, YOUR HONOR.  WE WILL

17   BE CALLING ALVIN LIVERS TO THE STAND.  HE IS A RESIDENT OF THE

18   LOWER NINTH WARD.  HE WILL BE TALKING ABOUT THE DAMAGES TO HIS

19   HOUSE, AND THE DAMAGES THAT HE AND HIS WIFE SUFFERED DURING

20   HURRICANE KATRINA.

21            THE COURT:  THANK YOU, SIR.

22            MR. JERALD ANDRY:  WE HAVE A LIST OF EXHIBITS, AND AGAIN,

23   WOULD YOU PREFER THAT WE OFFER THESE EXHIBITS IN ADVANCE OF THE

24   TESTIMONY OR AT THE END?

25            THE COURT:  WELL, AGAIN, I AM HOPING WE CAN DO THIS
```

```
 1    WITHOUT GOING OVER EACH AND EVERY ONE AND OFFERING THEM.  THAT'S
 2    ONE OF THE REASONS WE HAVE MOTIONS IN LIMINE IS SO THAT WE CAN
 3    SMOOTHLY DO THIS.  DOES THE DEFENSE HAVE ANY OBJECTION TO THE
 4    DEFENDANTS THAT HAVE BEEN TENDERED REFERENCE MR. LIVERS THAT IS NOT
 5    ALREADY BEEN HEARD IN A MOTION IN LIMINE AND RULED UPON.
 6              MR. FARRELL:  NO, YOUR HONOR.
 7              THE COURT:  YOU CAN INTRODUCE THEM AT THE BEGINNING IF
 8    YOU CHOOSE.
 9              MR. JERALD ANDRY:  YOUR HONOR, THEN WE WOULD OFFER AND
10    INTRODUCE INTO EVIDENCE THE EXHIBITS THAT WE HAVE PUBLISHED TO THE
11    COURT EARLIER THIS MORNING.  THEY INCLUDE JX 01504-0001, THE SF 95
12    FORMS; JX 01503-0001 AND 02 IN GLOBO --
13              THE COURT:  IS THERE ANY WAY TO MAKE THIS A LITTLE
14    EASIER?
15              MR. JERALD ANDRY:  YOUR HONOR, I HAVE ALREADY PROVIDED A
16    COPY OF THIS TO ALL PLAINTIFFS' COUNSEL AND TO THE COURT, WE WOULD
17    OFFER ALL OF THESE EXHIBITS INTO EVIDENCE.
18              THE COURT:  DO THAT.
19              MR. BRUNO:  JUST FOR THE RECORD, SO THAT NOBODY -- WE
20    WILL SUBMIT A LIST AGAIN.
21              THE COURT:  I UNDERSTAND.
22              MR. BRUNO:  SOME PIECE OF PAPER SO THAT --
23              MR. JERALD ANDRY:  I SUBMITTED THE LIST.
24              THE COURT:  HE SUBMITTED THE LIST.
25              MR. BRUNO:  IS IT ON THE RECORD SOMEWHERE?
```

1          THE COURT:  IT'S NOW GOING TO BE IN THE RECORD, I'M ABOUT

2    TO ADMIT IT.  SHEENA, DO YOU HAVE A COPY OF THE LIST?

3          THE DEPUTY CLERK:  YES, THIS IS WHAT HE PROVIDED ME.

4    THAT WAS THE LIST.

5          THE COURT:  OKAY.  IT IS ADMITTED.

6          MR. JERALD ANDRY:  THANK YOU, YOUR HONOR.

7          THE COURT:  AND I'VE LOOKED AT THE LIST AND THIS IS --

8    WE'LL PUT -- JUST TO MARK IT FOR THE RECORD AS WELL, LIVERS 1 IN

9    GLOBO.

10          MR. JERALD ANDRY:  THANK YOU, YOUR HONOR.

11                       DIRECT EXAMINATION

12    BY MR. JERALD ANDRY:

13    Q.  MOVING RIGHT ALONG.  MR. LIVERS, WHERE DO YOU CURRENTLY RESIDE?

14    A.  123492 PACES POINT, GONZALES.

15          THE COURT:  GO AHEAD.

16    BY MR. JERALD ANDRY:

17    Q.  WE ENCOURAGED MR. LIVERS TO SPEAK LOUDLY, SO I THINK WE OVERDID

18    IT.

19          MR. LIVERS, PLEASE TELL THE COURT YOUR FULL NAME, PLEASE.

20    A.  WHAT?

21    Q.  YOUR FULL NAME.

22    A.  MY FULL NAME IS ALVIN LIVERS.

23    Q.  MR. LIVERS, DO I UNDERSTAND CORRECTLY THAT YOU HAVE A HEARING

24    DIFFICULTY?

25    A.  UH-HUH.

1  Q.  AND SO I AM GOING TO TRY MY BEST TO SPEAK UP AND MAKE SURE THAT

2  YOU HEAR ME.  IF YOU DON'T HEAR ME, JUST LET ME KNOW.  THANK YOU.

3  A.  OKAY.

4  Q.  MR. LIVERS, ARE YOU RETIRED?  ARE YOU RETIRED?

5  A.  YES.

6  Q.  AND WHERE DID YOU WORK BEFORE YOU RETIRED?

7  A.  I WORKED AT DOMINOES SUGAR.

8  Q.  AND WHAT KIND OF WORK DID YOU DO?

9  A.  I WAS A LOADING OPERATOR.

10  Q.  AND ARE YOU MARRIED?

11  A.  YES.  BEEN MARRIED 51 YEARS, GOING ON 51.

12  Q.  WHAT'S YOUR WIFE'S NAME?

13  A.  BARBARA LIVERS.

14  Q.  YOU AND MRS. LIVERS ARE BOTH HERE IN THE COURTROOM TODAY; IS

15  THAT RIGHT?

16  A.  YES.

17  Q.  HOW MANY CHILDREN DO YOU HAVE?

18  A.  THREE.

19  Q.  ARE ALL OF YOUR CHILDREN ADULTS?

20  A.  YES.

21  Q.  AND ARE ALL OF YOUR CHILDREN HAD ALREADY LEFT THE HOME AND WERE

22  GONE BY THE TIME OF KATRINA; IS THAT CORRECT?

23  A.  YES.

24  Q.  I WOULD LIKE TO TALK TO YOU A LITTLE BIT ABOUT KATRINA.  WHERE

25  DID YOU RESIDE AT THE TIME OF KATRINA?

1   A.  I WENT TO BATON ROUGE BY MY WIFE COUSIN.

2   Q.  NO.  WHERE DID YOU RESIDE PRIOR TO KATRINA, BEFORE KATRINA?

3   A.  OH, 4924 ST. CLAUDE AVENUE.

4        MR. JERALD ANDRY:  YOUR HONOR, WE HAVE EXHIBIT PX

5   4671-0003.  IT'S A DEMONSTRATIVE PIECE OF EVIDENCE.

6   BY MR. JERALD ANDRY:

7   Q.  MR. LIVERS, CAN YOU SEE ON THE MAP THERE'S A CURSOR, AND CARL

8   HAS BEEN SO KIND AS TO HIGHLIGHT THE AREA.  IS THAT APPROXIMATELY

9   WHERE YOU LIVED, WHERE THAT PUSH PIN IS ON THE MAP?

10  A.  I CAN'T REALLY TELL.

11  Q.  LET'S TALK ABOUT WHERE YOUR HOUSE WAS WHEN YOU -- PRIOR TO

12  KATRINA.  DID YOU LIVE NEAR THE BRIDGE, THE ST. CLAUDE BRIDGE?

13  A.  I LIVED NEAR THE BRIDGE.  AS A MATTER OF FACT, ACROSS FROM THE

14  BRIDGE.

15  Q.  ACROSS THE STREET FROM THE BRIDGE?

16  A.  ST. CLAUDE AVENUE BRIDGE.

17  Q.  AND BETWEEN WHAT STREET AND WHAT STREET WAS YOUR HOUSE?

18  A.  TENNESSEE AND DESLONDE.

19  Q.  MR. LIVERS, I WOULD LIKE TO SHOW YOU A FORM.  THIS IS AN SF 95

20  FORM.  IT'S JOINT EXHIBIT 01503-001 AND 002.  MR. LIVERS, DO YOU

21  HAVE YOUR GLASSES?

22  A.  YES, SORRY.

23  Q.  DO YOU RECOGNIZE THIS DOCUMENT, MR. LIVERS?

24  A.  YES, I DO.

25  Q.  CAN YOU, AGAIN, SPEAK UP A LITTLE BIT.

1    A.  YES, I DO.

2    Q.  CAN YOU TELL US -- TELL THE COURT WHAT THIS IS?

3    A.  THIS IS THE DOCUMENT THAT I PRESENTED, I THINK, TO THE CORPS OF

4    ENGINEERS.

5    Q.  AND WHAT IS THIS DOCUMENT ABOUT?  IS THIS ABOUT YOUR CLAIM?

6    A.  YEAH.

7    Q.  AND I SEE AT THE BOTTOM OF THE DOCUMENT THERE'S A SIGNATURE.

8    IS THAT YOUR SIGNATURE?

9    A.  YES.  YES, IT IS.

10   Q.  NOW, MR. LIVERS, THERE WAS ANOTHER FORM FILED, ANOTHER SF 95

11   FORM WHICH WAS 01503-0001 THROUGH 0002.  DID YOU AUTHORIZE SOMEONE

12   TO FILE THIS DOCUMENT FOR YOU?  IT'S GOING TO COME UP IN A SECOND.

13   THE PAGE BEFORE THAT, CARL.

14   A.  OKAY.

15   Q.  I THINK THAT'S THE SAME DOCUMENT.  DID I MISSPOKE?

16            THE COURT:  WHAT ARE YOU ASKING HIM NOW, SIR?  IS THAT

17   HIS SIGNATURE ON THE FORM?

18            MR. JERALD ANDRY:  THERE'S ANOTHER DOCUMENT, JUDGE.

19            THE COURT:  I KNOW THERE'S ANOTHER DOCUMENT --

20   BY MR. JERALD ANDRY:

21   Q.  DID YOU AUTHORIZE THIS FORM TO BE FILED ON YOUR BEHALF?

22   A.  YES.

23   Q.  AND DO YOU RECOGNIZE THE ADDRESS AND THE NAME ON THE DOCUMENT

24   AT THE TOP?

25   A.  YES, I DO.

```
 1   Q.  AND DO YOU RECOGNIZE THE AMOUNTS THAT ARE BEING CLAIMED THAT

 2   ARE ABOUT THREE-QUARTERS OF THE WAY DOWN THE PAGE?

 3   A.  YES, I RECOGNIZE IT.

 4   Q.  AND HOW DO YOU RECOGNIZE THOSE NUMBERS?

 5   A.  THE NUMBER RIGHT HERE ON THE LEFT, THAT WOULD BE MY LEFT, THESE

 6   NUMBERS WAS GIVEN TO ME BY THE ROAD HOME.

 7   Q.  SO THESE ARE ACCURATE REFLECTIONS OF THE NUMBERS THAT YOU WERE

 8   CLAIMING?

 9   A.  YES.

10        MR. JERALD ANDRY:  YOUR HONOR, WE WOULD SUGGEST THAT

11   MR. LIVERS HAS COMPLIED WITH THE RULES OF REQUIRED -- OF WAITING

12   SIX MONTHS TO FILE HIS LAWSUIT, AND I BELIEVE YOUR HONOR HAS

13   ALREADY RULED ON IT.

14        THE COURT:  SUBJECT TO ANY OBJECTIONS PREVIOUSLY URGED BY

15   THE UNITED STATES -- ARE YOU MAKING AN INTRODUCTION INTO EVIDENCE?

16   YOU'VE ALREADY INTRODUCED THIS.

17        MR. JERALD ANDRY:  THE DOCUMENT HAS ALREADY BEEN

18   INTRODUCED.  I APOLOGIZE, YOUR HONOR, I'LL MOVE ON.

19   BY MR. JERALD ANDRY:

20   Q.  MR. LIVERS, I WOULD LIKE TO SHOW YOU ANOTHER DOCUMENT, THIS IS

21   PX 4642-0001 THROUGH 0004.  I WOULD JUST LIKE TO SHOW YOU THE FIRST

22   PAGE, 0001.  IF WE COULD GO BACK TO 0001, CARL.

23        DO YOU RECOGNIZE THAT DOCUMENT, MR. LIVERS?

24   A.  OKAY.

25   Q.  THIS APPEARS TO BE AN ACT OF SALE.
```

1    A.   OKAY.   THAT'S THE ACT OF SALE FOR THE PROPERTY.

2    Q.   AND WHAT ACT OF SALE IS THAT?

3    A.   THAT WAS THE PURCHASE ACT OF SALE FOR 4924 ST. CLAUDE.

4    Q.   AND DID YOU PURCHASE THAT HOUSE IN THIS ACT OF SALE?

5    A.   YES, I DID.

6    Q.   AND YOU RECOGNIZE THE DOCUMENT AND THE AMOUNTS THAT YOU

7    PURCHASED IT FOR?

8    A.   YES, I DID.

9    Q.   I BELIEVE YOU PURCHASED IT FOR 17,000; IS THAT CORRECT?

10   A.   YES, SIR.

11   Q.   AND THESE ARE YOUR SIGNATURES ON THE ACT OF SALE?

12   A.   YES, IT IS.

13            THE COURT:   DO YOU WANT TO SHOW HIM THE SIGNATURES?

14            MR. JERALD ANDRY:   THE SIGNATURES ARE ON PAGE 0004.

15   BY MR. JERALD ANDRY:

16   Q.   MR. LIVERS IS THAT --

17            THE COURT:   THAT'S ACTUALLY A COPY, A CONFORMED COPY IT

18   APPEARS.

19            MR. JERALD ANDRY:   THANK YOU, JUDGE.

20   BY MR. JERALD ANDRY:

21   Q.   COULD YOU TELL THE COURT A LITTLE BIT ABOUT YOUR HOUSE, THE

22   HOUSE THAT WE'RE TALKING ABOUT ON ST. CLAUDE AVENUE.   CAN YOU TELL

23   US WHAT KIND OF CONSTRUCTION IT WAS?   WAS IT ON A SLAB OR PIERS?

24   A.   IT WAS ON SLAB.

25   Q.   AND WHAT WAS THE OUTSIDE OF THE HOUSE MADE OF?

1   A.  IT HAD BRICK IN THE FRONT AND AN ADDITION I PUT ON IN THE BACK.

2   THEY HAD T1-11.  THAT'S WHAT THE TEXTURE WAS CALLED.

3   Q.  TEXTURE 1-11, THAT'S WOODEN SIDING?

4   A.  YEAH.

5   Q.  DID YOU DO ANY IMPROVEMENTS TO THE HOUSE FROM THE TIME THAT YOU

6   BOUGHT IT IN 1971 BEFORE AUGUST 29TH, 2005?

7   A.  YES, I DID.

8   Q.  CAN YOU TELL US -- CAN YOU TELL THE COURT WHAT KIND OF THINGS

9   THAT YOU DID.  I KNOW YOU SAID YOU PUT AN ADDITION.  CAN YOU TELL

10  US WHAT YOU DID?

11  A.  I DID AN ADDITION.  I REDID THE ENTIRE FLOORS ON IT.  I PUT

12  CERAMIC ALL THE WAY THROUGH THE BOTTOM.  I PUT A NEW BATHROOM, A

13  BATHTUB, NEW CERAMIC AROUND IT.  IT WAS A NEW FACE BOWL AND

14  CABINET.

15  Q.  DID YOU DO ANY -- THE CAMELBACK ADDITION, THAT ADDED ANOTHER

16  FLOOR?

17  A.  YES, IT ADDED TWO ROOMS.

18  Q.  AND WHAT KIND OF ROOMS WERE THOSE?

19  A.  WELL, THOSE WAS TWO REGULAR ROOMS BUT THEY DIDN'T HAVE -- THEY

20  DIDN'T HAVE THE TILE ON IT, CERAMIC ON THOSE.  THEY HAD CARPET.

21  Q.  WAS THERE A BATHROOM?

22  A.  YES, IT DID.  I HAD A BATHROOM THAT HAD CERAMIC AND A NEW TUB I

23  HAD GOT PUT IN THAT ONE TOO.  I GOT IT INSTALLED, REDID THE OLD ONE

24  AND MADE -- PUT CERAMIC -- HAD CERAMIC PUT ALL AROUND IT.  AND A

25  NEW TUB, AND THE SINK.  I BOUGHT ANOTHER FACE BOWL -- I MEAN,

1   CABINET AND SINK.

2   Q.  MR. LIVERS, WE ALL KNOW THAT WE'RE HERE TO TALK ABOUT KATRINA.

3   DID YOU HAVE -- WERE THERE CONTENTS INSIDE OF YOUR HOUSE, WERE

4   THERE THINGS INSIDE OF YOUR HOUSE AT THE TIME YOU LEFT FOR THE

5   STORM?

6   A.  I BEG YOUR PARDON?

7   Q.  YOUR PERSONAL PROPERTY, THINGS LIKE THAT INSIDE THE HOUSE?

8   A.  YES.

9   Q.  AND WERE THEY AFFECTED BY THE STORM?

10  A.  YES, THEY WAS.

11  Q.  COULD YOU EXPLAIN TO THE COURT HOW THEY WERE AFFECTED?

12  A.  WELL, THEY HAD TEN TO 11 FEET OF WATER WAS IN MY HOUSE, AND IT

13  DESTROYED EVERYTHING I HAD, THE FURNITURES AND THE CABINETS.  I HAD

14  NEW CABINETS THAT I HAD PUT UP THERE, IT WASN'T EXACTLY THREE OR

15  FOUR-DAYS OLD, BUT IT WAS A COUPLE OF YEARS OLD.  LIKE, ABOUT FOUR,

16  FIVE YEARS, SOMETHING LIKE THAT.

17  Q.  WAS THERE ANYTHING THAT WAS SALVAGEABLE IN YOUR HOUSE,

18  MR. LIVERS?

19  A.  I CAN'T REMEMBER, NO.

20  Q.  I WOULD LIKE TO SHOW YOU ANOTHER EXHIBIT, IT'S JX

21  01493-0067-0072.  MR. LIVERS, DID YOU PREPARE A LIST OF CONTENTS OF

22  YOUR HOUSE IN CONNECTION WITH THIS LITIGATION WITH WHAT WE'RE HERE

23  TO DEAL WITH TODAY?

24  A.  YES.

25  Q.  DOES THIS LOOK -- THIS DOCUMENT RUNS ON FOR SEVERAL PAGES, BUT

1  GENERALLY DO THESE LOOK LIKE THE CONTENTS OF YOUR HOUSE?

2  A.  YES.

3  Q.  AND WERE THESE -- WHEN YOU PREPARED THESE CONTENTS, WHAT TYPES

4  OF -- HOW DID YOU COME UP WITH THE AMOUNTS THAT YOU WERE PUTTING

5  FOR EACH ITEM?

6  A.  WELL, FOR EACH ITEM -- EACH ITEM WE MADE A ROUGH ESTIMATE ON

7  WHAT IT WOULD COST.

8  Q.  WHEN YOU SAY "WHAT IT WOULD COST"?

9  A.  WHAT IT COST.

10  Q.  WHAT IT COST NEW --

11  A.  YEAH.

12  Q.  -- OR TO REPLACE IT?

13  A.  TO REPLACE IT.

14  Q.  AND THERE'S ANOTHER DOCUMENT THAT WE WOULD ALSO -- THAT WE'VE

15  ALREADY INTRODUCED, THAT'S 01498-0001-0006.  THAT'S THREE ZEROES,

16  0006, SORRY.

17       MR. LIVERS, THIS IS A HANDWRITTEN LIST.  WHOSE

18  HANDWRITING IS THAT?

19  A.  THIS HANDWRITING, IT'S MY WIFE.  ME AND HER WAS DOING THIS

20  TOGETHER.  SHE WAS DOING SOME WRITING ON IT.

21  Q.  I WOULD LIKE TO ASK YOU, HOW DID Y'ALL GO ABOUT MAKING THIS

22  LIST?  DID YOU JUST THINK ABOUT IT ROOM BY ROOM OR HOW DID YOU DO

23  IT?

24  A.  WELL, WE THOUGHT ABOUT IT ROOM BY ROOM, ABOUT WHAT WE HAD IN

25  EACH ROOM AND WHAT DID IT COST.

1   Q.  I AM GOING TO DRAW YOUR ATTENTION TO ONE THING THAT'S GLARING.

2   IT'S LINE 57, CARL, ON PAGE THREE.  IF YOU'LL LOOK DOWN, YOU SEE A

3   TELEVISION, IT'S ON LINE 57.  DO YOU SEE THAT THERE?  AND IT SAYS

4   IT'S $15,000.  IS THAT WHAT YOU INTENDED TO WRITE, MR. LIVERS?

5   A.  NO, NO.  THAT'S A MISPRINT.

6   Q.  WHAT WAS IT SUPPOSED TO BE?

7   A.  1,500.

8   Q.  WOULD IT BE FAIR TO SAY THAT THERE MAY BE A COUPLE OF OTHER

9   THINGS THAT ARE LIKE THAT IN THIS LIST?

10  A.  WELL, YEAH.  YEAH.  WE MADE A ROUGH ESTIMATE ON THE ITEMS, SO I

11  WOULDN'T SAY THAT IT WAS ACCURATE TO THE "T."

12  Q.  ESSENTIALLY, YOU DID THE BEST YOU COULD?

13  A.  DID THE BEST WE COULD UNDER THE CIRCUMSTANCES WE WAS UNDER.

14  Q.  NOW, THIS LIST, DO YOU KNOW WHAT ULTIMATELY WAS SUPPOSED TO

15  HAPPEN WITH THIS LIST?  WHERE IT WAS SUPPOSED TO GO WHEN YOU

16  PROVIDED IT?

17  A.  WELL, I WAS SUPPOSED TO SEND IT IN TO THE OFFICE.

18  Q.  AND WHERE WAS IT SUPPOSED TO GO AFTER THAT?

19  A.  IT WAS SUPPOSED TO GO TO SCOTT TAYLOR.

20  Q.  AND DO YOU KNOW WHAT HIS FUNCTION IS IN THIS CASE?

21  A.  WELL, HE WAS SUPPOSED TO -- WELL, I JUST USE THE WORD.  HE WAS

22  SUPPOSED TO BE THE HEAD PERSON THAT WAS DOING THE JOB.

23  Q.  MR. LIVERS, YOU BOUGHT THE HOUSE IN 1971.  DID YOU LIVE THERE

24  CONTINUOUSLY THROUGH 2005?

25  A.  OH, YES.

```
 1   Q.  AND TELL US HOW YOU CAME TO BUY THAT HOUSE.

 2   A.  I ACTUALLY BOUGHT THAT HOUSE FOR A TAX RETURN.  I HAD A REAL

 3   ESTATE LADY, HER NAME WAS DORIS HEBERT, AND SHE HELPED ME TO USE

 4   THE TAX RETURN THAT I HAD GOT TO BUY THE -- PURCHASE THE HOUSE;

 5   BECAUSE SHE TALKED TO THE PEOPLE THAT OWNED THE HOUSE AND HAD THEM

 6   TO PAY FOR THE CLOSING COSTS AND I JUST PAID FOR THE PREPAID ITEM

 7   AND DIFFERENT THINGS LIKE THAT, AND I WAS ABLE TO BUY IT.  I WAS

 8   ABLE TO BUY THE HOUSE LIKE THAT.

 9   Q.  HAD YOU EVER BOUGHT A HOUSE BEFORE?

10   A.  OH, NO, I WAS RENTING.

11   Q.  AND DID YOU EXPECT TO BE ABLE TO BUY A HOUSE SOME DAY OR WERE

12   YOU JUST HOPING?

13   A.  I ALWAYS HAD THE AMERICAN DREAM OF BUYING -- OWNING MY OWN

14   PROPERTY.

15   Q.  YOU'VE TALKED ABOUT EARLIER THAT YOU HAVE THREE CHILDREN AND

16   THAT THEY WERE ALL GROWN, BUT DID YOU RAISE YOUR CHILDREN IN THIS

17   HOUSE?

18   A.  YES, I DID.

19   Q.  DID YOU HAVE -- WHERE DID THEY GO TO SCHOOL?

20   A.  THEY WENT TO SCHOOL WAS CLOSE AROUND THE CORNER AND THEY HAD

21   ONE CALLED MCDONOUGH FOR THE YOUNGER KIDS.

22   Q.  AND WERE THOSE CLOSE BY?

23   A.  OH, YES, THEY WAS WALKING DISTANCE.

24   Q.  SO DID YOU BELONG TO A CHURCH?

25   A.  YES.
```

```
 1    Q.   AND WHERE WAS THE CHURCH?

