1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  KATRINA CANAL BREACHES*   CIVIL ACTION
     CONSOLIDATED LITIGATION         *
6                                    *   NO. 05-4182
                                     *
7                                    *   SECTION K(2)
     PERTAINS TO:  MRGO              *
8    ARMSTRONG NO. 10-CV-866         *   NEW ORLEANS, LOUISIANA
                                     *
9                                    *   SEPTEMBER 12, 2012
     * * * * * * * * * * * * * * * * *

10                   DAY ONE, AFTERNOON SESSION
11                    BENCH TRIAL BEFORE THE
                 HONORABLE STANWOOD R. DUVAL, JR.
12                 UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14
     FOR THE PLAINTIFFS:          BRUNO & BRUNO
15                                BY: JOSEPH M. BRUNO, ESQ.
                                  855 BARONNE STREET
16                                NEW ORLEANS, LA 70113

14:13  17
14:13
14:13
14:13  18  FOR THE DEFENDANT WASHINGTON
       GROUP INTERNATIONAL, INC.:   STONE PIGMAN WALTHER WITTMANN
14:13  19                           BY:  WILLIAM D. TREEBY, ESQ.
14:13                               BY:  JAMES C. GULOTTA, JR., ESQ.
14:13  20                           BY:  HEATHER S. LONIAN, ESQ
14:13                               BY:  MAGGIE A. BROUSSARD, ESQ.
14:13  21                           546 CARONDELET STREET
14:13                               NEW ORLEANS, LA 70130
14:13  22

23

24

25

```
14:13    1   APPEARANCES CONTINUED:
14:13
14:13    2   FOR THE DEFENDANT WASHINGTON
14:13        GROUP INTERNATIONAL, INC.:      JONES DAY
14:13    3                                   BY: ADRIAN WAGER-ZITO, ESQ.
14:13                                        BY:  DEBRA S. CLAYMAN, ESQ.
14:13    4                                   BY:  CHRISTOPHER N. THATCH, ESQ.
14:13                                        BY:  CHRISTOPHER R. FARRELL, ESQ.
14:13    5                                   BY:  JULIA CRONIN, ESQ.
14:13                                        BY:  BRIAN KERWIN, ESQ.
14:13    6                                   51 LOUISIANA AVENUE, N.W.
14:13                                        WASHINGTON, D.C. 20001
14:13    7
14:13
14:13    8

         9   FOR THE DEFENDANT UNITED
             STATES OF AMERICA:              U.S. DEPARTMENT OF JUSTICE
        10                                   CIVIL DIVISION, TORTS BRANCH
                                             BY:  ROBIN D. SMITH, ESQ.
        11                                   BY:  JAMES F. MCCONNON, JR., ESQ.
                                             BY:  RUPERT MITSCH, ESQ.
        12                                   BY:  CONOR KELLS, ESQ.
                                             BY:  JOHN A. WOODCOCK, ESQ.
        13                                   BENJAMIN FRANKLIN STATION
                                             P.O. BOX 888
        14                                   WASHINGTON, D.C. 20044

        15

        16
             OFFICIAL COURT REPORTER:        JODI SIMCOX, RMR, FCRR
        17                                   500 POYDRAS STREET
                                             ROOM HB-406
        18                                   NEW ORLEANS, LOUISIANA 70130
                                             (504) 589-7780
        19                                   JODI_SIMCOX@LAED.USCOURTS.GOV

        20

        21   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

        22   PRODUCED BY COMPUTER.

        23

        24

        25
```

1                        <u>I N D E X</u>

2                                                    <u>PAGE</u>

3

    CHAD A. MORRIS
4        DIRECT EXAMINATION BY MR. STEVENS:          129
         CROSS-EXAMINATION BY MS. WAGER-ZITO:        199
5        CROSS-EXAMINATION BY MR. KELLS:             210

6   FRED HOLMES, JR.
         DIRECT EXAMINATION BY MR. ANDRY:            217
7        CROSS-EXAMINATION BY MR. THATCH:            241
         REDIRECT EXAMINATION BY MR. ANDRY:          267
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:37 | 1 | **AFTERNOON SESSION** |
| 13:37 | 2 | **(SEPTEMBER 12, 2012)** |
| 13:37 | 3 | * * * * * |
| 13:37 | 4 | **THE DEPUTY CLERK:**  ALL RISE. |
| 13:59 | 5 | **THE COURT:**  I UNDERSTAND THERE'S BEEN A REQUEST FOR A |
| 13:59 | 6 | BENCH CONFERENCE. |
| 13:59 | 7 | **MR. BRUNO:**  YES, YOUR HONOR. |
| 13:59 | 8 | (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT |
| 13:59 | 9 | THE BENCH.) |
| 13:59 | 10 | **MR. BRUNO:**  I'M OUTNUMBERED. |
| 13:59 | 11 | JUDGE, I JUST DON'T WANT TO MAKE ANY MISTAKES. |
| 13:59 | 12 | I DON'T KNOW THAT I UNDERSTAND WHAT THE COURT CONTEMPLATES WITH |
| 13:59 | 13 | REGARD TO THE 705.  SO LET ME ASK YOU THIS QUESTION. |
| 14:00 | 14 | **THE COURT:**  705? |
| 14:00 | 15 | **MR. BRUNO:**  THE SHORTENED SUMMARIES OF THE EXPERTS. |
| 14:00 | 16 | **THE COURT:**  YES. |
| 14:00 | 17 | **MR. BRUNO:**  IS THE REDIRECT LIMITED TO WHAT'S ON |
| 14:00 | 18 | CROSS? |
| 14:00 | 19 | **THE COURT:**  IS YOUR -- YOUR REDIRECT -- |
| 14:00 | 20 | **MR. BRUNO:**  LIMITED TO CROSS? |
| 14:00 | 21 | **THE COURT:**  I THINK THINKING THROUGH -- I THINK IT'S |
| 14:00 | 22 | A REALLY GOOD QUESTION.  I THINK, THINKING THROUGH IT, I'M NOT |
| 14:00 | 23 | GOING TO BE THAT RESTRICTIVE, BUT I'M GOING TO ALLOW RECROSS. |
| 14:00 | 24 | SEE, IN OTHER WORDS -- |
| 14:00 | 25 | **MR. BRUNO:**  RIGHT. |

| 14:00 | 1 | **THE COURT:**  -- I HEAR YOU.  AND I TOOK -- FOR ALL |

14:00    1    **THE COURT:**  -- I HEAR YOU.  AND I TOOK -- FOR ALL

14:00    2    SIDES.  I THINK IT'S A GOOD QUESTION.  I WAS JUST THINKING

14:00    3    ABOUT THAT AND I THOUGHT THAT I'M GOING TO ALLOW LIMITED

14:00    4    RECROSS, BUT RECROSS TO BE CONFINED -- THAT RECROSS WOULD BE

14:00    5    CONFINED.

14:00    6    **MR. BRUNO:**  ALL RIGHT.  WELL, I -- FIRST OF ALL, WHAT

14:00    7    I THOUGHT WE WERE DOING WAS COMPLIANT, AND I'D LIKE TO CONTINUE

14:00    8    TO DO IT, BECAUSE I'VE GOT MY TRIAL LAID OUT THAT I FINISH NEXT

14:00    9    WEDNESDAY.

14:00    10    SO I DON'T KNOW IF MR. TREEBY'S CONCEPT OF

14:00    11    *SHORTENED* IS FAR DIFFERENT FROM MINE; BUT I ASSURE YOU, IT WAS

14:01    12    SHORTER THAN IT WOULD HAVE BEEN IF HAD I COVERED THE

14:01    13    WATERFRONT.

14:01    14    WE'RE DOING IT THE WAY WE'RE DOING IT BECAUSE,

14:01    15    I'M NOT SAYING YOU'RE DENYING US, BUT I FEEL LIKE I'VE GOT TO

14:01    16    COVER WHAT I'VE GOT TO COVER TO MEET MY RECORD REQUIREMENTS ON

14:01    17    APPEAL.

14:01    18    **THE COURT:**  YES, I'M GOING TO LET YOU COVER IT.

14:01    19    THAT'S WHY I'M GOING TO ALLOW RECROSS.

14:01    20    **MR. BRUNO:**  I MEAN ON DIRECT.

14:01    21    **THE COURT:**  YEAH.  RIGHT.  FOR THIS WITNESS, TO GET

14:01    22    THE GEOGRAPHICAL STUFF, I UNDERSTAND THAT.

14:01    23    **MR. BRUNO:**  THANK YOU.  THAT'S --

14:01    24    **MR. TREEBY:**  IF YOUR HONOR PLEASE, JUST SO WE'RE ALL

14:01    25    ON THE SAME PAGE.  WE'VE BEEN WORKING ON THE SUMMARY DIRECT.

| | | |
|---|---|---|
| 14:01 | 1 | OURS IS ESSENTIALLY NOT GOING TO BE VERY MUCH OF A |
| 14:01 | 2 | QUESTION-AND-ANSWER THING. |
| 14:01 | 3 | IT'S GOING TO BE A COUPLE OF QUESTIONS AFTER |
| 14:01 | 4 | VOIR DIRE AND THEN LET THEM RESPOND. |
| 14:01 | 5 | **THE COURT:**  AND THEN YOU GET AN HOUR TAKEN -- |
| 14:01 | 6 | **MR. TREEBY:**  WE THINK THOSE WILL BE UNDER -- WITHOUT |
| 14:01 | 7 | ANY QUESTIONS FROM THE COURT, OF COURSE, THAT WILL BE UNDER TWO |
| 14:01 | 8 | HOURS, EACH ONE OF THEM. |
| 14:01 | 9 | **MR. BRUNO:**  WELL, THE PROBLEM WITH THAT, THOUGH, IS |
| 14:01 | 10 | IF IT'S A LIMITED REDIRECT, THEN WE'RE GOING TO BE FIGHTING |
| 14:01 | 11 | OVER WHETHER OR NOT -- |
| 14:01 | 12 | **THE COURT:**  BUT I'VE ALREADY ALLAYED THAT QUESTION. |
| 14:01 | 13 | **MR. BRUNO:**  ALL RIGHT.  SO -- |
| 14:01 | 14 | **THE COURT:**  BUT I'M GOING TO ALLOW RECROSS, BECAUSE |
| 14:02 | 15 | I'M NOT GOING TO MAKE IT A LIMITED -- LIMITED, OTHER THAN THE |
| 14:02 | 16 | BOUNDS -- |
| 14:02 | 17 | **MR. TREEBY:**  THE RECROSS IS LIMITED, BUT NOT THE |
| 14:02 | 18 | CROSS-EXAMINATION. |
| 14:02 | 19 | **THE COURT:**  EXACTLY WHAT I WAS GOING TO SAY. |
| 14:02 | 20 | THAT'S -- |
| 14:02 | 21 | **MR. BRUNO:**  NO, THE REDIRECT. |
| 14:02 | 22 | **MR. SCHULTZ:**  I'M GOING TO BE PUTTING BEA ON ON |
| 14:02 | 23 | MONDAY, AND I HOPE WE'RE NOT SAYING THAT HE'S GOING TO BE TWO |
| 14:02 | 24 | HOURS -- |
| 14:02 | 25 | **MR. TREEBY:**  NO.  I'M JUST TELLING YOU WHAT WE'RE |

14:02    1    DOING.

14:02    2            **MR. BRUNO:**  RIGHT.  IT'S NOT RECROSS, IT'S REDIRECT.

14:02    3            **THE COURT:**  705 IS NOT ROCKET SCIENCE.

14:02    4            **MR. SCHULTZ:**  RIGHT.  OKAY.  SO THAT'S -- SO WE MAY

14:02    5    CHOOSE TO BE LONGER THAN THEY CONTEMPLATE, BUT THAT'S FINE.

14:02    6            **THE COURT:**  NO.  YOU ELICIT THE OPINIONS, THAT'S

14:02    7    GENERALLY THE WAY IT WORKS.  THIS WITNESS HAS -- SO WE'RE

14:02    8    GETTING THE STAGE SET FOR WHERE EVERYTHING IS.  AND I REALIZE

14:02    9    YOU OBJECTED TO SOME OF THE OPINIONS.

14:02   10            BUT FROM YOUR STANDPOINT, YOU CAN DO IT EITHER

14:02   11    NOW OR ON --

14:02   12            **MR. BRUNO:**  ON REDIRECT.

14:02   13            **THE COURT:**  -- ON REDIRECT.  BECAUSE I'M NOT GOING TO

14:02   14    LIMIT REDIRECT.

14:02   15            **MR. BRUNO:**  OKAY.  THAT'S WHAT I THOUGHT YOU SAID.

14:02   16            **THE COURT:**  I'M NOT GOING TO LIMIT IT, OTHER THAN

14:02   17    UNDER THE RULES OF EVIDENCE AND THE EXPERT REPORT, ET CETERA.

14:02   18    THAT IS IMPLICIT IN MY STATEMENT.

14:03   19            **MR. STEVENS:**  YOUR HONOR, I APOLOGIZE FOR BEING A

14:03   20    LITTLE LATE GETTING BACK, BUT I WAS TRYING TO EDIT MY SPOT AND

14:03   21    MY OUTLINES.

14:03   22            **MR. BRUNO:**  YOU DON'T HAVE TO.  YOU CAN DO IT IN

14:03   23    REDIRECT.  THAT'S UP TO YOU.

14:03   24            **MR. STEVENS:**  WELL, WE MAY COME UPON A FEW SLIDES

14:03   25    THAT I DON'T WANT YOU TO THINK I'M TRYING TO FORCE SOMETHING

```
14:03    1   THAT I KNOW IS OUTSIDE THE SCOPE.  JUST BEAR WITH US AND WE'LL
14:03    2   SKIP IT, SO IT'S EASIER THAN TRYING TO RECREATE THE
14:03    3   POWERPOINTS.
14:03    4           THE COURT:  ALL RIGHT.
14:03    5           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN
14:03    6   OPEN COURT.)
14:03    7           THE COURT:  BY THE WAY, FOR THE RECORD, THE PURPOSE
14:03    8   OF THE RULE 705 IS REALLY FOR CLARITY OF THE RECORD AND
14:04    9   PRECISENESS OF THE TESTIMONY, WHERE THE EXPERT LAYS OUT THE
14:04   10   BASIC FUNDAMENTALS OF HIS OR HER OPINION, AND THEN THERE IS
14:04   11   CROSS-EXAMINATION AND THEN THERE'S REDIRECT, WHICH I'M NOT
14:04   12   GOING TO CONSTRAIN, AS I WOULD IN NORMAL REDIRECT, AS I'VE
14:04   13   STATED.
14:04   14           I'M GOING TO CONSTRAIN IT ONLY FOR REPETITION,
14:04   15   RABBIT TRAILS, AND THE RULES OF EVIDENCE AND THE REPORT.
14:04   16           OKAY.  YOU MAY PROCEED WHEN READY, SIR.
14:04   17           MR. STEVENS:  THANK YOU.  GIVE ME JUST A MOMENT TO --
14:04   18   I ARRIVED AT THE COUNTER DOWNSTAIRS WITHOUT A PICTURE ID.  I
14:04   19   WANT YOU TO KNOW YOUR SECURITY STAFF IS ON TOP OF THAT
14:04   20   REQUIREMENT.
14:04   21           THE COURT:  WELL, IT'S BEEN WORSE SINCE CERTAIN
14:05   22   PEOPLE POSING AS OTHER PEOPLE CAME HERE, EVEN THOUGH I RECEIVED
14:05   23   SOME CRITICISM IN THE PRESS FOR MY HARSH REACTION TO THAT.  IT
14:05   24   CONSTRAINED ACCESS TO THIS COURTHOUSE, WHICH I DO NOT LIKE.
14:05   25           GO AHEAD, SIR.
```

CHAD A. MORRIS - DIRECT

14:05    1           AND ALSO EMBARRASSED THE CSOS.  I'M SPEAKING OF

14:05    2    SOMETHING THAT HAPPENED A COUPLE OF YEARS AGO.

14:04    3           (WHEREUPON, **CHAD A. MORRIS**, HAVING BEEN PREVIOUSLY

14:04    4    DULY SWORN, TESTIFIED AS FOLLOWS.)

14:04    5                      **DIRECT EXAMINATION**

14:05    6    BY MR. STEVENS:

14:05    7    **Q.**   MR. MORRIS, AS YOU STATED IN YOUR REPORT, THE PRIMARY

14:05    8    FOCUS IN THIS CASE WAS TO OBTAIN AND INTERPRET KEY

14:06    9    SURVEY-RELATED DATA FOR THE USE IN EXAMINING THE CAUSE AND

14:06   10    RESULTS OF FLOODWALL BREACHES ALONG THE IHNC.

14:06   11           SO LET'S TALK ABOUT THE TYPES OF ACTIVITIES THAT YOU

14:06   12    SET OUT TO INTERPRET AND MAP IN THE CONTEXT OF THIS CASE.

14:06   13           NEXT SLIDE, PLEASE.

14:06   14           COULD YOU EXPLAIN FOR THE COURT THE TYPES OF

14:06   15    ACTIVITIES THAT HAD THE BIGGEST IMPACT ON SOILS ALONG THE EBIA?

14:06   16    **A.**   THE ONES LISTED --

14:06   17           **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.

14:06   18           **THE COURT:**  JUST A MINUTE.  THAT IS GETTING -- IN

14:06   19    OTHER WORDS, WHICH ONES DID HE MAP?  YOU JUST ASKED HIM THAT.

14:06   20           **MR. STEVENS:**  THANK YOU.

14:06   21    BY MR. STEVENS:

14:06   22    **Q.**   DESCRIBE FOR THE COURT THE CONSTRUCTION ACTIVITIES THAT

14:06   23    YOU MAPPED IN THE AREA OF THE EBIA.

14:06   24    **A.**   THE ONES THAT I LOOKED AT ARE LISTED:  BUILDING AND SLAB

14:06   25    REMOVAL, BURIED FOUNDATION REMOVAL, PILE REMOVAL, SOIL

CHAD A. MORRIS - DIRECT

14:07    1    REMEDIATION AREAS, TRANSITE REMOVAL AREAS, AND GRID TRENCHING.

14:07    2    **Q.**   NOW, FOR THOSE OF US WHO MAY BE GETTING BAPTIZED TO THIS

14:07    3    CASE BY REVIEWING A TRANSCRIPT AT A LATER DATE, AND PERHAPS

14:07    4    EVEN SOME OF US WHO ARE MORE FAMILIAR WITH THE DETAILS OF THE

14:07    5    EBIA THAN WE EVER DREAMED WE MIGHT BE, WOULD YOU AGREE THAT A

14:07    6    BRIEF SUMMARY OF THE NUMBERS ASSIGNED TO VARIOUS OF THE BASIC

14:07    7    FEATURES AND STRUCTURES WOULD HELP WITH AN UNDERSTANDING OF THE

14:07    8    NUMBERING SYSTEM?

14:07    9    **A.**   I THINK THAT IT WOULD.

14:07   10    **Q.**   AND --

14:07   11            **THE COURT:**  CAN YOU EDUCATE ME -- AND I PROBABLY

14:07   12    SHOULD KNOW THIS -- WHAT IS TRANSITE REMOVAL?

14:07   13            **MR. STEVENS:**  TRANSITE IS ANOTHER WAY OF SAYING ACM,

14:07   14    ASBESTOS-CONTAINING MATERIALS.

14:07   15            **THE COURT:**  OKAY.  AND I ASSUME YOU CONCUR?

14:07   16            **THE WITNESS:**  YES, SIR.

14:07   17            **THE COURT:**  THANK YOU.

14:07   18    BY MR. STEVENS:

14:08   19    **Q.**   LET'S HIGHLIGHT A FEW OF THE OVERLAPPING OR DUPLICATIVE

14:08   20    NUMBERS THAT WOULD CAUSE CONFUSION IN TERMS OF UNDERSTANDING

14:08   21    THE SPATIAL RELATIONSHIPS OF VARIOUS FEATURES THAT WE JUST

14:08   22    DISCUSSED.

14:08   23            CAN YOU LIST FOR US THOSE THINGS -- NEXT SLIDE,

14:08   24    PLEASE -- THOSE THINGS THAT HAVE NUMBERS ASSIGNED TO THEM?

14:08   25    **A.**   THE BUILDINGS AND SLABS WE SAW ON ONE OF THE PREVIOUS

CHAD A. MORRIS - DIRECT

14:08    1    IMAGES HAD BUILDING NUMBERS THAT STARTED AT THE NORTH END OF

14:08    2    THE BOLAND SITE, AND THEY RANGE FROM 1 THROUGH 40-SOMETHING

14:08    3    WITH SOME "A" NUMBERS MIXED IN.  THAT WAS ONE SET OF NUMBERS.

14:08    4         THERE WERE NUMBERS ASSOCIATED WITH SUBSURFACE

14:08    5    FOUNDATIONS ON VARIOUS DIFFERENT SKETCHES.  AND THOSE HAD

14:09    6    NUMBERS THAT, AGAIN, WOULD, IN PLACES, START OVER WITH NUMBER 1

14:09    7    OR X1 OR 001, WHICH COULD CERTAINLY BE CONFUSING AS TO WHICH

14:09    8    LOCATION WAS BEING DESCRIBED IN A PHOTOGRAPH THAT MIGHT JUST

14:09    9    HAVE A REFERENCE TO 7 OR 001 OR SOMETHING LIKE THAT.

14:09   10         THE SOIL REMEDIATION AREAS IN THE BOLAND AREA STARTED

14:09   11    OVER AT NUMBER 1 AGAIN.  SO WE REALLY HAD AT LEAST THREE OR

14:09   12    FOUR DIFFERENT ACTIVITIES BEING DESCRIBED, AND ALL USING -- OR

14:09   13    IN MANY CASES, USING NUMBERS THAT -- THAT OVERLAPPED AND

14:09   14    CERTAINLY MADE IT DIFFICULT TO SORT OUT WHICH ACTIVITY OR WHICH

14:09   15    LOCATION WAS BEING REFERRED TO.

14:09   16    Q.  WOULD IT BE FAIR TO SAY THAT IN -- WE'LL GO THROUGH EACH

14:09   17    IN A BIT TO GIVE SOME EXAMPLES.

14:09   18         BUT WOULD IT BE FAIR TO SAY THAT THE PRIMARY

14:10   19    CONFUSION, IF THERE IS A PRIMARY ONE, WOULD BE WITH RELATION TO

14:10   20    THE SUBSURFACE FOUNDATIONS AND THEIR LOCATION AND THE NUMBERS

14:10   21    ASSIGNED TO THEM?

14:10   22    A.  YES, I THINK THAT'S CORRECT.

14:10   23    Q.  ALL RIGHT.  WOULD YOU PLEASE SHARE WITH US A FEW TYPES OF

14:10   24    THOSE?

14:10   25         NEXT SLIDE, PLEASE.

CHAD A. MORRIS - DIRECT

14:10      1              THIS WAS FORMERLY MARKED AS JX 1576 AT PAGE 7.  WE

14:10      2      STARTED WITH THIS DIAGRAM THIS MORNING.

14:10      3              TELL THE COURT WHAT THOSE NUMBER APPELLATIONS ARE.

14:10      4      **A.**   THE NUMBERS HERE BASICALLY REFER TO STRUCTURES.  SO THE

14:10      5      NUMBER IN THE FAR RIGHT-HAND SIDE OF THE DRAWING THAT'S NUMBER

14:10      6      1, AND THE NUMBER 2 NEXT TO IT, THOSE ARE ESSENTIALLY BUILDING

14:10      7      NUMBERS OR AREAS ASSOCIATED WITH BUILDINGS.

14:10      8              AND IN THE CASE OF NUMBER 1, THERE WASN'T ACTUALLY A

14:10      9      BUILDING THERE AT THE TIME, BUT THERE WERE SLABS THERE THAT

14:10     10      THEY KNEW ABOUT.

14:10     11              SO THESE ARE BUILDINGS OR SLABS THAT WERE KNOWN,

14:11     12      BASICALLY, PRIOR TO THE BEGINNING OF THE WORK ON THE SITE.

14:11     13      **Q.**   NEXT SLIDE, PLEASE.  JX 1674, PAGE 7.  THIS IS FROM

14:11     14      DR. SILVA'S APPENDIX B AT FIGURE 6.

14:11     15              MR. MORRIS --

14:11     16              **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  THIS IS ONE

14:11     17      OF THOSE DOCUMENTS -- THIS IS FROM DR. SILVA'S REPORT, BUT

14:11     18      OVERLAID ON THAT ARE -- IS INFORMATION FROM QARS THAT

14:11     19      MR. MORRIS TESTIFIED HE DID NOT LOOK AT WHEN HE PUT TOGETHER

14:11     20      HIS REPORT.

14:11     21              SO IT'S BEYOND THE SCOPE OF HIS REPORT, AND HE'S

14:11     22      TRYING TO PINPOINT EXCAVATIONS THAT HE EXPRESSLY TESTIFIED IN

14:11     23      HIS DEPOSITION THAT HE DID NOT KNOW EXACTLY WHERE VARIOUS

14:11     24      EXCAVATIONS WERE.

14:11     25              **MR. STEVENS:**  ACTUALLY, IT'S ONLY OFFERED AT THIS

14:11   1   POINT, YOUR HONOR, TO SHOW THE NUMBERING SYSTEM.  THE QUESTION
14:11   2   IS:  DOES THIS ACCURATELY REFLECT THE NUMBERING SYSTEM THAT WE
14:11   3   JUST LOOKED AT ON THE PREVIOUS SLIDE.
14:11   4           **THE COURT:**  ITS LIMITED PURPOSE IS TO SHOW --
14:11   5           **MR. STEVENS:**  THE NUMBERING SYSTEM FOR BUILDINGS IN
14:11   6   THE BOLAND MARINE AREA.
14:11   7           **THE COURT:**  TELL ME HOW THAT DIFFERS FROM WHAT HE'S
14:12   8   TESTIFYING.
14:12   9           **MR. STEVENS:**  THE SLIDE BEFORE, PLEASE.
14:12   10          **THE COURT:**  I SAW THE SLIDE BEFORE.
14:12   11          **MR. STEVENS:**  THAT'S THE SAME INFORMATION AS
14:12   12  PORTRAYED ON THE NEXT SLIDE.  WE HAVE NO INTENTION OF GOING
14:12   13  INTO THE QAR, THE LITTLE WINDOWS OR TAGS THAT DR. SILVA ADDED
14:12   14  TO IT.  IT'S NOT PART OF THIS.  WE'RE NOT GOING TO GO INTO THAT
14:12   15  AT ALL, JUDGE.
14:12   16          IT'S JUST TO SHOW THAT THE YELLOW BOXES ON THIS
14:12   17  MAP OR AERIAL WITH -- THAT CORRESPOND TO THE NUMBERS YOU SHOW
14:12   18  ON THE PREVIOUS SLIDE.
14:12   19          **THE COURT:**  OKAY.  FOR THAT LIMITED PURPOSE, I'LL
14:12   20  ALLOW IT.
14:12   21          **MR. STEVENS:**  OKAY.  AND IT ALSO ALLOWS THE COURT --
14:12   22  **BY MR. STEVENS:**
14:12   23  **Q.**  OR WOULD YOU AGREE, MR. MORRIS, THAT THIS MAP ALLOWS THE
14:12   24  COURT TO PERHAPS MORE PRECISELY VIEW THE SPATIAL RELATIONSHIP
14:12   25  BETWEEN THESE BUILDINGS AND STRUCTURES BY NUMBER AND THE NORTH

CHAD A. MORRIS - DIRECT


14:12    1   BREACH?

14:12    2   **A.**   YES.  IF I UNDERSTAND THE QUESTION PROPERLY, THE NUMBERS

14:12    3   ON THIS DRAWING ARE CONSISTENT WITH THE NUMBERS ON THE PREVIOUS

14:12    4   DRAWING.  AND THEY -- THEY LAY OUT THE LOCATIONS OF THOSE

14:13    5   BUILDING SITES THAT WE LOOKED AT ON THE FIRST MAP.

14:13    6   **Q.**   OKAY.  AND WE'RE GOING TO SHOW IN A MOMENT A HAND SKETCH

14:13    7   THAT HAS NUMBERS THAT YOU TOLD US WE'D HEAR ABOUT.  AND IS THE

14:13    8   AREA THAT'S GOING TO BE DEPICTED BY THE HAND SKETCHES ALSO

14:13    9   REFERRING TO THIS SAME GENERAL LOCATION AND THE SAME BUILDINGS

14:13   10   OR STRUCTURES?

14:13   11   **A.**   THE NUMBERS ARE DIFFERENT, BUT THEY'RE IN THE --

14:13   12   EVERYTHING THAT RELATES TO THE SUBSURFACE FOUNDATIONS ARE IN

14:13   13   THE BOLAND AREA, AND THEY WOULD FALL ON THIS MAP, YES.

14:13   14   **Q.**   NEXT SLIDE, PLEASE.  PX 3806.  IT'S A WGI DOCUMENT.

14:13   15        THIS SKETCH OF THE BOLAND MARINE AREA, MR. MORRIS,

14:13   16   DOES IT DESCRIBE OR DEPICT OR ATTEMPT TO DEPICT THE SAME

14:13   17   STRUCTURES THAT WERE IN THE PREVIOUS SLIDE?

14:13   18   **A.**   THIS SLIDE -- THE HANDWRITTEN NOTES ON THIS SLIDE

14:13   19   REPRESENT EIGHT SUBSURFACE FOUNDATIONS THAT WERE IDENTIFIED

14:13   20   DURING CONSTRUCTION.  AND THEIR LOCATIONS ARE DEPICTED IN A

14:14   21   MANNER THAT WOULD ALLOW SOMEONE TO DETERMINE APPROXIMATELY

14:14   22   WHERE THEY'RE LOCATED, BECAUSE IT ALSO SHOWS SOME OF THE --

14:14   23   MANY OF THE SAME FOUNDATIONS OR BUILDING STRUCTURES THAT WERE

14:14   24   SHOWN ON THE PREVIOUS IMAGES.

14:14   25   **Q.**   OKAY.  SO IF WE COULD GO BACK TO THE PREVIOUS IMAGE.

CHAD A. MORRIS - DIRECT

14:14    1              THIS SHOWS THE BUILDINGS THAT WERE IN THAT AREA AND
14:14    2    NUMBERED 1 THROUGH 42.
14:14    3              IF WE'D GO BACK TO THE NEXT IMAGE.
14:14    4              AND THIS SHOWS SUBSURFACE FOUNDATIONS THAT WERE
14:14    5    SUBSEQUENTLY DISCOVERED DURING THE DEMOLITION OF THOSE OTHER
14:14    6    BUILDINGS; IS THAT FAIR?
14:14    7    **A.**   THAT'S CORRECT.
14:14    8    **Q.**   OKAY.  AND CAN YOU -- THE NUMBERS HERE, THERE'S A POUND
14:14    9    SIGN, HANDWRITTEN NUMBERS, POUND SIGN, 1, 2, 3, ALL THE WAY TO
14:14   10    5.  AND THEN IT SAYS "NORTHWEST, SOUTHERN, AND NORTHEAST."
14:14   11              DO THOSE EIGHT STRUCTURES CORRESPOND WITH YET ANOTHER
14:14   12    SET OF NUMBERS?
14:14   13    **A.**   YES.  THESE -- THESE NUMBERS, AS YOU SEE -- NUMBER 1, FOR
14:14   14    INSTANCE, ON THIS SKETCH IS OBVIOUSLY NOT AT THE CONCRETE SLABS
14:15   15    NUMBER 1 THAT ARE NOTED IN THE -- ON THE RIGHT-HAND SIDE.
14:15   16              SO, OBVIOUSLY, IF YOU SEE A 1 HERE THAT'S NOT IN THE
14:15   17    SAME PLACE AS THE 1 FOR THE CONCRETE SLAB --
14:15   18    **Q.**   SO FOR THE COURT, IF WE SAY CONCRETE SLAB NUMBER 1, WITH
14:15   19    THIS HANDWRITTEN NOTE OF 1, AND YOU TRY TO RELATE THAT TO A
14:15   20    BUILDING NUMBER, WE KNOW THAT BUILDING NUMBER 1 IS OVER HERE,
14:15   21    UP IN THE TOP RIGHT CORNER THAT WE'VE BEEN TALKING ABOUT MOST
14:15   22    OF THE MORNING, IN THE AREA WHERE IT ERODED.
14:15   23              SO CONCRETE SLAB NUMBER 1 AND THIS NUMBER 1 ARE
14:15   24    OBVIOUSLY TWO DIFFERENT PLACES?
14:15   25    **A.**   THAT'S CORRECT.

CHAD A. MORRIS - DIRECT

| 14:15 | 1 | **Q.**  OKAY. |

14:15  1  **Q.**  OKAY.

14:15  2  **A.**  AND --

14:15  3  **Q.**  IF YOU -- CAN YOU GIVE US THE NEXT SLIDE, PLEASE?

14:15  4  NOW, THIS IS A HAND-DRAWN SKETCH.  EXPLAIN TO THE

14:15  5  COURT WHAT IS DEPICTED HERE.  AND FIRST --

14:15  6  **MS. WAGER-ZITO:**  OBJECTION.  I'M SORRY.

14:15  7  **THE COURT:**  GO AHEAD.

14:15  8  **MS. WAGER-ZITO:**  THIS IS FROM A QAR THAT HE DIDN'T

14:15  9  REVIEW, AND HE SHOULD NOT BE ALLOWED TO TESTIFY.

14:16  10  **THE COURT:**  I'M NOT SURE WHERE WE'RE GOING WITH THIS,

14:16  11  SIR.  YOU KNOW, YOU'RE NOT GOING --

14:16  12  **MR. STEVENS:**  ALL WE'RE --

14:16  13  **THE COURT:**  DID HE RENDER AN OPINION IN REFERENCE TO

14:16  14  THIS?

14:16  15  **MR. STEVENS:**  NO, SIR.  THIS IS ALL ABOUT NUMBERING.

14:16  16  **THE COURT:**  I KNOW.  BUT WHAT ARE WE TRYING TO DO

14:16  17  HERE?

14:16  18  **MR. STEVENS:**  THIS IS THE SAME STRUCTURE SHOWN ON THE

14:16  19  PREVIOUS SLIDE, EXCEPT THEY HAVE DIFFERENT NUMBERS NOW.  IT'S

14:16  20  JUST FOR THE -- FOR EVERYONE'S INFORMATION TO GO --

14:16  21  **THE COURT:**  YOU SAID THE PREVIOUS SLIDE.  THE ONE

14:16  22  THAT WAS PRESENTED BY MR. MORRIS IN HIS REPORT WAS -- WELL, I'M

14:16  23  LOOKING AT FIGURE 3-2 IN HIS REPORT.  I FORGOT WHAT THE EXHIBIT

14:16  24  NUMBER WAS.  THE ONE IN MR. MORRIS' REPORT.

14:16  25  **MR. STEVENS:**  YES, SIR.

CHAD A. MORRIS - DIRECT

14:16      1          **THE COURT:**  AND THAT'S INTENDED -- THAT SHOWED

14:16      2   VARIOUS, IT SAYS, PLANNED WORK AREAS AT BOLAND MARINE.

14:16      3   FLOODWALL BREACH -- THAT WAS FIGURE 3-2.

14:16      4          **MR. STEVENS:**  CORRECT.

14:16      5          **THE COURT:**  AND CERTAIN NUMBERS WERE ASSIGNED

14:16      6   TO . . .

14:16      7          **MS. WAGER-ZITO:**  AND, YOUR HONOR, AT HIS DEPOSITION,

14:16      8   HE TESTIFIED THAT HE DIDN'T KNOW WHERE ANY OF THESE EXCAVATIONS

14:16      9   WERE.  HE DIDN'T KNOW WHERE THE WEDDING CAKE STRUCTURE WAS ON

14:16     10   BOLAND.  AND NOW HE'S TRYING TO PUT THINGS ON A MAP WHEN HE

14:16     11   DIDN'T KNOW WHERE THEY WERE.

14:17     12          AND WHEN WE ASKED HIM ABOUT THAT FIRST FIGURE,

14:17     13   WITH ALL THE NUMBERS ON IT, HE TESTIFIED THAT HE DIDN'T KNOW IF

14:17     14   THERE WERE EXCAVATIONS OR DEMOLITIONS AT THOSE PARTICULAR

14:17     15   AREAS.

14:17     16          **THE COURT:**  OKAY.  I GUESS MY POINT IS:  IS THIS

14:17     17   WITNESS THE BEST WITNESS TO DO THIS?  DON'T YOU HAVE OTHER

14:17     18   WITNESSES THAT ARE COMING FROM WGI WHO ARE GOING TO SAY THE --

14:17     19          **MR. STEVENS:**  SURE.  BUT WE'RE GOING TO CREATE A WEEK

14:17     20   OR TWO OF TESTIMONY UNDER CONFUSION.  I DON'T WANT TO TALK

14:17     21   ABOUT LOCATION.  IF I SAID IT, I MISSPOKE OR I GOT AHEAD OF

14:17     22   MYSELF.

14:17     23          ALL I WANT TO ASK ABOUT IS THESE NUMBERS, DO

14:17     24   THEY CORRESPOND TO THE NUMBERS ON THE PREVIOUS SLIDE, FOR THE

14:17     25   COURT'S EDIFICATION AND EVERYONE WHO READS THIS TRANSCRIPT.

CHAD A. MORRIS - DIRECT

14:17     1        **THE COURT:**  WELL, LET ME MAKE SURE I UNDERSTAND.

14:17     2  WE'RE GOING TO HAVE TO TAKE A LITTLE TIME IF WE'RE GOING TO DO

14:17     3  THIS.

14:17     4            WE HAVE THIS SLIDE PRESENTED BY MR. MORRIS --

14:17     5  THAT'S NOT IT.  THE FIRST ONE, THE ONE IN HIS REPORT.

14:17     6         **MR. STEVENS:**  YES, SIR.

14:17     7         **THE COURT:**  OKAY.  AND THEY HAVE NUMBERS ON IT?

14:17     8         **MR. STEVENS:**  BUILDING NUMBERS.

14:17     9         **THE COURT:**  BUILDING NUMBERS, 1 THROUGH

14:18   10  SUCH-AND-SUCH?

14:18   11         **MR. STEVENS:**  42-ISH.

14:18   12         **THE COURT:**  ALL RIGHT.  AND ALL THAT DOES IS THAT

14:18   13  ONLY PURPORTS TO SHOW BUILDINGS?

14:18   14         **MR. STEVENS:**  YES, SIR.

14:18   15         **THE COURT:**  OKAY.  AND THEN -- AND THEN HE HAS OTHER

14:18   16  STRUCTURES, OTHER IMAGES SHOWN IN THE AERIAL PARAGRAPH THAT ARE

14:18   17  MAPPED OUT, AND THESE ARE MARKED IN RED ON THERE.

14:18   18         **MS. WAGER-ZITO:**  THOSE ARE THOSE SAME STRUCTURES,

14:18   19  YOUR HONOR.

14:18   20         **MR. STEVENS:**  YES, SIR.  THE BUILDING NUMBERS IN THE

14:18   21  FIRST DIAGRAM -- GO BACK, YOUR HONOR.

14:18   22         **THE COURT:**  THEY'RE ALL BUILDINGS?

14:18   23         **MR. STEVENS:**  YES, SIR.  THOSE YELLOW BOXES ON THIS

14:18   24  MAP -- GO BACK A SLIDE.

14:18   25         THOSE SQUARES HERE WITH THE NUMBERS 1 THROUGH 42

CHAD A. MORRIS - DIRECT

14:18      1    CORRESPOND.  THOSE ARE THE SAME BUILDINGS --

14:18      2              **THE COURT:**  I UNDERSTAND.

14:18      3              **MR. STEVENS:**  -- FOR NUMBERING PURPOSES.

14:18      4              **THE COURT:**  I UNDERSTAND.  BUT DID HE PRESENT A --

14:18      5              **MR. STEVENS:**  NO, SIR.

14:18      6              **THE COURT:**  I UNDERSTAND THOSE ARE BUILDINGS.  THOSE

14:18      7    ARE THE LOCATION OF BUILDINGS, AND NOBODY'S ARGUING THAT THOSE

14:18      8    ARE THE WRONG LOCATIONS.

14:19      9              **MR. STEVENS:**  I HAVEN'T SEEN A REAL DISPUTE ABOUT

14:19     10    THAT WHATSOEVER.  IT'S JUST --

14:19     11              **THE COURT:**  UNLESS YOU ANTICIPATE SOMETHING.  I

14:19     12    UNDERSTAND.

14:19     13                   NOW, WHAT YOU'RE TELLING ME IS I'M GOING TO SEE

14:19     14    OTHER NUMBERS, AND THOSE OTHER NUMBERS MAY BE 1, BUT IT MAY NOT

14:19     15    BE A BUILDING?

14:19     16              **MR. STEVENS:**  NO, SIR.  IT MAY -- GO FORWARD, CARL,

14:19     17    ONE MORE.

14:19     18              **THE COURT:**  WAIT.  HOLD ON.

14:19     19              **MR. STEVENS:**  YOU SEE THIS RIGHT -- TO GET A BASIC

14:19     20    IDEA OF WHERE THAT IS, DO YOU SEE WHERE NUMBER 5 IS, THE POUND

14:19     21    SIGN 5 AND THE POUND SIGN 4?  WE'LL GO WITH THAT.

14:19     22                   OR LET'S GO 1 AND 2, EASIER.  1 AND 2.  OKAY?

14:19     23    YOU'RE GOING TO -- THAT'S A SUBSURFACE FOUNDATION.

14:19     24              **THE COURT:**  I UNDERSTAND.  IT'S NOT A BUILDING.

14:19     25              **MR. STEVENS:**  THAT IS CORRECT.

CHAD A. MORRIS - DIRECT

14:19   1          **THE COURT:**  THAT'S WHAT I JUST SAID.  IN OTHER WORDS,
14:19   2   YOU'RE SHOWING IMAGES OF THINGS OTHER THAN BUILDINGS THAT MAY
14:19   3   HAVE THE SAME NUMBER THAT A BUILDING DOES.
14:19   4          **MR. MITSCH:**  CORRECT.
14:19   5          **THE COURT:**  I UNDERSTAND.  YOU CAN'T ESTABLISH
14:19   6   THAT -- AND THIS WITNESS DID NOT OPINE ON THAT, NOR DID HE
14:19   7   PRESENT ANY -- SAYING -- TESTS TO LOCATE ALL THE SUBSURFACE --
14:19   8          **MR. STEVENS:**  NO.  STRICTLY FOR EDIFICATION OF THE
14:19   9   COURT.  AND WE'RE NOT --
14:19   10          **THE COURT:**  WELL, THE COURT, I'M SURE, CAN GET
14:19   11   EDIFIED ANOTHER WAY.  I'VE GOT THE POINT THAT THERE ARE NUMBERS
14:20   12   FOR BUILDINGS AND NUMBERS FOR OTHER THINGS.  AND THE NUMBERS
14:20   13   MAY BE THE SAME, BUT IT MAY NOT BE A BUILDING.
14:20   14          THAT'S NOT --
14:20   15          **MS. WAGER-ZITO:**  AND, YOUR HONOR, IN HIS REPORT AND
14:20   16   IN HIS DEPOSITION, HE DIDN'T MAP ANYTHING BUT THE BUILDINGS.
14:20   17   HE DID NOT MAP THE DESTINATION SITES.
14:20   18          **THE COURT:**  I'VE GOT THAT.  I'M LOOKING AT IT, AND
14:20   19   I'VE GOT THAT.  I'VE GOT THAT POINT.
14:20   20          **MR. STEVENS:**  FOR THE RECORD, WE OFFER IT FOR
14:20   21   FOUNDATIONAL EVIDENCE THAT YOU COULD RELY ON WHEN WE LOOK AT
14:20   22   PHOTOGRAPHS OR WHEN YOU RECEIVE AND TRY AND -- HE DOES OFFER
14:20   23   OPINIONS ABOUT THOSE.
14:20   24          **THE COURT:**  OKAY.  WELL, I THINK YOU'RE GOING TO HAVE
14:20   25   TO MOVE ON, BECAUSE IT'S -- I'M SURE IT CAN BE ELICITED BY

CHAD A. MORRIS - DIRECT

14:20    1   QUESTIONING SOMEONE WHO -- WITH WGI OR OTHER S.

14:20    2              BUT I'VE GOT THE GENERAL POINT:  THE BUILDING

14:20    3   NUMBERS ARE NOT THE SAME.  THERE'S OTHER NUMBERS I MIGHT SEE OF

14:20    4   SUBSURFACE EXCAVATIONS.

14:20    5          **MR. STEVENS:**  THAT'S CORRECT, YOUR HONOR.

14:20    6          **THE COURT:**  AND, HOPEFULLY, THERE WILL BE A MAP OR

14:20    7   SOMETHING THAT SHOWS ME WHERE THEY ARE, BECAUSE IT'S KIND OF

14:20    8   IMPORTANT.

14:20    9          **MR. STEVENS:**  IT IS.

14:20   10          **THE COURT:**  LET'S MOVE ON.

14:20   11          **MR. STEVENS:**  OKAY.  LET'S SEE.  SKIP FORWARD.  ONE

14:20   12   MORE.  ONE MORE.  AND WE DID A SUMMARY FOR THE COURT, BUT WE

14:20   13   WON'T GO THERE.

14:20   14              LET'S SEE.  BACK UP.

14:20   15              THE NUMBERING SYSTEM, THERE WERE BUILDINGS,

14:21   16   SUBSURFACE FOUNDATION SLABS, A SECOND GROUP OF SUBSURFACE

14:21   17   FOUNDATION SLABS, AND SOIL REMEDIATION AREAS THAT WERE ASSIGNED

14:21   18   NUMBERS.

14:21   19          **THE COURT:**  RIGHT.  AND I --

14:21   20          **MR. STEVENS:**  AND FOR THE BENEFIT OF EVERYONE, I

14:21   21   THOUGHT IT WOULD BE HELPFUL.

14:21   22              ALL RIGHT.  MOVE ON.  NEXT.

14:21   23   BY MR. STEVENS:

14:21   24   **Q.**   LET'S TALK ABOUT ANOTHER ACTIVITY THAT YOU DID OPINE ABOUT

14:21   25   IN YOUR REPORT, AND THAT'S PILE REMOVAL.

CHAD A. MORRIS - DIRECT

| | | |
|--|--|--|
| 14:21 | 1 | NEXT SLIDE. |
| 14:21 | 2 | FOR ORIENTATION PURPOSES -- |
| 14:21 | 3 | **MR. STEVENS:**  AND THIS IS PROBABLY THE MOST CONFUSING |
| 14:21 | 4 | PICTURE I'VE COME ACROSS, YOUR HONOR. |
| 14:21 | 5 | **BY MR. STEVENS:** |
| 14:21 | 6 | **Q.**   -- COULD YOU ORIENT US WHERE THIS IS ON THE GLOBE AND |
| 14:21 | 7 | WHERE THE CAMERAMAN WOULD BE STANDING? |
| 14:21 | 8 | **A.**   THE CAPTION READS -- |
| 14:21 | 9 | **THE COURT:**  YOU MIGHT DO BEST BY GOING BACK TO THE |
| 14:21 | 10 | SLIDE THAT HE PREPARED THAT SHOWS THE AREA AND THEN HE CAN |
| 14:21 | 11 | POINT OUT ON THAT SLIDE WHERE THIS WOULD BE. |
| 14:21 | 12 | **MR. STEVENS:**  OKAY.  CAN YOU GO BACK TO THAT FIRST |
| 14:21 | 13 | SLIDE IN THE SERIES, CARL?  LET ME GET MY -- |
| 14:21 | 14 | **THE COURT:**  I'M SORRY.  I DON'T HAVE THE NUMBER |
| 14:21 | 15 | EITHER. |
| 14:21 | 16 | **MR. STEVENS:**  GIVE ME THAT.  THERE IT IS.  JX -- |
| 14:22 | 17 | **THE COURT:**  SLIDE 3. |
| 14:22 | 18 | **MR. STEVENS:**  SLIDE 3.  JX 1576. |
| 14:22 | 19 | **THE COURT:**  THAT'S IT.  THANK YOU. |
| 14:22 | 20 | **MR. STEVENS:**  1576. |
| 14:22 | 21 | **BY MR. STEVENS:** |
| 14:22 | 22 | **Q.**   MR. MORRIS, CAN YOU SHOW US HERE WHERE THOSE WHARF PILES |
| 14:22 | 23 | WERE POSITIONED? |
| 14:22 | 24 | **A.**   THE PHOTOGRAPH DOESN'T ALLOW FOR, CERTAINLY, PINPOINT |
| 14:22 | 25 | LOCATIONS.  BUT -- |

CHAD A. MORRIS - DIRECT

14:22    1              **THE COURT:**  A GENERAL IDEA.

14:22    2              **THE WITNESS:**  GENERALLY, THE PHOTOGRAPHER WOULD BE ON

14:22    3    THE BANK SOMEWHERE IN -- ON THE INSIDE OF THE WHARF.  THE

14:22    4    CAMERA WOULD BE LOOKING IN THIS DIRECTION, BECAUSE THE BRIDGE

14:22    5    CAN BE VIEWED IN THE BACKGROUND.

14:22    6                   SO WE'RE, BASICALLY, JUST LOOKING AT -- IF WE GO

14:22    7    BACK TO THE IMAGE -- WHARF PILES THAT WERE REMOVED IN THAT

14:22    8    AREA.

14:22    9              **THE COURT:**  THE COURT IS DULY ORIENTED.

14:22   10    BY MR. STEVENS:

14:22   11    **Q.**  AND THEN THE BRIDGE IN THE BACKGROUND OF SLIDE 21 IS THE

14:22   12    OLD FLORIDA AVENUE BRIDGE BECAUSE THE NEW ONE IS BLUE.  THAT --

14:22   13    THAT WOULD BE THE OLD BRIDGE.  JUST SO WE DON'T GET CONFUSED.

14:22   14              **THE COURT:**  RIGHT.  I UNDERSTAND.  WE'RE LOOKING

14:22   15    TOWARDS THE FLORIDA -- THE OLD FLORIDA AVENUE BRIDGE.

14:23   16    BY MR. STEVENS:

14:23   17    **Q.**  ALL RIGHT.  AND, MR. MORRIS, THOSE -- THOSE PILES WERE

14:23   18    REMOVED; CORRECT?

14:23   19    **A.**  YES.

14:23   20    **Q.**  ALL RIGHT.

14:23   21              **MR. STEVENS:**  I'M HAVING A TIME TAKING THINGS OUT OF

14:23   22    MY ORDER, JUDGE.

14:23   23                   HERE WE GO.  THE NEXT SLIDE PLEASE.

14:23   24    BY MR. STEVENS:

14:23   25    **Q.**  THIS IS FIGURE 3.8 FROM YOUR REPORT, JX 15- -- 1576,

CHAD A. MORRIS - DIRECT

14:23   1   NUMBER 1O.  THESE ARE WHARF PILES AFTER THEY WERE REMOVED.

14:23   2   **A.**   YES.  THIS IS A PHOTOGRAPH OF TIMBER PILES THAT WERE

14:23   3   REMOVED FROM THE WHARF.  IT JUST SHOWS THAT THERE WERE MANY OF

14:23   4   THEM AND THAT THEY WERE RELATIVELY LONG.

14:24   5   **Q.**   WERE YOU EVER ABLE TO DETERMINE AN APPROXIMATE NUMBER OF

14:24   6   PILES THAT WERE REMOVED FROM THE WHARF AREA?

14:24   7   **A.**   ONLY TO SAY THAT THERE WERE HUNDREDS.

14:24   8   **Q.**   OKAY.  IF I ASKED YOU TO ASSUME HYPOTHETICALLY THAT OTHERS

14:24   9   HAVE OPINED THAT THERE WERE AS MANY AS -- UPWARDS OF 800 PILES

14:24   10  REMOVED FROM THE SHORELINE --

14:24   11          **MR. KELLS:**  OBJECTION, YOUR HONOR.

14:24   12          **THE COURT:**  THAT'S CERTAINLY NOT TO HIS KNOWLEDGE,

14:24   13  AND THAT'S NOT A KIND OF HYPOTHETICAL AN EXPERT CAN ANSWER.

14:24   14          **MR. STEVENS:**  THAT'S FINE.

14:24   15          **THE COURT:**  IT WOULD HAVE TO BE A SURVEY QUESTION OR

14:24   16  A MAPPING QUESTION EVEN TO BE A HYPOTHETICAL.  SO IT'S

14:24   17  SUSTAINED.

14:24   18          **MR. STEVENS:**  ALL RIGHT.

14:24   19  **BY MR. STEVENS:**

14:24   20  **Q.**   THE PHOTOS OF -- THE PILINGS SHOWN IN THIS PHOTOGRAPH, THE

14:24   21  CAPTION READS "WHARF PILES REMOVAL."  IT SHOWS PILES 51 TO

14:24   22  73 FEET LONG.

14:24   23          DO THOSE PILES APPEAR TO YOU TO BE OF THAT DIMENSION?

14:24   24          **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.

14:24   25          **THE COURT:**  HE CAN'T -- EVEN IF HE'S AN EXPERT,

CHAD A. MORRIS - DIRECT

14:24    1    UNLESS HE'S GOT SOME KIND OF NEW TECHNIQUE MENTALLY THAT I

14:24    2    DON'T KNOW ABOUT, HE CANNOT POSSIBLY ANSWER THAT QUESTION.

14:24    3              I CAN LOOK AT IT AS WELL AS HE CAN AND KNOW IT'S

14:25    4    BIG.

14:25    5         MS. WAGER-ZITO:  AND THE INFORMATION ON THE --

14:25    6         THE COURT:  IT'S NOT A TOOTHPICK.

14:25    7         MS. WAGER-ZITO:  THE INFORMATION ON THE GRID COMES

14:25    8    FROM A QAR, YOUR HONOR.  THAT'S NOT THE ORIGINAL CAPTION ON THE

14:25    9    PHOTO.

14:25   10         THE COURT:  I UNDERSTAND.  BUT I'M SURE YOU'RE NOT

14:25   11    CONTESTING THAT THOSE AREN'T LARGE SUBSTANTIAL PILINGS.

14:25   12         MS. WAGER-ZITO:  NO, YOUR HONOR.

14:25   13         THE COURT:  THE COURT CAN SEE THAT.  THEY'RE BIG.

14:25   14    I'VE SEEN MANY PILINGS.  GO AHEAD.  I'VE EVEN DRIVEN SOME.

14:25   15              GO AHEAD.

14:25   16    BY MR. STEVENS:

14:25   17    Q.   NEXT SLIDE.  JX 157.15.

14:25   18              NOW, THIS -- DESCRIBE FOR THE COURT WHAT WE HAVE

14:25   19    HERE.

14:25   20    A.   THIS IS A DOCUMENT FROM MY REPORT THAT LISTS INFORMATION

14:25   21    ABOUT EIGHT SUBSURFACE FOUNDATIONS THAT WERE FOUND DURING THE

14:25   22    CONSTRUCTION ACTIVITIES AT THE SITE.

14:25   23    Q.   AND THIS IS CONTAINED IN YOUR REPORT.  AND THOSE

14:25   24    SUBSURFACE FOUNDATIONS, DID THEY ULTIMATELY TURN OUT TO BE THE

14:25   25    SUBSURFACE FOUNDATIONS WE LOOKED AT ON THE HAND-SKETCHED MAP A

CHAD A. MORRIS - DIRECT

14:25   1   MOMENT AGO?

14:25   2   **A.**   YES.

14:25   3        **MR. STEVENS:**  AND CAN YOU GO BACK TO THE SLIDE,

14:25   4   CARL -- NO, NO, NO.  17.

14:26   5   **BY MR. STEVENS:**

14:26   6   **Q.**   IS THAT THE EIGHT SUBSURFACE FOUNDATIONS DESCRIBED IN THAT

14:26   7   PROPOSAL?

14:26   8        **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.

14:26   9        **THE COURT:**  YEAH.  COUNSEL, I'M NOT -- IS THIS THE

14:26   10   ONLY EVIDENCE YOU'RE GOING TO BE PRESENTING ON WHERE THE EIGHT

14:26   11   SUBSURFACE FOUNDATIONS ARE LOCATED?

14:26   12        **MR. STEVENS:**  NO, SIR.

14:26   13        **THE COURT:**  BECAUSE I DON'T SEE A MAP OF THEM

14:26   14   ANYWHERE.

14:26   15        **MR. STEVENS:**  WELL --

14:26   16        **THE COURT:**  IN YOUR -- IN THIS REPORT.  I DON'T.  I

14:26   17   DON'T KNOW HOW HARD THAT WAS TO DO, BUT I DON'T SEE IT.  I KNOW

14:26   18   I'VE SEEN DIAGRAMS, I'VE LOOKED AT THE EXPERT REPORTS, AND

14:26   19   THERE'S CERTAINLY SOME DEPICTIONS AS TO WHERE THEY'RE LOCATED.

14:26   20        BUT . . .

14:26   21        **MR. STEVENS:**  LET ME GO BACK TO SLIDE 23.

14:26   22   **BY MR. STEVENS:**

14:26   23   **Q.**   IN TERMS OF THE NUMBER OF PILES THAT WERE ASHORE -- WE

14:26   24   TALKED ABOUT WHARF PILES A MOMENT AGO.  AT THE -- THE BOTTOM

14:27   25   QUOTE SAYS, "2, PILINGS ARE EXPECTED TO BE LOCATED UNDER ALL

CHAD A. MORRIS - DIRECT

14:27    1   SUBSURFACE FOUNDATIONS."

14:27    2              IN YOUR INVESTIGATION, DID YOU DETERMINE THAT THERE

14:27    3   WERE PILES UNDER SUBSURFACE FOUNDATIONS?

14:27    4   **A.**   YES.

14:27    5   **Q.**   AND HOW MANY AREAS OR SUBSURFACE FOUNDATIONS DID YOU FIND

14:27    6   THERE TO BE PILINGS BENEATH?

14:27    7              **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  HE DID NOT

14:27    8   OPINE ON THIS IN HIS REPORT.

14:27    9              **MR. STEVENS:**  THIS IS FROM HIS REPORT.

14:27   10              **MS. WAGER-ZITO:**  THIS PARTICULAR DOCUMENT IS, BUT --

14:27   11              **THE COURT:**  I'M GOING TO OVERRULE THE OBJECTION.  I

14:27   12   CAN READ EIGHT.

14:27   13              **MR. STEVENS:**  IN THIS ONE?

14:27   14              **THE COURT:**  YEAH.

14:27   15              **MR. STEVENS:**  NEXT PHOTOGRAPH.

14:27   16              **THE COURT:**  AND THAT'S NOT A REAL BIG DISPUTE.  THERE

14:27   17   WERE, IN FACT, EIGHT, I ASSUME.

14:27   18              **MR. STEVENS:**  DESCRIBED IN THAT DIAGRAM, YOUR HONOR.

14:27   19              **THE COURT:**  YES.

14:27   20              **MR. STEVENS:**  DESCRIBED IN THAT DOCUMENT, YES, SIR.

14:27   21   BY **MR. STEVENS:**

14:27   22   **Q.**   SLIDE 25, PX 1576-13.

14:27   23              IS THIS AN EXAMPLE OF SUBSURFACE FOUNDATION PILINGS?

14:28   24   **A.**   YES, IT IS.

14:28   25   **Q.**   DESCRIBE FOR THE COURT THE SPATIAL RELATIONSHIP, IF YOU

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:28 | 1 | CAN, OF THIS TYPE OF ACTIVITY IN RELATION TO THE NORTH BREACH. |
| 14:28 | 2 | **A.**   FROM THE PHOTOGRAPH ITSELF, I CANNOT.  THESE, FROM THE |
| 14:28 | 3 | PREVIOUS SKETCHES WE SAW, THEY HAPPENED IN THE BOLAND MARINE |
| 14:28 | 4 | AREA. |
| 14:28 | 5 | **Q.**   AND THE CAPTION HERE SAYS "BOLAND PILINGS UNDER SUBSURFACE |
| 14:28 | 6 | CONCRETE, FOUNDATION 007."  IS THAT 007? |
| 14:28 | 7 | **A.**   THAT'S FROM THE QAR. |
| 14:28 | 8 | **Q.**   THAT'S FROM THE Q- -- OKAY. |
| 14:28 | 9 | GO TO SLIDE 27.  WE'LL HAVE TO SKIP ONE. |
| 14:28 | 10 | EXPLORATORY EXCAVATION AT SUBSURFACE CONCRETE AT |
| 14:28 | 11 | NUMBER 7.  THE DATE OF THAT PHOTOGRAPH IS JUNE 22ND, 2001? |
| 14:29 | 12 | **A.**   THAT'S CORRECT. |
| 14:29 | 13 | **Q.**   OKAY.  IT SAYS, "FULL REACH OF EQUIPMENT." |
| 14:29 | 14 | MR. MORRIS, DO YOU KNOW WHAT THE FULL REACH OF THAT |
| 14:29 | 15 | EXCAVATOR IS? |
| 14:29 | 16 | **A.**   I KNOW IT NOW.  I DID NOT KNOW IT AT THE TIME OF MY |
| 14:29 | 17 | DEPOSITION. |
| 14:29 | 18 | **Q.**   OKAY. |
| 14:29 | 19 | NEXT SLIDE.  THE SUBSURFACE -- NEXT SLIDE. |
| 14:29 | 20 | NEXT SLIDE. |
| 14:29 | 21 | **MR. STEVENS:**  I APOLOGIZE, YOUR HONOR. |
| 14:29 | 22 | NEXT SLIDE. |
| 14:29 | 23 | **THE COURT:**  NO PROBLEM. |
| 14:29 | 24 | **BY MR. STEVENS:** |
| 14:29 | 25 | **Q.**   OKAY.  THERE WE GO. |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:29 | 1 | THE SUBSURFACE FOUNDATION AT NUMBER 7 IS DATED |
| 14:30 | 2 | JUNE 22ND, '01 IN PX -- JX 1576-11.  CORRECT? |
| 14:30 | 3 | **A.**   I DON'T SEE A DASH 11.  IT'S DASH 15. |
| 14:30 | 4 | BUT, YES, THIS IS A PHOTOGRAPH OF THE SAME |
| 14:30 | 5 | FOUNDATION, FROM THE SAME SERIES OF PHOTOGRAPHS. |
| 14:30 | 6 | **Q.**   AND THE NEXT SLIDE. |
| 14:30 | 7 | THE -- WHAT DOES THIS PHOTOGRAPH DEPICT? |
| 14:30 | 8 | **A.**   THIS IS THE SAME HOLE, SAME FOUNDATION.  THEY JUST REMOVED |
| 14:30 | 9 | SOME OF THE STEEL AND SAY, SUBSURFACE FOUNDATION THAT WAS AT |
| 14:30 | 10 | THAT LOCATION. |
| 14:30 | 11 | **Q.**   OKAY.  NOW, THIS SLIDE IS DATED JUNE 28TH OF 2001.  AND |
| 14:30 | 12 | THE CAPTION IS "SUBSURFACE CONCRETE BELOW NUMBER 7, WEST SIDE." |
| 14:30 | 13 | DO YOU KNOW WHETHER OR NOT THAT PILE -- OR THAT |
| 14:31 | 14 | SUBSURFACE FOUNDATION WAS REMOVED ON THAT DAY? |
| 14:31 | 15 | **MR. KELLS:**  I'M GOING TO OBJECT, YOUR HONOR.  HE |
| 14:31 | 16 | DOESN'T HAVE ANY FIRSTHAND KNOWLEDGE, AND HE WASN'T THERE. |
| 14:31 | 17 | THIS WASN'T IN HIS REPORT.  IT'S NOT EVEN AN OPINION. |
| 14:31 | 18 | **THE COURT:**  WHERE ARE WE GOING WITH THIS, COUNSEL?  I |
| 14:31 | 19 | KNOW THAT IT ULTIMATELY WAS REMOVED. |
| 14:31 | 20 | **BY MR. STEVENS:** |
| 14:31 | 21 | **Q.**   CAN YOU DESCRIBE WHAT IS - THE ACTIVITY THAT'S GOING ON IN |
| 14:31 | 22 | THIS PHOTOGRAPH? |
| 14:31 | 23 | **A.**   THE AREA HAS BEEN BACKFILLED AND THE FOUNDATION HAD NOT |
| 14:31 | 24 | BEEN REMOVED AT THIS TIME. |
| 14:31 | 25 | **Q.**   OKAY.  NEXT SLIDE. |

CHAD A. MORRIS - DIRECT

14:31    1    THIS PHOTOGRAPH, IS THAT THE SAME FOUNDATION THAT IS

14:31    2    SHOWN IN THE PREVIOUS PHOTOGRAPH, EXCEPT NOW WE'RE -- THE DATE

14:31    3    IS NOVEMBER 7TH OF 2001?

14:31    4    **A.**   YES, I BELIEVE IT IS.

14:31    5         **MR. KELLS:**  OBJECTION.  AGAIN, THIS IS COMING FROM A

14:32    6    QAR THAT HE SAID HE NEVER CONSIDERED OR REVIEWED.  IT'S --

14:32    7         **THE COURT:**  WELL, THIS PHOTOGRAPH IS IN HIS REPORT.

14:32    8    I'M GOING TO LET HIM COMMENT ON IT.

14:32    9         I'M ASSUME IT'S IN HIS REPORT.  IS IT?

14:32   10         **MS. WAGER-ZITO:**  IT'S NOT IN HIS REPORT, YOUR HONOR.

14:32   11         **MR. KELLS:**  I MEAN, COUNSEL IS TESTIFYING FROM THE

14:32   12    CAPTION ON THE SLIDE, NOT EVEN FROM THE CAPTION ON THE

14:32   13    PHOTOGRAPH.

14:32   14         **THE COURT:**  SO IS THERE A PHOTOGRAPH --

14:32   15         **MR. KELLS:**  WE KNOW WE CAN READ THE CAPTION ON THE

14:32   16    PHOTOGRAPH.

14:32   17         **THE COURT:**  JUST A MINUTE.  IS THE PHOTOGRAPH IN HIS

14:32   18    REPORT?

14:32   19         **THE WITNESS:**  NO, IT'S NOT.

14:32   20         **MS. WAGER-ZITO:**  NO, YOUR HONOR.

14:32   21         **THE COURT:**  OKAY.  SO I DON'T KNOW WHERE YOU'RE GOING

14:32   22    WITH THIS, COUNSEL.  IT'S NOT IN HIS REPORT.  I MEAN, YOU

14:32   23    KNOW --

14:32   24         **MR. STEVENS:**  IT'S JUST A PHOTOGRAPH THAT --

14:32   25         **THE COURT:**  I UNDERSTAND WHAT IT JUST IS.  BUT

CHAD A. MORRIS - DIRECT

14:32   1   SOMEBODY SHOULD HAVE BEEN PREPARED TO GIVE THE RELEVANCE TO THE

14:32   2   COURT IN AN OPINION, IF IT'S GOING TO BE EXPERT TESTIMONY.  I

14:32   3   CAN LOOK AND SEE WHAT IT IS.  I DON'T HAVE TO HAVE A MANY --

14:32   4   MANY DEGREES TO SAY THAT'S A BIG PIECE OF CONCRETE AND IT

14:32   5   LOOKS --

14:32   6               BUT THIS WITNESS DOESN'T HAVE THIS IN HIS

14:32   7   REPORT.  IS THERE NO OTHER WITNESS WHO IS GOING TO TESTIFY TO

14:32   8   THIS?  YOU KNOW?  I MEAN, YOU DON'T HAVE ANY OTHER INFORMATION

14:32   9   OR ANY OTHER WITNESS TO ELICIT THIS INFORMATION?

14:32   10          **MR. STEVENS:**  YOUR HONOR, THESE PHOTOGRAPHS --

14:32   11          **THE COURT:**  I DON'T KNOW WHY IT TAKES AN EXPERT IN

14:32   12   MAPPING AND SURVEYING TO SAY, "THAT'S A BIG PIECE OF CONCRETE."

14:33   13          **MR. STEVENS:**  WELL, THE -- THE --

14:33   14          **THE COURT:**  A MAPPING AND SURVEYING WOULD SAY, "THIS

14:33   15   IS WHERE WE MAPPED IT.  THIS IS WHERE IT WAS."

14:33   16          **MR. STEVENS:**  YES, YOUR HONOR.

14:33   17          **THE COURT:**  I'M NOT SURE WHAT THE REST OF THIS IS.

14:33   18          **MR. STEVENS:**  AT THE TIME OF HIS DEPOSITION REPORT,

14:33   19   HE WAS NOT ABLE TO DO THAT.  HE DID NOT HAVE THE QARS IN A

14:33   20   FORMAT THAT WERE USABLE.  THEY CAME -- THAT CAME MUCH LATER.

14:33   21   MUCH LATER.

14:33   22          **THE COURT:**  I UNDERSTAND.  AND I GUESS SOMEBODY

14:33   23   SHOULD HAVE GOTTEN LEAVE FROM THE COURT OR SOMETHING BECAUSE I

14:33   24   CAN'T RECTIFY ALL OF THAT NOW.

14:33   25          **MS. WAGER-ZITO:**  YOUR HONOR, I WOULD JUST NOTE, THEY

CHAD A. MORRIS - DIRECT

14:33    1    HAD ALL OF THE QARS.  THEY WERE PRODUCED EARLY IN DISCOVERY.

14:33    2    HE'S SAYING HE DIDN'T HAVE THE GIS DATABASE.  THAT'S A

14:33    3    COMPLETELY DIFFERENT STORY, AND WE CAN DISCUSS THAT AT A

14:33    4    DIFFERENT TIME.  THEY HAD ALL THE QARS.

14:33    5              **THE COURT:**  WELL, WE DON'T HAVE TO DISCUSS IT.  IT IS

14:33    6    WHAT IT IS NOW.  WE'RE DEALING WITH PRESENT, REALTIME REALITY.

14:33    7    AND SO IF SOMEBODY NEEDED RELIEF FROM THE COURT, THEY HAD TO

14:33    8    SEEK IT.

14:33    9              **MR. STEVENS:**  CAN I ASK THIS, YOUR HONOR, OF MR --

14:33   10              **THE COURT:**  IS THERE A DISPUTE AS TO WHERE THE

14:33   11    WEDDING CAKE STRUCTURE IS LOCATED?

14:34   12              **MR. STEVENS:**  NO, SIR, NOT THE WEDDING CAKE

14:34   13    STRUCTURE.

14:34   14              **THE COURT:**  OKAY.  IS THERE A DISPUTE AS TO WHERE

14:34   15    THIS IS LOCATED?

14:34   16              **MR. STEVENS:**  NO, SIR.

14:34   17              **THE COURT:**  OKAY.  SO THERE'S NO REAL DISPUTE ON THE

14:34   18    MAPS PRODUCED BY THE DEFENDANTS WHERE THIS IS LOCATED.

14:34   19                   I GUESS WE'RE GOING TO HAVE A DISPUTE AS TO WHAT

14:34   20    THE DEPTH IS OR TO WHAT SOIL WAS PUT IN.  I'M SURE THAT'S GOING

14:34   21    TO BE TRUE.

14:34   22                   BUT I'M WONDERING, IS THERE A DISPUTE AS TO ANY

14:34   23    OF THIS?  IS THIS A POINTS OF CONTENTION?  OR IS THERE A

14:34   24    DISPUTE, IF YOU LOOKED AT THE DEFENDANTS' EXHIBITS THAT SHOW

14:34   25    WHERE THESE THINGS ARE AND DO YOU HAVE EXCEPTIONS AS TO WHERE

CHAD A. MORRIS - DIRECT

14:34    1   THEY ARE, IN FACT LOCATED?

14:34    2          **MR. STEVENS:**  YES, SIR.  THEY ARE NOT LOCATED.

14:34    3   THAT'S THE POINT, WAS THEY WERE NOT ON THE DEFENDANTS' MAPS AT

14:34    4   ALL.  THEY WEREN'T CONSIDERED.  THESE SUBSURFACE FOUNDATIONS

14:34    5   WEREN'T CONSIDERED IN THEIR ANALYSIS, AND THEY WEREN'T ON DR.

14:34    6   SILVA-TULLA'S MAP.

14:34    7          **THE COURT:**  I ASSUME YOU'LL BRING THAT OUT ON

14:34    8   CROSS-EXAMINATION.

14:34    9          **MR. STEVENS:**  YES, SIR.

14:34   10          **THE COURT:**  THAT MIGHT EVEN BE A BETTER PLACE TO

14:34   11   BRING IT OUT --

14:34   12          **THE WITNESS:**  YES, SIR.

14:34   13          **THE COURT:**  -- THAN A WITNESS WHO'S LOOKING AT IT

14:34   14   FROM PICTURES HE DIDN'T PRODUCE IN HIS REPORT.

14:34   15   **BY MR. STEVENS:**

14:34   16   **Q.**   FOR OUR PURPOSES TODAY, IN TERMS OF THE SPATIAL

14:34   17   RELATIONSHIP OF THIS STRUCTURE SHOWN IN PX 3393-347, WHAT IS

14:34   18   ITS RELATIONSHIP TO THE NORTH BREACH?

14:35   19          **THE COURT:**  DO YOU HAVE ANYBODY ELSE YOU CAN ASK THIS

14:35   20   QUESTION?  BECAUSE HE DIDN'T OPINE ON THIS.  HE DIDN'T HAVE

14:35   21   ANYTHING IN HIS REPORT THAT'S REMOTELY ABOUT THIS.

14:35   22          **MR. STEVENS:**  YOUR HONOR --

14:35   23          **THE COURT:**  SO I'M WONDERING HOW -- IF I LET HIM DO

14:35   24   THIS, I'M GOING TO HAVE TO LET EVERYBODY MEANDER AWAY FROM

14:35   25   THEIR REPORTS, AND I CANNOT DO THIS.  I WON'T DO THAT, EXCEPT

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:35 | 1 | WITH A FEW -- A LITTLE SHADING, AND THAT'S ABOUT IT. |
| 14:35 | 2 | THIS IS BEYOND SHADING. |
| 14:35 | 3 | **MR. STEVENS:**  ONE MOMENT, YOUR HONOR. |
| 14:35 | 4 | **THE COURT:**  I'M NOT SAYING I'M GOING TO BE |
| 14:35 | 5 | 100 PERCENT LITERAL, BUT I'M GOING TO BE AT LEAST 90 PERCENT |
| 14:35 | 6 | LITERAL. |
| 14:35 | 7 | YOU CAN ASK THE EXPERT:  DID YOU CONSIDER THIS |
| 14:35 | 8 | IN RENDERING YOUR OPINION, THIS BIG CONCRETE STRUCTURE HERE? |
| 14:35 | 9 | WHY DIDN'T YOU?  HERE IT IS.  THERE'S A PICTURE OF IT.  THEIR |
| 14:35 | 10 | EXPERT.  AND I ASSUME HE OR SHE CAN EITHER SAY, "HEY, I DIDN'T |
| 14:35 | 11 | KNOW ABOUT IT," OR -- YOU KNOW. |
| 14:36 | 12 | **MR. STEVENS:**  YOUR HONOR, WE WILL -- WE'LL CALL THE |
| 14:36 | 13 | OTHER WITNESS. |
| 14:36 | 14 | **THE COURT:**  ARE WE JUST FINDING OUT ABOUT THESE HUNKS |
| 14:36 | 15 | OF CONCRETE NOW? |
| 14:36 | 16 | **MR. STEVENS:**  WELL, YES, SIR.  WE'RE JUST FIGURING |
| 14:36 | 17 | OUT, WITH THE NUMBERING CONFUSION, AND THIS WAS ALL -- |
| 14:36 | 18 | **THE COURT:**  I UNDERSTAND THAT.  I UNDERSTAND THAT. |
| 14:36 | 19 | BUT DID WE KNOW THERE WAS A BIG HUNK OF CONCRETE THERE?  YOU |
| 14:36 | 20 | SAW THAT PICTURE WAY BEFORE -- THAT PICTURE. |
| 14:36 | 21 | **MR. STEVENS:**  YES, SIR.  THAT PHOTOGRAPH WAS THERE, |
| 14:36 | 22 | AND THEIR PHOTOGRAPHS OF THE SAME GENERAL AREA.  AND THAT |
| 14:36 | 23 | PHOTOGRAPH THAT SHOWS WITH THE BACKHOE AT DEEP -- AT DEPTH AND |
| 14:36 | 24 | THE BIG CHUNK OF CONCRETE IS ACTUALLY FROM UNDERNEATH THERE. |
| 14:36 | 25 | BUT WITH -- PIECING IT ALL TOGETHER, WHAT YOU |

CHAD A. MORRIS - DIRECT

14:36    1    HAVE IS A PHOTOGRAPH OF THE SUBSURFACE WORK.  AND THEN LATER,

14:36    2    ONCE THEY CLEAR -- IT'S ACTUALLY BEFORE.  WHEN THEY CLEAR IT,

14:36    3    IT LOOKS LIKE IT'S EXCAVATION WORK EARLY IN THE TRANSITE PHASE,

14:36    4    AND THEY CAME -- THEY RECOVERED IT AND CAME BACK LATER.

14:36    5                 IT'S JUST A VERY DIFFICULT TASK TO KEEP UP WITH

14:36    6    WHEN THINGS WERE DONE AND WHAT STAGES AND WHAT PHASES.

14:36    7                 AND SO WHEN MR. MORRIS GOT THE QARS AND THE

14:36    8    INFORMATION HE NEEDED TO HELP TRIANGULATE, IF YOU WILL, WHERE A

14:37    9    PHOTOGRAPH WAS IN RELATION TO THE NORTH BREACH, IT JUST WASN'T

14:37   10    POSSIBLE FOR HIM AT THAT TIME.

14:37   11                 SO IT'S NOT IN HIS REPORT.  THEIR EXPERTS THEN

14:37   12    OFFER MAPS AND SUGGEST THAT THESE ARE THE SUBSURFACE

14:37   13    FOUNDATIONS AND STRUCTURES THAT WERE REMOVED IN THIS AREA, BUT

14:37   14    THEY'RE NOT ON THOSE MAPS.

14:37   15                 AND THAT WAS WHAT THE WHOLE POINT OF THE

14:37   16    NUMBERING SYSTEM WAS, TO EDUCATE EVERYONE ABOUT THE CONFUSION

14:37   17    AND ENABLE US TO THEN PLACE THESE STRUCTURES WITH THE RIGHT

14:37   18    NUMBERS IN THE RIGHT LOCATION.

14:37   19              **MR. BRUNO:**  YOUR HONOR, THE FACT IS THIS --

14:37   20              **THE COURT:**  WELL, IT'S A LITTLE LATE TO BE DOING THAT

14:37   21    HERE TODAY.

14:37   22              **MR. BRUNO:**  AND THAT -- YOUR HONOR, YOU'RE RIGHT.

14:37   23    AND WHAT I -- IT'S MY FAULT.  BECAUSE I CAN DO THIS ONE OF TWO

14:37   24    WAYS.  I CAN CALL MR. MONTEGUT, WHICH I WAS TRYING TO AVOID,

14:37   25    BECAUSE I WAS TRYING TO SHORTEN THE TRIAL.  I WILL NOW HAVE TO

CHAD A. MORRIS - DIRECT

14:37    1    CALL MR. MONTEGUT.

14:37    2              I THOUGHT THIS WAS NON-CONTROVERSIAL.  THEY

14:37    3    CAN'T POSSIBLY DISPUTE THE LOCATIONS, THE SIZE, THE DEPTH OF

14:37    4    ANY OF THESE THINGS.  WE WERE JUST TRYING TO ORIENT.  I THOUGHT

14:37    5    IT WOULD BE EASIER AND BETTER TO DO IT THIS WAY.

14:38    6              THE DEFENDANTS CONTINUE TO OBJECT BECAUSE THEY

14:38    7    DON'T WANT THE EVIDENCE TO GO IN.  THAT'S FINE.  WE WILL JUST

14:38    8    HAVE TO CALL ADDITIONAL CORPS WITNESSES, WHICH WILL TAKE A LOT

14:38    9    OF TIME UNNECESSARILY.

14:38   10              AND I ACCEPT THE RESPONSIBILITY BECAUSE I MADE

14:38   11    THE CALL TO TRY TO USE THIS WITNESS SIMPLY TO LOCATE THESE

14:38   12    HOLES, WHICH NOBODY DISPUTES, ON A MAP.  SO WE UNDERSTAND --

14:38   13         **THE COURT:**  ARE THE HOLES LOCATED, WERE YOU SAYING --

14:38   14    AND THESE HOLES, WE'LL CALL THEM, THESE EXCAVATIONS, WHATEVER

14:38   15    THEY ARE --

14:38   16         **MR. BRUNO:**  THINGS.

14:38   17         **THE COURT:**  ARE NOT LOCATED ACCURATELY ON ANY OTHER

14:38   18    MAP THAT I'M GOING TO SEE IS WHAT YOUR -- IS WHAT YOUR

14:38   19    CONTENTION IS.

14:38   20              I'M SURE THE DEFENDANTS WILL ARGUE --

14:38   21         **MR. BRUNO:**  OF COURSE.

14:38   22         **MR. KELLS:**  THAT IS CORRECT.

14:38   23         **MR. BRUNO:**  THE PARTIES AGREE THAT THEY ARE THERE,

14:38   24    THEY HAPPENED.  BUT THE LITTLE DISAGREEMENT HERE IS WHETHER THE

14:38   25    EXPERTS PROPERLY ACCOUNTED FOR THEM.

CHAD A. MORRIS - DIRECT

14:38   1          SO, OBVIOUSLY, MY BURDEN IS TO SHOW THEY'RE
14:38   2   THERE.
14:38   3          NOW, THERE'S ONLY ONE WAY TO DO THAT, AND THAT'S
14:38   4   TO SHOW YOU EACH QAR.  JUDGE, LOOK AT THIS ONE, HERE'S WHERE IT
14:38   5   IS, HERE'S THE HOLE.  THAT'S WHAT YOU --
14:38   6          **THE COURT:**  WELL, YOU CAN CERTAINLY ASK THE EXPERT,
14:38   7   "DID YOU ACCOUNT FOR THIS?"
14:38   8          **MR. BRUNO:**  THAT'S FOR CROSS.  BUT I HAVE TO -- I
14:38   9   HAVE TO MEET MY BURDEN BEFORE I REST, JUDGE.
14:38   10         **THE COURT:**  I UNDERSTAND.
14:38   11         **MR. BRUNO:**  YOU'RE ABSOLUTELY CORRECT.
14:39   12         **THE COURT:**  I UNDERSTAND WHAT YOU'RE SAYING.  YOU'VE
14:39   13  GOT TO PROVE YOUR CASE.
14:39   14         **MR. BRUNO:**  AND SO YOU ARE RIGHT, AND I WILL DO THAT.
14:39   15  FRANKLY, I'M WONDERING WHY I WOULD DO THAT, BECAUSE THERE'S
14:39   16  NOTHING IN REAL CONTROVERSY HERE.
14:39   17         BUT WHAT I'M LISTENING TO IS, HE DIDN'T PUT IT
14:39   18  IN HIS REPORT, BUT IT'S THEIR DOCUMENTS.  THERE'S NO DISPUTE
14:39   19  WHATSOEVER AS TO WHETHER OR NOT THE QAR IS REAL.  IT'S THEIR
14:39   20  QARS.
14:39   21         SO THE DISPUTE IS, WELL, WE DIDN'T REALLY KNOW,
14:39   22  BECAUSE HE DIDN'T PUT IT IN HIS REPORT THAT HE WAS GOING TO
14:39   23  TALK ABOUT A QAR, AND HE'S GOING TO TELL YOU WHAT -- WHAT THE
14:39   24  QAR SAYS IN THE VERBIAGE IN THE QAR.
14:39   25         **THE COURT:**  SO THE PURPOSE OF THE TESTIMONY IS TO

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:39 | 1 | ELICIT WHERE THE -- |
| 14:39 | 2 | **MR. BRUNO:**  WHERE.  NOTHING ELSE.  WHERE THIS STUFF |
| 14:39 | 3 | IS. |
| 14:39 | 4 | **THE COURT:**  THE PROXIMITY. |
| 14:39 | 5 | **MR. BRUNO:**  JUST WHERE IT IS. |
| 14:39 | 6 | **THE COURT:**  NOW, MR. MONTEGUT WON'T BE ABLE TO PUT IT |
| 14:39 | 7 | ON THE MAP, BUT HE'LL BE ABLE TO SAY THE GENERAL VICINITY? |
| 14:39 | 8 | **MR. BRUNO:**  THAT'S WHY WE'RE USING CHAD BECAUSE -- |
| 14:39 | 9 | **THE COURT:**  I UNDERSTAND. |
| 14:39 | 10 | **MR. BRUNO:**  HE OFFERS NO OPINION ON SOILS -- |
| 14:39 | 11 | **THE COURT:**  I UNDERSTAND.  YOU MAY HAVE TO USE |
| 14:39 | 12 | SOMEBODY WITH PERSONAL KNOWLEDGE. |
| 14:39 | 13 | **MR. BRUNO:**  AND THAT'S FINE. |
| 14:39 | 14 | **THE COURT:**  IF THAT'S WHAT WE'RE GOING TO DO -- YOU |
| 14:39 | 15 | KNOW, I'M MEAN, THAT'S WHAT WE'RE DOING.  BUT WE'RE GOING TO |
| 14:40 | 16 | PLAY HARDBALL WITH EVERYBODY. |
| 14:40 | 17 | **MR. BRUNO:**  RIGHT. |
| 14:40 | 18 | **THE COURT:**  UNDERSTAND, EVERYBODY.  I MEAN, SO IS HE, |
| 14:40 | 19 | SO IS SHALL WE. |
| 14:40 | 20 | **MR. TREEBY:**  SO WE'RE NOT -- YOUR HONOR, PLEASE.  I |
| 14:40 | 21 | WOULD NOT HAVE STOOD UP, EXCEPT MR. BRUNO STOOD UP. |
| 14:40 | 22 | **THE COURT:**  OH, I KNOW. |
| 14:40 | 23 | **MR. TREEBY:**  BUT WE DON'T AGREE WITH HIS |
| 14:40 | 24 | CHARACTERIZATION OF ANY OF THIS.  THEY'VE HAD ALL THESE |
| 14:40 | 25 | DOCUMENTS -- |

| 14:40 | 1 | **THE COURT:**  OH, I UNDERSTAND. |

14:40   1        **THE COURT:**  OH, I UNDERSTAND.

14:40   2        **MR. TREEBY:**  THEY ARE ALL PROPERLY MAPPED, THEY ARE

14:40   3   ALL PROPERLY LOCATED.  AND IF THEY DON'T THINK THEY ARE, THEY

14:40   4   CAN CERTAINLY CROSS-EXAMINE OUR WITNESSES AND FIND THAT OUT.

14:40   5        BUT THIS WITNESS, WE DIDN'T KNOW TO

14:40   6   COUNTER-CROSS-EXAMINE HIM ON THINGS THAT WEREN'T IN HIS REPORT.

14:40   7        **THE COURT:**  THAT'S WHY I'M SUSTAINING YOUR OBJECTIONS

14:40   8   ON THIS.

14:40   9        **MR. BRUNO:**  AND I JUST WANT TO BE CLEAR.  I DID NOT

14:40   10  SAY ANYTHING ABOUT WHAT MR. TREEBY SAID.  ALL I SAID WAS

14:40   11  THERE'S NO DISPUTE THAT THE QARS EXIST.  THEY EXIST.  THEY

14:40   12  WROTE THEM.  THE QARS TELL EVERYONE WHERE THESE THINGS ARE.  NO

14:40   13  DISPUTE.  OKAY?

14:40   14       ALL I'M TRYING TO DO IS FIND AN EFFICIENT,

14:40   15  TIME-SAVING WAY TO PUT IT BEFORE YOUR HONOR.

14:40   16       THERE'S TWO WAYS TO DO IT:  SHOW YOU EACH ONE,

14:40   17  CALL THE -- MR. MONTEGUT, WHO SIGNED EACH ONE, AND HAVE HIM

14:41   18  SHOW YOU ONE AT A TIME; OR IN A FASHION WHICH I -- AND, AGAIN,

14:41   19  IT'S MY FAULT -- HAVE AN EXPERT WHO IS NOT AN EXPERT ON

14:41   20  ENGINEERING OR SOILS OR NOTHING CONTROVERSIAL, SIMPLY TO POINT

14:41   21  OUT, "OKAY.  YEAH, I KNOW WHERE THIS STUFF IS BECAUSE I KNOW

14:41   22  MAPS AND I CAN READ THE QAR AND I CAN LOCATE THE QAR ON THE

14:41   23  MAP."

14:41   24       SO THAT'S WHAT WE HAD HOPED TO DO.  AND YOU'RE

14:41   25  RIGHT, HARDBALL IS HARDBALL, AND IT'S MY FAULT.  WE WILL HAVE

CHAD A. MORRIS - DIRECT


14:41    1   TO CALL MR. MONTEGUT TO COME TO THE WITNESS STAND AND I DO THE

14:41    2   SAME EXERCISE WITH THE SAME DOCUMENTS.

14:41    3           **THE COURT:**  I GUESS I DON'T KNOW IF I EVEN UNDERSTAND

14:41    4   WHAT THE DISPUTE IS AS TO THESE LOCATIONS -- AS TO THESE

14:41    5   STRUCTURES.  I'M NOT SURE WHAT IT IS.

14:41    6           **MR. BRUNO:**  I DON'T EITHER.  BECAUSE --

14:41    7           **THE COURT:**  DOES ONE PUT IT ON ONE SIDE 15 FEET AWAY,

14:41    8   OR DO THEY --

14:41    9           **MR. STEVENS:**  NO, SIR.  IT'S NONEXISTENT.  THERE'S --

14:41   10           **THE COURT:**  YOU MEAN THERE'S NO MAP -- THERE'S NO --

14:41   11   THERE'S NO EXHIBIT PRODUCED BY THE DEFENDANTS?

14:41   12           **MR. STEVENS:**  THEY HAVE SOME.

14:41   13           **THE COURT:**  BECAUSE YOU CAN INTRODUCE THAT INTO

14:41   14   EVIDENCE IN YOUR CASE, IF YOU WANTED TO, THAT SHOW WHERE THESE

14:42   15   STRUCTURES ARE LOCATED.  THAT'S WHAT YOU'RE TELLING ME?

14:42   16           **MR. STEVENS:**  THAT IS CORRECT.  NO COMPLETE ONE.

14:42   17   THERE'S ONE.  DR. TULLA HAS ONE.  IT HAS 4 OF 14 SUBSURFACE

14:42   18   FOUNDATIONS, PILE-SUPPORTED SUBSURFACE FOUNDATIONS, THAT

14:42   19   EXCAVATORS HAD TO REACH WAY DOWN TO EXCAVATE AROUND BEFORE THEY

14:42   20   COULD PULL THE PILES OUT THAT ARE NOT ON HIS MAP.

14:42   21           THAT'S WHY I WAS GOING TO HAVE MR. MORRIS LOOK

14:42   22   AT THIS AND TELL US WHICH ONES OF THESE ARE ON HIS --

14:42   23           **THE COURT:**  LET ME ASK YOU THIS:  DOES YOUR EXPERT

14:42   24   OPINE ABOUT THESE STRUCTURES?

14:42   25           **MR. STEVENS:**  OPINE --

CHAD A. MORRIS - DIRECT

14:42    1          **THE COURT:**  I MEAN, IN --

14:42    2              **MR. BRUNO:**  DR. BEA DOES.  YES, OF COURSE.

14:42    3              **MR. STEVENS:**  OH, YES.  YES.

14:42    4          THESE ARE WHERE THE HOLES -- HIS TASK WAS TO

14:42    5    PROVIDE DR. BEA WITH INFORMATION, OR THE COURT, WITH

14:42    6    INFORMATION TO HELP THIS COURT ARRIVE AT THE TRUTH, WHICH IS,

14:42    7    DID THE EXCAVATION WORK AT THE EBIA CONTRIBUTE TO UNDERSEEPAGE,

14:42    8    ET CETERA, AS YOU TOLD US THIS MORNING.

14:42    9          **THE COURT:**  WE'RE PRETTY STUCK RIGHT NOW.  AND ALL I

14:42   10    KNOW IS YOU'VE GOT A CERTAIN AMOUNT OF TIME, BETTER USE IT

14:43   11    WISELY.

14:43   12              **MR. STEVENS:**  THANK YOU, YOUR HONOR.

14:43   13          IT'S NOT GOING TO TAKE LONG, AND IT IS

14:43   14    ULTIMATELY THE TRUTH.  IF IT'S NOT, I'LL STAND CORRECTED.  IF

14:43   15    THEY CAN PROVE THAT WHAT CHAD MORRIS SAYS ABOUT THESE

14:43   16    FOUNDATIONS --

14:43   17          **THE COURT:**  WELL, I'M NOT SAYING IT'S NOT THE TRUTH.

14:43   18    I'M NOT COMMENTING ON THE TRUTH.  I'VE JUST GOT TO CONSTRAIN

14:43   19    THE TESTIMONY BECAUSE I'M NOT -- ONCE I OPEN THAT DOOR, I'VE

14:43   20    OPENED IT.

14:43   21              **MR. STEVENS:**  THANK YOU, YOUR HONOR.

14:43   22          ONE FINAL POINT:  EVERY BIT OF THIS INFORMATION

14:43   23    THAT HE USES TO HELP THE COURT UNDERSTAND HOW MANY STRUCTURES

14:43   24    THERE WERE, WHICH ONES WERE THE SAME NUMBERS AND WHICH ONES ARE

14:43   25    DUPLICATIVE, AND WHERE THEY WERE IN RELATION TO THE NORTH AND

CHAD A. MORRIS - DIRECT

14:43     1   SOUTH BREACH, AND HOW DEEP THEY WERE SO YOU CAN ANALYZE SEEPAGE

14:43     2   ISSUES LATER, COMES FROM AND IS DEPENDENT UPON NOTHING MORE

14:43     3   THAN AERIAL PHOTOGRAPHS, THEIR MAPS AND SURVEYS, THEIR

14:43     4   PHOTOGRAPHS AND THEIR QARS, WHICH ARE ALL THINGS THAT THERE'S

14:43     5   REALLY NO DISPUTE ABOUT.

14:43     6              HE'S JUST BASING --

14:43     7         **THE COURT:**  IT'S NEEDING TO BE PRODUCED.  THAT'S WHY

14:43     8   WE HAVE RULES.  AGAIN, IF THERE WAS SOME EGREGIOUS PROBLEM THAT

14:43     9   YOU COULD NOT HAVE AVOIDED, AS MUCH AS I HATE IT, I WOULD HAVE

14:44    10   LOOKED AT A CONTINUANCE.  OTHER THAN THAT, I CAN'T JUST

14:44    11   COMPLETELY EVISCERATE THE FEDERAL RULES OF EVIDENCE IN MY OWN

14:44    12   COURTROOM.  I CAN'T DO IT.

14:44    13         **MR. STEVENS:**  AND I DON'T UNDER- -- WELL, I GUESS THE

14:44    14   ULTIMATE --

14:44    15         **THE COURT:**  WELL, LET ME SAY THIS:  THIS HAS NOW COME

14:44    16   TO AN END.

14:43    17         **MR. STEVENS:**  THANK YOU, YOUR HONOR.

14:44    18         **THE COURT:**  DO YOU HAVE ANY FURTHER QUESTIONS OF THE

14:44    19   WITNESS?

14:44    20         **MR. STEVENS:**  OH, I DO, YOUR HONOR.  YES, SIR.

14:44    21         **THE COURT:**  LET'S MOVE ON.

14:43    22         **MR. STEVENS:**  BUT IT, AGAIN --

14:44    23         **THE COURT:**  AS FAR AS I'M CONCERNED, WE CAN DISCUSS

14:44    24   THIS.  THIS IS YOUR TIME WE'RE USING HERE, AND IT'S NOT USING

14:44    25   IT CONSTRUCTIVELY.  I'VE GOT THE POINT THAT THE DEFENDANTS

CHAD A. MORRIS - DIRECT

14:44    1    DIDN'T USE FOUR OF THE STRUCTURES IN THEIR ANALYSIS, AND THAT

14:44    2    YOU DON'T HAVE ANY MAPS OF THESE STRUCTURES FROM ANY WITNESS

14:44    3    YET THAT I'VE HEARD.

14:44    4    **BY MR. STEVENS:**

14:44    5    **Q.**   LET'S SEE.   WHERE WERE WE WITH YOUR SLIDES, HERE?

14:44    6              IF WE GO BACK TO 34.   OKAY.

14:45    7              NEXT SLIDE.

14:45    8              OKAY.   THIS MAP, THIS DRAWING THAT SHOWS 1 AND 2, CAN

14:45    9    YOU ORIENT FOR THE COURT WHERE THE SUBSURFACE FOUNDATIONS WERE

14:45   10    THAT WERE FOUND IN THE REPORT THAT YOU SUBMITTED A MOMENT

14:45   11    AGO -- NOT THE REPORT, BUT IN THE DOCUMENT YOU SHOWED US THAT

14:45   12    FOUND EIGHT SUBSURFACE FOUNDATIONS --

14:45   13              **THE COURT:**   COUNSEL, WE'RE GOING UP THE SAME TREE.

14:45   14              **MR. STEVENS:**   OKAY.

14:45   15              **THE COURT:**   IT'S NOT GOING TO WORK.

14:45   16              **MR. STEVENS:**   BUT THAT IS IN HIS REPORT, YOUR HONOR.

14:45   17              **THE COURT:**   WHAT IS?

14:45   18              **MR. STEVENS:**   THE DESCRIPTION OF THE EIGHT SUBSURFACE

14:45   19    FOUNDATIONS.

14:45   20              **THE COURT:**   OKAY.

14:45   21              **MR. MITSCH:**   IT'S IN --

14:45   22              **THE COURT:**   LET'S LOOK AT IT THEN.   I KNOW YOU SHOWED

14:45   23    ME THE -- THE ESTIMATE BASIS AND ASSUMPTION --

14:45   24              **MR. STEVENS:**   YES, SIR.

14:45   25              **THE COURT:**   -- THE 2.0, AND THE EIGHT DISCOVERED

CHAD A. MORRIS - DIRECT

14:45    1    SUBSURFACE CONCRETE FOUNDATIONS LOCATED AT THE BOLAND MARINE

14:46    2    SITE.

14:43    3              **MR. STEVENS:**  YES, SIR.

14:46    4              **THE COURT:**  SEVEN OF THE CONCRETE -- I CAN READ THAT.

14:46    5    OKAY.  THAT'S IN HIS REPORT, AND I HAVE ADMITTED THE REPORT.

14:46    6              **MR. STEVENS:**  YES, SIR.  AND I WAS JUST ASKING HIM IF

14:46    7    HE COULD --

14:46    8              **THE COURT:**  AND I'VE ALLOWED HIM TO TESTIFY AS TO

14:46    9    THOSE THINGS.

14:46    10             **MR. STEVENS:**  RIGHT.

14:43    11   **BY MR. STEVENS:**

14:43    12   **Q.**  AND WITHIN THAT RESTRICTION, CAN YOU TELL US IF THOSE

14:46    13   EIGHT SUBSURFACE FOUNDATIONS ARE DEPICTED ON THIS MAP?

14:46    14             **THE COURT:**  I'M GOING TO ALLOW THAT QUESTION, LIKE I

14:46    15   SAID.

14:46    16             **THE WITNESS:**  I BELIEVE THEY'RE THE SAME EIGHT

14:46    17   SUBSURFACE FOUNDATIONS.

14:46    18   **BY MR. STEVENS:**

14:46    19   **Q.**  EXCEPT HERE THEY'RE NUMBERED 1, 2, 3, 4, 5, AND NORTHWEST,

14:46    20   SOUTHERN, AND NORTHEAST; CORRECT?

14:46    21   **A.**  YES.

14:46    22   **Q.**  THANK YOU.

14:46    23             NEXT SLIDE.

14:46    24             NEXT SLIDE.

14:46    25             OKAY.  LET'S TALK ABOUT SOIL REMEDIATION.  WAS SOIL

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:46 | 1 | REMEDIATION ONE OF THE ACTIVITIES YOU EXAMINED IN DETERMINING |
| 14:47 | 2 | WHETHER OR NOT YOU COULD SPATIALLY ASSESS WHERE THEY MADE THESE |
| 14:47 | 3 | DIGS? |
| 14:47 | 4 | **A.**   AT THE TIME OF MY REPORT, I VIEWED PHOTOGRAPHS THAT SHOWED |
| 14:47 | 5 | SOIL REMEDIATION ACTIVITIES, YES. |
| 14:47 | 6 | **Q.**   OKAY.  AND THE SOIL REMEDIATION ACTIVITIES -- NEXT |
| 14:47 | 7 | SLIDE -- |
| 14:47 | 8 | DR. SILVA'S MAP, IT'S JX 1674 AT PAGE 6, FIGURE 5, |
| 14:47 | 9 | FROM APPENDIX B OF HIS REPORT. |
| 14:47 | 10 | DO THESE PINK SQUARES -- |
| 14:47 | 11 | **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  THIS IS |
| 14:47 | 12 | ANOTHER ONE THAT'S GOT INFORMATION FROM QARS.  HE DID NOT OPINE |
| 14:47 | 13 | IN HIS REPORT ON THE LOCATIONS OF THE REMEDIATION EXCAVATIONS, |
| 14:47 | 14 | AND HE CERTAINLY DID NOT HAVE THIS DOCUMENT IN HIS REPORT OR |
| 14:47 | 15 | ANYTHING LIKE IT. |
| 14:47 | 16 | **THE COURT:**  OKAY.  COUNSEL, YOUR -- |
| 14:47 | 17 | **MR. STEVENS:**  I DON'T DISAGREE.  I'LL STIPULATE THAT |
| 14:47 | 18 | THE SOIL REMEDIATION AREAS OUTLINED IN PINK, OR LAVENDER, ON |
| 14:48 | 19 | HIS REPORT ARE CORRECT.  WE'RE JUST DOING THAT FOR ORIENTATION, |
| 14:48 | 20 | TO SHOW WHERE THE SOIL REMEDIATION ACTIVITIES TOOK PLACE. |
| 14:48 | 21 | THERE'S NO OPINION INVOLVED.  IT'S JUST FOR THE COURT'S |
| 14:48 | 22 | EDIFICATION. |
| 14:48 | 23 | **THE COURT:**  I ASSUME THERE'S NO ARGUMENT.  THEIR |
| 14:48 | 24 | EXPERT DID IT. |
| 14:48 | 25 | **MR. STEVENS:**  RIGHT. |

CHAD A. MORRIS - DIRECT

14:48    1   BY MR. STEVENS:

14:48    2   Q.   NOW, DID WE --

14:48    3           THE COURT:  YOU CAN INTRODUCE THAT INTO EVIDENCE

14:48    4   YOURSELF AND SAY, "YOUR HONOR, THIS PURPORTS TO BE WHERE THE

14:48    5   SOIL EXCAVATION IS, AND WE CONCUR," IF YOU CAN AGREE WITH IT.

14:48    6           MR. STEVENS:  WE DON'T HAVE ANY REAL DISPUTE ABOUT

14:48    7   WHERE THE EXCAVATION --

14:48    8           THE COURT:  THE LAVENDER LINES.

14:48    9           MR. STEVENS:  -- THE GENERAL AREA.  NOW --

14:48   10           THE COURT:  WELL, IT'S A GOOD THING BECAUSE YOU SURE

14:48   11   DON'T HAVE ANY EVIDENCE CONTRADICTING IT.

14:48   12           MR. STEVENS:  NO, NOT ON A MAP.

14:48   13   BY MR. STEVENS:

14:48   14   Q.   LET'S LOOK AT SOME PHOTOGRAPHS ON THE GROUND OF WHAT SOIL

14:48   15   EXCAVATION ACTIVITIES IN THIS AREA LOOKED LIKE, MR. MORRIS.

14:48   16           NEXT SLIDE.

14:48   17           MR. KELLS:  YOUR HONOR, WAS THE OBJECTION SUSTAINED?

14:48   18           THE COURT:  YES, COUNSEL, IT WAS.  IT WAS.  EXCEPT

14:49   19   THAT I -- NOBODY'S DISPUTING THE LAVENDER LINES.  SO, YOU KNOW,

14:49   20   COME ON.

14:49   21           WHAT IS IT, 2012?  MAYBE I THOUGHT IT WAS 2007.

14:49   22   I'M SORRY.  GO AHEAD.  LET'S MOVE ON.

14:49   23   BY MR. STEVENS:

14:49   24   Q.   TELL US WHAT THIS MAP SHOWS.

14:49   25   A.   IT'S THE ONE WE LOOKED AT PREVIOUSLY.  IT SHOWS THE

CHAD A. MORRIS - DIRECT

14:49    1   BUILDING AREAS AND IT SHOWS AN AREA THAT WAS EXCAVATED AT THE

14:49    2   NORTH END OF BOLAND'S PROPERTY THAT'S IN LINE WITH THE NORTH

14:49    3   BREACH.

14:49    4   **Q.**   OKAY.  LET'S LOOK AT ANOTHER ACTIVITY, GRID TRENCHING.

14:49    5           **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  THERE WAS NO

14:49    6   DISCUSSION ABOUT GRID TRENCHING IN MR. MORRIS' REPORT.  THIS

14:50    7   PHOTOGRAPH WAS NOT IN HIS REPORT.

14:50    8           **THE COURT:**  I HAVEN'T SEEN THE PHOTOGRAPH YET, SO I'M

14:50    9   NOT --

14:50   10           **MS. WAGER-ZITO:**  I'M SORRY, YOUR HONOR.

14:50   11           **THE COURT:**  I'M LOOKING AT THE POWERPOINT HERE.

14:50   12           **MS. WAGER-ZITO:**  BUT THERE WAS NO DISCUSSION OF GRID

14:50   13   TRENCHING IN HIS REPORT.

14:50   14           **THE COURT:**  ALL RIGHT.  COUNSEL, WHAT'S THE RESPONSE

14:50   15   TO THE OBJECTION?

14:50   16           **MR. STEVENS:**  MY RESPONSE TO THE OBJECTION IS THIS IS

14:50   17   AN EXAMPLE OF GRID TRENCHING.  I DON'T THINK IT'S IN

14:50   18   MR. MORRIS' -- THIS PARTICULAR PHOTOGRAPH IS IN MR. MORRIS' --

14:50   19           **THE COURT:**  IS THE CONCEPT OF GRID TRENCHING IN HIS

14:50   20   REPORT?

14:50   21           **MR. STEVENS:**  ABSOLUTELY.

14:50   22           **THE COURT:**  WHERE?

14:50   23           **MR. STEVENS:**  EX- -- ALL EXCAVATIONS IN THE AREA --

14:50   24   **BY MR. STEVENS:**

14:50   25   **Q.**   MR. MORRIS, DID YOU ADDRESS GRID TRENCHING IN YOUR REPORT?

CHAD A. MORRIS - DIRECT

14:50    1        **THE COURT:**  WHAT'S THE DIFFERENCE BETWEEN GRID

14:50    2   TRENCHING AND EXCAVATION AND SAND --

14:50    3        **MR. STEVENS:**  NONE.  IT'S DIGGING IN THE AREA, AND IT

14:50    4   WOULD AFFECT THE ABILITY OF WATER TO MIGRATE DOWNWARD INTO THE

14:50    5   MARSHLANDS --

14:50    6        **THE COURT:**  I UNDERSTAND.  BUT THAT'S NOT THIS

14:50    7   WITNESS' --

14:50    8        **THE WITNESS:**  I HAVE NO PHOTOGRAPHS OF GRID TRENCHING

14:50    9   ON THE BOLAND SITE IN THIS REPORT.

14:51   10            ACTUALLY, NO PHOTOGRAPHS OF GRID TRENCHING ON

14:51   11   EITHER SIDE IN THIS REPORT.

14:51   12   **BY MR. STEVENS:**

14:51   13   **Q.**  WELL, LET ME ASK YOU, SIR.  WE'LL GO TO --

14:51   14        **THE COURT:**  WHAT'S THE DIFFERENCE BETWEEN -- JUST FOR

14:51   15   MY EDIFICATION, DO YOU KNOW WHAT GRID TRENCHING IS?

14:51   16        **THE WITNESS:**  YES, I DO.

14:51   17        **THE COURT:**  WOULD YOU PLEASE TELL THE COURT?

14:51   18        **THE WITNESS:**  GRID TRENCHING IS AN OPERATION OF DOING

14:51   19   EXPLORATORY EXCAVATION ON A GRID PATTERN IN ORDER TO IDENTIFY

14:51   20   POTENTIALLY BURIED OBJECTS AND FIND THEIR LOCATIONS.

14:51   21        **THE COURT:**  OKAY.  I UNDERSTAND.

14:51   22   **BY MR. STEVENS:**

14:51   23   **Q.**  AND, MR. MORRIS, WAS ONE OF THE THINGS WE ASKED YOU TO

14:51   24   LOOK AT IN CONNECTION WITH THE GIS DATABASE WE RECEIVED FROM

14:51   25   THE DEFENDANTS ON FRIDAY THE PATTERN OF GRID TRENCHING?

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:51 | 1 | **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR. |
| 14:51 | 2 | **THE COURT:**  I KNOW YOU RECEIVED IT ON FRIDAY.  YOU'RE |
| 14:51 | 3 | GOING TO HAVE TO IMPEACH THOSE WITNESSES THROUGH THEM.  I'M |
| 14:52 | 4 | ASSUMING YOU CAN SURVIVE A RULE 50 MOTION. |
| 14:52 | 5 | BUT, I MEAN, OTHERWISE, COUNSEL, I'VE TRIED TO |
| 14:52 | 6 | MAKE IT CLEAR THAT I -- IF I OPEN THE DOOR FOR THIS WITNESS, |
| 14:52 | 7 | I'LL HAVE OPENED THE DOOR FOR ALL WITNESSES. |
| 14:52 | 8 | HE JUST -- I KNOW YOU GOT IT ON FRIDAY.  I DON'T |
| 14:52 | 9 | KNOW WHY YOU WAITED UNTIL THE -- I'M SURE THERE'S SOME GOOD |
| 14:52 | 10 | REASON WHY YOU DIDN'T SEEK A MOTION TO COMPEL THAT INFORMATION, |
| 14:52 | 11 | WHICH WOULD HAVE ENABLED YOU TO HAVE DONE THIS IF YOU DIDN'T |
| 14:52 | 12 | HAVE IT BEFORE. |
| 14:52 | 13 | AND I KNOW THE OTHER SIDE IS GOING TO SAY YOU |
| 14:52 | 14 | HAD IT BEFORE, SO NO USE GETTING INTO AN ARGUMENT.  BUT THE |
| 14:52 | 15 | BOTTOM LINE IS HE CAN'T TESTIFY AS TO GRID TRENCHING. |
| 14:52 | 16 | **BY MR. STEVENS:** |
| 14:52 | 17 | **Q.**  LET ME ASK YOU THIS WAY, IF I CAN LAY A LITTLE FOUNDATION, |
| 14:52 | 18 | PLEASE. |
| 14:52 | 19 | MR. MORRIS, YOU HAVE SHOWN US EARLIER AERIAL |
| 14:52 | 20 | PHOTOGRAPHS OF THE AREA OF THE EBIA ADJACENT TO THE NORTH |
| 14:52 | 21 | BREACH. |
| 14:52 | 22 | WE PAINSTAKINGLY WENT THROUGH THE SHORELINE EROSION |
| 14:53 | 23 | AS IT MOVED FROM WEST TO EAST TOWARDS THE NORTH BREACH, AND |
| 14:53 | 24 | THAT WAS BASED ON AERIAL PHOTOGRAPHS. |
| 14:53 | 25 | HAVE YOU HAD ANY CHANCE TO PLACE THE GRID TRENCHING |

CHAD A. MORRIS - DIRECT

14:53    1    PATTERN FROM THE DEFENDANTS' GIS ONTO THAT PHOTOGRAPH?

14:53    2         **THE COURT:**  COUNSEL, IT'S THE SAME QUESTION.  STOP

14:53    3    IT.  YOU CAN PROFFER IT AT THE END OF TRIAL.  THE COURT WILL

14:53    4    SAY THAT, ACCORDING TO ITS CLEAR RULES, IT'S NOT IN HIS REPORT,

14:53    5    IT'S WAY BEYOND THE SCOPE OF HIS REPORT.

14:53    6         AND I REALIZE -- AND A REBUTTAL REPORT IS NOT

14:53    7    FILED DURING A TRIAL UNDER ANY COURT ANYWHERE.

14:53    8    **BY MR. STEVENS:**

14:53    9    **Q.**   LET ME ASK YOU --

14:53   10         SLIDE 47, PLEASE.  WE'LL TALK ABOUT TRANSITE REMOVAL

14:53   11    AS ANOTHER ACTIVITY OF SOIL DISTURBANCE IN THE EBIA AREA --

14:53   12    **A.**   IT'S NOT IN MY REPORT.

14:53   13    **Q.**   OKAY.  THIS IS A MAP DEPICTED BY -- OR PRESENTED BY

14:53   14    DR. SILVA, JX 1674-5.  IT'S FIGURE 4 OF APPENDIX B OF HIS

14:54   15    REPORT.

14:54   16         THE SHADED AREAS ARE FOR PHASE 1, TRANSITE REMOVAL.

14:54   17    AND IT'S KIND OF DIFFICULT TO READ, BUT THERE'S A PHASE 2

14:54   18    THAT'S A SLIGHTLY DIFFERENT GREENISH COLOR WITH LITTLE SPECS.

14:54   19         **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.

14:54   20         **THE COURT:**  I'M NOT SURE WHAT YOUR QUESTION IS.

14:54   21    **BY MR. STEVENS:**

14:54   22    **Q.**   MY QUESTION TO YOU IS THIS:  IN YOUR REVIEW OF PHOTOGRAPHS

14:54   23    IN THIS CASE, DID YOU DETERMINE THAT THERE WAS TRANSITE REMOVAL

14:54   24    ACTIVITIES IN THE SHADED AREA SHOWN BY DR. SILVA?

14:54   25         **MS. WAGER-ZITO:**  YOUR HONOR, THE WITNESS JUST SAID

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:54 | 1 | "IT'S NOT IN MY REPORT." |
| 14:54 | 2 | **THE COURT:**  IS THAT CORRECT, MR. MORRIS? |
| 14:54 | 3 | **THE WITNESS:**  THAT IS CORRECT. |
| 14:54 | 4 | BY MR. STEVENS: |
| 14:54 | 5 | **Q.**  THE AREA SHOWN BY DR. TULLA IN THE UPPER RIGHT-HAND CORNER |
| 14:54 | 6 | THAT WE LOOKED AT EARLIER WITH THE SHADED GREEN ON TOP, IS THAT |
| 14:54 | 7 | THE SAME AREA THAT WE WERE LOOKING AT THIS MORNING WHERE |
| 14:54 | 8 | BUILDING NUMBER 1 WAS? |
| 14:54 | 9 | **A.**  YES, IT IS. |
| 14:54 | 10 | **Q.**  IS THAT THE SAME AREA IMMEDIATELY WEST OF THE NORTH BREACH |
| 14:55 | 11 | WHERE THE SHORELINE ERODED, I THINK YOU TOLD US, 180 FEET |
| 14:55 | 12 | TOWARD THE FLOODWALL AT THE NORTH BREACH? |
| 14:55 | 13 | **A.**  YES, IT IS. |
| 14:55 | 14 | **Q.**  IN TERMS OF DISTANCE FROM THE FLOODWALL, CAN YOU ESTIMATE |
| 14:55 | 15 | FOR US THE NEAREST DISTANCE BETWEEN THE NORTH BREACH AND THE |
| 14:55 | 16 | BLUE SHADED AREA FOR PHASE 1 TRANSITE REMOVAL, ACCORDING TO |
| 14:55 | 17 | DR. SILVA? |
| 14:55 | 18 | **A.**  DISTANCE FROM WHAT TO WHAT? |
| 14:55 | 19 | **Q.**  THE DISTANCE FROM THE FLOODWALL AT THE NORTH BREACH TO THE |
| 14:55 | 20 | NEAREST EDGE OF THE TRANSITE REMOVAL, PHASE 1. |
| 14:55 | 21 | **A.**  IT'S A SCALE LINE.  IT'S 100 FEET, MAYBE, FROM THE |
| 14:55 | 22 | FLOODWALL. |
| 14:55 | 23 | **Q.**  ALL RIGHT.  IF WE ESTABLISHED EARLIER, I THINK WHEN WE |
| 14:55 | 24 | LOOKED AT THE POST -- |
| 14:55 | 25 | **THE COURT:**  I CAN SEE THE SCALE. |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:56 | 1 | **MR. STEVENS:**  OKAY.  THANK YOU. |
| 14:56 | 2 | **BY MR. STEVENS:** |
| 14:56 | 3 | **Q.**  IN TERMS OF TRANSITE REMOVAL IN THE AREA WE WERE JUST |
| 14:56 | 4 | TALKING ABOUT, WHICH LATER CAME TO BE KNOWN AS EAST OF AREA |
| 14:56 | 5 | 8 -- THE NEXT SLIDE, PLEASE -- WE SHOWED THIS PHOTOGRAPH THIS |
| 14:56 | 6 | MORNING. |
| 14:56 | 7 | IS THAT THE SAME AREA IN FRONT OF THE NORTH BREACH |
| 14:56 | 8 | THAT WE WERE DESCRIBING EARLIER THAT SAYS "PHASE 2 ACM |
| 14:56 | 9 | EXCAVATION EAST OF AREA 8 AT BOLAND"? |
| 14:56 | 10 | **A.**  THIS IS THE AREA THAT IS IMMEDIATELY IN FRONT OF THE NORTH |
| 14:56 | 11 | BREACH THAT WAS -- THAT WE IDENTIFIED AS A SAND -- WHERE THEY |
| 14:56 | 12 | PLACED SAND PREVIOUSLY.  YES. |
| 14:56 | 13 | **Q.**  AND THE TECHNIQUE, IF YOU WILL, OF HAVING A PILE OF SAND |
| 14:56 | 14 | NEXT TO THE EXCAVATED LOCATION, IS THAT A PROPER OR AN |
| 14:57 | 15 | APPROPRIATE TECHNIQUE OR METHOD FOR BACKFILLING, IN YOUR |
| 14:57 | 16 | ESTIMATION? |
| 14:57 | 17 | **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR. |
| 14:57 | 18 | **MR. KELLS:**  OBJECTION, YOUR HONOR. |
| 14:57 | 19 | **THE COURT:**  SUSTAINED. |
| 14:57 | 20 | **BY MR. STEVENS:** |
| 14:57 | 21 | **Q.**  LET'S TALK ABOUT BACKFILLING AND SEE IF WE CAN ESTABLISH A |
| 14:57 | 22 | FOUNDATION. |
| 14:57 | 23 | YOU TOLD US EARLIER YOU HAD EXPERIENCE IN OBSERVING |
| 14:57 | 24 | AND ENSURING COMPLIANCE WITH PROPER LIFTS; CORRECT? |
| 14:57 | 25 | **A.**  YES. |

CHAD A. MORRIS - DIRECT

14:57    1    **Q.**   HAVE YOU EVER, IN THE HISTORY OF YOUR EMPLOYMENT, KNOWN

14:57    2    LIFTS OF 8 TO 10 FEET TO BE A PROPER BACKFILLING TECHNIQUE?

14:57    3            **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.

14:57    4            **MR. KELLS:**  OBJECTION, YOUR HONOR.

14:57    5            **THE COURT:**  OKAY.  AND THAT'S NOT PART OF HIS

14:57    6    EXPERTISE.

14:57    7                 LET'S SEE IF HE -- BUT -- HOLD ON.

14:57    8                 "BACKFILLING OF THESE EXCAVATIONS APPEARED TO

14:58    9    HAVE BEEN CONSISTED PRIMARILY OF NON-COMPACTED MATERIAL AND

14:58   10    SAND."  THAT'S THE EXTENT OF HIS -- HE DIDN'T TALK ABOUT,

14:58   11    "WELL, IT SHOULD HAVE BEEN LIFTED IN ONE-FOOT OR TWO-FOOT" --

14:58   12    IT JUST SAYS -- ALL HE SAYS -- AND I'M LETTING THAT IN.

14:58   13            **MR. STEVENS:**  OKAY.

14:58   14            **THE COURT:**  -- WAS THAT IT WAS FILLED WITH SAND OR

14:58   15    NON-COMPACTED MATERIAL.

14:58   16            **MR. STEVENS:**  OKAY.  NEXT SLIDE.

14:58   17                 THANK YOU, YOUR HONOR.

14:58   18                 NEXT SLIDE.

14:58   19    BY MR. STEVENS:

14:58   20    **Q.**   JX 1576 NUMBER 14.  CAN YOU TELL US SPATIALLY WHERE THIS

14:58   21    AREA IS IN RELATION TO THE PHOTOGRAPH WE JUST OBSERVED OR WHERE

14:58   22    IT IS IN RELATION TO THE NORTH BREACH?

14:58   23    **A.**   THE FLORIDA AVENUE BRIDGE IS VISIBLE IN THE BACKGROUND.

14:58   24    THIS WAS IN -- THE DATE ON THE PHOTOGRAPH IS MARCH 22ND OF

14:58   25    2005.  SO THIS IS -- THIS IS NEAR THE NORTH END OF THE BOLAND

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 14:58 | 1 | MARINE PROPERTY. |
| 14:58 | 2 | **Q.**   SO THIS WOULD BE ABOUT FIVE MONTHS BEFORE HURRICANE |
| 14:58 | 3 | KATRINA. |
| 14:58 | 4 | IS IT IN THE SAME AREA THAT YOU SHOWED US THIS |
| 14:59 | 5 | MORNING TO BE THE ERODED AREA THAT MOVED ROUGHLY 180 FEET |
| 14:59 | 6 | TOWARD THE NORTH BREACH? |
| 14:59 | 7 | **A.**   YES, IT IS. |
| 14:59 | 8 | **Q.**   THE BLUE BRIDGE IN THE BACKGROUND IS THE NEW FLORIDA |
| 14:59 | 9 | AVENUE BRIDGE, FOR THE RECORD. |
| 14:59 | 10 | NEXT SLIDE. |
| 14:59 | 11 | THAT IS THE SAME PHOTOGRAPH THAT WE LOOKED AT |
| 14:59 | 12 | EARLIER.  CAN YOU SHOW THE COURT HERE APPROXIMATELY WHERE -- OR |
| 14:59 | 13 | THE GENERAL LOCATION OF WHERE THAT BACKFILLING OPERATION WAS |
| 14:59 | 14 | TAKING PLACE IN -- |
| 14:59 | 15 | **THE COURT:**  BY THE WAY, COUNSEL, IF YOU WANT TO PRINT |
| 14:59 | 16 | ANY OF THESE, WE ARE ABLE TO DO THAT. |
| 14:59 | 17 | **MR. STEVENS:**  THANK YOU.  THANK YOU.  I MEANT TO DO |
| 14:59 | 18 | THAT EARLIER, AND IT'S THE SAME THING.  SO IF WE COULD PRINT |
| 14:59 | 19 | THIS SCREEN, THAT WOULD BE WONDERFUL, AND WE CAN ASSIGN IT THIS |
| 14:59 | 20 | NUMBER PLUS DOT 1. |
| 14:59 | 21 | **THE COURT:**  YES. |
| 14:59 | 22 | **MR. STEVENS:**  OKAY.  SO JX 1576-0009.1 WILL BE |
| 14:59 | 23 | MR. MORRIS' MARK OF WHERE THIS ACTIVITY WAS TAKING PLACE AS |
| 15:00 | 24 | SHOWN IN JX 1576, PAGE 14. |
| 15:00 | 25 | **THE COURT:**  SHEILA, ARE YOU GOING TO DO THAT? |

CHAD A. MORRIS - DIRECT

15:00   1          **THE DEPUTY CLERK:**  YES, I WILL.

15:00   2          **THE COURT:**  YOU CAN PROBABLY MOVE ON WHILE SHE'S

15:00   3   PRINTING IT.

15:00   4          **THE DEPUTY CLERK:**  WAIT.

15:00   5          **THE COURT:**  OH, SHE HAS TO CAPTURE IT FIRST.

15:00   6              I REALIZE THIS IS NOT FUN FOR ANY OF YOU, TRUST

15:00   7   ME.  I WOULD LIKE TO GIVE ALL OF YOU WHATEVER YOU'D LOVE TO

15:00   8   HAVE, BUT I AM CONSTRAINED AS WELL.

15:00   9          **MR. STEVENS:**  THANK YOU, YOUR HONOR.  WE KNOW.

15:00   10          **THE COURT:**  I'M SURE I'M GOING TO MAKE EVERYBODY

15:00   11  UNHAPPY BY THE END OF THIS TRIAL.  IT DOESN'T MAKE ME HAPPY.  I

15:00   12  KNOW THAT.  ALL RIGHT.

15:00   13          **MR. STEVENS:**  THANK YOU.

15:00   14              NEXT SLIDE, PLEASE.

15:01   15  **BY MR. STEVENS:**

15:01   16  **Q.**   THIS SLIDE IS OF A PHOTOGRAPH.  IT SAYS "PLACING IMPORTED

15:01   17  SAND BACKFILL MATERIAL AT THE NORTH SIDE OF AREA 2 AT BOLAND

15:01   18  MARINE."

15:01   19          FOR ORIENTATION PURPOSES, CAN YOU TELL US WHERE THAT

15:01   20  IS IN RELATION TO THE NORTH BREACH?

15:01   21  **A.**   IT'S FARTHER SOUTH.

15:01   22  **Q.**   OKAY.

15:01   23  **A.**   IT'S SOUTH OF THE NORTH BREACH.

15:01   24  **Q.**   AND IT WOULD BE SOUTH OF THE AREA WE JUST LOOKED AT IN

15:01   25  SLIDE 15?

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:01 | 1 | **A.**   YES, IT IS. |
| 15:01 | 2 | **Q.**   OKAY.  OH, I SEE.  I BETTER NOT -- JX 1576, PAGE 14. |
| 15:01 | 3 | GO BACK A SLIDE, PLEASE, CARL. |
| 15:01 | 4 | WOULD YOU SHOW THE COURT WHERE AREA 2 IS IN THIS |
| 15:01 | 5 | PHOTOGRAPH? |
| 15:01 | 6 | **A.**   IT'S NOT THE SAME AREA 2.  THIS REFERS TO A REMEDIATION |
| 15:01 | 7 | AREA 2. |
| 15:01 | 8 | **Q.**   DO WE NEED TO GO BACK TO -- SO IS THE REMEDIATION -- |
| 15:01 | 9 | **A.**   YOU HAVE SLIDES THAT DON'T SHOW -- THAT SHOW THINGS THAT |
| 15:01 | 10 | ARE NOT IN MY REPORT. |
| 15:01 | 11 | **Q.**   OKAY.  BUT IS THERE A REMEDIATION AREA -- IS THERE A |
| 15:02 | 12 | REMEDIATION AREA NUMBER 2? |
| 15:02 | 13 | **A.**   YES, THERE IS. |
| 15:02 | 14 | **Q.**   OKAY.  AND THE REMEDIATION AREA NUMBER 2 WOULD BE |
| 15:02 | 15 | SOMEWHERE IN THE BOLAND MARINE SITE? |
| 15:02 | 16 | **A.**   YES, IT WOULD BE. |
| 14:50 | 17 | **MR. STEVENS:**  AT SOME POINT, YOUR HONOR, WE HOPE TO |
| 15:02 | 18 | TIE THAT UP FOR YOU. |
| 15:02 | 19 | **THE COURT:**  GOT IT.  THERE'S NOT A LOT OF DISPUTE |
| 15:02 | 20 | ABOUT THAT KIND OF THING. |
| 15:02 | 21 | **MR. STEVENS:**  NO, SIR. |
| 15:02 | 22 | **BY MR. STEVENS:** |
| 15:02 | 23 | **Q.**   ALL RIGHT.  LET'S GO TO SAUCER. |
| 15:02 | 24 | BEFORE WE DO -- BEFORE WE LEAVE THE NORTH BREACH, |
| 15:02 | 25 | WOULD YOU AGREE, CONSISTENT WITH YOUR OPINION, THERE WERE |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:02 | 1 | EXCAVATIONS IN THE AREA IMMEDIATELY ADJACENT TO THE NORTH |
| 15:02 | 2 | BREACH AT BOLAND MARINE? |
| 15:02 | 3 | **A.**   YES.   I BELIEVE THERE ARE PHOTOGRAPHS THAT SHOW THAT. |
| 15:02 | 4 | **Q.**   AND THOSE EXTENSIVE EXCAVATIONS WERE, FOR THE MOST PART, |
| 15:02 | 5 | FILLED -- OR BACKFILLED WITH SAND? |
| 15:03 | 6 | **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  HE TESTIFIED |
| 15:03 | 7 | IN HIS DEPOSITION HE DIDN'T KNOW WHERE ALL THE EXCAVATIONS |
| 15:03 | 8 | WERE.  HE DIDN'T KNOW HOW THEY WERE BACKFILLED. |
| 15:03 | 9 | **THE COURT:**  OVERRULED.  IT'S IN HIS REPORT.  YOU CAN |
| 15:03 | 10 | IMPEACH HIM IN HIS DEPOSITION. |
| 15:03 | 11 | **THE WITNESS:**  THE AERIAL -- THE EXCAVATIONS |
| 15:03 | 12 | ASSOCIATED WITH THE ONES SHOWN IN THE AERIAL PHOTOGRAPH, TO MY |
| 15:03 | 13 | KNOWLEDGE, WERE BACKFILLED WITH SAND. |
| 15:03 | 14 | **BY MR. STEVENS:** |
| 15:03 | 15 | **Q.**   THANK YOU. |
| 15:03 | 16 | AND THE PHOTOGRAPHS THAT WE JUST SHOWED DEMONSTRATED |
| 15:03 | 17 | THAT THAT WAS SAND? |
| 15:03 | 18 | **A.**   YES. |
| 15:03 | 19 | **Q.**   THANK YOU. |
| 15:03 | 20 | ALL RIGHT.  LET'S GO TO SAUCER MARINE. |
| 15:03 | 21 | NEXT SLIDE. |
| 15:03 | 22 | AGAIN, FOR ORIENTATION PURPOSES, THERE WERE BUILDING |
| 15:03 | 23 | NUMBERS FOR -- ASSIGNED TO VARIOUS OBJECTS AND STRUCTURES THAT |
| 15:03 | 24 | NEEDED TO BE REMOVED AT THE SAUCER SITE, CORRECT, ADJACENT TO |
| 15:03 | 25 | THE SOUTH BREACH? |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:03 | 1 | **A.**   THAT'S CORRECT. |
| 15:03 | 2 | **Q.**   ALL RIGHT.  THE BUILDING NUMBERS AT SAUCER, FOR THE |
| 15:03 | 3 | RECORD, RANGE FROM -- I THINK IT'S 80 TO 107. |
| 15:04 | 4 | **MR. KELLS:**  YOUR HONOR -- |
| 15:04 | 5 | **THE COURT:**  WHAT'S YOUR OBJECTION, SIR? |
| 15:04 | 6 | **MR. KELLS:**  YEAH.  I UNDERSTAND THAT HE'S JUST LAYING |
| 15:04 | 7 | FOUNDATION, BUT I'VE HEARD A LOT OF COUNSEL'S TESTIMONY.  BUT |
| 15:04 | 8 | THE WITNESS HIMSELF HASN'T ACTUALLY SAID WHAT THE NUMBERS ARE |
| 15:04 | 9 | OR IDENTIFIED THEM OR EXPLAINED HOW HE COULD IDENTIFY THEM. |
| 15:04 | 10 | **THE COURT:**  ALL RIGHT.  LET ME ASK YOU THIS:  THE -- |
| 15:04 | 11 | BECAUSE WE ONLY HAVE THE NUMBERS ON THE BOLAND MARINE SITE, WE |
| 15:04 | 12 | DON'T HAVE A MAP OF ALL OF THE NUMBERS. |
| 15:04 | 13 | I ASSUME THAT'S WHAT THE OBJECTION IS. |
| 15:04 | 14 | **MR. KELLS:**  WELL, PART OF THE OBJECTION IS I'M JUST |
| 15:04 | 15 | NOT SURE THAT IT'S EVEN OPINION TESTIMONY.  AND I UNDERSTAND |
| 15:04 | 16 | THAT HE'S TRYING TO LAY A FOUNDATION, BUT HE'S SIMPLY |
| 15:04 | 17 | TESTIFYING TO HIS UNDERSTANDING OF WHAT THESE NUMBERS ARE |
| 15:04 | 18 | REPRESENTING, AND WE HAVEN'T HEARD ANYTHING FROM THE WITNESS |
| 15:04 | 19 | HIMSELF. |
| 15:04 | 20 | AND THAT'S SOMETHING THAT I -- YOU KNOW, FROM MY |
| 15:05 | 21 | UNDERSTANDING, COULD COME IN THROUGH A FACT WITNESS. |
| 15:05 | 22 | **THE COURT:**  WELL, THAT'S GENERALLY WHERE THEY COME |
| 15:05 | 23 | IN.  LAWYERS ARE NOT GOING TO BE GIVING ANY EVIDENCE HERE, I |
| 15:05 | 24 | PROMISE YOU. |
| 15:05 | 25 | SO THERE'S AN OBJECTION TO YOUR QUESTION, SIR. |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:05 | 1 | **BY MR. STEVENS:** |
| 15:05 | 2 | **Q.**  MR. MORRIS -- |
| 15:05 | 3 | **MR. STEVENS:**  I'LL WITHDRAW THE QUESTION, YOUR HONOR. |
| 15:05 | 4 | **THE COURT:**  ALL RIGHT. |
| 15:05 | 5 | **BY MR. STEVENS:** |
| 15:05 | 6 | **Q.**  MR. MORRIS, FOR ORIENTATION PURPOSES, CAN YOU TELL US |
| 15:05 | 7 | WHERE THE SOUTH BREACH IS LOCATED IN THE SAUCER MARINE AREA? |
| 15:05 | 8 | **A.**  THIS MAP SHOWS THE SOUTH -- THE GENERAL ORIENTATION OF THE |
| 15:05 | 9 | SOUTH BREAK, AND IT'S IN RED.  ACTUALLY, IT'S CLOSER -- THE |
| 15:05 | 10 | LINE DRAWN ON THIS MAP WAS LABELED ON THE MAP AS "FLOODWALL." |
| 15:05 | 11 | THE ACTUAL LOCATION OF THE FLOODWALL IS ALONGSIDE SUREKOTE |
| 15:05 | 12 | ROAD.  THE BREACH BASICALLY IS IN THAT AREA. |
| 15:06 | 13 | **THE COURT:**  WAIT.  MAY I POINT OUT, SIR, THAT THE |
| 15:06 | 14 | NUMBERS THAT YOU ARE REFERRING TO ARE IN HIS REPORT, AND I |
| 15:06 | 15 | MISSPOKE, UNDER THE NORTH -- UNDER THE SOUTH BREACH.  SO I |
| 15:06 | 16 | APOLOGIZE. |
| 15:06 | 17 | **MR. STEVENS:**  THIS IS A -- |
| 15:06 | 18 | **THE COURT:**  SO THIS IS IN HIS REPORT, SO YOU CAN |
| 15:06 | 19 | CERTAINLY ASK HIM IF THOSE NUMBERS REPRESENT BUILDINGS, TO HIS |
| 15:06 | 20 | KNOWLEDGE. |
| 15:06 | 21 | **MR. STEVENS:**  WELL, THANK YOU. |
| 15:06 | 22 | **THE COURT:**  AND YOU WERE JUST ASKING HIM THE RANGE. |
| 15:06 | 23 | IT MAKES NO DIFFERENCE.  WE CAN COUNT. |
| 15:06 | 24 | **MR. STEVENS:**  I WAS JUST DOING IT FOR ORIENTATION FOR |
| 15:06 | 25 | EVERYONE, SO THAT WE WOULD KNOW THAT -- |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:06 | 1 | **THE COURT:**  WE CAN FIGURE IT OUT. |
| 15:06 | 2 | **BY MR. STEVENS:** |
| 15:06 | 3 | **Q.**   ALL RIGHT.  YOU JUST POINTED OUT FOR US THAT IN YOUR |
| 15:06 | 4 | ORIGINAL REPORT YOU INDICATED THAT THIS RED LINE WAS THE |
| 15:06 | 5 | BREACH.  ACTUALLY, I THINK YOU -- IF YOU SEE THE WHOLE DIAGRAM, |
| 15:06 | 6 | THIS WAS LABELED "FLOODWALL," WAS IT NOT? |
| 15:06 | 7 | **A.**   YES. |
| 15:06 | 8 | **Q.**   AND THE FLOODWALL IS ACTUALLY CLOSER THAN WHAT'S SHOWN |
| 15:06 | 9 | HERE.  WE'LL GET BETTER PICTURES OF IT.  THIS IS A CONCEPTUAL |
| 15:06 | 10 | DRAWING. |
| 15:06 | 11 | BUT FOR ORIENTATION PURPOSES, DO YOU USE SOME OF |
| 15:06 | 12 | THESE BUILDING NUMBERS IN ANALYZING PHOTOGRAPHS TO DEPICT |
| 15:07 | 13 | ACTIVITIES -- EXCAVATION ACTIVITIES AND PILE REMOVAL ACTIVITIES |
| 15:07 | 14 | IN THE SAUCER MARINE SITE? |
| 15:07 | 15 | **A.**   THESE ARE BUILDING NUMBERS AND THEY CAN BE USED FOR THAT |
| 15:07 | 16 | TASK. |
| 15:07 | 17 | **Q.**   ALL RIGHT. |
| 15:07 | 18 | THE NEXT PICTURE. |
| 15:07 | 19 | THE CAPTION READS "PILE REMOVAL AT 100." |
| 15:07 | 20 | SO IF WE GO BACK TO THE PREVIOUS SLIDE, IS THE 100 |
| 15:07 | 21 | REFERENCED IN THAT CAPTION THE SAME AS THIS BUILDING SHOWN IN |
| 15:07 | 22 | THE DIAGRAM WE MENTIONED A MOMENT AGO, 1576-17? |
| 15:07 | 23 | **A.**   YES. |
| 15:07 | 24 | **Q.**   AND IN TERMS OF ITS RELATIONSHIP TO THE SOUTH BREACH, |
| 15:07 | 25 | WOULD 1- -- WHERE DOES 100 FALL ON THE ROUGHLY 800-FOOT LENGTH |

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:07 | 1 | OF THE SOUTH BREACH? |
| 15:07 | 2 | **A.**   ROUGHLY IN THE MIDDLE OF IT. |
| 15:07 | 3 | **Q.**   OKAY. |
| 15:08 | 4 |        NEXT SLIDE. |
| 15:08 | 5 |        NOW, PILE REMOVAL ACTIVITIES WAS SOMETHING YOU |
| 15:08 | 6 | ANALYZED FOR BOTH BOLAND AND SAUCER; CORRECT? |
| 15:08 | 7 | **A.**   YES. |
| 15:08 | 8 | **Q.**   DESCRIBE FOR THE COURT HOW YOU DETERMINED, OTHER THAN WITH |
| 15:08 | 9 | THIS CAPTION, THAT THIS PILE REMOVAL OCCURRED AT NUMBER 100. |
| 15:08 | 10 | **A.**   IT SAYS "NUMBER 100" ON IT. |
| 15:08 | 11 | **Q.**   OKAY.  OTHER THAN THAT, YOU JUST RELATED IT BACK TO THE |
| 15:08 | 12 | OTHER PHOTOGRAPH, THE DIAGRAM WE JUST REVIEWED; CORRECT? |
| 15:08 | 13 | **A.**   YES. |
| 15:08 | 14 | **Q.**   ALL RIGHT. |
| 15:08 | 15 |        NEXT SLIDE, 1674-12. |
| 15:08 | 16 |        IT'S FIGURE 10 OF APPENDIX B OF DR. SILVA'S REPORT. |
| 15:08 | 17 | DOES HIS -- |
| 15:08 | 18 |        **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR. |
| 15:08 | 19 |        **THE COURT:**  YES.  AND THE NATURE OF IT? |
| 15:08 | 20 |        **MS. WAGER-ZITO:**  THIS ONE, IT'S ALSO BEYOND THE SCOPE |
| 15:08 | 21 | OF HIS REPORT.  THIS ALSO CONTAINS INFORMATION FROM QARS THAT |
| 15:08 | 22 | HE DIDN'T REVIEW PRIOR TO ISSUING HIS REPORT, AND HADN'T |
| 15:08 | 23 | REVIEWED AT THE TIME OF HIS DEPOSITION AND COULDN'T SPEAK TO |
| 15:09 | 24 | PARTICULAR LOCATIONS OF PARTICULAR EXCAVATIONS AT SAUCER |
| 15:09 | 25 | SIMILAR TO THE SITUATION AT BOLAND. |

CHAD A. MORRIS - DIRECT

15:09    1          **THE COURT:**  ALL RIGHT.

15:09    2                 I'M GOING TO ALLOW YOU TO ASK THE QUESTION SINCE

15:09    3    I DON'T KNOW WHAT IT IS YET.

15:09    4          **MR. STEVENS:**  THANK YOU, YOUR HONOR.

15:09    5          **THE COURT:**  WHAT'S THE QUESTION?

15:09    6    **BY MR. STEVENS:**

15:09    7    **Q.**  MR. MORRIS, IS THE BUILDING LOCATION -- THE LOCATION FOR

15:09    8    BUILDING NUMBER 100 SHOWN ON DR. SILVA'S FIGURE 10?

15:09    9    **A.**  YES.  THE BUILDING FIGURES ARE ALL CONSISTENT.

15:09   10    **Q.**  AND WE DON'T HAVE THE SAME PROBLEM WITH NUMBERING OF

15:09   11    SUBSURFACE FOUNDATIONS, ET CETERA, THAT WE HAD AT THE BOLAND

15:09   12    MARINE SITE ON THE NORTH BREACH?

15:09   13    **A.**  NO.

15:09   14    **Q.**  THESE REMAIN CONSISTENT AND WERE NOT DUPLICATIVE.  ALL

15:09   15    RIGHT.

15:09   16          **THE COURT:**  I'M GOING TO ALLOW THE QUESTION AND THE

15:09   17    ANSWER.

15:09   18                 GO AHEAD.

15:09   19          **MR. STEVENS:**  THANK YOU.

15:09   20    **BY MR. STEVENS:**

15:09   21    **Q.**  THE 8- -- ROUGHLY 800-FOOT LENGTH OF THE SOUTH BREACH, IS

15:09   22    IT CONSISTENT WITH THE -- THE CRUDE ESTIMATE YOU MADE ON THE

15:09   23    PREVIOUS DIAGRAM?

15:10   24    **A.**  YES.

15:10   25    **Q.**  OKAY.  LET'S TALK ABOUT SOIL REMEDIATION AT THE SAUCER

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:10 | 1 | SITE. |
| 15:10 | 2 | TO YOUR KNOWLEDGE, WAS SIMILAR SOIL REMEDIATION |
| 15:10 | 3 | CONDUCTED AT SAUCER AS IT WAS AT BOLAND? |
| 15:10 | 4 | **A.**  YES. |
| 15:10 | 5 | **Q.**  DID YOU DETERMINE THAT THE SOIL REMEDIATION ACTIVITIES AT |
| 15:10 | 6 | THE SAUCER SITE WERE SIMILARLY BACKFILLED? |
| 15:10 | 7 | **A.**  NOT AT THE TIME OF MY REPORT. |
| 15:10 | 8 | **Q.**  OKAY.  LET ME ASK YOU -- |
| 15:11 | 9 | NEXT SLIDE.  SKIP.  NEXT ONE. |
| 15:11 | 10 | NEXT ONE.  ONE MORE.  ONE MORE.  THANK YOU. |
| 15:11 | 11 | JX 0409-09.  DOES -- CAN YOU GIVE THE COURT AN |
| 15:11 | 12 | APPROXIMATION OF WHERE BUILDING NUMBER 100 WOULD BE ON THIS |
| 15:11 | 13 | SLIDE? |
| 15:11 | 14 | **A.**  IT'S -- I'D HAVE TO LOOK AT THE MAP.  DO YOU HAVE MAP THE |
| 15:11 | 15 | AGAIN? |
| 15:11 | 16 | **Q.**  DO YOU WANT TO GO BACK TO THE MAP? |
| 15:11 | 17 | **THE COURT:**  HERE YOU GO. |
| 15:11 | 18 | **THE WITNESS:**  THANK YOU. |
| 15:11 | 19 | **MR. STEVENS:**  THANK YOU, JUDGE. |
| 15:11 | 20 | **THE COURT:**  I HOPE I GAVE HIM THE RIGHT ONE. |
| 15:12 | 21 | **MR. STEVENS:**  JX 1576-17. |
| 15:12 | 22 | THAT'S NOT IN, CARL.  GO TO 1674-10, SLIDE 63. |
| 15:12 | 23 | THERE YOU GO, 1674, PAGE 9. |
| 15:12 | 24 | **BY MR. STEVENS:** |
| 15:12 | 25 | **Q.**  FOR THE BENEFIT OF THE COURT, CAN YOU APPROXIMATE WHERE |

```
15:12    1   BUILDING NUMBER 100 WOULD BE LOCATED WHEN THE PILE REMOVAL WAS
15:12    2   TAKING PLACE?
15:13    3           THE COURT:  ARE WE TALKING ABOUT THE SAUCER MARINE
15:13    4   SITE?
15:13    5           MR. STEVENS:  YES, SIR.
15:13    6           THE COURT:  THERE'S 100 THERE.  BY THE 22 -- IT'S
15:13    7   22G.
15:13    8           MR. STEVENS:  YET ANOTHER SET OF NUMBERS, YOUR HONOR.
15:13    9           THE WITNESS:  NO, THAT'S BUILDING NUMBER 100.  IT'S
15:13   10   IN THERE.
15:13   11   BY MR. STEVENS:
15:13   12   Q.   BUILDING NUMBER 100 IS WHERE?
15:13   13           THE COURT:  RIGHT WHERE IT SAYS 100.
15:12   14           MR. STEVENS:  RIGHT.  OKAY.
15:13   15   BY MR. STEVENS:
15:13   16   Q.   WHAT I WANTED TO ASK YOU WAS:  ALONG THE BOTTOM OF THIS
15:13   17   DRAWING, THIS MAP, THERE ARE SOME MORE NUMBERS.
15:13   18           AND IF YOU'D GO BACK A SLIDE, CARL.
15:13   19           THESE NUMBERS ACROSS THE BOTTOM AT SAUCER MARINE,
15:13   20   WHERE IS SAYS -- IT STARTS AT 22 AND IT GOES TO 38, WHAT ARE
15:13   21   THOSE NUMBERS, SIR?
15:13   22           MR. KELLS:  I OBJECT, YOUR HONOR.  I DON'T EVEN DON'T
15:13   23   KNOW WHAT THIS SLIDE IS, AND IS CERTAINLY DIDN'T APPEAR IN
15:13   24   MR. MORRIS' REPORT?
15:13   25           THE COURT:  NO, IT DIDN'T.  I DON'T KNOW IF HE'S
```

CHAD A. MORRIS - DIRECT

15:13   1   GOING TO USE IT TO PLACE SOMETHING -- TO LOCATE SOMETHING THAT
15:13   2   IS IN HIS REPORT, BUT TO THE EXTENT -- THIS SHOULDN'T BE -- THE
15:14   3   COURT KIND OF KNOWS WHAT THESE NUMBERS ARE, BUT I -- I HOPE
15:14   4   EVERYBODY DOES.
15:14   5           BUT I'M GOING TO ALLOW THE QUESTION, BUT BE
15:14   6   READY TO OBJECT.
15:14   7           MR. STEVENS:  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE.
15:14   8   BY MR. STEVENS:
15:14   9   Q.   THE SOUTH BREACH, THE RED LINE.
15:14   10  A.   DO YOU WANT ME TO ANSWER THAT QUESTION?
15:14   11  Q.   YES.
15:14   12  A.   WOULD YOU LIKE ME TO ANSWER THAT QUESTION?
15:14   13  Q.   YEAH, PLEASE.
15:14   14  A.   THOSE ARE GRID LINES ASSOCIATED WITH SAMPLING LOCATIONS.
15:14   15  Q.   OKAY.  WITH SOIL REMEDIATION SAMPLING AS OPPOSED TO GRID
15:14   16  TRENCHING.
15:14   17          NOW, THIS RED LINE, CAN YOU TELL THOSE SAME NUMBERS
15:14   18  ACROSS THE BOTTOM -- IT'S SIMILAR NUMBERS.  CAN YOU TELL US
15:14   19  WHERE THE NUMBERS START AND STOP FOR THE SOUTH BREACH --
15:14   20          MS. WAGER-ZITO:  OBJECTION, YOUR HONOR.
15:14   21  BY MR. STEVENS:
15:14   22  Q.   -- APPROXIMATELY?
15:14   23          MS. WAGER-ZITO:  THIS IS OUTSIDE THE SCOPE.
15:14   24          THE COURT:  WELL, IT DOESN'T TAKE -- LET ME JUST SAY
15:14   25  THIS:  I CAN KIND OF LOOK AT THE LINE ON THIS EXHIBIT AND TELL

CHAD A. MORRIS - DIRECT

15:14    1   WHERE THE -- SO I ASSUME YOU'RE LEADING UP TO SOMETHING?

15:14    2              **MR. STEVENS:**  YES.  WELL -- AND IT'S ALSO FOR THOSE

15:14    3   WHO MIGHT READ THIS RECORD.  I KNOW YOU'RE LIGHT YEARS AHEAD OF

15:15    4   EVERYONE ON THIS CASE, JUDGE --

15:15    5              **THE COURT:**  NOT REALLY.

15:15    6              **MR. STEVENS:**  -- IN TERMS OF UNDERSTANDING THIS.

15:15    7   BY MR. STEVENS:

15:15    8   **Q.**   BUT, CHAD, IF YOU WOULD -- OR, MR. MORRIS, WOULD YOU

15:15    9   DESCRIBE FOR THE COURT THE NUMBERS ACROSS THE BOTTOM OF THE

15:15   10   PREVIOUS SLIDE THAT CORRESPOND WITH THE SOUTH BREACH?

15:15   11              **THE COURT:**  THE PREVIOUS SLIDE BEING WHAT?

15:15   12              **MR. STEVENS:**  0409-9.

15:15   13              **THE COURT:**  WHERE ARE WE GOING WITH THIS, COUNSEL?

15:15   14              **MR. STEVENS:**  I JUST WANTED TO ORIENT THE COURT ON

15:15   15   WHERE THIS WAS AND WHAT THOSE NUMBERS MEANT FOR THE NEXT SLIDE,

15:15   16   WHICH IS THE MAP.

15:15   17              **THE COURT:**  I'M GOING TO GIVE YOU SOME LEEWAY AND

15:15   18   ALLOW HIM TO ANSWER THIS QUESTION.

15:15   19              **MR. STEVENS:**  THANK YOU.

15:15   20              **THE WITNESS:**  THE NUMBERS ALONG THE -- NEAR THE RED

15:15   21   LINE THAT ARE PINK DOTS WITH NUMBERS NEXT TO THEM WOULD

15:15   22   CORRESPOND TO THE SAME GRID SYSTEM THAT IS SHOWN IN THE

15:15   23   PREVIOUS SLIDE.

15:15   24   BY MR. STEVENS:

15:15   25   **Q.**   THANK YOU.

CHAD A. MORRIS - DIRECT

15:12    1              **MR. STEVENS:**  IT WAS GOING A DIFFERENT DIRECTION,

15:15    2    YOUR HONOR, BUT THE DIRECTION GOT DERAILED.

15:16    3    **BY MR. STEVENS:**

15:12    4    **Q.**   LET'S TALK ABOUT THE OTHER FEATURES OF THE SAUCER MARINE

15:16    5    SITE, PARTICULARLY A DRAINAGE DITCH THAT WAS SITUATED ON THIS

15:16    6    SITE.

15:16    7              3404-485, SLIDE 66.

15:16    8              DESCRIBE FOR THE COURT -- ORIENT US HERE WHAT WE'RE

15:16    9    LOOKING AT AND WHAT DIRECTION.

15:16   10              **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  THIS WAS NOT

15:16   11    IN HIS REPORT.  THIS WAS NOT DISCUSSED AT HIS DEPOSITION.

15:16   12              **THE COURT:**  OVERRULED.  HE CAN TELL ME WHERE THE

15:16   13    THING IS POINTING, AND THEN WE'LL GO -- I THINK HE'S QUALIFIED

15:16   14    TO DO THAT.

15:16   15              **MR. STEVENS:**  THANK YOU, JUDGE.

15:16   16              **THE COURT:**  AND WE CAN GO TO THE NEXT QUESTION, WHERE

15:16   17    THERE MAY BE AN OBJECTION.

15:16   18              **THE WITNESS:**  THIS IS A DRAINAGE DITCH THAT'S LOCATED

15:16   19    PARALLEL WITH SUREKOTE ROAD.  IN THE BACKGROUND ON THE

15:16   20    LEFT-HAND SIDE OF THE PHOTOGRAPH YOU CAN SEE THE FLOODWALL.  IN

15:16   21    THE BACKGROUND IN THE MIDDLE TO THE RIGHT SIDE IS THE BRIDGE

15:16   22    FOR CLAIBORNE AVENUE.

15:17   23                   SO WE'RE LOOKING SOUTH.  AND THE CAPTION LABELS

15:17   24    IT AS INDIAN/MAYER, SO WE'RE NORTH OF THE SAUCER MARINE

15:17   25    PROPERTY.  WE'RE LOOKING SOUTH ONTO THE SAUCER MARINE PROPERTY.

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:17 | 1 | **BY MR. STEVENS:** |
| 15:17 | 2 | **Q.**   OKAY.  AND IN RELATIONSHIP TO SUREKOTE ROAD, HAVE YOU MADE |
| 15:17 | 3 | A DETERMINATION OF THE DISTANCE BETWEEN THE WESTERN EDGE OF |
| 15:17 | 4 | SUREKOTE ROAD AND THE EASTERNMOST BANK OF THIS DRAINAGE DITCH? |
| 15:17 | 5 | **A.**   I DID NOT DO THAT AT THE TIME OF MY REPORT.  IT'S READILY |
| 15:17 | 6 | APPARENT IN THIS PHOTOGRAPH THAT THEY'RE CLOSE TOGETHER. |
| 15:17 | 7 | **Q.**   OKAY. |
| 15:17 | 8 | **THE COURT:**  THE COURT DOESN'T NEED AN EXPERT WITNESS |
| 15:17 | 9 | TO LOOK AT THIS, SEE IT'S A DITCH, SEE IT'S CLOSE TO THE |
| 15:17 | 10 | FLOODWALL.  AND WITHIN, I GUESS, LOOKING AT THE TRUCK, WITHIN |
| 15:17 | 11 | 50 FEET.  WITHIN 50 FEET. |
| 15:17 | 12 | **MR. STEVENS:**  THANK YOU, YOUR HONOR. |
| 15:17 | 13 | **THE COURT:**  AND IF I'M WRONG, I'M SURE SOMEBODY WHO'S |
| 15:17 | 14 | MEASURED IT WILL TELL ME, IF IT BECOMES RELEVANT IN THIS CASE. |
| 15:18 | 15 | **MR. STEVENS:**  THANK YOU, SIR. |
| 15:18 | 16 | **THE COURT:**  IT DOESN'T REQUIRE A . . . |
| 15:18 | 17 | **BY MR. STEVENS:** |
| 15:18 | 18 | **Q.**   NEXT SLIDE. |
| 15:18 | 19 | BACK UP ONE MORE SLIDE. |
| 15:18 | 20 | I WANT TO ASK YOU ABOUT ANOTHER FEATURE IN THAT |
| 15:18 | 21 | PHOTOGRAPH.  WHERE THE TRUCK IS HERE IN THE BACKGROUND HERE, |
| 15:18 | 22 | CAN YOU DESCRIBE FOR THE COURT WHAT THAT STRUCTURE IS? |
| 15:18 | 23 | **A.**   YOU SEE THAT THE DITCH IS BLOCKED -- OR THE DITCH IS |
| 15:18 | 24 | BLOCKED THERE.  THAT'S A ROADWAY THAT GOES OVER THE DITCH. |
| 15:18 | 25 | THERE WOULD BE A CULVERT THERE. |

CHAD A. MORRIS - DIRECT

15:18  1    **Q.**  ALL RIGHT.

15:18  2          NEXT SLIDE.

15:18  3          **THE COURT:**  ALL RIGHT.  COUNSEL, I PROMISE YOU I

15:18  4    DON'T NEED AN EXPERT TO TELL ME WHAT A CULVERT IS.  I PROMISE

15:18  5    YOU.

15:18  6    **BY MR. STEVENS:**

15:18  7    **Q.**  IN TERMS OF ITS RELATIONSHIP TO THE SOUTH BREACH, CAN YOU

15:18  8    SHOW THE COURT WHERE THE CULVERT IS?

15:18  9    **A.**  WELL, WE CAN SEE THE ROADWAY -- I'M SORRY.  IT'S HARD TO

15:18  10   DO ON THIS.  IT'S JUST TO --

15:18  11         **MR. KELLS:**  YOUR HONOR, I HATE TO OBJECT.  BUT THE

15:18  12   LAST PHOTOGRAPH WAS OF A DIFFERENT SITE FROM SAUCER MARINE AND

15:19  13   THEY'RE NOW TRYING TO ORIENT THE NON-SAUCER MARINE SITE.

15:19  14         **THE COURT:**  WELL, THAT'S A REASONABLE OBJECTION.

15:19  15         **MR. STEVENS:**  I'M NOT AWARE OF ANY --

15:19  16   **BY MR. STEVENS:**

15:19  17   **Q.**  LET ME ASK YOU THIS, MR. MORRIS:  BASED ON YOUR REVIEW IN

15:19  18   THIS CASE, HAVE YOU FOUND ANY OTHER CROSSOVER IN THE SAUCER

15:19  19   MARINE SITE OR ANYWHERE NEAR THE SOUTH BREACH?

15:19  20   **A.**  NO.

15:19  21   **Q.**  THE YELLOW LINE ON THE FAR RIGHT OF THIS DIAGRAM, DOES IT

15:19  22   SEPARATE SAUCER FROM ANOTHER LOCATION, INDIAN TOWING OR MAYER

15:19  23   YACHT?

15:19  24   **A.**  YES.

15:19  25   **Q.**  OKAY.  CAN YOU TELL US FROM YOUR ESTIMATION WHERE THE

CHAD A. MORRIS - DIRECT

15:19    1   PHOTOGRAPHER MIGHT HAVE BEEN OR AN APPROXIMATE LOCATION WHERE

15:19    2   THE PHOTOGRAPHER WAS STANDING IN SLIDE 66?

15:19    3          BACK UP.

15:19    4   **A.**   WE -- I CAN'T TELL SPECIFICALLY.  ALL I CAN TELL YOU IS

15:19    5   THAT IT'S NORTH OF THAT CROSSOVER.  AND THEN LOOKING SOUTHERLY,

15:19    6   YOU CAN SEE THE WALL.  I CAN'T TELL YOU SPECIFICALLY WHERE IT

15:20    7   IS.

15:20    8          **THE COURT:**  COUNSEL, I'M GIVING YOU SOME LEEWAY.

15:20    9          **MR. STEVENS:**  THANK YOU, YOUR HONOR.

15:20   10          **THE COURT:**  BUT IT'S ABOUT TO BE WITHDRAWN.

15:20   11   **BY MR. STEVENS:**

15:20   12   **Q.**   ALL RIGHT.  FROM THE DIAGRAM, CAN YOU TELL IF THAT

15:20   13   DRAINAGE DITCH -- CAN YOU ORIENT THE COURT AS TO WHERE THAT

15:20   14   DRAINAGE DITCH -- THE LENGTH OF THAT DRAINAGE DITCH ALONG THE

15:20   15   WALL?

15:20   16          **THE COURT:**  THE COURT CAN FIGURE OUT WITH THE SCALE.

15:20   17   IF YOU WANT TO MAKE IT A PART OF YOUR BRIEF, THERE'S A SCALE,

15:20   18   AND THERE IT IS.  I SEE IT AND I CAN MEASURE IT.

15:20   19          **MR. STEVENS:**  THANK YOU, YOUR HONOR.

15:20   20          **THE COURT:**  YOU CAN PUT IT IN YOUR BRIEF BECAUSE

15:20   21   THERE'S THE SCALE.  IT APPEARS TO BE CLEAR.

15:20   22   **BY MR. STEVENS:**

15:20   23   **Q.**   YOU WOULD AGREE, WOULD YOU NOT, MR. MORRIS, THAT THAT

15:20   24   DRAINAGE DITCH RUNS THE ENTIRE LENGTH OF THE 800-FOOT SOUTH

15:20   25   BREACH?

CHAD A. MORRIS - DIRECT

15:20      1    **A.**   YES.

15:20      2            **THE COURT:**  COUNSEL, YOU'RE GOING BEYOND HIS REPORT.

15:20      3    I SAID THERE WOULD BE A LITTLE -- I'M 90 PERCENT LITERAL, AND

15:21      4    NOW I'M GOING TO -- YOU'RE GOING TO -- YOU'VE GOT TO STICK TO

15:21      5    HIS REPORT.

15:21      6            **MR. STEVENS:**  THANK YOU, SIR.

15:21      7            **THE COURT:**  UNLESS THERE'S SOMETHING THAT'S SO COMMON

15:21      8    SENSICAL THAT WOULD BE HELPFUL TO THE COURT THAT THE COURT

15:21      9    MIGHT SOMEHOW NOT GLEAN AFTER 20 DAYS OF TRIAL.

15:21     10    **BY MR. STEVENS:**

15:21     11    **Q.**   IN TERMS OF YOUR REPORT, YOU TALKED ABOUT EXTENSIVE

15:21     12    EXCAVATIONS IN THE AREA OR VICINITY OF THE SOUTH BREACH.

15:21     13            WOULD YOU LOOK AT SOME EXAMPLES OF EXTENSIVE

15:21     14    EXCAVATIONS IN THAT AREA?

15:21     15            SLIDE 74, PLEASE, DATED MAY 14TH, 2001, PHOTOGRAPH 12

15:21     16    AT SAUCER.  THE CAPTION READS "UNDERGROUND WATERLINE RUNNING

15:22     17    PARALLEL TO THE SEWER LINE."

15:22     18            IS THAT AN EXCAVATION THAT YOU DETERMINED TO BE AT

15:22     19    THE SAUCER SITE?

15:22     20    **A.**   THE CAPTION SAYS SAUCER.

15:22     21    **Q.**   OKAY.

15:22     22    **A.**   SO IT WOULD BE AT THE SAUCER SITE.

15:22     23    **Q.**   THE NEXT PHOTOGRAPH.

15:22     24            THIS SAYS, "2-INCH, 4-INCH, AND 8-INCH LINES RUNNING

15:22     25    EAST/WEST, UNDERGROUND UTILITIES, DATED MAY 14TH, OF '01, AT

CHAD A. MORRIS - DIRECT

15:22  1  THE SAUCER SITE, PHOTOGRAPH 14."

15:22  2        HAVE YOU BEEN ABLE TO -- CAN YOU SHOW US ON THE MAP

15:22  3  WE JUST LOOKED AT WHERE THIS EXCAVATION IS TAKING PLACE IN

15:22  4  RELATION TO THE SOUTH BREACH?

15:22  5        BACK UP, CARL, FOR THE -- SLIDE 70.

15:22  6  **A.**   WELL, WE CAN SEE THE -- YOU CAN SEE THE WALL IN THE

15:22  7  BACKGROUND.

15:23  8        CAN YOU GO BACK TO THE PHOTOGRAPH?

15:23  9  **Q.**   SLIDE 75?

15:23  10  **A.**   YOU SEE THE WALL IN THE BACKGROUND.  YOU CAN SEE SUREKOTE

15:23  11  ROAD.  YOU CAN SEE THE DITCH.  YOU CAN SEE HE'S TRENCHING.  SO

15:23  12  HE'S RUNNING PARALLEL WITH THE DITCH, OR PARALLEL WITH SUREKOTE

15:23  13  ROAD.  AND HE WOULD BE MOVING IN A NORTHERLY DIRECTION.

15:23  14  **Q.**   THE NEXT PHOTOGRAPH -- I'M SORRY.

15:23  15        GO BACK ONE.  ONE MORE.  THANK YOU.

15:23  16        **THE COURT:**  YOU KNOW, WE HAVEN'T EVEN GOT TO THE

15:23  17  PLAINTIFF PROPERTY VALUE.  AND I'M GOING TO TELL YOU, THIS IS

15:23  18  NOT HELPING THE COURT.

15:24  19        **MR. STEVENS:**  I'M SORRY, YOUR HONOR.

15:24  20        **THE COURT:**  IT'S JUST NOT.  I MEAN, THE PICTURES ARE

15:24  21  IN EVIDENCE.  I CAN LOOK -- YOU CAN SHOW ME WHAT THE CAPTION IS

15:24  22  IF THEY'RE THEIR PICTURES.  I CAN FIGURE OUT THAT'S AN

15:24  23  EXCAVATION, AND THAT'S ABOUT ALL HE CAN SAY.

15:24  24  **BY MR. STEVENS:**

15:24  25  **Q.**   ALL RIGHT.  LET'S TALK ABOUT BACKFILLING AT SAUCER MARINE.

CHAD A. MORRIS - DIRECT

| | | |
|---|---|---|
| 15:24 | 1 | GO TO SLIDE 80. |
| 15:24 | 2 | IN TERMS OF BACKFILLING OPERATIONS OR ACTIVITIES, CAN |
| 15:24 | 3 | YOU TELL THE COURT WHETHER OR NOT THAT IS WHAT IS TAKING PLACE |
| 15:24 | 4 | IN THIS PHOTOGRAPH? |
| 15:24 | 5 | **A.**  THAT'S WHAT THE PHOTOGRAPH SAYS. |
| 15:24 | 6 | **THE COURT:**  YES.  COUNSEL, THAT'S NOT HELPING ME. |
| 15:24 | 7 | SHOW ME THE PICTURES THAT ARE -- REFER TO ME IN BRIEF.  IT SAYS |
| 15:24 | 8 | "BACKFILLING OF SEWER TRENCH." |
| 15:24 | 9 | BY MR. STEVENS: |
| 15:24 | 10 | **Q.**  CAN YOU -- CAN YOU SHOW THE COURT WHERE THIS BACKFILLING |
| 15:24 | 11 | OF THE SEWER TRENCH IS TAKING PLACE? |
| 15:24 | 12 | **THE COURT:**  I'M HOPING SOME EXPERT IS GOING TO OPINE |
| 15:25 | 13 | THAT THIS -- THIS SEWER TRENCH HAD SOMETHING TO DO WITH THE |
| 15:25 | 14 | FAILURE OF THE -- OF THE FLOODWALL.  I HOPE YOU'RE NOT ENGAGING |
| 15:25 | 15 | IN THAT BECAUSE -- |
| 15:25 | 16 | **MR. STEVENS:**  YES, SIR. |
| 15:25 | 17 | **THE COURT:**  -- I'VE LOOKED AT THE EXPERT REPORTS AND |
| 15:25 | 18 | THE DEPOSITIONS. |
| 15:25 | 19 | ALL RIGHT.  GO AHEAD. |
| 15:25 | 20 | **MR. STEVENS:**  YES, SIR. |
| 15:25 | 21 | BY MR. STEVENS: |
| 15:25 | 22 | **Q.**  MR. MORRIS, CAN YOU DESCRIBE FOR THE COURT ON SLIDE |
| 15:25 | 23 | NUMBER -- THERE YOU GO -- WHERE -- THIS IS SLIDE NUMBER 70, |
| 15:25 | 24 | 1674-10, WHERE THIS BACKFILLING OPERATION IS TAKING PLACE? |
| 15:25 | 25 | **MR. KELLS:**  YOUR HONOR, IF I CAN JUST OBJECT. |

CHAD A. MORRIS - DIRECT

15:25    1           **THE COURT:**  YES, SIR?

15:25    2           **MR. KELLS:**  IT CERTAINLY WOULDN'T HAVE BEEN IN HIS

15:25    3  REPORT.  THIS WOULD BE THE FIRST TIME POST-DEPOSITION THAT HE'S

15:25    4  ATTEMPTING TO SPECIFY WHERE AN EXCAVATION TOOK PLACE ON THAT

15:25    5  SITE.

15:25    6           **THE COURT:**  I'VE GIVEN HIM SOME LEEWAY, BUT IF

15:25    7  THERE'S A PICTURE IN HIS REPORT.  THIS PICTURE WASN'T EVEN IN

15:25    8  HIS REPORT.  I'VE LET YOU GO ON PRETTY FAR, COUNSEL.

15:26    9           **MR. STEVENS:**  THANK YOU, YOUR HONOR.

15:26   10           **THE COURT:**  I DON'T KNOW HOW I --

15:26   11           **MR. STEVENS:**  I'M DONE.

15:26   12           **THE COURT:**  -- DON'T SUSTAIN THAT OBJECTION.

15:26   13           **MR. STEVENS:**  CAN I ASK ONE MORE?

15:26   14           **THE COURT:**  YOU CAN ASK -- I'M NOT STOPPING YOU.

15:26   15           **MR. STEVENS:**  OKAY.

15:26   16  BY MR. STEVENS:

15:26   17  **Q.**   MR. MORRIS, IN RELATION TO THIS YELLOW RECTANGLE SHOWN ON

15:26   18  FIGURE 9 OF APPENDIX B OF DR. SILVA'S REPORT WHICH IS LABELED

15:26   19  AS "NONEXISTENT EXCAVATION," CAN YOU TELL THE COURT WHETHER OR

15:26   20  NOT THAT SEWER LINE REMOVAL AND BACKFILLING WITH THE BULLDOZER

15:26   21  WE JUST SAW, WHERE THEY ARE IN RELATION TO THAT YELLOW

15:26   22  RECTANGLE?

15:26   23           **MS. WAGER-ZITO:**  OBJECTION, YOUR HONOR.  IT'S OUTSIDE

15:26   24  THE SCOPE OF HIS REPORT.  HE DIDN'T KNOW WHERE THE EXCAVATIONS

15:26   25  WERE WHEN WE DEPOSED HIM, AND THIS WOULD BE A NEW OPINION.

CHAD A. MORRIS - DIRECT

15:26    1           **THE COURT:**  I'M NOT SURE WHAT -- I'M NOT SURE WHAT IT

15:26    2    IS.  I'M GOING TO SUSTAIN THE -- I'M GOING TO SUSTAIN THE

15:26    3    OBJECTION AT THIS TIME.

15:27    4           **MR. STEVENS:**  SLIDE 80, PX 3376-0482.

15:27    5    **BY MR. STEVENS:**

15:27    6    **Q.**  WOULD YOU AGREE, SIR, THAT WHEREVER THIS IS, IT IS, IN

15:27    7    FACT, UNCOMPACTED BACKFILL MATERIAL?

15:27    8    **A.**  THERE'S MORE INFORMATION NECESSARY TO REACH THAT

15:27    9    CONCLUSION.

15:27   10           **THE COURT:**  HE'S ANSWERED IT.

15:27   11           **MR. STEVENS:**  THANK YOU VERY MUCH.

15:27   12               I HAVE NO FURTHER QUESTIONS.

15:27   13           **THE COURT:**  LET ME ASK YOU THIS:  WHAT ABOUT THE

15:27   14    PLAINTIFFS' ELEVATIONS?

15:27   15           **MR. STEVENS:**  OH, YES.  GOSH.  I'M SORRY.

15:27   16           **THE COURT:**  I DON'T THINK YOU WANT TO FORGET THAT.

15:27   17           **MR. STEVENS:**  OH, GOSH, I'M SORRY.  I'M -- I WAS

15:27   18    MOVING ON.

15:27   19           **THE COURT:**  I KNOW -- I KNOW YOU'RE EXHAUSTED.  I'LL

15:27   20    TELL YOU WHAT, I'LL LET YOU TAKE A 10-MINUTE, AT THE MOST,

15:27   21    RECESS.

15:27   22           **MR. STEVENS:**  THANK YOU.  I APPRECIATE IT.

15:27   23           **THE COURT:**  ALL RIGHT.

15:43   24           (WHEREUPON, THE COURT TOOK A RECESS.)

15:43   25           **THE DEPUTY CLERK:**  ALL RISE.

CHAD A. MORRIS - DIRECT

15:43   1          COURT'S IN SESSION.  PLEASE BE SEATED.

15:43   2          **MR. STEVENS:**  YOUR HONOR, IN CONNECTION WITH THE

15:44   3   ELEVATIONS OF THE PLAINTIFFS' PROPERTY, WE HAVE REACHED A

15:44   4   STIPULATION AND AN AGREEMENT.

15:44   5          ACTUALLY, THE STIPULA- -- THE WRITTEN

15:44   6   STIPULATION WAS OFFERED INTO EVIDENCE EARLIER THIS MORNING.

15:44   7          **THE COURT:**  OH, SURE.

15:44   8          **MR. STEVENS:**  PX 4670.  AND THIS CHART AND DIAGRAM,

15:44   9   PAGE 3 IS PART OF THAT STIPULATION.  SO THE PARTIES HAVE AGREED

15:44   10  TO STIPULATE THAT IF ASKED TO TESTIFY ABOUT THESE ELEVATIONS,

15:44   11  MR. MORRIS WOULD STATE THAT THEY ARE ACCURATE.

15:44   12         **THE COURT:**  THAT'S CERTAINLY SATISFACTORY WITH THE

15:44   13  COURT IF IT'S SATISFACTORY WITH ALL THE PARTIES.  AND THE COURT

15:44   14  CERTAINLY APPRECIATES ANY STIPULATION.

15:44   15         **MR. STEVENS:**  THANK YOU, SIR.

15:44   16         AND WE TENDER THE WITNESS.

15:44   17         **THE COURT:**  AND YOU'LL FILE THAT INTO THE RECORD, THE

15:44   18  STIPULATION?

15:44   19         **MR. BRUNO:**  ACTUALLY, JUDGE, WE REDACTED THE -- THIS

15:44   20  DEMONSTRATIVE AND WE NEED TO REDACT THE ORIGINAL EXHIBIT TO

15:45   21  REMOVE THE SECOND LOCATION FOR MR. WASHINGTON.

15:45   22         **THE COURT:**  RIGHT.

15:45   23         **MR. BRUNO:**  I'M JUST TELLING YOU NOW, IN CASE I

15:45   24  FORGET.

15:45   25         **THE COURT:**  RIGHT.  SO YOU WILL DO THAT IN THE

CHAD A. MORRIS - DIRECT

15:45   1   MORNING?  YOU WILL DO THAT?

15:45   2           **MR. BRUNO:**  YES.  WE NEED TO GIVE YOU A SUBSTITUTE

15:45   3   EXHIBIT.

15:45   4           **THE COURT:**  ALL RIGHT.

15:45   5           **MR. STEVENS:**  AND, YOUR HONOR, IN CONNECTION WITH

15:45   6   MR. MORRIS' TESTIMONY, I HAVE AN INDEX OF ALL THE JX'S AND PX'S

15:45   7   THAT WE REFERENCED IN OUR SLIDE PRESENTATION, AND IT'S

15:45   8   OBVIOUSLY BEEN BUTCHERED A BIT.

15:45   9           I WOULD LIKE TO HAVE A MOMENT TO CONFIRM WHICH

15:45  10   ONES WE ACTUALLY REFERENCED --

15:45  11           **THE COURT:**  YOU MAY.

15:45  12           **MR. STEVENS:**  -- AND WHICH ONES WERE, YOU KNOW,

15:45  13   OBJECTIONS WERE SUSTAINED AS TO.  AND WE'LL SUBMIT A LIST,

15:45  14   WE'LL COMPARE IT WITH COUNSEL FOR THE DEFENDANTS.  BUT I WANT

15:45  15   TO PUT A PLACEHOLDER HERE, AND THEN WE'LL MAKE A PROFFER ON ALL

15:45  16   OF THOSE THAT WERE NOT --

15:45  17           **THE COURT:**  ABSOLUTELY.  THAT WILL BE BUSINESS WE'LL

15:45  18   TAKE CARE OF MAYBE IN THE MORNING RIGHT BEFORE WE START.  DOES

15:45  19   THAT MAKE SENSE?  YOU'LL HAVE HAD TIME TO GO OVER IT AT THAT

15:45  20   TIME?

15:45  21           **MR. STEVENS:**  I THINK WE CAN GET IT DONE BY MORNING;

15:45  22   IF NOT, WE'LL DO IT AS SOON AS POSSIBLE.

15:46  23           **THE COURT:**  OKAY.

15:46  24           **MR. STEVENS:**  THANK YOU VERY MUCH, YOUR HONOR.

15:46  25           I TENDER THE WITNESS.

CHAD A. MORRIS - DIRECT

15:46    1              **MR. BRUNO:**  ONE MOMENT.  NOT PX 4670, IT'S PX 4671.

15:46    2              **MR. STEVENS:**  DID I MISSPEAK?

15:46    3              **MR. BRUNO:**  YES.

15:46    4              **MR. STEVENS:**  THAT'S NOT UNUSUAL.

15:46    5              **THE COURT:**  BEFORE WE COMMENCE, JUST A GENERAL

15:46    6    STATEMENT:  I HAVE ALWAYS BEEN ONE WHO REALLY, TO TRY TO GET TO

15:46    7    THE DEEP TRUTH OF THE MATTER IS THAT THE -- IS THE ESSENTIAL

15:46    8    THING THAT THE JUSTICE SYSTEM SHOULD TRY TO DO, BUT WE HAVE TO

15:46    9    DO IT IN THE BOUNDS OF THE RULES THAT WE GO BY.

15:46   10              AND I'M GOING TO TRY AS BEST AS POSSIBLE TO BE

15:46   11    FAIR TO EVERYONE.  BUT AT THE SAME TIME, WE'VE GOT TO -- WE'VE

15:46   12    GOT TO OBSERVE THE BASIC PROTOCOLS IN REGARDS TO EXPERT

15:46   13    REPORTS.  IN A CASE LIKE THIS, IT'S ALWAYS A PROBLEM.  AND I'M

15:46   14    GENERALLY GOING TO ENFORCE IT PRETTY STRICTLY.  THAT'S JUST THE

15:46   15    WAY IT HAS TO BE OR WE'LL GO FAR AFIELD.

15:46   16              OKAY.  WITH THAT, THE NEXT -- OH, YES, MA'AM?

15:47   17              **MS. WAGER-ZITO:**  I'M JUST --

15:47   18              **THE COURT:**  CROSS-EXAMINATION, THAT'S RIGHT.

15:47   19              **MS. WAGER-ZITO:**  ALTHOUGH, MAYBE I SHOULD TAKE THE

15:47   20    HINT, YOUR HONOR.

15:47   21              **THE COURT:**  OH, NO, NO.  ABSOLUTELY.  YOU GO RIGHT

15:47   22    AHEAD.  FORGIVE ME.

15:47   23              **MS. WAGER-ZITO:**  I THINK I CAN BE PRETTY BRIEF ABOUT

15:47   24    THIS ONE.

15:47   25              YOUR HONOR, THE PLAINTIFFS HAVE GRACIOUSLY

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 15:47 | 1 | AGREED TO ALLOW US TO USE SOME OF THEIR MATERIALS FOR THE |
| 15:47 | 2 | BEGINNING, BECAUSE I WANT TO GO BACK TO -- |
| 15:47 | 3 | **THE COURT:** ALL RIGHT. |
| 15:47 | 4 | **MS. WAGER-ZITO:** -- SOME OF THE SLIDES THAT |
| 15:47 | 5 | MR. MORRIS LOOKED AT. |
| 15:47 | 6 | **CROSS-EXAMINATION** |
| 15:47 | 7 | BY MS. WAGER-ZITO: |
| 15:47 | 8 | Q. GOOD AFTERNOON, MR. MORRIS. |
| 15:47 | 9 | A. GOOD AFTERNOON. |
| 15:47 | 10 | **MS. WAGER-ZITO:** CAN YOU PUT UP MORRIS 10, SLIDE 10? |
| 15:47 | 11 | BY MS. WAGER-ZITO: |
| 15:48 | 12 | Q. MR. MORRIS, YOU REFERRED TO THIS AREA AS THE AREA EAST OF |
| 15:48 | 13 | AREA 8; IS THAT CORRECT? |
| 15:48 | 14 | A. THAT'S WHAT THE CAPTION SAYS, YES. |
| 15:48 | 15 | Q. AND YOU COMMENTED ON THE FACT -- THE SAND BACKFILL IN THIS |
| 15:48 | 16 | PICTURE HERE. BUT YOU DON'T KNOW EXACTLY HOW THIS EXCAVATION |
| 15:48 | 17 | WAS ULTIMATELY DONE. YOU DIDN'T SEE IT WHEN THE BACKFILL WAS |
| 15:48 | 18 | COMPLETED; CORRECT? |
| 15:48 | 19 | A. THAT'S CORRECT. I CAN COMMENT ON WHAT'S IN THE |
| 15:48 | 20 | PHOTOGRAPH. |
| 15:48 | 21 | Q. AND YOU CAN'T COMMENT ON HOW IT WAS COMPACTED; CORRECT? |
| 15:48 | 22 | A. NO. BUT AS WE SAW IN THE AERIAL PHOTOGRAPHS, I CAN |
| 15:48 | 23 | COMMENT ON WHAT WASN'T THERE AFTER THE STORM. |
| 15:48 | 24 | Q. THE PHOTOGRAPHS ONLY SHOW A POINT IN TIME; CORRECT? |
| 15:48 | 25 | A. THAT'S CORRECT. |

CHAD A. MORRIS - CROSS

15:48    1    Q.   AND YOU DON'T KNOW HOW DEEP THIS EXCAVATION WAS; CORRECT?

15:48    2    A.   ACTUALLY, NOW I DO HAVE AN IDEA OF HOW DEEP.  I DID NOT AT

15:48    3    THE TIME OF MY REPORT.  IF YOU WANT TO OPEN THAT DOOR, I WILL

15:48    4    WALK THROUGH IT, IF I'M ALLOWED.  BUT I DON'T THINK YOU WANT TO

15:48    5    DO THAT.

15:49    6    Q.   I'M NOT -- AT THE TIME THAT YOU WERE --

15:49    7          THE COURT:  WHAT A GRACIOUS WITNESS.

15:49    8          MS. WAGER-ZITO:  AND I APPRECIATE THAT, BUT I THINK I

15:49    9    WILL DECLINE.

15:49   10    BY MS. WAGER-ZITO:

15:49   11    Q.   AT THE TIME THAT YOU RENDERED YOUR OPINION AND AT THE TIME

15:49   12    YOU WERE DEPOSED, YOU DIDN'T KNOW HOW DEEP THIS EXCAVATION WAS;

15:49   13    CORRECT?

15:49   14    A.   THAT'S CORRECT.

15:49   15    Q.   AND YOU CAN ALSO -- WE CAN ALL SEE IN THAT PICTURE THAT

15:49   16    THERE'S SOME CLAY IN THAT PICTURE AS WELL; CORRECT?

15:49   17    A.   I CAN -- AS YOU NOTED, I'M NOT AN EXPERT ON MATERIALS.  I

15:49   18    CAN SEE THAT THERE'S SOME CLAY IN THE FOREGROUND.  IT LOOKS TO

15:49   19    ME LIKE THE MATERIAL THAT THEY'RE FILLING WITH, AND THE CAPTION

15:49   20    SAYS THAT THEY'RE FILLING IT WITH SAND.

15:49   21          MS. WAGER-ZITO:  CAN YOU GO TO SLIDE 11, PLEASE?

15:49   22    BY MS. WAGER-ZITO:

15:49   23    Q.   WE SAW THIS ONE SEVERAL TIMES, BUT I WANT TO TALK ABOUT

15:49   24    THE BANK AREA THAT YOU WERE DISCUSSING ON YOUR DIRECT.

15:49   25          DO YOU KNOW THE TIDAL CONDITIONS ON THE DATE THAT

CHAD A. MORRIS - CROSS

15:49    1    THIS PHOTO WAS TAKEN?

15:50    2    **A.**   NO, I DO NOT.

15:50    3    **Q.**   AND DO YOU KNOW -- AND ARE YOU AWARE THAT THERE'S -- EVEN

15:50    4    AFTER THE EXCAVATIONS AND AFTER THE DATE OF THIS PHOTO, THERE'S

15:50    5    STILL A BANK AT THIS LOCATION IF YOU LOOK AT A PHOTO AT LOW

15:50    6    TIDE?

15:50    7    **A.**   I CAN SEE THAT THE AREA IN QUESTION IS UNDER WATER AT THE

15:50    8    DAY OF THIS PHOTOGRAPH.  AND WE LOOKED AT THE PREVIOUS AERIAL

15:50    9    PHOTOGRAPHS THAT SHOW THAT THIS AREA WAS NOWHERE NEAR THE

15:50    10    WATER, MUCH HIGHER.  I CAN -- I CAN SEE THAT.

15:50    11         WHETHER OR NOT THERE WAS A -- YOU KNOW, THE DETAILS

15:50    12    OF THE BANK, I CERTAINLY DID NOT SEE THAT WITH MY OWN EYES

15:50    13    PRIOR TO KATRINA.

15:50    14    **Q.**   AND, AGAIN, THIS PHOTO IS JUST A STILL PHOTO IN TIME AND

15:50    15    DOESN'T SPEAK TO WHAT THIS LOOKED LIKE AT THE END OF THE

15:50    16    PROJECT; CORRECT?

15:50    17    **A.**   THAT'S CORRECT.

15:50    18    **Q.**   AND ARE YOU AWARE THAT THIS ELEVATION THAT'S SHOWN HERE

15:50    19    WAS THE LOWEST ELEVATION ON THE EAST BANK INDUSTRIAL AREA?

15:51    20         **THE COURT:**  JUST SO I'M CORRECT, WHAT ELEVATION ARE

15:51    21    WE SPEAKING OF?

15:51    22         **MS. WAGER-ZITO:**  I'M SORRY, YOUR HONOR.  THE ONE WE

15:51    23    DISCUSSED EXTENSIVELY ON DIRECT, WHERE THE BANK CHANGED IN

15:51    24    THE -- IN THE UPPER PART OF THE PHOTO.

15:51    25         **THE COURT:**  DO YOU HAVE A POINTER OR A LASER?

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 15:51 | 1 | **MS. WAGER-ZITO:**  WHY DON'T YOU POINT FOR ME, BILL? |
| 15:51 | 2 | **THE WITNESS:**  HERE'S A LASER POINTER IF YOU NEED ONE. |
| 15:51 | 3 | **MS. WAGER-ZITO:**  OH, OKAY. |
| 15:51 | 4 | **THE COURT:**  IT MIGHT JUST HELP ME A LITTLE BIT. |
| 15:51 | 5 | THANK YOU. |
| 15:51 | 6 | OKAY.  AND THE QUESTION WAS, AGAIN? |
| 15:51 | 7 | BY MS. WAGER-ZITO: |
| 15:51 | 8 | **Q.**  THAT THIS PART OF THE SITE WAS THE LOWEST ELEVATION ON THE |
| 15:51 | 9 | EBIA. |
| 15:51 | 10 | **A.**  IS THAT A QUESTION OR A STATEMENT? |
| 15:51 | 11 | **Q.**  ARE YOU AWARE OF THAT? |
| 15:51 | 12 | **A.**  BEFORE OR AFTER THE EXCAVATIONS? |
| 15:51 | 13 | **Q.**  BEFORE THE EXCAVATIONS.  AT THE TIME THE WORK WAS BEING |
| 15:51 | 14 | PERFORMED. |
| 15:51 | 15 | **A.**  WELL, IF WE LOOK BACK AT THE PREVIOUS SLIDES, I CAN SHOW |
| 15:51 | 16 | YOU THAT IT APPEARS TO BE ALL VERY MUCH WITHIN WHAT IS DRY |
| 15:52 | 17 | LAND, AND WELL ON THAT LAND BEING -- THE ELEVATIONS OF THE |
| 15:52 | 18 | GROUND AT THAT PARTICULAR LOCATION PRIOR TO THE STORM, I DON'T |
| 15:52 | 19 | KNOW IT OFF THE TOP OF MY HEAD. |
| 15:52 | 20 | I KNOW THAT THERE IS DATA THAT WILL ALLOW SOMEONE TO |
| 15:52 | 21 | LOOK AT THAT. |
| 15:52 | 22 | **Q.**  BUT YOU DON'T KNOW THAT? |
| 11:37 | 23 | **A.**  (NO VERBAL RESPONSE.) |
| 15:52 | 24 | **Q.**  AND YOU DON'T KNOW THE DEPTH OF THE EXCAVATION THAT WAS |
| 15:52 | 25 | CONDUCTED THERE? |

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 15:52 | 1 | **A.**   IT WAS 14 FEET, ACCORDING TO THE NFAATT REPORTS, IF YOU |
| 15:52 | 2 | WANT TO OPEN THAT DOOR AGAIN. |
| 15:52 | 3 | **Q.**   BUT YOU DIDN'T KNOW THAT AT THE TIME YOU DID YOUR REPORT? |
| 15:52 | 4 | **A.**   NO, I DID NOT. |
| 15:52 | 5 | **Q.**   AND YOU CAN'T TELL FROM THIS AERIAL PHOTO THE DEPTH OF |
| 15:52 | 6 | THIS EXCAVATION? |
| 15:52 | 7 | **A.**   NO, NOT FROM THE AERIAL PHOTOGRAPH. |
| 15:52 | 8 | **Q.**   YOU CAN'T TELL FROM ANY AERIAL PHOTO THE DEPTH OF |
| 15:52 | 9 | EXCAVATIONS; CORRECT? |
| 15:52 | 10 | **A.**   NO, YOU CANNOT. |
| 15:52 | 11 | **Q.**   IF WE COULD -- |
| 15:52 | 12 | **THE COURT:**  LOOKING AT THE DIFFERENT IMAGES, THAT'S |
| 15:53 | 13 | ALL -- THAT THAT IMAGE, AS OPPOSED TO THAT IMAGE, YOU CAN SEE |
| 15:53 | 14 | WHAT NUANCES -- |
| 15:53 | 15 | **THE WITNESS:**  A FISHERMAN WOULD BE INTERESTED IN |
| 15:53 | 16 | THAT. |
| 15:53 | 17 | **THE COURT:**  YOU THINK? |
| 15:53 | 18 | **MS. WAGER-ZITO:**  JUST PUT UP 52. |
| 15:53 | 19 | BY MS. WAGER-ZITO: |
| 15:53 | 20 | **Q.**   AND YOU TALKED A LITTLE BIT ABOUT THIS EXCAVATION ON |
| 15:53 | 21 | DIRECT AS WELL, MR. MORRIS.  AND YOU COULDN'T LOCATE THIS |
| 15:53 | 22 | EXCAVATION ON THE MAP AT THE TIME OF YOUR REPORT -- OR WHEN YOU |
| 15:53 | 23 | GAVE YOUR DEPOSITION; CORRECT? |
| 15:53 | 24 | **A.**   THAT'S CORRECT. |
| 15:53 | 25 | **Q.**   SO YOU'RE NOT AWARE, ARE YOU, THAT THIS EXCAVATION WAS |

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 15:53 | 1 | 600 FEET FROM THE SOUTH END OF THE NORTH BREACH? |
| 15:53 | 2 | **A.**   I AM AWARE OF IT NOW.  THIS IS AREA 2.  IT REFERS TO ONE |
| 15:53 | 3 | OF THE SOIL REMEDIATION AREAS, NOT ONE OF THE BUILDING NUMBERS. |
| 15:54 | 4 | IT'S PART OF THE NUMBER ISSUE. |
| 15:54 | 5 | **MS. WAGER-ZITO:**  I THINK I'M DONE.  WE CAN SWITCH |
| 15:54 | 6 | OVER TO OURS. |
| 15:54 | 7 | AND THANK YOU.  ON THE RECORD, THANK YOU. |
| 15:54 | 8 | **MR. STEVENS:**  YOU'RE WELCOME. |
| 15:54 | 9 | BY MS. WAGER-ZITO: |
| 15:54 | 10 | **Q.**   MR. MORRIS, YOU CAN'T TELL FROM SURVEY DATA THE EXACT |
| 15:54 | 11 | DEPTH AND LOCATION OF ANY OF THE INDIVIDUAL HOLES THAT WERE |
| 15:54 | 12 | EXCAVATED BY WASHINGTON GROUP?  YOU COULDN'T TELL AT THE TIME |
| 15:54 | 13 | OF YOUR REPORT OR YOUR DEPOSITION; CORRECT? |
| 15:54 | 14 | **A.**   THAT'S BECAUSE THERE WAS NO SURVEY DATA ON THE DEPTH OF |
| 15:54 | 15 | THE HOLES.  THEY SIMPLY DID NOT DOCUMENT IT IN THAT MANNER. |
| 15:54 | 16 | IN ORDER TO DETERMINE THOSE LOCATIONS, ONE HAS TO GO |
| 15:54 | 17 | THROUGH ALL THE QARS, ASSOCIATE IT WITH THE PHOTOGRAPHS, |
| 15:54 | 18 | ASSOCIATE IT WITH THE SKETCHES IN ORDER TO PUT THAT ALL -- THAT |
| 15:54 | 19 | BACK TOGETHER. |
| 15:54 | 20 | AND IN ORDER TO DO THAT, YOU HAVE TO HAVE THE QARS IN |
| 15:54 | 21 | A FORM THAT'S USEFUL.  I DIDN'T HAVE THAT IN A USEFUL FORM AT |
| 15:55 | 22 | THE TIME OF MY REPORT. |
| 15:55 | 23 | **Q.**   SO YOU -- YOU CANNOT TELL THE LOCATIONS OR THE DEPTHS? |
| 15:55 | 24 | **A.**   I COULD NOT, AT THE TIME OF MY REPORT. |
| 15:55 | 25 | **Q.**   NOR COULD YOU TELL WHERE THE UNDERGROUND PILES WERE |

CHAD A. MORRIS - CROSS

15:55   1   LOCATED EXACTLY AT THE TIME OF YOUR REPORT?

15:55   2   **A.**   I COULD NOT AT THE TIME OF MY REPORT, NO.

15:55   3   **Q.**   NOR COULD YOU TELL THE DEPTH OF THE PILES AT THE TIME OF

15:55   4   YOUR REPORT; CORRECT?

15:55   5   **A.**   IT'S IMPOSSIBLE WITHOUT GOING THROUGH THE QARS.

15:55   6   **Q.**   AND YOUR REPORT, IN FACT, WAS INTENDED TO PROVIDE A

15:55   7   GENERAL SENSE OF THE AMOUNT OF WORK THAT HAPPENED AT THE SITE;

15:55   8   CORRECT?

15:55   9   **A.**   IT WAS INTENDED TO SHOW AN EXAMPLE -- PHOTOGRAPHS THAT

15:55   10  SHOW EXAMPLES OF THE TYPES OF WORK THAT HAPPENED IN THE

15:55   11  VICINITY AND DEAL WITH THE PLAINTIFFS' ELEVATIONS, ET CETERA.

15:55   12  **Q.**   AT THE TIME OF YOUR REPORT AND AT THE TIME OF YOUR

15:55   13  DEPOSITION, YOU WERE NOT FAMILIAR WITH THE DEPTHS OF THE WORK

15:55   14  DONE AT EACH OF THE LOCATIONS BY WASHINGTON GROUP; CORRECT?

15:55   15  **A.**   AS DISCUSSED BEFORE, IN ORDER TO DO THAT, ONE HAS TO HAVE

15:55   16  ALL THE QARS, BECAUSE THE QARS HAVE THAT INFORMATION.

15:56   17          AND IT WAS NOT -- CERTAINLY, THEY DIDN'T DOCUMENT

15:56   18  THIS IN A MANNER THAT I'M USED TO IN INDUSTRIAL SITES WHERE

15:56   19  CONSTRUCTION ACTIVITIES TAKE PLACE AND YOU HAVE SURVEYORS GO

15:56   20  OUT AND MEASURE THESE THINGS AND THEY'RE ON MAPS.  IT WASN'T

15:56   21  DONE IN THAT MANNER.

15:56   22          YOU HAVE TO PUT IT TOGETHER THROUGH SKETCHES AND BITS

15:56   23  AND PIECES OF INFORMATION THAT ARE IN THE DAILY REPORTS, WHICH

15:56   24  THE QARS REPRESENT.

15:56   25  **Q.**   AND NOBODY GAVE YOU -- YOU NEVER LOOKED AT THE QARS?

CHAD A. MORRIS - CROSS

15:56    1   **A.**   I LOOKED.  THEY -- AT THE TIME THAT I HAD THEM, THEY

15:56    2   CONSISTED OF -- THE ONES I LOOKED AT, LITERALLY, THERE WOULD BE

15:56    3   ONE OR TWO PAGES OF A QAR AND THEN THERE'S AN E-MAIL.  AND THEN

15:56    4   600 DOCUMENTS LATER, THERE'S A COUPLE MORE PAGES OF THAT QAR,

15:56    5   AND NOTHING THAT TIES THEM TOGETHER IN A WAY THAT THEY CAN BE

15:56    6   EVALUATED IN AN ORGANIZED FASHION.

15:56    7   **Q.**   WHEN WE LOOKED AT YOUR REPORT EARLIER, WE LOOKED AT FIGURE

15:56    8   3.1 ON YOUR REPORT.

15:56    9   **A.**   I'D HAVE TO SEE IT.

15:56   10   **Q.**   DO YOU RECALL THAT?

15:56   11          CAN YOU PUT THAT ONE UP, FIGURE 3.1?  IT'S

15:57   12   JX 1576-0006.

15:57   13          AND YOU STATED THAT THIS IS A -- PURPORTS TO BE A

15:57   14   GRAPHIC DISPLAY OF THE WORK PERFORMED BY WASHINGTON GROUP AT

15:57   15   THE NORTH END OF THE EBIA.

15:57   16          MR. MORRIS, YOU CAN'T EVEN SAY WITH CERTAINTY, OR YOU

15:57   17   COULDN'T AT THE TIME YOU DID YOUR REPORT, THAT THE AREAS

15:57   18   DEPICTED IN RED WERE ACTUALLY EXCAVATED; CORRECT?

15:57   19   **A.**   THIS FIGURE WAS ACTUALLY NOT IN MY REPORT.  THIS WAS DONE

15:57   20   AT THE REQUEST OF HIS HONOR, ASKING BOTH SIDES TO SHOW WHERE

15:57   21   THE CHANNEL WAS WITH RESPECT TO WORK ACTIVITIES, AND I PUT IT

15:57   22   ON A MAP THAT I HAD PREVIOUSLY PREPARED SHOWING ITS LOCATION.

15:57   23          AT THE TIME I HAD NOT BEEN THROUGH ALL THE QARS AND

15:58   24   COULDN'T TELL YOU THAT THOSE RED BOXES WERE ONLY BUILDING

15:58   25   LOCATIONS AND NOT NECESSARILY WHERE INDIVIDUAL EXCAVATIONS

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 15:58 | 1 | HAPPENED.  THAT IS CORRECT. |
| 15:58 | 2 | **Q.**   THIS IS FIGURE 3.1 FROM YOUR REPORT. |
| 15:58 | 3 | **A.**   I STAND CORRECTED. |
| 15:58 | 4 | **Q.**   AND, AGAIN, THE QUESTION WAS SIMPLY:  DO YOU KNOW WHETHER |
| 15:58 | 5 | OR NOT EXCAVATIONS ACTUALLY HAPPENED IN THOSE RED POLYGONS? |
| 15:58 | 6 |         YOU DON'T KNOW -- |
| 15:58 | 7 | **A.**   I DO KNOW THAT. |
| 15:58 | 8 | **Q.**   YOU DID NOT KNOW THAT AT THE TIME YOU DID YOUR REPORT? |
| 15:58 | 9 | **A.**   I DID NOT THEN. |
| 15:58 | 10 | **Q.**   AND YOU DID NOT -- |
| 15:58 | 11 | **A.**   EXCEPT WHAT IS BLATANTLY OBVIOUS IN THE PHOTOGRAPH, WHERE |
| 15:58 | 12 | THE BANK CHANGED. |
| 15:58 | 13 | **Q.**   AND YOU DID NOT KNOW AT THE TIME OF YOUR REPORT WHAT WAS |
| 15:58 | 14 | EXCAVATED AT ANY OF THOSE LOCATIONS? |
| 15:58 | 15 | **A.**   IT'S IMPOSSIBLE UNTIL YOU GO THROUGH ALL THE QARS. |
| 15:58 | 16 | **Q.**   AND FROM THIS AERIAL PHOTO, YOU CAN'T TELL THE DEPTH OF |
| 15:58 | 17 | ANY OF THOSE EXCAVATIONS? |
| 15:58 | 18 | **A.**   IT IS NOT POSSIBLE FROM THESE AERIAL PHOTOGRAPHS, NO. |
| 15:58 | 19 | **Q.**   AND IF WE LOOKED AT THE SAME FIGURE, FIGURE 4.1, WHICH |
| 15:59 | 20 | SHOWS THE SAUCER SITE AND THE POLYGONS ON THAT FIGURE, YOUR |
| 15:59 | 21 | ANSWERS WOULD BE THE SAME? |
| 15:59 | 22 |         YOU DO NOT -- YOU DID NOT KNOW AT THE TIME YOU DID |
| 15:59 | 23 | YOUR REPORT OR GAVE YOUR DEPOSITION THAT, IN FACT, THE -- THERE |
| 15:59 | 24 | WERE ANY EXCAVATIONS CONDUCTED AT THOSE POLYGONS? |
| 15:59 | 25 | **A.**   ALL OF THE SAME CONDITIONS APPLY AT SAUCER.  THE QARS THAT |

CHAD A. MORRIS - CROSS

15:59    1   I LOOKED AT DID NOT ALLOW ME TO DO THAT.

15:59    2   **Q.**  AND YOUR OPINION THAT WASHINGTON GROUP DID NOT PROPERLY

15:59    3   COMPACT THE EXCAVATIONS AT THE EBIA IS BASED UPON THE FACT THAT

15:59    4   YOU'VE ONLY SEEN ONE PHOTOGRAPH OF THE PROJECT DEPICTING

15:59    5   COMPACTION; ISN'T THAT TRUE?

15:59    6   **A.**  MY OPINION THAT THE EXCAVATIONS WERE NOT PROPERLY

15:59    7   COMPACTED ARE BASED ON THE 20 YEARS THAT I'VE SEEN WHAT

15:59    8   COMPACTION ACTIVITIES LOOK LIKE IN AREAS WHERE THINGS ARE

15:59    9   DEFINED OR APPRECIATED TO BE CRITICAL.

15:59   10        IN THE NORTH LANDFILL, PEOPLE KNOW THAT THEY DON'T

16:00   11   WANT THIS STUFF SEEPING DOWN INTO THE GROUNDWATER, AND THEY DO

16:00   12   IT IN A MANNER THAT IS VERY DIFFERENT THAN WAS DONE HERE.

16:00   13        IN INDUSTRIAL SITES, WHERE BUILDINGS ARE GOING TO BE

16:00   14   THERE OR THEY DON'T WANT CRANES COLLAPSING BECAUSE OF SOFT

16:00   15   SOILS, THEY DO IT IN A MANNER VERY DIFFERENT THAN WAS DONE

16:00   16   HERE.

16:00   17        APPARENTLY, AT THIS LOCATION, THEY DID NOT DEEM IT TO

16:00   18   BE CRITICAL.

16:00   19   **Q.**  AT THE TIME OF YOUR REPORT, THE ONLY THING YOU KNEW ABOUT

16:00   20   WHAT THEY DID AT THIS LOCATION WAS BASED UPON THE PHOTOGRAPHS;

16:00   21   IS THAT CORRECT?

16:00   22   **A.**  THAT IS CORRECT.

16:00   23   **Q.**  SO YOUR OPINION IN THIS CASE, AT THE TIME YOU GAVE YOUR

16:00   24   REPORT AND THE TIME YOU GAVE YOUR DEPOSITION ON THE QUALITY OF

16:00   25   THE COMPACTION DONE AT THIS SITE, WAS BASED UPON PHOTOGRAPHS?

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 16:00 | 1 | **A.** IT WAS BASED ON THE PHOTOGRAPHS SHOWING BULLDOZERS PUSHING |
| 16:00 | 2 | LARGE AMOUNTS OF SAND INTO LARGE HOLES. |
| 16:00 | 3 | **Q.** BUT YOU DON'T KNOW WHAT HAPPENED FIVE MINUTES AFTER THAT |
| 16:00 | 4 | PICTURE WAS TAKEN; CORRECT? |
| 16:00 | 5 | **A.** ALL I COULD DO IS LOOK WHAT'S IN THE PHOTOGRAPHS.  AND AT |
| 16:00 | 6 | THE TIME, I DID NOT HAVE THE QARS THAT DOCUMENT THAT AS WELL. |
| 16:01 | 7 | **Q.** NOTWITHSTANDING THE STATEMENT IN YOUR REPORT THAT THERE |
| 16:01 | 8 | WERE MULTIPLE EXCAVATIONS IN THE AREA OF THE NORTH BREACH THAT |
| 16:01 | 9 | WENT AS DEEP AS 25 FEET BELOW SEA LEVEL, AT THE TIME YOU WROTE |
| 16:01 | 10 | YOUR REPORT AND AT THE TIME WE DEPOSED YOU, YOU WERE ONLY AWARE |
| 16:01 | 11 | OF ONE SUCH EXCAVATION; CORRECT? |
| 16:01 | 12 | **A.** AT THE TIME OF MY REPORT, YES.  OTHER THAN THE PILES THAT |
| 16:01 | 13 | SHOWS THERE ARE HUNDREDS OF THOSE, SO THOSE COULD CERTAINLY BE |
| 16:01 | 14 | INTERPRETED AS DEEP EXCAVATIONS.  AND EVEN WITHOUT THE QARS, |
| 16:01 | 15 | ONE CAN TELL THAT THOSE WENT DEEP. |
| 16:01 | 16 | **Q.** BUT OTHER THAN THE PILES AND THE ONE EXCAVATION AT THE |
| 16:01 | 17 | NORTH BREACH; CORRECT? |
| 16:01 | 18 | **A.** THAT'S CORRECT. |
| 16:02 | 19 | **Q.** IN YOUR WORK ON THIS CASE, YOU FOCUSED ON THE EXCAVATIONS |
| 16:02 | 20 | AT BOLAND AND SAUCER; CORRECT? |
| 16:02 | 21 | **A.** THAT'S CORRECT.  IN THE AREA OF THE NORTH AND SOUTH |
| 16:02 | 22 | BREACHES. |
| 16:02 | 23 | **Q.** YOU DIDN'T LOOK AT HOW THE EXCAVATIONS AT BOLAND AND |
| 16:02 | 24 | SAUCER COMPARE TO THE EXCAVATIONS THAT WASHINGTON GROUP DID ON |
| 16:02 | 25 | ANY OTHER SITES; CORRECT? |

CHAD A. MORRIS - CROSS

16:02     1         YOU DON'T KNOW IF THEY DID COMPARABLE EXCAVATIONS AT

16:02     2  THE OTHER SITES AT THE TIME YOU DID YOUR REPORT, DID YOU?

16:02     3  **A.**  I CAN SEE THE PHOTOGRAPHS.  I COULD SEE PHOTOGRAPHS.  I

16:02     4  DID SEE BOXES OF -- IN THE BOXES OF PHOTOGRAPHS THAT I

16:02     5  REVIEWED, THERE WERE PHOTOGRAPHS AT OTHER SITES AS WELL.

16:02     6         I WAS FOCUSING ON WHERE THE BREACHES HAPPENED,

16:02     7  HELPING -- I WAS RESPONDING TO A REQUEST FROM DR. BEA TO HELP

16:02     8  ANALYZE THE ACTIVITIES THAT HAPPENED IN THE VICINITY OF THE

16:02     9  BREACHES SO THAT HE COULD ASSESS WHETHER OR NOT THESE COULD

16:02   10  HAVE HAD IMPACTS ON WHY THE WALLS FAILED AT THOSE LOCATIONS.

16:02   11  **Q.**  IN CONNECTION WITH THE WORK YOU'VE DONE AND THE DOCUMENTS

16:02   12  AND PHOTOGRAPHS YOU REVIEWED, YOU HAVEN'T SEEN ANY EXCAVATION

16:03   13  GREATER THAN FIVE FEET BELOW GROUND WITHIN 25 FEET OF EITHER OF

16:03   14  THE NORTH OR THE SOUTH BREACH, IS THAT CORRECT?

16:03   15  **A.**  NO, I HAVE NOT, AT THE TIME OF MY DEPOSITION.

16:03   16        **MS. WAGER-ZITO:**  I'M GOING TO -- I THINK MR. KELLS

16:03   17  HAS A COUPLE QUESTIONS.

16:03   18        **THE COURT:**  SURE.  DO YOU WANT TO CONSULT WITH

16:03   19  COUNSEL?

16:03   20        **MR. KELLS:**  I JUST HAVE ONE OR TWO QUESTIONS,

16:03   21  YOUR HONOR.

16:03   22        **THE COURT:**  OH, OKAY.  SURE.

16:03   23               **CROSS-EXAMINATION**

16:03   24  BY MR. KELLS:

16:03   25  **Q.**  GOOD AFTERNOON, MR. MORRIS.

CHAD A. MORRIS - CROSS

| | | |
|---|---|---|
| 16:03 | 1 | **A.**   GOOD AFTERNOON. |
| 16:03 | 2 | **Q.**   JUST FOR THE RECORD, YOU'RE NOT A GEOTECHNICAL ENGINEER; |
| 16:03 | 3 | CORRECT? |
| 16:03 | 4 | **A.**   THAT'S CORRECT. |
| 16:03 | 5 | **Q.**   AND YOU ARE NOT LICENSED OR -- LICENSED AS AN ENGINEER IN |
| 16:03 | 6 | THE STATE OF LOUISIANA? |
| 16:03 | 7 | **A.**   NO.  I'M A LAND SURVEYOR. |
| 16:03 | 8 | **Q.**   YOUR EXPERTISE IS IN SURVEYING AND MAPPING SPATIAL |
| 16:04 | 9 | FEATURES.  AND IT SOUNDED LIKE YOU WERE PRETTY WELL QUALIFIED |
| 16:04 | 10 | FOR THAT PURPOSE. |
| 16:04 | 11 | **A.**   THANK YOU. |
| 16:04 | 12 | **Q.**   YOU TESTIFIED EARLIER ABOUT THE BANK CHANGING AT THE |
| 16:04 | 13 | BOLAND MARINE SITE AND THE WATER BEING A LITTLE BIT CLOSER TO |
| 16:04 | 14 | THE FLOODWALL THAN IT PREVIOUSLY HAD BEEN; IS THAT CORRECT? |
| 16:04 | 15 | **A.**   I WOULDN'T CHARACTERIZE IT AS A LITTLE BIT.  BUT, YES, I |
| 16:04 | 16 | RECALL THAT TESTIMONY. |
| 16:04 | 17 | **Q.**   I THINK YOU SAID IT WAS MAYBE 180 FEET FROM THE FLOODWALL. |
| 16:04 | 18 | **A.**   IN THE PHOTOGRAPH THE WATER'S EDGE HAD MOVED APPROXIMATELY |
| 16:04 | 19 | 180 FEET.  WELL, IT MOVED APPROXIMATELY 100-AND -- I'D HAVE TO |
| 16:04 | 20 | LOOK WHICH ONE WAS 180 AND WHICH ONE WAS 170. |
| 16:04 | 21 | **Q.**   AND THAT PHOTOGRAPH, IF I RECALL, WAS A PHOTOGRAPH FROM |
| 16:04 | 22 | APRIL OF 2005? |
| 16:04 | 23 | **A.**   THAT'S CORRECT. |
| 16:04 | 24 | **Q.**   IF I COULD BRING UP ON THE SCREEN DX 02707. |
| 16:04 | 25 | MR. MORRIS, THIS IS AN AERIAL PHOTOGRAPH TAKEN IN |

CHAD A. MORRIS - CROSS

16:05    1   APRIL OF 2005.  I DON'T KNOW OFFHAND IF IT'S EXACTLY THE SAME

16:05    2   PHOTOGRAPH THAT YOU USED TO SHOW THAT THE WATER HAD CREPT A

16:05    3   LITTLE CLOSER AT BOLAND MARINE OR NOT.

16:05    4            DOES IT APPEAR TO YOU THAT THIS IS AN AERIAL

16:05    5   PHOTOGRAPH OF THE EBIA TAKEN IN APRIL OF 2005?

16:05    6   **A.**   IT SAYS SOMETHING -- AUGUST 12TH?  I CAN'T READ THE DATE.

16:05    7   **Q.**   YEAH.  THAT'S FROM DR. SILVA'S REPORT.  IF WE ENLARGE THE

16:05    8   BASE MAP THERE --

16:05    9   **A.**   IF IT'S FROM GULF COAST AERIAL MAPPING, IT'S PROBABLY THE

16:05   10   SAME PHOTOGRAPH BECAUSE THEY -- I -- I OBTAINED THESE

16:05   11   PHOTOGRAPHS ORIGINALLY FROM GULF COAST AERIAL MAPPING AND

16:05   12   PROVIDED THEM TO BOTH SIDES.

16:05   13   **Q.**   OKAY.

16:05   14   **A.**   AND THERE WAS ONLY ONE IN 2005 PRIOR TO THE STORM.

16:05   15   **Q.**   OKAY.  SO YOU WOULD AGREE WITH ME THAT THIS IS A FAIR

16:05   16   REPRESENTATION OF WHAT THE EBIA LOOKED LIKE FROM ABOVE IN APRIL

16:05   17   OF 2005?

16:05   18   **A.**   YES, I BELIEVE IT IS.

16:05   19   **Q.**   OKAY.  AND SO AT THE BOLAND MARINE SITE, I BELIEVE YOU

16:05   20   TESTIFIED EARLIER THAT THE WATER'S EDGE WAS APPROXIMATELY

16:06   21   180 FEET FROM THE FLOODWALL?

16:06   22   **A.**   YES, I BELIEVE SO.

16:06   23   **Q.**   AND DOES SOMEONE HAVE THE POINTER?  CAN WE POINT OUT THE

16:06   24   FLOODWALL?

16:06   25            WOULD YOU AGREE WITH ME, WHERE THE POINTER IS

CHAD A. MORRIS - CROSS

16:06    1    EXTENDING, FROM NORTH DOWN TO THE SOUTH IS WHERE THAT FLOODWALL
16:06    2    WAS LOCATED ALONG THE EBIA?
16:06    3    **A.**   YES.  IT'S ALONG THE EDGE OF SUREKOTE ROAD.
16:06    4    **Q.**   OKAY.  DO YOU SEE THE PARCEL THERE THAT'S IDENTIFIED AS
16:06    5    MCDONOGH MARINE?
16:06    6    **A.**   YES.
16:06    7          **THE COURT:**  LET ME MAKE SURE -- OKAY.  I SEE IT.
16:06    8    YES.  ALL RIGHT.
16:06    9    **BY MR. KELLS:**
16:06   10    **Q.**   WOULD YOU AGREE WITH ME THAT THE WATER IS MUCH CLOSER AT
16:06   11    MCDONOGH MARINE THAN IT IS AT BOLAND MARINE?
16:06   12    **A.**   YES.  AND --
16:06   13    **Q.**   YOU WOULD AGREE IT'S CLOSER AT MCDONOGH THAN IT IS AT
16:06   14    BOLAND?
16:06   15    **A.**   YES.  MAY I EXPAND UPON THAT?
16:06   16          **THE COURT:**  YES, YOU MAY.
16:06   17          **THE WITNESS:**  I HAPPEN TO KNOW THAT THAT'S THE
16:06   18    LOCATION THAT THEY SELECTED TO BE THE BORROW PIT, AND THEY DID
16:06   19    TESTING FOR THAT AND PLACED CLAY LINERS.
16:07   20           TO ME THIS SHOWS THAT IF DONE PROPERLY AND
16:07   21    CAREFULLY, WHERE YOU TAKE THE TIME AND EFFORT TO DO IT WELL,
16:07   22    YOU CAN DO IT WELL.
16:07   23          **MR. KELLS:**  YOUR HONOR, I WOULD OBJECT TO THAT AS
16:07   24    NONRESPONSIVE, AND AN OPINION BOTH OUTSIDE OF HIS EXPERTISE AND
16:07   25    NOT CONTAINED IN HIS REPORT.

CHAD A. MORRIS - CROSS

16:07    1            MOVE TO STRIKE THE RESPONSE.

16:07    2            **THE COURT:**  I'M GOING TO OVERRULE IT.

16:07    3                 GO AHEAD.

16:07    4    **BY MR. KELLS:**

16:07    5    **Q.**   NOW, MR. MORRIS, I BELIEVE YOU TESTIFIED EARLIER THAT YOU

16:07    6    WERE NOT PHYSICALLY PRESENT AT THE EBIA; IS THAT CORRECT?

16:07    7    **A.**   THAT IS CORRECT.

16:07    8    **Q.**   SO YOU NEVER OBSERVED ANY OF THE WORK DONE AS PART OF TASK

16:07    9    ORDER 26; IS THAT CORRECT?

16:07   10    **A.**   I DID NOT.

16:07   11    **Q.**   SO YOU DON'T HAVE ANY FIRSTHAND KNOWLEDGE WHETHER OR NOT

16:07   12    THEY DID, IN FACT, PLACE A CLAY LINER, AS YOU'VE DESCRIBED IT?

16:07   13    **A.**   I'VE SEEN PHOTOGRAPHS.

16:07   14            **THE COURT:**  THE COURT'S READ THE DEPOSITIONS, SO WE

16:07   15    KNOW IT'S NOT A DISPUTED FACT.

16:07   16                 GO AHEAD.

16:07   17    **BY MR. KELLS:**

16:07   18    **Q.**   AND YOU WOULD AGREE WITH ME THAT THE MCDONOUGH MARINE SITE

16:07   19    IS SOUTH OF THE BOLAND MARINE PARCEL?

16:07   20    **A.**   YES.

16:07   21    **Q.**   AND IT'S NORTH OF THE SAUCER MARINE PARCEL?

16:07   22    **A.**   YES.

16:08   23    **Q.**   AT THE INDIAN TOWING PARCEL IN THE MIDDLE THERE, WOULD YOU

16:08   24    AGREE WITH ME THAT THERE IS A BODY OF WATER IN THE CENTER OF

16:08   25    THAT PARCEL?

CHAD A. MORRIS - CROSS

16:08   1   **A.**   YES.

16:08   2   **Q.**   AND WOULD YOU AGREE WITH ME THAT THAT WATER IS CLOSER TO

16:08   3   THE FLOODWALL THAN ANY OF THE WATER AT THE BOLAND MARINE SITE?

16:08   4   **A.**   YES.

16:08   5   **Q.**   AND TO YOUR KNOWLEDGE, WAS THERE A FLOODWALL FAILURE AT

16:08   6   THE INDIAN TOWING SITE?

16:08   7   **A.**   THERE WAS NOT.

16:08   8   **Q.**   AND THERE WAS NO FLOODWALL FAILURE AT MCDONOUGH MARINE; IS

16:08   9   THAT CORRECT?

16:08   10   **A.**   THAT IS CORRECT.

16:08   11          **MR. KELLS:**  I HAVE NO FURTHER QUESTIONS, UNLESS --

16:08   12              THANK YOU VERY MUCH, MR. MORRIS.

16:08   13          **THE COURT:**  COUNSEL, THANK YOU.

16:08   14              ANY REDIRECT?

16:08   15          **MR. STEVENS:**  NO, YOUR HONOR.  THANK YOU VERY MUCH.

16:08   16          **THE COURT:**  MR. MORRIS, THANK YOU.

16:08   17          **THE WITNESS:**  THANK YOU.

16:08   18          **THE COURT:**  JUST KNOW THAT ANY -- ANY EXCLUSION OF

16:08   19   YOUR OPINIONS DOES NOT RELATE TO YOUR EXPERTISE AS AN EXCELLENT

16:09   20   LAND SURVEYOR AND TECHNICAL PERSON.  THE COURT HAS SEEN YOU

16:09   21   BEFORE.  ALL RIGHT.

16:09   22          **THE WITNESS:**  THANK YOU.

16:09   23          **MR. STEVENS:**  COULD WE HAVE ONE MINUTE IN PLACE,

16:09   24   YOUR HONOR, FOR A CREW CHANGE?

16:09   25          **MR. ANDRY:**  YOUR HONOR, AT THIS TIME THE PLAINTIFFS

CHAD A. MORRIS - CROSS

16:09    1    WOULD LIKE TO CALL MR. FRED HOLMES.

16:09    2              **THE COURT:**  OKAY.

16:09    3              **MR. ANDRY:**  AND, HOPEFULLY, BASED ON WHAT I'VE READ

16:09    4    AND KIND OF WHAT I'VE HEARD, IT WON'T BE AS NEAR AS ARDUOUS AS

16:09    5    MR. MORRIS' TESTIMONY.

16:09    6              **THE COURT:**  I WOULDN'T THINK SO.

16:09    7              **MR. ANDRY:**  AND, YOUR HONOR, CONSISTENT WITH THE

16:09    8    COURT'S INSTRUCTION AND FOR THE COURT'S CONVENIENCE, THIS IS

16:09    9    MR. FRED HOLMES, WHO IS A PLAINTIFF, WHO LIVED AT 1205 PERRIN,

16:09   10    AND HE'LL TESTIFY ABOUT THE FACTS AND CIRCUMSTANCES SURROUNDING

16:09   11    HIS HOUSE AND THE DAMAGE THAT HE SUSTAINED.

16:09   12              **THE COURT:**  THANK YOU.

16:10   13              (WHEREUPON, **FRED HOLMES, JR.,** HAVING BEEN DULY SWORN,

16:10   14    TESTIFIED AS FOLLOWS.)

16:10   15              **THE DEPUTY CLERK:**  PLEASE STATE YOUR FULL NAME AND

16:10   16    CORRECT SPELLING FOR THE RECORD.

16:10   17              **THE WITNESS:**  FRED HOLMES, JR., F-R-E-D, H-O-L-M-E-S.

16:10   18              **MR. ANDRY:**  AND, YOUR HONOR, IN CONJUNCTION WITH

16:10   19    MR. HOLMES' TESTIMONY, AS YOU REQUESTED THIS MORNING, WE'VE

16:10   20    PROVI- -- WE HAVE A GROUP OF EXHIBITS THAT WE'VE PROVIDED THE

16:10   21    DEFENDANTS AND TO YOUR HONOR.  AND WE WILL OFFER THOSE,

16:10   22    DEPENDING IF THERE'S NO OBJECTION, WHICH I DON'T THINK THERE

16:10   23    IS.  BUT WE WILL OFFER THOSE AS MR. FRED HOLMES -- OR

16:10   24    MR. HOLMES IN GLOBO 1.

16:10   25              **THE COURT:**  ANY OBJECTION FROM ANY OF THE DEFENDANTS?

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:10 | 1 | **MR. THATCH:** NO OBJECTION, YOUR HONOR. |
| 16:10 | 2 | **MR. SMITH:** NO OBJECTION FROM THE UNITED STATES. |
| 16:10 | 3 | **THE COURT:** THANK YOU. LET IT BE ADMITTED. |
| 16:10 | 4 | **DIRECT EXAMINATION** |
| 16:10 | 5 | BY MR. ANDRY: |
| 16:10 | 6 | **Q.** MR. HOLMES, COULD YOU STATE YOUR NAME AND ADDRESS FOR THE |
| 16:11 | 7 | RECORD? |
| 16:11 | 8 | **A.** YES, SIR. FRED HOLMES, CURRENTLY RESIDING AT 30231 |
| 16:11 | 9 | GLENBORO DRIVE, IN SPRING, TEXAS. |
| 16:11 | 10 | **Q.** MR. HOLMES, WHERE DID YOU GROW UP? |
| 16:11 | 11 | **A.** I GREW UP IN ST. BERNARD PARISH. |
| 16:11 | 12 | **Q.** DID YOU LIVE IN CHALMETTE OR ARABI? |
| 16:11 | 13 | **A.** AS A CHILD, I LIVED IN CHALMETTE. AND THEN EVENTUALLY, |
| 16:11 | 14 | WHEN I -- LATER, AFTER I GOT MARRIED, WE MOVED INTO ARABI. |
| 16:11 | 15 | **Q.** IS YOUR FAMILY FROM CHALMETTE AND ARABI? |
| 16:11 | 16 | **A.** YES, SIR. I HAVE A VERY LARGE FAMILY IN THE ST. BERNARD |
| 16:11 | 17 | AREA. |
| 16:11 | 18 | **Q.** WHERE DID YOU GO TO HIGH SCHOOL? |
| 16:11 | 19 | **A.** I ACTUALLY WENT TO CHALMETTE HIGH SCHOOL. THAT'S WHERE I |
| 16:11 | 20 | MET MY WIFE. |
| 16:11 | 21 | **Q.** DID YOU SPEND YOUR WHOLE LIFETIME IN CHALMETTE AND |
| 16:11 | 22 | ST. BERNARD? |
| 16:11 | 23 | **A.** YES, SIR. |
| 16:11 | 24 | **Q.** AND YOU MET -- ARE YOU MARRIED NOW? |
| 16:11 | 25 | **A.** YES, SIR, I AM. |

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:11 | 1 | **Q.** HOW LONG HAVE YOU BEEN MARRIED? |
| 16:11 | 2 | **A.** IT'S -- THIS YEAR IT'S 20 YEARS. |
| 16:11 | 3 | **Q.** WHEN DID YOU MEET YOUR WIFE? |
| 16:11 | 4 | **A.** WE MET IN HIGH SCHOOL IN A FRENCH CLASS, ACTUALLY. |
| 16:11 | 5 | **Q.** DID SHE GO TO CHALMETTE ALSO? |
| 16:11 | 6 | **A.** YES, SIR, SHE DID. |
| 16:11 | 7 | **Q.** IS HER FAMILY FROM CHALMETTE ALSO? |
| 16:12 | 8 | **A.** YES, SIR.  THAT'S CORRECT. |
| 16:12 | 9 | **Q.** IS IT FAIR TO SAY THAT SHE SPENT HER WHOLE LIFE IN |
| 16:12 | 10 | CHALMETTE, LOUISIANA, ALSO? |
| 16:12 | 11 | **A.** ABSOLUTELY. |
| 16:12 | 12 | **Q.** DID YOU ALL BELONG TO CHURCH IN CHALMETTE? |
| 16:12 | 13 | **A.** YES, SIR.  WE WENT TO ST. MARK'S. |
| 16:12 | 14 | **Q.** WHERE IN CHALMETTE IS ST. MARK'S LOCATED? |
| 16:12 | 15 | **A.** IT'S BACK NEAR -- IT'S, I BELIEVE JEANNIE AND PLAZA DRIVE, |
| 16:12 | 16 | I BELIEVE.  SOMEWHERE -- SOMEWHERE NEAR PLAZA.  IT IS IN |
| 16:12 | 17 | CHALMETTE, THOUGH, IN THE -- I WOULD SAY THE BACK PART. |
| 16:12 | 18 | **Q.** IS IT BACK BY THE 40 ARPENT CANAL? |
| 16:12 | 19 | **A.** HEADING DOWN THAT WAY.  THAT'S CORRECT. |
| 16:12 | 20 | **Q.** WHEN DID YOU GRADUATE FROM HIGH SCHOOL? |
| 16:12 | 21 | **A.** I GRADUATED IN '90, 1990. |
| 16:12 | 22 | **Q.** ALL RIGHT.  AND GOING BACK A LITTLE BIT, WHERE DID YOU |
| 16:12 | 23 | LIVE AT THE TIME OF KATRINA? |
| 16:12 | 24 | **A.** AT THE TIME OF KATRINA, I LIVED AT 1205 PERRIN DRIVE, IN |
| 16:13 | 25 | ARABI. |

FRED HOLMES, JR. - DIRECT

16:13    1    **Q.**   AND FOR HOUSEKEEPING PURPOSES, COULD YOU PUT UP 4671-A,

16:13    2    PLEASE?

16:13    3          AND IN LOOKING AT THAT DEMONSTRATIVE, CAN YOU LOCATE

16:13    4    WHERE, APPROXIMATELY, YOUR HOUSE ON PERRIN DRIVE IS ON THAT

16:13    5    MAP?

16:13    6    **A.**   YES, SIR.  IT'S EXACTLY WHERE THE PINPOINT IS WITH OUR

16:13    7    NAME ON IT.

16:13    8    **Q.**   AND IS THAT THE HOME THAT YOU AND YOUR WIFE -- IS THAT THE

16:13    9    FIRST HOME YOU EVER BOUGHT?

16:13   10    **A.**   YES, SIR, IT IS.

16:13   11    **Q.**   WHERE DID YOU LIVE PRIOR TO THAT?

16:13   12    **A.**   SEVEN YEARS PRIOR, WE LIVED RIGHT AROUND THE CORNER ON

16:13   13    SEAL DRIVE, PROBABLY ABOUT THREE BLOCKS AWAY.

16:13   14    **Q.**   AND SO YOU MOVED, BASICALLY, ABOUT THREE BLOCKS WHEN YOU

16:13   15    BOUGHT YOUR FIRST HOUSE?

16:13   16    **A.**   YES, SIR.  THAT'S CORRECT.

16:13   17    **Q.**   WHAT TYPE OF WORK WERE YOU DOING AT THE TIME?

16:13   18    **A.**   AT THE TIME I WAS A SUPPLY MANAGER AT THE UNIVERSITY OF

16:13   19    NEW ORLEANS.

16:13   20    **Q.**   IS THAT WHAT YOU DID WHEN YOU GOT OUT OF HIGH SCHOOL?

16:13   21    **A.**   NO, SIR.  I HAD VARIOUS JOBS.  I WORKED AT A -- I WORKED

16:14   22    SHORTLY AT WALMART, AND THEN WORKED AT SCHWEGMANN'S GROCERY FOR

16:14   23    A LITTLE BIT JUST BEFORE I GOT MARRIED.

16:14   24    **Q.**   WHAT TYPE OF JOB HISTORY DID YOUR WIFE HAVE?

16:14   25    **A.**   SHE WORKED AS A FINANCIAL AID COUNSELOR AT DELGADO FOR

FRED HOLMES, JR. - DIRECT


16:14    1    MANY YEARS.

16:14    2    **Q.**   AND YOU'RE A PLAINTIFF IN THIS LAWSUIT; IS THAT CORRECT?

16:14    3    **A.**   YES, SIR.

16:14    4    **Q.**   AND DID YOU SEND A FORM 95 TO THE CORPS OF ENGINEERS TO

16:14    5    PUT THEM ON NOTICE THAT YOU HAD A CLAIM WITH THE FLOODING OF

16:14    6    YOUR HOUSE?

16:14    7    **A.**   YES, SIR.

16:14    8    **Q.**   AND COULD YOU PULL UP 1486 -- JX 1486-01 TO 03 -- OR 01 IS

16:14    9    FINE.

16:14    10           DO YOU RECOGNIZE THAT DOCUMENT?

16:14    11   **A.**   YES, SIR.

16:14    12   **Q.**   AND IS THAT DOCUMENT THE FORM 95 THAT YOU FILLED OUT IN

16:14    13   CONJUNCTION WITH -- TO PUT THE CORPS ON NOTICE OF THE LAWSUIT

16:14    14   HEREIN?

16:14    15   **A.**   YES, SIR.

16:14    16   **Q.**   AND GOING BACK TO SEAL DRIVE, HOW LONG HAD YOUR WIFE AND

16:15    17   YOU BEEN MARRIED AT THE TIME?

16:15    18   **A.**   WE WERE MARRIED, BASICALLY, ABOUT TEN YEARS.

16:15    19   **Q.**   AND DID YOU AND YOUR WIFE DATE FROM THE TIME YOU -- WAS

16:15    20   SHE YOUR HIGH SCHOOL SWEETHEART?

16:15    21   **A.**   YES, SIR.

16:15    22   **Q.**   AND WHEN YOU BOUGHT -- TELL ME ABOUT BUYING THE HOUSE ON

16:15    23   PERRIN DRIVE.

16:15    24   **A.**   IT WAS QUITE AN EXCITING TIME FOR US, BEING OUR FIRST

16:15    25   HOME.  I'M SORRY.

FRED HOLMES, JR. - DIRECT

16:15    1          MY FATHER-IN-LAW, YOU KNOW, WAS ALWAYS ONTO ME

16:15    2    SAYING, "HEY, YOU NEED TO LOOK INTO BUYING A HOUSE.  YOU KNOW,

16:15    3    EVERYTHING IS GOOD.  IT'S A NICE LITTLE HOUSE THAT YOU HAVE,

16:15    4    BUT IT'S NOT A HOUSE THAT YOU OWN.  IT'S NOT SOMETHING THAT YOU

16:15    5    CAN SECURE YOUR FUTURE."  SO I WAS VERY PROUD WHEN WE FIRST GOT

16:16    6    IT.

16:16    7    Q.   HOW DID YOU FURNISH THE HOUSE ON PERRIN DRIVE?

16:16    8    A.   WE BOUGHT EVERYTHING NEW.  YOU KNOW, EVERYTHING THAT WE

16:16    9    HAD SAVED TOWARDS -- YOU KNOW, THIS WAS THE ULTIMATE.  THIS WAS

16:16   10    OUR DREAM.  SO NEEDLESS TO SAY, WE HAD BOUGHT ALL NEW FURNITURE

16:16   11    FOR THE HOUSE.

16:16   12    Q.   WHEN DID YOU MOVE INTO THE HOUSE ON PERRIN DRIVE?

16:16   13    A.   IT WOULD HAVE BEEN 2003.

16:16   14    Q.   SO APPROXIMATELY APRIL OF 2003?

16:16   15    A.   YES, SIR.  THAT'S CORRECT.

16:16   16    Q.   AND HOW MUCH DID YOU PAY FOR THE HOUSE?

16:16   17    A.   I BELIEVE AT THE END, $107,000.

16:16   18    Q.   DID YOU TAKE MONEY OUT OF YOUR SAVINGS TO MAKE A DOWN

16:16   19    PAYMENT?

16:16   20    A.   YES, SIR, I DID.

16:16   21    Q.   AND YOU PAID -- AND YOU TOOK MONEY OUT OF YOUR SAVINGS TO

16:16   22    BUY THE FURNITURE THAT WAS IN YOUR HOUSE; IS THAT CORRECT?

16:16   23    A.   YES, SIR.  THAT'S CORRECT.

16:16   24    Q.   AND TELL US AND TELL THE COURT -- TELL THE COURT.

16:16   25    DESCRIBE YOUR HOUSE.  IF YOU'RE WALKING IN THE FRONT DOOR OF

FRED HOLMES, JR. - DIRECT

16:16   1   YOUR HOUSE, DESCRIBE WHAT YOUR HOUSE LOOKED LIKE.  WAS IT A
16:16   2   SLAB HOUSE?  WAS IT A ONE-STORY BRICK?
16:16   3        JUST TAKE A FEW MINUTES AND DESCRIBE THE HOUSE, IF
16:17   4   YOU WERE WALKING THROUGH THE FRONT DOOR, WHAT YOUR HOUSE LOOKED
16:17   5   LIKE.
16:17   6   **A.**   IT WAS A ONE-STORY BRICK HOUSE.  AS YOU FIRST WALKED INTO
16:17   7   THE FIRST DOOR, THAT WAS THE LIVING ROOM AREA.  AS YOU WALKED
16:17   8   PAST THE LIVING ROOM, ONE OF -- THE SHORT HALLWAY LED YOU INTO
16:17   9   THE FAMILY ROOM, TO -- JUST TO THE RIGHT IS WHERE THEY HAD A
16:17   10  KITCHEN/DINING ROOM COMBO.
16:17   11       AND TO THE LEFT WAS A SHORT HALLWAY THAT LED YOU TO
16:17   12  THE RESTROOM AND THE TWO BEDROOMS.
16:17   13  **Q.**   DID YOU MAKE ANY IMPROVEMENTS TO YOUR HOUSE, FROM THE TIME
16:17   14  YOU PURCHASED IT IN APRIL OF '03 TO AUGUST OF 2005?
16:17   15  **A.**   YES, SIR, WE DID.
16:17   16  **Q.**   COULD YOU TELL THE COURT WHAT IMPROVEMENTS YOU MADE TO
16:17   17  YOUR HOUSE BETWEEN APRIL OF 2003 AND AUGUST OF 2005?
16:17   18  **A.**   YES, SIR.  WE CHANGED OUT ALL -- MY WIFE'S GRANDFATHER AND
16:17   19  I CHANGED OUT ALL THE ELECTRICAL OUTLETS AND LIGHT FIXTURES ON
16:18   20  THE HOUSE.  AND ALSO THE SCREENED-IN PORCH IN THE BACK -- IN
16:18   21  THE BACK OF THE HOUSE ACTUALLY HAD TERMITE DAMAGE.  SO WE HAD
16:18   22  TO TEAR OUT ALL THE SIDEWALLS AND REBUILD IT.
16:18   23  **Q.**   DID YOU ALL HAVE A POOL IN THE BACKYARD?
16:18   24  **A.**   YES, SIR, A LITTLE ABOVE-THE-GROUND POOL.
16:18   25  **Q.**   AND WAS THAT A HOME THAT YOU AND YOUR WIFE EXPECTED TO

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:18 | 1 | SPEND THE NEXT 30 YEARS IN? |
| 16:18 | 2 | **A.**   ABSOLUTELY. |
| 16:18 | 3 | **Q.**   ALL RIGHT.  DID YOU PLAN ON MOVING AT ALL FROM THAT HOUSE? |
| 16:18 | 4 | **A.**   NO, SIR. |
| 16:18 | 5 | **Q.**   DID -- |
| 16:18 | 6 | **A.**   NO, SIR. |
| 16:18 | 7 | **Q.**   I'M SORRY? |
| 16:18 | 8 | **A.**   THAT'S OKAY.  IT WAS OUR DREAM HOUSE. |
| 16:18 | 9 | **Q.**   WOULD IT BE FAIR TO SAY THAT, AS THE HOMEOWNER AND AS THE |
| 16:18 | 10 | FATHER AND THE HUSBAND, THAT THAT WAS A PROUD MOMENT FOR YOU TO |
| 16:18 | 11 | HAVE A HOUSE THAT YOU ACTUALLY BOUGHT? |
| 16:18 | 12 | **A.**   YEAH, I WAS VERY PROUD OF IT.  JUST THE CHRISTMAS BEFORE, |
| 16:18 | 13 | WE HAD THE FAMILY FOR THE FIRST TIME COME TO OUR PLACE INSTEAD |
| 16:18 | 14 | OF GOING TO THEIRS.  SO IT WAS VERY GOOD. |
| 16:18 | 15 | **Q.**   AND HOW MANY -- DID YOUR FAMILY LIVE IN AND AROUND YOUR |
| 16:19 | 16 | HOUSE ON PERRIN DRIVE? |
| 16:19 | 17 | **A.**   YES, SIR.  EVERYBODY WAS WITHIN A MILE OF EACH OTHER. |
| 16:19 | 18 | **Q.**   AND HAVE YOU EVER HEARD OF ST. BERNARD BEING REFERRED TO |
| 16:19 | 19 | AS "THE PARISH"? |
| 16:19 | 20 | **A.**   YES, SIR. |
| 16:19 | 21 | **Q.**   AND WHY IS IT -- WHY DO YOU THINK IT'S REFERRED TO AS "THE |
| 16:19 | 22 | PARISH"? |
| 16:19 | 23 | **A.**   WELL, WE ALL KNOW IT AS GOD'S COUNTRY.  IT WAS HOME. |
| 16:19 | 24 | **Q.**   AND WAS THAT WHERE YOU GREW UP AND YOU PLANNED TO HAVE |
| 16:19 | 25 | YOUR KIDS GROW UP? |

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:19 | 1 | **A.**  ABSOLUTELY. |
| 16:19 | 2 | **Q.**  YOU ALL DIDN'T HAVE ANY CHILDREN.  BUT DID YOU ALL HAVE |
| 16:19 | 3 | PETS? |
| 16:19 | 4 | **A.**  YES, SIR. |
| 16:19 | 5 | **Q.**  WHAT PETS DID YOU ALL HAVE? |
| 16:19 | 6 | **A.**  I HAD TWO DOGS AND A CAT.  THAT WAS BASICALLY OUR |
| 16:19 | 7 | CHILDREN. |
| 16:19 | 8 | **Q.**  NOW, MOVING TOWARDS -- HOW LONG HAD YOU HAD THOSE PETS? |
| 16:19 | 9 | I'M SORRY. |
| 16:19 | 10 | **A.**  I HAD ONE FOR 17 YEARS, ANOTHER FOR 7, AND ANOTHER FOR 3. |
| 16:19 | 11 | **Q.**  OKAY.  AND WERE THOSE PETS WITH YOU IN AUGUST OF 2005? |
| 16:19 | 12 | **A.**  YES, SIR. |
| 16:20 | 13 | **Q.**  AND TELL ME ABOUT, JUST BRIEFLY, A WEEK IN THE LIFE OF |
| 16:20 | 14 | FRED -- IS YOUR WIFE'S NAME JENEEN? |
| 16:20 | 15 | **A.**  YES, SIR. |
| 16:20 | 16 | **Q.**  I'M SORRY? |
| 16:20 | 17 | **A.**  THAT'S CORRECT.  YES, SIR. |
| 16:20 | 18 | **Q.**  TELL US ABOUT A WEEK IN THE LIFE OF FRED AND JENEEN HOLMES |
| 16:20 | 19 | AS IT RELATES TO THE COMMUNITY AND YOUR HOUSE THAT YOU'VE NOW |
| 16:20 | 20 | BOUGHT AND LIVED IN? |
| 16:20 | 21 | **A.**  REALLY GREAT.  YOU KNOW, A REALLY TIGHTKNIT NEIGHBORHOOD. |
| 16:20 | 22 | I KNEW MY NEIGHBORS.  I WOULD SEE ONE SET OF NEIGHBORS EACH |
| 16:20 | 23 | MORNING, AND I WOULD SEE THE OTHER SET OF NEIGHBORS COMING HOME |
| 16:20 | 24 | AT THE END OF THE DAY. |
| 16:20 | 25 | WE WOULD SPEND TIME EITHER WITH MY MOM OR |

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:20 | 1 | FATHER-IN-LAW DURING THE WEEK, AND ON WEEKENDS WE WOULD TAKE |
| 16:20 | 2 | EXPENDITURES [*SIC*]. |
| 16:20 | 3 | **Q.**   AND DID YOU SPEND TIME WITH YOUR FATHER-IN-LAW AND YOUR |
| 16:20 | 4 | MOTHER-IN-LAW A LOT? |
| 16:20 | 5 | **A.**   YES, SIR.  ABSOLUTELY. |
| 16:20 | 6 | **Q.**   AND WERE YOU CLOSE WITH THEM? |
| 16:20 | 7 | **A.**   YES, SIR. |
| 16:20 | 8 | **Q.**   IN AUGUST OF 2005, WHEN DID YOU FIRST BECOME AWARE OF |
| 16:21 | 9 | HURRICANE KATRINA IN THE GULF? |
| 16:21 | 10 | **A.**   JUST HEARING FROM THE NEWS REPORTS, THE FORECAST THAT THEY |
| 16:21 | 11 | WERE GIVING. |
| 16:21 | 12 | **Q.**   AND WHEN DID YOU -- DID YOU EVACUATE FOR THE STORM? |
| 16:21 | 13 | **A.**   YES, SIR.  WE MADE PLANS TO EVACUATE EITHER THE WEDNESDAY |
| 16:21 | 14 | OR THURSDAY BEFORE THE STORM HIT. |
| 16:21 | 15 | **Q.**   AND WHAT DID YOU DO IN ORDER TO EVACUATE FOR THE STORM? |
| 16:21 | 16 | **A.**   WE WENT -- WE WENT ONLINE TRYING TO FIND AVAILABLE HOTELS |
| 16:21 | 17 | THAT WOULD ACCEPT PETS.  THAT WAS REALLY OUR BIGGEST PROBLEM. |
| 16:21 | 18 | **Q.**   ALL RIGHT.  AND DID YOU FIND ANY PLACES THAT WOULD ACCEPT |
| 16:21 | 19 | PETS? |
| 16:21 | 20 | **A.**   NORTH HOUSTON, SOMEPLACE I NEVER THOUGHT I'D EVER END UP. |
| 16:21 | 21 | **Q.**   AND SO YOU ALL EVACUATED -- WHO EVACUATED TO HOUSTON, YOUR |
| 16:21 | 22 | WIFE AND THE PETS? |
| 16:21 | 23 | **A.**   ME AND MY WIFE, WE HAD THREE PETS, MY MOTHER-IN-LAW AND MY |
| 16:21 | 24 | MOTHER-IN-LAW'S FATHER, SO MY WIFE'S GRANDFATHER, AND HIS DOG. |
| 16:21 | 25 | SO FOUR PETS, FOUR ADULTS INSIDE OF TWO CAMRYS. |

FRED HOLMES, JR. - DIRECT

16:21    1   **Q.**   DID YOU HAVE ANY OTHER VEHICLES AT THE TIME?

16:21    2   **A.**   YES, SIR.  WE HAD TO LEAVE BEHIND THE '98 COROLLA.

16:22    3   **Q.**   WHAT DID YOU TAKE WITH YOU WHEN YOU EVACUATED?

16:22    4   **A.**   I MEAN, BASED ON THE AMOUNT OF BODIES THAT WE HAD IN EACH

16:22    5   CAR, WE COULDN'T TAKE MUCH.  BUT YOU KNOW, MOSTLY IMPORTANT

16:22    6   PAPERS AND, YOU KNOW, A COUPLE OF DAYS' WORTH OF CLOTHES.

16:22    7          WE HAD NO CLUE WHAT WE WERE UP AGAINST, YOU KNOW.  WE

16:22    8   WERE THINKING IT WOULD BE JUST LIKE ANY OTHER THREAT THAT WE'VE

16:22    9   HAD:  WE'D LEAVE FOR A COUPLE DAYS, YOU MIGHT BE OUT OF POWER,

16:22   10   AND WE'D COME BACK HOME AND MAYBE HAVE TO THROW OUT SOME FOOD,

16:22   11   MAYBE.  THAT WAS THE WORST THAT WE THOUGHT IT WOULD BE.

16:22   12   **Q.**   AND WHAT HAPPENED WHEN YOU GOT TO HOUSTON?

16:22   13   **A.**   THAT WAS A VERY LONG TRIP FOR US.  WHAT SHOULD HAVE TAKEN

16:22   14   FIVE AND A HALF, SIX HOURS, ENDED UP TAKING 23 HOURS IN

16:22   15   GRIDLOCK TRAFFIC.

16:22   16   **Q.**   AND WHAT WERE THE -- WHAT WAS THE HOTEL LIKE WHEN YOU GOT

16:22   17   THERE?

16:22   18   **A.**   ALL THAT WE COULD SECURE WAS THE ONE ROOM, SO IT WAS FOUR

16:22   19   ADULTS AND FOUR ANIMALS IN ONE ROOM.

16:23   20          LUCKILY, YOU KNOW, LATER THAT DAY WE WERE ABLE TO

16:23   21   FIND A SECOND ROOM FOR MY WIFE'S GRANDFATHER AND MY

16:23   22   MOTHER-IN-LAW.

16:23   23   **Q.**   HOW LONG DID YOU ALL STAY IN THAT HOTEL?

16:23   24          WELL, LET ME ASK YOU THIS:  WHEN YOU CHECKED IN,

16:23   25   KATRINA HIT THE NEXT DAY; IS THAT RIGHT?

FRED HOLMES, JR. - DIRECT

16:23    1    **A.**    IT HIT THAT MORNING WHEN WE ARRIVED.  WE ARRIVED AS IT WAS

16:23    2    HITTING.

16:23    3    **Q.**    AND HOW DID YOU OBTAIN NEWS OF WHAT WAS HAPPENING TO YOUR

16:23    4    HOUSE ON PERRIN AND TO THE NEIGHBORHOOD THAT YOU GREW UP IN?

16:23    5    **A.**    THEY HAD -- I BELIEVE THEY HAD -- IN THE LOBBY AREA THEY

16:23    6    HAD A TELEVISION WHERE THEY WERE REPORTING ON IT.

16:23    7    **Q.**    WHEN DID YOU FIRST -- OR DID YOU FIND OUT THE CONDITION OF

16:23    8    THE HOUSE THAT YOU -- YOUR HOUSE THAT YOU PURCHASED THAT YOU

16:23    9    LEFT BEHIND?

16:23   10    **A.**    WE WEREN'T SURE EXACTLY WHAT THE CONDITION WAS.  BUT BASED

16:23   11    ON THE NEWS AND WHAT WE WERE SEEING PHOTOS OF, BASED ON THE

16:23   12    WATER IN THE NINTH WARD AREA AND ALSO CHALMETTE MEDICAL, WE

16:24   13    KNEW OUR HOUSE WAS COMPLETELY FLOODED.

16:24   14    **Q.**    AND I MAY HAVE BEEN REMISS FOR NOT ASKING EARLIER.

16:24   15         BUT AT THE TIME, BEFORE YOU LEFT, HOW WERE YOU -- YOU

16:24   16    WERE EMPLOYED BY UNO.  I DID ASK YOU THAT?

16:24   17    **A.**    YES, SIR.

16:24   18    **Q.**    HOW WAS YOUR WIFE EMPLOYED?

16:24   19    **A.**    SHE WAS AT DELGADO COMMUNITY COLLEGE.

16:24   20    **Q.**    AND WHAT DID SHE DO WITH DELGADO?

16:24   21    **A.**    SHE WAS A FINANCIAL AID COUNSELOR.

16:24   22    **Q.**    SO AT THE TIME OF THE STORM, WHEN YOU ALL LEFT, SHE WAS

16:24   23    WORKING AT DELGADO AND YOU WERE WORKING AT UNO?

16:24   24    **A.**    YES, SIR.  WHICH IS PRETTY COOL BECAUSE, YOU KNOW, THEY

16:24   25    WERE TEN MINUTES APART.  WE'D GO TO LUNCH EVERY DAY TOGETHER.

FRED HOLMES, JR. - DIRECT

16:24    1    **Q.**   AND WHEN YOU STARTED TO FIND OUT THAT ST. BERNARD WAS

16:24    2    FLOODED, AND THAT IN ALL LIKELIHOOD YOUR HOUSE WAS FLOODED, HOW

16:24    3    DID THAT MAKE YOU FEEL?

16:24    4    **A.**   IT WAS DEVASTATING.  I MEAN, I DIDN'T KNOW WHAT WE WERE

16:24    5    GOING TO DO.  YOU KNOW, I DIDN'T KNOW WHAT THE FUTURE WOULD

16:24    6    HOLD.

16:24    7    **Q.**   WERE YOU ABLE TO GO BACK?  WHEN WAS THE FIRST TIME YOU

16:24    8    WERE ABLE TO GO BACK TO SEE YOUR HOUSE?

16:24    9    **A.**   NOT UNTIL OCTOBER.  WE THOUGHT WE WOULD GET TO GO IN

16:25   10    SEPTEMBER, BUT THEN RITA CAME AND REFLOODED THE AREA, AND WE

16:25   11    HAD TO WAIT TO GET THE CLEARANCE AFTER THAT.  IT WASN'T UNTIL

16:25   12    LATE OCTOBER.

16:25   13    **Q.**   AND BETWEEN AUGUST 29TH OR 28TH OF 2005, WHEN YOU CHECKED

16:25   14    IN, AND OCTOBER, THAT YOU WERE JUST TELLING ME ABOUT, WHERE

16:25   15    WERE YOU LIVING IN HOUSTON AT THE TIME?

16:25   16    **A.**   WE WERE LIVING AT THE HOTEL.  WE ENDED UP, ULTIMATELY,

16:25   17    LIVING THERE FOR FOUR MONTHS.  THAT WAS OUR HOME,

16:25   18    UNFORTUNATELY.

16:25   19    **Q.**   SO YOU AND YOUR WIFE HAD -- BECAUSE OF THE FLOODING, HAD

16:25   20    TO STAY AWAY AND SUFFER THE INCONVENIENCE OF GOING FROM A HOUSE

16:25   21    THAT YOU OWNED TO LIVING IN A HOTEL ROOM WITH YOU AND THE THREE

16:25   22    PETS?

16:25   23    **A.**   CORRECT, YES, SIR.

16:25   24    **Q.**   NOW, COME -- LET'S GO BACK TO THE FIRST TIME YOU CAME BACK

16:25   25    TO YOUR HOUSE AFTER KATRINA.  WAS THAT AN EXCITING TIME FOR YOU

FRED HOLMES, JR. - DIRECT

16:25   1   TO GO BACK?

16:25   2   **A.**   NO, SIR.

16:25   3   **Q.**   WERE YOU APPREHENSIVE TO GO -- TELL US ABOUT WHEN YOU CAME

16:26   4   BACK.  WHAT THAT WAS LIKE.  HOW DID YOU GET INTO ST. BERNARD

16:26   5   PARISH?

16:26   6   **A.**   WE -- I DROVE IN.  WE ENDED UP GETTING A RENTAL CAR TO

16:26   7   COME IN.  AND JUST AS YOU -- AS YOU WERE GETTING CLOSER, YOU

16:26   8   COULD JUST FEEL THE AIR GETTING REALLY THICK, AS YOU WERE

16:26   9   DRIVING IN CLOSE.

16:26   10   **Q.**   AND DID YOU COME DOWN CLAIBORNE OR DID YOU COME DOWN

16:26   11   ST. CLAUDE?

16:26   12   **A.**   ACTUALLY, I BELIEVE WE CAME THROUGH PARISH ROAD WHEN WE

16:26   13   CAME IN.

16:26   14   **Q.**   AND WHEN YOU WENT OVER THE GREEN BRIDGE, DID YOU LOOK TO

16:26   15   SEE WHERE YOUR HOUSE WAS?

16:26   16   **A.**   NO, SIR.

16:26   17   **Q.**   AND AS YOU GOT CLOSER TO YOUR HOUSE -- AS YOU GOT CLOSER

16:26   18   TO YOUR HOUSE, WHAT DID YOU THINK?

16:26   19   **A.**   I DIDN'T KNOW WHAT TO EXPECT.  ALL I COULD SEE WAS HOUSES

16:26   20   DESTROYED THAT WAS ON HIGHER GROUND THAN WHAT I WAS.

16:26   21   **Q.**   AND WHEN YOU DROVE UP TO YOUR HOUSE, WHAT DID YOU SEE?

16:26   22   **A.**   IT LOOKED LIKE A BOMB WENT OFF INSIDE THE HOUSE.

16:26   23   EVERYTHING WAS JUST -- YOU KNOW, THERE WAS WET MUD EVERYWHERE.

16:27   24            THINGS THAT WERE ON THE CEILING WERE NOW ON THE

16:27   25   GROUND.  THE ACTUAL CEILING ITSELF WAS ON THE GROUND OVERLAYING

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:27 | 1 | EVERYTHING THAT WAS THERE AS WELL. |
| 16:27 | 2 | **Q.**   WAS THERE ANYTHING IN YOUR HOUSE THAT WAS SALVAGEABLE? |
| 16:27 | 3 | **A.**   NO, SIR.   EVERYTHING WAS DESTROYED. |
| 16:27 | 4 | **Q.**   AND COULD YOU TELL US ABOUT SOME OF THE THINGS THAT YOU |
| 16:27 | 5 | LOST? |
| 16:27 | 6 | **A.**   WE LOST EVERYTHING.   ALL OUR FURNITURE, PRETTY MUCH |
| 16:27 | 7 | EVERYTHING.   WE SAVED, LIKE I SAID, A COUPLE DAYS' WORTH OF |
| 16:27 | 8 | CLOTHES AND SOME IMPORTANT DOCUMENTATION. |
| 16:27 | 9 | WE LEFT BEHIND MY WIFE'S WEDDING DRESS.   I ACCIDENTLY |
| 16:27 | 10 | LEFT BEHIND A VIDEO RECORDING OF THE PARTY THAT WE HAD IN |
| 16:27 | 11 | DECEMBER.   I LEFT THAT BEHIND. |
| 16:27 | 12 | CAN I GET A LITTLE SIP OF WATER? |
| 16:28 | 13 | **Q.**   YES, SIR. |
| 16:28 | 14 | **THE DEPUTY CLERK:**   IT'S RIGHT THERE BY YOU. |
| 16:28 | 15 | **BY MR. ANDRY:** |
| 16:28 | 16 | **Q.**   AND, MR. HOLMES, WITHOUT RELIVING EVERY STEP OF EVERY |
| 16:28 | 17 | ROOM -- |
| 16:28 | 18 | **A.**   YES, SIR. |
| 16:28 | 19 | **Q.**   -- WHAT DID YOU DO THE DAY THAT YOU WERE THERE? |
| 16:28 | 20 | **A.**   IT WAS PRETTY MUCH JUST TRYING TO SEE IF THERE WAS |
| 16:28 | 21 | ANYTHING THAT WE COULD -- WE COULD SALVAGE.   WE PULLED OUT A |
| 16:28 | 22 | COUPLE OF THINGS, AND ONCE YOU GOT IT OUT INTO TO THE DAYLIGHT, |
| 16:28 | 23 | YOU COULD SEE THERE WAS NO WAY.   YOU KNOW, WE HAD TO ACTUALLY |
| 16:28 | 24 | HAVE GAS MASKS ON, BASICALLY, TO BE ABLE TO BREATHE. |
| 16:28 | 25 | **Q.**   DID YOU HAVE GAS MASKS ON? |

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:28 | 1 | **A.** YES, SIR. |
| 16:28 | 2 | **Q.** AND WHY WERE YOU WEARING GAS MASKS? |
| 16:28 | 3 | **A.** WE WERE TOLD THAT IF YOU PLANNED ON GOING INSIDE THE HOMES |
| 16:28 | 4 | THAT YOU HAD TO BECAUSE IT WOULD HAVE INFECTED YOUR LUNGS. |
| 16:28 | 5 | **Q.** DID THE GAS MASK HELP WITH THE SMELL? |
| 16:28 | 6 | **A.** FOR THE MOST PART, UNTIL I ACCIDENTLY OPENED THE |
| 16:28 | 7 | REFRIGERATOR. |
| 16:29 | 8 | **Q.** OKAY.  AND LET ME ASK YOU THIS.  WE -- |
| 16:29 | 9 | **MR. ANDRY:** MAY I APPROACH THE WITNESS, YOUR HONOR, |
| 16:29 | 10 | TO GO THROUGH THE PHOTOGRAPHS IN AN EFFORT TO EXPEDITE THE |
| 16:29 | 11 | PROCESS? |
| 16:29 | 12 | **THE COURT:** ALL RIGHT.  IF YOU THINK IT WOULD |
| 16:29 | 13 | EXPEDITE IT, I'LL -- |
| 16:29 | 14 | **MR. ANDRY:** IT WILL EXPEDITE IT, I PROMISE, AND I'LL |
| 16:29 | 15 | WALK BRISKLY. |
| 16:29 | 16 | **BY MR. ANDRY:** |
| 16:29 | 17 | **Q.** THERE IS A GROUP OF PHOTOGRAPHS THAT ARE -- THERE'S A |
| 16:29 | 18 | GROUP OF PHOTOGRAPHS IN THERE THAT ARE -- SPECIFICALLY, |
| 16:29 | 19 | JX 1606-42 THROUGH 127. |
| 16:29 | 20 | AND IT -- THE NOTATION ON THE PHOTOGRAPHS, IF YOU |
| 16:29 | 21 | LOOK IN THE GROUP OF PAPERS THAT I HANDED YOU, MR. HOLMES, IT'S |
| 16:29 | 22 | TAKEN BY -- IT SAYS "TAKEN BY HOMEOWNER."  AND THEN THERE'S A |
| 16:29 | 23 | DATE, IF YOU LOOK ON THE SCREEN, OF 10/5/2005. |
| 16:29 | 24 | **A.** YES, SIR. |
| 16:29 | 25 | **Q.** ARE THOSE THE PHOTOGRAPHS THAT YOU TOOK THE DAY THAT YOU |

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:29 | 1 | RETURNED TO YOUR HOUSE? |
| 16:29 | 2 | **A.**   YES, SIR.  THAT'S CORRECT. |
| 16:29 | 3 | **Q.**   AND IF THESE PHOTOGRAPHS ARE SHOWN AS BEING TAKEN BY |
| 16:29 | 4 | HOMEOWNER ON 10/5/2005, DO YOU HAVE ANY REASON TO BELIEVE THAT |
| 16:29 | 5 | YOU DIDN'T RETURN HOME THAT DATE AND TAKE THOSE PICTURES? |
| 16:30 | 6 | **A.**   NO.  THESE ARE PICTURES THAT I TOOK.. |
| 16:30 | 7 | **Q.**   AND IN LOOKING AT THE PHOTOGRAPHS, GOING THROUGH THEM KIND |
| 16:30 | 8 | OF TOGETHER, ARE THOSE PHOTOGRAPHS A FAIR AND ACCURATE |
| 16:30 | 9 | DEPICTION OF WHAT YOU SAW AT YOUR HOUSE ON OCTOBER 5TH, 2005, |
| 16:30 | 10 | WHEN YOU TOOK THE PHOTOGRAPHS? |
| 16:30 | 11 | **A.**   FROM A VISUAL, YES.  THAT'S CORRECT. |
| 16:30 | 12 | **Q.**   HOW LONG DID YOU STAY AT YOUR HOUSE ON THAT DAY? |
| 16:30 | 13 | **A.**   WE COULD ONLY STAY FOR THE DAY.  WE DROVE BACK THE SAME |
| 16:30 | 14 | DAY. |
| 16:30 | 15 | **Q.**   DID THE NATIONAL GUARD COME BY AND GET YOU AND SAY THAT |
| 16:30 | 16 | YOU HAD TO LEAVE? |
| 16:30 | 17 | **A.**   THEY CAME PROBABLY TOWARDS THE END OF THE DAY AND GAVE US |
| 16:30 | 18 | SOME WATER.  AND THEY DID ADVISE US THAT ONCE IT STARTED TO GET |
| 16:30 | 19 | DARK WE HAD TO LEAVE. |
| 16:30 | 20 | **Q.**   AND WHEN YOU WENT BACK TO HOUSTON AND YOU GOT BACK -- HOW |
| 16:30 | 21 | LONG DID IT TAKE YOU TO GET BACK TO HOUSTON? |
| 16:30 | 22 | **A.**   I REALLY DON'T RECALL.  IT'S BEEN A WHILE. |
| 16:30 | 23 | **Q.**   WHEN YOU GOT BACK TO HOUSTON AND YOU SAT IN YOUR HOTEL |
| 16:30 | 24 | ROOM WITH YOU AND YOUR WIFE AND YOUR DOGS AND DISCUSSED THE |
| 16:30 | 25 | HOUSE THAT YOU'D BOUGHT AND THE DEVASTATION THAT YOU HAD SEEN, |

FRED HOLMES, JR. - DIRECT

| 16:31 | 1 | HOW DID THAT MAKE YOU FEEL? |
| 16:31 | 2 | **A.**   IT WAS HORRIBLE TO TELL HER THIS.  I MEAN, SHE KNEW |
| 16:31 | 3 | ALREADY THAT IT WAS, YOU KNOW, A TOTAL LOSS.  BUT I DIDN'T KNOW |
| 16:31 | 4 | HOW TO PUT IT INTO WORDS.  ALL I COULD DO IS CRY. |
| 16:31 | 5 | **Q.**   NOW, LET'S -- WE'LL KIND OF MOVE OFF OF THAT.  WHAT DID |
| 16:31 | 6 | YOU DO BETWEEN OCTOBER OF 2005 AND JAN- -- I MEAN, WAS THAT THE |
| 16:31 | 7 | ONLY TIME YOU EVER WENT BACK TO THE HOUSE? |
| 16:31 | 8 | **A.**   WE WENT BACK ONE OTHER TIME A COUPLE OF MONTHS LATER.  I |
| 16:31 | 9 | DON'T RECALL EXACTLY WHEN, BUT IT WAS JUST TO SEE, ONCE THE |
| 16:31 | 10 | AREA KIND OF DRIED UP A LITTLE BIT, IF MAYBE THERE MIGHT HAVE |
| 16:31 | 11 | BEEN SOMETHING THAT WE OVERLOOKED. |
| 16:31 | 12 | **Q.**   AND DID YOU FIND ANYTHING SALVAGEABLE WHEN YOU WENT BACK |
| 16:31 | 13 | THAT TIME? |
| 16:31 | 14 | **A.**   NO.  THERE WAS SOME MOMENTOS THAT WE TOOK, BUT THEY -- WE |
| 16:31 | 15 | ENDED UP HAVING TO THROW IT AWAY BECAUSE WE COULDN'T SALVAGE |
| 16:31 | 16 | IT. |
| 16:31 | 17 | **Q.**   SO THE MAJORITY -- WOULD IT BE FAIR TO SAY THAT THE |
| 16:31 | 18 | MAJORITY OF THE STUFF THAT YOU HAD ACCUMULATED WITH YOUR WIFE |
| 16:31 | 19 | IN THE HOUSE THAT YOU -- THE FIRST HOUSE YOU EVER BOUGHT WAS |
| 16:32 | 20 | DESTROYED BY THE FLOODWATERS? |
| 16:32 | 21 | **A.**   YES, SIR.  THAT'S CORRECT. |
| 16:32 | 22 | **Q.**   HOW LONG DID YOU LIVE IN THE HOTEL ROOM IN HOUSTON? |
| 16:32 | 23 | **A.**   ROUGHLY FOUR MONTHS. |
| 16:32 | 24 | **Q.**   AND SO APPROXIMATELY JANUARY OF '06? |
| 16:32 | 25 | **A.**   YES, SIR.  THAT'S CORRECT. |

FRED HOLMES, JR. - DIRECT

16:32   1   **Q.**  HOW DID YOUR HOUSING CHANGE IN JANUARY OF '06?

16:32   2   **A.**  IN JANUARY OF '06, THAT'S WHEN -- ALL THE TIMES WHEN THEY

16:32   3   WERE SAYING THAT THEY WERE NOT GOING TO PROVIDE ANY MORE

16:32   4   FUNDING FOR ANYONE TO STAY IN THE HOTELS.

16:32   5           BY THE GRACE OF GOD AND CATHOLIC CHARITIES, WE WERE

16:32   6   ABLE TO STAY IN A FORECLOSED HOME FOR A PERIOD OF UP TO A YEAR,

16:32   7   BASICALLY, RENT-FREE.

16:32   8   **Q.**  AND DID YOU PAY FOR THE HOTEL ROOM THAT YOU WERE STAYING

16:32   9   IN?

16:32   10  **A.**  I DID INITIALLY, UNTIL FEMA AND THEN RED CROSS STARTED

16:32   11  ACTUALLY PAYING FOR THE ROOM.

16:32   12  **Q.**  SO DURING THE FOUR MONTHS THAT YOU STAYED THERE, DID YOU

16:33   13  PAY FOR THAT HOTEL ROOM AT ALL?

16:33   14  **A.**  MAYBE.  I CAN'T REMEMBER IF IT WAS THE FIRST WEEK OR FIRST

16:33   15  MONTH.  I CAN'T RECALL AT THIS TIME.

16:33   16  **Q.**  OKAY.  AND DID YOU INCUR ADDITIONAL LIVING EXPENSE WHILE

16:33   17  YOU WERE LIVING IN HOUSTON DURING THAT FOUR-MONTH PERIOD?

16:33   18  **A.**  YES, SIR.  I MEAN, WE TRIED TO ECONOMIZE THE BEST THAT WE

16:33   19  COULD, BUT -- YOU KNOW, TO KEEP FROM GOING OUT TO EAT OR

16:33   20  ANYTHING LIKE THAT.  WE HAD A SMALL KITCHENETTE, SO WE TRIED TO

16:33   21  COOK AS MANY MEALS AS WE COULD TO SAVE SOME MONEY.

16:33   22  **Q.**  IN JANUARY OF '06 THROUGH TODAY IS -- YOU'RE LIVING IN A

16:33   23  HOUSE IN GREENBRIER, TEXAS [SIC], THAT YOU OBTAINED THROUGH

16:33   24  CATHOLIC CHARITIES AND FANNIE MAE; IS THAT CORRECT?

16:33   25  **A.**  THAT'S CORRECT.  WE ENDED UP GETTING AN SBA LOAN TO

FRED HOLMES, JR. - DIRECT

16:33   1   PURCHASE THE HOME.  YES, SIR.

16:33   2   **Q.**   HAD YOU NOT GOTTEN AN SBA LOAN, COULD YOU HAVE PURCHASED

16:33   3   THE HOUSE YOU'RE CURRENTLY LIVING IN NOW?

16:33   4   **A.**   NO, SIR.  ABSOLUTELY NOT.

16:33   5   **Q.**   AND WHY IS THAT?

16:33   6   **A.**   FOR ONE, PART OF THE PLAN WITH FANNIE MAE AND CATHOLIC

16:34   7   CHARITIES WAS THAT IF SOMEONE WAS TO PURCHASE THE HOME THAT

16:34   8   WENT THROUGH THE LEASING PROGRAM, THEY PUT SO MUCH TOWARDS THE

16:34   9   CLOSING.  AND ALSO, I THINK IT WAS ABOUT $15,000 THAT THEY GAVE

16:34   10  TOWARDS THE PURCHASE OF THE HOME.

16:34   11  **Q.**   AND --

16:34   12  **A.**   AND THAT WAS PRETTY MUCH THE ONLY WAY WE COULD HAVE

16:34   13  AFFORDED IT.

16:34   14  **Q.**   HOW LONG -- OR HOW LONG WERE YOU EMPLOYED BY UNO FROM THE

16:34   15  TIME OF THE HURRICANE?

16:34   16  **A.**   ACTUALLY, I WAS ON PAYROLL, AS IT WERE, THROUGH JANUARY,

16:34   17  THAT'S WHEN THEY -- OF '06.  AND THAT'S WHEN THEY GAVE ME THE

16:34   18  OFFICIAL FURLOUGH NOTICE, WHICH IS EFFECTIVELY A LAYOFF.

16:34   19           UP TO -- YOU KNOW, FROM KATRINA TO THE TIME THAT I

16:34   20  WAS ACTUALLY FURLOUGHED, THEY WERE PAYING ME OFF OF MY PERSONAL

16:34   21  TIME THAT I HAD EARNED THROUGH THE YEARS.

16:34   22  **Q.**   AND SO YOU WERE EFFECTIVELY LET GO FROM THE UNIVERSITY OF

16:34   23  NEW ORLEANS' EMPLOYMENT IN JANUARY OF '06?

16:34   24  **A.**   THAT'S CORRECT.  YES, SIR.

16:35   25  **Q.**   DID YOU MAKE -- DID YOU TRY TO COME BACK?

FRED HOLMES, JR. - DIRECT

16:35    1    **A.**   YES, SIR.  WE -- WE WERE ON SEVERAL WAITING LISTS TO GET A
16:35    2    FEMA TRAILER.  WE HAD -- SINCE WE BOTH WORK AT UNIVERSITIES, WE
16:35    3    WERE ON WAITING LISTS FOR EACH OF THOSE AND ALSO WITH FEMA
16:35    4    THEMSELVES ON A WAITING LIST TO HAVE ONE ON OUR PROPERTY.
16:35    5    **Q.**   DID YOU EVER GET A FEMA TRAILER ON PERRIN DRIVE?
16:35    6    **A.**   NO, SIR, I DID NOT.  WE ENDED UP AT THE -- WE ENDED UP
16:35    7    BEING FURLOUGHED.  ONCE THE FURLOUGH TOOK EFFECT, WE WERE
16:35    8    REMOVED FROM THE WAITING LISTS.
16:35    9    **Q.**   SO YOU DIDN'T HAVE AN OPPORTUNITY TO COME BACK, EVEN
16:35   10    THOUGH YOU WOULD HAVE?
16:35   11    **A.**   THAT'S CORRECT.
16:35   12    **Q.**   ALL RIGHT.  HOW LONG DID YOUR WIFE REMAIN EMPLOYED BY
16:35   13    DELGADO?
16:35   14    **A.**   SHE WAS EMPLOYED A COUPLE MORE MONTHS AFTER I WAS.
16:35   15    BECAUSE AT FIRST THEY WERE WILLING TO LET HER WORK FROM ABROAD
16:35   16    FOR A SHORT PERIOD OF TIME, AND THEN SHE EXHAUSTED HER PERSONAL
16:35   17    TIME.
16:35   18    **Q.**   AND WHAT DID YOU DO FOR EMPLOYMENT AFTER YOU WERE LET GO
16:36   19    FROM UNO?
16:36   20    **A.**   AFTER I WAS LET GO FROM UNO, WE HAD DREW UNEMPLOYMENT FOR
16:36   21    A SHORT BIT.  I WAS ACTIVELY SEEKING EMPLOYMENT.  I ACTUALLY
16:36   22    DIDN'T FIND WORK UNTIL JANUARY OF '07 AT RICE UNIVERSITY.
16:36   23    **Q.**   IS THAT WHERE YOU'RE CURRENTLY EMPLOYED NOW?
16:36   24    **A.**   YES, SIR.  SAME -- SAME JOB.  YES, SIR.
16:36   25    **Q.**   WHEN YOU WERE DOING YOUR JOB SEARCH, DID YOU SEARCH IN

FRED HOLMES, JR. - DIRECT

| | | |
|---|---|---|
| 16:36 | 1 | NEW ORLEANS FOR JOBS? |
| 16:36 | 2 | **A.**   YES, SIR.  ABSOLUTELY. |
| 16:36 | 3 | **Q.**   AND WERE YOU SUCCESSFUL IN THE JOB SEARCH DOWN HERE? |
| 16:36 | 4 | **A.**   NO, SIR. |
| 16:36 | 5 | **Q.**   LET'S TALK ABOUT YOUR HOUSE THAT YOU HAD ON PERRIN DRIVE. |
| 16:36 | 6 | **A.**   YES, SIR. |
| 16:36 | 7 | **Q.**   YOU MADE A WIND CLAIM FOR THAT HOUSE; IS THAT CORRECT? |
| 16:36 | 8 | **A.**   THAT'S CORRECT. |
| 16:36 | 9 | **Q.**   WERE YOU REPRESENTED BY A LAWYER? |
| 16:36 | 10 | **A.**   YES, SIR. |
| 16:36 | 11 | **Q.**   WHAT WAS HIS NAME? |
| 16:36 | 12 | **A.**   V.J. DAUTERIVE. |
| 16:36 | 13 | **Q.**   DID YOU MAKE A FLOOD CLAIM FOR THE HOUSE ALSO? |
| 16:36 | 14 | **A.**   YES, SIR. |
| 16:36 | 15 | **Q.**   WITH YOUR FLOOD INSURANCE? |
| 16:36 | 16 | **A.**   YES, SIR, I DID. |
| 16:36 | 17 | **Q.**   DID YOU RECEIVE FUNDS FROM YOUR FLOOD INSURER? |
| 16:36 | 18 | **A.**   YES, SIR, I DID.  BUT IT ENDED UP BEING A SHORTFALL, AS IT |
| 16:36 | 19 | WERE. |
| 16:36 | 20 | **Q.**   AND WHY DID YOU HAVE A SHORTFALL WITH THE FLOOD INSURANCE? |
| 16:37 | 21 | **A.**   THERE WAS -- WHEN MY INSURANCE COMPANY UNDERWROTE THE |
| 16:37 | 22 | POLICY, THEY INDICATED THAT THE FLOOD ELEVATION WAS .3.  BUT IN |
| 16:37 | 23 | FACT, ACCORDING TO THE FLOOD ELEVATION, WAS NEGATIVE .3.  SO IT |
| 16:37 | 24 | ENDED UP BEING -- IT REQUIRED AN ADDITIONAL PREMIUM TO BRING MY |
| 16:37 | 25 | POLICY UP TO STANDARDS.  UNFORTUNATELY, MY MORTGAGE COMPANY, |

FRED HOLMES, JR. - DIRECT

16:37    1  ALL THEY DID WAS ACCEPTED THE LOWER AMOUNTS AND PAID THE

16:37    2  PREMIUM AS IT WAS PREVIOUSLY, SINCE THE -- AND THE HOMEOWNERS

16:37    3  INSURANCE WAS ESCROWED INTO MY MORTGAGE PAYMENTS.

16:37    4  **Q.**   SO WAS IT THAT, IN EFFECT, THAT THE MORTGAGE COMPANY

16:37    5  DIDN'T PROVIDE THE RIGHT AMOUNT OF FLOOD INSURANCE, SO YOU JUST

16:37    6  HAD A LITTLE, AS OPPOSED TO A LOT?

16:37    7  **A.**   THAT IS CORRECT.

16:37    8  **Q.**   HOW MUCH DID YOU RECEIVE FROM YOUR FLOOD INSURER?

16:37    9  **A.**   I WANT TO SAY IN THE $35,000 RANGE FOR THE ACTUAL

16:38   10  STRUCTURE AND ABOUT 10,000 IN CONTENTS, AS OPPOSED TO 110,000

16:38   11  AND 60,000.

16:38   12  **Q.**   HOW MUCH DID YOU RECEIVE FROM YOUR WIND/RAIN INSURER?

16:38   13  **A.**   I DON'T RECALL THAT AMOUNT.  IT WAS WAY FAR FROM ANY KIND

16:38   14  OF POLICY LIMITS.

16:38   15  **Q.**   DID YOU MAKE A ROAD HOME CLAIM?

16:38   16  **A.**   YES, SIR, I DID.

16:38   17  **Q.**   WHAT WAS THE STATUS OF -- OR THE RESULT OF, I SHOULD SAY,

16:38   18  OF YOUR ROAD HOME CLAIM?

16:38   19  **A.**   WE ENDED UP ACCEPTING OPTION NUMBER 3.

16:38   20           OPTION NUMBER 1, OBVIOUSLY, TO REBUILD THE HOUSE WITH

16:38   21  EVERYTHING I HAD, THERE WAS NO WAY IT WOULD HAVE COVERED.

16:38   22           THEN OPTION NUMBER 2, IF I WOULD HAVE ACCEPTED THAT,

16:38   23  I STILL WOULD HAVE HAD TO PAY MY MORTGAGE COMPANY AN ADDITIONAL

16:38   24  20 TO $30,000, JUST TO PAY OFF THE REST OF THE LOAN, BECAUSE IT

16:39   25  ONLY WENT UP TO 80,000.

FRED HOLMES, JR. - DIRECT

16:39     1    **Q.**   SO JUST FOR THE COURT'S EDIFICATION AND TO KEEP THE RECORD
16:39     2    STRAIGHT, WHEN YOU BOUGHT YOUR HOUSE IN 2003, DID YOU HAVE A
16:39     3    30-YEAR MORTGAGE?
16:39     4    **A.**   YES, SIR.  THAT'S CORRECT.
16:39     5    **Q.**   SO IN THE '05/'06 TIME FLAME, YOU HAD PAID APPROXIMATELY
16:39     6    TWO YEARS OF THAT MORTGAGE?
16:39     7    **A.**   YES, SIR.  THAT'S CORRECT.
16:39     8    **Q.**   AND HOW MUCH WAS THE PRINCIPAL OF THE MORTGAGE THAT YOU
16:39     9    TOOK OUT ON YOUR HOUSE?
16:39    10    **A.**   WELL, WE'RE TALKING ABOUT THE --
16:39    11    **Q.**   ON PERRIN DRIVE.
16:39    12    **A.**   IT WAS -- $107,000 WAS THE LOAN WITH -- I THINK IT WAS
16:39    13    5-AND-A-QUARTER-PERCENT INTEREST WHICH, UNFORTUNATELY, AT THE
16:39    14    VERY BEGINNING OF THE LOAN, THAT'S WHEN THEY TAKE OUT MORE
16:39    15    INTEREST THAN PRINCIPAL.  I MEAN, THAT THEY APPLY TOWARD YOUR
16:39    16    PAYMENTS.
16:39    17    **Q.**   AND SO AT THE TIME OF KATRINA, YOU OWED APPROXIMATELY THE
16:39    18    FULL VALUE OF YOUR HOUSE THAT YOU PURCHASED?
16:39    19    **A.**   BASICALLY, YES, SIR.  I THINK MAYBE A THOUSAND OR TWO
16:39    20    THOUSAND WAS PAID OFF TOWARDS IT.
16:39    21    **Q.**   AND YOU TESTIFIED THAT YOU GOT $35,000, APPROXIMATELY,
16:40    22    FROM THE HOME INSURER AND SOME ROAD HOME MONEY.
16:40    23          WHAT DID YOU DO WITH THOSE FUNDS?
16:40    24    **A.**   THE 35,000, BETWEEN THAT AND THE ROAD HOME MONEY, THE
16:40    25    MORTGAGE COMPANY ENDED UP ACCEPTING A SHORT SALE FOR THE

FRED HOLMES, JR. - DIRECT

16:40    1    REMAINDER OF THE AMOUNT.

16:40    2    Q.   SIR, DO YOU -- IS IT -- DID YOU USE ALL THOSE FUNDS TO

16:40    3    SELL YOUR -- TO CANCEL THE MORTGAGE, EFFECTIVELY, THAT YOU HAD

16:40    4    ON PERRIN STREET?

16:40    5    A.   YES, SIR.  THAT'S CORRECT.  FOR QUITE A FEW MONTHS, I

16:40    6    THINK THROUGH -- I WANT TO SAY AUGUST OF '06, WE WERE STILL

16:40    7    PAYING A MORTGAGE ON A PROPERTY THAT WE COULD NOT EVEN LIVE IN.

16:40    8    Q.   SO AT THE TIME YOU WERE LIVING IN HOUSTON AND YOU WERE

16:40    9    UNEMPLOYED AND YOU WERE PAYING A MORTGAGE ON A HOUSE THAT WAS

16:40   10    UNINHABITABLE?

16:40   11    A.   YES, SIR.  THAT'S CORRECT.

16:40   12    Q.   WE TALKED ABOUT CHALMETTE BEING THE PARISH.  WOULD YOU

16:40   13    HAVE MOVED BACK HERE -- COULD YOU AFFORD TO MOVE BACK HERE NOW?

16:41   14    A.   I MEAN, I WOULD -- I WOULD HAVE LOVED TO.  YOU KNOW, GIVEN

16:41   15    THE RIGHT SITUATION, I WOULD HAVE LOVED TO MOVE BACK.  BUT YOU

16:41   16    KNOW, IT WAS -- IT WAS OUR EVERY INTENTION TO MOVE BACK UP

16:41   17    UNTIL THE POINT TO WHERE WE PHYSICALLY COULD NOT.

16:41   18    Q.   IS YOUR WIFE EMPLOYED?

16:41   19    A.   NO, SIR, SHE'S NOT.

16:41   20    Q.   AND IS -- WHY IS SHE UNEMPLOYED?

16:41   21    A.   HUH?  WELL, FOR HEALTH REASONS.  SHE HAD SURGERY RECENTLY,

16:41   22    AND I DIDN'T WANT HER DEALING WITH EXTRA STRESS AND -- YOU

16:41   23    KNOW, THAT.  SO IT WAS A BETTER -- YOU KNOW, IT WAS BETTER IF

16:41   24    SHE QUIT THE JOB.

16:41   25            **MR. ANDRY:**  I DON'T HAVE ANY OTHER QUESTIONS,

FRED HOLMES, JR. - CROSS

16:41    1    YOUR HONOR.

16:41    2            THE COURT:  OKAY.

16:42    3            MR. THATCH:  YOUR HONOR, I HAVE SOMEONE WITH MY

16:42    4    DOCUMENTS WHO'S COMING INTO THE COURTROOM RIGHT NOW, HOPEFULLY,

16:42    5    AS WE SPEAK.

16:42    6            THE COURT:  SURE.  THERE SHE IS.  NO PROBLEM.

16:42    7                    CROSS-EXAMINATION

16:42    8    BY MR. THATCH:

16:42    9    Q.   GOOD AFTERNOON, MR. HOLMES.

16:42   10    A.   GOOD AFTERNOON.

16:42   11    Q.   WE MET IN YOUR DEPOSITION IN SEPTEMBER.  MY NAME IS CHRIS

16:42   12    THATCH.  I REPRESENT THE WASHINGTON GROUP IN THIS LITIGATION.

16:42   13    AND I UNDERSTAND YOU'VE BEEN THROUGH A LOT.  I APPRECIATE THAT,

16:42   14    SO WE'LL GET THROUGH THIS AS QUICKLY AS WE CAN.  ALL RIGHT?

16:42   15    A.   I APPRECIATE THAT.  THANK YOU.

16:42   16    Q.   NOW, YOU HAD MENTIONED THAT WHEN YOU EVACUATED FROM

16:42   17    NEW ORLEANS AFTER THE STORM THAT YOU STAYED AT HOTELS BEFORE

16:42   18    MOVING INTO THE HOUSE ON GLENBORO DRIVE; CORRECT?

16:43   19    A.   YES, SIR.  THAT IS CORRECT.

16:43   20    Q.   AND YOU HAD MENTIONED THAT YOU HAD THE BENEFIT

16:43   21    ORGANIZATIONS PAYING FOR YOUR HOTEL DURING THAT PERIOD OF TIME;

16:43   22    IS THAT CORRECT?

16:43   23    A.   THAT'S CORRECT.

16:43   24    Q.   YOU MENTIONED THAT YOU PAID FOR THE HOTEL YOURSELF FOR A

16:43   25    PERIOD OF TIME, BUT YOU WEREN'T SURE EXACTLY HOW LONG; IS THAT

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:43 | 1 | CORRECT? |
| 16:43 | 2 | **A.**   THAT'S CORRECT.  IT'S BEEN TOO FAR LONG AGO. |
| 16:43 | 3 | **Q.**   A BRIEF PERIOD OF TIME; WOULD THAT BE ACCURATE? |
| 16:43 | 4 | **A.**   RIGHT, VERY BRIEF. |
| 16:43 | 5 | **Q.**   AND YOU PURCHASED YOUR HOUSE WHERE YOU'RE CURRENTLY LIVING |
| 16:43 | 6 | ON GLENBORO DRIVE IN JANUARY OF 2007; IS THAT CORRECT? |
| 16:43 | 7 | **A.**   ROUGHLY.  I DON'T REMEMBER EXACTLY WHEN WE CLOSED. |
| 16:43 | 8 | **Q.**   WELL, AROUND THE SAME TIME THAT YOU PURCHASED THAT HOUSE, |
| 16:43 | 9 | YOU BEGAN WORKING FOR RICE UNIVERSITY; IS THAT CORRECT? |
| 16:43 | 10 | **A.**   THAT'S CORRECT. |
| 16:43 | 11 | **Q.**   AND YOUR WIFE, BEFORE SHE -- AND I UNDERSTAND YOU |
| 16:43 | 12 | TESTIFIED THAT YOUR WIFE'S NO LONGER EMPLOYED; CORRECT? |
| 16:43 | 13 | **A.**   THAT'S CORRECT, AT THIS TIME. |
| 16:43 | 14 | **Q.**   AND BEFORE THAT, SHE WAS ALSO EMPLOYED AT RICE UNIVERSITY; |
| 16:44 | 15 | CORRECT? |
| 16:44 | 16 | **A.**   CORRECT.  YES, SIR. |
| 16:44 | 17 | **Q.**   AND YOU HAD MENTIONED WORKING FOR THE UNIVERSITY OF |
| 16:44 | 18 | NEW ORLEANS, UNO, AT THE TIME THE STORM HIT; CORRECT? |
| 16:44 | 19 | **A.**   THAT'S CORRECT. |
| 16:44 | 20 | **Q.**   AND YOU WORKED FOR THE UNIVERSITY OF NEW ORLEANS THROUGH |
| 16:44 | 21 | JANUARY OF 2006? |
| 16:44 | 22 | **A.**   THAT'S CORRECT. |
| 16:44 | 23 | **Q.**   AND YOU RECEIVED FULL BENEFITS FROM THE UNIVERSITY OF |
| 16:44 | 24 | NEW ORLEANS UNTIL JANUARY OF 2006; CORRECT? |
| 16:44 | 25 | **A.**   TO MY UNDERSTANDING, YES, SIR. |

FRED HOLMES, JR. - CROSS

16:44  1   Q.   NOW, YOU MENTIONED VISITING NEW ORLEANS AFTER THE -- AFTER

16:44  2   THE STORM.  AND YOU SAID YOU HAD VISITED NEW ORLEANS TWICE; IS

16:44  3   THAT CORRECT?

16:44  4   A.   YES, SIR.  THAT'S CORRECT.

16:44  5   Q.   THE FIRST TIME WAS IN OCTOBER AND THE SECOND TIME WAS A

16:44  6   FEW MONTHS LATER --

16:44  7   A.   THAT'S CORRECT.

16:44  8   Q.   -- MAYBE AROUND THE BEGINNING OF 2006?

16:44  9   A.   IT MAY HAVE EVEN STILL HAVE BEEN IN 2005.  I CAN'T RECALL.

16:44  10  Q.   AND THOSE WERE -- THOSE WERE SHORT VISITS TO NEW ORLEANS;

16:44  11  CORRECT?

16:44  12  A.   YES, SIR.  IT WAS JUST A -- PRETTY MUCH SEARCH TO SEE IF

16:44  13  THERE WAS ANYTHING THAT WE COULD SALVAGE.

16:45  14  Q.   IT LASTED NO MORE THAN A DAY?

16:45  15  A.   NO.  DEFINITELY THE SAME DAY.

16:45  16  Q.   SO YOU DIDN'T SPEND ANY TIME DURING THOSE TRIPS LOOKING

16:45  17  FOR HOUSING IN NEW ORLEANS WHILE YOU WERE THERE?

16:45  18  A.   NO, SIR.  MOST OF THAT WAS DONE FROM IN TEXAS.

16:45  19  Q.   AND WHEN YOU WERE BACK FOR THOSE TRIPS YOU MENTIONED

16:45  20  INSPECTING OR GOING BACK TO VISIT YOUR HOUSE AT PERRIN DRIVE;

16:45  21  CORRECT?

16:45  22  A.   YES, SIR.

16:45  23  Q.   AND WHEN YOU WENT BACK TO PERRIN DRIVE, I UNDERSTAND YOU

16:45  24  TESTIFIED THAT YOU WENT IN WITH GAS MASKS AND THE CONTENTS WERE

16:45  25  IN BAD SHAPE.  THE HOUSE, HOWEVER, WAS STILL STANDING; IS THAT

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:45 | 1 | CORRECT? |
| 16:45 | 2 | **A.**   THE BRICK WAS STILL STANDING.  BUT ACTUALLY, I TOOK TWO |
| 16:45 | 3 | STEPS, ACTUALLY, ON -- IN THE ATTIC SPACE, AND YOU COULD JUST |
| 16:45 | 4 | FEEL IT TREMBLING.  I HAD TO QUICKLY GET OUT OF THERE. |
| 16:45 | 5 | **Q.**   THE HOUSE ITSELF, THE EXTERIOR, WAS STILL STANDING? |
| 16:45 | 6 | **A.**   THE BRICKS WERE STILL STANDING. |
| 16:45 | 7 | **Q.**   THE BRICKS WERE INTACT? |
| 16:45 | 8 | **A.**   THAT I COULD SEE. |
| 16:45 | 9 | **Q.**   AND YOU NEVER MET WITH ANY CONTRACTORS OR OBTAINED ANY |
| 16:45 | 10 | ESTIMATES TO REBUILD THE PERRIN DRIVE HOME; IS THAT CORRECT? |
| 16:46 | 11 | **A.**   THAT'S CORRECT. |
| 16:46 | 12 | **Q.**   YOU ACTUALLY CHOSE TO SELL THE PERRIN DRIVE HOME THROUGH |
| 16:46 | 13 | THE ROAD HOME PROGRAM AND RELOCATE TO TEXAS, AS YOU TESTIFIED; |
| 16:46 | 14 | IS THAT CORRECT? |
| 16:46 | 15 | **A.**   IT KIND OF CHOSE ME.  BUT, YES, SIR. |
| 16:46 | 16 | **Q.**   AND ROAD HOME PAID $34,000 -- $34,608.18 FOR THE PERRIN |
| 16:46 | 17 | DRIVE HOME; IS THAT ACCURATE? |
| 16:46 | 18 | **A.**   I BELIEVE SO.  I WANT TO SAY THAT'S ACCURATE. |
| 16:46 | 19 | **Q.**   I WANT TO SHOW YOU A DOCUMENT, JUST TO CLARIFY FOR THE |
| 16:46 | 20 | RECORD.  IT'S DX 01773-0117. |
| 16:46 | 21 |        CAN YOU PULL IT UP? |
| 16:46 | 22 |        MR. HOLMES, DO YOU RECOGNIZE THIS AS YOUR ROAD HOME |
| 16:46 | 23 | ACT OF CASH SALE? |
| 16:46 | 24 | **A.**   YES, SIR. |
| 16:46 | 25 | **Q.**   AND THAT'S YOUR NAME AT THE TOP OF THE DOCUMENT; CORRECT? |

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:46 | 1 | **A.** YES, SIR. THAT'S CORRECT. |
| 16:46 | 2 | **Q.** AND YOU SEE JUST ABOVE THE SECOND HIGHLIGHT IN THE |
| 16:46 | 3 | PARAGRAPH THAT BEGINS "WHO DECLARED THAT FOR AND IN |
| 16:47 | 4 | CONSIDERATION OF THE PRICE . . ." |
| 16:47 | 5 | DO YOU SEE THAT, SIR? |
| 16:47 | 6 | **A.** YES, SIR. |
| 16:47 | 7 | **Q.** DO YOU SEE THE PRICE $34,608.18? |
| 16:47 | 8 | **A.** I SEE IT NOW, YES, SIR. |
| 16:47 | 9 | **Q.** THAT'S ACCURATE? |
| 16:47 | 10 | **A.** I BELIEVE THAT'S ACCURATE. YES, SIR. |
| 16:47 | 11 | **MR. THATCH:** YOUR HONOR, I WOULD MOVE TO ADMIT THIS |
| 16:47 | 12 | EXHIBIT. |
| 16:47 | 13 | **MR. ANDRY:** NO, OBJECTION, YOUR HONOR. |
| 16:47 | 14 | **THE COURT:** SUBJECT TO THE STATEMENTS I'VE ALREADY |
| 16:47 | 15 | MADE, LET IT BE ADMITTED. |
| 16:47 | 16 | WITH RESPECT TO THE LAST ROAD HOME STATEMENT, |
| 16:47 | 17 | LET IT BE ADMITTED. |
| 16:47 | 18 | **BY MR. THATCH:** |
| 16:47 | 19 | **Q.** NOW, MR. HOLMES, I BELIEVE WE MAY HAVE TOUCHED ON THIS A |
| 16:47 | 20 | BIT IN YOUR DIRECT, BUT I'M NOT ENTIRELY CLEAR. ROAD HOME GAVE |
| 16:47 | 21 | YOU THREE OPTIONS WITH RESPECT TO THEIR PROGRAM; CORRECT? |
| 16:47 | 22 | **A.** YES, SIR. THAT'S CORRECT. |
| 16:47 | 23 | **Q.** THE FIRST WAS TO STAY IN LOUISIANA AND REBUILD YOUR HOME? |
| 16:47 | 24 | **A.** YES, SIR. |
| 16:47 | 25 | **Q.** AND THE SECOND WAS TO SELL YOUR HOME AND STAY IN |

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:47 | 1 | LOUISIANA? |
| 16:47 | 2 | **A.**   THAT'S CORRECT. |
| 16:47 | 3 | **Q.**   AND THEN THE THIRD WAS TO TELL YOUR HOME AND RELOCATE TO |
| 16:47 | 4 | ANOTHER STATE; IS THAT CORRECT? |
| 16:47 | 5 | **A.**   THAT'S CORRECT.  YES, SIR. |
| 16:47 | 6 | **Q.**   AND YOU WERE AWARE THAT IF YOU HAD DECIDED TO STAY IN NEW |
| 16:47 | 7 | ORLEANS AND REBUILD THE PERRIN DRIVE HOUSE, ROAD HOME WOULD |
| 16:48 | 8 | HAVE PAID YOU MORE MONEY FOR THE HOUSE? |
| 16:48 | 9 | **A.**   YES.  BUT THE -- BY MY MORTGAGE COMPANY ACCEPTING THE |
| 16:48 | 10 | SHORT SALE, IT ENDED UP MAKING IT AFFORDABLE AT THAT POINT. |
| 16:48 | 11 | **Q.**   LET ME PULL UP DX 01773-144. |
| 16:48 | 12 | DO YOU RECOGNIZE THIS DOCUMENT, MR. HOLMES? |
| 16:48 | 13 | **A.**   YES, SIR. |
| 16:48 | 14 | **Q.**   CAN YOU TELL ME WHAT IT IS? |
| 16:48 | 15 | **MR. ANDRY:**  YOUR HONOR, I OBJECT ON THE BASIS OF |
| 16:48 | 16 | RELEVANCE.  I DON'T EVEN KNOW WHAT THAT DOCUMENT IS. |
| 16:47 | 17 | **MR. THATCH:**  YOUR HONOR, THIS IS THE BENEFIT |
| 16:48 | 18 | SELECTION FORM FROM THE ROAD HOME PROGRAM.  IT WAS PRODUCED IN |
| 16:48 | 19 | THE ROAD HOME FILES.  IT'S GOT MR. HOLMES' SIGNATURE.  WE CAN |
| 16:48 | 20 | GO THROUGH THE DOCUMENT AND BUILD THE FOUNDATION. |
| 16:48 | 21 | **THE COURT:**  TO THE EXTENT -- ONE, JUST TO GET IT |
| 16:48 | 22 | CLEAR FOR THE RECORD:  TO THE EXTENT THAT THIS RELATES IN SOME |
| 16:48 | 23 | WAY TO THE ISSUE OF HOW WE VALUE THE LOSS, I WILL ALLOW IT FOR |
| 16:48 | 24 | WHATEVER RELEVANCE THAT HAS. |
| 16:48 | 25 | AND I'VE ALREADY HELD THAT THE ROAD HOME MONIES, |

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:48 | 1 | AT LEAST BY MY LIKES, WERE NOT PART OF -- OR A -- WOULD NOT BE |
| 16:49 | 2 | DEDUCTED FROM THE AMOUNT UNDER THE COLLATERAL SOURCE RULE. |
| 16:49 | 3 | AND IN LIGHT OF THE PREVIOUS THINGS I'VE ALREADY |
| 16:49 | 4 | DONE, INCLUDING THE -- |
| 16:49 | 5 | **MR. ANDRY:**  BUT, YOUR HONOR, THE OBJECTION IS HE'S |
| 16:49 | 6 | APPARENTLY TRYING TO OFFER THIS TO URGE THAT HE HAD A CHOICE TO |
| 16:49 | 7 | SELL HIS HOUSE FOR MORE MONEY AND HE CHOSE A LESSER BENEFIT, |
| 16:49 | 8 | WHICH I THINK IS NOT SUPPORTED BY THAT DOCUMENT.  AND -- |
| 16:49 | 9 | **THE COURT:**  IT MAY GO -- IT MAY GO, IN SOME PERHAPS |
| 16:49 | 10 | ATTENUATED WAY, TO HIS INTENT TO REBUILD.  BUT I'LL ALLOW IT |
| 16:49 | 11 | IN. |
| 16:49 | 12 | **MR. ANDRY:**  CAN YOU NOTE OUR CONTINUING OBJECTION, |
| 16:49 | 13 | YOUR HONOR? |
| 16:49 | 14 | **THE COURT:**  ABSOLUTELY. |
| 16:49 | 15 | **MR. ANDRY:**  THANK YOU. |
| 16:47 | 16 | **THE COURT:**  ALL OBJECTIONS ARE CONTINUING AND THEY'RE |
| 16:49 | 17 | NEVER WAIVED UNTIL YOU WAIVE THEM. |
| 16:47 | 18 | **MR. THATCH:**  AND IF YOU COULD PULL UP OPTION 1, |
| 16:50 | 19 | HIGHLIGHT OPTION 1 AT THE TOP. |
| 16:50 | 20 | **BY MR. THATCH:** |
| 16:47 | 21 | **Q.**   MR. HOLMES, YOU SEE THIS AND RECOGNIZE IT AS THE FIRST |
| 16:50 | 22 | OPTION THAT ROAD HOME GAVE YOU WITH RESPECT TO THE PROGRAM? |
| 16:50 | 23 | **A.**   THAT'S -- THAT'S CORRECT. |
| 16:50 | 24 | **Q.**   AND THIS DOCUMENT SAYS THAT OPTION 1 THAT ROAD HOME |
| 16:50 | 25 | PROVIDED -- WOULD HAVE PROVIDED $84,360.30? |

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:50 | 1 | **A.**   THAT'S CORRECT, TOWARDS A LOAN OF $105,000. |
| 16:50 | 2 | **Q.**   MR. HOLMES, YOU LOOKED AT SOME PHOTOS OF YOUR HOUSE DURING |
| 16:50 | 3 | YOUR DIRECT TESTIMONY; CORRECT? |
| 16:50 | 4 | **A.**   YES, SIR. |
| 16:50 | 5 | **Q.**   YOUR ATTORNEYS PROVIDED THOSE PHOTOS TO PLAINTIFFS' EXPERT |
| 16:50 | 6 | SCOTT TAYLOR IN THIS CASE; IS THAT RIGHT? |
| 16:50 | 7 | **A.**   YES, SIR.  THAT'S CORRECT. |
| 16:50 | 8 | **Q.**   BUT YOU NEVER SPOKE TO MR. TAYLOR ABOUT THESE PHOTOS; IS |
| 16:50 | 9 | THAT CORRECT1? |
| 16:50 | 10 | **A.**   I WANT TO SAY THAT'S CORRECT. |
| 16:50 | 11 | **Q.**   YOU NEVER VISITED THE PERRIN DRIVE HOME WITH MR. TAYLOR, |
| 16:51 | 12 | DID YOU? |
| 16:51 | 13 | **A.**   NO, SIR, I DID NOT. |
| 16:51 | 14 | **Q.**   AND MR. TAYLOR NEVER ASKED YOU ANY COMMENTS -- ASKED YOU |
| 16:51 | 15 | FOR ANY COMMENTS ABOUT THE LOSS REPORT FOR YOUR PROPERTY THAT |
| 16:51 | 16 | HE SUBMITTED IN THIS CASE? |
| 16:51 | 17 | **A.**   I DON'T THINK SO. |
| 16:51 | 18 | **Q.**   MR. HOLMES, WE ALSO LOOKED AT THE CONTENTS LIST -- I'M |
| 16:51 | 19 | SORRY.  WE DIDN'T LOOK AT THE CONTENTS LIST.  BUT THE CONTENTS |
| 16:51 | 20 | LIST WAS PROVIDED TO ME AS AN EXHIBIT AND WAS ADMITTED AT THE |
| 16:51 | 21 | BEGINNING OF YOUR TESTIMONY. |
| 16:51 | 22 | **A.**   OKAY. |
| 16:51 | 23 | **Q.**   AND IT IS EXHIBIT JX 01606-0128. |
| 16:47 | 24 |        **MR. THATCH:**  IF WE COULD PULL THAT DOCUMENT UP.  I'M |
| 16:51 | 25 | SURE WE HAVE IT IN OUR PRESENTATION.  IT WAS PROVIDED TO US. |

FRED HOLMES, JR. - CROSS

16:51   1   AND IF NOT, YOUR HONOR, I COULD PROVIDE IT TO THE WITNESS.

16:51   2              JX 01606-0128.  IF YOU WOULD GO TO PAGE --

16:51   3              **MR. ANDRY:**  IN AN EFFORT TO ASSIST THE COURT AND

16:51   4   COUNSEL, I BELIEVE HE'S REFERRING TO JX 1606.

16:47   5              **MR. THATCH:**  WE GOT IT.

16:52   6              **THE COURT:**  HE'S GOT IT.

16:47   7              **MR. THATCH:**  IT'S ACTUALLY PAGE 0128, ERIC.

16:52   8   **BY MR. THATCH:**

16:47   9   **Q.**   OKAY.  NOW, THERE'S SEVERAL DOCUMENTS HERE -- I'M SORRY --

16:52  10   SEVERAL PAGES IN THIS DOCUMENT THAT'S BEEN ADMITTED AS AN

16:52  11   EXHIBIT.

16:52  12              BUT I WANT TO TAKE YOU TO THE FIRST PAGE HERE.  YOU

16:52  13   SEE DOWN AROUND THE MIDDLE IT SAYS "CPAP BREATHING MACHINE."

16:52  14              DO YOU SEE THAT?

16:52  15   **A.**   THAT'S CORRECT.

16:52  16   **Q.**   AND YOU SEE THE BASE RCV IS LISTED AS $1,500?

16:52  17   **A.**   YES, SIR.  THAT'S CORRECT.

16:52  18   **Q.**   NOW, THAT CPAP MACHINE DIDN'T ACTUALLY BELONG TO YOU;

16:52  19   CORRECT?

16:52  20   **A.**   IT DID NOT.  THAT WAS MY MOTHER-IN-LAW'S.

16:52  21   **Q.**   SO YOU DIDN'T OWN THAT, OBVIOUSLY -- THAT ITEM, BEFORE THE

16:52  22   STORM -- BEFORE THE STORM HIT?

16:52  23   **A.**   THAT'S CORRECT.  SHE HAD STAYED OVERNIGHT WITH US.

16:52  24   **Q.**   IS THERE ANYTHING ELSE ON THIS LIST THAT YOU DIDN'T OWN OR

16:53  25   YOUR WIFE DIDN'T OWN THAT WE SHOULD BE AWARE OF?

FRED HOLMES, JR. - CROSS

16:53  1  **A.**   NOT THAT I'M AWARE OF.  I BELIEVE THAT WAS THE ONLY THING.
16:53  2  **Q.**   AND THIS CONTENTS LIST YOU PROVIDED TO MR. TAYLOR AS WELL;
16:53  3  CORRECT?
16:53  4  **A.**   THAT'S CORRECT.
16:53  5  **Q.**   AND YOU DON'T RECALL HAVING ANY DISCUSSION WITH MR. TAYLOR
16:53  6  ABOUT THIS LIST; IS THAT RIGHT?
16:53  7  **A.**   THAT'S CORRECT.  I BELIEVE IT WAS JUST EXCHANGED THROUGH
16:53  8  E-MAILS.
16:53  9  **Q.**   IN THOSE E-MAILS, DID YOU DULY DISCUSS ANY OF THE
16:53  10  PARTICULAR ITEMS ON THIS LIST WITH MR. TAYLOR?
16:53  11  **A.**   NO, SIR.
16:53  12  **Q.**   AND IN THAT E-MAIL COMMUNICATION, DID HE ASK YOU ANY
16:53  13  QUESTIONS ABOUT THESE ITEMS?
16:53  14  **A.**   I DON'T THINK SO.
16:53  15  **Q.**   MR. HOLMES, YOU MENTIONED THAT YOU OWNED A 1998 TOYOTA
16:53  16  COROLLA WHEN KATRINA HIT; CORRECT?
16:53  17  **A.**   THAT'S CORRECT.
16:53  18  **Q.**   AND YOU SUBMITTED AN INSURANCE CLAIM TO GEICO FOR
16:53  19  COMPUTER-RELATED DAMAGE TO THAT COROLLA?
16:53  20  **A.**   THAT'S CORRECT.
16:53  21  **Q.**   AND YOU RECEIVED $5,641.98 FROM GEICO FOR THE DAMAGE TO
16:53  22  THAT COROLLA; IS THAT RIGHT?
16:53  23  **A.**   THAT'S CORRECT.
16:54  24  **Q.**   MR. HOLMES, WE TALKED A LITTLE BIT ABOUT YOUR FLOOD
16:54  25  INSURANCE CLAIMS THAT YOU MADE IN CONNECTION WITH KATRINA.

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:54 | 1 | YOU HAD A FLOOD INSURANCE POLICY WITH FIDELITY |
| 16:54 | 2 | NATIONAL PROPERTY AND CASUALTY; IS THAT RIGHT? |
| 16:54 | 3 | **A.**   THAT'S NOT WHO WE ORIGINALLY TOOK OUT, BUT THEY ULTIMATELY |
| 16:54 | 4 | BOUGHT OUT THE COMPANY. |
| 16:54 | 5 | **Q.**   THAT WAS THE COMPANY THAT INSURED YOU AT THE TIME? |
| 16:54 | 6 | **A.**   AT THE TIME, YES, SIR. |
| 16:54 | 7 | **Q.**   AND YOU TALKED ABOUT HOW MUCH YOU WERE PAID UNDER THAT |
| 16:54 | 8 | POLICY.  AND I'D ACTUALLY LIKE TO SHOW YOU A DOCUMENT.  I MAY |
| 16:54 | 9 | HAVE TO CLARIFY THE RECORD. |
| 16:54 | 10 | ERIC, WOULD YOU PULL UP JX 01548-0470. |
| 16:54 | 11 | ERIC, IF YOU COULD JUST HIGHLIGHT THAT ENTIRE PIECE |
| 16:54 | 12 | AND BLOW IT UP, IT WILL BE EASIER TO READ. |
| 16:55 | 13 | MR. HOLMES, DO YOU RECOGNIZE THIS DOCUMENT? |
| 16:55 | 14 | **A.**   I THINK SO, BUT I'M NOT SURE. |
| 16:55 | 15 | **Q.**   WELL, YOU SEE AT THE TOP OF THE DOCUMENT IT SAYS "FIDELITY |
| 16:55 | 16 | NATIONAL PROPERTY AND CASUALTY CLAIMS SYSTEM PAYMENT HISTORY"? |
| 16:55 | 17 | **A.**   THAT'S CORRECT. |
| 16:55 | 18 | **Q.**   FIDELITY NATIONAL PROPERTY AND CASUALTY WAS THE FLOOD |
| 16:55 | 19 | INSURER WE JUST MENTIONED WHO YOU HAD YOUR POLICY WITH; |
| 16:55 | 20 | CORRECT? |
| 16:55 | 21 | **A.**   THAT'S CORRECT. |
| 16:55 | 22 | **Q.**   IN THE MIDDLE OF THE PAGE -- IN THE MIDDLE OF THIS BLOWUP |
| 16:55 | 23 | YOU SEE IT SAYS "PAID TO FRED N. HOLMES." |
| 16:55 | 24 | THAT'S YOU; CORRECT? |
| 16:55 | 25 | **A.**   THAT'S CORRECT.  YES, SIR. |

FRED HOLMES, JR. - CROSS

16:55   1   **Q.**   AND UNDER PAYMENT REASON IT SAYS "SETTLEMENT OF BUILDING

16:55   2   DAMAGE LESS DEDUCTIBLE ARISING FROM LOSS"?

16:55   3   **THE COURT:**   IT SAYS "FRED N. HOLMES AND JENEEN M.

16:55   4   HOLMES AND STANDARD MORTGAGE CORPORATION."

16:55   5   **MR. THATCH:**   YES, YOUR HONOR.

16:55   6   **THE COURT:**   JUST FOR THE --

16:57   7   **MR. THATCH:**   YES.

16:55   8   **THE WITNESS:**   WHICH STANDARD MORTGAGE RECEIVED.

16:55   9   **MR. THATCH:**   AND IF YOU COULD GO THROUGH, ERIC, EACH

16:55   10  OF THESE PAGES.  WE CAN WALK THROUGH EACH OF THE PAYMENTS HERE,

16:56   11  BUT I'LL SUBMIT THE DOCUMENT --

16:56   12  **MR. ANDRY:**   AND, YOUR HONOR, WE'VE ADMITTED THE

16:56   13  AMOUNTS.  AND ACTUALLY, WE STAND CORRECTED.  I THINK MR. HOLMES

16:56   14  TESTIFIED THAT HE RECEIVED $35,000, AND COUNSEL JUST POINTED

16:56   15  OUT THAT IT WAS LESS THAN THAT.  HE ACTUALLY RECEIVED 27,400.

16:56   16  SO WE THANK HIM FOR ADDING TO THE CLAIM.

16:56   17  BUT, NONETHELESS, YOUR HONOR, WE'VE STIPULATED

16:56   18  TO THE AMOUNTS.  TO THE EXTENT THERE'S ANY OTHER

16:56   19  CHARACTERIZATION ON THESE DOCUMENTS THAT HE'S REFERRING TO,

16:56   20  IT'S CLASSIC HEARSAY, AND THEY'RE OFFERING IT INTO EVIDENCE TO

16:56   21  PROVE THE TRUTH OF THE MATTER ASSERTED.

16:56   22  **THE COURT:**   I'M NOT SURE WHAT THAT WOULD BE OTHER

16:56   23  THAN THE AMOUNT.

16:56   24  **MR. ANDRY:**   WELL, I THINK HE'S TRYING TO SHOW THIS

16:56   25  AMOUNT WAS PAID IN FLOOD; AND, THEREFORE, THAT HE'S RECEIVED

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:56 | 1 | SOME, AND TO RECEIVE OTHER FLOOD WOULD BE SOMEHOW DOUBLE |
| 16:56 | 2 | DIPPING. |
| 16:56 | 3 | HOWEVER, THE CLASSIFICATION FOR THOSE, WE THINK |
| 16:56 | 4 | IS HEARSAY. |
| 15:43 | 5 | **MR. THATCH:**  YOUR HONOR, IF I MAY.  WE UNDERSTAND |
| 16:56 | 6 | YOUR RULING ON COLLATERAL SOURCE.  WE'RE NOT OFFERING IT FOR |
| 16:56 | 7 | THAT PURPOSE.  WE'RE SIMPLY OFFERING IT TO CLARIFY THE RECORD |
| 16:56 | 8 | ON THE PAYMENT THAT MR. HOLMES RECEIVED, SUBJECT -- OR, RATHER, |
| 16:56 | 9 | CONTRARY TO MR. ANDRY'S OBJECTION. |
| 16:56 | 10 | IF WE GO THROUGH THE ENTIRE DOCUMENT, WE'LL |
| 16:57 | 11 | ACTUALLY SEE ALL OF THE PAYMENTS THAT WERE MADE. |
| 16:57 | 12 | AND I COULD SUBMIT -- WE CAN GO THROUGH AND ADD |
| 16:57 | 13 | THEM, BUT I'VE DONE THE ADDITION MYSELF.  AND SO I CAN GO |
| 16:57 | 14 | THROUGH AND GET THOSE NUMBERS, AND WE CAN BE DONE WITH THE |
| 16:57 | 15 | DOCUMENT. |
| 16:57 | 16 | **THE COURT:**  THE COLLATERAL SOURCE THAT I THOUGHT WE |
| 16:57 | 17 | WERE GOING TO PROFFER, BUT THIS MAY BE JUST AS QUICK. |
| 16:57 | 18 | IS THERE ANY OTHER RELEVANCE THAT YOU'RE |
| 16:57 | 19 | ATTEMPTING TO ADDUCE OTHER THAN REQUESTING THE COURT TO DEDUCT |
| 16:57 | 20 | THE FLOOD INSURANCE? |
| 16:57 | 21 | I KNOW THE ROAD HOME -- I'M NOT SURE YOU'RE EVEN |
| 16:57 | 22 | REQUESTING THAT.  I KNOW THE ROAD HOME YOU ARE, BUT I'M NOT |
| 16:57 | 23 | SURE YOU'RE SAYING THAT THE FLOOD INSURANCE IS NOT SUBJECT TO |
| 16:57 | 24 | THE COLLATERAL SOURCE RULE.  YOU MIGHT CLARIFY ME. |
| 16:57 | 25 | **MR. THATCH:**  I THINK -- I THINK OUR ARGUMENT HERE AND |

FRED HOLMES, JR. - CROSS

16:57    1    OUR POSITION ON THIS EVIDENCE IS SIMILAR TO THE ROAD HOME

16:57    2    EVIDENCE, AND THAT WE'RE NOT ARGUING CONTRARY -- WE'RE NOT

16:57    3    TRYING TO GET INTO ANYTHING CONTRARY OR COLLATERAL SOURCE.

16:57    4              **THE COURT:**  YOU'RE ARGUING HE HAD ENOUGH -- HE HAD

16:57    5    ENOUGH FUNDS TO REBUILD HIS HOME?

16:57    6              **THE WITNESS:**  PRECISELY.

16:57    7              **THE COURT:**  ALL RIGHT.  GOT IT.

16:57    8                   AND JUST SO THE RECORD IS CLEAR, WE WOULD MOVE

16:57    9    FOR THE ADMISSION OF THE EXHIBIT.

16:58   10              **THE COURT:**  THE COURT'S GOING TO ALLOW IT.

16:58   11    **BY MR. THATCH:**

16:57   12    **Q.**   AND WITHOUT HAVING TO GO THROUGH EACH PAGE, THE FIDELITY

16:58   13    PAID YOU, MR. HOLMES, 37,400 FOR DAMAGE TO THE PERRIN DRIVE

16:58   14    HOME IN CONNECTION WITH KATRINA?

16:58   15    **A.**   CORRECT.

16:58   16    **Q.**   AND FIDELITY PAID $15,800 FOR DAMAGE TO THE CONTENTS OF

16:58   17    YOUR HOME IN CONNECTION WITH KATRINA?

16:58   18    **A.**   THAT'S CORRECT.

16:58   19              **MR. ANDRY:**  BUT, YOUR HONOR, I DON'T THINK THAT'S

16:58   20    CORRECT.  I THINK AT THE TIME HE HAD AN ATTORNEY, AND THE

16:58   21    AMOUNTS THAT HE RECEIVED WERE SUBJECT TO ATTORNEYS' FEES, SO I

16:58   22    DON'T THINK HE RECEIVED --

16:58   23              **THE COURT:**  YOU CAN ASK HIM THAT --

16:58   24              **MR. ANDRY:**  I'LL ASK HIM THAT, YOUR HONOR.  I'M

16:58   25    SORRY.

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:58 | 1 | **THE COURT:**  ALL RIGHT. |
| 16:58 | 2 | **BY MR. THATCH:** |
| 16:57 | 3 | **Q.**   NOW, MR. HOLMES, WE TALKED ABOUT ALSO -- I'M SORRY. |
| 16:58 | 4 | YOU TALKED ABOUT, WITH YOUR COUNSEL, ON DIRECT THE |
| 16:58 | 5 | FACT THAT YOU RECEIVED, IN YOUR WORDS, A SHORTFALL THROUGH THIS |
| 16:58 | 6 | CLAIM POLICY; IS THAT RIGHT? |
| 16:58 | 7 | **A.**   THAT'S CORRECT. |
| 16:58 | 8 | **Q.**   NOW, IN CONNECTION WITH AND RESPONSE TO WHAT YOU REFERRED |
| 16:58 | 9 | TO AS A SHORTFALL, YOU FILED A LAWSUIT AGAINST YOUR FLOOD |
| 16:58 | 10 | INSURER; IS THAT RIGHT? |
| 16:58 | 11 | **A.**   THAT -- I BELIEVE SO. |
| 16:58 | 12 | **Q.**   YOU ALSO FILED A LAWSUIT AGAINST STANDARD MORTGAGE |
| 16:58 | 13 | COMPANY; IS THAT RIGHT? |
| 16:58 | 14 | **A.**   THAT'S CORRECT. |
| 16:59 | 15 | **Q.**   AND YOU ALSO FILED A LAWSUIT AGAINST THE PERSON WITH |
| 16:59 | 16 | STANDARD MORTGAGE WHO WAS RESPONSIBLE FOR COMPUTING YOUR POLICY |
| 16:59 | 17 | AMOUNTS; IS THAT RIGHT? |
| 16:59 | 18 | **A.**   THAT'S CORRECT. |
| 16:59 | 19 | **Q.**   AND THOSE LAWSUITS WERE DISMISSED; IS THAT RIGHT? |
| 16:59 | 20 | **A.**   I THINK THAT ENDED UP BEING THE ULTIMATE. |
| 16:59 | 21 | **Q.**   YOU DIDN'T RECEIVE ANY JUDGMENT AS A RESULT OF ANY OF |
| 16:59 | 22 | THOSE LAWSUITS; IS THAT CORRECT? |
| 16:59 | 23 | **A.**   I THINK -- I THINK THAT'S CORRECT. |
| 16:59 | 24 | **Q.**   NOW, MR. HOLMES, I BELIEVE YOU ALSO TOUCHED ON DIRECT THE |
| 16:59 | 25 | FACT THAT YOU HAD A HOMEOWNERS INSURANCE POLICY WHEN KATRINA |

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 16:59 | 1 | HIT; CORRECT? |
| 16:59 | 2 | A.   THAT'S CORRECT. |
| 16:59 | 3 | Q.   AND THAT POLICY WAS WITH TRIPLE A, ALSO REFERRED TO AS |
| 16:59 | 4 | AUTO CLUB FAMILY OR AUTO CLUB FINANCIAL? |
| 16:59 | 5 | A.   CORRECT. |
| 16:59 | 6 | Q.   AND YOU MADE A CLAIM UNDER THAT POLICY FOR ASSISTANCE |
| 16:59 | 7 | AFTER KATRINA; CORRECT? |
| 16:59 | 8 | A.   CORRECT. |
| 17:00 | 9 | Q.   AND YOU RECALL YOU RECEIVED A PAYMENT OF $2,700 -- I'M |
| 17:00 | 10 | SORRY -- $2,000 -- 700 -- $2,750 FROM AUTO CLUB IN CONNECTION |
| 17:00 | 11 | WITH KATRINA; CORRECT? |
| 17:00 | 12 | A.   CORRECT.  THAT WAS PART OF THE CIVIL AUTHORITY, YOU KNOW, |
| 17:00 | 13 | THE REFRIGERATOR SPOILED AND EVERYTHING -- EVERYTHING LIKE |
| 17:00 | 14 | THAT. |
| 17:00 | 15 | Q.   ERIC, IF WE COULD PULL UP JX 1479. |
| 17:00 | 16 | MR. ANDRY:  AGAIN, YOUR HONOR, WE OBJECT.  EVERY -- |
| 17:00 | 17 | WHAT IS IT?  I'M SORRY, YOUR HONOR.  I THINK IT'S THE WRONG |
| 17:00 | 18 | SHEET.  GO AHEAD. |
| 17:00 | 19 | BY MR. THATCH: |
| 16:57 | 20 | Q.   MR. HOLMES, DO YOU RECOGNIZE THIS DOCUMENT? |
| 17:00 | 21 | A.   YES, SIR. |
| 17:00 | 22 | Q.   DO YOU RECOGNIZE IT TO BE A STATEMENT BY AUTO CLUB FAMILY |
| 17:00 | 23 | WHO WAS YOUR INSURER AT THE TIME FOR HOMEOWNERS -- |
| 17:00 | 24 | A.   THAT'S CORRECT. |
| 17:00 | 25 | Q.   -- OF PAYMENT TO YOU? |

FRED HOLMES, JR. - CROSS

17:00    1    **A.**    THAT'S CORRECT.  YES, SIR.

17:00    2    **Q.**    AND, ERIC, IF YOU GO DOWN TO THE BOTTOM.

17:00    3    YOU'LL THAT SEE THAT AMOUNT THAT SAYS 27- -- $2,750?

17:00    4    **MR. ANDRY:**  YOUR HONOR, WE OBJECT TO THAT.  I GOT IT

17:00    5    DOWN.

17:00    6    IN YOUR MOTION IN LIMINE, YOU SPECIFICALLY SAID

17:00    7    "THE COURT WILL NOT ALLOW THE ADMISSION OF ADJUSTER'S OPINIONS,

17:01    8    REPORTS AND OTHER SUCH DATA," IN YOU MOTION IN LIMINE REGARDING

17:01    9    COLLATERAL SOURCE.

17:01   10    WE WOULD SUBMIT, YOUR HONOR, THAT THIS IS OTHER

17:01   11    SUCH DATA OTHER THAN THE SPECIFIC AMOUNT WHICH WE ALREADY HAVE

17:01   12    IN.  SO THE DOCUMENT IS EITHER IRRELEVANT AND/OR ITS

17:01   13    OBJECTIONABLE BECAUSE IT'S OUTSIDE THE SCOPE YOUR MOTION IN

17:01   14    LIMINE RULING.

17:01   15    **MR. THATCH:**  YOUR HONOR, IF I MAY.

17:01   16    **THE COURT:**  YES, SIR.

17:01   17    **MR. THATCH:**  WE'RE NOT -- WE'RE NOT OFFERING THIS

17:01   18    DOCUMENT TO SHOW ANY OPINIONS BY ANY ADJUSTERS.  MR. HOLMES

17:01   19    MENTIONED, IN RESPONSE TO MY QUESTION, THAT THE AMOUNT THAT HE

17:01   20    RECEIVED WAS SPECIFIC TO LOSS OF USE.

17:01   21    TWO THINGS.  I'M SIMPLY OFFERING THE DOCUMENT TO

17:01   22    SHOW THAT THAT ACTUALLY ISN'T THE CASE.  IF YOU SEE PERSONAL

17:01   23    PROPERTY, UNDER COVERAGE C, WAS ALSO A PART OF THAT PAYMENT.

17:01   24    AND ALSO, JUST TO CLARIFY FOR THE RECORD, THAT

17:01   25    IS THE PAYMENT.  WE JUST WANT THE PAYMENT IN.  THAT'S IT.

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 17:01 | 1 | WE'RE NOT LOOKING AT IT FOR ANY OTHER REASON. |
| 17:01 | 2 | **MR. ANDRY:** THE PAYMENT'S IN, YOUR HONOR, SO THERE'S |
| 17:01 | 3 | NO NEED FOR THE DOCUMENT, BECAUSE THE PAYMENT AMOUNTS ARE |
| 17:01 | 4 | ALREADY IN. |
| 17:01 | 5 | **THE COURT:** WELL, THE DOCUMENT MEANS NOTHING TO ME, |
| 17:01 | 6 | THE PAYMENT DOES. I DON'T SEE ANY OTHER -- I'M GOING TO LET IT |
| 17:02 | 7 | IN BECAUSE IT'S THERE. |
| 16:57 | 8 | **MR. THATCH:** THANK YOU, YOUR HONOR. |
| 17:02 | 9 | **THE COURT:** THE ONLY THING -- AND THAT MAY MEAN |
| 17:02 | 10 | NOTHING TO ME, BECAUSE -- LET ME MAKE IT CLEAR: SIMPLY BECAUSE |
| 17:02 | 11 | IN MY MOTION IN LIMINE I SAID, YOU KNOW, I'M STILL PONDERING |
| 17:02 | 12 | THE DIMINUTION OF VALUE VERSUS THE -- VERSUS THE REPLACEMENT |
| 17:02 | 13 | COSTS. |
| 17:02 | 14 | THERE ARE MANY FACTORS THAT GO IN, AND MERELY |
| 17:02 | 15 | BECAUSE WHAT THE FINANCES WERE, THERE ARE A LOT OF OTHER THINGS |
| 17:02 | 16 | I THINK I HAVE TO CONSIDER IN MAKING THAT DECISION, AND I'VE |
| 17:02 | 17 | GOT TO HAVE MORE TIME AND BRIEFING ON WHAT THE SUPREME COURT |
| 17:02 | 18 | INTENDED IN *ROMAN CATHOLIC* AND IT'S PROGENY. |
| 17:02 | 19 | SO -- BUT I'VE LEFT THAT DOOR OPEN, AND IT'S |
| 17:02 | 20 | STILL OPEN, SO THEY'RE TRYING TO SHOW THAT HE WAS IN A POSITION |
| 17:02 | 21 | TO REBUILD THAT HOME. |
| 16:57 | 22 | **MR. THATCH:** THANK YOU, YOUR HONOR. |
| 17:02 | 23 | BY **MR. THATCH:** |
| 16:57 | 24 | **Q.** NOW, MR. HOLMES, WE WERE TALKING ABOUT YOUR INSURANCE |
| 17:03 | 25 | POLICY WITH AUTO CLUB. |

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 17:03 | 1 | YOU FILED A LAWSUIT AGAINST AUTO CLUB SEEKING |
| 17:03 | 2 | ADDITIONAL ASSISTANCE IN CONNECTION WITH KATRINA; IS THAT |
| 17:03 | 3 | CORRECT? |
| 17:03 | 4 | **A.** YES, THAT'S CORRECT. |
| 17:03 | 5 | **Q.** AND IN THAT LAWSUIT, YOU CLAIMED THAT A PORTION OF THE |
| 17:03 | 6 | PERRIN DRIVE HOME AND SEVERAL OF YOUR PERSONAL PROPERTY ITEMS |
| 17:03 | 7 | WERE DAMAGED BY WIND OR WIND-DRIVEN RAIN; IS THAT CORRECT? |
| 17:03 | 8 | **A.** THAT'S CORRECT.  IT WAS KIND OF WHAT I WAS ADVISED BY MY |
| 17:03 | 9 | ATTORNEY AT THAT TIME. |
| 17:03 | 10 | **Q.** BUT YOU MADE THE CLAIM UNDER YOUR POLICY; IS THAT CORRECT? |
| 17:03 | 11 | **A.** THAT'S -- |
| 17:03 | 12 | **Q.** I'M SORRY.  STRIKE THAT. |
| 17:03 | 13 | YOU FILED A LAWSUIT SEEKING, ON YOUR BEHALF, RECOVERY |
| 17:03 | 14 | FOR WIND AND WIND-DRIVEN RAIN DAMAGE UNDER YOUR POLICY? |
| 17:03 | 15 | **A.** AGAIN, AT THAT POINT, WE HAD NO IDEA WHAT WAS WIND, WHAT |
| 17:03 | 16 | WAS WATER.  WE WERE JUST TRYING TO GET ANYTHING THAT WE COULD |
| 17:03 | 17 | TO SURVIVE. |
| 17:03 | 18 | **Q.** YOU ALSO SOUGHT ADDITIONAL LIVING EXPENSES IN THAT |
| 17:03 | 19 | LAWSUIT? |
| 17:03 | 20 | **A.** I CAN'T RECALL THAT. |
| 17:03 | 21 | **Q.** ERIC, WILL YOU BRING UP JX 1480. |
| 17:04 | 22 | **MR. ANDRY:** YOUR HONOR, AGAIN, WE OBJECT TO THE |
| 17:04 | 23 | RELEVANCE OF ALL THE LAWSUIT STUFF.  WE HAVE THE AMOUNT |
| 17:04 | 24 | ADMITTED THAT HE RECEIVED, AND WE KNOW THAT HE MADE THE CLAIMS. |
| 17:04 | 25 | WHAT A LAWYER WROTE ON A PIECE OF PAPER OR WHAT |

FRED HOLMES, JR. - CROSS

| 17:04 | 1 | THE COMPLAINT SAID OR WHAT HE WAS ADVISED BY HIS ATTORNEY, |
| 17:04 | 2 | THAT'S ALL IRRELEVANT TO THIS PROCEEDING. |
| 16:57 | 3 | **MR. THATCH:**  IF I MAY, YOUR HONOR. |
| 17:04 | 4 | WE HAVE AN AMOUNT IN.  THAT AMOUNT IS NOT |
| 17:04 | 5 | RELEVANT TO THIS LAWSUIT.  THIS LAWSUIT IS SEPARATE AND APART |
| 17:04 | 6 | FROM THAT AMOUNT THAT WE HAVE IN EVIDENCE. |
| 17:04 | 7 | I ALSO UNDERSTAND YOUR HONOR'S RULING FROM THIS |
| 17:04 | 8 | MORNING, BUT I MAY STAND CORRECTED, BUT MY UNDERSTANDING IS |
| 17:04 | 9 | THAT PLAINTIFFS' STATEMENTS ABOUT WIND AND WIND-DRIVEN RAIN -- |
| 17:04 | 10 | **MR. ANDRY:**  NO, NOT THOSE STATEMENTS, YOUR HONOR. |
| 17:04 | 11 | AND TO THE EXTENT A LAWYER MADE THE STATEMENT, I MEAN, HE'S GOT |
| 17:04 | 12 | ON THE SCREEN A PETITION FOR DAMAGES.  TO THE EXTENT THAT MR. |
| 17:04 | 13 | V.J. DAUTERIVE MADE STATEMENTS ABOUT -- |
| 17:04 | 14 | **THE COURT:**  IT'S A JUDICIAL ADMISSION. |
| 16:57 | 15 | **MR. THATCH:**  YES, YOUR HONOR. |
|  | 16 | **MR. ANDRY:**  IT'S -- |
| 17:04 | 17 | **THE COURT:**  HE'S SAYING IT'S A JUDICIAL ADMISSION, |
| 17:04 | 18 | AND THAT WOULD SOMEHOW GO TO HIS FLOOD CLAIM. |
| 17:04 | 19 | THE COURT UNDERSTANDS THE HUNDREDS OF THOUSANDS |
| 17:05 | 20 | LAWSUITS THAT WERE FILED HERE -- I WAS INVOLVED IN MANY OF |
| 17:05 | 21 | THEM -- AND THE INCREDIBLE CONFUSION THAT NONE OF YOU WHO |
| 17:05 | 22 | WEREN'T HERE CAN EVEN POSSIBLY EVEN FATHOM OR BEGIN TO |
| 17:05 | 23 | COMPREHEND.  SO THE COURT WILL -- ALL OF THAT WILL GO INTO THE |
| 17:05 | 24 | COURT'S THINKING ON THIS. |
| 17:05 | 25 | HOWEVER, TO THE EXTENT IT IS A JUDICIAL |

FRED HOLMES, JR. - CROSS

17:05    1  ADMISSION, I'M REALLY MORE INTERESTED IN WHAT HE GOT, BUT YOU

17:05    2  CAN POINT IT OUT.

17:05    3          IT WAS EVERYBODY IN NEW ORLEANS SCRAMBLING TO DO

17:05    4  WHATEVER THEY COULD, BUT I UNDERSTAND IT.  AND IF IT'S AN

17:05    5  ADMISSION, THE COURT WILL LOOK AT IT IN CONTEXT.

16:57    6          **MR. THATCH:**  THANK YOU, YOUR HONOR.

17:05    7          **THE COURT:**  WHAT WAS THE ADMISSION?  DID IT -- LET ME

17:05    8  ASK YOU THIS:  DID YOU RECEIVE ANYTHING FROM THIS LAWSUIT, SIR?

17:05    9          **THE WITNESS:**  I THINK THEY ENDED UP SETTLING.  I

17:05   10  DON'T REMEMBER THE AMOUNTS.

17:05   11          **THE COURT:**  OKAY.  I'LL LET COUNSEL PROCEED, THEN.

17:05   12          GO AHEAD.

16:57   13          **MR. THATCH:**  THANK YOU, YOUR HONOR.

17:06   14          IF YOU COULD, ERIC, PULL THAT DOCUMENT UP VERY

17:06   15  QUICKLY.

17:06   16          **THE COURT:**  THE AMOUNT DOES MEAN SOMETHING TO ME,

17:06   17  BECAUSE THAT WOULD NOT BE COVERED BY THE COLLATERAL SOURCE

17:06   18  RULE.

16:57   19          **MR. THATCH:**  AND, ERIC, IF YOU COULD PULL UP THAT --

17:06   20  THE LAST PARAGRAPH ON THAT FRONT -- FIRST PAGE.

17:06   21  **BY MR. THATCH:**

16:57   22  **Q.**   DO YOU SEE THAT PARAGRAPH, MR. HOLMES?

17:06   23          IT SAYS THAT "ON AUGUST 29TH, 2005, THE IMMOVABLE

17:06   24  PROPERTY LOCATED AT 1205 PERRIN DRIVE, ARABI, LOUISIANA, IN THE

17:06   25  PARISH OF ST. BERNARD, SUFFERED EXTENSIVE WIND DAMAGE AS A

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 17:06 | 1 | RESULT OF HURRICANE KATRINA." |
| 17:06 | 2 | DO YOU SEE THAT? |
| 17:06 | 3 | **A.**   I SEE IT, YES, SIR. |
| 17:06 | 4 | **Q.**   AND IT GOES ON.  "MORE PARTICULARLY, DAMAGES" -- |
| 17:06 | 5 | ERIC, COULD YOU PULL THAT BACK UP. |
| 17:06 | 6 | "DAMAGES INCLUDE, BUT ARE NOT LIMITED TO THE |
| 17:06 | 7 | FOLLOWING." |
| 17:06 | 8 | AND THEN, ERIC, JUST JUMP TO THE NEXT PAGE.  ALL |
| 17:06 | 9 | RIGHT.  THOSE ITEMS AT THE VERY TOP, PLEASE. |
| 17:06 | 10 | "ROOF DAMAGE, WIND DAMAGE TO THE FRONT DOOR, |
| 17:06 | 11 | WINDBLOWN RAIN, MOLD AND ADDITIONAL LIVING EXPENSES." |
| 17:06 | 12 | DO YOU SEE THAT, MR. HOLMES? |
| 17:06 | 13 | **A.**   YES, SIR. |
| 17:07 | 14 | **Q.**   AND YOU UNDERSTAND THIS PETITION FOR DAMAGES WAS TRUE AND |
| 17:07 | 15 | CORRECT WHEN IT WAS FILED? |
| 17:07 | 16 | **A.**   I MEAN, UNDER ADVISEMENT FROM MY ATTORNEY AT THAT TIME, |
| 17:07 | 17 | YES, SIR. |
| 17:07 | 18 | **Q.**   BUT IN YOUR LAWSUIT AGAINST YOUR INSURER; CORRECT? |
| 17:07 | 19 | **A.**   CORRECT.  AGAIN, UNDER ADVISEMENT. |
| 17:07 | 20 | **THE COURT:**  WELL, LET'S MOVE ON FROM THAT AND SEE |
| 17:07 | 21 | WHAT HE GOT.  IT'S GOING TO BE RELEVANT IF HE DID, IN FACT, GET |
| 17:07 | 22 | IT. |
| 17:07 | 23 | **MR. THATCH:**  WHY DON'T WE PULL UP JX 1483. |
| 17:07 | 24 | BY MR. THATCH: |
| 17:07 | 25 | **Q.**   DO YOU RECOGNIZE THIS DOCUMENT, MR. HOLMES? |

FRED HOLMES, JR. - CROSS

17:07  1            **MR. ANDRY:**  OBJECTION, YOUR HONOR, TO THE SETTLEMENT,

17:07  2  ON THE GROUNDS THAT IT'S A SETTLEMENT AND THE EXTERNAL -- IT'S

17:07  3  NOT A DIRECT SETTLEMENT.

17:07  4            **THE COURT:**  OVERRULED.  OVERRULED.  HE CAN ASK HIM

17:07  5  ABOUT IT.

17:07  6  **BY MR. THATCH:**

17:07  7  **Q.**   MR. HOLMES, YOU UNDERSTAND THAT THIS IS THE SETTLEMENT

17:07  8  AGREEMENT THAT YOU MADE WITH YOUR HOMEOWNERS INSURER FOR THE

17:08  9  WIND AND RAIN DAMAGE CLAIMS TO YOUR HOME?

17:08  10  **A.**   YES, SIR.  CORRECT.

17:08  11  **Q.**   AND YOU SEE THE AMOUNT OF PAYMENT ON THIS DOCUMENT?  IT

17:08  12  SAYS $20,000; CORRECT?

17:08  13  **A.**   YES, SIR.  THAT'S CORRECT.

17:08  14            **MR. THATCH:**  YOUR HONOR, I'D LIKE TO MOVE THIS

17:08  15  EVIDENCE -- THIS DOCUMENT INTO ADMISSION -- INTO EVIDENCE.

17:08  16            **THE COURT:**  SUBJECT TO THE OBJECTION, LET IT BE

17:08  17  ADMITTED.

17:08  18            **MR. THATCH:**  THE COURT'S INDULGENCES FOR JUST ONE

17:08  19  MINUTE.

17:08  20            **THE COURT:**  CERTAINLY.

17:08  21            **MR. THATCH:**  THANK YOU, YOUR HONOR.

17:09  22            **THE WITNESS:**  EXCUSE ME, YOUR HONOR.  MY WATER

17:09  23  DECANTER IS EMPTY.  CAN I GET SOME MORE WATER?

17:09  24            **THE COURT:**  SURE.

17:09  25            **THE WITNESS:**  THIS ONE IS EMPTY.

FRED HOLMES, JR. - CROSS

| | | |
|---|---|---|
| 17:09 | 1 | **THE COURT:**  SURE.  SHEENA, CAN YOU GET HIM A CUP OF |
| 17:09 | 2 | WATER? |
| 17:09 | 3 | **THE WITNESS:**  I DO APOLOGIZE. |
| 17:09 | 4 | **THE COURT:**  WE GOT IT.  THANK YOU. |
| 17:10 | 5 | **THE WITNESS:**  THANK YOU. |
| 17:10 | 6 | THANK YOU.  I APPRECIATE IT. |
| 17:10 | 7 | **THE DEPUTY CLERK:**  UH-HUH. |
| 17:10 | 8 | **THE COURT:**  OKAY.  SIR. |
| 17:10 | 9 | BY MR. THATCH: |
| 17:10 | 10 | Q.   ARE YOU OKAY, MR. HOLMES? |
| 17:10 | 11 | A.   YES, SIR. |
| 17:10 | 12 | Q.   JUST A FEW QUESTIONS AND THEN I'LL BE DONE. |
| 17:10 | 13 | YOU HAD -- WE HAD TALKED ABOUT THE ROAD HOME PROGRAM |
| 17:10 | 14 | AND THE PAYMENT THAT WAS MADE TO YOU -- |
| 17:10 | 15 | A.   YES, SIR. |
| 17:10 | 16 | Q.   -- FOR THE PERRIN DRIVE HOME; CORRECT? |
| 17:10 | 17 | A.   THAT'S CORRECT. |
| 17:10 | 18 | Q.   AND WE ALSO TALKED ABOUT THE OPTION 1 THAT WE LOOKED AT, |
| 17:10 | 19 | THE EXHIBIT FOR THE 80-SOME-ODD THOUSAND DOLLARS IF YOU HAD |
| 17:10 | 20 | RECEIVED -- IF YOU HAD OPTION 1? |
| 17:10 | 21 | A.   THAT'S CORRECT. |
| 17:10 | 22 | Q.   AND YOU UNDERSTOOD THAT IF YOU HAD CHOSEN OPTION 1 THAT |
| 17:10 | 23 | YOU STILL WOULD HAVE RECEIVED MONEY FROM YOUR FLOOD INSURER; IS |
| 17:10 | 24 | THAT CORRECT? |
| 17:10 | 25 | A.   THAT IS CORRECT.  BUT IF YOU -- YES.  THE HOUSE WAS VALUED |

FRED HOLMES, JR. - CROSS

17:10    1    AT $107,000.  IF YOU TRIED TO REBUILD THAT HOUSE, IT WOULD HAVE

17:11    2    COST MUCH MORE, ESPECIALLY THE COST OF LUMBER AND EVERYTHING AT

17:11    3    THAT TIME.

17:11    4    **Q.**    BUT YOU UNDERSTAND, JUST TO CLARIFY, THAT YOU WOULD HAVE

17:11    5    RECEIVED THAT MONEY REGARDLESS?

17:11    6    **A.**    YES, SIR, I UNDERSTAND THAT.

17:11    7    **Q.**    AND WE TALKED A LITTLE BIT ABOUT --

17:11    8              **THE COURT:**  JUST A MINUTE.

17:11    9              MR. BRUNO, I KNOW YOU KNOW A LOT ABOUT THIS, I

17:11   10    JUST WANT TO GET SOMETHING CLEAR.  I MAY WANT, BUT NOT RIGHT

17:11   11    NOW, WHAT THE ASSIGNMENT MEANT WHEN YOU SIGNED WITH THE ROAD

17:11   12    HOME.

17:11   13              **MR. BRUNO:**  YES, YOUR HONOR.

17:11   14              **THE COURT:**  OKAY.  UNDER WHAT OPTION.  GO AHEAD.

17:11   15    **BY MR. THATCH:**

17:11   16    **Q.**    MR. HOLMES, WE TALKED ABOUT THE -- YOUR JOB WITH UNO THAT

17:11   17    YOU HAD BEFORE THE STORM, CORRECT?

17:11   18    **A.**    YES, SIR; THAT'S CORRECT.

17:11   19    **Q.**    AND YOU MENTIONED -- YOU MENTIONED YOUR FURLOUGH, AS YOU

17:11   20    REFERRED TO IT; CORRECT?

17:11   21    **A.**    THAT'S CORRECT.

17:11   22    **Q.**    NOW, YOU UNDERSTOOD THAT IF YOU RETURNED TO NEW ORLEANS

17:11   23    AND HAD A PLACE TO LIVE THERE, YOU WOULD HAVE BEEN ABLE TO

17:11   24    CONTINUE TO WORK FOR UNO AFTER JANUARY OF '06?

17:11   25    **A.**    HAD I BEEN SUCCESSFULLY ABLE TO.  UNFORTUNATELY, AT THAT

266

FRED HOLMES, JR. - CROSS

17:12   1   TIME, FOR A FAMILY OF FOUR WITH FOUR PETS, THE MINIMUM I COULD
17:12   2   FIND WAS A PLACE OF AT LEAST $10,000 TO MOVE IN.
17:12   3   **Q.**   YOU MENTIONED A FAMILY OF FOUR.  BUT IT WAS JUST YOU AND
17:12   4   YOUR WIFE LIVING ON PERRIN DRIVE; CORRECT?
17:12   5   **A.**   THAT IS CORRECT.  BUT, AGAIN, WHO EVACUATED WITH US THAT
17:12   6   WAS STAYING WITH US WAS MY MOTHER-IN-LAW AND HER ELDERLY FATHER
17:12   7   THAT WE WERE TAKING CARE OF.
17:12   8   **Q.**   WERE THEY LIVING AT THE PERRIN DRIVE HOME AT THE TIME OF
17:12   9   KATRINA?
17:12   10  **A.**   NO, THEY WERE NOT.  BUT THEY PRETTY MUCH MOVED IN WITH US,
17:12   11  IN EFFECT.
17:12   12  **Q.**   ARE YOU SAYING YOU EXPECTED THEM TO LIVE WITH YOU FOR THE
17:12   13  DURATION IF YOU HAD MOVED BACK TO PERRIN DRIVE?
17:12   14  **A.**   IT COULD VERY WELL HAVE HAPPENED, YES, SIR.
17:12   15  **Q.**   BUT YOU DIDN'T INITIALLY PLAN FOR THAT?
17:12   16  **A.**   THAT WASN'T THE INITIAL PLAN.  BUT AGAIN, THAT WAS -- WE
17:12   17  HAD TO TAKE CARE OF THEM.  WE COULDN'T MOVE BACK TO LOUISIANA
17:12   18  AND LEAVE THEM STRANDED IN TEXAS.
17:12   19          **MR. THATCH:**  NO FURTHER QUESTIONS, YOUR HONOR.
17:12   20             THANKS, MR. HOLMES.
17:12   21          **THE COURT:**  THANK YOU, SIR.
17:12   22          **MR. ANDRY:**  YOUR HONOR, A BRIEF REDIRECT?
17:13   23          **THE COURT:**  YES, SIR.
        24
        25

USDC - EDLA
** HOURLY TRANSCRIPT **

FRED HOLMES, JR. - REDIRECT

| | | |
|---|---|---|
| 17:13 | 1 | **REDIRECT EXAMINATION** |
| 17:13 | 2 | BY MR. ANDRY: |
| 17:13 | 3 | **Q.**   MR. HOLMES, COUNSEL, I THINK, JUST KIND OF SCOLDED YOU |
| 17:13 | 4 | ABOUT HOW YOU MADE SOME CHOICE TO MOVE BACK IN WITH YOUR |
| 17:13 | 5 | MOTHER-IN-LAW AND FATHER-IN-LAW. |
| 17:13 | 6 | **MR. THATCH:**  YOUR HONOR, I JUST OBJECT. |
| 17:13 | 7 | **THE COURT:**  I AGREE.  I AGREE.  COUNSEL -- |
| 17:13 | 8 | **MR. ANDRY:**  I'M SORRY, YOUR HONOR. |
| 17:13 | 9 | **THE COURT:**  -- LET'S KEEP AWAY FROM THAT. |
| 17:13 | 10 | **MR. ANDRY:**  I'M SORRY, YOUR HONOR. |
| 17:13 | 11 | **THE COURT:**  LET ME SAY IT AGAIN.  IT'S ASTONISHINGLY |
| 17:13 | 12 | UNPERSUASIVE.  I CAN'T -- I DON'T KNOW HOW MANY TIMES -- |
| 17:13 | 13 | **MR. ANDRY:**  I UNDERSTAND THAT, AND IT WAS NOT MEANT |
| 17:13 | 14 | TO BE DISPARAGING TO COUNSEL. |
| 17:13 | 15 | **THE COURT:**  WELL, WHATEVER IT IS, IT'S A SETUP.  I |
| 17:13 | 16 | DON'T NEED IT. |
| 17:13 | 17 | **MR. ANDRY:**  I UNDERSTAND, YOUR HONOR, AND IT WAS NOT |
| 17:13 | 18 | MEANT THAT WAY.  I APOLOGIZE TO THE COURT AND TO COUNSEL, TO |
| 17:13 | 19 | THE EXTENT IT WAS. |
| 17:13 | 20 | **THE COURT:**  OKAY.  WE CAN MOVE ON.  WE CAN MOVE ON. |
| 17:13 | 21 | BY MR. ANDRY: |
| 17:13 | 22 | **Q.**   DID YOU MAKE A CHOICE TO LIVE IN HOUSTON?  DID YOU WAKE UP |
| 17:13 | 23 | ONE DAY AND SAY, "I WANT TO MOVE TO HOUSTON"? |
| 17:13 | 24 | **A.**   NO, SIR.  IT WAS A VERY EXHAUSTIVE PROCESS.  IT WAS |
| 17:13 | 25 | DEFINITELY NOT SOMETHING THAT WE CHOSE UP FRONT. |

FRED HOLMES, JR. - REDIRECT

17:13   1   **Q.**   AND WHEN YOU WERE LIVING IN HOUSTON, YOU WERE LIVING IN

17:13   2   HOUSTON WITH YOUR WIFE AND FOUR PETS AND DIDN'T HAVE A JOB FOR

17:13   3   A YEAR; IS THAT RIGHT?

17:13   4   **A.**   THAT'S CORRECT.

17:13   5   **Q.**   AND YOUR WIFE DEVELOPED HEALTH PROBLEMS; IS THAT RIGHT?

17:14   6   **A.**   THAT'S CORRECT.

17:14   7   **Q.**   AND YOUR WIFE IS UNEMPLOYED; IS THAT RIGHT?

17:14   8   **A.**   AT THAT TIME; YES, SIR.

17:14   9   **Q.**   AND DID YOU -- COULD -- DID YOU LOOK FOR JOBS DOWN HERE,

17:14   10  AND THEY DIDN'T HAVE THEM; RIGHT?

17:14   11  **A.**   DIDN'T HAVE THEM.

17:14   12  **Q.**   AND THE MONEY THAT YOU RECEIVED -- COUNSEL CORRECTED US.

17:14   13  AND INSTEAD OF RECEIVING $35,000, I THINK YOU RECEIVED $27,400?

17:14   14          **THE COURT:**   WELL, HE RECEIVED ANOTHER --

17:14   15          **MR. ANDRY:**   $10,000 FOR CONTENTS.  I'M GOING TO OFFER

17:14   16  COVER THAT, YOUR HONOR.  I'M GOING TO COVER THAT.

17:14   17  **BY MR. ANDRY:**

17:14   18  **Q.**   BUT THE 27,400 -- TO BE SPECIFIC FOR PURPOSES OF THE

17:14   19  RECORD, THE 27,400 THAT YOU RECEIVED, THAT WAS SUBJECT TO

17:14   20  ATTORNEYS' FEES; IS THAT RIGHT?

17:14   21  **A.**   CORRECT.  YES, SIR.

17:14   22  **Q.**   DO YOU REMEMBER HOW MUCH YOU ACTUALLY RECEIVED?

17:14   23  **A.**   I DON'T REMEMBER THE FINAL AMOUNT.  NO, SIR.

17:14   24  **Q.**   AND THE REMAIN- -- AND THE OTHER MONEY, THE $10,000 THAT

17:14   25  YOU RECEIVED IN CONTENTS, THAT WAS SUBJECT TO ATTORNEYS' FEES

FRED HOLMES, JR. - REDIRECT

| | | |
|---|---|---|
| 17:14 | 1 | ALSO; IS THAT CORRECT? |
| 17:14 | 2 | **A.**   THAT'S CORRECT. |
| 17:14 | 3 | **Q.**   AND THE $20,000 THAT YOU RECEIVED FROM THE SETTLEMENT THAT |
| 17:14 | 4 | WAS MENTIONED -- |
| 17:14 | 5 | **A.**   YES, SIR. |
| 17:14 | 6 | **Q.**   -- THAT WAS SUBJECT TO ATTORNEYS' FEES ALSO, WASN'T IT? |
| 17:14 | 7 | **A.**   YES, SIR.  THAT'S CORRECT. |
| 17:15 | 8 | **Q.**   AND AT THE TIME, WHAT WERE YOU LIVING ON -- AT THE TIME OF |
| 17:15 | 9 | ALL THOSE SETTLEMENTS AND ALL THOSE PAYMENTS, WHAT WERE YOU |
| 17:15 | 10 | USING TO PAY FOR YOU AND YOUR WIFE AND YOUR PETS TO LIVE? |
| 17:15 | 11 | **A.**   WHATEVER PAYMENTS THAT I GOT FROM THE CONTENTS AND |
| 17:15 | 12 | WHATEVER LITTLE BIT OF SAVINGS THAT WE STILL HAD. |
| 17:15 | 13 | **Q.**   DID YOU USE -- WHAT DID YOU PUT UP TO GET YOUR NEW HOUSE |
| 17:15 | 14 | ON GREENBRIAR -- OR GLENBORO, THAT YOU LIVE IN NOW? |
| 17:15 | 15 | **A.**   THE HOUSE THAT I'M LIVING IN NOW, WE ACTUALLY HAD TO |
| 17:15 | 16 | BORROW MONEY FROM FAMILY TO BE ABLE TO GET THE ACTUAL DOWN |
| 17:15 | 17 | PAYMENT.  WE COULDN'T AFFORD IT. |
| 17:15 | 18 | **Q.**   SO YOU DIDN'T -- YOU -- YOU AND JENEEN DID NOT HAVE THE |
| 17:15 | 19 | MONEY TO BUY -- TO PUT DOWN A DOWN PAYMENT ON A HOUSE, EVEN IN |
| 17:15 | 20 | '07.  YOU HAD TO BORROW IT FROM PEOPLE? |
| 17:15 | 21 | **A.**   THAT'S CORRECT. |
| 17:15 | 22 | **Q.**   AND YOU HIRED MR. V.J. DAUTERIVE AS YOUR ATTORNEY IN THAT |
| 17:16 | 23 | PETITION THAT HE PUT UP THERE.  DO YOU REMEMBER THAT? |
| 17:16 | 24 | **A.**   YES, SIR. |
| 17:16 | 25 | **Q.**   DID YOU TELL MR. V.J. DAUTERIVE WHAT TO PUT IN THAT |

FRED HOLMES, JR. - REDIRECT

| | | |
|---|---|---|
| 17:16 | 1 | PETITION? |
| 17:16 | 2 | **A.**   NO, SIR.  HE ADVISED. |
| 17:16 | 3 | **MR. ANDRY:**  OKAY.  I HAVE NO OTHER QUESTIONS, YOUR |
| 17:16 | 4 | HONOR. |
| 17:16 | 5 | **MR. THATCH:**  YOUR HONOR, JUST ONE QUICK QUESTION? |
| 17:16 | 6 | **THE COURT:**  NOPE.  I'M NOT GOING TO OPEN THAT DOOR. |
| 17:16 | 7 | THAT WOULD BE ONE QUICK QUESTION, AND THEN I'LL -- I PROMISE |
| 17:16 | 8 | YOU, IT WON'T -- WHATEVER IT WAS, IT WASN'T GOING TO AFFECT |
| 17:16 | 9 | WHAT I'M GOING TO DO. |
| 17:16 | 10 | YOU CAN STEP DOWN, SIR. |
| 17:16 | 11 | **THE WITNESS:**  THANK YOU, YOUR HONOR. |
| 17:16 | 12 | **THE COURT:**  I AM GOING TO ALLOW, THOUGH, RECROSS, AS |
| 17:16 | 13 | I SAID, WITH EXPERTS THAT ARE INVOLVED BASED ON THE PROTOCOL |
| 17:16 | 14 | THAT I'VE SET UP.  IT WILL BE LIMITED.  THAT'S ABOUT THE ONLY |
| 17:16 | 15 | RECROSS THAT I WILL ALLOW.  BUT I AM GOING TO ALLOW THAT, AS I |
| 17:16 | 16 | SAID EARLIER.  OKAY. |
| 17:16 | 17 | **MR. BRUNO:**  ACTUALLY, JUDGE, NOW, I MISSED THAT. |
| 17:16 | 18 | SO -- |
| 17:16 | 19 | **THE COURT:**  OH, WOW.  MAN, I -- |
| 17:16 | 20 | **MR. BRUNO:**  SO DIRECT, CROSS, REDIRECT, AND RECROSS? |
| 17:16 | 21 | **THE COURT:**  I SAID THAT PROBABLY -- |
| 17:16 | 22 | **MR. BRUNO:**  I MISSED THAT.  I'M GRANTED. |
| 17:16 | 23 | **THE COURT:**  OH, WOW. |
| 17:16 | 24 | **MR. BRUNO:**  I AM GRANTED. |
| 17:16 | 25 | **THE COURT:**  YOU WERE STANDING RIGHT THERE, JOE.  I |

```
17:16    1    DID, BUT LIMITED TO WHAT COMES OUT.

17:16    2            MR. BRUNO:  THAT DOESN'T SEEM VERY EFFICIENT,

17:17    3    YOUR HONOR, WITH ALL DUE RESPECT.

17:17    4            THE COURT:  WELL, YOU KNOW, I'LL TELL YOU WHAT, GIVE

17:17    5    ME WHEN AN "F?"  HOW ABOUT THAT?  AT THE END OF TRIAL.

17:17    6            BUT GUESS WHAT?  THAT'S WHAT I'M DOING.  YOU

17:17    7    MIGHT LIKE IT, TOO.

17:17    8            MR. BRUNO:  YOU'RE THE BOSS.

17:17    9            THE COURT:  I THINK YOU MIGHT LIKE IT.

17:17    10           MR. BRUNO:  I UNDERSTAND.  I'M JUST A POOR --

17:17    11           THE COURT:  IT IS AS SIMPLE AS THIS:  BECAUSE OF THE

17:17    12    TRUNCATED DIRECT THAT I -- I WANT, SO THAT IT WILL MORE

17:17    13    ELOQUENTLY SET FORTH THE OPINIONS THAT THIS COURT IS GOING TO

17:17    14    HAVE TO DEVELOP.  THEN THERE WOULD BE CROSS, THEN THERE WOULD

17:17    15    BE REDIRECT, AND THEN RECROSS.

17:17    16           SO FOR THEIR EXPERTS, THAT HELPS YOU.

17:17    17           MR. BRUNO:  I GOTCHA.  I GOTCHA.

17:17    18           THE COURT:  BUT EVEN IF IT'S INEFFICIENT, IF I FIND

17:17    19    IT'S INEFFICIENT AND IT'S NOT WORKING WELL, I'LL -- WHAT I'M

17:17    20    SAYING, IT'S GOING TO BE LIMITED RECROSS.  LIMITED.  AND IF I

17:18    21    HEAR THE SAME THING TWICE, I WANT YOU TO -- EVERYBODY -- I AM

17:18    22    GOING TO STOP IT.  I DON'T LIKE TO HEAR THE SAME THINGS TWICE.

17:18    23           I GIVE A LITTLE LEEWAY THE FIRST COUPLE OF DAYS.

17:18    24    AFTER OF THAT IT BECOMES EXCRUCIATINGLY PAINFUL TO ME.

17:18    25    REPETITION IS NOT REALLY SOMETHING I LIKE, UNLESS IT'S ME.  I
```

| | | |
|---|---|---|
| 17:18 | 1 | HAVE TO SAY THAT TO CHILDREN AND OTHERS. |
| 17:18 | 2 | I CAN ONLY BE SO, SHALL WE SAY, JUDGE-LIKE. |
| 17:18 | 3 | OKAY. |
| 17:18 | 4 | **MR. BRUNO:**  WELL, JUDGE, WE HAVE NO MORE WITNESSES |
| 17:18 | 5 | AVAILABLE FOR TODAY.  I DON'T KNOW IF YOU WANT TO KEEP WORKING |
| 17:18 | 6 | OR NOT. |
| 17:18 | 7 | **THE COURT:**  NO, I THINK WE'LL -- IT'S BEEN A LONG |
| 17:18 | 8 | ENOUGH DAY FOR EVERYBODY.  I MEAN, I THINK THIS IS THE |
| 17:18 | 9 | WITNESSES THAT YOU HAD INDICATED. |
| 17:18 | 10 | **MR. BRUNO:**  YES.  WE'RE ON SCHEDULE SO FAR. |
| 17:18 | 11 | **THE COURT:**  AND I -- CERTAINLY, I THINK WE'LL -- |
| 17:18 | 12 | WE'LL GET THROUGH THIS AS WELL AS WE CAN, AND I THINK YOU |
| 17:18 | 13 | UNDERSTAND WHAT MY GUIDELINES, BASICALLY, ARE. |
| 17:18 | 14 | AND, LOOK, WE'LL SEE HOW THE EXPERTS GO, BUT I |
| 17:19 | 15 | JUST THINK IT MAKES SENSE THE WAY THAT I'M DOING IT, WITH THE |
| 17:19 | 16 | IDEA THAT YOU'RE NOT GOING TO HAVE -- WHEN I SAY NO REPETITION, |
| 17:19 | 17 | ANYTHING THAT REALLY BECOMES SOMETHING THAT I'M GLAZING OVER |
| 17:19 | 18 | THAT I KNOW SO WELL. |
| 17:19 | 19 | OKAY.  THANK YOU. |
| 17:19 | 20 | **MR. BRUNO:**  THANK YOU, JUDGE. |
| 17:19 | 21 | **THE COURT:**  WE'RE ADJOURNED UNTIL 9:00 TOMORROW |
| 17:19 | 22 | MORNING. |
| 17:19 | 23 | (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.) |
| | 24 | |
| | 25 | |

17:19    1              *****

17:19    2              __CERTIFICATE__

17:19    3              I, JODI SIMCOX, RMR, FCRR, OFFICIAL COURT REPORTER

17:19    4    FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF

17:19    5    LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

17:19    6    CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND

17:19    7    UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE

17:19    8    ABOVE-ENTITLED AND NUMBERED MATTER.

17:19
17:19    9
17:19
17:19   10
17:19
17:19   11                        S/ JODI SIMCOX, RMR, FCRR
17:19                             JODI SIMCOX, RMR, FCRR
17:19   12                        OFFICIAL COURT REPORTER
17:19

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
USDC - EDLA
** HOURLY TRANSCRIPT **

17:19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

