09:02

                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

*****************************************************************

IN RE:  KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION              DOCKET NO. 05-CV-4182
                                     NEW ORLEANS, LOUISIANA
PERTAINS TO:  MRGO                   THURSDAY, SEPTEMBER 13, 2012
       *ARMSTRONG NO. 10-CV-866*

*****************************************************************


                        DAY 2 - MORNING SESSION
                     TRANSCRIPT OF TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
                       UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:              BRUNO & BRUNO
                               BY:  JOSEPH M. BRUNO, ESQ.
                               855 BARONNE ST.
                               NEW ORLEANS, LA 70113


                               THE ANDRY LAW FIRM
                               BY:  JONATHAN B. ANDRY, ESQ.
                               610 BARONNE ST.
                               NEW ORLEANS, LA 70113


                               BARON & BUDD
                               BY:  THOMAS SIMS, ESQ.
                               3102 OAK LAWN AVE., SUITE 1100
                               DALLAS, TX 75219


                               DEGRAVELLES, PALMINTIER,
                               HOLTHAUS & FRUGE
                               BY:  MICHAEL C. PALMINTIER, ESQ.
                                    JOSHUA M. PALMINTIER, ESQ.
                               618 MAIN STREET
                               BATON ROUGE, LA 70801


─────────────HOURLY COPY TRANSCRIPT─────────────

```
 1

 2                    DOMENGEAUX, WRIGHT, ROY & EDWARDS
                      BY:  ELLWOOD C. STEVENS, JR., ESQ.
 3                         BONNIE KENDRICK, ESQ.
                      P. O. BOX 3668
 4                    556 JEFFERSON ST.
                      LAFAYETTE, LA 70502
 5

 6                    THE DUDENHEFER LAW FIRM, LLC
                      BY:  FRANK C. DUDENHEFER, JR., ESQ.
 7                    601 POYDRAS ST., SUITE 2655
                      NEW ORLEANS, LA 70130-6004
 8

 9                    FAYARD & HONEYCUTT
                      BY:  CALVIN C. FAYARD, JR., ESQ.
10                    519 FLORIDA AVE., S.W.
                      DENHAM SPRINGS, LA 70726
11

12                    JOANEN LAW FIRM
                      BY:  SCOTT JOANEN, ESQ.
13                    4905 FRERET ST., SUITE B
                      NEW ORLEANS, LA 70115
14

15                    LEVIN, PAPANTONIO, THOMAS,
                      MITCHELL, RAFFERTY & PROCTOR
16                    BY:  MATTHEW D. SCHULTZ, ESQ.
                      316 S. BAYLEN ST., SUITE 600
17                    PENSACOLA, FL 32502

18
                      THE TRIAL LAW FIRM PC
19                    BY:  ANDREW P. OWEN
                      800 WILTSHIRE BLVD., SUITE 500
20                    LOS ANGELES, CA 90017

21
                      J. ROBERT WARREN, II, A PLC
22                    BY:  J. ROBERT WARREN, II, ESQ.
                      1718 SHORT ST.
23                    NEW ORLEANS, LA 70118

24

25
```

```
 1
    FOR THE DEFENDANT WASHINGTON
 2  GROUP INTERNATIONAL, INC.:      STONE PIGMAN WALTHER WITTMANN
                                    BY:  WILLIAM D. TREEBY, ESQ.
 3                                       JAMES C. GULOTTA, JR., ESQ.
                                         HEATHER S. LONIAN, ESQ
 4                                       MAGGIE A. BROUSSARD, ESQ.
                                    546 CARONDELET STREET
 5                                  NEW ORLEANS, LA 70130

 6
                                          - AND -
 7

 8                                  JONES DAY
                                    BY:  ADRIAN WAGER-ZITO, ESQ.
 9                                       DEBRA S. CLAYMAN, ESQ.
                                         CHRISTOPHER N. THATCH, ESQ.
10                                       CHRISTOPHER R. FARRELL, ESQ.
                                         JULIA CRONIN, ESQ.
11                                       BRIAN KERWIN, ESQ.
                                    51 LOUISIANA AVENUE, N.W.
12                                  WASHINGTON, D.C. 20001

13

14
    FOR THE DEFENDANT UNITED
15  STATES OF AMERICA:             U.S. DEPARTMENT OF JUSTICE
                                   CIVIL DIVISION, TORTS BRANCH
16                                 BY:  ROBIN D. SMITH, ESQ.
                                        JAMES F. MCCONNON, JR., ESQ.
17                                      RUPERT MITSCH, ESQ.
                                        CONOR KELLS, ESQ.
18                                      JOHN A. WOODCOCK, ESQ.
                                   BENJAMIN FRANKLIN STATION
19                                 P.O. BOX 888
                                   WASHINGTON, D.C. 20044
20

21
    OFFICIAL COURT REPORTER:       KAREN A. IBOS, CCR, RPR, CRR, RMR
22                                 500 POYDRAS STREET, ROOM HB-406
                                   NEW ORLEANS, LOUISIANA 70130
23                                 (504) 589-7776

24

25       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY COMPUTER.
```

1

2                              I N D E X

3

4    WITNESSES FOR THE PLAINTIFFS:                    PAGE/LINE:

5

6    GERARD A. COLLETTI

7      DIRECT EXAMINATION BY MR. BRUNO                286/21

8      CROSS-EXAMINATION BY MR. WOODCOCK              343/19

9      CROSS-EXAMINATION BY MS. CRONIN                358/1

10     REDIRECT EXAMINATION BY MR. BRUNO              360/6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(THURSDAY, SEPTEMBER 13, 2012)

(MORNING SESSION)


(OPEN COURT.)

09:02    THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE BE SEATED.

09:02    THE COURT:  GOOD MORNING.  OKAY.

09:02    MR. JOANEN:  GOOD MORNING, YOUR HONOR.  SCOTT JOANEN ON

09:02  BEHALF OF THE PLAINTIFFS.

09:02    YOUR HONOR, AT THIS TIME I AM GOING TO INTRODUCE SOME OF

09:03  THE DEPOSITION CUTS INTO THE RECORD.

09:03    THE COURT:  AND AGAIN, SUBJECT TO THE SAME CAVEAT THAT

09:03  THOSE OBJECTIONS THAT I HAVE NOT RULED ON THAT IF THE PARTIES

09:03  HAVEN'T AGREED ON, SUBJECT TO THAT, AND SUBJECT TO ANY OBJECTIONS

09:03  PREVIOUSLY MADE.

09:03    MR. JOANEN:  AND IN RESPONSE TO THAT, YOUR HONOR, I'M

09:03  SURE I'LL BE --

09:03    MR. WOODCOCK:  WE HAVE A FACT WITNESS IN THE ROOM.

09:03    THE COURT:  I JUST REALIZED WE NEVER IMPOSED THE

09:03  SEQUESTRATION ORDER, AND WE CAN PUT THAT ONE ON THE COURT.  I'M

09:03  GLAD -- THANK YOU, SIR, FOR OBSERVING THAT, AND THE COURT WILL

09:03  ENTER -- I ASSUME THERE IS A MOTION OF SEQUESTRATION IN OUR

09:03  PRETRIAL MEETING.

09:03    MR. BRUNO:  I DON'T RECALL NOW, BUT MAY I MAKE THE MOTION

09:03  NOW?

09:03  1          THE COURT:  OH, ABSOLUTELY.  THE MOTION IS MADE AND, OF

09:03  2  COURSE, IT STARTS TODAY SINCE I DIDN'T GIVE THE ORDER YESTERDAY.

09:03  3  BUT ANY WITNESS, OTHER THAN AN EXPERT WITNESS, IS ADMONISHED TO NOT

09:04  4  COME INTO THE COURTROOM UNTIL SUCH TIME AS THEY'RE CALLED TO

09:04  5  TESTIFY, TO NOT DISCUSS THEIR TESTIMONY WITH ANYONE ONCE THEY'VE

09:04  6  STARTED COMMENCING THEIR TESTIMONY, AND NOT TO DISCUSS WITH ANYONE

09:04  7  ELSE THEIR TESTIMONY.  AND I ASK THE LAWYERS TO PLEASE BE ALERT IF

09:04  8  ANYONE COMES IN WHO IS SUBJECT TO THE SEQUESTRATION ORDER.

09:04  9          IS THERE ANYONE IN HERE WHO IS A WITNESS NOT AN EXPERT?

09:04  10  ALL RIGHT.

09:04  11          MR. JOANEN:  I WILL SHARE WITH THE COURT THAT MR. MCELWEE

09:04  12  WILL BE TESTIFYING THIS MORNING.  HE IS NOT HERE YET, SO WHEN HE

09:04  13  GETS HERE, HE SAID HE WOULD TEXT ME WHEN HE GETS DOWNSTAIRS, AND I

09:04  14  WILL CATCH HIM BEFORE HE GETS HERE.  AND THEN TODAY WE WOULD HAVE

09:04  15  MR. SPENCER, BUT HE WON'T BE UNTIL THIS AFTERNOON.

09:04  16          THE COURT:  ALL RIGHT.  OKAY.  ALL RIGHT.  SIR, THANK YOU

09:04  17  FOR BRINGING THAT TO THE COURT'S ATTENTION, AND YOU CAN GO AHEAD

09:05  18  AND PROCEED.

09:05  19          MR. JOANEN:  YES, YOUR HONOR.  THE FIRST ONE WE'RE GOING

09:05  20  TO INTRODUCE IS 30(B)(6) DEPOSITION TESTIMONY OF THE CORPS OF

09:05  21  ENGINEERS THROUGH ITS DESIGNEE MR. GREISHABER.  AS I UNDERSTAND,

09:05  22  THAT IS ONE OF THE DEPOSITIONS THAT HAS A PENDING OBJECTION.  I DO

09:05  23  NOT BELIEVE THAT ANY OF THE -- ANYTHING I WILL READ ABOUT THAT

09:05  24  AFFECTS THAT IN ANY WAY.  IF IT IS, IT IS NOT INTENTIONAL, AND I

09:05  25  APOLOGIZE TO THE COURT.  BUT I WENT THROUGH IT TO MAKE SURE I

09:05  1   DIDN'T THINK ANYTHING WAS IN THERE.

09:05  2          WITH THAT BEING SAID, YOUR HONOR, AT THIS TIME I WOULD

09:05  3   LIKE TO OFFER, FILE, AND INTRODUCE INTO EVIDENCE THE DEPOSITION

09:05  4   TESTIMONY OF THE DEFENDANT UNITED STATES OF AMERICA THROUGH ITS

09:05  5   RULE 30(B)(6) DESIGNEE JOHN GREISHABER.  MR. GREISHABER WAS

09:05  6   PRESENTED BY THE COURT TO DISCUSS GEOTECHNICAL ISSUES RELATED TO

09:05  7   SHEET PILE TIP DEPTH ON THE EBIA FLOODWALL AND THE POTENTIAL FOR

09:05  8   UNDER SEEPAGE INDUCED INSTABILITY OF THE EBIA HURRICANE PROTECTION

09:06  9   STRUCTURE.

09:06  10         THE COURT:  GO AHEAD, SIR.

09:06  11         MR. JOANEN:  MR. GREISHABER CONFIRMED THAT FLOOD

09:06  12  PROTECTION IS EXTREMELY IMPORTANT TO THE CORPS AND IT MAKES SURE

09:06  13  THAT WHATEVER WORK IS DONE NEAR A FLOOD PROTECTION STRUCTURE DOES

09:06  14  NOT VIOLATE THE INTEGRITY OF THE FLOOD PROTECTION STRUCTURE.  AS IT

09:06  15  RELATES TO THIS TOPIC, THE EBIA JOB WAS FAIRLY SIMPLISTIC.  THE

09:06  16  ONLY WAY YOU COULD ENDANGER THE FLOODWALL WAS BY SOME FORM OF

09:06  17  INAPPROPRIATE EXCAVATION OR INAPPROPRIATE BACKFILL.  IN THE CORPS

09:06  18  NEW ORLEANS DISTRICT, THE GEOTECHNICAL BRANCH RESPONDS TO REQUEST

09:06  19  FOR ASSISTANCE FROM THE CONSTRUCTION DIVISION.  THERE ARE

09:06  20  ENGINEERING GUIDELINES THAT ARE USED AS TOOLS TO EVALUATE

09:06  21  EXCAVATIONS AROUND FLOOD CONTROL PROJECTS.

09:06  22         THE CORPS POLICY MANDATES THAT THE CORPS EVALUATE

09:06  23  EXCAVATIONS NEAR FLOOD CONTROL STRUCTURES.  SUCH EVALUATIONS

09:06  24  INCLUDE WALL STABILITY, SEEPAGE, AND GLOBAL STABILITY.  FOR

09:06  25  EXAMPLE, AN EXCAVATION TO MINUS 19.75 FEET WITHIN 300 FEET OF THE

09:07 1    FLOODWALL THE GEOTECHNICAL DIVISION WOULD EXPECT TO SEE SUCH A

09:07 2    PLAN.  ALSO, FOR THE REMOVAL OF PILES, THE CORPS WAS REQUIRED TO

09:07 3    EVALUATE WHETHER THERE WAS ANY POTENTIAL FOR IMPACT ON THE FLOOD

09:07 4    CONTROL STRUCTURE.

09:07 5         MR. GREISHABER EXPLAINED THAT THE PROCESS BY WHICH THE

09:07 6    CORPS EVALUATES A PERMIT FOR WORK IS NOT WRITTEN DOWN, BUT PEOPLE

09:07 7    IN THE BUSINESS IN DOING EXCAVATIONS KNOW YOU NEED A PERMIT.  THREE

09:07 8    HUNDRED FEET FROM THE HURRICANE FLOOD PROTECTION STRUCTURE LIKE

09:07 9    THAT AT THE EBIA IS A CRITERIA THAT APPLIES TO THE PERMIT

09:07 10   REQUIREMENTS.  ONCE RECEIVING THE PERMIT APPLICATION, THE CORPS

09:07 11   TAKES THE PROPOSED WORK AND EVALUATES WHAT THE IMPACT OF THE

09:07 12   PROPOSED WORK IS ON THE DESIGN.  ADDITIONALLY, MR. GREISHABER

09:07 13   CONFIRMED THAT THE AS-BUILT CONSTRUCTION DRAWINGS OF THE SHEET PILE

09:07 14   TIP DEPTH THAT THE EBIA FLOODWALL HAD A DESIGN DEPTH OF MINUS EIGHT

09:07 15   FEET.

09:07 16        NEXT, YOUR HONOR, WE WOULD LIKE TO OFFER, FILE, AND

09:07 17   INTRODUCE INTO THE RECORD THE DEPOSITION TESTIMONY OF MR. --

09:07 18        THE COURT:  LET ME MAKE ONE POINT JUST SO EVERYBODY WILL

09:08 19   KNOW, I REALIZE THAT'S PLAINTIFF'S CHARACTERIZATION OF THE SUMMARY.

09:08 20   I HAVE MADE MY OWN.  I HAVE READ MR. GREISHABER'S DEPOSITION, WHO I

09:08 21   UNDERSTAND YOU MAY HAVE SAID IS A GEOTECHNICAL ENGINEER AND FORMER

09:08 22   ASSISTANT TO THE CHIEF ENGINEERING DIVISION OF THE NEW ORLEANS

09:08 23   DISTRICT.  AND I HAVE MADE MY OWN SUMMARY OF THE DEPOSITION.  AND

09:08 24   I'M SURE I'LL HEAR FROM YOU AS WELL IN BRIEFING.  YES, GO AHEAD.

09:08 25        MR. JOANEN:  YES, YOUR HONOR.  NOW, I WOULD LIKE TO MOVE

09:08  1    TO INTRODUCE THE DEPOSITION --

09:08  2            THE COURT:  LET THAT BE INTRODUCED BY THE WAY,

09:08  3    MR. GREISHABER'S DEPOSITION, SUBJECT TO THE OBJECTIONS NOT

09:08  4    PREVIOUSLY RULED ON.

09:08  5            MR. JOANEN:  NEXT, WE WOULD LIKE TO OFFER, FILE, AND

09:08  6    INTRODUCE INTO EVIDENCE THE DEPOSITION TESTIMONY OF RICHARD PINNER.

09:08  7    YOUR HONOR, AT THE TIME OF HIS DEPOSITION MR. PINNER WAS IN CHARGE

09:08  8    OF THE GEOTECHNICAL BRANCH OF THE CORPS OF ENGINEER, NEW ORLEANS

09:08  9    DISTRICT, ENGINEERING DEPARTMENT.  MR. PINNER'S TESTIMONY EXPLAINS

09:08 10    THE PERMITTING PROCESS FROM THE GEOTECHNICAL BRANCH PERSPECTIVE.

09:08 11            MR. PINNER'S TESTIMONY GENERALLY EXPLAINS THE PROCESS OF

09:08 12    THE PERMITTING OF WORKS THAT TAKE PLACE NEAR FLOOD CONTROL

09:09 13    STRUCTURES.  THE LEVEE BOARD ULTIMATELY GRANTS THE PERMIT, BUT THE

09:09 14    BOARD WOULD SUBMIT THE REQUEST FOR A PERMIT TO THE CORPS'

09:09 15    OPERATIONS DEPARTMENTS.  BECAUSE THERE IS A HIGH DEGREE OF

09:09 16    IMPORTANCE IN PROTECTING THE INTEGRITY OF A FLOOD CONTROL

09:09 17    STRUCTURE, THE NEW ORLEANS DISTRICT'S GENERAL GUIDELINES INDICATE

09:09 18    THE NEED FOR AN ASSESSMENT OF EXCAVATIONS IF THEY'RE GOING TO BE

09:09 19    WITHIN 300 FEET OF A HURRICANE PROTECTION STRUCTURE AND 1,500 FEET

09:09 20    FOR A RIVER LEVEE PROJECT.  A REQUEST FOR A PERMIT FROM THE LEVEE

09:09 21    BOARD TO PERFORM WORK WITHIN THIS AREA WOULD BE FORWARDED TO THE

09:09 22    CORPS' OPERATIONS DEPARTMENT.

09:09 23            IN THE GEOTECHNICAL DEPARTMENT, COMPONENT PARTS OF AN

09:09 24    ASSESSMENT OF THE PROPOSED WORK MIGHT EVALUATE LOCAL STABILITY,

09:09 25    GLOBAL STABILITY, AND SEEPAGE.  SEEPAGE CAN AFFECT THE INTEGRITY OF

09:09  1    THE FLOOD CONTROL STRUCTURE BY ALLOWING WATER TO SEEP AND REMOVE

09:09  2    SOIL MATERIAL AS IT PRODUCES AN EXIT GRADIENT, BUT THERE CAN ALSO

09:10  3    BE UPLIFT PRESSURE WHICH CREATES AN EXIT GRADIENT AND REDUCES THE

09:10  4    STRUCTURE'S FACTORS OF SAFETY.  MR. PINNER INDICATED THAT

09:10  5    MR. GERALD COLLETTI WOULD BE BETTER ABLE TO DESCRIBE THE PROCESS

09:10  6    WITHIN THE OPERATIONS DEPARTMENT.

09:10  7         THE COURT:  LET THAT BE INTRODUCED SUBJECT TO ANY

09:10  8    OBJECTIONS PREVIOUSLY MADE AND SUBJECT TO ANY OBJECTIONS NOT RULED

09:10  9    UPON.

09:10  10         MR. BRUNO:  JUST LET ME JUST ALERT YOU THAT I DON'T WANT

09:10  11   THERE TO BE CONFUSION, BUT OBVIOUSLY THIS DEPOSITION IS COMING IN

09:10  12   ON THE PLAINTIFF'S SIDE, BUT WE WERE ALERTED BY THE DEFENDANTS --

09:10  13   AND THEY MAY HAVE CHANGED THEIR MIND -- BUT WE WERE ALERTED THEY

09:10  14   WERE GOING TO CALL MR. PINNER LIVE IN THEIR CASE, JUST SO THAT YOU

09:10  15   WERE AWARE OF THAT.

09:10  16         THE COURT:  OKAY.  LET'S TRY TO KEEP IT -- I'VE READ THE

09:10  17   DEPOSITIONS.  LET'S TRY TO KEEP IT -- WHEN HE IS CALLED I'M

09:10  18   REALLY -- AGAIN, REMEMBER MY CONSTRAINTS ABOUT, WHOEVER CALLS HIM,

09:10  19   REPETITION.

09:10  20         MR. JOANEN:  YES, YOUR HONOR.  NEXT, YOUR HONOR, AT THIS

09:10  21   TIME THE PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO EVIDENCE

09:11  22   THE DEPOSITION TESTIMONY OF RICHARD VARUSO.  AT THE TIME OF HIS

09:11  23   DEPOSITION, MR. VARUSO WAS SECOND IN CHARGE OF THE GEOTECHNICAL

09:11  24   BRANCH OF THE CORPS' NEW ORLEANS DISTRICT ENGINEERING DEPARTMENT

09:11  25   UNDER MR. RICHARD PINNER.  MR. VARUSO'S TESTIMONY RELATES TO

09:11  1  PERMITTING FOR PROJECTS INVOLVING EXCAVATIONS AND BACKFILL IN THE

09:11  2  CRITICAL AREA OF THE FLOOD CONTROL PROJECT THAT COULD HAVE A DIRECT

09:11  3  IMPACT ON THE STABILITY OF THE FLOOD CONTROL STRUCTURE.

09:11  4       BECAUSE THERE ARE NO SPECIFIC GUIDELINES IN THE NEW

09:11  5  ORLEANS DISTRICT, SUCH EXCAVATIONS SHOULD BE EVALUATED ON A

09:11  6  CASE-BY-CASE BASIS.  FOR THIRD PARTIES, A PERMIT MUST BE SUBMITTED

09:11  7  THROUGH THE CORPS' OPERATIONS DEPARTMENTS.  WHEN THE PROJECT IS A

09:11  8  CORPS PROJECT, THE CORPS WILL EVALUATE THE WORK WHEN PREPARING THE

09:11  9  PLANS AND SPECIFICATIONS OF THE PROJECT.  WHEN THE CORPS WILL DO

09:11 10  ADDITIONAL CONSTRUCTION NEAR A HURRICANE PROTECTION STRUCTURE, IT

09:11 11  WILL BE REVIEWED AND WAS CALLED A BCOE REVIEW WHICH MEANS

09:12 12  BUILDABILITY, CONSTRUCTABILITY AND OPERABILITY.  THE OFFICE STAFF

09:12 13  PREPARES A SET OF PLANS AND SPECIFICATIONS IS REVIEWED BY ALMOST

09:12 14  EVERY DIVISION IN THE CORPS.  THE CORPS MUST DETERMINE IF THE PLANS

09:12 15  AND SPECIFICATIONS WOULD HAVE THE POTENTIAL FOR IMPACT ON THE

09:12 16  STRUCTURAL STABILITY OF THE FLOODWALL.

09:12 17       MR. VARUSO ADMITTED THAT WHEN PERFORMING AN EXCAVATION

09:12 18  NEAR A FLOOD CONTROL STRUCTURE, AN EVALUATION AND ASSESSMENT MUST

09:12 19  BE MADE AS TO WHETHER THERE IS POTENTIAL FOR UNDER SEEPAGE BECAUSE

09:12 20  THAT MIGHT DICTATE THAT THE USE OF A PARTICULAR BACKFILL WAS

09:12 21  APPROPRIATE.  THE SHEET PILE CUT OFF OF THE EBIA FLOODWALL HAS AS

09:12 22  ONE OF ITS PURPOSES CUTTING OFF UNDER SEEPAGE.

09:12 23       IN ADDITION TO EXCESSIVE FLOWS OF WATER THAT CAN

09:12 24  PROPAGATE MOVEMENT OF SOILS THAT CAN POTENTIALLY STABILIZE THE

09:12 25  FOUNDATION OF THE FLOOD CONTROL STRUCTURE, THERE CAN ALSO BE A

09:12  1   BUILD UP OF PRESSURE IN UNDERLYING SOILS THAT CAN CAUSE UPLIFT

09:12  2   PRESSURE AND HAS THE POSSIBILITY OF DESTABILIZING THE FOUNDATION.

09:13  3   THAT'S IT, YOUR HONOR.

09:13  4        THE COURT:  LET THAT BE ADMITTED SUBJECT TO THE SAME

09:13  5   CAVEATS I'VE STATED BEFORE.

09:13  6        MR. JOANEN:  AND FINALLY, AT THIS POINT, YOUR HONOR,

09:13  7   PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO EVIDENCE THE

09:13  8   DEPOSITION TESTIMONY OF MR. WALTER BAUMY.  AT THE TIME OF

09:13  9   MR. BAUMY'S DEPOSITION, HE WAS THE CHIEF OF THE ENGINEERING

09:13  10  DIVISION AT THE NEW ORLEANS DISTRICT OFFICE.  THERE ARE --

09:13  11  MR. BAUMY TESTIFIED THAT THERE ARE DIFFERENT CONTRACTING MECHANISMS

09:13  12  FOR CORPS PROJECTS WHERE A JOB IS PUT ON ADVERTISEMENT, WHERE THERE

09:13  13  ARE PLANS AND SPECIFICATIONS AVAILABLE, VERSUS IF THEY'RE GOING OUT

09:13  14  TO A CONTRACTOR DESIGN AND EXECUTE WHERE YOU MIGHT HAVE LIMITED

09:13  15  KNOWLEDGE OR LIMITED CONTRACT DOCUMENTS.

09:13  16       MR. BAUMY ALSO SUBSTANTIATES THAT THERE ARE PERMITTING

09:13  17  REQUIREMENTS FOR EXCAVATION WORK PERFORMED NEAR A HURRICANE

09:13  18  PROTECTION STRUCTURE THAT INVOLVE BOTH THE LEVEE BOARD AND THE

09:13  19  CORPS.  SUCH PERMIT REQUESTS ARE HANDLED BY THE CORPS' OPERATIONS

09:13  20  DEPARTMENT.  A TECHNICAL REVIEW OF THE PERMIT REQUEST IS DONE BY

09:14  21  THE ENGINEERING DEPARTMENT.  MR. BAUMY UNDERSTOOD THAT THERE IS AN

09:14  22  AREA ADJACENT TO A HURRICANE PROTECTION STRUCTURE WITHIN WHICH AN

09:14  23  ASSESSMENT OR ANALYSIS OF EXCAVATIONS SHOULD BE DONE.  MR. BAUMY,

09:14  24  THOUGH, DID DEFER TO MR. COLLETTI AS TO THE SCOPE OF THE CRITICAL

09:14  25  AREA.  AND THAT'S ALL FOR MR. BAUMY'S TESTIMONY.

09:14  1          THE COURT:  SUBJECT TO THE OBJECTIONS PREVIOUSLY URGED

09:14  2     AND SUBJECT TO ANY OBJECTIONS I HAVEN'T YET RULED ON, LET IT BE

09:14  3     ADMITTED.

09:14  4          MR. JOANEN:  YES, YOUR HONOR.  AND JUST FOR HOUSEKEEPING

09:14  5     PURPOSES, THE DEPOSITION OF THE CORPS OF ENGINEERS 30(B)(6)

09:14  6     MR. GREISHABER WAS JX 1647, THE DEPOSITION CUTS OF MR. PINNER WAS

09:14  7     JX 1668, OF MR. VARUSO WAS JX 1669, AND MR. BAUMY WAS JX 1670.

09:14  8          THE COURT:  THANK YOU VERY MUCH.

09:14  9          MR. JOANEN:  WITH THAT, YOUR HONOR, WE WOULD CALL

09:14 10     MR. GERALD (SIC) COLLETTI TO THE STAND.

09:15 11          THE DEPUTY CLERK:  PLEASE RAISE YOUR RIGHT HAND.

09:15 12       (WHEREUPON, GERARD A. COLLETTI, WAS SWORN IN AND TESTIFIED AS

09:15 13       FOLLOWS:)

09:15 14          THE DEPUTY CLERK:  PLEASE BE SEATED.  WOULD YOU STATE

09:15 15     YOUR NAME AND ALSO SPELL IT FOR THE RECORD?

09:15 16          THE WITNESS:  GERARD ANTHONY COLLETTI.  IT'S G-E-R-A-R-D,

09:15 17     ANTHONY, A-N-T-H-O-N-Y, COLLETTI, C-O-L-L-E-T-T-I.

09:15 18          THE COURT:  YES, SIR, YOU MAY PROCEED MR. BRUNO.

09:15 19          MR. BRUNO:  THANK YOU, YOUR HONOR.

09:15 20                    DIRECT EXAMINATION

09:15 21     BY MR. BRUNO:

09:16 22     Q.  GOOD MORNING, MR. COLLETTI.  GOOD TO SEE YOU AGAIN.  FIRST OF

09:16 23     ALL, WOULD YOU TELL JUDGE DUVAL BY WHOM ARE YOU EMPLOYED?

09:16 24     A.  UNITED STATES ARMY CORPS OF ENGINEERS, NEW ORLEANS DISTRICT.

09:16 25     Q.  COULD WE CALL UP JX 1664-0001.  MR. COLLETTI, YOU REMEMBER WE

09:16  1   TOOK YOUR DEPOSITION.  IT'S BEEN AWHILE NOW, AND I ONLY MAKE THAT

09:16  2   POINT BECAUSE I WAS CURIOUS TO KNOW IF YOUR POSITION AT THE CORPS

09:16  3   HAS CHANGED SINCE THE TIME THAT YOU GAVE ME THIS CV?

