```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3    ********************************************************

      IN RE:  KATRINA CANAL BREACHES
 4    CONSOLIDATED LITIGATION          DOCKET NO. 05-CV-4182
                                       NEW ORLEANS, LOUISIANA
 5    PERTAINS TO:  MRGO              FRIDAY, SEPTEMBER 14, 2012
             ARMSTRONG NO. 10-CV-866
 6

      ********************************************************
 7


 8                     DAY 3 - MORNING SESSION
                    TRANSCRIPT OF TRIAL PROCEEDINGS
 9           HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
                     UNITED STATES DISTRICT JUDGE
10


11

      APPEARANCES:
12

      FOR THE PLAINTIFF:              BRUNO & BRUNO
13                                    BY:  JOSEPH M. BRUNO, ESQ.
                                      855 BARONNE ST.
14                                    NEW ORLEANS, LA 70113

15
                                      THE ANDRY LAW FIRM
16                                    BY:  JONATHAN B. ANDRY, ESQ.
                                      610 BARONNE ST.
17                                    NEW ORLEANS, LA 70113

18
                                      BARON & BUDD
19                                    BY:  THOMAS SIMS, ESQ.
                                      3102 OAK LAWN AVE., SUITE 1100
20                                    DALLAS, TX 75219

21
                                      DEGRAVELLES, PALMINTIER,
22                                    HOLTHAUS & FRUGE
                                      BY:  MICHAEL C. PALMINTIER, ESQ.
23                                         JOSHUA M. PALMINTIER, ESQ.
                                      618 MAIN STREET
24                                    BATON ROUGE, LA 70801

25
```

```
 1
                          DOMENGEAUX, WRIGHT, ROY & EDWARDS
 2                        BY:  ELLWOOD C. STEVENS, JR., ESQ.
                               BONNIE KENDRICK, ESQ.
 3                        P. O. BOX 3668
                          556 JEFFERSON ST.
 4                        LAFAYETTE, LA 70502

 5
                          THE DUDENHEFER LAW FIRM, LLC
 6                        BY:  FRANK C. DUDENHEFER, JR., ESQ.
                          601 POYDRAS ST., SUITE 2655
 7                        NEW ORLEANS, LA 70130-6004

 8
                          FAYARD & HONEYCUTT
 9                        BY:  CALVIN C. FAYARD, JR., ESQ.
                          519 FLORIDA AVE., S.W.
10                        DENHAM SPRINGS, LA 70726

11
                          JOANEN LAW FIRM
12                        BY:  SCOTT JOANEN, ESQ.
                          4905 FRERET ST., SUITE B
13                        NEW ORLEANS, LA 70115

14
                          LEVIN, PAPANTONIO, THOMAS,
15                        MITCHELL, RAFFERTY & PROCTOR
                          BY:  MATTHEW D. SCHULTZ, ESQ.
16                        316 S. BAYLEN ST., SUITE 600
                          PENSACOLA, FL 32502
17

18                        THE TRIAL LAW FIRM PC
                          BY:  ANDREW P. OWEN
19                        800 WILTSHIRE BLVD., SUITE 500
                          LOS ANGELES, CA 90017
20

21                        J. ROBERT WARREN, II, A PLC
                          BY:  J. ROBERT WARREN, II, ESQ.
22                        1718 SHORT ST.
                          NEW ORLEANS, LA 70118
23

24

25
```

```
 1
        FOR THE DEFENDANT WASHINGTON
 2      GROUP INTERNATIONAL, INC.:        STONE PIGMAN WALTHER WITTMANN
                                          BY:  WILLIAM D. TREEBY, ESQ.
 3                                             JAMES C. GULOTTA, JR., ESQ.
                                               HEATHER S. LONIAN, ESQ
 4                                             MAGGIE A. BROUSSARD, ESQ.
                                          546 CARONDELET STREET
 5                                        NEW ORLEANS, LA 70130

 6
                                                 - AND -
 7

 8                                        JONES DAY
                                          BY:  ADRIAN WAGER-ZITO, ESQ.
 9                                             DEBRA S. CLAYMAN, ESQ.
                                               CHRISTOPHER N. THATCH, ESQ.
10                                             CHRISTOPHER R. FARRELL, ESQ.
                                               JULIA CRONIN, ESQ.
11                                             BRIAN KERWIN, ESQ.
                                          51 LOUISIANA AVENUE, N.W.
12                                        WASHINGTON, D.C. 20001

13

14
        FOR THE DEFENDANT UNITED
15      STATES OF AMERICA:               U.S. DEPARTMENT OF JUSTICE
                                          CIVIL DIVISION, TORTS BRANCH
16                                        BY:  ROBIN D. SMITH, ESQ.
                                               JAMES F. MCCONNON, JR., ESQ.
17                                             RUPERT MITSCH, ESQ.
                                               CONOR KELLS, ESQ.
18                                             JOHN A. WOODCOCK, ESQ.
                                          BENJAMIN FRANKLIN STATION
19                                        P.O. BOX 888
                                          WASHINGTON, D.C. 20044
20

21
        OFFICIAL COURT REPORTER:          KAREN A. IBOS, CCR, RPR, CRR, RMR
22                                        500 POYDRAS STREET, ROOM HB-406
                                          NEW ORLEANS, LOUISIANA 70130
23                                        (504) 589-7776

24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
        PRODUCED BY COMPUTER.
```

542

1

2                           I N D E X

3

4    WITNESSES FOR THE PLAINTIFFS:                    PAGE/LINE:

5

6    DR. JONATHAN DAVID ROGERS

7

8      VOIR DIRE EXAMINATION BY MR. SIMS           544/15

9      DIRECT EXAMINATION BY MR. SIMS              554/8

10     CROSS-EXAMINATION BY MR. MITSCH             588/6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(FRIDAY, SEPTEMBER 14, 2012)

(MORNING SESSION)


(OPEN COURT.)

09:07:18  THE DEPUTY CLERK:  COURT IS IN SESSION.  PLEASE BE SEATED.

09:07:20  THE COURT:  GOOD MORNING.

09:07:22  MR. BRUNO:  GOOD MORNING, JUDGE.

09:07:24  THE COURT:  GOOD MORNING.

09:07:25  MR. BRUNO:  LET ME BY WAY OF INFORMATION -- THIS IS NOT A

09:07:28  COMPLAINT, THIS IS NOT CONTROVERSY, THIS IS JUST INFORMATION.

09:07:30  THE COURT:  YES, SIR.

09:07:31  MR. BRUNO:  LET ME START WITH THAT.  I JUST WANT YOU TO

09:07:33  BE AWARE THAT THE DEFENDANTS HAVE KINDLY OVER THE PAST FIVE DAYS

09:07:37  PROVIDED THE PLAINTIFFS WITH BETTER MORE LEGIBLE COPIES OF THE

09:07:42  EXHIBITS, AND WE'RE WORKING EARNESTLY TO INTEGRATE ALL OF THAT INTO

09:07:46  OUR SYSTEMS.  AND I SAY THAT TO YOU NOW BECAUSE THERE MAY BE A

09:07:51  MOMENT WHERE WE MIGHT HAVE TO SAY TO A WITNESS OR THE DEFENDANT,

09:07:53  LET ME TAKE A QUICK PAUSE TO LOOK AT THE BETTER LEGIBLE COPY,

09:07:58  THAT'S ALL.

09:07:58  THE COURT:  FINE.

09:07:59  MR. BRUNO:  WITH THAT, I INTRODUCE TOM SIMS, A MEMBER OF

09:08:02  OUR TEAM, WHO WILL CALL OUR FIRST WITNESS THIS MORNING.

09:08:06  MR. SIMS:  THANK YOU, YOUR HONOR.  GOOD MORNING, YOUR

09:08:09  HONOR.

09:08:09  1          THE COURT:  GOOD MORNING.

09:08:10  2          MR. SIMS:  AT THIS TIME, THE PLAINTIFFS WILL CALL

09:08:14  3   DR. DAVID ROGERS TO THE STAND.

09:08:26  4          THE COURT:  ALL OF YOU ARE GIVING MY STAFF A GOOD

09:08:30  5   EXERCISE WORKOUT IN THE MORNING HAULING THESE BOOKS.  I'M SURE

09:08:38  6   YOU'VE HAD IT AS WELL.

09:08:39  7          THE DEPUTY CLERK:  PLEASE RAISE YOUR RIGHT HAND.

09:08:41  8      (WHEREUPON, JONATHAN DAVID ROGERS, WAS SWORN IN AND TESTIFIED

09:08:43  9        AS FOLLOWS:)

09:08:43 10          THE DEPUTY CLERK:  WOULD YOU PLEASE STATE YOUR NAME AND

09:08:44 11   SPELL IT FOR THE RECORD?

09:08:45 12          THE WITNESS:  JONATHAN DAVID ROGERS, J-O-N-A-T-H-A-N,

09:08:55 13   D-A-V-I-D, THEN R-O-G-E-R-S.

09:09:01 14                  VOIR DIRE EXAMINATION

09:09:02 15   BY MR. SIMS:

09:09:03 16   Q.  GOOD MORNING, DR. ROGERS.

09:09:04 17   A.  GOOD MORNING.

09:09:05 18   Q.  WHY DON'T WE HAVE YOU START BY TELLING THE COURT YOUR AREAS OF

09:09:08 19   EXPERTISE.

09:09:09 20   A.  GEOLOGICAL AND GEOTECHNICAL ENGINEERING.

09:09:12 21   Q.  WHAT TOPIC WILL YOU BE ADDRESSING --

09:09:17 22          MR. SIMS:  SORRY, YOUR HONOR.

09:09:31 23   BY MR. SIMS:

09:09:31 24   Q.  WHAT TOPIC WILL YOU BE ADDRESSING TODAY?

09:09:33 25   A.  MY OPINIONS REGARDING THE STANDARD OF CARE THAT MUST BE

09:09:37  1    EXERCISED WHEN EXCAVATING THE VICINITY OF FLOOD PROTECTION

09:09:41  2    STRUCTURES.

09:09:41  3    Q.  AND HAVE YOU BEEN ASKED BY THE PLAINTIFFS TO ADDRESS CAUSATION

09:09:44  4    IN THIS CASE?

09:09:45  5    A.  NO.

09:09:46  6    Q.  AND IN CONNECTION WITH YOUR REVIEW OF THE MATERIALS IN THIS

09:09:49  7    CASE, DID YOU ATTEMPT TO DISCOVER WHY THE IHNC BREACHES FAILED?

09:09:53  8    A.  NO, I DID NOT.

09:09:54  9    Q.  AND CAN YOU START OFF BY TELLING THE COURT A LITTLE BIT ABOUT

09:09:59  10   YOUR EDUCATIONAL BACKGROUND?

09:10:00  11   A.  WELL, I RECEIVED MY UNDERGRADUATE EDUCATION AT THE CALIFORNIA

09:10:06  12   STATE POLYTECHNIC UNIVERSITY UNDER MARINE CORPS PLATOON LEADER

09:10:11  13   CORPS SCHOLARSHIP, GRADUATING WITH A MAJOR IN GEOLOGY AND A MINOR

09:10:15  14   IN CIVIL ENGINEERING IN 1976.  AFTER SERVICE WITH THE MARINE CORPS,

09:10:21  15   I ATTENDED THE UNIVERSITY OF CALIFORNIA AT BERKELEY AND RECEIVED MY

09:10:26  16   MASTER OF SCIENCE WITH A MASTERS THESIS IN 1979.  AND THEN I STAYED

09:10:33  17   ON AND COMPLETED A DOCTORATE WITH A DUAL MAJOR IN GEOLOGICAL AND

09:10:38  18   GEOTECHNICAL ENGINEERING, ALSO FROM BERKELEY, GRANTED IN 1982.

09:10:43  19           MR. SIMS:  AND, YOUR HONOR, AT THIS TIME THE PLAINTIFFS

09:10:45  20   WOULD INTRODUCE DR. ROGERS RESUMÉ AND IT IS IDENTIFIED AS DX 01812.

09:10:51  21           THE COURT:  THANK YOU.  ANY OBJECTION TO THE RESUMÉ?

09:10:53  22           MR. MITSCH:  NO OBJECTION, YOUR HONOR.

09:10:56  23           MR. TREEBY:  NO, YOUR HONOR.

09:10:57  24           THE COURT:  LET IT BE ADMITTED.

09:10:59  25           MR. SIMS:  THANK YOU, YOUR HONOR.

09:11:00 1    BY MR. SIMS:

09:11:01 2    Q.  DR. ROGERS, WHAT IS GEOTECHNICAL ENGINEERING?

09:11:03 3    A.  GEOTECHNICAL ENGINEERING IS A SUBDISCIPLINE OF CIVIL

09:11:07 4    ENGINEERING, WHICH WAS ORIGINALLY CALLED SOIL MECHANICS AND

09:11:09 5    FOUNDATION ENGINEERING.  IT DEALS WITH BEHAVIOR OF THE EARTH IN A

09:11:14 6    BROAD SENSE.

09:11:14 7    Q.  AND HOW LONG HAVE YOU BEEN WORKING IN THE FIELDS OF GEOLOGICAL

09:11:18 8    AND GEOTECHNICAL ENGINEERING?

09:11:20 9    A.  SINCE 1979.

09:11:22 10   Q.  AND CAN YOU SHARE FOR US SOME OF THE EXPERIENCE YOU'VE HAD

09:11:27 11   WORKING ON LEVEE AND SOIL AND DAM INVESTIGATIONS WHERE YOU'VE

09:11:30 12   APPLIED YOUR EXPERIENCE IN THE FIELD OF GEOLOGICAL AND GEOTECHNICAL

09:11:33 13   ENGINEERING?

09:11:33 14   A.  WELL, THAT STARTED WHEN I WAS IN GRADUATE SCHOOL ACTUALLY

09:11:40 15   WORKED ON THE CONSTRUCTION AND COMPACTION RECORDS ON THE TETON DAM

09:11:46 16   FAILURE, AND THEN TRANSITIONED OVER TO TUNNEL FAILURE PROBLEMS WITH

09:11:53 17   SIDE CANYON TUNNELS ON DAMS AND HIGHWAYS.  THE FIRST LEVEE FAILURE

09:11:58 18   I WORKED ON WAS THE ALVISO SLOUGH FAILURE THAT OCCURRED IN 19 -- IT

09:12:04 19   GOT OVERTOPPED IN 1982 STORMS IN THE SAN FRANCISCO BAY AREA AND

09:12:08 20   ACTUALLY FAILED IN THE 1983 STORMS THE FOLLOWING YEAR.  THEN IN

09:12:13 21   FEBRUARY OF 1986 WE HAD A SERIES OF HEAVY STORMS IN NORTHERN

09:12:18 22   CALIFORNIA AND SOUTHERN CALIFORNIA, WORKED ON THE SAN JACINTO LEVEE

09:12:22 23   FAILURE ON THE SAN JACINTO RIVER NEAR THE TOWN OF SAN JACINTO DOWN

09:12:28 24   IN RIVERSIDE COUNTY.  THAT WAS A LOS ANGELES DISTRICT, CORPS OF

09:12:32 25   ENGINEERS LEVEE.

09:12:32  1          AND THE LINDA OLIVEHURST LEVEE FAILURE ON THE LOWER YUBA

09:12:35  2    RIVER ABOUT 55 MILES NORTH OF SACRAMENTO, WHICH WAS BUILT BY THE

09:12:39  3    SACRAMENTO DISTRICT OF THE CORPS OF ENGINEERS.  AND THAT CASE

09:12:43  4    BECAME THE PATERNO FLOOD CASE WHICH I CONTINUED WORKING ON THAT IN

09:12:48  5    THE LITIGATION THAT WENT ON FOR 15 YEARS OFF AND ON.

09:12:52  6          AND THEN IN THE EARLY 1990S WE HAD SOME SMALLER LEVEE

09:12:58  7    FAILURES I WORKED ON ON MARSH CREEK AND ON ROCK SLOUGH IN EASTERN

09:13:02  8    CONTRA COSTA COUNTY.  AND THEN 19 -- JANUARY '97 THE ARBOGA LEVEE

09:13:10  9    FAILURE ON THE FEATHER RIVER, ALSO NORTH OF SACRAMENTO.  AND THEN

09:13:16 10    JUNE 2004 THE UPPER JONES TRACT FAILURE ON MIDDLE RIVER OF THE

09:13:21 11    SAN -- ON THE JOAQUIN RIVER IN THE SAN JOAQUIN DELTA.

09:13:26 12          AND THEN 2005 THE KATRINA, HURRICANE KATRINA FAILURES

09:13:31 13    DOWN HERE.  I CAME DOWN WITH THE USGS RECONNAISSANCE GROUP

09:13:35 14    INITIALLY, AND THEN WAS AFFILIATED WITH THE NATIONAL SCIENCE

09:13:42 15    FOUNDATION TEAM IN LATE NOVEMBER OF 2005 AND WORKED WITH THEM FROM

09:13:48 16    THEN ON UNTIL WE COMPLETED OUR REPORT IN 2006.

09:13:56 17          AND THEN I WORKED ON THE MIDDLE MISSISSIPPI LEVEE

09:13:58 18    FAILURES, A NUMBER OF THEM, IN 2008 FLOODS IN IOWA, ILLINOIS, AND

09:14:04 19    MISSOURI.  AND THEN THE 2011 FLOODS ON THE MISSOURI AND MIDDLE AND

09:14:10 20    LOWER MISSISSIPPI RIVER, WHICH IS A RECORD FLOOD, WORKED ON SEVERAL

09:14:14 21    LEVEE FAILURES, LOOKING AT LEVEE FAILURES IN THAT FLOOD AS WELL.

09:14:18 22          SO ALTOGETHER I PUT UP A LIST ABOUT SIX MONTHS AGO AND IT

09:14:22 23    WAS ABOUT 44 LEVEES THAT I HAD TAKEN DETAILED LOOKS AT AND TRIED TO

09:14:27 24    FIGURE OUT WHY THEY FAILED.

09:14:29 25    Q.  AND YOU'VE ALSO INVESTIGATED DAM FAILURES; IS THAT RIGHT?

09:14:32  1    A.   YES.   THAT'S PROBABLY WHAT I AM PROBABLY MORE WELL-KNOWN FOR IN

09:14:37  2    MY PUBLICATIONS.

09:14:37  3    Q.   AND PRIOR TO ENTERING ACADEMIA, DID YOU ALSO WORK IN PRIVATE

09:14:40  4    INDUSTRY?

09:14:41  5    A.   YES.   FROM 1979 TO 2001.

09:14:47  6    Q.   AND IN CONNECTION WITH THAT WORK, DID YOU ALSO -- WERE YOU ALSO

09:14:51  7    A PARTNER AT A CONSTRUCTION MANAGEMENT FIRM?

09:14:52  8    A.   YES.   FROM 1987 TO 1998 I WAS -- WE HAD A COMPANY CALLED

09:15:00  9    ROGERS/CAULFIELD, I WAS A 50 PERCENT PARTNER AND WAS -- WE WERE

09:15:04 10    GENERAL ENGINEERING CONTRACTORS.   IT'S AN A LICENSE AND MOSTLY WHAT

09:15:08 11    WE DID WAS EXCAVATION AND GRADING WORK, EMERGENCY REPAIRS AND

09:15:14 12    PERMIT SLOPE REPAIRS, A LOT WITH USING MECHANICALLY STABILIZED

09:15:19 13    EMBANKMENT TECHNOLOGIES, SOIL REINFORCEMENT TECHNOLOGIES.

09:15:24 14    Q.   AND HAVE YOU HAD THE OPPORTUNITY TO PUBLISH REGARDING THE

09:15:26 15    SUBJECT OF FLOOD CONTROL IN NEW ORLEANS?

09:15:28 16    A.   YES.   I HAVE PUBLISHED SOME ON THAT.   IN THE MAY 2008 ISSUE OF

09:15:36 17    ASCE'S *JOURNAL OF GEOTECHNICAL AND GEOENVIRONMENTAL ENGINEERING*, I

09:15:42 18    HAD AN ARTICLE.   I WAS THE SOLE AUTHOR OF THE ARTICLE IN THERE THAT

09:15:45 19    WAS ON THE HISTORY IN THE FLOOD PROTECTION SYSTEM IN NEW ORLEANS.

09:15:48 20    Q.   AND WERE YOU ALSO ONE OF THE CONTRIBUTING AUTHORS TO THE ILIT

09:15:52 21    REPORT?

09:15:52 22    A.   YES, I WAS.   AND I WAS A CONTRIBUTING AUTHOR ON THE OTHER

09:15:55 23    ARTICLES AS WELL.   ACTUALLY, FIVE OTHER ARTICLES ON KATRINA.

09:16:00 24    Q.   IN YOUR CURRENT POSSESSION -- IN YOUR CURRENT POSITION AS A

09:16:05 25    PROFESSOR OF GEOLOGICAL ENGINEERING, CAN YOU TELL THE COURT SOME OF

09:16:08  1    THE COURSES THAT YOU TEACH?

09:16:09  2    A.  WELL, I TEACH -- MY GRADUATE CLASS IS ON THE GEOTECHNICAL

09:16:15  3    CONSTRUCTION PRACTICE, BECAUSE I GREW UP IN THE GRADING AND

09:16:17  4    EXCAVATION INDUSTRY IN LOS ANGELES COUNTY.  AND I STARTED TEACHING

09:16:25  5    COURSES FOR THE ARMY ENGINEER CAPTAINS AT NEARBY FORT LEONARD WOOD.

09:16:31  6    IT'S ABOUT 24 MILES FROM OUR CAMPUS, SO WE HAVE A PROGRAM FOR THEM

09:16:37  7    THAT I HELPED PUT TOGETHER.  IT'S A MASTER OF SCIENCE AND MILITARY

09:16:41  8    GEOLOGICAL ENGINEERING.  AND ONE OF THE COURSES I PUT TOGETHER FOR

09:16:46  9    THEM WAS THAT GEOTECHNICAL CONSTRUCTION PRACTICE COURSE.  IT

09:16:49 10    BASICALLY FOCUSES ON EXCAVATION AND GRADING, COMPACTION, SLOPE

09:16:54 11    STABILITY, PROBLEM SLOPE EROSION, THINGS LIKE THAT.  AS FAR AS I

09:17:00 12    KNOW, IT'S THE ONLY CLASS IN THE UNITED STATES THAT'S FOCUSED

09:17:04 13    SLOWLY ON THE GRADING AND EXCAVATION ISSUES AS THE PRINCIPLE

09:17:07 14    PURPOSE OF THE COURSE.

09:17:09 15    Q.  AND DO YOU ALSO TEACH A COURSE REGARDING THE EVOLUTION AND

09:17:12 16    DEVELOPMENT OF FLOOD CONTROL ENGINEERING IN THE UNITED STATES?

09:17:15 17    A.  YES.  I PUT THAT COURSE TOGETHER FOR THE CORPS OF ENGINEERS AS

09:17:19 18    WELL.  INITIALLY, TAUGHT IT IN THE ENGINEER CAPTAINS CAREER COURSE

09:17:24 19    AT FORT WOOD AND THEN ACTUALLY STOOD IT UP AS A REGULAR COURSE AT

09:17:29 20    THE UNIVERSITY; BUT BASICALLY MOST OF MY STUDENTS ARE CORPS OF

09:17:33 21    ENGINEERS ACTIVE DUTY OFFICERS, RESERVE OFFICERS, AND CIVILIAN

09:17:37 22    ENGINEERS AT THE 12 DIFFERENT CORPS DISTRICTS.

09:17:41 23    Q.  DO YOU KNOW APPROXIMATELY HOW MANY ENGINEERS FROM THE ARMY

09:17:45 24    CORPS OF ENGINEERS HAVE ATTENDED YOUR COURSES?

09:17:46 25    A.  TO DATE, ABOUT 550.

09:17:49  1    Q.  AND, DR. ROGERS, DO YOU HOLD ANY PROFESSIONAL REGISTRATIONS OR

09:17:53  2    CERTIFICATIONS?

09:17:53  3    A.  YES.  I AM A REGISTERED PROFESSIONAL ENGINEER, CIVIL

09:17:59  4    ENGINEERING, PROFESSIONAL GEOLOGIST, CERTIFIED ENGINEERING

09:18:04  5    GEOLOGIST, AND CERTIFIED HYDROGEOLOGIST, ALL BY EXAMINATION IN THE

09:18:09  6    STATE OF CALIFORNIA.

09:18:10  7    Q.  AND HOW ABOUT IN THE PAST, HAVE YOU HELD ANY OTHER PROFESSIONAL

09:18:13  8    REGISTRATIONS OR CERTIFICATIONS?

09:18:14  9    A.  YES.  I WAS PREVIOUSLY LICENSED AS A GENERAL ENGINEERING

09:18:18 10    CONTRACTOR, AS I MENTIONED PREVIOUSLY, AND AS A CIVIL AND

09:18:21 11    GEOTECHNICAL ENGINEER IN CALIFORNIA BETWEEN 1983 TO 1996.

09:18:26 12    Q.  AND YOU'RE NO LONGER A LICENSED GEOTECHNICAL ENGINEER; IS THAT

09:18:30 13    RIGHT?

09:18:30 14    A.  THAT'S CORRECT.

09:18:30 15    Q.  AND WHAT HAPPENED?

09:18:32 16    A.  WELL, WHEN I -- A FEW MONTHS AFTER I GRADUATED FROM BERKELEY, I

09:18:38 17    WAS WORKING FOR ALAN KROPP & ASSOCIATES IN BERKELEY.  THE DEADLINE

09:18:44 18    CAME UP TO APPLY FOR THE PROFESSIONAL ENGINEERS EXAM, AND HAVING

09:18:48 19    HAD SIX YEARS OF FULL-TIME GRADUATE WORK IN CIVIL ENGINEERING, I

09:18:54 20    WAS PRETTY CONFIDENT THAT I COULD SHOW THAT I HAD FIVE YEARS OF

09:18:58 21    THAT AS EXPERIENCE.  YOU CAN CLAIM FOUR YEARS FOR UNDERGRADUATE IN

09:19:02 22    CALIFORNIA AND UP TO ONE YEAR FOR GRADUATE.

09:19:04 23          AND SO WHEN I WENT IN THERE AND STARTED FILLING OUT THE

09:19:07 24    FORM, I FOUND OUT THAT ALL THEY CARED ABOUT FOR THE FOUR YEARS WAS

09:19:11 25    AN UNDERGRADUATE DEGREE IN ENGINEERING FROM AN ABET ACCREDITED

PROGRAM.  DOESN'T MATTER IF IT WAS CIVIL ENGINEERING, IT JUST HAS

TO BE AN ABET ACCREDITED DEGREE WHICH SAYS ENGINEERING ON IT, WHICH

MY DEGREE FROM CAL POLYTECHNIC WAS IN GEOLOGY WITH A MINOR IN

CIVIL, MINORS DON'T COUNT.

          AND SO I GOT VERY FRUSTRATED THAT I WAS GOING TO LOSE 200

UNITS OF ENGINEERING CREDITS, AND SO I FELT THAT THE ENDS JUSTIFIED

THE MEANS.  WHEN I WAS A BRUSK YOUNG MAN, AS MANY YOUNG MARINES

THINK LIKE, AND I JUST CHECKED THAT BOX AND I SAID, "I HAVE THE

EQUIVALENT OF THAT," AND I GOT TO TAKE ALL OF THE EXAMS ANYWAY.

AND I PASSED THE EXAMS IN THE SPRING OF '83 AND WENT ON WITH MY

CAREER, AND HAD NEVER REVISITED ITSELF UNTIL I STARTED --

          WELL, TWO THINGS HAPPENED.  I MADE LORD JESUS CHRIST MY

SAVIOUR AND BECAME A CHRISTIAN, AND THEN I STARTED TEACHING AT

BERKELEY PART-TIME IN THE FALL OF '94.  AND I WASN'T THERE TOO LONG

AND THEY STARTED HAVING ME TEACH A PROFESSIONAL PRACTICE COURSE AND

THEN PROFESSIONAL ETHICS.  AND WHEN WE GOT INTO PROFESSIONAL

ETHICS, I STARTED RESEARCHING THE HISTORY OF PROFESSIONAL

ENGINEERING REGISTRATION BECAUSE I AM A ZEALOUS PROPONENT OF CIVIL

ENGINEERING.  I LOVE BEING A CIVIL ENGINEER AND I LOVE THE

PROFESSION OF CIVIL ENGINEERING.

          AND WHEN I GOT INTO THE HISTORY OF THIS IN CALIFORNIA, IT

CAME ABOUT AS THE RESULT OF A FAILURE OF THE ST. FRANCIS DAM IN

MARCH 1928, I FOUND OUT THE REASON THEY HAD THAT RULE IN THERE IT

WAS FROM 1928.  AND IN 1928 THE MOST GRADUATE WORK YOU COULD DO IN

THE STATE OF CALIFORNIA WAS AT BERKELEY OR STANFORD WAS ONE YEAR.

09:20:55  1   AND SO REGARDLESS OF HOW MANY -- NOBODY STAYED AT GRADUATE SCHOOL

09:20:59  2   MORE THAN ONE YEAR IN 1928 IN THOSE DAYS.  THEY DIDN'T HAVE FACULTY

09:21:02  3   WITH -- THEY HAD VERY FEW OF THE FACULTY HAD PH.D.S, JUST A VERY

09:21:08  4   SMALL PERCENTAGE OF THEM.

09:21:09  5        AND SO I CAME TO UNDERSTAND HOW THAT RULE CAME TO BE, AND

09:21:18  6   I KEPT TALKING TO THE STUDENTS ABOUT HOW IMPORTANT INTEGRITY WAS,

09:21:22  7   AND THE HOLY SPIRIT IS TALKING TO ME BACK HERE IN MY HEAD SAYING,

09:21:26  8   "DAVE, YOU'RE A BIG PROPONENT OF INTEGRITY.  DON'T YOU HAVE

09:21:29  9   SOMETHING IN YOUR PAST?"  YOU KNOW HOW LITTLE VOICES GO, AND I

09:21:33 10   SAID, "YEAH, I DO.  I DO."  AND EVENTUALLY I TOLD MY WIFE AND I

09:21:42 11   PRAYED ABOUT IT AND I DECIDED THAT I WANTED TO HAVE A CLEAN

09:21:47 12   CONSCIOUS MORE THAN I WANTED TO BE SEEN AS SUCCESSFUL IN THE

09:21:51 13   WORLD'S EYES, WHICH I WAS SEEN AT THAT TIME BY MOST PEOPLE.

09:21:54 14        AND SO I TOOK MY CERTIFICATES AND I WENT UP TO THE STATE

09:21:58 15   BOARD OF REGISTRATION.  THEY WERE PRETTY MYSTIFIED WHY I WOULD BE

09:22:04 16   DOING SOMETHING LIKE THIS, AND I SAID, YOU KNOW, WHAT I DID,

09:22:07 17   WHETHER I AGREE WITH IT OR NOT, I VIOLATED THE SPIRIT OF THIS

09:22:13 18   LEGISLATION, AND THE ENDS DON'T JUSTIFY THE MEANS.  IT'S HOW WE

09:22:19 19   PLAY THE GAME THAT MATTERS.  AND I'M GOING TO TURN THESE IN AND I

09:22:25 20   AM GOING TO PROBABLY LOSE MY COMPANY, WHICH I DID, AND I AM GOING

09:22:28 21   TO START OVER AGAIN AS AN ENGINEER IN TRAINING AND COME BACK.

09:22:32 22        AND I TOOK THAT EXAMINATION -- THERE WERE FOUR

09:22:34 23   EXAMINATIONS YOU HAVE TO TAKE IN CALIFORNIA NOW TO GET REGISTERED

09:22:36 24   AS A CIVIL ENGINEER -- I TOOK THOSE ALONGSIDE 27 OF MY STUDENTS

09:22:41 25   FROM BERKELEY, AND I THINK THAT WAS ONE OF THE HAPPIEST DAYS OF MY

09:22:46  1   LIFE WHEN I DID THAT AND PASSED THAT EXAM AGAIN AT AGE 47 IN 2001.

