1                UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  KATRINA CANAL BREACHES*   CIVIL ACTION
     CONSOLIDATED LITIGATION     *
6                            *   NO. 05-4182
                           *
7                           *   SECTION K(2)
     PERTAINS TO:  MRGO         *
8   ARMSTRONG NO. 10-CV-866     *   NEW ORLEANS, LOUISIANA
                           *
9                           *   SEPTEMBER 14, 2012
     * * * * * * * * * * * * * * * * *

10             DAY THREE, AFTERNOON SESSION

11             BENCH TRIAL BEFORE THE
           HONORABLE STANWOOD R. DUVAL, JR.
12            UNITED STATES DISTRICT JUDGE

13

    APPEARANCES:
14

    FOR THE PLAINTIFFS:         BRUNO & BRUNO
15                        BY: JOSEPH M. BRUNO, ESQ.
                        855 BARONNE STREET
16                        NEW ORLEANS, LOUISIANA 70113

17

18                        THE ANDRY LAW FIRM
                        BY: JONATHAN B. ANDRY, ESQ.
19                        610 BARONNE ST.
                        NEW ORLEANS, LOUISIANA 70113
20

21                        BARON & BUDD
                        BY: THOMAS SIMS, ESQ.
22                        3102 OAK LAWN AVE.
                        SUITE 1100
23                        DALLAS, TEXAS 75219

24

25

1   APPEARANCES CONTINUED:

2   FOR THE PLAINTIFFS:          DEGRAVELLES, PALMINTIER,
                                   HOLTHAUS & FRUGE
3                                BY: MICHAEL C. PALMINTIER, ESQ.
                                 BY:  JOSHUA M. PALMINTIER, ESQ.
4                                618 MAIN STREET
                                 BATON ROUGE, LOUISIANA 70801
5

6
                                 DOMENGEAUX, WRIGHT, ROY & EDWARDS
7                                BY: ELLWOOD C. STEVENS, JR., ESQ.
                                 BY: BONNIE KENDRICK, ESQ.
8                                P. O. BOX 3668
                                 556 JEFFERSON ST.
9                                LAFAYETTE, LOUISIANA 70502

10

11                               THE DUDENHEFER LAW FIRM, LLC
                                 BY: FRANK DUDENHEFER, JR., ESQ.
12                               601 POYDRAS ST.
                                 SUITE 2655
13                               NEW ORLEANS, LOUISIANA 70130-6004

14

15                               FAYARD & HONEYCUTT
                                 BY: CALVIN C. FAYARD, JR., ESQ.
16                               519 FLORIDA AVE., S.W.
                                 DENHAM SPRINGS, LOUISIANA 70726
17

18
                                 JOANEN LAW FIRM
19                               BY: SCOTT JOANEN, ESQ.
                                 4905 FRERET ST.
20                               SUITE B
                                 NEW ORLEANS, LOUISIANA 70115
21

22
                                 LEVIN, PAPANTONIO, THOMAS,
23                                 MITCHELL, RAFFERTY & PROCTOR
                                 BY: MATTHEW D. SCHULTZ, ESQ.
24                               316 S. BAYLEN ST.
                                 SUITE 600
25                               PENSACOLA, FLORIDA 32502

```
1   APPEARANCES CONTINUED:

2   FOR THE PLAINTIFFS:            THE TRIAL LAW FIRM PC
                                   BY: ANDREW P. OWEN, ESQ.
3                                  800 WILTSHIRE BLVD.
                                   SUITE 500
4                                  LOS ANGELES, CALIFORNIA 90017

5

6                                  J. ROBERT WARREN, II, A PLC
                                   BY: J. ROBERT WARREN, II, ESQ.
7                                  1718 SHORT ST.
                                   NEW ORLEANS, LOUISIANA 70118
8

9
    FOR THE DEFENDANT WASHINGTON
10  GROUP INTERNATIONAL, INC.:     STONE PIGMAN WALTHER WITTMANN
                                   BY:  WILLIAM D. TREEBY, ESQ.
11                                 BY:  JAMES C. GULOTTA, JR., ESQ.
                                   BY:  HEATHER S. LONIAN, ESQ
12                                 BY:  MAGGIE A. BROUSSARD, ESQ.
                                   546 CARONDELET STREET
13                                 NEW ORLEANS, LOUISIANA 70130

14

15

16

17

18

19

20

21

22

23

24

25
```

1  APPEARANCES CONTINUED:

2  FOR THE DEFENDANT WASHINGTON
   GROUP INTERNATIONAL, INC.:        JONES DAY
3                                    BY:  ADRIAN WAGER-ZITO, ESQ.
                                     BY:  DEBRA S. CLAYMAN, ESQ.
4                                    BY:  CHRISTOPHER N. THATCH, ESQ.
                                     BY:  CHRISTOPHER R. FARRELL, ESQ.
5                                    BY:  JULIA CRONIN, ESQ.
                                     BY:  BRIAN KERWIN, ESQ.
6                                    51 LOUISIANA AVENUE, N.W.
                                     WASHINGTON, D.C. 20001
7

8

9  FOR THE DEFENDANT UNITED
   STATES OF AMERICA:                U.S. DEPARTMENT OF JUSTICE
10                                   CIVIL DIVISION, TORTS BRANCH
                                     BY:  ROBIN D. SMITH, ESQ.
11                                   BY:  JAMES F. MCCONNON, JR., ESQ.
                                     BY:  RUPERT MITSCH, ESQ.
12                                   BY:  CONOR KELLS, ESQ.
                                     BY:  JOHN A. WOODCOCK, ESQ.
13                                   BENJAMIN FRANKLIN STATION
                                     P.O. BOX 888
14                                   WASHINGTON, D.C. 20044

15

16
   OFFICIAL COURT REPORTER:          JODI SIMCOX, RMR, FCRR
17                                   500 POYDRAS STREET
                                     ROOM HB-406
18                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7780
19                                   JODI_SIMCOX@LAED.USCOURTS.GOV

20

21  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

22  PRODUCED BY COMPUTER.

23

24

25

1                              I N D E X

2                                                              PAGE

3
   JONATHAN DAVID ROGERS
4        CROSS-EXAMINATION BY MR. MITSCH:              646
         CROSS-EXAMINATION BY MR. TREEBY:              675
5        REDIRECT EXAMINATION BY MR. SIMS:             732
         RECROSS-EXAMINATION BY MR. MITSCH:            760
6        RECROSS-EXAMINATION BY MR. TREEBY:            762
         RE-REDIRECT EXAMINATION BY MR. SIMS:          765
7
   MICHAEL O'DOWD
8        DIRECT EXAMINATION BY MR. OWEN:               768

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 12:45 | 1 | **AFTERNOON SESSION** |
| 12:45 | 2 | **(SEPTEMBER 14, 2012)** |
| 12:45 | 3 | * * * * * |
| 12:45 | 4 | **THE DEPUTY CLERK:**  ALL RISE. |
| 13:02 | 5 | COURT'S IN SESSION.  PLEASE BE SEATED. |
| 13:02 | 6 | **THE COURT:**  OKAY.  COUNSEL, YOU MAY PROCEED -- |
| 13:02 | 7 | **MR. MITSCH:**  THANK YOU. |
| 13:02 | 8 | **THE COURT:**  -- WHEN YOU'RE READY. |
| 10:32 | 9 | (WHEREUPON, **JONATHAN DAVID ROGERS**, HAVING BEEN |
| 10:32 | 10 | PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS.) |
| 13:02 | 11 | **CROSS-EXAMINATION** |
| 13:02 | 12 | BY MR. MITSCH: |
| 13:02 | 13 | **Q.**  ALL RIGHT.  LET'S TAKE A LOOK AT CHAPTER 3.  WE'RE IN |
| 13:02 | 14 | STILL JX-46, WHICH IS THE DESIGNING AND CONSTRUCTION OF LEVEES |
| 13:02 | 15 | REGULATION.  AND I WOULD LIKE YOU TO GO TO 36, WHICH IS JX-46, |
| 13:02 | 16 | PAGE 28.  THAT'S THE PERMEABILITY SECTION. |
| 13:02 | 17 | THAT READS -- ARE YOU THERE? |
| 13:03 | 18 | **A.**  NO, NOT QUITE.  I'M STILL WORKING ON IT. |
| 13:03 | 19 | ALL RIGHT.  I'M ON IT. |
| 13:03 | 20 | **Q.**  THIS SECTION STARTS WITH:  "GENERALLY THERE'S NO NEED FOR |
| 13:03 | 21 | LABORATORY PERMEABILITY TESTS ON FINE-GRAINED FILL MATERIALS, |
| 13:03 | 22 | NOR ON SURFACE CLAYS OVERLAYING PERVIOUS FOUNDATION DEPOSITS." |
| 13:03 | 23 | OKAY.  FINE-GRAINED MATERIALS INCLUDE CLAYS; CORRECT? |
| 13:03 | 24 | **A.**  YES, AND SILTS. |
| 13:03 | 25 | **Q.**  THE NEXT SENTENCE STATES THAT:  "IN UNDERSEEPAGE ANALYSES, |

JONATHAN DAVID ROGERS - CROSS


13:03    1    SIMPLIFYING ASSUMPTIONS MUST BE MADE RELATIVE TO THICKNESS AND

13:03    2    SOIL TYPE OF FINE-GRAINED SURFACE BLANKETS."

13:03    3            DO YOU SEE THAT?

13:03    4    A.   YES.

13:03    5    Q.   SO THIS MANUAL PERMITS THE USE OF SIMPLIFYING ASSUMPTIONS

13:03    6    DEPENDING ON THE CIRCUMSTANCES; CORRECT?

13:03    7    A.   THAT WOULD APPEAR TO BE THE INFERENCE ONE WOULD DRAW FROM

13:03    8    THAT SENTENCE.

13:03    9    Q.   OKAY.  SECTION 3-6 ALSO STATES THAT:  "THE AVERAGE VALUE

13:03   10    OF THE COEFFICIENT OF PERMEABILITY BASED ON THE DOMINANT SOIL

13:04   11    TYPE IS GENERALLY OF SUFFICIENT ACCURACY FOR USE IN

13:04   12    UNDERSEEPAGE ANALYSES AND LABORATORY TESTS ARE NOT ESSENTIAL."

13:04   13            DO YOU SEE THAT?

13:04   14    A.   YES.

13:04   15    Q.   SO THE DOMINANT SOIL TYPE'S PERMEABILITY CONTROLS FOR

13:04   16    UNDERSEEPAGE ANALYSIS ACCORDING TO THIS EM; CORRECT?

13:04   17    A.   YES.

13:04   18    Q.   OKAY.  LET'S --

13:04   19            THE COURT:  YOU'RE ON THE CONSTRUCTION OF LEVEES --

13:04   20    DESIGN AND CONSTRUCTION OF LEVEES; IS THAT IT?

13:04   21            MR. MITSCH:  YES.  THIS IS STILL THAT.

13:04   22            THE COURT:  OKAY.

13:04   23    BY MR. MITSCH:

13:04   24    Q.   OKAY.  LET'S GO TO CHAPTER 5 OF THIS, AND I'LL TAKE YOU TO

13:04   25    THE PAGE.  THAT'S JX 46-36.  THAT STATES THAT:  "WITHOUT

JONATHAN DAVID ROGERS - CROSS


13:04    1    CONTROL, UNDERSEEPAGE IN PERVIOUS FOUNDATIONS BENEATH LEVEES

13:04    2    MAY RESULT IN EXCESSIVE HYDROSTATIC PRESSURES, SAND BOILS" --

13:05    3    I'M SKIPPING -- "AND PIPING BENEATH THE LEVEE ITSELF."

13:05    4         THE THREE POTENTIAL SEEPAGE PROBLEMS LISTED IN THAT

13:05    5    PARAGRAPH PRESUME THERE IS A PERVIOUS FOUNDATION BENEATH THE

13:05    6    LEVEE; CORRECT?  THAT'S WHAT THAT SAYS?

13:05    7    A.   YES.  IT DOESN'T SAY ANYTHING ABOUT THE SCALE OF IT.  IT

13:05    8    JUST SAYS *PERVIOUS*.

13:05    9    Q.   THE LAST PART OF THE EM I WANT TO ASK YOU ABOUT IS

13:05   10    APPENDIX B, "MATHEMATICAL ANALYSIS OF UNDERSEEPAGE," AND THAT'S

13:05   11    JX PAGE 83.  THAT SAYS THAT:  "THE DESIGN OF SEEPAGE CONTROL

13:05   12    MEASURES FOR LEVEES OFTEN REQUIRES AN UNDERSEEPAGE ANALYSIS

13:05   13    WITHOUT THE USE OF PIEZOMETRIC DATA AND SEEPAGE MEASUREMENTS."

13:06   14    CORRECT?

13:06   15    A.   YES.

13:06   16    Q.   SO YOU AGREE THAT THE MANUAL CONTEMPLATES THAT

13:06   17    UNDERSEEPAGE ASSESSMENTS CAN BE MADE WITHOUT SEEPAGE

13:06   18    MEASUREMENTS; CORRECT?

13:06   19    A.   YEAH.  SOMETIMES YOU'RE -- YOU'RE OBLIGED TO DO THAT

13:06   20    BECAUSE YOU DON'T HAVE THE PIEZOMETRIC DATA OR THE SEEPAGE

13:06   21    MEASUREMENTS.

13:06   22    Q.   AND YOU AGREE THAT ENGINEERS ARE REQUIRED TO EXERCISE

13:06   23    ENGINEERING JUDGMENT IN DETERMINING THE SOIL PROFILES AND SOIL

13:06   24    INPUT PARAMETERS THAT INFORM UNDERSEEPAGE ANALYSIS; CORRECT?

13:06   25    A.   I'D PUT THE CAVEAT ON THAT OF GEOTECHNICAL AND GEOLOGICAL

JONATHAN DAVID ROGERS - CROSS

13:06      1    ENGINEERS, YES.  NOT STRUCTURAL ENGINEERS, GENERAL CIVIL

13:06      2    ENGINEERS, CONSTRUCTION ENGINEERS.

13:06      3    **Q.**    THAT'S FINE.  THANK YOU.

13:06      4            SECTION B-1 FURTHER STATES AT THE BOTTOM:  "AS IS

13:06      5    NORMALLY THE CASE, SOUND ENGINEERING JUDGMENT MUST BE EXERCISED

13:06      6    IN DETERMINING SOIL PROFILES AND SOIL INPUT PARAMETERS FOR

13:06      7    THESE ANALYSES."  CORRECT?

13:06      8    **A.**    YES.

13:06      9    **Q.**    AND, AGAIN, THIS SENTENCE TELLS THE READER, THE

13:07     10    GEOTECHNICAL ENGINEER, THAT HE OR SHE HAS TO EXERCISE

13:07     11    ENGINEERING JUDGMENT; CORRECT?

13:07     12    **A.**    RIGHT.  THAT'S PART OF THE REASON THAT THEY HAVE THE

13:07     13    INDEPENDENT TECHNICAL REVIEW PROCESS.  SO AN ENGINEER -- A

13:07     14    JUNIOR ENGINEER MAY START OUT USING NUMBERS OR VALUES THAT ARE

13:07     15    IN PREVIOUS REPORTS OR SOMETHING; BUT, HOPEFULLY, AS THAT GETS

13:07     16    REVIEWED GOING UP THE LINE, INCLUDING THE ITR, THE INDEPENDENT

13:07     17    TECHNICAL REVIEW, WHATEVER NUMBER THEY CHOOSE IN THEIR JUDGMENT

13:07     18    WILL GET SECOND-GUESSED BY PEOPLE WITH MORE EXPERIENCE.

13:07     19    **Q.**    EXACTLY.

13:07     20            AND SINCE ORGANIC CLAY IS THE DOMINANT MATERIAL IN

13:07     21    THE MATERIALS THAT WE'RE DEALING WITH, AND SOIL PROFILES THAT

13:07     22    WE'RE DEALING WITH, THE PERMEABILITY IS WHAT -- ITS

13:07     23    PERMEABILITY IS WHAT CONTROLS FOR ASSESSING UNDERSEEPAGE;

13:07     24    CORRECT?

13:07     25    **A.**    NO.  HERE I PUT MY GEOLOGIST HAT ON.  THE ORGANIC CLAY IS

JONATHAN DAVID ROGERS - CROSS

13:07   1   A SOIL MECHANICS CLASSIFICATION.  IT'S NOT A GEOLOGICAL

13:08   2   CLASSIFICATION.  SOIL MECHANICS PEOPLE LOOK AT WHAT THE GEOLOGY

13:08   3   IS AND THEN THEY DECIDE WHAT BIN TO PUT IT IN ACCORDING TO

13:08   4   BEHAVIOR, ENGINEERING PROPERTIES BEHAVIOR.

13:08   5          SO IF THERE IS A SEAM OF PEAT IN THERE, THEY MAY NOT

13:08   6   CONSIDER THAT TO BE DIFFERENT IF THEY DON'T CALL IT OUT AND

13:08   7   DIFFERENTIATE IT AS IN THE BORING LOGS DO SHOW.

13:08   8          IF YOU GO BACK TO THAT -- YOU'LL SEE THIS IN THAT

13:08   9   CROSS SECTION YOU GAVE ME JUST BEFORE LUNCH, JX-40-TAK-0193.

13:08  10   IF YOU GO DOWN THERE AND YOU LOOK IN THE LEGEND AND YOU SEE,

13:08  11   WHAT DOES IT SAY ABOUT THE MARSH UNIT?  IT SAYS:  "THE SOIL

13:08  12   MECHANICS CLASSIFICATION OF THE MARSH UNIT IS CLAY WITH ORGANIC

13:08  13   MATTER."  BUT WHEN YOU GO ON THE LEFT SIDE, THERE'S THE

13:08  14   GEOLOGICAL DESCRIPTIONS.  AND THERE IT SAYS:  "MARSH, VERY SOFT

13:08  15   ORGANIC CLAYS WITH PEAT."

13:08  16          SO THE PERMEABILITY OF THE PEAT COULD BE

13:09  17   SIGNIFICANTLY DIFFERENT, THAT PEAT LENS, FROM THE PERMEABILITY

13:09  18   OF THE VERY SOFT ORGANIC CLAY.  SO THAT'S ONE OF THOSE JUDGMENT

13:09  19   CALLS YOU HAVE TO LOOK AT AND SAY, "OKAY, IF I GOT PEAT THERE,

13:09  20   IS THAT GOING TO BE A WEAK LINK THAT COULD HURT ME?"

13:09  21          BECAUSE IT'S THE WEAK LINKS THAT CREATE LEVEE

13:09  22   FAILURES, NOT THE GENERAL CONDITIONS.  IT'S USUALLY A WEAK LINK

13:09  23   OF SOME SORT.  SO THAT'S WHERE THE ENGINEERING JUDGMENT COMES

13:09  24   IN, RIGHT THERE.

13:09  25   Q.   WE'RE AGREED THAT --

JONATHAN DAVID ROGERS - CROSS

13:09    1  **A.**   YEAH.

13:09    2  **Q.**   -- WHAT THE DOMINANT ISSUE, THOUGH, IS THAT THIS IS AN

13:09    3  EXERCISE OF ENGINEERING JUDGMENT; CORRECT?

13:09    4  **A.**   THAT'S CORRECT.

13:09    5  **Q.**   AND ENGINEERS MAKE EVALUATIONS ABOUT THE CHARACTER OF THE

13:09    6  SOILS IN A PARTICULAR AREA; CORRECT?

13:09    7  **A.**   CORRECT.

13:09    8  **Q.**   AND THEIR DETERMINATION OF WHAT THE PERMEABILITY OF WHAT

13:09    9  THEY'VE IDENTIFIED AS THE SOIL IS WHAT GOES INTO DETERMINING

13:09   10  THE UNDERSEEPAGE ANALYSIS; CORRECT?

13:09   11  **A.**   YES.

13:09   12  **Q.**   THANK YOU.

13:09   13        THIS EM IS DATED APRIL 30TH, 2000; CORRECT?

13:10   14  **A.**   I BELIEVE THAT'S CORRECT, YES.

13:10   15  **Q.**   THE LEVEE AND THE FLOODWALL ALONG THE EBIA WERE ALREADY

13:10   16  CONSTRUCTED IN PLACE WELL BEFORE TASK ORDER 26, WEREN'T THEY?

13:10   17  **A.**   WELL, IT WAS IN PLACE BEFORE DM 3, YEAH.

13:10   18  **Q.**   AND, IN FACT, THE DESIGN OF THAT EBIA FLOODWALL WAS BASED,

13:10   19  WHAT WE TALKED ABOUT EARLIER, DM NO. 3 FROM 1966, ISN'T IT?

13:10   20  **A.**   YES.

13:10   21  **Q.**   SO IN 1966, WHEN THE EBIA FLOODWALL WAS DESIGNED, THIS EM

13:10   22  WASN'T EVEN APPLICABLE, WAS IT?  IT DIDN'T EVEN EXIST?

13:10   23  **A.**   WELL, THERE MIGHT HAVE BEEN A PREVIOUS VERSION OF IT.

13:10   24  THERE WAS -- I DON'T KNOW IF WHAT -- IF 1913 -- I DON'T KNOW

13:10   25  WHAT YEAR IT DATES BACK TO.  THIS IS JUST THE LATEST REVISION.

JONATHAN DAVID ROGERS - CROSS


13:10   1        THEY GENERALLY REVISE THESE ABOUT EVERY DECADE.

13:10   2   Q.   BUT THE REALITY IS IS THAT YOU DON'T KNOW?

13:10   3   A.   I DON'T KNOW FOR CERTAIN.  BUT I WOULD ASSUME THERE WAS

13:11   4   SOME SORT OF MANUAL EVEN BACK AT THAT TIME, BUT I MIGHT BE

13:11   5   WRONG.

13:11   6   Q.   LET'S GO BACK TO JX -- SINCE YOU BROUGHT THIS UP, LET'S GO

13:11   7   BACK TO JX 4-0114, AND THAT'S THE DESIGN MEMORANDUM, AGAIN, FOR

13:11   8   THE FLOODWALL.

13:11   9   A.   114?

13:11   10  Q.   114, YEAH.  NOT THE PLATES.

13:11   11       MR. MITSCH:  JUST HIGHLIGHT THE SEEPAGE AND UPLIFT

13:11   12  SECTION, 31.

13:11   13       THE WITNESS:  ALL RIGHT.

13:11   14  BY MR. MITSCH:

13:11   15  Q.   WE TALKED EARLIER TODAY THAT THE CORPS HAD MADE AN

13:11   16  ASSESSMENT OF SEEPAGE AND UPLIFT POTENTIAL; CORRECT?

13:11   17  A.   YES.

13:11   18  Q.   AND THAT ASSESSMENT WAS BASED ON SHORT-TERM LOAD DURATION

13:11   19  AND THE KNOWN SOIL CONDITIONS AT THE TIME; CORRECT?

13:12   20  A.   RIGHT.

13:12   21  Q.   AND THOSE ARE FACTORS THAT THE CORPS ENGINEERING MANUALS

13:12   22  STILL CONSIDER IMPORTANT TODAY; CORRECT?

13:12   23  A.   CORRECT.

13:12   24  Q.   IF THE CORPS WERE WRONG IN 1966, IF IT INCORRECTLY

13:12   25  ASSESSED SEEPAGE IN 1966, THAT ERROR WAS AN ERROR IN DESIGN OF

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 13:12 | 1 | THE LEVEE, WASN'T IT? |
| 13:12 | 2 | **A.**   YES. |
| 13:12 | 3 | **Q.**   THANK YOU. |
| 13:12 | 4 | AND IF THE CORPS' ASSUMPTION THAT SEEPAGE WOULD NOT |
| 13:12 | 5 | BE A PROBLEM BASED ON THE CLAY SOILS INFORMED THE CORPS' |
| 13:12 | 6 | APPROVAL OF WGI'S WORK PLANS BETWEEN -- STRIKE THAT.  STRIKE |
| 13:12 | 7 | THAT. |
| 13:12 | 8 | LET'S MOVE ON.  I WANT TO GO TO JX-38. |
| 13:13 | 9 | THAT EM IS "CONFINED DISPOSAL OF DREDGED MATERIAL." |
| 13:13 | 10 | NOW, IN YOUR REPORT, YOU OPINE THAT THIS MANUAL |
| 13:13 | 11 | REQUIRED THE CORPS TO DO MORE EXTENSIVE FIELD INVESTIGATIONS; |
| 13:13 | 12 | ISN'T THAT CORRECT? |
| 13:13 | 13 | **A.**   YES.  THE REPORT -- THESE REPORTS, THESE EMS, THEY PROVIDE |
| 13:13 | 14 | GUIDANCE FOR YOU TO PERFORM ENGINEERING ANALYSES.  SO THEY'RE |
| 13:13 | 15 | NOT PRESCRIPTIVE SAYING, "YOU MUST DO 1, 2, 3, 4, 5."  WHAT |
| 13:13 | 16 | THEY'RE DOING IS PROVIDING GUIDANCE AND SAYING, "YOU SHOULD |
| 13:13 | 17 | CONSIDER, THIS, THIS, THIS, THIS, AND THIS," AND THEN DECIDE |
| 13:13 | 18 | WHICH ELEMENTS ARE APPROPRIATE TO YOUR CONDITIONS, YOUR SITE. |
| 13:13 | 19 | **Q.**   AND THE CONSIDERATIONS REQUIRE ENGINEERING JUDGMENT; |
| 13:13 | 20 | RIGHT? |
| 13:13 | 21 | **A.**   YES. |
| 13:13 | 22 | **Q.**   OKAY.  SECTION 11 OF THE MANUAL, PAGE -- |
| 13:13 | 23 | **MR. MITSCH:**  LET'S SEE JX-38-007. |
| 13:14 | 24 | **BY MR. MITSCH:** |
| 13:14 | 25 | **Q.**   THIS EMPHASIZES WHAT YOU JUST SAID. |

JONATHAN DAVID ROGERS - CROSS


13:14    1        "THIS MANUAL PROVIDES GUIDANCE FOR PLANNING,

13:14    2   DESIGNING, CONSTRUCTING, OPERATING AND MANAGING CONFINED

13:14    3   DREDGED MATERIAL DISPOSAL AREAS."  CORRECT?

13:14    4   A.   YES, YES.

13:14    5   Q.   TASK ORDER 26 DID NOT DEAL WITH DREDGED MATERIAL DISPOSAL

13:14    6   AREAS, DID IT?

13:14    7   A.   YES, THAT'S WHAT THE WHOLE SITE WAS.  THE WHOLE SITE WAS A

13:14    8   DREDGED MATERIALS SITE.  IT WAS COVERED WITH A SALVAGE OF

13:14    9   DREDGED MATERIAL THAT DATED BACK 80 YEARS.

13:14   10   Q.   YOU WOULD AGREE, THOUGH, THAT THE MANUAL PROVIDES --

13:14   11   SIMPLY PROVIDES GUIDANCE TO THE READER; CORRECT?

13:14   12   A.   ALL THE MANUALS PROVIDE GUIDANCE FOR ENGINEERING ANALYSES

13:14   13   AND DECISIONS.

13:14   14   Q.   LET'S GO TO 38-0093.

13:15   15   A.   IS THAT IN THE SAME MANUAL?

13:15   16   Q.   YES.

13:15   17   A.   OKAY.  TABLE 6.

13:15   18   Q.   THAT TABLE IS LISTED AS "FACTORS AFFECTING THE EXTENT OF

13:15   19   FIELD INVESTIGATION AND DESIGN STUDIES."

13:15   20        AND THEN A LITTLE BIT FURTHER DOWN IT SAYS:  "FIELD

13:15   21   INVESTIGATIONS AND DESIGN STUDIES SHOULD BE MORE EXTENSIVE

13:15   22   WHERE."  AND THEN IT SAYS:  "UNDERSEEPAGE AND/OR SETTLEMENT

13:15   23   PROBLEMS ARE SEVERE."  DO YOU SEE THAT?

13:15   24   A.   YES.

13:15   25   Q.   SO THE GUIDANCE IN THIS MANUAL IS THAT WHERE UNDERSEEPAGE

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 13:15 | 1 | PROBLEMS ARE SEVERE, MORE EXTENSIVE TESTING IS INDICATED; |
| 13:15 | 2 | RIGHT? |
| 13:15 | 3 | **A.**   YES. |
| 13:15 | 4 | **Q.**   OKAY.  YOU PREVIOUSLY AGREED THAT CLAY SOILS ARE |
| 13:16 | 5 | FINE-GRAINED COHESIVE SOILS; CORRECT? |
| 13:16 | 6 | **A.**   YES. |
| 13:16 | 7 | **Q.**   OKAY.  LET'S GO TO TABLE 6-4, AND THAT'S ON PAGE 96.  LET |
| 13:16 | 8 | ME DIRECT YOU TO THE TITLE, WHICH IS "LABORATORY TESTING OF |
| 13:16 | 9 | FINE-GRAINED COHESIVE SOILS." |
| 13:16 | 10 | AND THEN A LITTLE BIT FURTHER DOWN, "PERMEABILITY" |
| 13:16 | 11 | AND THAT STATEMENT -- AND THAT STATEMENT READS:  "PERMEABILITY |
| 13:16 | 12 | LABORATORY TESTING IS GENERALLY NOT REQUIRED FOR FINE-GRAINED |
| 13:16 | 13 | COHESIVE SOILS AS SUCH SOILS CAN BE ASSUMED TO BE ESSENTIALLY |
| 13:16 | 14 | IMPERVIOUS IN SEEPAGE ANALYSES.  CAN BE COMPUTED FROM |
| 13:16 | 15 | CONSOLIDATION TESTS . . ." |
| 13:16 | 16 | DO YOU SEE THAT? |
| 13:16 | 17 | **A.**   YES. |
| 13:17 | 18 | **Q.**   SO THIS MANUAL'S GUIDANCE FOR FINE-GRAINED SOILS IS THAT |
| 13:17 | 19 | ADDITIONAL TESTING IS NOT REQUIRED BECAUSE FINE-GRAINED SOILS |
| 13:17 | 20 | CAN BE ASSUMED TO BE IMPERVIOUS IN SEEPAGE ANALYSES; CORRECT? |
| 13:17 | 21 | **A.**   NO.  THE WORD "GENERALLY" DOESN'T -- IS NOT PRESCRIPTIVE |
| 13:17 | 22 | AS YOU'VE DESCRIBED IT.  "GENERALLY" MEANS MUCH OF THE TIME YOU |
| 13:17 | 23 | DON'T HAVE TO DO IT.  IF YOU ARE ABOVE THE WATER TABLE IN THE |
| 13:17 | 24 | PARTIALLY SATURATED ZONE WHERE YOU HAVE DESSICATION FRACTURES, |
| 13:17 | 25 | THAT'S WHAT KILLS US OUT IN THE CALIFORNIA BAY DELTA.  SO THERE |

JONATHAN DAVID ROGERS - CROSS


13:17    1   YOU DO HAVE TO BE CAREFUL.

13:17    2           WHAT THIS IS TALKING ABOUT IS, GENERALLY, IF WE'RE

13:17    3   BELOW THE ZONE OF SATURATION, WE'VE GOT SOME CAP ON US, THEN

13:17    4   IT'S ESSENTIALLY IMPERVIOUS.  AND IT DOESN'T SAY, YOU KNOW,

13:17    5   WHERE THAT CUTOFF IS, IF IT'S 10 TO THE MINUS 6 CENTIMETERS PER

13:17    6   SECOND, 10 TO THE MINUS 7.  MOST PEOPLE CUT IT OFF SOMEWHERE

13:17    7   BETWEEN THOSE TWO.

13:17    8           AND IT SAYS THERE, IF YOU WANT TO KNOW WHERE IT IS,

13:18    9   WHAT RANGE YOU'RE IN TO CHECK, YOU CAN COMPUTE THAT FROM

13:18   10   CONSOLIDATION TESTS.

13:18   11   **Q.**  AND THAT'S WHERE THE ENGINEERING JUDGMENT COMES IN AGAIN,

13:18   12   DOESN'T IT?

13:18   13   **A.**  CORRECT.

13:18   14   **Q.**  AND THAT'S WHERE THE KNOWLEDGE ABOUT THE LOCAL AREA COMES

13:18   15   IN; RIGHT?

13:18   16   **A.**  YES.

13:18   17           **THE COURT:**  I'M GOING TO ASK A QUESTION, SO YOU CAN

13:18   18   FOLLOW-UP ON IT.  I DON'T WANT TO WAIT UNTIL YOU'RE FINISHED TO

13:18   19   GET TO BE -- TO GIVE YOU A CHANCE.

13:18   20               THE QUESTION IS:  IN THE STANDARD OF CARE

13:18   21   TESTIMONY YOU GAVE AND ALL OF THE MATERIALS YOU'VE STATED

13:18   22   YOU'VE REVIEWED, DID YOU SEE ANY SPECIFIC INSTANCE OF

13:18   23   ENGINEERING JUDGMENT REFERENCE ANY EXCAVATION MORE THAN THREE

13:18   24   FEET DEEP OTHER THAN THE MCDONOUGH MARINE?

13:18   25           **THE WITNESS:**  NO.

JONATHAN DAVID ROGERS - CROSS


13:18   1            THE COURT:  DID YOU SEE ANY MENTION OF ANY ENGINEER

13:18   2   OR ANYONE FOR EITHER OF THE DEFENDANTS STATING THEY RELIED IN

13:18   3   NOT DOING SO UNDER THE 1966 STUDY THAT WAS MADE?

13:18   4            THE WITNESS:  NO.  I DIDN'T SEE ANY REFERENCE TO THE

13:18   5   1966 STUDY --

13:19   6            THE COURT:  OKAY.

13:19   7            MR. TREEBY:  -- IN ANYTHING THAT I REVIEWED, YOUR

13:19   8   HONOR.

13:19   9            THE COURT:  THANK YOU.

13:19  10   BY MR. MITSCH:

13:19  11   Q.   WHEN I ASKED YOU THE QUESTION WHETHER OR NOT THE MANUAL'S

13:19  12   GUIDANCE PROVIDED THAT FINE-GRAINED SOILS IS THAT ADDITIONAL

13:19  13   TESTING IS NOT REQUIRED, THAT WAS YOUR ENGINEERING JUDGMENT;

13:19  14   CORRECT?

13:19  15   A.   IN ANSWERING THE QUESTION?

13:19  16   Q.   YES.

13:19  17   A.   YES.  YEAH, IT WOULD BE.

13:19  18   Q.   AND ANOTHER ENGINEER MIGHT COME TO A DIFFERENT CONCLUSION;

13:19  19   CORRECT?

13:19  20   A.   THAT'S TRUE.

13:19  21   Q.   ANOTHER GEOTECHNICAL ENGINEER?

13:19  22   A.   YES.

13:19  23   Q.   LET'S KEEP IT IN THE FAMILY.

13:19  24   A.   UNFORTUNATELY, IT IS, THAT'S TRUE.  IF YOU HAVE FIVE

13:19  25   GEOTECHNICAL ENGINEERS LOOKING AT SOMETHING, WE'RE PROBABLY ALL

JONATHAN DAVID ROGERS - CROSS


13:19    1    FIVE GOING TO HAVE A SLIGHTLY DIFFERENT TAKE ON IT, DEPENDING

13:19    2    ON THE PEDIGREE OF OUR PROFESSIONAL EXPERIENCE AND TRAINING.

13:19    3           THERE'S ALWAYS GOING TO BE SOME NUANCES WE SEE THINGS

13:19    4    DIFFERENTLY ON.

13:19    5    Q.    RIGHT.

13:19    6    A.    LIKE I'M A CONSTRUCTION GUY.  I GREW UP MOVING DIRT

13:20    7    AROUND.  SO I DON'T TEND TO BE SOMEBODY THAT CALCULATES THE

13:20    8    SHEAR STRENGTH TO THE LAST PSI.  OKAY?  I JUST WANT TO LOOK AT

13:20    9    THE BIG KAHUNA.  YOU KNOW, "HOW AM I GOING TO MOVE THIS STUFF

13:20   10    AROUND?  WELL, HOW IS IT GOING TO HURT ME?  HOW AM I GOING TO

13:20   11    MOST EFFICIENTLY MOVE IT, COMPACT IT, TAKE IT OFF, WHATEVER I

13:20   12    HAVE TO DO FROM A CONSTRUCTION SIDE OF THE HOUSE?"

13:20   13           SO THAT'S -- THAT'S WHERE MY PREJUDICE COMES FROM MY

13:20   14    GROWING UP IN IT.

13:20   15    Q.    SO GIVEN THAT THERE ARE DIFFERENT TAKES THAT ENGINEERS CAN

13:20   16    TAKE OF THESE -- DIFFERENT EVALUATIONS THAT THEY CAN MAKE OF

13:20   17    THESE SITUATIONS, IT'S NOT NECESSARILY TRUE THAT JUST BECAUSE

13:20   18    YOU'VE COME TO ONE CONCLUSION THAT -- AND ANOTHER ENGINEER HAS

13:20   19    COME TO ANOTHER CONCLUSION, THAT THAT OTHER ENGINEER IS SOMEHOW

13:20   20    NEGLIGENT; IS THAT RIGHT?

13:20   21    A.    WELL, THAT'S THE SAD FACT WHEN YOU LOOK AT ANY PROJECT.

13:20   22    YOU KNOW, YOU CAN HAVE SOMEBODY THERE ON THE PROJECT TEAM AND

13:20   23    SAY, "OKAY.  I CHECKED THE GEOLOGY BOX.  I GOT A GEOLOGIST."

13:20   24    IS THAT GOING TO INSULATE THAT PROJECT FROM HAVING A GEOLOGICAL

13:21   25    DISASTER?  NO.

JONATHAN DAVID ROGERS - CROSS


13:21    1         BECAUSE THEN YOUR GEOLOGICAL EXPERTISE INPUT IS

13:21    2    LIMITED TO THAT ONE PERSON'S CAREER AND PEDIGREE OF

13:21    3    PROFESSIONAL EXPERIENCE.  THAT'S WHY YOU WANT AS MANY EYES

13:21    4    LOOKING AT IT AS POSSIBLE.

13:21    5         BUT IF YOU NEVER RUN ANYTHING BY THE GEOTECHNICAL

13:21    6    BRANCH, THEN YOU'RE NOT GOING TO GET ANYBODY FROM OVER THERE

13:21    7    LOOKING AT SOMETHING AND PROVIDING OVERSIGHT OF IT AND

13:21    8    PROVIDING ADVICE FOR WHETHER THEY THINK YOU'RE STARTING TO RIDE

13:21    9    OVER NEAR THE DANGER AREA OR GETTING OUTSIDE THE STANDARD OF

13:21    10   PRACTICE.

13:21    11        SO IF YOU WANT TO HAVE ADVICE ON STANDARD OF PRACTICE

13:21    12   THAT'S GEOTECHNICAL, YOU'VE GOT TO TALK TO GEOTECHNICAL PEOPLE.

13:21    13   Q.   LET'S GO TO THE NEXT ONE, THE NEXT EM, 2502, RETAINING AND

13:21    14   FLOODWALLS.

13:21    15   A.   OOH, THAT'S THE BIG ONE.

13:21    16   Q.   LET'S GO TO JX-40-13.  AND THAT SAYS UNDER "PURPOSE" THAT:

13:22    17   "THIS MANUAL PROVIDES GUIDANCE FOR THE SAFE DESIGN AND

13:22    18   ECONOMICAL CONSTRUCTION OF RETAINING AND FLOODWALLS."  CORRECT?

13:22    19   A.   YES.

13:22    20   Q.   TASK ORDER 26 DID NOT INVOLVE THE DESIGN OF A RETAINING OR

13:22    21   FLOODWALL, DID IT?

13:22    22   A.   NO.

13:22    23   Q.   AND YOU WOULD AGREE THAT THE MANUAL ITSELF TELLS THE

13:22    24   READER AGAIN THAT IT'S JUST MERELY GUIDANCE; CORRECT?

13:22    25   A.   THIS IS GUIDANCE FOR PEOPLE THAT ARE EITHER DESIGNING THEM

JONATHAN DAVID ROGERS - CROSS

13:22    1    OR ASSESSING THEM, RETAINING WALLS.

13:22    2    **Q.**    OKAY.

13:22    3    **A.**    SO . . .

13:22    4    **Q.**    NOW, THE FLOODWALL ADJACENT TO THE EBIA WAS CONSTRUCTED AS

13:22    5    AN I-WALL; CORRECT?

13:22    6    **A.**    RIGHT.  IT WAS A RELATIVELY UNUSUAL KIND OF RETAINING

13:22    7    STRUCTURE AT THE TIME IT WAS BUILT.

13:22    8    **Q.**    IN FACT, AT THE TIME OF TASK ORDER 26, THAT WALL WAS A

13:23    9    CANTILEVERED I-WALL; CORRECT?

13:23    10   **A.**    WHO CALLED IT A CANTILEVERED ONE?  I MEAN --

13:23    11   **Q.**    WELL, I'M ASKING YOU.

13:23    12   **A.**    -- YOU COULD CALL IT THAT, YES.

13:23    13   **Q.**    OKAY.

13:23    14   **A.**    OKAY.  BUT IS THAT SOMETHING THE CORPS CALLED IT OR -- I

13:23    15   DON'T -- I DON'T UNDERSTAND THE QUESTION.

13:23    16   **Q.**    WELL, WE'RE GOING TO GET TO THAT.

13:23    17   **A.**    OH, OKAY.

13:23    18   **Q.**    I'LL TAKE YOU AT YOUR WORD --

13:23    19   **A.**    ALL RIGHT.  OKAY.

13:23    20   **Q.**    -- IN THAT WE CAN CALL IT A CANTILEVERED I-WALL.

13:23    21   **A.**    RIGHT.

13:23    22   **Q.**    LET'S LOOK AT SECTION 2-7 OF THIS MANUAL.  AND THAT'S ON

13:23    23   PAGE JX-40-18.  THE FIRST SENTENCE:  "I-TYPE FLOODWALLS CONSIST

13:23    24   OF DRIVEN SHEET PILES CAPPED BY A CONCRETE WALL."

13:23    25          THAT'S WHAT WE HAVE HERE AT THE EBIA, DON'T WE?

JONATHAN DAVID ROGERS - CROSS

13:23    1    **A.**   YES.

13:24    2    **Q.**   OKAY.  LET'S GO TO THE SECOND TO THE LAST SENTENCE:  "THE

13:24    3    DESIGN OF THESE TYPES OF WALL IS BEYOND THE SCOPE OF THIS

13:24    4    MANUAL."  DO YOU SEE THAT?

13:24    5    **A.**   YES.

13:24    6    **Q.**   OKAY.  SO THE WALL -- SO THAT CANTILEVERED I-WALL IS

13:24    7    BEYOND THE SCOPE OF THIS MANUAL; CORRECT?

13:24    8    **A.**   YES.

13:24    9    **Q.**   AND A COUPLE MOMENTS AGO WHEN I INTRODUCED THIS, YOU SAID,

13:24   10    "RETAINING AND FLOODWALLS, OOH, THAT'S THE BIG ONE"?

13:24   11    **A.**   IT'S THE BIG -- YEAH.  THAT'S ONE OF THE LARGEST MANUALS

13:24   12    THAT THE CORPS HAS.

13:24   13    **Q.**   AND WE DON'T NEED THIS ONE BECAUSE IT DOESN'T APPLY?

13:24   14    **A.**   NO, NO.  IT HAS -- IT HAS INFORMATION IN THERE THAT GIVES

13:24   15    YOU GUIDANCE ON ASSESSING WHETHER YOU COULD DAMAGE THOSE WALLS

13:24   16    OR GET INTO THEIR INFLUENCE AREA OF THEIR LOADING DIAGRAMS.  SO

13:24   17    THAT'S WHY I WOULD MENTION IT.

13:24   18         IT'S STILL SOMETHING -- THE STRUCTURES GUYS, WHEN YOU

13:24   19    DO THE CHECK AND YOU BLOW IT BY THE STRUCTURES BRANCH, THEY

13:24   20    WOULD LOOK TO THIS MANUAL FOR THEIR GUIDANCE THE WAY THE

13:24   21    GEOTECHNICAL PEOPLE LOOK AT THE SEEPAGE MANUAL, THE LEVEE

13:24   22    CONSTRUCTION MANUAL AND THE DREDGED MATERIAL MANUALS.

13:25   23    **Q.**   LET'S GO TO PAGE JX-40-169.  OKAY.  THAT'S SECTION 7-3.

13:25   24    SECOND SENTENCE:  "SEEPAGE CONTROL IS A PRIMARY CONSIDERATION

13:25   25    OF FLOODWALL DESIGN."

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 13:25 | 1 | DO YOU SEE THAT? |
| 13:25 | 2 | A.   YES. |
| 13:25 | 3 | Q.   GO TO THE SECOND TO THE LAST SENTENCE. |
| 13:25 | 4 | MR. MITSCH:  CAN WE BRING THAT UP, PLEASE?  CAN WE |
| 13:25 | 5 | ENLARGE THAT? |
| 13:25 | 6 | BY MR. MITSCH: |
| 13:25 | 7 | Q.   THAT SAYS THAT:  "UNDERSEEPAGE CONTROL MEASURES VARY |
| 13:25 | 8 | BECAUSE THE SELECTION AND DESIGN OF AN APPROPRIATE CONTROL |
| 13:25 | 9 | SCHEME IS HIGHLY DEPENDENT ON SITE-SPECIFIC CONDITIONS, |
| 13:25 | 10 | PARTICULARLY THE STRATIFICATION AND PERMEABILITY OF FOUNDATION |
| 13:26 | 11 | MATERIALS." |
| 13:26 | 12 | DO YOU SEE THAT? |
| 13:26 | 13 | A.   YES. |
| 13:26 | 14 | Q.   AND YOU AGREE THAT ACCORDING TO THE GUIDANCE IN THIS |
| 13:26 | 15 | MANUAL, SITE-SPECIFIC CONDITIONS INFORM AN ENGINEER'S DECISION |
| 13:26 | 16 | ABOUT WHAT KIND OF SEEPAGE CONTROL IS NECESSARY; CORRECT? |
| 13:26 | 17 | A.   YES.  SEEPAGE, MOST OFTEN, IS A MATTER OF EITHER THE |
| 13:26 | 18 | HISTORIC RECORDS, THEY GO BACK AND LOOK AND SEE WHERE THE WET |
| 13:26 | 19 | AREAS ARE, OR A MATTER OF OPERATION AND MAINTENANCE |
| 13:26 | 20 | OBSERVATIONS BEING NOTED. |
| 13:26 | 21 | YOU DON'T -- YOU CAN'T AFFORD OVER THOUSANDS AND |
| 13:26 | 22 | THOUSANDS OF MILES OF LEVEES TO GO ALONG AND PUT IN PIEZOMETERS |
| 13:26 | 23 | EVERY COUPLE HUNDRED FEET. |
| 13:26 | 24 | Q.   AND SO WHEN THE ENGINEERS ARE MAKING THOSE DECISIONS, |
| 13:26 | 25 | HOPEFULLY INFORMED DECISIONS, THEY'RE EXERCISING THEIR |

JONATHAN DAVID ROGERS - CROSS

13:26    1   GEOTECHNICAL ENGINEERING EXPERIENCE, AREN'T THEY?

13:26    2   **A.**   AND THEIR JUDGMENT, YES.

13:26    3   **Q.**   AND THEIR JUDGMENT.

13:26    4         AND YOU AGREE THAT THE PERMEABILITY OF THE FOUNDATION

13:26    5   MATERIALS IS AN IMPORTANT CONSIDERATION IN DECIDING WHETHER OR

13:26    6   NOT SEEPAGE CONTROL IS NECESSARY; CORRECT?

13:27    7   **A.**   CORRECT.

13:27    8   **Q.**   OKAY.

13:27    9   **A.**   AND, ALSO, THE UNCERTAINTY WHEN YOU HAVE A GEOLOGIC

13:27   10   SITUATION WHERE YOU CAN HAVE -- WHERE THE DEPOSITIONAL

13:27   11   CONDITIONS WHERE, LIKE, SAY, ALONG THE MISSISSIPPI RIVER, THE

13:27   12   BIGGEST -- THE MISSISSIPPI RIVER VALLEY, THE BIGGEST PROBLEM WE

13:27   13   HAVE HAD ARE GOING AROUND BENDS, YOU ACTUALLY GET DEPOSITS THAT

13:27   14   DRAPE OVER AT AN ANGLE AS YOU GO AROUND THE INSIDE OF THESE

13:27   15   BENDS, AND THEY'RE NOT LATERALLY CONTIGUOUS.

13:27   16         AND PEOPLE WILL DRILL A HOLE THROUGH THEM AND THEY'LL

13:27   17   DRILL A HOLE OVER HERE AND THEY'LL DRAW THEM GOING STRAIGHT

13:27   18   BETWEEN THEM AND THEY DON'T.  AND YOU ACTUALLY CAN GET WATER

13:27   19   TRAPPED IN THOSE PERVIOUS STRATUMS, AND THAT'S WHAT GIVES US

13:27   20   FITS WHEN WE HAVE LARGE FLOODS, LIKE THE 2011 FLOOD.

13:27   21         SO THE CHANGE -- YOU KNOW, THE UNCERTAINTY IN THE

13:27   22   GEOLOGIC CONDITIONS ALSO PLAY A BIG ROLE IN UNDERSEEPAGE

13:27   23   CONTROL.  SOMETIMES UNDERSEEPAGE CONTROL IS VERY, VERY ERRATIC

13:28   24   IN TERMS OF WHERE YOU HAVE TO PLACE IT.  AGAIN, IT GETS BACK TO

13:28   25   THAT CONCEPT I WAS SAYING OF WEAK LINK, THE WEAK GEOLOGIC LINK.

JONATHAN DAVID ROGERS - CROSS


13:28    1    **Q.**   LET'S GO TO JX-42.  AND THIS IS "ENGINEER MANUAL, DESIGN

13:28    2    OF SHEET PILE WALLS."

13:28    3         SO UNDER "PURPOSE" THE FIRST SENTENCE:  "THIS MANUAL

13:28    4    PROVIDES INFORMATION ON FOUNDATION EXPLORATION AND TESTING

13:28    5    PROCEDURES" -- ET CETERA -- "AND CONSTRUCTION CONSIDERATION FOR

13:28    6    THE SELECTION, DESIGN AND INSTALLATION OF SHEET PILE WALLS."

13:28    7         DO YOU SEE THAT?

13:29    8    **A.**   YES.

13:29    9    **Q.**   AND YOU SEE THE NEXT SENTENCE, WHICH READS:  "THE GUIDANCE

13:29   10    IS BASED ON THE PRESENT STATE OF THE TECHNOLOGY FOR SHEET

13:29   11    PILE-SOIL-STRUCTURE INTERACTION BEHAVIOR"?

13:29   12    **A.**   YES.

13:29   13    **Q.**   AND YOU SEE THE NEXT SENTENCE, IT SAYS:  "THIS MANUAL

13:29   14    PROVIDES DESIGN GUIDANCE INTENDED SPECIFICALLY FOR THE

13:29   15    GEOTECHNICAL AND STRUCTURAL ENGINEER."

13:29   16         DO YOU SEE THAT?

13:29   17    **A.**   YES.

13:29   18    **Q.**   AND, AGAIN, THIS TELLS US THAT THIS MANUAL PROVIDES

13:29   19    GUIDANCE AND IT'S LEFT TO THE ENGINEER IN HIS DISCRETION, HER

13:29   20    DISCRETION, TO MAKE THE DETERMINATIONS WHAT TO APPLY IN THIS?

13:29   21    **A.**   RIGHT.  TO THE GEOTECHNICAL ENGINEER OR STRUCTURAL

13:29   22    ENGINEER.

13:29   23    **Q.**   EXACTLY.

13:29   24         TASK ORDER 26 DIDN'T INVOLVE THE DESIGNING OF ANY

13:29   25    SHEET PILE WALLS, DID IT?

JONATHAN DAVID ROGERS - CROSS

13:29    1    **A.**   NO, NOT THAT I KNOW OF, EXCEPT FOR THE TEMPORARY ONES THEY

13:30    2    HAD TO PUT AROUND FOR THE COFFERDAM.

13:30    3    **Q.**   RIGHT.  AND WEDDING CAKE AND SEWER LIFT; RIGHT?

13:30    4    **A.**   RIGHT.

13:30    5    **Q.**   AND THE SHEET PILE WALLS THAT WERE PART OF THE EBIA

13:30    6    FLOODWALL HAD ALREADY BEEN DESIGNED, AND THAT WAS BACK IN 1966;

13:30    7    CORRECT?

13:30    8    **A.**   '66 AND '80 --

13:30    9    **Q.**   196- --

13:30   10    **A.**   -- YEAH.  YOU HAD BOTH GROUPS.

13:30   11           **THE COURT:**  WHEN YOU SAY '80, ARE YOU TALKING ABOUT

13:30   12    THE FLOODWALL THAT IS NORTH OF THE BREACHES HERE?

13:30   13           **THE WITNESS:**  YEAH, FROM THE BREACH ON, AROUND --

13:30   14    WRAPPING AROUND THE NORTH END OF THE SITE.  THAT'S THE 1981

13:30   15    WALL.  THE OTHER ONE IS A 1967, '69.  SOMEWHERE AROUND '69.

13:30   16           **THE COURT:**  THE 1981 WALL WAS NOT INVOLVED IN THE

13:30   17    BREACHES HERE?

13:30   18           **THE WITNESS:**  CORRECT.  IT WAS RIGHT AT THAT

13:30   19    JUNCTURE.

13:30   20           **THE COURT:**  THAT'S THE ONE THAT'S APPROXIMATELY 25 --

13:30   21    MINUS 25?

13:30   22           **THE WITNESS:**  YES.

13:30   23    **BY MR. MITSCH:**

13:30   24    **Q.**   WAS IT A MISTAKE NOT TO EXTEND THE SHEET PILES ALONG THE

13:30   25    EBIA FLOODWALL TO MINUS 25?

JONATHAN DAVID ROGERS - CROSS


13:30    1    **A.**   I DIDN'T LOOK AT THAT ISSUE, COUNSELOR.

13:31    2    **Q.**   BUT IF IT WAS A MISTAKE, THAT WOULD BE A DESIGN ISSUE,

13:31    3    WOULDN'T IT?

13:31    4    **A.**   YOU KNOW, IN ORDER TO DO SOMETHING LIKE THAT -- YOU MEAN,

13:31    5    AFTER THE FACT?  YOU'VE GOT TO GIVE ME --

13:31    6            **THE COURT:**  THE COURT'S AWARE THAT THAT MIGHT BE

13:31    7    IMPLICATED IN THE FLOOD CONTROL ACT, BUT IT'S THE KNOWLEDGE

13:31    8    THAT IT WAS -- IT MAY RELATE TO THE SOIL CONDITIONS, HOW

13:31    9    DIFFERENT THEY ARE IN ONE PLACE TO ANOTHER; AND, THEREFORE, IF

13:31   10    IT'S 8 FEET AND YOU'RE EXCAVATING, IS IT ANY DIFFERENT THAN IF

13:31   11    YOU'RE 25 FEET AND YOU'RE EXCAVATING?

13:31   12            THE COURT'S WELL AWARE WITH THE LIMITATIONS OF

13:31   13    THE FLOOD CONTROL ACT OF 1928.

13:31   14    **BY MR. MITSCH:**

13:31   15    **Q.**   LET'S LOOK AT SECTION --

13:31   16            **THE COURT:**  AND I DON'T THINK ANYONE IS CONTENDING

13:31   17    THAT THIS LEVEE WAS IMPROPERLY DESIGNED.  AM I CORRECT ABOUT

13:31   18    THAT?  THE LEVEE THAT BREACHED -- EXCUSE ME, THE FLOODWALL THAT

13:31   19    BREACHED.  IS ANYONE CONTENDING IN THIS THAT IT WAS IMPROPERLY

13:31   20    DESIGNED?

13:31   21            **MR. BRUNO:**  THE PLAINTIFFS ARE NOT.

13:32   22            **MR. MITSCH:**  IT DOESN'T MAKE ANY DIFFERENCE WHETHER

13:32   23    OR NOT --

13:32   24            **THE COURT:**  NO, NO, IT DOESN'T.  IT'S JUST A QUES- --

13:32   25    THE REASON THAT -- WAIT.  MR. SMITH MAYBE WANTED TO SAY

JONATHAN DAVID ROGERS - CROSS


13:32    1   SOMETHING.

13:32    2              **MR. SMITH:**  NO.  IT'S MR. MITSCH'S --

13:32    3              **THE COURT:**  OH, OKAY.  AND THAT'S MY UNDERSTANDING.

13:32    4                  WASHINGTON GROUP MIGHT BE . . .

13:32    5              **MR. TREEBY:**  WELL, YOUR HONOR, WE DON'T -- WE

13:32    6   BELIEVE IT WAS -- WE DON'T HAVE ANY -- WE'RE NOT GOING TO

13:32    7   QUARREL WITH THE DESIGN, EXCEPT THAT IT'S DESIGN AS DESIGNED --

13:32    8              **THE COURT:**  RIGHT.

13:32    9              **MR. TREEBY:**  -- DIDN'T HAVE, FOR EXAMPLE, SURGE

13:32   10   PROTECTION ON THE BACKSIDE.  IF IT DID, WE BELIEVE IT WOULD

13:32   11   HAVE HAD A BIG EFFECT ON WHETHER OR NOT IT BREACHED IN THIS

13:32   12   INSTANCE.

13:32   13                  SO FOR US TO SAY -- I'M NOT GOING TO CONCEDE --

13:32   14              **THE COURT:**  OKAY.  I UNDERSTAND.  YOUR RIGHTS ARE

13:32   15   RESERVED.  ALL RIGHT.  I UNDERSTAND.

13:32   16              **MR. MITSCH:**  AND NEITHER ARE WE, YOUR HONOR.

13:32   17              **THE COURT:**  RIGHT.  I UNDERSTAND.

13:32   18   BY MR. MITSCH:

13:32   19   **Q.**   LET'S GO TO SECTION 1-4 42 -- OF JX-42-0006.

13:32   20              **THE COURT:**  THE COURT REALIZES THAT IF THIS LEVEE --

13:33   21   IF THIS FLOODWALL FAILED FOR ANY REASON OTHER THAN -- AND I

13:33   22   KNOW YOUR ARGUMENT WITH THIS, TOO -- BUT FOR ANY REASON OTHER

13:33   23   THAN A FAILURE TO PROPERLY ASSESS AND DEAL WITH THE

13:33   24   EXCAVATIONS, AND THOSE EXCAVATIONS DID, IN FACT -- WERE A

13:33   25   SUBSTANTIAL CAUSE, THEN THE CORPS, OR WASHINGTON GROUP, WOULD

JONATHAN DAVID ROGERS - CROSS


13:33    1   NOT BE LIABLE.

13:33    2              THE COURT COMPLETELY UNDERSTANDS THAT.

13:33    3              **MR. MITSCH:**  ISSUES THAT WILL BE RESERVED FOR ANOTHER

13:33    4   DAY, YOUR HONOR.

13:33    5              **THE COURT:**  YES.  OKAY.

13:33    6              **MR. MITSCH:**  NOT DURING THIS CROSS-EXAMINATION.

13:33    7              **THE COURT:**  OKAY.  ABSOLUTELY.

13:33    8              **THE WITNESS:**  OKAY.  COUNSELOR, I'M NOT FAMILIAR WITH

13:33    9   WHAT DOCUMENT YOU'RE IN.  CAN YOU TELL ME WHAT IT IS?

13:33   10   **BY MR. MITSCH:**

13:33   11   **Q.**   OKAY.  SURE.  IT'S JX-42.

13:33   12   **A.**   NO, I NEED -- I'M NOT A LAWYER.  I NEED THE AMERICAN NAME,

13:33   13   WHAT THE TITLE OF IT IS.

13:33   14   **Q.**   "DESIGN OF SHEET PILE WALLS."

13:33   15   **A.**   OKAY.  WE'RE STILL IN SHEET PILE WALLS?

13:33   16   **Q.**   WE'RE STILL THERE.

13:33   17   **A.**   OKAY.  THANK YOU.

13:33   18   **Q.**   AND GO TO PAGE 6, PLEASE.

13:33   19   **A.**   ALL RIGHT.

13:33   20   **Q.**   AND, AGAIN, THE PURPOSE OF THIS MANUAL IS TO PROVIDE

13:33   21   GUIDANCE FOR THE SAFE DESIGN AND ECONOMICAL CONSTRUCTION OF

13:34   22   SHEET PILE WALLS; CORRECT?

13:34   23   **A.**   YES.

13:34   24   **Q.**   GO TO 1-4, A LITTLE BIT FURTHER DOWN THE PAGE.

13:34   25   **A.**   WELL, THAT'S THE ONE YOU HAVE ON THE SCREEN.  I'M SORRY.

JONATHAN DAVID ROGERS - CROSS


13:34    1    I DIDN'T SEE THE OTHER ONE.

13:34    2    **Q.**   OKAY.  1-1 IS WHAT I READ BEFORE.

13:34    3    **A.**   OH, OKAY.  CAN WE ENLARGE THAT SO I -- I CAN'T READ IT.

13:34    4              **MR. MITSCH:**  SCROLL BACK TO 1-1.

13:34    5    **BY MR. MITSCH:**

13:34    6    **Q.**   AGAIN, THIS STATES THAT THE PURPOSE OF MANUAL IS TO

13:34    7    PROVIDE GUIDANCE; CORRECT?

13:34    8    **A.**   YES.

13:34    9    **Q.**   NOW, LET'S GO BACK TO 1-4.

13:34   10              AND THAT SAYS:  "DESIGN GUIDANCE PROVIDED HEREIN IS

13:34   11    INTENDED TO APPLY TO WALL/SOIL SYSTEMS OF TRADITIONAL HEIGHTS

13:34   12    AND CONFIGURATIONS IN AN ESSENTIALLY STATIC LOADING

13:34   13    ENVIRONMENT."

13:34   14              DO YOU SEE THAT?

13:34   15    **A.**   YES.

13:34   16    **Q.**   A HURRICANE STORM SURGE ISN'T A STATIC LOADING EVENT, IS

13:35   17    IT?

13:35   18    **A.**   NO.  IT'S VERY MUCH A DYNAMIC LOADING -- SHORT-TERM

13:35   19    DYNAMIC.

13:35   20    **Q.**   EXACTLY.  THANK YOU.

13:35   21              LET'S LOOK AT SECTION 2-1 ON PAGE 8.

13:35   22              AND YOU CITED THIS SECTION IN YOUR REPORT, ACTUALLY?

13:35   23    **A.**   RIGHT.

13:35   24    **Q.**   AND IT STATES THAT THERE IS -- THAT:  "THE COORDINATION

13:35   25    REQUIRED FOR DESIGN AND CONSTRUCTION OF A SHEET PILE WALL IS

JONATHAN DAVID ROGERS - CROSS

13:35    1    DEPENDENT ON THE TYPE AND LOCATION OF THE PROJECT."  CORRECT?

13:35    2    **A.**    YES.

13:35    3    **Q.**    AND IT STATES THAT THE SECTION CONTEMPLATES THAT THE

13:35    4    COORDINATION EFFORT WILL DEPEND ON THE TYPE AND LOCATION OF THE

13:35    5    PROJECT; CORRECT?

13:35    6    **A.**    YES.  AND THEN IT GOES ON TO EXPAND UPON THAT RIGHT IN THE

13:36    7    NEXT SENTENCE.

13:36    8    **Q.**    OKAY.  AND THAT COORDINATION REFERS TO DESIGN AND

13:36    9    CONSTRUCTION OF THE SHEET PILE WALL; CORRECT?

13:36    10   **A.**    RIGHT.  SHEET PILE WALLS MORE THAN OTHER STRUCTURES

13:36    11   REQUIRE COORDINATION AND COOPERATION BETWEEN DIFFERENT

13:36    12   SUBDISCIPLINES OF CIVIL ENGINEERING.

13:36    13   **Q.**    AND YOU'VE PREVIOUSLY AGREED THAT THE SHEET PILE WALL USED

13:36    14   ALONG THE EBIA FLOODWALL WAS ALREADY IN PLACE AT THE TIME OF

13:36    15   TASK ORDER 26; CORRECT?

13:36    16   **A.**    YES.

13:36    17   **Q.**    AND THAT THE COORDINATION EFFORTS THAT ARE REFERRED TO IN

13:36    18   THIS MANUAL WERE ALREADY COMPLETED BY THE TIME TASK ORDER 26

13:36    19   STARTED; CORRECT?

13:36    20   **A.**    RIGHT.  AND THE REASON I HAVE THAT THERE IS BECAUSE IF

13:36    21   YOU'RE GOING TO HAVE IT ASSESSED, IT HAS TO BE ASSESSED BY

13:36    22   THOSE THREE GROUPS:  STRUCTURAL, GEOTECHNICAL AND HYDROLOGY.

13:36    23   YOU WOULD LIKE TO HAVE EACH ONE OF THEM CHIME IN ON IT IF

13:36    24   YOU'RE ASSESSING IT.

13:36    25          SO AN ASSESSMENT CAN BE SOMETHING AS SIMPLE AS A

JONATHAN DAVID ROGERS - CROSS


13:36   1   60-SECOND LOOK AT SOMETHING AND SENDING AN E-MAIL; OR IT CAN BE

13:37   2   LOOKING AT IT FOR AN HOUR OR A COUPLE OF HOURS AND SAYING,

13:37   3   "WELL, WE DON'T HAVE ENOUGH INFORMATION HERE.  WE WOULD NEED TO

13:37   4   DO AN ANALYSIS."

13:37   5            AND THEN YOU GO FROM BEING AN ASSESSMENT TO A LITTLE

13:37   6   HIGHER LEVEL OF ASSESSMENT.  SO I'M NOT -- I'M NOT BOUNDING --

13:37   7   THE TERM "ASSESSMENT" IS PRETTY QUALITATIVE AND BROAD.

13:37   8            **THE COURT:**  LET ME MAKE SURE I UNDERSTAND WHERE WE

13:37   9   ARE.

13:37   10           ARE YOU SAYING AN ASSESSMENT, THAT'S ONLY AN

13:37   11  ASSESSMENT DURING THE CONSTRUCTION OF THE FLOODWALL, OR ARE YOU

13:37   12  TALKING ABOUT AN ASSESSMENT -- DO YOU -- IN YOUR OPINION, IS

13:37   13  THIS SOMETHING THAT WOULD APPLY TO AN ASSESSMENT SUBSEQUENT TO

13:37   14  THE CONSTRUCTION OF THE FLOODWALL?

13:37   15           **THE WITNESS:**  NO.  THIS IS POST-CONSTRUCTION

13:37   16  ASSESSMENTS, LIKE WHEN WE HAVE PENETRATIONS OR EXCAVATIONS,

13:37   17  ANYTHING WE'RE DOING IN PROXIMITY TO THE WALL.

13:37   18           **THE COURT:**  OKAY.

13:37   19           **THE WITNESS:**  IT'S PRETTY COMMONPLACE IN ALL CORPS

13:37   20  DISTRICTS THAT HAVE FLOOD PROTECTION STRUCTURES OR LEVEES.

13:37   21           ALL I'M SAYING IS WHEN IT'S A SHEET PILE WALL,

13:37   22  THEN YOU GOT TO GO PAST GEOTECHNICAL.  YOU'VE ALSO GOT TO GET

13:38   23  STRUCTURAL'S CONCURRENCE, AND THEN SOMETIMES YOU GOT TO GET

13:38   24  HYDROLOGY'S AS WELL.  ESPECIALLY IF IT'S LIKE WHAT'S COME UP ON

13:38   25  THE CHAIN OF ROCKS SHIPPING CHANNEL, YOU KNOW, BECAUSE THAT HAS

JONATHAN DAVID ROGERS - CROSS

13:38    1   WATER IN IT ALL THE TIME AND THEN IT CYCLES UP DURING FLOODS.

13:38    2   SO THEN YOU HAVE TO ACTUALLY TALK TO THE HYDROLOGY PEOPLE AS

13:38    3   WELL IN THAT KIND OF CASE.

13:38    4   **BY MR. MITSCH:**

13:38    5   **Q.**   WE HAD TALKED ABOUT DESIGN MEMORANDUM NO. 3 FROM 1966 AND

13:38    6   WE'VE LOOKED AT PLATE 28.  THAT WAS THE ONE -- THE LARGER ONE

13:38    7   THAT I HANDED TO YOU.

13:38    8   **A.**   RIGHT.

13:38    9   **Q.**   AND YOU'VE AGREED THAT THE PLATE SHOWED THAT THE

13:38   10   FOUNDATION MATERIALS -- WELL, THE PLATE SHOWED FOUNDATION

13:38   11   MATERIALS ALONG THAT WALL ALIGNMENT IN 1966; CORRECT?

13:38   12   **A.**   CORRECT.

13:38   13   **Q.**   AND YOU WOULD AGREE THAT IN 1966, THE CORPS CONSIDERED THE

13:39   14   FOUNDATION MATERIALS IN DETERMINING THE DESIGN AND CONSTRUCTION

13:39   15   OF THE SHEET PILE THAT WAS USED TO CONSTRUCT THAT FLOODWALL;

13:39   16   CORRECT?

13:39   17   **A.**   YES.  THE THING THAT'S UNUSUAL ABOUT DM 3 AND THE

13:39   18   CHALMETTE PLAN IS THAT IT COVERS 40,000 ACRES.  AND SO THEY'RE

13:39   19   STARTING AT THE MISSISSIPPI RIVER, GOING UP THE IHNC, TURNING

13:39   20   ON THE MRGO, GOING ALL THE WAY OUT TO LAWLER SLEW, THEN COMING

13:39   21   BACK DOWN TO LAKE BORGNE, VIOLET CANAL.  IT'S AN ENORMOUS AREA.

13:39   22         SO IT'S A LITTLE BIT UNUSUAL IN THAT FOR THIS

13:39   23   PARTICULAR DESIGN SECTION, THAT'S A LARGE AREA.  THAT'S A

13:39   24   LARGER AREA THAN YOU -- YOU'RE ONLY GOING TO SEE THIS ONCE IN A

13:39   25   GENERATION WHERE THEY'RE COVERING THIS MUCH MILEAGE IN ONE

JONATHAN DAVID ROGERS - CROSS

13:39    1    REPORT.

13:39    2              AND SO THE REASON I'M SAYING THAT IS BECAUSE THIS IS

13:39    3    ON A VERY GROSS SCALE AND DETAIL.  IF YOU COMPARE THIS WITH THE

13:39    4    WORK THAT DR. MARR AND THE REST OF US DID AND THAT'S A LOT MORE

13:39    5    DETAILED THAN THIS IS.  THAT'S THE NATURE OF THE BEAST WHEN

13:40    6    YOU'RE DOING A VERY LARGE PROJECT, YOU HAVE TO MAKE

13:40    7    GENERALIZATIONS ABOUT WHAT'S THERE THAT ARE SUITABLE TO MAKE

13:40    8    YOUR DESIGN.

13:40    9              SO YOU'RE NOT GOING TO GET ALL THE LITTLE GEOLOGICAL

13:40   10    NUANCES IN THERE THAT YOU MIGHT IF IT WAS A SMALLER SCALE OF

13:40   11    AREA THAT THEY WERE ASSESSING.

13:40   12    Q.   UNLESS I'VE GOT THIS ALL WRONG, DR. ROGERS, I'M LOOKING AT

13:40   13    PLATE NO. 28 AND I SEE THE EBIA FLOODWALL.  I'M NOT LOOKING

13:40   14    ANYPLACE ELSE.

13:40   15    A.   RIGHT.  BUT IT'S --

13:40   16    Q.   EXACTLY.

13:40   17    A.   BUT YOU'RE LOOKING AT A 9,000-FOOT, YOU KNOW, AREA.  SO

13:40   18    THAT'S A LONG -- THAT'S A BIG REACH --

13:40   19    Q.   BUT THIS PLATE --

13:40   20    A.   -- AND YOU'RE PUTTING IT ON A LITTLE PIECE OF PAPER, YEAH.

13:40   21    Q.   RIGHT.  WELL, IT'S ACTUALLY A BIG PIECE OF PAPER.

13:40   22    A.   WELL . . .

13:40   23    Q.   BUT THIS PLATE REFERS TO THAT PARTICULAR AREA; RIGHT?

13:40   24              THE COURT:  THE COURT UNDERSTANDS THAT.  I THINK HE

13:40   25    WAS SAYING -- AND HE CAN -- AND YOU CAN CORRECT ME, ANYBODY CAN

JONATHAN DAVID ROGERS - CROSS


13:40    1    CORRECT ME -- I THINK HE WAS SAYING THAT BECAUSE OF THE EXTENT

13:40    2    OF THIS PROJECT, A PLATE IN A NORMAL -- IN A SMALLER FLOODWALL

13:41    3    CONSTRUCTION OR LEVEE CONSTRUCTION WOULD BE -- NOT COVER

13:41    4    9,000 FEET.

13:41    5                IS THAT --

13:41    6           **THE WITNESS:**  RIGHT.

13:41    7           **THE COURT:**  -- WHAT YOU'RE SAYING?

13:41    8           **THE WITNESS:**  IT WOULD DEFINITELY -- IT WOULD TEND TO

13:41    9    BE MORE DETAILED THAN THESE ARE.  AND YOU SEE THAT IN THEIR

13:41   10    LATER PRODUCTS THAT THE DISTRICT DOES AFTER '66.

13:41   11            THIS IS IN THE WAKE OF BETSY AND THEY'VE GOT A

13:41   12    TREMENDOUS AREA THAT THEY GOT TO ATTACK.  THEY HAD TO ATTACK IT

13:41   13    VERY QUICKLY.  THAT'S WHY THEY PUT THE SHEET PILES IN.  AND

13:41   14    THEN THIS WAS PART OF THE PERMANENT SOLUTION TO GO ON TOP OF

13:41   15    THE SHEET PILES, WHICH WASN'T THE CORPS' IDEA.  THAT WAS A

13:41   16    POLITICAL EXPEDIENT TO PROTECT THESE PEOPLE IN THE LOWER NINTH

13:41   17    WARD AND ELSEWHERE WHO BEEN FLOODED OUT BY BETSY.

13:41   18            SO THEY HAD TO COVER A LOT OF MILEAGE IN A VERY

13:41   19    SHORT AMOUNT OF TIME TO GET THIS OUT WHEN THEY DID IN NOVEMBER

13:41   20    OF '66.

13:41   21        **MR. MITSCH:**  I'M HAPPY TO BLAME IT ON THE

13:41   22    POLITICIANS, DR. ROGERS.

13:41   23            THANK YOU.  THAT'S ALL I HAVE FOR NOW.

13:42   24        **THE COURT:**  AND I'M GOING TO GIVE YOU THE RIGHT OF

13:42   25    RECROSS, LIMITED TO WHAT'S -- AND, OF COURSE, YOU CAN COME UP,

JONATHAN DAVID ROGERS - CROSS


| | | |
|---|---|---|
| 13:42 | 1 | TOO, MR. TREEBY -- BUT THE RIGHT OF RECROSS, BUT LIMITED TO |
| 13:42 | 2 | WHAT IS BROUGHT OUT ON COUNSEL'S NEXT EXAMINATION. |
| 13:42 | 3 | YES, SIR, MR. TREEBY. |
| 13:42 | 4 | **CROSS-EXAMINATION** |
| 13:42 | 5 | **BY MR. TREEBY:** |
| 13:42 | 6 | **Q.**   DR. ROGERS, WE'VE MET BEFORE.  MY NAME IS BILL TREEBY.  I |
| 13:42 | 7 | DON'T KNOW IF YOU REMEMBER, BUT I WAS AT YOUR DEPOSITION. |
| 13:42 | 8 | **A.**   I DEFINITELY REMEMBER YOU, MR. TREEBY. |
| 13:42 | 9 | **Q.**   AND I'M GOING TO START OFF WITH JUST SOME VERY BASIC |
| 13:42 | 10 | QUESTIONS AND IT'S JUST BACKGROUND AND THEN GET INTO MORE |
| 13:42 | 11 | SPECIFICS.  AND MOST OF WHAT I'M DEALING WITH HERE, WE DEALT |
| 13:42 | 12 | WITH AT YOUR DEPOSITION, SO IT SHOULD BE FAMILIAR TO YOU. |
| 13:43 | 13 | THE TERM "GRANULAR AQUIFER" REFERS TO SOMETHING WHERE |
| 13:43 | 14 | YOU CAN SEE THE GRAINS WITH YOUR OWN NAKED EYE, LIKE SAND OR |
| 13:43 | 15 | GRAVEL.  IT DOESN'T HAVE MUCH FINES; RIGHT? |
| 13:43 | 16 | **A.**   CORRECT. |
| 13:43 | 17 | **THE COURT:**  CAN WE DEFINE "FINES"?  ARE YOU MAKING -- |
| 13:43 | 18 | **MR. TREEBY:**  "FINES," I'LL ASK HIM. |
| 13:43 | 19 | **THE COURT:**  YEAH, YEAH. |
| 13:43 | 20 | **BY MR. TREEBY:** |
| 13:43 | 21 | **Q.**   IN FACT, YOU GAVE US A GOOD DEFINITION OF "FINES" IN YOUR |
| 13:43 | 22 | DEPOSITION.  GO AHEAD AND SHARE IT WITH THE COURT. |
| 13:43 | 23 | **A.**   I WOULDN'T KNOW WHERE IT IS IN THE DEPOSITION. |
| 13:43 | 24 | **Q.**   WELL, WHAT YOU STATED THERE -- AND YOU CAN TELL ME IF YOU |
| 13:43 | 25 | REMEMBER.  WHAT YOU STATED THERE WAS THAT "FINES" ARE GENERALLY |

676

JONATHAN DAVID ROGERS - CROSS


13:43    1    DEFINED AS MATERIAL WHICH IS FINER THAN A NO. 2 SIEVE?

13:43    2    **A.**    NUMBER 200.

13:43    3    **Q.**    NUMBER 200.  I'M SORRY.  YOU'RE RIGHT.  I READ IT WRONG.

13:43    4    **A.**    OKAY.

13:43    5    **Q.**    IT SAYS 200 IN MY NOTES.

13:43    6              **THE COURT:**  TO THE EXTENT THE COURT CAN UNDERSTAND

13:43    7    THAT, I APPRECIATE IT.

13:43    8              **THE WITNESS:**  A 200 SIEVE IS 200 MESH OPENINGS IN

13:43    9    ONE INCH.  SO IT'S PRETTY FINE-GRAIN STUFF.  IT'S SO SMALL YOU

13:43   10    NEED A MICROSCOPE TO LOOK AT THE PARTICLES.

13:43   11    **BY MR. TREEBY:**

13:43   12    **Q.**    AND WHEN -- SO THE FINES ARE THINGS THAT WOULD PASS

13:44   13    THROUGH THAT SIEVE, BUT GRAINS THAT YOU'RE TALKING ABOUT BEING

13:44   14    ABLE TO SEE, THAT WOULD NOT PASS THROUGH THE SIEVE; RIGHT?

13:44   15    **A.**    RIGHT.

13:44   16    **Q.**    OKAY.  AND AN AQUIFER IS, AND I'M QUOTING FROM ASTM, I

13:44   17    THINK:  "A GEOLOGICAL FORMATION, GROUP OF FORMATIONS OR PART OF

13:44   18    A FORMATION THAT IS SATURATED AND IS CAPABLE OF PROVIDING A

13:44   19    SIGNIFICANT QUANTITY OF WATER."  RIGHT?

13:44   20    **A.**    YEAH, THAT'S HOW -- THAT'S HOW IT'S GENERALLY USED FOR

13:44   21    GROUNDWATER SUPPLY IN THAT SENSE.  YES.

13:44   22    **Q.**    THAT'S A PRETTY TYPICAL DEFINITION, IS IT NOT?

13:44   23    **A.**    YES.

13:44   24    **Q.**    AND THE ADDITION OF THE WORD "GRANULAR" TO THE WORD

13:44   25    "AQUIFER" MAKES IT CLEAR THAT THIS FORMATION OF MATERIALS

JONATHAN DAVID ROGERS - CROSS

13:44     1    CONSISTS OF GRAINS THAT WOULD ALLOW THE RELATIVELY EASY FLOW OF

13:44     2    WATER IN AN AQUIFER; RIGHT?

13:44     3    **A.**   WELL, YEAH, IT DEPENDS WHAT "EASY" MEANS.  I MEAN, WHEN

13:44     4    LOS ANGELES WAS SETTLED IN THE LATE 19TH CENTURY, THEY STARTED

13:44     5    WRITING -- THE ENGINEERS THERE STARTED WRITING PAPERS ABOUT HOW

13:45     6    THEY WOULD NEVER HAVE TO BUILD DAMS BECAUSE THEY HAVE THESE

13:45     7    POROUS PERVIOUS GRAVELS COMING OFF THE SAN GABRIEL, SANTA

13:45     8    MONICA MOUNTAINS THAT HAD ENOUGH WATER FOR 20 MILLION PEOPLE.

13:45     9           THE PROBLEM WAS WHEN THEY WENT OUT AND DRILLED THE

13:45    10    HOLES, BECAUSE OF CAPILLARY ATTRACTION, YOU CAN SELDOM GET MORE

13:45    11    THAN 30 PERCENT OF THE WATER OUT.

13:45    12           SO THEY ENDED UP HAVING TO BUILD THE WORLD'S LONGEST

13:45    13    AQUEDUCTS, THE OWENS RIVER AND THE COLORADO RIVER, OVER THE

13:45    14    NEXT 50 YEARS.  SO THESE ARE GENERALITIES.

13:45    15    **Q.**   I TOLD YOU I'M JUST DEALING IN GENERAL TERMS HERE AT THE

13:45    16    BEGINNING.

13:45    17    **A.**   OKAY.  ALL RIGHT.

13:45    18    **Q.**   I'M JUST TRY TO GO LAY A FOUNDATION.

13:45    19    **A.**   ALL RIGHT.

13:45    20    **Q.**   OKAY.  AN AQUITARD -- WE TALKED ABOUT AQUIFERS.  AN

13:45    21    AQUITARD, ON THE OTHER HAND, IS A CONFINING BED THAT RETARDS

13:45    22    BUT DOES NOT PREVENT THE FLOW OF WATER TO OR FROM AN ADJACENT

13:45    23    AQUIFER; IS THAT RIGHT?

13:45    24    **A.**   YES.

13:45    25    **Q.**   AND YOU ARE FAMILIAR, I BELIEVE YOU SAID, WITH THE ASTM

JONATHAN DAVID ROGERS - CROSS

13:45    1  SOILS CLASSIFICATION, ASTM D2487; RIGHT?

13:45    2  **A.**  THE UNIFIED SOIL CLASSIFICATION SYSTEM?

13:46    3  **Q.**  YES.

13:46    4  **A.**  YES.

13:46    5  **Q.**  AND UNDER THAT CLASSIFICATION, ORGANIC CLAY WOULD BE

13:46    6  CONSIDERED AN AQUITARD; RIGHT?

13:46    7  **A.**  YES.  BY ITSELF IT WOULD BE, YES, AS THE FORMATION.

13:46    8  **Q.**  AGAIN, WE'RE DEALING WITH GENERAL TERMS HERE.  I

13:46    9  UNDERSTAND THAT.

13:46   10       BECAUSE ORGANIC CLAY IS CONSIDERED A RELATIVELY

13:46   11  IMPERVIOUS MATERIAL; IS THAT RIGHT?

13:46   12  **A.**  IF IT'S SATURATED AND UNDER SOME MAJOR CONFINEMENT, YES.

13:46   13  **Q.**  AND, GENERALLY, THE -- GENERALLY, THE ORGANIC CLAYS FOUND

13:46   14  IN THE SOILS INVESTIGATION THAT WAS PERFORMED AT GREAT

13:46   15  EXPENSE -- MAINLY TO THE DEFENDANTS, I MIGHT ADD -- LAST

13:46   16  SUMMER --

13:46   17       **MR. BRUNO:**  NOT ENTIRELY TRUE, YOUR HONOR.  WE PUT UP

13:46   18  SOME MONEY.

13:46   19       **THE COURT:**  ALL RIGHT.  WE'RE NOT GOING TO DEBATE.

13:46   20  **BY MR. TREEBY:**

13:46   21  **Q.**  GENERALLY, THE ORGANIC CLAYS FOUND IN THE SOILS

13:46   22  INVESTIGATION IN THE EAST BANK INDUSTRIAL AREA WOULD ACT AS AN

13:46   23  AQUITARD; RIGHT?

13:46   24  **A.**  IT DEPENDS ON -- IT'S ALL A MATTER OF SCALE, MR. TREEBY.

13:47   25  BECAUSE YOU HAVE -- THE PEAK HORIZONS THAT ARE WITHIN IT

JONATHAN DAVID ROGERS - CROSS

13:47    1    ARE GOING TO BE A HIGHER PERMEABILITY BY SEVERAL ORDERS OF

13:47    2    MAGNITUDE.

13:47    3          EVEN THOUGH THEY'RE NOT VERY BIG AND THEY'RE NOT BIG

13:47    4    ENOUGH FOR YOU, USING A SOIL MECHANICS CLASSIFICATION SCHEME,

13:47    5    TO COUNT THEM, THEY COULD STILL TRANSMIT PORE PRESSURES AND

13:47    6    THAT'S WHY YOU WOULD WANT TO BE CONCERNED ABOUT THEM.

13:47    7    **Q.**   OKAY.  YOU KIND OF WENT AFIELD, BUT SINCE YOU DID, LET ME

13:47    8    CHASE THAT RABBIT, OKAY?

13:47    9    **A.**   OKAY.

13:47   10    **Q.**   LET ME GET THAT -- I WISH I HAD A REALTIME UP HERE BECAUSE

13:47   11    I DON'T WANT TO MISQUOTE YOU.  LET'S SEE IF I CAN TRY IT FROM

13:47   12    MEMORY.

13:47   13          **THE COURT:**   YOU SHOULD HAVE ONE.

13:47   14    **BY MR. TREEBY:**

13:47   15    **Q.**   "THEY COULD STILL TRANSMIT PORE PRESSURES AND THAT'S WHY

13:47   16    YOU WOULD WANT TO BE CONCERNED ABOUT THEM."

13:47   17          THAT'S WHAT YOU SAID; RIGHT?

13:47   18    **A.**   YES.

13:47   19    **Q.**   AND IF THEY TRANSMITTED PORE PRESSURES, THEY WOULD ALSO

13:47   20    TRANSFER FLOW; ISN'T THAT RIGHT?

13:47   21    **A.**   NO.

13:47   22    **Q.**   NO.

13:47   23          YOU CAN TRANSFER PORE PRESSURES WITHOUT TRANSFERRING

13:48   24    FLOW; IS THAT RIGHT?

13:48   25    **A.**   YEAH.  THAT'S THE PROBLEM WE HAVE AT HOOVER DAM RIGHT NOW

JONATHAN DAVID ROGERS - CROSS


13:48    1    WITH THE UPLIFT PRESSURES WE'RE DEALING WITH.  IT'S NOT A

13:48    2    SIGNIFICANT QUANTITY OF WATER, BUT IT'S A PRESSURE THAT'S IN

13:48    3    MICROSCOPIC CRACKS THAT'S COMING THROUGH THE DAM.

13:48    4          SO IT'S TRUE -- YOU KNOW, THE THINGS YOU WERE GIVING

13:48    5    ME BEFORE WERE DEVELOPED MOSTLY FOR WATER RESOURCES AND

13:48    6    HYDROLOGY DEVELOPMENT, WHERE YOU WENT LIKE -- LIKE

13:48    7    MR. MULHOLLAND IN LOS ANGELES, YOU WANT TO GET -- PULL WATER

13:48    8    OUT OF THE GROUND.  AND THOSE THINGS ARE TRUE.

13:48    9          BUT YOU CAN STILL -- IF YOU HAVE A SATURATED HORIZON

13:48    10   AND YOU PUT A PRESSURE ON IT, THAT PRESSURE IS GOING TO BE

13:48    11   TRANSMITTED THROUGH THAT HORIZON ALMOST INSTANTANEOUSLY, BUT

13:48    12   YOU MAY NOT SEE SIGNIFICANT FLOW IF THERE'S NOWHERE FOR THE

13:48    13   FLOW -- YOU KNOW, THE FLOW CAN'T MOVE THROUGH THE MATERIAL

13:48    14   BECAUSE OF ITS TORTUOUS FLOW PATH CHARACTERISTICS OR IT'S SHUT

13:48    15   OFF AT ONE END.

13:49    16         AND SO SOMETIMES THIN LITTLE SEAMS THAT PINCH OFF ARE

13:49    17   THE ONES THAT DEVELOP THE EXCESS PORE PRESSURES BECAUSE THEY

13:49    18   HAVE NO OUTLET.  AND THAT'S THE ONES THAT GIVE US THE MOST

13:49    19   TROUBLE, LIKE IN THE FLOODS WE HAD LAST YEAR IN 2011, WHERE WE

13:49    20   HAVE A SEAM CROSSING UNDER AND IT'S DIMINISHING IN SIZE.

13:49    21   Q.   WAS THAT HERE?  THE FLOODS LAST YEAR, WAS THAT HERE?

13:49    22   A.   YEAH.  WELL, IT WAS UP IN TENNESSEE.

13:49    23   Q.   OH, IN TENNESSEE.

13:49    24   A.   YEAH.

13:49    25   Q.   NOW, LET ME ASK YOU THIS:  YOU WOULD AGREE THE MORE CLAYEY

JONATHAN DAVID ROGERS - CROSS


13:49    1    THE MATERIAL IS, THE MORE IMPERVIOUS IT'S GOING TO BE; RIGHT?

13:49    2    **A.**    IT SHOULD BE, YES.

13:49    3    **Q.**    AND ON PAGE 1, PARAGRAPH 5 OF YOUR REPORT, YOU CONCLUDE --

13:49    4    AND I THINK YOU'LL REMEMBER THIS, BUT MAYBE YOU CAN REFER TO

13:49    5    IT -- BASED ON YOUR REVIEW OF ALL THE AVAILABLE DATA, THAT THE

13:49    6    PERMEABILITY OF WHAT YOU CALLED THE SWAMP-MARSH LAYER AT THE

13:49    7    EBIA SITE HAS A MOST LIKELY VALUE OF 10 TO THE MINUS

13:49    8    5 CENTIMETERS PER SECOND; RIGHT?

13:49    9    **A.**    THAT'S CORRECT, YES.

13:49   10    **Q.**    YOUR PUMPING TESTS FROM THE PLAINTIFF'S EBIA SOUTH SITE

13:50   11    GAVE YOU A PERMEABILITY OF 10 TO THE MINUS 6 CENTIMETERS PER

13:50   12    SECOND; RIGHT?

13:50   13    **A.**    WELL, SOME OF THEM WILL GIVE YOU ONE ANSWER.  I MEAN, WE

13:50   14    HAVE 16 POLES OUT THERE.

13:50   15    **Q.**    NO, WAIT.  ANSWER THAT --

13:50   16           **THE COURT:**  OKAY.  YEAH --

13:50   17           **MR. TREEBY:**  YOUR HONOR, I WOULD LIKE AN ANSWER AND

13:50   18    THEN -- I DON'T MIND THE EXPLANATION AFTER WE GET THE ANSWER.

13:50   19           **THE COURT:**  THAT IS PERFECTLY APPROPRIATE.  SO IF YOU

13:50   20    WOULD, PLEASE, ANSWER THE QUESTION AND THEN YOU COULD EXPLAIN

13:50   21    YOUR ANSWER, IF YOU WOULD.

13:50   22           **THE WITNESS:**  SURE.  I MEAN, THAT'S WHAT I SAID

13:50   23    THERE:  IT RANGES FROM 10 TO THE MINUS 4, 10 TO THE MINUS 6.

13:50   24           **THE COURT:**  BUT HE ASKED YOU ABOUT A SPECIFIC TEST.

13:50   25             YOU MIGHT ASK THAT QUESTION AGAIN.

JONATHAN DAVID ROGERS - CROSS

13:50    1    **MR. TREEBY:**  YES.

13:50    2    **BY MR. TREEBY:**

13:50    3    **Q.**  YOUR PUMPING TESTS -- YOUR PUMPING TESTS -- FROM THE

13:50    4    PLAINTIFF'S EBIA SOUTH SITE GAVE YOU A PERMEABILITY OF 10 TO

13:50    5    THE MINUS 6 CENTIMETERS PER SECOND; ISN'T THAT RIGHT?

13:50    6    **A.**  WHICH TESTS AND WHERE?

13:50    7    **Q.**  THE EBIA SOUTH PUMPING TEST SITE.

13:50    8    **A.**  WELL, LET ME LOOK IT UP.  I DON'T REMEMBER WHAT THE EXACT

13:50    9    NUMBERS WERE.

13:50   10    **THE COURT:**  DO WE HAVE A NUMBER FOR THAT SITE,

13:50   11    MR. TREEBY, BY ANY CHANCE?

13:50   12    **MR. TREEBY:**  I HAVE IT IN HIS DEPOSITION, YOUR HONOR.

13:50   13    IF YOU WOULD PULL UP PAGE 252, LINE -- THE DATE

13:51   14    OF THE DEPOSITION WAS MARCH 17TH, PAGE 252, BEGINNING AT

13:51   15    LINE 16.

13:51   16    **MR. SIMS:**  YOUR HONOR, WE JUST ASK THAT THE EXPERT BE

13:51   17    PROVIDED THE OPPORTUNITY TO CONSULT HIS ACTUAL REPORT WHERE

13:51   18    HE REPORTS THESE.

13:51   19    **THE COURT:**  HE'S GOING TO GET --

13:51   20    **MR. TREEBY:**  MR. SIMS, I'D BE HAPPY TO HAVE YOU

13:51   21    CONDUCT YOUR EXAMINATION, YOUR HONOR, AND I WILL CONDUCT --

13:51   22    **THE COURT:**  ALL RIGHT.  WE'RE NOT -- HE JUST WANTS --

13:51   23    THE COURT WILL MAKE SURE THE EXPERT HAS EVERY OPPORTUNITY TO

13:51   24    ANSWER FAIRLY.  DON'T WORRY.

13:51   25    **THE WITNESS:**  WHAT PAGE IS THIS ON?

JONATHAN DAVID ROGERS - CROSS


13:51    1   **BY MR. TREEBY:**

13:51    2   **Q.**   IT'S UP ON THE SCREEN.  THIS IS PAGE 252 AT LINE 16.

13:51    3   THAT'S WHERE IT'S BEGINNING THERE.

13:51    4           "Q.  WE TALKED A LITTLE BIT ABOUT THIS, BUT I'M

13:51    5        CORRECT IN ASSUMING THAT BY HAVING THIS RANGE, 10 TO THE

13:51    6        MINUS 4 OR 10 TO THE MINUS 6, YOU GOT THE 10 TO THE MINUS

13:51    7        4 FROM THE SCHOOL SITE, YOU GOT 10 TO THE MINUS 6 FROM THE

13:51    8        EBIA SOUTH SITE?

13:51    9           AND YOU ANSWERED:  "RIGHT."

13:51   10           IS THAT STILL CORRECT?

13:51   11   **A.**   I WANT TO LOOK AT IT AND SEE THE CONTEXT OF IT.  BECAUSE

13:51   12   THIS IS -- YOU GOT ME ALL RUSHED LAST TIME AND I GOT SO

13:52   13   CONFUSED, AND YOU'RE DOING IT TO ME AGAIN TODAY.  SO I WANT TO

13:52   14   SLOW DOWN AND LOOK AT WHAT THE CONTEXT OF THE QUESTION WAS AND

13:52   15   BE ABLE TO READ IT ABOVE IT AND BELOW SO I CAN SEE --

13:52   16           **THE COURT:**  DO YOU HAVE THAT TEST?  I MEAN, DO YOU

13:52   17   HAVE THE --

13:52   18           **THE WITNESS:**  YES.

13:52   19           **THE COURT:**  WE HAD AN EXHIBIT WITH THE -- I DON'T

13:52   20   KNOW IF IT HAD THE --

13:52   21           **THE WITNESS:**  252.

13:52   22           **THE COURT:**  I DON'T KNOW IF WE HAD THE RESULT OF THE

13:52   23   TEST ON THAT EXHIBIT.  BUT JUST TAKE A FEW SECONDS HERE, SIR,

13:52   24   IF YOU NEED TO.

        25

JONATHAN DAVID ROGERS - CROSS


13:52    1    **BY MR. TREEBY:**

13:52    2    **Q.**   IF YOU WANT TO LOOK AT IT IN YOUR REPORT, IT'S PAGE 1,

13:52    3    PARAGRAPH 5.

13:52    4    **A.**   WELL, YEAH, BUT I NEED TO SEE THE DATA FROM THE SITES.

13:52    5    THAT'S WHAT I NEED TO LOOK AT.

13:53    6            **THE COURT:**  PAGE 1, PARAGRAPH 5.  I'M GOING TO GO

13:53    7    LOOK AT IT.

13:53    8            **THE WITNESS:**  I DON'T RECALL GIVING YOU ONE FROM THE

13:53    9    SCHOOL SITE.

13:53   10    **BY MR. TREEBY:**

13:53   11    **Q.**   IF YOU WANT TO LOOK AT IT IN YOUR REPORT, LET'S PULL IT

13:53   12    UP.

13:53   13            **MR. TREEBY:**  IT'S JX -- YEAH.  IT'S THE PUMPING TEST

13:53   14    REPORT.  I'M SORRY.  JX-01598-0001.

13:53   15            **THE COURT:**  WHAT PAGE WOULD THAT BE ON HIS REPORT?

13:53   16            **THE WITNESS:**  YEAH, WHAT PAGE WOULD THAT BE?

13:53   17            **MR. TREEBY:**  YEAH, I DON'T KNOW.  I THINK THIS WAS IN

13:53   18    HIS RELIANCE MATERIALS, YOUR HONOR.

13:53   19            **THE COURT:**  RELIANCE MATERIALS.  OKAY.  ALL RIGHT.

13:53   20    THANK YOU.

13:53   21            **MR. TREEBY:**  BUT WE USED IT AS AN EXHIBIT IN HIS

13:53   22    DEPOSITION.

13:53   23            **THE COURT:**  ALL RIGHT.

13:53   24            **MR. SIMS:**  YOUR HONOR, I CAN OFFER AN ASSIST ON THE

13:53   25    PAGE IN THE REPORT, WITH THE COURT'S PERMISSION.  IT'S ON PAGE

JONATHAN DAVID ROGERS - CROSS

13:53      1    219.

13:53      2             **MR. TREEBY:**  WELL, I'D JUST AS SOON USE THE TABLE

13:53      3    THAT I'VE CALLED UP.  IT'S FROM THE PUMPING TEST.

13:53      4             **THE COURT:**  ALL RIGHT.  FINE.

13:53      5             ALL RIGHT.  MR. TREEBY'S CALLED UP --

13:53      6             **MR. TREEBY:**  JX-01958-0001.

13:54      7             AND WOULD YOU BLOW UP THE BOTTOM SECTION --

13:54      8    WELL, FIRST, THE LITTLE -- WHAT'S IN RED UP IN THE -- IN THE

13:54      9    RED BOX.  THAT'S THE SOUTH EBIA PUMP TEST 2 RESULTS, PAGE 14.

13:54     10    THAT'S WHERE IT'S FROM.

13:54     11             **THE WITNESS:**  OKAY.

13:54     12             **MR. TREEBY:**  THEN BLOW UP THE BOTTOM SECTION WHERE WE

13:54     13    HAVE THE TABLE.

13:54     14    **BY MR. TREEBY:**

13:54     15    **Q.**  AND THE PERMEABILITY AT THE PUMP WELL WAS 2.95 TIMES 10 TO

13:54     16    THE MINUS 6; IS THAT RIGHT?

13:54     17    **A.**  YES.

13:54     18             **THE COURT:**  DO YOU SEE IT, SIR?

13:54     19    **BY MR. TREEBY:**

13:54     20    **Q.**  CAN YOU READ IT?

13:54     21    **A.**  YES.

13:54     22    **Q.**  OKAY.  AND THERE'S SIMILAR VALUES ALL THE WAY DOWN AT THE

13:54     23    OBSERVATION WELLS ON THAT PUMP TEST SITE; RIGHT?  AND THAT'S --

13:54     24    **A.**  WELL, THEY'RE ALL IN THE -- LET'S SEE.  THERE'S -- ONE,

13:54     25    TWO, THREE, FOUR, FIVE -- SIX THAT ARE 10 TO THE MINUS 6 AND --

JONATHAN DAVID ROGERS - CROSS


13:55    1  ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN -- EIGHT OF THEM THAT

13:55    2  ARE IN THE 10 TO THE MINUS 5 RANGE.

13:55    3          **MR. TREEBY:**  AM I GOING BLIND, YOUR HONOR?

13:55    4              CAN YOU BLOW THAT UP BIGGER?  I CAN'T SEE ANY

13:55    5  5S.  OH, THERE'S SOME AT THE BOTTOM.

13:55    6          **THE COURT:**  THERE ARE SOME 5S.

13:55    7          **THE WITNESS:**  SOME 5S AT THE BOTTOM.  OKAY.

13:55    8          **THE COURT:**  NOW, I'M NOT SURE WHAT ALL THIS MEANS.  I

13:55    9  ASSUMING I WILL GET EDUCATED.

13:55   10          **MR. TREEBY:**  NO, NO.  I UNDERSTAND, YOUR HONOR.  AND

13:55   11  I DIDN'T WANT TO GET BOGGED DOWN.  I'M SORRY, YOUR HONOR.

13:55   12          **THE COURT:**  WELL, THAT'S OKAY.

13:55   13          **MR. TREEBY:**  I'LL KEEP TRYING.

13:55   14  **BY MR. TREEBY:**

13:55   15  **Q.**  OKAY.  BUT YOU SAW IN YOUR TESTIMONY THAT THAT'S WHAT YOU

13:55   16  SAID, AND YOU DID A MINUTE AGO AS WELL SAY 10 TO THE MINUS 4 TO

13:55   17  10 TO THE MINUS 6.  BUT THE PERMEABILITY NUMBERS --

13:55   18              DR. ROGERS, I'M SORRY.  DO YOU WANT TO KEEP LOOKING?

13:55   19  **A.**  YEAH.  BECAUSE WHAT I'M CONFUSED ABOUT HERE IS YOU

13:55   20  MENTIONED THE SCHOOL SITE AND THE EBIA SOUTH SITE AND --

13:55   21          **THE COURT:**  WELL, HE'S REFERRING RIGHT NOW TO THE

13:55   22  EBIA SOUTH SITE.  AM I CORRECT, MR. TREEBY?

13:55   23          **MR. TREEBY:**  YES, I AM.

13:55   24          **THE COURT:**  AND SO THE QUESTION IS DIRECTED TO THE

13:56   25  EBIA SOUTH SITE.  I'M LOOKING AT AN EXHIBIT, WHICH APPARENTLY

JONATHAN DAVID ROGERS - CROSS


13:56    1    REPRESENTS THE RESULTS FROM THAT TEST.  THE COURT DOESN'T

13:56    2    PRETEND TO UNDERSTAND ALL THE NUANCES THERE, BUT I'M LOOKING AT

13:56    3    IT.

13:56    4              **MR. TREEBY:**  WELL, WE'LL --

13:56    5              **THE COURT:**  YOU'LL EDUCATE ME AS WE GO ALONG.

13:56    6              **MR. TREEBY:**  WE'LL TRY, AND EDUCATE ME ALONG THE WAY.

13:56    7    **BY MR. TREEBY:**

13:56    8    **Q.**  AND YOU'VE GOT DIFFERENT PERMEABILITY NUMBERS OVER AT YOUR

13:56    9    SCHOOL SITE; RIGHT?

13:56   10    **A.**  RIGHT.

13:56   11    **Q.**  BUT YOU AGREED WITH ME AT YOUR DEPOSITION THAT THE

13:56   12    PERMEABILITY NUMBERS YOU GET AT THE SCHOOL SITE CANNOT BE USED

13:56   13    TO DETERMINE SEEPAGE UNDERNEATH THE IHNC LEVEE; RIGHT?

13:56   14    **A.**  RIGHT.  AND I THINK WHAT YOU -- YOU WERE ASKING ME A

13:56   15    QUESTION THERE AND YOU'RE MIXING THEM, AND THAT'S WHAT I'M

13:56   16    TAKING EXCEPTION TO.

13:56   17    **Q.**  OKAY.  WELL, I DON'T WANT TO --

13:56   18    **A.**  IN THE QUESTION YOU MIXED THEM.

13:56   19    **Q.**  I DON'T WANT TO CONFUSE YOU, AND YOU JUST TELL ME WHAT

13:56   20    CONFUSES YOU AT ANY TIME I CONFUSE YOU.  BECAUSE I'M CAPABLE OF

13:56   21    IT BECAUSE I'M MAYBE CONFUSED MYSELF.

13:56   22              YOU'VE INDICATED THAT YOU PARTICIPATED, I BELIEVE, IN

13:56   23    WHAT IS KNOWN AS THE INDEPENDENT LEVEE INVESTIGATION TEAM

13:56   24    INVESTIGATION; IS THAT RIGHT?

13:56   25    **A.**  YES.

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 13:57 | 1 | **Q.**   AND THAT REPORT WAS A COLLABORATIVE EFFORT BY A NUMBER OF |
| 13:57 | 2 | PEOPLE, INCLUDING DRS. ROBERT BEA AND RAY SEED AT BERKELEY; |
| 13:57 | 3 | RIGHT? |
| 13:57 | 4 | **A.**   YES. |
| 13:57 | 5 | **Q.**   AND I WANT TO SHOW YOU AN EXCERPT.  IT'S JX-1597.  AND I |
| 13:57 | 6 | WANT TO GO TO -- WHAT PAGE?  I DON'T HAVE A PAGE NUMBER. |
| 13:57 | 7 | BUT DO YOU REMEMBER -- DO YOU REMEMBER THAT YOU HAD |
| 13:57 | 8 | SOMETHING TO DO WITH CHAPTER 6 OF THE ILIT REPORT? |
| 13:57 | 9 | **A.**   YEAH.  WHAT IS CHAPTER 6?  REMIND ME AGAIN.  WHAT'S THE |
| 13:57 | 10 | TITLE OF IT?  WHAT EXHIBIT WAS IT AGAIN ON MY DEPOSITION?  I |
| 13:57 | 11 | SHOULD HAVE IT. |
| 13:57 | 12 | **THE COURT:**  YEAH.  WELL, HE'S GOING TO SHOW UP HERE. |
| 13:57 | 13 | MAYBE WE CAN DO BEST FIRST -- WELL, ONCE HE BRINGS IT UP. |
| 13:57 | 14 | **MR. TREEBY:**  YES. |
| 13:57 | 15 | BY MR. TREEBY: |
| 13:57 | 16 | **Q.**   I THINK IT'S -- |
| 13:57 | 17 | **A.**   EXHIBIT 23? |
| 13:57 | 18 | **Q.**   -- PAGE 2 I WANT TO GO TO.  PAGE 2. |
| 13:58 | 19 | **THE COURT:**  IT'S RIGHT ON THE SCREEN, SIR. |
| 13:58 | 20 | BY MR. TREEBY: |
| 13:58 | 21 | **Q.**   YEAH, IT'S RIGHT UP THERE.  AND THE HIGHLIGHTED SECTION, I |
| 13:58 | 22 | THINK YOU CAN READ THAT. |
| 13:58 | 23 | BUT DO YOU REMEMBER BEING AN AUTHOR OF THIS SECTION |
| 13:58 | 24 | OF THIS REPORT? |
| 13:58 | 25 | **A.**   WELL, YEAH.  THERE WAS LIKE 15 OR SO OF US THAT WERE |

JONATHAN DAVID ROGERS - CROSS


13:58    1    CO-AUTHORS OF IT.

13:58    2    **Q.**  RIGHT.

13:58    3           BUT YOU WERE A REVIEWER OF THIS CHAPTER, WERE YOU

13:58    4    NOT?

13:58    5    **A.**  ONE OF THEM, YES.

13:58    6    **Q.**  OKAY.

13:58    7    **A.**  I THINK WE COVERED THIS IN MY DEPOSITION.

13:58    8    **Q.**  WE DID.

13:58    9           **THE COURT:**  RIGHT.  BUT I WASN'T THERE, SIR, SO -- WE

13:58   10    NEED TO MAKE A RECORD HERE.

13:58   11    **BY MR. TREEBY:**

13:58   12    **Q.**  MAYBE WE NEED TO MAKE THAT EXPLANATION, DR. ROGERS.

13:58   13           **THE COURT:**  WHATEVER WAS COVERED IN DEPOSITION IS NOT

13:58   14    IN EVIDENCE.

13:58   15           **MR. TREEBY:**  RIGHT.

13:58   16           **THE WITNESS:**  OKAY.

13:58   17    **BY MR. TREEBY:**

13:58   18    **Q.**  I HAVE TO PUT IN EVIDENCE THINGS YOU SAID IN YOUR

13:58   19    DEPOSITION.

13:58   20    **A.**  OKAY.

13:58   21    **Q.**  SO PARDON ME FOR MAKING YOU GO BACK OVER IT.  THAT'S KIND

13:58   22    OF MY JOB.  OKAY.

13:58   23    **A.**  I JUST DON'T WANT TO SAY SOMETHING THAT'S INCONSISTENT.

13:58   24    THAT'S ALL.  I'M CONCERNED.

13:58   25    **Q.**  I'LL TRY TO PREVENT THAT.

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 13:58 | 1 | AND YOU TESTIFIED IN YOUR DEPOSITION, JUST TO MAKE IT |
| 13:59 | 2 | EASIER, THAT YOU WERE NOT THE PRIMARY AUTHOR OF CHAPTER 6, BUT |
| 13:59 | 3 | YOU WERE RESPONSIBLE FOR REVIEWING IT.  DO YOU RECALL THAT? |
| 13:59 | 4 | **A.**   YES, THAT SOUNDS RIGHT. |
| 13:59 | 5 | **Q.**   OKAY.  AND IN ADDITION TO YOU, DIEGO COBOS-ROA WAS |
| 13:59 | 6 | INVOLVED IN WRITING CHAPTER 6 OF THE ILIT REPORT.  I BELIEVE |
| 13:59 | 7 | YOU'VE TESTIFIED TO THAT.  DO YOU RECALL THAT? |
| 13:59 | 8 | **A.**   YES. |
| 13:59 | 9 | **Q.**   AND XAVIER GRUNAUER -- VERA-GRUNAUER OR GRUNAUER-VERA -- |
| 13:59 | 10 | I'M NEVER SURE WHICH WAY IT GOES -- ALSO MAY HAVE BEEN |
| 13:59 | 11 | INVOLVED.  IS THAT YOUR RECOLLECTION? |
| 13:59 | 12 | **A.**   YES. |
| 13:59 | 13 | **Q.**   YOU'RE AWARE THAT THE PERMEABILITY VALUE THAT WAS |
| 13:59 | 14 | ESTABLISHED IN THE ILIT REPORT FOR WHAT THE REPORT REFERS TO AS |
| 13:59 | 15 | THE MARSH LAYER AT THE EBIA IN CHAPTER 6 WAS 10 TO THE MINUS |
| 13:59 | 16 | 2 CENTIMETERS PER SECOND; RIGHT? |
| 13:59 | 17 | **A.**   THAT WAS WHAT THEY WROTE DOWN THERE, YES. |
| 13:59 | 18 | **Q.**   YES. |
| 13:59 | 19 | AND, IN FACT, YOU WERE SOMEWHAT INVOLVED IN COMING UP |
| 13:59 | 20 | WITH THAT PERMEABILITY OF 10 TO THE MINUS 2 FOR THAT AREA; |
| 13:59 | 21 | ISN'T THAT TRUE? |
| 14:00 | 22 | **A.**   YES, BECAUSE OF WHAT WE HAD SEEN OUT AT 17TH STREET. |
| 14:00 | 23 | **Q.**   RIGHT.  AND THAT'S WHERE I'M HEADED.  AND THIS IS -- |
| 14:00 | 24 | AGAIN, I'M TRYING TO GET THROUGH SOME BACKGROUND. |
| 14:00 | 25 | IN DETERMINING THAT PERMEABILITY NUMBER AT THE EBIA |

JONATHAN DAVID ROGERS - CROSS

14:00    1    FOR THE PURPOSES OF THE ILIT REPORT, YOU WERE INFLUENCED BY

14:00    2    DRILLING THAT YOU OBSERVED ON THE OTHER SIDE OF TOWN ALONG THE

14:00    3    17TH STREET CANAL; IS THAT RIGHT?

14:00    4    A.    THAT'S A FAIR ASSESSMENT OF IT, COUNSELOR.

14:00    5    Q.    SPECIFICALLY, YOU OBSERVED WHEN A SHELBY TUBE WAS PUSHED

14:00    6    INTO THAT SWAMP-MARSH LAYER -- AT LEAST WHAT YOU IDENTIFIED AS

14:00    7    A SWAMP-MARSH LAYER -- ALONG THE 17TH STREET CANAL AND YOU SAW

14:00    8    WATER SQUIRT OUT OF ADJACENT HOLES; ISN'T THAT RIGHT?

14:00    9    A.    YES.

14:00   10    Q.    AND THAT INDICATED TO YOU THAT THE MATERIAL WAS HIGHLY

14:00   11    PERMEABLE; RIGHT?

14:00   12    A.    THAT WAS A VERY SURPRISING RESULT, YEAH.

14:00   13    Q.    NOW, BUT A SIMILAR INCIDENT -- AT LEAST YOU NEVER SAW A

14:00   14    SIMILAR INCIDENT AT THE EBIA; ISN'T THAT RIGHT?

14:00   15    A.    THAT'S CORRECT.

14:00   16    Q.    THIS SQUIRTING INCIDENT AT THE 17TH STREET CANAL, IN PART,

14:00   17    CORRECT ME IF I'M WRONG, EXPLAINS WHERE THE ILIT REPORT'S VERY

14:01   18    HIGH HYDRAULIC CONDUCTIVITY VALUE OF 10 TO THE MINUS 2 CAME

14:01   19    FROM FOR THE EBIA; RIGHT?

14:01   20    A.    YEAH, THAT'S MY HONEST ASSESSMENT OF IT.

14:01   21    Q.    OKAY.  AND YOU CAME TO THINK THAT IT WAS POSSIBLE THAT

14:01   22    ANYTHING THAT'S ORGANIC OR HAS PEATS OR THAT WAS SWAMPY COULD

14:01   23    HAVE A VERY HIGH PERMEABILITY; RIGHT?

14:01   24    A.    AT THAT TIME THAT WAS THE WAY I WAS THINKING, YES.

14:01   25    Q.    ALL RIGHT.  BUT AS FAR AS YOU KNOW, THE INDEPENDENT LEVEE

JONATHAN DAVID ROGERS - CROSS

14:01    1    INVESTIGATION TEAM DID NOT DO ANY SITE-SPECIFIC TESTING IN THE

14:01    2    EBIA TO ASSESS THE PERMEABILITY OF THE SO-CALLED SWAMP OR MARSH

14:01    3    LAYER; RIGHT?

14:01    4    **A.**    THAT'S CORRECT.

14:01    5    **Q.**    OKAY.  AND I JUST WANTED THAT BACKGROUND TO BE THERE

14:01    6    BECAUSE YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT -- AND WE

14:01    7    HOPE TO EDUCATE ALL OF US ABOUT THE DIFFERENCES BETWEEN

14:01    8    SOMETHING LIKE 10 TO THE MINUS 2 AND 10 TO THE MINUS 5 OR 6 --

14:01    9    THOSE ARE ORDERS OF MAGNITUDE DIFFERENCE IN PERMEABILITY, ARE

14:01    10   THEY NOT?

14:01    11   **A.**    YEAH.  IT'S KIND OF LIKE TALKING ABOUT THE NATIONAL DEBT.

14:02    12   **Q.**    RIGHT.

14:02    13           TO OBTAIN THE HYDROGEOLOGIC PROPERTY, SUCH AS

14:02    14   PERMEABILITY, FROM PUMPING TEST DATA, YOUR TEAM USED A COMPUTER

14:02    15   PROGRAM KNOWN AS AQUIFERTEST PRO SOFTWARE; IS THAT RIGHT?

14:02    16   **A.**    YES.

14:02    17   **Q.**    AND KEVIN POPE RAN THE AQUIFERTEST PRO COMPUTER PROGRAM

14:02    18   UNDER YOUR SUPERVISION; IS THAT RIGHT?

14:02    19   **A.**    YES.

14:02    20   **Q.**    AND THAT'S ABOUT THE SITE -- THE EBIA SITE; RIGHT?

14:02    21   **A.**    WELL, BUT WE RAN IT AT BOTH SITES, YES.

14:02    22   **Q.**    WELL, I SAY THE EBIA SITE.  I MEAN, THAT WAS THE SCHOOL

14:02    23   SITE AND THE EBIA SOUTH.

14:02    24           AND THIS WAS IN THE SUMMER OF 2011; RIGHT?

14:02    25   **A.**    YES.  IT MIGHT HAVE BEEN JUST GETTING INTO THE FALL -- I

JONATHAN DAVID ROGERS - CROSS


14:02    1   MEAN, THE FALL SOLSTICE AROUND THE 21ST OF SEPTEMBER AND THAT'S

14:02    2   WHEN WE WERE DOING THE FIRST -- THE PUMP TEST WAS ACTUALLY IN

14:02    3   LATE -- LATE SEPTEMBER, I THINK.

14:02    4   **Q.**   WE DON'T HAVE FALL IN SEPTEMBER.

14:02    5   **A.**   OKAY.

14:02    6   **Q.**   I'M SORRY, DR. ROGERS.

14:02    7   **A.**   I'M JUST TRYING TO BE PRECISE.

14:03    8   **Q.**   AND YOU JUST TESTIFIED THAT KEVIN POPE RAN THAT PROGRAM

14:03    9   UNDER YOUR SUPERVISION, BUT, OF COURSE, YOU KNOW -- YOU ALSO

14:03   10   KNOW HOW TO RUN THESE ANALYSIS; ISN'T THAT RIGHT?

14:03   11   **A.**   I DON'T HAVE AS MUCH EXPERIENCE WITH THEM AS KEVIN DOES

14:03   12   BECAUSE HE DOES THEM, YOU KNOW, WEEK IN AND WEEK OUT ALL THE

14:03   13   TIME.  I HAVEN'T RUN THEM FOR ABOUT A DECADE, SINCE I GOT INTO

14:03   14   ACADEMIA.

14:03   15   **Q.**   OKAY.  I GUESS -- WELL, YOU TOLD ME IN YOUR DEPOSITION

14:03   16   THAT YOU DID KNOW HOW TO RUN THEM.

14:03   17   **A.**   YEAH.  WELL, I TEACH -- I TEACH THAT IN MY CLASSES.

14:03   18   **Q.**   OH, OKAY.

14:03   19   **A.**   WE ACTUALLY DO SIMPLE PROBLEMS IN THE CLASS AND

14:03   20   EVERYTHING.

14:04   21   **Q.**   AND YOU GAVE -- IN YOUR RELIANCE MATERIALS, YOU GAVE THE

14:04   22   DEFENDANTS THE OUTPUT FILES FROM MR. POPE'S COMPUTER RUNS IN

14:04   23   THE FORM OF THOUSANDS OF PAGES OF MATERIAL THAT WAS PART OF

14:04   24   YOUR RELIANCE MATERIALS; RIGHT?

14:04   25   **A.**   OKAY.

JONATHAN DAVID ROGERS - CROSS

14:04    1          **THE COURT:**  IS THAT CORRECT?  YOU JUST SAID --

14:04    2          **THE WITNESS:**  I DON'T KNOW HOW MANY PAGES IT WAS,

14:04    3    SO . . .

14:04    4          **THE COURT:**  OKAY.

14:04    5    **BY MR. TREEBY:**

14:04    6    **Q.**   WELL, OKAY.  AT YOUR DEFINITION YOU SAID:  "THAT'S

14:04    7    CORRECT.  I BELIEVE THAT'S CORRECT."  THAT WAS YOUR ANSWER TO

14:04    8    THAT QUESTION.

14:04    9    **A.**   OKAY.

14:04    10   **Q.**   DO YOU WANT TO CHANGE IT NOW?

14:04    11   **A.**   I STILL DON'T KNOW HOW MANY PAGES.

14:04    12          **THE COURT:**  HE'S QUIBBLING OVER THE AMOUNT OF PAGES.

14:04    13              SO YOU GAVE HIM ALL THE MATERIALS YOU HAD?

14:04    14          **THE WITNESS:**  YEAH, THAT WE HAD.

14:04    15          **THE COURT:**  ALL RIGHT.  THAT'S ALL I NEED.  THANK

14:04    16   YOU.

14:04    17   **BY MR. TREEBY:**

14:04    18   **Q.**   OKAY.  BUT -- AND YOU ARE PERSONALLY COMPETENT TO DO FLOW

14:04    19   ANALYSES, NOT JUST PUMPING TEST ANALYSES; ISN'T THAT TRUE?

14:04    20   **A.**   YES.

14:04    21   **Q.**   AND YOU WOULD AGREE THAT THE ANALYSIS OF GROUNDWATER FLOW

14:04    22   DURING THE KATRINA STORM SURGE WOULD BE A TRANSIENT FLOW

14:04    23   ANALYSIS; RIGHT?  YES OR NO?  AND THEN IF YOU WANT TO EXPLAIN,

14:05    24   PLEASE DO.

14:05    25   **A.**   WELL, IT DEPENDS HOW DEEP YOU'RE TALKING DOWN UNDER THE

JONATHAN DAVID ROGERS - CROSS

14:05    1    GROUND.  THAT'S WHY I'M GIVING THE --

14:05    2          **MR. TREEBY:**  OKAY.  LET'S CALL IT UP.  LET'S PLAY THE

14:05    3    CLIP.

14:05    4          **MR. SIMS:**  YOUR HONOR, I DON'T THINK HE'S HAD A

14:05    5    CHANCE TO FINISH HIS ANSWER ON THAT ONE.  I MEAN, MR. TREEBY'S

14:05    6    WELCOME TO FOLLOW-UP, BUT I DON'T THINK HE FINISHED HIS ANSWER.

14:05    7          **THE COURT:**  ARE YOU FINISHED YOUR ANSWER, SIR?

14:05    8          **THE WITNESS:**  YES.

14:05    9          **THE COURT:**  NOW, HE HASN'T OPINED ON THIS, AND I

14:05   10    DON'T KNOW IF DR. BEA'S TESTIFIED THAT HE'S RELIED ON THIS.  SO

14:05   11    I'M NOT SURE IF WE'RE ELICITING OPINIONS THAT HAVEN'T BEEN

14:05   12    RENDERED.

14:05   13          **MR. TREEBY:**  I HOPE TO CONNECT IT UP SO THAT IT MEANS

14:05   14    SOMETHING TO THE COURT; IF NOT, I WILL HAVE WASTED MY TIME,

14:05   15    YOUR HONOR, BUT I'M TRYING.

14:05   16          **THE COURT:**  OKAY.

14:05   17          **MR. TREEBY:**  OKAY.  LET'S PLAY IT.

14:05   18          (WHEREUPON, THE VIDEO CLIP WAS PLAYED AS FOLLOWS:)

14:05   19          **THE COURT:**  WE'RE HAVING TECHNICAL DIFFICULTIES.

14:05   20          **MR. TREEBY:**  CAN WE HAVE SOME SOUND?

14:05   21          (WHEREUPON, THE VIDEO CLIP WAS PLAYED AS FOLLOWS:)

14:05   22          **MR. TREEBY:**  WHOA, WHOA.  GET IT BACK TO THE

14:05   23    BEGINNING.

13:42   24          (WHEREUPON, THE VIDEO CLIP WAS PLAYED AS FOLLOWS:)

14:05   25          "Q.  AND FIRST, YOU WOULD AGREE THAT THE ANALYSIS OF

JONATHAN DAVID ROGERS - CROSS

14:06    1    GROUNDWATER FLOW DURING THE KATRINA STORM SURGE WOULD BE A

14:06    2    TRANSIENT FLOW ANALYSIS; RIGHT?

14:06    3         "A.  RIGHT."

14:06    4         (WHEREUPON, THE VIDEO CLIP CONCLUDED.)

14:06    5         **MR. TREEBY:**  WELL, WE SEE THE TRANSCRIPT.

14:06    6         **THE COURT:**  I CAN READ IT, YES.

14:06    7         **MR. TREEBY:**  OKAY.

14:06    8    BY MR. TREEBY:

14:06    9    **Q.**   OKAY.  AND IN YOUR REPORT ON PAGE 222, YOU ACTUALLY CITE

14:06   10    TO A REFERENCE BOOK BY FREEZE AND CHERRY, 1979, ENTITLED

14:06   11    *GROUNDWATER*.  THAT'S THE NAME OF THE BOOK; RIGHT?

14:06   12    **A.**   YES.

14:06   13    **Q.**   AND YOU CONSIDER FREEZE AND CHERRY TO BE AN AUTHORITATIVE

14:06   14    REFERENCE BOOK AS IT RELATES TO GROUNDWATER FLOW; RIGHT?

14:06   15    **A.**   YES.  WE HAD THE SAME PH.D. ADVISER AT THE SAME SCHOOL, SO

14:06   16    I KNOW AL FREEZE AND HAVE HEARD LOTS OF LECTURES FROM HIM, AND

14:06   17    THAT'S THE BOOK THAT I USED IN MY GROUNDWATER HYDROLOGY CLASS

14:06   18    IN GRAD SCHOOL.

14:06   19    **Q.**   OKAY.  I WANT TO SHOW YOU AN EXCERPT FROM FREEZE AND

14:07   20    CHERRY PAGES 60 -- FROM JX-1404.

14:07   21         **MR. TREEBY:**  THAT'S THE COVER PAGE.  GO TO 140- --

14:07   22    AND I THINK THE BOTTOM NUMBER IS 0003.  YES, PULL THAT UP.

14:07   23    BY MR. TREEBY:

14:07   24    **Q.**   THAT'S THE TRANSIENT SATURATED FLOW ANALYSIS FORMULA, IS

14:07   25    IT NOT?

JONATHAN DAVID ROGERS - CROSS

14:07     1    **A.**   YES.

14:07     2              **MR. TREEBY:**  AND THEN GO TO THE NEXT PAGE.  AND I

14:07     3    NEED FOR YOU TO HIGHLIGHT THE NEXT TO THE LAST PARAGRAPH, IF

14:07     4    YOU WOULD, ON THE NEXT PAGE, 1404.

14:07     5              NO, ABOVE THAT.  WELL, I CAN'T TELL.  IT'S WHERE

14:07     6    IT SAYS EQUATION 2.76.  0004 --

14:08     7              **THE COURT:**  ARE YOU TALKING ABOUT THE DIFFUSION --

14:08     8              **MR. TREEBY:**  WELL, HERE, I'VE GOT THE POINTER.  I'M

14:08     9    SORRY, I SHOULD HAVE --

14:08    10              **THE COURT:**  THE DIFFUSION EQUATION.

14:08    11              **MR. TREEBY:**  THERE WE GO.

14:08    12    **BY MR. TREEBY:**

14:08    13    **Q.**   DIFFUSION EQUATION, THAT IS THE EQUATION FOR TRANSIENT

14:08    14    FLOW ANALYSIS, IS IT NOT?

14:08    15    **A.**   RIGHT.  THAT MEANS YOU'VE GOT WATER MOVING THROUGH THE

14:08    16    SYSTEM.

14:08    17    **Q.**   RIGHT.

14:08    18              AND TO SOLVE --

14:08    19    **A.**   WHICH IS DIFFERENT FROM -- THAT'S DIFFERENT FROM WHAT I

14:08    20    WAS TALKING ABOUT BEFORE WITH WHAT WE'RE ENCOUNTERING AT THE

14:08    21    DAMS --

14:08    22    **Q.**   I'M NOT ASKING YOU ABOUT THAT.

14:08    23    **A.**   OKAY.

14:08    24    **Q.**   I'M ASKING YOU ABOUT THIS.

14:08    25    **A.**   ALL RIGHT.

JONATHAN DAVID ROGERS - CROSS

14:08    1    **Q.**   OKAY.  AND TO SOLVE A TRANSIENT FLOW PROBLEM, ONE REQUIRES

14:08    2    KNOWLEDGE OF THREE BASIC HYDROGEOLOGIC PARAMETERS; ISN'T THAT

14:08    3    RIGHT?

14:08    4    **A.**   RIGHT.

14:08    5    **Q.**   AND THOSE THREE BASIC HYDROGEOLOGICAL PARAMETERS, AS SHOWN

14:08    6    ON THE BOTTOM OF -- RIGHT HERE IN THIS WHAT WE'VE HIGHLIGHTED,

14:08    7    ARE:  HYDRAULIC CONDUCTIVITY, COMPRESSIBILITY AND POROSITY;

14:08    8    ISN'T THAT CORRECT?

14:09    9    **A.**   RIGHT.

14:09   10    **Q.**   THE LETTER "N" IS POROSITY; RIGHT?

14:09   11    **A.**   RIGHT.

14:09   12    **Q.**   THE "ALPHA" IS THE COMPRESSIBILITY OF THE AQUIFER; RIGHT?

14:09   13    **A.**   RIGHT.

14:09   14    **Q.**   AND THE LETTER "K" IS THE PERMEABILITY OR HYDRAULIC

14:09   15    CONDUCTIVITY; RIGHT?

14:09   16    **A.**   RIGHT.

14:09   17    **Q.**   AND ONE OF THE HYDROGEOLOGIC PROPERTIES THAT YOU

14:09   18    OBTAINED --

14:09   19            **MR. TREEBY:**  THAT'S ENOUGH FOR THAT.

14:09   20    **BY MR. TREEBY:**

14:09   21    **Q.**   -- THAT YOU OBTAINED FROM THE SOILS ANALYZED IN YOUR

14:09   22    PUMPING TEST RESULTS WAS STORAGE COEFFICIENT; RIGHT?

14:09   23    **A.**   THAT COMES OUT OF THE AQUATEST --

14:09   24    **Q.**   YES.

14:09   25    **A.**   -- PRO ANALYSIS.

JONATHAN DAVID ROGERS - CROSS

14:09    1    **Q.**   AND COMPRESSIBILITY AS A BASIC HYDROGEOLOGICAL PARAMETER

14:09    2    IS DIRECTLY RELATED TO STORAGE COEFFICIENT; RIGHT?

14:09    3    **A.**   CORRECT.

14:09    4    **Q.**   YOU WOULD AGREE, WOULD YOU NOT, THAT TRANSLATING THE

14:09    5    STORAGE COEFFICIENT INTO A COMPRESSIBILITY VALUE, THAT FREEZE

14:09    6    AND CHERRY SAYS IS A BASIC PARAMETER, IS IMPORTANT FOR DOING A

14:10    7    TRANSIENT SEEPAGE ANALYSIS; RIGHT?

14:10    8    **A.**   RIGHT.

14:10    9    **Q.**   AND THAT'S IN SATURATED SOILS; RIGHT?

14:10   10    **A.**   YEAH.  IF YOU WANTED TO KNOW HOW MUCH WATER WAS FLOWING

14:10   11    THROUGH IT, THAT'S SOMETHING YOU WOULD NEED TO KNOW.

14:10   12    **Q.**   OKAY.  YOU HAVE THIS KNOWLEDGE, YOU OBVIOUSLY -- YOU

14:10   13    EITHER TRAINED WITH OR AT THE SAME TIME OR UNDER ONE OF THESE

14:10   14    TWO AUTHORS, BUT YOU WEREN'T ASKED TO PERFORM A SEEPAGE

14:10   15    ANALYSIS IN THIS CASE; RIGHT?

14:10   16    **A.**   NO.

14:10   17    **Q.**   YOU WERE JUST PROVIDING INPUTS TO DR. BEA AND HE WAS DOING

14:10   18    THE SEEPAGE ANALYSIS; RIGHT?

14:10   19    **A.**   I THINK HE HAD DIEGO COBOS-ROA DOING THE SEEPAGE ANALYSIS.

14:10   20    **Q.**   UNDER HIS SUPERVISION?

14:10   21    **A.**   YES.

14:10   22    **Q.**   AND DR. BEA NEVER ASKED YOU FOR THE STORAGE COEFFICIENT

14:10   23    THAT YOU PRODUCED AS A MATTER OF COURSE FROM THE PUMPING TEST

14:10   24    ANALYSIS; RIGHT?

14:10   25    **A.**   NOT THAT I RECALL, NO.

JONATHAN DAVID ROGERS - CROSS

14:10   1   **Q.**   OKAY.  I'M GOING TO SHOW YOU JX-1598-001 THROUGH 0015.

14:11   2   I'M NOT GOING TO GO THROUGH ALL THESE PAGES.  I'M JUST GOING TO

14:11   3   LOOK AT PROBABLY THE TOP ONE.

14:11   4           OKAY.  I THINK WE JUST LOOKED AT THIS, DID WE NOT?

14:11   5           **THE COURT:**  WE DID.  WE DID.  I HOPE SO.

14:11   6           **MR. TREEBY:**  YEAH, WE DID.  BUT I'M LOOKING AT A

14:11   7   DIFFERENT PARAMETER HERE.

14:11   8           **THE COURT:**  RIGHT.

14:11   9   **BY MR. TREEBY:**

14:11   10  **Q.**   BECAUSE NOT ONLY --

14:11   11          **MR. TREEBY:**  IF YOU WOULD BLOW UP THAT TABLE AT THE

14:11   12  BOTTOM RIGHT HERE.

14:11   13  **BY MR. TREEBY:**

14:11   14  **Q.**   NOT ONLY DOES IT SHOW HYDRAULIC CONDUCTIVITY IN

14:11   15  CENTIMETERS PER SECOND, BUT IT ALSO -- AND THIS WAS, AS YOU

14:11   16  SAID, AN AUTOMATIC OUTPUT OF YOUR TESTS?

14:11   17  **A.**   RIGHT.

14:11   18  **Q.**   -- IT ALSO DETERMINES STORAGE COEFFICIENT, AND THESE ARE

14:11   19  THE STORAGE COEFFICIENTS FOUND AT EACH OF THE OBSERVATION WELLS

14:11   20  AND THE PUMPING WELL; RIGHT?

14:11   21  **A.**   CORRECT.  AND IF YOU GO BACK ONE --

14:11   22          **THE COURT:**  I CAN'T HEAR YOU.

14:11   23          **THE WITNESS:**  IF YOU GO BACK TO THE BIG PICTURE OF

14:12   24  THE WHOLE PAGE.  I DON'T KNOW IF I CAN POINT WITH THIS THING ON

14:12   25  THE SCREEN.

JONATHAN DAVID ROGERS - CROSS

14:12    1    **BY MR. TREEBY:**

14:12    2    **Q.**   IS THIS SOMEHOW IN ANSWER TO MY LAST QUESTION?

14:12    3    **A.**   YEAH.  I JUST WANTED YOU TO KNOW THIS.

14:12    4              IS THIS GOING TO SHOW UP?  OKAY.

14:12    5              THIS LINE -- THIS JAGGED LINE IS THE ACTUAL DATA, AND

14:12    6    THEN THAT NICE, PRETTY CURVED LINE, THAT IS THE ASSUMED

14:12    7    SOLUTION FOR IT -- MATHEMATICAL SOLUTION THAT GIVES YOU THOSE

14:12    8    ANSWERS.

14:12    9    **Q.**   OKAY.

14:12   10    **A.**   SO . . .

14:12   11    **Q.**   NOW --

14:12   12    **A.**   OOPS.  HOW DO I GET RID OF THOSE?

14:12   13              **THE COURT:**  I CAN DO THAT, I THINK.

14:12   14    **BY MR. TREEBY:**

14:12   15    **Q.**   AND, DR. ROGERS, YOU WOULD AGREE, WOULD YOU NOT, THAT YOU

14:12   16    NEED THE STORAGE COEFFICIENT TO PROVIDE A COMPLETE SITE

14:12   17    CHARACTERIZATION FOR A TRANSIENT SEEPAGE ANALYSIS; RIGHT?

14:12   18    **A.**   YEAH, FOR A TRANSIENT SEEPAGE ANALYSIS.

14:12   19    **Q.**   THAT'S ALL I'M ASKING.

14:12   20    **A.**   YEAH.

14:12   21    **Q.**   OKAY.  YOU JUST SAVED SOME TIME THERE.

14:13   22              AND ONE OF THE MAIN PURPOSES OF YOUR REPORT, I

14:13   23    BELIEVE YOU TESTIFIED, WAS TO PROVIDE DR. BEA WITH A COMPLETE

14:13   24    SITE CHARACTERIZATION FOR HIS SEEPAGE ANALYSIS; RIGHT?

14:13   25    **A.**   RIGHT.

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 14:13 | 1 | **Q.**  NOW, BASED ON YOUR ANALYSES AND WHAT YOU OBSERVED AND ALL |
| 14:13 | 2 | THE TESTS THAT YOU'VE NOW SEEN, THAT WE'VE PAID FOR, YOU WOULD |
| 14:13 | 3 | AGREE THAT THE ORGANIC -- YOU KNOW THE JOKE, IT IS THAT -- |
| 14:13 | 4 | YOU'D AGREE THAT THE ORGANIC SOILS IN THE EAST BANK INDUSTRIAL |
| 14:13 | 5 | AREA ARE COMPRESSIBLE; RIGHT? |
| 14:13 | 6 | **A.**  OKAY.  WELL, WE GOT -- THAT'S A -- |
| 14:13 | 7 | **Q.**  WELL, THAT'S A YES OR NO FIRST. |
| 14:13 | 8 | **A.**  THAT'S A LOADED QUESTION. |
| 14:13 | 9 | **THE COURT:**  IT COULD BE, "I DON'T KNOW."  THAT'S ALSO |
| 14:13 | 10 | POSSIBLE.  BUT WHATEVER YOUR ANSWER IS, YOU NEED TO ANSWER IT. |
| 14:13 | 11 | **THE WITNESS:**  THERE'S SOILS AND THEN THERE'S A LAYER |
| 14:13 | 12 | OF DREDGE TAILINGS.  SO THERE'S NATIVE SOILS AND THERE'S |
| 14:13 | 13 | MAN-MADE SOILS. |
| 14:13 | 14 | **MR. TREEBY:**  I ASKED FOR ORGANIC SOILS. |
| 14:13 | 15 | **THE COURT:**  OKAY.  BUT WE NEED A -- IF HE CAN.  IF |
| 14:13 | 16 | YOU CAN ANSWER THE QUESTION, YOU MUST DO SO. |
| 14:14 | 17 | WOULD YOU REPEAT THE QUESTION? |
| 14:14 | 18 | **THE WITNESS:**  YEAH, WHAT'S THE QUESTION AGAIN? |
| 14:14 | 19 | BY MR. TREEBY: |
| 14:14 | 20 | **Q.**  BASED ON YOUR ANALYSES, YOU WOULD AGREE, WOULD YOU NOT, |
| 14:14 | 21 | THAT THE ORGANIC SOILS IN THE EAST BANK INDUSTRIAL AREA ARE |
| 14:14 | 22 | COMPRESSIBLE; RIGHT? |
| 14:14 | 23 | **A.**  YES, THEY ARE COMPRESSIBLE. |
| 14:14 | 24 | **Q.**  AND THE HIGHER THE ORGANIC CONTENT, THE MORE COMPRESSIBLE |
| 14:14 | 25 | THE SOILS GENERALLY WILL BE; RIGHT? |

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 14:14 | 1 | **A.**   YES. |
| 14:14 | 2 | **Q.**   OKAY.  NOW I WANT TO TALK A LITTLE BIT ABOUT STANDARD OF |
| 14:14 | 3 | CARE. |
| 14:14 | 4 | AT THE TIME, AT LEAST OF YOUR DEPOSITION, YOU DID NOT |
| 14:14 | 5 | HAVE ANY PERSONAL EXPERIENCE WORKING UNDER -- WORKING WITH, I |
| 14:14 | 6 | SHOULD SAY, A TERC; AM I RIGHT? |
| 14:14 | 7 | **A.**   RIGHT.  I'VE HEARD ALL ABOUT THEM BECAUSE WE'VE DONE HTRW |
| 14:15 | 8 | PROJECTS FOR THE DEPARTMENT OF ENERGY AND FOR THE NAVY, BUT I |
| 14:15 | 9 | HAD NOT WORKED UNDER A TERC. |
| 14:15 | 10 | **Q.**   OKAY.  AND YOU DON'T HAVE ANY PERSONAL EXPERIENCE WORKING |
| 14:15 | 11 | UNDER AN INDEFINITE DELIVERY, INDEFINITE QUANTITY CONTRACT WITH |
| 14:15 | 12 | THE CORPS OF ENGINEERS; CORRECT? |
| 14:15 | 13 | **A.**   WELL, YES.  SURE.  I FOUND OUT LATER THAT THAT'S THE KIND |
| 14:15 | 14 | OF CONTRACT I HAVE ON THE INDEPENDENT EXTERNAL PEER REVIEWS |
| 14:15 | 15 | THAT I'M DOING FOR THE DAM CONSTRUCTION PROJECTS.  THOSE ARE |
| 14:15 | 16 | IDIQS. |
| 14:15 | 17 | **Q.**   BUT YOU DIDN'T KNOW IT AT THE TIME OF YOUR DEPOSITION? |
| 14:15 | 18 | **A.**   NO, I DIDN'T. |
| 14:15 | 19 | **Q.**   OKAY.  AND, ALSO, YOU DIDN'T REVIEW THE TERC AT ISSUE IN |
| 14:15 | 20 | THIS CASE WHEN PREPARING YOUR EXPERT OPINIONS ON STANDARD OF |
| 14:15 | 21 | CARE; ISN'T THAT RIGHT? |
| 14:15 | 22 | **A.**   RIGHT. |
| 14:15 | 23 | **Q.**   AND YOU ALSO DIDN'T REVIEW -- PRIOR TO YOUR REPORT AND |
| 14:15 | 24 | DEPOSITION, YOU DIDN'T REVIEW TASK ORDER 26 OR ANY OF THE |
| 14:15 | 25 | MODIFICATIONS TO TASK ORDER 26; RIGHT? |

JONATHAN DAVID ROGERS - CROSS

14:15    1    **A.**    THAT TURNED OUT -- THAT TURNED OUT THAT I WAS WRONG ON

14:16    2    THAT.  I DIDN'T REALIZE IT WAS TASK ORDER 26 BECAUSE IT DIDN'T

14:16    3    HAVE A BIG SIGN ON IT THAT SAYS "TASK ORDER 26."  IT'S VERY

14:16    4    SMALL PRINTING DOWN THE MIDDLE AND THERE'S A LITTLE 00026.  SO

14:16    5    WHEN YOU HAD ASKED ME THAT, I HAD NO RECOLLECTION OF SEEING --

14:16    6              I WAS THINKING OF SOMETHING WITH A BIG COVER, "CORPS

14:16    7    OF ENGINEERS," THE CASTLE, "TASK ORDER 26."  SO I ANSWERED

14:16    8    INCORRECTLY TO THAT.  I DID KNOW ABOUT IT, I HAD SEEN IT, AND I

14:16    9    HAD THE FIRST 20 MODS LISTED IN MY REPORT.

14:16   10    **Q.**    WE SHOWED THE DOCUMENT TO YOU, DID WE NOT, AT THE

14:16   11    DEFINITION?  DON'T YOU RECALL THAT?

14:16   12    **A.**    NO, I DON'T.  YOU MIGHT HAVE.

14:16   13    **Q.**    OKAY.  WELL, IT'S -- LET'S CALL IT UP.  IT'S

14:16   14    JX-00049-0001.  AND THIS INFORMED OUR CROSS-EXAMINATION OF YOU

14:16   15    AT THE DEPOSITION, OKAY?

14:16   16    **A.**    RIGHT.

14:16   17    **Q.**    THIS IS THE DOCUMENT THAT TASK ORDER 26 IS.

14:16   18    **A.**    RIGHT.

14:16   19              **MR. TREEBY:**  AND WOULD YOU PULL IT UP AT THE TOP SO

14:16   20    THAT EVERYBODY CAN READ IT?  RIGHT AT THE "ORDER FOR SUPPLIES,"

14:17   21    RIGHT CROSS THE TOP.

14:17   22    **BY MR. TREEBY:**

14:17   23    **Q.**    DO YOU RECALL ME SHOWING YOU THIS DOCUMENT?  DO YOU SEE

14:17   24    "26" UNDER "DELIVERY ORDER NUMBER"?

14:17   25    **A.**    YEAH.  IT'S REAL HARD TO SEE.  WHAT I REMEMBER IS HOW HARD

JONATHAN DAVID ROGERS - CROSS

14:17    1    IT WAS TO SEE THE 26.  THAT'S WHAT I REMEMBER.  YEAH, THERE IS

14:17    2    IT.  THOSE ARE THE ORDER NUMBERS.

14:17    3    **Q.**   BUT I SHOWED IT TO YOU; RIGHT?

14:17    4    **A.**   YES, I REMEMBER THAT.

14:17    5    **Q.**   AND YOU SAID YOU'D NEVER SEEN IT BEFORE; RIGHT?

14:17    6    **A.**   WELL, I HADN'T SEEN THIS PAGE OF IT, NO.  SEE, THAT'S JUST

14:17    7    THE CONTRACT COVER.  I HAD LOOKED AT THE BODY OF THE ORDER.

14:17    8    IT'S NOT REAL LONG.

14:17    9    **Q.**   GO JUST GO -- TO THE NEXT PAGE.

14:17   10    **A.**   OKAY.

14:17   11    **Q.**   GO TO THE NEXT PAGE.

14:17   12            THIS WAS ALL IN THE DOCUMENT THAT WAS EXHIBIT 15 TO

14:17   13    YOUR DEPOSITION?

14:17   14    **A.**   RIGHT.

14:17   15    **Q.**   READ THAT AT THE TOP, IF YOU WOULD.

14:17   16            **MR. TREEBY:**  BLOW IT UP AT THE TOP.

14:17   17            **THE WITNESS:**  RIGHT.  YEAH, I HAD EVEN -- I -- IT

14:17   18    JUST DOESN'T HAVE BIG HUGE WORDS SAYING "TASK ORDER 26."  YEAH,

14:18   19    THERE IT IS, AND IT'S PRETTY SMALL.  SO I JUST MISSED THAT

14:18   20    ASPECT OF IT.  YOU GUYS ARE ALL FAMILIAR WITH IT AND THAT'S

14:18   21    WHAT YOU CALL IT, BUT I JUST HADN'T RECALLED IT WHEN YOU WERE

14:18   22    DEPOSING ME.

14:18   23            **THE COURT:**  HAD YOU RENDERED A REPORT AT THAT TIME?

14:18   24            **THE WITNESS:**  YES, I HAD.

14:18   25            **THE COURT:**  AND WERE -- WAS THERE ANY REFERENCE TO

JONATHAN DAVID ROGERS - CROSS

14:18    1    MATERIAL FROM TASK ORDER 26 IN YOUR REPORT?

14:18    2              **THE WITNESS:**  YES.  YES, THERE WAS.

14:18    3              **THE COURT:**  OKAY.

14:18    4              **THE WITNESS:**  PIECES HAVE BEEN GIVEN TO ME.  BUT I

14:18    5    DIDN'T HAVE THE -- YOU KNOW, WHEN I WAS GIVEN THESE THINGS, I

14:18    6    DIDN'T REMEMBER SEEING "TASK ORDER 26."  AND SO WHEN I PREPARED

14:18    7    THE REPORT AND SENT IT TO THE ATTORNEYS, THEY ADDED "TASK

14:18    8    ORDER 26" RIGHT IN THERE TO IT AND I SAID, "OH, OKAY.  THAT'S

14:18    9    WHAT THAT WAS CALLED."

14:18   10              **MR. TREEBY:**  YOUR HONOR, I DON'T KNOW ABOUT THAT.

14:18   11    BY MR. TREEBY:

14:18   12    **Q.**   WOULD YOU AGREE WITH ME, OR CAN YOU AGREE WITH ME, OR WE

14:18   13    CAN PROVE IT LATER, IF WE NEED TO, TASK -- THIS DOCUMENT -- THE

14:18   14    ENTIRE DOCUMENT DOESN'T APPEAR IN YOUR RELIANCE MATERIALS?

14:19   15              AND LET ME USE THE RIGHT TERM.  DOESN'T APPEAR IN

14:19   16    YOUR MATTERS CONSIDERED.

14:19   17              **MR. SIMS:**  I'M GOING TO OBJECT, YOUR HONOR, ON THE

14:19   18    GROUND OF VAGUE.  I'M NOT SURE WHAT HE MEANS BY "MATTERS

14:19   19    CONSIDERED."

14:19   20              **MR. TREEBY:**  THE FEDERAL RULES TALK ABOUT MATTERS

14:19   21    CONSIDERED.  THAT'S WHAT'S SUPPOSED TO BE ATTACHED TO AN EXPERT

14:19   22    REPORT.  THAT'S WHAT I MEAN BY "MATTERS CONSIDERED."

14:19   23              **THE COURT:**  I UNDERSTAND WHAT IT IS.

14:19   24    BY MR. TREEBY:

14:19   25    **Q.**   YOU WERE ASKED TO PROVIDE EVERYTHING THAT YOU LOOKED AT IN

JONATHAN DAVID ROGERS - CROSS


14:19    1   CONNECTION WITH YOUR REPORT, WERE YOU NOT?

14:19    2   **A.**   YEAH.  I MEAN, I LISTED THE FIRST 20 MODS OUT OF 56 MODS

14:19    3   IN MY EXPERT REPORT.

14:19    4          **THE COURT:**  TELL ME WHAT THE MOD IS SO I UNDERSTAND

14:19    5   IT.  MR. TREEBY MAY, BUT JUST TELL ME SPECIFICALLY.

14:19    6          **THE WITNESS:**  MODIFICATIONS WHEN THEY GET OUT THERE

14:19    7   ON THE JOB --

14:19    8          **THE COURT:**  ALL RIGHT.

14:19    9          **THE WITNESS:**  -- THEY MAKE.  IT'S A --

14:19   10          **MR. TREEBY:**  TASK ORDER 26 AND THEN THERE WERE

14:19   11   MODIFICATIONS TO TASK ORDER 26.

14:19   12          **THE COURT:**  OF COURSE.  I UNDERSTAND THAT.  WE'RE

14:19   13   TALKING ABOUT MODIFICATIONS TO THE ORIGINAL TASK ORDER THAT YOU

14:19   14   LISTED IN YOUR REPORT.

14:19   15          **THE WITNESS:**  RIGHT, RIGHT.

14:19   16          **THE COURT:**  OKAY.

14:19   17          **THE WITNESS:**  AND THAT'S WHAT YOU'D EXPECT ON THIS

14:19   18   KIND OF A JOB, ON AN HTRW JOB.

14:19   19   **BY MR. TREEBY:**

14:19   20   **Q.**   WELL, IN ANY CASE, BASED ON YOUR INVESTIGATION, YOU DIDN'T

14:19   21   FIND ANYTHING THAT WOULD INDICATE THAT WASHINGTON GROUP WAS

14:20   22   AUTHORIZED BY THE CORPS OF ENGINEERS TO DO ANY GEOTECHNICAL

14:20   23   ENGINEERING RELATIVE TO THE LEVEES AND FLOODWALLS ALONG THE

14:20   24   EAST BANK INDUSTRIAL AREA; RIGHT?

14:20   25   **A.**   RIGHT.  THEY NEVER ASKED TO DO IT.

JONATHAN DAVID ROGERS - CROSS

14:20    1    **Q.**   AND, OF COURSE, YOU UNDERSTAND THAT IN AN ID- -- NOW
14:20    2    YOU'RE EVEN DOING ONE -- IN AN IDIQ CONTRACT, IN ORDER FOR
14:20    3    WASHINGTON GROUP INTERNATIONAL TO ASSIGN PROFESSIONALS TO THIS
14:20    4    TASK ORDER, THEY HAVE TO HAVE APPROVAL FROM THE CORPS; RIGHT?
14:20    5    **A.**   RIGHT.  THEY HAVE TO HAVE SHOOT SOMETHING UP THE CHAIN AND
14:20    6    ASK AND JUSTIFY BRINGING THAT PERSON ONTO THE PROJECT AND HAVE
14:20    7    A COST JUSTIFICATION FOR IT AS WELL AS A TECHNICAL
14:20    8    JUSTIFICATION.
14:20    9             AND IT USUALLY HAS TO GET SIGNED OFF AT SEVERAL
14:20   10    LEVELS TO GET APPROVED.
14:20   11    **Q.**   BECAUSE THE CORPS HAS A REPRESENTATIVE OUT THERE IN THE
14:20   12    FIELD ON A DAILY BASIS WHILE WASHINGTON GROUP WAS PERFORMING
14:20   13    THEIR WORK; RIGHT?
14:20   14    **A.**   THAT'S CORRECT.  THAT'S WHAT I'VE BEEN TOLD ANYWAY, YES.
14:20   15    I WASN'T THERE.
14:20   16    **Q.**   WELL, YOU WOULD AGREE THE CORPS IS GENERALLY GOING TO HAVE
14:21   17    A REPRESENTATIVE OUT THERE IN THE FIELD WHILE THEY'RE DOING THE
14:21   18    WORK; RIGHT?
14:21   19    **A.**   YEAH.  THEY SHOULD HAVE SOMEBODY THERE, YES.
14:21   20    **Q.**   AND YOU WOULD AGREE THAT WASHINGTON GROUP AND THE CORPS
14:21   21    WOULD COMMUNICATE ON A DAY-TO-DAY BASIS; CORRECT?
14:21   22    **A.**   YEAH, THAT'S THE NATURE OF A TERC CONTRACT.
14:21   23    **Q.**   YOU'VE OPINED THAT:  "TO THE EXTENT WASHINGTON GROUP
14:21   24    INTERNATIONAL'S WORK IN THE EAST BANK INDUSTRIAL AREA" -- AND
14:21   25    I'M QUOTING YOU -- "CREATED A HOLE, TRENCH OR OTHER OPENING,

JONATHAN DAVID ROGERS - CROSS

14:21    1    WASHINGTON GROUP WAS REQUIRED TO BACKFILL THE OPENING WITH

14:21    2    PROPER MATERIALS AND THEN PROPERLY COMPACT THAT MATERIAL."

14:21    3    RIGHT?

14:21    4    **A.**    RIGHT.

14:21    5    **Q.**    AND BY "PROPER MATERIALS," YOU MEAN SOMETHING THAT'S

14:21    6    APPROVED BY THE OWNER, THE CORPS OF ENGINEERS; RIGHT?

14:21    7    **A.**    WELL, YEAH.  THE CORPS OF ENGINEERS IS THE WORLD'S LARGEST

14:21    8    ENGINEERING ORGANIZATION, SO THAT'S A -- I DIDN'T QUALIFY IT BY

14:21    9    SAYING WHO AT THE CORPS OF ENGINEERS.  I JUST SAID, YES, IT

14:21    10   NEEDS TO RUN UP THE FLAG OF CHAIN OF COMMAND TO GET APPROVED BY

14:22    11   EVERYBODY WHO'S APPROPRIATE TO APPROVE IT.

14:22    12   **Q.**    OKAY.  LET ME CALL UP YOUR TESTIMONY.  MAYBE YOU'VE

14:22    13   FORGOTTEN WHAT YOU SAID.

14:22    14   **A.**    YOU ALWAYS SAID IN MY DEPOSITION "CORPS APPROVAL."  AND TO

14:22    15   AN ENGINEER LIKE ME, "CORPS APPROVAL" MEANS MORE THAN -- IF

14:22    16   IT'S SOMETHING THAT HAS TO DO WITH ENGINEERING, IT MEANS MORE

14:22    17   THAN JUST THE CONSTRUCTION MANAGER THAT'S ON THE SITE.

14:22    18            SO THAT'S WHY WE GOT INTO A -- I WAS -- I WAS

14:22    19   THINKING WE'RE TALKING ENGINEERS OVER AN ENGINEERING DIVISION

14:22    20   AND YOU'RE TALKING ABOUT A CONSTRUCTION MANAGER.  AND SO WE

14:22    21   MISSED EACH OTHER BY A COUNTRY MILE ON THAT SET OF QUESTIONS.

14:22    22            I JUST WANT TO MAKE -- THAT BECAME ABUNDANTLY CLEAR

14:22    23   AFTER MY DEPOSITION THAT I HAD MISUNDERSTOOD WHAT YOU MEAN BY

14:22    24   "CORPS APPROVAL."

14:22    25   **Q.**    NOW, WE'LL GET THERE.  BUT JUST SO THAT WE GET THE RECORD

JONATHAN DAVID ROGERS - CROSS


14:22   1   CLEAR, I WANT TO PULL UP PAGE 174 OF YOUR DEPOSITION TO MAKE

14:23   2   SURE YOU'RE NOT NOW CHANGING YOUR UNDERSTANDING.

14:23   3        **MR. TREEBY:**  MARCH 17, '12, PAGE 174, BEGINNING AT

14:23   4   LINE 7, HIGHLIGHT UP TO LINE 18.  7 THROUGH 18.

14:23   5   **BY MR. TREEBY:**

14:23   6   **Q.**   NOW, THERE WAS SOME INTERRUPTION HERE.  I START MY

14:23   7   QUESTION, PAGE 228:

14:23   8            "Q.   THE SENTENCE THAT BEGINS, 'TO THE EXTENT' -- DO

14:23   9        YOU SEE THAT?

14:23   10           "A.   YES.

14:23   11           "Q.   -- THIS WORK CREATED A HOLE, TRENCH OR OTHER

14:23   12       OPENING, WASHINGTON GROUP AND THE CORPS WERE REQUIRED TO

14:23   13       BACKFILL THE OPENING WITH PROPER MATERIALS AND THEN

14:23   14       PROPERLY COMPACT THAT MATERIAL.

14:23   15           "OKAY.  AS YOU USE IT THERE, WHAT ARE 'PROPER

14:23   16   MATERIALS'?"

14:23   17           HERE'S WHAT YOU ANSWERED:

14:23   18           "A.   SOMETHING THAT'S APPROVED BY THE OWNER, BY THE

14:23   19       CORPS."

14:23   20   **A.**   RIGHT.

14:23   21   **Q.**   DO YOU CHANGE THAT NOW?

14:23   22   **A.**   YEAH.  WELL, WHEN I SAY "THE CORPS," I'M ASSUMING

14:23   23   ENGINEERING DIVISION AT THE CORPS, NOT JUST A CONSTRUCTION

14:23   24   MANAGER IN A PICKUP TRUCK WITH A HARD HAT ON THE SITE.

14:23   25           **THE COURT:**  THE COURT WILL MAKE THE INTERPRETATION

JONATHAN DAVID ROGERS - CROSS


14:23    1    THERE.

14:23    2    **BY MR. TREEBY:**

14:23    3    **Q.**    DID YOU REVIEW AND SIGN YOUR DEPOSITION?

14:23    4    **A.**    YEAH.

14:24    5    **Q.**    DID YOU?

14:24    6    **A.**    YES, I DID.  I DID A VERY DETAILED REVIEW OF IT.

14:24    7    **Q.**    AND DID YOU MAKE ANY CHANGES IN THIS SECTION OF YOUR

14:24    8    DEPOSITION?

14:24    9    **A.**    NO.  BECAUSE I JUST CHANGED THE THINGS THAT WERE

14:24   10    TYPOGRAPHICAL ERRORS.

14:24   11    **Q.**    OKAY.  YOU PRESUMED THAT THE BACKFILL MATERIAL FOR EVERY

14:24   12    SUCH HOLE, TRENCH OR OPENING WAS, IN FACT, APPROVED BY THE

14:24   13    CORPS OF ENGINEERS; RIGHT?

14:24   14    **A.**    THAT'S HOW YOU REPRESENTED IT TO ME IN THE QUESTIONS, YES.

14:24   15    **Q.**    YOU'VE PRESUM- -- YOU PRESUMED THAT, DID YOU NOT?

14:24   16    **A.**    YES, I DID.

14:24   17    **Q.**    "INDEED, WASHINGTON GROUP'S WORK PLANS WERE REVIEWED AND

14:24   18    APPROVED BY THE CORPS BEFORE WORK BEGAN."

14:24   19            THAT'S WHAT YOU SAID; RIGHT?

14:24   20    **A.**    YES.

14:24   21    **Q.**    AND THE CORPS OF ENGINEERS MONITORED -- AND BY THE WAY,

14:24   22    BEFORE THAT, YOU CITED TO LEE GUILLORY AND/OR JIM MONTEGUT FROM

14:24   23    THE CORPS; RIGHT?

14:24   24    **A.**    RIGHT.

14:24   25    **Q.**    BOTH ENGINEERS, BOTH EXPERIENCED ENGINEERS, IS THAT RIGHT,

JONATHAN DAVID ROGERS - CROSS

| | | |
|---|---|---|
| 14:24 | 1 | OR DO YOU KNOW? |
| 14:24 | 2 | **A.**  WELL, LATER, I -- AFTER THE DEPOSITION, I READ THEIR |
| 14:25 | 3 | ENTIRE DEP- -- AFTER MY DEPOSITION, I READ THEIR ENTIRE |
| 14:25 | 4 | DEPOSITIONS AND THEN I FOUND ONLY ONE OF THEM IS REGISTERED AND |
| 14:25 | 5 | NEITHER ONE OF THEM HAVE GEOTECHNICAL EXPERTISE. |
| 14:25 | 6 | **Q.**  YOU'RE NOT REGISTERED IN THE STATE OF LOUISIANA, ARE YOU? |
| 14:25 | 7 | **THE COURT:**  THE COURT WILL MAKE A DETERMINATION OF |
| 14:25 | 8 | WHAT HE MEANT BY "THE CORPS."  WE CAN GO ON ALL DAY ABOUT THIS. |
| 14:25 | 9 | **MR. TREEBY:**  OKAY.  NO, YOUR HONOR.  OKAY.  LET ME |
| 14:25 | 10 | CONTINUE. |
| 14:25 | 11 | **THE COURT:**  AND COMMON SENSE WILL PLAY A PART. |
| 14:25 | 12 | GO AHEAD. |
| 14:25 | 13 | **MR. TREEBY:**  THANK YOU, YOUR HONOR, FOR CURBING ME. |
| 14:25 | 14 | **THE COURT:**  WELL, I DON'T WANT TO OVERLY CURB YOU. |
| 14:25 | 15 | GO AHEAD. |
| 14:25 | 16 | BY MR. TREEBY: |
| 14:25 | 17 | **Q.**  AND YOU TESTIFIED THAT THE CORPS MONITORED WASHINGTON |
| 14:25 | 18 | GROUP'S WORK ON A DAILY BASIS; ISN'T THAT RIGHT? |
| 14:25 | 19 | **A.**  YES. |
| 14:25 | 20 | **Q.**  IN YOUR EXPERIENCE -- IN FACT, LET ME BACK UP.  CHANGING |
| 14:25 | 21 | THE SUBJECT HERE SOMEWHAT. |
| 14:25 | 22 | YOU TESTIFIED IN YOUR DIRECT EXAMINATION A LITTLE |
| 14:25 | 23 | WHILE AGO THAT -- ABOUT COMPACTION.  AND I BELIEVE YOUR |
| 14:26 | 24 | DEFINITION OF "COMPACTION" IS, "ANY PROCESS THAT MAKES DENSER"; |
| 14:26 | 25 | IS THAT RIGHT? |

JONATHAN DAVID ROGERS - CROSS


14:26    1    **A.**   YES.  IT'S A COLLOQUIAL TERM.  IT DOESN'T HAVE A TIGHT,

14:26    2    YOU KNOW, TECHNICAL DEFINITION.

14:26    3    **Q.**   THANK YOU.

14:26    4         AND THERE ARE DIFFERENT LEVELS OF COMPACTION, ARE

14:26    5    THERE NOT?

14:26    6    **A.**   YES.

14:26    7    **Q.**   AND JUST BECAUSE SOMEBODY SAYS SOIL SHOULD BE COMPACTED OR

14:26    8    SOME MANUAL SAYS SOIL SHOULD BE COMPACTED, FOR EXAMPLE, IT

14:26    9    DOESN'T MEAN THAT IT'S GOT TO BE 90 PERCENT PROCTOR OR IT'S NOT

14:26   10    COMPACTED; RIGHT?

14:26   11    **A.**   WELL, IF IT'S COMING OUT OF A GEOTECHNICAL BRANCH, IT'S

14:26   12    USUALLY GOING TO BE 90 PERCENT PROCTOR OR BETTER.  SOMETIMES

14:26   13    THEY ALLOW 85 PERCENT ON -- IT'S CALLED SEMI-COMPACTED FILL ON

14:26   14    LEVEES.  BUT, GENERALLY, THEY'RE GOING TO HAVE SOME NUMBER OR

14:26   15    SOME WAY OF GAUGING THE QUALITY SO THAT YOU HAVE SOME KIND OF

14:26   16    QUALITY ASSURANCE.

14:26   17         IF YOU JUST SAY, "RUN OVER IT THREE TIMES WITH A

14:27   18    SUCH-AND-SUCH," THAT'S CALLED A METHOD COMPACTION.  BUT USUALLY

14:27   19    THAT IS PRECEDED BY A FIELD TEST TO MAKE SURE THE METHOD

14:27   20    COMPACTION MEASURES WILL GIVE YOU THE LEVEL OF COMPACTION

14:27   21    THAT'S DESIRED BY THE ENGINEER OR THE OWNER OR WHOEVER IS

14:27   22    PROVIDING GEOTECHNICAL INPUT.

14:27   23    **Q.**   AND METHOD COMPACTION, FOR AN EXPERIENCED ENGINEER, BASED

14:27   24    ON HIS PRIOR EXPERIENCE, MIGHT VERY WELL GIVE HIM THE

14:27   25    SATISFACTION THAT IT WAS PROPERLY COMPACTED; ISN'T THAT

JONATHAN DAVID ROGERS - CROSS

14:27   1   CORRECT?

14:27   2   **A.**   NO.  PROPERLY, YOU NEED TO HAVE A TEST.

14:27   3   **Q.**   NEVER?

14:27   4   **A.**   NEVER?

14:27   5   **Q.**   IN OTHER WORDS, YOU'RE SAYING COMPACTION EQUALS IN EVERY

14:27   6   CASE 90 PERCENT PROCTOR; IS THAT WHAT YOUR TESTIMONY IS?

14:27   7   **A.**   NO, NO, NOT AT ALL.

14:27   8   **Q.**   OKAY.  THAT'S WHAT I WAS TRYING TO GET AT.

14:27   9        OKAY.  IN YOUR --

14:27   10   **A.**   NOW, THAT'S THE MOST -- THAT'S THE MOST USUAL ONE YOU'LL

14:27   11   GET.  IF YOU ASK A GEOTECHNICAL ENGINEER AT THE GEOTECHNICAL

14:27   12   BRANCH, "HOW MUCH DO I HAVE TO COMPACT IT TO?" WHAT THEY'RE

14:27   13   GOING TO SAY TO YOU 98 TIMES OUT OF 100 IS, "90 PERCENT

14:27   14   PROCTOR."

14:27   15   **Q.**   OKAY.

14:28   16   **A.**   BUT ON AN ENVIRONMENTAL REMEDIATION SITE, WE TYPICALLY TRY

14:28   17   TO JUST GET IT BACK TO WHAT IT WAS, TO THE DENSITY THAT'S

14:28   18   THERE.

14:28   19   **Q.**   THANK YOU.

14:28   20        IN YOUR EXPERIENCE, A PROCTOR TEST GENERALLY IS USED

14:28   21   TO VERIFY THAT COMPACTION HAS BEEN ACHIEVED TO THE OWNER OR

14:28   22   REGULATOR'S DESIRED DENSITY; RIGHT?

14:28   23   **A.**   RIGHT.

14:28   24   **Q.**   A PROCTOR TEST, AND I'M QUOTING YOU NOW:  "KEEPS THE

14:28   25   CONTRACTOR HONEST AND MAKES HIM DO AS GOOD A JOB AS HE CAN DO

JONATHAN DAVID ROGERS - CROSS

14:28    1   COMPACTING."  RIGHT?

14:28    2   **A.**   YES.

14:28    3   **Q.**   BECAUSE HOW ELSE ARE YOU GOING TO ENSURE THAT THE

14:28    4   CONTRACTOR IS DOING HIGH QUALITY WORK UNLESS YOU HAVE SOME

14:28    5   BENCHMARK THAT YOU'RE GRADING HIM BY; RIGHT?

14:28    6   **A.**   YES.

14:28    7   **Q.**   AND THE PERSON RESPONSIBLE FOR KEEPING THE CONTRACTOR

14:28    8   HONEST IS THE CONSTRUCTION MANAGER WHO IS MANAGING THE PROJECT

14:28    9   AND THE REGULATOR OVERSEEING THE PROJECT; RIGHT?

14:28   10   **A.**   YES.

14:28   11   **Q.**   AND ON TASK ORDER 26, THE CONSTRUCTION MANAGER AND THE

14:28   12   REGULATOR WERE THE CORPS OF ENGINEERS; RIGHT?

14:28   13   **A.**   YES.

14:29   14   **Q.**   THUS, THE CORPS WAS RESPONSIBLE, TO QUOTE YOU, FOR KEEPING

14:29   15   WGI HONEST; RIGHT?

14:29   16   **A.**   YES.  THAT SEEMS LIKE A REASONABLE TRAIN.

14:29   17   **Q.**   SO IF THE CORPS APPROVED THE METHOD FOR COMPACTING THE

14:29   18   SOIL AND THE TYPE OF SOIL THAT WENT INTO THE EXCAVATION, THAT

14:29   19   WOULD SATISFY WASHINGTON GROUP'S RESPONSIBILITY ON TASK

14:29   20   ORDER 26; RIGHT?

14:29   21   **A.**   THAT'S WHERE WE PART WAYS.

14:29   22   **Q.**   YOU DON'T AGREE WITH THAT?

14:29   23   **A.**   NO.  BECAUSE IT'S WHO AT THE CORPS NOW.  BECAUSE NOW

14:29   24   YOU'RE TALKING ABOUT SOMETHING THAT'S A DISCIPLINE OF CIVIL

14:29   25   ENGINEERING.

JONATHAN DAVID ROGERS - CROSS

14:29      1    **Q.**   WELL, LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.

14:29      2    **A.**   YEAH.

14:29      3              **MR. TREEBY:**  PLAY THE CLIP.

13:42      4              (WHEREUPON, THE VIDEO CLIP WAS PLAYED AS FOLLOWS:)

14:29      5              "Q.  SO WHO IS RESPONSIBLE FOR, QUOTE, KEEPING THE

14:29      6         CONTRACTOR HONEST, AS YOU USE THE TERM?

14:29      7              "A.  THE CORPS WOULD BE, THEN.  THEY'RE THE

14:29      8         REGULATOR."

14:29      9              **THE COURT:**  EXCUSE ME.

14:29     10              **MR. BRUNO:**  LET'S FOCUS ON THE READING, AT LEAST.

13:42     11              (WHEREUPON, THE VIDEO CLIP WAS PLAYED AS FOLLOWS:)

14:29     12              "Q.  AND IF THEY APPROVE THE METHOD FOR COMPACTING

14:29     13         THE SOIL AND APPROVE THE SOIL THAT WENT INTO THE

14:29     14         EXCAVATION, WOULD THAT SATISFY WASHINGTON GROUP'S

14:29     15         RESPONSIBILITY?  NOT THE CORPS' RESPONSIBILITY, WASHINGTON

14:30     16         GROUP'S.

14:30     17              "A.  YEAH.  I SUPPOSE AS LONG AS THEY GOT EVERYTHING

14:30     18         IN WRITING, THAT THEY'RE DOING IT IN ACCORDANCE WITH HOW

14:30     19         THEY'RE BEING DIRECTED."

14:30     20              (WHEREUPON, THE VIDEO CLIP CONCLUDED.)

14:30     21              **THE COURT:**  OKAY.

14:30     22              **MR. BRUNO:**  I THINK YOU NEED TO GIVE THAT TO THE

14:30     23    COURT REPORTER.

14:30     24              **MR. TREEBY:**  I DON'T BELIEVE I'M TAKING THAT OUT OF

14:30     25    CONTEXT, BUT IF YOUR HONOR WANTS THE CONTEXT, I'D BE HAPPY TO

JONATHAN DAVID ROGERS - CROSS


14:30     1   PROVIDE THE WHOLE SECTION.

14:30     2           **THE COURT:**  IT'S NOT IN THE RECORD BECAUSE SHE

14:30     3   COULDN'T --

14:30     4           **MR. TREEBY:**  THE COURT REPORTER COULDN'T RECORD IT.

14:30     5           **MR. BRUNO:**  NO, THE COURT REPORTER GOT IT.

14:30     6           **THE COURT:**  THE COURT REPORTER DID?

14:30     7               DID YOU GET IT, MA'AM?

14:30     8           **THE COURT REPORTER:**  I WROTE IT FROM THE TEXT.

14:30     9           **THE COURT:**  ALL RIGHT.  THAT'S FINE.  IT'S IN THE

14:30    10   RECORD.

14:30    11           **MR. TREEBY:**  OKAY.

14:30    12           **MR. BRUNO:**  SHE DESERVES A ROUND OF APPLAUSE FOR

14:30    13   THAT.

14:30    14           **THE COURT:**  YEAH, YEAH.  OKAY.  IT'S PRETTY AMAZING

14:30    15   WHAT COURT REPORTERS DO.

14:30    16               MR. TREEBY, IF EVER YOU NEED A BREAK, YOU LET ME

14:30    17   KNOW, TOO, IF YOU GET -- ARE YOU GOOD?

14:30    18           **MR. TREEBY:**  IF YOU WANT TO TAKE ONE --

14:30    19           **THE COURT:**  OH, NO, NO.  I'M FINE.  IT'S UP TO YOU.

14:31    20   IT'S MORE STRESS ON YOU ASKING THE QUESTIONS THAN IT IS ON ME

14:31    21   LISTENING.

14:31    22   **BY MR. TREEBY:**

14:31    23   **Q.**  AS A GENERAL MATTER, DR. ROGERS, YOUR OPINION IS THAT THE

14:31    24   USE OF IMPORTED RIVER SAND ON TASK ORDER 26, AS A GENERAL

14:31    25   MATTER, WAS APPROPRIATE; RIGHT?

JONATHAN DAVID ROGERS - CROSS

14:31   1   **A.**   YES.

14:31   2   **Q.**   AND YOU'VE ALSO OPINED THAT THE USE OF COMPACTED NATIVE

14:31   3   SPOIL MATERIAL AS BACKFILL WAS NOT IMPROPER; ISN'T THAT RIGHT?

14:31   4   **A.**   THAT'S CORRECT.  YOU'D ALWAYS TRY TO USE THE NATIVE STUFF

14:31   5   TO SAVE MONEY, IF YOU CAN USE IT.

14:31   6   **Q.**   BACK WHEN YOU WERE IN PRIVATE PRACTICE 15 OR 16 YEARS AGO,

14:31   7   YOU WORKED ON DESIGN TYPE PROJECTS FOR THE CORPS OF ENGINEERS;

14:31   8   RIGHT?

14:31   9   **A.**   YES.

14:31   10   **Q.**   AND AS A RESULT, YOU KNOW THAT AN "ER" IS A CORPS ENGINEER

14:31   11   REGULATION; RIGHT?

14:31   12   **A.**   RIGHT.

14:31   13   **Q.**   AND AN "EM" IS A CORPS ENGINEER MANUAL; RIGHT?

14:31   14   **A.**   RIGHT.

14:31   15   **Q.**   AND YOU ALSO KNOW THAT THE CORPS OF ENGINEERS USUALLY

14:32   16   CITES IN CONTRACTS WITH THIRD PARTIES ANY EM OR ER THAT IT

14:32   17   WANTS ITS CONTRACTORS TO FOLLOW ON A PROJECT; RIGHT?

14:32   18   **A.**   YES.  BECAUSE IF IT'S A SPECIFIC DESIGN WORK FOR -- LIKE

14:32   19   ESPECIALLY FOR LEVEES, THEY'RE GOING TO BE PRETTY SPECIFIC.

14:32   20   **Q.**   YOU'RE FAMILIAR WITH ENGINEERING MANUAL 1110-2-193

14:32   21   ENTITLED "DESIGN AND CONSTRUCTION OF LEVEES."

14:32   22         I BELIEVE YOU TESTIFIED ABOUT IT, MAYBE BOTH ON

14:32   23   DIRECT AND ON PRIOR CROSS?

14:32   24   **A.**   YES.

14:32   25   **Q.**   AND YOU CITED IN YOUR EXPERT REPORT, ON PAGE 234, IN

JONATHAN DAVID ROGERS - CROSS

14:32    1    SUPPORT OF YOUR STANDARD OF CARE OPINION; RIGHT?

14:32    2    **A.**    YES.

14:32    3    **Q.**    OKAY.

14:33    4         **MR. TREEBY:**  IF YOU WOULD, PULL UP JX-00046-0054 OF

14:33    5    THIS MANUAL.

14:33    6    **BY MR. TREEBY:**

14:33    7    **Q.**    THIS WAS EXHIBIT 43 TO YOUR DEPOSITION.

14:33    8         **MR. TREEBY:**  AND I THINK WE NEED TO FLIP IT.  THERE

14:33    9    WE GO.

14:33   10         AND WOULD YOU BLOW UP THE VERY TOP TWO LINES,

14:33   11    JUST FOR -- SO WE CAN SEE THEM?

14:33   12    **BY MR. TREEBY:**

14:33   13    **Q.**    TABLE 7-1 IS ENTITLED "CLASSIFICATION ACCORDING TO

14:33   14    CONSTRUCTION METHOD OF LEVEES COMPOSED OF IMPERVIOUS AND

14:33   15    SEMI-PERVIOUS MATERIALS."

14:33   16         DO YOU SEE THAT?

14:33   17    **A.**    YES.

14:33   18    **Q.**    AND THEN UNDER THAT, IF YOU WOULD -- WELL, THERE ARE THREE

14:33   19    COLUMNS:  "CATEGORY," THE SECOND COLUMN IS "CONSTRUCTION

14:34   20    METHOD, THE THIRD COLUMN IS "USE."  RIGHT?

14:34   21    **A.**    YES.

14:34   22    **Q.**    AND LET'S GO DOWN TO UNDER THE "CONSTRUCTION METHOD" FOR

14:34   23    UNCOMPACTED FILL, THE VERY LAST CATEGORY RIGHT THERE.

14:34   24         **MR. TREEBY:**  BLOW THAT UP, IF YOU WOULD, BIGGER.

14:34   25         IS THAT AS BIG AS IT WILL GO, I GUESS?  THAT

JONATHAN DAVID ROGERS - CROSS

14:34    1    HELPS.  EVEN WITH MY POOR EYESIGHT, I CAN SEE THAT.  SO THE --

14:34    2    LET ME LOOK AT THE DOCUMENT.  I DON'T KNOW.  MAYBE CAN YOU PULL

14:34    3    THE CAPTION, THE COLUMN HEADING UP -- THE THREE COLUMN HEADINGS

14:34    4    WE LOOKED AT SO WE CAN SEE THEM RIGHT ON TOP OF THIS?  LET'S

14:35    5    PULL THOSE.

14:35    6              I CAN SEE A LITTLE BETTER ON THIS MONITOR, BUT

14:35    7    I'M SURE IT'S JUST MY EYESIGHT.

14:35    8    **BY MR. TREEBY:**

14:35    9    **Q.**   UNDER CATEGORY 3 THERE'S A CATEGORY -- LET'S LOOK AT THE

14:35   10    CATEGORY UNDER "UNCOMPACTED" AND LET'S LOOK AT THE

14:35   11    "CONSTRUCTION METHOD" DOWN AT THE BOTTOM.

14:35   12              THE "CONSTRUCTION METHOD" FOR "UNCOMPACTED SOILS" IS:

14:35   13    "FILL CAST OR DUMPED IN PLACE IN THICK LAYERS WITH LITTLE OR NO

14:35   14    SPREADING OR COMPACTION."

14:35   15              DO YOU SEE THAT?

14:35   16    **A.**   YES.

14:35   17    **Q.**   OR IT COULD BE:  "HYDRAULIC FILL BY DREDGE, OFTEN FROM

14:35   18    CHANNEL EXCAVATION."

14:35   19              BUT LET'S JUST FOCUS ON A, FILL CAST OR DUMPED IN

14:35   20    PLACE IN THICK LAYERS.

14:36   21              AND UNDER "USE" FOR "UNCOMPACTED FILL," IT

14:36   22    STATES:  "LEVEES INFREQUENTLY CONSTRUCTED TODAY USING METHOD

14:36   23    EXCEPT FOR TEMPORARY EMERGENCY."

14:36   24              AND THEN THE SECOND SENTENCE IS THE ONE I WANT

14:36   25    TO FOCUS ON.

JONATHAN DAVID ROGERS - CROSS

14:36     1          **MR. TREEBY:**  IF YOU COULD HIGHLIGHT JUST THAT SECOND

14:36     2   SENTENCE, "BOTH METHODS."  AND THE NEXT LINE.  CAN YOU JUST

14:36     3   PULL THAT OUT?

14:36     4   **BY MR. TREEBY:**

14:36     5   **Q.**   "BOTH METHODS ARE USED FOR CONSTRUCTION OF STABILITY

14:36     6   BERMS, PIT FILLS AND SEEPAGE BERMS."

14:36     7          DO YOU SEE THAT?

14:36     8   **A.**   YES.

14:36     9   **Q.**   AND A PIT FILL COULD BE AN EXCAVATION OR BORROW PIT BEYOND

14:36    10   THE TOE OF THE LEVEE; RIGHT?

14:36    11   **A.**   RIGHT.  THAT'S TYPICALLY WHAT THEY -- HOW THEY BUILT THE

14:36    12   LEVEES IN THE OLD DAYS, THEY WOULD BORROW OFF EITHER SIDE OF

14:36    13   THE LEVEE.

14:36    14   **Q.**   THIS INDICATES THEN THAT IF THE OWNER APPROVES IT, ONE CAN

14:36    15   USE UNCOMPACTED FILL TO BACKFILL EXCAVATIONS BEYOND THE TOE OF

14:37    16   THE LEVEE; RIGHT?

14:37    17   **A.**   IF THE GEOTECHNICAL BRANCH BUYS OFF ON IT IN WRITING, YES.

14:37    18   **Q.**   AND MOST OF THE EXCAVATIONS IN THE EBIA WERE AT LEAST

14:37    19   TRACK-WALKED WITH A DOZER OR TAMPED WITH THE BUCKET OF AN

14:37    20   EXCAVATOR; RIGHT?

14:37    21   **A.**   THAT'S THE REPRESENTATION THAT'S BEEN MADE TO ME, YES,

14:37    22   COUNSELOR.

14:37    23   **Q.**   WELL, THAT'S THE REPRESENTATIONS MADE TO YOU.  DO YOU DENY

14:37    24   THAT'S WHAT HAPPENED?

14:37    25   **A.**   NO.  THAT'S WHAT I SEE IN THE PICTURES.  I DON'T KNOW I

JONATHAN DAVID ROGERS - CROSS


14:37    1    SEE THE BUCKET TAMPING, BUT I SEE THE TRACK-WALKING.

14:37    2    **Q.**   WELL --

14:37    3              **MR. TREEBY:**   OKAY.   LET'S PULL UP -- I HATE TO DO

14:37    4    THIS, BUT PAGE 182 OF THE DEPOSITION, LINE 13 THROUGH LINE 17.

14:37    5    CAN WE PULL LINE 13 THROUGH 17 OUT?

14:37    6    **BY MR. TREEBY:**

14:37    7    **Q.**   I ASKED YOU:

14:37    8              "Q.   ARE YOU AWARE OF ANY EXCAVATIONS THAT WERE NOT

14:37    9         BACKFILLED IN ACCORDANCE WITH THAT IN THE EAST BANK

14:37   10         INDUSTRIAL AREA?"

14:37   11         AND WE'RE TALKING ABOUT THAT PROVISION OF THIS TABLE.

14:38   12         AND YOU SAID:

14:38   13              "A.   NO, THEY DID TRACK-WALK IT OR BUCKET TAMP IT."

14:38   14         YOU VOLUNTEERED THAT?

14:38   15    **A.**   YEAH.   THAT'S BASED ON THE PHOTOGRAPHS, THE REVIEW OF THE

14:38   16    PHOTOGRAPHS.

14:38   17    **Q.**   SO YOU DID SEE A PHOTOGRAPH SAYING IT WAS BUCKET TAMPED?

14:38   18    **A.**   YEAH.   ONE OR TWO, PROBABLY.

14:38   19    **Q.**   OKAY.   SO THIS WOULD INDICATE AT LEAST SOME COMPACTION IS

14:38   20    TAKING PLACE, MAKING THE SOIL DENSER; CORRECT?

14:38   21    **A.**   YES.   IT'S JUST OF AN UNKNOWN QUANTITY, UNKNOWN EFFORT.

14:38   22    **Q.**   THAT WOULD BE MORE COMPACTION THAN WHAT ENGINEERING

14:38   23    MANUAL 1913 DESCRIBES AS UNCOMPACTED FILL; RIGHT?

14:38   24    **A.**   YES, IT WOULD BE.

14:38   25    **Q.**   THERE'S NOTHING IN THAT PROVISION ABOUT PROCTOR; RIGHT?

JONATHAN DAVID ROGERS - CROSS

14:38    1    UNDER UNCOMPACTED FILL?

14:38    2    **A.**    RIGHT.

14:38    3    **Q.**    NOW, YOU KNOW A LOT ABOUT THE SOILS IN THE EAST BANK

14:38    4    INDUSTRIAL AREA AT VARYING DEPTHS FROM REVIEWING BORING LOGS;

14:39    5    RIGHT?

14:39    6    **A.**    I BELIEVE SO.

14:39    7    **Q.**    DID YOU SAY YOU DID BELIEVE SO?

14:39    8    **A.**    YES, I BELIEVE SO.

14:39    9    **Q.**    I'M SORRY.  I APOLOGIZE.

14:39   10            YOU WOULD EXPECT THAT ANY OPEN HOLES LEFT FROM PILING

14:39   11    EXTRACTIONS IN THE CANAL ALONG THE WESTERN EDGE OF THE EAST

14:39   12    BANK INDUSTRIAL AREA WOULD CLOSE UP IN A FEW DAYS DUE TO THE

14:39   13    LATERAL PRESSURE ON THE SUBSURFACE CLAYS IN THIS AREA; RIGHT?

14:39   14    **A.**    RIGHT.  I DID SOME RESEARCH ON THAT AFTER THE DEPOSITION,

14:39   15    THOUGH, AND IT TURNS OUT THAT THE ONLY THING I COULD FIND IN

14:39   16    THE LITERATURE ACTUALLY SUGGESTS THAT I WAS WRONG.  SO . . .

14:39   17            BUT WHEN YOU'RE OUT UNDER THE WATER AND YOU'RE ON A

14:39   18    SLOPE UNDER THE WATER, I WOULD EXPECT THEM IN THOSE KIND OF

14:39   19    MATERIALS, THE FAT CLAYS, TO CLOSE UP.

14:39   20            BUT THERE'S ACTUALLY A PAPER BY THE U.S. GEOLOGICAL

14:39   21    SURVEY IN THE SAN FRANCISCO BAY SEDIMENTS WHERE THEY WENT OUT

14:39   22    AND LOOKED AND SAID THEY DON'T CLOSE UP IF THEY'RE IN COHESIVE

14:40   23    MATERIALS.  THAT CAME OUT IN LATE 2002/EARLY 2003.

14:40   24            SO I MAY NOT HAVE BEEN ALTOGETHER RIGHT IN THAT, BUT

14:40   25    THAT'S HOW THE PROFESSION GENERALLY USED TO BELIEVE.  I WOULD

JONATHAN DAVID ROGERS - CROSS

14:40   1   SAY THAT'S A PRETTY FAIR CHARACTERIZATION.

14:40   2   **Q.**   AND IF THE PILING HOLES WERE NOT IN THE CANAL UNDER WATER

14:40   3   BUT ONSHORE IN THE EAST BANK INDUSTRIAL AREA, YOU WOULD STILL

14:40   4   EXPECT THE HOLES FROM THE EXTRACTION OF PILINGS TO CLOSE UP

14:40   5   WITHIN A FEW DAYS OR MONTHS IN THE SOFT CLAYS; RIGHT?

14:40   6   **A.**   IT JUST DEPENDS HOW -- HOW STIFF THEY ARE.  SO THAT'S WHY

14:40   7   WE GROUT HOLES TYPICALLY, BECAUSE WE DON'T KNOW HOW LONG IT

14:40   8   WILL TAKE THEM --

14:40   9           **MR. TREEBY:**  CALL UP PAGE 190, PLEASE.

14:40   10          **THE WITNESS:**  WELL, I'M NOT SAYING THAT I DIDN'T SAY

14:40   11  THAT AT THE TIME.  I JUST SAID I DID SOME RESEARCH ON IT SINCE

14:40   12  YOU DID DEPOSE ME TO FIND OUT IF THAT WAS ACTUALLY THE

14:40   13  PREVAILING THOUGHT OF EVERYBODY AND I LEARNED THAT I WAS WRONG.

14:40   14  **BY MR. TREEBY:**

14:40   15  **Q.**   WELL, YOUR RESEARCH, YOU JUST SAID, WAS IN THE SAN

14:40   16  FRANCISCO BAY; RIGHT?

14:40   17  **A.**   THAT'S WHERE THE PAPER WAS -- WHERE THEY CHECKED THEM OUT,

14:40   18  CHECKED THE HOLES OUT.

14:40   19  **Q.**   DID YOU DO ANY OTHER RESEARCH?

14:40   20  **A.**   I COULDN'T FIND ANYBODY ELSE THAT HAS FOLLOWED UP ON

14:41   21  HOLES.

14:41   22  **Q.**   OKAY.  I'M NOT ASKING YOU ABOUT ANYTHING IN THE BAY HERE,

14:41   23  I'M ASKING YOU ABOUT SOMETHING ONSHORE IN THE EAST BANK

14:41   24  INDUSTRIAL AREA.

14:41   25  **A.**   WELL, THEY'RE SIMILAR KINDS OF MATERIALS, COUNSELOR.  I

JONATHAN DAVID ROGERS - CROSS


14:41    1   MEAN, IT'S NOT LIKE WE'RE TALKING, YOU KNOW, THE SAND DUNES OF

14:41    2   EGYPT VERSUS NEW ORLEANS.  IT'S THE SAME SIMILAR KINDS OF

14:41    3   MATERIALS.  THEY'RE ESTUARINE CLAYS, SOFT CLAYS, FAT CLAYS LIKE

14:41    4   WE HAVE IN NEW ORLEANS.

14:41    5   **Q.**   SO AT LEAST AT YOUR DEPOSITION TIME YOU AGREED THAT YOU

14:41    6   WOULD EXPECT THOSE PILING HOLES TO CLOSE UP PRETTY QUICKLY AND

14:41    7   YOU SAID PRETTY QUICKLY AND THEN YOU SAID:  "I DON'T KNOW IF

14:41    8   IT'S A FEW DAY OR A FEW MONTHS, BUT IT ISN'T GOING TO BE A FEW

14:41    9   YEARS, IT'S GOING TO BE PRETTY SOON"?

14:41   10   **A.**   RIGHT.  BECAUSE THAT'S HOW WE'VE ALWAYS BEEN TAUGHT.

14:41   11   THAT'S THE GENERAL GIST OF THE PROFESSION.

14:42   12   **Q.**   OKAY.  I WANT YOU TO -- I WANT TO PULL UP JX-1389,

14:42   13   PAGE 80, AND THIS IS DR. BEA'S FEBRUARY 1ST, 2012 REPORT.

14:42   14           **MR. TREEBY:**  JX-1389.  001.  I'M SORRY, 0081.  I'M

14:42   15   SORRY, 0081.  NEXT PAGE.

14:42   16           WOULD YOU BLOW UP THE TOP FIGURE FIRST?

14:42   17   **BY MR. TREEBY:**

14:42   18   **Q.**   THIS IS FIGURE 43 IN DR. BEA'S REPORT.  IT'S CORRECT, IS

14:42   19   IT NOT, THAT FIGURE 43 COMPORTS WITH YOUR UNDERSTANDING OF WHAT

14:42   20   THE CROSS SECTION OF THE NORTH BREACH SHOULD BE EXCEPT FOR WHAT

14:42   21   IS LABELED THE BACKFILLED EXCAVATION, THAT LARGE SQUARE HOLE;

14:42   22   IS THAT RIGHT?

14:43   23   **A.**   RIGHT.  I DON'T KNOW ANYTHING ABOUT THAT, THE BACKFILLED

14:43   24   EXCAVATION.

14:43   25   **Q.**   YOU DON'T KNOW WHAT COULD BE DEPICTED BY THAT BACKFILLED

JONATHAN DAVID ROGERS - CROSS

14:43   1   EXCAVATION; RIGHT?

14:43   2   **A.**   I JUST DON'T KNOW ANYTHING ABOUT IT.

14:43   3   **Q.**   RIGHT.  THAT'S FINE.

14:43   4        **MR. TREEBY:**  PULL UP, IF YOU WOULD, DX-2651-0114 AND

14:43   5   0115.  WE'LL PULL UP 4 FIRST AND THEN WE'LL HAVE TO CONTINUE

14:43   6   OVER TO THE NEXT PAGE.

14:43   7        BLOW UP THAT BOTTOM SECTION THERE, IF YOU WOULD.

14:44   8   **BY MR. TREEBY:**

14:44   9   **Q.**   THIS READS:  "ON AUGUST 29TH, 2005, DURING HURRICANE

14:44   10  KATRINA BOTH SIDES OF THE IHNC WERE OVERTOPPED BY THE STORM

14:44   11  SURGE CONVERGING ON THE IHNC FROM LAKES BORGNE AND

14:44   12  PONTCHARTRAIN.  SUSTAINED OVERTOPPING FLOW UNDERMINED THE

14:44   13  LANDSIDE TOE OF THE LEVEES IN PLACES GOUGING DOWN AS MUCH AS

14:44   14  5 PLUS FEET BELOW THE CREST OF THE EARTHEN LEVEE.  IN ADDITION,

14:44   15  THERE" --

14:44   16        AND THIS IS THE PART I WANT YOU TO HIGHLIGHT ON.

14:44   17        "IN ADDITION, THERE WAS AMPLE --

14:44   18        **MR. TREEBY:**  OH, GO BACK.  YES, 1-4.  I DIDN'T FINISH

14:44   19  THAT LAST SENTENCE.  I'M SLOW.  LAST SENTENCE, LAST LINE.

14:44   20  **BY MR. TREEBY:**

14:44   21  **Q.**   "IN ADDITION, THERE WAS SIMPLY PHYSICAL EVIDENCE OF

14:44   22  UNDERSEEPAGE AT BOTH" --

14:44   23        **MR. TREEBY:**  AND THEN GO TO THE NEXT PAGE, THE TOP

14:44   24  TWO LINES -- ACTUALLY, TOP THREE LINES.

        25

JONATHAN DAVID ROGERS - CROSS

14:45   1   **BY MR. TREEBY:**

14:45   2   **Q.**   -- "OF THE EASTERN IHNC BREACHES, IN THE FORM OF LINEAR

14:45   3   SAND BOILS."

14:45   4           YOU CITED THAT AS AMPLE PHYSICAL EVIDENCE OF

14:45   5   UNDERSEEPAGE AT BOTH OF THE EASTERN IHNC BREACHES IN YOUR

14:45   6   REPORT.  AND I JUST WANTED TO CLEAR THAT UP.

14:45   7   **A.**   RIGHT.

14:45   8   **Q.**   I KNOW YOU DIDN'T STATE IT ON DIRECT, BUT YOU THOUGHT YOU

14:45   9   SAW THESE SO-CALLED SAND BOILS ON YOUR FIRST TRIP TO THE IHNC

14:45   10  IN OCTOBER OF 2005; CORRECT?

14:45   11  **A.**   YEAH, I DID SEE THEM.  IT WASN'T THAT I THOUGHT I SAW.

14:45   12  **Q.**   RIGHT.

14:45   13          BUT YOU NOW KNOW THAT THE SAND BOILS THAT YOU

14:46   14  THOUGHT -- THAT YOU SAW WERE PROBABLY SAND BLOWN UP ALONG THE

14:46   15  BACKSIDE OF THE SHEET PILES OF THE SEWERAGE AND WATER BOARD BOX

14:46   16  CULVERT; RIGHT?

14:46   17  **A.**   YES.  THAT I -- AFTER I SAW THE DESIGN AS PART OF THIS

14:46   18  PROJECT, WHEN THE DESIGN FINALLY GOT TO US AND FOUND OUT THAT

14:46   19  THEY HAD BACKFILLED SAND, THAT ALL LINED UP, AND I WAS VERY

14:46   20  TRANSPARENT ABOUT THAT AT MY DEPOSITION.

14:46   21  **Q.**   ABSOLUTELY.  I JUST WANTED TO GET IT INTO THE RECORD.

14:46   22  THAT'S ALL.

14:46   23  **A.**   I THINK THAT'S THE EXPLANATION FOR THEM BEING SO LINEAR IS

14:46   24  THEY WERE SAND BLOWN UP ALONG THE -- THAT LINE.

14:46   25  **Q.**   COMING OUT THE CULVERT AND THE PERFORATIONS IN THE

JONATHAN DAVID ROGERS - CROSS

14:46   1   CULVERT --

14:46   2   **A.**   CORRECT.

14:46   3   **Q.**   -- AND NOT UNDERSEEPAGE; RIGHT?

14:46   4   **A.**   CORRECT.

14:46   5   **Q.**   IN FACT, THOSE AREN'T -- WHAT YOU SAW, YOU NOW REALIZE,

14:46   6   WERE NOT EVIDENCE OF SEEPAGE UNDER THE LEVEE AT ALL; RIGHT?

14:46   7   **A.**   WELL, IT'S SEEPAGE, THERE'S -- THERE'S GROUND --

14:46   8   **Q.**   UNDER THE LEVEE?

14:46   9   **A.**   YEAH, THERE'S WATER THAT GOT BLOWN UP OUT OF IT.  YEAH,

14:46  10   YOU KNOW.

14:46  11   **Q.**   BUT NOT UNDER THE LEVEE; RIGHT?

14:46  12   **A.**   WELL, WE DON'T KNOW WHAT'S GOING ON UNDER THE LEVEE.

14:47  13   **Q.**   OKAY.  WELL, LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION.

14:47  14   **A.**   YEAH.  IT APPEARS THAT IT'S WATER FROM THE CONDUIT THAT

14:47  15   BLEW IT UP.  BECAUSE THE CONDUIT WOULD HAVE GOTTEN TOTALLY

14:47  16   FILLED.

14:47  17   **Q.**   I WANTED TO GO BACK JUST A LITTLE BIT TO SOMETHING WE

14:47  18   COVERED A LITTLE BIT EARLIER, BUT I'M GOING TO COVER THIS VERY

14:47  19   BRIEFLY.  BECAUSE I PROBABLY -- SOMETIMES IN MY IGNORANCE, I

14:47  20   OVERLOOK SOME OBVIOUS THINGS.

14:47  21        YOU'RE EXPERIENCED IN DOING FLOW ANALYSES; RIGHT?

14:47  22   **A.**   WELL, I HAVEN'T DONE A LOT OF THEM SINCE I BECAME A

14:47  23   PROFESSOR.  WE USED TO --

14:47  24   **Q.**   I'M JUST GOING TO TALK THEORY HERE.

14:47  25   **A.**   ALL RIGHT.

JONATHAN DAVID ROGERS - CROSS

14:47   1   **Q.**   SO YOU'RE EXPERIENCED WITH THE THEORY OF FLOW ANALYSES;

14:47   2   RIGHT?

14:47   3   **A.**   RIGHT.

14:47   4   **Q.**   WHEN YOU DO A FLOW ANALYSES, YOU CANNOT SEPARATE FLOW FROM

14:47   5   PRESSURE OR HEADS; RIGHT?  YOU CAN'T SEPARATE THEM, THEY BOTH

14:48   6   ARE PRODUCED FROM THE ANALYSES?

14:48   7   **A.**   YEAH.  WELL, THAT'S GOING THROUGH -- THERE IS A DIFFERENCE

14:48   8   BETWEEN FLOW AND PRESSURE HEAD.  PRESSURE HEAD --

14:48   9   **Q.**   THAT'S NOT MY QUESTION.

14:48   10   **A.**   OKAY.

14:48   11   **Q.**   I WASN'T ASKING WHETHER THERE WAS A DIFFERENCE.  I WAS

14:48   12   ASKING:  WHEN YOU SOLVE THAT EQUATION, YOU GET BOTH, RIGHT --

14:48   13   **A.**   OH, RIGHT.

14:48   14   **Q.**   -- THE FLOW AND PRESSURE?

14:48   15   **A.**   YES.  IF YOU'RE USING STEADY STATE --

14:48   16   **Q.**   I'M TALKING ABOUT THE THEORY.

14:48   17   **A.**   IF YOU'RE USING STEADY STATE SEEPAGE, RIGHT, YOU'RE GOING

14:48   18   TO GET THAT.

14:48   19   **Q.**   IF YOU USE TRANSIENT FLOW ANALYSIS AND YOU SOLVE THAT

14:48   20   EQUATION, YOU'RE GOING TO GET BOTH FLOW AND PRESSURE, ARE YOU

14:48   21   NOT?

14:48   22   **A.**   CORRECT.

14:48   23   **Q.**   IT'S ALL IN THE EQUATION; RIGHT?

14:48   24   **A.**   CORRECT.

14:48   25   **Q.**   IT'S MATH?

JONATHAN DAVID ROGERS - CROSS

14:48 1 **A.** RIGHT.

14:48 2 **Q.** I KNOW GEOLOGISTS AND ENGINEERS KIND OF ARGUE WITH ONE

14:48 3 ANOTHER ABOUT A LOT OF THINGS, BUT THAT'S A THEORY; RIGHT?

14:48 4 **A.** YEAH.  I'M A HYDRO- -- I'M TRAINING IN HYDROGEOLOGY, SO I

14:49 5 UNDERSTAND THAT.

14:49 6   **MR. TREEBY:**  JUST A COUPLE MORE QUESTIONS.  THREE

14:49 7 MORE ACTUALLY.

14:49 8 **BY MR. TREEBY:**

14:49 9 **Q.** THIS RELIES ON YOUR KNOWLEDGE OF THE HISTORY OF THIS AREA

14:49 10 BECAUSE YOU SEEMED, FOR 100-AND-SOME PAGES IN YOUR REPORT, VERY

14:49 11 INTERESTED IN THE HISTORY, WHICH I LIKE HISTORY.  I'M A HISTORY

14:49 12 MINOR.

14:49 13   THE CORPS' LOCK REPLACEMENT PROJECT WAS A MUCH LARGER

14:49 14 PROJECT THAN JUST THE CLEARING AND REMEDIATION OF THE EAST BANK

14:49 15 INDUSTRIAL AREA; RIGHT?

14:49 16 **A.** OH, YES.

14:49 17 **Q.** IN 1997, IN FACT, THE CORPS COMPLETED A NINE-VOLUME

14:49 18 EVALUATION REPORT FOR THE LOCK REPLACEMENT PROJECT THAT

14:49 19 RECOMMENDED -- AND THIS COURT ULTIMATELY APPROVED --

14:49 20 BUILDING -- OR NOT STOPPING THE BUILDING OF A NEW LOCK NORTH OF

14:49 21 CLAIBORNE AVENUE; RIGHT?

14:49 22 **A.** NO, I DIDN'T REALIZE --

14:49 23   **THE COURT:**  IT COULD BE ALL MY FAULT, BUT GO AHEAD.

14:49 24 **BY MR. TREEBY:**

14:49 25 **Q.** WELL, YOU MIGHT NOT HAVE KNOWN ABOUT THE COURT, BUT YOU

JONATHAN DAVID ROGERS - CROSS


14:49  1  DID KNOW ABOUT THE NINE-VOLUME EVALUATION REPORT FOR THE LOCK

14:50  2  REPLACEMENT PROJECT THAT RECOMMENDED BUILDING A NEW LOCK NORTH

14:50  3  OF CLAIBORNE AVENUE; RIGHT?

14:50  4  **A.**   YES.

14:50  5  **Q.**   WASHINGTON GROUP WAS NOT INVOLVED IN DOING ANY OF THE

14:50  6  ENGINEERING ANALYSES ASSOCIATED WITH THAT LOCK REPLACEMENT;

14:50  7  RIGHT?

14:50  8  **A.**   THAT WOULD BE MY UNDERSTANDING, YES.

14:50  9  **Q.**   THAT WAS DONE BY THE CORPS OF ENGINEERS; RIGHT?

14:50  10  **A.**   YES.

14:50  11       **MR. TREEBY:**  ONE SECOND, YOUR HONOR, COULD I JUST

14:50  12  CAUCUS?

14:50  13       **THE COURT:**  YES, SIR.  ABSOLUTELY, ABSOLUTELY.

14:50  14            AFTER MR. TREEBY IS COMPLETED, WE'LL TAKE BREAK.

14:50  15  I'M SURE THE COURT REPORTER, AMONG OTHERS, WILL BE READY FOR

14:50  16  IT.

14:50  17       **MR. TREEBY:**  YOUR HONOR, PLEASE, I'M FINISHED FOR

14:50  18  NOW.

14:50  19       **THE COURT:**  THANK YOU, SIR.

14:50  20            AND YOU'LL BE UP WHEN WE COME BACK.

14:50  21       **MR. TREEBY:**  RESERVING THE RIGHT, IF NECESSARY, TO

14:50  22  RECROSS.

14:50  23       **THE COURT:**  THAT'S CORRECT.

14:50  24       **THE DEPUTY CLERK:**  ALL RISE.

14:50  25            (WHEREUPON, THE COURT TOOK A RECESS.)

JONATHAN DAVID ROGERS – REDIRECT

15:07    1    **THE DEPUTY CLERK:**  ALL RISE.

15:07    2        COURT'S IN SESSION.  PLEASE BE SEATED.

15:07    3    **THE COURT:**  YES, SIR.

15:07    4    **MR. SIMS:**  THANK YOU, YOUR HONOR.

15:07    5        **REDIRECT EXAMINATION**

15:07    6    BY MR. SIMS:

15:07    7    **Q.**  DR. ROGERS, YOU WERE SHOWN A NUMBER OF BORINGS FROM THE

15:07    8    FUGRO SAMPLING; CORRECT?

15:07    9    **A.**  YES.

15:07    10    **Q.**  DO YOU RECALL SEEING THOSE?

15:07    11        AND YOU UNDERSTAND, OBVIOUSLY, THAT THOSE WERE DONE

15:07    12    AFTER HURRICANE KATRINA; CORRECT?

15:07    13    **A.**  YES.

15:07    14    **Q.**  SOME FIVE, SIX YEARS AFTER THE FACT?

15:07    15    **A.**  YES.

15:07    16    **Q.**  AND CAN YOU TELL ME WHAT HAPPENED AT THE EBIA SITE DURING

15:08    17    THE PERIOD FROM JUST BEFORE HURRICANE KATRINA STRUCK TO WHEN

15:08    18    THOSE FUGRO BORINGS TOOK PLACE IN 2011?  WAS THERE ANY

15:08    19    SIGNIFICANT ACTIVITY AT THAT SITE?

15:08    20    **A.**  THERE WAS A GREAT DEAL OF SIGNIFICANT ACTIVITY.  THE CORPS

15:08    21    OF ENGINEERS CAME IN AND INSTALLED ROCK COFFERDAMS, LARGE

15:08    22    RIPRAP, VERY POROUS COFFERDAMS, AND THEN THEY WERE COMPRISED

15:08    23    DURING HURRICANE RITA A MONTH LATER.  AND THEN THEY CAME IN AND

15:08    24    REBUILT THE COFFERDAMS AGAIN.  AND THEN THEY HAD TO COME UP

15:08    25    WITH A SCHEME FOR REBUILDING THE EBIA FLOOD PROTECTION

JONATHAN DAVID ROGERS - REDIRECT


15:08     1    CORRIDOR.

15:08     2         AND SO EVERYTHING WAS PULLED BACK AND STOCKPILED.

15:08     3    THE LEVEE WAS -- THE SHEET PILES, THE WALL WAS TORN OFF.  THE

15:08     4    SHEET PILES WERE PUSHED DOWN, A NEW WALL WAS PUT UP.  SO THERE

15:08     5    WAS A TREMENDOUS AMOUNT OF SURCHARGE EFFORT THAT WENT IN THERE,

15:08     6    ESPECIALLY IN THE VICINITY WHERE THE SOUTH BREACH OCCURRED.

15:08     7         I FELT THAT AREA WAS SO DISTURBED THAT GOING IN THERE

15:09     8    AND DRILLING IS OKAY, YOU CAN GET SOME IDEA WHAT THE

15:09     9    STRATIGRAPHY WAS, BUT IT HAD BEEN PRELOADED.  SO YOU WOULDN'T

15:09    10    EXPECT THE COMPRESSIBLE MATERIALS TO BE REPRESENTATIVE OF WHAT

15:09    11    THEY PROBABLY WERE IN 2005 WHEN KATRINA HIT.  THEY HAD BEEN

15:09    12    PRELOADED FOR A COUPLE OF YEARS.

15:09    13         THAT PROJECT DIDN'T GET FINISHED OFF UNTIL EARLY

15:09    14    200- -- LATE 2007/EARLY 2008.  IT WAS JUST COMPLETED BY THE

15:09    15    TIME HURRICANE IKE AND GUSTAV HIT IN 2008, THANK GOODNESS.

15:09    16         AND THEN BEFORE THAT, OF COURSE, YOU HAVE, YOU KNOW,

15:09    17    THE LOADING OF THE WATER DURING KATRINA AND RITA AS WELL AS A

15:09    18    LOAD FACTOR, TOO.

15:09    19         SO THERE'S A LOT OF LOADING AND UNLOADING THAT WENT

15:09    20    ON AFTER AUGUST 29TH, 2005.

15:09    21    Q.   AND THE MMG BORINGS THAT YOU'VE REVIEWED AND THAT HAVE

15:09    22    BEEN CENTRAL TO THIS CASE, THOSE ARE ALL CONDUCTED AT OR NEAR

15:10    23    THE TIME THAT WGI'S WORK BEGAN AT THE EBIA SITE; CORRECT?

15:10    24    A.   YEAH, IN THE EARLY 2000S.

15:10    25    Q.   SO, OBVIOUSLY, THEY WEREN'T SUBJECT TO ANY OF THE SITE

JONATHAN DAVID ROGERS - REDIRECT

15:10   1   DISTURBANCES YOU'VE JUST DESCRIBED?

15:10   2   **A.**   CORRECT.

15:10   3   **Q.**   AND YOU'VE REVIEWED SOME OF THOSE BORINGS; CORRECT?

15:10   4   **A.**   YES.  THERE'S A GREAT NUMBER OF THEM.

15:10   5            **MR. SIMS:**  IF WE COULD PULL UP, PLEASE, JX-01660.

15:10   6   AND JUST THE FIRST PAGE, PLEASE.

15:10   7            IF YOU WOULD GO TO THE NEXT PAGE, PLEASE.

15:10   8   **BY MR. SIMS:**

15:10   9   **Q.**   THIS IS SOME OF THOSE MMG BORINGS; CORRECT?

15:10   10  **A.**   YES.

15:10   11  **Q.**   AND THESE ARE FOR THE BOLAND MARINE SITE; IS THAT RIGHT?

15:10   12  **A.**   YES.

15:10   13  **Q.**   AND THE DATE ON THESE IS JULY 2002?

15:10   14  **A.**   YES.

15:10   15           **MR. SIMS:**  AND IF YOU COULD TURN TO PAGE 112 OF THIS

15:10   16  DOCUMENT, PLEASE.  AND HIGHLIGHT THIS AREA DOWN HERE.

15:11   17  **BY MR. SIMS:**

15:11   18  **Q.**   NOW, IN YOUR TESTIMONY YOU SPOKE ABOUT STRINGERS, PEAT AND

15:11   19  HIGHLY ORGANIC MATERIAL; IS THAT RIGHT?

15:11   20  **A.**   YES.

15:11   21  **Q.**   WOULD YOU USE THIS TERM "LENS"?  IS THAT ANOTHER TERM YOU

15:11   22  WOULD USE --

15:11   23  **A.**   YES.

15:11   24  **Q.**   -- TO DESCRIBE THE PRESENCE?

15:11   25  **A.**   YEAH.

JONATHAN DAVID ROGERS - REDIRECT


15:11    1    **Q.**   AND THIS HAS SOME PEAT PRESENT AND ORGANIC CLAY PRESENT --

15:11    2         **MR. SIMS:**   CARL, IF YOU COULD SCROLL TO THE LEFT SO

15:11    3    WE COULD HAVE THAT ELEVATION -- OR THE DEPTH, I SHOULD SAY.

15:11    4    RIGHT AROUND THERE.  IT'S TO THE LEFT.  WE NEED THE NUMBERS ON

15:11    5    THE LEFT.

15:11    6         **THE COURT:**   YEAH.  WE NEED TO GO A LITTLE MORE TO

15:11    7    THE -- YEAH.

15:11    8    **BY MR. SIMS:**

15:11    9    **Q.**   IT LOOKS ABOUT EIGHT FEET.  YOU'VE GOT IT ON YOUR SCREEN

15:11   10    THERE; IS THAT RIGHT?  A DEPTH OF ABOUT EIGHT FEET?

15:11   11    **A.**   YES.

15:11   12    **Q.**   AND JUST ABOVE THAT, IN FACT, AT A DEPTH OF APPROXIMATELY

15:11   13    SEVEN FEET, THERE'S A NOTATION OF CLAY WITH ABUNDANT ORGANICS;

15:12   14    IS THAT RIGHT?

15:12   15    **A.**   YES.

15:12   16         **MR. SIMS:**   AND IF WE COULD TURN TO 151 IN THIS

15:12   17    DOCUMENT, PLEASE?  AND IF YOU COULD BLOW UP THIS SECTION RIGHT

15:12   18    IN HERE.

15:12   19         YOU'RE MISSING THE NUMBERS.  I NEED THE NUMBERS.

15:12   20    RIGHT THERE.  THANK YOU.

15:12   21    **BY MR. SIMS:**

15:12   22    **Q.**   AND DOES THIS APPEAR TO SHOW AN ORGANIC RICH, SILTY CLAY

15:12   23    BEGINNING AT APPROXIMATELY THREE FEET IN DEPTH?

15:12   24    **A.**   YES.

15:12   25         **MR. SIMS:**   AND IF YOU COULD TURN TO 166, PLEASE.

JONATHAN DAVID ROGERS - REDIRECT


15:12    1           AND I'M GOING TO ASK YOU TO -- I APOLOGIZE.

15:12    2  THAT'S ACTUALLY THE WRONG ONE.  168, PLEASE.  WE'RE GOING TO

15:12    3  FOCUS IN ON --

15:12    4           I'M SORRY, CARL.  MOVE ON TO THE NEXT ONE.  I'VE

15:12    5  GOT THE NUMBER WRONG.  I WANT PAGE 72, PLEASE, IN THAT

15:12    6  DOCUMENT.  RIGHT IN HERE, IF YOU COULD GET IN ON THIS AREA.

15:13    7  THANK YOU.

15:13    8  **BY MR. SIMS:**

15:13    9  **Q.**  AND, ONCE AGAIN, YOU'VE GOT SILT WITH ORGANIC RICH LAYERS;

15:13  10  IS THAT RIGHT?  AND THAT'S STARTING AT ABOUT FIVE FEET?

15:13  11  **A.**  YES.

15:13  12  **Q.**  AND THEN WE HAVE SOME PEATY ORGANIC SILT DOWN HERE

15:13  13  STARTING AT ABOUT EIGHT AND A HALF FEET?

15:13  14  **A.**  YES.

15:13  15        **MR. SIMS:**  AND IF YOU COULD GO TO 79, PLEASE, CARL?

15:13  16  AND RIGHT AROUND HERE, PLEASE.

15:13  17  **BY MR. SIMS:**

15:13  18  **Q.**  IT LOOSE LIKE YOU'VE GOT A LAYER OF ORGANIC RICH CLAY

15:13  19  RIGHT AROUND THE DEPTH OF EIGHT FEET?

15:13  20  **A.**  YES.

15:13  21  **Q.**  OKAY.  SO YOU'VE SEEN, AS YOU'VE REFERRED TO IN YOUR

15:13  22  TESTIMONY, THE CROSS SECTIONS THAT WERE COMPARED BY DR. MARR,

15:14  23  IS THAT RIGHT, IN THIS CASE?

15:14  24  **A.**  YES.

15:14  25  **Q.**  AND YOU UNDERSTAND HE'S ONE OF THE EXPERTS FOR THE

JONATHAN DAVID ROGERS - REDIRECT

15:14     1   DEFENDANT?

15:14     2   **A.**   YES.

15:14     3   **Q.**   ALL RIGHT.  LET'S PULL UP ONE OF THOSE CROSS SECTIONS.

15:14     4            **MR. SIMS:**  LET'S PULL UP JX-1871, AND I'D LIKE

15:14     5   PAGE 14-A.

15:14     6            THANK YOU.

15:14     7            AND IF YOU COULD SCROLL OVER, CARL, SO WE HAVE

15:14     8   THE ELEVATION -- I'M SORRY, THE DEPTH.

15:14     9   **BY MR. SIMS:**

15:14    10   **Q.**   AND IS THIS ONE OF THE CROSS SECTIONS THAT YOU REVIEWED

15:14    11   THAT COMES FROM DR. MARR'S REPORT?

15:14    12   **A.**   YES.

15:14    13   **Q.**   AND WITHOUT GOING THROUGH EACH CROSS SECTION, IS IT FAIR

15:14    14   TO SAY THAT DR. MARR CHARACTERIZED --

15:14    15            **THE COURT:**  WAIT.  JUST A MINUTE, SIR.  I'M SORRY.

15:14    16            **MS. DALEY:**  WE HAVE A PROBLEM, JUDGE.

15:14    17            **THE COURT:**  WHAT'S THE PROBLEM?

15:14    18            **MS. DALEY:**  WE DON'T HAVE THE EXHIBITS.  THEY WEREN'T

15:14    19   PROVIDED, THOSE NUMBERS, SO I HAVE TO GO GET THEM.

15:15    20            **THE COURT:**  WE'LL TRY TO CORRECT THIS MATTER ABOUT

15:15    21   EXHIBITS AND NUMBERS AFTER WE FINISH.

15:15    22            **MR. SIMS:**  THANK YOU, YOUR HONOR.

15:15    23            **THE COURT:**  GO AHEAD.

15:15    24            **MR. SIMS:**  COULD YOU PUT THAT BACK ON THE SCREEN,

15:15    25   PLEASE?

JONATHAN DAVID ROGERS - REDIRECT


15:15    1    **BY MR. SIMS:**

15:15    2    **Q.**   AND, AGAIN, YOU RECOGNIZE THIS AS ONE OF DR. MARR'S CROSS

15:15    3    SECTIONS?

15:15    4    **A.**   YES.

15:15    5    **Q.**   AND IF CARL COULD BLOW IT UP, THERE'S A NOTATION HERE FOR

15:15    6    THE LAYER OF SOIL.  AND IT SAYS, "UPPER ORGANIC CLAY AND LOWER

15:15    7    ORGANIC CLAY"?

15:15    8    **A.**   YES.

15:15    9    **Q.**   AND IN REVIEWING DR. MARR'S CROSS SECTIONS, DID HE

15:15   10    GENERALLY SHOW THAT UPPER ORGANIC CLAY LAYER STARTING AT DEPTHS

15:15   11    AROUND MINUS 5, MINUS 6?

15:15   12    **A.**   YES.

15:15   13    **Q.**   ABOUT FIVE OR SIX FEET DOWN?

15:15   14    **A.**   YES.

15:15   15    **Q.**   AND THAT'S QUITE A BIT DIFFERENT FROM THE STATEMENT MADE

15:15   16    BY MR. RUPERT IN REGARDS TO THE 1960 -- SORRY -- BY COUNSEL FOR

15:15   17    DOJ IN REFERENCE TO THE 1966 DESIGN MEMORANDUM WHERE THAT

15:15   18    SECTION INDICATED THAT THE LEAN CLAY FILL OCCUPIED THE UPPER

15:15   19    STRATIGRAPHY AT A DEPTH OF APPROXIMATELY 11 TO 13 FEET;

15:16   20    CORRECT?

15:16   21    **A.**   RIGHT.  AND THAT'S WHY I -- AND I MADE THAT COMMENT BACK

15:16   22    TO HIM WHEN I WAS BEING CROSS-EXAMINED BY HIM.  SO THIS

15:16   23    DEMARCATION BETWEEN CLAY FILL AND UPPER ORGANIC CLAYS, THAT'S

15:16   24    THE OLD BAYOU BIENVENUE MARSH, THAT UPPER ORGANIC CLAY.  THAT'S

15:16   25    WHY YOU'RE SEEING ALL THOSE ORGANICS AND THEY'RE PRESERVED.

JONATHAN DAVID ROGERS - REDIRECT


15:16   1        AND THEN THE CLAY FILL IS THE CLAY FILL.  IT'S THE

15:16   2   DREDGE SPOILS THAT CAME OUT OF THE IHNC IN THREE DIFFERENT

15:16   3   GENERATIONS OF DREDGING AND GOT PILED ON TOP OF BAYOU BIENVENUE

15:16   4   MARSH -- OR SWAMP, I'M SORRY.

15:16   5   **Q.**   AND THE KNOWLEDGE THAT THOSE ORGANIC CLAYS COULD BE

15:16   6   ENCOUNTERED AT DEPTHS AS SHALLOW AS FIVE OR SIX FEET, THAT

15:16   7   COMES FROM THE MMG BORINGS; CORRECT?

15:16   8   **A.**   YES.

15:16   9   **Q.**   AND THAT INFORMATION WAS AVAILABLE TO WGI WHEN IT WAS

15:16   10   PERFORMING ITS EXCAVATIONS; CORRECT?

15:16   11   **A.**   WELL, THAT WAS THEIR SUBCONTRACTOR AND PARTNER.  THEY WERE

15:16   12   THEIR ENVIRONMENTAL TESTING PARTNER, YES.

15:16   13   **Q.**   SO LET ME ASK YOU, DR. ROGERS:  HAVE YOU SEEN ANY EVIDENCE

15:16   14   THAT ANYONE FROM WGI OR THE CORPS LOOKED AT THE 1966 DESIGN

15:17   15   MEMORANDUM'S ASSESSMENT OF SEEPAGE AND UPLIFT IN CONNECTION

15:17   16   WITH THEIR WORK AT THE EBIA SITE?

15:17   17   **A.**   I HAVEN'T SEEN ANY DOCUMENTATION OF THAT, NO.

15:17   18        **THE COURT:**  THE COURT ASKED THAT VERY QUESTION ABOUT

15:17   19   AN HOUR AGO.

15:17   20        **MR. SIMS:**  THANK YOU, YOUR HONOR.

15:17   21        **THE WITNESS:**  OH, THAT'S RIGHT.

15:17   22   **BY MR. SIMS:**

15:17   23   **Q.**   HOW DID YOU -- GIVEN THAT, IS IT FAIR TO SAY THAT NO ONE

15:17   24   FROM WGI AND THE CORPS, TO YOUR KNOWLEDGE, EVER LOOKED AT THE

15:17   25   MMG SOIL BORINGS AND THE SCOPE OF WORK BEING COMPLETED BY WGI

JONATHAN DAVID ROGERS - REDIRECT

15:17   1   AND COMPARED IT WITH WHAT WAS ASSUMED BACK IN 1966 AND WHAT WAS

15:17   2   KNOWN?

15:17   3   **A.**   RIGHT.   THAT'S THE KIND OF THING YOU WOULD EXPECT TO OCCUR

15:17   4   IF THEY HAD SHOT A MEMO OFF THE SITE UP TO THE ENGINEERING

15:17   5   DIVISION TO ASK FOR ADVICE OR CONCURRENCE OR REVIEW, THE

15:17   6   GEOTECHNICAL BRANCH WOULD BE THE PEOPLE WHO WOULD DO THAT.

15:17   7        THEY WOULD GO BACK AND GET THE -- DO YOU REMEMBER

15:17   8   DR. GRIESHABER'S DEPOSITION?  HE STATED IT QUITE WELL.  THEY

15:18   9   WOULD GO BACK AND THEN LOOK AT THE ORIGINAL DESIGN

15:18   10  DOCUMENTATION AND THEN LOOK AT WHAT'S PROPOSED OR WHAT'S BEING

15:18   11  DONE OUT THERE AND THEY WOULD BE THE ONES WHO WOULD MAKE THAT

15:18   12  GEOTECHNICAL COMPARISON.  BUT YOU HAVE TO NOTIFY THEM THAT YOU

15:18   13  WANT THAT.

15:18   14  **Q.**   IN FACT, IN RESPONSE TO MR. TREEBY'S QUESTION ABOUT

15:18   15  WHETHER OR NOT WGI WAS EVER AUTHORIZED BY THE CORPS TO DO A

15:18   16  GEOTECHNICAL ENGINEERING ANALYSIS, I BELIEVE ONE OF YOUR

15:18   17  RESPONSES WAS, "WELL, THEY NEVER ASKED."  IS THAT RIGHT?

15:18   18  **A.**   CORRECT.

15:18   19  **Q.**   BUT WHY IS THAT IMPORTANT?

15:18   20  **A.**   WELL, YOU HAVE TO ASK AND YOU HAVE TO HAVE A JUSTIFICATION

15:18   21  WITH THE REQUEST TO GET AUTHORIZED TO GET PAID FOR IT.  SO IT'S

15:18   22  A CATCH 22 THAT YOU GET IN.  IF YOU'RE THERE AND YOU SAY,

15:18   23  "WELL, THEY'RE NOT GOING TO PAY FOR ME TO HAVE ENGINEERING,"

15:18   24  WHICH COULD BE THE WAY YOU FEEL, BECAUSE THEY KEEP PUSHING ON

15:18   25  YOU AND SAYING, "HEY, YOU GUYS ARE SPENDING TOO MUCH.  YOU'RE

JONATHAN DAVID ROGERS - REDIRECT


15:18   1    GOING WAY OVER BUDGET."  YOU'VE GOT TO FIGHT THEM.  I MEAN, I

15:18   2    HAVE THAT SAME PROBLEM WITH THEM AS WELL.

15:18   3          YOU HAVE TO FIGHT THEM AND SAY, "NO.  WE JUST WANT TO

15:18   4    KNOW IF YOU CONCUR WITH THIS.  AND IF YOU THINK WE NEED TO HAVE

15:19   5    GEOTECHNICAL -- OR OUR OWN GEOTECHNICAL EXPERTISE OUT HERE, YOU

15:19   6    NEED TO TELL US THAT, TOO.  WE THINK WE NEED TO HAVE SOMEBODY."

15:19   7          AND SO USUALLY IT'S A GIVE AND TAKE.  YOU SHOOT IT UP

15:19   8    THE CHAIN.  BUT, BASICALLY, GEOTECHNICAL ISSUES HAVE TO BE

15:19   9    ANSWERED BY THE GEOTECHNICAL BRANCH, NOT SOMEBODY ELSE MAKING

15:19   10   THAT DECISION FOR THEM.  YOU GOT TO RUN IT BY THEM.

15:19   11         AND, GENERALLY, THEY'RE GOING TO TAKE A LOOK AT IT

15:19   12   FOR AN HOUR AND GET BACK TO YOU AND LET YOU KNOW IF THEY -- IF

15:19   13   YES, NO, OR WE NEED TO DO MORE.

15:19   14   **Q.**   AND SO DID YOU SEE ANY EVIDENCE THAT WGI EVER ASKED FOR

15:19   15   AUTHORITY TO PERFORM GEOTECHNICAL ENGINEERING ANALYSES IN

15:19   16   CONNECTION WITH THEIR WORK AT THE EBIA SITE?

15:19   17   **A.**   INCREDIBLY, I NEVER DID.

15:19   18   **Q.**   AND YOU REVIEWED THE CONTRACT DOCUMENTS THAT ACTUALLY GAVE

15:19   19   WGI RESPONSIBILITY FOR ALL ENGINEERING SERVICES; CORRECT?

15:19   20   **A.**   INCLUDING GEOTECHNICAL.

15:19   21         **MR. TREEBY:**  OBJECTION, YOUR HONOR.  THAT GOES BEYOND

15:19   22   WHAT THIS WITNESS HAS TESTIFIED TO AND HE SAID HE HADN'T LOOKED

15:19   23   AT ANY OF THESE DOCUMENTS BEFORE, AND THEY DON'T AUTHORIZE

15:19   24   THAT, AS YOUR HONOR WELL KNOWS AND HAS RULED.

15:19   25         **MR. SIMS:**  YOUR HONOR, WE ACTUALLY SPECIFICALLY

JONATHAN DAVID ROGERS - REDIRECT


15:20   1   ADDRESSED THESE CONTRACTS.

15:20   2           **THE COURT:**  YEAH.  I'M GOING TO ALLOW THE QUESTION.

15:20   3   YOUR OBJECTION IS NOTED AND THE COURT WILL ULTIMATELY HAVE TO

15:20   4   INTERPRET THE CONTRACTS TO DETERMINE WHAT THE RESPONSIBILITY

15:20   5   ACTUALLY WAS.

15:20   6   **BY MR. SIMS:**

15:20   7   **Q.**   NOW --

15:20   8           **THE COURT:**  IN LIGHT OF ALL THE TESTIMONY, OF COURSE.

15:20   9           GO AHEAD.

15:20   10  **BY MR. SIMS:**

15:20   11  **Q.**   DR. ROGERS, YOU SAID THAT, I THINK, AS A GENERAL MATTER,

15:20   12  RIVER SAND IN TERMS OF ITS USE AS BACKFILL MATERIAL AT THE EBIA

15:20   13  SITE WAS PROPER; IS THAT RIGHT?

15:20   14  **A.**   YEAH, DEPENDING WHERE YOU PUT IT.  YOU WOULDN'T WANT TO

15:20   15  PUT IT IN EXCAVATION ON SURKOTE ROAD RIGHT OUT BY THE LEVEE

15:20   16  NECESSARILY.  YOU'D WANT THE GEOTECHNICAL BRANCH'S CONCURRENCE

15:20   17  TO DO SOMETHING LIKE THAT.  THE FARTHER AWAY YOU GET FROM THE

15:20   18  LEVEE, THE LESS CONCERNED I OR THEM WOULD PROBABLY BE.

15:20   19           BUT A LOT OF TIMES, YOU KNOW, YOU HAVE TO BRING IN

15:20   20  THE SAND BECAUSE IT'S EASY -- IT'S LESS COMPRESSIBLE.  AND IF

15:20   21  YOU WANT TO HAVE WORKING SURFACES AND YOU'VE GOT A LOT OF

15:20   22  EQUIPMENT -- I MEAN, THEY'RE TRUCKING 53,000 TONS OF TAINTED

15:20   23  MATERIALS OFF THIS SITE.  THAT'S A LOT OF LOADING BY TRUCKLOAD.

15:20   24  THAT'S A LOT OF TRUCKLOADS, THOUSANDS OF TRUCKLOADS.

15:21   25           SO YOU HAVE TO BRING SOMETHING OUT THERE SO THEY CAN

JONATHAN DAVID ROGERS - REDIRECT


15:21    1   WORK -- HAVE THEIR TRAFFICABILITY AND WORKABILITY ON THE SITE.

15:21    2   SO THAT'S -- THAT'S JUST A REALITY.

15:21    3   **Q.**   AND IN DETERMINING HOW CLOSE TO THE ACTUAL FLOODWALL YOU

15:21    4   COULD USE RIVER SAND AS BACKFILL, IS THAT SOMETHING THAT WOULD

15:21    5   REQUIRE THE INPUT OF GEOTECHNICAL?

15:21    6   **A.**   YEAH.  GEOTECHNICAL TYPICALLY WANTS TO SEE THAT,

15:21    7   ESPECIALLY IF YOU'RE WITHIN, YOU KNOW, FAIRLY CLOSE PROXIMITY

15:21    8   OF THE WALL, LIKE, YOU KNOW, 100 FEET AWAY.  YEAH, THEY'RE

15:21    9   DEFINITELY GOING TO BE INTERESTED IN IT.

15:21   10           AND THEY'LL TYPICALLY TELL YOU IF THERE'S -- IF

15:21   11   YOU'RE GOING TO BACKFILL WITH SAND OR SOMETHING, THEY USUALLY

15:21   12   HAVE YOU PUT IN A CLAY LINER BETWEEN THE CUT AND YOUR SAND FILL

15:21   13   SO THAT YOU HAVE SOME SORT OF SEEPAGE BARRIER THERE PROTECTING

15:21   14   THE WALL AND YOU DON'T DIMINISH THE FACTOR SAFETY OF THE WALL.

15:21   15   **Q.**   AND IN YOUR REVIEW OF THE VARIOUS SITE PHOTOGRAPHS, DID

15:21   16   YOU SEE ANY EVIDENCE OF THE USE OF SAND AS A BACKFILL MATERIAL

15:22   17   IN AREAS THAT YOU FOUND TO BE TOO CLOSE TO THE LEVEE?

15:22   18   **A.**   YEAH.  UP AROUND THE BOLAND, THAT AREA 8, AREA 6.

15:22   19   **Q.**   AND DID YOU SEE ANY EVIDENCE THAT ANYONE FROM

15:22   20   GEOTECHNICAL, EITHER WITHIN WGI OR WITHIN THE CORPS, HAD

15:22   21   EVALUATED THE USE OF BACKFILL AT THAT LOCATION -- I'M SORRY,

15:22   22   THE USE OF SAND AS BACKFILL MATERIAL AT THAT LOCATION?

15:22   23   **A.**   I DIDN'T SEE ANYTHING THAT WAS A TECHNICAL EVALUATION OF

15:22   24   IT OR RUNNING IT BY THE GEOTECHNICAL BRANCH, WHICH SURPRISED

15:22   25   ME.

JONATHAN DAVID ROGERS - REDIRECT

15:22    1    **Q.**   AND YOU WERE ASKED SOME QUESTIONS ABOUT ONE OF THE

15:22    2    ENGINEERING MANUALS.  IT WAS THE -- I'M SORRY, LET ME GET TO

15:22    3    THE RIGHT ONE HERE -- DESIGN AND CONSTRUCTION OF LEVEES.  DO

15:22    4    YOU RECALL THAT?

15:22    5    **A.**   YES.

15:22    6    **Q.**   AND MR. TREEBY SHOWED YOU A TABLE THAT TALKED ABOUT THESE

15:22    7    PIT FILLS?

15:22    8    **A.**   YES.

15:22    9    **Q.**   AND IS THERE ANYTHING -- AND I'LL DIRECT YOUR ATTENTION TO

15:22   10    SPECIFICALLY SECTION 4.1 OF THAT DOCUMENT.  IS THERE AN

15:23   11    ACKNOWLEDGMENT IN THAT DOCUMENT ABOUT SOME OF THE RISKS

15:23   12    ASSOCIATED WITH BORROW PITS?

15:23   13    **A.**   YES.

15:23   14            **MR. SIMS:**  AND, CARL, IF YOU COULD BRING UP JX-46,

15:23   15    PAGE 32, PLEASE.

15:23   16                 AND IF YOU COULD HIGHLIGHT THE FIRST PARAGRAPH,

15:23   17    PLEASE.

15:23   18    **BY MR. SIMS:**

15:23   19    **Q.**   IS THIS THE LANGUAGE YOU WERE REFERRING TO WHEN YOU TALKED

15:23   20    ABOUT THE WARNING IN 1913 ABOUT USE OF BORROW PITS?

15:23   21    **A.**   YES.

15:23   22    **Q.**   AND WHAT DOES THIS TELL YOU IN TERMS OF WHETHER OR NOT IT

15:23   23    COULD BE ACCEPTABLE TO USE UNCOMPACTED FILL IN ALL INSTANCES

15:23   24    FOR BORROW PITS?

15:23   25    **A.**   WELL, CAN I READ IT, COUNSEL?

JONATHAN DAVID ROGERS - REDIRECT

15:23    1   **Q.**   SURE.IT?

15:23    2   **A.**   IT SAYS:  "4.1.  GENERAL" -- WHICH IS -- CHAPTER 4 IS

15:23    3   BORROW AREAS.

15:23    4            IT SAYS:  "IN THE PAST, BORROW AREAS WERE SELECTED

15:23    5   LARGELY ON THE BASIS OF MATERIAL TYPES AND QUANTITIES AND HAUL

15:24    6   DISTANCES.  TODAY, BORROW AREAS RECEIVE MUCH MORE ATTENTION AND

15:24    7   MUST BE CAREFULLY PLANNED AND DESIGNED, BECAUSE OF

15:24    8   CONSIDERATIONS, SUCH AS ENVIRONMENTAL ASPECTS, INCREASING LAND

15:24    9   VALUES, AND GREATER RECOGNITION OF THE EFFECTS OF BORROW AREAS

15:24   10   WITH RESPECT TO UNDERSEEPAGE, UPLIFT PRESSURES, OVERALL LEVEE

15:24   11   STABILITY, AND EROSION."

15:24   12            AND THEN THE FOLLOWING PARAGRAPHS DISCUSS SOME OF

15:24   13   THOSE FACTORS INVOLVED IN LOCATING AND USING BORROW AREAS.

15:24   14            AND IN 1913, 2000 VERSION, THEY ADDED A GRAPHIC,

15:24   15   FIGURE 4.1, WHICH IS ON PAGE 34, WHERE THEY TALK ABOUT THE

15:24   16   DESIRE TO MAKE THEM SHALLOWER AND BROADER AND GET THEM FARTHER

15:24   17   AWAY FROM THE LEVEES THAN THEY HAD BEEN HISTORICALLY.

15:24   18   **Q.**   AND SO RETURNING ACTUALLY TO PAGE 32, TOWARDS THE BOTTOM

15:24   19   OF THAT PAGE UNDER THE SECTION 4.3A --

15:25   20            **MR. SIMS:**  AND, CARL, RIGHT AROUND --

15:25   21   **BY MR. SIMS:**

15:25   22   **Q.**   AND THERE'S A STATEMENT HERE THAT:  "BORROW AREAS MAY

15:25   23   INCREASE THE SEVERITY OF UNDERSEEPAGE EFFECTS"?

15:25   24   **A.**   YES.

15:25   25   **Q.**   IS THAT ONE OF THE REASONS SOMEONE CAN'T MAKE A BLANKET

JONATHAN DAVID ROGERS - REDIRECT

15:25    1    STATEMENT THAT A BORROW PIT OR PITS IN GENERAL ADJACENT TO A

15:25    2    LEVEE CAN BE UNCOMPACTED?

15:25    3    **A.**    CORRECT.

15:25    4    **Q.**    AND DOES THAT EXCUSE THE ENGINEER FROM HAVING TO PERFORM

15:25    5    ANY KIND OF ANALYSIS TO DETERMINE IF, IN FACT, THE FILLS USED

15:25    6    IN THAT BORROW PIT HAVE TO BE COMPACTED?

15:25    7    **A.**    WELL, YOU'D WANT TO RUN IT BY GEOTECHNICAL AND GET THEIR

15:25    8    BUY-OFF ON IT.

15:25    9    **Q.**    AND THAT HAPPENED IN THIS CASE, DIDN'T IT, WITH RESPECT TO

15:25    10   THE BORROW PIT AT MCDONOUGH?  RIGHT?

15:25    11   **A.**    YES.

15:25    12   **Q.**    AND THERE WAS ACTUALLY A SPECIFIC PROCTOR STANDARD THAT

15:25    13   WAS PROVIDED; IS THAT RIGHT?

15:25    14   **A.**    THEIR RESPONSE, YES.

15:25    15   **Q.**    WHY DON'T WE TAKE A LOOK AT THAT DOCUMENT BRIEFLY?

15:25    16            **MR. SIMS:**  IT'S JX-1285.  AND IF YOU COULD TURN TO

15:26    17   THE SECOND PAGE AND BLOW UP RIGHT HERE.

15:26    18   **BY MR. SIMS:**

15:26    19   **Q.**    SO THERE'S A REQUEST FOR AN EVALUATION OF THE STABILITY OF

15:26    20   THE PROPOSED BORROW PIT; IS THAT RIGHT?

15:26    21   **A.**    YES.

15:26    22   **Q.**    AND THEN RETURNING TO THE FIRST PAGE --

15:26    23            **THE COURT:**  EXCUSE ME, COUNSEL.  I'M NOT CLEAR

15:26    24   FROM -- THIS REQUEST IS FROM WGI?

15:26    25            **MR. SIMS:**  NO, YOUR HONOR.  IT'S FROM LEE GUILLORY AT

JONATHAN DAVID ROGERS - REDIRECT

15:26    1    THE CORPS.  AND THERE WILL BE TESTIMONY REGARDING THIS DOCUMENT

15:26    2    IN SOME OF THE DEPOSITIONS.

15:26    3              **THE COURT:**  ALL RIGHT.

15:26    4              **MR. SIMS:**  IT WAS ACTUALLY PASSED THROUGH THE CHIEF

15:26    5    OF CONSTRUCTION TO THE CHIEF OF ENGINEERING.

15:26    6              **THE COURT:**  ALL RIGHT.

15:26    7    BY MR. SIMS:

15:26    8    **Q.**  AND SO THERE WAS A REQUEST TO EVALUATE THAT BORROW PIT.

15:26    9    AND LET'S RETURN TO THE FIRST PAGE, WHICH WAS THE RESPONSE FROM

15:26   10    THE GEOTECHNICAL BRANCH; CORRECT?

15:26   11    **A.**  WELL, IT CAME THROUGH -- YEAH, IT PROBABLY WAS FROM THE

15:26   12    GEOTECHNICAL BRANCH.  IT CAME THROUGH GERALD SATTERLEE, WHO'S

15:26   13    CHIEF OF THE ENGINEERING DIVISION, WHICH IS WHAT THE

15:26   14    GEOTECHNICAL BRANCH IS A COMPONENT PART OF.

15:26   15    **Q.**  AND THE RESPONSE FROM GEOTECHNICAL WAS YOU HAD TO COMPACT

15:27   16    TO 90 PERCENT PROCTOR; RIGHT?

15:27   17    **A.**  YES.

15:27   18    **Q.**  SO REGARDLESS OF WHAT 1913 SAYS ABOUT THE USE OF PIT FILLS

15:27   19    AND UNCOMPACTED FILL MATERIAL, IN THIS CASE, GEOTECHNICAL

15:27   20    LOOKED AT IT AND SAID 90 PERCENT PROCTOR; RIGHT?

15:27   21    **A.**  RIGHT.  AND THE REASON WE THINK IT'S THE GEOTECHNICAL,

15:27   22    BECAUSE RIGHT BELOW THAT IT SAYS POC, PERSON OF CONTACT, IS

15:27   23    JULIE OLIPHANT, AND JULIE OLIPHANT WAS IN GEOTECHNICAL AT THE

15:27   24    TIME.

15:27   25    **Q.**  AND THIS ISN'T THE ONLY TIME THAT THE CORPS ACTUALLY

JONATHAN DAVID ROGERS - REDIRECT


15:27   1   DISCUSSED THE NEED TO PROPERLY BACKFILL AND COMPACT THE

15:27   2   MATERIALS THAT WERE USED AT THE EBIA SITE; RIGHT?

15:27   3   **A.**   RIGHT.  THERE WAS ONE OTHER OCCASION WHERE THERE WAS

15:27   4   CORRESPONDENCE TO THAT EFFECT.

15:27   5            **THE COURT:**  WHILE YOU'RE ON THE BORROW PIT, A QUICK

15:27   6   QUESTION, AND I'M SURE COUNSEL IS GOING TO GET TO IT, BUT WAS

15:27   7   THERE A CLAY LINING, TO YOUR KNOWLEDGE, INVOLVED WITH THE

15:27   8   BORROW PIT, ULTIMATELY?

15:27   9            **THE WITNESS:**  NO, BECAUSE IT WAS -- IT WAS COMPRISED

15:27   10  OF CLAY.  THEY COULD SEE THE CLAY ON THE SIDES OF THE BORROW

15:27   11  PIT.

15:27   12           **THE COURT:**  OKAY, OKAY.  WE HAD SOME TESTIMONY

15:27   13  EARLIER, SO I WANTED TO GET THAT STRAIGHT.

15:27   14           **MR. SIMS:**  IF YOU COULD TURN TO JX-1238, PLEASE.  AND

15:28   15  IF YOU COULD ACTUALLY TURN TO THE NEXT PAGE, WE'LL JUST

15:28   16  ESTABLISH WHO THIS IS FROM.

15:28   17  **BY MR. SIMS:**

15:28   18  **Q.**   DO YOU SEE JIM GATELY WROTE THIS?

15:28   19  **A.**   YES.

15:28   20           **MR. SIMS:**  AND IF YOU COULD RETURN TO THE FIRST PAGE.

15:28   21  **BY MR. SIMS:**

15:28   22  **Q.**   AND IT WAS TO MS. SPADARO.  DO YOU SEE THAT?

15:28   23  **A.**   YES.

15:28   24  **Q.**   AND YOU UNDERSTAND SHE'S ONE OF THE INDIVIDUALS WHO IS

15:28   25  ASSOCIATED FROM THE CORPS SIDE WITH THE EBIA SITE PROJECT?

JONATHAN DAVID ROGERS - REDIRECT

15:28    1   **A.**   SHE'S IN THE GEOTECHNICAL BRANCH, I BELIEVE, YES.

15:28    2             **MR. SIMS:**  AND IF YOU TURN TO SUBPARAGRAPH D OF THIS

15:28    3   DOCUMENT.

15:28    4   **BY MR. SIMS:**

15:28    5   **Q.**   THAT'S A COMPACTION STANDARD, ISN'T IT?

15:28    6   **A.**   YEP, AND THAT'S WHAT I WOULD EXPECT TO SEE, FOLKS.  THAT'S

15:28    7   THE MOST SIGNIFICANT THING I SAW DURING MY REVIEW OF THIS -- OF

15:28    8   THE EBIA SITE WAS:  "SOIL USED TO BACKFILL ANY OF THE

15:28    9   EXCAVATIONS SHOULD BE COMPACTED TO THE DENSITY OF THE EXISTING

15:28   10   SOIL."

15:28   11             BECAUSE YOU'RE TRYING TO LIMIT SEEPAGE INFILTRATION

15:29   12   TO WHAT IT WAS LIKE BEFORE YOU REMEDIATED IT.  YOU DON'T WANT

15:29   13   TO MAKE IT WORSE.  YOU KNOW, CAUSE NO HARM, DO NO HARM.

15:29   14   **Q.**   AND THERE'S NO DOUBT IN YOUR MIND --

15:29   15   **A.**   SO THAT'S THE NO-BRAINER -- THAT IS THE NO-BRAINER

15:29   16   RECOMMENDATION.  SO YOU'RE NOT SAYING TO THEM, "HEY, YOU GOT TO

15:29   17   DO IT TO 90, 95, 98, 100."  NO, YOU'RE SAYING, "YOU'VE GOT TO

15:29   18   DO IT TO WHAT IT IS ALREADY OUT THERE."  AND IT'S DREDGE

15:29   19   SPOILS, SO IT MIGHT BE ONLY 78.  IT MIGHT BE ONLY 69.

15:29   20             BUT YOU'VE GOT TO DO A DETERMINATION TO KNOW IF

15:29   21   YOU'RE GETTING IT TO THAT DENSITY.  THAT IS JUST THE WAY

15:29   22   GRADING WORKS, FOLKS.

15:29   23   **Q.**   AND DOES THAT DETERMINATION REQUIRE COMPACTION TESTING?

15:29   24   **A.**   WELL, IT REQUIRES COMPACTION TESTING.  AND EVEN ON THE

15:29   25   CORPS PROJECTS WHERE THEY DO SEMI-COMPACTED FILL, THEY DON'T DO

JONATHAN DAVID ROGERS - REDIRECT

15:29   1   COMPACTION TESTING, THEY STILL REQUIRE THE OPTIMUM MOISTURE

15:29   2   CONTENT DETERMINATION ON ALL THE EMERGENCY STORM REPAIRS AND

15:29   3   THINGS.  AND YOU HAVE TO -- YOU HAVE TO TRACK-WALK IT OR ROLL

15:30   4   IT WITHIN 10 POINTS OF OPTIMUM MOISTURE.

15:30   5           SO YOU HAVE TO HAVE SOME KIND OF TEST.  NONE OF US

15:30   6   HAVE, YOU KNOW, CALIBRATED EYES, EVEN THOSE OF US WITH PH.D.'S

15:30   7   IN DIRT, CAN JUST GO OUT THERE AND LOOK AT IT AND TELL YOU,

15:30   8   "YEAH, THAT'S FINE.  BASED ON MY 30 YEARS OF EXPERIENCE, I

15:30   9   THINK THAT'S 89 PERCENT."  IT DOESN'T WORK THAT WAY.

15:30   10          YOU HAVE TO DO THE TEST.  THE TEST IS THERE TO HELP

15:30   11  THE CONTRACTOR SO HE DOESN'T OVERDO IT OR UNDERDO IT, THAT HE

15:30   12  DOES IT JUST RIGHT.

15:30   13          AND IN THIS KIND OF CASE WHERE YOU'RE NOT GOING TO

15:30   14  DRIVE VEHICLES ON IT, IT'S NOT GOING TO BE USED FOR ANYTHING,

15:30   15  THERE'S YOUR STANDARD, PUT IT BACK TO THE DENSITY OF THE

15:30   16  EXISTING SOIL.

15:30   17          **MR. SIMS:**  AND, CARL, IF YOU COULD SCROLL UP AND JUST

15:30   18  SHOW THE DATE THAT APPEARS ON THE TOP OF THIS DOCUMENT.

15:30   19  **BY MR. SIMS:**

15:30   20  **Q.**  AGAIN, THIS IS JX-1238.  AND THIS IS SEPTEMBER OF 2000; IS

15:30   21  THAT RIGHT?

15:30   22  **A.**  YES.

15:30   23  **Q.**  AND THAT'S REALLY BEFORE ANY OF THE SUBSTANTIAL PORTION OF

15:30   24  THE EBIA SITE REMEDIATION BEGAN; CORRECT?

15:30   25  **A.**  CORRECT.

JONATHAN DAVID ROGERS - REDIRECT


15:31    1        AND SEE, THE SUBJECT LINE BENEATH JEAN SPADARO'S

15:31    2    NAME?  WHAT'S THE SUBJECT?  THE SUBJECT IS -- DOWN, DOWN, THE

15:31    3    NEXT ONE DOWN.  OH, YES, IT'S THE SAME ONE.  OKAY.  "GEO-TECH

15:31    4    INPUT FOR EAST SIDE DEMOLITION."  SO THERE YOU ARE.  THERE'S

15:31    5    YOUR GEOTECHNICAL INPUT.

15:31    6    Q.    AND HAVE YOU SEEN ANY EVIDENCE -- ANY EVIDENCE OF ANY KIND

15:31    7    THAT SUGGESTS THAT THE COMPACTION THAT OCCURRED AT THE EBIA

15:31    8    SITE MET THIS STANDARD?

15:31    9    A.    NO.  THAT'S MY COMPLAINT, FOLKS.  THAT'S IT.

15:31   10    Q.    NOW, DR. ROGERS, IN EVALUATING THE STANDARD OF CARE FOR A

15:31   11    SITE LIKE THIS, IS IT IMPORTANT TO CONSIDER THE DEGREE OF

15:31   12    MODIFICATIONS AND CHANGES THAT OCCURRED OVER THE LIFE OF THE

15:31   13    WORK?

15:31   14    A.    OF COURSE.

15:31   15    Q.    AND WHY IS THAT SO VITAL?

15:31   16    A.    BECAUSE WHEN WGI CAME ON -- NOW, THIS IS A VERY DIFFICULT

15:31   17    JOB.  THIS JOB, THEY HAD NO IDEA.  IT'S JUST A SERIES OF

15:31   18    MINEFIELDS AT DIFFERENT ELEVATIONS ALL OVER THIS PLACE.  THEY

15:32   19    HAD SOME IDEA OF WHAT THEY WERE GOING TO FIND OUT THERE, BUT

15:32   20    THERE'S NO WAY TO DOCUMENT ALL THE KINDS OF HETEROGENEITIES

15:32   21    THAT THEY DISCOVERED OUT THERE.

15:32   22        SO YOU HAVE TO DIG AND PROBE, JUST LIKE CLEARING A

15:32   23    MINEFIELD.  YOU DON'T HAVE A MAP OF WHERE THE MINES ARE, YOU

15:32   24    GOT TO GO FIND THEM.  AND SO YOU HAVE TO DOCUMENT, DOCUMENT,

15:32   25    DOCUMENT WHAT YOU'RE DOING AS YOU GO ALONG AND YOU'RE JUST

JONATHAN DAVID ROGERS - REDIRECT


15:32    1    DIGGING UP HOLES ALL OVER THE PLACE.  THIS PLACE IS JUST

15:32    2    CRISS-CROSSED WITH EXPLORATORY TRENCHES AND HOLES, EXCAVATION

15:32    3    HOLES.  YOU'RE TAKING STUFF OUT AND TAINTED MATERIAL IS COMING

15:32    4    OUT.

15:32    5         I MEAN, IT'S JUST A -- IT'S JUST A SWISS CHEESE MESS

15:32    6    UP THERE.  AND YOU CAN SAY, "WELL, IT'S ALL CLAY.  IT DOESN'T

15:32    7    MATTER, IT DOESN'T MATTER."  IT'S THE ANALOGY OF, YOU KNOW,

15:32    8    DYING BY A THOUSAND BEE STINGS.  ONE BEE STING IS NOT GOING TO

15:32    9    KILL YOU, BUT 5,000 BEE STINGS CAN KILL YOUR LEVEE.

15:32   10         SO THAT'S WHAT YOU -- THAT'S WHY YOU WANT

15:32   11    GEOTECHNICAL LOOKING AT IT.  GEOTECHNICAL NEEDS TO GET OUT

15:32   12    THERE AND SEE THE SCOPE, HOW MUCH EXCAVATION WORK WAS GOING ON.

15:33   13    THEY MIGHT HAVE -- I WOULD IMAGINE THEY'VE GOTTEN A LITTLE MORE

15:33   14    CONCERNED THAN HOW IT WAS ORIGINALLY PORTRAYED TO THEM IN THE

15:33   15    INITIAL -- THE INITIAL SUBMITTAL TO OLD THAT JUST LISTED TWO

15:33   16    AND A HALF TABLES OF THREE-FOOT DEEP EXCAVATIONS.

15:33   17    Q.   AND, IN FACT, YOU'VE SEEN WRITTEN STATEMENTS BY WGI ITSELF

15:33   18    THAT ACKNOWLEDGED THIS PROJECT WAS FAR MORE COMPLEX THAN

15:33   19    INITIALLY ANTICIPATED?

15:33   20    A.   IT SURE WAS.

15:33   21         MR. SIMS:  IF YOU COULD PULL UP 3082, PLEASE, PX.

15:33   22              AND IF YOU COULD BLOW UP THIS TOP HALF RIGHT

15:33   23    HERE.

15:33   24    BY MR. SIMS:

15:33   25    Q.   AND MR. O'CONNOR IS THE PROJECT MANAGER FROM WGI; CORRECT?

753

JONATHAN DAVID ROGERS - REDIRECT

15:33   1   **A.**   YES.

15:33   2   **Q.**   AND WHAT STATEMENT DOES HE MAKE ABOUT THE COMPLEXITY OF

15:33   3   THE EBIA PROJECT AS OPPOSED TO WORKING IN A PLACE LIKE IRAQ?

15:33   4   **A.**   DO YOU WANT ME TO READ IT?

15:34   5   **Q.**   SURE.

15:34   6   **A.**   THIS IS WRITTEN TUESDAY, AUGUST 2ND, 2005, A FEW WEEKS

15:34   7   BEFORE KATRINA, REGARDING NOTICE FROM THE STATE OF LOUISIANA

15:34   8   FOR EBIA.

15:34   9       "A MONTH OR SO AGO, I WAS ASKED WHAT I THOUGHT OF

15:34   10  WORKING IN IRAQ.  I RESPONDED BY SAYING, 'I'VE BEEN ON HARDER

15:34   11  JOBS, I'VE DEALT WITH TOUGHER PROBLEMS.'  OF COURSE, I WAS

15:34   12  REFERRING TO THE EBIA.  THE PEOPLE THAT WORKED ON THE EBIA

15:34   13  SHOULD BE CONGRATULATED.  I ALWAYS THOUGHT THAT THE COMPANY

15:34   14  FAILED TO UNDERSTAND THE DIFFICULTIES THAT THIS PARTICULAR JOB

15:34   15  PRESENTED."

15:34   16  **Q.**   YOU CAN STOP THERE.  THANK YOU, DR. ROGERS.

15:34   17       IS THIS PRETTY STRONG EVIDENCE THAT THE EBIA SITE

15:34   18  WORK WAS A LOT MORE DEMANDING ON WGI THAN IT THOUGHT GOING IN?

15:34   19  **A.**   YES.  AND YOU CAN SEE THAT JUST LOOKING AT THE

15:34   20  4,000 PHOTOGRAPHS, TOO.

15:34   21  **Q.**   AND DURING THE COURSE OF THE ROUGHLY FIVE YEARS THAT WGI

15:34   22  WAS OUT AT THE EBIA SITE, NOT ONCE DID THEY ASK THE CORPS TO BE

15:34   23  ABLE TO BRING IN ANY GEOTECHNICAL ENGINEERING EXPERTISE; RIGHT?

15:35   24  **A.**   RIGHT.

15:35   25  **Q.**   AND THERE WAS SOME DISCUSSION ABOUT THE CORPS APPROVING

JONATHAN DAVID ROGERS - REDIRECT


15:35    1    SOME OF THE WORK OUT AT THE EBIA SITE; CORRECT?

15:35    2    **A.**   YES.

15:35    3    **Q.**   AND YOU UNDERSTAND THAT MR. GUILLORY WAS THE CONSTRUCTION

15:35    4    MANAGER; RIGHT?

15:35    5    **A.**   YES.

15:35    6    **Q.**   AND, IN FACT, MR. MONTEGUT WAS WORKING UNDER HIM ON BEHALF

15:35    7    OF THE CORPS AND WAS ACTUALLY PRESENT AT THE SITE ON A DAY IN

15:35    8    AND DAY OUT BASIS?

15:35    9    **A.**   YES, THAT'S MY UNDERSTANDING.

15:35    10   **Q.**   AND MR. MONTEGUT WAS ONE OF THE INDIVIDUALS WHO WAS

15:35    11   PROVIDING APPROVAL TO WGI FOR THINGS LIKE COMPACTION; CORRECT?

15:35    12   **A.**   YES, THAT APPEARS TO BE THE CASE.

15:35    13   **Q.**   AND HAVE YOU SEEN ANY STATEMENTS FROM MR. MONTEGUT, FOR

15:35    14   EXAMPLE, IN HIS DEPOSITION, THAT SUGGESTS THAT HE MAY NOT

15:35    15   REALLY UNDERSTAND HOW COMPACTION WORKS?

15:35    16   **A.**   YES.

15:35    17          **MR. SIMS:**  WHY DON'T WE BRING THAT UP?  IT'S PAGE --

15:35    18   IT'S PAGE 74, CARL, OF THE MONTEGUT DEPOSITION.

15:36    19          AND IF YOU COULD START AT 73 AND PUT THOSE NEXT

15:36    20   TO EACH OTHER, PLEASE.

15:36    21          CAN YOU GET THEM NEXT TO EACH OTHER?

15:37    22          CARL, LET'S DO THIS, WHY DON'T YOU JUST BRING UP

15:37    23   PAGE 74, AND I'LL JUST SHOW IT FOR THE COURT.  HE HAS HIS

15:37    24   DEPOSITION TESTIMONY.

         25

JONATHAN DAVID ROGERS - REDIRECT


15:37    1    **BY MR. SIMS:**

15:37    2    **Q.**   AND I'LL DRAW YOUR ATTENTION -- BECAUSE MR. MONTEGUT,

15:37    3    OBVIOUSLY, GIVES QUITE A LONG ANSWER HERE.

15:37    4              **MR. TREEBY:**  YEAH, WE'D LIKE THE WHOLE ANSWER, YOUR

15:37    5    HONOR.

15:37    6              **MR. SIMS:**  AND THAT'S FINE WITH ME, YOUR HONOR.  IT'S

15:37    7    UP TO THE COURT'S PLEASURE.

15:37    8              **THE COURT:**  WELL, THE WHOLE ANSWER, IT'S IN THE

15:37    9    RECORD, AND I'VE READ IT.  BUT IF YOU WANT -- IT IS IN THE

15:37   10    RECORD.  IT'S BEEN INTRODUCED, RIGHT, MR. MONTEGUT'S

15:37   11    DEPOSITION?

15:37   12              **MR. SIMS:**  YES, YOUR HONOR, IT HAS.

15:37   13              **THE COURT:**  ALL RIGHT.

15:37   14    **BY MR. SIMS:**

15:37   15    **Q.**   SO MY QUESTION FOR YOU REALLY IS ON PAGE 74 AND STARTING

15:37   16    WITH THIS PASSAGE:  "AND IT WOULD HAVE BEEN VERY EASY TO NOTICE

15:37   17    IF THERE WAS A PROBLEM BECAUSE THE MATERIAL OVER TIME, IT WILL

15:37   18    ACHIEVE A CERTAIN AMOUNT OF COMPACTION ON ITS OWN."

15:37   19              AND HE TALKS ABOUT HOW THAT IT WOULD HAVE BEEN VERY

15:37   20    EASY TO KNOW IT BECAUSE THE AREA WOULD HAVE BEEN -- WOULD HAVE

15:37   21    SUBSIDED AND THERE WOULD HAVE BEEN A DEPRESSION OR A HOLE IN

15:37   22    THE GROUND AT THAT SITE.

15:37   23              YOU'VE SEEN THAT TESTIMONY BEFORE; CORRECT?

15:37   24    **A.**   YES.

15:37   25    **Q.**   AND IF A STUDENT IN ONE OF YOUR COURSES, IN RESPONSE TO A

JONATHAN DAVID ROGERS - REDIRECT

15:38   1   QUESTION OF HOW DO YOU EVALUATE PROPER COMPACTION, HAD GIVEN

15:38   2   THIS TYPE OF ANSWER, WHAT KIND OF GRADE WOULD YOU HAVE GIVEN

15:38   3   THAT STUDENT?

15:38   4   **A.**   I WOULD HAVE FLUNKED HIM BECAUSE THAT'S -- THE CAT'S

15:38   5   ALREADY OUT THE DOOR, YOU KNOW.  BY THAT TIME, YOU SEE IT

15:38   6   SINKING AND SETTLING DIFFERENTIALLY, IT'S TOO LATE TO DO MUCH

15:38   7   ABOUT IT WITHOUT GOING OUT AND GETTING ANOTHER CONTRACTOR GOING

15:38   8   GO BACK TO FIX IT.

15:38   9   **Q.**   AND, IN FACT, FOR MR. GUILLORY, ISN'T IT TRUE THAT HE

15:38   10   TESTIFIED THAT HE DOESN'T EVEN KNOW IF COMPACTION AFFECTS

15:38   11   SEEPAGE.  YOU SAW THAT TESTIMONY; CORRECT?

15:38   12   **A.**   YES, I SAW THAT ONE.

15:38   13   **Q.**   AND THESE ARE THE INDIVIDUALS WHO ARE APPROVING WGI'S

15:38   14   COMPACTION AND BACKFILL; RIGHT?

15:38   15   **A.**   YES.

15:38   16   **Q.**   BRIEFLY RETURN TO THE 1966 DESIGN MEMORANDUM.  YOU TALKED

15:38   17   ABOUT ISSUES RELATED TO ENGINEERING JUDGMENT, CORRECT, AND THE

15:38   18   IMPORTANCE OF EXERCISING THAT JUDGMENT?

15:38   19   **A.**   YEAH.

15:38   20   **Q.**   AND IN TERMS OF EVALUATING SOMETHING LIKE A FLOODWALL

15:38   21   THAT'S SET IN AN URBAN ENVIRONMENT FOR SEEPAGE AND UPLIFT

15:38   22   PRESSURES, DOES THAT JUDGMENT CONCERN SAFETY AND ISSUES OF

15:39   23   SAFETY?

15:39   24   **A.**   YES.  FIRST -- YOU KNOW, THAT'S ONE OF YOUR FOREMOST

15:39   25   ISSUES YOU'RE ALWAYS LOOKING AT IS SAFETY.

JONATHAN DAVID ROGERS - REDIRECT


15:39    1    **Q.**   DR. ROGERS, HAVE YOU SEEN ANYTHING IN THE 1966 DESIGN

15:39    2    MEMORANDUM TO SUGGEST THAT THAT LEVEE WAS NOT DESIGNED WELL OR

15:39    3    HAD BEEN DESIGNED IMPROPERLY?

15:39    4    **A.**   NO.

15:39    5    **Q.**   JUST CURIOUS, DR. ROGERS, WHAT WOULD HAVE THE COST OF

15:39    6    COMPACTION HAVE BEEN?  IN A PROJECT LIKE THIS, YOU UNDERSTOOD

15:39    7    THAT IT WAS ABOUT A 30-, $31 MILLION PROJECT.  WHAT WOULD THE

15:39    8    COST BE FOR SOMETHING LIKE THAT?  FOR COMPACTION TESTING, I

15:39    9    SHOULD SAY.

15:39   10    **A.**   I DID A ROUGH ESTIMATE OF IT.  CAN I GET UP ON THE BOARD?

15:40   11    **Q.**   SURE.  IF YOU KIND OF HAVE THE PUNCH LINE, I THINK THAT

15:40   12    MIGHT BE FINE FOR THE COURT.

15:40   13    **A.**   OKAY.

15:40   14    **Q.**   JUST AS A PERCENTAGE OF THE OVERALL CONTRACT, IF YOU COULD

15:40   15    STATE IT THAT WAY.

15:40   16    **A.**   OKAY.  ENGINEERS LIKE CALCULATORS.  I HAVE TO GET MY

15:40   17    CALCULATOR.

15:40   18          IF WE LOOK AT A JOB LIKE THIS WHERE IT'S JUST AN

15:40   19    ENVIRONMENTAL CLEANUP, IT'S NOT A HIGHWAY, IT'S NOT A DAM, IT'S

15:40   20    NOT A LEVEE EMBANKMENT, IT'S JUST GETTING THE DIRT BACK INTO

15:40   21    THE SAME BASIC DENSITY THAT IT IS.  IT'S PROBABLY NOT GOING TO

15:40   22    BE A REAL HIGH DENSITY.

15:40   23          I FIGURED THEY'D BE OUT THERE THREE AND A HALF YEARS

15:40   24    OF WORK.  AND I ADDED UP ABOUT HOW MUCH TIME THEY'RE ACTUALLY

15:40   25    WORKING AND THAT'S AT 50 WORK WEEKS A YEAR.

JONATHAN DAVID ROGERS - REDIRECT


15:40    1          **MR. TREEBY:**  YOUR HONOR, PLEASE.  THIS IS A BRAND-NEW

15:41    2   OPINION, COMPLETELY OUTSIDE HIS REPORT.

15:41    3          **THE COURT:**  THIS IS TRUE.

15:41    4          **MR. SIMS:**  YOUR HONOR, THERE WAS CROSS-EXAMIN- --

15:41    5          **MR. TREEBY:**  WE SUB --

15:41    6          **MR. SIMS:**  -- SOME TESTIMONY FROM --

15:41    7          **THE COURT:**  JUST A MINUTE.  LET HIM FINISH THE

15:41    8   OBJECTION.  LET HIM FINISH OBJECTING.  YOU FINISHED YOUR

15:41    9   RESPONSE.

15:41   10          GO AHEAD.

15:41   11          **MR. SIMS:**  THERE WAS SOME DISCUSSION ABOUT COMPACTION

15:41   12   TESTING AND WHETHER OR NOT THAT'S ACTUALLY REQUIRED AND WHETHER

15:41   13   OR NOT YOU COULD RELY ON SOMEONE ON THE FIELD FOR THAT.

15:41   14          IT SEEMS TO ME IF THE COURT, IN EVALUATING

15:41   15   WHETHER OR NOT THAT'S A REASONABLE POSITION, MIGHT WANT TO KNOW

15:41   16   WHAT KIND OF COSTS WE'RE TALKING ABOUT, IF THIS IS A

15:41   17   SIGNIFICANT COST OR NOT.

15:41   18          **MR. TREEBY:**  IF YOUR HONOR PLEASE, IT'S NOT A

15:41   19   QUESTION OF COST.  IT'S NONE OF THAT.  THIS IS AN EXPERT

15:41   20   OPINION THIS MAN IS GIVING FOR THE FIRST TIME RIGHT NOW, NOT IN

15:41   21   HIS REPORT.

15:41   22          **THE COURT:**  WELL, DON'T FORGET -- I DO AGREE WITH

15:41   23   THAT.  WE WENT INTO A LOT OF TESTIMONY ABOUT COMPACTION, NOT

15:41   24   NECESSARILY -- I REALIZE IT'S A NEW OPINION.  I UNDERSTAND

15:41   25   THAT.

JONATHAN DAVID ROGERS - REDIRECT


15:41    1        **MR. SIMS:**  BUT, YOUR HONOR, WHAT WE'RE TRYING TO

15:41    2    REBUT IS THE NOTION THAT WGI AND THE CORPS CAN RELY ON SOMEONE

15:41    3    AT THE SITE TO SIMPLY EYEBALL AND SAY THAT'S SUFFICIENT.

15:41    4        **THE COURT:**  WELL, HE'S ALREADY SAID IT'S NOT.  HE'S

15:42    5    ALREADY SAID IT'S NOT.

15:42    6        I CAN SAY THIS:  IF ANYBODY SAYS IT'S A MATTER

15:42    7    OF MONEY, I'M GOING TO SAY --

15:42    8        IS ANYBODY STATING THAT THE REASON IT WASN'T

15:42    9    COMPACTED WAS BECAUSE OF MONEY?  IS ANYBODY TAKING THAT

15:42   10    POSITION?

15:42   11        **MR. TREEBY:**  NO.  MY OBJECTION IS --

15:42   12        **MR. SMITH:**  NO, YOUR HONOR.

15:42   13        **THE COURT:**  THEN IT BECOMES IRRELEVANT.

15:42   14        **MR. SIMS:**  OKAY.  THANK YOU, YOUR HONOR.

15:42   15        THANK YOU, DR. ROGERS.

15:42   16        **THE WITNESS:**  THANK YOU, JUDGE.

15:42   17        **THE COURT:**  AND THANK YOU, SIR.

15:42   18        OKAY.  DON'T FORGET THE CROSS-EXAMINATION IS

15:42   19    GOING TO BE LIMITED TO, BASICALLY, NEW THINGS THAT WERE BROUGHT

15:42   20    OUT.  AND WE'LL SEE HOW THIS WORKS.

15:42   21        **MR. TREEBY:**  I HAVE A SHORT MEMORY, YOUR HONOR, SO

15:42   22    FOR MY SAKE, IT'S GOING TO BE VERY SHORT.

15:42   23        **THE COURT:**  OKAY.  SOMETIMES, MR. TREEBY, BREVITY IS

15:42   24    THE SOUL OF NOT ONLY WIT BUT PERSUASION.

        25

JONATHAN DAVID ROGERS - RECROSS

| | |
|---|---|
| 15:43 | 1 |
| 15:43 | 2 |
| 15:43 | 3 |
| 15:43 | 4 |
| 15:43 | 5 |
| 15:43 | 6 |
| 15:43 | 7 |
| 15:43 | 8 |
| 15:43 | 9 |
| 15:43 | 10 |
| 15:43 | 11 |
| 15:43 | 12 |
| 15:43 | 13 |
| 15:43 | 14 |
| 15:43 | 15 |
| 15:43 | 16 |
| 15:43 | 17 |
| 15:43 | 18 |
| 15:43 | 19 |
| 15:43 | 20 |
| 15:43 | 21 |
| 15:43 | 22 |
| 15:43 | 23 |
| 15:43 | 24 |
| 15:43 | 25 |

1                    **RECROSS-EXAMINATION**

2  **BY MR. MITSCH:**

3  **Q.**  DR. ROGERS, I JUST WANT TO CONFIRM ONE OF THE THINGS THAT

4  YOU SAID -- I THINK THAT YOU SAID.

5            MR. SIMS WAS ASKING YOU ABOUT THE MCDONOUGH MARINE

6  BORROW PIT AND I BELIEVE YOU SAID THAT IT WAS YOUR ASSUMPTION

7  THAT THE BORROW PIT WAS LINED WITH CLAY.  IS THAT TRUE?

8  **A.**  NO.

9            **THE COURT:**  NO, HE SAID JUST THE OPPOSITE.

10            **MR. TREEBY:**  IT WAS JUST THE OPPOSITE.

11            **MR. MITSCH:**  OKAY.

12            **THE COURT:**  BUT I ASKED HIM THAT AND HE SAID NO.

13            **MR. MITSCH:**  OKAY.

14            **MR. BRUNO:**  IT WAS ASKED AND ANSWERED.

15  **BY MR. MITSCH:**

16  **Q.**  NOW, YOU DISCUSSED THE TWO EXCAVATIONS ALONG SURKOTE ROAD,

17  WHICH I BELIEVE WERE APPROXIMATELY ABOUT 15 OR SO FEET AWAY

18  FROM SURKOTE ROAD.  AND MR. SIMS --

19  **A.**  NO, NO.

20  **Q.**  -- I BELIEVE, SHOWED YOU --

21  **A.**  16 FEET AWAY FROM THE FLOODWALL, THAT ONE?

22  **Q.**  YES, YES.

23  **A.**  OKAY.

24  **Q.**  I'M SORRY.

25  **A.**  AND ABOUT 125 FOOT LONG.  THAT'S ONE SECTION THAT I RECALL

JONATHAN DAVID ROGERS - RECROSS

15:43   1   THAT THEY RAN OVER THERE FOR REVIEW AT THE SAME TIME THEY RAN

15:43   2   THE BORROW PIT FOR REVIEW.

15:43   3   **Q.**   EXACTLY.

15:44   4          THOSE TWO, THE BORROW PIT -- THERE WAS DISCUSSION

15:44   5   ABOUT THE BORROW PIT AND THEN THERE WERE TWO OTHER EXCAVATIONS

15:44   6   AND THEY WERE ABOUT 15 FEET FROM SURKOTE ROAD; RIGHT?

15:44   7   **A.**   NO.   THEY WERE 15 -- 16 FEET FROM THE FLOODWALL.

15:44   8   **Q.**   FROM THE FLOODWALL.

15:44   9   **A.**   THEY WERE THE EXCAVATION OF SURKOTE ROAD.

15:44   10  **Q.**   THE GEOTECH EVALUATION THAT WAS DONE THERE, THE INPUT THAT

15:44   11  WAS SOUGHT, WAS THAT FOR SEEPAGE OR WAS THAT FOR A STABILITY

15:44   12  ANALYSIS?

15:44   13  **A.**   WELL, I DON'T KNOW.   I MEAN, WHEN IT GOES OVER TO THE

15:44   14  GEOTECHNICAL BRANCH, THEY WOULD LOOK AT BOTH OF THOSE THINGS.

15:44   15  IT'S A JUDGMENT CALL ON THEIR PART.   PROBABLY WHEN YOU GET REAL

15:44   16  CLOSE, SEEPAGE WOULD BE -- CERTAINLY WOULD BE AN ISSUE.

15:44   17         BUT THE REASON THAT MR. GUILLORY SENT IT OVER THERE

15:44   18  WAS BECAUSE THEY WERE GETTING INTO THE LEVEE ACTUALLY.   SO HE

15:44   19  WAS CONCERNED ABOUT, YOU KNOW, "ARE WE IN TROUBLE HERE BECAUSE

15:44   20  WE'RE ACTUALLY EXCAVATING INTO THE SLOPING GROUND COMING OFF

15:44   21  THE LEVEE?"

15:44   22         SO HE'S ASKING FOR A MINIMUM CONTROL LINE, WHICH IS

15:44   23  BASICALLY A -- A MINIMUM CONTROL LINE, FOR ALL THE REST OF YOU,

15:44   24  IS, BASICALLY, I CAN'T EXCAVATE DEEPER THAN THAT IMAGERY LINE

15:45   25  OR I'LL ENDANGER THE LEVEE.   AND THAT WAS THE PROPER THING TO

JONATHAN DAVID ROGERS - RECROSS

15:45   1   DO IN THAT PARTICULAR INSTANCE.  HE DID THE RIGHT THING.

15:45   2        **MR. MITSCH:**  THAT'S ALL I WANTED TO ESTABLISH.

15:45   3          THANK YOU.

15:45   4        **THE WITNESS:**  OKAY.

15:45   5        **THE COURT:**  THAT WAS INCISIVE.  THANK YOU, COUNSEL.

15:45   6                **RECROSS-EXAMINATION**

15:45   7   BY MR. TREEBY:

15:45   8   **Q.**  DR. ROGERS, CAN YOU POINT TO ANY SITUATION IN WHICH

15:45   9   WASHINGTON GROUP INTERNATIONAL DID NOT COMPLY WITH THE

15:45  10   DIRECTIONS GIVEN THEM BY THE CORPS AS TO COMPACTION?

15:45  11   **A.**  GIVEN TO THEM BY THE CONSTRUCTION ENGINEERS?

15:45  12   **Q.**  BY THE CORPS OF ENGINEERS' REPRESENTATIVES?

15:45  13   **A.**  NO, I CAN'T.

15:45  14   **Q.**  CAN YOU POINT TO ANY SITUATION IN WHICH WASHINGTON GROUP

15:45  15   INTERNATIONAL DID NOT BACKFILL WITH MATERIAL APPROVED BY THE

15:46  16   CORPS OF ENGINEERS' PERSONNEL?

15:46  17   **A.**  NO.

15:46  18   **Q.**  I JUST WANT TO CLEAR SOMETHING UP, AND I'M SURE YOU DIDN'T

15:46  19   MEAN THIS, BUT I WANT TO MAKE SURE.

15:46  20   **A.**  OKAY.

15:46  21   **Q.**  YOU USED A TERMINOLOGY "DEATH BY A THOUSAND STINGS."  DO

15:46  22   YOU RECALL THAT?

15:46  23   **A.**  YES.

15:46  24   **Q.**  YOU WEREN'T TRYING TO EXPRESS AN OPINION ON CAUSATION FOR

15:46  25   THE FLOODWALL FAILURE, WERE YOU?

JONATHAN DAVID ROGERS - RECROSS

15:46     1   **A.**   NO, NO.  WHAT I'M SAYING IS THERE'S --

15:46     2   **Q.**   THAT'S OKAY.  THAT'S ALL I WANTED.

15:46     3   **A.**   OKAY.

15:46     4          **MR. TREEBY:**  THANK YOU.

15:46     5          **MR. SIMS:**  YOUR HONOR, I JUST WOULD ASK THAT

15:46     6   DR. ROGERS FINISH HIS ANSWER.

15:46     7          **THE COURT:**  ALL RIGHT.  HE CAN FINISH HIS ANSWER.  HE

15:46     8   CAN EXPLAIN WHAT HE MEANT BY "DEATH BY A THOUSAND STINGS."

15:46     9          **MR. TREEBY:**  OH, I'M SORRY.  OKAY.  LET ME BE HERE

15:46    10   BECAUSE I MAY WANT TO ASK HIM A QUESTION ABOUT HIS EXPLANATION.

15:46    11          **THE COURT:**  I HOPE NOT.

15:46    12          **MR. TREEBY:**  I DO, TOO.

15:46    13          **THE COURT:**  OKAY.  GO AHEAD.

15:46    14          **THE WITNESS:**  YOU, AND VERY CREDIBLY ON YOUR PART,

15:46    15   YOU ASKED ME IN MY DEPOSITION, YOU KNOW, WHERE, "THEY HAVE TO

15:46    16   GO TO THE GEOTECHNICAL BRANCH FOR THE APPROVAL OF EVERY SINGLE

15:46    17   LITTLE TOM, DICK AND HARRY HOLE THEY PUT OUT THERE?"

15:46    18              AND THAT WAS A GOOD QUESTION BECAUSE IT'S A --

15:46    19   HOW CONCERNED THE GEOTECHNICAL BRANCH SHOULD BE IS A MATTER OF

15:47    20   AGGREGATE SCALE OF EVERYTHING THAT'S GOING ON OUT THERE.  ONE

15:47    21   OR TWO SMALL HOLES, NO, THAT'S NOT NEARLY AS POTENTIALLY

15:47    22   INJURIOUS AS A THOUSAND HOLES.  THAT'S WHAT I'M TRYING TO SAY.

15:47    23              SO EVEN IF YOU DID A WHOLE BUNCH OF EXCAVATIONS

15:47    24   AND THEY'RE ALL THREE TO FIVE FEET DEEP, BUT IF YOU'RE DOING

15:47    25   THOUSANDS OF THEM, THE NET AGGREGATE IMPACT OF THAT COULD BE

JONATHAN DAVID ROGERS - RECROSS

15:47   1   SIGNIFICANT, WHEREAS JUST ONE OR TWO OF THEM WOULD NOT BE

15:47   2   STATISTICALLY SIGNIFICANT.

15:47   3              AND THE REASON IS THIS:  THE REASON IS GEOLOGY

15:47   4   HAS THESE LITTLE FLOW CORRIDORS THAT YOU CAN NEVER PREDICT

15:47   5   WHERE EVERY SINGLE ONE OF THEM ARE.  SO THE MORE HOLES YOU HAVE

15:47   6   OUT THERE, THE MORE YOU'RE INCREASING YOUR CHANCE OF HITTING A

15:47   7   CONDUIT THAT CAN CREATE SOME KIND OF SEEPAGE PROBLEM.  SO IT'S

15:47   8   A STATISTICAL THING.

15:47   9              SO THAT'S WHY YOU WANT GEOTECHNICAL BRANCH'S

15:47   10   EXPERTISE TO LOOK OVER YOUR SHOULDER, LIKE HE DID IN THAT CASE

15:47   11   WITH THE MCDONOUGH PIT.

15:47   12   **BY MR. TREEBY:**

15:47   13   **Q.**   WELL, LIKE WE DIDN'T DO THAT.  YOU ADMITTED THAT.  WE

15:47   14   DIDN'T DO THAT, THE CORPS OF ENGINEERS WHO WERE RESPONSIBLE FOR

15:48   15   THE GEOTECHNICAL ENGINEER ON THE SITE DID THAT; ISN'T THAT

15:48   16   CORRECT?

15:48   17   **A.**   YES.  THAT'S CORRECT.  THAT'S CORRECT.

15:48   18   **Q.**   BUT YOU DON'T KNOW WHETHER THE AGGREGATE WAS OR IT WAS NOT

15:48   19   A PROBLEM AND YOU'RE NOT EXPRESSING A CAUSATION OPINION; RIGHT?

15:48   20   **A.**   NO, I'M NOT.

15:48   21   **Q.**   THANK YOU.

15:48   22   **A.**   NO.  I'M JUST SAYING THE GEOTECHNICAL BRANCH WOULD BE

15:48   23   INTERESTED IN MATTERS OF SCALE AS WELL AS MATTERS OF NUMERICAL,

15:48   24   HOW MANY -- HOW MANY OF THEM.

25

JONATHAN DAVID ROGERS - RE-REDIRECT

| | | |
|---|---|---|
| 15:48 | 1 | **RE-REDIRECT EXAMINATION** |
| 15:48 | 2 | **BY MR. SIMS:** |
| 15:48 | 3 | **Q.**   DR. ROGERS, THE MEMO THAT WAS -- |
| 15:48 | 4 | **MR. TREEBY:**  WHOA, WHOA. |
| 15:48 | 5 | **THE COURT:**  WAIT A MINUTE, WAIT A MINUTE, WAIT A |
| 15:48 | 6 | MINUTE. |
| 15:48 | 7 | **MR. BRUNO:**  WE GET THE LAST WORD -- |
| 15:48 | 8 | **THE COURT:**  YOU'RE GOING TO HAVE TO TELL ME WHY -- |
| 15:48 | 9 | **MR. SIMS:**  IT'S IN DIRECT RESPONSE TO ONE OF |
| 15:48 | 10 | MR. TREEBY'S QUESTIONS, YOUR HONOR. |
| 15:48 | 11 | **MR. BRUNO:**  THE PLAINTIFF HAS THE LAST WORD. |
| 15:48 | 12 | **THE COURT:**  HOLD ON.  I'M GOING TO FIGURE THIS OUT. |
| 15:48 | 13 | **MR. BRUNO:**  I'M SORRY, YOUR HONOR. |
| 15:48 | 14 | **THE COURT:**  AND I KNEW THIS MIGHT BE A PROBLEM. |
| 15:49 | 15 | YOU KNOW, I WANTED TO MAKE -- LET ME SAY WHAT I |
| 15:49 | 16 | WANT TO MAKE SURE.  I WANT TO MAKE SURE THE DEFENDANTS, AND |
| 15:49 | 17 | THEN LATER ON THE PLAINTIFFS, HAD ENOUGH OPPORTUNITY TO TALK TO |
| 15:49 | 18 | THE EXPERT AND THEY WOULDN'T GET SANDBAGGED ON REDIRECT.  THAT |
| 15:49 | 19 | WAS MY MAIN CONCERN, AND YOU HAVE NOT. |
| 15:49 | 20 | BUT I'M GOING TO ALLOW SOME -- |
| 15:49 | 21 | **MR. TREEBY:**  RE-REDIRECT? |
| 15:49 | 22 | **THE COURT:**  SOME, BECAUSE GENERALLY THE PLAINTIFF |
| 15:49 | 23 | GETS THE LAST SHOT.  MY WHOLE IDEA OF THIS SCHEME WAS TO NOT |
| 15:49 | 24 | ALLOW SANDBAGGING, BUT IT'S GOING TO BE REALLY SHORT. |
| 15:49 | 25 | **MR. SIMS:**  IT WILL BE, YOUR HONOR. |

JONATHAN DAVID ROGERS - RE-REDIRECT


15:49   1        **THE COURT:**  ALL RIGHT.  AND IF YOU BRING OUT

15:49   2   SOMETHING NEW, I'M GOING TO HAVE TO -- I'M GOING TO HEAR AN

15:49   3   OBJECTION AND WE'RE GOING TO -- ANYTHING THAT MR. TREEBY DIDN'T

15:49   4   SAY, THEN I'M GOING TO SHUT IT DOWN.  ANYTHING THAT MR. TREEBY

15:49   5   DIDN'T COVER.

15:49   6   **BY MR. SIMS:**

15:49   7   **Q.**   DR. ROGERS, YOU WERE ASKED BE MR. TREEBY WHETHER OR NOT,

15:49   8   TO YOUR KNOWLEDGE, WGI EVER FAILED TO BACKFILL OR COMPACT

15:49   9   MATERIALS IN ACCORDANCE WITH A STATEMENT FROM THE CORPS OR A

15:49   10  REQUEST FROM THE CORPS; CORRECT?  DO YOU RECALL THAT?

15:49   11  **A.**   YES.

15:49   12  **Q.**   YOU SAID YOU WEREN'T AWARE OF ANY; CORRECT?

15:49   13  **A.**   CORRECT.

15:49   14  **Q.**   THE SEPTEMBER 2000 MEMO WHICH SET OUT A STANDARD FOR

15:50   15  COMPACTION, WHICH IS TO EQUATE THE DENSITY OF THE NATIVE SOILS,

15:50   16  DO YOU KNOW WHETHER OR NOT THAT INFORMATION WAS EVER

15:50   17  COMMUNICATED TO WGI?

15:50   18  **A.**   NO, I DON'T.

15:50   19        **MR. SIMS:**  THANK YOU.

15:50   20        **THE COURT:**  OKAY.  ALL RIGHT.  WE'VE GOT NOW --

15:50   21  AGAIN, AS COUNSEL SAID, WHAT'S SAUCE FOR THE GOOSE, I'M GOING

15:50   22  TO HAVE TO APPLY THESE WATERS EQUITABLY WITH THE DEFENSE AS

15:50   23  WELL.

15:50   24        **MR. TREEBY:**  WE KNOW ABOUT SAUCE IN NEW ORLEANS, YOUR

15:50   25  HONOR.

| | | |
|---|---|---|
| 15:50 | 1 | **THE COURT:**  YES.  ABSOLUTELY.  AND I HOPE WE HAVE |
| 15:50 | 2 | SOME TONIGHT, I MUST SAY. |
| 15:50 | 3 | ALL RIGHT.  SIR, YOU MAY GATHER YOUR ROSEBUDS |
| 15:50 | 4 | AND STEP DOWN. |
| 15:50 | 5 | **THE WITNESS:**  THANK YOU. |
| 15:50 | 6 | **THE COURT:**  MR. BRUNO, I'M ASSUMING WE DON'T HAVE |
| 15:50 | 7 | ANOTHER EXPERT WITNESS COMING UP? |
| 15:50 | 8 | **MR. BRUNO:**  I WAS THINKING ABOUT THAT, YOUR HONOR. |
| 15:50 | 9 | I'M GOING TO RECONSIDER IT, THOUGH.  NO.  WE HAVE ONLY ONE |
| 15:51 | 10 | WITNESS -- WELL, WE HAD CONTEMPLATED TWO.  WE ARE GOING TO MAKE |
| 15:51 | 11 | IT ONLY ONE. |
| 15:51 | 12 | **THE COURT:**  ALL RIGHT.  WE HAVE TIME IF YOU -- |
| 15:51 | 13 | **MR. BRUNO:**  BUT MR. O'DOWD IS HERE.  IT'S A VERY -- |
| 15:51 | 14 | YOU'LL REMEMBER HIM.  HE TESTIFIED IN THE BARGE TRIAL. |
| 15:51 | 15 | **THE COURT:**  I DO, I DO. |
| 15:51 | 16 | **MR. BRUNO:**  VERY BRIEF.  I'M TOLD BY OPPOSING |
| 15:51 | 17 | COUNSEL, VERY BRIEF CROSS, SMALL LITTLE YOUR WE WANT TO TOUCH |
| 15:51 | 18 | ON. |
| 15:51 | 19 | WE'RE GOING TO TAKE THE PLAINTIFF AND PUT HIM |
| 15:51 | 20 | TUESDAY OR WEDNESDAY. |
| 15:51 | 21 | **THE COURT:**  YOU CAN -- LOOK, I'M HERE IF YOU WANT TO |
| 15:51 | 22 | DO IT. |
| 15:51 | 23 | **MR. BRUNO:**  I UNDERSTAND.  BUT, JUDGE, WE ONLY HAVE |
| 15:51 | 24 | DR. BEA, ONE LAST PLAINTIFF, A COUPLE OF OTHER DEPOS TO PUT IN |
| 15:51 | 25 | AND THE DAMAGES EXPERTS.  SO WITH YOUR INDULGENCE, I WOULD LIKE |

15:51    1  TO JUST CALL THIS THE LAST WITNESS OF THE DAY.

15:51    2           **THE COURT:**  ALL RIGHT.  IS THAT GOING TO BE

15:51    3  MR. ARMSTRONG YOU'RE TALKING ABOUT?

15:51    4           **MR. BRUNO:**  YES, YES.  THAT'S THE ONE.

15:51    5           **THE COURT:**  BECAUSE WE PROMISED MR. TREEBY HE WAS

15:51    6  GOING TO COME.

15:51    7           **MR. BRUNO:**  NO, THEY -- I TOLD THEM HE WASN'T COMING.

15:51    8           **THE COURT:**  OKAY.  ALL RIGHT.

15:51    9           (WHEREUPON, **MICHAEL O'DOWD**, HAVING BEEN DULY SWORN,

15:51   10  TESTIFIED AS FOLLOWS.)

09:20   11           **THE DEPUTY CLERK:**  PLEASE STATE YOUR FULL NAME AND

09:20   12  CORRECT SPELLING FOR THE RECORD.

15:53   13           **THE WITNESS:**  MICHAEL O'DOWD, M-I-C-H-A-E-L, O,

15:53   14  APOSTROPHE, D-O-W-D.

15:53   15                       **DIRECT EXAMINATION**

15:53   16  BY MR. OWEN:

15:53   17  **Q.**   ALL RIGHT.  GOOD AFTERNOON, MR. O'DOWD.

15:53   18  **A.**   GOOD AFTERNOON.

15:53   19  **Q.**   MY NAME IS ANDY OWEN AND I REPRESENT THE PLAINTIFFS.

15:53   20  **A.**   OKAY.

15:53   21  **Q.**   AND I'M JUST HERE TO ASK YOU A FEW QUESTIONS.  THE

15:53   22  MATERIAL, TO GIVE YOU AN IDEA AND TO GIVE, YOUR HONOR, SOME

15:53   23  CONTEXT, IT'S JUST BRIEFLY GOING TO DISCUSS SOME OF THE PHOTOS

15:53   24  THAT, AS I UNDERSTAND IT, THAT YOU TOOK DURING KATRINA AND THE

15:53   25  WAIVE HEIGHT IN THE CANAL DURING KATRINA --

MICHAEL O'DOWD - DIRECT

| | | |
|---|---|---|
| 15:53 | 1 | **A.**   OKAY. |
| 15:53 | 2 | **Q.**   -- BASED ON THOSE PHOTOS.  SO LET'S BRIEFLY BEGIN AT THE |
| 15:53 | 3 | TOP. |
| 15:53 | 4 | SO, MR. O'DOWD, DID YOU EVER WORK FOR THE ARMY CORPS? |
| 15:53 | 5 | **A.**   YES, I HAVE. |
| 15:53 | 6 | **Q.**   OKAY.  AND WHERE DID YOU WORK FOR THEM? |
| 15:53 | 7 | **A.**   I WORKED AT THE INDUSTRIAL CANAL LOCKS. |
| 15:54 | 8 | **Q.**   AND HOW LONG HAD YOU WORKED AT THE LOCKS BEFORE KATRINA? |
| 15:54 | 9 | **A.**   IN THE NEIGHBORHOOD OF 30 -- 36 YEARS. |
| 15:54 | 10 | **Q.**   OKAY.  NOW, AS I UNDERSTAND IT, YOU'RE RETIRED; IS THAT |
| 15:54 | 11 | RIGHT? |
| 15:54 | 12 | **A.**   YES, SIR. |
| 15:54 | 13 | **Q.**   AND WERE YOU WORKING FOR THE CORPS IN AUGUST OF 2005? |
| 15:54 | 14 | **A.**   YES, I WAS. |
| 15:54 | 15 | **Q.**   AND WHAT WAS YOUR JOB TITLE THEN? |
| 15:54 | 16 | **A.**   LOCK AND DAM EQUIPMENT MECHANIC SUPERVISOR OR BRIEFLY THE |
| 15:54 | 17 | LOCK MASTER. |
| 15:54 | 18 | **Q.**   OKAY.  WERE YOU WORKING AT THE LOCKS ON AUGUST 28TH, 2005? |
| 15:54 | 19 | **A.**   YES, I WAS. |
| 15:54 | 20 | **Q.**   NOW, ON AUGUST 28TH, DO YOU KNOW WHETHER THE FLORIDA |
| 15:54 | 21 | AVENUE BRIDGE WAS UP OR DOWN, AND BY "DOWN," I MEAN THAT PEOPLE |
| 15:54 | 22 | COULD WALK AND CARS COULD GO ACROSS IT? |
| 15:54 | 23 | **A.**   I WOULD SAY IT WAS DOWN. |
| 15:54 | 24 | **Q.**   AND WHERE WERE YOU ON AUGUST 29TH, 2005? |
| 15:54 | 25 | **A.**   AT THE LOCKS. |

MICHAEL O'DOWD - DIRECT


15:54   1   **Q.**   DID YOU TAKE PHOTOGRAPHS DURING HURRICANE KATRINA ON

15:54   2   AUGUST 29TH?

15:54   3   **A.**   YES.  YES, SIR.

15:54   4   **Q.**   OKAY.

15:55   5          **MR. OWEN:**  CARL, COULD YOU PLEASE PULL UP

15:55   6   PX-4534-0002?

15:55   7   **BY MR. OWEN:**

15:55   8   **Q.**   MR. O'DOWD, AND I HAVE A SET IF YOU WANT TO HAND HOLD

15:55   9   THEM, BUT IF YOU CAN SEE THEM UP HERE, THAT'S UP TO YOU, IF YOU

15:55   10  CAN SEE IT ON THE MONITOR.

15:55   11         IS THIS ONE OF THE PHOTOGRAPHS YOU TOOK DURING

15:55   12  HURRICANE KATRINA?

15:55   13  **A.**   YES, SIR.

15:55   14  **Q.**   OKAY.  AND WHAT DOES THIS PHOTOGRAPH SHOW?

15:55   15  **A.**   WELL, IT CAUGHT MY EYE.  I TOOK THAT PICTURE BECAUSE THIS

15:55   16  WAS THE FIRST TIME I'VE SEEN WHITECAPS IN THE LOCK CHAMBER AND

15:55   17  ALSO THE WATER WAS PUSHED UP TOWARDS THE SOUTH END OF THE LOCKS

15:55   18  IN A WEDGE SHAPE LIKE.

15:55   19  **Q.**   DO YOU RECALL WHERE YOU WERE WHEN YOU TOOK THIS PHOTO?

15:55   20  **A.**   YES.  RIGHT DOWN IN FRONT OF THE LOCK MASTER'S OFFICE.

15:55   21  **Q.**   OKAY.  NOW, IS THIS PHOTO POINTING TOWARDS THE RIVER OR

15:55   22  TOWARDS CLAIBORNE AVENUE?

15:55   23  **A.**   TOWARDS THE RIVER.

15:55   24  **Q.**   OKAY.  AND DO YOU RECALL AT WHAT TIME THIS PHOTOGRAPH WAS

15:56   25  TAKEN?

MICHAEL O'DOWD - DIRECT


15:56   1   **A.**   NO, SIR, IT WOULD JUST BE A GUESS.

15:56   2   **Q.**   OKAY.  DO YOU RECALL BEING PREVIOUSLY ASKED ABOUT THIS

15:56   3   PHOTOGRAPH IN THE BARGE TRIAL?

15:56   4   **A.**   YES, SIR.

15:56   5   **Q.**   OKAY.  AND DO YOU RECALL WHETHER OR NOT YOU GAVE A TIME AS

15:56   6   TO WHAT THAT PHOTOGRAPH MIGHT BE?

15:56   7   **A.**   IF I DID, IT WAS A GUESS.

15:56   8   **Q.**   OKAY.  SO IF -- IF YOU TESTIFIED -- OR IF YOU SAID IN THAT

15:56   9   BARGE TESTIMONY THAT IT WAS BETWEEN 7:00 TO 8:00 A.M., WOULD

15:56   10   THAT REFRESH YOUR MEMORY ABOUT YOUR TESTIMONY?

15:56   11   **A.**   I WOULD SAY IT'S CLOSE TO THERE.  LIKE I SAID, I DIDN'T

15:56   12   HAVE A DATE STAMP ON THE CAMERA AND I DON'T REMEMBER.  THINGS

15:56   13   WAS HECTIC.

15:56   14   **Q.**   RIGHT.

15:56   15       WOULD 7:00 TO 8:00 O'CLOCK BE A REASONABLE

15:56   16   APPROXIMATION?

15:56   17   **A.**   I WOULD SAY SO.

15:56   18   **Q.**   OKAY.

15:56   19   **A.**   BUT WE KEPT A GAUGE READING AT THE LOCKS AND THAT WAS AT

15:56   20   THE -- PROBABLY THE HIGHEST POINT.  SO YOU COULD PINPOINT THE

15:56   21   TIME WITH THAT TIME.

15:56   22   **Q.**   OKAY.  THANK YOU.

15:56   23       **THE COURT:**  CAN YOU JUST, FOR THE RECORD -- AND YOU

15:56   24   MAY BE GETTING THIS, COUNSEL -- TELL US WHERE THE LOCKS ARE

15:57   25   SITUATED, FOR THE RECORD, LET'S SAY TO THE FLORIDA AVENUE

MICHAEL O'DOWD - DIRECT

15:57    1   BRIDGE.

15:57    2          **THE WITNESS:**  IT WOULD BE NORTHBOUND.

15:57    3          **THE COURT:**  NORTHBOUND?

15:57    4          **THE WITNESS:**  YES, SIR.

15:57    5          **THE COURT:**  YOU ARE NORTH OF THE FLORIDA AVENUE --

15:57    6   THE FLORIDA AVENUE BRIDGE IS NORTHBOUND OF YOU?

15:57    7          **THE WITNESS:**  OF ME, YES, SIR.

15:57    8          **THE COURT:**  AND THE -- AND THE OTHER BRIDGE, IS THAT

15:57    9   THE ST. CLAUDE?

15:57   10          **THE WITNESS:**  ST. CLAUDE.

15:57   11          **THE COURT:**  THE ST. CLAUDE BRIDGE, THAT'S SOUTHBOUND

15:57   12   OF YOU?

15:57   13          **THE WITNESS:**  YES, SIR.  IT'S ACTUALLY PART OF THE

15:57   14   LOCKS/RIVER.

15:57   15          **THE COURT:**  ALL RIGHT.  SO YOU'RE REALLY RIGHT ON OR

15:57   16   ADJACENT TO THE ST. CLAUDE BRIDGE?

15:57   17          **THE WITNESS:**  YES, YES.

15:57   18          **THE COURT:**  VERY NEAR.

15:57   19          **THE WITNESS:**  A LITTLE -- A LITTLE NORTH OF IT.  JUST

15:57   20   700 FEET.

15:57   21          **THE COURT:**  THAT HELPS ORIENT US.  THANK YOU.

15:57   22   **BY MR. OWEN:**

15:57   23   **Q.**  OKAY.  NOW, WITH RESPECT TO THE WAVES THAT YOU SEE IN

15:57   24   THESE PHOTOS, MR. O'DOWD, COULD YOU TELL ME HOW -- COULD YOU

15:57   25   APPROXIMATE HOW BIG THESE WAVES ARE?

MICHAEL O'DOWD - DIRECT

15:57   1   **A.**   I WOULD SAY IN THE NEIGHBORHOOD OF TWO.

15:57   2   **Q.**   OKAY.  SO IN THIS PHOTO, CAN YOU TELL WHAT DIRECTION THE

15:57   3   WAVES ARE MOVING?

15:57   4   **A.**   IT WAS MORE MOVING TOWARDS THE SOUTH OF THE LOCKS.

15:58   5   **Q.**   OKAY.  SO TOWARDS THE RIVER?

15:58   6   **A.**   TOWARDS THE RIVER.

15:58   7   **Q.**   OKAY.  AND THAT'S -- I MAY BE STATING THE OBVIOUS.  SO

15:58   8   THIS -- THIS PICTURE IS -- IT'S DEPICTING WAVES MOVING

15:58   9   SOUTHBOUND; CORRECT?

15:58   10   **A.**   YES.

15:58   11            **MR. OWEN:**  ALL RIGHT.  YOUR HONOR, I WOULD LIKE TO

15:58   12   MOVE INTO EVIDENCE THIS PHOTOGRAPH.

15:58   13            **THE COURT:**  ANY OBJECTION?

15:58   14            **MR. FARRELL:**  NO, YOUR HONOR.

15:58   15            **MR. WOODCOCK:**  NO, YOUR HONOR.  JUST FOR THE RECORD,

15:58   16   THOUGH, THERE ARE BETTER QUALITY PHOTOS OF THIS AT JX-1922.

15:58   17   JUST IN THE FUTURE IF YOU WOULD --

15:58   18            **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.

15:58   19            AND I ASSUME 1922 IS GOING TO COME IN?

15:58   20            **MR. WOODCOCK:**  YES.

15:58   21            **THE COURT:**  ALL RIGHT.  LET IT BE ADMITTED.

15:58   22            **MR. BRUNO:**  REFERENCE THEM ALL TO THE COURT SO THEY

15:58   23   KNOW HOW TO FIND THEM.

15:58   24            **MR. WOODCOCK:**  I BELIEVE THEY'RE IN THE SAME ORDER AS

15:58   25   THE "PX," IT'S JUST -- IT'S EXACTLY THE SAME EXHIBIT IN THE

MICHAEL O'DOWD - DIRECT


15:58    1   SAME ORDER --

15:58    2            **MR. BRUNO:**  WHY DON'T WE GIVE THE JUDGE THE RANGE,

15:58    3   JUST SO THE RECORD IS CLEAR.

15:59    4            **MR. WOODCOCK:**  OKAY.  IT'S JX-01922-0001 THROUGH

15:59    5   0017.

15:59    6            **THE COURT:**  THANK YOU.

15:59    7            **MR. OWEN:**  OKAY.  SO THEN WHY DON'T WE TRY TO PULL

15:59    8   UP -- LET'S PULL UP ANOTHER PHOTOGRAPH.  LET'S GO TO JX --

15:59    9   THAT'S 1922?

15:59   10            **MR. WOODCOCK:**  1922.

15:59   11            **MR. OWEN:**  OKAY.  LET'S GO TO JX-1922-0004.

15:59   12                  THERE YOU GO.

15:59   13   **BY MR. OWEN:**

15:59   14   **Q.**   OKAY.  MR. O'DOWD, IS THIS ANOTHER PHOTOGRAPH THAT YOU

15:59   15   TOOK DURING HURRICANE KATRINA?

15:59   16   **A.**   YES, SIR.

15:59   17   **Q.**   OKAY.  AND WHAT DOES THIS PHOTOGRAPH SHOW?

15:59   18   **A.**   WELL, IT WAS THE OPPOSITE DIRECTION.  IT WAS -- IT WAS

15:59   19   TAKEN TOWARDS THE NORTHEAST.

15:59   20   **Q.**   OKAY.  SO, IN OTHER WORDS, IT'S TAKEN -- THE PHOTO IS --

15:59   21   YOU CAN SEE -- OR IT'S IN THE DIRECTION OF CLAIBORNE AVENUE

15:59   22   BRIDGE; IS THAT RIGHT?

15:59   23   **A.**   YES, SIR, UH-HUH.

15:59   24   **Q.**   AND COULD YOU APPROXIMATE HOW FAR AWAY THE LOCK IS FROM

16:00   25   THE CLAIBORNE AVENUE BRIDGE?

MICHAEL O'DOWD - DIRECT

| | | |
|---|---|---|
| 16:00 | 1 | **A.**   NO. |
| 16:00 | 2 | **Q.**   OKAY.  STANDING HERE TODAY, YOU WOULDN'T HAVE AN ESTIMATE? |
| 16:00 | 3 | **A.**   7-, 800 FEET, MAYBE. |
| 16:00 | 4 | **Q.**   OKAY.  AND I -- IT MIGHT BE THE SAME ANSWER, BUT CAN YOU |
| 16:00 | 5 | APPROXIMATE ABOUT WHAT TIME THIS PHOTO WAS TAKEN? |
| 16:00 | 6 | **A.**   NO, SIR. |
| 16:00 | 7 | **Q.**   SO IF THE LAST PHOTO IF YOU SAID WAS BETWEEN 7:00 TO |
| 16:00 | 8 | 8:00 A.M., THIS MIGHT BE THE SAME TIME; WOULD THAT BE |
| 16:00 | 9 | REASONABLE? |
| 16:00 | 10 | **A.**   YES. |
| 16:00 | 11 | **Q.**   AND, AGAIN, THE WAVES IN THIS PICTURE, WOULD YOU DESCRIBE |
| 16:00 | 12 | THEM AS BEING HOW BIG? |
| 16:00 | 13 | **A.**   IN THE NEIGHBORHOOD OF TWO FEET.  YOU HAD GUSTS -- YOU |
| 16:00 | 14 | KNOW, THE WIND WAS GUSTING.  SO AT DIFFERENT TIMES IT WAS AT |
| 16:00 | 15 | DIFFERENT HEIGHTS THAT DAY. |
| 16:00 | 16 | **Q.**   SO IF I DESCRIBE THE WAVES AS ONE TO TWO FEET, WOULD THAT |
| 16:00 | 17 | BE REASONABLE? |
| 16:00 | 18 | **A.**   OH, I WOULD IMAGINE SO. |
| 16:00 | 19 | **Q.**   NOW, ARE THE WAVES THAT WE'VE SEEN IN THE LAST TWO PHOTOS |
| 16:00 | 20 | TYPICAL OF THE WAVES THAT EXISTED AT THE TIME YOU TOOK THEM? |
| 16:00 | 21 | **A.**   WELL, REMEMBER, I WASN'T STANDING THERE WATCHING THE |
| 16:00 | 22 | WAVES.  I MEAN, I TOOK THE PICTURE, BUT I WAS DOING OTHER STUFF |
| 16:00 | 23 | AT THE SAME TIME. |
| 16:01 | 24 | **Q.**   NO, AND I APPRECIATE THAT. |
| 16:01 | 25 | SO MY QUESTION IS:  BASED ON THE TIME THAT YOU WERE |

MICHAEL O'DOWD - DIRECT


16:01    1   OUT THERE WITNESSING THE WAVES AND TAKING THE PICTURES, WERE

16:01    2   THE OTHER WAVES THAT WERE GOING ON AT THAT SAME TIME TYPICAL OF

16:01    3   THE WAVES THAT WE'VE SEEN IN THE LAST TWO PHOTOS?

16:01    4   **A.**   I WOULD SAY SO IN THE TIME I WAS OUT THERE, YES.

16:01    5   **Q.**   OKAY.  NOW, DURING HURRICANE KATRINA, DID YOU WITNESS A

16:01    6   20-FOOT WAVE IN THE IHNC?

16:01    7   **A.**   NO, SIR.

16:01    8   **Q.**   OKAY.  AND DID ANY GIANT WAVE HIT YOUR LOCK DURING

16:01    9   KATRINA?

16:01   10   **A.**   NO, SIR.

16:01   11   **Q.**   DID YOU WORK AT THE LOCK DURING HURRICANES OTHER THAN

16:01   12   KATRINA?

16:01   13   **A.**   YES, SIR.

16:01   14   **Q.**   OKAY.  AND IN YOUR 38 YEARS OF WORKING AT THE LOCK, HAVE

16:01   15   YOU EVER SEEN A 20-FOOT WAVE IN THE CANAL --

16:01   16           **MR. FARRELL:**  OBJECTION, YOUR HONOR.  NOBODY HERE IS

16:01   17   ARGUING THAT THERE'S A 20-FOOT WAVE COMING DOWN THE CANAL.  I

16:01   18   DON'T SEE THE RELEVANCE OF THESE QUESTIONS.

16:01   19           **MR. OWEN:**  IF WE CAN STIPULATE THAT THE WAVES ARE ONE

16:01   20   TO TWO FEET IN THE IHNC --

16:01   21           **THE COURT:**  WELL, IT'S CERTAINLY NOT -- WELL, IT'S A

16:01   22   LONG WAY FROM 1 TO 2 AND 20 FEET.

16:01   23           **MR. TREEBY:**  WE'LL STIPULATE THEY'RE NOT 20.

16:01   24           **THE COURT:**  ALL RIGHT.  SO THAT'S A STIPULATION THE

16:01   25   COURT WOULD EMBRACE.  I DON'T WANT US TO BE GROUND HOG DAY.

MICHAEL O'DOWD - DIRECT

16:02    1   IT'S ENOUGH -- IT'S CLOSE ENOUGH TO IT AS IT IS.

16:02    2           MR. OWEN:  THEN WITH THAT, YOUR HONOR, I WOULD LIKE

16:02    3   TO MOVE INTO EVIDENCE PHOTOGRAPH JX-1922-0004.

16:02    4           THE COURT:  LET IT BE ADMITTED.  AND, COUNSEL, WE

16:02    5   WILL ALSO LOOK AT THE OTHER PHOTOGRAPHS OF THE SAME THING THAT

16:02    6   ARE, HOPEFULLY, CLEARER.  GO AHEAD.

16:02    7           MR. OWEN:  OKAY.  CARL, COULD WE GO TO 0007?

16:02    8   BY MR. OWEN:

16:02    9   Q.   OKAY.  MR. O'DOWD, IS THIS ANOTHER PHOTOGRAPH THAT YOU

16:02   10   TOOK?

16:02   11   A.   YES, SIR.

16:02   12   Q.   OKAY.  AND CAN YOU APPROXIMATE ABOUT WHAT TIME YOU TOOK

16:02   13   THIS PHOTO?

16:02   14   A.   IT WAS HOURS -- SEVERAL HOURS AFTER THE PREVIOUS ONES.

16:02   15   Q.   SO SEVERAL HOURS AFTER 7:00 TO 8:00 A.M.; WOULD THAT BE

16:02   16   ACCURATE?

16:02   17   A.   I GUESS SO.

16:02   18   Q.   IN LOOKING AT THIS PHOTO, MY ONLY ONE QUESTION IS:  WITH

16:03   19   RESPECT TO THAT BRIDGE IN THE BACKGROUND, WHAT BRIDGE IS THAT?

16:03   20   A.   CLAIBORNE AVENUE.

16:03   21   Q.   HOW ABOUT THE ONE BEYOND IT?  IT'S, I BELIEVE --

16:03   22   A.   FLORIDA AVENUE.

16:03   23   Q.   THAT'S THE FLORIDA AVENUE BRIDGE.

16:03   24        IS THAT BRIDGE UP OR DOWN?

16:03   25   A.   DOWN.

MICHAEL O'DOWD - DIRECT

16:03    1    **Q.**   OKAY.  AND IT WAS DOWN DURING KATRINA; RIGHT?

16:03    2    **A.**   YES.

16:03    3         **MR. OWEN:**  YOUR HONOR, I'D LIKE TO MOVE INTO EVIDENCE

16:03    4    THIS PHOTOGRAPH, JX-1922-0007.

16:03    5         **THE COURT:**  NO OBJECTION?

16:03    6              LET IT BE ADMITTED.

16:03    7    **BY MR. OWEN:**

16:03    8    **Q.**   MR. O'DOWD, IN YOUR 38 YEARS AS THE IHNC LOCK MASTER, DO

16:03    9    YOU HAVE AN UNDERSTANDING ABOUT THE TYPICAL WATER LEVEL IN THE

16:03   10    IHNC, ASSUMING NORMAL WEATHER CONDITIONS?

16:03   11    **A.**   YES.

16:03   12    **Q.**   AND WHAT WOULD THAT UNDERSTANDING BE?

16:03   13    **A.**   ZERO TO FIVE FEET ON THE GAUGE.

16:03   14    **Q.**   0.5?

16:03   15    **A.**   ZERO TO FIVE FEET.

16:04   16    **Q.**   OH, ZERO TO FIVE FEET.  OKAY.

16:04   17         **MR. OWEN:**  LET'S PUT UP THIS NEXT PHOTO.  THIS IS

16:04   18    PX-4740.

16:04   19              EXCUSE ME, YOUR HONOR.

16:04   20         **THE COURT:**  SURE.

16:05   21         **MR. OWEN:**  CAN YOU TAKE AWAY THE TOP ONE?

16:05   22    **BY MR. OWEN:**

16:05   23    **Q.**   OKAY.  AND IT'S NOT LABELED ON THIS PHOTO, BUT THIS IS

16:05   24    PX-4740.  MR. O'DOWD, I KNOW YOU DID NOT TAKE THIS PICTURE.

16:05   25    **A.**   RIGHT.

MICHAEL O'DOWD - DIRECT

16:05    1   **Q.**   BUT MY FIRST QUESTION TO YOU IS:  CAN YOU TELL WHAT BRIDGE

16:05    2   IS IN THIS PICTURE?

16:05    3   **A.**   FLORIDA AVENUE.

16:05    4   **Q.**   OKAY.  CAN YOU TELL ME ON WHAT SIDE OF THE IHNC THE

16:05    5   PHOTOGRAPHER IS STANDING ON?

16:05    6   **A.**   HE WOULD HAVE TO BE ON THE EAST SIDE.

16:05    7   **Q.**   SO THAT MEANS, OBVIOUSLY, HE'S LOOKING WEST; IS THAT

16:05    8   RIGHT?

16:05    9   **A.**   YES.

16:06   10   **Q.**   OKAY.  NOW, IN THIS PHOTO IS THE FLORIDA AVENUE UP OR

16:06   11   DOWN?

16:06   12   **A.**   PARTIALLY UP.

16:06   13   **Q.**   PARTIALLY UP.

16:06   14          NOW, FOR THIS NEXT QUESTION, I WANT YOU TO ASSUME

16:06   15   THAT THE FLORIDA AVENUE BRIDGE IS DOWN, LIKE IT WAS DURING

16:06   16   KATRINA.  IN YOUR 38 YEARS AS THE IHNC LOCK MASTER, DO YOU HAVE

16:06   17   AN UNDERSTANDING ABOUT THE DIFFERENCE BETWEEN THE TYPICAL IHNC

16:06   18   WATER LEVEL, WHICH YOU'VE SAID WAS ZERO TO FIVE FEET?

16:06   19   **A.**   APPROXIMATELY.

16:06   20   **Q.**   OKAY.  AND THE BOTTOM OF THE FLORIDA AVENUE BRIDGE WHEN

16:06   21   IT'S DOWN?

16:06   22   **A.**   NO.

16:06   23   **Q.**   OKAY.  SO SITTING HERE TODAY, YOU COULDN'T ESTIMATE --

16:06   24   **A.**   THAT'S A FAIRLY NEW BRIDGE AT FLORIDA AVENUE.  YOU KNOW,

16:06   25   BEFORE THEY HAD BASCULE BRIDGE, THAT'S A LIFT BRIDGE.

MICHAEL O'DOWD - DIRECT


16:06     1  **Q.**  SO THIS WAS PUT IN AFTER KATRINA?

16:06     2  **A.**  NO, NO, NO, NO.

16:06     3         **MR. OWEN:**  OKAY.  SO, CARL, CAN YOU ENLARGE THE

16:06     4  WATER -- YEAH, THE LEFT SIDE OF THE PHOTO WHERE THE BRIDGE IS

16:06     5  AND WHERE THAT PORTION MEETS THE WATER.

16:07     6  **BY MR. OWEN:**

16:07     7  **Q.**  OKAY.  CAN YOU TELL -- MR. O'DOWD, CAN YOU APPROXIMATE --

16:07     8  THERE YOU GO.

16:07     9         ALL RIGHT.  ARE YOU ABLE TO, SITTING HERE TODAY,

16:07    10  ESTIMATE THE DISTANCE BETWEEN THAT WATER LEVEL AND THE TOP OF

16:07    11  THAT CONCRETE ABUTMENT IN BETWEEN WHERE THE FLORIDA AVENUE

16:07    12  BRIDGE IS?

16:07    13  **A.**  NO, SIR.

16:07    14         **MR. WOODCOCK:**  OBJECTION, YOUR HONOR.

16:07    15         **THE COURT:**  WELL, EITHER HE CAN OR HE CAN'T, AND HE

16:07    16  SAYS HE CAN'T.

16:07    17         **MR. OWEN:**  I'D LIKE TO MOVE INTO EVIDENCE THIS

16:07    18  PHOTOGRAPH, PX-4740.

16:07    19         **THE COURT:**  ANY OBJECTION?

16:07    20         **MR. WOODCOCK:**  NO, YOUR HONOR.

16:08    21         **MR. FARRELL:**  NO, YOUR HONOR.

16:08    22         **MR. OWEN:**  THANK YOU, MR. O'DOWD.

16:08    23         YOUR HONOR, I WOULD TENDER THE WITNESS.

16:08    24         **THE COURT:**  CROSS-EXAMINATION, PLEASE.

16:08    25         **MR. FARRELL:**  I'M SORRY, YOUR HONOR, ONE MOMENT.

MICHAEL O'DOWD - CROSS

| | | |
|---|---|---|
| 16:08 | 1 | **THE COURT:**  QUITE ALL RIGHT. |
| 16:08 | 2 | **MR. FARRELL:**  I'M PLAYING WITH PAPER HERE. |
| 16:08 | 3 | LET ME SEE.  ERIC, CAN YOU PUT UP ON THE -- |
| 16:08 | 4 | THE COURT HAD A COUPLE OF QUESTIONS ABOUT THE |
| 16:08 | 5 | LOCATION OF THE LOCK.  FOR THE RECORD, I'VE GOT A PHOTOGRAPH |
| 16:08 | 6 | THAT MIGHT HELP CLARIFY FOR EVERYONE AS WELL. |
| 16:08 | 7 | ERIC, CAN YOU PUT UP ON THE SCENE DX-01954, |
| 16:08 | 8 | PLEASE? |
| 16:08 | 9 | **CROSS-EXAMINATION** |
| 16:08 | 10 | BY MR. FARRELL: |
| 16:09 | 11 | **Q.**  AND, MR. O'DOWD, DO YOU RECOGNIZE WHAT THIS IS A |
| 16:09 | 12 | PHOTOGRAPH OF? |
| 16:09 | 13 | **MR. FARRELL:**  ERIC, IF YOU CAN ZOOM IN ON THE MIDDLE |
| 16:09 | 14 | AREA THERE, THE WIDTH OF IT?  THANK YOU. |
| 16:09 | 15 | BY MR. FARRELL: |
| 16:09 | 16 | **Q.**  DO YOU RECOGNIZE WHAT THAT IS A PHOTOGRAPH OF? |
| 16:09 | 17 | **A.**  YES, SIR. |
| 16:09 | 18 | **Q.**  WHAT IS THAT? |
| 16:09 | 19 | **A.**  IT LOOKS LIKE THE FLORIDA AVENUE BRIDGE ON THE RIGHT-HAND |
| 16:09 | 20 | SIDE, CLAIBORNE ON THE OPPOSITE. |
| 16:09 | 21 | **Q.**  AND YOU SAID CLAIBORNE ON THE OPPOSITE SIDE? |
| 16:09 | 22 | **A.**  YES.  IT LOOKS LIKE CLAIBORNE. |
| 16:09 | 23 | **Q.**  OKAY.  AND I THINK IT MAY HAVE JUST BEEN CROPPED OUT, BUT |
| 16:09 | 24 | CAN YOU -- I THINK YOU CAN TOUCH THE SCREEN, I'M TOLD, AND PUT |
| 16:09 | 25 | A LITTLE RED MARK WHERE THE IHNC LOCKS ARE LOCATED? |

MICHAEL O'DOWD - CROSS

16:09    1            **THE COURT:** HE CAN.

16:09    2            **THE WITNESS:** IT WOULD BE OVER HERE.

16:09    3            **MR. FARRELL:** OKAY.  IT LOOKS LIKE WE'RE NOT SEEING

16:09    4    IT.

16:09    5            **THE COURT:** YOU CAN TOUCH THE SCREEN.  DID YOU TOUCH

16:09    6    THE SCREEN?

16:09    7            **THE WITNESS:** YES, SIR, I DID.  THERE IT IS.

16:09    8            **THE COURT:** ALL RIGHT.  GOOD.

16:09    9            **MR. FARRELL:** ALL RIGHT.

16:09    10   BY MR. FARRELL:

16:09    11   **Q.**  AND YOU SAID FLORIDA AVENUE IS ON THE RIGHT SIDE OF THE

16:09    12   SCREEN?

16:09    13   **A.**  THE RIGHT-HAND SIDE, YES, SIR.

16:09    14   **Q.**  AND HOW FAR WOULD YOU SAY IT IS?  I'M SORRY IF THE COURT

16:09    15   HAD ASKED THIS ALREADY.  HOW FAR WOULD YOU SAY IT IS FROM THE

16:10    16   IHNC LOCK TO THE FLORIDA AVENUE BRIDGE, JUST YOUR ESTIMATE?

16:10    17   **A.**  OH, IT WOULD STRICTLY BE A GUESS.  I MEAN, I --

16:10    18   **Q.**  A MILE?  LESS THAN A MILE?

16:10    19   **A.**  I'D SAY IT'S AROUND PROBABLY 6-, 7-, 800 FEET FROM THE

16:10    20   LOCK TO CLAIBORNE AVENUE BRIDGE.  I WOULDN'T HAVE ANY IDEA.

16:10    21   **Q.**  THAT'S -- THAT'S FINE.  THAT'S FINE.  THAT'S A PERFECTLY

16:10    22   GOOD ANSWER, SIR.

16:10    23   **A.**  I HAD NOTHING TO DO WITH CLAIBORNE OR FLORIDA AVENUE

16:10    24   BRIDGE, SO . . .

16:10    25            **MR. FARRELL:** AND I'M SORRY.  IS IT CARL?  CAN YOU

MICHAEL O'DOWD - CROSS

16:10   1   BRING UP THE PHOTOGRAPHS THAT WE WERE JUST LOOKING AT, JX-1922?

16:10   2   AND CAN YOU GO TO JX-1922-0004 AGAIN, PLEASE?

16:11   3               THANK YOU.

16:11   4   **BY MR. FARRELL:**

16:11   5   **Q.**   NOW, I BELIEVE, MR. O'DOWD, YOU SAID THIS WAS A PHOTOGRAPH

16:11   6   LOOKING NORTH AT THE CLAIBORNE AVENUE BRIDGE DURING HURRICANE

16:11   7   KATRINA?

16:11   8   **A.**   TOWARDS THE BRIDGE, YES.

16:11   9   **Q.**   OKAY.  CAN YOU SEE THE CLAIBORNE AVENUE BRIDGE IN THIS

16:11   10  PICTURE?

16:11   11  **A.**   YOU CAN BARELY SEE IT ON THE TOP SIDE -- OR THE LEFT-HAND

16:11   12  SIDE, I MEANT.  TOP LEFT-HAND SIDE.

16:11   13              **THE COURT:**  IT HAS A VERY MONET LOOK TO IT.

16:11   14              **MR. FARRELL:**  YEAH.

16:11   15  **BY MR. FARRELL:**

16:11   16  **Q.**   CAN YOU TOUCH THE SCREEN WHERE THAT IS, JUST FOR THE

16:11   17  FOLKS.

16:11   18  **A.**   THIS IS THE TOWER RIGHT HERE.

16:11   19  **Q.**   OKAY.  AND SO CERTAINLY DURING THIS TIME YOU TOOK THIS

16:11   20  PHOTO, YOU COULDN'T SEE BEYOND THE CLAIBORNE AVENUE BRIDGE?

16:11   21  **A.**   NO, SIR.

16:11   22  **Q.**   AND YOU CERTAINLY COULDN'T SEE AS FAR NORTH AS THE FLORIDA

16:11   23  AVENUE BRIDGE?

16:11   24  **A.**   NO, SIR.

16:11   25  **Q.**   OKAY.  I BELIEVE IN RESPONSE TO COUNSEL'S QUESTION ABOUT

MICHAEL O'DOWD - CROSS

16:11    1    WHAT WAS HAPPENING DURING THE STORM, YOU SAID SOMETHING TO THE

16:11    2    EFFECT OF, "I WASN'T JUST STANDING THERE WATCHING THE WATER.  I

16:11    3    HAD SOME OTHER THINGS TO DO"?

16:11    4    **A.**   YES.

16:11    5    **Q.**   IS IT FAIR TO SAY THAT DURING THE HEIGHT OF THE STORM, YOU

16:11    6    WERE IN AND OUT OF THE LOCK MASTER'S BUILDING?

16:11    7    **A.**   ABSOLUTELY, YES, SIR.

16:11    8    **Q.**   AND DOES THE -- THE LOCK MASTER'S BUILDING HAS STORM

16:11    9    SHUTTERS ON IT; IS THAT RIGHT?

16:12   10    **A.**   CORRECT.

16:12   11    **Q.**   AND WERE THEY -- I ASSUME THEY WERE DOWN DURING THE STORM?

16:12   12    **A.**   YES, THEY WERE.

16:12   13    **Q.**   YOU TESTIFIED THIS AFTERNOON THAT THE WAVES THAT YOU HAD

16:12   14    SEEN IN THE CANAL WERE ABOUT TWO FEET HIGH; IS THAT RIGHT?

16:12   15    **A.**   I WOULD ESTIMATE THEM THERE, YES.

16:12   16    **Q.**   OKAY.  A LITTLE HIGHER OR A LITTLE LOWER?

16:12   17    **A.**   CORRECT.

16:12   18    **Q.**   OKAY.  AND WHEN YOU SAY THAT, YOU'RE SPEAKING SPECIFICALLY

16:12   19    ABOUT THE WAVES YOU SAW THERE IN THE LOCK; CORRECT?

16:12   20    **A.**   CORRECT.

16:12   21         **MR. FARRELL:**  YOUR HONOR, IF I MAY FOR ONE MOMENT

16:12   22    CAUCUS WITH MY TEAM.

16:12   23         **THE COURT:**  YOU CERTAINLY MAY, SIR.

16:12   24         **MR. FARRELL:**  THANK YOU.

16:12   25         ALL RIGHT.  NO FURTHER QUESTIONS, YOUR HONOR.

| | | |
|--|--|--|
| 16:12 | 1 | **THE COURT:**  THANK YOU, COUNSEL. |
| 16:13 | 2 | **MR. WOODCOCK:**  NOTHING FROM THE UNITED STATES. |
| 16:13 | 3 | **THE COURT:**  THANK YOU, SIR. |
| 16:13 | 4 | ANY REDIRECT? |
| 16:13 | 5 | **MR. OWEN:**  NO, YOUR HONOR. |
| 16:13 | 6 | **THE COURT:**  SIR, YOU ARE FREE TO GO. |
| 16:13 | 7 | **THE WITNESS:**  THANK YOU, SIR. |
| 16:13 | 8 | **THE COURT:**  THANK YOU. |
| 16:13 | 9 | **MR. BRUNO:**  THAT'S ALL WE HAVE TODAY, JUDGE, IF |
| 16:13 | 10 | THAT'S OKAY WITH YOU. |
| 16:13 | 11 | **THE COURT:**  ALL RIGHT.  YOU THINK WE'RE MOVING ALONG |
| 16:13 | 12 | WELL? |
| 16:13 | 13 | **MR. BRUNO:**  JUDGE, AS I SAID TO YOU, YOU KNOW, WE'RE |
| 16:13 | 14 | PERHAPS -- WELL, ACTUALLY, THIS GENTLEMAN WAS SCHEDULED FOR |
| 16:13 | 15 | MONDAY MORNING.  SO WE DID A LITTLE BACKFLIP.  I THINK WE'RE |
| 16:13 | 16 | RIGHT -- WE'RE WAY ON SCHEDULE.  JUST SO YOU KNOW, |
| 16:13 | 17 | SPECIFICALLY, MONDAY MORNING, DR. BEA TAKES THE STAND. |
| 16:13 | 18 | **THE COURT:**  OKAY. |
| 16:13 | 19 | **MR. BRUNO:**  HE WILL TAKE HOWEVER LONG HE TAKES. |
| 16:13 | 20 | THEN WE HAVE THE TWO DAMAGE EXPERTS, THEN WE |
| 16:13 | 21 | FINISH WITH THE PLAINTIFF AND WE CLEAR UP THE FOOLISHNESS WITH |
| 16:13 | 22 | THE EXHIBITS AND WE INTRODUCE, YOU KNOW, A FEW OTHER DEPO CUTS |
| 16:13 | 23 | AND WE'RE DONE. |
| 16:13 | 24 | **THE COURT:**  OKAY. |
| 16:13 | 25 | **MR. BRUNO:**  THANK YOU. |

| | | |
|---|---|---|
| 16:13 | 1 | **THE COURT:**  THANK YOU. |
| 16:13 | 2 | **MR. BRUNO:**  SO WE'RE LOOKING AT MAYBE WEDNESDAY BY |
| 16:13 | 3 | THE LATEST, I'M THINKING.  SO I KEPT MY PROMISE. |
| 16:13 | 4 | **THE COURT:**  ALL RIGHT. |
| 16:13 | 5 | **MR. BRUNO:**  SO FAR. |
| 16:13 | 6 | **THE COURT:**  SO FAR. |
| 16:13 | 7 | YES, MA'AM?  OH, I THOUGHT YOU WERE SUMMONING |
| 16:14 | 8 | THE COURT. |
| 16:14 | 9 | **MR. TREEBY:**  NO, YOUR HONOR.  WE WANT TO TALK TO -- |
| 16:14 | 10 | **THE COURT:**  OH, YOU WANT TO TALK TO THE REALLY |
| 16:14 | 11 | IMPORTANT PEOPLE.  I'M GOING TO LEAVE. |
| 16:14 | 12 | LET'S HOPE THAT THE SAINTS WIN SO THE COURT WILL |
| 16:14 | 13 | BE, HOPEFULLY, IN A MORE SERENE STATE OF MIND.  I'M PRETTY SURE |
| 16:14 | 14 | LSU WILL. |
| 16:14 | 15 | **THE DEPUTY CLERK:**  ALL RISE. |
| 16:14 | 16 | (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.) |
| | 17 | ***** |
| | 18 | **CERTIFICATE** |
| | 19 | I, JODI SIMCOX, RMR, FCRR, OFFICIAL COURT REPORTER |
| | 20 | FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND |
| | 21 | CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER. |
| | 22 | |
| | 23 | |
| | 24 | S/ JODI SIMCOX, RMR, FCRR |
| | 25 | JODI SIMCOX, RMR, FCRR OFFICIAL COURT REPORTER |