1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3
 * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
4
 IN RE:  KATRINA CANAL BREACHES     DOCKET 05-CV-4182
5 CONSOLIDATED LITIGATION
                                    SECTION K
6
 PERTAINS TO:  MRGO              NEW ORLEANS, LOUISIANA
7        ARMSTRONG NO. 10-CV-866
                                    SEPTEMBER 17, 2012
8
 * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
9

10               DAY 4, AFTERNOON SESSION
              TRANSCRIPT OF TRIAL PROCEEDINGS
11       BEFORE THE HONORABLE STANWOOD R. DUVAL JR.
                UNITED STATES DISTRICT JUDGE
12

13 APPEARANCES:

14
 FOR THE PLAINTIFFS:          BRUNO & BRUNO
15                            BY:  JOSEPH M. BRUNO, ESQ.
                             855 BARONNE STREET
16                            NEW ORLEANS, LOUISIANA 70113

17 FOR THE PLAINTIFFS:          THE ANDRY LAW FIRM
                             BY:  JONATHAN B. ANDRY, ESQ.
18                            610 BARONNE STREET
                             NEW ORLEANS, LOUISIANA 70113
19
 FOR THE PLAINTIFFS:          BARON & BUDD, PC
20                            BY:  THOMAS SIMS, ESQ.
                             3102 OAK LAWN AVENUE, SUITE 1100
21                            DALLAS, TEXAS 75219

22 FOR THE PLAINTIFFS:          DEGRAVELLES PALMINTIER
                               HOLTHAUS & FRUGÉ
23                            BY:  MICHAEL C. PALMINTIER, ESQ.
                                  JOSHUA M. PALMINTIER, ESQ.
24                            618 MAIN STREET
                             BATON ROUGE, LOUISIANA 70801
25

*HOURLY TRANSCRIPT*

```
 1   APPEARANCES:

 2
     FOR THE PLAINTIFFS:          DOMENGEAUX WRIGHT ROY
 3                                  & EDWARDS, LLC
                                  BY:  ELWOOD C. STEVENS JR., ESQ.
 4                                       BONNIE KENDRICK, ESQ.
                                  556 JEFFERSON STREET, SUITE 500
 5                                POST OFFICE BOX 3668
                                  LAFAYETTE, LOUISIANA 70502
 6
     FOR THE PLAINTIFFS:          THE DUDENHEFER LAW FIRM
 7                                BY:  FRANK C. DUDENHEFER JR., ESQ.
                                  601 POYDRAS STREET, SUITE 2655
 8                                NEW ORLEANS, LOUISIANA 70130

 9   FOR THE PLAINTIFFS:          FAYARD & HONEYCUTT, APC
                                  BY:  CALVIN C. FAYARD JR., ESQ.
10                                519 FLORIDA AVENUE, S.W.
                                  DENHAM SPRINGS, LOUISIANA 70726
11
     FOR THE PLAINTIFFS:          JOANEN LAW FIRM
12                                BY:  SCOTT JOANEN, ESQ.
                                  4905 FRERET STREET, SUITE B
13                                NEW ORLEANS, LOUISIANA 70115

14   FOR THE PLAINTIFFS:          LEVIN PAPANTONIO THOMAS
                                    MITCHELL RAFFERTY & PROCTOR
15                                BY:  MATTHEW D. SCHULTZ, ESQ.
                                  316 SOUTH BAYLEN STREET, SUITE 600
16                                PENSACOLA, FLORIDA 32502

17   FOR THE PLAINTIFFS:          THE TRIAL LAW FIRM, PC
                                  BY:  ANDREW P. OWEN, ESQ.
18                                800 WILTSHIRE BLVD., SUITE 500
                                  LOS ANGELES, CALIFORNIA 90017
19
     FOR THE PLAINTIFFS:          J. ROBERT WARREN II, APLC
20                                BY:  J. ROBERT WARREN II, ESQ.
                                  1718 SHORT STREET
21                                NEW ORLEANS, LOUISIANA 70118

22   FOR THE PLAINTIFFS:          COTCHETT PITRE & MCCARTHY, LLP
                                  BY:  PHILIP L. GREGORY, ESQ.
23                                840 MALCOLM ROAD, SUITE 200
                                  BURLINGAME, CALIFORNIA 94010
24

25
```

```
1    APPEARANCES:

2
     FOR THE DEFENDANT,            STONE PIGMAN WALTHER WITTMANN, LLC
3    WASHINGTON GROUP             BY:  WILLIAM D. TREEBY, ESQ.
     INTERNATIONAL, INC.:              JAMES C. GULOTTA JR., ESQ.
4                                      HEATHER S. LONIAN, ESQ.
                                       MAGGIE A. BROUSSARD, ESQ.
5                                 546 CARONDELET STREET
                                  NEW ORLEANS, LOUISIANA 70130
6
     FOR THE DEFENDANT,            JONES DAY (WASHINGTON)
7    WASHINGTON GROUP             BY:  ADRIAN WAGER-ZITO, ESQ.
     INTERNATIONAL, INC.:              DEBRA S. CLAYMAN, ESQ.
8                                      CHRISTOPHER N. THATCH, ESQ.
                                       CHRISTOPHER R. FARRELL, ESQ.
9                                      JULIA CRONIN, ESQ.
                                       BRIAN KERWIN, ESQ.
10                                51 LOUISIANA AVENUE, N.W.
                                  WASHINGTON, D.C. 20001
11
     FOR THE DEFENDANT,            U.S. DEPARTMENT OF JUSTICE
12   UNITED STATES OF AMERICA:     CIVIL RIGHTS DIVISION-TORTS BRANCH
                                  BY:  ROBIN D. SMITH, ESQ.
13                                     JAMES F. MCCONNON JR., ESQ.
                                       RUPERT MITSCH, ESQ.
14                                     CONOR KELLS, ESQ.
                                       JOHN A. WOODCOCK, ESQ.
15                                BENJAMIN FRANKLIN STATION
                                  POST OFFICE BOX 888
16                                WASHINGTON, DC 20044

17   OFFICIAL COURT REPORTER:      TONI DOYLE TUSA, CCR, FCRR
                                  500 POYDRAS STREET, ROOM HB-406
18                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7778
19                                TONI_TUSA@LAED.USCOURTS.GOV

20

21
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
22   COMPUTER-AIDED TRANSCRIPTION SOFTWARE.

23

24

25
```

*HOURLY TRANSCRIPT*

1                          **I N D E X**

2                                                    <u>PAGE</u>

3
ROBERT G. BEA, PH.D.

4
     CROSS-EXAMINATION BY MR. TREEBY              871

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:55 | 1 | **AFTERNOON SESSION** |
| 12:55 | 2 | **(SEPTEMBER 17, 2012)** |
| 12:54 | 3 | (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.) |
| 12:58 | 4 | **THE DEPUTY CLERK:**  COURT IS IN SESSION.  PLEASE BE |
| 13:02 | 5 | SEATED. |
| 13:02 | 6 | **THE COURT:**  GOOD AFTERNOON. |
| 13:02 | 7 | **ROBERT G. BEA, PH.D.,** |
| 13:02 | 8 | HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS: |
| 13:02 | 9 | **CROSS-EXAMINATION** |
| 13:02 | 10 | BY MR. TREEBY: |
| 13:02 | 11 | **Q.**   DR. BEA, BEFORE I GET INTO THE MEAT OF MY |
| 13:02 | 12 | CROSS-EXAMINATION, I WANTED TO JUST CLEAR UP A COUPLE OF THINGS |
| 13:02 | 13 | THAT CAME UP EARLIER TODAY.  YOU TOLD US THIS MORNING THAT A |
| 13:02 | 14 | LIGHT WENT ON WHEN LOOKING AT SOME PIEZOMETER DATA FROM THE |
| 13:02 | 15 | 17TH STREET CANAL SITE; IS THAT CORRECT? |
| 13:02 | 16 | **A.**   THAT'S CORRECT. |
| 13:02 | 17 | **Q.**   CAN YOU IDENTIFY THOSE PIEZOMETERS FOR US, PLEASE. |
| 13:02 | 18 | **A.**   THE PIEZOMETERS ARE IDENTIFIED IN DETAIL IN MY EXPERT |
| 13:02 | 19 | REPORTS, PLURAL, FOR THE CANAL LITIGATION.  I CAN'T REMEMBER |
| 13:03 | 20 | THEIR NUMBERS OR IDENTIFICATION. |
| 13:03 | 21 | **Q.**   SO HOW WOULD WE BEST FIND OUT WHICH SPECIFIC PIEZOMETERS |
| 13:03 | 22 | YOU ARE TALKING ABOUT? |
| 13:03 | 23 | **A.**   YOU COULD GO TO THE U.S. ARMY CORPS OF ENGINEERS DOCUMENT |
| 13:03 | 24 | ARCHIVED FOR THE 17TH STREET CANAL SAFE WATER LEVEL STUDY, LOOK |
| 13:03 | 25 | IN THAT DOCUMENT ARCHIVE FOR A FOLDER TITLED "PIEZOMETERS" WITH |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:03 | 1 | THE DETAILS.  THE DISCUSSION OF THE PIEZOMETERS INSTALLATION |
| 13:03 | 2 | AND FUNDAMENTAL RESULTS ARE INCLUDED IN THE BODY OF THAT SAFE |
| 13:03 | 3 | WATER LEVEL REPORT. |
| 13:03 | 4 | Q.   I TAKE IT FROM YOUR ANSWER THAT THOSE PIEZOMETERS ARE NOT |
| 13:04 | 5 | IDENTIFIED IN YOUR RELIANCE MATERIALS IN THIS CASE. |
| 13:04 | 6 | A.   THE WORK ASSOCIATED WITH THE PIEZOMETERS IS CITED IN MY |
| 13:04 | 7 | RELIANCE MATERIALS. |
| 13:04 | 8 | Q.   BUT NOT THE SPECIFIC IDENTIFICATION OF THE PIEZOMETERS; IS |
| 13:04 | 9 | THAT CORRECT? |
| 13:04 | 10 | A.   I DON'T RECALL.  IT'S A VERY LONG TIME AGO, MANY |
| 13:04 | 11 | DOCUMENTS. |
| 13:04 | 12 | Q.   ONE OTHER CLEANUP DETAIL, DR. BEA.  YOU TALKED ABOUT -- WE |
| 13:04 | 13 | TALKED A LITTLE BIT ABOUT YOUR BOOKS THAT WERE PUBLISHED BY |
| 13:04 | 14 | VICK COPY PUBLISHERS THAT HAVE THE SAME NAMES AS SOME COURSES |
| 13:04 | 15 | YOU TAUGHT.  DO YOU RECALL THAT? |
| 13:04 | 16 | A.   CORRECT. |
| 13:04 | 17 | Q.   ARE YOU SAYING ALL THREE OF THOSE BOOKS ARE IN YOUR |
| 13:04 | 18 | RELIANCE MATERIALS? |
| 13:04 | 19 | A.   THEY ARE SUPPOSED TO BE.  I FURNISHED ELECTRONIC COPIES TO |
| 13:05 | 20 | A SECURE WEB SITE.  THE RELIANCE LIST WAS TO BE BASED ON THOSE |
| 13:05 | 21 | DOCUMENTS.  I HAVE NOT CHECKED THE RELIANCE LIST ITSELF. |
| 13:05 | 22 | Q.   OKAY. |
| 13:05 | 23 | A.   IF YOU HAVE DIFFICULTY IN LOCATING IT, I WOULD BE GLAD TO |
| 13:05 | 24 | PRODUCE THEM FOR YOU. |
| 13:05 | 25 | Q.   WE MAY DO THAT AFTER WE SEARCH AND MAKE SURE.  OKAY. |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:05 | 1 | DR. BEA, YOU CONTEND, DO YOU NOT, THAT WASHINGTON |
| 13:05 | 2 | GROUP INTERNATIONAL'S EXCAVATIONS AT THE EAST BANK INDUSTRIAL |
| 13:05 | 3 | AREA CONTRIBUTED TO THE NORTH AND SOUTH BREACHES; ISN'T THAT |
| 13:05 | 4 | RIGHT? |
| 13:05 | 5 | **A.**   THAT'S CORRECT. |
| 13:05 | 6 | **Q.**   BUT YOU HAVE TESTIFIED THAT SEVERAL OTHER FACTORS OTHER |
| 13:05 | 7 | THAN EXCAVATIONS ALSO CONTRIBUTED TO THE EAST BANK INDUSTRIAL |
| 13:05 | 8 | AREA BREACHES; ISN'T THAT RIGHT? |
| 13:06 | 9 | **A.**   TO THE LOWER NINTH WARD BREACHES. |
| 13:06 | 10 | **Q.**   THE BREACHES IN THE FLOODWALL CLAIBORNE AVENUE AND FLORIDA |
| 13:06 | 11 | AVENUE, JUST SO WE'RE TALKING ABOUT IT, RIGHT? |
| 13:06 | 12 | **A.**   YES, SIR. |
| 13:06 | 13 | **Q.**   FOR INSTANCE, OTHER THAN EXCAVATIONS, YOU BELIEVE THAT -- |
| 13:06 | 14 | AND I QUOTE:  THE SUREKOTE ROAD OVERPASS CONTRIBUTED TO THE |
| 13:06 | 15 | NORTH BREACH.  ISN'T THAT RIGHT? |
| 13:06 | 16 | **A.**   THAT'S CORRECT. |
| 13:06 | 17 | **Q.**   OTHER THAN EXCAVATIONS, YOU ALSO BELIEVE THAT WATER |
| 13:06 | 18 | PRESSURE CONTRIBUTED TO THE FLOODWALL FAILURES; ISN'T THAT |
| 13:06 | 19 | RIGHT? |
| 13:06 | 20 | **A.**   THAT'S CORRECT. |
| 13:06 | 21 | **Q.**   OTHER THAN EXCAVATIONS, YOU ALSO BELIEVE THAT SOIL |
| 13:06 | 22 | CONDITIONS UNDER THE FLOODWALL, CONDITIONS ON THE BACK SIDE OF |
| 13:06 | 23 | THE FLOODWALL -- FOR EXAMPLE, GRASS MOWED ON THE BACK SIDE OF |
| 13:06 | 24 | THE FLOODWALL, THE LOW ELEVATIONS ALONG THE STRETCH BETWEEN THE |
| 13:06 | 25 | NORTH AND SOUTH BREACHES -- WERE ALL CONTRIBUTORS TO THE |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:06 | 1 | CAUSATION OF THE EAST BANK INDUSTRIAL AREA BREACHES; ISN'T THAT |
| 13:06 | 2 | RIGHT? |
| 13:06 | 3 | A.    THAT'S CORRECT.  IT'S AN INTEGRATED SYSTEM. |
| 13:07 | 4 | Q.    I'M JUST GOING TO COVER SOME OF IT, BECAUSE YOU WENT ON AT |
| 13:07 | 5 | LENGTH IN YOUR DEPOSITION ABOUT THE CONTRIBUTING FACTORS.  DO |
| 13:07 | 6 | YOU RECALL, DR. BEA, THAT YOU PROVIDED IN YOUR DEPOSITION A |
| 13:07 | 7 | LONG LIST OF CONTRIBUTORS TO THE FLOODWALL LEVEE FAILURES OTHER |
| 13:07 | 8 | THAN THE EXCAVATIONS YOU DREW IN CONCEPTUAL CROSS SECTIONS. |
| 13:07 | 9 | MY EXACT QUESTION AT YOUR DEPOSITION WAS THIS: |
| 13:07 | 10 | "QUESTION:  WHAT FACTORS OTHER THAN THE BACKFILLED |
| 13:07 | 11 | EXCAVATIONS DESCRIBED IN THE ANALYTICAL CROSS SECTIONS DO |
| 13:07 | 12 | YOU CONTEND CONTRIBUTED TO THE EAST BANK INDUSTRIAL AREA |
| 13:07 | 13 | LEVEE/FLOODWALL FAILURES?" |
| 13:07 | 14 | THAT WAS MY QUESTION.  THEN YOU PROVIDE A LONG LIST. |
| 13:07 | 15 | DO YOU JUST RECALL IN GENERAL THAT HAPPENING? |
| 13:07 | 16 | MR. SCHULTZ:  CAN I GET THE CITE, PLEASE, MR. TREEBY? |
| 13:07 | 17 | MR. TREEBY:  YES, I'LL GIVE YOU THE CITE. |
| 13:07 | 18 | THE WITNESS:  YES, SIR. |
| 13:07 | 19 | MR. TREEBY:  IT'S ON THE MARCH 27 DEPOSITION, |
| 13:07 | 20 | PAGE 124 TO 126.  IT'S A LONG SECTION. |
| 13:08 | 21 | BY MR. TREEBY: |
| 13:08 | 22 | Q.    YOU STATED AT THE END OF THAT LIST, DID YOU NOT, THAT |
| 13:08 | 23 | THESE OTHER CONTRIBUTORS, IN ANSWER TO THAT QUESTION, INCLUDED |
| 13:08 | 24 | "THE EFFECTS OF THE BARGE ENTERING THE SOUTH BREACH?"  DO YOU |
| 13:08 | 25 | RECALL THAT? |

ROBERT G. BEA - CROSS

| | |
|---|---|
| 13:08 | 1 |
| 13:08 | 2 |
| 13:08 | 3 |
| 13:08 | 4 |
| 13:08 | 5 |
| 13:08 | 6 |
| 13:08 | 7 |
| 13:08 | 8 |
| 13:08 | 9 |
| 13:09 | 10 |
| 13:09 | 11 |
| 13:09 | 12 |
| 13:09 | 13 |
| 13:09 | 14 |
| 13:09 | 15 |
| 13:09 | 16 |
| 13:09 | 17 |
| 13:09 | 18 |
| 13:09 | 19 |
| 13:09 | 20 |
| 13:09 | 21 |
| 13:09 | 22 |
| 13:09 | 23 |
| 13:09 | 24 |
| 13:09 | 25 |

**A.**   YES, THAT'S CORRECT.

**Q.**   YOU ALSO CONTEND THAT THE TENSION GAP IS ANOTHER IMPORTANT
CONTRIBUTOR TO THE NORTH AND SOUTH BREACHES; ISN'T THAT RIGHT?

**A.**   WHICH TENSION GAP?

**Q.**   I ASKED THAT QUESTION, AND YOU SAID YES TO IT.

**A.**   THE TENSION GAP I SAID YES TO IS THE TENSION GAP FORMED
BETWEEN THE FLOODWALL SHEET PILING ON THE FLOOD SIDE OF THE
WALL.

**Q.**   RIGHT.  SO YOU AGREE THAT IF A GAP FORMS AT THE FLOODWALL
BREACHES AT THOSE SITES ON THE CANAL SIDE, AS YOU HAVE
POSTULATED UNDER YOUR THEORIES, AND THE GAP GOES ALL THE WAY
DOWN TO THE TIP OF THE SHEET PILE, THAT WOULD BE AN IMPORTANT
PART OF THE DESTABILIZATION OF THE FLOODWALL; ISN'T THAT RIGHT?

**A.**   YES, SIR.

**Q.**   IN FACT, YOU TESTIFIED THAT THE GAP WOULD BE A DOMINANT
PART OF THE DESTABILIZATION OF THE FLOODWALL; ISN'T THAT RIGHT?

**A.**   IT'S AN IMPORTANT PART, YES.

**Q.**   YOU DO KNOW THAT ALL OF THE PARTIES IN THIS CASE
PARTICIPATED, TO VARYING EXTENTS, IN A JOINT SOILS
INVESTIGATION PROGRAM AT THE EAST BANK INDUSTRIAL AREA TO
DETERMINE THE SITE-SPECIFIC PROPERTIES OF THE SOILS IN THAT
LOCATION, RIGHT?

**A.**   YES.

**Q.**   DR. DAVID ROGERS, MR. KEVIN POPE, DR. RUNE STORESUND WERE
THE THREE KEY INDIVIDUALS REPRESENTING THE PLAINTIFFS IN THAT

ROBERT G. BEA - CROSS

13:10     1    TESTING PROGRAM.  AM I RIGHT?

13:10     2    **A.**    CORRECT.

13:10     3    **Q.**    YOU PARTICIPATED IN THE PROGRAM ONLY AS AN OBSERVER; ISN'T

13:10     4    THAT RIGHT?

13:10     5    **A.**    THAT'S CORRECT.

13:10     6    **Q.**    DID YOU EVER VISIT THE EAST BANK INDUSTRIAL AREA DURING

13:10     7    THE JOINT SOILS INVESTIGATION?

13:10     8    **A.**    NO.

13:10     9    **Q.**    NOW, YOU DID KNOW, I BELIEVE, THAT THE JOINT SOILS

13:10    10    INVESTIGATION PROGRAM REQUIRED THE SOILS BEING INVESTIGATED TO

13:10    11    BE CLASSIFIED BY THE THIRD-PARTY CONSULTANT FUGRO ACCORDING TO

13:10    12    ASTM D2487; ISN'T THAT RIGHT?

13:10    13    **A.**    YES, SIR.

13:10    14    **Q.**    BUT YOU'RE NOT YOURSELF, OR AT LEAST WEREN'T AT THE TIME

13:10    15    YOUR DEPOSITION WAS TAKEN, FAMILIAR WITH THAT PARTICULAR ASTM;

13:10    16    ISN'T THAT CORRECT?

13:10    17    **A.**    THAT'S CORRECT, SIR.

13:10    18    **Q.**    BASED ON THE ASTM D2487 STANDARD, YOU KNOW NOW, I ASSUME,

13:11    19    THAT FUGRO CLASSIFIED THE SOIL LAYER THAT YOU HAVE REFERRED TO

13:11    20    AS THE *SWAMP MARSH LAYER* AS AN ORGANIC CLAY LAYER.  RIGHT?

13:11    21    **A.**    IT'S CHANGED ITS NAME THROUGH THE EVOLUTION.  AT THE END

13:11    22    OF THAT EVOLUTION, THE GENERAL TERM APPLIED IS *ORGANIC CLAY* FOR

13:11    23    THE SITES NEAR AND CLOSE TO OR ADJACENT TO THE FLOODWALL

13:11    24    ALIGNMENT.

13:11    25    **Q.**    NOW, DR. BEA, LET'S DISCUSS PERMEABILITY FOR A MOMENT.

ROBERT G. BEA - CROSS

13:11  1   YOU AGREE, DO YOU NOT, THAT THE PERMEABILITY OF SPECIFIC SOILS

13:11  2   IS A MATERIAL PROPERTY OF THOSE SOILS?

13:12  3   **A.**   YES, AS LONG AS WE UNDERSTAND IN THE USE OF THE TERM *SOIL*

13:12  4   IS WATER AND THE WATER EFFECTS.

13:12  5   **Q.**   WHEN I ASKED YOU THAT QUESTION AT YOUR DEPOSITION, YOU

13:12  6   DIDN'T INCLUDE WATER.  DO YOU RECALL THAT?

13:12  7   **A.**   WELL, THAT'S BECAUSE THE SOILS THAT WE ARE TALKING ABOUT

13:12  8   ARE BELOW, IN GENERAL, THE GROUNDWATER TABLE FREQUENTLY

13:12  9   IDENTIFIED BY ENGINEERS AS THE PHREATIC -- THAT'S SPELLED

13:12  10  P-H-R-E-A-T-I-C -- SURFACE.  SO THOSE SOILS IMPLICITLY --

13:12  11  EXPLICITLY INVOLVE WATER.

13:12  12  **Q.**   AND MATERIAL PROPERTIES OF SOILS IS SOMETHING THAT ONE CAN

13:13  13  DETERMINE SCIENTIFICALLY; ISN'T THAT RIGHT?

13:13  14  **A.**   YES.

13:13  15  **Q.**   HYDRAULIC CONDUCTIVITY OF SPECIFIC SOILS IS A MATERIAL

13:13  16  PROPERTY OF THE SOIL GIVEN THE FLUID THAT FLOWS THROUGH THOSE

13:13  17  SOILS; ISN'T THAT CORRECT?

13:13  18  **A.**   THAT IS CORRECT.

13:13  19  **Q.**   AND THE MATERIAL PROPERTIES OF THESE SOILS AND THESE

13:13  20  FLUIDS ARE MATTERS THAT ONE CAN DETERMINE SCIENTIFICALLY,

13:13  21  RIGHT?

13:13  22  **A.**   THAT'S RIGHT.

13:13  23  **Q.**   NOW, IN THIS CASE YOU RELIED ON DR. ROGERS FOR SOME OF THE

13:13  24  INFORMATION YOU INCLUDED IN YOUR EXPERT REPORTS; ISN'T THAT

13:13  25  RIGHT?

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:13 | 1 | **A.** THAT IS CORRECT, BUT THAT STATEMENT NEEDS TO BE BROUGHT |
| 13:13 | 2 | FORWARD AS A CLARIFICATION TO A STATEMENT YOU MADE EARLIER TO |
| 13:14 | 3 | THE COURT THAT DR. ROGERS WAS RESPONSIBLE FOR DEVELOPMENT OF |
| 13:14 | 4 | THE ANALYTICAL CROSS SECTIONS.  THAT'S NOT FACTUAL OR TRUE. |
| 13:14 | 5 | **Q.** I DON'T THINK I SAID ANYTHING LIKE THAT YET, BUT WE WILL |
| 13:14 | 6 | GET THERE PERHAPS. |
| 13:14 | 7 | **A.** IT'S IN THE RECORD. |
| 13:14 | 8 | **Q.** THE RECORD OF THIS TRIAL? |
| 13:14 | 9 | **A.** YES. |
| 13:14 | 10 | **Q.** YOU KNOW THE QUALIFICATIONS OF DR. ROGERS; ISN'T THAT |
| 13:14 | 11 | TRUE? |
| 13:14 | 12 | **A.** YES, I DO. |
| 13:14 | 13 | **Q.** IN FACT, YOU SERVED ON THE FACULTY OF UC BERKELEY WITH |
| 13:14 | 14 | DR. ROGERS, RIGHT? |
| 13:14 | 15 | **A.** THAT'S CORRECT. |
| 13:14 | 16 | **Q.** YOU KNOW THAT IN THIS CASE DR. ROGERS RELIED ON THE |
| 13:14 | 17 | SERVICES AND EXPERTISE OF A GENTLEMAN NAMED KEVIN POPE, RIGHT? |
| 13:14 | 18 | **A.** THAT'S RIGHT. |
| 13:14 | 19 | **Q.** AND KEVIN POPE USED STANDARD SCIENTIFIC METHODS TO |
| 13:14 | 20 | EVALUATE RESULTS FROM PUMPING TESTS CONDUCTED AT SITES THAT |
| 13:14 | 21 | WERE SELECTED BY THE PLAINTIFFS' EXPERT TEAM.  YOU KNEW THAT? |
| 13:15 | 22 | **A.** YES, SIR. |
| 13:15 | 23 | **Q.** THE PURPOSE OF THOSE PUMPING TESTS WAS TO DETERMINE THE |
| 13:15 | 24 | PERMEABILITY OF THE ORGANIC CLAY LAYERS THAT YOU BELIEVED WERE |
| 13:15 | 25 | IMPLICATED IN THE FLOODWALL FAILURES IN THE EAST BANK |

ROBERT G. BEA - CROSS

13:15  1  INDUSTRIAL AREA; ISN'T THAT RIGHT?

13:15  2  **A.**   THAT'S CORRECT.

13:15  3  **Q.**   AND THE RESULTS OF THESE ANALYSES BY DR. ROGERS AND KEVIN

13:15  4  POPE DETERMINED A BEST ESTIMATE THAT THE PERMEABILITY OF THOSE

13:15  5  SOILS WAS 1 TIMES 10 TO THE MINUS 5 CENTIMETERS PER SECOND,

13:15  6  RIGHT?

13:15  7  **A.**   THAT WAS THE BEST ESTIMATE, AND IT WAS BOUNDED BY A FACTOR

13:15  8  OF 10 MORE PERMEABLE AND LESS PERMEABLE.  SO IT'S A BEST

13:15  9  ESTIMATE WITH AN UNCERTAINTY BAND.

13:15  10 **Q.**   WELL, LET'S TALK ABOUT THAT BOUNDED BY 6 AND 4.  I'LL TRY

13:15  11 TO MAKE IT SIMPLE.  WHEN YOU SAY IT WAS BOUNDED BY 4, THE

13:16  12 HIGHER PERMEABILITY SETTING, THAT WAS FROM A PUMPING TEST OVER

13:16  13 AT THE SCHOOL SITE HALF A MILE OR SO AWAY FROM THE FLOODWALL,

13:16  14 RIGHT?

13:16  15 **A.**   NO, SIR.

13:16  16 **Q.**   WHERE DID HE GET 4 EXCEPT AT THE SCHOOL SITE?

13:16  17 **A.**   THE 10 MINUS 4 CAME FROM ONE, OR SEVERAL ACTUALLY, TO MY

13:16  18 RECOLLECTION, OF TESTS THAT WERE DONE AT THE SOUTH EBIA SITE.

13:16  19 THE JUSTIFICATION RATIONALE FOR THE SPECIFICATION OF THIS

13:16  20 IMPORTANT UNCERTAINTY RANGE IS DOCUMENTED IN DR. ROGERS' EXPERT

13:16  21 REPORT.

13:16  22 **Q.**   NOW, YOU NOW AGREE, HOWEVER, THAT 1 TIMES 10 TO THE

13:16  23 MINUS 5 CENTIMETERS PER SECOND VALUE PRODUCED FROM THE

13:16  24 PLAINTIFFS' PUMPING TEST IS THE BEST ESTIMATE OF PERMEABILITY

13:17  25 FOR THE SOILS, RIGHT?

ROBERT G. BEA - CROSS

13:17  1    **A.**  FOR THE --

13:17  2    **Q.**  AT THE EBIA.  I'M SORRY.  EXCUSE ME.  I DIDN'T FINISH MY

13:17  3    QUESTION.  LET ME START OVER SO I DON'T HAVE A CONFUSING

13:17  4    RECORD.

13:17  5        YOU NOW AGREE, THE PLAINTIFFS NOW AGREE -- I THINK

13:17  6    THERE'S EVEN A STIPULATION -- THAT THE 1 TIMES 10 TO THE

13:17  7    MINUS 5 CENTIMETERS PER SECOND VALUE PRODUCED FROM THE

13:17  8    PLAINTIFFS' PUMPING TEST AT THE SOUTH EBIA IS THE BEST ESTIMATE

13:17  9    OF PERMEABILITY FOR THOSE SOILS AT THE EBIA, CORRECT?

13:17  10   **A.**  INCORRECT.  THAT PERMEABILITY IS SPECIFICALLY ATTRIBUTED

13:17  11   TO THE BURIED SWAMP MARSH ORGANIC CLAY ALSO IDENTIFIED AS

13:17  12   MARSH 1, MARSH 2 DEPOSITS AT THE U.S. ARMY CORPS OF ENGINEERS

13:17  13   INTERAGENCY PERFORMANCE EVALUATION TASKFORCE.

13:17  14       SO THAT VERY CRITICAL DEPOSIT GOES UNDER A VARIETY OF

13:18  15   NAMES.  ACTUALLY THAT'S APPROPRIATE BECAUSE THE CHARACTERISTICS

13:18  16   OF THE DEPOSIT ARE HIGHLY VARIABLE.

13:18  17   **Q.**  IN FACT, ALL OF THE EXPERTS IN THIS CASE AGREE WITH THAT

13:18  18   BEST ESTIMATE PERMEABILITY FOR THAT SOIL LAYER; ISN'T THAT

13:18  19   RIGHT?

13:18  20   **A.**  I CAN'T ATTEST TO ALL EXPERTS, BUT I THINK THE PRIMARY

13:18  21   EXPERTS WORKING ON CAUSATION ISSUES HAVE AGREED TO THAT FIGURE.

13:18  22   **Q.**  NOW, DR. BEA, I HEARD IN YOUR SUMMARY DIRECT SOME

13:18  23   DISCUSSION OF THIS, BUT I THINK IT'S IMPORTANT TO GO THROUGH

13:18  24   IT, SO BEAR WITH ME.  AND I BELIEVE ALL OF THIS COMES DIRECTLY

13:18  25   FROM THE RECORD AND YOUR TESTIMONY, BUT WE'LL SEE.

ROBERT G. BEA - CROSS

13:18     1            OVER THE YEARS YOU HAVE HELD DIFFERING OPINIONS

13:18     2    REGARDING YOUR BEST ESTIMATE OF THE PERMEABILITY OF THE ORGANIC

13:18     3    CLAY LAYER IN THE EAST BANK INDUSTRIAL AREA; ISN'T THAT RIGHT?

13:19     4    A.    YES.

13:19     5    Q.    YOU WERE, IN FACT, A COAUTHOR OF THE 2006 ILIT REPORT,

13:19     6    CORRECT?

13:19     7    A.    CORRECT.

13:19     8    Q.    AND THAT REPORT INCLUDED A BEST ESTIMATE OF THE MARSH

13:19     9    LAYER SOILS AT THE EBIA OF 1 TIMES 10 TO THE MINUS 2

13:19    10    CENTIMETERS PER SECOND, RIGHT?

13:19    11    A.    THAT'S CORRECT.

13:19    12    Q.    AND IN JANUARY OF 2009, YOU SUBMITTED A DECLARATION TO

13:19    13    THIS COURT IN THE *ROBINSON* LITIGATION IN WHICH YOU OPINED THAT

13:19    14    THE BEST ESTIMATE FOR THE PERMEABILITY OR HYDRAULIC

13:19    15    CONDUCTIVITY OF THE MARSH LAYER AT THE EBIA WAS 1 TIMES 10 TO

13:19    16    THE MINUS 3 CENTIMETERS PER SECOND; ISN'T THAT RIGHT?

13:19    17    A.    THAT'S CORRECT.

13:19    18    Q.    AND THEN DURING THE *BARGE* LITIGATION YOU TESTIFIED TO THIS

13:19    19    COURT THAT THE BEST ESTIMATE OF THE PERMEABILITY OF THE

13:19    20    CRITICAL MARSH LAYER WAS 1 TIMES 10 TO THE MINUS 4 CENTIMETERS

13:19    21    PER SECOND; ISN'T THAT TRUE?

13:20    22    A.    AS I RECALL, THAT IS CORRECT.

13:20    23    Q.    IN YOUR REPORT SUBMITTED IN THIS MATTER YOU NOW AGREE,

13:20    24    BASED ON THE TESTING PERFORMED BY FUGRO AND KEVIN POPE AND

13:20    25    DR. ROGERS, THAT 1 TIMES 10 TO THE MINUS 5 CENTIMETERS PER

ROBERT G. BEA - CROSS

13:20  1  SECOND IS THE CORRECT PERMEABILITY OF THAT ORGANIC CLAY LAYER;

13:20  2  ISN'T THAT TRUE?

13:20  3  A.   THAT'S TRUE FOR THE SPECIFIED TEST CONNECTIONS.

13:20  4  Q.   RIGHT.  AND JUST SO WE PUT THAT IN SOME FRAMEWORK, THAT

13:20  5  IS, FROM ILIT TO NOW, THAT'S THREE ORDERS OF MAGNITUDE LESS

13:20  6  PERMEABLE THAN FIRST OPINED IN THE ILIT REPORT, CORRECT?

13:20  7  A.   YES.

13:20  8  Q.   1000 TIMES LOWER THAN THE ILIT ESTIMATE, RIGHT?

13:20  9  A.   THAT'S CORRECT.  AND THAT'S A REFLECTION OF THE POWER OF

13:21  10 KNOWLEDGE OR THE POWER OF IGNORANCE.

13:21  11 Q.   100 TIMES LOWER THAN YOUR BEST ESTIMATE IN *ROBINSON*; ISN'T

13:21  12 THAT CORRECT?

13:21  13 A.   FOR THE BEST ESTIMATE, THE IMPORTANT THING THAT I BELIEVE

13:21  14 YOU'RE OMITTING IN THE INDEPENDENT LED INVESTIGATION WORK

13:21  15 STAGE 2, A MUCH BROADER RANGE OF PERMEABILITIES FOR THE

13:21  16 DEPOSITS WE ARE DISCUSSING WERE EXPLICITLY ANALYZED RANGING

13:21  17 FROM THE INITIALLY ASSUMED VALUE OF 10 TO THE MINUS 2

13:21  18 CENTIMETERS PER SECOND TO 10 TO THE MINUS 6 CENTIMETERS PER

13:22  19 SECOND.

13:22  20        IN THE WORK WE DID FOR *ROBINSON*, WE ALSO INVESTIGATED

13:22  21 AN UNCERTAINTY BAND CONCERNING THE PERMEABILITY TO IDENTIFY ITS

13:22  22 INFLUENCE EFFECTS IN THE CAUSATION OF THE BREACHES.  AND IN THE

13:22  23 CASE OF AREAS THAT WE STUDIED FOR NONBREACH, WE TREATED THEM

13:22  24 THE SAME WAY.  WE ARE NOT DOING SINGLE-VALUED ANALYSES IN

13:22  25 GENERAL.

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:22 | 1 | **Q.**  I WELCOME ALL OF YOUR EXPRESSIONS, BUT I WANT TO GET BACK |
| 13:22 | 2 | TO WHAT I WAS REALLY ASKING ABOUT, WHICH WAS THIS, THE ORDERS |
| 13:23 | 3 | OF MAGNITUDE.  IT WENT FROM A THOUSAND TIMES LOWER THAN THE |
| 13:23 | 4 | ILIT ESTIMATE, RIGHT? |
| 13:23 | 5 | **A.**  YES, SIR. |
| 13:23 | 6 | **Q.**  TO A HUNDRED TIMES LOWER IN YOUR ESTIMATE IN *ROBINSON*? |
| 13:23 | 7 | **A.**  YES. |
| 13:23 | 8 | **Q.**  TO 10 TIMES LOWER THAN YOUR ESTIMATE IN *BARGE*; ISN'T THAT |
| 13:23 | 9 | RIGHT? |
| 13:23 | 10 | **A.**  THAT'S CORRECT. |
| 13:23 | 11 | **Q.**  JUST SO WE ARE ABLE TO UNDERSTAND, AGAIN, WHAT ORDERS OF |
| 13:23 | 12 | MAGNITUDE IS FOR THE RECORD, 3 ORDERS MEANS 1000 TIMES LOWER; 2 |
| 13:23 | 13 | ORDERS MEANS 100 TIMES LOWER; 1 ORDER OF MAGNITUDE MEANS 10 |
| 13:23 | 14 | TIMES LOWER, RIGHT? |
| 13:23 | 15 | **A.**  THAT'S CORRECT.  THE PERMEABILITY OF THE SOIL, TO MAKE |
| 13:23 | 16 | THIS SENSIBLE FOR NORMAL PEOPLE, IS HIGHLY SENSITIVE TO THE |
| 13:23 | 17 | COMPOSITION OF THE SOIL.  IF IT'S VERY COARSE-GRAINED, THE |
| 13:23 | 18 | PERMEABILITY WILL BE HIGH.  IF IT'S VERY FINE-GRAINED AND WELL |
| 13:24 | 19 | GRADED, PERMEABILITY CAN BE VERY LOW.  SO WHAT'S BEING |
| 13:24 | 20 | REFLECTED HERE IS THE RESULT OF EXTREME SENSITIVITY OF THIS |
| 13:24 | 21 | PERMEABILITY TO SOIL/WATER COMPOSITION STRUCTURE. |
| 13:24 | 22 | **Q.**  BUT DESPITE THOSE DIFFERENCES IN THE ORDER OF MAGNITUDE, |
| 13:24 | 23 | AS I UNDERSTAND IT, YOU STILL HOLD THE OPINION THAT THE |
| 13:24 | 24 | BREACHES OF THE IHNC FLOODWALL DEVELOPED AS A RESULT OF |
| 13:24 | 25 | HYDRAULIC SEEPAGE THROUGH THE ORGANIC CLAY LAYER.  ISN'T THAT |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:24 | 1 | CORRECT? |
| 13:24 | 2 | **A.**   THAT IS FUNDAMENTALLY CORRECT, WITH THE PROVISOS I |
| 13:24 | 3 | ATTEMPTED TO STATE THIS MORNING ON THE USE OF THE TERM *SEEPAGE*. |
| 13:24 | 4 | THAT TERM HAS GOTTEN US INTO A LOT OF COMMUNICATION |
| 13:24 | 5 | DIFFICULTIES. |
| 13:24 | 6 | **Q.**   WELL, FUNNY YOU SHOULD SAY THAT BECAUSE THAT'S WHERE I'M |
| 13:24 | 7 | GOING.   YOU'RE FAMILIAR WITH *DARCY'S LAW*, ARE YOU NOT, DR. BEA? |
| 13:25 | 8 | **A.**   YES, SIR. |
| 13:25 | 9 | **Q.**   IT'S BEEN AROUND SINCE 1850, I UNDERSTAND.   IS THAT RIGHT? |
| 13:25 | 10 | **A.**   YOUR HISTORY MEMORY IS MUCH BETTER THAN MINE. |
| 13:25 | 11 | **Q.**   DARCY'S LAW STATES THAT THE QUANTITIES OF FLOW -- QUANTITY |
| 13:25 | 12 | OF FLOW -- IS PROPORTIONAL TO THE TOTAL HEAD DIFFERENCE DRIVING |
| 13:25 | 13 | THE FLOW.   IS THAT CORRECT? |
| 13:25 | 14 | **A.**   THAT'S CORRECT.   THAT'S PART OF THE STATEMENT. |
| 13:25 | 15 | **Q.**   SO THE LARGER THE TOTAL HEAD DIFFERENCE, THE LARGER THE |
| 13:25 | 16 | FLOW QUANTITY, CORRECT? |
| 13:25 | 17 | **A.**   CORRECT. |
| 13:25 | 18 | **Q.**   AND THE LARGER THE TOTAL HEAD DIFFERENCE, THE LARGER THE |
| 13:25 | 19 | PORE PRESSURES, CORRECT? |
| 13:25 | 20 | **A.**   CORRECT. |
| 13:25 | 21 | **Q.**   AND THE LARGER THE TOTAL HEAD DIFFERENCE THE LARGER THE |
| 13:25 | 22 | PORE PRESSURES, CORRECT? |
| 13:25 | 23 | **A.**   GIVEN THAT THE PARAMETERS IN DARCY'S LAW ARE HELD CONSTANT |
| 13:26 | 24 | FOR YOUR HYPOTHETICAL, YES. |
| 13:26 | 25 | **Q.**   I'M DEALING JUST WITH MATH, JUST AN EQUATION, AS I ASKED |

ROBERT G. BEA - CROSS

13:26   1   DR. ROGERS ABOUT THE OTHER DAY.  AND THAT'S THE MATH, ISN'T IT?

13:26   2   **A.**   WELL, THAT --

13:26   3   **Q.**   TOTAL HEAD DIFFERENCE DRIVES THE FLOW AND DRIVES THE

13:26   4   PRESSURES.

13:26   5   **A.**   ARE YOU MAKING A STATEMENT OR ASKING A QUESTION?  I CAN'T

13:26   6   TELL.

13:26   7   **Q.**   ISN'T THAT CORRECT, THE TOTAL HEAD DIFFERENCE DRIVES BOTH

13:26   8   THE PORE PRESSURES AND THE QUANTITIES OF THE FLOW?

13:26   9   **A.**   IT'S ONE OF THE KEY ELEMENTS THAT DRIVES THAT FLOW

13:26  10   MECHANICS.

13:26  11        **THE COURT:**  MR. TREEBY, FOR THE RECORD, IF YOU DON'T

13:26  12   MIND, JUST GET FROM THE WITNESS HIS DEFINITION OF WHAT *HEAD*

13:26  13   *PRESSURE* IS.

13:26  14        **MR. TREEBY:**  THE TOTAL HEAD DIFFERENCE.

13:26  15        **THE COURT:**  WHAT IT MEANS TO SOMEONE WHO HASN'T READ

13:26  16   ALL OF THIS AND DOESN'T KNOW WHAT HEAD PRESSURE IS.

13:27  17        **MR. TREEBY:**  HEAD DIFFERENCE, REALLY.

13:27  18        **THE COURT:**  HEAD DIFFERENTIAL.

13:27  19        **MR. TREEBY:**  RIGHT.

13:27  20   BY MR. TREEBY:

13:27  21   **Q.**   SO WHAT WE ARE TALKING ABOUT -- IN FACT, IT'S KIND OF THE

13:27  22   WAY DARCY FIGURED IT OUT, WAS, IF YOU PUT WATER IN A SYSTEM AND

13:27  23   YOU HAVE ONE CUP OVER HERE THAT'S THIS HIGH AND THE OTHER CUP

13:27  24   OVER HERE THAT'S THIS HIGH, IT'S THE DIFFERENCE BETWEEN THE TOP

13:27  25   OF THE WATER HERE AND THE TOP OF THE WATER HERE THAT'S THE

ROBERT G. BEA - CROSS

13:27    1    DIFFERENCE IN THE HEAD, RIGHT?

13:27    2    **A.**    THAT'S CORRECT, I THINK.

13:27    3    **Q.**    SO JUST TO BRING IT TO THIS -- AND I KNOW WE ARE TALKING

13:27    4    GENERALITIES AND WE ARE TALKING THEORY, DARCY'S LAW, BUT THEORY

13:27    5    IS IMPORTANT, RIGHT?  YOU DON'T DISREGARD THE THEORY OF THESE

13:27    6    EQUATIONS, DO YOU?

13:27    7    **A.**    OH, ABSOLUTELY NOT.

13:27    8    **Q.**    LET ME TRY TO BRING IT TO THIS CASE IN JUST A MINUTE.

13:27    9         SO WHEN THE WATER RISES ON THE FLOODWALL, YOU HAVE

13:27   10    WATER UP 10 FEET ON THE FLOODWALL, AND THERE'S NO -- LET'S

13:28   11    ASSUME FOR THIS DISCUSSION TO UNDERSTAND TOTAL HEAD DIFFERENCE

13:28   12    THAT THERE'S NO WATER OVER HERE ON THE OTHER SIDE OR, IF THERE

13:28   13    IS, IT'S SUBTERRANEAN, OKAY, ON THE PROTECTED SIDE, ON THE LAND

13:28   14    SIDE?

13:28   15    **A.**    AT THE GROUND SURFACE, FOR EXAMPLE.

13:28   16    **Q.**    RIGHT, RIGHT, RIGHT.  THE DIFFERENCE BETWEEN THE WATER

13:28   17    HERE, THE STRESS THAT THAT WATER IS PLACING ON THE SOILS, THE

13:28   18    DIFFERENCE BETWEEN THAT HEAD AND THE HEAD ON THE LAND SIDE

13:28   19    DRIVES PRESSURE AND FLOWS, RIGHT?

13:28   20    **A.**    CORRECT.

13:28   21    **Q.**    OKAY.  SO IF I HAVE A HORIZONTAL TUBE FILLED WITH

13:28   22    SATURATED SOIL ON ONE END, VENTED TO THE ATMOSPHERE, AND I

13:28   23    APPLY A WATER PRESSURE TO THE OPPOSITE END, DARCY'S LAW SAYS

13:28   24    THAT THE FLOW WILL BE PROPORTIONAL TO THE DIFFERENCE IN THAT

13:28   25    PRESSURE, RIGHT?

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:29 | 1 | **A.**   I'M STRUGGLING TO CONSTRUCT MENTALLY A PICTURE OF THE |
| 13:29 | 2 | EXPERIMENT YOU ARE DESCRIBING, BUT I THINK YOU HAVE DESCRIBED |
| 13:29 | 3 | IT CORRECTLY, YES. |
| 13:29 | 4 | **Q.**   IF I DOUBLE THE WATER PRESSURE, THE QUANTITY OF FLOW WILL |
| 13:29 | 5 | DOUBLE, RIGHT?  IT'S JUST MATH. |
| 13:29 | 6 | **A.**   AND YOUR HYPOTHETICAL CONTINUES TO BE BASED ON DARCY'S |
| 13:29 | 7 | LAW? |
| 13:29 | 8 | **Q.**   ABSOLUTELY. |
| 13:29 | 9 | **A.**   THAT'S CORRECT. |
| 13:29 | 10 | **Q.**   SO THE HIGHER THE PRESSURE, THE HIGHER THE QUANTITIES OF |
| 13:29 | 11 | FLOW? |
| 13:29 | 12 | **A.**   CORRECT. |
| 13:29 | 13 | **Q.**   NOW, AS EARLY AS 2008, IN AN ARTICLE THAT YOU PUBLISHED |
| 13:30 | 14 | WITH MR. COBOS-ROA, YOU FOUND THAT YOUR SEEPAGE ANALYSIS |
| 13:30 | 15 | RESULTS WERE RELATIVELY INSENSITIVE TO A PLAUSIBLE RANGE OF |
| 13:30 | 16 | PERMEABILITY OR HYDRAULIC CONDUCTIVITY FROM 10 TO THE MINUS 2 |
| 13:30 | 17 | TO 10 TO THE MINUS 6; ISN'T THAT TRUE? |
| 13:30 | 18 | **A.**   THAT'S CORRECT. |
| 13:30 | 19 | **Q.**   YOU ALSO TESTIFIED, DID YOU NOT, IN THIS CASE, THAT YOU |
| 13:30 | 20 | RECOGNIZED THAT YOUR ANALYSIS OF THE UPLIFT PRESSURES WAS |
| 13:30 | 21 | RELATIVELY INSENSITIVE TO CHANGES IN HYDRAULIC CONDUCTIVITY. |
| 13:30 | 22 | CORRECT? |
| 13:30 | 23 | **A.**   CORRECT. |
| 13:30 | 24 | **Q.**   IN FACT, YOU HAVE TESTIFIED THAT YOU'RE NOT TALKING ABOUT |
| 13:30 | 25 | FLOWS; YOU'RE TALKING ABOUT CONDUCT OF PRESSURES.  RIGHT? |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:30 | 1 | **A.**   CORRECT. |
| 13:30 | 2 | **Q.**   BUT YOU STILL THOUGHT IT WAS IMPORTANT TO HAVE DIEGO |
| 13:30 | 3 | COBOS-ROA DO A TRANSIENT FLOW ANALYSIS USING A COMPUTER PROGRAM |
| 13:31 | 4 | KNOWN AS SEEP/W? |
| 13:31 | 5 | **A.**   CORRECT. |
| 13:31 | 6 | **Q.**   YOU NOW SAY AND AGREE, I THINK, THAT THERE IS NO FLOW; YOU |
| 13:31 | 7 | CONTEND IT'S JUST PRESSURE.  RIGHT? |
| 13:31 | 8 | **A.**   THAT'S INCORRECT. |
| 13:31 | 9 | **Q.**   WELL, LET ME SHOW YOU WHAT YOU SAID AT YOUR DEPOSITION IN |
| 13:31 | 10 | RESPONSE TO THAT QUESTION.  IT'S ON MARCH 27, PAGE 197, |
| 13:31 | 11 | BEGINNING AT LINE 6, GOING THROUGH LINE 18. |
| 13:31 | 12 |      **"QUESTION:**  YOU'RE MAKING A CONVENTION THAT THE |
| 13:31 | 13 |      OBSERVED RISE IN THE WATER LEVEL" -- HAVE I GOT THE RIGHT |
| 13:31 | 14 |      DEPOSITION? |
| 13:31 | 15 |      **THE COURT:**  I DON'T THINK SO. |
| 13:31 | 16 |      **MR. TREEBY:**  I THINK I MAY HAVE GIVEN YOU A BAD |
| 13:31 | 17 | CITATION HERE. |
| 13:31 | 18 |      **THE COURT:**  JUST THE WRONG LINE. |
| 13:31 | 19 |      **MR. TREEBY:**  I HAVE THE WRONG LINE. |
| 13:31 | 20 | **BY MR. TREEBY:** |
| 13:31 | 21 | **Q.**   WELL, I THINK WE HAVE TO TAKE THE WHOLE THING TO |
| 13:32 | 22 | UNDERSTAND THE QUESTION, SO WE'LL START OVER. |
| 13:32 | 23 |      **"QUESTION:**  SO YOU'RE MAKING A CONTENTION THAT THE |
| 13:32 | 24 |      OBSERVED RISE IN THE WATER LEVEL IN THE ARMY CORPS |
| 13:32 | 25 |      PIEZOMETER, PZ3, IS DUE TO THE FLOW FROM THE IHNC, AND |

ROBERT G. BEA - CROSS

13:32    1        THAT IS THROUGH THE BURIED MARSH SWAMP SOILS, RIGHT?

13:32    2            "ANSWER:  NO.

13:32    3            "QUESTION:  IT'S NOT THROUGH THE BURIED MARSH SOILS?

13:32    4            "ANSWER:  I DIDN'T MENTION FLOW; I MENTIONED

13:32    5        PRESSURE.  THEY ARE DIFFERENT THINGS.

13:32    6            "QUESTION:  SO THERE'S NO FLOW; IT'S JUST PRESSURE?

13:32    7            "ANSWER:  THAT'S CORRECT."

13:32    8    BY MR. TREEBY:

13:32    9    Q.   IF I UNDERSTAND, AND I THINK I DO, YOUR TESTIMONY THERE,

13:32   10    WHAT YOU WERE TALKING ABOUT WAS YOU HAVE A PIEZOMETER, PZ3.

13:32   11    PZ3 WAS LOCATED ON THE CANAL SIDE OF THE FLOODWALL, IS THAT

13:32   12    RIGHT, IN THE EAST BANK INDUSTRIAL AREA?

13:32   13    A.   THAT'S CORRECT.

13:32   14    Q.   WHAT'S HAPPENING HERE, ACCORDING TO YOUR TESTIMONY, IS, AS

13:32   15    THE WEIGHT OF THE WATER COMES UP OVER THE LAND, GETS HIGHER,

13:32   16    IT'S EXERTING TOTAL VERTICAL STRESS STRAIGHT DOWN ON THAT SOIL

13:33   17    WEIGHT, RIGHT?

13:33   18    A.   THAT'S PART OF THE PICTURE.  THAT'S NOT THE PICTURE.

13:33   19    Q.   I'M NOT SAYING IT'S THE WHOLE PICTURE.  I'M TAKING IT A

13:33   20    STEP AT A TIME, BECAUSE I HAVE TO, FRANKLY.

13:33   21        THE TOTAL VERTICAL STRESS PRESSING DOWN, AND WHAT

13:33   22    THAT DOES IS INCREASE THE PORE PRESSURE OF THE FULLY

13:33   23    SATURATED -- OF THE WATER IN THE FULLY SATURATED SOILS, WHICH

13:33   24    IS DOWN WHERE THE PIEZOMETER IS MEASURING, RIGHT?

13:33   25    A.   WELL, THAT'S CONDITIONAL ON WHAT'S BETWEEN THE BOTTOM OF

ROBERT G. BEA - CROSS

13:33  1   THE WATER THAT YOU ARE CITING AND THE BURIED SWAMP MARSH LAYER.

13:33  2   IF I GOT A MATERIAL THAT IS PARTIALLY SATURATED, HIGHLY

13:33  3   COMPRESSIBLE, THAT WILL BE A DIFFERENT PRESSURE TRANSMISSION

13:33  4   THAN IF I HAVE A CONNECTION BETWEEN THE BOTTOM OF THE WATER YOU

13:33  5   HAVE CITED THAT IS NONCOMPRESSIBLE, MEANING IT'S VERY STIFF

13:34  6   COMPARED TO THE OTHER POSSIBILITY.

13:34  7          SO THE EFFECT IN THE BURIED SWAMP MARSH LAYER IS

13:34  8   HIGHLY DEPENDENT ON WHAT'S BETWEEN THIS WATER YOU HAVE IMPOSED

13:34  9   IN YOUR HYPOTHETICAL AND BURIED MARSH SWAMP LAYER.

13:34  10  Q.   I THINK I FOLLOWED THAT, BUT WE ARE GOING TO NEED SOME

13:34  11  CLARIFICATION.  YOU HAVE TESTIFIED, HAVE YOU NOT, THAT THE

13:34  12  FOCUS OF YOUR ANALYSES FOR THIS CASE WAS THE TRANSMISSION OF

13:34  13  HYDRAULIC PRESSURE, NOT HYDRAULIC FLOWS?  ISN'T THAT RIGHT?

13:34  14  A.   YES, THAT'S CORRECT.

13:34  15  Q.   AND IN YOUR ANALYSIS THE PRESSURE TRANSMISSION THAT YOU

13:34  16  CLAIM OCCURRED AT THE EAST BANK INDUSTRIAL AREA WAS NOT THE

13:35  17  RESULT OF SEEPAGE; ISN'T THAT CORRECT?

13:35  18  A.   NO.

13:35  19  Q.   WELL, WE ARE GOING TO HAVE TO LOOK AGAIN.  LET'S LOOK AT

13:35  20  THIS TIME.  THIS IS ON YOUR APRIL 16, 2012 DEPOSITION,

13:35  21  PAGE 278, LINES 1 THROUGH 3.

13:35  22          "QUESTION:  IS THAT PRESSURE TRANSMISSION A RESULT OF

13:35  23      SEEPAGE?

13:35  24          "ANSWER:  IT'S A RESULT OF PRESSURE."

13:35  25          THAT WAS WHAT YOU ANSWERED THEN.  THAT WAS THE

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:35 | 1 | FOCUS -- WE COULD TAKE -- IT WAS IN THE CONTEXT OF WHAT YOUR |
| 13:35 | 2 | ANALYSIS WAS ABOUT HERE.  IS THAT WRONG? |
| 13:35 | 3 | **A.**   THE PHENOMENON OF PRESSURE TRANSMISSION AND WATER QUANTITY |
| 13:35 | 4 | TRANSMISSION OR TRANSLATION IS INEXORABLY LINKED TOGETHER |
| 13:35 | 5 | THROUGH THE WATER.  THAT THEN HAS A SIGNIFICANT INFLUENCE FOR |
| 13:36 | 6 | WHAT'S AROUND, PERHAPS EVEN MIXED INTO, THAT WATER. |
| 13:36 | 7 | THIS IS THE REASON THIS MORNING I WAS ATTEMPTING TO |
| 13:36 | 8 | CAREFULLY AS POSSIBLE SAY WE ARE CONCERNED WITH TWO VERY |
| 13:36 | 9 | IMPORTANT HYDRAULIC CONDUCTIVITY EFFECTS.  ONE IS WHAT |
| 13:36 | 10 | ENGINEERS CLASSICALLY HAVE CALLED *SEEPAGE*.  THAT REFERS TO THE |
| 13:36 | 11 | TRANSMISSION OF IMPORTANT QUANTITIES OF WATER THAT CAN ACT TO |
| 13:36 | 12 | DESTABILIZE STRUCTURES. |
| 13:36 | 13 | LINKED TO THAT IS PRESSURE, AND THE PRESSURE CAN HAVE |
| 13:37 | 14 | ITS EFFECTS.  IN WORK THAT I HAVE DONE TO THIS POINT, WE ARE IN |
| 13:37 | 15 | FACT TREATING BOTH, BOTH WATER TRANSMISSION EFFECT AND PRESSURE |
| 13:37 | 16 | TRANSMISSION EFFECT. |
| 13:37 | 17 | WHAT I THINK YOU ARE HIGHLIGHTING, WE HAVE LEARNED |
| 13:37 | 18 | THAT THE PRESSURE TRANSMISSION EFFECT IS OF UTMOST IMPORTANCE, |
| 13:37 | 19 | THE MOST IMPORTANT IN THE BREACH CAUSATION NOT ONLY AT THE |
| 13:37 | 20 | LOWER NINTH WARD BUT AT THE OTHER MAJOR BREACHES I DISCUSSED |
| 13:37 | 21 | THIS MORNING. |
| 13:37 | 22 | **Q.**   OKAY.  I THINK IT WOULD BE GOOD FOR US AT THIS POINT TO GO |
| 13:37 | 23 | BACK AND GET SOME BASIC DEFINITIONS, AND I'M GOING TO GET THEM |
| 13:37 | 24 | FROM YOUR TESTIMONY IN THIS AND OTHER CASES. |
| 13:37 | 25 | YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT SEEPAGE |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:37 | 1 | INVOLVES UNDERGROUND TRANSMISSION OF SIGNIFICANT QUANTITIES OF |
| 13:38 | 2 | WATER? |
| 13:38 | 3 | A.   IT CAN. |
| 13:38 | 4 | Q.   WELL, THAT'S THE WAY YOU DEFINED *SEEPAGE* IN THE *BARGE* |
| 13:38 | 5 | REPORT, APPENDIX C, AT PAGE 103, PARAGRAPH 102.  THAT'S THE WAY |
| 13:38 | 6 | YOU DEFINED IT. |
| 13:38 | 7 | A.   THAT'S JUST FINE FOR TRANSMISSION OF FLUID QUANTITIES, |
| 13:38 | 8 | THAT'S CORRECT. |
| 13:38 | 9 | Q.   BUT YOU SAY THAT -- SEEPAGE INVOLVES UNDERGROUND |
| 13:38 | 10 | TRANSMISSION OF SIGNIFICANT QUANTITIES OF WATER. |
| 13:38 | 11 | THE COURT:  SO LET ME -- FOR ME TO GET IT CLEAR, |
| 13:38 | 12 | DR. BEA, IF IT WAS AN INSIGNIFICANT QUANTITY OF WATER THAT WAS |
| 13:38 | 13 | TRANSMITTED, WOULD THAT STILL BE SEEPAGE? |
| 13:38 | 14 | THE WITNESS:  SURE. |
| 13:38 | 15 | BY MR. TREEBY: |
| 13:38 | 16 | Q.   IT WOULD BE INSIGNIFICANT PRESSURES.  WE HAVE ALREADY |
| 13:38 | 17 | LINKED PRESSURE AND SEEPAGE, HAVE WE NOT? |
| 13:38 | 18 | A.   NO, I DID NOT MAKE THAT ONE-TO-ONE LIKE YOU JUST SAID. |
| 13:38 | 19 | Q.   I THOUGHT THAT WAS DARCY'S LAW. |
| 13:38 | 20 | A.   YOU JUST SAID THAT IF THERE WAS INSIGNIFICANT SEEPAGE, IT |
| 13:38 | 21 | WOULD LEAD TO INSIGNIFICANT PRESSURE.  THAT'S WHAT I HEARD.  IF |
| 13:39 | 22 | I HEARD WRONG, PLEASE CORRECT ME. |
| 13:39 | 23 | THE COURT:  MY UNDERSTANDING OF YOUR ANSWER, THAT'S |
| 13:39 | 24 | NOT NECESSARILY TRUE.  AND I THINK MR. TREEBY IS GOING TO ASK |
| 13:39 | 25 | YOU SOME MORE QUESTIONS.  I'LL STEP OUT. |

ROBERT G. BEA - CROSS

13:39    1    **BY MR. TREEBY:**

13:39    2    **Q.**   IF THEY ARE PROPORTIONAL; IF ONE INCREASES, THE OTHER IS

13:39    3    GOING TO INCREASE.  IF ONE IS SIGNIFICANT, THE OTHER IS GOING

13:39    4    TO BE THE SIGNIFICANT, RIGHT, BECAUSE THEY ARE LINKED IN THE

13:39    5    EQUATION AS A MATTER OF FUNDAMENTAL MATH THEORY.  ISN'T THAT

13:39    6    RIGHT?

13:39    7    **A.**   SIGNIFICANT TO WHAT?  BREACH CAUSATION OR SIGNIFICANT IN

13:39    8    THE CONTEXT OF THE THEORY?

13:39    9    **Q.**   RELATIVE TO EACH OTHER SIGNIFICANT --

13:39   10    **A.**   NO.

13:39   11    **Q.**   -- BECAUSE THEY ARE PROPORTIONAL?

13:39   12    **A.**   NO.  THAT'S THE DIFFICULT POINT TO MAKE.  I CAN HAVE AN

13:39   13    INSIGNIFICANT AMOUNT OF FLUID TRANSMISSION OR A QUANTITY OF

13:40   14    FLUID BEING PASSED THROUGH THIS SYSTEM, BUT THE PRESSURES CAN

13:40   15    STILL BE VERY SIGNIFICANT, LARGE, IN ITS EFFECT ON THE SOIL

13:40   16    STRUCTURE SYSTEM.

13:40   17    **Q.**   WELL, IN FACT, ISN'T IT TRUE THAT YOU CAN HAVE HIGH

13:40   18    PRESSURES AND LOW FLOW QUANTITIES IF YOU HAVE LOW PERMEABILITY,

13:40   19    IMPERVIOUS SOILS?

13:40   20    **A.**   I DON'T HAVE THE RECORD HERE IN FRONT OF ME.  IF YOU

13:40   21    COULD, REPEAT YOUR QUESTION.

13:40   22    **Q.**   ISN'T IT CORRECT THAT YOU CAN HAVE HIGH PRESSURES AND LOW

13:40   23    FLOW QUANTITIES IF YOU HAVE LOW PERMEABILITY OF SOILS?

13:41   24    **A.**   YES, THAT'S TRUE, BUT YOU CAN ALSO HAVE IT FOR HIGHLY

13:41   25    PERMEABLE SOILS.

ROBERT G. BEA - CROSS

13:41   1   **Q.**   YOU WOULDN'T HAVE LOW FLOW QUANTITIES THEN.  IT WOULD BE

13:41   2   HIGHER FLOW QUANTITIES, RELATIVELY, WOULD IT NOT?

13:41   3   **A.**   THAT'S CORRECT.

13:41   4   **Q.**   THERE WE GO.  OKAY.  WE'LL KEEP GOING.  MAYBE IT WILL

13:41   5   BECOME CLEARER AS WE GO.

13:41   6           **THE COURT:**  MR. TREEBY, I REALLY DON'T WANT TO ASK

13:41   7   TOO MANY QUESTIONS IN THIS TRIAL, BUT I DO HAVE TO UNDERSTAND

13:41   8   IT.

13:41   9           MR. TREEBY HAD GONE OVER WITH YOU THE

13:41   10  IMPLICATIONS OF DARCY'S LAW.  LET'S ASSUME HIS HYPOTHET OF LOW

13:41   11  PERMEABILITY AND HIGH PRESSURE.  DOES THE SAME PROPORTION AS

13:42   12  SET FORTH IN THE MATH THAT EMBODIES DARCY'S LAW APPLY?

13:42   13          MY QUESTION, IF YOU DON'T UNDERSTAND IT, THAT'S

13:42   14  QUITE ALL RIGHT.  I'M NOT SURE I DO EITHER.

13:42   15          **THE WITNESS:**  WELL, DARCY'S LAW IS APPLYING TO THE

13:42   16  FLOW THE TRANSMISSION OF WATER QUANTITIES THROUGH THE SOIL

13:42   17  STRUCTURE.  THE CRITICAL THING IN DARCY'S LAW THAT MAKES IT THE

13:42   18  FUNDAMENTALS WE TEACH ENGINEERS WITH IS THE SOIL SKELETON IS

13:42   19  FUNDAMENTALLY INCOMPRESSIBLE, WHICH MEANS YOU CAN DRAW A BOX

13:42   20  REPRESENTING THE SOIL AND INSIDE THE BOX IS WATER SPACE, PORE

13:42   21  SPACE.

13:42   22          WHAT THE THEORY SAYS IS THAT BOX DOESN'T CHANGE,

13:42   23  AND THAT'S IMPORTANT BECAUSE THE ENGINEER THEN IS ABLE TO STUDY

13:43   24  THE WATER COMING IN, AND IT BETTER EQUAL THE WATER COMING OUT

13:43   25  BECAUSE THE VOLUME IS BEING HELD CONSTANT.

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:43 | 1 | IF YOU LET THAT VOLUME SQUISH AROUND, WE'LL CALL |
| 13:43 | 2 | IT, YOU HAVE ANOTHER VERY COMPLEX AND DIFFICULT PROBLEM, SOME |
| 13:43 | 3 | PEOPLE OF WHICH CONTEND IT'S NOT YET APPROPRIATELY SOLVED. |
| 13:43 | 4 | SO DARCY'S LAW IS IDEALIZED, BUT WITH IT IS NOT |
| 13:43 | 5 | ONLY THE TRANSMISSION OF FLOW THROUGH THAT CENTER OF THE BOX, |
| 13:43 | 6 | LIKE A CULVERT, BUT PRESSURE, BECAUSE DARCY'S LAW IS APPLYING |
| 13:43 | 7 | TO THE QUANTITY OF FLOW COMING THROUGH THAT BOX. |
| 13:43 | 8 | NOW, WITH EVEN NO FLOW, JUST AS MR. TREEBY WAS |
| 13:44 | 9 | FORMING, I COULD PUT A PRESSURE HERE AND I'M GOING TO GET A |
| 13:44 | 10 | PRESSURE THERE, AND IT'S BECAUSE WATER IS INCOMPRESSIBLE.  IF |
| 13:44 | 11 | THAT WATER HAD GAS IN IT OR IT WAS SQUISHY LIKE A SPONGE YOU |
| 13:44 | 12 | USE IN YOUR SINK, A VERY, VERY DIFFERENT PICTURE. |
| 13:44 | 13 | **BY MR. TREEBY:** |
| 13:44 | 14 | **Q.**   RIGHT. |
| 13:44 | 15 | **A.**   SO THIS CRITICALITY OF DARCY'S LAW IS A MAJOR ISSUE.  IT |
| 13:44 | 16 | INVOLVES TWO THINGS:  FLOW TRANSMISSION AND PRESSURE. |
| 13:44 | 17 | **THE COURT:**  ALL RIGHT. |
| 13:44 | 18 | **BY MR. TREEBY:** |
| 13:44 | 19 | **Q.**   AT THE RISK OF CONFUSING US FURTHER, BUT I DON'T THINK SO, |
| 13:44 | 20 | DARCY, IN FACT, IN HIS TEST FROM WHICH HE DERIVED DARCY'S LAW |
| 13:44 | 21 | WASN'T USING INCOMPRESSIBLE SOILS.  HE WAS USING FULLY |
| 13:44 | 22 | SATURATED SOILS, AND THE SOIL SKELETON WAS NOT INCOMPRESSIBLE, |
| 13:44 | 23 | ISN'T THAT RIGHT, THE SKELETON OF THE SOIL?  I'M NOT TALKING |
| 13:44 | 24 | ABOUT THE CONTAINER HE HAD IT IN; I'M TALKING ABOUT THE |
| 13:45 | 25 | SKELETON OF THE SOIL. |

ROBERT G. BEA - CROSS

13:45　1　**A.**　FIRST OF ALL, I DON'T KNOW THE CONTAINER HE HAS IT IN.  I

13:45　2　DON'T KNOW THE REFERENCE YOU'RE CITING.  WE WERE DISCUSSING

13:45　3　DARCY'S LAW.  THAT LAW EXPRESSES A QUANTITY OF FLOW IS A

13:45　4　FUNCTION OF THREE OTHER VARIABLES, AND HE DERIVED THAT FROM

13:45　5　EXPERIMENTS.  HE DETERMINED THAT HE COULD BEST SIMULATE THE

13:45　6　EXPERIMENTAL RESULTS HE WAS CONCERNED WITH, FLOW QUANTITY

13:45　7　TRANSMISSION, WITH DARCY'S LAW.

13:45　8　**Q.**　RIGHT.  I WAS JUST TRYING TO ADDRESS ONE STATEMENT YOU

13:45　9　MADE IN YOUR RESPONSE TO THE JUDGE.  YOU SAID THE SOIL SKELETON

13:45　10　WAS INCOMPRESSIBLE.  THAT'S NOT CORRECT, IS IT?

13:45　11　**A.**　I'M SAYING DARCY'S LAW, THAT IS A CRUCIAL ASSUMPTION, AND

13:45　12　IT'S STATED AS INCOMPRESSIBLE SOIL SKELETON AND INCOMPRESSIBLE

13:46　13　FLUID.  AND THERE ARE OTHERS.

13:46　14　**Q.**　WE ARE GOING TO DISAGREE ABOUT THAT, AND WE'LL SEE WHERE

13:46　15　THAT GOES.

13:46　16　　　　OKAY.  GOING BACK TO SEEPAGE.  YOU WOULD AGREE, WOULD

13:46　17　YOU NOT, THAT SEEPAGE IS ASSOCIATED WITH HYDRAULIC

13:46　18　CONDUCTIVITY?

13:46　19　**A.**　CORRECT.

13:46　20　**Q.**　IN ILIT YOUR TEAM CONCLUDED THAT BOTH FAILURES AT THE IHNC

13:46　21　WERE PRINCIPALLY DUE TO UNDERSEEPAGE FLOWS THAT PASS BENEATH

13:46　22　THE SHEET PILE CURTAINS SUPPORTING THE CONCRETE FLOODWALLS AT

13:46　23　THE CREST OF THE LEVEES; ISN'T THAT CORRECT?

13:46　24　**A.**　I THINK THAT'S FUNDAMENTALLY CORRECT, HOWEVER, WITH THE

13:46　25　PROVISO THAT BECAUSE OF THE LACK OF DEFINITIVE INFORMATION ON

ROBERT G. BEA - CROSS

13:46    1   THE PERMEABILITIES WE WERE USING AT THAT TIME, WE COULDN'T BE

13:46    2   CERTAIN IT WAS OUR BEST JUDGMENT.

13:46    3   **Q.**   AND THAT WAS BECAUSE YOU HAD 10 TO THE MINUS 2 CENTIMETERS

13:47    4   PER SECOND?

13:47    5   **A.**   THAT'S CORRECT.  NOW, WE WERE STILL USING A STEADY FLOW

13:47    6   DARCY'S LAW DOMINATED ANALYSIS.

13:47    7   **Q.**   WE ARE GOING TO GET TO STEADY FLOW LATER, BUT I'M TRYING

13:47    8   TO KEEP THIS IN BITS AND PIECES.

13:47    9   **A.**   WELL, I AGREES WITH BITS AND PIECES, BUT WHAT I'M TRYING

13:47   10   TO ENSURE WE DON'T LOSE IS COHERENCE.  SO THERE'S BEEN A

13:47   11   COHERENCE OF USING FUNDAMENTAL SOIL MECHANICS PHYSICS IN THE

13:47   12   GENERIC CATEGORY WE HAVE CALL SEEPAGE.

13:47   13   **Q.**   OKAY.  IN FACT, THE ILIT TEAM CONCLUDED THAT "WHILE

13:47   14   OVERTOPPING ENTRENCHING WERE IN FACT OCCURRING, IT WAS

13:47   15   UNDERSEEPAGE-INDUCED STABILITY THAT ACTUALLY DEVELOPED THE MORE

13:47   16   CRITICAL MECHANISM THAT LED TO THE FAILURE AT THE EBIA,"

13:48   17   CORRECT?

13:48   18   **A.**   CORRECT.

13:48   19   **Q.**   THOSE CONCLUSIONS WERE BASED ON THE DEFINITION OF SEEPAGE

13:48   20   THAT YOU GAVE US THAT WE JUST DISCUSSED, RIGHT?

13:48   21   **A.**   CORRECT.

13:48   22   **Q.**   PRIOR TO YOUR WORK IN *ROBINSON*, YOU CONCLUDED THAT

13:48   23   UNDERSEEPAGE OCCURRED INDEPENDENT OF THE EXCAVATIONS AT THE

13:48   24   EAST BANK INDUSTRIAL AREA; ISN'T THAT CORRECT?  YOU SO

13:48   25   TESTIFIED IN *BARGE*.  I'M NOT TRYING TO TRICK YOU.

ROBERT G. BEA - CROSS

13:48   1   **A.**   REPEAT YOUR QUESTION, PLEASE.

13:48   2   **Q.**   PRIOR TO YOUR WORK IN *ROBINSON*, YOU CONCLUDED THAT

13:48   3   UNDERSEEPAGE OCCURRED INDEPENDENT OF THE EXCAVATIONS AT THE

13:48   4   EAST BANK INDUSTRIAL AREA; ISN'T THAT CORRECT?

13:48   5   **A.**   I THINK THAT'S NOT CORRECT.

13:48   6   **Q.**   LET'S SEE WHAT YOU SAID, BECAUSE IT WAS IN ANSWER TO THE

13:48   7   COURT'S QUESTION IN THE *BARGE* TRIAL.  IT'S DX-1590-0203.  IT'S

13:48   8   THE *BARGE* TESTIMONY AT PAGE 2779, LINES 5 THROUGH 20.  THE

13:48   9   COURT SUGGESTED A QUESTION TO COUNSEL.

13:49   10          "**THE COURT:**  WHY DON'T YOU SAY AT WHAT POINT IN TIME,

13:49   11      DID YOU FIRST CONSIDER THE EBIA IMMEDIATE YEAS WORK IN ANY

13:49   12      WAY CONTRIBUTED TO FAILURE OF THE NORTH BREACH."  THEN

13:49   13      MR. KHORRAMI ASKED YOU.

13:49   14          "**QUESTION:**  THE COURT ASKED THE QUESTION.  COULD YOU

13:49   15      PLEASE ANSWER IT.

13:49   16          "**ANSWER:**  WELL, THE QUESTION AND ANSWER IS, DURING

13:49   17      THE MRGO *ROBINSON* WORK, I ADDRESSED THE PERFORMANCE IN

13:49   18      THIS AREA DURING HURRICANE KATRINA.

13:49   19          "**QUESTION:**  THAT'S WHEN YOU FIRST STARTED CONSIDERING

13:49   20      WHETHER EBIA AND THE EXCAVATIONS HAD ANY EFFECT ON THE

13:49   21      ACTUAL BREACHES, CORRECT?

13:49   22          "**ANSWER:**  THAT'S CORRECT.

13:49   23          "**QUESTION:**  PRIOR TO THAT TIME, YOUR CONCLUSIONS WERE

13:49   24      THAT UNDERSEEPAGE OCCURRED INDEPENDENT OF THOSE

13:49   25      EXCAVATIONS, CORRECT?

ROBERT G. BEA - CROSS

| | |
|---|---|
| 13:49 | 1 |
| 13:49 | 2 |
| 13:49 | 3 |

13:49    1        **"ANSWER:**  THAT'S CORRECT."

13:49    2        THAT'S WHAT YOU TESTIFIED IN *BARGE*.  DO YOU RECALL

13:49    3    THAT?

13:49    4    **A.**   YES, SIR.  THE THING I'M TRYING TO INJECT IS, AS I

13:50    5    TRANSITIONED FROM THE CANAL LITIGATION TO THE MRGO *ROBINSON*,

13:50    6    WROTE A SPECIAL STIPULATION, AND THE STIPULATION REGARDED THE

13:50    7    CONCLUSIONS I HAD REACHED CONCERNING THE EFFECTS OF THE EBIA

13:50    8    EXCAVATIONS.  IT'S NOT CLEAR IN MY MIND THAT I WAS ACTUALLY

13:50    9    WRITING THAT STIPULATION FOR *ROBINSON*, BUT IT MAKES SENSE

13:50   10    THAT'S WHAT I WAS WRITING IT FOR.

13:50   11    **BY MR. TREEBY:**

13:50   12    **Q.**   THE TESTIMONY WE JUST TALKED ABOUT WAS NOT IN A

13:50   13    DECLARATION, WASN'T ANYTHING YOU WROTE.  IT WAS WHAT YOU

13:50   14    TESTIFIED TO IN THIS COURT UNDER OATH.

13:50   15    **A.**   AND THE POINT I'M TRYING TO CLARIFY IS THE LACK OF CLARITY

13:50   16    IN MY MEMORY ABOUT THIS SPECIAL STIPULATION.

13:50   17    **Q.**   OKAY.  IN PARAGRAPH 148 ON PAGE 106 OF YOUR JANUARY 2009

13:51   18    DECLARATION TO THIS COURT IN *ROBINSON*, YOU STATED THAT YOUR

13:51   19    ANALYSES, AND I QUOTE, SHOW THAT HYDRAULIC CONDUCTIVITY EFFECTS

13:51   20    PLAYED A MAJOR ROLE IN THE DEVELOPMENT OF BOTH THE NORTH AND

13:51   21    SOUTH BREACHES.  CORRECT?

13:51   22    **A.**   THAT SOUNDS CORRECT.

13:51   23    **Q.**   AND ONE OF THOSE HYDRAULIC CONDUCTIVITY EFFECTS IS, AND

13:51   24    I'M QUOTING, THE TRANSMISSION OF WATER THROUGH THE BURIED MARSH

13:51   25    SWAMP LAYERS, CAUSING SEEPAGE-RELATED DEGRADATIONS OF THE SOIL

ROBERT G. BEA - CROSS

13:51    1    STRUCTURE, REDUCTIONS IN STRENGTH, EROSION, BLOWOUTS, CLOSE
13:51    2    QUOTE.
13:51    3              IS THAT CORRECT?
13:51    4    A.   YES, SIR.
13:51    5    Q.   I'M SKIPPING SOME OF THESE THAT ARE JUST REDUNDANT BECAUSE
13:51    6    YOU TOOK THE SAME POSITION ON NUMEROUS OCCASIONS.
13:51    7              MR. SCHULTZ:   JUDGE, IF HE WANTS TO MAKE A RECORD OF
13:51    8    WHAT DR. BEA SAID, I WOULD ASK THAT HE ESTABLISH IT RATHER THAN
13:52    9    SUMMARIZE IT BEFORE ASKING A QUESTION.
13:52   10              MR. TREEBY:   THAT'S FINE.   I DIDN'T MEAN TO SUMMARIZE
13:52   11    IT.
13:52   12              I HAVE HEARD YOUR HONOR SAY, AND I APPRECIATE IT
13:52   13    VERY MUCH, WHAT I SAY IS NOT EVIDENCE IN THIS CASE.
13:52   14              THE COURT:   THIS IS TRUE.
13:52   15              MR. TREEBY:   AND WHAT HE SAYS ISN'T EVIDENCE EITHER.
13:52   16              THE COURT:   THAT IS ALSO TRUE.
13:52   17    BY MR. TREEBY:
13:52   18    Q.   ALSO IN YOUR TESTIMONY IN THE *BARGE* TRIAL YOU DESCRIBED
13:52   19    THE RESULTS OF A SEEPAGE BLOWOUT TO THE COURT.   DO YOU RECALL
13:52   20    THAT?
13:52   21    A.   YES, SIR.   I SHOWED PICTURES TO THE COURT.
13:52   22    Q.   YOU TESTIFIED IN THE *BARGE* TRIAL THAT THE FAILURE AT THE
13:52   23    NORTH BREACH WAS "INITIATED WITH UNDERLEVEE SEEPAGE AND
13:52   24    HYDRAULIC UPLIFT, AND THAT THOSE EFFECTS RESULTED IN BLOWOUT,"
13:53   25    CORRECT?

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:53 | 1 | **A.**   CORRECT.  THAT WAS ONE OF THE FIRST STAGES IN DEVELOPMENT |
| 13:53 | 2 | OF THE BREACH. |
| 13:53 | 3 | **Q.**   WHEN YOU TESTIFIED AT THE *BARGE* TRIAL THAT WE ARE JUST |
| 13:53 | 4 | REFERRING TO HERE, YOU WERE STILL USING THE SAME -- YOU HAVEN'T |
| 13:53 | 5 | CHANGED YOUR DEFINITION OF SEEPAGE, HAVE YOU?  YOU WERE USING |
| 13:53 | 6 | THAT SAME DEFINITION, RIGHT?  *UNDERGROUND TRANSMISSION OF* |
| 13:53 | 7 | *SIGNIFICANT QUANTITIES OF WATER.* |
| 13:53 | 8 | **A.**   THAT'S CORRECT, SIR. |
| 13:53 | 9 | **Q.**   OKAY.  TURNING TO YOUR FEBRUARY 1 REPORT IN THIS CASE, YOU |
| 13:53 | 10 | STATED THAT YOUR FUNDAMENTAL CONCLUSION IS THAT THE BREACHES |
| 13:53 | 11 | THAT DEVELOPED AT THE EBIA FLOODWALL "WERE INITIATED WITH SURGE |
| 13:53 | 12 | WATER PRESSURES DEVELOPED ON THE WATER SIDE OF THE FLOOD |
| 13:53 | 13 | PROTECTION STRUCTURES COUPLED WITH HYDRAULIC SEEPAGE AND UPLIFT |
| 13:53 | 14 | PRESSURES GENERATED IN THE MARSH LAYERS UNDER THE SOIL LEVEE |
| 13:54 | 15 | THROUGH NEARBY EXCAVATIONS BACKFILLED WITH HIGH PERMEABILITY |
| 13:54 | 16 | MATERIALS."  IS THAT CORRECT? |
| 13:54 | 17 | **A.**   YES, SIR. |
| 13:54 | 18 | **Q.**   HAVE YOU CHANGED THAT OPINION? |
| 13:54 | 19 | **A.**   NO, SIR.  YOU SAW IT THIS MORNING. |
| 13:55 | 20 | **Q.**   JUST SO -- I THINK YOU HAVE SAID THIS, BUT I WANT TO BRING |
| 13:55 | 21 | IT BACK INTO FOCUS WITH ONE QUESTION.  DESPITE ALL OF THAT, YOU |
| 13:55 | 22 | CONTEND THAT A THOUSAND TIMES DIFFERENT REALLY -- LET ME MAKE |
| 13:55 | 23 | IT RIGHT. |
| 13:55 | 24 | WHAT IS FOUR ORDERS OF MAGNITUDE?  WE HAVE TALKED |
| 13:55 | 25 | ABOUT A THOUSAND.  THAT'S THREE ORDERS.  WHAT IS FOUR ORDERS? |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:55 | 1 | IS THAT 10,000? |
| 13:55 | 2 | **A.**   10,000. |
| 13:55 | 3 | **Q.**   THAT 10,000 TIMES DIFFERENCE IN PERMEABILITY, IT'S YOUR |
| 13:55 | 4 | TESTIMONY THAT THE SEEPAGE AND THE PRESSURE AND THE FAILURE |
| 13:56 | 5 | HERE IS RELATIVELY INSENSITIVE TO 10,000 TIMES DIFFERENCE IN |
| 13:56 | 6 | PERMEABILITY OF THESE SOILS; IS THAT RIGHT? |
| 13:56 | 7 | **A.**   I THINK THAT'S INCORRECT IN THE WAY YOU MIXED THINGS IN |
| 13:56 | 8 | YOUR QUESTION. |
| 13:56 | 9 | **Q.**   I PROBABLY ASKED A VERY BAD QUESTION. |
| 13:56 | 10 | **A.**   WELL -- |
| 13:56 | 11 | **Q.**   LET'S JUST SAY 10 TO THE MINUS 2, 10 TO THE MINUS 6, |
| 13:56 | 12 | THAT'S 10,000 TIMES DIFFERENCE, RIGHT? |
| 13:56 | 13 | **A.**   THAT'S CORRECT, SIR. |
| 13:56 | 14 | **Q.**   THE FAILURE HERE IS RELATIVELY INSENSITIVE TO THAT RANGE |
| 13:56 | 15 | OF DIFFERENCE.  ISN'T THAT WHAT YOU'RE SAYING? |
| 13:56 | 16 | **A.**   NO.  AND I WOULD LIKE TO ADD AN EXPLANATION THAT MIGHT |
| 13:56 | 17 | HELP US BOTH AND THE COURT. |
| 13:56 | 18 | A FAILURE IS NOT A SINGLE STEP.  A FAILURE REQUIRES |
| 13:56 | 19 | MULTIPLE STEPS.  ONE OF THE FIRST STEPS IN THAT *STAIRSTEP TO* |
| 13:57 | 20 | *HELL*, I CALL IT, HAPPENS, FOR EXAMPLE, AT THE NORTH BREACH. |
| 13:57 | 21 | WE THINK ONE OF THE EARLIEST LOCAL FAILURES IS ONE |
| 13:57 | 22 | RELATED TO FLOW TRANSMISSION OF WATER.  FLOW TRANSMISSION OF |
| 13:57 | 23 | WATER IS VERY SENSITIVE TO PERMEABILITY. |
| 13:57 | 24 | LATER, AS THE SEQUENCE UNFOLDS, THE DOMINANT STEP |
| 13:57 | 25 | THAT BEGINS TO CONTROL BREACH CAUSATION ARE THE HYDRAULIC |

ROBERT G. BEA - CROSS

13:57  1   PRESSURES THAT DEVELOPED.  THOSE HYDRAULIC PRESSURES ARE

13:57  2   RELATIVELY INSENSITIVE TO THE HYDRAULIC CONDUCTIVITY WE HAVE

13:57  3   CALLED *PERMEABILITY*.

13:58  4   **Q.**   NOW, DR. BEA, YOU ENTITLED A SECTION OF YOUR REBUTTAL

13:58  5   REPORT "HYDRAULIC PRESSURE CONDUCTIVITY ANALYSES," CORRECT?

13:58  6   **A.**   THAT'S CORRECT.

13:58  7   **Q.**   YOU ATTENDED THE DEPOSITION OF MR. COBOS-ROA IN

13:58  8   SAN FRANCISCO?

13:58  9   **A.**   THAT'S CORRECT.

13:58  10  **Q.**   MR. COBOS-ROA WAS A GRADUATE STUDENT IN YOUR DEPARTMENT AT

13:58  11  UC BERKELEY; ISN'T THAT RIGHT?

13:58  12  **A.**   WE WERE BOTH IN THE SAME DEPARTMENT OF -- NOT THE

13:58  13  DEPARTMENT -- I'M NOT THE DEPARTMENT CHAIR, SO IT'S NOT MY

13:58  14  DEPARTMENT.

13:58  15  **Q.**   THE DEPARTMENT THAT YOU WERE PART OF, THE DEPARTMENT OF

13:58  16  CIVIL ENGINEERING, HE WAS A GRADUATE STUDENT IN THAT

13:58  17  DEPARTMENT, RIGHT?

13:59  18  **A.**   THAT'S CORRECT, SIR.

13:59  19  **Q.**   AND THE TWO OF YOU HAVE COAUTHORED SEVERAL PAPERS AND

13:59  20  REPORTS TOGETHER OVER THE YEARS, CORRECT?

13:59  21  **A.**   YES, SIR.

13:59  22  **Q.**   SO YOU KNOW THAT AT HIS DEPOSITION, MR. COBOS-ROA

13:59  23  TESTIFIED HE HAS NEVER HEARD THE TERM *HYDRAULIC PRESSURE*

13:59  24  *CONDUCTIVITY ANALYSIS* IN ANY COURSE HE HAS TAKEN.

13:59  25           DO YOU RECALL THAT?

**ROBERT G. BEA - CROSS**

| | | |
|---|---|---|
| 13:59 | 1 | **A.**   YES, SIR. |
| 13:59 | 2 | **Q.**   YOU HAVE NO BASIS TO DISAGREE WITH HIS STATEMENT THAT HE |
| 13:59 | 3 | HAD NOT HEARD THAT TERMINOLOGY IN ANY OF HIS COURSES, RIGHT? |
| 13:59 | 4 | **A.**   NO.  I HAVE NO BASIS TO SAY HE WAS NOT CORRECT. |
| 13:59 | 5 | **Q.**   YOU REMEMBERED THAT WE ASKED MR. COBOS-ROA WHO HE TOOK |
| 13:59 | 6 | COURSES WITH AT BERKELEY IN THE CIVIL ENGINEERING DEPARTMENT; |
| 13:59 | 7 | AND I DON'T KNOW THIS, BUT YOUR NAME DIDN'T COME UP. |
| 13:59 | 8 |         IS THAT BECAUSE YOU DIDN'T TEACH HIM ANY COURSES? |
| 13:59 | 9 | **A.**   THAT'S CORRECT. |
| 13:59 | 10 | **Q.**   THAT WAS A DEDUCTION.  IT WASN'T -- I DIDN'T KNOW FOR |
| 13:59 | 11 | SURE. |
| 13:59 | 12 | **A.**   THAT'S THE POWER OF THE DEDUCTIVE PROCESS. |
| 13:59 | 13 | **Q.**   MR. COBOS-ROA ALSO TESTIFIED THAT HE NEVER READ THE TERM, |
| 14:00 | 14 | QUOTE, HYDRAULIC PRESSURE CONDUCTIVITY, CLOSE QUOTE, IN ANY |
| 14:00 | 15 | ENGINEERING TEXTBOOK HE STUDIED. |
| 14:00 | 16 |         DO YOU RECALL THAT? |
| 14:00 | 17 | **A.**   NO. |
| 14:00 | 18 | **Q.**   LET ME SHOW IT TO YOU BECAUSE IT'S IN EVIDENCE.  IT'S |
| 14:00 | 19 | COBOS-ROA DEPOSITION PAGE 216, LINES 16 THROUGH 24. |
| 14:00 | 20 |         YOU WERE THERE, THOUGH. |
| 14:00 | 21 | **A.**   YES, SIR. |
| 14:00 | 22 | **Q.**   I DON'T BLAME YOU FOR NOT REMEMBERING EVERYTHING THAT WAS |
| 14:00 | 23 | SAID, BUT YOU WERE THERE. |
| 14:00 | 24 |         "QUESTION:  IN WHAT COURSE OR WHAT COURSE OF STUDY OR |
| 14:00 | 25 |         OTHER SOURCE PRIOR TO THIS CASE HAD YOU EVER HEARD THE |

ROBERT G. BEA - CROSS

14:00   1        TERM *HYDRAULIC CONDUCTIVITY PRESSURE* USED?

14:00   2             **"ANSWER:**  I DO NOT RECALL HEARING THAT IN ANY OF MY

14:00   3        COURSES.

14:00   4             **"QUESTION:**  ANY BOOKS THAT YOU HAVE READ ON

14:00   5        ENGINEERING?

14:00   6             **"ANSWER:**  NO."

14:00   7        YOU HAVE NO REASON TO DISAGREE WITH HIM ON THAT

14:00   8   STATEMENT EITHER; ISN'T THAT TRUE?

14:00   9   **A.**   THAT'S CORRECT.

14:00   10  **Q.**   IN FACT, I ASKED YOU THIS QUESTION, AND YOU ANSWERED ME.

14:00   11  IN FACT, YOU KNOW OF ONLY ONE ENGINEERING TEXTBOOK THAT USES

14:00   12  THE TERM *HYDRAULIC PRESSURE CONDUCTIVITY*, AND YOU WERE THE

14:01   13  AUTHOR OF THAT TEXTBOOK; ISN'T THAT RIGHT?

14:01   14  **A.**   THAT'S CORRECT, BUT --

14:01   15  **Q.**   WAIT.  IS THAT CORRECT OR NOT CORRECT?

14:01   16  **A.**   I SAID YES.

14:01   17  **Q.**   OKAY.  GO AHEAD.

14:01   18  **A.**   AND I WAS GOING TO ADD, THE REASON I TITLED THAT SECTION

14:01   19  IN MY REBUTTAL REPORT WAS IN AN ATTEMPT TO COMMUNICATE AS

14:01   20  CLEARLY TO THE COURT AND TO OTHER PEOPLE CONCERNED WITH MY WORK

14:01   21  THAT I WAS FOCUSING THAT WORK ON THE PRESSURE ELEMENT INVOLVED

14:01   22  IN HYDRAULIC CONDUCTIVITY TO DISCRIMINATE IT AS CLEARLY AS I

14:01   23  COULD FROM THE WATER TRANSMISSION FREQUENTLY CALLED,

14:01   24  GENERICALLY, *SEEPAGE*.

14:01   25        SO THAT'S THE REASON THAT I PUT THAT TERM EXPLICITLY

ROBERT G. BEA - CROSS

14:01    1   IN THAT REPORT.

14:02    2   **Q.**    AND THAT BOOK IS ONE OF THE BOOKS THAT VICK COPY

14:02    3   PUBLISHERS IS LISTED AS THE PUBLISHER FOR, RIGHT?

14:02    4   **A.**    THAT'S CORRECT.

14:02    5   **Q.**    WHICH SPECIFIC BOOK WAS THAT?  I DIDN'T ASK YOU THAT AT

14:02    6   YOUR DEPOSITION, SO WHICH OF THE THREE WAS THAT?

14:02    7   **A.**    IT SHOULD BE THE ONE ENTITLED *LOAD ENGINEERING*.

14:02    8   **Q.**    YOU DID NOT USE THAT TERM *HYDRAULIC PRESSURE CONDUCTIVITY*

14:02    9   IN YOUR ORIGINAL FEBRUARY 1, 2012 REPORT, DID YOU, IN THIS

14:02   10   CASE?

14:02   11   **A.**    I THINK THAT'S CORRECT.

14:02   12           **THE COURT:**  QUESTION:  WHAT'S THE CORRELATION, IF

14:02   13   ANY, BETWEEN THE WORDS *HYDRAULIC PRESSURE CONDUCTIVITY* AND

14:02   14   *UPLIFT*?

14:02   15           **THE WITNESS:**  THE WORDING IS INTENDED TO DO JUST WHAT

14:02   16   IT DID:  TO LEAD YOU TO MAKE THE DIRECT COUPLING TO UPLIFT.

14:02   17           THE PRESSURE IS BEING CONDUCTED, AND IF YOU HAVE

14:03   18   AN IMPERMEABLE BLOCK OVER THE TOP OF IT, LIKE THE LEVEE ON THE

14:03   19   PROTECTED SIDE, THE PRESSURE ACTS UNDER THE BLOCK TO REDUCE ITS

14:03   20   RESISTANCE TO THE LATERAL FORCES COMING FROM THE WALL.

14:03   21           THE ANALOGY I USED, IT'S LIKE TAKING A 350-POUND

14:03   22   LSU LINEBACKER AND LIFTING THE LINEBACKER BY HIS BELT SO THAT

14:03   23   HE WEIGHS 35 POUNDS.  AT THAT POINT, IT'S EASY TO GET AROUND

14:03   24   THAT LINEBACKER.

14:03   25           AGAIN, THE DIFFICULTY IS --

ROBERT G. BEA - CROSS

14:03    1    BY MR. TREEBY:

14:03    2    **Q.**    AND YOU -- EXCUSE ME.

14:03    3    **A.**    -- WORDS ARE SO IMPORTANT.  I STRUGGLE TO COMMUNICATE SOME

14:04    4    OF THESE IMPORTANT THINGS SO THAT, AS I PUT IT, NORMAL PEOPLE

14:04    5    CAN UNDERSTAND.

14:04    6    **Q.**    YOU INDICATED TO THE COURT JUST NOW THAT YOU WANTED TO

14:04    7    LEAD THE COURT TO MAKE THE DIRECT CONNECTION?

14:04    8    **A.**    YES, BETWEEN PRESSURE AND UPLIFT.

14:04    9    **Q.**    RIGHT.  RIGHT.

14:04   10         WITHOUT FLOW, RIGHT?

14:04   11    **A.**    WELL, IT CAN BE WITH OR WITHOUT.

14:04   12    **Q.**    OKAY.

14:04   13    **A.**    IN THIS CASE, IF WE TALK ABOUT NORTH BREACH, IT'S WITH.

14:04   14    YOU CAN'T CUT THE WATER IN HALF.  YOU HAVE TO TREAT IT

14:04   15    APPROPRIATELY.

14:05   16    **Q.**    NOW, DR. BEA, DESPITE YOUR TESTIMONY THAT ESSENTIALLY --

14:05   17    YOU HAVE TESTIFIED THIS IS A PRESSURE PROBLEM, NOT A FLOW

14:05   18    PROBLEM, RIGHT?

14:05   19         THIS IS PART OF YOUR SAYING "WE'RE SOLVING" -- DO YOU

14:05   20    REMEMBER THAT MOMENT WHEN YOU SAID "WE'RE SOLVING" -- YOU SAID

14:05   21    IT A COUPLE TIMES -- "WE'RE SOLVING TWO DIFFERENT PROBLEMS.

14:05   22    ALL THESE OTHER EXPERTS AND I, WE ARE SOLVING TWO DIFFERENT

14:05   23    PROBLEMS," RIGHT?

14:05   24         DO YOU REMEMBER THAT?

14:05   25    **A.**    I REMEMBER THAT VERY CLEARLY, AND THAT WAS MY STRUGGLE TO

ROBERT G. BEA - CROSS

14:05  1    EXPLAIN.  I WAS IN CAUSATION FOCUSED, NOT UNILATERALLY, BUT ON

14:05  2    THE PRESSURE EFFECTS.  THAT DID NOT MEAN TO COMMUNICATE TO MY

14:05  3    EXPERT COLLEAGUES THAT I WAS IGNORING SEEPAGE OR WATER

14:05  4    TRANSMISSION EFFECTS.

14:05  5    Q.   DO YOU RECALL TESTIFYING THIS IS A PRESSURE PROBLEM, NOT A

14:05  6    FLOW PROBLEM?

14:05  7    A.   AND I'M REFERRING TO BREACH CAUSATION, YES.

14:06  8    Q.   RIGHT.  AND YOU AGREE, HOWEVER -- AND I KNOW THIS IS THE

14:06  9    QUESTION I DID ASK ONCE BEFORE, AND I APOLOGIZE -- YOU AGREE

14:06  10   THAT YOUR EXPERT TEAM USED SOFTWARE CALLED SEEP/W, PUBLISHED BY

14:06  11   GEO-SLOPE INTERNATIONAL, A SUITE KNOWN AS *GEOSTUDIOS*, TO RUN

14:06  12   FLOW ANALYSES THAT YOU USED IN YOUR ORIGINAL EXPERT REPORT IN

14:06  13   THIS CASE, RIGHT?

14:06  14         THAT'S WHAT SEEP/W DOES?

14:06  15   A.   SEEP/W DOES A LOT OF THINGS, BUT I THINK YOUR STATEMENT IS

14:06  16   TRUE AND ACCURATE.

14:06  17   Q.   YOU DON'T HAVE -- YOU AND I ARE ALMOST OF THE SAME

14:06  18   GENERATION.  I'M A LITTLE BIT YOUNGER, NOT MUCH.  YOU DON'T

14:06  19   HAVE THE TRAINING OR EXPERIENCE TO RUN FLOW ANALYSIS IN THE

14:06  20   SEEP/W COMPUTER PROGRAM; ISN'T THAT TRUE?

14:07  21   A.   THE FIRST THING YOU CITED WAS TRAINING.  THAT'S TRUE.

14:07  22   EXPERIENCE, THAT'S NOT TRUE.

14:07  23         MR. SCHULTZ:  I DON'T WANT TO STOP MR. TREEBY AT AN

14:07  24   INCONVENIENT POINT.  I'M JUST NOTING THAT WE HAVE BEEN GOING A

14:07  25   LITTLE OVER AN HOUR.

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:07 | 1 | **THE COURT:**  IS THAT ALL RIGHT WITH YOU? |
| 14:07 | 2 | **MR. TREEBY:**  THAT'S FINE. |
| 14:07 | 3 | **THE COURT:**  WE WILL TAKE A 10-MINUTE RECESS. |
| 14:07 | 4 | (RECESS.) |
| 14:25 | 5 | **MR. TREEBY:**  YOUR HONOR, BEST-LAID PLANS. |
| 14:25 | 6 | **THE COURT:**  YES, I KNOW. |
| 14:25 | 7 | **MR. TREEBY:**  DO YOU KNOW ABOUT THOSE THINGS? |
| 14:25 | 8 | **THE COURT:**  YES, SIR. |
| 14:25 | 9 | **MR. TREEBY:**  WE HAVE IT, BUT WE ARE TRYING TO FIND IT |
| 14:25 | 10 | ELECTRONICALLY TO DEAL WITH SOMETHING SO IT DOESN'T GET STALE. |
| 14:25 | 11 | I DON'T KNOW IF DR. BEA HAS THIS OR IF IT WOULD |
| 14:25 | 12 | BE ACCEPTABLE EVEN IF HE DOES, IF HE HAS DR. ROGERS' REPORT IN |
| 14:25 | 13 | THIS CASE, BECAUSE HE SAID SOMETHING ABOUT DR. ROGERS' REPORT |
| 14:25 | 14 | THAT I JUST WANT TO CLEAR UP THE RECORD ON. |
| 14:26 | 15 | **THE COURT:**  I HAVE IT LIKE YOU HAVE IT, BUT -- |
| 14:26 | 16 | **MR. TREEBY:**  I JUST HAVE IT IN PAPER, AND I'M TRYING |
| 14:26 | 17 | TO GET IT FOUND AS AN EXHIBIT SO WE CAN PUBLISH IT. |
| 14:26 | 18 | **THE COURT:**  I DON'T THINK WE HAVE IT -- WE HAVE NOT |
| 14:26 | 19 | INTRODUCED IT AS AN EXHIBIT -- |
| 14:26 | 20 | **MR. TREEBY:**  NO, NO. |
| 14:26 | 21 | **THE COURT:**  -- BUT IT'S LABELED.  YOU HAVE IT |
| 14:26 | 22 | ELECTRONICALLY. |
| 14:26 | 23 | **MR. TREEBY:**  WE HAVE IT.  WE JUST HAVE TO FIND IT AND |
| 14:26 | 24 | A SPECIFIC TABLE IN IT. |
| 14:26 | 25 | **MR. BRUNO:**  WHICH EXHIBIT NUMBER? |

ROBERT G. BEA - CROSS

14:26    1        **MR. TREEBY:**  I CAN'T IDENTIFY THE EXHIBIT NUMBER.  I
14:26    2   CAN IDENTIFY IT AS AN EXHIBIT TO HIS FIGURE IN HIS REPORT.
14:26    3        **MR. BRUNO:**  DO YOU KNOW WHAT PAGE IT'S ON?
14:26    4        **MR. TREEBY:**  PAGE 219 OF HIS REPORT.
14:26    5        **MR. BRUNO:**  PAGE 219?
14:26    6        **MR. TREEBY:**  YES.
14:26    7        **MR. BRUNO:**  WE WILL LOOK FOR IT.
14:26    8        **THE COURT:**  IS THAT ALL WE ARE GOING TO BE TALKING
14:26    9   ABOUT?
14:26   10        **MR. TREEBY:**  NO, NO, NO.  IT'S NOT.  I WAS JUST
14:26   11   TRYING TO DO IT WHILE IT'S FRESH.
14:27   12             WE WILL JUST PROCEED AND COME TO THAT WHEN WE
14:27   13   GET TO IT.
14:27   14        **THE WITNESS:**  OKAY.
14:27   15   BY MR. TREEBY:
14:27   16   **Q.**   NOW, THE LAST QUESTION, JUST SO WE KEEP THIS ON TRACK, IS
14:27   17   I ASKED YOU -- YOU DON'T HAVE, DO YOU, THE TRAINING OR THE
14:27   18   EXPERIENCE TO RUN FLOW ANALYSES IN THE SEEP/W COMPUTER PROGRAM;
14:27   19   ISN'T THAT TRUE?
14:27   20   **A.**   I'M NOT SKILLED IN THE UTILIZATION OF THAT PROGRAM.  I
14:27   21   HAVE TRAINING AND THE BACKGROUND REQUIRED TO PERFORM THOSE
14:27   22   ANALYSES -- AND THE EXPERIENCE.
14:27   23   **Q.**   THAT'S CLOSE ENOUGH TO YOUR ANSWER.  BASICALLY YOU
14:27   24   TESTIFIED IF I HAD TRAINING AND EXPERIENCE, I COULD RUN IT; BUT
14:27   25   I DON'T HAVE TRAINING AND EXPERIENCE TO OPERATE THAT PROGRAM.

**ROBERT G. BEA - CROSS**

| | | |
|---|---|---|
| 14:27 | 1 | IS THAT FAIR? |
| 14:27 | 2 | **A.**  THAT'S CORRECT, SIR. |
| 14:27 | 3 | **Q.**  IN THIS CASE, YOU USED THE SERVICES OF MR. DIEGO COBOS-ROA |
| 14:27 | 4 | TO PERFORM THE SEEP/W FLOW ANALYSES, CORRECT? |
| 14:28 | 5 | **A.**  THAT'S CORRECT. |
| 14:28 | 6 | **Q.**  MR. COBOS-ROA ALSO PERFORMED THE SLOPE/W STABILITY |
| 14:28 | 7 | ANALYSES THAT YOU USED IN YOUR ORIGINAL EXPERT REPORT IN THIS |
| 14:28 | 8 | CASE, CORRECT? |
| 14:28 | 9 | **A.**  WITH THE ASSISTANCE OF DR. GRUNAUER. |
| 14:28 | 10 | **Q.**  BY THE WAY, YOU SAY DR. GRUNAUER.  DID YOU KNOW, IN FACT, |
| 14:28 | 11 | HE DOES NOT YET HAVE HIS PH.D.? |
| 14:28 | 12 | **A.**  NO, I DIDN'T. |
| 14:28 | 13 | **Q.**  I'M NOT SURE THAT'S IMPORTANT, BUT I LIKE FOR PEOPLE TO |
| 14:28 | 14 | SAY WHAT THEY ARE WHEN THEY WRITE THINGS AND SO FORTH, BUT WE |
| 14:28 | 15 | WILL GET TO THAT. |
| 14:28 | 16 | NOW, COBOS-ROA'S SEEP/W FLOW ANALYSES -- LET ME BACK |
| 14:28 | 17 | UP. |
| 14:28 | 18 | SEEP/W CAN BE USED AS A TOOL TO ACCOMPLISH A |
| 14:28 | 19 | STEADY-STATE FLOW ANALYSIS, RIGHT? |
| 14:28 | 20 | **A.**  CORRECT. |
| 14:28 | 21 | **Q.**  I THINK YOU KNOW THIS BASED ON YOUR TESTIMONY:  WHEN YOU |
| 14:28 | 22 | BEGIN TO USE THE SEEP/W PROGRAM DURING A GIVEN SESSION, YOU |
| 14:28 | 23 | MUST CHOOSE WHETHER YOU WANT TO PERFORM A STEADY FLOW -- |
| 14:29 | 24 | STEADY-STATE FLOW ANALYSIS OR A TRANSIENT FLOW ANALYSIS WITH |
| 14:29 | 25 | THE PROGRAM, CORRECT? |

ROBERT G. BEA - CROSS

14:29  1  **A.**   CORRECT.

14:29  2  **Q.**   YOU KNOW MR. COBOS-ROA TESTIFIED THAT WITH RESPECT TO THE

14:29  3  SEEP/W FLOW ANALYSES THAT HE RAN IN THIS CASE, HE CHOSE TO

14:29  4  MODEL TRANSIENT FLOW CONDITIONS, NOT STEADY-STATE FLOW

14:29  5  CONDITIONS, CORRECT?

14:29  6  **A.**   IN THE WORK WE HAVE DONE, WE HAVE PERFORMED BOTH.

14:29  7  **Q.**   I JUST -- MY QUESTION -- WITH ALL DUE RESPECT -- AND I

14:29  8  DON'T WANT TO CUT YOU OFF -- IF YOU WANT TO EXPLAIN SOMETHING,

14:29  9  I WANT YOU TO DO IT, BUT I DO NEED TO KIND OF KEEP A COHERENT

14:29  10  FLOW AS YOU HAVE INDICATED.

14:29  11      WHEN HE MADE THE CHOICE FOR THE ANALYSES HE RAN IN

14:29  12  SEEP/W, YOU KNOW THAT HE CHOSE TRANSIENT FLOW CONDITIONS, NOT

14:30  13  STEADY-STATE FLOW CONDITIONS IN THE COMPUTER PROGRAM, DON'T

14:30  14  YOU?

14:30  15  **A.**   FOR SOME OF THE CASES, YES.

14:30  16  **Q.**   ISN'T IT ALSO TRUE THAT MR. COBOS-ROA USED THE SAME

14:30  17  SOFTWARE PROGRAM TO RUN TRANSIENT FLOW ANALYSES FOR YOU IN

14:30  18  CONNECTION WITH YOUR TESTIMONY IN THE BARGE LITIGATION?

14:30  19  **A.**   CORRECT.

14:30  20  **Q.**   HE USED THE SAME SOFTWARE TO RUN TRANSIENT FLOW ANALYSES

14:30  21  FOR YOU IN CONNECTION WITH YOUR TESTIMONY IN THE *ROBINSON* CASE;

14:30  22  ISN'T THAT RIGHT?

14:30  23  **A.**   CORRECT.

14:30  24  **Q.**   MR. COBOS-ROA ALSO RAN TRANSIENT FLOW ANALYSES FOR YOU IN

14:30  25  CONNECTION WITH YOUR JOINT AUTHORSHIP OF VARIOUS PAPERS IN 2008

**ROBERT G. BEA - CROSS**

14:30   1   ABOUT THE EBIA FLOODWALL LEVEE FAILURES, CORRECT?

14:30   2   **A.**   CORRECT.

14:30   3   **Q.**   NOW, IN YOUR REBUTTAL REPORT, YOU USED THE TERM, ALL

14:31   4   TOGETHER, *TRANSIENT STEADY FLOW CONDITIONS*, CLOSED QUOTE, IN

14:31   5   YOUR REPORT.

14:31   6   **A.**   CORRECT.

14:31   7   **Q.**   DON'T YOU USE THAT?

14:31   8   **A.**   I BELIEVE THAT'S ACCURATE.

14:31   9   **Q.**   BUT I BELIEVE IT'S ALSO ACCURATE TO SAY THAT YOU WERE

14:31   10  UNABLE TO POINT TO ANY GEOTECHNICAL ENGINEERING TEXT THAT USES

14:31   11  THOSE FOUR WORDS, *TRANSIENT STEADY FLOW CONDITIONS*, IN ONE

14:31   12  PHRASE; ISN'T THAT RIGHT?

14:31   13  **A.**   THAT'S CORRECT.

14:31   14  **Q.**   NOW, I WANT TO TALK A LITTLE BIT --

14:31   15              **MR. TREEBY:**  DO WE HAVE THIS YET?

14:31   16              IT WOULD BE -- YES, WE CAN DO THIS NOW IF YOU

14:31   17  CAN HELP ME.  OH, YOU HAVE IT?

14:31   18              JX-2031, AND IT SHOULD BE PAGE 219 UNLESS IT'S

14:31   19  THE WRONG NUMBER ON THE COVER PAGE.

14:31   20              **THE COURT:**  I THINK WHAT YOU ARE LOOKING AT IN THE

14:31   21  REPORT OF DR. ROGERS IS AT PAGE 219.

14:32   22              WE ARE TALKING ABOUT DR. ROGERS' REPORT?

14:32   23              **MR. TREEBY:**  DR. ROGERS' REPORT, YES.

14:32   24              SO THAT'S THE COVER.  SO GO, I THINK, THEN, TO

14:32   25  220 PROBABLY.

ROBERT G. BEA - CROSS

| 14:32 | 1 | THERE IT IS.  OKAY. |
| 14:32 | 2 | BY MR. TREEBY: |
| 14:32 | 3 | Q.   WE ARE GOING TO HAVE TO BLOW THIS UP.  AND I UNDERSTAND, |
| 14:32 | 4 | DR. BEA, AND I WILL BE HAPPY TO HAND YOU A COPY IF IT WILL |
| 14:32 | 5 | HELP. |
| 14:32 | 6 | THE COURT:  WE'LL SEE HOW THE BLOWUP WORKS. |
| 14:32 | 7 | MR. TREEBY:  I WANT YOU TO BLOW UP THE BOTTOM TABLE. |
| 14:32 | 8 | BY MR. TREEBY: |
| 14:32 | 9 | Q.   DO YOU RECALL YOU TESTIFIED EARLIER THIS AFTERNOON THAT AT |
| 14:32 | 10 | THE SOUTH EBIA SITE, DR. ROGERS FOUND SOME 10 TO THE MINUS 4 |
| 14:32 | 11 | CENTIMETERS PER SECOND PERMEABILITIES? |
| 14:32 | 12 | DO YOU RECALL THAT? |
| 14:32 | 13 | A.   I RECALL I SAID THAT HE DID, AND THAT LED THEN TO OUR |
| 14:32 | 14 | ABILITY TO QUANTIFY THE UNCERTAINTY BAND OR THE BEST ESTIMATE |
| 14:32 | 15 | VALUE OF 1 TIMES 10 TO THE MINUS 5 CENTIMETERS PER SECOND. |
| 14:33 | 16 | Q.   IF YOU WOULD LOOK AT THIS -- BECAUSE WE HAVE LOOKED AT |
| 14:33 | 17 | IT -- AND YOU SHOW ME ONE PERMEABILITY THAT'S AS HIGH AS 10 TO |
| 14:33 | 18 | THE MINUS 4 ON THIS TABLE THAT IS ALL THE ESTIMATED VALUES OF |
| 14:33 | 19 | HYDRAULIC CONDUCTIVITY FOR THE TWO TEST RUNS THAT THE |
| 14:33 | 20 | PLAINTIFFS RAN AT THE EBIA SOUTH TEST SITE. |
| 14:33 | 21 | A.   I DON'T SEE A VALUE THAT HIGH. |
| 14:33 | 22 | DR. ROGERS IN HIS REPORT MADE A STATEMENT THAT THE |
| 14:33 | 23 | UNCERTAINTY AROUND THE 10 TO THE MINUS 5 WAS 10 TO THE MINUS 4 |
| 14:33 | 24 | TO 10 TO THE MINUS 6. |
| 14:33 | 25 | Q.   HE ALSO SAID IN HIS DEPOSITION AND IN HIS REPORT THAT THE |

**ROBERT G. BEA - CROSS**

| | |
|---|---|
| 14:33 | 1 |
| 14:33 | 2 |
| 14:33 | 3 |
| 14:33 | 4 |
| 14:34 | 5 |
| 14:34 | 6 |
| 14:34 | 7 |
| 14:34 | 8 |
| 14:34 | 9 |
| 14:34 | 10 |
| 14:34 | 11 |
| 14:34 | 12 |
| 14:34 | 13 |
| 14:34 | 14 |
| 14:34 | 15 |
| 14:34 | 16 |
| 14:34 | 17 |
| 14:34 | 18 |
| 14:35 | 19 |
| 14:35 | 20 |
| 14:35 | 21 |
| 14:35 | 22 |
| 14:35 | 23 |
| 14:35 | 24 |
| 14:35 | 25 |

1  10 TO THE MINUS 4 CAME FROM THE SCHOOL SITE.

2           DO YOU RECALL THAT?

3  **A.**   NO, I DON'T.

4  **Q.**   WELL, WE WILL -- AT LEAST THERE'S NO 10 TO THE MINUS 4 ON

5  THESE RECORDS, RIGHT?

6  **A.**   THAT'S CORRECT.

7           COULD I CONTINUE MY EXPLANATION SO I DON'T MISLEAD

8  YOU OR THE COURT?

9           I SUBSEQUENTLY RETURNED TO DR. ROGERS AND

10  DR. STORESUND AND ASKED WHAT THEY MEANT ABOUT *LOWER BOUND,*

11  *UPPER BOUND.*

12          AT THAT POINT, THEY CONTACTED KEVIN POPE AND

13  DEVELOPED A TABLE LISTING THE MEASURED PERMEABILITY VALUES

14  USING DIFFERENT ANALYTICAL MODELS TO PROCESS THE PUMP TEST

15  RESULTS.  THEY DEVELOPED, ACTUALLY, A STATISTICAL ANALYSIS OF

16  THAT DATA TO DEMONSTRATE THAT THE 10 TO THE MINUS 4 AND 10 TO

17  THE MINUS 6 WERE APPROXIMATELY PLUS AND MINUS 1 STANDARD

18  DEVIATION VALUES FROM THE MEAN BEST ESTIMATE VALUE.

19  **Q.**   IF I TELL YOU WE HAVE NEVER BEEN GIVEN ANYTHING FROM

20  ROGERS OR POPE OR YOU THAT WOULD INDICATE THAT THERE WERE 10 TO

21  THE MINUS 4 RESULTS AT THE SOUTH EBIA SIDE, CAN YOU CONTRADICT

22  THAT?

23  **A.**   NO.

24          **THE COURT:**  COUNSEL, CAN I HAVE A SIDEBAR -- BECAUSE

25  I WANT TO TALK TO Y'ALL.

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:35 | 1 | (THE FOLLOWING PROCEEDINGS WERE HELD AT THE BENCH.) |
| 14:35 | 2 | **THE COURT:**  I DID NOT WANT TO SAY THIS IN FRONT OF |
| 14:35 | 3 | THE WITNESS TO PROMPT HIM IN ANY WAY, BUT I HAVE A RECOLLECTION |
| 14:36 | 4 | OF WHEN DR. ROGERS WAS TESTIFYING OF SEEING SOMETHING THAT SAID |
| 14:36 | 5 | 10 TO THE MINUS 6.  AND SOME OF THEM HAD 10 TO THE MINUS 4 ON |
| 14:36 | 6 | IT, SOME EXHIBIT, SOMETHING I SAW. |
| 14:36 | 7 | **MR. TREEBY:**  THAT'S AT THE OTHER SITE.  THAT'S AT THE |
| 14:36 | 8 | SCHOOL SITE. |
| 14:36 | 9 | **THE COURT:**  OKAY. |
| 14:36 | 10 | **MR. SCHULTZ:**  IF WE ARE GOING TO TESTIFY HERE -- |
| 14:36 | 11 | **THE COURT:**  SO I DID SEE SOMETHING? |
| 14:36 | 12 | **MR. TREEBY:**  YES, YOU DID, ABSOLUTELY. |
| 14:36 | 13 | **MR. SIMS:**  I WOULDN'T -- |
| 14:36 | 14 | **THE COURT:**  I DON'T NEED A DEBATE ABOUT IT.  I |
| 14:36 | 15 | JUST -- |
| 14:36 | 16 | **MR. TREEBY:**  IF YOU HAVE SOMETHING, SHOW IT TO ME. |
| 14:36 | 17 | **THE COURT:**  I JUST REMEMBERED SEEING SOMETHING. |
| 14:36 | 18 | **MR. TREEBY:**  I BELIEVE -- |
| 14:36 | 19 | **MR. SCHULTZ:**  WE'LL DO IT ON REDIRECT, JUDGE. |
| 14:36 | 20 | **THE COURT:**  I DIDN'T WANT TO PROMPT ANYBODY. |
| 14:36 | 21 | (END OF BENCH CONFERENCE.) |
| 14:37 | 22 | BY MR. TREEBY: |
| 14:37 | 23 | Q.  I'M GOING TO CHANGE SUBJECTS NOW.  I'M GOING TO TALK ABOUT |
| 14:37 | 24 | THE LOST/STOLEN 3D SEEPAGE ANALYSES AND OTHERS. |
| 14:37 | 25 | DR. BEA, YOU REFERRED TO 3D SEEPAGE ANALYSES IN |

ROBERT G. BEA - CROSS

14:37   1    SEEP/W THAT YOU STATE MR. COBOS-ROA CONDUCTED FOR YOU IN

14:37   2    CONNECTION WITH THE EBIA BREACHES, CORRECT?

14:37   3    **A.**    CORRECT.

14:37   4    **Q.**    THOSE 3D SEEPAGE ANALYSES WERE NOT PERFORMED FOR THIS

14:37   5    CASE; ISN'T THAT RIGHT?

14:37   6    **A.**    THAT'S CORRECT.

14:37   7    **Q.**    YOU AGREE THAT 3D SEEPAGE ANALYSES ARE COMPLEX; ISN'T THAT

14:37   8    RIGHT?

14:37   9    **A.**    YES, SIR.

14:37   10    **Q.**    YOU AGREE THAT 3D SEEPAGE ANALYSES ARE IMPORTANT; THEY

14:37   11    PROVIDE SUPPORT FOR YOUR OPINIONS REGARDING THE SOUTH BREACH

14:38   12    FAILURE, DO THEY NOT?

14:38   13    **A.**    IT'S NOT SUPPORT, BUT RATHER -- WELL, PERHAPS IT IS, BUT

14:38   14    LET ME EXPLAIN WHERE I AM TRYING TO COMMUNICATE TO YOU.

14:38   15         THE TWO-DIMENSIONAL ANALYSIS IS WHAT IT SAYS.

14:38   16    THERE'S ONLY FLOW IN THE TWO DIMENSIONS, X AND Y, LIKE LOOKING

14:38   17    AT A PICTURE, WHERE THE REAL WORLD IS THREE-DIMENSIONAL SO THAT

14:38   18    WATER CAN ENTER FROM THE SIDES OF THAT PICTURE.

14:38   19         WHAT WE DID WAS TO PERFORM 3D ANALYSES OF FEATURES

14:38   20    THAT WERE NARROW ENOUGH TO POTENTIALLY MAKE IMPORTANT

14:38   21    DIFFERENCES IN THE FLOW MECHANICS FOR THOSE NARROW FEATURES.

14:39   22    SO IT BECOMES A COMPONENT IN UNDERSTANDING THE UNCERTAINTIES.

14:39   23         THE BASIC CONCLUSIONS THAT WE HAVE REACHED AT THIS

14:39   24    STAGE ARE INDEPENDENT OF THAT 3D EFFECT.

14:39   25    **Q.**    WELL, YOU -- IN YOUR REPORT, YOU SAY IT ENHANCED THE

ROBERT G. BEA - CROSS

14:39   1    PRESSURES BY 30 PERCENT, RIGHT?

14:39   2    **A.**   THAT'S CORRECT.

14:39   3    **Q.**   SO THAT -- TO ME, 30 PERCENT IS IMPORTANT IN THIS CASE

14:39   4    SINCE WE HAVE A HORSE RACE AND WE DON'T HAVE A PHOTO FINISH AND

14:39   5    ONE NOSE GOT THERE BEFORE THE OTHER.  SO IT'S IMPORTANT TO ME.

14:39   6            YOU DID NOT PROVIDE US THOSE 3D SEEPAGE ANALYSES;

14:39   7    ISN'T THAT TRUE?

14:39   8    **A.**   WELL, WE COULDN'T.

14:39   9    **Q.**   I UNDERSTAND.  YOU DIDN'T BECAUSE YOU COULDN'T.

14:39   10   **A.**   YES, SIR.

14:39   11   **Q.**   MR. COBOS-ROA TESTIFIED THAT THE LAPTOP HE USED TO STORE

14:39   12   THE 3D SEEPAGE ANALYSES WAS STOLEN.

14:39   13           DO YOU RECALL THAT?

14:39   14   **A.**   YES, SIR.

14:39   15   **Q.**   HE ALSO TESTIFIED THAT THE SEPARATE EXTERNAL HARD DRIVE HE

14:39   16   USED TO STORE A BACKUP COPY OF THE 3D SEEPAGE ANALYSES WAS

14:40   17   EITHER LOST, DROPPED, BOTH, DAMAGED.  RIGHT?

14:40   18   **A.**   GONE.

14:40   19   **Q.**   GONE.

14:40   20           AND YOU KNOW, DO YOU NOT, THAT MR.COBOS-ROA TESTIFIED

14:40   21   THAT HE SENT THE INPUT PARAMETERS, THE CROSS SECTIONS, AND THE

14:40   22   OTHER DATA HE USED TO RUN THE 3D SEEPAGE ANALYSES TO YOU BEFORE

14:40   23   THOSE ANALYSES WERE STOLEN AND LOST, RIGHT?

14:40   24   **A.**   I DON'T RECALL RECEIVING ANY INPUT FILES, AND IT MAKES

14:40   25   SENSE THAT I WOULDN'T.  I DON'T HAVE THE PROCESS -- OR THE

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:40 | 1 | ABILITY TO PROCESS THOSE OR EVEN READ THOSE INPUT FILES. |
| 14:40 | 2 | HE IS CORRECT THAT HE SENT ME OUTPUT PROCESS RESULTS |
| 14:40 | 3 | FROM THOSE ANALYSES.  I DID NOT WITHHOLD FROM YOU ANY |
| 14:40 | 4 | ELECTRONIC FILES THAT I HAD RECEIVED FROM DR. COBOS-ROA. |
| 14:41 | 5 | Q.   I WOULD LIKE TO LOOK, THEN, AT COBOS-ROA'S DEPOSITION. |
| 14:41 | 6 | YOU WERE THERE.  I WOULD LIKE TO LOOK AT HIS DEPOSITION AT |
| 14:41 | 7 | PAGE 188, 5 THROUGH 15, LINE -- THROUGH 189, 5 THROUGH 15. |
| 14:41 | 8 | IT'S A LONG EXCERPT, AND HOPEFULLY -- LET'S SEE WHERE TO START. |
| 14:41 | 9 | START AT LINE 5, IF YOU WOULD, THE QUESTION ON |
| 14:41 | 10 | LINE 5. |
| 14:41 | 11 | MR. TREEBY:  BLOW IT UP BEGINNING WITH THE QUESTION |
| 14:41 | 12 | ON LINE 5 SO EVERYBODY CAN READ IT. |
| 14:41 | 13 | "QUESTION:  IF YOU SIMPLY -- WELL, DID YOU -- EXCUSE |
| 14:41 | 14 | ME.  LET ME SAY IT THIS WAY:  AFTER YOU LOST BOTH THE |
| 14:41 | 15 | STOLEN LAPTOP AND LOST THE EXTERNAL HARD DRIVE, DID YOU |
| 14:41 | 16 | STILL HAVE AVAILABLE TO YOU THE INPUTS THAT YOU USED IN |
| 14:41 | 17 | CONNECTION WITH YOUR PRIOR MODELING OF THE BREACHES IN THE |
| 14:41 | 18 | EAST BANK INDUSTRIAL AREA? |
| 14:41 | 19 | "ANSWER:  CAN YOU PLEASE DEFINE *INPUTS*? |
| 14:42 | 20 | "QUESTION:  INPUT, INPUT PARAMETERS, INPUT VALUES, |
| 14:42 | 21 | CROSS SECTIONS, WHATEVER IT IS THAT YOU WOULD INPUT INTO |
| 14:42 | 22 | THAT MODEL TO MAKE IT WORK.  DID YOU HAVE THAT STUFF |
| 14:42 | 23 | AVAILABLE TO YOU? |
| 14:42 | 24 | "ANSWER:  I RECALL I SENT A DVD TO DR. BEA WITH THE |
| 14:42 | 25 | MODELS AND, I GUESS, THE REPORTS WE HAD PRODUCED.  SO, |

ROBERT G. BEA - CROSS

14:42  1       YES, THE INPUTS WERE IN POSSESSION OTHER THAN MINE."

14:42  2  BY MR. TREEBY:

14:42  3  Q.   HE GOES ON TO SAY HE SENT IT BEFORE THEY WERE LOST,

14:42  4  OBVIOUSLY.

14:42  5       DO YOU RECALL THAT?

14:42  6  A.   YES.

14:42  7  Q.   DO YOU DENY THAT?

14:42  8  A.   NO.

14:42  9  Q.   SO THAT'S NOT OUTPUTS; THAT'S INPUTS.

14:42  10  A.   THAT'S CORRECT.

14:42  11  Q.   HE ALSO TESTIFIED THAT THE INFORMATION COULD HAVE BEEN

14:42  12  USED TO RECREATE THE 3D SEEPAGE ANALYSES IN ONE MONTH.

14:42  13       DO YOU RECALL THAT TESTIMONY BY DIEGO COBOS-ROA?

14:42  14  A.   NO, I DON'T, BUT IT SOUNDS CORRECT.

14:42  15  Q.   SO IF YOU SIMPLY USED THE INPUTS THAT WERE AVAILABLE TO

14:42  16  YOU IN THE -- IN CONNECTION WITH YOUR OCTOBER -- 8-A AND 8-B

14:43  17  REPORTS, HOW LONG WOULD IT TAKE YOU TO RUN ANOTHER 3D FLOW

14:43  18  ANALYSIS IN THIS CASE TO REPLICATE THE ONE THAT YOU DID IN 2008

14:43  19  THAT WAS APPARENTLY LOST ON THE STOLEN LAPTOP AND THE LOST HARD

14:43  20  DRIVE?

14:43  21  A.   A MONTH PERHAPS.

14:43  22  Q.   BUT YOU DID NOT ASK HIM TO RUN THE 3D SEEPAGE ANALYSES FOR

14:43  23  THIS CASE, DID YOU?

14:43  24  A.   NO.

14:43  25  Q.   I WANT TO TALK ABOUT COMPRESSIBILITY A LITTLE BIT.

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:43 | 1 | THE SAME STANDARD SCIENTIFIC METHODS THAT WERE USED |
| 14:43 | 2 | TO EVALUATE PERMEABILITY RESULTS FROM THE PLAINTIFFS' PUMPING |
| 14:43 | 3 | TESTS PRODUCED ANOTHER MATERIAL PROPERTY FOR THOSE SAME SOILS; |
| 14:43 | 4 | NAMELY, THE STORAGE COEFFICIENT OF THOSE SOILS. |
| 14:43 | 5 | ISN'T THAT CORRECT? |
| 14:43 | 6 | **A.**   CORRECT. |
| 14:43 | 7 | **Q.**   WHEN A QUALIFIED SCIENTIST KNOWS THE STORAGE COEFFICIENT |
| 14:44 | 8 | OF GIVEN SOILS, THAT SCIENTIST CAN USE WELL RECOGNIZED AND |
| 14:44 | 9 | COMMONLY USED EQUATIONS TO CONVERT STORAGE COEFFICIENT TO |
| 14:44 | 10 | COEFFICIENT OF VOLUME CHANGE WHICH IS KNOWN SCIENTIFICALLY AS |
| 14:44 | 11 | M SUB V; IS THAT CORRECT? |
| 14:44 | 12 | **A.**   YES, SIR. |
| 14:44 | 13 | **Q.**   AND THE M SUB V VALUE IS A REFLECTION OF THE SOIL'S |
| 14:44 | 14 | COMPRESSIBILITY; ISN'T THAT RIGHT? |
| 14:44 | 15 | **A.**   IT'S A REFLECTION OF THE SOIL/WATER COMPRESSIBILITY. |
| 14:44 | 16 | THAT'S CORRECT. |
| 14:44 | 17 | **Q.**   AND THE COMPRESSIBILITY OF A SOIL SKELETON REFLECTS THE |
| 14:44 | 18 | RATIO OF CHANGE IN DEFORMATION OVER CHANGE IN STRESS; ISN'T |
| 14:44 | 19 | THAT RIGHT? |
| 14:44 | 20 | **A.**   YES. |
| 14:44 | 21 | **Q.**   AND YOU HAVE AGREED, HAVE YOU NOT, THAT M SUB V IS A |
| 14:44 | 22 | CRUCIAL PARAMETER? |
| 14:44 | 23 | **A.**   YES.  THAT PARAMETER IS CRUCIAL BECAUSE OF THE EFFECTS IT |
| 14:45 | 24 | HAS IN BEING ABLE TO GET OUTPUTS FROM THE ANALYTICAL MODEL THAT |
| 14:45 | 25 | MATCH THE FIELD MEASUREMENTS; NOT LABORATORY MEASUREMENTS, BUT |

ROBERT G. BEA - CROSS

14:45   1   FIELD MEASUREMENTS UNDER SURGE, HIGH-WATER CONDITIONS.

14:45   2   **Q.**   RIGHT.

14:45   3   **A.**   THAT'S DIFFERENT THAN WHAT'S IN A PUMP TEST.  A PUMP TEST,

14:45   4   JUST THE TERM YOU USED, *STORATIVITY*, IS CONCERNED WITH

14:45   5   GROUNDWATER FLOWS AND PRODUCTION VERY EARLY ON IN THE

14:45   6   17TH STREET WORK.  THAT'S WHY WE PAID SO MUCH ATTENTION TO THIS

14:45   7   M SUB V COMPRESSIBILITY COEFFICIENT.

14:46   8   **Q.**   I'M GLAD YOU MENTIONED THAT YOU PAID SO MUCH ATTENTION TO

14:46   9   IT BECAUSE YOU DIDN'T EVEN MENTION THIS CRUCIAL SOIL PROPERTY

14:46   10  PARAMETER, M SUB V, IN YOUR ORIGINAL EXPERT REPORT FOR THIS

14:46   11  CASE; ISN'T THAT RIGHT?  YES OR NO?

14:46   12          EXPLAIN IT IF YOU WANT, BUT FIRST ANSWER ME YES OR

14:46   13  NO:  YOU DIDN'T MENTION THAT CRUCIAL SOIL PROPERTY PARAMETER IN

14:46   14  YOUR ORIGINAL EXPERT REPORT IN THIS CASE.

14:46   15  **A.**   I DON'T RECALL.  I WOULD BE GLAD TO REVIEW MY REPORT TO

14:46   16  CONFIRM YOUR STATEMENT; BUT KNOWING YOU, YOU HAVE ALREADY DONE

14:46   17  THAT AND HAVE FOUND I DID NOT.

14:46   18  **Q.**   THAT'S CORRECT.  AND, IN FACT, YOU ANSWERED ME IN YOUR

14:46   19  DEPOSITION THAT YOU WEREN'T FOCUSED, ACTUALLY, ON M SUB V

14:46   20  DESPITE THE FACT IT WAS A CRUCIAL PARAMETER.

14:46   21          DO YOU RECALL THAT?

14:46   22  **A.**   NO, I DON'T.

14:46   23          **MR. TREEBY:**  PLEASE PLAY OR -- WE DON'T HAVE A VIDEO

14:47   24  CLIP ON THIS ONE.

14:47   25          PULL UP HIS AUGUST 10 DEPOSITION IN

ROBERT G. BEA - CROSS

14:47   1   SAN FRANCISCO PAGE 27, LINES 9 THROUGH 17.

14:47   2   BY MR. TREEBY:

14:47   3   Q.   I ASKED YOU:

14:47   4         "QUESTION:  IF THAT IS SO CRUCIAL, WHY IS IT NOT

14:47   5   MENTIONED IN YOUR ORIGINAL REPORT, THE FEBRUARY 1 REPORT,

14:47   6   OR ANY OF YOUR PUBLISHED PAPERS ON THE KATRINA FAILURES?

14:47   7         "ANSWER:  WE WERE NOT FOCUSED, ACTUALLY, ON M SUB V,

14:47   8   BUT RATHER ON AN ANALYTICAL PROCESS THAT WOULD

14:47   9   APPROPRIATELY MODEL STEADY FLOW CONDITIONS THAT MET AN

14:47   10  INCOMPRESSIBLE SOIL AND AN INCOMPRESSIBLE FLUID."

14:47   11        IS THAT YOUR ANSWER?

14:47   12  A.   THAT'S CORRECT, SIR.

14:47   13  Q.   YOU WEREN'T FOCUSED ON IT.  BUT YOU SAID A MINUTE AGO THAT

14:47   14  YOU REALLY FOCUSED ON IT IN THE 17TH STREET CANAL.

14:47   15        DID I HEAR YOU RIGHT?

14:47   16  A.   WELL, THE EXPLANATION IS TIED UP IN THAT PARAMETER

14:47   17  M SUB V.  IN THE EARLY WORK, OUR CONCERN WAS WHAT SHOULD THAT

14:47   18  BE?

14:48   19        WE, OF COURSE, TURNED TO THE CLASSICAL TEXTBOOKS,

14:48   20  DETERMINED WHAT THOSE VALUES COULD BE, AND THEN WE ATTEMPTED TO

14:48   21  MODEL THE PIEZOMETER MEASUREMENTS WE DISCUSSED EARLIER AT THE

14:48   22  17TH STREET CANAL.

14:48   23        AS WE DID THAT, WE MADE -- FOR ME -- WHAT WAS A

14:48   24  REMARKABLE PIECE OF INSIGHT:  THAT THE M SUB V VALUE NEEDED TO

14:48   25  BE VERY SMALL, CLOSE TO ZERO.  IF THE VALUE WERE ZERO BY

ROBERT G. BEA - CROSS

14:48    1    DEFAULT, THE ANALYSIS WOULD BECOME CLASSICAL STEADY FLOW.

14:48    2              BUT WE DIDN'T WANT TO CARRY IT ZERO BECAUSE OF A

14:49    3    CONCERN I HAD THAT INPUTTING ZERO TO THE COMPUTER PROGRAM FOR

14:49    4    THE ANALYSES WE WERE PERFORMING WOULD PRODUCE A NUMERICAL

14:49    5    INSTABILITY.  IT'S A NUMERICAL SOLUTION, MATHEMATICAL, AND

14:49    6    INTRODUCTION OF ZERO INTO MATHEMATICAL EXPRESSIONS CAN CAUSE

14:49    7    INSTABILITIES.

14:49    8              SO WHAT WE DID WAS TO PERFORM A SERIES OF NUMERICAL

14:49    9    EXPERIMENTS CHANGING M SUB V FROM SOMETHING THAT IN MY WORLD IS

14:49   10    ZERO:  10 TO THE MINUS 9 PER POUNDS PER SQUARE FOOT.

14:49   11              I'M SORRY FOR THE CONFUSING TERMS, BUT THAT'S

14:49   12    ENGINEERING.  BUT IT'S A VERY, VERY SMALL COMPRESSIBILITY,

14:50   13    WHICH MEANS IT'S ABOUT THE COMPRESSIBILITY OF CONCRETE, ROCK,

14:50   14    OR WATER.

14:50   15              THE OTHER COMPRESSIBILITY IS STILL SMALL, BUT SEVERAL

14:50   16    ORDERS OF MAGNITUDE BIGGER -- FOR EXAMPLE, 10 TO THE MINUS 5 --

14:50   17    BUT THAT COMPRESSIBILITY IS NOW REFLECTING NOT THE

14:50   18    COMPRESSIBILITY OF THE WATER OR THE CONCRETE BUT OF THE SOIL

14:50   19    SKELETON.

14:50   20              SO WE INVESTIGATED THE WHOLE RANGE AND SAID WHICH ONE

14:50   21    IN THIS RANGE MATCHES THE PIEZOMETERS BECAUSE WE COULD SIMULATE

14:50   22    THE PIEZOMETERS WHERE THEY WERE IN THE WATER IN THE MODEL.  AND

14:50   23    WE FOUND, EUREKA, IT'S ZERO OR 10 TO THE MINUS 9.

14:50   24              AT THAT POINT, CONSIDERATION OF M SUB V BECAME

14:51   25    TOTALLY SECONDARY.

ROBERT G. BEA - CROSS

14:51   1        **MR. TREEBY:**  I'M GOING TO OBJECT TO THE RESPONSE,

14:51   2   THAT IT WASN'T RESPONSIVE.

14:51   3        **THE COURT:**  I'M GOING TO OVERRULE IT.

14:51   4        **MR. TREEBY:**  I REALIZED THAT.

14:51   5   **BY MR. TREEBY:**

14:51   6   **Q.**   THERE'S SO MANY THINGS YOU HAVE SAID THERE THAT WE HAVE TO

14:51   7   EXPLORE, BUT WE WILL EXPLORE THEM.

14:51   8        IF YOU INPUT ZERO INTO SEEP/W, DID YOU KNOW THAT THE

14:51   9   PROGRAM TAKES CARE OF AVOIDING THAT INSTABILITY YOU DESCRIBED?

14:51   10  **A.**   I DIDN'T AT THE TIME.  I DO KNOW THAT NOW, SIR.

14:51   11  **Q.**   WE'LL COME BACK TO THAT.

14:51   12       YOU AGREE, DO YOU NOT, THAT DR. ROGERS AND MR. POPE

14:51   13  DETERMINED A STORAGE COEFFICIENT FROM THE PUMPING TEST AT THE

14:51   14  PLAINTIFFS' SOUTH EBIA SITE GIVING A SITE-SPECIFIC M SUB V,

14:51   15  DON'T YOU?

14:51   16  **A.**   I DO NOW, YES, SIR.

14:51   17  **Q.**   THAT ACTUAL M SUB V DERIVED FROM DR. ROGERS' AND KEVIN

14:51   18  POPE'S WORK ON THE SOUTH EBIA SITE IS 2 TIMES 10 TO THE MINUS

14:52   19  5, 1 OVER PSF; ISN'T THAT CORRECT?

14:52   20  **A.**   CORRECT, SIR.

14:52   21  **Q.**   BUT YOU DID NOT USE THAT SITE-SPECIFIC M SUB V IN THE

14:52   22  SEEP/W FLOW ANALYSES THAT MR. COBOS-ROA PERFORMED FOR YOU IN

14:52   23  THIS CASE; ISN'T THAT CORRECT?

14:52   24  **A.**   THAT'S CORRECT.

14:52   25  **Q.**   INSTEAD, MR. COBOS-ROA USED, AS YOU HAVE TESTIFIED HERE,

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:52 | 1 | AN M SUB V OF 1 TIMES 10 TO THE MINUS 9, 1 OVER PSF FOR YOUR |
| 14:52 | 2 | FLOW ANALYSES.  AT TIMES, HE DID THAT; IS THAT RIGHT? |
| 14:52 | 3 | **A.**   YOUR QUESTION CONFUSED ME.  WOULD YOU RESTATE IT SLOWLY? |
| 14:52 | 4 | **Q.**   I WAS GOING TOO FAST, SO LET ME START OVER. |
| 14:52 | 5 | **A.**   THANK YOU, SIR. |
| 14:52 | 6 | **Q.**   WHAT MR. COBOS-ROA USED INSTEAD WAS AN M SUB V OF 1 TIMES |
| 14:52 | 7 | 10 TO THE MINUS 9, 1 OVER PSF FOR YOUR FLOW ANALYSES IN THIS |
| 14:52 | 8 | CASE, CORRECT? |
| 14:52 | 9 | **A.**   THAT'S CORRECT, SIR. |
| 14:52 | 10 | **Q.**   BUT IN FACT -- I THINK YOU LEARNED THIS PERHAPS DURING |
| 14:52 | 11 | YOUR DEPOSITION; I'M NOT SURE -- HE USED ZERO AT TIMES FOR SOME |
| 14:53 | 12 | OF THE SOIL STRATUM, DID HE NOT? |
| 14:53 | 13 | **A.**   YES. |
| 14:53 | 14 | **Q.**   YOU DIDN'T KNOW THAT BEFORE, HOWEVER, RIGHT? |
| 14:53 | 15 | **A.**   THAT'S CORRECT, SIR. |
| 14:53 | 16 | **Q.**   YOU AGREE, DO YOU NOT, DR. BEA, THAT FOR A GIVEN VALUE OF |
| 14:53 | 17 | M SUB V AND PERMEABILITY, YOU CAN COMPUTE THE VALUE OF THE |
| 14:53 | 18 | COEFFICIENT OF COMPRESSIBILITY OR C SUB V USING A STANDARD |
| 14:53 | 19 | FORMULA FAMILIAR TO GEOTECHNICAL ENGINEERS; ISN'T THAT RIGHT? |
| 14:53 | 20 | **A.**   THAT'S CORRECT, SIR. |
| 14:53 | 21 | **Q.**   I'M -- YOU HAD THAT LONG ANSWER, AND I WISH I HAD REALTIME |
| 14:53 | 22 | SITTING RIGHT HERE.  I SHOULD HAVE BROUGHT IT UP HERE IF THAT |
| 14:53 | 23 | WAS POSSIBLE. |
| 14:53 | 24 | YOU SAID SOMETHING IN THE MIDDLE OF THAT LONG ANSWER |
| 14:53 | 25 | THAT -- |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:53 | 1 | **THE COURT:**  IF YOU WANT TO TAKE THE TIME TO LOOK AT |
| 14:53 | 2 | IT, YOU MAY IF YOU WANT TO -- IF YOU WANT TO DO THAT. |
| 14:54 | 3 | OUR EXCELLENT COURT REPORTER GOT IT CLOSE TO |
| 14:54 | 4 | CORRECT.  THAT'S AMAZING. |
| 14:54 | 5 | **MR. TREEBY:**  I'M GOING TO LET THEM TRY TO FIND IT AND |
| 14:54 | 6 | NOT WASTE THE COURT'S TIME, BUT WE WILL FIND IT AND COME BACK |
| 14:54 | 7 | TO IT. |
| 14:54 | 8 | **BY MR. TREEBY:** |
| 14:54 | 9 | **Q.**   I THINK WE CAN AGREE ON THIS:  THE SOLE PROPERTY USED BY |
| 14:54 | 10 | YOU IN COBOS-ROA'S COMPUTER ANALYSIS AS M SUB V WAS BEHAVING |
| 14:54 | 11 | FUNDAMENTALLY AS AN INCOMPRESSIBLE MATERIAL; IS THAT CORRECT? |
| 14:54 | 12 | **A.**   THAT'S CORRECT. |
| 14:54 | 13 | **Q.**   IN FACT, YOU SAID LIKE WATER BUT, IN FACT, MORE |
| 14:54 | 14 | INCOMPRESSIBLE EVEN THAN WATER; ISN'T THAT CORRECT?  BY AT |
| 14:54 | 15 | LEAST ONE ORDER OF MAGNITUDE? |
| 14:55 | 16 | **A.**   I'M NOT CERTAIN THAT THAT STATEMENT IS TRUE.  I KNOW THAT |
| 14:55 | 17 | THE, QUOTE, COMMON WISDOM WOULD PUT IT APPROXIMATELY AT 8 TIMES |
| 14:55 | 18 | 10 TO THE MINUS 9 PER POUNDS PER SQUARE FOOT.  AND WE IN FACT |
| 14:55 | 19 | INVESTIGATED THAT SPECIFIC VALUE AND ALSO THE 10 TO THE MINUS |
| 14:55 | 20 | 9.  THE 10 TO THE MINUS 9 VALUE GAVE US THE BEST AGREEMENT WITH |
| 14:55 | 21 | THE MEASURED PIEZOMETER RESULTS.  AND ON THAT BASIS, I CHOSE |
| 14:55 | 22 | 1 TIMES 10 TO THE MINUS 9. |
| 14:56 | 23 | THIS IS VERY IMPORTANT AND, IN FACT, IMPORTANT ENOUGH |
| 14:56 | 24 | TO BE PUT INTO THE INTRODUCTION OF THE SEEP/W MANUAL IN THE |
| 14:56 | 25 | INTRODUCTORY PART.  THEY CAUTION ENGINEERS NOT TO BECOME |

ROBERT G. BEA - CROSS

14:56  1  PREOCCUPIED WITH THE QUANTITY OF FLOW, BUT RATHER TO BECOME

14:56  2  PREOCCUPIED AT THE OUTSET WITH THE PRESSURES.

14:56  3         SO WE WERE IN FACT FOLLOWING THE GUIDELINES IN SEEP/W

14:56  4  INCLUDING PERFORMING THE NUMERICAL EXPERIMENTS TO COMPARE WITH

14:56  5  FIELD-TEST DATA APPROPRIATE FOR THE SITUATION WE WERE MODELING.

14:56  6  THAT CHOICE WAS NOT CASUAL, ACCIDENTAL, OR MEANT TO BE

14:57  7  SUBVERSION TO THE PHYSICS OF THE WORLD, BUT RATHER AN ATTEMPT

14:57  8  TO PERFORM HIGH-QUALITY FORENSIC ENGINEERING ANALYSES THAT HAD

14:57  9  BEEN APPROPRIATELY VALIDATED; CALIBRATED WITH APPROPRIATE

14:57  10 FIELD-TEST MEASUREMENTS.  WE ARE NOT TRYING TO SHAM ANYBODY OR

14:57  11 ANYTHING.

14:57  12 Q.   I WANT TO TALK A LITTLE BIT ABOUT THIS SELECTION OF

14:57  13 M SUB V.  YOU HAVE TALKED ABOUT IT A COUPLE TIMES ALREADY.

14:57  14         AT MR. COBOS-ROA'S DEPOSITION, HE DISCUSSED -- AND WE

14:57  15 QUIZZED HIM -- ACTUALLY, HE BROUGHT IT UP, AND THEN WE QUIZZED

14:57  16 HIM AT SOME LENGTH -- ON THE CIRCUMSTANCES BY WHICH 1 TIMES 10

14:57  17 TO THE MINUS 9, 1 OVER PSF M SUB V VALUE WAS SELECTED FOR YOUR

14:57  18 FLOW ANALYSES.

14:57  19         AND YOU HEARD HIS EXPLANATION AT HIS DEPOSITION,

14:57  20 RIGHT?

14:57  21 A.   I WAS THERE THE ENTIRE TIME.  I DON'T RECALL THE

14:58  22 EXPLANATION.

14:58  23 Q.   MR. COBOS-ROA TESTIFIED, AND I'M QUOTING:  THAT YOU,

14:58  24 QUOTE, ASKED HIM TO FIND A WAY HOW WE CAN MODEL THIS

14:58  25 INCOMPRESSIBLE RESPONSE OF THE SOILS IN SEEP/W.

**ROBERT G. BEA - CROSS**

14:58    1              DO YOU RECALL THAT?

14:58    2    **A.**   YES, SIR.

14:58    3    **Q.**   IN RESPONSE TO YOUR REQUEST, MR. COBOS-ROA SAID THAT HE,

14:58    4    QUOTE, LOOKED FOR A NUMBER THAT WAS REPRESENTATIVE OF THIS

14:58    5    CONDITION, CLOSE QUOTE, AND CAME BACK TO YOU AND SAID, QUOTE,

14:58    6    HEY, IF WE USE THIS VALUE OF 10 TO THE MINUS 9, IT SEEMS LIKE

14:58    7    WE GET THIS RESPONSE.

14:58    8              DO YOU RECALL THAT TO BE HIS TESTIMONY?

14:58    9    **A.**   YES.  AND THE RESPONSE HE WAS REFERRING TO WERE THOSE

14:58   10    PIEZOMETER MEASUREMENT RESPONSES.

14:58   11    **Q.**   MR. COBOS-ROA SAID YOU THEN ACCEPTED HIS 1 TIMES 10 TO THE

14:58   12    MINUS 9, 1 OVER PSF M SUB V VALUE, QUOTE, AND THAT'S WHY HE

14:58   13    WENT WITH THOSE VALUES.

14:58   14              DO YOU RECALL THAT?

14:58   15    **A.**   YES, SIR.

14:59   16    **Q.**   AND HE TESTIFIED CLEARLY THAT YOU, QUOTE, DID NOT TELL HIM

14:59   17    TO USE 10 TO THE MINUS 9; HOWEVER, YOU DID APPROVE THE USE OF

14:59   18    10 TO THE MINUS 9.

14:59   19              DO YOU RECALL THAT TESTIMONY?

14:59   20    **A.**   NO, I DON'T, BUT IT'S PERHAPS -- HOW TO PUT IT -- TELLING

14:59   21    SOMEONE APPROVING OR ARRIVING AT A DECISION ON WHAT IS AN

14:59   22    APPROPRIATE ACTION, TO ME, THOSE ARE PRETTY CLOSE TOGETHER.

14:59   23    IT'S JUST A PERSONALITY THING.  I DON'T LIKE TO TELL YOUNG

14:59   24    ENGINEERS, QUOTE, WHAT TO DO.  I WOULD RATHER LIBERATE IT WITH

14:59   25    THEM SO THEY LEAVE BETTER OFF AFTER THAT PROCESS THAN WHEN THEY

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 14:59 | 1 | CAME TO ME.  A GOOD PART OF MY RESPONSIBILITY IS EDUCATION, AND |
| 14:59 | 2 | EDUCATION DOES NOT COME FROM TELLING PEOPLE WHAT TO DO. |
| 15:00 | 3 | **Q.**   OKAY.  NOW, YOU KNOW THAT THE SEEP/W ANALYSES THAT |
| 15:00 | 4 | MR. COBOS-ROA RAN FOR YOU PRODUCED AS AN OUTPUT PORE PRESSURES |
| 15:00 | 5 | FOR THE VARIOUS CROSS SECTIONS IN YOUR REPORTS, CORRECT? |
| 15:00 | 6 | **A.**   YES, SIR. |
| 15:00 | 7 | **Q.**   THOSE PORE PRESSURES THAT WERE RECEIVED AS OUTPUTS FROM |
| 15:00 | 8 | THE SEEP/W RUNS WERE AN IMPORTANT INPUT TO YOUR STABILITY |
| 15:00 | 9 | ANALYSES, ALSO RUN BY COBOS-ROA, COMPUTED USING SLOPE/W FOR |
| 15:00 | 10 | EACH OF THE CROSS SECTION CASES IN YOUR REPORTS; ISN'T THAT |
| 15:00 | 11 | CORRECT? |
| 15:00 | 12 | **A.**   THAT'S CORRECT. |
| 15:00 | 13 | **Q.**   IN OTHER WORDS, IF YOU HAD USED A HIGHER M SUB V, IN OTHER |
| 15:00 | 14 | WORDS, A MORE COMPRESSIBLE MATERIAL PROPERTY? |
| 15:01 | 15 | **A.**   I SEE THAT.  I THINK YOU MEANT LOWER? |
| 15:01 | 16 | **THE COURT:**  LOWER.  I THINK YOU MEANT, LIKE, 10 TO |
| 15:01 | 17 | THE MINUS 9, AS AN EXAMPLE, IS HIGH; AND YOU'RE TALKING ABOUT |
| 15:01 | 18 | MAKING IT LOWER, LIKE 10 TO THE MINUS 5? |
| 15:01 | 19 | **MR. TREEBY:**  LESS COMPRESSIBLE.  THAT IS CONFUSING TO |
| 15:01 | 20 | ME.  IT HAS BEEN IN THE PAST.  I GET IT RIGHT SOMETIMES. |
| 15:01 | 21 | **THE COURT:**  10 TO THE MINUS 4 WOULD BE LESS |
| 15:01 | 22 | COMPRESSIBLE THAN 10 TO THE MINUS 9, WHICH IS -- |
| 15:01 | 23 | **MR. TREEBY:**  NO, NO, NO. |
| 15:01 | 24 | **THE COURT:**  I'M WRONG? |
| 15:01 | 25 | **THE WITNESS:**  THAT'S A FLIP THAT'S GOING ON. |

ROBERT G. BEA - CROSS

15:01   1          **MR. TREEBY:**  10 TO THE MINUS 9, AS YOU SAID BEFORE,

15:01   2   IS LIKE CONCRETE.

15:01   3          **THE COURT:**  THAT'S WHAT I WAS THINKING.

15:01   4          **THE WITNESS:**  CORRECT.

15:01   5   **BY MR. TREEBY:**

15:01   6   **Q.**   10 TO THE MINUS 9.

15:01   7          **THE COURT:**  THAT'S NOT VERY COMPRESSIBLE; IS THAT

15:01   8   CORRECT?

15:01   9          **MR. TREEBY:**  YES.  IT'S HIGHLY INCOMPRESSIBLE.

15:01  10          **THE COURT:**  THAT'S EXACTLY WHAT I'M THINKING.

15:01  11   **BY MR. TREEBY:**

15:01  12   **Q.**   10 TO THE MINUS 5, ON THE OTHER HAND, IS LIKE AN ORGANIC

15:01  13   CLAY.  IT'S MORE COMPRESSIBLE, RIGHT?

15:01  14   **A.**   A SPONGE IN A KITCHEN SINK.

15:01  15          **THE COURT:**  THAT WAS MY UNDERSTANDING.

15:01  16          **MR. TREEBY:**  IT'S ACTUALLY A HIGHER NUMBER, THOUGH,

15:02  17   I'VE LEARNED, I THINK.  THE NUMBER IS HIGHER BECAUSE YOU ARE

15:02  18   GOING CLOSER BACK TO ZERO.  YOU ARE AT MINUS, AND YOU'RE GOING

15:02  19   BACK TO ZERO.

15:02  20          AM I RIGHT?

15:02  21          **THE COURT:**  I UNDERSTAND.  I MEANT HIGHER

15:02  22   COMPRESSIBILITY.

15:02  23   **BY MR. TREEBY:**

15:02  24   **Q.**   IF YOU HAD USED AN M SUB V IN MR. COBOS-ROA'S SEEP/W RUNS

15:02  25   OF THE SITE-SPECIFIC M SUB V DETERMINED BY ROGERS AND POPE --

**ROBERT G. BEA - CROSS**

15:02    1   1 TIMES 10 TO THE MINUS 5, 1 OVER PSF -- THE PORE PRESSURES

15:02    2   PRODUCED AS OUTPUTS FROM SEEP/W WOULD HAVE BEEN LOWER DURING

15:02    3   THE ELAPSED TIME FOR THE KATRINA STORM SURGE; ISN'T THAT

15:02    4   CORRECT?

15:02    5   **A.**   THAT IS CORRECT.  I DID NOT RUN THOSE SPECIFIC ANALYSES,

15:02    6   BUT DR. SILVA-TULLA DID, AND IN HIS EXPERT REPORT COMMENTS ON

15:03    7   THE DIFFERENCES THAT HE FOUND IN THE CRITICAL PORE PRESSURES ON

15:03    8   THE PROTECTED SIDE.  HE DID NOT PROVIDE SUFFICIENT DETAILS, ANY

15:03    9   DETAILS, ON CITING THE SIGNIFICANT DIFFERENCE.

15:03   10           WHEN I READ THAT, I SAID THAT MADE SENSE.  THAT'S

15:03   11   EXACTLY WHAT WE HAD FOUND EARLIER.

15:03   12   **Q.**   WE'LL COME BACK ABOUT WHETHER YOU FOUND THAT, BUT I WANT

15:03   13   TO GO ON TRYING TO KEEP COHERENCE IN MY LINE OF QUESTIONING.

15:03   14   **A.**   THANK YOU.

15:03   15   **Q.**   IF, IN FACT, MR. COBOS-ROA HAD USED THE M SUB V VALUE

15:03   16   DERIVED FROM THE PLAINTIFFS' PUMPING TESTS -- 2 TIMES 10 TO THE

15:03   17   MINUS 5, 1 OVER PSF -- YOUR SEEP/W FLOW ANALYSES WOULD NOT HAVE

15:03   18   RESULTED IN UPLIFT PRESSURES THAT INDICATE ANY DANGER TO THE

15:03   19   FLOODWALL; ISN'T THAT RIGHT?

15:03   20   **A.**   WELL, IT -- ISN'T THAT RIGHT?

15:04   21   **Q.**   ISN'T IT CORRECT?

15:04   22   **A.**   NO, I DON'T THINK IT'S CORRECT.  AND I'M STRUGGLING HERE

15:04   23   BECAUSE IF WE USED THAT VALUE, WE COULD NOT REPLICATE THE

15:04   24   PIEZOMETER MEASUREMENTS THAT WERE ALSO MADE AT THE LOWER NINTH

15:04   25   WARD.

ROBERT G. BEA - CROSS

15:04    1              SO THE GUIDING LIGHT IN THIS HAS NOT BEEN PUMPING

15:04    2    TEST RESULT DONE UNDER CONDITIONS THAT DON'T SIMULATE WHAT WE

15:04    3    ARE ATTEMPTING TO ANALYZE, AND CONSEQUENTLY THE DECISION WAS TO

15:04    4    USE INCOMPRESSIBLE CONDITIONS CHARACTERISTIC OF DARCY'S LAW AS

15:04    5    YOU CITED; AND IT WAS, AGAIN, BECAUSE OF THE FIELD PIEZOMETER

15:05    6    TEST.

15:05    7              SO ADOPTING AN INCORRECT M SUB V INTO THE ANALYSIS

15:05    8    BECAUSE IT COMES FROM A FIELD PUMP TEST IS IN CONFLICT WITH

15:05    9    REPLICATING WHAT IS MEASURED IN THE FIELD UNDER APPROPRIATE

15:05   10    CONDITIONS.

15:05   11    Q.   ARE YOU FINISHED?

15:05   12    A.   I'M PROBABLY MORE THAN FINISHED.

15:05   13    Q.   YOU SAID IT WASN'T CORRECT.

15:05   14              MY STATEMENT THAT IF, IN FACT, HE USED AN M SUB V

15:05   15    VALUE DERIVED FROM THE PLAINTIFFS' PUMPING TEST -- 2 TIMES 10

15:05   16    TO THE MINUS 5 -- YOUR SEEP FLOW ANALYSES WOULD NOT HAVE

15:05   17    RESULTED IN UPLIFT PRESSURES THAT INDICATED ANY DANGER IN THE

15:05   18    FLOODWAY.  YOU SAID THAT'S NOT CORRECT.  THAT WAS YOUR ANSWER.

15:05   19              HERE'S WHAT YOUR ANSWER WAS AT YOUR DEPOSITION

15:05   20    APRIL 16, 2012, PAGE 30, LINES 11 THROUGH 23:

15:05   21              "QUESTION:  SO IF THAT IS THE CORRECT ASSUMPTION FOR

15:05   22         M SUB V FOR THE SITE-SPECIFIC MATERIALS AT THE EBIA SOUTH

15:05   23         PUMP SITE -- IF THAT WAS THE CORRECT ASSUMPTION -- I'M

15:06   24         ASKING YOU -- THE FLOW ANALYSES USING SEEP/W WOULD NOT

15:06   25         RESULT IN UPLIFT PRESSURES THAT INDICATE ANY DANGER TO THE

ROBERT G. BEA - CROSS

| | |
|---|---|
| 15:06 | 1 |
| 15:06 | 2 |
| 15:06 | 3 |
| 15:06 | 4 |
| 15:06 | 5 |
| 15:06 | 6 |
| 15:06 | 7 |
| 15:06 | 8 |
| 15:06 | 9 |
| 15:06 | 10 |
| 15:06 | 11 |
| 15:06 | 12 |
| 15:06 | 13 |
| 15:06 | 14 |
| 15:06 | 15 |
| 15:06 | 16 |
| 15:07 | 17 |
| 15:07 | 18 |
| 15:07 | 19 |
| 15:07 | 20 |
| 15:07 | 21 |
| 15:07 | 22 |
| 15:07 | 23 |
| 15:07 | 24 |
| 15:07 | 25 |

1    FLOODWALL; ISN'T THAT RIGHT?

2         "ANSWER:  THAT'S CORRECT."

3         NOW YOU SAY IT'S INCORRECT.  THEN YOU SAID IT WAS

4  CORRECT.

5  A.   NO, THAT'S NOT WHAT I'M TRYING TO BRING WITH THAT WORD

6  *CORRECT*, SIR, AND HENCE AN EXPLANATION.

7         THE COURT:  JUST SO THE COURT CAN UNDERSTAND THIS --

8  AND I'M NOT SURE WHO IS GOING TO CORRECT ME, MR. TREEBY OR

9  DR. BEA -- IS THAT IF WE USE THE VALUE 10 TO THE MINUS 5 -- AND

10  I'M USING SHORTHAND -- THE RESULT WOULD BE THAT THE UPLIFT

11  PRESSURES, ET CETERA, WERE NOT SUFFICIENT TO ENDANGER THE

12  FLOODWALL.

13         MR. TREEBY:  THAT'S RIGHT.

14         THE COURT:  BUT DR. BEA, AS I UNDERSTAND HIS

15  TESTIMONY, HE STATES THAT THE PREMISE THAT IS INCORRECT IS THAT

16  USING THE PUMP STATION -- EXCUSE ME, THE PUMP TEST RATHER THAN

17  THE PIEZOMETERS AT THE 17TH STREET CANAL MAKES THE DIFFERENCE.

18  AND THAT'S WHY HE USED 10 TO THE MINUS 9.

19         I THINK THAT'S THE BOTTOM LINE OF THE TESTIMONY.

20         MR. TREEBY:  I THINK THAT'S WHAT HE IS SAYING, AND WE

21  WILL DEAL WITH THAT.

22         BUT WHEN HE SAYS -- I HAVE JUST ASKED HIM THE

23  SAME QUESTION -- AND NOW HE SAYS IT'S INCORRECT, AND HE SAID IT

24  WAS CORRECT AT HIS DEPOSITION.  I HAVE TO BRING THAT OUT.

25         THE COURT:  I UNDERSTAND.  I'M JUST DISTILLING IT TO

ROBERT G. BEA - CROSS

15:07  1  WHAT I THINK THE FINAL ANALYSIS IS OF WHERE WE ARE RIGHT NOW.

15:07  2  BY MR. TREEBY:

15:07  3  Q.   DR. BEA, YOU AREN'T AWARE OF ANY FIELD OBSERVATION BY

15:07  4  ANYONE DURING THE FUGRO INVESTIGATION AT THE EBIA THAT

15:07  5  CORROBORATES YOUR INSTANTANEOUS PRESSURE COMMUNICATION THEORY,

15:07  6  ARE YOU?

15:07  7  A.   I'M NOT AWARE OF ANY.  THAT'S CORRECT.

15:07  8  Q.   DR. BEA, FOR THE FIRST TIME --

15:07  9  A.   I'M SORRY, SIR.  IT'S BECAUSE I WOULD LIKE THE TRANSCRIPT

15:08  10  OF THE TESTIMONY TO BE USEFUL, CLEAR.

15:08  11       WE ARE ATTEMPTING TO MODEL A VERY COMPLEX PROCESS IN

15:08  12  THE REAL WORLD.  OUR ANALYTICAL MODELS, BOTH METAL AND

15:08  13  THEORETICAL, HAVE SIGNIFICANT LIMITATIONS.  CONSEQUENTLY, IT'S

15:08  14  IMPORTANT TO BE EXTREMELY JUDICIOUS ABOUT WHAT YOU CHOOSE TO

15:08  15  ACCEPT OR REJECT.

15:08  16       ALL I'M ATTEMPTING TO DO IS TO BE JUDICIOUS; MAKE

15:08  17  SURE I CAN EXPLAIN TO PEOPLE WHY THAT CHOICE OR CHOICES WERE

15:09  18  MADE.

15:09  19       I'M NOT ATTEMPTING TO ARRIVE AT A PRECONCEIVED

15:09  20  RESULT.  THAT'S ALL I AM STRUGGLING TO COMMUNICATE.

15:09  21  Q.   NOW, DR. BEA, FOR THE FIRST TIME AFTER MR. COBOS-ROA'S

15:09  22  DEPOSITION, YOU TESTIFIED THAT YOU BASED YOUR 1 TIMES 10 TO THE

15:09  23  MINUS 9, 1 OVER PSF M SUB V VALUE, QUOTE -- AND I'M QUOTING

15:09  24  YOU -- NOT ON STORAGE COEFFICIENT, CLOSED QUOTE, AS

15:09  25  MR. COBOS-ROA EXPLAINED, BUT RATHER ON THE DILATATIONAL WAVE

ROBERT G. BEA - CROSS

15:09   1   VELOCITY THAT IS SENSITIVE TO THE WATER COMPRESSIBILITY.

15:09   2        AM I CORRECT IN THAT STATEMENT?

15:09   3   **A.**   THE CONTEXT IS THAT THERE ARE TWO M SUB VS.  ONE M SUB V

15:09   4   IS DOMINATED BY THE COMPRESSIBILITY OF THE SOIL SKELETON.  THE

15:10   5   OTHER M SUB V IS DOMINATED BY THE COMPRESSIBILITY OF THE FLUID.

15:10   6        AND WHAT I WAS EXPRESSING IS THAT THE DILATATIONAL

15:10   7   VELOCITY, PROPAGATION OF ENERGY WAVE THROUGH THE SOIL WATER

15:10   8   SYSTEM, BETTER REFLECTS THE COMPRESSIBILITY THAN THE OTHER

15:10   9   M SUB V.

15:10   10  **Q.**   WE ARE GOING TO GET THERE.  I CAN ONLY DO IT ONE QUESTION

15:10   11  AT A TIME.

15:10   12       MR. COBOS-ROA DID NOT MENTION IN HIS DEPOSITION

15:10   13  DILATATIONAL WAVE VELOCITY, DID HE?

15:10   14  **A.**   NO, HE DID NOT.

15:10   15  **Q.**   PRIOR TO YOUR APRIL 16, 2012, REBUTTAL DEPOSITION, YOU HAD

15:10   16  NEVER MENTIONED DILATATIONAL WAVE VELOCITY IN ANYTHING WRITTEN

15:10   17  OR SPOKEN RELATED TO THE KATRINA BREACHES; ISN'T THAT TRUE?

15:10   18  **A.**   MY MEMORY IS NOT THAT GOOD, BUT I THINK YOU'RE PROBABLY

15:11   19  CORRECT.

15:11   20  **Q.**   YOU DIDN'T MENTION IT IN YOUR EXPERT REPORTS PREVIOUSLY,

15:11   21  RIGHT?

15:11   22  **A.**   YOU'RE REFERRING TO THE *ROBINSON* 17TH STREET CANAL, THOSE

15:11   23  PREVIOUS REPORTS?

15:11   24  **Q.**   I'M REFERRING TO ALL PREVIOUS REPORTS INCLUDING YOUR

15:11   25  FEBRUARY 1 REPORT IN THIS CASE.

ROBERT G. BEA - CROSS

15:11   1   **A.**   THAT'S CORRECT.

15:11   2   **Q.**   YOU DIDN'T MENTION DILATATIONAL WAVE VELOCITY DURING YOUR

15:11   3   INITIAL TWO-DAY DEPOSITION MARCH 27 AND 28 DESPITE BEING ASKED

15:11   4   SEVERAL QUESTIONS ABOUT THE ACTUAL COMPRESSIBILITIES FOR THESE

15:11   5   EBIA SOILS VERSUS YOUR HYPOTHETICAL COMPRESSIBILITY; ISN'T THAT

15:11   6   TRUE?

15:11   7   **A.**   I DON'T RECALL.

15:11   8   **Q.**   LET'S TALK A FEW MINUTES ABOUT DILATATIONAL WAVE VELOCITY

15:11   9   BECAUSE YOU BROUGHT IT UP, AND WE HAVE TO DEAL WITH IT.

15:11   10          YOU AGREED WITH ME AT THE AUGUST 10 DEPOSITION THAT

15:11   11   WAS PRECIPITATED, ACTUALLY, BY THAT SUBJECT, THAT P-WAVE, THE

15:12   12   LETTER P, DASH, WAVE VELOCITY IS A TERM COMMONLY USED TO REFER

15:12   13   TO DILATATIONAL WAVE VELOCITY; ISN'T THAT RIGHT?

15:12   14   **A.**   YES, SIR.

15:12   15   **Q.**   P-WAVE VELOCITY IS ANOTHER WAY TO SAY THE SAME THING:

15:12   16   DILATATIONAL WAVE VELOCITY, RIGHT?

15:12   17   **A.**   CORRECT.

15:12   18   **Q.**   WHEN YOU MEASURE THE P-WAVE -- FOR THE COURT'S BENEFIT,

15:12   19   THE ONLY REASON I'M CHANGING TERMS ON YOU IS IT'S EASIER FOR ME

15:12   20   TO SAY P-WAVE.

15:12   21          **THE COURT:**  ANYTHING THAT'S EASIER, I WILL CERTAINLY

15:12   22   ACCEPT.

15:12   23   **BY MR. TREEBY:**

15:12   24   **Q.**   WHEN YOU MEASURE THE P-WAVE VELOCITY IN SATURATED CLAYS,

15:12   25   SUCH AS THE CLAYS AT THE EAST BANK INDUSTRIAL AREA, THE

ROBERT G. BEA - CROSS

15:12   1    MEASUREMENT REFLECTS MOSTLY THE P-WAVE VELOCITY IN WATER,

15:12   2    CORRECT?

15:12   3    **A.**   CORRECT.

15:12   4    **Q.**   ANY M SUB V VALUE DETERMINED FROM SUCH P-WAVE VELOCITY

15:12   5    MEASURES WOULD OR SHOULD CORRESPOND, THEN, TO THE

15:12   6    COMPRESSIBILITY OF WATER; ISN'T THAT RIGHT?

15:12   7    **A.**   THAT'S CORRECT.

15:12   8    **Q.**   YOU HAVE TESTIFIED THAT THE DILATATIONAL WAVE VELOCITY

15:13   9    ASSOCIATED WITH THE EAST BANK INDUSTRIAL AREA SWAMP MARSH

15:13   10   DEPOSITS IS APPROXIMATELY 5,055 FEET PER SECOND, CORRECT?

15:13   11   **A.**   THAT'S MY ESTIMATE.  THE ESTIMATE IS BASED ON MY

15:13   12   EXPERIENCE ASSOCIATED WITH P-WAVE PROPAGATION IN GEOPHYSICS FOR

15:13   13   OFFSHORE APPLICATIONS.  IT'S VERY IMPORTANT IN EXPLORING FOR

15:13   14   OIL AND IS ALSO A VERY IMPORTANT PARAMETER IN THE PROPAGATION

15:13   15   OF EARTHQUAKE WAVES IN SOIL.

15:13   16   **Q.**   I'M GOING TO PUT UP ON THE SCREEN DX-02685, PAGES 0001 AND

15:13   17   0002, WHICH IS A CALCULATION THAT I BELIEVE YOU AGREED WITH

15:13   18   AUGUST 10 --

15:13   19          **THE COURT:**  CAN YOU SWITCH THAT, DX --

15:14   20          **MR. TREEBY:**  LET'S TAKE IT ONE AT A TIME.  TAKE 0001

15:14   21   FIRST AND BLOW IT UP.

15:14   22   **BY MR. TREEBY:**

15:14   23   **Q.**   DO YOU RECALL SEEING THIS AT YOUR DEPOSITION?

15:14   24   **A.**   YES, SIR.

15:14   25   **Q.**   I BELIEVE YOU AGREED THAT YOUR 1 TIMES 10 TO THE MINUS 9,

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 15:14 | 1 | 1 OVER PSF M SUB V VALUE ACTUALLY CORRESPONDS TO A P-WAVE |
| 15:14 | 2 | VELOCITY OF APPROXIMATELY 20,530 FEET PER SECOND, ASSUMING A |
| 15:14 | 3 | 76.4 AVERAGE UNIT WEIGHT FOR THE ORGANIC CLAYS; IS THAT |
| 15:14 | 4 | CORRECT? |
| 15:14 | 5 | **A.**   THAT'S CORRECT. |
| 15:14 | 6 | **Q.**   AND A P-WAVE VELOCITY OF 20,530 FEET PER SECOND IS ABOUT |
| 15:14 | 7 | FOUR TIMES THE VALUE OF 5,055 FEET PER SECOND THAT YOU SAID YOU |
| 15:14 | 8 | USED BASED ON YOUR M SUB V OF 1 TIMES 10 TO THE MINUS 9 AND |
| 15:15 | 9 | 1 OVER PSF; ISN'T THAT CORRECT? |
| 15:15 | 10 | **A.**   THAT IS CORRECT. |
| 15:15 | 11 | **Q.**   THAT GETS ME BACK, BECAUSE P-WAVE VELOCITY IS JUST THE |
| 15:15 | 12 | INVERSE, IS IT NOT, OF M SUB V -- OF THE M SUB V THAT WAS SITE |
| 15:15 | 13 | SPECIFIC, THE KIND OF M SUB V THAT WAS SITE SPECIFIC? |
| 15:15 | 14 | **A.**   CORRECT. |
| 15:15 | 15 | **Q.**   SO THAT'S WHY I WAS ASKING YOU EARLIER:  ARE YOU SURE THAT |
| 15:15 | 16 | THE M SUB V OF WATER IS EQUIVALENT TO 1 TIMES 10 TO THE |
| 15:15 | 17 | MINUS 9?  IT DOESN'T MAKE SENSE MATHEMATICALLY TO THIS SIMPLE |
| 15:15 | 18 | ALGEBRA STUDENT IN HIGH SCHOOL.  I MIGHT HAVE TAKEN A COUPLE |
| 15:15 | 19 | HOURS IN COLLEGE. |
| 15:15 | 20 | **A.**   I THINK THE REASON FOR YOUR CONFUSION IS THE TWO OF US ARE |
| 15:15 | 21 | APPROACHING WHAT M SUB V SHOULD BE VERY DIFFERENTLY.  YOU'RE |
| 15:15 | 22 | APPROACHING IT THROUGH, IN THIS EXAMPLE, A THEORETICAL WAVE |
| 15:16 | 23 | MECHANICS CONCERNING PROPAGATION OF COMPRESSIVE WAVES IN A |
| 15:16 | 24 | FLUID SOIL MEDIUM.  I'M NOT NEARLY THAT SOPHISTICATED.  I'M |
| 15:16 | 25 | JUST KIND OF A DUMB FARM BOY FROM MINERAL WELLS, TEXAS. |

ROBERT G. BEA - CROSS

15:16   1          I TAKE THE FIELD PIEZOMETER MEASUREMENTS UNDER

15:16   2   HIGH-WATER CONDITIONS WITH A PIEZOMETER EMBEDDED IN THE MEDIUM

15:16   3   I'M CONCERNED WITH.  I TAKE MY ANALYTICAL MODEL, DO THE

15:16   4   NUMERICAL EXPERIMENTS AS, IN FACT, SUGGESTED -- INSTRUCTED BY

15:16   5   THE SEEP/W MANUAL SO THAT I CAN REPLICATE THAT MEASUREMENT.

15:16   6          NOW, AT THAT POINT, YOU HAVE TO EXPLAIN THE PHYSICAL

15:16   7   BASIS FOR THOSE PARAMETERS.  THE CLOSEST ONE COMES TO BE THE

15:16   8   COMPRESSIONAL DILATATIONAL WAVE PROPAGATION IN A THEORETICAL

15:17   9   SOIL WATER MEDIUM.

15:17   10         NOW, YOU SHOWED ME A TABLE LATER IN MY DEPOSITION

15:17   11  WHERE THE PROPAGATION VELOCITIES WERE MUCH HIGHER THAN

15:17   12  5,055 FEET PER SECOND.

15:17   13  Q.   THIS CALCULATION FROM YOUR 1 TIMES 10 TO THE MINUS 9

15:17   14  M SUB V INVERTED.

15:17   15  A.   YOU SHOWED VALUES THAT WERE MUCH HIGHER THAN THAT AND

15:17   16  DRIVE YOU TOWARD THOSE HIGH VELOCITIES.

15:17   17  Q.   MY ONLY POINT THAT I'M TRYING TO GET YOU TO AGREE WITH ME,

15:17   18  IF WE CAN AGREE -- IF WE CAN'T, WE CAN'T -- IS THAT IT'S

15:17   19  INCORRECT TO SAY 1 TIMES 10 TO THE MINUS 9, 1 OVER PSF IS THE

15:17   20  SAME COMPRESSIBILITY AS WATER; ISN'T THAT TRUE?

15:17   21  A.   THAT'S TRUE.

15:18   22  Q.   THANK YOU.

15:18   23         NOW -- AND BY THE WAY, JUST AS AN ASIDE, I COME FROM

15:18   24  WEST TEXAS.  I'VE BEEN TO MINERAL WELLS, AND THERE ARE A LOT OF

15:18   25  CLEVER PEOPLE IN MINERAL WELLS.

**ROBERT G. BEA - CROSS**

15:18   1   **A.**   MY FATHER WAS ONE OF THEM.   MY MOTHER WAS EVEN MORE

15:18   2   CLEVER.

15:18   3   **Q.**   IN FACT, IT'S YOUR POSITION THAT FULLY SATURATED CLAYS IN

15:18   4   OFFSHORE LOCATIONS, SUCH AS THE GULF OF MEXICO SEABED AND THE

15:18   5   CONGO AND NIGER RIVER DELTAS, HAVE M SUB V VALUE OF 1 TIMES

15:18   6   10 TO THE MINUS 9, 1 OVER PSF.

15:18   7           IS THAT RIGHT?

15:18   8   **A.**   NO, NOT REALLY.   WHAT I'M CONVEYING THERE IS WHAT'S

15:18   9   CONTROLLING THE PROCESSES IS COMPRESSIBILITY OF WATER, NOT

15:18   10   COMPRESSIBILITY OF THE TRADITIONAL ONSHORE SOIL VIEW OF THE

15:18   11   WORLD.   THE BEST WAY --

15:19   12   **Q.**   I DON'T WANT TO BELABOR THIS POINT, BUT DIDN'T YOU SAY

15:19   13   THAT IN YOUR DEPOSITION?

15:19   14   **A.**   I DON'T REMEMBER THAT.   PLEASE REPEAT IT.

15:19   15           **MR. TREEBY:**   LET'S JUST PULL IT UP.   I THINK THAT'S

15:19   16   THE EASIEST WAY.

15:19   17   **BY MR. TREEBY:**

15:19   18   **Q.**   PAGE -- ON YOUR APRIL 16 DEPOSITION, PAGE 226, LINE 25,

15:19   19   GOING TO 227, LINE 22, THE BOTTOM LINE SAYS:

15:19   20           **"QUESTION:**   DO YOU KNOW OF ANY OTHER SOILS ANYWHERE

15:19   21       IN THE WORLD THAT HAVE AN M SUB V VALUE OF 10 TO THE MINUS

15:19   22       9?

15:19   23           **"ANSWER:**   UH-HUH.

15:19   24           **"QUESTION:**   WOULD YOU JUST PLEASE TELL US WHAT THOSE

15:19   25       ARE AND WHERE THOSE ARE.

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

15:19   1        "**ANSWER:**  SURE.  GO DOWN HERE TO THE MOUTH OF THE
15:19   2   RIVER TO THE EAST BAY AREA.  YOU'LL FIND SUCH MATERIALS.  THAT,
15:19   3   I THINK, IS PROBABLY A TYPO.  GO TO THE WEST DELTA BLOCK 114.
15:19   4   YOU'LL FIND SOME.
15:20   5        "**QUESTION:**  EXCUSE ME.  WAIT A MINUTE.  I NEED TO
15:20   6      KNOW WHERE THEY ARE.
15:20   7        "**ANSWER:**  THEY'RE CLAYS.
15:20   8        "**QUESTION:**  CLAYS.
15:20   9        "**ANSWER:**  WATER-SATURATED CLAYS.  WE COULD GO TO
15:20  10      COMPARABLE MATERIALS IN THE NIGER RIVER DELTA.  WE CAN GO
15:20  11      TO COMPARABLE MATERIALS IN THE CONGO DELTA.  THERE'S A
15:20  12      WIDE VARIETY OF LOCATIONS IN THE OFFSHORE WORLD IN WHICH
15:20  13      THESE INCOMPRESSIBLE BEHAVIOR MATERIALS EXIST AND HAVE
15:20  14      EXISTED AND HAVE BEEN ANALYZED FOR MANY YEARS."
15:20  15        YOU DON'T DISAGREE WITH THOSE.  YOU WERE JUST
15:20  16   APPROXIMATING; IS THAT RIGHT?
15:20  17   **A.**   THE ANSWER IS CORRECT, AND THE KEY WORDS ARE
15:20  18   *INCOMPRESSIBLE*.  THAT CAN BE ZERO, AND IT CAN BE 10 TO THE
15:20  19   MINUS 9.  IT CAN BE 10 TO THE MINUS 8.  IT CAN'T BE 10 TO THE
15:20  20   MINUS 5.
15:20  21   **Q.**   IT'S NOT 10 TO THE MINUS 9.  IN FACT, THAT WAS WHERE I WAS
15:20  22   HEADED.
15:20  23        YOU AGREED WITH ME IN YOUR DEPOSITION THAT WATER --
15:20  24   WATER, PURE WATER -- NOT PURE WATER, SALT WATER -- ACTUALLY
15:20  25   WOULD BE 2 TIMES 4 TIMES 10 TO THE MINUS 8, 1 OVER PSF, AN

ROBERT G. BEA - CROSS

15:21    1    ORDER OF MAGNITUDE DIFFERENT THAN WHAT YOU USED IN THE SEEP/W

15:21    2    PROGRAM, RIGHT?

15:21    3    **A.**    CORRECT.

15:21    4    **Q.**    YOU AGREED WITH ME THAT THE M SUB V THAT YOU USED DOESN'T

15:21    5    CORRESPOND TO THE M SUB V OF THE SOIL SKELETON OR FRAME AT THE

15:21    6    EAST BANK INDUSTRIAL AREA; ISN'T THAT TRUE?

15:21    7    **A.**    THAT'S TRUE.

15:21    8    **Q.**    YOU AGREED THAT THE M SUB V VALUE THAT YOU USED DOESN'T

15:21    9    CORRESPOND TO THE M SUB V VALUE OF THE SOIL GRAINS IN THAT SOIL

15:21   10    SKELETON OR FRAME; ISN'T THAT TRUE?

15:21   11    **A.**    I THINK THAT'S TRUE.

15:21   12    **Q.**    I'M NOT GOING TO GO THERE.  I THINK WE MADE THE POINT.  I

15:21   13    WILL SKIP ON DOWN.

15:21   14         NOW, WE HAVE HEARD THE EARLIER EXPLANATIONS FOR YOUR

15:22   15    USE OF THIS M SUB V THAT MR. COBOS-ROA SAID HE DIDN'T KNOW OF

15:22   16    ANY SOIL ANYWHERE IN THE UNIVERSE THAT HAD THAT M SUB V VALUE;

15:22   17    IT WAS THAT INCOMPRESSIBLE.

15:22   18         WE HAVE HEARD THE OTHER EXPLANATIONS FOR IT.  YOUR

15:22   19    MOST RECENT EXPLANATION FOR THAT M SUB V WAS THE ONE THAT YOU

15:22   20    HAVE SAID A COUPLE TIMES HERE THAT CAME FROM THE 17TH STREET

15:22   21    CANAL PIEZOMETERS, RIGHT?

15:22   22    **A.**    CORRECT.

15:22   23    **Q.**    WE ARE GOING TO TRY TO GET A DEFINITION OF WHICH SPECIFIC

15:22   24    PIEZOMETERS YOU SAY PRODUCED THIS.

15:22   25         IN YOUR DEPOSITION JUST LAST MONTH, AUGUST 10, YOU

**ROBERT G. BEA - CROSS**

| | |
|---|---|
| 15:22 | 1 |
| 15:22 | 2 |
| 15:22 | 3 |

15:22  1   TESTIFIED THAT YOU, NOT COBOS-ROA, CHOSE THE 1 TIMES 10 TO THE

15:22  2   MINUS 9, 1 OVER PSF M SUB V MEASUREMENT FOR THE SEEP ANALYSES;

15:22  3   ISN'T THAT RIGHT?

15:22  4   A.   THAT'S CORRECT.  I TAKE FULL RESPONSIBILITY FOR THE INPUTS

15:22  5   AND, CONSEQUENTLY, THE OUTPUTS USED IN THIS WORK.

15:23  6   Q.   THIS IS DESPITE MR. COBOS-ROA'S PRIOR TESTIMONY THAT HE

15:23  7   DECIDED TO USE IT AFTER A REQUEST BY YOU TO TRY TO REACH A

15:23  8   CERTAIN RESULT, CAPTURE AN INCOMPRESSIBLE RESPONSE IN THE

15:23  9   ORGANIC CLAY, AND THAT YOU THEN APPROVED IT.

15:23  10          TO ME, THOSE AREN'T COMPATIBLE.  ARE THEY TO YOU?

15:23  11  A.   YES.

15:23  12  Q.   OKAY.  YOU TESTIFIED AUGUST 10 THAT YOU BASED YOUR CHOICE

15:23  13  OF 1 TIMES 10 TO THE MINUS 9, 1 OVER PSF M SUB V ON PIEZOMETER

15:23  14  MEASUREMENTS TAKEN FROM THE 17TH STREET CANAL BREACH LOCATION,

15:23  15  CORRECT?

15:23  16  A.   THAT'S ONE OF THE SOURCES.

15:23  17  Q.   YOU TESTIFIED THAT IT WAS WHEN YOU SAW THE MEASUREMENTS

15:23  18  FROM THE 17TH STREET CANAL PIEZOMETERS THAT YOU DECIDED -- AND

15:23  19  I'M QUOTING YOU -- OUR ANALYTICAL MODELS FOR THE EBIA BREACHES

15:23  20  NEED TO BE ABLE TO REPLICATE THIS BEHAVIOR.

15:23  21          ISN'T THAT RIGHT?

15:23  22  A.   THAT'S CORRECT.

15:23  23  Q.   IT WAS BASED ON THOSE 17TH STREET CANAL PIEZOMETER

15:24  24  MEASUREMENTS TAKEN IN THOSE 17TH STREET CANAL SOILS THAT YOU

15:24  25  SAID CAUSED YOU TO DETERMINE THAT M SUB V BETWEEN 10 TO THE

ROBERT G. BEA - CROSS

15:24  1  MINUS 8 AND 10 TO THE MINUS 9 WOULD PRODUCE AN APPROPRIATE

15:24  2  PRESSURE RESPONSE IN THE EBIA MATERIALS; ISN'T THAT RIGHT?

15:24  3  A.   THAT'S CORRECT.

15:24  4  Q.   YOU NOW CLAIM AS OF YOUR AUGUST 10 DEPOSITION FOR THE

15:24  5  FIRST TIME THAT IN 2008, IN 2009 THIS -- YOU NOW CLAIM IN YOUR

15:24  6  DEPOSITION THAT FOR THE -- YOU ASKED MR. COBOS-ROA TO PERFORM

15:24  7  SEEP/W ANALYSES CALLED *PARAMETRIC STUDIES* ON THAT PHASE OF YOUR

15:24  8  WORK AT THE LOWER NINTH WARD TO DETERMINE WHAT M SUB V

15:24  9  PARAMETER IN THE RANGE OF ALL THE WAY FROM 10 TO THE MINUS 5 TO

15:24  10 10 TO THE MINUS 9 YOU COULD USE TO APPROPRIATELY MEASURE THIS

15:24  11 RAPID PRESSURE TRANSMISSION.

15:24  12       ISN'T THAT WHAT YOU NOW TESTIFY?

15:24  13 A.   NO.  WE DON'T MEASURE THE PRESSURES.  WE PREDICT THEM.

15:25  14 THEY ARE THE OUTPUTS FROM THE ANALYTICAL MODEL.  SO WE GO BACK

15:25  15 THROUGH THE SAME PROCESS AT THE LOWER NINTH WARD TO ENSURE THAT

15:25  16 WE ARE GETTING AS INSTANTANEOUS HYDRAULIC PRESSURE RESPONSE IN

15:25  17 THE MODELING.

15:25  18 Q.   SO YOU WANT TO HAVE AN INSTANTANEOUS, SO YOU HAVE TO COME

15:25  19 UP WITH AN M SUB V THAT WILL CREATE IT, RIGHT?

15:25  20 A.   WELL, WE HAVE IT BECAUSE IT'S FIELD TEST DATA.

15:25  21 Q.   AT 17TH STREET CANAL, RIGHT?

15:25  22 A.   AT THAT STAGE, YES.  BUT LATER, WE HAVE IT AT THE LOWER

15:25  23 NINTH WARD, AND THE LOWER NINTH WARD SHOWED THE SAME RESULTS.

15:25  24       WE ALSO HAD IN 2007 AND 2008 THE LONDON CANAL

15:25  25 EXPERIMENTS.  SO IT'S NOT A SINGLE-TEST DATA-POINT PROCESS.

ROBERT G. BEA - CROSS

15:26    1    Q.   BY THE WAY, I DIDN'T SAY "MEASURE."  I SAID "MODEL."

15:26    2            OR AT LEAST, IF I DIDN'T SAY "MODEL," I MEANT TO SAY

15:26    3    "MODEL."

15:26    4            HERE'S WHAT YOUR ANSWER WAS:  THAT IN 2008, 2009, YOU

15:26    5    ASKED MR. COBOS-ROA TO PERFORM SEEP/W ANALYSES CALLED

15:26    6    *PARAMETRIC STUDIES* ON THAT PHASE OF YOUR WORK AT THE LOWER

15:26    7    NINTH WARD TO DETERMINE WHAT M SUB V PARAMETER IN THE RANGE OF

15:26    8    10 TO THE MINUS 5 AND 10 TO THE MINUS 9 YOU COULD USE TO,

15:26    9    QUOTE, APPROPRIATELY MODEL THIS RAPID PRESSURE TRANSMISSION.

15:26   10            DO YOU RECALL THAT?

15:26   11    A.   YES, SIR.

15:26   12    Q.   AND BASED ON THAT PARAMETRIC STUDY, YOU SAY YOU DETERMINED

15:26   13    THAT 1 TIMES 10 TO THE MINUS 9, 1 OVER PSF M SUB V WOULD GET

15:26   14    YOU THAT RAPID PRESSURE TRANSMISSION AT THE EBIA; ISN'T THAT

15:26   15    TRUE?

15:26   16    A.   THAT'S CORRECT.

15:27   17    Q.   I'VE BEEN TOLD FROM PEOPLE I TRUST THAT A PARAMETRIC STUDY

15:27   18    IS SOMETHING WHERE YOU JUST -- YOU START, IN THIS CASE, MODEL

15:27   19    RUNS USING DIFFERENT PARAMETERS JUST TO SEE WHAT THE EFFECT OF

15:27   20    THE DIFFERENT PARAMETERS WILL HAVE ON THE RESPONSE YOU GET.

15:27   21            IS THAT A FAIR REPRESENTATION OF A PARAMETRIC STUDY

15:27   22    IN THIS CONTEXT?

15:27   23    A.   YES.

15:27   24    Q.   BUT YOU DON'T HAVE THIS PARAMETRIC STUDY THAT YOU CLAIM

15:27   25    MR. COBOS-ROA CONDUCTED ON 10 TO THE MINUS 5 TO 10 TO THE

ROBERT G. BEA - CROSS

15:27   1   MINUS 9 M SUB V TO SHOW US AND TO SHOW DR. SILVA OR SHOW THE
15:27   2   COURT FOR THAT MATTER; ISN'T THAT RIGHT?
15:27   3   **A.**   THAT'S CORRECT.  AND THE EXPLANATION GOES BACK TO THE LOSS
15:27   4   OF THE PRIMARY FILES ON DIEGO'S LAPTOP COMPUTER AND THEN THE
15:28   5   AWFUL LOSS ON HIS BACKUP DRIVE.
15:28   6         THE REPETITION OF THOSE EXPERIMENTS IS SOMETHING THAT
15:28   7   YOU CAN IN FACT PERFORM AND IN FACT HAVE PERFORMED BASED ON
15:28   8   WHAT DR. SILVA-TULLA PUT INTO HIS REPORT, SO YOU KNOW NOW THE
15:28   9   DRAMATIC SENSITIVITY OF THE PRESSURES TO THESE M SUB V INPUT
15:28  10   PARAMETERS.
15:28  11   **Q.**   WE ARE GOING TO TAKE A BREAK, BUT ONE MORE QUESTION.
15:28  12         **THE COURT:**  SURE.  SURE.
15:28  13   **BY MR. TREEBY:**
15:28  14   **Q.**   ISN'T IT TRUE THAT YOU NEVER BEFORE AUGUST 10, 2012, A
15:28  15   LITTLE OVER A MONTH AGO, MENTIONED --
15:28  16   **A.**   I REMEMBER THAT ONE WELL.
15:28  17         **THE COURT:**  GO AHEAD.  LET HIM FINISH THE QUESTION.
15:28  18         **THE WITNESS:**  SURE.
15:28  19   **BY MR. TREEBY:**
15:28  20   **Q.**   YOU NEVER BEFORE THAT TIME MENTIONED THAT THESE PARAMETRIC
15:29  21   STUDIES HAD BEEN DONE; ISN'T THAT TRUE?
15:29  22   **A.**   I DON'T THINK THAT'S TRUE, SIR.
15:29  23   **Q.**   WILL YOU PLEASE POINT ME WHEN YOU COME BACK FROM THE
15:29  24   BREAK, IF YOU CAN, TO ANY MENTION THAT YOU HAVE MADE IN ANY OF
15:29  25   YOUR REPORTS ON THIS INVESTIGATION, BEGINNING TO END, THAT

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 15:29 | 1 | MENTIONED THESE PARAMETRIC STUDIES THAT RESULTED IN YOUR |
| 15:29 | 2 | M SUB V SELECTION? |
| 15:29 | 3 | **A.**   NO, SIR. |
| 15:29 | 4 | **THE COURT:**  WAIT.  WHEN YOUR COUNSEL STANDS UP -- |
| 15:29 | 5 | **MR. SCHULTZ:**  I WOULD LIKE TO LODGE AN OBJECTION.  I |
| 15:29 | 6 | THINK MR. TREEBY HAS TO TAKE THE ANSWER ON THE COLLATERAL |
| 15:29 | 7 | EVIDENCE ISSUE, WHICH IS WHAT THIS IS; AND SECOND OF ALL, I |
| 15:29 | 8 | DON'T THINK WE SHOULD BE GIVING HOMEWORK ASSIGNMENTS TO THE |
| 15:29 | 9 | WITNESS ON A 10-MINUTE BREAK. |
| 15:29 | 10 | IF MR. TREEBY HAS EVIDENCE TO IMPEACH HIM WITH, |
| 15:29 | 11 | THEN WE CAN HEAR IT. |
| 15:29 | 12 | **MR. TREEBY:**  WE HAVE NO SUCH STUDIES.  THEY HAVE |
| 15:29 | 13 | NEVER BEEN MENTIONED.  WE'VE LOOKED EVERYWHERE.  WE DON'T SEE |
| 15:29 | 14 | ANY MENTION OF PARAMETRIC STUDIES.  I WILL REPRESENT THAT TO |
| 15:29 | 15 | THE COURT AND THE WITNESS. |
| 15:29 | 16 | **THE COURT:**  THE COURT WILL ACCEPT THAT UNTIL |
| 15:29 | 17 | OTHERWISE CONTRADICTED. |
| 15:29 | 18 | **MR. TREEBY:**  THANK YOU, YOUR HONOR. |
| 15:29 | 19 | **THE COURT:**  WE WILL TAKE A BREAK. |
| 15:30 | 20 | AND ULTIMATELY, I HOPE ALL OF YOU KNOW, I'M |
| 15:30 | 21 | HOPING FOR SOME INCISIVE BRIEFING WHEN THIS IS OVER -- I KNOW |
| 15:30 | 22 | THERE ARE A LOT OF DETAILS -- TO PINPOINT THE PRIMARY ISSUES OF |
| 15:30 | 23 | DISAGREEMENT, THE PRIMARY ISSUES. |
| 15:30 | 24 | I UNDERSTAND COMPRESSIBILITY IS GOING TO BE ONE, |
| 15:30 | 25 | BUT -- AND I KNOW IN YOUR BRIEFING -- AND WHICH I APPRECIATE IN |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 15:30 | 1 | THE PRETRIAL BRIEFING THAT WAS DONE -- BUT JUST TO HIGHLIGHT |
| 15:30 | 2 | THOSE AND SAY WHY THEY ARE IMPORTANT. |
| 15:30 | 3 | **MR. TREEBY:**  THANK YOU. |
| 15:30 | 4 | **THE COURT:**  THANK YOU. |
| 15:30 | 5 | (RECESS.) |
| 15:51 | 6 | **THE COURT:**  MR. TREEBY, BEFORE YOU START, I JUST HAVE |
| 15:51 | 7 | A COUPLE QUESTIONS. |
| 15:51 | 8 | JUST TO BENCHMARK THINGS IN MY MIND AND FOR THE |
| 15:51 | 9 | RECORD SO I WILL FULLY UNDERSTAND THE IMPORT OF YOUR QUESTIONS |
| 15:51 | 10 | AND DR. BEA'S ANSWERS -- AND DR. BEA, I'M NOT LOOKING FOR A |
| 15:51 | 11 | PEDOLOGICAL ANSWER, JUST FOR A CONCEPTUAL ANSWER; I'M SURE THE |
| 15:52 | 12 | PEDOLOGICAL PART WILL COME OUT IN DUE COURSE -- IS IT POSSIBLE |
| 15:52 | 13 | FOR A SOIL, IN YOUR OPINION, OR A SOIL STRATA TO BE PERMEABLE |
| 15:52 | 14 | BUT INCOMPRESSIBLE? |
| 15:52 | 15 | **THE WITNESS:**  YES. |
| 15:52 | 16 | **THE COURT:**  THAT'S PRETTY MUCH IT.  THANK YOU. |
| 15:52 | 17 | **MR. TREEBY:**  WE WILL GO THERE BEFORE THIS CASE IS |
| 15:52 | 18 | OVER. |
| 15:52 | 19 | **THE COURT:**  I KNOW.  I'M JUST BENCHMARKING. |
| 15:52 | 20 | **MR. TREEBY:**  WE WILL GO THERE. |
| 15:52 | 21 | **THE COURT:**  I KNEW WE WOULD.  I JUST WANTED TO MAKE |
| 15:52 | 22 | SURE I COULD DELINEATE THE ISSUES IN MY OWN MIND. |
| 15:52 | 23 | **BY MR. TREEBY:** |
| 15:52 | 24 | **Q.**  LET'S TALK ABOUT THE 17TH STREET CANAL BREACH.  YOU |
| 15:52 | 25 | MENTIONED IT SEVERAL TIMES THIS MORNING AND THIS AFTERNOON. |

ROBERT G. BEA - CROSS

15:52    1              THAT BREACH LOCATION IS ALMOST 7 MILES FROM THE EAST

15:53    2    BANK INDUSTRIAL AREA, RIGHT?

15:53    3    A.    YES.

15:53    4    Q.    THE PIEZOMETER MEASUREMENTS YOU USED TO DEVELOP THESE

15:53    5    STEADY FLOW CONDITIONS TO DO WHAT YOU DID IN YOUR MODEL AT THE

15:53    6    EAST BANK INDUSTRIAL AREA WERE APPROXIMATELY 200 FEET SOUTH OF

15:53    7    THE ACTUAL 17TH STREET CANAL BREACH LOCATION; ISN'T THAT

15:53    8    CORRECT?

15:53    9    A.    THAT'S CORRECT, SIR.

15:53   10    Q.    YOU AGREE, DO YOU NOT, THAT THE GEOTECHNICAL CONDITIONS AT

15:53   11    THE 17TH STREET CANAL ARE DIFFERENT THAN THE GEOTECHNICAL

15:53   12    CONDITIONS AT THE EAST BANK INDUSTRIAL AREA; ISN'T THAT RIGHT?

15:53   13    A.    THEY ARE DIFFERENT AND SIMILAR.

15:53   14    Q.    IN FACT, THE I-WALL CONDITIONS ARE DIFFERENT, AND THOSE

15:53   15    THINGS ARE SPECIFIC TO THAT LOCATION, ARE THEY NOT?

15:53   16    A.    YES, SIR.

15:53   17    Q.    DO YOU KNOW DR. ROGERS TESTIFIED THAT WHEN A SHELBY TUBE

15:53   18    WAS PUSHED INTO THE ORGANIC CLAY MATERIAL ALONG THE 17TH STREET

15:53   19    CANAL, HE SAW WATER SQUIRT OUT OF ALL THE ADJACENT HOLES, WHICH

15:53   20    INDICATED THE MATERIAL WAS HIGHLY PERMEABLE?  DO YOU RECALL

15:53   21    THAT?

15:53   22    A.    YES, SIR.  THAT'S AN IMPORTANT ELEMENT BOTH HISTORICALLY,

15:54   23    AND IN ONE OF MY -- IT'S EITHER DEPOSITION OR REPORT -- I

15:54   24    REPORTED THE SAME THING AT THE LOWER NINTH WARD.  I CONFUSED

15:54   25    THE TWO LOCATIONS.  THE LOCATION AT WHICH THAT HOLE-SQUIRTING

ROBERT G. BEA - CROSS

15:54    1   OBSERVATION WAS DEVELOPED WAS THE 17TH STREET CANAL.

15:54    2   **Q.**   THAT MISTAKEN UNDERSTANDING, IN FACT, HAS INFLUENCED YOUR

15:54    3   OPINIONS OVER THE YEARS, HAS IT NOT, AT LEAST AT THE BEGINNING?

15:54    4   **A.**   WELL, AT THE BEGINNING, I WASN'T -- I DON'T RECALL IT AT

15:54    5   THIS LEVEL OF UNDERSTANDING AND HAD NOT GRASPED THE IMPORTANCE

15:54    6   OF THE OBSERVATION MADE AT 17TH STREET.  LATER, I DID.

15:54    7   **Q.**   DR. ROGERS SAID HE DID NOT SEE A SIMILAR INCIDENT AT THE

15:55    8   EBIA, AND YOU AGREE WITH THAT; AM I RIGHT?

15:55    9   **A.**   YES, SIR.

15:55   10   **Q.**   YOU HAVE ALSO REFERRED TO THE LONDON AVENUE CANAL BREACHES

15:55   11   AS, QUOTE, VALIDATION, CLOSE QUOTE, FOR YOUR ANALYSES OF THE

15:55   12   EAST BANK INDUSTRIAL AREA FLOODWALL BREACHES.

15:55   13          ISN'T THAT THE CASE?

15:55   14   **A.**   YES, SIR.

15:55   15   **Q.**   ISN'T IT TRUE THAT THE LOUISIANA AVENUE CANAL FLOOD

15:55   16   PROTECTION STRUCTURE THAT FAILED -- I'M SORRY.  LET ME START

15:55   17   OVER.

15:55   18          ISN'T IT TRUE THAT THE LONDON AVENUE CANAL FLOOD

15:55   19   CONTROL STRUCTURE -- FLOOD PROTECTION STRUCTURE THAT FAILED IS

15:55   20   ALMOST FOUR MILES FROM THE EAST BANK INDUSTRIAL AREA?

15:55   21   **A.**   YES.  AND THERE'S MORE THAN ONE STRUCTURE INVOLVED.

15:55   22   **Q.**   YOU AGREE THAT THE SITE CONDITIONS AT THE LONDON AVENUE

15:55   23   CANAL ARE SIMILAR TO THE SITE CONDITIONS AT THE EAST BANK

15:55   24   INDUSTRIAL AREA, QUOTE, ONLY IN A VERY LOOSE WAY.  RIGHT?

15:55   25   **A.**   I THINK THAT'S TRUE, BUT FOR THE PURPOSES OF CONCERN FOR

ROBERT G. BEA - CROSS

15:56   1   THIS COURT, THE FLOW SEEPAGE PRESSURE CONDITIONS THAT WE ARE
15:56   2   DELIBERATING, CONCERNED WITH, WE MODELED THE CHARACTERISTICS AT
15:56   3   THE LOCATIONS YOU CITED IN THE SAME WAY:  INCOMPRESSIBLE SOIL
15:56   4   SKELETON, INCOMPRESSIBLE WATER CONTROLLED BY DARCY'S LAW AND
15:56   5   THE PHYSICS OF FLUIDS.
15:56   6       SO THAT'S A COMMONALITY THROUGH THOSE CASES, AND EVEN
15:56   7   THE SITE SOIL CHARACTERISTICS ARE NOT IDENTICAL.  THAT'S
15:56   8   ACTUALLY A GOOD TEST TO THE GENERALITY OF THIS PRESSURE
15:56   9   TRANSMISSION EFFECT.
15:56   10  Q.   IN FACT, YOU HAVE TESTIFIED THE CONFIGURATION OF THE SOILS
15:57   11  ARE DIFFERENT, THE CONFIGURATION OF WHAT'S ON THE WATER SIDE OF
15:57   12  THE WALLS ARE DIFFERENT.  SO THERE ARE SIMILARITIES, BUT THERE
15:57   13  ARE VERY IMPORTANT DIFFERENCES.  ISN'T THAT WHAT YOU SAID?
15:57   14  A.   YES, SIR.
15:57   15  Q.   THANK YOU.
15:57   16  A.   VERY SIMILAR TO PEOPLE.  AT A FUNDAMENTAL LEVEL, WE ARE
15:57   17  ALL THE SAME, BUT THERE ARE VERY IMPORTANT DIFFERENCES.
15:57   18  Q.   NOW, YOU HAVE TESTIFIED, HAVE YOU NOT, THAT PINE ISLAND
15:57   19  SANDS EXISTED AT THE EAST BANK INDUSTRIAL AREA MORE THAN
15:57   20  60 FEET BELOW GROUND SURFACE?
15:57   21  A.   YES, SIR.
15:57   22  Q.   BUT YOU DON'T CONTEND THAT THOSE PINE ISLAND SANDS WERE
15:57   23  INVOLVED IN THE EAST BANK INDUSTRIAL AREA FAILURES; ISN'T THAT
15:57   24  TRUE?
15:57   25  A.   WELL, THEY WERE A FOUNDATION COMPONENT UNDERNEATH THE

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 15:57 | 1 | ACTIVE SURFACE COMPONENT.  AND ONE OF THE THINGS THAT ENGINEERS |
| 15:58 | 2 | NEED TO BE VERY CAREFUL OF IS SUBDIVIDING SYSTEMS THAT HAVE |
| 15:58 | 3 | THESE INTERACTIVE, INTERCONNECTED, INTERDEPENDENT COMPONENTS. |
| 15:58 | 4 | SO THE SANDS DO PLAY A ROLE, BUT THEY ARE NOT A MAJOR ROLE, AS |
| 15:58 | 5 | YOU STATED. |
| 15:58 | 6 | **Q.**   NO, IT'S AS YOU STATED.  YOUR TESTIMONY ON AUGUST 10, |
| 15:58 | 7 | PAGE 132, LINES 2 THROUGH 4, TO A VERY SIMPLE QUESTION GAVE ME |
| 15:58 | 8 | A VERY SIMPLE ANSWER. |
| 15:58 | 9 | "QUESTION:  OKAY.  AND YOU DON'T CONTEND THOSE -- |
| 15:58 | 10 | SPEAKING OF THE PINE ISLAND SANDS -- WERE INVOLVED IN THE |
| 15:58 | 11 | EBIA FAILURES, DO YOU? |
| 15:58 | 12 | "ANSWER:  NO." |
| 15:58 | 13 | CORRECT?  IS THAT CORRECT? |
| 15:58 | 14 | **A.**   WELL, OF COURSE, YOU CAN READ IT, BUT WHAT -- |
| 15:58 | 15 | **Q.**   RIGHT.  BUT NO, IT'S MORE IMPORTANT THAN THAT.  WHEN I ASK |
| 15:58 | 16 | FOR A YES OR NO AND YOU GIVE ME A LONG EXPLANATION WITHOUT THE |
| 15:59 | 17 | NO, IT'S FRUSTRATING.  IT'S FRUSTRATING.  LET'S SAY IT THAT |
| 15:59 | 18 | WAY.  I APOLOGIZE FOR MY FRUSTRATION. |
| 15:59 | 19 | **THE COURT:**  YOU CAN ASK THE COURT FOR HIM TO DIRECT |
| 15:59 | 20 | AN ANSWER TO THE QUESTION. |
| 15:59 | 21 | **MR. TREEBY:**  THANK YOU. |
| 15:59 | 22 | **MR. SCHULTZ:**  FOR THE RECORD, YOUR HONOR, THE |
| 15:59 | 23 | PLAINTIFFS WOULD PREFER THAT TO TESTIMONY OR SUMMARIES -- |
| 15:59 | 24 | **MR. TREEBY:**  SO DO I. |
| 15:59 | 25 | **THE COURT:**  WE ARE IN AGREEMENT ON SOMETHING.  RIGHT. |

ROBERT G. BEA - CROSS

15:59    1    GO AHEAD.

15:59    2    **BY MR. TREEBY:**

15:59    3    **Q.**   THE PINE ISLAND SANDS WERE INVOLVED IN THE LONDON AVENUE

15:59    4    FAILURES; ISN'T THAT RIGHT?

15:59    5    **A.**   YES, SIR.

15:59    6    **Q.**   YOU TESTIFIED -- AND I BELIEVE IT'S IN THE SLIDES THAT WE

15:59    7    HAVE SEEN AND I THINK IT'S INFERRED, AT LEAST IN YOUR TESTIMONY

15:59    8    HERE TODAY -- THAT THE PIEZOMETERS PZ3 AND PZ6 AT THE EAST BANK

15:59    9    INDUSTRIAL AREA PROVIDE SUPPORT FOR YOUR OPINION THAT PRESSURE

16:00   10    WAS TRANSMITTED RAPIDLY FROM THE CANAL SIDE OF THE FLOODWALL TO

16:00   11    THE LAND SIDE THROUGH THE ORGANIC CLAY LAYER DURING THE KATRINA

16:00   12    STORM SURGE; ISN'T THAT CORRECT?

16:00   13    **A.**   I THINK THAT IS INCORRECT.  BUT AS YOU WERE STATING IT, IT

16:00   14    WAS CONFINED TO THE LAND SIDE.  PZ3 AND 6 ARE ON THE FLOOD

16:00   15    SIDE.

16:00   16    **Q.**   THE CANAL SIDE.  THAT'S WHAT I SAID.

16:00   17    **A.**   THAT'S CORRECT.

16:00   18    **Q.**   THAT'S WHAT I WAS TALKING ABOUT, THE CANAL SIDE.

16:00   19           YOU KNOW, BASED ON WHAT YOU JUST SAID, THAT BOTH OF

16:00   20    THOSE PIEZOMETERS ARE LOCATED ON THE CANAL SIDE OF THE

16:00   21    LEVEE/FLOODWALL; ISN'T THAT CORRECT?

16:00   22    **A.**   THAT'S CORRECT.  THEY WERE ALSO ACCOMPANIED BY OTHER VERY

16:00   23    IMPORTANT PIEZOMETERS ON THE PROTECTED SIDE.

16:00   24    **Q.**   THOSE PIEZOMETERS ON THE PROTECTED SIDE, HOWEVER, ARE

16:00   25    AFTER KATRINA.  THEY WERE AFTER -- AFTER ALL THE REPAIRS ON THE

ROBERT G. BEA - CROSS

16:01  1   FLOODWALL; ISN'T THAT CORRECT?

16:01  2   **A.**   ALL OF THE PZ SERIES AT THE LOWER NINTH WARD WERE

16:01  3   INSTALLED AFTER KATRINA.

16:01  4   **Q.**   SO YOU HAVE NO PIEZOMETERS BEFORE KATRINA SHOWING

16:01  5   TRANSMISSION IMPRESSIONS FROM ONE SIDE OF THE FLOODWALL TO THE

16:01  6   OTHER; ISN'T THAT CORRECT, SIR?

16:01  7   **A.**   THAT'S CORRECT, SIR.

16:01  8   **Q.**   NOW, YOU PUT A LOT OF STOCK IN THE PIEZOMETER -- I'M GOING

16:01  9   TO ASK YOU A LITTLE BIT ABOUT PZ3.  THE TOP OF PIEZOMETER PZ3

16:01  10  WAS AT AN ELEVATION OF 6.2 FEET; ISN'T THAT RIGHT?

16:01  11  **A.**   I THINK THAT'S CORRECT, SIR.

16:01  12  **Q.**   WHEN I TALK *ELEVATIONS* IN THIS CASE, UNLESS I SAY

16:01  13  OTHERWISE, I'M TALKING ABOUT NAVD 88 2004.65.

16:01  14  **A.**   THE SAME FOR ME, THAT'S CORRECT.

16:01  15  **Q.**   AND THE FLOODWALLS AT THE IHNC DURING HURRICANE IKE ROSE

16:02  16  TO 9.27 FEET; ISN'T THAT RIGHT?

16:02  17  **A.**   CORRECT.

16:02  18         **THE COURT:**  FLOODWATERS?  IS THAT WHAT YOU SAID?

16:02  19         **MR. TREEBY:**  YES.

16:02  20  **BY MR. TREEBY:**

16:02  21  **Q.**   THE FLOODWATERS, THE SURGE FROM HURRICANE IKE, WHICH IS

16:02  22  AFTER KATRINA.  AND YOU AGREE THAT AT THE PEAK OF

16:02  23  HURRICANE IKE, THE TOP OF PZ3 WAS SUBMERGED UNDER MORE THAN

16:02  24  3 FEET OF WATER; ISN'T THAT CORRECT?

16:02  25  **A.**   THAT'S CORRECT.

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:02 | 1 | **Q.**   AND ALSO DURING IKE'S PEAK SURGE, THE GROUND SURFACE AT |
| 16:02 | 2 | PZ3 WAS SUBMERGED UNDER ABOUT 6 FEET OF WATER; ISN'T THAT |
| 16:02 | 3 | RIGHT? |
| 16:02 | 4 | **A.**   YES, SIR. |
| 16:02 | 5 | **Q.**   AND THAT WOULD CREATE A DIRECT LOAD OF THE WEIGHT OF WATER |
| 16:02 | 6 | OVER THE SOIL ON THE CANAL SIDE OF THE FLOODWALL; ISN'T THAT |
| 16:02 | 7 | RIGHT? |
| 16:02 | 8 | **A.**   YES, SIR. |
| 16:02 | 9 | **Q.**   THAT'S A VERTICAL FORCE DOWNWARD, RIGHT? |
| 16:02 | 10 | **A.**   YES. |
| 16:02 | 11 | **Q.**   SIMILARLY, AT THE PEAK OF THE STORM SURGE FOR HURRICANE |
| 16:02 | 12 | GUSTAV, THE TOP OF PZ3 WAS SUBMERGED UNDER NEARLY 6 FEET OF |
| 16:03 | 13 | WATER; ISN'T THAT RIGHT? |
| 16:03 | 14 | **A.**   THAT'S CORRECT. |
| 16:03 | 15 | **Q.**   AND THE GROUND SURFACE AT PZ3 WAS SUBMERGED UNDER ABOUT |
| 16:03 | 16 | 9 FEET OF WATER DURING GUSTAV; ISN'T THAT RIGHT? |
| 16:03 | 17 | **A.**   IT MIGHT BE FATIGUE, BUT I WAS HAVING TROUBLE KEEPING UP |
| 16:03 | 18 | WITH THE DETAILS IN YOUR LAST QUESTION.  WOULD YOU REPEAT IT, |
| 16:03 | 19 | PLEASE, SIR. |
| 16:03 | 20 | **Q.**   YOU WOULDN'T BE THE ONLY ONE WHO IS FATIGUED, BUT I |
| 16:03 | 21 | UNDERSTAND AND I'LL BE HAPPY TO REPEAT IT. |
| 16:03 | 22 |         THE GROUND SURFACE AT PZ3 WAS SUBMERGED UNDER ABOUT |
| 16:03 | 23 | 9 FEET OF WATER DURING HURRICANE GUSTAV; ISN'T THAT RIGHT? |
| 16:03 | 24 | **A.**   I THINK THAT'S CORRECT. |
| 16:03 | 25 | **Q.**   YOU AGREE, DO YOU NOT -- I'M QUOTING NOW FROM YOUR REPORT: |

ROBERT G. BEA - CROSS

16:03   1    "IF THE PIEZOMETER WAS NOT SEALED WITH A WATERTIGHT CAP, IT
16:03   2    MIGHT HAVE ALLOWED SURGE WATER TO LEAK THROUGH THE TOP OF THE
16:03   3    PIEZOMETER PIPE."  ISN'T THAT CORRECT?
16:03   4    A.   YES.  I SPECIFICALLY CONSIDERED THAT IMPORTANT FACT AND
16:04   5    ALLUDED TO ITS IMPORTANCE, AS I EXPLAINED TO THE COURT, THE
16:04   6    PIEZOMETER MEASUREMENTS AT 17TH STREET.
16:04   7    Q.   AND THIS WATER LEAKAGE, IF IT OCCURRED, THROUGH THE TOP OF
16:04   8    THE PIEZOMETER COULD -- OF THE ENCLOSURE FOR THE PIEZOMETER
16:04   9    COULD CONTRIBUTE TO THE RESPONSES OBSERVED IN THE PIEZOMETERS
16:04  10    ASSOCIATED WITH THE RISING WATER LEVELS FOR PZ3; ISN'T THAT
16:04  11    CORRECT?
16:04  12    A.   IF IT LEAKED, THAT'S CORRECT.
16:04  13    Q.   YOU DON'T KNOW WHETHER OR NOT, I BELIEVE, BASED ON YOUR
16:04  14    REPORT, THE PZ3 CAPS WERE LEAKING OR NOT DURING GUSTAV OR IKE,
16:04  15    DO YOU?
16:04  16    A.   THE CONCLUSION I CAME TO WAS THERE WAS NO SIGNIFICANT
16:04  17    LEAKAGE.
16:04  18    Q.   BUT YOU DON'T KNOW WHETHER -- YOU REALLY DON'T KNOW
16:05  19    WHETHER OR NOT; ISN'T THAT TRUE?
16:05  20    A.   NO, THAT'S NOT TRUE.
16:05  21    Q.   OKAY.  YOU PUT IN YOUR REPORT -- I'M SORRY -- YOU
16:05  22    TESTIFIED IN YOUR MARCH 27 DEPOSITION THAT THE PZ3 WAS, TO USE
16:05  23    YOUR LANGUAGE, QUOTE, PURPORTEDLY CAPPED.  RIGHT?
16:05  24    A.   THAT'S CORRECT.
16:05  25         I HAVE CONFIRMED THE NATURE OF THE CAPPING.  BUT AT

ROBERT G. BEA - CROSS

16:05  1    THE TIME OF THAT TESTIMONY, THAT'S CORRECT.

16:05  2    **Q.**   WHO DID YOU CONFIRM IT WITH?

16:05  3    **A.**   DR. STORESUND.

16:05  4    **Q.**   WAS HE THERE DURING OR RIGHT AFTER HURRICANE IKE?

16:05  5    **A.**   NO, BUT --

16:05  6    **Q.**   GUSTAV?

16:05  7    **A.**   NO, SIR.

16:05  8         FIRST I HAD TO CHASE DOWN, DETERMINE THE DETAILS OF

16:05  9    THE CAPPING AT PIEZOMETER 3 I SUBSEQUENTLY DID HAVE, BUT BEFORE

16:06  10   THAT TIME I REACHED THE CONCLUSION THERE WAS NO SIGNIFICANT

16:06  11   LEAKAGE.  I DID SO SOLELY ON THE BASIS OF MY ANALYSIS OF THE

16:06  12   RECORDINGS.

16:06  13   **Q.**   THAT WAS AFTER YOUR MARCH 27 DEPOSITION?

16:06  14   **A.**   NO, IT WAS WELL BEFORE.  THIS EXPLANATION IS CONTAINED IN

16:06  15   MY EXPERT REPORT OF FEBRUARY 1, 2012.

16:06  16   **Q.**   WELL, I -- LET'S SEE WHAT YOU SAID AT YOUR DEPOSITION,

16:06  17   BECAUSE I TOOK IT A LITTLE BIT DIFFERENT.  SO LET'S LOOK AT

16:06  18   WHAT YOU SAID THERE.  PAGE 200, MARCH 27, 2012.

16:06  19   **A.**   THANK YOU.

16:06  20   **Q.**   PAGE 200, LINES 12 THROUGH 17.  ACTUALLY WE WILL START

16:06  21   BACK AT LINE 14, IF YOU WILL.

16:07  22        "THE ANSWER WAS NOT CLEAR, BUT PZ3 WAS PURPORTEDLY

16:07  23   CAPPED, MEANING THERE'S A CAP ON THE TOP OF THE PIEZOMETER TO

16:07  24   INHIBIT SIGNIFICANT WATER ENTRY."

16:07  25        GO BACK TO LINE 14.

ROBERT G. BEA - CROSS

| | |
|---|---|
| 16:07 | 1 |  THAT WAS LINE 14?  I'M SORRY.
| 16:07 | 2 |  "WELL, WE PURSUED THIS FACTOR BECAUSE OF WHAT YOU ARE
| 16:07 | 3 | QUESTIONING, WE HAD TO QUESTION.  THE ANSWER WAS NOT CLEAR, BUT
| 16:07 | 4 | PZ WAS PURPORTEDLY CAPPED, MEANING THERE'S A CAP TO INHIBIT
| 16:07 | 5 | SIGNIFICANT WATER ENTRY."
| 16:07 | 6 |  "THE ANSWER WAS NOT CLEAR," IS WHAT YOU SAID THERE.
| 16:07 | 7 | A.  THAT'S CORRECT.
| 16:07 | 8 | Q.  IN FACT, JUST TO GET TO MORE IMPORTANT THINGS, THE LOAD OF
| 16:07 | 9 | THE WATER OVER THE LAND SURFACE IN THE EBIA DURING THE STORM
| 16:07 | 10 | SURGES WOULD NECESSITATE THE INCREASE IN PORE PRESSURES ON THE
| 16:08 | 11 | CANAL SIDE SOIL SIMPLY BECAUSE OF THE LOAD OR TOTAL STRESS
| 16:08 | 12 | INCREASE DUE TO THE WATER LAYER.  AND I THINK WE COVERED THIS
| 16:08 | 13 | THIS MORNING.  I THINK WE COVERED THIS EARLIER TODAY.  WOULD
| 16:08 | 14 | YOU AGREE THAT THAT'S RIGHT?
| 16:08 | 15 | A.  WELL, THE DIFFICULTY IN ANSWERING YES, NO, RIGHT, WRONG IS
| 16:08 | 16 | THE SOILS ACROSS THE EXPANSE OF THE EAST BANK INDUSTRIAL AREA
| 16:08 | 17 | HAVE VERY DIFFERENT HYDRAULIC PROPERTIES, INCLUDING THEIR
| 16:08 | 18 | COMPRESSIBILITY.  SOME ARE VERY, VERY STIFF; SOME ARE VERY,
| 16:08 | 19 | VERY SOFT.
| 16:08 | 20 |  IT'S THE STIFF ELEMENTS THAT CARRY THE PRESSURE
| 16:08 | 21 | FORCES OR TRANSMIT THEM BELOW TO THE BURIED SWAMP MARSH LAYER.
| 16:08 | 22 | SO IT'S AN OVERGENERALIZATION, AS YOU'RE FORMING THAT
| 16:09 | 23 | HYPOTHESIS.
| 16:09 | 24 | Q.  I THINK, JUST TO GO TO THE BOTTOM LINE OF THIS, THE
| 16:09 | 25 | RESPONSE OF PZ3 AND PZ6 TO THE STORM SURGES THAT WERE MEASURED

ROBERT G. BEA - CROSS

16:09    1    BY THEM CAN BE SOLELY EXPLAINED BY THE EFFECTS OF VERTICAL
16:09    2    TOTAL STRESS; ISN'T THAT CORRECT?
16:09    3    **A.**   NO.
16:09    4    **Q.**   LET'S LOOK UP WHAT YOU SAID AT YOUR DEPOSITION, 3-27
16:09    5    DEPOSITION, PAGE 204, LINES 21 THROUGH 25.
16:09    6            "QUESTION:  SO THE RESPONSE OF PZ3 TO THE STORM SURGE
16:09    7        CAN BE EXPLAINED SOLELY BY THE EFFECTS OF CHANGE IN
16:09    8        VERTICAL TOTAL STRESS; ISN'T THAT CORRECT?
16:09    9            "ANSWER:  I THINK IT IS APPROPRIATELY EXPLAINED."
16:09   10            THE WITNESS:  EXPLAINED WHERE?  PLEASE COMPLETE THE
16:09   11    STATEMENT.
16:09   12            THE COURT:  IS THERE A PAGE 205?  THERE WE GO.
16:10   13            MR. TREEBY:  DID SOMETHING HAPPEN ON YOUR SCREENS?
16:10   14            THE COURT:  YES, SIR.
16:10   15            MR. TREEBY:  I'M SORRY.  IT'S 205.
16:10   16            THE COURT:  YOU WENT TO 204.  THAT WAS PART OF IT.
16:10   17    THEN WE WENT TO THE NEXT --
16:10   18            MR. TREEBY:  OH, YES.
16:10   19            "ANSWER:  THAT WAY, WITH THE EXCEPTION OF THE
16:10   20        DIFFERENCES IN THE PRESSURES, THE TWO PEAKS DON'T COINCIDE
16:10   21        IN TERMS OF THEIR MAGNITUDE.  IT TELLS ME THAT I'M
16:10   22        EXPERIENCING LOSSES AS I COMMUNICATE WITH THE WATER ON TOP
16:10   23        OF THE EBIA SITE AND THE PIEZOMETER SCREENS THAT ARE
16:10   24        RECORDING THAT RESPONSE.  SO I HAVE THE EQUIVALENT OF A
16:10   25        FRICTIONAL DAMPING IN PRESSURE RELATED TO PERMEABILITY.

ROBERT G. BEA - CROSS

| | |
|---|---|
| 16:10 | 1 |
| 16:10 | 2 |
| 16:10 | 3 |
| 16:10 | 4 |
| 16:10 | 5 |
| 16:10 | 6 |
| 16:10 | 7 |
| 16:11 | 8 |
| 16:11 | 9 |
| 16:11 | 10 |
| 16:11 | 11 |
| 16:11 | 12 |
| 16:11 | 13 |
| 16:11 | 14 |
| 16:11 | 15 |
| 16:11 | 16 |
| 16:11 | 17 |
| 16:11 | 18 |
| 16:11 | 19 |
| 16:12 | 20 |
| 16:12 | 21 |
| 16:12 | 22 |
| 16:12 | 23 |
| 16:12 | 24 |
| 16:12 | 25 |

1            **"QUESTION:**  SO IT WOULD GO UP AS THE WATER FIRST

2        SUBMERGED THE GROUND LEVEL, CORRECT, AND GET HIGHER AND

3        HIGHER.  IT WOULD GO UP."

4            RIGHT, THAT'S THE WHOLE ANSWER.  I APOLOGIZE FOR NOT

5    HAVING THE WHOLE ANSWER.

6            **THE COURT:**  NO PROBLEM.

7    BY MR. TREEBY:

8    **Q.**   YOU EQUATE, DO YOU NOT, DR. BEA, FULLY SATURATED FLOW

9    CONDITIONS WITH INCOMPRESSIBILITY?  ISN'T THAT TRUE?

10   **A.**   YOUR QUESTION PERTAINS SPECIFICALLY TO THE LOWER NINTH

11   WARD LOCATION AND THE HYDRAULIC CONDUCTIVITY CHARACTERISTICS OF

12   THE BURIED SWAMP MARSH LAYER ORGANIC CLAY DEPOSITS?

13   **Q.**   YES.

14   **A.**   ANSWER, YES.

15   **Q.**   YOU ARE FAMILIAR WITH DR. CARL TERZAGHI, RIGHT?

16   **A.**   YES.

17   **Q.**   YOU HAVE WORKED WITH HIM; ISN'T THAT CORRECT?

18   **A.**   WITH HE AND HIS WIFE, YES, AND WORKED WITH -- I WAS A

19   GRADUATE STUDENT DOING EXPERIMENTAL WORK ON CLAY BEHAVIOR UNDER

20   LONG-TERM LOADINGS, AND DR. TERZAGHI VISITED ME IN THE

21   LABORATORY.  WE DISCUSSED MY WORK.  IN ADDITION, I WORKED WITH

22   HIM IN THE CLASSROOM WHERE HE GAVE LECTURES.

23            **MR. TREEBY:**  YOUR HONOR, PLEASE, I DIDN'T ASK HIM --

24            **THE WITNESS:**  I'M TRYING TO EXPLAIN --

25            **MR. TREEBY:**  I'M TRYING TO GET DONE.

ROBERT G. BEA - CROSS

16:12   1          **THE WITNESS:**  I'M TRYING TO EXPLAIN WHAT THE WORD
16:12   2   *WORKED WITH* MEANS.
16:12   3          **THE COURT:**  IS THAT YOUR QUESTION, DID HE WORK WITH
16:12   4   HIM?
16:12   5          **MR. TREEBY:**  I JUST ASKED IF HE WORKED WITH HIM OR
16:12   6   NOT.  I SAID, ISN'T THAT CORRECT, YOU WORKED WITH HIM?
16:12   7          **THE COURT:**  HE IS GOING INTO -- I'M NOT SURE IF
16:12   8   THAT'S GERMANE.
16:12   9          **MR. TREEBY:**  IT'S NOT TO MY EXAMINATION TO KNOW ALL
16:12   10  HE DID WORK WITH HIM.  I'M TRUSTING HE DID WORK WITH HIM.  BUT,
16:12   11  YOUR HONOR, PLEASE, I JUST -- I WOULD LIKE TO GET DONE BEFORE I
16:12   12  USE UP ALL MY TIME.
16:13   13         **THE COURT:**  WE WILL TAKE NOTE THAT HE WORKED WITH
16:13   14  HIM.  IF COUNSEL NEEDS TO DEVELOP THAT FURTHER, COUNSEL CAN DO
16:13   15  THAT ON REDIRECT.  GO AHEAD.
16:13   16         **MR. TREEBY:**  THANK YOU, YOUR HONOR.
16:13   17  **BY MR. TREEBY:**
16:13   18  **Q.**   YOU ARE FAMILIAR WITH HIS WORK WITH DR. RALPH PECK
16:13   19  ENTITLED "SOIL MECHANICS IN ENGINEERING PRACTICE"; ISN'T THAT
16:13   20  TRUE?
16:13   21  **A.**   THAT'S TRUE.
16:13   22  **Q.**   YOU KNOW IN THAT WORK OF DRS. TERZAGHI AND PECK, THEY
16:13   23  CONCLUDE THAT "WHEN SATURATED, ORGANIC CLAY IS LIKELY TO BE
16:13   24  VERY COMPRESSIBLE"; ISN'T THAT RIGHT?
16:13   25  **A.**   IT CAN BE, SURE.

ROBERT G. BEA - CROSS

16:13   1   **Q.**   "LIKELY TO BE VERY COMPRESSIBLE."  THAT'S WHAT THE BOOK
16:13   2   SAYS.  DO YOU DISAGREE WITH THAT?
16:13   3   **A.**   I CAN'T DISAGREE WITH THE BOOK.  IT SAYS WHAT IT SAYS.
16:13   4   **Q.**   WELL, I'M NOT ASKING YOU IF THAT'S WHAT THE BOOK SAYS.
16:13   5   I'M ASKING IF YOU AGREE WITH WHAT DRS. TERZAGHI AND PECK
16:13   6   CONCLUDED IN THEIR BOOK, IF YOU AGREE WITH IT.
16:13   7   **A.**   I WOULD NEED TO REVIEW THE ENTIRE SECTION YOU ARE QUOTING
16:13   8   IN ORDER TO NOTE THE CONTEXT SO THAT I COULD APPROPRIATELY
16:13   9   ANSWER YES, NO.
16:13   10  **Q.**   LET'S CALL UP DX-02457, PAGE 0002.  AND BY THE WAY, THIS
16:14   11  WAS USED IN, I BELIEVE, A REPLY BRIEF IN THIS CASE.  LET'S LOOK
16:14   12  AT IT.  THIS IS THE WHOLE PAGE.  LET'S PIN DOWN WHERE THAT
16:14   13  STATEMENT IS QUOTED, AND THEN WE WILL TRY TO GET SOME LANGUAGE
16:14   14  AROUND IT.  IT'S A WHOLE PARAGRAPH:
16:14   15       "ORGANIC CLAY IS A CLAY THAT OWES SOME OF ITS
16:14   16  SIGNIFICANT PHYSICAL PROPERTIES TO THE PRESENCE OF FINELY
16:14   17  DIVIDED ORGANIC MATTER.  WHEN SATURATED, ORGANIC CLAY IS LIKELY
16:14   18  TO BE VERY COMPRESSIBLE; BUT WHEN DRY, ITS STRENGTH IS VERY
16:14   19  HIGH.  IT IS USUALLY DARK GRAY OR BLACK AND IT MAY HAVE A
16:14   20  CONSPICUOUS ODOR."
16:15   21       THAT'S THE WHOLE PARAGRAPH.  DO YOU WANT TO READ
16:15   22  OTHER PARTS OF THE PAGE?
16:15   23  **A.**   WELL, THE ANSWER IS NO.  I THINK THIS IS THE EXPRESSION OF
16:15   24  THEIR OBSERVATIONS CONCERNING HOW ORGANIC CLAY BEHAVES.
16:15   25  **Q.**   IN FACT, PLAINTIFFS' EXPERT DR. ROGERS TESTIFIED THAT

ROBERT G. BEA - CROSS

16:15    1    FULLY SATURATED ORGANIC SOILS AT THE EBIA ARE CONSIDERED

16:15    2    COMPRESSIBLE.  DO YOU RECALL THAT?

16:15    3    **A.**   NO, I DON'T, BUT IF WE COULD REVIEW THE DEPOSITION

16:15    4    TRANSCRIPT.

16:15    5    **Q.**   VOLUME 2 OF HIS DEPOSITION, MARCH 17, PAGE 37, LINE 24,

16:15    6    THROUGH 38, LINE 3.

16:15    7              **"QUESTION:** SO THESE SOILS" --

16:16    8              **MR. TREEBY:**  COUNSEL CAN CORRECT ME IF I'M WRONG.  WE

16:16    9    ARE TALKING ABOUT THE SOILS WE HAVE ALL BEEN TALKING ABOUT, THE

16:16   10    ORGANIC CLAY LAYER.

16:16   11              **MR. SCHULTZ:**  IN ALL CANDOR, JUDGE, I'M NOT SURE THIS

16:16   12    IS AN APPROPRIATE USE OF THE DEPOSITION.

16:16   13              **THE COURT:**  IT WOULD HAVE TO BE TESTIMONY HE RENDERED

16:16   14    HERE.  THIS IS NOT TESTIMONY IN THIS COURT.

16:16   15              **MR. TREEBY:**  WELL, THEN, I WOULD MOVE THAT THAT

16:16   16    PORTION OF HIS DEPOSITION BE ADMITTED.  IT'S CERTAINLY RELEVANT

16:16   17    TO THE EXAMINATION.  AND I WOULD MOVE -- IN FACT, I WAS GOING

16:16   18    TO MOVE THAT IT BE ADMITTED.  IT'S UNDER A CATEGORY 2.  IT'S ON

16:16   19    THE EXHIBIT LIST.  IT'S UNDER A CATEGORY 2, WHICH MEANS WHEN

16:16   20    YOU USE IT, YOU HAVE THE OPTION, SUBJECT TO OBJECTION AND

16:16   21    SUBJECT TO THE COURT'S RULING, TO MOVE IT INTO EVIDENCE.  SO I

16:16   22    WILL DO THAT.

16:16   23              **THE COURT:**  ANY OBJECTION?

16:16   24              **MR. SCHULTZ:**  WE WOULD OBJECT, YOUR HONOR.  I OBJECT

16:16   25    TO THE PROCEDURE OF TAKING THE DEPOSITION TESTIMONY OF ONE --

ROBERT G. BEA - CROSS

16:16   1          **THE COURT:**  I'M REALLY MORE INTERESTED IN WHAT THIS

16:16   2   WITNESS THINKS ABOUT IT, FRANKLY, AND THEN YOUR EXPERT.

16:16   3          **MR. TREEBY:**  WE'LL CONTINUE.

16:16   4   **BY MR. TREEBY:**

16:16   5   **Q.**   YOU WERE AWARE, WERE YOU NOT, THAT THE DIGITAL FLOW

16:16   6   ANALYSIS SOFTWARE PROGRAMS USED BY OTHER EXPERTS IN THIS CASE

16:17   7   THAT YOU HAVE EXAMINED ALL TREATED THE ORGANIC CLAY LAYER AS

16:17   8   FULLY SATURATED, DON'T YOU?

16:17   9   **A.**   CORRECT.

16:17   10  **Q.**   YOU WERE ALSO AWARE THAT THE SEEP/W SOFTWARE PROGRAMS USED

16:17   11  BY MR. COBOS-ROA FOR YOU TOOK ACCOUNT OF FULLY SATURATED

16:17   12  CONDITIONS; ISN'T THAT CORRECT?

16:17   13  **A.**   THAT'S CORRECT.

16:17   14         **THE COURT:**  MR. TREEBY, FORGIVE MY IGNORANCE.

16:17   15         IF I COULD GET A QUICK DEFINITION, SIR, OF *FULLY*

16:17   16  *SATURATED*, NOT DETAILED.  MY DAD, WHO WAS A CHEMISTRY AND

16:17   17  PHYSICS MAJOR -- I REMEMBER, WHEN MY MOTHER ASKED HIM HOW HER

16:17   18  CAR WORKED, THREE DAYS LATER SHE SAID SHE DIDN'T CARE.  I'M

16:17   19  MORE LIKE MY MOTHER, I'M AFRAID.  COULD YOU GIVE ME A SHORT

16:17   20  DEFINITION OF WHAT *FULLY SATURATED* MEANS FROM A GEOTECHNICAL

16:17   21  STANDPOINT?

16:17   22         **THE WITNESS:**  TAKE A DRY SPONGE NEXT TO YOUR KITCHEN

16:17   23  SINK.  FILL THE SINK WITH WATER.  PUT THE SPONGE INTO THE

16:18   24  WATER.  LET IT SIT THERE FOR PERHAPS A SHORT TIME.  PICK IT UP.

16:18   25  THAT'S FULLY SATURATED.  THERE'S NO MORE GAS OR THAT SORT OF

**ROBERT G. BEA - CROSS**

16:18  1    STUFF CREEPING AROUND IN THAT SPONGE.

16:18  2    **BY MR. TREEBY:**

16:18  3    **Q.**   CORRECT ME IF I'M WRONG.  I THINK IT'S JUST WHAT YOU SAID,

16:18  4    BUT MAYBE IT HELPS ME TO SAY IT IN MY WORDS AND SEE IF YOU

16:18  5    AGREE.  A FULLY SATURATED SOIL IS A SOIL IN WHICH -- WHATEVER

16:18  6    FLUID IT IS THAT IS SATURATING THAT SOIL IS -- FILLS ALL THE

16:18  7    PORES AND THERE'S NO GAS LEFT IN IT; NO AIR, NO GAS.

16:18  8    **A.**   FULLY SATURATED MEANING 100 PERCENT.  WHAT YOU HAD STATED

16:18  9    IS TRUE, BUT IT'S UNUSUAL TO FIND SOILS LIKE WE ARE CONCERNED

16:19  10   WITH HERE THAT ARE TRULY FULLY SATURATED.

16:19  11   **Q.**   BUT THEY ARE TREATED AS FULLY SATURATED, AT LEAST IN THESE

16:19  12   COMPUTER PROGRAMS, ARE THEY NOT?

16:19  13   **A.**   WELL, THEY CAN BE IF YOU LET THEM, MEANING YOU --

16:19  14   **Q.**    IF IT'S BELOW -- I'M SORRY.  I DIDN'T MEAN -- I DON'T WANT

16:19  15   TO CUT YOU OFF, BUT LET'S SEE IF WE CAN GET ON THE SAME PAGE.

16:19  16          I UNDERSTAND THE SOILS ABOVE THE PHREATIC SURFACE

16:19  17   THAT HAVEN'T BEEN SITTING IN WATER FOR A LONG TIME ARE PROBABLY

16:19  18   NOT FULLY SATURATED.  BUT THE ONES BELOW THAT ARE FULLY

16:19  19   SATURATED, ISN'T THAT CORRECT?  AT LEAST IN THE TERMS THAT

16:19  20   EVERYBODY HAS USED HERE, THOSE WOULD BE FULLY SATURATED?  YOU

16:19  21   MIGHT FIND A MOLECULE OF GAS THERE SOMEWHERE, BUT IT'S

16:19  22   BASICALLY EVERYBODY HAS TREATED THOSE AS FULLY SATURATED.  IS

16:19  23   THAT FAIR?

16:19  24   **A.**   YES.

16:19  25   **Q.**   THANK YOU.

ROBERT G. BEA - CROSS

16:19    1              YOU HAVE STATED, WHEN THERE'S NO CHANGE IN VOID

16:19    2    RATIO, NO CHANGE IN SATURATION, THAT IS DEFINING STEADY FLOW

16:19    3    HYDRAULIC CONDUCTIVITY ANALYSIS.  DO YOU RECALL SAYING THAT?

16:20    4    A.   YES, SIR.

16:20    5    Q.   YOU STATED THAT FOR YOUR FLOW ANALYSES, THE CLAYS BELOW

16:20    6    THE PHREATIC SURFACE -- THE WATER TABLE, IN COMMON TERMS --

16:20    7    GIVEN THAT LOADING CONDITIONS ARE BEING MODELED AS

16:20    8    INCOMPRESSIBLE, THE SOILS ABOVE THAT SURFACE, UNTIL THEY BECOME

16:20    9    SATURATED, HAVE TO BE MODELED TO APPROPRIATELY ACCOUNT FOR THAT

16:20   10    COMPRESSIBILITY; IS THAT CORRECT?

16:20   11    A.   THAT'S CORRECT, SIR.

16:20   12    Q.   YOU AGREE THAT IT TAKES TIME FOR SOILS THAT ARE ABOVE THE

16:20   13    WATER TABLE, THE PHREATIC SURFACE, TO BECOME FULLY SATURATED;

16:20   14    ISN'T THAT TRUE?

16:20   15    A.   THAT'S CORRECT.

16:20   16    Q.   THAT WOULD MEAN, WOULD IT NOT, THAT ABOVE THE WATER TABLE

16:20   17    THE ANALYSES SHOULD USE A HIGHER COMPRESSIBILITY DURING THE

16:20   18    KATRINA STORM SURGE, RIGHT?

16:20   19    A.   WELL, THE PROPER MODELING WILL INVOLVE HIGHER

16:21   20    COMPRESSIBILITY FOR THE SOILS ABOVE THE PHREATIC SURFACE THAT

16:21   21    HAVE NOT YET BEEN SATURATED.  OTHER SOILS NEXT-DOOR COULD BE

16:21   22    FULLY SATURATED AND THEREFORE ARE BEHAVING IN A DIFFERENT WAY.

16:21   23              I ATTEMPTED TO EXPLAIN THIS AS THE VERY STIFF COLUMNS

16:21   24    HOLDING UP A BUILDING AND VERY SOFT COLUMNS ALSO HOLDING UP THE

16:21   25    BUILDING.  IT'S THE STIFF COLUMNS WHO HAVE, IN FACT, DURING

ROBERT G. BEA - CROSS

16:21    1    THAT TIME BEEN INTRUDED WITH WATER, BECOME SATURATED.  THEY ARE

16:21    2    GOING TO BEHAVE VERY STIFFLY.  THE OTHERS ARE GOING TO BEHAVE

16:21    3    VERY SOFTLY.  IT'S THE STIFF THAT WINS.

16:21    4    Q.    THE ONLY REASON I'M BRINGING THIS UP, YOU KNOW THAT THE

16:22    5    SMALL VOLUME OF UNSATURATED SOILS IN DR. SILVA'S FLOW ANALYSES

16:22    6    CONSISTS OF A NARROW LAYER OF SOILS NEAR THE GROUND SURFACE

16:22    7    ABOVE THE WATER TABLE THAT YOU WOULD AGREE ARE NOT A HUNDRED

16:22    8    PERCENT SATURATED, RIGHT?

16:22    9    A.    PLEASE REPEAT YOUR QUESTION.

16:22   10    Q.    YOU KNOW, DO YOU NOT, THAT THE -- LET ME BREAK IT UP INTO

16:22   11    PIECES.

16:22   12    A.    THANK YOU.

16:22   13    Q.    DR. SILVA'S FLOW ANALYSES, YOU HAVE LOOKED AT THEM?

16:22   14    A.    YES, SIR.

16:22   15    Q.    YOU HAVE LOOKED AT THE FACT, HAVE YOU NOT, THAT THERE IS A

16:22   16    SMALL VOLUME OF UNSATURATED SOILS IN HIS FLOW ANALYSES

16:22   17    CONSISTING OF A NARROW LAYER OF SOILS NEAR THE GROUND SURFACE

16:22   18    ABOVE THE WATER TABLE THAT YOU WOULD AGREE ARE NOT A HUNDRED

16:22   19    PERCENT SATURATED; ISN'T THAT RIGHT?

16:22   20    A.    WELL, THAT'S TRUE IN HIS MODEL.  I WOULD NOT AGREE THAT

16:23   21    THAT'S TRUE IN REALITY.

16:23   22    Q.    MR. COBOS-ROA'S SEEP/W ANALYSES DID NOT TREAT ANY SOILS AS

16:23   23    UNSATURATED; ISN'T THAT TRUE?

16:23   24    A.    I THINK THAT'S NOT TRUE.

16:23   25    Q.    HE TREATED THEM ALL AS AN M SUB V OF MINUS 9, AND THAT IS

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:23 | 1 | BASED IN YOUR TESTIMONY ON FULLY SATURATED SOILS; ISN'T THAT |
| 16:23 | 2 | CORRECT? |
| 16:23 | 3 | **A.**   FIRST OF ALL, THE M SUB V THAT WE ARE DISCUSSING, I THINK, |
| 16:23 | 4 | IS THE CONTROL PARAMETER TO PERFORM THE FLOW HYDRAULIC |
| 16:23 | 5 | CONDUCTIVITY ANALYSES.  WE CHOSE THAT TO MODEL INCOMPRESSIBLE |
| 16:23 | 6 | SOIL SKELETON AND INCOMPRESSIBLE FLUID. |
| 16:24 | 7 | THIS IS, WE THINK, APPROPRIATE FOR SOILS BELOW THE |
| 16:24 | 8 | PHREATIC SURFACE AT THE TIME OF INUNDATION FROM THE KATRINA |
| 16:24 | 9 | SURGE.  THOSE SOILS ARE PROVIDED WITH FUNCTIONS FOR SWELLING |
| 16:24 | 10 | AND SHRINKAGE, AND THAT BECOMES IMPORTANT FOR SOME OF THE |
| 16:24 | 11 | SOILS. |
| 16:24 | 12 | **Q.**   I THINK I HEARD AN ANSWER.  LET'S CLEAR SOMETHING UP |
| 16:24 | 13 | BEFORE WE GET TO THE NEXT -- |
| 16:24 | 14 | **MR. SCHULTZ:**  CAN I LODGE AN OBJECTION? |
| 16:24 | 15 | **MR. TREEBY:**  WITHDRAWN.  WITHDRAWN. |
| 16:24 | 16 | **MR. SCHULTZ:**  WE WOULD ASK THAT MR. TREEBY REEL BACK |
| 16:24 | 17 | A LITTLE BIT ON THE GRATUITOUS COMMENTS AND WHETHER DOCUMENTS |
| 16:25 | 18 | HAVE BEEN PUT IN BRIEFS AND SO ON. |
| 16:25 | 19 | **THE COURT:**  YOU HAVE ASKED AND THE COURT WILL ATTEMPT |
| 16:25 | 20 | TO ENFORCE THAT.  GO AHEAD. |
| 16:25 | 21 | **MR. TREEBY:**  THANK YOU, YOUR HONOR. |
| 16:25 | 22 | BY MR. TREEBY: |
| 16:25 | 23 | **Q.**   I WANT TO CLEAR SOMETHING UP.  WHEN YOU GO INTO |
| 16:25 | 24 | CROSS SECTIONS, YOUR CROSS SECTIONS -- BUT BEFORE I DO, I WANT |
| 16:25 | 25 | TO CLEAR SOMETHING UP FROM EARLIER TESTIMONY TODAY.  YOU SAID |

ROBERT G. BEA - CROSS

16:25   1  EARLIER TODAY THAT IT'S NOT FACTUAL OR TRUE THAT DR. ROGERS

16:25   2  DEVELOPED YOUR ANALYTICAL CROSS SECTIONS.  DID I HEAR THAT

16:25   3  CORRECTLY?

16:25   4  **A.**   YOU HEARD THAT CORRECTLY.

16:25   5  **Q.**   THEN I'VE GOT TO SOMEHOW GET THAT SQUARED WITH YOUR

16:25   6  TESTIMONY ON MARCH 28 IN WHICH YOU SAID THAT DR. ROGERS DID THE

16:25   7  PHASE 2 WORK THAT RESULTED IN YOUR CASE 2 CROSS SECTIONS.  WERE

16:25   8  YOU WRONG THEN?

16:25   9  **A.**   NO.  IT'S BECAUSE YOU'RE MIXING AND MATCHING INCORRECTLY.

16:25   10 HE ONLY DEVELOPED A PORTION OF THE CROSS SECTIONS IDENTIFIED AS

16:25   11 CASE 2.  THERE IS ANOTHER SET OF CROSS SECTIONS IDENTIFIED AS

16:26   12 CASE 1.  MYSELF AND MR. CHAD MORRIS WERE RESPONSIBLE FOR THE

16:26   13 CASE 1 CROSS SECTIONS.  DR. ROGERS, TOGETHER WITH DR. STORESUND

16:26   14 AND OTHER PEOPLE, WERE RESPONSIBLE FOR CASE 2.

16:26   15       I HAD TO REVIEW THEIR CROSS SECTIONS, APPROVE THEM

16:26   16 FOR INTEGRATION INTO MY STUDIES.  ULTIMATELY I HAVE TO TAKE

16:26   17 RESPONSIBILITY FOR ALL CROSS SECTIONS THAT ARE CONTAINED IN MY

16:26   18 EXPERT REPORT, SIR.

16:26   19 **Q.**   I'M READING FROM YOUR TESTIMONY.  WE HAVE THE BENEFIT OF

16:26   20 BEING ABLE TO READ IT SHORTLY AFTER YOU GIVE IT.  THIS IS AT

16:26   21 1317 SECONDS -- 32 SECONDS.  THAT MEANS, IF I UNDERSTAND MY

16:27   22 MILITARY TIME, 11732 THIS AFTERNOON, JUST WHEN I STARTED.

16:27   23       AND I ASKED THE QUESTION -- IN THIS CASE I WASN'T

16:27   24 LIMITING IT TO CASE 1, CASE 2.  HERE'S MY QUESTION.

16:27   25       "QUESTION:  NOW, IN THIS CASE YOU RELIED ON

**ROBERT G. BEA - CROSS**

| | |
|---|---|
| 16:27 | 1 |
| 16:27 | 2 |

16:27    1        DR. ROGERS FOR SOME OF THE INFORMATION YOU INCLUDED IN

16:27    2        YOUR EXPERT REPORTS; ISN'T THAT RIGHT?

16:27    3             "ANSWER:  THAT IS CORRECT.  THAT STATEMENT NEEDS TO

16:27    4        BE BROUGHT FORWARD AS A CLARIFICATION TO A STATEMENT YOU

16:27    5        MADE EARLIER TO THE COURT" -- I DON'T KNOW WHEN -- "THAT

16:27    6        DR. ROGERS WAS RESPONSIBLE FOR DEVELOPMENT OF THE

16:27    7        ANALYTICAL CROSS SECTIONS.  THAT'S NOT FACTUAL OR TRUE."

16:27    8             IT IS TRUE, AT LEAST AS TO YOUR CASE 2

16:27    9   CROSS SECTIONS, IS IT NOT?

16:27   10             MR. SCHULTZ:  JUDGE, CAN WE ASK QUESTIONS INSTEAD OF

16:27   11   GIVING TESTIMONY?

16:27   12             MR. TREEBY:  I JUST ASKED A QUESTION.

16:27   13             THE COURT:  YOUR OBJECTION IS OVERRULED.

16:27   14                ANSWER THE QUESTION.

16:27   15             THE WITNESS:  THE STATEMENT I WAS TAKING EXCEPTION TO

16:27   16   WAS DONE DURING THE EARLIER PARTS OF THIS PROCEEDING.  YOU WERE

16:28   17   THE ONE THAT MADE THE STATEMENT SO THE TRANSCRIPT REFLECTED

16:28   18   THAT IT ATTRIBUTED ALL OF THE CROSS SECTIONS THAT WERE USED AT

16:28   19   THE -- IN MY ANALYSES TO DR. ROGERS.  I TOOK EXCEPTION TO THAT

16:28   20   OVERGENERALIZATION BECAUSE DR. ROGERS DID NOT HAVE ANY ROLE IN

16:28   21   THE CASE 1 CROSS SECTIONS.  HE WAS A PRINCIPAL PERSON WORKING

16:28   22   IN THE CASE 2 CROSS SECTIONS.

16:28   23                OVERGENERALIZATIONS CAN BE VERY DESTRUCTIVE.

16:28   24   BY MR. TREEBY:

16:28   25   Q.   WE ARE IN AGREEMENT ON THAT.

**ROBERT G. BEA - CROSS**

16:28   1   **A.**   GOOD.

16:28   2   **Q.**   LET'S TALK ABOUT YOUR CROSS SECTIONS FOR THE NORTH AND

16:28   3   SOUTH BREACHES.  THESE CROSS SECTIONS FOUND IN YOUR ORIGINAL

16:29   4   REPORT WERE USED BY MR. COBOS-ROA IN PERFORMING HIS SEEP/W AND

16:29   5   SLOPE/W ANALYSES TO PROVIDE FLOW ANALYSES AND STABILITY

16:29   6   ANALYSES FOR YOUR OPINIONS REGARDING THE NORTH AND SOUTH

16:29   7   BREACHES; ISN'T THAT TRUE?

16:29   8   **A.**   PLEASE DEFINE WHAT THE WORD *ORIGINAL* IS REFERRING TO IN

16:29   9   YOUR QUESTION.

16:29   10   **Q.**   YOUR FEBRUARY 1, 2012 REPORT.

16:29   11   **A.**   YES, SIR.

16:29   12   **Q.**   YOU HAVE TOLD US, HAVE YOU NOT, THAT THE CROSS SECTIONS IN

16:29   13   YOUR REPORT, QUOTE, PRESENT REASONABLE REPRESENTATIONS OF THE

16:29   14   GEOTECHNICAL AND FLOODWALL CONDITIONS THAT EXISTED AT THE THREE

16:29   15   ANALYSIS SITES AT THE TIME OF THE HURRICANE KATRINA; ISN'T THAT

16:29   16   CORRECT?

16:29   17   **A.**   THAT'S CORRECT.

16:29   18   **Q.**   IN APPENDIX B OF YOUR ORIGINAL REPORT, YOU SHOW YOUR

16:29   19   CROSS SECTIONS FOR THE NORTH BREACH CASE 1-1 AND 1-2.  DO YOU

16:29   20   RECALL THAT?

16:29   21   **A.**   YES, SIR.

16:30   22   **Q.**   I'LL PULL THEM UP ANY TIME, IF YOU WANT TO SEE THEM.  I'M

16:30   23   NOT TRYING TO HIDE THEM, SIR.

16:30   24        IN BOTH OF THOSE CROSS SECTIONS, FOR THE NORTH BREACH

16:30   25   CASE 1-1 AND 1-2, YOU SHOW A BACKFILLED EXCAVATION.  DO YOU

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:30 | 1 | RECALL THAT? |
| 16:30 | 2 | **A.**   MORE THAN ONE. |
| 16:30 | 3 | **Q.**   THERE'S A LARGE ONE, HOWEVER, CLOSE TO THE FLOODWALL; |
| 16:30 | 4 | ISN'T THAT CORRECT? |
| 16:30 | 5 | **A.**   PLEASE DEFINE *CLOSE TO*. |
| 16:30 | 6 | **Q.**   LET'S PULL IT UP. |
| 16:30 | 7 | **THE COURT:**  LET'S DO THAT. |
| 16:30 | 8 | **MR. TREEBY:**   JX-1391-0014 AND OO -- LET'S DO THEM ONE |
| 16:30 | 9 | AT A TIME.  0014, AND THEN WE WILL DO 0015.  BLOW UP THAT |
| 16:30 | 10 | CROSS SECTION AT THE TOP. |
| 16:30 | 11 | **BY MR. TREEBY:** |
| 16:30 | 12 | **Q.**   I'M TALKING ABOUT WHAT LOOKS TO ME LIKE A RELATIVELY LARGE |
| 16:30 | 13 | BACKFILLED EXCAVATION RIGHT THERE WHERE THE ARROW IS POINTED. |
| 16:31 | 14 | I DON'T KNOW WHO DID THAT, BUT THANK YOU.  DO YOU SEE THAT? |
| 16:31 | 15 | THAT'S THE BACKFILLED EXCAVATION I'M REFERRING TO. |
| 16:31 | 16 | **A.**   THAT ONE. |
| 16:31 | 17 | **Q.**   YES, CASE 1-1. |
| 16:31 | 18 | **THE COURT:**  DR. BEA JUST MARKED IT HIMSELF. |
| 16:31 | 19 | **MR. TREEBY:**  GO TO THE NEXT PAGE.  BLOW THAT ONE UP, |
| 16:31 | 20 | THE CROSS SECTIONS. |
| 16:31 | 21 | **BY MR. TREEBY:** |
| 16:31 | 22 | **Q.**   THIS IS CASE 1-2.  YOU HAVE WHAT LOOKS TO ME LIKE PRETTY |
| 16:31 | 23 | MUCH THE SAME BACKFILLED EXCAVATION SHOWN IN THIS |
| 16:31 | 24 | CROSS SECTION.  IS THAT RIGHT? |
| 16:31 | 25 | **A.**   WELL, THIS BACKFILLED EXCAVATION I'LL MARK WITH THE RED |

ROBERT G. BEA - CROSS

| | |
|---|---|
| 16:31 | 1 | SQUARE IS ABUTTED TO YET ANOTHER BACKFILLED EXCAVATION TO THE |
| 16:31 | 2 | RIGHT OR TO THE INDUSTRIAL CANAL SIDE. |
| 16:31 | 3 | **Q.** IS IT YOUR INTENTION IN LABELING THIS CROSS SECTION THAT |
| 16:32 | 4 | THE WORDS *BACKFILLED EXCAVATION* THAT APPEAR IMMEDIATELY ABOVE |
| 16:32 | 5 | THAT YELLOW SQUARE, I'LL CALL IT, THAT THE ARROW IS POINTED TO |
| 16:32 | 6 | AND THAT -- THE ARROW IS POINTED TO.  LET'S TAKE THAT ONE.  ARE |
| 16:32 | 7 | YOU SAYING THAT THAT LABEL, "BACKFILLED EXCAVATION," WAS |
| 16:32 | 8 | INTENDED TO APPLY TO THE YELLOW STUFF TO THE RIGHT AND THE |
| 16:32 | 9 | YELLOW STUFF TO THE LEFT? |
| 16:32 | 10 | **A.** NO, TO THE YELLOW STUFF TO THE LEFT. |
| 16:32 | 11 | **Q.** AND NOT THE YELLOW STUFF TO THE RIGHT? |
| 16:32 | 12 | **A.** THAT'S CORRECT. |
| 16:32 | 13 | **Q.** WE WERE SUPPOSED TO TELL THAT BY THAT LABEL? |
| 16:32 | 14 | **A.** THAT'S CORRECT. |
| 16:32 | 15 | **Q.** OKAY.  WELL, WE'LL DEAL WITH THAT. |
| 16:32 | 16 | I'M GOING TO TALK TO YOU ABOUT THAT SQUARE, OKAY, THE |
| 16:32 | 17 | ONE THAT THE ARROW IS POINTED TO. |
| 16:32 | 18 | **A.** THANK YOU.  THERE ARE THREE SQUARES THAT ARE THERE NOW. |
| 16:32 | 19 | **Q.** THE YELLOW SQUARE, "1," RIGHT? |
| 16:32 | 20 | **THE COURT:** HE KNOWS THE ONE THE ARROW IS POINTED TO. |
| 16:32 | 21 | THAT'S WHERE YOUR QUESTIONS WILL BE DIRECTED. |
| 16:33 | 22 | **MR. TREEBY:** YES, THEY ARE.  THANK YOU. |
| 16:33 | 23 | BY MR. TREEBY: |
| 16:33 | 24 | **Q.** YOU DESCRIBED THAT EXCAVATION IN YOUR REPORT AS, QUOTE, A |
| 16:33 | 25 | DEEP BACKFILLED RECTANGULAR EXCAVATION LOCATED APPROXIMATELY |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:33 | 1 | 60 FEET FROM THE SHEET PILE; ISN'T THAT RIGHT? |
| 16:33 | 2 | **A.**   THAT'S CORRECT. |
| 16:33 | 3 | **Q.**   YOU ALSO SAY THAT THE EXCAVATION WAS 25 FEET WIDE, |
| 16:33 | 4 | 100 FEET LONG, AND APPROXIMATELY 10 FEET DEEP.  DO YOU SEE |
| 16:33 | 5 | THAT? |
| 16:33 | 6 | **A.**   YES. |
| 16:33 | 7 | **Q.**   BUT THE CROSS SECTION IN FIGURE 43 -- IS THAT WHAT WE |
| 16:33 | 8 | HAVE -- 43 OF YOUR REPORT -- LET'S GO TO FIGURE 43 IN YOUR |
| 16:33 | 9 | REPORT BECAUSE I THINK IT'S THE SAME CROSS SECTION. |
| 16:33 | 10 | **THE COURT:**  I'LL REMOVE THE RED MARKS. |
| 16:33 | 11 | **BY MR. TREEBY:** |
| 16:33 | 12 | **Q.**   1389-0081. |
| 16:33 | 13 | **THE COURT:**  IT'S FIGURE 11.  I'M LOOKING AT FIGURE 11 |
| 16:33 | 14 | HERE. |
| 16:33 | 15 | **MR. TREEBY:**  I NEED JX-1389-0081.  THEN 81, NOT 0001. |
| 16:34 | 16 | THERE WE GO. |
| 16:34 | 17 | THE TOP OF THOSE TWO IF YOU WOULD.  FIGURE 43. |
| 16:34 | 18 | HERE WE GO. |
| 16:34 | 19 | **BY MR. TREEBY:** |
| 16:34 | 20 | **Q.**   THE NORTH BREACH CROSS SECTION, CASE 1-1.  IT'S SUPPOSED |
| 16:34 | 21 | TO BE THE SAME CROSS SECTION, RIGHT, AS THE OTHER FIGURE WE |
| 16:34 | 22 | LOOKED AT ON FIGURE 11, BECAUSE IT'S THE NORTH BREACH |
| 16:34 | 23 | CROSS SECTION, CASE 1-1. |
| 16:34 | 24 | **A.**   THAT'S CORRECT. |
| 16:34 | 25 | **Q.**   BUT THIS CROSS SECTION IN FIGURE 43 APPEARS TO SHOW THAT |

ROBERT G. BEA - CROSS

16:34   1   SAME BACKFILLED EXCAVATION, THE YELLOW SQUARE, DEEPER THAN

16:35   2   10 FEET FROM GROUND SURFACE, MAYBE CLOSER TO 15 TO 17 FEET

16:35   3   BELOW GROUND SURFACE; ISN'T THAT RIGHT?

16:35   4   **A.**   IT SHOWS THE SURFACE AT APPROXIMATELY AN ELEVATION OF PLUS

16:35   5   2 FEET PLUS 3 FEET AND THE BOTTOM MINUS 9 FEET.

16:35   6   **Q.**   THAT'S ABOUT 17 FEET BELOW GROUND SURFACE?

16:35   7   **A.**   9 PLUS 3 IS NOT 17.

16:35   8   **Q.**   WELL, OKAY.

16:35   9           **THE COURT:**  WHERE DID WE GET THE 3, DR. BEA?  I

16:35   10  UNDERSTAND THE 9.

16:35   11          **THE WITNESS:**  RIGHT THERE, THE GROUND SURFACE ABOVE

16:35   12  ZERO.

16:35   13          **THE COURT:**  I GOT IT.  THANK YOU.  THANK YOU.

16:36   14  **BY MR. TREEBY:**

16:36   15  **Q.**   OKAY.  ISN'T IT TRUE THAT YOU HAVE NO EVIDENCE PRE-KATRINA

16:36   16  FOR ANY BACKFILLED EXCAVATION AT THAT LOCATION OF THE

16:36   17  CROSS SECTION THAT YOU SHOW IN CASE 1-1 OR CASE 1-2 NORTH

16:36   18  BREACH THAT WAS THAT DEEP, THAT WIDE, AND THAT LONG?

16:36   19  **A.**   I THINK THAT IS NOT A CORRECT GENERALIZATION.

16:36   20  **Q.**   I'M NOT TRYING TO DECEIVE YOU HERE.  SO LET'S CALL UP YOUR

16:36   21  MARCH 28.  WE ARE GOING TO PLAY THE VIDEO OF 113, 3 THROUGH 17.

16:36   22          (VIDEO PLAYED.)

16:36   23          **"QUESTION:**  NOW, WHAT I'M ASKING IS NOT ABOUT CONCEPT

16:36   24      AND NOT ABOUT WHAT YOU SAW IN PHOTOGRAPHS AFTER KATRINA.

16:36   25      I'M ASKING ABOUT ANY EVIDENCE YOU HAVE PRE-KATRINA FOR ANY

ROBERT G. BEA - CROSS

16:36   1        EXCAVATION AT THAT LOCATION THAT WAS A 15- TO 17-FOOT DEEP
16:37   2        EXCAVATION WITH ANYTHING NEAR THESE DIMENSIONS, 25 FEET
16:37   3        WIDE, 100 FEET LONG, 15 TO 17 FEET DEEP, AT THAT LOCATION.
16:37   4        ANY EVIDENCE.
16:37   5             "ANSWER:  AND YOUR QUESTION OF ME IS, DO I HAVE A
16:37   6        DOCUMENT THAT SAYS A HOLE EXCAVATION WITH THOSE DIMENSIONS
16:37   7        WAS DEVELOPED AT THAT LOCATION BY WGI PRE-KATRINA?  THE
16:37   8        ANSWER TO THAT IS NO.  I DON'T HAVE A COMPLETE ENOUGH
16:37   9        RECORD TO TRACE IT."
16:37  10             (VIDEO STOPPED.)
16:37  11   BY MR. TREEBY:
16:37  12   Q.   NOW, JUST TO CLEAR UP SOMETHING BECAUSE OF THE MEASUREMENT
16:37  13   THAT'S 9, 13, THAT, I HAD ASKED YOU TO LOOK AT IT BECAUSE THESE
16:37  14   FIGURES ARE PRETTY HARD TO READ IN TERMS OF WHAT THEY ARE
16:37  15   DEPICTING.
16:37  16   A.   YES, SIR.
16:38  17   Q.   I HAD ASKED YOU -- IN YOUR DEPOSITION I HAD ASKED YOU
16:38  18   WHETHER THAT CROSS SECTION APPEARED AT FIGURE 43 -- APPEARED TO
16:38  19   SHOW THE SAME BACKFILLED EXCAVATION DEEPER THAN 10 FEET FROM
16:38  20   GROUND SURFACE, MAYBE CLOSER TO 15 TO 17 FEET BELOW GROUND
16:38  21   SURFACE; ISN'T THAT RIGHT?
16:38  22             AND YOUR ANSWER WAS?
16:38  23             "ANSWER:  AND IT IS BECAUSE THE 10-FOOT REFERENCE IS
16:38  24        A REFERENCE TO ELEVATION AND THE 15 TO 17 FEET IS THE
16:38  25        DEPTH OF YOUR EXCAVATION ABOVE GROUND SURFACE."

ROBERT G. BEA - CROSS

16:38   1           SO I TOOK THAT TO MEAN YOU READ IT AS 15 TO 17 FEET.
16:38   2   IS THAT FAIR?
16:38   3   **A.**   THAT'S NOT FAIR.
16:38   4           **MR. SCHULTZ:**  CAN I GET A CITE, PLEASE?
16:38   5   **BY MR. TREEBY:**
16:38   6   **Q.**   LET'S LOOK AT --
16:38   7           **MR. TREEBY:**  YES, YOU CAN.  LET'S LOOK AT IT, IN
16:38   8   FACT.  MARCH 28 --
16:38   9           **THE COURT:**  I'M A LITTLE CONFUSED NOW.  THE FIGURE
16:38   10  THAT I LOOKED AT ONLY SHOWS APPROXIMATELY 9 TO 10 FEET AND THEN
16:38   11  2 TO 3 FEET TO GROUND LEVEL.
16:38   12          **MR. TREEBY:**  IT'S ALL SUBJECT TO SCALE AND ALL THAT.
16:38   13  I DIDN'T WANT THE COURT TO THINK I WAS MISLEADING THE COURT
16:38   14  WHEN I SAID 15 TO 17 FEET.  I TOOK IT FROM AN ANSWER.
16:39   15          **THE COURT:**  I UNDERSTAND THAT.  I WOULD NEVER ASSUME
16:39   16  YOU WERE DOING THAT, NOR THE WITNESS.
16:39   17  **BY MR. TREEBY:**
16:39   18          **MR. TREEBY:**  SO LET'S LOOK AT IT.  LET'S LOOK AT --
16:39   19          **THE COURT:**  SO WE HAVE THE CORRECT DEPICTION ON THE
16:39   20  GRAPH NOW ON THE BASIC, AND WE ARE MOVING ON FROM THERE.
16:39   21          **MR. TREEBY:**  RIGHT.  RIGHT.  WE'LL LEAVE THAT.  I'LL
16:39   22  MOVE ON.
16:39   23  **BY MR. TREEBY:**
16:39   24  **Q.**   ANYWAY, YOU CERTAINLY HAVE NO DOCUMENTATION FROM ALL OF
16:39   25  THE RECORDS THAT WERE KEPT ABOUT THE WORK THAT WASHINGTON GROUP

ROBERT G. BEA - CROSS

16:39  1    DID THAT SAYS A HOLE EXCAVATION WITH THOSE DIMENSIONS OR

16:39  2    ANYTHING LIKE THEM WAS DEVELOPED BY WASHINGTON GROUP

16:39  3    PRE-KATRINA; ISN'T THAT RIGHT?

16:39  4           MR. SCHULTZ:  I'M SORRY, YOUR HONOR.  I LODGE AN

16:39  5    OBJECTION ON VAGUENESS.  I DON'T KNOW IF THOSE DIMENSIONS ARE

16:39  6    NOW BACK TO MINUS 9 OR ARE STILL AT MINUS 15 TO 17.

16:39  7           THE COURT:  WHY DON'T WE TAKE THE DEPICTION AS SHOWN

16:39  8    ON FIGURE 4 WE JUST SAW.

16:40  9           MR. SCHULTZ:  THANK YOU.

16:40  10          MR. TREEBY:  BY THE WAY, FIGURE 43 -- I GOT SOME HELP

16:40  11   HERE.  I NEED IT.  FIGURE 43 SHOWS A GROUND SURFACE ACTUALLY AT

16:40  12   ABOUT 6.8 FEET, NOT 3 FEET, ACCORDING TO THE SCALE ON

16:40  13   FIGURE 43.  LET'S PULL IT UP AGAIN.

16:40  14          THE WITNESS:  LET'S DO.

16:40  15          MR. TREEBY:  THAT'S WHERE WE GOT 15 TO 17.

16:40  16          THE COURT:  OKAY.

16:40  17          THE WITNESS:  IF I MISREAD IT, I MISREAD IT.  IT

16:40  18   NEEDS TO BE CORRECTED.

16:40  19   BY MR. TREEBY:

16:40  20   Q.  IS THAT RIGHT?

16:40  21          THE COURT:  HE SAID HE WOULD LIKE TO LOOK AT IT.  IF

16:40  22   HE IS WRONG, HE WANTS TO CORRECT IT.

16:40  23          MR. TREEBY:  THAT'S FINE.

16:40  24              IT'S JX-1389-0081.  BLOW UP THAT TOP ONE.

16:40  25   THERE'S A LABEL ON THERE THAT SAYS ABOUT 6.8 FEET SOMEWHERE.

**ROBERT G. BEA - CROSS**

16:40   1   WHERE IS THAT LABEL?

16:40   2           **THE COURT:**  I'M LOOKING.  I SEE GSE UP AT THE TOP,

16:41   3   6.8.  I'M NOT SURE WHAT THAT MEANS, BUT I SEE IT.

16:41   4           **MR. TREEBY:**  OH, I SEE IT.  IT'S RIGHT UP THERE IN

16:41   5   THE LEFT, RIGHT AT -- THE TOP PRINTING AT THE LEFT -- JUST TO

16:41   6   THE LEFT AND UP FROM THE BACKFILLED EXCAVATION.  IT SAYS

16:41   7   6.8 FEET, "APPROXIMATELY 6.8 FEET GROUND SURFACE ELEVATION."

16:41   8           **MR. BRUNO:**  WHY DON'T WE BLOW IT UP.

16:41   9           **MR. TREEBY:**  CAN YOU BLOW THAT UP, THAT LITTLE PIECE

16:41   10  RIGHT THERE?  THERE WE GO.

16:41   11  **BY MR. TREEBY:**

16:41   12  **Q.**   DO YOU SEE THAT?  "GROUND SURFACE ELEVATION, 6.8 FEET

16:41   13  NAVD88?

16:41   14  **A.**   YES.

16:41   15  **Q.**   GROUND SURFACE ISN'T A NEGATIVE 6.8.  THAT'S NOT WHAT THAT

16:42   16  MEANS, IS IT?  YOU DIDN'T MEAN TO SAY THAT, DID YOU?  IF SO,

16:42   17  IT'S WORSE THAN I THOUGHT.

16:42   18  **A.**   THE ANSWER IS NO.  THE CROSS SECTION -- AND I'VE GOT A

16:42   19  COPY UP HERE IN FRONT OF ME.  THE SURFACE IS APPROXIMATELY

16:42   20  PLUS 5, NOT PLUS 3, IN NAVD88.  AND THE BOTTOM IS APPROXIMATELY

16:42   21  MINUS 9 FEET IN NAVD88.

16:42   22  **Q.**   WE ARE GETTING CLOSER.  WE ARE 14 FEET, ACCORDING TO WHAT

16:42   23  YOU ARE SAYING.  I'M GOING TO BE SATISFIED WITH 14 FEET DEEP.

16:42   24  **A.**   I THINK WE ARE THERE.

16:42   25          **THE COURT:**  THANK YOU, COUNSEL.

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:43 | 1 | BY MR. TREEBY: |
| 16:43 | 2 | Q.   ISN'T IT TRUE THAT YOU HAVE NO EVIDENCE PRE-KATRINA FOR |
| 16:43 | 3 | ANY BACKFILLED EXCAVATION AT THAT LOCATION OF THAT |
| 16:43 | 4 | CROSS SECTION YOU SHOW IN CASE 1-1 OR 1-2, NORTH BREACH, THAT |
| 16:43 | 5 | HAS THOSE DIMENSIONS AS SHOWN ON THAT FIGURE?  BECAUSE THAT'S |
| 16:43 | 6 | WHAT I WAS ASKING YOU ABOUT, WAS THE FIGURE. |
| 16:43 | 7 | A.   WELL, THE ANSWER TO THAT IS YES.  AND IN THE REPORT I |
| 16:43 | 8 | DOCUMENTED THE EXCAVATIONS PERFORMED IN THAT AREA THAT COULD |
| 16:43 | 9 | EXPLAIN THAT FEATURE.  THAT FEATURE IS THE PRODUCT OF THE |
| 16:43 | 10 | INDUCTIVE ANALYSIS. |
| 16:43 | 11 | WE USED PHOTOGRAPHIC INFORMATION GATHERED AT THE SITE |
| 16:44 | 12 | SHORTLY AFTER KATRINA LEFT THE AREA AND BEFORE RITA ENTERED, TO |
| 16:44 | 13 | ESTIMATE THE GENERAL DIMENSIONS OF THE UNUSUAL HOLE THAT THEN |
| 16:44 | 14 | WE BEGAN TO TRACE BACK THROUGH THE RECORD TO DETERMINE HOW YOU |
| 16:44 | 15 | COULD EXPLAIN THAT HOLE'S PRESENCE. |
| 16:44 | 16 | I DOCUMENTED IN MY REPORT THE AVAILABLE EVIDENCE TO |
| 16:44 | 17 | SUBSTANTIATE WHEN, WHERE, HOW THAT HOLE GOT THERE. |
| 16:44 | 18 | Q.   IN YOUR DEPOSITION, MARCH 28, 2012, PAGE 113, BEGINNING AT |
| 16:44 | 19 | LINE 12, GOING THROUGH LINE 17.  THIS FOLLOWED ON THE LAST |
| 16:45 | 20 | QUESTION THAT WE HAVE ALREADY SEEN, WHERE WE ARE TALKING ABOUT |
| 16:45 | 21 | THIS FIGURE, BEGINNING AT LINE 12. |
| 16:45 | 22 | "ANSWER:  AND YOUR QUESTION OF ME IS, DO I HAVE A |
| 16:45 | 23 | DOCUMENT THAT SAYS A HOLE EXCAVATION WITH THOSE DIMENSIONS |
| 16:45 | 24 | WAS DEVELOPED AT THAT LOCATION BY WASHINGTON GROUP |
| 16:45 | 25 | PRE-KATRINA?  THE ANSWER TO THAT IS NO.  I DON'T HAVE A |

**ROBERT G. BEA - CROSS**

16:45   1          COMPLETE ENOUGH RECORD TO TRACE IT."

16:45   2                  IS YOUR ANSWER DIFFERENT NOW?

16:45   3   **A.**   NO.

16:45   4          **THE COURT:**  I UNDERSTAND HIS ANSWER.  HE DOESN'T HAVE

16:45   5   A DOCUMENT; HE USED INDUCTIVE REASONING, LOOKING AT THE --

16:45   6          **MR. TREEBY:**  PICTURE AFTER THE STORM.

16:45   7          **THE COURT:**  AND THE HOLE THAT WAS THERE.  I

16:45   8   UNDERSTAND.  I'M SURE IT WILL BE CONTESTED, BUT I UNDERSTAND

16:45   9   HIS ANSWER.

16:45   10  **BY MR. TREEBY:**

16:45   11  **Q.**   IN ANY CASE, YOU DON'T KNOW WHEN ANY SUCH EXCAVATION WAS

16:45   12  PERFORMED BY WASHINGTON GROUP.  ISN'T THAT LOGICAL?

16:45   13  **A.**   NO.

16:45   14  **Q.**   IT'S NOT LOGICAL?

16:45   15  **A.**   NO, IT'S NOT.  WASHINGTON GROUP DOCUMENTED IN THAT 20,000

16:46   16  PAGES I CITED AND THE 8,000 PHOTOGRAPHS WHEN EXCAVATIONS WERE

16:46   17  MADE, GAVE US GENERAL INFORMATION ON THE GEOMETRIC

16:46   18  CHARACTERISTICS OF EXCAVATIONS.

16:46   19         **MR. TREEBY:**  I'M GOING TO CALL THE COURT'S ATTENTION

16:46   20  AND COUNSEL'S TO MARCH 28, 2012, PAGE 113, FOLLOWING RIGHT

16:46   21  AFTER THAT, LINE 18 THROUGH 21.  WE A HAVE A VIDEO.

16:46   22          (VIDEO PLAYED.)

16:46   23         **"QUESTION:**  AS A RESULT, YOU DON'T KNOW WHEN ANY SUCH

16:46   24         EXCAVATION WAS PERFORMED BY WASHINGTON GROUP.  ISN'T THAT

16:46   25         LOGICAL?

ROBERT G. BEA - CROSS

16:46    1           **"ANSWER:** THAT'S CORRECT."

16:46    2           (VIDEO STOPPED.)

16:46    3           **THE COURT:** THANK YOU, COUNSEL.

16:46    4    BY MR. TREEBY:

16:46    5    **Q.** NOW, YOU HAVE ALREADY TESTIFIED AGAIN TODAY, I BELIEVE,

16:46    6    THAT YOU RELIED TO SOME EXTENT ON CHAD MORRIS' REPORT TO

16:46    7    PREPARE YOUR EXPERT OPINIONS IN THIS CASE.  IS THAT CORRECT?

16:46    8    **A.** ON TWO REPORTS.

16:46    9    **Q.** HIS REPORTS ARE CITED SEVERAL TIMES IN YOUR REPORT; ISN'T

16:46   10    THAT CORRECT?

16:46   11    **A.** THAT'S CORRECT.

16:46   12    **Q.** HE WAS QUALIFIED HERE AS AN EXPERT IN SURVEYS AND MAPPING?

16:47   13    **A.** YES, SIR.

16:47   14    **Q.** DO YOU KNOW THAT CHAD MORRIS TESTIFIED IN THIS CASE THAT

16:47   15    YOU CAN'T TELL FROM ANY AERIAL PHOTO THE DEPTH OF EXCAVATIONS?

16:47   16    **A.** THAT'S CORRECT.

16:47   17    **Q.** YOU HAVE AGREED THAT THE GRID TRENCHING PERFORMED AT THE

16:47   18    EAST BANK INDUSTRIAL AREA WE'LL HEAR MORE ABOUT EXTENDED TO A

16:47   19    DEPTH OF ONLY 5 FEET BELOW THE GROUND SURFACE; ISN'T THAT

16:47   20    CORRECT?

16:47   21    **A.** THAT WAS A GENERAL FIGURE IN THE DOCUMENTATION.

16:47   22    **Q.** YOU AGREE THAT THAT'S CORRECT, DO YOU NOT?

16:47   23    **A.** YES.

16:47   24    **Q.** THANK YOU.

16:47   25           YOU KNOW THAT THE ELEVATION OF THE SURFACE AT THE

ROBERT G. BEA - CROSS

16:47    1    EBIA -- I ASSUME YOU KNOW THAT THE SURFACE OF THE GROUND AT THE

16:47    2    EBIA WAS TYPICALLY ABOVE ZERO FEET ELEVATION, NAVD88-2004.65;

16:48    3    IS THAT RIGHT?

16:48    4    A.    THAT'S TRUE FOR AREAS THAT WERE NOT PURPOSELY FLOODED, FOR

16:48    5    EXAMPLE, THE MCDONOUGH BORROW PIT, WHICH THE BOTTOM OF THAT

16:48    6    EXCAVATION IS BELOW THE SURFACE.

16:48    7    Q.    I PROBABLY SHOULD HAVE ASKED A BETTER, MORE PRECISE

16:48    8    QUESTION.  YOU KNOW THAT BEFORE ANY EXCAVATIONS WERE DONE BY

16:48    9    WASHINGTON GROUP, THE ELEVATION OF THE SURFACE AT THE EBIA WAS

16:48   10    TYPICALLY ABOVE ZERO FEET ELEVATION; ISN'T THAT CORRECT?

16:48   11    A.    THAT'S CORRECT.  DR. MARR PRODUCES AN EXCELLENT

16:48   12    CROSS SECTION LONGITUDINALLY NORTH/SOUTH TO LET US UNDERSTAND

16:48   13    THE AVERAGE GROUND ELEVATION ON THE EBIA JUST BEFORE KATRINA

16:49   14    WAS APPROXIMATELY PLUS 2 TO PLUS 3 FEET NAVD88.

16:49   15    Q.    SO THE DEPTHS OF ANY EXCAVATION WOULD NOT MEAN THAT IT WAS

16:49   16    THAT DISTANCE BELOW ZERO FEET ELEVATION?

16:49   17    A.    THAT'S CORRECT, SIR.

16:49   18    Q.    FOR EXAMPLE, THE BOTTOM OF A 16-FOOT DEEP EXCAVATION THAT

16:49   19    STARTED AT PLUS 11.5 FEET ELEVATION WOULD BE AT MINUS 4.5 FEET

16:49   20    ELEVATION; IS THAT RIGHT?

16:49   21    A.    PLEASE REPEAT THOSE FIGURES, SO I CAN --

16:49   22    Q.    YOU HAVE THE BOTTOM OF AN EXCAVATION AT 16 FEET.

16:49   23          MR. TREEBY:  AND I USE THESE NUMBERS FOR A PURPOSE,

16:49   24    YOUR HONOR.  THEY ARE NOT RANDOM.

16:49   25          THE COURT:  RIGHT.

ROBERT G. BEA - CROSS

16:49  1  **BY MR. TREEBY:**

16:49  2  **Q.**   IF THE BOTTOM OF A 16 FEET DEEP EXCAVATION -- EXCAVATION,

16:49  3  THE RECORDS ALL SHOW, IS 16 FEET DEEP.  IF IT STARTED -- IF THE

16:49  4  TOP OF THE EXCAVATION WAS AT PLUS 11.5 FEET ELEVATION, THEN THE

16:50  5  BOTTOM WOULD BE AT MINUS 4.5 FEET ELEVATION.  ISN'T THAT

16:50  6  CORRECT?

16:50  7  **A.**   CORRECT.

16:50  8  **Q.**   GRID TRENCHING CERTAINLY WASN'T 15 TO 17 FEET DEEP; ISN'T

16:50  9  THAT CORRECT?

16:50  10  **A.**   WELL, THIS IS THE DIFFICULTY OF ANSWERING THIS SORT OF

16:50  11  QUESTION FOR ME.  THE GRID TRENCHING IN GENERAL HAD A DEPTH OF

16:50  12  5 FEET.  DURING THAT PROCESS OF THE GRID TRENCHING, THINGS WERE

16:50  13  ENCOUNTERED THAT WERE SIGNIFICANTLY DEEPER THAT HAD BEEN TO

16:50  14  REMOVED.  SO I'M TRYING TO KEEP CLEAR FOR THE COURT THAT

16:50  15  THERE'S ACTUALLY A VERY COMPLEX SET OF EXCAVATIONS THAT ARE

16:51  16  INVOLVED HERE.

16:51  17  **Q.**   THE FACTS OF THAT ARE GOING TO BE GONE INTO.  I'M JUST

16:51  18  TRYING TO GET GENERAL INFORMATION THAT YOU KNOW.

16:51  19       WELL, YOU DO KNOW GRID TRENCHING -- YOU DON'T KNOW OF

16:51  20  ANY GRID TRENCHING THAT WENT 14 FEET DEEP, DO YOU?

16:51  21       **THE COURT:**  ARE WE EQUATING GRID TRENCHING WITH

16:51  22  EXCAVATING OBJECTS FOUND THAT WERE NOT CONTEMPLATED?

16:51  23       **MR. TREEBY:**  GRID TRENCHING --

16:51  24       **THE COURT:**  JUST GENERIC GRID TRENCHING?

16:51  25       **MR. TREEBY:**  RIGHT, JUST THE GENERIC GRID TRENCHING,

ROBERT G. BEA - CROSS

16:51    1    THE PATTERN OF GRIDS THAT WERE, I BELIEVE, 2 FEET WIDE EACH,

16:51    2    GENERALLY 5 FEET DEEP, AND GENERALLY 25 FEET APART.  THAT'S, I

16:51    3    BELIEVE, THE GRID, BUT THAT WILL ALL BE -- I'M NOT GIVING

16:51    4    EVIDENCE OBVIOUSLY.

16:51    5            THE COURT:  SURE.  I UNDERSTAND.

16:51    6    BY MR. TREEBY:

16:51    7    Q.   DO YOU KNOW OF ANY EVIDENCE IN WHICH A GRID TRENCH

16:51    8    OPERATION TO FIND OBSTACLES RAN INTO SOMETHING DOWN TO -- THAT

16:52    9    REQUIRED THEM TO GO DOWN TO 14 FEET.  AT THE LOCATION OF YOUR

16:52   10    CROSS SECTIONS -- I SHOULD HAVE ADDED THAT.

16:52   11    A.   THE CROSS SECTION IS A TWO-DIMENSIONAL CUT.

16:52   12            MR. TREEBY:  YOUR HONOR, I WOULD LIKE AN ANSWER TO MY

16:52   13    QUESTION.  THAT'S A YES OR NO.

16:52   14            THE COURT:  DO YOU KNOW OF ANY -- BY GRID TRENCHING,

16:52   15    ARE WE ALSO MEANING EXCAVATIONS?

16:52   16            MR. TREEBY:  WE MEAN AN EXCAVATION THAT CONSISTED OF

16:52   17    GRID TRENCHING FOR THE PURPOSE OF DETERMINING WHERE OBSTACLES

16:52   18    MIGHT BE.

16:52   19            THE COURT:  SO WE'RE NOT TALKING ABOUT THE

16:52   20    EXCAVATION --

16:52   21            MR. TREEBY:  NO, JUST THE GRID TRENCHING.

16:52   22            THE COURT:  -- JUST THE GRID TRENCHING TO GO THROUGH

16:52   23    AND DISCOVER THINGS.

16:52   24            MR. TREEBY:  ANY INSTANCE THAT HE KNOWS OF THAT THE

16:52   25    GRID TRENCHING OPERATION --

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:52 | 1 | THE COURT:  GOTCHA. |
| 16:52 | 2 | MR. TREEBY:  -- FOUND SOME OBSTACLE THAT REQUIRED |
| 16:52 | 3 | SOMEBODY TO GO DOWN 14 FEET. |
| 16:52 | 4 | BY MR. TREEBY: |
| 16:52 | 5 | Q.   DO YOU KNOW OF ANY EXAMPLE OF THAT, A SPECIFIC EXAMPLE OF |
| 16:53 | 6 | THAT? |
| 16:53 | 7 | A.   YES. |
| 16:53 | 8 | Q.   WHAT IS THE LOCATION OF THAT -- TELL YOU WHAT.  AT THE |
| 16:53 | 9 | LOCATION -- |
| 16:53 | 10 | MR. TREEBY:  I'M SORRY.  MAYBE I'M GETTING TIRED, |
| 16:53 | 11 | YOUR HONOR. |
| 16:53 | 12 | BY MR. TREEBY: |
| 16:53 | 13 | Q.   I'M TRYING TO TALK ABOUT YOUR CROSS SECTION, SO LET'S GO |
| 16:53 | 14 | BACK AND LET ME REPAIR MY QUESTION. |
| 16:53 | 15 | A.   OKAY. |
| 16:53 | 16 | Q.   DO YOU KNOW OF ANY SITUATION IN WHICH GRID TRENCHING DONE |
| 16:53 | 17 | ENCOUNTERED AN OBSTACLE THAT REQUIRED AN EXCAVATION DOWN TO |
| 16:53 | 18 | 14 FEET AT THE LOCATION OF YOUR CROSS SECTIONS? |
| 16:53 | 19 | MR. SCHULTZ:  I JUST WANT TO BE CLEAR, YOUR HONOR, IF |
| 16:53 | 20 | WE ARE TALKING ABOUT EVERY CROSS SECTION NOW, AND WE WERE |
| 16:53 | 21 | TALKING ABOUT 1-1. |
| 16:53 | 22 | THE COURT:  I'M NOT CERTAIN.  I DON'T KNOW. |
| 16:53 | 23 | BY MR. TREEBY: |
| 16:53 | 24 | Q.   NORTH BREACH, THAT'S WHAT I'M TALKING ABOUT.  I'M SORRY IF |
| 16:53 | 25 | I DIDN'T MAKE THAT CLEAR. |

ROBERT G. BEA - CROSS

16:53   1   **A.**   AT THAT SINGLE LOCATION, ANSWER, NO.

16:53   2   **Q.**   YOU ALSO AGREE YOU DO NOT, THAT NO GRID TRENCHING AT ALL

16:53   3   WAS PERFORMED EAST OF SUREKOTE ROAD, BETWEEN THE ROAD AND THE

16:54   4   FLOODWALL.  ISN'T THAT RIGHT?

16:54   5   **A.**   I BELIEVE THAT'S CORRECT.

16:54   6   **Q.**   YOU AGREE -- AND I'M TALKING ABOUT A DIFFERENT KIND OF

16:54   7   EXCAVATION NOW.  YOU AGREE THAT THE AVERAGE DEPTH OF ACM,

16:54   8   ASBESTOS-CONTAINING MATERIALS/TRANSITE CONTAMINATION, AT BOLAND

16:54   9   MARINE WAS ESTIMATED TO BE 2 FEET; IS THAT CORRECT?

16:54   10   **A.**   I DON'T THINK THAT'S CORRECT.  AND THE REASON I'M

16:54   11   PROCEEDING SLOWLY IS THAT WORD *AVERAGE*.

16:54   12   IN YOUR DOCUMENTATION -- IN FACT, DR. STARK BROUGHT

16:54   13   FORWARD THE PHOTOGRAPHS THAT SHOW, I THINK IT WAS, PRECISELY

16:54   14   56 INCHES FROM GROUND SURFACE TO THE BOTTOM OF THAT WALL OF THE

16:54   15   ACM EXCAVATION BOLAND NORTH QUADRANT.

16:55   16   **Q.**   I ASKED ABOUT THE AVERAGE DEPTH; I DIDN'T ASK ABOUT THE

16:55   17   DEEPEST DEPTH.

16:55   18   **A.**   WELL, I HAVEN'T PERFORMED A GEOGRAPHIC -- OR PARDON ME, A

16:55   19   STATISTICAL ANALYSIS THAT LET'S ME RESPOND POSITIVELY AND

16:55   20   CORRECTLY TO YOUR QUESTION.

16:55   21   **Q.**   HAVE YOU READ THE RECORDS THAT STATE THAT THE -- STATEMENT

16:55   22   OF WORK FOR EXCAVATIONS, ACMS, ETC., THAT STATES, AND I QUOTE:

16:55   23   AVERAGE DEPTH OF TRANSITE CONTAMINATION IS ESTIMATED TO BE

16:55   24   2 FEET?  HAVE YOU READ THAT?

16:55   25   **MR. SCHULTZ:**  CAN WE GET A CITE FOR THAT, PLEASE.

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:55 | 1 | **MR. TREEBY:** YES.  I JUST GAVE IT.  JX-58-0001 AT |
| 16:55 | 2 | 0006. |
| 16:55 | 3 | **BY MR. TREEBY:** |
| 16:55 | 4 | **Q.** DO YOU RECALL READING THAT, IS MY FIRST QUESTION. |
| 16:55 | 5 | **A.** NO. |
| 16:55 | 6 | **Q.** YOU DON'T DENY THAT THAT'S THERE?  IN THE RECORDS?  LET'S |
| 16:55 | 7 | CALL IT UP. |
| 16:56 | 8 | **MR. BRUNO:** WE STIPULATE IT'S THERE. |
| 16:56 | 9 | **MR. TREEBY:** YOU STIPULATE? |
| 16:56 | 10 | **THE COURT:** IT'S THERE IN THE DOCUMENT. |
| 16:56 | 11 | **MR. TREEBY:** THAT'S ALL I'M TRYING TO GET. |
| 16:56 | 12 | **THE COURT:** IN THE DOCUMENT. |
| 16:56 | 13 | **BY MR. TREEBY:** |
| 16:56 | 14 | **Q.** TO GET TO MY POINT -- AND I'M NOT STILL TALKING ABOUT THE |
| 16:56 | 15 | NORTH BREACH -- YOU HAVE NO EVIDENCE, DO YOU, THAT ACM TRANSITE |
| 16:56 | 16 | EXCAVATIONS AT BOLAND MARINE WERE 10 FEET DEEP, MUCH LESS |
| 16:56 | 17 | 14 FEET DEEP; ISN'T THAT CORRECT? |
| 16:56 | 18 | **A.** THE PAUSE I'M HAVING IS THE TRANSITE EXCAVATIONS AT THE |
| 16:56 | 19 | NORTH END OF BOLAND MARINE ENCOUNTERED LARGE, THICK CONCRETE |
| 16:56 | 20 | BLOCKS, APPROXIMATELY 5 FEET THICK, THAT WERE LOCATED WITHIN |
| 16:57 | 21 | THE TRANSITE EXCAVATION.  THOSE BLOCKS WERE LATER SALVAGED |
| 16:57 | 22 | BELOW THE BOTTOM OF THE TRANSITE EXCAVATION; IN THIS CASE, |
| 16:57 | 23 | APPROXIMATELY 5 FEET BELOW GROUND SURFACE. |
| 16:57 | 24 | AND PILINGS WERE THEN EXTRACTED FROM THE BOTTOMS OF |
| 16:57 | 25 | THOSE BLOCKS THAT WERE APPROXIMATELY 20 FEET LONG.  SO |

ROBERT G. BEA - CROSS

16:57  1  EXCAVATIONS ASSOCIATED WITH THE TRANSITE DID IN FACT IDENTIFY

16:57  2  THINGS THAT PENETRATED WELL BELOW THE MINUS -- PARDON ME, THE

16:57  3  5 FEET BELOW GROUND SURFACE FOR TRANSITE EXCAVATIONS.

16:57  4  Q.   SOMEHOW WE GOT OFF MY QUESTION, BUT WHAT I ASKED YOU WAS:

16:57  5  YOU DON'T HAVE ANY EVIDENCE THAT ACM TRANSITE EXCAVATIONS AT

16:58  6  BOLAND WERE EVEN 10 FEET DEEP; ISN'T THAT CORRECT?

16:58  7  A.   WELL, I THINK --

16:58  8  Q.   ANSWER YES OR NO, AND THEN WE WILL TAKE THE SAME

16:58  9  EXPLANATION AGAIN IF YOU WANT TO GIVE IT.  I WILL ACCEPT IT

16:58  10 THAT YOU ARE GOING TO TESTIFY TO THE SAME EXPLANATION AGAIN,

16:58  11 BUT CAN I GET A NO OR A YES TO THAT?

16:58  12 A.   PLEASE REPEAT YOUR QUESTION.

16:58  13 Q.   YOU DO NOT HAVE ANY EVIDENCE THAT ACM TRANSITE EXCAVATIONS

16:58  14 AT BOLAND WERE EVEN 10 FEET DEEP; ISN'T THAT CORRECT?

16:58  15 A.   I THINK THAT'S CORRECT.

16:58  16 Q.   I'M NOW GOING TO START TO TALK A LITTLE BIT ABOUT THE

16:59  17 SOUTH BREACH CROSS SECTIONS, CASES 1-1 AND 1-2.

16:59  18      MR. TREEBY:  IF WE CAN CALL THAT UP SO THAT IT'S

16:59  19 AVAILABLE, JX-1391-0041, WHICH IS FROM YOUR FEBRUARY 1, 2012

16:59  20 APPENDIX B TO YOUR REPORT.

16:59  21      I THINK WE HAVE A BAD SELECTION HERE,

16:59  22 YOUR HONOR.  WE'LL COVER THAT ONE.

17:00  23      THE COURT:  WHERE ARE WE GOING TO HERE?

17:00  24      MR. BRUNO:  JUST POINTING OUT IT'S BEEN AN HOUR.

17:00  25 IT'S 5:00.  I DIDN'T KNOW IF THIS WAS A GOOD BREAKING POINT FOR

**ROBERT G. BEA - CROSS**

17:00    1    HIM, BUT I WANTED TO --

17:00    2         **MR. TREEBY:**  MY ONLY CONCERN IS GETTING THIS TRIAL

17:00    3    DONE IN THE SCHEDULE YOUR HONOR HAS.

17:00    4         **THE COURT:**  IT'S GOING TO BE DONE TO SCHEDULE IF IT

17:00    5    HAS TO BE DONE UNTIL MIDNIGHT.

17:00    6         **MR. BRUNO:**  THAT'S WHAT I'M SAYING.

17:00    7         **THE COURT:**  IF I START HEARING THE SAME THING TOO

17:00    8    MUCH WHEN I HEAR THIS STREAM OF EXPERTS -- I DON'T WANT TO HEAR

17:00    9    IT.  Y'ALL HAVE BEEN VERY ORGANIZED.  I UNDERSTAND.

17:00    10        **MR. TREEBY:**  IF YOU SEE ME BEING REPETITIOUS, PLEASE

17:00    11   TELL ME, BECAUSE I AM TRYING NOT TO BE --

17:00    12        **THE COURT:**  I CERTAINLY WILL.

17:00    13        **MR. TREEBY:**  I HAD BY ONE PAGE THIS WRONG.  IT'S

17:00    14   JX-1391-0040.

17:01    15             AND IF YOU WOULD BLOW UP THAT.  THIS IS

17:01    16   FIGURE --

17:01    17        **THE COURT:**  THIS LOOKS VERY FAMILIAR.

17:01    18        **MR. TREEBY:**  SOUTH BREACH CROSS SECTION, CASE 1-1,

17:01    19   FIGURE 33.

17:01    20        **THE COURT:**  GOT IT.

17:01    21   **BY MR. TREEBY:**

17:01    22   **Q.**  YOU HAVE ON THIS CROSS SECTION, DR. BEA, IT LOOKS TO ME

17:01    23   LIKE A VERY SIMILAR BACKFILLED EXCAVATION THAT WE -- THE ONES

17:01    24   WE HAVE BEEN TALKING ABOUT, BUT IT SEEMS QUITE A BIT CLOSER TO

17:01    25   THE FLOODWALL.  AND YOU DESCRIBED THIS EXCAVATION IN YOUR

ROBERT G. BEA - CROSS

17:01   1   REPORT AS, QUOTE, AN EXCAVATION AT THE WATER-SIDE TOE.

17:01   2        DO YOU RECALL THAT?

17:01   3   **A.**   YES, SIR.

17:01   4   **Q.**   BY *WATER-SIDE TOE*, YOU MEAN AT THE TOE OF THE LEVEE ON THE

17:01   5   CANAL SIDE OF THE SAUCER MARINE SITE; IS THAT CORRECT?

17:01   6   **A.**   THAT'S CORRECT.

17:01   7   **Q.**   YOU ALSO STATE IN YOUR FEBRUARY 1 REPORT THAT THE

17:01   8   BACKFILLED EXCAVATION IN THESE CROSS SECTIONS IS 20 TO 25 FEET

17:01   9   WIDE, 50 FEET LONG, AND APPROXIMATELY 8 TO 10 FEET DEEP; IS

17:02   10  THAT CORRECT?

17:02   11  **A.**   THAT'S CORRECT.

17:02   12  **Q.**   THE CROSS SECTION IN THIS FIGURE 33 --

17:02   13       **MR. TREEBY:**  AND JUST SO THE COURT KNOWS, IT'S ALSO

17:02   14  FIGURE 63 IN THE MAIN SECTION OF HIS REPORT -- THAT'S WHAT WAS

17:02   15  CONFUSING US.

17:02   16       **THE COURT:**  ALL RIGHT.

17:02   17       **MR. TREEBY:**  IT'S THE SAME CROSS SECTION.

17:02   18  BY MR. TREEBY:

17:02   19  **Q.**   THE CROSS SECTION IN THIS FIGURE OF YOUR REPORT THAT WE

17:02   20  HAVE ON THE SCREEN, FIGURE 33, APPEARS TO SHOW THE BACKFILLED

17:02   21  EXCAVATION ABOUT 20 FEET DEEP BELOW PRE-KATRINA GROUND SURFACE;

17:02   22  ISN'T THAT RIGHT?

17:03   23       I KNOW WHAT IT SAID IN YOUR REPORT, BUT THE

17:03   24  CROSS SECTION SEEMS TO SHOW IT TO BE 20 FEET DEEP.

17:03   25  **A.**   WE ARE GOING FROM APPROXIMATELY PLUS 5 FEET AT THE SURFACE

ROBERT G. BEA - CROSS

17:03   1   TO APPROXIMATELY MINUS 11 FEET, 12 FEET AT ITS BOTTOM.  IF YOU
17:03   2   TAKE THOSE TWO FIGURES, ADD THEM TOGETHER, YOU WILL HAVE THE
17:03   3   DIMENSION -- SPECIFIC DIMENSION FOR DEPTH USED IN THIS
17:03   4   ANALYTICAL CROSS SECTION.
17:03   5   Q.   I GUESS I OBVIOUSLY WAS HAVING A LITTLE TROUBLE READING
17:03   6   THEM IN YOUR DEPOSITION, BUT YOU SEEM TO AGREE WITH ME,
17:03   7   ACTUALLY, BECAUSE IN YOUR DEPOSITION I ASKED, AND YOU SAID THAT
17:03   8   THIS CROSS SECTION APPEARS TO SHOW THIS BACKFILLED EXCAVATION
17:04   9   ALMOST 20 FEET DEEP.
17:04   10          AND THIS IS DEPOSITION -- FOR COUNSEL'S BENEFIT, THIS
17:04   11   IS DEPOSITION PAGE 125.  THIS HAS TO BE THE MARCH 28
17:04   12   DEPOSITION.  MARCH 28, PAGE 125, LINES 8 THROUGH 15.
17:04   13          "QUESTION:  THIS CROSS SECTION APPEARS TO SHOW THIS
17:04   14      BACKFILLED EXCAVATION IS ALMOST 20 FEET DEEP BELOW THE
17:04   15      PRE-KATRINA GROUND SURFACE; ISN'T THAT CORRECT?
17:04   16          "ANSWER:  THAT'S CORRECT."
17:04   17          SO IN ANY CASE, WE ARE AT 16 TO 20 FEET DEEP, LET'S
17:04   18   SAY, BASED ON THAT.
17:04   19   A.   CORRECT.
17:04   20   Q.   ISN'T IT TRUE YOU HAVE NO EVIDENCE PRE-KATRINA THAT SHOWS
17:04   21   THAT WASHINGTON GROUP DID AN EXCAVATION WITH THE DIMENSIONS
17:04   22   SHOWN ON YOUR SOUTH BREACH CASE 1-1 CROSS SECTION WE HAVE JUST
17:04   23   LOOKED AT?
17:04   24   A.   NO, THAT'S NOT CORRECT.
17:05   25   Q.   OKAY.  LET'S LOOK AT THE VIDEO CLIP.  THIS IS FROM

**ROBERT G. BEA - CROSS**

17:05   1    MARCH 28, 2012, PAGE 116, LINE 13, TO PAGE 117, LINE 6.

17:05   2          (VIDEO PLAYED.)

17:05   3          "QUESTION:  BUT NOW I'M TALKING ABOUT THE SOUTH

17:05   4    BREACH.  YOU HAVE A SIMILAR CONCEPTUAL CROSS SECTION, AND

17:05   5    YOU SHOW AN EXCAVATION TO DEPTH.

17:05   6          "ANSWER:  CORRECT.

17:05   7          "QUESTION:  AND --

17:05   8          "ANSWER:  THAT'S THE CASE 1.

17:05   9          "QUESTION:  OKAY.  AND, IN FACT, YOU HAVE -- WELL, IS

17:05  10    IT TRUE YOU DON'T HAVE ANY EVIDENCE PRE-KATRINA THAT

17:05  11    WASHINGTON GROUP PERFORMED SUCH AN EXCAVATION?

17:05  12          "ANSWER:  AT THAT LOCATION?

17:05  13          "QUESTION:  AT THAT LOCATION.

17:05  14          "ANSWER:  ALL OF THE EVIDENCE THAT WE CITED FOR BOTH

17:05  15    CASES 1 AND 2 ARE CONTAINED IN MY REPORT.  I DON'T THINK

17:05  16    WE WERE ABLE TO TRACE THE CASE 1 EXCAVATION TO A SPECIFIC

17:06  17    DOCUMENT CONCERNING WGI'S WORK AT THAT LOCATION.  THE

17:06  18    DOCUMENT TRAIL WENT COLD."

17:06  19          (VIDEO STOPPED.)

17:06  20          IS THAT STILL YOUR ANSWER?

17:06  21   **A.**   YES.

17:06  22          **THE COURT:**  MR. TREEBY, PROBABLY AT THIS TIME WE

17:06  23   OUGHT TO TAKE A RECESS.  IT'S BEEN A WHILE FOR THE WITNESS.

17:06  24          I'M WILLING -- DO YOU WANT TO CONTINUE ON FOR AT

17:06  25   LEAST --

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 17:06 | 1 | **MR. TREEBY:**  I WOULD LIKE TO, YOUR HONOR, IF |
| 17:06 | 2 | YOUR HONOR IS WILLING TO AND THE WITNESS IS ABLE. |
| 17:06 | 3 | **THE COURT:**  I'LL ASK DR. BEA. |
| 17:06 | 4 | ARE YOU PHYSICALLY UP TO THIS?  WOULD YOU -- |
| 17:06 | 5 | **THE WITNESS:**  YES, SIR.  YOU WANT TO GET FINISHED. |
| 17:06 | 6 | **THE COURT:**  I'M ASKING YOU:  ARE YOU PHYSICALLY UP TO |
| 17:06 | 7 | THIS? |
| 17:06 | 8 | **THE WITNESS:**  SURE. |
| 17:06 | 9 | **THE COURT:**  THAT'S MORE IMPORTANT THAN THE REST OF |
| 17:06 | 10 | US. |
| 17:06 | 11 | **THE WITNESS:**  IF I SENSE I'M NOT UP, I'LL LET YOU |
| 17:06 | 12 | KNOW. |
| 17:06 | 13 | **THE COURT:**  THAT'S FAIR ENOUGH.  WE'LL TAKE A |
| 17:06 | 14 | 10-MINUTE RECESS AND COME BACK. |
| 17:07 | 15 | (RECESS.) |
| 17:20 | 16 | **THE COURT:**  DR. BEA, ARE YOU READY TO PROCEED? |
| 17:20 | 17 | MR. TREEBY. |
| 17:20 | 18 | **MR. TREEBY:**  THANK YOU, YOUR HONOR. |
| 17:20 | 19 | **THE COURT:**  LET'S GO. |
| 17:20 | 20 | **BY MR. TREEBY:** |
| 17:20 | 21 | **Q.**   I'M GOING TO CONTINUE IN THE SOUTH BREACH, BUT I'M GOING |
| 17:20 | 22 | TO LOOK AT YOUR SOUTH BREACH CASE 2 CROSS SECTION, AND I WANT |
| 17:20 | 23 | TO PULL THAT UP. |
| 17:20 | 24 | **MR. TREEBY:**  IT'S JX-1391-0046 AND 47.  PULL THAT UP, |
| 17:21 | 25 | IF YOU WOULD, THIS BOTTOM CROSS SECTION. |

**ROBERT G. BEA - CROSS**

17:21   1   **BY MR. TREEBY:**

17:21   2   **Q.**   THIS IS FIGURE 41, SOUTH BREACH, CASE 2-1.

17:21   3        THAT CROSS SECTION SHOWS AN AREA IDENTIFIED THERE AS

17:21   4   *TRENCH BACKFILL*?

17:21   5   **A.**   CORRECT.

17:21   6   **Q.**   YOU ASSUME IN YOUR REPORT THE CONTRACTORS DUG SUCH A

17:21   7   TRENCH TO REMOVE TWO UTILITIES:  A 6-INCH WATERLINE AND A

17:21   8   2-INCH GAS LINE, CORRECT?

17:21   9   **A.**   CORRECT.

17:21   10  **Q.**   YOU ASSUME THAT THAT TRENCH IS 8 FEET DEEP AT ITS DEEPEST

17:21   11  POINT; IS THAT CORRECT?

17:22   12  **A.**   THAT'S CORRECT.

17:22   13  **Q.**   THE DIMENSIONS AND DEPTH OF THIS ASSUMED TRENCH CAME FROM

17:22   14  DR. ROGERS' WORK.

17:22   15       ISN'T THAT YOUR UNDERSTANDING?

17:22   16  **A.**   THE COLLABORATION BETWEEN DR. ROGERS AND DR. STORESUND.

17:22   17  **Q.**   DO YOU KNOW OF ANY EVIDENCE ASIDE FROM A SET OF 1969 PLANS

17:22   18  THAT DR. ROGERS COULD COME UP WITH THAT SHOWED ANY EVIDENCE

17:22   19  THAT A 6-INCH WATERLINE AND A 2-INCH GAS LINE, UTILITIES,

17:22   20  EXISTED EVEN AT THIS LOCATION?

17:22   21  **A.**   WELL, THE JUSTIFICATION FOR THAT CROSS SECTION IS A

17:22   22  DOCUMENT IN MY EXPERT REPORT, APPENDIX B.

17:22   23  **Q.**   BUT YOU DID -- YOU DID RELY --

17:23   24       **MR. TREEBY:**  AND WE HAVE THIS SAME ISSUE, YOUR HONOR.

17:23   25  I'LL GO AHEAD AND BRING IT UP BECAUSE I DON'T THINK WE RESOLVED

ROBERT G. BEA - CROSS

17:23  1   IT.  I MAY BE WRONG.

17:23  2          WHEN WE HAD DR. ROGERS' WORK THAT DR. BEA RELIED

17:23  3   UPON, WE WOULD LIKE TO MOVE IN ANY OF THOSE SECTIONS OF

17:23  4   DR. ROGERS' DEPOSITION, EVEN IF THEY WEREN'T TESTIFIED HERE AT

17:23  5   TRIAL.

17:23  6          AND IF THAT'S -- WE ARE GOING TO TRY TO DO THAT,

17:23  7   AND WE ASKED EARLIER ABOUT THAT.

17:23  8          AND I'M NOT SURE YOUR HONOR RULED.  I COULD BE

17:23  9   WRONG.

17:23 10       THE COURT:  I'M TRYING TO THINK WHAT THIS OPENS THE

17:23 11   RECORD UP TO.  I DON'T KNOW IF THE PLAINTIFF TOOK ANY

17:23 12   DEPOSITIONS OF RELIANCE WITNESSES AS WELL.

17:23 13       MR. SCHULTZ:  I DO NOT KNOW THE ANSWER TO THAT,

17:23 14   YOUR HONOR, BUT I KNOW THEY HAD DR. ROGERS ON THE STAND.  AND

17:23 15   THAT WOULD BE THE APPROPRIATE TIME TO ADDUCE EVIDENCE AT THE

17:23 16   TRIAL RATHER THAN THROUGH HEARSAY.

17:23 17       MR. TREEBY:  EXCEPT, YOUR HONOR, THIS WITNESS RELIED

17:23 18   ON DR. ROGERS FOR THIS INFORMATION.  AND WHAT HE JUST SAID IS

17:24 19   THE DOCUMENTATION --

17:24 20       THE COURT:  TO THE EXTENT IT'S NOT IN EVIDENCE TO

17:24 21   DOCUMENT IT, IT EITHER IS OR ISN'T IN EVIDENCE.  I ASSUME THE

17:24 22   PARTIES WILL POINT IT OUT TO ME IN TESTIMONY TO DOCUMENT WHAT

17:24 23   ANYONE RELIED ON TO MAKE THIS DIAGRAM.

17:24 24          IF IT ISN'T DR. ROGERS' TESTIMONY, HIS REPORT,

17:24 25   IT'S NOT IN EVIDENCE.  THEN IT WILL HAVE TO COME FROM SOMEWHERE

ROBERT G. BEA - CROSS

| | |
|---|---|
| 17:24 | 1 | ELSE. |
| 17:24 | 2 | **MR. BRUNO:** JUDGE, ABSOLUTELY, THEIR DOCUMENTS WILL |
| 17:24 | 3 | CLEARLY DEMONSTRATE THAT THESE BOTH EXIST. |
| 17:24 | 4 | **MR. TREEBY:** IF YOUR HONOR PLEASE, IT'S NOT |
| 17:24 | 5 | DR. ROGERS' REPORT I'M TALKING ABOUT; IT'S DR. ROGERS' |
| 17:24 | 6 | TESTIMONY IN DEPOSITION, THE PORTIONS THAT -- IN WHICH THIS |
| 17:24 | 7 | WITNESS SAYS HE RELIED ON DR. ROGERS TO PROVIDE HIM THIS |
| 17:24 | 8 | CROSS SECTION. |
| 17:24 | 9 | DR. ROGERS TESTIFIED HE -- AS TO WHAT EVIDENCE |
| 17:24 | 10 | HE HAD FOR THIS CROSS SECTION. I WOULD LIKE TO GET THAT IN |
| 17:24 | 11 | EVIDENCE BY MOVING THOSE SECTIONS OF HIS DEPOSITION TESTIMONY |
| 17:25 | 12 | INTO EVIDENCE. |
| 17:25 | 13 | THAT'S WHAT -- AND I BROUGHT IT UP BECAUSE I |
| 17:25 | 14 | KNOW WE TALKED ABOUT THIS PROBABLY 30, 45 MINUTES AGO, BUT I'M |
| 17:25 | 15 | NOT SURE THERE WAS A RULING. |
| 17:25 | 16 | **THE COURT:** WELL, I'M CONCERNED THAT DR. ROGERS WAS |
| 17:25 | 17 | HERE. HE WASN'T ASKED THAT HERE. |
| 17:25 | 18 | WHAT I'M SAYING IS I DON'T SEE HOW, IF THERE IS |
| 17:25 | 19 | NO EVIDENCE IN HIS TESTIMONY THUS FAR, DR. ROGERS OR DR. BEA, |
| 17:25 | 20 | AS TO WHAT THEY RELIED ON, THEN -- |
| 17:25 | 21 | **MR. TREEBY:** I'LL APPROACH IT THAT WAY, YOUR HONOR, |
| 17:25 | 22 | FOR NOW. |
| 17:25 | 23 | **THE COURT:** WE'LL SEE WHERE WE GO. BUT AT THAT POINT |
| 17:25 | 24 | THERE THEN IS NO EVIDENCE. |
| 17:25 | 25 | NOW, IF THERE'S SOMETHING CONTRADICTORY IN THE |

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 17:25 | 1 | DEPOSITION, WE WILL HAVE TO LOOK AT IT LATER.  IF PLAINTIFF |
| 17:25 | 2 | PUTS ON INFORMATION THAT CONTRADICTS SOMETHING DR. ROGERS SAID, |
| 17:25 | 3 | THEN WE'LL LOOK AT THAT IN ANOTHER LIGHT. |
| 17:25 | 4 | BY MR. TREEBY: |
| 17:25 | 5 | Q.   CAN YOU POINT US, DR. BEA, TO ANY EVIDENCE THAT THIS |
| 17:25 | 6 | 6-INCH WATERLINE AND 2-INCH GAS LINE EXISTED AT THAT LOCATION? |
| 17:26 | 7 | A.   YES, AND IT'S DOCUMENTED IN MY FEBRUARY 1 EXPERT REPORT. |
| 17:26 | 8 | I CITE SPECIFICALLY UTILITIES THAT ARE RUNNING EAST-WEST THAT |
| 17:26 | 9 | ARE IN THIS VICINITY, AND THAT'S IN APPENDIX B OF THAT EXPERT |
| 17:26 | 10 | REPORT. |
| 17:26 | 11 | Q.   CAN YOU POINT US WHERE IN APPENDIX B?  WE HAVEN'T SEEN IT. |
| 17:26 | 12 | WE JUST SAW THAT YOU RELIED ON -- |
| 17:26 | 13 | THE COURT:  WE ARE NOT GOING TO TAKE TIME FOR HIM TO |
| 17:26 | 14 | GO THROUGH THE ENTIRE REPORT.  WE CAN JUST -- IN ARGUMENT YOU |
| 17:27 | 15 | CAN DIRECT THE COURT TO APPENDIX B AND SAY, "JUDGE, THERE'S |
| 17:27 | 16 | NOTHING IN IT," OR THE PLAINTIFFS CAN SAY, "HERE'S WHERE IT |
| 17:27 | 17 | IS."  BUT WE CAN'T HAVE EXPERTS ROAMING THROUGH THEIR REPORTS. |
| 17:27 | 18 | THEY'RE TOO LARGE.  UNLESS YOU CAN ASK HIM TOMORROW.  IF HE HAS |
| 17:27 | 19 | TIME -- |
| 17:27 | 20 | MR. TREEBY:  I'M MOVING ALONG. |
| 17:27 | 21 | THE WITNESS:  COULD I MAKE A CORRECTION TO THE |
| 17:27 | 22 | RECORD? |
| 17:27 | 23 | THE COURT:  YES. |
| 17:27 | 24 | THE WITNESS:  THE DIAGRAMS I'M REFERRING TO ARE IN |
| 17:27 | 25 | THE BODY OF THE REPORT. |

ROBERT G. BEA - CROSS

17:27    1              **THE COURT:**  NOT IN THE APPENDIX.

17:27    2              **THE WITNESS:**  THAT'S CORRECT.  DEALING WITH THE SOUTH

17:27    3    BREACH.  I WAS INCORRECT.

17:27    4              **MR. TREEBY:**  WE'LL COME BACK TO THAT.

17:27    5    BY MR. TREEBY:

17:27    6    Q.   I SHOW YOU A DOCUMENT WE HAVE MARKED AS JX-008 -- EXCUSE

17:27    7    ME, JX-0846.  THIS IS A DAILY REPORT.

17:27    8              **MR. TREEBY:**  MAYBE BLOW UP THE TOP TWO OR THREE LINES

17:28    9    JUST TO IDENTIFY IT.

17:28   10    BY MR. TREEBY:

17:28   11    Q.   INSPECTOR'S QUALITY ASSURANCE REPORT, A QAR DAILY LOG OF

17:28   12    CONSTRUCTION, CIVIL, DATED SEPTEMBER 4, 2003.  LOOK AT THE

17:28   13    PAGES --

17:28   14              **MR. TREEBY:**  AND LET'S GO TO PAGES 9 AND 10.  0009

17:28   15    AND 10.  AND JUST BLOW UP 9, IF YOU WOULD.  AT THE VERY TOP --

17:28   16    LET'S JUST TAKE IT A PIECE AT A TIME, THE TOP PART.  THIS IS AN

17:28   17    IHNC PROJECT PREPARATORY PHASE MEETING MINUTES.  FEATURE OF

17:28   18    WORK THAT SAME DAY.  CONDUCTED A PREPARATORY MEETING.  THE

17:28   19    FOLLOWING PERSONS ATTENDED, AND IT HAS A LIST OF PEOPLE, AND IT

17:28   20    SAYS "SCOPE OF WORK, UTILITY REMOVAL."

17:28   21              GO ON DOWN TO THE NEXT PART OF THE REPORT.

17:29   22    BY MR. TREEBY:

17:29   23    Q.   SCOPE OF WORK, IT TALKS ABOUT THREE WATERLINES, THREE GAS

17:29   24    LINES, ONE SEWER LINE, AND HAS SITE PREPARATION WORK PLAN.

17:29   25              HAVE YOU EVER SEEN THIS DOCUMENT BEFORE?

*HOURLY TRANSCRIPT*

ROBERT G. BEA - CROSS

17:29    1   A.   I DON'T RECALL IT SPECIFICALLY, BUT I PROBABLY HAVE.

17:29    2            MR. TREEBY:   GO TO PAGE 10, IF YOU WOULD.   I WANT YOU

17:29    3   TO BLOW UP THE SECTION WHERE -- WHERE IS THAT ON THE PAGE?

17:29    4   BY MR. TREEBY:

17:29    5   Q.   RIGHT HERE ON THIS DOCUMENT IT SAYS:   "NO SHORING OR

17:29    6   SLOPING OF TRENCH WALLS IS ANTICIPATED.   WHERE LINE IS TO BE

17:29    7   CAPPED, THE TRENCH SHOULD NOT EXCEED 2 FEET IN DEPTH.   THE

17:30    8   REMAINING PIPE WILL BE REMOVED USING THE EXCAVATOR, AND NO

17:30    9   PERSONNEL WILL BE NEEDED TO ENTER THE TRENCH."

17:30   10            DO YOU HAVE ANY EVIDENCE THAT WOULD SAY THAT'S NOT

17:30   11   WHAT HAPPENED AT THAT SITE?

17:30   12   A.   WELL, FIRST, I DON'T KNOW WHERE THIS CAP IS BEING PLACED.

17:30   13   Q.   THIS IS THE LIFT -- THIS INVOLVES THE LIFT STATION

17:30   14   DISCHARGE LINE.   YOU KNOW WHERE THE LIFT STATION IS, DO YOU

17:30   15   NOT?

17:30   16   A.   YES, SIR.

17:30   17   Q.   THAT WAS AT THE EDGE OF SAUCER AND INDIAN TOWING.   DO YOU

17:30   18   RECALL THAT?

17:30   19   A.   YES.   IN FACT, IT CAME UP PREVIOUSLY IN OUR DISCUSSIONS.

17:30   20   THE LIFT STATION HAS LATERALS THAT RUN NORTH-SOUTH PARALLEL TO

17:31   21   SUREKOTE ROAD.   AND ON THE LIFT STATION EXCAVATION REMOVAL, IT

17:31   22   ULTIMATELY ALSO HAD TO INVOLVE THE LATERAL SET OF SEWER LINES.

17:31   23   THEY HAD PERIODICALLY PLACED MANHOLES SO THAT THEY COULD SOLVE

17:31   24   PROBLEMS IN THE SEWER LINE.

17:31   25            AND THEN PERPENDICULAR TO THAT, RUNNING TOWARD THE

ROBERT G. BEA - CROSS

17:31   1   I-WALL WERE OTHER UTILITY SEWER LINES.  AND WHAT WE ARE -- OR
17:32   2   MY FRUSTRATION HERE IS UNDERSTANDING GEOGRAPHICALLY WHERE WE
17:32   3   ARE AT AND WHICH LINES WE ARE REFERRING TO.  THIS IS CRUCIAL
17:32   4   BECAUSE SOME OF THE UTILITY EXCAVATIONS WERE DONE SEVERAL
17:32   5   TIMES.  THE SHALLOWER UTILITIES WERE REMOVED, AND SUBSEQUENTLY
17:32   6   DEEPER EXCAVATIONS PERFORMED TO REMOVE THE DEEPER UTILITIES,
17:32   7   INCLUDING SEWER LATERALS.
17:32   8   Q.   YOU WEREN'T THERE PERSONALLY, SO YOU HAD TO LEARN THIS
17:32   9   FROM DOCUMENTATION, RIGHT?
17:32   10  A.   YES, SIR.
17:32   11  Q.   WHAT DOCUMENTATION?  IS IT ALL, YOU SAY, CONTAINED IN YOUR
17:32   12  REPORT?
17:32   13  A.   NO.  THIS IS BACK TO THAT 20,000 PAGES THAT WE NOW HAVE OF
17:32   14  THE DOCUMENTATION AND THE MORE THAN 8,000 PHOTOGRAPHS.  THE
17:32   15  PHOTOGRAPHS PROVIDE SOME VERY, VERY VIVID TESTIMONY TO THE
17:33   16  EXCAVATIONS I'M REFERRING TO CONNECTED TO THE SEWER.
17:33   17  Q.   I THINK WE WILL GET TO THAT.
17:33   18        LET'S LOOK AT DOCUMENT JX-0848, AND I WANT US TO LOOK
17:33   19  AT PAGE 0002.  THIS IS A QAR, NO. 690, FROM SEPTEMBER 6 THROUGH
17:33   20  8, 2003, TWO DAYS TO FOUR DAYS LATER.
17:33   21        MR. TREEBY:  IF YOU WOULD PULL UP THE OBSERVATIONS
17:33   22  THERE.
17:33   23  BY MR. TREEBY:
17:33   24  Q.   UNDER FOLLOW-UP UTILITY REMOVAL, DO YOU SEE THAT SECTION?
17:33   25  A.   YES, SIR.

ROBERT G. BEA - CROSS

17:33  1    **Q.**  IT SAYS:  "OBSERVED THE REMOVAL OF OLD HYDRANT LINES ON

17:34  2    FLOOD SIDE OF LEVEE I-WALL AT SAUCER MARINE, ITT, AND MAYER

17:34  3    YACHT.  OBSERVED THE NEWLY MOBILIZED BH310 RUBBER-TIRED BACKHOE

17:34  4    ASSISTING WITH THE EXTRACTION OF ABANDONED UTILITY AND

17:34  5    BACKFILLING WITH SHALLOW TRENCH IN 1-FOOT LIFTS.  OBSERVED THE

17:34  6    BH310 AND D41.  THOSE ARE COMPACTING THE TRENCHES.  ASSURED

17:34  7    LINES REMOVED WITHOUT DAMAGE OR DEFACING THE I-WALL."

17:34  8         HAVE YOU SEEN THIS DOCUMENT BEFORE?

17:34  9    **A.**  I THINK SO.

17:34  10   **Q.**  DO YOU HAVE ANY REASON TO DISAGREE WITH WHAT THEY ARE

17:34  11   SAYING HERE ABOUT SHALLOW TRENCHES AND BACKFILLING IT IN 1-FOOT

17:34  12   LIFTS AND COMPACTING IT AS INDICATED?

17:34  13   **A.**  NO.

17:34  14   **Q.**  CERTAINLY THERE'S NOTHING IN THIS CONTEMPORANEOUS REPORT

17:34  15   OF THE UTILITY WORK ABOUT TRENCHING TO 10 FEET, IS THERE?

17:34  16   **A.**  PLEASE REPEAT THAT QUESTION.

17:34  17   **Q.**  YOU SAID YOU HAVE LOOKED AT THIS DOCUMENT.  IT'S TRUE, IS

17:35  18   IT NOT, THERE'S NOTHING IN THIS CONTEMPORANEOUS REPORT OF THE

17:35  19   UTILITY REMOVAL WORK, ABOUT TRENCHING TO 10 FEET DEPTH, IS

17:35  20   THERE?

17:35  21   **A.**  IN THIS SPECIFIC DOCUMENT?

17:35  22   **Q.**  YES.

17:35  23   **A.**  OBVIOUSLY NOT.

17:35  24   **Q.**  I WANT TO SHOW YOU ANOTHER DOCUMENT, WE MARKED AS

17:35  25   JX-1338-0013, WHICH IS DATED SEPTEMBER 8, 2003, PHOTOS OF

ROBERT G. BEA - CROSS

17:35    1    TRENCH REMOVAL AT SAUCER MARINE DESCRIBED IN QAR690.

17:35    2             MR. TREEBY:  BLOW UP THE TITLE ON THAT.

17:35    3    UNCOVERING -- GO TO THE NEXT PICTURE.  BLOW UP THE TITLE --

17:35    4    WELL, BLOW UP THE PICTURE.

17:35    5    BY MR. TREEBY:

17:35    6    Q.   "UTILITY LINE EXPOSED AND SPLICE CLAMP CUT."  THAT'S AT

17:35    7    THE FLOODWALL, IS IT NOT, OR CLOSE TO IT?

17:36    8    A.   YES, SIR.

17:36    9    Q.   THAT'S NOT 10 FEET DEEP, IS IT?

17:36   10    A.   NO.

17:36   11    Q.   I WANT TO SHOW YOU ANOTHER DOCUMENT MARKED -- NO, WE JUST

17:36   12    DID THAT ONE.

17:36   13             MR. TREEBY:  JX-1306 AT PAGE 0003.

17:36   14             I'M SORRY.  GO BACK TO THE PRIOR SLIDE, IF YOU

17:36   15    WILL.  I'M TRYING TO CONNECT TWO RECORDS HERE.  GO BACK TO THE

17:36   16    PRIOR PICTURE.  LOOK AT THE BOTTOM.  IT'S THE BOTTOM PICTURE.

17:37   17    "UTILITY LINE EXPOSED."

17:37   18             THE COURT:  THAT'S THE SAME PICTURE WE JUST LOOKED

17:37   19    AT.

17:37   20             MR. TREEBY:  RIGHT, IT IS.

17:37   21             NOTE THE NUMBER AT THE BOTTOM LEFT,

17:37   22    187-090803-13.  NOW GO TO THE LOG OF PHOTOS, WHICH IS THE NEXT

17:37   23    PAGE, I BELIEVE.  IS THAT RIGHT?  NO, IT'S O -- IT'S A

17:37   24    DIFFERENT DOCUMENT, 01338 -- JX-01338, PAGE 1.  IF YOU CAN PULL

17:38   25    UP THAT SAME NUMBER WE JUST IDENTIFIED, 187-090803-13-SM, WHICH

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 17:38 | 1 | IS SAUCER MARINE, IT'S THE SECOND ITEM THERE. |
| 17:38 | 2 | **BY MR. TREEBY:** |
| 17:38 | 3 | **Q.**   AND THE DESCRIPTIVE IS -- WHICH TIES IT TO THAT PHOTO: |
| 17:38 | 4 | "UTILITY LINE EXPOSED AND SUPPLY CLAMP CUT.  SAUCER MARINE, |
| 17:38 | 5 | AM30 SOUTH." |
| 17:38 | 6 |         DO YOU KNOW WHAT THE AM30 SOUTH STANDS FOR? |
| 17:38 | 7 | **A.**   AT THIS POINT TODAY, NO.  CAN YOU SHOW ME A LOCATION MAP |
| 17:39 | 8 | WHERE IT IS, PLEASE. |
| 17:39 | 9 | **Q.**   ALL WE HAVE SO FAR IS IT'S SAUCER MARINE UTILITY LINE, SO |
| 17:39 | 10 | THAT'S WHAT WE HAVE RIGHT THERE. |
| 17:39 | 11 |         YOU'RE SAYING THAT ANY DEFINITIVE INFORMATION ON ANY |
| 17:39 | 12 | UTILITY LINES THAT YOU HAVE WOULD BE IN YOUR REPORT; IS THAT |
| 17:39 | 13 | RIGHT? |
| 17:39 | 14 | **A.**   NO. |
| 17:39 | 15 | **Q.**   BE REFERENCED IN YOUR REPORT? |
| 17:39 | 16 | **A.**   NO, NOT NECESSARILY. |
| 17:39 | 17 | **Q.**   WELL, DO YOU HAVE EVIDENCE OF -- I'M TRYING TO PIN DOWN |
| 17:39 | 18 | WHERE YOU GOT THAT TRENCH FOR UTILITIES BECAUSE WE DON'T FIND |
| 17:39 | 19 | ANY TRENCH THAT DEEP IN THE RECORDS. |
| 17:39 | 20 | **A.**   I STATED MY ANSWER TO THAT IN THE FORM OF THE REFERENCES |
| 17:39 | 21 | DOCUMENTATION CONTAINED IN MY FEBRUARY 1 EXPERT REPORT, AND |
| 17:39 | 22 | THAT INFORMATION WAS OBTAINED DIRECTLY FROM DR. DAVID ROGERS |
| 17:39 | 23 | AND DR. RUNE STORESUND.  I REVIEWED IT, APPROVED IT, ADDED |
| 17:40 | 24 | ELEMENTS IN THEIR REFERENCE.  SO THE REFERENCE PAPER TRAIL |
| 17:40 | 25 | YOU'RE SEARCHING FOR IS DOCUMENTED IN MY EXPERT REPORT. |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 17:40 | 1 | **Q.** LET'S TALK ABOUT THE BORROW PIT.  YOU OPINED THAT THE |
| 17:40 | 2 | EASTERN EDGE OF THE BORROW PIT WAS LOCATED APPROXIMATELY |
| 17:40 | 3 | 75 FEET FROM THE FLOODWALL; IS THAT RIGHT? |
| 17:40 | 4 | **A.** I BELIEVE THAT'S CORRECT. |
| 17:40 | 5 | **Q.** YOU HAVE STATED THE BORROW PIT WAS 10 TO 14 FEET DEEP; IS |
| 17:40 | 6 | THAT RIGHT? |
| 17:40 | 7 | **A.** THAT IS CORRECT. |
| 17:40 | 8 | **Q.** THE BORROW PIT WAS NEVER BACKFILLED; ISN'T THAT CORRECT? |
| 17:40 | 9 | **A.** WELL, THE ENTIRE BORROW PIT, OF COURSE, WASN'T BACKFILLED. |
| 17:40 | 10 | BUT THERE WERE SPECIAL THINGS DONE TO THE SLOPES, SIDE SLOPES |
| 17:41 | 11 | OF THE BORROW PIT AND, IN SEVERAL INSTANCES, TO THE BOTTOM OF |
| 17:41 | 12 | THE BORROW PIT. |
| 17:41 | 13 | **Q.** YOU HAVE OPINED THAT THE MCDONOUGH MARINE LOCATION FOR THE |
| 17:41 | 14 | BORROW PIT WAS -- AND I QUOTE YOU -- CHOSEN BECAUSE THE |
| 17:41 | 15 | EXTENSIVE CORING OF THE AREA PERFORMED BY WASHINGTON GROUP |
| 17:41 | 16 | INTERNATIONAL HAD IDENTIFIED THE PREDOMINANTLY COHESIVE CLAY |
| 17:41 | 17 | SOILS IN THIS AREA.  AM I CORRECT? |
| 17:41 | 18 | **A.** CORRECT. |
| 17:41 | 19 | **Q.** IN FACT, YOU MADE A CONNECTION BETWEEN SAMPLE TEST RESULTS |
| 17:41 | 20 | INDICATING CLEAN SOILS IN THAT AREA AND CORING RESULTS AND |
| 17:41 | 21 | SUPPLIED THAT AS A MOTIVE FOR THAT SITE SELECTION FOR THE |
| 17:41 | 22 | BORROW PIT; ISN'T THAT RIGHT? |
| 17:41 | 23 | **A.** AS A MOTIVE, CORRECT. |
| 17:41 | 24 | **Q.** I WANT TO SHOW YOU A DOCUMENT, JX-0108, WHICH IS A RECAP |
| 17:41 | 25 | SUBMITTAL REPORT.  THAT'S THE FRONT PAGE OF IT, AUGUST 2001. |

ROBERT G. BEA - CROSS

17:42    1    THIS IS AT THE TIME THAT THE BORROW PIT WAS BEING SELECTED.

17:42    2             LOOK AT PAGE, IF YOU WILL, JX-0108-0008, THE THIRD

17:42    3    LINE.  I'M READING:  "THE BORROW PIT WAS ORIGINALLY PROPOSED TO

17:42    4    BE IN THE INTERNATIONAL TANK TERMINAL FACILITY, BUT DURING

17:42    5    DRILLING A SIGNIFICANT NUMBER OF UNDERGROUND OBSTRUCTIONS WAS

17:42    6    DISCOVERED THAT MADE THE AREA UNSUITABLE AS A BORROW PIT, AND

17:42    7    SO THE LOCATION WAS CHANGED.  THE AREA AT THE MCDONOUGH MARINE

17:42    8    FACILITY WAS CHOSEN BECAUSE OF ITS APPARENT LACK OF CHEMICAL

17:42    9    IMPACT.  BASED ON THE ANALYTICAL RESULTS, THIS PROVED TO BE THE

17:43   10    CASE."

17:43   11             I SHOWED YOU THIS AT YOUR DEPOSITION.  I READ THAT

17:43   12    CORRECTLY, DID I NOT?

17:43   13    A.   YES, YOU DID.

17:43   14    Q.   IN DESCRIBING THE MOTIVE FOR SITE SELECTION OF THE BORROW

17:43   15    PIT, YOU DID NOT INCLUDE THIS STATEMENT IN YOUR EXPERT REPORT;

17:43   16    ISN'T THAT RIGHT?

17:43   17    A.   THAT'S CORRECT.

17:43   18    Q.   DR. BEA, YOU HAVE ALSO OPINED -- AND I'M QUOTING FROM YOUR

17:43   19    REPORT -- BECAUSE OF CONCERNS FOR SEEPAGE UNDER THE FLOODWALL,

17:43   20    CLAY WAS PLACED ON THE EASTERN WALL OF THE BORROW PIT.

17:43   21             DO YOU RECALL THAT?

17:43   22    A.   I THINK SO.

17:43   23    Q.   LET'S PULL IT UP.  JX-1389-0046.  AND I'M DEALING WITH

17:43   24    YOUR OPINION THAT IT WAS CONCERNS FOR SEEPAGE UNDER THE

17:44   25    FLOODWALL THAT CLAY WAS PLACED IN A CERTAIN PLACE THAT YOU SAY

ROBERT G. BEA - CROSS

17:44  1    IT WAS PLACED.

17:44  2          LET'S LOOK AT PAGE 0046.  AND I'M TRYING TO FIND THE

17:44  3    LANGUAGE "BECAUSE OF CONCERNS FOR SEEPAGE."  IT'S IN THE MIDDLE

17:44  4    OF THE PARAGRAPH ABOUT SIX LINES FROM THE BOTTOM TO THE END.

17:44  5    THIS IS FROM YOUR REPORT:

17:44  6          "BECAUSE OF CONCERNS FOR SEEPAGE UNDER THE FLOODWALL,

17:44  7    CLAY WAS PLACED ON THE EASTERN WALL OF THE BORROW PIT.  THE

17:44  8    OTHER WALLS OF THE BORROW PIT WERE DRESSED WITH CLAYS OBTAINED

17:44  9    FROM THE BORROW PIT.  THE BOTTOM OF THE BORROW PIT HAD BEEN

17:44  10   PREVIOUSLY COVERED WITH DREDGED SPOILS FROM THE IHNC THAT

17:44  11   BURIED THE SWAMP MARSH DEPOSITS."

17:44  12         IT GOES ON TO TALK ABOUT THE LATER FLOODING OF THE

17:45  13   BORROW PIT.

17:45  14         THE IMPORTANCE THERE IS THIS IS YOUR NEAR BREACH

17:45  15   ANALYSIS, AND YOU HAVE DESCRIBED EARLIER TODAY -- YOU DON'T

17:45  16   NEED TO GO INTO IT AGAIN -- WHY IT'S IMPORTANT TO CHECK OTHER

17:45  17   LOCATIONS THAT DON'T FAIL?

17:45  18   A.   CORRECT.

17:45  19   Q.   SO WE HAVE HEARD ALL THAT.

17:45  20         IN YOUR REPORT YOU HAVE TAKEN THE POSITION THAT IT

17:45  21   WAS SPECIFICALLY BECAUSE OF CONCERNS FOR SEEPAGE UNDER THE

17:45  22   FLOODWALL THAT CERTAIN ACTIONS WERE TAKEN.  IN FACT, YOU HAVE

17:45  23   NO DIRECT EVIDENCE, DOCUMENTS, OR TESTIMONY THAT EITHER

17:45  24   WASHINGTON GROUP OR THE CORPS HAD THOSE CONCERNS; ISN'T THAT

17:45  25   TRUE?

ROBERT G. BEA - CROSS

17:45    1   **A.**   NO, I THINK THAT'S NOT TRUE.

17:45    2   **Q.**   IT'S A DEDUCTION, IS IT NOT?  ISN'T THAT WHAT YOU

17:45    3   DESCRIBED IT?

17:45    4   **A.**   DID YOU SAY "DEDUCTION" OR --

17:45    5   **Q.**   DEDUCTION.  DEDUCTION.

17:45    6   **A.**   COULD I EXPLAIN?

17:45    7   **Q.**   WELL, FIRST ANSWER THE QUESTION, AND THEN I WILL BE HAPPY

17:45    8   TO HAVE AN EXPLANATION.

17:45    9          ISN'T IT TRUE YOU HAVE NO EVIDENCE OTHER THAN

17:46   10   DEDUCTION, ANY DIRECT EVIDENCE THAT ANYONE HAD THE CONCERN THAT

17:46   11   YOU DESCRIBE IN THAT SENTENCE?  ISN'T IT TRUE IT WAS ONLY A

17:46   12   DEDUCTION?

17:46   13   **A.**   YES.

17:46   14   **Q.**   YOU AGREE THAT YOUR OPINION ABOUT CONCERN FOR UNDERSEEPAGE

17:46   15   AT THE BORROW PIT IS JUST A DEDUCTION.  AND YOU REFER TO

17:46   16   FIGURE 26 IN YOUR ORIGINAL REPORT TO SUPPORT THE IDEA THAT CLAY

17:46   17   WAS PLACED THERE BECAUSE OF SEEPAGE CONCERNS, DON'T YOU?

17:46   18   **A.**   BUT --

17:46   19   **Q.**   I'LL PULL IT UP.  FIGURE 26.  THIS IS JX-1389-0046.

17:46   20          **MR. TREEBY:**  I THINK THIS WILL BE ON 47.  BOTTOM

17:46   21   FIGURE, PULL THAT UP, PLEASE.

17:47   22   **BY MR. TREEBY:**

17:47   23   **Q.**   THIS IS YOUR FIGURE 26, AND THIS IS YOUR CAPTION ON

17:47   24   FIGURE 26.  FIRST LET ME SAY THIS:  THIS IS YOUR CAPTION, NOT

17:47   25   THE ORIGINAL PHOTO CAPTION, RIGHT?

ROBERT G. BEA - CROSS

17:47    1    A.   I THINK THAT'S CORRECT.

17:47    2    Q.   "DRESSING THE WALLS OF THE EXCAVATIONS FOR SOIL BORROW PIT

17:47    3    ADJACENT TO FLOODWALL WITH CLAYS AT MCDONOUGH MARINE.  NOTE THE

17:47    4    STANDING WATER IN THE BOTTOM OF THE EXCAVATION."

17:47    5    A.   CORRECT.  THEY'RE USING A MATERIAL FROM THE BORROW PIT

17:47    6    ITSELF TO DRESS THOSE SLOPES.

17:47    7    Q.   DO YOU DISAGREE WITH DR. ROGERS, WHO TESTIFIED FRIDAY TO

17:47    8    THIS COURT, THAT THERE WAS NO CLAY LINING PLACED ON THE BORROW

17:47    9    PIT BUT, RATHER, THE BORROW PIT WAS SIMPLY COMPRISED OF CLAY?

17:47   10    A.   I THINK THAT'S A CORRECT PORTRAYAL.

17:47   11    Q.   LET ME SHOW YOU AND THE COURT THE SAME PHOTO AS FIGURE 26

17:48   12    FROM YOUR REPORT BUT WITH WASHINGTON GROUP'S CONTEMPORANEOUS

17:48   13    CAPTION MARKED JX-1361.  IT'S THE BOTTOM PICTURE.  THIS IS THE

17:48   14    CONTEMPORANEOUS CAPTION.  IT SAYS "REWORKED SLOPE EAST SIDE

17:48   15    SOUTHEAST BORROW PIT."  IS THAT RIGHT?

17:48   16    A.   YES, SIR.

17:48   17    Q.   THE CAPTION DOESN'T SAY ANYTHING ABOUT LINING THE BORROW

17:48   18    PIT WITH CLAY, DOES IT?

17:48   19    A.   NO.  I'M LOOKING AT THE FEATURES, OBVIOUS FEATURES IN THE

17:48   20    PHOTOGRAPH TO DEDUCE THAT THEY HAVE SPECIFICALLY ADDRESSED THAT

17:48   21    SLOPE.

17:48   22    Q.   WE ARE GOING TO GET TO THAT IN JUST A MOMENT, BUT YOU

17:48   23    KNOW -- DO YOU KNOW HOW TO READ THAT CAPTION AT THE BOTTOM TO

17:48   24    GET THE DATE?  IT'S JULY 2, 2002, RIGHT?

17:49   25    A.   THAT'S CORRECT.  07-02-02.

ROBERT G. BEA - CROSS

17:49    1    **Q.**   YOU KNOW, DO YOU NOT, THAT THE REMEDIATION PROJECT

17:49    2    CONTINUED INTO THE YEAR 2005?

17:49    3    **A.**   CORRECT.

17:49    4    **Q.**   SO THE CONTRACTORS WOULD HAVE TO CONTINUE TO REMOVE SOIL

17:49    5    FROM THE BORROW PIT TO USE FOR FILL AFTER JULY 2, 2002; ISN'T

17:49    6    THAT RIGHT?

17:49    7    **A.**   THAT'S CORRECT.

17:49    8    **Q.**   I WANT TO SHOW YOU A DAILY REPORT WHICH IS JX-0555.  IT'S

17:49    9    A DAILY REPORT DATED JULY 20, 2002, THE SAME -- IN FACT, I

17:49   10    THINK -- IS IT JULY 2?

17:49   11            **MR. TREEBY:**  WHAT'S THE DATE ON THERE?  NO, IT'S

17:49   12    JULY 2.  MISTYPED IT IN MY QUESTION.

17:49   13    **BY MR. TREEBY:**

17:49   14    **Q.**   IT'S THE SAME DATE AS THE PICTURE, RIGHT, THAT WE JUST

17:49   15    SAW?  IS THAT CORRECT?

17:49   16    **A.**   CORRECT.

17:49   17    **Q.**   THE SECOND PAGE OF THIS DOCUMENT -- GO TO THE NEXT PAGE,

17:49   18    WHICH IS JX-13 -- NO.  JX-0555-0002, AND UNDER FOLLOW-UP SITE

17:50   19    WORK, IT SAYS:  "OBSERVED CONTRACTOR'S PERSONNEL PERFORMING

17:50   20    HOUSEKEEPING AND SITE MAINTENANCE.  OBSERVED REPAIRS MADE TO

17:50   21    SILT FENCE.  THOSE ARE GRADED TO ALLEVIATE DRAINAGE.  OBSERVED

17:50   22    PC270 EXCAVATING BORROW MATERIAL ALONG THE EASTERN SLOPE OF

17:50   23    MCDONOUGH MARINE.  ASSUMED THAT THE EASTERN SLOPE OF THE PIT

17:50   24    SHAPED ACCORDING TO DESIGN TEMPLATE."

17:50   25            THAT'S WHAT THE WORK FOR THAT DAY, THE DESCRIPTION OF

**ROBERT G. BEA - CROSS**

17:50  1   THE WORK SAYS; IS THAT CORRECT?

17:50  2   **A.**   YES, SIR.

17:50  3   **Q.**   THERE'S NOTHING IN THIS QAR, IF YOU LOOKED AT IT, ABOUT

17:50  4   THE CONTRACTORS RESHAPING THE WALLS OF THE BORROW PIT BECAUSE

17:50  5   OF CONCERNS FOR SEEPAGE, IS THERE?  SEEPAGE.  I'M TALKING ABOUT

17:51  6   SEEPAGE.

17:51  7   **A.**   THEIR PRIMARY CONCERN IS SLOPE STABILITY.  AT THIS PHASE,

17:51  8   AS NEAR AS I CAN DETERMINE, THEY HAD CONVINCED THEMSELVES THERE

17:51  9   WAS NO CONCERN FOR THE SEEPAGE THAT WE ARE DISCUSSING HERE

17:51  10  TODAY.

17:51  11  **Q.**   I'M ADDRESSING YOUR REPORT WHERE YOU SAY THERE WERE

17:51  12  CONCERNS FOR SEEPAGE AND THAT'S WHY THEY DID WHAT THEY DID.

17:51  13  THAT'S WHAT I'M ADDRESSING.  SO IT'S CLEAR HERE THAT THE

17:51  14  CONTRACTORS WERE REMOVING MATERIAL FROM THE SLOPE TO USE FOR

17:51  15  FILL, THEN THEY RESHAPED THE SLOPE TO CONFORM WITH THE DESIGN

17:51  16  TEMPLATE FOR THE BORROW PIT, JUST AS THE CONTEMPORANEOUS

17:51  17  CAPTION ON THE JULY 2 PHOTO INDICATED, RIGHT?

17:51  18  **A.**   CORRECT.

17:51  19          **MR. SCHULTZ:**  YOUR HONOR, THIS MAY BE A BAD POINT,

17:51  20  BUT I PROMISED DR. BEA I WOULD TELL HIM WHEN WE HAD BEEN GOING

17:51  21  A HALF HOUR TO LET HIM CHECK HOW HE IS.  I DON'T MEAN TO

17:52  22  INTERRUPT, BUT --

17:52  23          **MR. TREEBY:**  SURE, CHECK.

17:52  24          **THE WITNESS:**  I WOULD LIKE TO STOP AT A CONVENIENT

17:52  25  POINT.

ROBERT G. BEA - CROSS

17:52   1              THE COURT:  I THINK THAT'S A GOOD IDEA.  WHY DON'T WE
17:52   2    FINISH UP THIS THREAD.
17:52   3              MR. TREEBY:  LET ME SEE HOW LONG THIS THREAD IS,
17:52   4    YOUR HONOR.  I CAN BREAK IT RIGHT HERE, BUT LET ME JUST SEE.
17:52   5              THE COURT:  IT'S UP TO YOU, SIR, UP TO A POINT.
17:52   6              MR. TREEBY:  I WOULD JUST LIKE TO FINISH THIS THREAD.
17:52   7    IT'S HOPEFULLY JUST A COUPLE QUESTIONS.  IS THAT ALL RIGHT,
17:52   8    DR. BEA?
17:52   9              THE WITNESS:  WHEN DO YOU PLAN TO FINISH?
17:52  10              MR. TREEBY:  I THINK IT WOULD BE IN ABOUT FIVE
17:52  11    MINUTES.
17:52  12              THE COURT:  WE'LL STOP IN FIVE.
17:52  13              MR. TREEBY:  THAT'S FINE, YOUR HONOR.
17:52  14    BY MR. TREEBY:
17:52  15    Q.   THE CONTEMPORANEOUS CAPTION ON THE PHOTO IS EVIDENCE THAT
17:52  16    THE SLOPE WAS BEING SHAPED TO COMPLY WITH THE GEOTECHNICAL
17:53  17    ENGINEERING BRANCH INSTRUCTION AS TO SLOPE FOR THE SIDES OF THE
17:53  18    BORROW PIT; ISN'T THAT RIGHT?
17:53  19    A.   THAT'S CORRECT.
17:53  20    Q.   SINCE YOU SAY "THAT'S CORRECT," WE COULD -- YOU'VE SEEN
17:53  21    THOSE INSTRUCTIONS, HAVE YOU NOT?
17:53  22    A.   I BELIEVE SO.
17:53  23    Q.   ISN'T IT TRUE, THEN, THAT THE ADVICE FROM THE GEOTECHNICAL
17:53  24    ENGINEERING DIVISION AT THE CORPS DOES NOT INCLUDE ANYTHING
17:53  25    ABOUT PLACING CLAY ON THE EASTERN WALL OF THE BORROW PIT TO

ROBERT G. BEA - CROSS

17:53   1    PREVENT SEEPAGE?

17:53   2    **A.**   THAT'S TRUE.

17:53   3            **MR. TREEBY:**  THANK YOU, YOUR HONOR.

17:53   4            **THE COURT:**  THANK YOU, DR. BEA.  WE WILL RESUME IN

17:53   5    THE MORNING AT 9:00.

17:53   6            **THE WITNESS:**  THANK YOU.

17:53   7            **THE COURT:**  YOU MAY STEP DOWN.

17:54   8                EVENTUALLY WE WILL GET TO EVERYTHING, BUT --

17:54   9    EVERYBODY CAN BE SEATED.  THE COURT HAS READ ALL THE

17:54   10   DEPOSITIONS, AND I HAVE SOME NOTES.  HOPEFULLY WE CAN PUT ALL

17:54   11   THOSE TOGETHER.  I'M TRYING TO NOT ASK TOO MANY QUESTIONS ABOUT

17:54   12   THOSE.  I AM INTERESTED IN THE MCDONOUGH BORROW PIT AND THE

17:54   13   ISSUE OF CLAY BECAUSE MR. STAGGS SAID SOMETHING IN HIS

17:54   14   DEPOSITION.  I'M NOT SURE WHAT IT MEANS, IF IT MEANS ANYTHING.

17:54   15   I'M INTERESTED IN THE COMPACTION ISSUE THERE AS WELL, JUST TO

17:54   16   LET EVERYBODY KNOW AHEAD OF TIME.

17:54   17           **MR. TREEBY:**  THANK YOU, YOUR HONOR.

17:54   18           **THE COURT:**  WE WILL SEE YOU AT 9:00 IN THE MORNING.

17:54   19           (PROCEEDINGS ADJOURNED.)

17:54   20                         * * *

        21

        22

        23

        24

        25

*HOURLY TRANSCRIPT*

1    <u>**CERTIFICATE**</u>

2         I, TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

3    REPORTER FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT

4    OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE

5    AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND

6    UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE

7    ABOVE-ENTITLED MATTER.

8

9

10                           S/ TONI DOYLE TUSA
                             TONI DOYLE TUSA, CCR, FCRR
11                           OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25