```
 1              IN THE UNITED STATES DISTRICT COURT FOR
                 THE EASTERN DISTRICT OF LOUISIANA
 2                        AT NEW ORLEANS

 3     ****************************************************************
       IN RE:  KATRINA CANAL BREACHES
 4     CONSOLIDATED LITIGATION
       PERTAINS TO:  MRGO               Docket No. 05-CV-4182
 5         Armstrong No. 10-CV-866      September 18, 2012
       ****************************************************************
 6

 7                      TUESDAY, MORNING SESSION
                     TRANSCRIPT OF TRIAL PROCEEDINGS
 8          HEARD BEFORE THE HONORABLE STANWOOD DUVAL
                     UNITED STATES DISTRICT JUDGE
 9

10

11

12

13
       SUSAN A. ZIELIE, RMR, FCRR
14     Official Court Reporter
       HB 406
15     500 Poydras Street
       New Orleans, Louisiana 70130
16     susan_zielie@laed.uscourts.gov
       504.589.7781
17

18
       Proceedings Recorded by Computer-aided Stenography.
19

20

21

22

23

24

25
```

```
1   APPEARANCES:
    For the Plaintiffs:           BRUNO & BRUNO
2                                 BY:  JOSEPH M. BRUNO, ESQ.
                                  855 Baronne Street
3                                 New Orleans LA 70113

4                                 THE ANDRY LAW FIRM
                                  BY:  JONATHAN B. ANDRY, ESQ.
5                                 610 Baronne Street
                                  New Orleans LA 70113
6
                                  BARON & BUDD
7                                 BY:  THOMAS SIMS, ESQ.
                                  3102 Oak Lawn Avenue, Suite 1100
8                                 Dallas TX 75219

9                                 DEGRAVELLES PALMINTIER HOLTHAUS
                                     & FRUGE
10                                BY:  MICHAEL C. PALMINTIER, ESQ.
                                       JOSHUA M. PALMINTIER, ESQ.
11                                718 Main Street
                                  Baton Rouge LA 70801
12
                                  DOMENGEAUX WRIGHT ROY & EDWARDS
13                                BY:  ELWOOD C. STEVENS, JR. ESQ.
                                       BONNIE KENDRICK, ESQ.
14                                PO Box 3668
                                  556 Jefferson Street
15                                Lafayette LA 70502

16                                THE DUDENHEFER LAW FIRM, LLC
                                  BY:  FRANK DUDENHEFER, JR., ESQ.
17                                601 Poydras Street, Suite 2655
                                  New Orleans LA 70130-6004
18
                                  FAYARD & HONEYCUTT
19                                BY:  CALVIN C. FAYARD, JR., ESQ.
                                  519 Florida Avenue SW
20                                Denham Springs LA 70726

21                                JOANEN LAW FIRM
                                  BY:  SCOTT JOANEN, ESQ.
22                                4905 Freret Street, Suite B
                                  New Orleans LA 70115
23
                                  LEVIN PAPANTONIO THOMAS MITCHELL
24                                   RAFFERTY & PROCTOR
                                  BY:  MATTHEW D. SCHULTZ, ESQ.
25                                316 S. Baylen Street, Suite 600
                                  Pensacola FL 32502
```

```
 1                              THE TRIAL LAW FIRM, PC
                                BY:  ANDREW P. OWEN
 2                              800 Wiltshire Blvd, Suite 500
                                Los Angeles CA 90017
 3
                                J. ROBERT WARREN, II, A PLC
 4                              BY:  J. ROBERT WARREN, II, ESQ.
                                1718 Short Street
 5                              New Orleans LA 70118

 6                              COTCHETT PITRE & McCARTHY, LLP
                                BY:  PHILIP L. GREGORY, ESQ.
 7                              840 Malcolm Road, Suite 200
                                Burlingame CA 94010
 8
     For the Defendant Washington   STONE PIGMAN WALTHER WITTMAN
 9   Group International, Inc.:  BY:  WILLIAM D. TREEBY, ESQ.
                                     JAMES C. GULOTTA, JR., ESQ.
10                                   HEATHER S. LONIAN, ESQ.
                                     MAGGIE A. BROUSSARD, ESQ.
11                              546 Carondelet Street
                                New Orleans LA 70130
12
                                     - AND -
13
                                JONES DAY
14                              BY:  ADRIAN WAGER-ZITO, ESQ.
                                     DEBRA S. CLAYMAN, ESQ.
15                                   CHRISTOPHER N. THATCH, ESQ.
                                     CHRISTOPHER FARRELL, ESQ.
16                                   JULIA CRONIN, ESQ.
                                     BRIAN KERWIN, ESQ.
17                              51 Louisiana Avenue NW
                                Washington DC 20001
18
     For the Defendant United   US DEPARTMENT OF JUSTICE
19   States of America:         CIVIL DIVISION, TORTS BRANCH
                                BY:  ROBIN D. SMITH, ESQ.
20                                   JAMES F. McCONNON, JR. ESQ.
                                     RUPERT MITSCH, ESQ.
21                                   CONOR KELLS, ESQ.
                                     JOHN A. WOODCOCK, ESQ.
22                              Benjamin Franklin Station
                                PO Box 888
23                              Washington DC 20044

24

25
```

:59:45

```
:59:45   1              NEW ORLEANS, LOUISIANA; TUESDAY, SEPTEMBER 18, 2012

:59:45   2                            9:00 A.M.

:08:26   3              MR. TREEBY:  Good morning.

:08:31   4              THE COURT:  You ready to proceed, Mr. Treeby?

:08:34   5                   I just have a couple of questions.  Let me make it

:08:36   6     clear, the reason I ask these questions is not for any in-depth

:08:41   7     probing.  Simply to make sure I have a grasp on the principles

:08:44   8     that have been discussed via your direct and your cross and his

:08:48   9     answers.  So I'll try to make the questions concisive.

:08:58  10                   Dr. Bea, as I understand it, the parties have come

:09:03  11     to an understanding that the soil characterization at all

:09:09  12     relevant places in this litigation for general purposes is 10 to

:09:17  13     the minus 5 -- and I'm using shorthand.  Is that your

:09:20  14     understanding?

:09:21  15              MR. SCHULTZ:  That's permeability.

:09:23  16              THE COURT:  Permeability, I'm glad you said that.

:09:29  17                   The 10 to the minus 9 that you used in your

:09:32  18     program relates to compressibility but not to permeability?

:09:40  19              THE WITNESS:  Correct.

:09:41  20              THE COURT:  The next question is, if a soil is not

:09:48  21     saturated, is it more compressible than if it were saturated?

:09:52  22              THE WITNESS:  Yes.

:09:53  23              THE COURT:  The dryer, the more compressible?

:09:56  24              THE WITNESS:  Correct.

:09:57  25              THE COURT:  And final question.  Upon what basis -- and
```

:10:04  1   this is the only more probative question -- upon what basis did

:10:09  2   you find that the soils involved in your analysis were

:10:14  3   saturated?

:10:15  4          THE WITNESS:  Results from a laboratory testing.  In

:10:26  5   the key soils involved, the buried marsh swamp deposits and also

:10:36  6   the responses from the piezometers that have been embedded in

:10:45  7   the soils.

:10:46  8          THE COURT:  All right.  Thank you, sir.

:10:48  9              Mr. Treeby, I relinquish the witness.

:10:51  10          MR. TREEBY:  Thank you.

:10:51  11                  CROSS EXAMINATION (CONTINUED)

:10:51  12   BY MR. TREEBY:

:10:53  13   Q   Good morning, Dr. Bea.

:10:54  14   A   Good morning.

:10:56  15   Q   Dr. Bea, you have stated in your report that the entire

:11:01  16   community of excavations provided a substantial number of

:11:07  17   hydrologic connections with what you call the swamp-marsh layer;

:11:11  18   is that correct?

:11:11  19   A   Yes, sir.

:11:12  20   Q   But at your April 16th deposition, you could not tell us

:11:16  21   which excavations exacerbated your alleged, quote, hydraulic

:11:24  22   connectivity pressure connections, close quote, with the swamp

:11:28  23   marsh layer; isn't that also correct?

:11:30  24   A   I don't think so.  The cross-sections that we discussed

:11:38  25   yesterday identify excavation features that were important but

:11:49  1   in the context of those cross-sections.  So we identified

:11:58  2   specific excavations that exacerbated the uplift pressures of

:12:08  3   water connectivity.

:12:11  4   Q   You identified as those excavations which exacerbated a

:12:18  5   substantial number of hydraulic connections as those you showed

:12:22  6   in the cross-section; isn't that right?

:12:24  7   A   Well, here's --

:12:26  8   Q   Isn't that right?  Again, yes or no, and I'd be happy for an

:12:31  9   explanation.

:12:32  10  A   I'm sorry, sir.  No, that's not correct.  The cross-sections

:12:37  11  are two-dimensional idealizations of a complex three-dimensional

:12:48  12  thing.  It's like a picture frame cut through a complex room.

:12:57  13  The struggle on the part the analyst is to know where to

:13:05  14  reach outside of the framework of the picture to bring into the

:13:10  15  picture.  The general rule of thumb I use is that line you

:13:16  16  continue to focus on; and, as to me, actually has depth.  But

:13:24  17  the rule I've used is 100 feet to the right, 100 feet to the

:13:30  18  left.

:13:33  19          When you ask for a specific excavation in that

:13:37  20  cross-section, and say I want it exactly that cross-section, you

:13:44  21  will detect I struggle to answer your question crisply because

:13:53  22  the two-dimensional picture is in fact a three-dimensional

:13:59  23  picture.

:14:01  24          The other thing I struggle with is you point to a

:14:05  25  particular shape.  You seem to be very interested in the box

:14:15   1   that we discussed.  That box is an idealization.  In fact, in my

:14:23   2   report, I state that specifically and say that the real word is

:14:29   3   more complex.  But, in a model, in an analytical model, we can't

:14:37   4   bring in all of that complexity.  That leads to uncertainties.

:14:43   5   I specifically identified for you, sir, the uncertainties that

:14:49   6   we have in drawing such cross-sections.

:14:54   7             There's another one that is crucial to this case,

:14:58   8   and that's the context between the buried swamp marsh layer and

:15:05   9   the excavations.  In the cross-sections, there are many straight

:15:11   10  lines that in fact don't exist.  And you can say wait a

:15:20   11  second --

:15:20   12        MR. TREEBY:  Your Honor, this is going far beyond my

:15:21   13  question, which was yes or no.  And this explanation is not

:15:27   14  consistent with his testimony; and, I would like to demonstrate

:15:29   15  that, but my question gets lost at some point.

:15:33   16        THE COURT:  Well, these are complex matters; and

:15:35   17  sometimes to answer the question and explain it is not confined

:15:40   18  to a sentence.  Your question was, I think, the location of the

:15:51   19  so-called excavations.

:15:53   20        MR. TREEBY:  No.  My question -- I'll read it again.

:15:53   21  BY MR. TREEBY:

:15:57   22  Q   At your April 16 rebuttal deposition, you could not tell us

:16:00   23  which particular excavations exacerbated your alleged hydraulic

:16:07   24  conductivity exposure connections with the swamp marsh layer;

:16:11   25  isn't that right?

| | | |
|---|---|---|
| :16:12 | 1 | THE COURT:  That does relate to location to some |
| :16:14 | 2 | degree, all right. |
| :16:15 | 3 | THE WITNESS:  And I said that's not right. |
| :16:18 | 4 | THE COURT:  And he says that's not correct. |
| :16:21 | 5 | If you want him to explain it on redirect, that's |
| :16:24 | 6 | fine. |
| :16:26 | 7 | MR. TREEBY:  Well, I think that belongs on redirect, |
| :16:28 | 8 | Your Honor. |
| :16:28 | 9 | THE COURT:  Okay.  He said it's not correct. |
| :16:28 | 10 | BY MR. TREEBY: |
| :16:32 | 11 | Q   It's not correct, but here's what you said at your |
| :16:34 | 12 | deposition. |
| :16:34 | 13 | MR. TREEBY:  Please call it up, April 16, 2012. |
| :16:39 | 14 | THE COURT:  And he's going to be allowed to explain |
| :16:41 | 15 | this, sir.  After -- |
| :16:43 | 16 | MR. TREEBY:  I understand, Your Honor. |
| :16:44 | 17 | THE COURT:  You're allowed to do this, but he's going |
| :16:49 | 18 | to be allowed to explain it. |
| :16:51 | 19 | MR. TREEBY:  Page 85, line 24.  And we're going to |
| :16:54 | 20 | continue up to page 87, line 10.  Because there was an |
| :16:58 | 21 | explanation here, but it was a different explanation. |
| :17:01 | 22 | THE COURT:  Let's read it. |
| :17:02 | 23 | MR. TREEBY:  Last two lines of this page. |
| :17:02 | 24 | BY MR. TREEBY: |
| :17:03 | 25 | Q   Are you able, sitting here -- I can't read it when you do |

:17:11  1  that -- are you able, sitting here, looking at what you've given

:17:15  2  us in your GIS model, to tell me and mark which compactions you

:17:24  3  contend are deep enough and close enough to the I-wall to have

:17:29  4  exacerbated the hydraulic conductivity pressure connections?

:17:35  5              Answer:  No, I could not.  But we could -- I just

:17:39  6  can't do it, sitting here, with any level of detail.

:17:42  7              That's fairly important to you in this case, but

:17:44  8  you can't do that?

:17:45  9              Answer:  No.  What would it take -- and I was --

:17:50  10  keep going.

:17:57  11              Not in a deposition which is the only vehicle I

:17:59  12  have to ask you questions about it for you to tell us that,

:18:02  13  because we can't tell from your plan.  You've already said that.

:18:05  14  We can't tell it; right?  We can't tell the depth, you can't

:18:09  15  even tell the depth.

:18:11  16              Answer:  No, I can't.  That's correct.

:18:13  17              So how can I get this information from you?

:18:17  18              Continue.

:18:23  19              Page 87:  Well, we would have to do a correlation

:18:28  20  for you to identify specific compactions, then connect that to

:18:33  21  their depth, then correlate that with the contact elevation for

:18:36  22  the varied swamp marsh deposit, and you could produce a table

:18:40  23  that would portray all that information.  That's one of the

:18:42  24  powers of the GIS system, would be one of the reasons we went to

:18:44  25  this depth of work.  But, sitting here today, I can't do that

:18:48  1   for you.

:18:48  2                   Do you have such a table?

:18:49  3                   No.  I would be more than glad to produce it if I

:18:53  4   had it.

:18:54  5                   Keep going.

:18:58  6                   Have you done such a correlation?

:19:00  7                   No.

:19:01  8                   So, despite the fact you write a report saying a

:19:05  9   number of these descriptions that is that effect, you can't tell

:19:07  10  us which one do right now?

:19:10  11                  I could point to general ones, and we cited for

:19:13  12  example the wedding cake structure previously discussed.  We've

:19:16  13  had discussions concerning the piles that were pulled and the

:19:19  14  voids left behind from those piles.  We can cite the Area 8 that

:19:32  15  we've discussed; that, although did it not put you in contact

:19:36  16  with the buried swamp marsh deposit, it put the system in

:19:41  17  contact with the other sandy, shelly materials.  So this is a

:19:43  18  multi-connection problem, not an individual excavation problem.

:19:46  19  And, hence, my inability to provide the detail that you're

:19:49  20  requesting.

:19:49  21                  Has anyone done such a correlation?

:19:51  22                  I think only in a general sense, certainly --

:19:54  23                  And I believe that's the end of the part that we

:19:57  24  were trying to get at.

:19:59  25                  And, if it can't be done and you just have to use

:20:02  1    idealized cross-sections, that's fine.  You said you used

:20:07  2    idealized cross-sections.

:20:09  3                And what I want to do, Dr. Bea, is ask you whether

:20:13  4    those idealized cross-sections, to use your terms, represent the

:20:19  5    real word.  That's what I want to do.  The real world.

:20:22  6          MR. SCHULTZ:  Can we just get on with the examination,

:20:24  7    Your Honor?

:20:25  8          MR. TREEBY:  Yes, we can.

:20:25  9          THE COURT:  All right, all right.  I'm going to say, if

:20:28  10   this gets too testy, I'm going to get really testy.  Do you all

:20:33  11   understand that?

:20:34  12               All right.  So let's move.

:20:34  13   BY MR. TREEBY:

:20:38  14   Q   The only excavations that Mr. Cobos-Roa modeled in his

:20:47  15   SEEP-W and SLOPE-W model were computer representations of the

:20:54  16   cross-sections; is that right?

:20:56  17   A   Yes.

:20:56  18   Q   In fact, neither you or Mr. Cobos-Roa have done any digital

:21:01  19   computer SEEP analyses since you were served on March 28th this

:21:05  20   year; isn't that right?

:21:06  21   A   That's correct.

:21:06  22   Q   So the computer flow analysis computer runs by Dr. Cobos-Roa

:21:13  23   for this case did not take into account or model any excavation

:21:18  24   that you may have identified since March 28, 2012; isn't that

:21:22  25   logical?

:21:23   1   A    No, sir.

:21:26   2   Q    So you agree that the idealized excavations that appear in

:21:30   3   your cross-sections are the only excavations that Cobos-Roa

:21:34   4   modeled in your SEEP-W and SLOPE-W analysis; isn't that correct?

