1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

4

IN RE:  KATRINA CANAL BREACHES      DOCKET 05-CV-4182
5  CONSOLIDATED LITIGATION
                                    SECTION K
6
PERTAINS TO:  MRGO                  NEW ORLEANS, LOUISIANA
7       *ARMSTRONG NO. 10-CV-866*
                                    SEPTEMBER 18, 2012
8
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

9

10              DAY 5, AFTERNOON SESSION
            TRANSCRIPT OF TRIAL PROCEEDINGS
11     BEFORE THE HONORABLE STANWOOD R. DUVAL JR.
                UNITED STATES DISTRICT JUDGE
12

13  APPEARANCES:

14

FOR THE PLAINTIFFS:          BRUNO & BRUNO
15                           BY:  JOSEPH M. BRUNO, ESQ.
                             855 BARONNE STREET
16                           NEW ORLEANS, LOUISIANA 70113

17  FOR THE PLAINTIFFS:          THE ANDRY LAW FIRM
                             BY:  JONATHAN B. ANDRY, ESQ.
18                           610 BARONNE STREET
                             NEW ORLEANS, LOUISIANA 70113
19
FOR THE PLAINTIFFS:          BARON & BUDD, PC
20                           BY:  THOMAS SIMS, ESQ.
                             3102 OAK LAWN AVENUE, SUITE 1100
21                           DALLAS, TEXAS 75219

22  FOR THE PLAINTIFFS:          DEGRAVELLES PALMINTIER
                               HOLTHAUS & FRUGÉ
23                           BY:  MICHAEL C. PALMINTIER, ESQ.
                                  JOSHUA M. PALMINTIER, ESQ.
24                           618 MAIN STREET
                             BATON ROUGE, LOUISIANA 70801
25

*HOURLY TRANSCRIPT*

APPEARANCES:

FOR THE PLAINTIFFS:          DOMENGEAUX WRIGHT ROY
                               & EDWARDS, LLC
                             BY:  ELWOOD C. STEVENS JR., ESQ.
                                  BONNIE KENDRICK, ESQ.
                             556 JEFFERSON STREET, SUITE 500
                             POST OFFICE BOX 3668
                             LAFAYETTE, LOUISIANA 70502

FOR THE PLAINTIFFS:          THE DUDENHEFER LAW FIRM
                             BY:  FRANK C. DUDENHEFER JR., ESQ.
                             601 POYDRAS STREET, SUITE 2655
                             NEW ORLEANS, LOUISIANA 70130

FOR THE PLAINTIFFS:          FAYARD & HONEYCUTT, APC
                             BY:  CALVIN C. FAYARD JR., ESQ.
                             519 FLORIDA AVENUE, S.W.
                             DENHAM SPRINGS, LOUISIANA 70726

FOR THE PLAINTIFFS:          JOANEN LAW FIRM
                             BY:  SCOTT JOANEN, ESQ.
                             4905 FRERET STREET, SUITE B
                             NEW ORLEANS, LOUISIANA 70115

FOR THE PLAINTIFFS:          LEVIN PAPANTONIO THOMAS
                               MITCHELL RAFFERTY & PROCTOR
                             BY:  MATTHEW D. SCHULTZ, ESQ.
                             316 SOUTH BAYLEN STREET, SUITE 600
                             PENSACOLA, FLORIDA 32502

FOR THE PLAINTIFFS:          THE TRIAL LAW FIRM, PC
                             BY:  ANDREW P. OWEN, ESQ.
                             800 WILTSHIRE BLVD., SUITE 500
                             LOS ANGELES, CALIFORNIA 90017

FOR THE PLAINTIFFS:          J. ROBERT WARREN II, APLC
                             BY:  J. ROBERT WARREN II, ESQ.
                             1718 SHORT STREET
                             NEW ORLEANS, LOUISIANA 70118

FOR THE PLAINTIFFS:          COTCHETT PITRE & MCCARTHY, LLP
                             BY:  PHILIP L. GREGORY, ESQ.
                             840 MALCOLM ROAD, SUITE 200
                             BURLINGAME, CALIFORNIA 94010

```
 1   APPEARANCES:

 2
     FOR THE DEFENDANT,            STONE PIGMAN WALTHER WITTMANN, LLC
 3   WASHINGTON GROUP             BY:  WILLIAM D. TREEBY, ESQ.
     INTERNATIONAL, INC.:              JAMES C. GULOTTA JR., ESQ.
 4                                     HEATHER S. LONIAN, ESQ.
                                       MAGGIE A. BROUSSARD, ESQ.
 5                                546 CARONDELET STREET
                                  NEW ORLEANS, LOUISIANA 70130
 6
     FOR THE DEFENDANT,            JONES DAY (WASHINGTON)
 7   WASHINGTON GROUP             BY:  ADRIAN WAGER-ZITO, ESQ.
     INTERNATIONAL, INC.:              DEBRA S. CLAYMAN, ESQ.
 8                                     CHRISTOPHER N. THATCH, ESQ.
                                       CHRISTOPHER R. FARRELL, ESQ.
 9                                     JULIA CRONIN, ESQ.
                                       BRIAN KERWIN, ESQ.
10                                51 LOUISIANA AVENUE, N.W.
                                  WASHINGTON, D.C. 20001
11
     FOR THE DEFENDANT,            U.S. DEPARTMENT OF JUSTICE
12   UNITED STATES OF AMERICA:     CIVIL RIGHTS DIVISION-TORTS BRANCH
                                  BY:  ROBIN D. SMITH, ESQ.
13                                     JAMES F. MCCONNON JR., ESQ.
                                       RUPERT MITSCH, ESQ.
14                                     CONOR KELLS, ESQ.
                                       JOHN A. WOODCOCK, ESQ.
15                                BENJAMIN FRANKLIN STATION
                                  POST OFFICE BOX 888
16                                WASHINGTON, DC 20044

17   OFFICIAL COURT REPORTER:      TONI DOYLE TUSA, CCR, FCRR
                                  500 POYDRAS STREET, ROOM HB-406
18                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7778
19                                TONI_TUSA@LAED.USCOURTS.GOV

20

21
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
22   COMPUTER-AIDED TRANSCRIPTION SOFTWARE.

23

24

25
```

*HOURLY TRANSCRIPT*

1          <u>I N D E X</u>

2                                          <u>PAGE</u>

3     ROBERT G. BEA, PH.D.

4          CROSS-EXAMINATION BY MR. SMITH          1114

5          REDIRECT EXAMINATION BY MR. SCHULTZ      1132

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:53 | 1 | **AFTERNOON SESSION** |
| 12:53 | 2 | **(SEPTEMBER 18, 2012)** |
| 12:53 | 3 | (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.) |
| 13:19 | 4 | **THE COURT:**  SIR, ARE YOU READY TO PROCEED? |
| 13:19 | 5 | **MR. SMITH:**  I AM, YOUR HONOR. |
| 13:19 | 6 | **ROBERT G. BEA, PH.D.,** |
| 13:19 | 7 | HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS**:** |
| 13:19 | 8 | **CROSS-EXAMINATION** |
| 13:19 | 9 | BY MR. SMITH**:** |
| 13:19 | 10 | **Q.**  DR. BEA, I WONDER IF WE COULD GO BACK TO ONE OF THE SLIDES |
| 13:19 | 11 | THAT WE HAD BEFORE THE BREAK. |
| 13:19 | 12 | DO YOU SEE SLIDE 4 WHERE WE HAD THE TWO DIFFERENT |
| 13:19 | 13 | TYPES OF SOILS?  WE HAD THE LARGE-GRAINED SOIL ON THE LEFT AND |
| 13:19 | 14 | THE SMALL-GRAINED SOIL ON THE RIGHT. |
| 13:19 | 15 | WOULD IT BE FAIR TO SAY THAT THE PROTOTYPICAL |
| 13:19 | 16 | SMALL-GRAINED SOIL IS A CLAY? |
| 13:19 | 17 | **A.**  YES. |
| 13:19 | 18 | **Q.**  AND COULD WE SAY THAT THE PROTOTYPICAL LARGE-GRAINED SOIL |
| 13:20 | 19 | WOULD BE A SAND? |
| 13:20 | 20 | **A.**  OR GRAVEL. |
| 13:20 | 21 | **Q.**  OR GRAVEL? |
| 13:20 | 22 | **A.**  YES. |
| 13:20 | 23 | **Q.**  WOULD YOU AGREE WITH ME, DR. BEA, THAT CLAY GENERALLY |
| 13:20 | 24 | REMAINS UNDRAINED AFTER A CHANGE IN LOAD FOR A LONG TIME? |
| 13:20 | 25 | **A.**  I HAVE TROUBLE WITH THAT WORD *GENERALLY.* THERE ARE |

ROBERT G. BEA - CROSS

13:20    1   CONDITIONS WHERE THAT IS NOT TRUE.  THERE ARE CONDITIONS WHERE

13:20    2   THAT IS TRUE.

13:20    3   Q.   WELL, LET'S GO TO -- I ASKED YOU THIS VERY QUESTION IN ONE

13:20    4   OF YOUR DEPOSITIONS, AND YOU GAVE ME AN UNEQUIVOCAL ANSWER IN

13:20    5   YOUR DEPOSITION.  SO I WOULD LIKE TO GET AN UNEQUIVOCAL ANSWER

13:20    6   AT LEAST ON THE RECORD HERE.

13:20    7            MR. SMITH:  SO IF WE COULD GO TO JX-1395-0007, AND IF

13:21    8   WE COULD GO TO THE BOTTOM OF THAT PAGE.  ON THAT IMAGE, IT

13:21    9   WOULD BE PAGE 307, THE LAST -- LINE 21 THROUGH 25.

13:21   10   BY MR. SMITH:

13:21   11   Q.   THIS WAS THE DEPOSITION THAT WAS TAKEN -- IT WOULD HAVE

13:21   12   BEEN THE DEPOSITION THAT WAS TAKEN -- YOUR FIRST DEPOSITION --

13:21   13   THIS IS THE SECOND DAY.  THIS IS MARCH 28.

13:21   14            I ASKED YOU:

13:21   15            "QUESTION:  WOULD YOU AGREE THAT CLAYS GENERALLY

13:21   16        REMAIN IN AN UNDRAINED CONDITION FOR A LONG TIME AFTER A

13:21   17        LOAD CHANGE BECAUSE THE PERMEABILITY OF CLAY IS LOW?

13:21   18            "ANSWER:  YES."

13:21   19            THE COURT:  WELL, HE SAID, "YES, BUT."

13:22   20            MR. SMITH:  "BUT THEY CAN BE MODELED."

13:22   21            WE CAN GO ON TO SEE THE REST OF HIS ANSWER, BUT

13:22   22   THE ANSWER WAS AN UNEQUIVOCAL "YES" WITH AN EXPLANATION:

13:22   23            "THEY CAN BE MODELED, EITHER DRAINED OR

13:22   24   UNDRAINED CONDITIONS.  THE CRITICAL THING IS TO ENSURE THAT THE

13:22   25   MODEL IS PRODUCING THE -- A CORRECT REASONABLE, PLAUSIBLE

ROBERT G. BEA - CROSS

13:22  1    STRESS/STRAIN BEHAVIOR FOR THE MATERIAL."

13:22  2              **THE WITNESS:**  YES, SIR.

13:22  3    **BY MR. SMITH:**

13:22  4    **Q.**   YOU WOULD AGREE WITH THAT AGAIN TODAY, WOULDN'T YOU,

13:22  5    DR. BEA?

13:22  6    **A.**   THAT'S CORRECT.

13:22  7    **Q.**   NOW, YOU WOULD ALSO AGREE, WOULDN'T YOU, DR. BEA, THAT THE

13:22  8    TIME IT TAKES TO DRAIN -- FOR A PARTICULAR UNIT OF SOIL TO

13:22  9    DRAIN CAN BE CALCULATED IF YOU KNOW THE DRAINAGE

13:22  10   CHARACTERISTICS OF THAT PARTICULAR SOIL UNIT?

13:22  11   **A.**   CORRECT.

13:22  12   **Q.**   AND THOSE -- WE WENT THROUGH THIS MORNING YOUR DEPOSITION,

13:22  13   SO I THINK -- I HOPE I'VE GOT IT RIGHT.

13:23  14             THOSE ESSENTIAL DRAINAGE CHARACTERISTICS CONSIST OF

13:23  15   AT LEAST THREE THINGS.  I IDENTIFIED THREE, AND IF THERE'S

13:23  16   ANOTHER, I'M SURE YOU'LL TELL ME.

13:23  17             ONE, PERMEABILITY; TWO, THE COEFFICIENT OF

13:23  18   CONSOLIDATION; AND, THREE, THE SIZE OF THE SOIL UNIT OR THE

13:23  19   LENGTH OF THE DRAINAGE PATH.

13:23  20   **A.**   THAT'S SO GOOD SO FAR.

13:23  21   **Q.**   THOSE WERE THE THREE I CITED IN YOUR DEPOSITION.  YOU

13:23  22   AGREED WITH THEM.

13:23  23   **A.**   CORRECT.  THERE ARE OTHERS.

13:23  24             **THE COURT:**  LET ME ASK ONE QUESTION.  I WANT TO CLEAR

13:23  25   UP SOMETHING FOR MY MIND.

ROBERT G. BEA - CROSS

13:23   1            DR. BEA, IF A SOIL IS UNDRAINED -- AND I MAY
13:23   2   HAVE ASKED YOU THIS -- IF IT IS COMPLETELY UNDRAINED, IS IT
13:23   3   CORRECT TO SAY IT IS NO LONGER SATURATED?
13:23   4            THE WITNESS:  NO.
13:23   5            THE COURT:  SO I HOPE -- SO *UNDRAINED* DOESN'T MEAN,
13:24   6   WHEN IT'S COMPLETELY UNDRAINED, THAT THE LIQUID WITHIN THE SOIL
13:24   7   UNIT OR WHATEVER WE ARE SAMPLING IS -- HAS BEEN DRAINED OUT OF
13:24   8   IT?
13:24   9            THE WITNESS:  NO.
13:24  10            THE COURT:  CAN YOU BRIEFLY TELL ME WHAT -- BECAUSE
13:24  11   APPARENTLY I DON'T UNDERSTAND RIGHT NOW WHAT *DRAINED* MEANS.
13:24  12   WHEN A SOIL EXEMPLAR, PICTORIAL THING -- IF A SOIL IS *DRAINED*,
13:24  13   WHAT DOES THAT MEAN?
13:24  14            THE WITNESS:  IT MEANS THAT THE PORE WATER IS ABLE TO
13:24  15   MIGRATE AWAY FROM THE STRESS AREA.  THAT'S THE REASON I MADE
13:24  16   THE CRUDE ANALOGY TO MY BLADDER.
13:24  17            THE COURT:  I HOPE I WILL UNDERSTAND A LITTLE BETTER
13:25  18   AS WE GO ALONG.
13:25  19            GO AHEAD.
13:25  20            MR. SMITH:  LET ME JUST GO BACK TO OUR SLIDE SHOW
13:25  21   THEN, YOUR HONOR, BECAUSE THIS WAS ONE OF THE THINGS I'M TRYING
13:25  22   TO ESTABLISH, AND I WOULD LIKE THE COURT TO GET WITH US.
13:25  23   BELIEVE ME, I UNDERSTAND HOW HARD THIS IS.  YOU DON'T KNOW HOW
13:25  24   MANY HOURS I'VE SPENT TRYING TO FIGURE THIS OUT, AND I STILL
13:25  25   GET CONFUSED EVERY TIME WE TALK ABOUT IT.

ROBERT G. BEA - CROSS

13:25   1              IF WE CAN GO TO THE NEXT SLIDE, SLIDE 5, PLEASE.
13:25   2   **BY MR. SMITH:**
13:25   3   **Q.**   THIS IS PART OF THE DEFINITION THAT WAS GIVEN IN DUNCAN
13:25   4   AND WRIGHT ABOUT WHAT HAPPENS UNDER DRAINED CONDITIONS.  AND,
13:25   5   AGAIN, I THINK WE SAID AT THE OUTSET OF OUR DISCUSSION THESE
13:25   6   ARE FULLY SATURATED SOIL UNITS.  THE SATURATION LEVEL NEVER
13:25   7   CHANGES WHILE THIS PROCESS IS GOING ON.
13:25   8   **A.**   RIGHT.
13:25   9   **Q.**   THERE'S NO AIR IN THE PORES.  IT'S COMPLETELY
13:25   10  FLUID-FILLED.
13:25   11  **A.**   CORRECT.
13:25   12  **Q.**   BUT UNDER DRAINED CONDITIONS, WHEN YOU HAVE A CHANGE IN
13:25   13  THE LOAD, THE STRESS ON THE SOIL, THE WATER PRESSURE IN THE
13:26   14  VOIDS IN THE SOIL DON'T CHANGE.  THEY STAY THE SAME BECAUSE
13:26   15  WHEN THAT SOIL IS STRESSED, WHEN THE LOAD'S PUT ON IT, THAT
13:26   16  WATER FLOWS FREELY RIGHT OUT OF IT.
13:26   17          SO A KEY CHARACTERISTIC FOR DIFFERENTIATING BETWEEN
13:26   18  DRAINED AND UNDRAINED IS THE PORE WATER PRESSURE.  IF THAT PORE
13:26   19  WATER PRESSURE STAYS THE SAME WHEN YOU PUT THAT LOAD ON, YOU
13:26   20  SAY, "WELL, IT'S DRAINED.  WE HAD NO CHANGE IN PORE WATER
13:26   21  PRESSURE."
13:26   22          BUT IF YOU PUT STRESS ON IT AND THAT PORE WATER
13:26   23  PRESSURE STARTS TO RISE -- LET'S GO TO THE NEXT DEPOSITION
13:26   24  BECAUSE I HOPE I'M STATING THIS CORRECTLY.
13:26   25          **MR. SCHULTZ:**  CAN WE GET IN THE RECORD -- I ASSUME WE

**ROBERT G. BEA - CROSS**

13:26    1   ARE GETTING THE WITNESS TO CONFIRM.

13:26    2   **BY MR. SMITH:**

13:26    3   **Q.**   DR. BEA, YOU ARE NODDING.  IF YOU DISAGREE, TELL ME.

13:26    4   **A.**   DISAGREE WITH YOUR READING OF THE TEXT?

13:26    5   **Q.**   I DON'T KNOW WHY COUNSEL STOOD UP, TO BE HONEST.

13:26    6           **MR. SCHULTZ:**  I WANT TO UNDERSTAND IT TOO, BUT THERE

13:26    7   WERE SEVEN OR EIGHT QUESTIONS IN A ROW, AND DR. BEA WAS

13:27    8   NODDING, AND I WANT THE RECORD TO BE CLEAR.

13:27    9   **BY MR. SMITH:**

13:27   10   **Q.**   DR. BEA, WERE YOU IN AGREEMENT WITH THE DESCRIPTIONS I WAS

13:27   11   GIVING JUST RECENTLY?

13:27   12   **A.**   LET'S GO BACK.

13:27   13   **Q.**   LET'S GO BACK TO THE LAST ONE.

13:27   14   **A.**   OKAY.

13:27   15   **Q.**   IS THIS A TRUE STATEMENT AS FAR AS YOU'RE CONCERNED?  WHEN

13:27   16   I SAY *A TRUE STATEMENT*, WE ARE LOOKING AT JX-1949 AT 19.  WE

13:27   17   HAVE CALLED OUT A STATEMENT ON THAT PAGE ABOUT DRAINED

13:27   18   CONDITIONS.

13:27   19   **A.**   THAT'S TRUE, AND IT'S CONDITIONAL ON THAT BECAUSE WATER

13:27   20   CAN MOVE IN OR OUT OF THE SOIL FREELY.

13:27   21   **Q.**   LET'S CONTRAST THAT, THEN, FOR THE COURT.

13:27   22           THEY ALSO THEN CONTRAST THAT WITH AN UNDRAINED

13:27   23   CONDITION, AND I LEFT THE LARGER TEXT BLOCK HERE BECAUSE THE

13:27   24   WORD *UNDRAINED* DOESN'T APPEAR IN THE SECOND SENTENCE HERE.  WE

13:28   25   SAW THAT FIRST SENTENCE BEFORE ABOUT NO FLOW, WATER IN OR OUT,

ROBERT G. BEA - CROSS

13:28   1   BUT THEN THE SECOND PART HERE, DUNCAN AND WRIGHT, SAYS:

13:28   2   "CHANGES IN THE LOADS ON THE SOIL CAUSE CHANGES IN THE WATER

13:28   3   PRESSURE IN THE VOIDS BECAUSE THE WATER CANNOT MOVE IN OR OUT

13:28   4   IN RESPONSE TO THE TENDENCY FOR THE VOLUME OF VOIDS TO CHANGE."

13:28   5           IS THAT A FAIR DESCRIPTION OF THE UNDRAINED

13:28   6   CONDITION, DR. BEA?

13:28   7   **A.**   YES, SIR.

13:28   8           **THE COURT:**  I THINK THE COURT UNDERSTANDS THE

13:28   9   PROPOSITION THAT -- ALTHOUGH NOT TO THE DEGREE I WOULD LIKE --

13:28   10  THAT UNDRAINED SOIL -- UNDRAINED SOIL WILL CAUSE -- THE

13:28   11  PRESSURE WILL INCREASE AS THE LOAD INCREASES.

13:28   12          **MR. SMITH:**  RIGHT.  OR IF THE LOAD IS REMOVED, THEN

13:29   13  THE PRESSURE COULD GO DOWN, BUT THAT'S RIGHT.

13:29   14          **THE COURT:**  I UNDERSTAND.

13:29   15          **MR. SMITH:**  IT'S BECAUSE YOU ARE CONFINING THIS FLUID

13:29   16  INSIDE THAT UNIT OF SOIL BY THE SIZE OF THE PORE PARTICLES --

13:29   17          **THE COURT:**  I DO UNDERSTAND THAT.  THE ONLY THING I

13:29   18  DON'T THINK I COMPLETELY UNDERSTAND -- AND YOU GET THAT I'M NOT

13:29   19  ASKING YOU TO GO INTO IT -- IS NECESSARILY THE DIFFERENCE

13:29   20  BETWEEN *SATURATED* AND *DRAINED* OR *UNDRAINED*, BUT WE WILL GET

13:29   21  THERE.

13:29   22  **BY MR. SMITH:**

13:29   23  **Q.**   I THINK BEFORE WE LOOKED AT THESE -- AND YOU CAN LEAVE

13:29   24  THAT UP OR TAKE IT DOWN.

13:29   25          **MR. SMITH:**  TAKE IT DOWN, IF YOU WILL, DON.

ROBERT G. BEA - CROSS

| | |
|---|---|
| 13:29 | 1 |
| 13:29 | 2 |
| 13:29 | 3 |
| 13:29 | 4 |
| 13:29 | 5 |
| 13:29 | 6 |
| 13:29 | 7 |
| 13:30 | 8 |
| 13:30 | 9 |
| 13:30 | 10 |
| 13:30 | 11 |
| 13:30 | 12 |
| 13:30 | 13 |
| 13:30 | 14 |
| 13:30 | 15 |
| 13:30 | 16 |
| 13:30 | 17 |
| 13:31 | 18 |
| 13:31 | 19 |
| 13:31 | 20 |
| 13:31 | 21 |
| 13:31 | 22 |
| 13:31 | 23 |
| 13:31 | 24 |
| 13:31 | 25 |

THANK YOU.

**BY MR. SMITH:**

**Q.**   BEFORE WE LOOKED AT THOSE SLIDES, I THINK WE WERE TALKING ABOUT THE FACT THAT A GEOTECHNICAL ENGINEER, IF HE IS ARMED WITH THE KEY ESSENTIAL CHARACTERISTICS FOR DRAINAGE OF A SOIL UNIT, CAN CALCULATE HOW LONG IT WILL TAKE FOR THAT PORE WATER PRESSURE TO RETURN TO EQUILIBRIUM AFTER A CHANGE IN LOAD IS EXERTED ON THAT SOIL UNIT.

IS THAT CORRECT, DR. BEA?

**A.**   YES, BUT FOR CERTAIN CONDITIONS.  THERE ARE EXCEPTIONS TO THAT CALCULATION ABILITY IF THE PRESSURES GET VERY HIGH RELATIVE TO THE STRENGTH OF THE SOIL.

**Q.**   NOW, IN THIS CASE, YOU DID NOT CALCULATE THE TIME THAT IT WOULD TAKE FOR THE LOWER ORGANIC CLAY -- WHICH YOU IN YOUR NOMENCLATURE CALLED THE *SWAMP MARSH* -- YOU DID NOT CALCULATE THE TIME IT WOULD TAKE FOR THAT LOWER ORGANIC CLAY TO TRANSITION FROM AN UNDRAINED TO A DRAINED CONDITION WHEN THE SURGE BEGAN TO IMPOSE STRESSES ON THE SOILS, DID YOU?

**A.**   THAT'S CORRECT.  I DID NOT.

**Q.**   YOU TREATED THOSE -- EVEN THOUGH YOU DID NOT CALCULATE THAT TIME, YOU TREATED THE ORGANIC CLAY AT THE BREACH SITES AS BEING ESSENTIALLY IN AN UNDRAINED CONDITION; IS THAT CORRECT?

**A.**   THAT'S CONDITIONAL ON WHAT CHARACTERISTIC OF THE SWAMP MARSH DEPOSIT WE ARE DISCUSSING.  IF YOU CONSTRAIN YOUR QUESTION TO THE SHARED STRENGTH OF THAT DEPOSIT, THAT'S ONE

ROBERT G. BEA - CROSS

13:31    1   ANSWER.  IF YOU ARE CONSTRAINING YOUR CONDITION TO THE SEEPAGE

13:32    2   CHARACTERISTICS OF THAT DEPOSIT, THAT'S ANOTHER THING.

13:32    3          ARE YOU CONDITIONING YOUR QUESTION ON THE

13:32    4   SHEAR-STRENGTH BEHAVIOR?

13:32    5          **THE COURT:**  EXCUSE ME FOR A MINUTE, BUT I NOTICE MY

13:32    6   REALTIME IS NOT SHOWING UP.

13:32    7          IS ANYBODY ELSE HAVING THAT PROBLEM?

13:32    8          **MR. SMITH:**  WE ARE UP, YOUR HONOR.

13:32    9   BY MR. SMITH:

13:32   10   **Q.**   I APPRECIATE THAT SOMETIMES A SIMPLE ANSWER IS DIFFICULT

13:32   11   TO GIVE, BUT I DID ASK YOU THIS SAME QUESTION IN YOUR

13:33   12   DEPOSITION, AND I THINK I GOT AN UNEQUIVOCAL ANSWER.

13:33   13          I WONDER IF WE COULD STAY IN -- I THINK WE WERE IN

13:33   14   JX-1395.

13:33   15          **MR. SMITH:**  LET'S GO TO IMAGE 0075, PAGE 299, IF WE

13:33   16   CAN CALL UP LINES 19 THROUGH 24, 25.

13:33   17   BY MR. SMITH:

13:33   18   **Q.**   I ASKED YOU THIS QUESTION IN YOUR DEPOSITION, DR. BEA:

13:33   19          **"QUESTION:**  IN APPLYING THOSE FACTORS -- AGAIN, THOSE

13:33   20       ARE THOSE DRAINAGE FACTORS THAT WE TALKED ABOUT EARLIER --

13:33   21       WHAT DID YOU DETERMINE WAS THE LOWER ORGANIC CLAY IN A

13:33   22       DRAINED OR AN UNDRAINED CONDITION AT THE TIME OF BREACHING

13:33   23       OF THE NORTH -- THE FLOODWALL?

13:33   24          **"ANSWER:**  ESSENTIALLY IN AN UNDRAINED CONDITION.  THE

13:33   25       EVALUATION OF SHEAR STRENGTHS WERE BASED ON THAT."

ROBERT G. BEA - CROSS

13:33   1        DO YOU STAND BY THAT TESTIMONY TODAY, DR. BEA?

13:34   2   **A.**   I WOULD LIKE TO SEE THE REMAINDER OF THE ANSWER, PLEASE,

13:34   3   SIR.

13:34   4   **Q.**   CERTAINLY.

13:34   5        **MR. SMITH:**  CAN WE CALL UP THE NEXT PAGE, DOWN THE

13:34   6   FIRST SEVEN LINES.

13:34   7        **THE WITNESS:**  THE STATEMENT IN THE TRANSCRIPT IS

13:34   8   ACCURATE.  CORRECT.

13:34   9   **BY MR. SMITH:**

13:34   10  **Q.**   I THINK YOU WOULD AGREE THAT WHEN WE ARE TALKING ABOUT

13:34   11  SHEAR STRENGTH, WE ARE TALKING ABOUT A CHARACTERISTIC THAT IS

13:34   12  IMPORTANT IN ANALYZING THE LATERAL STABILITY OF A LEVEE, THE

13:34   13  FLOODWALL; THE LEVEE AND FLOODWALLS THAT ARE AT ISSUE IN THIS

13:34   14  CASE.

13:35   15  **A.**   YES, SIR.

13:35   16  **Q.**   IT'S IMPORTANT TO PROPERLY -- IN PROPERLY ANALYZING THE

13:35   17  GLOBAL STABILITY OR THE LATERAL STABILITY OF THE LEVEE AND

13:35   18  FLOODWALL TO MEASURE OR ESTIMATE THE SOIL STRENGTH CORRECTLY;

13:35   19  ISN'T THAT TRUE?

13:35   20  **A.**   THAT'S VERY TRUE.

13:35   21  **Q.**   ISN'T IT ALSO TRUE THAT A MEANINGFUL STABILITY ANALYSIS

13:35   22  CAN BE PERFORMED ONLY IF THE SHEAR STRENGTHS USED IN THE

13:35   23  ANALYSIS ARE APPROPRIATE FOR THE SOILS AND THEIR PARTICULAR

13:35   24  CONDITIONS?

13:35   25  **A.**   PLEASE REPEAT YOUR QUESTION.

ROBERT G. BEA - CROSS

13:35   1    Q.   ISN'T IT TRUE THAT A MEANINGFUL STABILITY ANALYSIS CAN BE
13:35   2    PERFORMED ONLY IF THE SHEAR STRENGTHS USED IN THE ANALYSIS ARE
13:35   3    APPROPRIATE FOR THE SOILS AND THEIR PARTICULAR CONDITIONS?
13:36   4    A.   CORRECT.
13:36   5    Q.   I THINK AS YOU PREVIOUSLY AGREED, THE SOILS THAT WERE
13:36   6    INVOLVED IN THE NORTH AND SOUTH BREACHES EXPERIENCED
13:36   7    CONTINUOUSLY CHANGING LOADS AS THE STORM SURGE ROSE OVER THE
13:36   8    EBIA AND UP AGAINST THE FLOODWALL; IS THAT CORRECT?
13:36   9    A.   YES, SIR.
13:36   10   Q.   SO YOU WOULD AGREE, THEN, THAT THE FOUNDATION ORGANIC CLAY
13:36   11   SOILS BEHAVED MECHANICALLY IN AN UNDRAINED MANNER AT THE TIME
13:36   12   OF THE FAILURE?
13:36   13   A.   NO.
13:36   14   Q.   YOU WOULD NOT AGREE.  OKAY.
13:37   15        WOULD YOU AGREE THAT THE CONCEPTS OF DRAINED AND
13:37   16   UNDRAINED PROVIDE A BASIS FOR ANALYZING SOIL STRENGTH?
13:37   17   A.   THEY PROVIDE SUCH A BASIS, TWO APPROACHES:  DRAINED AND
13:37   18   UNDRAINED.
13:37   19   Q.   ONE OF THE REASONS WHY THIS IS A KEY DETERMINATION FOR
13:37   20   ANALYZING SOIL STRENGTH IS THAT DIFFERENT EQUATIONS ARE USED
13:37   21   DEPENDING ON WHETHER A SOIL IS IN AN UNDRAINED CONDITION OR A
13:37   22   DRAINED CONDITION.
13:37   23        ISN'T THAT ALSO TRUE?
13:37   24   A.   YES, SIR.
13:37   25   Q.   THAT, IN FACT, IS ONE DIFFERENCE BETWEEN YOUR LATERAL

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 13:37 | 1 | STABILITY ANALYSES IN THIS CASE AND THE STABILITY ANALYSES |
| 13:37 | 2 | PERFORMED BY THE DEFENDANTS' EXPERTS; ISN'T THAT TRUE? |
| 13:37 | 3 | **A.**   I DON'T THINK SO. |
| 13:37 | 4 | **Q.**   ISN'T IT TRUE THAT YOU ANALYZED THE STRENGTH OF THE LOWER |
| 13:37 | 5 | ORGANIC CLAY, THE SOIL LAYER JUST BELOW THE FLOODWALL, USING |
| 13:37 | 6 | THE EFFECTIVE STRESS EQUATION? |
| 13:38 | 7 | **A.**   THAT WAS ONE WAY. |
| 13:38 | 8 | **Q.**   AND THE DEFENDANTS' EXPERTS USED THE TOTAL STRESS |
| 13:38 | 9 | EQUATION. |
| 13:38 | 10 | **A.**   THAT'S THE SECOND WAY.  I USED BOTH WAYS. |
| 13:38 | 11 | **Q.**   THE WAYS YOU REPORTED IN YOUR EXPERT REPORTS IN THIS CASE, |
| 13:38 | 12 | YOU DIDN'T REPORT DOING IT BOTH WAYS.  YOU REPORTED ONLY USING |
| 13:38 | 13 | THE EFFECTIVE STRESS METHOD OF ANALYSIS; ISN'T THAT CORRECT? |
| 13:38 | 14 | **A.**   NO, THAT'S NOT CORRECT. |
| 13:38 | 15 | TO SAVE FURTHER MYSTERY, IN MY REBUTTAL REPORT, I |
| 13:38 | 16 | EXPLICITLY ADDRESSED BOTH:  ADDRESSED THE IMPACT ON THE |
| 13:38 | 17 | FAILURES AT THE NORTH BREACH AND SOUTH BREACH; AND IN MY |
| 13:38 | 18 | ONGOING ANALYSIS REPORT PRODUCED THE VALIDATION CALCULATIONS |
| 13:39 | 19 | THE DEFENSE REQUESTED, MY HAND CALCULATIONS. |
| 13:39 | 20 | SO IN THOSE TWO REPORTS, BOTH CONDITIONS HAVE BEEN |
| 13:39 | 21 | REPORTED.  AND IN MY EXPERT REPORTS, MEANING PLURAL, BOTH |
| 13:39 | 22 | DRAINED AND UNDRAINED SHEAR-STRENGTH CHARACTERISTICS FOR BOTH |
| 13:39 | 23 | BREACHES HAVE BEEN ADDRESSED. |
| 13:40 | 24 | **THE COURT:**  MR. SMITH, I'M GOING TO ASK ANOTHER |
| 13:40 | 25 | QUESTION THAT MAY BE COMPLETELY OBTUSE, AND I HAVE A FEELING IT |

ROBERT G. BEA - CROSS

13:40    1    IS, BUT I'M GOING TO TRY IT ANYHOW.

13:40    2                DR. BEA, I WILL JUST USE A SOIL PARTICLE.  AS I

13:40    3    UNDERSTAND IT, YOU SAID IT COULD BE SATURATED EVEN THOUGH IT

13:40    4    HAD BEEN DRAINED.  AND I GUESS WHAT I DON'T UNDERSTAND IS IF

13:40    5    THE VOIDS HAVE BEEN -- THIS IS NOT IN THE REAL WORLD.  WE ARE

13:40    6    TALKING ABOUT THEORY.

13:41    7                THE WITNESS:  OKAY.

13:41    8                THE COURT:  IF THE VOIDS BETWEEN THE PORES HAVE BEEN

13:41    9    DRAINED, WHY IS THE SOIL STILL SATURATED?

13:41   10                THE WITNESS:  INFLOW OF WATER FROM THE BOUNDARIES.

13:41   11                THE COURT:  SIR?

13:41   12                THE WITNESS:  INFLOW OF WATER FROM THE BOUNDARIES.

13:41   13    IN ESSENCE, THAT SOIL IS SURROUNDED BY OTHER SOIL.  AND WHAT

13:41   14    YOU ARE SEEING IS THE COMPOSITE RESPONSE OF THAT SYSTEM SO THAT

13:41   15    IT'S ABLE TO MAINTAIN ITS SATURATION.

13:41   16                THE COURT:  I'M NOT SURE I COMPLETELY UNDERSTAND

13:41   17    THAT, BUT I WILL LEAVE IT AT THAT.

13:41   18                THE WITNESS:  WELL, I THINK YOU DO BECAUSE IF THE

13:41   19    BOUNDARIES WERE HELD CONSTANT AND YOU DRAINED THE WATER OUT,

13:41   20    WHERE IS THE MAGIC WATER COMING FROM?  THE ANSWER HAS TO BE:

13:42   21    COMING IN THROUGH THE BOUNDARIES.  IF YOU KEEP THEM FIXED, THEN

13:42   22    IT BECOMES PARTIALLY SATURATED.

13:42   23                THE COURT:  OKAY.

13:42   24                GO AHEAD, SIR.

        25

ROBERT G. BEA - CROSS

13:42    1   BY MR. SMITH:

13:42    2   Q.   DR. BEA, YOU WERE EXPLAINING TO ME THAT YOU USED BOTH A

13:42    3   TOTAL STRESS METHOD OF ASSESSING THE SHEAR STRENGTH AND AN

13:42    4   EFFECTIVE STRESS METHOD IN THIS CASE.

13:42    5   A.   YES.   I DID DISCUSS ON PAGE 101, 102, 103, 104, AND 105,

13:42    6   SOME ON 106 IN MY REBUTTAL REPORT DATED APRIL 3, 2012.

13:42    7   Q.   BUT IN THE TECHNICAL APPENDICES ATTACHED TO YOUR INITIAL

13:43    8   REPORT IN THIS CASE, YOU ONLY REPORTED DRAINED EFFECTIVE STRESS

13:43    9   STRENGTHS; ISN'T THAT CORRECT?

13:43   10   A.   I WILL HAVE TO CHECK THE REPORT TO PROPERLY RESPOND TO

13:43   11   YOUR QUESTION.

