1             UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3    * * * * * * * * * * * * * * * * * * * * * * * * * *

4

IN RE:  KATRINA CANAL BREACHES   DOCKET 05-CV-4182

5   CONSOLIDATED LITIGATION

                              SECTION K

6

PERTAINS TO:  MRGO          NEW ORLEANS, LOUISIANA

7      ARMSTRONG NO. 10-CV-866

                              SEPTEMBER 19, 2012

8    * * * * * * * * * * * * * * * * * * * * * * * * * *

9

10           DAY 6, AFTERNOON SESSION

          TRANSCRIPT OF TRIAL PROCEEDINGS

11    BEFORE THE HONORABLE STANWOOD R. DUVAL JR.

           UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14

FOR THE PLAINTIFFS:        BRUNO & BRUNO

15                  BY:  JOSEPH M. BRUNO, ESQ.

                  855 BARONNE STREET

16               NEW ORLEANS, LOUISIANA 70113

17   FOR THE PLAINTIFFS:        THE ANDRY LAW FIRM

                  BY:  JONATHAN B. ANDRY, ESQ.

18               610 BARONNE STREET

                  NEW ORLEANS, LOUISIANA 70113

19

FOR THE PLAINTIFFS:        BARON & BUDD, PC

20                  BY:  THOMAS SIMS, ESQ.

                  3102 OAK LAWN AVENUE, SUITE 1100

21               DALLAS, TEXAS 75219

22   FOR THE PLAINTIFFS:        DEGRAVELLES PALMINTIER

                    HOLTHAUS & FRUGÉ

23               BY:  MICHAEL C. PALMINTIER, ESQ.

                    JOSHUA M. PALMINTIER, ESQ.

24               618 MAIN STREET

                  BATON ROUGE, LOUISIANA 70801

25

1    APPEARANCES:

2
     FOR THE PLAINTIFFS:          DOMENGEAUX WRIGHT ROY
3                                   & EDWARDS, LLC
                                  BY:  ELWOOD C. STEVENS JR., ESQ.
4                                      BONNIE KENDRICK, ESQ.
                                  556 JEFFERSON STREET, SUITE 500
5                                 POST OFFICE BOX 3668
                                  LAFAYETTE, LOUISIANA 70502
6
     FOR THE PLAINTIFFS:          THE DUDENHEFER LAW FIRM
7                                 BY:  FRANK C. DUDENHEFER JR., ESQ.
                                  601 POYDRAS STREET, SUITE 2655
8                                 NEW ORLEANS, LOUISIANA 70130

9    FOR THE PLAINTIFFS:          FAYARD & HONEYCUTT, APC
                                  BY:  CALVIN C. FAYARD JR., ESQ.
10                                519 FLORIDA AVENUE, S.W.
                                  DENHAM SPRINGS, LOUISIANA 70726
11
     FOR THE PLAINTIFFS:          JOANEN LAW FIRM
12                                BY:  SCOTT JOANEN, ESQ.
                                  4905 FRERET STREET, SUITE B
13                                NEW ORLEANS, LOUISIANA 70115

14   FOR THE PLAINTIFFS:          LEVIN PAPANTONIO THOMAS
                                    MITCHELL RAFFERTY & PROCTOR
15                                BY:  MATTHEW D. SCHULTZ, ESQ.
                                  316 SOUTH BAYLEN STREET, SUITE 600
16                                PENSACOLA, FLORIDA 32502

17   FOR THE PLAINTIFFS:          THE TRIAL LAW FIRM, PC
                                  BY:  ANDREW P. OWEN, ESQ.
18                                800 WILTSHIRE BLVD., SUITE 500
                                  LOS ANGELES, CALIFORNIA 90017
19
     FOR THE PLAINTIFFS:          J. ROBERT WARREN II, APLC
20                                BY:  J. ROBERT WARREN II, ESQ.
                                  1718 SHORT STREET
21                                NEW ORLEANS, LOUISIANA 70118

22   FOR THE PLAINTIFFS:          COTCHETT PITRE & MCCARTHY, LLP
                                  BY:  PHILIP L. GREGORY, ESQ.
23                                840 MALCOLM ROAD, SUITE 200
                                  BURLINGAME, CALIFORNIA 94010
24

25

1    APPEARANCES:

2
     FOR THE DEFENDANT,           STONE PIGMAN WALTHER WITTMANN, LLC
3    WASHINGTON GROUP            BY:  WILLIAM D. TREEBY, ESQ.
     INTERNATIONAL, INC.:             JAMES C. GULOTTA JR., ESQ.
4                                     HEATHER S. LONIAN, ESQ.
                                      MAGGIE A. BROUSSARD, ESQ.
5                                546 CARONDELET STREET
                                 NEW ORLEANS, LOUISIANA 70130
6
     FOR THE DEFENDANT,           JONES DAY (WASHINGTON)
7    WASHINGTON GROUP            BY:  ADRIAN WAGER-ZITO, ESQ.
     INTERNATIONAL, INC.:             DEBRA S. CLAYMAN, ESQ.
8                                     CHRISTOPHER N. THATCH, ESQ.
                                      CHRISTOPHER R. FARRELL, ESQ.
9                                     JULIA CRONIN, ESQ.
                                      BRIAN KERWIN, ESQ.
10                               51 LOUISIANA AVENUE, N.W.
                                 WASHINGTON, D.C. 20001
11
     FOR THE DEFENDANT,           U.S. DEPARTMENT OF JUSTICE
12   UNITED STATES OF AMERICA:    CIVIL RIGHTS DIVISION-TORTS BRANCH
                                  BY:  ROBIN D. SMITH, ESQ.
13                                     JAMES F. MCCONNON JR., ESQ.
                                       RUPERT MITSCH, ESQ.
14                                     CONOR KELLS, ESQ.
                                       JOHN A. WOODCOCK, ESQ.
15                               BENJAMIN FRANKLIN STATION
                                 POST OFFICE BOX 888
16                               WASHINGTON, DC 20044

17   OFFICIAL COURT REPORTER:     TONI DOYLE TUSA, CCR, FCRR
                                  500 POYDRAS STREET, ROOM HB-406
18                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7778
19                                TONI_TUSA@LAED.USCOURTS.GOV

20

21
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
22   COMPUTER-AIDED TRANSCRIPTION SOFTWARE.

23

24

25

*HOURLY TRANSCRIPT*

1  <u>**I N D E X**</u>

2                                                                       <u>PAGE</u>

3  ROBERT G. BEA

4        FURTHER RECROSS-EXAMINATION BY MR. TREEBY     1326

5        FURTHER RECROSS-EXAMINATION BY MR. SMITH      1402

6        FURTHER REDIRECT EXAMINATION BY MR. SCHULTZ   1442

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 12:58 | 1  | <div align="center">**AFTERNOON SESSION**</div>              |
| 12:58 | 2  | <div align="center">**(SEPTEMBER 19, 2012)**</div>           |
| 12:58 | 3  | (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)         |
| 13:21 | 4  | **THE COURT:**  GOOD AFTERNOON.  MR. TREEBY, YOU ARE         |
| 13:21 | 5  | READY TO PROCEED WITH EXAMINATION?                            |
| 13:21 | 6  | **MR. TREEBY:**  READY TO PROCEED, YOUR HONOR.              |
| 13:21 | 7  | <div align="center">**ROBERT G. BEA, PH.D.,**</div>          |
| 13:21 | 8  | HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:                 |
| 13:21 | 9  | <div align="center">**FURTHER RECROSS-EXAMINATION**</div>    |
| 13:21 | 10 | BY MR. TREEBY:                                                |
| 13:21 | 11 | **Q.**   GOOD AFTERNOON, DR. BEA.                            |
| 13:21 | 12 | **A.**   GOOD AFTERNOON, MR. TREEBY.                         |
| 13:21 | 13 | **MR. TREEBY:**  WHAT I'M GOING TO TRY TO DO, YOUR HONOR,   |
| 13:21 | 14 | AND COUNSEL, IS -- BECAUSE I'M GOING TO DEAL WITH SOME OF THE |
| 13:21 | 15 | THINGS THAT WERE SAID THIS MORNING -- I'M MORE PREPARED       |
| 13:21 | 16 | ACTUALLY, OBVIOUSLY, TO DEAL WITH THE THINGS THAT WERE SAID   |
| 13:21 | 17 | BEFORE THIS MORNING, SO I'M GOING TO START WITH THOSE.  IT'S  |
| 13:21 | 18 | GOING TO REQUIRE ME TO GO BACK AND FORTH A LITTLE BIT, A FEW  |
| 13:22 | 19 | TIMES WITH THE TRIAL TRANSCRIPT.                              |
| 13:22 | 20 | WE DON'T HAVE A HARD COPY THAT HAS TIMES AND                  |
| 13:22 | 21 | LINES, WHICH IS WHAT I HAD WRITTEN DOWN WHEN IT WAS GOING ON. |
| 13:22 | 22 | SO HOPEFULLY IT WON'T BE TOO DISRUPTIVE.  I WILL DO MY BEST.  |
| 13:22 | 23 | **THE COURT:**  I WILL SAY ALL OF THE ATTORNEYS HAVE BEEN   |
| 13:22 | 24 | VERY PREPARED AND DONE THEIR BEST UNDER THESE CIRCUMSTANCES, SO |
| 13:22 | 25 | THE COURT APPRECIATES IT.  GO AHEAD, SIR.                     |

## ROBERT G. BEA - FURTHER RECROSS

| | |
|---|---|
| 13:22 | 1 | **BY MR. TREEBY:** |
| 13:22 | 2 | **Q.**   THE FIRST THING I HEARD YOU SAY EARLY THIS MORNING AT |
| 13:22 | 3 | 9:10, LINE 23, I BELIEVE IT WAS -- BUT MAYBE YOU CAN REMEMBER |
| 13:22 | 4 | THIS.  OTHERWISE WE CAN GO TO THE TRANSCRIPT. |
| 13:22 | 5 | AND I KNOW THIS WAS A SERIES OF QUESTIONS THAT |
| 13:22 | 6 | MR. SCHULTZ ASKED YOU ABOUT THE BACKFILL AND COMPACTION FOR THE |
| 13:22 | 7 | SEWER LIFT STATION AND THEN FOR THE WEDDING CAKE STRUCTURE. |
| 13:22 | 8 | AND HE STARTED AND SPENT MORE TIME ON THE SEWER LIFT STATION |
| 13:23 | 9 | AND THEN JUST KIND OF ASKED YOU, WAS IT THE SAME THING ON THE |
| 13:23 | 10 | WEDDING CAKE STRUCTURE.  HE WAS ASKING YOU ABOUT COMPACTION; HE |
| 13:23 | 11 | WAS ASKING YOU ABOUT BACKFILL AND THE MATERIALS USED FOR |
| 13:23 | 12 | BACKFILL. |
| 13:23 | 13 | DO YOU RECALL THAT LINE? |
| 13:23 | 14 | **A.**   YES. |
| 13:23 | 15 | **Q.**   THE FIRST THING I WANT TO CLEAR UP -- BECAUSE I HAVE A |
| 13:23 | 16 | SECTION AND I DON'T NEED TO GO THROUGH IT LATER.  I DID PREPARE |
| 13:23 | 17 | FOR THIS -- BECAUSE YESTERDAY YOU SAID -- YESTERDAY AFTERNOON |
| 13:23 | 18 | YOU SAID, IN DIRECT RESPONSE TO DIRECT QUESTIONS FROM COUNSEL, |
| 13:23 | 19 | THAT THERE WERE NO LIFTS IN COMPACTION FOR THOSE STRUCTURES |
| 13:23 | 20 | SPECIFICALLY.  THERE WERE NO LIFTS AND THERE WAS NO COMPACTION; |
| 13:23 | 21 | YOU JUST DUMPED 10 FEET OF SOIL IN THERE, AND THAT'S NOT |
| 13:23 | 22 | COMPACTION. |
| 13:23 | 23 | DO YOU RECALL THAT? |
| 13:23 | 24 | **A.**   YES, SIR. |
| 13:23 | 25 | **Q.**   THAT WAS IN ERROR, WASN'T IT? |

ROBERT G. BEA - FURTHER RECROSS

13:23   1   **A.**   THAT'S CORRECT.

13:23   2   **Q.**   THAT'S WHAT -- MR. SCHULTZ WAS CLEARING THAT UP TO SOME

13:23   3   EXTENT THIS MORNING --

13:23   4   **A.**   THAT'S CORRECT.

13:23   5   **Q.**   -- AND I APPRECIATE THAT.

13:23   6   HERE'S MY QUESTION.  IN FACT, YOU ARE CORRECT AND YOU

13:23   7   TESTIFIED THAT THERE WAS A MIXTURE OF SOIL, OF NATIVE SOIL AND

13:23   8   SAND, USED IN THE SEWER LIFT STATION.  AND IT WAS ALL APPROVED

13:24   9   BY THE CORPS AND NO DEFICIENCIES NOTED, RIGHT?

13:24   10   **A.**   RIGHT.

13:24   11   **Q.**   BUT WHEN ASKED ABOUT SIMILAR AT THE WEDDING CAKE

13:24   12   STRUCTURE, YOU SAID, YES, IT WAS SIMILAR.

13:24   13   THAT WASN'T TRUE, WAS IT?  BECAUSE THERE WAS NO SAND

13:24   14   AND NATIVE SOIL MIXTURE IN THE WEDDING CAKE STRUCTURE; ISN'T

13:24   15   THAT TRUE?

13:24   16   **A.**   THAT'S CORRECT.

13:24   17   **Q.**   THANK YOU.

13:24   18   DO YOU RECALL THAT LITTLE DRAWING, THAT WAS A HAND

13:24   19   DRAWING THAT SHOWED THE -- IT WAS ACTUALLY PAGE 52 IN QAR.  I

13:24   20   DON'T NEED TO CALL IT UP UNLESS WE HAVE A DIFFERENCE OF OPINION

13:24   21   ABOUT THIS -- QAR 125 I THINK IT WAS.  IT WAS THE UTILITY POLE

13:24   22   EXCAVATION -- THE LINE OF THE UTILITY POLE EXCAVATIONS.

13:24   23   DO YOU RECALL THAT DRAWING?

13:24   24   **A.**   YES.

13:25   25   **Q.**   I THINK YOU'LL REMEMBER THIS, AT THE BOTTOM RIGHT-HAND

ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 13:25 | 1 | CORNER OF THAT LITTLE HAND SKETCH IT SAID "NOT TO SCALE," |
| 13:25 | 2 | RIGHT? |
| 13:25 | 3 | **A.**   CORRECT. |
| 13:25 | 4 | **Q.**   AND AM I NOT CORRECT THAT THE UTILITY POLE EXCAVATION WAS |
| 13:25 | 5 | NOT CONTINUOUS, IT WAS JUST EACH UTILITY POLE? |
| 13:25 | 6 | **A.**   OH, I WAS REFERRING TO THE EXCAVATION TO THE WEST OF THE |
| 13:25 | 7 | TELEPHONE POLE ALIGNMENT. |
| 13:25 | 8 | **Q.**   BUT THE UTILITY POLE HOLES, THEY WERE BACKFILLED, WERE |
| 13:25 | 9 | THEY NOT? |
| 13:25 | 10 | **A.**   YES, THEY WERE. |
| 13:25 | 11 | **Q.**   OKAY. |
| 13:25 | 12 | **A.**   THAT'S NOT WHAT THAT SKETCH WAS PORTRAYING, TO MY |
| 13:25 | 13 | RECOLLECTION. |
| 13:25 | 14 | **Q.**   OKAY.   BUT WE ARE SQUARE ON THAT. |
| 13:25 | 15 | ANOTHER THING YOU TOUCHED ON IN YOUR TESTIMONY THIS |
| 13:25 | 16 | MORNING WAS -- AND YOU PULLED UP BORING 25A AT SAUCER MARINE |
| 13:26 | 17 | SITE. |
| 13:26 | 18 | **A.**   OKAY. |
| 13:26 | 19 | **Q.**   AND THIS IS -- AND WE ARE GOING TO PULL IT UP -- |
| 13:26 | 20 | JX-01659-0013.   THIS IS JUST A SAMPLE BORING BY MMG; IS THAT |
| 13:26 | 21 | RIGHT? |
| 13:26 | 22 | **A.**   THAT'S CORRECT, SIR. |
| 13:26 | 23 | **Q.**   LET ME JUST SEE -- YOU KNOW THAT THESE MMG SAMPLE BORINGS |
| 13:26 | 24 | WERE DONE WITH A SPLIT-SPOON SAMPLE; ISN'T THAT RIGHT? |
| 13:26 | 25 | **A.**   THAT'S CORRECT. |

ROBERT G. BEA - FURTHER RECROSS

13:26  1   Q.   A SPLIT-SPOON SAMPLING TOOL, SHALL WE CALL IT, SPLIT-SPOON
13:26  2   TOOL, HAS A FAIRLY RELATIVELY THICK METAL AROUND THE OUTSIDE;
13:26  3   IS THAT CORRECT?  RELATIVE, FOR EXAMPLE, TO A THIN-WALL SHELBY
13:26  4   TUBE THAT WE ARE GOING TO TALK ABOUT LATER.
13:27  5   A.   CORRECT, CORRECT.
13:27  6   Q.   AND IT'S NOT UNCOMMON, IS IT, IN TAKING A SPLIT-SPOON
13:27  7   SAMPLE FOR ENVIRONMENTAL PURPOSES INTO SOILS THAT ARE THIS OLD,
13:27  8   SHALL WE SAY, IN THAT SITE, TO HAVE -- TO NOT GET RECOVERY FROM
13:27  9   SOME SECTIONS?
13:27  10         YOU TALKED ABOUT IT LIKE IT WAS POURING OUT AT THAT
13:27  11  LEVEL AND THAT'S WHY THEY DIDN'T GET ANY RECOVERY FROM 5 TO, I
13:27  12  THINK IT WAS, 9 FEET.  YOU SOMEHOW EXTRAPOLATED THAT WAS JUST
13:27  13  POURING OUT OF THE GROUND.
13:27  14  A.   AND I STATED I HAD INFERRED THAT AND STATED THE BASES FOR
13:27  15  THAT INFERENCE.
13:27  16  Q.   I UNDERSTAND THAT, BUT AREN'T THERE A LOT OF OTHER
13:27  17  INFERENCES THAT CAN BE DRAWN FROM THAT WITH A SPLIT-SPOON
13:27  18  SAMPLE TOOL?
13:27  19  A.   CERTAINLY.
13:27  20  Q.   CERTAINLY.  ONE OF THEM IS THAT IT HITS A LITTLE TWIG OR A
13:27  21  LITTLE PIECE OF DEBRIS AND, THEREFORE, THERE'S NOTHING THERE.
13:28  22  WE HAD THIS WITH THE THIN-WALL SHELBY TUBES IN LAST YEAR'S
13:28  23  JOINT SOILS INVESTIGATION; ISN'T THAT CORRECT?  NONRECOVERY FOR
13:28  24  SECTIONS --
13:28  25  A.   YES.

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 13:28 | 1 | **Q.**   -- EVEN WITH -- AND THE SPLIT-SPOON SAMPLE IS A MUCH |
| 13:28 | 2 | SMALLER DIAMETER HOLE WITH A MUCH LARGER WALL ON THE TUBE; |
| 13:28 | 3 | ISN'T THAT RIGHT? |
| 13:28 | 4 | **A.**   YES. |
| 13:28 | 5 | **Q.**   YOU MAY RECALL THIS, AND WE MAY NEED TO PULL IT UP OR NOT, |
| 13:28 | 6 | IF YOU RECALL IT.  YOUR SOUTH BREACH CROSS SECTIONS ON PAGE 96 |
| 13:28 | 7 | OF YOUR EXPERT REPORT, 1389, YOU HAVE A BACKFILLED EXCAVATION |
| 13:28 | 8 | SHOWN IN THAT CROSS SECTION; IS THAT CORRECT? |
| 13:28 | 9 | **MR. TREEBY:**  LET'S PULL THAT UP.  CAN YOU BLOW UP THE |
| 13:29 | 10 | CROSS SECTION. |
| 13:29 | 11 | **BY MR. TREEBY:** |
| 13:29 | 12 | **Q.**   REAL FAINTLY RIGHT UNDER "BACKFILL EXCAVATION" -- DO YOU |
| 13:29 | 13 | SEE THAT? |
| 13:29 | 14 | **A.**   YES, SIR. |
| 13:29 | 15 | **Q.**   -- THERE'S A NUMBER, RIGHT? |
| 13:29 | 16 | **A.**   I CAN SEE AN A.  PERFECT.  29A.  THANK YOU. |
| 13:29 | 17 | **Q.**   NOW, YOU CAN SEE IT.  THANK THE OPERATOR. |
| 13:29 | 18 | BUT IT'S 29A -- |
| 13:29 | 19 | **A.**   CORRECT. |
| 13:29 | 20 | **Q.**   -- NOT 25A, RIGHT? |
| 13:29 | 21 | **A.**   THAT'S TRUE FOR THIS CROSS SECTION. |
| 13:29 | 22 | **Q.**   RIGHT.  LET'S LOOK AT THE BORING, THE EXPLORATORY BORING |
| 13:29 | 23 | TAKEN FOR ENVIRONMENTAL REMEDIATION PURPOSES, NOT GEOTECHNICAL |
| 13:29 | 24 | PURPOSES.  LET'S LOOK AT THE BORING LOG FOR THAT BORING? |
| 13:29 | 25 | **MR. TREEBY:**  IF WE PULL THAT UP, THAT'S |

## ROBERT G. BEA - FURTHER RECROSS

13:29    1    JX-01659-0092, THE BORING LOG.

13:30    2    **BY MR. TREEBY:**

13:30    3    **Q.**    DO YOU HAVE THIS?  YOU SHOULD HAVE THIS ON YOUR SCREEN.  I

13:30    4    DON'T KNOW IF YOU CAN READ IT.

13:30    5         **MR. TREEBY:**  LET'S BLOW UP MAYBE HALF OF IT AT A

13:30    6    TIME.  TAKE THE TOP HALF FIRST.

13:30    7    **BY MR. TREEBY:**

13:30    8    **Q.**    IT HAS TOPSOIL FROM ZERO TO 6 INCHES?

13:30    9    **A.**    YES, SIR.

13:30    10   **Q.**    THEN IT HAS FILL, SAND, POORLY GRADED, FINE-GRAINED,

13:30    11   BROWN, DRY.  THAT'S THE NEXT LAYER.

13:30    12        LET ME JUST ASK YOU IF YOU KNOW THIS OR NOT, THAT

13:30    13   THESE MMG BORINGS WERE TYPICALLY TAKEN -- THIS WHOLE SERIES OF

13:30    14   MMG BORINGS, AT THE A SECTION --

13:30    15   **A.**    CORRECT.

13:30    16   **Q.**    -- WERE TAKEN RIGHT NEAR THE EDGE OR IN THE SHOULDER OF

13:31    17   SUREKOTE ROAD?

13:31    18   **A.**    THAT'S CORRECT.

13:31    19   **Q.**    THAT WOULD EXPLAIN WHAT'S RIGHT HERE BECAUSE THE MATERIALS

13:31    20   THAT WE SEE IN THOSE A BORINGS ARE BASICALLY REMNANTS OF ROAD

13:31    21   BASE OR ROAD BASE.  ISN'T THAT FAIR?

13:31    22   **A.**    NO.  TO THE BEST OF MY KNOWLEDGE, THOSE WERE NOT

13:31    23   PENETRATING ROADBED FILL INTENTIONALLY.  THEY HAD PULLED OFF TO

13:31    24   THE SIDE ENOUGH SO THE DRILL RIG COULD STAY CLEAR OF THE

13:31    25   TRAFFIC THE ROAD HAD TO CARRY, AND DID NOT INTENTIONALLY

ROBERT G. BEA - FURTHER RECROSS

13:31    1   PENETRATE ROADBED FILL.

13:31    2   **Q.**   WE ARE IN AGREEMENT.  BUT IF YOU ARE TAKING IT RIGHT ON

13:31    3   THE SHOULDER OF THE ROAD, THE TOPSOIL LAYERS ARE GOING TO BE

13:31    4   SOMEWHAT INFLUENCED BY THE BED FOR THE ROAD, ARE THEY NOT?

13:32    5   **A.**   WELL, THEY COULD BE DEPENDING ON ITS PROXIMITY TO THE

13:32    6   ROADBED.

13:32    7   **Q.**   RIGHT.  WE DON'T HAVE -- IN MOST INSTANCES, AT LEAST, WE

13:32    8   DON'T HAVE THAT PRECISE A MEASUREMENT, DO WE, FROM THE -- EXACT

13:32    9   MEASUREMENTS FROM THE WALL TO THE ROAD OR EVEN WHERE THE EDGE

13:32   10   OF THE ROAD IS?

13:32   11   **A.**   WELL, WE HAVE GOT REASONABLY PRECISE LOCATIONS BASED ON

13:32   12   THE GEOGRAPHIC INFORMATION SYSTEM PROCESSING OF THE AVAILABLE

13:32   13   AERIAL PHOTOGRAPHY.  AND WE ALSO HAVE THE GLOBAL POSITIONING

13:32   14   SYSTEM COORDINATES ON THE MMG BORINGS.

13:32   15   **Q.**   WHAT IS THE PLUS AND MINUS ERROR RATE IN THAT, IF YOU

13:32   16   KNOW?

13:32   17   **A.**   THEY WERE USING DGPS, THAT'S DIFFERENTIAL GLOBAL

13:33   18   POSITIONING SYSTEM, I BELIEVE, AT 3 TO 6 INCHES.

13:33   19   **Q.**   WE MAY COME BACK TO THAT.

13:33   20        BUT THE CROSS SECTION YOU SHOW HERE, THAT WE JUST

13:33   21   SHOWED, YOUR BACKFILL, THAT WAS AT 29A, NOT 25A, RIGHT?

13:33   22   **A.**   THAT'S CORRECT.

13:33   23   **Q.**   THOSE ARE ABOUT 200 FEET APART; ISN'T THAT RIGHT?

13:33   24   **A.**   THAT'S CORRECT.

13:33   25   **Q.**   AND THIS CROSS SECTION, THIS BORING, THEY DID HAVE

## ROBERT G. BEA - FURTHER RECROSS

13:33    1  REASONABLY DECENT RECOVERY IN THE BORING FROM THE SPLIT-SPOON

13:33    2  SAMPLING TOOL.  AND FOR THE NEXT LAYER --

13:33    3          **MR. TREEBY:**  WOULD YOU SHOW US THE NEXT LAYER.

13:33    4  **BY MR. TREEBY:**

13:33    5  **Q.**  IS FROM 4 TO 6 FEET, IS SILTY CLAY, GRAY WITH ORANGE-BROWN

13:33    6  SOMETHING -- MOTTLING -- STIFF, DRY, FEW ORGANICS.  NEXT LAYER

13:34    7  IS FROM 6 TO 9, I THINK, CLAYEY SILT, GRAY, VERY SOFT, VARVED,

13:34    8  I GUESS, SOFT, WAS ABOUT --

13:34    9          I DON'T KNOW WHAT THE T STANDS FOR.  DO YOU KNOW WHAT

13:34   10  THAT IS?  SOME ORGANICS UNDER THAT, ANYWAY.

13:34   11          **MR. TREEBY:**  LET'S GO TO THE NEXT LAYER.

13:34   12  **BY MR. TREEBY:**

13:34   13  **Q.**  FROM 9 DOWN TO 15 FEET, WHICH IS I THINK WHERE THIS ONE

13:34   14  STOPS, WE HAVE CLAY, SILT, GRAY, VERY SOFT, SOME WOOD, NO ODOR,

13:34   15  SILTY CLAY, GRAY, HARD WOOD, MOTTLING, GRANULAR CONSISTENCY.

13:34   16          I THINK YOU HAVE ADMITTED THAT THESE WERE BORINGS

13:35   17  TAKEN FROM DETERMINING WHETHER THERE WERE CONTAMINANTS.  IS

13:35   18  THAT --

13:35   19  **A.**  YES, SIR.

13:35   20  **Q.**  THIS MORNING AT 10:07, LINES 3 THROUGH 6.  I WANT TO BE

13:35   21  ACCURATE HERE.  SO LET ME GET IT.

13:36   22          LET ME SEE IF I CAN DO IT WITHOUT THE TRANSCRIPT.  I

13:36   23  APOLOGIZE FOR THE DELAY.  I BELIEVE YOU PROBABLY WILL BE ABLE

13:36   24  TO RECALL THIS.  IN RESPONSE TO QUESTIONS BY COUNSEL, YOU SAID

13:36   25  THAT ON THE WEST THERE WAS OVERTOPPING, BUT THE WALL WAS STILL

## ROBERT G. BEA - FURTHER RECROSS

13:36  1  STANDING AT THE WEST.  DO YOU RECALL THAT?  DESPITE SCOUR

13:36  2  TRENCHES OF -- I DON'T KNOW WHAT YOU SAID -- 5 TO 7 FEET.  I'M

13:36  3  NOT SURE.

13:36  4  A.   YES, SIR.  I CITED THE PORT OF NEW ORLEANS FACILITY ON

13:36  5  THAT SITE.  AND I THINK THERE WAS ONE MAJOR BREACH TO THE NORTH

13:36  6  END OF THE PORT OF NEW ORLEANS FACILITIES AND A VERY LONG

13:37  7  STRETCH, NORTH AND SOUTH, UNBREACHED.

13:37  8  Q.   THAT WAS NORTH OF THE FRANCE ROAD PARKWAY; ISN'T THAT

13:37  9  CORRECT?

13:37  10            THE COURT:  YOU'RE TALKING ABOUT THE BREACH?

13:37  11            MR. TREEBY:  YES.  THE BREACH ON THE WEST SIDE.

13:37  12  BY MR. TREEBY:

13:37  13  Q.   IT WAS NORTH OF THE FRANCE ROAD PARKWAY AND NORTH OF THE

13:37  14  FRANCE ROAD FLOODGATES THAT ALLOW THAT PARKWAY TO ENTER THE

13:37  15  PORT OF NEW ORLEANS FACILITY.  ISN'T THAT CORRECT?

13:37  16  A.   I THINK THAT'S CORRECT.  THE MENTAL COORDINATES I KEY IS

13:37  17  AT THE T-INTERSECTION WHERE THE GULF INTRACOASTAL WATERWAY

13:37  18  INTERSECTED THE NORTH-SOUTH TRENDING INDUSTRIAL CANAL.

13:37  19  BY MR. TREEBY:

13:37  20  Q.   WE ARE GOING TO GET THERE.

13:37  21       BUT YOU KNEW -- AND THAT BREACH, IF THE WALL WASN'T

13:37  22  STILL STANDING, THERE WAS A BREACH THERE, A SIGNIFICANT BREACH;

13:37  23  ISN'T THAT RIGHT?

13:37  24  A.   YES.

13:37  25  Q.   THE I-WALL FELL OVER?

## ROBERT G. BEA - FURTHER RECROSS

13:37  1   **A.**   IN THE SHORT SECTION, THAT'S CORRECT.

13:37  2   **Q.**   WE'LL SEE HOW SHORT IT WAS, BUT -- ARE YOU GOING TO

13:37  3   TESTIFY HOW SHORT IT WAS?

13:38  4   **A.**   I CAN'T.  I DON'T REMEMBER.

13:38  5   **Q.**   OKAY.  WE'LL SHOW HOW SHORT IT WAS.

13:38  6   **A.**   THE DOCUMENTS SPECIFY.

13:38  7   **Q.**   BUT YOU ATTRIBUTED THAT BREACH TO BACK SCOUR, DIDN'T YOU?

13:38  8   **A.**   I BELIEVE THAT'S CORRECT.

13:38  9   **Q.**   AND YOU SAID IT'S RIGHT -- YOU'RE CORRECT.  YOU SAID IT'S

13:38  10  RIGHT WHERE THE GIWW COMES IN TO THE INNER HARBOR NAVIGATIONAL

13:38  11  CANAL.  THAT'S CORRECT.

13:38  12  **A.**   THAT'S CORRECT.

13:38  13  **Q.**   BUT IN FRONT OF THAT FLOODWALL, WHICH IS ABOUT A 12 1/2 TO

13:38  14  13-FOOT FLOODWALL, THERE'S A 15-FOOT FLOODWALL RIGHT AT THE

13:38  15  CANAL'S EDGE PROTECTING THAT BACK WALL; ISN'T THAT TRUE?

13:38  16  **A.**   I THINK THAT'S NOT TRUE, BUT I HAVE TO REVISIT -- THE ONE

13:38  17  I'M MOST FAMILIAR WITH IS THE INDEPENDENT LEVEE INVESTIGATION

13:38  18  TEAM REPORT.  THE ELEMENT MOST IMPORTANT IN THE AREA YOU'RE

13:39  19  POINTING OUT, THERE WAS A ROAD OVERPASS THAT WAS SUPPORTED ON

13:39  20  DEEP SHELL FILL.  AND WE HAVE PICTURES AND DID ANALYSIS ON THE

13:39  21  BREACH OF THAT ROADWAY AS IT COULD HAVE INFLUENCED THE I-WALL

13:39  22  BEHIND IT.

13:39  23  **Q.**   WELL, WE'LL GET INTO ALL OF THAT LATER, BUT I JUST WANTED

13:39  24  TO -- YOU DID ATTRIBUTE THAT FLOODWALL FAILURE AT THE BACK WALL

13:39  25  IN THAT AREA, THAT I-WALL FAILURE TO BACK SCOUR, RIGHT?

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 13:39 | 1 | **A.**   THAT'S CORRECT. |
| 13:39 | 2 | **Q.**   I'LL ASK THIS AS PRECISELY AS I CAN.  DID YOU DO ANY |
| 13:39 | 3 | COMPUTER MODELING AT THE NORTH BREACH AREA? |
| 13:40 | 4 | **A.**   LOWER NINTH WARD? |
| 13:40 | 5 | **Q.**   THE NORTH BREACH AREA OF THE EAST BANK INDUSTRIAL AREA, |
| 13:40 | 6 | DID YOU DO ANY COMPUTER MODELING ANALYSES WITH NO EXCAVATIONS? |
| 13:40 | 7 | **A.**   NO. |
| 13:40 | 8 | **Q.**   DID YOU DO ANY COMPUTER MODELING OF THE SOUTH BREACH IN |
| 13:40 | 9 | THE EBIA WITHOUT ANY EXCAVATIONS? |
| 13:40 | 10 | **A.**   NO. |
| 13:40 | 11 | **Q.**   YOU TALKED ABOUT MEASURING -- DOING SOME MEASUREMENTS WHEN |
| 13:40 | 12 | YOU WERE LOOKING AT BACK SCOUR AFTER THE STORMS.  THAT WAS |
| 13:40 | 13 | AFTER RITA, RIGHT? |
| 13:40 | 14 | **A.**   THE DATE BEST IN MY MEMORY IS AUGUST 29, AND THAT'S |
| 13:40 | 15 | FOLLOWING RITA, THAT'S CORRECT. |
| 13:40 | 16 | **Q.**   SEPTEMBER 29, RIGHT? |
| 13:41 | 17 | **A.**   I'M SORRY.  YES, SIR. |
| 13:41 | 18 | **Q.**   SEPTEMBER 29. |
| 13:41 | 19 | **A.**   AUGUST 29 IS WHEN WE HAD THE TROUBLE. |
| 13:41 | 20 | **Q.**   YOU TALKED ABOUT TAKING AN INSTRUMENT WITH YOU THAT YOU |
| 13:41 | 21 | WERE USING AS YOU WERE OUT THERE ON SEPTEMBER 29, AFTER RITA, |
| 13:41 | 22 | LOOKING AT BACK SCOUR. |
| 13:41 | 23 | **A.**   YES, SIR. |
| 13:41 | 24 | **Q.**   WHAT WAS THAT INSTRUMENT? |
| 13:41 | 25 | **A.**   IT'S A TORVANE. |

ROBERT G. BEA - FURTHER RECROSS

13:41  1  **Q.**  WOULD YOU SPELL THE WORD.

13:41  2  **A.**  T-O-R-V-A-N-E.

13:41  3  **Q.**  I KNOW YOU KNOW THIS, BUT THAT TORVANE DOES GIVE YOU SOME

13:41  4  SOIL CHARACTERISTICS, AS YOU SAID, BUT WHAT IT DOESN'T GIVE YOU

13:41  5  IS PLASTICITY; ISN'T THAT CORRECT?

13:41  6  **A.**  THAT'S CORRECT.

13:42  7  **Q.**  THE PIEZOMETERS THAT YOU SHOWED US JUST A FEW MINUTES AGO,

13:42  8  THEY WERE PZ3, PZ6, AND PZ2, RIGHT?

13:42  9  **A.**  YES, SIR.

13:42  10      COULD I MAKE A FURTHER STATEMENT REGARDING YOUR

13:42  11  PREVIOUS QUESTION?

13:42  12  **Q.**  I ASKED YOU WHETHER IT MEASURED PLASTICITY.  THAT'S ALL I

13:42  13  ASKED YOU.  AND YOU SAID NO, AND THAT'S CORRECT.  SO I DON'T

13:42  14  KNOW THAT THAT REQUIRES EXPLANATION.  MAYBE THAT'S FOR --

13:42  15  **A.**  WELL, THAT'S NOT THE ONLY INSTRUMENT I USED.

13:42  16  **Q.**  OH, WHAT OTHER INSTRUMENT?  I ASKED YOU WHAT INSTRUMENTS.

13:42  17  WHAT INSTRUMENTS DID YOU USE?

13:42  18  **A.**  MY MOUTH.  THAT'S THE BEA TEST TO DETERMINE IF THERE'S

13:43  19  GRIT IN THE CLAY SAMPLE.  THAT'S THE REASON I DO THAT TEST.  IF

13:43  20  YOU CLASSIFY MY TASTE IN THE GRIT TEST, SO TO SPEAK -- THAT'S

13:43  21  THE REASON I PERFORMED THAT TEST.  IF IT'S VERY, VERY GRITTY, I

13:43  22  WOULD EXPECT IT TO BE LOW PLASTICITY.  IF IT'S NOT VERY GRITTY,

13:43  23  I EXPECT IT TO BE HIGH PLASTICITY.

