1    IN THE UNITED STATES DISTRICT COURT FOR
     THE EASTERN DISTRICT OF LOUISIANA
2              AT NEW ORLEANS

3    ************************************************************
     IN RE:  KATRINA CANAL BREACHES
4    CONSOLIDATED LITIGATION
     PERTAINS TO:  MRGO              Docket No. 05-CV-4182
5         *Armstrong No. 10-CV-866*    September 20, 2012
     ************************************************************

6

7                  THURSDAY, MORNING SESSION
                 TRANSCRIPT OF TRIAL PROCEEDINGS
8        HEARD BEFORE THE HONORABLE STANWOOD DUVAL
                 UNITED STATES DISTRICT JUDGE

9

10

11

12

13
     SUSAN A. ZIELIE, RMR, FCRR
14   Official Court Reporter
     HB 406
15   500 Poydras Street
     New Orleans, Louisiana 70130
16   susan_zielie@laed.uscourts.gov
     504.589.7781
17
     Proceedings Recorded by Computer-aided Stenography.
18

19

20

21

22

23

24

25

```
 1   APPEARANCES:
     For the Plaintiffs:              BRUNO & BRUNO
 2                                    BY:  JOSEPH M. BRUNO, ESQ.
                                      855 Baronne Street
 3                                    New Orleans LA 70113

 4                                    THE ANDRY LAW FIRM
                                      BY:  JONATHAN B. ANDRY, ESQ.
 5                                    610 Baronne Street
                                      New Orleans LA 70113
 6
                                      BARON & BUDD
 7                                    BY:  THOMAS SIMS, ESQ.
                                      3102 Oak Lawn Avenue, Suite 1100
 8                                    Dallas TX 75219

 9                                    DEGRAVELLES PALMINTIER HOLTHAUS
                                        & FRUGE
10                                    BY:  MICHAEL C. PALMINTIER, ESQ.
                                           JOSHUA M. PALMINTIER, ESQ.
11                                    718 Main Street
                                      Baton Rouge LA 70801
12
                                      DOMENGEAUX WRIGHT ROY & EDWARDS
13                                    BY:  ELWOOD C. STEVENS, JR. ESQ.
                                           BONNIE KENDRICK, ESQ.
14                                    PO Box 3668
                                      556 Jefferson Street
15                                    Lafayette LA 70502

16                                    THE DUDENHEFER LAW FIRM, LLC
                                      BY:  FRANK DUDENHEFER, JR., ESQ.
17                                    601 Poydras Street, Suite 2655
                                      New Orleans LA 70130-6004
18
                                      FAYARD & HONEYCUTT
19                                    BY:  CALVIN C. FAYARD, JR., ESQ.
                                      519 Florida Avenue SW
20                                    Denham Springs LA 70726

21                                    JOANEN LAW FIRM
                                      BY:  SCOTT JOANEN, ESQ.
22                                    4905 Freret Street, Suite B
                                      New Orleans LA 70115
23
                                      LEVIN PAPANTONIO THOMAS MITCHELL
24                                        RAFFERTY & PROCTOR
                                      BY:  MATTHEW D. SCHULTZ, ESQ.
25                                    316 S. Baylen Street, Suite 600
                                      Pensacola FL 32502
```

```
 1                                    THE TRIAL LAW FIRM, PC
                                      BY:  ANDREW P. OWEN
 2                                    800 Wiltshire Blvd, Suite 500
                                      Los Angeles CA 90017
 3
                                      J. ROBERT WARREN, II, A PLC
 4                                    BY:  J. ROBERT WARREN, II, ESQ.
                                      1718 Short Street
 5                                    New Orleans LA 70118

 6                                    COTCHETT PITRE & McCARTHY, LLP
                                      BY:  PHILIP L. GREGORY, ESQ.
 7                                    840 Malcolm Road, Suite 200
                                      Burlingame CA 94010
 8
     For the Defendant Washington     STONE PIGMAN WALTHER WITTMAN
 9   Group International, Inc.:        BY:  WILLIAM D. TREEBY, ESQ.
                                           JAMES C. GULOTTA, JR., ESQ.
10                                         HEATHER S. LONIAN, ESQ.
                                           MAGGIE A. BROUSSARD, ESQ.
11                                    546 Carondelet Street
                                      New Orleans LA 70130
12
                                          - AND -
13
                                      JONES DAY
14                                    BY:  ADRIAN WAGER-ZITO, ESQ.
                                           DEBRA S. CLAYMAN, ESQ.
15                                         CHRISTOPHER N. THATCH, ESQ.
                                           CHRISTOPHER FARRELL, ESQ.
16                                         JULIA CRONIN, ESQ.
                                           BRIAN KERWIN, ESQ.
17                                    51 Louisiana Avenue NW
                                      Washington DC 20001
18
     For the Defendant United         US DEPARTMENT OF JUSTICE
19    States of America:              CIVIL DIVISION, TORTS BRANCH
                                      BY:  ROBIN D. SMITH, ESQ.
20                                         JAMES F. McCONNON, JR. ESQ.
                                           RUPERT MITSCH, ESQ.
21                                         CONOR KELLS, ESQ.
                                           JOHN A. WOODCOCK, ESQ.
22                                    Benjamin Franklin Station
                                      PO Box 888
23                                    Washington DC 20044

24

25
```

```
 1          NEW ORLEANS, LOUISIANA; THURSDAY, SEPTEMBER 20, 2012

 2                            9:08 A.M.

 3          THE COURT:  Good morning.  Are we ready?

 4              Yes, sir.

 5          MR. JOANEN:  Good morning, Your Honor, Scott Joanen on

 6   behalf of plaintiffs.  Plaintiffs are ready to proceed with the

 7   presentation of their case.

 8              I do want to express that Mr. Bruno's unable to be

 9   here this morning.  He's back at the office making sure we get

10   all our ducks in the row.  But he didn't mean any disrespect to

11   the Court.

12          THE COURT:  Absolutely.

13          MR. JOANEN:  With that, I will give you Josh

14   Palmintier, who'll begin the presentation of the evidence.

15          THE COURT:  Yes.

16          MR. PALMINTIER:  May it please the Court, Josh

17   Palmintier, Degravelles Palmintier Holthaus & Fruge.

18              Before we get started today, I was hoping we could

19   have a side bar.  I've discussed this issue, a couple of issues,

20   that I want to discuss with you with both defendants.  And if we

21   could have a side bar concerning a couple of issues?

22          THE COURT:  All right.

23              (Sidebar Conference.)

24          THE COURT:  You tell me why is --

25          MR. PALMINTIER:  Your Honor, this is all about the
```

1   efficiency of the Court and timing here.  We've stipulated to

2   certain documents, the reports of these damages experts, being

3   admitted into evidence.  And so, as a possible way to save time,

4   we were looking for the guidance of the Court to find out

5   whether you'd like us to do just a direct, the cross and a

6   redirect.  Since, really, the direct here is going to be a

7   summary direct anyway because you already have the reports.  And

8   we're just looking for your guidance.

9           MR. McCONNON:  Essentially, the subject matter of these

10  witnesses is easier than Bea and the other guys.

11          MR. KELLS:  I don't think we have any problem.

12          What I understand is they'd like to have the

13  report be the summary direct.

14          THE COURT:  Is that what you're saying?

15          MR. McCONNON:  As an order of presentation, we'd agreed

16  with defense to put the exhibits in for the damages experts, our

17  damages experts and theirs.  I think what Mr. Palmintier is

18  suggesting to you is you do a normal presentation where you have

19  direct, cross and then redirect, as opposed to the summary

20  direct.  Because, effectively, the summary direct is what would

21  be a regular direct, given the subject matter and that it's not

22  really difficult.

23          THE COURT:  I don't have a problem about that if you

24  don't.  All right.  Okay.  That's fine.

25          MR. PALMINTIER:  The other issue that I wanted to

 1   discuss, Your Honor, was that, regarding your motion in limine

 2   order concerning the collateral source, and that you're giving

 3   an offset for wind and rain retaliation.  And so, Your Honor, we

 4   really just wanted guidance.  We think it's irrelevant, wind and

 5   rain is irrelevant concerning that case, since we're going to be

 6   getting an offset for that anyway.  And we just wanted to hear

 7   from you in terms of guidance for that.

 8        THE COURT:  You mean -- I'm not sure I understand.  You

 9   mean, your expert going into wind and rain?

10        MR. PALMINTIER:  We anticipate that there may be some

11   cross going into wind and rain; and, if there's already an

12   offset there, we don't know if that would be irrelevant to this

13   matter.

14        MR. THATCH:  I think we have to prove -- we have to

15   prove it.  I'm not sure I fully understand what he's saying.

16        THE COURT:  I guess he's saying, if there's been money

17   paid that's going to be -- in the event there is a judgment --

18   that would be deducted from the judgment, you may not regard

19   that as the gospel apathy that there is more wind and rain

20   damage.

21        MR. McCONNON:  That's exactly the point, there's an

22   offset, but we think it may be more.

23        THE COURT:  It may be more.

24        MR. McCONNON:  It may be more than that because the

25   plaintiffs have settled for a lesser amount.

```
 1              THE COURT:  I agree.  I'm going to allow that come in.

 2              MR. LANDRY:  That's fine.  That's fine.

 3              THE COURT:  Because it's not wholly writ, the amount

 4   paid.  So, if you think you can prove more damage than what was

 5   attributable to something other than flood, you may.

 6              MR. McCONNON:  It's their burden; and, just because

 7   there was a settlement with, for example, with the Armstrongs

 8   with the Liberty Mutual, that doesn't mean anything.  It's their

 9   burden to prove.

10              THE COURT:  Ergo, the need for testimony.

11              MS. WAGER-ZITO:  Your Honor, with these witnesses, it's

12   not going to be a lot.  This is more relevant to our damages.

13              THE COURT:  We hope not.  I would hope not.  Thank you.

14                  (Sidebar concluded.)

15              THE COURT:  Sir, are you ready to -- we'll get a

16   witness up, and then you can proceed.

17              MR. PALMINTIER:  Thank you, Your Honor.

18                  Plaintiffs call John Crawford, civil engineer.

19                  And, Your Honor, as an introduction, Mr. Crawford

20   is a professional engineer who has extensive experience

21   assessing properties in relation to post-Katrina flood damages,

22   and he will be testifying today to damages caused by flood

23   waters to the homes of the plaintiffs from an engineering

24   perspective.

25              THE COURT:  Thank you, sir.
```

```
 1                 JOHN CRAWFORD, being duly sworn, testified as

 2     follows:

 3               THE CLERK:  Would you please state your name and spell

 4     it for the record.

 5               THE WITNESS:  John W. Crawford, J-O-H-N

 6     C-R-A-W-F-O-R-D.

 7               MR. PALMINTIER:  One other thing.  We want to -- we've

 8     got a list of exhibits, Your Honor.  And what we would like to

 9     do is offer in-globo this list of exhibits that we-

10               MR. THATCH:  Your Honor, just quickly, I didn't get a

11     list of exhibits.  Just so we can take a look at it before.

12                    (Pause in proceedings.)

13               MR. PALMINTIER:  Your Honor, I've been told there's no

14     objection to the exhibit list.

15               THE COURT:  Okay.  Let them be admitted.

16                  (Exhibits admitted.)

17               MR. PALMINTIER:  May we proceed?

18               THE COURT:  You may.

19                          DIRECT EXAMINATION

20     BY MR. PALMINTIER:

21     Q   Good morning, Mr. Crawford.

22     A   Good morning.

23     Q   What is your occupation?

24     A   I'm a civil engineer.

25     Q   And, in your filed of expertise, we asked you to look at
```

1   facts and data as pertains to the affects of flood waters on

2   certain homes in the St. Bernard polder; is that correct?

3   A   That's correct.

4   Q   In particular, that being the five homes that we asked you

5   to assess; is that correct?

6   A   That's correct.

7   Q   We've asked you to provide us with an opinion as an expert

8   witness.  Please tell the Court the areas of expertise in which

9   you are prepared to testify.

10  A   I'm testifying today as a civil engineer with a focus on

11  forensic analysis of flood damaged properties or homes.

12  Q   Mr. Crawford, could you please tell us about your

13  educational background and licenses received.

14  A   Sure.  I have a Bachelor of Science in civil engineering

15  from Texas A&M University.  I'm a state-licensed professional

16  engineer in Louisiana, Texas, Mississippi, Alabama, Florida.

17  I'm on the National Council of Examiners for Engineering and

18  Surveying.  I'm also a state of Louisiana registered commercial

19  contractor.

20  Q   Thank you.

21          MR. PALMINTIER:  Next slide.

22  BY MR. PALMINTIER:

23  Q   And can you please go into your professional experience.

24  A   After I graduated Texas A&M, I worked in the oil field for a

25  brief stint.  Wasn't too happy with that, so I entered the civil

```
1   forensic world in about 1994.  In 1994, where I've been for

2   approximately 18 years.  Since then -- and, when I say civil

3   forensic engineer, what that entails is basically doing damage

4   assessments and costs of those assessments to properties due to

5   flood, wind, rain, tornadoes, product liability.  Anything that

6   would cause damage to a structure, we go in, we find out how,

7   when and why that structure was damaged and what to do about it.

8   Q   And so a large portion of your professional experience has

9   been forensic engineering and specifically in relation to flood

10  damage to structures; is that correct?

11  A   That's correct.  I do a lot of work for the National Flood

12  Insurance Program.  I work for plaintiff's attorneys, defense

13  attorneys.  A large section of my work is analyzing flood damage

14  and the costs to repair that flood damage.

15  Q   Thank you.

16             And you have published work as well; isn't that

17  correct?

18  A   That's correct.

19  Q   And could you tell us a little bit about what the topic of

20  that was.

21  A   As you can see on this slide, I co-authored a report with

22  James Crawford, who is my brother, on the Hurricane Ike Wind and

23  Surge Damage East of Roll-Over Pass.  And that paper had to do

24  with how storms like Hurricane damaged structures in a

25  particular island.
```

1   Q   And you are a member of the Society of Engineers; are you

2   not?

3   A   I am.

4   Q   Have you ever testified at a court in Louisiana?

5   A   Yes, I have.  I've testified in this court.

6   Q   And have you ever testified anywhere else besides this

7   court?

8   A   Yes.  I've testified in Jefferson Parish CDC Orleans Parish

9   CDC.

10  Q   Thank you.

11          MR. PALMINTIER:  Your Honor, we would now tender this

12  witness as an expert in the field of engineering.

13          MR. THATCH:  No objection, Your Honor.

14          MR. McCONNON:  No objection, Your Honor.

15          THE COURT:  The Court admitted Mr. Crawford.

16          MR. PALMINTIER:  Your Honor, thank you.

17  BY MR. PALMINTIER:

18  Q   Mr. Crawford, what were you asked to do in this case?

19  A   I was asked to perform a flood damage assessment for the

20  subject properties.

21  Q   Generally, what were your opinions regarding damages caused

22  by the flood?

23  A   In generally, I found that the flood water heights rose well

24  above the foundation of each of the plaintiffs' homes, flood

25  waters stagnated in the residence for a period of above 10 days,

 1   this water stagnation coupled with the prolonged loss of

 2   electricity in a closed environment exacerbated flood related

 3   damages and floodwater caused extensive damages to the interior

 4   and exterior finishes of plaintiff's homes.  I also did a more

 5   detailed analysis of each property.

 6   Q    Thank you.  And we'll get to that.

 7              What documents did you review in helping to

 8   formulate your opinion?

 9   A    I used a lot of reliance materials in this case.  And it's

10   on the slide there.  Would you want me to read that?

11   Q    I'll just get into a couple in order to not get too

12   involved.

13              Let's talk about the damages estimate prepared by

14   Scott Taylor with supporting documents.

15   A    Okay.

16   Q    How did you use that?

17   A    I reviewed Scott Taylor's report.  I reviewed his

18   photographs and the homeowner photographs.  Most importantly

19   within this documentation was the photographs provided by the

20   homeowners that he had documented that gave me a lot of

21   information on the type of flood damages that were -- that

22   occurred in these residences.

23   Q    Next, can you please tell us how you used the survey and

24   spacial report by Chad Morris?

25   A    Chad Morris provided elevations along the ground around the

1    homes as well as the floor heights within the homes.  This

2    helped me discern how deep the water had gotten into the

3    properties.

4    Q   Understood.

5             And you also had photographs and other

6    miscellaneous documentation; didn't you?

7    A   Yes, I did.

8    Q   And how did you use those documents?

9    A   I consider that part of my general working knowledge.  I

10   actually live close to the St. Bernard polder.  And, during the

11   course of the breach and thereafter, I saw hundreds and hundreds

12   of photographs.  I perused the FEMA website that documents a lot

13   of photographs.  My general working knowledge of the area.  I

14   did hundreds of reports in that area and around New Orleans.  So

15   I have a unique general working knowledge of this particular

16   part of New Orleans.

17   Q   Mr. Crawford, you also performed an onsite inspection at

18   each of these homes; did you not?

19   A   Correct.

20   Q   Why don't you tell the Court generally what your methodology

21   was in your inspection of the properties.

22   A   First off, I would go to the properties and bring my

23   reliance materials I thought that were necessary to bring with

24   me.  And I would go to the properties and I would photograph the

25   properties, photograph the surrounding properties and canvass

1    the area for any forensic evidence that would help me discern

2    how high water got into these residences.

3    Q    And is this methodology essentially similar to what other

4    professional engineers would use if given the same task?

5    A    Yes.

6    Q    Now, you talked about forensic evidence.  What particular

7    forensic evidence were you looking for?

8    A    Well, one of the things I was looking for was high water

9    marks or stagnated water marks.

10   Q    Why don't you tell the Court what standing or stagnated

11   water mark is.

12   A    In this case, water rose and it fell within these homes;

13   and, at some points, it stayed at certain levels for a long

14   period of time.

15   Q    How long is a long period of time?

16   A    Okay.  Well, it depends on -- and let me back up just a

17   little bit.  Stagnation mark occurs once the water stays there

18   for a long period of time and then it drops.  And, once it

19   drops, it leaves a discernible mark for a long period of time,

20   and you can go back and see that mark.

21             And then you asked me how long does this take.  It

22   depends on the type of materials.  If it's a gypsum board, wood

23   product, it takes days upon days.