 2    A.   CHURCH WAS ON DESLONDE.

 3    Q.   NOW, DESLONDE IS THE STREET THAT'S RIGHT NEXT TO YOUR HOUSE --

 4    A.   RIGHT.

 5    Q.   -- RIGHT?

 6    A.   YES, IT IS.

 7    Q.   SO HOW FAR WAS THE CHURCH?

 8    A.   ABOUT TWO-AND-A-HALF BLOCKS.

 9    Q.   YOU COULD JUST WALK THERE?

10    A.   YES.

11    Q.   WERE YOU FAIRLY ACTIVE IN YOUR CHURCH?

12    A.   YES, I WAS.

13    Q.   AND WHEN I SAY "ACTIVE" FROM THE ENTIRE TIME THAT YOU LIVED

14    THERE?

15    A.   YES.  BUT I MUST SAY, MY WIFE, SHE WAS MORE ACTIVE THAN I WAS.

16    AND I REALLY HURT FOR HER FOR THE SIMPLE REASON SHE WAS INVOLVED.

17    SHE WAS AN EVANGELIST AND SHE WAS INVOLVED IN PROGRAMS AND FOOD

18    DISTRIBUTING TO HELP -- TO HELP THE OLDER PEOPLE AND THE NEEDY.

19    SHE USED TO MINISTER AT DIFFERENT PLACES AND THINGS LIKE THAT

20    THERE.  SO WE REALLY -- WE REALLY LOST ALL OF THAT.

21    Q.   I WOULD LIKE TO SHOW YOU SOME PHOTOGRAPHS OF YOUR HOUSE.  I

22    BELIEVE THAT THESE ARE PHOTOGRAPHS THAT YOU TOOK.  IT'S JX 01495

23    STARTING WITH 0001, CARL.  WHAT'S THAT A PHOTOGRAPH OF?

24    A.   THAT'S THE FRONT OF MY HOUSE.

25    Q.   CAN WE LOOK AT THE NEXT PICTURE?
```

1    A.  IT'S NOT UP YET.

2    Q.  IT'S COMING.  WE'RE TRYING TO CATCH UP WITH YOU, MR. LIVERS.

3    A.  THIS -- THAT'S MY NAME ON IT.

4    Q.  THAT'S YOUR NAME THERE?

5    A.  YES, THAT'S MY NAME, L-I-V-E-R-S.

6    Q.  AND WHAT'S THIS A PICTURE OF?

7    A.  THIS IS A PICTURE OF A UTILITY SHED WE HAD.  I CALL IT A

8    UTILITY SHED, BUT WE HAD, LIKE, A SINK, STOVE.  WE HAD A MICROWAVE,

9    WE HAD A FREEZER, WE HAD CLOTHES BACK THERE, THE WINTER CLOTHES.

10   SHE WOULD BRING HER WINTER CLOTHES BACK THERE.

11   Q.  THIS IS BEHIND YOUR HOUSE?

12   A.  YES.

13   Q.  NOT CONNECTED?

14   A.  NO.

15   Q.  AND THE SIDING THAT WE SEE HERE, IS THIS WHAT YOU REFERRED TO

16   AS THE T1-11?

17   A.  YES.

18   Q.  CAN WE LOOK AT THE NEXT PHOTO.  THIS IS A -- WHAT'S THIS A

19   PHOTOGRAPH OF, MR. LIVERS?

20   A.  THIS IS THE RIGHT SIDE.  IF YOU'RE LOOKING DIRECT ON ST. CLAUDE

21   AVENUE, THIS WOULD BE THE RIGHT SIDE OF MY HOUSE.

22   Q.  AND YOU CAN RECOGNIZE THIS AS YOUR HOUSE.  WERE THERE ANY OTHER

23   HOUSES LIKE YOURS ON THIS STREET?

24   A.  NO.  THE ONLY HOUSE IN THE BLOCK LIKE THAT WAS MINE, THE

25   CAMELBACK.

1    Q.  CAN WE LOOK AT THE NEXT PHOTO.  MR. LIVERS, THIS IS SORT OF A

2    SCRAMBLED PICTURE.  IT'S HARD TO TELL WHAT THINGS ARE.  DO YOU KNOW

3    WHEN THIS PICTURE WAS TAKEN?

4    A.  THIS PICTURE IS THE UTILITY THING THAT I HAD BACK THERE.  I

5    KNOW THE RACKS AND DIFFERENT THINGS LIKE THAT BACK THERE.

6    Q.  THAT'S THE INSIDE OF THE --

7    A.  YEAH.

8    Q.  -- OF THE UTILITY SHED?

9    A.  YEAH.

10   Q.  WE CAN MOVE TO THE NEXT PHOTO, SLIDE.  NEXT SLIDE, PLEASE.

11   THIS IS ANOTHER PHOTOGRAPH, IS THIS THE SAME LOCATION?

12   A.  THAT'S THE SAME -- YEAH, THIS IS THE FREEZER STUCK BACK THERE

13   (INDICATING).

14   Q.  IN THIS PHOTOGRAPH CAN YOU TELL WHETHER THIS IS BEFORE OR AFTER

15   THE STORM?

16   A.  THIS IS AFTER THE STORM.

17   Q.  AND HOW CAN YOU TELL THAT?  I'M SORRY TO HAVE TO ASK IT TO YOU

18   THAT WAY, BUT HOW CAN YOU TELL?

19   A.  I CAN TELL BECAUSE ALL OF THIS IS DESTROYED.

20   Q.  IT'S ALL DESTROYED.  IS THAT WHERE THE CHEST -- WHAT'S THE

21   THING THAT WE SEE AT THE BOTTOM OF THE PICTURE?

22   A.  THAT'S THE FREEZER HERE (INDICATING).

23   Q.  IS THAT WHERE THE FREEZER WAS SUPPOSED TO GO, IS THAT WHERE IT

24   NORMALLY WAS?

25   A.  IT WAS RIGHT BY -- THE FREEZER WAS BY THE DOOR AND IT FLOAT

1  SOMEWHERE.

2  Q.  IT LOOKS LIKE IT'S IN FRONT OF THE DOOR NOW.  IS THAT WHERE IT

3  WENT?

4  A.  YEAH.

5  Q.  CAN WE GO TO THE NEXT SLIDE, CARL.  ONE MORE.  NOW, I KNOW THIS

6  IS HARD, MR. LIVERS.  THIS IS THE INSIDE OF YOUR HOUSE.  CAN YOU

7  TELL US WHERE INSIDE YOUR HOUSE THAT IS?

8  A.  THIS WAS THE DEN.

9  Q.  YOUR DEN?

10  A.  YEAH.  I MEAN, NOT THE DEN, I'M SORRY.  I APOLOGIZE FOR THAT.

11  THIS WAS THE DINING ROOM.

12  Q.  NOW, WE SEE SOME FURNITURE AND THINGS IN THERE.  DO YOU

13  RECOGNIZE THESE?

14  A.  YES, YES, I DO.

15  Q.  AND WHAT ARE THEY?

16  A.  THESE WAS -- THIS PICKLED CHAIR WAS THE DINING ROOM SET, WENT

17  WITH THE DINING ROOM TABLE.

18  Q.  BUT IT'S IN THE DEN.  DO YOU KNOW HOW IT GOT THERE?

19  A.  THEY HAD A LOT OF STUFF THAT FLOAT.

20  Q.  I'M SORRY.  FLOAT?

21  A.  THEY HAD A LOT OF STUFF THAT FLOAT DIFFERENT PLACES.

22  Q.  CAN WE LOOK AT THE NEXT PHOTO.

23  A.  THAT'S THE TABLE.

24  Q.  AND WHICH ROOM IS THIS, MR. LIVERS?

25  A.  THIS WOULD BE THE LIVING ROOM.

1    Q.  AND CAN YOU TELL WHAT ROOM IT IS -- ARE THERE ANY FEATURES THAT

2    STAND OUT IN THE ROOM THAT TELL US?

3    A.  YEAH, BECAUSE THE AIR CONDITIONING.  BECAUSE THE FRONT PART WAS

4    CENTRAL HEAT, BUT NOT CENTRAL AIR.  THE ADDITION PART WAS CENTRAL

5    HEAT AND AIR.  THIS WAS A UNIT THAT USED TO TAKE CARE OF THE FRONT

6    PART.

7    Q.  SO WHEN YOU DID THAT ADDITION YOU PUT CENTRAL AIR AND HEAT IN

8    YOUR HOUSE?

9    A.  YEAH.

10   Q.  DID YOU DO ANYTHING ELSE FOR HEAT IN YOUR HOUSE THAT YOU ADDED

11   ON?

12   A.  I HAD A HEATER.  THERE WAS A CENTRAL HEATER I HAD REPLACED, BUT

13   IT WAS ABOUT FOUR YEARS OLD.

14   Q.  DID YOU HAVE ANY OTHER THINGS THAT HELPED YOU WITH THE HEAT IN

15   THE WINTER TIME THAT YOU HAD ADDED TO THE HOUSE?

16   A.  THE CENTRAL HEAT ON THE ADDITION PART AND THE OTHER PART IN THE

17   FRONT WAS WITH THE HEATER THAT I AM EXPLAINING TO YOU RIGHT NOW,

18   THAT IT WAS ABOUT FOUR YEARS OLD.  USED TO TAKE CARE OF THE FRONT

19   PART OF THE HOUSE.

20   Q.  WAS THERE A FIREPLACE IN THE HOUSE?

21   A.  IT WAS IN THE DEN.  I HAD ONE IN THE DEN.  A FIREPLACE WITH

22   STONE, MADE OUT OF STONE AND BRICKS, IT WAS IN THE DEN.  AND I HAD

23   ONE THAT WAS IN THE FRONT THAT MY WIFE HAD MENTIONED WAS A PORTABLE

24   ONE, SO SHE DIDN'T REALLY -- I DON'T THINK SHE REALLY MENTIONED

25   ABOUT THE ONE THAT WAS IN THE DEN, THAT WAS BACK THERE IN THE DEN

1  PART THAT WAS MADE OUT OF THE BRICK AND THE STONE AND THINGS LIKE

2  THAT.

3  Q.  WE'RE JUST GOING TO HAVE YOU HERE TODAY, MR. LIVERS, SO WE

4  ARE -- WE'LL JUST CONCENTRATE ON YOUR LIST.

5  A.  UH-HUH.

6  Q.  WAS THAT FIREPLACE SOMETHING THAT YOU ADDED AFTER YOU BOUGHT

7  THE HOUSE?

8  A.  THE FIREPLACE WAS WHAT I ADDED WHEN I PUT THE ADDITION ON.

9  Q.  DID YOU DO ANY WORK TO YOUR KITCHEN?

10  A.  YES.

11  Q.  WHAT DID YOU DO IN YOUR KITCHEN?

12  A.  MY KITCHEN WAS -- I HAD GOT TILE WORK DONE IN THE KITCHEN AND I

13  HAD THE CABINETS.  I HAD THEM ALL THE WAY AROUND THE ENTIRE KITCHEN

14  WITH A BROOM CLOSET AND ALL LIKE THAT.

15  Q.  WHAT KIND OF CABINETS WERE THEY?  WAS IT SOMETHING YOU BOUGHT

16  OFF THE RACK?

17  A.  IT WAS PICKLED.

18  Q.  PICKLED?

19  A.  UH-HUH.

20  Q.  DID YOU BUY THEM FROM A STORE?

21  A.  NO, I HAD THEM MADE.

22  Q.  THEY WERE MADE FOR YOUR HOUSE?

23  A.  YEAH, I HAD THEM MADE.

24  Q.  I THINK THAT THEY WERE LISTED ON THAT LIST OF ITEMS.

25  A.  YES, IT WAS.

1    Q.  WHEN THE HURRICANE CAME, KATRINA, WHAT DID YOU AND YOUR WIFE

2    DO?  WHERE DID Y'ALL GO?

3    A.  WE WENT TO BATON ROUGE TO A RELATIVE OF MY WIFE.

4    Q.  AND HOW LONG DID YOU STAY THERE?

5    A.  ABOUT A WEEK OR TWO.

6    Q.  DID YOU HAVE EXPENSES WHILE YOU WERE GONE?

7    A.  WELL, I WASN'T GOING TO GO TO PEOPLE HOUSE AND DON'T

8    CONTRIBUTE, DON'T HELP WITH THE GROCERIES AND DIFFERENT THINGS LIKE

9    THAT.  NOW, I HAD EXPENSE FOR MYSELF AT THE SAME TIME BECAUSE I

10   DIDN'T REALLY HAVE ANYTHING BUT WHAT I WAS WEARING.

11   Q.  DID YOU BRING THINGS -- DID YOU AND YOUR WIFE BRING THINGS WITH

12   YOU WHEN YOU LEFT?

13   A.  NO.

14   Q.  WHAT WAS YOUR EXPECTATION --

15   A.  MY EXPECTATION WAS THAT WE WOULD BE BACK HOME THE NEXT DAY WHEN

16   IT PASSED.

17   Q.  AFTER YOU LEFT -- YOU SAID YOU STAYED IN BATON ROUGE A COUPLE

18   OF WEEKS, RIGHT?

19   A.  YEAH.

20   Q.  WHERE DID YOU GO AFTER THAT?

21   A.  AFTER THAT I WENT BY MY DAUGHTER IN MARRERO.

22   Q.  AND HOW LONG DID YOU STAY THERE?

23   A.  THAT'S THE LONGEST I STAYED A COUPLE OF MONTHS THERE.

24   Q.  AND THEN AFTER YOUR DAUGHTER IN MARRERO, WHERE DID YOU GO?

25   A.  I FINALLY -- AFTER SEARCHING, I FINALLY FOUND AN APARTMENT.  IT

```
 1   WAS IN FOREST ISLE, THAT WAS THE NAME OF THE COMPLEX ITSELF.
 2   Q.  WHAT CITY IS THAT IN?
 3   A.  THAT WAS IN ALGIERS.
 4   Q.  AND DID YOU HAVE TO PAY RENT THERE?
 5   A.  WELL, YES.
 6   Q.  DID YOU HAVE ANY ASSISTANCE WITH THAT RENT?
 7   A.  I DON'T REMEMBER HAVING NO ASSISTANCE.
 8   Q.  SO YOU JUST PAID THE RENT?
 9   A.  I REMEMBER -- I REMEMBER WRITING CHECKS FOR THE RENT.
10   Q.  AND HOW LONG DID YOU STAY AT FOREST ISLES?
11   A.  WELL, I STAYED THERE FROM DECEMBER 22ND UNTIL APRIL 27TH OF
12   '06.  THAT'S WHEN I PURCHASED THE HOUSE IN GONZALES.
13   Q.  LET'S TALK ABOUT AFTER KATRINA WHILE YOU WERE LIVING IN THESE
14   DIFFERENT PLACES.  WHEN WAS THE FIRST TIME YOU WENT BACK TO YOUR
15   HOUSE IN ST. CLAUDE?
16   A.  WHEN THEY ALLOWED ME TO GO BACK.
17   Q.  WHEN WHO ALLOWED YOU TO GO BACK?
18   A.  THE NATIONAL GUARDS WAS DOWN THERE ON ST. CLAUDE BY THE BRIDGE
19   AND CLAIBORNE BY THE BRIDGE.
20   Q.  DID THEY KEEP YOU FROM GOING BACK TO YOUR PROPERTY?
21   A.  WELL, YEAH.  YOU COULDN'T -- YOU COULDN'T GO BACK UNTIL THE
22   CITY WOULD ALLOW YOU TO GO BACK AND INSPECT YOUR PROPERTY.
23   Q.  AND DO YOU REMEMBER ABOUT HOW LONG THAT WAS?
24   A.  I REALLY DON'T.
25   Q.  WEEKS, MONTHS?
```

```
 1    A.  IT WAS WEEKS.

 2    Q.  AND WHEN YOU WENT BACK, WHAT WERE THE THINGS THAT YOU DID?

 3    A.  THE THINGS THAT I DID WHEN I WENT BACK, I CRIED WAS THE FIRST

 4    THING.  I HAD BURIED MY MOM IN JULY AND I STOOD UP GOOD FOR MY

 5    BROTHERS AND MY SISTERS, BUT I DIDN'T STAND UP GOOD WHEN I SEEN

 6    THAT HOUSE.

 7    Q.  WHEN WAS THE FIRST TIME THAT YOU KNEW THAT YOUR HOUSE HAD

 8    FLOODED?

 9    A.  ACTUALLY, ME AND MY WIFE WAS IN BATON ROUGE.  WHEN WE WAS IN

10    BATON ROUGE WE WERE LOOKING AT TELEVISION BUT I WAS IN ANOTHER

11    ROOM, SHE WAS IN ANOTHER ROOM BECAUSE IT WAS DIFFERENT TVS.  SHE

12    CALLED ME.  SHE CALLED ME AND CNN.  NOW, HOW THEY GOT THE PICTURES,

13    I DON'T KNOW.

14    Q.  WHAT PICTURES?

15    A.  THE PICTURES THEY WERE SHOWING ON THE TV.  I ACTUALLY, I

16    ACTUALLY SAW MY HOUSE.

17    Q.  AND WHERE WAS -- WHAT DID YOU SEE?  WAS THERE ANY WATER?

18    A.  WATER.

19    Q.  HOW DID YOU KNOW IT WAS YOUR HOUSE?

20    A.  BECAUSE I SAW.  THE WAY WHEN THEY WAS FILMING IT, I SAW THE

21    ST. CLAUDE BRIDGE.  I KNOW THE DIFFERENCE FROM THE ST. CLAUDE THAN

22    THE CLAIBORNE.  I SAW THE ST. CLAUDE BRIDGE WHEN THEY WAS FILMING

23    IT.  NOW, WHAT THEY WAS IN OR HOW DID THEY FILM IT, I DON'T KNOW.

24    BUT MY WIFE SAID, "OH, LORD.  THAT LOOK LIKE OUR HOUSE," AND I

25    REALLY TRIED TO BRUSH IT OFF, BUT I KNEW IT WAS.  BECAUSE MY HOUSE
```

```
 1   ON THE SIDE OF THAT BRIDGE WAS THE ONLY CAMELBACK IN THAT BLOCK.

 2   Q.  AND WHAT PARTS OF YOUR HOUSE COULD YOU SEE?

 3   A.  WELL, I SAW THE TOP PART.

 4   Q.  THE CAMEL, THE BACK?

 5   A.  THE BACK CAMELBACK PART.  I THINK THE REST WAS LIKE UP TO THE

 6   SOFFIKAS (PHONETIC) AND DIFFERENT THINGS LIKE THAT THERE.

 7   Q.  YOU SAID YOU SAW THAT ON TV?

 8   A.  I DID.

 9   Q.  WHEN YOU WENT BACK TO YOUR HOUSE THE FIRST TIME, WERE YOU

10   PREPARED FOR WHAT YOU SAW?

11   A.  NO.

12   Q.  TELL US WHY.

13   A.  I TELL YOU WHY.  BECAUSE IT TOOK ME 30 YEARS TO PAY FOR THAT

14   HOUSE.  I WORK HARD.  I HAD ODD JOBS THAT I WORK IN THE SHIPYARD.

15   IT WASN'T STEADY, BUT I HUNG IN THERE.  AND WHEN I REALLY SEEN MY

16   HOUSE, MY WHOLE -- THE WHOLE DREAM I HAD LOOKED LIKE IT JUST WENT

17   UP IN SMOKES.

18   Q.  HAD YOU PAID OFF YOUR HOUSE BEFORE?

19   A.  I HAD PAID OFF MY HOUSE IN -- AND IT WAS IN -- LIKE, A YEAR

20   BEFORE I RETIRED.  I WAS LOOKING FOR THE AMERICAN DREAM THAT

21   EVERYBODY IS ENTITLED TO.

22   Q.  HAD YOU RETIRED BEFORE KATRINA?

23   A.  YES.

24   Q.  DESCRIBE, IF YOU WILL, WHAT, LIKE, A NORMAL WEEK WAS LIKE FOR

25   YOU BEFORE KATRINA.
```

1   A.  BEFORE KATRINA, A NORMAL WEEK WAS I HAD -- I HAD NEIGHBORS THAT

2   I CAN TALK TO.  THEY WAS GOOD NEIGHBORS ON EACH SIDE.  I HAD AN

3   AREA WHICH WAS SUPPOSED TO BE AN EXTERIOR AREA WHERE MY HOUSE WAS

4   IN THE BEGINNING WHERE THEY HAD A COLLEGE BACK THERE CALLED HOLY

5   CROSS.  I USED TO WALK OVER THERE, WATCH THEM PLAY BASEBALL.  MY

6   SON USED TO COME GET ME TO GO FISHING.  I HAD THINGS WHERE I COULD

7   JUST -- PLACES I COULD JUST WALK AND GO TO OR DIDN'T EVEN HAVE TO

8   WORRY ABOUT CATCHING THE BUS AND DIFFERENT THINGS LIKE THAT.

9   Q.  DID YOU HAVE ANY RELATIVES IN YOUR NEIGHBORHOOD?

10  A.  YES, ALL OF MY FAMILY WAS DOWN THERE.

11  Q.  DID ALL OF YOUR FAMILY'S HOUSES HAVE THE SAME THING HAPPEN TO

12  THEM IN KATRINA?

13  A.  YES, THEY DID.

14  Q.  DID YOU DO THINGS AROUND YOUR HOUSE BEFORE KATRINA?

15  A.  BEFORE KATRINA?

16  Q.  YES.

17  A.  WELL, I TOOK, LIKE, MY LAWN CHAIRS AND STUFF LIKE THAT THERE I

18  HAD, I JUST TOOK THEM AND TRIED TO PUT THEM IN A SECURE PLACE OR

19  SOMETHING LIKE THAT THERE.

20  Q.  YEAH, WE'RE TALKING ABOUT IN THE YEAR OR SO LEADING UP TO

21  KATRINA, DID YOU HAVE -- DID YOU DO ANY MAINTENANCE-TYPE THINGS

22  AROUND YOUR HOUSE?  JUST ON A NORMAL, WEEKLY BASIS.

23  A.  WELL, YEAH, I DID MAINTENANCE AROUND THE HOUSE.  I MUST HAVE

24  PAINT THE HOUSE MORE THAN -- THE PART WHERE THE T1-11 AT, I MUST

25  HAVE PAINT THAT MORE THAN ANYBODY IN THE BLOCK BECAUSE THEY USED TO

1   TEASE ME ABOUT IT.

2   Q.  NOW, AFTER KATRINA AND NOW THAT YOU'VE MOVED TO GONZALES, HOW

3   IS YOUR LIFE DIFFERENT?

4   A.  WELL, MY LIFE IS DIFFERENT IN THIS WAY:  MY NEIGHBORS ARE FINE

5   BUT AS FAR AS FOR BEING LIKE IT WAS IN NEW ORLEANS, IT'S NOT.  FOR

6   THE SIMPLE REASON I WAS OUT THERE, I BEEN OUT THERE ABOUT OVER FIVE

7   YEARS NOW AND I NEVER DROVE MY CAR AT NIGHT, BECAUSE THIS IS THE

8   DIFFERENCE:  IN THE CITY I WAS ABLE TO DO THESE TYPE OF THINGS

9   BECAUSE WE HAD STREET LIGHTS ON EVERY OTHER CORNER, DIFFERENT

10  THINGS LIKE THAT.  BUT IN THE AREA THAT I'M IN NOW IN GONZALES,

11  I'LL BE HONEST, THE REASON WHY I NEVER REALLY GOT IN TO DOING THIS

12  BECAUSE YOU GOT, YOU GOT -- THE ROADS ARE DIFFERENT.  YOU GOT A

13  TWO-LANE HIGHWAY AND DIFFERENT THINGS LIKE THAT.  AND I AM NOT

14  FAMILIAR, AS LONG AS I BEEN OUT THERE, I AM NOT FAMILIAR WITH THE

15  WHOLE PARISH AS IT IS.

16  Q.  HAD YOU LIVED YOUR WHOLE LIFE BEFORE KATRINA IN THE LOWER NINTH

17  WARD?

18  A.  YES, I WAS BORN AND RAISED DOWN THERE.

19  Q.  WHEN YOU CAME BACK TO SEE YOUR HOUSE AFTER KATRINA, DID YOU DO

20  ANYTHING TO THE -- DID YOU START DOING ANYTHING TO THE HOUSE, ANY

21  WORK?

22  A.  I CLEAN IT OUT.

23  Q.  HOW FAR DID YOU CLEAN IT OUT, THE THINGS INSIDE?

24  A.  I GUT THE WHOLE THING OUT.

25  Q.  YOU GUTTED IT ALL OUT?

1  A.  YEAH.  THROWED IT OUT, STACK IT ON THE ROAD, I HAD HELP WITH MY

2  WIFE'S COUSIN, BUT I DID ALL OF THE WORK MYSELF DOING ALL OF THAT.

3  Q.  HOW OLD WERE YOU AT THE TIME?

4  A.  SIXTY-FIVE.

5  Q.  YOU WERE DOING ALL OF THIS WORK YOURSELF?

6  A.  WELL, I HAD TO.  I HAD HELP FOR TWO DAYS AND THAT WAS MY WIFE'S

7  COUSIN.

8  Q.  DID YOU HAVE INTENTIONS ON MOVING BACK TO YOUR HOUSE ON

9  ST. CLAUDE?

10  A.  OH, YEAH, I HAD INTENTIONS.  I HAD INTENTION.  I WENT TO GET A

11  PERMIT, AND I HAD TO GO EARLY IN THE MORNING BECAUSE IT LOOKED LIKE

12  IT WAS A SAINTS GAME.  THAT'S HOW MANY PEOPLE WAS GETTING PERMITS

13  TO TRY TO RESTORE THEIR HOUSE BACK AND THINGS LIKE THAT.  YEAH, I

14  HAD INTENTIONS.

15  Q.  WHAT KIND OF THINGS DID YOU DO?  WHAT KIND OF THINGS DID YOU DO

16  AFTER YOU GUTTED THE HOUSE?

17  A.  AFTER I GUTTED THE HOUSE, I HAD ALL OF THE STUDS WAS CLEANED,

18  THE BAD ONES, IF THEY WAS BAD, I REPLACED THEM; BUT FOR STARTING

19  THE WIRING, I DIDN'T DO THAT.

20  Q.  WHAT HAPPENED WITH THE WIRING?

21  A.  WELL, EVENTUALLY THAT'S THE PART GOT UGLY, BECAUSE REGARDLESS

22  OF HOW YOU FEEL OR WHAT YOU GO THROUGH THEY STILL GOT PEOPLE

23  WAITING FOR OPPORTUNITIES, AND THEY STOLE MY WIRE AT FIRST.

24  Q.  SO AFTER YOU PUT ALL OF THIS WIRE BACK IN THE HOUSE?

25  A.  I HAD PUT WIRE BACK AND ROUGHED IT IN.  IT WASN'T WHERE I WAS

1   PUT THEM IN THE PLUG AND THINGS LIKE THAT.  THAT WASN'T ME THAT DID

2   IT.  THEY GOT IT ALL ROUGHED IN AND DIFFERENT THINGS LIKE THAT

3   THERE.  THEY STOLE THE WIRE OUT OF IT.

4   Q.  DID THAT DISCOURAGE YOU?

5   A.  YES, IT DID IN A WAY.  BUT I WENT ON, AND THE NEXT TIME -- THE

6   NEXT TIME THE STUFF THAT I WOULD BRING, LIKE, THE TWO-BY-FOURS THAT

7   I HAD THAT I WAS GOING TO USE, WELL, THEY DISAPPEARED, TOO.

8   Q.  SO DID THAT HAVE AN EFFECT ON WHETHER OR NOT YOU ULTIMATELY

9   DECIDED TO MOVE BACK?

10  A.  YES.  ALONG WITH ME AND MY WIFE, WE HAVE CONDITIONS, MEDICAL

11  CONDITIONS.

12  Q.  YES, SIR.

13  A.  THERE WAS NO HOSPITAL THERE, THERE WAS NO GROCERIES.  THERE WAS

14  ACTUALLY WHEN THE TIME THAT I AM TALKING THERE WAS NOTHING REALLY

15  AVAILABLE; AND JUST LIKE I ENJOYED THE HOUSE, WE HAD TO SIT DOWN

16  AND REALLY, REALLY GO THROUGH WHETHER WE WERE GOING TO STAY OR

17  WHETHER WE WAS GOING TO LEAVE.  BECAUSE LIKE I SAID, SHE WAS

18  INVOLVED IN THE MINISTRY AND SHE WAS INVOLVED DEARLY.

19          SO WE HAD TO SIT DOWN AND FIGURE THAT OUT.  AND WHEN WE

20  CAME TO THE CONCLUSION THAT WE COULDN'T HANG NO MORE, WE COULDN'T

21  REALLY STAY ANYMORE BECAUSE OF JUST WHAT I'M TELLING YOU.  I HAD

22  GLAUCOMA.  I HAD TO FIND SOME WAY TO GO OVER THE RIVER TO GET A

23  DOCTOR SO I COULD CONTINUE MY PROCEDURES.  SO IT WAS THINGS LIKE

24  THAT THAT WE THOUGHT ABOUT BEFORE WE REALLY LEFT.

25          I GOT HIGH BLOOD PRESSURE.  I HAD TO GET MY MEDICATION

```
1    FOR THAT, TOO.  BUT I DIDN'T HAVE THE SAME DOCTOR SO WE HAD TO
2    THINK ON THAT.  BUT WE WAS OVER THE RIVER BY MY DAUGHTER, IT'S
3    TRUE, BUT AT THAT TIME THEY DIDN'T EVEN REALLY HAVE TOO MUCH TO
4    EVEN GET GAS.  BECAUSE AT ONE TIME WE WENT WAY TO BOUTTE TO GET GAS
5    BECAUSE WE TALKING ABOUT A CITY THAT WAS COMPLETELY CRIPPLED, BUT
6    NOT ON THAT SIDE.  BUT YOU HAD -- BUT IT CAUSED A LOT OF ELECTRIC
7    OUT WHERE YOU HAD TO GO A GOOD DISTANCE FOR TO GET GAS AND
8    DIFFERENT THINGS LIKE THAT.  IT'S THINGS WHERE -- YOU KNOW, YOU
9    LOST SOMETHING BUT IT GOT TO A POINT WHERE WE HAD TO MAKE A
10   DECISION TO TURN IT LOOSE.
11   Q.  MR. LIVERS, I WOULD LIKE TO TALK TO YOU A LITTLE BIT ABOUT.
12   YOU HAD WIND INSURANCE WITH STATE FARM; IS THAT CORRECT?
13   A.  YES, I DID.
14   Q.  AND DID YOU RECEIVE SOME CHECKS FROM STATE FARM?
15   A.  YES, I DID.
16   Q.  DO YOU REMEMBER HOW MUCH THE CHECKS WERE?
17   A.  I CAN GIVE YOU A ROUGH IDEA, NOT TO THE PENNY.  BECAUSE ONE
18   WAS, LIKE, $2,000; THE OTHER ONE WAS LIKE 11,000 SOME ODD DOLLARS.
19   ALTOGETHER IT WAS LIKE 13,000 SOME ODD DOLLARS.
20   Q.  SO IF I SUGGESTED TO YOU THAT THE ONE CHECK MIGHT BE 2,356.71,
21   DOES THAT SOUND RIGHT?
22   A.  THEY -- YEAH, I HAD TWO CHECKS.
23   Q.  AND ANOTHER CHECK FOR 11,304.11.  DOES THAT SOUND RIGHT?
24   A.  I HAD TWO CHECKS.
25            MR. JERALD ANDRY:  TENDER THE WITNESS, YOUR HONOR.
```

```
 1                    THE COURT:  THANK YOU, SIR.