09:16  4   A.  NO, IT HAS NOT.

09:16  5   Q.  COULD YOU BLOW UP, CARL, THE DECEMBER 4 TO OCTOBER 6TH -- I'M

09:16  6   SORRY, LET'S START AT THE TOP.  OCTOBER 6 TO THE PRESENT.  THERE WE

09:16  7   GO.  TELL JUDGE DUVAL WHAT DO YOU DO NOW AT THE CORPS?

09:16  8   A.  I AM THE ASSISTANT CHIEF OF OPERATIONS DIVISION FOR THE NEW

09:17  9   ORLEANS DISTRICT.  DO YOU WANT ME TO EXPOUND ON THAT OR JUST --

09:17  10  Q.  LET ME ASK YOU THIS.  TELL JUDGE DUVAL, WHAT DOES THE

09:17  11  OPERATIONS DIVISION DO?

09:17  12  A.  WE DO A LITTLE BIT OF EVERYTHING FROM NAVIGATION, FLOOD

09:17  13  CONTROL, ENVIRONMENTAL, NATURAL RESOURCE MANAGEMENT, REGULATORY

09:17  14  PERMITTING, DREDGING.  IT'S A LITTLE BIT OF EVERYTHING FOR

09:17  15  COMPLETED FEDERAL PROJECTS.

09:17  16  Q.  LET'S GO TO THE SECOND PARAGRAPH.  IT STARTS WITH DECEMBER THE

09:17  17  6TH - OCTOBER THE 6TH.  WOULD YOU BLOW UP THE PARAGRAPH THERE, AS

09:17  18  OPERATIONS MANAGER.  OKAY.  FROM, OBVIOUSLY, DECEMBER THE 6TH TO

09:18  19  OCTOBER THE 6TH YOU WERE THE OPERATIONS MANAGER FOR COMPLETED

09:18  20  WORKS.  WOULD YOU PLEASE EXPLAIN TO US WHAT IS A COMPLETED WORK?

09:18  21  A.  A COMPLETED PROJECTS OR, YOU KNOW, THEY GO THROUGH THE

09:18  22  ENGINEERING, DESIGN, CONSTRUCTION PHASE, AND THEN THEY COME OVER AS

09:18  23  A COMPLETED PROJECT WHERE NO ADDITIONAL WORK IS EXPECTED TO BE DONE

09:18  24  ON THAT PROJECT.

09:18  25  Q.  IS A FEDERAL -- I'M SORRY.  I'M STUTTERING.  IS A FEDERAL FLOOD

09:18  1    CONTROL STRUCTURE A COMPLETED WORK?

09:18  2    A.  GENERALLY, IT CAN BE.  THERE MAY BE ADDITIONAL WORK.  WE RELY

09:18  3    UPON OUR ENGINEERING DIVISION TO MAKE THAT DETERMINATION.  THEY

09:18  4    NOTIFY US WHEN NO ADDITIONAL WORK IS PLANNED ON THAT FEATURE OF THE

09:18  5    PROJECT.

09:18  6    Q.  LET'S BE SPECIFIC TO THE WALL WHICH IS THE SUBJECT OF THIS

09:18  7    LITIGATION, AND THAT IS THE FLOODWALL BETWEEN CLAIBORNE AND

09:19  8    FLORIDA.  AT THE TIME OF HURRICANE KATRINA, WAS THAT A COMPLETED

09:19  9    WORK?

09:19  10   A.  YES, IT WAS.

09:19  11   Q.  NOW, YOUR JOB AS I APPRECIATE IT, AND TELL ME IF I'M WRONG, WAS

09:19  12   TO MAKE CERTAIN THAT THAT WALL OPERATED THE WAY IT WAS SUPPOSED TO

09:19  13   OPERATE; IS THAT ACCURATE?

09:19  14   A.  WE OVERSAW THE OPERATION AND MAINTENANCE THAT WAS BEING DONE BY

09:19  15   THE ORLEANS LEVEE DISTRICT, SO WE DID INSPECTIONS, WE OVERSAW THE

09:19  16   PERMITTING PROCESSES THAT THEY ADMINISTERED.

09:19  17   Q.  RIGHT.

09:19  18   A.  SO, YES.

09:19  19   Q.  IS IT NECESSARY, MR. COLLETTI, FOR YOU TO HAVE SOME

09:19  20   UNDERSTANDING OF HOW THE FLOOD CONTROL STRUCTURE, PARTICULARLY THE

09:19  21   ONE AT ISSUE, WORKS?  IN OTHER WORDS, WHAT'S IT SUPPOSED TO DO?

09:19  22   A.  WELL, IT'S SUPPOSED TO FUNCTION AS IT WAS DESIGNED TO STAND UP

09:19  23   TO WHATEVER CONDITIONS THAT THEY HAD PLANNED FOR INITIALLY UNDER

09:19  24   THAT DESIGN.

09:19  25   Q.  NOW, DO YOU KNOW WHETHER OR NOT THE GRASS ON EITHER SIDE OF THE

09:19  1   FLOOD CONTROL STRUCTURE AT THIS LOCATION IS A COMPONENT PART OF THE

09:20  2   STRUCTURE?

09:20  3   A.  IT'S MY UNDERSTANDING THAT, YES, IT WAS.

09:20  4   Q.  IN FACT, THE GRASS IS PUT THERE FOR A REASON, ISN'T IT?

09:20  5   A.  IT WAS A PARTIAL I-WALL AND LEVEE SECTION.

09:20  6   Q.  WHAT'S THE PURPOSE OF THE GRASS?

09:20  7   A.  THE PURPOSE OF THE GRASS IS TO HOLD THAT WALL SOMEWHAT AS A

09:20  8   STABILIZER IN PLACE.

09:20  9   Q.  SUPPOSED TO PREVENT EROSION AS WELL; ISN'T THAT TRUE?

09:20  10  A.  YES, IT DOES.

09:20  11  Q.  NOW, WITH REGARD TO THE RIGHT OF WAY WHEREIN GENERALLY FLOOD

09:20  12  CONTROL STRUCTURES ARE LOCATED, IN THE COURSE OF DOING WHAT YOU DO,

09:20  13  THAT IS TO MAINTAIN THESE THINGS, HOW DO YOU KNOW WHAT THE RIGHT OF

09:20  14  WAY IS?

09:20  15  A.  THE RIGHT OF WAY IS ESTABLISHED AT THE TIME OF -- DURING

09:20  16  CONSTRUCTION.  YOU MAY HAVE A CONSTRUCTION RIGHT OF WAY AS WELL AS

09:20  17  A FINAL DESIGN RIGHT OF WAY.  IT CAN VARY THROUGHOUT THE PROJECT OR

09:21  18  THE LENGTH OF THE PROJECT.  SO GENERALLY WITH A WALL IT'S ABOUT TEN

09:21  19  FEET FROM A FLOODWALL, BUT THAT'S NOT A DEFINED THING THROUGHOUT

09:21  20  THE ENTIRE SYSTEM.

09:21  21  Q.  RIGHT.  WELL, INSOFAR AS DOING WHAT YOU DO WHEN YOU'RE OUT

09:21  22  THERE INSPECTING, I AM JUST TRYING TO GET A SENSE AS YOU'RE OUT

09:21  23  THERE LOOKING AT THE WALL.  DO YOU, AS YOU'RE LOOKING AT THE WALL,

09:21  24  HAVE SOME SENSE OF WHERE THE RIGHT OF WAY IS?  IN OTHER WORDS, WHAT

09:21  25  IS CONTAINED WITHIN THE PARTICULAR FLOOD CONTROL STRUCTURE?

09:21  1   A.  WHEN WE'RE OUT THERE LOOKING AT THE WALL, WHAT WE'RE LOOKING

09:21  2   FOR IS WHETHER OR NOT THE LEVEE DISTRICT IS DOING THE MAINTENANCE

09:21  3   THAT THEY'RE REQUIRED TO DO, CUTTING THE GRASS, IF THERE'S ANY

09:21  4   GRAFFITI ON THE WALL, IF THERE'S ANY EROSION THEY'RE MAKING REPAIRS

09:21  5   ON THAT.  SO ANYTHING WITHIN THAT GENERAL VICINITY OF THAT WALL

09:21  6   WE'RE GOING TO LOOK AT.

09:21  7   Q.  ALL RIGHT.  NOW, THIS WALL, YOU KNOW, IS AN I-WALL WHICH HAS A

09:22  8   LITTLE LEVEE EMBANKMENT ON EITHER SIDE, CORRECT?

09:22  9   A.  THAT'S CORRECT.

09:22  10  Q.  IS THE LEVEE EMBANKMENT PART OF THE I-WALL?

09:22  11  A.  IT'S PART OF THE DESIGN FOR THE I-WALL?

09:22  12  Q.  YES.

09:22  13  A.  YES.

09:22  14          THE COURT:  ARE WE TALKING ABOUT PRE-2000 --

09:22  15          MR. BRUNO:  KATRINA, PRE-KATRINA.

09:22  16          THE COURT:  PRE-AUGUST 29TH.

09:22  17          MR. BRUNO:  IT'S MY FAULT.  LET ME ESTABLISH THAT FOR THE

09:22  18  RECORD.

09:22  19  BY MR. BRUNO:

09:22  20  Q.  WE ARE GOING TO BE TALKING ABOUT THE I-WALL BETWEEN CLAIBORNE

09:22  21  AND FLORIDA AS IT EXISTED BEFORE KATRINA.  LET'S MAKE THAT CLEAR

09:22  22  FOR THE RECORD.  IS THAT FAIR?

09:22  23  A.  YES, SIR.

09:22  24  Q.  SO IN ANY CASE, THERE IS AN I-WALL AND THERE IS THIS LITTLE

09:22  25  LEVEE EMBANKMENT?

09:22   1    A.   (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

09:22   2    Q.   DO YOU KNOW WHAT THE RIGHT OF WAY IS FOR THAT WALL?

09:22   3    A.   OFFHAND?

09:22   4            THE COURT:   YOU MEAN THE DISTANCE OF THE RIGHT OF WAY?

09:22   5            MR. BRUNO:   YES.

09:22   6            THE COURT:   THE BOUNDARIES OF THE RIGHT OF WAY?

09:23   7            MR. BRUNO:   AS ALWAYS, THANK GOD FOR JUDGE DUVAL BECAUSE

09:23   8    HE HELPS ME ASK THESE QUESTIONS INTELLIGENTLY.   SO THE BOUNDARIES

09:23   9    OF THE RIGHT OF WAY.

09:23   10           THE COURT:   I'M NOT QUITE AS INVOLVED, SO GO AHEAD.

09:23   11           THE WITNESS:   AT THAT SPECIFIC SITE, I DON'T KNOW

09:23   12   OFFHAND.   I WOULD HAVE TO GO BACK TO THE DRAWINGS, THE DESIGN

09:23   13   DRAWINGS AND LOOK AT THAT.

09:23   14   BY MR. BRUNO:

09:23   15   Q.   OKAY.   FAIR ENOUGH, I GOTCHA.   LET'S SEE.

09:23   16           IN YOUR ROLE, YOU'VE SAID YOU EVALUATED AND PROCESSED

09:23   17   HUNDREDS OF FLOOD CONTROL PERMIT APPLICATIONS.   TELL THE JUDGE,

09:23   18   WHAT DID YOU MEAN WHEN YOU SAY YOU "EVALUATE THE APPLICATIONS"?

09:23   19   A.   THE FLOOD CONTROL PERMIT APPLICATIONS ARE THE LEVEE DISTRICT

09:23   20   PERMITS.   WE GET APPLICATIONS SUBMITTED BY THE APPLICANT.   WE

09:23   21   PROCESS THEM WITHIN THE CORPS, AS WELL AS DOTD PROCESSES THEM FROM

09:23   22   AN ENGINEERING EVALUATION.   WHAT MY OFFICE WOULD DO IS WE WOULD

09:24   23   RECEIVE THE APPLICATION THAT WAS SENT TO THE LEVEE DISTRICT, WE

09:24   24   WOULD THEN FORWARD IT TO OUR ENGINEERING DIVISION TO DO MORE EXPERT

09:24   25   SUBJECT MATTER EXPERT TYPE OF EVALUATION.

09:24  1    Q.  OKAY.  ALL RIGHT.  YOU SAY HERE, "I INSURED SPONSOR O&M

09:24  2    COMPLIANCE."  TELL THE JUDGE WHAT YOU MEANT BY THAT.

09:24  3    A.  WHAT WE DO IS WE OVERSEE THE RESPONSIBILITIES OF THE LEVEE

09:24  4    DISTRICT.  WE WANTED TO MAKE SURE THAT THEY ARE PRESERVING THE

09:24  5    FEDERAL INVESTMENT.  WE WANT TO MAKE SURE THAT THEY'RE CUTTING THE

09:24  6    GRASS, THEY'RE REPAIRING ANY EROSION, AND THINGS OF THAT SORT.

09:24  7    Q.  YOU ALSO REFERENCED TITLE 33 CFR 208.1 IN THIS PIECE?

09:24  8    A.  THAT'S CORRECT.

09:24  9    Q.  DO YOU SEE THAT?  ARE YOU FAMILIAR WITH THAT REGULATION?

09:25  10   A.  YES.  THAT REGULATION IS THE ONE PRIMARILY GIVES THE DELEGATION

09:25  11   AUTHORITY TO THE LEVEE DISTRICT AND SPECIFIES THE GENERAL O&M

09:25  12   REQUIREMENTS.

09:25  13   Q.  BEFORE WE GET INTO THAT IN GREATER DETAIL, LET'S GO TO THE NEXT

09:25  14   PAGE, WHICH IS NO. 2, AND LET'S BLOW UP THE DECEMBER 9 TO JULY '91

09:25  15   PARAGRAPH.  THAT'S IT THERE.  OKAY.  IT SAYS HERE THAT YOU WERE A

09:25  16   PROJECT MANAGER FOR MR&T CONSTRUCTION PROJECTS IN THE PLANNING,

09:25  17   PROGRAMS AND PROJECT MANAGEMENT DIVISION.  FIRST, TELL THE JUDGE,

09:25  18   WHAT DOES THE PLANNING, PROGRAMS, AND PROJECT MANAGEMENT DIVISION

09:25  19   DO?

09:25  20   A.  THAT'S THE GROUP THAT AT THE BEGINNING OF A PROJECT THEY DO THE

09:25  21   STUDIES, THEY DO THE BASIC PROJECT MANAGEMENT.  THE PROGRAM PORTION

09:26  22   IS THE MONEYS PORTION OF THE DIVISION, BUT IT'S THE EARLY ON OF ANY

09:26  23   PROJECT THAT'S GOING TO BE UNDERTAKEN BY THE CORPS.  ONCE IT'S

09:26  24   FEDERALLY AUTHORIZED, THE PLANNING PROCESS STARTS AND THEN THE

09:26  25   PROJECT MANAGEMENT MOVES IT INTO THE NEXT PHASE WHICH WOULD BE

09:26  1   ENGINEERING, DESIGN.

09:26  2   Q.  ALL RIGHT.  LET'S GO TO PAGE 4.  AND IF WE CAN HIGHLIGHT THE

09:26  3   TOP SECTION OF THIS STARTING WITH ABILITY AND SKILL.  WHERE IT

09:26  4   BEGINS -- YOU SAY, "I HAVE EXTENSIVE KNOWLEDGE OF OPERATIONS

09:26  5   DIVISION FUNCTIONS, AS WELL AS MOST OTHER DISTRICT FUNCTIONS, AN

09:27  6   EXTREMELY IMPORTANT ASSET FOR AN ASSISTANT CHIEF OF THE OPERATIONS

09:27  7   DIVISION."  SO YOU NOT ONLY KNOW YOUR OWN SECTION, YOU KNOW A LOT

09:27  8   ABOUT THE OTHER DIVISIONS IN THE NEW ORLEANS DISTRICT OFFICE; ISN'T

09:27  9   THAT ACCURATE?

09:27  10  A.  I DO KNOW ABOUT THE OTHER DIVISIONS AND OFFICES.  I DON'T KNOW

09:27  11  THE DETAILS OF ALL OF THOSE OFFICES, BUT I DO KNOW WHAT THEIR

09:27  12  RESPONSIBILITIES ARE FROM A STANDPOINT OF THAT BASIC KNOWLEDGE OF

09:27  13  WHAT THEY NEED TO DO WITHIN THOSE DIVISIONS OR OFFICES.

09:27  14  Q.  AND THE BOTTOM SENTENCE OF THIS PAGE, IF YOU COULD HIGHLIGHT

09:27  15  THAT FOR ME.  I JUST WANT TO READ THE LAST SENTENCE.  "THESE ROLES

09:27  16  REQUIRE KNOWLEDGE OF ALL LEVELS AND FUNCTIONS OF THE" -- GO TO THE

09:28  17  NEXT PAGE -- "ENTIRE DISTRICT WORK FORCE, AS WELL AS THE FUNCTION

09:28  18  AND ORGANIZATIONAL STRUCTURE OF OTHER GOVERNMENTAL AGENCIES FOR

09:28  19  MUTUAL AID SUPPORT."  AND THEN YOU GO ON TO SAY, "MY ABILITY AND

09:28  20  SKILLS WERE NECESSARY IN GROUPS IN LARGER MULTI-DISCIPLINARY TEAMS

09:28  21  FROM THROUGHOUT THE DISTRICT ORGANIZATION CONSISTING OF ENGINEERS,

09:28  22  TECHNICIANS, ENVIRONMENTALISTS, HIRE LABOR, CONSTRUCTION PERSONNEL,

09:28  23  CONTRACTING SPECIALISTS, REAL ESTATE SPECIALISTS, ADMINISTRATIVE

09:28  24  SUPPORT PERSONNEL, AND OTHERS."  SO YOU HAVE A LOT OF KNOWLEDGE,

09:28  25  RIGHT?

09:28  1    A.  I THINK SO.

09:28  2    Q.  OKAY.  AND, IN FACT, YOU SPEAK FOR THE CORPS, DON'T YOU?

09:28  3    YOU'RE IN THE SPEAKERS PROGRAM?

09:28  4    A.  I'VE DONE PRESENTATIONS BEFORE, YES.

09:28  5    Q.  THEY DON'T JUST LET ANYBODY SPEAK FOR THE CORPS, DO THEY?  THEY

09:29  6    AT LEAST WANT TO MAKE CERTAIN THAT THE PERSON THAT THEY ALLOW TO

09:29  7    SPEAK FOR THE CORPS KNOWS A LITTLE BIT ABOUT WHAT THEY'RE TALKING

09:29  8    ABOUT; ISN'T THAT TRUE?

09:29  9    A.  YES, IT IS.

09:29  10   Q.  SO LET ME ASK YOU THIS:  DO YOU KNOW WHAT A DESIGN

09:29  11   DOCUMENTATION REPORT IS?

09:29  12   A.  IT'S A REPORT THAT'S ISSUED BY THE DESIGN GROUP.  I AM NOT REAL

09:29  13   FAMILIAR WITH THOSE, THE DETAILS OF THEM.  IT'S DONE GENERALLY BY

09:29  14   THE ENGINEERING PEOPLE AND PROJECT MANAGEMENT FOLKS.

09:29  15   Q.  YOU KNOW ONE WHEN YOU SEE ONE?

09:29  16   A.  I HADN'T SEEN ONE IN AWHILE, BUT.

09:29  17   Q.  DO YOU KNOW WHAT A DESIGN MEMORANDUM IS?

09:29  18   A.  YES.  THAT'S AN INTERNAL MEMORANDUM WITHIN THE DESIGN GROUP.

09:30  19   AGAIN, THAT'S A DIFFERENT GROUP THAN OPERATIONS DIVISION.

09:30  20   Q.  AND DO YOU FROM TIME TO TIME HAVE TO REVIEW ENGINEERING

09:30  21   REGULATIONS?

09:30  22   A.  YES, WE REVIEW THE ONES THAT APPLY GENERALLY TO US, YES.

09:30  23   Q.  YOU BELIEVE YOU HAVE THE ABILITY AND EXPERTISE TO INTERPRET AN

09:30  24   ENGINEERING REGULATION?

09:30  25   A.  WE'VE BEEN DOING IT FOR YEARS.

09:30  1   Q.  SURE.  THAT'S WHY THEY'RE WRITTEN DOWN SO FOLKS LIKE YOU CAN

09:30  2   READ THEM AND UNDERSTAND THEM?

09:30  3   A.  AND TRY TO INTERPRET THEM.

09:30  4   Q.  AS YOU'VE TOLD THE JUDGE, YOUR ROLE IS TO MAKE CERTAIN THAT

09:30  5   THESE, AMONG OTHER COMPLETED PROJECTS, THE FLOOD CONTROL STRUCTURES

09:30  6   ARE PROPERLY MAINTAINED AND OPERATED, CORRECT?

09:30  7   A.  THAT'S CORRECT.

09:30  8   Q.  OBVIOUSLY, A COMPONENT PART -- THESE FLOOD CONTROL STRUCTURES

09:30  9   HAVE A COMPONENT OF THEM THAT ARE ABOVE THE SURFACE OF THE GROUND,

09:31 10   DON'T THEY?

09:31 11   A.  IN THIS CASE, YES.

09:31 12   Q.  AND THERE'S A COMPONENT OF THESE FLOOD CONTROL STRUCTURES THAT

09:31 13   ARE BELOW THE GROUND; ISN'T THAT TRUE?

09:31 14   A.  YES.

09:31 15   Q.  NOW, AS PART OF YOUR WORK WHEN YOU'RE DOING THESE INSPECTIONS,

09:31 16   DO YOU ASSESS WHETHER OR NOT THESE FLOOD CONTROL STRUCTURES, AS YOU

09:31 17   ARE ABLE TO VISUALIZE THEM, HAVE BEEN DAMAGED IN SOME FASHION;

09:31 18   PERHAPS A CAR RAN INTO THEM OR BROKEN CONCRETE AND THINGS LIKE

09:31 19   THAT?

09:31 20   A.  IT IS A VISUAL INSPECTION OF WHAT YOU'RE ABLE TO SEE OUT THERE.

09:31 21   YOU'RE NOT DOING A SUBSURFACE-TYPE OF INSPECTION OR ANYTHING OF

09:31 22   THAT SORT.

09:31 23   Q.  UNDERSTOOD.  BUT WHAT I AM TRYING TO UNDERSTAND IS WHAT IS THE

09:31 24   OBLIGATION OF THE LOCAL SPONSOR TO PREVENT THOSE KINDS OF THINGS

09:31 25   FROM HAPPENING, IF YOU KNOW?

09:31  1   A.  WELL, THEIR OBLIGATION IS TO OPERATE, PROTECT, AND MAINTAIN,

09:31  2   YOU KNOW, THAT STRUCTURE OR THAT LEVEE, AND THEY DO THAT THROUGH AN

09:32  3   ACTIVE PERMIT PROGRAM, THEY DO THAT THROUGH THEIR INSPECTIONS AS

09:32  4   WELL.

09:32  5   Q.  WELL, I AM TALKING ABOUT JUST THE EASY STUFF.  LIKE, FOR

09:32  6   EXAMPLE, DRIVING YOUR CAR OVER THE LEVEE.  BY DRIVING YOUR CAR INTO

09:32  7   THE LEVEE, IS THE LOCAL SPONSOR REQUIRED TO TAKE SOME STEPS TO KEEP

09:32  8   THOSE KINDS OF THINGS FROM HAPPENING?

09:32  9   A.  THAT'S CORRECT.  THAT'S WHY THEY ADMINISTER, YOU KNOW, THEY NOT

09:32  10  ONLY ADMINISTER A PERMITS PROGRAM FOR CERTAIN TYPES OF ACTIVITIES,

09:32  11  BUT THEY ALSO HAVE A POLICE DEPARTMENT AND SUCH THAT THEY'RE ABLE

09:32  12  TO ENFORCE VANDALISMS AND THINGS.

09:32  13  Q.  EXACTLY.  PART OF YOUR INSPECTION OF THESE LEVEES IS TO MAKE

09:32  14  CERTAIN THAT THE LOCAL SPONSORS ARE DOING THAT JOB AS WELL; ISN'T

09:32  15  THAT TRUE?  THAT THEY ARE, IN FACT, POLICING THESE FLOOD CONTROL

09:32  16  STRUCTURES AND DOING WHAT THEY CAN TO KEEP PEOPLE FROM DAMAGING

09:33  17  THEM; ISN'T THAT TRUE?

09:33  18  A.  THAT'S CORRECT.

09:33  19  Q.  NOW, THIS MAY SEEM LIKE A WEIRD QUESTION, BUT JUST LET ME ASK

09:33  20  IT.  SO OBVIOUSLY IF I, A CITIZEN, DRIVE MY CAR ON TOP OF THE

09:33  21  LEVEE, THE LOCAL SPONSOR IS GOING TO TELL ME NOT TO DO THAT,

09:33  22  CORRECT?

09:33  23  A.  CORRECT.

09:33  24  Q.  NOW, IF SOMEONE DRIVING A CORPS TRUCK, A CORPS PERSONNEL DRIVES

09:33  25  ONTO THE LEVEE, DO THEY GET TO DRIVE ON THE LEVEE AND POTENTIALLY

09:33  1    DAMAGE IT; IS THAT OKAY?

09:33  2    A.  YES, IT IS.  THE CODE OF FEDERAL REGULATION, TITLE 33:208.10

09:33  3    DOES ALLOW US UNLIMITED ACCESS ON THE FEDERAL PROJECTS.  SO, YES,

09:33  4    WE DO THAT.  WE GENERALLY TALK WITH THE LEVEE DISTRICT BEFORE WE

09:33  5    DO, YOU KNOW, GOING OUT THERE BECAUSE WE USUALLY, IF WE'RE GOING TO

09:33  6    LOOK AT IT, WE WANT THEM WITH US MANY OF THE TIMES.

09:33  7    Q.  FAIR ENOUGH.  SO, OKAY.  I'VE GOT A POLICEMAN THAT KEEPS ME

09:33  8    FROM DAMAGING THE LEVEE.  WHO KEEPS THE CORPS DRIVING HIS CORPS

09:34  9    TRUCK FROM DAMAGING THE LEVEE?

09:34  10   A.  THAT SAME POLICEMAN AND THAT ORLEANS LEVEE DISTRICT.

09:34  11   Q.  SO THAT WE'RE CLEAR HERE, IT DOESN'T MAKE ANY DIFFERENCE

09:34  12   WHETHER IT'S JOHN Q. CITIZEN OR WHETHER IT'S THE CORPS OF

09:34  13   ENGINEERS, NEITHER ONE OF THEM CAN DRIVE THEIR CAR ON TO THAT LEVEE

09:34  14   AND DAMAGE IT, CORRECT?

09:34  15   A.  THAT'S CORRECT, WITHOUT HAVING TO MAKE REPAIRS.

09:34  16   Q.  SURE.  AND THERE'S ENGINEERING GUIDANCE AVAILABLE TO THE CORPS

09:34  17   WHICH ALLOWS THE LOCAL SPONSOR AS WELL AS THE CORPS TO UNDERSTAND

09:34  18   THE KINDS OF THINGS THAT YOU DON'T WANT TO DAMAGE, RIGHT?

09:34  19   A.  THAT'S CORRECT.

09:34  20   Q.  AND AGAIN, SOMETHING EASY.  WE DON'T WANT PEOPLE TAKING THAT

09:34  21   GRASS OFF OF THAT LEVEE, BECAUSE IF WE TAKE THAT GRASS OFF THAT

09:34  22   LEVEE IT'S GOING TO PROMOTE EROSION; ISN'T THAT TRUE?

09:34  23   A.  THAT'S CORRECT.

09:34  24   Q.  SO WE DON'T WANT JOHN Q. PUBLIC REMOVING THE GRASS, AND WE

09:35  25   DON'T WANT THE CORPS REMOVING THE GRASS; ISN'T THAT ACCURATE?

09:35  1    A.  IT DEPENDS ON THE SITUATION.  I MEAN, WE MAY BE REMOVING IT --

09:35  2    Q.  PURPOSELY.

09:35  3    A.  -- FOR CONSTRUCTION PURPOSES.

09:35  4    Q.  I AM NOT TALKING ABOUT PURPOSELY, I AM TALKING ABOUT

09:35  5    INAPPROPRIATELY, OKAY.  ALL I AM TRYING TO ESTABLISH HERE,

09:35  6    MR. COLLETTI, I AM NOT PLAYING GAMES WITH YOU OR ANYBODY ELSE.  I'M

09:35  7    TRYING TO UNDERSTAND IF THE NEED TO PROTECT THE LEVEE IS ANY

09:35  8    DIFFERENT BETWEEN THE PUBLIC AND THE CORPS.  BOTH ENTITIES HAVE TO

09:35  9    PROTECT THAT LEVEE; ISN'T THAT TRUE?

09:35  10   A.  YES.

09:35  11   Q.  AND THAT'S BECAUSE THAT FLOOD CONTROL STRUCTURE IS A PRETTY

09:35  12   IMPORTANT STRUCTURE, ISN'T IT?