09:22:52  2   Q.  AND AT THE TIME DID YOU NOTIFY THE UNIVERSITY WHERE YOU WERE

09:22:54  3   TEACHING THAT YOU HAD RELINQUISHED YOUR LICENSE?

09:22:57  4   A.  I ASKED FOR A PRIVATE MEETING WITH THEM IMMEDIATELY AND

09:23:00  5   APPRAISED THEM INSIDE CLOSED DOORS BECAUSE I KNEW THAT THEY SHOULD

09:23:05  6   HAVE THE PREROGATIVE OF LETTING ME GO IF THEY WANTED TO DO THAT,

09:23:08  7   BUT THEY DID NOT.  THEY WERE VERY SUPPORTIVE OF WHAT I WAS DOING

09:23:12  8   AND ENCOURAGED ME TO TALK ABOUT IT WITH THE STUDENTS AS MUCH AS

09:23:15  9   POSSIBLE AND TO MAKE IT, LIKE, A CASE STUDY FOR THEM AND TO PUT

09:23:20 10   MUCH MORE EMPHASIS ON PROFESSIONAL REGISTRATION.  WHEN I WENT

09:23:23 11   THROUGH BERKELEY THERE WAS NO EMPHASIS ON PROFESSIONAL

09:23:25 12   REGISTRATION.  I THOUGHT THAT WAS ONE OF THE GREAT HOLES IN THEIR

09:23:29 13   PROGRAM THAT THEY DID NOT ADDRESS IT NEARLY ENOUGH IN MY OPINION.

09:23:33 14   Q.  SO, DR. ROGERS, DURING THE COURSE OF YOUR CAREER, HAVE YOU

09:23:36 15   RECEIVED ANY RECOGNITION AMONG YOUR PEERS FOR YOUR CONTRIBUTIONS?

09:23:40 16   A.  YEAH, I'VE BEEN VERY -- MORE THAN FORTUNE IN THAT PARTICULAR

09:23:44 17   AREA.  I HAVE RECEIVED CONSIDERABLE APPRECIATION FROM MY PEERS FOR

09:23:52 18   MY WORK ON GEOFORENSICS AND ON REASSESSMENT OF DAM FAILURES, THOSE

09:23:57 19   KINDS OF THINGS.

09:23:59 20        MR. SIMS:  YOUR HONOR, AT THIS TIME THE PLAINTIFFS WOULD

09:24:01 21   ASK THE COURT ACCEPT DR. ROGERS AS AN EXPERT IN THE FIELDS OF

09:24:04 22   GEOLOGICAL AND GEOTECHNICAL ENGINEERING.

09:24:07 23        THE COURT:  ALL RIGHT.

09:24:10 24        MR. MITSCH:  THE UNITED STATES HAS NO OBJECTION, YOUR

09:24:13 25   HONOR.

09:24:13 1                    THE COURT:  THANK YOU.

09:24:14 2                    MR. TREEBY:  WASHINGTON GROUP HAS NO OBJECTION, YOUR

09:24:16 3     HONOR.

09:24:16 4                    THE COURT:  THANK YOU, COUNSEL.  THE COURT ACCEPTS

09:24:18 5     DR. ROGERS AS TENDERED.  THANK YOU, COUNSEL.

09:24:21 6                    MR. SIMS:  THANK YOU, YOUR HONOR.

09:24:22 7                              DIRECT EXAMINATION

09:24:22 8     BY MR. SIMS:

09:24:23 9     Q.  DR. ROGERS, WE'RE GOING TO TURN TO THE NEXT SLIDE AND HAVE YOU

09:24:26 10    PROVIDE A SUMMARY OF YOUR OPINIONS THAT YOU'RE OFFERING THIS

09:24:28 11    MORNING.

09:24:29 12                   BUT BEFORE DOING SO, LET ME ASK YOU, ARE ALL OF THE

09:24:31 13    OPINIONS YOU'RE GOING TO BE OFFERING TODAY BASED UPON YOUR

09:24:35 14    EXPERTISE AND EXPERIENCE IN THE FIELDS OF GEOLOGICAL AND

09:24:39 15    GEOTECHNICAL ENGINEERING?

09:24:40 16    A.  YES.

09:24:40 17    Q.  AND ARE THOSE OPINIONS BEING OFFERED BASED ON REASONABLE

09:24:44 18    SCIENTIFIC CERTAINTY?

09:24:45 19    A.  I BELIEVE SO.

09:24:45 20    Q.  SO WHY DON'T YOU SUMMARIZE FOR THE COURT, IF YOU COULD,

09:24:51 21    DR. ROGERS, THE OPINIONS THAT YOU'RE OFFERING IN THIS CASE.

09:24:54 22    A.  AM I ALLOWED TO READ?

09:25:00 23    Q.  IF YOU WOULD LIKE.

09:25:00 24    A.  I WOULD.  "1.  GIVEN THE PROXIMITY OF THE EBIA SITE TO THE IHNC

09:25:07 25    FLOODWALL, WGI AND THE CORPS OF ENGINEERS WERE REQUIRED TO CONDUCT

09:25:12  1    GEOTECHNICAL EVALUATIONS WHILE PERFORMING SUBSURFACE EXPLORATION

09:25:18  2    AND EXCAVATION ACTIVITIES AT THE SITE.

09:25:23  3         2.   AMONG OTHER THINGS, A GEOTECHNICAL EVALUATION SHOULD

09:25:27  4    ASSESS ANY IMPACTS ON SEEPAGE AND UPLIFT HAZARDS.

09:25:31  5         3.   WGI AND THE CORPS OF ENGINEERS FAILED TO PERFORM THE

09:25:37  6    REQUIRED GEOTECHNICAL EVALUATIONS.

09:25:40  7         4.   PROPER COMPACTION OF APPROPRIATE BACKFILL MATERIALS IS

09:25:49  8    ONE METHOD FOR MITIGATING SEEPAGE AND UPLIFT HAZARDS WHEN

09:25:53  9    PERFORMING EXCAVATIONS, BUT WGI AND THE CORPS OF ENGINEERS FAILED

09:25:58 10    TO PROPERLY BACKFILL AND COMPACT THE EXCAVATIONS."

09:26:02 11    Q.  NOW, IN REACHING THE OPINIONS THAT YOU'VE DESCRIBED FOR THE

09:26:04 12    COURT, CAN YOU TELL US WHAT MATERIALS YOU REVIEWED?

09:26:07 13    A.  WELL, THE TESTIMONY THAT I HAD BEEN GIVEN OF CORPS OF ENGINEERS

09:26:13 14    AND WGI REPRESENTATIVES, THE DOCUMENTS FROM THE PROJECT MADE BY THE

09:26:22 15    CORPS OF ENGINEERS AND WGI, THE ALMOST 4,000 PHOTOGRAPHS OF WGI'S

09:26:28 16    DEMOLITION AND REMEDIATION WORK ON THE SITE, AND HISTORIC SOILS AND

09:26:34 17    GEOLOGICAL INVESTIGATIONS OF THE IHNC AREA AND THE EBIA SITE DATING

09:26:40 18    BACK ABOUT 90 YEARS, TO THE NINETEEN TEENS.

09:26:43 19    Q.  AND, DR. ROGERS, YOU MENTION THAT YOU'VE BEEN INVOLVED IN

09:26:47 20    NUMEROUS LEVEE INVESTIGATIONS, CORRECT?

09:26:48 21    A.  YES.

09:26:49 22    Q.  AND WHAT HAVE YOU LEARNED REGARDING THE UNIQUENESS OF LEVEES

09:26:52 23    AND FLOODWALLS AS ENGINEERING STRUCTURES?

09:26:54 24    A.  WELL, LEVEES ARE AN UNUSUAL ENGINEERING STRUCTURE IN THAT

09:27:03 25    THEY -- THEIR ONLY CONSISTENCY IS THEIR INCONSISTENCY, THAT THEY

09:27:09  1    RUN OVER LONG, LONG, DISTANCES CONTINUOUSLY, AND THEY'RE BASICALLY

09:27:15  2    MADE OF THE MATERIAL THAT'S RIGHT NEXT TO THE DIKE, OR VERY CLOSE

09:27:19  3    TO THE DIKE MOST OF THE TIME.  SO YOU HAVE DIFFERENT MATERIALS BUT

09:27:24  4    VERY OFTEN WITH THE SAME "ONE SIZE FITS ALL" CROSS SECTION.

09:27:29  5            AND THEN YOU HAVE HETEROGENOUS FOUNDATIONS THAT THEY'RE

09:27:33  6    FOUNDED UPON.  IF YOU'RE IN A FLOOD PLANE AREA, IT'S VERY

09:27:37  7    HETEROGENOUS ESPECIALLY WHERE YOU HAVE MEANDERING CHANNELS.  AND IF

09:27:41  8    YOU'RE IN A DELTA AREA LIKE NEW ORLEANS YOU HAVE VARIOUS

09:27:45  9    HETEROGENOUS CONDITIONS.  THEY'RE ALWAYS CHANGING.  SO YOU HAVE

09:27:49 10    THOSE MANY UNKNOWNS THAT YOU'RE ALWAYS COMBATTING.  SO YOU LOOK AT

09:27:53 11    THAT LEVEE JUST LIKE A LITTLE PILE OF DIRT GOING ALONG, IT HAS

09:27:57 12    GRASS ON IT, AND IT JUST LOOKS SO BENIGN AND IT BELIES HOW COMPLEX

09:28:02 13    A STRUCTURE IT ACTUALLY IS AND HOW FRAGILE A STRUCTURE IT ACTUALLY

09:28:08 14    IS.  LEVEES ARE 1,000 TIMES MORE LIKELY TO FAIL THAN DAMS.

09:28:13 15    Q.  GIVEN THE VULNERABILITIES THAT YOU'VE JUST DESCRIBED,

09:28:16 16    DR. ROGERS, WAS A GEOTECHNICAL EVALUATION REQUIRED IN CONNECTION

09:28:19 17    WITH WGI'S AND THE CORPS' WORK AT THE EBIA SITE?

09:28:23 18    A.  YES.

09:28:23 19    Q.  AND IS THAT OPINION BASED ON SOUND ENGINEERING PRINCIPLES?

09:28:28 20    A.  YES, I BELIEVE SO.

09:28:30 21    Q.  IS IT ALSO BASED ON THE TESTIMONY YOU'VE REVIEWED OF CORPS

09:28:34 22    REPRESENTATIVES?

09:28:34 23    A.  YES.

09:28:35 24    Q.  IS IT BASED ON THE CORPS' OWN POLICIES AND PROCEDURES?

09:28:39 25    A.  I BELIEVE SO.

09:28:40  1    Q.  AND IS IT BASED ON THE STANDARD OF PRACTICE THAT YOU'VE

09:28:42  2    ENCOUNTERED IN THE INDUSTRY FOR THE LAST 30 YEARS?

09:28:45  3    A.  YES.

09:28:45  4    Q.  LET'S START WITH SOME OF THE TESTIMONY YOU REVIEWED OF CORPS

09:28:48  5    REPRESENTATIVES.  AND WITHOUT GOING THROUGH EACH ONE SINCE THEY'RE

09:28:54  6    ON THE SLIDE, I'LL JUST ASK YOU, IS THIS SOME OF THE TESTIMONY THAT

09:28:57  7    YOU'RE RELYING UPON FOR YOUR OPINION THAT THE CORPS RECOGNIZES THE

09:29:02  8    REQUIREMENT TO PERFORM A GEOTECHNICAL EVALUATION WHEN EXCAVATING

09:29:06  9    NEAR A LEVEE OR FLOODWALL?

09:29:07 10    A.  YES.

09:29:07 11    Q.  AND HAVE YOU SEEN ANY TESTIMONY FROM CORPS REPRESENTATIVES IN

09:29:14 12    WHICH THOSE REPRESENTATIVES STATE THAT ANY EXCAVATIONS WITHIN

09:29:18 13    300 FEET OF A FLOODWALL MUST BE EVALUATED?

09:29:20 14    A.  YES.

09:29:21 15    Q.  NEXT SLIDE, PLEASE.  ONCE AGAIN, WE WON'T GO THROUGH EACH OF

09:29:27 16    THESE, BUT IS THIS SOME OF THE TESTIMONY THAT YOU REVIEWED

09:29:30 17    REGARDING THAT REQUIREMENT?

09:29:30 18    A.  YES.

09:29:32 19    Q.  AND OTHER THAN THIS TESTIMONY, ARE YOU AWARE OF ANY MANUALS OR

09:29:35 20    REGULATIONS PUBLISHED BY THE CORPS THAT REQUIRE GEOTECHNICAL

09:29:39 21    EVALUATION WHEN PERFORMING EXCAVATIONS IN THE VICINITY OF A LEVEE

09:29:43 22    OR FLOODWALL?

09:29:44 23    A.  YES.  ENGINEER REGULATIONS.

09:29:49 24    Q.  AND ONCE AGAIN, WE WON'T REVIEW EACH OF THESE IN DETAIL, BUT

09:29:53 25    ARE THESE THE ENGINEERING REGULATIONS AND MANUALS YOU'RE

09:29:55  1  REFERENCING?

09:29:56  2  A.  YES.

09:29:56  3  Q.  AND IS THERE ANY ONE OF THESE IN PARTICULAR YOU WOULD LIKE TO

09:30:00  4  BRING TO THE COURT'S ATTENTION?

09:30:01  5  A.  THE FIRST ONE, 1150, ENGINEERING AND DESIGN FOR CIVIL WORKS

09:30:06  6  PROJECT.

09:30:07  7  Q.  AND WHY IS THIS PARTICULAR ENGINEER REGULATION IMPORTANT TO

09:30:10  8  YOUR ANALYSIS?

09:30:10  9  A.  WELL, THIS IS THE BUILDING BLOCK OF ALL CORPS OF ENGINEERING

09:30:16  10  REGULATIONS.  IT SETS FORTH THE MINIMUM STANDARDS THAT THEY -- FOR

09:30:20  11  ENGINEERING AND DESIGN THAT THEY EXPECT FOR ALL OF THEIR CIVIL

09:30:22  12  WORKS PROJECTS.

09:30:23  13  Q.  AND DOES THIS DOCUMENT ONLY APPLY TO THE CORPS OF ENGINEERS?

09:30:27  14  A.  NO, IT ALSO APPLIES TO THEIR CONTRACTOR, THE PEOPLE THEY HIRE

09:30:32  15  TO DO ENGINEERING AND DESIGN WORK FOR CIVIL WORKS PROJECTS.

09:30:35  16  Q.  AND HOW DO YOU KNOW THAT, DR. ROGERS?

09:30:37  17  A.  BECAUSE IT SAYS SO IN THE DOCUMENT, PARAGRAPH 19.5.

09:30:50  18  Q.  EVEN IF YOU HAD CONCLUDED, DR. ROGERS, THAT THIS PARTICULAR

09:30:53  19  ENGINEER REGULATION DIDN'T APPLY TO WGI, WOULD YOU STILL FIND IT

09:30:57  20  RELEVANT TO YOUR ANALYSIS OF THE STANDARD OF CARE?

09:30:59  21  A.  YES.

09:31:01  22  Q.  AND WHY IS THAT?

09:31:02  23  A.  THE CORPS DOESN'T DEVELOP THESE STANDARDS IN A VACUUM.  THEY

09:31:08  24  ARE BUILT.  THEY'VE EVOLVED OVER 200 YEARS OF EXPERIENCE AND

09:31:13  25  THEY'VE REALLY HAVE BASICALLY BECOME THE INDUSTRY STANDARDS.  WE

09:31:18  1    ALL ARE AWARE OF THEM AND WE USE THEM.  EVEN THEIR RECOMMENDATIONS

09:31:22  2    FOR THE WAY THAT TESTING AND ANALYSES ARE PERFORMED ARE ROUTINELY

09:31:27  3    REFERENCED IN CONTRACT DOCUMENTS, NOT ONLY IN FEDERAL PROJECTS, BUT

09:31:31  4    IN STATE AND LOCAL AND COUNTY PROJECTS.  LOCAL RECLAMATION

09:31:38  5    DISTRICTS THAT I DEAL WITH IN CALIFORNIA, I'LL USE THE CORPS

09:31:41  6    STANDARDS AND SPECIFICATIONS.  AND THEIR REGULATIONS --

09:31:45  7          BASICALLY, THEY'RE A USEFUL TOOL FOR TELLING YOU WHAT THE

09:31:51  8    PREVAILING PRACTICE IS IN THE UNITED STATES AS A WHOLE.  I WOULD

09:31:54  9    ALWAYS LOOK TO A CORPS DOCUMENT FIRST TO SEE WHAT THE PREVAILING

09:31:57 10    PRACTICE WAS.

09:31:58 11    Q.  LET'S TALK ABOUT --

09:32:00 12          MR. MITSCH:  YOUR HONOR, MAY I HAVE A MOMENT?  IT'S MY

09:32:03 13    UNDERSTANDING THAT THE EXPERTS WERE TO PRESENT THEIR OWN -- DO

09:32:09 14    THEIR OWN PRESENTATIONS AS OPPOSED TO A DIRECT EXAMINATION.  I

09:32:13 15    THOUGHT WE HAD -- WE HAD A DISCUSSION ABOUT THAT DURING THE

09:32:17 16    PRETRIAL CONFERENCE, WE HAD A SIDE BAR HERE THE OTHER DAY, AND I AM

09:32:23 17    JUST CONFUSED.

09:32:24 18          THE COURT:  MAKE SURE I UNDERSTAND YOUR OBJECTION.  ARE

09:32:27 19    YOU SAYING THAT THIS IS NOT ACCORDING TO 705 OF THE FEDERAL RULES

09:32:36 20    OF EVIDENCE?

09:32:36 21          MR. MITSCH:  AS I UNDERSTAND IT, YOUR HONOR.  I

09:32:38 22    ANTICIPATED, AND CERTAINLY WE'VE PREPARED OUR WITNESSES WITH THIS

09:32:44 23    ASSUMPTION, THAT WE WOULD INTRODUCE THE WITNESSES, WE WOULD QUALIFY

09:32:49 24    THE WITNESSES, AND THEN THEY WOULD GIVE A PRESENTATION, THEIR

09:32:54 25    OPINIONS, AS OPPOSED TO A DIRECT EXAMINATION.

09:33:01   1          THE COURT:  COUNSEL -- I'M SORRY, MR. TREEBY.

09:33:05   2          MR. TREEBY:  I JOIN THAT OBJECTION, I WANT TO BE MORE

09:33:08   3   SPECIFIC.  THE COURT ORDERED US TO PRESENT EXPERT TESTIMONY

09:33:15   4   PURSUANT TO RULE 705.  WE HAVE PREPARED ACCORDINGLY AND THIS IS

09:33:21   5   BEYOND THAT.

09:33:21   6          THE COURT:  ALL RIGHT.  ANY RESPONSE?

09:33:24   7          MR. SIMS:  YES, YOUR HONOR.  705 STATES THAT THE EXPERT

09:33:27   8   CAN GIVE IN A SUMMARY FASHION HIS OPINIONS AND THE REASONS

09:33:31   9   THEREFORE WITHOUT HAVING TO GO INTO THE FACT -- SPECIFIC FACTS AND

09:33:33  10   DATA.  AND YOUR HONOR PROBABLY CAN ALREADY TELL FROM MY

09:33:36  11   PRESENTATION THAT'S EXACTLY WHAT WE'RE DOING.  WE HAVEN'T REVIEWED

09:33:39  12   THE DEPOSITION TESTIMONY IN DETAIL, WE'VE SIMPLY GIVEN IT IN THE

09:33:42  13   BULLET POINT FASHION FOR THE COURT.  WE LISTED NUMEROUS ENGINEERING

09:33:45  14   REGULATIONS AND MANUALS.  WE WON'T BE GOING THROUGH EACH OF THOSE,

09:33:47  15   WE CHOSE ONE SIMPLY TO HIGHLIGHT THE ISSUE.

09:33:51  16          I DON'T THINK 705 EVER ABROGATED THE NORMAL RULES OF

09:33:54  17   PROCEDURE IN AN EXAMINATION THAT ARE SET OUT IN THE RULES OF CIVIL

09:33:58  18   PROCEDURE AND THE RULES OF EVIDENCE.  AND THIS IS EXACTLY HOW

09:34:00  19   MR. MORRIS'S EXAMINATION WENT AND THIS IS HOW WE PREPARED OUR

09:34:02  20   WITNESSES.

09:34:03  21          THE COURT:  MR. MORRIS' EXAMINATION WAS AN ABROGATION,

09:34:07  22   OKAY.  THAT'S NOT HOW IT WAS SUPPOSED TO GO.  I UNDERSTAND WHAT

09:34:11  23   YOU'RE SAYING.  AND, LOOK, 705 IS -- IT'S NOT LIKE IT'S MANIFESTLY

09:34:21  24   COMPLETELY EVIDENT ON HOW TO DO IT, BUT LET ME ASK YOU THIS:  HOW

09:34:28  25   LONG DO YOU ANTICIPATE YOUR SUMMARY PRESENTATION WILL TAKE, AS YOU

09:34:33   1   CHARACTERIZE IT?

09:34:34   2          MR. SIMS:  SURE, YOUR HONOR.  ONE HOUR TO ONE HOUR AND

09:34:38   3   15 MINUTES.  AND WE'VE ALREADY SPENT A GOOD 15 OR 20 MINUTES.  I

09:34:43   4   WOULD SAY 40 MINUTES.

09:34:44   5          THE COURT:  I AM NOT SURE -- IT SAYS 705:  "UNLESS THE

09:34:49   6   COURT ORDERS OTHERWISE" -- WHICH I HAVEN'T.  IN FACT, I'VE ORDERED

09:34:53   7   THIS -- "AN EXPERT MAY STATE AN OPINION AND GIVE THE REASONS FOR IT

09:34:57   8   WITHOUT TESTIFYING TO THE UNDERLYING FACTS OR DATA, BUT THE EXPERT

09:35:00   9   MAY BE REQUIRED TO DISCLOSE THOSE FACTS OR DATA ON

09:35:04  10   CROSS-EXAMINATION."  AND HE IS ALLOWED TO SAY THE REASONS,

09:35:14  11   THEREFORE, AND IS THAT WHAT YOU'RE TRYING TO --

09:35:16  12          MR. SIMS:  YES, YOUR HONOR.  AGAIN, YOU ARE GOING TO SEE

09:35:19  13   VERY FEW ACTUAL DOCUMENTS OR INDIVIDUAL FACTS HIGHLIGHTED DURING

09:35:22  14   THIS PRESENTATION.

09:35:24  15          THE COURT:  IT'S A BIT BROAD, BUT I AM NOT GOING TO

09:35:28  16   COMPLETELY DISRUPT YOUR PRESENTATION.  BUT COUNSEL CAN OBJECT

09:35:35  17   AGAIN.  I AM GOING TO ALLOW YOU TO DO THIS BECAUSE HE'S STATING THE

09:35:39  18   REASONS, THE REASONS I REVIEWED THE DOCUMENTS, ET CETERA.  SO

09:35:45  19   YOU'RE ATTEMPTING TO GO THROUGH ALL OF THE REASONS IN A SUMMARY

09:35:48  20   FASHION EVEN THOUGH YOU'RE STATING SOME OF THE UNDERLYING

09:35:53  21   DOCUMENTS, ET CETERA, BUT YOU'RE NOT GOING INTO DETAIL.  ALTHOUGH

09:35:56  22   THAT'S A BIT OF A HYBRID, NOTING THE OBJECTION, I AM GOING TO ALLOW

09:36:00  23   YOU TO CONTINUE.  BUT COUNSEL MAY OBJECT AGAIN.

09:36:05  24          MR. SIMS:  THANK YOU, YOUR HONOR.

09:36:06  25   BY MR. SIMS:

09:36:09 1   Q.  DR. ROGERS, DOES THIS PARTICULAR ENGINEERING REGULATION REQUIRE

09:36:12 2   THE PREPARATION OF ANY KIND OF REPORT?

09:36:14 3   A.  YES.

09:36:15 4   Q.  WHY DON'T WE BRING UP THE NEXT SLIDE.  IF YOU CAN GO THROUGH

09:36:22 5   ALL FOUR BULLET POINTS.  WHY DON'T YOU SUMMARIZE FOR THE COURT THE

09:36:26 6   KEY POINTS THAT YOU'VE DRAWN FROM THE ENGINEERING REGULATION AS IT

09:36:29 7   APPLIES TO THE REPORT THAT YOU REFERENCED.

09:36:31 8   A.  WELL, SECTION 8 OF 1150 HAS A REQUIREMENT FOR A DDR, WHAT WE

09:36:38 9   KNOW IN THE INDUSTRY AS A DESIGN DOCUMENTATION REPORT, FOR ANY

09:36:43 10  CIVIL WORKS PROJECT.

09:36:49 11  Q.  WHAT DOES THAT DDR FINALIZE?

09:36:52 12  A.  DDR IS NOT FINALIZED UNTIL AFTER THE COMPLETION OF THE

09:36:54 13  CONSTRUCTION WORK AND THE DISTRICT ENGINEER SIGNS OFF ON IT.

09:36:57 14  Q.  AND DOES THE DDR HAVE TO ACTUALLY ADDRESS ALL OF THE

09:37:01 15  MODIFICATIONS THAT TAKE PLACE DURING THE PENDENCY OF THE PROJECT?

09:37:04 16  A.  SURE DOES.  THE DDR IS A CRADLE-TO-GRAVE DOCUMENT, SO THAT

09:37:08 17  SOMEBODY 100 YEARS FROM NOW CAN SEE EXACTLY WHAT THE ENGINEERS AND

09:37:15 18  SCIENTISTS DID IN TERMS OF INVESTIGATING A SITE, IN TERMS OF DOING

09:37:20 19  THE LABORATORY TESTING, IN TERMS OF SELECTING THE REPRESENTATIVE

09:37:24 20  MATERIAL STRENGTH VALUES AND HOW THEY DID THE CALCULATIONS.  THEY

09:37:28 21  EVEN HAVE TO HAVE SAMPLE CALCULATIONS, BECAUSE THIS WORK ALL GOES

09:37:33 22  OUT NOW FOR INDEPENDENT TECHNICAL REVIEW.

09:37:35 23          SINCE 1978 THE CORPS HAS HAD THEIR OWN INDEPENDENT

09:37:39 24  TECHNICAL REVIEW PANELS WHO REVIEW IT IN CLOSED DOORS BY

09:37:43 25  THEMSELVES, SO THEY'LL CATCH ANYTHING THERE THAT DOESN'T LEAVE A

09:37:47  1    REAL CLEAR TRAIL OF WHAT IT IS YOU DID, WHAT YOU ASSUMED, AND THEN

09:37:51  2    HOW YOU CAME UP WITH THE PLANS AND SPECIFICATIONS, AND THEN YOU GO

09:37:56  3    TO CONSTRUCTION.  AND IT DOCUMENTS ALL OF THE MODIFICATIONS THAT

09:38:00  4    OCCUR DURING CONSTRUCTION, INCLUDING THE CORRESPONDENCE THAT GOES

09:38:05  5    BACK AND FORTH BETWEEN THE CONTRACTOR AND THE CORPS OR THE AD FIRM

09:38:12  6    AND THE CORPS, AND THEN WHAT THEY END UP DECIDING TO DO AND THE

09:38:15  7    DOCUMENTATION OF WHAT THEY DID.

09:38:16  8         SO IT'S A VERY -- IT'S A SELF-STANDING DOCUMENT.  IT'S

09:38:19  9    THE MOST IMPORTANT DOCUMENT THAT WE PRODUCE AS CIVIL ENGINEERS ON

09:38:25 10    LARGE PUBLIC CIVIL WORKS PROJECTS, BECAUSE THAT'S THE DOCUMENT

09:38:29 11    WE'RE GOING TO TURN TO SOME DAY WHEN WE GO OUT THERE TO DO REMEDIAL

09:38:34 12    WORK OR REPAIR OR BUILD A NEW MODIFICATION TO IT, BUILD A NEWER,

09:38:39 13    LARGER, HIGHER STRUCTURE LIKE WE'RE GOING TO HAVE TO DO ALONG THE

09:38:42 14    MISSISSIPPI RIVER AFTER LAST YEAR'S FLOOD.

09:38:44 15         AND THE CORPS OF ENGINEERS WAS ACTUALLY AT THE FOREFRONT

09:38:48 16    OF THIS STARTING BACK IN THE MID-1930S.  ACTUALLY, WHEN THEY HIRED

09:38:51 17    ED BURWELL, THE BURWELL AWARD THAT I WAS GIVEN BACK IN THE EARLY

09:38:55 18    '90S WAS NAMED AFTER HIM.  HE WAS THE FIRST CHIEF GEOLOGIST OF THE

09:38:59 19    CORPS OF ENGINEERS.  HE SAW THAT THE BUREAU OF RECLAMATION

09:39:03 20    INITIATED THIS AT HOOVER DAM IN THE EARLY '30S, SO THE CORPS

09:39:06 21    STARTING DOING IT IN 1935.  AND IT'S REALLY PAID ENORMOUS DIVIDENDS

09:39:09 22    TO THEM, ESPECIALLY ON THEIR DAMS.  WE'VE GONE BACK IN AND HAD TO

09:39:14 23    DO CORRECTIVE WORK, REMEDIAL WORK, AGING CORRECTIONS.  WE LOOK AT

09:39:19 24    THOSE FILES, THOSE DDR'S.

09:39:21 25         AND THEY'RE KEPT AT THE DISTRICT OFFICE, THE ORIGINALS AT

09:39:24  1    THE DISTRICT OFFICE.  A COPY IS SENT TO HEADQUARTERS, USACE IN

09:39:28  2    WASHINGTON, AND THEY'RE ARCHIVED OVER IN THE LIBRARY AT FORT

09:39:33  3    BELVOIR.  I HAVE ACTUALLY BEEN TO BELVOIR ON DIFFERENT PROJECTS I

09:39:35  4    AM REVIEWING AND GONE INTO THOSE DOCUMENTS AND REVIEWED THEM AND

09:39:38  5    THEY'RE INVALUABLE, ESPECIALLY THE PHOTOGRAPHS.

09:39:40  6    Q.  AND, DR. ROGERS, IS THE DDR SUPPOSED TO INCLUDE THE RESULTS OF

09:39:44  7    ANY GEOTECHNICAL INVESTIGATIONS?

09:39:45  8    A.  EVERY PIECE OF GEOTECHNICAL INVESTIGATION SHOULD BE IN THE DDR.

09:39:50  9    SOMETIMES IT WILL BE JUST A BRIEF, ONE PAGE, WE LOOKED AT THIS, WE

09:39:54 10    DON'T THINK THERE'S A PROBLEM.  OTHER TIMES IT WILL BE A

09:39:57 11    CORRESPONDENCE THAT GOES BACK AND FORTH FOR QUITE AWHILE WHILE THEY

09:40:00 12    ARGUE ABOUT WHAT AN OPERABLE OR ACCEPTABLE FACTOR OF SAFETY WOULD

09:40:05 13    BE OR WHAT METHODOLOGY THEY WOULD USE TO MAKE THAT CALCULATION.

09:40:09 14         SOMETIMES CONSULTANTS WILL PRO OFFER A DIFFERENT

09:40:13 15    METHODOLOGY THAN THE CORPS USES, THAT'S BECOME INCREASINGLY

09:40:17 16    FREQUENT IN THE LAST SEVERAL DECADES, AND SO THEY WILL HAVE A

09:40:21 17    USUALLY VERY CLEAR CHAIN OF CORRESPONDENCE GOING BACK AND FORTH

09:40:25 18    THAT THE PANEL MEMBERS CAN LOOK AT AND SEE WHAT HAPPENED AND WHO

09:40:30 19    CHANGED THEIR MINDS AND WHAT KIND OF AGREEMENT THEY CAME TO.  SO

09:40:32 20    IT'S ALL DOCUMENTED IN THERE.  THE WHOLE IDEA IS IT'S A STAND-ALONE

09:40:36 21    DOCUMENT BECAUSE, YOU KNOW, 40 YEARS FROM NOW YOU'RE NOT GOING TO

09:40:40 22    BE ABLE TO CALL THESE PEOPLE UP AND ASK THEM WHAT THEIR INTENT IS.