:21:41   5   A    Yes, sir.

:21:41   6   Q    And the first thing I want to talk about then in that

:21:45   7   connection is pilings.  For example, you opined about piling

:21:53   8   removals that you believe left voids; is that right?

:21:56   9   A    That's correct.

:21:56   10   Q    Those piling removals are not shown in your computer model

:22:01   11   for the failure or nonfailure cases; isn't that correct?

:22:05   12   A    That's correct.

:22:05   13   Q    Many of the pilings removed from the EBIA during the task

:22:12   14   for the 26 performed by the Washington Group International were

:22:16   15   in the canal; isn't that correct?

:22:17   16   A    That's correct.

:22:18   17   Q    You're aware, are you not, that Dr. Rogers testified at this

:22:23   18   trial that the general gist of the profession is that holes left

:22:28   19   after piling extractions close up in a few days or a few months;

:22:32   20   but, it isn't going to be a few years, it's going to be pretty

:22:35   21   soon; isn't that correct?

:22:36   22            THE COURT:  Was that in the water, sir?

:22:39   23            MR. TREEBY:  Both, but --

:22:41   24            THE COURT:  That's not my recollection.

:22:42   25            MR. TREEBY:  No.  That's not in the water.  You're

1028

| | | |
|---|---|---|
| :22:45 | 1 | right.  That was not in the water. |
| :22:46 | 2 | THE COURT:  I thought that was in the water, sir.  I |
| :22:49 | 3 | may be incorrect. |
| :22:50 | 4 | MR. TREEBY:  It was not.  It was not in the water. |
| :22:55 | 5 | MR. SCHULTZ:  Your Honor, we'll lodge an objection that |
| :22:57 | 6 | it's an incorrect characterization.  I was not there |
| :22:59 | 7 | personally -- |
| :23:00 | 8 | THE COURT:  I may not be correct, I'm not looking at |
| :23:03 | 9 | the record. |
| :23:04 | 10 | MR. TREEBY:  It's in the trial transcript.  I'll give |
| :23:06 | 11 | the Court and the counsel the citation.  It was on September |
| :23:09 | 12 | 14th, last Friday, at page 725, lines 5 through 11.  That's in |
| :23:16 | 13 | his trial testimony.  And that was concerning -- and the Court |
| :23:24 | 14 | can look at it in the context in the transcript -- but I will |
| :23:28 | 15 | represent to the Court, that was concerning the onshore |
| :23:31 | 16 | excavations.  He said in the canal, it closed up much more |
| :23:34 | 17 | quick. |
| :23:34 | 18 | THE COURT:  That was my understanding. |
| :23:36 | 19 | MR. TREEBY:  That's right. |
| :23:37 | 20 | THE COURT:  We'll get to the nuances later, but that's |
| :23:39 | 21 | the general concept.  I understand. |
| :23:41 | 22 | Go ahead, Mr. Treeby.  And thank you for the |
| :23:44 | 23 | citation. |
| :23:44 | 24 | BY MR. TREEBY: |
| :23:49 | 25 | Q   You've reviewed the deposition testimony of Lee Guillory in |

:23:53  1    this case; haven't you?

:23:55  2    A   Yes, sir.

:23:55  3    Q   You have?

:23:56  4    A   Yes.

:23:57  5    Q   I'm sorry, sometimes I'm not hearing clearly.

:24:00  6    A   Me, too.

:24:01  7    Q   Mr. Guillory was a civil engineer and project manager for

:24:05  8    the Corps of Engineers on Task Order 26 at the EBIA, you know

:24:10  9    that; right?

:24:11  10   A   Yes, sir.

:24:11  11   Q   He was on the site during the project and oversaw the work

:24:14  12   that was conducted there; is that your understanding?

:24:16  13   A   Yes, sir.

:24:19  14   Q   You know Mr. Guillory testified then from reading his --

:24:23  15   which is in the deposition designation in this case -- that the

:24:26  16   pilings that were pulled during the project, quote:  Very rarely

:24:30  17   left a hole because the clay conditions and silty layers in the

:24:34  18   ground generally close in and collapse as soon as you pull the

:24:37  19   pilings out.  Do you recall reading that?

:24:39  20   A   Yes.

:24:40  21   Q   And he was an observer at the scene; right?

:24:51  22   A   Right.

:24:52  23           There was additional testimony, I forgot by which

:24:57  24   one of Mr. Guillory's colleagues, that provided further detail

:25:02  25   concerning voids left by piles even after attempts to seal those

:25:15   1   voids.

:25:17   2                   I also testified to the experience I'd had

:25:21   3   personally with pile extractions in an appropriate location --

:25:28   4           MR. TREEBY:  Your Honor, please, I believe this is

:25:30   5   redirect.

:25:31   6           THE COURT:  No, sir.  I'm going to let him explain his

:25:34   7   answer.  We're in a vacuum.  I'm in a vacuum, which is not good.

:25:38   8              Go ahead.

:25:39   9           THE WITNESS:  I understand the vacuum.

:25:41   10          THE COURT:  I'm going to let the other experts explain

:25:44   11   their answers as well.

:25:46   12              Go ahead, sir.

:25:47   13          THE WITNESS:  I explained to you that we had in fact

:25:50   14   formed detailed investigations of the pile closures because we

:25:57   15   found that they were not closing after substantial periods of

:26:02   16   time.

:26:05   17                   As I read Dr. Rogers' testimony here, he opined

:26:10   18   that he was reflecting the so-called common wisdom, that proved

:26:17   19   out not to be so wise, that in fact information had become

:26:24   20   available to say that the pile holes frequently did not close.

:26:32   21   I'm sure you can consult with the deposition -- or, pardon me,

:26:37   22   the testimony transcript.  There's more to it than a simple open

:26:43   23   or close.  I wish it were that simple.

:26:43   24   BY MR. TREEBY:

:26:49   25   Q   Okay.

:26:50  1    A    Thank you.

:26:55  2    Q    And you know, do you not, back to the issue of what was

:27:02  3    modeled, that Mr. Cobos-Roa did not model grid exceptions in his

:27:08  4    SEEP-W and SLOPE-W analysis; isn't that correct?

:27:11  5    A    No, that's actually not correct.

:27:16  6    Q    Well, you agree that the grid trenching performed on the

:27:21  7    EBIA trenched to a depth of the 5 feet below ground surface;

:27:23  8    isn't that correct?

:27:25  9    A    That's a so-called average depth.

:27:29  10            THE COURT:  I think we've been through this, the grid

:27:32  11   trenching.  But, if there's a new point you want to make, you're

:27:36  12   certainly free to do so.

:27:38  13            THE WITNESS:  May I provide further explanation?

:27:41  14            THE COURT:  Right now, I've heard grid trenching; and,

:27:45  15   if Mr. Treeby wants to bring up -- the real question was the

:27:48  16   first question, did Mr. Cobos-Roa include that in his model.

:27:52  17            MR. TREEBY:  That's it.

:27:53  18            THE COURT:  And you said none.  And so the explanation

:27:56  19   should be related to did he or didn't he include it in his

:28:00  20   model.

:28:00  21            MR. TREEBY:  And I'll have to prove that with somebody

:28:03  22   who has actually reviewed the model runs, which I don't think

:28:06  23   includes Dr. Bea.

:28:06  24   BY MR. TREEBY:

:28:09  25   Q    You testified yesterday that the ground surface elevation

:28:12  1  before the Washington group was on the site was about two and a

:28:15  2  half feet, I believe?

:28:17  3  A    Two.

:28:17  4  Q    Plus two and a half feet?

:28:18  5  A    Plus two to three feet.

:28:21  6  Q    Okay.

:28:23  7           And, in general, you know that the elevation of

:28:27  8  the East Bank Industrial Area sloped from a higher elevation at

:28:30  9  Surekote Road generally to a lower elevation as it went west

:28:34  10  toward the canal; isn't that right?

:28:36  11  A    Yes, sir.

:28:37  12  Q    You opined about the sewer lift station excavation at Saucer

:28:47  13  Marine; am I right?

:28:48  14  A    Correct.

:28:48  15  Q    But, in fact, that station is not modeled in your SEEP-W or

:28:54  16  SLOPE-W analyses; isn't that true?

:28:59  17  A    Please repeat your question.  There's a part with the sewer

:29:06  18  I didn't hear.

:29:07  19  Q    Sewer?

:29:09  20           MR. TREEBY:  I'm going to ask the court report to read

:29:12  21  it back.

:29:14  22           THE COURT:  I don't want to do it.  You're right, the

:29:16  23  court reporter, if you could, please.

:29:22  24           I think the question was, was it modeled in either

:29:25  25  of the SEEP-W --

:29:26  1          MR. TREEBY:  And SLOPE-W analysis.

:29:29  2          THE COURT:  And SLOPE-W analyses.  That the sewer lift

:29:33  3  station --

:29:34  4          THE WITNESS:  I didn't hear the word lift.

:29:38  5             The answer is no, that was not modeled.

:29:44  6          MR. TREEBY:  And I put myself a note here, Your Honor,

:29:47  7  to clarify the record because, I mislead myself and the witness

:29:53  8  yesterday when I said something about the location of the sewer

:29:56  9  lift station.  And I put that transcript here -- oh, here we go.

:30:00  10         THE COURT:  Take your time, sir.

:30:01  11         MR. TREEBY:  Sitting right here.

:30:02  12            Of this in the trial transcript yesterday.  It's

:30:05  13  at page 101, at looks like 5:30.  Maybe that explains it.  I'm

:30:15  14  going to try to use something.

:30:16  15         THE COURT:  I promise you, I do remember enough of what

:30:18  16  it was like to do this to feel your pain.  Go ahead.

:30:18  17  BY MR. TREEBY:

:30:22  18  Q   The question was about the sewer lift station, that was at

:30:26  19  the edge of Saucer and Indian Towing; do you recall that?

:30:29  20            And your answer was yes.

:30:30  21  A   Yes.

:30:31  22  Q   In fact, it was at the edge of Saucer Marine Yacht?

:30:36  23  A   To the north.

:30:37  24  Q   So I just wanted to correct the record.

:30:40  25         THE COURT:  Thank you, sir.

:30:40   1    BY MR. TREEBY:

:30:42   2    Q   Back to the sewer lift station, you've said that was not

:30:44   3    modeled your analyses.

:30:48   4                The sewer lift station, I believe you will agree,

:30:50   5    was almost 200 feet north of the north end of the south breach;

:30:55   6    is that right?

:30:55   7    A   Yes, sir.

:30:56   8    Q   And you also testified or wrote in your reports about the

:31:00   9    wedding cake excavation at Boland Marine; isn't that right?

:31:04   10   A   Correct.

:31:04   11   Q   But you did not model this excavation either in your SEEP or

:31:13   12   SLOPE/W analysis; isn't that correct?

:31:15   13   A   Yes, sir.

:31:16   14        THE COURT:  Mr. Treeby, just to make sure you

:31:18   15   understand this, because this is foreign to me and I'm sure I'm

:31:23   16   going to get it later on, you said -- I'm sorry I missed it --

:31:26   17   200 feet north?

:31:28   18        MR. TREEBY:  North of the north end of the south

:31:32   19   breach.

:31:32   20        THE COURT:  Okay, okay.  I understand it now.

:31:34   21            So it would be in between the north breach and the

:31:39   22   south breach.

:31:40   23        MR. TREEBY:  Exactly.

:31:40   24        THE COURT:  Thank you.  Sorry I got lost a little bit.

:31:43   25   Go ahead.

:31:43   1   BY MR. TREEBY:

:31:44   2   Q   And you know -- well, let me make sure.  I don't think I got

:31:49   3   an answer to that question.  I'm not sure.

:31:50   4               Did I get an answer to my question?  I don't

:31:53   5   think --

:31:54   6   A   I'm sure you must have.  You wouldn't let me go without an

:31:54   7   answer.

:32:01   8   Q   Just for the protection of the record, I'm go to ask the

:32:03   9   court reporter -- I asked, you did not model this excavation,

:32:06   10  speaking of the wedding cake structure in SEEP-W or SLOPE-W, and

:32:11   11  I don't remember if he answered.

:32:13   12  A   We didn't.  We did not model specifically that excavation.

:32:18   13  Q   Thank you.

:32:20   14              You know as well that the wedding cake excavation

:32:24   15  was almost 600 feet away from the south end of the north breach;

:32:30   16  isn't that right?

:32:31   17  A   Yes, sir.

:32:35   18  Q   I want to talk a little bit about that excavation that's not

:32:41   19  modeled in your analyses, but I want to ask you -- because it's

:32:46   20  in your report, I want to refer you to this.  And this is --

:32:49   21              MR. TREEBY:  And I want to pull up JX 1389 Bea report

:32:57   22  at 49.  I don't have the JX page number.  I'm looking for figure

:33:17   23  28.  That's at the top.

:33:17   24  BY MR. TREEBY:

:33:23   25  Q   This is from your report, figure 28.  This is from your

```
:33:25   1   February 1st, 2012 report.

:33:29   2                   And your caption on this document on this

:33:35   3   photograph says:  Cofferdam at Boland Marine site dug to depth

:33:40   4   exceeding 20 feet.  Water entry was associated with penetration

:33:45   5   of organic layers encountered at about 16 feet.

:33:50   6                   I don't know what that dash is about, or if it's

:33:52   7   just 16 feet.  But, in any case.

:33:55   8                   That's your label.  That's your label on the

:33:56   9   photograph; is that right.

:33:57  10   A   I think it's correct.

:34:00  11   Q   That's not the contemporaneous label; isn't that correct?

:34:03  12   A   That's correct.  The dash is minus 16 feet.

:34:07  13   Q   Oh, minus 15 feet.  Thank you.

:34:13  14                   Now, once again, just to keep this concept in

:34:16  15   mind, you don't know the elevation of the top of that

:34:20  16   excavation; isn't that right?

:34:22  17   A   We could determine it; but, sitting here today, I don't know

:34:28  18   it.

:34:28  19   Q   But, in any case, you don't see any water flowing out of the

:34:33  20   organic layers in this photo; isn't that correct?

:34:35  21   A   I just see the accumulation of water in the cofferdam.

:34:41  22   Q   The water is still in this photograph; isn't it?

:34:44  23   A   Yes, sir.

:34:45  24   Q   And you certainly didn't witness any water flowing from the

:34:48  25   organic layers when this hole was excavated; right?  You weren't
```

:34:53  1    there?

:34:53  2    A    I wasn't there.

:34:54  3    Q    I want to show you a document marked JX 1359 --

:34:59  4           THE COURT:  Mr. Freebee, not to disrupt you too much --

:35:04  5    do we have a name for this excavation?

:35:06  6           MR. TREEBY:  Wedding cake.

:35:07  7           THE COURT:  That's what I thought.  I just didn't want

:35:09  8    to imply it.

:35:09  9    BY MR. TREEBY:

:35:12  10   Q    This is wedding cake?

:35:12  11   A    Yes, sir.  After we removed the wedding cake.

:35:16  12   Q    Right.

:35:16  13          THE COURT:  I understand.

:35:16  14   BY MR. TREEBY:

:35:23  15   Q    I want to show you a document marked JX 1359.  And the photo

:35:30  16   at the top of this document is the photo -- we've already done

:35:33  17   that.  I'm sorry.  Excuse me.

:35:37  18              What I want to take you to is the contemporaneous

:35:42  19   photo caption -- what's the exhibit number for this?  This is

:36:27  20   the contemporaneous photo captured on that photograph; isn't

:36:30  21   that true?

:36:31  22   A    I think that's true.

:36:32  23   Q    Standing water inside the cofferdam not flowing from inside

:36:38  24   the cofferdam?

:36:40  25   A    That's right.

:36:43   1    Q   I'm going to show you a document and put it up on the screen

:36:45   2    which is marked JX 0448.  This is a QAR No. 29E, and it's on

:37:09   3    February 14, 2002; isn't that correct?

:37:11   4    A   Yes, sir.

:37:12   5    Q   And that is the day before the photo in figure 28 was taken;

:37:16   6    isn't that right?

:37:17   7    A   Yes, sir.

:37:20   8    Q   Turn if you would to page 007 of this QAR, which is JX

:37:28   9    4480007.  Titled Nonconformance Report Issues.  And it says

:37:37   10   under that site maintenance -- can you find that -- site

:37:41   11   maintenance and dewatering of the cofferdam work area at Boland

:37:44   12   Marine is not being effectively maintained or dewatered as

:37:48   13   indicated in the construction agreement.  And then it talks

:37:52   14   about -- it says however ponding water has been an issue in that

:37:57   15   area, minimal attempts to maintain the area, and it talks about

:38:03   16   removal plan.

:38:04   17           Now turn -- on that same page, the QAR says that

:38:11   18   the work plan for removal of the southern block -- which is what

:38:14   19   they called the wedding cake structure; right?

:38:17   20   A   Yes, sir.

:38:18   21   Q   Indicates that it is anticipated to encounter ground water.

:38:21   22   Is that correct?

:38:24   23           MR. TREEBY:  Pull it up.

:38:25   24           THE COURT:  Make sure he can see it.

:38:25   25   BY MR. TREEBY:

1039

:38:29  1    Q    Is anticipated --

:38:39  2            THE COURT:  That's the second paragraph in issue, too.

:38:39  3    BY MR. TREEBY:

:38:43  4    Q    I just didn't go far enough.