13:43   12   Q.   WELL, I'LL HAVE AN OPPORTUNITY ON RECROSS, I THINK, AND I

13:43   13   WILL BE BETTER PREPARED FOR THIS AND YOU WILL HAVE A CHANCE,

13:43   14   TOO, DR. BEA.   I'M TOLD BY COUNSEL IT PROBABLY WON'T BE UNTIL

13:43   15   TOMORROW, SO WE'LL BOTH HAVE A CHANCE TO BONE UP ON THIS.

13:43   16   A.   IF WE COULD TAKE A FEW SECONDS, I COULD LOOK IN THE BODY

13:43   17   OF MY EXPERT REPORT TO CONFIRM MY MEMORY IS ACCURATE.

13:43   18        DO YOU WISH TO TAKE A FEW SECONDS OR MINUTES, SIR?

13:43   19   Q.   YES, YOU MAY.   THANK YOU.

13:44   20        MR. SMITH:   YOUR HONOR, IF I COULD DIRECT DR. BEA TO

13:44   21   THE TABLES IN HIS APPENDIX.

13:44   22        THE COURT:   YOU MAY.

13:45   23        MR. SMITH:   JX-1392.   THERE IS A *BEST ESTIMATE SOIL*

13:45   24   *PROPERTIES TABLE*.   THERE ARE TWO OF THEM, ACTUALLY:   ONE FOR

13:45   25   THE NORTH BREACH AND ONE FOR THE SOUTH BREACH.

ROBERT G. BEA - CROSS

13:45    1                    IF WE COULD GO TO JX-1392-0034.  IF WE COULD
13:46    2   CALL OUT TABLE 5.
13:46    3   BY MR. SMITH:
13:46    4   Q.   DR. BEA, IF YOU LOOK AT THIS TABLE, WHAT YOU WILL SEE, I
13:46    5   BELIEVE -- AND CORRECT ME IF I'M WRONG -- THAT FOR THE MARSH
13:46    6   UNDER THE LEVEE, YOU DON'T REPORT AN UNDRAINED SHEAR STRENGTH;
13:46    7   ISN'T THAT CORRECT?
13:46    8   A.   THAT'S CORRECT.
13:46    9   Q.   YOU DON'T REPORT AN UNDRAINED SHEAR STRENGTH FOR THE SWAMP
13:46   10   MARSH IN THE AREA AWAY FROM THE LEVEE, THE FREE-FIELD AREA,
13:46   11   EITHER, YOU DO?
13:46   12   A.   THAT'S CORRECT.
13:46   13   Q.   YOU HAVE CHARACTERIZED BOTH OF THESE USING AN EFFECTIVE
13:46   14   STRESS ANALYSIS, HAVEN'T YOU, USING FEET?
13:46   15   A.   YES, SIR.  THANK YOU.
13:46   16            MR. SMITH:  THE SAME THING WOULD BE TRUE IF WE COULD
13:46   17   CALL UP JX-1392-0041, TABLE 8 AT THE TOP OF THAT PAGE.  IF YOU
13:46   18   CALL THAT UP.
13:46   19   BY MR. SMITH:
13:46   20   Q.   WE WILL SEE THE SAME THING IS TRUE FOR THE SOUTH BREACH AS
13:46   21   WELL AND THE NEAR BREACH SITES?
13:47   22   A.   THANK YOU.  YOU HAVE CLARIFIED THE DIFFERENCE BETWEEN THE
13:47   23   ANALYSES PERFORMED IN 2012 AND THE ANALYSES PERFORMED IN
13:47   24   2008 -- SAME CONDITIONS, SAME CROSS SECTIONS -- AND THE
13:47   25   COMPARISON OF THE RESULTS ARE SHOWN ON PAGE 104 AND 105 OF MY

ROBERT G. BEA - CROSS

13:47    1   REBUTTAL REPORT.

13:47    2           THE MYSTERY HAS BEEN ADDRESSED.  I TREATED IT BOTH

13:47    3   WAYS.

13:47    4   Q.   BUT NOT IN YOUR LATERAL STABILITY ANALYSES THAT YOU BASED

13:47    5   YOUR OPINIONS ON IN THIS CASE.  I UNDERSTAND THAT YOU WENT BACK

13:47    6   AND CALCULATED IT AND DID WHAT YOU CONSIDER TO BE A VALIDATION

13:47    7   OF YOUR EFFECTIVE STRESS SOIL STRENGTHS.  BUT WHAT YOU REPORT

13:47    8   TO US IN YOUR INITIAL REPORT, AS THOSE TABLES SAY, THE LEGEND

13:48    9   IN THOSE TABLES SAY, YOUR LATERAL STABILITY ANALYSES IN THIS

13:48   10   CASE ARE BASED ON THOSE EFFECTIVE STRESS -- WHAT SOME PEOPLE

13:48   11   MIGHT CALL *DRAINED SHEAR STRENGTHS*; ISN'T THAT CORRECT?

13:48   12   A.   THAT'S ONE OF THE BASES FOR MY OPINIONS.  MY OPINIONS ARE

13:48   13   BASED ON MY DETERMINATION OF WHAT'S APPROPRIATE TO ARRIVE AT

13:48   14   THAT OPINION.

13:48   15           AND AS I EXPLAINED IN MY REBUTTAL REPORT, I USED BOTH

13:48   16   SETS OF STRENGTH ANALYSES FOR THE PERFORMANCE OF THE MARSH

13:48   17   SWAMP DEPOSITS AND ARRIVED AT THE CONCLUSION THAT THE

13:48   18   DIFFERENCE IN THE CONDITIONS CAUSING FAILURE WERE RELATIVELY

13:48   19   INSIGNIFICANT.

13:49   20           THE WATER ELEVATION THAT CAUSED THE NORTH BREACH AND

13:49   21   THE SOUTH BREACH WERE WITHIN ONE FOOT OF EACH OTHER, BUT

13:49   22   REFLECTING THE DIFFERENCE IN A SIMULATION OF SHEAR STRENGTH

13:49   23   USING THE TWO APPROACHES.

13:49   24           SO I DETERMINED PARAMETRICALLY THAT THE DIFFERENCE IN

13:49   25   THE SIMULATION I EMPLOYED WAS NOT SIGNIFICANT TO MY OPINION.  I

ROBERT G. BEA - CROSS

13:49    1    DID NOT RELY ON ONLY ONE ANALYSIS.

13:49    2    **Q.**   THE DEFENDANTS' EXPERTS, YOU WOULD AGREE -- LET ME

13:49    3    WITHDRAW THAT QUESTION.

13:49    4            YOU WOULD AGREE, WOULDN'T YOU, THOUGH, DR. BEA, THAT

13:49    5    THE EFFECTIVE STRESS EQUATION IS GENERALLY USED TO ASSESS THE

13:50    6    SHEAR STRENGTH OF DRAINED SOILS; ISN'T THAT TRUE?

13:50    7    **A.**   NO.

13:50    8    **Q.**   WOULD YOU AGREE THAT THE DEFENDANTS' EXPERT USED THE TOTAL

13:50    9    STRESS EQUATION TO CALCULATE THE SHEAR STRENGTH FOR THEIR

13:50   10    STABILITY ANALYSES IN THIS CASE, IF YOU KNOW?

13:50   11    **A.**   I THINK TWO OF THEM DID.  I DON'T RECALL CLEARLY FOR THE

13:50   12    OTHER ONE OR TWO.

13:50   13    **Q.**   YOU WOULD AGREE THAT THE TOTAL STRESS EQUATION IS

13:50   14    TYPICALLY USED TO ADDRESS THE SHEAR STRENGTH OF UNDRAINED

13:50   15    SOILS; ISN'T THAT TRUE?

13:50   16    **A.**   NO.

13:50   17    **Q.**   PRIOR TO THIS CASE YOU DID USE EXCLUSIVELY THE TOTAL

13:50   18    STRESS METHOD TO ASSESS THE SHEAR STRENGTH OF THE ORGANIC CLAY,

13:50   19    DIDN'T YOU?

13:50   20    **A.**   THAT'S CORRECT.

13:50   21    **Q.**   YOU USED THE STRESS METHOD IN *ROBINSON*, YOU USED THE TOTAL

13:51   22    STRESS METHOD IN *BARGE*, AND YOU USED THE TOTAL STRESS METHOD IN

13:51   23    YOUR PRIOR STUDIES, CORRECT?

13:51   24    **A.**   YES, SIR.

13:51   25    **Q.**   BUT IN THIS CASE, IN YOUR INITIAL REPORT AT LEAST, AS WE

ROBERT G. BEA - CROSS

| 13:51 | 1 | HAVE JUST SEEN, YOU STATED THAT YOU WERE BASING YOUR SHEAR |
| 13:51 | 2 | STRENGTH ASSESSMENTS USING A DIFFERENT METHOD, CORRECT? |
| 13:51 | 3 | **A.**   THAT'S CORRECT.  AND THE REASON THAT WE DID THAT, WE WERE |
| 13:51 | 4 | CONCERNED FOR THE PERMEABILITY OR DRAINAGE EFFECTS, AND SO WE |
| 13:51 | 5 | WENT THROUGH THE ANALYSIS PROCESS TO DETERMINE THE BEST |
| 13:51 | 6 | ESTIMATE OF THE EFFECTIVE STRESS PARAMETER AND CORRELATED THAT |
| 13:51 | 7 | WITH THE UNDRAINED STRENGTH PARAMETER. |
| 13:52 | 8 | **Q.**   I HAVE ONE FINAL QUESTION AT THIS TIME, DR. BEA, AND IT'S |
| 13:52 | 9 | VERY SIMILAR TO THE QUESTION I THINK I ASKED YOU AT THE OUTSET |
| 13:52 | 10 | OF MY EXAMINATION THIS MORNING.  THIS COMES -- AGAIN, IT'S A |
| 13:52 | 11 | STATEMENT FROM DUNCAN AND WRIGHT.  I'M SURE YOU WILL AGREE WITH |
| 13:52 | 12 | IT, BECAUSE I HAVE SHOWED IT TO YOU AT YOUR DEPOSITION AND YOU |
| 13:52 | 13 | AGREED THEN AND I'M SURE YOU WILL AGREE NOW.  BUT I WOULD LIKE |
| 13:52 | 14 | THE COURT TO SEE THIS AS WELL. |
| 13:52 | 15 | **MR. SMITH:**  IF WE COULD SEE THE LAST SLIDE, PLEASE. |
| 13:52 | 16 | BY MR. SMITH: |
| 13:52 | 17 | **Q.**   THIS IS A STATEMENT FROM -- AGAIN, THIS IS A STATEMENT |
| 13:52 | 18 | FROM DUNCAN AND WRIGHT.  THIS IS JX-1949 AT PAGE 19.  THIS IS |
| 13:52 | 19 | THE VERY FIRST STATEMENT THAT APPEARS IN THE CHAPTER ON SOIL |
| 13:52 | 20 | MECHANICS PRINCIPLES.  IN THAT CHAPTER, ON THAT PAGE DUNCAN AND |
| 13:52 | 21 | WRIGHT SAY:  "FOR SLOPE STABILITY ANALYSES TO BE USEFUL, THEY |
| 13:52 | 22 | MUST REPRESENT THE CORRECT PROBLEM, CORRECTLY FORMULATED." |
| 13:53 | 23 | YOU AGREE WITH THAT, DON'T YOU, DR. BEA? |
| 13:53 | 24 | **A.**   VERY DEFINITELY. |
| 13:53 | 25 | **MR. SMITH:**  NO FURTHER QUESTIONS AT THIS TIME. |

ROBERT G. BEA - CROSS

13:53    1          THE COURT:  THANK YOU.

13:53    2          MR. SMITH:  I MAY HAVE ANOTHER QUESTION.  I

13:53    3    APOLOGIZE.  I'M BEING TOLD I MUST HAVE ANOTHER QUESTION.

13:53    4          THE COURT:  SUBJECT TO YOUR RECROSS, WHICH I'M GOING

13:53    5    TO ALLOW UP TO A POINT.  WE ARE NOW ON REDIRECT.

13:53    6          MR. SCHULTZ:  THANK YOU, YOUR HONOR.

13:53    7                JUDGE, WE HAVE COVERED SOME KIND OF HIGH-END

13:53    8    STUFF, AND I'M GOING TO TRY AND ELIMINATE REDUNDANCIES AS I GO

13:53    9    ALONG.  IT MAY FEEL A LITTLE UNEVEN, BUT I'M TRYING TO NOT GO

13:54   10    BACK OVER PLOWED GROUND ESSENTIALLY.

13:54   11                      REDIRECT EXAMINATION

13:54   12    BY MR. SCHULTZ:

13:54   13    Q.   WE WENT THROUGH YOUR QUALIFICATIONS YESTERDAY, DR. BEA.

13:54   14    WE LOOKED AT A SUMMARY OF YOUR OPINIONS.  I'M NOT GOING TO GO

13:54   15    BACK THROUGH ALL OF THAT HERE.

13:54   16                WE DID LOOK AT A BULLET POINT INDICATING YOU WERE

13:54   17    GOING TO DISCUSS THE CONTEXT AND BACKGROUND REASONS FOR YOUR

13:54   18    CONCLUSIONS, AND WE MENTIONED THERE TWO ISSUES, SOILS AND

13:54   19    EXCAVATIONS, CORRECT?

13:54   20    A.   CORRECT.

13:54   21    Q.   I WANT TO ASK YOU -- AND THIS IS THE OPENING SLIDE FOR

13:54   22    THAT.  IN FACT, I WANT TO -- WELL, FIRST LET ME ASK YOU THIS.

13:54   23    BEFORE WE TALK ABOUT EITHER, JUST CONCEPTUALLY WHEN WE ARE

13:54   24    TALKING ABOUT CAUSATION AND YOUR CAUSATION OPINIONS IN THIS

13:55   25    CASE, IS THERE A HOLE, AN EXCAVATION OUT THERE ON THE SITE THAT

ROBERT G. BEA - REDIRECT

13:55    1    IS THE CAUSE, THE MAGIC EXCAVATION, IF YOU WILL, THAT CAUSED

13:55    2    EITHER BREACH OR BOTH?

13:55    3    A.    ABSOLUTELY NOT.

13:55    4    Q.    WHEN YOU MODELED -- PERFORMED THE MODELS THAT WE LOOKED AT

13:55    5    YESTERDAY WITH THE SQUARES AND RECTANGLES IN YOUR REPORT, WAS

13:55    6    IT YOUR ATTEMPT TO REPRESENT OR RE-CREATE OR MIMIC A REAL-WORLD

13:55    7    EXCAVATION OF THE PRECISE DIMENSIONS SHOWN IN YOUR MODEL?

13:55    8    A.    NO.

13:55    9    Q.    YOU HAD A DISCUSSION THIS MORNING ABOUT 2D VERSUS 3D, AND

13:55   10    THAT DISCUSSION, THE EXPLANATION FOR WHY THAT WAS NOT WHAT YOU

13:55   11    WERE ATTEMPTING TO DO?

13:55   12    A.    THAT'S CORRECT.

13:55   13    Q.    WE NEED NOT PLOW THROUGH THAT AGAIN.

13:55   14          ANOTHER PREFATORY QUESTION, DR. BEA.  ARE THERE TWO

13:55   15    WAYS THAT THESE EXCAVATIONS CAN SERVE IN CAUSATIVE TERMS AS

13:56   16    AGENTS OF CAUSATION, IF YOU WILL, FOR THE BREACHES?

13:56   17    A.    PLEASE REPEAT YOUR QUESTION.

13:56   18    Q.    SURE.  ARE THERE TWO WAYS IN WHICH THE EXCAVATIONS SERVE

13:56   19    AS CANDIDATES, IF YOU WILL, FOR CAUSES FOR THE BREACHES?  I

13:56   20    HAVE IN MIND DEPTH AND MOVEMENT OF THE PHREATIC SURFACE.

13:56   21    A.    YES.

13:56   22    Q.    CAN YOU JUST ELABORATE ON THAT VERY BRIEFLY BEFORE WE TALK

13:56   23    ABOUT THE SOILS AND THE EXCAVATIONS.

13:56   24    A.    WELL, THE DEPTH OF THE EXCAVATION IS IMPORTANT AS IT

13:56   25    RELATES TO ESTABLISHMENT OF HYDRAULIC CONNECTION TO THE BURIED

ROBERT G. BEA - REDIRECT

13:56   1   MARSH SWAMP LAYERS.  I CALL IT THE "KNEE BONE CONNECTS TO THE
13:56   2   LEG BONE."
13:56   3          THE OTHER PART THAT'S IMPORTANT IS THE
13:56   4   CHARACTERISTICS OF THE EXCAVATIONS THAT ARE COMBINED CAN LEAD
13:57   5   TO THE PHREATIC SURFACE BEING BROUGHT VERY CLOSE TO THE
13:57   6   FLOODWALL, IN FACT, TO ITS FACE.  AND THAT HAS YET ANOTHER
13:57   7   IMPORTANT EFFECT IN THE FAILURE CAUSATION.
13:57   8   Q.   I HEARD THE JUDGE THANK MR. TREEBY FOR SAYING "PHREATIC
13:57   9   SURFACE ALSO KNOWN AS THE WATER TABLE."  IS THAT A FAIR
13:57   10  CHARACTERIZATION?
13:57   11  A.   YES.
13:57   12  Q.   WE CAN USE *WATER TABLE* INSTEAD OF *PHREATIC SURFACE*
13:57   13  SYNONYMOUSLY?
13:57   14  A.   YES.
13:57   15  Q.   WE ARE GOING TO TALK IN THE CONTEXT THAT YOU JUST
13:57   16  DESCRIBED A LITTLE BIT ABOUT SOILS, DR. BEA.  YOU HAVE A SLIDE
13:57   17  ENTITLED "NATURE OF SOILS, SOIL LAYERS UNDER THE EAST BANK OF
13:57   18  THE IHNC."  BEFORE WE DO THAT, I WANT TO ASK YOU, HAVE YOU
13:57   19  DESIGNED OFFSHORE PLATFORMS IN YOUR PROFESSIONAL CAREER?
13:57   20  A.   YES.  I THINK THERE ARE ABOUT 30 AROUND THE WORLD THAT
13:58   21  HAVE MY SIGNATURE ON THEM AS THE PRINCIPAL DESIGN ENGINEER.
13:58   22  Q.   IS IT FAIR TO SAY, DR. BEA, THAT THE EXISTENCE OR SURVIVAL
13:58   23  OF THOSE PLATFORMS AND THE PEOPLE ON THOSE PLATFORMS DEPENDED
13:58   24  ON YOUR UNDERSTANDING OF THE NATURE OF THE SOILS, LIQUID
13:58   25  DYNAMICS, FLUID DYNAMICS, SOIL DYNAMICS INVOLVED IN THE

ROBERT G. BEA - REDIRECT

13:58   1   CREATION OF THOSE PLATFORMS?
13:58   2   **A.**   THAT'S CORRECT.  IN SEVERAL INSTANCES IT INVOLVED MY OWN
13:58   3   PERSONAL SURVIVAL.  I WAS ASKED TO BE ON THE PLATFORMS AT THE
13:58   4   TIME THEY WERE SEVERELY LOADED.  ONE'S PROXIMITY TO THE RISK
13:58   5   CERTAINLY CHANGES ONE'S JUDGMENT ABOUT ITS ACCEPTABILITY.
13:58   6   **Q.**   HAVE YOU DONE PROFESSIONAL WORK DURING THE COURSE OF YOUR
13:58   7   PROFESSIONAL CAREER IN LOUISIANA, IN LOUISIANA SOILS THAT
13:59   8   REQUIRED A PROFESSIONAL UNDERSTANDING AND APPLICATION OF THE
13:59   9   SOIL PRINCIPLES THAT YOU HAVE BEEN DISCUSSING IN THE LAST
13:59   10  COUPLE OF DAYS?
13:59   11  **A.**   VERY DEFINITELY.  HAD MY CAREER NOT INVOLVED VERY, VERY
13:59   12  EXTENSIVE EXPERIENCE WITH THESE GOD-GIVEN UNIQUE SOILS,
13:59   13  THERE'S -- I THINK I COULDN'T PERSONALLY HAVE ANY WAY TO
13:59   14  REASONABLY MAKE CONNECTIONS WITH THIS UNIQUE ENVIRONMENT.  IT'S
13:59   15  BEEN CRUCIAL TO THE LAST SEVEN YEARS OF MY LIFE.
13:59   16          **MR. SCHULTZ:**  YOUR HONOR, WITH PERMISSION, THE SLIDE
13:59   17  WE ARE LOOKING AT HERE, WHICH WE HAVE IDENTIFIED AS -- AND
13:59   18  DR. BEA WILL CONFIRM THIS -- OUT OF THE IPET REPORT.  WE LOOKED
13:59   19  AT FANCY WAYS TO TRY AND DO THIS ON THE SCREEN, AND I THINK
13:59   20  THAT WE CAME TO THE CONCLUSION THE EASIEST WAY TO TALK ABOUT
14:00   21  THE FEW THINGS WE ARE GOING TO TALK ABOUT WOULD BE JUST FOR
14:00   22  FOLKS TO HAVE A BLOWUP OF IT.  SO WE BROUGHT BLOWUPS.  WITH
14:00   23  YOUR PERMISSION, I WILL APPROACH AND PRESENT ONE FOR YOU.  AND,
14:00   24  OF COURSE, I HAVE COPIES FOR COUNSEL.
14:00   25          **THE COURT:**  ALL RIGHT.

ROBERT G. BEA - REDIRECT

14:00  1   **BY MR. SCHULTZ:**
14:00  2   **Q.**   DO YOU HAVE ONE ALREADY, DR. BEA?  GREAT.
14:00  3          FIRST OF ALL, DR. BEA, TELL US THE SOURCE OF THIS
14:00  4   DOCUMENT AND, IN A WORD, WHAT WE ARE LOOKING AT HERE?
14:00  5   **A.**   THE SOURCE OF THE DOCUMENT IS AN EXTENSIVE EFFORT
14:00  6   CONDUCTED BY THE U.S. ARMY CORPS OF ENGINEERS AND
14:00  7   CONSULTANTS/ADVISERS DURING THE INTERAGENCY PERFORMANCE
14:01  8   EVALUATION TASKFORCE ASSESSMENT OF THE BREACH CAUSATION AT THE
14:01  9   LOWER NINTH WARD.
14:01  10  **Q.**   I WANT TO FOCUS YOUR ATTENTION, DR. BEA, ON WHAT YOU HAVE
14:01  11  HIGHLIGHTED ON THE SCREEN -- IT'S NOT HIGHLIGHTED ON THE PAPER
14:01  12  COPIES, BUT WHAT IS REFERRED TO BY IPET AS THE SWAMP MARSH.  DO
14:01  13  YOU SEE THAT SECTION?
14:01  14  **A.**   YES, SIR.
14:01  15  **Q.**   FIRST OF ALL, SWAMP MARSH IS NOT, IS IT, DR. BEA, A TERM
14:01  16  THAT YOU INVENTED TO APPLY IN THIS CASE?
14:01  17  **A.**   THAT'S CORRECT.  I DID NOT INVENT THAT TERM.
14:01  18  **Q.**   WE HAVE HEARD THE SWAMP MARSH REFERRED TO IN THIS CASE AS
14:01  19  ORGANIC CLAYS?
14:01  20  **A.**   YES, SIR.
14:01  21  **Q.**   LET ME ASK YOU, ARE ORGANIC CLAYS NECESSARILY OR ON ALL
14:01  22  OCCASIONS AT LEAST STIFF CLAYS LIKE A MODELING CLAY THAT YOU
14:01  23  WOULD USE AS A KID OR THAT A SCULPTOR WOULD USE?
14:02  24  **A.**   OH, NO.  THEY CAN BE MUCH MORE FLUID.
14:02  25  **Q.**   IS IT YOUR OPINION THAT THE SWAMP MARSH LAYER AT ISSUE IN

ROBERT G. BEA - REDIRECT

14:02   1    THIS CASE IS IN FACT MUCH MORE FLUID THAN HOW WE MIGHT IMAGINE

14:02   2    A MODELING CLAY, FOR EXAMPLE?

14:02   3    **A.**   WELL, THE TROUBLE WITH A SWAMP MARSH IS IT CHANGES ITS

14:02   4    CHARACTER ALMOST FROM INCH TO INCH.  ANYONE THAT'S HAD THE

14:02   5    EXPERIENCE OF WALKING THROUGH A SWAMP MARSH LAYER WILL KNOW

14:02   6    INSTANTLY WHAT I'M REFERRING TO.  IT CAN BE FIRM ENOUGH TO

14:02   7    STAND ON PERHAPS NEXT TO THE CYPRESS KNEES -- THE CYPRESS

14:02   8    TREES, AND YOU TAKE ONE MAJOR STEP -- AND IN FACT, IT HAPPENED

14:02   9    TO ME -- YOU'RE IN OVER YOUR HEAD IN MUCK.  SO IT CAN CHANGE

14:03   10   CHARACTERISTICS EXTREMELY RAPIDLY.

14:03   11        IN ONE AREA IT CAN LOOK LIKE AN ORGANIC CLAY.  BUT

14:03   12   YOU MOVE OVER A FEW FEET AND SUDDENLY YOU'RE IN A PEAT BOG

14:03   13   WHERE IT'S NOTHING BUT ORGANICS.  SO ONE OF THE DIFFICULTIES

14:03   14   ASSOCIATED WITH WHAT IS SHOWN ON THE SCREEN WITH RED IS IT'S

14:03   15   EXTREMELY VARIABLE.  TECHNICAL ENGINEERS WITH EXTENSIVE

14:03   16   EXPERIENCE IN THIS KIND OF THING RECOGNIZE THIS AS HORRIBLY

14:03   17   TREACHEROUS.  I THINK MR. KAUFMAN, WITH THE U.S. ARMY CORPS OF

14:03   18   ENGINEERS, DESIGNATED IT AS SUCH BY DR. KAUFMAN WITH THE U.S.

14:04   19   ARMY CORPS OF ENGINEERS.

14:04   20        SO THE REASON FOR TAKING A LOT OF THE COURT'S TIME IS

14:04   21   TO MAKE IT CLEAR THAT BY NO MEANS IS THIS SOMETHING THAT'S ONE

14:04   22   THING ONLY.  IT'S EXTREMELY VARIABLE.  IT CHANGES PROPERTIES

14:04   23   POTENTIALLY RAPIDLY BETWEEN THOSE VERTICAL LINES THAT ARE DATA

14:04   24   POINTS.  AND ONE OF THE THINGS THAT I'M EXTREMELY CONCERNED

14:05   25   WITH IS WHAT'S GOING ON BETWEEN WHERE YOU HAVE DATA BECAUSE OF

14:05   1   HAVING SPENT A LOT OF TIME WALKING THROUGH SWAMPS.

14:05   2   Q.   NOW, DR. BEA, WE'LL KEEP THAT CAVEAT IN MIND GOING FORWARD

14:05   3   IN THIS DISCUSSION.  I THINK IT'S ABUNDANTLY CLEAR NOW, BUT LET

14:05   4   ME ASK YOU, IN YOUR OPINION, IS THAT SWAMP MARSH LAYER, ALSO

14:05   5   DESCRIBED AS UPPER AND LOWER ORGANIC CLAYS ELSEWHERE IN THE

14:05   6   RECORD, THAT IS THE CONDUIT FOR THE TRANSMISSION OF PRESSURE,

14:05   7   UPLIFT PRESSURES?

14:05   8   A.   THAT'S CORRECT.  AS SHOWN IN THIS ILLUSTRATION, BELOW IT

14:05   9   ARE THE INTERDISTRIBUTARY CLAYS.  IN SHORT TERMS, THAT'S BEFORE

14:05   10  THE SWAMP GOT THERE.  SO IT'S BASICALLY WHAT WE CALL *FAT CLAYS*,

14:05   11  BUT SOME SILT'S IN IT.

14:05   12          OVER THE TOP OF THE RED LAYER IS MATERIALS THAT WE

14:06   13  PUT IN OVER THE SWAMP MARSH.  IN FACT, YOU CAN SEE IT EXPOSED

14:06   14  NORTH OF THE LOWER NINTH WARD OUT TOWARD THE SEWAGE TREATMENT

14:06   15  PLANT.

14:06   16          SO THOSE LESS PERMEABLE MATERIALS ALSO ARE

14:06   17  TREACHEROUS BECAUSE OF THEIR VARIABILITY, BUT THEY FORM A

14:06   18  BEAUTIFUL SANDWICH FOR THIS PRESSURE-CONDUCTIVE MARSH SWAMP

14:06   19  LAYER.  SO IT'S THAT SANDWICH THAT'S THE PROBLEM.

14:06   20  Q.   SO IS IT CORRECT, DR. BEA, THAT THE LEVEE FILL ON TOP AND

14:06   21  THE INTERDISTRIBUTARY CLAYS ON BOTTOM ARE CONFINING SPACES, AS

14:06   22  THE TERM HAS BEEN USED, FOR THAT SWAMP MARSH LAYER?

14:06   23  A.   THAT'S CORRECT, SIR.

14:06   24  Q.   AGAIN, WITH THE CAVEAT YOU JUST GAVE ABOUT THE

14:06   25  IRREGULARITY OF THE SWAMP MARSH SURFACE BENEATH THE GROUND,

ROBERT G. BEA - REDIRECT

14:06    1   HAVE YOU HAD AN OPPORTUNITY TO EYEBALL THIS CHART AND GIVE AN

14:07    2   ESTIMATE OF WHERE THE TOP OF THAT SWAMP MARSH LAYER LIES IN

14:07    3   TERMS OF ELEVATION?

14:07    4   **A.**   YES.

14:07    5           **MR. SCHULTZ:**  AND WE PROVIDED COPIES FOR THE COURT,

14:07    6   YOUR HONOR, FOR EVERYONE TO LOOK AT SIMULTANEOUSLY.

14:07    7   **BY MR. SCHULTZ:**

14:07    8   **Q.**   BUT IN YOUR OPINION, DR. BEA, HAVING REVIEWED THIS, WITHIN

14:07    9   A RANGE AND WITH THE CAVEAT YOU HAVE GIVEN, WHERE DO WE FIND

14:07   10   THE TOP OF THAT SWAMP MARSH LAYER IN TERMS OF NAVD88 ELEVATION

14:07   11   ACCORDING TO THIS IPET DIAGRAM?

14:07   12   **A.**   MINUS 4 FEET TO MINUS 5 FEET.

14:07   13   **Q.**   AGAIN, THERE'S A DISTINCTION, IS THERE NOT, BETWEEN

14:07   14   ELEVATION AND GROUND SURFACE?  SO IF WE ASSUMED JUST

14:07   15   HYPOTHETICALLY THAT THERE'S A 2-FOOT GROUND SURFACE AND THE

14:07   16   SWAMP MARSH IS AT AN ELEVATION OF MINUS 4 AND MINUS 5, HOW DEEP

14:07   17   WOULD YOU HAVE TO DIG DOWN TO PIERCE THAT SWAMP MARSH LAYER

14:07   18   FROM GROUND SURFACE?

14:07   19   **A.**   6 TO 7 FEET.

14:08   20           **MR. SCHULTZ:**  IF WE COULD, YOUR HONOR, WE HAVE ONE

14:08   21   OTHER DEMONSTRATIVE OF THE SAME NATURE, IF WE LOOK AT THE

14:08   22   FOLLOWING SLIDE WE WOULD USE FOR THE SAME PURPOSE.  WITH THE

14:08   23   COURT'S PERMISSION, I WILL APPROACH AGAIN.

14:08   24           **THE COURT:**  ALL RIGHT.

14:08   25           **MR. SCHULTZ:**  THIS IS TWO DOCUMENTS, YOUR HONOR.  ONE

ROBERT G. BEA - REDIRECT

14:08   1   PRESERVES ALL OF THE NOTATIONS, BECAUSE THIS IS A FIGURE FROM

14:08   2   DEFENSE EXPERT DR. ALLEN MARR.  WE DID NOT WANT TO GIVE JUST A

14:08   3   GRAPHIC REPRESENTATION WITHOUT ALL OF HIS ACCOMPANYING TEXT,

14:08   4   BUT WE DID WANT TO BLOW IT UP AND LOOK JUST AT THE DIAGRAM, SO

14:08   5   WE DID IT BOTH WAYS BASICALLY.

14:08   6            **THE COURT:**  THANK YOU.

14:09   7   **BY MR. SCHULTZ:**

14:09   8   **Q.**   MAY I ASK YOU, DR. BEA, IN GENERAL TERMS ARE WE LOOKING

14:09   9   AT -- FIRST OF ALL, WHERE DOES THIS COME FROM?  I INDICATED TO

14:09  10   THE COURT.  I WOULD LIKE YOUR TESTIMONY ON IT.

14:09  11   **A.**   WELL, THIS COMES FROM APPENDIX G IN DR. ALLEN MARR'S

14:09  12   EXPERT REPORT IN THIS CASE.

14:09  13   **Q.**   DID YOU LOOK AT THIS WORK DURING THE COURSE OF YOUR WORK

14:09  14   ON THIS CASE?

14:09  15   **A.**   VERY CAREFULLY, YES.

14:09  16   **Q.**   IN TERMS OF THIS DIAGRAM AT LEAST, IS THIS GOOD WORK BY

14:09  17   DR. MARR, IN YOUR OBSERVATION?

14:09  18   **A.**   IT'S OUTSTANDINGLY GOOD.

14:09  19   **Q.**   I WANT TO DO ESSENTIALLY, DR. BEA, WHAT WE DID JUST A

14:09  20   MOMENT AGO.  AGAIN, LET ME ASK YOU, HAVE YOU HAD AN OPPORTUNITY

14:09  21   TO LOOK AT THIS DOCUMENT BEFOREHAND TO ESTIMATE, AS BEST WE

14:09  22   CAN, BASED ON THE REPRESENTATION HERE, THE ELEVATION OF THE TOP

14:10  23   OF SWAMP MARSH LAYER AT THE SOUTH BREACH AND NORTH BREACH

14:10  24   SECTIONS?

14:10  25   **A.**   YES.

14:10    1    **Q.**   LET ME PREFACE IT WITH THIS QUESTION.  DR. MARR HAS THESE

14:10    2    LABELED AS UPPER ORGANIC CLAY AND LOWER ORGANIC CLAY.  ARE THE

14:10    3    UPPER AND LOWER ORGANIC CLAYS, AS REPRESENTED HERE,

14:10    4    CO-EXTENSIVE OR SYNONYMOUS WITH THE SWAMP MARSH LAYER THAT YOU

14:10    5    HAVE BEEN REFERRING TO?

14:10    6    **A.**   YES.

14:10    7    **Q.**   BASED ON YOUR -- BEFORE I ASK YOU THAT, I WOULD ASSUME,

14:10    8    DR. BEA -- AND CONFIRM OR DENY, IF YOU WOULD -- THAT THE

14:10    9    IRREGULAR OR ERRATIC NATURE OF THE TOP OF SWAMP MARSH IS GOING

14:10   10    TO BE JUST AS TRUE REGARDLESS OF WHICH DIAGRAM, WHETHER IPET OR

14:10   11    DR. MARR'S, THAT WE ARE LOOKING AT?

14:10   12    **A.**   THAT'S CORRECT.  AND THAT HELPS EXPLAIN SOME OF THE WAVY

14:10   13    LINES THAT YOU SEE IN THE IPET CROSS SECTION COMPARED WITH

14:10   14    DR. MARR.  THE IPET GROUP HAD SOME OF PROBABLY THE BEST

14:11   15    CONTEMPORANEOUS GEOLOGISTS IN THE WORLD THAT NOTE THIS AREA.

14:11   16    SO THEY WERE OBVIOUSLY VERY SENSITIVE TO POINTING OUT POTENTIAL

14:11   17    IRREGULARITIES BETWEEN THE VERTICAL LINES, WHICH ARE DATA

14:11   18    POINTS.

14:11   19         DR. MARR, HOWEVER, DOES A REASONABLY GREAT JOB

14:11   20    ACTUALLY OF PORTRAYING THE SAME THING, BUT IT DOESN'T SHOW AS

14:11   21    MUCH OF THOSE IRREGULARITIES BETWEEN THE DATA POINTS, AND I

14:11   22    THINK THAT'S PRINCIPALLY BECAUSE OF THE MIXTURE OF DIFFERENT

14:11   23    PEOPLE INVOLVED IN THE TWO DIFFERENT SETS OF WORK.

14:11   24    **Q.**   NOW, LET ME ASK -- LOOKING UP AT THE CHART, DR. BEA, WE

14:12   25    SEE THAT IT'S ELEVATION NAVD88 ON THE LEFT.  IS THAT THE SAME

14:12  1   DATA THAT YOU INDICATED YOU WOULD BE USING THROUGHOUT THE TRIAL

14:12  2   UNLESS YOU SAID OTHERWISE?

14:12  3   A.   YES, SIR.

14:12  4   Q.   WE SEE A DOTTED LINE WITH A ZERO RUNNING THE LENGTH OF THE

14:12  5   EBIA.  WHAT DOES THAT ZERO REPRESENT?

14:12  6   A.   THAT'S ZERO NAVD88 ELEVATION.

14:12  7   Q.   SO WE HAVE AN ELEVATION OF ZERO, THE GROUND, OBVIOUSLY THE

14:12  8   BROWN PART, RISES UP ABOVE THE ZERO LEVEL?

14:12  9   A.   YES, SIR.

14:12  10  Q.   DID YOU HAVE AN OPPORTUNITY TO EYEBALL THAT IN THE SAME

14:12  11  WAY YOU DID THE TOP OF SWAMP MARSH IN THE IPET DIAGRAM WE

14:12  12  DISCUSSED A FEW MINUTES AGO?

14:12  13  A.   YES, SIR.

14:12  14  Q.   EVERYONE HAS A COPY.  IN YOUR OPINION, DR. BEA, WHERE DO

14:12  15  WE SEE -- AND I'M FOCUSING ON THE SOUTH BREACH SECTION RIGHT

14:12  16  NOW -- THE AVERAGE OR BEST ESTIMATE FOR TOP-OF-GROUND ELEVATION

14:12  17  AT THE SOUTH BREACH AREA?

14:12  18  A.   A REASONABLE LINE THROUGH THERE WOULD BE PLUS 3 FEET.

14:13  19  Q.   AT THE NORTH BREACH?

14:13  20  A.   SIMILAR ELEVATION.