13:43  24      I DID NOT DETECT ANYTHING THAT WOULD SERIOUSLY CRUNCH

13:43  25  OR ERODE MY TEETH DOWN THE ENTIRE STRETCH.

## ROBERT G. BEA – FURTHER RECROSS

| | | |
|---|---|---|
| 13:43 | 1 | **Q.** LET'S GET BACK TO THE PIEZOMETERS. PZ2, PZ3, PZ6, THOSE |
| 13:43 | 2 | ARE THE ONES YOU TALKED ABOUT, RIGHT? |
| 13:43 | 3 | **A.** CORRECT. |
| 13:43 | 4 | **Q.** ALL OF THOSE WERE INSTALLED AFTER KATRINA AND AFTER THE |
| 13:43 | 5 | WALL WAS REBUILT, CORRECT? |
| 13:43 | 6 | **A.** CORRECT. |
| 13:43 | 7 | **Q.** THE ONLY ONE OF THOSE THAT WAS LANDSIDE OF THE FLOODWALL |
| 13:43 | 8 | WAS PZ2; IS THAT CORRECT? |
| 13:44 | 9 | **A.** NO. THERE WERE OTHERS LANDSIDE. |
| 13:44 | 10 | **Q.** I'M SORRY. THAT'S THE ONE YOU TALKED ABOUT. |
| 13:44 | 11 | **A.** YES, SIR. |
| 13:44 | 12 | **Q.** THAT'S THE ONE YOU PUT UP ON THE SCREEN. THAT'S ALL I'M |
| 13:44 | 13 | INTERESTED IN. |
| 13:44 | 14 | **A.** CORRECT. |
| 13:44 | 15 | **Q.** PZ2, WHERE YOU WERE COMPARING ITS HEARTBEAT LINE, WHATEVER |
| 13:44 | 16 | YOU WANT TO CALL IT, YOU WERE COMPARING THAT WITH PZ3, PZ6? |
| 13:44 | 17 | **A.** CORRECT. |
| 13:44 | 18 | **Q.** THAT LINE -- WHEN GUSTAV HAPPENED OR IKE HAPPENED, IT |
| 13:44 | 19 | DIDN'T HAVE ANY VERTICAL STRESS FROM STORM SURGE LOAD ON IT; |
| 13:44 | 20 | ISN'T THAT CORRECT? PZ2. |
| 13:44 | 21 | **A.** WELL, PZ2 IS ON THE LAND SIDE. |
| 13:44 | 22 | **Q.** RIGHT. |
| 13:44 | 23 | **A.** THE VERTICAL STRESSES ARE ON THE FLOOD SIDE. AND THERE |
| 13:44 | 24 | WAS NO INDICATION OF THE TRANSMISSION OF THOSE VERTICAL |
| 13:44 | 25 | LOADINGS ON PZ2'S HEARTBEAT. |

## ROBERT G. BEA - FURTHER RECROSS

13:45  1  **Q.**  NOW, YOU HAVE TALKED ABOUT PILINGS AT SAUCER, YOU TALKED

13:45  2  ABOUT PILINGS AT BOLAND, RIGHT?  REMEMBER?  PIERCING THE

13:45  3  ORGANIC CLAY LAYER.  DO YOU RECALL THAT, SIR?

13:45  4  **A.**  THAT'S CORRECT, SIR.

13:45  5  **Q.**  THERE WERE ALSO PILINGS AT THE MCDONOUGH MARINE FACILITY,

13:45  6  HUNDREDS OF THEM THAT PIERCED THE ORGANIC CLAY LAYER

13:45  7  REPEATEDLY; ISN'T THAT TRUE?

13:45  8  **A.**  I THINK THAT'S TRUE.  THERE WERE --

13:45  9  **Q.**  EXCUSE ME.

13:45  10  **A.**  I THINK THE PILINGS WE ARE TALKING ABOUT ARE TOWARD THE

13:45  11  BANK OF THE INDUSTRIAL CANAL.  AM I CORRECT?

13:45  12  **Q.**  WELL, THERE WERE ALSO PILINGS, FOR EXAMPLE, AT THE ITT

13:45  13  SITE THAT WERE WELL LANDWARD OF THE CANAL SITE, ISN'T THAT

13:45  14  TRUE, THAT PIERCED THE ORGANIC CLAY LAYER?

13:46  15  **A.**  YES, SIR.

13:46  16  **Q.**  THERE WERE ALSO SUCH PILINGS, CLEARLY LANDSIDE AT THE

13:46  17  INDIAN TOWING SITE; ISN'T THAT CORRECT?

13:46  18  **A.**  YES, SIR.

13:46  19  **Q.**  THEY PIERCED THE ORGANIC CLAY LAYER?

13:46  20  **A.**  YES.

13:46  21  **Q.**  CORRECT ME IF I'M WRONG:  I DON'T SEE ANYWHERE IN ANY OF

13:46  22  YOUR MATERIAL THAT WE HAVE LOOKED AT -- MOSTLY, I HAVE LOOKED

13:46  23  AT IT ALL BECAUSE I HAVE IT, BUT WE HAVE LOOKED AT IT

13:46  24  COLLECTIVELY -- AND WE DON'T SEE ANYTHING WHERE YOU SHOW ANY

13:46  25  CALCULATIONS OF THE TOTAL VOLUMES OF SOIL REMOVED AT ANY PLACE.

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 13:46 | 1 | IS THAT FAIR? |
| 13:46 | 2 | **A.**  I THINK THAT'S FAIR. |
| 13:46 | 3 | **Q.**  BUT YET YOU CAME HERE AND SAID THERE WERE 2 MILLION CUBIC |
| 13:46 | 4 | FEET TAKEN FROM BOLAND AND 1 MILLION CUBIC FEET TAKEN FROM |
| 13:46 | 5 | SAUCER; ISN'T THAT CORRECT? |
| 13:46 | 6 | **A.**  THAT'S CORRECT. |
| 13:47 | 7 | **Q.**  EXCUSE ME? |
| 13:47 | 8 | **A.**  WELL, THOSE FIGURES ARE BASED ON ONE OF WGI'S -- I'LL CALL |
| 13:47 | 9 | IT COMPLETION REPORTS OF THE TOTAL AMOUNT OF SOIL MATERIAL |
| 13:47 | 10 | REMOVED FROM EACH OF THE PRIMARY SITES.  SO I TOOK THAT |
| 13:47 | 11 | INFORMATION TO DETERMINE THE CUBIC FEET FIGURES I QUOTED. |
| 13:47 | 12 | **Q.**  DID YOU HAPPEN TO CALCULATE THE TOTAL VOLUME TAKEN FROM |
| 13:47 | 13 | THE MCDONOUGH MARINE SITE? |
| 13:47 | 14 | **A.**  WELL, THE INFORMATION WAS NOT PRESENTED IN THAT WAY.  THE |
| 13:47 | 15 | INFORMATION IS BEING PRESENTED AS MATERIAL TRANSPORTED FROM |
| 13:47 | 16 | SITE.  I THINK I COMMENTED THAT OTHER SITES, FOR EXAMPLE, MOST |
| 13:48 | 17 | IMPORTANTLY, THE BORROW PIT, OF COURSE, HAD A LARGE AMOUNT OF |
| 13:48 | 18 | MATERIAL EXCAVATED FROM THE BORROW PIT ITSELF, BUT IT WAS KEPT |
| 13:48 | 19 | ON THE EBIA SITE. |
| 13:48 | 20 | **Q.**  I TAKE IT THAT YOU, THEN, HAVE NOT THOROUGHLY READ |
| 13:48 | 21 | DR. SIKORA'S REPORT; IS THAT RIGHT? |
| 13:48 | 22 | **A.**  WELL, I THOROUGHLY READ IT BECAUSE I WAS VERY INTERESTED |
| 13:48 | 23 | IN IT, BUT I THINK THE DETAILS OF THAT READING ARE NOT IN MY |
| 13:48 | 24 | BRAIN TODAY. |
| 13:48 | 25 | **Q.**  YOU DIDN'T TAKE VOLUMES FROM ANY OF OTHER SITES:  MAYER |

## ROBERT G. BEA – FURTHER RECROSS

| | |
|---|---|
| 13:48 | 1 |
| 13:48 | 2 |
| 13:48 | 3 |
| 13:49 | 4 |
| 13:49 | 5 |
| 13:49 | 6 |
| 13:49 | 7 |
| 13:49 | 8 |
| 13:49 | 9 |
| 13:49 | 10 |
| 13:49 | 11 |
| 13:49 | 12 |
| 13:49 | 13 |
| 13:49 | 14 |
| 13:49 | 15 |
| 13:49 | 16 |
| 13:49 | 17 |
| 13:49 | 18 |
| 13:49 | 19 |
| 13:49 | 20 |
| 13:49 | 21 |
| 13:50 | 22 |
| 13:50 | 23 |
| 13:50 | 24 |
| 13:50 | 25 |

1 YACHT, ITT, INDIAN TOWING; IS THAT FAIR?

2 **A.**    NO.  I DID.  I TOOK THE ENTIRE STRETCH OF THE EBIA SITE,

3 AND I CALCULATED THE CUBIC FOOTAGE OF MATERIAL TRANSPORTED FROM

4 EACH SITE FROM THE NORTH ALL THE WAY TO THE SOUTH.

5 **Q.**    BUT THAT'S NOT IN YOUR REPORT.

6 **A.**    THAT'S CORRECT.

7 **Q.**    YOU TESTIFIED IN THIS TRIAL AND AT YOUR DEPOSITION AND

8 GAVE ME A LIST OF THE 10 OUT OF 644 REFERENCES IN YOUR

9 APPENDIX A THAT DEALT WITH LEVEES, FLOODWALLS, AND FLOOD

10 CONTROL STRUCTURES.

11         DO YOU RECALL THAT?

12 **A.**    YES, SIR.

13 **Q.**    THREE OF THOSE WERE BOOKS.

14 **A.**    CORRECT.

15         **THE COURT:**  WE KNOW THE BOOKS, AND SO WE CAN GET

16 RIGHT TO IT.  WE HAVE BEEN THROUGH THE NAMES, AND TWO WERE

17 PROVIDED LATE AND ONE WAS PENDING.

18 **BY MR. TREEBY:**

19 **Q.**    WE STILL HAVEN'T RECEIVED, HAVE WE, DR. BEA, THE *LOAD*

20 *ENGINEERING* BOOK?

21 **A.**    WELL, I HAVE A QUESTION IN THAT REGARD.

22         I BELIEVE YOU SHOWED THE COVER OF THE BOOK; IS THAT

23 CORRECT?

24 **Q.**    NO, NOT THE *LOAD ENGINEERING* BOOK.  WE DON'T HAVE IT.  WE

25 HAVE NEVER SEEN IT.

ROBERT G. BEA - FURTHER RECROSS

13:50    1        I JUST HAVE A COUPLE QUESTIONS.

13:50    2    **A.**   I'M RECALLING HAVING SEEN IT ON THE SCREEN.  THAT'S HOW I

13:50    3    DETERMINED WHAT BOOK YOU WERE REQUESTING.

13:50    4    **Q.**   I WAS REQUESTING YOUR BOOK CALLED *LOAD ENGINEERING*,

13:50    5    *RELIABILITY BASED LOADINGS FOR LIFE-CYCLE ENGINEERING OF*

13:50    6    *SYSTEMS*.  THAT'S WHAT I WAS ASKING ABOUT, AND IT WAS ONE OF THE

13:50    7    THREE THAT WERE VICK COPY PUBLISHERS.  AND WE DON'T HAVE IT,

13:50    8    AND I HAVE NEVER SEEN IT, SO I CERTAINLY DIDN'T PUT IT UP ON A

13:50    9    SLIDE.  BUT I DON'T WANT TO BELABOR THIS.  I JUST HAVE A COUPLE

13:50   10    QUESTIONS.

13:50   11        WE DO HAVE THE TWO:  *MARGINS OF QUALITY IN*

13:50   12    *ENGINEERING SYSTEMS* [SIC] AND *HUMAN & ORGANIZATIONAL FACTORS:*

13:50   13    *RISK ASSESSMENT AND MANAGEMENT OF ENGINEERED SYSTEMS* [SIC].

13:51   14        WE HAVE DONE, I THINK, A THOROUGH COMPUTER SEARCH OF

13:51   15    THOSE BOOKS.  WE FIND NOWHERE IN THEM IS THE WORD *LEVEE*.  IS

13:51   16    THAT WORD FOUND?  *FLOODWALL*, THAT WORD FOUND?  OR *FLOOD-CONTROL*

13:51   17    *STRUCTURES*, THOSE TWO WORDS FOUND?

13:51   18        DO YOU BELIEVE THOSE WORDS ARE IN THOSE TEXTS?

13:51   19    **A.**   NO.  YOU WON'T FIND THOSE WORDS IN THE *LOAD ENGINEERING*

13:51   20    TEXT.  I VERY LATE LAST NIGHT ATTEMPTED TO LOCATE THAT TEXT FOR

13:51   21    YOU.  I COULD NOT FIND THE PLACE WHERE IT WAS ARCHIVED.  I'LL

13:51   22    PRODUCE IT WHEN I RETURN HOME.  I HAVE THOSE FILES IN MY OFFICE

13:51   23    AT HOME.

13:51   24    **Q.**   THANK YOU, DR. BEA.

13:52   25        THERE WAS JUST -- I NOW, HOPEFULLY, CAN MAKE A LITTLE

ROBERT G. BEA - FURTHER RECROSS

13:52   1    BIT MORE PROGRESS.

13:52   2          I ASKED YOU YESTERDAY, AND I DO HAVE A TRANSCRIPT

13:52   3    HERE, ABOUT THE LENGTHY TESTIMONY WHICH IS FOUND IN THE TRIAL

13:52   4    TRANSCRIPT AT PAGE 1022 BEGINNING AT LINE 22 ON THAT PAGE AND

13:52   5    WENT BACK AND FORTH ALL THE WAY DOWN TO -- SO I'M NOT GOING TO

13:52   6    READ ALL THIS -- DOWN TO 1026 WHERE THE COURT ADMONISHED US TO

13:52   7    NOT BE TESTY.

13:52   8          **THE COURT:**  IN A TESTY WAY, I'M SURE.

13:52   9          BUT GO AHEAD.

13:52   10   BY MR. TREEBY:

13:52   11   **Q.**   BUT WHAT THAT WHOLE LINE WAS ABOUT WAS ESTABLISHING THAT I

13:52   12   HAD TRIED VERY HARD, THOROUGHLY, AT YOUR APRIL 16 REBUTTAL

13:53   13   DEPOSITION TO ASK YOU TO TELL US ANY PARTICULAR EXCAVATIONS

13:53   14   THAT YOUR ALLEGED HYDRAULIC CONDUCTIVITY EXPOSURE CONNECTIONS

13:53   15   WITH THE SWAMP MARSH LAYERS, HOW WE WOULD FIND WHICH THOSE

13:53   16   WERE, ANY OR ALL OF THOSE.

13:53   17          AND THAT WHOLE LINE ENDED WITH YOU TELLING ME -- AND

13:53   18   YOU CORRECT ME IF I MISCHARACTERIZE IT; I'M GOING TO TRY TO

13:53   19   PROPERLY CHARACTERIZE IT -- THAT YOU WOULD HAVE TO DO A

13:53   20   CORRELATION TO DO THAT -- YOU HAVE NOT DONE IT -- TO GET

13:53   21   DEPTHS -- YOU COULDN'T IDENTIFY THOSE EXCAVATIONS FOR ME AND

13:53   22   THE COURT.

13:53   23          **MR. SCHULTZ:**  YOUR HONOR --

13:53   24          **MR. TREEBY:**  EXCUSE ME.  I'M NOT FINISHED WITH MY

13:53   25   QUESTION.

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 13:53 | 1 | **MR. SCHULTZ:**  LET ME KNOW WHEN YOU ARE FINISHED. |
| 13:53 | 2 | **MR. TREEBY:**  I WILL. |
| 13:53 | 3 | BY MR. TREEBY: |
| 13:53 | 4 | **Q.**  MY APPRECIATION OF THAT -- AND THE COURT WILL HAVE ITS OWN |
| 13:53 | 5 | APPRECIATION -- WAS THAT YOU COULD NOT AT YOUR APRIL 16 |
| 13:53 | 6 | DEPOSITION GIVE ME SPECIFIC EXCAVATIONS THAT YOU WERE REFERRING |
| 13:54 | 7 | TO. |
| 13:54 | 8 | AND I WAS TRYING TO RELATE IT, FRANKLY, TO YOUR |
| 13:54 | 9 | MODEL, AND I WENT ON AFTER THAT TO TALK ABOUT THAT. |
| 13:54 | 10 | SO DO YOU RECALL THAT WHOLE LINE OF TESTIMONY? |
| 13:54 | 11 | **THE COURT:**  YOUR OBJECTION, SIR? |
| 13:54 | 12 | **MR. SCHULTZ:**  MY OBJECTION, YOUR HONOR, IS I BELIEVE |
| 13:54 | 13 | IT MISCHARACTERIZES THE TESTIMONY WHICH I'VE READ SEVERAL |
| 13:54 | 14 | TIMES. |
| 13:54 | 15 | THERE ARE A LOT OF QUESTIONS ABOUT SPECIFIC AND |
| 13:54 | 16 | GENERAL EXCAVATIONS, AND THERE ARE A LOT OF ANSWERS.  AND I |
| 13:54 | 17 | DON'T THINK IT'S A FAIR WAY TO CROSS-EXAMINE TRYING TO LUMP ALL |
| 13:54 | 18 | THAT INTO ONE NARRATIVE QUESTION, SO I OBJECT TO THE QUESTION. |
| 13:54 | 19 | **THE COURT:**  BASED ON THE ACUMEN OF THE WITNESS AND |
| 13:54 | 20 | HIS KNOWLEDGE, I'M GOING TO ALLOW HIM TO ATTEMPT TO ANSWER THE |
| 13:54 | 21 | QUESTION. |
| 13:54 | 22 | IF HE CANNOT, HE CAN HONESTLY SAY HE DOESN'T |
| 13:54 | 23 | KNOW. |
| 13:54 | 24 | **MR. TREEBY:**  I'M SURE YOU WEREN'T TRYING TO HIDE THE |
| 13:54 | 25 | BALL ON ME ON APRIL 16.  LET ME SAY THAT. |

## ROBERT G. BEA - FURTHER RECROSS

13:54  1          **THE WITNESS:**  MR. TREEBY --

13:54  2    **BY MR. TREEBY:**

13:54  3    **Q.**  WAIT.  LET ME FINISH.  I'M GOING TO SAY THAT.  DON'T ASK A

13:54  4    QUESTION.

13:54  5          **THE COURT:**  IS THAT A QUESTION?

13:54  6              WE HAD ANOTHER QUESTION PENDING THAT HE NEVER

13:54  7    ANSWERED.  I DIDN'T SUSTAIN THE OBJECTION.  I SAID HE CAN

13:54  8    ANSWER IT.  SO WE HAVE ANOTHER QUESTION NOW FOLLOWING THAT

13:54  9    QUESTION WITHOUT AN ANSWER, AND THAT DOESN'T WORK.

13:55  10             DO YOU RECALL THE FIRST QUESTION?

13:55  11         **THE WITNESS:**  YES.

13:55  12         **MR. TREEBY:**  THAT WAS THE ANSWER.  HE RECALLS IT.

13:55  13   THAT WAS MY QUESTION, DID HE RECALL ALL THAT.

13:55  14         **THE COURT:**  I MEAN DID HE RECALL THE QUESTION THAT

13:55  15   MR. TREEBY POSED.

13:55  16         **THE WITNESS:**  YES.

13:55  17         **THE COURT:**  THE FIRST QUESTION, AND YOU MAY NOW

13:55  18   ANSWER IT IF YOU WISH, IF YOU CAN.

13:55  19         **THE WITNESS:**  THE INFORMATION THAT YOU WERE SEEKING

13:55  20   COMES FROM A DATABASE OF 20,000 PAGES.  MY ABILITY TO CORRELATE

13:55  21   EACH OF THE MAJOR CONTRIBUTORS' EXCAVATION CONTRIBUTORS WOULD

13:55  22   REQUIRE ME TO REMEMBER THE REPORTS THAT ARE ARCHIVED IN THAT

13:55  23   20,000 PAGES.

13:55  24             THE WORK OR THE DOCUMENTATION THAT I WAS USING

13:56  25   WAS PROVIDED BY WGI AND THE DEPARTMENT OF JUSTICE.  THAT

## ROBERT G. BEA - FURTHER RECROSS

13:56   1   INFORMATION WAS BEING USED IN A PROGRESSIVE DEVELOPMENT OF

13:56   2   SOMETHING WE CALLED A *GEOGRAPHIC INFORMATION SYSTEM MAPPING* OF

13:56   3   LOCATIONS, DEPTHS CORRELATED TO THE REPORTS, AND WE HAD A

13:56   4   DISCUSSION DURING MY DEPOSITION OF AN EARLY VERSION OF THAT

13:56   5   MAPPING.

13:56   6             SO THE DATA I'M REFERRING TO IS THERE.  I CAN'T

13:56   7   HIDE IT FROM YOU BECAUSE YOU PROVIDED IT.

13:56   8             AND MY MEMORY IS SUCH THAT I CAN'T MAP FROM ALL

13:56   9   OF THE EXCAVATIONS TO THE SPECIFIC REPORTS.  AND WHAT YOU WERE

13:57   10   EXPERIENCING WAS NOT AN ATTEMPT TO HIDE THINGS FROM YOU, BUT

13:57   11   RATHER TO ANSWER HONESTLY ABOUT THE INABILITY OF MY MEMORY TO

13:57   12   CONTAIN THAT MUCH INFORMATION.

13:57   13   **BY MR. TREEBY:**

13:57   14   **Q.**   SO IT'S CLEAR, I WASN'T ASKING FOR ALL 20,000 THINGS.  I

13:57   15   WAS ONLY ASKING FOR ANY EVIDENCE THAT WOULD SUPPORT THE

13:57   16   CROSS SECTIONS AND EVIDENCE -- CROSS SECTIONS THAT YOU USED TO

13:57   17   ANALYZE, TO DO COMPUTER MODEL ANALYSIS AT THE NORTH AND SOUTH

13:57   18   BREACHES, CASE 1-1, 1-2, FOR BOTH LOCATIONS.  THAT'S WHAT I WAS

13:57   19   TRYING TO GET AT AND GET YOU TO TELL ME.

13:57   20             I HEARD YOU YESTERDAY COME UP WITH SOME SMOKING GUNS.

13:57   21   THE SMOKING GUNS, IT WOULD SEEM TO ME -- NOT THE 20,000, BUT

13:58   22   THE 8 OR 10, QUOTE, SMOKING GUNS THAT YOU YESTERDAY ATTEMPTED

13:58   23   OR I THINK YOU WERE ATTEMPTING TO CONNECT SOMEHOW TO YOUR

13:58   24   MODEL -- IS THAT WHAT YOU WERE DOING?

13:58   25   **A.**   YESTERDAY?

## ROBERT G. BEA - FURTHER RECROSS

13:58    1    **Q.**   YES.

13:58    2    **A.**   YES.

13:58    3    **Q.**   THOSE WERE NOT DISCLOSED TO US, AND THAT'S -- THOSE WERE

13:58    4    NOT DISCLOSED IN YOUR ANSWERS; ISN'T THAT TRUE?

13:58    5    **A.**   NO, THAT IS NOT TRUE.  IN MY EXPERT REPORT DOCUMENTING THE

13:58    6    CASE 1 CROSS SECTIONS AT NORTH BREACH AND SOUTH BREACH, I

13:58    7    INCLUDED ILLUSTRATIONS FROM YOUR REPORTS THAT MAPPED TO THOSE

13:58    8    EXCAVATIONS THAT CORRELATE TO THE FEATURES SHOWN ON THE

13:58    9    CROSS SECTION.  THOSE ARE IN THE REPORT.

13:58    10   **Q.**   WELL, THAT WILL BE, ACTUALLY, A MATTER FOR THE JUDGE TO

13:58    11   DETERMINE AT THE APPROPRIATE TIME.

13:59    12            **MR. TREEBY:**  AT THIS POINT, JUST FOR THE RECORD, I

13:59    13   MAKE AN OBJECTION UNDER RULE 26 THAT WE WERE NOT PROVIDED THE

13:59    14   FACTS OR DATA CONSIDERED BY THE WITNESS IN FORMING THOSE

13:59    15   OPINIONS BASED ON WHAT I HEARD YESTERDAY AFTERNOON.

13:59    16            AND I UNDERSTAND, YOUR HONOR --

13:59    17            **THE COURT:**  I WILL HAVE TO DEFER RULING ON THAT UNTIL

13:59    18   I -- FRANKLY, UNTIL -- ASSUMING WE -- ASSUMING WE GO THROUGH

13:59    19   THE ENTIRE TRIAL AND BRIEFING, ET CETERA.

13:59    20            **MR. SCHULTZ:**  THE ONLY THING I WOULD SAY IN RESPONSE

13:59    21   RATHER THAN DEBATING IT HERE, YOUR HONOR, IS YOU WILL FIND IT

13:59    22   IN THE DEPOSITION.

13:59    23   **BY MR. TREEBY:**

13:59    24   **Q.**   NOW LET'S PROCEED FOR A FEW MORE QUESTIONS.

13:59    25            FIRST OF ALL, YOU KNOW AND I THINK YOU HAVE

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 13:59 | 1 | TESTIFIED, BUT I WANT TO MAKE SURE, THAT THERE WAS GRID |
| 13:59 | 2 | TRENCHING ON THE ENTIRE SITE FROM NORTH TO SOUTH, 3,000-PLUS |
| 13:59 | 3 | LINEAL FEET ALMOST JUST NORTH OF CLAIBORNE BRIDGE ALMOST TO THE |
| 13:59 | 4 | FLORIDA BRIDGE.  THERE WAS GRID TRENCHING OVER THE WHOLE SITE; |
| 13:59 | 5 | ISN'T THAT TRUE? |
| 13:59 | 6 | **A.**   YES. |
| 13:59 | 7 | **Q.**   YOUR NORTH BREACH CASE 2 CROSS SECTIONS -- AND I'M GOING |
| 14:00 | 8 | TO PULL THEM UP JUST TO REFRESH EVERYBODY -- YOUR NORTH BREACH |
| 14:00 | 9 | CASE 2 CROSS SECTIONS SHOW A, QUOTE, DEEP SAND AND SHELL FILL |
| 14:00 | 10 | LAYER THAT, QUOTE, ABUTS THE FLOODWALL AT THE LOCATION OF THE |
| 14:00 | 11 | STRUCTURAL CONNECTION BETWEEN THE 1966 SHEET PILE WALL AND THE |
| 14:00 | 12 | 1980S DEEPER SHEET PILE WALL, CLOSE QUOTE. |
| 14:00 | 13 |         DO YOU RECALL THAT? |
| 14:00 | 14 | **A.**   YES, SIR. |
| 14:00 | 15 | **Q.**   I'M GOING TO PULL THAT UP.  WE'LL PULL THAT UP. |
| 14:00 | 16 |         IT'S IN JX-1391 IN YOUR FEBRUARY 1 REPORT, |
| 14:00 | 17 | APPENDIX B, AND I'M GOING TO GO TO PAGE 16.  AND THEN WE WILL |
| 14:00 | 18 | IN A MINUTE LOOK AT PAGE 31. |
| 14:00 | 19 |         **MR. TREEBY:**  JUST SO WE ARE ORIENTED, LET'S PULL UP, |
| 14:00 | 20 | ONE AT A TIME, 16 FIRST.  BLOW UP THE CROSS SECTION. |
| 14:01 | 21 | **BY MR. TREEBY:** |
| 14:01 | 22 | **Q.**   YOU CANNOT POINT US TO ANY PARTICULAR DOCUMENT THAT SHOWS |
| 14:01 | 23 | THAT SHELLS WERE USED TO BACKFILL ANY EXCAVATION BY WASHINGTON |
| 14:01 | 24 | GROUP INTERNATIONAL AT THE EBIA; ISN'T THAT TRUE? |
| 14:01 | 25 | **A.**   PLEASE REPEAT YOUR QUESTION. |

## ROBERT G. BEA - FURTHER RECROSS

14:01   1    **Q.** YOU CANNOT POINT TO ANY PARTICULAR DOCUMENT THAT SHOWS

14:01   2    THAT SHELLS WERE USED TO BACKFILL ANY EXCAVATION BY WASHINGTON

14:01   3    GROUP AT THE EAST BANK INDUSTRIAL AREA.

14:01   4    **A.** CORRECT.

14:01   5    **Q.** IN FACT, WHENEVER YOU USE THE TERM *PREEXISTING FILL* IN

14:01   6    YOUR EXPERT REPORTS AND IN YOUR TESTIMONY, YOU'RE REFERRING TO

14:01   7    FILL THAT PREEXISTED WASHINGTON GROUP'S WORK AT THE SITE; IS

14:02   8    THAT CORRECT?

14:02   9    **A.** I GOT LOST IN THE QUESTION.

14:02  10    **Q.** LET ME START OVER.

14:02  11    **A.** PLEASE.

14:02  12    **Q.** I APOLOGIZE.  I WITHDRAW THAT QUESTION.  BAD QUESTION.  I

14:02  13    STUTTERED IN THE MIDDLE OF IT, MAKING IT WORSE.

14:02  14        IN FACT, IN YOUR REPORTS AND IN YOUR TESTIMONY WHEN

14:02  15    YOU USE THE TERM *PREEXISTING FILL*, YOU ARE REFERRING TO FILL

14:02  16    THAT PREEXISTED WASHINGTON GROUP'S WORK AT THE SITE; ISN'T THAT

14:02  17    CORRECT?

14:02  18    **A.** YES, SIR.

14:02  19    **Q.** YOU DON'T HAVE ANY EVIDENCE THAT WASHINGTON GROUP USED

14:02  20    SHELL TO FILL ANY OF THE EXCAVATIONS IN THIS CASE, DO YOU?

14:02  21    **A.** WELL, SOME OF THE EXCAVATIONS WERE BACKFILLED WITH NATIVE

14:02  22    SOIL CONTAINING SHELLS, AND I COMMENTED ON THAT POINT YESTERDAY

14:03  23    AND REFERRED TO THE SHELLS AS LAKE PONTCHARTRAIN CLAMSHELLS.

14:03  24        **THE COURT:** ANY OF THE SHELLS THAT WAS IN THE

14:03  25    PREEXISTING SOIL WERE ALSO PREEXISTING.  THE COURT HAS GOT IT.

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 14:03 | 1 | **MR. TREEBY:**  RIGHT.  I PROBABLY SHOULDN'T HAVE EVEN |
| 14:03 | 2 | ASKED THAT QUESTION BECAUSE I WAS REDUNDANT. |
| 14:03 | 3 | **BY MR. TREEBY:** |
| 14:03 | 4 | **Q.**   YOU AGREE, THOUGH, THAT THE ALLEGED SHELL FILL IS NOT PURE |
| 14:03 | 5 | SHELL FILL? |
| 14:03 | 6 | **A.**   CORRECT. |
| 14:03 | 7 | **Q.**   THERE WERE SILTS AND SANDS MIXED IN WITH THE SHELLS IN THE |
| 14:03 | 8 | AREA WE ARE TALKING ABOUT HERE AT THE NORTH BREACH; ISN'T THAT |
| 14:03 | 9 | RIGHT? |
| 14:03 | 10 | **A.**   YES, SIR. |
| 14:03 | 11 | **Q.**   AND THOSE SILTS AND SANDS WOULD REDUCE THE HYDRAULIC |
| 14:03 | 12 | CONDUCTIVITY OF THE SHELL FILL; ISN'T THAT RIGHT? |
| 14:03 | 13 | **A.**   THAT'S CORRECT. |
| 14:03 | 14 | **Q.**   ALSO, YOU HAVE NO EVIDENCE OF PREEXISTING -- EVEN |
| 14:03 | 15 | PREEXISTING PERVIOUS SHELL FILL LAYERS AT THE SOUTH BREACH; IS |
| 14:03 | 16 | THAT CORRECT? |
| 14:03 | 17 | WE WERE TALKING ABOUT THE NORTH BREACH, NOW THE SOUTH |
| 14:03 | 18 | BREACH. |
| 14:03 | 19 | **A.**   I THINK THAT'S NOT CORRECT. |
| 14:03 | 20 | **MR. TREEBY:**  LET'S CALL UP YOUR APRIL 16, 2012, |
| 14:03 | 21 | DEPOSITION. |
| 14:04 | 22 | **BY MR. TREEBY:** |
| 14:04 | 23 | **Q.**   PAGE 120, 11 THROUGH 14: |
| 14:04 | 24 | **"QUESTION:**  ISN'T IT TRUE THAT YOU HAVE NO EVIDENCE |
| 14:04 | 25 | OF PREEXISTING PERVIOUS SHELL FILL LAYERS AT THE SOUTH |

## ROBERT G. BEA - FURTHER RECROSS

14:04  1        BREACH SITE?

14:04  2            **"ANSWER:** YES, SIR."

14:04  3        IS THAT CORRECT?

14:04  4  **A.**   YES.  WHAT I WAS REFERRING TO WAS A SHELL FILL THAT HAD

14:04  5  BEEN USED IN EXCAVATIONS.  THERE IS EVIDENCE AT SOUTH BREACH OF

14:04  6  A SHELL FILL THAT WAS PART OF AN EARLY HAUL ROAD DOWN THAT

14:04  7  SECTION OF THE FLOOD PROTECTION STRUCTURE.  THAT EVIDENCE IS

14:04  8  CITED IN THE EXPERT REPORTS WRITTEN BY DR. CUSHING AND

14:05  9  DR. REDA BAKEER AS PART OF THE *BARGE* TRIAL.  SO THEY HAVE

14:05  10 PHOTOGRAPHIC EVIDENCE OF A THIN SHELL FILL ATTRIBUTED TO THE

14:05  11 VERY EARLY ROADBED.

14:05  12        THAT'S THE ONLY EXCEPTION TO THIS, YES, SIR, THAT I'M

14:05  13 AWARE OF.

14:05  14 **Q.**   I TAKE IT YOU DIDN'T KNOW THAT WHEN WE TOOK YOUR

14:05  15 DEPOSITION IN APRIL?

14:05  16 **A.**   THAT'S CORRECT.

14:05  17 **Q.**   IT'S BASED ON SOMEBODY ELSE'S REPORT IN *BARGE* --

14:05  18 **A.**   YES, SIR.

14:05  19 **Q.**   -- THAT YOU HAVE READ SINCE THEN?

14:05  20 **A.**   YES.

14:05  21        **THE COURT:** JUST TO CLEAR MATTERS UP, DOES THAT

14:05  22 PARTICULAR SHELL FILL YOU JUST TALKED ABOUT HAVE ANYTHING TO DO

14:05  23 WITH YOUR OPINIONS AS TO CAUSATION HERE?

14:05  24        **THE WITNESS:** NO.

14:06  25        **MR. TREEBY:** THANK YOU, YOUR HONOR.  I WOULD HAVE

## ROBERT G. BEA - FURTHER RECROSS

14:06  1  BEEN AFRAID TO ASK THAT QUESTION BECAUSE I DIDN'T HAVE IT IN

14:06  2  THE DEPOSITION.

14:06  3         **THE COURT:**  I DON'T BLAME YOU.

14:06  4         **MR. TREEBY:**  I JUST WANTED TO BE CANDID.

14:06  5  **BY MR. TREEBY:**

14:06  6  **Q.**   OKAY.  YOU BASED THE EXISTENCE OF THE SHELL FILL IN YOUR

14:06  7  NORTH BREACH CASE 2 CROSS SECTIONS ON -- AND I BELIEVE YOU

14:06  8  TESTIFIED TO IT JUST A LITTLE WHILE AGO -- ON BORING 81A; IS

14:06  9  THAT CORRECT?

14:06  10  **A.**   THAT'S ONE.  WE HAVE BORING 79A, THEY SKIPPED 80, AND I

14:06  11  THINK 78A.

14:06  12  **Q.**   I'M GOING TO SHOW YOU A DOCUMENT MARKED JX-116 WHICH IS AN

14:06  13  EXCERPT FROM THE RECAP SUBMITTAL REPORT AT BOLAND.

14:06  14         **MR. TREEBY:**  TURN TO PAGE, IF YOU WOULD, JX-116-632.

14:06  15  **BY MR. TREEBY:**

14:06  16  **Q.**   THIS IS THE BORING LOG FOR 81A, ISN'T IT?

14:07  17  **A.**   YES, SIR.

14:07  18  **Q.**   I WILL TAKE YOU THROUGH THIS JUST A LITTLE BIT.  IT

14:07  19  SHOWS --

14:07  20         **MR. TREEBY:**  AND MAYBE BLOW THIS UP -- BLOW UP, I

14:07  21  GUESS, DOWN THROUGH 6 FEET FIRST.

14:07  22  **BY MR. TREEBY:**

14:07  23  **Q.**   IT SHOWS A FILL, SHELL, AND SILTY SAND MIX IF YOU GO ALL

14:07  24  THE WAY DOWN, 16 FEET FROM THE TOP OF THE BOREHOLE; ISN'T THAT

14:07  25  RIGHT?

## ROBERT G. BEA - FURTHER RECROSS

14:07   1   **A.**   I CAN'T SEE THE BOTTOM.

14:07   2           **MR. TREEBY:**  TAKE IT TO THE BOTTOM.  IT'S ON THE

14:08   3   SCREEN.  GO DOWN TO 16 FEET.

14:08   4   **BY MR. TREEBY:**

14:08   5   **Q.**   AND THIS IS 16 FEET FROM THE TOP OF THE HOLE, RIGHT?

14:08   6           **MR. TREEBY:**  PULL UP THAT DOWN TO 16 FEET.  TAKE IT

14:08   7   FROM 12 DOWN TO 16.  JUST PULL THAT.