24   Q    We'll get into that in greater depth a little bit later on.

25   Is it important to get the highest standing water mark?

1  A   Yes, it's important.

2  Q   Why is that?

3  A   The highest standing water mark gives me evidence as to how

4  high the water rose into the home or the peak elevation.

5  Q   Now, in flooding scenarios, do you always have a standing

6  water mark?

7  A   No.  Sometimes high dynamic forces, such as wave and moving

8  water, may wash over the house or knock it off its piers, and

9  then you don't have a mark.

10  Q   Is there any other way -- isn't it true that in a lot of

11  floods the water first peaks and then recedes quickly?

12  A   Yes, yes.  Hurricane Ike is a good example.  Water came in

13  the home, rose and fell very quickly, and you didn't have such

14  stagnation marks.

15  Q   But, in this case, we did have stagnation marks; is that

16  correct?

17  A   Yes.  Lots of them.

18  Q   And were you able to find the highest standing water line in

19  the majority of these properties?

20  A   Yes.

21  Q   You were looking for forensic evidence to see if that

22  corroborated with measurements as given in the Vrijling

23  hydrology reports; is that correct?

24  A   That's correct.

25  Q   And, during the inspection, you were determining whether the

1   peak height measurements in the Vrijling hydrology reports,

2   specifically the hydrology report related to the forensic

3   evidence, you were able to gather during your inspection; is

4   that correct?

5   A    That's correct.

6   Q    Now, before we go any further, let me ask you this question.

7   Is it within your scope as an expert, scope of your expertise as

8   an engineer, to rely upon and/or interpret hydrology reports?

9   A    Yes, it is.

10  Q    And have you had the occasion to interpret hydrology reports

11  in the past in your work?

12  A    Yes, I have.

13  Q    How did you use the Vrijling reports?

14  A    I brought them onsite with me as I look at these high water

15  marks.

16  Q    And what did you find in relation to the hydrology reports

17  as to the forensic evidence?

18  A    The forensic evidence that I found, Your Honor, supported

19  the Vrijling reports and the hydrology reports.  It proved to me

20  that they were accurate representation of how high the water

21  rose in the homes.

22  Q    From your education and experience with flood damage to the

23  property, what would you consider to be the main factors to look

24  at when determining flood damage in homes?

25  A    Well, first off, if hydrodynamic forces don't decimate a

1    structure or structurally compromise a structure and the

2    structure is still standing, which is in the case of most of

3    these residences, you're looking at height and duration.

4    Q    Tell us -- tell the Court what you mean by height in this

5    circumstance.

6    A    Well, height's important because it tells me which materials

7    are saturated and how high the water got, whether it be to the

8    baseboards, the attic or the baseboards, cabinets, attic, above

9    the attic, above the house.  So it tells me how high the water

10   rose in the home.  What materials were affected, basically.

11   Q    What materials were saturated?

12   A    Yes.

13   Q    Okay.  And you also have duration there.  Tell us why

14   duration is an important factor in determining flood related

15   damages.

16   A    Duration is very important because it gives you a time

17   element of how long water was in the house.  And the first

18   element of that that's important is standing water.  And it's

19   important I guess at this point to -- in my reports, I

20   determined that water was in these residences up to 10 days.

21   Q    Okay.  And I've put up a couple of photographs.  And, in

22   relation to that, could you explain what -- can you tell us what

23   you see.

24   A    On the left-hand side, there's a photograph of the Ninth

25   Ward, and you can see that there is the breach of IHNC on the

1    left-hand side.  This photograph was taken on August 31st, which

2    is approximately a day after the breaches.  And it shows a total

3    devastation in this area and water up to the rooftops.

4              And, in the background, what's important is you

5    can see the blue bridge, and that's the Florida Avenue bridge,

6    Your Honor.

7              On the right-hand photograph, you can also see

8    that blue bridge.  And, from the vantage point, you're looking

9    into the Ninth Ward, and you can see that water is still flooded

10   in the Ninth Ward photograph.  This is a photograph that's taken

11   from the FEMA website, something I peruse commonly in my field

12   of expertise.  And you can see the date is a September 7, 2005.

13   This is 10 days after the breach, and this is one of the

14   photographs I used to determine that, without a shadow of doubt,

15   we had water in these residences for up to 10 days.

16   Q    Thank you.

17             MR. PALMINTIER:  Crawford 9.

18   BY MR. PALMINTIER:

19   Q    Could you tell the Court what this photograph depicts.

20   A    This photograph's a typical neighborhood in St. Bernard

21   Parish, it's called a track home neighborhood.  You can see

22   clearly from this photograph -- and this is another one of these

23   -- of hundred of photographs that I've looked at, this is really

24   common, of my knowledge, of how high water was in the St.

25   Bernard polder up to 11 days.  In this instance, September 8,

1    2005.  And I think this is an important photograph because I

2    assumed a very conservative circumstance of up to 10 days.  And

3    I actually believe and know it was longer than that.  But, for

4    the purposes of what I was assigned to do, that up to 10 days

5    pretty much gets the point across.

6    Q    Now, would it matter if it was even shorter than 10 days in

7    terms of standing water in the homes?

8    A    No.  And, in this case, it's really, you know, several days.

9                    What you're looking at is a saturation of the

10   materials.

11                   And, if you can go back to the slide I think that

12   had the mitigation of duration of standing water, the duration

13   of standing water and mitigation is what's important.  It's at

14   the time that these -- how long was the duration between the

15   time that these materials were saturated and the time that they

16   were actually being able to be mitigated.  From the time that

17   these materials are saturated, you have a rise in ambient air, a

18   rise in the moisture contents in the area.  You have oxidation

19   that starts of your structural members, like nails, structural

20   connections.  You have wicking, which is water drawing up the

21   walls.  So at the time you have -- at the time that you start

22   with the total saturation of materials until the time that that

23   home is being able to be opened up and the moisture being able

24   to be taken out of the house, and the materials removed from

25   that house, you have this duration.  And this was a unique event

 1  because this duration was very, very long.  It was months before

 2  people were able to return to start to remove these materials.

 3  Q    Sounds like what you're saying is that, until materials are

 4  mitigated damages will continue to be worse; is that correct?

 5  A    That's absolutely correct, especially in this case.

 6  Q    So you gave a max height for each of the five properties and

 7  gave a conclusion as to what damages there were due to flood?

 8  A    Correct.

 9  Q    You were also asked to do rebuttal reports; is that correct?

10  A    That's correct.

11  Q    Please tell the Court what you did in these rebuttal

12  reports.

13  A    New information had come in to the case on different

14  modeling scenarios, so I was asked to do a rebuttal of damages

15  based on those different modeling scenarios.  So I looked at the

16  Daltymple hydrograph, I looked at the Vrijling hydrograph, I

17  looked at the Danner reports, the damage expert for defense and

18  I also looked at Madsen Kneppers and Associates' cost estimates.

19  Q    And was your task to review these reports and to find out

20  whether or not these different modeling scenarios in terms of

21  max heights, what kind of damages were caused there?

22  A    Yes.

23  Q    And did you use theoretical modeling scenarios given by the

24  hydrologists?

25  A    Yes, I used the Vrijling report.

1   Q    Why did you use the Vrijling report as opposed to the

2   Dalrymple report?

3   A    I found that was Vrijling report was more accurate.

4          MR. THATCH:  Your Honor --

5          MR. PALMINTIER:  Going to or the --

6          MR. THATCH:  I don't think this witness is qualified or

7   his opinion in this case -- he's not opining in this case about

8   the two different hydrographs, what the sufficiency is and

9   whether they're accurate.  And, that's not part of his opinion,

10  it's never part of his opinion.

11         THE COURT:  I understand your objection.  I'm going to

12  overrule and he can state, and I won't regard it as an expert

13  report why I used the Vrijling report.  I hadn't assumed

14  something would be asked on cross examination.  He can state why

15  he chose to use that.

16         MR. PALMINTIER:  Thank you, Your Honor.

17  BY MR. PALMINTIER:

18  A    Used the Vrijling report because I felt it was more easily

19  understood and it broke out the scenarios more correctly.  It

20  was really two reasons.  And, as you can see -- and I'll use

21  this pen.  On the Vrijling report, it's really easy to see these

22  little humps.  And these little humps show you the actual height

23  of these different scenarios.  So I was able to read these

24  heights very simply.  So the Vrijling report broke the scenarios

25  out in a way that I could interpret them as a civil engineer

1    easily and determine the maximum heights.

2              Now, if you look it the Dalrymple hydrograph, this

3    hydrograph rises and rises and rises, and it actually never

4    forms or a hump or a peak.  It's just kind of cut off.  As such,

5    can't really determine that that's a maximum height.  And I know

6    as an engineer, in reading hydrographs, if that curve continues

7    to rise, Your Honor, it doesn't peak, it just continues to go.

8    I need to see how much further that goes.

9              Secondly, the scenarios in Dalrymple didn't

10   isolate the IHNC north, IHNC south in such as way as the

11   Vrijling did.  So I found the Dalrymple hydrograph to be

12   confusing, and that I would have to call Dr. Dalrymple and have

13   a conversation with him to be able to see how he modeled these

14   scenarios and if I could compare apples to apples.  And I didn't

15   have the occasion to call him or the access to call him so that

16   I could compare apples to apples, so I stuck with the Vrijling

17   hydrograph.

18   Q   Can you please show the Court how you used the Vrijling

19   hydrographs.

20   A   Sure.  And, as I stated before, there's a hump right here.

21   And this is all causes, Your Honor.  You draw a line to the left

22   and you see that it's 11 feet.  That is the total depth above

23   the ground elevation.  This is all defined in the legend.  This

24   is the high ground elevation and the Armstrong all-causes high

25   elevation.

```
 1              If you add those two together, you get this
 2   figure, which is 13.9 feet.  That's the total depth from the
 3   ground to the top of the hydrograph.  That's also consistent
 4   with the working knowledge I have in that area.
 5              Now, below the legend, you see a simple formula
 6   that I used, it's 13.9 feet, which is the total minus the .6
 7   feet, which is the slab height.  The reason I used .6 feet in
 8   this, this is the Armstrong case, is because typically slab on
 9   grades are about 8 inches above the ground.  So you would use .6
10   feet, and you would have a total of 13.3 feet.  13.3 feet would
11   be the height above the floor that this house flooded to.  And
12   that would be the height -- if you were standing on the floor,
13   if you looked up, it would be 13.3 feet.
14   Q   So you were able to extrapolate from the hydrographs the max
15   height above the floor for each of the scenarios; is that
16   correct?
17   A   Correct.  And, if it please Your Honor, I can show you this
18   is had a NOM STHASHGS.  Here is the red graph.  You can see on
19   the graph, they isolate IHNC-only, no other causes.  From that
20   line, I can extrapolate over.  I can see, at 7 feet, use the
21   same formula and I come up with IHNC-only, which is 9.3 feet.
22              MR. PALMINTIER:  And, Your Honor, as we move into each
23   property, being that you have the reports, we're just going to
24   summarize, give a couple of different scenarios, rather than all
25   the different scenarios, if it pleases the Court.
```

```
 1              00612.  JX 01563-02.  And, if you could zoom in on
 2   the first photograph, Karl.
 3   BY MR. PALMINTIER:
 4   Q   Mr. Crawford, did you take this photograph?
 5   A   Yes, I did.
 6   Q   What does it depict?
 7   A   That's the property of the Armstrong residence.  Location of
 8   the Armstrong residence, which was removed.  The slab,
 9   everything was removed at the time of my inspection.
10   Q   Now, were you able to find any adjacent properties where you
11   could find a high watermark?
12   A   This is actually the first property I've been back to since
13   Katrina where the whole neighborhood had either been either
14   renovated or the structures completely remove to the point where
15   you could not find any more physical or forensic evidence on
16   watermarks.
17   Q   So how did you make the determination as to the highest
18   watermark?
19   A   Well, my inspection, I've done numerous inspections in this
20   neighborhood.  I've been through many, many, taking water marks
21   from some of these demolished residences, and I know that it was
22   in the attic.  Consistent with the hydrograph.
23              MR. PALMINTIER:  Crawford 14.
24   BY MR. PALMINTIER:
25   Q   Mr. Crawford, this is the hydrograph we did review earlier.
```

1   And it shows that all causes above floor were 13.4 and the IHNC

2   was 19.3 above floor.

3   A   9.3.  I believe you said 19.  13.3, all causes, 9.3

4   IHNC-only.

5             MR. PALMINTIER:  Crawford 15.

6   BY MR. PALMINTIER:

7   Q   From those heights from the flood waters, please give the

8   Court your opinion as to the flood related damages.

9   A   Flood related damages from all causes, from the IHNC only,

10  were extensive and necessitated the removal of interior gypsum

11  board walls, ceilings, cabinets, counter tops, HVAC, electrical

12  components, wall sheathing and flooring materials, allowances

13  for inspection of the foundation, cleaning of the wall cavities,

14  re-nailing all of the exposed structural wood and cleaning and

15  sanitizing all of exposed wood would be required, as well as

16  replacement of all roofing materials, roof sheathing soffit

17  framing and attic insulation.

18  Q   In reference to the Armstrong property, is this a home that

19  you would renovate and you would make all these changes to?

20  A   No.

21  Q   Why not?

22  A   Because of the amount of selective demolition you would have

23  to do to this house.  And, from selective demolition, I mean you

24  have two choices:  You can tear a house down or you can pick

25  apart each piece of these damaged materials.  In other words,

1   you have to take the roof off, you have to take the sheathing

2   off, you have to get to the wall sheathing, you to have to take

3   the flooring materials, you have to take the wall materials out.

4   So, basically, if you could visualize this, you'd end up with a

5   slab with nothing but studs left.  And that takes a long period

6   of time and is very costly.  So selective demolition overrules

7   the cost of just taking the house down and rebuilding it

8   completely.  So that's what I would recommend in doing from the

9   amount of damage that you had at the Armstrong residence.

10  Q    You also did an assessment or an inspection of the Holmes'

11  property; is that correct?

12  A    That's correct.

13         MR. PALMINTIER:   01561001.  And let's zoom in on that

14  first photograph.

15  BY MR. PALMINTIER:

16  Q    And this is a picture of the Holmes' property on Perrin

17  Drive; is that correct?

18  A    That's correct.

19  Q    And what does this photograph depict?

20  A    Again, this is photograph of a house that's been completely

21  demolished and foundation removed, and you're looking at the

22  property that it resided on.

23         MR. PALMINTIER:   JX 01561002.  Let's focus in on the

24  second photograph.  Thank you.

25  BY MR. PALMINTIER:

1477

1   Q    What does this picture depict?

2   A    That's a good depiction of a stagnant water line, and that's

3   on the fascia board on the eave of a home directly across the

4   street from the Holmes' residence.  This was a water mark I was

5   able to find within 15 feet of the home that had been

6   demolished.

7   Q    And how did you use this water mark for the Holmes'?

8   A    This water marked home showed me that water rose for a

9   certain elevation that was consistent with the hydrographs.  And

10  it also showed me that the -- that my theory of duration is

11  prevalent because you can see this fascia board, a board that

12  would be on the outside of a residence, it's used to being hit

13  by water.  But, when you have water standing there for a long,

14  long period of time, days upon days, it causes damage to that

15  material, to the point of needing to be removed.  As well the

16  nail right above, you can see, is oxidized severely and needed

17  to be re-manufactured and replaced as well.

18  Q    Now, is it your opinion that this is as high as the water

19  got?

20  A    Not in this particular case.  I believe water rose into the

21  attic of this home across the -- from the Holmes' residence,

22  this address.

23  Q    What you extrapolated in the photographs here is that the

24  all-causes was 12.4 feet above floor and IHNC was only 8.6 feet

25  above floor?

```
1    A    That's correct.

2    Q    What were the damages, in your opinion, to this home?

3    A    The damages in this home were similar to the Armstrong home;

4    and, I can read it out, but it's exactly the same as the

5    Armstrong home.

6    Q    Now, Mr. Crawford, we have this far you've given your

7    opinion on two properties, and there are four different

8    scenarios that we've gone into, and the damages are similar.

9    Can you explain to the Court why it is that the damages are

10   similar even though we have different water heights?

11   A    These are first-story homes, and all the elevations are

12   above 8.6 feet in these four elevations.  So, once water rises

13   into the attic and it stays for this prolonged period of time,

14   the saturation of this material begins -- and it goes back to my

15   duration theory and what I know about duration.  Once water

16   rises into these attics, it's going to soak into the sheathing,

17   the roof sheathing, the shingles.  It's going to debond the

18   shingles.  It's going to warp the roof sheathing.  The light

19   materials, like insulation, are going to be saturated.  And

20   these are going to be there for months.  It's going to cause

21   damage for months.  So, at that point, when you come back to

22   mitigate these damages, you're going to have to remove the

23   roofing materials, the soffit materials.  So it doesn't matter

24   if it's 8.6 feet to 12 to 13 feet; as long as water's in this

25   attic, the repair to the damages remain the same.
```

1  Q   And, just as was your opinion in reference to the Armstrong

2  property, it's your opinion that a total demolition is necessary

3  for this home?

4  A   Yes.  In this case, the selective demolition would override

5  the cost to demolish and rebuild.

6         THE COURT:  Counsel, have you brought out -- and

7  forgive me if you have -- the amount of water depth that would

8  be attributed to the IHNC only?

9         MR. PALMINTIER:  Yes, Your Honor.  The amount

10  attributed to the IHNC only is 8.6 feet in the Holmes'

11  residence.

12         THE COURT:  Thank you.

13  BY MR. PALMINTIER:

14  Q   If we move on to the Washington property that you inspected,

15  JX 15640006.  First slide.

16         This is a picture that you took of the Washington

17  residence on Charbonnet; is that correct?

18  A   That's correct.

19  Q   And the home there is a completely new home; it's not the

20  home prior to Katrina; is it?

21  A   No.  It's completely -- had been completely demolished and

22  rebuilt.

23         MR. PALMINTIER:  JX 1564000, first slide.

24  BY MR. PALMINTIER:

25  Q   Please tell the Court what this photograph depicts.

1   A    I canvassed the neighbors in this neighborhood, and I found

2   this debris line in a house that was still -- had not been --

3   had not undergone demolition or been rebuilt.  That debris line

4   is in the second story.  This property is approximately 1,200

5   feet away from the Washington residence, and this gave me an

6   idea of standing water in this residence.