 2                    MR. JERALD ANDRY:  THANK YOU, MR. LIVERS.

 3                    THE WITNESS:  YOU'RE WELCOME.

 4                    MR. JERALD ANDRY:  AND YOU HAVE SOME MORE QUESTIONS

 5      COMING.

 6                    THE WITNESS:  I DON'T MIND.

 7                              CROSS-EXAMINATION

 8      BY MR. FARRELL:

 9      Q.  GOOD MORNING, YOUR HONOR.  GOOD MORNING, MR. LIVERS.

10      A.  GOOD MORNING.

11      Q.  DO YOU REMEMBER WE MET LAST YEAR?  MY NAME IS CHRIS FARRELL.

12      A.  YES, YES, I DO.

13                    MR. FARRELL:  JUST A HOUSEKEEPING MATTER FOR THE COURT,

14      YOUR HONOR.  I HAVE SOME EXHIBITS HERE IN HARD COPY.  WE ARE GOING

15      TO PUT THEM UP ON THE SCREEN AS WELL, BUT THERE ARE A FEW I WOULD

16      LIKE TO HAND TO MR. LIVERS.  WHEN THAT COMES, I'LL ASK PERMISSION

17      TO APPROACH.

18                    THE COURT:  ALL RIGHT.

19                    MR. JERALD ANDRY:  DO YOU HAVE COPIES YOU CAN GIVE ME

20      BEFORE?

21                    MR. FARRELL:  IF I WIND UP USING THEM, I WILL GIVE YOU

22      COPIES.

23      BY MR. FARRELL:

24      Q.  MR. LIVERS, I JUST WANT TO PIGGYBACK OFF OF A QUESTION

25      MR. LANDRY HAD ASKED YOU THIS MORNING.  YOU HAD MENTIONED WHEN YOU
```

1  FIRST GOT BACK TO YOUR HOUSE WHETHER YOU WERE ABLE TO SALVAGE

2  ANYTHING FROM THE HOME.  DO YOU REMEMBER HIM ASKING YOU THAT?

3  A.  YES, I REMEMBER HIM ASKING ME THAT.

4  Q.  I THINK YOU SAID THIS MORNING THAT YOU WEREN'T ABLE TO SALVAGE

5  ANYTHING FROM THE HOUSE AT ALL; IS THAT CORRECT?

6  A.  I DID, I DID.

7  Q.  WERE YOU ABLE TO SALVAGE ANYTHING FROM THE SECOND FLOOR?  YOU

8  MENTIONED IT WAS A CAMELBACK HOUSE.  DID YOU TAKE ANYTHING OUT OF

9  THE SECOND FLOOR?

10  A.  CORRECTION, I DID.

11  Q.  AND WHAT WAS THAT?

12  A.  IT WAS A BEDROOM FRAME.  IT WAS THE HEAD -- IT WAS THE HEAD

13  BOARD AND THE FOOT BOARD AND TWO RAILINGS.  IT WAS A PIECE OF

14  FURNITURE THAT WE HAD GOT FROM ROSENBERG.  AND IT HAD THE STENCH,

15  BUT WE WAS ABLE TO SALVAGE THAT BECAUSE IT WAS FOR SENTIMENTAL

16  REASONS THAT WE SALVAGED THAT, YOU'RE CORRECT.

17  Q.  I THOUGHT I HAD REMEMBERED THAT.  THANK YOU.  MR. ANDRY WAS

18  JUST ASKING YOU ABOUT YOUR INSURANCE POLICY WITH STATE FARM.  THAT

19  WAS THE HOMEOWNERS WIND AND RAIN INSURANCE POLICY, RIGHT?

20  A.  RIGHT.

21  Q.  YOU DID NOT HAVE ANY FLOOD INSURANCE?

22  A.  NO, I DID NOT HAVE ANY FLOOD INSURANCE.  I WAS DECLARED AS

23  IN -- NOT IN A FLOOD AREA WHEN I BOUGHT THE HOUSE, BECAUSE THAT WAS

24  THE SILLY PART ON ME.

25  Q.  YOU MENTIONED TO MR. ANDRY THAT STATE FARM HAD MADE SOME

1  PAYMENTS UNDER THAT POLICY TO YOU?

2  A.  THEY DID.

3  Q.  AND THAT THOSE PAYMENTS CAME IN STEPS, IN INCREMENTS?

4  A.  YES.  THIS IS HOW THEY CAME IN STEPS -- THE FIRST ADJUSTER CAME

5  OUT AND HE REFUSED TO PAY ME FOR THE WHOLE FENCE.  HE WANTED TO PAY

6  ME FOR THREE OR FOUR BOARDS OR WHATEVER HE HAD IN MIND.

7  Q.  AND SO HE --

8  A.  OKAY.  WAIT.  LET ME FINISH.

9  Q.  I'M SORRY, GO AHEAD.

10  A.  THAT WAS THE FIRST ADJUSTER.  HE THEN WENT ON THE CAMELBACK AND

11  HE SURVEYED THE ROOF AND HE COME BACK AND HE WAS TELLING ME, WELL,

12  THE ROOF, THE ROOF IS CHIPPED UP HERE -- IN OTHER WORDS, I DID NOT

13  LIKE HIS EVALUATION OF MY PROPERTY.  AND AS A POLICYHOLDER IT WAS

14  MY RIGHT TO CALL MY INSURANCE AND LET THEM KNOW THAT I DIDN'T LIKE

15  IT.

16  Q.  THAT'S RIGHT.

17  A.  SO THEY TOLD ME I CAN GET ANOTHER ADJUSTER, AND I GOT AN

18  ADJUSTER THAT CAME FROM TEXAS AND HE WRITTEN THE SECOND POLICY THAT

19  BROUGHT ME TO THE ELEVEN HUNDRED SOME ODD DOLLARS -- 11,000 SOME

20  ODD DOLLARS.

21  Q.  I REMEMBER US TALKING ABOUT THAT, THAT'S RIGHT.  I ACTUALLY

22  WANT TO SHOW YOU A COUPLE OF DOCUMENTS TO ASK YOU A COUPLE OF

23  QUESTIONS ABOUT THAT FIRST ADJUSTER'S TRIP OUT.  I AM GOING TO SHOW

24  YOU ON THE SCREEN, AND I WILL GIVE YOU A COPY AS WELL, OF JX 1492.

25  A.  I DON'T KNOW THE NUMBERS.  I'LL BE HONEST.

```
 1              THE COURT:  HE IS GOING TO SHOW YOU ON THE SCREEN FIRST.

 2   AND WHY DOES HE HAVE -- WHY DO YOU HAVE TO GO UP THERE, JUST I'M

 3   WONDERING SIR, YOU JUST TELL ME THE REASON.

 4              MR. FARRELL:  THIS ONE IT'S LESS -- THERE'S LESS OF A

 5   REASON FOR THIS DOCUMENT, YOUR HONOR, BUT WE HAVE SOME ADDITIONAL

 6   PHOTOGRAPHS THAT I WOULD JUST ASK HIM TO FLIP THROUGH RATHER THAN

 7   FLIP THROUGH SCREEN BY SCREEN.  IT MIGHT JUST BE EASY EASIER FOR

 8   HIM TO LOOK.

 9              THE COURT:  ALL RIGHT.  IT'S YOUR TIME.

10              MR. JERALD ANDRY:  YOUR HONOR, WE WOULD OBJECT TO THE

11   INTRODUCTION OF ANY OF THIS EVIDENCE.

12              THE COURT:  I CAN'T HEAR YOU, SIR.

13              MR. JERALD ANDRY:  YOUR HONOR, WE WOULD OBJECT TO THE

14   INSTRUCTION OF ANY OF THIS EVIDENCE REGARDING THE WIND POLICY.

15   THERE'S ALREADY BEEN A MOTION IN LIMINE AND YOU'VE ALREADY RULED ON

16   THAT, I BELIEVE.

17              THE COURT:  WELL --

18              MR. JERALD ANDRY:  IT'S HEARSAY, YOUR HONOR, AND THE

19   AMOUNTS ARE ALREADY IN EVIDENCE.  WE'VE ALREADY COVERED THAT.

20              THE COURT:  OKAY.

21              MR. FARRELL:  YOUR HONOR, IF I MAY, I AM NOT TRYING TO

22   INTRODUCE THIS TO DISCUSS THE AMOUNTS THAT ARE IN, BUT I BELIEVE IN

23   YOUR HONOR'S ORDER ON THAT MOTION IN LIMINE --

24              THE COURT:  THE WIND POLICY I REGARDED AS NOT A

25   COLLATERAL SOURCE BECAUSE IT WAS NOT THE RESULT OF FLOOD, AND
```

1    THEREFORE, THAT'S -- IT'S NOT -- YOU'RE NOT SEEKING WIND DAMAGE

2    HERE BUT FLOOD DAMAGE.  SO TO THAT EXTENT, I SAID IT COULD COME IN.

3            MR. FARRELL:  THAT'S CORRECT AND THAT'S ALL WE'RE TRYING

4    TO SHOW.  THIS IS JUST A WIND AND RAIN POLICY AND IT'S JUST --

5            THE COURT:  I COMPLETELY UNDERSTAND AND SO FAR I

6    UNDERSTAND THAT HE'S BEEN PAID NEAR $14,000 TOTAL ON THE POLICY.

7    THAT'S WHAT I UNDERSTAND THUS FAR.

8            MR. FARRELL:  YES.  MAY I PROCEED WITH THE -- I'M SORRY.

9    I AM NOT CLEAR ON THE RESOLUTION OF THE OBJECTION.

10           THE COURT:  I AM NOT CLEAR ON THE OBJECTION ITSELF.  WHAT

11   IS IT YOU'RE ATTEMPTING TO --

12           MR. FARRELL:  I AM JUST ATTEMPTING TO SHOW WITH THIS

13   DOCUMENT AND THEN WITH A SEPARATE DOCUMENT THE ADDITIONAL DOCUMENT

14   MR. LIVERS REFERENCED WHAT EXACTLY STATE FARM COVERED, WHICH

15   PORTIONS OF HIS PROPERTY WERE SEEN AS WIND AND RAIN DAMAGE.

16           MR. JERALD ANDRY:  YOUR HONOR, WE, ONCE AGAIN, BELIEVE

17   THAT'S HEARSAY.  THE AMOUNTS THAT MR. --

18           THE COURT:  OPINIONS OF THE ADJUSTER, AS I SAID, ARE NOT

19   COMING IN, THEY'RE NOT.

20           MR. FARRELL:  UNDERSTOOD.  AND AGAIN --

21           THE COURT:  I AM NOT QUITE SURE WHERE WE'RE GETTING.  ARE

22   WE GETTING TO THE VALUE OF THE HOME?

23           MR. FARRELL:  NO, JUST THE PORTIONS OF THE HOME THAT ARE

24   DAMAGED BY WIND, THE PARTS OF THE HOUSE FOR WHICH THE PLAINTIFFS

25   HAVE ALREADY BEEN COMPENSATED.

1          THE COURT:  ALL RIGHT.  JUST FOR THAT LIMITED PURPOSE.

2     ARE YOU SAYING THAT I SHOULD THEN ASSESS MORE THAN -- IN OTHER

3     WORDS, IS THE ULTIMATE ARGUMENT GOING TO BE THERE WAS ACTUALLY MORE

4     DAMAGE BY WIND THAN BY WATER THAN HE WAS PAID FOR?  IS THAT WHERE

5     WE'RE GOING?

6          MR. FARRELL:  NO, YOUR HONOR.

7          THE COURT:  WELL, WHERE ARE WE GOING WITH THIS?

8          MR. FARRELL:  JUST TRYING TO MAKE THE RECORD OF WHAT HAS

9     BEEN COVERED AND WHAT WAS REIMBURSED UNDER THE WIND AND RAIN

10    POLICY.  FOR EXAMPLE, HE MENTIONED THE ROOF OF HIS HOUSE, STATE

11    FARM PAID FOR THE ROOF.  SO THIS DOCUMENT WOULD SHOW THE ROOF, THE

12    FENCING.  AND THEN WHEN THE SECOND ADJUSTER CAME BACK THERE WAS A

13    REVISION UPWARDS BECAUSE --

14         THE COURT:  I UNDERSTAND HE SAID THAT.  I AM NOT SURE

15    WHAT -- HOW I AM BEING ENLIGHTENED.  AGAIN, IT'S YOUR TIME.  IT'S

16    YOUR TIME.  IT'S COMPLETELY, FRANKLY, HARMLESS, SO FAR AS I CAN SEE

17    RIGHT NOW.  PERHAPS IRRELEVANT AND REDUNDANT, BUT AGAIN, IT'S THEIR

18    TIME.  AND THIS IS -- AND THESE OBJECTIONS ARE ABOUT TO GO ON YOUR

19    TIME, SO MAKE IT PRECISE.  WHAT'S THE OBJECTION?

20         MR. JERALD ANDRY:  PRECISELY THE INDICATIONS ARE FROM

21    THE -- THAT THE DOCUMENT -- IN THE DOCUMENT THERE ARE INDICATIONS

22    FROM THE ADJUSTER AS TO WHAT THEY THOUGHT IT WAS, AND ALL OF THAT

23    IS HEARSAY.  THE AMOUNTS WE DON'T OBJECT TO.

24         THE COURT:  WHATEVER IT IS, I AM NOT GOING TO PAY ANY

25    ATTENTION TO IT NOR WILL THE COURT OF APPEAL BECAUSE IT IS.  AND

1  I'VE ALREADY ASKED COUNSEL IF THAT'S HIS PURPOSE AND HE SAID TO ME,

2  "NO."

3           MR. FARRELL:  THAT'S CORRECT.  AND I WILL BE VERY BRIEF

4  WITH THESE, YOUR HONOR.

5           THE COURT:  LET'S GO AHEAD.  IT COULD BE REDUNDANT,

6  UNLESS IT CONTRADICTS WHAT HE'S ALREADY SAID.

7  BY MR. FARRELL:

8  Q.  SO, MR. LIVERS, I AM GOING TO PUT UP ON THE SCREEN FOR YOU JX

9  1492.  JUST VERY BRIEFLY, DO YOU RECOGNIZE THIS DOCUMENT?

10  A.  (WITNESS REVIEWS DOCUMENT.)

11  Q.  LET ME SEE IF I CAN HELP YOU.  DO YOU SEE YOUR NAME AT THE TOP

12  UPPER LEFT-HAND CORNER OF THIS DOCUMENT, MR. LIVERS?

13  A.  YES, I DO.  YEAH, MAKE IT BIGGER.

14  Q.  DO YOU SEE YOUR ADDRESS BELOW THAT?

15  A.  YES, I DO.  4924 --

16  Q.  DO YOU RECALL RECEIVING THIS DOCUMENT?

17  A.  HUH?

18  Q.  DO YOU RECALL RECEIVING THIS DOCUMENT?

19  A.  IS IT FROM STATE FARM?  I MUST HAVE SEEN IT.

20  Q.  I'M SORRY, CAN YOU SPEAK A LITTLE LOUDER?

21  A.  IF IT'S FROM STATE FARM, IT MUST BE RECEIVED IT.

22           MR. JERALD ANDRY:  YOUR HONOR, WE WOULD NOTE OUR

23  CONTINUING OBJECTION TO RELEVANCE.

24           THE COURT:  I UNDERSTAND.  ALL OBJECTIONS ARE CONTINUING

25  FROM HERE TO ETERNITY.

```
 1   BY MR. FARRELL:
 2   Q.  I JUST WANT YOU TO TURN -- CAN WE CLICK OVER TO PAGE 0004.
 3           THE COURT:  AND I MAY BE INTERPOSING AN OBJECTION SOON,
 4   SO GO AHEAD.
 5   BY MR. FARRELL:
 6   Q.  JUST TRYING TO CONFIRM WHAT YOU HAD SAID EARLIER.  YOU SAID THE
 7   ADJUSTER WENT ON YOUR ROOF.  DO YOU SEE THE UPPER LEFT-HAND CORNER
 8   OF THIS DOCUMENT?
 9   A.  OKAY.  SO WHAT YOU -- REPEAT YOURSELF.  WHAT YOU WANT ME TO
10   LOOK FOR?
11   Q.  THAT'S OKAY.  I WAS JUST ASKING WHETHER YOU HAD SEEN THIS
12   DOCUMENT BEFORE AND WHETHER IT CONFIRMS THAT WHAT YOU HAD JUST SAID
13   THAT STATE FARM HAD COME OUT AND LOOKED AT YOUR ROOF AND LOOKED AT
14   YOUR FENCE.
15   A.  AND I ALSO SAID IT WAS TWO ADJUSTERS.
16   Q.  AND I AM JUST SPEAKING ABOUT THAT FIRST ADJUSTER.
17   A.  I CANNOT -- I CANNOT TELL YOU WHAT HE LOOKED LIKE, WHEN DID HE
18   COME.
19   Q.  OKAY.
20   A.  BECAUSE HE CAME WHEN I WASN'T EVEN THERE.  THAT WAS ONE OF MY
21   BIGGEST ARGUMENTS TO MY INSURANCE COMPANY.
22   Q.  LET ME MOVE ON FROM THIS DOCUMENT.  YOU MENTIONED THAT THERE
23   WAS A SECOND ADJUSTER THAT CAME OUT TO YOUR PROPERTY?
24   A.  YES, I DID.
25   Q.  HE CAME FROM TEXAS?
```

1    A.  YES, HE DID.

2    Q.  AND HE TOOK A LOOK AT YOUR PROPERTY AND YOU MENTION THAT HE

3    GAVE YOU -- HE TOOK ANOTHER LOOK AND SAID YOU WERE ENTITLED TO MORE

4    MONEY, ANOTHER RECOVERY?

5    A.  YES.

6    Q.  CORRECT, YES.  AND SPECIFICALLY HE SAID THAT YOU WERE ENTITLED

7    TO RECOVER FOR YOUR MASTER BEDROOM ON THE SECOND FLOOR?

8    A.  HE SURE DID.

9    Q.  AND THE OTHER ROOM ON THE SECOND FLOOR?

10   A.  THIS IS WHY HE SAID IT, BECAUSE THE WINDOW WAS BROKE OUT OF

11   THERE COMPLETELY.  THE FIRST ADJUSTER, HE DIDN'T EVEN -- HE DIDN'T

12   EVEN BOTHER TO LOOK UP THERE.  OKAY.

13   Q.  YES.

14   A.  THE SECOND, THE SECOND THING WAS THE PATIO DOORS.

15   Q.  THE PATIO DOORS ON THE FIRST FLOOR?

16   A.  ON THE FIRST FLOOR.  THEY WAS OUT, THEY WAS BUSTED.  HE -- HE

17   EXPLAINED TO ME LIKE HE WAS THERE WHEN KATRINA PASSED.  AND WHAT I

18   MEAN BY THAT, HE SAID LOOKED LIKE SOMETHING IN THE INSIDE FLOAT AND

19   BROKE IT.  SO I WASN'T GOING TO TOLERATE THAT.  I WORK TOO HARD FOR

20   THE STUFF I LOST.  I WAS NOT GOING TO TOLERATE THAT, SO I GOT

21   ANOTHER ADJUSTER, AND HE COME BACK OUT AND HE TOLD ME THAT HE'S NOT

22   GOING TO GIVE ME NO MONEY FOR NO TWO, THREE BOARDS BECAUSE THE

23   WHOLE FENCE NEED TO BE REPLACED PLUS THE COSTS THAT IT WAS GOING TO

24   BE FOR ME TO GET IT REPLACED.  SO THAT'S THE KIND OF ADJUSTER THAT

25   CAME OUT THE SECOND TIME.

1  Q.  THE SECOND ADJUSTER ALSO COVERED YOU FOR THE IRON DOORS ON THE

2  FIRST FLOOR, RIGHT?

3  A.  HE DID.  HE DID.

4  Q.  AND YOUR FRONT DOOR?

5  A.  THE IRON DOORS IN THE FRONT, HE COVERED THAT.  IT WASN'T NO

6  FRONT DOOR, THE ENTRY DOOR.  IT WAS JUST THE IRON DOORS THAT YOU

7  COME THROUGH FIRST BEFORE YOU GET TO THE ENTRY DOOR.

8  Q.  I SEE, I UNDERSTAND.  AND ALSO YOUR SHED IN THE BACK WE WERE

9  DISCUSSING EARLIER?

10  A.  YES, HE DID.

11  Q.  I WOULD LIKE TO SHOW YOU NOW WHAT'S BEEN MARKED AS JX 1495.

12          MR. FARRELL:  YOUR HONOR, THIS IS ONE OF THE GROUPS OF

13  PHOTOGRAPHS I WAS JUST DISCUSSING.  IF I MAY APPROACH THE WITNESS?

14          THE COURT:  WE'LL SEE HOW THAT WORKS, IF IT'S QUICKER

15  THAN ACTUALLY PUTTING IT UP ON THE SCREEN.

16          MR. FARRELL:  SURE.

17          THE COURT:  BECAUSE I FIND THE WALTZ BACK AND FORTH

18  SOMETIMES SLOWS THINGS DOWN.  BUT AGAIN, I AM KEEPING IN MIND IT'S

19  YOUR TIME.

20          MR. FARRELL:  I UNDERSTAND AND I WILL TRY TO WALK

21  BRISKLY.

22          THE COURT:  EVERYBODY UNDERSTAND TIME IS GOING TO BE

23  ENFORCED.  THE COURT ENCOURAGED THE ATTORNEYS TO BE EXPEDITIOUS AND

24  STICK TO THE MORE SALIENT DETAILS THAT ARE INVOLVED IN THIS CASE.

25  GO AHEAD, SIR.

```
 1   BY MR. FARRELL:

 2   Q.  MR. LIVERS, I AM SHOWING YOU WHAT HAS BEEN MARKED AS JX 1459.

 3   CAN YOU PUT THAT UP ON THE SCREEN, PLEASE.  IT'S A STACK OF

 4   PHOTOGRAPHS.  DO YOU RECOGNIZE THE PHOTOGRAPHS?

 5            THE COURT:  WE'VE BEEN THROUGH THEM.  I RECOGNIZE THEM,

 6   TOO.

 7            MR. FARRELL:  YES, YOUR HONOR, WE'VE SEEN SOME OF THEM,

 8   THAT'S CORRECT.

 9   BY MR. FARRELL:

10   Q.  AND YOU HAD MENTIONED TO MR. ANDRY THESE ARE PHOTOS THAT YOU

11   TOOK OF YOUR HOME RIGHT AFTER KATRINA, CORRECT?

12   A.  YEAH, I TOOK SOME PHOTOS, TOO.

13   Q.  THESE ARE A FAIR AND ACCURATE DESCRIPTION OF HOW EVERYTHING

14   LOOKED WHEN YOU WERE THERE JUST AFTER THE STORM?

15   A.  YEAH.

16            MR. FARRELL:  YOUR HONOR, I WOULD LIKE TO MOVE EXHIBIT JX

17   1495 INTO EVIDENCE.

18            THE COURT:  OKAY.  ARE THOSE THE SAME PICTURES,

19   PHOTOGRAPHS THAT THE PLAINTIFFS HAVE ADMITTED INTO EVIDENCE AS

20   WELL?  WHY ARE WE HAVING DUPLICATES OF THE SAME?

21            MR. FARRELL:  I'M SORRY.  THERE WERE EXCERPTS OF THIS

22   EXHIBIT THAT WERE ENTERED IN.  I THINK IT WAS PAGE ONE, PAGE TWO,

23   PAGE FOUR, PAGE FIVE, BUT THERE ARE A TOTAL OF 26 PHOTOS HERE.

24            THE COURT:  YOU WANT ALL OF THE PHOTOS?

25            MR. FARRELL:  I WOULD LIKE TO MOVE ALL 26 IN, THE
```

1    COMPLETE EXHIBIT.

2            THE COURT:  LET IT BE ADMITTED THE COMPLETE EXHIBIT,

3    GOTCHA.

4    BY MR. FARRELL:

5    Q.  MR. LIVERS, NOW, I WOULD LIKE TO HAND YOU A DOCUMENT THAT'S

6    BEEN MARKED AS JX 1497, AND A COPY FOR COUNSEL AS WELL.  AND, ERIC,

7    CAN YOU PUT THAT UP ON THE SCREEN AS WELL, PLEASE.

8            MR. LIVERS, CAN YOU TAKE A LOOK AT THESE PHOTOS AS WELL.

9    ERIC, IF YOU WANT TO SLIDE SHOW THROUGH THEM FOR THE COURT.  DO YOU

10   RECOGNIZE WHAT THESE ARE PHOTOGRAPHS OF?

11   A.  THAT'S MY HOUSE AND THAT'S ME STANDING THERE.

12           MR. FARRELL:  AND AGAIN, YOUR HONOR, THE PLAINTIFFS HAVE

13   MOVED A COUPLE OF THESE PAGES INTO EVIDENCE ALREADY, I WOULD JUST

14   LIKE TO MOVE INTO EVIDENCE THE BALANCE OF THE PHOTOS.  THERE ARE A

15   TOTAL OF 33.

16           MR. JERALD ANDRY:  NO OBJECTION, YOUR HONOR.

17           THE COURT:  LET THEM BE ADMITTED.

18           MR. FARRELL:  THANK YOU.

19   BY MR. FARRELL:

20   Q.  MR. LIVERS, MR. ANDRY HAD BEEN ASKING YOU EARLIER THIS MORNING

21   ABOUT A LIST OF CONTENTS THAT YOU PREPARED FOR YOUR ATTORNEYS IN

22   THIS CASE AND YOU SAW THAT UP ON THE SCREEN.  DO YOU RECALL THAT?

23   A.  YEAH, I RECALL THAT.

24   Q.  DO YOU RECALL SHORTLY AFTER HURRICANE KATRINA IN 2005 YOU AND

25   YOUR WIFE PUT TOGETHER ANOTHER LIST OF CONTENTS --

1    A.  YES, WE DID.

2    Q.  -- FOR THE HOME.  I AM GOING TO PUT UP ON THE SCREEN JX 1511.

3    MR. LIVERS, LET'S -- I'LL ASK YOU FIRST -- ON THE FIRST PAGE, DO

4    YOU RECOGNIZE THIS PAGE OF THIS DOCUMENT AT ALL?

5    A.  NO.  THAT'S A BANK WHERE MY DAUGHTER USED TO WORK, AMSOUTH.

6    Q.  AND IN THE UPPER RIGHT IS THAT YOUR WIFE'S NAME?

7    A.  YEP.

8    Q.  I WOULD LIKE TO TURN ACTUALLY TO PAGE THREE, ERIC, 003 OF THE

9    EXHIBIT.  DO YOU RECOGNIZE -- LET'S BLOW UP THAT RIGHT SIDE, THAT

10   UPPER-RIGHT SIDE.  FIRST OFF, CAN YOU READ THE NAME AND ADDRESS

11   THERE?

12   A.  THAT'S ALVIN AND BARBARA LIVERS, 4924 ST. CLAUDE AVENUE, NEW

13   ORLEANS, LOUISIANA, ZIP CODE 70117, 10-18-05.

14   Q.  DO YOU RECOGNIZE THE HANDWRITING HERE?  IS THAT YOUR WIFE'S

15   HANDWRITING?

16   A.  I DON'T KNOW.  IT'S PRINTED.

17   Q.  I'M SORRY.  CAN YOU SAY THAT AGAIN?

18   A.  I SAID IT'S PRINTED OUT.  IT LOOKS LIKE HER HANDWRITING.

19   Q.  DO YOU RECOGNIZE THIS DOCUMENT?

20   A.  (WITNESS REVIEWS DOCUMENT.)

21   Q.  LET ME TURN TO PAGE 004.  DO YOU RECOGNIZE THIS DOCUMENT AS A

22   LIST THAT YOU AND YOUR WIFE PREPARED IN OCTOBER OF 2005 OF THE

23   CONTENTS OF YOUR HOME?

24   A.  YEAH.

25        MR. FARRELL:  YOUR HONOR, I WOULD LIKE TO MOVE JX 1511

1    INTO EVIDENCE AS WELL.

2           MR. JERALD ANDRY:  WE'VE ALREADY NOTED OUR OBJECTION

3    OBVIOUSLY, YOUR HONOR.

4           THE COURT:  OKAY.  I AM LOOKING AT THEFT-PRONE ITEMS, IS

5    THAT WHAT I AM LOOKING AT?

6           MR. JERALD ANDRY:  THAT'S THIS PARTICULAR PAGE, YES.

7    WHAT I WOULD LIKE TO -- ERIC, CAN YOU PLEASE MOVE TO PAGE FIVE,

8    SIX.

9           THE COURT:  IT CAN BE ADMITTED.

10   BY MR. FARRELL:

11   Q.  MR. LIVERS, AS WE'VE SEEN IN SOME OF THESE PHOTOS, AFTER

12   HURRICANE KATRINA YOUR HOME ON ST. CLAUDE AVENUE WAS STILL

13   STANDING, CORRECT?

14   A.  IT'S STILL STANDING.

15   Q.  IT'S STILL STANDING NOW?

16   A.  YES.

17   Q.  YOU MENTIONED THAT YOU HAD -- YOU AND YOUR WIFE'S COUSIN AND

18   YOU SPECIFICALLY HAD GUTTED THE PROPERTY, HAD STARTED TO PUT NEW

19   WIRING IN, CORRECT?

20   A.  CORRECT.

21   Q.  BUT YOU NEVER TALKED TO ANY CONTRACTORS ABOUT A REBUILD OR

22   REPAIR JOB, CORRECT?

23   A.  I HAD TALKED TO SEVERAL CONTRACTORS.

24   Q.  DID YOU GET AN ESTIMATE FROM ANY CONTRACTORS AS TO HOW MUCH

25   MONEY IT WOULD COST TO REPAIR THE HOUSE?

1    A.  NO, NO, I DIDN'T.

2    Q.  AND YOU HAD SAID EARLIER YOU HAD DECIDED, I BELIEVE IT WAS

3    JANUARY 2006, IN OR ABOUT JANUARY OF 2006, THAT YOU WEREN'T GOING

4    TO RETURN TO YOUR HOME IN LOWER NINTH WARD?

5    A.  I CAN'T REMEMBER THE DATES.

6    Q.  AND YOU ULTIMATELY SOLD THE ST. CLAUDE AVENUE HOME TO THE ROAD

7    HOME PROGRAM; IS THAT CORRECT?

8    A.  YES, I DID.  YES, I DID.

9    Q.  AND DO YOU REMEMBER UNDER ROAD HOME YOU HAD THREE OPTIONS, IT

10   WAS TO STAY IN YOUR HOME AND REBUILD WAS ONE OPTION?

11   A.  I REMEMBER ALL THREE OF THEM.

12   Q.  WHAT WERE THE THREE?

13   A.  THIS WHAT REALLY GOT ME PUZZLED, BECAUSE IT SEEMS LIKE THAT

14   WHAT YOU TRYING TO SAY, LIKE, IF I AM BEING PUNISHED.  BUT HERE,

15   LET ME FINISH.

16           THE COURT:  HE ASKED YOU ABOUT THE THREE OPTIONS, SIR.

17   DO YOU RECALL THE THREE OPTIONS?

18           THE WITNESS:  YES, YOUR HONOR, I DO.

19           THE COURT:  TELL US WHAT THE THREE OPTIONS WERE AND THEN

20   YOU CAN COMMENT ON IT IF YOU WISH.

21           THE WITNESS:  OKAY.  THANK YOU, YOUR HONOR.  THE THREE

22   OPTIONS WAS:  ONE, YOU CAN STAY AND REPAIR THE HOUSE, THAT WAS

23   OPTION NO. 1.  OPTION NO. 2 WAS YOU CAN SELL YOUR HOUSE TO THE ROAD

24   HOME, AS LONG AS YOU BUY ANOTHER HOUSE IN THE STATE OF LOUISIANA.

25   THIRD OPTION WAS YOU CAN SELL YOUR HOME AND YOU CAN MOVE TO TEXAS,