09:35  13   A.  VERY IMPORTANT.

09:35  14   Q.  AND I DON'T WANT TO STATE THE OBVIOUS.  WE HAVE ACTUAL EVIDENCE

09:35  15   AFTER KATRINA WHERE EVERYBODY AND ANYBODY CAN UNDERSTAND THE

09:35  16   DEVASTATION THAT OCCURS IF THOSE THINGS DON'T FUNCTION THE WAY

09:35  17   THEY'RE SUPPOSED TO FUNCTION; ISN'T THAT TRUE?

09:35  18   A.  THAT'S CORRECT.

09:35  19   Q.  AND WE HAVE EVIDENCE OF WHAT HAPPENS IF THOSE THINGS GET

09:35  20   DAMAGED AND IF THAT DAMAGE CAUSES THOSE WELLS TO FAIL, WE KNOW THE

09:36  21   CONSEQUENCES, RIGHT?

09:36  22   A.  WE'VE SEEN IT.

09:36  23   Q.  SO WE UNDERSTAND, DO WE NOT, IT IS OF PARAMOUNT IMPORTANCE,

09:36  24   PARAMOUNT IMPORTANCE TO MAKE CERTAIN THAT THOSE STRUCTURES DO NOT

09:36  25   GET DAMAGED, CORRECT?

09:36  1    A.  I BELIEVE SO, YES.

09:36  2    Q.  AND SO IF YOU'RE DRIVING YOUR CAR AND THEN INSPECTION -- WELL,

09:36  3    WITHDRAW.

09:36  4        IS THERE ANY POTENTIAL -- WE TALKED ABOUT THE OBVIOUS, OKAY.

09:36  5    YOU DRIVE YOUR CAR INTO THE WALL, THAT'S PRETTY OBVIOUS.  WHAT IS

09:36  6    THE POTENTIAL DAMAGE THAT MIGHT OCCUR TO A WALL FROM ACTIVITIES

09:36  7    THAT TAKE PLACE NEAR THAT WALL?

09:36  8    A.  THERE'S DAMAGES -- I DON'T ASSESS THOSE TYPES OF EVALUATIONS.

09:36  9    THAT'S OUR ENGINEERING DIVISION DOES THAT.

09:36  10   Q.  DIDN'T ASK YOU THAT.  DO YOU KNOW WHETHER OR NOT THERE ARE ANY

09:36  11   POTENTIAL ACTIVITIES THAT COULD TAKE PLACE NEAR A FLOODWALL THAT

09:37  12   MIGHT DAMAGE THAT FLOODWALL FROM BELOW?

09:37  13   A.  YES.

09:37  14   Q.  WHAT ARE THEY?  TELL THE JUDGE.

09:37  15   A.  WE HAVE -- ANY SUBSURFACE TYPES OF ACTIVITIES, PILE DRIVING,

09:37  16   EXCAVATIONS, POOLS, SEISMIC WORK, PRETTY MUCH ANY TYPE OF

09:37  17   SUBSURFACE ACTIVITY HAS THAT POTENTIAL.

09:37  18   Q.  RIGHT.  AND SO IF YOU'RE DRIVING YOUR CAR ON YOUR INSPECTION

09:37  19   WITH THE LOCAL FOLKS LIKE Y'ALL DO, AND YOU DO IT -- HOW OFTEN DO

09:37  20   Y'ALL DO THAT?

09:37  21   A.  WE'RE REQUIRED TO DO IT ONCE A YEAR.

09:37  22   Q.  ONCE A YEAR.

09:37  23   A.  BUT IT'S DONE, YOU KNOW, MORE FREQUENTLY THAN THAT.

09:37  24   Q.  HOW FREQUENTLY DID YOU DO IT BEFORE KATRINA?

09:37  25   A.  AS I SAID, FORMERLY IT'S ONCE A YEAR, BUT WE HAVE PEOPLE OUT IN

09:37   1   THE FIELD ALL THE TIME, SO.

09:37   2   Q.  I DON'T WANT TO MAKE AN ISSUE OF THAT.  ALL I WANT TO GET A

09:37   3   SENSE OF IS IF YOU'RE DRIVING YOUR CAR ON ONE OF THESE INSPECTIONS

09:37   4   AND YOU OBSERVE SOMEBODY EITHER DIGGING HOLES OR PUTTING A WELL IN,

09:38   5   I THINK YOU SAID SEISMIC ACTIVITY OR ANY OF THESE THINGS, WHAT DO

09:38   6   YOU DO?

09:38   7   A.  WE STOP -- AT THAT TIME, WE'RE WITH THE LEVEE DISTRICT AS WELL

09:38   8   AS DOTD, ALONG THERE WE WOULD FIND OUT WHETHER OR NOT THEY HAD A

09:38   9   PERMIT TO BE DOING THAT TYPE OF WORK.  SO WE CAN ACTUALLY STOP THAT

09:38  10   INSPECTION AND ENSURE THAT THEY HAVE ALL OF THE NECESSARY PERMITS,

09:38  11   OR THE ACTIVITY IS THEN STOPPED UNTIL THE EVALUATION IS DONE.

09:38  12   Q.  NOW, WHY DO YOU DO THAT?  WHY?  WHY DO YOU STOP THE CAR?

09:38  13   A.  TO MAKE SURE THAT THAT -- THAT WHAT THEY'RE DOING AT LEAST HAS

09:38  14   BEEN EVALUATED FROM AN ENGINEERING STANDPOINT AND ITS IMPACTS ON

09:38  15   THE LEVEE.

09:38  16   Q.  AND THAT'S BECAUSE THIS LOCAL DISTRICT HAS ENGINEERING

09:39  17   GUIDELINES WHICH DESCRIBE THE KINDS OF ACTIVITIES WHICH COULD

09:39  18   DAMAGE THAT FLOODWALL; ISN'T THAT TRUE?

09:39  19   A.  YES, WE DO.

09:39  20   Q.  AND THOSE GUIDELINES ARE, IF YOU DIG HOLES IN THE VICINITY OF A

09:39  21   FLOOD CONTROL STRUCTURE, THERE'S THE POTENTIAL THAT YOU COULD

09:39  22   UNDERMINE THE LEVEE; ISN'T THAT TRUE?

09:39  23   A.  THAT'S A POSSIBILITY.

09:39  24   Q.  IF YOU DRILL A WELL, IT COULD UNDERMINE THAT LEVEE; ISN'T THAT

09:39  25   TRUE?

09:39   1    A.  IT HAS THAT POSSIBILITY.

09:39   2    Q.  IF YOU DO SEISMIC ACTIVITY, YOU COULD ENDANGER THAT LEVEE,

09:39   3    RIGHT?

09:39   4    A.  THAT'S CORRECT.

09:39   5    Q.  ONCE AGAIN, I AM NOT ASKING A STUPID QUESTION, BUT MAYBE, YEAH.

09:39   6    IT DOESN'T MATTER WHETHER IT'S JOHN Q. PUBLIC DOING THE WORK OR THE

09:39   7    CORPS DOING THE WORK, IT'S THE NATURE OF THE WORK THAT CAN

09:39   8    POTENTIALLY DAMAGE THE LEVEE; ISN'T THAT TRUE?

09:39   9    A.  IT HAS TO BE EVALUATED, YES.

09:39   10   Q.  IT HAS TO BE EVALUATED.  WHY DOES IT HAVE TO BE EVALUATED?

09:39   11   A.  TO BASICALLY TO MAKE SURE THAT YOU'RE NOT DAMAGING THE

09:40   12   STRUCTURAL INTEGRITY OF THAT LEVEE OR FLOODWALL.

09:40   13   Q.  NOW, IF AN EXPERT IN THIS CASE SAYS FROM THAT WITNESS STAND

09:40   14   THAT YOU'RE SITTING IN THAT HE TALKED TO YOU AND YOU TOLD HIM THERE

09:40   15   ARE NO ENGINEERING GUIDELINES WHICH REQUIRE AN EVALUATION OF

09:40   16   EXCAVATIONS, WELDS, AND THE LIKE NEAR A FLOOD CONTROL LEVEE, WOULD

09:40   17   HE BE TELLING THE TRUTH?

09:40   18   A.  THAT THERE WERE NO GUIDELINES?

09:40   19   Q.  NONE.

09:40   20   A.  NO, HE WOULD NOT.

09:40   21   Q.  IS IT MANDATORY THAT AN EVALUATION BE DONE OF HOLES,

09:40   22   EXCAVATIONS, WELLS, SEISMIC ACTIVITY.  IS THAT MANDATORY IN YOUR

09:40   23   MIND TO PRESERVE THE INTEGRITY OF THAT FLOODWALL?

09:40   24   A.  NOT NECESSARILY.  IT'S A CASE-BY-CASE BASIS THAT OUR

09:40   25   ENGINEERING DIVISION MAKES THAT DETERMINATION.

09:40  1  Q.  I DIDN'T ASK THAT.  I SAID -- I DIDN'T ASK YOU WHETHER THE WORK

09:41  2  IS PERMITABLE.  I SAID THIS:  IS IT MANDATORY THAT SOMEBODY

09:41  3  EVALUATE IT IN ORDER TO DECIDE WHETHER OR NOT IT'S GOING TO OR NOT

09:41  4  GOING TO DAMAGE THE FLOODWALL?  THAT'S WHAT I ASKED YOU.

09:41  5  A.  IF I INTERPRET THIS CORRECTLY, THE EVALUATION IS DONE BY

09:41  6  ENGINEERING.

09:41  7  Q.  I DIDN'T ASK YOU THAT EITHER.  WITH ALL DUE RESPECT,

09:41  8  MR. COLLETTI, I DIDN'T ASK YOU WHETHER IT WAS DONE --

09:41  9          THE COURT:  IN OTHER WORDS, IS IT MANDATORY THAT ONE

09:41 10  OBTAINS A PERMIT BEFORE ONE CAN WORK IN THE VICINITY OF THE LEVEE?

09:41 11          THE WITNESS:  THAT VARIES DEPENDING ON WHO THAT

09:41 12  APPLICATION WOULD BE.  IF IT'S, AS WE CALL IT, A THIRD-PARTY

09:41 13  APPLICANT, WE DO THE EVALUATION.  IF IT'S A CORPS CONTRACT, WE GET

09:41 14  A RIGHT OF ENTRY AND WE DO ALL OF THE EVALUATION OURSELVES.

09:41 15  BY MR. BRUNO:

09:41 16  Q.  I AM NOT QUITE THERE YET, WITH ALL DUE RESPECT, YOUR HONOR.  I

09:41 17  DON'T WANT TO GET INTO THIS PERMIT AND NO PERMIT BUSINESS.  ALL I

09:42 18  WANT TO KNOW IS IS THERE A STANDARD IN THIS DISTRICT OFFICE?  I

09:42 19  DON'T CARE WHO IT IS, THE PRESIDENT, THE CORPS, ME, ANYBODY.  IF

09:42 20  SOMEONE, REGARDLESS OF WHO THEY ARE, INTENDS TO DO EXCAVATIONS NEAR

09:42 21  A FLOOD CONTROL PROJECT, IS IT MANDATORY THAT SOME KIND OF

09:42 22  EVALUATION TAKE PLACE TO ASCERTAIN WHETHER OR NOT THAT WORK

09:42 23  ACTIVITY MIGHT UNDERMINE THE WALL, YES OR NO?

09:42 24  A.  WORK WITHIN 300 FEET OF A FLOODWALL, A HURRICANE FLOODWALL IS

09:42 25  WHAT WE REQUIRE IN OUR PERMIT PROCESS.

09:42   1   Q. WITH ALL DUE RESPECT, THAT'S NOT RESPONSIVE TO MY QUESTION.

09:42   2   LET ME TRY IT ONE MORE TIME. I AM NOT ASKING YOU ABOUT A PERMIT

09:42   3   NOW.

09:42   4           MS. CRONIN: OBJECTION, YOUR HONOR. THIS QUESTION HAS

09:42   5   BEEN ASKED AND ANSWERED MULTIPLE TIMES.

09:42   6           THE COURT: OVERRULED. SIR, IF ANYONE WANTS TO

09:43   7   EXCAVATE -- DO SOME EXCAVATION WITHIN 300 FEET OF THE FLOODWALL,

09:43   8   WHOEVER THAT ENTITY OR PERSON IS, IS THAT PERSON -- DOES THE

09:43   9   CORPS -- IS THE CORPS OBLIGATED TO EVALUATE THE EXCAVATION BEFORE

09:43   10   IT TAKES PLACE?

09:43   11           THE WITNESS: GENERALLY, YES.

09:43   12           MR. BRUNO: OKAY. THANK YOU. JUDGE ONCE AGAIN, COMES TO

09:43   13   MY RESCUE.

09:43   14           THE COURT: YOU SAID "GENERALLY." CAN YOU EXPLAIN TO

09:43   15   ME -- THAT'S A BIT EQUIVOCAL. WHEN WOULD THE CORPS NOT HAVE TO

09:43   16   MAKE AN EVALUATION IF ANYONE, AND THAT INCLUDES THE UNIVERSE, WERE

09:43   17   EXCAVATING NEAR THE FLOODWALL?

09:43   18           THE WITNESS: OUR ENGINEERING DIVISION HAS A LOT OF

09:44   19   GEOTECHNICAL INFORMATION AND GEOLOGICAL INFORMATION IN THE

09:44   20   VICINITIES OF LOTS OF OUR FEDERAL PROJECTS, AND THEY MAY ALREADY

09:44   21   HAVE THAT INFORMATION AVAILABLE AND HAVE THE KNOWLEDGE TO SAY,

09:44   22   "HEY" --

09:44   23           THE COURT: NO NEED TO MAKE AN EVALUATION.

09:44   24           THE WITNESS: -- "NO NEED TO MAKE ANOTHER EVALUATION."

09:44   25           THE COURT: I'LL LEAVE IT AT THAT.

09:44  1   BY MR. BRUNO:

09:44  2   Q.  EVEN IN THAT INSTANCE THERE'S STILL AN EVALUATION, IS THERE

09:44  3   NOT?

09:44  4   A.  THERE WAS AT ONE TIME, YES.

09:44  5   Q.  NO, NO, NO.  THERE IS STILL THE EXERCISE BY WHICH SOMEONE SAYS,

09:44  6   LET ME GO IN MY FILE DRAWER AND SEE WHAT I HAVE TO ASCERTAIN HOW

09:44  7   MUCH MORE I HAVE TO DO; ISN'T THAT TRUE?

09:44  8   A.  YES.

09:44  9   Q.  SO THERE'S STILL -- THERE IS A MANDATORY EVALUATION REQUIRED TO

09:44  10  ASCERTAIN WHETHER OR NOT THAT HOLE MIGHT DAMAGE THE WALL.  AND I

09:44  11  UNDERSTAND THERE MAY BE ONE ALREADY, BUT YOU AT LEAST HAVE TO GO

09:44  12  AND LOOK IN THE FILE DRAWER AND SEE WHAT'S THERE, CORRECT?

09:44  13  A.  CORRECT.

09:44  14  Q.  NOW, YOU'LL HAVE TO HELP ME HERE BECAUSE I DON'T KNOW IF THAT'S

09:45  15  DIFFERENT FROM WHAT YOU TOLD ME IN YOUR DEPOSITION OR NOT.  SO I

09:45  16  WOULD LIKE TO CALL UP JX 1663.

09:45  17          THE COURT:  IF WHAT'S DIFFERENT?

09:45  18          MR. BRUNO:  THAT IS YOU GO LOOK IN THE FILE DRAWER

09:45  19  BECAUSE I HADN'T HEARD THAT BEFORE, THAT PART OF IT.

09:45  20          THE COURT:  OKAY.

09:45  21          MR. BRUNO:  I DID TAKE HIS DEPOSITION.  I DID ASK HIM

09:45  22  THESE QUESTIONS.

09:45  23          THE COURT:  ALL RIGHT.

09:45  24  BY MR. BRUNO:

09:47  25  Q.  OKAY.  IF WE WOULD GO TO PAGE 40, WHICH IS -- I DON'T KNOW WHAT

09:47  1    THE JX NUMBER IS.

09:47  2            THE LAW CLERK:  JX 1663-11 IS THE JX NUMBER.

09:47  3    BY MR. BRUNO:

09:47  4    Q.  CAN YOU BLOW UP PAGE 40.  YOU SEE THERE, AND UNFORTUNATELY

09:47  5    THERE'S A LITTLE BIT OF BACKGROUND THAT WE HAVE TO DEVELOP -- IS

09:47  6    BECAUSE WHAT I ASKED YOU WAS THE WASHINGTON GROUP DID SOME WORK,

09:47  7    ASKED HIM IF HE KNEW WHAT A TERC WAS.  DO YOU KNOW WHAT A TERC IS

09:47  8    TODAY, BY THE WAY?

09:47  9    A.  I GOT A LITTLE BIT BETTER UNDERSTANDING OF IT, BUT WE DON'T --

09:48  10   IN OP'S WE DON'T DEAL WITH THAT VERY OFTEN.

09:48  11   Q.  SO YOU MET WITH THE LAWYERS AFTER THE DEPOSITION?

09:48  12   A.  AFTER WE DID THAT --

09:48  13   Q.  YOU WENT AND DID SOME RESEARCH ON TERC?

09:48  14   A.  NO, JUST BASIC, SAID WHAT IS IT.

09:48  15   Q.  I ASKED THE QUESTION, YOU'RE DIGGING A HOLE WITHIN 300 FEET OF

09:48  16   THE CENTER LINE ON EACH SIDE OF THE HURRICANE PROTECTION STRUCTURE

09:48  17   ON THE INDUSTRIAL CANAL.  YOU'RE GOING DOWN 25 FEET TO REMOVE, I

09:48  18   DONT KNOW, SOME KIND OF OBJECT DOWN THERE.  DO YOU KNOW WHAT KIND

09:48  19   OF -- YOU ARE ON THE WATER SIDE, LET ME MAKE THAT CLEAR.  WHAT KIND

09:48  20   OF AN ASSESSMENT WOULD YOUR ENGINEERING DIVISION DO IN THAT

09:48  21   CONTEXT?

09:48  22            GO TO PAGE 41.  AND YOUR ANSWER IS AT LINE 21.  "SO IF I

09:48  23   UNDERSTAND YOU CORRECTLY, YOU'RE TALKING ABOUT A HOLE IN THE

09:48  24   INDUSTRIAL CANAL, WITHIN 300 FEET -- "  LET'S GO TO PAGE 42,

09:49  25   LINE 1.  IT SAYS, "-- OF THE STRUCTURE.  GENERALLY, IF IT IS NOT

09:49  1    UNDER EMERGENCY CONDITIONS, IF IT WAS AN APPLICANT COMING IN TO DO

09:49  2    THAT VERSUS US, WE WOULD REQUIRE A DEPARTMENT OF THE ARMY PERMIT

09:49  3    THROUGH OUR REGULATORY BRANCH AND ALSO THE ORLEANS LEVEE DISTRICT

09:49  4    WOULD REQUIRE A PERMIT OR LETTER OF NO OBJECTION BECAUSE OF THE

09:49  5    IMPACTS IT MAY HAVE ON THE WALL."

09:49  6            THAT'S A LITTLE DIFFERENT THAN WHERE I WAS GOING, BUT

09:49  7    SINCE WE'RE HERE, IS THERE A NEED FOR A DEPARTMENT OF THE ARMY

09:49  8    PERMIT?

09:49  9    A.  IF IT'S AN OUTSIDE APPLICANT, YES, THERE WOULD HAVE BEEN.

09:49  10   Q.  SO THERE'S TWO PERMITS REQUIRED, THERE'S AN OLD PERMIT AND A

09:49  11   DEPARTMENT OF ARMY PERMIT?

09:49  12   A.  FOR AN OUTSIDE APPLICANT, YES.

09:49  13   Q.  TWO DIFFERENT THINGS?

09:49  14   A.  AS WE CALL IT, A THIRD-PARTY APPLICANT, NOT THE CORPS, YOU

09:49  15   KNOW, NOT THE CORPS CONTRACTOR, I MEAN, THAT'S WHAT I MEAN BY A

09:49  16   THIRD-PARTY APPLICANT.  IF IT WAS YOU, IF IT WAS YOU COMING IN HERE

09:50  17   TO DO THIS.

09:50  18   Q.  ALL RIGHT.  TWO SEPARATE PERMITS, RIGHT?

09:50  19           THE COURT:  THE COURT UNDERSTANDS THOUGH THAT THIS

09:50  20   WITNESS'S TESTIMONY IS STATING A CONTRACTOR SUCH AS WGI WOULD NOT

09:50  21   HAVE TO HAVE A DEPARTMENT OF THE ARMY PERMIT; IS THAT CORRECT?

09:50  22           THE WITNESS:  THAT'S CORRECT.

09:50  23           MR. BRUNO:  THAT'S RIGHT.  LET'S GO THROUGH THAT.  I AM

09:50  24   NOT ON PERMITS.  I JUST DIDN'T KNOW --

09:50  25           THE COURT:  I UNDERSTAND.  I JUST WANT TO GET THAT CLEAR.

09:50  1   BY MR. BRUNO:

09:50  2   Q.  OKAY.  LET'S SEE.  NOW, THAT WE HAVE THE BACKGROUND, LET'S GO

09:50  3   TO PAGE 42, LINE 21.  HERE IS WHERE I ASKED:  "NOW, I BELIEVE YOU

09:50  4   QUALIFIED YOUR ANSWER TO BE IN THE CONTEXT OF A THIRD PARTY.  WHAT

09:50  5   ABOUT IF IT'S THE CORPS DOING THE WORK, AGAIN, THROUGH A

09:50  6   CONTRACTOR, IS THERE ANY DIFFERENCE IN THE EVALUATION?"  A. NO.  WE

09:51  7   DID THAT PRIOR TO DEVELOPING THE SCOPE OF WORK.  AND THAT'S

09:51  8   DONE" -- AND IT SAYS THE SAME TYPE OF THING, NOT THINK, RIGHT, FAIR

09:51  9   ENOUGH?

09:51  10  A.  YES.

09:51  11  Q.  "IS DONE WHERE WE WOULD BE DEVELOPING THE PLANS AND SPECS

09:51  12  IN-HOUSE."

09:51  13         MS. CRONIN:  YOUR HONOR, I OBJECT.  MY UNDERSTANDING IS

09:51  14  THE PURPOSE OF THIS IS TO IMPEACH THE WITNESS'S TESTIMONY.  MY

09:51  15  UNDERSTANDING OF WHAT THE PRIOR TESTIMONY IS IS THAT HE ASKED

09:51  16  WHETHER OR NOT EVERYBODY IS REQUIRED TO -- WHETHER OR NOT THE

09:51  17  EVALUATION IS THE SAME AND THE WITNESS SAID, "YES" AND THAT IS

09:51  18  EXACTLY WHAT THIS DEPOSITION TESTIMONY SAYS AS WELL.

09:51  19         MR. BRUNO:  THAT'S NOT MY --

09:51  20         THE COURT:  ARE YOU WILLING TO STIPULATE THE EVALUATION

09:51  21  IS THE SAME AND THAT'S HIS TESTIMONY?

09:51  22         MR. BRUNO:  I'LL TAKE THAT.

09:51  23         THE COURT:  YOU MAY WANT TO THINK ABOUT THAT, COUNSEL.

09:51  24         MS. CRONIN:  THE WITNESS SAID THAT THEY DO AN EVALUATION

09:52  25  OF WHETHER OR NOT -- LET ME READ THE TRANSCRIPT.  IS THAT ALL RIGHT

09:52 1    IF I LOOK AT MY NOTES?  ONE SECOND, PLEASE.

09:52 2          THE COURT:  YES, YOU MAY.  NOT GOING TO TAKE TOO MUCH

09:52 3    TIME ON THIS BECAUSE I AM GOING TO RULE AND ROLL.  I'LL GIVE YOU A

09:52 4    LITTLE TIME.  JUST FOR THE -- THE ONLY SMALL POINT I THINK WE'RE

09:52 5    TALKING ABOUT, AND THIS IS THE COURT'S UNDERSTANDING, IS THAT HE

09:52 6    STATED THAT THE EVALUATION COULD BE IN ESSENCE PASSIVE IF THERE IS

09:52 7    ALREADY BEEN AN EVALUATION AS TO THAT AREA, AND, THEREFORE, YOU

09:52 8    WOULD NOT HAVE TO GO THROUGH AN ACTIVE EVALUATION IN THE EVENT

09:52 9    THERE HAD BEEN A PREVIOUS EVALUATION THAT WOULD SATISFY THE CORPS.

09:52 10   THAT IS MY UNDERSTANDING GENERALLY OF HIS TESTIMONY.  ANYBODY ELSE

09:52 11   WANT TO COMMENT?

09:52 12         MR. WOODCOCK:  YOUR HONOR, IT DEPENDS ON THE TYPE OF

09:52 13   PROJECT --

09:52 14         THE COURT:  IS THAT AN OBJECTION?  THAT'S A BRIEF.  BUT

09:53 15   AS A GENERAL RULE, IF THEY'RE DIGGING LARGE HOLES NEAR THE LEVEE,

09:53 16   THERE'S GOING TO HAVE TO BE AN EVALUATION, THE EVALUATION CAN BE --

09:53 17   IF THE CORPS IS SATISFIED THAT THE LARGE HOLE, THAT'S WHAT HE IS

09:53 18   SAYING.  IF THERE HAS ALREADY BEEN AN EVALUATION OR SOMETHING THAT

09:53 19   WOULD GIVE THEM COMFORT, THEY WOULDN'T HAVE TO DO AN ACTIVE,

09:53 20   ANOTHER EVALUATION, REINVENT THE WHEEL.  THAT'S MY GENERAL

09:53 21   UNDERSTANDING.

09:53 22         AND YOU CAN CLEAR THAT UP ON CROSS-EXAMINATION IF YOU

09:53 23   WISH.  OR WHATEVER YOU WANT TO CALL IT WITH THIS WITNESS.  WHATEVER

09:53 24   KIND OF EXAMINATION YOU WISH TO MAKE.  AND THAT'S MY UNDERSTANDING

09:53 25   AND NO ONE IS GOING TO CHANGE THAT UNDERSTANDING RIGHT NOW.  I AM

09:53 1   JUST TELLING YOU THAT RIGHT NOW.  YOU CAN SAY WHAT YOU WILL.

09:53 2           MS. CRONIN:  I THINK THAT'S FINE, YOUR HONOR.  I JUST

09:53 3   DON'T UNDERSTAND THE PURPOSE --

09:53 4           THE COURT:  YOU MAY HAVE A POINT THERE.  I AM HOPING WE

09:53 5   GET TO THAT AND WE MAY BE ON IT.

09:53 6           MS. CRONIN:  THANK YOU, YOUR HONOR.

09:53 7           THE COURT:  IT MAY BE VERY NUANCE IMPEACHMENT, I AGREE,

09:53 8   IF IT'S IMPEACHMENT AT ALL.  I AGREE WITH THAT TOO.  I'LL LET IT GO

09:54 9   ON A LITTLE FURTHER.

09:54 10  BY MR. BRUNO:

09:54 11  Q.  I AM NOT TRYING TO CHARACTERIZE IT.  ALL I AM TRYING TO GET

09:54 12  HERE IS THIS -- AND I THOUGHT -- AND I GUESS WE DON'T HAVE A

09:54 13  STIPULATION -- WHICH MEANS THERE'S SOMETHING DIFFERENT BETWEEN THE

09:54 14  EVALUATION THAT'S DONE IF IT'S THE CORPS AS OPPOSED TO THE

09:54 15  EVALUATION THAT'S DONE IF THIS WAS A THIRD PARTY.  I'M CONFUSED.

09:54 16  IS IT THE SAME EVALUATION OR IS IT DIFFERENT?

09:54 17  A.  SAME TYPE OF EVALUATION.

09:54 18  Q.  IT'S EXACTLY THE SAME, ISN'T IT?

09:54 19  A.  GOES THROUGH OUR ENGINEERING DIVISION.

09:54 20  Q.  ABSOLUTELY.  NOW, EVEN IF THERE IS SOME PAPERS IN A FILE

09:54 21  DRAWER, YOU HAVE TO UNDERTAKE THE EVALUATION TO ASCERTAIN WHETHER

09:54 22  OR NOT THE PAPERS IN THE FILE DRAWER SATISFY THE ENGINEERING

09:54 23  NECESSITY FOR ASCERTAINING WHETHER OR NOT THAT HOLE IS GOING TO

09:54 24  DAMAGE THE WALL; ISN'T THAT TRUE?

09:54 25  A.  ENGINEERING DOES THAT, YES.

09:54  1   Q.  GOT TO GO LOOK AT THAT FILE DRAWER, GOT TO GO OPEN THE FILE,

09:54  2   HAVE TO SEE WHAT DOES THIS STUFF SAY, DOES IT ANSWER MY QUESTION,

09:54  3   RIGHT?

09:54  4   A.  I AM NOT DOWN THERE, BUT I -- THEY DO MAKE THAT EVALUATION.

09:54  5   Q.  ALL RIGHT.  THANK YOU.  NOW, DO YOU KNOW, MR. COLLETTI, WHAT

09:55  6   THE ASSESSMENT IS?  IN OTHER WORDS, WHAT DO THEY ASSESS WHEN THEY

09:55  7   LOOK AT A HOLE?