09:40:43 23    ALL YOU'RE GOING TO KNOW IS WHAT'S ON PAPER IN THE DDR.

09:40:45 24    Q.  AND, DR. ROGERS, OTHER THAN THE ENGINEER REGULATIONS AND

09:40:49 25    ENGINEER MANUALS, HAVE YOU SEEN ANY OTHER WRITTEN GUIDANCE FROM THE

09:40:52  1   CORPS REGARDING THE NEED TO PERFORM AN ANALYSIS AND ASSESSMENT OF

09:40:57  2   EXCAVATIONS WITHIN 300 FEET OF THE FLOODWALL?

09:40:59  3   A.  YES.  WE SEE THAT IN THEIR OWN TESTIMONY, AND WE SEE IT IN

09:41:05  4   OTHER DOCUMENTS LIKE THE KANSAS CITY GUIDANCE DOCUMENT.

09:41:10  5          MR. MITSCH:  OBJECTION, YOUR HONOR.

09:41:11  6          THE COURT:  YOUR OBJECTION IS PRESERVED ON THE KANSAS

09:41:14  7   CITY GUIDANCE.  I'VE RULED ON THAT IN LIMINE.  ALTHOUGH I FIND IT

09:41:19  8   DOESN'T NECESSARILY APPLY TO NEW ORLEANS, IT IS PROBATIVE FOR

09:41:24  9   PEOPLE TO BE QUESTIONED ABOUT.

09:41:26 10          MR. MITSCH:  MIGHT I ALSO BE HEARD?  IT'S ALSO NOT IN HIS

09:41:30 11   REPORT, SO IF HE IS ASKING QUESTIONS ABOUT THAT NOW, WE WILL BE

09:41:35 12   GOING BEYOND THE SCOPE OF HIS REPORT.

09:41:37 13          MR. SIMS:  I CAN CLARIFY THAT WITH MY VERY NEXT QUESTION,

09:41:39 14   OR I SHOULD SAY TWO QUESTIONS.  OR I AM HAPPY TO MAKE A PROFFER FOR

09:41:43 15   YOUR HONOR.

09:41:43 16          THE COURT:  IF THE WORDS "KANSAS CITY GUIDELINES" ARE NOT

09:41:46 17   IN HIS REPORT, THAT IS NOT SUFFICIENT --

09:41:49 18          MR. SIMS:  YOUR HONOR --

09:41:52 19          THE COURT:  THAT IS NOT A SUFFICIENT -- TELL ME WHAT YOU

09:41:54 20   WERE GOING TO SAY.

09:41:55 21          MR. SIMS:  DR. ROGERS CLEARLY SAID IN HIS REPORT --

09:41:58 22          THE COURT:  THE CORPS' ALREADY AGREED RIGHT HERE,

09:42:01 23   MR. COLLETTI SAID IT'S 300 FEET.  I AM NOT SURE WHAT DIFFERENCE IT

09:42:03 24   MAKES.  MR. COLLETTI SAID THAT AS HAVE OTHER MEMBERS OF THE CORPS,

09:42:06 25   SIR, IN THE DEPOSITION.  SO WHETHER HE SAYS IT OR NOT, SO WHAT?

09:42:09   1          MR. SIMS:  AND, YOUR HONOR, THE ONLY POINT IS THAT

09:42:12   2   DR. ROGERS --

09:42:13   3          THE COURT:  I AM NOT SAYING THEY APPLIED THE KANSAS CITY

09:42:16   4   GUIDELINES, BUT THEY CERTAINLY SOME OF THEM HAD SAID THEY APPLIED A

09:42:18   5   300-FOOT RULE OR 250 FEET FROM THE LEVEE.

09:42:20   6          MR. SIMS:  AND, YOUR HONOR, THAT'S EXACTLY THE POINT

09:42:23   7   DR. ROGERS IS GOING TO SAY, HE DOES NOT STATE THAT THE KANSAS CITY

09:42:26   8   GUIDELINE APPLIES IN NEW ORLEANS.  WHAT HE IS GOING TO SAY IS

09:42:30   9   REFLECTION OF THE STANDARD OF CARE IN THE INDUSTRY.  SIMPLY FOR

09:42:33  10   THAT PURPOSE IS WHY HE CITES IT.  BUT WE WILL MOVE ON.

09:42:36  11          THE COURT:  WHY DON'T YOU MOVE ON.  AND YOU ARE GOING A

09:42:37  12   LITTLE TOO MUCH INTO THE UNDERLYING FACTS.

09:42:39  13          MR. SIMS:  I UNDERSTAND, YOUR HONOR.

09:42:43  14   BY MR. SIMS:

09:42:44  15   Q.  NOW, YOUR REPORT, YOU ALSO TALK ABOUT A PARTICULAR CODE OF

09:42:46  16   FEDERAL REGULATION AS FURTHER EVIDENCE OF THE NEED TO PERFORM A

09:42:49  17   GEOTECHNICAL EVALUATION, CORRECT?

09:42:51  18   A.  YES, THAT'S RIGHT.

09:42:51  19   Q.  WE DON'T NEED TO GO INTO IT IN ANY SPECIFICS, BUT THIS IS THE

09:42:55  20   REGULATION YOU'RE REFERENCING?

09:42:57  21   A.  YES, 208.10 IS THE ONE THAT TALKS ABOUT EXCAVATION AND

09:43:02  22   CONSTRUCTIONS PERMITTED WITHIN THE LIMITS OF PROJECT RIGHT OF WAYS.

09:43:08  23          MR. SIMS:  YOUR HONOR HAS SEEN IT, SO I WANT TO MOVE ON

09:43:10  24   IN THE SPIRIT OF THE COURT'S DESIRE.

09:43:12  25          THE COURT:  PLEASE.

09:43:13  1    BY MR. SIMS:

09:43:13  2    Q.  NOW, YOU'VE SAID THAT WGI --

09:43:15  3              THE COURT:  YOU WILL BE GIVEN AN OPPORTUNITY AFTER

09:43:17  4    CROSS-EXAMINATION TO GO INTO THIS DEPENDING ON THE

09:43:19  5    CROSS-EXAMINATION.

09:43:21  6              MR. SIMS:  UNDERSTAND, YOUR HONOR.

09:43:23  7              THE COURT:  WHICH I'M SURE WILL BE VERY THOROUGH.

09:43:25  8    BY MR. SIMS:

09:43:26  9    Q.  YOU STATED THAT WGI AND THE CORPS ARE RESPONSIBLE FOR ENSURING

09:43:28 10    THAT A GEOTECHNICAL EVALUATION BE PERFORMED, CORRECT?

09:43:30 11    A.  YES.

09:43:31 12    Q.  WHAT IS THE PRIMARY REASON YOU BELIEVE THAT WGI IS RESPONSIBLE

09:43:35 13    FOR INSURING THAT A GEOTECHNICAL EVALUATION WAS PERFORMED IN

09:43:38 14    CONNECTION WITH THE EBIA SITE WORK?  WHAT WAS THE PRIMARY REASON?

09:43:41 15    A.  JUST WHAT IT SAYS AT THE BOTTOM OF 208.10, BECAUSE YOU WANT TO

09:43:45 16    CONSTRUCT IT IN ACCORDANCE WITH STANDARD ENGINEERING PRACTICE.

09:43:47 17    Q.  AND THE FACT THAT IT WAS WGI WAS OUT THERE PERFORMING THE WORK,

09:43:51 18    DOES THAT HAVE ANY ROLE?

09:43:56 19    A.  YES, THEY'RE THE ONES DIGGING THE HOLES, COUNSELOR.

09:43:56 20    Q.  AND HAVE YOU SEEN ANY TESTIMONY FROM WGI REPRESENTATIVES TO

09:44:00 21    INDICATE THAT WGI WAS WELL AWARE THAT PERFORMING EXCAVATIONS

09:44:04 22    ADJACENT TO A LEVEE OR FLOODWALL COULD ACTUALLY HARM THE LEVEE OR

09:44:08 23    FLOODWALL?

09:44:09 24    A.  YES, THERE'S SOME TESTIMONY FROM THEM.

09:44:11 25    Q.  IS THAT SOME OF THAT TESTIMONY DEPICTED ON THE SLIDE?

09:44:13   1   A.  YES.

09:44:14   2   Q.  AND IN PARTICULAR, THE SECOND QUOTE ATTRIBUTED TO MR. O'CONNOR,

09:44:17   3   THE TESTIMONY FROM MR. O'CONNOR, THE PHENOMENON THAT HE IS

09:44:22   4   DESCRIBING, IS THAT WHAT'S KNOWN AS SEEPAGE?

09:44:23   5   A.  THAT WOULD BE THE INFERENCE I WOULD DRAW FROM HIS ANSWER, YES.

09:44:26   6   Q.  AND DID THE CONTRACT BETWEEN THE CORPS AND WGI REGARDING THE

09:44:30   7   EBIA SITE WORK, DID IT ADDRESS WHETHER OR NOT WGI WOULD BE

09:44:34   8   PROVIDING ANY GEOTECHNICAL AND ENGINEERING ASSISTANCE OR ADVICE?

09:44:37   9   A.  YES.  IT DID.

09:44:38  10   Q.  AND HOW SO?

09:44:39  11   A.  IN TASK ORDER 26.

09:44:45  12   Q.  IS THAT THE FIRST PAGE OF WHICH IS REFLECTED ON THE SCREEN?

09:44:47  13   A.  YES.

09:44:48  14   Q.  AND TURNING TO THE NEXT SLIDE, PLEASE.  IS THAT THE LANGUAGE

09:44:51  15   YOU HAD IN MIND?

09:44:52  16   A.  YES, "THE CONTRACTOR SHALL FURNISH ALL ENGINEERING SERVICES,

09:44:57  17   SUPPLYING PROJECT REQUIREMENTS."

09:44:59  18   Q.  AND TASK ORDER 26 IS, IN FACT, A TASK ORDER ISSUED PURSUANT TO

09:45:03  19   AN UMBRELLA CONTRACT, RIGHT?

09:45:05  20   A.  YES.  THERE'S TWO CONTRACTS:  THERE'S THE UMBRELLA CONTRACT IS

09:45:08  21   THE TERC, TOTAL ENVIRONMENTAL REMEDIATION CONTRACT, RESTORATION

09:45:13  22   CONTRACT.  I CAN'T REMEMBER WHAT THE "R" STANDS FOR.  AND THEN TASK

09:45:18  23   ORDERS WOULD BE -- TERCS GO ON FOR YEARS AND THEIR UMBRELLA NOT TO

09:45:24  24   EXCEED NUMBERS, VERY LARGE NUMBERS.  AND THEN TASK ORDER WOULD BE

09:45:28  25   THE CONTRACT THAT SPECIFICALLY ADDRESSES THE EBIA SITE AND WORK IN

09:45:34   1    NEW ORLEANS.

09:45:34   2    Q.  AND A TERC -- THE TERC CONTRACT IS AN IDIQ CONTRACT, RIGHT?

09:45:39   3    A.  YES, AN INDEFINITE DELIVERY, INDEFINITE QUALITY -- QUANTITY

09:45:44   4    CONTRACT, YES.

09:45:44   5    Q.  AND WHY IS THAT SIGNIFICANT TO YOUR ANALYSIS?

09:45:48   6    A.  WELL, IDIQ IS WHAT IS USED WHEN YOU HAVE A COMPLEX PROBLEM

09:45:57   7    WHERE IT'S VERY DIFFICULT AHEAD OF TIME TO SCOPE OUT HOW MUCH

09:46:01   8    ENGINEERING AND ANALYSIS IS GOING TO BE REQUIRED.  IN THE

09:46:06   9    INDEPENDENT ENGINEERING EVALUATION TEST THAT I DO FOR THE CORPS OF

09:46:11  10    ENGINEERS THROUGH NOBELIS AND BATTELLE, THOSE ARE IDIQ CONTRACTS.

09:46:16  11         BECAUSE WHEN WE GO IN AS A PEER-REVIEW PANEL ON

09:46:18  12    CONSTRUCTION METHODOLOGIES THAT THE CORPS IS PROPOSING TO USE FOR

09:46:23  13    DAM SAFETY REMEDIATION, WE NEVER KNOW HOW MANY HOURS WE'RE GOING TO

09:46:30  14    SPEND GOING BACK AND FORTH WITH THE CONTRACTOR, OR WITH THEIR

09:46:37  15    ENGINEERS WHO ARE PUTTING THESE PACKAGES TOGETHER, TO SEE WHETHER

09:46:40  16    WE CAN TWEAK THOSE DESIGNS SO THAT THEY ARE NOT OVERLY BROAD OR

09:46:50  17    OVERLY FAT.  SO AN IDIQ IS A VERY APPROPRIATE METHODOLOGY TO USE

09:46:56  18    WHEN YOU DON'T KNOW WHAT YOU HAVE PRECISELY AT THE SITE.  SO IT'S

09:47:00  19    VERY APPROPRIATE IN MY OPINION TO THE EBIA SITE.

09:47:02  20    Q.  AND THE TERC BETWEEN WGI AND THE CORPS IN THIS CASE, DID IT

09:47:07  21    HAVE ANY LANGUAGE ABOUT THE NEED FOR THE WGI TO PROVIDE ENGINEERING

09:47:10  22    ADVICE AND ENGINEERING SERVICES?

09:47:11  23    A.  YES.

09:47:12  24    Q.  AND WE WON'T GO THROUGH IT IN DETAIL, BUT IF YOU COULD BRING UP

09:47:16  25    THE NEXT SLIDE.  IS THAT THE LANGUAGE FROM THE TERC?

09:47:19  1   A.  YES.  IT'S PARAGRAPH -- UNDER SECTION 2.4 -- 2.4.3, ENGINEERING

09:47:27  2   ADVICE DURING THE REMEDIAL ACTION BY THE ARCHITECT ENGINEERING FIRM

09:47:33  3   PROVIDING THOSE SERVICES IN SUPPORT OF REMEDIAL ACTION.  SO TO ME

09:47:36  4   THAT SAYS THEY HAVE TO -- THEY'RE BEING CHARGED WITH PROVIDING

09:47:39  5   ENGINEERING ADVICE DURING THE REMEDIATION.

09:47:43  6   Q.  AND TURNING TO THE NEXT SLIDE, AND WE'RE TURNING TO TASK ORDER

09:47:46  7   26.  DOES TASK ORDER 26 REQUIRE THE CORPS TO PREPARE SOME TYPE OF A

09:47:50  8   REPORT IN CONNECTION WITH THIS WORK AT THE EBIA SITE?

09:47:53  9   A.  YES.  IT'S IN THE LOWER PARAGRAPH THERE.  IT SAYS, "CONTRACTOR

09:47:58  10  SHALL PREPARE A COMPREHENSIVE REPORT RECOMMENDING THE SCOPE AND

09:48:02  11  DURATION OF THE REMEDIATION AND DEMOLITION THAT WILL BE REQUIRED,

09:48:07  12  INCLUDING ANY DATA GAPS THAT MAY NEED TO BE FILLED BY SAMPLING OR

09:48:11  13  OTHER INVESTIGATIONS."

09:48:12  14  Q.  AND DID, IN FACT, WGI PREPARE SUCH A REPORT?

09:48:15  15  A.  YES, THEY DID.

09:48:16  16  Q.  IS THAT DEPICTED ON THE NEXT SLIDE?

09:48:19  17  A.  WELL, THAT'S THE COVER SHEET OF THE COMMENTS THAT CAME BACK.

09:48:25  18  IT WAS MORRISON KNUDSEN AT THAT TIME BEFORE WGI HAD BOUGHT THEM

09:48:30  19  OUT, AND THEY TURNED IN THEIR INITIAL REPORT SUBMITTAL, I BELIEVE,

09:48:34  20  ON 2 DECEMBER '99, THEN IT PASSED TO THE CORPS.  YOU CAN SEE THE

09:48:39  21  CORPS REVIEW ERS THERE LISTED, LEE GUILLORY, GARY BROUSE, GEORGE

09:48:43  22  BACUTA, AND GENE SPADARO FROM THE NEW ORLEANS DISTRICT.

09:48:47  23       THEY PASSED THAT BACK WITH THEIR COMMENTS ON 29 DECEMBER,

09:48:50  24  I WOULD TAKE FROM THE DATES SHOWN THERE.  AND THEN MORRIS KNUDSEN,

09:48:55  25  DENNIS O'CONNOR AND JIM BLAZEK, RESPONDED BY 10 JANUARY 2000.

09:49:01 1    Q.  AND IS THERE LANGUAGE WITHIN THE RECOMMENDATION REPORT THAT

09:49:04 2    INDICATES WGI WOULD BE PROVIDING ENGINEERING AND SPECIFICALLY

09:49:08 3    GEOTECHNICAL ENGINEERING SERVICES?

09:49:09 4    A.  YES, THERE IS.

09:49:10 5    Q.  AND IS THAT LANGUAGE DEPICTED ON THE SCREEN?

09:49:15 6    A.  YES.

09:49:15 7    Q.  WAS WGI THE ONLY PARTY THAT HAD RESPONSIBILITY FOR ENSURING

09:49:20 8    THAT A GEOTECHNICAL EVALUATION WAS PERFORMED?

09:49:22 9    A.  NO.  THE CORPS OF ENGINEERS IS ALSO OUT THERE WATCHING THE

09:49:27 10   PROJECT.  IT'S THEIR PROJECT.

09:49:29 11   Q.  AND DID YOU REVIEW TESTIMONY FROM REPRESENTATIVES OF THE CORPS

09:49:32 12   IN WHICH THEY ACKNOWLEDGED HAVING A RESPONSIBILITY?

09:49:35 13   A.  YES.

09:49:35 14   Q.  I APOLOGIZE.  BEFORE WE TURN TO THAT, DID YOU REVIEW ANY

09:49:43 15   TESTIMONY FROM CORPS REPRESENTATIVES IN WHICH THEY ACKNOWLEDGED

09:49:46 16   THAT THEY HAD AN EXPECTATION THAT WGI WOULD PROVIDE GEOTECHNICAL

09:49:49 17   SERVICES?

09:49:50 18   A.  YES.  THE EXCERPTS FROM LEE GUILLORY'S DEPOSITION, HIS 30(B)(6)

09:49:58 19   DEPOSITION WHICH ARE THERE ON THE SCREEN.

09:49:59 20   Q.  SO THEN TURNING TO THE SLIDE OF TESTIMONY FROM CORPS

09:50:02 21   REPRESENTATIVES ABOUT THEIR RESPONSIBILITY WITH RESPECT TO THE EBIA

09:50:06 22   PROJECT, IS THIS SOME OF THE TESTIMONY YOU'RE RELYING ON?

09:50:09 23   A.  YES.

09:50:09 24   Q.  AND WHO IS MR. PINNER?

09:50:10 25   A.  MR. PINNER IS CHIEF OF THE GEOTECHNICAL BRANCH AT THE NEW

09:50:16   1    ORLEANS DISTRICT, AND DR. GREISHABER WAS IN THE GEOTECHNICAL BRANCH

09:50:21   2    WHEN THEY WERE ACTUALLY DOING THE LOCK REPLACEMENT PROJECT DESIGN,

09:50:24   3    I BELIEVE, BACK IN THE 1990S, AND HE WENT ON TO BECOME THE

09:50:27   4    ASSISTANT CHIEF OF THE ENGINEERING DIVISION AT THE NEW ORLEANS

09:50:27   5    DISTRICT.

09:50:29   6    Q.  SO EVEN THOUGH THE CORPS HIRED WGI TO PERFORM THE GEOTECHNICAL

09:50:33   7    EVALUATION AND GEOTECHNICAL SERVICES, THE CORPS STILL HAD

09:50:38   8    RESPONSIBILITY TO ENSURE THAT THE GEOTECHNICAL EVALUATION WAS DONE

09:50:41   9    AND DONE PROPERLY?

09:50:43  10           MR. TREEBY:  YOUR HONOR, THAT IS TOTALLY -- THE

09:50:45  11    FOUNDATION FOR THAT QUESTION IS TOTALLY ABSENT.  THE DOCUMENTS THAT

09:50:49  12    HAVE BEEN SHOWN -- FIRST PLACE, THIS WITNESS TESTIFIED AT LENGTH

09:50:53  13    WHEN WE EXAMINED HIM, HE HAD NOT LOOKED AT ANY OF THE TERC

09:50:56  14    DOCUMENTS, HE HAD NOT LOOKED AT ANY OF THOSE, AND NOW HE IS TALKING

09:51:00  15    ABOUT THEM.  HE DIDN'T LOOK AT THEM BEFORE HE GAVE HIS OPINION.

09:51:03  16           BUT MORE IMPORTANTLY, THE QUESTION COUNSEL JUST ASKED

09:51:07  17    SAID -- AND, YOU KNOW, SAID AS THOUGH IT WAS A FACT, SOMEHOW WAS

09:51:11  18    BASED ON WHAT THE WITNESS WAS JUST SHOWN, THAT WASHINGTON GROUP WAS

09:51:17  19    HIRED TO DO GEOTECHNICAL WORK WITH REGARD TO THE FLOODWALLS AND

09:51:20  20    LEVEES.  THAT'S JUST A MISREPRESENTATION OF THE FACT AND NOT

09:51:24  21    SUPPORTED BY THE DOCUMENTS HE JUST SAID.  BUT COUNSEL KIND OF

09:51:26  22    INSERTED HIS QUESTION TO GET A YES, AND I OBJECT, BECAUSE THERE'S

09:51:30  23    NO FOUNDATION FOR THAT.

09:51:32  24           MR. SIMS:  WELL, YOUR HONOR, I THINK IT'S

09:51:33  25    MISCHARACTERIZING MY QUESTION.  I DIDN'T REFERENCE FLOODWALLS OR

09:51:36  1    LEVEES IN MY QUESTION.  SECOND, DR. ROGERS TESTIFIED AT HIS

09:51:39  2    DEPOSITION THAT HE'S VERY FAMILIAR WITH THE TERC PROJECTS IN

09:51:42  3    GENERAL FOR THESE TYPE OF SITES, HTRW SITES, AND IN HIS EXPERIENCE

09:51:46  4    THEY ALWAYS REQUIRE GEOTECHNICAL COMPONENTS, AND IT'S ON THAT BASIS

09:51:49  5    THAT HE ANSWERED THAT QUESTION AT HIS DEPOSITION.

09:51:52  6            THE COURT:  I AM GOING TO LET THAT BE EXPLORED ON

09:51:54  7    CROSS-EXAMINATION.  MOVE ON AND DON'T FORGET THIS IS SUPPOSED TO BE

09:51:57  8    705.  I AM GIVING YOU SOME LATITUDE, BUT I CAN SEE THAT IT'S

09:52:02  9    TRUNCATED, NOT AS MUCH AS I HAD WISHED, BUT I AM NOT GOING TO

09:52:05 10    DISRUPT IT THAT MUCH.  BUT I DO WANT YOU TO REALIZE ALL OF THIS CAN

09:52:10 11    BE BROUGHT OUT, AND IT MIGHT EVEN BE MORE ENLIGHTENING TO BRING IT

09:52:14 12    OUT ON CROSS-EXAMINATION.

09:52:16 13            MR. SIMS:  I UNDERSTAND, YOUR HONOR.

09:52:18 14    BY MR. SIMS:

09:52:18 15    Q.  DR. ROGERS, DID YOU UNDERSTAND MY QUESTION OR SHOULD I REPHRASE

09:52:20 16    IT?

09:52:21 17    A.  COULD YOU PLEASE?

09:52:22 18    Q.  SURE.  ASSUMING THAT THE CORPS HIRED WGI TO PERFORM

09:52:26 19    GEOTECHNICAL ENGINEERING SERVICES WITH REGARD TO THE EBIA SITE

09:52:30 20    PROJECT, DOES THAT FACT RELIEVE THE CORPS OF RESPONSIBILITY FOR

09:52:36 21    ENSURING THAT A GEOTECHNICAL EVALUATION OF THE EXCAVATIONS

09:52:40 22    PERFORMED AT THE EBIA SITE WAS, IN FACT, PERFORMED AND PERFORMED

09:52:44 23    CORRECTLY?

09:52:44 24    A.  NO, THAT'S THEIR OWN TESTIMONY.  I MEAN, THAT'S STANDARD

09:52:49 25    PROCEDURE WHEN YOU'RE OPERATING WITHIN 300 FEET OF THE FLOODWALL

09:52:53  1    YOU WOULD WANT SOMEBODY FROM GEOTECHNICAL LOOKING AT IT IF IT'S

09:52:57  2    MORE THAN -- IF IT'S SOMETHING MORE THAN THREE FEET DEEP.  YOU'RE

09:53:00  3    NOT GOING TO SEND IT OVER THERE EVERY TIME THEY DIG A LITTLE HOLE

09:53:04  4    SOMEWHERE.  THEY HAVE TO LOOK AT BOTH THE SCALE OF IT AND THE

09:53:06  5    AGGREGATE QUANTITY OF WHAT THEY'RE DOING OUT THERE.

09:53:10  6            THE GEOTECHNICAL BRANCH ENGINEERS HAVE THAT EXPERTISE TO

09:53:14  7    LOOK AT IT AND AT LEAST YOU'RE RUNNING IT BY THEM, AND THEY WOULD

09:53:17  8    SAY, OH, THIS IS STARTING TO GET A LOT BIGGER THAN I THOUGHT IT WAS

09:53:21  9    GOING TO BE.  CAN WE HAVE A DISCUSSION OR CAN WE DO THIS OR THAT?

09:53:25 10    I MEAN, IT'S THEIR DISCRETION TO DO WHATEVER THEY FEEL THEY NEED TO

09:53:30 11    DO TO MAINTAIN THE INTEGRITY OF THAT FLOOD PROTECTION SYSTEM.

09:53:33 12    Q.  DR. ROGERS, DO THE ELEMENTS OF A GEOTECHNICAL EVALUATION

09:53:37 13    INCLUDE AN ANALYSIS OF LOCAL STABILITY, GLOBAL STABILITY, AND

09:53:42 14    SEEPAGE?

09:53:43 15    A.  THOSE ARE USUALLY THREE OUT OF ABOUT, YEAH, SIX OR SEVEN THAT

09:53:47 16    ARE VERY TYPICALLY DONE, YES.

09:53:48 17    Q.  AND DR. GREISHABER CERTAINLY RECOGNIZES THAT; IS THAT RIGHT?

09:53:52 18    A.  I BELIEVE SO.

09:53:52 19    Q.  WHAT ABOUT SEEPAGE AND UPLIFT PRESSURE EFFECTS, SHOULD A

09:53:57 20    GEOTECHNICAL EVALUATION ADDRESS THOSE EFFECTS?

09:53:58 21    A.  GENERALLY DOES, YES.

09:53:59 22    Q.  AND HAVE YOU SEEN TESTIMONY FROM THE CORPS ACKNOWLEDGING THAT

09:54:03 23    FACT?

09:54:03 24    A.  YES.

09:54:04 25    Q.  IS THAT REFLECTED IN THE SLIDE?

09:54:06  1    A.  YES, IT IS.

09:54:07  2    Q.  HAVE YOU SEEN ANY MATERIALS IN TERMS OF ENGINEERING MANUALS AND

09:54:12  3    ENGINEERING REGULATIONS THAT WE DESCRIBED EARLIER?  DO SOME OF

09:54:16  4    THOSE ADDRESS THE HAZARDS ASSOCIATED WITH SEEPAGE AND UPLIFT?

09:54:19  5    A.  YES.  THE LEVEE MANUAL THE CORPS MAINTAINS.  1913 COVERS THAT

09:54:26  6    IN CHAPTER 5 ON SEEPAGE CONTROL.

09:54:28  7    Q.  AND WE WON'T REVIEW THIS, SO IF YOU COULD GO TO SLIDE 30,

09:54:33  8    PLEASE, CARL.  HAVE YOU SEEN ANY MATERIALS FROM THE CORPS DATING

09:54:37  9    BACK TO THE 1960S IN WHICH THE CORPS RECOGNIZED SPECIFIC TO THE

09:54:41 10    EBIA SITE THE HAZARD OF SEEPAGE AND UPLIFT?

09:54:45 11    A.  YES, IN THE DESIGN MEMORANDUM NO. 3.  THAT'S THE COVER PAGE YOU

09:54:49 12    SEE THERE.

09:54:50 13    Q.  AND IS THIS A SNIP IT FROM THE TABLE OF CONTENTS OF THAT DESIGN

09:54:55 14    MEMORANDUM?

09:54:55 15    A.  YES, IT IS.

09:54:56 16    Q.  AND PARAGRAPH 27 IS ADDRESSED THE DESIGN AND CONSTRUCTION

09:54:58 17    PROBLEMS, CORRECT?

09:54:59 18    A.  YES.

09:54:59 19    Q.  AND THE NOTATION IN THE PARENTHETICAL, DOES THAT SPECIFIC

09:55:04 20    NOTATION, DOES THAT ENCOMPASS THE EBIA SITE?

09:55:06 21    A.  YEAH, THE EBIA IS BASICALLY FROM STATION 16 OR STATION 14 TO

09:55:11 22    ABOUT STATION 66, SO IT IS WITHIN THAT REACH THAT'S LISTED THERE.

09:55:15 23    Q.  AND TURNING TO THE NEXT SLIDE, THIS PASSAGE APPEARS IN

09:55:19 24    PARAGRAPH 27; IS THAT RIGHT?

09:55:20 25    A.  YES.

09:55:20  1    Q.  AND IS IT SIGNIFICANT BECAUSE THE CORPS RECOGNIZES THE

09:55:24  2    POTENTIAL PROBLEM OF SEEPAGE AND UPLIFT?

09:55:26  3    A.  YES.

09:55:27  4    Q.  SO BASED ON YOUR REVIEW OF TESTIMONY BY THE CORPS

09:55:32  5    REPRESENTATIVES, THE CORPS' OWN POLICIES AND PROCEDURES, THE CORPS'

09:55:36  6    ANALYSIS OF THE EBIA SITE, AND YOUR OWN EXPERIENCE IN THE INDUSTRY,

09:55:40  7    SHOULD A GEOTECHNICAL EVALUATION INCLUDE AN ASSESSMENT OF SEEPAGE

09:55:44  8    AND UPLIFT?

09:55:44  9    A.  YES.

09:55:45  10   Q.  AND DID YOU REVIEW THE TESTIMONY OF DR. GREISHABER WHEN HE

09:55:49  11   DESCRIBES THE PROCEDURE THAT SHOULD BE FOLLOWED WHEN PERFORMING A

09:55:52  12   GEOTECHNICAL EVALUATION?

09:55:53  13   A.  YES.

09:55:54  14   Q.  IS THAT SUMMARIZED HERE ON THE SCREEN?

09:55:55  15   A.  YES.

09:55:56  16   Q.  ARE YOU AWARE OF ANY EXAMPLES WHERE THE CORPS REVISITED THE

09:56:03  17   ANALYSIS DONE IN 1966 BECAUSE THERE WAS NEW INFORMATION OR THERE

09:56:08  18   HAD BEEN A CHANGE CONDITION?

09:56:09  19   A.  YES, THAT OCCURRED IN 1980 IN THE FLORIDA AVENUE IMPROVEMENT

09:56:13  20   PROJECT.

09:56:13  21   Q.  AND CAN YOU BRIEFLY DESCRIBE WHAT HAPPENED?

09:56:16  22   A.  WELL, THE CORPS CAME IN TO THAT AREA IN THE LATE '70S AND 1980

09:56:26  23   AND PUT THE REPORT OUT, AND THEY DRILLED A FEW MORE BORINGS AT THE

09:56:29  24   NORTH END OF THE EBIA SITE NEAR THE SIPHON STRUCTURES AND CROSSOVER

09:56:35  25   STRUCTURES THAT ARE THERE FOR SEWER AND WATER AND FLOOD RUN OFF

09:56:39  1   THAT GOES TO PUMP STATION 5, AND THEY SAW THINGS IN THOSE BORING

09:56:44  2   LOGS THAT CONCERNED THEM, GAVE THEM A DIFFERENT CROSS SECTION.