:38:44  5            Hamped construction work plan, the plan indicates

:38:50  6    it's anticipated to encounter ground water and a pump will be

:38:54  7    used to dewater the excavation, and then it describes the pumps.

:39:05  8            You agree, would you not, Dr. Bea, that it is

:39:09  9    common to find ground water at the bottom of excavations that

:39:12  10   are below sea level in an area such as the EBIA; isn't that

:39:16  11   right?

:39:16  12   A    Yes, sir.

:39:16  13   Q    And it's also possible is it not that the water at the

:39:19  14   bottom of the excavation was rainfall runoff; isn't that

:39:24  15   correct?  Possibly?

:39:24  16   A    Well, it didn't appear so, because your QAR identified:

:39:32  17   Weather, no rainfall.

:39:34  18   Q    I asked if it was possible that the water in the bottom of

:39:38  19   the excavation was rain runoff.  Is that possible?

:39:43  20   A    Well, from the record I read, it appears as though the

:39:51  21   deconstruction people were having a continuing problem with

:39:57  22   standing water in the bottom of the excavation given the deep

:40:04  23   watering that they were performing.  So they couldn't get rid of

:40:10  24   the water.  It was sustained flow.

:40:12  25   Q    We went through this at your deposition.  Do you recall that

:40:15  1   you went through this whole sequence, showed you all these same

:40:19  2   documents?  Do you recall that?

:40:19  3   A   Vaguely.

:40:20  4           MR. SCHULTZ:  Your Honor, may I ask --

:40:23  5           MR. TREEBY:  Excuse me.

:40:25  6           MR. SCHULTZ:  May I ask, in terms of rule of

:40:27  7   completeness, which we have one here with the QAR that they are

:40:30  8   discussing, would you prefer that we deal with that

:40:33  9   contemporaneously?

:40:35  10          THE COURT:  Yes.

:40:35  11          MR. SCHULTZ:  Then we would ask to see page 2 of the

:40:38  12  QAR.

:40:38  13          THE COURT:  No.  I misspoke.  Redirect.

:40:41  14          MR. SCHULTZ:  Thank you, Your Honor.

:40:41  15          THE COURT:  I'm not going to disrupt.

:40:44  16          MR. SCHULTZ:  I understand.

:40:44  17          THE COURT:  This would be not smooth at all.  So note

:40:47  18  it on redirect.

:40:48  19  BY MR. TREEBY:

:40:50  20  Q   Now, you do have some recollection of me dealing with this

:40:54  21  at your deposition on March 28th; is that right?

:40:57  22  A   Yes, sir.

:40:57  23  Q   I would just -- I was following through with what you said

:41:02  24  there, and I asked you the same question:  It's also possible,

:41:07  25  is it not, that the water of the excavation was rain runoff;

1041

:41:12   1   right?

:41:13   2             You said:  I don't know that it was.

:41:15   3             I said:  Is that possible?

:41:16   4             And you said:  Of course.

:41:18   5             You would agree with that; would you not?  Or are

:41:20   6   you changing --

:41:21   7   A   The context of the question and my answer, for me, is

:41:26   8   appropriate.

:41:26   9   Q   Thank you.

:41:34   10            And, just to close that loop, because I went

:41:36   11  through this with you at that time, the water at the bottom of

:41:40   12  the excavation in your figure 28 might have been a combination

:41:42   13  of ground water and rain water that collected over time due to

:41:47   14  extensive dewatering activities; isn't that true?

:41:50   15  A   True.

:41:51   16  Q   Now, in your original report on page 53 -- we don't need to

:41:56   17  call it up unless you don't remember it.  I've got him ready,

:42:00   18  hopefully, to call it up.  But, in paragraph 53 of your original

:42:03   19  February 1, 2012 report, page 52, you state that:  Removal of

:42:10   20  barges, piles, underground storage tanks and underground

:42:14   21  utilities, for example, sewer, water, gas lines, reached and

:42:17   22  substantially exceeded elevations of minus 10 feet to minus 25

:42:23   23  feet in EBIA 88.  Do you recall that?

:42:27   24  A   Yes, sir.

:42:28   25  Q   But, at your March 28th deposition, you could not identify

:42:32  1   any excavations as deep as minus 25 feet except for the wedding

:42:39  2   cake, sewer lift station and railroad tanker car; isn't that

:42:45  3   correct?

:42:45  4   A   I don't recall that data now.  I do recall expressing the

:42:53  5   concern with the sewer lift station ladder lift.

:43:04  6   Q   Let me refresh your recollection then.  Let's call up your

:43:07  7   March 28th, deposition, page 57, lines 15, through page 58, line

:43:13  8   3.  57-15.

:43:18  9             Question:  So what excavation between minus 15 and

:43:21  10  minus 25 are you referring to in paragraph 52 in which you refer

:43:26  11  to figures 32A and 32B?

:43:28  12            Answer:  Excavations that penetrated to that deep,

:43:33  13  for example, at Saucer and the wedding cake structure, both.

:43:37  14            Question:  Are there any other penetrations that

:43:39  15  you contend -- excavations, I should say -- that you contend

:43:43  16  were as deep as minus 25 feet other than wedding cake and sewer

:43:49  17  lift station?

:43:51  18            Keep going.

:43:56  19            So your caption says it's --

:44:00  20        MR. TREEBY:  Is this the next page?

:44:03  21        THE COURT:  You don't have an answer.  So we might --

:44:06  22  we're missing something there.

:44:06  23  BY MR. TREEBY:

:44:09  24  Q   Page 58:  I don't recall; but, the information, as I said

:44:18  25  earlier, is being compiled for us at this time.  But those were

:44:21  1    the principal ones I was using as an example of excavations that

:44:26  2    encountered the buried swamp marsh layers.

:44:33  3                    Do you recall that?

:44:34  4    A   Yes.

:44:36  5    Q   But you said -- you do know, do you not, that Mr. Chad

:44:45  6    Morris testified here on September 12 that, not including the

:44:50  7    wedding cake excavation and some piling extractions, he wasn't

:44:54  8    aware of any excavations at the EBIA cite that exceeded minus 25

:44:59  9    feet below sea level; isn't that right?  He used the term sea

:45:03  10   level, I didn't.

:45:04  11   A   I don't recall because I reviewed his deposition in route to

:45:14  12   here.

:45:17  13   Q   I would refer the Court and counsel for the trial transcript

:45:21  14   record is on 9/12 at page 209 beginning at line 7 and going down

:45:30  15   to line 18.

:45:38  16          THE COURT:  Thank you, sir, for the site.

:45:40  17          THE WITNESS:  Thank you.

:45:40  18   BY MR. TREEBY:

:45:41  19   Q   You did -- and, in fairness, you did bring up -- you

:45:45  20   mentioned barges in your report.

:45:47  21   A   Yes.

:45:48  22   Q   The only barges removed during the project, however, were

:45:51  23   located at the canal bank or in some cases completely submerged

:45:56  24   in the canal; isn't that right?

:45:57  25   A   Correct.

:45:58  1  Q    You don't have any evidence that barges were removed near

:46:01  2  the flood wall; do you?

:46:03  3  A    No.

:46:04  4  Q    By Washington Group?

:46:06  5  A    I said no.

:46:07  6  Q    Okay.  And you did mention, also in fairness, as we went

:46:13  7  through that, this whole train of thought in your deposition,

:46:17  8  that the removal of a buried railroad tank car -- other than the

:46:22  9  removal of a buried railroad tank car, there were no other

:46:27  10  storage tanks removed that reached or exceeded 25 feet; is that

:46:31  11  right?

:46:31  12  A    I think that's correct.

:46:32  13  Q    And the railroad tanker car was submerged in the canal;

:46:36  14  right?

:46:36  15  A    Correct.  Boland Marine.

:46:42  16  Q    Okay.  You're aware, are you not, Dr. Bea, that the drainage

:47:00  17  ditch along Surekote Road pre-existed -- at Saucer Marine

:47:05  18  pre-existed Washington Group's work in the Industrial Canal

:47:11  19  areas; isn't that right?

:47:12  20  A    The drainage ditch that pre-existed was shown in a number of

:47:22  21  pre-site clearing photographs as showing a drainage ditch

:47:29  22  relatively shallow and narrow, and weed-choked gross filled a

:47:41  23  ditch.  And this ditch is to the west shoulder of Surekote Road.

:47:52  24  Q    And extended from the south end of Saucer Marine to just

:47:59  25  past the north end of Indian Towing; isn't that right?

```
:48:02   1   A   Yes, sir.

:48:03   2   Q   It wasn't located at Boland Marine at all; right?

:48:07   3   A   I recall that -- I recall that there was a shallow ditch at

:48:20   4   Boland.  But I think that shallow storm water ditch was post-WGI

:48:28   5   work.  WGI was attempting to get drainage from that section

:48:35   6   south to the east-west connection to the Industrial Canal.  So I

:48:42   7   think that one was post-deconstruction.

:48:49   8            MR. TREEBY:  Give me a second, Your Honor.

:48:51   9            THE COURT:  Yes, sir.

:48:52   10              (Pause in proceedings.)

:49:35   11           MR. TREEBY:  I want to pull up -- I don't know if we

:49:38   12   have this, maybe plaintiffs can help us with this.

:49:38   13   BY MR. TREEBY:

:49:40   14   Q   We were given in advance some slides, but maybe you'll

:49:44   15   remember this, because I suspect that you had some hand in

:49:49   16   preparing that presentation.  We were given a side that said

:49:52   17   that the ditch parallel to Surekote Road was poorly backfilled.

:49:57   18   Do you recall that?

:49:57   19   A   I think so.

:49:58   20   Q   And I want to show you a demonstrative from Chad Morris's

:50:05   21   direct examination first, which is PX 3404, line 0385.  Page

:50:16   22   0385.

:50:32   23           MR. TREEBY:  And would you blow up the bottom figure?

:50:32   24   BY MR. TREEBY:

:50:37   25   Q   This is a photograph in the contemporaneous -- that's it.
```

:50:46   1    That's what I want -- says here:  Hay bales replaced in

:50:52   2    accordance with SWPPP.  This is the drainage ditch at Saucer; is

:50:58   3    that right?

:50:58   4    A   This is at a time period and appears to be where the

:51:05   5    drainage ditch makes the right-hand turn headed toward the

:51:14   6    Industrial Canal.

:51:15   7    Q   Right.

:51:16   8                    And he, based on this photo, the drainage ditch

:51:19   9    was no more than two and a half feet deep; is that right?

:51:22   10   A   Repeat your question.

:51:26   11   Q   Can you tell, based on this photo, that the drainage ditch

:51:29   12   is no more -- you said it was shallow, but it was no more than

:51:33   13   two and a half feet deep; right?

:51:34   14   A   Well, I can't tell.

:51:36   15   Q   Okay.  I'll take your testimony it was shallow.  We'll go

:51:38   16   with that.

:51:39   17   A   I can't tell for sure.  If I could tell which way those hay

:51:45   18   bales were turned, I could.  The hay bales normally are two feet

:51:52   19   by two feet by four feet in length, with the wrapping wires

:51:58   20   around the two feet direction.  And, if these are turned on

:52:03   21   their ends, which is typical for this purpose, that would be

:52:15   22   three feet deep.

:52:16   23   Q   Two and a half, three feet.  Let's take three feet, just for

:52:19   24   my purposes.

:52:19   25                    The drainage, we've already talked about where it was

:52:21  1   located.  I want to show you the Corps of Engineers' quality

:52:26  2   assurance report for August 31st, 2004, which is JX 01073-001,

:52:34  3   first, to identify it.

:52:37  4            MR. TREEBY:  Pull the document.  Okay.  It's report No.

:52:39  5   915, dated August 31, 2004.

:52:43  6                 And then go to page 2, if you would.  And, if you

:52:46  7   would highlight the text in the second box, middle of the second

:52:51  8   line.

:52:53  9   BY MR. TREEBY:

:52:58  10  Q   Observe in the second line -- you got it?

:53:03  11  A   I'm behind you.

:53:06  12                 What is the date of this QAR?  Year?

:53:11  13  Q   Yeah.  August 31, 2004.

:53:14  14  A   And the photograph we were looking at is 2002; is that

:53:19  15  correct?

:53:20  16  Q   Probably.  I'm not going -- it's not important to my

:53:24  17  questions.  If it's important, I'm sure counsel will bring it

:53:27  18  up.

:53:28  19  A   It's important to my answer.

:53:29  20  Q   I don't know how you could know what the answer is till I

:53:32  21  ask the question.  But we'll go on.

:53:37  22                 It's observed the PC 220 excavator and staging

:53:42  23  backfill material from the borrow pit.  And then continue.

:53:49  24  Place -- continue -- assured borrow pit excavation performed not

:53:55  25  approved design limits.  Observed the PC 220 excavator and D41p

:54:02   1    dozer placing semi-compacted backfill into the drainage system

:54:08   2    that parallels Surekote Road and rough grading the adjacent

:54:12   3    area, assured dressed area slope to naturally drain the canal to

:54:18   4    avoid standing water to the adjacent levee.

:54:21   5                    You saw that in the report; correct.

:54:23   6    A    Yes, sir.

:54:31   7                    And the conclusion of this?  Are you asking a

:54:33   8    question about it?

:54:35   9    Q    I'm about to.

:54:36   10   A    Okay, sir.

:54:37   11   Q    When you claimed in your direct testimony, slide 02, that

:54:43   12   the ditch parallel to Surekote Road was poorly backfilled, you

:54:48   13   had not considered this QAR; isn't that right?

:54:51   14   A    I think that's incorrect.

:54:52   15   Q    You had considered this?

:54:53   16   A    That's correct.

:54:54   17   Q    And you consider that poor backfill?

:54:57   18   A    What's that?

:54:58   19   Q    What we just read from this QAR.

:55:01   20   A    Let me read it, please.

:55:05   21   Q    Go ahead.

:55:08   22                    (Pause in proceedings.)

:55:25   23                    THE WITNESS:  Yes, sir.  Now please repeat your

:55:27   24   question.

:55:28   25   BY MR. TREEBY:

:55:28    1    Q   When you claimed in your direct testimony, slide 002, that

:55:33    2    the ditch parallel to Surkote Road was poorly backfilled, you

:55:37    3    had not considered this QAR from 2004; isn't that right?

:55:42    4    A   I think that is incorrect.

:55:47    5    Q   You had considered this, and you considered what you

:55:49    6    described there as poor backfill; is that what you're saying?

:55:52    7    A   That's correct.

:55:53    8    Q   Okay.  That's fair.  We'll deal with that.

:55:56    9              You agree that Washington Group International took

:55:58   10    materials from the borrow pit at McDonough and transported the

:56:02   11    fill to other locations on the site to use as unpolluted

:56:06   12    backfill materials; right?

:56:08   13    A   Correct.

:56:08   14    Q   And let me just step back a question.  You consider that's

:56:11   15    poor backfill.  Would you at least agree, based on the QAR, that

:56:15   16    that backfill and that compaction was approved by the Corps of

:56:20   17    Engineers?

:56:20   18    A   I don't think I saw an approval.  I saw the recording of the

:56:29   19    observations.

:56:29   20    Q   You didn't read the last three words on that paragraph:  No

:56:32   21    deficiencies noted?

:56:35   22              MR. TREEBY:  Let's pull it up again.  Pull it up again.

:56:35   23    By MR. TREEBY:

:56:38   24    Q   At the end of that paragraph, do you see that:  No

:56:40   25    deficiencies noted?

:56:42  1    A    Yes.

:56:42  2    Q    And that's a Corps document; is it not?

:56:44  3    A    Yes.

:56:45  4    Q    So would you agree with me that, according to this, the

:56:49  5    Corps of Engineers approved that backfill that you call poor

:56:53  6    backfill?

:56:55  7    A    Well, in the interpretation of what's here, I think you made

:57:04  8    a link that I did not make.  You made a link between excavation

:57:11  9    from the borrow pit and what the statement says, it's being

:57:16  10   backfilled into the storm water ditch.  I think that's an

:57:22  11   incorrect connection.

:57:23  12   Q    Would you agree that the Corps approved what I'm reading

:57:34  13   now, observed the PC 220 excavator and 241p dozer placing

:57:43  14   semi-compacted fill into the drainage system that parallels

:57:47  15   Surkote Road and rough grading the adjacent area, assured

:57:54  16   dressed area sloped to the naturally terrain to the canal and

:57:57  17   avoid standing water adjacent to levee, observed the PC 220

:58:04  18   dozer and TC 35 farm tractor cleaning mud.  After that, it says:

:58:08  19   No deficiencies observed.

:58:09  20            And you know from your experience that this QAR is

:58:12  21   signed off on by the Corps of Engineers before it says no

:58:14  22   deficiencies noted; isn't that correct?

:58:17  23   A    Yes.

:58:19  24   Q    Now, you do know, do you not, that a large majority of the

:58:25  25   volume of excavations during Task Order 26 were backfilled with

:58:30   1   material from the borrow pit; isn't that right?

:58:33   2   A   Yes.

:58:34   3   Q   And you agree that the borrow pit contains predominately

:58:40   4   cohesive clay soils; isn't that correct?

:58:42   5   A   That's correct.

:58:42   6   Q   Nevertheless, in your original expert report, February 1,

:58:47   7   2012, you wrote that excavations were backfilled with, quote:

:58:49   8   Very porous soils; example:  Sands, shells, uncompacted native

:58:57   9   soils.  Isn't that right?