14:13  21  Q.   I WOULD ASK THE SAME QUESTION, DR. BEA, THAT I ASKED WITH

14:13  22  RESPECT TO THE IPET REPORT.  BASED ON YOUR REVIEW OF THIS,

14:13  23  WHERE WOULD YOU PLACE THE TOP OF SWAMP MARSH AT THE SOUTH

14:13  24  BREACH SECTION?

14:13  25  A.   COMPARABLE ELEVATION.  MEANING MINUS 5 FEET, BUT IT IS

ROBERT G. BEA - REDIRECT

14:13  1   PERHAPS SHALLOWER, MINUS 4 FEET.

14:13  2   Q.   DO WE SEE SOME IRREGULARITY OF THE TOP OF SWAMP MARSH

14:13  3   RECORDED AT THE SOUTH BREACH SECTION, A WAVE OR HUMP, IF YOU

14:13  4   WILL?

14:13  5   A.   YES.  DR. MARR IS DOING A VERY DILIGENT EFFORT TO PROPERLY

14:13  6   INTERPRET THE RESULTS FROM THE BORINGS TESTING THAT'S BEEN DONE

14:14  7   IN THE AREA.  THAT'S NOT A SIMPLE TASK.  SO HE IS REFLECTING

14:14  8   IT, AS ACCURATELY AS I THINK WE KNOW HOW TO, THE IRREGULARITY

14:14  9   IN THAT UPPER SURFACE.

14:14  10  Q.   SO AT THE SOUTH BREACH, IF WE ACCEPT A 3-FOOT ABOVEGROUND

14:14  11  ELEVATION AS A RULE OF THUMB, IF YOU WILL, AND A MINUS 4 TO

14:14  12  MINUS 5, AS YOU INDICATED, FOR THE TOP OF THE SWAMP MARSH, AT

14:14  13  WHAT POINT, AGAIN WITH THE CAVEATS YOU HAVE GIVEN, IN DIGGING A

14:14  14  HOLE FROM THE GROUND SURFACE AT THE SOUTH BREACH SECTION DO YOU

14:14  15  RUN A LIKELIHOOD OF PIERCING THAT SWAMP MARSH LAYER?

14:14  16  A.   7 TO 8 FEET.

14:14  17  Q.   I WANT TO MOVE TO THE NORTH BREACH SECTION, DR. BEA.  YOU

14:14  18  HAVE ALREADY TOLD US THE SAME GROUND ELEVATION, I BELIEVE?

14:14  19  A.   THAT'S CORRECT.

14:14  20  Q.   HOW ABOUT FOR THE TOP OF THE SWAMP MARSH LAYER?

14:14  21  A.   APPROXIMATELY MINUS 4 TO MINUS 5 FEET.

14:15  22  Q.   SO, AGAIN MAY WE INFER THAT IN THE NORTH BREACH SECTION,

14:15  23  AT BOLAND MARINE SPECIFICALLY, A HOLE AT 7 TO 8 FEET, WITH THE

14:15  24  CAVEATS YOU HAVE GIVEN, HAS A LIKELIHOOD OF PIERCING THAT SWAMP

14:15  25  MARSH LAYER?

ROBERT G. BEA - REDIRECT

14:15    1    A.    CORRECT.

14:15    2    Q.    IS IT POSSIBLE, DR. BEA, THAT AT POINTS AT BOLAND OR AT

14:15    3    SAUCER MARINE AT THE SOUTH BREACH, THE SWAMP MARSH LAYER IS AT

14:15    4    MINUS 2 OR MINUS 1O, FOR THAT MATTER?

14:15    5    A.    YES.

14:15    6    Q.    THERE IS VARIATION?

14:15    7    A.    YES.

14:15    8    Q.    LOOKING AT THE BORROW PIT PROFILE, IS THERE ANYTHING ABOUT

14:15    9    THE BORROW PIT PROFILE WITH RESPECT TO THE PLACEMENT OF THE

14:15   10    SWAMP MARSH LAYER OR UPPER ORGANIC CLAYS, AS IT'S LABELED ON

14:15   11    THIS REPRESENTATION, THAT IS SIGNIFICANT TO YOU IN TERMS OF

14:15   12    YOUR CAUSATION OPINION?

14:15   13    A.    YES.

14:15   14    Q.    WHAT IS THAT?

14:15   15    A.    WELL -- AND I WAS DELIGHTED TO SEE THAT DR. MARR AND HIS

14:16   16    COLLEAGUES HAD ARRIVED AT THE SAME CONCLUSION THAT I HAD

14:16   17    ARRIVED AT.  THE BORROW PIT IS CONTAINED WITHIN THE UPPER CLAY

14:16   18    FILL AND DOES NOT PENETRATE THE UPPER ORGANIC CLAY.  OUR

14:16   19    CROSS SECTION FOR THAT AREA SHOWS SUCH CHARACTERISTIC.

14:16   20            THAT'S VERY IMPORTANT TO HELP US UNDERSTAND WHY THE

14:16   21    FLOODWALL, I-WALL IN THE MCDONOUGH BORROW PIT AREA SURVIVED.

14:16   22    IT WAS NEAR FAILURE, BUT DID NOT FAIL, WHERE AT EITHER END, AT

14:17   23    THE NORTH BREACH AND SOUTH BREACH, IT DID FAIL.

14:17   24    Q.    LET ME ASK YOU WHILE WE ARE AT THIS POINT IN THE RECORD,

14:17   25    DR. BEA, ARE YOU FAMILIAR WITH THE EXCAVATIONS -- IN THE SOUTH

ROBERT G. BEA - REDIRECT

14:17  1  BREACH, LET'S TALK ABOUT SAUCER MARINE -- THAT WERE 7 TO 8 FEET

14:17  2  DEEP OR DEEPER?

14:17  3  **A.**   YES.

14:17  4  **Q.**   MORE THAN ONE?

14:17  5  **A.**   YES.

14:17  6  **Q.**   ARE YOU FAMILIAR -- SAME QUESTION FOR BOLAND MARINE.  ARE

14:17  7  YOU FAMILIAR WITH EXCAVATIONS, BASED ON YOUR REVIEW OF THE

14:17  8  DOCUMENTS AT BOLAND MARINE, THAT ARE 7 TO 8 FEET DEEP OR

14:17  9  DEEPER?

14:17  10  **A.**   YES.

14:17  11        **MR. SCHULTZ:**  CAN WE SEE THE NEXT SIDE, PLEASE.

14:17  12            I'M SORRY.  JUDGE, I DON'T HAVE THE TIME.

14:17  13        **THE COURT:**  JUST A MINUTE.

14:17  14            BY THE WAY, COUNSEL, I ASSUME YOU WILL LET THE

14:18  15  COURT KNOW WHEN IT'S TIME TO TAKE A RECESS FOR DR. BEA.

14:18  16        **MR. SCHULTZ:**  THAT'S WHY I WAS JUST LOOKING FOR MY

14:18  17  WATCH, JUDGE.  I HAVE 2:20.  I'M THINKING NOW MAY BE THE TIME,

14:18  18  SUBJECT TO DR. BEA'S --

14:18  19        **THE COURT:**  IT'S UP TO YOU.

14:18  20        **MR. SCHULTZ:**  DR. BEA.

14:18  21        **THE WITNESS:**  IT'S UP TO YOU.  IF IT'S BEST TO KEEP

14:18  22  ROLLING, THIS EXPLANATION IS --

14:18  23        **THE COURT:**  WE BETTER KEEP ON JUST A LITTLE BIT.

14:18  24        **THE WITNESS:**  IT CAN BE LENGTHY, BUT I'LL TRUNCATE IT

14:18  25  AS BEST I CAN SO WE CAN TAKE A BREAK.

ROBERT G. BEA - REDIRECT

14:18    1    BY MR. SCHULTZ:

14:18    2    Q.    IF WE LOOK AT THE NEXT SLIDE, DR. BEA, IN YOUR

14:18    3    PRESENTATION.

14:18    4            I DO THINK -- IF I COULD BE PERMITTED A LITTLE BIT OF

14:18    5    NARRATIVE -- WE HAVE TALKED ABOUT THIS ON YOUR

14:18    6    CROSS-EXAMINATION IN A WAY THAT WE HAD NOT NECESSARILY

14:18    7    ANTICIPATED.  I WOULD APPRECIATE YOUR COMMENTS ON THIS FOR THE

14:18    8    BENEFIT OF THE COURT, KEEPING IN MIND THE COURT HAS HEARD A

14:19    9    GREAT DEAL ABOUT HYDRAULIC CONDUCTIVITIES AT THIS POINT.

14:19    10   A.    THE VERTICAL SCALE IS THE PERMEABILITY, HYDRAULIC

14:19    11   CONDUCTIVITY.  AT THE TOP OF THE SCALE, THE PERMEABILITY IS

14:19    12   10 TO THE MINUS 1 CENTIMETERS PER SECOND.  AT THE BOTTOM IS

14:19    13   10 TO THE MINUS 7.

14:19    14           SOILS THAT ARE IN THE RANGE OF 10 TO THE MINUS 1 ARE

14:19    15   HIGHLY PERVIOUS, SUCH THINGS AS GRAVELS AND POORLY SORTED

14:19    16   LARGE-GRAINED SANDS.  AT THE BOTTOM ARE VERY IMPERVIOUS CLAYS.

14:20    17   SO WE ARE GOING FROM EASY FLOW TO ALMOST IMPOSSIBLE

14:20    18   TRANSMISSION OF WATER THROUGH THE SEDIMENT.

14:20    19           THE HORIZONTAL SCALE IS A MEASURE OF THE AMOUNT OF

14:20    20   WATER THAT'S CONTAINED IN THOSE SOILS.  IT STARTS AT ZERO, NO

14:20    21   WATER IN THE SOIL.  A HUNDRED PERCENT WATER CONTENT MEANS THE

14:20    22   WEIGHT OF THE WATER IS EQUAL TO THE WEIGHT OF THE SOIL GRAINS.

14:20    23           SO I HAVE GOT ONE POUND OF PANCAKE MIX, AND I'M GOING

14:20    24   TO PUT INTO IT ONE POUND OF MILK, AND THAT WOULD GIVE YOU A

14:21    25   FEELING FOR THAT 100 PERCENT.

ROBERT G. BEA - REDIRECT

14:21   1              THE COURT:  WOULD THAT BE SATURATED AT THAT POINT?

14:21   2              THE WITNESS:  YES.  I'M GOING TO STIR IT REALLY WELL.

14:21   3    I DON'T LIKE THAT KIND OF BUBBLES IN MY PANCAKE.

14:21   4                   NOW, I DREW THREE BLUE BLOTCHES ON THAT PLOT

14:21   5    THAT PORTRAYED THE WATER CONTENT RANGE FOR OUR 2011

14:21   6    FIELD-TESTING WORK AT THE SCHOOL SITE.  AND THAT'S AT THE NORTH

14:21   7    CENTRAL PART OF THE LOWER NINTH WARD, WELL REMOVED FROM THE

14:21   8    LEVEE ALIGNMENT.

14:21   9                   THE NEXT BLUE BOX IS THE SOUTH EBIA SITE, AND

14:21   10   THAT'S DOWN SOUTH OF THE SOUTH BREACH WHERE THE WALL TAKES A

14:22   11   RIGHT-ANGLE TURN TOWARD THE INDUSTRIAL CANAL, JUST A LITTLE BIT

14:22   12   NORTH OF THE CLAIBORNE BRIDGE.

14:22   13                  AND THE LAST LITTLE BLOCK SHOWN IS THE TEST SITE

14:22   14   IDENTIFIED AS MW57E.

14:22   15                  SO I'M PLOTTING THE PERMEABILITIES THAT CAME

14:22   16   FROM THIS WORK.  I DREW THOSE THREE ORANGE DIAGONAL LINES TO

14:22   17   PORTRAY REASONABLE PROJECTION OF, IN THE MIDDLE, THE BEST

14:22   18   ESTIMATE AND PLUS OR MINUS 1 STANDARD DEVIATION TO THE OUTER

14:22   19   ORANGE LINES.

14:22   20                  I GAVE A REFERENCE TO THE PERMEABILITY AND THE

14:23   21   CHARACTERISTICS OF THE SOIL TAKEN FROM MR. BEAR -- OR DR. BEAR,

14:23   22   1972, SO YOU CAN LOOK AT IT AND CORRELATE CENTIMETERS A SECOND

14:23   23   AND FEET PER DAY TO THE TYPE OF SOIL AND SEE WHERE WE ARE

14:23   24   CHARACTERIZING THE IMPORTANT PROPERTIES FOR OUR NORTH AND SOUTH

14:23   25   BREACHES BASED ON THE SOUTH EBIA RESULTS AND HOW IT'S BRACKETED

ROBERT G. BEA - REDIRECT

| | |
|---|---|
| 14:23 | 1 | BY THE OTHER TEST SITES. |
| 14:23 | 2 | FOR BETTER REFERENCE FOR PEOPLE, LIKE WHEN I'M |
| 14:23 | 3 | TRYING TO EXPLAIN THIS TO MY WIFE, AT THE LOWER RIGHT ARE FOUR |
| 14:23 | 4 | CONTAINERS OF SOIL; ONE FILLED WITH GRAVEL; NEXT, SILT -- OR |
| 14:24 | 5 | SAND; NEXT, SILT; NEXT, CLAY.  AND THE DEPTH OF THE MATERIAL IS |
| 14:24 | 6 | 1 METER, ABOUT 3 FEET, AND THE PORTRAYAL SHOWS WONDERFULLY HOW |
| 14:24 | 7 | LONG IT TAKES THE WATER TO GET THROUGH. |
| 14:24 | 8 | FOR EXAMPLE, THAT 1 METER OF GRAVEL, TWO |
| 14:24 | 9 | MINUTES; SAND TAKES YOU ABOUT 2 HOURS; SILT, 200 DAYS; CLAY, |
| 14:24 | 10 | 200 YEARS.  AND I'M DEAD FOUR TIMES. |
| 14:24 | 11 | SO IT'S A WAY TO TRY AND MAKE SOME INTUITIVE, |
| 14:24 | 12 | CONCEPTUAL SENSE OF -- I'LL CALL IT *THESE NUMBERS*, MEANING |
| 14:24 | 13 | PERMEABILITY AND WATER CONTENT. |
| 14:24 | 14 | **BY MR. SCHULTZ:** |
| 14:24 | 15 | **Q.**   MAY I ASK, DR. BEA, IF WE LOOK AT THE FIGURES DOWN ON THE |
| 14:24 | 16 | RIGHT, IS THIS ALSO AT LEAST A CRUDE REPRESENTATION OF WHY, IF |
| 14:25 | 17 | YOU ARE WORKING NEXT TO A FLOOD-CONTROL PROJECT IN ANY WAY, YOU |
| 14:25 | 18 | DON'T BACKFILL HOLES WITH GRAVEL? |
| 14:25 | 19 | **A.**   YES. |
| 14:25 | 20 | **MR. SCHULTZ:**  CAN WE LOOK AT THE NEXT SIDE, PLEASE, |
| 14:25 | 21 | CARL. |
| 14:25 | 22 | **BY MR. SCHULTZ:** |
| 14:25 | 23 | **Q.**   THE LAST SLIDE TALKED ABOUT WATER CONTENT.  IS WATER |
| 14:25 | 24 | CONTENT -- LET ME ASK YOU GENERALLY -- OF SOILS -- AND WE ARE |
| 14:25 | 25 | TALKING ABOUT THE SOILS IN THE SWAMP MARSH NOW -- AT THE HEART |

ROBERT G. BEA - REDIRECT

14:25  1  OF YOUR OPINIONS IN THIS CASE?

14:25  2  **A.**   YES.

14:25  3  **Q.**   IS THAT AT THE HEART OF YOUR PRESSURE TRANSMISSION THEORY,

14:25  4  THE LIQUID NATURE OF THE SOILS IN THE SWAMP MARSH?

14:25  5  **A.**   THAT'S CORRECT.

14:25  6  **Q.**   IS THAT WHY YOU MODELED THE SWAMP MARSH AS *INCOMPRESSIBLE*?

14:25  7  **A.**   CORRECT.  WELL, THAT'S ONE OF THE REASONS.  THE KEY REASON

14:25  8  I WANT EVERYONE TO REMEMBER:  THE MODELING IS SENSITIVE, OF

14:25  9  COURSE, TO THE SOILS AND THEIR UNUSUAL CHARACTERISTICS.  AND

14:25  10  I'M CONTRITE ENOUGH TO SAY THAT I CAN'T POSSIBLY MODEL IN

14:26  11  ACCURATE DETAIL THE PERFORMANCE OF SUCH A COMPLEX MEDIA.  IF I

14:26  12  DIDN'T HAVE THOSE FIELD MEASUREMENTS, I WOULD BE IN TOUGH DAMN

14:26  13  SHAPE.

14:26  14       SO IT'S A WAY TO SAY THAT IT'S THE COHERENCE OF

14:26  15  UNDERSTANDING THE SOIL AND ITS UNIQUE CHARACTERISTICS, BUT THE

14:26  16  GOD-SENT IMPORTANT THING TO HANG ON TO ARE THESE FIELD

14:26  17  MEASUREMENTS UNDER PROTOTYPE FLOODING CONDITIONS.

14:26  18       SO IT'S A COMBINATION.

14:26  19  **Q.**   THE TITLE OF THIS SLIDE, DR. BEA, IS *NATURE OF SOILS,*

14:26  20  *SWAMP MARSH DEPOSITS, WATER CONTENTS VERY HIGH.*

14:26  21       I WILL TELL YOU IN ALL CANDOR I DON'T KNOW WHAT THE

14:26  22  FIGURES MEAN ON THE LEFT AND RIGHT.  IF YOU COULD HELP US THERE

14:26  23  AND DESCRIBE THE MEAN IN TERMS OF WATER CONTENT HERE IN THE

14:27  24  SWAMP MARSH.

14:27  25  **A.**   WELL, FIRST I COMPILED THE DATA POINTS THAT ARE SHOWN AS

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 14:27 | 1 | THOSE RECTANGULAR-TURNED-ON-ITS-END DATA POINTS.  THOSE DATA |
| 14:27 | 2 | POINTS COME FROM THE SOIL-BORING TESTING AVAILABLE ALONG THE |
| 14:27 | 3 | LEVEE ALIGNMENT.  THAT'S IMPORTANT BECAUSE IT'S THOSE SOILS |
| 14:27 | 4 | THAT WE ARE CONCERNED WITH.  SO I DIDN'T GO OUTSIDE THAT BOUND |
| 14:27 | 5 | BECAUSE THOSE SOILS HAVEN'T EXPERIENCED THE OVERBURDEN AND |
| 14:27 | 6 | CONSTRUCTION ACTIVITY THAT THE SOILS UNDER THE LEVEE ALIGNMENT |
| 14:27 | 7 | HAVE. |
| 14:27 | 8 | I WAS ALSO VERY CAUTIOUS NOT TO USE SOME OF THE |
| 14:28 | 9 | SOIL-BORING INFORMATION WE OBTAINED IN THE 2011 PROGRAM BECAUSE |
| 14:28 | 10 | THEY WERE BEING TAKEN IN SOIL CONDITIONS THAT HAD, TO THE BEST |
| 14:28 | 11 | OF MY KNOWLEDGE, BEEN VERY SUBSTANTIALLY CHANGED AS A RESULT OF |
| 14:28 | 12 | THE POST-KATRINA ACTIVITIES.  SO THIS IS CONSTRAINED TO BE A |
| 14:28 | 13 | GOOD REPRESENTATION OF WHAT'S UNDER THAT WALL AT THE TIME |
| 14:28 | 14 | KATRINA STRIKES. |
| 14:28 | 15 | I SHOW A HORIZONTAL SCALE, WHICH IS WATER CONTENT.  A |
| 14:28 | 16 | VERTICAL SCALE IS ELEVATION, NAVD88. |
| 14:28 | 17 | SO I WENT TO THE SOIL BORINGS ALONG THE ALIGNMENT, |
| 14:28 | 18 | DETERMINED ELEVATION AND WATER CONTENT DETERMINED BY THE |
| 14:28 | 19 | LABORATORY TEST RESULTS, PLOTTED THE PLOT, AND THEN COMPILED |
| 14:29 | 20 | THE DATA TO DETERMINE THE MEAN VALUE.  SO I SUMMED IT AND |
| 14:29 | 21 | DIVIDED BY THE NUMBER OF DATA POINTS.  THAT GAVE ME THE MEAN, |
| 14:29 | 22 | OR AVERAGE AS IT'S ALSO KNOWN.  THAT'S APPROXIMATELY |
| 14:29 | 23 | 200 PERCENT WATER CONTENT. |
| 14:29 | 24 | I DETERMINED THE PLUS AND MINUS 1 STANDARD DEVIATION, |
| 14:29 | 25 | SO 84 PERCENT OF THE DATA, GIVEN A NORMAL DISTRIBUTION, IS |

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 14:29 | 1 | CONTAINED WITHIN THOSE TWO BOUNDS:  PLUS ONE SIGMA IN CLASS |
| 14:29 | 2 | GRADINGS WOULD BE AN A; MINUS 1 SIGMA IN CLASS GRADINGS WOULD |
| 14:29 | 3 | BE PERHAPS A D.  AND SO I'M ATTEMPTING TO EXPRESS THE |
| 14:29 | 4 | VARIABILITY IN A QUANTITATIVE, ANALYTICAL FORM. |
| 14:30 | 5 | IF YOU HAD FREE FLUID WITHIN THE SOIL FOR THAT MEAN |
| 14:30 | 6 | VALUE OF 200 PERCENT, THE SOIL WOULD HAVE THE CONSISTENCY OF |
| 14:30 | 7 | THIN PANCAKE BATTER. |
| 14:30 | 8 | TO GIVE YOU AN APPRECIATION, AT 300 PERCENT, THE |
| 14:30 | 9 | PANCAKE BATTER WILL STAY ON THE GRIDDLE.  AT 100 PERCENT, THE |
| 14:30 | 10 | PANCAKES ARE STILL VERY BIG.  AT 50 PERCENT, THE SWAMP MARSH |
| 14:30 | 11 | LAYER DOESN'T HAVE IT. |
| 14:30 | 12 | SO IT'S ATTEMPTING TO PUT ON ONE GRAPH TO FOCUS ON |
| 14:30 | 13 | THE UNIQUE CHARACTERISTICS OF THESE, OF THE SWAMP MARSH |
| 14:31 | 14 | DEPOSIT.  MY APOLOGY FOR THE LONG EXPLANATION. |
| 14:31 | 15 | **Q.**   I UNDERSTAND, DR. BEA. |
| 14:31 | 16 | AT THE MEAN JUST BELOW 200 PERCENT, DOES THIS MEAN |
| 14:31 | 17 | THAT YOU CAN HAVE SOMETHING THAT IS STILL CALLED AN ORGANIC |
| 14:31 | 18 | CLAY BUT HAS THE CONSISTENCY OF THIN PANCAKE BATTER? |
| 14:31 | 19 | **A.**   YES.  AND THE WORDS I WANT TO EMPHASIZE IS THE ASSESSMENTS |
| 14:31 | 20 | I AM SHOWING HERE IS BASED ON THE ORGANIC MATERIAL HAVING |
| 14:31 | 21 | SURRENDERED ITS WATER.  THIS IS, AGAIN, A VERY, VERY CRITICAL |
| 14:31 | 22 | THING TO UNDERSTAND THE UNUSUAL BEHAVIOR PROPERTIES OF THESE |
| 14:31 | 23 | SOILS. |
| 14:31 | 24 | **THE COURT:**  COULD YOU EXPLAIN WHAT YOU MEAN BY |
| 14:32 | 25 | *SURRENDERED THE WATER*? |

## ROBERT G. BEA - REDIRECT

14:32   1        **THE WITNESS:**  YES, SIR.  SIX WEEKS AGO, MY WIFE WENT

14:32   2   TO NORTHERN MICHIGAN TO PARTICIPATE IN A FAMILY REUNION.  SO

14:32   3   SHE'S GONE.  I'M AT HOME, AND IT'S LEARN HOW TO COOK AND EAT,

14:32   4   BOB.

14:32   5        SO I WENT TO THE LOWER PART OF OUR PROPERTY, AND

14:32   6   I GATHERED A FULL BOWL OF SANTA ROSA PLUMS.  I BROUGHT THE

14:32   7   PLUMS BACK AND COVERED THEM WITH SARAN WRAP AND PUT THEM IN THE

14:33   8   BACK OF THE REFRIGERATOR BECAUSE I KNEW THOSE DAMN PLUMS WERE

14:33   9   GOING TO GO OFF AT THE SAME TIME, SO TO SPEAK, GET ROTTEN AND

14:33  10   RIPE, AND I DON'T LIKE TO EAT ROTTEN PLUMS.

14:33  11        SO FOR THE FIRST COUPLE OF DAYS AT LUNCHTIME, I

14:33  12   GO AND GET PLUMS.  BUT AS USUAL, BOB GOT DIVERTED TO THINGS

14:33  13   LIKE WHAT BRINGS ME HERE TODAY, AND I FORGOT THE PLUMS.

14:33  14        MY WIFE COMES HOME -- AND THAT WAS AN

14:33  15   INTERESTING EXPERIENCE BECAUSE SHE WAS GONE DURING MY STROKE --

14:33  16   BUT AFTER WE GOT THROUGH THAT, SHE GOES IN TO CHECK THE

14:33  17   REFRIGERATOR.  IN THE BACK IS MY BOWL OF PLUMS.  IT HAD TURNED

14:33  18   FROM PLUMS TO MUSH.  THE SKINS HAD, IN SOME CASES, SUNK TO THE

14:34  19   BOTTOM.  THERE WERE THE A FEW WITH MOLD ON THE TOP; BUT WHAT

14:34  20   WAS IN BETWEEN, SHE CAREFULLY TOOK OUT TO THE BACK YARD AND

14:34  21   THREW IT ON THE GROUND.  IT WAS ALL FLUID.  THE PLUMS HAD

14:34  22   SURRENDERED THE WATER.

14:34  23        **THE COURT:**  IS THAT -- NOT TO GET OFF TRACK, AND

14:34  24   EVENTUALLY I'M GOING TO GET THIS -- DOES THAT HAVE ANYTHING TO

14:34  25   DO WITH DRAINED OR UNDRAINED?

ROBERT G. BEA - REDIRECT

14:34    1          **THE WITNESS:**  IN A WAY IT DOES BECAUSE PART OF THIS

14:34    2   WATER ISSUE INVOLVES WHERE THE WATER IS COMING FROM AND WHERE

14:34    3   IT'S GOING TO WHEN YOU PUT IT UNDER PRESSURE.

14:34    4          **THE COURT:**  I HAVE A BASIC UNDERSTANDING.

14:34    5          **THE WITNESS:**  YOU ARE RIGHT ON A CRITICAL POINT.

14:34    6          **THE COURT:**  I DO UNDERSTAND JUST AS A FOOTNOTE.  I DO

14:34    7   UNDERSTAND THAT CERTAINLY THE DEFENSE IS CONTENDING AND WILL

14:35    8   CONTINUE TO CONTEND THAT SOME OF THE RESULTS OF DR. BEA'S

14:35    9   STUDIES AND OPINIONS ARE SKEWED BY VIRTUE OF THE INPUT INTO THE

14:35   10   PROGRAM INCLUDING THE 10 TO THE MINUS 9, THE INCOMPRESSIBILITY,

14:35   11   AND DRAINED OR UNDRAINED.  I REALIZE THAT AFFECTS THE PRESSURE

14:35   12   FIGURES.  I JUST WANT TO UNDERSTAND IT BETTER, AND I'M SURE I

14:35   13   WILL WHEN IT'S ALL OVER.  OKAY.

14:35   14          **MR. SCHULTZ:**  I THINK, JUDGE, ACTUALLY, THIS WOULD BE

14:35   15   A GOOD TIME FOR A BREAK.

14:35   16          **THE COURT:**  I THINK SO.

14:35   17          **THE WITNESS:**  THANK YOU.

14:35   18          (RECESS.)

14:52   19          **THE COURT:**  WHENEVER YOU ARE READY TO PROCEED,

14:52   20   COUNSEL.

14:52   21          **MR. SCHULTZ:**  THANK YOU, YOUR HONOR.

14:52   22   **BY MR. SCHULTZ:**

14:52   23   **Q.**   WE HAD A CONVERSATION ON THE BREAK, DR. BEA, TRYING TO

14:52   24   SOLVE THE RIDDLE OF THE DRAINED VERSUS UNDRAINED.  LET ME HELP

14:52   25   WITH THIS HYPOTHETICAL THAT I PRESENTED TO YOU.  I LIVE IN

ROBERT G. BEA - REDIRECT

14:52    1    PENSACOLA.  WHEN I'M WALKING DOWN THE BEACH RIGHT AT THE

14:52    2    SHORELINE, WHERE THE WATER WASHES UP ON THE SHORE, THE SAND

14:53    3    BECOMES SATURATED, CORRECT?

14:53    4    A.    CORRECT.

14:53    5    Q.    AS YOU ARE USING THAT TERM?

14:53    6    A.    YES.

14:53    7    Q.    WHEN I STEP MY FOOT ON IT, YOU CAN SEE THE WATER

14:53    8    UNDERNEATH MY FOOT, FROM THE PRESSURE OF MY FOOT, DISSIPATE.

14:53    9    THE SAND TURNS WHITE AGAIN UNDERNEATH MY FOOT, AND THE REST OF

14:53   10    IT AROUND IS DARK AND IT'S STILL WET.

14:53   11            WOULD THAT BE AN EXAMPLE OF THAT SAND BECOMING, FIRST

14:53   12    OF ALL, UNSATURATED?

14:53   13    A.    YES.  THAT'S THE SAND IMMEDIATELY ADJACENT TO YOUR FOOT.

14:53   14    Q.    SO THE SAND WENT FROM SATURATED TO UNSATURATED, BUT THE

14:53   15    WHOLE TIME, WOULD THAT SAND HAVE BEEN IN A DRAINED CONDITION,

14:53   16    MEANING THAT IT WAS CAPABLE OF HAVING WATER FLOW IN AND FLOW

14:53   17    OUT OF IT?

14:53   18    A.    YES.

14:53   19    Q.    THE UNIT OF SAND UNDERNEATH MY FOOT THAT'S SUBJECT TO

14:53   20    PRESSURE?

14:53   21    A.    CORRECT.

14:53   22    Q.    IF I TOOK THAT SAME UNIT OF SAND THAT WAS UNDER MY FOOT

14:53   23    AND PUT IT INTO A BOX AND PUT PRESSURE ON IT, BUT IT'S CONFINED

14:53   24    BY THE WALLS OF THAT METAL BOX, LET'S SAY, WE HAVE THE SAME

14:53   25    SAND, JUST AS WET, SO WE HAVE A SATURATED SAND; BUT BECAUSE

## ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 14:53 | 1 | IT'S CONFINED BY THAT BOX, IS IT NOW IN AN UNDRAINED CONDITION? |
| 14:54 | 2 | **A.**   CORRECT. |
| 14:54 | 3 | **Q.**   MEANING NO WATER CAN COME IN, NO WATER CAN COME OUT? |
| 14:54 | 4 | **A.**   CORRECT. |
| 14:54 | 5 | **Q.**   EVEN IF I DRAINED ALL THE WATER OUT OF THAT, I WOULD NOW |
| 14:54 | 6 | HAVE AN UNSATURATED, UNDRAINED BLOCK OF SAND INSIDE A BOX, |
| 14:54 | 7 | CORRECT? |
| 14:54 | 8 | **A.**   THAT IS CORRECT. |
| 14:54 | 9 | **Q.**   IF I PUT PRESSURE ON THERE, EVENTUALLY THAT PRESSURE, IF |
| 14:54 | 10 | SUFFICIENT, HAS TO GO SOMEWHERE EVEN IF IT MEANS BLOWING OUT |
| 14:54 | 11 | THE BACK OF THAT BOX? |
| 14:54 | 12 | **A.**   THAT'S CORRECT. |
| 14:54 | 13 | **MR. SCHULTZ:**  I DON'T KNOW IF IT HELPS, JUDGE.  THAT |
| 14:54 | 14 | WAS THE BEST I COULD DO. |
| 14:54 | 15 | **THE COURT:**  WELL, IT WAS VERY QUICKLY DONE AND IS |
| 14:54 | 16 | CERTAINLY SOMEWHAT ILLUMINATING. |
| 14:54 | 17 | **BY MR. SCHULTZ:** |
| 14:54 | 18 | **Q.**   DR. BEA, NOW IN THE VEIN OF OUR PEDOLOGICAL SOIL |
| 14:54 | 19 | CONVERSATION, YOU BROUGHT SAMPLES OF VARIOUS SOILS OR SOILS |
| 14:54 | 20 | WITH VARIOUS WATER CONTENTS, CORRECT, FOR THE COURT TO REVIEW? |
| 14:54 | 21 | **A.**   CORRECT. |
| 14:54 | 22 | **MR. SCHULTZ:**  YOUR HONOR, FOR THE RECORD -- AND I |
| 14:54 | 23 | WILL ASK HIM ABOUT THE PROVIDENCE OF THESE MATERIALS -- THE |
| 14:54 | 24 | DEFENDANTS OVER THE WEEKEND AND THREE OF THEIR EXPERTS CAME AND |
| 14:54 | 25 | REVIEWED THESE AND I BELIEVE HAVE NO OBJECTION TO THE |

ROBERT G. BEA - REDIRECT

14:54    1    DEMONSTRATION.

14:54    2         MR. TREEBY:  WE HAVE NO OBJECTION TO THE

14:55    3    DEMONSTRATION, BUT WE ALL DO OBJECT THAT THE SOILS THAT ARE

14:55    4    BEING REPRESENTED THERE ARE NOT AT ALL REPRESENTATIVE OF THE

14:55    5    EAST BANK INDUSTRIAL AREA.  BUT THAT'S DEMONSTRATIVE.  IT'S NOT

14:55    6    EVIDENCE.  IT IS WHAT IT IS.

14:55    7         MR. SCHULTZ:  IT IS A DEMONSTRATIVE, YOUR HONOR.

14:55    8    THAT IS CORRECT.

14:55    9         THE COURT:  ALL RIGHT.

14:55   10         MR. SCHULTZ:  JUDGE, I DON'T KNOW MECHANICALLY HOW TO

14:55   11    DO THIS.  THE POINT, OF COURSE, WAS TO DEMONSTRATE TO YOU, TO

14:55   12    THE COURT, HOW SOIL THAT IS OTHERWISE -- THE BASE SOIL BEING

14:55   13    IDENTICAL, VARIES IN CONSTITUENCY -- I DON'T KNOW IF THAT'S THE

14:55   14    RIGHT WORD, DR. BEA -- DEPENDING ON THE WATER CONTENT.

14:55   15         THE WITNESS:  YES.  YOU CAN LOOK AT -- FIRST I WOULD

14:55   16    LIKE TO CORRECT A STATEMENT MADE BY MR. TREEBY.  WE WERE VERY

14:55   17    CAREFUL TO ENSURE THAT THE SOIL HERE IS REPRESENTATIVE OF THE

14:55   18    CLAYS THAT ARE UNDER THE EAST BANK INDUSTRIAL AREA.  WE ARE NOT

14:56   19    JERKS ENOUGH TO SAY WE WILL GIVE YOU A COMPLETELY DIFFERENT

14:56   20    SOIL FROM THAT UNDER EBIA.  WE WENT ALL THE WAY TO ENSURE THESE

14:56   21    ARE PRIMARILY WHAT'S CALLED MONTMORILLONITE CLAYS,

14:56   22    M-O-N-T-M-O-R-I-L-L-I-N-I-T-E.

14:56   23         MR. TREEBY:  IF YOUR HONOR, PLEASE, THERE'S NO CHAIN

14:56   24    OF CUSTODY BEEN ESTABLISHED.  WE HAD A SOILS INVESTIGATION.

14:56   25    THOSE SOILS ARE AVAILABLE TO THE PARTIES.  BOUDREAUX CAN BRING

ROBERT G. BEA - REDIRECT

14:56   1   THEM.  THESE ARE NOT THOSE SOILS.  WE DON'T KNOW WHAT THEY ARE.

14:56   2   **THE COURT:**  NOR DO I.

14:56   3   **MR. TREEBY:**  THANK YOU.

14:56   4   **MR. SCHULTZ:**  THEY ARE FOR DEMONSTRATIVE PURPOSES,

14:56   5   YOUR HONOR.

14:56   6   **BY MR. SCHULTZ:**

14:56   7   **Q.**  DR. BEA, IF YOU COULD DEMONSTRATE FOR THE COURT BRIEFLY

14:57   8   EACH OF THE SOIL SAMPLES AND THE WATER CONTENT IN EACH.

14:57   9   LET ME ASK YOU, BY THE WAY -- I HAVE ASSUMED A

14:57   10   CERTAIN KNOWLEDGE THAT I CERTAINLY DIDN'T POSSESS BEFORE THIS

14:57   11   CASE -- HOW CAN YOU HAVE SOIL THAT IS 200 PERCENT WATER OR

14:57   12   300 PERCENT WATER?

14:57   13   **A.**  WELL, AS I DESCRIBED, WHAT'S CALLED THE *WATER CONTENT* IS

14:57   14   THE WEIGHT OF THE WATER DIVIDED BY THE WEIGHT OF THE SOIL.  SO

14:57   15   YOU COULD TAKE A 1-POUND BAG OF PANCAKE BATTER, TAKE 2 POUNDS

14:57   16   OF MILK, POUR THAT INTO A BOWL, AND WE WILL HAVE PANCAKE BATTER

14:57   17   WITH 200 PERCENT MILK CONTENT.

14:57   18   **Q.**  THANK YOU.

14:57   19   **A.**  BUT WHAT'S IN THIS JAR IS A SOIL LIKE THE EBIA CLAYS, LIKE

14:58   20   THE ATCHAFALAYA CLAYS THAT HAS A 50 PERCENT WATER CONTENT.  YOU

14:58   21   CAN TAKE OFF THE CAP AND YOU CAN PUT YOUR FINGER IN IT.  IT

14:58   22   LOOKS VERY MUCH LIKE WHAT WE SEE AT THE EBIA SITE.  MOST OF THE

14:58   23   CLAYS THAT WE ARE DISCUSSING, WITH THE EXCEPTION OF THE SWAMP

14:58   24   MARSH DEPOSITS, ARE OF THAT CONSISTENCY.