14:08   8   **BY MR. TREEBY:**

14:08   9   **Q.**   FILL, SHELL, AND SILTY SAND AND SO FORTH.  AND IT CHANGES

14:08   10  A LITTLE BIT, BUT THAT'S ESSENTIALLY WHAT IT IS.

14:08   11          THAT'S THE LAYER YOU'RE TALKING ABOUT, ISN'T IT?

14:08   12  **A.**   WE HAVE TO KEEP GOING.  I THINK IT'S 17 1/2 FEET.

14:08   13  **Q.**   OKAY.  LET'S GO -- 17 1/2 FEET?  LET'S SEE WHAT THAT SAYS.

14:08   14  **A.**   RIGHT THERE.

14:08   15  **Q.**   FILL, SILTY SAND, FEW SHELLS.  OKAY.  THERE'S A FEW

14:09   16  SHELLS.

14:09   17          THAT'S A LITTLE DIFFERENT THAN ABOVE IT, RIGHT?

14:09   18  **A.**   YES.

14:09   19  **Q.**   AGAIN, THIS IS THE ENVIRONMENTAL REMEDIATION BORING LOG?

14:09   20  **A.**   THAT'S CORRECT, SIR.

14:09   21  **Q.**   LOOK AT THE DATE IN THE UPPER RIGHT-HAND CORNER OF THE

14:09   22  LOG.

14:09   23          **MR. TREEBY:**  GO BACK TO THE LOG ON PAGE JX-116-632.

14:09   24  **BY MR. TREEBY:**

14:09   25  **Q.**   ALL RIGHT.  WE HAVE THE DATE:  OCTOBER 4, 2001, RIGHT?

## ROBERT G. BEA - FURTHER RECROSS

14:09  1   "DATE HOLE STARTED OCTOBER 4, DATE HOLE COMPLETED."

14:09  2   **A.**   CORRECT.

14:09  3   **Q.**   OCTOBER 4.

14:09  4        AND THE NAME OF THE MMG GEOLOGIST WHO LOGGED THE

14:10  5   BORING IS AT THE BOTTOM LEFT-HAND CORNER OF THIS PAGE.  BOTTOM

14:10  6   LEFT-HAND CORNER.  S. CALLOWAY, RIGHT?

14:10  7   **A.**   YES, SIR.

14:10  8   **Q.**   MS. CALLOWAY'S INITIALS ARE THERE.

14:10  9        AND I THEN WANT TO TAKE YOU TO ANOTHER DOCUMENT WHICH

14:10  10  IS MARKED JX-1315-012, WHICH IS A PHOTOGRAPH OF BOREHOLE

14:10  11  DRILLING AT SUREKOTE ROAD ON OCTOBER 4, 2001.  IT'S PAGE 12.

14:11  12       **MR. TREEBY:**  BLOW UP THE TOP ONE.

14:11  13  **BY MR. TREEBY:**

14:11  14  **Q.**   THAT WAS THE SAME DAY, WAS IT NOT?

14:11  15  **A.**   YES, SIR.

14:11  16  **Q.**   THAT'S A BOREHOLE DRILLING ON SUREKOTE ROAD OUTSIDE THE

14:11  17  SECURITY GATE.

14:11  18       DO YOU SEE THAT?

14:11  19  **A.**   YES, SIR.

14:11  20  **Q.**   JUST SO WE CAN ORIENT THE COURT -- CORRECT ME IF I'M

14:11  21  WRONG -- THIS IS A PHOTOGRAPH TAKEN FROM INSIDE THE EAST BANK

14:11  22  INDUSTRIAL AREA LOOKING BACK TOWARD THE PUMP STATION; IS THAT

14:11  23  RIGHT?

14:11  24  **A.**   YES, SIR.

14:11  25  **Q.**   NEAR THE CREST OF SUREKOTE ROAD GOING OVER THE FLOOD WALL;

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 14:11 | 1 | ISN'T THAT CORRECT? |
| 14:11 | 2 | **A.**   YES, SIR. |
| 14:11 | 3 | **Q.**   THE CAPTION READS "BOL," FOR BOLAND MARINE, "BOREHOLE |
| 14:11 | 4 | DRILLING ON SUREKOTE ROAD OUTSIDE SECURITY FENCE." |
| 14:11 | 5 | THIS CORRESPONDS TO THE SAME DATE OF MS. CALLOWAY'S |
| 14:11 | 6 | LOG SHOWING THE LOCATION OF 81A. |
| 14:11 | 7 | WOULD YOU AGREE? |
| 14:11 | 8 | **A.**   YES, SIR. |
| 14:11 | 9 | **Q.**   I PRESUME YOU KNOW, DO YOU NOT, THAT MMG BORING 81A IS THE |
| 14:12 | 10 | ONLY MMG BOREHOLE THAT WAS DRILLED IN THIS AREA AT THE NORTH |
| 14:12 | 11 | END OF THE BOLAND NEAREST THE FLOOD WALL; IS THAT CORRECT? |
| 14:12 | 12 | **A.**   THAT'S CORRECT. |
| 14:12 | 13 | **Q.**   I WANT TO SHOW YOU ANOTHER DOCUMENT MARKED JX-0353, WHICH |
| 14:12 | 14 | IS QAR 195.  THIS IS THE DAILY FIELD REPORT FOR |
| 14:12 | 15 | OCTOBER 4, 2001. |
| 14:12 | 16 | **MR. TREEBY:**  BLOW UP THE TOP. |
| 14:12 | 17 | **BY MR. TREEBY:** |
| 14:12 | 18 | **Q.**   THURSDAY, OCTOBER 4, 2001, REPORT 195. |
| 14:12 | 19 | IT HAS THE SAME DATE AS THE BORING LOG FOR 81A WE |
| 14:12 | 20 | JUST LOOKED AT, RIGHT? |
| 14:12 | 21 | **A.**   YES, SIR. |
| 14:12 | 22 | **Q.**   NOW TURN TO PAGE 27 IN THIS DOCUMENT IF YOU WOULD.  THIS |
| 14:12 | 23 | IS THE SAME QAR. |
| 14:12 | 24 | YOU CAN SEE AT THE RIGHT-HAND COLUMN OF THIS |
| 14:12 | 25 | DRILLER'S LOG BY MS. CALLOWAY THE SITUATION OF 81A, RIGHT? |

## ROBERT G. BEA - FURTHER RECROSS

14:13   1   **A.**   THIS IS THE FIRST TIME I HAVE SEEN THIS DOCUMENT.   WHERE

14:13   2   ARE YOU REFERRING TO?

14:13   3   **Q.**   TOP, THE RIGHT-HAND COLUMN.

14:13   4           DO YOU SEE THAT?

14:13   5   **A.**   YES, SIR.

14:13   6   **Q.**   THE RIGHT-HAND COLUMN AT THE VERY TOP, IT SAYS:   "81A IS

14:13   7   SITUATED 37 FEET WEST OF THE NORTH-SOUTH FLOODWALL AND 19 FEET

14:13   8   SOUTH OF THE EASTERN EAST-WEST FLOODWALL ABOUT 2 FEET EAST OF

14:13   9   SUREKOTE ROAD."

14:13  10           IS THAT WHAT IT SAYS?

14:13  11   **A.**   YES, SIR.

14:13  12   **Q.**   AT THE BOTTOM OF EACH PAGE, DO YOU SEE THE INITIALS OF SC,

14:13  13   MS. CALLOWAY?

14:13  14   **A.**   YES, SIR.

14:13  15   **Q.**   NOW, YOU WOULD AGREE WITH ME, BASED ON THE PHOTOGRAPH,

14:14  16   THAT THE ELEVATION IN THIS AREA WHERE BOREHOLE 81A WAS DRILLED

14:14  17   AT THE CREST OF SUREKOTE ROAD WAS AT LEAST PLUS 11.5 FEET,

14:14  18   NAVD88; ISN'T THAT CORRECT?

14:14  19   **A.**   I WOULD NOT DRAW THAT CONCLUSION.

14:14  20   **Q.**   YOU KNOW HOW HIGH OR TALL THAT FLOODWALL WAS, RIGHT?

14:14  21   **A.**   YES, SIR.

14:14  22   **Q.**   YOU KNOW HOW HIGH THE CREST OF THE ROAD WOULD BE TO HAVE

14:14  23   TO GET OVER IT, RIGHT?

14:14  24   **A.**   YES.

14:14  25   **Q.**   I THINK I'M BEING CONSERVATIVE TO SAY THAT IT WOULD BE

ROBERT G. BEA – FURTHER RECROSS

14:14    1    PLUS 11.5 FEET, NAVD88; IS THAT FAIR?

14:14    2    **A.**   PLEASE, NOW, I HAVE GOT THE GEOMETRY YOU'RE REFERRING TO.

14:14    3         PLEASE REPEAT YOUR QUESTION.

14:14    4    **Q.**   YES.  WOULD YOU NOT AGREE, NOW THAT YOU HAVE ORIENTED

14:14    5    YOURSELF TO THIS LOCATION, THAT THE ELEVATION IN THIS AREA NEAR

14:14    6    THE CREST OF SUREKOTE ROAD WHERE BOREHOLE 81A WAS DRILLED WAS

14:14    7    AT LEAST PLUS 11.5 FEET, NAVD88, RIGHT?

14:15    8    **A.**   NOT RIGHT.

14:15    9    **Q.**   DO YOU KNOW WHAT THE ELEVATION OF SUREKOTE ROAD WAS AS IT

14:15   10    WENT OVER THE TOP OF THAT FLOODWALL?

14:15   11    **A.**   NO, I DON'T.

14:15   12    **Q.**   YOU DON'T KNOW.  IS THAT FAIR TO SAY?

14:15   13    **A.**   I DON'T KNOW.  THIS VERY POINT WAS DELIBERATED EXTENSIVELY

14:15   14    IN THIS VERY COURT IN THE COMPARISON OF THE WORK PERFORMED BY

14:15   15    MYSELF AND DR. MORENO ALL THE WAY TO THE POINT OF NOTING IN A

14:15   16    LOG YOU DIDN'T SHOW THAT THEY HAD MOVED THE LOCATION.  AND THIS

14:15   17    IS AFTER THEY DID THE ORIGINAL SIGHTING OF THE RIG.  AND WE

14:16   18    PURSUED ALL THE WAY TO MMG IN BATON ROUGE WHERE THE FINAL

14:16   19    BORING WAS LOCATED.  AND IT WAS DETERMINED USING A HANDHELD

14:16   20    DIFFERENTIAL GEOGRAPHIC POSITIONING SYSTEM INSTRUMENT.

14:16   21         AND THOSE EIGHT SIGNIFICANT FIGURE -- LATITUDE AND

14:16   22    LONGITUDE THAT WAS SHOWN ON THE FRONT PAGE OF THE BORING LOG

14:16   23    YOU SHOWED ME DEFINES WHERE THE HOLE WAS DRILLED.

14:16   24         WE THEN USED GEOGRAPHIC POSITIONING SYSTEM MAPPING TO

14:16   25    LOCATE THE POSITION OF THE RIG WHEN IT DID TAKE THAT HOLE, AND

## ROBERT G. BEA - FURTHER RECROSS

14:16    1    IT'S NOT AT THE CREST OF SUREKOTE ROAD.  THERE'S A BIG DROP IN

14:16    2    ELEVATION FROM SUREKOTE ROAD TO THE FACE OF THE FLOODWALL YOU

14:17    3    REFERRED TO.

14:17    4            SO YOU CAN'T MAKE A CORRELATION TO THE ROAD SURFACE

14:17    5    ELEVATION TO GET WHERE THAT SANDY, SHELLY MATERIAL ACTUALLY IS

14:17    6    LOCATED IN TERMS OF ELEVATION.

14:17    7    Q.   SO YOU'RE SAYING THAT WHEN MS. CALLOWAY, AT AN

14:17    8    UNSUSPICIOUS TIME IN THIS CASE, WHEN THE WORK WAS DONE, SHE

14:17    9    JUST MISREPRESENTED THAT SHE MEASURED 31 FEET WEST OF THE

14:17   10    NORTH-SOUTH FLOODWALL AND 19 FEET SOUTH OF THE EASTERN

14:17   11    EAST-WEST FLOODWALL AND 2 FEET EAST OF SUREKOTE ROAD.  SHE JUST

14:17   12    MISSED IT?

14:17   13    A.   NO, I DON'T THINK SO.  THE CONFUSION THAT'S IN THIS POINT

14:17   14    IS THE BOREHOLE HAS TO BE ACCURATELY LOCATED IN ORDER TO REACH

14:17   15    A REASONABLE DEDUCTION OF THE ELEVATIONS ASSOCIATED WITH THE

14:18   16    LAYERING BECAUSE THEY'RE A REFERENCE TO GROUND LEVEL THAT WAS

14:18   17    VERY THOROUGHLY DEVELOPED IN THIS VERY COURTROOM.

14:18   18    Q.   WE AGREE.  AND IF THE TOP OF THE HOLE HERE IS 11.5 FEET

14:18   19    PLUS --

14:18   20    A.   IF.

14:18   21    Q.   LET'S JUST MAKE THAT ASSUMPTION --

14:18   22    A.   YES, SIR.

14:18   23    Q.   -- THAT THIS IS A CORRECT RECORD THIS WOMAN WROTE

14:18   24    UNSUSPICIOUSLY BACK AT THAT TIME.  MAKE THAT ASSUMPTION.

14:18   25    A.   WELL, I THINK THAT'S JUST FINE BECAUSE SHE --

## ROBERT G. BEA - FURTHER RECROSS

14:18  1  **Q.**   LET'S MAKE THAT ASSUMPTION.

14:18  2  **A.**   YES, SIR.

14:18  3  **Q.**   AND IF, IN FACT, THAT LOCATION, 2 FEET EAST OF SUREKOTE

14:18  4  ROAD, 37 WEST, THAT CAN BE TRIANGULATED, AND 19 FEET SOUTH OF

14:18  5  THE EASTERN EAST-WEST FLOODWALL, IF THAT CAN BE TRIANGULATED,

14:18  6  AND IT SHOWS THAT IT'S A PLUS 11.5 FEET -- LET'S MAKE THAT

14:18  7  ASSUMPTION.

14:18  8  **A.**   OKAY.

14:18  9  **Q.**   YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT 81A, THE

14:18  10  SHELL THAT'S SHOWN IN THAT BORING --

14:18  11  **A.**   FOR THE UPPER 18 FEET APPROXIMATELY.

14:18  12  **Q.**   WELL, NOW IT'S 18 --

14:19  13  **A.**   17 1/2 --

14:19  14  **Q.**   WHATEVER.

14:19  15  **A.**   17 3/4.

14:19  16  **Q.**   -- WOULD NOT BE REPRESENTATIVE OF THE MATERIAL 100 FEET

14:19  17  AWAY OVER AT THE FLOODWALL?

14:19  18  **A.**   WELL, HOW DO YOU KNOW THAT?

14:19  19  **Q.**   ISN'T THAT TRUE?  ISN'T THAT TRUE?  IF IT'S NOT, IT'S NOT.

14:19  20  IF YOU DISAGREE, FINE.

14:19  21  **A.**   I DISAGREE.

14:19  22  **Q.**   OKAY.  THAT'S GOOD.

14:19  23       NOW, BELOW THE LOCATION YOU SEE THE STANDARD

14:19  24  PENETRATION TEST RESULTS TAKEN DURING THE DRILLING OF 81A;

14:19  25  ISN'T THAT RIGHT?

## ROBERT G. BEA - FURTHER RECROSS

14:19   1   **A.**   YES, SIR.

14:19   2   **Q.**   SO IT WAS DRILLED THERE, WASN'T IT?

14:19   3   **A.**   WHEREVER *THERE* IS.

14:19   4   **Q.**   *THERE* BEING 37 FEET WEST OF THE NORTH-SOUTH FLOODWALL,

14:19   5   19 FEET SOUTH OF THE EASTERN EAST-WEST FLOODWALL, 2 FEET EAST

14:19   6   OF SUREKOTE ROAD.  THAT'S WHERE IT WAS DRILLED, RIGHT?

14:19   7   **A.**   WELL, MY DIFFICULTY IN CORROBORATING THAT, I EXPLAINED

14:20   8   EARLIER.  THE TABLE YOU OMITTED FROM THE BORING 81A DOCUMENT

14:20   9   INDICATES THEY HAD TO MOVE THE RIG FROM WHERE THEY STARTED THE

14:20   10  CORING TO GET IT FULLY OFF OF THE ROAD.

14:20   11          I THINK IT'S A SIGNIFICANT FIGURE, BUT XY COORDINATES

14:20   12  DETERMINED WITH AN INSTRUMENT DON'T PUT IT AT 2 FEET OFF THE

14:20   13  SHOULDER OF THE ROAD.  THAT HAS A SIGNIFICANT EFFECT ON THE

14:20   14  ELEVATION REFERENCED.

14:20   15  **Q.**   WE CERTAINLY AGREE WITH THAT.

14:20   16          SO LET'S JUST MAKE AN ASSUMPTION BECAUSE THIS IS

14:20   17  SIMPLE MATH THAT I EVEN IN HIGH SCHOOL ALGEBRA COULD DO.  IF,

14:20   18  IN FACT, THE TOP OF HOLE IS PLUS 11.5 FEET -- I'M GOING TO ASK

14:21   19  YOU TO MAKE SOME ASSUMPTIONS -- AND IF THE BOTTOM OF THE SHEET

14:21   20  PILE TIP IS MINUS 11.7 FEET, IF THAT'S TRUE, I'M SURE YOU CAN

14:21   21  DO THE MATH AND TELL ME HOW FAR -- EVEN IF THIS SHELL FILL

14:21   22  CONTINUED ALL THE WAY OVER TO THE AREA OF THE NORTH BREACH, THE

14:21   23  NORTH END OF THE NORTH BREACH, IF IT DID; LET'S ASSUME IT DID

14:21   24  JUST SAKE OF DISCUSSION.  IF IT DID, JUST TELL US HOW MANY FEET

14:21   25  ABOVE THAT SHEET PILE TIP THAT SHELL FILL WOULD BE.

## ROBERT G. BEA - FURTHER RECROSS

14:21  1   **A.**   THE TOP ELEVATION IS?

14:21  2   **Q.**   11.5 FEET PLUS.

14:21  3   **A.**   NAVD88.

14:22  4   **Q.**   ALL OF IT -- EVERY ELEVATION I'M GOING TO GIVE YOU, UNLESS

14:22  5   I SAY TO THE CONTRARY, IS NAVD88(2004.65).

14:22  6   **A.**   OKAY.  AND THE NEXT IS ELEVATION --

14:22  7   **Q.**   ASSUME THE SHEET PILE TIP THERE AT THE NORTH BREACH, AT

14:22  8   THE NORTH END, THE VERY NORTH END OF THE NORTH BREACH, IS MINUS

14:22  9   11.7 FEET.

14:22  10  **A.**   YES, SIR.

14:22  11  **Q.**   AND USE YOUR 17 FEET THAT THE SHELL GOES TO, JUST FOR

14:22  12  PURPOSES OF THIS DISCUSSION, THAT IT GOES DOWN FROM THE TOP,

14:22  13  WHICH IS 11.5 FEET, DOWN 17 FEET.  WHAT WOULD BE THE ELEVATION

14:22  14  OF THE BOTTOM OF THAT SHELL FILL IF YOU MAKE THE ASSUMPTION IT

14:22  15  CARRIES ALL THE WAY OVER TO THE NORTH END OF THE NORTH BREACH?

14:23  16  **A.**   HAVE YOU WORKED THE FIGURES?

14:23  17          **THE COURT:**  HE IS JUST ASKING IF YOU CAN DO IT.

14:23  18          **MR. TREEBY:**  I COULD, BUT, YOUR HONOR, I THOUGHT

14:23  19  DR. BEA COULD DO IT FASTER THAN THIS POOR LAWYER COULD.  WE CAN

14:23  20  GO ON.  WE'LL EITHER PROVE THOSE FACTS THAT WE ARE ASSUMING OR

14:23  21  NOT.

14:23  22  **BY MR. TREEBY:**

14:23  23  **Q.**   YOU WOULD AGREE IT WOULD BE SIGNIFICANTLY ABOVE THE TIP

14:23  24  DEPTH; ISN'T THAT CORRECT?

14:23  25  **A.**   IF THE GROUND ELEVATION IS PLUS 11.5 FEET AND THE

## ROBERT G. BEA - FURTHER RECROSS

14:23   1   REFERENCE ELEVATION YOU'RE SEEKING IS MINUS 17.5 FEET, THAT

14:23   2   INTERVAL IS 29 FEET.

14:23   3   **Q.**   OKAY.  IT WOULD BE -- HOW FAR ABOVE THE SHEET PILE TIP

14:24   4   WOULD IT BE, THE BOTTOM OF THAT SHELL FILL THAT YOU CALCULATE

14:24   5   AT 17 FEET?

14:24   6   **A.**   23 FEET.  PLUS 11.5?

14:24   7   **Q.**   YES.

14:24   8   **A.**   TO MINUS 11.5?

14:24   9   **Q.**   YES.

14:24   10  **A.**   I ADDED THE TWO TOGETHER AND GOT 23.

14:24   11          **THE COURT:**  ARE YOU SAYING THAT THE BORE TIP -- THE

14:24   12  BORE TIP -- THIS LOG, WHERE WOULD THE END OF THE LOG BE NAVD88?

14:24   13  IS THAT -- BASED ON YOUR HYPOTHET.

14:24   14          **MR. TREEBY:**  YES.

14:24   15          **THE COURT:**  CAN I ASK HIM THAT QUESTION?

14:24   16          **MR. TREEBY:**  SURE.  SURE.

14:24   17          **THE COURT:**  WHERE WOULD THE BORE LOG HAVE ENDED

14:24   18  NAVD88 -- I'M USING SHORTHAND -- ASSUMING THE 11 1/2-FOOT

14:24   19  ELEVATION?

14:25   20          **THE WITNESS:**  29 FEET, AND THAT'S THE UPPER SHELL

14:25   21  FILL.  THAT'S A DISTANCE FROM GROUND SURFACE TO THE BOTTOM

14:25   22  REFERENCE TO NAVD88.

14:25   23          **MR. TREEBY:**  LET'S PULL BACK UP THE BORING LOG.

14:25   24          **THE COURT:**  I DIDN'T UNDERSTAND THE 29 FEET, SIR.

14:25   25  29 FEET -- WE ADD 11 TO GET 29, WE WOULD HAVE TO -- I GUESS I'M

ROBERT G. BEA - FURTHER RECROSS

14:25    1    WONDERING HOW -- WHAT THIS LOG SHOWS IS -- THE LOG WENT DOWN

14:25    2    HOW FAR?  THE LOG DEMONSTRATES THAT THE PROBE WENT DOWN HOW

14:25    3    FAR?

14:25    4            THE WITNESS:  A LITTLE OVER 18 FEET.

14:25    5            MR. TREEBY:  22 FEET, YOUR HONOR.

14:25    6            THE WITNESS:  20?  GREAT.

14:25    7            THE COURT:  WE'LL SAY 20.  IS THAT 20 NAVD88?

14:26    8            THE WITNESS:  NO.

14:26    9            THE COURT:  THAT'S THE PROBLEM.

14:26   10            THE WITNESS:  THAT'S GROUND SURFACE.

14:26   11            MR. TREEBY:  I'M TRANSLATING IT ALL TO NAVD88.

14:26   12    THAT'S WHAT I'M SAYING.  LET'S START OVER.

14:26   13            THE COURT:  I GET THE PICTURE.  IF THE ELEVATION WAS

14:26   14    AS YOU SAY IT IS, THE LOG WOULD BE SAMPLING SOIL MUCH HIGHER IN

14:26   15    ELEVATION THAN IT WOULD BE IF IT WERE STARTING AT GROUND ZERO,

14:26   16    AS AN EXAMPLE.

14:26   17            MR. TREEBY:  YES, YOUR HONOR.

14:26   18            THE COURT:  OF COURSE, I UNDERSTAND IT.

14:26   19            MR. TREEBY:  THE POINT IS THAT THE BORING LOGS -- AND

14:26   20    I KNOW DR. BEA WILL AGREE WITH ME ON THIS -- THE BORING LOGS,

14:26   21    THEY SHOW DEPTHS; THEY DON'T SHOW ELEVATIONS AT ALL.

14:26   22            THE WITNESS:  THAT'S CORRECT.

14:26   23    BY MR. TREEBY:

14:26   24    Q.   SO YOU HAVE TO DETERMINE WHAT THE TOP OF HOLE ELEVATION IS

14:26   25    IN ORDER TO DETERMINE HOW DEEP THAT SHELL FILL GOES?

## ROBERT G. BEA - FURTHER RECROSS

14:26   1   **A.**   RIGHT.

14:26   2   **Q.**   IT JUST SO HAPPENS THIS BORING LOG IS 22 FEET DEEP.

14:26   3   THAT'S HOW FAR THE HOLE BORING LOG WENT.  BUT IF IT WENT FROM

14:27   4   11.5 FEET UP, WE KNOW --

14:27   5        **THE COURT:**  WE KNOW THAT THE SAMPLE WOULD BE

14:27   6   DIFFERENT THAN IF THE ELEVATION OF THE SAMPLE WERE LOWER.

14:27   7        **THE WITNESS:**  RIGHT.

14:27   8        **THE COURT:**  THAT, I UNDERSTAND.

14:27   9        THE CONTROVERSY, AS I SAID IN ANOTHER CASE,

14:27   10  WHERE WAS THE ACTUAL LOCATION OF 81A.

14:27   11       **MR. TREEBY:**  WE'LL HOPEFULLY ESTABLISH THAT.

14:27   12       **THE COURT:**  BASED ON MY RULING, I WAS NOT OBLIGED TO

14:27   13  FIND THAT IN THAT RULING, I MUST SAY.

14:27   14  **BY MR. TREEBY:**

14:27   15  **Q.**   YESTERDAY, DR. BEA, AT ABOUT 4:15 P.M., PAGE 170, LINES 3

14:27   16  THROUGH 7 OF THE TRANSCRIPT, YOU TESTIFIED THAT THE SEWER LIFT

14:27   17  STATION AND THE WEDDING CAKE STRUCTURE -- WE ALREADY DID THIS.

14:27   18  STRIKE THAT.  I'VE GOT TO READ AHEAD.  WE ALREADY COVERED THIS.

14:27   19       **THE COURT:**  THANK YOU, SIR.

14:28   20       MR. TREEBY, WOULD THIS BE --

14:28   21       **MR. TREEBY:**  GOOD TIME TO BREAK, SURE.

14:28   22       **THE COURT:**  I'M TRYING TO REMEMBER.  HOW LONG HAVE

14:28   23  YOU BEEN UP?

14:28   24       **MR. BRUNO:**  WE STARTED AT 12:20, JUDGE.

14:28   25       **MR. TREEBY:**  IT'S BEEN ABOUT AN HOUR.

ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 14:28 | 1 | **THE COURT:** LET'S TAKE A BREAK. |
| 14:28 | 2 | (RECESS.) |
| 14:43 | 3 | **MR. TREEBY:** YOUR HONOR, PLEASE -- I JUST SHARED WITH |
| 14:43 | 4 | MY CO-COUNSEL, IF THESE BREAKS WERE A LITTLE LONGER, MY CROSS |
| 14:43 | 5 | WOULD PROBABLY BE SHORTER. |
| 14:43 | 6 | **THE COURT:** WE WILL DO WHAT WE CAN TO ACCOMMODATE |
| 14:43 | 7 | YOU, SIR. |
| 14:43 | 8 | **MR. TREEBY:** I MAY BE LOOKING DOWN AND HAVE TO MAKE |
| 14:43 | 9 | DECISIONS ON THE FLY, BUT I'M TRYING TO SHORTEN IT. |
| 14:43 | 10 | **THE COURT:** SURE. |
| 14:43 | 11 | **BY MR. TREEBY:** |
| 14:43 | 12 | **Q.** DR. BEA, I WANT TO TAKE YOU TO A SUBJECT THAT YOU HAVE |
| 14:43 | 13 | TALKED ABOUT IN YOUR DIRECT EXAMINATION, ABOUT THE SANDY |
| 14:44 | 14 | BACKFILL AT THE AREA 8, ETC., THAT AREA -- |
| 14:44 | 15 | **A.** YES, SIR. |
| 14:44 | 16 | **Q.** -- NORTH OF BOLAND. AREA 8 IS FROM ABOUT THE MIDDLE -- |
| 14:44 | 17 | GOING FROM EAST TO WEST, AREA 8 STARTS AT ABOUT THE MIDDLE AND |
| 14:44 | 18 | GOES TO THE CANAL'S EDGE; IS THAT RIGHT, SIR? |
| 14:44 | 19 | **A.** YES, SIR. |
| 14:44 | 20 | **Q.** LET'S LOOK AT JX-1391-0013, WHICH IS APPENDIX B, FIGURE 9 |
| 14:44 | 21 | OF YOUR REPORT. YOU REFERRED TO -- FIGURE 9 HAS A COUPLE OF |
| 14:45 | 22 | PHOTOGRAPHS LAYING ON TOP OF EACH OTHER. AND THIS WAS IN YOUR |
| 14:45 | 23 | REPORT. ONE OF THEM IS 2002, AND ONE OF THEM IS 2005. |
| 14:45 | 24 | WE CAN CLEARLY SAY A COUPLE OF THINGS THAT HAPPENED |
| 14:45 | 25 | DURING THE JOB. ONE IS THAT THE JOB TRAILER IS MOVED FROM ONE |

## ROBERT G. BEA - FURTHER RECROSS

14:45   1   SIDE OF SUREKOTE ROAD TO THE OTHER.

14:45   2   **A.**   YES, SIR.

14:45   3   **Q.**   AND THE SITE IS OBVIOUSLY MORE UNIFORM-LOOKING IN THE 2005

14:45   4   FIGURE.  WOULD YOU AGREE?

14:45   5   **A.**   YES, SIR.

14:45   6   **Q.**   BUT YOU WOULD AGREE IN BOTH OF THESE PHOTOS THERE IS AN

14:45   7   AREA OF GRASS TO THE WEST OF SUREKOTE ROAD BEFORE THE ROAD

14:45   8   TURNS NORTHWEST; IS THAT RIGHT?

14:45   9   **A.**   YES, SIR.

14:45   10   **Q.**   AND THE GRASS IS LOCATED BETWEEN SUREKOTE ROAD AND THE

14:45   11   BEIGE-COLORED AREA THAT YOU REFERRED TO AS SANDY BACKFILL; IS

14:45   12   THAT CORRECT?

14:45   13   **A.**   YES, SIR.

14:45   14   **Q.**   SO EVEN IN 2005, THERE WAS STILL GRASS THERE IN THAT WEDGE

14:46   15   THAT I HAVE BEEN DESCRIBING; IS THAT RIGHT?

14:46   16   **A.**   YES, SIR.

14:46   17   **Q.**   THERE'S NOT SANDY BACKFILL IN THAT GRASS AREA, RIGHT?  THE

14:46   18   WEDGE RIGHT THERE?

14:46   19   **A.**   THERE'S COARSE-GRAINED SHELLY MATERIAL UNDER THAT GRASS

14:46   20   AREA.

14:46   21   **Q.**   I'M TALKING ABOUT BACKFILL, THOUGH.

14:46   22   **A.**   OKAY.  NO.

14:46   23   **Q.**   OKAY.  AND YOU HAVE AGREED, I BELIEVE, THAT THE WESTERN

14:46   24   EDGE OF SUREKOTE ROAD FACING THE CANAL AT THIS POINT -- RIGHT

14:46   25   UP HERE AT THE NORTH, THIS AREA OF THE WEDGE I'M TALKING

## ROBERT G. BEA – FURTHER RECROSS

14:46  1    ABOUT -- THAT THE WEST EDGE OF SUREKOTE ROAD IS ABOUT 40 FEET

14:46  2    FROM THE FLOODWALL, RIGHT?

14:46  3    **A.**   THAT'S CORRECT.

14:46  4    **Q.**   ALL OF THE ACM TRANSITE EXCAVATIONS THAT WERE PERFORMED AT

14:46  5    BOLAND WERE WEST OF SUREKOTE ROAD, RIGHT?

14:46  6    **A.**   THAT'S CORRECT.

14:46  7    **Q.**   I WANT TO LOOK AT A SIMILAR PHOTO FROM YOUR REPORT AT

14:47  8    JX-1389-0060, WHICH IS FIGURE 37B.  THIS IS YOUR FIGURE 37B,

14:47  9    AND THIS SHOWS THE SAME SANDY BACKFILL WE JUST DESCRIBED.

14:47  10            YOU HAVE ARROWS POINTING TO IT, RIGHT?

14:47  11   **A.**   CORRECT.

14:47  12   **Q.**   I THINK YOU HAVE AGREED WITH ME THAT FROM THIS AERIAL

14:47  13   PHOTOGRAPH, YOU HAVE NO WAY TO TELL THE DEPTH OF WHAT YOU ARE

14:47  14   CALLING *SANDY BACKFILL*.

14:47  15            ISN'T THAT RIGHT?

14:47  16   **A.**   THAT'S CORRECT.

14:47  17   **Q.**   YOU DON'T KNOW WHETHER THE TIDE IS HIGH AT THE MOMENT THAT

14:47  18   PICTURE WAS TAKEN OR LOW; ISN'T THAT RIGHT?

14:47  19   **A.**   THAT'S CORRECT.

14:48  20   **Q.**   I BELIEVE YOU HAVE AGREED WITH ME THAT YOU ALSO CANNOT

14:48  21   TELL FROM THESE PHOTOGRAPHS THE DIMENSIONS OF ANY OF THE

14:48  22   EXCAVATIONS IN THAT AREA.  ISN'T THAT ALSO RIGHT?

14:48  23   **A.**   THAT'S CORRECT.

14:48  24   **Q.**   I WANT TO SHOW YOU ANOTHER FIGURE FROM YOUR ORIGINAL

14:48  25   REPORT IN THIS CASE DATED FEBRUARY 1, 2012.  THIS IS FIGURE 29

## ROBERT G. BEA - FURTHER RECROSS

14:48    1    AT JX-1389-0050.  YOUR FIGURE FOR --

14:48    2            **MR. TREEBY:**  LET'S PULL UP JUST THE FIGURE.  IS THAT

14:48    3    PAGE 50?  YES.  THE BOTTOM PHOTO.  WOULD YOU BLOW THAT UP,

14:48    4    PLEASE.

14:48    5    **BY MR. TREEBY:**

14:48    6    **Q.**   THIS CAPTION ON THIS PHOTOGRAPH SAYS "EXCAVATIONS TO

14:49    7    REMOVE CONTAMINATED SOILS AT BOLAND MARINE SITE IMMEDIATELY

14:49    8    ADJACENT TO FLOODWALL," RIGHT?

14:49    9    **A.**   RIGHT.

14:49   10    **Q.**   YOU NOW KNOW FIGURE 19, IN FACT, SHOWS THE HORIZONTAL

14:49   11    FLOODWALL AT THE NORTHERNMOST POINT OF BOLAND THAT RAN ROUGHLY

14:49   12    EAST TO WEST AND PROVIDED THE NORTHERN BOUNDARY TO THE EAST

14:49   13    BANK INDUSTRIAL AREA, NOT THE FLOODWALL THAT BREACHED DURING

14:49   14    KATRINA; ISN'T THAT RIGHT?

14:49   15    **A.**   WELL, THE WORD IN YOUR QUESTION THAT CONFUSED ME IS IF YOU

14:49   16    HAVE A HORIZONTAL FLOODWALL, YOU DON'T HAVE A FLOODWALL.

14:49   17    **Q.**   OKAY.  I ASKED IT THAT WAY -- IT'S PROBABLY A POOR

14:49   18    QUESTION, SO FORGIVE ME THAT.

14:49   19            BUT YOU DO KNOW THAT FIGURE 29 SHOWS THE FLOODWALL,

14:49   20    NOT WHERE IT BREACHED, BUT --

14:49   21    **A.**   THAT'S CORRECT.

14:49   22    **Q.**   -- THE FLOODWALL THAT RAN EAST TO WEST AT THE NORTH END OF

14:50   23    THE BOLAND MARINE SITE?

14:50   24    **A.**   AND THAT'S WHY YOU CAN SEE THE FLORIDA AVENUE BRIDGE IN

14:50   25    THE BACKGROUND.

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 14:50 | 1 | **Q.**   THAT WASN'T CLEAR IN YOUR ORIGINAL REPORT THAT THAT WAS |
| 14:50 | 2 | THE FLOODWALL YOU WERE TALKING ABOUT IN THAT CAPTION; ISN'T |
| 14:50 | 3 | THAT RIGHT? |
| 14:50 | 4 | **A.**   I'M REFERRING TO THE EAST-WEST-TRENDING FLOODWALL THAT |
| 14:50 | 5 | PARALLELS FLORIDA AVENUE BRIDGE IN THE BACKGROUND.  THAT'S A |
| 14:50 | 6 | FLOODWALL.  AND THE EXCAVATION LOOKS LIKE IT'S IMMEDIATELY |
| 14:50 | 7 | ADJACENT TO IT. |
| 14:50 | 8 | **Q.**   WELL, LET ME SHOW YOU A DOCUMENT MARKED JX-1363.  IT'S |
| 14:50 | 9 | BEA EXHIBIT 32. |
| 14:50 | 10 | **MR. TREEBY:**  BLOW UP THE BOTTOM PICTURE, IF YOU |
| 14:50 | 11 | WOULD. |
| 14:51 | 12 | **BY MR. TREEBY:** |
| 14:51 | 13 | **Q.**   THIS IS THE SAME PHOTOGRAPH, IS IT NOT? |
| 14:51 | 14 | **A.**   YES, SIR. |
| 14:51 | 15 | **Q.**   THIS ONE HAS THE CONTEMPORANEOUS CAPTION, CORRECT? |
| 14:51 | 16 | **A.**   YES, SIR. |
| 14:51 | 17 | **Q.**   THIS HAPPENED ON NUMEROUS OCCASIONS, BUT THIS SAYS |
| 14:51 | 18 | "CONTINUING EXCAVATION OF ACM AT THE NORTHEAST CORNER OF AREA 8 |
| 14:51 | 19 | AT BOLAND MARINE," RIGHT? |
| 14:51 | 20 | **A.**   YES, SIR.  ACM IS -- |
| 14:51 | 21 | **Q.**   MAYBE WE WILL JUST DEAL WITH THIS AT ONE TIME, AND I WILL |
| 14:51 | 22 | TRY TO AVOID BEING REPETITIOUS WITH THIS. |
| 14:51 | 23 | YOU WOULD AGREE WITH ME THERE WERE NUMEROUS OCCASIONS |
| 14:51 | 24 | WHERE YOU ADDED A CAPTION TO A PHOTOGRAPH THAT WAS NOT THE |
| 14:51 | 25 | CONTEMPORANEOUS CAPTION.  IS THAT FAIR? |

## ROBERT G. BEA - FURTHER RECROSS

14:51  1   **A.**   YES.  WE DISCUSSED THAT DURING MY DEPOSITIONS.