7            MR. PALMINTIER:  Crawford 23.

8   BY MR. PALMINTIER:

9   Q    Now, so, in the 1910 Charbonnet Street property, what you

10  took from the hydrograph was that all causes reached 11 feet

11  above floor and that IHNC-only reached 7.5 feet above floor; is

12  that correct?

13  A    That's correct.

14  Q    And what were your -- what was your determination of damages

15  to this property?

16            MR. PALMINTIER:  Next Crawford.

17  BY MR. PALMINTIER:

18  A    On the structure was damage to the point of needing complete

19  demolition.

20  Q    Why is this different than the other scenarios?

21  A    This property was located at a point in the area of the

22  Ninth Ward that underwent a lot of hydrodynamic forces.  A lot

23  of these homes were subjected to wave forces and/or moving water

24  forces that caused the structural problems, structural damage or

25  complete failure.

1    Q    So, the homes in this area, they not only flooded but they

2    also, due to the flood, experienced hydrodynamic forces?

3    A    Correct.

4            THE COURT:  Do we have information as to what the

5    approximate distance that this home would be from the site of

6    the flood wall along the Industrial Canal?  If you don't know,

7    that's fine.

8            THE WITNESS:  I don't know.

9            THE COURT:  All right.  Thank you.

10   BY MR. PALMINTIER:

11   Q    Now, do you have any other sources that allowed you -- that

12   corroborated the opinion that you'd come up with?

13   A    Yes, the Rimkus report.

14   Q    And were there photographs that you reviewed that were part

15   of the Rimkus report?

16   A    Yes, I did.

17           THE COURT:  What report is that, sir?

18           MR. PALMINTIER:  The Rimkus report is an engineering

19   report that was done prior to -- or prior to our involvement in

20   this.

21           THE COURT:  All right, thank you.

22   BY MR. PALMINTIER:

23   Q    And were there photographs -- you did review those.

24           MR. PALMINTIER:  JX 16230005.

25               Actually, zoom in on the first one.

1    BY MR. PALMINTIER:

2    Q    And what does this photograph depict?

3    A    That this residence had been structurally compromised.  It's

4    been laterally shifted on its piers.  So it's structurally

5    compromised.  And, not only is structurally compromised, but it

6    was flooded to 11 feet in all causes and 7.58 feet from the

7    IHNC-only causes.  So this is, in my opinion, a totally

8    devastated home.

9    Q    And, basically, you don't believe that it would be prudent

10   to renovate this home; you believe that this should be a total

11   demolition?

12   A    Absolutely.

13   Q    And, in fact, was this a total demolition?

14   A    It was.

15          MR. PALMINTIER:  Please pull up 476710003 JX.

16          Actually, let's just move on to JX 015560001.

17   BY MR. PALMINTIER:

18   Q    This is a photograph that you took of the Livers' residence;

19   is that correct?

20   A    That's correct.

21   Q    And can you tell us what type of structure this is.

22   A    It's a single story structure with a second story addition

23   in the rear.

24          MR. PALMINTIER:  And if you could go to Crawford 27,

25   please.

1   BY MR. PALMINTIER:

2   Q    And what you found from the hydrographs is that, for all

3   causes, the height was 9.4 feet above floor, and for IHNC-only

4   it was 6.2 feet above floor; is that correct?

5   A    Correct.

6   Q    And what -- Crawford 28 -- what were the damages in the

7   Livers' residence, in your opinion?

8   A    In the Livers' residence, the flood related damages were,

9   all causes and the IHNC, were extensive sieve and necessitated

10  remove of the interior gypsum board walls, ceilings, cabinets,

11  countertops, HVAC, electrical components, wall sheathing and

12  floor materials.  Allowances for inspections of the foundation,

13  cleaning of the wall cavities, re-nail of all exposed structural

14  wood and cleaning and sanitizing all exposed wood would be

15  required.

16                This paragraph defines the damages that would

17  have been associated with the living area only, not the attic.

18  Q    And that is because it didn't reach the attic space; is that

19  correct?

20  A    Well, the all-causes did, but the IHNC-only didn't.  So the

21  IHNC-only would be prevalent to this paragraph, where all-causes

22  would have reached the attic in the first floor section of this

23  home, which is the front section and caused damage to that, to

24  the roof.  In that area.

25                But, in the second story, it would only cause the

1    need to gut the gypsum board materials if it reached the attic

2    in the first floor.  It would have gotten partially in the

3    second floor.  Wicking would have occurred, you'd have to take

4    down the wall gypsum board and those materials in the second

5    floor from all-causes.

6    Q    In terms of roofs in this scenario, in the all-causes

7    scenario where you have the need to replace the first floor

8    roof, for matching purposes, would you want to replace the

9    second floor roof as well?

10   A    I would think so, yes.

11          MR. PALMINTIER:  Karl, pull up JX 01562001, please.

12   Zoom in on the second photograph.

13   BY MR. PALMINTIER:

14   Q    And this is a photograph of the Coats' home that you

15   inspected; is that correct?

16   A    That's correct.

17   Q    And the home had been reconstructed prior to your

18   inspection; correct?

19   A    Correct.

20   Q    So you're not able to find a standing water line on this

21   residence?

22   A    No, I wasn't.

23   Q    But you were able to find a water line, like in some other

24   instances, on an adjacent property; correct?

25   A    Correct.  I was able to find -- and I think in that

 1   photograph on the right-hand side, you can see that part of the

 2   house that next door had not been completely renovated, had been

 3   gutted.  I was able to find some stagnant water marks on the

 4   windows.

 5           MR. PALMINTIER:  JX 15620006, Karl.  First photograph.

 6   BY MR. PALMINTIER:

 7   Q   And this is a photograph that shows the standing water line

 8   that you found; is that correct?

 9   A   Yeah.  And you can see and I will even point real quick that

10   that is being an example of standing water line on a window.

11   And this is six years after the flood.

12   Q   Mr. Crawford, could you please explain to the Court how it

13   is that you can use a water line on an adjacent home.

14   A   What I do is I find a water line like this on adjacent home.

15   And I think, in that photograph, on that page, you'll see --

16   actually, you'll see here, this is my compy level, which is a

17   leveling device.  And I can mark that at 0.0 or a reference

18   mark.  I can bring that right over to the subject property,

19   which is the Coats' property, and I can find that same 00 mark.

20   And, just utilizing a simple tape, I can tell how high the water

21   got above the floor.  And, again, this is forensic evidence I

22   used to verify the accuracy of the Vrijling report.

23           MR. PALMINTIER:  Crawford 31.

24   BY MR. PALMINTIER:

25   Q   In reference to the Coats' property, you found that

1    all-causes 6.7 feet above floor and IHNC-only was 3.1 feet above

2    floor; correct?

3    A    Correct.

4          MR. PALMINTIER:  Crawford 32.

5    BY MR. PALMINTIER:

6    Q    What were the damages to the property for the two scenarios

7    and why?

8    A    Flood related damages to the Coats' property from all-causes

9    and the IHNC-only were similar, because they did not reach the

10   attic.  It would have been extensive and necessitated the

11   removal of interior gypsum board walls, ceilings, cabinets,

12   countertops, HVAC, electrical components, wall sheathing,

13   exterior wall cladding and flooring materials.  Allowances for

14   inspections of the foundation cleaning of the wall cavities,

15   re-nailing of all exposed structural wood and cleaning and

16   sanitizing of all expressed wood would be required.

17          This would be consistent with water entering these

18   first floors for a long duration.  Such as the Livers'

19   residence, we had the IHNC case getting into that first floor.

20   Q    Thank you.

21          Now, Mr. Crawford, were you able to speak with Mr.

22   Scott Taylor prior to preparing your rebuttal reports?

23   A    Yes.

24   Q    And who is Mr. Scott Taylor?

25   A    Mr. Scott Taylor performed the costs analysis for the flood

1    related damages in this case.

2    Q   And did you speak with him specifically concerning the

3    hydrographs and the maximum heights above floor that you've

4    extrapolated from the Vrijling hydrographs?

5    A   Yeah.  It became evident, Your Honor, that we had all these

6    different scenarios and all these different heights and all

7    these different causes.  So I contacted Scott to discuss, if

8    water got so high in these residences from all these different

9    causes, what kind of damage it would cause, so that he could be

10   more accurate in his cost estimate.

11              THE COURT:  Thank you.

12              MR. PALMINTIER:  Thank you, Mr. Crawford.  Could you

13   please answer any questions the defense may have.

14                        CROSS EXAMINATION

15   BY MR. THATCH:

16   Q   Morning, Mr. Crawford.  Chris Thatch, I represent Washington

17   Group International in this litigation.

18              You and I met at your deposition several months

19   ago; correct?

20   A   Correct.

21   Q   Just have a few questions for you, Mr. Crawford.  You have

22   no opinion in this case about the cost of damage to each of the

23   plaintiffs' houses; do you?

24   A   Costs of damages?  No, I don't.

25   Q   And you have no opinion in this case about what percentage

1    of the water that collected in each of the plaintiffs' homes

2    during Katrina was attributable to rain water as opposed to

3    flood water; correct?

4    A    Correct.

5    Q    And you know from reviewing various whether reports to

6    prepare your expert opinions in this case that rainfall totals

7    were between 10 to 12 inches during Katrina; is that correct?

8    A    That's consistent.

9    Q    You agree that, if rain totals were between 10 and 12

10   inches, some of the water that collected in the plaintiff's

11   homes could have been rain water?

12   A    Could have been.

13   Q    Now, the expert reports that you submitted in this case

14   discuss Katrina flood water elevations in the plaintiffs'

15   residence and in four different scenarios; correct?

16   A    Correct.

17   Q    All-causes scenario, IHNC-only scenarios and IHNC-south

18   breach surges and IHNC-north breach surges; is that correct?

19   A    Correct.

20   Q    We didn't discuss about the IHNC-south breach and north

21   breach as far as your scenarios this morning; correct?

22   A    Correct.

23   Q    Now, you have no opinion in this case about the flood water

24   elevations or damages resulting from MRGO only; is that correct?

25   A    Correct.

1   Q   And you also have no opinion in this case about wind damage

2   to any of the plaintiffs' homes; is that right?

3   A   It was beyond the scope of my report.

4   Q   Well, you're not aware that all five of the plaintiffs for

5   whom you issued reports in this case made claims for wind damage

6   on their home owner's insurance polices?

7   A   I'm not aware of that.

8   Q   You've he done several other Katrina-related flood

9   assessments where you determined the property was damaged by

10  wind or wind-driven rain; is that correct?

11  A   Correct.

12  Q   I think you said you've done hundreds of flood assessments

13  related to Katrina; is that right?

14  A   Correct.

15  Q   Let's talk about for a few minutes the plaintiffs'

16  properties in this case.  You inspected the Armstrong property

17  on July 19, 2011; is that right?

18  A   Correct.

19  Q   And that was roughly six years after Katrina?

20  A   Yes.

21  Q   And I think you mentioned this during your direct; but, just

22  to clarify, the Armstrong house had been demolished by that

23  time; is that right?

24  A   That's correct.

25  Q   There was no foundation to inspect when you saw the property

1   on that day; is that right?

2   A   That's correct.

3   Q   Aside the from the lot itself, there was nothing on the

4   property to inspect; isn't that right?

5   A   Correct.

6   Q   And you concluded that flood waters were in the Armstrong

7   residence to approximately 6.1 feet in the

8   IHNC-north-breach-only scenario; is that right?

9   A   If I might use a sheet of paper?

10  Q   We can pull up your rebuttal report, that might be easier.

11  A   I actually have all of the depths here, so I can access

12  those depths.  If you could ask the question again.  Or that

13  would be even better.

14  Q   You concluded that flood waters within the Armstrong

15  residence rose to approximately 6.1 feet in your

16  IHNC-north-breach-only scenario; is that correct?

17  A   That's correct.

18  Q   And you agree, in your IHNC-north-breach-only scenario for

19  the Armstrong home, replacement for the all of the roofing

20  materials, roof sheathing, soffit and attic materials would not

21  have been required; is that right?

22  A   North breach only?

23  Q   Yes.

24  A   Yes.

25  Q   We talked also about the Coats' residence during your direct

1  testimony; is that right?

2  A   That's correct.

3  Q   And you inspected the Coats' property twice I believe,

4  correct?  From your deposition, once on June 2007 and then again

5  on July 19th; is that correct?

6  A   Correct.

7  Q   And, when you inspected the Coats' property on June 2007,

8  you just wanted to see what the other experts were doing; is

9  that right?

10 A   Well, I was asked to follow the other experts and see what

11 their methodology was.  It wasn't just as simple as that; but,

12 yeah, I basically watched the methodology of the other experts.

13 Q   You didn't take any of your own measurements at that time;

14 is that right?

15 A   No.

16 Q   You didn't use any of your field equipment to do any type of

17 work at that house when you were there on July 2007; is that

18 correct?

19 A   Correct.

20 Q   And, when you inspected the Coats' property on July 19,

21 2011, the house had been renovated; is that right?

22 A   Correct.

23 Q   And you computed in your expert report that flood waters

24 within the Coats' residence rose to approximately 2.2 feet in

25 your IHNC-south-breach-only scenario; correct?

1    A    That's correct.

2    Q    You also concluded that the flood water elevations for the

3    north-breach-only scenario of the Coats' property was negative

4    .5 feet; is that right?

5    A    That's correct.

6    Q    In other words, the flood water from the north-breach-only

7    would have been below the floor of the house; is that right?

8    A    Yeah.  Approximately, yes.  Below the floor of the house in

9    the sense of the finished floor of the house.

10   Q    And would you agree, it is difficult to determine how

11   damaged the Coats' residence would have been in the

12   north-breach-only area flood water only of negative five feet?

13   A    I have determined that to be correct; because, when water

14   approaches the baseboards of a house or the floorboard of a

15   house, sometimes water wicks into that house and can cause a lot

16   more damage, and then sometimes it doesn't.  So, in this

17   theorological data, it would be hard to ascertain, yes, correct.

18   Q    Just so we're clear, with the information that you have,

19   based on the information that you reviewed for this property,

20   you would agree that it would be difficult to tell at that

21   depth, negative .5 feet, what the damage was to the house?

22   A    That's correct.

23   Q    Now, you also concluded that water would have risen on a

24   height of only 3.1 feet above the floor of the house in your

25   IHNC-only-scenario for this residence; correct?

1   A   Correct.

2   Q   It's your opinion is that, in the event an IHNC breach, the

3   damage to the interior of the Coats' residence would include the

4   ceilings; is that right?

5   A   Correct.

6   Q   Actually opine that the ceilings in the Coats' residence

7   would have been removed and replaced; is that right?

8   A   Should have been, yes.

9   Q   How high were the ceilings in the Coats' residence, Mr.

10   Crawford?

11   A   I'm not exactly sure, but I believe they were above 8 feet.

12   Q   So, roughly 5 feet above where the water would have risen in

13   that IHNC-only scenario; is that right?

14   A   Correct.

15   Q   Now, you also opined that flood water stagnated within the

16   Coats' residence for a long period of time, up to 10 days.  And

17   we heard this testimony with respect to each of the residences;

18   correct?

19   A   Correct.

20   Q   Now, your opinions regarding stagnant water in all five

21   residences are not based on a study or analysis of the

22   hydrographs that you showed us; is that right?

23   A   Correct.  Well, it can be partially seen in the hydographs.

24   In the Vrijling hydrograph, you can see a time element on where

25   you have this peak.  And, at least for two days, you have this

1    drawdown of water that occurred.  So you can say, for 24 hours

2    or 48 hours -- I can't remember exactly how long -- but you can

3    get a little bit of a time element from those hydrographs.

4    Q    Why don't we look at one of those hydrographs for the Coats'

5    residence in particular, PX 471.  Page -- and it is it the -- if

6    I can read that.

7               So this is the hydrograph that you used to develop

8    your opinions regarding the Coats' residence; is that correct?

9    A    That's correct.

10   Q    And you see the red line on the hydrograph shows the

11   flooding estimated at the Coats' residence for the IHNC-only

12   breach -- and I think we looked at some of the other residences

13   in your hydrograph?

14   A    That's correct.

15   Q    And, in the IHNC-only flooding estimate flooded near peak at

16   7.5 feet.  Is that right?

17   A    That's correct.

18   Q    And, in your original expert report, you took the ground

19   elevation of approximately, I believe, 4.3 feet into account,

20   and you concluded that there was, as a result, 3.1 feet of water

21   above the floors inside the Coats' residence in the IHNC-only

22   scenario; is that correct?

23   A    According to the hydrographs, correct.

24   Q    So, if you follow the red line to the end of the hydrograph

25   on the right side, and if you look at the times down at the

1   bottom of the hydrograph, you would agree that, at midnight, on

2   August 29th, the elevation estimated in this hydrograph is just

3   over 5 feet; correct?

4   A    According to the hydrographs, correct.

5   Q    And, again, using the floor elevation of about 4.3 feet,

6   there would have been only .7 to .8 feet of water inside the

7   Coats' residence less than a day after the storm first hit; is

8   that right?

9   A    Theoretically.

10  Q    You didn't take that into account when you opined about the

11  water stagnating within this residence for up to 10 days?

12  A    Yes, I did.  I mean, I know, in this area, that water was in

13  these homes for up to 10 days.  And that's not as important as

14  the time it takes to stagnate these materials.  And what you are

15  showing me right here is, according to these theoretical models,

16  even the theoretical models are telling me that there's plenty

17  of time form all these materials in the first floor to be

18  stagnated long enough to start causing damage to these

19  materials.  The plaster in this case, gypsum board, nails.  And,

20  again, it's the duration, because these materials were saturated

21  within the living space of this home for over a month, for

22  months before they could be mitigated.  The problem start to

23  rise to the ceilings.  That's why I included the ceilings.

24  Q    Well, in this particular case, Mr. Crawford, we've got water

25  stagnating for roughly 24 hours; and, by the end of that period,

1    it's at .7 to .8 feet; correct?

2    A    Correct.

3    Q    So it's stagnating at a level below a foot in the house; is

4    that right?

5    A    A foot or so in the house theoretically, yes.

6    Q    And that's, in terms of duration, that's far much shorter

7    than 10 days; isn't that right?