```
 1    CALIFORNIA, BUT YOU GET, LIKE, $3,500 FOR YOUR PROPERTY -- $35,000

 2    FOR YOUR PROPERTY.

 3    BY MR. FARRELL:

 4    Q.  AND WHAT OPTION DID YOU AND YOUR WIFE CHOOSE?

 5    A.  I CHOOSE THE BEST FOR MY FAMILY, WAS OPTION 2.

 6    Q.  OPTION 2 WAS WHAT YOU CHOSE?

 7    A.  THAT'S WHAT I CHOSE.

 8    Q.  SELL YOUR HOME, MOVE SOMEWHERE ELSE IN LOUISIANA?

 9    A.  THAT'S WHAT I CHOSE.

10    Q.  I AM GOING TO SHOW YOU NOW JX 1508.  AND ERIC, IF WE COULD BLOW

11    UP THAT TOP HALF BECAUSE THIS PRINT IS VERY SMALL.

12    A.  IT SURE IS.

13    Q.  MR. LIVERS, DO YOU RECOGNIZE THIS DOCUMENT?

14    A.  IT LOOK LIKE AN ACT OF SALE, EAST BATON ROUGE.

15    Q.  AND THIS IS THE ACT OF SALE --

16    A.  STATE OF LOUISIANA.

17         THE COURT:  YOU CAN SIMPLY ASK HIM:  IS THIS YOUR ACT OF

18    SALE TO THE ROAD HOME PROGRAM?

19         MR. FARRELL:  THANK YOU, YOUR HONOR, THAT'S CORRECT.

20         THE WITNESS:  IT LOOKS CORRECT.

21    BY MR. FARRELL:

22    Q.  AND IT LOOKS LIKE YOU SOLD THE PROPERTY TO THE ROAD HOME FOR

23    $120,552.07?

24    A.  NO, I DIDN'T.  I SAID THAT BECAUSE I DON'T KNOW HOW THEY

25    CALCULATED, BUT I GOT $70,000.  SO YOU CAN EXPLAIN TO ME HOW THEY
```

1   CALCULATED IT?

2   Q.  LET ME ASK THIS QUESTION.  LET ME SAY THE ACT OF CASH SALE HERE

3   PURPORTS TO SAY THAT THE HOME WAS SOLD TO YOU -- YOU SOLD THE HOME

4   FOR $120,552.07.

5          MR. JERALD ANDRY:  OBJECTION, YOUR HONOR.  HE IS CALLING

6   FOR A LEGAL CONCLUSION.

7          THE COURT:  HE CAN TELL -- HE CAN SAY WHAT HE RECEIVED.

8   AND AGAIN, I'VE ALREADY RULED THAT THIS IS NOT A COLLATERAL SOURCE.

9   THAT, OF COURSE, IS GOING TO BE OBJECTED TO BY THE PARTIES AND GO

10  UP TO THE COURT OF APPEAL.  SO TO THE EXTENT IT GOES TO THE VALUE

11  OF THE HOME, WE'LL LET IT IN.  OF COURSE, THAT AMOUNT IS PROSCRIBED

12  BY LAW AND DOESN'T NECESSARILY REFLECT VALUE.

13         GO AHEAD.  HE ASKED YOU, "DOES IT SAY THAT?"  DOES IS SAY

14  $120,500 AND THAT'S NOT A LEGAL CONCLUSION, HE CAN READ IT.

15         THE WITNESS:  IT SAYS $125,000 (SIC).

16         MR. FARRELL:  YOUR HONOR, I WOULD LIKE TO MOVE JX 1508

17  INTO EVIDENCE.

18         THE COURT:  SUBJECT TO THE OBJECTIONS PREVIOUSLY OFFERED

19  AND SUBJECT TO THE COURT'S ALREADY RULING THAT IT'S NOT A

20  COLLATERAL SOURCE, IT HAS VERY LITTLE PERSUASIVE VALUE AS TO THE

21  ACTUAL VALUE OF THE HOME, BUT TO THE EXTENT THAT IT DOES, I'LL LET

22  IT IN.

23         MR. FARRELL:  THANK YOU, YOUR HONOR.

24  BY MR. FARRELL:

25  Q.  AND, MR. LIVERS, YOU NOW LIVE IN GONZALES YOU MENTIONED THIS

```
 1   MORNING.

 2   A.  YES.

 3   Q.  AND HOW DID YOU PAY FOR THE HOME IN GONZALES?

 4   A.  HOW DID I PAY FOR IT?

 5   Q.  YES.

 6   A.  WELL, THE MONEY I GOT FROM THE ROAD HOME, I TOOK THAT MONEY,

 7   OKAY.  PLUS I TOOK MY SAVINGS AND I ADDED TO THAT AND I PAID FOR

 8   THE HOME IN GONZALES.  BECAUSE THEY WANTED ME TO TAKE AND PAY LIKE

 9   I DID FOR THE HOUSE DOWN THERE, NOTES AND DIFFERENT THINGS LIKE

10   THAT.  AIN'T NO WAY AT MY AGE I WAS GOING TO MAKE NO 30 MORE YEARS,

11   SO I TOOK MY SAVINGS AND ADDED TO THE MONEY THEY GAVE ME, AND I

12   PAID THE HOUSE OUT COMPLETELY.

13   Q.  NO MORTGAGE AT THIS POINT?

14          THE COURT:  NO MORTGAGE.  YOU CAN ANSWER THE QUESTION.

15   YOU HAD NO MORTGAGE ON IT?

16          THE WITNESS:  NO.

17          THE COURT:  THE COURT JUST HAS A COUPLE OF QUESTIONS.

18   AND I WANT TO FOLLOW-UP ON THE 125,000 THAT THE ACT OF SALE STATED

19   YOU RECEIVED.  YOU SAID YOU RECEIVED SOMETHING LIKE $70,000 OR A

20   LITTLE OVER 70,000?

21          THE WITNESS:  THAT WAS THE PRICE FOR THE HOUSE.  THE REST

22   OF IT WAS A GRANT.

23          THE COURT:  OH, I SEE.

24          THE WITNESS:  THAT MADE THEM COME TO A 120-SOME THOUSAND

25   DOLLARS.
```

```
1              THE COURT:  SO YOU'RE SAYING THE $50,000-SOME ODD --

2              THE WITNESS:  WAS A GRANT.

3              THE COURT:  ALL RIGHT.

4              MR. FARRELL:  JUST ONE MOMENT, YOUR HONOR.  NO FURTHER

5   QUESTIONS.  THANK YOU, MR. LIVERS.

6              THE COURT:  AND THANK YOU, COUNSEL.

7              THE WITNESS:  THANK YOU.

8              THE COURT:  ANY REDIRECT?

9                        REDIRECT EXAMINATION

10  BY MR. JERALD ANDRY:

11  Q.  BRIEFLY, YOUR HONOR.  JUST COUPLE OF OTHER QUESTIONS,

12  MR. LIVERS.  COULD YOU AFFORD TO MOVE BACK TO THE HOUSE IN

13  ST. CLAUDE?

14  A.  NOT THAT I SOLD IT.  I MEAN, NOT AT THE PRESENT TIME.

15  Q.  WHEN YOU SAY "AT THE PRESENT TIME," AT THE TIME THAT YOU WERE

16  THINKING ABOUT REBUILDING THE HOUSE, COULD YOU AFFORD TO REBUILD

17  IT?  DID YOU HAVE THE MONEY TO REBUILD IT?

18  A.  NO, NOT IF I DIDN'T GET IT FROM THE ROAD HOME.

19  Q.  WAS THAT PART OF YOUR DECISION AS TO WHY YOU LEFT?

20  A.  THAT WAS PART OF MY DECISION -- PART OF MY DECISION PLUS --

21  PLUS WHAT I HAD ALREADY SAVED ABOUT -- IN OTHER WORDS, JUST AS GOOD

22  AS I TALKED ABOUT HOW BEAUTIFUL IT WAS TO LIVE IN THAT AREA, AFTER

23  KATRINA, THE NEIGHBORHOOD DIDN'T -- IT WASN'T THE SAME ANYMORE.

24  BECAUSE THEY HAD START -- AS FAST AS YOU DO THINGS, THEY START

25  STEALING STUFF AND DIFFERENT THINGS LIKE THAT.  IT'S A LOT OF
```

1    DIFFERENT THINGS THAT CAME TO THAT POINT.

2              MR. JERALD ANDRY:  THANK YOU.  NO FURTHER QUESTIONS.

3              THE COURT:  YOU CAN STEP DOWN, SIR.  THANK YOU VERY MUCH.

4              THE WITNESS:  THANK YOU, YOUR HONOR.

5              MR. JERALD ANDRY:  IS IT OKAY IF I HELP HIM?

6              THE COURT:  OH, SURE, ABSOLUTELY.  IT'S VERY DIFFICULT,

7    TREACHEROUS FOR ANYONE TO WALK THROUGH THIS COURTROOM.

8              MR. JOANEN:  YOUR HONOR, SCOTT JOANEN FOR THE PLAINTIFFS.

9    AT THIS TIME, YOUR HONOR, WE WOULD LIKE TO INTRODUCE SOME OF THE

10   DEPOSITION CUTS, AND WITH THAT I'LL ALSO PUBLISH SOME OF THE

11   DOCUMENTS THAT ARE REFERENCED IN THAT AND WILL ALSO GIVE THE COURT

12   SOME UNDERSTANDING OF WHAT THE NEXT TESTIMONY WILL COME FORTH.

13             THE COURT:  ALL RIGHT.  AND, MR. TREEBY, TO THE EXTENT

14   THAT THERE ARE OBJECTIONS IN THESE CUTS THAT I HAVEN'T RULED ON YET

15   THAT YOU NEED ME TO RULE ON BECAUSE THERE WAS NO OBJECTION, I

16   REALIZE THAT I'VE GOT -- WE WILL DO THAT WHEN WE GET FROM THE

17   PLAINTIFFS WHICH ONES THEY'RE GOING -- THEY WANT TO LODGE AN

18   OBJECTION TO, OR IF YOU AND THE PLAINTIFFS COME TO AN AGREEMENT

19   THAT WOULD BE GREAT AS WELL, BUT YOU DON'T HAVE TO.

20             MR. JOANEN:  ALSO I THINK THE TWO DEPOSITIONS THAT WERE

21   INTRODUCED, WHICH ARE THE 30(B)(6)S OF MS. ANN VEIGEL, WGI

22   30(B)(6)S, AND MR. STEVEN ROE, THOSE DO NOT HAVE THOSE OUTSTANDING

23   OBJECTIONS THAT APPLY, AS I UNDERSTAND.

24             MR. TREEBY:  THAT'S RIGHT.

25             MR. JOANEN:  YOUR HONOR, AT THIS TIME PLAINTIFFS WOULD

1   OFFER, FILE, AND INTRODUCE INTO EVIDENCE THE DEPOSITION TESTIMONY

2   OF THE DEFENDANT WASHINGTON GROUP INTERNATIONAL THROUGH ITS RULE

3   30(B)(6) DESIGNEE ANN VEIGEL, PX 4647.  AND AS I UNDERSTAND IT, WE

4   ARE NOT PROVIDING ANOTHER COPY TO THE COURT BECAUSE --

5           THE COURT:  THE COURT HAS ITS COPY AND IT'S MARKED

6   COPIES.

7           MR. JOANEN:  AND, YOUR HONOR, JUST TO GIVE YOU SOME

8   REFERENCE, MS. VEIGEL'S TESTIMONY IS OFFERED AT THIS TIME TO ALLOW

9   THE COURT TO UNDERSTAND THE CONTRACTING MECHANISM BETWEEN THE CORPS

10  OF ENGINEERS AND WGI.  THE TERC, WHICH IS THE TOTAL ENVIRONMENTAL

11  RESTORATION CONTRACT WAS EXECUTED ON -- IN AUGUST OF 1994.  THIS

12  PARTICULAR CONTRACT WAS TO ADDRESS REMEDIATION EFFORTS OF

13  HAZARDOUS, TOXIC, AND RADIOACTIVE WASTE SITES IN THE SOUTHWEST

14  DIVISION OF THE CORPS OF ENGINEERS.  SUCH A CONTRACT IS IDENTIFIED

15  AS AN INDEFINITE DELIVERY, INDEFINITE QUANTITY CONTRACT OR IDIQ.

16  YOU'LL PROBABLY HEAR THAT TERM QUITE OFTEN IN THE TESTIMONY.

17          AND THIS CONTRACT ALLOWED THE PARTIES FLEXIBILITY IN

18  ADDRESSING THE NEEDS OF A PARTICULAR PROJECT, BECAUSE WGI WOULDN'T

19  KNOW SPECIFICALLY WHERE IT WOULD BE WORKING OR WHAT SPECIFIC TASKS

20  IT WOULD BE REQUIRED TO PERFORM WHEN THE CONTRACT WAS EXECUTED IN

21  1994.

22          EACH PARTICULAR PROJECT WOULD BE REFERRED TO AS A TASK

23  ORDER.  THE TASK ORDER FOR THE EBIA BECAME KNOWN AS TASK ORDER 26

24  AND WAS ASSIGNED TO THE CONTRACTOR WHEN WGI RECEIVED A STATEMENT OF

25  WORK THAT WAS PREPARED BY THE CORPS.  ALONG WITH THIS STATEMENT OF

1    WORK, THE CORPS WOULD PROVIDE INFORMATION RELATIVE TO THE SITE, AND

2    I'LL PUBLISH THOSE IN A MOMENT.

3            UPON RECEIPT OF THE STATEMENT OF WORK, WGI WAS EXPECTED

4    TO PROVIDE COMPLETE ARCHITECTURAL AND ENGINEERING SERVICES; TO

5    EVALUATE AND SUPPORT THE IMPLEMENTATION OF THE REMEDIAL ACTION,

6    PREPARE A PROPOSAL FOR ITS WORK AND PAYMENT, AND ULTIMATELY,

7    PREPARE A WORK PLAN FOR THE SITE BASED UPON THAT INFORMATION

8    PROVIDED BY THE CORPS.  HERE WGI, WHICH REPRESENTS ITSELF TO HAVE

9    ENGINEERING EXPERTISE, UNDERSTOOD THAT THE CORPS WAS RELYING ON

10   WGI'S PROFESSIONAL JUDGMENT IN TERMS OF MAKING RECOMMENDATIONS FOR

11   THE TYPE OF WORK THAT OUGHT TO BE DONE IN ORDER TO ACCOMPLISH THE

12   GOAL OF THE TERC ITSELF AND CONSISTENTLY MONITOR THE PROJECT AS

13   WORK PROCEEDED TO KEEP THE CORPS INFORMED OF ALL DEVELOPMENTS.

14           ALSO, YOUR HONOR, AT THIS TIME, WE WOULD LIKE TO OFFER,

15   FILE, AND INTRODUCE INTO EVIDENCE THE DEPOSITION TESTIMONY OF THE

16   DEFENDANT WASHINGTON GROUP INTERNATIONAL, INC., THROUGH ITS RULE

17   30(B)(6) DESIGNEE, MR. STEVEN ROE.  MR. STEVEN ROE IS THE --

18           THE COURT:  JUST A MINUTE.

19           MR. TREEBY:  I BELIEVE MR. JOANEN IS SIMPLY READING FROM

20   THE SUMMARIES WE HAVE PROVIDED TO THE COURT.  WE HAVE NO OBJECTION

21   TO THOSE SUMMARIES OR WE WOULD HAVE ALREADY OBJECTED.  SO.

22           THE COURT:  YOU'RE NOT SAYING THAT THEY ARE ACCURATE OR

23   INACCURATE.

24           MR. TREEBY:  NO.

25           THE COURT:  BECAUSE I'VE LOOKED AT THE SUMMARIES.  I