09:55  8   A.  I WOULD RELY ON GEOTECHNICAL ENGINEERS TO DO THAT WHEN THEY DO

09:55  9   THAT EVALUATION.  WHEN WE SEND SOMETHING DOWN TO THEM, IT GOES TO

09:55  10  VARIOUS OFFICES WITHIN ENGINEERING DIVISION.  THERE'S A

09:55  11  GEOTECHNICAL, THERE'S A CIVIL BRANCH, THERE'S A HYDRAULICS AND

09:55  12  HYDROLOGY BRANCH, THERE'S VARIOUS OFFICES.  THEY MAKE THAT

09:55  13  EVALUATION WITHIN ENGINEERING DIVISION.

09:55  14  Q.  NOW, HERE IS WHERE I AM CURIOUS.  IF -- AND I CAN SHOW THIS

09:55  15  BECAUSE IT'S ALREADY IN EVIDENCE, LET'S GO TO PX 4687, PAGE 14.

09:55  16          THE LAW CLERK:  SAY THAT AGAIN.

09:55  17          MR. BRUNO:  THIS IS MR. PINNER'S DEPO CUTS THAT JUST GOT

09:55  18  OFFERED INTO EVIDENCE, PX 4687 AT PAGE 14.  THAT'S PAGE 15.  BACK

09:56  19  ONE SLIDE.  GO DOWN.  I'M SORRY, GO UP.

09:56  20  BY MR. BRUNO:

09:56  21  Q.  ALL RIGHT.  I'M JUMPING BUT THE THREE THINGS YOU LOOK AT ARE

09:56  22  LOCAL STABILITY, GENERAL STABILITY, AND SEEPAGE, OKAY.  NOW, THIS

09:56  23  IS MY QUESTION:  AS THE GUY IN CHARGE OF OPERATIONS IN MAKING

09:57  24  CERTAIN THAT THERE'S NO DAMAGE DONE TO THESE FLOODWALLS, DO YOU

09:57  25  HAVE ANY ROLE IN MAKING CERTAIN THAT EVEN YOUR OWN CORPS DOES THE

09:57  1  THREE EVALUATIONS THAT MR. PINNER SAYS NEED TO BE DONE?

09:57  2  A.  NO, THAT IS DONE BY THE CHIEF OF ENGINEERING DIVISION.

09:57  3  Q.  SO I GUESS WHAT YOU'RE TELLING ME IS THAT IF PINNER SAYS YOU

09:57  4  HAVE TO DO, WITH REGARD TO EACH HOLE, A GLOBAL STABILITY ANALYSIS,

09:57  5  A LOCAL STABILITY ANALYSIS, AND A SEEPAGE ANALYSIS, YOUR

09:57  6  EXPECTATION IS THAT THEY WILL DO ALL THREE; ISN'T THAT CORRECT?

09:57  7  A.  IF THAT WAS IN PART OF THE PERMITTING OR PART OF THE CONTRACT,

09:57  8  YES.

09:57  9  Q.  AND TO FOLLOW THROUGH WITH THE SUGGESTION THAT MAYBE THERE'S

09:57  10  SOMETHING IN THE FILE DRAWER, IF YOU DON'T DO IT THERE BETTER BE IN

09:57  11  THE FILE DRAWER AN OLD SEEPAGE ANALYSIS UPON WHICH YOU CAN RELY;

09:57  12  ISN'T THAT TRUE?

09:57  13  A.  SHOULD BE.

09:57  14  Q.  AND ON TOP OF THAT, YOU WANT TO MAKE SURE THAT OLD SEEPAGE

09:58  15  ANALYSIS IS STILL VALID; ISN'T THAT TRUE?

09:58  16  A.  I WOULD SAY YES.

09:58  17  Q.  WOULD IT SURPRISE YOU TO KNOW --

09:58  18      MR. BRUNO:  YOUR HONOR, I AM REFERRING TO THE PRETRIAL

09:58  19  ORDER JUST FOR CONTEXT FOR YOU, NOT FOR THE WITNESS.

09:58  20  BY MR. BRUNO:

09:58  21  Q.  WOULD IT SURPRISE YOU TO KNOW, MR. COLLETTI, THAT THE ONLY

09:58  22  DOCUMENTED SEEPAGE ASSESSMENT THAT WAS DONE IN CONNECTION WITH THE

09:58  23  WGI WORK WAS DONE 30 YEARS BEFORE THE WASHINGTON GROUP SET FOOT ON

09:58  24  THAT SITE?  WOULD THAT SURPRISE YOU?

09:58  25  A.  I DON'T KNOW ENOUGH ABOUT THE GEOTECHNICAL BACKGROUND TO MAKE

09:58  1    THAT DECISION.

09:58  2    Q.  OKAY.  FAIR ENOUGH.  JUST TO ROUND THIS OUT, AT THE TIME OF

09:58  3    YOUR DEPOSITION, I ASKED YOU WHETHER THERE WERE SOME WRITTEN

09:58  4    GUIDELINES AND THERE ARE NO WRITTEN GUIDELINES, RIGHT?

09:59  5    A.  THERE WAS NOT AT THE TIME -- WELL, THERE WERE, THEY WEREN'T

09:59  6    PUBLISHED ON A WEB SITE OR ANYTHING.

09:59  7    Q.  WHEN YOU SAY THEY WERE WRITTEN, I GUESS I AM NOW CONFUSED

09:59  8    AGAIN.  WRITTEN, WERE THEY COMPILED IN A FORM THAT A PERSON COULD

09:59  9    GO TO A FILE DRAWER AND SAY, "I WOULD LIKE TO LOOK AT THE

09:59  10   GUIDELINES THAT EXIST WITH REGARD TO THE EVALUATION OF HOLES."  WAS

09:59  11   THAT THE FORM THAT THEY TOOK?

09:59  12   A.  ENGINEERING DIVISION WOULD HAVE THEIR GUIDELINES, YES.

09:59  13   Q.  BUT THERE WASN'T ANYTHING THAT THE PUBLIC COULD RELY ON?

09:59  14   A.  IF THEY REQUESTED IT, WE COULD PROVIDE IT TO THEM, YES.

09:59  15   Q.  I'M SORRY.  I THOUGHT YOU JUST SAID NOW WE HAVE SOME PUBLISHED

09:59  16   GUIDELINES.  I AM CONFUSED.

09:59  17   A.  WE HAVE A POLICY THAT WE HAVE ON OUR WEB SITE ON THE PROCESSING

09:59  18   FOR THAT, BUT WE DON'T HAVE EVERY ONE OF OUR INDIVIDUAL GUIDANCE

09:59  19   FOR STABILITY ANALYSIS AND SUCH, NO, WE DON'T.

09:59  20   Q.  CAN WE CALL UP, PLEASE, 4738.  THIS IS THAT NEW EXHIBIT, JANET.

09:59  21        THE LAW CLERK:  OKAY.

10:00  22        MR. WOODCOCK:  OBJECTION, YOUR HONOR.  JACK WOODCOCK FOR

10:00  23   THE UNITED STATES.  THIS IS, AS MR. COLLETTI TESTIFIED AT THE TIME,

10:00  24   IT'S AT ISSUE IN THIS CASE.  THERE ARE NO WRITTEN GUIDELINES.  THIS

10:00  25   IS A SUBSEQUENT REMEDIAL MEASURE EXCLUDIBLE UNDER RULE 407.  IT'S

10:00  1    ALSO IRRELEVANT.  IT --

10:00  2            MR. BRUNO:  FIRST OF ALL, JUDGE, NO. 1, LUCIA THEIR

10:00  3    EXPERT, COMMENTS ON THIS DOCUMENT IN HIS EXPERT REPORT, THAT'S

10:00  4    NO. 1.  NO. 2, IF IT'S A SUBSEQUENT REMEDIAL MEASURE, IT INDICATES

10:00  5    THAT THEY HAD THE KNOWLEDGE OF THE FACTS THAT ARE CONTAINED IN THIS

10:00  6    THING AND IT WAS FEASIBLE TO PUBLISH THOSE KINDS OF THINGS.  SO I

10:00  7    BELIEVE THAT THIS DOCUMENT IS RELEVANT TO DEMONSTRATE THE

10:00  8    KNOWLEDGE.

10:00  9            THE THIRD THING, WHICH I HAVEN'T DISCOVERED YET BECAUSE I

10:00  10   WANT TO ASK HIM, IS WHETHER OR NOT, IN FACT, THIS REPRESENTS ANY

10:00  11   CHANGE IN THE GUIDELINES; THAT IS, I WANT TO GET INTO SOME

10:00  12   SUBSTANTIVE THINGS THAT ARE IN HERE, AND BECAUSE THEY WEREN'T

10:00  13   PUBLISHED BEFORE, I WOULD LIKE TO ASK HIM WHETHER OR NOT THE

10:01  14   SUBSTANTIVE STUFF IS NEW OR -- YOU RECALL HE TESTIFIED WE HAD THE

10:01  15   GUIDELINES IN THE OFFICE, WE COULD HAVE PULLED THEM OUT OF THE

10:01  16   DRAWER AND HANDED THEM TO YOU.  THIS IS JUST A COMPACT WAY OF

10:01  17   REACHING THAT SAME POINT.

10:01  18           THE COURT:  YOU'RE GOING TO HAVE TO LET ME LOOK AT THIS

10:01  19   DOCUMENT A BIT.  IT'S MY UNDERSTANDING THIS WITNESS IS ALREADY

10:01  20   TESTIFIED PRIOR TO KATRINA, AT LEAST IT WAS HIS UNDERSTANDING THAT

10:01  21   THERE WAS A 300-FOOT GENERAL RULE ON THE WATER SIDE OF THE LEVEE.

10:01  22   I THINK HE'S TESTIFIED TO THAT.

10:01  23           MR. BRUNO:  YES, THAT'S TRUE.

10:01  24           THE COURT:  SO I AM TRYING TO ASCERTAIN --

10:01  25           MR. BRUNO:  LET ME TELL YOU WHERE I AM GOING, JUDGE.

10:01  1          THE COURT:  -- ONE, WHY ISN'T IT THE SUBJECT OF A

10:01  2  REMEDIAL MEASURE?  AND I NEED TO LOOK AT THE RULE AND THE ENTIRE

10:01  3  PERMIT.  IT'S HARD TO RULE ON THIS WITHOUT -- I HAVE NOT READ THIS,

10:01  4  SO.

10:01  5          MR. BRUNO:  OKAY.  ALL RIGHT.  LET'S DO IT THIS WAY.

10:01  6  MR. COLLETTI, I AM GOING TO DO IT AS A HYPOTHETICAL.

10:02  7          WITHDRAW THE EXHIBIT, PUT IT DOWN.

10:02  8  BY MR. BRUNO:

10:02  9  Q.  MR. COLLETTI, IN 19 -- 2005 -- AND RECALL, YOU JUST TOLD US

10:02  10  THAT THERE WERE SOME ENGINEERING GUIDELINES IN A FILE DRAWER, THAT

10:02  11  IF SOMEBODY ASKED FOR A COPY OF YOU WOULD HAVE PROVIDED THEM WITH A

10:02  12  COPY.  DID YOU NOT JUST SAY THAT?

10:02  13  A.  YES.

10:02  14          THE COURT:  IS THAT PRE-KATRINA?

10:02  15          MR. BRUNO:  PRE-KATRINA, BEFORE KATRINA.  YES?

10:02  16          THE WITNESS:  YES.

10:02  17  BY MR. BRUNO:

10:02  18  Q.  SO IF I WANTED TO KNOW SOMETHING ABOUT COMPACTION AND YOU HAD A

10:02  19  GUIDELINE ON IT, YOU COULD HAVE JUST GONE TO THE FILE DRAWER,

10:02  20  PULLED IT OUT, MADE A XEROX COPY, AND HANDED IT TO ME; CORRECT?

10:02  21  A.  I WOULD HAVE GONE TO THE ENGINEERING DIVISION.

10:02  22  Q.  THIS PIECE OF PAPER THAT I JUST SHOWED THAT'S ON YOUR WEB SITE,

10:02  23  DOES THAT REPRESENT ANYTHING NEW?  IS THERE A NEW GUIDELINE WITH

10:02  24  REGARD TO COMPACTION --

10:02  25          MR. WOODCOCK:  OBJECTION, YOUR HONOR.  THIS IS JUST A

10:02  1    BACK WAY TO GET INTO THE CONTEXT OF THE EXHIBIT.

10:03  2              MR. BRUNO:  JUDGE, WHETHER IT'S A FRONT WAY OR BACK WAY

10:03  3    OR SIDE WAY, IF THERE'S NO CHANGE IN THE GUIDELINE BETWEEN BEFORE

10:03  4    KATRINA AND POST-KATRINA, IT IS STILL EVIDENCE AND IT HAPPENS TO BE

10:03  5    IN A COMPACT, CONCISE PLACE FOR ME TO BE ABLE TO SHOW IT.

10:03  6              THE COURT:  YOU CAN ASK HIM -- HOLD ON.

10:03  7              MR. WOODCOCK:  YOUR HONOR --

10:03  8              THE COURT:  RIGHT NOW, NO ONE CAN APPROACH.  SIT DOWN AND

10:03  9    I AM GOING TO TAKE A LITTLE TIME.

10:03 10              MR. BRUNO:  THANK YOU, JUDGE.

10:04 11              THE COURT:  BY THE WAY, NO ONE IS EXEMPT FOR THIS.  THIS

10:04 12    IS GOING TO BE TIME FOR BOTH OF YOU.

10:04 13              MR. BRUNO:  THANK YOU, JUDGE.

10:05 14              THE COURT:  THIS IS REALLY CUMBERSOME.  OKAY.  AND LET ME

10:06 15    LOOK AT THIS BRIEFLY.  I KNEW 407 HAD BEEN AMENDED, AND I DIDN'T

10:06 16    HAVE THE AMENDED COPY.  I NOW DO.  I DON'T SEE HOW THIS IS --

10:07 17    MR. BRUNO, I AM NOT QUITE SURE I UNDERSTAND THE RELEVANCE AND WHERE

10:07 18    WE'RE GOING HERE.

10:07 19              MR. BRUNO:  OKAY.  FAIR ENOUGH, JUDGE.

10:07 20              THE COURT:  SO I AM GOING TO SUSTAIN THE OBJECTION.

10:07 21              MR. BRUNO:  THANK YOU, YOUR HONOR.

10:07 22    BY MR. BRUNO:

10:07 23    Q.  MR. COLLETTI, WERE YOU AWARE OF ANY OF THE GUIDELINES THAT

10:07 24    RELATE TO LEVEE BACKFILL?

10:07 25    A.  IN TERMS OF LEVEE STIPULATIONS FOR HOW THEY HAVE TO DO IT?

10:07  1   Q.  NO, NO, NO.  IN TERMS OF IF YOU'RE DOING SOME WORK.

10:07  2               THE COURT:  IS THIS PRE-KATRINA?

10:07  3               MR. BRUNO:  PRE-KATRINA.

10:07  4               THE WITNESS:  OUR ENGINEERING DIVISION WOULD ESTABLISH

10:07  5   THAT AND THAT WOULD BE PART OF THE CRITERIA AND STIPULATION FOR ANY

10:07  6   PERMITTING.

10:07  7   BY MR. BRUNO:

10:07  8   Q.  ALL RIGHT.  FAIR ENOUGH.  IS IT TRUE THAT BEFORE HURRICANE

10:07  9   KATRINA -- IS IT TRUE THAT BEFORE HURRICANE KATRINA IF LEVEE

10:07 10   BACKFILL MATERIAL IS REQUIRED AS PART OF THE PERMITTED WORK, THE PI

10:08 11   OF THE NEW FILL MUST BE TEN OR MORE BY ATTERBERG LIMITS BY ASTM

10:08 12   D4318 AND THE MATERIAL IS CLASSIFIED AS EITHER CH OR CL BY ASTM

10:08 13   D2487 WITH LESS THAN 35 PERCENT SAND RETAINED ON THE NUMBER 200C BY

10:08 14   ASTM D1140 --

10:08 15               THE COURT:  CAN YOU GO SLOW?  I CAN'T IMAGINE FOR THE

10:08 16   COURT REPORTER, WHO IS EXCEPTIONAL, BUT WE WOULD -- A LITTLE

10:08 17   SLOWER.

10:08 18               MR. BRUNO:  IN ADDITION, THE BACKFILL MATERIAL MUST HAVE

10:08 19   AN ORGANIC CONTENT OF NO GREATER THAN NINE PERCENT AS DETERMINED BY

10:08 20   ASTM D2974, METHOD C, BACKFILL MATERIAL --

10:09 21               MR. WOODCOCK:  OBJECTION, YOUR HONOR.  HE IS SIMPLY

10:09 22   READING FROM THE EXHIBIT YOU JUST SAID WASN'T RELEVANT.

10:09 23               THE COURT:  BUT HE'S ASKING -- WELL, I DIDN'T KNOW THAT.

10:09 24   HE'S ASKING IF THAT EXISTED PRE-KATRINA.

10:09 25               MR. BRUNO:  RIGHT.  I CAN WRITE IT DOWN ON A NOTEPAD AND

10:09  1   READ IT, SAME THING.

10:09  2         THE COURT:  I AM GOING TO ASK YOU -- IN OTHER WORDS, WERE

10:09  3   THERE ANY -- TO BE FAIR, YOU CAN SAY WERE THERE ANY SPECIFIC

10:09  4   GUIDELINES PRE-KATRINA THAT RELATED TO THE QUALITIES AND PROPERTIES

10:09  5   OF THE BACKFILL.

10:09  6         MR. BRUNO:  CORRECT.

10:09  7         THE COURT:  WHY DON'T YOU JUST ASK HIM THAT.

10:09  8         MR. BRUNO:  I WAS BEING MORE DETAILED, BUT I'LL --

10:09  9         THE COURT:  NO, YOU WERE -- WHY DON'T YOU ASK THAT BEFORE

10:09 10   WE DO GO THROUGH THE BACK DOOR ON AN EXHIBIT THAT I HAVE STRICKEN.

10:09 11   ASK HIM THAT AND THEN GO FROM THERE.

10:09 12         MR. BRUNO:  I WILL, BUT I WAS NOT TRYING TO BACK DOOR

10:09 13   ANYTHING.

10:09 14         THE COURT:  WHATEVER YOU WERE TRYING TO DO, LET'S DO IT

10:09 15   THAT WAY.

10:09 16   BY MR. BRUNO:

10:09 17   Q.  WERE THERE ANY COMPACTION REQUIREMENTS FOR BACKFILL OF A LEVEE

10:09 18   THAT PREEXISTED HURRICANE KATRINA?

10:09 19   A.  YES, THERE WERE GUIDELINES.

10:09 20   Q.  OKAY.

10:09 21   A.  I DON'T KNOW IF THEY WERE THOSE SPECIFIC ONES.

10:10 22         THE COURT:  DO YOU KNOW WHAT THE GUIDELINES WERE

10:10 23   SPECIFICALLY, NOW OR THEN?

10:10 24         THE WITNESS:  NO, I DO NOT.

10:10 25         THE COURT:  ALL RIGHT.  THANK YOU.

10:10  1    BY MR. BRUNO:

10:10  2    Q.  DO YOU KNOW IF THE BACKFILL REQUIREMENTS RELATED IN ANY WAY TO

10:10  3    MAKING CERTAIN THAT HOLES DIDN'T UNDERMINE THE FLOODWALL?

10:10  4    A.  WE LEFT THAT TO OUR ENGINEERING FOLKS.

10:10  5    Q.  I WANT TO ASK YOU -- I KNOW YOU LEFT IT TO THEM, BUT I'M ASKING

10:10  6    YOU THE QUESTION.  DO YOU KNOW, MAYBE YOU DON'T KNOW, I DON'T KNOW,

10:10  7    THAT'S WHY I'M ASKING.  DO YOU KNOW WHETHER OR NOT BACKFILL

10:10  8    REQUIREMENTS, THAT YOU DON'T HAVE THE DETAILS ON, ARE THERE TO

10:10  9    PROTECT THE WALL AGAINST HOLES THAT WERE DUG NEAR THE WALL?  THAT'S

10:10  10   WHAT I AM ASKING YOU.  DO YOU KNOW THAT?

10:10  11   A.  YES, THERE ARE BACKFILL REQUIREMENTS, YES.

10:10  12   Q.  AND THEY'RE THERE TO PREVENT THE HOLE FROM DAMAGING THE

10:10  13   FLOODWALL; ISN'T THAT TRUE?

10:10  14   A.  I WOULD SAY YES.

10:10  15        MR. BRUNO:  OF COURSE, THANK YOU.  MAYBE SOMETIMES THE

10:10  16   FRONT DOOR IS BETTER THAN THE BACK DOOR, YOU'RE RIGHT.

10:11  17        THE COURT:  IT'S CERTAINLY MORE ADMISSIBLE.

10:11  18        MR. BRUNO:  GOT ME.

10:11  19   BY MR. BRUNO:

10:11  20   Q.  LET'S TALK ABOUT THIS PROCESS.  NOW, WE'RE GETTING INTO THE

10:11  21   BUSINESS OF WE GOT THE PROTECTION, WE KNOW WE HAVE A GUIDELINE,

10:11  22   RIGHT?  AND NOW WE HAVE THE BUSINESS OF IS IT A THIRD PARTY, IS IT

10:11  23   THE CORPS, OR IS IT A CONTRACTOR WORKING FOR THE CORPS.  LET'S TALK

10:11  24   ABOUT THE PROCESS BY WHICH WE PROTECT OUR LEVEE, OKAY?  THAT'S WHAT

10:11  25   I WANT TO TALK ABOUT NOW.  WE KNOW THAT IF IT'S A THIRD PARTY, WE

10:11  1    HAVE THIS PERMIT PROCESS IN PLACE -- WHICH I AM GOING TO TALK ABOUT

10:11  2    IN A BIT -- CORRECT?

10:11  3    A.  YES.

10:11  4    Q.  AND THERE ARE TWO PERMITS YOU HAVE TO GET, ONE FROM THE OLD AND

10:11  5    ONE FROM YOUR -- WHAT DID YOU CALL IT?

10:11  6    A.  A REGULATORY BRANCH IF IT'S IN A WATERWAY, NAVIGABLE WATERWAY

10:11  7    OR IN THE WETLANDS.

10:11  8    Q.  NOW, YOU CHANGED UP A LITTLE BIT.  SO -- THEN I MISUNDERSTOOD

10:11  9    YOU.  WHEN I SHOWED YOU YOUR DEPOSITION TESTIMONY --

10:12  10             THE COURT:  OKAY.  GO AHEAD.

10:12  11             MR. BRUNO:  I DON'T WANT THE RECORD TO BE CONVOLUTED

10:12  12    BECAUSE I SHOWED YOU YOUR DEPOSITION TESTIMONY, AND IN YOUR

10:12  13    DEPOSITION TESTIMONY YOU SAID AN OLD PERMIT AND A REGULATORY

10:12  14    PERMIT --

10:12  15             THE COURT:  THE DEPARTMENT OF THE ARMY AS I RECALL THE

10:12  16    WORDS, SPECIFIC WORDS.  AND HE SAID THE DEPARTMENT OF THE ARMY

10:12  17    PERMIT WAS NOT REQUIRED IF IT WAS A SUBCONTRACTOR OF THE CORPS.

10:12  18             MR. BRUNO:  CORRECT.  NOW, WE'RE TALKING ABOUT THIRD

10:12  19    PARTIES.

10:12  20             THE COURT:  WE'RE TALKING ABOUT A THIRD PARTY, OKAY.

10:12  21             MR. BRUNO:  THIRD PARTIES.

10:12  22    BY MR. BRUNO:

10:12  23    Q.  AND I GOT A LITTLE CONFUSED BECAUSE NOW YOU QUALIFIED THE

10:12  24    DEPARTMENT OF THE ARMY PERMIT, AND I JUST WANT TO MAKE SURE THAT'S

10:12  25    WHAT YOU HAD IN YOUR MIND WHEN YOU GAVE YOUR TESTIMONY BECAUSE I

10:12  1   DON'T WANT TO SEEM LIKE YOU SAID SOMETHING WRONG OR DIFFERENT IN

10:12  2   YOUR DEPOSITION THAN WHAT YOU'RE SAYING TODAY.  SO WHEN YOU SAID A

10:12  3   DEPARTMENT OF THE ARMY PERMIT IN YOUR DEPOSITION, YOU WERE THINKING

10:12  4   ABOUT WHAT?

10:12  5   A.  I WAS THINKING ABOUT A THIRD-PARTY APPLICANT.

10:12  6   Q.  BUT --

10:12  7   A.  FOR THAT PORTION OF THE WORK THAT WAS IN THE WATERWAY ITSELF.

10:12  8   Q.  OKAY.  FAIR ENOUGH.  I WANT TO BE CLEAR ON THIS.  THE THIRD

10:13  9   PARTY IN YOUR MIND, IF IT'S NOT IN THE WATER, THE THIRD PARTY NEEDS

10:13  10  TO APPLY FOR A PERMIT, RIGHT?

10:13  11  A.  THEY NEED TO APPLY -- WHICH TYPE OF PERMIT?

10:13  12  Q.  I SAID IF IT'S NOT IN THE WATER.

10:13  13       THE COURT:  HE SAID TWO DIFFERENT PERMITS, THOUGH.  IN

10:13  14  OTHER WORDS, HE SAID IF IT'S IN THE WATER, THE DEPARTMENT OF ARMY.

10:13  15  IF IT'S NOT THE WATER, IS IT ONLY THE --

10:13  16       THE WITNESS:  IT'S A LEVEE DISTRICT.

10:13  17       THE COURT:  ONLY THE LEVEE DISTRICT.  SIMPLE AS THAT.

10:13  18       THE WITNESS:  I JUST WANT TO BE CLEAR.

10:13  19       THE COURT:  IT'S CLEAR TO ME.

10:13  20       MR. BRUNO:  THAT'S FINE.

10:13  21  BY MR. BRUNO:

10:13  22  Q.  THIS CASE RIGHT HERE, THIS CASE RIGHT HERE, IF THERE WAS A

10:13  23  THIRD PARTY DOING THE DIGGING OF THE HOLES IN THE EBIA, THEY WOULD

10:13  24  HAVE HAD TO GET A PERMIT, CORRECT?

10:13  25  A.  YES.

10:13  1   Q.  OKAY.  FINE.  LET'S LEAVE THAT ALONE FOR A MOMENT.  LET'S TALK

10:13  2   ABOUT THE CORPS.

10:13  3        NOW, THE CORPS FROM TIME TO TIME SUBCONTRACTS WITH

10:13  4   ENGINEERS TO DO ENGINEERING, RIGHT?

10:13  5   A.  YES.

10:13  6   Q.  AND THERE'S NOTHING THAT PROHIBITS THE CORPS OF ENGINEERS FROM

10:13  7   SUBCONTRACTING WITH A THIRD-PARTY CONTRACTOR TO DO AN EVALUATION OF

10:14  8   HOLES IF THAT IS SOMETHING THAT NEEDS TO BE DONE WITHIN THE

10:14  9   GUIDELINES THAT WE JUST EXHAUSTIVELY HAVE GONE THROUGH; ISN'T THAT

10:14  10  TRUE?

10:14  11  A.  WE DON'T DO THAT FOR PERMITTING PURPOSES.

10:14  12  Q.  I AM NOT TALKING ABOUT PERMITS.  LET'S MOVE THAT OFF THE TABLE

10:14  13  FOR THE MOMENT.  IT'S OVER HERE, IT'S IN A BOX, WE'RE NOT GOING TO

10:14  14  LOOK AT IT.  WE'RE NOW TALKING ABOUT WORK DONE BY THE CORPS.  YOU

10:14  15  TOLD US THERE'S NO NEED FOR A PERMIT, RIGHT?

10:14  16  A.  THAT'S CORRECT.

10:14  17  Q.  BUT YOU TOLD US THERE'S STILL A NEED FOR AN ENGINEERING

10:14  18  EVALUATION, RIGHT?

10:14  19  A.  THAT'S CORRECT.

10:14  20  Q.  LET'S FOCUS ON THAT.  WHAT I AM TRYING TO UNDERSTAND IS THAT

10:14  21  THERE'S TWO WAYS FOR THAT TO BE ACCOMPLISHED, THE CORPS CAN DO IT

10:14  22  ITSELF, RIGHT?

10:14  23  A.  YES.

10:14  24  Q.  OR THE CORPS COULD SUBCONTRACT OUT TO SOMEBODY ELSE; ISN'T THAT

10:14  25  TRUE?

10:14   1    A.  YES.

10:14   2    Q.  SO IT'S NOT MANDATORY THAT THE CORPS DO THIS EVALUATION ITSELF,

10:14   3    IT COULD HIRE SOMEBODY LIKE WASHINGTON GROUP TO DO IT, RIGHT?

10:15   4    A.  THAT'S CORRECT.

10:15   5    Q.  DO YOU KNOW WHAT A SCOPE OF WORK IS?

10:15   6    A.  YES.