09:56:49  3   THEY IDENTIFIED SOME SILTS AND SOME FILL MATERIALS, AND THEY HAD A

09:56:57  4   VERY GOOD-SIZED WALL THEY WERE GOING TO PUT IN ALONG THERE TO

09:57:00  5   SAFEGUARD THAT AREA.  AND THEY DID A LANE'S WEIGHTED CREEP RATIO

09:57:06  6   ASSESSMENT ON THAT T-WALL, REINFORCED CONCRETE T-WALL, AND ENDED UP

09:57:10  7   DECIDING THEY HAD TO HAVE SHEET PILES THAT WERE A LOT DEEPER THAN

09:57:13  8   THE SHEET PILES THAT HAD BEEN PUT IN IN THE 19 -- LATE '60S RIGHT

09:57:18  9   THERE NEXT TO THEM.

09:57:19 10   Q.  SO, DR. ROGERS, I WOULD LIKE TO BRIEFLY TALK TO YOU ABOUT WHAT

09:57:23 11   GEOTECHNICAL EVALUATION WAS ACTUALLY PERFORMED IN CONNECTION WITH

09:57:26 12   THE EBIA WORK SPECIFICALLY.  LET ME ASK YOU FIRST ABOUT WGI.  DID

09:57:29 13   WGI PERFORM ANY GEOTECHNICAL EVALUATIONS THAT YOU COULD DISCERN?

09:57:32 14   A.  NONE THAT I'VE SEEN TO DATE, NO.

09:57:35 15   Q.  AND HAVE YOU FOUND ANY INSTANCES THAT THEY RELIED ON A

09:57:39 16   SUBCONTRACTOR TO PERFORM A GEOTECHNICAL EVALUATION OF ANY KIND?

09:57:42 17   A.  YES.  THEY HAD A SUBCONTRACTOR, REGISTERED CIVIL ENGINEER IN

09:57:47 18   LOUISIANA DO A CAISSON DESIGN FOR THEM FOR THE SEWER LIFT STRUCTURE

09:57:54 19   AND FOR THE WEDDING CAKE STRUCTURE AND FOR THE SUNKEN TANKER RAIL

09:57:58 20   CAR OUT ON THE SHORELINE.

09:58:00 21   Q.  AND ARE THOSE THE ONLY THREE EXCAVATIONS WHICH YOU COULD

09:58:03 22   IDENTIFY WHERE WGI RELIED ON A SUBCONTRACTOR FOR SOME TYPE OF

09:58:07 23   GEOTECHNICAL ENGINEERING EXPERIENCE?

09:58:08 24   A.  YES.

09:58:09 25   Q.  AND TO YOUR KNOWLEDGE, DID THAT SUBCONTRACTOR EVER LOOK AT

09:58:12  1    SEEPAGE?

09:58:13  2    A.   NOT THAT I AM AWARE OF.

09:58:14  3    Q.   IN LIGHT OF WHAT WGI DID AT THE EBIA SITE IN TERMS OF

09:58:20  4    GEOTECHNICAL EVALUATION, WHAT IS YOUR OPINION ON WHETHER OR NOT WGI

09:58:24  5    MET THE STANDARD OF CARE WHEN PERFORMING EXCAVATIONS ADJACENT TO A

09:58:28  6    LEVEE OR FLOODWALL?

09:58:30  7    A.   I FEEL THEY FELL BELOW THE STANDARD OF CARE, ESPECIALLY WHEN

09:58:34  8    THEY WERE EXCAVATING SO CLOSE TO IT AND EXPOSING PERVIOUS MATERIALS

09:58:40  9    IN SOME INSTANCES.

09:58:42  10   Q.   AND HOW ABOUT THE CORPS?  TO YOUR KNOWLEDGE, DID ANYONE AT THE

09:58:45  11   CORPS PERFORM A GEOTECHNICAL EVALUATION WITH REGARD TO ANY OF THE

09:58:48  12   EXCAVATIONS AT THE EBIA SITE?

09:58:50  13   A.   ON ONE OCCASION.

09:58:53  14   Q.   AND WHEN WAS THAT?

09:58:54  15   A.   THAT WAS THE MCDONOUGH MARINE BURROW PIT AND A 125-FOOT SECTION

09:59:00  16   OF SUREKOTE ROAD THAT WAS WITHIN 16 FEET OF THE FLOODWALL.

09:59:04  17   Q.   AND OTHER THAN THOSE TWO EVALUATIONS OR THOSE TWO EXCAVATIONS,

09:59:10  18   DID YOU COME ACROSS ANY EVIDENCE TO SUGGEST THAT THE CORPS

09:59:12  19   PERFORMED A GEOTECHNICAL EVALUATION WITH REGARD TO ANY OF THE OTHER

09:59:15  20   EXCAVATIONS AT THE EBIA SITE?

09:59:17  21   A.   NO.

09:59:17  22   Q.   DID THE CORPS' ACTIONS SATISFY THE STANDARD OF CARE WHEN HIRING

09:59:25  23   AN ARCHITECTURE AND ENGINEERING FIRM LIKE WGI TO DESIGN AND OVERSEE

09:59:30  24   EXCAVATIONS IN THE VICINITY OF THE FLOODWALL?

09:59:31  25   A.   I DON'T BELIEVE THEY DID, NO.

09:59:32  1    Q.  LET'S TALK BRIEFLY ABOUT BACKFILL AND COMPACTION.  WHAT IS

09:59:36  2    BACKFILL, DR. ROGERS?

09:59:37  3    A.  BACKFILL IS WHEN YOU GENERALLY PUT EARTHEN MATERIAL, CAN BE

09:59:44  4    GRAVEL OR CLAY, WHATEVER YOU HAVE AS BACKFILL, PUT IT BACK INTO AN

09:59:48  5    EXCAVATION.

09:59:51  6    Q.  AND WHAT DOES COMPACTION MEAN?

09:59:53  7    A.  COMPACTION MEANS YOU DENSIFY THAT FILL MATERIAL TO TRY AND

09:59:58  8    EXPEL AS MANY OF THE AIR VOIDS AS REASONABLY POSSIBLE SO THAT YOU

10:00:03  9    INCREASE ITS STRENGTH, YOU DECREASE ITS DEFORMABILITY, YOU INCREASE

10:00:10 10    ITS ABILITY TO RESIST PENETRATION OF SEEPAGE IF IT'S COHESIVE

10:00:19 11    MATERIAL, IF IT'S CLAY MATERIAL.

10:00:21 12    Q.  AND ARE THERE TESTS AVAILABLE THAT WILL TEST THE LEVEL OF SOIL

10:00:25 13    COMPACTION?

10:00:25 14    A.  YES.  SOIL COMPACTION TESTS BEGAN WITH A GUY NAMED PAPPY PORTER

10:00:29 15    WITH THE CALIFORNIA DIVISION OF HIGHWAYS IN 1927.  FIRST STANDARD

10:00:34 16    CAME OUT IN 1928, IT WAS A WET DENSITY STANDARD.  AND THE DRY

10:00:38 17    DENSITY STANDARD, THE ONE WE CALL THE PROCTOR TEST WAS DEVELOPED BY

10:00:42 18    A RALPH ROSCOE PROCTOR AT THE LA DEPARTMENT OF WATER AND POWER IN

10:00:45 19    THE FALL OF '32, SPRING OF 1933, FOR THE BOUQUET CANYON RESERVOIR

10:00:53 20    PROJECT WERE TWO EMBANKMENT DAMS.

10:00:55 21         AND THOSE WERE PUBLISHED IN A SERIES OF FIVE ARTICLES IN

10:00:58 22    ENGINEERING NEWS RECORD THROUGH THE SUMMER OF 1933 AND EARLY FALL

10:01:04 23    OF 1933, AND THEY QUICKLY BECAME THE STANDARD THAT EVERYBODY USED,

10:01:08 24    INCLUDING THE ARMY CORPS OF ENGINEERS BY 1940 WERE USING IT.

10:01:12 25         AND THEN THE MODIFIED PROCTOR TEST WAS DEVELOPED BY THE

10:01:16  1   CORPS OF ENGINEERS DURING THE SECOND WORLD WAR, ACTUALLY STARTING
10:01:21  2   IN MAY OF 1941 THROUGH ABOUT OCTOBER '45.  AND IT WAS PRINCIPALLY
10:01:27  3   FOCUSED ON AIRFIELD PAVEMENTS AND HIGHWAY PAVEMENTS THAT THEY
10:01:33  4   DEVELOPED A MUCH STRICTER STANDARD WITH MORE ENERGY INPUT.  THE
10:01:36  5   STANDARD PROCTOR HAS AN ENERGY INPUT OF 12,600-FOOT POUNDS PER
10:01:42  6   CUBIC FOOT OF SOIL.  THE MODIFIED PROCTOR STANDARD HAS 56,000-FOOT
10:01:47  7   POUNDS OF INPUT ENERGY PER CUBIC FOOT OF SOIL.
10:01:50  8   Q.  AND IF YOU'RE GIVEN A PARTICULAR COMPACTION SPECIFICATION SUCH
10:01:53  9   AS 90 PERCENT PROCTOR FOR A SITE, HOW WOULD YOU GO ABOUT
10:01:56 10   DETERMINING IF THAT LEVEL OF COMPACTION HAD BEEN MET?
10:01:58 11   A.  WELL, YOU START BY GOING OUT TO THE SITE AND GETTING ABOUT AN
10:02:02 12   85 TO 100-POUND BULK SAMPLE OF WHAT YOU FEEL IS REPRESENTATIVE
10:02:07 13   MATERIAL THAT YOU'RE GOING TO BE DEALING WITH.  SOMETIMES YOU
10:02:10 14   EXCAVATE A TEST PIT TO GET THAT MATERIAL, A SMALL TEST PIT.  AND
10:02:15 15   YOU TAKE IT BACK TO YOUR SOILS LABORATORY AND YOU DRY IT OUT, SOME
10:02:21 16   OF IT OUT AND SOME OF IT YOU LEAVE IT IN NATURAL MOISTURE; AND YOU
10:02:25 17   CHANGE THE MOISTURE CONTENT, BUT YOU COMPACT IT WITH THE SAME LEVEL
10:02:29 18   OF ENERGY, 12,600-FOOT POUNDS PER CUBIC FOOT FOR THE STANDARD
10:02:34 19   PROCTOR TEST.
10:02:35 20           AND BY DOING THAT, WHAT YOU SEE IS THE IMPACT OF MOISTURE
10:02:39 21   ON THE DENSIFICATION PROCESS.  IF YOU DON'T EXPEL -- IF THE SOIL
10:02:46 22   IS -- IF IT'S CLAY SOIL AND IT'S TOO WET, IT'S VERY HARD TO COMPACT
10:02:50 23   AND GET THE AIR VOIDS EXPELLED BECAUSE THE CLAY SOIL IS VERY, VERY,
10:02:57 24   TIGHT AND DOESN'T LIKE TO GIVE UP THE AIR THAT'S ENTRAINED IN IT.
10:03:01 25   IF YOU DRY IT OUT MORE, IT'S EASIER TO COMPACT, BUT IT HAS OTHER

10:03:07  1   DELETERIOUS SIDE EFFECTS BECAUSE IT CAN ABSORB MUCH MORE WATER

10:03:11  2   LATER AND SOFTEN THROUGH THAT ABSORPTION OF WATER AND SWELLING.

10:03:15  3          SO THE IDEA IS TO GO OUT THERE AND SEE WHAT THE OPTIMUM

10:03:20  4   MOISTURE CONTENT IS.  THAT'S THE OPERATIVE THING THEY WANT TO FIND

10:03:24  5   OUT SO THEY KNOW HOW CLOSE ARE THEY TO OPTIMUM MOISTURE CONTENT

10:03:30  6   BECAUSE THAT'S GOING TO HELP THEM MECHANICALLY COMPACT THE SOIL.

10:03:33  7   SO WE EVEN USE THAT FOR SEMI-COMPACTED FILL STANDARDS ON ANY LEVEE

10:03:37  8   REPAIRS, LEVEE TRIMMING OR ROUTINE STUFF.  YOU STILL GOT TO KNOW

10:03:40  9   THE OPTIMUM MOISTURE CONTENT OF THE MATERIAL YOU'RE WORKING WITH.

10:03:48 10          THEN, ONCE YOU HAVE THAT, WE CALL IT IN A COLLOQUIAL TERM

10:03:49 11   FOR IT IS A COMPACTION CURVE.  ONCE YOU HAVE THE COMPACTION CURVE,

10:03:51 12   THEN YOU WOULD SEND A SOILS TECHNICIAN OUT TO THE FIELD WHERE

10:03:56 13   THEY'RE DOING THE FILLING, AND DEPENDING ON WHAT KIND OF ROLLER

10:04:01 14   THEY'RE USING, IF THEY'RE USING A PAD ROLLER OR A SHEEP'S FOOT

10:04:05 15   ROLLER, YOU WILL EXCAVATE DOWN TO GET BENEATH THE SURFACE, FOUR TO

10:04:09 16   SIX TO 12 INCHES, YOU TAKE A DENSITY TEST, AND THEN YOU BURN -- YOU

10:04:14 17   TAKE A SAMPLE OF THE SOIL AND YOU KNOW THE VOLUME OF THAT SAMPLE

10:04:19 18   AND YOU CAN DETERMINE THE DENSITY USING SAND CONE OR NUCLEAR

10:04:24 19   DENSITY GAUGE WITH A CESIUM-134 ELEMENT TO GET THE WATER CONTENT.

10:04:29 20   AND THEN YOU LOOK AT THE WATER CONTENT COMPARED TO COMPACTION CURVE

10:04:32 21   AND SEE WHERE YOU ARE.  ARE YOU AT 85 PERCENT, 90 PERCENT,

10:04:37 22   95 PERCENT.  SO IT'S A TEST.  IT'S A ROUTINE TEST THAT YOU RUN WHEN

10:04:41 23   YOU'RE PLACING FILL.

10:04:43 24   Q.  AND, DR. ROGERS --

10:04:46 25          MR. MITSCH:  YOUR HONOR, THAT LAST RESPONSE BY DR. ROGERS

```
10:04:50   1   DIDN'T SOUND LIKE A SUMMARY.  I AM NOT GOING TO OBJECT TO IT.  I
10:04:54   2   JUST WANT TO POINT OUT THAT THAT KIND OF RESPONSE IS OUTSIDE 705.
10:05:01   3   AND IF HE IS GOING TO BE GIVEN THAT LATITUDE, WHAT'S SAUCE FOR THE
10:05:08   4   GOOSE IS SAUCE FOR THE GANDER.
10:05:09   5          THE COURT:  THAT'S TRUE.  WHATEVER -- I AGREE WITH THE
10:05:11   6   SAUCE FOR THE GOOSE, SAUCE FOR THE GANDER.  AND THE COURT IS AWARE
10:05:14   7   THAT -- LET ME SAY THIS.  IF YOUR DIRECT EXPERT TESTIMONY IS
10:05:23   8   SUFFICIENTLY TRUNCATED, THE COURT WILL GIVE YOU SOME LATITUDE.  SO
10:05:29   9   HOW MUCH MORE TIME DO YOU HAVE?
10:05:31  10          MR. SIMS:  I HAVE FIVE QUESTIONS LEFT, YOUR HONOR.
10:05:33  11          THE COURT:  AND I DO AGREE THAT THAT WAS BEYOND WHAT I
10:05:36  12   ENVISIONED, BUT AS LONG AS IT'S -- AS LONG AS EVERYBODY'S
10:05:42  13   SUFFICIENTLY TRUNCATED, THIS HAS BEEN A LITTLE MORE THAN I THOUGHT,
10:05:46  14   BUT IF YOU COULD FINISH IT IN FIVE QUESTIONS THAT AT LEAST WILL BE
10:05:49  15   YOUR EXPERT WILL HAVE TAKEN LESS THAN AN HOUR OR AN HOUR ON DIRECT.
10:05:54  16   I CAN LIVE WITH THAT.  GO AHEAD.
10:05:56  17          MR. SIMS:  THANK YOU, YOUR HONOR.
10:05:57  18   BY MR. SIMS:
10:05:58  19   Q.  DR. ROGERS --
10:05:59  20          THE COURT:  DEPENDING ON THE EXPERT.  SOME EXPERTS MAY BE
10:06:01  21   MORE TRUNCATED.
10:06:02  22          MR. MITSCH:  EXACTLY, WE UNDERSTAND.
10:06:04  23   BY MR. SIMS:
10:06:04  24   Q.  DR. ROGERS, BASED ON YOUR REVIEW OF THE SITE DOCUMENTS AND
10:06:07  25   PHOTOGRAPHS, DO YOU KNOW IF WGI ALWAYS BACKFILLED ITS EXCAVATIONS
```

10:06:10  1    WITH THE SAME MATERIAL THAT WAS REMOVED FROM THOSE EXCAVATIONS?

10:06:14  2    A.  NO.  COUNSEL, THAT'S NOT REALLY POSSIBLE IN AN ENVIRONMENTAL

10:06:18  3    REMEDIATION PROJECT BECAUSE THEY'RE TRYING TO REMOVE TAINTED

10:06:22  4    MATERIALS.  AND THEY ALSO ARE REMOVING DEBRIS, CONSTRUCTION DEBRIS,

10:06:28  5    TRASH, ALL MANNER OF THINGS WERE ON THIS SITE, SO IT'S NOT ALWAYS

10:06:32  6    POSSIBLE TO PUT THE SAME MATERIAL BACK.  IN FACT, THAT'S NOT GOING

10:06:36  7    TO HAPPEN VERY OFTEN IF YOU'RE ACTUALLY TAKING TAINTED MATERIAL OUT

10:06:40  8    AND DEBRIS OUT.

10:06:41  9    Q.  AND, DR. ROGERS, IF A SPECIFIC COMPACTION STANDARD HAD BEEN

10:06:47 10    IDENTIFIED SUCH AS 90 PERCENT PROCTOR OR COMPACTING TO THE SAME

10:06:50 11    LEVEL OF DENSITY AS THE ADJACENT SOILS, WOULD COMPACTION TESTING BE

10:06:55 12    REQUIRED TO ENSURE THAT THAT STANDARD HAD BEEN MET?

10:06:58 13    A.  YES.

10:06:59 14    Q.  AND DID YOU REVIEW ANY COMPACTION TESTING THAT WAS DONE BY WGI,

10:07:04 15    ITS SUBCONTRACTORS, OR THE CORPS AT THE EBIA SITE DURING THE

10:07:07 16    PENDENCY OF THIS PROJECT?

10:07:09 17    A.  NO, I NEVER SAW ANY.

10:07:11 18    Q.  BASED ON YOUR REVIEW THEN ON THE SITE DOCUMENTS AND

10:07:15 19    PHOTOGRAPHS, DO YOU KNOW IF WGI AND THE CORPS SATISFIED THE

10:07:17 20    STANDARD OF CARE WITH REGARD TO THE COMPACTION AND BACKFILLING

10:07:22 21    MATERIALS?

10:07:22 22    A.  I DON'T FEEL THAT THEY DID.

10:07:25 23         MR. SIMS:  THANK YOU, YOUR HONOR, I PASS THE WITNESS.

10:07:28 24         THE COURT:  COUNSEL, I AM GOING TO GIVE YOU THE OPTION.

10:07:30 25    DO YOU WANT TO TAKE A TEN-MINUTE RECESS BEFORE YOU START OR START

10:07:33  1   AND THEN TAKE A RECESS?

10:07:34  2          MR. MITSCH:  I THINK I WOULD RATHER HAVE TEN MINUTES SO I

10:07:37  3   CAN GET SET UP.

10:07:37  4          THE COURT:  THAT'S WHAT I THOUGHT AND YOU CERTAINLY HAVE

10:07:39  5   THAT.

10:07:40  6          MR. BRUNO:  YOUR HONOR, MAY WE JUST HAVE A SHORT SIDE

10:07:42  7   BAR?  JUST TWO SECONDS.

10:07:44  8          THE COURT:  OKAY.

10:07:58  9       (WHEREUPON, THE FOLLOWING SIDEBAR CONFERENCE WAS HELD:)

10:08:02  10         MR. BRUNO:  FIRST, JUDGE, WE WENT THROUGH A MONTH-LONG

10:08:11  11  TRIAL IN ROBINSON AND DIDN'T HAVE ANY DIFFICULTY WITH THIS

10:08:13  12  TRUNCATED PROCESS.  I HAVE ONE EXPERT WITNESS LEFT DR. ROBERT BEA.

10:08:18  13  HE IS A VERY CONTROVERSIAL EXPERT.  I AM SIMPLY WONDERING WHETHER

10:08:21  14  OR NOT IT WILL BE WORTH FIVE MINUTES OF THE COURT'S TIME SOMETIME

10:08:24  15  LATER TODAY TO DISCUSS WHAT YOU HAVE IN MIND WITH REGARD TO

10:08:26  16  TRUNCATED.  OBVIOUSLY, IF IT WAS NOT LIMBED TO TIME, BUT THEY HAVE

10:08:29  17  SOMETHING IN THEIR MIND, YOU HAVE SOMETHING IN YOUR MIND, I HAVE AN

10:08:32  18  OBLIGATION TO MEET MY BURDEN OF PROOF, SO I DON'T WANT TO MAKE ANY

10:08:35  19  MISTAKES.  I WAS HOPING THAT WE COULD HAVE A DISCUSSION.

10:08:38  20         THE COURT:  YOU HAVE RECROSS.

10:08:41  21         MR. BRUNO:  I UNDERSTAND.  BUT IN TERMS -- I AM JUST

10:08:43  22  TRYING TO MAKE SURE MY GUYS WHEN THEY PUT BEA ON --

10:08:48  23         THE COURT:  GO AHEAD.

10:08:49  24         MR. BRUNO:  I KNOW I HAVE RECROSS.  THAT'S WHY I ASKED

10:08:51  25  THE QUESTION.  WAS MY CROSS, MY CROSS -- DIRECT, CROSS, I HAVE

10:08:58  1   REDIRECT.

10:09:00  2            THE COURT:  UH-HUH.

10:09:01  3            MR. BRUNO:  I ASK YOU, AM I LIMITED ON MY REDIRECT BY

10:09:04  4   WHAT THEY COVER ON CROSS?  SUPPOSE THEY SIT DOWN AND DON'T SAY

10:09:07  5   ANYTHING, THEN I AM KIND OF IN A TRICK BAG.

10:09:09  6            THE COURT:  THOSE OPINIONS ARE LOOKING PRETTY GOOD.

10:09:11  7            MR. BRUNO:  BUT THEN THE SCOPE.

10:09:13  8            THE COURT:  HIS OPINIONS ARE LOOKING PRETTY GOOD.  I

10:09:16  9   ASSUME THEY'RE UNCONTESTED.

10:09:18 10            MR. BRUNO:  I'M TALKING ABOUT A LITTLE BIT MORE MEAT ON

10:09:20 11   THE BONES.

10:09:20 12            THE COURT:  THE FIFTH CIRCUIT MIGHT BUT THAT'S GOING TO

10:09:22 13   BE THEIR PROBLEM.  IF THEY DO NOT PRESENT ANY CROSS-EXAMINATION AND

10:09:26 14   THE OPINIONS ARE GIVEN AS I'VE MADE THE RULE, YOU CAN SAY THIS IS

10:09:30 15   WHAT I'VE RELIED ON TO MAKE MY OPINION.

10:09:31 16            MR. BRUNO:  OKAY.  FAIR ENOUGH.

10:09:32 17            THE COURT:  IN OTHER WORDS, THIS IS WHAT I RELIED UPON TO

10:09:34 18   MAKE MY OPINIONS.  I REVIEWED THE FOLLOWING AND HERE ARE MY

10:09:36 19   OPINIONS.  BOOM.

10:09:39 20            MR. BRUNO:  GOTCHA.

10:09:40 21            THE COURT:  NOBODY QUESTIONS HIM, LET ME JUST SAY THIS, I

10:09:42 22   WILL BE SHOCKED.

10:09:43 23            MR. SMITH:  JUDGE, WE'RE TALKING ABOUT MR. WITNESS.  THE

10:09:46 24   PLAINTIFFS HAVE DR. BEA, REALLY, REALLY, DO THEY THINK THEY ARE NOT

10:09:51 25   GOING TO CROSS DR. BEA?

10:09:53 1          MR. BRUNO:  NOT THE POINT.  I AM AN ADVOCATE.  I HAVE TO

10:09:56 2  COVER MY BUTT, AND I DON'T KNOW WHAT THEY'RE GOING TO DO OR NOT DO.

10:09:59 3  I WANT TO HELP SERVE THE COURT.  I HAVE A GUY COMING ON MONDAY --

10:10:02 4          THE COURT:  YOUR MOTION IS YOU GIVE WHAT YOU DID TO

10:10:05 5  PREPARE FOR YOUR OPINIONS, YOU BASICALLY GIVE YOUR OPINIONS, AND

10:10:09 6  THEN THE OTHER SIDE HAS AT THOSE OPINIONS, AND THEN YOU CAN COME

10:10:13 7  BACK AND SAY, WELL, WHAT DID YOU RELY ON TO MAKE THE OPINION?  THEN

10:10:18 8  THEY'LL BE ASKING WHAT HE RELIED ON AS WELL.

10:10:21 9          MR. BRUNO:  THAT'S FINE.  THAT SHOULD TAKE NO MORE THAN

10:10:23 10  20 MINUTES 30 MINUTES, ALL OF THE EXPERTS, NOT TWO HOURS.

10:10:27 11          THE COURT:  I AM NOT SURE ABOUT THAT.  IT MAY TAKE A

10:10:29 12  LITTLE LONGER THAN THAT.  I AM GOING TO GIVE SOME LEEWAY.  THIS IS

10:10:32 13  NOT SOMETHING -- I AM NOT MOSES, YOU KNOW.  WE'RE DOING THE BEST WE

10:10:37 14  CAN.  WHAT I MEAN IS I DIDN'T GET SOMETHING ENLIGHTENING ON A

10:10:41 15  TABLET.  WE ARE GOING TO USE COMMONSENSE IN DOING THAT.

10:10:45 16          MR. BRUNO:  WHAT AT I AM TRYING TO DO, AS THE GUY FIRST

10:10:48 17  UP IN THE CASE, I'M THE PLAINTIFF.  I AM THE FIRST UP.  THEY HAVE

10:10:50 18  THE OPPORTUNITY TO SEE HIS EXPERIENCE AND GET A SENSE OF WHERE

10:10:53 19  YOU'RE COMING FROM.  ALL I WANT TO DO IS MAKE SURE THAT ON MONDAY I

10:10:56 20  MAKE THIS AS SMOOTH AS I POSSIBLY CAN FOR THE COURT AND FOR

10:11:00 21  EVERYBODY INVOLVED.

10:11:01 22          THE COURT:  WE CAN TALK ABOUT THAT.  LET'S GO ON WITH THE

10:11:03 23  CASE RIGHT NOW.  IF YOU WANT TO TALK ABOUT DR. BEA, LET'S GET THIS

10:11:07 24  THING MOVING FIRST.  AND BELIEVE ME I THINK THERE IS GOING TO BE

10:11:10 25  SUFFICIENT QUESTIONS.

10:11:12  1              MR. BRUNO:  OKAY.

10:11:13  2              THE COURT:  IF NOT, YOU WIN.  WHAT I AM SAYING IS YOU

10:11:19  3    DON'T HAVE TO DISCLOSE THE UNDERLYING DATA.  IF HE GIVES HIS

10:11:23  4    OPINION AND NO ONE QUESTIONS HIM, WELL, THOSE OPINIONS ARE GOLDEN.

10:11:27  5              MR. BRUNO:  GOTCHA.  WE ARE NOW GOING TO START OUR

10:11:35  6    TEN-MINUTE RECESS.

10:45:27  7          (WHEREUPON, A RECESS WAS TAKEN.)

10:25:41  8          (OPEN COURT.)

10:25:41  9              THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE BE SEATED.

10:25:46 10              THE COURT:  BEFORE WE COMMENCE, JUST ONE BRIEF STATEMENT

10:25:48 11    ON THE 705 ISSUE.  THE COURT'S PURPOSE WAS TO HAVE A TRUNCATED

10:25:57 12    PRESENTATION ON DIRECT SO THAT THE FOCAL POINT OF THE OPINIONS

10:26:02 13    WOULD NOT BE OBSCURED IN TWO DAYS OF TESTIMONY AND IT MORE DIRECTLY

10:26:11 14    PRESENTS WHAT THE EXPERT'S GOING TO BE TESTIFYING ABOUT.  IN THE

10:26:16 15    EVENT THAT AN EXPERT AFTER HE OR SHE GIVES THEIR RESPECTIVE

10:26:24 16    DOCUMENTS AND THINGS THAT THEY DID AND THEIR SUMMARY OPINION, IF NO

10:26:29 17    ONE QUESTIONS THEM, WELL, THE COURT WILL FIND THOSE OPINIONS ARE

10:26:34 18    UNCHALLENGED.  THERE'S A TON OF EVIDENCE IN THE RECORD AND THEY

10:26:39 19    WOULD HAVE ALREADY STATED WHAT THEY DID.  THESE ARE THE THINGS WE

10:26:42 20    DID AND WHAT WE RELIED ON, NOT IN DETAIL.

10:26:47 21              SO THAT'S NOT GOING TO HAPPEN HERE, IT'S SIMPLY NOT GOING

10:26:50 22    TO HAPPEN.  SO IT WOULD BE GREAT FOR ME BUT BAD FOR SOMEBODY ELSE,

10:26:57 23    SO I JUST DON'T THINK IT'S GOING TO HAPPEN.  I DON'T THINK IT'S A

10:27:00 24    CONCERN.

10:27:00 25              ALL RIGHT.  WITH THAT, COUNSEL, ARE YOU READY TO PROCEED?

10:27:05  1              MR. MITSCH:  I AM.

10:27:06  2              THE COURT:  ALL RIGHT.  PLEASE DO.

10:27:07  3              MR. MITSCH:  THANK YOU.

10:27:08  4                       CROSS-EXAMINATION

10:27:08  5    BY MR. MITSCH:

10:27:08  6    Q.  GOOD MORNING, DR. ROGERS.  WE MET AT THE DEPOSITION, DIDN'T WE?

10:27:12  7    A.  YES.

10:27:12  8    Q.  IN FACT, WE MET LAST NIGHT AT ROUSES SUPERMARKET, DIDN'T WE?

10:27:16  9    A.  YES.

10:27:17 10    Q.  BOTH OF US APPARENTLY DIDN'T GET THE MEMORANDUM ABOUT THE FINE

10:27:22 11    NEW ORLEANS CUISINE.  DOCTOR, PRIOR TO KATRINA, YOU DIDN'T DO ANY

10:27:29 12    ENGINEERING WORK IN LOUISIANA, DID YOU?

10:27:31 13    A.  NO.

10:27:31 14    Q.  AND YOU ARE NOT LICENSED AS A CIVIL ENGINEER IN LOUISIANA, ARE

10:27:38 15    YOU?

10:27:38 16    A.  NO.  I HAVE APPLIED FOR THE GEOLOGY REGISTRATION THAT THEY'RE

10:27:43 17    STARTING UP IN LOUISIANA, BUT I AM NOT A REGISTERED ENGINEER HERE.

10:27:45 18    Q.  AND I TAKE IT YOU ARE NOT LICENSED AS A SOIL ENGINEER IN

10:27:49 19    LOUISIANA?

10:27:50 20    A.  I DON'T THINK THEY HAVE A SOIL ENGINEERING LICENSURE HERE.

10:27:53 21    Q.  THEY DO IN CALIFORNIA, RIGHT?

10:27:55 22    A.  YES.