:58:58   10  A   Correct.

:58:58   11  Q   You now agree, do you not, that to the extent Washington

:59:02   12  Group backfilled excavations with imported material from off the

:59:07   13  site, Washington Group International used the Corps' approved

:59:11   14  river sand; isn't that correct?

:59:13   15  A   I believe that's correct.

:59:20   16          I think the connection that is providing

:59:26   17  difficulty for me in my expert report is I don't consider an

:59:33   18  uncompacted river sand as an appropriate backfill as considering

:59:45   19  its potential effects on a very important civil infrastructure

:59:51   20  system, the flood protection system, for the Lower Ninth Ward.

:59:58   21  Q   And, Dr. Bea, as a general matter, you would agree with

:00:03   22  Dr. Rogers in his trial testimony that the use of import river

:00:09   23  sand on Task Order 26 as a general matter was appropriate; isn't

:00:13   24  that right?  I'm talking about backfill.  We'll get to

:00:17   25  compaction.  I'm talking about backfill.

```
:00:20   1   A   Well, no.  I really don't agree with that as a generality

:00:30   2   when that backfill and material is being used in the immediate

:00:35   3   proximity of an important flood protection structure.

:00:42   4   Q   I would refer the Court to -- for purposes of giving a

:00:48   5   citation here, for purposes of the trial, Dr. Rogers, at page

:00:53   6   717, beginning on line 23 and continuing on to 718, line 5, he

:01:03   7   testified to the effect that I just represented.  You disagree

:01:07   8   with that?

:01:07   9   A   Well, I think he later in his testimony disagrees with it

:01:12  10   for the same reasons I just stated.

:01:19  11   Q   You do agree, do you not, that river sand is less permeable

:01:22  12   than beach sand?  Isn't that right?

:01:24  13   A   That depends on which beach you get the sand from.

:01:39  14          MR. TREEBY:  Call up, please, March 28, page 53, lines

:01:44  15   6 through 8.

:01:44  16   BY MR. TREEBY:

:01:48  17   Q   And river sand is less permeable than beach sand; isn't that

:01:51  18   correct?

:01:52  19              Answer:  That's true.

:01:54  20              You didn't tell me anything about other beaches;

:01:56  21   right?

:01:57  22   A   Well, I was responding here to a generality.  Meaning, if we

:02:03  23   went to Pensacola Beach, took the sand from that high tide area,

:02:11  24   I'm going to have a course grain, poorly graded material, that's

:02:18  25   very, very permeable.
```

1053

```
:02:21   1            River sand can have, in fact, comparable
:02:25   2   variability characteristics, depending on where it's taken from.
:02:32   3            Generalities are very dangerous.  But, in this
:02:38   4   case as I was referring to, that generality is true.
:02:44   5   Q   And you also agree that river sand is commonly used for
:02:47   6   backfill in the New Orleans area; isn't that correct?
:02:50   7   A   Yes, sir.
:02:53   8   Q   You can't point to any specific document showing that shells
:02:58   9   were used by Washington Group to backfill any excavation; isn't
:03:02  10   that true?
:03:03  11   A   Please repeat your question.
:03:09  12   Q   Since I read it, I'll repeat it.
:03:16  13   A   Thank you, sir.
:03:17  14            MR. TREEBY:  I take some risk, but the Court will give
:03:19  15   me that leniency, I'll save the court reporter.
:03:22  16            THE COURT:  Absolutely.
:03:22  17   BY MR. TREEBY:
:03:23  18   Q   You cannot point to any specific document showing that
:03:27  19   Washington Group used shells to backfill any excavation; isn't
:03:34  20   that right?
:03:34  21   A   No.
:03:35  22   Q   Okay.  Let's look at page 80 of your March 28th deposition,
:03:41  23   line 23, to page 81, line 2.  I asked the question:  Can you
:03:58  24   point me to any specific document that supports the statement
:04:00  25   that shells were used to backfill any excavation by Washington
```

:04:06   1    Group in its work at the EBIA.

:04:10   2                   Your answer was, no, you can't point me any such.

:04:13   3                   Is that still true?

:04:14   4    A   Yes.  But there's a conflict.  Because the answer I gave you

:04:19   5    here is, if you considered the photographs that I've reviewed as

:04:29   6    a document, there are plentiful photographs showing the backfill

:04:35   7    being used in a variety of excavations that contain what appears

:04:41   8    to be Lake Pontchartrain clam shells.  And that's mixed in with

:04:48   9    the native materials.

:04:51   10   Q   Any shell that existed at the EBIA was part of the native

:04:55   11   soil and was not put there by Washington Group; isn't that

:04:59   12   correct?

:04:59   13   A   I think that's correct.

:05:04   14   Q   Now let's talk about compaction a little bit.  You have also

:05:07   15   opined in your original expert report in this case that

:05:11   16   excavations were not compacted.  Is that right?

:05:15   17   A   I don't recall the specifics; but, when I use the term

:05:23   18   compaction, I mean an engineered compaction technique, not

:05:31   19   backtracking of over boats over sand.

:05:35   20   Q   Isn't it true, and you know that, that the Corps of

:05:39   21   Engineers told Washington Group how and what method to use to

:05:43   22   compact the backfills?

:05:46   23   A   Well, since I don't have any audio transcripts, I don't know

:05:51   24   what the Corps told WGI concerning that point.

:06:08   25                   MR. SCHULTZ:  There was a pause, Your Honor.  I just

```
:06:10   1   want to note the time for Mr. Treeby and the Court.

:06:13   2            MR. TREEBY:  One question.

:06:14   3            THE COURT:  Sure.

:06:14   4   BY MR. TREEBY:

:06:16   5   Q   If I understood you correctly -- and I don't have realtime

:06:19   6   here but I'm trying to go from my poor memory -- I think what

:06:23   7   you just agreed with me about was that you can't point to

:06:28   8   anything that would indicate Washington Group didn't follow the

:06:32   9   Corps' instructions with regard to compaction of backfill; is

:06:35  10   that fair?

:06:35  11   A   I think that's fair.

:06:38  12            MR. TREEBY:  Stop here.

:06:39  13            THE COURT:  All right.  We'll take a ten minute recess.

:06:42  14   Thank you.

:06:43  15            Gentlemen, I know you're all doing an excellent

:06:46  16   job.  I realize this case has gone on for a long time, there's

:06:49  17   been tons of depositions, it's a serious case.  I understand the

:06:53  18   tensions that result from such a difficult and tedious case and

:06:57  19   being so, shall we say, together for such a long time in

:07:00  20   depositions.  So the Court understands that.  And you're doing a

:07:04  21   fine job.  Thank you.

:07:07  22            THE CASE MANAGER:  All rise.

:07:08  23            (Proceedings in recess.)

:07:08  24            CROSS EXAMINATION (CONTINUED)

:07:08  25   BY MR. TREEBY:
```

1056

:26:49  1   Q    Dr. Bea, before we go on -- and I'm not going to be much

:26:53  2   longer on this -- you said yesterday -- and I just want to get

:26:56  3   what your best knowledge is.  Yesterday, you testified that the

:27:00  4   three books that you testified about, because you listed them as

:27:03  5   books which talk about levees, flood walls and flood -- or flood

:27:09  6   control structures, you listed those three books when we did

:27:12  7   that 10 item list from your 600 however many references.

:27:17  8   A    Yes, sir.

:27:17  9   Q    And I believe you said -- and I want to offer you an

:27:21  10  opportunity to correct it if you know differently now -- that

:27:23  11  that was in your reliance materials.  Have you checked to see if

:27:31  12  in fact those were in your reliance materials?

:27:34  13  A    I have not checked.

:27:36  14  Q    Okay.

:27:36  15  A    But, last night, I produced the two texts that were missing,

:27:47  16  and provided them to counsel last night and at 5 a.m. this

:27:53  17  morning.

:27:53  18  Q    We have two, but there is a third that's still missing.  It

:27:58  19  starts with the word Load Engineering.  It's one you referred to

:28:01  20  in your testimony yesterday.  Do you recall that?

:28:03  21  A    Yes.  And my impression was perhaps incorrect.  You already

:28:10  22  had the text Load Engineering.  If you don't, I'm more than glad

:28:17  23  to also locate that file and produce it for you.

:28:20  24  Q    We would appreciate that.  And counsel, I think, has been

:28:25  25  diligent in trying to find it; and, so far, has not been able to

:28:28  1  find it.  So Load Engineering, the title of the book titled Load

:28:32  2  Engineering is the one that we're missing.  We would like to

:28:35  3  have that.

:28:36  4  A  I'll request to counsel, please, somebody send me a

:28:41  5  reminder, and I'll get it.

:28:44  6  Q  I want to talk -- we've talked about excavations that were

:28:48  7  backfilled to some extent, that's all I want to cover on that

:28:52  8  with you at this time.

:28:53  9      I want to talk to you now about excavations that

:28:55  10  were not backfilled.  You know, do you not, that some

:28:57  11  excavations were not backfilled during the Washington Group

:29:00  12  International remediation project; isn't that right?

:29:02  13  A  The specific one is McDonough burrow.

:29:11  14  Q  I'm going to take you through them.  But you know there were

:29:14  15  some that were not backfilled; is that right?  Excavations that

:29:18  16  were not backfilled?

:29:19  17  A  I think that's correct, yes, sir.

:29:21  18  Q  Okay.  We know the borrow pit that you just referred to was

:29:24  19  not backfilled.  And the levees and flood walls did not breach

:29:28  20  at the site where the borrow pit was located; isn't that

:29:31  21  correct?

:29:31  22  A  That's correct.

:29:33  23  Q  And, in addition, Washington Group did not backfill a

:29:37  24  recapped excavation at the Indian Towing site; isn't that

:29:42  25  correct?

| | | |
|---|---|---|
| :29:42 | 1 | A   That's correct. |
| :29:43 | 2 | Q   And the flood walls did not fail adjacent to the Indian |
| :29:48 | 3 | Towing site; isn't that correct? |
| :29:49 | 4 | A   That's correct. |
| :29:49 | 5 | Q   I believe you have testified -- but, if you want to change |
| :30:00 | 6 | it, that's fine -- aside from the borrow pit and the Indian |
| :30:03 | 7 | Towing excavations, excavations in the water and some piling |
| :30:07 | 8 | excavations, you weren't aware of any excavations in the East |
| :30:11 | 9 | Bank Industrial Area that were not backfilled; isn't that |
| :30:13 | 10 | correct? |
| :30:13 | 11 | A   The only one that I can't clear from my memory is the storm |
| :30:37 | 12 | water ditch east-west return to the Industrial Canal.  The |
| :30:47 | 13 | backfilling at the intersection at storm water ditch lateral and |
| :30:58 | 14 | Industrial Canal is not clear.  That's the only exception I |
| :31:04 | 15 | recall. |
| :31:04 | 16 | Q   You didn't recall that when you testified on March 28th; is |
| :31:07 | 17 | that correct? |
| :31:08 | 18 | A   That's correct. |
| :31:10 | 19 | Q   Okay.  You did not have any experience working with a total |
| :31:21 | 20 | environmental restoration contractor prior to this case; is that |
| :31:25 | 21 | right? |
| :31:25 | 22 | A   That's correct. |
| :31:26 | 23 | Q   And you didn't review the actual TERC between Washington |
| :31:32 | 24 | Group International and the Corps of Engineers' Tulsa that |
| :31:37 | 25 | governed Washington Group's restoration in the EBIA, at least by |

:31:41  1   the time of your depositions; isn't that correct?

:31:43  2   A   Yes, sir.

:31:43  3   Q   In your experience with US Army Corps of Engineers' contract

:31:48  4   work, you would agree with me, would you not, that the Corps

:31:53  5   specifies in those contracts by its environmental regs or

:31:58  6   engineering manuals should apply to a particular contract; isn't

:32:02  7   that copyright?

:32:02  8   A   Yes, sir.

:32:03  9   Q   And you did not see in what you had reviewed any evidence

:32:10  10  that any of those engineering manuals or engineering regs were

:32:14  11  incorporated into or referenced in Washington Group's TERC

:32:18  12  contract with the Corps; isn't that correct?

:32:21  13  A   Please repeat that question.

:32:25  14  Q   Did you see any evidence that any of these engineering

:32:30  15  manuals were incorporated into or referenced in Washington Group

:32:35  16  International's Task Order 26?

:32:37  17  A   I don't recall at that level of detail.

:32:49  18  Q   The conditions that are usually necessary for piping to

:33:01  19  occur include sandy, silty, high permeability, high erodibility

:33:07  20  material; isn't that right?

:33:08  21  A   Please define piping.

:33:15  22  Q   I'll tell you what, I'll let you define it, because you did

:33:22  23  for me at the deposition.

:33:23  24          THE COURT:  Ask him what his -- do you have an

:33:25  25  understanding what piping is?

:33:26  1           THE WITNESS:  I do.  In the geotechnical sense.  But

:33:31  2    he's asked a general question, and I don't know what he's using

:33:35  3    it as his term piping.

:33:35  4    BY MR. TREEBY:

:33:38  5    Q   You apparently --

:33:40  6    A   For example, sewer piping.

:33:43  7    Q   Excuse me.  I asked you that question at your deposition.

:33:48  8    Actually, I asked you what conditions -- it was not even a

:33:52  9    leading question, I just asked you what conditions are usually

:33:55  10   necessary for piping to occur.  You understood it then, and you

:33:58  11   said sandy, silty, high permeability, high erodibility material.

:34:03  12   Is that still your answer?

:34:05  13   A   Yes.

:34:05  14   Q   And you did not evaluate this failure mode, piping, for

:34:11  15   either the north or south breach; isn't that right?

:34:14  16   A   Not quite.  We addressed hydraulic gradient flow rates.  And

:34:27  17   that parameter is attempting flows where velocities are high

:34:42  18   enough to cause piping.  And those results are included in my

:34:47  19   expert report.

:34:48  20   Q   March 28th, page 152, lines 6 through 8.  Did you evaluate

:34:58  21   and somebody -- it's right after the question and answer that we

:35:01  22   just looked at -- did you evaluate this failure mode, piping,

:35:06  23   for either the north or south breach?

:35:08  24           Answer:  Not really.

:35:10  25           So is that correct?

:35:11  1   A   That's correct.

:35:12  2   Q   Thank you.

:35:13  3   A   But it's not correct in terms of piping applied to the soils

:35:21  4   that we have at the north breach-south breach.  The context of

:35:28  5   my answer was in the context of sandy, silty soils.

:35:36  6   Q   You are familiar, are you not, Dr. Bea, with the minimum

:35:44  7   control line that the US Army Corps of Engineers had previously

:35:48  8   established for excavations in the East Bank Industrial Area

:35:51  9   prior to the beginning of Washington Group International's

:35:54  10  remediation work; isn't that right?

:35:56  11  A   I think that's correct.

:35:58  12  Q   And you have agreed, have you not, that the statement of

:36:04  13  such a control line was the responsibility of the Army Corps of

:36:09  14  Engineers and not the responsibility of Washington Group

:36:13  15  International; right?

:36:13  16  A   That's correct.

:36:13  17  Q   And your understanding of the control line established by

:36:16  18  the US Army Corps of Engineers is that it was, quote, intended

:36:21  19  to be a line for alert to the working done concerning potential

:36:30  20  endangerment for the protection of the levee system for the

:36:34  21  Lower Ninth Ward; isn't that right?

:36:35  22  A   Yes, sir.

:36:35  23  Q   And you understood that the minimum control line established

:36:39  24  here was from the tow of the levee at the slope down into the

:36:44  25  subterrane under soils; isn't that right?

:36:46  1   A   Yes, sir.

:36:48  2   Q   I'm going to try to collapse a lot of these questions that I

:36:57  3   have here.

:36:59  4                 Melvin McElwee -- and I know you know him --

:37:03  5   testified here in this Court.  And I'm trying to think of a way

:37:08  6   to summarize what I would -- I could do through many questions

:37:11  7   based on your prior testimony.

:37:14  8                 Isn't it correct that a mistake was made in ILIT

:37:20  9   to say that Melvin McElwee told anyone that he had done work

:37:29 10   adjacent to the flood wall we're concerned with?  That was a

:37:33 11   mistake in ILIT; was it not?

:37:35 12   A   I think that's an incorrect statement.

:37:38 13   Q   We'll take it a step at a time.

:37:42 14                 You were one of the authors of ILIT; right?

:37:44 15   A   Correct.

:37:45 16   Q   And I want to show you JX 2032-203.  And in this section of

:38:08 17   the report --

:38:09 18            MR. TREEBY:  Can you maybe blow up the top?  Let's see

:38:11 19   if it identifies the section.   618.

:38:11 20   BY MR. TREEBY:

:38:19 21   Q   This is chapter 6, page 18 in the ILIT report; right?

:38:23 22   A   It appears to be my copy, both sides.  It's so fuzzy.

:38:38 23   Q   He's pulling up what's at the bottom of that page.

:38:41 24   A   Go up.

:38:42 25                 That's big enough, I can see it.

:38:45  1    Q    Me too.

:38:46  2                    Do you recall this that section of ILIT was

:38:48  3    dealing with the East Bank Industrial Area?

:38:51  4    A    Correct.