14:58   25   **THE WITNESS:**  MR. TREEBY, WITH APPROVAL FROM COUNSEL,

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 14:58 | 1 | I'M GLAD TO SURRENDER THE SAMPLES FOR YOUR FULL MINERALOGICAL |
| 14:58 | 2 | TESTING.  YOU CAN ALSO TEST THEM TO CONFIRM THE WATER CONTENTS. |
| 14:59 | 3 | **MR. TREEBY:**  WE TESTED THE SOILS THAT CAME FROM THE |
| 14:59 | 4 | ORGANIC MARSH LAYER, AND WE WOULD RATHER USE THOSE BECAUSE THE |
| 14:59 | 5 | CHAIN OF CUSTODY HAS BEEN CLEARLY ESTABLISHED. |
| 14:59 | 6 | **THE COURT:**  THE COURT HAS GOT THAT POINT COMPLETELY |
| 14:59 | 7 | MADE. |
| 14:59 | 8 | **THE WITNESS:**  THAT WOULD BE A GREAT EXPERIMENT FOR |
| 14:59 | 9 | YOU TO RUN. |
| 14:59 | 10 | THIS IS AT 75 PERCENT, AND THIS IS STILL NOT |
| 14:59 | 11 | WITHIN THE BAND OF OUR SWAMP MARSH SOIL.  IT'S PLASTIC.  YOU |
| 14:59 | 12 | CAN STICK YOUR FINGER IN IT TO ENSURE YOU'RE REASONABLY -- |
| 14:59 | 13 | **THE COURT:**  I MIGHT SAY THAT -- LET IT BE KNOWN, NOT |
| 14:59 | 14 | AS AN EXPERT, BUT I HAVE BEEN IN THE MARSH QUITE A FEW TIMES. |
| 14:59 | 15 | I HAVE BEEN UNDER THE MARSH, SO I KNOW WHAT IT FEELS LIKE.  BUT |
| 15:00 | 16 | I WILL STICK MY FINGER IN HERE ANYHOW, AND I'VE GOT THE FEEL |
| 15:00 | 17 | FOR IT, SUCH AS IT IS. |
| 15:00 | 18 | HERE YOU GO, SIR. |
| 15:00 | 19 | AND I'VE SMELLED IT AS WELL.  I'M NOT TALKING |
| 15:00 | 20 | ABOUT THE EBIA.  LET ME MAKE IT CLEAR.  I'M TALKING ABOUT THE |
| 15:00 | 21 | MARSHES OF TERREBONNE AND LAFOURCHE PARISH. |
| 15:00 | 22 | **THE WITNESS:**  IF YOU TASTED IT, AS I JUST DID, YOU |
| 15:00 | 23 | WOULD FEEL BETWEEN YOUR LIPS AND TONGUE, TEETH, NO GRIT.  SO |
| 15:00 | 24 | IT'S ESSENTIALLY PURE CLAY. |
| 15:00 | 25 | THIS IS 100 PERCENT WATER CONTENT.  WHAT WE'RE |

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 15:00 | 1 | HERE TO ANSWER -- |
| 15:00 | 2 | **THE COURT:**  I CAN HEAR THAT.  DON'T HURT YOURSELF. |
| 15:00 | 3 | **THE WITNESS:**  ARE YOU KIDDING?  I'VE BEEN HURT ALL MY |
| 15:01 | 4 | LIFE. |
| 15:01 | 5 | **THE COURT:**  ALL RIGHT.  I CAN SEE THAT THAT'S WHAT |
| 15:01 | 6 | WE'RE -- |
| 15:01 | 7 | **THE WITNESS:**  THAT'S WHAT'S MEANT BY THE THIN |
| 15:01 | 8 | PANCAKE. |
| 15:01 | 9 | **MR. SCHULTZ:**  THAT WAS 100? |
| 15:01 | 10 | **THE COURT:**  100 PERCENT. |
| 15:01 | 11 | **THE WITNESS:**  HERE'S 200. |
| 15:01 | 12 | **BY MR. SCHULTZ:** |
| 15:01 | 13 | **Q.**   FOR THE RECORD, THAT IS THE LAST, 200 PERCENT? |
| 15:01 | 14 | **A.**   CORRECT. |
| 15:01 | 15 | **THE COURT:**  NOW, ARE YOU SAYING THE 100 PERCENT WOULD |
| 15:01 | 16 | BE MORE EQUIVALENT TO THE MEAN? |
| 15:01 | 17 | **THE WITNESS:**  THE CONNECTION YOU ARE MAKING IS |
| 15:01 | 18 | PERFECT.  RAY SEED, WHO IS A DEAR FRIEND, HE WENT THROUGH THIS |
| 15:01 | 19 | FRESHMAN CLASS EXPERIMENT AND WALKED AWAY THINKING DIFFERENTLY. |
| 15:02 | 20 | **BY MR. SCHULTZ:** |
| 15:02 | 21 | **Q.**   NOW, DR. BEA, LET ME ASK YOU WHILE YOU ARE PUTTING THE CAP |
| 15:02 | 22 | BACK ON THOSE, IF YOU PUT ORGANICS INTO THOSE -- IF YOU PUT |
| 15:02 | 23 | WHATEVER, SHREDDED WOOD, OLD CYPRESS, THINGS THAT ARE BREAKING |
| 15:02 | 24 | DOWN IN THE SOIL, FROM MY LAYMAN'S POINT OF VIEW, ALTHOUGH IT |
| 15:02 | 25 | MAY CHANGE THE CONSISTENCY, WOULD THE WATER CONTENT WE SEE |

ROBERT G. BEA - REDIRECT

15:02   1   THERE REMAIN THE SAME, THE ACTUAL AMOUNT OF LIQUID, RELATIVE

15:02   2   AMOUNT OF LIQUID?

15:02   3   A.   YES.  ALL WE HAVE TO DO IS MAINTAIN THE WEIGHT OF SOLIDS

15:02   4   TO THE WEIGHT OF FLUID.  THIS IS -- WELL, OUR BODIES ARE

15:02   5   98 PERCENT FLUID.

15:02   6           MR. SCHULTZ:  FOR THE RECORD, YOUR HONOR, I THINK YOU

15:02   7   MAY HAVE SEEN THIS BEFORE IN THE *BARGE* TRIAL, BUT DR. BEA HAS A

15:02   8   SAMPLE OF SOIL FROM THE EBIA SWAMP MARSH.

15:03   9   BY MR. SCHULTZ:

15:03   10  Q.   DR. BEA, IF YOU COULD EXPLAIN BEFORE YOU SHOW IT TO THE

15:03   11  COURT HOW THIS WAS DERIVED, WHERE IT CAME FROM.  BY THE WAY, IT

15:03   12  WAS MANIPULATED OVER THE WEEKEND.  YOU MIGHT WANT TO PUT THAT

15:03   13  ON A PAPER TOWEL BECAUSE IT MAY BE A LITTLE MESSY ON THE

15:03   14  OUTSIDE OF THE BAG.

15:03   15          THE COURT:  WE MAY NOT HAVE COMPLETE INTEGRITY OF THE

15:03   16  CONTAINER.

15:03   17          THE WITNESS:  AS YOU CAN SEE.

15:03   18  BY MR. SCHULTZ:

15:03   19  Q.   IT HAS SURRENDERED ITS WATER.

15:03   20  A.   THIS IS A LOWER NINTH WARD SOIL.  YOU CAN PUT IT IN YOUR

15:03   21  FINGERS AND YOU CAN FEEL THE GRITTY ORGANICS.

15:03   22          THE COURT:  I DO FEEL THAT.

15:03   23          THE WITNESS:  I WAS AT THE LOWER NINTH WARD.  THIS IS

15:03   24  2007, AND THE SEWERAGE AND WATER BOARD ARE THERE ALONG JOURDAN

15:04   25  ROAD MAKING REPAIRS TO THE SEWER LATERALS.  THEY HAD EXCAVATED

ROBERT G. BEA - REDIRECT

15:04   1   A HOLE APPROXIMATELY 8 FEET BELOW GROUND LEVEL, HAD THE SIDE

15:04   2   TAPERED.  AND THE GUYS WERE DOWN IN THE HOLE MAKING THE REPAIR

15:04   3   TO THE SEWER MAIN.  I WALKED BY AND LOOKED AT WHAT THEY HAD

15:04   4   GOTTEN OUT OF THE BOTTOM OF THE HOLE AND ASKED THEM IF I COULD

15:04   5   HAVE IT.  I GOT A SAMPLE, PUT IT INTO A BAG; I LABELED IT, AND

15:04   6   HAVE KEPT IT IN TRIPLE BAGGIES SO I COULD PRESERVE ITS WATER

15:05   7   CONTENT.

15:05   8            THE OTHER SAMPLE IS THE BLACK TOOTHPASTE FROM

15:05   9   UNDERNEATH THE 17TH STREET CANAL BREACH.

15:05   10           **THE COURT:**  YES, SIR.

15:05   11           **MR. SCHULTZ:**  THANK YOU, DR. BEA.

15:05   12           **THE COURT:**  THANK YOU.

15:05   13   BY MR. SCHULTZ:

15:05   14   **Q.**  LET ME ASK YOU, DR. BEA, WHILE YOU ARE PUTTING THIS BACK

15:05   15   TOGETHER, IN TERMS OF THE LIQUID CONTENT OF THE SOILS, IS THERE

15:05   16   A BASIC ENGINEERING CALCULATION THAT CAN BE DONE TO GIVE YOU A

15:05   17   BENCHMARK OR A REFERENCE POINT FOR THE LIQUIDITY OF A GIVEN

15:05   18   SOIL?

15:05   19   **A.**  YES.

15:05   20   **Q.**  WHAT IS THAT CALLED?

15:05   21           **MR. TREEBY:**  YOUR HONOR, PLEASE CAN WE APPROACH THE

15:05   22   BENCH?

15:05   23           **THE COURT:**  YES, SIR, YOU MAY.

15:05   24           (THE FOLLOWING PROCEEDINGS WERE HELD AT THE BENCH.)

15:06   25           **THE COURT:**  DO WE HAVE EVERYONE WE NEED HERE?

## ROBERT G. BEA - REDIRECT

15:06  1          YES, SIR.

15:06  2          **MR. TREEBY:**  IF YOUR HONOR PLEASE, HE IS GETTING TO

15:06  3  THIS SLIDE HERE AND HE IS BRINGING UP SOMETHING CALLED A

15:06  4  *LIQUIDITY INDEX*.  HE HAS KIND OF BEEN DABBLING IN THIS ALREADY

15:06  5  IN THIS TESTIMONY.  I TRIED TO GIVE IT AS MUCH LEEWAY AS IT

15:06  6  DESERVED.  WE HAVE SEARCHED EVERYTHING HE HAS EVER WRITTEN IN

15:06  7  THIS CASE AND ANY OTHER CASE AND PARTICULARLY HIS EXPERT

15:06  8  REPORTS.

15:06  9          LIQUIDITY INDEX IS SOMETHING THAT'S USED IN

15:06  10  AGRICULTURE THAT HAS TO DO WITH GROWING THINGS.  WE HAVE NOT

15:06  11  INTERROGATED HIM ANYTHING ABOUT THE APPLICATION OF LIQUIDITY

15:06  12  INDEX TO HIS OPINIONS IN THIS CASE BECAUSE HE NEVER MENTIONED

15:06  13  IT BEFORE.  WE BELIEVE IT'S MORE JUNK SCIENCE.  WE BELIEVE IT'S

15:07  14  MORE JUNK SCIENCE, AND I'M SURE THE PLAINTIFFS WILL DISAGREE

15:07  15  WITH THAT.

15:07  16          MORE IMPORTANTLY, THIS IS WHAT WE HAVE FEARED

15:07  17  FROM THE BEGINNING OF THIS CASE, AND IT'S BEEN PROVEN TRUE THAT

15:07  18  THERE'S GOING TO BE A SHIFT AND A SHIFT AND A SHIFT.

15:07  19  THEREFORE, WE HAVE AN ORIGINAL REPORT, A REBUTTAL REPORT, A

15:07  20  SUPPLEMENTAL REPORT, AND EVERY TIME THE OPINION SHIFTS.  SO WE

15:07  21  ARE JUST A LITTLE BIT -- WE DON'T KNOW WHAT WE ARE DEALING

15:07  22  WITH.

15:07  23          WE ASK HIM QUESTIONS ABOUT EVERYTHING WE CAN

15:07  24  BASED ON WHAT WE LEARNED.  HE BROUGHT UP DILATATION OF THE WAVE

15:07  25  VELOCITY FOR THE FIRST TIME IN HIS REBUTTAL DEPOSITION, NOT

ROBERT G. BEA - REDIRECT

15:07  1    EVEN IN HIS REBUTTAL REPORT.  WE SCRAMBLED AND ASKED HIM
15:07  2    QUESTIONS ABOUT THAT.
15:07  3              THIS IS THE FIRST TIME THIS CONCEPT HAS EVER
15:07  4    BEEN MENTIONED IN THIS CASE.
15:07  5              **THE COURT:**  OKAY.
15:07  6              **MR. TREEBY:**  WE THINK THAT SHOULD BE EXCLUDED.  WE
15:07  7    SHOULD NOT HAVE TO DEAL WITH IT.  IF WE DO, IT'S UNFAIR.
15:07  8    THAT'S OUR POSITION.
15:07  9              **MR. SCHULTZ:**  YOUR HONOR, DR. BEA JUST TESTIFIED THIS
15:07  10   IS A SIMPLE CALCULATION.  IF I'M PERMITTED A PROFFER, HE WILL
15:08  11   TELL YOU IT'S A CALCULATION EVERY FRESHMAN ENGINEERING STUDENT
15:08  12   LEARNS TO REACH THIS BENCHMARK.  HE IS TAKING KNOWN EVIDENCE IN
15:08  13   THIS CASE AND APPLYING A CALCULATION TO IT, NO DIFFERENT IN
15:08  14   PRINCIPLE FROM WHAT I TOOK --
15:08  15             **THE COURT:**  SO WHAT ARE WE TRYING TO PROVE HERE, SIR?
15:08  16             **MR. SCHULTZ:**  YOU WILL SEE ON THE NEXT SLIDE HE TAKES
15:08  17   THE FUGRO 2011 BORINGS, WHICH WERE AVAILABLE TO ALL PARTIES --
15:08  18   TAKES THE FUGRO 2011 BORINGS AVAILABLE TO ALL PARTIES, PICKS
15:08  19   THREE KNOWN NUMBERS.  THERE ARE THREE NUMBERS YOU HAVE TO HAVE
15:08  20   TO CALCULATE THE LIQUIDITY INDEX.  THOSE ARE PROVIDED IN THE
15:08  21   FUGRO BORINGS, I THINK, FOR THE PURPOSE OF DOING SUCH A
15:08  22   CALCULATION.  AND HE LOOKED AT SEVERAL OF THE BORINGS AND DID A
15:08  23   MEAN CALCULATION FOR THE LIQUIDITY INDEX OF THE SOILS AT THE
15:08  24   EBIA BASED ON MATERIALS AVAILABLE TO EVERYONE, YOUR HONOR.
15:08  25             I WOULD PROPOSE THIS IS NO DIFFERENT IN

ROBERT G. BEA - REDIRECT

15:08    1   PRINCIPLE FROM HIM TAKING THE DR. ALLEN MARR EXHIBIT AND
15:09    2   SAYING, "HERE IS THE GROUND ELEVATION.  HERE IS THE TOP OF
15:09    3   SWAMP MARSH.  I'M DOING SOME MATH TO TELL YOU WHAT THAT MEANS."
15:09    4          HE IS TAKING KNOWN EVIDENCE IN THE POSSESSION OF
15:09    5   ALL PARTIES AND DOING A BASIC ENGINEERING CALCULATION ON IT,
15:09    6   WHICH I BELIEVE WE WILL PROBABLY SEE QUITE A BIT OF FROM THE
15:09    7   DEFENSE EXPERT.
15:09    8          MR. SMITH:  THE POINT IS NOT THAT IT'S A BASIC
15:09    9   CALCULATION.  THE POINT IS THAT IF IT HAS SOME RELEVANCE TO
15:09   10   THIS CASE, THAT RELEVANCE HAS NEVER BEEN MADE KNOWN TO THE
15:09   11   PARTIES, AND PRESUMABLY HE IS GOING TO USE IT AS SUPPORT FOR
15:09   12   HIS OPINIONS.  WE HAVE NEVER HEARD THIS AS A BASIS FOR SUPPORT
15:09   13   FOR HIS OPINIONS.
15:09   14          MR. TREEBY:  I'M TOLD BY MY EXPERTS THAT IT IS A MORE
15:09   15   COMPLEX SUBJECT.  IT IS A CALCULATION AND ANALYSIS, THAT'S
15:09   16   TRUE.  AND I'M TOLD THAT IF WE HAD THE OPPORTUNITY TO SIT DOWN
15:09   17   WITH HIM, WITH THE TEXTBOOKS ABOUT LIQUIDITY INDEX AND ALL THE
15:09   18   KNOWN TREATISES ABOUT LIQUIDITY INDEX, WE COULD PROVE -- IF WE
15:10   19   HAD TIME AND IT DIDN'T COME UP 48 HOURS BEFORE HE GOT ON THE
15:10   20   STAND, WE COULD PROVE IT HAS NO APPLICATION TO THIS CASE, BUT I
15:10   21   HAVEN'T BEEN ABLE TO EXAMINE HIM ON THIS.
15:10   22          THE COURT:  WHAT'S THE ULTIMATE GOAL?  WHAT ASPECT OF
15:10   23   THIS CASE DOES IT RELATE TO?  WE KNOW HE -- WE KNOW -- TELL ME.
15:10   24   I DON'T WANT TO LEAD YOU INTO IT.
15:10   25          MR. SCHULTZ:  I WILL TELL YOU, YOUR HONOR.  I WILL

## ROBERT G. BEA - REDIRECT

15:10    1    TELL YOU THIS.  THE POINT IS THIS.

15:10    2            **THE COURT:**  WE ARE NOT GOING TO HAVE PIGS IN POKES.

15:10    3    YOU HAVE TO TELL ME WHAT IT IS.

15:10    4            **MR. SCHULTZ:**  THE RELEVANCE IS ON THE SLIDE ITSELF.

15:10    5    IN OTHER WORDS, IT GIVES US A NAME BY WHICH TO REFER TO THE

15:10    6    SOILS.  SO IF WE HAVE A LIQUIDITY INDEX OF 2 -- DR. BEA HAS

15:10    7    DONE A MEAN CALCULATION VERY MUCH LIKE YOU SAW THE MEAN

15:10    8    CALCULATION FOR WATER CONTENT ON THE PREVIOUS SLIDE.  WE ARE

15:10    9    NOT GOING TO THEN TAKE THAT AND POP UP SOMEWHERE ELSE SOME

15:10   10    REVELATION ABOUT THE LIQUIDITY.

15:10   11            **THE COURT:**  SO DOES THE LIQUIDITY INDEX GO INTO

15:11   12    WHETHER THE SOIL IS DRAINED OR UNDRAINED, COMPRESSIBLE OR

15:11   13    INCOMPRESSIBLE?

15:11   14            **MR. SCHULTZ:**  IT DOES NOT.  IT ONLY GOES TO FURTHER

15:11   15    EMPHASIZE THE LIQUID NATURE OF THE SOILS, HENCE THE WAY IN

15:11   16    WHICH HE MODELED.

15:11   17            **MR. TREEBY:**  HE HAS NEVER TALKED ABOUT LIQUID CLAYS

15:11   18    IN THIS CASE.  THERE ARE LIQUID CLAYS, I'M TOLD -- FOR EXAMPLE,

15:11   19    IN SCANDINAVIA, WHERE A CHEMICAL REACTION TAKES PLACE AND CLAY

15:11   20    TURNS INTO LIQUID.  WE DON'T HAVE THAT HERE.  IT'S NEVER BEEN

15:11   21    AN ISSUE.

15:11   22            THIS LIQUIDITY INDEX IS AN AGRICULTURAL TERM

15:11   23    THAT HAS NO APPLICATION, BUT IN ORDER TO WALK HIM THROUGH THAT

15:11   24    WITH LEARNED TREATISES, WE WOULD HAVE TAKEN HIM TO THOSE

15:11   25    TREATISES, EXAMINED HIM AND GOT HIM TO ADMIT ALL THE BASIC

ROBERT G. BEA - REDIRECT

15:11   1   BUILDING BLOCKS AS TO WHY IT DOESN'T APPLY HERE.  WE HAVE NOT

15:11   2   HAD THAT OPPORTUNITY.

15:11   3         **THE COURT:**  MY INCLINATION IS NOT TO OPEN THE DOOR TO

15:11   4   SOMETHING YOU CAN'T ARTICULATE THAT'S WITHIN THE AMBIT OF HIS

15:12   5   EXPERT REPORT AND GET IN NEW CALCULATIONS.  WE WOULD NEVER GET

15:12   6   TO IT.  I AM RELUCTANT TO LET IT IN.

15:12   7         **MR. SCHULTZ:**  I UNDERSTAND.

15:12   8         (END OF BENCH CONFERENCE.)

15:12   9   BY MR. SCHULTZ:

15:12   10  **Q.**  DR. BEA, YOU WERE JUST DESCRIBING FOR ME -- OR YOU

15:13   11  DESCRIBED FOR ME EARLIER THAT THE WATER CONTENT OF SOILS WHICH

15:13   12  YOU HAVE BEEN DISCUSSING IS AT THE HEART OF YOUR ANALYSIS AND

15:13   13  THE WAY IN WHICH YOU MODELED THE SOILS IN THE SWAMP MARSH AT

15:13   14  THE EBIA.  IS THAT RIGHT?

15:13   15  **A.**  THAT'S CORRECT.

15:13   16        **MR. SCHULTZ:**  IF WE COULD PULL UP, PLEASE,

15:13   17  PX-3393-10.  BLOW THIS UP JUST A LITTLE BIT.

15:13   18  BY MR. SCHULTZ:

15:13   19  **Q.**  FIRST OF ALL, CAN YOU TELL THE COURT THE SOURCE OF THE TWO

15:13   20  PHOTOGRAPHS WE SEE ON THIS PAGE?

15:13   21  **A.**  THOSE ARE PART OF THE PHOTOGRAPHIC DOCUMENTATION PRODUCED

15:13   22  BY WASHINGTON GROUP INTERNATIONAL AND THE DEPARTMENT OF JUSTICE

15:13   23  CHRONICLING THE EBIA SITE-CLEARING ACTIVITIES.

15:13   24  **Q.**  IS THIS PHOTOGRAPH, DR. BEA, RELEVANT TO YOUR OPINION

15:13   25  ABOUT THE LIQUID NATURE OF THE SOILS AT LEAST IN PLACES AT THE

*HOURLY TRANSCRIPT*

ROBERT G. BEA - REDIRECT

15:14   1   EBIA AND PARTICULARLY THE SWAMP MARSH?

15:14   2   **A.**   YES.

15:14   3   **Q.**   IN WHAT WAY IS IT RELEVANT TO THAT?

15:14   4   **A.**   WELL, FOR EXAMPLE, THE SAMPLE BEING SHOWN HERE IS AT

15:14   5   SAUCER MARINE.  THE SAMPLE IS BEING TAKEN IN CONJUNCTION WITH

15:14   6   PERFORMING BOREHOLE 17E.  THIS IS PART OF THE MMG FUGRO SOIL

15:14   7   SAMPLING PROGRAM.

15:14   8        WHEN THEY TOOK THE SAMPLE -- THE TUBE IS CAPABLE OF

15:14   9   BEING SPLIT INTO TWO HALFS.  SO THE TUBE IS INSERTED INTO THE

15:14   10  SOILS.  WE ARE AT A DEPTH OF APPROXIMATELY 10 FEET BELOW GROUND

15:14   11  SURFACE.  LUCKILY, IN THE SOIL TUBE, AT THE BOTTOM THERE WAS

15:15   12  SOME STRONGER, SANDIER MATERIALS.  IT WAS ABLE TO CONTAIN

15:15   13  WITHIN THE TUBE THE OTHER CLAY MATERIALS THAT WERE VIRTUALLY

15:15   14  LIQUID.

15:15   15  **Q.**   BASED, DR. BEA, ON QUESTIONS FROM MR. TREEBY, CAN YOU TELL

15:15   16  FROM THE CODE, IF YOU WILL, ON THE BOTTOM LEFT OF THIS

15:15   17  PHOTOGRAPH THAT IT WAS TAKEN IN JULY OF 2001?

15:15   18  **A.**   THAT'S CORRECT.

15:15   19  **Q.**   CAN WE LOOK AT THE PHOTOGRAPH ON THE BOTTOM OF THE SAME

15:15   20  PAGE.  WHAT DO WE SEE HERE, DR. BEA?  SAME DATE, BY THE WAY.

15:15   21  **A.**   THIS SHOWS THOSE STRONGER MATERIALS THAT WERE LUCKILY

15:15   22  CAPTURED IN THIS SECTION OF THE TUBE THAT ACTED AS A PLUG AT

15:15   23  THE BOTTOM, KEEPING THE FLUID SOILS FROM ESCAPING ABOVE.  YOU

15:15   24  CAN SEE OBVIOUSLY THE PLASTIC NATURE OF THE SOIL, AND HAVING

15:16   25  LOOKED AT THE SAMPLES YOU DID, WE ARE IN THE 75 PERCENT RANGE

ROBERT G. BEA - REDIRECT

15:16    1    OF WATER CONTENT.

15:16    2           **MR. SCHULTZ:**  CAN WE PULL UP, PLEASE, CARL,

15:16    3    PX-3393-220.

15:16    4    **BY MR. SCHULTZ:**

15:16    5    **Q.**   DR. BEA, I WANT TO LOOK AT THE BOTTOM PHOTOGRAPH.  IS THIS

15:16    6    ANOTHER PHOTOGRAPH TAKEN BY WGI ON THE SITE IN 2001?

15:16    7    **A.**   THAT'S CORRECT.

15:16    8    **Q.**   WHAT DOES -- DOES THE "BOL" INDICATE BOLAND?

15:16    9    **A.**   THAT'S CORRECT.

15:16   10    **Q.**   I GUESS THE WORD *BOLAND MARINE* ON THE INDEX CARD DOES AS

15:16   11    WELL.  CAN YOU DESCRIBE FOR THE COURT WHAT WE SEE IN THIS

15:16   12    SPLIT-SPOON EXAMPLE, BASED ON YOUR KNOWLEDGE OF SOIL BORINGS?

15:16   13    **A.**   THE SOIL BORING THAT IS BEING PERFORMED HERE IS AT BOLAND

15:16   14    MARINE.  IT'S BOREHOLE 63H.  SO WE ARE OUT AWAY FROM THE

15:17   15    FLOODWALL.  THE A SERIES BORINGS ARE CLOSE TO THE FLOODWALL,

15:17   16    AND IT GOES B, C, D, E, F, G AS WE MOVE OUT TO THE INDUSTRIAL

15:17   17    CANAL.  LUCKILY, AGAIN, IN THE BOTTOM OF THIS SPLIT-SPOON

15:17   18    SAMPLER, WE GOT ACTUALLY AN UNDESIRABLE THING, OILY, CLAYEY,

15:17   19    SANDY MATERIAL.

15:17   20           BUT IT WAS LUCKY BECAUSE IT, TOO, JAMMED THE BOTTOM

15:17   21    OF THE SPLIT-BARREL CORING TUBE, AND YOU CAN SEE THE TRANSITION

15:17   22    FROM PLASTIC MATERIAL PROGRESSIVELY TO FLUID AS YOU MOVE UP IN

15:17   23    THAT CORE.  THE CORE IS LABELED AT 4 FEET TO 9 FEET BELOW

15:17   24    GROUND SURFACE.

15:18   25           WE HAVE ENCOUNTERED THOSE WEAKER MATERIALS SHALLOWER

ROBERT G. BEA - REDIRECT

15:18    1   OUT TOWARD THE CANAL BECAUSE THEY HAVEN'T BEEN SUBJECTED TO AS

15:18    2   MUCH OVERBURDENED COMPRESSION SETTLEMENT AS THE SOILS CLOSER IN

15:18    3   TO THE LEVEE.  SO THE SWAMPY, MARSHY HIGH-WATER CONTENT

15:18    4   MATERIALS ARE ACTUALLY SHAPED LIKE A DISH, KIND OF TURNED ON

15:18    5   ITS SIDE.

15:18    6              **MR. SCHULTZ:**  IF WE COULD, CARL, COULD WE SKIP TO

15:18    7   SLIDE 16, PLEASE.

15:18    8   **BY MR. SCHULTZ:**

15:18    9   **Q.**   DR. BEA, BEFORE WE STOP TALKING ABOUT SOILS AND TALK A

15:18   10   LITTLE BIT ABOUT THE EXCAVATIONS, PREPARATORY TO YOUR OPINIONS,

15:18   11   WE HAVE A SLIDE REGARDING SAND.

15:18   12              FIRST OF ALL, WHY IS SAND IMPORTANT TO UNDERSTAND

15:18   13   WHEN WE ARE TALKING ABOUT THE EBIA AND THE WORK THAT WAS DONE

15:18   14   OUT THERE AND IN PARTICULAR WITH REFERENCE TO YOUR CAUSATION

15:18   15   OPINIONS?

15:19   16   **A.**   WELL, I TOUCHED ON IT EARLIER.  SAND IS POTENTIALLY VERY

15:19   17   PERMEABLE.  IT CAN TRANSMIT WATER QUICKLY.

15:19   18   **Q.**   WAS SAND USED AS BACKFILL AT THE EBIA?

15:19   19   **A.**   WELL, CLEARLY THIS IS A PHOTOGRAPH PRODUCED IN THE WGI-DOJ

15:19   20   DOCUMENTATION SHOWING A BULLDOZER PUSHING SAND INTO THE

15:19   21   NORTHERN SECTOR OF THE EAST BANK INDUSTRIAL AREA.  WE ARE

15:19   22   ACTUALLY AT BOLAND, AND YOU CAN SEE THE PIERS OF THE FLORIDA

15:19   23   AVENUE BRIDGE IN THE BACKGROUND.

15:19   24   **Q.**   BASED ON YOUR REVIEW OF DOCUMENTATION, DR. BEA, DID THEY

15:19   25   USE SAND ALONE IN EXCAVATIONS OR SAND IN CONJUNCTION WITH OTHER

ROBERT G. BEA - REDIRECT

15:20   1   SOILS, LIKE NATIVE SOILS, IN BACKFILLING EXCAVATIONS OR BOTH?

15:20   2   **A.**   IT WAS ACTUALLY A COMBINATION OF THOSE SORTS OF THINGS.

15:20   3   SOME AREAS WOULD BE PARTIALLY FILLED WITH CLAYS.  FOR EXAMPLE,

15:20   4   FROM THE MCDONOUGH BORROW PIT, UPPER PORTIONS COULD BE

15:20   5   BACKFILLED WITH NATIVE MATERIALS, CLODS OF IT, AND THAT'S WHERE

15:20   6   SOME OF THE WHITE SHELLS SHOW UP IN THE PICTURE.  SO THERE'S A

15:20   7   REMARKABLE DIVERSITY OF BACKFILLING THAT INHABITS THIS

15:20   8   COMMUNITY OF EXCAVATIONS.

15:20   9   **Q.**   IF YOU ARE OUT ON THE SITE AND YOU HAVE A HOLE THAT YOU

15:20   10  WANT TO FILL UP AND YOU TAKE A PREDOMINANTLY CLAY BACKFILL AND

15:20   11  MIX IT WITH SAND AND FILL THE HOLE WITH A MIXTURE OF THEM, IN

15:21   12  GENERAL TERMS, WHAT'S THAT'S GOING TO DO TO THE PERMEABILITY OF

15:21   13  THE BACKFILL?

15:21   14  **A.**   IT REDUCES THE PERMEABILITY RELATIVE TO THE PURE SAND; AND

15:21   15  RELATIVE TO THE CLAY, IT WILL INCREASE ITS PERMEABILITY.

15:21   16          SO THE INTRODUCTION OF THE COARSER MATERIAL

15:21   17  ACCORDING, IN FACT, TO COMMON SENSE, WILL INCREASE FLOW

15:21   18  TRANSMISSION -- PRESSURE TRANSMISSION THROUGH THAT MIXTURE.

15:21   19  **Q.**   YOU MENTIONED YESTERDAY THAT RIVER SAND WAS USED OUT ON

15:21   20  THE SITE?

15:21   21  **A.**   YES.

15:21   22  **Q.**   DID YOU OBTAIN A SAMPLE OF RIVER SAND FROM MURPHY

15:21   23  CONSTRUCTION?

15:21   24  **A.**   YES.

15:21   25  **Q.**   IS MURPHY CONSTRUCTION ONE OF THE SUPPLIERS FOR THE EBIA

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 15:21 | 1 | OF RIVER SAND? |
| 15:21 | 2 | **A.**   YES, SIR. |
| 15:21 | 3 | **MR. SCHULTZ:**  WE HAVE ONE OTHER DEMONSTRATIVE FOR THE |
| 15:21 | 4 | COURT. |
| 15:21 | 5 | **THE COURT:**  ALL RIGHT. |
| 15:21 | 6 | BY MR. SCHULTZ: |
| 15:21 | 7 | **Q.**   DR. BEA, IF YOU COULD, FIRST OF ALL, I WOULD LIKE FOR YOU |
| 15:21 | 8 | TO EXPLAIN TO THE JUDGE -- |
| 15:21 | 9 | **MR. SCHULTZ:**  IF I CAN ASSIST, YOUR HONOR, I CAN HELP |
| 15:21 | 10 | HIM PUT THIS STUFF UP ON THE STAND FOR YOU. |
| 15:22 | 11 | IS IT OKAY TO APPROACH? |
| 15:22 | 12 | **THE WITNESS:**  IT'S FINE. |
| 15:22 | 13 | BY MR. SCHULTZ: |
| 15:22 | 14 | **Q.**   IF YOU WILL, EXPLAIN TO THE JUDGE WHAT YOU WILL BE DOING |
| 15:22 | 15 | AS YOU'RE PUTTING THIS TOGETHER. |
| 15:22 | 16 | **A.**   ONE OF THE ISSUES RAISED IN THIS -- |
| 15:22 | 17 | **MR. TREEBY:**  IF YOUR HONOR PLEASE, LET ME INTERRUPT |
| 15:22 | 18 | NOW RATHER THAN INTERRUPT IN THE MIDDLE JUST TO MAKE THIS |
| 15:22 | 19 | CAUTIONARY OBJECTION. |
| 15:22 | 20 | **THE COURT:**  YES, SIR. |
| 15:22 | 21 | **MR. TREEBY:**  WE SAW WHAT WAS PRODUCED AS MURPHY RIVER |
| 15:22 | 22 | SAND.  IT WAS SHOWN TO US ON SATURDAY AS A DEMONSTRATIVE.  IF |
| 15:22 | 23 | THIS WITNESS IS GOING TO TESTIFY ABOUT WHAT THE PERMEABILITY OF |
| 15:22 | 24 | THIS MATERIAL IS, WE WOULD OBJECT BECAUSE THERE HAS BEEN NO |
| 15:22 | 25 | TEST OF THESE MATERIALS.  IT'S A DEMONSTRATIVE. |

ROBERT G. BEA - REDIRECT

15:22   1              SO I DIDN'T KNOW IF HE WAS GOING THERE, BUT I
15:22   2   WANTED TO --
15:22   3         THE COURT:  YOU'RE MAKING AN ANTICIPATORY OBJECTION?
15:22   4         MR. TREEBY:  YES.
15:22   5         THE COURT:  I UNDERSTAND.  I'LL DEFER RULING ON YOUR
15:22   6   ANTICIPATORY OBJECTION UNTIL -- IF AND WHEN WE GET THERE.
15:23   7         MR. TREEBY:  THANK YOU, YOUR HONOR.
15:23   8   BY MR. SCHULTZ:
15:23   9   Q.   DR. BEA, BY WAY --
15:23  10         MR. SCHULTZ:  BY THE WAY, JUDGE -- AND I UNDERSTAND
15:23  11   THERE'S NOT AN OBJECTION IN TERMS OF CHAIN OF CUSTODY BECAUSE
15:23  12   THIS IS A DEMONSTRATIVE -- WE DID OBTAIN A PIECE OF PAPER THAT
15:23  13   IS NOT EVIDENCE BUT WOULD INDICATE THIS CAME FROM MURPHY
15:23  14   CONSTRUCTION AND IT IS PUMPED RIVER SAND.  AND WE CAN PRODUCE
15:23  15   THAT IF THE COURT DESIRES.
15:23  16         THE COURT:  ALL RIGHT.
15:23  17   BY MR. SCHULTZ:
15:23  18   Q.   DR. BEA?
15:23  19   A.   THIS -- AND I'M SORRY, IT'S BEEN -- IT'S BEEN A LITTLE BIT
15:23  20   AFFECTED BY WATER -- BUT THIS IS THE RECEIPT FROM MURPHY.
15:23  21         THE COURT:  YES, SIR.
15:23  22         THE WITNESS:  THIS IS A SAMPLE OF THE SAND.  THE SAND
15:23  23   IS DISCUSSED IN DR. TIM STARK'S EXPERT REPORT TO THE COURT.  HE
15:24  24   PRODUCED A GRADATION CURVE THAT PURPORTEDLY REPRESENTS A
15:24  25   QUANTITATIVE WAY TO TELL HOW THE SAND GRAINS ARE DISTRIBUTED IN

ROBERT G. BEA - REDIRECT

15:24    1    SIZE.

15:24    2                SO THAT SAMPLE SAID THAT THE 50TH PERCENTILE OF

15:24    3    THE SAND GRAINS HAD A DIAMETER OF .25 MILLIMETERS.  SO WE ARE

15:24    4    ABLE TO QUANTITATIVELY TELL A LOT OF THINGS ABOUT THIS

15:24    5    FASCINATING MATERIAL CALLED *MURPHY SAND*.

15:24    6                APPARENTLY, IT'S BEEN USED ALL OVER NEW ORLEANS.

15:24    7    ACCORDING TO INFORMATION FROM MR. LUKE EHRENSING, PRESIDENT OF

15:25    8    THIGPEN CONSTRUCTION SERVICES, IT'S USED TO BACKFILL AROUND

15:25    9    NEW ORLEANS ABOUT 70 PERCENT OF THE AREAS NEEDING BACKFILL.