14:51  2   **Q.**   ON SOME OCCASIONS, AT LEAST, IT WAS IN ERROR; ISN'T THAT

14:51  3   CORRECT?  I CAN TAKE YOU THROUGH THEM IF I NEED TO, BUT I WOULD

14:51  4   RATHER NOT.

14:51  5   **A.**   OKAY.

14:51  6   **Q.**   WOULD YOU AGREE WITH ME -- THERE WERE ERRORS THAT YOU

14:51  7   AGREED WITH ME NEEDED TO BE CORRECTED WHEN YOU LOOKED AT THE

14:52  8   CONTEMPORANEOUS PHOTO CAPTION; ISN'T THAT RIGHT?

14:52  9   **A.**   I THINK THAT'S CORRECT, AND THE DEPOSITION TRANSCRIPTS

14:52  10  WILL RESOLVE THAT ISSUE, BUT I THINK THAT'S CORRECT.

14:52  11  **Q.**   LET'S LOOK AT FIGURE 31 IN YOUR FEBRUARY 1 REPORT, 2012,

14:52  12  AND I THINK IT'S AT PAGE 50.  JX-1389-0051.  LET'S JUST DO ONE

14:52  13  OF THESE, AND HOPEFULLY LEAVE IT AT THAT.

14:52  14          FIGURE 31, THE BOTTOM ONE, THIS IS THE -- FIGURE 31,

14:52  15  THE BOTTOM ONE, THE CAPTION SAYS:  "BACKFILLING EXCAVATIONS

14:52  16  WITH IMPORTED SAND AT BOLAND MARINE."

14:53  17          IS THAT WHAT IT SAYS?

14:53  18  **A.**   YES, SIR.

14:53  19  **Q.**   LET'S LOOK AT THE SAME PICTURE, JX-1354-004, 31, THE

14:53  20  BOTTOM PICTURE.

14:53  21          THIS WAS THE CONTEMPORANEOUS CAPTION:  "PLACING

14:53  22  IMPORTED SAND BACKFILL IN PHASE 2 ACM EXCAVATION EAST OF AREA 8

14:53  23  AT BOLAND MARINE," RIGHT?

14:53  24  **A.**   YES.

14:53  25  **Q.**   LET ME SEE.  I'M GOING TO SKIP THOSE.

## ROBERT G. BEA - FURTHER RECROSS

14:53   1          NOW, I WANT TO SHOW YOU A DOCUMENT -- I'M SKIPPING

14:53   2   65 -- JX-0122, WHICH IS THE NFAATT FOR BOLAND.  THIS IS THE NO

14:54   3   FURTHER ACTION AT THIS TIME REPORT FOR BOLAND MARINE SITE.

14:54   4   THAT'S THE FRONT PAGE.

14:54   5          GO TO PAGE 0041 IN THIS DOCUMENT BECAUSE THERE WAS

14:54   6   SOME CONFUSION ABOUT THIS.

14:54   7          THIS IS A MAP OF THE BOLAND MARINE SITE, AND IT IS A

14:54   8   MAP THAT GIVES US AREAS AS THEY WERE USED FOR PURPOSES OF THE

14:54   9   EXCAVATION; IS THAT CORRECT?

14:54   10  A.   YES, SIR.

14:54   11  Q.   IN FACT, AREA 2, WHICH IS REFERENCED IN SOME OF THE

14:54   12  PHOTOGRAPHS AND SOME OF YOUR TEXT IN YOUR REPORT, IS AT THE

14:54   13  VERY SOUTH END OF BOLAND ON THIS MAP, NOT THE NORTH END; ISN'T

14:54   14  THAT RIGHT?

14:54   15  A.   YES, SIR.  THAT'S A MEMBER OF THE COMMUNITY OF EXCAVATIONS

14:54   16  I REFERRED TO.

14:54   17  Q.   IS IT FAIR TO SAY THAT AREA 2 IS SEVERAL HUNDRED FEET FROM

14:54   18  THE SOUTH END OF THE NORTH BREACH IN THIS PHOTOGRAPH?

14:55   19  A.   YES, SIR.

14:55   20  Q.   YOU NOW KNOW, DO YOU NOT, THAT THE CORPS HAD ITS OWN

14:55   21  PROFESSIONAL ENGINEERS AND GEOTECHNICAL ENGINEERS, AS NEEDED,

14:55   22  ASSIGNED TO WORK ON TASK ORDER 26; ISN'T THAT RIGHT?

14:55   23  A.   CORRECT.

14:55   24  Q.   YOU ARE FAMILIAR WITH JIM MONTEGUT, ARE YOU NOT?

14:55   25  A.   YES.

## ROBERT G. BEA - FURTHER RECROSS

14:55  1   **Q.**   HE WAS THE CONTRACTING OFFICER'S REPRESENTATIVE AND

14:55  2   PROJECT ENGINEER FOR THE CORPS ON TASK ORDER 26?

14:55  3   **A.**   CORRECT.

14:55  4   **Q.**   MR. MONTEGUT WAS A CIVIL ENGINEER -- NOT LICENSED, BUT A

14:55  5   CIVIL ENGINEER; IS THAT RIGHT?

14:56  6   **A.**   I BELIEVE THAT IS CORRECT.

14:56  7   **Q.**   YOU KNOW HE WAS DEPOSED IN THIS CASE?

14:56  8   **A.**   YES.

14:56  9   **Q.**   BUT HIS DEPOSITION TESTIMONY ISN'T INCLUDED IN YOUR

14:56  10  RELIANCE MATERIALS.  WOULD THAT BE CORRECT?

14:56  11  **A.**   MY RELIANCE MATERIAL LIST IS EXTENSIVE, AND I DON'T

14:56  12  RECALL.

14:56  13  **Q.**   VERY GOOD.

14:56  14  **A.**   YOU CAN CHECK IT.

14:56  15  **Q.**   YOU ARE ALSO FAMILIAR WITH LEE GUILLORY, RIGHT?

14:56  16  **A.**   YES, SIR.

14:56  17  **Q.**   YOU DID CITE TO HIS DEPOSITION TESTIMONY IN YOUR REBUTTAL

14:56  18  REPORT; ISN'T THAT RIGHT?

14:56  19  **A.**   YES, SIR.

14:56  20  **Q.**   MR. GUILLORY WAS THE CONTRACTOR'S OFFICER REPRESENTATIVE

14:56  21  AND CONSTRUCTION MANAGER FOR THE CORPS ON TASK ORDER 26?

14:56  22  **A.**   YES.

14:56  23  **Q.**   HE WAS A LICENSED PROFESSIONAL ENGINEER, WASN'T HE?

14:56  24  **A.**   I BELIEVE THAT'S CORRECT.

14:56  25  **Q.**   YOU ARE FAMILIAR WITH JOHN GRIESHABER, THE GEOTECHNICAL

ROBERT G. BEA - FURTHER RECROSS

14:56   1   ENGINEER WITH THE CORPS; IS THAT RIGHT?

14:56   2   **A.**   YES, SIR.

14:56   3   **Q.**   YOU ARE AWARE NOW, ARE YOU NOT, THAT MR. GRIESHABER HAS

14:56   4   TESTIFIED THAT IT WAS MR. GUILLORY'S CALL AND DECISION AS TO

14:57   5   WHETHER OR NOT HE THOUGHT HE NEEDED TO SEEK ADVICE FROM THE

14:57   6   GEOTECHNICAL ENGINEERING DIVISION ON ANY PARTICULAR EXCAVATION

14:57   7   IN THE EAST BANK INDUSTRIAL AREA.  RIGHT?

14:57   8   **A.**   YES, SIR.

14:57   9   **Q.**   YOU ARE ALSO FAMILIAR WITH GERALD DICHARRY, AREN'T YOU?

14:57   10   **A.**   VAGUELY.  THAT ONE, I DON'T THINK I REVIEWED; BUT I

14:57   11   REVIEWED A LOT OF DOCUMENTS.

14:57   12   **Q.**   YOU DON'T THINK YOU REVIEWED IT?

14:57   13   **A.**   I THINK THAT'S CORRECT.

14:57   14        **THE COURT:**  IS THERE A DEPOSITION OF MR. DICHARRY?

14:57   15        **MR. TREEBY:**  YES.

14:57   16        **THE COURT:**  I HAVEN'T EITHER, AS I RECALL.  I READ

14:57   17   ALL THE DEPOSITIONS TENDERED.  I DON'T REMEMBER READING

14:57   18   DICHARRY.

14:57   19        **MR. TREEBY:**  WE DESIGNATED MR. DICHARRY.  HE IS A

14:57   20   SENIOR PROJECT ENGINEER FOR --

14:57   21        I GUESS WE SHOULD DO WHAT MR. JOANEN DID.

14:57   22        **THE COURT:**  I MAY NEED TO GET A LIST OF YOUR -- I MAY

14:58   23   HAVE IT SOMEWHERE, I DON'T KNOW -- I'VE GOT YOUR DESIGNATIONS

14:58   24   IN THE 30(B)(6) DEPOSITIONS IN ONE VOLUME THAT -- SEVERAL

14:58   25   VOLUMES THAT I READ, BUT YOU MAY HAVE SOME WHERE YOU

## ROBERT G. BEA - FURTHER RECROSS

14:58  1  DESIGNATE -- WHEN YOU DID THE INITIAL DESIGNATION AND YOU

14:58  2  WANTED IT INTRODUCED, AND I MAY NOT -- I HAVE NOT READ THOSE.

14:58  3       **MR. TREEBY:**  WE WILL MAKE SURE THAT IF YOU DON'T HAVE

14:58  4  A COPY, YOU GET IT; BUT IT WAS DESIGNATED, YES.

14:58  5       **THE COURT:**  I'M SURE I DO.  I DON'T KNOW IF I HAVE

14:58  6  THAT.  WE HAVE A LOT OF BOOKS AND A LOT OF BINDERS.  I WANT TO

14:58  7  MAKE SURE I HAVE THAT.

14:58  8       **MR. TREEBY:**  WE ARE GOING TO MAKE SURE YOU HAVE THAT,

14:58  9  YOUR HONOR.

14:58  10      **THE COURT:**  OKAY.

14:58  11      **MR. TREEBY:**  JUST FOR THE COURT'S EDIFICATION, HE WAS

14:58  12  THE SENIOR PROJECT MANAGER FOR THE INNER HARBOR NAVIGATIONAL

14:58  13  CANAL LOCK REPLACEMENT PROJECT.

14:59  14      **THE COURT:**  YES, WE DO.  WE DO.  OKAY.  IT WAS

14:59  15  PROBABLY SHORT.  I DO HAVE IT RIGHT HERE, AND I HAVE A SHORT

14:59  16  SUMMARY.

14:59  17      **MR. TREEBY:**  RIGHT.

14:59  18      **THE COURT:**  MY SUMMARY MAY NEED TO BE EXPANDED,

14:59  19  DEPENDING --

14:59  20      **MR. TREEBY:**  I PROBABLY WON'T ESTABLISH IT.  SINCE

14:59  21  THIS WITNESS DIDN'T READ IT, I PROBABLY WILL SKIP THESE

14:59  22  QUESTIONS, BUT WE'LL MAKE SURE THEY ARE CALLED TO THE COURT'S

14:59  23  ATTENTION AT SOME POINT ON OUR CASE.

14:59  24      **THE COURT:**  FORGIVE ME, BUT I DID READ THE

14:59  25  DEPOSITION.

## ROBERT G. BEA - FURTHER RECROSS

15:00    1    BY MR. TREEBY:

15:00    2    Q.   NOW, ON PAGE 43 OF YOUR REBUTTAL REPORT, IN THE FIRST FULL

15:00    3    SENTENCE -- AND I WILL READ IT -- BUT IF YOU WANT CONTEXT,

15:00    4    WE'LL PULL IT UP ON THE SCREEN SO YOU CAN SEE THE WHOLE THING.

15:00    5         ON PAGE 43 OF YOUR REBUTTAL REPORT IN THE FIRST FULL

15:00    6    SENTENCE, YOU STATE, AND I QUOTE:  LEE GUILLORY, THE PROJECT

15:00    7    DELIVERY TEAM MANAGER, EXPLAINED THAT THE CORPS EXPECTED

15:00    8    GEOTECHNICAL SUPPORT FROM WGI IN THAT THEY HAD STAFF AT HOME

15:00    9    OFFICE IN DENVER THAT COULD BE CALLED UPON FOR ANY GEOTECH

15:00   10    SUPPORT, CLOSE QUOTE.

15:00   11    A.   THAT'S MY UNDERSTANDING.

15:00   12    Q.   YOU CITE FOR THAT STATEMENT TO THE FIRST DAY OF

15:00   13    MR. GUILLORY'S DEPOSITION TESTIMONY AT PAGES 150 TO 151 TO

15:00   14    SUPPORT THIS STATEMENT.

15:00   15         AND I MAKE THAT REPRESENTATION TO YOU AND YOU CAN,

15:00   16    AGAIN, CHECK IT.

15:00   17         DO YOU KNOW THAT REGARDING THAT VERY SAME DEPOSITION

15:01   18    TESTIMONY, MR. GUILLORY EXPLAINED UNDER OATH THAT HE NEVER

15:01   19    REQUESTED OR REQUIRED GEOTECHNICAL SUPPORT FROM WASHINGTON

15:01   20    GROUP'S HOME OFFICE IN DENVER RELATING SPECIFICALLY TO THE

15:01   21    LEVEES AND FLOODWALLS IN THE EAST BANK INDUSTRIAL AREA?

15:01   22         MR. SCHULTZ:  YOUR HONOR, CAN I LODGE A SCOPE

15:01   23    OBJECTION?

15:01   24         THE COURT:  I'M SORRY.  I DIDN'T HEAR YOU.

15:01   25         MR. SCHULTZ:  OBJECTION ON THE GROUNDS OF BEING

ROBERT G. BEA - FURTHER RECROSS

15:01   1   BEYOND THE SCOPE OF DIRECT.

15:01   2          **THE COURT:**  THE COURT IS NOT GOING TO CONFINE THE

15:01   3   CROSS TO DIRECT UNLESS IT GOES REALLY FAR AFIELD.

15:01   4          **MR. TREEBY:**  I WOULD HOPE I WOULD GET SOME LEEWAY.

15:01   5   **BY MR. TREEBY:**

15:01   6   **Q.**  THIS IS GUILLORY'S DEPOSITION, VOLUME 2, 56, LINE 10,

15:01   7   THROUGH 57, LINE 22.

15:01   8          IF YOU WOULD, THE RELEVANT PORTION, I BELIEVE, BEGINS

15:01   9   ON LINE 17 ON PAGE 57, BUT I GAVE THE WHOLE REFERENCE FOR

15:02   10  CONTEXT TO MAKE SURE THERE'S NO MISUNDERSTANDING.

15:02   11          THIS WAS THE QUESTION THAT WAS ASKED BEGINNING AT

15:02   12  LINE 17:

15:02   13          **"QUESTION:**  WHAT KIND OF GEOTECHNICAL SUPPORT WERE

15:02   14      YOU REFERRING TO SPECIFICALLY?"

15:02   15          REFERRING TO HIS PRIOR DAY'S TESTIMONY THAT YOU

15:02   16  CITED.

15:02   17          **"ANSWER:**  WHEN WE DEVELOPED THE RECAP AND CORRECTIVE

15:02   18      ACTION PLANS FOR REMOVAL OF THE CONTAMINATED AREAS IN THE

15:02   19      EBIA, THE CORRECTIVE ACTION PLAN REQUIRED US TO IDENTIFY

15:02   20      THE HORIZONTAL AND VERTICAL LIMITS OF EXCAVATION OF EACH

15:02   21      ONE OF THE CONTAMINATED SITES AND TO DESIGN THE

15:02   22      ENGINEERING -- USING ENGINEERING CONSIDERATIONS, DESIGN

15:02   23      THE SLOPES AND CUTS THAT WE WOULD USE TO REACH THOSE

15:02   24      PARTICULAR ELEVATIONS.  AND THE WASHINGTON GROUP STAFF

15:02   25      MADE RECOMMENDATIONS ON WHAT SIDE SLOPES AND DEPTHS AND

ROBERT G. BEA - FURTHER RECROSS

15:03   1          EQUIPMENT WOULD BE UTILIZED FOR THOSE PARTICULAR

15:03   2     EXCAVATIONS AND DESIGNED THOSE IN THE CORRECTIVE ACTION

15:03   3     PLANS.

15:03   4          "QUESTION:  WERE YOU REFERRING TO ANYTHING ELSE WHEN

15:03   5     YOU SAID THIS?

15:03   6          "ANSWER:  IN GENERAL, JUST WHATEVER KIND OF -- SOIL

15:03   7     OR GEOTECHNICAL SUPPORT THAT WE NEEDED TO BE THE UTILIZED

15:03   8     ON THE PROJECT, WHETHER IT BE FOR REMOVING UNDERGROUND

15:03   9     OBSTRUCTIONS OR PULLING PILING, PULLING SHEET PILING,

15:03  10     DEMOLITION OF CONCRETE STRUCTURES.  ULTIMATELY WE HAD

15:03  11     THREE COFFERDAMS BUILT ON SITE TO REMOVE UNDERGROUND

15:03  12     OBSTRUCTIONS.

15:03  13          "QUESTION:  LET ME ASK IT THIS WAY:  DID YOU EVER

15:03  14     REQUEST OR REQUIRE GEOTECHNICAL SUPPORT FROM WASHINGTON

15:03  15     GROUP RELATING SPECIFICALLY TO THE LEVEES AND FLOODWALLS

15:03  16     IN THE EAST BANK INDUSTRIAL AREA?

15:03  17          "ANSWER:  NO."

15:03  18          YOU DID NOT CRITERIA THAT IN YOUR RELIANCE MATERIAL;

15:03  19     IS THAT CORRECT?

15:03  20     A.   YES, SIR.

15:03  21     Q.   ON THE TOP OF PAGE JX-1414, PAGE 44, PARAGRAPH 56 OF YOUR

15:04  22     REBUTTAL REPORT, IT SAYS -- I'LL SAVE TIME AND READ IT, BUT IF

15:04  23     THERE'S ANY QUESTION AS TO CONTEXT, JUST ASK ME AND WE'LL PUT

15:04  24     IT UP.

15:04  25     A.   AGREED.

## ROBERT G. BEA - FURTHER RECROSS

15:04    1   **Q.**   THIS IS FROM YOUR REPORT -- REBUTTAL REPORT.

15:04    2          IT SAYS:  "THIS EXPECTATION THAT WGI WOULD ADVISE

15:04    3   CORPS ABOUT GEOTECHNICAL ISSUES INCLUDED ANY POTENTIAL EFFECT

15:04    4   OR DAMAGE TO THE FLOODWALL AND THAT THE LICENSED ENGINEERS THAT

15:04    5   WGI HIRED WOULD ADDRESS THOSE ISSUES."

15:04    6          DO YOU REMEMBER THAT IN YOUR REPORT?

15:04    7   **A.**   YES, SIR.

15:04    8   **Q.**   AND YOU CITE FOR THAT STATEMENT TO THE FIRST DAY OF

15:04    9   MR. GUILLORY'S DEPOSITION TESTIMONY AT PAGES 166 TO 167 TO

15:04   10   SUPPORT THIS STATEMENT.  AND I REPRESENT IT'S THERE, AND YOU

15:04   11   CITED TO IT.

15:04   12          ARE YOU NOW AWARE THAT MR. GUILLORY WAS ASKED ABOUT

15:04   13   THE VERY LANGUAGE THAT YOU CITE TO ON THOSE PAGES, AND HE SAID

15:04   14   THAT HIS TESTIMONY WAS ABOUT THE REMOVAL OF THE SEWER LIFT

15:04   15   STATION?

15:05   16   **A.**   I DON'T RECALL THAT, NO.

15:05   17   **Q.**   AND YOU DON'T RECALL PUTTING THAT IN YOUR RELIANCE

15:05   18   MATERIALS AS WELL; IS THAT CORRECT?

15:05   19   **A.**   WHAT'S THAT?

15:05   20   **Q.**   THIS -- THE NEXT -- WHAT I'M ABOUT TO SHOW YOU.  I'M

15:05   21   SORRY.  I GOT AHEAD OF MYSELF.

15:05   22          I'M CALLING UP GUILLORY DEPOSITION VOLUME 2,

15:05   23   PAGE 140, 11 THROUGH 141, 21:

15:05   24          **"ANSWER:**  I HAVE READ THE DESIGNATED PORTIONS ON

15:05   25      PAGE 166 AND 167 AS ASKED."

## ROBERT G. BEA – FURTHER RECROSS

15:05    1          THAT'S WHAT YOU CITED TO ME, RIGHT?

15:05    2  **A.**   YES.

15:05    3  **Q.**       **"QUESTION:**  MY QUESTION IS:  DOES THIS TESTIMONY.

15:05    4       RELATE TO THE LIFT STATION EXCAVATION?

15:05    5           **"ANSWER:**  CORRECT.  IT DOES ADDRESS THE SEWER LIFT

15:05    6       STATION.

15:05    7           **"QUESTION:**  OKAY.  AND THE QUESTION FROM MR. BRUNO

15:05    8       WAS, I UNDERSTAND, SO THAT YOUR EXPECTATION WAS THAT IF

15:06    9       THERE WAS GOING TO BE ANY POTENTIAL EFFECT OR DAMAGE TO

15:06    10       THE FLOODWALL, YOU WOULD HAVE EXPECTED THE LICENSED

15:06    11       ENGINEERS THAT WGI HIRED TO ADDRESS THOSE ISSUES, CORRECT?

15:06    12           **"ANSWER:**  CORRECT.

15:06    13           **"QUESTION:**  AND ALL I WANT TO ASK YOU IS ON THIS

15:06    14       PROJECT, TASK ORDER 26, DID YOU HAVE ANY CONCERNS ABOUT

15:06    15       THE POTENTIAL EFFECT OF DAMAGE TO THE FLOODWALL FROM THE

15:06    16       EXCAVATION OF THE LIFT STATION?

15:06    17           **"ANSWER:**  NO.

15:06    18           **"QUESTION:**  WHY NOT?

15:06    19           **"ANSWER:**  BECAUSE THE DESIGN AND INSTALLATION OF A

15:06    20       BRACED COFFERDAM SYSTEM DOES NOT ALLOW SOIL MOVEMENT TO

15:06    21       OCCUR THAT WOULD ADVERSELY AFFECT THE FLOOD–CONTROL

15:06    22       STRUCTURE.  AND THIS COFFERDAM AND THE OTHER TWO AT BOLAND

15:06    23       MARINE WERE DESIGNED BY A PROFESSIONAL LICENSED ENGINEER

15:06    24       IN THE STATE OF LOUISIANA AND INSTALLED BY PROFESSIONAL

15:06    25       CONTRACTORS WITH FULL QUALITY CONTROL AND QUALITY

## ROBERT G. BEA - FURTHER RECROSS

15:06    1          ASSURANCE DURING THE ENTIRE PROCESS."

15:07    2               YOU DIDN'T CITE TO THAT IN YOUR RELIANCE MATERIALS,

15:07    3    DID YOU?

15:07    4    **A.**   NO.

15:07    5    **Q.**   YOU ARE NOW AWARE, ARE YOU NOT, THAT MR. GUILLORY

15:07    6    TESTIFIED THAT IF HE THOUGHT, AS THE CONSTRUCTION MANAGER ON

15:07    7    THE PROJECT, THAT HE NEEDED GEOTECHNICAL INPUT FROM SOMEBODY AT

15:07    8    THE CORPS FAMILIAR WITH THE DESIGN OF THE LEVEES AND

15:07    9    FLOODWALLS, HE WOULD HAVE SOUGHT THAT?  BUT HE DID NOT SEEK

15:07    10   THAT INPUT FOR THE BRACED EXCAVATIONS INCLUDING THE LIFT

15:07    11   STATION, THE WEDDING CAKE, OR THE SUNKEN TANKER DIESEL CAR.

15:07    12          IS THAT RIGHT?

15:07    13   **A.**   YES, SIR.

15:08    14   **Q.**   YOU HAVE ON PAGE 43, PARAGRAPH 57, OF YOUR REBUTTAL

15:08    15   REPORT, JX-1414, PAGE 44, YOU REFERRED TO A PORTION OF THE

15:08    16   JUNE 1, 1999, STATEMENT OF WORK THAT THE CORPS ISSUED TO

15:08    17   WASHINGTON GROUP.

15:08    18          DO YOU RECALL THAT?

15:08    19   **A.**   YES, SIR.

15:08    20   **Q.**   AND WE HAVE PULLED THAT PARAGRAPH UP, AND THIS IS FROM

15:08    21   YOUR REPORT.

15:08    22               YOU STATE THAT WE WERE ISSUED A STATEMENT OF WORK,

15:08    23   WASHINGTON GROUP WAS, AND HERE THE CORPS, YOU SAY, IDENTIFIED

15:08    24   PROJECT REQUIREMENTS, WASHINGTON GROUP.

15:08    25               AND THEN YOU QUOTED FROM THE STATEMENT OF WORK:

## ROBERT G. BEA – FURTHER RECROSS

15:08   1   "SHALL FURNISH ALL ENGINEERING SERVICES, MATERIALS, SUPPLIES,

15:08   2   LABOR AS REQUIRED IN CONNECTION WITH THE TECHNICAL REVIEW OF

15:08   3   SITE DOCUMENTS ASSOCIATED WITH THE DEMOLITION AND THE

15:09   4   REMEDIATION OF THE EBIA."

15:09   5           YOU WENT ON DOWN TO QUOTE MORE, AND IT'S THERE.  I

15:09   6   JUST WON'T READ IT NOW, BUT IT'S THERE.

15:09   7           AND, AS REQUIRED -- IT SAYS *SITE DOCUMENTS*.

15:09   8           DO YOU RECALL WHAT THE BOUNDARY OF THE SITE WAS?

15:09   9   **A.**   THE BOUNDARY OF WHICH SITE?

15:09  10   **Q.**   THE SITE THAT'S BEING REFERRED TO HERE.

15:09  11   **A.**   NO, I DON'T.

15:09  12   **Q.**   ARE YOU AWARE OF THE FACT THAT MR. GUILLORY DRAFTED THIS

15:09  13   JUNE 1, 1999, STATEMENT OF WORK?

15:09  14   **A.**   I THINK THAT'S CORRECT.

15:09  15   **Q.**   YOU ARE NOW AWARE, ARE YOU NOT, THAT MR. GUILLORY

15:09  16   DESCRIBED UNDER OATH WHAT HE MEANT WHEN HE USED THE TERM

15:09  17   *ENGINEERING SERVICES* IN THE STATEMENT OF WORK?

15:09  18   **A.**   YES.

15:09  19   **Q.**   BUT YOU DIDN'T PROVIDE THAT REFERENCE TO MR. GUILLORY'S

15:10  20   DEPOSITION; IS THAT RIGHT?

15:10  21   **A.**   THAT'S CORRECT.

15:10  22           **MR. TREEBY:**  IT'S IN EVIDENCE HERE, AND I WOULD REFER

15:10  23   THE COURT TO IT.  IT'S GUILLORY VOLUME 2, PAGE 46, BEGINNING AT

15:10  24   LINE 6:

15:10  25           **"QUESTION:**  WHAT DID YOU UNDERSTAND ALL ENGINEERING

## ROBERT G. BEA - FURTHER RECROSS

15:10   1    SERVICES TO INCLUDE?  AND FEEL FREE TO READ THE REST OF IT

15:10   2    IF YOU NEED TO.

15:10   3        "ANSWER:  THAT'S JUST A GENERAL DESCRIPTION TO

15:10   4    INCLUDE ALL ENGINEERING, ADMINISTRATION, DESIGN, CONTRACT

15:10   5    BIDDING, SUBCONTRACTOR BIDDING, AWARDS, ANY SELF-PERFORMED

15:10   6    CONSTRUCTION THAT WASHINGTON GROUP OR MK WOULD DO

15:10   7    THEMSELVES AND JUST THE ENTIRE GAMUT OF CONTRACT

15:10   8    MANAGEMENT AND CONTRACT ADMINISTRATION OF THE TASK ORDER.

15:10   9        "QUESTION:  WOULD THAT INCLUDE -- WERE YOU ASKING THE

15:10   10   CONTRACTOR TO PROVIDE ANY ENGINEERING SERVICES RELATIVE TO

15:10   11   THE LEVEES AND THE FLOODWALLS IN THE EAST BANK INDUSTRIAL

15:10   12   AREA?"

15:10   13       WE CAN SKIP THE OBJECTION, I BELIEVE.

15:10   14       "ANSWER:  NOT SPECIFICALLY TO THE LEVEES AND

15:11   15   FLOODWALLS, BUT TO THE 32 ACRES OF THE EBIA.

15:11   16       "QUESTION:  WHY NOT THE LEVEES AND FLOODWALLS?

15:11   17       "ANSWER:  THE JOURDAN AVENUE LEVEE AND FLOODWALL

15:11   18   SERVED MAINLY AS A PERIMETER OF OUR 32-ACRE SITE.  IT DID

15:11   19   NOT INCLUDE ANY PHYSICAL WORK ON THAT PARTICULAR -- THOSE

15:11   20   TWO PARTICULAR FLOOD-CONTROL WORKS.  IT WAS MERELY A

15:11   21   THREE-SIDED PERIMETER OF OUR 32-ACRE PROJECT.  AND THE

15:11   22   CLOSEST WE GOT TO THE LEVEES AND FLOODWALLS WAS BUILDING

15:11   23   THE PERIMETER CHAIN-LINK FENCE JUST TO THE PROTECTED SIDE

15:11   24   OF THE FLOODWALL."

15:11   25       THAT WAS HIS TESTIMONY ABOUT WHAT HE MEANT BY

## ROBERT G. BEA - FURTHER RECROSS

15:11 1 *ENGINEERING SERVICES.*

15:11 2   ON PAGE 45, PARAGRAPH 60 OF YOUR REBUTTAL REPORT, YOU

15:11 3 DISCUSSED THE WGI GROUNDWATER MONITORING REPORT.

15:11 4   DO YOU RECALL THAT?

15:11 5 **A.** YES.

15:11 6   **MR. TREEBY:** LET'S CALL IT UP, PARAGRAPH 60, OF YOUR

15:11 7 REBUTTAL REPORT.

15:12 8 **BY MR. TREEBY:**

15:12 9 **Q.** YOU DISCUSS THAT GROUNDWATER MONITORING REPORT.  YOU CITE

15:12 10 TO THE GROUNDWATER REPORT TO SUGGEST THAT "THE GROUNDWATER

15:12 11 LEVEL PHREATIC SURFACE IN SOILS ADJACENT TO THE IHNC HAVE BEEN

15:12 12 ALLOWED TO PENETRATE, ESSENTIALLY UNCHANGED, TO THE FACE OF THE

15:12 13 FLOODWALL."

15:12 14   ISN'T THAT WHAT YOU WROTE?

15:12 15 **A.** YES, SIR.

15:12 16 **Q.** AND YOU ALSO CITE -- I BELIEVE IT'S AT THE BOTTOM OF THAT

15:12 17 PAGE, TOP OF THE NEXT PAGE -- YOU CITE TO THE E-MAIL THAT YOU

15:12 18 TALKED ABOUT EARLIER HERE TODAY.

15:12 19   **MR. TREEBY:** COULD WE GO BACK TO THE PRIOR PAGE, 46.

15:12 20 **BY MR. TREEBY:**

15:12 21 **Q.** AS INDICATED IN THE E-MAIL EXCHANGE BETWEEN GEORGE BACUTA,

15:12 22 RICHARD LESSER, AND LEE GUILLORY --

15:13 23   **MR. TREEBY:** I WANT TO GO TO THE E-MAIL.  IT'S 1414.

15:13 24 AT 4647, THIS IS WHAT IT SAYS.

15:13 25   EXCUSE ME, YOUR HONOR.  I'M SORRY.

## ROBERT G. BEA - FURTHER RECROSS

15:13    1    **BY MR. TREEBY:**

15:13    2    **Q.**   THE TEXT OF THE E-MAIL SAYS:  "NOTE THAT THE 1997 REPORT,

15:13    3    GROUNDWATER FLOW INFORMATION, ACTUALLY THE GROUNDWATER DATA WAS

15:13    4    COLLECTED" -- WE HAVE READ THIS BEFORE.  THIS ALREADY CAME IN.

15:13    5                 **THE COURT:**  IT DID.

15:13    6    **BY MR. TREEBY:**

15:13    7    **Q.**   THIS IS JUST REMINDING WHAT YOU TESTIFIED EARLIER TODAY.

15:13    8                 I WANT TO DEVELOP THAT A LITTLE BIT.  MR. BACUTA WAS

15:14    9    A GEOLOGIST, GEOCHEMIST FOR THE CORPS; IS THAT RIGHT?

15:14   10    **A.**   YES, SIR.

15:14   11    **Q.**   HIS DEPOSITION IS IN EVIDENCE HERE.

15:14   12                 DO YOU KNOW MR. BACUTA HAS TESTIFIED HERE THAT AFTER

15:14   13    ALL OF WASHINGTON GROUP'S WORK AT THE EBIA, THE INNER HARBOR

15:14   14    NAVIGATIONAL CANAL AND THE GROUNDWATER WERE NOT HYDRAULICALLY

15:14   15    CONNECTED BECAUSE THE SUBSURFACE IS LARGELY CLAY MATERIAL THAT

15:14   16    HAS A LOW PERMEABILITY?

15:14   17                 DO YOU KNOW HE TESTIFIED THAT WAY?

15:14   18    **A.**   NO, SIR.

15:14   19    **Q.**   ARE YOU AWARE MR. BACUTA ALSO TESTIFIED THAT REGARDING HIS

15:14   20    DEPOSITION -- LET ME GO BACK.

15:14   21                 **MR. TREEBY:**  I'M SORRY, YOUR HONOR, BUT THAT IS THE

15:14   22    DESIGNATED DEPOSITION OF BACUTA, PAGE 182, LINES 10 THROUGH 18,

15:14   23    AND WE DON'T NEED TO CALL THOSE UP.

15:14   24    **BY MR. TREEBY:**

15:14   25    **Q.**   I'M JUST GIVING THEM AS A REFERENCE BECAUSE YOU HAVE

## ROBERT G. BEA - FURTHER RECROSS

15:14   1   AGREED THAT YOU KNEW HE TESTIFIED TO THAT.

15:15   2            ARE YOU AWARE ALSO THAT MR. BACUTA TESTIFIED IN HIS

15:15   3   DEPOSITION TESTIMONY ABOUT GROUNDWATER FLOW, SUBSURFACE SOIL,

15:15   4   DRAINAGE ACROSS THE FLOODWALL WITH A SHEET PILE CURTAIN OF

15:15   5   MINUS 8 FEET?  THERE WAS NO CONCERN WHATSOEVER ABOUT

15:15   6   UNDERSEEPAGE.  DID YOU KNOW HE TESTIFIED TO THAT?

15:15   7   **A.**   I BELIEVE THAT'S CORRECT.

15:15   8   **Q.**   THAT'S AT BACUTA DEPOSITION PAGE 168, LINES 5 THROUGH 11.

15:15   9   DEPOSITION PAGE 168, LINES 5 THROUGH 11.

15:15  10            **MR. TREEBY:**  WE ARE ACTUALLY SAVING TIME, YOUR HONOR.

15:15  11            **THE COURT:**  GOOD.

15:16  12   **BY MR. TREEBY:**

15:16  13   **Q.**   FINALLY, ON THIS LINE OF QUESTIONS, DR. BEA, ISN'T IT TRUE

15:16  14   THAT YOU HAVE NOT SEEN ANY EVIDENCE TO SUGGEST THAT WASHINGTON

15:16  15   GROUP INTERNATIONAL HAD ANY RESPONSIBILITY UNDER TASK ORDER 26

15:16  16   FOR EVALUATING THE IMPACT OF THE PROPOSED BYPASS CHANNEL ON THE

15:16  17   LEVEE'S FLOODWALLS IN THE EAST BANK INDUSTRIAL AREA?

15:16  18   **A.**   PLEASE REPEAT THAT QUESTION.

15:16  19   **Q.**   DR. BEA, ISN'T IT TRUE YOU HAVE NOT SEEN ANY EVIDENCE TO

15:16  20   SUGGEST THAT WASHINGTON GROUP INTERNATIONAL HAD ANY

15:16  21   RESPONSIBILITY UNDER TASK ORDER 26 FOR EVALUATING THE IMPACT OF

15:16  22   THE PROPOSED BYPASS CHANNEL ON THE LEVEE'S FLOODWALLS IN THE

15:16  23   EAST BANK INDUSTRIAL AREA?

15:16  24   **A.**   THAT IS CORRECT.

15:17  25   **Q.**   YOU TESTIFIED -- THERE WAS A SLIDE PUT UP AND YOU WERE

## ROBERT G. BEA - FURTHER RECROSS

15:17   1   ASKED SOME QUESTIONS ABOUT IT.  I HAVE A SLIDE NUMBER.  I

15:17   2   BELIEVE IT WAS YOUR SLIDE 49.  IT WAS WHAT WE CALLED YOUR

15:17   3   SLIDE 49, BUT I DON'T KNOW IF THAT'S ACCURATE.  SO LET'S PUT IT

15:17   4   UP.  YOU'LL SEE WHAT WE'RE TALKING ABOUT, AND THE COURT WILL AS

15:17   5   WELL.