8    A    Yes.

9    Q    And the ceiling in house almost certainly is roughly around

10   8 feet, similar to the ceiling in the other house we discussed?

11   A    Correct.

12   Q    So that gives us a difference of almost 8 feet; correct?

13   A    Yes.  I guess mu point is, it doesn't matter in this case.

14   So the damages remain the same.  It's the theory I have in the

15   attics space, Your Honor, water is stagnating even in 48 hours.

16   We're talking here, 3 feet, it drops down to 1 feet.  Even if

17   this theoretical model is true, water stayed in this house long

18   enough to saturate all these materials.  And, if it was even to

19   drop out of this home, this home is encapsulated, it's closed-in

20   heat, humidity starts to rise.  All of these damages started to

21   get exacerbated over time.  And it's the unique case of the

22   polder, which is a bowel, you had to be dewatered.  People can

23   only get back to these residences a month, a month and a half

24   later.  There's no electricity.  You have to dehumidify these

25   homes.  You have to get companies like Serpro to come in, take

1   these materials out before they can stop these damages from

2   migrating.  That's the whole point, it's the duration.  And the

3   time is little bit more important than the height, and the

4   stagnant water height in particular.  It's really the time and

5   the height of the water gets into the home and the time that it

6   takes to saturate those materials.

7   Q   But you would agree, Mr. Crawford, just to make clear, that

8   in this particular hydrograph, that water was stagnating at an

9   elevation of .7 to .8 feet as early as 24 hours after the storm;

10  correct?

11  A   That's correct.

12        MR. PALMINTIER:  Objection, this is asked and answered.

13        THE COURT:  Understand that.  Your point is made.  We

14  can move on from that.

15  BY MR. THATCH:

16  Q   Now, Mr. Crawford, you inspected the Holmes' property on

17  July 19th; is that right?

18  A   Correct.

19  Q   And the Holmes' residence had been demolished at that point;

20  is that right?

21  A   Correct.

22  Q   And there was no foundation to inspect; is that right?

23  A   Correct.

24  Q   And you concluded that flood waters within the Holmes'

25  residence rose to approximately 5.2 feet, in your

1    IHNC-south-breach-only scenario; correct?

2    A    Correct.

3    Q    And you would agree that --

4    A    I'm sorry, north only.  IHNC-north-only homes should be 5.2

5    feet.

6    Q    Let me just pull it up just so to make sure that we're

7    clear.  It's PX 1221 page 2.

8              And you may be right, Mr. Crawford.  I just want

9    to make sure.

10   A    You can see an executive summary, first paragraph, last

11   sentence, 5.2 feet from the north breach at the IHNC-only.

12   Q    Yes, you are right.  I stand corrected.  Thank you.

13   A    You're welcome.

14   Q    But you would agree that, in your north-breach-only scenario

15   for the residence, placement of all room and materials?

16   A    Replacement of some of the material.

17   Q    And the attic materials would not have been required, is

18   that correct?

19   A    That's correct.

20   Q    Now, you also mentioned inspecting -- you mentioned

21   inspecting all the properties, but you inspected the Livers'

22   property on July 19, 2011, six years after Katrina; right?

23   A    Correct.

24   Q    And you concluded that flood waters within the Livers

25   residence rose to approximately 5.4 feet in your

1    IHNC-south-breach-only scenario and 2.2 feet in your

2    IHNC-north-breach scenario; correct?

3    A    Correct.

4    Q    And you would agree that, in your IHNC-only, your

5    north-breach-only and your south-breach-only scenarios for the

6    Livers' residence, the flood water heights from Katrina would

7    not have required the replacement of all roofing materials, roof

8    sheathing, soffit, framing and attic insulation materials; is

9    that right?

10   A    Correct.  It may have necessitated the removal of the

11   insulation materials, they are highly subjected to mold.  I

12   don't know if I accidentally left that out.

13   Q    I think you did leave it out.  Whether or not it was asked,

14   I I'm not sure.  I was just reading directly from your report,

15   which include the insulation materials.

16   A    That would have been a marginal requirement.  Most likely

17   would have had to have been removed.

18   Q    Well, you'd also agree that these three scenarios --

19   A    Let me back up.  I'm taking the ceilings out; right?  And,

20   if you take the ceilings out, you've got to remove and replace

21   the insulation.  So, again, some of these things are again --

22   and it's important to know that I believe Scott Taylor will come

23   and be more specific about exactly what materials.  So we are,

24   just for the record, talking about general repairs.  And this is

25   a great example.  I'm going to take the ceilings out, I'm going

 1   to have to remove and replace attic insulation.  So, if you ask

 2   me that the attic insulation doesn't need to be removed, it may

 3   have been not damaged, but it may need to be removed from a

 4   construction perspective.

 5   Q    Just so we're clear, you aren't giving opinions on the

 6   amount that would have to be paid to replace each one of these

 7   homes; is that right?

 8   A    That's correct.

 9        THE COURT:  It's not in his report, the Court

10   understands that.

11   BY MR. THATCH:

12   Q    You'd also agree that in these three scenarios for the

13   Livers' residence, the IHNC-only and the north breach and the

14   south breach, the photos from the Katrina would not have caused

15   damages to the interior sector of the home?

16   A    I'm sorry, you lost me.  Can you repeat that?

17   Q    In the three scenarios that we discussed for the Livers'

18   residence, you did an estimate for the IHNC-only and the south

19   breach, and the damage from Katrina would not have cause damage

20   to the interior finishes on the second story of the home; is

21   that right?

22   A    Correct.

23   Q    And you reviewed photographs at the Livers' residence that

24   were taken just after Katrina; correct?

25   A    Correct.

1    Q    You don't recall seeing any evidence of flooding in the

2    second story of the home in those photographs; isn't that right?

3    A    Well, I believe -- no.  And I think Mr. Taylor would be able

4    to answer that question more accurately.

5    Q    Now, moving to the Washington property, you inspected the

6    Washington Charbonnet property on July 2011 as well; right?

7    A    Also.

8    Q    You also inspected it on July 26th?

9    A    Correct.

10   Q    And the Washington residence was rebuilt by that time;

11   correct?

12   A    Correct.

13   Q    Now, for the Washington property, you concluded that flood

14   waters within the residence rose to approximately 6.5 feet in

15   your IHNC-south-breach-only scenario and 3.8 feet in your IHNC-

16   north-breach scenario; is that right?

17   A    That's correct.

18   Q    And you relied on the findings you mentioned of the Rimkus

19   report to conclude the floodwater laterally displaced the

20   residence on its piers and damaged the residence to the point of

21   needing complete demolition.

22   A    No.  I also relied on the my general working knowledge of

23   that area.  And, I don't know the exact days continuous because

24   I didn't measure it to the IHNC breaches, but I do know that a

25   lot of homes in this area were subjected to hydrodynamic force,

```
 1   and I inspected a lot of homes in this area that were completely

 2   knocked off their foundation.  So I'm relying on my general

 3   knowledge.

 4            THE COURT:  Do you have the address of that home in

 5   your report?

 6            THE WITNESS:  Yes.

 7            THE COURT:  Could you provide that?

 8                I don't want you to spend too much time.  I know

 9   we have it when the plaintiff testified.

10            THE WITNESS:  Do you want me to give it to you?

11            THE COURT:  If you can do it in the next minute.  If

12   you can do it in one minute.

13            THE WITNESS:  1910 to 1910 1/2 Charbonnet, New Orleans,

14   Louisiana.

15            THE COURT:  All right.  Thank you.

16   BY MR. THATCH:

17   Q   Now, Mr. Crawford, I believe you mentioned you found a

18   standing water mark about two and a half feet away from the --

19   A   That's correct.

20   Q   Do you have an opinion why that house wasn't demolished?

21   A   Actually, there was -- I had to stop the demolition of the

22   house to get that water mark.

23   Q   Were you aware of any other houses in the neighborhood that

24   were still standing after Katrina?

25   A   Yes.
```

1   Q    Now, we mentioned the Rimkus report was at least part of

2   your -- part of the information that you used to develop your

3   opinion on regarding the Washington property; is that right?

4   A    It helped me.  I guess I would say I relied on the

5   photographs in there.

6   Q    Well, you were familiar with the Rimkus report; is that

7   right?

8   A    Yes.

9   Q    But you know that and the Rimkus report also found that

10  there were broken roof decking panels and missing shingles,

11  soffits, fascia and siding as a result of windblown debris and

12  forces associated with high winds during Hurricane Katrina;

13  correct?

14       MR. PALMINTIER:  Objection, that's hearsay.  It's part

15  of a motion in limine that you granted in reference to --

16       THE COURT:  Well, one, I don't think this witness is

17  opining on wind damage.  I don't think he -- in general, he said

18  he has done reports that related to wind damage, but it was not

19  his task here.  And therefore, I'm not sure he relied on that

20  report for any wind damage opinion.  Therefore, under that

21  circumstance, it would be hearsay.  So I'm going to sustain your

22  objection.

23  BY MR. THATCH:

24  Q    Just one more question, Mr. Crawford, just to make clear

25  with respect to the wind damage.  You didn't include wind

```
 1    damage --
 2              THE COURT:  This is a fair question, counsel.
 3    BY MR. THATCH:
 4    Q   You didn't include the potential damage by wind or
 5    wind-driven rain in any of your assessments of the damage of the
 6    property of this -- of the plaintiff's property in this case; is
 7    that correct?
 8    A   It was beyond the scope of my report.  I did flood damage
 9    only.
10              MR. THATCH:  Thank you, Mr. Crawford.
11              THE COURT:  Thank you, sir.
12              MR. McCONNON:  The US has no questions, Your Honor.
13              THE COURT:  I'm glad, because I thought the questioning
14    was very thorough on the part of your co-counsel -- the other
15    counsel.  Thank you.
16                   Redirect.
17              MR. PALMINTIER:  Be a quick redirect.  It's usually
18    famous last words coming from attorney.
19                         REDIRECT EXAMINATION
20    BY MR. PALMINTIER:
21    Q   Mr. Crawford, were you asked about wind and rain damage in
22    the cross, and I would like to ask you this question.
23              After your initial flood damage assessment and
24    even in your rebuttal, did you at least take into account the
25    possibility of wind and rain damage?
```

1           THE COURT:  Counsel, you've opened a door here.  I

2   don't know if you want to open because I'm going to let him

3   recross on it.  It's up to you.  I'm going to let him recross --

4               I'm going to let you, if he open this door.

5           MR. PALMINTIER:  Withdrawn, Your Honor.

6           And, Your Honor, that being said, we have no other

7   questions on redirect.

8           THE COURT:  It was very brief.  Thank you.

9           MR. JOANEN:  Your Honor, we plan to call Scott Taylor

10  next.  If the Court would like to take a break, we can do that.

11          THE COURT:  We can take a ten-minute recess.

12              (Proceedings in recess.)

13          MR. LANDRY:  Your Honor, at this time, the plaintiffs

14  could call Scott Taylor to the stand.

15          THE COURT:  Please be seated.

16              Remind me -- if you will remind me to talk about

17  Yom Kippur when we have a little break.

18          MR. LANDRY:  Your Honor, Mr. Taylor is going to testify

19  basically as an adjustor who valued the plaintiffs' property.

20  In conjunction with his testimony, we have two things.  One of

21  them is the exhibits from Mr. Taylor's testimony, which is

22  essentially the reports that he drafted in this matter, his

23  expert reports.  I provided them to the defendants, and I don't

24  know that they have any --

25          MR. McCONNON:  The United States has no objection, Your

1    Honor.

2            THE COURT:  Thank you, sir.

3            MS. WAGER-ZITO:  No objection, Your Honor.

4                SCOTT TAYLOR, being duly sworn, testified as

5    follows:

6            MR. LANDRY:  And we'll offer these as Taylor in-globo 1

7    for the Court.

8            THE COURT:  All right.

9            MR. LANDRY:  And we also have --

10           THE COURT:  It will be introduced.

11           MR. LANDRY:  And it also includes his curriculum vitae,

12   Your Honor.  But we also have a demonstrative that I'll provide

13   to the Court, which is a chart of the damages that Mr. Taylor --

14   and I've showed it to the defendants and they have no objection

15   to it.

16           THE COURT:  All right.

17           MR. LANDRY:  But I'll provide that to the Court.  It's

18   Taylor 01.

19           THE COURT:  Thank you, sir.

20               You have one for me?

21       MR. LANDRY:  Yes.

22       THE COURT:  Thank you very much, sir.

23                        DIRECT EXAMINATION

24   BY MR. LANDRY:

25   Q   Mr. Taylor, good morning.  How are you employed?

1    A    I'm an adjustor, an insurance adjustor.

2    Q    And who do you work for?  Are you an independent adjustor?

3    A    I'm an independent adjustor, yes.

4    Q    And what does that mean?

5    A    I take on clients, different carriers, different

6    opportunities to adjust properties.

7    Q    And who is your biggest client now?

8    A    Florida Citizens.

9    Q    Which type of insurance does Florida Citizens write?

10   A    Homeowners.

11   Q    So you're adjusting claims now for Florida Citizens?

12   A    Yes.

13   Q    How long have you been adjusting properties?

14   A    Over 20 years.

15   Q    And how many properties would you say you've adjusted in

16   your career?

17   A    Over the thousands.

18   Q    When you do an adjustment, do you employ the same

19   methodology for every adjustment that you do?

20   A    Basically, yes.

21   Q    Could you explain to the Court the methodology that you use?

22   A    Well, there's two segments to -- if it's a claim, then

23   there's two segments to it.  There's the scoping segment, which

24   is the compilation of all the damages.  And then there's the

25   estimating segment, which is producing the results of that

1    compilation.

2    Q    You were asked in this case to adjust properties.

3              Did you employ the same methodology in this case?

4    A    Yes.  In the cases that were mentioned here that I looked

5    into, I went through a five-scope sequence or a five-point scope

6    sequence that I use on each of them anywhere.  Along the line

7    that I can use the same scope, I always do.  And it involves --

8    it involves a process that starts with getting a general

9    perspective of the layout of the place.  It means having eyes-on

10   if at all possible.  So the idea is that you're there with your

11   eyes on, look at it, get a perspective of what it is, and again,

12   to sketch it out or diagram it, and get a general perspective of

13   how high things were, how high ceilings are, how wide rooms are,

14   that kind of thing.  Get a layout.  Get a visual perspective as

15   much as you can.

16             At that point then you go back in and -- with your

17   sketch and your diagrams, then you begin to measure things,

18   dimension them, find out what the precise numbers are, count

19   things if it's a matter of counting.  You determine the amount

20   of things at that point by dimensioning everything properly.

21             After that, I document the damages and determine

22   what is wrong with it, what is happening here, what do I see,

23   what do I observe, and document everything I can.

24             The next point is that I will then determine the

25   protocol for which it's to be restored.  So should it be

1    repaired?  Should it be replaced?  Should it be refinished?

2    Should it be cleaned?  Should something else happen in order to

3    put it back whole.

4              And the last thing I do is, then I take that

5    information, and then I use that to determine what photographs

6    are necessary to corroborate that, that scope.

7    Q   In this case you were asked to adjust damage to properties

8    associated with a catastrophic event, that being the flooding

9    from Hurricane Katrina.

10             Have you had occasion in your career prior to

11   adjust properties associated or that were damaged by a

12   catastrophic event?

13   A   Yes.

14   Q   Approximately how many times have you done that in your

15   career?

16   A   I've approached over -- well over a thousand houses and

17   homes and businesses that were damaged in a catastrophic event.

18   Q   And specifically with regard to Hurricane Katrina, had you

19   adjusted other properties or determined the damage amounts on

20   other properties associated with the floodwaters from Hurricane

21   Katrina?

22   A   Yes, I have.

23   Q   And approximately how many of those have you done?

24   A   Close to a thousand, I'm sure.

25   Q   And since it's hurricane damage from Katrina, is it safe to

1    assume that the majority of those adjustments were done in and

2    around the New Orleans area?

3    A    Yes.

4    Q    Did you employ the same methodology in doing all of those

5    that you just described to the Court?

6    A    Yes, Pretty much so.

7              In the case of most of the Katrina damages that I

8    was looking at, if the houses were still there, then I used

9    every one of those steps.  And if they were not there, then

10   that's where perspective comes in.  Because sometimes you were

11   left with a shell.  If the shell's there, you can still see

12   where the layout of the rooms are, you can still get a

13   perspective, get dimensions, you can still get a lot of that,

14   and you can map out the house that way.

15   Q    In this case you were also asked to determine damage amount

16   for the contents that were lost.

17        Have you ever occasion to adjust a property to

18   determine the damages associated with lost contents?

19   A    Yes.

20   Q    Approximately how many times have you done that?

21   A    Hundreds, maybe thousands.

22   Q    And similarly, you were asked to determine the amount of

23   additional living expenses.

24              Have you ever had occasion to do that before in

25   your career as an adjustor?

1    A    Yes, I have.

2    Q    Approximately how many times have you been asked to do --

3    A    Again, hundreds of times.

4    Q    Do you work with a program called Xactimate?

5    A    I do.

6    Q    Could you explain to the Court what Xactimate does and why

7    you feel it's necessary to use that in your practice as an

8    adjustor?

9    A    Xactimate is an estimating program, and that is the second

10   phase of adjusting.  If you're going to put a scope together,

11   you need something to put it into.  And it will produce the

12   results for you because it has a very exacting way of doing

13   that.  It is well engineered over many years and is accepted as

14   the gold standard among insurance companies and contractors

15   alike.