```
 1    CHECKED THE CITATIONS, AND SOME OF IT IS ACCURATE AND SOME OF IT IS

 2    NOT.  BUT I HAVE GONE OVER THE DEPOSITIONS, EVERY WORD OF THEM; AND

 3    ALSO, JUST AS A MATTER OF COURSE, CHECKED THE CITATIONS TO THE

 4    SUMMARIES, SOME OF WHICH WERE INCORRECT, SOME OF WHICH WERE NOT.

 5    SO YOU'RE MAKING YOUR RECORD, MR. TREEBY HAS --

 6              MR. TREEBY:  I DON'T THINK ANY OF THAT IS EVIDENCE, YOUR

 7    HONOR.

 8              THE COURT:  IT'S NOT REALLY EVIDENCE, IT'S NOT EVIDENCE.

 9    IT'S SIMPLY COUNSEL READING WHAT THE SUMMARY IS.

10              MR. JOANEN:  THAT'S IT, I AM SUMMARIZING THE SUMMARY.

11              THE COURT:  FOR THE RECORD, FOR THE COURT OF APPEAL

12    PRIMARILY TO UNDERSTAND WHAT THE PLAINTIFF CONTENDS THIS DEPOSITION

13    SAYS.  THAT'S ABOUT IT.

14              MR. JOANEN:  THAT'S CORRECT.

15              THE COURT:  IT'S A BOOK MARK IF SOME POOR SOUL IS GOING

16    TO READ THIS ENTIRE RECORD.

17              MR. TREEBY:  WE WEREN'T PREPARED TO DO THAT, AND WE

18    PROBABLY WON'T DO THAT, AND WE DON'T UNDERSTAND THE NECESSITY TO DO

19    THAT.

20              THE COURT:  I UNDERSTAND, AND YOU'RE NOT OBLIGATED TO DO

21    THAT.

22              MR. TREEBY:  THANK YOU.

23              MR. JOANEN:  I AM TRYING TO BE BRIEF, YOUR HONOR.  AND

24    REALLY THIS IS FOR THE PRESERVATION OF THE RECORD FOR PEOPLE WHO

25    HAVE TO READ IT.
```

1          THE COURT:  I UNDERSTAND.

2          MR. JOANEN:  IT'S QUITE VOLUMINOUS AS YOU KNOW.

3  MR. STEVEN ROE WAS THE TERC PROGRAM MANAGER AND WAS RESPONSIBLE FOR

4  NEGOTIATING TASK ORDER 26 WITH THE CORPS.  MR. ROE DESCRIBED THE

5  TERC AS A COST PLUS/COST REIMBURSABLE CONTRACT STRATEGY WHEREIN THE

6  CORPS WAS PROVIDE A STATEMENT OF WORK, WGI WOULD THEN PRODUCE A

7  PROPOSAL, AND THEN WOULD PRODUCE WORK PLANS.  THEN AS WGI MOBILIZED

8  AND STARTED DOING THE WORK, THEY WERE CONTINUALLY REFINING THE

9  REQUIREMENTS AND THE SCOPE OF WORK AS THEY WENT ALONG.

10          THE INITIAL STATEMENT OF WORK SET FORTH THE PROJECT

11  REQUIREMENTS FOR WHICH WGI WAS PERFORMED A TECHNICAL REVIEW OF THE

12  SITE DOCUMENTS PROVIDED BY THE CORPS AND GENERATE A COMPREHENSIVE

13  RECOMMENDATION REPORT TO DEFINE THE REQUIREMENTS BY WHICH THIS WORK

14  WOULD BE DONE.  AT THE START, WGI DID NOT HAVE ANY UNDERSTANDING OF

15  THE QUALITY OF THE SOILS IN LOUISIANA, IN OR AROUND BAYOUS LIKE THE

16  IHNC, NOR DID IT HAVE AN UNDERSTANDING OF THE IMPORTANCE OF FLOOD

17  PROTECTION TO THE PEOPLE OF THE CITY OF NEW ORLEANS.  THEY FELT

18  THIS WAS THE CORPS' JOB.  WGI DID NOTHING TO ASCERTAIN WHETHER THE

19  WORK IT PROPOSED TO DO WOULD HAVE A NEGATIVE IMPACT ON FLOOD

20  CONTROL BECAUSE IT FELT THAT THIS WAS NOT IN THEIR SCOPE OF WORK TO

21  DO SO.

22          WGI DID UNDERSTAND THAT EXCAVATIONS NEAR A FLOODWALL

23  MIGHT DAMAGE THE FLOODWALL, AND WGI DOES HAVE INDIVIDUALS WITHIN

24  ITS COMPANY WITH EXPERTISE ON THAT SUBJECT; HOWEVER, WGI DID NOT

25  UNDERTAKE SUCH AN INVESTIGATION AND DID NOT BELIEVE THAT THE PERMIT

1    REQUEST SUGGESTED WGI UNDERTAKE SUCH WORK.

2              AND THEN WE'LL ALSO HAVE THAT ULTIMATELY THE PERMIT

3    LETTER THAT WAS SENT TO WGI BY THE ORLEANS LEVEE DISTRICT WAS NOT

4    SIGNED BY WGI BECAUSE THEIR LAWYERS TOLD THEM NOT TO DO SO.  THE --

5              MR. TREEBY:  IF YOUR HONOR PLEASE, THAT WAS, THAT

6    STATEMENT HE MADE THERE WAS OBJECTED TO.  IT'S ONE OF THE MATTERS

7    THAT HAS NOT BEEN RULED ON.

8              THE COURT:  OKAY.

9              MR. JOANEN:  I DON'T KNOW.  I APOLOGIZE, YOUR HONOR.

10             WGI ADMITTED THAT DENNIS O'CONNOR WROTE THE RECAP

11   CRITERIA DOCUMENT THAT HE ERRONEOUSLY IDENTIFIED THE SHEET PILE

12   DEPTH AT EBIA AT MINUS 25 FEET CLAIMING THAT THIS WOULD CUT OFF

13   GROUND WATER FLOW UNDER THE FLOODWALL.  THIS AREA WAS HIGHLIGHTED

14   BECAUSE THE FLOW OF GROUND WATER WAS CHANGED DUE TO SOIL

15   DISTURBANCES AND THE DIFFERENT COMPACTION PARAMETERS THAN THE

16   NATIVE SOILS.  THIS FACT WAS FURTHER IDENTIFIED IN WGI'S GROUND

17   WATER MONITORING REPORT WHICH RECOGNIZED THAT THE LARGE EMBANKMENT

18   AT THE BOLAND SITE WAS LARGELY DUE TO THE VOLUME OF SOILS REMOVED

19   DURING REMEDIATION OF BOLAND, WHICH WERE THEN REPLACED WITH

20   BACKFILL BUT NOT COMPACTED TO THE STATE THAT THEY WERE PRIOR TO THE

21   EXCAVATION.  WGI ALSO ADMITTED THAT BECAUSE THE CORPS WASN'T

22   PUTTING A BUILDING ON THE SOIL THEY WEREN'T TOO STRINGENT ON

23   COMPACTION REQUIREMENTS.

24             AND, YOUR HONOR, AT THIS TIME, I WOULD LIKE TO SHOW THE

25   COURT SOME OF THE DOCUMENTS THAT I JUST REFERENCED.  MY

 1    UNDERSTANDING IS THAT WE ARE TO PROVIDE A COPY.  WE'RE GOING TO PUT

 2    THEM ON THE SCREEN AND PROVIDE COPIES TO THE COURT.

 3            YOUR HONOR, THE FIRST WILL BE JX 48, NO. 1.  YOUR HONOR,

 4    HERE IS A COPY OF JX 48 FOR THE COURT.

 5            THE COURT:  THAT'S THE CONTRACT.

 6            MR. JOANEN:  THIS IS THE TERC.

 7            THE COURT:  THE TERC.

 8            MR. JOANEN:  YES, YOUR HONOR.  AT THIS TIME, I WOULD ASK

 9    MR. GATHERS IF HE COULD TURN TO PAGE 11, JX 48-11.  AND, YOUR

10    HONOR, IF WE CAN BLOW THAT UP A LITTLE BIT.  DRAW YOUR ATTENTION TO

11    THE PARAGRAPH RIGHT HERE, WHICH IS 2.3.  TALKS ABOUT THE

12    INVESTIGATIONS AND STUDY THAT THE TERC WOULD POTENTIALLY

13    CONTEMPLATE BETWEEN THE PARTIES.  IT ALSO INDICATES THAT THE

14    INDIVIDUAL DELIVERY ORDER WOULD PROVIDE MORE INDICATIONS THAT WOULD

15    ULTIMATELY BE SET FORTH IN THE STATEMENT OF WORK BY WGI.

16            IF WE CAN TURN THE PAGE, PAGE 12.  SECTION 2.4 AND

17    2.43 -- 2.41, YES, YOU'LL SEE WHERE IN THE TERC IT INDICATES THERE

18    WERE REQUIREMENTS FOR ARCHITECT/ENGINEER-TYPE SERVICES FOR THE

19    REMEDIAL ACTION, AND THAT THE CONTRACTOR SHALL PROVIDE SUCH

20    SERVICES TO SUPPORT THE INFORMATION -- IMPLEMENTATION OF THE WORK.

21    IT THEN FOLLOWS UP WITH THE DESIGN INDICATIONS THAT WOULD BE NEEDED

22    AND THE TYPE OF SERVICES AND TYPE OF SPECIALTIES THAT WOULD BE

23    REQUIRED.  AND AGAIN, THIS IS THE OVERARCHING CONTRACT FROM 1994,

24    YOUR HONOR.

25            AND TURNING TO JUST THE NEXT PAGE, CONTINUATION OF

1    PARAGRAPH 2.41 AND THAT'S JUST FURTHERING OUT THAT PARAGRAPH, YOUR

2    HONOR.  INDICATES THAT EVERYTHING --

3            MR. TREEBY:  IF YOUR HONOR PLEASE, I WOULD OBJECT TO HIM

4    CHARACTERIZE -- THIS IS AN EXHIBIT, IT'S IN EVIDENCE, IT DOESN'T

5    NEED TO BE CHARACTERIZED BY COUNSEL.  WE ARE NOT ARGUING NOW AND

6    THAT'S WHAT I HEAR.  THIS ISN'T EVIDENCE THAT MR. JOANEN IS

7    OFFERING.

8            MR. JOANEN:  YOUR HONOR, WE'RE JUST PUTTING UP FOR THE

9    COURT TO SEE TO GIVE CONTEXT TO WHERE WE ARE MOVING PRESENTING SO

10   THAT THERE IS AN UNDERSTANDING OF WHY CERTAIN WITNESSES ARE BEING

11   CALLED.  I WOULD EXPLAIN TO THE COURT THAT WHEN WE'VE HAD NEW

12   INDIVIDUALS COME INTO THE TRIAL TEAM, WE'VE HAD TO EXPLAIN TO THEM

13   ABOUT THE PROJECT, THESE ARE THINGS THAT HAVE PROVED HELPFUL.  I

14   KNOW THAT YOUR HONOR IS MUCH FURTHER ALONG THAN THAT, BUT WE ARE

15   GIVING IT CONTEXT.

16           THE COURT:  I HOPE SO.  BUT THE CONTACT -- MR. TREEBY HAS

17   A POINT.  IF YOU'RE POINTING OUT THE SPECIFIC PARAGRAPHS YOU INTEND

18   TO ULTIMATELY BRIEF, THAT'S FINE.

19           MR. JOANEN:  YES, SIR, YOUR HONOR.

20           THE COURT:  AND GIVE AN INTRODUCTION.  THESE ARE THE

21   PARAGRAPHS YOU'RE POINTING OUT.

22           MR. JOANEN:  CORRECT, YOUR HONOR.

23           MR. TREEBY:  MY ONLY OBJECTION IS TO THE

24   CHARACTERIZATION.

25           THE COURT:  I UNDERSTAND.

1          MR. JOANEN:  YOUR HONOR, MOVING NOW TO THE NEXT EXHIBIT,

2     WHICH WOULD BE PX 2969.  THAT'S PART OF THE 1997 NEW LOCK AND

3     CONNECTING CHANNELS REPORT.  THIS WOULD BE VOLUME 3 OF 9.  AND YOUR

4     HONOR, I HAVE COPIES FOR THE COURT RIGHT HERE.

5          IF WE COULD GO TO PX 2969-225 WHERE WE HAVE SOIL

6     CONDITIONS.  THIS IS PARAGRAPH B.3.14.  AND AGAIN, THIS IS THE 1997

7     NEW LOCK AND CONNECTING CHANNELS REPORT WHERE THERE WAS AN

8     INDICATION OF THE SOIL CONDITIONS THAT WERE IDENTIFIED IN THIS

9     REPORT.  AND I'LL DRAW THE COURT'S ATTENTION TO THE ELEVATIONS,

10    NATURAL GROUND, NATURAL LEVEE DEPOSITS UNDERLAIN BY MARSH AND DELTA

11    DEPOSITS, AND THAT THESE DEPOSITS CONSIST OF VERY SOFT AND MEDIUM

12    CLAYS AND SOME SILT LENSES.

13         IF WE COULD THEN TURN TO PAGE 2969-233 -- 223, I'M SORRY.

14    AND YOUR HONOR, DRAWING YOUR ATTENTION TO THE BOTTOM PARAGRAPH

15    RIGHT HERE, INVESTIGATION PERFORMED, PARAGRAPH B.3.44.  AND AGAIN,

16    THIS IS MORE INDICATION OF THE TYPES OF THINGS THAT THEY'RE FINDING

17    IN THE EBIA PRIOR TO THE INSTITUTION OF TASK ORDER 26.  IT

18    INDICATES THE TYPE OF INVESTIGATIONS THAT WERE PERFORMED.

19         AND IF WE CAN TURN THE PAGE TO PAGE 234, WITHIN

20    SUBSURFACE CONDITIONS.  THIS PARAGRAPH RIGHT HERE.  IT WILL BE THE

21    WORD "SWAMP AND MARSH DEPOSIT," YOU WILL SEE RIGHT HERE, YOUR

22    HONOR.  THERE IS AN INDICATION OF THE TYPE OF SOILS THAT THEY WERE

23    FINDING AND THE DESCRIPTIONS THAT WERE WITHIN THE CORPS' KNOWLEDGE

24    AT THE TIME AS THEY WERE LEADING IN TO THE TASK ORDER 26.

25         YOUR HONOR, NEXT, WE WILL DRAW YOUR ATTENTION TO DOCUMENT

1    NUMBER JX 049 AND THIS IS THE DOCUMENT, YOUR HONOR, THAT INSTITUTED

2    TASK ORDER 26.  IF I CAN CALL YOUR ATTENTION TO PAGE 3 OF THIS, AND

3    YOU'LL SEE THIS PARAGRAPH RIGHT HERE, PARAGRAPH 3 "PROJECT

4    REQUIREMENTS."  THIS INDICATES THE TYPE OF REQUIREMENTS THAT THE

5    CORPS OF ENGINEERS WAS TELLING THE CORPS OF ENGINEERS IT WAS

6    EXPECTING -- OR THAT IT WAS SETTING FORTH AS THE PROJECT WAS

7    COMMENCING.

8           AND THEN IF WE CAN TURN THE PAGE.  YOU'LL SEE THAT THIS

9    PARAGRAPH JUST CONTINUES ON AND JUST GIVES A GENERAL OPENING

10   STATEMENT FOR WHAT THE TYPES OF SERVICES WERE TO BE EXPECTED.

11   YOU'LL SEE THAT THEY ARE INDICATING THAT THE CORPS WOULD BE

12   EXPECTING A COMPREHENSIVE RECOMMENDATIONS REPORT AND THAT THEY ARE

13   REFERENCING THAT THERE WILL BE DATA GAPS TO BE FILLED AT THIS TIME.

14          IF WE LOOK DOWN A LITTLE LOWER IN THE PAGE UNDER SECTION

15   6, WHICH IS GOVERNMENT FURNISHED INFORMATION, YOU'LL SEE THE FIRST

16   1997, VOLUME 5, APPENDIX C, YOU WILL SEE THIS SAMPLING AND ANALOGY

17   REPORT.  YOU WILL SEE THIS QUITE OFTEN THROUGHOUT THE COURSE OF THE

18   TESTIMONY.

19          THAT PARTICULAR DOCUMENT, YOUR HONOR, IS JX 32-1.  YOU'LL

20   SEE -- AND I'LL PROVIDE A COPY TO THE COURT, YOU'LL SEE THAT THIS

21   IS WRITTEN PRIOR TO 1997, BUT WAS INCLUDED IN VOLUME 5 OF THE 1997

22   REPORT.  AND IF WE COULD TURN TO PAGE 22, THAT WOULD BE JX 32-22,

23   YOU WILL SEE THAT PARAGRAPH RIGHT HERE, THE THIRD ONE.  ONE MORE

24   DOWN, CARL.  AGAIN, DISCUSSING SOIL CONDITIONS.  INDICATES THE

25   TYPES OF AND CONDITIONS THEY WILL BE FINDING AT CERTAIN LEVELS

1    THROUGHOUT THE EBIA AREA.

2          AND IF WE GO TO THE NEXT PARAGRAPH.  YOU'LL SEE A

3    DESCRIPTION OF THE TYPES OF SOILS THAT YOU'RE GOING TO FIND AND THE

4    DEPTHS OF THOSE SOILS.  AGAIN, THIS WAS ONE OF THE DOCUMENTS THAT

5    WERE PROVIDED TO WGI TO UNDERSTAND THE CONDITIONS.

6          IF WE GO TO PAGE 23, PARAGRAPH 2.4.2, SITE HYDROLOGY.

7    AND AGAIN, YOUR HONOR, THIS IS TALKING ABOUT A LOT OF THE

8    INFORMATION THAT WAS DONE BY PREVIOUS INVESTIGATIONS.

9          ALSO, DRAW YOUR ATTENTION TO THIS PARAGRAPH RIGHT HERE

10   WHERE THEY'RE TALKING ABOUT SOIL CONDITIONS THAT WERE FOUND NORTH

11   OF THE REACH 1 MRGO, AND THAT THEY'RE TALKING ABOUT THE FACT THAT

12   SIMILAR HYDRAULIC CONDITIONS (INAUDIBLE) FOR THE BYPASS CHANNEL.

13         ALSO, I WILL POINT OUT, YOUR HONOR, THAT THIS INFORMATION

14   WILL BE FOUND IN OTHER DOCUMENTS THAT WERE PRODUCED BY WGI.  THIS

15   WAS WRITTEN BY THE CORPS, BUT WGI ENCAPSULATED IN THEIR OWN

16   DOCUMENTS THAT THEY PROVIDED BACK TO THE CORPS.

17         IF WE TURN TO PAGE 28, YOU'LL SEE -- IN THE SECOND

18   PARAGRAPH RIGHT HERE, YOU'LL SEE THEY TALK ABOUT, AGAIN, THAT

19   THEY'VE DONE SOME STUDIES, TOOK SOIL BORINGS ON EITHER SIDE OF THE

20   FLOODWALL AND THEY DID NOTE THE FACT THAT THE SHEET PILE EXTENDED

21   TO NEGATIVE EIGHT FEET NGVD AT THIS POINT.

22         AND THEN, IF WE TURN TO PAGE 41, PARAGRAPH 7.0.  AND

23   AGAIN, HERE YOU'LL SEE THAT SHEET PILE THEY'RE TALKING ABOUT THE

24   FLOODWALL AGAIN.  AGAIN, THEY SAY THAT THE THEY FIND THE SHEET PILE

25   IS AT MINUS EIGHT FEET NGVD.

```
 1              YOUR HONOR, WITH THAT, WGI PRODUCED A RECOMMENDATION

 2    REPORT -- I MEAN A PROPOSAL, I'M SORRY.  THIS WILL BE JX 1228.

 3    PROVIDING A COPY TO THE COURT.  AND AGAIN, YOUR HONOR, YOU KNOW

 4    FROM THE DEPOSITION TESTIMONY OF MR. ROE THAT WGI PRODUCED THIS

 5    PROPOSAL TO WGI.

 6              THE COURT:  WGI PRODUCED IT --

 7              MR. JOANEN:  I'M SORRY, TO THE CORPS, YES, SIR.  IF WE

 8    COULD TURN TO PAGE 6.  AND THE FIRST PARAGRAPH UP HERE.  THEY'RE

 9    INDICATING THE TYPES OF SERVICES THEY'RE GOING TO PROVIDE AS A

10    RESULT OF THIS PARTICULAR SCOPE OF WORK AND THEY'RE SUPPOSED TO

11    PRODUCE A RECOMMENDATIONS REPORT.

12              THEN IF WE GO DOWN, THE THIRD BULLET POINT RIGHT HERE

13    (INDICATING).  HERE WGI IS INDICATING THAT THEY ARE GOING TO BE

14    SEEKING APPROVALS OF PERMITS AND THINGS OF THAT NATURE.

15              ALSO, IF WE GO DOWN TO THIS PARAGRAPH RIGHT HERE, THE

16    RECOMMENDATIONS REPORT.  THIS IS WHERE WGI BEGINS TO SAY WHAT TYPES

17    OF THINGS ARE GOING TO BE INCLUDED IN THIS RECOMMENDATIONS REPORT,

18    AND YOU WILL SEE THE BOTTOM ONE RIGHT HERE INDICATES THAT THEY

19    WOULD BE SEEKING CERTAIN PERMITS.

20              AND THEN, IF WE GO TO THE NEXT PAGE, YOU'LL SEE UNDER THE

21    ASSUMPTIONS PART, NO. 1, INDICATES THAT THE MAJORITY OF THE WORK

22    WILL BE DONE BY THE NEW ORLEANS OFFICE, AND YOU'LL HEAR TESTIMONY

23    ABOUT THAT, BUT ALSO THAT THE ADMINISTRATION OF TECHNICAL OVERSIGHT

24    WOULD BE PROVIDED BY THE DENVER HOME OFFICE.

25              ALSO, IF WE GO UP TO THE PARAGRAPH BEFORE THAT, THERE IS
```

1    AN INDICATION THAT DATA GAPS WOULD BE FOUND AND THEY WOULD BE

2    ADDRESSED IN THE RECOMMENDATIONS REPORT.  AND THAT TERM "DATA GAPS"

3    YOU WILL SEE THROUGHOUT THE COURSE OF THE TESTIMONY.

4         NEXT, WE'LL GO TO RECOMMENDATION REPORT.  THAT'S PX 4364.

5    PROVIDING A COPY TO THE COURT, YOUR HONOR.  AND, YOUR HONOR, THIS

6    IS THE RESULT OF THAT EFFORT PURSUANT TO THAT PROPOSAL OF WORK.  IF

7    I CAN DRAW YOUR ATTENTION TO PAGE 5, PX 4364, PAGE 5.  AND AGAIN,

8    YOU WILL HAVE THE EXECUTIVE SUMMARY UP HERE WHICH INDICATES WHAT

9    THEY HOPE TO ACCOMPLISH WITH THIS.

10        AND THEN THE NEXT PARAGRAPH, TOO, ACTUALLY SAYS WHAT THE

11   PURPOSE OF IT IS.  AND I AM NOT GOING TO READ IT TO YOUR HONOR, YOU

12   WILL BE ABLE TO TAKE THAT IN YOURSELF.

13        BUT I WANT TO POINT OUT IF YOU GO A LITTLE FURTHER DOWN,

14   IF WE CAN, RIGHT HERE, WHERE IT SAYS "DATA GAPS" AGAIN, THEY'RE

15   INDICATING THAT THEY UNDERSTAND THAT THERE ARE DATA GAPS AND THEY

16   NEED TO BE ADDRESSED AT SOME POINT.

17        I AM TRYING TO GO A LITTLE QUICKER, YOUR HONOR.

18        IF WE COULD GO TO PAGE 28.  ONE OF THE THINGS THAT THE

19   RECOMMENDATION REPORT INDICATED THEY WOULD MAKE THE PROJECT WORK

20   PLAN.  AND IN THAT PROJECT WORK PLAN, PART OF IT THEY WOULD HAVE

21   YOU GO TO THE BOTTOM, PARAGRAPH 5.1.2.1.5.  THIS INDICATES THAT THE

22   PROJECT WORK PLAN WOULD INVOLVE DETAILED ENGINEERING REGARDING

23   THESE CERTAIN PARTICULAR SPECIALTIES.

24        AND IF WE GO TO THE NEXT PAGE, YOU'LL SEE SOME OF THOSE

25   SPECIALTIES AT THE TOP.  PAGE 29.  SEE RIGHT HERE, YOUR HONOR, THEY

1    INDICATE THAT THERE WOULD BE GEOTECHNICAL AND GEOLOGY AND HYDROLOGY

2    SERVICES PROVIDED THAT WOULD BE IN PREPARATION OF THE WORK PLANS.

3           NEXT, YOUR HONOR, WE HAVE THE RECAP CRITERIA DOCUMENT,

4    WHICH IS JX 1825.  I'LL PROVIDE A COPY TO THE COURT.  YOUR HONOR,

5    YOU'LL UNDERSTAND THE TESTIMONY LATER ON WHY THERE IS -- THE

6    PROJECT WAS TAKING TWO DIFFERENT TASKS:  ONE, WAS PROJECT WORK

7    PLAN; ONE, AS UNDER THE RECAP AREA.  AND I'LL JUST DRAW YOUR

8    ATTENTION FIRST ON THE FIRST PAGE JUNE 2000 WAS WHEN IT WAS FIRST

9    BEING PASSED AROUND.

10          AND I'LL DRAW YOUR ATTENTION TO PAGE 4 OF THIS DOCUMENT,

11   PARAGRAPH 4.2.  AND YOU'LL SEE HERE THAT WGI WAS REFERENCING GROUND

12   WATER AND EBIA, AND THEY INDICATED THAT IT IS THEIR BELIEF THAT THE

13   FLOODWALL REACHED THE DEPTH OF AT LEAST MINUS 25 FEET AND THIS

14   WOULD BE ESSENTIALLY INTERRUPT THE WATER FLOW IN THE EASTERLY

15   DIRECTION AT LOWER ELEVATIONS TO 25 FEET.  THE IMPORTANCE OF THIS

16   DOCUMENT WILL ALSO BE ADDRESSED FURTHER ON.

17          MOVING ON TO PROJECT WORK PLAN, WHICH IS JX 1252, PROVIDE

18   A COPY TO THE COURT.  AND I'LL DRAW YOUR ATTENTION TO PAGE 15 OF

19   THIS.  UNDER THE PROJECT SCOPE AND HERE, YOU CAN SEE THAT THERE'S

20   THE SCOPE OF THE WORK PROJECT PLAN AS GOING TO BE FOLLOWING.  I

21   DON'T WANT TO READ IT TO YOU.

22          THE COURT:  THANK YOU.

23          MR. JOANEN:  IF I CAN DRAW YOUR ATTENTION QUICKLY TO PAGE

24   23, PARAGRAPH 3.1.1, PERMITS AND NOTIFICATIONS, YOU WILL SEE THAT

25   THERE'S CERTAIN PERMITS WOULD BE OBTAINED.  AGAIN, THIS IS IN THE

1    PROJECT WORK PLAN AFTER THE RECOMMENDATION REPORT HAD BEEN WRITTEN.

2              AND, YOUR HONOR, I AM NOT GOING TO CALL UP ALL OF THE

3    DOCUMENTS THAT ARE IN HERE THAT REFERENCE THE SCOPES OF WORK, YOU

4    WILL SEE THAT IN THE DOCUMENT, BUT I WOULD CALL YOUR ATTENTION TO

5    PAGE 52.  YOU'LL SEE RIGHT HERE CONTAMINATED SOIL AREAS.  THIS IS

6    TALKING ABOUT WHAT THEY ANTICIPATE AT THE TIME WHERE THEY WOULD BE

7    REMEDIATING SOIL, REMOVING SOILS, THE DEPTHS THAT THEY WOULD HAVE

8    TO GO THROUGH.

9              AND THE PAGES GO FROM THERE TO PAGE 54.  IF WE CAN TURN

10   TO PAGE 54, YOU WILL SEE THE DEPTHS OF ALL THREE FEET HERE.  THEY

11   CONTINUE ON THREE FEET EXCEPT FOR THE LAST ONE, DISTRIBUTOR'S OIL.

12   IT'S HARD TO READ, EIGHT FEET.  OTHER THAN THAT, THEY'RE ALL AT

13   THREE.

14             AND THEN REAL QUICKLY, YOUR HONOR, JX 1255, WHICH IS THE

15   SAMPLING AND ANALYSIS PLAN.  I'LL PROVIDE A COPY TO THE COURT.  IF

16   WE CAN TURN REAL QUICKLY TO PAGE 20.  AND THIS WOULD BE THE LAST

17   PARAGRAPH, AND AGAIN, THIS INDICATES THE MOST COMPREHENSIVE

18   INVESTIGATION AND INDICATES THE VARIOUS LAYERS OF THE SOIL WHICH

19   YOU CAN SEE.  THERE'S DIFFERENT ZONES THAT THE SOILS ARE FOUND IN.

20   THAT WILL CERTAINLY BE ADDRESSED BY THE EXPERTS AS THIS CASE GOES

21   ON.

22             WE CAN TURN TO PAGE 30.  SECOND PARAGRAPH RIGHT HERE

23   (INDICATING).  THIS IS UNDERLYING -- THIS IS MORE ABOUT THE SOILS,

24   AND YOU'LL SEE THIS LANGUAGE IS SIMILAR TO THE LANGUAGE THAT WAS

25   FOUND IN THAT SAMPLING ANALYSIS REPORT.

1              THE COURT:  YEP.

2              MR. JOANEN:  IF WE TURN THE PAGE, THIS WILL BE PAGE 31.

3   THIS PORTION RIGHT HERE OF IHNC EASTBANK HYDROGEOLOGY, AND YOU WILL

4   SEE STARTING HERE AND GOING ALL THE WAY DOWN TO HERE YOU'LL SEE THE

5   SAME LANGUAGE THAT WAS FOUND IN THE ANALYSIS REPORT; SO IT'S

6   OBVIOUSLY TAKEN FROM THAT REPORT AND PLACED IN HERE WHERE THEY HAVE

7   DONE STUDIES AT AREAS OTHER THAN JUST EBIA.

8              THEN IF WE CAN TURN QUICKLY TO PAGE 68.  YOU SEE THIS TOP

9   PARAGRAPH HERE (INDICATING), WHERE THEY'RE DISCUSSING THE FLOW OF

10  GROUND WATER.  AND I'M SURE YOUR HONOR WILL BE READING THIS AT SOME

11  POINT, BUT THEY INDICATE THERE'S NO DATA ON THE GROUND WATER FLOW

12  BELOW FIVE FEET BELOW GROUND SURFACE.  THE IMPORTANCE OF THAT WILL

13  BE DISCUSSED BY THE EXPERTS.

14             AND THEN FINALLY, YOUR HONOR, I'LL TURN YOUR ATTENTION TO

15  JX 1299.  THIS IS THE GROUND WATER CHARACTER MONITORING REPORT.

16  PROVIDE A COPY TO THE COURT.  IF I COULD DRAW YOUR ATTENTION TO

17  PAGE 7.  IN PARTICULAR, YOUR HONOR, THE WATER LEVEL MEASUREMENTS

18  PARAGRAPH, AND YOU'LL SEE HERE THAT THEY TALK ABOUT POTENTIAL

19  METRIC SURFACE MAPS AND THAT INDICATE THAT GROUND WATER FLOWS

20  EASTWARD FROM THE CANAL.  THERE'S A LARGE EMBANKMENT ON THE NORTH

21  END OF THE SITE THAT IS LIKELY DUE TO THE LARGE VOLUME OF SOILS

22  REMOVED DURING THE REMEDIATION OF BOLAND.

23             AND YOUR HONOR, THERE IS A TABLE, TABLE 2, WHICH IS ON

24  PAGE 27, AND THIS TABLE RIGHT HERE.  IF WE CAN BLOW THIS UP RIGHT

25  HERE, CARL.  THIS IS THAT TABLE THAT THEY WERE REFERENCING ON THAT,

1  AND YOU'LL SEE THIS IS THE BOLAND MARINE, AND YOU'LL HAVE TESTIMONY

2  REGARDING THE IMPORTANCE OF THIS AREA RIGHT HERE (INDICATING).  AND

3  AGAIN, THIS DEALS WITH GROUND WATER FLOW, THE THINGS THAT WERE

4  REFERENCED THROUGHOUT THE DOCUMENTS THAT WE HAVE DISCUSSED.

5       THE COURT:  AND I RECALL, HAVING READ THE DEPOSITIONS,

6  THEY WERE ALSO MENTIONED IN SEVERAL OF THE DEPOSITIONS.

7       MR. JOANEN:  YES, SIR, YOUR HONOR.

8       WITH THAT, YOUR HONOR, THAT'S THE END OF THIS PART OF THE

9  PRESENTATION.  WE WILL BE CALLING MR. CHAD MORRIS NEXT.  I DON'T

10  KNOW IF YOU WANT TO TAKE A BREAK.

11       THE COURT:  WE WILL BE TAKING A RECESS.  FIFTEEN MINUTES

12  ENOUGH FOR EVERYBODY?

13       MR. BRUNO:  YES, YOUR HONOR.  THANK YOU VERY MUCH.

14       THE COURT:  ALL RIGHT.  15-MINUTE RECESS.

15     (WHEREUPON, A RECESS WAS TAKEN.)

16     (OPEN COURT.)

17       THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE, BE

18  SEATED.

19       LET ME PLACE YOU UNDER OATH, PLEASE.  RAISE YOUR RIGHT

20  HAND.

21     (WHEREUPON, CHAD A. MORRIS, WAS SWORN IN AND TESTIFIED AS

22     FOLLOWS:)

23       THE DEPUTY CLERK:  WOULD YOU PLEASE STATE YOUR NAME AND

24  SPELL IT FOR THE RECORD?

25       THE WITNESS:  CHAD, C-H-A-D, AARON, A-A-R-O-N, MORRIS,

1   M-O-R-R-I-S.

2                    VOIR DIRE EXAMINATION

3   BY MR. STEVENS:

4   Q.  MR. MORRIS, YOU'RE A PROFESSIONAL LAND SURVEYOR; IS THAT

5   CORRECT?

6   A.  THAT'S CORRECT.

7   Q.  AM I CORRECT THAT IN THAT CAPACITY YOU'VE ISSUED TWO REPORTS IN

8   CONNECTION WITH THE NORTH AND SOUTH BREACHES OF THE IHNC?

9   A.  THAT'S RIGHT.

10  Q.  FIRST REPORT DATED JANUARY 29 OF '09 THAT YOU COAUTHORED WITH

11  DR. BOB BEA, ALSO KNOWN AS TECHNICAL REPORT NO. 5, AND ENTITLED

12  IHNC LOCK EXPANSION, EBIA SITE CLEARING EXCAVATIONS, LOWER NINTH

13  WARD BREACHES.  AND THAT WAS IN THE COMPANION, IF YOU WILL, THE

14  ROBINSON MATTER.

15  A.  THAT'S RIGHT.

16  Q.  IT INVOLVES THE SAME BREACHES -- THAT REPORT INVOLVES THE SAME

17  BREACHES THAT WE ARE HERE ABOUT TODAY, CORRECT?

18  A.  YES.

19  Q.  AND YOUR SECOND REPORT IS DATED JULY 18TH OF --

20           MS. WAGER-ZITO:  EXCUSE ME, YOUR HONOR, THAT REPORT WAS

21  FROM ROBINSON.

22           THE COURT:  GIVE ME JUST A MINUTE.  I HAD A REPORT THAT

23  DIDN'T WEIGH TEN POUNDS, JUST INTERNAL.  HOLD ON ONE SECOND.  JUST

24  A MINUTE.

25           SORRY FOR THE INTERRUPTION.  MOVE ON.  LET'S MOVE.  ALL

1    RIGHT.

2              MR. STEVENS:  THANK YOU, YOUR HONOR.  MS. WAGER HAD AN

3    OBJECTION.

4              THE COURT:  YES, MA'AM.

5              MS. WAGER-ZITO:  YOUR HONOR, WE WOULD OBJECT TO ANY

6    REFERENCE TO THE REPORT OR ANY USAGE BY MR. MORRIS IN THIS CASE OF

7    THE REPORT THAT HE PREPARED IN CONNECTION WITH THE ROBINSON

8    PROCEEDING.  THE QUESTION MR. STEVENS JUST ASKED HIM ABOUT WAS DID

9    HE PREPARE TWO REPORTS, AND THE FIRST ONE HE MENTIONED WAS FOR

10   ROBINSON.

11             MR. STEVENS:  YES, YOUR HONOR, IT IS JUST TO SHOW

12   FOUNDATION HERE AND FAMILIARITY WITH THE CASE, THE AREA, THE SAME

13   LIDAR DATA SETS.  I AM NOT GOING TO ASK HIM ANY OF THE OPINIONS

14   FROM IT.  I JUST WANT TO ASK HIM FOR YOUR CONSIDERATION IN TERMS OF

15   HIS QUALIFICATIONS TO OFFER HIM OPINIONS IN THIS MATTER.

16             THE COURT:  TO THAT LIMITED EXTENT, I'LL ALLOW IT.  MAKE

17   IT QUICK.

18             MR. STEVENS:  THANK YOU, YOUR HONOR.

19   BY MR. STEVENS:

20   Q.  JUST IDENTIFIED THE REPORT IS JX 3967.  WE DON'T NEED TO SEE

21   IT, BUT FOR THE RECORD THAT'S THE JANUARY --

22             THE COURT:  THE REPORT ITSELF WILL NOT COME IN.  THERE IS

23   NO QUESTION ABOUT THAT.

24             MR. STEVENS:  THAT'S CORRECT.

25             MS. WAGER-ZITO:  THANK YOU, YOUR HONOR.