10:15   7    Q.  AND YOU'VE ALREADY TOLD US THAT YOU KNOW AT LEAST -- I'M SORRY,

10:15   8    WITHDRAW.

10:15   9         LET'S TALK ABOUT FOR THE MOMENT THE CIRCUMSTANCE WHERE

10:15   10   THE CORPS IS DOING THE WORK, OKAY?  THE CORPS IS DOING THE WORK.

10:15   11   IN THE CASE OF THE CORPS DOING THE WORK, THEY ARE REQUIRED TO

10:15   12   PREPARE A SERIES OF DOCUMENTS WHICH DOCUMENT THEIR WORK; ISN'T THAT

10:15   13   TRUE?

10:15   14   A.  YES.

10:15   15   Q.  AND YOU KNOW ENOUGH ABOUT THE PROCESS TO KNOW THAT WHEN YOU DO

10:15   16   ENGINEERING WORK, THE CORPS REQUIRES THAT WHATEVER ENGINEERING WORK

10:15   17   THEY DO MUST BE DOCUMENTED SO THAT IT CAN BE SUBJECT TO AN

10:15   18   INDEPENDENT REVIEW; ISN'T THAT TRUE?

10:15   19   A.  CORRECT.

10:16   20   Q.  AND IT'S GOT TO BE IN SUCH A FASHION SO THAT YOU CAN SIMPLY

10:16   21   PICK UP THE FILE, TAKE IT TO THE INDEPENDENT REVIEWER, AND THEY'VE

10:16   22   GOT EVERYTHING THEY NEED IN ORDER TO INDEPENDENTLY EVALUATE THE

10:16   23   ENGINEERING WORK THAT WAS DONE BY THE CORPS; ISN'T THAT TRUE?

10:16   24   A.  I CAN'T COMMENT ON THAT BECAUSE I HAVEN'T BEEN INVOLVED IN IT.

10:16   25   Q.  WELL, YOU DO KNOW THAT THERE IS A REQUIREMENT FOR INDEPENDENT

10:16  1   REVIEW, RIGHT?

10:16  2   A.  YES.

10:16  3   Q.  WELL, LET'S -- FOR THE FUN OF IT, LET'S CALL UP JX 44.  THIS IS

10:16  4   AN ENGINEERING REGULATION, IT'S DATED 31 AUGUST 1999, AND LET'S GO

10:16  5   TO PAGE 45.

10:16  6        AND THE TOP HALF OF THE FIRST PARAGRAPH, I JUST WANT TO

10:17  7   KNOW IF THIS IS CONSISTENT WITH YOUR UNDERSTANDING, I KNOW YOU'RE

10:17  8   NOT AN ENGINEER.  BUT IT SAYS HERE THAT THE DESIGN DOCUMENTATION

10:17  9   REPORT IS AN IMPLEMENTATION DOCUMENT THAT PROVIDES THE TECHNICAL

10:17  10  BASIS FOR THE PLANS AND SPECIFICATIONS.  DO YOU KNOW WHAT PLANS AND

10:17  11  SPECIFICATIONS ARE?

10:17  12  A.  YES.

10:17  13       MS. CRONIN:  OBJECTION, YOUR HONOR.  MR. BRUNO HAS

10:17  14  ESTABLISHED NO FOUNDATION THAT THE WITNESS HAS EVER SEEN THIS

10:17  15  DOCUMENT BEFORE, AND I THINK THE WITNESS SHOULD BE ABLE TO LOOK AT

10:17  16  THE ENTIRE EXHIBIT BEFORE HE IS ASKED TO INTERPRET.

10:17  17       MR. BRUNO:  I AM NOT ASKING HIM TO INTERPRET IT.

10:17  18       THE COURT:  I AM NOT SURE WHERE WE ARE GOING WITH THIS.

10:17  19  HE NEEDS TO TESTIFY AS TO WHAT HIS PERSONAL KNOWLEDGE.

10:17  20       MR. BRUNO:  EXACTLY.

10:17  21       THE COURT:  AND I AM NOT SURE WHAT YOUR THREAD IS HERE,

10:17  22  BUT YOU CAN ASK HIM IF HE KNOWS.  HE DOESN'T HAVE TO READ THE

10:17  23  ENTIRE DOCUMENT.  IF HE KNOWS WHAT -- HE KNOWS WHAT A -- WHAT WAS

10:17  24  YOUR QUESTION?  DO YOU KNOW WHAT A PLANS AND SPECIFICATIONS ARE?

10:18  25  WELL, YES, HE DOES.  I AM NOT SURE WHAT THAT MEANS IN THE WHOLE

10:18  1   SCHEME OF THIS CASE, BUT HE DOES.

10:18  2          MR. BRUNO:  JUDGE, I HAVEN'T ASKED THE REST OF MY

10:18  3   QUESTION.

10:18  4          THE COURT:  OVERRULE THE OBJECTION AS TO THAT QUESTION.

10:18  5   OVERRULED.

10:18  6   BY MR. BRUNO:

10:18  7   Q.  IT SAYS, "IT SERVES MAINLY AS A SUMMARY OF THE DESIGN TO BE

10:18  8   USED BY THE PDT DURING DEVELOPMENT OF THE P&S."  NOW, IT SAYS, "THE

10:18  9   DDR IS A DESIGN DOCUMENTATION REPORT IS USED BY THE INDEPENDENT

10:18  10  TECHNICAL REVIEW TEAM FOR REVIEWING THE DESIGN AND THE P&S THAT IS

10:18  11  AVAILABLE FOR FUTURE REFERENCE."  IS THAT CONSISTENT WITH WHAT YOU

10:18  12  JUST TOLD US A FEW MOMENTS AGO THAT THE WORK OF THE ENGINEERS HAS

10:18  13  TO BE DONE IN SUCH A WAY THAT IT CAN BE REVIEWED BY THIS ITR TEAM,

10:18  14  INDEPENDENT TECHNICAL REVIEW TEAM?  IS THAT CONSISTENT WITH THAT?

10:18  15  THAT'S ALL I'M ASKING.

10:18  16         MR. WOODCOCK:  OBJECTION, MR. COLLETTI'S TESTIMONY, I AM

10:18  17  NOT SURE -- I'VE NEVER HEARD MR. COLLETTI HIMSELF SAY THESE

10:18  18  ACRONYMS, BUT HE DIDN'T TESTIFY ABOUT THIS SUBJECT.

10:18  19         MR. BRUNO:  I ASKED THE QUESTION IF THIS IS CONSISTENT

10:19  20  WITH HIS TESTIMONY.  HE SAYS IT HAS TO BE REVIEWED BY AN

10:19  21  INDEPENDENT TEAM.

10:19  22         THE COURT:  THAT'S REALLY ARGUMENT.  YOU CAN ARGUE THAT

10:19  23  HERE IS THIS THING AND IT'S CONSISTENT WITH HIS TESTIMONY.

10:19  24         MR. BRUNO:  EXCEPT THAT, JUDGE, I WANT TO, WITH

10:19  25  RESPECT -- SHOW -- I WANT TO CENTER THE COURT ON THESE THINGS SO

10:19  1    THAT AT THE END OF THE CASE --

10:19  2            THE COURT:  IS HAS TO BE THROUGH A WITNESS WHO REALLY IS

10:19  3    FAMILIAR WITH THIS.  HE'S ALREADY TESTIFIED WITHIN HIS PERSONAL

10:19  4    KNOWLEDGE.  I AM JUST NOT SURE WHERE WE'RE GOING WITH THIS.  I

10:19  5    DON'T THINK IT'S PARTICULARLY OBJECTIONABLE.  I AM NOT SURE YOU'RE

10:19  6    CENTERING THE COURT ON SOMETHING THAT COULD BE DONE IN A BRIEF WITH

10:19  7    THIS EXHIBIT AND THE COURT IS GOING TO READ THE HECK OUT OF IT.

10:19  8            MR. BRUNO:  JUDGE, I KNOW THAT.  IT'S MY JUDGMENT, I

10:19  9    AGREE WITH YOU.  I COULD DO ALL OF THIS IN A BRIEF, I COULD, BUT IN

10:19  10   MY JUDGMENT IN ORDER TO PROPERLY PRESENT MY CASE TO YOU --

10:19  11           THE COURT:  I AM GOING TO LET THIS ONE QUESTION TO BE

10:19  12   ASKED, AND HE CAN SAY HE DOESN'T KNOW, THAT IT'S NOT WITHIN HIS

10:19  13   PERSONAL KNOWLEDGE, THAT HE DOESN'T UNDERSTAND IT.

10:19  14           MR. BRUNO:  I AM GOING TO MOVE ON.  LET'S GO TO PAGE 46.

10:19  15   BY MR. BRUNO:

10:19  16   Q.  AND I WANT TO FOCUS ON D-7.  MR. COLLETTI, DO YOU KNOW WHETHER

10:20  17   OR NOT THE RESULTS OF INVESTIGATIONS AND CALCULATIONS THAT DEAL

10:20  18   WITH THE EVALUATIONS HAVE TO BE INCLUDED IN THE DDR?  DO YOU JUST

10:20  19   SIMPLY KNOW THAT, YES OR NO?

10:20  20           MS. CRONIN:  YOUR HONOR, I OBJECT AGAIN.  I'M SORRY.

10:20  21           THE COURT:  I AM -- HE CAN -- YOU CAN ASK HIM IF HE KNOWS

10:20  22   THAT FOR WHATEVER RELEVANCE IT IS.  IF THERE'S A RELEVANCE

10:20  23   OBJECTION, LET ME KNOW; BUT HE CAN TELL ME IF HE KNOWS THAT BECAUSE

10:20  24   IT'S WITHIN HIS PERSONAL KNOWLEDGE.

10:20  25           MS. CRONIN:  MY OBJECTION IS THAT HE IS BEING ASKED THESE

10:20  1    QUESTIONS IN THE CONTEXT OF A DOCUMENT IT SAYS, "RESULTS OF

10:20  2    INVESTIGATION ANALYSIS AND CALCULATIONS MADE FOR THE DESIGN SHALL

10:20  3    BE INCLUDED."  I AM NOT SURE WHAT PARTICULAR DESIGN THIS IS TALKING

10:20  4    TO OR IF IT'S TALKING ABOUT A DDR GENERALLY.  I DON'T KNOW WHAT

10:20  5    THIS DOCUMENT IS, THE WITNESS HASN'T SEEN THE ENTIRE DOCUMENT.

10:21  6         THE COURT:  LET'S TAKE THE DOCUMENT OFF.

10:21  7         MR. BRUNO:  FINE.

10:21  8    BY MR. BRUNO:

10:21  9    Q.  DO YOU KNOW, MR. COLLETTI, WHETHER OR NOT A DESIGN

10:21  10   DOCUMENTATION REPORT HAS TO INCLUDE A DESCRIPTION OF ANY UNDER

10:21  11   SEEPAGE ANALYSIS THAT WAS PERFORMED IN CONNECTION WITH THE DESIGN

10:21  12   OF THE PROJECT?

10:21  13   A.  I DO NOT KNOW THAT WITH CERTAINTY.

10:21  14        THE COURT:  THERE ARE WITNESSES -- YOU HAVE A LOT OF

10:21  15   30(B)(6) DEPOSITIONS, THERE ARE WITNESSES WHO DEAL WITH THAT

10:21  16   TECHNICAL PART OF IT.

10:21  17        MR. BRUNO:  I UNDERSTAND, JUDGE, BUT AS I SAID --

10:21  18        THE COURT:  LET ME TELL YOU WHAT I DO UNDERSTAND.  I

10:21  19   UNDERSTAND THAT IT'S THE PLAINTIFFS' ALLEGATION THAT THE ONLY

10:21  20   GEOTECHNICAL EVALUATION THAT WAS MADE IN THIS ENTIRE PROJECT WAS AT

10:21  21   MCDONOGH BORROW PIT, AND SOME OF THE WITNESSES, THE DEPOSITION

10:21  22   WITNESSES SEEM TO CONFIRM THAT.  I AM GOING TO ALLOW THE DEFENSE A

10:21  23   CHANCE TO EXPLAIN WHY OR IF IT'S ACCURATE.  I UNDERSTAND THAT.

10:21  24        MR. BRUNO:  THE ONLY PIECE THAT'S MISSING THERE IS IF IT

10:21  25   WAS DONE, IT NEEDS TO HAVE BEEN DESCRIBED IN THE DOCUMENT.

10:21  1        THE COURT:  I UNDERSTAND, BUT THIS WITNESS IS NOT THE

10:21  2   WITNESS TO GET THAT THROUGH.  YOU GIVE ME THAT IN THE PAPER.  THE

10:21  3   WITNESS HAS TO HAVE PERSONAL KNOWLEDGE.  HE KNOWS WHAT HIS JOB IS.

10:21  4   BY MR. BRUNO:

10:21  5   Q.  WE SAID -- LET'S LEAVE IN THE BUSINESS OF WHAT THE CORPS DOES,

10:22  6   OKAY?  LET'S TALK ABOUT THE OPTION THE CORPS HAS TO SUBCONTRACT

10:22  7   THIS OUT WITH SOMEBODY ELSE, RIGHT?  NOW, THE WAY THE CORPS DOES

10:22  8   THAT IS THROUGH A STATEMENT OF WORK.  I THINK YOU ARE, MAYBE I AM

10:22  9   WRONG, BUT I THOUGHT YOU TOLD ME YOU KNOW WHAT A STATEMENT OF WORK

10:22  10  IS?

10:22  11  A.  YES.

10:22  12  Q.  AND IN THE STATEMENT OF WORK THERE'S A DESCRIPTION OF WHAT THE

10:22  13  CORPS EXPECTS THIS THIRD-PARTY CONTRACTOR TO DO, RIGHT?

10:22  14  A.  YES.

10:22  15  Q.  AND THEN THE THIRD-PARTY CONTRACTOR PREPARES A RECOMMENDATION

10:22  16  REPORT WHICH TELLS TO THE CORPS WHAT THEY PROPOSE BE DONE.  IS THAT

10:22  17  HOW IT HAPPENS?

10:22  18  A.  I BELIEVE SO.

10:22  19  Q.  CALL UP 4364, NO. 1.  PAGE 28.  DETAIL OF ENGINEERING 5.1.2.5,

10:23  20  BOTTOM OF THE PAGE, DETAILED ENGINEERING.  SAYS HERE, "SYSTEMATIC

10:23  21  UNITS OF WORK THAT WILL BE INTEGRATED INTO THE OVERALL PROJECT

10:23  22  SHALL BE IDENTIFIED WITH RESPECT TO LOCATION, OPERATIONS, AND

10:23  23  EXECUTION.  ENGINEERING DETAILS ARE TO INCLUDE," AND IT LISTS A

10:23  24  BUNCH OF THINGS.  GO TO THE NEXT PAGE 29, SO I CAN ASK THE

10:23  25  QUESTION.  AND KEEP BOTH ON THE SCREEN IF YOU COULD BECAUSE IT'S A

10:23  1    CONTINUATION.

10:23  2            ALL RIGHT.  HERE IS MY SIMPLE QUESTION:  THIS DOCUMENT

10:24  3    SAYS THAT THESE WILL BE INCLUDED IN THE SCOPE OF THE WORK.  NOW,

10:24  4    WHAT I WANT TO KNOW IS WHETHER OR NOT GEOTECHNICAL IS THE KIND OF

10:24  5    THING, OR THE KIND OF EXPERTISE, OR THE SUBSET OF ENGINEERING THAT

10:24  6    WOULD BE UTILIZED TO ASSESS HOLES?  IS THAT WHAT ONE -- IS THAT THE

10:24  7    DISCIPLINE THAT ONE WOULD LOOK AT?

10:24  8            MS. CRONIN:  YOUR HONOR, I OBJECT.

10:24  9            THE COURT:  AND THE NATURE OF YOUR OBJECTION UNDER WHAT

10:24  10   FEDERAL RULE?  WHAT'S YOUR OBJECTION?

10:24  11           MS. CRONIN:  I OBJECT ON THE BASIS THAT THIS WITNESS --

10:24  12   HE HASN'T ESTABLISHED ANY FOUNDATION THAT THIS WITNESS HAS SEEN

10:24  13   THIS DOCUMENT.  IF HE WANTS TO ASK A QUESTION ABOUT GEOTECHNICAL

10:24  14   ENGINEERING, HE CAN ASK THE QUESTION WITHOUT -- IN THE CONTEXT OF

10:24  15   THIS DOCUMENT.  BUT TRYING TO LINK THE TWO WITHOUT SHOWING THE

10:24  16   WITNESS THE DOCUMENT OR WHAT IT PERTAINS TO.

10:24  17           THE COURT:  WELL, THERE'S NO MYSTERY HERE TO ANYONE, AND

10:24  18   I DON'T KNOW WHY THIS WITNESS EVEN NEEDS TO TESTIFY.  CLEARLY, I

10:24  19   THINK ALL WOULD AGREE THAT IF WE'RE GOING TO BE ANALYZING SOILS --

10:24  20   AND I AM USING THAT WORD IN A VERY BROAD FASHION -- GENERALLY THE

10:25  21   DISCIPLINE THAT DOES THAT IS A GEOTECHNICAL ENGINEER.  THE COURT

10:25  22   UNDERSTANDS THAT.  I DON'T KNOW WHY THIS WITNESS HAS TO -- AND IF

10:25  23   ONE IS GOING SUB STRATA, GENERALLY GEOTECHNICAL ENGINEERS ARE THE

10:25  24   PERSONS TO EVALUATE THAT, AMONG OTHER ENGINEERING DISCIPLINES.  I

10:25  25   KNOW THAT.  WE ALL KNOW THAT.

10:25  1              MR. BRUNO:  OKAY.  THANK YOU, JUDGE.

10:25  2              THE COURT:  SO I AM NOT SURE WHERE WE ARE GOING WITH

10:25  3  THIS.

10:25  4              MR. BRUNO:  ALL RIGHT.

10:25  5              THE COURT:  AND THIS IS ALREADY IN EVIDENCE, I SAW IT IN

10:25  6  THE BEGINNING AND I'VE READ IT.

10:25  7              MR. BRUNO:  OKAY.

10:25  8              THE COURT:  WHICH IS REALLY MORE IMPORTANT AND I

10:25  9  UNDERSTAND IT.  AS BEST I CAN.  LET'S MOVE ON.  I AM NOT SURE WHAT

10:25  10  THE POINT IS.

10:25  11  BY MR. BRUNO:

10:25  12  Q.  MOVING ON.  THIRD POINT IS PERMITS.  WE GOT THREE METHODS HERE

10:25  13  BY WHICH WE CAN PROTECT OUR FLOODWALL DEPENDING UPON WHO IS DOING

10:25  14  THE WORK.  IF IT'S THE CORPS, THE CORPS HAS IT DO ITS OWN

10:25  15  ENGINEERING EVALUATION OR IT CAN SUBCONTRACT IT OUT.  THEY DO THE

10:26  16  ENGINEERING EVALUATION OR WE HAVE THIS PERMIT PROCESS, OKAY?  FAIR

10:26  17  ENOUGH.

10:26  18              NOW, LET'S TALK ABOUT THE PERMIT PROCESS.  YOU SAID

10:26  19  GENERALLY SPEAKING THERE IS NO REQUIREMENT FOR A SUBCONTRACTOR OF A

10:26  20  CORPS -- OF THE CORPS TO GO GET A PERMIT, RIGHT?

10:26  21  A.  CORRECT.

10:26  22  Q.  HOWEVER, THE CORPS, IF IT SO CHOOSES, CAN BY CONTRACT REQUIRE

10:26  23  ITS SUBCONTRACTOR TO GO GET A PERMIT; ISN'T THAT TRUE?

10:26  24  A.  I'VE NEVER SEEN IT, BUT IT'S POSSIBLE.

10:26  25  Q.  YOU'VE NEVER SEEN IT.  LET ME SHOW YOU ONE.  LET'S GO TO JX

10:26  1    1260.  THIS IS NOT IN ORDER -- I'M SORRY, LET'S BACK UP.  YOU'VE

10:26  2    NEVER SEEN IT.

10:26  3         IF THE CONTRACT SAYS GET A PERMIT, THAT WOULD REQUIRE THE

10:26  4    CONTRACTING PARTY TO GET A PERMIT; ISN'T THAT TRUE?

10:27  5    A.  I DON'T KNOW.

10:27  6    Q.  SO WE WOULD HAVE TO LOOK AT THE CONTRACT, RIGHT?

10:27  7         THE COURT:  THE COURT HAS READ THE DEPOSITIONS OF THE

10:27  8    OTHER CORPS PEOPLE WHO WERE FAMILIAR WITH THE CONTRACT AND THE

10:27  9    PERMIT.

10:27  10        MR. BRUNO:  I JUST DON'T WANT --

10:27  11   BY MR. BRUNO:

10:27  12   Q.  YOU ARE NOT SAYING, YOU ARE NOT SAYING, ARE YOU, MR. COLLETTI,

10:27  13   THAT THE CORPS CANNOT REQUIRE A SUBCONTRACTOR TO BE REQUIRED --

10:27  14        THE COURT:  WHETHER HE IS SAYING IT OR NOT, IT WOULD MEAN

10:27  15   ABSOLUTELY NOTHING TO ME.  OF COURSE THE CORPS CAN.

10:27  16        MR. BRUNO:  THANK YOU, JUDGE.  LET'S CALL UP JX 01260.

10:27  17   THIS IS A SERIES OF DOCUMENTS.  THIS IS A TERRIBLE DOCUMENT.  THE

10:27  18   DOCUMENT WE WANT TO GO TO FIRST IS 12.  I WANT YOU TO ASSUME FOR ME

10:28  19   THAT -- WELL, LET'S LOOK AT IT FIRST.

10:28  20        THE SUBJECT SAYS, "LEVEE BOARD PERMITS AND

10:28  21   NOTIFICATIONS."  THAT'S WHAT IT SAYS ON THE LETTER.  DO YOU KNOW

10:28  22   WHAT IS THE PROCESS BY WHICH A CONTRACTOR APPLIES TO THE LEVEE

10:28  23   BOARD FOR A PERMIT?  WHAT DO THEY DO?

10:28  24   A.  IN THIS CASE, I DON'T KNOW WHY THEY DID IT, BUT THEY'RE

10:28  25   FOLLOWING THE PROCEDURE OF A THIRD PARTY-TYPE APPLICANT.

10:28  1   Q.  YOU VOLUNTARILY GAVE THAT AS PART OF YOUR ANSWER.  DID THE

10:28  2   LAWYERS TELL YOU TO SAY THAT?

10:28  3   A.  NO.  I'VE LOOKED AT THIS DOCUMENT.  I CAN'T FIGURE OUT WHAT --

10:28  4   WHY IT'S BEEN DONE THIS WAY.

10:29  5   Q.  THEY SHOWED YOU THAT DOCUMENT BEFORE YOUR TESTIMONY TODAY?

10:29  6   A.  I THINK YOU SHOWED ME THAT DOCUMENT.  SOMEBODY SHOWED ME THAT

10:29  7   DOCUMENT --

10:29  8   Q.  FAIR ENOUGH.

10:29  9   A.  -- IN THE PAST.

10:29  10  Q.  BUT FOR SOME REASON YOU FELT COMPELLED TO TELL THE COURT --

10:29  11        THE COURT:  WE DON'T HAVE TO EDITORIALIZE.  THE COURT IS

10:29  12  KEEN ENOUGH TO GET ANY NUANCE, I PROMISE YOU.

10:29  13        MR. BRUNO:  THANK YOU, JUDGE.  LET'S MOVE ON.

10:29  14  BY MR. BRUNO:

10:29  15  Q.  SO THIS IS THE PROCESS THAT WOULD BE UNDERTAKEN BY A THIRD

10:29  16  PARTY ASKING FOR A PERMIT, CORRECT?

10:29  17  A.  CORRECT.

10:29  18  Q.  AND WOULD YOU AGREE WITH ME THAT IT IS ESSENTIAL TO DESCRIBE

10:29  19  WITH PARTICULARITY THE WORK THAT WAS CONTEMPLATED TO BE DONE SO

10:29  20  THAT THE PERMITTING AGENCY CAN ACCURATELY ASSESS THE WORK.  WOULD

10:29  21  YOU AGREE WITH THAT?

10:29  22  A.  I WOULD AGREE WITH THAT.

10:29  23  Q.  AND SINCE WE'VE ALREADY COVERED AND WE ARE NOT GOING TO COVER

10:29  24  AGAIN THE BUSINESS OF HOLES, TO THE EXTENT THAT THE CONTEMPLATED

10:29  25  WORK INCLUDES HOLES, YOU BETTER DESCRIBE ALL OF THE HOLES IN YOUR

10:29  1   PERMIT; ISN'T THAT TRUE?

10:30  2   A.  YES.

10:30  3   Q.  AND IF YOU DON'T DESCRIBE THE HOLES IN THE PERMIT, THEN THE

10:30  4   PERMITTING AUTHORITY HAS NO WAY TO ASSESS THE HOLES; ISN'T THAT

10:30  5   RIGHT?

10:30  6   A.  THAT'S CORRECT.

10:30  7   Q.  AND MORE IMPORTANTLY, IF YOU HAVE AN UNDERSTANDING OF THE WORK

10:30  8   THAT'S CONTEMPLATED ON THE FIRST DAY AND ON THE TENTH DAY OR THE

10:30  9   65TH DAY OR THE 407TH DAY THE WORK CHANGES, YOU HAVE TO TELL THE

10:30  10  PERMITTING AGENCY THAT YOU'RE DOING SOMETHING DIFFERENT, DON'T YOU?

10:30  11  A.  THAT'S CORRECT.

10:30  12  Q.  NOW, NEXT PAGE, PLEASE.  FOCUS ON THE DEMOLITION AND REMOVAL.

10:30  13  MAKE IT BIG.  SO THIS IS A DESCRIPTION OF THE WORK.  IT SAYS,

10:30  14  "REMOVAL OF ALL ELECTRICAL, SEWER, GAS, WATER, AND TELEPHONE

10:30  15  FACILITIES ON THE SITE INCLUDING THE BOLAND SEWER LIFT STATION

10:30  16  (IDENTIFIED AS ITEM 114 ON FIGURE 3-5 AND TABLE 3-5).  SAID

10:31  17  DEMOLITION OF ALL ABOVE GROUND AND SUBSURFACE STRUCTURES INCLUDING

10:31  18  SLABS, FOUNDATION, BARGES," AND REFERS TO A FIGURE 3-5, RIGHT?

10:31  19  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

10:31  20  Q.  SAYS, "EXCAVATION AND REMEDIATION AREAS OF FIGURE 3-2, 3-3 AND

10:31  21  3-6 AND TABLE 3-7."  IT SAYS THAT TOO, RIGHT?

10:31  22  A.  RIGHT.

10:31  23  Q.  AND IT SAYS, "REMOVAL OF ALL WOODEN AND STEEL PILINGS TO A

10:31  24  DEPTH OF 36 FEET."  CORRECT?

10:31  25  A.  CORRECT.

10:31  1    Q.  NOW, IN ORDER TO EVALUATE THIS PERMIT, I HAVE TO KNOW WHERE

10:31  2    THESE PILINGS ARE, DON'T I?

10:31  3    A.  THAT'S CORRECT.

10:31  4    Q.  GOT TO KNOW IT, OKAY.  AND I GOT TO KNOW A LITTLE SOMETHING

10:31  5    ABOUT THOSE EXCAVATIONS, DON'T I?

10:31  6    A.  YES, YOU DO.

10:31  7    Q.  SO I HAVE TO RELY ON WHAT THEY TELL ME, RIGHT?  RIGHT?

10:31  8    A.  THERE SHOULD BE DRAWINGS SHOWING THAT, YES.

10:31  9    Q.  EXACTLY.  THERE SHOULD BE DRAWINGS SHOWING THAT.  BUT LET'S

10:32  10   LOOK AT THE TABLES FIRST THAT WERE INCLUDED IN THIS SUBMITTAL.  GO

10:32  11   TO PAGE 22.  AND BLOW UP, PLEASE, THE TABLE, CARL, IF YOU DON'T

10:32  12   MIND.  AND WHAT WE SEE HERE IS SOMETHING CALLED A DEMOLITION

10:32  13   INVENTORY.  OKAY?

10:32  14   A.  OKAY.

10:32  15   Q.  LISTS A WHOLE BUNCH OF STUFF.  DO YOU SEE ANYTHING ON THIS

10:32  16   TABLE THAT WOULD SUGGEST THAT ANY OF THESE THINGS ARE BELOW GROUND?

10:32  17   A.  (WITNESS REVIEWS DOCUMENT.)  THESE CONCRETE SLABS, THEY COULD

10:33  18   BE BELOW GROUND, PARTIALLY BELOW GROUND.

10:33  19   Q.  ALL RIGHT.  WELL, THEY COULD BE, BUT IF YOU WERE A PERMIT

10:33  20   REVIEWING AGENT, ALL YOU GOT IS WHAT'S ON THE PIECE OF PAPER AND

10:33  21   THOSE OTHER FIGURES, RIGHT?

10:33  22   A.  AND ANY DRAWINGS THAT WOULD BE ASSOCIATED WITH IT.

10:33  23   Q.  THAT'S WHAT I MEANT.  THE OTHER FIGURES OF THE DRAWINGS, RIGHT,

10:33  24   THAT'S ALL YOU GOT?