10:27:55 23    Q.  AND YOUR ONLY EXPERIENCE ACTUALLY IN THE NEW ORLEANS,

10:28:01 24    LOUISIANA, AREA PRIOR TO KATRINA WAS WHILE YOU WERE IN THE NAVY, I

10:28:06 25    BELIEVE?

10:28:06  1    A.  YES.

10:28:06  2    Q.  AND OBVIOUSLY YOU DON'T STAMP DRAWINGS, ENGINEERING DRAWINGS

10:28:11  3    HERE, DO YOU?

10:28:11  4    A.  NO.

10:28:12  5    Q.  EARLIER THIS MORNING, DOCTOR, YOU TESTIFIED THAT IN 1982 YOU

10:28:26  6    APPLIED FOR A LICENSE AS A CIVIL -- TO TAKE THE EXAM FOR, AS A

10:28:35  7    CIVIL ENGINEER; IS THAT CORRECT?

10:28:36  8    A.  YES.

10:28:36  9    Q.  AND, IN FACT, ON NOVEMBER 26TH, 1982, YOU FILED AN APPLICATION

10:28:41  10   FOR THAT CERTIFICATE OF REGISTRATION, CORRECT?

10:28:45  11   A.  I DON'T KNOW THE DATE.  THAT'S THE APPROXIMATE TIME FRAME, YES.

10:28:50  12   Q.  AND THAT WAS WITH THE CALIFORNIA BOARD OF REGISTRATION FOR

10:28:53  13   PROFESSIONAL ENGINEERS AND LAND SURVEYORS, CORRECT?

10:28:56  14   A.  YES.

10:28:56  15   Q.  YOU SIGNED THAT APPLICATION?

10:28:58  16   A.  YES.

10:28:59  17   Q.  YOU SIGNED IT UNDER PENALTY OF PERJURY?

10:29:02  18   A.  YES.

10:29:02  19   Q.  SAME PENALTY, SAME OATH THAT YOU TOOK TODAY?

10:29:06  20   A.  YES.

10:29:07  21   Q.  AND ON THAT APPLICATION YOU INDICATED THAT YOU HAD RECEIVED A

10:29:10  22   BS DEGREE FROM CAL STATE POLYTECHNIC UNIVERSITY WITH A COURSE OF

10:29:15  23   STUDY IN CIVIL ENGINEERING, CORRECT?

10:29:17  24   A.  YES.

10:29:18  25   Q.  IN TRUTH, YOUR STUDY WAS NOT IN CIVIL ENGINEERING BUT IN

```
10:29:21  1   GEOLOGY, CORRECT?
10:29:22  2   A.  I HAD A MINOR IN CIVIL ENGINEERING AND A MAJOR WAS IN GEOLOGY.
10:29:25  3   Q.  LET'S NOT MINCE WORDS.  YOU LIED TO THE CALIFORNIA BOARD IN
10:29:30  4   1982, CORRECT?
10:29:31  5   A.  YES, YES.
10:29:31  6   Q.  ON JUNE 30TH, 1986, YOU FILED AN APPLICATION WITH THAT SAME
10:29:38  7   BOARD FOR AUTHORITY TO USE THE TITLE "SOIL ENGINEER"; ISN'T THAT
10:29:44  8   TRUE?
10:29:44  9   A.  IT'S GEOTECHNICAL ENGINEER, I BELIEVE, COUNSEL.
10:29:46 10   Q.  IT'S A DIFFERENT DATE AND THE TITLE IS "SOIL ENGINEER".
10:29:51 11   A.  OKAY.  I DON'T REMEMBER THAT, THAT THEY USED THAT TITLE, BUT.
10:29:54 12   Q.  ON JUNE 30TH, 1986, ON THAT APPLICATION YOU, AGAIN, STATED THAT
10:30:00 13   YOU HAD A BACHELOR OF SCIENCE IN CIVIL ENGINEERING, CORRECT?
10:30:04 14   A.  I DON'T RECALL, I MIGHT HAVE, YEAH.
10:30:07 15   Q.  YOU LIED TO THE CALIFORNIA BOARD FOR THE SECOND TIME IN 1986,
10:30:12 16   CORRECT?
10:30:13 17   A.  YES.  APPEARS SO.
10:30:15 18   Q.  ON APRIL 6, 1987, YOU FILED YET ANOTHER APPLICATION WITH THE
10:30:21 19   CALIFORNIA BOARD, CORRECT?
10:30:23 20   A.  THIS IS AFTER I TOOK THE TEST YOU MEAN?
10:30:27 21   Q.  ON APRIL 6TH, 1987.
10:30:32 22   A.  CAN I SEE A DOCUMENT OR SOMETHING THEN?
10:30:36 23   Q.  INDEED YOU CAN.
10:30:38 24        MR. MITSCH:  YOUR HONOR, IN THE IMPEACHMENT BINDER, FIRST
10:30:40 25   DOCUMENT.
```

10:30:43  1          THE COURT:  I KNOW IT WAS GIVEN TO ME.  I HAVE IT, YES,

10:30:48  2  YES, I HAVE IT.  THANK YOU.

10:30:48  3  BY MR. MITSCH:

10:30:54  4  Q.  CAN WE BRING THAT UP ON THE SCREEN.  THE DOCUMENT IS ENTITLED

10:31:14  5  PROPOSED DECISION PURSUANT TO STIPULATION, AND WHAT I WOULD LIKE

10:31:19  6  YOU TO DO IS GO TO THE -- I'M SORRY, DOCTOR, DID WE GIVE YOU A

10:31:24  7  COPY?

10:31:24  8  A.  NO, YOU DID NOT.

10:31:29  9          MR. MITSCH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

10:31:32 10          THE COURT:  YOU MAY, SIR.

10:31:51 11  BY MR. MITSCH:

10:31:51 12  Q.  THE DOCUMENT'S ENTITLED PROPOSED DECISION PURSUANT TO

10:31:54 13  STIPULATION, AND WHAT I WOULD LIKE YOU TO DO IS SCROLL THROUGH TO

10:31:58 14  THE FIFTH PAGE -- THE SIXTH PAGE ACTUALLY, AND YOUR SIGNATURE IS

10:32:14 15  THERE DATED OCTOBER 7TH, 1996.  DO YOU SEE THAT?

10:32:19 16  A.  YES.  OH, WAIT.  THE DATE YOU GAVE BEFORE IS '86.

10:32:24 17  Q.  THIS PROPOSED DECISION PURSUANT TO STIPULATION IS DATED 1996.

10:32:30 18  A.  CORRECT.

10:32:30 19  Q.  I AM JUST IDENTIFYING THE DOCUMENT AND IDENTIFYING YOUR

10:32:34 20  SIGNATURE.

10:32:34 21  A.  YES.

10:32:35 22  Q.  OKAY.  NOW, I WANT YOU TO LOOK AT THE NEXT PAGE, PLEASE.

10:32:46 23  THAT'S ENTITLED ACCUSATION, AND THE COMPLAINANT IS A CINDI

10:32:54 24  CHRISTENSEN, EXECUTIVE OFFICER, BOARD OF REGISTRATION PROFESSIONAL

10:32:58 25  ENGINEERS AND LAND SURVEYORS.  YOU CAN SEE HER SIGNATURE ON PAGE 3

10:33:03  1    OF THE DOCUMENT.

10:33:04  2    A.  YES.

10:33:04  3    Q.  NOW I WOULD LIKE YOU TO GO TO THE PREVIOUS PAGE, PAGE 2 OF THE

10:33:10  4    ACCUSATION, PARAGRAPH 6.  PARAGRAPH 6 READS:  "ON JUNE 30TH, 1986,

10:33:23  5    AND APRIL 6TH, 1987, RESPONDENT FILED APPLICATIONS FOR AUTHORITY TO

10:33:27  6    USE THE TITLE "SOIL ENGINEER" WITH THE BOARDS."

10:33:33  7    A.  OKAY.

10:33:34  8    Q.  DO YOU SEE THAT?

10:33:34  9    A.  YES.

10:33:35  10   Q.  IT CONTINUES, "BOTH APPLICATIONS WERE SIGNED UNDER PENALTY OF

10:33:39  11   PERJURY.  ON BOTH APPLICATIONS, RESPONDENT INDICATED THAT HE HAD

10:33:43  12   RECEIVED A BS DEGREE FROM CAL STATE POLY WITH A COURSE OF STUDY IN

10:33:48  13   CIVIL ENGINEERING."  DO YOU SEE THAT?

10:33:50  14   A.  YES.

10:33:50  15   Q.  "AND IN TRUTH AND IN FACT, RESPONDENT'S COURSE OF STUDY AT CAL

10:33:55  16   STATE WAS NOT IN CIVIL ENGINEERING BUT IN EARTH SCIENCES GEOLOGY"?

10:34:00  17   A.  YES.

10:34:00  18   Q.  DO YOU SEE THAT?  SO DOES THAT REFRESH YOUR RECOLLECTION ABOUT

10:34:06  19   THE APPLICATION THAT YOU SUBMITTED ON APRIL 6TH, 1987?

10:34:12  20   A.  YES.  LET ME EXPLAIN TO YOU WHY THE TWO DATES ARE.

10:34:16  21   Q.  NOW, SIR.  NOW, SIR.  MY QUESTION IS --

10:34:16  22         THE COURT:  I AM GOING TO LET HIM EXPLAIN, SIR.  HE HAS A

10:34:20  23   RIGHT TO EXPLAIN AND I AM GOING TO LET HIM DO IT.  YOU MAY EXPLAIN.

10:34:25  24         THE WITNESS:  THANK YOU, YOUR HONOR.  JUNE 30TH, '86, IS

10:34:28  25   THE APPLICATION FOR THE FIRST EXAMINATION.  THE PROGRAM STARTED IN

10:34:36  1   1986 AND THEY DID NOT START -- AND THE FIRST EXAMINATION WAS

10:34:41  2   BETWEEN THOSE TWO DATES.  THE APRIL 6TH DATE IS THE DATE -- AFTER I

10:34:47  3   HAD PASSED, I HAD BEEN NOTIFIED THAT I PASSED THE EXAMINATION AND

10:34:50  4   THEN YOU SEND IN YOUR CHECK AND YOU SIGN WHATEVER IT IS YOU HAVE TO

10:34:55  5   DO TO GET THE CERTIFICATE.

10:34:56  6        SO ONE OF THEM IS THE APPLICATION TO TAKE THE

10:34:58  7   EXAMINATION, THE OTHER ONE IS THE APPLICATION FOR THE CERTIFICATE

10:35:04  8   AFTER YOU'VE PASSED THE EXAMINATION.  SO THAT IT BECAME OPERATIVE

10:35:10  9   IN CALIFORNIA THAT TITLE ACT IN 1987, MY RECOLLECTION.

10:35:15  10        MR. MITSCH:  AND I APOLOGIZE, YOUR HONOR, I JUMPED THE

10:35:18  11   GUN A LITTLE BIT ON THAT.

10:35:20  12        THE COURT:  THE COURT HAS JUMPED THE GUN ON MANY

10:35:22  13   OCCASIONS, I UNDERSTAND.

10:35:22  14   BY MR. MITSCH:

10:35:25  15   Q.  THE UPSHOT, DOCTOR, IS THAT ON THREE SEPARATE OCCASIONS YOU

10:35:29  16   LIED TO THE CALIFORNIA BOARD?

10:35:31  17   A.  YES, THAT'S THE PROBLEM WITH LYING IS ONCE YOU LIE, YOU HAVE TO

10:35:33  18   KEEP LYING TO COVER THE LIE.  I RECOGNIZE THAT.  THAT'S ONE OF THE

10:35:37  19   THINGS I TALK ABOUT IN MY PROFESSIONAL PRACTICE AND ETHICS COURSE.

10:35:44  20   SO I UNDERSTAND.

10:35:46  21   Q.  LET'S GO TO JX -- LET'S GO TO PAGE 214 OF YOUR REPORT, WHICH IS

10:35:56  22   JX 2031, PAGE 215.  DO YOU HAVE A COPY OF YOUR REPORT, DOCTOR?

10:36:23  23   A.  YEAH, I HAVE MY ORIGINAL HERE.

10:36:39  24   Q.  GOING TO THE BOTTOM OF THE PAGE, LAST TWO SENTENCES, BOETLER

10:36:45  25   (1965) MADE A STATISTICAL COMPARISON.

10:36:49  1    A.   NO, THAT'S NOT ON THIS PAGE.

10:36:54  2    Q.   I HAVE YOUR REVISED JANUARY 18TH REPORT, PAGE 214.

10:37:05  3    A.   OKAY.  I HAVE THE ORIGINAL REPORT.  LET'S SEE.  OH, WAIT.

10:37:09  4    YEAH, I CAN.  OKAY.  I WAS ON 215.  THE SCREEN WAS ON 215, COUNSEL.

10:37:14  5    OKAY.  I GOT IT.  I SEE IT, BOELTER, YES.

10:37:20  6    Q.   IT'S EXHIBIT JX 2031 AND PAGES 0215.

10:37:28  7    A.   RIGHT, WE'RE ON IT NOW.

10:37:33  8    Q.   DO YOU SEE THE SENTENCES THAT BEGIN, "BOELTER (1965)" AND GOES

10:37:39  9    TO THE END OF THE PAGE?

10:37:40  10   A.   YES.

10:37:43  11   Q.   AND CAN WE TRY TO HIGHLIGHT THAT UP HERE.

10:37:48  12            THE COURT:  I MAY BE ON THE WRONG PAGE, I'M SORRY.

10:37:53  13            MR. MITSCH:  THE BOTTOM OF THE PAGE, "BOELTER (1965)".

10:38:06  14            THE COURT:  I'M SORRY, COUNSEL.  IF YOU JUST GIVE ME A

10:38:09  15   SECOND.  I CAN LOOK AT THIS, I CAN LOOK AT YOUR PRESENTATION; BUT

10:38:14  16   THE EXPERT REPORT I HAVE IS -- EXCUSE ME -- IS DELAYING YOU.  IT'S

10:38:27  17   JANUARY 5TH, 2012, THE ONE I AM LOOKING AT.

10:38:31  18            MR. MITSCH:  RIGHT.  AND THERE WAS A REVISED REPORT.

10:38:47  19            THE COURT:  HOLD ON JUST A MINUTE.  MY 215 ON THIS

10:38:57  20   REPORT --

10:39:01  21            MR. MITSCH:  WE'RE ACTUALLY LOOKING AT PAGE 214.

10:39:05  22            THE COURT:  OKAY.  I APOLOGIZE.  I THOUGHT IT WAS 215,

10:39:07  23   OKAY.  GO AHEAD.

10:39:09  24            MR. MITSCH:  BUT IN ANY EVENT, YOUR HONOR, WHAT I WANTED

10:39:11  25   THE WITNESS TO FOCUS ON WAS THOSE SENTENCES THERE (INDICATING).

10:39:11  1   BY MR. MITSCH:

10:39:21  2   Q.  WE WENT OVER THIS IN YOUR DEPOSITION, DOCTOR.

10:39:23  3   A.  YES.

10:39:24  4   Q.  AND THE UPSHOT OF THIS IS, OF COURSE, THAT THESE SENTENCES WERE

10:39:30  5   TAKEN FROM ANOTHER PROFESSIONAL ARTICLE, THE RYCROFT ARTICLE, WHICH

10:39:35  6   IS JX 1584.  YOU AGREE WITH THAT?

10:39:37  7   A.  YES.

10:39:38  8   Q.  AND THAT WAS SLOPPY, WASN'T IT, THAT YOU DIDN'T PUT QUOTATION

10:39:42  9   MARKS AROUND THAT?

10:39:43 10   A.  RIGHT, AND I TRIED TO EXPLAIN THAT.

10:39:49 11   Q.  LET'S GO TO THE REPORT AGAIN AT PAGE 100 -- PAGE 99 OF YOUR

10:39:55 12   REPORT, I'M SORRY.  JX 2031-100.  ARE WE THERE?

10:40:38 13   A.  YES.

10:40:39 14   Q.  AND CAN YOU HIGHLIGHT BEGINNING FLORIDA AVENUE BRIDGE.  TAKING

10:40:48 15   US DOWN.  NOW, THOSE PARAGRAPHS WERE ALSO TAKEN FROM ANOTHER

10:40:57 16   DOCUMENT, WEREN'T THEY?

10:40:58 17   A.  YES.

10:40:58 18   Q.  AND THAT DOCUMENT'S IDENTIFIED AS JX 1585 AND THOSE PARAGRAPHS

10:41:05 19   ARE ON PAGE 2 OF THAT DOCUMENT?

10:41:07 20   A.  CORRECT.

10:41:08 21   Q.  AND AGAIN, YOU FAILED TO ATTRIBUTE IN YOUR REPORT THAT

10:41:13 22   INFORMATION TO THE AUTHORS OF THE PREVIOUS DOCUMENT, CORRECT?

10:41:16 23   A.  YES, I DID.

10:41:17 24   Q.  AND AGAIN, THAT WAS SLOPPY.  YOU AGREE WITH THAT?

10:41:21 25   A.  THAT'S THE NATURE OF THE BEAST, COUNSELOR, WHEN YOU ARE A

10:41:25  1   PROFESSOR AND YOU'RE DOING THIS PART-TIME AND YOU HAVE STUDENTS

10:41:28  2   COMING AND GOING AND YOU HAVE TO GET UP AND LEAVE.  I AM NOT IN A

10:41:32  3   SITUATION -- I GET INTERRUPTED A LOT, SO THOSE KIND OF THINGS DO

10:41:37  4   HAPPEN.  I APOLOGIZE FOR THEM.  IT CERTAINLY NEVER WAS MY INTENT.

10:41:40  5   Q.  AND YOU EXPLAINED IN YOUR DEPOSITION THAT IF YOU WERE PREPARING

10:41:43  6   A PAPER FOR PUBLICATION IN A PROFESSIONAL JOURNAL, YOU WOULD BE

10:41:47  7   MORE CAREFUL ABOUT THINGS LIKE THAT, RIGHT?

10:41:48  8   A.  YES.

10:41:49  9   Q.  AND YOU NOTED THAT YOU DON'T TREAT CONSULTING REPORTS AS BEING

10:41:52 10   WITH THAT LEVEL OF SCRUTINY, CORRECT?

10:41:54 11   A.  THAT'S WHAT I SAID.

10:41:56 12   Q.  AND APPARENTLY, YOU ALSO DON'T TREAT REPORTS FOR COURT WITH

10:41:59 13   THAT LEVEL OF SCRUTINY, CORRECT?

10:42:01 14   A.  WELL, I AM JUST TRYING TO GET THE INFORMATION IN THERE AND I

10:42:10 15   DON'T -- YOU KNOW, WHAT HAPPENS IS I PULL THAT INTO THE DOCUMENT

10:42:13 16   MOST LIKELY AND THEN I GOT INTERRUPTED, AND THEN WHEN I CAME BACK,

10:42:17 17   I FORGOT TO EITHER INDENT IT AND ATTRIBUTE IT OR FOOTNOTE IT OR

10:42:23 18   REWRITE IT.

10:42:29 19   Q.  GO TO PAGE 210 OF YOUR CORRECTED REPORT, FIGURE 197, AND THAT

10:42:35 20   IS DX 2031-0211.  COULD YOU BRING THAT UP, PLEASE.

10:42:59 21   A.  YEAH.

10:43:06 22   Q.  NOW, THAT SAYS, FIGURE 197, "REPRESENTATIVE VALUES OF HYDRAULIC

10:43:12 23   CONDUCTIVITY COMPILED BY PROFESSOR JACOB BEAR AND POSTED ON

10:43:19 24   WIKIPEDIA."  THAT'S NOT WHAT YOUR ORIGINAL REPORT SAID, DID IT?

10:43:24 25   A.  RIGHT.  THE ORIGINAL REPORT JUST SAID, "BY JACOB BEAR," AND IT

10:43:27  1    HAD THE WRONG DATE, IT HAD '82 INSTEAD OF '72.

10:43:30  2    Q.  RIGHT.  AND YOUR ORIGINAL REPORT ALSO SAID THAT IT HAD BEEN

10:43:34  3    MODIFIED FROM A TEXTBOOK AUTHORED BY PROFESSOR BEAR, CORRECT?

10:43:38  4    A.  WELL, THAT'S WHAT IT IS, YEAH.

10:43:40  5    Q.  AND THE REASON IT SAID "MODIFIED" WAS BECAUSE THAT, IN FACT,

10:43:45  6    ISN'T WHAT'S IN PROFESSOR BEAR'S TEXTBOOK, CORRECT?

10:43:48  7    A.  WHAT DO YOU MEAN BY THAT?

10:43:50  8    Q.  WELL, LET'S GO TO JX 1587, PAGE 3.  THAT'S THE CHART THAT WAS

10:44:02  9    IN PROFESSOR BEAR'S BOOK.

10:44:08 10    A.  HUMPH, OKAY.

10:44:11 11    Q.  AT YOUR DEPOSITION I SHOWED YOU THE WIKIPEDIA EXTRACT ON

10:44:17 12    HYDRAULIC CONDUCTIVITY THAT WAS THE SOURCE --

10:44:20 13    A.  RIGHT.

10:44:21 14    Q.  -- OF THE CHART FIGURE 197 IN YOUR REPORT, CORRECT?

10:44:26 15    A.  RIGHT.  I HADN'T PREVIOUSLY REALIZED THAT'S WHERE IT CAME FROM.

10:44:31 16    Q.  AND YOU'VE CORRECTED --

10:44:33 17    A.  YES.

10:44:34 18    Q.  -- YOUR REPORT TO REFLECT THAT?

10:44:35 19    A.  YES, THAT'S VERY IMPORTANT TO ME.  I LIKE TO ATTRIBUTE THINGS

10:44:39 20    TO WHO THEY SHOULD BE ATTRIBUTED TO.

10:44:40 21    Q.  AND YOU UNDERSTAND THAT THERE ARE CONTRIBUTORS TO WIKIPEDIA TO

10:44:48 22    PIECES LIKE HYDRAULIC CONDUCTIVITY?

10:44:51 23    A.  YES.  I AM ONE OF THE FREQUENT CONTRIBUTORS TO WIKIPEDIA.

10:44:54 24    Q.  CAN WE GO TO THE WIKIPEDIA AND THAT IS JX 1588-0005.  AND CAN

10:45:23 25    WE GO TO THE CONTRIBUTORS AT THE END.  SHOULD BE THE LAST PAGE,

10:46:07  1   SECTION CALLED CONTRIBUTORS.  ARTICLE SOURCES AND CONTRIBUTORS.

10:46:24  2   THERE ARE VARIOUS PEOPLE LISTED THERE.  THEGUYFROMSATURN, 48

10:46:30  3   ANONYMOUS EDITS.  I AM NOT GOING TO ASK YOU WHETHER OR NOT YOU ARE

10:46:34  4   THE GUY FROM SATURN, BUT I AM GOING TO ASK YOU, DOCTOR, YOU DIDN'T

10:46:39  5   MAKE ANY ATTEMPT TO GO OUT AND CHECK THE ACCURACY OF THE

10:46:42  6   CONTRIBUTIONS THAT ALL OF THESE PEOPLE MADE, DID YOU?

10:46:45  7   A.  NO, I DIDN'T EVEN KNOW THAT THAT CHART -- I'VE BEEN USING THAT

10:46:49  8   CHART IN MY TEACHING FOR YEARS, AND I DIDN'T KNOW IT WAS POSTED ON

10:46:52  9   WIKIPEDIA.  I DIDN'T KNOW WHERE I HAD GOTTEN IT FROM.  I GOT IT

10:46:56 10   WHEN I WAS TEACHING OUT AT BERKELEY WAY BACK.

10:46:59 11   Q.  OKAY.  THANK YOU.  LET'S MOVE ON.  YOU DID A SITE

10:47:02 12   CHARACTERIZATION AT THE EBIA LAST SUMMER, CORRECT?

10:47:04 13   A.  YES.

10:47:05 14   Q.  YOU DIDN'T DO AN ANALYSIS OF WHY THE WALLS FAILED, CORRECT?

10:47:09 15   A.  CORRECT.

10:47:09 16   Q.  AND YOU'RE NOT IN A POSITION TO OFFER AN OPINION ABOUT WHAT

10:47:12 17   ACTIVITIES, IF ANY, BY EITHER THE CORPS -- I WITHDRAW THAT.

10:47:18 18          YOU ALSO WEREN'T ASKED TO DETERMINE WHETHER THERE WAS ANY

10:47:22 19   UNDER SEEPAGE UNDER THE FLOODWALLS AT THE EBIA, CORRECT?

10:47:24 20   A.  RIGHT, I WAS NOT.

10:47:27 21   Q.  EVEN THOUGH YOU'RE QUALIFIED TO DO SO, CORRECT?

10:47:30 22   A.  YEAH, I SUPPOSE I COULD DO THAT IF I WAS ASKED TO.

10:47:37 23   Q.  GO TO JX 1591.

10:47:41 24   A.  I DON'T KNOW WHAT THAT IS.  OH, OKAY.

10:47:43 25   Q.  THAT'S THE STANDARD, THE ASTM STANDARD PRACTICE FOR

10:47:47   1   CLASSIFICATION OF SOILS FOR ENGINEERING PURPOSES.  DO YOU SEE THAT?

10:47:55   2   A.  YES.

10:47:55   3   Q.  AND PLEASE, WOULD YOU GO TO SECTION 3.15.  THERE'S A DEFINITION

10:48:06   4   OF PEAT THERE?

10:48:09   5   A.  YES.

10:48:10   6   Q.  DO YOU AGREE WITH THAT DEFINITION?

10:48:12   7            MR. SIMS:  YOUR HONOR, I WANT TO OBJECT.  I THINK I KNOW

10:48:15   8   WHERE THIS LINE IS GOING.  THIS IS OUTSIDE THE SCOPE OF THE DIRECT

10:48:18   9   EXAMINATION.  I UNDERSTAND THE GUIDANCE THAT THE COURT HAS LAID

10:48:20  10   DOWN AND THAT THE ABBREVIATED DIRECT EXAM WILL NOT RESTRICT --

10:48:26  11            THE COURT:  CORRECT.

10:48:27  12            MR. SIMS: -- THE CROSS AS TO THOSE OPINIONS THAT THE

10:48:30  13   EXPERT IS EXPRESSING.  AND DR. ROGERS HAS NOT MADE ANY OPINIONS AND

10:48:33  14   OFFERED ANY OPINIONS TODAY REGARDING SOIL CLASSIFICATION AND SOIL

10:48:37  15   DESCRIPTIONS.

10:48:38  16            ALTHOUGH HE WROTE QUITE A LARGE REPORT, HIS OPINIONS THIS

10:48:42  17   MORNING ARE FOCUSED ON STANDARD OF CARE.  AND THAT'S WHY PLAINTIFFS

10:48:46  18   HAVE OFFERED HIM.  WE ARE NOT SEEKING TO ADMIT THOSE OTHER OPINIONS

10:48:49  19   EXPRESSED IN HIS REPORT THAT FALL OUTSIDE THE STANDARD OF CARE.

10:48:52  20   AND MUCH -- THERE WAS SIGNIFICANT DISCUSSION IN THE REPORT ABOUT

10:48:55  21   PEAT, BUT THE COURT DIDN'T HEAR ANY OF THOSE OPINIONS TODAY.  AND

10:48:59  22   GIVEN 611, CROSS IS LIMITED TO THE SCOPE OF DIRECT WITHIN THE

10:49:05  23   BOUNDS THAT THE COURT HAS SET OUT, BUT THERE WAS NEVER AN OPINION

10:49:08  24   FROM THIS WITNESS ON THAT TOPIC.

10:49:09  25            THE COURT:  OKAY.

10:49:10  1        MR. MITSCH:  YOUR HONOR, THIS IS DR. ROGERS' REPORT.  OF

10:49:17  2   THE APPROXIMATELY 250 PAGES THAT HE'S SUBMITTED, PERHAPS SEVEN OR

10:49:23  3   EIGHT OF THEM ARE ON STANDARD OF CARE.  I THINK THAT WE HAVE THE

10:49:28  4   LATITUDE, WE SHOULD BE GIVEN THE LATITUDE TO ADDRESS THE OPINIONS

10:49:32  5   THAT ARE CONTAINED IN THIS REPORT.  YOU'VE SAID THAT YOU'VE

10:49:36  6   REVIEWED THE REPORT AND IN THE SIDE BAR THAT WE HAD I BELIEVE ON

10:49:41  7   WEDNESDAY MORNING YOU SAID THAT CROSS-EXAMINATION WOULD NOT BE

10:49:45  8   LIMITED TO THE DIRECT EXAMINATION.

10:49:48  9        THE COURT:  TRUE.  BUT IF THOSE OPINIONS ARE NOT GOING TO

10:49:54 10   BE BEFORE THIS COURT, THE COURT'S REALLY, FRANKLY, A LOT MORE

10:50:01 11   INTERESTED IN -- WHATEVER WAS IN HIS REPORT ABOUT PEAT, IS MORE

10:50:05 12   INTERESTED IN HIS TESTIMONY GIVEN HERE BECAUSE THE REPORT'S NOT

10:50:09 13   COMING IN EVIDENCE.  THE COURT'S GOING TO BE LOOKING AT THE

10:50:11 14   TRANSCRIPT AND HIS OPINIONS ON STANDARD OF CARE.  I AM NOT SURE

10:50:16 15   WHERE WE'RE GOING WITH THIS.  I'LL GIVE YOU A LITTLE LATITUDE, BUT

10:50:20 16   IT'S NOT GOING TO BE OVERLY PERSUASIVE TO ME IF IT DOESN'T RELATE

10:50:25 17   TO THE OPINIONS THAT WERE ACTUALLY RENDERED TO THE COURT.  THAT'S

10:50:28 18   ALL I AM GOING TO BE LOOKING AT, FRANKLY.  BUT I AM GOING TO GIVE

10:50:32 19   YOU SOME LATITUDE.  YES, SIR, MR. TREEBY.

10:50:35 20        MR. TREEBY:  I AGREE WITH MR. MITSCH.  BUT THE OTHER

10:50:38 21   THING I WOULD SAY IS IT'S NOT JUST WHAT THIS WITNESS HAS SAID

10:50:41 22   BECAUSE DR. BEA RELIES ON WHAT THIS WITNESS SAYS IN A LOT OF

10:50:46 23   REGARDS INCLUDING REGARDING PEAT.  AND SO TO THE EXTENT DR. BEA IS

10:50:50 24   THEN GOING TO GIVE OPINIONS RELYING ON HIM WHEN WE HAVEN'T BEEN

10:50:54 25   ABLE TO CROSS THE SOURCE OF THAT RELIANCE, SEEMS TO ME --

10:50:59  1        THE COURT:  ARE YOU SAYING THAT DR. BEA -- THE DEFINITION

10:51:04  2  OF PEAT I'M SURE IS ASTONISHINGLY ESOTERIC AND HAS, I'M SURE, IN

10:51:09  3  MANY DIFFERENT JOURNALS AND ON THE INTERNET, ET CETERA, GIVEN

10:51:15  4  DIFFERENT CHARACTERIZATIONS.  BUT I AM NOT SURE WHAT IT HAS TO DO

10:51:21  5  WITH THE STANDARD OF CARE.  AND WHAT YOU'RE SAYING IS THAT DR. BEA

10:51:24  6  RELIED ON THIS --

10:51:25  7        MR. TREEBY:  FOR SITE CHARACTERIZATION, YES.

10:51:27  8        THE COURT:  -- TO TALK ABOUT PEAT.  HE'S BEEN TALKING

10:51:29  9  ABOUT PEAT FOR A LONG TIME.  TO THAT EXTENT, I'LL ALLOW IT, BUT I

10:51:34 10  AM NOT GOING TO LET IT GO ON TOO LONG I CAN TELL YOU.

10:51:38 11        MR. MITSCH:  YOUR HONOR, THE OTHER ISSUE THAT I THINK IS

10:51:40 12  IMPORTANT HERE IS THAT DR. ROGERS GAVE AN EXPERT OPINION ON WHAT

10:51:46 13  WAS NECESSARY TO DO, WHAT THE CORPS, WHAT WGI WAS REQUIRED TO DO.