:38:52  5    Q    And you've already said you're familiar with Mr. McElwee.

:39:00  6    A    Yes.

:39:00  7    Q    And I want you to turn then to page 618 of the final ILIT

:39:10  8    report, which is JX 2032-203.  And I want you to pull up the

:39:21  9    section, if you will, on -- I want to say it's the fourth

:39:24  10   paragraph.  Where it begins:  This site.  Right in the middle of

:39:30  11   the page.  This site has a well documented history of

:39:34  12   underseepage problems.  This site -- the East Bank Industrial

:39:40  13   Area, McElwee Construction had great difficulty dewatering and

:39:45  14   excavation at this site during earlier construction and

:39:47  15   residents of the neighborhood had also previously reported

:39:49  16   problems with seepage at the inboard toe.

:39:53  17                    That's an error; wasn't it?

:39:56  18   A    Please define it.

:39:58  19   Q    That statement in ILIT is in error as regards McElwee

:40:03  20   Construction having difficulty in excavation at the East Bank

:39:39  21   Industrial Area?

:40:14  22   A    The question you asked is that portion of the statement was

:40:20  23   incorrect.

:40:20  24   Q    That's all I was trying to establish.  And I believe that --

:40:27  25   I'm trying to shorten this, but maybe I can't.  These

1064

| | | |
|---|---|---|
| :40:29 | 1 | statements, as it relates to McElwee Construction, you testified |
| :40:34 | 2 | are completely without foundation; isn't that correct?  That is, |
| :40:41 | 3 | this statement we just read about McElwee Construction and where |
| :40:44 | 4 | it did work is without foundation; isn't that correct? |
| :40:46 | 5 | A   No, that's not correct. |
| :40:48 | 6 | THE COURT:  Can I ask a question? |
| :40:50 | 7 | Dr. Bea, do you agree that McElwee Construction at |
| :40:54 | 8 | no time did any work in the vicinity of the remediation that's |
| :41:00 | 9 | involved in this case? |
| :41:02 | 10 | THE WITNESS:  Yes, sir. |
| :41:02 | 11 | THE COURT:  All right.  We've got that established.  He |
| :41:05 | 12 | agrees that McElwee Construction never did any work in the |
| :41:11 | 13 | vicinity of this, the project that we're talking about here.  So |
| :41:15 | 14 | where do we go from there? |
| :41:16 | 15 | MR. TREEBY:  Thank you, Your Honor. |
| :41:16 | 16 | BY MR. TREEBY: |
| :41:18 | 17 | Q   So the connection in ILIT in this paragraph is incorrect to |
| :41:21 | 18 | McElwee Construction.  It's incorrect; right? |
| :41:24 | 19 | A   Correct. |
| :41:25 | 20 | Q   You're aware, are you not, that the site he was referring to |
| :41:35 | 21 | was three to four miles north of the EBIA, north of the Gulf |
| :41:41 | 22 | intercostal waterway and north of I-10, the Dwyer Road pumping |
| :41:46 | 23 | station; right? |
| :41:46 | 24 | A   That's correct.  I issued an expert report that contains a |
| :41:53 | 25 | chapter chronicling the Dwyer Road experiences. |

:42:03  1   Q   And ILIT also represents -- and I can take you to it if you

:42:08  2   want and I will for counsel's benefit if he wants -- but ILIT

:42:13  3   also represents that McElwee Brothers Construction had received

:42:17  4   expressions of concerns from residents from the lower Ninth Ward

:42:20  5   about seepage or ponding along the Industrial Canal, but you

:42:24  6   know now that this is not true; isn't that correct?

:42:26  7   A   No.  In fact, I don't.  But Melvin is good friends with lots

:42:31  8   of people formerly in the Lower Ninth Ward, so I have no

:42:36  9   personal knowledge information to discredit that statement and I

:42:43  10  did not write it.

:42:45  11  Q   You're aware that Mr. McElwee, McElwee Construction provided

:42:50  12  written responses to discovery requests in this case.  Have you

:42:53  13  read them?

:42:54  14  A   I don't think so.

:42:58  15  Q   They're in the record, and I'll ask you the same way I did

:43:01  16  at your deposition.  Are you aware that in further written

:43:04  17  response to subpoenas Mr. McElwee stated that McElwee Brothers

:43:09  18  had never, quote, received complaints or expressions of concerns

:43:12  19  from residents in the Lower Ninth Ward about underseepage or

:43:17  20  ponding along the Industrial Canal, and I asked if you were

:43:20  21  aware of that, and you said no.  I asked if you deny that, and

:43:23  22  you said no.

:43:24  23  A   I think that's correct.

:43:25  24  Q   And he testified to that in this trial; did he not?

:43:29  25  A   That's just fine.  That is just fine.  That is just fine.

```
:43:44   1              MR. TREEBY:  If Your Honor please, we have tried and
:43:47   2    hopefully succeeded to limit our cross at this time to what was
:43:51   3    brought out or inferred even in direct testimony.  Depending
:43:57   4    upon where plaintiffs go with their full direct testimony,
:44:06   5    called redirect, we may have more questions.
:44:07   6              THE COURT:  Yes, sir.
:44:08   7              MR. TREEBY:  Thank you, Your Honor.
:44:10   8              THE COURT:  Mr. Smith.
:45:22   9              MR. SMITH:  Good morning.  Robin Smith for the United
:45:24   10   States.
:44:21   11                        CROSS EXAMINATION
:44:21   12   BY MR. SMITH:
:45:25   13   Q    Good morning, Dr. Bea.
:45:27   14   A    Good morning.
:45:27   15   Q    Dr. Bea, I want to start by going through a little bit of
:45:30   16   the testimony that you gave yesterday.
:45:34   17              In your testimony yesterday, you emphasized the
:45:39   18   importance of validating your scientific analyses with real
:45:43   19   world observations.
:45:45   20   A    Yes, sir.
:45:46   21   Q    And, in fact, if the court reporter quoted you correctly,
:45:53   22   you said right is determined by field data validations.
:45:58   23   A    That's correct.  Under appropriate conditions.
:46:03   24   Q    And you agree, I'm sure, that understanding the material
:46:08   25   properties of soils is necessary if you're going to correctly
```

:46:15  1    assess the mechanical behavior of those soils?

:46:18  2    A   Yes, sir.

:46:19  3    Q   And I think that, yesterday, one of the things that you

:46:25  4    talked about was the fact that many of these properties can be

:46:28  5    determined scientifically; isn't that correct?

:46:31  6    A   Yes, sir.

:46:31  7    Q   In this case, the plaintiffs retained two experts to

:46:41  8    participate in the soils exploration and testing program that

:46:46  9    the parties conducted last summer in the EBIA and also in the

:46:51  10   Lower Ninth Ward, Kevin Pope and Dr. David Rogers.  And, as you

:46:56  11   know, they used site-specific test results to calculate some of

:47:01  12   the key material properties of the organic clay at the south

:47:09  13   EBIA site; is that correct?

:47:11  14   A   Yes.

:47:12  15   Q   And one of those key properties that was evaluated by Mr.

:47:15  16   Pope and Dr. Rogers was the organic clays' ability to store

:47:22  17   water; wasn't it?

:47:24  18   A   Please repeat that question.

:47:31  19   Q   Yes.

:47:32  20            One of the key properties, key physical properties

:47:37  21   evaluated by Mr. Pope and Dr. Rogers was the organic clays'

:47:44  22   ability to store water.  Do you recall that?

:47:47  23   A   Could you refer me, please, to the section in Dr. Rogers'

:47:56  24   expert report that develops that assertion.

:48:03  25   Q   Let me reframe the question and maybe it will help

:48:06   1   understand my question.  Maybe I've tried to make it -- state it

:48:11   2   in layman's terms, and probably I've got it mixed up.  Trying to

:48:15   3   avoid some of the technical jargon that makes it hard to

:48:19   4   understand this case.

:48:20   5                  They calculated a number -- and I think you

:48:21   6   talked about this yesterday so I don't think this is controversy

:48:26   7   -- it's a factor, a multiplier, if I understand what

:48:31   8   coefficients are, that geotechnical engineers use to quantify

:48:34   9   how much water a specific soil can hold.  And that number is

:48:38   10  referred to as the storage coefficient of that particular soil;

:48:44   11  is that correct?

:48:45   12  A    That's correct.  So far.

:48:47   13  Q    And I think that you agreed yesterday that you were asked

:48:52   14  whether they, Dr. Rogers, computed the storage coefficient for

:48:58   15  the lower organic clay.  And I think you agreed that, yes, he

:49:02   16  did.

:49:03   17  A    I hope you didn't, because I don't recall anywhere in his

:49:11   18  expert report where storage coefficient is calculated.  The work

:49:21   19  on storage coefficients followed or perhaps even paralleled his

:49:30   20  expert report.  That's what led to my request to you for you to

:49:33   21  identify in Dr. Rogers' expert report where the purported

:49:40   22  storage coefficient is defined and determined.

:49:46   23  Q    Well, I have to confess to you, Dr. Bea, I'm not prepared to

:49:49   24  do that; because, yesterday, you agreed with us.  And I'd like

:49:52   25  to, if we may, show you your testimony from yesterday where you

:49:56  1    agreed with this statement.

:49:58  2         MR. SMITH:  If we could go to the hourly transcript for

:50:09  3    yesterday, page 925, lines -- let's begin with line 11.  If we

:50:18  4    can call out lines 11 through 16.

:50:41  5         THE COURT:  Mr. Smith, I don't know if there are

:50:43  6    technical difficulties or not.

:50:47  7              All right, good.

:50:54  8         MR. SMITH:  It's page 925.  And if we could call out

:50:59  9    lines 11 through 16.

:51:56  10             Your Honor, we don't have this apparently in our

:51:59  11   electronic database.  I have the hourly transcript here.  Can I

:52:05  12   read it into the record?

:52:06  13        THE COURT:  Yes.  You certainly may do that.

:52:06  14   BY MR. SMITH:

:52:09  15   Q   Dr. Bea, I'm going to read to you from your testimony

:52:12  16   yesterday.  This is of the hourly transcript which we received

:52:16  17   late last night or early this morning, I'm not sure which, page

:52:19  18   925.  I'm going to begin reading at line 16.  This is a question

:52:24  19   by Mr. Treeby to you.  And it begins:  We'll come back to that.

:52:28  20   You agree, do you not, that Dr. Rogers and Mr. Pope determined a

:52:33  21   storage coefficent from the pumping test at the plaintiff's

:52:37  22   south EBIA site giving a site specific M sub V; don't you?

:52:44  23             And your answer was:  I do now, yes, sir.

:52:47  24             So you remember that?

:52:48  25   A   Yes, sir.

:52:49  1   Q   And am I correct -- because I may be confused -- but isn't

:52:53  2   that, what they call a coefficient, isn't that a multiplier

:52:58  3   that's used to indicate how much water a particular unit of soil

:53:03  4   can store?

:53:03  5   A   Correct.

:53:04  6   Q   And I believe you also testified yesterday that there's a

:53:13  7   known relationship between the quantity of the water that a soil

:53:19  8   can store and the soils' ability to expand and contract?  Am I

:53:27  9   willing your testimony correctly?

:53:28  10  A   I think so.  You have it in front of you.

:53:30  11  Q   You as a qualified scientist know the storage coefficient,

:53:35  12  can compute the coefficient of volume change, which in

:53:41  13  engineering shorthand is often referred to as M sub V.

:53:45  14  A   Yes, sir.

:53:46  15  Q   We talked about that at length yesterday.

:53:48  16  A   Yes.

:53:48  17  Q   And M sub V is another material of property of soils used by

:53:56  18  geotechnical engineers; correct?

:53:59  19  A   Correct.

:53:59  20  Q   Would it be fair to say then that the M sub V can be

:54:06  21  determined -- of a particular soil can be determined by using

:54:10  22  field data from other sites, just as Dr. Rogers and Mr. Pope

:54:17  23  determined it at the south EBIA site?

:54:20  24  A   M sub V -- and you please correct me -- M sub V is not a

:54:37  25  single valued term.  It's got variability and it's reflecting a

:54:43   1   series of variabilities that affect performance of real soils.

:54:51   2   In this case, for example, two M sub Vs have been discussed.

:54:58   3   One governed by the compressibility of the soil skeleton, and

:55:04   4   that's when we're squeezing water out of the soil appropriate to

:55:09   5   your condition, as you've stated it.  And the other similarly

:55:15   6   defined as M sub V is based on the compressibility of the water

:55:22   7   soil system governed or dominated by water compressibility.

:55:29   8   Those numbers are dramatically different for the same M sub V.

:55:36   9   So I'm just attempting to make clear, it's not just a single

:55:40   10   number.

:55:41   11   Q   Just so that we're clear, when we, in our discussion this

:55:44   12   morning, when I use the term M sub V in asking you questions

:55:49   13   today, I'm referring to the storage coefficient.

:55:52   14   A   Okay.

:55:53   15   Q   All right?

:55:54   16   And that storage coefficient, that M sub V can be

:55:58   17   computed if you have data from other sites in the same way that

:56:04   18   Mr. Pope and Dr. Rogers computed it at the south EBIA; correct?

:56:10   19   A   Yes, sir.

:56:10   20   Q   And I believe you further testified yesterday that this

:56:21   21   coefficient of volume change is a crucial perimeter of soils?

:56:24   22   A   Yes, sir.

:56:24   23   Q   So let's -- talked yesterday about your 17th Street

:56:29   24   analysis.

:56:29   25   A   Yes.

:56:30  1   Q   And you called attention to how your understanding of M sub

:56:39  2   V, this coefficient of volume change, evolved over time as you

:56:46  3   were considering the data from the 17th Street site.

:56:49  4   A   Yes, sir.

:56:50  5   Q   And you said very early, we paid much attention to the M sub

:57:01  6   V coefficient, because you were trying to understand certain

:57:05  7   data that did not seem to fit in with the way you were

:57:08  8   understanding that M sub V?

:57:09  9   A   That's correct.

:57:09  10  Q   And you testified that you turned to some of the classic

:57:13  11  texts in the field to try to understand this, and you obtained

:57:18  12  some piezometer measurements.   I'm just trying to bring this

:57:22  13  back to everybody's memory.

:57:23  14  A   Thank you.

:57:25  15            But the way, I produced for you early this morning

:57:31  16  the piezometer measurements, the report written by the Corps on

:57:44  17  installation and the overview report dealing with the

:57:50  18  utilization of those records.

:57:52  19  Q   Thank you, Dr. Bea.   I appreciate the that.

:57:56  20            Based on those records, the piezometer

:57:58  21  measurements, you made what you called a remarkable discovery.

:58:02  22  You discovered that the M sub V value needed to be very small,

:58:06  23  close to zero; correct?

:58:07  24  A   Correct.

:58:07  25  Q   And, your words, you didn't want to destabilize the computer

:58:11  1    program by entering zero in, so you performed a series of

:58:16  2    numerical experiments to see how the results would change of

:58:22  3    modeling this with various very low, very, very small numbers;

:58:26  4    correct?

:58:26  5    A    Correct.

:58:26  6    Q    And you investigated the whole range, and then you found the

:58:34  7    one that matches the piezometers and matched the observations

:58:39  8    and the data that you had received at that site, 17th Street

:58:43  9    site; correct?

:58:44  10   A    Correct.

:58:45  11   Q    And I believe you termed this as an eureka moment?

:58:53  12   A    It was.

:58:53  13   Q    Like the light went on suddenly?

:58:56  14   A    It was, for me.

:58:57  15   Q    And at that point the M sub V became, quote, totally

:59:00  16   secondary.  Do you remember that?

:59:02  17   A    Well, it's not a secondary in a general sense.  But, once we

:59:10  18   had been able to get this immediate pressure response, that

:59:16  19   parameter was then defined at that level.  Other parameters then

:59:22  20   become of key importance to also validate.  That's what I was

:59:27  21   attempting to express.

:59:29  22   Q    You're not denying that you said that yesterday?  I don't

:59:32  23   want to waste our time -- that's not your point?

:59:35  24   A    No, that's not my point.

:59:36  25   Q    You did use those words to describe it, you're just

:59:39   1    clarifying your intent?

:59:41   2    A    That's correct.  I think, if it was, quote, not important,

:59:48   3    we probably would not be here discussing this topic.

:59:55   4    Q    Now, my question for you is, after you had that eureka

:00:01   5    moment and you discovered that entering a very, very small

:00:07   6    number for the coefficient of volume change resolved some of the

:00:12   7    problems with the data that you were looking at, did you run any

:00:16   8    tests or did you observe any soil samples and have others run

:00:21   9    tests of specific soil samples, just as Dr. Rogers and Mr. Pope

:00:25   10   did, at the south EBIA site to confirm that the compressibility

:00:32   11   of those soils at the 17th Street site was as low as your theory

:00:41   12   or your conclusion from the piezometric data led you to believe?

:00:46   13   A    Well, there's a technical conflict in the question you've

:00:55   14   asked.  And my direct answer would be no, I obviously wouldn't

:01:05   15   make such a comparison.  You can't get the M sub V that we were

:01:11   16   -- we determined from the piezometer measurements from a storage

:01:16   17   coefficient.  Those two things are reflecting different behavior

:01:21   18   characteristics in the soil.  The storage coefficient leads to,

:01:30   19   because of the analytical formulation, to an immediate

:01:34   20   subtraction from the measured affects associated with the

:01:43   21   compressible flow mechanics.