15:25   10    THE IMPORTANCE OF THAT IS WE HAVE GOT REASONABLY GOOD ASSURANCE

15:25   11    THAT WHAT WE'VE GOT HERE IS AT LEAST REPRESENTATIVE OF WHAT'S

15:25   12    IN THAT PICTURE.

15:25   13                **THE COURT:**  THANK YOU, SIR.

15:25   14                **THE WITNESS:**  NEXT, BRIEFLY, WHAT I DID WAS I TOOK A

15:25   15    DRINK BOTTLE, AND I CUT THE BOTTOM OUT OF IT.  AND THEN MY WIFE

15:25   16    EARLIER HAD GIVEN ME SOME OF HER OLD PANTY HOSE.  I KEEP THEM

15:26   17    UNDER THE BENCH IN MY GARAGE TO WIPE SURFACES OF WOODWORK I'M

15:26   18    GOING TO VARNISH.

15:26   19                SO I THOUGHT, WELL, HOW CAN I CONTAIN THE SAND;

15:26   20    NOT LET IT COME THROUGH, BUT LET WATER COME THROUGH?

15:26   21                SO I TOOK SOME OF YOUR WATER.  THE SAND IS HERE

15:26   22    IN THE --

15:26   23                **THE COURT:**  THIS PURPORTS TO BE RIVER SAND?  THE

15:26   24    SAME --

15:26   25                **THE WITNESS:**  IT'S THE SAME.

ROBERT G. BEA - REDIRECT

15:26   1                    **THE COURT:**  -- RIVER SAND?

15:26   2   **BY MR. SCHULTZ:**

15:26   3   **Q.**   DID YOU PUT IT IN THERE YOURSELF, DR. BEA?

15:26   4   **A.**   YES, SIR.

15:27   5   **Q.**   NOW, DR. BEA, THE ANALOGY THAT YOU'RE DRAWING HERE,

15:27   6   OBVIOUSLY, WOULD BE WITH A BACKFILLED -- PURELY SAND-BACKFILLED

15:27   7   EXCAVATION --

15:27   8   **A.**   THAT'S CORRECT.

15:27   9   **Q.**   -- IN TERMS OF PERMEABILITY?

15:27   10   **A.**   THAT'S CORRECT.

15:27   11   **Q.**   AND WHAT WOULD HAPPEN, DR. BEA, IF YOU TOOK ALL OF

15:27   12   KATRINA'S SURGE WATERS AND PUT THEM ON TOP OF THE WATER THAT

15:27   13   YOU POURED INTO THAT BOTTLE?

15:27   14   **A.**   I WOULD RUPTURE THE FOOT SOCK OF MY WIFE'S PANTY HOSE.  IT

15:27   15   WOULD BLOW OUT.

15:27   16                    **MR. TREEBY:**  YOUR HONOR, WE WOULD OBJECT TO THE

15:27   17   OBJECTIVITY OF THIS DEMONSTRATION.  I DON'T THINK I SEE A DOZER

15:27   18   IN HERE THAT COMPACTED THAT SAND AND MADE IT LESS PERMEABLE.

15:27   19                    **THE COURT:**  THE COURT WILL NOTE THAT TO MY KNOWLEDGE,

15:27   20   A DOZER DID NOT COMPACT THE SAND.

15:27   21                    **THE WITNESS:**  YES, BUT YOU CAN COMPACT THE SAND.  I

15:27   22   HAVE.  ALL YOU HAVE TO DO IS PUSH DOWN ON THE BOTTLE AND BANG

15:27   23   IT UP AND DOWN UNTIL THE SAND WON'T COMPACT ANYMORE.  AND WHEN

15:28   24   YOU POUR WATER THROUGH IT, YOU GET THE SAME RESULT.

15:28   25                    **THE COURT:**  THE COURT NOTES FOR THE RECORD THAT

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 15:28 | 1 | WATER -- FOR THE PURPOSES OF THIS DEMONSTRATION THAT WATER DID |
| 15:28 | 2 | COME THROUGH THE SAND AND THROUGH THE PANTY HOSE, A CERTAIN |
| 15:28 | 3 | AMOUNT OF WATER WHICH I'M NOT GOING TO QUANTIFY, BUT THE COURT |
| 15:28 | 4 | NOTED IT WAS A RAPID DEVELOPMENT. |
| 15:28 | 5 | **THE WITNESS:**  A COUPLE. |
| 15:28 | 6 | BY MR. SCHULTZ: |
| 15:28 | 7 | **Q.**  DR. BEA, WE WILL BE LOOKING AT SOME OF THE EXCAVATIONS IN |
| 15:28 | 8 | PARTICULAR GOING FORWARD HERE. |
| 15:28 | 9 | ARE THE EXCAVATIONS THAT WE ARE TALKING ABOUT, OUT AT |
| 15:28 | 10 | BOLAND MARINE PARTICULARLY, THE SIZE OF THAT WATER BOTTLE? |
| 15:28 | 11 | **A.**  I WISH THEY WERE; BUT, NO, THEY ARE MUCH LARGER. |
| 15:28 | 12 | **MR. SCHULTZ:**  IF WE COULD LOOK, PLEASE, CARL, AT |
| 15:28 | 13 | SLIDE 17. |
| 15:28 | 14 | BY MR. SCHULTZ: |
| 15:28 | 15 | **Q.**  AGAIN, AS A PRELIMINARY AND NECESSARY, I'M AFRAID, |
| 15:28 | 16 | DISCUSSION OF YOUR CAUSATION OPINIONS, DR. BEA, WE WANTED TO |
| 15:29 | 17 | LOOK AT A HANDFUL OF THE EXCAVATIONS, THE NATURE OF THE |
| 15:29 | 18 | EXCAVATIONS THAT YOU WILL BE ARTICULATING. |
| 15:29 | 19 | LET ME ASK YOU THIS QUESTION:  IS IT, IN YOUR |
| 15:29 | 20 | OPINION, NECESSARY TO GIVE A LITTLE BACKGROUND ON THESE |
| 15:29 | 21 | EXCAVATIONS WHICH YOU HAVE BEEN QUESTIONED ON ALREADY ON |
| 15:29 | 22 | CROSS-EXAMINATION IN ORDER FOR THE COURT TO MAKE SENSE OF THE |
| 15:29 | 23 | CONCLUSIONS YOU WILL BE ARTICULATING ABOUT CAUSATION? |
| 15:29 | 24 | **A.**  YES.  AND HAVE ALREADY ARTICULATED AT THE START OF MY |
| 15:29 | 25 | TESTIMONY. |

## ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 15:29 | 1 | **Q.**   THE FIRST SLIDE, DR. BEA, IS FOUNDATION REMOVAL AND |
| 15:29 | 2 | SUBSURFACE OBSTRUCTIONS. |
| 15:29 | 3 |          I WANT TO WALK AS QUICKLY AS WE CAN THROUGH THIS.  I |
| 15:29 | 4 | WANT TO NOTE THIS AT THE OUTSET:  YOU MENTIONED YESTERDAY, I |
| 15:29 | 5 | BELIEVE, THAT THERE WERE MORE THAN 20,000 PAGES OF QARS? |
| 15:29 | 6 | **A.**   YES. |
| 15:29 | 7 | **Q.**   ARE QARS THE DAILY QUALITY ASSURANCE REPORTS, WORK |
| 15:29 | 8 | REPORTS, OUT ON THE SITE? |
| 15:29 | 9 | **A.**   THAT'S CORRECT. |
| 15:29 | 10 | **Q.**   OF THOSE 20,000 PAGES -- HOW MANY QARS THEMSELVES WERE |
| 15:30 | 11 | THERE? |
| 15:30 | 12 | **A.**   I DON'T RECALL THE NUMBER. |
| 15:30 | 13 | **Q.**   MORE THAN A THOUSAND? |
| 15:30 | 14 | **A.**   YES. |
| 15:30 | 15 | **Q.**   HOW MANY HAVE YOU BROUGHT TO EXEMPLIFY WHAT YOU ARE GOING |
| 15:30 | 16 | TO BE TALKING ABOUT TO THE COURT?  JUST A BALLPARK. |
| 15:30 | 17 | **A.**   TEN. |
| 15:30 | 18 | **Q.**   YOU MENTIONED YESTERDAY 8,000 PHOTOGRAPHS; MORE THAN |
| 15:30 | 19 | 8,000, I BELIEVE? |
| 15:30 | 20 | **A.**   YES. |
| 15:30 | 21 | **Q.**   HAVE YOU BROUGHT JUST A HANDFUL OF STUFF THAT YOU FEEL IS |
| 15:30 | 22 | IMPORTANT FOR THE COURT? |
| 15:30 | 23 | **A.**   CORRECT. |
| 15:30 | 24 | **Q.**   IF WE TAKE A LOOK FIRST, DR. BEA, AT THE FOUNDATION |
| 15:30 | 25 | REMOVAL AND SUBSURFACE OBSTRUCTIONS -- AND WE WANT TO BE BRISK |

ROBERT G. BEA - REDIRECT

15:30   1   ABOUT THIS AS WE GO THROUGH THEM -- WHAT SORT OF FOUNDATIONS

15:30   2   ARE WE TALKING ABOUT, AND WHAT SORT OF SUBSURFACE OBSTRUCTIONS,

15:30   3   IN A NUTSHELL?

15:30   4   **A.**   WELL, WE ENCOUNTERED A CONCRETE BLOCK AT, IN THIS CASE,

15:30   5   BOLAND MARINE SPECIFICALLY ASSOCIATED WITH A BUILDING

15:31   6   SUBSURFACE SUPPORT PAD, AND AN EXCAVATOR IS DIGGING AT THAT

15:31   7   FOUNDATION.

15:31   8          DIMENSIONS OF THE EXCAVATOR, RELATIVE TO WHERE IT'S

15:31   9   REACHING INTO THAT HOLE THAT'S BEEN PRODUCED THERE, IS

15:31  10   SOMETHING TO THE ORDER OF 15 FEET.

15:31  11   **Q.**   IF WE TAKE A LOOK, PLEASE, AT PX-3376-0327 --

15:31  12          **MR. SCHULTZ:**  AND I DO HAVE COPIES OF THESE FOR

15:31  13   COUNSEL IF YOU WOULD LIKE THEM.  THEY WILL ALL BE PHOTOGRAPHS,

15:31  14   BUT WE CAN FIND HARD COPIES.

15:31  15          **THE COURT:**  IS THAT THE SO-CALLED *WEDDING CAKE*

15:31  16   *STRUCTURE*?

15:31  17          **THE WITNESS:**  NO.  IT'S A DIFFERENT STRUCTURE.

15:31  18          **THE COURT:**  DIFFERENT STRUCTURE.  THANK YOU.

15:31  19   BY MR. SCHULTZ:

15:31  20   **Q.**   NOW, DO WE HAVE HERE, DR. BEA, AN EXAMPLE OF A SUBSURFACE

15:31  21   SLAB?

15:31  22   **A.**   YES, SIR.

15:31  23   **Q.**   IS THIS JUST AN EXAMPLE OF HOW SLABS COULD BE

15:32  24   THEMSELVES -- HAVE SOME DEPTH TO THEM?

15:32  25   **A.**   YES.

ROBERT G. BEA - REDIRECT

15:32    1   **Q.**   SO WHEN WE SEE REMOVAL OF FOUNDATIONS AND THE FOUNDATIONS
15:32    2   FOR ALL THE BUILDINGS OUT ON THE SITE, THEY ARE NOT ALL
15:32    3   NECESSARILY 6 INCHES THICK, FOR EXAMPLE, ARE THEY?
15:32    4   **A.**   THAT'S CORRECT.  TYPICALLY, THEY WERE REPORTED AS 2 FEET
15:32    5   IN DEPTH, AND THE PHOTOGRAPH SHOWS A CONCRETE FOUNDATION
15:32    6   SUBSTANTIALLY DEEPER PENETRATING THAN 2 FEET.
15:32    7   **Q.**   DID MANY OF THESE FOUNDATIONS -- OR AT LEAST SOME OF THE
15:32    8   FOUNDATIONS AT SAUCER AND BOLAND MARINE IN PARTICULAR -- HAVE
15:32    9   SUBSURFACE PILINGS BENEATH THE SLAB?
15:32   10   **A.**   YES.
15:32   11   **Q.**   WITH REFERENCE TO YOUR 6 TO 8 FOOT OF STRIKE ZONE, IF YOU
15:32   12   WILL, FOR THE SWAMP MARSH LAYER, WOULD THESE PILINGS, AS A
15:32   13   RULE, PIERCE THAT 6-TO-8-FOOT DEPTH?
15:33   14   **A.**   YES.
15:33   15         **MR. SCHULTZ:**  IF WE COULD LOOK, PLEASE, AT THE
15:33   16   FOLLOWING SLIDE, CARL, SLIDE 18.
15:33   17   **BY MR. SCHULTZ:**
15:33   18   **Q.**   WOULD THIS BE AN EXAMPLE, DR. BEA, OF PILING REMOVAL AT
15:33   19   THE SITE?
15:33   20   **A.**   YES, SIR.
15:33   21   **Q.**   THIS PARTICULAR ONE AT BOLAND MARINE?
15:33   22   **A.**   THAT'S CORRECT.
15:33   23   **Q.**   IS THERE -- WELL, LET ME ASK YOU THIS:  LET'S PULL UP
15:33   24   JX 1261, WHICH IS A DEMOLITION WORK PLAN SUBMITTED BY HAMP'S
15:33   25   CONSTRUCTION, LLC.

ROBERT G. BEA - REDIRECT

| | |
|---|---|
| 15:33 | 1 |
| 15:33 | 2 |
| 15:33 | 3 |
| 15:33 | 4 |
| 15:33 | 5 |
| 15:34 | 6 |
| 15:34 | 7 |
| 15:34 | 8 |
| 15:34 | 9 |
| 15:34 | 10 |
| 15:34 | 11 |
| 15:34 | 12 |
| 15:34 | 13 |
| 15:34 | 14 |
| 15:34 | 15 |
| 15:34 | 16 |
| 15:34 | 17 |
| 15:34 | 18 |
| 15:34 | 19 |
| 15:34 | 20 |
| 15:34 | 21 |
| 15:35 | 22 |
| 15:35 | 23 |
| 15:35 | 24 |
| 15:35 | 25 |

1            DO YOU RECOGNIZE THIS DOCUMENT, DR. BEA?

2   **A.**   YES.

3   **Q.**   DO YOU HAVE YOUR COPY IN HAND?

4   **A.**   YES, SIR.

5   **Q.**   IF WE CAN LOOK AT PAGE 23 OF THE DOCUMENT AT SECTION 3.6,

6   WE HAVE -- FIRST OF ALL, IS THIS A DEMOLITION PLAN THAT

7   INCLUDES ON THE FACE OF IT -- AND BASED ON YOUR REVIEW OF IT --

8   REMOVAL BY A SUBCONTRACTOR FOR WGI OF UNDERGROUND PIPING AND

9   PILINGS?

10  **A.**   THAT'S CORRECT.

11  **Q.**   I APOLOGIZE.  WE SHOULD BEEN AT PAGE 20, I BELIEVE, FOR

12  PILINGS.

13  **A.**   THAT'S CORRECT.

14  **Q.**   AT SECTION 3.3, IT INDICATES THAT TIMBER PILES ARE ASSUMED

15  TO BE 20 FEET BY 20 INCHES DIAMETER BY 40 FEET IN VERTICAL

16  LENGTH AND ARE ESTIMATED TO BE PRESENT UNDER BUILDING

17  STRUCTURES AND ALONG THE SHORELINE.  THIS IS A PLANNING

18  DOCUMENT.

19          DR. BEA, BASED ON YOUR REVIEW OF THE RECORDS, WERE

20  THERE IN FACT TIMBER PILINGS OF THOSE GENERAL DIMENSIONS FOUND

21  BENEATH BUILDING FOUNDATIONS ALONG THE SHORELINE?

22  **A.**   YES.  AND OTHER FOUNDATIONS OTHER THAN BUILDINGS.

23  **Q.**   THERE IS AN INDICATION THAT PRIOR TO EXTRACTING THESE

24  WOODPILES, THE SUBCONTRACTOR WOULD EXPOSE AT LEAST 2 FEET OF

25  ALL TIMBER PILES WITH THE EXCAVATOR AND CUT OFF THE DAMAGED

## ROBERT G. BEA - REDIRECT

15:35  1  TOPS OF THE PILINGS USING A CHAIN SAW.

15:35  2          ARE THESE ALREADY BY THEIR NATURE SUBSURFACE

15:35  3  STRUCTURES, THE PILINGS, BY THE TIME THEY ARE EXCAVATING DOWN

15:35  4  2 FEET ON THEM?

15:35  5  **A.**   YES, SIR.

15:35  6  **Q.**   WOULD THAT BE ONE OF THE REASONS FOR THAT MYSTERY OR

15:35  7  CONCLUSION THAT, LET'S SAY, THE MAJORITY OF THESE PILINGS WOULD

15:35  8  GO DEEPER THAN THE 6-TO-8-FOOT STRIKE ZONE?

15:35  9  **A.**   THAT'S CORRECT.

15:35  10  **Q.**   IF WE COULD LOOK AT -- LET ME ASK YOU ABOUT NUMBERS.

15:35  11          SAUCER AND BOLAND MARINE:  DO YOU HAVE EVEN A GENERAL

15:35  12  BALLPARK OF HOW MANY FOUNDATION PILINGS THERE WERE OUT ON THESE

15:35  13  SITES THAT WERE PULLED?

15:35  14  **A.**   HUNDREDS.

15:35  15  **Q.**   AS A RULE, WERE THESE BASED -- ON YOUR REVIEW OF THE

15:35  16  DOCUMENTS, WERE THESE PILING VOIDS BACKFILLED?

15:35  17  **A.**   NO.

15:36  18          **MR. SCHULTZ:**  IF WE COULD TAKE A LOOK, PLEASE, CARL,

15:36  19  AT PX-3375-0014.  WE HAVE GOT TWO PHOTOGRAPHS HERE.  IF WE

15:36  20  COULD BLOW BOTH OF THEM UP SIMULTANEOUSLY, I THINK THAT WOULD

15:36  21  BE A LITTLE QUICKER.

15:36  22  **BY MR. SCHULTZ:**

15:36  23  **Q.**   DR. BEA, ARE THESE JUST EXAMPLES OF FOUNDATION PILINGS OUT

15:36  24  AT SAUCER MARINE?

15:36  25  **A.**   YES, SIR.

ROBERT G. BEA - REDIRECT

15:36   1    Q.   SOME OF THE HUNDREDS YOU WERE REFERRING TO?

15:36   2    A.   THAT'S CORRECT.

15:36   3          MR. SCHULTZ:  THE NEXT EXHIBIT, PLEASE, CARL, WOULD

15:36   4    BE 3393-0347.

15:36   5    BY MR. SCHULTZ:

15:36   6    Q.   PERHAPS YOU COULD DESCRIBE FOR THE COURT, DR. BEA, WHAT WE

15:36   7    SEE IN THE PHOTOGRAPH.

15:36   8          FIRST OF ALL, LET'S ORIENT WHERE WE ARE.

15:36   9          WHICH SITE IS THIS ON?

15:36   10         THE COURT:  JUST A SECOND, COUNSEL.

15:36   11         THE LAW CLERK:  NONE OF THESE PICTURES I HAVE, SO IF

15:36   12   YOU COULD MAKE -- GIVE US COPIES.

15:37   13         MR. SCHULTZ:  YES, WE ABSOLUTELY SHOULD HAVE GIVEN

15:37   14   THEM TO YOU, AND I BELIEVE WE HAVE A SET RIGHT HERE IN ORDER

15:37   15   THAT WE CAN GIVE TO YOU.

15:37   16         THE COURT:  I CAN'T HEAR.

15:37   17         MR. TREEBY:  YOUR HONOR, I WAS ASKING COUNSEL -- AND

15:37   18   IF HE DOESN'T WANT TO, WE WILL MAKE DO -- I WAS ASKING HIM FOR

15:37   19   A SET.  IF HE HAS A SET, I WOULD LIKE A SET.  I DON'T HAVE TO

15:37   20   HAVE THEM NOW.  I WOULD JUST LIKE TO HAVE THEM SO TO SAVE ME

15:37   21   FROM HAVING TO GO AND PHYSICALLY PULL THEM ALL OUT NOW TO BE

15:37   22   PREPARED TO ASK HIM A FEW QUESTIONS.

15:37   23         THE COURT:  RIGHT.

15:37   24         MR. SCHULTZ:  YOUR HONOR, THAT IS NOT PART OF THE

15:37   25   COURT RULE.  I'M HAPPY TO LIVE BY THAT RULE AS LONG AS IT'S

ROBERT G. BEA - REDIRECT

15:37   1   GOOD FOR THE GANDER WHILE I'M ON THE DEFENSE SIDE IF WE ARE NOW

15:37   2   GOING TO TRADE EXHIBITS.

15:37   3           **MR. TREEBY:**  YOU SAID WE COULD TRADE THEM AS WE GO.

15:37   4   THAT'S FINE.  LET'S JUST DO THAT.  YOU GIVE THEM TO ME AS YOU

15:37   5   GET THEM.  THAT'S FINE.  I'LL DO THE SAME.  I'LL DO THE SAME.

15:38   6           **THE COURT:**  THERE'S NO RULE.

15:38   7           **MR. SCHULTZ:**  YOUR HONOR, I'M FINE AS LONG AS WE ARE

15:38   8   ALL PLAYING BY THE SAME RULES.

15:38   9           **THE COURT:**  AS LONG AS IT'S A MORE ELEGANT

15:38  10   PRESENTATION FOR EVERYONE.  WE NEED THEM SIMPLY BECAUSE WE MAKE

15:38  11   SIMULTANEOUS NOTES ON THEM.

15:38  12           **MR. SCHULTZ:**  MY APOLOGIES.  IT WAS MY UNDERSTANDING

15:38  13   WE HAD DELIVERED A SET IN ORDER JUST LIKE THE ONE I'M PULLING

15:38  14   FROM, JUST LIKE I HAVE FOR THE DEFENDANTS THAT I CAN HAND TO

15:38  15   THEM.

15:38  16               AND WE ARE ACTUALLY AT AN HOUR BREAK.  WE CAN

15:38  17   HAVE THAT SITTING HERE WHEN WE COME BACK FROM IT IF THAT WILL

15:38  18   HELP.

15:38  19           **MR. TREEBY:**  YOUR HONOR, I'M NOT TRYING TO MAKE

15:38  20   TROUBLE.  I'M JUST TRYING TO SAY WITH THIS WITNESS, SINCE I

15:38  21   THINK HE IS GOING TO PROBABLY TAKE UP ON REDIRECT MOST OF THE

15:38  22   REST OF THE DAY --

15:38  23           **THE COURT:**  I WOULD AGREE.

15:38  24           **MR. TREEBY:**  -- I CAN TAKE HIM AT THE END, BUT WHEN

15:38  25   WE GET THE SHORTER WITNESSES -- AND I'LL FOLLOW THIS RULE

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 15:38 | 1 | TOO -- IF COUNSEL WANTS THEM, I WILL HAND THEM TO HIM AS WE USE |
| 15:38 | 2 | THEM SO HE'S GOT THEM. |
| 15:38 | 3 | **THE COURT:**  IT CAN EXPEDITE THE PROCESS. |
| 15:39 | 4 | **MR. TREEBY:**  YES. |
| 15:39 | 5 | **MR. SCHULTZ:**  JUST SO WE'RE ALL ON THE SAME PAGE, |
| 15:39 | 6 | JUDGE, WHAT I PLAN TO DO ON THE BREAK IS JUST HAND YOU A STACK |
| 15:39 | 7 | THAT I THINK WILL APPROXIMATE WHAT I'M GOING TO DO THROUGH THE |
| 15:39 | 8 | DAY, WHICH MAY BE THE MAJORITY OF THEM. |
| 15:39 | 9 | BUT WHAT I DON'T WANT TO DO, UNLESS WE ARE GOING |
| 15:39 | 10 | TO HAVE AN UNDERSTANDING BETWEEN THE PARTIES, IS HAND OVER WHAT |
| 15:39 | 11 | WOULD BE EFFECTIVELY AN OUTLINE OF THE ENTIRE PRESENTATION. |
| 15:39 | 12 | **MR. TREEBY:**  I DON'T WANT THAT. |
| 15:39 | 13 | **THE COURT:**  HE IS NOT ASKING FOR THAT. |
| 15:39 | 14 | **MR. TREEBY:**  I DON'T WANT THAT. |
| 15:39 | 15 | **MR. SCHULTZ:**  I THINK WE ARE ON THE SAME PAGE. |
| 15:39 | 16 | SO A BREAK, YOUR HONOR? |
| 15:39 | 17 | **THE COURT:**  YES. |
| 15:39 | 18 | (RECESS.) |
| 15:56 | 19 | **THE COURT:**  YES, SIR. |
| 15:56 | 20 | **MR. SCHULTZ:**  WHAT I HAVE DONE, YOUR HONOR, IS WHAT |
| 15:56 | 21 | WE COULD PUT TOGETHER IN ORDER DURING THE BREAK.  I HOPE WE'LL |
| 15:56 | 22 | CARRY THIS THROUGH THE BALANCE OF THE DAY.  WE HAVE PROVIDED |
| 15:56 | 23 | THESE TO THE DEFENDANTS.  I'M TRYING TO FIND MY STOPPING POINT. |
| 15:56 | 24 | THOSE ARE THE ONES WE HAVE DONE.  THIS IS WHERE WE ARE. |
| 15:56 | 25 | **THE COURT:**  THANK YOU.  OKAY.  TIME PASSES FAST WHEN |

ROBERT G. BEA - REDIRECT

15:57   1   YOU ARE HAVING THIS MUCH FUN.

15:57   2         **MR. SCHULTZ:**  I UNDERSTAND, YOUR HONOR.  IT IS

15:57   3   SOMEWHAT LABORIOUS GOING THROUGH THESE.  THAT'S WHY DR. BEA

15:57   4   TOOK SO MUCH TIME TO CULL THEM DOWN.

15:57   5   **BY MR. SCHULTZ:**

15:57   6   **Q.**   DR. BEA, WE WERE LOOKING AT THIS PHOTOGRAPH WHEN WE TOOK

15:57   7   THE BREAK.  IT IS, FOR THE RECORD, ACCORDING TO THE

15:57   8   CONTEMPORANEOUS TIME CODE, A PHOTOGRAPH TAKEN ON NOVEMBER 7,

15:57   9   2001, PHOTOGRAPH 6 AT BOLAND MARINE, ENTITLED "SUBSURFACE

15:57   10  CONCRETE EAST OF HAUL ROAD."  I WOULD LIKE TO ORIENT THE COURT

15:57   11  AS TO WHERE WE ARE ON THE SITE WITH RESPECT TO THE OBJECT IN

15:57   12  THIS PHOTOGRAPH.

15:57   13  **A.**   THE FOUNDATION BLOCK IS APPROXIMATELY 200 FEET WEST OF THE

15:57   14  FLOODWALL.  WE ARE TO THE WEST OF SUREKOTE ROAD.  YOU CAN SEE

15:58   15  THE SINGLE TRAILER IN THE BACKGROUND THAT'S AT THE EARLY STAGE,

15:58   16  BEFORE WE MOVE THOSE TRAILERS TO THE EAST SIDE OF SUREKOTE

15:58   17  ROAD.  THE BRIDGE IN THE BACKGROUND IS THE CLAIBORNE AVENUE

15:58   18  BRIDGE.  SO WE ARE LOOKING FROM NORTH TO SOUTH.

15:58   19         THAT CONCRETE BLOCK IS APPROXIMATELY 150 FEET SOUTH

15:58   20  OF THE SOUTH END OF THE NORTH BREACH.  AND THERE'S AN

15:58   21  EXCAVATION, A TRANSITE EXCAVATION THAT HAS CARRIED US VIRTUALLY

15:58   22  TO THE SHOULDER OF SUREKOTE ROAD.  AND AS THEY WERE PERFORMING

15:58   23  THIS EXCAVATION, THEY UNCOVERED BY SURPRISE THESE TWO BURIED

15:59   24  CONCRETE BLOCKS.

15:59   25         NOT SHOWN YET, PERHAPS IT WILL BE LATER, UNDER THOSE

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 15:59 | 1 | CONCRETE BLOCKS ARE DEEPLY FOUNDED PILING. |
| 15:59 | 2 | **Q.**   STILL UNDER THIS GENERAL HEADING, DR. BEA, OF FOUNDATIONS |
| 15:59 | 3 | AND SUBSURFACE OBSTRUCTIONS, IS THIS THEN ANOTHER EXAMPLE OF A |
| 15:59 | 4 | SUBSURFACE CONCRETE FOUNDATION THAT HAS ALREADY BEEN EXCAVATED |
| 15:59 | 5 | AROUND? |
| 15:59 | 6 | **A.**   YES.  AND THIS WAS ACTUALLY AN IMPORTANT -- VERY IMPORTANT |
| 15:59 | 7 | FINDING FOR ME.  THIS EXCAVATION IS CONCORDANT WITH OUR |
| 16:00 | 8 | MYSTERIOUS LABELED, SOMETIMES IMAGINARY, SQUARE BOX. |
| 16:00 | 9 | **Q.**   NOW, DR. BEA, THERE'S AN AREA, IS THERE NOT, JUST NORTH OF |
| 16:00 | 10 | THIS THAT WILL BECOME RELEVANT IN TERMS OF TRANSITE |
| 16:00 | 11 | EXCAVATIONS? |
| 16:00 | 12 | **A.**   THAT'S CORRECT. |
| 16:00 | 13 | **Q.**   THE AREA YOU REFERRED TO YESTERDAY KNOWN AS THE AREA EAST |
| 16:00 | 14 | OF 8? |
| 16:00 | 15 | **A.**   THAT'S CORRECT. |
| 16:00 | 16 | **Q.**   WE WILL GET THERE, DR. BEA.  BUT IN YOUR OPINION, DO |
| 16:00 | 17 | THE -- DOES THE DEPTH OF THE FOUNDATION BLOCKS SEEN HERE HAVE |
| 16:00 | 18 | ANY CONNECTION IN CAUSATION TERMS WITH THAT AREA EAST OF 8 THAT |
| 16:00 | 19 | YOU WILL DISCUSS LATER TODAY OR TOMORROW MORNING? |
| 16:00 | 20 | **A.**   THAT'S CORRECT. |
| 16:00 | 21 | **Q.**   IN WHAT WAY? |
| 16:00 | 22 | **A.**   WELL, WE ARE ESTABLISHING MULTIPLE OF HYDRAULIC |
| 16:00 | 23 | CONNECTIONS.  THIS IS ALSO ONE OF THE FRUSTRATIONS I WAS |
| 16:00 | 24 | EXPRESSING WITH THESE TWO-DIMENSIONAL EAST-WEST CROSS SECTIONS |
| 16:00 | 25 | WE WORK WITH, THIS BEING 150 FEET SOUTH OF THAT CROSS SECTION |

ROBERT G. BEA - REDIRECT

16:01  1   APPROXIMATELY.  THE DEPTH AND EXTENT OF THESE EXCAVATIONS AND

16:01  2   THE PILING UNDER THEM CAN, IN FACT, COMMUNICATE WITH THAT

16:01  3   CROSS SECTION.  IT'S A T-CONNECTION.  SO THESE THINGS NORTH AND

16:01  4   SOUTH OF THE LOCATION THAT MR. TREEBY WAS ASKING ME ABOUT ARE

16:01  5   ABLE TO FEED THAT CROSS SECTION.

16:01  6          MR. SCHULTZ:  IF WE GO TO THE NEXT SLIDE, PLEASE,

16:01  7   CARL, SLIDE 19.

16:01  8   BY MR. SCHULTZ:

16:01  9   Q.   AGAIN, MOVING THROUGH THE TYPES OF EXCAVATIONS, DR. BEA,

16:01  10  THIS IS A SERIES OF DOCUMENTS CONCERNING GRID TRENCHING, WHICH

16:01  11  YOU HAVE TALKED ABOUT ON CROSS-EXAMINATION.

16:01  12  A.   YES, SIR.

16:01  13  Q.   TELL THE COURT AGAIN THE SPECIFIED DEPTH FOR GRID

16:01  14  TRENCHES.

16:01  15  A.   5 FEET PLUS OR MINUS.

16:01  16  Q.   NOW, MR. TREEBY ASKED YOU THIS MORNING -- I THINK IT WAS

16:02  17  THIS MORNING -- WHETHER YOU KNEW OF ANY GRID TRENCHING THAT

16:02  18  EITHER WENT TO A DEPTH OF 14 FEET OR FOUND OBSTRUCTIONS THAT

16:02  19  THEMSELVES WENT TO A DEPTH OF 14 FEET.  AND I BELIEVE YOUR

16:02  20  ANSWER WAS THAT YOU DID NOT KNOW OF ANY.  CORRECT?

16:02  21  A.   CORRECT.

16:02  22  Q.   BASED ON THE TESTIMONY YOU HAVE ALREADY GIVEN ABOUT WHERE

16:02  23  THAT TOP OF SWAMP MARSH IS LOCATED, DO YOU HAVE TO GET TO

16:02  24  14 FEET --

16:02  25  A.   NO.

## ROBERT G. BEA - REDIRECT

16:02  1   **Q.**   -- FOR THEM TO BE OF CONCERN?

16:02  2   **A.**   NO.

16:02  3        **MR. SCHULTZ:**  LET'S PULL UP, IF WE CAN, JX-1238.  I

16:02  4   BELIEVE THIS IS --

16:02  5   **BY MR. SCHULTZ:**

16:02  6   **Q.**   LET ME ASK YOU, DR. BEA --

16:02  7   **A.**   NUMBER AGAIN?

16:02  8   **Q.**   SIR?  I'M SORRY.  JX-1238.

16:02  9   **A.**   THANK YOU.

16:02  10  **Q.**   AN E-MAIL FROM JEAN SPADARO TO LEE GUILLORY.

16:02  11       **THE COURT:**  YOU'RE GOING TO BLOW THIS UP?

16:02  12       **MR. SCHULTZ:**  I WAS JUST CHECKING, YOUR HONOR, TO SEE

16:02  13  IF THIS HAD BEEN USED WITH DR. ROGERS.  I WAS NOT IN THE

16:03  14  COURTROOM AT THE TIME.  I'D LIKE TO KNOW IF THE COURT HAS SEEN

16:03  15  IT BEFORE.

16:03  16  **BY MR. SCHULTZ:**

16:03  17  **Q.**   DR. BEA, HAVE YOU SEEN THIS E-MAIL BEFORE?

16:03  18  **A.**   YES.

16:03  19  **Q.**   THE SUBJECT OF THE E-MAIL, BY ITS OWN TITLE, IS INNER

16:03  20  HARBOR NAVIGATIONAL CANAL EAST SIDE INDUSTRIAL AREA

16:03  21  DEMOLITION," DATED SEPTEMBER 13, 2000.

16:03  22       WHERE IN THE TERMS OF THE LIFE OF THE PROJECT WOULD

16:03  23  SEPTEMBER 13, 2000, BE?

16:03  24  **A.**   IT PUTS US VERY EARLY, BEFORE WE ARE INTO ANY SIGNIFICANT

16:03  25  SITE-CLEARING ACTIVITIES.

## ROBERT G. BEA - REDIRECT

16:03   1   **Q.**   DO YOU RECOGNIZE -- IF WE LOOK UP AT THE TOP, THE

16:03   2   FORWARDING E-MAIL IS FROM JEAN SPADARO TO MR. LEE GUILLORY.  DO

16:03   3   YOU RECOGNIZE LEE GUILLORY AS ONE OF THE TOP CORPS FOLKS?

16:03   4   **A.**   YES, SIR.

16:03   5   **Q.**   THAT PORTION OF THE E-MAIL IS ENTITLED "GEOTECHNICAL INPUT

16:03   6   FOR EAST SIDE DEMOLITION"?

16:03   7   **A.**   THAT'S CORRECT.

16:03   8   **Q.**   OF INTEREST, DR. BEA, IT INDICATES THERE WAS A MEETING ON

16:03   9   SEPTEMBER 8, 2000, WITH MS. SPADARO, REQUESTING GEOTECH INPUT.

16:03  10   IN SUBSECTION D -- IF WE GO UP TO THE TOP, JUST SO THE RECORD

16:04  11   IS CLEAR, THE FORWARDING MESSAGE, DR. BEA, IS FROM JIM GATELY:

16:04  12   "JEAN, HERE IS WHAT I HAVE.  I CAN'T THINK OF ANY MORE THAN

16:04  13   THIS.  CALL IF YOU HAVE ANY QUESTIONS."

16:04  14          DOES IT APPEAR, DR. BEA, THAT JEAN SPADARO TOOK THAT

16:04  15   E-MAIL FROM MR. GATELY AND FORWARDED IT TO MR. GUILLORY?

16:04  16   **A.**   THAT'S CORRECT.

16:04  17   **Q.**   THAT E-MAIL INCLUDES REFERENCE TO THE MEETING THAT I JUST

16:04  18   MADE AND SOME DISCUSSION, DOES IT NOT, OF BACKFILL AND

16:04  19   COMPACTION OF EXCAVATIONS ON THE EBIA?

16:04  20   **A.**   YES.

16:04  21   **Q.**   PARTICULARLY SECTION B INDICATES THAT "ANY EXCAVATION

16:04  22   DEEPER THAN 3 FEET SHALL HAVE THE SLOPES CUT ON A 1V ON 3H

16:04  23   SLOPE."  WHAT DOES THAT MEAN?

16:04  24   **A.**   1 VERTICAL FOOT TO 3 HORIZONTAL SLOPE.  IT'S A SLOPE THAT

16:04  25   WOULD MATCH THAT 1 TO 3 DIMENSION.

ROBERT G. BEA - REDIRECT

16:04  1    Q.   IF WE LOOK DOWN AT SUBPARAGRAPH D, IT INDICATES OR STATES:

16:05  2    "SOIL USED TO BACKFILL ANY OF THE EXCAVATIONS SHALL BE

16:05  3    COMPACTED TO THE DENSITY OF THE EXISTING SOIL."