15:17   6          49.  THERE IT IS.  DO YOU RECALL THIS BEING UP THERE?

15:17   7   A.   YES.

15:17   8   Q.   YOU SHOW IN THIS SLIDE THAT "I-WALLS SHALL BE CHECKED FOR

15:17   9   SEEPAGE EROSION (PIPING) BY EVALUATING THE CRITICAL SEEPAGE

15:17   10  GRADIENT AS DESCRIBED IN EM1110-2-1901" --

15:18   11  A.   RIGHT.

15:18   12  Q.   -- "FOR UPLIFT AND HEAVE."  RIGHT?

15:18   13  A.   YES.

15:18   14  Q.   YOU AGREE, DO YOU NOT, THAT EM1110-2-1901, WHICH IS

15:18   15  JX-0037, SHOULD BE USED TO EVALUATE THE CRITICAL SEEPAGE

15:18   16  GRADIENT; ISN'T THAT RIGHT?

15:18   17  A.   YES.

15:18   18  Q.   YOUR CITATION --

15:18   19  A.   THAT'S WHAT THAT SAYS.

15:18   20  Q.   YOUR CITATION ON THE SCREEN FROM THAT EM COMES FROM

15:18   21  EC110-2-6066, RIGHT?

15:18   22  A.   YES.

15:18   23  Q.   I THINK YOU DESCRIBED THIS, BUT JUST FOR THE COURT'S

15:18   24  EDIFICATION --

15:18   25          **MR. TREEBY:**  IF WE WILL PUT UP JX-0047-0145 FROM THAT

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 15:18 | 1 | NEWER CIRCULAR, ENGINEERING CIRCULAR, EC110-2-6066. |
| 15:19 | 2 | **BY MR. TREEBY:** |
| 15:19 | 3 | **Q.**   I WANT US TO LOOK AT THIS, LOOK AT THIS DOCUMENT YOU |
| 15:19 | 4 | REFERENCE.  YOU STOP AFTER "UPLIFT AND HEAVE," AND THEN YOU |
| 15:19 | 5 | HAVE THE REST OF THE LINE THERE, WHICH SAYS "ANALYSIS SHALL BE |
| 15:19 | 6 | BASED ON." |
| 15:19 | 7 | DO YOU SEE THAT? |
| 15:19 | 8 | **A.**   YES.  NO. |
| 15:19 | 9 | **MR. TREEBY:**  LET'S PUT UP THE REST OF THE LANGUAGE |
| 15:19 | 10 | THERE WHERE IT STOPS.  CAN YOU PULL THAT UP? |
| 15:19 | 11 | **BY MR. TREEBY:** |
| 15:19 | 12 | **Q.**   RIGHT IN THE MIDDLE OF THAT PARAGRAPH B, DO YOU SEE THE |
| 15:19 | 13 | WORD "ANALYSIS SHALL BE BASED," WHICH IS WHERE YOU STOPPED? |
| 15:19 | 14 | **A.**   YES, SIR. |
| 15:19 | 15 | **Q.**   THE SOURCE DOCUMENT CONTINUES:  "ANALYSIS SHALL BE BASED |
| 15:20 | 16 | ON WATER TO THE TOP OF THE WALL." |
| 15:20 | 17 | DO YOU SEE THAT? |
| 15:20 | 18 | **A.**   YES, SIR. |
| 15:20 | 19 | **Q.**   IT GOES ON TO SAY:  "THE SEEPAGE ANALYSIS SHALL CONSIDER |
| 15:20 | 20 | THE FLOODSIDE GAP WHICH WILL SHORTEN THE SEEPAGE PATH." |
| 15:20 | 21 | **A.**   YES, SIR. |
| 15:20 | 22 | **Q.**   "IF A FREE-DRAINING LAYER IS PRESENT AND CLOSE TO THE |
| 15:20 | 23 | SHEET PILING TIP, AS SHOWN IN FIGURE 6-9, OR IF THE SHEET |
| 15:20 | 24 | PILING PENETRATES THE FREE-DRAINING LAYER, A SEEPAGE ANALYSIS |
| 15:20 | 25 | SHALL BE PERFORMED." |

ROBERT G. BEA - FURTHER RECROSS

15:20    1    **A.**    CORRECT.

15:20    2    **Q.**    YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT FREE-DRAINING

15:20    3    LAYER, AS THAT TERM IS USED IN THIS EM1110, IS SPEAKING OF A

15:20    4    HIGH-PERMEABILITY MATERIAL?

15:20    5    **A.**    IN GENERAL, THAT'S TRUE.

15:20    6    **Q.**    YOU WOULD AGREE, WOULD YOU NOT, THAT EBIA ORGANIC CLAY

15:20    7    WITH A PERMEABILITY OF 1 TIMES 10 TO THE MINUS 5 CENTIMETERS

15:20    8    PER SECOND IS NOT A FREE-DRAINING MATERIAL?

15:21    9    **A.**    THAT'S CORRECT.

15:21   10    **Q.**    YOU WOULD AGREE THAT THERE IS NO FREE-DRAINING LAYER CLOSE

15:21   11    TO THE SHEET PILE TIP AT THE NORTH BREACH AREA, WOULDN'T YOU?

15:21   12    **A.**    PLEASE REPEAT THAT.

15:21   13    **Q.**    IT'S ORGANIC CLAY, I BELIEVE YOU SAID.

15:21   14    **A.**    I ASKED IF YOU WOULD PLEASE REPEAT YOUR QUESTION.

15:21   15    **Q.**    I THINK I CAN SKIP IT.  YOU GAVE ME THE ANSWER I NEEDED.

15:21   16    I'LL JUST SKIP THAT BECAUSE WE KNOW WHAT THE ORGANIC CLAY'S

15:21   17    PERMEABILITIES WERE.

15:21   18            THEN -- OH, I WANTED TO LEAVE -- GO BACK.  I WANTED

15:21   19    TO READ THE LAST SENTENCE OF THAT PARAGRAPH.  THE LAST SENTENCE

15:21   20    OF THAT PARAGRAPH SAYS:  "WHEN THE WALL FOUNDATION MATERIALS

15:22   21    CONSIST ENTIRELY OF CLAY, THE LESSER POTENTIAL FOR DEVELOPING A

15:22   22    STEADY-STATE SEEPAGE CONDITION MAY NEGATE THE NEED TO CHECK FOR

15:22   23    PIPING."

15:22   24            CAN YOU READ THAT?

15:22   25    **A.**    YES, SIR.

## ROBERT G. BEA - FURTHER RECROSS

15:22   1   **Q.**   GOOD.  I'M GOING TO GO TO ANOTHER SUBJECT, YOUR TRENCH

15:22   2   DEPTH TESTIMONY ON DIRECT.

15:22   3   **A.**   YES, SIR.

15:22   4   **Q.**   YOUR SLIDE 27, WHICH WE WANT TO CALL UP, STATES, QUOTE,

15:22   5   6-FOOT SCOUR TRENCH ON WEST, 3 TO 4 FEET ON EAST.

15:22   6           CORRECT?

15:22   7   **A.**   CORRECT.

15:22   8   **Q.**   NOW, WE HAVE ESTABLISHED THAT YOU ARE A PRINCIPAL AUTHOR

15:22   9   OF THE ILIT REPORT; ISN'T THAT RIGHT?

15:22  10   **A.**   CORRECT.

15:22  11   **Q.**   I WANT TO CALL UP JX-2032-0193, AND I WANT TO SHOW YOU

15:23  12   PAGE 6 -- PAGE 6-8 OF THE ILIT REPORT AT THE TOP OF THE PAGE.

15:23  13   MAYBE YOU WILL REMEMBER THIS, BUT WE WILL CALL IT UP HERE.

15:23  14   MAYBE YOU WILL REMEMBER THIS.

15:23  15         THE ILIT TEAM ACTUALLY MEASURED THE SCOUR TRENCH

15:24  16   DEPTH ON THE LAND SIDE, THE PROTECTED SIDE, ON BOTH ENDS OF THE

15:24  17   SOUTH BREACH IN THE I-WALL IN THE EAST BANK INDUSTRIAL AREA;

15:24  18   ISN'T THAT RIGHT?

15:24  19   **A.**   THAT'S CORRECT.

15:24  20   **Q.**   ON THAT PAGE OR MAYBE FROM YOUR MEMORY IF WE NEVER GET

15:24  21   PART OF THE PAGE UP, THAT WE CAN SEE IT, BASED ON THOSE

15:24  22   MEASUREMENTS DONE AT THE TIME OF THE ILIT DEPOSITION, IT

15:24  23   STATES, AND I'M QUOTING FROM IT -- HOPEFULLY WE WILL GET TO IT

15:24  24   IN A SECOND:  OVERTOPPING AND SCOUR OCCURRED AT BOTH ENDS OF

15:24  25   THIS BREACH FEATURE, AND THE RESULTING SCOURED TRENCHES REACHED

## ROBERT G. BEA – FURTHER RECROSS

| | | |
|---|---|---|
| 15:24 | 1 | DEPTHS OF UP TO 5.5 FEET IN SECTIONS THAT DID NOT SUBSEQUENTLY |
| 15:24 | 2 | FAIL. |
| 15:24 | 3 | ISN'T THAT WHAT IT SAYS? |
| 15:24 | 4 | **A.**   YES.  I DID NOT WRITE THAT 5.5 FEET. |
| 15:25 | 5 | **Q.**   LET'S GO TO SLIDE 31 FROM YOUR REPORT.  YOU SHOW A |
| 15:25 | 6 | HYDRAULIC CAR LIFT HERE, RIGHT? |
| 15:25 | 7 | **A.**   YES, SIR. |
| 15:25 | 8 | **Q.**   YOU AGREE, DO YOU NOT, THAT IN ORDER FOR THE CAR TO GO UP, |
| 15:25 | 9 | YOU NEED TO HAVE SUBSTANTIAL FLOW THROUGH THE HYDRAULIC LIFT |
| 15:25 | 10 | SYSTEM?  ISN'T THAT CORRECT? |
| 15:25 | 11 | **A.**   NO. |
| 15:25 | 12 | **Q.**   NO FLOW, NO LIFT; ISN'T THAT CORRECT? |
| 15:25 | 13 | **A.**   NO. |
| 15:25 | 14 | **Q.**   SO YOU CAN HAVE THAT LIFT OPERATING WITHOUT ANY FLUID |
| 15:25 | 15 | FLOWING IN ANY DIRECTION?  IS THAT YOUR TESTIMONY? |
| 15:25 | 16 | **A.**   THAT'S NOT MY TESTIMONY. |
| 15:25 | 17 | **Q.**   MAYBE IT'S THE WAY I PHRASED THE QUESTION.  LET'S SEE IF |
| 15:25 | 18 | WE CAN GET IT STRAIGHT. |
| 15:25 | 19 | WHEN YOU HAVE FORCE COMING DOWN IN THAT SMALL |
| 15:25 | 20 | CYLINDER AT THE LEFT, YOU'RE GOING TO PUSH FORCE DOWN, RIGHT? |
| 15:25 | 21 | **A.**   YES. |
| 15:25 | 22 | **Q.**   THAT'S GOING TO CAUSE FLOW TOWARD THE BIG CYLINDER, IS IT |
| 15:25 | 23 | NOT? |
| 15:25 | 24 | **A.**   NOT UNTIL I START TO RAISE THE CAR. |
| 15:25 | 25 | **Q.**   RIGHT.  IN ORDER TO RAISE THE CAR -- IN OTHER WORDS, NOT |

## ROBERT G. BEA - FURTHER RECROSS

15:26   1   UNTIL, SO WHEN IT STARTS RAISING --

15:26   2   **A.**   NO.

15:26   3   **Q.**   WHEN IT --

15:26   4   **A.**   I SHOULD BE QUIET AND LET YOU COMPLETE YOUR QUESTION.   I

15:26   5   APOLOGIZE.

15:26   6   **Q.**   LET ME GET IT STRAIGHT.   I'M SATISFIED WITH THAT, IF

15:26   7   THAT'S WHAT YOU WANT TO SAY.

15:26   8           YOU'RE SAYING, IF THERE'S NO FLOW, THERE'S NO LIFT.

15:26   9   THERE CAN BE LIFT WITHOUT ANY FLOW.   IS THAT WHAT YOU ARE

15:26   10  SAYING?

15:26   11  **A.**   THE PROCESS IS, AS SOON AS I DEVELOP SUFFICIENT PRESSURE

15:26   12  ON THE CAR SIDE, THE CAR'S WEIGHT IS NEUTRALIZED.   THE PISTON

15:26   13  ON THAT SIDE STARTS TO RAISE.   FLUID AT THAT POINT HAS TO BE

15:26   14  PUT IN TO SUSTAIN THAT UPLIFT PRESSURE IN PROPORTION TO THE

15:26   15  VOLUME OF THAT PISTON.   BUT THE FORCE THAT LIFTED THE CAR

15:27   16  DIDN'T REQUIRE ANY FLOW.   INITIALLY.

15:27   17  **Q.**   AT SOME POINT IN THAT PROCESS, BEFORE THE CAR GOES UP

15:27   18  THERE'S FLOW, RIGHT?

15:27   19  **A.**   NO.

15:27   20  **Q.**   OKAY.   YOU WOULD ALSO AGREE, WOULD YOU NOT, THAT IN ORDER

15:27   21  TO LIFT THE CAR YOU NEED TO CONTAIN THE LIFTING FLUID WITHIN A

15:27   22  RIGID SYSTEM?   IS THAT CORRECT?

15:27   23  **A.**   YES.

15:27   24  **Q.**   IF INSTEAD OF A RIGID CONNECTION BETWEEN THE PISTON ON THE

15:27   25  LEFT AND THE LIFT AT THE RIGHT, YOU HAD A FLEXIBLE RUBBER HOSE,

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 15:27 | 1 | THERE WOULD BE NO UPLIFT, AT LEAST RIGHT AWAY; ISN'T THAT |
| 15:27 | 2 | CORRECT? |
| 15:27 | 3 | **A.**   NO.   YOU WOULD HAVE THE PRESSURE, BUT THE PRESSURE WILL BE |
| 15:27 | 4 | AFFECTED BY THE EXPANSION OF YOUR RUBBER HOSE. |
| 15:28 | 5 | **Q.**   RIGHT.   THAT'S WHY IN A BRAKE SYSTEM YOU DON'T PUT RUBBER |
| 15:28 | 6 | HOSES, RIGHT? |
| 15:28 | 7 | **A.**   YES, SIR. |
| 15:28 | 8 | **Q.**   YOU WANT STEEL LINES THAT ARE TOTALLY INCOMPRESSIBLE, |
| 15:28 | 9 | RIGHT? |
| 15:28 | 10 | **A.**   THAT'S CORRECT. |
| 15:28 | 11 | **Q.**   SO NO MOVEMENT OF THE BRAKE CALIPERS, NO BRAKING, RIGHT? |
| 15:28 | 12 | **A.**   THAT'S CORRECT. |
| 15:28 | 13 | **Q.**   I GOT AHEAD OF MYSELF.   YOU WOULD NOT LIKE, WOULD YOU, |
| 15:28 | 14 | DR. BEA, TO DRIVE A CAR WITH THE BRAKE FLUID REPLACED WITH EBIA |
| 15:28 | 15 | CLAY; ISN'T THAT CORRECT? |
| 15:28 | 16 | **A.**   REPEAT THAT QUESTION. |
| 15:28 | 17 | **Q.**   YOU WOULD NOT LIKE TO DRIVE A CAR WITH THE BRAKE FLUID |
| 15:28 | 18 | HAVING BEEN REPLACED WITH THE CLAY FROM THE EAST BANK |
| 15:28 | 19 | INDUSTRIAL AREA? |
| 15:28 | 20 | **A.**   THAT'S CORRECT. |
| 15:28 | 21 | **Q.**   LOOK AT SLIDE 34, IF WE COULD.   THIS SLIDE SHOWS, DOES IT |
| 15:29 | 22 | NOT, DR. BEA, ON THE UPPER RIGHT-HAND CORNER A FIGURE FROM YOUR |
| 15:29 | 23 | REPORT THAT ILLUSTRATES UPLIFT PRESSURES?   AM I CORRECT? |
| 15:29 | 24 | **A.**   YES, SIR. |
| 15:29 | 25 | **Q.**   AND THE PRESSURE AT THE LANDSIDE GROUND SURFACE IS QUITE |

## ROBERT G. BEA – FURTHER RECROSS

| | | |
|---|---|---|
| 15:29 | 1 | HIGH IN THIS ILLUSTRATION; IS THAT CORRECT? |
| 15:29 | 2 | **A.**   YES, SIR. |
| 15:29 | 3 | **Q.**   THE TOTAL HEAD ON THE LEFT IS ABOVE THE GROUND SURFACE ON |
| 15:29 | 4 | THE RIGHT; IS THAT CORRECT? |
| 15:29 | 5 | **A.**   YES, SIR. |
| 15:30 | 6 | **Q.**   THIS WOULD MEAN, WOULD IT NOT, THAT IF WE HAD A PIEZOMETER |
| 15:30 | 7 | AT THAT LOCATION ON THE LEFT, UNDER THE WATER TOTAL HEAD, THE |
| 15:30 | 8 | WATER LEVEL INSIDE THAT PIEZOMETER WOULD RAISE ABOVE THE GROUND |
| 15:30 | 9 | SURFACE?  CORRECT? |
| 15:30 | 10 | **A.**   CORRECT. |
| 15:30 | 11 | **Q.**   THESE HIGH UPLIFT PRESSURES, AS ILLUSTRATED, SUGGEST |
| 15:30 | 12 | UNSATISFACTORY PERFORMANCE, EVEN FAILURE.  AM I RIGHT? |
| 15:30 | 13 | **A.**   YES. |
| 15:30 | 14 | **Q.**   THESE HIGH UPLIFT PRESSURES APPEAR TO RESULT FROM A GAP |
| 15:30 | 15 | THAT IS FORMED BEHIND THE CANAL SIDE OF THE I-WALL PILE SHEET |
| 15:30 | 16 | PILES; IS THAT RIGHT? |
| 15:30 | 17 | **A.**   NO. |
| 15:30 | 18 | **Q.**   WELL, IT APPEARS LIKE THERE'S A GAP THERE.  THE GAP ON THE |
| 15:30 | 19 | LEFT, I'M TALKING ABOUT. |
| 15:30 | 20 | **A.**   THERE IS A GAP ON THE LEFT.  THE PRESSURE ASSOCIATED WITH |
| 15:30 | 21 | THE BOTTOM OF THE GAP IS THERE.  THE PRESSURE AT THAT SAME |
| 15:31 | 22 | POINT ASSOCIATED WITH THAT PRESSURE AND THE FLOW PRESSURE IS |
| 15:31 | 23 | INDICATED BY THIS ARROW.  THOSE ARROWS ARE DIFFERENT |
| 15:31 | 24 | MAGNITUDES. |
| 15:31 | 25 | **THE COURT:**  THOSE ARROWS ARE DIFFERENT MAGNITUDES |

## ROBERT G. BEA - FURTHER RECROSS

15:31   1   FROM WHAT, SIR?  FROM EACH OTHER OR FROM THE OTHER ARROW?

15:31   2          **THE WITNESS:**  FROM THE HYDROSTATIC PRESSURE

15:31   3   HORIZONTAL SHOWN HERE.  1, 2.  2 IS BIGGER THAN 1.  THAT'S

15:31   4   BECAUSE OF THE ADDITIVE PRESSURE FROM THE FLOW.  SO IT'S TWO

15:32   5   PRESSURES.

15:32   6          **THE COURT:**  ARE YOU SAYING WITHOUT THE ARROWS, WHICH

15:32   7   WE WILL CALL THE VERTICAL ARROWS -- WITHOUT THE VERTICAL ARROWS

15:32   8   ON THE BOTTOM, IS IT YOUR TESTIMONY, IN ESSENCE, THAT THERE

15:32   9   WOULD NOT BE SUFFICIENT PRESSURE TO CAUSE FAILURE?

15:32  10          **THE WITNESS:**  WELL, NO.  IT COULD.  WE ARE SHOWING

15:32  11   SLIP DEVELOPING ALONG THIS PASSIVE WEDGE.  SO FAILURE CAN BE

15:32  12   UNDERWAY AT EXACTLY THIS TIME.

15:32  13          **THE COURT:**  JUST TO MAKE SURE I HAVE THIS STRAIGHT

15:32  14   NOW THAT WE ARE GETTING INTO THIS.  THE VERTICAL ARROWS, ALL OF

15:32  15   THEM -- AND THEY GET SMALLER AS THEY GO ALONG -- ARE THEY WHAT

15:32  16   WE CALL *UPLIFT PRESSURES*?

15:32  17          **THE WITNESS:**  YES, SIR.

15:32  18          **THE COURT:**  THE HORIZONTAL ARROWS WHICH APPEAR THERE,

15:33  19   WHAT TYPE OF PRESSURE IS THAT?

15:33  20          **THE WITNESS:**  HYDROSTATIC PRESSURE THAT'S DEVELOPED

15:33  21   IN THE OPENED TENSION GAP.  SO THE WATER HAS FLOWED INTO THAT

15:33  22   GAP, AND THIS IS THE HYDROSTATIC PRESSURE OF THAT WATER.

15:33  23          **THE COURT:**  IS THE PURPOSE OF THIS DEMONSTRATIVE TO

15:33  24   SHOW WHAT UPLIFT -- TELL ME WHAT THE PURPOSE OF IT IS.  YOU

15:33  25   MIGHT JUST TELL ME AGAIN WHAT THE PURPOSE OF IT IS.

## ROBERT G. BEA – FURTHER RECROSS

15:33  1          **THE WITNESS:**  TO SHOW WHAT UPLIFT PRESSURES ARE.  THE

15:33  2   SENTENCE YOU DIDN'T COMPLETE IS THE CORRECT INTERPRETATION.

15:33  3          **THE COURT:**  I UNDERSTAND.  HENCE UPLIFT PRESSURES.

15:34  4          **MR. TREEBY:**  IF YOUR HONOR PLEASE, I DON'T KNOW IF

15:34  5   THIS IS A GOOD TIME TO TAKE A BREAK.  I HAVE JUST A FEW

15:34  6   QUESTIONS, BUT I DON'T WANT TO GET THEM CONFUSED.  CAN WE DO

15:34  7   THAT?

15:34  8          **THE COURT:**  WE'LL ACCOMMODATE YOU.

15:34  9          **MR. TREEBY:**  I'M ALMOST FINISHED.

15:34  10          MR. SMITH, I DON'T KNOW IF YOUR TEAM IS GOING TO

15:34  11   ALSO HAVE CROSS.

15:34  12          **MR. SMITH:**  WE ARE, YOUR HONOR.

15:34  13          (RECESS.)

15:50  14   **BY MR. TREEBY:**

15:50  15   **Q.**  DR. BEA, I MAY HAVE ASKED A BAD QUESTION, BECAUSE I GOT AN

15:50  16   ANSWER THAT I WENT BACK THERE SCRATCHING MY HEAD ABOUT.  SO

15:50  17   WHEN I WENT BACK AND CAREFULLY LOOKED AT THE TRANSCRIPT, MAYBE

15:51  18   I JUST DIDN'T ASK A GOOD QUESTION.

15:51  19          HERE'S WHAT I ASKED YOU, AND YOU SAID NO TO THIS.

15:51  20          "SO AT SOME POINT IN THAT PROCESS BEFORE THE CAR GOES

15:51  21   UP, THERE'S FLOW, RIGHT?"

15:51  22          AND YOU SAID "NO."

15:51  23          I'M SITTING HERE SCRATCHING MY HEAD.  THEN I WENT

15:51  24   BACK AND LOOKED.  "BEFORE."  THE CAR, WHEN IT STARTS UP, STARTS

15:51  25   GOING UP, THERE WILL BE FLOW?

## ROBERT G. BEA - FURTHER RECROSS

15:51  1  **A.**  AT THE POINT YOU HAVE SIGNIFICANT UPWARD MOVEMENT OF THE

15:51  2  CAR, THERE HAS TO BE FLOW.

15:51  3  **Q.**  THAT'S WHAT I WAS TRYING TO GET, AND I JUST DIDN'T ASK A

15:51  4  GOOD QUESTION.

15:51  5       NOW, YOU REVIEWED, I BELIEVE YOU SAID YESTERDAY,

15:51  6  ABOUT 10 QARS IN DETAILS WITH THEIR DETACHMENT.  IS THAT ABOUT

15:51  7  RIGHT?  MAYBE I WAS WRONG.  I'M SORRY.  I MAY HAVE MISHEARD

15:52  8  YOU.  I THOUGHT WHEN YOU WERE TALKING -- AND YOU WENT INTO

15:52  9  DETAIL YESTERDAY ABOUT SOME QARS.  I THOUGHT YOU USED THE

15:52  10  NUMBER 10 FOR THE ONES YOU HAD LOOKED AT LIKE THAT AND

15:52  11  PRESENTED YESTERDAY.

15:52  12  **A.**  THAT'S TRUE, BUT THAT'S NOT THE ENTIRE POPULATION OF QARS.

15:52  13  **Q.**  I MISUNDERSTOOD.  BUT IN ANY CASE, YOU DIDN'T READ THEM

15:52  14  ALL.  DID YOU READ ALL THOUSAND AND ALL THEIR ATTACHMENTS?

15:52  15  **A.**  NO.

15:52  16  **Q.**  BUT YOU DID SHOW THE COURT SEVERAL OF THOSE IN YOUR

15:52  17  TESTIMONY ABOUT EXCAVATIONS, BACKFILLS, AND COMPACTION.  DO YOU

15:52  18  RECALL THAT?

15:52  19  **A.**  YES, SIR.

15:52  20  **Q.**  IN REVIEWING THE ONES YOU DID REVIEW, THEN, EVEN BEYOND

15:52  21  THE ONES THAT YOU PRESENTED YESTERDAY, ISN'T IT TRUE YOU NEVER

15:52  22  ONCE SAW ANY INDICATION OF DEFICIENCIES NOTED?

15:52  23  **A.**  I THINK THAT'S CORRECT.  I REMEMBER THEY WERE CONCERNED

15:53  24  SEVERAL TIMES ABOUT SAFETY ISSUES.

15:53  25  **Q.**  IF YOU SAW ANYTHING LIKE THAT, IT ENDED UP RESULTING IN NO

ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 15:53 | 1 | DEFICIENCIES.  ISN'T THAT WHAT YOU SAW? |
| 15:53 | 2 | **A.**   I THINK THAT'S CORRECT. |
| 15:53 | 3 | **Q.**   YESTERDAY, DR. BEA, AFTER I HAD CROSS-EXAMINED YOU ABOUT |
| 15:53 | 4 | THE HYDRAULIC CONDUCTIVITY, YOUR TEAM FOUND AT THE SOUTH EBIA, |
| 15:53 | 5 | REGARDING YOUR PRIOR STATEMENT THAT DR. ROGERS FOUND |
| 15:53 | 6 | PERMEABILITIES OF FROM 1 TIMES 10 TO THE MINUS 4 TO 1 TIMES 10 |
| 15:53 | 7 | TO THE MINUS 6 AT THE SOUTH EBIA SITE -- THIS WAS AT TRIAL |
| 15:53 | 8 | TRANSCRIPT PAGE 879. |
| 15:53 | 9 | DO YOU RECALL YOU CAME BACK -- I SHOWED YOU A TABLE. |
| 15:53 | 10 | **A.**   YES, SIR. |
| 15:53 | 11 | **Q.**   I'M JUST SETTING THIS UP.  I SHOWED YOU A TABLE AT ABOUT |
| 15:53 | 12 | 10:41, ACTUALLY, IN THE MORNING. |
| 15:54 | 13 | **A.**   YES, SIR. |
| 15:54 | 14 | **Q.**   IN HIS REPORT FOR THE SOUTH EBIA PUMPING TEST, AND IT ONLY |
| 15:54 | 15 | SHOWS -- AND YOU AGREED WITH ME AFTER LOOKING AT IT THAT IT |
| 15:54 | 16 | ONLY SHOWS 10 TO THE MINUS 6 AND 10 TO THE MINUS 5.  DO YOU |
| 15:54 | 17 | RECALL THAT? |
| 15:54 | 18 | **A.**   I REMEMBER THAT AS A GENERALIZATION.  IF YOU LOOK AT THE |
| 15:54 | 19 | FIRST DIGIT, YOU'LL SEE MORE PRECISION TO DEFINE THE CLASS |
| 15:54 | 20 | INTERVAL, LOW TO HIGH. |
| 15:54 | 21 | **Q.**   SO IT MIGHT BE SOMETHING ELSE TIMES 10 TO THE MINUS 5, |
| 15:54 | 22 | SOMETHING ELSE TIMES 10 TO THE MINUS 6? |
| 15:54 | 23 | **A.**   THAT'S CORRECT. |
| 15:54 | 24 | **Q.**   I UNDERSTAND THAT. |
| 15:54 | 25 | BUT THEN ON REDIRECT -- AND THIS IS WHAT I'M |

## ROBERT G. BEA - FURTHER RECROSS

15:54  1    ADDRESSING -- YOU STATED:  "MR. TREEBY SHOWED A TABLE THAT

15:54  2    DIDN'T HAVE THE 10 TO THE MINUS 4, BUT IF YOU TURNED THE PAGE,

15:54  3    YOU WOULD SEE THE ANSWER TO THAT BIG MYSTERY."

15:54  4         DO YOU RECALL SAYING THAT?

15:54  5    A.   EXACTLY.

15:54  6    Q.   WELL, DR. BEA, LET'S TURN THE PAGE.  JX-2031, PAGE 221, OF

15:55  7    DR. ROGERS' REPORT.  THAT'S THE TABLE.  NOW LET'S TURN THE

15:55  8    PAGE.  I'M GOING TO BLOW UP THE TOP PARAGRAPH.

15:55  9         "AT THIS SITE" -- SPEAKING OF THE EBIA -- "UPPER AND

15:55  10   LOWER PORTIONS OF A MARKED PEAT HORIZON WERE SELECTED FOR

15:55  11   INSTRUMENTATION.  BASED ON THE RESULTS OF THE IN SITU

15:55  12   PERMEABILITY TESTS PERFORMED AT THE SOUTH EBIA AND SCHOOL

15:55  13   SITES, A RANGE OF PERMEABILITIES ARE APPROPRIATE FOR THE UPPER

15:55  14   SWAMP DEPOSIT WITH A LOW PERMEABILITY OF 1 TIMES 10 TO THE

15:55  15   MINUS 6 CENTIMETERS PER SECOND, A MEDIAN PERMEABILITY OF

15:55  16   1 TIMES 10 TO THE MINUS 5 CENTIMETERS PER SECOND, AND A HIGH

15:56  17   PERMEABILITY OF 1 TIMES 10 TO THE MINUS 3 CENTIMETERS PER

15:56  18   SECOND."

15:56  19        DO YOU SEE THAT?

15:56  20   A.   YES, SIR.

15:56  21   Q.   IN FACT, THAT NEXT PAGE DOESN'T HAVE ANYWHERE ON IT A

15:56  22   10 TO THE MINUS 4; ISN'T THAT CORRECT?

15:56  23   A.   BUT 10 TO THE MINUS 4 IS BETWEEN 10 TO THE MINUS 5 AND

15:56  24   10 TO THE MINUS 3.

15:56  25   Q.   WE ALL UNDERSTAND THAT.  BUT IT STATES THAT HIGH

## ROBERT G. BEA - FURTHER RECROSS

15:56    1    PERMEABILITY ACTUALLY FROM THE SCHOOL SITES -- THE 10 TO THE

15:56    2    MINUS 3 OBVIOUSLY IS AT THE SCHOOL SITE; ISN'T THAT RIGHT?

15:56    3    **A.**    THAT'S CORRECT.   THE SPECIFIC DEFINITION OF 10 TO THE

15:56    4    MINUS 4 TO 10 TO THE MINUS 6 IS PRESENTED BY DR. ROGERS IN THE

15:56    5    EXECUTIVE SUMMARY INTRODUCTORY PORTION OF HIS REPORT.

15:56    6    **Q.**    AND THAT WAS BECAUSE HE FOUND THAT HIS BEST ESTIMATE AT

15:56    7    THE SCHOOL SITE, WHICH HE ADMITTED WASN'T RELEVANT TO THE EBIA

15:56    8    FAILURES, WAS 10 TO THE MINUS -- HIS BEST ESTIMATE WAS 10 TO

15:57    9    THE MINUS 4; AND HIS BEST ESTIMATE AT THE SOUTH EBIA WAS 10 TO

15:57    10    THE MINUS 6.   AND, THEREFORE, HE SETTLED ON 10 TO THE MINUS 5

15:57    11    AS REPRESENTATIVE, AND IT'S BEEN STIPULATED.

15:57    12            ISN'T THAT WHAT HAPPENED?

15:57    13    **A.**    WELL, I WASN'T PRESENT WHEN DR. ROGERS PERFORMED HIS

15:57    14    ANALYSIS, BUT AFTER I RECEIVED HIS INITIAL DRAFT REPORT, I

15:57    15    ASKED HOW THE BOUNDS HAD BEEN DEFINED AND WHAT THEY

15:57    16    REPRESENTED.

15:57    17            IT MAKES A BIG DIFFERENCE IF A BOUND HAS A ZERO

15:57    18    PROBABILITY.   AND SO I THEN GO BACK TO THE DATA SET FOR SOUTH

15:58    19    EBIA SITE.   THEY ANALYZED IT USING RIGOROUS STATISTICAL METHODS

15:58    20    AND THEN PROVIDED THE INFORMATION THAT THOSE BOUNDS BASICALLY

15:58    21    REPRESENTED PLUS AND 1 MINUS STANDARD DEVIATION, WITH THE MEAN

15:58    22    MEDIAN VALUE IN BETWEEN.

15:58    23    **Q.**    THANK YOU, DR. BEA.   I APPRECIATE IT.

15:58    24    **A.**    YES, SIR.

15:58    25            **THE COURT:**   THANK YOU, MR. TREEBY.

*HOURLY TRANSCRIPT*

## ROBERT G. BEA – FURTHER RECROSS

15:58  1          MR. SMITH, ARE YOU GOING TO BE DOING THE

15:58  2   QUESTIONING?

15:58  3          **MR. SMITH:**  I WILL.  YOUR HONOR, I APOLOGIZE, BUT

15:58  4   THERE'S SOMETHING THAT I HAVE TO HAVE, AND I DON'T HAVE IT WITH

15:58  5   ME.  TREEBY SURPRISED ME BY FINISHING SO SWIFTLY.  IF WE CAN

15:59  6   JUST HAVE A FEW MORE MOMENTS, MAYBE A 10 MINUTE BREAK, I CAN

15:59  7   HAVE SOMEBODY PICK IT UP.

15:59  8          **THE COURT:**  ABSOLUTELY.  WE WILL DO THAT.

15:59  9          **MR. SMITH:**  THANK YOU VERY MUCH.  I PROMISE I WILL BE

15:59  10  DONE BY 5:00.  WELL, I WILL DO MY BEST EFFORT TO FINISH TODAY.

15:59  11         **THE COURT:**  I'M NOT HOLDING YOU TO IT.

15:59  12         **MR. SCHULTZ:**  I THINK I HAVE LITERALLY 10 MINUTES.

15:59  13         **THE COURT:**  WE WILL FINISH SO DR. BEA CAN GO HOME.

15:59  14         **MR. SCHULTZ:**  I JUST WANT TO MAKE SURE I HAVE A RIGHT

15:59  15  TO IT.  THE DEFENDANTS HAVE ALREADY SAID THEY DON'T OBJECT.

15:59  16         **THE COURT:**  YES.  THEY WILL HAVE THE SAME RIGHT, AND

15:59  17  IT'S GOING TO BE SOMEWHAT CABINED BY ME.  MY CONTOURS ARE NOT

15:59  18  CLEAR.

15:59  19         (RECESS.)

16:18  20         **THE COURT:**  MR. SMITH, I THINK IT'S IMPORTANT,

16:18  21  DR. BEA, THAT I ASK IT NOW.

16:18  22         **MR. SMITH:**  IT MIGHT HELP ME.

16:18  23         **THE COURT:**  IT MAY NOT, BUT IF YOU WANT TO ASK HIM

16:18  24  ABOUT IT, IT MIGHT.

16:18  25          DR. BEA, AS A GENERAL PRINCIPLE, ARE THERE

ROBERT G. BEA - FURTHER RECROSS

16:18  1  UPLIFT PRESSURES IF THERE IS NO HYDRAULIC CONNECTION BETWEEN

16:18  2  THE WATERSIDE OF A FLOODWALL AND THE LEVEE SIDE?

16:19  3  **THE WITNESS:**  NO.

16:19  4  **THE COURT:**  WERE THERE IN YOUR STUDIES HYDRAULIC

16:19  5  UPLIFT PRESSURES AT THE MCDONOUGH MARINE SITE?

16:19  6  **THE WITNESS:**  YES.

16:19  7  **THE COURT:**  I THINK YOU HAVE ALREADY TESTIFIED THAT

16:19  8  THE UPLIFT PRESSURES AT THE BREACH SITES WERE GREATER.

16:19  9  **THE WITNESS:**  CORRECT.

16:19  10  **THE COURT:**  CAN YOU GIVE ME A NOTION AS TO THE

16:19  11  MAGNITUDE OF DIFFERENCE?

16:19  12  **THE WITNESS:**  YES.  THE MAGNITUDE IS REFLECTED IN THE

16:19  13  FACTOR OF SAFETY FOR A GIVEN WATER ELEVATION.  THE COMPARISON

16:19  14  BETWEEN SOUTH BREACH AND MCDONOUGH, AT THE SOUTH BREACH, THE

16:20  15  FACTOR OF SAFETY IS 1 AT FAILURE WATER LEVEL CONDITION.

16:20  16  THE FACTOR OF SAFETY AT MCDONOUGH FOR THAT SAME

16:20  17  WATER LEVEL CONDITION IS 1.2 TO 1.3.  SO IT'S A 20 TO

16:20  18  30 PERCENT CHANGE JUST AS IT WAS AT 17TH.