16   Q    What does Xactimate do specifically, or what do you use

17   Xactimate for in your practice in adjusting properties?

18   A    When I put the scope into Xactimate and list the

19   demographics of the claim or whatever the property happens to

20   be, it then will actually do counts for you.  You put in the

21   sketch, you put in the information, and then, in the end, it

22   produces for you an exact count of how many sheets of sheetrock

23   go in that room, if you are going that room, how many nails are

24   needed to hold shingles in place, how many shingles, how many

25   pieces of sheeting on the roof.  Whatever it is that you've put

```
 1    in as the scope, it will know based on the dimensioning and the

 2    precise numbers that you've put into it exactly how many pieces

 3    of material, as well as estimating, not just the material costs

 4    but profit, overhead, the labor involved in the removal and

 5    replacement, if it's a removal and replace item.  It does a lot

 6    of things that normally would take you many, many, many hours to

 7    do without the program.

 8    Q    So essentially the program, you go out and inspect the

 9    property, take pictures, and then put that information, a sketch

10    of the property -- and I mean, by scope, I guess you mean the

11    property into Xactimate and it calculates the amount of damages

12    for you; is that correct?

13    A    It does produce the numbers for you in the end, yes.

14    Q    And how does Xactimate know the prices for lumber in

15    New Orleans, Louisiana for example?

16    A    Xactimate uses a pricing structure that allows them to

17    update their pricing index for each ZIP code in the United

18    States once every quarter at a minimum.  Because what they --

19    the majority of the work that they do in updating their

20    programming is updating their pricing.

21              I've been two times to their headquarters, their

22    world headquarters, where they do the work of updating things

23    and creating new additions and upgrades to the program.  And in

24    doing so, I've observed an entire floor of their main building

25    dedicated just to updating pricing.
```

1    So what they do is, they have hired everybody from

2    the industries, industries associated with construction and

3    restoration, everything from water mitigation experts to general

4    contracting experts to roofing experts to mold and remediation

5    experts to foundation experts and engineers as well, all

6    employed to update their pricing every quarter, along with

7    support staff.  And they supplement that by reaching out to the

8    people that are in the field and field contractors and field

9    adjustors, and also retail outlets.  And all of that is done

10   with surveys of in excess of 2 or 3,000 per month that they send

11   out trying to make sure that they have the most current pricing

12   for every situation.

13        In the case of Katrina and other catastrophic

14   situations, they will update that pricing information as much as

15   weekly or sometimes even daily as the price -- as the demand for

16   materials is increased and the price goes up.  So they stay on

17   top of it.  It becomes very fluid at that point.  So they focus

18   their energies when something like that's going on.

19   Q   So in your career and practice as an adjustor, Xactimate --

20   would it be fair to say that Xactimate makes the results of your

21   adjustment very reliable?

22   A   Well, I would say so.  I know that the largest carriers in

23   the country, insurance carriers, depend on it for their

24   estimating program.

25   Q   Are you a licensed adjustor in the State of Louisiana?

1    A    I am.

2    Q    Are you a certified NFIP adjustor?

3    A    I am.

4    Q    What does that mean?  What is a NFIP certification?

5    A    National Flood Insurance Program is the only program under

6    which flood claims are administered.  And it's the only program

7    under which they're written -- under which the policies are

8    written.  They're written -- it's one single policy, Sometimes

9    on the paper of other carriers, but it's still the same policy

10   and it's administered by the National Flood Insurance Program.

11   Q    Do you do -- currently do continuing education for your

12   practice as an adjustor?

13   A    I'm not doing as much now because I'm very busy working in a

14   disputed claims unit that does settlements and I have a large

15   load.  So I'm not able to keep the class schedule going.  But

16   I've -- I have a class that I teach all of the basic adjusting

17   skills to, and I have a second class that I teach Xactimate in.

18   And I've done that for hundreds of adjustors over the last

19   several years.

20   Q    Mr. Taylor, have you ever given expert testimony as an

21   expert adjustor?

22   A    I have.

23   Q    When was that?

24   A    In this court.

25   Q    And was that in the case of Robinson vs. The United States?

1  A   Yes, it was.

2  Q   And in that case were you asked to adjust or assess the

3  damage to properties located in the St. Bernard and Ninth Ward

4  area as it relates to the flood damage from Hurricane Katrina?

5  A   Yes.

6  Q   You were qualified as an expert in that matter?

7  A   Yes, I was.

8  Q   And did you employ the same methodology in this matter that

9  you did in the Robinson matter with regard to the adjustments

10 that you did?

11 A   As much as possible, yes.

12       MR. LANDRY:  At this time, Your Honor, we'd like to

13 tender Mr. Taylor as an expert adjustor.

14       MS. WAGER-ZITO:  No objection, Your Honor.

15       MR. McCONNON:  No objections, Your Honor.

16       THE COURT:  Thank you, counsel.

17         The Court accepts Mr. Taylor as tendered.

18       MR. LANDRY:  Thank you, Your Honor.

19 BY MR. LANDRY:

20 Q   Mr. Taylor, what were you asked to do in this case?

21 A   I was asked to assess flood damages to several properties in

22 the New Orleans area.

23       MR. LANDRY:  Karl, could you pull up PX 4671003,

24 please.  Might be three zeros.  4671 PX 4671-003.  Just pull up

25 the bottom part, the photograph.

1  BY MR. LANDRY:

2  Q   That's Livers, Coats, Washington, Holmes and Armstrong.

3                      Are those the properties that you adjusted in

4  this matter?

5  A   It appears they are, yes.

6  Q   And have those, based on the plaintiffs' testimony or from

7  what you've observed, the approximate location of plaintiffs'

8  homes that you adjusted?

9  A   Yes.

10  Q   And in this instance, you were asked only to do the

11  residences for the plaintiffs; is that right?

12  A   That's correct.

13  Q   And what specifically were you ask to do from a -- or to

14  evaluate from a damage perspective?

15  A   I was asked to look at the effects of the rising water in

16  these and the flood in general, which amounted to how high the

17  water got and the damages associated with it and then how long

18  it stayed there and the damages associated with that.

19  Q   And we just saw Mr. Crawford's testimony where he talked

20  about height and duration of the water.

21                      In your practice as an expert adjustor, in

22  evaluating the damage from water, do you have any of

23  characteristics that you look for or events that you look for

24  that you would use in assessing the damage?

25  A   Well, I look at what's obvious first.  You see if you see

 1    water marks on things, you know, how high water got at that

 2    moment.  You don't whether that's the high water mark, the low

 3    water mark.  You're looking at a water mark, so you know you had

 4    standing water.

 5                    Then you look at the amount of humidity that

 6    might have been in the air and might have affected other things

 7    in the room beyond that water mark.  You might see ceiling

 8    sagging or fan blades dropping or those kinds of things that may

 9    or may not have touched water but may have been affected by the

10    humidity and the amount of moisture in the air.

11                    You will look at the effect of mold in the area

12    and what it's done, how much it's grown, how fast it's grown,

13    what it's reached and what it's done.

14                    All of those things come into play when it comes

15    to the height and duration of water damage in a home.

16    Q    In your opinion in this case, with regard to the five

17    plaintiffs' homes, was the height of the water more important in

18    your consideration or was the duration that the water remained

19    in the homes more important in your consideration?

20    A    I think it was a mixed bag there.  Because in some cases,

21    the height of the water clearly was absolutely overwhelming

22    entire homes.  In other cases, it appeared that the fact that

23    the water had stayed so long made the damage even worse.  And --

24    or that the homes had been had been shut up for so long after

25    the water was gone created further damages and made it

1  impossible for mitigation to take place.  Because until

2  mitigation takes place inside a home, the damages continue to

3  increase.

4  Q   So inside the homes, you have sheetrock and other materials

5  that are water-absorbent.

6           Do those materials wick water?  And could you

7  explain what that means and what the effect of that --

8  A   Wicking is an effect such as a straw, drinking up a straw.

9  Anything that's absorptive like that can wick water right up a

10 surface, vertically or horizontally or in other directions.  It

11 just pulls the water into it and becomes -- I think Mr. Crawford

12 used the word saturated.  And that's exactly what you see, you

13 see saturation occurring.

14           But more than that, it creates a breeding ground

15 for all kinds of molds and mildews, which begin to grow very

16 quickly.  And once that happens, then you have two things

17 happening:  You've got molds, which -- and mildews will attack

18 the -- not just the surfaces, but work into the structural

19 integrity of the building materials themselves; and you have

20 corrosion from moisture as well.

21           It will attack banding and nails and supporting

22 structures.  The wood itself becomes out of square and

23 nonfunctional in its basic foundational stability.  And so you

24 have that going on.

25           You've got brick ties that tie your bricks to your

1    walls that now have corroded, and given enough time, the entire

2    walls -- we've seen it in New Orleans -- just fall off the side

3    of a house as a result of corrosion.  So you have that kind of

4    thing.

5                You have roof straps that tie down joists, tie

6    down the roof joists, roof structures to the walls, and those

7    begin to fail.  You've got a lot of situations where the nailing

8    of sheathing is now at risk because you've got rusted nails,

9    you've got water that's -- moisture that's come into situations

10   and created untenable situations for a homeowner for a number of

11   reasons

12   Q    From a damage perspective, does standing water in a house

13   affect the electrical system?  And if so, what problems does

14   that create?

15   A    Well, all mechanicals become affected.  You know, it's not

16   just the electrical.  Yes, the electrical becomes shorted out.

17   Once water gets into junction boxes, you've got a real hazard in

18   which it gets into the wiring systems and it becomes -- they're

19   nonfunctional at that point.  I've never heard of an adjustor --

20   or an electrician that was willing to just fix a few outlets

21   after the water was over the -- in the house over the junction

22   boxes and stand by that work.  Because it's at risk at that

23   point.

24                You have the HVAC systems which become infected.

25   They're corroded.  The entire air conditioning system in homes

 1  become corroded and ineffective.  They have to be replaced and

 2  pulled out.  And because of where they are, your -- you're into

 3  the foundational structures of the house as well.  You're

 4  pulling things out of the house that are part and parcel to the

 5  structure, not just the mechanicals, but just the supporting

 6  straps, everything else we're talking about.  Things become

 7  unusable at that point for safety sake.

 8  Q   And so we discussed wicking and the damage to the

 9  mechanicals and the standing water.

10             And did all of the structures that you examined of

11  the plaintiffs' residences, did they all have or experience that

12  type of phenomenon that we just discussed?

13  A   Yes.  In one form or another, they did.

14  Q   Now, let's talk about the Armstrong property.

15             Did you have occasion to adjust the damage on the

16  Armstrong property?

17  A   I did.

18  Q   And what conclusion did you reach with regard to the

19  dwelling?

20  A   Well, the dwelling was at risk completely because it was

21  gone.  That was the first thing I observed.  But after I

22  investigated and looked into it, I saw that not only was it

23  gone, but that there was water that had reached well into the

24  attic and made it so that everything that I just discussed came

25  into play and everything was at risk, and everything would have

1  been necessary to replace at that point.  So the complete

2  demolition of the house was necessary.

3  Q   So you recommended a total demolition and reconstruct for

4  the Armstrong property; is that right?

5  A   Yes, I did.

6        MR. LANDRY:  Could you pull up the Taylor 01

7  demonstrative, please.

8  BY MR. LANDRY:

9  Q   Is that what you determined the amount of the damage to be

10 for the Armstrong dwelling?

11 A   I did.

12 Q   Is the methodology and conclusions, those are expressed in

13 your 10/20/11 report that we've introduced into evidence which

14 is JX 01605-001 through 57?

15 A   Yes.

16 Q   Did you reach an opinion with regard to the Armstrongs with

17 content damage?

18 A   I did.

19 Q   And what was that opinion?

20 A   That they had a total loss of almost everything they own,

21 and it's represented by the numbers in the report there,

22 $181,498.40.

23 Q   In the Robinson trial, you used a factor of 50 percent to

24 determine the contents.

25        Did you employ that same methodology here?

1   A    No, not in this case.

2   Q    And why did you not use it in this case?

3   A    The conservative factor of 50 percent is what an adjustor

4   will use without having any contents lists.  And the reason they

5   might do that is because of the fact that it's a standard

6   practice in an insurance claim, for example, to give an

7   evaluation of 50 percent of the value of the home towards

8   contents coverage.  And that would be paid for by the homeowner

9   if it's an insurance claim.  But they would have that much

10  coverage at a minimum.

11             In most cases, we found that they started there

12  and came up with their coverages because they actually had more

13  contents.  That's why in -- it's a preferred method to be able

14  to use actual contents lists.

15  Q    Did you get an actual contents list in this case?

16  A    I did.

17  Q    And let me go back a little bit.  In part of your adjustment

18  of the Armstrong property, did you have occasion to meet and/or

19  talk with the Armstrongs about their property and their

20  contents?

21  A    I did.

22  Q    On how many occasions did you talk with them?

23  A    I met with them once directly, and then it was on the phone

24  once or twice to try to get additional information about

25  contents in particular.

1   Q   And did they provide you with a contents list?

2   A   They did.

3   Q   And in your view, was that a complete contents list or as

4   complete as it possibly could be?

5   A   I think ultimately I was able to get an abridged list or an

6   amended list also from counsel that -- through the phone

7   conversations that they went ahead and provided more things

8   because -- that were missing and added to that list.  So yes,

9   between those, I compiled a list.

10  Q   And so in contents damage for the Armstrongs, you concluded

11  that they had $181,498.40 in damage; is that correct?

12  A   Yes.

13  Q   You also had occasion for the Armstrongs to determine an

14  amount of additional living expenses, or ALE; is that correct?

15  A   Yes.

16  Q   And could you tell the Court how you arrived at the number

17  of $38,881.46 with regard to the Armstrongs.

18  A   Well, in that case, I did use a percentage on that.  And

19  again, it uses a standard practice of 20 percent that you see on

20  Coverage A of a home if you're using that, that factor.  And,

21  when I say Coverage A, the amount of the value of the dwelling.

22          Once you arrive at that number, you take 20

23  percent and that becomes a one year's allotment for additional

24  living expenses, Or basically what it would cost in the process

25  of one year to do 20 percent for a year.

1   Q    And why would you use that methodology of a percentage for

2   calculating ALE as opposed to actual receipts?

3   A    Well, because in a catastrophic situation such as this,

4   people have lost all their means of even compiling things, and

5   they come back and they're missing half of the things that they

6   would have used to help them in that instance.  They're in a

7   transitory situation in which they're constantly having --

8   things that they spend and don't even realize that those are

9   additional living expenses, they don't keep receipts.  And for

10  them to be able to come up with all the receipts for two years

11  of living or however long it took for them to get back into

12  their home is a monumental task, and they're very rarely able to

13  come up with all the receipts that it would take to substantiate

14  each and every item.

15            One example might be laundry.  People do laundry

16  at home normally.  But they spend money on laundry when they're

17  out of home.  Then don't think of that as an additional living

18  expense in general.  So they don't save laundromat receipts, and

19  they don't save dry cleaning receipts and that kind of thing.

20  It just becomes an impossibility.  And when you're going this

21  far after the fact of them digging up all those receipts becomes

22  almost impossible.

23  Q    Did you also have occasion to adjust the damages associated

24  with the Holmes' property?

25  A    I did.

1    Q    And what was your conclusion with regard to the dwelling or

2    the damages associated with the dwelling of the Holmes'

3    property?

4    A    The Holmes' property was much like the Armstrong in that --

5    because of the amount of water in it and it was very obvious

6    that it needed to be replaced.  So I recommended a total

7    teardown and reconstruction.

8    Q    In Mr. Holmes' testimony, counsel for the defendant asked

9    him if the bricks were still standing at his house and why he

10   didn't come back and build back with those bricks.

11                  Why would that be imprudent from your perspective?

12   Or from a damage perspective, why would that be imprudent or

13   impossible?

14   A    Well, because as I spoke of earlier, you've got brick ties,

15   you've got other things that go into that that support those

16   bricks in an amount -- and allow them to stay clad to the house.

17   They have -- they're basically -- they are not structural as

18   much as they are a facade.  Brick is generally not the main

19   structure of the house; it's what it's clad in.  But they will

20   fall.  And they're very expensive cladding, mind you, but they

21   will fall off if there's rust taking over and corrosion on the

22   brick ties.

23   Q    And so the brick ties is the metal piece that holds the

24   brick wall.  As they build the brick wall, they put a piece of

25   metal, they screw it in the wall and they mortar on top of it.

1   That's the tie --

2   A   Exactly.

3   Q   -- the piece of metal that holds the brick to the wall of

4   the house; right?

5   A   Yes.

6   Q   And from a damage perspective, that gets well with standing

7   water and would corrode and you might have a brick wall fall

8   off?

9   A   Yes.  And we saw many cases for that.

10   Q   So based on that, you recommended a total reconstruction for

11   the Holmes' house also?

12   A   Yes.

13   Q   What was the amount of reconstruction that you determined

14   for the Holmes' residence?

15   A   $180,761.23.

16   Q   And in looking at your reports, there's a bunch of data

17   that's in those.

18           Does that -- is that the data from Xactimate that

19   we spoke of?

20   A   Looking at which, I'm sorry?

21   Q   Looking at the Holmes' report, for example -- they're all

22   the same, but in looking at the Holmes' report -- let's go to

23   Holmes.  I'll tell you which one it is.  It is JX 01607001

24   through 149 -- excuse me -- 150.

25           We're looking at that report.  Specifically I'll

1    direct to you a page.  For example, page 21, JX 16701.

2                    Is that the data that prints out Xactimate?

3    A    Yes.

4    Q    And so the conclusion that you reached of $180,761.23,

5    that's a compilation of all of that data as we see on page 21

6    right there?

7    A    Yes.

8    Q    In all of the damage to the Holmes' property that you

9    calculated that lead up to the 180,000, that's included in your.

10   /report about the Holmes' property specifically?

11   A    Yes, it is.

12   Q    And with the Holmes, did you talk and Mr. and Mrs. Holmes?

13   A    I talked with Mr. Holmes, yes.

14   Q    And did you -- did Mr. Holmes provide you with a contents

15   list?

16   A    He provided me with photographs and contents lists.  And

17   yes.

18   Q    And was it important for you to get photographs from

19   Mr. Holmes?

20   A    Actually, it was.  Because they were actual photographs of

21   the house immediately following the event, or as soon as he

22   could get in there.

23   Q    Did you see photographs from the Armstrong property also?

24   A    I did.  I saw photographs and video.

25   Q    Did you calculate a damage amount for the Holmes for

1  contents?

2  A   I did.

3  Q   And what was that amount?

4  A   $171,893.88.

5  Q   And did you calculate -- was that based on a contents list

6  that was provided to you by Mr. Holmes?

7  A   By Mr. Holmes and an amended one with counsel, yes.

8  Q   And did you feel that was a complete list or as complete as

9  possible list of the contents that Mr. and Mrs. Holmes had at

10  the time their home was damaged?

11  A   It's as complete as they could come up with at that time,

12  yes.

13  Q   Did you determine the amount of additional living expense

14  damage that the Holmes' sustained?