```
1    BY MR. STEVENS:

2    Q.  THE SECOND REPORT YOU DID IN THIS MATTER INVOLVING THE IHNC AND

3    THE NORTH AND SOUTH BREACHES IS JX 1576, AND IT'S ENTITLED SURVEY

4    AND SPATIAL DATA IN THE VICINITY OF THE IHNC, CORRECT?

5    A.  YES, THAT'S CORRECT.

6             MR. STEVENS:  YOUR HONOR, MR. MORRIS' CV IS MARKED JX

7    1575.  CAN YOU CALL THAT UP.  IT'S 15 -- IT'S ACTUALLY 1578, CARL.

8    THERE IT IS, THANK YOU.

9             HIS PROFESSIONAL QUALIFICATIONS, HOWEVER, AND RELEVANT

10   EXPERIENCE AND WORK HISTORY, WHICH I'LL REVIEW WITH HIM IN A

11   MINUTE, ARE ACTUALLY MORE FULLY EXPLAINED AT PAGES 2 AND 3 OF HIS

12   JULY 18, 2011, REPORT.  SO WITH THE COURT'S PERMISSION, I WOULD

13   LIKE TO PUBLISH JX 1576, THE REPORT, PAGE 2 AND 3.

14            THE COURT:  PAGES 2 AND 3 OF THE REPORT BECAUSE I THINK

15   WE ALREADY STATED UNLESS THERE WAS A STIPULATION, I AM NOT GOING TO

16   LET THE EXPERT REPORTS IN, UNLESS BOTH OF YOU AGREE, AS EVIDENCE,

17   AND I THINK THERE ARE A COUPLE THAT YOU HAVE.  BUT JUST PAGES 2 AND

18   3, THE CV, CAN CERTAINLY COME IN.  I DON'T THINK THERE'S ANY

19   OBJECTION TO THE CV ITSELF; IS THAT CORRECT?

20            MS. WAGER-ZITO:  NO, YOUR HONOR.

21            MR. STEVENS:  AND THEN THERE IS THE QUALIFICATIONS AND

22   PROFESSIONAL EXPERIENCE.

23            THE COURT:  THAT PORTION OF IT MAY BE INTRODUCED AS AN

24   EXHIBIT.

25            MR. STEVENS:  THANK YOU, YOUR HONOR.
```

```
 1   BY MR. STEVENS:

 2   Q.  MR. MORRIS, ACCORDING TO THE REPORT, YOU GRADUATED WITH HONORS

 3   FROM THE UNIVERSITY OF FLORIDA IN 1991 WITH A BACHELOR OF SCIENCE

 4   DEGREE IN SURVEYING AND MAPPING; IS THAT CORRECT?

 5   A.  YES, THAT'S CORRECT.

 6   Q.  DID YOU RECEIVE ANY HONORS WHILE YOU WERE AT THE UNIVERSITY OF

 7   FLORIDA?

 8   A.  WON A NATIONAL SCHOLARSHIP.

 9   Q.  ARE YOU A LICENSED PROFESSIONAL LAND SURVEYOR IN THE STATE OF

10   LOUISIANA AND TEXAS?

11   A.  YES.

12   Q.  IN WHAT YEAR WERE YOU FIRST LICENSED?

13   A.  1996.

14   Q.  HAVE YOU BEEN CONTINUOUSLY LICENSED SINCE THAT TIME?

15   A.  YES.

16   Q.  ARE YOU A MEMBER OF THE LSPS, THE LOUISIANA SOCIETY OF

17   PROFESSIONAL SURVEYORS?

18   A.  YES, I AM.

19   Q.  ARE YOU A MEMBER OF THE NATIONAL SOCIETY, THE NSPS?

20   A.  I AM NOT SURE IF THAT'S CURRENT.  I WAS.

21   Q.  LET ME ASK YOU THIS.  IS IT ALSO CORRECT THAT YOU PREPARED MAPS

22   FOR AND WON THE AMERICAN CONGRESS OF SURVEYING AND MAPPING, THE

23   ACSM'S NATIONWIDE MAP AND PLAT COMPETITION THREE SEPARATE TIMES?

24   A.  YES, THAT'S CORRECT.

25   Q.  1997, 1999, AND 2001?
```

1    A.  YES.

2    Q.  MR. MORRIS, BEFORE WE GET INTO THE PARTICULARS OF YOUR WORK

3    HISTORY AND THE TYPES OF SURVEYING AND MAPPING TECHNIQUES AND TOOLS

4    AND THE DATA THAT YOU HAVE HAD PARTICULAR EXPERIENCE WITH OVER THE

5    COURSE OF YOUR CAREER, LET ME ASK YOU A COUPLE OF PREFATORY

6    QUESTIONS.

7            FIRST, IN THIS CASE, HAS THE PRIMARY FOCUS OF YOUR

8    EFFORTS BEEN TO OBTAIN AND INTERPRET KEY SURVEY RELATED DATA FOR

9    USE IN EXAMINING THE CAUSE AND RESULTS OF THE FLOODWALL BREACHES

10   ALONG THE IHNC DURING AND AFTER HURRICANE KATRINA?

11   A.  YES.

12   Q.  AM I CORRECT, SIR, THAT IN CONNECTION WITH THIS CASE THE DATA

13   THAT YOU OBTAINED WERE REVIEWED -- THAT YOU OBTAINED, REVIEWED AND

14   INTERPRETED WERE -- AND I'LL CHECK THEM, AND YOU CONFIRM YEA OR

15   NAY -- SURVEY DATA?

16   A.  YES.

17   Q.  SPATIAL DATA?

18   A.  YES.

19   Q.  AERIAL PHOTOGRAPHS?

20   A.  YES.

21   Q.  LIDAR DATA?

22   A.  YES.

23   Q.  TERRESTRIAL PHOTOGRAPHS?

24   A.  YES.

25   Q.  CONSTRUCTION DRAWINGS?

1    A.  YES.

2    Q.  AND HAVE YOU OF LATE BEEN ABLE TO REVIEW OR INTERPRET SOME OF

3    THE DEFENDANTS' GIS DATA FILES THAT WE RECEIVED ON FRIDAY?

4    A.  YES.

5    Q.  WHAT EXPERIENCE DO YOU HAVE IN TERMS OF YOUR WORK HISTORY?  IF

6    YOU WOULD BRIEFLY DESCRIBE FOR THE COURT, YOUR EMPLOYMENT HISTORY

7    FROM 1991 FORWARD.

8    A.  I GRADUATED FROM THE UNIVERSITY OF FLORIDA IN 1991 AND WENT TO

9    WORK FOR HYDRO CONSULTANTS IN BATON ROUGE, LOUISIANA, THAT'S A

10   HYDROGRAPHIC AND INDUSTRIAL SURVEY FIRM PRIMARILY.  I STARTED AS A

11   PROJECT COORDINATOR AND WORKED UP TO OPERATIONS MANAGER, WAS

12   EMPLOYED THERE FOR 13 YEARS.

13   Q.  AND WHAT WERE YOUR DUTIES AND RESPONSIBILITIES AS A PROJECT

14   COORDINATOR AND OPERATIONS MANAGER FOR HYDRO CONSULTANTS, INC.?

15   A.  SUPERVISING FIELD CREW ACTIVITIES, ALL FIELD ACTIVITIES,

16   SUPERVISING THE OFFICE STAFF, AND THE COMPLETION OF DRAWINGS AND

17   REPORTS.

18   Q.  AND DID THE REPORTS THAT YOU PREPARED IN CONNECTION WITH YOUR

19   MANAGEMENT POSITION THERE REQUIRE YOU TO EITHER PREPARE OR CONFIRM

20   COMPLIANCE WITH DAILY REPORTING REQUIREMENTS AND QUALITY

21   CONTROL/QUALITY ASSURANCE DOCUMENTATION?

22   A.  YES, MANY OF THE PROJECTS THAT WE WORKED ON HAD SIMILAR

23   REQUIREMENTS TO WHAT WE SEE HERE.

24   Q.  WOULD YOU TELL US, PLEASE, ABOUT SOME OF THE TYPES OF PROJECTS

25   FOR HYDRO CONSULTANTS, INC. THAT YOU WERE INVOLVED IN DURING YOUR

1   EMPLOYMENT THAT RELATED IN SOME WAY TO PREPARING YOU FOR OFFERING

2   OPINIONS IN THIS CASE?

3   A.  A FEW THAT APPLY DIRECTLY WOULD BE THE NORTH LANDFILL

4   CONSTRUCTION HAD TO DO WITH COMPACTION, HUNDREDS OF PROJECTS

5   INVOLVING MAPPING OF ABOVE AND BELOW GROUND FEATURES, INLAND

6   HYDROGRAPHIC SURVEY WORK, PIPELINE SURVEYS, SURVEYS OF LEVEES.

7   THERE ARE NUMEROUS.

8   Q.  DID THOSE PROJECTS INVOLVE THE USE OF DATA SETS AND ANALYSIS

9   AND INTERPRETATION OR TECHNIQUES THAT YOU CONSIDERED OR PERFORMED

10  IN CONNECTION WITH THE OPINIONS YOU HOLD IN THIS CASE?

11  A.  YES.

12  Q.  LET'S TALK ABOUT WORK YOU DID AT LANDSOURCE.  ACCORDING TO YOUR

13  CV YOU WORKED AT LANDSOURCE, INC.  TELL US ABOUT THAT EMPLOYMENT.

14  A.  I WAS THE VICE-PRESIDENT IN CHARGE OF THE INDUSTRIAL WORK, AND

15  REALLY WAS A CONTINUATION OF THE VERY SIMILAR WORK THAT I DID AT

16  HYDRO CONSULTANTS.  AND ALSO BEGAN, DURING THAT TIME BEGAN WORK ON

17  THE DEFENSE OF MURPHY OIL AND THE OIL SPILL IN THE CHALMETTE AREA.

18  Q.  AND IN CONNECTION WITH THE WORK YOU DID FOR THE MURPHY OIL

19  CASE, WERE YOU RETAINED BY THE PLAINTIFFS OR THE DEFENDANTS?

20  A.  THE DEFENDANTS.

21  Q.  WOULD IT BE FAIR TO SAY THAT YOUR EFFORTS TO DATE AS A

22  PROFESSIONAL LAND SURVEYOR HAVE FOCUSED ALMOST EXCLUSIVELY ON

23  INDUSTRIAL SURVEYING AND MAPPING SINCE YOU GRADUATED FROM THE

24  UNIVERSITY OF FLORIDA IN 1991?

25  A.  YES.

```
1   Q.  WHILE WITH LANDSOURCE DID YOU HAVE OCCASION TO DO -- I'M SORRY,

2   I ALREADY COVERED THAT.

3           IN CONNECTION WITH YOUR OVERALL WORK EXPERIENCE, HAVE YOU

4   BEEN REQUIRED TO MAP UNDERGROUND FOUNDATIONS IN PARTICULAR?

5   A.  YES.

6   Q.  CAN YOU GIVE US AN ESTIMATION OF THE NUMBER OF THAT TYPE OF

7   PROJECT YOU'VE BEEN INVOLVED IN?

8   A.  THAT INVOLVED UNDERGROUND FOUNDATIONS, GUESSTIMATE WOULD BE 50.

9   Q.  AND WERE THOSE MAPPING PROJECTS FOR UNDERGROUND FOUNDATIONS

10  OFTEN DONE IN THE ABSENCE OF PRECISE SURVEY DATA?

11  A.  YES.  AT TIMES WE OBVIOUSLY CAN'T SEE THROUGH THE GROUND AND

12  THE DATA ISN'T ALWAYS PERFECT, AND AS IT RELATES TO THE MAPPING OF

13  UNDERGROUND FEATURES QUITE OFTEN WE HAVE TO MAKE DUE WITH THE BEST

14  AVAILABLE INFORMATION.

15  Q.  IS THAT BASICALLY WHAT YOU HAD TO DO IN THIS CASE?

16  A.  YES.

17  Q.  IN CONNECTION WITH THE WORK THAT YOU DID THEN, WERE YOU CALLED

18  UPON AND DID YOU EMPLOY THE TECHNIQUES AND METHODOLOGIES

19  SUBSTANTIALLY SIMILAR TO WHAT YOU'VE DONE IN THIS CASE?

20  A.  YES.

21  Q.  HAVE YOU HAD ANY PARTICULAR EXPERIENCE IN UNDERSTANDING AND

22  WORKING WITH THE HORIZONTAL COORDINATES FOR SPATIAL DATA AND

23  ELEVATIONS UNIQUE TO THIS REGION OF THE STATE OF LOUISIANA?

24  A.  YES.

25  Q.  AND THIS REGION I AM TALKING ABOUT THE GREATER NEW ORLEANS
```

1    AREA.

2    A.  YES.

3    Q.  MR. MORRIS, OVER THE PAST 20 YEARS OR SO, HAVE YOU HAD OCCASION

4    TO OBSERVE BACKFILLING ACTIVITIES AT VARIOUS CONSTRUCTION SITES?

5    A.  YES.

6    Q.  HAVE YOU HAD PERSONAL EXPERIENCE IN APPLYING OR REQUIRING

7    COMPLIANCE WITH PROPER TECHNIQUES FOR QUALITY COMPACTION

8    BACKFILLING OPERATIONS?

9    A.  I SHOULD CLARIFY THAT MY EXPERIENCE IS WITH PERFORMING THE

10   SURVEY WORK ASSOCIATED WITH THOSE COMPLIANCES.

11   Q.  OKAY.

12   A.  IN THAT REGARD, YES.

13   Q.  CAN YOU GIVE THE COURT EXAMPLES OF YOUR PERSONAL EXPERIENCE IN

14   THE LAYERING OF BACKFILL IN LIFTS?

15   A.  IN THE NORTH LANDFILL IN BATON ROUGE, HYDRO CONSULTANTS WAS

16   HIRED TO PERFORM ONE OF THE QUALITY ASSURANCE CHECKS THAT HAS TO

17   HAPPEN DURING THAT PROCESS, AND WE WOULD MEASURE THE ELEVATION OF

18   THE GROUND SURFACE BEFORE AND AFTER SIX-INCH LIFTS WERE PLACED; AND

19   THEN EQUIPMENT WAS USED ON THEM SUCH AS ROLLERS AND TAMPERS TO

20   COMPACT THE MATERIAL, WE WOULD COME BACK AFTER THE LIFT WAS

21   SUPPOSED TO BE SATISFACTORY AND WE WOULD AGAIN SHOOT THE ELEVATION

22   OF THE GROUND SURFACE TO INSURE THE COMPLIANCE WITH THE THICKNESS.

23          AND WHILE DOING THAT OBSERVED OTHER PEOPLE DOING TESTING

24   OF THE SOIL COMPACTION.  MY INVOLVEMENT WAS LIMITED TO THE

25   SURVEYING OF THE THICKNESSES.

1    Q.  ARE YOU GENERALLY FAMILIAR WITH THE HEAVY EQUIPMENT TYPICALLY

2    UTILIZED IN THE TYPE OF CONSTRUCTION AND EXCAVATION PROJECT

3    INVOLVED IN THIS CASE?

4    A.  YES.

5    Q.  ARE YOU FAMILIAR WITH AND HAVE YOU HAD EXPERIENCE IN THE TYPES

6    OF DAILY PROJECT DOCUMENTS, I ACTUALLY COVERED THAT, AND THE

7    REPORTS TYPICALLY PRODUCE AT EXCAVATION PROJECTS?

8    A.  YES.

9    Q.  HAVE YOU BEEN REQUIRED OVER THE SPAN OF YOUR CAREER TO RELY

10   UPON AND INTERPRET AND IMPLEMENT CONSTRUCTION DRAWINGS?

11   A.  YES.

12   Q.  MAPS?

13   A.  YES.

14   Q.  PLANS?

15   A.  YES.

16   Q.  SURVEYS?

17   A.  YES.

18   Q.  PROPOSALS?

19   A.  YES.

20   Q.  DID YOU REVIEW AND RELY UPON THOSE TYPES OF THINGS IN FORMING

21   THE OPINIONS YOU HOLD IN THIS CASE?

22   A.  YES, I DID.

23   Q.  IN TERMS OF SURVEYING TECHNIQUES, HAVE YOU DEVELOPED ANY LEVEL

24   OF EXPERTISE OR SPECIALIZED KNOWLEDGE IN ANY PARTICULAR TECHNIQUES?

25   A.  I WOULD SAY THAT MY WORK WOULD RELATE TO INDUSTRIAL SURVEYING,

1   AND I FEEL VERY COMFORTABLE IN SPEAKING WITH THINGS THAT RELATE TO

2   WORK THAT HAPPENS ON INDUSTRIAL SURVEYING SITES.

3   Q.  DO THE TECHNIQUES THAT YOU'VE USED OVER THE YEARS, HAVE YOU HAD

4   SUBSTANTIAL EXPERIENCE INCLUDE THINGS LIKE TRADITIONAL SURVEYING?

5   A.  YES.

6   Q.  GPS, GLOBAL POSITIONING SYSTEMS?

7   A.  YES.

8   Q.  WOULD THAT INCLUDE BOTH STATIC GPS AND DIFFERENTIAL GPS?

9   A.  AND KINEMATIC, YES.

10   Q.  AND REAL TIME OR KINEMATIC GPS?

11   A.  YES.

12   Q.  WHAT ABOUT LIDAR OR LIGHT DETECTION AND RANGING DATA?

13   A.  I'VE USED IT MANY TIMES.

14   Q.  AND GIS, GEOGRAPHIC INFORMATION SYSTEMS OR LAYERING?

15   A.  I UNDERSTAND THE PROCESS THERE AS WELL.

16   Q.  AND DO YOU HAVE EXPERIENCE WITH THE USE OF PHOTOGRAMATIC --

17   A.  YOU HAD IT RIGHT THE FIRST TIME.

18   Q.  -- PHOTOGRAMATIC DATA?

19   A.  YES.

20   Q.  MR. MORRIS, WHAT PERCENT OF YOUR LICENSED PROFESSIONAL LAND

21   SURVEYING COHORTS, IF YOU WILL, WHAT PERCENT OF THOSE FOLKS ARE

22   ABLE TO PERFORM THESE PARTICULAR SURVEYING AND MAPPING TECHNIQUES

23   THAT YOU JUST DESCRIBED?

24   A.  RELATIVELY SMALL PERCENT, JUST NOT THAT MANY ARE FOCUSED IN THE

25   INDUSTRIAL SECTOR, MANY ARE FOCUSED ON BOUNDARY WORK WHICH WOULD BE

1    DIFFERENT.

2    Q.  HAVE YOU QUALIFIED IN COURT BEFORE OR BEEN TENDERED AS AN

3    EXPERT IN COURTS BEFORE IN THE FIELD OF SURVEYING AND MAPPING?

4    A.  YES.

5    Q.  ACCORDING TO YOUR CV, MR. MORRIS, YOU'VE BEEN RETAINED AS AN

6    EXPERT IN TWO LOUISIANA STATE COURT CASES, ONE IN THE 19TH JDC IN

7    EAST BATON ROUGE AND ANOTHER IN THE 25TH JDC IN PLAQUEMINES.  WERE

8    YOU EVER REJECTED BY ANY COURT?

9    A.  NOT QUALIFIED IN THE PLAQUEMINES CASE, THAT HASN'T COME TO

10    TRIAL YET.

11    Q.  BUT YOU'VE BEEN TENDERED AS AN EXPERT IN THAT CASE, THE COURT

12    HASN'T DECIDED WHETHER IT'S GOING TO ACCEPT YOU OR NOT?

13    A.  I DON'T KNOW IF IT IS.  I DON'T KNOW WHERE THAT ONE STANDS.

14    Q.  THANK YOU FOR THAT.  THE POINT IS IN ONE CASE, CAN YOU TELL US

15    WHICH PARTY YOU WERE RETAINED BY, EAST BATON ROUGE, PLAINTIFF OR

16    DEFENDANT?

17    A.  DEFENDANT.

18    Q.  PLAQUEMINES?

19    A.  PLAINTIFF.

20    Q.  AND THEN YOU HAVE TWO EASTERN DISTRICT CASES, MURPHY OIL AND

21    ROBINSON; SAME THING, ONE DEFENDANT, ONE PLAINTIFF?

22    A.  YES.

23    Q.  I NOTE THAT AT PAGE THREE OF YOUR REPORT YOU'RE ALSO LIST AN

24    OIL SPILL CASE IN COFFEYVILLE, KANSAS AND A KATRINA RELATED CASE

25    AGAINST MERCY HOSPITAL, ARE THOSE ON BEHALF OF PLAINTIFFS OR

1   DEFENDANTS?

2   A.  DEFENDANTS.

3   Q.  I ASKED YOU, FOUR DEFENSE CASES AND TWO PLAINTIFF CASES IS THE

4   EXTENT OF YOUR LEGAL CAREER SO FAR?

5   A.  PRETTY MUCH.

6   Q.  IN TERMS OF THE PERCENTAGE OF YOUR WORK THAT YOU DEVOTE TO

7   LEGAL MATTERS AS OPPOSED TO YOUR OTHER WORK AS A PROFESSIONAL LAND

8   SURVEYOR, WHAT PERCENT OF YOUR WORK REPRESENTS LEGAL WORK?

9   A.  TEN TO 20 PERCENT.

10  Q.  MR. MORRIS, IN EACH OF THESE PRIOR COURT CASES, WERE YOU CALLED

11  UPON TO EVALUATE AND INTERPRET SPATIAL CHARACTERISTICS AND

12  RELATIONSHIPS OF OBJECTS AND FEATURES AT PARTICULAR LOCATIONS

13  THROUGH THE USE OF SIMILAR DATA SETS AND DOCUMENTATION BY EMPLOYING

14  SUBSTANTIALLY EQUIVALENT METHODOLOGY THAT YOU USED IN THIS CASE?

15  A.  YES, THERE ARE CERTAINLY MANY SIMILARITIES.

16  Q.  WOULD OTHERS IN YOUR FIELD OF EXPERTISE EMPLOY THESE METHODS

17  AND TECHNIQUES IN A SUBSTANTIALLY SIMILAR WAY TO THE ONES YOU'VE

18  EMPLOYED IF THEY WERE CALLED UPON TO PERFORM THE TASK THAT YOU WERE

19  ASSIGNED?

20  A.  YES, I BELIEVE SO.

21  Q.  DID YOU EXERCISE THE SAME DEGREE OR LEVEL OF PROFESSIONAL

22  EFFORT AND APPLY THOSE METHODOLOGIES THAT YOU WOULD ORDINARILY

23  EMPLOY IN PERFORMING RELIABLE WORK FOR INDUSTRIAL AND CONSTRUCTION

24  CLIENTS?

25  A.  YES.

1           MR. STEVENS:  THANK YOU, YOUR HONOR, PLAINTIFFS TENDER

2   CHAD AARON MORRIS AS AN EXPERT IN THE FIELD OF SURVEYING AND

3   MAPPING BASED UPON HIS EDUCATION, TRAINING, AND EXPERIENCE.

4           THE COURT:  THE COURT REALIZES AN OBJECTION WAS LODGED

5   AND THE COURT HAS RULED ON IN LIMINE.  AND THAT OBJECTION IS

6   PRESERVED, BUT IF YOU WANT TO ASK SOME QUESTIONS, YOU MAY.  AND, OF

7   COURSE, WE DO THIS JUST TO LET THE COURT REPORTER KNOW, WHEN

8   THERE'S A TRAVERSE THIS GOES TO THE DEFENDANT'S TIME.

9           MS. WAGER-ZITO:  THANK YOU, YOUR HONOR, AND I'LL KEEP

10  THIS BRIEF BECAUSE MR. STEVENS TENDERED THE WITNESS AS AN EXPERT IN

11  SURVEYING AND MAPPING, BUT ASKED SOME QUESTIONS ABOUT HIS

12  EXPERIENCES WITH BACKFILLING AND COMPACTION AND UTILIZATION --

13          THE COURT:  HE DID.

14          MS. WAGER-ZITO:  -- OF CONSTRUCTION DOCUMENTS AND HOW

15  THOSE MIGHT BE USED ON A PROJECT, AND WE DO NOT BELIEVE THAT HIS

16  OPINION IN THIS CASE DEALT WITH BACKFILLING AND COMPACTION, NOR DID

17  HE GIVE ANY OPINIONS IN THIS CASE, HE DID NOT PREPARE A GIS, HE DID

18  NOT DO ANY GPS MODELING OF THIS SITE, SO WE WOULD LIKE TO EXPLORE

19  WITH HIM HIS EXPERTISE IN BACKFILLING AND COMPACTION, AND WE WOULD

20  LIKE TO LIMIT --

21          THE COURT:  HE DID GIVE AN OPINION, SO I UNDERSTAND YOUR

22  TRAVERSE, THAT BASED ON THE WGI IMAGES, I HAVE SEEN BACKFILLING OF

23  THESE EXCAVATION APPEARS TO HAVE CONSISTED PRIMARILY OF

24  NON-COMPACTED MATERIAL SO HE DID GIVE AN OPINION IN HIS REPORT.

25          MS. WAGER-ZITO:  AND HE DID AND THAT IS THE SUM AND

1    SUBSTANCE OF WHAT HE SAID ABOUT BACKFILLING COMPACTION IN HIS

2    OPINION.

3           THE COURT:  THAT IS TRUE.

4           MS. WAGER-ZITO:  AND AT HIS DEPOSITION HE EXPRESSLY SAID

5    THAT HE WAS NOT AN EXPERT IN BACKFILL AND COMPACTION AND HE WAS

6    NOT -- WE ASKED HIM IF HE HAD BEEN ASKED TO TESTIFY AT THIS TRIAL

7    ON HIS EXPERIENCES OBSERVING BACKFILL AND COMPACTION OF

8    EXCAVATIONS, AND THAT WAS AT PAGE 29 OF HIS DEPOSITION, AND HE

9    ANSWERED THAT HE HAD NOT.  AND I CAN ASK THE WITNESS THESE

10   QUESTIONS, YOUR HONOR.

11          THE COURT:  SURE.

12                          TRAVERSE EXAMINATION

13   BY MS. WAGER-ZITO:

14   Q.  MR. MORRIS, YOU DO NOT CONSIDER YOURSELF AN EXPERT IN

15   BACKFILLING AND COMPACTION OF EXCAVATIONS, CORRECT?

16   A.  I THINK WHAT WE SPOKE OF IN MY DEPOSITION WAS AND WHAT I TRIED

17   TO DO DURING MR. STEVENS' QUESTIONS ABOUT THAT WAS TO EXPLAIN WHAT

18   I HAVE OBSERVED OVER MY CAREER AND WHAT I FEEL COMFORTABLE

19   DISCUSSING IN TERMS OF, I'VE SURVEYED IT, I'VE BEEN AROUND IT, I'VE

20   SEEN IT, AND TO THAT EXTENT I AM KNOWLEDGEABLE ABOUT IT; BUT I DO

21   NOT POSSESS ALL OF THE DETAILS OF WHAT IT TAKES TO DO A PROPER

22   PROCTOR TEST, I'VE NEVER APPROACHED IT FROM THAT STANDPOINT.  MY

23   EXPERIENCE IS LIMITED TO WHAT I OBSERVED IN 22 YEARS OF OBSERVING

24   THESE TECHNIQUES IN THE FIELD.

25   Q.  AND WHEN WE ASKED YOU THE QUESTION, "DO YOU CONSIDER YOURSELF

1    AN EXPERT IN THESE MATTERS?"  YOUR ANSWER AS NO; IS THAT CORRECT?

2    A.  I THINK I'VE EXPLAINED MY LIMIT OF MY KNOWLEDGE IN THAT AREA.

3    Q.  AND YOUR EXPERIENCE WITH COMPACTION TESTING THAT YOU JUST

4    DISCUSSED ABOUT THE NORTH LANDFILL, THAT WAS WORK THAT YOU DID ON

5    THAT PROJECT FROM 2000 TO 2003?

6    A.  I BELIEVE THAT TIME FRAME SOUNDS CLOSE TO BEING RIGHT, I AM NOT

7    GREAT WITH DATES; BUT, YES, IT WAS DURING MY TIME AT HYDRO CONSULT

8    ANS.

9    Q.  AND YOU WERE ONLY ACTUALLY ON SITE AT THE LANDFILL FOR

10   APPROXIMATELY ONE TO TWO WEEKS?

11   A.  MANY TRIPS TO THE SITE.  I THINK THAT'S PROBABLY FAIR IN TERMS

12   OF THE TOTAL AMOUNT OF TIME ON SITE, YES.

13   Q.  AND OTHERWISE, YOUR EXPERIENCE WITH BACKFILL AND COMPACTION

14   INVOLVED BEING AN OBSERVER AT VARIOUS CONSTRUCTION SITES OVER THE

15   COURSE OF YEARS, BUT YOU WERE NOT VERY INVOLVED IN IT, IT WAS

16   SOMETHING YOU OBSERVED WHEN YOU WERE IN THE VICINITY; DOES THAT

17   ACCURATELY CONVEY YOUR EXPERIENCES?

18   A.  I THINK THAT ACCURATELY CONVEYS MY EXPERIENCES AND WHAT I JUST

19   SAID, YES.

20   Q.  BUT YOU WOULD AGREE THAT COMPACTION ACTIVITIES AT DIFFERENT

21   SITES AREN'T NECESSARILY UNIFORM, IT DEPENDS ON THE PARTICULAR SITE

22   THAT YOU'RE AT, WHAT NEEDS TO BE ACCOMPLISHED WITH BACKFILL AND

23   COMPACTION, CORRECT?

24   A.  YES.

25   Q.  AND WHETHER OR NOT SAND CAN BE COMPACTED IS OUTSIDE OF YOUR

1   AREA OF EXPERTISE?

2   A.  YES.

3   Q.  AND YOU WOULD AGREE THAT THE DETAILS OF THE MATERIAL USED FOR

4   COMPACTION AND THE NUANCES BETWEEN THE TYPES OF MATERIALS IS

5   OUTSIDE OF YOUR AREA OF EXPERTISE?

6   A.  YES, IT IS.

7   Q.  AND YOU'RE NOT FAMILIAR WITH THE KINDS OF BORROW MATERIAL THAT

8   WAS AVAILABLE AT THE EBIA SITE, CORRECT?

9   A.  CERTAINLY NOT INTIMATELY.

10  Q.  AND YOU DON'T KNOW WHAT KIND OF SOILS WERE NATIVE TO THE EBIA

11  SITE, CORRECT?

12  A.  NO.

13  Q.  AND YOU DIDN'T KNOW WHAT KIND OF SOILS WERE IN THE BORROW PIT

14  AT THE EBIA SITE, CORRECT?

15  A.  I HAVE SOME KNOWLEDGE ABOUT IT, BUT I CERTAINLY WOULD NOT

16  TENDER MYSELF AN EXPERT ON THOSE SOIL CONDITION.

17  Q.  AND YOU'RE NOT AN EXPERT IN SOIL CONDITIONS AT ALL, ARE YOU?

18  A.  NO, I AM NOT.

19  Q.  AND YOU DIDN'T, AT LEAST AS OF THE TIME THAT YOU WROTE YOUR

20  REPORT AND AS OF THE DATE OF YOUR DEPOSITION ON MARCH 9TH OF THIS

21  YEAR, YOU HADN'T REVIEWED ANY OF THE DAILY CONSTRUCTION DOCUMENTS

22  FOR THE EBIA PROJECT?

23  A.  I HAD SEEN SOME OF THEM, BUT I WAS UNABLE TO -- THE FORM THAT

24  THEY WERE PROVIDED TO ME AT THE TIME OF MY REPORT WAS DISJOINTED,

25  AND I CERTAINLY HADN'T DONE A COMPREHENSIVE REVIEW OF THEM BECAUSE

1    WHEN I HAD THEM AT THAT TIME MIGHT HAVE TWO PAGES OF THE QAR AND

2    THEN AN E-MAIL.  SO TO ANSWER YOUR QUESTION, NO, AT THE TIME OF MY

3    REPORT I HAD NOT BEEN ABLE TO DO ANY SORT OF A COMPREHENSIVE REVIEW

4    OF THOSE CONSTRUCTION DOCUMENTS.

5    Q.  AND YOUR OPINION, IN FORMING YOUR OPINION THAT YOU ISSUED IN

6    THIS CASE, YOU DID NOT UTILIZE THOSE QARS IN REACHING YOUR

7    OPINIONS, ALL YOU UTILIZED WERE THE IMAGES THAT WERE IN YOUR REPORT

8    AND THE ADDITIONAL PHOTOGRAPHS THAT YOU LOOKED AT IN A COUPLE OF

9    BOXES THAT WERE PROVIDED TO YOU?

10   A.  AT THE TIME OF MY REPORT, I HAD NOT UTILIZED THE DAILY REPORTS,

11   THAT'S CORRECT.

12   Q.  AND YOU DIDN'T PREPARE A GIS MODEL?

13   A.  NO, I HAVE NOT PREPARED A GIS MODEL.

14   Q.  OR GPS MODEL?

15   A.  I SHOULD CLARIFY.  GIS IS AN EXTREMELY BROAD TERM, AND IT

16   REALLY JUST RELATES TO LAYERING OF INFORMATION.  SO TO THE EXTENT

17   THAT I TOOK AN AERIAL PHOTOGRAPH AND OVERLAID SOME OF THE BUILDING

18   SITES, THAT IS A GIS.  A GIS REALLY JUST CAN GROW INTO SOMETHING

19   THAT CONTAINS HUNDREDS OF LAYERS, BUT IN AN ESSENCE, THAT IS A GIS.

20        SO TO THAT EXTENT I DID, BUT TO THE EXTENT THAT I THINK

21   YOU'RE ASKING HUNDREDS OF LAYERS, NO, I DID NOT.

22   Q.  AND IT'S ALL ABOUT THE UNDERLYING DATA, CORRECT?

23   A.  CERTAINLY THE UNDERLYING DATA ALWAYS MATTERS.

24   Q.  THE UNDERLYING DATA YOU PUT IN AND THEN YOU APPLY SOME SOFTWARE

25   TO IT AND YOU CAN CREATE A GIS MODEL?

1  A.  IT'S REALLY AS SIMPLE AS PUTTING THESE THINGS TOGETHER IN THE

2  SAME LOCATION SO THAT YOU CAN REVIEW THEM, REVIEW THE PARTS OF THE

3  INFORMATION THAT YOU ARE TRYING TO INVESTIGATION.  SO IT'S JUST A

4  MATTER OF LAYERING INFORMATION AND THEN BEING ABLE TO VIEW IT IN

5  CONJUNCTION WITH OTHER TYPES OF INFORMATION.

6  Q.  BUT THE ONLY GIS TYPE MODEL THAT YOU PREPARED AT LEAST IN YOUR

7  REPORT AND AT THE TIME OF YOUR DEPOSITION WERE THE COUPLE OF

8  FIGURES THAT ARE CONTAINED IN YOUR REPORT, CORRECT?

9  A.  YEAH, BASICALLY OVERLAYING --

10        THE COURT:  WE'RE GETTING CLOSE TO CROSS-EXAMINATION, I

11  ASSUME YOU'RE GOING TO CROSS-EXAMINE.  BUT GO AHEAD.

12        MS. WAGER-ZITO:  AND, YOUR HONOR, THAT WAS THE LAST

13  QUESTION.  WE WOULD OBJECT TO MR. MORRIS' GIVING OPINIONS ON

14  BACKFILL AND COMPACTION, WE DO NOT OBJECT TO HIM BEING QUALIFIED AS

15  AN EXPERT IN SURVEYING AND MAPPING.  WE DO -- WE WILL ALSO HAVE

16  SOME OBJECTIONS TO SOME OF THE DEMONSTRATIVES THAT WERE PROVIDED TO

17  US THE OTHER DAY BECAUSE WE THINK THOSE, TOO, GO BEYOND THE SCOPE

18  OF HIS REPORT AND I CAN RAISE THOSE AS THEY COME UP.

19        THE COURT:  PROBABLY THAT WOULD BE BEST.  I AM GOING TO

20  AT THIS TIME --

21        MR. KELLS:  YOUR HONOR, CONOR KELLS FOR THE UNITED

22  STATES.  I WOULD JUST LIKE TO LODGE ONE OTHER OBJECTION BASED ON

23  MR. STEVENS' SORT OF VOIR DIRE OF THE WITNESS.  MR. MORRIS PREPARED

24  REPORTS AND WILL BE TESTIFYING ABOUT CAUSATION, IT WAS MY

25  UNDERSTANDING THAT HE WAS NOT A CAUSATION EXPERT, THAT HE WOULD

1  BE --

2          THE COURT:  HE WILL BE LIMITED TO WHAT'S IN HIS REPORT OR

3  ELSE SOMETHING THAT IS EXTRAORDINARILY LOGICALLY AN EXTENSION

4  THEREOF.  AS WILL ALL EXPERTS.

5          MS. WAGER-ZITO:  THANK YOU, YOUR HONOR.

6          THE COURT:  SINCE THERE WAS NO DAUBERT CHALLENGE FILED ON

7  THIS GENTLEMAN, AS I SAID EARLIER, HE IS GOING TO BE ALLOWED TO

8  TESTIFY AS TO WHAT'S IN HIS REPORT AND BE CROSS-EXAMINED THEREBY,

9  HOPEFULLY NOT REPETITIVE.  ALL RIGHT.

10          GO AHEAD, SIR.

11          MR. STEVENS:  THANK YOU, YOUR HONOR.

12                        DIRECT EXAMINATION

13  BY MR. STEVENS:

14  Q.  HOLD UP, GOT SWALLOWED UP, STUCK IS IN A BOOK.

15          LET'S LOOK AT A SUMMARY OF YOUR OPINIONS AND CONCLUSIONS

16  IN THIS CASE.  MR. MORRIS, IF YOU WOULD, PLEASE, GO TO THE NEXT

17  SLIDE.  WHAT IS YOUR FIRST OPINION --

18          THE COURT:  EXCUSE ME, DO WE HAVE COPIES OF THIS?

19          MR. STEVENS:  I AM SORRY, YES, WE DO.  I MEANT TO HAND

20  THAT TO YOU AS SOON AS I WALKED UP.

21          THE COURT:  THANK YOU.

22          MR. STEVENS:  I APOLOGIZE.

23  BY MR. STEVENS:

24  Q.  MR. MORRIS, WHAT IS YOUR FIRST OPINION?

25  A.  MY INVESTIGATION REVEALED EXTENSIVE CONSTRUCTION ACTIVITIES,

 1   EXCAVATIONS, AND PILE REMOVAL ACTIVITIES IN THE VICINITY OF THE

 2   NORTH AND SOUTH BREACHES.

 3   Q.  AND YOUR SECOND OPINION?

 4   A.  INVESTIGATION REVEALED THAT MANY EXCAVATION AREAS, SUBSURFACE

 5   STRUCTURES AND HUNDREDS OF DEEP PILINGS WERE REMOVED AND EITHER NOT

 6   BACKFILLED OR POORLY BACKFILLED WITH LITTLE OR NO COMPACTION OR

 7   GROUTING.

 8   Q.  AND YOUR THIRD OPINION.

 9   A.  ELEVATIONS AND LOCATIONS OF PLAINTIFFS' PROPERTIES, USED BY THE

10   DUTCH MODELLING TEAM FOR CALCULATION OF INUNDATION LEVELS AT EACH

11   SITE ARE ACCURATE.

12   Q.  NOW, MR. MORRIS, WERE YOU ALSO ASKED TO REVIEW THE ACCURACY OF

13   THE DEFENDANTS' EXPERTS MAPPING OF CONSTRUCTION ACTIVITIES,

14   EXCAVATIONS, PILE REMOVAL, AND BACKFILLING IN THE VICINITY OF THE

15   NORTH AND SOUTH BREACHES?

16   A.  WAS ASKED TO DO THAT AFTER THE TIME OF MY DEPOSITION, YES.

17   Q.  AND YOU'VE SINCE SEEN THE GIS INFORMATION THAT WAS PROVIDED AND

18   EVALUATED IT AS WELL, CORRECT?

19   A.  I HAVE DONE SOME EVALUATION OF THE GIS, YES.

20   Q.  IS IT YOUR OPINION --

21       MS. WAGER-ZITO:  EXCUSE ME, OBJECTION, YOUR HONOR.  WE

22   WOULD OBJECT TO HIS GIVING ANY TESTIMONY, HE JUST SAID AFTER HIS

23   DEPOSITION HE REVIEWED OUR MODELLING WHERE OUR EXCAVATIONS WERE,

24   AND HE IS GOING TO GIVE SOME OPINIONS ON THAT, IT'S EXACTLY WHAT WE

25   WERE TALKING ABOUT.