10:33  25   A.  THAT'S CORRECT.

10:33  1    Q.  SO IF THE FIGURES DON'T SAY ANYTHING ABOUT THE DEPTH, THEN YOU

10:33  2    DON'T KNOW ANYTHING ABOUT THE DEPTH, RIGHT?

10:33  3    A.  THAT'S CORRECT.

10:33  4    Q.  AND THE PERMITTING AGENCY IS NOT GOING TO MAKE ANY ASSUMPTIONS,

10:33  5    ARE THEY?

10:33  6    A.  NO, WE DON'T.

10:33  7    Q.  NEXT PAGE, PLEASE.  TAKE A LOOK AT THIS ONE.  CAN WE BLOW THAT

10:34  8    UP OR MAGICALLY MAKE IT EASIER TO READ.  THERE'S A COLUMN WHICH

10:34  9    SAYS "HEIGHT," MR. COLLETTI.  DO YOU SEE THAT?

10:34  10   A.  I SEE THAT.

10:34  11   Q.  DO YOU SEE ANY NEGATIVE NUMBERS IN THAT HEIGHT COLUMN?

10:34  12   A.  NOT THAT I CAN SEE ON THIS, NO.

10:34  13   Q.  LET'S GO DOWN SO WE CAN GET THROUGH THIS QUICKLY.  NO NEGATIVE

10:34  14   NUMBERS, NO INDICATION OF ANYTHING BELOW GROUND, RIGHT?

10:34  15   A.  NOT THAT I SEE.

10:34  16   Q.  ALL RIGHT.  NEXT SLIDE, PLEASE.  SORRY.  NEXT SLIDE.  IT'S OUT

10:34  17   OF ORDER.

10:34  18          MR. BRUNO:  THE NEXT SLIDE IS 25, JUDGE.  IT'S KIND OF

10:34  19   WEIRD, THE BATES NUMBERS ARE IN ORDER, BUT THE DOCUMENT, WHEN YOU

10:34  20   LOOK AT IT, IT'S NOT IN ORDER, SO WE HAVE TO BE CAREFUL ABOUT THAT.

10:34  21          THE COURT:  ALL RIGHT.

10:34  22   BY MR. BRUNO:

10:34  23   Q.  SO THE NEXT SITE ID IS 73.  YOU RECALL THE LAST ONE WAS 72.

10:34  24   JUST A QUICK LOOK, ANY NEGATIVE NUMBERS THERE?

10:35  25   A.  NOT IN THE HEIGHT.

| | | |
|---|---|---|
| 10:35 | 1 | Q.  NOW, NO. 114, THERE WAS A REFERENCE IN THE -- AND I'LL READ IT |
| 10:35 | 2 | TO YOU AND WE'LL CALL IT BACK UP IF WE NEED TO, BUT IT SAYS, |
| 10:35 | 3 | "REMOVAL OF ALL ELECTRICAL, SEWER, GAS, WATER, AND TELEPHONE |
| 10:35 | 4 | FACILITIES ON THE SITE, INCLUDING THE BOLAND SEWER LIFT STATION |
| 10:35 | 5 | IDENTIFIED AS ITEM 114 ON FIGURE 3-5."  WOULD YOU AGREE WITH ME |
| 10:35 | 6 | THAT IS ITEM 114 ON TABLE THREE -- I'M SORRY, ON FIGURE 3-5 AND |
| 10:35 | 7 | TABLE 3-5, THAT'S WHAT THAT IS? |
| 10:35 | 8 | A.  APPEARS TO BE. |
| 10:35 | 9 | Q.  AND UNDER HEIGHT WE HAVE SOMETHING THAT SAYS "NR," RIGHT? |
| 10:35 | 10 | A.  YES, IT DOES. |
| 10:35 | 11 | Q.  WHICH MEANS NO RECORDED OR NO RECORD, RIGHT? |
| 10:35 | 12 | A.  I DON'T KNOW WHAT IT MEANS. |
| 10:36 | 13 | MS. CRONIN:  YOUR HONOR, I OBJECT.  HE ASKED THE WITNESS |
| 10:36 | 14 | WHETHER -- EXCUSE ME.  I'LL READ THE QUESTION, 114, "THERE'S A |
| 10:36 | 15 | REFERENCE TO THAT AND I WILL READ IT AND WE'LL CALL IT BACK UP IF |
| 10:36 | 16 | WE NEED TO, BUT IT SAYS, 'THE REMOVAL OF ALL ELECTRICAL, SEWER, |
| 10:36 | 17 | GAS, WATER, AND TELEPHONE FACILITIES TO THE SITE INCLUDING BOLAND |
| 10:36 | 18 | SEWER LIFT IDENTIFIED AS 114.'"  I APOLOGIZE TO THE COURT REPORTER. |
| 10:36 | 19 | THE QUESTION WAS:  WOULD YOU AGREE THAT THIS ITEM 114 ON TABLE 3 IS |
| 10:36 | 20 | FIGURE 3 -- TABLE 3 -5, THAT'S WHAT IT IS?  THE WITNESS DOESN'T SEE |
| 10:36 | 21 | TABLE 3-5. |
| 10:36 | 22 | MR. BRUNO:  LET'S GO UP AGAIN.  DO WE HAVE TO GO BACK |
| 10:36 | 23 | THREE PAGES? |
| 10:36 | 24 | MR. CRONIN:  I APOLOGIZE, YOUR HONOR, I THOUGHT HE WAS |
| 10:36 | 25 | ASKING TO IDENTIFY 114 ON THE GRAPHIC AS WELL, EXCUSE ME. |

10:36  1                    THE COURT:  OKAY.  THAT'S FINE.  I UNDERSTAND.

10:36  2                    MR. BRUNO:  NO PROBLEM.  NO HARM, NO FOUL.  I DO IT MORE

10:36  3     OFTEN THAN YOU.

10:36  4     BY MR. BRUNO:

10:36  5     Q.  TO GET US ORIENTED AGAIN, WE HAVE TO GO BACKWARDS TO GET THE

10:36  6     NEXT PAGE WHICH IS 24, AND JUST TO ROUND THIS OUT, THERE'S NO

10:37  7     NEGATIVE NUMBERS THERE AS WELL?

10:37  8     A.  NONE SHOWN.

10:37  9     Q.  OKAY, GOOD.  NOW, LET'S SEE.  LET'S LOOK AT THE OTHER TABLES.

10:37  10    LET'S LOOK AT SOME OF THE -- LET'S LOOK AT SOME OF THOSE FIGURES.

10:37  11                   THE COURT:  ARE YOU GOING TO THE GRAPHIC NOW?

10:37  12                   MR. BRUNO:  YES, JUDGE.  PAGE 26.  BLOW THAT UP.  YOU

10:37  13    CAN'T REALLY SEE ANYTHING THERE, SO WHAT WE DID DO IS -- LET'S SEE.

10:37  14    LET'S START AT TOP, 3-2.  LET'S CALL UP JX -- WHAT WE DID, JUDGE,

10:38  15    WE HAVE HALF PICTURES AND WE FOUND THE WHOLE PICTURES.

10:38  16                   THE COURT:  OKAY.

10:38  17                   MR. BRUNO:  SO IT'S JX 1252-30.  AND IF WE COULD FOCUS ON

10:38  18    THE BOX SO THAT I CAN BE CHECKED OUT ON THIS.  SO THE LEGEND SAYS

10:38  19    THERE 3-2.  THAT'S ONE OF THE MANY.  LET'S GO BACK TO THE -- BLOW

10:38  20    IT UP, AUGUST 28, 2000.  LET'S GO TO THE BIG PICTURE AGAIN.

10:38  21    HIGHLIGHT HALF OF IT SO THAT WE CAN LOOK AT IT.  YOU SEE ANYTHING

10:38  22    ON THERE THAT INDICATES DEPTH?

10:38  23                   MR. WOODCOCK:  OBJECTION, YOUR HONOR.  THIS LINE OF

10:38  24    QUESTIONING HAS GONE TOO FAR.  MR. COLLETTI HAS ALREADY TESTIFIED

10:38  25    HE NEVER SAW THE TERC UNTIL AFTER.  HE DIDN'T EVEN KNOW WHAT IT WAS

10:38 1    UNTIL AFTER HIS DEPOSITION.  MR. BRUNO IS SHOWING HIM MANY

10:39 2    DRAWINGS, HE HAS NO PERSONAL KNOWLEDGE.  THIS LINE OF QUESTIONING

10:39 3    IS IMPROPER.

10:39 4          THE COURT:  MR. BRUNO, DO YOU WANT TO RESPOND?

10:39 5          MR. BRUNO:  YES, I AM NOT SHOWING HIM THE TERC, I AM

10:39 6    SHOWING HIM THE PERMIT APPLICATION.

10:39 7          THE COURT:  YES, DO YOU WANT TO RESPOND?

10:39 8          MR. BRUNO:  THIS IS NOT THE TERC.  THIS IS THE PERMIT

10:39 9    APPLICATION.

10:39 10         THE COURT:  I UNDERSTAND YOU WANT TO SHOW HIM AS A PERSON

10:39 11   INVOLVED WITH THE PERMITTING PROCESS, YOU'VE GONE ON.  SO I'M GOING

10:39 12   TO LET IT GO TO ITS DENOUEMENT SINCE IT'S GONE THIS FAR.  WAS THE

10:39 13   PERMITTING AGENCY, OLD, SHOWN ANYTHING THAT WOULD DEMONSTRATE

10:39 14   DEPTH, AND I AM GOING TO ALLOW YOU TO DO THAT AND THEY CAN

10:39 15   CERTAINLY CROSS HIM.

10:39 16         MR. BRUNO:  SURE.  JUDGE, WE WILL JUST --

10:39 17         THE COURT:  I AM GOING TO OVERRULE THE OBJECTION.

10:39 18   BY MR. BRUNO:

10:39 19   Q.  HOW ABOUT WE DO IT THIS WAY.  YOU WOULD EXPECT, IN ORDER FOR

10:39 20   THE PERMITTING AGENCY TO BE ABLE TO ADEQUATELY EVALUATE THE PERMIT,

10:39 21   THAT THE PERMIT -- THE PERSON SEEKING THE PERMIT WOULD HAVE

10:39 22   SUBMITTED FIGURES THAT WOULD HAVE ALLOWED THE PERMITTING AGENCY TO

10:39 23   DETERMINE WHETHER THERE WERE HOLES, RIGHT?

10:39 24   A.  YES.

10:39 25         THE COURT:  AND WE HAVE BEEN THROUGH THAT.  HE'S

10:39  1    ESTABLISHED THAT.

10:40  2          MR. BRUNO:  SO THAT YOU KNOW, I WANT TO FOR THE RECORD,

10:40  3    JUDGE, FIGURE, AND I DON'T NEED TO PUT IT UP, BUT IN THE EXHIBIT

10:40  4    THE PAGES ARE CUT IN HALF.  I JUST WANT TO GIVE YOU EXHIBIT NUMBERS

10:40  5    FOR THE WHOLE PAGE WHICH IS IN A DIFFERENT PLACE, OKAY?  FIGURE 3-2

10:40  6    CAN BE FOUND AT JX 1252-0030.  FIGURE THREE --

10:40  7          THE COURT:  A LITTLE SLOWER.

10:40  8          MR. BRUNO:  I'M SLOW WHEN I SHOULD BE FAST AND FAST WHEN

10:40  9    I SHOULD BE SLOW.

10:40  10         THE COURT:  WE ALL DO THAT.

10:40  11         MR. BRUNO:  JX 01252-0030, IS FIGURE 3-2.  JX 1252-0033

10:40  12   IS FIGURE 3-3.  JX 01252-039 IS FIGURE 3-5.  JX 01252-0047 IS

10:41  13   FIGURE 3-6.  AND FINALLY, JX 01252-0057 IS FIGURE 3-7.  OKAY.  I

10:41  14   APOLOGIZE FOR THAT.

10:41  15         THE COURT:  NO PROBLEM.

10:41  16         MR. BRUNO:  SO WE WILL LEAVE THAT ALONE.  AND JUST TO

10:41  17   KIND OF ROUND THIS OUT.

10:41  18   BY MR. BRUNO:

10:41  19   Q.  THE PERMITTING PROCESS FROM TIME TO TIME ELICITS COMMENTS FROM

10:41  20   THE GEO TECH WHICH THEN GOES BACK TO THE PERSON REQUESTING THE

10:42  21   PERMIT AND THEY MAY BE CALLED UPON TO ASK FOR -- THEY MAY BE ASKED

10:42  22   FOR ADDITIONAL INFORMATION IN ORDER FOR THEM TO COMPLETE THE

10:42  23   PERMIT, RIGHT?

10:42  24   A.  THAT IS CORRECT.

10:42  25   Q.  AND JUST TO SHOW THIS LAST LITTLE PIECE OF THIS, THAT HAPPENED

10:42  1    HERE AND MR. O'CONNOR AT EXHIBIT 1260-008, IN FACT, RESPONDS TO THE

10:42  2    REQUEST FOR ADDITIONAL INFORMATION.  CAN YOU SHOW IT?  BLOW IT UP,

10:42  3    PLEASE, REAL QUICK.

10:42  4           NOW, WE'RE ALMOST AT THE END OF THIS PARTICULAR SECTION.

10:42  5    SO AT THE END OF THE DAY AT JX 1260-001-02, IT'S THE FIRST NUMBER

10:43  6    OF THIS DOCUMENT IT'S 0 -- YEAH.  AT THE END OF THE PROCESS,

10:43  7    MR. GREGORY BREERWOOD, DO YOU KNOW WHO HE IS?

10:43  8    A.  YES.

10:43  9    Q.  WHO IS HE?

10:43  10   A.  HE WAS THE CHIEF OF OPERATIONS DIVISION BACK AT THE TIME.  HE'S

10:43  11   RETIRED FROM THE CORPS NOW.

10:43  12   Q.  SO HE WRITES A LETTER TO MR. STEVEN SPENCER THE CHIEF ENGINEER.

10:43  13   IS THIS WHAT NORMALLY HAPPENS AFTER THE CORPS CONDUCTS ITS

10:43  14   EVALUATION OF WHATEVER WAS SUBMITTED TO IT?  THEY WRITE BACK TO THE

10:43  15   OLD?

10:43  16   A.  THAT'S CORRECT, TO THE PERMITTING AGENCY.

10:43  17   Q.  NOW, THE BOTTOM PARAGRAPH, PLEASE.

10:44  18          NOW, I NOTICED THAT THE LANGUAGE OF THIS IS THAT THIS IS

10:44  19   A LETTER OF NO OBJECTION.  DOES THAT MEAN THAT THE CORPS, IN THE

10:44  20   CONTEXT OF A REQUEST FOR A PERMIT, IS BLESSING AND SAYING THAT THE

10:44  21   WORK TO BE PERFORMED IS BEING DONE CORRECTLY?

10:44  22   A.  WHAT IT'S STATING IS THAT WE HAVE NO OBJECTION AS PROPOSED

10:44  23   PROVIDED THE STIPULATIONS THAT ARE IN THAT LETTER ARE PART OF THAT

10:44  24   PERMIT.

10:44  25   Q.  RIGHT.  SO YOU'RE MERELY, ALL THE CORPS IS DOING IN THE CONTEXT

10:44  1  OF A PERMIT IS SAYING, "WE HAVE NO OBJECTION," RIGHT?

10:44  2  A.  THAT'S CORRECT.

10:44  3  Q.  AND IT'S BASED SOLELY UPON WHAT INFORMATION THEY RECEIVED,

10:44  4  RIGHT?

10:44  5  A.  THAT'S CORRECT.

10:44  6  Q.  AND THEY'RE NOT COMMENTING UPON HOW THE CONTRACTOR CHOOSES TO

10:45  7  DO THE CONTRACTOR'S WORK, RIGHT?

10:45  8  A.  THAT PIECE GOES TO THE PERMITTING AGENT, YES.

10:45  9          THE COURT:  DO YOU WANT TO TAKE A RECESS, MR. BRUNO?

10:45 10          MR. BRUNO:  YES, YOUR HONOR.

10:45 11          THE COURT:  ARE YOU FINISHED WITH THIS LINE?

10:45 12          MR. BRUNO:  YES, THIS IS A PERFECT TIME TO TAKE A BREAK.

10:45 13          THE COURT:  ALL RIGHT.  ABOUT 11 O'CLOCK COME BACK.

10:45 14          THE DEPUTY CLERK:  ALL RISE, PLEASE.

10:45 15      (WHEREUPON, A RECESS WAS TAKEN.)

11:01 16      (OPEN COURT.)

11:01 17          THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE BE SEATED.

11:01 18  BY MR. BRUNO:

11:01 19  Q.  I HAVE ONE OR TWO MORE QUESTIONS, AND I WANT TO GET INTO THE

11:02 20  FORM OF HOW -- WE TALKED ALL ABOUT THE GUIDANCE.  WE TALKED ABOUT

11:02 21  THE FACT THAT YOU HAVE TO DO THE EVALUATION OF THE WHOLE 300 FEET.

11:02 22          SO NOW, THE LAST PIECE OF THE PUZZLE IS HOW DO YOU CONVEY

11:02 23  THAT INFORMATION TO THE GUY WHO IS DIGGING THE DITCH TO MAKE SURE

11:02 24  THAT THEY'RE DOING OR DIGGING THE DITCH OR BACKFILLING IT PROPERLY?

11:02 25  WITH REGARD TO THE CORPS, THE CORPS -- WHEN THE CORPS DOES ITS OWN

11:02  1    DESIGN AND ITS OWN SPECIFICATION, THEY BUILD THAT INTO THEIR

11:02  2    DESIGNS AND SPECIFICATIONS, RIGHT?

11:02  3    A.  CORRECT.

11:02  4    Q.  NOW, WHEN IT SUBCONTRACTS WITH A THIRD PARTY AND IT SAYS,

11:02  5    "THIRD PARTY, I WANT YOU TO TELL ME" -- BECAUSE IN THIS CASE --

11:02  6    WELL, I WITHDRAW.

11:02  7            DO YOU UNDERSTAND WHAT WASHINGTON GROUP DID FOR THE CORPS

11:02  8    IN THIS CASE?

11:02  9    A.  I DO, A LITTLE BIT NOW OF WHAT THE CONTRACT INVOLVED.

11:02  10   Q.  WELL, LET'S DO IT THIS WAY, HYPOTHETICALLY.  IF YOU'RE THE

11:03  11   CORPS AND IF YOU WANT TO DO SOME DEMOLITION AND YOU WANT TO DO SOME

11:03  12   REMEDIATION OF A SITE AND IT HAPPENS TO BE NEXT TO A FLOOD CONTROL

11:03  13   PROJECT, AND IF YOU DON'T KNOW WHAT'S THERE AND IF YOU DECIDE TO

11:03  14   HIRE SOMEBODY TO TELL YOU WHAT'S THERE, OKAY, WOULD YOU AGREE WITH

11:03  15   ME THAT YOU REALLY CAN'T KNOW EVERYTHING THAT IS CONTEMPLATED TO BE

11:03  16   DONE TO ACCOMPLISH THE TASK UNTIL SOMEBODY GOES OUT THERE AND TAKES

11:03  17   A LOOK AT IT, RIGHT?

11:03  18   A.  YES.

11:03  19   Q.  AND OVER TIME YOU MAY FIND NEW THINGS, SO IT'S ONE OF THOSE

11:03  20   THINGS, IT'S A MOVING TARGET, RIGHT?

11:03  21   A.  YES.

11:03  22   Q.  SO WOULD YOU AGREE WITH ME IT'S REALLY IMPOSSIBLE TO PREPARE

11:03  23   PLANS AND SPECIFICATIONS IN THE SAME WAY THAT YOU WOULD PREPARE

11:03  24   PLANS AND SPECIFICATIONS TO, SAY, BUILD A BUILDING OR BUILD A TABLE

11:03  25   OR BUILD A FLOODWALL, RIGHT?  IT'S NOT THE SAME?

11:03  1   A.   THAT'S CORRECT.

11:03  2   Q.   IT'S A MOVING TARGET, RIGHT?

11:03  3   A.   YES.

11:03  4   Q.   SO ANOTHER WAY THAT THE CORPS COULD OFFER THIS ADVICE IS BY

11:04  5   GIVING TO THE CONTRACTOR SOME GUIDANCE ABOUT WHAT IT NEEDS TO DO IN

11:04  6   ORDER TO NOT DAMAGE THE WALL, RIGHT?

11:04  7   A.   YES.

11:04  8   Q.   NOW, WHEN IT COMES TO HOLES, THE IDEA IS TO FILL UP THE HOLE

11:04  9   AND COMPACT THE HOLE SO THAT WATER CAN'T GO THROUGH THE HOLE AND

11:04  10  UNDERMINE THE LEVEE; IS THAT RIGHT?

11:04  11  A.   TECHNICALLY, YES.

11:04  12  Q.   SO THAT IF THE GUIDANCE IS WHAT I WANT YOU TO DO,

11:04  13  MR. CONTRACTOR, IS I WANT YOU TO DO A TEST OF THE COMPACTION OF THE

11:04  14  GROUND BEFORE YOU DIG THE HOLE, AND AFTER YOU FILL THE HOLE, I WANT

11:04  15  TO MAKE SURE THAT THE COMPACTION IS THE SAME AS IT WAS BEFORE YOU

11:04  16  STARTED, IT'S KIND OF -- THAT'S KIND OF ACCOMPLISHING THE SAME END,

11:04  17  RIGHT?

11:04  18  A.   TRYING TO.

11:04  19  Q.   CALL UP THE NEXT EXHIBIT, PLEASE.  WHICH NUMBER?  I FORGOT.  JX

11:05  20  01238.  IF WE LOOK AT THIS, THIS IS FROM -- DO YOU KNOW WHO GENE

11:05  21  SPADARO IS?

11:05  22  A.   NO, I DO NOT KNOW.

11:05  23  Q.   DO YOU KNOW WHO LEE GUILLORY?

11:05  24  A.   I KNOW LEE GUILLORY, YES.

11:05  25  Q.   IT SAYS, "GEO TECH INPUT FOR THE EAST SIDE DEMOLITION."  DO YOU

11:05   1   SEE THAT UP THERE IN BLACK AND WHITE?

11:05   2   A.  YES.

11:05   3   Q.  AND LET'S JUST GO DOWN TO THE BOTTOM OF THIS THING.  IT SAYS,

11:05   4   "(D) SOIL USED TO BACKFILL ANY OF THE EXCAVATIONS SHALL BE

11:05   5   COMPACTED TO THE DENSITY OF THE EXISTING SOIL."  SO THAT'S

11:05   6   CONSISTENT WITH WHAT WE JUST TALKED ABOUT, RIGHT?

11:05   7   A.  YES.

11:06   8            MR. BRUNO:  THAT'S ALL THE QUESTIONS I HAVE.  THANK YOU

11:06   9   VERY MUCH, MR. COLLETTI.

11:06   10           THE COURT:  THANK YOU.  THANK YOU, MR. BRUNO.  THE

11:06   11  GOVERNMENT CERTAINLY, AND WGI AS WELL I WOULD THINK, HAS THE OPTION

11:06   12  OF TALKING TO THIS WITNESS NOW TO A LIMITED DEGREE AND THEN CALLING

11:06   13  HIM BACK OR TAKING HIM NOW, IT'S YOUR CHOICE.

11:06   14           MR. WOODCOCK:  WE'LL EXAMINE THE WITNESS NOW.

11:06   15           THE COURT:  THAT MAKES IMMINENT SENSE.  THANK YOU.  SIR,

11:07   16  YOU MAY PROCEED.  I'M SORRY.  I'M JUST TYPING A FEW NOTES, BUT I

11:07   17  DON'T WANT TO SLOW YOU UP.  YOU CAN PROCEED, I'M LISTENING.

11:06   18                      CROSS-EXAMINATION

11:06   19  BY MR. WOODCOCK:

11:07   20  Q.  GOOD MORNING, MR. COLLETTI.

11:07   21  A.  GOOD MORNING.

11:07   22  Q.  MR. BRUNO SHOWED YOU YOUR CV AND WENT OVER YOUR LAST TWO

11:07   23  POSITIONS WITH THE CORPS.  BRIEFLY, I WOULD JUST LIKE TO GO THROUGH

11:07   24  AND PUT THOSE TWO POSITIONS INTO CONTEXT OF YOUR CAREER AND LIFE.

11:07   25  HOW LONG HAVE YOU WORKED FOR THE CORPS?

11:07  1   A.  THIRTY-FIVE PLUS YEARS.

11:07  2   Q.  AND WHEN DID YOU START THERE?

11:07  3   A.  I STARTED IN MAY OF 1977.

11:07  4   Q.  WHERE DID YOU GO TO COLLEGE?

11:07  5   A.  WENT TO THE UNIVERSITY OF NEW ORLEANS.

11:07  6   Q.  AND DID YOU GO TO THE CORPS RIGHT AFTER YOU GRADUATED FROM

11:08  7   COLLEGE?

11:08  8   A.  ACTUALLY, I WAS WORKING AT THE CORPS WHILE GOING TO COLLEGE.  I

11:08  9   WAS A COOP STUDENT FROM 1977 TO 1982 WHEN I GOT MY DEGREE.

11:08  10  Q.  WHAT DID YOU RECEIVE THAT DEGREE IN?

11:08  11  A.  BACHELOR OF SCIENCE AND ENGINEERING, CIVIL ENGINEERING.

11:08  12  Q.  ARE YOU PROFESSIONALLY LICENSED?

11:08  13  A.  NO, I AM NOT.

11:08  14  Q.  HAVE YOU EVER BEEN PROFESSIONALLY LICENSED?

11:08  15  A.  NO, I AM NOT.

11:08  16  Q.  WHY NOT?

11:08  17  A.  THERE WAS NO NEED THAT I FORESEEN.  I WAS IN OPERATIONS

11:08  18  DIVISION, I LIKED BEING IN THE OPERATIONS DIVISION.  THERE IS NO

11:08  19  REQUIREMENTS WITHIN THE OPERATIONS DIVISION, WE'RE NOT STAMPING

11:08  20  DRAWINGS OR ANYTHING OF THAT SORT WHERE PROFESSIONAL LICENSE WAS

11:08  21  REQUIRED, SO I DIDN'T PURSUE IT AT THE TIME AND HAVE YET TO.

11:08  22  Q.  SO IN THE COURSE OF YOUR CAREER, I BELIEVE YOU JUST SAID YOU'RE

11:08  23  NOT DESIGNING -- YOU'RE NOT INVOLVED IN DESIGN OF FLOOD CONTROL

11:08  24  PROJECTS?

11:08  25  A.  NO, I AM NOT.

11:09  1    Q.  AND YOU'RE NOT DOING -- YOU'RE NOT OFFERING ANY SPECIFIC

11:09  2    GEOTECHNICAL EXPERTISE?

11:09  3    A.  DEFINITELY NOT.

11:09  4    Q.  AND YOU SPENT THE MAJORITY OF THE 35 YEARS AT THE CORPS IN THE

11:09  5    OPERATIONS BRANCH; IS THAT CORRECT?

11:09  6    A.  ALL BUT ABOUT SIX TO EIGHT MONTHS SPENT IN OPERATIONS DIVISION.

11:09  7    Q.  DID YOU EVER WORK FOR ENGINEERING?

11:09  8    A.  WE DID A BRIEF -- UPON GRADUATION AND HIRING AT THE CORPS, YOU

11:09  9    WENT THROUGH ON AN ORIENTATION BASIS MAYBE TWO DAYS IN THIS

11:09  10   SECTION, TWO WEEKS IN THE OTHER SECTION, THREE DAYS IN ANOTHER

11:09  11   SECTION.  SO YOU WENT THROUGH FOR THAT ORIENTATION PURPOSES, BUT

11:09  12   THAT WAS IT.

11:09  13   Q.  SO YOU WORKED FOR ENGINEERING MAYBE FOR THREE DAYS 34 YEARS

11:09  14   AGO?

11:09  15   A.  IT WAS MORE LIKE PROBABLY ABOUT 20 DAYS; ALMOST, YEAH.  LONG

11:10  16   TIME AGO.

11:10  17   Q.  YOU'VE TESTIFIED ON MR. BRUNO'S CROSS-EXAMINATION THAT YOU

11:10  18   REVIEWED -- IN YOUR ROLE AS MANAGER FOR COMPLETED WORKS THAT YOU

11:10  19   REVIEWED PERMIT APPLICATIONS; IS THAT CORRECT?

11:10  20   A.  THAT IS CORRECT.

11:10  21   Q.  AND HOW MANY PERMITS DOES COMPLETED WORKS ISSUE EACH YEAR?

11:10  22   A.  BACK PRE-KATRINA WE WERE ISSUING ANYWHERE -- WELL, WE

11:10  23   ISSUED LETTERS OF NO OBJECTION, WE DIDN'T ISSUE PERMITS.  WE ISSUED

11:10  24   ANYWHERE FROM 300 TO 500 A YEAR.

11:10  25   Q.  I'M SORRY, I MISSPOKE.  HOW MANY PERMIT APPLICATIONS DO YOU

11:10 1    REVIEW A YEAR?