10:51:51 14  AND WHAT IT'S OR WHAT THEY ARE REQUIRED TO DO IS HEAVILY DEPENDENT

10:51:56 15  ON THE TYPE OF SOIL, THE SOIL CHARACTERIZATION.

10:51:59 16        THE COURT:  THAT'S TRUE.

10:52:01 17        MR. MITSCH:  AND IF THERE IS A CLAIM WHICH IS, IN FACT,

10:52:05 18  CONTAINED IN DR. ROGERS' REPORT THAT THERE IS PEAT OR THE

10:52:11 19  SUGGESTION THAT THERE IS PEAT, AND THERE IS A VAST AMOUNT OF

10:52:14 20  DISCUSSION ABOUT PEAT, MORE PEAT THAN WE HAD EVER POSSIBLY IMAGED,

10:52:20 21  IT'S NECESSARY TO DEBUNK THAT.  I NEED YOU TO WALK AWAY WITH THE

10:52:23 22  UNDERSTANDING THAT WHAT WE HAVE AT THAT SITE IS CLAY.  AND EVEN

10:52:31 23  THOUGH DR. ROGERS IN HIS 250-PAGE REPORT MAKES HUNDREDS OF

10:52:36 24  REFERENCES --

10:52:36 25        THE COURT:  YOU SAY AT THAT SITE, IS THAT DOWN TO

10:52:39  1    25 FEET?  ALL THE WAY DOWN TO 25 FEET?

10:52:41  2              MR. MITSCH:  WHEN I SAID "THAT SITE," I MEANT THE EBIA.

10:52:45  3              THE COURT:  THAT IT'S ALL CLAY ALL THE WAY DOWN TO

10:52:48  4    25 FEET.

10:52:48  5              MR. MITSCH:  YES.

10:52:48  6              THE COURT:  THAT'S GOING TO BE WHAT YOU'RE GOING TO TRY

10:52:51  7    TO CONVINCE THE COURT OF?

10:52:52  8              MR. MITSCH:  THAT'S OUR OPINION.

10:52:53  9              THE COURT:  AND CLAY IS LIKE ANYTHING ELSE, IT VARIES AS

10:52:58 10    WELL, BUT YOU'RE GOING TO SAY IT'S NOT PEAT.

10:53:00 11              MR. MITSCH:  IT'S NOT PEAT.

10:53:02 12              THE COURT:  I SEE YOUR POINT.

10:53:04 13              MR. MITSCH:  IT VARIES AND IT'S EXTRAORDINARILY

10:53:06 14    IMPERMEABLE.

10:53:07 15              THE COURT:  THIS HAS BEEN ENOUGH DEBATE, I WILL LET YOU

10:53:07 16    GO INTO IT TO SOME DEGREE.  IF IT GETS OVER BURDENSOME, WE'LL HAVE

10:53:12 17    ANOTHER OBJECTION.

10:53:13 18              MR. TREEBY:  WE DON'T HAVE TO COVER, BECAUSE I'M SURE

10:53:15 19    THIS ISSUE -- LET ME JUST ADD THIS FOR THE COURT'S -- SO THE COURT

10:53:21 20    KNOWS WHERE WE'RE COMING FROM.

10:53:23 21              DR. BEA RELIED ON DR. ROGERS FOR THE ENTIRE SITE

10:53:27 22    CHARACTERIZATION, INCLUDING HIS CROSS SECTIONS.  DR. ROGERS HAS NOT

10:53:32 23    TESTIFIED ABOUT ANY OF THAT HERE, BUT IF -- I KNOW FROM HIS REPORT

10:53:37 24    DR. BEA IS GOING TO SAY, YES, I RELIED ON DR. ROGERS.  FOR EXAMPLE,

10:53:43 25    MY CROSS SECTION 2-1 AND FOR THE PERMEABILITIES THAT WERE OUT THERE

10:53:49  1    OF THE SOILS.  THAT HASN'T -- NO OPINIONS HAVE COME OUT ABOUT THAT.

10:53:53  2    WE NEED TO TALK TO DR. ROGERS ABOUT THAT BECAUSE HE IS THE SOURCE

10:53:56  3    OF THAT INFORMATION SO THAT WHEN WE CROSS-EXAMINE DR. BEA, WE'LL

10:54:00  4    HAVE THAT INFORMATION.

10:54:01  5             MR. SIMS:  YOUR HONOR, THE VAST MAJORITY OF DR. ROGERS'

10:54:04  6    REPORT WAS DEVOTED TO PERMEABILITY.  IN FACT, THAT'S WHY HE WAS

10:54:08  7    ENLISTED TO ASSIST WITH THE FUDER (PHONETIC) PROGRAM.  ALL OF THAT

10:54:11  8    WENT AWAY WHEN THE PARTIES AGREED TO A SINGLE LINE IN THE PRETRIAL

10:54:14  9    ORDER THAT SAID THE PERMEABILITY IS TEN TO MINUS FIVE, WHICH WAS

10:54:18 10    DR. ROGERS' OPINION BY THE WAY.

10:54:20 11             SO FOR THEM TO NOW TRY TO SET HIM UP TO ATTACK HIS

10:54:22 12    CREDIBILITY ON AN OPINION THAT THEY'VE ALREADY AGREED TO AND HE

10:54:25 13    DIDN'T OFFER DURING DIRECT EXAMINATION, IS EXTREMELY UNFAIR.  AND

10:54:29 14    IT'S WELL OUTSIDE THE BOUNDS OF 611 AND WHAT WAS CONTEMPLATED, AND

10:54:33 15    IT'S OUTSIDE OF 705 BECAUSE THAT SUMMARY OPINION WAS NOT OFFERED.

10:54:37 16             THE COURT:  WELL, FIRST, LET ME, I GUESS WE CAN DEBATE --

10:54:40 17    BY THE WAY, I AM DIVIDING THE TIME HERE AGAINST BOTH OF YOU.  JUST

10:54:43 18    TO LET YOU KNOW THIS, TIME IS TICKING.  WHY DON'T WE TALK FOR ABOUT

10:54:50 19    60 MORE HOURS.

10:54:52 20             AT ANY RATE, IS THERE A STIPULATION TO THAT EFFECT WHAT

10:54:57 21    COUNSEL SAID?

10:55:00 22             MR. TREEBY:  THERE IS A COMMON UNDERSTANDING, BUT THERE

10:55:03 23    IS CERTAINLY NO STIPULATION.

10:55:04 24             THE COURT:  I AM NOT SURE WHAT THAT MEANS.  IS THERE A

10:55:08 25    DISAGREEMENT AS TO THE TEN TO THE MINUS FIVE?

10:55:11  1          MR. TREEBY:  AT THIS POINT, NO.  BUT IT'S IMPORTANT FOR

10:55:13  2  US TO POINT OUT THAT THIS HAS BEEN A SHIFTING TARGET BY THIS

10:55:17  3  WITNESS AND BY DR. BEA OVER TIME BECAUSE IT UNDERMINES THEIR

10:55:20  4  CREDIBILITY AS EXPERTS.

10:55:22  5          MR. SIMS:  SO THEY'RE TRYING TO ATTACK THE CREDIBILITY OF

10:55:24  6  OPINION THAT WASN'T OFFERED TO THE COURT THIS MORNING.

10:55:26  7          THE COURT:  I UNDERSTAND.  I AM GOING TO ALLOW A LITTLE

10:55:27  8  BIT OF THIS, BUT I DON'T -- IF IT ALL BOILS DOWN TO THE SAME THING,

10:55:33  9  THAT THERE'S AN AGREEMENT AS TO THE APPROPRIATE COMPONENT,

10:55:39 10  MATHEMATICAL COMPONENT OF THE PERMEABILITY AND THEN HOW WE APPLY IT

10:55:44 11  FROM THERE, I ASSUME DR. BEA WOULD BE THE APPROPRIATE PERSON TO

10:55:47 12  CROSS-EXAMINE THERE.

10:55:49 13          I'LL ALLOW THIS TO SOME DEGREE.  GO AHEAD.  YOU CAN ONLY

10:55:53 14  DEBATE THIS SO LONG.  GO AHEAD, COUNSEL.

10:55:58 15          MR. MITSCH:  OKAY.  THANK YOU, YOUR HONOR.

10:55:58 16  BY MR. MITSCH:

10:56:01 17  Q.  I AM GOING TO BE VERY QUICK HERE.  THIS CONTAINS THE ASTM 2487,

10:56:10 18  CONTAINS THE DEFINITION OF PEAT.  I TAKE IT YOU DON'T HAVE ANY

10:56:14 19  ISSUE WITH THAT, WITH THAT DEFINITION?

10:56:16 20  A.  NO.

10:56:16 21  Q.  GO A LITTLE FURTHER DOWN, THERE IS A DEFINITION OF

10:56:19 22  CLASSIFICATION OF ORGANIC CLAY.  I TAKE IT YOU DON'T HAVE ANY ISSUE

10:56:26 23  WITH THAT?

10:56:27 24  A.  NO.

10:56:35 25  Q.  WE'LL MOVE ON.  AT VARIOUS POINTS IN YOUR REPORT, DOCTOR, YOU

10:56:40  1    REFER TO SWAMPS AND MARSHES, CORRECT?

10:56:42  2    A.  YES.

10:56:43  3    Q.  THERE ARE A LOT OF CROSS SECTIONS THAT ARE -- THAT USE THE

10:56:47  4    TERMS SWAMP AND MARSHES, CORRECT?

10:56:50  5    A.  RIGHT.

10:56:54  6    Q.  FOR INSTANCE, ON PAGE 140 OF YOUR REPORT, WHICH IS DX

10:56:59  7    2031-0141.  PAGE 140.  ON THAT PAGE YOU SAY, "MORE THAN HALF OF NEW

10:57:24  8    ORLEANS AREA WAS ONCE COVERED BY MARSHES, ESSENTIALLY FLAT AREAS

10:57:27  9    WHERE ONLY VEGETATION IS GRASSES AND SEDGES."  CORRECT?

10:57:30 10    A.  YES.

10:57:35 11    Q.  AND IN YOUR REPORT, SOME OF THESE, SOME OF THE CROSS SECTIONS

10:57:39 12    THAT YOU HAVE DESCRIBE LAYERS OF SOIL AS MARSH WHEN, IN FACT, THEY

10:57:46 13    SHOULD BE LABELED LAYERS OF SWAMP; ISN'T THAT CORRECT?

10:57:49 14    A.  SHOW ME.

10:57:51 15    Q.  OKAY.  LET'S LOOK AT FIGURE 211 ON PAGE 223 OF YOUR REPORT.

10:58:12 16    A.  OKAY.

10:58:15 17         MR. SIMS:  THAT'S NOT THE ENTIRE FIGURE.  IF THEY CAN

10:58:18 18    BRING THE ENTIRE FIGURE UP.

10:58:20 19         THE COURT:  I AM LOOKING AT THE, SHALL WE SAY, RATHER

10:58:25 20    POLLOCK-LIKE FIGURE BENEATH.  I AM NOT A POLLOCK ARTIST.

10:58:40 21         MR. BRUNO:  I GOT THAT.

10:58:42 22         THE COURT:  I KNEW YOU WOULD.  IF THAT'S GERMANE TO IT,

10:58:45 23    WE CAN SHOW THE WHOLE THING, I DON'T KNOW.  OR YOU CAN BRING THAT

10:58:50 24    OUT.  OKAY.  THANK YOU, COUNSEL.

10:58:55 25         MR. MITSCH:  OKAY.  NOW, CAN WE GO BACK TO THAT TOP

10:58:57  1    PORTION.

10:58:57  2    BY MR. MITSCH:

10:59:00  3    Q.   THAT LAYER WHICH IS LABELED MARSH, THAT, IN FACT, SHOULD BE

10:59:04  4    SWAMP; ISN'T THAT CORRECT?

10:59:06  5    A.   THAT'S CORRECT.  WE COVERED THAT AT MY DEPOSITION AND I

10:59:10  6    EXPLAINED, AND YOU'RE TAKING IT OUT OF THE CONTEXT.  THIS HAS

10:59:15  7    NOTHING TO DO, THIS FIGURE HAS NOTHING TO DO WITH THE EBIA SITE.

10:59:20  8    THAT IS NOT WHY I PUT IT IN THERE.  I DIDN'T DRAFT THAT FIGURE, AND

10:59:24  9    YES, IT SHOULDN'T SAY MARSH, IT SHOULD SAY SWAMP.  IT MIGHT HAVE

10:59:30 10    SOME MARSH HORIZONS WITHIN THE SWAMP WHICH IS HOW YOU GET THE

10:59:36 11    PEATS.  BUT I DIDN'T PUT THIS IN THE REPORT TO BE A REPRESENTATION

10:59:40 12    OF OUR CURRENT UNDERSTANDING OF CONDITIONS ON THE EBIA.

10:59:45 13    Q.   BUT YOU AGREE, DOCTOR, THAT THE EBIA IS ESSENTIALLY SWAMP,

10:59:51 14    THAT'S WHERE IT CAME FROM ESSENTIALLY?

10:59:53 15    A.   THERE'S SWAMP UNITS WITH MARSH LAYERS IN THEM, YES, AND THE

10:59:59 16    MARSH LAYERS ARE SUBORDINATE IN TERMS OF VOLUME.

11:00:02 17    Q.   AND ORGANIC CLAY IS THE MOST COMMON DEPOSIT IN SWAMPS, CORRECT?

11:00:08 18    A.   YES.

11:00:08 19    Q.   AND ANOTHER WAY OF SAYING THAT IS THAT THE EBIA IS DOMINATED BY

11:00:14 20    FINE GRAIN SOILS, CORRECT?

11:00:15 21    A.   YES.

11:00:15 22    Q.   AND FINE GRAIN SOILS TYPICALLY HAVE LOW PERMEABILITY, CORRECT?

11:00:20 23    A.   YES.

11:00:20 24    Q.   THERE IS SOME PEAT IN THE EBIA YOU NOTED?

11:00:25 25    A.   YES.

11:00:25  1   Q.  AND YOU USE THE WORD "STRINGERS" TO DESCRIBE THAT PEAT,

11:00:30  2   CORRECT?

11:00:31  3   A.  CORRECT.

11:00:31  4   Q.  AND BY THAT YOU MEANT THAT THOSE WERE RELATIVELY THIN LAYERS OF

11:00:36  5   PEAT, CORRECT?

11:00:37  6   A.  YES, AS COMPARED TO THE WHOLE UNIT THICKNESS.

11:00:40  7   Q.  THE HORIZON I BELIEVE YOU USED, CORRECT?

11:00:43  8   A.  YEAH, GET UP TO MAYBE ABOUT TWO-AND-A-HALF FEET THICK.

11:00:47  9   Q.  LET'S GO TO PAGE 219 OF YOUR REPORT, FIGURE 208, AND THAT IS DX

11:00:54 10   2031-220.

11:01:04 11       MR. SIMS:  I AM JUST GOING TO OBJECT AGAIN.  THIS IS VERY

11:01:07 12   SPECIFIC TO THE DATA THAT WAS COLLECTED DURING THE FIELD PROGRAM.

11:01:09 13   AND ONCE AGAIN, THE DEFENDANTS ARE INTRODUCING OPINIONS FROM

11:01:14 14   DR. ROGERS THAT THEY KNOW DR. ROGERS DOESN'T ESPOUSE IN ORDER TO

11:01:19 15   TRY TO IMPEACH HIS CREDIBILITY.  DR. ROGERS, AS HE JUST SAID,

11:01:22 16   EXPLAINED IN HIS DEPOSITION, I KNOW THAT USE OF THE WORD MARSH IS

11:01:25 17   NOT CORRECT AND IT SHOULD HAVE BEEN SWAMP.

11:01:27 18       AND THEY'RE INTRODUCING THIS TESTIMONY TO TRY TO ATTACK

11:01:29 19   HIS CREDIBILITY FOR OPINIONS HE HASN'T OFFERED THIS MORNING.  AND

11:01:33 20   THERE WAS NO DISCUSSION --

11:01:34 21       THE COURT:  I'LL LET YOU HANDLE THAT ON REDIRECT.  IT'S

11:01:36 22   HARD FOR ME TO SORT THROUGH ALL OF THAT UNTIL YOU QUESTION HIM.

11:01:40 23       MR. SIMS:  JUST FOR THE RECORD, THE STIPULATION BETWEEN

11:01:42 24   THE PARTIES REGARDING THE NUMBERS THAT YOU SEE ON THIS SCREEN COME

11:01:46 25   DOWN TO A SINGLE NUMBER, TEN TO THE MINUS FIVE.  IT'S PARAGRAPH

11:01:49  1   NO. 87 IN THE UNCONTESTED MATERIAL FACTS OF THE JOINT PRETRIAL

11:01:54  2   ORDER.

11:01:54  3          THE COURT:  I UNDERSTAND.  THE COURT WILL KEEP ALL OF

11:01:56  4   THAT IN MIND.

11:01:56  5   BY MR. MITSCH:

11:02:00  6   Q.  WHAT I REFER YOU TO, DOCTOR, IS WHAT'S UNDERLINED, HIGHLIGHTED

11:02:05  7   IN YELLOW.  YELLOW HIGHLIGHTS:  "THE DEEPLY BURIED PEAT HORIZON ON

11:02:11  8   THE WATER SIDE OF THE IHNC FLOODWALL."  DO YOU SEE THAT?

11:02:13  9   A.  YES.

11:02:14  10  Q.  YOU'RE NOT REFERRING THERE TO SOLID PEAT BUT, IN FACT, YOU'RE

11:02:24  11  REFERRING TO STRINGERS OF PEAT, CORRECT?

11:02:26  12  A.  THAT'S SOLID PEAT, IT'S JUST THE UNITS THAT ARE IN ARE

11:02:32  13  RESTRICTED VERTICALLY.

11:02:33  14  Q.  AND THE STRINGERS WERE OF UNDETERMINED WIDTH, LENGTH, DEPTH,

11:02:37  15  CONTINUITIES, CORRECT?

11:02:38  16  A.  ALL YOU KNOW ABOUT THEM WHEN YOU DRILL A HOLE THROUGH THEM AT

11:02:42  17  ONE PLACE IS HOW THICK THEY ARE AT THAT PARTICULAR ONE PLACE AT

11:02:45  18  THAT TIME THAT YOU DRILL IT.  YOU DON'T KNOW ALL OF THE OTHER

11:02:49  19  VARIABLES SUCH AS HOW FAR IT CONTINUES LATERALLY, SPATIALLY IN ANY

11:02:56  20  DIRECTION.

11:02:56  21  Q.  PEAT ALSO HAS RELATIVELY LOW PERMEABILITY, DOESN'T IT?

11:03:08  22  A.  IT CAN.  IT CAN ALSO HAVE VERY HIGH PERMEABILITY.

11:03:14  23  Q.  AND IT DEPENDS ON WHICH KIND WE'RE TALKING ABOUT, RIGHT?

11:03:16  24  A.  WELL, IT DEPENDS ON WHETHER IT'S OXIDIZED OR NOT, AND WHETHER

11:03:20  25  IT'S BEEN SURCHARGED OR BURIED, UNDER WHAT CONDITIONS OF BURIAL,

11:03:25  1    AND HOW LONG IT'S BEEN BURIED, AND HOW DEEPLY IT'S BURIED.

11:03:30  2    Q.  OKAY.  AND IN YOUR REPORT -- AND I AM JUST GOING TO TRY TO DO

11:03:35  3    THIS IN A SUMMARY FASHION -- BUT YOU REFER AT ONE POINT TO ENGLISH

11:03:40  4    PEATS FROM THE HUMBERHEAD PEATLANDS, AND ANOTHER POINT YOU DISCUSS

11:03:46  5    MINNESOTA PEATS, AND ANOTHER POINT YOU DISCUSS MIDDLETON PEATS;

11:03:51  6    CORRECT, YOU RECOLLECT THAT?

11:03:52  7    A.  YES.

11:03:52  8    Q.  AND I THINK YOU WOULD AGREE THAT WE DON'T HAVE ANY MIDDLETON

11:03:58  9    PEAT OR ENGLISH OR MINNESOTA PEAT IN THE EBIA, CORRECT?

11:04:02 10    A.  RIGHT.  THE NORTHERN LATITUDE PEATS TEND TO BE SPHAGNUM PEATS

11:04:07 11    AND THE PEATS DOWN HERE IN THE MISSISSIPPI DELTA TEND TO BE

11:04:10 12    SPARTINA, GRASSES AND SEDGE, INCREASING AMOUNTS OF SEDGE AS YOU GO

11:04:15 13    INLAND FROM THE COAST.

11:04:17 14    Q.  WOULD YOU GO TO PAGE -- FIGURE 169 OF YOUR REPORT ON PAGE 177.

11:04:37 15    AND THAT IS DX 2031-0178.  THAT'S UP ON THE SCREEN HERE.  CAN WE

11:04:48 16    TRY TO ENLARGE THIS SECTION.

11:04:51 17         IT'S A LITTLE HARD TO SEE, DOCTOR, BUT THIS IS YOUR

11:05:00 18    FIGURE OF YOUR REPORT, AND IT'S AN OVERVIEW OF THE SOIL BORINGS

11:05:05 19    THAT WERE DONE AT THE EBIA LAST SUMMER.  DO YOU RECOGNIZE THAT?

11:05:10 20    A.  YES.

11:05:10 21    Q.  AND WHAT I AM GOING TO DO IS -- CAN YOU DESCRIBE WHAT THESE,

11:05:18 22    NOT THE RED CIRCLES HERE, THERE ARE FIVE OF THEM, BUT WHAT THESE

11:05:24 23    RED DOTS AND GREEN DOTS MEAN?

11:05:30 24    A.  WELL, THEY'RE INTENDED TO MEAN DEFENSE HOLES AND HOLES DRILLED

11:05:34 25    BY THE DEFENSE WHERE THE PLAINTIFFS DID NOT PARTAKE IN THEM.  SO WE

11:05:39  1    DID NOT GET TO WATCH THEM BE DRILLED OR SAMPLED, AND THEN WE HAD TO

11:05:44  2    WAIT MONTHS TO SEE WHAT THE RESULTS WERE.  AND THEN THE GREEN ONES

11:05:48  3    WERE THOSE HOLES THAT WERE -- THE COSTS WERE SHARED BY THE

11:05:53  4    PLAINTIFF AND DEFENSE, SO THEY WERE DRILLED AND SAMPLED WITH JOINT

11:05:57  5    OBSERVATION BY THE PLAINTIFFS AND DEFENSES IS MY UNDERSTANDING OF

11:06:00  6    THAT AS I DESIGNED IT.

11:06:02  7    Q.  THE PLAINTIFFS ALWAYS HAD THE OPTION TO PARTICIPATE IN ANY OF

11:06:07  8    THESE SOIL BORINGS, CORRECT?

11:06:12  9            THE COURT:  YOU CAN ANSWER IF YOU KNOW.

11:06:13 10            THE WITNESS:  I DON'T KNOW THAT, YEAH.  I WASN'T INVOLVED

11:06:15 11    IN THOSE DECISIONS.

11:06:15 12    BY MR. MITSCH:

11:06:19 13    Q.  OKAY.  LET'S GO TO BORING 26B.  AND IF WE FLIP BACK TO THE --

11:06:31 14    BEFORE WE GO THERE, CAN WE JUST GO BACK TO THE MAP AGAIN FOR A

11:06:35 15    SECOND.  26B IS OVER HERE, OKAY, THAT'S NEAR THE SOUTH EBIA SITE

11:06:45 16    (INDICATING).  DOES THAT LOOK RIGHT, DOCTOR?

11:06:48 17    A.  YEAH, THAT IS THE SOUTH EBIA SITE ON THE RIVER SIDE OR THE

11:06:53 18    WATER SIDE OF THE WALL.

11:06:55 19    Q.  EXACTLY.  CAN WE GO BACK TO THE BORING.  AND THAT, AGAIN, IS

11:07:02 20    BORING 26B, IT'S JX 1956-39.  THIS FIRST COLUMN, THIS REPRESENTS

11:07:21 21    THE DEPTH OF THE BORING, CORRECT?

11:07:24 22    A.  IT'S SUPPOSED TO, YES.

11:07:25 23    Q.  AND THE THIRD COLUMN HAS A SYMBOL, AND CAN YOU IDENTIFY THAT

11:07:33 24    SYMBOL FOR US?

11:07:35 25    A.  IT LOOKS LIKE DIAGONAL HATCHING.

11:07:39  1    Q.  AND WHAT IS THAT DIAGONAL HATCHING SUPPOSED TO INDICATE?

11:07:43  2    A.  I WOULD PRESUME IT'S FAT CLAY IS HOW THEY'VE CLASSIFIED IT

11:07:47  3    ANYWAY.

11:07:47  4    Q.  I THINK YOU WOULD AGREE THAT THE FIRST EIGHT FEET OR SO ON THIS

11:07:54  5    BORING TAKEN LAST SUMMER INDICATED LEAN CLAY, CORRECT?

11:07:59  6    A.  YES, THAT'S THE WAY IT'S BEEN INTERPRETED.

11:08:02  7    Q.  FROM EIGHT TO 20 THERE'S FAT CLAY, CORRECT?

11:08:06  8    A.  YES.

11:08:06  9    Q.  AND FROM 20 TO 24 THERE IS ORGANIC CLAY, CORRECT?

11:08:11  10   A.  THAT'S WHAT IT SHOWS.

11:08:13  11   Q.  AND CAN WE TAKE IT JUST A LITTLE BIT FURTHER DOWN?  THAT MAY

11:08:21  12   WELL BE THE END.  AND THE BOTTOM OF IT, IS IT ABOUT 27 FEET AND

11:08:28  13   THAT'S FAT CLAY, CORRECT?

11:08:30  14   A.  YES.  GOES A LITTLE UNDER 26, COUNSEL, 25.5 IT BOTTOMED OUT.

11:08:38  15   Q.  LET'S GO BACK TO THE MAP FOR A MOMENT.  CAN YOU GIVE ME THE

11:08:56  16   NEXT LEVEL IN WITH THE CIRCLES AND THE LOCATIONS WHERE THE BORINGS

11:09:06  17   ARE.  THIS IS THE ONE THAT I WANT.

11:09:14  18        THIS BORING OVER HERE, I BELIEVE IS BORING NO. 7, AND

11:09:19  19   THAT IS JX 1956-11?

11:09:33  20        THE LAW CLERK:  BORING NO. 7?

11:09:33  21   BY MR. MITSCH:

11:09:35  22   Q.  BORING NO. 7, JX 1956-11.  AND THAT'S NEAR THE SOUTH BREACH,

11:09:42  23   ISN'T THAT CORRECT, DOCTOR?

11:09:44  24   A.  APPEARS SO, YES.

11:09:45  25   Q.  LET'S LOOK WHAT WE HAVE HERE.  THE FIRST SEVEN FEET ARE FILL

11:09:54 1   FAT CLAY, CORRECT?

11:09:55 2   A.   THAT'S HOW IT'S BEEN INTERPRETED.

11:09:58 3   Q.   AND FROM 7 TO 13 FEET IT LOOKS LIKE IT'S FAT CLAY, CORRECT?

11:10:05 4   A.   YES.   THAT'S HOW IT'S BEEN INTERPRETED.

11:10:09 5   Q.   AND FROM 13 TO 20 FEET IT'S ORGANIC CLAY.   AND THEN -- THAT'S

11:10:22 6   ACTUALLY DOWN TO ABOUT 21 FEET, ORGANIC CLAY?

11:10:26 7   A.   YES.

11:10:27 8   Q.   AND THEN FROM 21 DOWN TO ABOUT 32 IS FAT CLAY, CORRECT?

11:10:33 9   A.   THAT'S HOW IT'S INTERPRETED.

11:10:35 10  Q.   LET'S GO BACK TO THE MAP.

11:10:44 11           THE COURT:   DO YOU WANT TO POINT OUT WHERE THAT ONE IS?

11:10:47 12  I AM HAVING TROUBLE FINDING IT.

11:10:49 13           MR. MITSCH:   THE SECOND ONE THAT I REFERRED TO IS OVER

11:10:52 14  HERE AND THAT'S ABOUT THE LOCATION OF THE SOUTH BREACH

11:10:56 15  (INDICATING).

11:10:56 16           THE COURT:   POINT IT TO ME AGAIN.

11:11:05 17           MR. MITSCH:   (INDICATING).

11:11:06 18           THE COURT:   AM I STILL LOOKING AT FIGURE 169?

11:11:12 19           MR. MITSCH:   IT IS STILL FIGURE 169, YOUR HONOR, BUT I'VE

11:11:16 20  MADE THESE CHANGES HERE.   I PUT THOSE EXTRA ADDITIONAL CIRCLES ON

11:11:20 21  THERE.

11:11:21 22           THE COURT:   OKAY.   THAT'S WHY I COULDN'T FIND THE CIRCLE.

11:11:24 23  SO THE NUMBER OF THIS ONE IS -- THIS IS NO. 7?

11:11:45 24           THE LAW CLERK:   IT'S OBLITERATED BY THE RED DOT.   SO

11:11:57 25  THAT'S -- OKAY.

11:12:02  1            THE COURT:  ALL RIGHT.  THANK YOU.  THAT WOULD BE RIGHT

11:12:03  2   AT THE FLOODWALL?

11:12:08  3            MR. MITSCH:  YES.

11:12:09  4            THE COURT:  ALL RIGHT.

11:12:09  5            MR. MITSCH:  RELATIVELY CLOSE.

11:12:11  6            THE COURT:  YES, EXACTLY.  ALL RIGHT.  THANK YOU,

11:12:13  7   COUNSEL.

11:12:13  8   BY MR. MITSCH:

11:12:16  9   Q.  NOW, LET'S GO FURTHER NORTH AND WE'RE GOING TO LOOK AT BORING

11:12:20 10   NO. 17, AND THAT IS JX 1956-26.  BUT LET ME SHOW IT ON THE MAP

11:12:31 11   FIRST.  I BELIEVE THAT'S UP THERE (INDICATING).  THAT'S IN THE

11:12:39 12   VICINITY OF THE NORTH BREACH, CORRECT, DOCTOR?

11:12:42 13   A.  YEAH.  IS IT THE ONE THAT OUTBOARD OR INBOARD TOWARD THE

11:12:46 14   CHANNEL?  THERE'S TWO OF THEM RIGHT THERE NEXT TO EACH OTHER.

11:12:50 15   Q.  IT'S HARD TO READ BUT IT'S NO. 26.

11:12:55 16   A.  THE OUTBOARD OKAY, TOWARDS THE WATER.

11:12:57 17   Q.  BORING 1956-26.  CAN WE PLEASE HAVE THE LOG.  NOW, THAT LOG

11:13:09 18   INDICATES FROM 0 TO 13 FEET THAT THERE IS FAT CLAY, CORRECT?

11:13:14 19   A.  THAT'S HOW IT'S BEEN INTERPRETED.

11:13:16 20   Q.  AND FROM 13 TO 20 FEET THAT'S ORGANIC CLAY, CORRECT?

11:13:24 21   A.  THAT'S HOW THEY INTERPRETED IT.

11:13:26 22   Q.  AND BELOW 20 FEET TO ABOUT 33 FEET LOOKS LIKE WE HAVE MORE FAT

11:13:31 23   CLAY, CORRECT?

11:13:32 24   A.  THAT'S THE INTERPRETATION.

11:13:33 25   Q.  NOW, I WANT YOU TO TAKE US BACK TO THE MAP, PLEASE.  AND I WANT

11:13:43  1    TO GO TO BORING 15.  VERY HARD TO READ.  I THINK -- DO YOU SEE

11:14:03  2    BORING 15?

11:14:09  3    A.  OKAY.  IS THAT -- IS BORING 13 A GREEN ONE IN MY ORIGINAL

11:14:16  4    FIGURE?  I GOT A GREEN AND RED ONE RIGHT NEXT TO EACH OTHER.  IT

11:14:21  5    SAYS 15.