:01:47   22   Q    Now, I don't want to get confused with the two M sub Vs.  It

:01:52   23   sounds like you're introducing the second M sub V into this

:01:56   24   conversation.  I don't want to get mistaken.

:01:58   25   A    No.  I have to because the agreement with the experimental

:02:02  1   data at the 17th Street Canal required that we go to that second

:02:06  2   M sub V.  So we wouldn't do tests to determine the first M sub V

:02:12  3   to corroborate the second one.

:02:15  4   Q   My question then to you, Dr. Bea, is, do you know which of

:02:19  5   those two M sub Vs were used by Mr. Cobos-Roa in obviating the

:02:30  6   SEEP-W to give you your seepage results in this litigation?  Was

:02:36  7   it the first M sub V, the coefficient of volume change that Mr.

:02:43  8   Cobos-Roa used, or was it this second M sub V that you

:02:46  9   discovered at the 17th Street site?

:02:48  10  A   The second.

:02:51  11  Q   You believe that Mr. Cobos-Roa was using the second M sub V

:02:58  12  in his modeling of the SEEP-W?

:03:02  13  A   It's not do I believe.  It's the extensive record that I

:03:06  14  hope we've established that we attempted to use consistently.

:03:11  15  But there were exceptions of 10 minus 9 per pounds per square

:03:21  16  foot.  And, as was discussed yesterday, there were exceptions

:03:25  17  where zero was used, rather than 10 to the minus 9.  And I

:03:32  18  remarked, for me, both of those numbers are zero.

:03:39  19  Q   I was trying to give you credit by saying you believed it.

:03:43  20  I was trying to imply that you wouldn't believe it if you didn't

:03:47  21  have some data to support it, and you've just established that

:03:50  22  you had some data.  But you believed it as well.  Based on the

:03:53  23  data, that's your belief?

:03:54  24  A   What you're detecting is I have a word sensitivity.  Belief

:04:02  25  is one of them, and assumptions is the other.  And both of them

:04:07  1    scare me.

:04:09  2    Q    I'm aware of that, Dr. Bea.

:04:15  3              THE COURT:   The Court will take judicial notice.

:04:17  4              Go ahead.

:04:17  5    BY MR. SMITH:

:04:20  6    Q    Well, my question then to you, Dr. Bea, is, after you had

:04:25  7    your eureka moment, and for your second M sub V, did you verify

:04:32  8    by any other empirical method that your conclusion of the soils

:04:40  9    incompressibility was correct?

:04:41  10   A    Yes.

:04:42  11   Q    And what were those methods?

:04:44  12   A    Well, was previously discussed when I referred to the 5,055

:04:56  13   feet per second, that rotational wave velocity to give me a

:05:02  14   first order magnitude estimate to the appropriate M sub V.

:05:09  15   That's how we got into that discussion.

:05:12  16   Q    I was asking you about empirical methods, not theoretical

:05:16  17   methods.  And it sounds to me like you found a theoretical

:05:21  18   method, and I don't know if it was in Lamb & Whitman or where

:05:24  19   exactly I found it, but in our prior discussions about this it

:05:28  20   sounded to me like you found a theoretical framework that your

:05:33  21   discovery of this M sub V was consistent with.  I'm asking about

:05:39  22   field testing.  Did you obtain any field test data, did you run

:05:42  23   some tests that established this 5,000 feet per second?

:05:45  24   A    No.  And that's where I referred to my extensive experience

:05:49  25   dealing with marine sediments where these things are reliant on

:05:54  1    for this type of work, and stated 5,055 feet per second is in

:06:02  2    fact a lower bound.  It can be as high as 8,000 feet per second.

:06:08  3    So I'm referring to empirical information in the context of a

:06:13  4    theory.

:06:16  5    Q    A theory based on empirical evidence.

:06:19  6                But you don't have any site-specific empirical

:06:21  7    data; do you?

:06:22  8    A    That's correct, sir.

:06:23  9    Q    Now, it seems to me then that we have some contrary if not

:06:30  10   conflicting data here.  We have the piezometric data which

:06:37  11   supports your M sub V that these pressure transmissions through

:06:42  12   the soil at 5,000 plus feet per second, and then we have our

:06:46  13   humble ordinary routine storage coefficient M sub V that 12

:06:53  14   mechanics, engineers use every day to solve these slope

:06:59  15   stability problems, seepage problems.  Am I misunderstanding

:07:05  16   there?

:07:06  17   A    Yeah.

:07:07  18           THE COURT:  Is he misunderstanding?

:07:10  19           THE WITNESS:  He is misunderstanding, correct.

:07:13  20           THE COURT:  I want to make sure.

:07:13  21   BY MR. SMITH:

:07:15  22   Q    Are you asserting, Dr. Bea, that the M sub V that you're

:07:19  23   relying on in your analysis here is the same M sub V that soil

:07:24  24   engineers across the United States routinely apply to solve

:07:31  25   seepage problems when they're faced with foundation conditions

:07:37  1    that they're investigating?

:07:37  2    A   Some of them.

:07:39  3    Q   I didn't ask about some of them.  Is that the ordinary

:07:42  4    way --

:07:42  5    A   No.

:07:43  6    Q   -- it's typically done?

:07:45  7    A   It's not the ordinary way.  But, if I talked to an engineer

:07:51  8    from Oklahoma that never dealt with sediments below water, if I

:07:58  9    go out to Chevron, be it here or in San Francisco, they would

:08:03  10   find this discussion upsetting.

:08:07  11   Q   Well, I'm not really -- I don't think you have to go that

:08:11  12   far to find people that wouldn't ordinarily use this.

:08:14  13   A   I think they are seated in this courtroom.

:08:17  14   Q   Well, that was close to my point.

:08:22  15              You were part of a team of elite investigators

:08:25  16   that came from the University of California at Berkeley and

:08:28  17   other academic institutions, and converged on New Orleans after

:08:32  18   this great disaster, as well as other teams of investigators,

:08:37  19   Team Louisiana and the team convened by the Army.  These were

:08:41  20   some of the foremost experts in the world, and they came to New

:08:46  21   Orleans to investigate the causes of these failures.  And none

:08:49  22   of them applied this method.

:08:53  23   A   Incorrect.

:08:56  24   Q   They applied the method?

:08:58  25   A   They applied steady flow conditions and analyzed the

:09:05   1    problem.  Used steady flow conditions.  And the premise of

:09:10   2    steady flow conditions is incompressible water and

:09:14   3    incompressible soil.  They used the theory.

:09:20   4    Q    Well, Dr. Bea --

:09:22   5    A    We are discussing.

:09:22   6    Q    -- this is a bit of a reduction analyst argument you're

:09:25   7    making here; isn't it?

:09:26   8    A    No.

:09:27   9    Q    Just because someone uses a steady state analysis doesn't

:09:30   10   mean they're using your dilatational modulus theory; does it?

:09:35   11   A    Yes.

:09:35   12   Q    You are, really?

:09:36   13   A    You're getting there.

:09:38   14   Q    So every engineer who was investigating this was using

:09:41   15   steady state, and they understood that your M sub V, the

:09:44   16   dilatational modulus M sub Vs was the theoretical foundation for

:09:49   17   the analysis they were doing; is that what you are telling this

:09:51   18   Court?

:09:52   19   A    I would never tell this Court anything that included the

:09:55   20   word every.

:09:58   21   Q    Okay.  Most of the engineers.

:10:03   22   A    I don't know most of the engineers.

:10:06   23   Q    Let's just talk about most of engineers then on the ILIT

:10:10   24   team.

:10:10   25   A    That is incorrect.

:10:13  1    Q    What is incorrect, Dr. Bea?  Let's define it.

:10:17  2    A    The ILIT group considered whether we should use steady flow

:10:22  3    or non-steady flow conditions.  The determination used

:10:30  4    consistently in that work was to base the work on steady flow

:10:36  5    conditions.  You will find, I think -- and you can do word

:10:40  6    searches better than me -- no definition of an M sub V based on

:10:47  7    storage coefficient anywhere in the independent levee

:10:53  8    investigation team report.

:10:55  9    Q    Well, I think it's fair to say you won't find any discussion

:10:58  10   of M sub V at all of any kind in the ILIT report; will you, Dr.

:11:03  11   Bea?  That's a little bit misleading; isn't it?

:11:06  12   A    No, it is not, because that's the reason.

:11:09  13   Q    I'm sorry, please define that.

:11:11  14   A    The M sub V chosen for that work was zero.

:11:19  15   Q    It's your testimony today that the ILIT report which

:11:23  16   analyzed the flood wall failure at the IHNC based its seepage

:11:31  17   analysis on an M sub V of zero?

:11:33  18   A    There were two sets.  One was done using finite element

:11:38  19   techniques.  The other was using more basic I'll call it

:11:46  20   techniques, such as SEEP/W.  The techniques we used to perform

:11:53  21   the so-called flow net analysis were based on steady flow

:12:02  22   conditions.  They have to be.  This is a key point to clarify

:12:13  23   for the judge.

:12:16  24   Q    Well, I'll tell you why would your testimony -- there's a

:12:19  25   number of reasons why your testimony is confusing to me.  It

:12:23  1  seems to be inconsistent, frankly, with the ILIT report on its

:12:27  2  face.  Because the ILIT report stated that the key parameter for

:12:34  3  determining how fast these uplift pressures would rise under the

:12:38  4  levee toe on the protected side was the permeability of the

:12:43  5  soils.  But, in your M sub V theory, the permeability of the

:12:48  6  soils doesn't really matter.

:12:51  7  A    No.  That's not true.

:12:52  8  Q    Well, really?

:12:54  9  A    Well, I think we're supposed to be concerned with the truth.

:12:59  10  Q    Well, I think we are, too.

:13:02  11         THE COURT:  I will assume everyone is here, including

:13:07  12  me.

:13:07  13         THE WITNESS:  Me, too.

:13:08  14         THE COURT:  Go ahead.

:13:08  15  BY MR. SMITH:

:13:10  16  Q    Dr. Bea, you have previously testified in your deposition

:13:12  17  many times that your theory of hydraulic pressure of

:13:17  18  conductivity analysis is insensitive to changes in permeability

:13:22  19  from a range of 10 to the minus 2 all the way up to 10 to the

:13:26  20  minus 6; and, as Mr. Treeby pointed out, that's an order of

:13:30  21  magnitude of 10 million.  It's only 10,000.  I'm sorry.  It's

:13:37  22  only 10,000.

:13:39  23  A    10 million is just as good in your frame.

:13:41  24  Q    There aren't any soils in this area that you were analyzing

:13:49  25  that fall outside that range.  Sands that have 10 minus 2 Class

| | | |
|---|---|---|
| :13:54 | 1 | were up to the 10 minus 16.  But ILIT considered that class, |
| :13:58 | 2 | those organic soils which they refused to call class -- and I |
| :14:02 | 3 | don't mean to use that pejoratively because I didn't mean it |
| :14:05 | 4 | that way -- but they viewed them as highly organic soils as |
| :14:10 | 5 | having a very high permeability, the same permeability of a |
| :14:15 | 6 | sand, 10 to the minus 2.  And that was the foundation for their |
| :14:20 | 7 | belief that underseepage was the problem in destabilizing the |
| :14:24 | 8 | levees.  They said -- and I ask you, isn't it correct -- that |
| :14:26 | 9 | they said that the problem was not driving the sheet piling deep |
| :14:31 | 10 | enough to cut off those flows through those mostly permeable |
| :14:35 | 11 | soils; isn't that what they wrote? |
| :14:39 | 12 | A   You pull up the report and show me the section you're |
| :14:45 | 13 | quoting.  In your previous monolog you've left out the word |
| :14:50 | 14 | relatively insensitive.  The work done by ILIT Phase II expanded |
| :15:00 | 15 | the permeability range from 10 to the minus 2 to 10 to the minus |
| :15:05 | 16 | I recall 6.  The results are contained in the subsequent |
| :15:12 | 17 | reports, and they demonstrate this relatively insensitivity of |
| :15:19 | 18 | the pressures to the plausible range in permeability. |
| :15:26 | 19 | Permeabilities has an important affect on this range through |
| :15:32 | 20 | transmission through space. |
| :15:34 | 21 | Q   Not in this range, not according to your prior testimony, |
| :15:37 | 22 | not in the range of 10 to the minus 12 minus 6.  You wrote in |
| :15:41 | 23 | your 2000 report in the Journal of Electronic Engineering that |
| :15:45 | 24 | it was relatively insensitive to changes within that range. |
| :15:49 | 25 | A   It is. |

:15:56  1    Q   I'm sorry, I guess I don't understand what the importance of

:16:00  2    that particular value is.

:16:01  3    A   When you say insensitive, it means I could plod a result or

:16:05  4    a pressure as a function of permeability, and the line is

:16:07  5    horizontal.  That's insensitive.

:16:10  6                    Relative says I have a slope and there is a slope

:16:13  7    there.  It is affected by permeability.  That's why we continue

:16:19  8    to be concerned with permeability at the East Bank Industrial

:16:28  9    Ninth Ward area, whether it's 12 minus 5 or 10 to the minus 2

:16:33  10   makes a difference.  And Dr. Rogers told you that.

:16:40  11   Q   Dr. Bea, I think you just gave me two different answers in

:16:44  12   the same response.

:16:44  13   A   I probably did.  I apologize.

:16:46  14   Q   The first answer, as I understood it, was the line remains

:16:49  15   horizontal.

:16:51  16   A   That the word was premised on non-sensitive.  It's like a

:16:55  17   dead person's heartbeat, it's just a straight line.  This one's

:16:59  18   got a slope to it showing there is sensitivity to permeability

:17:07  19   but it's relatively insensitive because the slope is not steep.

:17:11  20   Q   And it doesn't affect your outcome at all?  Does it?

:17:16  21   Outcome is the same?

:17:17  22   A   The course set me off, and I said an engineer worth his salt

:17:23  23   never accepts such a statement.

:17:24  24   Q   In your analysis.  I don't mean in the theoretic course.

:17:30  25   I'm talking about, in this case, in the ranges of permeability

:17:35  1  that we're considering in these soils, it just doesn't matter,

:17:40  2  does it, to you, whether it's 10 to the minus 2, 10 to the minus

:17:45  3  3?  Mr. Treeby went through this yesterday with you.

:17:48  4  A   The range we are considering for the buried swamp marsh

:17:58  5  layer was discussed yesterday 10 to the minus 4, 10 to the minus

:18:03  6  6 with a split of 10 to the minus 5.  Mr. Treeby showed a table

:18:09  7  that didn't have the 10 to the minus 4; but if you turned the

:18:12  8  page you'd see the answer to that big mystery.  Within that

:18:15  9  range, it is insensitive relatively.  If you carry it back to 10

:18:23  10 minus 2, you have greater sensitivity.  So my statement is in

:18:27  11 the context of the present range of permeability.  That was an

:18:34  12 important thing for us to determine last summer.

:18:39  13 Q   I want to make sure I understood your prior testimony.  Your

:18:45  14 testimony in this courtroom today is that the ILIT team relied

:18:49  15 on steady state analysis, not transient analysis; is that your

:18:53  16 testimony?

:18:56  17 A   The analyses run using SEEP/W were based on steady flow

:19:08  18 conditions, and that work is articulated in the Phase II ILIT

:19:15  19 publications.

:19:16  20 Q   I'm not talking about Phase II.  I'm talking about Phase I.

:19:20  21 A   Well, it's important to discriminate.

:19:23  22 Q   Yes, okay.  I'm talking about the reports that were issued

:19:25  23 in 2006.  The draft final report in May and the final report in

:19:30  24 July, those studies relied on transient flow, as I understand

:19:38  25 it, transient seepage conditions, not steady state conditions.

:19:43  1  Am I incorrect?

:19:45  2  A   No, you're not incorrect, but you are incorrect.  And you'll

:19:54  3  say what sort of double talk is that.  Is this more, quote, Bea

:20:01  4  speak.  No, it's not.  You can perform transient analyses using

:20:09  5  steady flow conditions.  And the poor judge is sitting here

:20:13  6  saying what in the hell is going on.

:20:16  7          And, Judge, all we're doing is performing a motion

:20:22  8  picture analysis.  One frame is steady.  And you move to the

:20:26  9  next frame, and it's a different input, different steady output.

:20:32  10  And you go to the next frame, movement.  And, by the end, you

:20:35  11  can see in a timeframe how it's changing.  Every one of the

:20:38  12  frames are steady state.

:20:42  13          THE COURT:  We're talking about the first ILIT report

:20:46  14  and its first amendment right now?

:20:50  15          THE WITNESS:  Yes.

:20:50  16  BY MR. SMITH:

:20:52  17  Q   Dr. Bea, you divided the ILIT studies into various phases.

:20:57  18  I think Your Honor's familiar with that.  And they continued for

:21:03  19  several years after 2006.  Some of those were studies performed

:21:06  20  by Dr. Bea and Mr. Cobos-Roa together.  I think they were the

:21:10  21  principal authors of those studies.

:21:13  22          I'm still a little bit perplexed, Dr. Bea.  When I

:21:18  23  tell you that the investigators who came to New Orleans were

:21:21  24  applying your M sub V value, that you discovered within an

:21:26  25  eureka moment, when a student came to you and said he was

:21:34  1    struggling to understand the data, and you said, if recall --

:21:38  2    let me just lay the premise and I will let you answer, Dr. Bea.