16:05  4         LET ME PREFACE THIS BY ASKING THIS:  DO YOU KNOW OF

16:05  5    ANY E-MAIL SUGGESTING OR CONFIRMING WHETHER THIS WAS

16:05  6    COMMUNICATED TO WGI THEMSELVES?

16:05  7    A.   NO, I COULD NOT MAKE THAT CONNECTION, BUT IT'S REASONABLE

16:05  8    TO EXPECT IT WOULD HAVE BEEN.

16:05  9    Q.   EVEN IF IT WAS NOT, DR. BEA, IN YOUR OPINION, HAVING

16:05  10   REVIEWED THIS E-MAIL AND WHAT WE ARE ABOUT TO DISCUSS, DOES

16:05  11   THIS REFLECT WHAT WOULD HAVE BEEN GOOD ENGINEERING PRACTICES IF

16:05  12   CARRIED OUT ON THE EBIA --

16:05  13   A.   YES.

16:05  14   Q.   -- IN TERMS OF BACKFILL AND COMPACTION?

16:05  15   A.   IT WAS THE RECOMMENDATIONS THAT WERE DEVELOPED BY A WOMAN

16:05  16   WHO HAS A GOOD GEOTECHNICAL ENGINEERING BACKGROUND.

16:05  17   Q.   AGAIN, THE INDICATION THAT SOIL USED TO BACKFILL ANY OF

16:05  18   THE EXCAVATIONS SHALL BE COMPACTED TO THE DENSITY OF THE

16:06  19   EXISTING SOIL, IN ORDER TO COMPLY WITH SUCH A REQUIREMENT OR

16:06  20   SUGGESTION OR ADMONITION OR GOOD ENGINEERING PRACTICE, WOULD

16:06  21   HAVE YOU TO TEST THE DENSITY OF THE EXISTING SOIL AT THE SITE

16:06  22   BEFORE YOU EVER DUG IN ORDER TO COMPLY?

16:06  23   A.   CERTAINLY.

16:06  24   Q.   HAVE YOU SEEN ANY INDICATION IN THE RECORDS THAT YOU HAVE

16:06  25   REVIEWED THAT WGI ENGAGED IN ANY SORT OF TESTING OF THE DENSITY

ROBERT G. BEA - REDIRECT

16:06    1    OF THE EXISTING SOIL BEFORE THEY STARTED DIGGING THE HOLES?

16:06    2    **A.**   I HAVEN'T SEEN OR LOCATED ANY DOCUMENTATION OF SUCH

16:06    3    ACTIVITIES.

16:06    4              **THE COURT:**  NOT TO DISRUPT YOU TOO MUCH, COUNSEL, BUT

16:06    5    MAINLY OUT OF CURIOSITY, HOW IS DENSITY EXPRESSED FROM A

16:06    6    GEOTECHNICAL STANDPOINT?

16:06    7              **THE WITNESS:**  IT'S PERCENT OF RELATIVE DENSITY.

16:06    8              IF YOU DEPOSITED A SOIL THROUGH WATER TO THE

16:07    9    BOTTOM OF AN EXCAVATION, IT WOULD BE VERY, VERY LOOSE.  IF I

16:07   10    DEPOSITED THAT SEDIMENT AND COMPACTED IT, IT WOULD GET DENSER.

16:07   11    THE ENGINEERS CAN MEASURE THE PERCENT COMPACTION RELATIVE

16:07   12    DENSITY TO THAT INITIAL STATE BY JUST POURING IT THROUGH WATER.

16:07   13              **THE COURT:**  SO IN ORDER TO DETERMINE THE DENSITY OF

16:07   14    THE EXISTING SOIL, HOW WOULD THAT BE EXPRESSED?

16:07   15              **THE WITNESS:**  POUNDS PER CUBIC FOOT.

16:07   16              **THE COURT:**  THERE YOU GO.

16:07   17              **THE WITNESS:**  OR YOU COULD DO A MORE SOPHISTICATED

16:07   18    DENSITY TESTING.

16:07   19              **THE COURT:**  OKAY.

16:07   20    **BY MR. SCHULTZ:**

16:07   21    **Q.**   IS THERE A MEANS OF -- AT LEAST A ROUGH APPROXIMATION-TYPE

16:07   22    FIELD TEST FOR DOING THIS SORT OF THING?

16:07   23    **A.**   SURE.

16:07   24    **Q.**   SO FOLLOWING THROUGH WITH THE LOGIC, IN ORDER TO COMPLY

16:07   25    WITH EITHER A DIRECTIVE OF THIS SORT OR JUST TO ENGAGE IN THIS

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 16:08 | 1 | AS A GOOD ENGINEERING PRACTICE, IF YOU WANT TO COMPACT BACK TO |
| 16:08 | 2 | THE DENSITY OF THE PREEXISTING SOIL, DO YOU ALSO HAVE TO TEST |
| 16:08 | 3 | THE ACTUAL COMPACTION THAT YOU HAVE ACHIEVED WHEN YOU BACKFILL? |
| 16:08 | 4 | **A.**   YES.   THERE ARE WELL-ACCEPTED GUIDELINES, FOR EXAMPLE, |
| 16:08 | 5 | PUBLISHED BY THE AMERICAN SOCIETY FOR TESTING AND MATERIALS, TO |
| 16:08 | 6 | PERFORM SUCH TESTS AND MAKE SUCH DETERMINATIONS. |
| 16:08 | 7 | **Q.**   IS THAT SOMETHING THAT CAN BE ACHIEVED IN THE FIELD? |
| 16:08 | 8 | **A.**   YES. |
| 16:08 | 9 | **Q.**   THERE WOULD NOT HAVE BEEN A PRACTICAL IMPEDIMENT, IN OTHER |
| 16:08 | 10 | WORDS, IN YOUR OPINION, TO DOING IT OUT ON THE SITE? |
| 16:08 | 11 | **A.**   THAT'S CORRECT. |
| 16:08 | 12 | **MR. SCHULTZ:**  FORGIVE ME, JUDGE, IF I'M BEING |
| 16:08 | 13 | REDUNDANT, BECAUSE I WASN'T HERE WITH DR. ROGERS, BUT I'LL ASK |
| 16:08 | 14 | THE QUESTION. |
| 16:08 | 15 | **BY MR. SCHULTZ:** |
| 16:08 | 16 | **Q.**   IN ORDER TO ACHIEVE THE DENSITY OF THE PREEXISTING SOIL, |
| 16:08 | 17 | DO YOU AT TIMES, PARTICULARLY WITH DEEPER HOLES, NEED TO |
| 16:08 | 18 | COMPACT AND LIFT? |
| 16:08 | 19 | **A.**   WITHOUT A DOUBT.  IF YOU DON'T, YOU CAN'T GET SUFFICIENT |
| 16:08 | 20 | COMPACTING ENERGY TO THE LAYER YOU'RE TRYING TO COMPACT.  IF |
| 16:09 | 21 | YOU MAKE IT TOO THICK, THE COMPACTION IS HAPPENING VERY CLOSE |
| 16:09 | 22 | TO THE SURFACE, BUT THE MATERIALS UNDER AREN'T.  SO USING THE |
| 16:09 | 23 | THIN-LIFT APPROACH IS A WAY TO PREVENT THAT TYPE OF RESULT. |
| 16:09 | 24 | THIS IS THE REASON WHY IN CONSTRUCTION OF ROADBEDS |
| 16:09 | 25 | THEY SPECIFY TO CONSTRUCT THEM IN THIN LAYERS.  SOMETIMES YOU |

ROBERT G. BEA - REDIRECT

16:09    1    CAN SEE A SHEET FOOT ROLLER GOING OVER THE ROADBED OR -- I'LL

16:09    2    SHOW MY AGE -- WITH A STEAMROLLER.  AND THAT'S WHAT THEY ARE

16:09    3    DOING.  SO THEY HAVE TO MAINTAIN THE THINNESS TO ACHIEVE THE

16:09    4    REQUIRED COMPACTIONS.

16:09    5    Q.   WAS THE LEVEE REPAIR AT MCDONOUGH AREA 1, A PHOTO FROM A

16:10    6    PAGE IN YOUR REPORT YESTERDAY, WHEN THAT WAS PERFORMED BY WGI,

16:10    7    TO YOUR RECOLLECTION, DID THEY COMPACT THAT IN LIFTS?

16:10    8    A.   YES.

16:10    9    Q.   SO WGI, DO YOU INFER, WAS FAMILIAR WITH THE CONCEPT OF

16:10    10   COMPACTING IN LIFTS?

16:10    11   A.   YES.

16:10    12          THE COURT:  WHEN YOU SAY MCDONOUGH AREA 1, BECAUSE I

16:10    13   GOT A LITTLE MIXED UP READING THE DEPOSITIONS, WE ARE NOT

16:10    14   TALKING ABOUT THE BORROW PIT BUT SOMETHING ELSE?

16:10    15          MR. SCHULTZ:  THAT IS CORRECT, YOUR HONOR, AND WE

16:10    16   WILL TALK ABOUT THAT LATER TODAY OR TOMORROW.

16:10    17          THE COURT:  I JUST WANT TO GET IT CLEAR FOR THE

16:10    18   RECORD.

16:10    19   BY MR. SCHULTZ:

16:10    20   Q.   JUST TO KIND OF PUT A BOW ON THAT, DR. BEA, IF I DIG A

16:10    21   HOLE AS DEEP AS ONE OF THESE PANELS ON THE WALL THAT IS MAYBE

16:10    22   8 FEET, IF I WANT TO GET THE SAME COMPACTION AT THE BOTTOM AS I

16:10    23   WANT TO ACHIEVE ON THE TOP, I CAN'T JUST DUMP DIRT IN IT AND

16:10    24   ROLL SOMETHING OVER IT.  I HAVE TO PACK IN STAGES?

16:10    25   A.   THAT'S CORRECT.

ROBERT G. BEA - REDIRECT

16:10    1   **Q.**   THAT'S WHAT'S KNOWN AS COMPACTING IN LIFTS?

16:10    2   **A.**   THAT'S CORRECT.

16:10    3   **Q.**   ASIDE FROM THE LEVEE REPAIR WE JUST MENTIONED, CAN YOU

16:10    4   THINK OF ANY EXCAVATIONS ON THE EBIA, BASED ON YOUR REVIEW OF

16:11    5   THE DOCUMENTS, THAT WERE COMPACTED IN LIFTS THAT WERE NOT

16:11    6   SUBJECT TO SPECIAL ENGINEERING PRACTICES, LIKE THE SEWER LIFT

16:11    7   STATION OR THE WEDDING CAKE?

16:11    8   **A.**   NO.

16:11    9   **Q.**   THAT WAS PROBABLY A REALLY BAD QUESTION.

16:11   10           **MR. TREEBY:**  I STARTED TO OBJECT, BUT HE'S AN EXPERT.

16:11   11           **THE COURT:**  ARE YOU GOING TO REDO IT, OR ARE YOU

16:11   12   SATISFIED WITH IT?

16:11   13           **MR. SCHULTZ:**  I THINK IT WILL BE CLEAR, JUDGE.

16:11   14   **BY MR. SCHULTZ:**

16:11   15   **Q.**   WAS THE SEWER LIFT STATION COMPACTED IN LIFTS?

16:11   16   **A.**   NO.

16:11   17   **Q.**   WAS THE WEDDING CAKE?

16:11   18   **A.**   NO, UNLESS YOU DEFINE THE LIFTS AS POURING IN 10 FEET OF

16:11   19   SOIL AND THEN PUTTING ANOTHER 10-FOOT OF SOIL ON TOP OF IT.

16:12   20   **Q.**   I THINK WE WILL GET INTO A LITTLE MORE DETAIL ON

16:12   21   PARTICULAR SITES MOMENTARILY.

16:12   22           ARE YOU AWARE, DR. BEA, OF WGI DOING COMPACTION

16:12   23   TESTING AFTER BACKFILL OF ANY OF THE EXCAVATIONS AT THE EBIA?

16:12   24   **A.**   NO.  I COULD FIND NO EVIDENCE OF SUCH TESTING.

16:12   25   **Q.**   HOW DO YOU BACKFILL PROPERLY -- IN YOUR OPINION, BACKFILL

ROBERT G. BEA - REDIRECT

16:12    1    A PILING VOID?

16:12    2         **THE COURT:**  JUST FOR MY SATISFACTION, CAN WE FIND OUT

16:12    3    IF THERE'S A DIFFERENCE BETWEEN A PILING THAT IS UNDER THE

16:12    4    WATER AND A PILING THAT'S NOT?

16:12    5         **MR. SCHULTZ:**  ABSOLUTELY.

16:12    6         **THE COURT:**  GO AHEAD, COUNSEL.

16:12    7    BY MR. SCHULTZ:

16:12    8    Q.  DR. BEA, LET'S TAKE FOUNDATION PILINGS IN REGULAR SOILS ON

16:12    9    LAND, EXCLUDE PILINGS OUT IN THE WATER.  HOW WOULD YOU PROPERLY

16:12   10    BACKFILL, IN YOUR OPINION, A PILING VOID LEFT BY SUCH A PILING?

16:12   11    A.  WELL, ONE WAY YOU COULD DO IT WOULD BE TO PUMP IN GROUT,

16:13   12    CEMENT IN FLUID FORM.  ESSENTIALLY YOU ARE REPLACING THE PILE

16:13   13    WITH AN UNREINFORCED PIECE OF CONCRETE.

16:13   14         AN ALTERNATIVE WOULD BE TO TRIM THE OTHER SOILS -- IT

16:13   15    COULD EVEN BE SAND IF THAT WAS NOT DESTRUCTIVE TO OTHER

16:13   16    THINGS -- TREAT IT IN THE SENSE OF YOU PUT IT WITH A LONG-NOSED

16:13   17    FUNNEL INTO THE HOLE AND WITHDRAW IT AS YOU ARE PUTTING IN THE

16:13   18    BACKFILL MATERIAL.

16:13   19         OTHER TECHNIQUES, SUCH AS ARE USED ON BORINGS, BORING

16:13   20    HOLES, YOU COULD FILL THEM WITH CLAY AND DO THAT IN SUCH A

16:13   21    WAY -- IN FACT, YOU CAN CHEMICALLY TREAT THE CLAYS SO THAT HIGH

16:14   22    STRENGTH AND LOW PERMEABILITY WILL BE ACHIEVED.

16:14   23    Q.  STILL ON THE FOUNDATION PILINGS IN SOILS ON LAND, ARE

16:14   24    THOSE PRACTICES THAT YOU JUST DESCRIBED IN YOUR REAL-WORLD

16:14   25    EXPERIENCE COMMON PRACTICES WITHIN THE INDUSTRY?

ROBERT G. BEA - REDIRECT

16:14     1    **A.**    YES.

16:14     2    **Q.**    ARE THERE PRACTICAL IMPEDIMENTS TO THOSE?  STRIKE THAT.

16:14     3             IF THERE WERE PRACTICAL IMPEDIMENTS TO THOSE, I

16:14     4    PRESUME THEY WOULD NOT BE COMMON PRACTICES.  CORRECT?

16:14     5    **A.**    THAT'S CORRECT.

16:14     6    **Q.**    NOW LET ME ASK THE QUESTION FOR THE BENEFIT OF THE COURT.

16:14     7    DR. BEA, DOES IT DIFFER IF WE MOVE OUT INTO THE WATER AND TALK

16:14     8    ABOUT WHARF PILINGS, PARTICULARLY AT BOLAND WHERE WE HAVE A

16:14     9    NUMBER OF THEM?

16:14    10    **A.**    WELL, ALWAYS WORKING IN WATER IS MORE DIFFICULT.  BUT THE

16:14    11    HOLE NOW, RATHER THAN BEING PARTIALLY FILLED WITH WATER AND THE

16:14    12    REST BEING AIR, IS NOW TOTALLY FILLED WITH WATER.  SO DROPPING

16:15    13    MATERIALS FROM THE TOP AND GOING ALL THE WAY TO THE BOTTOM OF

16:15    14    THE PILE IS EXTREMELY DIFFICULT, AND YOU COULD CALL THAT

16:15    15    IMPOSSIBLE.

16:15    16             SO YOU HAVE TO USE OTHER TECHNIQUES THAT WILL ALLOW

16:15    17    YOU TO SUCCESSFULLY SEAL THAT LONG SKINNY TUNNEL CALLED A *PILE*

16:15    18    *HOLE*, INJECT CEMENT OR OTHER CHEMICALLY TREATED MATERIALS TO

16:15    19    PROPERLY FILL THE HOLE.

16:15    20             BY THE WAY, IN THIS AREA THERE REALLY ISN'T A DRY

16:15    21    LAND PILE HOLE.  SINCE THE WATER TABLE IS VERY CLOSE TO THE

16:15    22    GROUND SURFACE, THAT HOLE CAN FILL WITH WATER; AND AT LEAST TO

16:15    23    THAT EXTENT, ITS LENGTH IS EQUIVALENT TO WHAT'S IN THE WATER.

16:16    24    **Q.**    AND YOU TOUCHED ON THIS IN CROSS, DR. BEA.  IS IT YOUR

16:16    25    OPINION -- WE HAVE TALKED ABOUT PILING VOIDS, VOIDS LEFT AFTER

ROBERT G. BEA - REDIRECT

16:16   1    EXTRACTING PILINGS.  IS IT YOUR OPINION YOU WOULD HAVE SUCH

16:16   2    VOIDS OUT ON THE SITE, BASED ON YOUR REVIEW OF THE DOCUMENTS?

16:16   3    A.   YES.

16:16   4    Q.   WE WERE TALKING ABOUT GRID TRENCHING.

16:16   5           MR. SCHULTZ:  IF WE CAN STEP BACK JUST FOR A MOMENT

16:16   6    AND PULL UP PX-3393-68.

16:16   7    BY MR. SCHULTZ:

16:16   8    Q.   IF YOU WOULD, DR. BEA, JUST DESCRIBE TO THE COURT WHAT WE

16:16   9    SEE HERE.  AND FOR THE RECORD, THESE ARE PHOTOGRAPHS FROM --

16:16   10   WELL, WE HAVE THE JX-NUMBER IN THE RECORD -- ENTITLED "VOIDS IN

16:16   11   BOREHOLES."

16:16   12   A.   ESSENTIALLY WHAT WE ARE SEEING HERE, A BORE HAS BEEN

16:16   13   DRILLED INTO THE EARTH.

16:17   14          LIKE THE SPLIT SPOONS WE SAW PREVIOUSLY, THIS IS HOW

16:17   15   THEY WERE ADVANCED, PUT INTO THE SOIL, BORING THE SOIL

16:17   16   PROGRESSIVELY, PUSHING OR IN SOME CASES HAMMERING THOSE TUBES

16:17   17   INTO PLACE.  ONCE THE SAMPLE WAS EXTRACTED, YOU GO IN, BORE OUT

16:17   18   THE HOLE, AND CONTINUE.  SO IT'S IN A CATERPILLAR LEAPFROGGING

16:17   19   WAY THAT THESE HOLES GET PUT INTO PLACE.  THESE ARE PHOTOGRAPHS

16:17   20   TAKEN FROM THE SURFACE, LOOKING DOWN INTO THE HOLE.  IN THE

16:17   21   LOWER ONE YOU CAN SEE THE WATER TABLE I WAS REFERRING -- YES,

16:17   22   THE WATER TABLE I WAS REFERRING TO EARLIER.

16:17   23   Q.   THESE ARE BORING HOLES, DR. BEA, NOT PILING VOIDS,

16:17   24   CORRECT?

16:17   25   A.   YES.  AND THAT'S AN IMPORTANT DISCRIMINATION.  THE REASON

ROBERT G. BEA - REDIRECT

16:18  1  IS THE BORING PROCESS ESSENTIALLY IS REMOVING THE SOIL.  WHEN

16:18  2  THE PILE IS PUT INTO PLACE, GIVEN IT'S A DISPLACEMENT PILE, IT

16:18  3  DISPLACES THE SOIL LATERALLY.  IT'S THE DIFFERENCE BETWEEN

16:18  4  DRILLING A HOLE INTO A 2 BY 4 AND POUNDING A BIG DAMN NAIL INTO

16:18  5  A 2 BY 4.

16:18  6       WHAT'S GOING ON IS THE SOIL THAT'S BEING COMPACTED

16:18  7  OUTWARD ACTUALLY STRENGTHENS THE SOIL AND INTRODUCES SOMETHING

16:18  8  CALLED *ARCHING*.  THAT'S THE REASONS THE ROMANS CAME UP WITH

16:18  9  ARCHES.  THE HOLE CAN STAND UP TO, IN FACT, VERY GREAT DEPTHS

16:18  10  BECAUSE THE LOADS COMING IN FROM THE DEEPER SOILS ARE ARCHING

16:18  11  AROUND THE HOLE.  AND THAT'S ONE OF THE REASONS WHY PEOPLE

16:19  12  FREQUENTLY REACH AN INCORRECT UNDERSTANDING ABOUT PILE HOLES

16:19  13  OPENING OR CLOSING, THIS ARCHING PHENOMENON.  IT'S COMPLETELY

16:19  14  IGNORED TOGETHER WITH THE COUNTERBALANCING EFFECTS OF WATER

16:19  15  INSIDE THE HOLE.

16:19  16  Q.   DR. BEA, WHAT WAS DONE WITH THE BOREHOLES OUT ON THE EBIA

16:19  17  SITE ONCE THEY WERE FINISHED WITH THEIR WORK ON THEM?

16:19  18  A.   THEY WERE SEALED BACK WITH BENTONITE, IN GENERAL.  SO WE

16:19  19  ARE USING A HIGH-DENSITY CLAY INJECTED INTO THE SOIL BORINGS TO

16:19  20  MAKE SURE THEY ARE -- I WILL CALL IT WATERTIGHT.  BUT WE DO

16:19  21  NOTHING WITH THE PILE HOLES OTHER THAN COVER THE SURFACE.

16:19  22       MR. SCHULTZ:  IF WE CAN GO BACK WHERE WE WERE,

16:19  23  PLEASE, CARL, ON GRID TRENCHING AT SLIDE 19.

16:19  24  BY MR. SCHULTZ:

16:20  25  Q.   PARTICULARLY, DR. BEA, YOU MENTIONED THIS MORNING IN CROSS

ROBERT G. BEA - REDIRECT

16:20    1    THAT ALTHOUGH THE GRID TRENCHES WERE 5 FEET DEEP, THEY WOULD

16:20    2    ENCOUNTER OBSTRUCTIONS, CORRECT?

16:20    3    A.    THAT'S CORRECT.

16:20    4          MR. SCHULTZ:  I DON'T KNOW IF WE CAN LOOK AT THEM

16:20    5    SIMULTANEOUSLY, THAT WOULD BE PREFERABLE, BUT JX-1322-0011.

16:20    6    BY MR. SCHULTZ:

16:20    7    Q.    DID YOU BRING JUST A FEW PHOTOGRAPHS TO GIVE AN INDICATION

16:20    8    OR A FEEL, IF YOU WOULD, DR. BEA, OF WHAT SORT OF OBSTRUCTIONS

16:20    9    WE ARE TALKING ABOUT?

16:20   10    A.    THAT'S CORRECT.

16:20   11    Q.    MAYBE WE CAN JUST PULL THEM UP INDIVIDUALLY AND TAKE A

16:20   12    LOOK AT THEM.

16:20   13          THIS FIRST ONE IS AT SAUCER 2001, ENTITLED "GRID

16:20   14    TRENCH EXCAVATING MARKED LOCATIONS."  THIS WOULD BE AN EXAMPLE,

16:20   15    I TAKE IT, DR. BEA, OF OBSTRUCTIONS PULLED OUT DURING GRID

16:20   16    TRENCHING?

16:20   17    A.    THAT'S CORRECT.

16:20   18    Q.    IS THAT WHAT WE'RE GOING TO SEE WITH THE OTHER TWO PHOTOS?

16:20   19    MAYBE WE CAN JUST TAKE A LOOK AT THEM.

16:20   20          ANOTHER EXAMPLE?  WHERE WOULD THIS ONE BE?

16:20   21    A.    THIS ONE IS AT BOLAND MARINE.  HERE'S YET ANOTHER OF

16:21   22    THESE.  THE DEVIL IS IN THE DETAILS.  SOME OF THE PILINGS WERE

16:21   23    OPEN INTO STEEL PIPE PILES, WE CALL THEM, AND THAT'S WHAT YOU

16:21   24    ARE SEEING.  ONE OF THEM IS BENT PRETTY BAD, KICKED OFF TO THE

16:21   25    RIGHT IN A PHOTOGRAPH.  THOSE PILES ARE NOT NEARLY AS EFFECTIVE

## ROBERT G. BEA - REDIRECT

16:21  1  AT DISPLACING THE SOILS.  SO THE BEHAVIOR OF THE HOLE LEFT IS

16:21  2  MUCH MORE LIKE A BOREHOLE THAN THE NORMAL DISPLACEMENT PILE OR

16:21  3  NAIL DRIVEN INTO THE GROUND.

16:21  4        MR. SCHULTZ:  CAN WE LOOK, CARL, AT PX-3393-215.

16:21  5  BY MR. SCHULTZ:

16:21  6  Q.   DR. BEA, IS IT PHOTOGRAPHS LIKE THIS OF GRID TRENCHING

16:21  7  THAT LED YOU TO CONCLUDE THAT ALTHOUGH GRID TRENCHING WAS

16:21  8  SPECIFIED AT 5 FEET, THE GRID TRENCHING RESULTED IN EXCAVATIONS

16:21  9  THAT EXCEEDED 5 FEET?

16:21  10  A.   INDEED.

16:21  11       MR. SCHULTZ:  IF WE COULD LOOK AT PX-3401-228.

16:22  12  BY MR. SCHULTZ:

16:22  13  Q.   DID GRID TRENCHING ENCOUNTER NOT ONLY PHYSICAL

16:22  14  OBSTRUCTIONS BUT SOIL CONTAMINATION, DR. BEA?

16:22  15  A.   YES.

16:22  16  Q.   WOULD THAT BE ANOTHER EXAMPLE OF SOMETHING THAT MIGHT

16:22  17  REQUIRE FURTHER REMEDIATION, FURTHER WORK, BEYOND THE SPECIFIED

16:22  18  5 FEET?

16:22  19  A.   INDEED.  AND THERE'S PLENTIFUL EXAMPLES WHERE THAT

16:22  20  HAPPENED.

16:22  21  Q.   I THINK YOU BROUGHT FOUR QARS TO DISCUSS LOCATIONS OF GRID

16:22  22  TRENCHING AT SAUCER AND BOLAND?

16:22  23  A.   CORRECT.

16:22  24       MR. SCHULTZ:  IF WE COULD PULL UP JX-0406, PLEASE.

16:22  25  BY MR. SCHULTZ:

ROBERT G. BEA - REDIRECT

16:22   1   **Q.**   FOR THE RECORD, THIS IS REPORT 248, A QAR, CORRECT,

16:22   2   DR. BEA?

16:22   3   **A.**   THAT'S CORRECT.

16:22   4   **Q.**   IT'S DATED TUESDAY, DECEMBER 18, 2001.

16:22   5           IF WE LOOK DOWN AT THE HIGHLIGHTED PORTION ON THE

16:22   6   FIRST PAGE, WE SEE THEY PERFORMED GRID TRENCHING AT SAUCER

16:22   7   MARINE.

16:22   8           AND I WOULD LIKE TO DIRECT YOUR ATTENTION, DR. BEA,

16:23   9   TO PAGE 4 OF THE QAR.

16:23   10   **A.**   YES, SIR.

16:23   11   **Q.**   IS THIS WHERE WE SEE A DESCRIPTION OF THE WORK THAT WAS

16:23   12   PERFORMED?

16:23   13   **A.**   CORRECT.

16:23   14   **Q.**   AND IT'S OF NOTE THAT THEY -- LET ME ASK YOU THIS:  WAS IT

16:23   15   A COMMON PRACTICE TO MEASURE THE GRID TRENCHES, BOTH LINEAR AND

16:23   16   AT LEAST ON OCCASIONS, DEPTHWISE?

16:23   17   **A.**   YES.

16:23   18   **Q.**   IN THIS INSTANCE, WE SEE THE MEASURED GRID TRENCH DEPTH AT

16:23   19   SAUCER ALL EXCEEDED 5 FEET IN DEPTH?

16:23   20   **A.**   YES.

16:23   21   **Q.**   IS THAT ANOTHER BASIS FOR YOUR INFERENCE OR OPINION THAT,

16:23   22   ALTHOUGH SPECIFIED AT 5 FEET, GRID TRENCHES EXCEEDED 5 FEET IN

16:23   23   DEPTH ON OCCASION?

16:23   24   **A.**   CORRECT.

16:23   25   **Q.**   WE DON'T KNOW HOW DEEP THIS ONE WENT, DO WE?

1201

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 16:23 | 1 | **A.**   UNFORTUNATELY, WE DON'T. |
| 16:23 | 2 | **Q.**   IS IT ALREADY STARTED OUT FAIRLY CLOSE TO THE STRIKE ZONE |
| 16:23 | 3 | FOR THE SWAMP MARSH AT 6 TO 8 FEET? |
| 16:23 | 4 | **A.**   WELL, IT CAN BE IN FACT SHALLOWER AS YOU MOVE FARTHER |
| 16:23 | 5 | TOWARD THE CANAL, SO WE COULD BE IN THE STRIKE ZONE, PERIOD. |
| 16:23 | 6 | **Q.**   EVEN WITH THE 5 FEET? |
| 16:24 | 7 | **A.**   THAT'S CORRECT. |
| 16:24 | 8 | **Q.**   LET'S TAKE A LOOK AT PAGE 9. |
| 16:24 | 9 |        WE SEE THE DAILY PROGRESS REPORT WITH HANDWRITTEN |
| 16:24 | 10 | NOTES THAT:  "MCDONOUGH CONSTRUCTION COMPLETED ALL NORTH-SOUTH |
| 16:24 | 11 | GRID TRENCHING EAST OF THE MOUND AT SAUCER, 5 TRENCHES AT |
| 16:24 | 12 | 340 FEET EACH.  STILL NEED TO PUSH BACKFILL INTO TRENCHES DUG |
| 16:24 | 13 | TODAY WITH DOZER.  DOZER SHOULD ARRIVE ON-SITE TOMORROW." |
| 16:24 | 14 |        IS THIS INDICATIVE OF THE STANDARD PRACTICE FOR |
| 16:24 | 15 | BACKFILLING THESE TRENCHES USING A BULLDOZER? |
| 16:24 | 16 | **A.**   STANDARD PRACTICE USED BY WGI AT THE EBIA.  IT'S NOT THE |
| 16:24 | 17 | ACCEPTED STANDARD PRACTICE FOR BACKFILLING IMPORTANT |
| 16:24 | 18 | EXCAVATIONS. |
| 16:24 | 19 | **Q.**   THANK YOU FOR THE CLARIFICATION. |
| 16:24 | 20 |        IF WE LOOK AT THE FOLLOWING PAGE, DID THEY PROVIDE US |
| 16:24 | 21 | A DIAGRAM? |
| 16:24 | 22 | **A.**   YES.  IN FACT, THIS DIAGRAM IS INCLUDED IN MY EXPERT |
| 16:24 | 23 | REPORT. |
| 16:25 | 24 | **Q.**   FIRST OF ALL, DOES THIS DIAGRAM SHOW GRID TRENCHING WITHIN |
| 16:25 | 25 | WHAT WILL EVENTUALLY BECOME THE GRID ZONE? |

ROBERT G. BEA - REDIRECT

16:25   1   **A.**   YES, SIR.

16:25   2   **Q.**   TO ORIENT THE COURT, WE ARE LOOKING -- THE WORD *SAUCER*

16:25   3   *MARINE* WOULD BE WHERE IF YOU ARE LOOKING DOWN ON THE SITE --

16:25   4   **A.**   TO THE LEFT-HAND SIDE.

16:25   5   **Q.**   UP AGAINST WHERE THE FLOODWALL WOULD BE?

16:25   6   **A.**   ABOVE -- PARDON ME.  ON THE ALIGNMENT OF THAT LINE SOUTH

16:25   7   OF THAT NAME, SAUCER MARINE.

16:25   8   **Q.**   DO WE SEE SUREKOTE ROAD RUNNING LEFT TO RIGHT IN THE

16:25   9   PICTURE?

16:25   10   **A.**   CORRECT.

16:25   11   **Q.**   HOW FAR IS THE WEST, MEANING TOWARD THE CANAL SIDE OF THE

16:25   12   SUREKOTE ROAD FROM THE FLOODWALL?

16:25   13   **A.**   ABOUT 40 FEET.

16:25   14   **Q.**   WE SEE THE DEPICTION OF WHERE THE GRID TRENCHING WENT ON

16:25   15   THIS PARTICULAR DAY WITHIN THE BREACH ZONE BASED ON THIS QAR,

16:25   16   CORRECT?

16:25   17   **A.**   WELL, IT'S EVEN WORSE.  IT'S IN THE UNUSUAL HOLE

16:26   18   IDENTIFIED AT THE CENTER NORTH END OF THE SOUTH BREACH.

16:26   19   EVERYTHING I CAN TELL CLEARLY SHOWS THIS AREA WAS INVOLVED IN

16:26   20   THE FORMATION CAUSATION OF THAT UNUSUALLY DEEP HOLE.

16:26   21        **THE COURT:**  ARE WE TALKING ABOUT THE NORTH BREACH

16:26   22   RATHER THAN THE SOUTH BREACH?

16:26   23        **THE WITNESS:**  WELL, SAUCER IS SOUTH.

16:26   24        **THE COURT:**  YOU'RE TALKING ABOUT THE SOUTH BREACH.

16:26   25        **THE WITNESS:**  THAT'S CORRECT.  AND THERE'S THAT BIG

ROBERT G. BEA - REDIRECT

16:26   1    BOW AT THE NORTH END OF THE SOUTH BREACH.  AND THIS GRID AREA
16:26   2    EXACTLY FITS OVER THE UNUSUAL HOLE WE FOUND IMMEDIATELY AFTER
16:26   3    KATRINA.
16:27   4              FOR ME, THIS IS A SMOKING GUN.
16:27   5    BY MR. SCHULTZ:
16:27   6    Q.   THANK YOU, DR. BEA.
16:27   7              DID YOU BRING THE ACCOMPANYING QAR THAT SHOWS THE
16:27   8    EAST-WEST GRID TRENCHING?
16:27   9    A.   I THINK I DID.
16:27   10   Q.   JX-0409?
16:27   11   A.   THANK YOU.  YES.
16:27   12   Q.   THE PREVIOUS QAR WAS DECEMBER 18, 2001.  THIS REPORT 251
16:27   13   IS DATED DECEMBER 21, 2001.  AGAIN, WE SEE A REFERENCE ON THE
16:27   14   FIRST PAGE THAT THEY PERFORMED GRID TRENCHING AT SAUCER MARINE.
16:27   15             I WOULD LIKE TO DIRECT YOUR ATTENTION, DR. BEA, TO
16:27   16   PAGE 4 OF THE REPORT.
16:27   17             LET ME ASK YOU GENERALLY:  HOW FAR APART WERE THE
16:27   18   GRIDS SPECIFIED IF THERE WAS A GENERAL SPECIFICATION IN TERMS
16:27   19   OF -- YOU SAID 5 FEET DEEP -- HOW FAR APART?
16:27   20   A.   I RECALL A 14-FOOT GRID, SOMETIMES 12.
16:27   21   Q.   THIS PARTICULAR INSTANCE --
16:27   22             MR. SCHULTZ:  IF WE CAN PULL UP THAT LANGUAGE,
16:28   23   PLEASE, CARL.
16:28   24   BY MR. SCHULTZ:
16:28   25   Q.   WE SEE EAST-WEST GRIDS LAID OUT ON THE NORTH END OF

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 16:28 | 1 | SAUCER.  THE EAST END OF THE MOUND GRIDS WERE 12 FEET APART. |
| 16:28 | 2 | COMPLETED 29 TRENCHES:  15 AT 65 FEET, 14 AT 55 FEET, GIVING A |
| 16:28 | 3 | TOTAL OF 1,745 LINEAR FEET.  MEASURED TRENCHES ALL EXCEEDED |
| 16:28 | 4 | 5 FEET IN DEPTH.  SMALL PIECES OF DEBRIS WERE ENCOUNTERED IN |
| 16:28 | 5 | THE TRENCHES AND REMOVED DURING EXCAVATING THE GRIDS. |
| 16:28 | 6 |        ARE THESE THE ACCOMPANYING EAST-WEST GRID LINES FOR |
| 16:28 | 7 | THE NORTH-SOUTH GRID LINES YOU JUST SHOWED THE COURT? |
| 16:28 | 8 | A.   THAT'S CORRECT. |
| 16:28 | 9 | Q.   ACCORDINGLY, ALSO, WITHIN THE BREACH ZONE -- |
| 16:28 | 10 | A.   CORRECT. |
| 16:28 | 11 | Q.   -- THE FUTURE BREACH ZONE? |
| 16:28 | 12 |        IF WE TAKE A LOOK AT PAGE 9 -- |
| 16:28 | 13 | A.   WE'LL HAVE CREATED A WAFFLE. |
| 16:28 | 14 |        PAGE NUMBER AGAIN? |
| 16:28 | 15 | Q.   PAGE 9. |
| 16:28 | 16 | A.   YES, SIR. |
| 16:28 | 17 | Q.   DO WE AGAIN SEE THESE EXCAVATIONS THAT, ACCORDING TO THIS |
| 16:29 | 18 | DOCUMENT, EXCEEDED 5 FEET IN DEPTH GOING UP TO THE WESTERN EDGE |
| 16:29 | 19 | OF SUREKOTE ROAD? |
| 16:29 | 20 | A.   THAT'S CORRECT. |
| 16:29 | 21 |        THE COURT:  COULD WE -- JUST FOR THE RECORD, DR. BEA, |
| 16:29 | 22 | COULD YOU POINT OUT WHERE SUREKOTE ROAD WOULD BE?  I THINK I |
| 16:29 | 23 | KNOW, BUT IF YOU WOULD POINT IT OUT. |
| 16:29 | 24 |        THE WITNESS:  THESE THINGS ARE LAYING RIGHT OVER |
| 16:29 | 25 | SUREKOTE ROAD. |

ROBERT G. BEA - REDIRECT

16:29   1          **THE COURT:**  THAT'S WHAT I THOUGHT.  THANK YOU.