16:20  19  **THE COURT:**  THE NORTH BREACH WOULD BE --

16:20  20  **THE WITNESS:**  SAME COMPARISON.

16:20  21  **THE COURT:**  SAME COMPARISON.THAT'S ALL.

16:20  22  **FURTHER RECROSS-EXAMINATION**

16:20  23  BY MR. SMITH:

16:20  24  **Q.**  DR. BEA, YESTERDAY YOU SHOWED A FIGURE FROM THE ILIT

16:20  25  REPORT FIGURE 6.45.

*HOURLY TRANSCRIPT*

ROBERT G. BEA - FURTHER RECROSS

16:20   1          I WOULD LIKE TO START WITH THAT FIGURE, IF WE CAN,
16:20   2   TODAY.  THAT'S JX-2032, AND WE WANT TO SEE FIGURE 6.45.  THAT'S
16:21   3   IMAGE 242.
16:21   4          WHEN YOU DISPLAYED THIS PHOTOGRAPH YESTERDAY AND
16:21   5   DISCUSSED IT, DR. BEA, YOU ATTRIBUTED THIS TO THE
16:21   6   10-FOOT-DEEP -- ACCORDING TO YOU, 10-FOOT-DEEP DRAINAGE DITCH
16:21   7   THAT MADE A RIGHT-HAND TURN AT SAUCER MARINE AND HEADED OUT TO
16:21   8   THE IHNC; ISN'T THAT CORRECT?
16:21   9   A.   THAT'S CORRECT.
16:21  10   Q.   THAT'S NOT WHAT THE ILIT TEAM CITED THIS CREVASSE SPLAY
16:21  11   FOR, IS IT?
16:21  12   A.   THEY CITED IT AS REFLECTING -- THIS IS MY RECOLLECTION --
16:21  13   AS REFLECTIVE OF UNDERSEEPAGE COMING THROUGH THE BERMS.
16:21  14   Q.   IN FACT, THEY DESCRIBED THIS AS CLEAR AND UNCOMPROMISING
16:22  15   EVIDENCE OF THE HIGH LATERAL PERMEABILITY OF THESE DEPOSITS AT
16:22  16   THIS SITE WHICH SHOWS A WELL-DEVELOPED CLASSIC CREVASSE SPLAY
16:22  17   THAT RESULTED FROM REVERSE UNDERSEEPAGE --
16:22  18   A.   CORRECT.
16:22  19   Q.   -- THROUGH THE SAME HIGHLY PERVIOUS MARSH DEPOSITS AS THE
16:22  20   PONDED FLOODWATERS DRAINED OUT FROM THE LOWER NINTH WARD AFTER
16:22  21   THE HURRICANE PASSED; ISN'T THAT CORRECT?
16:22  22   A.   THAT'S CORRECT.
16:22  23   Q.   ISN'T IT TRUE THAT AS RECENTLY AS 2009 IN THE *ROBINSON*
16:22  24   CASE, YOU WERE STILL CITING THIS CREVASSE SPLAY AS EVIDENCE OF
16:22  25   THE HIGH PERMEABILITY OF THE MARSH -- SWAMP MARSH DEPOSITS AT

## ROBERT G. BEA - FURTHER RECROSS

16:22  1   THE IHNC?

16:22  2              IF YOU DON'T RECALL, I'LL BE HAPPY TO SHOW YOU.

16:22  3   **A.**   PLEASE DO.

16:22  4   **Q.**   PX-141-226.

16:23  5              **MR. SMITH:**  LET'S GO TO IMAGE 249.

16:23  6              **THE COURT:**  MR. SMITH, IS THERE A LITTLE --

16:23  7              **MR. SMITH:**  I HEAR THAT HUM.

16:23  8              **THE COURT:**  IT'S DISRUPTIVE.  DO YOU KNOW FROM WHENCE

16:23  9   IT CAME?

16:23  10             **MR. SMITH:**  I HAVE A RED LIGHT ON MY -- I DON'T KNOW.

16:23  11  I HAVE NEVER SEEN THAT.

16:23  12             IS THAT ALWAYS THERE?

16:23  13             **MR. BRUNO:**  THAT'S BEEN THERE.

16:23  14             **THE COURT:**  IT'S UP TO YOU.  I'M WILLING TO MOVE ON.

16:23  15             **MR. SMITH:**  IT DOESN'T BOTHER ME, YOUR HONOR.  I'LL

16:23  16  GO ON, IF I MAY.

16:24  17  **BY MR. SMITH:**

16:24  18  **Q.**   THIS IS A FIGURE -- NO.  I'M SORRY.

16:24  19             **MR. SMITH:**  HAVE YOU NOT FOUND IT YET?

16:24  20             PX-141.

16:24  21             YOUR HONOR, THIS IS AN EXHIBIT THAT WE RECEIVED

16:24  22  FROM THE PLAINTIFFS LATE, AND IT'S -- SOMEBODY HAS GOT IT, IT

16:24  23  LOOKS LIKE.

16:24  24             **MR. BRUNO:**  WE HAVE IT.

16:24  25             **MR. TREEBY:**  IT'S OKAY.  WE HAVE GOT IT.

ROBERT G. BEA - FURTHER RECROSS

16:25    1          **MR. SMITH:**  I NEED THE DISCUSSION ON THE PAGE.  I

16:25    2   THINK THIS MAY BE SOMETHING -- DO YOU HAVE PX-141?

16:25    3          **THE COURT:**  THERE IT IS.

16:25    4          **MR. SMITH:**  LET'S SEE THE TOP OF THE PAGE.  THERE WE

16:25    5   GO.

16:25    6   **BY MR. SMITH:**

16:25    7   **Q.**   "ADDITIONAL EVIDENCE FOR THE NATURE OF THE UNDERSEEPAGE

16:25    8   POTENTIAL AT THESE TWO SITES WAS PROVIDED BY AN IMPRESSIVE

16:25    9   CREVASSE SPLAY, LOCAL TERM FOR FAN-SHAPED UNDERSEEPAGE EROSION

16:25   10   FEATURES, ILIT 2006.  THIS CREVASSE SPLAY DEVELOPED AT THE

16:25   11   OUTBOARD SIDE OF THE INTERIM REPAIR SECTION AT THE SOUTH

16:25   12   BREACH.  FIGURE C23.  THIS CREVASSE SPLAY OCCURRED AT THE

16:25   13   RELATIVELY LOW REVERSE FLOW GRADIENTS AS THE INBOARD AREA

16:25   14   CONTINUED TO DRAIN AFTER IT HAD ALREADY BEEN LARGELY UNWATERED

16:25   15   BY PUMPING AFTER INITIAL DRAINAGE THROUGH OPEN BREACHES.  THIS

16:25   16   CREVASSE SPLAY UNDERMINED THE OTHERWISE CONTINUOUS OUTBOARD

16:26   17   SIDE TOW FILL BLANKET ALONG THIS FRONTAGE.  THE LOCATION OF

16:26   18   THIS CREVASSE SPLAY, COINCIDENT WITH THE LOCATION OF THE SOUTH

16:26   19   BREACH FAILURE, PROVIDES STRONG SUPPORT FOR THE PRESENCE OF A

16:26   20   FOUNDATION STRATUM OF VERY HIGH LATERAL PERMEABILITY AT THIS

16:26   21   LOCATION."

16:26   22   **A.**   YES, SIR.

16:26   23   **Q.**   IN 2007, YOU WERE STILL CITING THAT WITH THE SAME TEXT AND

16:26   24   THE SAME EXPLANATION AS THE ILIT TEAM HAD CITED IT FOR IN 2006;

16:26   25   ISN'T THAT CORRECT?

16:26    1    **A.**   YES.

16:26    2    **Q.**   WHEN DID YOU DECIDE THAT THIS CREVASSE SPLAY WAS NOT

16:26    3    EVIDENCE OF REVERSE UNDERSEEPAGE BUT WAS INSTEAD EVIDENCE OF

16:26    4    UNDERSEEPAGE RELATED TO A TRENCH THAT WAS BACKFILLED BY

16:26    5    WASHINGTON GROUP INTERNATIONAL?

16:26    6    **A.**   DURING MY WORK ON THIS CASE, THE DIFFICULTY THAT IN FACT

16:26    7    WE HAD DURING THE ILIT TIME PERIOD IS THE GROUND AT THAT END OF

16:27    8    THE BREACH IS HIGHER ON THE LAND SIDE THAN AT ITS NORTH END.

16:27    9            SO THE QUESTION WAS:  WHY WOULD THE WATER DRAIN OUT

16:27   10    OF THE LOWER NINTH WARD AT THE HIGH END?  YOU WOULD EXPECT TO

16:27   11    SEE IT DISTRIBUTED TOWARD THE LOW END AND DISTRIBUTED UNDER

16:27   12    THAT ENTIRE ROCK BARRIER.

16:27   13            AT THAT POINT, THE QUESTION BECOMES, WELL, WHY WOULD

16:27   14    IT FOCUS THERE?

16:27   15            AND IT WAS, AS WE BEGAN TO UNDERSTAND THE DRAINAGE

16:27   16    DITCH, THAT WE THEN WERE ABLE TO DEVELOP A COHERENT EXPLANATION

16:27   17    OF WHY THE SPLAY WAS LOCATED WHERE IT WAS AND THE PROCESS OF

16:28   18    DRAINAGE THROUGH HIGH PERMEABILITY MATERIAL WAS IN FACT AT

16:28   19    PLAY, BUT IT WAS BEING CONCENTRATED BY THE DRAINAGE DITCH

16:28   20    RETURN TO THE CANAL.

16:28   21            AT THAT POINT, WE HAD A COHERENT UNDERSTANDING OF WHY

16:28   22    JUST THERE.

16:28   23    **Q.**   WELL, THE HURRICANE WAS IN 2005, CORRECT?

16:28   24    **A.**   THAT'S CORRECT.  AUGUST 29, I THINK.

16:28   25    **Q.**   YOU DIDN'T GO OUT TO THE SITE AFTER 2007 AND DO FURTHER

## ROBERT G. BEA – FURTHER RECROSS

16:28    1   SITE INVESTIGATION, DID YOU?

16:28    2   **A.**   YES.

16:28    3   **Q.**   IT WAS BASED ON SITE INVESTIGATION AFTER 2007 THAT YOU

16:28    4   DETERMINED THAT THIS WAS NOT THE RESULT OF HIGH LATERAL

16:28    5   PERMEABILITY FOUNDATION SOILS?

16:28    6   **A.**   NO, SIR.  I THINK I EXPLAINED THAT WE ENTERED THE

16:28    7   INVESTIGATION OF ANSWERING THE QUESTION:  WHY WAS THE REVERSE

16:29    8   SPLAY CONCENTRATED AT THE SOUTH END OF THE SOUTH BREACH?  WHY

16:29    9   WOULD IT JUST HAPPEN THERE WHEN LOGIC WOULD SAY IT SHOULD

16:29   10   HAPPEN, IF ANYWHERE, AT THE NORTH END BECAUSE THAT ENTIRE AREA,

16:29   11   AS WE DISCUSSED YESTERDAY, WITH THE LONGITUDINAL CROSS SECTION

16:29   12   DRAWN BY DR. MARR, WAS VIRTUALLY THE SAME.

16:29   13          SO AT THAT POINT, WE KNEW SOMETHING IS CONSTRAINED TO

16:29   14   DRAIN TOWARD THE HIGH SIDE.  AT THAT POINT, THE INVESTIGATION

16:29   15   SHIFTED TO WHAT WAS HAPPENING WITH THE STORM WATER DITCH.  AT

16:29   16   THAT POINT, IT CLOSED ITS CIRCLE.  WE COULD NOW EXPLAIN

16:29   17   PHYSICALLY WHY IT WAS HAPPENING, AND ALL OF THIS HAPPENED SINCE

16:30   18   WE BEGAN THIS PHASE OF OUR WORK.

16:30   19   **Q.**   DR. BEA, DO YOU KNOW WHAT *CONFIRMATIONAL BIAS* IS?

16:30   20   **A.**   YES, SIR.

16:30   21   **Q.**   MAYBE YOU CAN STATE FOR THE RECORD WHAT CONFIRMATIONAL

16:30   22   BIAS IS.

16:30   23   **A.**   WHAT I THINK I UNDERSTAND IS WHAT I WOULD LIKE TO

16:30   24   UNDERSTAND, AND THAT SAYS I HAVE ADDITIONAL INFORMATION THAT IS

16:30   25   ACTING TO DISPROVE MY BELIEF; AND CONFIRMATIONAL BIAS WOULD

## ROBERT G. BEA - FURTHER RECROSS

16:30    1    MAKE ME TAKE THAT INFORMATION, EVOLVE IT SO IT WOULD MATCH WITH

16:30    2    MY PRECONCEIVED IDEA.

16:30    3    **Q.**   IS THE ILIT TEAM'S INTERPRETATION OF THIS CREVASSE SPLAY,

16:30    4    IN YOUR OPINION, AN EXAMPLE OF CONFIRMATION BIAS?

16:31    5    **A.**   I HOPE NOT BECAUSE THAT WAS ONE OF THE FIRST

16:31    6    INVESTIGATIONS OF THIS FEATURE.  SO IF THERE WAS A TENDENCY TO

16:31    7    TRY TO CONFIRM ANYTHING, IT WOULD BE TO PERSIST IN WHAT YOU

16:31    8    FOUND INITIALLY.  THE EXAMPLE I HAVE TALKED THROUGH IS ACTUALLY

16:31    9    A COUNTEREXAMPLE TO CONFIRMATIONAL BIAS.

16:31   10          IF YOU LEARN SOMETHING NEW, YOU TRY AND PROFIT FROM

16:31   11    THAT AND DISCARD THE PREVIOUS VIEW IN FAVOR OF THE VALIDATED

16:31   12    INFORMATION YOU ANALYZED.

16:31   13    **Q.**   NOW, YOU WERE ASKED ABOUT MR. MELVIN MCELWEE YESTERDAY.

16:31   14    **A.**   YES.  YES.

16:31   15    **Q.**   MR. MCELWEE CONTACTED YOU, DIDN'T HE?

16:32   16    **A.**   YES, HE DID.

16:32   17    **Q.**   HE CONTACTED YOU VERY SOON AFTER YOU BEGAN YOUR

16:32   18    INVESTIGATION, DIDN'T HE?

16:32   19    **A.**   I'M TRYING TO RECALL THE TIME FRAME, BUT I THINK IT WAS OF

16:32   20    THE ORDER OF A YEAR AFTER THE INITIAL SITE VISITS I MADE.

16:32   21    **Q.**   I'M GOING TO REPRESENT TO YOU THAT IN THIS COURTROOM IN

16:32   22    THIS TRIAL, MR. MCELWEE CONFIRMED HE CONTACTED YOU BEFORE

16:32   23    OCTOBER 15, 2005.

16:32   24    **A.**   THAT MAY HAVE BEEN THE E-MAIL CONTACT.  THE FIRST TIME I

16:32   25    MET WITH HIM, I THINK IT WAS IN A HOTEL CONFERENCE ROOM IN

## ROBERT G. BEA – FURTHER RECROSS

16:32    1    LAROSE.  IT WAS NOT THEN.

16:32    2    **Q.**   IN THE ILIT REPORT, ONE OF THE BASES FOR THE ILIT TEAM'S

16:33    3    CONCLUSIONS THAT THE BREACHES IN THE LOWER NINTH WARD WERE A

16:33    4    "RESULT OF HIGH PERMEABILITY FOUNDATION SOILS WAS, IN THE

16:33    5    TEAM'S DESCRIPTION, CONTRACTORS' SIGNIFICANT PROBLEMS WITH

16:33    6    DEWATERING OF EXCAVATIONS ALONG THIS SAME FRONTAGE."

16:33    7         AND IN THE INVESTIGATOR'S WORDS, THEY SAID:  "THIS

16:33    8    BESPOKE OF HIGH LATERAL PERMEABILITY WITHIN THESE STRATA,"

16:33    9    SPEAKING OF THE MARSH DEPOSITS WHICH YOU HAVE OPINED ABOUT IN

16:33   10    THIS COURT.

16:33   11    **A.**   THAT'S CORRECT.  AND I TESTIFIED AT THIS TRIAL ABOUT THE

16:33   12    WORDING IN EXACTLY THIS SECTION.

16:33   13    **Q.**   THAT IS A DESCRIPTION -- THAT DESCRIPTION IS A DESCRIPTION

16:33   14    OF MR. MCELWEE'S REPORTS TO YOU, ISN'T IT?

16:33   15    **A.**   MR. MCELWEE ALSO REPORTED TO OTHER PEOPLE AND I, OF

16:34   16    COURSE, REPORTED TO OTHER PEOPLE WHO ARE MEMBERS OF THIS ILIT

16:34   17    TEAM.

16:34   18    **Q.**   YOU DON'T DENY THIS STATEMENT RELATING TO CONTRACTORS'

16:34   19    SIGNIFICANT PROBLEMS WITH DEWATERING EXCAVATIONS ALONG THIS

16:34   20    SAME FRONTAGE IS A REFERENCE TO MR. MCELWEE'S REPORTS OF

16:34   21    UNDERSEEPAGE AT ANOTHER SITE?

16:34   22    **A.**   THAT'S WHAT I DISCUSSED IN THIS TRIAL.

16:34   23    **Q.**   WHEN MR. MCELWEE'S NAME APPEARED ON THE PLAINTIFFS'

16:34   24    WITNESS LIST, I BEGAN TO WONDER IF YOU HAD MENTIONED

16:34   25    MR. MCELWEE IN ANY OF YOUR WORK IN THIS CASE.  AND I FOUND THAT

## ROBERT G. BEA - FURTHER RECROSS

16:35  1   YOU HAD MENTIONED MR. MCELWEE ONLY IN ONE PLACE, AND THAT WAS

16:35  2   IN A PLACE WHERE YOU REPORTED THAT WGI HAD ENCOUNTERED

16:35  3   SIGNIFICANT PROBLEMS DEWATERING THEIR EXCAVATIONS.  AND YOU HAD

16:35  4   TWO CITES:  TO THE WGI REPORT AND TO MR. MELVIN MCELWEE.

16:35  5            DID YOU KNOW WHEN YOU WROTE THIS REPORT IN THIS CASE

16:35  6   THAT MR. MCELWEE'S WORK WAS AT ANOTHER LOCATION?

16:35  7   A.   YES.  IN FACT, I DOCUMENTED IN THE *ROBINSON* CASE IT WAS AT

16:35  8   DWYER ROAD.  THERE'S A SPECIAL APPENDIX IN THE *ROBINSON* CASE

16:35  9   2008, 2009 REPORTS THAT CLEARLY SHOWED THAT THE MCELWEE

16:36  10  EXPERIENCES, I WILL CALL IT, WERE AT DWYER ROAD TO THE NORTH OF

16:36  11  LOWER NINTH WARD.

16:36  12  Q.   NOW, OVER THE LAST DAY AND A HALF --

16:36  13  A.   I COULDN'T HEAR YOU, SIR.  SORRY.

16:36  14  Q.   SORRY.  STARTING YESTERDAY AROUND LUNCH TIME, AS I RECALL,

16:36  15  AND CONTINUING ON THROUGH MOST OF THE MORNING THIS MORNING, YOU

16:36  16  WENT THROUGH A SERIES OF WASHINGTON GROUP PHOTOGRAPHS AND OTHER

16:36  17  DOCUMENTS THAT DEPICTED CONDITIONS THAT WERE INDICATIVE TO YOU

16:36  18  OF CONDUCT BY WASHINGTON GROUP THAT WAS RELATED TO THE CAUSE OF

16:36  19  THESE FAILURES, DIDN'T YOU?

16:36  20  A.   CORRECT.

16:36  21  Q.   I DIDN'T SEE ANY EVIDENCE OF PERSISTENT UNDERSEEPAGE IN

16:36  22  ANY OF THOSE DOCUMENTS.

16:36  23  A.   WELL, WE PORTRAYED WHAT I INTERPRETED FROM HERE, AND IT'S

16:36  24  A MATTER OF THE COURT RECORDS.

16:37  25  Q.   SO YOUR TESTIMONY IS THAT THE DOCUMENTS THAT YOU HAVE

ROBERT G. BEA - FURTHER RECROSS

16:37   1  DISPLAYED IN THIS COURT ARE ALL THE EVIDENCE THAT YOU HAVE OF
16:37   2  PERSISTENT UNDERSEEPAGE PROBLEMS AND DEWATERING PROBLEMS IN THE
16:37   3  EXCAVATIONS BY WGI FOR THE WORK PERFORMED UNDER TASK ORDER 26?
16:37   4  **A.**   NO.
16:37   5           **MR. SCHULTZ:**  YOUR HONOR, I WOULD LIKE TO OBJECT,
16:37   6  YOUR HONOR, ONLY BECAUSE I DON'T BELIEVE THAT DR. BEA IS
16:37   7  COMPETENT TO MAKE THAT DETERMINATION.
16:37   8           WE HAVE A SUMMARY EXHIBIT, FOR EXAMPLE, THAT IS
16:37   9  AT ISSUE THAT IS GOING TO INVOLVE --
16:37  10           **THE COURT:**  HE IS ASKING HIM TO REFERENCE HIS
16:37  11  OPINION, WHICH I THINK IS APPROPRIATE CROSS-EXAMINATION.
16:37  12           HE ALREADY ANSWERED NO TO YOUR QUESTION BEFORE
16:37  13  THE OBJECTION, SO THAT ANSWER STANDS.
16:37  14           YOU MAY WANT TO FOLLOW UP ON IT.  YOU CAN IF YOU
16:37  15  WISH.
16:37  16           MR. SMITH.
16:37  17  **BY MR. SMITH:**
16:37  18  **Q.**   WHAT WOULD THAT EVIDENCE BE, DR. BEA?
16:37  19  **A.**   OTHER INFORMATION IN THE DOCUMENTATION I HAVE REVIEWED.
16:37  20  ONE OF THE LATEST ARTICULATIONS OF WHAT'S BEEN A MULTIYEAR
16:38  21  EFFORT WAS INCLUDED IN MY REBUTTAL REPORT, AND THE COURT
16:38  22  DECIDED TO EXCLUDE IT.
16:38  23  **Q.**   ONE OF THE THINGS YOU AND I DISAGREED ABOUT -- I THINK IT
16:38  24  WAS THE DAY BEFORE YESTERDAY -- WAS WHETHER THERE WAS ANY PRIOR
16:38  25  APPLICATION OF YOUR PRESSURE TRANSMISSION THEORY IN THE

## ROBERT G. BEA - FURTHER RECROSS

16:38   1   INVESTIGATIONS PERFORMED INTO THESE FAILURES; ISN'T THAT

16:38   2   CORRECT?

16:38   3   **A.**   PLEASE REPEAT YOUR QUESTION.  THE PAGES YOU HELD UP WERE

16:38   4   DISTRACTING ME BECAUSE I PRODUCED THOSE PAGES LAST NIGHT IN

16:38   5   RESPONSE TO A SPECIFIC REQUEST, AND THAT DIDN'T MATCH WITH YOUR

16:39   6   QUESTION.

16:39   7           SO IF YOU WOULD PLEASE REPEAT IT.

16:39   8   **Q.**   I APOLOGIZE FOR DISTRACTING YOU.  I GUESS I SHOULD PUT IT

16:39   9   DOWN THIS TIME.

16:39   10          I ASKED YOU -- AND I THINK WE TALKED ABOUT WHETHER

16:39   11  ANY OF THE OTHER INVESTIGATORS INTO THE FAILURES THAT ARE AT

16:39   12  ISSUE IN THIS CASE HAD APPLIED YOUR M SUB V THEORY, YOUR

16:39   13  INSTANTANEOUS PRESSURE TRANSMISSION THEORY, IN THIS CASE?

16:39   14          DO YOU RECALL THAT?

16:39   15  **A.**   YES, I DO.

16:39   16  **Q.**   YOU SAID YES?

16:39   17  **A.**   YES.  THAT'S CORRECT.

16:39   18          BY THE WAY, IT'S NOT MY THEORY.  IF YOU WANT TO

16:39   19  ATTRIBUTE IT TO ANYONE, IT'S THE U.S. ARMY CORPS OF ENGINEERS'

16:39   20  THEORY.

16:39   21  **Q.**   FOR THE RECORD, I'M GOING TO CITE TO THE PAGE NUMBERS

16:39   22  WHERE WE HAD THIS COLLOQUY THE OTHER DAY.  I ASKED YOU AT

16:39   23  PAGE 1078, LINE 3:

16:40   24          "**QUESTION:**  IS THAT THE ORDINARY WAY --

16:40   25          "**ANSWER:**  NO.

## ROBERT G. BEA - FURTHER RECROSS

16:40    1          "QUESTION:  -- IT'S TYPICALLY DONE?

16:40    2          "ANSWER:  IT'S NOT THE ORDINARY WAY."

16:40    3          IF WE SKIP DOWN TO LINE 15, I BEGAN MY QUESTION ABOUT

16:40    4   THE ILIT TEAM.  I SAID:

16:40    5          "QUESTION:  YOU WERE A PART OF A TEAM OF ELITE

16:40    6       INVESTIGATORS WHO CAME HERE TO INVESTIGATE THIS."

16:40    7          AND I SAID:  "NONE OF THEM APPLIED THIS METHOD."

16:40    8          AND YOU SAID, "INCORRECT."

16:40    9   A.   THAT'S CORRECT.

16:40   10   Q.          "QUESTION:  THEY APPLIED THE METHOD I ASKED?

16:40   11          "ANSWER:  YES.  THEY APPLIED STEADY-FLOW CONDITIONS

16:40   12       AND ANALYZED THE PROBLEM -- USED STEADY-FLOW CONDITIONS.

16:40   13       AND THE PREMISE OF STEADY-FLOW CONDITIONS IS

16:40   14       INCOMPRESSIBLE WATER AND INCOMPRESSIBLE SOIL.  THEY USED

16:40   15       THE THEORY."

16:40   16   A.   CORRECT.

16:40   17   Q.   WE WENT ON DOWN AND WANTED TO FIND OUT WHERE THEY USED

16:41   18   THAT THEORY.  YOU STATED THAT ON PAGE 1080, LINE 2:  "THE ILIT

16:41   19   GROUP CONSIDERED WHETHER WE SHOULD USE STEADY-FLOW OR

16:41   20   NONSTEADY-FLOW CONDITIONS.  THE DETERMINATION USED CONSISTENTLY

16:41   21   IN THAT WORK WAS TO BASE THE WORK ON STEADY-FLOW CONDITIONS."

16:41   22          THEN YOU SAID:  "YOU WON'T FIND M SUB V THERE, BUT

16:41   23   THE EVIDENCE OF THEIR APPLICATION OF IT WAS IN THEIR -- THE

16:41   24   TERM STEADY FLOW."

16:41   25   A.   CORRECT.

## ROBERT G. BEA - FURTHER RECROSS

16:41  1   Q.   IF WE GO DOWN TO THE BOTTOM OF THAT PAGE, LINE 20, SAME

16:41  2   PAGE, YOU SAY:  "THE TECHNIQUES WE USED TO PERFORM THE

16:41  3   SO-CALLED FLOW NET ANALYSIS WERE BASED ON STEADY-FLOW

16:41  4   CONDITIONS.  THEY HAVE TO BE.  THIS IS A KEY POINT TO CLARIFY

16:42  5   FOR THE JUDGE."

16:42  6         MR. SCHULTZ:  YOUR HONOR, CAN I LODGE AN OBJECTION?

16:42  7   IT SEEMS TO BE IMPEACHMENT THROUGH PRIOR CONSISTENT TESTIMONY.

16:42  8   HE ASKED DR. BEA IF THIS IS WHAT HE SAID AND DR. BEA AGREED,

16:42  9   AND NOW HE'S PROCEEDING --

16:42  10         THE COURT:  I ASSUME HE IS BUILDING UP TO SOMETHING

16:42  11   ELSE.  SO I'M GOING TO OVERRULE THE OBJECTION IN ANTICIPATION

16:42  12   OF THE ULTIMATE --

16:42  13         MR. SMITH:  THANK YOU, YOUR HONOR.

16:42  14   BY MR. SMITH:

16:42  15   Q.   I JUST WANT TO NAIL THIS DOWN BECAUSE AT 1084, I ASKED YOU

16:42  16   AGAIN, LINE 13:

16:42  17         "QUESTION:  I WANT TO MAKE SURE I UNDERSTAND YOUR

16:42  18   TESTIMONY.  YOUR TESTIMONY IN THIS COURTROOM TODAY IS THAT THE

16:42  19   ILIT TEAM RELIED ON STEADY-STATE ANALYSIS, NOT TRANSIENT

16:42  20   ANALYSIS.  IS THAT YOUR TESTIMONY?

16:42  21         "ANSWER:  THE ANALYSES RUN USING SEEP/W WERE BASED ON

16:42  22      STEADY-FLOW CONDITIONS, AND THAT WORK IS ARTICULATED IN

16:42  23      THE PHASE 2 ILIT PUBLICATIONS."

16:42  24   A.   CORRECT.

16:42  25   Q.   THE PHASE 2 IS THE PUBLICATIONS THAT CAME OUT IN 2006,

ROBERT G. BEA - FURTHER RECROSS

16:43   1   CORRECT?

16:43   2   **A.**   NO.   PHASE 2 HAD THREE PUBLICATION SOURCES.   ONE WAS A

16:43   3   GEOCONGRESS HELD IN DENVER, COLORADO.   THEN THERE WAS A

16:43   4   SUBSEQUENT SET OF WORK THAT WAS SUMMARIZED AND PUBLISHED IN A

16:43   5   SPECIAL ISSUE OF THE *AMERICAN SOCIETY OF CIVIL ENGINEERS*

16:43   6   *GEOTECHNICAL AND GEOENVIRONMENTAL ENGINEERING.*   AND THAT WORK

16:43   7   CAME OUT ABOUT SIX TO NINE MONTHS AFTER THE DENVER, COLORADO

16:43   8   WORK.   THERE ARE SOME IMPORTANT DIFFERENCES BETWEEN THOSE TWO

16:43   9   SOURCES OF DOCUMENTATION IN PHASE 2.

16:44   10   **Q.**   WELL, IN YOUR EXPERT REPORT IN THIS CASE, YOU DEFINED THE

16:45   11   PHASES.   IN YOUR EXPERT REPORT IN THIS CASE, YOU DEFINED THE

16:45   12   PHASES OF THE ILIT TEAM'S WORK.

16:45   13   **A.**   YES.

16:45   14   **Q.**   AS YOU DEFINE IT IN YOUR EXPERT REPORT -- THAT WOULD BE

16:45   15   EXHIBIT 1389.

16:45   16          **MR. SMITH:**   IF WE GO TO PAGE 11, LET'S START THERE.

16:45   17          PHASE 2:   "FOLLOWING THE COMPLETION OF THE FIRST

16:45   18   PHASE OF FIELD INVESTIGATIONS, THE ILIT BEGAN ASSEMBLING

16:45   19   BACKGROUND INFORMATION AND DOCUMENTATION THAT RELATED TO THE

16:46   20   MANY FAILURES.   THIS INCLUDED ASSEMBLY OF DOCUMENTATION.   THESE

16:46   21   ANALYSES FOCUSED ON BOTH ENGINEERING MECHANICS AND THE

16:46   22   ORGANIZATIONAL MECHANICS.

16:46   23          "BY EARLY NOVEMBER 2005, THE PHASE 2 WORK WAS

16:46   24   COMPLETED AND A PRELIMINARY REPORT ISSUED TO THE NATIONAL

16:46   25   SCIENCE FOUNDATION IN 2005.   THE PHASE 2 WORK WAS COMPLETED ON

## ROBERT G. BEA - FURTHER RECROSS

16:46    1   MAY 14, 2006, WITH DELIVERY OF THE FINAL DRAFT REPORT

16:46    2   SUMMARIZING THE ILIT STUDIES OF THE FAILURES OF THE NOHPS THAT

16:46    3   DEVELOPED DURING HURRICANE KATRINA."

16:46    4          SO I ASK YOU AGAIN:  THE ILIT REPORTS THAT WERE THE

16:46    5   ISSUED IN MAY, THE FINAL DRAFT AND THE FINAL REPORT IN MAY AND

16:46    6   JULY OF 2006, THAT'S THE PHASE 2 STUDY WE ARE REFERRING TO,

16:46    7   ISN'T IT?

16:46    8   A.   NO, SIR, THAT'S NOT THE PHASE 2.  I'M TRYING TO -- DID IT

16:47    9   DIVIDE IT INTO THREE PHASES OR TWO?  I DON'T RECALL.

16:47   10   Q.   WELL, DR. BEA, I'M RELYING ON A REPORT YOU ISSUED IN THIS

16:47   11   CASE FOR THE DEFINITION OF PHASE 2.  IT'S NOT MY DEFINITION.

16:47   12   WELL, LET'S LOOK AT WHAT THEY USED.  LET'S LOOK AT WHAT THE

16:47   13   ILIT TEAM USED AND WHAT YOU DESCRIBED IN YOUR REPORT AS

16:47   14   PHASE 2.

16:47   15          MR. SMITH:  THE ILIT 2006 REPORT, THAT'S JX-2032.

16:47   16   LET'S GO TO IMAGE 198.  LET'S GO TO THE NEXT-TO-THE-LAST

16:47   17   PAGE -- NO, NEXT-TO-THE-LAST PARAGRAPH, WHICH SAYS "FINALLY" --

16:47   18   I'M SORRY, THE PARAGRAPH THAT SAYS "FINALLY."

16:47   19          THAT'S NOT THE RIGHT PAGE.  IT SHOULD BE 612.

16:48   20   I'M SORRY.  I MUST HAVE WRITTEN DOWN THE WRONG PAGE NUMBER.

16:48   21          THERE IT IS.  NEXT-TO-LAST PARAGRAPH.

16:48   22   BY MR. SMITH:

16:48   23   Q.   "FIGURE 6.38 AND 6.39 SHOW RESULTS OF THESE SENSITIVITY

16:48   24   ANALYSES, REFERRING TO THE LATERAL PERMEABILITY ANALYSES THAT

16:48   25   ARE DESCRIBED IN THE PRECEDING PARAGRAPH.  TRANSIENT-FLOW

## ROBERT G. BEA - FURTHER RECROSS

16:48   1   ANALYSES WERE PERFORMED IN WHICH CANAL WATER LEVELS WERE RAISED

16:48   2   PROGRESSIVELY."

16:48   3          THAT'S EXACTLY WHAT YOU DESCRIBED YESTERDAY, ISN'T

16:48   4   IT, DR. BEA?

16:48   5   A.   YES.

16:48   6   Q.   BUT THEY WEREN'T STEADY-FLOW ANALYSES, WERE THEY?  THEY

16:48   7   WERE TRANSIENT-FLOW ANALYSES.

16:48   8   A.   NO, SIR, THAT'S NOT CORRECT.  I ATTEMPTED TO EXPLAIN THAT

16:48   9   THE STEADY-FLOW MECHANICS WERE USED IN THE TRANSIENT ANALYSES

16:48   10  BY INCREASING THE WATER LEVEL, AS DESCRIBED IN WHAT YOU READ,

16:49   11  BUT MAKING TIME SNAPSHOTS THAT I DESCRIBED AS FRAMES IN A

16:49   12  MOVING PICTURE.  THE BASIC MECHANICS IN EACH OF THOSE SNAPSHOTS

16:49   13  IS STEADY STATE.

16:49   14  Q.   WELL, LET'S TURN TO THE NEXT PAGE, BECAUSE I WILL TELL

16:49   15  YOU, DR. BEA, THE PHRASE *STEADY-FLOW ANALYSIS* OR *ANALYSES* DOES

16:49   16  NOT APPEAR IN THIS CHAPTER.

16:49   17  A.   WELL, YOU JUST READ IT.

16:49   18          THE COURT:  EXCUSE ME, I AM NOW -- IF YOU INTENDED TO

16:49   19  GET ME CONFUSED, IT'S WORKING.  HE READ THE WORDS *TRANSIENT*

16:49   20  *FLOW*, AND SO -- I'M GOING TO LET MR. SMITH CONDUCT HIS

16:49   21  EXAMINATION.

16:49   22  BY MR. SMITH:

16:49   23  Q.   LET'S JUST STAY IN THAT VEIN.  LET'S GO BACK.  THESE

16:49   24  ANALYSES ARE DESCRIBED AS TRANSIENT-FLOW ANALYSES THREE TIMES

16:49   25  CONSISTENTLY?

ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 16:49 | 1 | **A.** BECAUSE WE ARE CHANGING THE INPUT WATER LEVELS, YES, SIR. |
| 16:50 | 2 | **Q.** SO YOU CONCEDE, THEN, THAT THE ANALYSES THAT WERE |
| 16:50 | 3 | PERFORMED BY THE ILIT TEAM IN THE PHASE 2 WORK WERE |
| 16:50 | 4 | CONSISTENTLY DESCRIBED IN THAT REPORT AS TRANSIENT-FLOW |
| 16:50 | 5 | ANALYSES; IS THAT -- YOU CONCEDE THAT, DR. BEA? |
| 16:50 | 6 | **A.** YES, SIR. |
| 16:50 | 7 | **Q.** BUT YOU CONTEND THAT, IN FACT, THEY ARE NOT TRANSIENT-FLOW |
| 16:50 | 8 | ANALYSES; THEY ARE STEADY-FLOW ANALYSES? |
| 16:50 | 9 | **A.** PLEASE REPEAT YOUR QUESTION OR THE ASSERTION. |
| 16:50 | 10 | **Q.** DO YOU CONCEDE -- OR DO WE NEED TO GO THROUGH EVERY USE OF |
| 16:50 | 11 | THE PHRASE TRANSIENT-FLOW ANALYSIS OR ANALYSES IN THIS CHAPTER? |
| 16:50 | 12 | DO YOU CONCEDE THAT THE PHRASE *TRANSIENT-FLOW ANALYSES* IS THE |
| 16:50 | 13 | ONLY DESCRIPTION OF THE LATERAL PERMEABILITY ANALYSES THAT |
| 16:50 | 14 | APPEARS IN CHAPTER 6, WHICH IS THE CHAPTER THAT PERTAINS TO THE |
| 16:51 | 15 | IHNC FAILURES THAT WE ARE HERE TO DECIDE ABOUT IN THIS CASE? |
| 16:51 | 16 | **A.** I BELIEVE THAT ON THE NEXT PAGE, PERHAPS IT WAS -- THE |
| 16:51 | 17 | COMPARISON IS MADE BETWEEN THE STEADY-STATE CONDITION AT THE |
| 16:51 | 18 | FINAL WATER LEVEL AND THE SEQUENCE OF STEADY-STATE ANALYSES |
| 16:51 | 19 | THAT WERE CALLED TRANSIENT-FLOW ANALYSES AT THAT SAME POINT IN |
| 16:51 | 20 | TIME. |
| 16:51 | 21 | **Q.** WELL, I'LL TELL YOU WHAT.  I'LL LET YOUR -- LET'S GO TO |
| 16:51 | 22 | THE NEXT PAGE, THEN, BECAUSE I DON'T THINK YOU'RE CORRECT, |
| 16:51 | 23 | DR. BEA. |
| 16:51 | 24 | **A.** YES, IT'S RIGHT UP HERE AT THE TOP:  "INFLUENCE ON THE |
| 16:52 | 25 | PORE PRESSURES, GIVEN THE RELATIVELY SLOW RATE OF CANAL WATER |

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 16:52 | 1 | LEVEL RISE, AND PORE PRESSURES WITHIN THE MAIN MARSH DEPOSIT AT |
| 16:52 | 2 | THE BASE OF THE INBOARD LEVEE TOE ARE ON THE ORDER OF |
| 16:52 | 3 | 85 PERCENT TO 92 PERCENT OF FULL STEADY-STATE PRESSURES AT THE |
| 16:52 | 4 | APPARENT TIME OF FAILURE." |
| 16:52 | 5 | SO WE ARE COMPARING THE SINGLE-SHOT STEADY-STATE WITH |
| 16:52 | 6 | THE SEQUENCE OF STEADY-STATE TRANSIENT-FLOW ANALYSES. |
| 16:52 | 7 | Q.  WELL, DR. BEA, YOU'RE THE EXPERT.  IF YOU ARE GOING TO |
| 16:52 | 8 | TELL THIS COURT THAT THAT'S WHAT THIS SENTENCE MEANS, THEN I'LL |
| 16:52 | 9 | HAVE TO HAVE MY EXPERTS EXPLAIN IT TO HIS HONOR, BECAUSE AS I |
| 16:52 | 10 | UNDERSTAND WHAT'S IN THIS PARAGRAPH AND THE PARAGRAPH BEFORE |
| 16:52 | 11 | THAT -- WE CAN GO TO THE PARAGRAPH BEFORE THAT WHERE THE PHRASE |
| 16:53 | 12 | *TRANSIENT-FLOW ANALYSES WERE PERFORMED* APPEARS, THE FIRST |
| 16:53 | 13 | PARAGRAPH THAT WE LOOKED AT. |
| 16:53 | 14 | WHAT'S BEING DESCRIBED THERE -- AND I WILL GIVE YOU A |
| 16:53 | 15 | CHANCE TO READ IT, DR. BEA -- AS I UNDERSTAND IT, IS THAT |
| 16:53 | 16 | TRANSIENT ANALYSES ARE BEING PERFORMED TO WATCH THE RATE OF |
| 16:53 | 17 | PORE WATER PRESSURE RISE. |
| 16:53 | 18 | A.  THAT'S CORRECT. |
| 16:53 | 19 | Q.  AND ALL THAT THIS PARAGRAPH AND THE SUCCEEDING PARAGRAPHS |
| 16:53 | 20 | ARE DESCRIBING IS A COMPARISON OF HOW LONG IT TOOK FOR |
| 16:53 | 21 | STEADY-STATE CONDITIONS TO DEVELOP. |
| 16:53 | 22 | A.  NO. |
| 16:53 | 23 | Q.  BUT THESE ARE NOT STEADY-STATE ANALYSES, ARE THEY? |
| 16:53 | 24 | A.  NO.  YOU ARE INCORRECTLY INTERPRETING WHAT WAS BEING DONE. |
| 16:53 | 25 | Q.  WELL, WE WILL LEAVE IT, THEN, AS IT IS; AND IF YOUR |

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 16:53 | 1 | COUNSEL WISHES TO PURSUE THIS FURTHER, I'LL LET HIM PURSUE THIS |
| 16:53 | 2 | ON RE-REDIRECT. |
| 16:54 | 3 | **THE COURT:**  IT'S A FIRST FOR ME TOO. |
| 16:54 | 4 | BY MR. SMITH: |
| 16:54 | 5 | Q.   ISN'T IT TRUE, DR. BEA, THAT THE ILIT TEAM'S ASSESSMENT OF |
| 16:54 | 6 | THE PERMEABILITY OF THE SWAMP MARSH LAYER AT THE IHNC WAS BASED |
| 16:54 | 7 | ON FIELD OBSERVATIONS, EXPERIENCE WITH SIMILAR GEOLOGIC UNITS |
| 16:54 | 8 | FROM OTHER REGIONS, AND THE ACCUMULATED REPORTS INDICATING HIGH |
| 16:54 | 9 | LATERAL PERMEABILITY RATHER THAN LABORATORY TESTS ON SOIL |
| 16:54 | 10 | SAMPLES TAKEN FROM THE FIELD? |
| 16:54 | 11 | A.   YES, SIR. |
| 16:55 | 12 | Q.   NOW LET'S TALK ABOUT SOMETHING THAT YOU TOUCHED ON THIS |
| 16:55 | 13 | MORNING, AND THAT IS REJECTED CAUSATION SCENARIOS. |
| 16:55 | 14 | **MR. SMITH:**  IF WE COULD SEE THE DEMONSTRATIVE EXHIBIT |
| 16:55 | 15 | SLIDE 27, REJECTED CAUSATION SCENARIOS. |
| 16:55 | 16 | BY MR. SMITH: |
| 16:55 | 17 | Q.   I'M PARTICULARLY INTERESTED IN THE SECOND REASON YOU GIVE |
| 16:55 | 18 | FOR YOUR CONCLUSION THAT OVERTOPPING DID NOT CAUSE THE NORTH |
| 16:55 | 19 | BREACH. |
| 16:55 | 20 | **MR. SMITH:**  AND IF WE COULD HIGHLIGHT THE SECOND |
| 16:55 | 21 | BULLET POINT. |
| 16:55 | 22 | BY MR. SMITH: |
| 16:55 | 23 | Q.   THE SECOND BULLET POINT SAYS:  "BRIEF WAVE OVERTOPPING NOT |
| 16:55 | 24 | CAUSATIVE." |
| 16:55 | 25 | IF WE GO TO THE NEXT SLIDE, THIS IS THE SAME -- |

## ROBERT G. BEA - FURTHER RECROSS

16:55   1   SIMILAR DEMONSTRATIVE FOR THE SOUTH BREACH.  AND AGAIN, ONE OF

16:56   2   THE REASONS YOU GAVE FOR YOUR CONCLUSION THAT OVERTOPPING DID

16:56   3   NOT CAUSE THE SOUTH BREACH, THE FIRST ONE IN THIS SLIDE IS

16:56   4   "WAVE OVERTOPPING WAS NOT CAUSATIVE."

16:56   5   **A.**   RIGHT.

16:56   6   **Q.**   YOU HAVE TESTIFIED IN THIS COURTROOM BEFORE ABOUT WAVE

16:56   7   OVERTOPPING, HAVEN'T YOU, DR. BEA?

16:56   8   **A.**   YES.

16:56   9   **Q.**   WHEN YOU TESTIFIED ABOUT WAVE OVERTOPPING BEFORE, YOU

16:56   10   TESTIFIED THAT IT WASN'T BRIEF, WAS IT?

16:56   11   **A.**   WHAT WASN'T BRIEF?

16:56   12   **Q.**   THE WAVE OVERTOPPING WAS NOT BRIEF.  WHEN YOU TESTIFIED IN

16:56   13   THE *BARGE* CASE, CORRECT ME IF I'M WRONG, YOU TESTIFIED THAT

16:56   14   WAVE OVERTOPPING BEGAN AN HOUR AND A HALF BEFORE THE SURGE

16:56   15   REACHED THE TOP OF THE FLOODWALL.

16:57   16   **A.**   WAS THAT TESTIMONY IN A COURT?

16:57   17   **Q.**   YES, IT WAS.  LET'S GO AHEAD AND PUT THAT TRIAL TRANSCRIPT

16:57   18   UP.

16:57   19   **A.**   GOOD.  THANK YOU.

16:57   20         **MR. SMITH:**  THAT'S AT *BARGE* TRIAL TESTIMONY DX-1590.

16:57   21   IT'S PAGE 2689.  START AT THE SECOND LINE.

16:57   22   **BY MR. SMITH:**

16:57   23   **Q.**   YOU'RE DESCRIBING A PICTURE, AND WE ARE GOING TO SHOW THE

16:57   24   COURT THAT PICTURE IN JUST A SECOND.

16:57   25         THE PICTURE IS TAKEN DURING THE PEAK SURGE OF

## ROBERT G. BEA – FURTHER RECROSS

16:57    1    HURRICANE GUSTAV, WHICH WAS 11 FEET.

16:57    2            THEN WE SKIP DOWN WHERE YOU ARE TALKING ABOUT WHERE

16:57    3    YOU GOT THAT INFORMATION.

16:57    4            THE NEXT PARAGRAPH:  "WE HAVE A FLOODWALL THAT'S AT

16:58    5    THE SAME APPROXIMATE ELEVATION AS WE HAD DURING HURRICANE

16:58    6    KATRINA, APPROXIMATELY 12.5 FEET."

16:58    7            SO THERE'S MY 12.5 FEET I WAS REFERENCING.

16:58    8    A.   THANK YOU.

16:58    9    Q.   "SO WE HAVE A PERFECT PICTURE FOR ME OF THE WAVE-

16:58   10    ASSOCIATED SPLASHING THAT IS TAKING PLACE AT THIS FLOODWALL."

16:58   11            THEN YOU TALK ABOUT BEING INTERESTED IN THE DEBRIS

16:58   12    THAT'S SHOWN IN THIS PHOTOGRAPH.  THEN AT THE BOTTOM OF THE

16:58   13    PAGE, YOU CONTINUE YOUR ANSWER:

16:58   14            "ANOTHER THING THAT'S IMPORTANT, THAT HAS BEEN

16:58   15    CONFUSING FOR THE COURT, IS EROSION CAN START AT THIS

16:58   16    CONDITION, WHICH MEANS WELL BEFORE THE SURGE HAS REACHED THE

16:58   17    TOP OF THE WALL, LARGE AMOUNTS OF WATER ARE COMING OVER THE TOP

16:58   18    OF THE WALL THAT LEADS TO EARLY DEVELOPMENT OF EROSION TRENCHES

16:58   19    ON THE PROTECTED SIDE."

16:58   20            THE COURT:  THAT'S NOT UP ON THE SCREEN YET.

16:58   21            MR. SMITH:  SORRY.  THAT'S AT THE BOTTOM OF THE PAGE.

16:58   22    IF WE CAN HIGHLIGHT THAT.

16:58   23            THE COURT:  THAT'S WHAT YOU JUST READ, IF DR. BEA

16:58   24    WANTS TO READ IT TO HIMSELF.

16:59   25            THE WITNESS:  YES, SIR.

ROBERT G. BEA - FURTHER RECROSS

16:59    1    BY MR. SMITH:

16:59    2    Q.    LET'S GO TO THE NEXT PAGE, BECAUSE THE COLLOQUY CONTINUES.

16:59    3    THE COURT INTERJECTS A QUESTION:  AND JUST FOR THE RECORD, SIR,

16:59    4    WHAT WOULD BE THE HEIGHT OF THE FLOODWALL THERE AND THE HEIGHT

16:59    5    OF THE WATER?

16:59    6                    "THE WITNESS:  12 1/2 FEET FOR THE FLOODWALL,

16:59    7    11 FEET FOR THE WATER AT THE TIME THE PHOTOGRAPH IS TAKEN."

16:59    8                    YOU REITERATE THAT AGAIN.  BUT YOU CONCLUDE YOUR

16:59    9    REITERATION OF THAT BY SAYING:  "SO IT'S EXACTLY WHAT WE ARE

16:59   10    PROJECTING FOR HURRICANE KATRINA."

16:59   11                    IS THAT YOUR TESTIMONY YOU GAVE IN THIS

16:59   12    COURTROOM TWO YEARS AGO, DR. BEA?

16:59   13    A.    YES, SIR.

16:59   14    Q.    THEN AT THE BOTTOM OF THAT SAME PAGE, IF WE COULD SCROLL

16:59   15    DOWN, THE EXAMINATION BY MR. RAFFMAN CONTINUES:

16:59   16                    "IF THE TOP OF THE FLOODWALL IN THE AREA OF THE SOUTH

16:59   17    BREACH HAD BEEN EVEN LOWER THAN 12 1/2 FEET" -- AND I THINK

16:59   18    WE'VE HEARD SOME EVIDENCE IN THIS CASE THAT IT WAS -- "AND I

16:59   19    KNOW THAT'S NOT SOMETHING YOU HAVE OPINED ON, BUT IF IT HAD

17:00   20    BEEN LOWER, YOU WOULD HAVE EARLIER EXPERIENCE OF THIS

17:00   21    PHENOMENON; ISN'T THAT RIGHT?"

17:00   22                    AND YOUR ANSWER WAS:  "AND THAT'S CORRECT."

17:00   23                    DO YOU HAVE A DIFFERENT OPINION IN THIS CASE DR. BEA?

17:00   24    A.    NO.

17:00   25                    MR. SMITH:  I WONDER IF WE COULD JUST SEE THAT

*HOURLY TRANSCRIPT*

## ROBERT G. BEA - FURTHER RECROSS

17:00  1    PHOTOGRAPH THAT DR. BEA IS DESCRIBING.  THAT'S DX-1589.

17:00  2    **BY MR. SMITH:**

17:00  3    **Q.**   THIS IS THE PICTURE THAT YOU USED TO ILLUSTRATE WHAT WAVE

17:00  4    OVERTOPPING AN HOUR AND A HALF BEFORE THE SURGE REACHED THE TOP

17:00  5    OF THE WALL WOULD LOOK LIKE DURING HURRICANE KATRINA, ISN'T IT,

17:00  6    SIR?

17:00  7    **A.**   THIS IS ON THE WEST SIDE OF THE INDUSTRIAL CANAL, SO THE

17:00  8    WAVES ARE BEING PUSHED AGAINST THE WALL.  THIS IS NOT THE EAST

17:01  9    SIDE.

17:01  10   **Q.**   THERE IS NO AMBIGUITY ABOUT YOUR TESTIMONY, SIR.  YOU MADE

17:01  11   THAT CLEAR TO THE COURT, BUT YOU SAID THIS IS INDICATIVE OF THE

17:01  12   CONDITIONS WE HAD DURING HURRICANE KATRINA.

17:01  13   **A.**   WELL, WE DID.  AND THIS IS ON THE WEST SIDE, AND IT'S

17:01  14   INDICATIVE OF THE CONDITIONS WE HAD DURING KATRINA.  NOT ON THE

17:01  15   EAST SIDE.

17:01  16   **Q.**   THIS WAS YOUR TESTIMONY, SIR, ABOUT THIS PICTURE:  "WE

17:01  17   HAVE A PERFECT PICTURE FOR ME OF THE WAVE-ASSOCIATED SPLASHING

17:01  18   THAT IS TAKING PLACE AT THIS FLOODWALL."

17:01  19   **A.**   THAT'S CORRECT.  THIS FLOODWALL IS ON THE WEST SIDE.

17:01  20   **Q.**   "WELL BEFORE THE SURGE HAS REACHED THE TOP OF THE WALL,

17:01  21   LARGE AMOUNTS OF WATER" -- ARE YOU TELLING THIS COURT TODAY

17:01  22   THAT YOU WERE NOT SHOWING THIS PICTURE TO THE COURT AND

17:01  23   DESCRIBING THIS PICTURE TO THE COURT AS EVIDENCE OF WHAT

17:01  24   HAPPENED DURING HURRICANE KATRINA ON THE EAST SIDE OF THE IHNC?

17:01  25   **A.**   THAT'S CORRECT.

## ROBERT G. BEA - FURTHER RECROSS

17:01   1   **Q.**   THANK YOU.

17:02   2          NOW LET'S TALK ABOUT YOUR REJECTED CAUSATION

17:02   3   SCENARIO, OVERTOPPING DID NOT CAUSE THE SOUTH BREACH.  ISN'T IT

17:02   4   TRUE, DR. BEA, THAT IN THE *BARGE* TRIAL YOU GAVE TESTIMONY

17:02   5   CONTRARY TO WHAT YOU HAVE GIVEN IN THIS COURTROOM TODAY ABOUT

17:02   6   OVERTOPPING AND CAUSATION?

17:02   7   **A.**   I HOPE NOT.

17:02   8   **Q.**   LET'S SEE YOUR TESTIMONY, PAGE 2617.  LET'S START AT LINE

17:02   9   16 SO WE GET THE WHOLE CONTEXT.  THIS IS THE *BARGE* TRIAL

17:03   10  TESTIMONY.  IT'S DX-1590, PAGE 2617.  WE WILL START AT LINE 16,

17:03   11  PLEASE:

17:03   12          **"QUESTION:**  AS YOU SIT HERE TODAY, PROFESSOR BEA, DO

17:03   13      YOU HAVE AN OPINION ABOUT THE CAUSES OF THE SOUTH BREACH?

17:03   14          **"ANSWER:**  YES.

17:03   15          **"QUESTION:**  TELL THE COURT, WHAT IS THAT OPINION?

17:03   16          **"ANSWER:**  THE SOUTH BREACH DEVELOPED PRIMARILY AS A

17:03   17      RESULT OF LATERAL INSTABILITY ACCOMPANIED WITH HYDRAULIC

17:03   18      UPLIFT.  IT WAS ASSOCIATED WITH SEEPAGE PRESSURES AND

17:03   19      EFFECTS, BUT THAT WAS NOT A PRIMARY CAUSATIVE MODE.

17:03   20          "THE SECOND KEY MODE OF FAILURE WAS THAT

17:03   21      ASSOCIATED WITH THE DEVELOPMENT OF THE EROSIONAL TRENCH ON

17:03   22      THE PROTECTED SIDE OF THE FLOODWALL.  THE COMBINATION OF

17:03   23      LATERAL INSTABILITY GENERAL TO THE FLOODWALL LEVEE SYSTEM

17:04   24      ACCOMPANIED WITH THE LATERAL INSTABILITY EXACERBATED BY

17:04   25      THE OVERTOPPING EROSION INSTABILITY RESULTED IN THE SOUTH

## ROBERT G. BEA - FURTHER RECROSS

17:04   1    BREACH."

17:04   2   **A.**   CORRECT.

17:04   3   **Q.**   HAVE YOU NOW REJECTED THAT AS A CAUSE, WHAT YOU TOLD THIS

17:04   4   COURT IN *BARGE* WAS THE SECOND KEY CAUSE OF THE SOUTH BREACH?

17:04   5   **A.**   NO, IT'S NOT THE SECOND KEY CAUSE.  IT'S A MODE OF FAILURE

17:04   6   THAT IS DEVELOPING AT THE SAME TIME AS THE OTHER MODE OF

17:04   7   FAILURE.

17:04   8   **Q.**   YOU HAVE A THING ABOUT WORDS, DON'T YOU, DR. BEA?  YOU

17:04   9   HAVE A WORD SENSITIVITY, AS YOU DESCRIBED IT YESTERDAY?

17:04   10   **A.**   MAY I PROVIDE THE REST OF MY ANSWER?

17:04   11   **Q.**   CERTAINLY.  CERTAINLY.

17:04   12   **A.**   WE, IN *BARGE* AS WELL AS HERE, SPECIFICALLY STUDIED THE

17:04   13   EFFECT OF THE WAVE OVERTOPPING TRENCH ON LATERAL STABILITY OF

17:05   14   THE SOUTH BREACH.  WE USED A FINITE ELEMENT COMPUTER PROGRAM

17:05   15   THAT COULD CAPTURE WHAT IS A PRETTY DIFFICULT SOIL-STRUCTURE

17:05   16   INTERACTION PROBLEM AND DETERMINED THAT FOR THE PEAK SURGE

17:05   17   HEIGHT, THAT WE HAD A FACTOR OF SAFETY IN EXCESS OF UNITY FOR A

17:05   18   SCOUR TRENCH OF 6 TO 8 FEET DEEP, WHICH THEN SAID THE WINNING

17:05   19   CAUSATIVE MODE OF FAILURE WAS LATERAL INSTABILITY.  THOSE

17:05   20   RESULTS ARE CONTAINED IN THE *BARGE* TRIAL WORK AS WELL AS IN MY

17:05   21   WORK WITH THIS CASE.

17:06   22   **Q.**   DR. BEA, YOU ON YOUR REDIRECT TESTIMONY TODAY CRITICIZED

17:06   23   DR. ALLEN MARR, ONE OF THE GOVERNMENT'S EXPERTS IN THIS CASE,

17:06   24   FOR HIS ERRONEOUS CALCULATIONS OF THE EROSION SCOUR TRENCH,

17:06   25   DIDN'T YOU?

ROBERT G. BEA - FURTHER RECROSS

17:06    1   **A.**   YES.

17:06    2   **Q.**   YOU PERFORMED YOUR OWN OVERTOPPING ANALYSIS, DIDN'T YOU,

17:06    3   DR. BEA?

17:06    4   **A.**   YES.

17:06    5   **Q.**   DO YOU KNOW WHAT THE HEIGHT OF THE FLOODWALL WAS FOR YOUR

17:06    6   EROSION TRENCH ANALYSIS?

17:06    7   **A.**   AT WHAT LOCATION?

17:06    8   **Q.**   WELL, AT THE LOCATIONS YOU ANALYZED FOR YOUR OPINIONS IN

17:06    9   THIS CASE.

17:06   10   **A.**   WELL, WE PRESCRIBED THE HEIGHT OF THE FLOODWALL THAT'S

17:06   11   DOCUMENTED IN MY REPORT.

17:06   12   **Q.**   DO YOU RECALL WHAT THAT DOCUMENTED HEIGHT OF THE FLOODWALL

17:06   13   IS?

17:06   14   **A.**   NO.  I WOULDN'T EVEN TRY TO.  WE CAN GO DIRECTLY TO THE

17:07   15   DOCUMENT AND GET THE CORRECT FIGURE.  WE DON'T HAVE TO CONFUSE

17:07   16   THE RECORD.

17:07   17   **Q.**   I DON'T WANT TO CONFUSE THE RECORD.

17:07   18         LET'S GO TO APPENDIX D.  THIS IS YOUR ANALYSIS OF

17:07   19   LOWER NINTH WARD FLOODWALL PERFORMANCE DURING HURRICANE

17:07   20   KATRINA.  THIS IS JX-1393, PAGE 24.

17:07   21         CAN YOU SEE WHAT THE HEIGHT OF THAT FLOODWALL IS IN

17:07   22   THIS SCOUR TRENCH DEPTH ANALYSIS THAT APPEARS IN YOUR EXPERT

17:07   23   REPORT IN THIS CASE?

17:07   24   **A.**   WELL, THAT'S NOT THE CONFIGURATION WE USED TO PERFORM

17:07   25   EROSION ANALYSES.  THIS FIGURE WAS DEVELOPED DURING THE *BARGE*

## ROBERT G. BEA - FURTHER RECROSS

17:07  1    TRIAL, AND THE USE OF IT IN THIS SECTION IS TO SHOW WHAT THE

17:08  2    AIRBORNE LIDAR SURVEYS SHOW AS THE DEPTH OF THE EROSION TRENCH.

17:08  3    THE AIRBORNE LIDAR SHOWS THE FLOODWALL ELEVATION FOR THE TWO

17:08  4    CROSS SECTIONS, 5 AND 6.  IT LOOKS APPROXIMATELY 13 FEET.

17:08  5    **Q.**   LET'S GO TO PAGE 2 IN THIS SAME DOCUMENT, FIGURE 1.

17:08  6              **MR. SMITH:**  IF WE CAN BLOW UP THE FIGURE AT THE TOP

17:08  7    OF THE PAGE.

17:08  8    **BY MR. SMITH:**

17:08  9    **Q.**   WHAT'S THE TOP OF WALL ELEVATION SHOWN IN THIS FIGURE,

17:09  10   DR. BEA, THAT YOU USED AS THE INPUT HYDROGRAPH FOR YOUR

17:09  11   HYDRAULIC CONDUCTIVE ANALYSES?

17:09  12   **A.**   REFERENCE BEING PLUS 13 FEET.

17:09  13   **Q.**   ISN'T IT TRUE THAT YOU DIDN'T DO ANY SCOUR TRENCH ANALYSES

17:09  14   USING THE ELEVATION -- THE TOP-OF-WALL ELEVATION LESS THAN

17:09  15   12.5 FEET?

17:09  16   **A.**   I WOULD HAVE TO CHECK MY REPORTS TO CONFIRM THAT

17:09  17   ASSERTION.

17:09  18   **Q.**   I WILL REPRESENT TO YOU, SIR, THAT THAT'S NOT WITHIN YOUR

17:09  19   REPORTS.

17:09  20              **THE COURT:**  DO YOU DISAGREE WITH THAT, DR. BEA?

17:09  21              **THE WITNESS:**  IF HE HAS CHECKED IT, THEN THAT WILL

17:09  22   KEEP THE RECORD CLEAR.

17:09  23   **BY MR. SMITH:**

17:09  24   **Q.**   LET'S TALK ABOUT YOUR HYDRAULIC CONDUCTIVITY PRESSURE

17:09  25   TRANSMISSION THEORY.  ISN'T IT TRUE, DR. BEA, THAT YOUR

ROBERT G. BEA - FURTHER RECROSS

17:10   1   ANALYSES ARE BASED UPON THE DEVELOPMENT OF A FLOODSIDE TENSION

17:10   2   CRACK THAT WAS FULLY OPENED WHEN THERE WERE 2 FEET OF WATER

17:10   3   ACTING ON THE EXPOSED CONCRETE PORTION OF THE FLOODWALL?

17:10   4   **A.**   YES, SIR.

17:10   5   **Q.**   THAT WOULD HAVE BEEN AT ABOUT 1:00 IN THE MORNING,

17:10   6   CORRECT?

17:10   7   **A.**   AT WHAT LOCATION?

17:10   8   **Q.**   THIS LOOKS LIKE IT'S THE -- ONE OF THE BREACHES, SOUTH OR

17:10   9   NORTH.

17:10   10   **MR. SMITH:**  LET'S PUT UP DX-1590.  D AS IN DAVID.

17:11   11   THIS IS A *BARGE* TRIAL TRANSCRIPT.  LET'S GO TO PAGE 2650.

17:11   12   **BY MR. SMITH:**

17:11   13   **Q.**   IT LOOKS TO ME, FROM THE CONTEXT OF THE TOP OF THIS PAGE,

17:11   14   THAT YOU'RE TALKING ABOUT THE NORTH BREACH, BUT FRANKLY --

17:11   15   **THE COURT:**  DO YOU WANT IT UP?

17:11   16   **MR. SMITH:**  YES.  I WOULD LIKE TO BE ABLE TO DISPLAY

17:11   17   THIS SO WE CAN ESTABLISH HIS TESTIMONY.

17:11   18   **MR. TREEBY:**  PAGE NUMBER?

17:11   19   **MR. SMITH:**  2650.

17:11   20   **BY MR. SMITH:**

17:11   21   **Q.**   WE'LL LOOK AT LINE 4.  I THINK THIS TELLS US WE ARE

17:11   22   TALKING ABOUT THE NORTH BREACH HERE.  LINES 4 THROUGH 8:

17:11   23   **"QUESTION:**  WHAT IS YOUR OPINION AS TO WHERE THE

17:11   24   SHELL WAS PRIOR TO THE NORTH BREACH IMMEDIATELY PRIOR TO

17:11   25   THE NORTH BREACH?

ROBERT G. BEA - FURTHER RECROSS

17:11  1          "ANSWER:  IT LOOKS LIKE IT WAS BOTH ADJACENT TO THE

17:12  2     FLOODWALL SHEET PILING AND UNDER SUREKOTE ROAD."

17:12  3          I'M ONLY CITING THAT TO ESTABLISH WHICH BREACH HERE

17:12  4     WE'RE TALKING ABOUT.  THE QUESTIONING BY MR. RAFFMAN BEGINS

17:12  5     FARTHER DOWN THE PAGE, ON LINE 21:

17:12  6          "QUESTION:  SO NOW WE MOVE TO AN HOUR LATER, 1:00 IN

17:12  7     THE MORNING.  WHAT'S HAPPENING AS WE MOVE TO 1:00 IN THE

17:12  8     MORNING?

17:12  9          "ANSWER:  BY 1:00 IN THE MORNING, THE SURGE ELEVATION

17:12  10    IS AT 7 FEET.  THAT PUTS APPROXIMATELY 2 FEET OF WATER

17:12  11    ACTING ON THE EXPOSED CONCRETE PORTION OF THE FLOODWALL

17:12  12    SHOWN HERE TO THE RIGHT.  THE FLOODWALL AT THIS TIME CAN

17:12  13    OPEN A TENSION CRACK THAT PROPAGATES IMMEDIATELY TO THE

17:12  14    TIP AND PERHAPS EVEN BELOW THE TIP OF THE SHEET PILING.

17:12  15    THE PHOTOGRAPHS SHOW RELIC FEATURES AFTER THE STORM HAS

17:12  16    PASSED IN THIS PHOTOGRAPH ON THE LEFT."

17:12  17          I WOULD JUST LIKE TO DISPLAY THE PHOTOGRAPHS YOU

17:12  18    ARE DESCRIBING.  IT'S DX-1589.

17:13  19    Q.  IS THIS THE EXAMPLE OF THE TENSION CRACK THAT YOU

17:14  20    DISPLAYED AND COMMENTED ON IN THE *BARGE* TRIAL, DR. BEA?

17:14  21    A.  YES, SIR.

17:14  22    Q.  YOU AGREE, DON'T YOU, THAT THAT TENSION CRACK WOULD HAVE

17:14  23    DEVELOPED ALL THE WAY TO THE TIP OF THE SHEET PILE AND PERHAPS

17:14  24    EVEN BELOW BY 1:00 IN THE MORNING?

17:14  25    A.  CORRECT.  AND THAT DIDN'T FAIL THE WALL.

## ROBERT G. BEA - FURTHER RECROSS

17:14    1    **Q.**   WELL, LET'S TALK ABOUT YOUR PRESSURE TRANSMISSION THEORY.

17:15    2    AS I UNDERSTAND YOUR PRESSURE TRANSMISSION THEORY, DR. BEA, IT

17:15    3    DEPENDS UPON THE SATURATION OF THE SOILS.  DO I UNDERSTAND THAT

17:15    4    CORRECTLY?

17:15    5    **A.**   YES.

17:15    6    **Q.**   FULLY SATURATED SOILS CAN SERVE AS A CONDUIT FOR IMMEDIATE

17:15    7    PRESSURE TRANSMISSION?

17:15    8    **A.**   YES.

17:15    9    **Q.**   THAT'S NOT JUST A TRAIT THAT'S UNIQUE TO ORGANIC CLAYS, IS

17:15   10    IT?

17:15   11    **A.**   GIVEN THE WATER CONTENT IS COMPARABLE, IT'S NOT A TRAIT

17:15   12    UNIQUE TO ORGANIC CLAY.

17:15   13    **Q.**   WELL, NOW, LET'S NOT CONFUSE THE COURT.  BECAUSE THIS

17:15   14    CONFUSED THE LAWYERS WHEN WE FIRST STARTED TALKING ABOUT WATER

17:15   15    CONTENTS.  AND WHEN WE -- THE ENGINEERS WOULD SAY THE WATER

17:15   16    CONTENT IS 200 PERCENT, THE LAWYERS WOULD GO, HOW CAN YOU HAVE

17:15   17    MORE THAN A HUNDRED PERCENT WATER CONTENT?  THAT JUST DOESN'T

17:15   18    MAKE SENSE, DOES IT?

17:15   19            BUT WHEN GEOTECHNICAL ENGINEERS TALK ABOUT WATER

17:15   20    CONTENTS, AS YOU MADE CLEAR, ALTHOUGH THE JUDGE MAY NOT HAVE

17:16   21    PICKED UP THE IMPLICATION FROM YOUR EXAMPLES YESTERDAY, WHAT WE

17:16   22    ARE DOING IS WE'RE JUST COMPARING THE WEIGHT OF THE DRIED-OUT

17:16   23    SOIL PARTICLES TO THE WEIGHT OF THE WATER THAT WAS WITHIN THAT

17:16   24    SOIL UNIT BEFORE WE DRIED IT OUT, CORRECT?

17:16   25    **A.**   THAT'S CORRECT.

ROBERT G. BEA - FURTHER RECROSS

17:16    1    **THE COURT:** THAT MAY HAVE BEEN ONE OF THE FEW THINGS

17:16    2    THE COURT DID ABSORB. I DON'T USUALLY ABSORB IN THE

17:16    3    GEOTECHNICAL.

17:16    4    **MR. SMITH:** IT TOOK US A LONG TIME TO FIGURE IT OUT,

17:16    5    SO YOU GOT IT QUICKER THAN WE DID.

17:16    6    **BY MR. SMITH:**

17:16    7    **Q.** DR. BEA, YOUR TESTIMONY TODAY IS THAT FULL SATURATION --

17:16    8    AND I THINK THAT'S A REDUNDANCY -- SATURATED SOILS, COMPLETE

17:16    9    SATURATION, NO AIRING, ARE YOU NOW REFINING YOUR THEORY THAT IT

17:16   10    ONLY APPLIES TO FULLY SATURATED SOILS THAT HAVE WATER THAT

17:17   11    WEIGHS MORE THAN THE WEIGHT OF THE DRIED SOIL PARTICLES?

17:17   12    **A.** THE HIGH-WATER-CONTENT SOILS ARE THE SOILS THAT ARE ABLE

17:17   13    TO TRANSMIT THE HYDRAULIC PRESSURES. IF THE WATER CONTENTS ARE

17:17   14    LOWER AT THAT POINT -- LET'S GO TO WATER CONTENT -- BE

17:17   15    QUANTITATIVE -- OF THE ORDER OF 30 PERCENT, IT WILL BE THE SOIL

17:17   16    STRUCTURE THAT IS TRANSMITTING PRESSURE, AND THAT'S MUCH LESS

17:17   17    EFFECTIVE AT THE TRANSMISSION OF PRESSURE. SO WATER CONTENT IS

17:17   18    CRUCIAL TO UNDERSTAND PRESSURE TRANSMISSION.

17:17   19    **Q.** SO FULL SATURATION IS NOT SUFFICIENT IN AND OF ITSELF?

17:17   20    **A.** THAT'S CORRECT.

17:17   21    **Q.** SO NOW WE KNOW, DON'T WE, THAT THIS THEORY THAT YOU HAVE

17:18   22    DESCRIBED HERE IN COURT DIDN'T APPEAR IN ANY OF YOUR REPORTS IN

17:18   23    THIS CASE, DID IT?

17:18   24    **A.** NO, THAT'S NOT SO.

17:18   25    **Q.** IT WASN'T IN YOUR FIRST REPORT, WAS IT?

ROBERT G. BEA - FURTHER RECROSS

17:18   1   **A.**   YES.

17:18   2   **Q.**   THE DILATATIONAL MODULUS THEORY WAS IN YOUR FIRST REPORT?

17:18   3   **A.**   THE -- IT'S NOT A DILATATIONAL THEORY.  IT'S A THEORY OF

17:18   4   FLOW ANALYSES THAT TREATS THE WATER AS INCOMPRESSIBLE AND

17:18   5   TREATS THE SOIL SKELETON AS INCOMPRESSIBLE, AND THAT DEFINES

17:18   6   STEADY-FLOW ANALYSIS.

17:18   7   **Q.**   WELL, I UNDERSTAND CONVENTIONAL STEADY-FLOW ANALYSIS, AND

17:18   8   THOSE ARE JUST FUNDAMENTAL PRINCIPLES THAT APPLY TO ANY KIND OF

17:18   9   ANALYSIS.  WATER IS INCOMPRESSIBLE AND --

17:18   10   **A.**   IT'S A SOIL STRUCTURE COMPRESSIBILITY ISSUE.  THAT'S THE

17:18   11   CRITICAL POINT.

17:18   12   **Q.**   IF YOU DO AN UNDRAINED ANALYSIS, YOU'RE ASSUMING THAT THE

17:19   13   CHANGE IN STRESS IS BEING BORNE BY THE WATER.  THERE'S NO SOIL

17:19   14   SKELETON STRESS, IS THERE?  THE EFFECT OF STRESS REMAINS THE

17:19   15   SAME.

17:19   16            SO THE WATER IS CARRYING THAT STRESS, ISN'T IT,

17:19   17   DR. BEA?  THAT DOESN'T DEPEND -- LET ME ASK YOU TO ANSWER THAT

17:19   18   QUESTION.

17:19   19            AM I CORRECT?

17:19   20   **A.**   NO, YOU'RE NOT.

17:19   21   **Q.**   I'M NOT CORRECT.  SO WHEN YOU DO A DRAINAGE ANALYSIS, THE

17:19   22   EFFECTIVE STRESS DOES NOT REMAIN THE SAME.

17:19   23   **A.**   WHEN YOU STARTED THE DISCUSSION, I BELIEVE WE WERE TALKING

17:19   24   ABOUT PRESSURE TRANSMISSION, AND THEN YOU SHIFTED TO SHEAR

17:19   25   STRENGTH CHARACTERIZATION.  I THINK YOU ARE MIXING INCORRECTLY.