15  A   Yes, I did.

16  Q   And what is that amount?

17  A   $36,152.25.

18  Q   And how did you calculate that amount?

19  A   That's based on a percentage of the damage to the home

20  itself.

21  Q   And is that the same methodology that you used with regard

22  to the Armstrongs?

23  A   Yes, it is.

24  Q   Moving on to the Washington property, did you adjust the

25  damage to the Washington property associated with the dwelling?

1   A   I did.

2   Q   And what was your opinion with regard to the Washington

3   property associated with the dwelling?

4   A   The Washington property had fallen off the piers that it was

5   on and renders it unsafe and unusable as a structure.  It had to

6   be demolished.

7   Q   Why wouldn't you just pick up the house and put it back on

8   the piers?

9   A   Well, once something comes off its foundation and it's made

10   of wood, it's not -- the beams and structures that support it

11   are now compromised and have -- don't have the integrity that

12   they did before.  Everything is out of square.  There may be

13   fractures that you're not even aware of all through the

14   structure that have to be dealt with.  And mitigating those one

15   at a time would be astronomical rather than just tearing it down

16   and starting over.

17   Q   And is that what Mr. Washington did?

18   A   Yes, he did.

19   Q   Did he rebuild on the same footprint that was the house

20   before?

21   A   Actually, he did not.

22   Q   Is this a smaller footprint?

23   A   No, not really.  It started out the same in the front it

24   appeared, but the back of the house was wider before, and so the

25   footprint was actually larger on the original house than on the

1    rebuild that he did on the redo.

2    Q   And moving on to the Livers' home, what did you determine

3    when you adjusted the Livers' home?

4    A   The Livers' home was a situation in which the water did not

5    reach into the second floor per se.  And during our inspection

6    of it, we were not able to get inside the upper floor at all.

7    Because we had no excess, we had to do it through photographs

8    and measurements from the outside.  And as such, I could not

9    confirm that the attic and second floor had mold or other issues

10   in it.  And to be conservative, I did not include that, and

11   rather, I decided that had prudence was to do a restoration of

12   the home rather than a rebuild.

13   Q   And what amount did you calculate for the restoration?

14   A   For the Livers' home $163,870.30.

15   Q   In looking at the demonstrative we have, on the left column

16   in the 10/20/11 report, it says $165,824, and then you read the

17   $163,870 number.

18               Could you explain the difference between those

19   numbers to the Court?

20   A   Yeah.  When we were given reports back concerning the

21   Livers' home and discussed it after depositions, originally it

22   happened, and then we with asked to do a rebuttal of another

23   report, we had an opportunity to make some corrections to the

24   exact layout of the inside of the house and make some changes

25   that dropped it down just a touch.  The amount of structure was

1   very -- very much different.  Very small difference.  It wasn't

2   much of any difference.

3   Q   So that's just based on the depositions in making

4   corrections that were mistakes that were found in your report or

5   pointed out in your report?

6   A   That's correct.

7   Q   I say mistakes.  There were parts pointed out in your report

8   in depositions that you now reflected in the corrected version

9   of your damage estimate?

10  A   That's correct.

11  Q   Did you determine an amount for contents for Mr. Livers?

12  A   We did.

13  Q   And what was that amount?

14  A   $77,971.57.

15  Q   Was that amount based on the contents lists given to you by

16  Mr. Livers?

17  A   Yes.  Given to us originally, and then with some corrections

18  made later, those were the end, end results, once we came down

19  to it.

20  Q   And I remember in the depositions they talked about a TV

21  being a $15,000 TV as opposed to a $1,500 TV.

22          Does the 77 in those discussions -- does the

23  $77,971 figure that you have in your October 20, 2011 report

24  reflect the corrections for the TV and those items that were

25  typographical mistakes?

1    A    Yes.  This was already corrected at that point.

2    Q    And did you reach an opinion with regard to ALE damages or

3    additional living expenses for Mr. Livers or for the Livers?

4    A    Yes.  It was $33,164.96.

5    Q    Did you determine that using a percentage methodology?

6    A    I did.

7    Q    And still the same percentage methodology that you used for

8    other plaintiffs?

9    A    Generally so.  Actually there was a -- there is an error in

10   that amount.

11   Q    What's that amount?

12   A    And I'll just point that out.

13            In that we did not update that ALE amount after

14   making the change to the dwelling damages.  It was left as the

15   original amount.

16   Q    So it would be a little bit lower?

17   A    A couple hundred dollars probably, yes.

18   Q    Okay.  So much instead of 77,971, it would be approximately

19   77,500?

20   A    Well, not the contents.

21   Q    I'm sorry.  The ALE -- I'm sorry.  36,164, it would be about

22   32,500?

23   A    Well, it's just a quick calculation.  You could just do it

24   by multiplying the 163,087.30 by 20 percent, and that will tell

25   you what it should have been.  And so -- But I didn't want to

1  make a change on this report since it was what was actually

2  presented.

3  Q    Thank you for making that change.

4          Now, with regard to the Coats' property, did you

5  perform an assessment of the Coats' property?

6  A    I did.

7  Q    And what did you determine with regard to the Coats'

8  dwelling?

9  A    The Coats' dwelling changed in my opinion based on new

10  information that came to us again after depositions.  We

11  discovered that, in our original interview with Charles Coats,

12  nephew of Ethel Coats, who had guided us through the property

13  and shown us where everything was, how it was set up.  And in

14  our original interview with him, he basically told us that it

15  was very similar to the way it had been prior to the storm.

16          However, when we arrived there, it had now been

17  reconstructed and re -- not totally reconstructed, but remodeled

18  and restored.  And at that point, his recollection was, yes,

19  this was the way it was set up.

20          We found out later that -- after the fact, that

21  the people living in it just prior to the storm testified

22  that -- or not testified -- they stated in deposition that they

23  were -- that it was actually being converted back to go a single

24  and that it did not have a second kitchen, for example.

25          So we took out the extra, the plumbing items and

1    the things that were associated with the changes that were

2    mentioned in -- that we became aware of, and it dropped it down

3    by about $6,000.

4    Q    In looking at the numbers that you have on the

5    demonstrative, in October 20th of 2011, in that report, you

6    determined the dwelling damages to be $217,999.29.  And then in

7    the April 20th of 2012 rebuttal report, you determined the

8    damages to be $211,813.36.  The difference is taking the -- what

9    you thought to be a double and making it a single which is what

10   it was at the time of the storm?

11   A    That's correct.

12   Q    So the $6,000 difference is the value of the second kitchen

13   and bathroom that you originally had in and you took that out?

14   A    Basically I took all the plumbing and extra electrical

15   things out, yes, that would have been associated.

16   Q    Did you have occasion to determine an amount for lost

17   contents for the Coats -- or for Mrs. Coats?

18   A    Yes, I did.

19   Q    And what was that amount?

20   A    $214,119.72.

21   Q    And how did you determine that amount?

22   A    That is based on lists provided through counsel, in this

23   case, because I was not able to talk with Mrs. Coats.

24   Q    In looking at this, did you determine an amount for

25   additional living expenses for the Coats?

1   A   I did.  It was $43,599.96.

2   Q   And is that based on the formula that you had just

3   discussed?

4   A   It is.

5   Q   Mr. Taylor, this flooding dynamic, or we are talking today

6   about the waters from the IHNC, and Mr. Crawford, you saw, did

7   the hydrographs dealing with the waters from the IHNC.

8              I want you to assume since you're an expert

9   that -- and realizing that these people had had a volume of

10  water, but assume for the purposes of this question that it was

11  the IHNC water only.

12             You listened to Mr. Crawford's testimony; didn't

13  you?

14  A   Yes.

15  Q   Are you familiar with the differences in the water that he

16  discussed in his testimony?

17  A   I am.

18  Q   And did you talk with Mr. Crawford about that?

19  A   I did.

20  Q   So for the purposes of this question, I'd like you to assume

21  that it was IHNC water only in all of the plaintiffs' properties

22  and ask you if that would change your opinion with regard to any

23  of the damages to the dwellings that you've just discussed.

24  A   It did chang my opinion as to the approach that you would

25  have, absolutely.  When I looked at the -- I think in the fact

```
 1    that the Armstrong the Livers -- Armstrong and Holmes cases,

 2    from what I understand on the arrival; of water, it was all

 3    pretty much simultaneously.  There was nothing that we could do,

 4    so we never even did a breakout of -- we didn't present those

 5    reports because it didn't seem to have made much of a

 6    difference.

 7              But, regardless of that, again, with mechanicals

 8    and everything else involved and actual observations, it did

 9    change some things, but then they were mitigated back to where I

10    went originally because of the actual observations.  For

11    example, start with -- who would you want to start with?

12    Q   Well, for example -- I don't -- did you have a change in any

13    damage with regard to any of those structures if there was only

14    IHNC water in them for the same amount of time that all the

15    water was in them --

16    A   All right.  Well, so I've mentioned Armstrong and Holmes.

17    Washington, no.  It fell off the piers, and that came as the

18    result of the initial onslaught of water, which I believe was

19    not ^ chk an IHNC breach that the initial onslaught came in.

20    Most likely came off its piers at that point with movement of

21    the water.

22              The fact of the matter is a house on piers is a

23    buoyant object, and it doesn't take a whole lot of water for it

24    to move.  I can't tell you the number of houses that I had to go

25    find after Katrina because they were blocks away, some of them.
```

1    And that -- all of those houses were houses on piers.  So the

2    point is, is that when they move, they move.  And it doesn't

3    matter.  If the water got to a certain height above the floor,

4    it's very capable of moving the whole house at that point when

5    it's on piers.

6    Q    With regard to the Coats' property, there's testimony this

7    morning that there was only 3 feet of water in the house as

8    opposed to 8 feet of water in the house.  I believe it was 3.1

9    feet above the floor from IHNC-only was the specific testimony.

10   A    Right.

11   Q    Assuming that would that change your opinion with regard to

12   the damage to the Coats' property?  And if so, why?

13   A    It would not, because of duration.  Duration was the real

14   issue here for me.  Because when I observed the house and went

15   into it, I could tell that it was still suffering from

16   structural issues just by walking through the house.  The floors

17   were warped, there was movement in the boards and that kind of

18   thing.  It was clear that there -- that it wasn't a sound home.

19        But I also decided that it would be prudent to

20   look into the attic, and I did, because I wanted to see if

21   they'd done anything up there.  And apparently they had not.

22   And so it still had the existing problems that were there.  And

23   they would have called for a reconstruction because I found

24   enough mold based on the duration of the water in that home and

25   the moisture levels in that home that must have been there --

1538

 1    must have been astronomical for some time -- that mold had

 2    infused the attic pretty much all through.  But even years

 3    later, you could see that it had been working on the structural

 4    elements of the attic.  It was still on all the sheathing

 5    undersides of the roof.  The sheathing in this case was 1 by 6

 6    planks because of the age of the home, in particular.  And the

 7    wicking in that home would have been pretty severe, too, because

 8    you have indiscriminate amount of wicking that's not constrained

 9    by separation between pieces of drywall, because it was plaster

10    as its base behind it and because that plastic being there, when

11    it could wick all the way up into the ceiling and beyond.

12            Not only that, but you had an old house that was

13    not particularly airtight anyway.  And so the moisture levels

14    would just go everywhere.  The spores from the mold would grow

15    everywhere and colonize all through that -- all through it.

16            You also had an existing chimneys that went

17    through the attic, and those had been compromised as well from

18    whatever source.  And because they were compromised, they -- in

19    those age houses, the chimneys actually are structural elements

20    at that point, because they begin to -- they tie into them, they

21    do all kinds of thing that become part of the house.  If you

22    take them how out, sometimes you have problems.  But these were

23    definitely having problems.  All the mortar was coming out and

24    falling in the attic.  You could see it in the chimney.  So

25    there were issues there.

1    I recommended that the house should have been

2  restored from the ground up, not from just -- not just doing a

3  remodel of it.

4  Q   And so am I correct in listening to your answers that, if it

5  was IHNC-only water with regard to the Armstrongs, the Livers,

6  the Holmes, Coats and Mr. Washington, that you would have found

7  the same amount of damage?

8  A   Pretty much, yes.  In the case of the -- in the case of

9  Livers, again I did not recommend replacing -- rebuilding it

10  altogether.  If it was an IHNC-only issue, I don't recall -- I

11  know that the -- I don't know the -- you'd have to remind of the

12  precise numbers of the water in there if it was IHNC-only water.

13    But at that point, it did not appear to get into

14  the second floor.  And since we did not have access, I was not

15  going to write imaginary damages based on something I couldn't

16  observe in the attic.  And so I just said I wasn't going to --

17  we're not going to replace the attic, which means we're in the

18  replacing the top half of the back section of house, which means

19  we can go ahead and do a restoration rather than a rebuild.

20    MR. LANDRY:  Okay.  Thank you, Mr. Taylor.

21    I have no other questions, Your Honor.

22    THE COURT:  Thank you.

23    Cross examination, counsel?

24    CROSS EXAMINATION

25  BY MS. WAGER-ZITO:

1    Q    Mr. Taylor, we've met before.  My name is Adrian Wager-Zito.

2    We've met before.  We met at your deposition.

3    A    Yes.

4    Q    Good to see you again.

5    A    Thank you.  Good to see you too.

6    Q    You testified on direct that you've been adjusting homes for

7    approximately 20 years.  Is that what you said?

8    A    Yes.

9    Q    But your formal education is that you received a BA in music

10   from Hardin-Simmons University in 1984?

11   A    Yes.

12   Q    And then after that, you went into the ministry for 20

13   years, working part-time as a carpenter to supplement your

14   income; is that correct?

15   A    Yes.

16   Q    And you were actually ordained as a minister in 1985?

17   A    Yes.

18   Q    And received a Master of Divinity in 1995?

19   A    Yes, that's correct.

20   Q    And being in the ministry was your full-time job from 1984

21   to 2005; is that correct?

22   A    Not on -- not throughout that entire time.  I was part-time

23   in ministry, part-time in construction, during the seminary

24   years in particular.

25   Q    Do you recall testifying in the Robinson case?

1541

1    A    Yes.

2    Q    You mentioned earlier that you have testified in the

3    Robinson case.

4              Do you recall in that case you testified that

5    ministry was your full-time job throughout the 1990s

6    A    Yes.

7    Q    And it wasn't until 2004 that you decided to leave the

8    ministry and go into insurance adjustment --

9    A    That's correct.

10   Q    -- full-time.

11             And it wasn't until 2004 that you took a class in

12   adjusting?

13   A    That's correct.

14   Q    And you also talked about all the licenses that you've held.

15             You didn't get any of those licenses until after

16   you had decided to go into adjusting in 2004 and 2005?

17   A    That's correct.

18   Q    And you've only been licensed in Louisiana for about a year?

19   A    Yeah.  There was no license in Louisiana during Katrina.

20   There was no adjustor license available.

21   Q    But you weren't adjusting in Louisiana before Katrina; were

22   you?

23   A    Not -- no, not before Katrina, no.

24   Q    Mr. Taylor, it would be correct to say that in your opinion

25   all of the plaintiffs' losses in this case, both as to their

 1    homes and their contents, were only the result of flooding;

 2    correct?

 3    A    That's the only thing that I was looking into.

 4    Q    And until you submitted your revised reports in April of

 5    this year, you made no attempt to distinguish between floodwater

 6    coming from the breaches in the IHNC as opposed to other

 7    sources, such as the MRGO?

 8    A    That's correct.

 9    Q    And in fact, I think you just testified that, even when you

10    did your revised reports in April of this year that you didn't

11    really change -- or you didn't change any of the numbers in

12    those reports as a result of water coming from the IHNC versus

13    the MRGO; correct?

14    A    That's correct.  I think that's pretty much true.

15    Q    And the only numbers you changed were in the Coats'

16    residence you have now finally made it a single even though in

17    your prior reports, you had been adjusting it as if it had been

18    a double?

19    A    That's correct, yes.

20    Q    And you made some very minor changes in the Livers' numbers,

21    but they were not because of a distinction between the flooding

22    coming from the MRGO versus the IHNC; correct?

23    A    No, they were not.

24    Q    And I take it you also -- based upon that answer, you have

25    not attempted to make any distinction in your damage analysis

1  based on whether or not water might have come from the north

2  breach or the south breach of the IHNC?

3  A    No.  There was no reason to, to break it off, break it out

4  between those that I was given, so I didn't do it.

5  Q   So if in this case, if Judge Duval were to rule that the

6  defendants are only liable for damages as a result of water from

7  the north breach, Judge Duval can't use your reports to do that;

8  can he?

9  A   I would not say that at all.  I would say that he would

10  be -- it would be very simple to use those reports.  It still

11  would -- if you look at my reports that break it out in

12  different scenarios and it tells you basically what the

13  different scenarios are, if the water reached this height, these

14  are the items that would be -- come into play; if it reached

15  another height, these are the items that would come into play;

16  if it reached a third height, it would be these items that came

17  into play.  And the only way to go against that is in actual

18  physical observation that's different than what those scenarios

19  would give you.

20              For example, the Coats.  The Coats had mold in the

21  attic.  So therefore, it didn't matter at that point that we

22  only had 3 and a half feet of water in there.  If it still

23  infused the sheathing in the attic, it still was going to do the

24  same amount of damage.

25              There's a point --

1   Q   But you didn't any -- you haven't done any analysis to

2   determine whether or not there would have been mold in the attic

3   if the only water that they are being compensated for is based

4   upon waters coming from the north breach and not the south

5   breach?

6   A   I don't agree with that.  And the reason I don't is that it

7   wasn't a matter of the height of the water; it was a matter of

8   the duration of the water in this case.  The water did not

9   subside and people were not back in those places for weeks and

10  months, And the mold spores and everything had grown at that

11  point.  And they weren't able to mitigate the damages.  And

12  that's what led to -- in my opinion, to the mold growing so

13  voraciously in the attic.

14  Q   But in your reports, there's nothing that says if the water

15  came to 3 feet, it's this damage; if it came to 6 feet, it's

16  this damage; if it came to 9 feet, it's this amount of the

17  damages.  You're basing this opinion only because you think it

18  would be the same of damages no matter what?

19  A   Well, I didn't say that.  If you look at the front page of

20  the reports, it tells how much water was in there, and then it

21  also tells you what the scenarios would be outside of any

22  personal observations.

23  Q   Let me ask it this way:  You didn't run any Xactimate

24  calculations based upon different water levels in the houses;

25  did you?