```
 1            THE COURT:  COUNSEL, YOU'RE SHAKING YOUR HEAD, IT DOES
 2   SEEM LIKE COUNSEL FOR THE DEFENDANT IS CORRECT.  TELL ME WHY SHE
 3   ISN'T.
 4            MR. STEVENS:  THE ONLY MODELLING HE IS LOOKING AT, IF YOU
 5   WANT TO CALL IT MODELLING, IS THE GIS DATABASE WE GOT FRIDAY.
 6            THE COURT:  I UNDERSTAND.  BUT THE WHOLE POINT IS I AM
 7   NOT GOING TO START LETTING HIM OPINING NOW ON THINGS HE HASN'T
 8   FILED A SUPPLEMENTAL REPORT WITH.  THEN WE OPEN THAT UP TO
 9   EVERYONE.  YOU'RE NOT GOING TO DO IT, YOU'RE NOT GOING TO DO IT.
10            MR. BRUNO:  I UNDERSTAND BUT WITH ALL RESPECT JUST TO
11   REMIND THE COURT --
12            THE COURT:  WITH ALL RESPECT, YOU BETTER UNDERSTAND
13   BECAUSE IT'S NOT GOING TO HAPPEN.  I LET THE DATA IN AND YOU CAN
14   USE THAT FOR CROSS-EXAMINATION, YOU DIDN'T SAY FOR OTHER OPINIONS.
15   THAT'S NOT GOING TO HAPPEN.  THEN EVERYBODY CAN GET IT, EVERYBODY
16   CAN DO IT.
17            MR. BRUNO:  JUDGE, JUST TO REMIND THE COURT, WE HAD A
18   MEETING AND AT THAT MEETING WE TALKED ABOUT THE NECESSITY OF
19   WRITING A REBUTTAL REPORT, AND THE COURT ADMONISHED ME AND THE
20   PARTIES AND SAID THE ONLY TIME YOU NEED TO WRITE A REBUTTAL REPORT
21   IS IF YOU WERE GOING TO CONDUCT SOME NEW ANALYSES OR NEW MODELS OR
22   THINGS OF THAT NATURE.
23            THE COURT:  LET ME MAKE IT CLEAR IT YOU, SIR, THERE WILL
24   BE NO OPINIONS GIVEN TO THIS COURT THAT HAVE NOT BEEN FILED WITH A
25   REPORT.  NONE.
```

```
 1          MR. BRUNO:  DOES THAT MEAN WE CAN'T DO ANY REBUTTAL OF

 2   THE DEFENDANTS' EXPERT REPORTS THROUGH EXPERTS?

 3          THE COURT:  THAT WILL MEAN YOU'RE FILING A REBUTTAL

 4   REPORT IN COURT FAR AFTER THE TIME TO FILE THEM.  SO I AM NOT SURE

 5   THEN WHAT -- YOU CANNOT FILE A REBUTTAL REPORT -- A REBUTTAL REPORT

 6   IS JUST THAT, YOU CAN'T, YOU'RE NOW GIVING A REBUTTAL REPORT DURING

 7   TRIAL.  IT CAN'T HAPPEN.

 8          MR. BRUNO:  YOU TOLD US, JUDGE, WE DIDN'T HAVE TO FILE A

 9   REBUTTAL REPORT, THAT'S THE PROBLEM.

10          THE COURT:  OF COURSE YOU DIDN'T HAVE TO, I SAID IF YOU

11   DIDN'T WANT TO; BUT THERE WAS A PROVISION, A TIME LIMIT FOR FILING

12   REBUTTAL REPORTS IN THE ORDER.  IT'S JUST HOW OPAQUE WE'RE GOING TO

13   BE.  WHEN I SAID YOU DIDN'T HAVE TO, SIR, THAT MEANS IF YOU DIDN'T

14   WANT TO FILE ONE, FINE.  BUT I DID SAY ALSO, IF YOU DO RECALL, THAT

15   YOU DO THAT AT YOUR OWN RISK.  YOU DO REMEMBER THAT, DON'T YOU?

16          MR. BRUNO:  JUDGE, THAT'S WHY I PROVOKED THE MEETING TO

17   UNDERSTAND THE RISK AND, JUDGE --

18          THE COURT:  WE'RE GOING NOWHERE HERE.  YOU BETTER GIVE ME

19   A PRECISE RULE -- HE IS NOT GOING TO BE ALLOWED TO GIVE THESE

20   OPINIONS, IT'S BACK DOOR, CAN'T DO IT.  I WOULD HAVE TO LET THE

21   OTHER SIDE DO IT, TOO, AND I AM NOT GOING TO LET THEM DO IT EITHER.

22          MR. BRUNO:  THE OTHER SIDE IS DOING IT AND, JUDGE, THIS

23   IS HOW THEY'RE DOING IT.  WE WERE REQUIRED TO GIVE THEM OUR EXPERT

24   REPORTS FIRST.  THEY WERE REQUIRED TO GIVE US THEIR EXPERTS AFTER,

25   SO THEY ESSENTIALLY REBUTTED OUR EXPERT REPORTS.  THERE WAS A
```

```
1    PROVISION FOR REBUTTAL REPORT, THE REASON --

2              THE COURT:  THAT ONLY YOU HAD.

3              MR. BRUNO:  THE ORDER THAT I HAD --

4              THE COURT:  THAT ONLY YOU HAD, THE DEFENDANT DID NOT HAVE

5    A PROVISION FOR REBUTTAL, SUPPLEMENTAL REPORTS.

6              MR. BRUNO:  WE WERE ORDER TO GO SEE MAGISTRATE WILKINSON

7    WHO TALKED TO US ABOUT HIS UNDERSTANDING OF THE --

8              THE COURT:  LOOK, I'VE BEEN THROUGH THE REBUTTAL REPORTS.

9    MY ORDER SPEAKS FOR ITSELF.  REBUTTAL REPORTS HAVE TO BE FILED BY

10   X.  THIS IS A FEDERAL RULE.  THERE IS A COURT ORDER HERE.  REBUTTAL

11   REPORTS ON MANY OCCASIONS AREN'T ALLOWED, I DID ALLOW THEM TO BE

12   FILED BY A CERTAIN TIME.

13             IF YOU WANTED A CONTINUANCE, YOU KNOW, BECAUSE YOU WERE

14   EGREGIOUSLY PREJUDICED, THAT'S FINE.  WE CAN'T HAVE THIS MAN GIVING

15   OPINIONS THAT THEY'VE NEVER HEARD.  WE CAN'T DO THAT.

16             MR. BRUNO:  JUDGE, THEY HAVE HEARD THESE OPINIONS.

17             THE COURT:  WELL, THEY HAVE NEVER SEEN IT EXPRESSED IN

18   WRITING.

19             MR. BRUNO:  JUDGE, WITH ALL RESPECT THEY HAVE, BUT I

20   UNDERSTAND YOUR RULING.

21             THE COURT:  WELL, MY POINT IS, AS I MADE IT CLEAR, AND IT

22   BETTER HAVE BEEN CLEAR UNLESS EVERYBODY IS GRANTED, NO REPORT, NO

23   REPORT, NO OPINION.  SIMPLE AS THAT.  OTHERWISE WE WOULD HAVE

24   COMPLETE ANARCHY AND CHAOS, AND WE ARE NOT GOING TO HAVE IT IN THIS

25   CASE, SO THAT'S THAT.
```

```
1              YOU CAN CROSS-EXAMINE THE PEOPLE ON THE INFORMATION THAT

2    I MADE THEM PRODUCE THAT YOU DIDN'T ASK TO PRODUCE UNTIL THE LAST

3    DAY, UNTIL THE MOTION IN LIMINE.

4              MR. STEVENS:  THAT'S FINE.  THANK YOU, YOUR HONOR.

5    BY MR. STEVENS:

6    Q.  MR. MORRIS, WHAT WERE YOU ASKED TO DO IN THIS CASE?

7    A.  ANALYZE THE SPATIAL CHARACTERISTICS OF EXCAVATIONS AND PILE

8    REMOVALS THAT HAPPENED IN THE VICINITY OF THE NORTH AND SOUTH

9    BREACHES.

10   Q.  AND CAN YOU TELL THE COURT HOW YOU WENT ABOUT THAT TASK?

11   A.  I REVIEWED PHOTOGRAPHS AND I OBTAINED AERIAL PHOTOGRAPHY AND

12   OVERLAID -- I ALSO LOOKED AT SOME OF THE CONSTRUCTION DRAWINGS, I

13   OVERLAID THOSE TO DETERMINE THE LOCATION OF SOME OF THESE

14   CONSTRUCTION ACTIVITIES WITH RESPECT TO THE NORTH AND SOUTH

15   BREACHES.

16   Q.  AND AS JUDGE DUVAL POINTED OUT EARLIER, YOU CONCLUDED THAT THE

17   REVIEW OF THAT MATERIAL CAUSED YOU TO CONCLUDE BASICALLY BOTH

18   LOCATIONS, PARTICULARLY BOLAND, WHAT I AM READING NOW FROM PAGE 15

19   OF YOUR REPORT, THAT THE WORK IN THE AREA WAS EXTENSIVE, IT

20   INCLUDED MULTIPLE EXCAVATIONS AND PILE REMOVALS WHICH EXTENDED TO

21   DEPTHS OF 25 FEET BELOW SEA LEVEL AND BASED ON THE WGI IMAGES

22   BACKFILLING OF THESE EXCAVATIONS APPEAR TO HAVE CONSISTED PRIMARILY

23   OF NON-COMPACTED MATERIAL AND SAND.  CORRECT?

24   A.  YES.

25   Q.  IN ASSISTING THE COURT IN UNDERSTANDING THE SPATIAL
```

1   RELATIONSHIPS BETWEEN THE ACTIVITIES IN THIS PROJECT IN THE EBIA

2   AND THE NORTH AND SOUTH BREACHES, DID YOU MAP THE SIGNIFICANT

3   FEATURES?

4   A.  I SHOWED THE OVERLAY OF SOME OF THE FEATURES.  YOU MAY WANT TO

5   LOOK AT THE FIRST COUPLE OF PAGES, FIRST COUPLE OF SLIDES IN THAT

6   PRESENTATION, BUT I DID OVERLAY THE -- THERE ARE SOME OF THEIR PLAN

7   WORK AREAS INITIALLY WITH THE AREA OF THE NORTH AND SOUTH BREACHES.

8   Q.  WERE YOU ABLE TO ARRIVE AT ANY, WHAT I WOULD SAY, SURVEY GRADE

9   DETERMINATIONS OF LOCATIONS?

10  A.  AT THAT TIME GENERALLY, NO, I WAS NOT.  I DIDN'T HAVE THE QARS

11  IN A USABLE FASHION, AND I USED THE -- BASICALLY THE PHOTOGRAPHS

12  THAT I HAD AND SOME OF THE MAPS THAT I WAS ABLE TO WORK WITH TO

13  SHOW THEIR GENERAL LOCATIONS.  BUT IN MOST CASES, THE DETAILED

14  ANALYSIS OF WHERE EACH INDIVIDUAL EXCAVATION WAS REQUIRED AN

15  INTIMATE KNOWLEDGE OF THOSE DAY-TO-DAY WORK PLANS OR WORK DOCUMENTS

16  IN ORDER TO PIECE IT TOGETHER.

17  Q.  AND LET'S TALK ABOUT THE NORTH BREACH, HERE AT JX 1576 AT PAGE

18  SEVEN, COULD YOU GIVE US A LITTLE ORIENTATION AS TO WHAT THIS

19  SHOWS?

20  A.  THIS IS JUST A GENERAL ORIENTATION MAP TO SHOW IN THE -- THIS

21  SHOWS BUILDING NUMBERS IN CONJUNCTION WITH THE APPROXIMATE LOCATION

22  OF THE NORTH BREACH, THESE WERE SOME OF THE PLAN WORK AREAS FOR WGI

23  IN ONE OF THE EARLIER PHASES OF THEIR WORK ACTIVITIES.

24  Q.  AND WOULD YOU AGREE THAT BUILDING NO. 1 IS THE NORTHERN MOST

25  BUILDING IN THE BOLAND MARINE SITE?

1    A.  YES.

2    Q.  NOW, SLIDE FOUR, PLEASE, NEXT.  THIS OVERLAY, HAVE YOU USED

3    YOUR GIS TECHNOLOGY TO OVERLAY THE BUILDINGS ON THE SAME

4    PHOTOGRAPH?

5    A.  THIS IS NOT THE SAME PHOTOGRAPH, THIS WAS A PHOTOGRAPH THAT WAS

6    TAKEN IN 1996 PRIOR TO WGI'S WORK AT THE SITE.

7    Q.  ALL RIGHT.

8    A.  AND, YES, WE WERE OVERLAYING SOME OF THE OUTLINES OF SOME OF

9    THE BUILDINGS FOR REFERENCE.

10   Q.  AND THE NORTHERN MOST BUILDING OF NO. 1 IS OUTLINED IN RED, AS

11   ARE ALL OF THE BUILDINGS, CORRECT?

12   A.  YES.

13   Q.  THERE ARE VISIBLE FEATURES THAT WERE DONE BEFORE WGI DID THEIR

14   WORK?

15   A.  THAT'S CORRECT, YOU CAN SEE -- ONE CAN SEE THE WHARF IS STILL

16   IN PLACE, AND WHILE IT'S NOT THE MOST CLEAR PHOTOGRAPH, YOU CAN SEE

17   THE BUILDINGS ARE STILL THERE AT THIS TIME.

18   Q.  AND HAVE YOU REPRESENTED FOR THE COURT THE LOCATION OF THE

19   NORTH BREACH?

20   A.  YES.  IT'S DEPICTED IN YELLOW WITH THE LABEL THAT SAYS BREAK.

21   Q.  MR. MORRIS, WHAT IS THE DISTANCE FROM THE INDUSTRIAL CANAL TO

22   THE WALL AT THE LOCATION OF THE FUTURE NORTH BREACH?

23   A.  AT THIS TIME IT WAS APPROXIMATELY 350 FEET.

24   Q.  NEXT SLIDE.

25          THE COURT:  MAKE SURE I UNDERSTAND THAT, SIR.  I

1    APOLOGIZE.  THE DISTANCE FROM WHAT POINT TO WHAT POINT?

2              MR. STEVENS:  I'M SORRY.

3              THE WITNESS:  THIS MAP IS FINE, IT SHOWS IT THE SAME, IT

4    HASN'T CHANGED.  I'M SORRY.  FROM THE WATER'S EDGE IN THIS AREA TO

5    THE WALL (INDICATING).

6              THE COURT:  OH, I SEE, THE WATER'S EDGE.  I UNDERSTAND,

7    THANK YOU.

8              MR. STEVENS:  350 FEET.

9    BY MR. STEVENS:

10   Q.  NOW, IN THE NEXT SLIDE WE'RE LOOKING AT A NOVEMBER 2002 AERIAL

11   PHOTOGRAPH WITH THE SAME GIS AERIAL BUILDINGS OUTLINES IN RED

12   SUPERIMPOSED ON IT?

13   A.  YES.  THIS IMAGE BASICALLY SHOWS OR THIS IMAGE SHOWS THE AREA

14   AFTER WGI PERFORMED SOME OF THE WORK AT THE SITE, ONE CAN SEE THE

15   BUILDINGS ARE NO LONGER THERE, BUT THE LAND MASS IS ESSENTIALLY

16   UNCHANGED.  THE WHARF IS GONE BUT THE LAND MASS ITSELF, IT'S STILL

17   APPROXIMATELY 350 FEET FROM THE WATER'S EDGE TO THE FLOODWALL AT

18   THIS POINT.

19   Q.  AND WOULD YOU AGREE THAT THERE'S STILL LAND MASS TO THE WEST OF

20   BUILDING NO. 1?

21   A.  YES.

22   Q.  FOR FUTURE REFERENCE, MR. MORRIS, WOULD YOU DESCRIBE THE

23   FEATURE OR CHARACTERISTICS IN THAT THIN BROWN LINE THAT RUNS IN A

24   NORTHERLY DIRECTION FROM THIS WHITISH TRAILER JUST TO THE WEST OF

25   SUREKOTE ROAD, WOULD YOU DESCRIBE FOR US WHAT THAT LITTLE THIN

1    PIECE OF GREEN PIZZA SHAPE IS?

2    A.   THERE IS AN EMBANKMENT WHERE SUREKOTE ROAD IS GETTING HIGHER TO

3    CROSS OVER THE FLOODWALL THERE.

4    Q.   THE NEXT SLIDE.  LET ME ASK YOU, DID THIS BANK HERE BETWEEN THE

5    NORTH BREACH AND THE SHORELINE JUST TO THE WEST OF BUILDING NO. 1

6    CHANGE OVER TIME?

7    A.   YES, IT CAN BE SEEN IN THE NEXT SLIDE.

8    Q.   NEXT SLIDE.  THIS IS AN AERIAL PHOTOGRAPH, IS IT NOT?

9    A.   YES.  IT'S DATED APRIL 15TH OF 2005, SO IT'S JUST FOUR MONTHS

10   BEFORE HURRICANE KATRINA.

11   Q.   SO TAX DAY 2005 IS WHEN THIS AERIAL PHOTOGRAPHIC IMAGE WAS

12   CAPTURED, CORRECT?

13   A.   YES.

14   Q.   SUPERIMPOSED ON THAT SAME IMAGE ARE THE SAME RED LINES FOR THE

15   BUILDINGS?

16   A.   THAT'S CORRECT.

17   Q.   NOW, HAS THE SHAPE OF THE SHORELINE IMMEDIATELY WEST OF THE

18   FUTURE NORTH BREACH CHANGED?

19   A.   YES.  AT THIS TIME IT'S READILY APPARENT IN THIS IMAGE THAT THE

20   WATER'S EDGE HAS MOVED CONSIDERABLY CLOSER TO THE NORTH BREACH, AND

21   IT HAS MOVED IN APPROXIMATELY 170 FEET AT THIS TIME; THE DISTANCE

22   FROM THE NORTH BREACH TO THE WATER'S EDGE WOULD BE APPROXIMATELY

23   180 FEET.

24   Q.   AND SO FROM THE IMMEDIATE, THE PICTURE IMMEDIATELY BEFORE THIS

25   ONE WAS DATED NOVEMBER 2002, THIS PHOTOGRAPH IS DATED APRIL 2005,

```
 1   SO OVER THE COURSE OF THAT THREE AND A HALF YEARS, THE SHORELINE

 2   MOVED IN TO WHERE WE SEE THE DARK IMAGE HERE, CORRECT?

 3   A.  THAT'S CORRECT.

 4   Q.  WHAT IS THAT DARK IMAGE UNDER WHAT USED TO BE BUILDING 1 AND

 5   WHATEVER THE BUILDING TO THE IMMEDIATE SOUTH OF BUILDING 1 IS?

 6   A.  THAT WOULD BE WHERE IT'S INUNDATED WITH WATER.

 7   Q.  HAVE YOU DETERMINED THE DISTANCE THAT THIS SHORELINE MOVED

 8   CLOSER TO THE FUTURE NORTH BREACH AREA?

 9   A.  SORRY, I ALREADY TOLD YOU.

10   Q.  I'M SORRY, I'M PAYING ATTENTION TO MYSELF.

11            THE COURT:  YOU CAN SAY IT AGAIN.

12            THE WITNESS:  170 FEET WOULD BE THE APPROXIMATE DISTANCE

13   IT MOVED IN, AND THE DISTANCE THAT IS STILL LEFT IS APPROXIMATELY

14   180 FEET FROM THE NORTH BREACH TO THE WATER'S EDGE.