11:10 2    A.  AT THAT TIME, ABOUT 300 TO 500.

11:10 3    Q.  IS THERE A COMMON PROCEDURE USED TO REVIEW THE PERMIT

11:10 4    APPLICATIONS?

11:10 5    A.  YES.

11:10 6    Q.  I BELIEVE YOU TESTIFIED THAT YOU WERE NOT PERSONALLY INVOLVED

11:11 7    WITH THE PERMIT APPLICATION PROCESS AT ISSUE IN THIS CASE WITH WGI?

11:11 8    A.  NO, I WAS NOT.

11:11 9    Q.  WHY IS THE PERMIT APPLICATION PROCESS REQUIRED?

11:11 10   A.  IT'S A PROTECTION MECHANISM SO THAT THE LEVEE DISTRICTS, THE

11:11 11   CORPS AND DOTD WOULD KNOW WHAT WAS GOING ON AROUND THOSE LEVEES AND

11:11 12   FLOODWALLS.  SO ANY ADVERSE IMPACTS WE ARE REQUIRED BY THE CODE OF

11:11 13   FEDERAL REGULATIONS, 33:208.10, THAT WE REVIEW ANY TYPES OF WORK

11:11 14   THAT MAY ADVERSELY IMPACT A FEDERAL PROJECT.

11:11 15   Q.  AND EXACTLY WHEN IS A PERMIT REQUIRED?

11:11 16   A.  IN THE CASE OF HURRICANE PROTECTION LEVEES, WITHIN 300 FEET.

11:11 17   ANY WORK WITHIN 300 FEET OF THE LEVEE CENTER LINE OR FLOODWALL

11:11 18   CENTER LINE.

11:11 19   Q.  IS THAT DIFFERENT FROM RIVER LEVEES?

11:11 20   A.  YES, IT IS.  ON RIVER LEVEES THE DISTANCE IS MUCH GREATER.

11:12 21   IT'S 1,500 FEET FOR SUBSURFACE-TYPE WORK, AND AS WE SAID, SEISMIC

11:12 22   WORK WAS 5,000 FEET.  BUT, THE REASON YOU HAVE A DIFFERENT --

11:12 23   HURRICANE PROJECT IS DIFFERENT THAN A RIVERINE TYPE OF PROJECT.

11:12 24   Q.  I BELIEVE YOU ALSO TESTIFIED THAT AT THE TIME OF HURRICANE

11:12 25   KATRINA AND BEFORE THE LEVEE PERMIT APPLICATION RULES FOR THE CORPS

11:12  1    WEREN'T WRITTEN DOWN?

11:12  2    A.  THAT'S CORRECT.

11:12  3    Q.  IS THAT CORRECT?  HOW DOES SOMEONE DOING WORK KNOW TO GET A

11:12  4    PERMIT THEN?

11:12  5    A.  WELL, THE MAJORITY OF YOUR APPLICANTS, THEY HAVE, YOU KNOW,

11:12  6    KNOWLEDGE OF THE SYSTEM.  BUT IF THEY DIDN'T, WE WORK VERY CLOSELY

11:12  7    WITH THE LEVEE DISTRICTS.  THE LEVEE DISTRICTS ENCOURAGE THE PARISH

11:12  8    AND CITY BUILDINGS PERMITS OFFICES, WHEN SOMEONE WOULD GO TO GET A

11:12  9    BUILDING PERMIT OR SUCH THEY WOULD REFER THEM TO THE LEVEE

11:12  10   DISTRICT.

11:12  11          WE ALSO HAD PEOPLE OUT IN THE FIELD AND LEVEE DISTRICTS

11:13  12   HAVE POLICE OFFICERS OUT IN THE FIELD.  IF THEY SEE ANYTHING GOING

11:13  13   ON, THEY CAN STOP THEM FOLKS AND SAY, "HEY, YOU KNOW, WHAT'S

11:13  14   HAPPENING?"  AND WE REALLY DIDN'T HAVE A PROBLEM VERY MUCH WITH

11:13  15   THAT.  SO AS SUCH, WE JUST NEVER DID PUBLISH ANYTHING.

11:13  16   Q.  I WOULD LIKE TO BRING UP JX 1260, PAGES 12 THROUGH 13.  AND I

11:13  17   BELIEVE YOU TESTIFIED THAT THIS IS A LETTER REQUESTING A PERMIT; IS

11:13  18   THAT CORRECT?

11:13  19   A.  YES, IT APPEARS TO BE, YES.

11:14  20   Q.  NOW, UP AT THE TOP, IT'S ACTUALLY CUT OFF, BUT YOU CAN SEE

11:14  21   BRIAN -- ON THE FIRST PAGE BRIAN AND GENEVA.  DO YOU KNOW WHO THOSE

11:14  22   PEOPLE ARE?

11:14  23   A.  YES.  BRIAN WORKED FOR ME, WOULD HAVE BEEN BRIAN KELLER IN THE

11:14  24   COMPLETED WORKS OFFICE; AND GENEVA GRILLE WAS THE CHIEF ENGINEER

11:14  25   FOR DOTD.

11:14  1   Q.  WHAT DOES THE CORPS DO WITH A LETTER LIKE THIS?

11:14  2   A.  WE RECEIVE IT IN THE OPERATIONS DIVISION AND THEN WE SEND A

11:14  3   MEMO TO ENGINEERING FOR REVIEW AND EVALUATION.  IT WOULD THEN GO

11:14  4   THROUGHOUT THE VARIOUS OFFICES AND SECTIONS OF ENGINEERING

11:14  5   DIVISION, THEY, IN TURN, WOULD WRITE BACK TO US.  IF THEY HAD NO

11:14  6   PROBLEM, THEY WOULD TELL US, "YOU CAN GO AHEAD AND ISSUE A LETTER

11:14  7   OF NO OBJECTION."  IF THERE WAS INSUFFICIENT INFORMATION, THEY

11:14  8   WOULD TELL US THAT THEY NEEDED ADDITIONAL INFORMATION TO MAKE A

11:15  9   PROPER EVALUATION ON IT.

11:15  10  Q.  I WOULD LIKE TO GO THROUGH THOSE STEPS BIT BY BIT.  BRING UP JX

11:15  11  1260, PAGE 6.  AND CAN YOU READ THAT PARAGRAPH NO. 1.

11:15  12  A.  "FORWARDED FOR REVIEW, COMMENT, AND RETURN.  IT IS REQUESTED

11:15  13  THAT ONLY GEOTECHNICAL BRANCH AND STRUCTURES BRANCH REVIEW THIS

11:15  14  REQUEST IN ORDER TO EXPEDITE A RESPONSE."

11:15  15  Q.  AND WHAT'S THE DIFFERENCE IN REVIEW BETWEEN A GEOTECHNICAL

11:15  16  REVIEW AND A STRUCTURAL REVIEW?

11:15  17  A.  THE GEOTECHNICAL FOLKS ARE LOOKING AT THE FOUNDATION SOILS AND

11:15  18  SUCH, WHEREAS THE STRUCTURES ARE LOOKING MORE AT THE STRUCTURAL

11:15  19  INTEGRITY OF THE WALL.

11:15  20  Q.  DOWN THERE BELOW PARAGRAPH 3, 00-264, DO YOU KNOW WHAT THAT

11:16  21  NUMBER IS?

11:16  22  A.  THAT'S A REVIEW -- THAT'S AN APPLICATION NUMBER THAT WE WOULD

11:16  23  JUST ASSIGN, THE NUMBER OF REVIEWS THAT YOU HAVE.  I THINK THAT

11:16  24  WOULD INDICATE THE YEAR 2000, 00 IS 2000, AND THIS WAS PROBABLY

11:16  25  NUMBER 264 THAT WE RECEIVED.

11:16  1    Q.  BRING UP PAGE 7 OF JX 1260.  AND IF YOU CAN HIGHLIGHT, YEAH,

11:16  2    THERE.  CAN YOU TELL THE COURT WHAT THIS DOCUMENT IS?

11:16  3    A.  THIS IS JUST RESPONSE BACK FROM OUR ENGINEERING DIVISION.  IT

11:16  4    SHOWS THE FOLKS, THE INDIVIDUALS THAT REVIEWED IT, WHAT OFFICE THEY

11:16  5    WERE IN, THE HOURS THAT THEY ARE GOING TO CHARGE TO OUR PROJECTS.

11:17  6    WE GET FUNDING IN OPERATIONS DIVISION, SO THEY'RE GOING TO ASK US

11:17  7    TO GIVE THEM MONEY FOR THE REVIEW.  SO THIS IS JUST THEIR WAY OF

11:17  8    SHOWING WHO LOOKED AT IT, FROM WHERE, HOW LONG, AND THEY SEND THAT

11:17  9    BACK TO US FOR ACCOUNTABILITY.

11:17  10   Q.  DO YOU KNOW WHO RICHARDSON IS?

11:17  11   A.  THAT WOULD HAVE BEEN JIM RICHARDSON.  HE WAS IN OUR ENGINEERING

11:17  12   DIVISION, GEOTECH BRANCH.

11:17  13   Q.  AND DO YOU KNOW -- IT LOOKS LIKE GONSKI (PHONETIC)?

11:17  14   A.  THAT WOULD BE MARK GONSKI AND HE WAS IN OUR STRUCTURES BRANCH.

11:17  15   Q.  AND LOOKING TO THE THIRD COLUMN TO THE RIGHT, THE REVIEW TIME,

11:17  16   IS A ONE-HOUR REVIEW TYPICAL FOR A PERMIT?

11:17  17   A.  IT'S STRICTLY ENGINEERING'S DETERMINATION.  IT VARIES.  IT

11:17  18   COULD BE TWO WEEKS, IT COULD BE TWO HOURS, IT VARIES DEPENDING ON

11:18  19   THE COMPLEXITY OF WHAT THEY'RE LOOKING AT.  SO THAT NUMBER COULD

11:18  20   VARY GREATLY FOR ANY GIVEN PERMIT.

11:18  21   Q.  AND IN THIS CASE, DO YOU KNOW IF MR. RICHARDSON AND GONSKI

11:18  22   REVIEWED THE TERC DOCUMENTS AT ISSUE IN THIS CASE?  DO YOU KNOW IF

11:18  23   THEY REVIEWED THE INITIAL PLANS AND SPECS FOR WGI?

11:18  24   A.  I DON'T KNOW THAT.

11:18  25   Q.  I SHOW YOU JX 1260, PAGE 5.  IS THIS THE TYPE OF MEMO THAT GOES

11:19  1   BACK TO THE OP'S DIVISION AFTER ENGINEERING REVIEW?

11:19  2   A.  YES.  THIS IS, YOU KNOW, AFTER THEIR REVIEW THEY'RE REQUESTING

11:19  3   THAT ADDITIONAL INFORMATION IS REQUIRED, AND THE SPECIFIC

11:19  4   ADDITIONAL INFORMATION THAT THEY WANT IS LISTED IN (A) AND (B).

11:19  5   Q.  WHAT DOES THE OP'S DIVISION DO WITH A MEMO LIKE THIS ONE?

11:19  6   A.  WE THEN RETURN THAT WITH THAT INFORMATION.  WE WRITE BACK TO

11:19  7   THE LEVEE DISTRICT AND THE APPLICANT, AND WE TELL THEM WE NEED

11:19  8   ADDITIONAL INFORMATION IN ORDER TO PROPERLY EVALUATE THE REQUEST;

11:19  9   AND THEN THE BALL IS BACK IN THEIR COURT TO SATISFY OUR REQUEST FOR

11:19  10  ADDITIONAL INFORMATION BEFORE THEY WOULD GET A LETTER OF NO

11:19  11  OBJECTION.

11:19  12  Q.  I SHOW YOU JX 1260, PAGE 4.  WHAT'S THE PURPOSE OF THIS

11:20  13  DOCUMENT?

11:20  14  A.  THIS IS -- ONCE WE RECEIVE THE REVISED INFORMATION, THE

11:20  15  ADDITIONAL INFORMATION THAT WE REQUEST, AS WE CAN SEE IN NO. 1,

11:20  16  WE'RE RE-FORWARDING THAT TO ENGINEERING DIVISION WITH THE NEW

11:20  17  INFORMATION THAT WAS REQUESTED FOR THEIR EVALUATION.

11:20  18  Q.  AND THE ENGINEERING REVIEW DOCUMENT WITH THE COLUMNS THAT WE

11:20  19  SAW BEFORE, IS THERE ANY WAY TO TELL ON THAT DOCUMENT WHETHER THE

11:20  20  REVIEW WAS DONE FOR THE FIRST TIME, THE FIRST ENGINEERING REVIEW OR

11:20  21  THE SECOND ENGINEERING REVIEW?  IF WE COULD BRING THAT UP.

11:20  22  A.  YEAH, I WOULD HAVE TO LOOK AT IT.

11:20  23  Q.  IT'S AT PAGE 7 OF JX 1260.  SO CAN YOU TELL WHETHER THIS WAS

11:21  24  DONE ON THE FIRST GO ROUND OR THE SECOND GO ROUND?

11:21  25  A.  NO, NOT FROM THIS YOU CANNOT.

11:21  1   Q.  I SHOW YOU JX 1260, PAGE 3, AND ASK YOU JUST TO READ THAT ONE

11:21  2   SENTENCE INTO THE RECORD.

11:21  3   A.  "WE HAVE NO ADVERSE COMMENTS REGARDING THE SUBJECT PERMIT

11:21  4   REQUEST."

11:21  5   Q.  WHAT DOES THE OP'S DIVISION THEN DO WITH THE TECHNICAL REVIEW

11:21  6   HAVING BEEN COMPLETE FROM THE ENGINEERING DIVISION?

11:21  7   A.  AT THAT POINT, WHAT THAT'S TELLING US IS THAT WE'RE OKAY TO

11:21  8   ISSUE A LETTER OF NO OBJECTION TO THE ORLEANS LEVEE DISTRICT, WHICH

11:21  9   WE WOULD DO.  WE MAY HAVE SOME STANDARD STIPULATIONS THAT WE WOULD

11:22  10  INCLUDE IN A LETTER OF NO OBJECTION, BUT BASICALLY THIS IS TELLING

11:22  11  US ENGINEERING IS SATISFIED WITH THE INFORMATION THEY HAVE RECEIVED

11:22  12  AND EVALUATED, AND THEY'RE OKAY FOR US TO APPROVE THE REQUEST.

11:22  13  Q.  AND I SHOW YOU JX 1260, PAGES 1 THROUGH 2.  I BELIEVE WE SAW

11:22  14  THIS EARLIER BEFORE.  AND YOU TESTIFIED THIS IS THE LETTER OF NO

11:22  15  OBJECTION ISSUED BY THE CORPS TO OLD; IS THAT CORRECT?

11:22  16  A.  THAT IS CORRECT.

11:22  17  Q.  AND I SEE OVER ON THE RIGHT YOUR NAME COLLETTI.  IS THAT YOU?

11:22  18  A.  THAT IS ME.

11:22  19  Q.  DID YOU REVIEW THIS LETTER OF NO OBJECTION?

11:22  20  A.  NO, I DID NOT.  THE WAY THAT'S SET UP, BRIAN KELLER INITIALED

11:22  21  FOR ME, WHICH WOULD USUALLY INDICATE I WAS OUT OF THE OFFICE OR ON

11:22  22  LEAVE OR ON INSPECTIONS OR WHATEVER, BUT HE HAD THE AUTHORITY TO

11:23  23  SIGN OFF FOR ME.

11:23  24  Q.  WHAT HAPPENS AFTER THE CORPS ISSUES A LETTER OF NO OBJECTION

11:23  25  LIKE THIS TO A LOCAL SPONSOR?

11:23  1   A.  AS YOU CAN SEE, WE COPY, FURNISH DOTD AS WELL SO THAT THEY HAVE

11:23  2   OUR COMMENTS, AND AT THAT POINT ENGINEER -- I MEAN, THE LEVEE

11:23  3   DISTRICT, ORLEANS LEVEE DISTRICT WOULD GET OUR INFORMATION.

11:23  4   GENERALLY, WHAT THEY WOULD DO IS ISSUE THEIR PERMIT WITH THE

11:23  5   STIPULATIONS THAT WE HAVE INCLUDED SO THAT IT'S AN INTEGRAL PART OF

11:23  6   THEIR PERMIT.  THE DOTD WOULD BE DOING A SIMILAR-TYPE OF EVALUATION

11:23  7   THAT THE CORPS WOULD.  THEY WOULD LOOK AT IT FROM THE STATE

11:23  8   STANDPOINT, AND THEY MAY HAVE SOME ADDITIONAL STIPULATIONS THAT

11:23  9   THEY WANT TO INCLUDE, SO THEY WOULD WRITE A SIMILAR TYPE OF LETTER

11:24  10  OF NO OBJECTION AS WELL.

11:24  11         AND THEN THE LEVEE DISTRICT -- IT'S UP TO THE LEVEE

11:24  12  DISTRICT AS THE PERMITTING AGENT TO ISSUE THE ACTUAL PERMIT.

11:24  13  Q.  SO THE LEVEE DISTRICT OR THE LOCAL SPONSOR HAS THE ULTIMATE

11:24  14  AUTHORITY TO ISSUE THE PERMIT?

11:24  15  A.  THAT IS CORRECT.

11:24  16  Q.  IF WORK WAS DONE WITHOUT A LOCAL SPONSOR OF THE LEVEE DISTRICT

11:24  17  ISSUING A PERMIT, WHAT COULD BE DONE ABOUT IT?

11:24  18  A.  IF THERE WAS WORK THAT WAS NOT PERMITTED, IS THAT WHAT YOU'RE

11:24  19  ASKING ME?

11:24  20  Q.  YES.

11:24  21  A.  THE LEVEE DISTRICT HAS THE AUTHORITY TO SHUTDOWN ANY OF THAT

11:24  22  WORK.  THEY HAVE ENFORCEMENT AUTHORITY FOR ANY TYPES OF PERMIT

11:24  23  ACTIONS, WHETHER IT WAS NO PERMIT OR WHETHER THEY WERE DOING

11:24  24  SOMETHING BEYOND WHAT THEY WERE ALREADY PERMITTED TO DO.  THE LEVEE

11:24  25  DISTRICT DOES HAVE THAT ENFORCEMENT AUTHORITY.

11:24  1    Q.  IS THE PROCESS THAT WE'VE JUST DESCRIBED, THE PERMIT REVIEW

11:24  2    PROCESS, IS THAT USED IF THE CORPS ITSELF IS DOING WORK ON THE

11:25  3    FLOODWALL?

11:25  4    A.  NO, IT'S A DIFFERENT TYPE OF PROCESS.  WE DON'T HAVE A PERMIT

11:25  5    FOR CORPS WORK THAT WE OURSELVES DO.  WE DO HAVE HIRED LABOR UNITS

11:25  6    THAT DO WORK OR CORPS CONTRACTORS THAT ARE DOING WORK ON OUR

11:25  7    BEHALF.

11:25  8    Q.  WHY IS THAT PROCESS DIFFERENT?

11:25  9    A.  GENERALLY, BECAUSE WE'RE DEVELOPING AND WE'VE DONE ALL OF THE

11:25  10   ENGINEERING EVALUATION.  WE'VE DEVELOPED THE PLANS AND SPECS AND

11:25  11   EVERYTHING, SO ALLS WE GET IN THOSE TYPES OF CASES IS A RIGHT OF

11:25  12   ENTRY FROM THE LANDOWNERS TO DO THE WORK.  WE ESSENTIALLY TAKE OVER

11:25  13   THAT PIECE OF LAND TO DO THAT WORK IN THERE.

11:25  14   Q.  WHO IN THE CORPS HANDLES GETTING THIS RIGHT OF ENTRY?

11:25  15   A.  THAT'S REAL ESTATE DIVISION.

11:25  16   Q.  AND ARE YOU FAMILIAR WITH THAT PROCESS?

11:25  17   A.  I JUST KNOW THAT THEY WRITE A LETTER TO THE LANDOWNERS

11:25  18   REQUESTING IT.  I DON'T WORK -- IN OPERATIONS WE DON'T WORK WITH

11:26  19   REAL ESTATE VERY MUCH.

11:26  20   Q.  DO YOU KNOW WHY THE PERMIT APPLICATION PROCESS WAS USED FOR

11:26  21   WGI'S WORK IN THE EBIA?

11:26  22   A.  NO, I DON'T.

11:26  23   Q.  WAS A PERMIT NECESSARY?

11:26  24   A.  NO, IT WAS NOT.

11:26  25         MR. BRUNO:  OBJECTION, YOUR HONOR.  THAT'S NOT WITHIN THE

11:26  1   PURVIEW OF THIS WITNESS.  THAT'S A DECISION MADE BY OLD --

11:26  2          THE COURT:  THE COURT WILL MAKE THAT ULTIMATE DECISION,

11:26  3   THE COURT'S READ THE CONTRACTS.

11:26  4          MR. BRUNO:  NO, I MEANT, NOT THE CONTRACT.  THIS IS

11:26  5   RELATIVE TO --

11:26  6          THE COURT:  I UNDERSTAND.  THE QUESTION WAS:  DID THEY

11:26  7   HAVE TO GO THROUGH A PERMIT.

11:26  8          MR. BRUNO:  RIGHT.  AND MY POINT IS, MY OBJECTION IS

11:26  9   THAT'S AN OLD DETERMINATION, NOT A CORPS DETERMINATION.

11:26  10         THE COURT:  THE OBJECTION IS NOTED AND OVERRULED.  GO

11:26  11  AHEAD.

11:26  12  BY MR. WOODCOCK:

11:26  13  Q.  IN YOUR TESTIMONY WITH BRUNO, YOU TALKED ABOUT INSPECTING

11:26  14  COMPLETED WORK AND YOU DEFINED COMPLETED WORKS FOR THE COURT.

11:26  15  A.  THAT'S COMPLETED PROJECTS WHERE THE CORPS HAD NO ADDITIONAL

11:27  16  PLANS TO DO ANY ADDITIONAL WORK ON THAT SECTION OF THE FEDERAL

11:27  17  PROJECT.  IT THEN BECOMES THE RESPONSIBILITY OF THE LOCAL SPONSOR,

11:27  18  IN THIS CASE THE ORLEANS LEVEE DISTRICT, TO OPERATE, MAINTAIN IT,

11:27  19  PROTECT IT, REPAIR IT IF NECESSARY.

11:27  20  Q.  I SHOW YOU DM-1001, PAGES 1 AND 2.  AND I DRAW YOUR ATTENTION

11:27  21  ON THE SECOND PAGE TO AT THE TOP (B)(1) WHERE IT SAYS, "THE

11:27  22  SUPERINTENDENT SHALL PROVIDE AT ALL TIMES SUCH MAINTENANCE AS MAY

11:27  23  BE REQUIRED TO ENSURE SERVICEABILITY OF THE STRUCTURES IN TIME OF

11:27  24  FLOODING."  WHO IS THE SUPERINTENDENT?

11:27  25  A.  SUPERINTENDENT IS THE LEVEE DISTRICT.

11:27  1   Q.  AND DOES THIS REGULATION DEFINE SUPERINTENDENT AS WELL?

11:28  2   A.  EXCUSE ME?

11:28  3   Q.  DOES THIS REGULATION DEFINE WHO THE SUPERINTENDENT IS?

11:28  4   A.  YES, IT SHOULD.  AT THE BEGINNING OF THE REGULATION SOMEWHERE

11:28  5   IT SAYS THAT -- IT DEFINES IT.  IT SHOULD BE IN THE OPENING -- BOY,

11:28  6   THAT'S TOO SMALL.  IN THE GENERAL SECTION SOMEWHERE.  IT'S WAY TOO

11:28  7   SMALL.

11:28  8   Q.  YOU HAVE BETTER EYES THAN I DO.

11:28  9           THE COURT:  IT'S NO. 2.

11:28  10          MR. WOODCOCK:  IT'S NO. 2 ON PAGE 1.

11:28  11  BY MR. WOODCOCK:

11:28  12  Q.  SO WHO HAD RESPONSIBILITY AT THE TIME OF HURRICANE KATRINA FOR

11:28  13  THE OPERATION AND MAINTENANCE OF THE EBIA FLOODWALLS?

11:28  14  A.  THE ORLEANS LEVEE DISTRICT.

11:28  15  Q.  AT THE TIME -- NOW, DOES THE CORPS HAVE ANY OBLIGATIONS TO

11:29  16  INSPECT THE COMPLETED STRUCTURES?

11:29  17  A.  YES.  BY REGULATIONS WE ARE REQUIRED TO AT LEAST CONDUCT AN

11:29  18  ANNUAL O&M, AS WE CALL IT, AN O&M COMPLIANCE INSPECTION.  IT'S A

11:29  19  MULTI-AGENCY INSPECTION THAT INCLUDES AT MINIMUM THE CORPS, DOTD,

11:29  20  AND THE LEVEE DISTRICT.  WE OFTEN HAD SEVERAL OTHERS, PARTICULARLY

11:29  21  IN THE ORLEANS GROUP, WE HAD THE PORT OF NEW ORLEANS, WE HAD THE

11:29  22  CITY EMERGENCY MANAGEMENT FOLKS.  WE OFTEN HAD SOMEONE FROM THE

11:29  23  COAST GUARD AS WELL BECAUSE THERE WERE SO MANY STAKEHOLDERS

11:29  24  INVOLVED.

11:29  25          BUT THAT, YOU KNOW, AS I SAID, BY REGULATION WE HAVE ONE

11:29  1   ANNUAL O&M COMPLIANCE, BUT THERE'S INSPECTIONS THAT ARE BEING

11:29  2   CONDUCTED THROUGHOUT THE YEAR.

11:29  3   Q.  HOW MANY MILES OF COMPLETED WORKS DID YOU HAVE TO INSPECT, DID

11:30  4   YOUR DIVISION HAVE TO INSPECT ANNUALLY?

11:30  5   A.  OUR OFFICE WAS RESPONSIBLE FOR ALMOST 1,300 MILES, AND SOME OF

11:30  6   THAT WAS HURRICANE LEVEES AND FLOODWALLS AND SOME OF THAT IS -- THE

11:30  7   MAJORITY OF THAT IS THE MISSISSIPPI RIVER AND TRIBUTARIES PROJECT.

11:30  8   Q.  WHAT ARE YOU ACTUALLY LOOKING FOR WHEN YOU GO ON THESE

11:30  9   INSPECTIONS?

11:30 10   A.  WE'RE OUT THERE TO OVERSEE THE MAINTENANCE THAT'S BEING

11:30 11   PERFORMED BY THE LEVEE DISTRICT - THEY'RE CUTTING THE GRASS, ARE

11:30 12   THEY REPAIRING EROSION, ARE THEY FILLING UP BURROW HOLES FROM

11:30 13   ARMADILLOS OR -- WELL, IN ORLEANS CASE, HOGS, WILD HOGS DID A LOT

11:30 14   OF DAMAGE.  WE'RE LOOKING FOR GRAFFITI, WE'RE LOOKING FOR RUST ON

11:30 15   GATES, THINGS OF THAT SORT.  JUST OVERALL GENERAL MAINTENANCE

11:30 16   REQUIREMENTS THAT YOU CAN VISUALLY SEE.  WE'RE NOT DOING ANY TYPE

11:31 17   OF SUBSURFACE INVESTIGATIONS, AND WE'RE NOT DOING ELEVATION SURVEYS

11:31 18   OR ANYTHING LIKE THAT SORT.

11:31 19   Q.  IN YOUR ROLE OVERSEEING THE OVER 1,300 MILES OF COMPLETED WORKS

11:31 20   IN THE NEW ORLEANS DISTRICT, BEFORE KATRINA HAD YOU HAD ANY REPORTS

11:31 21   OF EROSION OR SEEPAGE ISSUES OR PIPING AT ANY OF THOSE LEVEES?

11:31 22   A.  OH, SURE.  YOU KNOW, PARTICULARLY DURING HIGH WATER YOU GET

11:31 23   PLENTY OF REPORTS IN EACH AREA AND EACH AREA IS INDEPENDENTLY

11:31 24   LOOKED AT, WE CALL IT A SITE SPECIFIC INVESTIGATION.  WE GENERALLY

11:31 25   DO THAT WITH THE GEO TECH FOLKS FROM THE CORPS ALONG WITH AN

11:31  1    OPERATIONS PERSON, WE INVITE THE LEVEE DISTRICTS AS WELL AS DOTD TO

11:31  2    PARTICIPATE IN THAT.  HOWEVER, THEY'RE DEPENDING REALLY ON OUR

11:32  3    EVALUATION TO GIVE THEM GUIDANCE AS TO WHAT NEEDS TO BE DONE, IF

11:32  4    ANYTHING.

11:32  5    Q.  HAVE YOU RECEIVED ANY REPORTS OF SEEPAGE ISSUES IN THE EBIA?

11:32  6    A.  I DON'T RECALL ANY, NO.

11:32  7              MR. WOODCOCK:  JUST ONE MOMENT, YOUR HONOR.

11:32  8              THE COURT:  SURE.  IF YOU NEED TO CONSULT WITH COUNSEL.

11:32  9              MR. WOODCOCK:  JUST A COUPLE MORE QUESTIONS.