11:14:27  6    Q.  I'M SORRY, BORING 15 IS A LITTLE BIT FURTHER NORTH.  DO YOU SEE

11:14:38  7    THAT (INDICATING)?

11:14:39  8    A.  YES.

11:14:40  9    Q.  AND THAT'S NEAR THE WEDDING CAKE STRUCTURE, ISN'T IT,

11:14:43 10    APPROXIMATELY?  IT'S NOT EXACTLY IN THE SAME SPOT, BUT IT'S NEAR

11:14:47 11    IT.

11:14:47 12    A.  I'LL ACCEPT YOUR REPRESENTATION OF THAT FOR THE PURPOSE OF THE

11:14:50 13    QUESTION.

11:14:50 14    Q.  SO LET'S TAKE -- LET'S GO TO THAT LOG, PLEASE.

11:14:56 15         THE COURT:  LET ME MAKE A LITTLE NOTE HERE.  I KNOW

11:14:59 16    DR. BEA IS GOING TO TESTIFY.  I REALLY DON'T WANT -- SPEAKING OF

11:15:04 17    BORING, I DON'T WANT TO SEE THE SAME BORINGS AGAIN WITH DR. BEA

11:15:08 18    BECAUSE ALL HE IS DOING IS SAYING, YEAH, THAT'S A BORING AND THAT'S

11:15:11 19    WHAT IT SAYS.  I CAN SEE WHAT IT SAYS.

11:15:13 20         MR. MITSCH:  WE'RE USING DR. ROGERS IN A LIMITED WAY TO

11:15:18 21    TRY TO CHARACTERIZE THE SOILS.

11:15:21 22         THE COURT:  HE'S SIMPLY IDENTIFYING WHAT THE BORINGS ON

11:15:23 23    THE FACE OF THE BORINGS.

11:15:25 24         MR. SIMS:  YOUR HONOR, I JUST REURGE THE SAME OBJECTION.

11:15:28 25    I THINK WE SPENT ABOUT AS MUCH TIME ON CROSS NOW AS I DID ON MY

1:15:31  1   DIRECT EXAMINATION AND --

1:15:31  2         THE COURT:  I AM NOT GOING TO LIMIT HIS TIME ON CROSS,

1:15:33  3   BUT I JUST WANT EVERYBODY TO UNDERSTAND THAT THESE BORINGS ARE

1:15:38  4   SELF-EVIDENT AND HE IS NOT CONTRADICTING THEM.

1:15:41  5         MR. MITSCH:  NO, I UNDERSTAND.  WHAT I AM TRYING TO DO,

1:15:44  6   YOUR HONOR, IS JUST SHOW YOU SOME ILLUSTRATIVE BORING LOGS OF WHAT

1:15:49  7   WAS DONE LAST SUMMER.

1:15:50  8         THE COURT:  RIGHT, I UNDERSTAND.  I'VE GOT THAT.  I JUST

1:15:54  9   DON'T WANT TO SEE THEM THROUGH EACH EXPERT.  THAT'S ALL I'M SAYING.

1:15:59 10         MR. MITSCH:  I UNDERSTAND.

1:16:00 11         THE COURT:  UNLESS IT'S REALLY NECESSARY.  GO AHEAD.

1:16:00 12   BY MR. MITSCH:

1:16:03 13   Q.  SO LET'S GO TO THE BORING 15 LOG, WHICH IS JX 1956-23.  AND

1:16:12 14   AGAIN, FIRST COUPLE OF FEET LOOK LIKE LEAN CLAY AND FROM ABOUT 2 TO

1:16:21 15   ABOUT 12 FEET THERE IS FAT CLAY, CORRECT, DOCTOR?

1:16:24 16   A.  THAT'S THE INTERPRETATION MADE ON THE LOG, YES.

1:16:27 17   Q.  AND THEN THERE'S ABOUT A FOOT OF ORGANIC CLAY FOLLOWED BY

1:16:32 18   ANOTHER 12 OR 13 FEET OF FAT CLAY, CORRECT?

1:16:36 19   A.  THAT IS THE INTERPRETATION.

1:16:40 20   Q.  NOW, LET'S GO TO -- FOR THE LAST ONE, I WANT TO GO TO BORING 10

1:16:45 21   WHICH IS IN THE VICINITY OF THE MCDONOUGH MARINE SITE, AND WE'LL

1:16:59 22   JUST GO THROUGH THAT AGAIN VERY, VERY, QUICKLY.  THE FIRST FEET OR

1:17:02 23   SO ARE LEAN CLAY, CORRECT?

1:17:05 24   A.  YEAH, THAT'S THE INTERPRETATION.

1:17:07 25   Q.  AND THE NEXT 13, 14 FEET ARE FAT CLAY?

11:17:14  1    A.  THAT WAS THEIR INTERPRETATION, YES.

11:17:16  2    Q.  FOLLOWED BY SOME ORGANIC CLAY TO ABOUT FIVE FEET AND THEN FAT

11:17:22  3    CLAY FOR ANOTHER TEN FEET OR SO, CORRECT?

11:17:24  4    A.  THAT'S THE INTERPRETATION ON THE LOG.

11:17:26  5    Q.  OKAY.  NOW, IN ORDER TO EVALUATE THE SOILS NEAR A BREACH IN A

11:17:49  6    LEVEE, YOU WOULD DO OR ONE COULD DO A SHEAR STRENGTH ANALYSIS,

11:17:56  7    CORRECT?  THAT'S, IN FACT, WHAT YOU WOULD DO OF THE SOILS?

11:17:59  8    A.  WELL, IF YOU'RE LOOKING AT SOMETHING THAT INVOLVED THE SHEAR

11:18:04  9    STRENGTH OF THE SOIL BEING WHAT YOU -- THIS IS A FORENSIC

11:18:09 10    INVESTIGATION YOU MEAN AFTER A LEVEE FAILURE?

11:18:11 11    Q.  YES.

11:18:12 12    A.  YOUR HYPOTHETICAL?  IT'S A HYPOTHETICAL?

11:18:15 13    Q.  YOU'RE EVALUATING -- I ASKED YOU THIS QUESTION IN YOUR

11:18:19 14    DEPOSITION.

11:18:19 15    A.  OKAY.  CAN WE REVISIT THAT THEN?

11:18:23 16    Q.  CAN WE LOOK AT THAT?

11:18:25 17    A.  YES.

11:18:25 18    Q.  GO TO PAGE 96, VOLUME 1, LINE 17 TO 23.

11:18:33 19    A.  JUST A MINUTE.

11:18:52 20    Q.  CAN WE BRING UP THAT DEPOSITION CUT, PLEASE?

11:18:55 21         THE COURT:  HE IS GOING TO PUT IT ON THE SCREEN, SIR, AS

11:18:57 22    WELL.

11:19:07 23         THE WITNESS:  ALL RIGHT.  I AM ON PAGE 91.

11:19:09 24    BY MR. MITSCH:

11:19:10 25    Q.  PAGE 96.

11:19:11  1    A.   NINETY-SIX?

11:19:12  2    Q.   NINETY-SIX, 17 TO 23.

11:19:16  3              THE COURT:   THERE IT IS ON THE SCREEN.

11:19:16  4    BY MR. MITSCH:

11:19:27  5    Q.   IT STARTED AT NINE.

11:19:31  6    A.   OKAY.   IT'S NEAR A BREACHED LEVEE, OKAY.

11:19:35  7    Q.   AND MY QUESTION WAS, IS WOULD YOU DO A SHEAR STRENGTH ANALYSIS

11:19:39  8    TO EVALUATE THAT, TO EVALUATE THOSE SOILS, CORRECT?

11:19:42  9    A.   YES.   IT'S A GENERAL QUESTION.

11:19:45 10    Q.   RIGHT.

11:19:45 11    A.   SO ONE HAS TO MAKE SOME ASSUMPTIONS ABOUT WHAT SORT OF BREACH

11:19:51 12    IT IS, WHETHER IT'S A SEEPAGE AND UNDER PIPING OR IT'S A SOFTENING

11:19:58 13    OF THE SOIL ON THE LIQUEFACTION, OR WHETHER IT'S A SLOPE FAILURE.

11:20:02 14    Q.   I UNDERSTAND.   BUT IN ANY EVENT, YOU WOULD DO A SHEAR STRENGTH

11:20:07 15    ANALYSIS?

11:20:07 16    A.   IF YOU WANT TO DO A BACK CALCULATION OF THE SAFETY WITH RESPECT

11:20:14 17    AND DO THE SHEAR STRENGTH, YEAH, YOU NEED A SHEAR STRENGTH

11:20:18 18    ANALYSIS.

11:20:18 19    Q.   AND YOU'RE QUALIFIED TO DO THAT, CORRECT?

11:20:20 20    A.   YES.

11:20:21 21    Q.   AND YOU DID NOT DO THAT IN THE EBIA SOILS?

11:20:27 22    A.   THE PLACE IS SO DISTURBED IT WOULD BE LONG PAST THE POINT WHERE

11:20:32 23    YOU COULD DO MUCH ON THAT, BECAUSE WHERE THE ACTUAL FAILURES

11:20:37 24    OCCURRED HAVE BEEN REPAIRED AND SURCHARGED WITH HUGE PILES OF ROCK

11:20:42 25    AT BOTH SITES FOR THE COFFERDAM THAT THEY BUILT TWICE BEFORE RITA

1:20:47   1    AND AFTER RITA.  SO I DIDN'T THINK IT WOULD BE REPRESENTATIVE OF

1:20:51   2    THE SOIL CONDITIONS AT THE TIME THE HURRICANE HIT IN AUGUST OF

1:20:56   3    2005.  SO I TRUSTED THE EXPERTISE OF THE DEFENSE EXPERTS TO FERRET

1:21:04   4    SHEAR STRENGTH OUT BECAUSE THAT'S THEIR EXPERTISE AREA MUCH MORE

1:21:09   5    THAN MY OWN.

1:21:10   6    Q.  BUT IN ANY EVENT, IF ASKED BY THE PLAINTIFFS' COUNSEL, YOU

1:21:14   7    COULD HAVE DONE THAT ANALYSIS, CORRECT?

1:21:16   8    A.  I COULD DO A LOT OF THINGS IF YOU GOT A CHECKBOOK.

1:21:19   9    Q.  YOU'VE ANSWERED MY QUESTION, I TAKE IT THAT'S A YES THEN.

1:21:24  10          AND YOU WERE ASKED, HOWEVER, TO DO AN ANALYSIS OF THE

1:21:27  11    PERMEABILITY OF THE SOILS, CORRECT?

1:21:29  12    A.  YES.

1:21:30  13    Q.  AND SPECIFICALLY THE PERMEABILITY OF THE ORGANIC LAYERS,

1:21:35  14    CORRECT?

1:21:36  15    A.  YES.

1:21:36  16    Q.  AND ONE OF THE REASONS YOU DIDN'T DO IT IS BECAUSE YOU KNEW

1:21:40  17    THAT THE DEFENDANTS' EXPERTS WERE GOING TO BE DOING THIS EXERCISE,

1:21:45  18    CORRECT?

1:21:45  19    A.  YOU JUST LOST ME.

1:21:47  20    Q.  ONE OF THE REASONS WHY YOU DIDN'T DO A SHEAR STRENGTH

1:21:50  21    ANALYSIS --

1:21:50  22          THE COURT:  BECAUSE WE WERE TALKING ABOUT PERMEABILITY.

1:21:53  23          THE WITNESS:  YOU JUST CROSSED OVER.

1:21:55  24          THE COURT:  IT'S A LITTLE CONFUSING.

1:21:55  25    BY MR. MITSCH:

11:21:57  1    Q.  I DID.  I JUST WANTED TO ESTABLISH THAT YOU WERE ASKED TO DO

11:22:00  2    PERMEABILITY ANALYSIS, BUT THAT YOU WEREN'T ASKED TO DO A SHEAR

11:22:04  3    STRENGTH ANALYSIS, CORRECT?

11:22:05  4    A.  YEAH, I THINK WE ACTUALLY DISCUSSED IT, AND I SAID TO THE

11:22:10  5    COUNSEL ON MY SIDE WHAT I JUST TOLD YOU, WHICH WAS I WILL TRUST THE

11:22:15  6    OTHER PEOPLE'S FIGURES ON SHEAR STRENGTH.  THEY GOT A CAVALCADE OF

11:22:19  7    EXPERTS ON SHEAR STRENGTH LINED UP, AND I DON'T KNOW THAT WE NEED

11:22:22  8    TO DUPLICATE THAT.  AND THERE'S THE PROBLEM ABOUT POST-KATRINA

11:22:27  9    LOADING, WHICH IS GOING TO MAKE MATERIAL STRONGER FROM HAVING BEEN

11:22:33  10   SURCHARGED.

11:22:34  11   Q.  YOU KNOW TIM STARK?

11:22:36  12   A.  YES, FOR MANY YEARS.

11:22:37  13   Q.  YOU DESCRIBED HIM IN YOUR DEPOSITION AS A WORLD LEADER IN SHEAR

11:22:41  14   STRENGTH ASSESSMENT OF SOILS, CORRECT?

11:22:43  15   A.  YES.

11:22:43  16   Q.  AND YOU ALSO KNOW OF TOM BRANDON AND ALLEN MARR, CORRECT?

11:22:47  17   A.  YES.

11:22:47  18   Q.  AND FRANCISCO SILVA-TULLA?

11:22:50  19   A.  YES.

11:22:51  20   Q.  AND YOU RECOGNIZE THAT THESE WERE INDIVIDUALS WHO ARE WORLD

11:22:54  21   LEADERS IN THE ASSESSMENT OF THOSE ISSUES, CORRECT?

11:22:58  22   A.  I FEEL THAT THEY ARE.  I'VE ALWAYS RESPECTED THEIR WORK.

11:23:01  23   Q.  THERE IS -- YOU'RE FAMILIAR WITH THE TEXT BY LAMBE AND WHITMAN

11:23:05  24   CALLED *SOIL MECHANICS*?

11:23:07  25   A.  YES, THE 1969 TEXTBOOK?

```
11:23:10   1    Q.  YES.  THAT'S A LEADING TEXTBOOK IN THE FIELD?
11:23:13   2    A.  ONE OF THEM.
11:23:14   3    Q.  DR. BEA, IN FACT, REFERRED TO IT AS A BIBLE.  ARE YOU AWARE OF
11:23:19   4    THAT?
11:23:19   5    A.  NO.  IT'S NOT THE SAME BIBLE I READ, BUT IT'S A GOOD BOOK.
11:23:24   6    Q.  IT WAS A BIBLE AND LOWER CASE.
11:23:28   7    A.  OKAY.
11:23:29   8    Q.  AND DID YOU KNOW THAT THE NEWEST EDITION OF THAT TEXT WILL LIST
11:23:34   9    DR. SILVA-TULLA AS ONE OF THE COAUTHORS?
11:23:37  10    A.  I DIDN'T KNOW THAT.  CONGRATULATIONS, FRANCISCO.  I KNOW YOU'RE
11:23:41  11    OUT THERE SOMEWHERE.
11:23:43  12    Q.  DURING THE DRILLING PROGRAM, YOU WERE ONLY OUT THERE, I THINK
11:23:50  13    YOU WERE OUT THERE DURING THE DRILLING FOR ABOUT THREE TO FIVE
11:23:54  14    DAYS, IS THAT YOUR RECOLLECTION?
11:23:55  15    A.  EACH TIME, YEAH, THAT I WENT DOWN, YEAH.
11:23:57  16    Q.  AND YOU ONLY WITNESSED A HANDFUL OF THE BORINGS, CORRECT?
11:24:01  17    A.  RIGHT, BECAUSE WE DIDN'T PAY TO GET THE WITNESS, THE GREAT
11:24:06  18    MAJORITY OF THEM BY THE DEFENSE.
11:24:07  19    Q.  AND THAT WAS AT THE SCHOOL SITE AND THE RAILROAD SITE, CORRECT?
11:24:11  20    A.  YES.
11:24:12  21    Q.  AND THOSE WERE TWO SITES THAT YOU CHOSE, CORRECT?
11:24:15  22    A.  YEAH, MYSELF AND DR. STORESUND, YES.
11:24:20  23    Q.  AND THE RAILROAD SITE, THE POINT WAS TO USE THE RAILROAD SITE
11:24:24  24    AS A PLACE TO DO THE PUMPING TESTS, CORRECT?
11:24:28  25    A.  CORRECT.
```

11:24:29  1   Q.  AND THAT ONE DIDN'T WORK OUT AT ALL, DID IT?

11:24:33  2   A.  NO.  IT DIDN'T WORK OUT BECAUSE WE RAN INTO CONSTRUCTION

11:24:39  3   DEBRIS.  AND BEING A CONSTRUCTION PERSON, I LOOKED ACROSS THE

11:24:43  4   STREET AND SAW A LITTLE COMPANY THAT HAD A BOBCAT, AND I SAID, I

11:24:47  5   NEED TO GET THE BOBCAT OVER HERE AND DIG A POTHOLE.  AND TIM STARK

11:24:52  6   DIDN'T KNOW WHAT A POTHOLE WAS.  SO HE CALLED UP THE ATTORNEYS AND

11:24:56  7   SAID, ROGERS WANTS TO DIG TEST PITS, AND EVERYTHING STOPPED.  I

11:25:01  8   WASN'T TRYING TO DIG TEST PITS, I WAS JUST TRYING TO GET THE DEBRIS

11:25:05  9   OUT OF THE WAY SO I CAN GET THE BORING IN THE GROUND.

11:25:09  10          ANYWAY, WE HAD A GOOD LAUGH ABOUT IT LATER.  BUT THE SITE

11:25:11  11  HAD TOO MUCH TRASH, DEBRIS, CONCRETE, BRICKS AND STUFF ON THE

11:25:15  12  SURFACE.  EVERYBODY JUST DECIDED TO ABANDON IT.  IT COULD HAVE BEEN

11:25:18  13  WORKED IF WE DIDN'T HAVE SO MANY ATTORNEYS IN THE STEW.

11:25:21  14  Q.  ALL RIGHT.  IN ANY EVENT, IT WAS ABANDONED AND YOU WENT TO THE

11:25:26  15  SCHOOL SITE, CORRECT?

11:25:27  16  A.  YES.

11:25:27  17  Q.  AND AGAIN, THE SCHOOL SITE WAS YOUR CHOICE, CORRECT?

11:25:31  18  A.  RIGHT.

11:25:32  19  Q.  AND YOU AGREED IN YOUR DEPOSITION THAT THE PERMEABILITY VALUES

11:25:39  20  THAT WERE OBTAINED DURING THE PUMPING TESTS AT THE SCHOOL SITE

11:25:44  21  COULD NOT BE USED TO ANALYZE POTENTIAL SEEPAGE AT THE EBIA

11:25:47  22  FLOODWALLS, CORRECT?

11:25:48  23  A.  THAT'S RIGHT.  WE WANTED TO SEE WHAT THE UPPER BOUND WAS ON THE

11:25:53  24  NATURAL DEPOSITS BEFORE THEY GET SURCHARGED WITH THE DREDGE FILL.

11:25:59  25  Q.  NOW, THE NEXT SITE THAT YOU CHOSE WAS THE SOUTH EBIA SITE,

11:26:08  1    CORRECT?

11:26:08  2    A.  YES.

11:26:10  3    Q.  AND I BELIEVE IN YOUR REPORT YOU SAY THAT YOU BELIEVED THAT WAS

11:26:14  4    THE LEAST DISTURBED AREA?

11:26:15  5    A.  YEAH, I DID SAY THAT.

11:26:17  6    Q.  AND YOU ACKNOWLEDGE THAT THE EBIA AREA PRIOR TO KATRINA HAD

11:26:24  7    EXPERIENCED CONSIDERABLE DISTURBANCES FOR 85 YEARS, CORRECT?

11:26:28  8    A.  YES.

11:26:28  9    Q.  AND THAT INCLUDED CONSTRUCTION, DEMOLITION, PILINGS,

11:26:32  10   INSTALLATION, CORRECT?

11:26:33  11   A.  WELL, NO, SOUTH SIDE DIDN'T HAVE --

11:26:35  12   Q.  NOT THE SOUTH SIDE, BUT THE EBIA SITE GENERALLY.

11:26:39  13   A.  YES, CORRECT.

11:26:40  14   Q.  AND THAT KIND OF ACTIVITY OVER TIME TENDS TO COMPRESS SOIL,

11:26:44  15   DOESN'T IT?

11:26:44  16   A.  YES.

11:26:45  17   Q.  AND WHEN YOU COMPRESS SOIL THAT MAKES THE SOIL LESS PERMEABLE,

11:26:49  18   CORRECT?

11:26:50  19   A.  GENERALLY, YES.

11:26:51  20   Q.  NOW, YOU DID PUMPING TESTS AT THE SCHOOL SITES, AND WHAT I

11:27:10  21   WOULD LIKE YOU IT DO, JUST VERY BRIEFLY, IS TO EXPLAIN TO THE COURT

11:27:14  22   WHAT THE PURPOSE OF A PUMPING TEST IS.  AND IF YOU WANT TO USE AN

11:27:23  23   ILLUSTRATION FROM YOUR REPORT, FEEL FREE.

11:27:29  24          MR. SIMS:  YOUR HONOR, I AM JUST GOING TO RE-URGE THE

11:27:32  25   SAME OBJECTION.  I DON'T KNOW WHAT THE PURPOSE IS OF HAVING

11:27:34  1    UNCONTESTED MATERIAL FACTS IF WE'RE GOING TO SPEND SIGNIFICANT TIME

11:27:38  2    DURING THE TRIAL ITSELF TO ESTABLISH THEM.

11:27:40  3            THE COURT:  I DON'T EITHER, I GUESS IT'S THEIR TIME AND

11:27:43  4    THAT -- IF THE TEN TO THE MINUS FIVE IS ALL THAT IS NEEDED, THEN

11:27:50  5    CERTAINLY YOU'RE RIGHT.  IF THERE ARE MORE NUANCES TO THE TEN TO

11:27:54  6    THE MINUS FIVE, AND I DON'T KNOW THAT.

11:27:55  7            MR. SIMS:  FOR THE RECORD, YOUR HONOR, I MISSPOKE IT WAS

11:27:58  8    PARAGRAPH NO. 87, I THINK I SAID 86 EARLIER.

11:28:01  9            THE COURT:  YOU SAID 87.

11:28:07 10            MR. SIMS:  I DID, OKAY, THANK YOU.

11:28:07 11            THE COURT:  YOU'RE SAYING ALL OF THE GEOTECHNICAL

11:28:09 12    TESTIMONY IS MOOT, IS THAT WHAT YOU'RE SAYING, COUNSEL?

11:28:15 13            MR. SIMS:  NO, NOT AT ALL, YOUR HONOR.  BUT DR. ROGERS,

11:28:19 14    ONE OF HIS PRINCIPLE PURPOSES IN HIS REPORT WAS TO IDENTIFY THE

11:28:22 15    HYDRAULIC PERMEABILITY AT THE SITE.

11:28:25 16            THE COURT:  AS TO HYDRAULIC PERMEABILITY.  YOU'VE SAYING,

11:28:29 17    IN YOUR MIND THERE'S A STIPULATION AS TO WHAT THE HYDRAULIC

11:28:32 18    PERMEABILITY OF THE EBIA RELEVANT SOILS ARE?

11:28:37 19            MR. SIMS:  I BELIEVE THE PHRASE THAT'S USED IS ORGANIC

11:28:39 20    CLAYS IN THE STIPULATION, YOUR HONOR.

11:28:41 21            THE COURT:  ALL RIGHT.  OKAY.

11:28:46 22    BY MR. MITSCH:

11:28:47 23    Q.  JUST BRIEFLY EXPLAIN WHAT A PUMPING TEST IS, DOCTOR.

11:28:51 24    A.  I AM LOOKING FOR A GOOD FIGURE TO THROW UP THERE.  FIGURE 192

11:28:55 25    MIGHT BE A GOOD ONE JUST TO THROW UP THERE, IT'S EASILY UNDERSTOOD.

11:28:59  1    IT'S ON PAGE 201 OF MY EXPERT REPORT.

11:29:05  2              THE COURT:  THANK YOU, DOCTOR.

11:29:19  3              THE WITNESS:  IT'S THE UPPER FIGURE, WE CAN ISOLATE IT

11:29:21  4    WITH THE CAPTION, PLEASE, ALWAYS.  JUST THE CAPTION, YEAH, THERE

11:29:27  5    YOU GO.

11:29:30  6              OKAY.  THIS IS THE BASIC PREMISE OF AN IN-SITU, WHICH

11:29:36  7    MEANS IN THE GROUND, PERMEABILITY TEST, WHICH GENERALLY GIVE YOU

11:29:41  8    MUCH HIGHER VALUES THAN LABORATORY TESTS FOR A VARIETY OF REASONS,

11:29:46  9    THAT'S A MATTER OF RECORD IN THE LITERATURE AND IT'S MENTIONED IN

11:29:48 10    MY REPORT.  SO THAT'S WHY YOU WANT TO GO OUT AND DO IT IN THE FIELD

11:29:52 11    VERSUS JUST DOING IT IN THE LABORATORY.

11:29:53 12              SO THAT'S WHY WE DID THESE TESTS --

11:29:56 13              THE COURT:  MAY I ASK YOU ONE QUESTION.  WHEN YOU SAY

11:29:58 14    HIGHER VALUES, DOES THAT MEAN MORE ACCURATE OR DOES IT RELATE TO

11:30:07 15    THE PERMEABILITY?

11:30:08 16              THE WITNESS:  MUCH MORE PERVIOUS GENERALLY IN FIELD TESTS

11:30:12 17    THAN IN LAB TESTS.

11:30:13 18              THE COURT:  A FIELD TEST WILL GENERALLY SHOW HIGHER

11:30:16 19    VALUES OF PERVIOUSNESS?

11:30:19 20              THE WITNESS:  YES.

11:30:20 21              THE COURT:  THANK YOU.

11:30:20 22              THE WITNESS:  SO THE IDEA IS YOU PUT A CENTRAL PUMPING

11:30:23 23    WELL, WHICH IS USUALLY A LARGER DIAMETER WELL WITH A SCREEN DOWN AT

11:30:29 24    THE HORIZON OF INTEREST.  AND THEN YOU WOULD -- AND THAT'S BELOW

11:30:36 25    THE WATER TABLE, THE LIGHT BLUE LINE THERE IS THE WATER TABLE,

11:30:40  1   WHATEVER THE WATER TABLE IS AT THE PARTICULAR TIME YOU DO THE TEST.

11:30:44  2        AND THEN OBSERVATION WELLS CAN BE, ONE WELL SOME DISTANCE

11:30:48  3   AWAY, THEY CAN BE -- IN THIS CASE WE'RE SHOWING NESTED WELLS

11:30:52  4   BECAUSE THAT'S WHAT WE USED.  NESTED MEANS I'VE GOT THE SCREENS ON

11:30:56  5   THOSE SMALLER OBSERVATION WELLS AT THE LAYER OF INTEREST THAT I

11:31:00  6   WANT TO ASSESS PERMEABILITY ON.  AND THEY HAVE TO BE SEPARATED

11:31:04  7   COMPLETELY FROM ONE ANOTHER, SO THEY'RE SOME DISTANCE APART.

11:31:09  8        AND THEN IF YOU WANTED TO KNOW MORE ABOUT THE ANISOTROPY

11:31:18  9   OF THESE PARTICULAR HORIZONS, YOU INSTALL A SERIES OF OBSERVATION

11:31:24 10   WELLS GENERALLY IN SOME SORT OF RADIAL PATTERN EMANATING OUT FROM

11:31:29 11   THE PUMPING WELL, THE PUMPING WELL BECOMES MORE OR LESS IN THE

11:31:32 12   CENTER, AND THEN YOU PUMP WATER OUT AND MEASURE THE DRAW DOWN ON

11:31:41 13   THE PUMPING WELL AND THEN MEASURE THE RESPONSE OF THE OBSERVATION

11:31:46 14   WELLS.

11:31:48 15   BY MR. MITSCH:

11:31:48 16   Q.  AND THE IDEA IS THAT BY PUMPING, USING THE PUMPING WELL YOU GET

11:31:53 17   AN INDICATION OF THE PERMEABILITY OF THE SURROUNDING SOILS,

11:31:57 18   CORRECT?

11:31:57 19   A.  RIGHT.  PERMEABILITY WITH RESPECT TO HYDRAULIC CONDUCTIVITY, SO

11:32:02 20   IT'S WATER PERMEABILITY THAT WE'RE LOOKING FOR.

11:32:04 21   Q.  AND WHEN YOU DO THAT, YOU WANT TO MAKE SURE THAT WHAT, THE DRAW

11:32:12 22   DOWN OR THE EFFECT THAT YOU'RE SEEING IS ACTUALLY WHAT'S BEEN

11:32:18 23   CAUSED BY THE PUMPING, RIGHT, YOU WANT TO MAKE SURE THAT YOU WANT

11:32:21 24   TO ISOLATE THAT IT'S THE PUMPING AND NOT SOME OTHER EXTERNAL

11:32:25 25   INFLUENCE, CORRECT?

11:32:26  1    A.  GIVE ME AN EXAMPLE OF WHAT YOU'RE WORRIED ABOUT.

11:32:31  2    Q.  TIDES.

11:32:34  3    A.  OH, SURE.  YOU HAVE TIDAL EFFECTS, YOU HAVE DIURNAL TIDES,

11:32:40  4    EARTH TIDES, AS WELL AS COASTAL OCEAN TIDES, THOSE ARE ALWAYS GOING

11:32:44  5    TO BE THERE.  IF YOU LOOK AT THE DATA OVER ENOUGH DAYS, YOU WILL

11:32:48  6    SEE THESE LITTLE HUMPS UP AND DOWN, AND WHAT WE DO IS WE DRAW A

11:32:52  7    DASH LINE BETWEEN THE CENTER OF ALL OF THOSE TO ACCOUNT FOR THEM.

11:32:55  8    YOU CAN ALSO DO IT MATHEMATICALLY IF YOU WANT TO CHARGE A CLIENT

11:32:58  9    MORE MONEY.  BUT IT'S A VERY EASY THING TO DO WITH A RULER.

11:33:02  10   Q.  AND WHEN YOU DID PUMPING TESTS AT THE SCHOOL SITE YOU DIDN'T

11:33:06  11   CORRECT FOR TIDAL INFLUENCES, DID YOU?

11:33:09  12   A.  WE HAVE DONE IT SINCE MY DEPOSITION.

11:33:10  13   Q.  I KNOW, BUT AT THE TIME YOU DID AND AT THE TIME YOU WROTE THIS

11:33:13  14   BOOK -- ACTUALLY, IT IS FREUDIAN SLIP, IT IS A BOOK -- YOU DIDN'T

11:33:19  15   CORRECT FOR THE TIDAL INFLUENCES?

11:33:21  16   A.  RIGHT, WE HADN'T HAD TIME TO DO IT, WE WERE WORKING IN TOO

11:33:25  17   SHORT OF A TIME FRAME.  IT WAS A REAL FUN CHRISTMAS VACATION,

11:33:29  18   BELIEVE ME.

11:33:29  19   Q.  FOR ALL OF US.

11:33:32  20   A.  YEAH.

11:33:32  21   Q.  LET'S MOVE ON TO STANDARD OF CARE, DOCTOR.  YOU AGREE THAT

11:33:37  22   THERE ARE A LOT OF WAYS THAT GEOTECHNICAL ENGINEERS ACQUIRE

11:33:40  23   INFORMATION ABOUT A SITE, CORRECT?

11:33:42  24   A.  YES.

11:33:42  25   Q.  SOIL BORINGS ARE ONE WAY, CORRECT?

627

11:33:46  1   A.   YES.

11:33:47  2   Q.   AND EXPERIENCE WORKING AN AREA PLAYS A ROLE IN THAT EVALUATION,

11:33:52  3   CORRECT?

11:33:52  4   A.   ESPECIALLY FOR GEOTECHNICAL ENGINEERS, YES.