:21:41  3    A    Thank you.

:21:41  4    Q    You turned to the student, you said yesterday, and said:  Do

:21:47  5    you have those pressures in your lateral stability analysis?

:21:53  6    And, according to your testimony yesterday, the student

:21:56  7    responded to you:  No, that's not how we normally do it.

:22:04  8                 Do I recall your testimony yesterday correctly?

:22:07  9    A    I don't think so.

:22:13  10   Q    Well then, let's put it on the screen before we discuss it

:22:16  11   so you can see what you said, and then you can comment on what

:22:19  12   you said and explain to the judge why what you said yesterday is

:22:23  13   different from what you're saying today.

:22:25  14   A    Thank you, sir.

:22:27  15   Q    There is on page 842 of the daily transcript we received

:23:00  16   yesterday.

:23:01  17              THE COURT:  Okay, you have it.

:23:01  18   BY MR. SMITH:

:23:08  19   Q    So it's relatively a long answer.  But I'll let -- I don't

:23:16  20   know, can you read that, Dr. Bea?  It's pretty hard to read.

:23:20  21              MR. SMITH:  Can I give him a copy?

:23:23  22              THE WITNESS:  I'm blind it one eye.  Much better, thank

:23:23  23   you.

:23:23  24   BY MR. SMITH:

:23:28  25   Q    Just let you read that to yourself, because it's way at the

:23:32  1    end when you come to the part about the student, and I want to

:23:35  2    give you a chance to read the context.

:23:38  3                    (Pause in proceedings.)

:23:40  4              THE WITNESS:  Yes, sir.

:23:40  5    BY MR. SMITH:

:23:41  6    Q   You say that struggle went on until the Corps of Engineers

:23:45  7    did the 17th Canal safe water level investigation not widely

:23:50  8    publicized and I got this piezometer data.

:23:52  9              MR. SMITH:  And we will turn the page to the next page.

:23:54  10   His answer continues for another page.

:23:59  11                    You go on and explain with the piesometers about

:24:01  12   that page.  We go all the way down to line 24 at the bottom of

:24:05  13   that page.

:24:05  14                    Would you call up lines 24 and 25.

:24:05  15   BY MR. SMITH:

:24:14  16   Q   And we said -- or I actually turned to a student and I said:

:24:19  17   Do you have those pressures in your lateral stability?  You'll

:24:24  18   have to turn the page to see how this continues -- do you have

:24:29  19   those pressures in your lateral stability analysis?

:24:32  20                    And the student came back and said:  No.  That's

:24:35  21   not normal.  We don't do that normally.

:24:38  22                    And I said:  Well, in this case, God doesn't

:24:41  23   believe your normally.  She refuses to separate the effect.

:24:45  24   Let's find out what those pressures are.  Let's put them in and

:24:48  25   let's see what happens.

:24:54  1          And this is essentially what led to your epiphany?

:24:57  2   A   Yes.

:24:58  3   Q   And, yet, I'm having a hard time reconciling the fact that

:25:02  4   your epiphany is based on a principle that you contend was being

:25:07  5   applied all the time by the ILIT investigators.

:25:10  6   A   And that's because you're horribly confused at this study.

:25:16  7   Let me see if I could help.

:25:22  8          In the independent levee investigation team work,

:25:29  9   there were two categories of analyses that we were performing.

:25:35  10  The timeframe is 2005 and 2006.  The first category were the

:25:45  11  things that engineers typically call seepage analyses.  In the

:25:53  12  second category were lateral stability analyses.

:26:01  13         Now, you took that timeframe and the basis of the

:26:07  14  analyses and said but it's different when you are in 2007 and

:26:14  15  2008.  And, indeed, there were important differences.  And the

:26:26  16  important difference that you brought forward in this transcript

:26:32  17  was when I asked Mr. Cobos-Roa had he taken the pressures from

:26:41  18  our analyses and put them into the lateral stability analysis.

:26:49  19  And the transcript accurately reflects or I discovered that it

:26:56  20  was not being put into those analyses, referring to the 2007-8

:27:04  21  generation.

:27:06  22         The confusion is the focus of that discussion is

:27:15  23  lateral stability with or without pressure.  Once we said,

:27:22  24  ah-ha, you got the pressure, you don't have the pressure, that

:27:26  25  needs to be brought in here, then the backtrack goes, well,

:27:29  1   let's be sure we got the right pressures.  You could have the

:27:36  2   wrong pressures.  Here's where the data provided by the Corps

:27:43  3   becomes instrumental in defining, quote, what's not a page in

:27:49  4   the textbook or somebody with a Ph.D.  So we said let's pick it

:27:56  5   on real field data, make sure we have the pressures correctly in

:28:01  6   the lateral stability analysis.  The combination of those two

:28:07  7   things was the eureka moment.

:28:12  8              Did I help with the confusion?  Or add to it?

:28:16  9   Q   I think you did your best.  We united souls may not quite

:28:22  10  get it yet, but we'll keep trying.

:28:27  11  A   I'm sorry.  I'm sorry.

:28:29  12  Q   Let me ask a simple question, if I may.

:28:31  13             Does a normal normal -- does a conventional

:28:35  14  stability analysis incorporate this discovery that you've been

:28:43  15  describing to us?

:28:44  16  A   Yes.

:28:49  17             MR. SCHULTZ:  Your Honor --

:28:49  18             THE COURT:  Wait, wait.

:28:51  19             Yes.

:28:51  20             MR. SCHULTZ:  This is actually quite exciting, but I

:28:54  21  just wanted to note the time because Dr. Bea had asked.

:28:57  22             THE COURT:  We just have a few more minutes here.

:29:03  23             Prior to your eureka moment, and we'll state, was

:29:10  24  it common to compute the pressures we've discussed into a

:29:16  25  lateral stability analysis?

:29:19  1          THE WITNESS:  No.  It wasn't.

:29:21  2          THE COURT:  Okay.  That's what I think Mr. Smith was

:29:25  3    asking.  And that's why I was confused.

:29:27  4          MR. SMITH:  Thank you, Your Honor.  That's very

:29:31  5    helpful.

:29:31  6                Now would be a good time for a 10 minute break.

:29:34  7    Thank you, Your Honor.

:29:36  8                (Proceedings in recess.)

:42:55  9          THE COURT:  Mr. Smith, I just have a couple of

:42:58  10   questions to hopefully clarify.

:42:59  11         MR. SMITH:  It might help clarify in my mind, Judge,

:43:03  12   too.

:43:04  13         THE COURT:  We started off this discussion talking

:43:06  14   about storage capacity.  Could you just give me as concisely as

:43:09  15   possible the definition from a geotechnical standpoint of

:43:16  16   storage capacity of sorts.

:43:19  17         THE WITNESS:  Yes.  And I'll start with our sponge in

:43:28  18   the example.  You took a grass sponge, put it in the sink,

:43:33  19   absorb water.  And then you take the sponge out of the sink over

:43:37  20   a dish, you squeeze it, and water is going to come out.  That

:43:44  21   water is reflective of the storage capacity of the sponge.

:43:49  22         THE COURT:  And does some soils have -- and I know --

:43:55  23   does it relate to the permeability analysis?

:43:58  24         THE WITNESS:  Yes.

:43:59  25         THE COURT:  The storage capacity?

:44:01  1                    And, in determining the mathematical expression of

:44:11  2  permeability, does one use storage capacity to determine the

:44:19  3  permeability mathematical expression?

:44:23  4              THE WITNESS:  No.

:44:23  5              THE COURT:  And is it the storage -- some soils have

:44:28  6  more storing capacity than others?

:44:32  7              THE WITNESS:  Correct.

:44:32  8              THE COURT:  And, as I understand your testimony thus

:44:37  9  far, in your analysis relating to uplift pressures, storage

:44:45  10  capacity was -- let me -- was not particularly significant?  And

:44:56  11  you can tell me, please --

:44:57  12              THE WITNESS:  You're correct.

:44:58  13              THE COURT:  I'm going to leave it at that, Mr. Smith.

:45:02  14              THE WITNESS:  One other thing I'd like to inject.  When

:45:07  15  I talk about a eureka moment, it's a eureka moment for me.  I

:45:16  16  may be one of the last idiots in the world so I don't

:45:21  17  extrapolate it to everyone.

:45:21  18  BY MR. SMITH:

:45:26  19  Q   You need to be careful, Dr. Bea, because I think this is the

:45:29  20  third time you've been qualified as an expert in this court.

:45:34  21  A   I do need to be careful, but qualification as an expert is

:45:47  22  no assurance that a person is not -- stop.

:46:11  23  Q   I just have one more question about this dilatational

:46:15  24  modulus principle that you've applied in this case.  It doesn't

:46:20  25  appear in -- at least, explicitly, it's not mentioned in your

:46:25  1   initial report or your rebuttal report, and I don't think it's

:46:30  2   explicitly mentioned in any of your prior work related to this

:46:34  3   litigation.  When you were questioned about it at one of your

:46:40  4   depositions, and you cited a standard text in the field, Lamb &

:46:49  5   Whitman, as describing this principle, and I wonder if you know

:46:57  6   -- you may not know.  I wouldn't expect you to know

:46:59  7   extemporaneous where in Lamb & Whitman this principle is found.

:47:07  8   I have the text here, and I'm prepared if His Honor would let me

:47:13  9   give the text and you can find it.  And I could also direct you

:47:17  10  to a section that our experts think you may be relying on.  But

:47:21  11  we'd like to have, for completeness of the record, you to

:47:25  12  identify the particular portions of this text that you're

:47:28  13  relying on for your theory.

:47:32  14  A   And the principle is the principal of dilatational wave

:47:37  15  velocity as connected to the coefficient of compressibility, M

:47:48  16  sub V.  Is that correct?

:47:51  17  Q   And I know you have described it for us in those terms

:47:56  18  before.  Would you be able to find that principle in this text

:48:00  19  if I --

:48:01  20        THE COURT:  We're not going to spend an hour doing it,

:48:05  21  I can promise you.

:48:06  22        MR. SMITH:  Your Honor, it's my time.

:48:08  23        THE COURT:  It's my time, too, though.  And we're not

:48:12  24  going to spend an hour looking for that in this court, I can

:48:16  25  promise you that.

```
:48:16   1    BY MR. SMITH:
:48:18   2    Q    Would you be able to, even if we gave you some help to find
:48:22   3    that text in this book, Doctor?
:48:25   4    A    I can find it, yes.  It will take time, yes.  And I am still
:48:30   5    struggling to have you define the principle.  If my previous
:48:37   6    deposition is acceptable and with the approval of counsel, I
:48:42   7    will locate the sections tonight and provide them for you.  I
:48:51   8    did an awful thing and tore the key pages out of my very used
:48:58   9    book, and I brought them with me.  But I do not have them here
:49:03   10   in the courtroom.  They're at my hotel room.  So, to conserve
:49:10   11   time, I'll be glad to, with approval from my counsel, produce
:49:16   12   them for you tomorrow morning.
:49:17   13   Q    Sounds like you are pretty familiar with that section.  I've
:49:20   14   got a section --
:49:21   15   A    It's more than one section.  In fact, it's three.
:49:24   16   Q    Three sections.
:49:27   17              So you tore three sections out of the book and
:49:29   18   brought it with you?
:49:30   19   A    Yes, I did.  And I hate to tear things out of books but --
:49:35   20        MR. SMITH:  Well, Your Honor, I don't know if Dr. Bea
:49:37   21   is going to be on the stand tomorrow.  That's my problem.
:49:40   22        THE COURT:  I certainly want to accommodate you in
:49:43   23   being able to talk to him about that so you might -- we might
:49:46   24   have to reserve a section out of your examination and defer it,
:49:51   25   even if he's on redirect, if you can -- I will allow you to do
```

:49:55  1    it at some point while he's here on recross.

:49:59  2               MR. SCHULTZ:  If it helps, Your Honor, I think, unless

:50:02  3    Mr. Smith finishes up immediately, Dr. Bea will be on the stand

:50:06  4    tomorrow, because our redirect will be considerable.

:50:09  5               THE COURT:  I would bet.  I'm afraid so.

:50:13  6               Go ahead.

:50:13  7    BY MR. SMITH:

:50:14  8    Q   Dr. Bea, I would like to go on --

:50:17  9               THE WITNESS:  Could I ask a question?  I brought the, I

:50:22  10   think, for sure, the sections in the paper form also

:50:30  11   electronically.  Given enough energy tonight, I could identify

:50:39  12   the sections, produce them electronically to my counsel.  And

:50:46  13   they can, in turn, provide it to the Court even if I'm not here

:50:52  14   tomorrow.  I'm glad to identify them for you.

:50:56  15              MR. SMITH:  Thank you, Dr. Bea.

:50:56  16   BY MR. SMITH:

:50:58  17   Q   I want to move on to a little different topic here.

:51:02  18              You were retained by the attorneys in this

:51:05  19   litigation to determine what caused the north and south breaches

:51:13  20   along the IHNC in the Lower Ninth Ward; correct?

:51:17  21   A   Correct.

:51:17  22   Q   And, to make those determinations, you relied on a variety

:51:20  23   of geotechnical analyses; didn't you?

:51:22  24   A   Yes, sir.

:51:22  25   Q   And, as you stated helpfully just before the break, those

:51:28  1    analyses fall generally into two categories, two types, seepage

:51:36  2    analyses and lateral stability or slope stability analyses; is

:51:40  3    that correct?

:51:41  4    A    Well, not taken to the context you just put it.  I was

:51:50  5    talking in a context of the eureka moment and your comparison to

:51:55  6    the original independent levee investigation team analyses.  At

:52:04  7    the Lower Ninth Ward, the scope of framework of analyses had to

:52:10  8    be expanded because of the unique characteristics at the Lower

:52:17  9    Ninth Ward compared to the 17th Street Canal.  For example --

:52:24  10   Q    Before you go on for examples, I'd like to ask a question.

:52:28  11              THE COURT:  Go ahead, Mr. Smith.

:52:28  12   BY MR. SMITH:

:52:31  13   Q    Maybe I could help direct our discussion today, Dr. Bea.

:52:37  14              THE COURT:  Please.

:52:37  15   BY MR. SMITH:

:52:38  16   Q    Otherwise, you and His Honor can sit down and go have lunch

:52:43  17   together and figure this out.

:52:44  18              I asked you whether your analyses fall into two

:52:47  19   main categories, and you identified one as seepage.  We've spent

:52:51  20   all the time up to now I think talking about seepage.  And I had

:52:55  21   another main category which was called slope stability.

:52:58  22              And do you have a third category for your analyses

:53:01  23   in this case?

:53:02  24   A    Sure.

:53:02  25   Q    What's that third category?

:53:03  1    A    Wind wave currents reflections at the sea wall impacts the

:53:12  2    barge on the wall, overtopping erosion analysis.  There's a much

:53:22  3    wider group of analyses because the expanse of the problem is

:53:28  4    different at this location than 17.

:53:32  5    Q    I heard you describe some different analyses, but those

:53:38  6    don't sound like categorical types to me.

:53:40  7    A    They do to me.

:53:41  8    Q    Maybe I'm misunderstanding.  There is a category of the wind

:53:44  9    wave analyses, and you've got a section in your report dealing

:53:47  10   with wind wave studies, I take it?

:53:48  11   A    It's not wind waive studies.  It's taking wind wave surge

:53:54  12   conditions and then bringing those to evaluate an overtopping

:54:00  13   erosion and those effects.  That then has to be connected to the

:54:05  14   lateral stability and the lateral stability has to be connected

:54:09  15   to the underseepage.  This is a crucial thing of the proper

:54:15  16   integration of the analytical work.  It's called synthesis.

:54:21  17   Q    I would like to talk about slope stability analyses, your

:54:26  18   slope stability analyses.

:54:29  19   A    Okay.

:54:29  20                    At Lower Ninth Ward; is that correct?

:54:33  21   Q    Yes.

:54:34  22   A    Thank you.

:54:35  23   Q    One of the daunting tasks, and I think Your Honor will agree

:54:38  24   with me, facing this Court is deciding whether your analyses and

:54:42  25   the defendants' analyses yield reliable results --

:54:47   1   A   Yes.

:54:47   2   Q   -- that this Court can rely on for deciding this case.

:54:53   3               You would agree, wouldn't you, that for your

:54:56   4   analyses to be useful to the Court they must represent the

:54:59   5   correct problem, correctly formulated; is that correct?

:55:04   6   A   So far, so good.

:55:06   7   Q   I mentioned this earlier and I think you agreed with me,

:55:13   8   that if you use the term lateral stability and I use the term

:55:18   9   slope stability, we're talking about the same thing?

:55:20   10  A   But I don't think we established that.  But that's

:55:25   11  acceptable.

:55:26   12  Q   Okay.  This is one basic type of analysis; correct?

:55:31   13  A   Correct.

:55:32   14  Q   To explore the foundation of your opinions, I'd like to

:55:39   15  review some of the concepts that are applied by engineers to

:55:45   16  understand the mechanical behavior of soils.  And one of those

:55:51   17  concepts which I believe is an issue in this case is the concept

:55:57   18  of drain and undrained conditions.  Do you agree, Doctor?

:56:02   19  A   Yes, sir.