16:29   2          **THE WITNESS:**  AGAIN, THEY ARE RIGHT IN THE MYSTERIOUS

16:29   3   DEEP HOLE FOUND AT THE SOUTH BREACH NORTH END RIGHT WHERE THE

16:29   4   BIG BOLAND CENTER IS LOCATED.

16:29   5   **BY MR. SCHULTZ:**

16:29   6   **Q.**  DR. BEA, WOULD THIS AREA ALSO BE EXCAVATED AT A DIFFERENT

16:29   7   POINT IN TIME FOR UTILITIES?

16:29   8   **A.**  YES.

16:30   9          **THE COURT:**  WHAT WAS THE PRIMARY PURPOSE OF THE GRID

16:30   10   TRENCHES, JUST FOR THE RECORD?

16:30   11          **THE WITNESS:**  THEY WERE ATTEMPTING TO FIND

16:30   12   OBSTRUCTIONS BELOW THE GROUND THAT WOULD PROVIDE DIFFICULTY FOR

16:30   13   THE FUTURE ANTICIPATED LOCK EXPANSION ACTIVITIES.

16:30   14          SO IF WE HAD, FOR EXAMPLE, TO DO DREDGING FOR

16:30   15   SOME REASON -- THIS AREA, YOU ARE USING A CUTTERHEAD DREDGE --

16:30   16   YOU DON'T WANT TO STOP IT UP WITH SOMETHING STEEL.

16:30   17   **BY MR. SCHULTZ:**

16:30   18   **Q.**  FOR THE BENEFIT OF THE COURT, DR. BEA, DID THE WORK AT THE

16:30   19   EBIA GENERALLY FALL INTO TWO PHASES?

16:30   20   **A.**  YES.

16:30   21   **Q.**  TELL THE COURT, IF YOU WOULD, THE FIRST PHASE OF WORK

16:30   22   INVOLVED, GENERALLY SPEAKING, WHAT SORT OF DEMOLITION?  WHAT

16:30   23   SORT OF WORK?

16:30   24   **A.**  WELL, BUILDING SURFACE FACILITIES ARE PRIMARY THINGS, AND

16:30   25   THEN THEY MAKE A SECOND PASS TO FURTHER REMOVE CONTAMINATED

ROBERT G. BEA - REDIRECT

16:31    1    MATERIAL AND OTHER SUBGROUND-LEVEL OBSTRUCTIONS.

16:31    2    **Q.**    THE SECOND PHASE OF WORK?

16:31    3    **A.**    YES.

16:31    4    **Q.**    YOU DESCRIBED THE FIRST PHASE AS --

16:31    5    **A.**    SURFACE.

16:31    6    **Q.**    -- SURFACE, AND THE SECOND WAS SUBSURFACE?

16:31    7    **A.**    TO CLEAN UP, WHICH MEANS POLLUTED MATERIALS.  FOR EXAMPLE,

16:31    8    AT BOLAND, WE HAD A PHASE 1 TRANSITE, BUT ASBESTOS-CONTAINING

16:31    9    MATERIAL, ACM REMOVAL, AND A SECOND PHASE AND A COMBINATION OF

16:31    10   THOSE TWO PHASES.  ULTIMATELY, I HAD TO INCORPORATE IN OUR

16:31    11   ANALYTICAL CROSS SECTIONS.

16:32    12         SO IT'S NOT A STRAIGHTFORWARD HISTORY OR TIME BASED

16:32    13   TO IDENTIFY THE GUILTY EXCAVATIONS.

16:32    14   **Q.**    DR. BEA, IF WE CAN LOOK AT JX-0506 -- AND TO EXPEDITE THIS

16:32    15   SOMEWHAT, DO YOU HAVE WHAT IS BASICALLY A COUNTERPART OF QARS

16:32    16   FOR THE BOLAND SITE WE JUST SAW FOR THE SAUCER SITE IN TERMS OF

16:32    17   GRID TRENCHING?

16:32    18   **A.**    YES, SIR.

16:32    19   **Q.**    FOR THE RECORD, THIS IS REPORT 348, APRIL 25, 2002,

16:32    20   INDICATING THEY PERFORMED GRID TRENCHING AT BOLAND MARINE?

16:32    21   **A.**    CORRECT.

16:32    22   **Q.**    BOLAND MARINE, DR. BEA, IS THAT THE EVENTUAL SITE -- OR

16:32    23   THE SITE OF THE EVENTUAL NORTH BREACH?

16:32    24   **A.**    YES, SIR.

16:32    25   **Q.**    IF WE LOOK OVER ON PAGE 2, THEY INDICATE THEY ARE

ROBERT G. BEA - REDIRECT

16:32   1   EXCAVATING 2,100-LINEAR-FEET, NORTH-SOUTH TRENCHES AT THE NORTH
16:32   2   END OF BOLAND MARINE.
16:32   3        WHERE WAS THE BREACH SIDE OF BOLAND MARINE?  NORTH OR
16:32   4   SOUTH END OF BOLAND?
16:32   5   A.   NORTH.
16:32   6   Q.   THEY ARE TRENCHING AT THE NORTH END OF BOLAND MARINE,
16:33   7   LOCATING AND MARKING OBSTRUCTIONS AND DOZER BACKFILLING
16:33   8   TRENCHES WITH SPOIL.
16:33   9        DOES THIS INDICATE, DR. BEA, THE SAME PRACTICE FOR
16:33   10  BACKFILLING THAT WE SAW AT SAUCER MARINE A MOMENT AGO?
16:33   11  A.   YES, SIR.
16:33   12  Q.   IS THAT PROPER BACKFILLING, IN YOUR ENGINEERING JUDGMENT,
16:33   13  FOR SOMEONE WORKING CLOSING TO A FLOOD-CONTROL STRUCTURE?
16:33   14  A.   NO, SIR.
16:33   15  Q.   THEY INDICATE OBSTRUCTIONS -- I WANT TO TAKE A LOOK AT
16:33   16  PAGE 4, THOUGH -- THEY INDICATE OBSTRUCTIONS WERE FOUND DURING
16:33   17  TRENCHING.  THEY WERE MARKED WITH PIN FLAGS, AND THE TRENCH WAS
16:33   18  THEN BACKFILLED.
16:33   19        IS IT A COMMON PRACTICE ON THE SITE, DR. BEA, FROM
16:33   20  TIME TO TIME, AT LEAST, FOR THEM TO FIND OBSTRUCTIONS AND
16:33   21  DECIDE, FOR WHATEVER REASON, WE ARE GOING TO COVER THIS UP,
16:33   22  MARK IT, AND WE'LL COME BACK AND DIG IT UP AGAIN -- DIG IT UP
16:33   23  LATER?
16:33   24  A.   CERTAINLY.
16:33   25  Q.   IS THIS AN EXAMPLE OF THAT?

ROBERT G. BEA - REDIRECT

16:33    1    A.   YES.

16:33    2    Q.   DOWN BELOW, IT INDICATES THERE IS AN UNDERGROUND STORAGE

16:33    3    TANK THAT IS REMOVED FROM A 10 BY 16 BY 7-FOOT-DEEP EXCAVATION

16:33    4    AND POSITIONED ON PILINGS.

16:34    5            WOULD THIS BE AN EXAMPLE OF JUST SUCH AN OCCURRENCE?

16:34    6    A.   YES.

16:34    7    Q.   IF WE LOOK OVER AT PAGE 30, DESCRIBE FOR THE COURT, IF YOU

16:34    8    WOULD, PLEASE, DR. BEA, WHERE WE ARE BASED ON THIS DIAGRAM AND

16:34    9    PARTICULARLY IN RELATION TO THE EVENTUAL NORTH BREACH SITE AT

16:34   10    BOLAND MARINE.

16:34   11    A.   AT FIRST, I'M FAIRLY CERTAIN -- AND I COULD CHECK THIS --

16:34   12    I BELIEVE THIS FIGURE IS ALSO INCLUDED IN MY EXPERT REPORT.  WE

16:34   13    ARE LOOKING AT THE GRID TRENCHING HAPPENING IMMEDIATELY

16:34   14    ADJACENT TO THE SUREKOTE ROAD OVERPASS.  THAT'S THE CRICK THAT

16:34   15    YOU SEE THERE.  WE ARE FACING NORTH THERE.

16:35   16            SO WE ARE GRID TRENCHING IN THIS AREA.  I IDENTIFIED

16:35   17    IN MY EXPERT REPORT AS CONTAINING THE TWO UNUSUAL HOLES THAT WE

16:35   18    FOUND AT THE CENTER OF THE NORTH BREACH.

16:35   19            AGAIN, I CALL THIS A SMOKING GUN DOCUMENT.

16:35   20    Q.   IF WE LOOK -- I WILL USE THE POINTER, DR. BEA -- AT THIS

16:35   21    TRENCH HERE, IS THAT IN CLOSE PROXIMITY TO SUREKOTE ROAD?

16:35   22    A.   YES.

16:35   23    Q.   OR THE SUREKOTE ROAD OVERPASS, AT LEAST?

16:35   24    A.   THAT'S CORRECT.

16:35   25    Q.   THERE'S AN INDICATION OF TRANSITE.  AND THEN THEY HAVE

ROBERT G. BEA - REDIRECT

16:35   1   LINES GOING OUT TO LITTLE PATCHES.
16:35   2           ARE THESE, BASED ON YOUR REVIEW OF THE DOCUMENTS,
16:35   3   AGAIN, AREAS OF TRANSITE THAT WOULD BE SUBJECT TO EXCAVATION AT
16:36   4   A FUTURE DATE?
16:36   5   **A.**   THAT'S CORRECT.
16:36   6   **Q.**   WAS THE TRANSITE EXCAVATION -- WHICH WE WILL TALK ABOUT IN
16:36   7   MORE DETAIL -- DID THAT COME AT THE VERY TAIL END OF THE
16:36   8   PROJECT?
16:36   9   **A.**   YES.
16:36   10  **Q.**   DID THOSE TRANSITE EXCAVATIONS OCCUR IN THIS AREA?
16:36   11  **A.**   YES.
16:36   12          **THE COURT:**  DR. BEA, DO YOU RECALL APPROXIMATELY, IF
16:36   13  YOU LOOK AT THE NUMBERS STARTING WITH 59 GOING TO 83 AT THE TOP
16:36   14  OF THIS EXHIBIT, WHICH OF THOSE NUMBERS WOULD APPROXIMATELY
16:36   15  ENCOMPASS THE NORTH BREACH, IF YOU RECALL?
16:36   16          IF YOU DON'T, THAT'S FINE.
16:36   17          **THE COURT:**  IF YOU DON'T KNOW, THAT'S FINE.
16:36   18          **THE WITNESS:**  NO.  NO.  I DAMN NEAR MEMORIZED THIS
16:37   19  STUFF.
16:37   20          **THE COURT:**  I SHOULD HAVE TOO.
16:37   21          **THE WITNESS:**  LET'S GO FROM 80, 81 TO 74, 75.
16:37   22          **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.
16:37   23  **BY MR. SCHULTZ:**
16:37   24  **Q.**   THAT'S BASED ON RECOLLECTION, DR. BEA?
16:37   25  **A.**   YES, SIR.

*HOURLY TRANSCRIPT*

ROBERT G. BEA - REDIRECT

16:37   1  **Q.**   IF YOUR RECOLLECTION HAPPENS TO BE FAULTY -- AND I,

16:37   2  FRANKLY, DON'T KNOW WHETHER IT IS OR NOT BECAUSE I DON'T KNOW

16:37   3  THE ANSWER -- WE CAN CORRECT IT LATER.

16:37   4          **THE COURT:**  THE COURT KNOWS IT'S RELATIVELY CLOSE.

16:37   5          **MR. SCHULTZ:**  THANK YOU, JUDGE.

16:37   6  **BY MR. SCHULTZ:**

16:37   7  **Q.**   JX-0507.  AS WE DID AT SAUCER MARINE, DR. BEA, IS THIS THE

16:37   8  ACCOMPANYING GRID TRENCHING FOR THE SAME GENERAL AREA AT BOLAND

16:37   9  MARINE?

16:37  10  **A.**   YES.

16:37  11  **Q.**   I MEAN -- FRIDAY, APRIL 26, 2002, AGAIN, WE SEE AN

16:38  12  INDICATION THAT THEY COMPLETED GRID TRENCHING AT BOLAND MARINE.

16:38  13          IF WE LOOK OVER AT PAGE 16, WE SEE AN ACCOMPANYING

16:38  14  DIAGRAM.

16:38  15  **A.**   YES, SIR.  I THINK THAT'S A DIAGRAM THAT MAY HAVE BEEN

16:38  16  SUPERFLUOUS, BUT I CONSIDERED IT OR DID INCLUDE IT IN MY EXPERT

16:38  17  REPORT BECAUSE OF ITS COMPARABLE IMPORTANCE TO WHAT I FOUND AT

16:38  18  THE SOUTH BREACH.  WE'VE FORMED NOW A WAFFLE SET OF

16:38  19  EXCAVATIONS.

16:38  20  **Q.**   ARE THESE -- AS WE MOVE OFF OF GRID TRENCHING, DR. BEA --

16:38  21  ARE THESE EXCAVATIONS RELEVANT?  YOU MENTIONED THERE ARE TWO

16:38  22  WAYS EXCAVATIONS CAN BE RELEVANT:  PIERCING THE SWAMP MARSH

16:38  23  LAYER OR MOVING THAT WATER TABLE CLOSER IN FROM THE CANAL

16:38  24  TOWARD THE FLOODWALL.

16:38  25          ARE THE GRID-TRENCHING OPERATIONS RELEVANT IN ONE WAY

ROBERT G. BEA - REDIRECT

16:39     1   OR THE OTHER OR BOTH?

16:39     2   **A.**   BOTH.

16:39     3          **MR. SCHULTZ:**   IF WE CAN MOVE, PLEASE, CARL, TO

16:39     4   SLIDE 20 --

16:39     5   **BY MR. SCHULTZ:**

16:39     6   **Q.**   -- ANOTHER TYPE OR SET OF EXCAVATIONS, DR. BEA, ON WHICH

16:39     7   YOU PREMISED YOUR OPINIONS WOULD BE THE REMOVAL OF UNDERGROUND

16:39     8   UTILITIES; IS THAT CORRECT?

16:39     9   **A.**   THAT'S CORRECT.

16:39    10   **Q.**   HENCE THE SLIDE WE SEE ON EXCAVATION OF UNDERGROUND

16:39    11   UTILITIES?

16:39    12   **A.**   THAT'S CORRECT.

16:39    13   **Q.**   IF YOU CAN GENERALIZE, IS THERE A GENERALIZED DEPTH FOR

16:39    14   THE REMOVAL OF UNDERGROUND UTILITIES AT THE EBIA?

16:39    15   **A.**   WELL, SOME OF THEM ARE VERY CLOSE TO THE SURFACE, 1 AND

16:39    16   2 FEET; AND OTHERS ARE -- FOR EXAMPLE, THE SEWER LINE LATERAL I

16:39    17   REFERRED TO YESTERDAY, THOSE CAN BE 12 FEET OR MORE BELOW THE

16:39    18   GROUND SURFACE.

16:40    19          TO THE RIGHT IN THIS PHOTOGRAPH, THIS THING IS ONE OF

16:40    20   THE VERTICAL MAN-ACCESS MANHOLES TO ACCESS THE SEWER LINE

16:40    21   RUNNING PARALLEL TO SUREKOTE ROAD HERE SHOWN WITH THAT GREEN

16:40    22   STRIPE.

16:40    23          WE EXCAVATED THAT SEWER MANHOLE.  THE BASE PAD FOR

16:40    24   THAT IS 22 FEET BELOW GROUND SURFACE, AND SO WE HAVE A WIDE

16:40    25   VARIETY OF UNDERGROUND UTILITIES THAT ARE BEING REMOVED AND

ROBERT G. BEA - REDIRECT

16:40    1    EXCAVATED.

16:40    2              THIS DISTANCE FROM THE FLOODWALL IS APPROXIMATELY

16:41    3    75 TO 80 FEET.  THAT IS AT THE WESTERN EXTENT OF THIS

16:41    4    MYSTERIOUS DEEP HOLE THAT I IDENTIFIED AT THE SOUTH BREACH BIG

16:41    5    BOW AREA.

16:41    6    Q.   NOW, THIS MORNING MR. TREEBY ASKED YOU QUESTIONS ABOUT THE

16:41    7    DRAINAGE DITCH AND SHOWED YOU A PHOTOGRAPH OF THE DRAINAGE

16:41    8    DITCH.

16:41    9              DO YOU RECALL THAT?

16:41    10   A.   YES.

16:41    11   Q.   IF YOU CAN ORIENT THE COURT, PLEASE -- I GUESS THIS

16:41    12   PHOTOGRAPH WILL DO AS WELL AS ANY -- IS THIS THE SEWER MAIN

16:41    13   TRENCH BEING EXCAVATED HERE?

16:41    14   A.   YES.

16:41    15   Q.   HENCE, THE MANHOLE?

16:41    16   A.   THAT'S CORRECT.

16:41    17   Q.   WHERE DOES THE DITCH LIE WITH REFERENCE TO THE SEWER LINE

16:41    18   AND THE FLOODWALL?

16:41    19   A.   THE SEWER LINE IS TO THE WEST OF THE DRAINAGE DITCH.  SO

16:41    20   WE HAVE SUREKOTE, WE HAVE DRAINAGE DITCH CLOSE TO THE SHOULDER

16:42    21   OF SUREKOTE, AND THEN WE HAVE -- THE NEXT LINE OF ATTACK ARE

16:42    22   THESE SEWER LINE ELEMENTS PARALLELLING, AGAIN, SUREKOTE.  WE

16:42    23   NOW SPAN PERFECTLY THAT DAMN DEEP HOLE AT THE SOUTH BREACH.

16:42    24   Q.   THE DRAINAGE DITCH, DR. BEA --

16:42    25              MR. SCHULTZ:  LET'S PULL UP, IF WE COULD, PLEASE,

ROBERT G. BEA - REDIRECT

16:42   1   PX 3393-74.

16:42   2   **BY MR. SCHULTZ:**

16:42   3   **Q.**   YOU POINTED OUT WITH MR. TREEBY THAT WGI DID NOT

16:42   4   ORIGINALLY DIG THIS DRAINAGE DITCH, DID THEY?

16:42   5   **A.**   REPEAT THAT QUESTION, PLEASE.

16:42   6   **Q.**   DID WGI ORIGINALLY DIG THIS DRAINAGE DITCH, OR DID IT

16:42   7   PREEXIST THEIR WORK ON THE SITE?

16:42   8   **A.**   WELL, THE EARLY VERSION -- IN FACT, THIS IS A GOOD

16:42   9   PHOTOGRAPH -- I REFERRED TO AS THE *SHALLOWER*, *WEED-CHOKED*

16:43   10  *DRAINAGE DITCH*.

16:43   11  **Q.**   DOES THIS SHOW THIS ORIENTATION TO SUREKOTE ROAD AND

16:43   12  SUREKOTE ROAD TO THE WALL?

16:43   13  **A.**   YES.  AND VERY, VERY -- FROM FORENSIC ENGINEERING AT WORK,

16:43   14  THIS SIGN IS IMPORTANT BECAUSE THE PRIMARY DRAINAGE IS COMING

16:43   15  DOWN THIS LINE AND MAKING A RIGHT-ANGLE TURN, AND WE ARE HEADED

16:43   16  TOWARD THE INDUSTRIAL CANAL.

16:43   17          WE FOUND SOME VERY INTERESTING FEATURES, I'LL CALL

16:43   18  IT, ASSOCIATED WITH THAT PARTICULAR TURN; HENCE, I WANT TO DRAW

16:43   19  YOUR ATTENTION TO IT, AND YOU CAN SEE THE PROXIMITY OF THE

16:43   20  DRAINAGE DITCH TO THE SHOULDER OF SUREKOTE ROAD.

16:43   21  **Q.**   DR. BEA, IS THIS THE WESTERN SHOULDER OR EDGE OF SUREKOTE

16:43   22  ROAD THAT YOU HAVE TOLD US ABOUT IS 40 FEET FROM THE FLOODWALL?

16:44   23  **A.**   THAT'S CORRECT.

16:44   24          **MR. SCHULTZ:**  IF WE COULD LOOK, PLEASE, AT

16:44   25  PX 3404-508.

ROBERT G. BEA - REDIRECT

16:44  1    BY MR. SCHULTZ:

16:44  2    Q.   NOW, YOU TOLD US THE DRAINAGE DITCH PREEXISTED WGI'S WORK.

16:44  3         DID WGI MAINTAIN THAT DITCH DURING THE COURSE OF ITS

16:44  4    WORK?

16:44  5    A.   YES.

16:44  6    Q.   WHAT SORT OF EQUIPMENT DID THEY USE TO MAINTAIN IT?

16:44  7    A.   BACKHOES, EXTENDED-ARM BACKHOES, ANYTHING THAT THEY COULD

16:44  8    REASONABLY BRING TO THE SITE TO BOTH WIDEN AND SUBSTANTIALLY

16:44  9    DEEPEN THIS DRAINAGE DITCH.

16:44  10   Q.   DID WGI PUMP -- I THINK YOU EVEN SAID THIS MORNING -- DID

16:44  11   WGI PUMP WATER INTO THE DITCH WHEN IT WAS DEWATERING SITES?

16:44  12   A.   YES.  THIS IS, AGAIN, THE PRIMARY REASON FOR THE DRAINAGE

16:44  13   DITCH.  DURING THE CONSTRUCTION WORK GOING ON AT MCDONOUGH

16:44  14   BORROW PIT TO THE NORTH, THEY WERE PUMPING WATER FROM THOSE

16:45  15   EXCAVATIONS BECAUSE IT COLLECTED FREQUENTLY, RAPIDLY, AND

16:45  16   DEEPLY AND THEN PUMPED IT INTO THIS DITCH; AND THIS DITCH THEN

16:45  17   DRAINED TO THE INDUSTRIAL CANAL PAST THAT ROAD SIGN.

16:45  18   Q.   AS A FORENSIC ENGINEER, CAN YOU LOOK AT THIS PHOTOGRAPH

16:45  19   AND GIVE ANY KIND OF ESTIMATE OF THE DEPTH OF THAT DITCH, AT

16:45  20   THIS POINT IN TIME AT LEAST, WHICH IS IN 2002?  AND I WOULD

16:45  21   NOTE THAT'S MORE THAN A YEAR LATER THAN THE PHOTOGRAPH WE JUST

16:45  22   LOOKED AT.

16:45  23   A.   YES.  IN FACT, I WILL CALL IT -- WHEN I FOUND THIS

16:45  24   PHOTOGRAPH, I GOT LITERALLY SICK TO MY STOMACH.  THE HAY BALES

16:45  25   ARE THE TIPOFF.  THE HAY BALES ARE 2 FEET BY 2 FEET BY 4 FEET,

ROBERT G. BEA - REDIRECT

16:46  1  AND THE BALES OF HAY ARE AROUND THE 2-FOOT DIMENSION.

16:46  2       THE HAY BALES HERE -- AND THEY SHOWED THAT LINEAR

16:46  3  LINE CONNECTING THE TOP BALES TO THE HAY BALES -- ARE

16:46  4  HORIZONTAL.  THOSE HAY BALES ARE 4 FEET LONG.  THEY ARE

16:46  5  SITTING, IN FACT, ON TOP OF MATERIAL -- YOU CAN SEE THE KIND OF

16:46  6  GRAVELLY, SHELLY, SANDY STUFF BELOW THEM -- AND THEY HAVE HAD

16:46  7  TO PUT POLES IN WITH OTHER REINFORCEMENT TO KEEP THE HAY BALES

16:46  8  IN PLACE.

16:46  9       AND THEN ABOVE THE HAY BALES IS APPROXIMATELY A

16:46  10  DISTANCE EQUAL TO THE HEIGHT OF THE HAY BALE.  SO IF YOU TAKE

16:47  11  4 PLUS 4, YOU HAVE 8, AND WE HAVE ABOUT 2 FEET BELOW THE BOTTOM

16:47  12  OF THE HAY BALES.  WE ARE 10 FEET BELOW GROUND SURFACE.  THAT'S

16:47  13  A SERIOUS HOLE.

16:47  14  **Q.**   DOES THIS DITCH, DR. BEA, RUN THE ENTIRE LENGTH OF THE

16:47  15  SAUCER MARINE SITE?

16:47  16  **A.**   YES.

16:47  17  **Q.**   WHAT'S YOUR APPROXIMATION OF THE DISTANCE FROM THE

16:47  18  FLOODWALL TO THE EASTERN EDGE OF THIS DITCH?

16:47  19  **A.**   APPROXIMATELY 60 FEET.

16:47  20  **Q.**   DR. BEA, MR. TREEBY SHOWED YOU A QAR ABOUT BACKFILLING OF

16:47  21  THE DITCH.

16:47  22       DO YOU RECALL THAT?

16:47  23  **A.**   YES, SIR.

16:47  24       **MR. SCHULTZ:**  CAN WE PULL UP JX-0108-7, PLEASE.

16:47  25

ROBERT G. BEA - REDIRECT

16:47  1   **BY MR. SCHULTZ:**

16:47  2   **Q.**   THIS IS QAR 929 DATED THE SEPTEMBER 29, 2004.

16:48  3        DOES THIS QAR RELATE ALSO TO THE BACKFILLING OF THE

16:48  4   DRAINAGE DITCH, DR. BEA?

16:48  5   **A.**   YES, SIR.

16:48  6   **Q.**   IF WE LOOK OVER AT PAGE 3, WE CAN SEE AN INDICATION THAT

16:48  7   IS A SAUCER MARINE LOCATION; BACKFILLING DRAINAGE DITCH,

16:48  8   CORRECT?

16:48  9   **A.**   CORRECT.  PAGE 2 HAS GONE MORE DETAILS.

16:48  10        **MR. SCHULTZ:**  LET'S LOOK AT PAGE 2.

16:48  11   **BY MR. SCHULTZ:**

16:48  12   **Q.**   WHAT DETAILS WOULD YOU LIKE TO POINT OUT, DR. BEA?

16:48  13   **A.**   IT'S ABOUT MIDWAY STARTING HERE WITH OBSERVED:

16:48  14        OBSERVED THE PC220 EXCAVATOR LOAD TRUCKS.  THE TRUCKS

16:48  15   FOLLOWED THE APPROVED TRAFFIC PLAN.  OBSERVED THE PC220

16:48  16   EXCAVATOR LOAD TWO STRANCO DUMP TRUCKS WITH MILLED ASPHALT

16:49  17   TRANSPORTED TO AND USED AS BACKFILL FOR THE DRAINAGE DITCH

16:49  18   ADJACENT TO SUREKOTE ROAD.  OBSERVED THE D41P DOZER BACKFILLING

16:49  19   THE DRAINAGE DITCH AND CAPPING THE MILLED ASPHALT WITH

16:49  20   PREVIOUSLY STAGED BORROW PIT MATERIAL."

16:49  21        OH, WE EVEN HAVE PHOTOGRAPHS OF THE MILLED ASPHALT

16:49  22   THAT CAME FROM THE ABANDONMENT OR SALVAGE OF SUREKOTE ROAD.

16:49  23   THEY PURPOSEFULLY KEPT THAT MATERIAL BACK TO BACKFILL THE

16:49  24   DRAINAGE DITCH.

16:49  25        ANOTHER, FOR ME, SMOKING GUN DOCUMENT.

ROBERT G. BEA - REDIRECT

16:49    1   BY MR. SCHULTZ:

16:49    2   Q.   IF WE LOOK OVER AT PAGE 6, DR. BEA, AGAIN, WE SEE A DAILY

16:49    3   PROGRESS REPORT FROM THE QAR WHERE THEY INDICATE THEY STARTED

16:49    4   HAULING ASPHALT MATERIAL TO BACKFILL THE DRAINAGE DITCH, PUSHED

16:50    5   THE MATERIAL INTO THE DRAINAGE DITCH, CONTINUED TO LOAD OUT

16:50    6   ASPHALT MATERIAL AND PUSHED IT INTO THE DRAINAGE DITCH TO

16:50    7   BACKFILL.

16:50    8        YOU JUST TOLD US WE ARE WITHIN 60 FEET OF THE

16:50    9   FLOODWALL?

16:50   10   A.   YES.

16:50   11   Q.   IS MILLED ASPHALT A HIGHLY PERMEABLE OR A HIGHLY

16:50   12   IMPERMEABLE SUBSTANCE?

16:50   13   A.   HIGHLY PERMEABLE.

16:50   14   Q.   THEY INDICATED THEY PUT A CLAY CAP ON IT OR A BORROW PIT

16:50   15   CAP ON IT.

16:50   16        WHAT EFFECT WOULD THAT HAVE, DR. BEA, IN YOUR

16:50   17   OPINION?

16:50   18   A.   WELL, IT HIDES IT.  ALL IT IS, IS KIND OF A ROOF OR SHELL

16:50   19   OVER THE TOP.  AND GIVEN THE WEATHER EXTREMES HERE, THAT GETS

16:50   20   CRITICALLY CRACKED UP.  WE CAN COMMUNICATE EASILY, QUICKLY WITH

16:50   21   THIS JUNK WE PUSHED INTO THE STORM WATER DITCH.

16:50   22   Q.   IT INDICATES JUST THAT, ASPHALT MATERIAL PUSHED INTO

16:50   23   DRAINAGE DITCH TO BACKFILL.  IS THERE ANY INDICATION HERE OF

16:51   24   COMPACTION OR COMPACTION TESTING OF THE SORT THAT WE TALKED

16:51   25   ABOUT EARLIER?

ROBERT G. BEA - REDIRECT

16:51   1   **A.**   NO.

16:51   2   **Q.**   IN YOUR ENGINEERING JUDGMENT, DR. BEA, IS THAT PROPER

16:51   3   BACKFILLING AND COMPACTION METHODS FOR SOMEONE WITHIN 60 FEET

16:51   4   OF A FLOOD CONTROL PROJECT?

16:51   5   **A.**   ABSOLUTELY NOT.

16:51   6   **Q.**   IF WE LOOK AT JX-0108-9, PLEASE.  THIS IS REPORT 931 FROM

16:51   7   OCTOBER 2004.

16:51   8          OVER AT PAGE 28, DR. BEA, WE SEE THE OBSERVATION THAT

16:51   9   AN EXCAVATOR IS REMOVING UNDERGROUND UTILITIES FROM UNDER

16:51   10   SUREKOTE ROAD AT SAUCER MARINE, MAYER YACHT, INDIAN TOWING, AND

16:51   11   BOLAND MARINE.

16:51   12          "ASSURED UTILITIES ARE CHASED TO THEIR TERMINATION

16:51   13   AND TOTALLY REMOVED.  OBSERVED THE DOZER BACKFILLING THE

16:51   14   DRAINAGE DITCH AND VOIDS CREATED WHEN THE UTILITIES WERE

16:51   15   REMOVED."

16:51   16          LET ME ASK YOU, FIRST OF ALL, DOES THAT INDICATE TO

16:51   17   YOU WHETHER UTILITIES CROSSED THAT DRAINAGE DITCH?

16:52   18   **A.**   YES.

16:52   19   **Q.**   THEY LEFT VOIDS WHEN EXCAVATED?

16:52   20   **A.**   THAT'S CORRECT.

16:52   21   **Q.**   "ASSURED BACKFILL MATERIAL WAS SEMICOMPACTED WITH MULTIPLE

16:52   22   PASSES OF THE DOZER."

16:52   23          DO YOU KNOW WHAT *SEMICOMPACTED* MEANS IN THE CONTEXT

16:52   24   USED HERE?

16:52   25   **A.**   YES.

ROBERT G. BEA - REDIRECT

16:52  1  **Q.**   WHAT DOES IT MEAN.

16:52  2  **A.**   IMPROPER.

16:52  3  **Q.**   ARE WE STILL WITHIN 60 FEET OF A FLOODWALL?

16:52  4  **A.**   YES.

16:52  5  **Q.**   IS THERE ANY INDICATION, DR. BEA, YET AGAIN BACKFILLING

16:52  6  THIS DITCH, THAT THERE'S ANY COMPACTION TESTING OR ANYTHING

16:52  7  OTHER THAN RUNNING A BULLDOZER OVER IT?

16:52  8  **A.**   NO.

16:52  9  **Q.**   IF WE ASSUME THAT DITCH -- LET'S SAY IT'S 6 FEET DEEP.  IS

16:52  10  PUSHING OF SOILS INTO A DITCH AND RUNNING A BULLDOZER OVER THEM

16:52  11  SUFFICIENT OR PROPER OR GOOD ENGINEERING PRACTICES, IN YOUR

16:53  12  OPINION?

16:53  13  **A.**   NO.

16:53  14  **Q.**   LET'S TAKE A LOOK AT THE LAST EXHIBIT REGARDING THE

16:53  15  DRAINAGE DITCH, AT JX-2032-0242.  AND THIS WOULD BE A

16:53  16  DEMONSTRATIVE OUT OF THE ILIT REPORT WHICH WE SAW EARLIER THIS

16:53  17  MORNING.  FIRST OF ALL, THIS IS FIGURE 6.45 FROM THE ILIT

16:53  18  REPORT, AERIAL VIEW OF THE SOUTH BREACH AT THE EAST BANK OF THE

16:53  19  IHNC AT THE WEST END OF THE NINTH WARD, SHOWING THE CREVASSE

16:53  20  SPLAY GENERATED BY REVERSE DRAINAGE FLOW.

16:53  21       CAN YOU DESCRIBE FOR US WHAT THAT MEANS AND WHY YOU

16:53  22  INCLUDED THIS PHOTOGRAPH AS THE LAST PHOTOGRAPH IN THIS SERIES

16:53  23  OF DOCUMENTS ON THE DRAINAGE DITCH?

16:53  24  **A.**   WELL, WE, MEANING THE INDEPENDENT LEVEE INVESTIGATIONS

16:53  25  TEAM -- WE WERE ALWAYS INQUISITIVE ABOUT THIS INTERESTING

ROBERT G. BEA - REDIRECT

16:54   1   FEATURE THAT SHOWS UP AT THE SOUTH END OF THE SOUTH BREACH.
16:54   2           **THE COURT:**  COUNSEL, I REALLY AM SORRY TO INTERRUPT
16:54   3   BOTH YOU AND DR. BEA AT THIS TIME.  I HAVE A LITTLE MALFUNCTION
16:54   4   I THINK THE COURT REPORTER CAN HELP ME WITH.  WE WILL TAKE A
16:54   5   10-MINUTE RECESS TO DO THAT, AND THEN WE'LL PROBABLY WRAP UP
16:54   6   AROUND 5:30.  IS THAT SATISFACTORY, OR WOULD YOU WANT TO GO
16:54   7   LONGER?
16:54   8           **MR. SCHULTZ:**  JUDGE, WE HAVE ANOTHER SERIES OF
16:54   9   DOCUMENTS.  I THINK WE CAN DO IT IN ABOUT THAT AMOUNT OF TIME.
16:54  10           **THE COURT:**  THAT'S NOT WRITTEN IN STONE.  WE'LL SEE
16:54  11   HOW IT WORKS OUT.  I'M SORRY TO INTERRUPT.
16:54  12           (RECESS.)
17:05  13           **MR. SCHULTZ:**  YOUR HONOR, IF I COULD APPROACH.  WE
17:05  14   HAVE THE EXHIBITS.  WE'VE GONE THROUGH THE FIRST SET.  THIS IS
17:05  15   THE END.  IF IT'S OF ANY BENEFIT TO THE COURT AS A ROAD MAP,
17:05  16   JUDGE, NUMBER ONE, WE DO HAVE OUR SUMMARY EXHIBIT.  THESE
17:05  17   DOCUMENTS CAN BE TEDIOUS.  I'M TRYING TO KEEP A GOOD CLIP.  THE
17:05  18   SUMMARY EXHIBIT WILL HELP WITH ORIENTING A LOT.
17:05  19           **MR. TREEBY:**  WE HAVE A SUMMARY EXHIBIT NOW?  IS THAT
17:05  20   WHAT WE HAVE?
17:05  21           **MR. SCHULTZ:**  YOU OBJECTED, AND IT WAS OVERRULED.  I
17:05  22   ASSUMED IT WOULD BE ADMITTED AT SOME POINT.  I WAS JUST
17:05  23   POINTING OUT THAT IT WOULD HELP WITH THE ORIENTATION.
17:05  24           **MR. TREEBY:**  MY UNDERSTANDING, AND I COULD HAVE
17:05  25   MISUNDERSTOOD.  MY UNDERSTANDING WAS THAT YOUR HONOR OVERRULED

ROBERT G. BEA - REDIRECT

17:06   1   OUR OBJECTION BUT THAT IT STILL HAD TO BE PROPER SUMMARY
17:06   2   EVIDENCE, THAT SOMEONE HAD TO PROPERLY IDENTIFY THE WORK WHEN
17:06   3   IT CAME UP.  I GUESS IT NOW HAS COME UP.  I WOULD BE PREPARED
17:06   4   TO ARGUE ABOUT THAT BECAUSE I DON'T THINK THAT HAS BEEN DONE BY
17:06   5   THE TESTIMONY 'TIL NOW.
17:06   6           NOW, IF IT'S SOMETHING -- MAYBE IT'S --
17:06   7           **THE COURT:**  NO.  I'M GOING TO REVISIT MY RULING, BUT
17:06   8   I'M CERTAINLY NOT GOING TO -- I'M NOT QUITE SURE -- I'M GOING
17:06   9   TO LOOK AT YOUR OBJECTION.  ONE OBJECTION WAS IT HAD TO BE
17:06  10   INTRODUCED INTO EVIDENCE ALREADY.  I SAID NO.
17:06  11           TWO, THE OTHER OBJECTION WAS IT WAS A BACK DOOR
17:06  12   TO GIVE OPINIONS THAT COULDN'T BE GIVEN, AND I SAID NO.
17:06  13           THAT'S WHAT I RECALL THE ESSENCE OF MY OPINION
17:06  14   WAS.
17:06  15           **MR. TREEBY:**  YES, YOUR HONOR, BUT UNDER RULE 1006 IT
17:06  16   REQUIRES -- SUMMARIES ARE EVIDENCE PROVIDED A PROPER FOUNDATION
17:06  17   IS LAID THAT THEY ARE TRUSTWORTHY AND SOMEONE TESTIFIES, "I DID
17:07  18   THIS SUMMARY AND I KNOW WHAT I'M TALKING ABOUT."  AND THERE'S A
17:07  19   LOT OF THINGS ON HERE, ON THIS SUMMARY, THAT HAVEN'T BEEN --
17:07  20           **THE COURT:**  WE CAN ARGUE THAT LATER WHEN THEY
17:07  21   INTRODUCE IT.  IT'S VERY LIKELY I'M GOING TO LET IT IN.
17:07  22           **MR. SCHULTZ:**  I WASN'T TRYING TO PICK THAT FIGHT NOW.
17:07  23           **THE COURT:**  THAT'S WHY I RULED IN LIMINE.
17:07  24           **MR. SCHULTZ:**  THE ONE OTHER THING BEING WE ARE GOING
17:07  25   TO TALK ABOUT SEWER LINE, AND I ONLY HAVE ONE MORE SET OF

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 17:07 | 1 | EXCAVATIONS IN THE MORNING, AND THEN WE MOVE ON. |
| 17:07 | 2 | **THE COURT:**  IF EVER THERE WAS A CASE THAT SUMMARY |
| 17:07 | 3 | EVIDENCE WAS REQUIRED, WITH THIS MANY DOCUMENTS, IT'S HERE. |
| 17:07 | 4 | LET ME SAY THAT.  BECAUSE WE ARE NOT GOING TO GO OVER EACH AND |
| 17:07 | 5 | EVERY QAR, I PROMISE YOU.  GO AHEAD. |
| 17:07 | 6 | **BY MR. SCHULTZ:** |
| 17:07 | 7 | **Q.**   DR. BEA, WE JUST TALKED ABOUT THE DRAINAGE DITCH.  YOU |
| 17:07 | 8 | HAVE ALREADY INDICATED IN PREVIOUS TESTIMONY THERE WAS A SEWER |
| 17:07 | 9 | MAIN RUNNING OFF OF THE SEWER LIFT STATION, CORRECT? |
| 17:07 | 10 | **A.**   CORRECT. |
| 17:07 | 11 | **Q.**   THE ONE THAT YOU TALKED ABOUT IT HAVING MANHOLES? |
| 17:07 | 12 | **A.**   CORRECT. |
| 17:07 | 13 | **Q.**   PLEASE ORIENT THE COURT WHERE THAT SEWER LINE WOULD RUN -- |
| 17:08 | 14 | **THE COURT:**  YOU HAD A PICTURE UP BEFORE. |
| 17:08 | 15 | **MR. SCHULTZ:**  I'M SORRY, JUDGE.  WE DIDN'T FINISH |
| 17:08 | 16 | THAT. |
| 17:08 | 17 | **BY MR. SCHULTZ:** |
| 17:08 | 18 | **Q.**   MY APOLOGIES, DR. BEA.  LET'S GO BACK THERE. |
| 17:08 | 19 | **THE LAW CLERK:**  JX-2032 PAGE 242. |
| 17:08 | 20 | **BY MR. SCHULTZ:** |
| 17:08 | 21 | **Q.**   SORRY ABOUT THAT, DR. BEA.  THIS WAS THE CREVASSE SPLAY. |
| 17:08 | 22 | IT MIGHT HELP IF YOU START OVER WITH YOUR EXPLANATION OF WHAT A |
| 17:08 | 23 | CREVASSE SPLAY IS AND WHY YOU INCLUDED THIS PHOTOGRAPH AS THE |
| 17:08 | 24 | CAPPING DOCUMENT, IF YOU WILL, FOR YOUR DISCUSSION OF THE DITCH |
| 17:08 | 25 | THAT WAS BACKFILLED AT SAUCER MARINE. |

ROBERT G. BEA - REDIRECT

17:08   1   **A.**   I'LL START WITH THE CREVASSE SPLAY.