*HOURLY TRANSCRIPT*

## ROBERT G. BEA - FURTHER RECROSS

17:19    1    **Q.**   WELL, I APOLOGIZE, AND I PROBABLY AM, BUT I GUESS I'M

17:19    2    CONFUSED BY THE NEW WRINKLE IN YOUR THEORY.

17:20    3    **A.**   IT'S NOT A NEW WRINKLE, SIR.

17:20    4    **Q.**   WELL, IT'S NEW TO ME, AND I'VE READ YOUR EXPERT REPORT --

17:20    5           **MR. SCHULTZ:**  CAN WE STICK TO QUESTIONS AND ANSWERS?

17:20    6           IF HE WANTS TO TALK ABOUT THE REPORT, I'M SURE

17:20    7    DR. BEA CAN ADDRESS IT.

17:20    8    **BY MR. SMITH:**

17:20    9    **Q.**   DR. BEA, I WOULD BE HAPPY FOR YOU TO TELL US WHERE IN YOUR

17:20   10    REPORTS IN THIS CASE YOU EXPLAIN THAT YOUR PRESSURE

17:20   11    TRANSMISSION THEORY ONLY APPLIES TO SOILS THAT HAVE WATER

17:20   12    CONTENTS OF A CERTAIN PERCENTAGE.

17:20   13    **A.**   IT'S IN THE DIAGRAMS THAT WE SHOWED YESTERDAY.  I SHOWED

17:20   14    THE WATER CONTENT RANGES ASSOCIATED WITH BURIED SWAMP MARSH

17:20   15    LAYER UNDER THE LEVEE ALIGNMENT, AND THAT RANGED FROM 100 TO

17:20   16    300 PERCENT FOR THE PLUS/MINUS 1 STANDARD DEVIATION.

17:20   17           THE VERY REASON I PUT THAT DIAGRAM TOGETHER AND THEN

17:20   18    PUT THE JAR SAMPLES SO THE COURT COULD MAKE A PHYSICAL

17:21   19    CONNECTION TO THAT DIAGRAM IS WHY I PROCEEDED THROUGH THAT

17:21   20    ENTIRE DISCUSSION.  HIGH WATER CONTENT IS SYNONYMOUS WITH AN

17:21   21    EFFECTIVE PRESSURE TRANSMISSION.

17:21   22    **Q.**   DO YOU KNOW WHAT APPENDIX THAT'S IN, OR IS THAT IN THE

17:21   23    BODY OF YOUR REPORT BECAUSE I WOULD LIKE TO LOOK AT THAT FIGURE

17:21   24    BECAUSE I DON'T BELIEVE IT SAYS ANYTHING AT ALL ABOUT

17:21   25    ASSOCIATING WATER CONTENTS WITH PRESSURE TRANSMISSION.

## ROBERT G. BEA - FURTHER RECROSS

17:21   1   **A.**   THE DIAGRAM IS IN MY EXPERT REPORT.  YOU CAN READ THE TEXT

17:21   2   IN MY EXPERT REPORT, AND THAT WILL TELL YOU WHAT IT'S FOR.

17:21   3   **Q.**   THE REPORT IS NOT IN THE RECORD, SIR, AND THAT'S WHY I

17:21   4   WOULD LIKE TO GET IT INTO THE RECORD --

17:21   5   **A.**   UNDERSTOOD.

17:21   6   **Q.**   -- TO ESTABLISH WHETHER YOU HAVE ACTUALLY REVEALED WHAT

17:21   7   YOU SAY IS NOT A NEW WRINKLE.

17:21   8        THIS IS ON PAGE 73, FIGURE 41B.  IT LOOKS LIKE IT IS

17:22   9   IN THE MAIN BODY OF YOUR EXPERT REPORT.  SO THAT WOULD BE

17:22   10  JX-1389, PAGE 73.

17:22   11       THE LEGEND DOESN'T SAY ANYTHING AT ALL ABOUT

17:22   12  PRESSURE, DOES IT, DR. BEA?

17:22   13  **A.**   NO.  IT'S TALKING ABOUT WATER CONTENT FOR THE SWAMP MARSH

17:23   14  DEPOSITS.  THE TEXT ON PAGE 72 EXPLAINS WHAT IT'S ABOUT.

17:23   15       **MR. SMITH:**  LET'S GO TO THE TEXT, THEN, THAT

17:23   16  REFERENCES FIGURE 41B.

17:23   17       LET'S JUST IF WE CAN BLOW UP PARAGRAPH 78

17:23   18  BECAUSE THAT'S WHERE HE REFERENCES THIS FIGURE AND SEE IF

17:23   19  THERE'S ANYTHING THERE.

17:23   20  **BY MR. SMITH:**

17:23   21  **Q.**   IT SAYS:  RESULTS FROM ANALYSES PERFORMED BY ROGERS WERE

17:23   22  CORROBORATED WITH EMPIRICAL RELATIONSHIPS BETWEEN THE IN SITU

17:23   23  WATER CONTENTS OF THE BURIED SWAMP MARSH DEPOSITS DETERMINED

17:23   24  DURING THE COURSE OF THE ILIT STUDY, IPET, AND BEA AND

17:23   25  COBOS-ROA.

## ROBERT G. BEA - FURTHER RECROSS

17:24    1            I'M SUMMARIZING HERE RATHER THAN READING ALL THE

17:24    2    WORDS.

17:24    3            **THE COURT:**  THAT'S QUITE ALL RIGHT.

17:24    4    **BY MR. SMITH:**

17:24    5    **Q.**    THE RETURN FROM THE 2011 FIELD TESTING SUMMARIZED AND

17:24    6    ANALYZED BY ROGERS SOUTH EBIA SITE AND THE SCHOOL SITE COMBINED

17:24    7    WITH THE IN SITU HYDRAULIC CONDUCTIVITY DETERMINED FROM THE

17:24    8    TESTS PERFORMED BY WGI AND MMD PREVIOUSLY SUMMARIZED.

17:24    9            AS WOULD BE EXPECTED, BASED ON RESULTS FROM OTHER

17:24   10    TYPES OF SOILS, THERE IS A LOGARITHMIC LINEAR RELATIONSHIP

17:24   11    BETWEEN THE IN SITU HYDRAULIC CONDUCTIVITY AND THE SWAMP MARSH

17:24   12    DEPOSITS WATER CONTENTS, FIGURE 41A.

17:24   13            I GUESS THE PREVIOUSLY SUMMARIZED, I SKIPPED OVER THE

17:24   14    ALLUSION TO FIGURE 41B.

17:24   15            THERE IS NOTHING THERE, DR. BEA, THAT IS SHOWING A

17:24   16    CORRELATION WITH PERMEABILITIES, HYDRAULIC PERMEABILITIES.

17:24   17            THAT SEEMS TO BE THE IMPORT OF THIS FIGURE IN YOUR

17:24   18    REPORT.

17:24   19    **A.**    YOU'RE SAYING THE IMPORT OF 41B?

17:24   20    **Q.**    YES.

17:24   21    **A.**    IT HAS TWO IMPORTS.  UNDER THE TERM *HYDRAULIC CONDUCTIVITY*

17:25   22    ARE TWO FACTORS.  ONE FACTOR IS TRANSMISSION OF WATER, AND

17:25   23    THAT'S DOMINATED BY PERMEABILITY AND THE TRANSMISSION OF

17:25   24    PRESSURE.  I THOUGHT I MADE THAT CLEAR.

17:25   25    **Q.**    LET'S SEE IF YOU MAKE IT CLEARER IN APPENDIX C BECAUSE WE

ROBERT G. BEA - FURTHER RECROSS

17:25    1    SEE THE SAME FIGURE IN APPENDIX C.

17:25    2    **A.**   I DON'T HAVE APPENDIX C.

17:25    3    **Q.**   I'LL HAVE TO BLOW THAT UP FOR YOU, DR. BEA.  THAT'S

17:25    4    JX-1392.

17:25    5           **MR. SMITH:**  LET'S JUST SEE THE FIRST PAGE, IF WE

17:25    6    COULD, SO WE KNOW WHAT THIS CHAPTER IS ABOUT.

17:25    7              THIS CHAPTER IS ABOUT SOIL BEHAVIOR

17:25    8    CHARACTERISTICS, AND THE FIRST HEADING IS "SOIL DEPOSITS,

17:25    9    HYDRAULIC CONDUCTIVITY PROPERTIES."

17:25   10              IF WE CAN JUST SEE THAT WHOLE PAGE.  THERE'S NO

17:26   11    OTHER HEADINGS THERE.

17:26   12              THE NEXT HEADING APPEARS AT THE TOP OF PAGE 3,

17:26   13    IF WE CAN SEE THE TOP OF PAGE 3, PLEASE.

17:26   14              THERE'S A DISCUSSION OF THE EBIA WGI MONITORING

17:26   15    WELLS.

17:26   16    BY MR. SMITH:

17:26   17    **Q.**   AGAIN, THIS IS ANOTHER SECTION DEALING WITH HORIZONTAL

17:26   18    HYDRAULIC CONDUCTIVITY VALUES, ISN'T IT, DR. BEA?

17:26   19    **A.**   YES, SIR.

17:26   20    **Q.**   THEN IF WE CAN GO TO PAGE 6.  AT THE TOP OF THAT PAGE, IT

17:26   21    SAYS USACE PZ3 SERIES DATA 2008?

17:26   22    **A.**   CORRECT.

17:26   23    **Q.**   THIS IS YOUR DISCUSSION OF THE RESPONSE OF THE PIEZOMETERS

17:26   24    TO THE RISING AND FALLING STORM SURGE, ISN'T IT?

17:26   25    **A.**   PRESSURE RESPONSE.

## ROBERT G. BEA - FURTHER RECROSS

17:26    1   **Q.**  WELL, DR. BEA, ACTUALLY, IT CALLS IT A *HYDROLOGIC*

17:27    2   *RESPONSE.*

17:27    3         IF WE LOOK AT THE LAST SENTENCE, "THIS CONFIGURATION

17:27    4   ALLOWED THIS PIEZOMETER TO SENSE AND RECORD THE HYDROLOGIC

17:27    5   RESPONSE OF THE BURIED SWAMP MARSH LAYER," I DON'T SEE THE WORD

17:27    6   *PRESSURE.*

17:27    7         **THE COURT:**  LET'S NOT TALK TO EACH OTHER.  WE ARE NOT

17:27    8   GOING TO DO THAT.  LET'S GET TO THE POINT.  DO NOT TALK TO EACH

17:27    9   OTHER UNLESS IT'S SOMETHING YOU GET PERMISSION OF THE COURT OR

17:27  10   IT'S NOT DURING COURT, BUT -- NOT DURING TESTIMONY.

17:27  11         AND THE QUESTION IS?

17:27  12   **BY MR. SMITH:**

17:27  13   **Q.**  I'M TRYING TO FIND THE REFERENCE TO GET TO THE CONTEXT OF

17:27  14   IT.  THIS APPEARS IN YOUR SUMMARY SECTION, DR. BEA, THAT BEGINS

17:27  15   ON PAGE 19.

17:27  16         IN THE SUMMARY SECTION, YOU SAY:  "IN THIS SECTION,

17:28  17   RESULTS FROM THE HYDRAULIC CONDUCTIVE ANALYTICAL MODELS HAVE

17:28  18   BEEN COMPARED WITH FIELD AND LABORATORY VALUES OF SWAMP MARSH

17:28  19   SOILS, HYDRAULIC CONDUCTIVITIES AVAILABLE FROM THE PUMP TESTS,

17:28  20   AND LABORATORY PERMEABILITY TESTS."

17:28  21         THE NEXT PARAGRAPH SAYS WHAT THOSE ARE, HYDRAULIC

17:28  22   CONDUCTIVITY FROM THE PUMP TESTS.

17:28  23         THE NEXT PARAGRAPH TALKS ABOUT THE HYDRAULIC

17:28  24   CONDUCTIVITIES OF THE LABORATORY TESTS.

17:28  25         TABLE 4 ON THE NEXT PAGE, AGAIN TALKING ABOUT SUMMARY

ROBERT G. BEA - FURTHER RECROSS

17:28   1    OF HYDRAULIC CONDUCTIVITY VALUES.  THERE'S A DISCUSSION BELOW

17:28   2    THAT TABLE TALKING ABOUT THE VERY IMPORTANT PART OF THE BEST

17:28   3    ESTIMATE SOIL PROPERTIES IN SITU COEFFICIENTS OF PERMEABILITY.

17:28   4         AND THEN WE FINALLY GET TO WHAT IS NOW FIGURE 16B,

17:28   5    AND, AGAIN, WE SEE BASICALLY THE SAME DESCRIPTION HERE WE SAW

17:29   6    IN YOUR TEXT --

17:29   7    A.   YES.

17:29   8    Q.   WHICH SAYS:  "RESULTS FROM ANALYSES PERFORMED BY ROGERS

17:29   9    WERE CORROBORATED WITH EMPIRICAL RELATIONSHIPS BETWEEN THE

17:29   10   IN SITU WATER CONTENTS OF THE BURIED SWAMP MARSH DEPOSITS

17:29   11   DETERMINED DURING THE COURSE OF THE ILIT, IPET, AND THE IN SITU

17:29   12   HORIZONTAL HYDRAULIC CONDUCTIVITY OF THESE DEPOSITS DETERMINED

17:29   13   DURING THE 2011 FIELD TESTING AT THE SCHOOL SITE AND THE SOUTH

17:29   14   EBIA SITE COMBINED WITH THE IN SITU HYDRAULIC CONDUCTIVITY

17:29   15   DETERMINED FROM THE TESTS -- PREVIOUSLY SUMMARIZED HERE IN

17:29   16   FIGURE 16A AND 16B."

17:29   17        IS IT YOUR TESTIMONY TODAY THAT THE CORPS AND THE

17:30   18   DEFENDANTS WERE SUPPOSED TO UNDERSTAND YOUR PRESSURE

17:30   19   TRANSMISSION THEORY BASED UPON THE WATER CONTENTS THAT ARE

17:30   20   STATED IN FIGURE 16B?

17:30   21   A.   THAT'S A COMPONENT OF THE UNDERSTANDING.  THE KEY

17:30   22   COMPONENT INVOLVED IN ALL THIS IS DETERMINING WHAT SOIL

17:30   23   CHARACTERISTICS ARE DOMINANTLY IMPORTANT IN TRANSMITTING

17:30   24   PRESSURE, AND THAT SHOULD BE CONDITIONED ON APPROPRIATE FIELD

17:30   25   TEST DATA.

## ROBERT G. BEA - FURTHER RECROSS

17:30   1          IN MY CASE, I UTILIZED THE FAMILY OF PZ MEASUREMENTS

17:30   2   MADE UNDER THAT APPROPRIATE HIGH WATER SURGE LIKE LOADING TO

17:31   3   THEN DETERMINE WHAT PROPERTIES WERE IMPORTANT AT THE SWAMP

17:31   4   MARSH LAYER.  THE PROPERTY OF KEY IMPORTANCE WAS WATER CONTENT.

17:31   5   **Q.**   DR. BEA, I WON'T PROMISE YOU THAT THE WORD *PRESSURE*

17:31   6   DOESN'T APPEAR IN THIS CHAPTER, BUT I HAVE LOOKED AT EVERY PAGE

17:31   7   JUST HASTILY WHILE YOU WERE ANSWERING.  I DON'T SEE THE WORD

17:31   8   *PRESSURE* ANYWHERE IN THIS CHAPTER.

17:31   9   **A.**   ANY TIME I USE THE TERM *HYDRAULIC CONDUCTIVITY*, I AM

17:31   10  ADDRESSING TWO CHARACTERISTICS OF THAT CONDUCTIVITY.  THE FIRST

17:31   11  ONE, MOST IMPORTANT, IS PRESSURE.  THE SECOND ONE IS THAT OF

17:31   12  WATER TRANSMISSION.

17:31   13          **THE COURT:**  WE HAVE BEEN OVER THIS.

17:31   14          **MR. SMITH:**  THANK YOU, YOUR HONOR.

17:31   15          I HAVE NO FURTHER QUESTIONS OF THIS WITNESS.

17:31   16          **MR. SCHULTZ:**  YOUR HONOR, I AM READY TO GO.

17:31   17          **THE COURT:**  I DID NOT WANT YOU TO FORGET SOMETHING.

17:31   18          DID YOU WANT TO INTRODUCE THE REPORT INTO

17:32   19  EVIDENCE?

17:32   20          **MR. SMITH:**  I WOULD LIKE TO INTRODUCE --

17:32   21          **THE COURT:**  I ASSUME IF WE ARE GOING TO DO IT, I

17:32   22  GUESS IT WOULD BE BOTH, ANY, AND ALL.

17:32   23          **MR. SMITH:**  THE BODY AND THE APPENDIX, APPENDIX C WAS

17:32   24  IT, WE USED.  YES, YOUR HONOR.

17:32   25          **THE COURT:**  ANY OBJECTION?

## ROBERT G. BEA – FURTHER RECROSS

17:32  1           **MR. BRUNO:**  NO.

17:32  2           **THE COURT:**  ALL RIGHT.  I WANT THE WHOLE SHOOTING

17:32  3  MATCH IF IT'S GOING TO COME IN.  THAT IS REPORT 1, REPORT 2,

17:32  4  PERIOD.

17:32  5           **MR. SMITH:**  YOUR HONOR, THAT'S FINE WITH ME.

17:32  6           **THE COURT:**  JUST SO I CAN MAKE SURE --

17:32  7           **MR. BRUNO:**  OF COURSE, JUDGE.

17:32  8           **THE COURT:**  FINE WITH EVERYBODY ELSE?

17:32  9               LET IT BE ADMITTED.  LET THEM BE ADMITTED.

17:32  10          **MR. SMITH:**  JUST FOR THE RECORD, ANY OF THOSE OTHER

17:32  11  DOCUMENTS THAT WE USED WERE CONDITIONAL RELEVANCE DOCUMENTS.

17:32  12  WE WOULD LIKE TO MOVE IN THE PORTIONS WE REFERRED TO TODAY.

17:33  13          **THE COURT:**  ADMITTED.

17:33  14          **MR. BRUNO:**  JUST FOR THE RECORD, THERE'S NO REASON TO

17:33  15  MOVE IN CONDITIONAL RELEVANCE DOCUMENTS.  THEY'RE ARE ALREADY

17:33  16  IN.  LET'S REMEMBER THAT, PLEASE.  I DON'T WANT TO CONFUSE THE

17:33  17  RECORD.

17:33  18          **MR. SMITH:**  I APOLOGIZE.

17:33  19          **THE COURT:**  I'M EASY.

17:33  20          **MR. BRUNO:**  TOMORROW WE SHOULD HAVE A FINISHED

17:33  21  COMPLETE EXHIBIT LIST, TOMORROW BEFORE WE REST.

17:33  22          **THE COURT:**  I WAS GOING TO ASK ABOUT THAT.

17:33  23               ARE WE GOING TO TRY TO GIVE DR. BEA THE OPTION

17:33  24  OF GOING HOME TOMORROW?

17:33  25          **MR. SCHULTZ:**  HE IS GOING HOME, JUDGE, BUT HE HAS

## ROBERT G. BEA - FURTHER RECROSS

| | | |
|---|---|---|
| 17:33 | 1 | BEEN GOING AN HOUR AND 20 MINUTES NOW. |
| 17:33 | 2 | **THE COURT:**  YOU WANT TO TAKE A BREAK AND THEN WE'LL |
| 17:33 | 3 | COME BACK AND WE'LL WRAP IT UP? |
| 17:33 | 4 | **MR. SCHULTZ:**  AND IT WILL BE SHORT. |
| 17:33 | 5 | **THE COURT:**  FINE.  ALL RIGHT. |
| 17:33 | 6 | (RECESS.) |
| 17:33 | 7 | **MR. SCHULTZ:**  I APOLOGIZE, YOUR HONOR, A COUPLE |
| 17:33 | 8 | THINGS I WILL TALK ABOUT -- I HAVE TO DO A COUPLE THINGS OLD |
| 17:33 | 9 | SCHOOL. |
| 17:33 | 10 | **FURTHER REDIRECT EXAMINATION** |
| 17:50 | 11 | BY MR. SCHULTZ: |
| 17:50 | 12 | **Q.**  DR. BEA, IT'S BEEN A LONG DAY.  ARE YOU OKAY GOING |
| 17:51 | 13 | FORWARD? |
| 17:51 | 14 | **A.**  YES.  THANK YOU FOR ASKING. |
| 17:51 | 15 | **Q.**  IT WILL NOT BE LONG.  I WANT TO START FIRST WITH THIS |
| 17:51 | 16 | NOTION THAT NOBODY KNEW THIS CASE WAS ABOUT PRESSURE, BY ASKING |
| 17:51 | 17 | YOU AT PAGE 20, IN FIGURE 1 OF YOUR REPORT -- |
| 17:51 | 18 | **THE COURT:**  YOU CAN USE THE ELMO IF YOU WISH. |
| 17:51 | 19 | **MR. SCHULTZ:**  IF I CAN SET IT UP, I WILL -- |
| 17:51 | 20 | **THE COURT:**  SHEENA CAN HELP YOU. |
| 17:51 | 21 | OH, WE ARE NOT GOING TO ELMO. |
| 17:51 | 22 | **MR. SCHULTZ:**  1389. |
| 17:51 | 23 | BY MR. SCHULTZ: |
| 17:51 | 24 | **Q.**  THIS IS, I TAKE IT, THE FIRST FIGURE IN YOUR REPORT, |
| 17:51 | 25 | DR. BEA.  UP ON THE LEFT, WHEN YOU MENTIONED SURGE PRESSURES, |

## ROBERT G. BEA – FURTHER REDIRECT

17:51  1   HYDRAULIC PRESSURES FROM IHNC, AND EBIA BACKFILLED EXCAVATIONS

17:51  2   AND UPLIFT PRESSURES, ARE THOSE THE PRESSURES YOU HAVE BEEN

17:51  3   TALKING ABOUT THROUGHOUT THE TRIAL?

17:52  4   A.   YES, SIR.

17:52  5   Q.   LET ME ASK YOU:  THE ARMY CORPS OF ENGINEERS PIEZOMETERS

17:52  6   WE TALKED ABOUT YESTERDAY THAT YOU HAVE PICTURES OF IN

17:52  7   APPENDIX C AND THAT YOU DISCUSSED THROUGHOUT YOUR REPORT, DO

17:52  8   THEY MEASURE THE COLOR OF THE SWAMP MARSH LAYER?

17:52  9   A.   NO.

17:52  10  Q.   DO THEY MEASURE THE ODOR OF THE SWAMP MARSH LAYER?

17:52  11  A.   NO.

17:52  12  Q.   WHAT DO THEY MEASURE?

17:52  13  A.   THEY MEASURE PRESSURE.

17:52  14  Q.   THE PHOTOGRAPH THAT YOU WERE SHOWN BY MR. SMITH OF THE

17:52  15  STICK COMING OVER THE WALL -- I WANT TO MAKE SURE THE RECORD IS

17:52  16  CLEAR.  THAT WAS OVERTOPPING AT THE IHNC DURING A HURRICANE

17:52  17  EVENT, CORRECT?

17:52  18  A.   GUSTAV.  YES, THAT'S CORRECT.

17:52  19  Q.   THAT WAS OVERTOPPING OF WHICH WALL?

17:52  20  A.   WEST SIDE.

17:52  21  Q.   THAT IS CONSISTENT, IS IT NOT, WITH EXACTLY WHAT YOU TOLD

17:52  22  THE COURT OF WHAT YOU COULD EXPECT IN THE KATRINA HURRICANE

17:52  23  EVENT, FOR ALL THE SAME REASONS, CORRECT?

17:52  24  A.   CORRECT.

17:52  25  Q.   I WANT TO TALK ABOUT THE SOUTH BREACH FOR A MOMENT BECAUSE

## ROBERT G. BEA - FURTHER REDIRECT

| | | |
|---|---|---|
| 17:52 | 1 | THERE WAS SOME DISCUSSION OF MODES OF FAILURE.  I WANT TO |
| 17:53 | 2 | CRYSTALLIZE A COUPLE THINGS FIRST. |
| 17:53 | 3 | NUMBER ONE, IF THERE ARE NO UPLIFT PRESSURES, IN YOUR |
| 17:53 | 4 | OPINION, ACTING AT THE SOUTH BREACH LOCATION DURING KATRINA, |
| 17:53 | 5 | CAN OVERTOPPING -- WOULD OVERTOPPING ALONE ACCOUNT FOR FAILURE |
| 17:53 | 6 | OF THE WALL? |
| 17:53 | 7 | **A.**   NO. |
| 17:53 | 8 | **Q.**   IF UPLIFT PRESSURES -- DID THE UPLIFT PRESSURES CAUSE THE |
| 17:53 | 9 | FAILURE OF THE WALL BEFORE THE OVERTOPPING SERVED AS A |
| 17:53 | 10 | SUBSTANTIAL CONTRIBUTING FACTOR OR CAUSE OF THE FAILURE IN THIS |
| 17:53 | 11 | HORSE RACE THAT YOU HAVE DESCRIBED? |
| 17:53 | 12 | **A.**   THAT'S CORRECT. |
| 17:53 | 13 | **Q.**   THERE WAS DISCUSSION OF YOUR OVERTOPPING ANALYSIS BEING -- |
| 17:53 | 14 | USING A WALL HEIGHT OF 12 1/2 FEET.  MY HYPOTHETICALS TO YOU |
| 17:53 | 15 | THIS MORNING REGARDING WAVE OVERTOPPING AND SURGE OVERTOPPING |
| 17:53 | 16 | USED DR. MARR'S LOWER WALL ELEVATIONS, CORRECT? |
| 17:53 | 17 | **A.**   THAT IS CORRECT. |
| 17:53 | 18 | **Q.**   YOUR OPINIONS ARE THE SAME AS THEY WERE THIS MORNING IN |
| 17:53 | 19 | THAT REGARD? |
| 17:53 | 20 | **A.**   THAT IS CORRECT. |
| 17:54 | 21 | **Q.**   I WANT TO STEP BACK FOR A MOMENT TO WHAT I THINK WAS THE |
| 17:54 | 22 | FIRST OR AT LEAST AN EARLY EXHIBIT THAT WE WERE SHOWN REGARDING |
| 17:54 | 23 | THE BORING AT 29A AT SAUCER, THAT'S JX-01659-0093 -- OR 0092 |
| 17:54 | 24 | ACTUALLY. |
| 17:54 | 25 | NOW, YOU SHOWED THE COURT ON YOUR DIRECT, DR. BEA, |

ROBERT G. BEA - FURTHER REDIRECT

17:54  1  THE BORING AT 25A?

17:54  2  **A.**   THAT'S CORRECT.

17:54  3  **Q.**   MR. TREEBY POINTED OUT THERE WAS A 29A IN YOUR MODELED

17:54  4  EXCAVATION AND TALKED WITH YOU ABOUT THIS BORING.  DO YOU

17:54  5  RECALL THAT?

17:54  6  **A.**   THAT'S CORRECT.

17:54  7  **Q.**   FIRST OF ALL, THE BORING -- AND I THINK THIS WAS BROUGHT

17:54  8  OUT ON MR. TREEBY'S EXAMINATION -- IS NOT ELEVATION, IT'S

17:54  9  DEPTH, CORRECT?

17:54  10  **A.**   THAT'S CORRECT.

17:54  11         **MR. SCHULTZ:**  CAN WE GO DOWN TO THE BOTTOM OF THIS

17:54  12  PAGE, PLEASE.

17:54  13  **BY MR. SCHULTZ:**

17:54  14  **Q.**   YOU HAVE TOLD US, DR. BEA, I BELIEVE, ON DIRECT, THAT

17:54  15  ACCORDING TO DR. MARR'S ELEVATIONS, YOU HAVE, A ROUGH RULE OF

17:55  16  THUMB, GROUND ELEVATION IN THE SAUCER MARINE SITE OF ABOUT

17:55  17  3 FEET.  IS THAT CORRECT?

17:55  18  **A.**   THAT'S CORRECT.

17:55  19  **Q.**   IF WE GO FROM 3 FEET, WE HAVE AT MINUS -- AT 7 FEET

17:55  20  DOWN -- WHICH WOULD BE AT NEGATIVE 4 ELEVATION; IS THAT RIGHT?

17:55  21  **A.**   CORRECT.

17:55  22  **Q.**   -- WE SEE THE WATER TABLE AND WE SEE CLAYEY SILT, GRAY,

17:55  23  VARVED, SOFT, WET, AT 7 FEET SOME ORGANICS.  DOES THAT INDICATE

17:55  24  SOMETHING TO YOU ABOUT THE SOILS AT THAT ELEVATION?

17:55  25  **A.**   YES.  IN ADDITION, THE PEOPLE WHO TOOK THE BORING

## ROBERT G. BEA - FURTHER REDIRECT

17:55    1   IDENTIFIED THAT AS THE NATIVE SURFACE, MEANING WHAT'S ON TOP

17:55    2   HAS BEEN FILL.

17:55    3            **MR. SCHULTZ:**  IF WE GO DOWN TO THE NEXT PAGE, PLEASE.

17:55    4   CAN WE BLOW UP THE NEXT ELEVATION.

17:55    5   **BY MR. SCHULTZ:**

17:56    6   **Q.**   AT WHAT APPEARS TO ME TO BE 9- TO 12-FOOT RANGE, CLAYEY

17:56    7   SILT, GRAY, VARVED, WET, SOFT FLUID FROM 10 TO 12 FEET.  AT A

17:56    8   DEPTH OF 10 TO 12 FEET, WITH A GROUND ELEVATION OF 3 FEET WOULD

17:56    9   BE WHAT ELEVATION?

17:56   10   **A.**   WELL, AT THE 10 FEET, 2 WOULD BE AT MINUS 8 FEET NAVD88.

17:56   11   **Q.**   IF WE SAY 3-FOOT RANGE, SUBTRACT THE 10 TO 12, WE ARE AT

17:56   12   MINUS 7 TO MINUS 9?

17:56   13   **A.**   YES.

17:56   14   **Q.**   IF WE USE THE 2-FOOT WE ARE OBVIOUSLY A FOOT LOWER?

17:56   15   **A.**   YES.

17:56   16   **Q.**   THE SLIDE THAT YOU SHOWED, DR. BEA -- WAS THE PURPOSE IN

17:56   17   SHOWING THE SLIDE OF THE BORING OF 25A TO INDICATE THERE WERE

17:56   18   SOIL SAMPLES TAKEN BY WGI AT THE BEGINNING OF THE PROJECT THAT

17:56   19   SHOULD HAVE ALERTED THEM TO THE DANGER OF IMPROPERLY

17:56   20   BACKFILLING EXCAVATIONS WITH SOILS OF THIS NATURE AT THE TOE OF

17:56   21   THE LEVEE?

17:57   22   **A.**   CORRECT, YES.

17:57   23   **Q.**   DOES THIS BORING SAMPLE, IN YOUR OPINION, BASED ON THE

17:57   24   CHARACTERISTICS OF THE SOILS WE SEE THERE, SEND THE SAME DANGER

17:57   25   SIGNALS, IF YOU WILL?

**ROBERT G. BEA - FURTHER REDIRECT**

17:57  1  **A.**  YES.

17:57  2  **Q.**  YOU WERE ASKED ABOUT MODELING OF THE NORTH BREACH AND

17:57  3  SOUTH BREACH WITHOUT EXCAVATIONS, AND WE TALKED ABOUT THIS, BUT

17:57  4  LET ME ASK IT THIS WAY.  DOES YOUR MODELING OF THE NEAR BREACH

17:57  5  SECTION 10 AMOUNT TO A MODEL OF THE NORTH AND SOUTH WITHOUT

17:57  6  EXCAVATIONS INASMUCH AS IT IS IDENTICAL TO THOSE EXCEPT THAT

17:57  7  THE ONLY VARIABLE IS YOU DON'T HAVE AN EXCAVATION PIERCING THE

17:57  8  SWAMP MARSH?

17:57  9  **A.**  PRECISELY.

17:57  10  **Q.**  YOU WERE SHOWN, I THINK, TESTIMONY BY MR. BACUTA, THE

17:57  11  GEOLOGIST -- I THINK HE WAS AN ENVIRONMENTAL PERSON WITH THE

17:57  12  CORPS -- INDICATING THAT THEY -- DESPITE THE E-MAIL WE LOOKED

17:57  13  AT THIS MORNING, THEY WERE NOT CONCERNED ABOUT UNDERSEEPAGE AT

17:58  14  THE EBIA.

17:58  15        DO YOU REMEMBER THAT?

17:58  16  **A.**  OH, YES.

17:58  17        **MR. TREEBY:**  I OBJECT, YOUR HONOR.  THE

17:58  18  CHARACTERIZATION, I JUST CAN'T LET HIM GET AWAY WITH

17:58  19  "ENVIRONMENTAL PERSON AT THE CORPS."  HIS QUALIFICATIONS WERE

17:58  20  IN HIS TESTIMONY, AND THAT SHOULD STAND.  IT WASN'T AS AN

17:58  21  ENVIRONMENTAL --

17:58  22        **THE COURT:**  THE COURT HAS READ HIS DEPOSITION, KNOWS

17:58  23  HIS QUALIFICATIONS.  JUST USE "DR. BACUTA."  I KNOW WHO HE IS.

17:58  24  I KNOW HIS QUALIFICATIONS.

17:58  25        **MR. SCHULTZ:**  IF HE IS A DOCTOR, MY APOLOGIES.

**ROBERT G. BEA - FURTHER REDIRECT**

17:58   1   **BY MR. SCHULTZ:**

17:58   2   **Q.**   DR. BACUTA -- YOU SAW THE TESTIMONY INDICATING THEY WERE

17:58   3   NOT CONCERNED ABOUT UNDERSEEPAGE DESPITE WHAT YOU HAD DISCUSSED

17:58   4   IN THE E-MAIL, CORRECT?

17:58   5   **A.**   CORRECT.

17:58   6   **Q.**   I WANT TO ASK YOU, BASED ON EVERYTHING THAT YOU HAVE

17:58   7   LOOKED AT IN THIS RECORD FOR THE WORK THAT WAS DONE OUT AT THE

17:58   8   SITE, WAS ANYBODY CONCERNED WITH UNDERSEEPAGE?

17:58   9   **A.**   NO.

17:58   10   **Q.**   SHOULD THEY HAVE BEEN?

17:58   11   **A.**   YES.

17:58   12   **Q.**   FOR THE REASONS YOU HAVE EXPRESSED IN TERMS OF THE

17:58   13   CAUSATION OF THE BREACHES?

17:58   14   **A.**   YES.

17:58   15         **MR. SCHULTZ:**  THANK YOU, DR. BEA.

17:58   16         **THE COURT:**  THANK YOU, SIR.  YOU MAY MERCIFULLY STAND

17:58   17   DOWN.

17:58   18           I ASSUME THE PLAINTIFF WILL COMPLETE ITS CASE

17:59   19   TOMORROW?

17:59   20         **MR. BRUNO:**  YES, YOUR HONOR, WE WILL.

17:59   21         **THE COURT:**  JUST TO LET THE DEFENDANT KNOW.  TOMORROW

17:59   22   I WILL GIVE YOU -- I DON'T THINK IT'S A PROBLEM AT ALL, BUT

17:59   23   I'LL GIVE YOU -- YOU MAY HAVE IT, BUT I WILL GIVE YOU THE TIME

17:59   24   THAT WE HAVE AT LEAST COMPUTED ALLOTTED TO EACH OF YOU.

17:59   25         **MR. TREEBY:**  IF YOUR HONOR PLEASE, MAYBE -- WE TALKED

17:59   1   TO PLAINTIFFS' COUNSEL ABOUT THIS, BUT WE DIDN'T INVOLVE THE

17:59   2   COURT IN DISCUSSION.  WE HAD ASKED THE COURT, AND THE COURT HAD

17:59   3   AGREED, THAT WE WOULD TAKE YOM KIPPUR OFF.

17:59   4        **THE COURT:**  YES, WE DID.  I CERTAINLY DID.

17:59   5        **MR. TREEBY:**  AND WE MAY, BUT WE WOULD LIKE TO --

17:59   6        **THE COURT:**  IT'S YOUR OPTION.  I WILL WORK OR NOT

17:59   7   WORK AT YOUR -- AT THE BEHEST OF EVERYONE.

17:59   8        **MR. BRUNO:**  JUDGE, WE SAID AT THEIR OPTION ENTIRELY,

17:59   9   WE WILL WORK OR NOT WORK.

17:59   10       **THE COURT:**  I'LL BE HERE REGARDLESS.

18:00   11       **MR. BRUNO:**  THANK YOU, YOUR HONOR.

18:00   12       **THE COURT:**  I DO HAVE A LITTLE CRIMINAL DOCKET, BUT

18:00   13  THEY GENERALLY SHRINK.  I'M NOT TALKING ABOUT A CRIMINAL TRIAL,

18:00   14  BUT A SENTENCING.  I USUALLY GET ABOUT FIVE CONTINUANCES FOR

18:00   15  EACH SENTENCE.  THANK YOU.

18:00   16            I WILL DO IT AGAIN, BUT I THINK ALL OF YOU HAVE

18:00   17  BEEN REALLY VERY PREPARED.  THIS IS A LOT OF MATERIAL TO COVER.

18:00   18  IT'S VERY DIFFICULT, IT'S VERY CONTENTIOUS.  I AM INDEED

18:00   19  FORTUNATE TO HAVE SUCH FINE ADVOCATES AND PREPARED ADVOCATES

18:00   20  HELPING ME ALONG.  THANK YOU.

18:00   21       **MR. BRUNO:**  THANK YOU, JUDGE.

18:01   22       (PROCEEDINGS ADJOURNED.)

18:01   23                     * * *

18:01   24

        25

*HOURLY TRANSCRIPT*

1    **<u>CERTIFICATE</u>**

2         I, TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT

3    REPORTER FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT

4    OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE

5    AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND

6    UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE

7    ABOVE-ENTITLED MATTER.

8

9

10                              S/ TONI DOYLE TUSA
                               TONI DOYLE TUSA, CCR, FCRR
11                             OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*HOURLY TRANSCRIPT*