1    A    Different water levels?  Yes and no.

2    Q    You ran one Xactimate damage.  You ran one Xactimate

3    analysis for each one of the homes, each one of the properties?

4    A    Oh, no, no.  I ran several scenarios in my computer and

5    arrived at similar conclusions.  And so I stuck with the same

6    one.  I ran tests in it by putting in different numbers of

7    whether it got this high, you still had to do these items.  And

8    at some point, you get to reconstruction, and so you just say,

9    you know what we're at?  We're at that reconstruction cost.

10   Q    None of these different analyses are in your report;

11   correct?

12   A    No.

13   Q    Thank you.

14   A    No.

15   Q    Thank you.

16              And, in preparing your opinions on damages to the

17   plaintiffs' homes and their contents, you made no attempt to

18   distinguish between damages caused by wind and rain versus

19   flooding; correct?

20   A    No, I did not.

21   Q    And at least with regard to the plaintiffs whose houses had

22   been demolished, there was clearly no way you could do that

23   because you couldn't go see their houses?

24   A    Well, I could see photographs of them, but I couldn't see

25   the actual houses anymore, no.

```
 1   Q    You couldn't inspect their houses to determine whether or

 2   not any of the damages were caused by wind and rain versus

 3   damages caused by flood if the houses weren't there anymore?

 4   A    Well, that's not true.  If you have photographs, you can

 5   observe damages.

 6   Q    In connection with the plaintiffs' homes that were still

 7   standing, you certainly could have looked to determine whether

 8   any of the damages were caused by wind and rain; correct?

 9   A    I could have if I'd take to do that, yes.

10   Q    But didn't do that?

11   A    No.

12   Q    Correct?

13            And, in preparing your damage estimates, you

14   didn't take into consideration the testimony of any of the

15   plaintiffs that some of the damage to their homes and their

16   contents were caused by wind and rain?

17   A    I was not given that information prior to my reports anyway.

18   Q    You didn't read the plaintiffs' deposition testimony before

19   you did your reports?

20   A    No, I did not.

21   Q    But they had already been deposed at the time you did your

22   reports; correct?

23            Your revised reports in October of 2011?  Or did

24   you just not know that?

25   A    I don't know, ma'am.  I don't know.
```

1  Q   And in doing in work on this case, you didn't consider it to

2  be relevant whether any claims made by any of the plaintiffs to

3  the insurance companies for any of their damages?

4  A   No, because I wouldn't know what they paid for and why they

5  paid for it.

6  Q   And it didn't affect your opinion in any way with regard to

7  any plaintiff whether or not they actually received any proceeds

8  from any insurance company?

9  A   No.  Again, I didn't know what they were paid or why they

10  were paid it, so ...

11  Q   And you didn't consider any legal documents filed by any of

12  the plaintiffs asserting that their damages were caused by wind

13  and rain prior to floodwaters arriving even though you agree

14  that you have no basis to dispute any of these documents?

15  A   I never saw any documents prior to my reports.

16  Q   And in putting together your damage reports, you didn't

17  deduct from any of your damage figures any amounts reflected

18  that the plaintiffs actually did receive --

19  A   No.

20  Q   -- for wind and rain damages?

21  A   No.

22  Q   Are you aware that Mr. and Mrs. Holmes stated in

23  interrogatories that they filed in connection with the

24  litigation that they filed that:  We contend that there was

25  extensive wind damage to the exterior of the house --

1    MR. LANDRY:  Object, Your Honor.  It's totally

2  irrelevant.  What they contend in a lawsuit that's separate from

3  this lawsuit is totally irrelevant.

4    THE COURT:  I'm going to allow it under cross

5  examination.  It may not be totally relevant.  I haven't made

6  that determination yet.

7    Go ahead.

8    MS. WAGER-ZITO:  Thank you, Your Honor.

9  By MS. WAGER-ZITO:

10 Q   We contend that there was extensive wind damage to the

11 exterior of the house as well as a majority of the contents of

12 the household.  We contend that the front door was blown off of

13 its hinges due to strong winds and caused a whirlwind within the

14 house and caused extensive damages to the -- and it said in the

15 interrogatories inferior and it should have read interior.

16    You didn't see those interrogatories or consider

17 that?

18 A   I did not see those or consider that, no.

19 Q   And with regard to the Washingtons, you were not aware that

20 they did not consider -- or you were not aware and you did not

21 consider that they were received payments from their homeowner's

22 insurance for damages to their Charbonnet property as a result

23 of rain and wind damage?

24    MR. LANDRY:  Objection, Your Honor.  They're

25 irrelevant.  In light of your earlier ruling where you said that

1    they have the burden of proof with regard to wind and rain and

2    the amount thereof, I think you said, Your Honor, at the sidebar

3    that the settlement amount is -- I don't know -- I forget the

4    words you used exactly.

5         THE COURT:  The settlement amount.

6         MR. LANDRY:  The settlement amount is irrelevant.

7         THE COURT:  No, I did not say it was irrelevant.  I

8    said it was not full writ, to quote me exactly.  Meaning that it

9    was not the be all-end all determination of the amount of wind

10   damage either one or the other.  So your objection is overruled.

11   BY MS. WAGER-ZITO:

12   Q    Do you need the question repeated?

13   A    Was there a question there?

14   Q    There was a question.

15             With regard to the Washingtons, you were unaware

16   and therefore didn't consider that they received payments from

17   their homeowner's insurance for damages to their property as a

18   result of wind and rain damage resulting from Katrina?

19        MR. LANDRY:  Objection, Your Honor.

20             Are you quoting the settlement document?

21        MS. WAGER-ZITO:  No, I'm quoting his deposition

22   testimony.

23        MR. LANDRY:  Because I was unaware of what you were

24   quoting.

25        THE COURT:  So what's the objection?  You're quoting

1   from --

2            MR. LANDRY:  The objection is still that it's

3   irrelevant, Your Honor.

4            THE COURT:  The ruling is still that it's overruled.

5   BY MS. WAGER-ZITO:

6   Q   Do you --

7   A   I was not aware of that.

8   Q   Thank you.

9            And you're similarly unaware that the Washingtons

10  sued their homeowners insurer and stated in their pleading:  As

11  a result of Hurricane Katrina wind forces, their property was

12  totally destroyed as well as all of the petitioner's personal

13  property at the above-mentioned address, which was the address

14  that you were adjusting?

15  A   I have no knowledge of that.

16  Q   And yet you still claim all of the Washingtons' damages were

17  caused by flooding even though you cannot say definitively that

18  there was damage from wind and rain?

19  A   I contend that it was a flood issue, yes.

20  Q   And you would agree that a review of damaged property closer

21  to the time of the peril being assessed would give you a better

22  idea of the cause of damage than a later inspection?  Would you

23  agree with that?

24  A   In general, that's probably true, yes.

25           MS. WAGER-ZITO:  Eric, can you bring up 1623?

```
 1   BY MS. WAGER-ZITO:

 2   Q   If you look on the screen, there's a document that's been

 3   marked as JX 1623.  And this is a report prepared by a company

 4   called Rimkus Consulting.

 5   A   Um-hum.

 6   Q   So you see that?

 7          MR. LANDRY:  Your Honor, we object that this is

 8   irrelevant based on your motion in limine ruling where you said

 9   the reports and other data of adjustors is specifically

10   excluded.  So this is specifically excluded, Your Honor, to the

11   extent it is a Rimkus report from his homeowner's insurance

12   claim.  It is specifically excluded by your motion in limine.

13          THE COURT:  All right.  And, counsel, your response?

14          MS. WAGER-ZITO:  For one, it was just admitted in

15   Mr. Crawford's testimony by the plaintiffs for his use in

16   determining the damages.

17          THE COURT:  I don't think --

18          MR. LANDRY:  I think the photograph was, not the report

19   itself.

20          THE COURT:  That's correct.  The photographs, I did say

21   in my ruling were admissible.

22          MR. LANDRY:  That's correct.  But this is specifically

23   other data --

24          THE COURT:  If a foundation was laid.  I agree, I

25   agree.
```

1        MR. LANDRY:  Thank you, Your Honor.

2        THE COURT:  I agree thus far.  And I'll listen to it.

3            We know that this gentleman did not consider wind

4   in any of the -- any of plaintiffs' wind or wind-driven rain in

5   any of the reports that I've gotten, in any of his estimates.  I

6   understand that.

7        MS. WAGER-ZITO:  And, Your Honor, I wasn't even

8   offering it to prove whether or not the damage was caused by

9   wind or rain; just to ask Mr. Taylor if he had considered

10  whether or not -- if he had looked at this document in

11  considering whether or not there were other causes of damage to

12  the property.

13       MR. LANDRY:  If they're trying to use it to offer proof

14  of the truth of the matters asserted therein, Your Honor, that's

15  hearsay.  And specifically she's trying --

16       THE COURT:  I haven't let it come in yet.  I am already

17  firmly convinced that this witness did not look at any evidence

18  that would indicate wind damage, whatever it was.  And that's

19  seen as the over-arching point.

20       MR. LANDRY:  I thank you, Your Honor.

21       THE COURT:  Unless someone can prove me incorrect.

22  BY MS. WAGER-ZITO:

23  Q   Did you consider specifically whether or not the damage to

24  the roof of the Washington's property was caused by wind and

25  rain versus flooding?

1    A    No.

2              MR. LANDRY:  Object, Your Honor.  It's beyond the scope

3    of his report.

4                   If she's opening the door to wind, then I can

5    ask him about his issues with wind with no recross.  Because if

6    this is --

7              THE COURT:  Well, let the Court make that

8    determination.  You will attempt to do that.

9              MR. LANDRY:  I apologize, Your Honor.  But when I

10   attempt to.  But what she's asking him essentially is:  Did you

11   make any determination about the Washington -- the roof of the

12   Washington residence with regard to wind?  And she's asking him

13   on the stand to make a wind damage estimate.

14             THE COURT:  I don't know if you're asking him that.

15             MS. WAGER-ZITO:  I certainly was not asking him that.

16             THE COURT:  I didn't get that.  I think it goes to my

17   already firm conclusion that he did not consider wind in any of

18   the opinions.

19             MS. WAGER-ZITO:  And we'll move on, Your Honor, because

20   I think we have clearly established that he has not.  He did not

21   do any --

22             THE COURT:  He said so.

23             MS. WAGER-ZITO:  -- consideration of wind and rain.

24   BY MS. WAGER-ZITO:

25   Q    I want to turn now to your opinions regarding repair versus

```
 1   replacement costs for some of the plaintiffs' properties, and

 2   you discussed that on direct.

 3               You're not a structural engineer; correct,

 4   Mr. Taylor?

 5   A   No, I'm not.

 6   Q   And in connection with your work on this case, you did not

 7   consult with a structural engineer for purposes of making a

 8   determination as to whether the plaintiffs' homes could be

 9   repaired versus whether they had to be rebuilt.  You made that

10   decision on your own?

11   A   Not entirely, no.

12               MS. WAGER-ZITO:  Can we have from --

13               THE WITNESS:  From which report are you discussing?

14   From which report are you discussing, are you mentioning it?

15   BY MS. WAGER-ZITO:

16   Q   I'm talking about all the plaintiffs.

17   A   Well, if I recall, we did a rebuttal report in the end, and

18   in the rebuttal reports, I did consultant with an engineer.

19   Q   You consulted with an engineer in connection with the amount

20   of water in the properties coming from the IHNC vs. MRGO, not

21   considering whether or not they -- as a structural matter, they

22   needed to be repaired or replaced?

23   A   Well, I discussed --

24   Q   Is that correct?

25   A   No, that's not correct.  I discussed thing with John
```

 1   Crawford at length that -- determining what level of damages

 2   happened depending on the amount of water in things.

 3   Q   And you did that after your deposition?

 4   A   Yes.

 5   Q   And frankly, I didn't see that in your reports.  All I saw

 6   that was new in your reports was a discussion of amounts of

 7   water.

 8   A   Well, if you looked at the -- at the general --

 9         MS. WAGER-ZITO:  So I move to strike any testimony

10   about discussions with Mr. Crawford that came in after your

11   deposition, after your reports, and that are outside of scope of

12   his report.

13         THE COURT:  Is there a question?

14         THE WITNESS:  Well, my question is:  Why would you say

15   that if you read the report?  The general loss statement at the

16   front of each of the reports clearly outlines three scenarios,

17   and it incorporates the data from John Crawford.  In discussing

18   that, we created the scenarios in collaboration.  So ...

19   BY MS. WAGER-ZITO:

20   Q   Is there any discussion in those reports as to consulting

21   with Mr. Crawford as a structural engineer in connection with

22   making a decision as to whether to give repair damages versus

23   replacement damages?

24   A   I think it's inherent in the general loss report that it had

25   to have been discussed in order to arrive at those scenarios'

1    conclusions.

2    Q    But you say it's inherent.  It's not explicit in the report?

3    A    It's not explicit, but it's inherent I think.

4    Q    And at the time of your deposition, when I asked you if you

5    had consulted with a structural engineer in connection with

6    making that determination as to whether the homes could be

7    repaired versus rebuilt, you said that you hadn't?

8    A    That's correct.

9          MR. LANDRY:  Objection, Your Honor.  That's not the

10   proper -- that's not the characterization.  She said:  Do you

11   remember what you talked about?  And he said:  I can't remember.

12   That's an improper use of his deposition from an impeachment

13   perspective because it's not a separate question and answer and

14   she's characterizing the testimony.  As a result, it's improper

15   cross examination.

16         THE COURT:  The Court -- I understand your objection.

17   It's overruled.

18         MS. WAGER-ZITO:  And the testimony speaks for itself.

19         THE COURT:  It does.

20         MS. WAGER-ZITO:  Thank you, Your Honor.

21         THE COURT:  And I think, if I understand it,

22   Mr. Crawford gave his testimony as an engineer, and this

23   gentleman is testifying as to costs, is what I'm understanding.

24         MR. LANDRY:  That is correct, Your Honor.

25         THE COURT:  All right.

1    BY MS. WAGER-ZITO:

2    Q   Now, I'd like to get in to talking about some of the reports

3    in a little more specifics.  And we're going to show you in a

4    minute the reports for the Holmes and the Armstrongs.  And for

5    these purposes, we're going to work with your October reports.

6              And, for both the Holmes and the Armstrongs, you

7    actually didn't do any revised reports in April; correct?

8    A   I did not submit any revised reports for those two.

9    Q   And it's your opinion that the measure of damages for both

10   the Holmes family and the Armstrong was replacement costs as

11   opposed to repair costs?

12   A   Yes.

13   Q   And turning first to the Armstrong property, you're aware

14   that the Armstrong home was intentionally torn down; right?

15   They made the decision to --

16   A   Yes.

17   Q   -- tear down the house?

18   A   Yes.

19          MS. WAGER-ZITO:  If we could put up 1607-002.  And, if

20   you could put the middle section, Restoration, Repairs.

21   BY MS. WAGER-ZITO:

22   Q   And you state that the Armstrong home was condemned, but

23   you're aware that in fact the Armstrong home was not condemned;

24   correct?

25   A   Well, I'm not aware of the -- if it wasn't, I wasn't aware

 1  that it wasn't.  I understood that many of the homes in that

 2  condition were absolutely condemned.

 3          THE COURT:  By condemned, I assume we mean by some

 4  governmental entity?

 5          MS. WAGER-ZITO:  Yes, Your Honor.

 6          THE COURT:  Thank you.

 7  BY MS. WAGER-ZITO:

 8  Q   Your sole basis for coming to the conclusion that the home

 9  was -- that the Armstrongs' home was condemned was the fact that

10  it was gone --

11  A   No.

12  Q   -- when you went to look at it?

13  A   No.  The experience I have in looking at homes that were

14  later condemned was those that were underwater were generally

15  condemned.

16          MS. WAGER-ZITO:  Eric, could you put his deposition

17  testimony at pages 213 to 214.  And we have to start at the

18  bottom of the page at 213.

19  BY MS. WAGER-ZITO:

20  Q   Actually, if you start at 19 and you look at the question,

21  if you look at the first paragraph:  To return the home to

22  pre-loss condition, it is likely based on the condemnation of

23  the home and slab, that even the foundation was put at risk.

24          And then your answer:  It was a natural conclusion

25  based on --

1    MS. WAGER-ZITO:  And go to the next page.

2  BY MS. WAGER-ZITO:

3  Q   -- the fact that it's gone now, because there were so many

4  razed homes that they left the foundation.

5  A   Okay.

6  Q   So that was the sole basis for your determination that the

7  home -- that the Armstrong home had been condemned?

8  A   That was a basis, yes.

9  Q   And your testimony in your deposition was that was the sole

10  basis for your opinion?

11  A   If that's what you say.

12  Q   That's what you said, sir.

13  A   If that's what I said.  At the time that was what I

14  believed, yes.

15    THE COURT:  There you go.

16    MS. WAGER-ZITO:  I'm sorry, Your Honor.  Did you

17  have --

18    THE COURT:  No.  I said -- that -- I think that clears

19  it up.

20  BY MS. WAGER-ZITO:

21  Q   And in fact, the Armstrongs made a decision on their own to

22  demolish their house even though they were never told that the

23  home was structurally unsound or that it could not be repaired.

24    Are you aware of that?

25  A   No.

1    Q    And since you didn't evaluate the Armstrong home before it

2    was torn down, you're not able to evaluate the foundation of the

3    home so you couldn't if it was put at risk by Katrina?

4    A    Is that a question?  I thought that was a statement.  I'm

5    sorry.

6    Q    No.  It was a question.

7                    Since you didn't evaluate the Armstrong home

8    before it was torn down, you're not able to -- were you not able

9    to evaluate the foundation of the home so you could not say if

10   it was put at risk as a result of Katrina; isn't that correct?

11   A    That's safe to say.  I wouldn't be able to absolutely state

12   that, yes.

13   Q    And you similarly cannot say conclusively that the damage to

14   the Armstrong home was so catastrophic that it had to be torn

15   down and rebuilt?

16   A    From a structural standpoint, no.

17   Q    And yet you have not endeavored to make any determination as

18   to what it would have cost to repair the Armstrongs' house as

19   opposed to rebuilding it?