15   BY MR. STEVENS:

16   Q.  SO IF WE STARTED WITH 350 AND 175 IS HALF, IT'S ABOUT 50

17   PERCENT CLOSER TO THE FUTURE NORTH BREACH THAN IT WAS BEFORE?

18   A.  YES.

19   Q.  THANK YOU.  AM I CORRECT, SIR, THAT THE, IN THE 2002 PHOTOGRAPH

20   WE LOOKED AT A MOMENT AGO, AND WE MIGHT BACK UP, THESE CONSTRUCTION

21   TRAILERS THAT ARE NOW ALL ALIKE, THESE WERE ON THE WEST SIDE OF

22   SUREKOTE ROAD IN NOVEMBER OF 2002, BUT IN THE NEXT PHOTOGRAPH THEY

23   ARE NOW ON THE EAST SIDE OF SUREKOTE ROAD ADJACENT TO THE FLOODWALL

24   AND I GUESS A LITTLE BIT OF THEM OVERLAP THE SOUTHERNMOST REACH OF

25   THE NORTH BREACH?
```

1     A.  YES.

2            MR. STEVENS:  YOUR HONOR, SOME OF THESE THINGS WE POINT

3     OUT FOR FUTURE REFERENCE, SO WHEN WE EXAMINE PHOTOGRAPHS AND THERE

4     ARE TRAILERS IN THE BACKGROUND WE WILL BE ABLE TO GET A BETTER IDEA

5     ABOUT WHERE THE PHOTOGRAPHER MIGHT BE STANDING.

6            THE COURT:  SURE.

7     BY MR. STEVENS:

8     Q.  AS TO THE AREA BETWEEN THE FUTURE NORTH BREACH AND THE NOW

9     INDENTED SHORELINE, THIS WHITISH GRAY OR TAN, LIGHTER COLOR ON THE

10    PHOTOGRAPH, CAN YOU TELL US WHAT THAT IS?

11    A.  I WOULDN'T BE ABLE TO JUST FROM THE PHOTOGRAPH, BUT THERE ARE

12    PHOTOGRAPHS THAT WERE TAKEN ON THE GROUND THAT SHOW THAT THERE WAS

13    SAND PLACED IN THAT AREA.

14    Q.  WE'VE ALREADY REVIEWED THAT, BUT THIS WOULD BE THE SAME GREEN

15    PIE SHAPE JUST ABOVE THE NORTHERN MOST END OF THIS TRAILER, THAT

16    WOULD BE THE SAME GRASSY AREA OF THE WEST OF THE SUREKOTE ROAD?

17    A.  THE EMBANKMENT OF SUREKOTE ROAD, YES.

18    Q.  NEXT SLIDE, JX 1576, IT'S THE SAME APRIL 15, '05 AERIAL IMAGE,

19    IS IT NOT?

20    A.  THAT'S RIGHT.

21    Q.  IT HAS THE SAME RED LINE BUILDINGS, BUT THIS IMAGE APPEARS TO

22    HAVE AN ADDITIONAL LAYER OF DATA SUPERIMPOSED ON THIS AERIAL

23    PHOTOGRAPH THAT WE'VE BEEN TALKING ABOUT.  MR. MORRIS, THE NEWLY

24    ADDED YELLOW LINES AND LABELED EDGE OF FUTURE CANAL, CAN YOU

25    EXPLAIN THAT TO THE COURT?

1   A.   THOSE WERE TAKEN FROM THE CORPS' CONSTRUCTION PLANS AND THEY

2   SHOWED THE LIMITS OF THE PROPOSED FUTURE CHANNEL.

3   Q.   AND CAN YOU GIVE THE COURT THE DISTANCE FROM THE WALL, THE

4   NEAREST EDGE, TO THE NEAREST EDGE OF THE PROPOSED CHANNEL?  SAYS

5   157 FEET HERE, DOES THAT SEEM TO BE CORRECT TO YOU?

6   A.   YES.

7   Q.   IN THE AREA IN THE VICINITY OF THE NORTH BREACH, THERE ARE SOME

8   BUILDINGS THAT ARE INSIDE THE PROPOSED FUTURE CHANNEL AND THERE ARE

9   SOME BUILDINGS THAT ARE OUTSIDE THE PERIMETER, IF YOU WILL, OF THE

10  FUTURE CHANNEL, CORRECT?

11  A.   YES, THAT'S CORRECT.

12  Q.   WOULD YOU AGREE THAT THIS ENTIRE AREA THAT HAS NOW ENCROACHED

13  180 FEET, TO ONLY 180 FEET AWAY FROM THE WALL OR THE FUTURE NORTH

14  BREACH, THAT THAT IS ENTIRELY OUTSIDE OF THE PERIMETER OF THE

15  FUTURE CHANNEL?

16  A.   CERTAINLY AT LEAST THE VAST MAJORITY OF IT IS.

17  Q.   NEXT SLIDE, PLEASE.  JX 1576 AT PAGE NINE.  THE RED IMAGES ARE

18  THE SAME BUILDINGS THAT WERE ON THERE FROM BEFORE, CORRECT?

19  A.   YES, THEY ARE.

20  Q.   NOW THIS PARAGRAPH IS DATED SEPTEMBER 2ND, 2005, WHICH WOULD BE

21  ABOUT THREE OR FOUR-DAYS AFTER HURRICANE KATRINA.  DID THE AREA

22  UNDER WATER EXPAND FURTHER EAST AND TOWARD THE FLOODWALL?

23  A.   YES.

24  Q.   CAN WE GO BACK TO THE PREVIOUS SLIDE.  SO NOW THE EXPANDED AREA

25  WHICH WAS SANDY BEFORE, HOW MUCH FURTHER TOWARD THE FUTURE NORTH

1   BREACH DID IT MOVE?

2   A.  APPROXIMATELY 50 FEET.

3   Q.  NEXT SLIDE.  SO IT USED TO BE HERE WHAT I AM POINTING TO NOW

4   AND NOW IT'S EVEN CLOSER TO THE NORTH BREACH, CORRECT?

5   A.  APPROXIMATELY 130 FEET AT THIS POINT FROM THE WALL TO THE LIMIT

6   OF WHAT CAN BE SEEN IN THIS IMAGE.

7   Q.  AND THIS ADDITIONAL EROSION THAT OCCURRED, WHAT DOES THAT

8   INDICATE TO YOU BASED UPON YOUR KNOWLEDGE ABOUT THE ACTIVITIES IN

9   THIS REGION?

10  A.  THAT THE MATERIAL THAT WAS PLACED THERE DIDN'T STAND UP --

11          MS. WAGER-ZITO:  OBJECTION, YOUR HONOR, THIS IS BEYOND

12  THE SCOPE OF HIS OPINION.

13          THE COURT:  SUSTAINED.

14  BY MR. STEVENS:

15  Q.  NEXT SLIDE.  THERE'S NO DATE ON THIS PARAGRAPH, BUT I AM GOING

16  TO ASK YOU TO ASSUME -- AND SOMEBODY CORRECT ME IF YOU KNOW AN

17  EXACT DATE, PLEASE SPEAK UP -- I AM GOING TO ASK YOU TO ASSUME IT'S

18  A PHOTOGRAPH FROM THE IPET REPORT AND IT'S TAKEN SHORTLY AFTER

19  HURRICANE KATRINA BUT BEFORE RITA.  IS THIS THE SAME AREA IN THE

20  IMMEDIATE VICINITY OF THE NORTH BREACH THAT WE'VE BEEN TALKING

21  ABOUT?

22  A.  YES, IT IS.

23  Q.  DOES THE PHOTOGRAPH DEPICT THE SAME FEATURE OF ADDITIONAL

24  EROSION TOWARD THE NORTH BREACH THAT WE OBSERVED OVER THE

25  PROGRESSION OF THE LAST FEW PHOTOGRAPHS?

1             MR. KELLS:  YOUR HONOR, I OBJECT.

2             MS. WAGER-ZITO:  OBJECTION, THIS IS BEYOND THE SCOPE OF

3    HIS REPORT.

4             THE COURT:  OVERRULED.  THE COURT FINDS THIS IS WITHIN

5    THE SCOPE OF HIS OPINIONS SINCE HE IS COMPARING THE SURVEY DATA HE

6    DID IN HIS OBSERVATIONS TO THIS PHOTOGRAPH.

7             MR. STEVENS:  THANK YOU.

8             THE WITNESS:  THIS AREA THAT'S ON THE LEFT SIDE OF THE

9    PHOTOGRAPH SHOWS KIND OF A SQUARE SHAPED AREA COMING IN, THAT WOULD

10   HAVE BEEN THE AREA THAT ERODED ADDITIONALLY DURING KATRINA, AT

11   LEAST IT WAS IN THAT AREA.

12            MR. STEVENS:  CAN WE GO BACK TO THE PREVIOUS SLIDE.

13   BY MR. STEVENS:

14   Q.  NOW, COULD YOU INDICATE TO THE COURT WHERE THIS IS?

15   A.  THE SAME SQUARE SHAPED INDENTATION WOULD BE THOSE TWO AREAS ARE

16   THE SAME AREA (INDICATING).

17   Q.  IN THE AREA WEST OF THE BREACH IN THAT SAME, I CALL IT A

18   CUTOUT, BUT ADDITIONAL EROSION SPACE OR NOTCH, IT'S SHOWN ON THE

19   PREVIOUS SLIDE, WOULD YOU AGREE THAT THERE WAS SAND BACKFILL

20   PREVIOUSLY COVERING THIS AREA, WHICH IS NOW GONE?

21            MS. WAGER-ZITO:  OBJECTION, YOUR HONOR.

22            THE COURT:  YOU WANT TO RESPOND TO THE OBJECTION?

23            MR. STEVENS:  I THINK THAT'S WITHIN THE PERCEPTION OF

24   JUST ABOUT ANYBODY, CERTAINLY A TRAINED --

25            THE COURT:  LET ME BE A LITTLE MORE METICULOUS THAN THAT.

```
 1              MR. STEVENS:  THANK YOU.  NOT MY FORTE.

 2              THE COURT:  HE STATED -- LET ME FIND IT, JUST GIVE ME A

 3    SECOND -- BASED ON THE WGI IMAGES I HAVE SEEN BACKFILLING OF THE

 4    EXCAVATIONS APPEAR TO HAVE BEEN CONSISTENT PRIMARILY OF

 5    NON-COMPACTED MATERIAL AND SAND.  YOU CAN ASK HIM TO LAY A

 6    FOUNDATION, SINCE THIS IS IN AND HE CAN BE CROSS-EXAMINED ABOUT IT,

 7    BUT WE NEED TO LAY A FOUNDATION TO SEE IF THAT DOES FIT IN THE

 8    SCOPE OF HIS REPORT.

 9              MR. STEVENS:  THANK YOU, YOUR HONOR.

10    BY MR. STEVENS:

11    Q.  NEXT SLIDE, PLEASE.  JX 1354.0004.  THE DATE OF THIS PHOTOGRAPH

12    IS FEBRUARY 18TH, 2005, WHICH WOULD BE APPROXIMATELY SIX MONTHS

13    BEFORE HURRICANE KATRINA; IS THAT RIGHT?

14    A.  YES.

15    Q.  AND THE CAPTION READS PLACING IMPORTED SAND BACKFILL IN PHASE 2

16    ACM EXCAVATION AREA EAST OF EIGHT AT BOLAND MARINE OR BM.  CAN YOU

17    GIVE US SOME ORIENTATION ABOUT THE FEATURES OF THE EBIA IN THE

18    VICINITY OF THE NORTH BREACH, IS THIS IT (INDICATING)?

19    A.  THE GREEN AREA IN THE BACK OF THIS PHOTOGRAPH WOULD BE THAT

20    SAME EMBANKMENT THAT WE DISCUSSED PREVIOUSLY, THIS IS THE AREA THAT

21    ULTIMATELY BREACHED.

22    Q.  THAT WOULD BE THE PIE SHAPE THING THAT WE TALKED ABOUT THAT

23    EMANATES NORTH FROM THE CONSTRUCTION TRAILERS?

24    A.  THAT IS WHAT YOU DESCRIBED AS THE PIE-SHAPED PIECE, YES.

25    Q.  ALL RIGHT.
```

```
 1    A.  TO THE LEFT OF THE MACHINERY THERE IS A PIECE OF FLOODWALL,

 2    THAT'S ACTUALLY A PIECE OF FLOODWALL THAT ANGLES OUT TOWARD THE

 3    IHNC.  SO THIS PHOTOGRAPH WAS TAKEN BASICALLY VERY CLOSE TO THOSE

 4    FEATURES IN THE AREA THAT WE WERE DISCUSSING ON THE PREVIOUS SLIDE,

 5    AND IT PRETTY CLEARLY SHOWED THAT THEY WERE PLACING SAND IN THAT

 6    AREA.

 7    Q.  WOULD YOU AGREE THAT THIS AREA IS BASICALLY ADJACENT TO OR

 8    DIRECTLY IN LINE WITH THE FUTURE NORTH BREACH --

 9    A.  YES.

10    Q.  -- THAT WOULD OCCUR IN A MATTER OF SIX MONTHS.

11             THE COURT:  DID YOU ANSWER THAT, SIR?

12             THE WITNESS:  YES, I AM SORRY.  MY ANSWER WAS YES.

13    BY MR. STEVENS:

14    Q.  THE CEMENT WALL THAT IS SEEN IMMEDIATELY IN FRONT OF THIS

15    EXCAVATOR, THAT IS AFTER THE WALL MAKES ITS TURN TOWARD THE FLORIDA

16    AVENUE BRIDGE, CORRECT?

17    A.  THAT'S CORRECT.  THAT PIECE OF THE WALL IS NOT THE LONG PIECE

18    THAT RUNS PARALLEL WITH THE IHNC, IT'S A PIECE THAT IS TURNED AND

19    IS ANGLING OUT TOWARDS THE IHNC.

20    Q.  AND YOU SEE A ROOF LINE IMMEDIATELY BEHIND THAT WALL?

21    A.  YES, I SEE A ROOF LINE.

22    Q.  MR. MORRIS, IN TERMS OF PROBABILITIES, IS IT MORE PROBABLE THAN

23    NOT THAT THE SANDY BACKFILL MATERIAL SHOWN IN THIS FEBRUARY 18,

24    2005, PHOTOGRAPH FROM WGI IS WHAT WE HAVE BEEN SEEING IN THE AERIAL

25    PHOTOGRAPHS WE REVIEWED ABOUT THE CHANGES IN THE SHORELINE, WHICH
```

1    WE ALSO DESCRIBED AS THE LIGHT COLORED AREA, DIRECTLY WEST OF THE

2    NORTH BREACH?

3           MR. KELLS:  YOUR HONOR, I OBJECT, IT'S OUTSIDE THE SCOPE,

4    IT'S OUTSIDE THE AREA OF HIS EXPERTISE.

5           THE COURT:  I'LL LET YOU RESPOND, BUT I AM NOT SURE HOW

6    THAT'S -- WHETHER THAT'S JUST A COMMON SENSE, WHETHER IT'S

7    EXPERTISE OR WHETHER IT'S SOMETHING YOU -- IT'S NOT IN HIS REPORT,

8    YOU MIGHT GIVE ME A RESPONSE.

9           MR. STEVENS:  SURE.  WELL, UNDER 701 HE IS AT LEAST A LAY

10   PERSON WITH SPECIALIZED KNOWLEDGE AND --

11          THE COURT:  A LAY PERSON WITH SPECIALIZED KNOWLEDGE HAS

12   TO FILE A REPORT, SIR.

13          MR. STEVENS:  HE'S BASICALLY OPINING FOR THE COURT THAT

14   THIS AREA SHOWN IN THIS PHOTOGRAPH IS SPATIALLY SITUATED --

15          THE COURT:  WHY DON'T YOU ASK HIM THAT?

16          MR. STEVENS:  OKAY.

17          THE COURT:  I'LL ALLOW HIM TO ANSWER THAT.

18          MR. STEVENS:  THANK YOU, SIR.

19          THE COURT:  AND THE COURT CAN MAKE WHATEVER DEDUCTIONS IT

20   WILL MAKE FROM THAT.

21   BY MR. STEVENS:

22   Q.  MR. MORRIS --

23          MR. KELLS:  IF I COULD JUST MAKE ONE CLARIFICATION.  MY

24   UNDERSTANDING IS THAT HE WAS NOT BEING OFFERED AS SOME SORT OF LAY

25   OPINION, THAT HE IS BEING OFFERED AS A SPECIALIZED TECHNICAL PERSON

1    IN SURVEYING AND MAPPING.

2         THE COURT:  I THINK IT'S WITHIN THE SCOPE OF HIS REPORT

3    AND SURVEYING TO GIVE, TO SAY IF THAT'S SPATIALLY THE SAME AREA

4    THAT'S SHOWN IN HIS REPORT, THAT'S ALL HE'S ASKING RIGHT NOW.

5    BY MR. STEVENS:

6    Q.  MR. MORRIS, IS THE AREA SHOWN IN THIS PHOTOGRAPH JX 1354-4, THE

7    SAME AREA AS WHAT WAS ERODED IN THE PREVIOUS PHOTOGRAPHS?

8    A.  THIS -- I BELIEVE THE THINGS THAT WE LOOKED AT IN THE

9    BACKGROUND OF THIS IMAGE SHOW PRETTY CLEARLY THAT IT WAS LOCATED IN

10   THAT VICINITY, YES.

11   Q.  THANK YOU.

12   A.  AND I THINK THE PHOTOGRAPH SHOWS PRETTY CLEARLY THAT THEY'RE

13   PLACING SAND THERE.

14   Q.  NEXT SLIDE.

15        THE COURT:  THE COURT KNOWS THAT THAT'S AT LEAST SOME

16   FORM OF, CAN'T TELL WHAT IT IS BY LOOKING AT IT, NOT IT'S FINE OR

17   COMPACTNESS OR ANYTHING ELSE.  I'M SURE SOMEBODY WILL EDUCATE ME AS

18   TIME GOES ON.

19        MR. STEVENS:  THANK YOU, YOUR HONOR.

20   BY MR. STEVENS:

21   Q.  AND THE PHOTOGRAPH JX 1576-9 IS THE SAME PHOTOGRAPH WE'VE BEEN

22   LOOKING AT EARLIER JUST FOR REFERENCE, THAT GREEN GRASSY AREA IS

23   IMMEDIATELY WEST OF THE NORTH BREACH.  COULD YOU SHOW THE COURT

24   APPROXIMATELY WHERE THAT SANDY AREA WE WERE LOOKING AT IN THE OTHER

25   PHOTOGRAPH WAS, THAT SANDY EXCAVATION?

1    A.   SOMEWHERE IN THAT AREA (WITNESS MARKS EXHIBIT.)

2    Q.   AND THAT SANDY AREA DIRECTLY IN LINE WITH THE NORTH BREACH?

3    A.   YES.

4              MR. STEVENS:  YOUR HONOR, WE'RE DONE WITH THAT AREA.  NOW

5    WOULD BE A GOOD TIME --

6              THE COURT:  WITHOUT, I DON'T WANT TO GET ANYBODY TOO

7    UPSET, BUT I WAS GOING TO ASK IS THERE AN APPELLATION FOR THAT

8    ALLEGED EXCAVATION THAT YOU REFERRED TO IN THE BRIEFS?  IN OTHER

9    WORDS, DO YOU HAVE, HAVE YOU NAMED IT, IS IT REFERRED TO?  AND I AM

10   NOT GOING TO ASK, I'M ASKING IF COUNSEL AGREE THAT IS IN THE AREA

11   OF EITHER THE BORROW PIT, I DON'T WANT TO THE --

12             MR. STEVENS:  NO, SIR, IT'S GOING TO BE A LAND SIDE

13   EXCAVATION AREA THAT WE'LL LEARN LATER IS BASICALLY CALLED THE AREA

14   EAST OF EIGHT, AND THAT'S A VERY SERIOUS ISSUE.

15             THE COURT:  ALL RIGHT.

16             MR. STEVENS:  IN DUE COURSE.  I CAN PROCEED OR ARE WE

17   GOOD?

18             THE COURT:  IT'S -- HOW MUCH LONGER DO YOU THINK YOU HAVE

19   WITH THIS WITNESS?

20             MR. STEVENS:  WELL, I'VE WRAPPED UP -- WITH THIS WITNESS?

21             THE COURT:  YES.

22             MR. STEVENS:  SUBSTANTIAL AMOUNT OF TIME, JUDGE.

23             THE COURT:  OKAY.  WE WILL TAKE A RECESS.

24             MR. TREEBY:  IF YOUR HONOR PLEASE, I WOULD LIKE TO

25   ADDRESS IT NOW.

1          WE ARE PREPARING, JUST TO INFORM US, BUT WE ARE PREPARING

2     SUMMARY DIRECT IN ACCORDANCE WITH YOUR HONOR'S REQUEST THAT WE DO

3     THAT, THIS SOUNDS LIKE AN ORDINARY DIRECT NOT A SUMMARY DIRECT.

4     NOW, I ASSUME JUST BECAUSE HE DOES THAT AND YOU DON'T MIND --

5          THE COURT:  NO, NO, I'M GLAD YOU BROUGHT THAT TO MY

6     ATTENTION, I WANTED HIM TO KIND OF ELICIT HIS OPINIONS, BUT THE

7     WHOLE PURPOSE -- AND THIS EXPERT I MAY GIVE A LITTLE LATITUDE TO,

8     BUT I WOULD LIKE TO PROCEED AS WE SUGGESTED, AS WE ORDERED, A

9     SUMMARY DIRECT, WHAT ARE YOUR OPINIONS AND, YOU KNOW.

10          MR. STEVENS:  YOUR HONOR, THIS WITNESS, IF YOU WOULD BEAR

11     WITH US, HE IS A BIT OF A SHOW-AND-TELL KIND OF WITNESS AND HE GAVE

12     HIS OPINIONS, BUT IT'S GOING TO HELP ALL OF US AND CERTAINLY A

13     REVIEWER WHO IS GOING TO GET BAPTIZED INTO THIS CASE LATER --

14          THE COURT:  I AM NOT SAYING YOU CAN'T BRING THIS OUT

15     AFTER MR. TREEBY CROSS-EXAMINES HIM.

16          MR. STEVENS:  A LOT OF THESE ARE FOUNDATIONS FOR HIS

17     OPINIONS, SO IF WE CAN WAIT ON THAT.

18          WE DO HAVE A SECTION THAT IF YOU WILL INDULGE US IT WILL

19     HELP EVERYONE.  YOU ASKED THE EXACT RIGHT QUESTION ABOUT IS THIS

20     GIVEN AN APPELLATION, THIS IS SOME SUBSTANTIAL CONFUSION ABOUT

21     NUMBERING OF AREAS AND STRUCTURES AND FEATURES AND THE WHOLE EBIA

22     SITE, SOME OF WHICH OVERLAP, SOME OF WHICH DIFFER FOR THE SAME

23     LOCATION, AND I THINK IT WOULD HELP EVERYONE TO HAVE THAT LITTLE

24     INDEX PUT TOGETHER

25          THE COURT:  IN GENERAL I CERTAINLY WANT TO STICK WITH THE

```
 1    RULE THAT MR. TREEBY REMINDED ME OF.

 2              MR. STEVENS:  YES, SIR.

 3              THE COURT:  BUT THAT MIGHT BE HELPFUL, WE WILL SEE WHEN

 4    WE GET THERE, WHICH I ASSUME WILL BE AFTER THE BREAK.

 5              WHAT WOULD YOU LIKE FOR A BREAK?  I'LL LEAVE IT UP TO YOU

 6    GUYS.  IS AN HOUR TOO SHORT OR WOULD YOU LIKE A LITTLE MORE?  HOW

 7    ABOUT 1:30 THEN.  ALL RIGHT.

 8              THE DEPUTY CLERK:  ALL RISE, PLEASE.

 9       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

10

11                         *  *  *  *  *  *

12

13                    REPORTER'S CERTIFICATE

14

15       I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED

16    STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY

17    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE

18    BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE

19    PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER.

20

21

22    _____

23    KAREN A. IBOS, CCR, RPR, CRR, RMR

24    OFFICIAL COURT REPORTER

25
```