11:32  10   BY MR. WOODCOCK:

11:32  11   Q.  I BELIEVE YOU TESTIFIED ON, WITH MR. BRUNO THAT YOU'VE NEVER

11:32  12   SEEN THE TERC UNTIL AFTER YOUR -- YOU DIDN'T EVEN KNOW WHAT A TERC

11:33  13   WAS UNTIL AFTER YOUR DEPOSITION; IS THAT CORRECT?

11:33  14   A.  THAT IS CORRECT.

11:33  15   Q.  AND HAVE YOU EVER SEEN ANY OF THE DOCUMENTS REGARDING THE TERC

11:33  16   THAT'S AT ISSUE IN THIS CASE?

11:33  17   A.  THE ONLY THING I SAW WAS WHAT WAS IN THOSE DOCUMENTS THAT WERE

11:33  18   PRESENTED IN THAT REQUEST, THAT PERMIT REQUEST, THAT'S THE ONLY

11:33  19   THING I'VE SEEN ON THAT.

11:33  20             MR. WOODCOCK:  THANK YOU.

11:33  21             THE COURT:  THANK YOU, SIR.

11:33  22             MS. CRONIN:  I HAVE JUST A COUPLE OF QUESTIONS, YOUR

11:33  23   HONOR.

11:33  24             THE COURT:  YES.

11:33  25                         CROSS-EXAMINATION

11:33  1    BY MS. CRONIN:

11:33  2    Q.  GOOD MORNING, MR. COLLETTI.

11:33  3    A.  GOOD MORNING.

11:33  4    Q.  I AM JULIA CRONIN, I AM WITH JONES DAY, AND I REPRESENT

11:33  5    WASHINGTON GROUP, AND I THINK WE'VE SPOKEN ON A COUPLE OF PRIOR

11:33  6    OCCASIONS.

11:33  7    A.  YES, MA'AM.

11:33  8    Q.  I JUST HAVE A COUPLE MORE QUESTIONS FOR YOU.  IF YOU PUT UP

11:33  9    JOINT EXHIBIT 1260, PLEASE, AT PAGE 0022.  CAN YOU SEE THAT?

11:33  10              THE COURT:  IF YOU CAN BLOW IT UP A LITTLE BIT.

11:34  11              THE WITNESS:  YOU'LL HAVE TO BLOW IT UP, I HAVE TO READ

11:34  12   IT.

11:34  13              THE COURT:  THERE YOU GO, THAT'S A LOT BETTER.

11:34  14   BY MS. CRONIN:

11:34  15   Q.  MR. COLLETTI, MR. BRUNO ASKED YOU WHETHER THE PERMITTING AGENCY

11:34  16   CAN TELL FROM THIS DOCUMENT WHETHER ANY ITEMS ARE UNDERGROUND.

11:34  17   DOES THE OLD ACTUALLY DO A TECHNICAL ANALYSIS OF A THIRD PARTY

11:34  18   PERMIT APPLICATION?

11:34  19   A.  THEY LOOK AT IT, BUT THEY, YOU KNOW, THEY GENERALLY RELY ON THE

11:34  20   CORPS OF ENGINEERS AND DOTD.  MOST LEVEE DISTRICTS DO NOT HAVE

11:34  21   ENGINEERS THAT WORK FOR THEM, SO THEY RELY HEAVILY UPON THE FEDERAL

11:34  22   ADVICE THAT WE GIVE THEM AND THE STATE ADVICE THAT DOTD GIVES THEM.

11:34  23   Q.  AND IF THE CORPS -- COULD THE CORPS -- EXCUSE ME.  COULD THE

11:34  24   CORPS IN DOING THE TECHNICAL ANALYSIS OF A THIRD-PARTY APPLICATION

11:34  25   REQUEST ADDITIONAL INFORMATION IF THE CORPS DIDN'T THINK THEY HAD

11:34   1    ADEQUATE INFORMATION TO COMPLETE THEIR ANALYSIS?

11:34   2    A.  ABSOLUTELY.  DO IT ALL THE TIME.

11:34   3    Q.  AND IF YOU LOOK AT PAGE 8, WOULD THIS BE CONSISTENT WITH THE

11:35   4    CORPS' ABILITY TO REQUEST ADDITIONAL INFORMATION IF THEY REQUIRED

11:35   5    IT?

11:35   6    A.  WHICH --

11:35   7            MS. CRONIN:  I'M SORRY, IT HASN'T COME UP YET.

11:35   8            THE COURT:  WHAT ARE WE LOOKING AT?

11:35   9            MS. CRONIN:  WOULD HIS RESPONSE BE CONSISTENT WITH THE

11:35  10    CORPS' ABILITY TO REQUEST ADDITIONAL INFORMATION IF THE CORPS

11:35  11    REQUESTED IT.

11:35  12            THE WITNESS:  YES.  THIS IS THE RESPONSE, THIS WOULD BE

11:35  13    THE RESPONSE THAT THEY WOULD COME BACK WITH SAYING HERE IS THE

11:35  14    ADDITIONAL INFORMATION YOU REQUESTED FOR FURTHER REVIEW.

11:35  15    BY MS. CRONIN:

11:35  16    Q.  WHAT WOULD HAPPEN IF THE CORPS CONTRACTOR'S ORIGINAL PLANS AS

11:35  17    REVIEWED BY THE CORPS CHANGED THROUGHOUT THE COURSE OF THE PROJECT?

11:35  18    A.  THE CONTRACTING OFFICER REPRESENTATIVE AND PROJECT ENGINEER ON

11:35  19    SITE, THE CORPS' CONTRACTING OFFICER REPRESENTATIVE, THEY WOULD

11:36  20    THEN PRESENT THAT BACK TO ENGINEERING DIVISION TO DETERMINE IF

11:36  21    THERE'S ADDITIONAL EVALUATION REQUIRED.

11:36  22    Q.  AND JUST ONE LAST QUESTION, MR. COLLETTI.  HAD WGI RECEIVED A

11:36  23    FORMAL PERMIT FROM THE OLD, WOULD IT HAVE TRIGGERED ANY ADDITIONAL

11:36  24    ENGINEERING ANALYSIS BEYOND THAT WHICH WAS ALREADY DONE?

11:36  25    A.  NO.  NOT THAT I AM AWARE OF.

```
11:36   1              MS. CRONIN:  THANK YOU.

11:36   2              THE COURT:  THANK YOU.  MR. BRUNO.

11:36   3              MR. BRUNO:  YES, I HAVE A FEW TRIGGERED BY THE

11:36   4    CROSS-EXAMINATION OF OPPOSING COUNSEL.

11:36   5                        REDIRECT EXAMINATION

11:36   6    BY MR. BRUNO:

11:36   7    Q.  LET'S CALL UP, IF YOU DON'T MIND, JX 1260-008, WE JUST LOOKED

11:37   8    AT THIS, THIS IS THE RESPONSE BY MR. O'CONNOR TO THE REQUEST FOR

11:37   9    ADDITIONAL INFORMATION BY THE CORPS.  AND IT'S -- GO THE TO NEXT

11:37  10    PAGE.  I'M SORRY, I HAVE THE WRONG PAGE.  I MEANT TO CALL UP JX

11:37  11    1260-13 -- NO, I'M SORRY, WRONG AGAIN.  THE JX 01260-0014.  I HAVE

11:38  12    A DIFFERENT -- JX 1260-14 IS HERE WHAT I'VE GOT.

11:38  13              THE LAW CLERK:  MR. BRUNO, ARE YOU LOOKING FOR THIS

11:38  14    FOLDOUT?  THIS IS WHAT THE COURT HAS BEEN GIVEN AS 14.

11:38  15              MR. BRUNO:  THAT'S WHAT I HAD HOPED TO PULL UP, SO I'M

11:38  16    SORRY, JUDGE.

11:38  17              THE COURT:  WHAT'S THE EXHIBIT NUMBER ON THAT?

11:38  18              MR. BRUNO:  IT'S 14, THE RIGHT ONE, THE ONE I WOULD LIKE.

11:38  19    I AM NOT SURE HOW -- IN ANY CASE, MAY I SHOW THAT TO THE WITNESS

11:38  20    REAL QUICK?

11:38  21              THE LAW CLERK:  SURE.

11:38  22              MR. BRUNO:  I DON'T WANT TO BELABOR THIS THING.

11:38  23              THE COURT:  SHOW IT TO OPPOSING COUNSEL AS WELL.

11:38  24              MR. WOODCOCK:  JUST SO THE RECORD IS CLEAR, THAT'S

11:38  25    DIVIDED INTO A NUMBER OF PAGES BECAUSE IT'S TOO BIG TO FIT ON ONE.
```

11:39  1          THE COURT:  ABSOLUTELY.  I UNDERSTAND IT'S A COMPOSITE.

11:39  2          MR. BRUNO:  BUT MY VERSION WAS A FULL PAGE THAT'S WHY I

11:39  3  AM CONFUSED, THAT'S OKAY.  THE POINT IS -- THIS IS ACTUALLY 14C TO

11:39  4  BE TECHNICALLY CORRECT.

11:39  5          MS. CRONIN:  MR. BRUNO, WE HAVE THE CORRECT PAGE IN THE

11:39  6  SYSTEM IT YOU WOULD LIKE TO PUT IT ON THE SCREEN.  WE HAVE THIS

11:39  7  PAGE IN THE SYSTEM IF YOU WOULD LIKE TO PUT IT ON THE SCREEN.

11:39  8          MR. BRUNO:  THE 14 ONE?  IT'S WITH THE SAME NUMBER.

11:39  9          MS. CRONIN:  YES.

11:39  10          MR. BRUNO:  WE APOLOGIZE, YOUR HONOR, PLEASE PUT IT UP.

11:39  11  BUT THE LARGER QUESTION, BILL, IS SAME NUMBER, TWO DIFFERENT

11:39  12  DOCUMENTS, THAT TROUBLES ME, THAT'S ALL AS AN ASIDE.

11:39  13          THE COURT:  WE CAN FIX THAT.

11:39  14          MR. BRUNO:  ANOTHER DAY.

11:39  15          THE COURT:  BUT THANK YOU, COUNSEL, FOR YOUR COOPERATION

11:39  16  THE COURT APPRECIATES IT.

11:39  17  BY MR. BRUNO:

11:39  18  Q.  SO THIS IS A DRAWING AND THERE ARE SOME THINGS IN RED ON THERE,

11:39  19  CORRECT?

11:39  20  A.  YES.

11:39  21  Q.  LET'S GO BACK TO JX 1260-005.  OKAY.  IT SAYS THERE:  "THE

11:40  22  FOLLOWING COMMENTS SHOULD BE RESOLVED AND THE PERMIT REQUEST

11:40  23  RESUBMITTED FOR OUR REVIEW.  THE DETAILS FOR THE UTILITY CROSSINGS

11:40  24  AT THE FLOOD GATES SHALL BE SUBMITTED --"

11:40  25          THE COURT:  FLOODWALL.

11:40   1   BY MR. BRUNO:

11:40   2   Q.  "FLOODWALL, MINOR COMMENTS IN RED ARE SHOWN IN FIGURE 1-1 AND

11:40   3   FIGURE 1.  OF COURSE HERE ARE, YOU HAVE IN FRONT OF YOU, THE RED

11:40   4   COMMENTS.  THEY'RE VERY SMALL, RIGHT?

11:40   5   A.  YES.

11:40   6   Q.  SO ALL THEY WANTED WAS A FEW LITTLE THINGS.  AND I ASK THIS

11:40   7   BECAUSE IT'S NOT LIKELY THAT THESE DRAWINGS WOULD HAVE BEEN

11:40   8   RESUBMITTED TO GEO TECH AND STRUCTURES WHEN THE NEW INFORMATION

11:40   9   CAME BACK; ISN'T THAT TRUE?

11:40   10  A.  YOU SAID NOT LIKELY?  THEY WOULD DEFINITELY GO BACK TO

11:40   11  ENGINEERING DIVISION.

11:40   12  Q.  NO, I UNDERSTAND.  BUT THERE'S NO NEED FOR GEO TECH TO LOOK AT

11:41   13  THIS, THIS IS JUST ONE OF THE TWO WHO NEEDS TO SEE THIS

11:41   14  INFORMATION?

11:41   15  A.  YOU'RE PROBABLY CORRECT BUT OP'S DIDN'T GET TO MAKE THAT

11:41   16  CHOICE.

11:41   17  Q.  NO, I AM NOT SAYING THAT.  I'M SAYING WITH REGARD TO THE HOUR

11:41   18  BUSINESS, THERE IS NO OTHER SHEET ON HERE THAT REFLECTS TIME SPENT

11:41   19  REVIEWING WHAT MR. O'CONNOR SENT BACK, RIGHT, IT'S LIKELY IT WAS

11:41   20  VERY BRIEF, CORRECT?

11:41   21  A.  MOST LIKELY, YES.

11:41   22  Q.  SO IT'S LIKELY THE ONE HOUR SPENT BY GEO TECH AND STRUCTURES

11:41   23  WAS SPENT ON THE REVIEW OF THE ORIGINAL APPLICATION; ISN'T THAT

11:41   24  TRUE?

11:41   25          MR. WOODCOCK:  OBJECTION, CALLS FOR SPECULATION.

11:41   1          THE COURT:  IT IS CERTAINLY SPECULATION, BUT IF HE HAS --

11:41   2   UNLESS IT'S TO HIS PERSONAL KNOWLEDGE.

11:41   3          THE WITNESS:  NO, I DON'T, I DON'T KNOW WHAT ENGINEER

11:41   4   DIVISION.

11:41   5          THE COURT:  HE SAID HE DOESN'T KNOW.

11:41   6   BY MR. BRUNO:

11:41   7   Q.  WOULD YOU AGREE WITH ME THAT ONE HOUR IS NOT ENOUGH TIME TO

11:41   8   EVALUATE 100 AND SOME ODD HOWEVER NUMBER OF STRUCTURES THERE WERE

11:41   9   ON THAT IF, IF THE ENGINEERING DEPARTMENT HAD KNOWN THAT THERE WERE

11:41   10  GOING TO BE HOLES?

11:42   11         MR. WOODCOCK:  SAME OBJECTION, YOUR HONOR, CALLS FOR

11:42   12  SPECULATION.

11:42   13         MR. BRUNO:  DON'T KNOW?

11:42   14         THE COURT:  I AM GOING TO LET HIM ANSWER THE QUESTION.

11:42   15         THE WITNESS:  DON'T KNOW, NO.

11:42   16         THE COURT:  HE DOESN'T KNOW, SO.  THAT'S A PERFECTLY GOOD

11:42   17  ANSWER.

11:42   18  BY MR. BRUNO:

11:42   19  Q.  LET'S CALL UP THIS CFR THAT COUNSEL REFERRED YOU TO A MOMENT

11:42   20  AGO.  WHICH IS DX DM-1001-0001.  DO WE HAVE THAT IN OUR SYSTEM?

11:42   21  MAY I ASK YOU TO PLEASE PUT THAT UP, PLEASE?  THE DX DM-1001-0001.

11:43   22  BLOW UP THE TOP PART.

11:43   23         NOW, MR. COLLETTI, YOU WERE ASKED SOME QUESTIONS ABOUT

11:43   24  THIS REGULATION, RIGHT?

11:43   25  A.  YES, SIR.

11:43   1   Q.  THERE'S NOTHING IN THIS REGULATION THAT TALKS ABOUT PERMITS, IS

11:43   2   THERE?

11:43   3   A.  ACTUALLY THERE IS.

11:43   4   Q.  WHERE IS THAT?

11:43   5   A.  IT SHOULD BE SOMEWHERE IN, WHERE IT TALKS ABOUT NO ENCROACHMENT

11:43   6   UPON THE RIGHTS OF WAY.

11:43   7   Q.  NO. 4?

11:43   8   A.  THAT WILL ADVERSELY IMPACT, NO. 4 AND NO. 5.  "NO ENCROACHMENT

11:43   9   OR TRESPASS WHICH WILL ADVERSELY AFFECT THE EFFICIENT OPERATION

11:44   10  MAINTENANCE --" IT'S MOVING.  SHALL BE PERMITS UPON THE RIGHTS OF

11:44   11  WAY.  AND THEN IN NO. 5 WHERE WE SAY, "NO IMPROVEMENT SHALL BE

11:44   12  PASSED OVER, UNDER, OR THROUGH THE WALLS ... OR IMPROVED CHANNELS

11:44   13  OR FLOODWAYS NOR SHALL ANY EXCAVATION OR CONSTRUCTION BE PERMITTED

11:44   14  WITHIN THE LIMITS OF THE PROJECT RIGHT OF WAY, NOR SHALL ANY CHANGE

11:44   15  BE MADE IN ANY FEATURED WORKS WITHOUT PRIOR DETERMINATION BY THE

11:44   16  DISTRICT ENGINEER, DEPARTMENT OF THE ARMY OR HIS AUTHORIZED

11:44   17  REPRESENTATIVES IN THAT CASE."  THAT'S WHERE THE PERMITTING COMES

11:44   18  IN.

11:44   19  Q.  THAT'S WHAT I WAS CONFUSED BY BECAUSE ALSO, ME READING THE

11:44   20  ENGLISH LANGUAGE, IT ALSO COULD SIMPLY MEAN YOU SHOULDN'T ALLOW

11:44   21  THIS TO HAPPEN; IN OTHER WORDS, IT DOESN'T REFER SPECIFICALLY TO

11:44   22  THE ISSUANCE OF A THING CALLED A PERMIT, IT JUST SAYS YOU SHOULDN'T

11:44   23  PERMIT THIS KIND OF ACTIVITY.

11:44   24  A.  THAT'S NOT THE WAY WE INTERPRET THAT.  BECAUSE THERE ARE ACTUAL

11:45   25  ENCROACHMENTS THAT WE DO PERMIT, FENCES AND PIPELINES AND RAMPS,

11:45  1    AND YOU NAME IT, THERE'S ALL TYPES OF ACTIVITIES THAT ARE

11:45  2    PERMITTED.

11:45  3    Q.  I UNDERSTAND.  BUT MY PROBLEM IS IS THAT YOU'RE NOT ISSUING THE

11:45  4    PERMIT, THAT'S BEING ISSUED BY SOMEBODY ELSE.  SO I'M CONFUSED --

11:45  5    A.  YES.

11:45  6    Q.  -- ABOUT HOW THIS REGULATION ADDRESSES WHAT THE OLD HAS TO DO

11:45  7    VIS-À-VIS A PERMIT.  UNLESS I AM MISSING SOMETHING, THIS ADDRESSES

11:45  8    SOMETHING THAT YOU, THE CORPS OF ENGINEERS, HAS TO DO?

11:45  9    A.  WELL, IN NO. 2 THERE WHERE WE'RE DELEGATING THAT O&M

11:45  10   RESPONSIBILITY AND THAT PROTECTION GOES IN THAT O&M RESPONSIBILITY

11:45  11   IS DELEGATED TO THE SUPERINTENDENT, WHICH IN THIS CASE IS THE OLD.

11:45  12   Q.  RIGHT, I SEE THAT.

11:45  13   A.  SO THE PERMITTING ACTIONS FOR ALL OF THIS, FOR THE LEVEE'S

11:46  14   PORTION OF IT, THE LAND PORTION OF IT LIES WITH THE LEVEE

11:46  15   DISTRICTS.

11:46  16   Q.  OKAY.  I GOT THAT.  BUT WHAT I AM SAYING TO YOU IS, THAT'S

11:46  17   NO. 2, NO. 4 IS A DIFFERENT NUMBER.  NO. 4 SAYS SOMETHING ELSE.

11:46  18   NO. 2 SAYS WHAT IT SAYS; IT SIMPLY SAYS IN NO. 4, NO ENCROACHMENT

11:46  19   OR TRESPASS WHICH WILL ADVERSELY AFFECT THE OPERATION, BLAH, BLAH,

11:46  20   BLAH, YOU SHOULDN'T ALLOW THAT TO OCCUR.  SO IT'S NOT LIMITED IN

11:46  21   ANY RESPECT TO THE ISSUANCE OR NON-ISSUANCE OF A PERMIT, IT'S MORE

11:46  22   BROAD THAN THAT, ISN'T IT?

11:46  23          MS. CRONIN:  YOUR HONOR, I THINK I AM GOING TO OBJECT

11:46  24   BASED ON --

11:46  25          THE COURT:  I AM GOING TO SUSTAIN THE OBJECTION.

11:46  1          MR. BRUNO:  FAIR ENOUGH.

11:46  2          THE COURT:  AND REALLY WHAT'S, THE REAL QUESTION IS HERE

11:46  3  LET'S KEEP IN MIND WHAT EXCAVATIONS WERE DONE, WHAT WAS THE DEPTH

11:46  4  OF THE EXCAVATION, WHAT WAS THE REVIEW DONE BY THE CORPS, IF ANY,

11:46  5  FROM A GEOTECHNICAL STANDPOINT OR WGI, AND THEN WHAT AFFECT DID

11:46  6  THAT HAVE, IF ANY, UPON THE DESTRUCTION OF THE NORTH AND SOUTH

11:47  7  BREACH.

11:47  8          MR. BRUNO:  YES, JUDGE.

11:47  9          THE COURT:  AND I GUESS THE QUESTION TO THE EXTENT THAT

11:47 10  THE PERMIT IS AT ISSUE, DO YOU KNOW WHERE THE AUTHORITY IS FOR THE

11:47 11  LEVEE DISTRICT TO BE THE ENTITY TO PROVIDE PERMITS TO THIRD

11:47 12  PARTIES?  IS THAT A CORPS REGULATION, IS IT A STATUTORY REGULATION?

11:47 13  IF YOU DON'T KNOW --

11:47 14          THE WITNESS:  I MEAN, WE'VE ALWAYS USED THIS REGULATION

11:47 15  AS THAT FOR WHAT THEY IMPOSE THAT PERMITTING.

11:47 16          THE COURT:  THAT'S FINE.

11:47 17          MR. BRUNO:  ONE MORE QUESTION.

11:47 18  BY MR. BRUNO:

11:47 19  Q.  NO. 5, LAST SENTENCE, IT SAYS:  "DRAWINGS OR PRINTS SHOWING

11:47 20  SUCH IMPROVEMENTS OR ALTERATIONS AS FINALLY CONSTRUCTED SHALL BE

11:47 21  FURNISHED TO THE DISTRICT ENGINEER AFTER COMPLETION OF WORK."

11:47 22  WHETHER THIS IS A PERMIT OR NOT A PERMIT, ALL I WANT TO KNOW IS DID

11:47 23  YOU GET FROM ANYBODY, DRAWINGS OR PRINTS SHOWING THE FINISHED WORK

11:47 24  THAT WAS DONE IN CONNECTION WITH THE DEMOLITION AND REMEDIATION OF

11:48 25  THE EBIA THAT WAS THE SUBJECT OF THIS PERMIT, DID YOU RECEIVE THAT?

11:48 1          MR. WOODCOCK:  OBJECTION.  IT'S NOT CLEAR AT ALL WHETHER

11:48 2  HE WOULD, HE HIMSELF WOULD RECEIVE THIS.

11:48 3          MR. BRUNO:  I'M SORRY, YOUR OFFICE.

11:48 4          THE COURT:  HE CAN TESTIFY ONLY TO HIS PERSONAL

11:48 5  KNOWLEDGE.  I WILL ALLOW HIM TO ANSWER IT IF HE KNOWS, I AM NOT

11:48 6  ASKING HIM TO GUESS, IF HE KNOWS.

11:48 7          THE WITNESS:  I HAVE NO IDEA, NO.

11:48 8  BY MR. BRUNO:

11:48 9  Q.  YOU HAVE NO IDEA EITHER WAY.

11:48 10 A.  NO.

11:48 11         MR. BRUNO:  ALL RIGHT.  THANK YOU.

11:48 12         THE COURT:  ONE OTHER QUESTION, AND NOT TO MUDDY THE

11:48 13 WATERS TOO MUCH.  BUT IN THE EVENT A SCOPE OF THE WORK IS OUTSIDE

11:48 14 THE RIGHT OF WAY, WHATEVER THE BOUNDARIES OF THE RIGHT OF WAY ARE,

11:48 15 IF IT'S A THIRD PARTY INVOLVED, NOT WGI, NOT A SUBCONTRACTOR BUT A

11:48 16 THIRD PARTY, DOES THAT THIRD PARTY STILL HAVE TO GET A PERMIT FROM

11:48 17 THE LEVEE DISTRICT, EVEN IF IT'S BEYOND THE RIGHT OF WAY, THE WORK

11:48 18 THAT THEY'RE DOING?

11:48 19         THE WITNESS:  IF IT'S WITHIN 300 FEET OF THAT LEVEE OR

11:48 20 FLOODWALL.

11:48 21         THE COURT:  AND THAT COMES FROM INTERNAL CORPS

11:49 22 GUIDELINES?

11:49 23         THE WITNESS:  IT COMES FROM THAT ADVERSE IMPACTS UPON THE

11:49 24 RIGHT OF WAY.

11:49 25         THE COURT:  ALL RIGHT.  AND THAT'S NOT A MATTER OF STATE

11:49  1   LAW I UNDERSTAND IT, IT'S A GUIDELINE TO YOUR KNOWLEDGE ESTABLISHED

11:49  2   BY THE CORPS?

11:49  3         THE WITNESS:  THAT'S CORRECT.  WE DON'T HAVE A DISTANCE

11:49  4   LIMITATION BECAUSE, JUST AS I SAID EARLIER, WITH SEISMIC SURVEYS IT

11:49  5   COULD BE 5,000 FEET AWAY.

11:49  6         THE COURT:  THAT'S TRUE.

11:49  7         MR. BRUNO:  JUST ONE FOLLOW-UP.

11:49  8         THE COURT:  I WILL LET YOU FOLLOW-UP AS WELL.

11:49  9   BY MR. BRUNO:

11:49  10  Q.  THE 300 FEET, AM I GETTING FROM WHAT YOU'RE TELLING ME THAT THE

11:49  11  300 FEET THE CORPS REGARDS AS AN ENCROACHMENT OF THE FLOODWALL

11:49  12  RIGHT OF WAY?

11:49  13  A.  IT HAS THE POTENTIAL, CERTAIN TYPES OF ACTIVITIES WITHIN THAT

11:49  14  RANGE HAS THE POTENTIAL.

11:49  15  Q.  SO IT'S NOT RELEVANT THAT YOU KNOW PRECISELY WHERE THAT RIGHT

11:49  16  OF WAY LINE IS, WHAT'S RELEVANT IS YOU KNOW WHERE THE 300 FEET IS?

11:49  17  A.  BASICALLY -- THAT'S WHY WE USE THE LEVEE OR FLOODWALL CENTER

11:49  18  LINE BECAUSE IT'S EASY TO DISCERN THAT POINT.

11:50  19        THE COURT:  I UNDERSTAND.  AND IF THERE'S ANYTHING THAT

11:50  20  PRECIPITATED, YOU CERTAINLY HAVE A RIGHT.

11:50  21        MR. WOODCOCK:  NO, YOUR HONOR.

11:50  22        THE COURT:  ALL RIGHT.  SIR, MR. BRUNO, YOU ARE FINISHED?

11:50  23        MR. BRUNO:  YES, I AM.  AND I WAS WONDERING IF YOU WANT

11:50  24  TO GET SOME LUNCH?

11:50  25        THE COURT:  WELL, MR. COLLETTI, FIRST YOU MAY STEP DOWN.

11:50  1              THE WITNESS:  THANK YOU, SIR.

11:50  2              THE COURT:  YOU'RE FREE TO GO OR FREE TO STAY.  THIS

11:50  3    WITNESS IS RELEASED, CORRECT, BY EVERYBODY?

11:50  4              MR. BRUNO:  YES.

11:50  5              THE COURT:  YOU MAY -- SO HE WOULD BE THEN RELIEVED OF

11:50  6    THE SEQUESTRATION ORDER, SO IF HE WANTS TO HAVE A GREAT AFTERNOON

11:50  7    AND NOT GO TO WORK HE CAN SIT IN HERE.  I BET HE WANTS TO LEAVE.

11:50  8    THANK YOU, MR. COLLETTI.

11:50  9              MR. WOODCOCK:  YOUR HONOR, I THINK THE SEQUESTRATION

11:50  10   ORDER IN EFFECT MIGHT BE GOOD FOR HIM.

11:50  11             MR. BRUNO:  YOU ARE ORDERED NOT TO COME BACK.

11:50  12             THE COURT:  I WOULD CERTAINLY ABIDE BY IT.  MAY I SAY,

11:50  13   IT'S NINE TO 12, WHO IS YOUR NEXT WITNESS?

11:50  14             MR. BRUNO:  MELVIN MCELWEE.

11:50  15             THE COURT:  WE WILL START AT ONE O'CLOCK.

11:51  16             MR. BRUNO:  YES, YOUR HONOR.

11:51  17             THE COURT:  SEE YOU AT ONE O'CLOCK.

11:51  18             THE DEPUTY CLERK:  ALL RISE, PLEASE.

11:51  19         (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

20

21                            *  *  *  *  *  *

22

23

24

25

REPORTER'S CERTIFICATE


     I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED
STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY
CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE
BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE
PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER.



_____

KAREN A. IBOS, CCR, RPR, CRR, RMR

OFFICIAL COURT REPORTER