11:33:56  5   Q.   AND, IN FACT, IN YOUR DEPOSITION YOU DESCRIBED THIS AS A

11:34:00  6   DOMINANT ROLE, CORRECT?

11:34:02  7   A.   BY GEOTECHNICAL ENGINEERS, YES.

11:34:04  8   Q.   BASED ON A GEOTECHNICAL ENGINEER'S EXPERIENCE WITH A PARTICULAR

11:34:08  9   SITE, YOU WOULD AGREE THAT THE NECESSITY TO DO ADDITIONAL

11:34:11 10   EVALUATIONS OR ASSESSMENTS IS DEPENDENT ON AN ENGINEER'S KNOWLEDGE

11:34:17 11   ABOUT THAT SITE, CORRECT?

11:34:18 12   A.   YES, I'D STAND BY THAT COMMENT.

11:34:21 13   Q.   AND IT'S FAIR TO SAY THAT AN ENGINEER'S EXPERIENCE IN AN AREA

11:34:26 14   IS OF ENORMOUS INFLUENCE AND VALUE IN GEOTECHNICAL ENGINEERING,

11:34:30 15   CORRECT?

11:34:30 16   A.   YES.

11:34:30 17   Q.   AND THAT'S BECAUSE EVERY AREA AND EVERY SITE HAS ITS OWN

11:34:35 18   DEVELOPMENT HISTORY, CORRECT?

11:34:36 19   A.   IT HAS ITS OWN GEOLOGICAL DEPOSITIONAL HISTORY AND IT'S OWN

11:34:40 20   ANTHROPOGENIC MAN CAUSED DEVELOPMENT HISTORY, ALTERATIONS OF THE

11:34:45 21   GROUND AND THE UNDERGROUND.

11:34:46 22   Q.   WHAT I WOULD LIKE YOU TO DO IS TO GO TO THE DESIGN

11:34:53 23   MEMORANDUM 3, IT WAS REFERRED TO IN YOUR DIRECT TESTIMONY.

11:34:57 24        THE COURT:   AND WE WILL SEE IT ON THE SCREEN, WE'LL SAVE

11:35:00 25   YOU THE EFFORT OF HAVING TO DO IT YOURSELF.   I ASSUME IT'S GOING TO

11:35:04  1    COME UP?

11:35:06  2              MR. MITSCH:  IT WILL, IT IS JX 4-0193.  MAY I APPROACH,

11:35:17  3    YOUR HONOR?

11:35:18  4              THE COURT:  YOU MAY.

11:35:23  5              MR. MITSCH:  WHAT I AM GOING TO BE REFERRING TO IS A

11:35:26  6    PLATE IN A DESIGN MEMORANDUM, AND IT WILL BE VERY HARD TO READ ON

11:35:29  7    THE SCREEN SO WHAT I HAVE ARE ADDITIONAL COPIES.  AND IF I MAY GIVE

11:35:33  8    ONE TO THE --

11:35:35  9              THE COURT:  YOU MAY.

11:35:38 10              THE WITNESS:  THANK YOU.

11:35:59 11    BY MR. MITSCH:

11:36:00 12    Q.  NOW, DESIGN MEMORANDUM 3 WAS THE -- IS THE SOURCE, IS THE

11:36:05 13    DESIGN DOCUMENT THAT PRECEDED THE CONSTRUCTION OF THE FLOODWALLS,

11:36:11 14    AMONG OTHER THINGS, BUT THE CONSTRUCTION OF THE FLOODWALLS ALONG

11:36:14 15    THE EBIA, CORRECT?

11:36:15 16    A.  YEAH, WITH THE EXCEPTION THAT THE SHEET PILES HAD ALREADY BEEN

11:36:18 17    PUT IN BY THE ORLEANS LEVEE DISTRICT.

11:36:20 18    Q.  OKAY.

11:36:22 19    A.  AND THE LEVEE WAS ALREADY THERE.

11:36:24 20    Q.  AND AS PART OF THAT, THE EFFORT IN DOING THIS DESIGN

11:36:32 21    MEMORANDUM, THE GEOTECHNICAL ENGINEERS INCLUDED A SOIL AND GEOLOGIC

11:36:38 22    PROFILE IN THE DESIGN MEMORANDUM, CORRECT?

11:36:42 23    A.  YES.

11:36:42 24    Q.  AND THAT WAS PLATE NO. 28, WHICH IS JX 4-0193.  NOW, I AM GOING

11:37:21 25    TO REPRESENT TO YOU THAT -- LET'S WALK OUR WAY THROUGH THIS

11:37:28 1   DOCUMENT.  DO YOU SEE THE FLORIDA AVENUE MARK THERE?

11:37:39 2   A.  YES, RIGHT NEXT TO THE EXISTING SIPHON.

11:37:44 3   Q.  AND THIS CROSS SECTION IS ESSENTIALLY LOOKING AT -- IF YOU WERE

11:37:51 4   STANDING IN THE MIDDLE OF THE CANAL AND YOU WERE LOOKING AT THE

11:37:54 5   FLOODWALL, CORRECT?

11:37:57 6   A.  STANDING IN THE MIDDLE OF THE CANAL?

11:37:59 7   Q.  IF YOU'RE ON THE CANAL SIDE AND YOU'RE LOOKING STRAIGHT AT THE

11:38:04 8   FLOODWALL, THAT'S WHAT THIS REPRESENTS FLORIDA AVENUE IS OVER HERE,

11:38:08 9   CLAIBORNE AVENUE IS OVER HERE, CORRECT?

11:38:10 10  A.  OH, OKAY.  YEAH, BASICALLY YOU'RE LOOKING, THE SECTION IS NORTH

11:38:14 11  SOUTH AND YOU'RE LOOKING WEST, IS THAT WHAT YOU'RE TRYING TO SAY?

11:38:17 12  Q.  YOU'RE LOOKING EAST.

11:38:18 13  A.  I'M LOOKING EAST?  I THINK I'M LOOKING TOWARD THE WEST.

11:38:22 14  Q.  OKAY.  I'M SORRY.  THE 4T OVER HERE I'LL REPRESENT TO YOU IS

11:38:32 15  THE APPROXIMATE LOCATION OF THE NORTH BREACH.

11:38:36 16          THE LAW CLERK:  SAY THAT AGAIN.

11:38:38 17          THE COURT:  WHAT WAS THAT?

11:38:39 18          MR. MITSCH:  THERE ARE SOME NUMBERS HERE, 4T AND 4, THOSE

11:38:46 19  ARE SOIL BORINGS.

11:38:47 20          THE COURT:  ALL RIGHT.

11:38:49 21  BY MR. MITSCH:

11:38:49 22  Q.  THAT'S THE APPROXIMATE LOCATION OF THE NORTH BREACH -- SOUTH

11:38:57 23  BREACH, SORRY.  AND NO. 8 RIGHT AROUND THERE IS THE APPROXIMATE

11:39:13 24  LOCATION OF THE NORTH BREACH (INDICATING)?

11:39:17 25          THE COURT:  NO. 8?

11:39:18  1          MR. MITSCH:  YES, BORING NO. 8.

11:39:20  2          THE COURT:  ALL RIGHT.

11:39:27  3   BY MR. MITSCH:

11:39:28  4   Q.  ACCORDING TO THIS PLATE IN 1966 THE GEOTECHNICAL ENGINEERS

11:39:32  5   CONCLUDED THAT THE FIRST, LOOKING FROM ABOUT TO MINUS 11, MINUS

11:39:45  6   12 FEET WAS FAT CLAY, THAT'S THIS AREA, RIGHT (INDICATING)?

11:39:50  7   A.  YES.  THAT'S HOW THEY CLASSIFIED IT JUST AS FILL, AND THEN DOWN

11:39:55  8   AT THE BOTTOM YOU SEE CH, THAT'S THE SOIL CLASSIFICATION; AND

11:39:59  9   THEY'RE CLASSIFYING IT AS FAT CLAYS.  SO IT'S SIMPLY, THE SOIL

11:40:04 10   CLASSIFICATIONS AND THEN THERE'S THE GEOLOGIC CLASSIFICATIONS,

11:40:09 11   ESTUARINE, INTERDISTRIBUTARY MARSH, AND SO ON?

11:40:14 12   Q.  AND BELOW THAT AREA THERE'S A MARSH LAYER, CORRECT?

11:40:18 13   A.  YES.

11:40:19 14   Q.  WHAT'S DENOMINATED AS A MARSH.  AND IF YOU LOOK AT THE LEGEND

11:40:22 15   OVER HERE THAT'S CALLED, THAT MATERIAL IS CLAY WITH ORGANIC MATTER,

11:40:28 16   RIGHT?

11:40:28 17   A.  RIGHT.

11:40:28 18   Q.  AND THAT TAKES US DOWN TO ABOUT 17 FEET OR SO?

11:40:36 19   A.  YEAH, LOOKS APPROXIMATELY RIGHT.  IT DIPS DOWN A LITTLE DEEPER

11:40:40 20   AT THE EAST END.

11:40:41 21   Q.  AND THEN BELOW THAT IS THE INTERDISTRIBUTARY LAYER, CORRECT?

11:40:47 22   A.  YES.

11:40:47 23   Q.  AND THAT AGAIN IS DESCRIBED AS FAT CLAY, CORRECT?

11:40:50 24   A.  YES.

11:40:51 25   Q.  NOW WHAT I WOULD LIKE YOU TO DO IN THAT SAME DESIGN MEMORANDUM

11:41:02 1    IS TO GO TO PAGE 31, AND THAT'S JX 4-0114.

11:41:41 2    A.  PAGE 18?

11:41:43 3    Q.  IT'S PAGE 18.  FOR THE RECORD IT'S JX 4-0114.  THAT PARAGRAPH

11:42:04 4    READS THAT: "BASED ON THE SOIL CONDITIONS ALONG THIS PART OF THE

11:42:08 5    PROJECT AND THE SHORT DURATION OF HURRICANE FLOODS, HAZARDOUS

11:42:12 6    SEEPAGE OR HYDROSTATIC UPLIFT ON THE PROTECTED SIDE IS NOT

11:42:16 7    ANTICIPATED."  I'VE READ THAT CORRECTLY?

11:42:18 8    A.  YES.

11:42:19 9    Q.  YOU AGREE THAT IN 1966 THE CORPS MADE AN UNDERSEEPAGE

11:42:29 10   ASSESSMENT OF THAT FLOODWALL ALONG THE EBIA, CORRECT?

11:42:33 11   A.  YEAH.  YES, THAT IS THE ASSESSMENT.

11:42:36 12   Q.  AND THE SOILS BETWEEN 1966 AND 2005 DIDN'T CHANGE APPRECIABLY

11:42:53 13   IN THAT AREA, DID THEY?

11:42:55 14   A.  WELL, THEY DID, JUST TO THE NORTH, YOU LOOK -- THEY DID FILL IN

11:43:01 15   THE CROSSOVER CHANNEL THAT WENT TO THE BAYOU BIENVENUE OUTFALL, SO

11:43:05 16   THEY PUT IN A BUNCH OF DREDGE FILL JUST TO THE NORTH OF NEXT TO

11:43:10 17   FLORIDA AVENUE AND THEY REBUILT FLORIDA AVENUE LATER IN 1980 --

11:43:14 18   Q.  I AM NOT TALKING ABOUT THE AREA NORTH OF FLORIDA AVENUE, I AM

11:43:18 19   TALKING ABOUT ALONG THE EBIA.  AND I AM REFERRING YOU SPECIFICALLY,

11:43:21 20   DOCTOR, TO THE SOIL BORINGS THAT WE'VE DISCUSSED AT SOME LENGTH

11:43:25 21   EARLIER TODAY.

11:43:26 22   A.  OKAY.

11:43:26 23   Q.  I SHOWED YOU FIVE SOIL BORINGS AND EACH OF THEM INDICATED,

11:43:32 24   ACCORDING TO YOUR TESTIMONY, THAT THERE WAS EITHER LEAN CLAY, FAT

11:43:38 25   CLAY, OR ORGANIC CLAY?

11:43:41  1   A.   ORGANIC CLAY.

11:43:42  2   Q.   AND THAT'S EXACTLY WHAT'S SHOWN IN PLATE NO. 28, ISN'T IT?

11:43:45  3   A.   PLATE 28.

11:43:48  4            THE COURT:   THAT'S THE ONE --

11:43:50  5            MR. MITSCH:   THAT'S THAT ONE.

11:43:53  6            THE WITNESS:   YEAH, I THINK IF YOU TRY, IF YOU LOOKED AT

11:43:58  7   CROSS SECTION DR. MARR CAME UP WITH, THAT'S THE ONE THAT I WOULD

11:44:02  8   HANG MY HAT ON THAT I WOULD AGREE WITH.   AND IT'S A LITTLE

11:44:05  9   DIFFERENT THAN THIS, A LITTLE MORE DETAILED.

11:44:08 10   BY MR. MITSCH:

11:44:08 11   Q.   IT'S MORE DETAILED, IT'S BEEN 40 YEARS.   BUT THE ESSENTIAL

11:44:12 12   SOILS, THE ORGANIC CLAYS, THE FAT CLAYS WERE THERE IN 1966 AND THEY

11:44:19 13   WERE THERE IN 2005?

11:44:20 14   A.   SURE.   I DIDN'T KNOW THAT'S ALL YOU WERE ASKING.

11:44:22 15   Q.   IN 2011, I'M ASKING.

11:44:26 16   A.   THE DIRT'S STILL THERE, IT'S THE FUNDAMENTAL PREMISE OF OUR

11:44:28 17   BUSINESS.

11:44:29 18   Q.   AND THE CHARACTER OF THAT DIRT IS STILL THE SAME, CORRECT?

11:44:31 19   A.   GENERALLY, YES.   OBVIOUSLY THERE'S GOING TO BE MORE DISTURBANCE

11:44:37 20   UP ON TOP GLOBALLY, SO IT DEPENDS.   AGAIN, IT'S A MATTER OF SCALE.

11:44:40 21   Q.   AND THE MORE DISTURBANCE MEANS THAT THE MORE THE SOIL IS

11:44:44 22   COMPRESSED, CORRECT?

11:44:45 23   A.   NO.   SOMETIMES PEOPLE ARE DIGGING PITS AND DROPPING TRASH IN

11:44:51 24   THEM AND COVERING IT UP SO THEY DON'T HAVE TO HAUL IT OFF AND PAY

11:44:55 25   THE DUMP FEE.

11:44:56  1    Q.  SO YOU BUILD THE BUILDING AND DRIVE A TRUCK AND YOU PLACE

11:45:02  2    CONSTRUCTION MATERIALS ALONG THE EBIA THAT WOULD TEND TO COMPRESS

11:45:06  3    THE SOIL, CORRECT?

11:45:08  4    A.  THAT'S CORRECT, THAT'S CORRECT.

11:45:08  5    Q.  AND THE MORE COMPRESSION, THE LESS PERMEABLE, CORRECT?

11:45:13  6    A.  WITH CLAYS.

11:45:15  7         THE COURT:  WOULD AN UNDERGROUND STRUCTURE INCREASE

11:45:19  8    COMPRESSIBILITY?

11:45:21  9         THE WITNESS:  NO.  UNDERGROUND STRUCTURES USUALLY DON'T

11:45:23 10    WAY AS MUCH AS THE SOIL, SO YOU'RE UNLOADING THE SOIL.  LIKE WHEN

11:45:27 11    YOU PUT IN A SWIMMING POOL, WATER DOESN'T WEIGH AS MUCH AS THE SOIL

11:45:31 12    DOES.  YOU VERY OFTEN SEE THE SWIMMING POOL START TO HEAVE OUT

11:45:35 13    AFTER TIME, THEY'RE START LIFTING, THEY'RE NOT AS HEAVY AS THE SOIL

11:45:38 14    THAT WAS THERE PRIOR TO THE POOL.  DEPENDS HOW QUICK YOU PUT THE

11:45:41 15    POOL IN.

11:45:42 16         THE COURT:  THANK YOU.

11:45:44 17    BY MR. MITSCH:

11:45:44 18    Q.  DO YOU KNOW WHAT THE LANE'S RATE OF CREEP RATIO IS?

11:45:48 19    A.  YES.

11:45:49 20    Q.  AND I THINK IN YOUR DEPOSITION YOU AGREED THAT IT'S A

11:45:52 21    SIMPLIFIED MEANS OF CHECKING IF HYDROSTATIC UPLIFT IS GETTING INTO

11:45:59 22    THE DANGER ZONE ON THE PROTECTED SIDE OF A LEVEE, CORRECT?

11:46:03 23    A.  YEAH.  THAT WAS AN INCOMPLETE ANSWER.

11:46:07 24    Q.  IN ANY EVENT THAT'S WHAT YOU SAID?

11:46:09 25    A.  YEAH, THAT'S WHAT I SAID.

11:46:10  1    Q.  AND YOU THEN FURTHER EXPLAINED THAT THAT TECHNIQUE ALLOWS

11:46:16  2    PEOPLE TO LOOK AT A LOT OF MILES OF LEVEE IN A SHORT PERIOD OF TIME

11:46:21  3    AND BASICALLY DIVIDE THEM INTO TWO BINS -- THESE ARE YOUR WORDS --

11:46:26  4    THE OKAY BIN AND THE NEED TO TAKE ANOTHER LOOK BIN, CORRECT?

11:46:30  5    A.  RIGHT.

11:46:31  6    Q.  AND THAT CREEP RATIO WAS A METHOD THAT WAS USED TO EVALUATE

11:46:41  7    LEVEES IN 1966, WASN'T IT?

11:46:44  8    A.  YES, IT CAME OUT IN 1934, '32, IN THAT AREA.

11:46:54  9          MR. MITSCH:  AND, YOUR HONOR, IT'S TEN TO 12 RIGHT NOW,

11:46:56 10    I'M STILL ON THE STANDARD OF CARE, I AM JUST GOING TO START TALKING

11:47:00 11    ABOUT THE VARIOUS REGULATIONS THAT DR. ROGERS REFERRED TO THIS

11:47:04 12    MORNING.

11:47:04 13          THE COURT:  GO TO 12.

11:47:06 14          MR. MITSCH:  YOU WANT TO GO TO 12, THAT'S FINE.

11:47:08 15    BY MR. MITSCH:

11:47:09 16    Q.  LET'S PULL UP JX 44.  AND THAT IS ER 1110-2-1150.  WHAT I WOULD

11:48:06 17    LIKE YOU TO DO IS GO TO PAGE FOUR, WE'RE ALREADY HERE, AND THE

11:48:12 18    SECTION THAT SAYS PURPOSE.  THE SECOND SENTENCE OF THAT REGULATION

11:48:31 19    READS:  "THE REGULATION PROVIDES GUIDANCE FOR DEVELOPING AND

11:48:34 20    DOCUMENTING QUALITY ENGINEERING ANALYSES AND DESIGNS FOR PROJECTS

11:48:39 21    AND PRODUCTS ON TIME AND IN ACCORDANCE WITH PROJECT MANAGEMENT

11:48:43 22    POLICY FOR CIVIL WORKS ACTIVITIES."  DID I READ THAT CORRECTLY?

11:48:47 23    A.  YES, I BELIEVE SO.

11:48:48 24    Q.  AND WHAT I WANT TO EMPHASIZE IS, YOU ADMIT YOU AGREE THAT THE

11:48:53 25    REGULATION PROVIDES GUIDANCE, CORRECT?

11:48:55  1    A.   YES.

11:48:56  2    Q.   LOOK AT THE SECTION NUMBERED SECTION 2.  APPLICABILITY.  AND

11:49:27  3    THE SECOND SENTENCE READS:  "THE GUIDANCE INCLUDED IN THE

11:49:30  4    REGULATION IS APPLICABLE TO ALL CIVIL WORKS ENGINEERING PRODUCTS

11:49:33  5    INCLUDING WORK TO DESIGN NEW PROJECTS, WORK TO MODIFY EXISTING

11:49:37  6    PROJECTS, AND WORK FOR OTHERS."  CORRECT?

11:49:40  7    A.   YES.

11:49:40  8    Q.   GO TO SECTION 6, POLICY, SECOND SENTENCE.  THAT SENTENCE READS:

11:50:00  9    "THE REGULATION AGAIN PROVIDES POLICY GUIDANCE TO BE USED WITH

11:50:04 10    PROFESSIONAL ENGINEERING JUDGMENT IN THE DEVELOPMENT OF ENGINEERING

11:50:08 11    PRODUCTS."  CORRECT?

11:50:09 12    A.   YES.

11:50:10 13    Q.   SO THE POLICY -- SO THIS REGULATION TELLS US TWO THINGS, FIRST

11:50:16 14    OF ALL, IT PROVIDES GUIDANCE, CORRECT?

11:50:19 15    A.   YES.

11:50:19 16    Q.   AND IT ASSUMES THAT PROFESSIONAL ENGINEERING JUDGMENT WILL BE

11:50:23 17    EXERCISED, CORRECT?

11:50:24 18    A.   WELL, IT'S SAYING, YEAH, WE'RE PROVIDING GUIDANCE AND THE

11:50:32 19    GUIDANCE, THE INTENT OF PROVIDING THAT GUIDANCE IS NOT FOR JOE ON

11:50:36 20    THE STREET, IT'S TO BE USED WITH PROFESSIONAL ENGINEERING JUDGMENT

11:50:40 21    BY ENGINEERS WHO ARE QUALIFIED TO MAKE THOSE JUDGMENTS.  YOU

11:50:44 22    CAN'T -- WHEN YOU GET YOUR CIVIL ENGINEERING LICENSE IN EVERY

11:50:47 23    STATE, ONE OF THE THINGS THEY TELL YOU RIGHT OFF THE TOP IS JUST

11:50:50 24    BECAUSE YOU'RE A REGISTERED ENGINEER DOESN'T MEAN YOU CAN HOLD

11:50:53 25    YOURSELF OUT TO DO STRUCTURAL ENGINEERING, HYDROLOGY, SOIL

11:50:58  1  MECHANICS, YOU BASICALLY HAVE A PRACTICE AREA WHERE YOUR EXPERTISE

11:51:03  2  IS.  SO AS LONG AS YOU DON'T PRACTICE OUTSIDE OF YOUR EXPERTISE

11:51:06  3  AREA, THEN YOU CAN EXERCISE PROFESSIONAL ENGINEERING JUDGMENT.

11:51:09  4  Q.  AND PROFESSIONAL ENGINEERING JUDGMENT REQUIRES AN ENGINEER TO

11:51:16  5  LOOK AT DIFFERENT VARIABLES, CORRECT?

11:51:18  6  A.  GENERALLY.

11:51:18  7  Q.  AND YOU AGREE, AGAIN, THAT LOCAL EXPERIENCE WITH GEOLOGICAL

11:51:25  8  NUANCES IN SOILS IN AN AREA HAS ENORMOUS INFLUENCE AND VALUE IN

11:51:32  9  EXERCISING GEOTECHNICAL ENGINEERING JUDGMENT, CORRECT?

11:51:36 10  A.  YES.  GEOTECHNICAL ENGINEER IS THE ONE SUB-DISCIPLINE OF CIVIL

11:51:40 11  ENGINEERING THAT PROBABLY REQUIRES MORE JUDGMENT THAN ANY OF THE

11:51:44 12  OTHER SUB DISCIPLINES, WITH A POSSIBLE EXCEPTIONAL OF GEOLOGICAL

11:51:49 13  ENGINEERING.  BECAUSE GEOLOGICAL ENGINEERS DELVE DEEPER INTO THE

11:51:54 14  EARTH SO IT TAKES A LOT OF JUDGMENT TO -- A LOT OF EXPERIENCE AND

11:51:59 15  GOOD QUALITY EXPERIENCE AND GOOD QUALITY MENTORING AND TRAINING TO

11:52:03 16  DEVELOP ENGINEERING JUDGMENT FOR GEOTECHNICAL ENGINEERING.

11:52:06 17  Q.  AND YOU AGREE THAT THOSE GEOLOGIC NUANCES IN SOILS CAN VARY

11:52:10 18  FROM LOCATION TO LOCATION, CORRECT?

11:52:12 19  A.  YES.

11:52:12 20  Q.  LET'S GO TO SECTION 10, JX 44-7.  AND I WOULD TO REFER TO THE

11:52:36 21  SECOND SENTENCE WHICH READS:  "DISTRICTS SHALL CONDUCT ANALYSES AND

11:52:40 22  INVESTIGATIONS IN ACCORDANCE WITH APPROVED ENGINEERING CRITERIA AND

11:52:42 23  GUIDANCE, COORDINATE ENGINEERING ACTIVITIES, AND SEEK ADVICE ON

11:52:46 24  PROBLEMS ENCOUNTERED DURING PROJECT DEVELOPMENT FROM THE

11:52:50 25  APPROPRIATE STAFFS."  DO YOU SEE THAT?

11:52:54  1   A.  YES.

11:52:54  2   Q.  AND THE SECOND SENTENCE READS:  "FOR ANALYSES OF SPECIAL AREAS

11:52:59  3   SUCH AS HAZARDOUS, TOXIC, AND RADIOACTIVE WASTE (HTRW) ASSIGNED TO

11:53:05  4   CENTERS OF EXPERTISE.  THE DISTRICTS SHALL COORDINATE AS NEEDED AND

11:53:09  5   COMPLY WITH THE REGULATION OF USE OF CENTERS OF EXPERTISE."

11:53:15  6   CORRECT?

11:53:15  7   A.  YES.

11:53:16  8   Q.  AND TASK ORDER 26 RELATED TO AN HTRW SITE OR PROJECT, DIDN'T

11:53:23  9   IT?

11:53:23  10  A.  YES.

11:53:24  11  Q.  AND THIS SENTENCE SAYS THE DISTRICTS SHALL COORDINATE AS

11:53:30  12  NEEDED, CORRECT?  I WANT YOU TO FOCUS ON THAT PHRASE AS NEEDED,

11:53:33  13  CORRECT?

11:53:34  14  A.  YES.

11:53:36  15  Q.  THE REGULATION DOESN'T DEFINE WHAT "AS NEEDED" IS, DOES IT?

11:53:45  16  A.  NO, IT JUST SAYS WHAT IT SAYS, COUNSEL.

11:53:48  17  Q.  RIGHT.  IT ASSUMES THAT PROFESSIONAL ENGINEERING JUDGMENT WILL

11:53:51  18  BE USED TO DETERMINE WHEN FURTHER COORDINATION IS NEEDED, CORRECT?

11:53:59  19  A.  YES.  AND IT ASSUMES WE'RE TALKING ABOUT TECHNICAL PEOPLE, NOT

11:54:05  20  FIELD PEOPLE.  WE'RE TALKING ABOUT TECHNICAL COORDINATION, SO

11:54:09  21  TECHNICAL COORDINATION IS OFFICE ENGINEERS WOULD BE MY

11:54:13  22  INTERPRETATION OF THAT.  SO THEY'RE GOING TO MAKE THAT

11:54:16  23  DETERMINATION WHETHER THEY NEED TO GO AND GET HELP FROM ONE OF THE

11:54:19  24  CENTERS OF EXPERTISE, THAT'S GENERALLY WHERE IT COMES FROM.  YOU'RE

11:54:22  25  NOT GOING TO CALL ERDC VICKSBURG IF YOU'RE THE CONSTRUCTION MANAGER

11:54:26  1    ON SOME CLEAN UP SITE, THAT'S GOING TO COME FROM THE DISTRICT.

11:54:29  2    Q.  BUT IN ANY EVENT, IT INCLUDES GEOTECHNICAL ENGINEERS, CORRECT?

11:54:32  3    A.  YES, YOU WOULD ASSUME THAT IT DOES.  I WOULD ASSUME THAT IT

11:54:35  4    DOES AT THE DISTRICT LEVEL IN THE GEOTECHNICAL BRANCH.

11:54:41  5    Q.  LET'S GO TO JX 46.

11:55:05  6    A.  IS THAT THE COVER PAGE?

11:55:17  7    Q.  THAT'S THE DESIGN AND CONSTRUCTION OF LEVEES.

11:55:20  8    A.  YES.

11:55:25  9    Q.  WHAT I WOULD LIKE YOU TO DO IS, JX 46 PAGE 11, SECTION 1.1.

11:55:38 10    SECTION 1.1 READS:  "THE PURPOSE OF THIS MANUAL IS TO PRESENT BASIC

11:55:42 11    PRINCIPLES USED IN THE DESIGN AND CONSTRUCTION OF EARTH LEVEES."

11:55:45 12    CORRECT?

11:55:45 13    A.  YES.

11:55:46 14    Q.  GO DOWN TO SECTION 1.5, THIRD PARAGRAPH.  THAT SAYS:  "THAT

11:55:52 15    NUMEROUS FACTORS MUST BE CONSIDERED IN LEVEE DESIGN."  CORRECT?

11:55:54 16    A.  THEY'RE NOT FOLLOWING YOU ON THE SCREEN, COUNSEL.

11:56:00 17    Q.  GO DOWN TO THE NEXT ONE, NUMBER THREE.  CAN WE GO TO THE NEXT,

11:56:12 18    PLEASE.  THE THIRD PARAGRAPH.

11:56:28 19          THAT SECTION SAYS:  "THAT NUMEROUS FACTORS MUST BE

11:56:31 20    CONSIDERED IN LEVEE DESIGN."  CORRECT?

11:56:32 21    A.  YES.

11:56:33 22    Q.  AND THAT THOSE FACTORS VARY FROM PROJECT TO PROJECT, CORRECT?

11:56:37 23    A.  YES.

11:56:37 24    Q.  AND THERE'S NO SPECIFIC STEP-BY-STEP PROCEDURE COVERING DETAILS

11:56:42 25    OF A PARTICULAR PROJECT, CORRECT?

11:56:44  1    A.   THAT'S CORRECT.   THEY CAN'T MAKE THIS "ONE SIZE FITS ALL"

11:56:49  2    BECAUSE OF THE GEOLOGICAL NUANCES AND IN DIFFERENT PARTS OF THE

11:56:54  3    COUNTRY.

11:56:55  4    Q.   AND THAT'S BECAUSE THIS REGULATION ASSUMES THAT ENGINEERING

11:57:02  5    EXPERIENCE AND DISCRETION WILL BE APPLIED, CORRECT?

11:57:06  6    A.   YES.   AND THE DESIGN PROCESS WITH THE CORPS OF ENGINEERS,

11:57:11  7    THEY'VE BEEN ONE OF THE BEST AGENCIES TO INSTITUTE INDEPENDENT

11:57:15  8    TECHNICAL REVIEW, ITR, OF DESIGNS AS WELL.   SO YOU'RE GOING TO HAVE

11:57:20  9    ANOTHER SET OF EYES THAT ARE GOING TO LOOK AT IT OUTSIDE THE

11:57:23 10    DISTRICT PEOPLE.   ESPECIALLY ON SEEPAGE ANALYSIS, I KNOW THAT FROM

11:57:30 11    MY OWN EXPERIENCE.

11:57:31 12    Q.   AND ONE OF THE FACTORS OR CONDITIONS TO BE CONSIDERED IS THE

11:57:36 13    DURATION OF WATER LOADING ON THE LEVEE, CORRECT?

11:57:39 14    A.   CORRECT.

11:57:39 15    Q.   SO A DIFFERENT ANALYSIS IF IT'S SHORT-TERM HURRICANE LOADING

11:57:45 16    VERSUS LONG-TERM LOADING BEHIND A DAMN, CORRECT?

11:57:50 17    A.   YEAH, OR RIVER.

11:57:51 18    Q.   OR RIVER.

11:57:52 19         THE COURT:   OKAY.   WE'LL TAKE A RECESS, WE'LL BE BACK AT

11:57:57 20    1 O'CLOCK.

11:57:59 21         THE DEPUTY CLERK:   ALL RISE.

11:58:09 22      (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

         23

         24                    *  *  *  *  *  *

         25

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED

 4   STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY

 5   CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE

 6   BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE

 7   PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER.

 8

 9

10   _____

11        KAREN A. IBOS, CCR, RPR, CRR, RMR

12        OFFICIAL COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25
```