:56:02   20  Q   You agree that these are fundamental concepts to the

:56:05   21  mechanical behavior of soils; correct?

:56:07   22  A   Yes, sir.

:56:09   23  Q   Thought you would, because I got this notion from one of the

:56:12   24  standard texts in the field, Soil Strength and Slope Stability

:56:18   25  by J. Michael Duncan and Steven G. Wright.  And we talked about

:56:24  1   this at one of your depositions, I believe?

:56:26  2   A   Yes, sir.

:56:26  3   Q   And you acknowledged that -- I think you acknowledged that

:56:31  4   Mike Duncan and Steve Wright are two of what you called Greek

:56:38  5   gods in the pantheon?

:56:41  6   A   With a small G.

:56:43  7   Q   So, from the great names to Zeus, then we can think of

:56:48  8   Professors Duncan and Wright as Aristotle?

:56:52  9           THE COURT:  Hopefully their fate won't be the same.

:56:56  10          THE WITNESS:  I don't think that's true.  I've

:56:58  11  previously demonstrated to this Court I don't have a good

:57:03  12  knowledge Greek anything.

:57:03  13  BY MR. SMITH:

:57:13  14  Q   Nor do I, Doctor.  His Honor obviously has a better

:57:17  15  knowledge than I do.

:57:18  16          THE WITNESS:  I didn't even know who Ouranos was.

:57:22  17          MR. SMITH:  I didn't want to portray my ignorance but I

:57:27  18  laughed at your joke.

:57:29  19          THE WITNESS:  These are good people.

:57:30  20  BY MR. SMITH:

:57:30  21  Q   I found the definition -- there's a chapter on Principles on

:57:35  22  Soil Mechanics, I found the definition of drained and undrained.

:57:37  23  And, I wanted to go through those here like we did in your

:57:40  24  deposition, just to sort of lay some of the ground rules for our

:57:43  25  analysis in our discussion today.

A    Thank you.

Q    And I think we have to say, to start with, before we bring

that up, please, that the definitions of drained and undrained

used by geotechnical engineers are not the common definitions

found in Merriam Websters dictionary.

A    That's correct, sir.

Q    To say soil is drained doesn't mean that it's empty of all

the water that was in it or that it's dry soil.  These concepts

that we start thinking in terms of dry or empty, we're going

down the wrong path.  It has a technical meaning that is

different from the common parlance for those two words, and

whether a soil in geotechnical terms is in a drained or an

undrained condition depends on the speed with which water can

move in or out of that soil unit in comparison with the length

of time that the soil is being subjected to some change in the

load on that soil.  Would you agree, Doctor?

A    I think that's correct.

Q    And as defined in -- and I took that from Duncan and Wright.

        MR. SMITH:  And this is an exhibit, Your Honor, it's JX

1949.

        THE COURT:  Yes, sir.

        MR. SMITH:  And that's at page 19.

        If we could see the next slide, we have the

definition of drained and undrained.

BY MR. SMITH:

:59:29   1   Q   And, according to Professors Duncan and Wright, drained is

:59:33   2   the condition under which water is able to flow into or out of a

:59:36   3   mass of soil in the length of time that the soil is subjected to

:59:40   4   some change in load.

:59:44   5              Conversely, undrained is the condition under which

:59:48   6   there's no flow into or out of a mass of soil in the length of

:59:53   7   time that the soil is subjected to some change in load.

:59:57   8              You agree with you that, don't you, Professor

:00:03   9   Bea?

:00:04   10   A   Basically, I do agree.  But the important thing that I don't

:00:10   11   see clearly called out here, the boundary conditions for the

:00:15   12   mass of soil are important in a determination of drain behavior

:00:24   13   versus undrained.  If I can find that soil mass through or with

:00:31   14   boundaries that are impermeable, of course it can't drain.  So

:00:38   15   the boundary conditions are in fact of critical importance in

:00:43   16   the determination of drained or undrained conditions.

:00:47   17   Q   And what you've done, just so we don't get sidetracked here,

:00:51   18   is identify some of the conditions that can cause a soil to

:00:54   19   behave in one of these manners?

:00:57   20   A   Yes, sir.

:00:57   21   Q   And so, in the laboratory, if you went to test a soil in an

:01:01   22   undrained condition, then you encase it in a latex wrapping so

:01:08   23   that none of the fluids can flow out of it while you're testing

:01:11   24   that soil; isn't that correct?

:01:13   25   A   Well, you frequently use two of those latex wrappers and

:01:24   1   even can have water escaping.  So we do everything we can in the

:01:32   2   lab to create appropriate conditions to determine soil

:01:40   3   properties.

:01:40   4   Q   But, when you're talking about boundary conditions, that

:01:43   5   would be a sample of a boundary condition?

:01:45   6   A   Well put.  Thank you.

:01:48   7   Q   And I think we've established that these concepts pertain to

:01:53   8   how the soil will behave with a load, or as stressors as

:01:57   9   engineers refer to it, is imposed on that soil.

:02:00  10   A   Yes, sir.

:02:01  11   Q   In our case involves units of soil that experience a change

:02:06  12   in load; doesn't it?

:02:09  13   A   Yes, sir.

:02:10  14   Q   And a principal source of that change in load was the storm

:02:13  15   surge that escaped out of the IHNC and flowed up and leaned on

:02:17  16   that flood wall and began to impose its weighing on that well;

:02:21  17   and, as that wall began to move, that wall imposed stress on the

:02:25  18   soils that were in the foundation; right?

:02:27  19   A   Well said.  Yes, sir.

:02:28  20   Q   And so we would refer to the weight of that water that's

:02:34  21   imposing that load as a stress?

:02:36  22   A   That's one source.

:02:37  23   Q   I didn't say it's the only source, but that's a terminology.

:02:43  24   When we talk about stresses, we're talking about the same

:02:46  25   phenomenon as this water that's moved into this area that's

:02:51  1    imposing its weight on these various some units; correct?

:02:55  2    A   I think the generalization is too dangerous.  But, to the

:03:00  3    extent you have used it, I'll say yes.

:03:06  4    Q   And so, in order for us to have a proper understanding of

:03:10  5    how these critical soils and the foundation of the levee, below

:03:16  6    the levee behaved during this storm surge loading, we need to

:03:21  7    appreciate whether those soils were in a drained condition or an

:03:26  8    undrained condition; don't we?

:03:28  9    A   Yes, sir.

:03:28  10   Q   Now, Dr. Bea, you've used previously in this courtroom a

:03:32  11   hydraulic car lift to illustrate your opinions in this case;

:03:37  12   haven't you?

:03:38  13   A   Yes.

:03:38  14   Q   And I wondered whether we today can illustrate the concepts

:03:43  15   of drained and undrained in the same way, and I'm going to show

:03:46  16   you a couple slides and we can discuss those.  And, if it's

:03:50  17   helpful to understand this, then we'll have done some good.  If

:03:54  18   not, then I apologize for doing this.  But I thought this might

:03:56  19   help us to talk about drained and undrained today.

:04:01  20            Now, just so that we're all clear on what we have

:04:04  21   here in front of us, we have illustrated here at the top of this

:04:08  22   figure two soil units, both of which are fully saturated.  So --

:04:14  23   and those are soil particles on the left.  They're big soil

:04:17  24   particles on the left so you can see the soil particles.  You

:04:20  25   can see how they're spaced among those soil particles within

:04:24   1   that soil unit.

:04:26   2              And, on the right, we have a soil unit that's

:04:29   3   similarly filed with water in all those spaces between those

:04:32   4   grains of soil, those soil particles.  And those spaces that are

:04:37   5   filled with water are called pores.

:04:39   6              So, these are both fully saturated, and the water,

:04:43   7   we can say, just to start with, is under a certain amount of

:04:45   8   pressure, maybe just be atmospheric pressure, but there's some

:04:50   9   pressure in those spaces in that water among those soil

:04:53   10  particles.

:04:54   11             You're nodding your head, Dr. Bea, and the court

:04:57   12  reporter can't see that.  Are you agreeing with my discussion so

:04:59   13  far?

:04:59   14  A   Yes.

:05:00   15  Q   Thank you.

:05:04   16  A   That's a bad personal characteristic I have.  If I'm

:05:10   17  agreeing with you, I nod yes.  And, if I'm disagreeing, I nod

:05:16   18  no.

:05:16   19  Q   All right.  Well, thank you, Dr. Bea.

:05:19   20             Now, is it true, Dr. Bea, that if we apply stress

:05:24   21  at rates within a certain range, the fluid in the cylinder on

:05:31   22  the left will be able to flow out as rapidly as the load is

:05:38   23  applied so that there's no increase in the pressure in that

:05:48   24  cylinder on the left?  There's certain range, if we push that

:05:54   25  piston down low slowly enough, that we can just freely flow

:05:58   1   right out of that piston without having a rise in that pressure;

:06:01   2   correct?

:06:02   3   A    Yes.

:06:02   4   Q    At least, as in a theoretical basis.

:06:06   5   A    Okay.

:06:06   6   Q    We're trying to establish a theoretical framework for

:06:09   7   understanding these things.

:06:10   8   A    Understood.

:06:11   9   Q    And, contrarily, on the right, it has a very small orifice

:06:17   10   at the bottom.  And so, if we're depressing both of those

:06:21   11   cylinders with the same equal pressure, we might be able to

:06:24   12   expel the fluid with the cylinder on the left without a rise in

:06:27   13   core pressure, but certainly that water pressure on the right

:06:31   14   could rise because it couldn't freely escape.  It would be

:06:36   15   pressurized by that piston as it comes down faster than the

:06:40   16   water can flow through that orifice out of that cylinder; is

:06:44   17   that correct?

:06:44   18   A    I think so.

:06:49   19              Is the size of the exit pipe orifice a reflection

:06:55   20   of the pore space shown in the upper figures?

:06:59   21   Q    It is meant to be an illustration of that.

:07:01   22   A    Thank you.

:07:02   23   Q    Yes.  And so -- you agree, that's a fair way to compare

:07:07   24   these two soil units?

:07:08   25   A    Yes.

| | | |
|---|---|---|
| :07:09 | 1 | Q   If you had very small particles of soil, very tiny pores, |
| :07:14 | 2 | you exert stress on it, that water might have trouble escaping |
| :07:17 | 3 | as fast as it could from the soil unit on the left? |
| :07:20 | 4 | A   That's correct. |
| :07:21 | 5 | THE COURT:  Mr. Smith, can I ask you, just for the |
| :07:24 | 6 | Court's help?  And this has been helpful, because I did read |
| :07:27 | 7 | your memorandum in talking about draining and undraining.  If |
| :07:33 | 8 | you could ask the witness -- I'd prefer you to -- to what makes |
| :07:39 | 9 | -- I understand they're both saturated.  And, so, saturation |
| :07:44 | 10 | does not necessarily equate to drained and undrained.  If you |
| :07:48 | 11 | could help me, if you want to, through this witness or whatever |
| :07:52 | 12 | witness you want, understand the difference as to why the one on |
| :07:56 | 13 | the left is drained and why the one on the right is undrained. |
| :07:59 | 14 | It's still not clear to me. |
| :08:00 | 15 | MR. SMITH:  I hope we're going to get there, Your |
| :08:02 | 16 | Honor. |
| :08:02 | 17 | THE COURT:  Okay. |
| :08:03 | 18 | MR. SMITH:  It has to do with the definitions mostly. |
| :08:05 | 19 | It's a conceptual thing, but I'm going to allow this witness to |
| :08:08 | 20 | help us go through this.  I'll have my chance later if I'm not |
| :08:14 | 21 | happy with his explanation. |
| :08:16 | 22 | THE COURT:  Whatever way you want to do it.  I just |
| :08:18 | 23 | want to ultimately understand it. |
| :08:19 | 24 | MR. SMITH:  I think that's why I'm attempting to do |
| :08:23 | 25 | this today, Your Honor.  I'm certainly willing to try to walk |

:08:26  1  through this with Dr. Bea, and we'll see if we can all come away

:08:29  2  with a better understanding.

:08:29  3  BY MR. SMITH:

:08:31  4  Q   So -- have we activated this to show the cylinders going

:08:35  5  down?

:08:39  6          THE COURT:  We're going to have animation here?

:08:43  7          THE WITNESS:  Fine.

:08:44  8          MR. SMITH:  A little bit.  Maybe.

:08:45  9          THE COURT:  We hope.

:08:45  10 BY MR. SMITH:

:08:46  11 Q   So we've got the label Pore Water on there.  We can see this

:08:52  12 theoretical range.

:09:01  13         THE COURT:  And, while you're doing that, as I

:09:03  14 understand it, Mr. Smith, the difference between the two

:09:06  15 diagrams, besides one being drained and undrained, is that the

:09:10  16 -- there's less space between the material --

:09:15  17         MR. SMITH:  The particles of soil.

:09:15  18         THE COURT:  -- the particles in one than the other.

:09:17  19         MR. SMITH:  The pores, right.

:09:17  20 BY MR. SMITH:

:09:18  21 Q   Dr. Bea, that's what you said earlier, the pores are tiny in

:09:22  22 the soil on the right.  And large, relatively -- small on the

:09:27  23 right, larger on the left?

:09:29  24         THE COURT:  I understand.

:09:31  25         THE WITNESS:  You can buy sponges that are like that.

```
:09:37   1   Some sponges have very fine pores in them.  And then you can see
:09:42   2   the next sponge, same size, is very, very large pore spaces.
:09:42   3   BY MR. SMITH:
:09:56   4   Q   So this is, the arrows are to illustrate that we're applying
:10:01   5   stress to these two soil units.  And, when we apply stress, a
:10:04   6   couple of things will happen, or could happen.  The soil units
:10:08   7   could actually compress and become smaller.  And so the
:10:13   8   particles of grain -- you're nodding yes, Dr. Bea; is that
:10:18   9   correct?
:10:18  10   A   Yes.
:10:19  11   Q   And then the water would be expelled as that's being
:10:23  12   compressed in the left.
:10:25  13              And, on the right, it might not be able to escape,
:10:28  14   and so that pressure in those pores would rise, even as the unit
:10:36  15   became -- tried to compress; is that correct, Dr. Bea?
:10:40  16   A   Yes, sir.  This, for me, this is a beautiful illustration of
:10:48  17   the aberrant behavior sometimes of my bladder.  That's an
:10:58  18   expulsion of pore water.  And sometimes it's easy for me to do
:11:07  19   that, sometimes it's very difficult.  And the difference is the
:11:12  20   size of that orifice.  So this has got to be very much like a
:11:20  21   human issue associated with drained and undrained behavior.
:11:26  22   Q   Now --
:11:29  23   A   It's very good.
:11:30  24   Q   Now, all of the soils that we've analyzed in this case, you
:11:35  25   and then the Fuget and some of the other laboratories that were
```

:11:39  1    involved in testing that were modeled for underseepage and

:11:52  2    stability -- let me withdraw that question and start over again.

:11:55  3    I've mangled it a bit, and I would like to start over fresh.

:12:02  4              The soils involved in the north and south

:12:04  5    breaches, I think we've talked about, underwent this type of

:12:09  6    loading, stressing, during Katrina as a result of the surge.

:12:16  7    And, during that surge loading, I think you would agree,

:12:20  8    wouldn't you, Dr. Bea, that those soils, those critical soils

:12:24  9    that were involved in the breaching were in an undrained

:12:28  10   condition?

:12:29  11   A    Well, quite to the contrary.  The analyses I performed

:12:36  12   focused on sheer strength of actuated behavior of both drained

:12:46  13   or undrained conditions, or attempted to.  And, for the record,

:13:01  14   the comparison of results for drained or undrained are contained

:13:08  15   in my rebuttal report.

:13:27  16             THE COURT:  Mr. Smith, the image on the left, which I

:13:30  17   recall was labeled as drained --

:13:35  18             THE WITNESS:  Drained.

:13:36  19             MR. SMITH:  Drained.

:13:37  20             THE COURT:  And does that mean drained after the

:13:40  21   pressure was applied?

:13:41  22             MR. SMITH:  Yes.

:13:42  23             THE COURT:  That's what I thought.  I just wanted to

:13:43  24   make sure I wasn't getting something mixed up.

:13:46  25             MR. SMITH:  Dr. Bea can correct me if I'm wrong.  The

:13:49   1   soil units can be in either condition before we -- at the outset

:13:52   2   of this little demonstration.  They could either be drained or

:13:55   3   undrained.

:13:56   4          THE COURT:  Right.

:13:56   5          MR. SMITH:  As soon as you apply that load, then they

:14:00   6   become undrained.  Because there's a change in load that happens

:14:04   7   faster than the water can escape.

:14:07   8          THE COURT:  Right.

:14:07   9          MR. SMITH:  If this would be a good time to take a

:14:10  10   break, Your Honor?

:14:11  11          THE COURT:  It would be.

:14:11  12          MR. SMITH:  I'd appreciate it.

:14:13  13          THE COURT:  You've got it.

:14:14  14              Let's come back at 1:15.

:14:17  15              (12:11 p.m., proceedings at recess.)

        16

        17                      CERTIFICATE

        18

        19      I, Susan A. Zielie, Official Court Reporter, do hereby
             certify that the foregoing transcript is correct.

        20                      /S/ SUSAN A. ZIELIE, FCRR
                             _____
        21                       Susan A. Zielie, FCRR

        22

        23

        24

        25