17:09   2   *CREVASSE* REFERS TO BREACHES IN LEVEES.  *SPLAY* REFERS

17:09   3   TO SOILS THAT ARE CARRIED BY THE GENERALLY INRUSHING

17:09   4   FLOODWATER.  AFTER THE WATER RECEDES, YOU HAVE A MINIATURE

17:09   5   DELTA.

17:09   6   IN THIS CASE WE ARE AT THE SOUTH BREACH.  HERE'S THE

17:09   7   LARGE BOW.  HERE'S THE SMALLER FEATURE.  WE'RE AT SOUTH END,

17:09   8   SOUTH BREACH THERE AND UP HERE AT THE NORTH END OF THE SOUTH

17:09   9   BREACH.

17:10   10   AFTER KATRINA HAPPENED, THE CORPS CAME IN AND

17:10   11   CONSTRUCTED A TEMPORARY CLOSURE BERM.  OF COURSE,

17:10   12   UNFORTUNATELY, WE GOT A SECOND CURSE FROM HURRICANE RITA, AND

17:10   13   THIS TEMPORARY BERM BREACHED IN THE SAME PLACE THE WALL HAD

17:10   14   BREACHED PRIOR OR DURING KATRINA.  SO THE CORPS COMES IN AND

17:10   15   CONSTRUCTS ANOTHER, MORE EXTENSIVE, MORE STABLE ROCK,

17:10   16   SAND-FILLED BERM, AND THAT'S THE FEATURE SHOWN HERE,

17:11   17   "ENCLOSURE."

17:11   18   NOW, THE BIG MYSTERIOUS HOLE THAT IS IN FACT

17:11   19   IDENTIFIED WITH THE SANDBAGS THEY HAD TO PUT THERE TO KEEP

17:11   20   PEOPLE FROM FALLING INTO THIS BIG DAMN HOLE AT THE CENTER

17:11   21   LOCATION, THE BIG BOW AT THE SOUTH BREACH.

17:11   22   NOW, UNDER THIS RUBBLE IS BURIED THE DRAINAGE DITCH.

17:11   23   THAT SIGN THAT I DREW YOUR ATTENTION TO HAS TURNED, AND THE

17:11   24   DITCH THAT'S HEADED TOWARD THE INDUSTRIAL CANAL IS UNDER THE

17:11   25   GROUND SURFACE, BURIED BY THESE TWO TEMPORARY REPAIR LEVEES.

ROBERT G. BEA - REDIRECT

17:12    1    THE WATER THAT'S BEING CONNECTED SUBTERRANEANLY IN THE BURIED

17:12    2    SEVERAL TIMES DRAINAGE DITCH IS STILL DRAINING THROUGH THE

17:12    3    DRAINAGE DITCH, AND THE FINE SEDIMENT, PERHAPS EVEN SOME OF IT

17:12    4    THE MILLED ASPHALT STUFF, IS WHAT IS CAUSING THIS VERY UNUSUAL

17:12    5    REVERSE SPLAY.

17:12    6            THIS SORT OF TRACKING, FROM HOW IT GETS INITIATED TO

17:12    7    WHAT HAPPENS AFTER THE BREACH HAS OCCURRED, IS A SIGNATURE OF

17:12    8    FORENSIC ENGINEERING.  SO HERE'S A FEATURE THAT CORROBORATES

17:13    9    THE BACKFILLING, THE IMPORTANCE OF THAT STORM WATER DITCH,

17:13   10    BECAUSE IT'S TELLING US SILENTLY IT'S STILL TRYING TO DRAIN.

17:13   11    Q.   DR. BEA, IN YOUR OPINION, IF THAT DITCH HAD BEEN FILLED,

17:13   12    FOR EXAMPLE, WITH CLAY AND COMPACTED IN LIFTS, THE WAY THE

17:13   13    LEVEE WAS REPAIRED IN AREA 1 OF MCDONOUGH, WOULD IT STILL BE

17:13   14    COMMUNICATING WATER AT THIS POINT IN TIME AFTER THE STORM?

17:13   15    A.   NO.

17:13   16    Q.   NOW, I WANT TO MOVE, DR. BEA, IF WE COULD, TO THE SEWER

17:13   17    LINE, WHICH WE WILL CLOSE OUT THE DAY WITH.  AND I WANT TO

17:13   18    REFER FIRST BACK TO -- WELL, LET'S ASK THIS FIRST.  YOU

17:13   19    MENTIONED THE SEWER LINE DURING YOUR TESTIMONY WITH MR. TREEBY.

17:13   20    ORIENT THE COURT, IF YOU WOULD, WHERE THE SEWER LINE IS ON THE

17:13   21    SITE.

17:13   22    A.   WELL, THERE'S A LOT OF SEWER LINES ON THE SITE.  THE SEWER

17:14   23    LIFT STATION IS ACTUALLY A GATHERING POINT.  ON THE INDUSTRIAL

17:14   24    SITE THEY HAD TO COLLECT SEWAGE TO GET TO THE SEWAGE LIFT

17:14   25    STATION THAT IS THEN TRANSPORTED TO THE WATER TREATMENT PLANT I

ROBERT G. BEA - REDIRECT

17:14  1  SPOKE OF EARLIER THAT'S NORTH OF THE -- PARDON ME -- THAT'S

17:14  2  SOUTH OF THE PUMP STATION 6 TO GATHER SEWAGE FROM ALL OF THE

17:14  3  FACILITIES.  AND THAT MEANS FROM BOLAND TO ITT, INCLUDING

17:14  4  SAUCER, THEY INSTALLED A SEWER COLLECTION LINE, AND THE

17:15  5  MANHOLES WERE PERIODICALLY PUT INTO PLACE SO THEY COULD ACCESS

17:15  6  THAT SEWER LINE.  THE SEWER LINE BURIED APPROXIMATELY 12 FEET

17:15  7  BELOW GROUND SURFACE AND PARALLELLING SUREKOTE ROAD AT THE

17:15  8  I-WALL SHOWN IN THE BACKGROUND.

17:15  9  Q.   REMIND US, IF YOU WOULD, DR. BEA, THE APPROXIMATE DISTANCE

17:15  10  BETWEEN THE SEWER LINE -- THE SEWER MAIN EXCAVATION AND THAT

17:15  11  DITCH THAT'S UP BY SUREKOTE ROAD.

17:15  12  A.   THE DITCH FOR THE SEWER LINE IS APPROXIMATELY 75 TO

17:15  13  80 FEET FROM THE WALL, AND THE STORM WATER DITCH IS

17:15  14  APPROXIMATELY 50 TO 60 FEET FROM THE WALL.  SO THESE TWO

17:16  15  EXCAVATIONS ARE PARALLELING EACH OTHER AND ACTUALLY PERFECTLY

17:16  16  DEFINE THE TWO BORDERS OF THAT UNUSUAL DEEP HOLE AT THE SOUTH

17:16  17  BREACH.

17:16  18  Q.   IF WE LOOK BACK AT JX-1261 -- THIS IS THE DOCUMENT WE

17:16  19  LOOKED AT A FEW MINUTES AGO WITH REGARD TO PILING REMOVAL, AND

17:16  20  IT SHOULD BE DOWN IN THE STACK.  THIS WAS -- DO YOU RECALL,

17:16  21  DR. BEA, A PLAN THAT WE -- FOR PILING REMOVAL AND OTHER

17:16  22  DEMOLITION, A SUBCONTRACT?

17:16  23  A.   THAT'S CORRECT.

17:16  24  Q.   WE LOOKED AT THE PILING REMOVAL PORTION.  I WANTED TO LOOK

17:16  25  AT PAGE 23, IF WE COULD, REGARDING UNDERGROUND PIPING AND SEWER

ROBERT G. BEA - REDIRECT

17:16    1    LINES.

17:16    2         IF WE LOOK AT SECTION 3.6 UP ON THE SCREEN, THE

17:16    3    DOCUMENT INDICATES:  "THE MAJORITY OF UNDERGROUND PIPING

17:17    4    REMOVAL IS ASSOCIATED WITH THE SANITARY SEWER LINE THAT RUNS

17:17    5    FROM THE NORTH AND SOUTH ENDS OF THE PROJECT TO AN APPROXIMATE

17:17    6    15-FOOT DEPTH, AND A CONCRETE MANHOLE, THE LOW POINT, ADJACENT

17:17    7    TO THE SEWER LIFT STATION ON-SITE."

17:17    8         IS THIS THE SEWER MAIN YOU REFERRED TO?

17:17    9    A.   THAT'S CORRECT.

17:17   10    Q.   IT INDICATES THERE WILL BE THREE SEPARATE OPERATIONS FOR

17:17   11    EXCAVATION:  THE SHALLOW UNDERGROUND LINES, THE REMOVAL OF THE

17:17   12    DEEP SEWER LINE, AND THE REMOVAL OF THE SEWER LIFT STATION.

17:17   13    A.   THAT'S CORRECT.

17:17   14    Q.   IF WE LOOK OVER AT THE FOLLOWING PAGE, SEWER LINES AND

17:17   15    MANHOLES ON PAGE 24 OF THIS DOCUMENT, THERE'S AN INDICATION

17:17   16    THAT THE EXCAVATED TRENCH WILL BE INSPECTED, THEN IMMEDIATELY

17:17   17    BACKFILLED WITH TRENCH SPOILS.

17:17   18         DOES THAT MEAN THE DIRT THAT CAME OUT OF THE TRENCH?

17:17   19    A.   CORRECT.

17:17   20    Q.   "USING A CAT D5-LGP DOZER.  NO COMPACTION EFFORT WILL BE

17:17   21    REQUIRED OTHER THAN WHAT THE TRACKS OF THE DOZER WILL ACHIEVE."

17:17   22         THIS IS THE PLAN.  BASED ON THE DOCUMENTS YOU BROUGHT

17:18   23    FOR THE COURT TO REVIEW, IS THIS IN FACT WHAT THEY DID?

17:18   24    A.   YES.

17:18   25    Q.   IS THERE ANY INDICATION IN EITHER THE PLAN OR THE

ROBERT G. BEA - REDIRECT

17:18  1   DOCUMENTS SHOWING THE WORK PERFORMED THAT THEY TESTED THE

17:18  2   DENSITY OF THE SOILS BEFORE THEY STARTED DIGGING OR TESTED THE

17:18  3   DENSITY OF THE SOILS AFTER THEY HAD BACKFILLED THIS TRENCH?

17:18  4   A.   NO EVIDENCE OF EITHER, CHECKING BEFORE OR AFTER.

17:18  5            MR. SCHULTZ:  IF WE LOOK AT JX-0250, PLEASE.

17:18  6   BY MR. SCHULTZ:

17:18  7   Q.   ANOTHER QAR, DR. BEA, NUMBERED 092?

17:18  8   A.   YES, SIR.

17:18  9   Q.   ARE YOU THERE?

17:18  10  A.   YES.

17:18  11  Q.   MAY 10, 2001.  THERE'S AN INDICATION ON THAT FIRST PAGE,

17:18  12  "REMOVED UNDERGROUND UTILITIES."

17:18  13  A.   CORRECT.

17:18  14  Q.   I WANTED TO DIRECT YOUR ATTENTION, DR. BEA, TO PAGE 16.

17:18  15  AGAIN, ANOTHER ONE OF THESE DAILY PROGRESS REPORTS THAT WE HAVE

17:19  16  SEEN, THIS ONE STATING THAT THEY BEGAN CHASING UNDERGROUND

17:19  17  UTILITIES AT SAUCER AND STARTED ON THE MAIN SEWER LINE RUNNING

17:19  18  NORTH-SOUTH ALONG SUREKOTE ROAD AND REMOVED ONE MANHOLE.

17:19  19            IS THIS THE INITIATION OF THE PROJECT THAT YOU'VE

17:19  20  DESCRIBED, THE REMOVAL OF THE SEWER MAIN?

17:19  21  A.   THAT'S CORRECT.

17:19  22  Q.   IS THAT THE SAME PROJECT WE JUST SAW DESCRIBED IN THE

17:19  23  HAMP'S SUBCONTRACT?

17:19  24  A.   THAT'S CORRECT.

17:19  25  Q.   IF WE LOOK AT PX-3376-0476.  THE QAR WE JUST LOOKED AT IS

ROBERT G. BEA - REDIRECT

17:19   1   MAY 10, DR. BEA.  THIS IS A PHOTOGRAPH.  TELL THE COURT, BASED

17:19   2   ON THE CODING, THE DATE OF THIS PHOTOGRAPH.

17:19   3   **A.**   WE ARE AT 2005.

17:19   4   **Q.**   I'M SORRY.  IF WE LOOK AT -- THE '05, I THINK, WOULD BE

17:19   5   THE PHOTOGRAPH NUMBER.

17:19   6   **A.**   THAT'S CORRECT.  I'M SORRY.

17:19   7   **Q.**   ARE WE BACK AT 2001?

17:19   8   **A.**   YES.

17:19   9   **Q.**   5-11?

17:19   10  **A.**   THANK YOU FOR THE CORRECTION.  IT'S LATE IN THE DAY.

17:19   11  **Q.**   THAT WOULD BE A DAY LATER THAN THE QAR WE JUST LOOKED AT

17:20   12  INDICATING SEWER LINE TRENCH AND MANHOLE EXCAVATION.  WOULD

17:20   13  THIS THEN BE, DR. BEA, PHOTO DOCUMENTATION OF THE REMOVAL OF

17:20   14  THAT TRENCH?

17:20   15  **A.**   YES, THAT'S CORRECT.

17:20   16  **Q.**   DO YOU SEE ANY FEATURES IN THIS PARTICULAR PHOTOGRAPH WE

17:20   17  HAVE ALREADY TALKED ABOUT IN TERMS OF EXCAVATED MATERIALS?

17:20   18  **A.**   WELL, YOU SEE THE CLODS OF MATERIAL THE EXCAVATOR IS

17:20   19  REMOVING TO, QUOTE, CHASE THE LINES.  THEY WERE IMMEDIATELY

17:20   20  VERTICALLY -- OR PARALLEL TO SUREKOTE.  THE I-WALL IS IN THE

17:20   21  BACKGROUND.

17:20   22  **Q.**   IS THIS A MANHOLE?

17:20   23  **A.**   YES.

17:20   24  **Q.**   WHAT IS THAT FEATURE ON THE MANHOLE?

17:20   25  **A.**   THAT'S THE CONCRETE PAD ON WHICH THE MANHOLE WAS FOUNDED.

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 17:20 | 1 | AND THE BOTTOM OF THAT IS THE 22 FEET I WAS REFERRING TO |
| 17:21 | 2 | EARLIER TODAY. |
| 17:21 | 3 | **Q.**   IF WE LOOK AT PX-3376-0478, ARE THESE MORE PHOTOS OF THIS |
| 17:21 | 4 | SAME SEWER TRENCH -- SEWER MAIN EXCAVATION WITHIN 75 TO 85 FEET |
| 17:21 | 5 | OF THE FLOODWALL? |
| 17:21 | 6 | **A.**   YES, SIR. |
| 17:21 | 7 | **Q.**   WHAT DO WE SEE HERE? |
| 17:21 | 8 | **A.**   ANOTHER MANHOLE. |
| 17:21 | 9 | **Q.**   CAN YOU INFER ANYTHING ABOUT THE DEPTH OF THIS TRENCH FROM |
| 17:21 | 10 | LOOKING AT THE PHOTOGRAPH AND THE ARM OF THAT EXCAVATOR? |
| 17:21 | 11 | **A.**   YEP.  HE IS DOWN 20 FEET, 15 FEET.  LOOKS LIKE 20 SINCE HE |
| 17:21 | 12 | IS ON THAT SECTION OF HIS LIFT ARM. |
| 17:21 | 13 | **Q.**   IF WE LOOK AT THE PHOTOGRAPH ON THE BOTTOM, IT INDICATES A |
| 17:21 | 14 | 2-INCH UNDERGROUND UTILITY PIPE NEAR MANHOLE.  WERE OTHER |
| 17:21 | 15 | UTILITY PIPES EXCAVATED IN THE VERY SAME EXCAVATION, THE SAME |
| 17:21 | 16 | TRENCH AS THE SEWER MAIN? |
| 17:21 | 17 | **A.**   YES.  IN FACT, SOMETIMES THERE WERE TWO EXCAVATIONS, BUT |
| 17:21 | 18 | ONE FIRST TO GET THE SHALLOW STUFF, AND THEN A SECOND ONE TO |
| 17:22 | 19 | GET THE DEEPER STUFF. |
| 17:22 | 20 | **Q.**   IF WE LOOK AT JX-00252, THIS WOULD BE THE QAR 094, |
| 17:22 | 21 | DR. BEA, FROM MAY 12 TO MAY 14.  SO WE ARE MOVING FORWARD A FEW |
| 17:22 | 22 | DAYS FROM THE LAST QAR WE LOOKED AT? |
| 17:22 | 23 | **A.**   YES. |
| 17:22 | 24 | **Q.**   AT PAGE 2 THERE'S AN INDICATION THAT THEY ARE THE |
| 17:22 | 25 | EXCAVATING 850 LINEAR FEET TRENCH IN SAUCER MARINE, REMOVING |

*HOURLY TRANSCRIPT*

ROBERT G. BEA - REDIRECT

17:22  1  UNDERGROUND UTILITIES RUNNING TO NO. 100.

17:22  2          IS NO. 100 A BUILDING NUMBER?

17:22  3  **A.**  THAT'S CORRECT.

17:22  4  **Q.**  AND YOU MENTIONED BEFORE -- WHEN I SAID "THESE SEWER

17:22  5  LINES," YOU SAID, "WELL, THERE ARE LOTS OF SEWER LINES."  IS

17:22  6  THIS AN INDICATION, DR. BEA, OF EAST-WEST RUNNING SEWER LINES?

17:22  7  **A.**  THAT'S CORRECT.

17:22  8  **Q.**  WHERE DO THOSE LINES RUN?

17:22  9  **A.**  WELL, THEY ARE RUNNING EAST-WEST TO ACCESS THE FACILITIES

17:22  10  THAT PREVIOUSLY WERE THERE REPRESENTING THE VARIOUS INDUSTRIAL

17:23  11  ACTIVITIES AT THE EAST BANK INDUSTRIAL AREA, SO THEY ARE

17:23  12  COLLECTION SEWER LINES.

17:23  13  **Q.**  DOES THAT MEAN -- DR. BEA, WE HAVE NORTH-SOUTH SEWER MAIN

17:23  14  EXCAVATIONS, EAST-WEST SEWER MAIN EXCAVATIONS, MUCH LIKE THE

17:23  15  GRID TRENCHING?

17:23  16  **A.**  THAT'S CORRECT.

17:23  17  **Q.**  IF WE LOOK HERE, IT SAYS:  "ASSURED 8-INCH SEWER LINE AND

17:23  18  1-INCH WATER PIPE WERE REMOVED FROM TRENCH WITH SEWER TRENCH,

17:23  19  PRODUCING EXCESSIVE WOOD DEBRIS RESULTING FROM SHORING COVERED

17:23  20  AFTER ORIGINAL INSTALLATION OF LINE."

17:23  21          FIRST OF ALL, DOES THIS INDICATE TO YOU, DR. BEA,

17:23  22  THAT THE 1-INCH WATER PIPE CAME OUT IN THE VERY SAME

17:23  23  EXCAVATION?

17:23  24  **A.**  YES.

17:23  25  **Q.**  WHY WOULD THERE BE WOOD SHORING INSIDE THAT TRENCH?

ROBERT G. BEA - REDIRECT

17:23  1   **A.**   THEY ARE TRYING TO STABILIZE THE WALLS OF THE TRENCH SO
17:23  2   THEY CAN SUCCESSFULLY AND SAFELY REMOVE THE UNDERGROUND
17:24  3   UTILITIES.
17:24  4   **Q.**   IF WE TAKE A LOOK, PLEASE, DR. BEA AT PAGE 18.   THERE'S AN
17:24  5   INDICATION HERE:   "EXCESSIVE AMOUNTS OF TIMBERS AT TRENCH FOR
17:24  6   SEWER.   DEPTH IS ALSO SLOPING DOWN CLOSER WE GET TO THE LIFT
17:24  7   STATION AT APPROXIMATELY 12 FEET DEEP DUE WEST OF AIR
17:24  8   MONITOR 33.   ALSO LOCATED 1-INCH UNDERGROUND WATER PIPE RUNNING
17:24  9   ADJACENT TO SEWER ABOUT 2 FEET DEEP.   ALSO NEED TO TRENCH
17:24  10  EAST-WEST AT 300-FOOT MARK FOR ONE 8-INCH SEWER AND SOME OTHER
17:24  11  PIPES."
17:24  12          IS THIS, DR. BEA, FURTHER CORROBORATION OF NOT ONLY
17:24  13  THESE NORTH-SOUTH RUNNING SEWER LINES, BUT EAST-WEST RUNNING
17:24  14  SEWER LINES?
17:24  15  **A.**   THAT'S CORRECT.
17:24  16  **Q.**   AND CORROBORATION OF AT LEAST A 12-FOOT TRENCH AT SAUCER
17:24  17  MARINE?
17:24  18  **A.**   THAT'S CORRECT.
17:24  19  **Q.**   IS THIS IN THE VICINITY OF THE BREACH?
17:24  20  **A.**   YES.
17:24  21  **Q.**   THE EVENTUAL BREACH?
17:25  22  **A.**   YES.
17:25  23  **Q.**   IF WE COULD LOOK, PLEASE, WE HAVE TWO MORE PHOTOGRAPHS, I
17:25  24  THINK, AND WE WILL CLOSE FOR THE DAY.
17:25  25          PX-3376-0485.   WE'RE NOW AT MAY 14, 2001.   TIMBERS

ROBERT G. BEA - REDIRECT

17:25   1   REMOVED FROM -- AT AM, AIR MONITOR 34.

17:25   2              WOULD THIS BE AN EXAMPLE OF THE TIMBERS WE JUST SAW

17:25   3   REFERENCED IN THE QAR AS THERE BEING AN EXCESSIVE NUMBER OF IN

17:25   4   THE TRENCH?

17:25   5   **A.**   YES.

17:25   6   **Q.**   DOES THE HEIGHT OF THAT SPOIL PILE AND THE TIMBERS GIVE

17:25   7   YOU ANY INDICATION OF THE NATURE OR EXTENT OF THE EXCAVATION?

17:25   8   **A.**   YES.

17:25   9   **Q.**   HOW WOULD YOU CHARACTERIZE IT?

17:25   10  **A.**   WELL, FIRST, THE NATURE IS IT'S A MESS, MEANING A

17:25   11  COMPILATION OF WHAT THEY ARE REMOVING IN THE WAY OF TIMBERS AND

17:25   12  OTHER ELEMENTS AND SOIL.  THE HEIGHT IS REFLECTIVE OF THE

17:25   13  VOLUME OF MATERIAL THAT'S BEING REMOVED.  IT'S OBVIOUSLY A LOT.

17:26   14  **Q.**   IF WE LOOK AT PX-3376-0482.  WHEN WE LOOKED AT THE PLAN,

17:26   15  DR. BEA, WE SAW THAT THEY PLANNED TO BACKFILL, NO COMPACTION

17:26   16  NECESSARY OTHER THAN WHAT'S REQUIRED WITH THE BULLDOZER.

17:26   17             IS THAT WHAT WE SEE DEPICTED HERE IN THIS PHOTOGRAPH?

17:26   18  **A.**   YES.

17:26   19  **Q.**   IN FACT, THE PHOTOGRAPH IS ENTITLED "BACKFILL OF SEWER

17:26   20  TRENCH."  THE DATE OF THIS PHOTOGRAPH, DR. BEA, MAY 14, '01,

17:26   21  WOULD THAT BE THE SAME DAY OF THE EXCAVATIONS WE JUST SAW?

17:26   22  **A.**   YES, SIR.

17:26   23  **Q.**   DOES THAT INDICATE TO YOU THAT THEY DID IN FACT JUST PUSH

17:26   24  THE SPOIL BACK IN AND PERHAPS RUN OVER IT WITH A BULLDOZER?

17:26   25  **A.**   YES, SIR.

ROBERT G. BEA - REDIRECT

17:26    1    **Q.**    WE ARE 70 OR 80 FEET FROM THE FLOODWALL?

17:26    2    **A.**    YES, SIR.

17:26    3    **Q.**    DOES THIS SEWER LINE TRENCH, WHICH YOU ALREADY TOLD ME RAN

17:26    4    THE ENTIRE LENGTH OF THE SAUCER MARINE SITE -- DOES IT BISECT

17:26    5    THAT EXCAVATION, THAT IDEALIZED EXCAVATION IN YOUR REPORT?

17:27    6    **A.**    YES.

17:27    7    **Q.**    DOES THE DRAINAGE DITCH BISECT THAT EXCAVATION AS WELL?

17:27    8    **A.**    YES.

17:27    9    **Q.**    DOES SUREKOTE ROAD, WHICH WE ALREADY SHOW WAS EXCAVATED TO

17:27   10    SOME EXTENT, BISECT THAT BOX AS WELL?

17:27   11    **A.**    THAT'S CORRECT.

17:27   12            **MR. SCHULTZ:**  I THINK THAT WOULD BE IT FOR THE DAY,

17:27   13    YOUR HONOR.

17:27   14            **THE COURT:**  DR. BEA, YOU CAN STEP DOWN.  WE WILL

17:27   15    RESUME TOMORROW.  I'M GOING TO TALK TO COUNSEL A LITTLE BIT.

17:27   16                FIRST, LET ME ASK YOU, COUNSEL, WITHOUT PUTTING

17:27   17    YOU ON AN EXACT SCHEDULE, HOW MUCH LONGER DO YOU THINK YOU HAVE

17:27   18    WITH DR. BEA?  I'M JUST TRYING TO, FOR THE DEFENDANTS AND ME,

17:27   19    FIND OUT WHAT THE SITUATION IS.

17:27   20            **MR. SCHULTZ:**  I'M ESTIMATING HERE, JUDGE, AND I THINK

17:27   21    IT WILL BE AT LEAST A HALF AN HOUR MORE ON THE EXCAVATIONS AND

17:27   22    PROBABLY 2 1/2 HOURS ON THE REMAINING CAUSATION OPINIONS.

17:28   23            **THE COURT:**  HOPEFULLY YOU WILL -- IT'S POSSIBLE WE

17:28   24    COULD FINISH BY LUNCH OR SHORTLY THEREAFTER.

17:28   25            **MR. SCHULTZ:**  THAT WOULD BE THE GOAL.

17:28    1          **THE COURT:**  JUST TO LET EVERYBODY KNOW BECAUSE YOU --

17:28    2   AND YOUR RECROSS.

17:28    3              ONE THING I WANTED TO TALK ABOUT IS MR. TREEBY

17:28    4   HAD MENTIONED SUMMARY EVIDENCE WHICH WAS MENTIONED IN LIMINE.

17:28    5   I GUESS I AM JUST TRYING TO FIGURE OUT THE BEST TIME TO HAVE

17:28    6   THE SKIRMISH THAT WE ARE GOING TO HAVE.

17:28    7              WHEN DO YOU INTEND TO INTRODUCE THE SUMMARY

17:28    8   EVIDENCE?

17:28    9          **MR. BRUNO:**  AFTER WE FINISH WITH DR. BEA.  WE WANT TO

17:28   10   GET THAT OUT OF THE WAY.

17:28   11          **THE COURT:**  I GUESS WE WILL TAKE IT UP AT THAT TIME.

17:28   12          **MR. BRUNO:**  JUDGE, IS THERE ANY POSSIBILITY -- I'M

17:28   13   REACHING HERE -- THAT I PUT ON ANOTHER WITNESS TOMORROW, OR DO

17:28   14   WE GIVE AWAY THE DAY TO THE RECROSS?

17:28   15          **THE COURT:**  I'M NOT SURE I UNDERSTOOD WHAT YOU MEAN.

17:28   16          **MR. BRUNO:**  TOMORROW.  I'M ASKING THE DEFENDANTS, IS

17:29   17   THERE ANY POSSIBILITY THAT -- I MAY NEED TO GET A WITNESS IN

17:29   18   LINE.  I DON'T THINK SO, BUT I'M --

17:29   19          **THE COURT:**  DO YOU ANTICIPATE YOUR RECROSS WILL TAKE

17:29   20   UP THE AFTERNOON?

17:29   21          **MR. TREEBY:**  THAT'S THE QUESTION?

17:29   22          **MR. BRUNO:**  DID I ASK IT THAT POORLY?  I'M SORRY.

17:29   23          **THE COURT:**  YOU DON'T WANT TO BE LEFT WITHOUT A

17:29   24   WITNESS.

17:29   25          **MR. BRUNO:**  NO.

17:29  1  **THE COURT:**  I'M GUESSING IT WOULD TAKE FROM 1:30 -- I
17:29  2  WOULD THINK IT WOULD TAKE THE AFTERNOON.
17:29  3  **MR. TREEBY:**  I MUST ADMIT FOR MY PART -- I CAN'T
17:29  4  SPEAK FOR ROBIN.  FOR MY PART I THINK IT'S A LITTLE SHORTER NOW
17:29  5  THAN I THOUGHT IT WOULD BE.  IF THEY TAKE 'TIL LUNCH, IF WE
17:29  6  START AFTER LUNCH --
17:29  7  **THE COURT:**  WE'LL ARGUE -- HE WILL OFFER THE SUMMARY
17:29  8  EVIDENCE AFTER DR. BEA.  YOU WE CAN MAKE THAT ARGUMENT THEN.
17:29  9  **MR. TREEBY:**  CAN I MAKE A SUGGESTION ABOUT THAT,
17:29  10  YOUR HONOR?
17:29  11  **THE COURT:**  SURE.  I'M OPEN TO SUGGESTIONS.
17:29  12  **MR. TREEBY:**  MY SUGGESTION WOULD BE THAT -- BECAUSE I
17:30  13  ASSUME THE FOUNDATION FOR THE SUMMARY THEY ARE ATTEMPTING TO
17:30  14  LAY IS FROM DR. BEA.
17:30  15  **MR. BRUNO:**  THERE IS NO FOUNDATION THAT IS NECESSARY
17:30  16  FOR A 1006 WITNESS/EXPERT.
17:30  17  **THE COURT:**  WE ARE NOT ARGUING IT RIGHT NOW.
17:30  18  **MR. BRUNO:**  IF I NEED ONE, JUDGE, I'LL BRING ONE IN.
17:30  19  PERHAPS WE SHOULD HAVE THE DISCUSSION SOONER RATHER THAN LATER.
17:30  20  **THE COURT:**  MAYBE YOU CAN AND MR. TREEBY CAN HAVE
17:30  21  THAT DISCUSSION.  IF YOU CAN'T AGREE ON THE PROTOCOL, THEN --
17:30  22  YOU WERE GOING TO SUGGEST SOMETHING ELSE.  GO AHEAD.
17:30  23  **MR. TREEBY:**  I WAS GOING TO SUGGEST THAT IF THAT'S --
17:30  24  I ASSUME THAT'S WHAT THEY WERE DOING.  BUT IF THAT'S NOT WHAT
17:30  25  THEY ARE DOING -- OH, WHAT I WAS GOING TO SUGGEST IS THAT WE

17:30  1   WAIT, THEN, 'TIL AFTERWARDS AND THEN LOOK AT WHAT'S BEEN

17:30  2   TESTIFIED TO, COMPARE IT TO THE SUMMARY, AND SEE IF WE THINK

17:30  3   IT'S TRUSTWORTHY, BECAUSE UNDER -- AS WE READ THE LAW, IT'S GOT

17:30  4   TO ACCURATELY CHARACTERIZE THE SOURCE MATERIAL.  I'M ALL IN

17:31  5   FAVOR OF SUMMARIES, COMPLETELY IN FAVOR OF SUMMARIES.  I WANT

17:31  6   TO SAVE AS MUCH TIME AS POSSIBLE.  BUT IF THE SUMMARY HAS

17:31  7   DETAILS ON IT -- AND WE NEED TO LOOK AT THAT AFTER THE FACT --

17:31  8   THAT THERE IS NO EVIDENTIARY FOUNDATION FOR, NONE -- AND WE

17:31  9   WILL EXAMINE -- WE ARE NOT ASKING YOUR HONOR TO DO THAT; WE

17:31  10  WILL DO IT.  WE WOULD LIKE TO BRIEF THAT.  AND MAYBE WE WON'T

17:31  11  IF IT'S ACCURATE.

17:31  12              THE COURT:  CERTAINLY YOU WILL HAVE THAT RIGHT.

17:31  13              MR. BRUNO:  THEY HAVE BEEN HAVING IT FOR THREE WEEKS.

17:31  14              THE COURT:  OKAY.

17:31  15              MR. BRUNO:  IT HAS IDENTIFIED -- YOU'LL REMEMBER,

17:31  16  JUST SO THE RECORD IS CLEAR, IT LISTS EVERY WGI DOCUMENT FROM

17:31  17  WHICH THE INFORMATION IS TAKEN.

17:31  18              BY THE WAY, IT LOOKS EXACTLY LIKE WHAT THEY

17:31  19  PRODUCED WITH REGARD TO THEIR SUMMARY EVIDENCE, AND IT'S A PART

17:31  20  OF -- I'M READING DR. MARR'S REPORT.  IT'S ALMOST A XEROX COPY

17:31  21  OF WHAT DR. MARR DID WHERE HE LISTED ALL THE THINGS.

17:31  22              THE COURT:  I'M NOT SURE EXACTLY WHAT ALL THE

17:32  23  PROBLEMS ARE.  I DON'T WANT TO SORT IT OUT NOW.  BUT I'M GOING

17:32  24  TO GIVE EVERYBODY AN OPPORTUNITY TO AIR IT AND, IF NECESSARY,

17:32  25  BRIEF IT.

17:32    1              THANK YOU.  WE HAVE HAD A NICE LONG DAY.
17:32    2    EVERYBODY IS READY TO GO HOME AND WORK SOME MORE, I'M SURE.  WE
17:32    3    ARE IN RECESS UNTIL 9:00 IN THE MORNING.
17:32    4              (PROCEEDINGS ADJOURNED.)
17:32    5                        *  *  *
         6                       **CERTIFICATE**
         7              I, TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT
         8    REPORTER FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT
         9    OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE
        10    AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND
        11    UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE
        12    ABOVE-ENTITLED MATTER.
        13
        14
        15                             S/ TONI DOYLE TUSA
                                       TONI DOYLE TUSA, CCR, FCRR
        16                             OFFICIAL COURT REPORTER
        17
        18
        19
        20
        21
        22
        23
        24
        25

*HOURLY TRANSCRIPT*