20   A    No, I did not do that.

21   Q    So if in this case Judge Duval were to determine that the

22   proper measure of damages for the Armstrong home was a repair

23   damage number as opposed to a replacement damage number, Judge

24   Duval can't use your report for that; isn't that true?

25   A    No, that's not true.  I think that the report, especially in

1    the rebuttal reports, make it clear that in my opinion that

2    house had to come down regardless of whether the slab was

3    structurally sound or not.

4    Q    You didn't do a rebuttal report for the Armstrong home.

5    A    I'm sorry.  In the initial reports.  I misspoke.  I think I

6    made it clear that I felt that it needed to come down regardless

7    of -- I was already quite aware of video that showed the water

8    over the house and other things.

9    Q    If Judge Duval decides that it could have been repaired, you

10   do not -- your report is not set up in such a way for him to

11   calculate repair damages versus replacement damages?

12   A    That report is not set up to calculate just the repairs, no.

13   But the repairs, based upon what I've seen --

14   Q    Thank you, Mr. Taylor.  You've answered the question.

15            THE COURT:  He can finish his answer.

16   BY MS. WAGER-ZITO:

17   A    The repairs based on what I've seen and my observation would

18   have been higher than the rebuilding of it because of all of the

19   additional elements that come in mitigating the damage as you

20   go?

21   Q    But you don't have those numbers written down somewhere for

22   Judge Duval to use?

23   A    No.  But he can see, based on my other reports, in my same

24   reports, those that are being restored are pretty high as well

25   and they didn't include complete demolishing of the house.

1    Q    Now I want to turn back to your report or turn to your

2    report for the Holmes' property.  And you similarly measured

3    their damages based upon your conclusion that the home had to be

4    demolished and rebuilt; correct?

5    A    I think so, yes.

6              MS. WAGER-ZITO:  Eric, if you could put up 1607-002.

7    And that same -- blow up that same middle section.

8    BY MS. WAGER-ZITO:

9    Q    And if you look in the first paragraph of that section,

10   similar to in the Armstrong report, you state in there in the

11   second-to-last line:  Based on the condemnation of the home and

12   slab, that even the foundation was put at risk.

13              Do you see that language?

14   A    Yes, I do.

15   Q    But similar to the Armstrongs', to your knowledge, there was

16   never any determination made by anyone that the Armstrong home

17   needed to be condemned?

18   A    I think that the statement there is as much -- is figurative

19   as it is literal in terms of any entity coming in and declaring

20   a condemnation.  If the homeowner declare it condemned, that --

21   it could be that too.  But the main thing I'm saying there is it

22   needed to be condemned, in my opinion.  That's where I'm trying

23   to go with that.  It needed to be there.

24   Q    But no legal entity ever condemned --

25   A    Not that I'm aware of, no.

1  Q   -- the Holmes' property?

2           And the sole basis for your opinion that the

3  foundation was put as risk was the fact that the foundation was

4  gone when you went to the site; isn't that correct?

5  A   That's primarily the reasoning behind it, yes.

6  Q   And since you're not a structural engineer, you're not

7  giving an opinion that this house could not have been repaired

8  structurally?

9  A   I don't think that my not being an engineer renders my

10 opinion useless when it comes to whether a house could be

11 repaired not.  My experience in seeing what repairs can be done

12 and can't be done and seeing engineer reports on varieties of

13 homes, I use engineers all the time in the course of my work.

14 I've read their reports for years.  I know what they discuss.

15 Q   You're not giving an opinion that the house could not have

16 been repaired structurally?

17 A   I can't scientifically say that, no.

18 Q   So you have no personal knowledge that the Holmes' residence

19 had to be demolished or that the foundation was unsound?

20 A   No scientific knowledge of it, no.

21 Q   No scientific knowledge or personal knowledge?

22 A   I have experience that renders my opinion that way, yes.

23 Q   But again, no scientific knowledge or personal knowledge?

24 A   That's correct.

25 Q   Yet, it's still your opinion that the correct measure of

1    damages for the Holmes' property is that their home should have

2    been rebuilt rather than repaired, although you have no basis to

3    dispute the defendant's expert opinion that the Holmes' main

4    residence did not receive any flood-related structural damage to

5    its foundation or raking ^ chk of frame; is that correct?

6        MR. LANDRY:  Objection, Your Honor.  She's asking him

7    to comment on the defense expert's conclusions from their

8    structural engineer.  He's testified he is not an engineer.  He

9    has no opinions about the engineer.

10       THE COURT:  I'm not either.  I think we best be heard

11   when we hear the defendant's structural engineer.  We're heard

12   from Mr. Crawford.  We've seen whatever pictures we have.  He

13   said -- I think he said that he has no scientific basis other

14   than his experience.  So let's leave it at that.

15   BY MS. WAGER-ZITO:

16   Q   And you didn't ask Mr. or Mrs. Holmes if there was any

17   reason that they could not rebuild their home in New Orleans at

18   the same site that they'd lived in?

19   A   No, I did not.

20   Q   So again, if Judge Duval were to rule in this case that the

21   correct measure of damages for the Holmes' property was that it

22   should be repaired rather than replaced, Judge Duval could not

23   use your report to come to a repair number versus a replacement

24   number?

25   A   I think he could.  I think he could because of the fact that

1    I demonstrated that water reached the attic level, and at that

2    point restoration would have been more expensive than rebuild.

3    Q   But you don't have any actual numbers in your report that

4    support a repair number versus a rebuild number?

5    A   It is known within the industry that an exact same scope of

6    damage based on new construction and/or in remodeling

7    construction, that the numbers are higher in the remodel than

8    they are in the new construction.  It is very well known in the

9    industry.  Xactimate employs that.  In fact, they even have a

10   questionnaire at the beginning of each of the scenarios in

11   which:  Are you doing a remodel?  Are you doing a replacement?

12   You know, the point being is that it gets higher when you do a

13   remodel.

14   Q   Regardless of that, the numbers are not in your report?

15   A   They are not in the report.  They would just be higher.

16   Q   Let's turn to the Livers' property.

17               With regard to the Livers, you're aware that they

18   chose not to remain at their pre-Katrina residence; correct?

19   They chose to move elsewhere?

20   A   Yes, I'm aware of that.

21   Q   And you know that's because, when you went to look at the

22   time property, you couldn't get into it because they didn't live

23   there anymore?

24   A   That's correct.

25   Q   But even knowing that, you calculated the damages for the

1  Livers as the cost to repair their home to its pre-Katrina

2  condition; right?

3  A    Yes, I did.

4  Q    And now let's turn to your -- the methodology that you

5  described before that you used to determine the cost to repair

6  or rebuild.  And you talked about the Xactimate software.  And

7  you've agreed that in using Xactimate software, it is critically

8  important that the input information into Xactimate be accurate

9  information, including as to the dimensions of the property and

10 the materials used in the property?

11 A    It's -- it is important, yes.  It's not always critical, but

12 it is important.

13 Q    Because if you don't put in accurate information, you're not

14 going to get accurate information back out?

15 A    I would have to stipulate what information you're

16 discussing.  So -- you know if you bring a question, I can

17 answer that specifically.

18 Q    But you would agree --

19 A    It is important, yes, ma'am.

20 Q    -- it is important?

21            And, in fact -- and we can bring it up -- but at

22 your deposition you agreed with me that it was critically

23 important to input accurate information relating to the claim

24 that you're adjusting.

25 A    Okay.  All right.  I will acknowledge that.  That's fine.

1   Q   In connection with preparing your damage reports for each of

2   the plaintiffs, you prepared a sketch of each of their homes,

3   and those sketches are included in your damage reports?

4   A   Yes.

5   Q   But, in preparing your reports, you didn't show any of the

6   sketches of those homes to the plaintiffs to make sure that they

7   were accurate?

8   A   I was not in a position to actually show them anything

9   because I never met with them afterwards, after I finished with

10  them the first time.

11  Q   So you just put those sketches in based upon the one

12  conversation you had with each of them?

13  A   Yes.  But again, I've looked at so many houses that were in

14  that condition that I've been able to over the years be able to

15  compile sketches based on what's existing or supposition,

16  sometimes in the case of Holmes and other -- in other situations

17  where the house was completely gone and you just interview them

18  about the number of rooms that they have and that kind of thing.

19  And then once information comes in that change your opinion, you

20  change it on the sketch.  Because they'll have looked at it and

21  they'll see it or whatever, and the next thing you know, they're

22  saying:  Well, we had them rooms or this was changed, this wall

23  was actually over there.  You make the changes as you find out.

24  Q   But you didn't have any of those conversations with any of

25  them after you did your sketches for them to say:  Well, you put

1  this room in the wrong place, or with regard to the Coats:

2  You've got an extra kitchen and you've got an extra bathroom?

3  A   Right.  That all came later before the last report, yes.

4  Q   In fact, you learned about the problem with the Coats' home

5  in between your first report and your July report and then your

6  October report, but you didn't make the change in your October

7  report?

8  A   I don't recall if I learned of it then or not.  I don't

9  recall when it was that I knew.  The -- obviously, there were

10  fluid things going on.  When we were given new information, I

11  made changes.  I made changes accordingly, using the best

12  judgment and sound practices that I could once that information

13  came new to me.

14  Q   Regardless of when you actually learned about the issue with

15  the Coats' property only being a single and your sketching it as

16  a double, you've now fixed that in your newest report; correct?

17  A   I believe so, yes.

18  Q   And we looked at it when on direct and we'll bring it up

19  again; but the damage amount that you attributed to the dwelling

20  for the Coats' property has only decreased by approximately

21  $6,000; is that correct?  We saw that when we looked on direct?

22  A   That's approximate, yes.

23  Q   Even though in your original estimate for the Coats'

24  property, the second kitchen and the second bath totalled over

25  $19,000?

1    A    When I put the new numbers in, I let the computer determine

2    how many items of what goes in there.  And if it only reduced it

3    by that, then I can't -- I didn't go in and count the number of

4    items that changed as much as I took the kitchen out, I took

5    whatever out what I was told about and changed it accordingly.

6                MS. WAGER-ZITO:  Eric, could you bring up JX 1609-003?

7                     It's not that one either.  31.

8                     Sorry about that.

9    BY MS. WAGER-ZITO:

10   A    I think what's happening here is you're presuming being that

11   because you removed a kitchen and bathroom, that you didn't

12   replace it with something.  And that's the difference.  Very

13   much so.  When you take one room out and make it a dining room

14   instead of a kitchen, you don't take the whole room out.  You

15   still have all the walls; you still have the other things.  You

16   can't replace an entire room's gross amount and just take it

17   out.  If the room still exists, the square footage is still

18   there.

19   Q    But you can see here that, at least on here the kitchen and

20   the bath -- not the bedrooms -- the kitchens and the bath total

21   over -- almost $19,000?

22   A    Absolutely.

23   Q    And continuing with the Coats' property, you also state that

24   the roof of the home appears to have been damaged.  And we can

25   show that to you in your report.

```
1   A    Yes.

2   Q    Do you remember that?

3   A    Yes.

4   Q    Yet until I told you at your deposition, you were not aware

5   that Ms. Coats had made a claim for damage to her roof resulting

6   from Hurricane Gustav?

7   A    No, I was not aware of that.

8   Q    And Hurricane Gustav was after Katrina; correct?

9   A    Yes, that's correct.

10  Q    And your inspection of the Coats' home was after Hurricane

11  Gustav.  So you can't distinguish between damage from the home

12  resulting from Katrina and damage that may have been come from a

13  later storm?

14  A    I didn't address wind damage, no.

15  Q    This isn't wind damage.  This is damage to her roof that

16  could have come from Gustav versus Katrina.

17  A    Well, I didn't recall Gustav being a flood situation.

18  Q    And you didn't review Ms. Coats' deposition testimony, so

19  were you unaware that she testified that she didn't need a new

20  result as a result of the Katrina, correct?

21  A    No, I was not aware of that.

22  Q    And the Coats' home is one of the homes that you did do a

23  revised report for, but you still include in your damage report

24  for the Coats' home exactly the same language relating to the

25  roof damage as you had in the October report; is that correct?
```

```
 1    A    I don't recall.  I really don't.

 2    Q    We can show you JX 1609002.

 3              MS. WAGER-ZITO:  The second paragraph.

 4    BY MS. WAGER-ZITO:

 5    Q    You state in there:  The slate roof was still in place but

 6    showed signs of failure inasmuch as the ridge pieces were in

 7    disarray and testing of faces showed the extensive movement of

 8    an inch or more lift in several locations.

 9    A    Um-hum.

10    Q    And if we can compare that to the -- your revised report

11    which is PX 4735 --

12              MS. WAGER-ZITO:  Can you put that up, Eric, also at

13    002.

14                   Your Honor, I don't -- this is not the right

15    document.

16                   (Pause in proceedings.)

17    BY MS. WAGER-ZITO:

18    Q    I'm going to read from this and we can show it to you.

19              THE COURT:  You may.

20    BY MS. WAGER-ZITO:

21    Q    But this states:  The slate roof was still in place but

22    showed signs of failure inasmuch as the ridge pieces were in

23    disarray and testing of the faces showed an extensive movement

24    of an inch or more lift in several locations.

25                   Will you take my word for it, that that's what it
```

 1   says?

 2   A   I will.

 3         MR. LANDRY:  Your Honor, I'll take her word, but I

 4   object because it seems to me that it's of the ^ chk ^ chk same

 5   report in both cases.

 6         THE COURT:  I think that was the --

 7         MR. LANDRY:  You would be required -

 8         MS. WAGER-ZITO:  That was the point.

 9         MR. LANDRY:  I'm confused by what she did.

10         THE COURT:  I'm not, so we can go head.

11         MS. WAGER-ZITO:  Okay.  Thank you, Your Honor.

12   BY MS. WAGER-ZITO:

13   Q   And all I'm doing was showing that it in fact was the same

14   exact language in both reports.

15   A   Exactly.  The observation didn't show the report because the

16   report was later.  You know, my -- those were personal

17   observations.

18   Q   And you didn't change your opinion notwithstanding

19   Mrs. Coats' statement that there was no the damage to the roof

20   as a result of Katrina?

21   A   Well, I had no knowledge of that.

22   Q   Well, we discussed that -- I -- we discussed that at your

23   deposition?

24   A   Right.  I had no -- oh, I see what you're saying.  And I

25   didn't change that.

1           Well, the thing that you've already discussed, if

2    there was damage from Gustav, that could have been other damage

3    that had result and had nothing no do with what we first talked

4    about.

5    Q   And you didn't change it even though I had pointed out to

6    you that Ms. Coats had said that there was no roof damage as a

7    result of Katrina?

8    A   I didn't change my observation, no.  I still observed the

9    same thing.

10   Q   And, in fact, you increased the amount of damage for the

11   roof for the Coats' property from an amount of $28,363 to

12   $31,361?

13   A   There was an alteration in the sketch size based on the

14   information given with that kitchen information when we were

15   given that, and they pointed out that there was an increase in

16   the roof in the back section.  So it did increase.  The back

17   section grew based on the information we were given that

18   included the removal of the kitchen, But that was nominal

19   compared to the removal of the kitchen.  It was just a slight

20   change in that.

21   Q   So that all just flowed from fixing it from a double to a

22   single?

23   A   It was part of the fixing; that's correct.

24   Q   And in your latest report on the Coats' home, you appear to

25   acknowledge that not all the floodwater at the Coats' home came

1    from the IHNC; correct?

2    A    Ultimately, yes.  The height would have changed according to

3    those hydrographs, yeah.

4    Q    But as we've already established, you didn't change your

5    damage numbers because you don't think those made any

6    difference?

7    A    No.  My observations trump that in that if I find that

8    the -- that mold grew throughout duration of the water, un into

9    the attic and included damaging the structure of the attic and

10   the chimneys and the sheathing boards, which were 1 by 6's,

11   those all had to be replaced if you're going to truly mitigate

12   it.

13   Q    You don't know what the duration of water would have been in

14   the Coats' residence in the case of the IHNC-only scenario;

15   correct?

16   A    Duration is not just a function of how long the water stayed

17   in the house itself.  Duration is a function of how long it took

18   before it was mitigated.  So the duration of the growth of the

19   mold and the duration of the damage escalating due to moisture

20   content isn't just as long as the water is literally standing in

21   the house.  It goes on.

22   Q    But the question was:  Do you know what the duration would

23   have been as a result of the IHNC-only scenario?

24   A    I couldn't say, no.

25   Q    Because the duration you testified to related to the

1   duration for all-causes; correct?

2   A   Certainly.

3   Q   And if we turn to --

4           THE COURT:  Counsel may I ask:  About how long do you

5   have more with this witness?  I mean, without a --

6           MS. WAGER-ZITO:  Another 20 minutes.

7           THE COURT:  Okay.  We're going to take a recess.

8               We will be back at 1:15.  And I'm reminding myself

9   just to be thinking about September 26th, and I realize there

10  are at least two different pronunciations of Yom Kippur or Yom

11  Kippur, and I think it relates to the Hebrew versus the Yiddish,

12  but I could be wrong about that.  But nonetheless, I am aware of

13  it.  And there may be a third.

14              Nonetheless, my problem is that I neglected to

15  tell you that I have a dental appointment I've already

16  continued, postponed, and I have a criminal that I have put to

17  2:00 o'clock because of dental appointment on Wednesday.

18              And I can try to rearrange a lot of that, but I

19  think the best I can do is, if I go head to the dental

20  appointment early in the morning and have the criminal stuff, we

21  can start sharply at 1 o'clock and have, you know, five or six

22  hours of work, if I can get that done.  And I'm going to work on

23  getting that done.  If you decide you want to work on Yom

24  Kippur.

25              MR. TREEBY:  We were going do assessment on Saturday

```
 1   morning and just see -- try to do better from where we were.

 2          THE COURT:  And I wanted to let you kind of fold that

 3   into the assessment.  So at best, we would start probably at 1

 4   o'clock and we'd go to 6:00, something like that.

 5          MR. TREEBY:  Okay.

 6          THE COURT:  All right?

 7              (12:19 p.m., proceedings concluded.)

 8

 9                       CERTIFICATE

10

11       I, Susan A. Zielie, Official Court Reporter, do hereby
     certify that the foregoing transcript is correct.

12

13

                             /S/ SUSAN A. ZIELIE, FCRR
14                           _____
                                 Susan A. Zielie, FCRR
15

16

17

18

19

20

21

22

23

24

25
```