1        UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3    * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

4
     IN RE:  KATRINA CANAL BREACHES     DOCKET 05-CV-4182
5    CONSOLIDATED LITIGATION
                                        SECTION F
6
     PERTAINS TO:  MRGO              NEW ORLEANS, LOUISIANA
7         ARMSTRONG NO. 10-CV-866
                                     SEPTEMBER 20, 2012
8
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
9

10               DAY 7, AFTERNOON SESSION
             TRANSCRIPT OF TRIAL PROCEEDINGS
11        BEFORE THE HONORABLE STANWOOD R. DUVAL JR.
                 UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14
     FOR THE PLAINTIFFS:          BRUNO & BRUNO
15                                BY:  JOSEPH M. BRUNO, ESQ.
                                  855 BARONNE STREET
16                                NEW ORLEANS, LOUISIANA 70113

17   FOR THE PLAINTIFFS:          THE ANDRY LAW FIRM
                                  BY:  JONATHAN B. ANDRY, ESQ.
18                                610 BARONNE STREET
                                  NEW ORLEANS, LOUISIANA 70113
19
     FOR THE PLAINTIFFS:          BARON & BUDD, PC
20                                BY:  THOMAS SIMS, ESQ.
                                  3102 OAK LAWN AVENUE, SUITE 1100
21                                DALLAS, TEXAS 75219

22   FOR THE PLAINTIFFS:          DEGRAVELLES PALMINTIER
                                    HOLTHAUS & FRUGÉ
23                                BY:  MICHAEL C. PALMINTIER, ESQ.
                                       JOSHUA M. PALMINTIER, ESQ.
24                                618 MAIN STREET
                                  BATON ROUGE, LOUISIANA 70801
25

1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:              DOMENGEAUX WRIGHT ROY
                                       & EDWARDS, LLC
4                                     BY:  ELWOOD C. STEVENS JR., ESQ.
                                          BONNIE KENDRICK, ESQ.
5                                     556 JEFFERSON STREET, SUITE 500
                                      POST OFFICE BOX 3668
6                                     LAFAYETTE, LOUISIANA 70502

7    FOR THE PLAINTIFFS:              THE DUDENHEFER LAW FIRM
                                      BY:  FRANK C. DUDENHEFER JR., ESQ.
8                                     601 POYDRAS STREET, SUITE 2655
                                      NEW ORLEANS, LOUISIANA 70130

9    FOR THE PLAINTIFFS:              FAYARD & HONEYCUTT, APC
                                      BY:  CALVIN C. FAYARD JR., ESQ.
10                                    519 FLORIDA AVENUE, S.W.
                                      DENHAM SPRINGS, LOUISIANA 70726

11

12   FOR THE PLAINTIFFS:              JOANEN LAW FIRM
                                      BY:  SCOTT JOANEN, ESQ.
13                                    4905 FRERET STREET, SUITE B
                                      NEW ORLEANS, LOUISIANA 70115

14   FOR THE PLAINTIFFS:              LEVIN PAPANTONIO THOMAS
                                       MITCHELL RAFFERTY & PROCTOR
15                                    BY:  MATTHEW D. SCHULTZ, ESQ.
                                      316 SOUTH BAYLEN STREET, SUITE 600
16                                    PENSACOLA, FLORIDA 32502

17   FOR THE PLAINTIFFS:              THE TRIAL LAW FIRM, PC
                                      BY:  ANDREW P. OWEN, ESQ.
18                                    800 WILTSHIRE BLVD., SUITE 500
                                      LOS ANGELES, CALIFORNIA 90017

19

20   FOR THE PLAINTIFFS:              J. ROBERT WARREN II, APLC
                                      BY:  J. ROBERT WARREN II, ESQ.
21                                    1718 SHORT STREET
                                      NEW ORLEANS, LOUISIANA 70118

22   FOR THE PLAINTIFFS:              COTCHETT PITRE & MCCARTHY, LLP
                                      BY:  PHILIP L. GREGORY, ESQ.
23                                    840 MALCOLM ROAD, SUITE 200
                                      BURLINGAME, CALIFORNIA 94010

24

25

*HOURLY TRANSCRIPT*

```
 1   APPEARANCES:

 2
     FOR THE DEFENDANT,          STONE PIGMAN WALTHER WITTMANN, LLC
 3   WASHINGTON GROUP           BY:  WILLIAM D. TREEBY, ESQ.
     INTERNATIONAL, INC.:            JAMES C. GULOTTA JR., ESQ.
 4                                   HEATHER S. LONIAN, ESQ.
                                     MAGGIE A. BROUSSARD, ESQ.
 5                               546 CARONDELET STREET
                                 NEW ORLEANS, LOUISIANA 70130
 6
     FOR THE DEFENDANT,          JONES DAY (WASHINGTON)
 7   WASHINGTON GROUP           BY:  ADRIAN WAGER-ZITO, ESQ.
     INTERNATIONAL, INC.:            DEBRA S. CLAYMAN, ESQ.
 8                                   CHRISTOPHER N. THATCH, ESQ.
                                     CHRISTOPHER R. FARRELL, ESQ.
 9                                   JULIA CRONIN, ESQ.
                                     BRIAN KERWIN, ESQ.
10                               51 LOUISIANA AVENUE, N.W.
                                 WASHINGTON, D.C. 20001
11
     FOR THE DEFENDANT,          U.S. DEPARTMENT OF JUSTICE
12   UNITED STATES OF AMERICA:   CIVIL RIGHTS DIVISION-TORTS BRANCH
                                 BY:  ROBIN D. SMITH, ESQ.
13                                   JAMES F. MCCONNON JR., ESQ.
                                     RUPERT MITSCH, ESQ.
14                                   CONOR KELLS, ESQ.
                                     JOHN A. WOODCOCK, ESQ.
15                               BENJAMIN FRANKLIN STATION
                                 POST OFFICE BOX 888
16                               WASHINGTON, DC 20044

17   OFFICIAL COURT REPORTER:    TONI DOYLE TUSA, CCR, FCRR
                                 500 POYDRAS STREET, ROOM HB-406
18                               NEW ORLEANS, LOUISIANA 70130
                                 (504) 589-7778
19                               TONI_TUSA@LAED.USCOURTS.GOV

20

21
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
22   COMPUTER-AIDED TRANSCRIPTION SOFTWARE.

23

24

25
```

*HOURLY TRANSCRIPT*

1

<u>I N D E X</u>

2

<u>PAGE</u>

3   SCOTT TAYLOR
        CROSS-EXAMINATION BY MS. WAGER-ZITO          1581
4       REDIRECT EXAMINATION BY MR. ANDRY            1613

5   KENNY ARMSTRONG
        DIRECT EXAMINATION BY MR. ANDRY              1619
6       CROSS-EXAMINATION BY MS. CRONIN              1642
        REDIRECT EXAMINATION                         1673

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*HOURLY TRANSCRIPT*

| | | |
|---|---|---|
| 13:10 | 1 | **AFTERNOON SESSION** |
| 13:10 | 2 | **(SEPTEMBER 20, 2012)** |
| 13:10 | 3 | (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.) |
| 13:19 | 4 | **THE COURT:**  ARE YOU READY TO PROCEED, COUNSEL? |
| 13:19 | 5 | **SCOTT TAYLOR,** |
| 13:19 | 6 | HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS: |
| 13:19 | 7 | **CROSS-EXAMINATION** |
| 13:19 | 8 | **BY MS. WAGER-ZITO:** |
| 13:19 | 9 | **Q.**   YOU HAVE NOW PRODUCED A NEW REPORT FOR THE LIVERS |
| 13:19 | 10 | PROPERTY. |
| 13:19 | 11 | THAT'S ONE OF THE AMENDED REPORTS, CORRECT? |
| 13:19 | 12 | **A.**   YES, IT IS. |
| 13:19 | 13 | **Q.**   IN THIS REPORT YOU ARE PURPORTING TO DISTINGUISH BETWEEN |
| 13:19 | 14 | THE FLOODWATERS AT THE LIVERS HOME FROM THE IHNC VERSUS OTHER |
| 13:19 | 15 | SOURCES OF WATER; IS THAT CORRECT? |
| 13:19 | 16 | **A.**   YES. |
| 13:19 | 17 | **Q.**   YOU WERE HERE WHEN MR. CRAWFORD WAS TESTIFYING EARLIER; IS |
| 13:19 | 18 | THAT RIGHT? |
| 13:19 | 19 | **A.**   YES, I WAS. |
| 13:19 | 20 | **Q.**   DID YOU HEAR MR. CRAWFORD'S TESTIMONY ABOUT THE DAMAGE TO |
| 13:19 | 21 | THE ROOF AND THE SECOND FLOOR OF THE LIVERS PROPERTY? |
| 13:19 | 22 | **A.**   YES. |
| 13:19 | 23 | **Q.**   BUT YOU DIDN'T MAKE ANY CHANGES TO YOUR DAMAGES REPORT TO |
| 13:19 | 24 | REFLECT -- |
| 13:19 | 25 | **THE COURT:**  I'M SORRY TO INTERRUPT, BUT WE HAVE |

*HOURLY TRANSCRIPT*

SCOTT TAYLOR - CROSS

13:20  1   ANOTHER GREMLIN-LIKE NOISE HERE I'M HEARING.  IT'S VERY

13:20  2   DISTRACTING.

13:20  3          MS. WAGER-ZITO:  I HEARD IT YESTERDAY, BUT I'M NOT

13:20  4   HEARING IT NOW.

13:20  5          THE COURT:  YOU DON'T HEAR IT?

13:20  6              LET'S PROCEED.

13:20  7   BY MS. WAGER-ZITO:

13:20  8   Q.   CAN YOU HEAR IT, MR. TAYLOR?

13:20  9   A.   I HEAR A BOOMING NOISE, BUT --

13:20  10          THE COURT:  IT IS.  WE WILL PROCEED, BUT IF IT GETS

13:20  11   TOO DISTRACTING, WE WILL HAVE TO RECTIFY IT.

13:20  12              GO AHEAD.  SORRY, COUNSEL.

13:20  13          MS. WAGER-ZITO:  LET ME KNOW IF I HAVE TO STOP,

13:20  14   YOUR HONOR.

13:20  15          THE COURT:  YES, I WILL.  THANK YOU.

13:20  16   BY MS. WAGER-ZITO:

13:20  17   Q.   WE WERE TALKING ABOUT MR. CRAWFORD'S TESTIMONY ABOUT THE

13:20  18   ROOF DAMAGE AND THE DAMAGE TO THE SECOND FLOOR OF THE LIVERS

13:20  19   PROPERTY.

13:20  20   A.   YES.

13:20  21   Q.   YOU DIDN'T MAKE ANY CHANGES TO YOUR EXPERT REPORT DAMAGES

13:20  22   FIGURES FOR THE LIVERS PROPERTY AS A RESULT OF THE TESTIMONY,

13:21  23   DID YOU?

13:21  24   A.   I DON'T RECALL PRECISELY WHEN.  THERE WERE SOME CHANGES IN

13:21  25   THERE, BUT I DON'T RECALL PRECISELY IF THERE WERE ANY CHANGES

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:21 | 1 | ACCORDING TO THE IHNC WATER. |
| 13:21 | 2 | **Q.**   THE TOTAL CHANGES WERE APPROXIMATELY $2,000? |
| 13:21 | 3 | **A.**   I BELIEVE -- |
| 13:21 | 4 | **Q.**   YOU LOWERED THE NUMBER BY APPROXIMATELY $2,000? |
| 13:21 | 5 | **A.**   I BELIEVE THAT'S RIGHT. |
| 13:21 | 6 | **Q.**   DO YOU BELIEVE ANY OF THAT WAS ATTRIBUTABLE TO DAMAGE FOR |
| 13:21 | 7 | THE ROOF OR THE SECOND FLOOR? |
| 13:21 | 8 | **A.**   I DON'T BELIEVE IT HAD ANYTHING TO DO WITH THE ROOF.  I |
| 13:21 | 9 | THINK IT HAD MORE TO DO WITH THE LAYOUT OF THE ROOMS AND THE |
| 13:21 | 10 | EXTENDED FOOTPRINT OVER THE BALCONY OR OVER THE PATIO ON THE |
| 13:21 | 11 | BACK.  SOMETHING LIKE THAT.  I DON'T RECALL THE PRECISE |
| 13:21 | 12 | REASONING. |
| 13:21 | 13 | **Q.**   YOU SAY IT DIDN'T HAVE ANYTHING TO DO WITH THE ROOF.  DO |
| 13:21 | 14 | YOU THINK IT HAD ANYTHING TO DO WITH MR. CRAWFORD'S VIEW OF |
| 13:21 | 15 | DAMAGES TO THE SECOND FLOOR OF THE LIVERS PROPERTY? |
| 13:21 | 16 | **A.**   WE DISCUSSED IT. |
| 13:21 | 17 | **Q.**   WHAT I'M ASKING YOU IS, DID YOUR CHANGE IN THE AMOUNT OF |
| 13:22 | 18 | DAMAGES TO THE LIVERS PROPERTY REFLECT MR. CRAWFORD'S VIEW ON |
| 13:22 | 19 | DAMAGES TO THE SECOND FLOOR OF THE LIVERS PROPERTY? |
| 13:22 | 20 | **A.**   IT IS POSSIBLE THAT IT DID TO SOME EXTENT. |
| 13:22 | 21 | **Q.**   BUT IN ANY EVENT, IT WAS LESS THAN $2,000? |
| 13:22 | 22 | **A.**   THAT'S CORRECT. |
| 13:22 | 23 |         **MR. ANDRY:**  YOUR HONOR, OUR REALTIME ISN'T WORKING. |
| 13:22 | 24 |         **MR. BRUNO:**  YOU HAVE TO PRESS THE BUTTON. |
| 13:22 | 25 |         **MR. ANDRY:**  WE GOT IT.  THANK YOU.  I PUSHED THE |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:22 | 1 | BUTTON. |
| 13:22 | 2 | **MS. WAGER-ZITO:** OPERATOR ERROR. |
| 13:22 | 3 | **THE COURT:** YOU MAY PROCEED, COUNSEL. |
| 13:22 | 4 | BY MS. WAGER-ZITO: |
| 13:22 | 5 | **Q.** YOU NEVER ACTUALLY WENT INSIDE THE LIVERS HOME AFTER |
| 13:22 | 6 | KATRINA TO LOOK AT THE SECOND FLOOR; IS THAT CORRECT? |
| 13:22 | 7 | **A.** NOT INSIDE, NO. |
| 13:22 | 8 | **Q.** EVEN THOUGH THE LIVERS HOME WAS STILL STANDING AFTER |
| 13:23 | 9 | KATRINA, CORRECT? |
| 13:23 | 10 | **A.** WELL, WE HAD NO ACCESS TO GET INSIDE. |
| 13:23 | 11 | **Q.** BUT IT WAS STILL THERE? |
| 13:23 | 12 | **A.** YES. |
| 13:23 | 13 | **Q.** THE ONLY EVIDENCE THAT YOU HAVE TO SUPPORT YOUR CONCLUSION |
| 13:23 | 14 | THAT THE SECOND FLOOR OF THE LIVERS HOME NEEDED REPAIRS AS A |
| 13:23 | 15 | RESULT OF FLOODING WAS YOUR OBSERVATION THAT IT HAD BEEN |
| 13:23 | 16 | GUTTED, AND YOU PRESUMED THAT A HOUSE IS NOT GUTTED FOR NO |
| 13:23 | 17 | REASON? |
| 13:23 | 18 | **A.** WELL, THAT MAY NOT BE THE ONLY REASON, BUT IT CERTAINLY IS |
| 13:23 | 19 | A FOUNDATIONAL REASON. |
| 13:23 | 20 | **Q.** DO YOU RECALL ME ASKING YOU AT YOUR DEPOSITION -- AND WE |
| 13:23 | 21 | CAN -- |
| 13:23 | 22 | **A.** I WOULD STIPULATE TO THAT, THAT I MAY HAVE SAID THAT. |
| 13:23 | 23 | **Q.** I WOULD LIKE TO MOVE ON TO A DISCUSSION OF ADDITIONAL |
| 13:23 | 24 | LIVING EXPENSES. |
| 13:24 | 25 | YOU TESTIFIED THAT YOU -- FOR ALL OF THE PLAINTIFFS, |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:24 | 1 | YOUR ADDITIONAL LIVING EXPENSES WERE BASED SOLELY ON TAKING A |
| 13:24 | 2 | 20 PERCENT NUMBER OF THE DWELLING DAMAGES FOR THEIR HOMES, |
| 13:24 | 3 | CORRECT? |
| 13:24 | 4 | A.   THAT'S TRUE.  THAT'S THE METHOD. |
| 13:24 | 5 | Q.   YOU WOULD AGREE THAT GENERALLY, THE FORMULA FOR |
| 13:24 | 6 | DETERMINING ADDITIONAL LIVING EXPENSES WOULD BE TO TAKE YOUR |
| 13:24 | 7 | PRE-EVENT NORMAL LIVING EXPENSES AND CONTRAST THAT TO THE |
| 13:24 | 8 | ACTUAL EXPENSES THAT OCCUR AND DEDUCT THE DIFFERENCE AND THAT |
| 13:24 | 9 | YOU WOULD DO THAT FOR EACH CATEGORY FOR WHICH THERE WOULD BE AN |
| 13:24 | 10 | EXPENSE? |
| 13:24 | 11 | IS THAT THE NORMAL WAY OF DOING IT? |
| 13:24 | 12 | A.   THAT'S A CONCISE WAY OF STATING IT, YES. |
| 13:24 | 13 | Q.   I THINK I TOOK YOUR WORDS, SO THANK YOU. |
| 13:24 | 14 | A.   WELL, THERE YOU GO. |
| 13:24 | 15 | Q.   YOU DID NOT USE ACTUAL NUMBERS FOR ANY OF THE PLAINTIFFS |
| 13:24 | 16 | IN THIS CASE, CORRECT? |
| 13:24 | 17 | A.   NO, I DID NOT. |
| 13:24 | 18 | Q.   BECAUSE YOU DIDN'T HAVE ANY ACTUAL NUMBERS FOR ANY OF THE |
| 13:24 | 19 | PLAINTIFFS REGARDING WHAT THEIR LIVING EXPENSES WERE, EITHER |
| 13:24 | 20 | PRE-KATRINA OR POST-KATRINA? |
| 13:25 | 21 | A.   NO.  I HAVE INTERVIEWED EACH OF THEM.  AND IN EACH CASE |
| 13:25 | 22 | WHEN I SPOKE TO THEM INITIALLY, I ASKED HOW THEY WERE PREPARED |
| 13:25 | 23 | TO PRODUCE RECEIPTS AND THAT KIND OF THING.  AND MOST OF THEM |
| 13:25 | 24 | COULD NOT TELL ME THAT THEY WERE ABLE TO PRODUCE THE KIND OF |
| 13:25 | 25 | DOCUMENTATION THAT WOULD BE NECESSARY TO MAKE IT VERY COMPLETE. |

SCOTT TAYLOR - CROSS

13:25  1  **Q.**   IS IT YOUR TESTIMONY YOU HAVE DISCUSSED WITH EACH OF THE

13:25  2  PLAINTIFFS THEIR ADDITIONAL LIVING EXPENSES?

13:25  3  **A.**   EITHER BY PHONE OR THROUGH COUNSEL, ONE WAY OR THE OTHER,

13:25  4  BECAUSE IN SOME CASES I HAD TO MEET THEM ON THE PHONE, YOU

13:25  5  KNOW.

13:25  6  **Q.**   YOU DIDN'T DISCUSS WITH ANY OF THEM ANY OF THEIR

13:25  7  ADDITIONAL LIVING EXPENSES AFTER YOU PREPARED YOUR REPORTS, IS

13:25  8  THAT CORRECT, BECAUSE YOU DIDN'T TALK TO THEM AFTER YOU

13:25  9  PREPARED YOUR REPORTS?

13:25  10  **A.**   I DID NOT DISCUSS ALE WITH THEM AFTERWARDS, NO.

13:25  11  **Q.**   AGAIN, YOU USED THE 20 PERCENT OF THE DAMAGES THAT CAME

13:25  12  FROM THE XACTIMATE PROGRAM; IS THAT CORRECT?

13:25  13  **A.**   20 PERCENT OF THE DAMAGES, YES.

13:25  14  **Q.**   RIGHT.   THE DAMAGES NUMBER THAT CAME FROM THE XACTIMATE

13:26  15  PROGRAM?

13:26  16  **A.**   THAT'S CORRECT.

13:26  17  **Q.**   SO IF THE XACTIMATE NUMBER IS WRONG, THE ALE NUMBER WOULD

13:26  18  SIMILARLY BE WRONG, CORRECT?

13:26  19  **A.**   IF THE XACTIMATE NEEDS TO BE ADJUSTED, SO WOULD THE ALE

13:26  20  NUMBER.

13:26  21  **Q.**   AGAIN, YOU DID NOT -- YOU DIDN'T ASK ANY OF THE PLAINTIFFS

13:26  22  WHETHER THEY THOUGHT THAT THIS NUMBER WAS A REASONABLE NUMBER,

13:26  23  BECAUSE YOU NEVER WENT TO THEM AND SAID -- MS. COATS IS NOT A

13:26  24  GOOD EXAMPLE, BUT, "MR. LIVERS, DID YOU IN FACT SPEND $33,164

13:26  25  IN ADDITIONAL LIVING EXPENSES POST-KATRINA?"

SCOTT TAYLOR - CROSS

13:26    1    **A.**    NOT AFTER THE FACT.  NO, I DID NOT.

13:26    2    **Q.**    YOU COULDN'T HAVE DONE IT BEFORE THE FACT --

13:26    3    **A.**    THAT'S CORRECT.

13:26    4    **Q.**    -- BECAUSE YOU DIDN'T KNOW WHAT THE NUMBER WAS GOING TO BE

13:26    5    WHEN YOU WERE HAVING CONVERSATIONS WITH THEM, CORRECT?

13:26    6    **A.**    THAT'S CORRECT --

13:26    7    **Q.**    AND EVEN THOUGH YOU REVIEWED THE DEPOSITION OF MR. HOLMES

13:27    8    REGARDING THEIR ACTUAL ADDITIONAL LIVING EXPENSES POST-KATRINA,

13:27    9    THAT DID NOT CAUSE YOU TO CHANGE YOUR TESTIMONY OR CHANGE YOUR

13:27    10   DAMAGE NUMBERS FOR THEIR ADDITIONAL LIVING EXPENSES --

13:27    11   **A.**    NO, IT DID NOT.

13:27    12   **Q.**    -- BECAUSE YOU DIDN'T READ THEIR DEPOSITIONS WHEN YOU WERE

13:27    13   PREPARING THE REPORTS, CORRECT?  YOU DIDN'T READ THEIR

13:27    14   DEPOSITIONS PRIOR TO PREPARING THE REPORTS?

13:27    15   **A.**    THAT'S CORRECT.

13:27    16        **MS. WAGER-ZITO:**  ERIC, COULD YOU BRING UP JX-1474.

13:27    17   IF YOU COULD GO TO 1474-004 AND 005 AND HIGHLIGHT ON THE BOTTOM

13:27    18   "ADDITIONAL LIVING EXPENSES."

13:28    19        **MR. ANDRY:**  YOUR HONOR, MAY I ASK TO BE PROVIDED WITH

13:28    20   A COPY OF THE DOCUMENT BECAUSE I HAVE NO IDEA WHAT IT IS.

13:28    21   **BY MS. WAGER-ZITO:**

13:28    22   **Q.**    THE HOLMESES TESTIFIED THAT THIS WAS A MEDIATION WORKSHEET

13:28    23   THEY HAD SOME INPUT IN.

13:28    24        DID YOU CONSIDER THIS DOCUMENT?

13:28    25        **MR. ANDRY:**  OBJECT, YOUR HONOR.  I DON'T REMEMBER THE

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:28 | 1 | HOLMESES TESTIFYING ABOUT THIS DOCUMENT AT ALL. I HAVE NEVER |
| 13:28 | 2 | SEEN IT BEFORE IT WAS HANDED TO ME. IT WAS A MEDIATION |
| 13:28 | 3 | WORKSHEET ASSOCIATED WITH, FROM WHAT I CAN GATHER, AN |
| 13:28 | 4 | AUTOMOBILE CLUB WHICH IS MR. HOLMES' INSURANCE CARRIER, HIS |
| 13:28 | 5 | HOMEOWNERS INSURANCE CARRIER. AND AS SUCH, THIS FALLS UNDER |
| 13:28 | 6 | THE OTHER DATA AND REPORTS THAT WAS SPECIFICALLY EXCLUDED BY |
| 13:28 | 7 | YOUR RULING ON THE MOTION IN LIMINE, AND WE WOULD OBJECT TO ITS |
| 13:28 | 8 | USE AND TESTIMONY SURROUNDING IT. |
| 13:28 | 9 | **THE COURT:** I WOULD NEED TO KNOW WHO PREPARED THE |
| 13:28 | 10 | DOCUMENT. AND AS I RECALL, MY RULING, WHICH WAS NOT CONTOURED |
| 13:29 | 11 | ELEGANTLY, BUT THAT IN THE EVENT IT WAS SOMETHING THAT THE |
| 13:29 | 12 | PLAINTIFF HIM- OR HERSELF HAD STATED, THAT WOULD BE ONE THING. |
| 13:29 | 13 | WE WOULD HAVE TO LAY THAT FOUNDATION. IF IT WAS SOMETHING |
| 13:29 | 14 | ELSE, IT WOULD BE HEARSAY. |
| 13:29 | 15 | I DON'T KNOW IF YOU INTEND ON INTRODUCING THIS |
| 13:29 | 16 | INTO EVIDENCE OR NOT; OTHERWISE, IT WOULD BE HEARSAY. |
| 13:29 | 17 | **MR. ANDRY:** IT'S HEARSAY AND OUTSIDE THE PARAMETERS |
| 13:29 | 18 | OF YOUR MOTION IN LIMINE, AND THERE'S NO FOUNDATION THAT |
| 13:29 | 19 | MR. HOLMES PREPARED THIS HIMSELF. THERE'S NO FOUNDATION AT |
| 13:29 | 20 | ALL. |
| 13:29 | 21 | **THE COURT:** I'M NOT QUITE SURE WHAT IT IS. |
| 13:29 | 22 | **MS. WAGER-ZITO:** YOUR HONOR, WE CAN DO THIS ANOTHER |
| 13:29 | 23 | WAY. |
| 13:29 | 24 | **BY MS. WAGER-ZITO:** |
| 13:29 | 25 | **Q.** YOU DID NOT SPEAK TO MR. HOLMES AND ASK HIM IF HE HAD EVER |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:29 | 1 | MADE ANY CLAIMS FOR ADDITIONAL LIVING EXPENSES IN ANY OTHER |
| 13:30 | 2 | PROCEEDING RELATING TO HIS ADDITIONAL LIVING EXPENSES FROM |
| 13:30 | 3 | KATRINA? |
| 13:30 | 4 | A.   NO, I DID NOT ASK HIM. |
| 13:30 | 5 | Q.   YOU NEVER ASKED HIM IF HE HAD TRIED TO FIGURE OUT HIS |
| 13:30 | 6 | ADDITIONAL LIVING EXPENSES IN CONNECTION WITH ANY OTHER CLAIM |
| 13:30 | 7 | THAT HE HAD MADE? |
| 13:30 | 8 | A.   ANY OTHER CLAIM?  NO, I DON'T RECALL THAT. |
| 13:30 | 9 | Q.   NOR IS YOUR OPINION CHANGED BY THE FACT MR. HOLMES |
| 13:30 | 10 | TESTIFIED IN HIS DEPOSITION THAT HE AND HIS WIFE PAID NO RENT |
| 13:30 | 11 | FOR THE FIRST YEAR THAT THEY LIVED IN THEIR NEW HOME AFTER |
| 13:30 | 12 | KATRINA? |
| 13:30 | 13 | A.   I HAD NO KNOWLEDGE OF THAT AT THE TIME. |
| 13:30 | 14 | Q.   WITH RESPECT TO THE LIVERS, YOU STATE IN YOUR REPORT -- |
| 13:30 | 15 | **MS. WAGER-ZITO:**  AND WE CAN BRING THIS UP.  IT'S |
| 13:30 | 16 | PX-4736-022. |
| 13:30 | 17 | ERIC, IF YOU CAN JUST HIGHLIGHT THE PARAGRAPH ON |
| 13:31 | 18 | "ADDITIONAL LIVING EXPENSES." |
| 13:31 | 19 | **BY MS. WAGER-ZITO:** |
| 13:31 | 20 | Q.   IN THE MIDDLE OF THE PARAGRAPH STARTING WITH THE -- IT |
| 13:31 | 21 | STATES IN THERE:  "BETWEEN THE TIME OF MANDATORY EVACUATION AND |
| 13:31 | 22 | THE TIME THE HOMEOWNER WAS ABLE TO SETTLE INTO A PERMANENT |
| 13:31 | 23 | RESIDENCE, MORE THAN ONE YEAR TRANSPIRED." |
| 13:31 | 24 | A.   I THINK I USED THAT SAME LANGUAGE GENERALLY IN MOST OF THE |
| 13:31 | 25 | REPORTS. |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:31 | 1 | Q.   THAT WAS WITHOUT SPEAKING TO ANY OF THE PLAINTIFFS TO FIND |
| 13:31 | 2 | OUT WHETHER IN FACT ONE YEAR HAD TRANSPIRED BEFORE THEY HAD |
| 13:31 | 3 | SETTLED INTO A NEW, PERMANENT RESIDENCE? |
| 13:31 | 4 | A.   WHEN I SPOKE TO MR. LIVERS, THERE WAS SOMEWHAT OF A |
| 13:31 | 5 | DISCREPANCY.  I WASN'T SURE WHAT HE WAS TELLING ME AND WHEN |
| 13:31 | 6 | THEY WERE GOING TO BE PERMANENTLY IN ANY SITUATION.  IT HAD |
| 13:31 | 7 | SOMETHING TO DO WITH SELLING THE HOUSE THAT THEY HAD. |
| 13:31 | 8 | AND I DIDN'T KNOW WHERE THEY WERE, BUT I KNEW IT HAD |
| 13:32 | 9 | BEEN YEARS LATER BY THIS TIME, AND THEY STILL WERE NOT BACK IN |
| 13:32 | 10 | THEIR ORIGINAL HOME, SO I JUST LEFT THE STANDARD LANGUAGE IN |
| 13:32 | 11 | THERE. |
| 13:32 | 12 | Q.   YOU WERE UNAWARE UNTIL I TOLD YOU AT YOUR DEPOSITION THAT |
| 13:32 | 13 | MR. LIVERS TESTIFIED THAT HE AND HIS WIFE MOVED INTO THEIR |
| 13:32 | 14 | CURRENT HOUSE IN APRIL 2006 AND HAD DECIDED NOT TO RETURN TO |
| 13:32 | 15 | THEIR PRE-KATRINA HOME AS EARLY AS JANUARY 2006. |
| 13:32 | 16 | A.   THAT'S CORRECT. |
| 13:32 | 17 | Q.   EVEN AFTER YOUR DEPOSITION AND MAKING AMENDMENTS TO YOUR |
| 13:32 | 18 | REPORT AND SPECIFICALLY ONE OF THEM TO THE LIVERS REPORT, THAT |
| 13:32 | 19 | DIDN'T CHANGE YOUR OPINION THAT THEY -- IT WAS MORE THAN A YEAR |
| 13:32 | 20 | HAD TRANSPIRED BEFORE THEY WERE ABLE TO SETTLE INTO A PERMANENT |
| 13:32 | 21 | RESIDENCE? |
| 13:32 | 22 | A.   WELL, IF YOU LOOK AT THE FIRST PART OF THAT, THE |
| 13:32 | 23 | ADDITIONAL LIVING EXPENSES IS DESIGNED TO BE COMMENSURATE WITH |
| 13:32 | 24 | THE PRECISE LIVING STANDARD THEY HAD AT THE TIME.  THEY NEVER |
| 13:32 | 25 | WERE ABLE TO RETURN TO THAT, AND THAT'S WHY I LEFT THAT IN |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:32 | 1 | THERE.  THEY CAN'T LIVE EXACTLY AS THEY DID BEFORE WHEN THEY |
| 13:33 | 2 | HAD TO MOVE INTO A DIFFERENT HOUSE ALTOGETHER. |
| 13:33 | 3 | AND SO I LEFT IT AT ONE YEAR.  IT COULD HAVE BEEN |
| 13:33 | 4 | GREATLY EXAGGERATED BEYOND THAT, BUT I LEFT IT THERE BECAUSE I |
| 13:33 | 5 | WAS TRYING NOT TO PUSH THAT BEYOND WHAT APPEARED TO BE |
| 13:33 | 6 | REASONABLE. |
| 13:33 | 7 | **Q.**   YOU DIDN'T DISCUSS IT WITH THEM? |
| 13:33 | 8 | **A.**   NOT ANY MORE AT THAT POINT, NO. |
| 13:33 | 9 | **Q.**   YOU WERE UNAWARE UNTIL I TOLD YOU AT YOUR DEPOSITION THAT |
| 13:33 | 10 | POST-KATRINA, MS. COATS RESIDED WITH FAMILY IN HAMMOND AND THAT |
| 13:33 | 11 | SHE HAD FEW EXPENSES, IF ANY? |
| 13:33 | 12 | **MR. ANDRY:**  YOUR HONOR, OBJECTION, TO THE EXTENT THAT |
| 13:33 | 13 | THIS IS ELICITING HOLMES AND MS. COATS, PARTICULARLY WITH |
| 13:33 | 14 | COATS, BECAUSE MS. COATS'S CHARITY IS A COLLATERAL SOURCE AND |
| 13:33 | 15 | THE FACT THAT THE CATHOLIC CHARITIES TOOK THE HOLMES IN AND/OR |
| 13:33 | 16 | THE FACT THAT RELATIVES TOOK IN MS. COATS -- IT'S COLLATERAL |
| 13:33 | 17 | SOURCE. |
| 13:33 | 18 | WE WOULD OBJECT ON THE BASIS IT'S COLLATERAL |
| 13:33 | 19 | SOURCE BECAUSE THEY STILL HAVE TO OBTAIN AND PAY FOR ADDITIONAL |
| 13:33 | 20 | LIVING EXPENSES, NOTWITHSTANDING THE COLLATERAL SOURCE. |
| 13:34 | 21 | **THE COURT:**  I DON'T THINK I SPECIFICALLY RULED ON |
| 13:34 | 22 | WHETHER -- AND IF I HAVE, PLEASE FORGIVE ME -- WHETHER A |
| 13:34 | 23 | CHARITABLE DONATION IN FACT COMES UNDER THE COLLATERAL SOURCE |
| 13:34 | 24 | RULE. |
| 13:34 | 25 | NONETHELESS, I'M PUTTING THAT ASIDE, AND I'M |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:34 | 1 | GOING TO ALLOW YOU TO PROCEED. |
| 13:34 | 2 | I OVERRULE THE OBJECTION. |
| 13:34 | 3 | **MS. WAGER-ZITO:**  THANK YOU, YOUR HONOR. |
| 13:34 | 4 | I DON'T BELIEVE THAT HAS BEEN RULED ON YET. |
| 13:34 | 5 | **BY MS. WAGER-ZITO:** |
| 13:34 | 6 | **Q.**   YOU HAVE NO INFORMATION AT ALL REGARDING MS. COATS'S |
| 13:34 | 7 | ACTUAL LIVING EXPENSES POST-KATRINA? |
| 13:34 | 8 | **A.**   NO, I DON'T. |
| 13:34 | 9 | **Q.**   IN FACT, YOU SAID BEFORE THAT YOU MET WITH MS. COATS'S |
| 13:34 | 10 | NEPHEW, CHARLIE COATS; IS THAT CORRECT? |
| 13:34 | 11 | **A.**   THAT'S CORRECT. |
| 13:34 | 12 | **Q.**   YOU DIDN'T MEET WITH MS. COATS'S FIANCÉ, NATHAN MORGAN, OR |
| 13:34 | 13 | ANY OF HER CHILDREN, DID YOU? |
| 13:34 | 14 | **A.**   NO.  THEY WERE NOT AVAILABLE AT THE TIME I WAS SCOPING. |
| 13:34 | 15 | **Q.**   YOU DIDN'T READ MR. MORGAN'S DEPOSITION, CORRECT? |
| 13:34 | 16 | **A.**   AT WHAT TIME? |
| 13:34 | 17 | **Q.**   BEFORE YOU PREPARED EITHER YOUR OCTOBER 2011 REPORT OR |
| 13:35 | 18 | YOUR APRIL 2012 REPORT. |
| 13:35 | 19 | **A.**   I DIDN'T GO INTO THAT AT ALL IN TERMS OF ALE AND WITH HIM |
| 13:35 | 20 | AT ALL. |
| 13:35 | 21 | **Q.**   I BELIEVE THE QUESTION WAS WHETHER OR NOT YOU HAD READ THE |
| 13:35 | 22 | DEPOSITIONS BEFORE YOU WROTE YOUR REPORT. |
| 13:35 | 23 | **A.**   CERTAINLY I KNOW I REVIEWED THE DEPOSITION BEFORE THE |
| 13:35 | 24 | APRIL -- I BELIEVE I DID.  I THINK I DID LOOK AT IT BEFORE |
| 13:35 | 25 | THAT; BUT THE TIMING OF THAT, I'M NOT SURE OF. |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:35 | 1 | **Q.** WE LOOKED AT THE SUMMARY CHART THAT WAS PUT TOGETHER WHEN |
| 13:35 | 2 | YOU WERE GIVING YOUR DIRECT TESTIMONY, AND I BELIEVE YOU |
| 13:35 | 3 | DISCUSSED THAT THERE WAS A MISTAKE IN THERE FOR THE LIVERS ON |
| 13:35 | 4 | THE ADDITIONAL LIVING EXPENSES BECAUSE YOU HAD LOWERED THE |
| 13:35 | 5 | NUMBER ON THAT, SO THE ALE SHOULD HAVE SIMILARLY BEEN LOWERED. |
| 13:35 | 6 | SO I ASSUME THE SAME WOULD BE TRUE -- AND I DON'T |
| 13:36 | 7 | THINK YOU DISCUSSED IT ON DIRECT -- FOR MS. COATS? |
| 13:36 | 8 | **A.** I SAW THAT, TOO, WHEN WE WERE IN DIRECT, BUT BECAUSE IT |
| 13:36 | 9 | WASN'T BROUGHT UP, I NEVER MENTIONED IT. |
| 13:36 | 10 | BUT I THINK THE MATH -- I WOULD INVITE SOMEONE TO DO |
| 13:36 | 11 | THE MATH AND TELL ME IF THE LATEST FIGURES ARE THE CORRECT ONES |
| 13:36 | 12 | OR NOT. I COULD DO IT. IT WOULDN'T TAKE JUST A SECOND. I |
| 13:36 | 13 | COULD TELL YOU WHETHER THAT NUMBER IS 20 PERCENT OR NOT. |
| 13:36 | 14 | **Q.** WELL, THE NUMBER IS EXACTLY THE SAME AS IT WAS BEFORE? |
| 13:36 | 15 | **A.** WELL, I NOTICED THAT. ACTUALLY, IT'S A FEW CENTS |
| 13:36 | 16 | DIFFERENT, AND I DON'T KNOW WHAT THAT FALLS INTO. I NOTICED |
| 13:36 | 17 | THE SAME THING. |
| 13:36 | 18 | **Q.** BUT THAT NUMBER SIMILARLY NEEDS TO BE CHANGED, CORRECT? |
| 13:36 | 19 | **A.** IF IT'S NOT CORRECT, YES; BUT I DON'T KNOW. I HAVEN'T |
| 13:36 | 20 | LOOKED TO SEE IF THAT'S ACTUALLY CORRECT AT THIS POINT. |
| 13:36 | 21 | **Q.** YOU WOULD AGREE THAT IF THE ARMSTRONGS RECEIVED MONEY FROM |
| 13:36 | 22 | THEIR INSURANCE COMPANY FOR ADDITIONAL LIVING EXPENSES, THAT |
| 13:37 | 23 | ANY AMOUNT YOU WOULD GIVE THEM NOW WOULD BE DUPLICATIVE OF THE |
| 13:37 | 24 | AMOUNT THAT YOU HAVE OPINED THEY ARE DUE FOR ADDITIONAL LIVING |
| 13:37 | 25 | EXPENSES? |

SCOTT TAYLOR - CROSS

| 13:37 | 1 | **MR. ANDRY:** BASED ON THE QUESTION, IT'S |
| 13:37 | 2 | COLLATERAL-SOURCE OBJECTION. |
| 13:37 | 3 | **THE COURT:** OVERRULED. |
| 13:37 | 4 | **THE WITNESS:** I REALLY CAN'T SPEAK TO WHAT SOMEBODY |
| 13:37 | 5 | HAS GIVEN THEM. I WAS NOT AWARE OF ANY OF THAT. FOR ME TO |
| 13:37 | 6 | MAKE A JUDGMENT AS TO WHETHER IT SHOULD BE ADDED OR NOT ADDED, |
| 13:37 | 7 | I THINK, GOES BEYOND MY SCOPE THERE. |
| 13:37 | 8 | **MS. WAGER-ZITO:** COULD YOU PUT UP THE DEPOSITION |
| 13:37 | 9 | TESTIMONY 186. HIGHLIGHT 14 THROUGH 18. |
| 13:37 | 10 | **BY MS. WAGER-ZITO:** |
| 13:37 | 11 | **Q.** DO YOU SEE THE QUESTION THERE: |
| 13:37 | 12 | "QUESTION: AND IF LIBERTY MUTUAL PAID THIS AMOUNT |
| 13:37 | 13 | THAT WAS REQUESTED AND REFLECTED ON THIS FORM, WOULD THAT |
| 13:37 | 14 | BE DUPLICATIVE OF THE AMOUNT THAT YOU WERE OPINING THAT |
| 13:38 | 15 | THEY SHOULD BE DUE FOR ADDITIONAL LIVING EXPENSES?" |
| 13:38 | 16 | **THE WITNESS:** WHAT AMOUNT IS THAT IN REFERENCE TO? |
| 13:38 | 17 | **MS. WAGER-ZITO:** GO TO PAGE 187. |
| 13:38 | 18 | **MR. ANDRY:** YOUR HONOR, THERE'S OBJECTIONS THAT ARE |
| 13:38 | 19 | INTERSPERSED THAT WE ARE SKIPPING OVER AS PART OF THE |
| 13:38 | 20 | QUESTIONING, AND I THINK THE COURT SHOULD BE AWARE OF THAT. |
| 13:38 | 21 | SHE HAD MENTIONED THERE WERE OBJECTIONS TO THE |
| 13:38 | 22 | QUESTION AND THE RESPONSE. I DON'T KNOW WHAT THE OBJECTION WAS |
| 13:38 | 23 | AT THE TIME. |
| 13:38 | 24 | BUT IN IMPEACHING, THERE HAS TO BE A QUESTION |
| 13:38 | 25 | AND ANSWER. AND SO IT'S AN IMPROPER USE OF A DEPOSITION |

SCOTT TAYLOR - CROSS

13:38     1    BECAUSE THERE ARE OBJECTIONS INTERSPERSED BETWEEN WHAT SHE IS

13:38     2    READING AND QUOTING TO THE WITNESS.

13:38     3         THE COURT:  I'M NOT SURE I COMPLETELY UNDERSTAND THE

13:38     4    OBJECTION.

13:38     5         MR. ANDRY:  THAT IT'S IMPROPER IMPEACHMENT,

13:38     6    YOUR HONOR.

13:38     7         THE COURT:  I UNDERSTAND, BUT I'M NOT QUITE SURE WHY.

13:38     8         ARE YOU SAYING HE GAVE AN INCONSISTENT ANSWER AT

13:38     9    THE DEPOSITION?

13:38    10         MS. WAGER-ZITO:  YES, YOUR HONOR.

13:38    11         THE COURT:  YOU'RE TRYING TO DEMONSTRATE HOW THAT

13:38    12    ANSWER IS INCONSISTENT?

13:38    13         MS. WAGER-ZITO:  YES, YOUR HONOR.

13:38    14         THE COURT:  IN ORDER TO DO THAT, YOU ARE SHOWING ME

13:38    15    CERTAIN QUESTIONS AND ANSWERS, CORRECT?

13:39    16         MS. WAGER-ZITO:  YES.

13:39    17         THE COURT:  IF YOU COULD POINT OUT WHAT PARTICULAR

13:39    18    OBJECTION, MR. ANDRY.  IF WE ARE GOING TO PURSUE THIS, IT

13:39    19    DISRUPTS THE FLOW AND THEREFORE SKEWS THE ANSWER AND THEREFORE

13:39    20    THEN DILUTES OR MITIGATES THE IMPEACHMENT.

13:39    21         MR. ANDRY:  SPECIFICALLY, THESE INDIVIDUALS HAD

13:39    22    HOMEOWNERS INSURERS AND FLOOD INSURERS, AND WE DON'T KNOW IF

13:39    23    THE INDIVIDUAL PLAINTIFF -- THE PLAINTIFF IN QUESTION SHE IS

13:39    24    TALKING ABOUT THE FLOOD INSURER OR THE HOMEOWNER, AND THAT

13:39    25    MAKES A DIFFERENCE FROM A COLLATERAL SOURCE RESPECT.

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:39 | 1 | **THE COURT:** I AGREE. THAT IS TRUE. I'M GOING TO |
| 13:39 | 2 | NOTE YOUR OBJECTION. |
| 13:39 | 3 | AND, COUNSEL, YOU CAN CONTINUE. |
| 13:39 | 4 | **MS. WAGER-ZITO:** THANK YOU, YOUR HONOR. |
| 13:39 | 5 | **BY MS. WAGER-ZITO:** |
| 13:39 | 6 | **Q.** THE QUESTION, MR. TAYLOR, IS THAT YOU WOULD AGREE THAT IF |
| 13:39 | 7 | THE ARMSTRONGS RECEIVED MONEY FROM THEIR INSURANCE COMPANY FOR |
| 13:39 | 8 | ADDITIONAL LIVING EXPENSES, IT WOULD BE DUPLICATIVE OF THE |
| 13:39 | 9 | AMOUNT THAT YOU'RE OPINING THAT THEY ARE DUE FOR ADDITIONAL |
| 13:39 | 10 | LIVING EXPENSES? |
| 13:39 | 11 | **A.** WELL, IF I UNDERSTAND WHAT YOU ARE SAYING, THAT IF IT WAS |
| 13:40 | 12 | THE SAME, EXACT MONEY THEN, YES, IT'S DUPLICATIVE. BUT IF IT'S |
| 13:40 | 13 | FROM SOME OTHER SOURCE OR FOR SOME OTHER REASON OTHER THAN WHAT |
| 13:40 | 14 | WOULD HAVE NORMALLY BEEN CONSIDERED ALE, THEN I CAN'T ANSWER |
| 13:40 | 15 | THAT FOR CERTAIN. |
| 13:40 | 16 | **THE COURT:** LET ME SAY THIS: THIS WITNESS IS NOT |
| 13:40 | 17 | GOING TO BE AN EXPERT ON THE COLLATERAL-SOURCE RULE. AND |
| 13:40 | 18 | FORTUNATELY, THE EXPERT, AT LEAST AT THIS LEVEL, WILL BE ME |
| 13:40 | 19 | AFTER HEARING FROM THE EXPERTS ON EACH SIDE AND BRIEFING. |
| 13:40 | 20 | **BY MS. WAGER-ZITO:** |
| 13:40 | 21 | **Q.** GENERALLY, WITH REGARD TO YOUR USE OF THIS 20 PERCENT |
| 13:40 | 22 | NUMBER FOR ALL THE PLAINTIFFS, YOU DIDN'T DO ANY EXAMINATION AS |
| 13:40 | 23 | TO WHETHER OR NOT THE NUMBER YOU USED WAS REASONABLE BASED UPON |
| 13:40 | 24 | THEIR INCOME OR THEIR SAVINGS OR ANY OTHER SOURCE OF MONEY THEY |
| 13:40 | 25 | HAD AVAILABLE TO THEM POST-KATRINA? |

SCOTT TAYLOR - CROSS

13:40  1  **A.**   THAT IS NOT THE METHOD BY WHICH I HAVE BEEN TRAINED TO

13:40  2  ASCERTAIN THAT KIND OF THING, USING INCOME.  INCOME FLUCTUATES.

13:40  3       ONE THING THAT SEEMS TO BE STANDARD IS SOMEBODY'S

13:40  4  HOME.  THAT'S A LONG-TERM THING, AND PEOPLE TEND TO LIVE IN

13:41  5  THEM FOR A WHILE, AND THEIR VALUE TENDS TO BE COMMENSURATE WITH

13:41  6  THEIR INCOME LEVELS.  SO WE USE THE VALUE OF THE HOME, NOT

13:41  7  OTHER FACTORS.

13:41  8  **Q.**   WITHOUT DOING -- WITHOUT MAKING ANY ATTEMPT TO SEE WHETHER

13:41  9  IT'S REASONABLE THAT, FOR EXAMPLE, MS. COATS WOULD HAVE $43,599

13:41  10  IN THE YEAR FOLLOWING KATRINA AND THAT SHE SPENT THAT MONEY ON

13:41  11  ADDITIONAL LIVING EXPENSES, YOU JUST TAKE THE 20 PERCENT?

13:41  12  **A.**   I TAKE THE 20 PERCENT.  I'VE HAD MANY OCCASIONS TO WORK

13:41  13  WITH ALE, AND THAT'S BEEN THE RULE OF DOING THAT.

13:41  14  **Q.**   LET'S MOVE ON TO DISCUSS THE CONTENTS NUMBERS.  YOU WOULD

13:41  15  AGREE WITH ME, MR. TAYLOR, THAT TO ASSESS DAMAGES TO CONTENTS,

13:41  16  YOU HAVE TO HAVE AN ACCURATE ASSESSMENT OF THE QUANTITY OF

13:41  17  CONTENTS, CORRECT?

13:41  18  **A.**   IT'S IMPORTANT TO GET AS GOOD INFORMATION AS YOU CAN, YES.

13:41  19  **Q.**   YOU WOULD HAVE TO HAVE AN ACCURATE ASSESSMENT OF THE

13:42  20  QUALITY OF THE ITEMS, CORRECT?

13:42  21  **A.**   THAT WOULD BE IMPORTANT AS WELL.

13:42  22  **Q.**   AND TO SOME DEGREE, AN ASSESSMENT OF THE AGE OF THE ITEMS?

13:42  23  **A.**   WELL, THAT WOULD DEPEND ON A COUPLE OF ISSUES.

13:42  24  **Q.**   TO SOME DEGREE?

13:42  25  **A.**   SOME DEGREE THE AGE OF THE ITEMS, YES.

SCOTT TAYLOR - CROSS

| 13:42 | 1 | **Q.**   IT'S CORRECT, IS IT NOT, WITH RESPECT TO THE PLAINTIFFS' |
|---|---|---|
| 13:42 | 2 | CONTENTS, YOU ASKED EACH OF THE PLAINTIFFS WITH THE EXCEPTION |
| 13:42 | 3 | OF MS. COATS TO FILL OUT A SPREADSHEET LISTING ALL OF THEIR |
| 13:42 | 4 | CONTENTS, AND YOU EXPLAINED TO THEM WHAT TO LIST ON THAT |
| 13:42 | 5 | SPREADSHEET, CORRECT? |
| 13:42 | 6 | **A.**   THAT'S MY INITIAL DIRECTION THAT WAS GIVEN TO THEM, YES. |
| 13:42 | 7 | **Q.**   WHEN YOU GIVE THEM THE INSTRUCTIONS TO FILL OUT THE |
| 13:42 | 8 | CONTENTS LIST, YOU TELL THEM THAT THEY NEED TO SAY THE TYPE AND |
| 13:42 | 9 | THE MATERIAL THAT THE CONTENTS ARE MADE OF, THE TYPE OF |
| 13:42 | 10 | MATERIAL AND THE CONTENTS OF THE MATERIAL -- THE MATERIAL OF |
| 13:42 | 11 | THE CONTENTS? |
| 13:42 | 12 | **A.**   I'M NOT SURE OF THE -- PERHAPS -- YEAH, THAT IS ONE OF THE |
| 13:43 | 13 | FACTORS, THE MATERIAL BEING USED, YES. |
| 13:43 | 14 | **Q.**   YOU ASKED THEM TO INCLUDE THE MAKE AND MODEL NUMBER OF THE |
| 13:43 | 15 | CONTENTS WHERE APPLICABLE? |
| 13:43 | 16 | **A.**   RIGHT.  YES, THAT'S CORRECT. |
| 13:43 | 17 | **Q.**   YOU WOULD AGREE WITH ME THAT RARELY DO YOU GET THE DETAILS |
| 13:43 | 18 | THAT YOU ARE LOOKING FOR TO ALLOW YOU TO DRILL DOWN TO THE |
| 13:43 | 19 | NUMBERS THAT YOU LIKE FOR THE CONTENTS? |
| 13:43 | 20 | **A.**   THAT'S TRUE.  THAT'S TRUE. |
| 13:43 | 21 | **Q.**   IF YOU DON'T GET THE LEVEL OF DETAIL, YOU JUST TAKE THE |
| 13:43 | 22 | NUMBERS, AND YOU ASSUME THAT THEY ARE RIGHT UNLESS SOMETHING |
| 13:43 | 23 | JUMPS OUT AT YOU -- |
| 13:43 | 24 | **A.**   THAT'S CORRECT. |
| 13:43 | 25 | **Q.**   -- ON THE CONTENTS LIST; IS THAT CORRECT? |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:43 | 1 | **A.** THAT'S CORRECT, YES. |
| 13:43 | 2 | **Q.** THANK YOU. |
| 13:43 | 3 | IN THIS CASE, IN FACT, MOST OF THE PLAINTIFFS DIDN'T |
| 13:43 | 4 | PROVIDE INFORMATION REGARDING THE AGE OF THE CONTENTS AND ONLY |
| 13:43 | 5 | A VERY LIMITED AMOUNT OF INFORMATION RELATING TO THE MAKE AND |
| 13:43 | 6 | THE MODEL NUMBER? |
| 13:43 | 7 | **A.** THAT'S CORRECT. |
| 13:43 | 8 | **Q.** YOU NEVER WENT BACK AND ASKED ANY QUESTIONS OF THE |
| 13:43 | 9 | PLAINTIFFS ABOUT THEIR CONTENTS LIST BECAUSE, AGAIN, YOU DIDN'T |
| 13:43 | 10 | SPEAK TO THEM AFTER YOU DID YOUR REPORTS? |
| 13:43 | 11 | **A.** THAT'S CORRECT. |
| 13:44 | 12 | **Q.** YOU PERFORMED ONLY LIMITED SPOT CHECKS TO MAKE SURE THE |
| 13:44 | 13 | CONTENTS NUMBERS APPEARED REASONABLE? |
| 13:44 | 14 | **A.** THAT'S TRUE. THEY WERE LIMITED. IT WASN'T ON EVERY ITEM, |
| 13:44 | 15 | OBVIOUSLY. |
| 13:44 | 16 | **Q.** YOU ONLY MADE -- YOU MADE ONLY A VERY LIMITED NUMBER OF |
| 13:44 | 17 | CHANGES TO THE CONTENTS LIST PROVIDED TO YOU, CORRECT? |
| 13:44 | 18 | **A.** WELL, THAT SEEMS SUBJECTIVE. I'M NOT SURE THAT THAT'S |
| 13:44 | 19 | TRUE. IT'S POSSIBLE. IT IS LIMITED, YES. |
| 13:44 | 20 | **Q.** YOU DIDN'T MAKE ANY ASSUMPTIONS REGARDING THE QUALITY OF |
| 13:44 | 21 | FURNISHINGS. YOU JUST USED THE NUMBERS THE PLAINTIFFS GAVE YOU |
| 13:44 | 22 | WITH REGARD TO THE QUALITY OF THE FURNISHINGS IN THEIR HOMES? |
| 13:44 | 23 | **A.** THAT MAY HAVE PLAYED INTO WHY SOME OF THE CHANGES I DID |
| 13:44 | 24 | MAKE WERE MADE. |
| 13:44 | 25 | **Q.** DO YOU RECALL WE DISCUSSED AT YOUR DEPOSITION WHETHER YOU |

SCOTT TAYLOR - CROSS

13:44    1    MADE CHANGES TO THE FURNITURE --

13:44    2    **A.**    NOT PRECISELY.  I DON'T RECALL.

13:44    3    **Q.**    IN FACT, THE ONLY THING YOU CAN RECALL CHANGING, FOR

13:45    4    EXAMPLE, ON THE ARMSTRONGS' CONTENTS LIST IS ONE ENTITY FOR $50

13:45    5    OF SHELVING, AND YOU CHANGED THAT TO REFLECT IT WAS THREE

13:45    6    DIFFERENT SHELVES INSTEAD OF ONE SHELF THAT WAS $50, AND

13:45    7    THEREFORE IT SHOULD HAVE BEEN $150?

13:45    8    **A.**    WELL, IT OFTEN HAPPENS THAT WHEN SOMEBODY IS FILLING OUT A

13:45    9    SHEET LIKE THAT AND THEY ARE NOT FAMILIAR WITH THE FORMATTING,

13:45   10    THEY MIGHT SAY THIS MANY OF THIS MANY ITEM, AND THEY COUNTED

13:45   11    WRONG.

13:45   12         THEY DON'T REALIZE THAT YOU ARE NOT ASKING THEM TO

13:45   13    PUT HOW MANY TOTAL.  YOU'RE ASKING THEM HOW MANY OF EACH.  AND

13:45   14    THE PROBLEM IS THAT THEY ARE LISTING IT INCORRECTLY, SO WHEN

13:45   15    THE NUMBERS COME OUT, THEY ARE NOT RIGHT.

13:45   16    **Q.**    THE QUESTION WAS:  IS THAT THE ONLY CHANGE THAT YOU CAN

13:45   17    RECALL MAKING ON THE ARMSTRONGS' LIST?

13:45   18    **A.**    I DON'T RECALL IF THAT'S THE ONLY CHANGE.

13:45   19    **Q.**    DO YOU RECALL ME ASKING YOU AT YOUR DEPOSITION WHETHER YOU

13:45   20    MADE ANY OTHER CHANGES ON THE ARMSTRONGS' CONTENTS LIST?

13:45   21    **A.**    VAGUELY.

13:45   22    **Q.**    AND THAT YOU TOLD ME THAT YOU HADN'T?

13:45   23    **A.**    I WILL CONCEDE THAT POINT, YES.

13:46   24    **Q.**    ANOTHER ITEM ON THE ARMSTRONGS' LIST WAS --

13:46   25         **MS. WAGER-ZITO:**  AND, YOUR HONOR, I PROMISE WE ARE

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:46 | 1 | NOT GOING TO GO THROUGH THE LIST LINE ITEM BY LINE ITEM. |
| 13:46 | 2 | **BY MS. WAGER-ZITO:** |
| 13:46 | 3 | **Q.**   ANOTHER ITEM ON THE LIST WAS A BASEBALL CARD COLLECTION |
| 13:46 | 4 | VALUED AT $7,500. |
| 13:46 | 5 |         DO YOU RECALL THAT AS BEING AN ITEM THAT YOU |
| 13:46 | 6 | QUESTIONED? |
| 13:46 | 7 | **A.**   I DON'T RECALL AT THIS TIME, NO. |
| 13:46 | 8 | **Q.**   DO YOU SEE THAT LISTING UP THERE? |
| 13:46 | 9 | **A.**   YES, I SEE IT. |
| 13:46 | 10 | **Q.**   YOU DIDN'T DISCUSS WITH MR. ARMSTRONG THE CONTENTS OF THAT |
| 13:46 | 11 | BASEBALL CARD COLLECTION; WHICH CARDS WERE IN IT? |
| 13:46 | 12 | **A.**   I DID NOT HAVE THE OPPORTUNITY TO DO THAT, NO. |
| 13:46 | 13 | **Q.**   WHEN YOU PREPARED THIS CONTENTS LIST, YOU ALSO DIDN'T |
| 13:46 | 14 | DISCUSS WITH MR. ARMSTRONG WHO THAT BASEBALL CARD COLLECTION |
| 13:46 | 15 | BELONGED TO, CORRECT? |
| 13:46 | 16 | **A.**   NO, I DID NOT. |
| 13:46 | 17 | **Q.**   YOU DIDN'T KNOW UNTIL WE ASKED YOU AT YOUR DEPOSITION THAT |
| 13:47 | 18 | THAT BASEBALL CARD COLLECTION BELONGED TO MR. ARMSTRONG'S SON? |
| 13:47 | 19 | **A.**   NO, I DID NOT. |
| 13:47 | 20 | **Q.**   ALSO ON THE ARMSTRONG'S CONTENTS LIST, YOU ALSO HAD A |
| 13:47 | 21 | 1998 BOAT WHICH YOU INCLUDED AND YOU VALUED AT $15,000? |
| 13:47 | 22 | **A.**   I RECALL THE BOAT, YES. |
| 13:47 | 23 | **Q.**   IN PREPARING YOUR VALUATION FOR THE BOAT, YOU USED |
| 13:47 | 24 | INFORMATION FROM EDMUNDS FOR A 2005 BOAT, NOT A 1998 BOAT? |
| 13:47 | 25 | **A.**   I DON'T KNOW THAT THERE WAS ANY AVAILABLE INFORMATION ON |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:47 | 1 | THE ONE; BUT I DID LOOK AT COST COMPARISONS OVER TIME TO SEE IF |
| 13:47 | 2 | THERE WAS A CHANGE IN THE MARKET ON BOATS, AND I DIDN'T SEE |
| 13:47 | 3 | ENOUGH TO WARRANT DISPUTING THAT THE YEAR MODEL -- BASICALLY, I |
| 13:47 | 4 | WENT AGAINST HOW MANY YEARS IT HAD BEEN SINCE THE FLOOD, AND SO |
| 13:48 | 5 | I WORKED IT IN THAT WAY.  IT SEEMED TO ME THAT THE NUMBERS BORE |
| 13:48 | 6 | OUT AT THE TIME. |
| 13:48 | 7 | Q.   YOU WEREN'T AWARE UNTIL I TOLD YOU AT YOUR DEPOSITION THAT |
| 13:48 | 8 | MR. ARMSTRONG VALUED THE BOAT AT $5,000 TO $6,000, CORRECT? |
| 13:48 | 9 | A.   NO, I WAS NOT. |
| 13:48 | 10 | Q.   GENERALLY, OTHER THAN ASKING THE ARMSTRONGS FOR THE |
| 13:48 | 11 | CONTENTS REPORT, YOU DIDN'T TAKE ANY OTHER STEPS TO ASCERTAIN |
| 13:48 | 12 | THE QUALITY OF EITHER THE FURNITURE OR THE APPLIANCES OR THE |
| 13:48 | 13 | MATERIALS IN THE ARMSTRONGS' HOME, CORRECT? |
| 13:48 | 14 | A.   NOT BEYOND OUR INITIAL CONVERSATIONS, NO, AND MY |
| 13:48 | 15 | OBSERVATIONS OF THE FURNITURE THAT THEY WERE LIVING WITH. |
| 13:48 | 16 | Q.   I WOULD LIKE TO ASK YOU A COUPLE QUESTIONS ABOUT |
| 13:48 | 17 | MS. COATS'S CONTENTS REPORT. |
| 13:48 | 18 | IT'S TRUE, IS IT NOT, THAT YOU DIDN'T QUESTION THE |
| 13:48 | 19 | VERACITY OF ANY OF THE CONTENTS LISTED ON MS. COATS'S REPORT? |
| 13:48 | 20 | A.   THAT'S CORRECT.  THAT WAS NOT GIVEN TO ME DIRECTLY.  IT |
| 13:48 | 21 | WAS THROUGH COUNSEL, AND THERE WAS NO CHANGES THAT I MADE AS A |
| 13:49 | 22 | RESULT. |
| 13:49 | 23 | Q.   YOU DIDN'T QUESTION AN ENTRY ON THAT REPORT? |
| 13:49 | 24 | **MS. WAGER-ZITO:**  ERIC, IF YOU COULD PUT THIS UP, IT'S |
| 13:49 | 25 | JX-1609-0070. |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:49 | 1 | **BY MS. WAGER-ZITO:** |
| 13:49 | 2 | **Q.**   YOU DIDN'T QUESTION AN ENTRY FOR MS. COATS'S CONTENTS FOR |
| 13:49 | 3 | $10,000 OF SUITS? |
| 13:49 | 4 | **A.**   NO, I DID NOT. |
| 13:49 | 5 | **Q.**   YOU'RE NOT AWARE THAT THOSE SUITS WERE MR. MORGAN'S SUITS? |
| 13:49 | 6 | **A.**   NO, I WAS NOT. |
| 13:49 | 7 | **Q.**   THERE'S ANOTHER ENTRY ON THERE FOR -- A LITTLE BIT FURTHER |
| 13:49 | 8 | DOWN -- FOR CHILDREN'S CLOTHING, $20,000? |
| 13:49 | 9 | **A.**   RIGHT.   I WAS UNDER THE IMPRESSION THERE WERE A LOT OF |
| 13:49 | 10 | CHILDREN LIVING IN THE HOME AT VARIOUS TIMES. |
| 13:49 | 11 | **Q.**   DO YOU KNOW WHOSE CHILDREN THEY WERE? |
| 13:49 | 12 | **A.**   NO. |
| 13:49 | 13 | **Q.**   YOU ARE UNAWARE THAT THEY WERE MS. COATS'S GRANDCHILDREN, |
| 13:49 | 14 | AND HER DAUGHTER WAS LIVING WITH HER AS WELL? |
| 13:49 | 15 | **A.**   NO, NOT EXACTLY SURE WHO THEY WERE. |
| 13:50 | 16 | **Q.**   YOU DIDN'T ASK ANYBODY WHO THE -- |
| 13:50 | 17 | **A.**   NOT AFTER THE FACT, NO. |
| 13:50 | 18 | **Q.**   ON THE COATS'S CONTENTS LIST -- AND WE CAN SHOW YOU THESE, |
| 13:50 | 19 | AND IT WOULD BE SOMEWHAT TORTURED TO DO SO -- BUT THERE ARE |
| 13:50 | 20 | ITEMS ON THERE THAT ARE MORE APPROPRIATELY ON THE STRUCTURES |
| 13:50 | 21 | LIST SUCH AS DOORS AND FLOORS AND TOILETS AND SINKS. |
| 13:50 | 22 |     DO YOU RECALL THAT? |
| 13:50 | 23 | **A.**   I DON'T RECALL AT THIS TIME, NO. |
| 13:50 | 24 | **Q.**   WE WILL SHOW YOU SOME OF THOSE. |
| 13:50 | 25 |     AND THIS IS JX-1609-0064.   THERE'S A DOOR. |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:50 | 1 | IF YOU GO TO THE NEXT PAGE, WHICH IS -- GO TO 0065, |
| 13:50 | 2 | LINE 32, THERE'S A SINK LISTED THERE. |
| 13:51 | 3 | GO TO 66, LINE 59, LINOLEUM FLOOR. |
| 13:51 | 4 | WOULD YOU AGREE THESE ARE ITEMS THAT ARE MORE |
| 13:51 | 5 | APPROPRIATELY LISTED IN THE STRUCTURES? |
| 13:51 | 6 | A.   GENERALLY SPEAKING, I WOULD; HOWEVER, I UNDERSTOOD ALSO AT |
| 13:51 | 7 | THE TIME THAT THIS CONTENTS LIST CAME IN THAT IT WAS PROVIDED |
| 13:51 | 8 | BY PEOPLE THAT WERE LIVING THERE AT THE TIME, AND THERE WAS |
| 13:51 | 9 | SUPPOSEDLY A REMODEL GOING ON IN WHICH THEY WERE CONVERTING AND |
| 13:51 | 10 | DOING THINGS. |
| 13:51 | 11 | IF THE ITEMS ARE NOT INSTALLED, THEY ARE THEN |
| 13:51 | 12 | CONTENTS IN ANY OTHER DISCUSSION.  SO I DON'T KNOW IF THOSE |
| 13:51 | 13 | WERE INSTALLED ITEMS OR THINGS THAT WERE BEING GATHERED TO DO |
| 13:52 | 14 | RESTORATION OR WHATEVER OR REMODELING.  I HAVE NO IDEA. |
| 13:52 | 15 | Q.   YOU INCLUDED IN YOUR DAMAGE NUMBERS -- IN THE XACTIMATE |
| 13:52 | 16 | ANALYSIS FOR MS. COATS'S HOME, YOU INCLUDED THE FLOORS AND THE |
| 13:52 | 17 | SINKS? |
| 13:52 | 18 | A.   ABSOLUTELY, I DID. |
| 13:52 | 19 | Q.   AND THE DOORS? |
| 13:52 | 20 | A.   BUT LIKE I SAID, IF THOSE WERE ITEMS THAT WERE PURCHASED |
| 13:52 | 21 | FOR A REMODEL, THAT DOESN'T MEAN YOU DON'T PAY FOR THE ONES |
| 13:52 | 22 | THAT ARE ALREADY THERE.  IF YOU HAVE A HOUSE FULL OF MATERIALS |
| 13:52 | 23 | FOR A REBUILD AND YOU HAVE $100,000 WORTH OF MARBLE THAT'S |
| 13:52 | 24 | SITTING THERE WAITING TO BE INSTALLED, DO YOU NOT GET THAT |
| 13:52 | 25 | BECAUSE IT WAS NOT INSTALLED? |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:52 | 1 | Q.   MS. COATS WAS NOT REBUILDING HER HOUSE AT THE TIME YOU |
| 13:52 | 2 | WERE DOING YOUR REPORT, CORRECT? |
| 13:52 | 3 | A.   I UNDERSTOOD WHEN THE CORRECTIONS WERE MADE, ESPECIALLY. |
| 13:52 | 4 | AND THAT'S ABOUT THE SAME TIME, I BELIEVE, BETWEEN THE FIRST |
| 13:52 | 5 | AND THE SECOND REPORT, THAT I GOT A VERY COMPLETE LIST THAT |
| 13:52 | 6 | INVOLVED ALL THESE ITEMS. |
| 13:52 | 7 | I WAS TOLD AT THAT TIME THAT THERE WAS SOME |
| 13:52 | 8 | REMODELING GOING ON. |
| 13:53 | 9 | Q.   MS. COATS WAS DECEASED AT THAT POINT -- |
| 13:53 | 10 | A.   OKAY. |
| 13:53 | 11 | Q.   -- SO SHE WASN'T REMODELING HER HOME. |
| 13:53 | 12 | A.   AT THE TIME OF THE FLOOD? |
| 13:53 | 13 | Q.   NO.  AT THE TIME YOU WERE DOING YOUR REPORT. |
| 13:53 | 14 | A.   NO, NO.  I'M TALKING ABOUT AT THE TIME OF THE FLOOD. |
| 13:53 | 15 | IF THOSE MATERIALS IN THE REMODEL WERE IN THE HOUSE, |
| 13:53 | 16 | THEY WOULD BE COUNTED AS CONTENTS. |
| 13:53 | 17 | Q.   YOU DIDN'T ASK ANYONE WHETHER OR NOT YOU WERE |
| 13:53 | 18 | OVERCOMPENSATING MS. COATS BY PUTTING IN BOTH PLACES -- ON THE |
| 13:53 | 19 | CONTENTS LIST AND ON THE STRUCTURES -- FLOORS AND SINKS AND |
| 13:53 | 20 | TOILETS AND DOORS? |
| 13:53 | 21 | A.   LET ME AGAIN REITERATE.  I DIDN'T PUT THEM IN THE SENSE |
| 13:53 | 22 | THERE WERE TWO SETS OF MATERIALS.  YOU'RE TALKING ABOUT THE |
| 13:53 | 23 | POSSIBILITY THAT THESE WERE PURCHASED ITEMS TO BE INSTALLED IN |
| 13:53 | 24 | ADDITION TO WHAT THEY ALREADY HAD IN THE HOUSE.  THAT'S A |
| 13:53 | 25 | POSSIBILITY, AND I DIDN'T QUESTION IT.  I DIDN'T HAVE THE |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:53 | 1 | OCCASION TO, NO. |
| 13:53 | 2 | **Q.**   EVEN AFTER YOUR DEPOSITION, AFTER WE WENT THROUGH THIS |
| 13:54 | 3 | VERY DISCUSSION AND YOU DID A NEW REPORT AFTER YOUR DEPOSITION, |
| 13:54 | 4 | YOU DIDN'T ASK ANYBODY ANY QUESTIONS ABOUT THESE CONTENTS LISTS |
| 13:54 | 5 | AND THESE STRUCTURES AND WHETHER THEY BELONGED IN BOTH PLACES? |
| 13:54 | 6 | **A.**   I DID NOT HAVE THE OCCASION TO, NO. |
| 13:54 | 7 | **Q.**   WITH REGARD TO THE HOLMESES, YOU NEVER WENT BACK TO |
| 13:54 | 8 | MR. HOLMES TO ASK HIM TO PROVIDE ANY INFORMATION REGARDING |
| 13:54 | 9 | MODELS OR THE AGE OF ANY OF HIS CONTENTS.  YOU JUST TOOK HIS |
| 13:54 | 10 | CONTENTS LIST AS IS AND PUT IT INTO YOUR DAMAGES REPORT, |
| 13:54 | 11 | CORRECT? |
| 13:54 | 12 | **A.**   I DON'T RECALL IF I MADE ANY CHANGES OR NOT. |
| 13:54 | 13 | **Q.**   DO YOU RECALL ME ASKING YOU AT YOUR DEPOSITION WHETHER YOU |
| 13:54 | 14 | MADE ANY CHANGES TO THE CONTENTS LIST? |
| 13:54 | 15 | **A.**   NOT PRECISELY. |
| 13:54 | 16 | **Q.**   OTHER THAN TO FORM? |
| 13:54 | 17 | **A.**   I DON'T RECALL. |
| 13:55 | 18 |         **MS. WAGER-ZITO:**  IF WE COULD HIGHLIGHT LINES 13 |
| 13:55 | 19 | TO 17. |
| 13:55 | 20 | **BY MS. WAGER-ZITO:** |
| 13:55 | 21 | **Q.**   I WILL REPRESENT TO YOU THIS IS IN OUR DISCUSSION ABOUT |
| 13:55 | 22 | THE HOLMESES: |
| 13:55 | 23 |         **"QUESTION:**  WHEN YOU ASKED THEM TO DO THE CONTENTS |
| 13:55 | 24 |     LIST, DID YOU ASK THEM TO PUT THE AGE ON ANY OF THEIR |
| 13:55 | 25 |     CONTENTS?" |

SCOTT TAYLOR - CROSS

13:55   1          **THE WITNESS:**  OKAY.

13:55   2          **MR. ANDRY:**  YOUR HONOR, AGAIN, IT'S IMPROPER

13:55   3   IMPEACHMENT.

13:55   4          **THE COURT:**  WE ARE NOT AT THE RIGHT SPOT YET.

13:55   5   BY MS. WAGER-ZITO:

13:55   6   **Q.**   GO TO 324, 13 TO 17:

13:55   7          "QUESTION:  DID YOU MAKE ANY CHANGES TO THE CONTENTS

13:55   8          LIST?

13:55   9          "ANSWER:  I DON'T RECALL ANY CHANGES THAT I MADE

13:55   10         OTHER THAN TO PUT IT IN THE FORM THAT I USED TO CALCULATE

13:55   11         EVERYTHING."

13:55   12  **Q.**   IS THAT YOUR TESTIMONY THEN?

13:55   13  **A.**   I DIDN'T RECALL THEN WHETHER I HAD MADE ANY CHANGES

13:55   14  EITHER.

13:55   15  **Q.**   GENERALLY, MR. TAYLOR, WITH REGARD TO ALL OF THE DAMAGES

13:55   16  FOR CONTENTS FOR ALL OF THE PLAINTIFFS, IT'S YOUR OPINION THAT

13:56   17  DEPRECIATION WAS NOT AN ISSUE THAT YOU SHOULD LOOK AT, CORRECT?

13:56   18  **A.**   THAT'S CORRECT.

13:56   19  **Q.**   YOU WOULD AGREE THAT IF JUDGE DUVAL DETERMINES THAT

13:56   20  DEPRECIATION IS A RELEVANT FACTOR TO LOOK AT TO DETERMINE --

13:56   21  FOR DETERMINATION OF PLAINTIFFS' DAMAGES IN THIS CASE, THAT

13:56   22  YOUR DAMAGE NUMBERS FOR THESE PLAINTIFFS WOULD BE OVERSTATED

13:56   23  AND WOULD NEED TO BE ADJUSTED?

13:56   24  **A.**   IF HE DETERMINES THAT DEPRECIATION IS, THAT'S PURE --

13:56   25  OBVIOUSLY, AT HIS TOTAL DISCRETION.  HOWEVER, I DIDN'T PREPARE

SCOTT TAYLOR - CROSS

13:56    1    DEPRECIATION BECAUSE I DIDN'T BELIEVE THAT IT APPLIED.

13:56    2    **Q.**    NOTWITHSTANDING THE FACT THAT JUDGE DUVAL RULED IN THE

13:56    3    *ROBINSON* CASE USING YOUR DAMAGES REPORTS THAT DEPRECIATION WAS

13:56    4    APPROPRIATE?

13:56    5    **A.**    I WAS NOT THERE AT THE TIME OF THE RULING, SO I DIDN'T

13:56    6    KNOW WHAT HE DECIDED IN THAT CASE.

13:56    7            **MR. ANDRY:**    THINKING BACK, I'M NOT FLUENT IN THE

13:56    8    *ROBINSON* RULING ON THAT PARTICULAR POINT.  I DON'T THINK YOU

13:56    9    DID DEPRECIATION OF THE CONTENTS IN *ROBINSON*, AND I THINK IT'S

13:56    10   AN IMPROPER QUESTION TO SUGGEST THAT YOU DID.

13:57    11           **THE COURT:**    I'M GOING TO OVERRULE THE OBJECTION, AND

13:57    12   I THINK I CAN MAKE THAT DETERMINATION PRETTY EASILY, PRETTY

13:57    13   EASY.  I KNOW IT WON'T BE IN PAGES 1 THROUGH 110.

13:57    14   **BY MS. WAGER-ZITO:**

13:57    15   **Q.**    YOU WOULD ALSO AGREE THAT TO PROPERLY ACCOUNT FOR

13:57    16   DEPRECIATION, YOU HAVE TO CONSIDER THE AGE AND DETERMINE THE

13:57    17   CONDITION AND CONSIDER THE FUNCTIONAL VALUE OF THE CONTENTS,

13:57    18   CORRECT?

13:57    19   **A.**    THOSE ARE DETERMINING FACTORS FOR DEPRECIATION, YES.

13:57    20   **Q.**    AGAIN, YOU DIDN'T DO THIS IN THIS CASE FOR ANY OF THE

13:57    21   CONTENTS FOR ANY OF THE PLAINTIFFS, CORRECT?

13:57    22   **A.**    I DID NOT.

13:57    23   **Q.**    MR. TAYLOR, JUST GOING BACK TO THE WIND AND RAIN ISSUE FOR

13:57    24   A SECOND, YOU WOULD AGREE THAT IF THE COURT DETERMINES THAT

13:57    25   SOME OF THE DAMAGES TO EACH OF THE PLAINTIFFS' HOMES WAS CAUSED

**SCOTT TAYLOR - CROSS**

| | | |
|---|---|---|
| 13:57 | 1 | BY WIND AND RAIN VERSUS FLOODING, YOUR REPORTS CANNOT |
| 13:57 | 2 | CONCLUSIVELY ASSIST THE COURT IN AWARDING A DAMAGE AMOUNT, |
| 13:57 | 3 | CORRECT? |
| 13:57 | 4 | **A.**   I DO NOT AGREE WITH THAT BECAUSE WE HAVE THE CAPABILITY OF |
| 13:58 | 5 | BREAKING OUT WHATEVER PORTIONS FROM THE REPORT, DIRECTLY FROM |
| 13:58 | 6 | THE REPORT, THAT WOULD BE NOT ACCOUNTED FOR. |
| 13:58 | 7 | FOR EXAMPLE, IF THEY WANTED TO TAKE THE ROOF OFF, WE |
| 13:58 | 8 | COULD TAKE THE ROOF OFF.  IT'S SEPARATED OUT.  IT'S BROKEN OUT. |
| 13:58 | 9 | IT'S POSSIBLE TO DO THAT. |
| 13:58 | 10 | **Q.**   IT WOULD TAKE ANOTHER ANALYSIS OF YOUR REPORT TO DO THAT? |
| 13:58 | 11 | IT'S NOT THERE RIGHT NOW? |
| 13:58 | 12 | **A.**   IT WOULDN'T TAKE MUCH ANALYSIS.  YOU JUST OPEN IT UP, AND |
| 13:58 | 13 | THERE IT IS.  THE NUMBERS, THEY SUBTOTAL ON EVERY ROOM.  THE |
| 13:58 | 14 | ROOF IS SUBTOTALED THINGS.  IT'S A VERY SIMPLE MATTER. |
| 13:58 | 15 | **Q.**   LET'S TAKE A LOOK AT YOUR DEPOSITION.  THIS IS PAGE 258. |
| 13:58 | 16 | **MR. ANDRY:**  YOUR HONOR, AGAIN, THIS IS A TOTALLY |
| 13:58 | 17 | DIFFERENT QUESTION. |
| 13:58 | 18 | **THE COURT:**  OKAY.  LET ME READ IT. |
| 13:58 | 19 | **MR. ANDRY:**  THIS IS A MUCH NARROWER -- SHE IS |
| 13:58 | 20 | CONFLATING THE IDEAS AND TRYING TO USE IT AS IMPEACHMENT.  THIS |
| 13:58 | 21 | IS AN ENTIRELY DIFFERENT QUESTION THAN THE ONE SHE ASKED. |
| 13:58 | 22 | **THE COURT:**  LET ME READ IT. |
| 13:59 | 23 | I'M GOING TO ALLOW THE QUESTION.  I OVERRULE THE |
| 13:59 | 24 | OBJECTION. |
| | 25 | |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 13:59 | 1 | BY MS. WAGER-ZITO: |
| 13:59 | 2 | Q.   MR. TAYLOR, I WOULD LIKE YOU TO TAKE A LOOK AT YOUR |
| 13:59 | 3 | DEPOSITION TESTIMONY.  AND I ASKED YOU: |
| 13:59 | 4 | "QUESTION:  MR. TAYLOR, I APPRECIATE YOUR REPORT.  I |
| 13:59 | 5 | AM FINDING THAT THE DAMAGE TO THE ROOF AND THE CONTENTS IN |
| 13:59 | 6 | THE ATTIC WAS CAUSED BY WIND AND RAIN AND NOT FLOODING. |
| 13:59 | 7 | WHAT'S YOUR OPINION AS TO DAMAGES?  CAN I FIGURE IT OUT |
| 13:59 | 8 | FROM YOUR REPORT?" |
| 13:59 | 9 | THERE WERE SOME OBJECTIONS, AND YOU ANSWERED: |
| 13:59 | 10 | "ANSWER:  NOT CONCLUSIVELY FROM MY REPORT.  IT WOULD |
| 13:59 | 11 | HAVE TO TAKE ANOTHER ANALYSIS ALTOGETHER." |
| 14:00 | 12 | DO YOU SEE THAT? |
| 14:00 | 13 | A.   I SEE THAT. |
| 14:00 | 14 | Q.   WAS THAT YOUR TESTIMONY AT YOUR DEPOSITION? |
| 14:00 | 15 | A.   YES, IT WAS. |
| 14:00 | 16 | THE COURT:  LET ME ASK YOU A QUESTION, SIR, SINCE I |
| 14:00 | 17 | MAY BE THE ONE THAT HAS TO -- I AM THE ONE THAT MAY HAVE TO DO |
| 14:00 | 18 | THAT.  IN THE EVENT I DO FIND, LET'S SAY AS AN EXAMPLE, THE |
| 14:00 | 19 | ROOF WAS DAMAGED BY WIND RATHER THAN -- OR RAIN RATHER THAN BY |
| 14:00 | 20 | FLOOD -- IS THERE AN ITEM IN -- I HAVE YOUR REPORT.  IT'S UP |
| 14:00 | 21 | HERE.  IF I LOOK AT YOUR REPORT, CAN I FIND HOW MUCH YOU |
| 14:00 | 22 | ALLOCATED FOR THE ROOF SPECIFICALLY?  IS THAT IN THE REPORT |
| 14:00 | 23 | SOMEWHERE? |
| 14:00 | 24 | THE WITNESS:  YES, IT IS. |
| | 25 | |

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 14:00 | 1 | **BY MS. WAGER-ZITO:** |
| 14:00 | 2 | **Q.**   MR. TAYLOR, OF ALL THE LICENSES THAT YOU NOW HOLD AND HAVE |
| 14:00 | 3 | HELD -- ALL THE LICENSES YOU HOLD AND HAVE HELD ARE FOR |
| 14:00 | 4 | INSURANCE ADJUSTING, NOT REAL ESTATE SALES OR APPRAISALS, |
| 14:01 | 5 | CORRECT? |
| 14:01 | 6 | **A.**   YES. |
| 14:01 | 7 | **Q.**   YOU DON'T WORK IN REAL ESTATE SALES OR APPRAISALS, AND YOU |
| 14:01 | 8 | NEVER HAVE, RIGHT? |
| 14:01 | 9 | **A.**   THAT'S CORRECT. |
| 14:01 | 10 | **Q.**   IN THIS CASE YOU DIDN'T DO ANY APPRAISAL OF ANY OF THE |
| 14:01 | 11 | PROPERTIES OR PERFORM AN EXHAUSTIVE VALUATION REPORT OF ANY OF |
| 14:01 | 12 | THE PLAINTIFFS' PROPERTIES -- SEPARATE FROM A DAMAGE REPORT, AN |
| 14:01 | 13 | APPRAISAL OF THE PROPERTIES? |
| 14:01 | 14 | **A.**   THAT'S NOT ENTIRELY TRUE.  I ALWAYS COMPARE THOSE IN |
| 14:01 | 15 | XACTIMATE AGAINST A VALUATION REPORT. |
| 14:01 | 16 | **Q.**   THERE'S NO VALUATION REPORT THAT YOU PRODUCED AND PRINTED |
| 14:01 | 17 | OUT AND THAT YOU'VE SHARED WITH THE COURT, CORRECT? |
| 14:01 | 18 | **A.**   NO.  I WAS ASKED TO PRODUCE THE DAMAGE REPORTS, NOT |
| 14:01 | 19 | VALUATION REPORTS.  I HAVE THOSE AND I ALWAYS CONSULT THOSE. |
| 14:01 | 20 | FOR ME IT'S PART OF MY TOOLS OF THE TRADE, CONSULTING THE |
| 14:01 | 21 | VALUATION REPORT BEFORE GOING FORWARD. |
| 14:01 | 22 | **Q.**   DID YOU SAY YOU HAVE THOSE? |
| 14:01 | 23 | **A.**   I CAN PRODUCE THEM.  I DIDN'T PRODUCE THEM.  I REVIEW |
| 14:01 | 24 | THEM. |
| 14:01 | 25 |         WHAT YOU HAVE TO UNDERSTAND IS THAT XACTIMATE IS SO |

SCOTT TAYLOR - CROSS

14:01  1  COMPREHENSIVE, IT ALLOWS YOU TO LOOK AT TOTAL VALUATIONS BASED

14:02  2  ON GOING THROUGH AN INTERVIEW PROCESS WITH THE PROGRAM.  WHEN

14:02  3  YOU FINISH, IT WILL GIVE YOU A VALUATION FOR THAT HOME.  WHEN

14:02  4  IT'S DONE, I ALWAYS LOOK AT THOSE NUMBERS BEFORE I START SO

14:02  5  THAT I CAN SEE WHERE I'M GOING.

14:02  6  **Q.**  AGAIN, I ASK YOU IF THERE'S A VALUATION REPORT THAT YOU

14:02  7  PRODUCED AND PRINTED OUT THAT CAN BE SHARED WITH THE COURT.

14:02  8  **A.**  IT WAS NOT PRODUCED AND PRINTED OUT, NO.

14:02  9  **Q.**  IN ANY OF YOUR REPORTS, THERE'S NOTHING ABOUT THE VALUE OF

14:02  10 ANY OF THE PROPERTIES PRIOR TO KATRINA, CORRECT?

14:02  11 **A.**  NO.

14:02  12 **Q.**  THERE'S NOTHING IN YOUR REPORTS ABOUT THE VALUE OF THE

14:02  13 PLAINTIFFS' PROPERTIES UNRESTORED AFTER KATRINA, CORRECT?

14:02  14 **A.**  NO.

14:02  15 **Q.**  SO IF JUDGE DUVAL WERE TO DETERMINE THAT THE PROPER

14:02  16 MEASURE OF DAMAGES IN THIS CASE WAS TO COMPARE THE VALUE OF THE

14:02  17 PROPERTIES BEFORE KATRINA TO THEIR POST-KATRINA VALUES, THE

14:02  18 COURT COULD NOT USE YOUR REPORTS FOR THAT PURPOSE, CORRECT?

14:03  19 **A.**  I THINK THAT THE COURT IS CAPABLE OF DETERMINING IT

14:03  20 HOWEVER HE WOULD LIKE TO.  I DON'T KNOW WHAT -- I'M NOT SURE I

14:03  21 EVEN UNDERSTAND THE FULL SCOPE OF THE QUESTION.

14:03  22        **MS. WAGER-ZITO:**  I HAVE NOTHING FURTHER, YOUR HONOR.

14:03  23        **THE COURT:**  THANK YOU.

14:03  24           DOES THE GOVERNMENT HAVE ANY QUESTIONS?

14:03  25        **MR. MCCONNON:**  NO QUESTIONS FROM THE UNITED STATES,

SCOTT TAYLOR - CROSS

| | | |
|---|---|---|
| 14:03 | 1 | YOUR HONOR. |
| 14:03 | 2 | **MR. ANDRY:**  JONATHAN ANDRY ON BEHALF OF THE |
| 14:03 | 3 | PLAINTIFFS. |
| | 4 | **REDIRECT EXAMINATION** |
| 14:03 | 5 | **BY MR. ANDRY:** |
| 14:03 | 6 | **Q.**  I HAVE A FEW QUESTIONS FOR YOU, MR. TAYLOR, THAT WILL |
| 14:03 | 7 | HOPEFULLY HELP THE COURT IN SEPARATING OUT THE PORTIONS OF THE |
| 14:03 | 8 | REPORT TO THE EXTENT THAT THERE -- AS I UNDERSTAND THE |
| 14:03 | 9 | DISCUSSION UNDER CROSS-EXAMINATION, YOU WERE ASKED IF YOU COULD |
| 14:03 | 10 | SEPARATE PARTS OF THE REPORT OUT IN THE EVENT THE JUDGE FINDS |
| 14:04 | 11 | THAT CERTAIN PORTIONS OF THE HOUSE WERE NOT DAMAGED BY WATERS |
| 14:04 | 12 | OR -- IS THAT TRUE?  COULD YOU DO THAT? |
| 14:04 | 13 | **A.**  YES. |
| 14:04 | 14 | **Q.**  I WOULD REFER YOU TO SPECIFICALLY MR. FRED HOLMES' REPORT, |
| 14:04 | 15 | WHICH IS JX-01607.  IT BEGINS AT 001, BUT TO PAGE 1607-21, |
| 14:04 | 16 | JX-1607-21. |
| 14:04 | 17 | IN LOOKING AT THAT, THAT APPEARS TO BE -- AND YOU CAN |
| 14:04 | 18 | TELL ME IF I'M WRONG, BUT THAT APPEARS TO BE THE ROOF DIAGRAM |
| 14:04 | 19 | FROM XACTIMATE FOR MR. HOLMES' HOUSE.  IS THAT CORRECT? |
| 14:04 | 20 | **A.**  YES. |
| 14:04 | 21 | **MR. ANDRY:**  IF YOU GO DOWN A LITTLE BIT MORE, PLEASE, |
| 14:04 | 22 | CARL. |
| 14:04 | 23 | **BY MR. ANDRY:** |
| 14:04 | 24 | **Q.**  IT HAS $10,110.59 FOR THAT ROOF; IS THAT CORRECT? |
| 14:04 | 25 | **A.**  YES. |

*HOURLY TRANSCRIPT*

SCOTT TAYLOR - REDIRECT

| | | |
|---|---|---|
| 14:04 | 1 | **Q.**   IF YOU GO DOWN A LITTLE FARTHER ON THE PAGE, RIGHT THERE, |
| 14:04 | 2 | IT SAYS PATIO ROOF, AND IT SAYS $3,053.68; IS THAT CORRECT? |
| 14:05 | 3 | **A.**   THAT'S CORRECT. |
| 14:05 | 4 | **Q.**   SO IF JUDGE DUVAL FOUND HYPOTHETICALLY FOR MR. HOLMES' |
| 14:05 | 5 | HOUSE THAT EITHER THE ROOF -- IS IT THE SAME WITH ALL THE OTHER |
| 14:05 | 6 | PLAINTIFFS?  ARE THESE REPORTS SIMILAR? |
| 14:05 | 7 | **A.**   VIRTUALLY THE SAME. |
| 14:05 | 8 | **Q.**   IF JUDGE DUVAL FOUND, WITH REGARD TO THE HOLMES HOUSE, |
| 14:05 | 9 | THAT HE WASN'T ENTITLED TO DAMAGE FOR THE PATIO ROOF, HE WOULD |
| 14:05 | 10 | JUST GO TO PAGE 21 OF THE REPORT, LIKE I DID, AND HE WOULD |
| 14:05 | 11 | SUBTRACT THAT VALUE OFF; IS THAT RIGHT? |
| 14:05 | 12 | **A.**   THAT'S CORRECT. |
| 14:05 | 13 | **Q.**   YOU WERE ASKED ABOUT HAVING TO DO ANOTHER ANALYSIS.  DID I |
| 14:05 | 14 | JUST DO THE ANALYSIS THAT YOU TOLD MS. ZITO ABOUT WITH REGARD |
| 14:05 | 15 | TO YOUR REPORTS? |
| 14:05 | 16 | **A.**   YES, YOU DID. |
| 14:05 | 17 | **Q.**   SO WHEN SHE ASKED YOU THAT YOU NEEDED TO DO A WHOLE OTHER |
| 14:05 | 18 | REPORT, THAT WOULD BE INCORRECT? |
| 14:05 | 19 | **A.**   THAT'S CORRECT.  YOU WOULDN'T NEED A NEW REPORT; YOU WOULD |
| 14:05 | 20 | NEED AN ANALYSIS LIKE YOU JUST DID. |
| 14:05 | 21 | **Q.**   THE ANALYSIS WOULD BE TO GO TO THE PAGE IN QUESTION AND |
| 14:05 | 22 | SEPARATE THOSE ITEMS OUT; IS THAT RIGHT? |
| 14:05 | 23 | **A.**   THAT'S CORRECT. |
| 14:05 | 24 | **Q.**   SHE ALSO ASKED YOU ABOUT MR. ARMSTRONG'S BOAT AND THE |
| 14:06 | 25 | VALUE THAT HE ASCRIBED TO THAT.  IS IT YOUR PRACTICE AS AN |

SCOTT TAYLOR - REDIRECT

| | | |
|---|---|---|
| 14:06 | 1 | EXPERT ADJUSTER TO JUST TAKE THE VALUES THAT PLAINTIFFS GIVE |
| 14:06 | 2 | YOU AND PUT THEM ON A SHEET? |
| 14:06 | 3 | **A.** WELL, IF IT'S A CONTENTS SHEET, GENERALLY I WOULD, BUT I |
| 14:06 | 4 | DIDN'T HAVE A VALUE SET FOR THAT BOAT. WE FOUND OUT THE BOAT |
| 14:06 | 5 | NEEDED TO BE ADDED TO THE LIST, AND I HAD TO DO MY OWN |
| 14:06 | 6 | RESEARCH. |
| 14:06 | 7 | **Q.** SO BASED ON YOUR RESEARCH, YOU CAME UP WITH A DIFFERENT |
| 14:06 | 8 | VALUE THAN MR. ARMSTRONG; IS THAT RIGHT? |
| 14:06 | 9 | **A.** THAT'S CORRECT. |
| 14:06 | 10 | **Q.** YOU WERE ALSO ASKED ABOUT MRS. COATS, SAYING SHE DIDN'T |
| 14:06 | 11 | NEED A NEW ROOF. IS IT YOUR PRACTICE AS AN EXPERT ADJUSTER TO |
| 14:06 | 12 | JUST TAKE THE OPINIONS OF THE PLAINTIFFS, OR DO YOU PERFORM |
| 14:06 | 13 | YOUR OWN ANALYSIS AND MAKE YOUR OWN DETERMINATIONS? |
| 14:06 | 14 | **A.** ANY TIME I CAN LOOK AT THE ITEMS MYSELF, IT'S MUCH BETTER |
| 14:06 | 15 | THAN IF I JUST LISTEN TO WHAT SOMEBODY TELLS ME ABOUT IT, EVEN |
| 14:06 | 16 | IF IT IS A HOMEOWNER. |
| 14:06 | 17 | WHAT'S TO SAY MRS. COATS OR ANY OTHER INDIVIDUAL THAT |
| 14:06 | 18 | LIVES IN A HOME KNOWS WHETHER THEIR ROOF HAS BEEN COMPROMISED |
| 14:06 | 19 | OR NOT? ARE THEY CONSTRUCTION PEOPLE? ARE THEY EXPERTS? DO |
| 14:07 | 20 | THEY EVEN HAVE ANY ROOFING BACKGROUND? DO THEY KNOW WHAT THEY |
| 14:07 | 21 | ARE TALKING ABOUT WHEN THEY SAY, "OH, I DIDN'T NEED A NEW |
| 14:07 | 22 | ROOF"? WELL, THAT'S BECAUSE THEY MAY HAVE LOOKED FROM THE |
| 14:07 | 23 | GROUND AND SAW THAT IT STILL HAD SHINGLES ON IT. |
| 14:07 | 24 | SO THERE'S REASONS FOR LOOKING AT IT CLOSER YOURSELF, |
| 14:07 | 25 | AND I DID. |

## SCOTT TAYLOR - REDIRECT

| | | |
|---|---|---|
| 14:07 | 1 | **Q.**   UNDER CROSS YOU WERE ALSO -- MS. ZITO SAID THAT THE |
| 14:07 | 2 | EVIDENCE THAT'S BEST IS THAT WHICH IS MOST CONTEMPORANEOUS WITH |
| 14:07 | 3 | THE CATASTROPHIC EVENT.  DO YOU REMEMBER HER SAYING THAT AND |
| 14:07 | 4 | ASKING YOU THAT QUESTION? |
| 14:07 | 5 | **A.**   VAGUELY, YES. |
| 14:07 | 6 | **Q.**   YOU HAVE SEEN A VIDEO, HAVEN'T YOU, IN PREPARATION OF YOUR |
| 14:07 | 7 | REPORT FOR THE ARMSTRONGS, WHICH SHOWS THE ARMSTRONG PROPERTY |
| 14:07 | 8 | TWO DAYS AFTER THE STORM; IS THAT RIGHT? |
| 14:07 | 9 | **A.**   YES. |
| 14:07 | 10 | **Q.**   IT SHOWS THE ARMSTRONG PROPERTY SITTING IN ABOUT 14 FEET |
| 14:07 | 11 | OF WATER OR MORE; IS THAT RIGHT? |
| 14:07 | 12 | **A.**   ALMOST EVERYTHING BUT THE TOP OF THE ROOF WAS COVERED, |
| 14:08 | 13 | YES. |
| 14:08 | 14 | **Q.**   WOULD YOU, THEN, CONSIDER THAT TO BE THE BEST EVIDENCE OF |
| 14:08 | 15 | THE DAMAGE TO THE ARMSTRONG PROPERTY BECAUSE IT WOULD BE THE |
| 14:08 | 16 | BEST EVIDENCE MOST CONTEMPORANEOUS FOR THE EVENT? |
| 14:08 | 17 | **A.**   IT'S CERTAINLY MUCH BETTER THAN SIX YEARS LATER, SO I |
| 14:08 | 18 | WOULD AGREE. |
| 14:08 | 19 | **MR. ANDRY:**  I DON'T HAVE ANY OTHER QUESTIONS. |
| 14:08 | 20 | **THE COURT:**  THANK YOU, SIR.  YOU MAY STEP DOWN. |
| 14:08 | 21 | THANK YOU. |
| 14:08 | 22 | **MR. ANDRY:**  AT THIS TIME, YOUR HONOR, THE PLAINTIFFS |
| 14:08 | 23 | WOULD CALL MR. KENNY ARMSTRONG TO THE STAND.  IF THE COURT |
| 14:08 | 24 | WOULD LIKE TO HAVE A BREAK, JUST LET ME KNOW. |
| 14:08 | 25 | **THE COURT:**  THE COURT IS FINE.  LET'S DO IT. |

SCOTT TAYLOR - REDIRECT

| 14:08 | 1 | **MR. ANDRY:** THANK YOU, YOUR HONOR. |
| 14:09 | 2 | **MR. ANDRY:** MR. TREEBY'S COMMENTS, YOUR HONOR, I |
| 14:09 | 3 | WOULD ASK THAT HE NOT MAKE COMMENTS. BUT NONETHELESS, HE SAID |
| 14:09 | 4 | SOMETHING ABOUT THE EXHIBITS WITH MS. JEANNINE. WE DID USE |
| 14:09 | 5 | THEM WITH JEANNINE. HE'S INCORRECT. I WOULD ASK THAT HE |
| 14:09 | 6 | REFRAIN FROM MAKING CONTENTS, AS YOU TOLD ME -- |
| 14:09 | 7 | **THE COURT:** I'M NOT SURE WHAT COMMENTS WERE MADE. |
| 14:09 | 8 | Y'ALL WERE HAVING A DISCUSSION. |
| 14:09 | 9 | **MR. ANDRY:** I SHOWED HIM SOME EXHIBITS AND SAID, |
| 14:09 | 10 | "THESE ARE THE SAME EXHIBITS I USED WITH JEANNINE," AND HE HAD |
| 14:09 | 11 | TO POP OFF AND SAY THAT -- |
| 14:09 | 12 | **MR. TREEBY:** CAN I DEFEND MYSELF, YOUR HONOR? |
| 14:09 | 13 | **THE COURT:** LET ME JUST SAY THIS: MY TIME FOR THIS |
| 14:09 | 14 | KIND OF PETTY, RIDICULOUS SQUABBLE IS LIMITED. |
| 14:09 | 15 | **MR. ANDRY:** I UNDERSTAND THAT, YOUR HONOR. |
| 14:09 | 16 | **THE COURT:** BOTH OF YOU WERE TALKING. MAYBE YOU |
| 14:09 | 17 | SHOULD DIRECT IT TO ME RIGHT AWAY. |
| 14:09 | 18 | **MR. ANDRY:** I DID DIRECT IT TO YOU. |
| 14:09 | 19 | **THE COURT:** THE CONVERSATION WENT ON FOR A LITTLE |
| 14:09 | 20 | WHILE. AND, FRANKLY, I DON'T CARE WHAT IT WAS. I CARE |
| 14:09 | 21 | NOTHING, WHAT IT IS. IF YOU WANT TO RESOLVE IT IN ANY OTHER |
| 14:10 | 22 | WAY OUTSIDE THE COURTROOM, IT'S FINE WITH ME TOO, BUT NOT IN A |
| 14:10 | 23 | HERE. GO AHEAD. |
| 14:10 | 24 | **MR. ANDRY:** MAYBE AFTER THE BREAK. |
| 14:10 | 25 | **THE COURT:** I WANT A GOOD CONSTITUTIONAL QUESTION. I |

SCOTT TAYLOR - REDIRECT

14:10  1   DIDN'T REALIZE HOW MUCH I APPRECIATED MY -- THOSE CASES.  GO

14:10  2   AHEAD.

14:10  3          MR. ANDRY:  I UNDERSTAND, YOUR HONOR.

14:10  4          THE COURT:  OF COURSE, DON'T TAKE MY HYPERBOLE, BUT

14:10  5   REALLY THAT'S JUST -- PETTINESS IS SOMETHING I HAVE REALLY NO

14:10  6   TOLERANCE FOR.

14:10  7          MR. ANDRY:  I UNDERSTAND.  AS DO I, YOUR HONOR.

14:10  8          THE COURT:  THEN, LET'S NOT ENGAGE IN IT.  LET'S MOVE

14:10  9   ON.

14:10  10         MR. ANDRY:  I'LL STOP THERE.  THANK YOU, YOUR HONOR.

14:10  11                  KENNY ARMSTRONG,

14:08  12  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

14:10  13         THE DEPUTY CLERK:  WOULD YOU PLEASE STATE YOUR NAME

14:10  14  AND SPELL IT FOR THE RECORD.

14:10  15         THE WITNESS:  KENNY ARMSTRONG, 2400 ARAMIS, MERAUX,

14:10  16  LOUISIANA.  K-E-N-N-Y A-R-M-S-T-R-O-N-G.

14:10  17         MR. ANDRY:  YOUR HONOR, IN CONJUNCTION WITH

14:10  18  MR. ARMSTRONG'S TESTIMONY, AS WE DID WITH MRS. JEANNINE

14:10  19  ARMSTRONG'S TESTIMONY, WE HAVE A LIST OF EXHIBITS WE HAVE

14:10  20  PROVIDED TO THE DEFENDANTS, AND WOULD ASK THAT WE PROVIDE THEM

14:11  21  TO THE COURT AND INTRODUCE THEM AS KENNY ARMSTRONG IN GLOBO 1.

14:11  22         THE COURT:  YES, SIR.

14:11  23         MR. MCCONNON:  THE UNITED STATES HAS NO OBJECTION TO

14:11  24  THE EXHIBITS, YOUR HONOR, BUT WE NOTED THERE'S NO PX NUMBER FOR

14:11  25  THE LAST -- THE UNITED STATES HAS NO OBJECTION TO THE EXHIBITS,

SCOTT TAYLOR - REDIRECT

| | | |
|---|---|---|
| 14:11 | 1 | BUT I WOULD NOTE THAT THE LAST ENTRY ON THE EXHIBIT LIST HAS NO |
| 14:11 | 2 | EXHIBIT ENTRY NUMBER, SO I'M NOT QUITE SURE WHICH NUMBER -- |
| 14:11 | 3 | **MR. ANDRY:**  THAT WAS DONE, YOUR HONOR -- WE WILL |
| 14:11 | 4 | PROVIDE A PX NUMBER.  IT WAS DONE BECAUSE I UNDERSTOOD THE |
| 14:11 | 5 | COURT WANTED THOSE DOCUMENTS TO BE INTRODUCED.  WE WEREN'T |
| 14:11 | 6 | PLANNING ON INTRODUCING THEM WITH MR. ARMSTRONG.  WE THOUGHT, |
| 14:11 | 7 | FOR THE BENEFIT OF THE RECORD AND THE COURT, IT WOULD BE GOOD |
| 14:11 | 8 | TO DO IT HERE.  I WILL PROVIDE YOU WITH A PX NUMBER FOR THOSE |
| 14:11 | 9 | DOCUMENTS AT THE CONCLUSION OF HIS TESTIMONY OR AS SOON AS I |
| 14:11 | 10 | CAN GET IT. |
| 14:11 | 11 | **THE COURT:**  ALL RIGHT, SIR.  LET ME AT THIS POINT |
| 14:12 | 12 | STATE THAT I GENERALLY KNOW WHEN I AM INTEMPERATE, AND TO THE |
| 14:12 | 13 | EXTENT I WAS INTEMPERATE IN THE LAST LITTLE SKIRMISH, I |
| 14:12 | 14 | ACKNOWLEDGE IT AND WILL TRY TO HARNESS MY OWN INTEMPERANCE. |
| 14:12 | 15 | LET'S GO AHEAD. |
| 14:12 | 16 | **DIRECT EXAMINATION** |
| 14:12 | 17 | BY MR. ANDRY: |
| 14:12 | 18 | **Q.**   MR. ARMSTRONG, GOOD AFTERNOON.  WHERE DID YOU GROW UP? |
| 14:13 | 19 | **A.**   I GREW UP IN CHALMETTE, LOUISIANA. |
| 14:13 | 20 | **Q.**   WHAT YEAR WERE YOU BORN IN? |
| 14:13 | 21 | **A.**   I WAS BORN IN 1963. |
| 14:13 | 22 | **Q.**   WHERE IN CHALMETTE DID YOU LIVE AS A CHILD? |
| 14:13 | 23 | **A.**   I LIVED SEVERAL PLACES.  MOSTLY -- WELL, REALLY MERAUX, |
| 14:13 | 24 | LOUISIANA, WHICH IS RIGHT BELOW CHALMETTE.  I GREW UP, STAYED |
| 14:13 | 25 | THERE MAYBE 15 YEARS. |

## KENNY ARMSTRONG - DIRECT

14:13    1   **Q.**   WHERE DID YOU GO TO GRAMMAR SCHOOL?

14:13    2   **A.**   I WENT TO C.F. ROWLEY SCHOOL.

14:13    3   **Q.**   WHERE IS THAT IN ST. BERNARD?

14:13    4   **A.**   IT'S IN THE HEART OF CHALMETTE, IN THE MIDDLE OF

14:13    5   CHALMETTE, CLOSE TO ST. BERNARD HIGHWAY.

14:13    6   **Q.**   LET ME SHOW YOU WHAT WE HAVE USED AS AN EXHIBIT.  IT'S

14:13    7   PX-4671-003.

14:13    8            **MR. ANDRY:**  KIND OF ZOOM IN ON THE ARMSTRONG PIN.

14:13    9   **BY MR. ANDRY:**

14:13   10   **Q.**   IS THAT THE APPROXIMATE LOCATION OF YOUR HOUSE AT THE TIME

14:13   11   OF KATRINA, WHICH WOULD BE AUGUST 29, 2005?

14:13   12   **A.**   YES, IT WAS.

14:13   13            **MR. ANDRY:**  COULD YOU ZOOM THAT OUT A LITTLE BIT.

14:14   14   **BY MR. ANDRY:**

14:14   15   **Q.**   WHAT PART OF CHALMETTE WOULD YOU SAY THAT WAS IN?

14:14   16   **A.**   WHERE MY HOUSE IS?

14:14   17   **Q.**   YES.

14:14   18   **A.**   THAT'S IN THE BEGINNING OF CHALMETTE.  IT'S ABOUT A HALF

14:14   19   MILE INTO CHALMETTE IN ST. BERNARD.

14:14   20   **Q.**   YOU WOULD BE GOING IN AN EASTERLY DIRECTION TO GET TO

14:14   21   MERAUX, WHERE YOU GREW UP; IS THAT RIGHT?

14:14   22   **A.**   CORRECT.

14:14   23   **Q.**   YOU WOULD BE GOING IN AN EASTERLY DIRECTION TO BE GOING TO

14:14   24   THE BOTTOM RIGHT OF THE PHOTOGRAPH?

14:14   25   **A.**   THAT'S CORRECT.

KENNY ARMSTRONG - DIRECT

14:14    1    **Q.**   WHERE DID YOU GO TO HIGH SCHOOL?

14:14    2    **A.**   CHALMETTE HIGH SCHOOL.

14:14    3    **Q.**   WOULD CHALMETTE HIGH -- WHERE WAS -- WHERE WOULD CHALMETTE

14:14    4    HIGH SCHOOL BE IN RELATION TO THE PIN WHICH REFLECTS THE

14:14    5    ARMSTRONG HOUSE?

14:14    6    **A.**   IF YOU COME BACK UP TO THE MAIN HIGHWAY, IT'S ABOUT THREE

14:14    7    MILES DOWN ON JUDGE PEREZ.

14:14    8    **Q.**   APPROXIMATELY HOW BIG AN AREA IS IT FROM YOUR HOUSE ON

14:14    9    HAMLET TO CHALMETTE HIGH SCHOOL, TO C.F. ROWLEY, WHERE YOU GREW

14:14   10    UP?

14:14   11    **A.**   ABOUT A MILE, STRAIGHT UP TO THE MAIN HIGHWAY.

14:14   12    **Q.**   DID YOU SPEND YOUR WHOLE LIFE, UP UNTIL THE TIME OF THE

14:14   13    STORM, LIVING IN CHALMETTE?

14:14   14    **A.**   MOST OF IT.  LIVED OUTSIDE OF IT FOR ONE YEAR, IN SLIDELL.

14:15   15    **Q.**   WHY DID YOU LIVE OUTSIDE OF IT, IN SLIDELL, FOR A YEAR?

14:15   16    **A.**   MY MOM TOOK SICK, AND WE STAYED WITH MY AUNT.

14:15   17    **Q.**   HOW OLD WERE YOU AT THE TIME?

14:15   18    **A.**   MAYBE THIRD GRADE, SECOND GRADE, SOMETHING LIKE THAT.

14:15   19    **Q.**   ARE YOU MARRIED NOW?

14:15   20    **A.**   I'M MARRIED FOR 30 YEARS.  I BETTER GET THIS ONE RIGHT.

14:15   21    30 YEARS.

14:15   22    **Q.**   HOW OLD WERE YOU WHEN YOU MET YOUR WIFE?

14:15   23    **A.**   ABOUT 15.

14:15   24    **Q.**   HOW OLD WAS SHE?

14:15   25    **A.**   16.

KENNY ARMSTRONG - DIRECT

14:15    1    **Q.**   WAS SHE YOUR HIGH SCHOOL SWEETHEART?

14:15    2    **A.**   YES, SHE WAS.

14:15    3    **Q.**   DID YOU DATE THE ENTIRE TIME?

14:15    4    **A.**   PROBABLY TWO YEARS, MAYBE 16, 17.

14:15    5    **Q.**   HOW ARE YOU EMPLOYED?

14:15    6    **A.**   I'M A DISTRICT SALES MANAGER FOR A BUDWEISER DISTRIBUTOR.

14:15    7    **Q.**   HOW LONG HAVE YOU BEEN THE DISTRICT SALES MANAGER FOR THE

14:15    8    BUDWEISER DISTRIBUTOR?

14:15    9    **A.**   PROBABLY 15 YEARS.  BEEN WORKING THERE FOR ALMOST

14:15   10    31 YEARS.

14:15   11    **Q.**   IS THAT THE JOB YOU TOOK RIGHT OUT OF HIGH SCHOOL?

14:15   12    **A.**   FIRST JOB I EVER HAD.

14:15   13    **Q.**   IS IT THE ONLY JOB YOU HAVE EVER HAD?

14:15   14    **A.**   OUTSIDE OF A PAPERBOY, THAT WAS IT.

14:16   15    **Q.**   IS JEANNINE THE ONLY WIFE YOU HAVE EVER HAD?

14:16   16    **A.**   I HOPE SO.  YES, IT IS.

14:16   17    **Q.**   HOW MANY CHILDREN DO YOU HAVE?

14:16   18    **A.**   WE HAVE THREE CHILDREN.

14:16   19    **Q.**   HOW OLD ARE THEY NOW?

14:16   20    **A.**   29, 26, AND 21.

14:16   21    **Q.**   WHERE DID YOU LIVE WITH THEM WHEN THEY WERE GROWING UP?

14:16   22    **A.**   WE LIVED IN THAT HOUSE.

14:16   23    **Q.**   THAT WAS THE HOUSE ON HAMLET?

14:16   24    **A.**   YES.  YES, IT WAS.

14:16   25    **Q.**   WHEN DID YOU BUY THAT HOUSE?

## KENNY ARMSTRONG - DIRECT

| | | |
|---|---|---|
| 14:16 | 1 | **A.**   1985. |
| 14:16 | 2 | **Q.**   HOW MUCH DID YOU PAY FOR IT IN 1985? |
| 14:16 | 3 | **A.**   $73,000. |
| 14:16 | 4 | **Q.**   I'M SORRY.  SAY AGAIN. |
| 14:16 | 5 | **A.**   $73,000. |
| 14:16 | 6 | **Q.**   HOW MANY PAYMENTS DID YOU -- EXCUSE ME.  HOW MUCH WAS YOUR |
| 14:16 | 7 | MORTGAGE PAYMENT AT THE TIME OF KATRINA ON YOUR HOUSE ON |
| 14:16 | 8 | HAMLET PLACE? |
| 14:16 | 9 | **A.**   I THINK IT WAS $850 OR $890. |
| 14:16 | 10 | **Q.**   HOW OLD WERE YOUR CHILDREN AT THE TIME OF KATRINA? |
| 14:16 | 11 | **A.**   22, 18 OR 19, AND 14 OR 15. |
| 14:16 | 12 | **Q.**   HOW MANY WERE LIVING WITH YOU AT THE TIME OF THE STORM? |
| 14:17 | 13 | **A.**   WELL, BOTH OF MY -- MY OLDEST SON AND MY YOUNGEST WERE |
| 14:17 | 14 | LIVING AT HOME, AND MY DAUGHTER WAS AT LSU. |
| 14:17 | 15 | **Q.**   YOU HAD TWO OF THEM LIVING WITH YOU? |
| 14:17 | 16 | **A.**   YES. |
| 14:17 | 17 | **Q.**   HOW MANY MORTGAGE PAYMENTS DID YOU HAVE LEFT ON THE HOUSE |
| 14:17 | 18 | ON HAMLET PLACE BEFORE YOU PAID FOR YOUR HOUSE? |
| 14:17 | 19 | **A.**   IT WAS LESS THAN TWO YEARS WHEN THE STORM HIT. |
| 14:17 | 20 | **Q.**   SO HAD YOU ACHIEVED THE AMERICAN DREAM OF GETTING THE KIDS |
| 14:17 | 21 | OUT OF THE HOUSE AND PAYING OFF THE MORTGAGE ON YOUR HOUSE? |
| 14:17 | 22 | **A.**   WE COULD SEE THE LIGHT AT THE END OF THE TUNNEL, YOU KNOW. |
| 14:17 | 23 | WE WERE CLOSE. |
| 14:17 | 24 | **Q.**   NOW, LET'S GO BACK TO -- DID YOUR PARENTS AND FAMILY LIVE |
| 14:17 | 25 | AROUND YOUR HOUSE ON HAMLET? |

**KENNY ARMSTRONG - DIRECT**

14:17   1    **A.**   MY MOTHER LIVED -- IF YOU ARE LOOKING AT THAT DIAGRAM AND

14:17   2    YOU SEE THE LIGHT-COLORED SECTION STRAIGHT UP FROM IT, TWO

14:17   3    BLOCKS OVER.  MY MOTHER-IN-LAW LIVED FIVE HOUSES AWAY.  MY

14:17   4    BROTHER LIVED FOUR MILES AWAY.

14:17   5    **Q.**   DID YOU HAVE FRIENDS AND OTHER FAMILY MEMBERS THAT LIVED

14:18   6    AROUND Y'ALL?

14:18   7    **A.**   OH, ABSOLUTELY.  EVERYBODY LIVED WITHIN ABOUT FIVE MILES

14:18   8    OF EACH OTHER, GIVE OR TAKE A LITTLE BIT.

14:18   9    **Q.**   COULD YOU DESCRIBE -- WERE YOU HEALTHY AT THE TIME?

14:18   10   **A.**   OH, YEAH, I WAS HEALTHY.  EVERYTHING WAS GOOD.  MY WIFE

14:18   11   WAS -- SHE HAD TAKEN SICK.  SHE HAD A BRAIN TUMOR.  BUT HER

14:18   12   REAL SICKNESS CAME AFTER SHE GOT AN AIRBORNE FUNGUS FROM SOIL

14:18   13   OR MOLD.  THAT'S WHAT THE INFECTIOUS DISEASE DOCTOR TOLD US.

14:18   14   **Q.**   BEFORE KATRINA, DID YOU HAVE ANY ILLNESS IN YOUR FAMILY?

14:18   15   **A.**   NO.  NO.

14:18   16   **Q.**   WHAT WAS A WEEK IN THE LIFE OF KENNY AND JEANNINE

14:18   17   ARMSTRONG AND THEIR CHILDREN LIKE BEFORE -- IN THE SUMMER OF

14:18   18   2005?

14:18   19   **A.**   LIFE WAS GOOD.  WE HAD -- WE HAD A GOOD SOCIAL LIFE.  WE

14:18   20   DID A LOT.  WENT ON VACATION ONCE OR TWICE A YEAR.  WE ENJOYED

14:18   21   A LOT OF COMPANY.  WE SOCIALIZED A LOT WITH A LOT OF FRIENDS.

14:18   22   WE ALL LIVED, LIKE I SAID, WITHIN FIVE MILES OF EACH OTHER.

14:19   23   CRAWFISH BOILS, CRAB BOILS.  DEPENDING ON THE SEASON, FARES,

14:19   24   FESTIVALS.  WE PARTICIPATED IN OUR KIDS' SCHOOL.  WE WERE

14:19   25   ACTIVE IN THAT.  I GUESS, THE AMERICAN DREAM, WE WERE LIVING

**KENNY ARMSTRONG - DIRECT**

14:19    1    IT.

14:19    2    **Q.**   LET ME ASK YOU THIS --

14:19    3        **MR. ANDRY:**  COULD YOU PULL UP JX-1446-01-03.

14:19    4    **BY MR. ANDRY:**

14:19    5    **Q.**   IS THAT THE PHOTOGRAPH OF THE BACK OF YOUR HOUSE PRIOR TO

14:19    6    KATRINA?

14:19    7    **A.**   YES, IT IS.

14:19    8    **Q.**   LOOK AT 02, PLEASE.  WHERE IS YOUR HOUSE IN THAT

14:19    9    PHOTOGRAPH?

14:19  10    **A.**   MY HOUSE IS THE ONE TO THE RIGHT, UNDER THE BIG TREE.

14:19  11    **Q.**   IS THAT LOOKING AT THE FRONT OF YOUR HOUSE TO THE RIGHT?

14:19  12    **A.**   YES, IT IS.

14:19  13        **MR. ANDRY:**  GO TO 01, PLEASE.  EXCUSE ME.  THE OTHER

14:19  14    WAY.

14:19  15    **BY MR. ANDRY:**

14:19  16    **Q.**   IS THAT THE FRONT LEFT OF YOUR HOUSE?

14:19  17    **A.**   THAT'S CORRECT.

14:19  18    **Q.**   BEFORE KATRINA?

14:19  19    **A.**   YES, IT WAS.

14:19  20    **Q.**   YOUR WIFE TESTIFIED THAT THERE WAS A TWO-STORY HOUSE TO

14:20  21    THE RIGHT.  IS THAT RIGHT?

14:20  22    **A.**   YES, IT IS.  THE TREE BLOCKS THE TOP PART OF IT, BUT THAT

14:20  23    IS A TWO-STORY.

14:20  24    **Q.**   DO YOU RECOGNIZE THE TWO-STORY HOUSE IN THAT PHOTOGRAPH?

14:20  25    **A.**   YES, I DO.

KENNY ARMSTRONG - DIRECT

14:20  1   **Q.**   WHEN DID Y'ALL FIRST DECIDE THAT YOU WERE GOING TO -- DID

14:20  2   YOU EVACUATE FOR HURRICANE KATRINA?

14:20  3   **A.**   YES, WE DID.  EARLY SUNDAY MORNING.

14:20  4   **Q.**   WHEN DID YOU FIRST DECIDE TO DO THAT?

14:20  5   **A.**   OH, NO, WE PLANNED ON LEAVING WHEN WE GOT THE NEWS THE

14:20  6   HURRICANE WAS COMING.  WE HAD A PLACE TO GO.  NO RUSH REALLY

14:20  7   FOR US TO GET OUT BECAUSE WE HAD A PLACE TO GO.  AND SO WE

14:20  8   WAITED UNTIL TRAFFIC ON THE INTERSTATE AND ALL THAT HAD DIED

14:20  9   DOWN A LITTLE BIT AND LEAVE SUNDAY MORNING.

14:20  10  **Q.**   HOW LONG DID YOU STAY AWAY FROM YOUR HOUSE -- EXCUSE ME.

14:20  11  CHANGE THAT.

14:20  12       WHEN DID YOU FIRST FIND OUT THAT THERE WAS DAMAGE TO

14:20  13  YOUR HOUSE?

14:20  14  **A.**   ACTUALLY TO SEE IT?

14:20  15  **Q.**   UH-HUH.

14:21  16  **A.**   I THINK IT WAS SOMETIME -- AND I USE RITA'S DATE ONLY

14:21  17  BECAUSE I WAS SUPPOSED TO MEET THE ADJUSTER THERE, AND WE HAD

14:21  18  TO CANCEL IT.  SO IT WAS SOMETIME AFTER RITA I WAS ABLE TO GET

14:21  19  BACK TO THE HOUSE.  I WAS IN THE PARISH BEFORE THAT.  I GOT

14:21  20  INTO THE PARISH EARLIER, BUT I WASN'T ABLE TO GET BACK TO MY

14:21  21  HOUSE BECAUSE IT STILL HAD WATER.

14:21  22  **Q.**   DID Y'ALL WATCH KATRINA IN BATON ROUGE?

14:21  23  **A.**   OH, YEAH.  SAW IT ON TV.  THEY DIDN'T SHOW A WHOLE LOT OF

14:21  24  CHALMETTE, THOUGH.

14:21  25  **Q.**   WERE YOU ABLE TO GO BACK IMMEDIATELY AFTER THE STORM?

KENNY ARMSTRONG - DIRECT

14:21   1   **A.**   OH, NO, NO.  IT WASN'T ACCESSIBLE.

14:21   2   **Q.**   WAS IT THE FIRST TIME YOU WENT BACK, THE TIME YOU WERE

14:21   3   JUST TELLING US ABOUT, SOMETIME AROUND HURRICANE RITA OR

14:21   4   SHORTLY THEREAFTER?

14:21   5   **A.**   I WAS ACTUALLY ABLE TO GET IN.  I DROVE A BUDWEISER TRUCK

14:21   6   IN THERE TO DONATE WATER, CANNED WATER, TO SOME OF THE PLACES

14:21   7   WHERE PEOPLE WOULD GO PICK UP ICE, WATER, AND THINGS.  ALSO, WE

14:21   8   HAD A COUPLE OF PLACES THAT WERE LOOKING FOR SOME ADULT

14:21   9   BEVERAGES.

14:21   10   **Q.**   IS THAT THE WAY YOU GOT BACK INTO THE PARISH?

14:21   11   **A.**   IT HELPED.

14:22   12   **Q.**   COULD YOU TELL THE COURT WHAT THAT DAY WAS LIKE FOR YOU.

14:22   13   **A.**   I REALLY THOUGHT WE GOT THROUGH IT PRETTY GOOD.  YOU'RE

14:22   14   TALKING ABOUT THE ACTUAL DAY THE STORM HIT?

14:22   15   **Q.**   THE DAY YOU WENT BACK.

14:22   16   **A.**   OH, NO.

14:22   17   **Q.**   WHEN YOU'RE GOING BACK IN THE BUDWEISER TRUCK, WHAT WAS

14:22   18   THAT LIKE?  HOW DID YOU GET TO YOUR HOUSE?

14:22   19   **A.**   WELL, WHAT HAPPENED WAS -- IF ANYBODY IS FAMILIAR THAT THE

14:22   20   STORM -- IT'S ONLY 15 MINUTES DOWN THE ROAD WHERE THIS

14:22   21   HAPPENED, AND WE HAD -- I WAS IN METAIRIE AT OUR FACILITY.  I

14:22   22   HAD TO DRIVE THE TRUCK OVER THE HUEY P. LONG BRIDGE, DRIVE THE

14:22   23   WEST BANK OVER THE GREATER NEW ORLEANS BRIDGE, THEN TAKE I-10

14:22   24   DOWN TO OVER THE HIGHRISE, DOWN CHEF HIGHWAY -- GET OFF AT

14:22   25   CHEF HIGHWAY, THEN COME OVER THE TOP OF WHAT WE CALL THE *GREEN*

KENNY ARMSTRONG - DIRECT

14:22   1   *BRIDGE*, THAT BRIDGE THAT CONNECTS NEW ORLEANS EAST AND

14:22   2   ST. BERNARD.  WHEN I WENT OVER THAT BRIDGE, NOTHING COULD

14:22   3   PREPARE YOU FOR WHAT I SAW.

14:22   4   **Q.**   WHAT DID YOU SEE?

14:22   5   **A.**   DEVASTATION, TOTAL DEVASTATION.  AND A CAMERA DOESN'T DO

14:23   6   IT JUSTICE.  YOU SEE THINGS THAT JUST DON'T BELONG.  IT WAS

14:23   7   LIKE GOING IN THE TWILIGHT ZONE, AND I MEAN THAT.  YOU SEE A

14:23   8   CAMERA SHOT AND ALL.

14:23   9           I HAD A GUY RIDING WITH ME FROM FIVE MILES OVER THE

14:23   10  MISSISSIPPI RIVER BRIDGE RIGHT HERE.  AND IF HE WOULDN'T HAVE

14:23   11  SAW WHAT I SAW, HE WOULD HAVE NEVER BELIEVED BECAUSE, LIKE I

14:23   12  SAY, A CAMERA DIDN'T DO JUSTICE TO WHAT YOU SAW.  TOTAL

14:23   13  DEVASTATION.  THIRD WORLD COUNTRY.  BOMB WENT OFF.  I DON'T

14:23   14  KNOW WHAT ELSE TO TELL YOU, BUT IT WAS HORRIBLE.

14:23   15  **Q.**   HOW LONG DID IT TAKE YOU TO GET TO YOUR HOUSE THAT DAY?

14:23   16  **A.**   NO, I DIDN'T MAKE IT THAT DAY.  WE COULDN'T GET THERE YET.

14:23   17  STILL WATER.  I WAS ONLY AT PARIS ROAD, AND YOU COULD ACCESS

14:23   18  ST. BERNARD HIGHWAY.  JUDGE PEREZ AND ALL WAS STILL UNDER SLUSH

14:23   19  AND MUD AND THAT.

14:23   20  **Q.**   YOU COULDN'T GET BACK TO YOUR HOUSE AFTER HURRICANE RITA

14:23   21  BECAUSE OF THE WATER --

14:23   22  **A.**   NO, I WAS ACTUALLY IN ST. BERNARD BEFORE RITA.

14:23   23  **Q.**   WELL, WHEN WAS THE FIRST TIME YOU WERE ABLE TO GO BACK TO

14:23   24  YOUR HOUSE?

14:23   25          DO YOU KNOW WHEN THE WATER GOT OUT OF ST. BERNARD?

KENNY ARMSTRONG - DIRECT

| | | |
|---|---|---|
| 14:23 | 1 | **A.**   NO, NO, I DON'T, BUT IT WAS -- WE STILL HAD WATER -- WHEN |
| 14:24 | 2 | I WENT IN -- PROBABLY THREE WEEKS AFTER WAS THE FIRST TIME. |
| 14:24 | 3 | TWO TO THREE WEEKS I WAS ABLE TO GET INTO ST. BERNARD, WE STILL |
| 14:24 | 4 | HAD SLUSH AND WATER BACK THERE BY OUR HOUSE.  WE COULDN'T GET |
| 14:24 | 5 | BACK THERE, EVEN WITH THAT BIG TRUCK.  THEY WOULDN'T LET YOU |
| 14:24 | 6 | BACK THERE NEITHER.  THERE WAS EARTH-MOVING TRUCKS, THE BIG |
| 14:24 | 7 | EXCAVATING TRUCKS FROM THE NATIONAL GUARD BACK THERE.  THEY |
| 14:24 | 8 | WERE RUNNING UP AND DOWN THE PARISH AND STUFF LIKE THAT. |
| 14:24 | 9 | **Q.**   WHEN WAS THE FIRST TIME YOU ACTUALLY GOT TO YOUR HOUSE? |
| 14:24 | 10 | **A.**   IT WAS SOMETIME RIGHT AFTER KATRINA.  I WENT BACK IN.  AND |
| 14:24 | 11 | WE HAD ACTUALLY, BELIEVE IT OR NOT, HAD A FEW PLACES OPEN BACK |
| 14:24 | 12 | UP.  WE GOT BACK IN -- THEY ALLOWED A FEW OF US.  WE ACTUALLY |
| 14:24 | 13 | HAD MAYBE 20-SOMETHING EMPLOYEES FROM ST. BERNARD WHO WERE |
| 14:24 | 14 | AFFECTED.  SO I WAS ABLE TO GET BACK IN AND GET ON JUDGE PEREZ. |
| 14:24 | 15 | I PARKED RIGHT IN THE FRONT OF MY SUBDIVISION AND ACTUALLY |
| 14:24 | 16 | WALKED BACK THERE. |
| 14:24 | 17 | **MR. ANDRY:**  COULD YOU PULL UP THAT DEMONSTRATIVE |
| 14:25 | 18 | AGAIN.  IT'S 4671-03. |
| 14:25 | 19 | **BY MR. ANDRY:** |
| 14:25 | 20 | **Q.**   ABOUT HOW FAR DID YOU HAVE TO WALK FROM JUDGE PEREZ? |
| 14:25 | 21 | WHERE IS JUDGE PEREZ ON THIS?  IF YOU COULD POINT TO IT. |
| 14:25 | 22 | **A.**   JUDGE PEREZ WOULD BE -- IF YOU ARE COMING STRAIGHT UP, |
| 14:25 | 23 | IT'S THE MAIN -- |
| 14:25 | 24 | **Q.**   IS THAT JUDGE PEREZ RIGHT THERE? |
| 14:25 | 25 | **A.**   NO, NO.  COME BACK.  COME BACK. |

KENNY ARMSTRONG - DIRECT

| 14:25 | 1  | **Q.**   COME BACK THERE? |
| 14:25 | 2  | **A.**   NO, NO.  COME UP, COME UP TOWARD ME. |
| 14:25 | 3  | **THE COURT:**  TOWARDS THE RIVER? |
| 14:25 | 4  | **THE WITNESS:**  YES, TOWARDS THE RIVER. |
| 14:25 | 5  | BY MR. ANDRY: |
| 14:25 | 6  | **Q.**   RIGHT HERE? |
| 14:25 | 7  | **A.**   NO.  KEEP ON COMING.  RIGHT THERE. |
| 14:25 | 8  | **Q.**   RIGHT THERE?  IS THAT ST. BERNARD HIGHWAY? |
| 14:25 | 9  | **A.**   NO, THAT'S JUDGE PEREZ. |
| 14:25 | 10 | **Q.**   DID YOU WALK FROM THERE? |
| 14:25 | 11 | **A.**   NO.  I ACTUALLY TURNED OFF OF JUDGE PEREZ, AND I GOT TO |
| 14:25 | 12 | THE HOSPITAL.  I DIDN'T WANT TO TAKE THAT BIG TRUCK OVER ONE OF |
| 14:26 | 13 | THOSE LITTLE BRIDGES.  I WASN'T SURE I -- SO IF YOU ARE COMING |
| 14:26 | 14 | BACK, I WALKED PROBABLY ABOUT 15 BLOCKS TO MY HOUSE. |
| 14:26 | 15 | **Q.**   DID YOU RECOGNIZE ANYTHING THAT YOU SAW WHEN YOU WALKED |
| 14:26 | 16 | THROUGH THAT? |
| 14:26 | 17 | **A.**   WELL, REALLY, LOOKING AT THE OTHER HOUSES, NOTHING |
| 14:26 | 18 | PREPARES YOU TO SEE YOUR HOUSE LOOKING LIKE THAT.  BUT JUST |
| 14:26 | 19 | SEEING THE OTHER HOUSES, I KNEW IT WOULDN'T BE GOOD, YOU KNOW. |
| 14:26 | 20 | THE HARDEST THING WAS HAVING TO GO BACK AND TELL NOT ONLY MY |
| 14:26 | 21 | WIFE, MY IN-LAWS WHAT THEIR HOUSE LOOKED LIKE. |
| 14:26 | 22 | **MR. ANDRY:**  COULD YOU PULL UP 1447-01. |
| 14:26 | 23 | BY MR. ANDRY: |
| 14:26 | 24 | **Q.**   IN THE UPPER LEFT-HAND CORNER, IS THAT WHAT YOU SAW WHEN |
| 14:26 | 25 | YOU GOT BACK TO YOUR HOUSE THAT DAY? |

KENNY ARMSTRONG - DIRECT

| | | |
|--|--|--|
| 14:26 | 1 | **A.**   YES, IT WAS. |
| 14:26 | 2 | **Q.**   DID YOU HAVE MUD INSIDE OF YOUR HOUSE? |
| 14:26 | 3 | **A.**   YES, ABOUT A FOOT AND A HALF. |
| 14:26 | 4 | **Q.**   DID YOU HAVE TO WALK -- DID YOU FIND ANYTHING THAT YOU |
| 14:26 | 5 | REMEMBERED FROM BEING THERE? |
| 14:27 | 6 | **A.**   NO.  WHEN I GOT BACK THERE, IT WAS STILL A LOT WETTER AND |
| 14:27 | 7 | SOUPY THROUGHOUT THE WHOLE STREET.  I ACTUALLY HAD TO WALK |
| 14:27 | 8 | THROUGH THAT TO GET IN THERE BECAUSE EVERYTHING WAS STILL BEING |
| 14:27 | 9 | PUSHED BACK.  THAT'S WHERE THE PARISH DRAINS FROM ST. BERNARD |
| 14:27 | 10 | HIGHWAY BACK TOWARDS MY HOUSE. |
| 14:27 | 11 | **Q.**   HOW LONG DID YOU STAY AT THE TIME HOUSE THAT DAY? |
| 14:27 | 12 | **A.**   MAYBE 15 MINUTES.  THEN I WALKED BY MY IN-LAWS' ACROSS THE |
| 14:27 | 13 | STREET, TO LOOK AND SEE WHAT THEY HAD. |
| 14:27 | 14 | **Q.**   HAVE YOU EVER SEEN A VIDEO OF YOUR HOUSE THAT WAS TAKEN |
| 14:27 | 15 | RIGHT ABOUT THE TIME OF THE -- SHORTLY AFTER THE STORM PASSED? |
| 14:27 | 16 | **A.**   YEAH.  A COUPLE GUYS THAT GREW UP ON THE STREET, AND ALSO |
| 14:27 | 17 | HE WAS FIRE AND RESCUE, THEY WERE DOING SOME RESCUE WORK OR |
| 14:27 | 18 | SURVEILLANCE OR LOOKING TO SEE IF PEOPLE NEEDED HELP IN A |
| 14:27 | 19 | FLATBOAT.  THEY ALL WORKED FOR THE FIRE DEPARTMENT.  HE WENT TO |
| 14:27 | 20 | SEE HIS DAD'S HOUSE, AND HE ACTUALLY PASSED RIGHT IN FRONT OF |
| 14:27 | 21 | MINE. |
| 14:28 | 22 | **Q.**   WAS THAT GENTLEMAN RONNIE SILVA?  IS THAT THE GUY'S NAME? |
| 14:28 | 23 | **A.**   RONALD SILVA, YEAH. |
| 14:28 | 24 | **Q.**   DID HE TAKE A VIDEO? |
| 14:28 | 25 | **A.**   YES.  HE VIDEOED A LOT OF THE PARISH.  IT JUST SHOWED |

KENNY ARMSTRONG - DIRECT

| | | |
|---|---|---|
| 14:28 | 1 | THE -- I MEAN, IT WAS JUST WATER FOR DAYS.  I JUST PRAYED TO |
| 14:28 | 2 | GOD THAT THAT THING HIT DURING THE DAYLIGHT, BECAUSE IF IT HAD |
| 14:28 | 3 | HIT AT NIGHT, WE WOULD HAVE HAD SOME PROBLEMS. |
| 14:28 | 4 | **MR. ANDRY:**  CAN YOU PULL UP THE VIDEO, 4153A.  LET'S |
| 14:28 | 5 | WATCH IT FROM THERE. |
| 14:28 | 6 | (VIDEO PLAYED.) |
| 14:28 | 7 | **BY MR. ANDRY:** |
| 14:28 | 8 | Q.   TELL US WHEN YOU CAN SEE YOUR HOUSE. |
| 14:28 | 9 | A.   ALL RIGHT.  THAT'S THE STREET AROUND THE CORNER FROM ME. |
| 14:28 | 10 | I RECOGNIZE THAT HOUSE. |
| 14:29 | 11 | THAT'S A GOOD FRIEND OF MINE'S GRASS-CUTTING TRAILER |
| 14:29 | 12 | RIGHT THERE UP ON HIS HOUSE. |
| 14:29 | 13 | Q.   IS THIS IN YOUR NEIGHBORHOOD? |
| 14:29 | 14 | A.   THAT BIG HOUSE ON YOUR LEFT.  YOU MAKE A LEFT TURN RIGHT |
| 14:30 | 15 | THERE, AND MY HOUSE IS ABOUT THREE HOUSES DOWN ON THE LEFT. |
| 14:30 | 16 | I'M SORRY.  IT'S THAT HOUSE RIGHT THERE.  THAT'S MY HOUSE RIGHT |
| 14:30 | 17 | IN BETWEEN THERE.  RIGHT THERE.  GO BACK.  RIGHT THERE. |
| 14:30 | 18 | Q.   IS THAT YOUR HOUSE RIGHT THERE TO THE LEFT? |
| 14:30 | 19 | A.   YES, IT IS. |
| 14:30 | 20 | **THE COURT:**  DO YOU WANT TO POINT IT OUT? |
| 14:30 | 21 | **BY MR. ANDRY:** |
| 14:30 | 22 | Q.   THAT HOUSE RIGHT THERE? |
| 14:30 | 23 | A.   THAT'S ME. |
| 14:30 | 24 | Q.   HOW DO YOU KNOW THAT'S YOUR HOUSE? |
| 14:30 | 25 | A.   I HAD A TWO-STORY NEXT TO IT AND AN OAK TREE IN THE FRONT. |

KENNY ARMSTRONG - DIRECT

| | | |
|---|---|---|
| 14:30 | 1 | **Q.** THAT'S YOUR HOUSE FROM THE BACK? |
| 14:30 | 2 | **A.** THAT'S IT. |
| 14:30 | 3 | **Q.** IS THAT YOUR ROOF WITH THE SHINGLES AND THE ROOF THAT'S |
| 14:30 | 4 | STILL ON THERE? |
| 14:30 | 5 | **A.** THAT LOOKS LIKE IT. I DON'T KNOW WHAT THAT IS ON THE |
| 14:30 | 6 | ROOF. |
| 14:30 | 7 | **MR. ANDRY:** COULD YOU PUSH PLAY AGAIN. PUSH PAUSE. |
| 14:31 | 8 | **THE WITNESS:** THAT'S MY HOUSE. |
| 14:31 | 9 | BY MR. ANDRY: |
| 14:31 | 10 | **Q.** IS THAT THE FRONT VERSION OF YOUR HOUSE? |
| 14:31 | 11 | **A.** YES, IT IS. |
| 14:31 | 12 | **Q.** IS THAT THE OAK TREE THAT'S STILL STANDING THERE IN THAT |
| 14:31 | 13 | VIDEO? |
| 14:31 | 14 | **A.** YES, IT IS. |
| 14:31 | 15 | **MR. ANDRY:** COULD YOU GO A LITTLE BIT MORE, PLEASE, |
| 14:31 | 16 | WITH THE VIDEO. STOP. |
| 14:31 | 17 | BY MR. ANDRY: |
| 14:31 | 18 | **Q.** IS THAT THE TWO-STORY HOUSE THAT'S NEXT TO YOUR HOUSE? |
| 14:31 | 19 | **A.** THAT'S CARL GAINES'S HOUSE, MY NEXT-DOOR NEIGHBOR. |
| 14:31 | 20 | **MR. ANDRY:** PULL UP JX-1446-05. NO, THAT'S THE WRONG |
| 14:31 | 21 | ONE. NEVER MIND. |
| 14:31 | 22 | BY MR. ANDRY: |
| 14:31 | 23 | **Q.** HOW HIGH WAS THE ROOF OF YOUR HOUSE? |
| 14:32 | 24 | **A.** I WOULD SAY 10 TO 12 FOOT HIGH, MAYBE 15 OFF OF THE -- |
| 14:32 | 25 | FROM WHERE THE ROOF STARTED UP ON THE PITCH. I WOULD SAY MAYBE |

## KENNY ARMSTRONG - DIRECT

| | | |
|---|---|---|
| 14:32 | 1 | 24 FEET, MAYBE, FROM THE SLAB. |
| 14:32 | 2 | **Q.**   DID MR. SILVA TELL YOU WHEN HE TOOK THAT VIDEO? |
| 14:32 | 3 | **A.**   HE TOLD ME IT WAS THE SECOND DAY.  IT WAS THE SECOND DAY |
| 14:32 | 4 | AFTER KATRINA, HE TOLD ME. |
| 14:32 | 5 | **Q.**   SO THAT WAS THE WATER AT YOUR HOUSE TWO DAYS AFTER THE |
| 14:32 | 6 | STORM? |
| 14:32 | 7 | **A.**   CORRECT. |
| 14:32 | 8 | **Q.**   HOW DID IT MAKE YOU FEEL TO WATCH THAT? |
| 14:32 | 9 | **A.**   IT JUST -- I DON'T KNOW.  I GUESS IF THE WALLS COULD TALK |
| 14:32 | 10 | OR SEE TO LET YOU KNOW WHAT HAPPENED -- IT BLEW OUR MINDS.  WE |
| 14:32 | 11 | HAD A BRAND-NEW OTTOMAN SOFA.  AND THE BACK DOOR WAS BUSTED |
| 14:32 | 12 | OPEN.  FROM WHAT, I DON'T KNOW.  BUT WE HAD THINGS IN THERE |
| 14:32 | 13 | THAT WERE MISSING.  BUT WE HAD OTHER PEOPLE'S STUFF.  WE DON'T |
| 14:33 | 14 | KNOW WHERE IT COME FROM. |
| 14:33 | 15 | I JUST DIDN'T KNOW HOW WE WOULD RECOVER FROM |
| 14:33 | 16 | SOMETHING LIKE THIS, YOU KNOW, ME AND MY FAMILY.  EVEN OUR |
| 14:33 | 17 | NEIGHBORS.  I JUST DIDN'T KNOW WHAT WE WOULD COME BACK TO AFTER |
| 14:33 | 18 | SEEING THIS. |
| 14:33 | 19 | THERE WAS SO MUCH RUMORS GOING ON ABOUT THE AREA WE |
| 14:33 | 20 | WERE GOING TO LIVE AND WHETHER TO COME BACK OR NOT TO COME |
| 14:33 | 21 | BACK; WHETHER IT WAS GOING TO BE GREEN SPACE OR NOT GREEN |
| 14:33 | 22 | SPACE. |
| 14:33 | 23 | IT REALLY JUST DESTROYED WHAT WE -- IT DESTROYED OUR |
| 14:33 | 24 | LIFE AT THE TIME.  WE ARE TRYING TO COME BACK. |
| 14:33 | 25 | **Q.**   DID YOU BRING JEANNINE AND THE KIDS BACK TO THE HOUSE? |

KENNY ARMSTRONG - DIRECT

14:33   1    **A.**   YES, I DID.

14:33   2    **Q.**   WHEN DID YOU FIRST DO THAT?

14:33   3    **A.**   SOMETIME IN OCTOBER.

14:33   4    **Q.**   DID YOU ASK IF THEY WANTED TO GO BACK?

14:33   5    **A.**   YEAH.  I WASN'T SURE IF I WANTED THEM TO SEE, BUT THEY

14:33   6    WANTED TO GO.  I DON'T THINK MY YOUNGEST CAME, BUT MY TWO

14:33   7    OLDEST, MY WIFE, AND MY BROTHER-IN-LAW, WE ALL WENT BACK.

14:33   8    **Q.**   WHEN YOU EVACUATED, WHAT DID YOU TAKE WITH YOU?

14:34   9    **A.**   THAT'S PROBABLY THE POOREST JOB WE EVER DID.  WE DIDN'T

14:34   10   TAKE VERY MUCH WITH US.

14:34   11        A FRIEND OF MINE -- WE PLANNED ON LEAVING.  HE CALLED

14:34   12   IN A PANIC, AND WE JUMPED IN THE CAR.  WE THOUGHT WE HAD STUFF

14:34   13   LOADED, AND WE LEFT A LOT OF THINGS WE NORMALLY WOULD TAKE.

14:34   14   BUT WE LEFT BEFORE, AND NOTHING LIKE THIS EVER HAPPENED, YOU

14:34   15   KNOW.

14:34   16   **Q.**   DID YOU LEAVE SENTIMENTAL STUFF THAT YOU CAN'T GET BACK?

14:34   17   **A.**   OH, YEAH, NO DOUBT.

14:34   18   **Q.**   DID YOU LEAVE ALL OF YOUR CLOTHES AND PRETTY MUCH

14:34   19   EVERYTHING YOU OWNED BACK IN THE HOUSE?

14:34   20   **A.**   MOST CLOTHES.  WELL, LIKE I SAY, WE LEFT BEFORE, AND IT

14:34   21   DIDN'T -- BUT WE LEFT ALMOST 99 PERCENT OF WHAT WE HAD, THINGS

14:34   22   WE WILL NEVER GET BACK.

14:34   23        I THINK MY WIFE LEFT AN ENGAGEMENT RING.  WE HAD

14:34   24   KIDS' PICTURES THAT WE CAN'T REPLACE.  YOU COME IN MY HOUSE

14:34   25   NOW, I HAVE PICTURES OF MY GRANDKIDS.  I'VE GOT SOME PICTURES

KENNY ARMSTRONG - DIRECT

14:34    1    OF MY -- YOU KNOW, THAT PEOPLE HAD.  BUT WE DON'T HAVE NO BABY

14:34    2    PICTURES OR NOTHING LIKE THAT.  NO VIDEOS.  I'LL NEVER SIT AND

14:34    3    WATCH A VIDEO WITH MY GRANDKIDS AND SHOW THEIR PARENTS WHEN

14:35    4    THEY WERE KIDS.

14:35    5           **MR. ANDRY:**  YOUR HONOR, I'VE BEEN HANDED A NOTE.  THE

14:35    6    NUMBER FOR THE ROAD HOME DOCUMENTS ARE DX-1771-69 FOR PURPOSES

14:35    7    OF THE RECORD.

14:35    8    **BY MR. ANDRY:**

14:35    9    **Q.**   HOW MANY TIMES DID YOU COME BACK AS A FAMILY TO TRY AND

14:35   10    SALVAGE STUFF FROM THE HOUSE?

14:35   11    **A.**   WE CAME BACK A COUPLE TIMES.  I WAS IN THERE A LOT MORE

14:35   12    AFTER THEY CLEARED THE ROADS.

14:35   13           THERE WAS NOTHING TO SALVAGE.  THERE WAS HARDLY

14:35   14    ANYTHING LEFT IN THERE FOR US TO TAKE.  WHO IS GOING TO GO TAKE

14:35   15    SOMETHING OUT OF THERE?  WOULD YOU WANT SOMETHING OUT OF THERE?

14:35   16    WOULD ANYBODY IN HERE WANT SOMETHING OUT OF THERE?  IT WASN'T

14:35   17    WORTH IT.

14:35   18    **Q.**   WHAT HAPPENED TO YOUR WIFE'S HEALTH -- WAS YOUR WIFE

14:35   19    WORKING AFTER THE STORM?

14:35   20    **A.**   NO.  NO.  SHE LOST HER JOB AT THE HOSPITAL.  THE HOSPITAL

14:35   21    WAS ABOUT A HALF A MILE FROM MY HOUSE.  IT WAS CLOSED AFTER

14:36   22    KATRINA.

14:36   23    **Q.**   SO POST-KATRINA, WAS THERE A HOSPITAL IN ST. BERNARD?

14:36   24    **A.**   POST-KATRINA?

14:36   25    **Q.**   YES.  AFTER KATRINA.

**KENNY ARMSTRONG - DIRECT**

14:36   1   **A.**   NO.

14:36   2   **Q.**   WERE YOU STILL EMPLOYED AFTER THE STORM?

14:36   3   **A.**   IT TOOK ABOUT TWO WEEKS BEFORE THEY DETERMINED WE LOST

14:36   4   HALF OF OR MORE THAN HALF OF OUR TERRITORY.  PLUS THERE WAS A

14:36   5   BAN ON ALCOHOL SALES, SO THEY DIDN'T CALL MANY OF US BACK TO

14:36   6   WORK AT THE TIME; MAYBE FIVE OR SIX PEOPLE OUT OF THE

14:36   7   300-SOMETHING EMPLOYED IN OUR PLACE.

14:36   8           WHEN THEY OPENED IT UP TO 30, I WAS CALLED BACK.

14:36   9   **Q.**   WERE YOU STILL OBLIGATED TO PAY FOR YOUR DAUGHTER'S

14:36   10   TUITION AT LSU AND YOUR CHILDREN'S TUITION AT OTHER SCHOOLS?

14:36   11   **A.**   YES, WE WERE.  I WANT TO SAY SOMETHING WITH THE CATHOLIC

14:36   12   SCHOOL AT ST. MICHAEL'S -- THEY MAYBE DIDN'T MAKE US PAY A

14:36   13   COUPLE OF THE NOTES, MAYBE, IF I'M NOT MISTAKEN.

14:36   14   **Q.**   WHERE DID YOU AND YOUR FAMILY MOVE POST-KATRINA FIRST?

14:37   15   **A.**   WE FIRST LIVED AT LOD COOK CONFERENCE CENTER ON LSU'S

14:37   16   CAMPUS.  WE MOVED FROM THERE IN WITH MY SISTER-IN-LAW, BUT MY

14:37   17   SISTER-IN-LAW WAS IN AGREEMENT ALREADY TO SELL HER HOME WHEN

14:37   18   KATRINA HIT.  SO THE GUY WHO WAS BUILDING THEIR NEW HOME PLACED

14:37   19   THREE APARTMENTS:  ONE FOR MY FAMILY, ONE FOR MY SISTER-IN-LAW,

14:37   20   AND ONE FOR MY IN-LAWS.

14:37   21           SO WE ACTUALLY WENT IN, ME AND MY FATHER-IN-LAW, AND

14:37   22   BOUGHT TWO FULLY FURNISHED APARTMENTS WITHOUT EVEN SEEING IT,

14:37   23   FROM CHASE BANK.

14:37   24   **Q.**   IS THAT WHERE YOU LIVED?

14:37   25   **A.**   WE LIVED THERE.

KENNY ARMSTRONG - DIRECT

14:37 1 **Q.** HOW LONG DID YOU LIVE THERE?

14:37 2 **A.** I WANT TO SAY AT LEAST A YEAR. I THINK MY DAUGHTER STAYED

14:37 3 THE WHOLE YEAR AT ST. MICHAEL'S.

14:37 4 **Q.** HOW DID THAT AFFECT YOUR LIFE WITH REGARD TO YOUR WORKING?

14:37 5 **A.** I USED TO GET UP IN THE MORNING AND GO TO WORK. AS SOON

14:37 6 AS I RODE OUT TO THE FIRST STREET, I WAS WITHIN MY TERRITORY.

14:38 7 NOW I'M DRIVING AN HOUR AND A HALF, AN HOUR AND 40 MINUTES

14:38 8 SOMETIMES, TO WORK; BACK AND FORTH, AN HOUR AND SOMETHING EACH

14:38 9 DAY. IT MADE FOR LONGER DAYS.

14:38 10 I DID DIFFERENT JOBS. WE DID WHATEVER IT TOOK TO

14:38 11 KEEP OUR JOB. WE WERE GLAD TO HAVE A JOB BECAUSE THERE WERE A

14:38 12 LOT OF PEOPLE THAT WE LET GO AT THE TIME WHO LOST THEIR JOBS

14:38 13 DUE TO THE STORM.

14:38 14 **Q.** DID YOUR WIFE, JEANNINE'S, HEALTH DETERIORATE AFTER THE

14:38 15 STORM?

14:38 16 **A.** SHE WAS DIAGNOSED WITH A BRAIN TUMOR, I THINK, IN

14:38 17 NOVEMBER. SO WE WERE JUST TRYING TO FIGURE OUT WHAT WE WERE

14:38 18 GOING TO DO, WHAT WAS THE BEST CASE FOR TREATMENT FOR HER, AND

14:38 19 THINGS LIKE THAT.

14:38 20 AND THEN IT WASN'T MUCH LONGER AFTER THAT, WHEN WE

14:38 21 MOVED, THAT SHE CAUGHT AN AIRBORNE FUNGUS.

14:38 22 **Q.** WHERE YOU SAY *AN AIRBORNE FUNGUS*, SHE TESTIFIED SHE HAD A

14:38 23 FUNGAL PNEUMONIA.

14:38 24 **A.** ALL I REMEMBER IS THE INFECTIOUS DISEASE DOCTOR AT

14:38 25 WEST JEFF TOLD US IT'S USUALLY IN MOLD OR USUALLY IN DIRT

14:39   1   THROUGH SOIL.  THAT'S WHERE YOU CONTRACT IT.  THERE WAS ALSO

14:39   2   ONE OTHER CASE THAT WAS GOING ON AT OCHSNER AT THE TIME.  IT'S

14:39   3   A VERY RARE DISEASE.

14:39   4   **Q.**   DID YOU INTERPRET THAT DOCTOR'S COMMENT TO YOU THAT SHE

14:39   5   MIGHT HAVE GOTTEN IT FROM -- NOT THAT WE ARE MAKING A CLAIM FOR

14:39   6   HER -- BUT DID YOU INTERPRET THAT TO BE THAT SHE MIGHT HAVE

14:39   7   CONTRACTED THAT IN THE SLUDGE AND ALL THAT THAT YOU WERE WADING

14:39   8   THROUGH AT YOUR HOUSE -- OR WHAT REMAINED OF YOUR HOUSE?

14:39   9   **A.**   WELL, WE HAD A GARDEN.  SO THAT WAS THE ONLY TIME SHE

14:39   10  REALLY CAME IN CONTACT WITH MOLD OR ANY TYPE OF DIRT OR SOIL.

14:39   11  **Q.**   HOW DID YOUR WIFE'S DISEASE WITH THE FUNGAL PNEUMONIA

14:39   12  AFFECT YOU AND YOUR FAMILY FROM A FINANCIAL PERSPECTIVE?

14:39   13  **A.**   WELL, RIGHT AFTER THE STORM, SHE DID DRAW UNEMPLOYMENT.

14:39   14  BUT SHE LOST HER JOB.  SHE LOST ANY KIND OF LONG-TERM

14:39   15  DISABILITY OR ANYTHING LIKE THAT THAT SHE MIGHT HAVE HAD.

14:39   16          SO SHE DIDN'T WORK FOR -- I'LL BE HONEST WITH YOU, I

14:40   17  DON'T REMEMBER WHEN SHE WENT BACK TO WORK -- SHE DIDN'T WORK

14:40   18  FOR A FEW YEARS.

14:40   19  **Q.**   WERE YOU ONLY THE BREADWINNER AT THE TIME?

14:40   20  **A.**   YES, I WAS.

14:40   21  **Q.**   YOU WERE SUPPORTING YOUR WIFE AND DAUGHTER AT LSU AND YOUR

14:40   22  OTHER CHILDREN AT THIS TIME?

14:40   23  **A.**   THAT'S CORRECT.

14:40   24  **Q.**   DID YOUR WIFE SUBSEQUENTLY START BACK TO WORK?

14:40   25  **A.**   SHE WENT BACK TO WORK PART-TIME.

KENNY ARMSTRONG - DIRECT

14:40   1   **Q.**   WHEN WAS THAT?

14:40   2   **A.**   I WOULD PROBABLY SAY MAYBE TWO YEARS AFTER THE STORM,

14:40   3   MAYBE LONGER.

14:40   4   **Q.**   DID YOU MAKE A CLAIM FOR THE WIND DAMAGE TO YOUR HOUSE OR

14:40   5   WHAT YOU PERCEIVED TO BE THE WIND DAMAGE OR WHAT YOU WERE TOLD

14:40   6   TO BE THE WIND DAMAGE FOR YOUR HOUSE ON HAMLET PLACE?

14:40   7   **A.**   WELL, WHAT I DID, I HAD AN AGENT COME OUT TO MY HOUSE.

14:40   8   AND THE FIRST TIME, I DIDN'T EVEN SEE HIM.  AND HE GAVE US AN

14:40   9   ESTIMATE -- AND I WANT TO GO BACK -- OF PAYING US $2,000 OR

14:40   10   $3,000.  ME AND HIM HAD A FEW CHOICE WORDS, AND THEY SAID THEY

14:41   11   WOULD SEND SOMEBODY ELSE OUT.

14:41   12       SO MAYBE EIGHT MONTHS LATER, THEY SENT SOMEBODY ELSE

14:41   13   OUT WHO WAS ALREADY AT MY HOME WHEN I GOT THERE, AND HE WROTE

14:41   14   UP ALL THE DAMAGES.  AND I THINK HIS NAME WAS WARD.  HE WROTE

14:41   15   UP EVERYTHING.

14:41   16       AND SO AFTER HE WROTE UP ALL THE STUFF -- IT WAS

14:41   17   PRETTY MUCH FROM THE WATERLINE UP -- THEY SENT AN EXPERT OUT.

14:41   18   YOU KNOW WHAT I'M SAYING?  HE WAS THE EXPERT FOR THAT COMPANY.

14:41   19   SO WHEN HE WROTE FROM THE WATERLINE UP, MOST OF THE DAMAGE AND

14:41   20   THAT, ME AND MY WIFE CONTACTED THEM ABOUT ATTIC CONTENT.

14:41   21       AND SHE TOLD US -- THE LADY ON THE PHONE TOLD ME,

14:41   22   "YOU SHOULD HAVE NEVER BEEN PAID WHAT YOU GOT, AND YOU ARE

14:41   23   LUCKY THEY DON'T TAKE BACK THEM CHECKS FOR THE CLAIM."

14:41   24       SO AFTER THAT IS WHEN WE HIRED ONE OF THE LAWYERS OUT

14:41   25   THERE, AND HE WENT AFTER OUR ATTIC CONTENTS, WHICH TURNED INTO

KENNY ARMSTRONG - DIRECT

| | | |
|---|---|---|
| 14:41 | 1 | WIND AND HAIL OR WHATEVER THEY SAY IT WAS. |
| 14:41 | 2 | **Q.**   ABOUT HOW MUCH WERE YOU PAID BY YOUR WIND INSURER? |
| 14:42 | 3 | **A.**   FOR THE CONTENTS UP? |
| 14:42 | 4 | **Q.**   UH-HUH. |
| 14:42 | 5 | **A.**   I WAS PAID $30,000.  AND COURT COSTS AND LAWYER FEES |
| 14:42 | 6 | WAS 12.  I THINK I ENDED UP WITH $18,400 FOR THE CONTENTS. |
| 14:42 | 7 | **Q.**   TIME FRAME:  WHEN WAS THAT IN RELATION TO THE STORM? |
| 14:42 | 8 | **A.**   HAD TO BE OVER A YEAR AFTER THE STORM OR MORE. |
| 14:42 | 9 | **Q.**   THAT WAS SOMETIME AROUND THE TIME YOUR WIFE HAD THE FUNGAL |
| 14:42 | 10 | PNEUMONIA AND THE OTHER PROBLEM? |
| 14:42 | 11 | **A.**   I WANT TO SAY 2007.  IF I LOOKED AT THE DOCUMENT RIGHT, IT |
| 14:42 | 12 | MIGHT HAVE BEEN 2007. |
| 14:42 | 13 | **Q.**   YOU RECEIVED THAT SETTLEMENT IN 2007? |
| 14:42 | 14 | **A.**   RIGHT. |
| 14:42 | 15 | **Q.**   PRIOR TO THAT, YOU WERE THE SOLE SOURCE OF INCOME FOR THE |
| 14:42 | 16 | FAMILY? |
| 14:42 | 17 | **A.**   THAT'S CORRECT. |
| 14:42 | 18 | **Q.**   DID YOU RECEIVE ANYTHING FROM ROAD HOME? |
| 14:42 | 19 | **A.**   YEAH.  THEY SAID WE GOT ABOUT -- THERE WAS A DISPUTE |
| 14:42 | 20 | BETWEEN WHETHER MY HOUSE WAS WORTH 140 OR 148.  WE DISPUTED |
| 14:42 | 21 | EVEN THAT.  WE THOUGHT IT WAS WORTH MORE ACCORDING TO THE SALES |
| 14:43 | 22 | IN THE AREA.  THE NEIGHBOR'S HOUSE SOLD FOR 161. |
| 14:43 | 23 | **Q.**   WHEN DID THAT SALE OCCUR? |
| 14:43 | 24 | **A.**   MAYBE TWO MONTHS BEFORE THE STORM, AND MY HOUSE WAS |
| 14:43 | 25 | ACTUALLY A LITTLE BIGGER THAN HIS. |

KENNY ARMSTRONG - DIRECT

14:43   1        WE SETTLED ON 148, AND WE RECEIVED 75 FROM ROAD HOME.

14:43   2   SO IT WAS THE DIFFERENCE OF THAT.  SO 148 MINUS $75,000 IS WHAT

14:43   3   WE GOT.

14:43   4   Q.   YOU ACCEPTED THE ROAD HOME MONEY AND BOUGHT THE HOUSE YOU

14:43   5   LIVE IN NOW?

14:43   6   A.   CORRECT.

14:43   7   Q.   YOU USED THE ROAD HOME MONEY TO PAY FOR THE HOUSE YOU HAVE

14:43   8   NOW?

14:43   9   A.   PRETTY MUCH.

14:43   10  Q.   DID ROAD HOME, TO YOUR KNOWLEDGE, ESTIMATE THE DAMAGE THAT

14:43   11  IT WOULD HAVE COST TO RECONSTRUCT YOUR HOUSE?

14:43   12  A.   ON A DOCUMENT I RECEIVED FROM ROAD HOME, ON ONE OF THE

14:43   13  PAGES IT SAYS THE ESTIMATED COST TO REDO MY HOUSE OR MAKE IT

14:43   14  LIVEABLE WAS $280,000.

14:43   15       MR. ANDRY:  I DON'T HAVE ANY OTHER QUESTIONS,

14:43   16  YOUR HONOR.

14:43   17       THE COURT:  THANK YOU, SIR.

14:43   18            CROSS-EXAMINATION

14:44   19  BY MS. CRONIN:

14:44   20  Q.   GOOD AFTERNOON, MR. ARMSTRONG.

14:44   21  A.   HOW YOU DOING?

14:44   22  Q.   WE MET BRIEFLY IN THE HALL THE OTHER DAY.

14:44   23  A.   YOU TRIED TO KICK ME OUT.

14:44   24  Q.   I APOLOGIZE FOR THAT.  WE ARE GLAD YOU ARE HERE TODAY.

14:44   25  THANK YOU.

KENNY ARMSTRONG - CROSS

14:44   1         **MS. CRONIN:**  I WOULD JUST LIKE TO START WITH TWO

14:44   2  EXHIBITS, YOUR HONOR.  THEY ARE PHOTOGRAPHS.  THEY ARE EXHIBITS

14:44   3  THAT WERE ON THE PLAINTIFFS' LIST; THEY WERE JUST NOT COMPLETE

14:44   4  COPIES OF THE EXHIBITS.

14:44   5          SO I WOULD JUST ASK MR. ARMSTRONG TO QUICKLY

14:44   6  IDENTIFY THEM, AND THAT'S ALL I HAVE TO DO WITH THOSE.

14:44   7          SO MAY I APPROACH?

14:44   8        **THE COURT:**  YES, YOU MAY.

14:44   9  **BY MS. CRONIN:**

14:44  10  **Q.**   MR. ARMSTRONG, THE FIRST SET OF EXHIBITS I GAVE YOU IS

14:45  11  JX-1446.  IF YOU COULD TAKE A LOOK AT THOSE PHOTOS.

14:45  12         CAN YOU SEE THAT JX-NUMBER?

14:45  13  **A.**   YES, MA'AM.

14:45  14  **Q.**   IF YOU COULD JUST TAKE A LOOK AT THOSE PHOTOS AND SEE IF

14:45  15  THOSE ARE PHOTOS OF YOUR HOUSE BOTH BEFORE AND AFTER KATRINA.

14:45  16  **A.**   OKAY.

14:45  17  **Q.**   I'M SORRY?

14:45  18  **A.**   THAT'S IT.

14:45  19  **Q.**   COULD YOU ALSO PLEASE LOOK AT JX-1448.

14:45  20        **MS. CRONIN:**  YOUR HONOR, WOULD YOU LIKE US TO PUT

14:45  21  THOSE UP FOR THE COURT?

14:45  22        **THE COURT:**  THAT'S FINE.

14:45  23  **BY MS. CRONIN:**

14:45  24  **Q.**   THESE ARE THE POST-KATRINA PHOTOS OF THE INTERIOR OF YOUR

14:45  25  HOUSE; IS THAT CORRECT?

KENNY ARMSTRONG - CROSS

14:45   1   **A.**   YES, MA'AM.

14:45   2   **Q.**   THANK YOU.

14:45   3        MR. ARMSTRONG, LIBERTY MUTUAL INSURANCE COMPANY WAS

14:45   4   YOUR HOMEOWNERS INSURANCE COMPANY PRIOR TO KATRINA FOR THE

14:45   5   HAMLET PLACE PROPERTY; ISN'T THAT CORRECT?

14:45   6   **A.**   CORRECT.

14:45   7   **Q.**   YOU UNDERSTOOD THAT LIBERTY MUTUAL DID NOT COVER FOR FLOOD

14:45   8   DAMAGE; IS THAT CORRECT?

14:45   9   **A.**   THAT'S CORRECT.

14:46   10  **Q.**   YOU ALSO HAD A SEPARATE FLOOD INSURANCE POLICY, CORRECT?

14:46   11  **A.**   CORRECT.

14:46   12  **Q.**   YOU MADE A CLAIM FOR DAMAGE TO YOUR HOUSE ON HAMLET AND

14:46   13  ITS CONTENTS FROM LIBERTY, YOUR HOMEOWNERS INSURER, FOR DAMAGE

14:46   14  DUE TO WIND AND WINDBLOWN RAIN, RIGHT?

14:46   15  **A.**   I MADE A CLAIM FOR THEM TO COME OUT AND SURVEY MY HOUSE.

14:46   16  I'M NOT THE PROFESSIONAL TO DETERMINE WHAT IT WAS.  OKAY?  BUT

14:46   17  THEY WROTE IT UP AS WIND -- THEY WROTE UP ABOVE THE WATERLINE.

14:46   18  I DON'T KNOW IF THEY EVER PUT IT WAS WINDBLOWN RAIN OR ANYTHING

14:46   19  LIKE THAT.

14:46   20  **Q.**   BUT YOU DID UNDERSTAND THAT LIBERTY MUTUAL DID NOT COVER

14:46   21  YOU FOR FLOOD; IS THAT CORRECT?

14:46   22  **A.**   NO.  CORRECT.

14:46   23  **Q.**   THANK YOU.

14:46   24        **MS. CRONIN:**  IF YOU COULD PUT UP JX-1454, PLEASE.

        25

**KENNY ARMSTRONG - CROSS**

14:46    1    **BY MS. CRONIN:**

14:46    2    **Q.**   MR. ARMSTRONG, IS THIS YOUR SIGNATURE ON THE PAGE?

14:46    3    **A.**   NO, IT'S NOT.

14:46    4    **Q.**   IS THIS YOUR WIFE'S HANDWRITING?

14:46    5    **A.**   YES, IT IS.

14:46    6    **Q.**   IS THIS A LETTER THAT YOU OR YOUR WIFE SENT TO YOUR

14:46    7    INSURANCE COMPANY PROVIDING ESTIMATES FROM TWO CONTRACTORS TO

14:46    8    REPAIR YOUR HOME?

14:47    9    **A.**   YES.

14:47    10            **MR. ANDRY:**  OBJECTION TO THE PACKAGE.  THE LETTER, I

14:47    11   DON'T HAVE A PROBLEM WITH.  BUT ATTACHED TO THAT THERE IS A

14:47    12   T-MAC CONTRACTOR ESTIMATE WHICH IS SPECIFICALLY EXCLUDED BY

14:47    13   YOUR MOTION IN LIMINE.

14:47    14            SO I WOULD ASK THAT COUNSEL REFRAIN FROM

14:47    15   REFERRING TO THAT.  AND THAT SPECIFICALLY IS JX-1454-07 AND 05.

14:47    16   I DON'T KNOW IF THERE'S AN 06 PAGE, BUT IT'S NOT IN THE GROUP I

14:47    17   WAS HANDED.  BUT THOSE ARE SPECIFICALLY EXCLUDED.

14:47    18            **MS. CRONIN:**  YOUR HONOR, MAY I BE HEARD?

14:47    19            **THE COURT:**  YES, YOU MAY.

14:47    20            **MS. CRONIN:**  YOUR HONOR, THESE ARE ADOPTED ADMISSIONS

14:47    21   BY THE PLAINTIFFS AS TO THE VALUE OF THE EXTENT OF THEIR

14:47    22   PROPERTY THAT WAS DAMAGED BY WIND AND WINDBLOWN RAIN.

14:47    23            **THE COURT:**  I NEED TO SEE IT.

14:47    24            **MR. ANDRY:**  I'LL PROVIDE YOU WITH MY COPY,

14:47    25   YOUR HONOR.

KENNY ARMSTRONG - CROSS

14:47  1          IT'S CLEARLY FROM AN ADJUSTING COMPANY AND NOT

14:47  2    PREPARED BY MR. ARMSTRONG.

14:47  3          **THE COURT:**  THE COURT DID --

14:48  4          **MS. CRONIN:**  YOUR HONOR, I WOULD ACKNOWLEDGE THE

14:48  5    FIRST PAGE IS IN FACT A LETTER FROM MRS. ARMSTRONG SAYING

14:48  6    "THESE TWO WHITE SHEETS ARE ESTIMATES FROM TWO CONTRACTORS

14:48  7    FOR" -- "TO REPAIR OUR HOME."

14:48  8          **THE COURT:**  THIS IS AN ESTIMATE FROM A CONTRACTOR

14:48  9    THAT WOULD -- WHERE THE SCOPE OF WORK INCLUDES RENOVATION TO

14:48  10   DAMAGED AREAS CAUSED ONLY BY WIND AND WINDBLOWN RAIN.  IT'S AN

14:49  11   ESTIMATE FROM A CONTRACTOR.  IT ALSO INCLUDES TREE REMOVAL.

14:49  12   OKAY.

14:49  13          YOUR OBJECTION IS, SIR, THIS IS HEARSAY?

14:49  14          **MR. ANDRY:**  TWO OBJECTIONS, YOUR HONOR.  ONE, THEY

14:49  15   ARE OFFERING IT TO PROVE THE TRUTH OF THE MATTER ASSERTED

14:49  16   THEREIN IS HEARSAY.  AND -- IT'S NOT MR. ARMSTRONG, IT'S NOT AN

14:49  17   ADMISSION BY A PARTY OPPONENT, SO IT'S HEARSAY -- AND IT'S

14:49  18   SPECIFICALLY EXCLUDED BY YOUR MOTION IN LIMINE TO THE EXTENT

14:49  19   IT'S NOT HEARSAY.

14:49  20          **THE COURT:**  ALL RIGHT.

14:49  21          **MS. CRONIN:**  YOUR HONOR, THIS IS AN ADOPTED ADMISSION

14:49  22   BY THE PLAINTIFFS.

14:49  23          I DON'T UNDERSTAND.  YOU'RE SAYING IT'S NOT AN

14:49  24   ADMISSION BY MR. ARMSTRONG, THE LETTER ITSELF?

14:49  25          **MR. ANDRY:**  I DON'T HAVE ANY PROBLEM WITH THE LETTER

**KENNY ARMSTRONG - CROSS**

14:49   1   ITSELF, WITH THE HANDWRITTEN STUFF.  BUT TO THE EXTENT -- I'M

14:49   2   SORRY, I FORGOT A PAGE BECAUSE I DIDN'T SEE IT.

14:49   3         **THE COURT:**  FIRST, WE ARE TALKING ABOUT TWO THINGS.

14:49   4   THERE'S A LETTER FROM --

14:49   5         **MR. ANDRY:**  YES.  YOUR HONOR, IT WOULD BE BETTER IF

14:49   6   WE DID ALL THIS ON THE BOARD.

14:49   7         **THE COURT:**  THERE'S A LETTER FROM MRS. ARMSTRONG.

14:49   8         **MS. CRONIN:**  YES, YOUR HONOR.  THIS IS A LETTER FROM

14:49   9   MRS. ARMSTRONG WHICH INCLUDES TWO DOCUMENTS TO THE INSURANCE

14:50  10   COMPANY.

14:50  11         AND OUR POSITION IS THAT THIS IS AN ADOPTED

14:50  12   ADMISSION BY THE PLAINTIFFS AS TO THE AMOUNT OF THEIR PROPERTY

14:50  13   THAT WAS DAMAGED BY WIND AND WINDBLOWN RAIN.

14:50  14         **THE COURT:**  I'M NOT SURE HOW A CONTRACTOR'S ESTIMATE

14:50  15   IS AN ADMISSION.

14:50  16         **MS. CRONIN:**  IF MRS. ARMSTRONG SENT A LETTER --

14:50  17         **THE COURT:**  YES, GO AHEAD.

14:50  18         **MS. CRONIN:**  IF MRS. ARMSTRONG SENT A LETTER

14:50  19   ATTACHING THESE TWO ESTIMATES, BOTH OF WHICH ARE MORE THAN

14:50  20   $50,000, AS THE COST TO REPAIR THEIR HOME, AND THE ESTIMATES

14:50  21   CLEARLY SAY THEY ARE FOR DAMAGE CAUSED BY WIND AND WINDBLOWN

14:50  22   RAIN --

14:50  23         **THE COURT:**  WELL, YOU ALREADY HAVE AN OFFSET BY

14:50  24   VIRTUE OF THIS COURT'S RULING -- I KNOW YOU WANT TO PROVE IT

14:50  25   WAS, IN FACT, WIND DAMAGE AS WELL.  I UNDERSTAND THAT.

KENNY ARMSTRONG - CROSS

14:50     1            I THINK IT HAS VERY, VERY LIMITED PROBATIVE

14:50     2   VALUE, BUT ONLY TO THE EXTENT THAT YOU HAVE THE BURDEN OF

14:51     3   PROVING -- THAT YOU WISH TO PROVE -- LET ME -- YOU WISH TO

14:51     4   PROVE THERE WAS WIND DAMAGE.  AND THEY HAVE ALREADY SAID THAT

14:51     5   SIMPLY BECAUSE YOU RECEIVED MONEY FROM IT DOESN'T NECESSARILY

14:51     6   MEAN THERE WAS WIND DAMAGE.  IT DOES MEAN YOU RECEIVED MONEY,

14:51     7   HOWEVER, AND THAT MONEY CAN'T BE A WINDFALL.  NO PUN INTENDED.

14:51     8            BUT THE COURT -- TO THAT LIMITED EXTENT, I'LL

14:51     9   LET IT IN, BUT I'M NOT GOING TO OPEN THE DOOR TO MUCH OF THIS,

14:51    10   FRANKLY, BECAUSE IT'S A CONTRACTOR'S ESTIMATE SHE'S SENDING, AS

14:51    11   ONE DOES, ON -- WHO IS SHE SENDING IT TO?

14:51    12          **MS. CRONIN:**  THE INSURANCE COMPANY.

14:51    13          **THE COURT:**  THE INSURANCE COMPANY.

14:51    14          **MR. ANDRY:**  MAY I SAY ONE THING?  TO THE EXTENT THEY

14:51    15   ARE GOING TO USE THAT IN THEIR CASE IN CHIEF TO PROVE THE TRUTH

14:51    16   OF THE MATTER ASSERTED IN THE CONTRACT OR ESTIMATE, THEN IT'S

14:51    17   CLASSIC HEARSAY, AND WE WOULD OBJECT TO THAT.

14:51    18            BUT NOTWITHSTANDING YOUR HONOR'S RULING, JUST

14:51    19   FOR THE PURPOSES OF THE RECORD, THEY ARE USING IT TO PROVE THE

14:52    20   TRUTH OF THE MATTER ASSERTED IN THERE THAT THESE ITEMS ARE

14:52    21   DAMAGED BY WIND.  AND SO IT'S NOT ONLY EXCLUDED BY YOUR MOTION

14:52    22   IN LIMINE BUT IT'S HEARSAY.  AND SO WITH YOUR HONOR'S RULING,

14:52    23   WE ABIDE.

14:52    24          **THE COURT:**  IN OTHER WORDS, YOU'RE SAYING, COUNSEL,

14:52    25   IT'S TANTAMOUNT TO A STATEMENT BY MRS. ARMSTRONG BY INCLUDING

**KENNY ARMSTRONG - CROSS**

| | | |
|---|---|---|
| 14:52 | 1 | THE ESTIMATE AND SENDING IT TO THE INSURANCE COMPANY. |
| 14:52 | 2 | I'M NOT SURE YOU'RE CORRECT, BUT OUT OF AN |
| 14:52 | 3 | ABUNDANCE OF CAUTION, I WILL LET IT INTO THE RECORD SUBJECT TO |
| 14:52 | 4 | YOUR OBJECTION. |
| 14:52 | 5 | YOU CAN MAKE IT AGAIN IF NECESSARY. |
| 14:52 | 6 | **MR. ANDRY:**  THANK YOU, YOUR HONOR. |
| 14:52 | 7 | BY MS. CRONIN: |
| 14:52 | 8 | Q.   MR. ARMSTRONG, YOU AND/OR YOUR WIFE SUBMITTED THESE |
| 14:52 | 9 | ESTIMATES TO YOUR INSURANCE COMPANY, CORRECT? |
| 14:52 | 10 | A.   CORRECT. |
| 14:52 | 11 | Q.   YOU KNOW THAT LIBERTY MUTUAL ENDED UP PAYING FOR YOUR |
| 14:52 | 12 | DAMAGES TO THE HOUSE, THE STRUCTURE ITSELF, FOR MORE THAN |
| 14:52 | 13 | $35,000, CORRECT? |
| 14:52 | 14 | A.   CORRECT. |
| 14:53 | 15 | Q.   I WOULD JUST SHOW YOU A COPY OF JX-1549, PAGE 78. |
| 14:53 | 16 | IS THIS A CHECK MADE OUT TO YOU, MR. ARMSTRONG? |
| 14:53 | 17 | A.   YES, IT WAS. |
| 14:53 | 18 | Q.   FOR $35,202.03? |
| 14:53 | 19 | A.   CORRECT. |
| 14:53 | 20 | **THE COURT:**  I DON'T KNOW IF THAT INCLUDES ALSO THE |
| 14:53 | 21 | TREE, WHICH I DON'T THINK IS INVOLVED IN THIS CLAIM. |
| 14:53 | 22 | **THE WITNESS:**  I THINK THE TREE WAS WRITTEN UP IN |
| 14:53 | 23 | THERE. |
| 14:53 | 24 | **THE COURT:**  IT SEEMS TO BE IN THE LETTER.  THE COURT |
| 14:53 | 25 | IS GOING TO -- I'M NOT GOING TO IGNORE THE WHOLE THING, BUT I'M |

KENNY ARMSTRONG - CROSS

14:53    1   DEFINITELY GOING TO IGNORE THE TREE.

14:53    2           **MS. CRONIN:**  NOTED, YOUR HONOR.

14:53    3           **THE COURT:**  ALTHOUGH, JUST LIKE A POEM, THERE'S NEVER

14:53    4   A CASE AS LOVELY AS A TREE.

14:53    5           GO AHEAD.

14:53    6           NOT TO DENIGRATE TREES.  I LOVE THEM MYSELF.

14:53    7   I'LL BE CALLED A TREE HUGGER.

14:54    8   **BY MS. CRONIN:**

14:54    9   **Q.**   ISN'T IT TRUE, MR. ARMSTRONG, THAT NO ONE ADVISED YOU THAT

14:54   10   YOUR HOUSE ON HAMLET PLACE COULD NOT BE REPAIRED AFTER THE

14:54   11   DAMAGES FROM HURRICANE KATRINA?

14:54   12   **A.**   I ADVISED MYSELF.  IF YOU SAW MY NEIGHBORHOOD, NOBODY IN

14:54   13   HERE WOULD HAVE WENT BACK TO THAT.  NOBODY DID GO BACK TO IT.

14:54   14   **Q.**   DID ANYONE EXPRESS -- DID ANY CONTRACTOR OR ANYONE

14:54   15   EXPRESSLY TELL YOU THAT YOUR HOME COULD NOT BE REPAIRED AFTER

14:54   16   HURRICANE KATRINA?

14:54   17   **A.**   NO, NOT THAT I KNOW OF.  BUT LIKE I'M TELLING Y'ALL, GO

14:54   18   LOOK AT MY NEIGHBORHOOD NOW.  IT'S NOTHING.  SO I MADE THE

14:54   19   RIGHT DECISION.

14:54   20   **Q.**   IN FACT, EVEN IF THE PRICE TO REBUILD HAD NOT BEEN, IN

14:54   21   YOUR WORDS, ASTRONOMICAL, YOU WOULD NOT HAVE REBUILT IN THAT

14:54   22   LOCATION ANYWAY; ISN'T THAT TRUE?

14:54   23   **A.**   WELL, THE SCHOOL THAT MY DAUGHTER WENT TO, THERE WAS NO

14:54   24   HOSPITAL OUT THERE.  WE LOST SO MUCH OUT THERE.  IT WASN'T A

14:54   25   THRIVING COMMUNITY AT THE TIME, SO I WOULDN'T HAVE BUILT OUT

KENNY ARMSTRONG - CROSS

14:54  1  THERE.

14:54  2  Q.   PART OF THE REASON YOU WOULDN'T HAVE BUILT OUT THERE IS

14:54  3  BECAUSE YOU WANTED TO MOVE TO HIGHER GROUND, CORRECT?

14:55  4  A.   THAT WOULD BE CORRECT.

14:55  5  Q.   YOUR BELIEF IS THAT YOUR HOUSE ON HAMLET PLACE WAS DAMAGED

14:55  6  BY BOTH WIND AND WATER; ISN'T THAT CORRECT?

14:55  7  A.   I THINK WIND PROBABLY PLAYED A SMALL PART.  I THINK IT WAS

14:55  8  MOSTLY WATER, LOOKING AT THAT VIDEO.

14:55  9  Q.   YOU BELIEVE THE CONTENTS OF YOUR HOME AT HAMLET PLACE WERE

14:55  10  ALSO DAMAGED BY A COMBINATION OF WIND AND WATER; ISN'T THAT

14:55  11  TRUE?

14:55  12  A.   I WOULD SAY MOSTLY WATER, BUT THEY HAD SOME SMALL HOLES IN

14:55  13  THE ROOF AND THAT.

14:55  14  Q.   YOU ALSO MADE A CLAIM TO LIBERTY MUTUAL INSURANCE FOR THE

14:55  15  CONTENTS OF YOUR ATTIC, DIDN'T YOU?

14:55  16  A.   CORRECT.

14:55  17       MS. CRONIN:  IF YOU COULD PUT UP JX-1546, PLEASE.

14:55  18  BY MS. CRONIN:

14:55  19  Q.   IS THIS YOUR WIFE'S HANDWRITING ON THIS DOCUMENT, SIR?

14:55  20  A.   COULD BE.

14:55  21  Q.   DO YOU KNOW THAT YOUR WIFE ACKNOWLEDGES THAT THAT'S HER

14:55  22  HANDWRITING IN HER DEPOSITION?

14:55  23  A.   OKAY.  I'LL GO WITH IT.

14:55  24  Q.   THANK YOU.  IN THE BOX ABOUT TWO-THIRDS OF THE PAGE DOWN

14:56  25  UNDER "DESCRIPTION OF LOSS," IT SAYS:  "DUE TO THE MULTIPLE

**KENNY ARMSTRONG - CROSS**

| | | |
|---|---|---|
| 14:56 | 1 | HOLES IN OUR ROOF, WE LOST ALL OF OUR ATTIC CONTENTS ALONG WITH |
| 14:56 | 2 | THE CEILINGS," CORRECT? |
| 14:56 | 3 | **A.**   CORRECT. |
| 14:56 | 4 | **Q.**   IF YOU LOOK AT PAGES 2 AND 3 OF THIS DOCUMENT, THIS IS A |
| 14:56 | 5 | LIST THAT WAS COMPILED BY YOU AND YOUR WIFE AND SUBMITTED TO |
| 14:56 | 6 | LIBERTY MUTUAL TO SET FORTH THE CONTENTS OF YOUR HOUSE YOU |
| 14:56 | 7 | CLAIM WERE DAMAGED DUE TO WIND AND WINDBLOWN RAIN; IS THAT |
| 14:56 | 8 | CORRECT? |
| 14:56 | 9 | **A.**   LET ME SEE IT. |
| 14:56 | 10 | THAT LOOKS LIKE IT. |
| 14:56 | 11 | **Q.**   AGAIN, YOU KNEW YOUR HOMEOWNERS INSURANCE ONLY COVERED |
| 14:56 | 12 | DAMAGES FROM WIND AND WINDBLOWN RAIN, CORRECT? |
| 14:56 | 13 | **THE COURT:**  ACCORDING TO THE FIFTH CIRCUIT. |
| 14:56 | 14 | **THE WITNESS:**  REPEAT THE QUESTION. |
| 14:56 | 15 | **THE COURT:**  BUT THAT'S A LONG STORY. |
| 14:56 | 16 | **THE WITNESS:**  REPEAT THE QUESTION. |
| 14:56 | 17 | **BY MS. CRONIN:** |
| 14:56 | 18 | **Q.**   SURE.  YOU KNEW THAT YOUR HOMEOWNERS INSURANCE ONLY |
| 14:56 | 19 | COVERED DAMAGES FROM WIND AND WINDBLOWN RAIN, CORRECT? |
| 14:57 | 20 | **A.**   THAT WOULD BE A FAIR ASSESSMENT.  YES. |
| 14:57 | 21 | **Q.**   THANK YOU. |
| 14:57 | 22 | YOU FILED A LAWSUIT CLAIMING $128,548 FOR WIND AND |
| 14:57 | 23 | WINDBLOWN DAMAGES AGAINST LIBERTY MUTUAL, YOUR HOMEOWNERS |
| 14:57 | 24 | INSURER; ISN'T THAT RIGHT? |
| 14:57 | 25 | **A.**   HOW MUCH? |

KENNY ARMSTRONG - CROSS

14:57    1           **MR. ANDRY:**  I MUST OBJECT, YOUR HONOR.  IT'S

14:57    2    IRRELEVANT.  WHAT WAS SAID IN THE PLEADING BY A LAWYER AND,

14:57    3    FROM MY UNDERSTANDING FROM THE EXHIBITS AN UNVERIFIED PETITION

14:57    4    AT THAT, IS TOTALLY IRRELEVANT.

14:57    5           BY THE SAME REASONING, IF HE HAD SAID WE GET

14:57    6    HALF A MILLION DOLLARS IN DAMAGE IN THE SUIT, HE WOULD HAVE TO

14:57    7    PAY THEM BACK MONEY.  IT'S TOTALLY IRRELEVANT.

14:57    8           **THE COURT:**  I'M GOING TO -- IT HAS, IN MY MIND, A

14:58    9    VERY ATTENUATED PROBATIVE VALUE, BUT I'M GOING TO ALLOW IT.  I

14:58   10    HAVE ALLOWED IT THUS FAR.

14:58   11           WHAT PEOPLE ALLEGE IN LAWSUITS IS NOT WHAT I'M

14:58   12    GOING TO NECESSARILY FIND IS THE DAMAGE TO THIS HOUSE.

14:58   13           I AM GOING TO USE THE EMPIRICAL EVIDENCE THAT I

14:58   14    HAVE RECEIVED ALONG WITH LOOKING AT EVERYTHING ELSE, AND I'M

14:58   15    CERTAINLY GOING TO GIVE THE DEFENDANTS A RIGHT TO ARGUE THAT.

14:58   16           **MS. CRONIN:**  ERIC, IF YOU COULD PUT UP A COPY OF

14:58   17    EXHIBIT JX-1431, PLEASE.  IF YOU COULD GO TO PAGE 6, PLEASE.

14:58   18           **MR. ANDRY:**  YOUR HONOR, THIS ISN'T EVEN THE PETITION.

14:58   19    THIS IS A NOTICE OF REMOVAL.

14:58   20           **THE COURT:**  I'M ASSUMING WE ARE GOING TO GET TO THE

14:58   21    PETITION THAT IS GENERALLY INCLUDED IN EVERY NOTICE OF REMOVAL.

14:58   22           **MS. CRONIN:**  THAT'S WHAT'S ON PAGE 6 NOW, YOUR HONOR.

14:58   23    **BY MS. CRONIN:**

14:58   24    **Q.**   MR. ARMSTRONG, THIS PETITION ATTACHED, FILED BY FRANK

14:59   25    IPPOLITO ON BEHALF OF YOU AND YOUR WIFE, HAVE YOU SEEN THIS

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 14:59 | 1 | BEFORE? |
| 14:59 | 2 | **A.**   YES, I DID. |
| 14:59 | 3 | **Q.**   DID YOU HIRE MR. IPPOLITO TO FILE THAT LAWSUIT? |
| 14:59 | 4 | **A.**   YES, WE DID. |
| 14:59 | 5 | **MS. CRONIN:**  IF YOU COULD PUT UP PAGE 16 OF THIS |
| 14:59 | 6 | DOCUMENT, ERIC. |
| 14:59 | 7 | **BY MS. CRONIN:** |
| 14:59 | 8 | **Q.**   THIS ESTIMATE SHOWS THAT ESTIMATE FOR $128,548 IN DAMAGES |
| 14:59 | 9 | FOR WIND AND WIND-RELATED DAMAGE ON THE HAMLET PROPERTY HOUSE, |
| 14:59 | 10 | CORRECT? |
| 14:59 | 11 | **MR. ANDRY:**  AGAIN, YOUR HONOR, WE OBJECT.  THIS IS |
| 14:59 | 12 | BEYOND THE SCOPE.  THIS IS NOT THE PETITION.  THIS IS ANOTHER |
| 14:59 | 13 | DOCUMENT THAT'S IN THIS PACKAGE THAT WE HAVE, AND IT'S NOT A |
| 14:59 | 14 | LAWSUIT ALLEGATION; IT IS AN ADJUSTMENT BY SOMEBODY THAT'S |
| 14:59 | 15 | SPECIFICALLY EXCLUDED BY YOUR MOTION IN LIMINE. |
| 14:59 | 16 | **THE COURT:**  I'M NOT SURE HOW THIS RELATES TO THE |
| 14:59 | 17 | LAWSUIT. |
| 14:59 | 18 | WAS THERE A SPECIFIC AMOUNT STATED IN THE |
| 14:59 | 19 | LAWSUIT? |
| 14:59 | 20 | **MR. ANDRY:**  YES.  IN THE LAWSUIT.  WE'VE NOW MOVED ON |
| 14:59 | 21 | TO SOME OTHER ESTIMATE THAT'S ATTACHED TO THIS PACKAGE. |
| 14:59 | 22 | **THE COURT:**  I DON'T WANT TO OPEN IT TO ESTIMATES. |
| 14:59 | 23 | THE LAWSUIT STATES A CERTAIN AMOUNT, AND THAT'S SUFFICIENT. |
| 15:00 | 24 | **MS. CRONIN:**  THANK YOU, YOUR HONOR. |
| | 25 | |

KENNY ARMSTRONG - CROSS

15:00    1   **BY MS. CRONIN:**

15:00    2   **Q.**   MR. ARMSTRONG, DID YOU SETTLE THIS LAWSUIT?

15:00    3   **A.**   YES, I DID.

15:00    4   **Q.**   AS A RESULT OF SETTLING THAT LAWSUIT, YOU LATER RECEIVED

15:00    5   $16,000 FOR WIND AND RAIN DAMAGE TO THE CONTENTS OF YOUR ATTIC;

15:00    6   IS THAT CORRECT?

15:00    7   **A.**   THAT'S NOT CORRECT.

15:00    8           **MS. CRONIN:**  ERIC, COULD YOU PLEASE PUT UP PAGE --

15:00    9           **THE COURT:**  LET ME ASK YOU A QUESTION:  THE

15:00   10   35,000-DOLLAR CHECK THAT'S BEEN DEMONSTRATED TO ME DID NOT

15:00   11   INCLUDE CONTENTS?

15:00   12           **MS. CRONIN:**  THAT'S CORRECT, YOUR HONOR.

15:00   13             ERIC, IF YOU COULD PUT UP JX-1549, PAGE 234.

15:00   14           **MR. ANDRY:**  YOUR HONOR, I OBJECT.

15:00   15           **THE COURT:**  NO MATTER WHETHER THE CLAIM WAS NOT A

15:00   16   GREAT CLAIM, NO MATTER IF A HUNDRED PERCENT OF THE HOUSE WAS

15:00   17   DAMAGED BY FLOOD, TO THE EXTENT THEY RECEIVED MONEY, I'M GOING

15:01   18   TO DEDUCT IT FROM ANY AWARD I GIVE.  MONEY FROM THE WIND

15:01   19   INSURANCE.

15:01   20           **MR. ANDRY:**  WE UNDERSTAND THAT, YOUR HONOR, BUT WHAT

15:01   21   WE ARE ENGAGED IN NOW IS NOT THAT.  WE ARE ENGAGED IN AN

15:01   22   ATTEMPT TO PROVE WIND DAMAGE THROUGH ESTIMATES AND CONJECTURE

15:01   23   AND PIECEMEAL PIECES OF PAPER THAT DON'T GO TOGETHER.

15:01   24           **THE COURT:**  I DO UNDERSTAND THAT.  AT THE VERY LEAST,

15:01   25   IT WILL BE THAT, AND IT MAY BE NO MORE.  I'M GIVING THEM A

**KENNY ARMSTRONG - CROSS**

| | | |
|---|---|---|
| 15:01 | 1 | CHANCE TO SHOW MORE BY THIS, THAT HE RECEIVED $16,000 FOR THE |
| 15:01 | 2 | CONTENTS.  SO AT THE VERY LEAST, IT'S RELEVANT FOR ME TO ADD ON |
| 15:01 | 3 | TO THE 35, TO DEDUCT FROM WHATEVER AWARD I MAKE, IF ANY.  AND |
| 15:01 | 4 | FOR THAT LIMITED PURPOSE, I WILL ALLOW IT. |
| 15:01 | 5 | **BY MS. CRONIN:** |
| 15:01 | 6 | **Q.**   MR. ARMSTRONG, DOES THIS REFRESH YOUR RECOLLECTION THAT |
| 15:01 | 7 | YOU RECEIVED $16,545? |
| 15:01 | 8 | **A.**   NO, IT'S NOT.  I GOT $18,400, IS WHAT I GOT.  I GOT -- |
| 15:01 | 9 | THAT'S WHAT I GOT. |
| 15:02 | 10 | **MS. CRONIN:**  THE COURT'S INDULGENCE FOR ONE MOMENT, |
| 15:02 | 11 | YOUR HONOR. |
| 15:02 | 12 | **BY MS. CRONIN:** |
| 15:02 | 13 | **Q.**   MR. ARMSTRONG, COULD YOU TELL ME THAT AMOUNT AGAIN? |
| 15:02 | 14 | **A.**   $18,400.  I SETTLED ON $30,000, AND THE LAWYER TOOK -- AND |
| 15:02 | 15 | COURT COSTS WAS 11,600-SOMETHING DOLLARS. |
| 15:02 | 16 | **MS. CRONIN:**  ERIC, COULD YOU PUT UP JX-1549-41. |
| 15:02 | 17 | **THE COURT:**  LET ME ASK YOU SOMETHING, SIR, TO MAKE |
| 15:02 | 18 | CLEAR THAT WE ARE ALL ON THE SAME TRACK HERE.  DID YOU RECEIVE |
| 15:02 | 19 | A CHECK FOR $35,000? |
| 15:02 | 20 | **THE WITNESS:**  YES, I DID. |
| 15:02 | 21 | **THE COURT:**  DID YOU RECEIVE ANOTHER CHECK FOR |
| 15:02 | 22 | $16,000? |
| 15:02 | 23 | **THE WITNESS:**  NO.  $18,000. |
| 15:02 | 24 | **THE COURT:**  OKAY.  SO YOU RECEIVED 35 AND 18. |
| 15:02 | 25 | **THE WITNESS:**  YES. |

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 15:03 | 1 | **THE COURT:**  I JUST WANTED TO MAKE SURE I WAS |
| 15:03 | 2 | UNDERSTANDING. |
| 15:03 | 3 | **THE WITNESS:**  NO, NO.  IT'S -- |
| 15:03 | 4 | **MS. CRONIN:**  WE ARE COMING TO PAGE 241, YOUR HONOR. |
| 15:03 | 5 | **THE COURT:**  CAN YOU BLOW THAT UP A LITTLE BIT. |
| 15:03 | 6 | THANK YOU.  THAT'S GOOD. |
| 15:03 | 7 | BY MS. CRONIN: |
| 15:03 | 8 | **Q.**  MR. ARMSTRONG, IS THIS A STATEMENT FROM LIBERTY MUTUAL |
| 15:03 | 9 | INSURANCE? |
| 15:03 | 10 | **A.**  I THINK WHAT WE GOT IS -- THE DOCUMENT I HAVE SHOWS |
| 15:03 | 11 | $18,400, AND THIS ONE SHOWS 16,000 AND SOMETHING.  SO THAT'S A |
| 15:03 | 12 | DOCUMENT I GOT FROM FRANK IPPOLITO.  IT MUST BE THE SAME THING, |
| 15:04 | 13 | JUST THAT HE HAS THE DIFFERENCE OF WHAT I GOT PAID VERSUS MAYBE |
| 15:04 | 14 | HE OWES ME SOME MONEY. |
| 15:04 | 15 | **THE COURT:**  YOU'RE SAYING WHAT YOU GOT WAS NET OF |
| 15:04 | 16 | ATTORNEYS' FEES. |
| 15:04 | 17 | **THE WITNESS:**  I WENT THROUGH THIS PAPER KNOWING THAT |
| 15:04 | 18 | THESE QUESTIONS WERE TO COME UP, AND WHEN I WENT THROUGH IT, I |
| 15:04 | 19 | HAVE THE PAPER THAT SAYS $18,400 IS WHAT I GOT.  SO MAYBE I |
| 15:04 | 20 | ONLY GOT $16,000. |
| 15:04 | 21 | **THE COURT:**  HE IS SAYING HE RECEIVED A TOTAL OF |
| 15:04 | 22 | $30,000. |
| 15:04 | 23 | IS THAT CORRECT? |
| 15:04 | 24 | **THE WITNESS:**  I RECEIVED $35,000 FOR STRUCTURE, TREE |
| 15:04 | 25 | REMOVAL, AND FENCE AND SOME OTHER THINGS.  AND I RECEIVED -- |

KENNY ARMSTRONG - CROSS

15:04    1    ACCORDING TO THE PAPERWORK, I GOT $18,400.  I DON'T HAVE A

15:04    2    CANCELED CHECK.  I HAVE A CANCELED CHECK FOR THE $35,000.  SO

15:04    3    THE DOCUMENT I SHOWED SHOWS THAT I RECEIVED $18,400.

15:04    4         **THE COURT:**  DID YOU UNDERSTAND THAT WHATEVER -- THAT

15:04    5    YOUR ATTORNEY WOULD HAVE RECEIVED -- WOULD HAVE KEPT THE REST

15:04    6    OF THAT?

15:04    7         **THE WITNESS:**  OH, NO, I UNDERSTOOD THAT.

15:04    8         **THE COURT:**  SO IT WOULD HAVE BEEN $18,000 PLUS

15:04    9    WHATEVER HE KEPT.

15:05   10         **THE WITNESS:**  RIGHT.

15:05   11         **THE COURT:**  I UNDERSTAND.

15:05   12         **MS. CRONIN:**  THANK YOU.

15:05   13    BY MS. CRONIN:

15:05   14    **Q.**   YOU PROVIDED RECEIPTS AND RECORDS TO LIBERTY MUTUAL WHEN

15:05   15    YOU MADE A CLAIM FOR ADDITIONAL LIVING EXPENSES UNDER YOUR

15:05   16    HOMEOWNERS INSURANCE CLAIM; ISN'T THAT CORRECT?

15:05   17    **A.**   I'M SURE WE DID.

15:05   18         **MS. CRONIN:**  ERIC, PLEASE PUT UP JX-1457.

15:05   19    BY MS. CRONIN:

15:05   20    **Q.**   MR. ARMSTRONG, IS THAT YOUR NAME AT THE BOTTOM OF THE

15:05   21    PAGE?

15:05   22    **A.**   YES, IT IS.

15:05   23    **Q.**   IS THIS YOUR WIFE'S HANDWRITING?

15:05   24    **A.**   SURE.

15:05   25         **MS. CRONIN:**   ERIC, IF YOU COULD FLIP THROUGH THE

KENNY ARMSTRONG - CROSS

15:05    1    PAGES IN THIS.

15:05    2    **BY MS. CRONIN:**

15:05    3    **Q.**   IS THIS A COPY OF THE RECEIPTS YOU SUBMITTED FOR

15:05    4    ADDITIONAL LIVING EXPENSES TO YOUR HOMEOWNERS INSURANCE

15:05    5    COMPANY?

15:05    6              **THE COURT:**  IF YOU COULD TURN THAT AROUND SO

15:05    7    MR. ARMSTRONG COULD SEE IT.

15:05    8              **THE WITNESS:**  IT'S DURING THAT TIME FRAME, I WOULD

15:05    9    IMAGINE.

15:05   10              **THE COURT:**  IT LOOKS LIKE AN ENTERGY BILL, WHAT I'M

15:05   11    LOOKING AT.  WHAT ARE WE LOOKING AT HERE?  I DON'T WANT TO SEE

15:06   12    A BUNCH OF ENTERGY BILLS IF WE --

15:06   13              **MS. CRONIN:**  RECEIPTS AND RECORDS THAT MR. AND

15:06   14    MRS. ARMSTRONG --

15:06   15              **THE COURT:**  WE DON'T HAVE A COMPILATION OF THAT?  WE

15:06   16    HAVE TO LOOK AT --

15:06   17              **MS. CRONIN:**  I DO HAVE A COMPILATION OF THAT,

15:06   18    YOUR HONOR.  I'M HAPPY TO APPROACH THE WITNESS AND GIVE IT TO

15:06   19    HIM.

15:06   20              **THE COURT:**  THAT WOULD BE GREAT.  I DON'T KNOW HOW

15:06   21    MANY ENTERGY BILLS THERE ARE, BUT MY TOLERANCE FOR THAT IS LOW.

15:06   22              **MR. TREEBY:**  THIS IS THE RIGHT PLACE FOR SUMMARY

15:06   23    EVIDENCE?

15:06   24              **THE COURT:**  YES.

15:06   25              **MR. BRUNO:**  THAT'S GOOD TO KNOW.

KENNY ARMSTRONG - CROSS

15:06   1           **THE COURT:**  HERE WE GO.

15:06   2   **BY MS. CRONIN:**

15:06   3   **Q.**   MR. ARMSTRONG, IS THIS A COPY OF THE RECEIPTS THAT YOU AND

15:06   4   YOUR WIFE SUBMITTED TO LIBERTY MUTUAL WHEN YOU MADE A CLAIM FOR

15:06   5   ADDITIONAL EXPENSES UNDER YOUR HOMEOWNERS INSURANCE CLAIM?

15:06   6   **A.**   YES, MA'AM.

15:06   7   **Q.**   YOU WERE PAID $9,875 FOR ADDITIONAL LIVING EXPENSES FROM

15:07   8   YOUR HOMEOWNERS INSURER, CORRECT?

15:07   9   **A.**   I'M NOT SURE ABOUT THAT.

15:07   10          **MS. CRONIN:**  ERIC, COULD YOU PUT BACK UP JX-1459.

15:07   11   PAGE 234.  234, PLEASE.  THANK YOU.

15:07   12   **BY MS. CRONIN:**

15:07   13   **Q.**   UNDER COVERAGE D FOR LOSS OF USE, DO YOU SEE THAT AMOUNT

15:07   14   FOR $9,875.80?

15:07   15   **A.**   YES, MA'AM.

15:07   16   **Q.**   DOES THAT SOUND LIKE THE AMOUNT YOU RECEIVED FOR

15:07   17   ADDITIONAL LIVING EXPENSES?

15:07   18   **A.**   I KNOW WE GOT SOME LIVING EXPENSE.  I DON'T HAVE A RECORD

15:07   19   OF WHAT IT EXACTLY WAS.  I THOUGHT THE INSURANCE COMPANY WORKED

15:07   20   FOR ME.

15:07   21   **Q.**   THANK YOU.

15:08   22          MR. ARMSTRONG, YOU MET WITH SCOTT TAYLOR ONCE OR

15:08   23   TWICE; ISN'T THAT CORRECT?

15:08   24   **A.**   I THINK WE MET ONCE BEFORE AT MY HOUSE.

15:08   25   **Q.**   MR. TAYLOR NEVER ASKED YOU ABOUT RELOCATION OR EVACUATION

*HOURLY TRANSCRIPT*

KENNY ARMSTRONG - CROSS

15:08    1    EXPENSES; ISN'T THAT CORRECT?

15:08    2    **A.**    IT'S A LONG TIME AGO.  I DON'T REMEMBER EVERYTHING THAT

15:08    3    WAS SAID.

15:08    4    **Q.**    YOU NEVER DISCUSSED OR PROVIDED HIM WITH ANY COPIES OF

15:08    5    DOCUMENTS YOU RECEIVED FROM YOUR INSURANCE COMPANIES; IS THAT

15:08    6    CORRECT?

15:08    7    **A.**    LIKE I SAY, I DON'T REMEMBER A LOT ABOUT IT, BUT I DON'T

15:08    8    RECALL THAT.

15:08    9    **Q.**    YOU AND YOUR WIFE PREPARED AN INVENTORY OF THE PERSONAL

15:08   10    PROPERTY YOU LOST IN THE STORM FOR MR. TAYLOR, RIGHT?

15:08   11    **A.**    YES, WE DID, AND MY KIDS ALSO.

15:08   12         **MS. CRONIN:**  IF YOU WOULD GET JX-1429.

15:08   13    **BY MS. CRONIN:**

15:08   14    **Q.**    THIS IS A COPY OF THAT INVENTORY, ISN'T IT?  I CAN BRING

15:08   15    YOU A FULL COPY OF THAT IF YOU WOULD LIKE TO SEE THE FULL COPY.

15:08   16    **A.**    OKAY.  THAT'S MY HANDWRITING.  GO AHEAD.

15:09   17         **MS. CRONIN:**  MAY I APPROACH?

15:09   18         **THE COURT:**  YOU CAN SHOW HIM THERE.  HE SAID THAT'S

15:09   19    HIS HANDWRITING.  THE COURT WILL ASSUME THAT IS IN FACT HIS

15:09   20    LIST, BASED ON THE TESTIMONY.

15:09   21    **BY MS. CRONIN:**

15:09   22    **Q.**    SOME OF THE ITEMS ON THE INVENTORY YOU AND YOUR WIFE

15:09   23    PREPARED FOR SCOTT TAYLOR WERE OWNED BY YOUR SON KENNETH JR.;

15:09   24    IS THAT CORRECT?

15:09   25    **A.**    SOME OF THE STUFF.  HE LIVED IN MY HOUSE.

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 15:09 | 1 | **MS. CRONIN:** I'M GOING TO PUT UP JX-1605, PAGES 42 TO |
| 15:09 | 2 | 55. THIS IS JUST A TYPED COPY OF THAT INVENTORY THAT WAS |
| 15:09 | 3 | INCLUDED IN MR. TAYLOR'S REPORT. |
| 15:09 | 4 | **THE COURT:** ALL RIGHT. |
| 15:09 | 5 | **MS. CRONIN:** ITEM 168 ON PAGE 0054, PLEASE, ERIC. |
| 15:09 | 6 | BY MS. CRONIN: |
| 15:09 | 7 | **Q.** THIS IS A BASEBALL CARD COLLECTION. THAT BASEBALL CARD |
| 15:09 | 8 | COLLECTION BELONGED TO YOUR SON, CORRECT? |
| 15:09 | 9 | **A.** YES, IT DID. |
| 15:09 | 10 | **MS. CRONIN:** ON THAT SAME PAGE, ERIC, IF YOU COULD GO |
| 15:09 | 11 | TO ITEM 175. |
| 15:09 | 12 | BY MS. CRONIN: |
| 15:09 | 13 | **Q.** THIS IS A BASEBALL SIGNED BY MICKEY MANTLE? |
| 15:10 | 14 | **A.** YES, IT WAS. |
| 15:10 | 15 | **Q.** THIS WAS ALSO OWNED BY YOUR SON; IS THAT CORRECT? |
| 15:10 | 16 | **A.** YES, IT WAS. |
| 15:10 | 17 | **MS. CRONIN:** ERIC, IF YOU COULD GO PLEASE, TO |
| 15:10 | 18 | PAGE 0046. |
| 15:10 | 19 | BY MS. CRONIN: |
| 15:10 | 20 | **Q.** ITEM 98 AND 99 ARE A SHOTGUN AND A HANDGUN, AND THEY ALSO |
| 15:10 | 21 | BELONGED TO YOUR SON, CORRECT? |
| 15:10 | 22 | **A.** THAT SEEMS ABOUT RIGHT. HE HAD A COUPLE GUNS. I DON'T |
| 15:10 | 23 | REMEMBER THE EXACT GUNS HE HAD UP THERE, BUT HE HAD A FEW. |
| 15:10 | 24 | **MS. CRONIN:** JUST ONE MORE ITEM, YOUR HONOR. |
| 15:10 | 25 | ON PAGE 51, ERIC, ITEM 213. |

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 15:10 | 1 | **BY MS. CRONIN:** |
| 15:10 | 2 | **Q.**   THIS IS 40 PAIRS OF MEN'S SHOES THAT YOU VALUED AT |
| 15:10 | 3 | APPROXIMATELY $3,200, AND THEY ALSO BELONGED TO YOUR SON? |
| 15:10 | 4 | **A.**   THAT WAS PROBABLY BOTH OF US. |
| 15:10 | 5 | **Q.**   DO YOU REMEMBER GIVING A DEPOSITION IN THIS CASE? |
| 15:10 | 6 | **A.**   I DON'T KNOW.  WE WAS IN THERE ABOUT EIGHT HOURS, SO I |
| 15:11 | 7 | DON'T KNOW. |
| 15:11 | 8 | **Q.**   DO YOU REMEMBER TESTIFYING AT YOUR DEPOSITION THAT THOSE |
| 15:11 | 9 | 40 PAIRS OF MEN'S SHOES BELONGED TO YOUR SON? |
| 15:11 | 10 | **A.**   HE HAS A SHOE FETISH, TRUST ME. |
| 15:11 | 11 | **Q.**   KENNETH JR. HAD ALREADY TURNED 18 BEFORE HURRICANE |
| 15:11 | 12 | KATRINA, CORRECT? |
| 15:11 | 13 | **A.**   MA'AM? |
| 15:11 | 14 | **Q.**   KENNETH JR. HAD ALREADY TURNED 18 BEFORE HURRICANE |
| 15:11 | 15 | KATRINA? |
| 15:11 | 16 | **A.**   HE WAS 22 YEARS OLD AT KATRINA.  THANK YOU. |
| 15:11 | 17 |         **MS. CRONIN:**  JUST A COUPLE MORE QUESTIONS, |
| 15:11 | 18 | YOUR HONOR. |
| 15:11 | 19 | **BY MS. CRONIN:** |
| 15:11 | 20 | **Q.**   MR. ARMSTRONG, YOU HAD A FLOOD INSURANCE POLICY WITH |
| 15:11 | 21 | ALLSTATE, ISN'T THAT CORRECT? |
| 15:11 | 22 | **A.**   THAT'S CORRECT. |
| 15:11 | 23 | **Q.**   YOU WERE PAID $42,100 FOR FLOOD DAMAGE TO YOUR HOUSE? |
| 15:11 | 24 |         **MR. ANDRY:**  OBJECT, YOUR HONOR, THAT'S A COLLATERAL |
| 15:11 | 25 | SOURCE. |

*HOURLY TRANSCRIPT*

KENNY ARMSTRONG - CROSS

15:11   1        **MS. CRONIN:**  MAY I FINISH MY --

15:11   2        **THE COURT:**  LET'S GET TO THE COLLATERAL SOURCE.  HE

15:11   3   IS OBJECTING TO THE WHOLE SUBJECT MATTER OF THE FLOOD INSURANCE

15:11   4   POLICY.  TELL ME WHY IT'S RELEVANT.

15:11   5        **MS. CRONIN:**  CERTAINLY, YOUR HONOR.  IT'S NOT FOR THE

15:11   6   PURPOSE OF OFFSETTING DAMAGES.  IT GOES TO SHOW THE FUNDS THEY

15:12   7   HAD AVAILABLE TO REBUILD THEIR HOUSE IF THEY CHOSE TO DO SO.

15:12   8        **THE COURT:**  THAT'S THE SAME REASON I'VE LET IT IN

15:12   9   BEFORE, RIGHT OR WRONG.  SO I WILL BE CONSISTENT AND LET IT IN.

15:12   10       **MR. ANDRY:**  THANK YOU, YOUR HONOR.

15:12   11  BY MS. CRONIN:

15:12   12  **Q.**  MR. ARMSTRONG, YOU WERE PAID $42,100 FOR FLOOD DAMAGE TO

15:12   13  YOUR HOUSE AND $14,300 FOR CONTENTS AFTER KATRINA; ISN'T THAT

15:12   14  CORRECT?

15:12   15  **A.**  I THINK IT WAS $11,000 WITH A $3,000 DEDUCTIBLE, AND THE

15:12   16  $42,000.  AND I HAD SIGNED A CHECK TO MY INSURANCE COMPANY

15:12   17  WHICH IN TURN PAID ALMOST $20,000 TO THE HOMEOWNER WHO OWNED

15:12   18  THE MORTGAGE ON MY HOME.

15:12   19       **MS. CRONIN:**  ERIC, COULD YOU PLEASE PUT UP DX-1777,

15:12   20  PAGES 33, 34, AND 35.

15:12   21  BY MS. CRONIN:

15:12   22  **Q.**  THAT FIRST PAGE, 33, IS THAT A CHECK MADE TO YOU,

15:12   23  MR. ARMSTRONG?

15:12   24  **A.**  YES, IT IS.

15:12   25  **Q.**  IS THAT FOR $3,000?

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 15:12 | 1 | **A.**   YES, IT IS. |
| 15:12 | 2 | **Q.**   IF YOU LOOK AT THE LOWER LEFT PART OF YOUR SCREEN, DO YOU |
| 15:12 | 3 | SEE IT SAYS *PARTIAL*? |
| 15:13 | 4 | **A.**   I GUESS THEY GIVE US BACK THE $3,000. |
| 15:13 | 5 | **MS. CRONIN:**  IF YOU COULD GO TO PAGE 34, PLEASE, |
| 15:13 | 6 | ERIC. |
| 15:13 | 7 | **BY MS. CRONIN:** |
| 15:13 | 8 | **Q.**   IS THIS ALSO A CHECK MADE TO YOU AND MRS. ARMSTRONG? |
| 15:13 | 9 | **A.**   THAT'S THE $14,000. |
| 15:13 | 10 | **THE COURT:**  DOES THAT ADD THE $11,300? |
| 15:13 | 11 | **MS. CRONIN:**  RIGHT. |
| 15:13 | 12 | **THE WITNESS:**  BECAUSE I HAVE THIS DOCUMENT THAT |
| 15:13 | 13 | SHOWED $11,300. |
| 15:13 | 14 | **MS. CRONIN:**  JUST ONE MORE PAGE, PLEASE, ERIC. |
| 15:13 | 15 | **BY MS. CRONIN:** |
| 15:13 | 16 | **Q.**   IS THAT A CHECK TO YOU AND MRS. ARMSTRONG FOR $42,100? |
| 15:13 | 17 | **THE COURT:**  AND WASHINGTON MUTUAL BANK. |
| 15:13 | 18 | **THE WITNESS:**  YEAH.  WE HAD TO SIGN IT AND GIVE IT |
| 15:13 | 19 | BACK TO THEM, AND THEY GAVE US BACK THE DIFFERENCE OF $22,000. |
| 15:13 | 20 | WE PAID OFF $19,000 AND SOMETHING.  WE HAD TO DO THAT. |
| 15:13 | 21 | **MS. CRONIN:**  ONE LAST DOCUMENT, ERIC, IF YOU COULD |
| 15:13 | 22 | PUT UP JX-1458. |
| 15:14 | 23 | **BY MS. CRONIN:** |
| 15:14 | 24 | **Q.**   MR. ARMSTRONG, IS THIS A LETTER ADDRESSED TO YOU FROM THE |
| 15:14 | 25 | ROAD HOME PROGRAM? |

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 15:14 | 1 | **A.**   LOOKS LIKE IT. |
| 15:14 | 2 | **Q.**   YOU CHOSE TO SELL YOUR HOME AND RELOCATE ELSEWHERE IN |
| 15:14 | 3 | LOUISIANA, CORRECT? |
| 15:14 | 4 | **A.**   CORRECT. |
| 15:14 | 5 | **MS. CRONIN:**  ERIC, IF YOU COULD PUT UP DX-1771, |
| 15:14 | 6 | PAGE 163. |
| 15:14 | 7 | BY MS. CRONIN: |
| 15:14 | 8 | **Q.**   MR. ARMSTRONG, AT THE BOTTOM RIGHT-HAND CORNER, IS THAT |
| 15:14 | 9 | YOUR SIGNATURE? |
| 15:14 | 10 | **A.**   CORRECT. |
| 15:14 | 11 | **Q.**   ABOVE THAT, IS THAT YOUR WIFE'S SIGNATURE? |
| 15:14 | 12 | **A.**   CORRECT. |
| 15:14 | 13 | **Q.**   THIS IS THE FINAL SETTLEMENT STATEMENT THAT SHOWED YOU |
| 15:14 | 14 | RECEIVED $75,370.89 FROM THE ROAD HOME PROGRAM, CORRECT? |
| 15:14 | 15 | **A.**   THAT'S CORRECT. |
| 15:14 | 16 | **MS. CRONIN:**  YOUR HONOR, I WOULD MOVE TO ADMIT THE |
| 15:14 | 17 | EXHIBITS THAT I HAVE USED.  SOME OF THE EXHIBITS ARE LARGE, SO |
| 15:14 | 18 | I WOULD ADMIT THE SPECIFIC PAGES.  I CAN PROVIDE THE CLERK WITH |
| 15:14 | 19 | A COPY OF THE -- SOME OF THEM WERE VERY LARGE EXHIBITS.  I'M |
| 15:15 | 20 | JUST TRYING TO ADMIT THE PAGES WE USED. |
| 15:15 | 21 | **MR. ANDRY:**  I WOULD ASK THAT ALL THE ADMITTED PAGES |
| 15:15 | 22 | THEY USED.  I DON'T KNOW WHAT EXHIBITS SHE SPEAKING OF, BEING |
| 15:15 | 23 | VOLUMINOUS.  TO THE EXTENT SHE HAS EXHIBITS SHE HASN'T USED |
| 15:15 | 24 | YET, I HAVEN'T SEEN THEM, SO I WOULD OBJECT. |
| 15:15 | 25 | **MS. CRONIN:**  IT ISN'T EXHIBITS I HAVEN'T USED YET. |

KENNY ARMSTRONG - CROSS

15:15    1           **MR. ANDRY:**  THE ONES YOU HAVE USED, JUST USE THE

15:15    2    PAGES.

15:15    3           **THE COURT:**  COUNSEL, YOU MIGHT ARTICULATE

15:15    4    SPECIFICALLY TO ME WHAT YOU INTEND TO INTRODUCE.

15:15    5           **MS. CRONIN:**  SURE.  NO PROBLEM.  I WOULD MOVE TO

15:15    6    ADMIT EXHIBIT 1447, 14 -- THESE ARE JX.  JX-1447, JX-1446,

15:15    7    JX-1454, JX-1455, JX-1456, JX-1431, JX-1457, JX-1429, JX-1605,

15:15    8    JX-1458.  AND THEN THE FOLLOWING ARE JUST PARTICULAR PAGES:

15:16    9    JX-1549, PAGES 78, 171, 234, 241.  DX-1777, PAGES 33, 34, 35.

15:16   10    AND DX-1771, PAGE 163.

15:16   11           **MR. ANDRY:**  YOUR HONOR, MY RESPONSE IS I HAVE NO IDEA

15:16   12    WHAT THOSE ARE.  WITH YOUR HONOR'S INDULGENCE -- AND I WILL

15:16   13    WORK WITH HER AND GO THROUGH AS MUCH AS I CAN.

15:16   14           **THE COURT:**  I THINK THAT'S A GREAT IDEA.

15:16   15           **MR. ANDRY:**  I WILL BE HAPPY TO DO THAT.  BUT AT THIS

15:16   16    POINT, JUST READING A LIST OF NUMBERS, I --

15:16   17           **THE COURT:**  WELL, I WILL DEFER RULING ON IT UNTIL YOU

15:16   18    HAVE VETTED THE SPECIFIC EXHIBITS.

15:16   19           **MR. ANDRY:**  YES, YOUR HONOR.  WE WILL BE HAPPY TO DO

15:16   20    THAT.

15:17   21           **THE COURT:**  HOLD ON JUST A SECOND.

15:17   22              ONE OF THE THINGS WE AGREED ON -- I HAVEN'T BEEN

15:17   23    PRIVY TO ALL YOU'VE DISCUSSED -- THAT WE WOULD ULTIMATELY HAVE

15:17   24    ONE LIST.  BUT THEN THAT MAKES IT DIFFICULT TO OBJECT TO WHAT'S

15:17   25    BEING DONE HERE.  WE THOUGHT WE HAD AN UNDERSTANDING THAT YOU

| | | |
|---|---|---|
| 15:17 | 1 | WOULD GET TOGETHER AND HAVE ONE LIST, YOU WOULD MOVE IT ALL IN. |
| 15:17 | 2 | WE WOULD HAVE A NEAT RECORD.  SO WE CAN KNOW WHAT SPECIFIC |
| 15:17 | 3 | EXHIBITS ARE LISTED. |
| 15:17 | 4 | **MR. TREEBY:**  IF YOUR HONOR PLEASE, I THINK, IN FACT, |
| 15:17 | 5 | THEY RESOLVED THE FINAL THREE OR FOUR PAGES.  AND EVERYTHING |
| 15:17 | 6 | THAT IS ON THE LIST THAT WASN'T OBJECTED TO, WHICH WE CALL THE |
| 15:17 | 7 | ZERO CATEGORY, THEY'RE IN EVIDENCE. |
| 15:17 | 8 | I THINK SOME OF THE DIFFICULTY IS JUST CAUSED |
| 15:17 | 9 | BECAUSE SOMETIMES COUNSEL DOESN'T -- IT'S A LONG LIST.  SO I |
| 15:17 | 10 | THINK THAT THOSE THAT ARE IN THAT ZERO CATEGORY ARE ADMITTED. |
| 15:18 | 11 | THE ONES THAT ARE IN THE 1 CATEGORY ARE CONDITIONALLY ADMITTED. |
| 15:18 | 12 | **MR. BRUNO:**  SURE. |
| 15:18 | 13 | **MR. TREEBY:**  IT'S ONLY THE ONES IN THE 2 CATEGORY |
| 15:18 | 14 | THAT REALLY ARE AT ISSUE. |
| 15:18 | 15 | **MR. BRUNO:**  RIGHT.  AND SO I THINK WE HAVE AGREED |
| 15:18 | 16 | THAT AT THE END OF THE DAY WE ARE STILL DOING THAT. |
| 15:18 | 17 | WHAT WE'LL BE MOVING INTO EVIDENCE ARE ONLY |
| 15:18 | 18 | THOSE EXHIBITS THAT COUNSEL REFERRED TO DURING THIS |
| 15:18 | 19 | EXAMINATION.  THAT WOULD BE CATEGORY 2 EXHIBITS.  BILL IS RIGHT |
| 15:18 | 20 | ON TARGET.  SO LET US WITHDRAW AND DEAL WITH THAT.  I DON'T |
| 15:18 | 21 | WANT TO TAKE YOUR TIME ON IT. |
| 15:18 | 22 | **MS. CRONIN:**  I WILL STATE BRIEFLY THAT THE EXHIBITS I |
| 15:18 | 23 | LISTED ARE IN FACT THE EXHIBITS THAT I USED.  ON PAPER SOME OF |
| 15:18 | 24 | THE HEARSAY OBJECTIONS WERE LODGED, WHICH I BELIEVE YOUR HONOR |
| 15:18 | 25 | HAS DEALT WITH IN HIS EXAMINATION.  SO THAT'S WHY I JUST WANTED |

KENNY ARMSTRONG - CROSS

| | | |
|---|---|---|
| 15:18 | 1 | TO MAKE IT CLEAR NOW. |
| 15:18 | 2 | **MR. ANDRY:** I'M NOT SAYING WE WON'T BE ABLE TO GET |
| 15:18 | 3 | THEM ALL DONE. I JUST HAVEN'T SEEN THE LIST. WHEN SHE SAID |
| 15:18 | 4 | THEY'RE VOLUMINOUS, THE STUFF SHE SHOWED. BUT WE WILL GO |
| 15:18 | 5 | THROUGH IT, YOUR HONOR. I WILL DO THE REDIRECT, AND THEN WE |
| 15:18 | 6 | WILL GO THROUGH IT. |
| 15:19 | 7 | **MR. MCCONNON:** THE UNITED STATES HAS NO OBJECTION TO |
| 15:19 | 8 | THE ADMISSION OF THESE EXHIBITS. |
| 15:19 | 9 | **THE COURT:** THANK YOU, COUNSEL. |
| 15:19 | 10 | **MS. CRONIN:** YOUR HONOR, I OMITTED ONE QUESTION I |
| 15:19 | 11 | NEED TO ASK MR. ARMSTRONG. |
| 15:19 | 12 | **THE COURT:** ALL RIGHT. |
| 15:19 | 13 | BY MS. CRONIN: |
| 15:19 | 14 | Q. MR. ARMSTRONG, DO YOU KNOW WHETHER THERE WAS A SUBROGATION |
| 15:19 | 15 | AGREEMENT IN YOUR AGREEMENT WITH THE ROAD HOME PROGRAM? |
| 15:19 | 16 | A. EXPLAIN THAT. |
| 15:19 | 17 | Q. I BELIEVE YOUR COUNSEL HAS MOVED TO ADMIT A DOCUMENT THAT |
| 15:19 | 18 | DEALS WITH THE SUBROGATION AGREEMENT FOR THE ROAD HOME PROGRAM. |
| 15:19 | 19 | SO I WOULD JUST LIKE TO CONFIRM SOME PIECE OF YOUR AGREEMENT. |
| 15:19 | 20 | **MS. CRONIN:** COULD YOU PUT IN DX -- |
| 15:19 | 21 | **THE COURT:** I THINK THE WORDS SUBROGATION *AGREEMENT* |
| 15:19 | 22 | WOULD BE DIFFICULT FOR ANY OF US THAT HAVEN'T BEEN TO LAW |
| 15:19 | 23 | SCHOOL AND MATRICULATED TO GIVE AN INCISIVE DEFINITION, |
| 15:19 | 24 | ESPECIALLY IN LOUISIANA. GO AHEAD. |
| 15:20 | 25 | **MS. CRONIN:** YES, YOUR HONOR. |

KENNY ARMSTRONG - CROSS

15:20    1    BY MS. CRONIN:

15:20    2    Q.   YOU HAVE AN AGREEMENT THAT YOU HAVE TO RETURN SOME FUNDS

15:20    3    THAT YOU OBTAINED FROM THE ROAD HOME PROGRAM?

15:20    4    A.   DO I HAVE TO RETURN ANYTHING?  NO, NOT AS LONG AS I STAY

15:20    5    IN THE STATE OF LOUISIANA.

15:20    6              MR. BRUNO:  YOUR HONOR, I HATE TO INTERRUPT, BUT YOU

15:20    7    ASKED ME TO MAKE THAT INQUIRY.

15:20    8              THE COURT:  I DID.

15:20    9              MR. BRUNO:  I HAVE THE ANSWER.  IT'S NOT WITHIN THE

15:20   10    KNOWLEDGE OF THIS WITNESS, WITH ALL DUE RESPECT.  I'M

15:20   11    NEGOTIATING WITH THE UNITED STATES OF AMERICA AS TO HOW TO

15:20   12    PRESENT THIS TO YOU, BUT I DON'T THINK IT'S APPROPRIATE TO ASK

15:20   13    THIS WITNESS.  HE IS NOT A LAWYER.  HE IS NOT THE JUDGE.  YOU

15:20   14    ARE.  I NEED NOT REMIND YOU OF THAT.

15:20   15              MS. CRONIN:  YOUR HONOR, MAY I ASK THE WITNESS TO

15:20   16    IDENTIFY A DOCUMENT HE HAS SIGNED?

15:20   17              MR. BRUNO:  WE ARE MOVING THOSE IN TOO.  I HAVE THE

15:20   18    ORIGINALS FROM THE STATE.  THIS IS THE --

15:20   19              MR. ANDRY:  YOUR HONOR, THE PROBLEM I HAVE WITH IT

15:20   20    IS, WITH THIS WITNESS, HE IS NOT A LAWYER AND HE IS BEING ASKED

15:20   21    TO DO STUFF.  HE GETS FEELINGS ASSOCIATED WITH THAT THAT HE

15:21   22    SHOULDN'T BE GETTING BECAUSE HE IS BEING ASKED TO DO SOMETHING

15:21   23    HE CAN'T DO.

15:21   24              THE COURT:  WE ARE NOT ASKING ALCHEMY HERE.  THE

15:21   25    QUESTION THE COURT HAS, ONE, HIS HOME WAS TRANSFERRED TO THE

KENNY ARMSTRONG - CROSS

15:21 1 STATE OF LOUISIANA, SO THAT'S -- LET ME JUST SAY THIS.  I AM

15:21 2 CERTAINLY NOT GOING TO REGARD THAT AS A QUID PRO QUO.

15:21 3                AS TO THE INSURANCE PROCEEDS, I AM INTERESTED IN

15:21 4 THE -- AS TO ANY OTHER THING HE RECEIVED FROM THE ROAD HOME.

15:21 5 OTHER THAN THAT, IS THERE ANY KIND OF AGREEMENT OR ASSIGNMENT,

15:21 6 ETC.?  I WOULD ASK THAT.

15:21 7           **MR. BRUNO:**  AND I HAVE AN ANSWER, BUT BEFORE I GIVE

15:21 8 IT TO YOU, I WAS GOING TO --

15:21 9           **THE COURT:**  DO THESE THINGS NEED TO BE VERIFIED BY

15:21 10 THE PARTIES, BY ANYBODY WHO SIGNED AN INDIVIDUAL SIGNATURE?

15:21 11           **MR. BRUNO:**  NO.  IN FACT, WHAT THEY HAVE ATTACHED IS

15:21 12 THE ORIGINAL ROAD HOME LIMITED SUBROGATION ASSIGNMENT

15:21 13 AGREEMENT, WHICH YOU HAVE ALREADY SEEN AND WHICH WE WILL BE --

15:21 14 PURSUANT TO YOUR ADMONISHMENT EARLY IN THE TRIAL, WE WILL MOVE

15:22 15 INTO EVIDENCE.  BUT IT'S ALL HERE.

15:22 16           **THE COURT:**  THE QUESTION IS, DID THE PLAINTIFFS HERE

15:22 17 EXECUTE SUCH AN AGREEMENT?

15:22 18           **MR. BRUNO:**  YES.  EACH OF THEM.

15:22 19           **MR. TREEBY:**  THERE'S A STIPULATION THAT THIS WAS -- I

15:22 20 THINK THAT'S ALL YOU ARE TRYING TO GET, IS THE SIGNATURE,

15:22 21 RIGHT?

15:22 22           **MR. BRUNO:**  AND WE AGREED --

15:22 23           **MS. CRONIN:**  YES, YOUR HONOR, JUST TO GET HIM TO

15:22 24 IDENTIFY THE DOCUMENT.

15:22 25           **MR. BRUNO:**  THE QUESTION WAS, DO YOU OWE ANYBODY ANY

**KENNY ARMSTRONG - CROSS**

15:22    1    MONEY?  THAT'S NOT FAIR.  WE ARE STIPULATING IT'S HERE.  I JUST

15:22    2    HAVE TO TALK TO ROBIN.

15:22    3              **THE COURT:**  I'M NOT GOING TO ASK HIM TO CHARACTERIZE

15:22    4    THE TERMS OF THE ROAD HOME AGREEMENT.  WE ARE NOT GOING TO DO

15:22    5    THAT OR EXPLAIN IT.  I AM INTERESTED IF THE ARMSTRONGS SIGNED

15:22    6    AN ASSIGNMENT.

15:22    7              **MS. CRONIN:**  YOUR HONOR, IF I MAY, IF WE COULD PUT UP

15:22    8    EXHIBIT DX-1771, PAGE 169 AND 170.

15:23    9    BY MS. CRONIN:

15:23   10    **Q.**  MR. ARMSTRONG, ERIC WILL BLOW IT UP FOR YOU.  CAN YOU JUST

15:23   11    VERIFY WHETHER OR NOT THIS IS YOUR SIGNATURE ON THE TOP

15:23   12    RIGHT-HAND SIDE OF THIS PAGE?

15:23   13    **A.**  YES, IT IS.

15:23   14              **MS. CRONIN:**  THANK YOU.

15:23   15              I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

15:23   16              **THE COURT:**  THAT WASN'T SO HARD.  WE MAYBE ALL OUGHT

15:23   17    TO COMMUNICATE A LITTLE BETTER SO WE WON'T HAVE A SKIRMISH WHEN

15:23   18    NONE IS NEEDED.  THE COURT WILL TAKE SOME DEGREE OF COMPARATIVE

15:23   19    NEGLIGENCE IN THAT AS WELL.  I WON'T ALLOCATE IT SINCE I MAY BE

15:23   20    THE MAJORITY OF THE LIABILITY.

15:23   21              **MR. ANDRY:**  MAY I DO REDIRECT, YOUR HONOR, BRIEFLY?

15:23   22              **THE COURT:**  SURE.

15:23   23              **MR. MCCONNON:**  YOUR HONOR, THE UNITED STATES HAS NO

15:23   24    QUESTIONS FOR THIS WITNESS.

15:23   25              **THE COURT:**  EXCUSE ME, SIR, FOR NOT ASKING.  SOMEHOW

**KENNY ARMSTRONG - CROSS**

| | | |
|---|---|---|
| 15:23 | 1 | THIS DAMAGE TESTIMONY PUTS ME INTO -- I ACTUALLY LIKE THE |
| 15:23 | 2 | EXPERT TESTIMONY MORE.  BUT I AM PAYING ATTENTION.  GO AHEAD. |
| 15:24 | 3 | REDIRECT EXAMINATION |
| 15:24 | 4 | BY MR. ANDRY: |
| 15:24 | 5 | Q.   MR. ARMSTRONG, DID YOU TESTIFY EARLIER THAT YOU WERE TOLD |
| 15:24 | 6 | BY ROAD HOME THAT IT WOULD COST APPROXIMATELY $289,000 TO |
| 15:24 | 7 | REBUILD YOUR HOUSE? |
| 15:24 | 8 | A.   THAT'S ONE OF THE DOCUMENTS THAT I HAVE -- WE RECEIVED A |
| 15:24 | 9 | PACKET FROM THEM.  AND IN ONE OF THE DOCUMENTS IT SAYS ABOUT |
| 15:24 | 10 | $279,000 AND SOMETHING.  SO 280, ROUNDED UP. |
| 15:24 | 11 | Q.   YOU ALSO TESTIFIED THAT YOU NEVER HAD A CONTRACTOR TELL |
| 15:24 | 12 | YOU ABOUT THE ENTIRE VALUE OF YOUR HOUSE, TO REBUILD THE HOUSE |
| 15:24 | 13 | ON HAMLET PLACE; IS THAT RIGHT? |
| 15:24 | 14 | A.   I NEVER HAD, NO. |
| 15:24 | 15 | Q.   SO THE ONLY EVIDENCE, THAT YOU KNOW OF, THAT IT WOULD COST |
| 15:24 | 16 | $279,000 TO REBUILD YOUR HOUSE AND PUT IT BACK IN THE CONDITION |
| 15:24 | 17 | SO YOU COULD LIVE IN IT AGAIN; IS THAT RIGHT? |
| 15:24 | 18 | A.   I KNEW IT WOULD COST A LOT MORE THAN IT WAS WORTH. |
| 15:24 | 19 | Q.   WE ALSO HAD TESTIMONY ABOUT YOU GETTING A CHECK FOR 42,000 |
| 15:24 | 20 | AND A CHECK FOR $30,000 AND SOME OTHER CHECKS.  DID YOU AT ANY |
| 15:24 | 21 | TIME EVER RECEIVE $279,000 IN CHECKS FROM ANY INSURANCE |
| 15:24 | 22 | COMPANY? |
| 15:24 | 23 | A.   NO, I DIDN'T. |
| 15:24 | 24 | Q.   AT ANY TIME, THEN, DID YOU -- THOSE WERE YEARS AFTER, |
| 15:25 | 25 | RIGHT, THAT WASN'T RIGHT AFTER THE STORM THAT YOU RECEIVED |

**KENNY ARMSTRONG - REDIRECT**

15:25   1   THOSE CHECKS?  RIGHT?

15:25   2   **A.**   NO.  I RECEIVED THE ALLSTATE, I THINK, FAIRLY SOON AND

15:25   3   THEN THE $35,000 WAS IN LATE JULY AND THE $16,000 AND SOMETHING

15:25   4   WAS 2007, IF I'M NOT MISTAKEN.

15:25   5   **Q.**   SO THAT WAS TWO YEARS AFTER?

15:25   6   **A.**   RIGHT.

15:25   7   **Q.**   THE LATE JULY, YOU WEREN'T TALKING ABOUT LATE JULY 2005;

15:25   8   YOU WERE TALKING ABOUT LATE JULY 2006, RIGHT?

15:25   9   **A.**   CORRECT.

15:25   10   **Q.**   SO YOU RECEIVED A PAYMENT -- AND YOU HAD TO GO FOR A WHOLE

15:25   11   YEAR WITH YOU BEING THE SOLE BREADWINNER, WITH YOUR WIFE NOT

15:25   12   WORKING, AND BEING ILL; IS THAT RIGHT?

15:25   13   **A.**   THAT'S CORRECT.

15:25   14   **Q.**   SO THE MONEY THAT YOU RECEIVED, THIS FOUND WEALTH, PAYING

15:25   15   YOU BACK FOR YOUR HOUSE, THAT WAS A YEAR LATER, RIGHT?

15:25   16   **A.**   RIGHT.

15:25   17   **Q.**   THE OTHER CHECKS WERE SUBSEQUENT TO THAT, RIGHT?

15:25   18   **A.**   THAT'S CORRECT.

15:25   19   **Q.**   SHE ALSO SAID THAT YOU DECIDED TO MOVE OUT OF YOUR HOUSE

15:25   20   ON HAMLET PLACE.  TO MOVE TO HIGHER GROUND, I THINK, IS THE

15:25   21   PHRASE SHE USED.

15:25   22   **A.**   THAT'S CORRECT.

15:26   23   **Q.**   COULD YOU TELL THE COURT HOW FAR YOUR NEW-FOUND HIGHER

15:26   24   GROUND IS FROM THE HOUSE YOU LIVED IN BEFORE?

15:26   25   **A.**   4 MILES, 4 1/2 MILES.

KENNY ARMSTRONG - REDIRECT

| | | |
|---|---|---|
| 15:26 | 1 | **Q.** IS THAT IN CHALMETTE ALSO? |
| 15:26 | 2 | **A.** IT'S RIGHT OUTSIDE OF CHALMETTE, IN MERAUX, LOUISIANA. |
| 15:26 | 3 | **Q.** AFTER KATRINA -- IS IT THE SAME NEIGHBORHOOD, SAME PLACE, |
| 15:26 | 4 | SAME PLACE WHERE YOU GREW UP, JUST A LITTLE DIFFERENT ADDRESS? |
| 15:26 | 5 | **A.** PRETTY MUCH.  I KNOW 90 PERCENT OF THE PEOPLE IN THERE. |
| 15:26 | 6 | ABOUT 90 PERCENT OF THE PEOPLE IN THERE, WE KNOW THEM. |
| 15:26 | 7 | **Q.** BUT YOU MOVED TO THE SAME ZIP CODE, JUST CLOSER TO THE |
| 15:26 | 8 | RIVER WHERE IT'S HIGHER, RIGHT? |
| 15:26 | 9 | **A.** DIFFERENT ZIP CODE, BUT IT'S RIGHT THERE. |
| 15:26 | 10 | **Q.** LET ME ASK YOU, MR. ARMSTRONG, DID YOU HAVE THE FINANCIAL |
| 15:26 | 11 | ABILITY TO MOVE BACK INTO THAT HOUSE ON HAMLET PLACE? |
| 15:26 | 12 | **A.** NOT $280,000. |
| 15:26 | 13 | **Q.** DID YOU HAVE ANY MONEY THAT YOU COULD DEVOTE TO REBUILDING |
| 15:26 | 14 | THAT HOUSE WHILE YOU ARE TAKING CARE OF YOUR FAMILY, PAYING FOR |
| 15:27 | 15 | YOUR STUFF, AND YOUR WIFE'S ILLNESS, ETC.?  DID YOU HAVE THE |
| 15:27 | 16 | ABILITY TO BUILD THAT BACK? |
| 15:27 | 17 | **A.** IT WOULD HAVE BEEN DIFFICULT. |
| 15:27 | 18 | **Q.** WOULD IT HAVE BEEN POSSIBLE? |
| 15:27 | 19 | **A.** IF I HAD USED MY RETIREMENT, MAYBE, BUT THAT'S ABOUT IT. |
| 15:27 | 20 | **Q.** THE OTHER QUESTION IS, GIVEN YOUR WIFE'S HEALTH AND THOSE |
| 15:27 | 21 | CONSIDERATIONS AND THE CONSIDERATION OF THE NEIGHBORHOOD BEING |
| 15:27 | 22 | GONE, WOULD YOU HAVE EVER MOVED BACK THERE EVEN IF YOU HAD THE |
| 15:27 | 23 | FINANCIAL CAPACITY TO DO SO? |
| 15:27 | 24 | **A.** NO, NO.  THE ONLY REASON WE BOUGHT BACK WHERE WE WERE -- |
| 15:27 | 25 | I THINK IT'S 119 HOMES IN THE NEIGHBORHOOD I'M IN, AND THERE'S |

## KENNY ARMSTRONG - REDIRECT

15:27  1  114 HOMES THAT ARE BACK.  THERE'S ONLY ONE HOUSE THAT'S NOT

15:27  2  BACK.  THAT'S ACROSS THE STREET FROM ME -- WHERE NOBODY LIVES

15:27  3  IN IT, AND THERE'S THREE HOUSES THAT WERE TORE DOWN DUE TO A

15:27  4  TORNADO HITTING IT.

15:27  5          **MR. ANDRY:**  I HAVE NO OTHER QUESTIONS.  THANK YOU.

15:27  6          **THE COURT:**  WE THANK YOU, SIR.  WE KNOW HOW DIFFICULT

15:27  7  IT IS TO RELIVE THE SCARS OF KATRINA.

15:27  8          **THE WITNESS:**  NO.  WE ARE GOOD.

15:27  9          **THE COURT:**  THANK YOU.  EVEN THOSE OF US WHO DIDN'T

15:28  10  FLOOD HAVE A FEW SCARS; EVEN SOME OF THOSE FROM OUT OF STATE

15:28  11  HAVE GOTTEN SCARS AS A RESULT.

15:28  12          ANYWAY, WITH THAT, WE WILL TAKE A RECESS.  AS I

15:28  13  UNDERSTAND IT -- WHAT'S NEXT?

15:28  14          **MR. BRUNO:**  WHAT IS NEXT IS WHAT WE CALL CLEANUP.  WE

15:28  15  HAVE DOCUMENTS --

15:28  16          **THE COURT:**  SHOULD WE TAKE A LITTLE LONGER BREAK SO

15:28  17  THE CLEANUP MIGHT BE A LITTLE LESS CONTENTIOUS?

15:28  18          **MR. BRUNO:**  WE HAVE TRIED AND WE KNOW WHERE WE ARE

15:28  19  WITH REGARD TO -- WE WILL TAKE 20 MINUTES.

15:28  20          **MR. TREEBY:**  ACTUALLY, YOU DON'T, BUT THAT'S OKAY.

15:28  21          **MR. BRUNO:**  FINE.  SO WE WILL TAKE 30 MINUTES.

15:28  22          **MR. TREEBY:**  WE CAN WORK SOME OF OUR DIFFERENCES OUT,

15:28  23  I THINK -- WE'LL SEE.  BUT SOME OF THEM WE WON'T BE ABLE TO

15:28  24  WORK OUT.  WE'LL PRESENT THOSE IN A VERY UNCONTENTIOUS --

15:28  25          **THE COURT:**  YOU CAN BE A BIT CONTENTIOUS.  THAT IS

| | | |
|---|---|---|
| 15:28 | 1 | PART OF YOUR JOB.  I REALIZE THAT.  HOW LONG WOULD YOU THINK |
| 15:28 | 2 | YOU WOULD NEED A RECESS? |
| 15:29 | 3 | **MR. BRUNO:**  30 MINUTES TOPS. |
| 15:29 | 4 | **THE COURT:**  THAT'S WHAT WE WILL DO, A 30-MINUTE |
| 15:29 | 5 | RECESS.  THANK YOU. |
| 15:29 | 6 | (RECESS.) |
| 16:08 | 7 | **MR. ANDRY:**  WE HAVE MET, AND WE HAVE GOT AN AGREEMENT |
| 16:09 | 8 | ON HER EXHIBITS THAT SHE WILL TELL YOU, AND THEN WE WILL GO ON. |
| 16:09 | 9 | **MS. CRONIN:**  NOTWITHSTANDING IN LIGHT OF THE |
| 16:09 | 10 | OBJECTIONS LODGED AND YOUR HONOR'S RULINGS, MR. ANDRY AND I |
| 16:09 | 11 | HAVE AGREED TO ADMIT THOSE EXHIBITS WITH TWO EXCEPTIONS. |
| 16:09 | 12 | I ERRONEOUSLY MENTIONED JX-1455, WHICH I DID NOT |
| 16:09 | 13 | USE; AND THEN PAGE 171 OF JX-1549 WAS A DUPLICATE. |
| 16:09 | 14 | **THE COURT:**  ALL THOSE YOU HAD LISTED PREVIOUSLY |
| 16:09 | 15 | EXCEPT FOR THOSE TWO? |
| 16:09 | 16 | **MS. CRONIN:**  YES, SIR. |
| 16:09 | 17 | **MR. ANDRY:**  WE AGREE TO THE LIST, BUT WITHOUT WAIVING |
| 16:09 | 18 | ANY OBJECTIONS WE MAY LODGE TO THOSE EXHIBITS.  BUT THE OTHERS, |
| 16:09 | 19 | SHE IS CORRECT. |
| 16:09 | 20 | THIS IS THE OTHER COPY.  I GAVE ONE COPY TO |
| 16:09 | 21 | Y'ALL OF THE VIDEO.  THIS IS THE OTHER EXTRA COPY THAT I'M |
| 16:09 | 22 | GOING TO PROVIDE TO Y'ALL, AND THAT WILL CONCLUDE THE MATTERS |
| 16:09 | 23 | ASSOCIATED WITH THE ARMSTRONGS. |
| 16:09 | 24 | **THE COURT:**  THANK YOU, COUNSEL. |
| 16:09 | 25 | **MR. BRUNO:**  YOUR HONOR, FIRST, THE GOVERNMENT HAS |

16:10    1    KINDLY AGREED TO STIPULATE THAT IF MR. DAN REES WERE TO COME

16:10    2    INTO THE COURTROOM AND TESTIFY, HE WOULD TESTIFY SUBSTANTIALLY

16:10    3    IN ACCORD WITH THIS LETTER WITH THE ATTACHMENTS WHICH I POSED,

16:10    4    YOU WILL SEE WHEN YOU READ IT, AS A QUESTION FROM YOUR HONOR

16:10    5    DIRECTED TO HIM.

16:10    6             IT IS A LETTER DATED SEPTEMBER 20, AND I TOOK

16:10    7    THE LIBERTY OF SUGGESTING THAT HE ASSUME A JUDGMENT IN THE

16:10    8    AMOUNT OF $100,000 FOR HOME DAMAGE.  AND THEN I ASKED HIM TO

16:10    9    CALCULATE THE PAYMENT BACK TO THE ROAD HOME USING THAT NUMBER.

16:10   10    I FIGURED THAT WOULD MAYBE MAKE SOME SENSE FOR YOU.  I HOPE SO.

16:10   11             AND IN ADDITION, ATTACHED TO THIS SEPTEMBER 20

16:10   12    LETTER IS A COPY OF THE ROAD HOME ASSIGNMENT EXECUTED BY ALL OF

16:10   13    THE PLAINTIFFS.

16:10   14             AND I WILL BEG THE FORGIVENESS OF JANET RIGHT

16:11   15    NOW BECAUSE IT DOESN'T HAVE ANY NUMBER ON IT, SO I'M GOING TO

16:11   16    CALL IT STATE OF LOUISIANA, SO IT'S UNIQUE, 1.

16:11   17             AND I HAVE A COPY FOR -- I HAVE TWO COPIES FOR

16:11   18    YOU.

16:11   19         **THE COURT:**  ANY OBJECTION?  I HEARD THE

16:11   20    UNITED STATES, BUT -- YES, SIR.

16:11   21         **MR. MCCONNON:**  YOUR HONOR, I JUST NOTE ONE THING.

16:11   22         **THE COURT:**  SURE.

16:11   23         **MR. MCCONNON:**  MR. WASHINGTON, OF COURSE, IS NOT ON

16:11   24    THE LIST BECAUSE HE'S ON OPTION 1 ON THE ROAD HOME PROGRAM;

16:11   25    WHEREAS THIS LETTER ADDRESSES OPTIONS 2 AND 3, SO THERE'S NOT A

| 16:11 | 1 | SUBROGATION AGREEMENT WITH MR. WASHINGTON. |

**THE COURT:**  THERE'S NO SUBROGATION -- MAY I REPEAT
WHAT YOU SAID, COUNSEL?

THERE'S NO SUBROGATION AGREEMENT FROM
MR. WASHINGTON; IS THAT CORRECT?

**MR. BRUNO:**  THAT'S CORRECT, YOUR HONOR.

**MR. TREEBY:**  OBJECTION.

**THE COURT:**  THANK YOU, MR. TREEBY.  I THANK COUNSEL
FOR THAT COOPERATION.  I APPRECIATE IT.

**MR. BRUNO:**  THAT LEAVES ME WITH SOME -- THANK YOU FOR
REMINDING ME OF THAT -- WE NEED TO ADD THE WASHINGTON LIMITED
SUBROGATION AGREEMENT, PLEASE, BEFORE WE ARE DONE.

THE NEXT ITEM OF BUSINESS, JUDGE, IS WE WOULD
MOVE INTO EVIDENCE PX-4751-001 *IN SERIATIM* TO -- IT'S AN
*IN GLOBO* EXHIBIT -- IT IS MULTIPLE PAGES.  THE TOP PAGE --

DO WE HAVE THIS ON THE ELMO?

HERE IT IS, JUDGE.

THE FIRST DOCUMENT IS A CERTIFICATION OF RECORDS
BY THE SEWERAGE AND WATER BOARD, AND THE DOCUMENT CONSISTS OF
SEVERAL PAGES OF A NOTEBOOK DATED 1976.  WHAT THIS DOES IS, IT
SHOWS THE DEPTH OF THE SEWER LINE THAT WE HAD SOME TESTIMONY
FROM DR. BEA ABOUT.

IN CONJUNCTION WITH THAT, WE HAVE AGREED WITH
MR. TREEBY THAT HE -- WE WILL HAVE NO OBJECTION TO AN EXHIBIT
FROM THE CONTRACTOR WHO ACTUALLY INSTALLED THE LINE, WHICH

| | | |
|---|---|---|
| 16:13 | 1 | HAPPENS TO BE URS. |
| 16:13 | 2 | MR. TREEBY:  ACTUALLY, NOT FROM THE CONTRACTOR. |
| 16:13 | 3 | BUT GO AHEAD. |
| 16:13 | 4 | MR. BRUNO:  I'M SORRY.  URS, WHO DID SOME OF THE |
| 16:13 | 5 | WORK. |
| 16:13 | 6 | DID YOU WANT TO COMMENT ON THAT? |
| 16:13 | 7 | MR. TREEBY:  YES. |
| 16:13 | 8 | YOUR HONOR, WE WERE PRESENTED A FEW DAYS AGO |
| 16:13 | 9 | NOW, TWO OR THREE DAYS AGO, WITH THESE FIELD NOTES FROM A MAN |
| 16:13 | 10 | NAMED GEORGE MYERS WHO ACTUALLY, INTERESTINGLY, STILL WORKS FOR |
| 16:13 | 11 | THE SEWERAGE AND WATER BOARD.  WE BEGAN TRYING TO UNDERSTAND |
| 16:13 | 12 | THEM AND INTERPRET THEM -- TRYING TO UNDERSTAND THEM AND |
| 16:13 | 13 | INTERPRET THEM. |
| 16:13 | 14 | AND WE WENT BACK, AND WE -- I THINK THEY -- WE |
| 16:13 | 15 | DISCOVERED OR OUR EXPERTS DISCOVERED IN WASHINGTON, DC THAT |
| 16:13 | 16 | THEY HAVE THE ACTUAL AS-BUILT DRAWINGS FROM THE -- THAT WERE -- |
| 16:13 | 17 | URS HAPPENED TO BE THE CONTRACTOR BACK IN 1976.  BUT MORE |
| 16:14 | 18 | IMPORTANTLY, THESE WERE STAMPED BY THE STATE OF LOUISIANA AND |
| 16:14 | 19 | CERTIFIED AND EVERYTHING SO WE COULD HAVE AN AS-BUILT PICTURE |
| 16:14 | 20 | OF THE WHOLE SEWER SYSTEM IN THE EAST BANK INDUSTRIAL AREA. |
| 16:14 | 21 | AND SO IT CONSISTS OF -- THE MOST IMPORTANT |
| 16:14 | 22 | PAGES CONSISTS OF TWO, AND THEN THERE ARE THE OTHER PAGES THAT |
| 16:14 | 23 | HAVE ELECTRICAL AND EVERYTHING ELSE. |
| 16:14 | 24 | WE WILL SUBMIT THESE AFTER WE GET THEM BRANDED |
| 16:14 | 25 | AND PROPERLY BLOWN UP AND WE HAVE GIVEN COPIES TO COUNSEL. |

16:14   1   AFTER WE GET THEM BRANDED AND BLOWN UP, WE WILL BE SUBMITTING

16:14   2   THEM WITH NO OBJECTION AS AN ADDITIONAL EXHIBIT --

16:14   3           **THE COURT:**  I UNDERSTAND.

16:14   4           **MR. TREEBY:**  -- TO THE LISTS THAT WE HAVE ALREADY.

16:14   5           AND SO WITH THAT AGREEMENT, WE ARE WITHDRAWING

16:14   6   OUR OBJECTION TO THE LATE ADDITION OF THESE FIELD NOTES.

16:14   7           **THE COURT:**  THANK YOU.

16:14   8           **MR. TREEBY:**  THE ONLY OTHER ADDITIONAL FEATURE IS IN

16:14   9   PART OF OUR EFFORT TO TRY TO MAKE SURE WE ALL UNDERSTAND THIS,

16:14  10   DR. SILVA MET WITH MR. MYERS TODAY.  AND COUNSEL HAS AGREED

16:14  11   THAT HE CAN TESTIFY ABOUT THAT, EVEN THOUGH IT'S NOT IN HIS

16:15  12   EXPERT REPORT, ABOUT THAT ADDITIONAL SUPPORT FOR WHAT HE WILL

16:15  13   HAVE TO ADD TO HIS FIGURES THAT WERE IN HIS REPORT ABOUT THE

16:15  14   SEWER SYSTEM THAT WERE RECEIVED AFTER THE EXPERT REPORTS WERE

16:15  15   FILED.

16:15  16           AND WE HAVE AGREEMENT ABOUT ALL THAT.  AND SO

16:15  17   WE, I THINK, REACHED AGREEMENT ON ALL THAT.

16:15  18           AND THEN WE COME TO THE ISSUE THAT WE DON'T HAVE

16:15  19   AGREEMENT ABOUT.

16:15  20           **THE COURT:**  WHAT ABOUT THE EXHIBITS, THOUGH, THE

16:15  21   MASTER LIST?  ARE WE GOING TO BE MOVING THOSE IN?

16:15  22           **MR. BRUNO:**  YES, JUDGE.  YES.  YES.  YES.

16:15  23           **THE COURT:**  TAKE THEM UP HOW YOU WANT TO.  I JUST WAS

16:15  24   CURIOUS ABOUT THE MACRO REASON.

16:15  25           **MR. BRUNO:**  WELL, FIRST, YOUR HONOR, I DIDN'T KNOW

| | | |
|---|---|---|
| 16:15 | 1 | THAT THE RECORD INDICATED, BUT DID YOU RECEIVE THE STATE OF |
| 16:15 | 2 | LOUISIANA DOCUMENT? |
| 16:15 | 3 | **THE COURT:**  I MOVED IT INTO EVIDENCE. |
| 16:15 | 4 | LET IT BE FILED WITHOUT OBJECTION. |
| 16:15 | 5 | **MR. BRUNO:**  IN FACT, CLIFFORD WASHINGTON'S SIGNED |
| 16:15 | 6 | SUBROGATION AGREEMENT IS ATTACHED, EVEN THOUGH IT'S NOT A 1 OR |
| 16:16 | 7 | 2 OR 3.  SO YOU HAVE THEM ALL HERE. |
| 16:16 | 8 | **THE COURT:**  ALL RIGHT. |
| 16:16 | 9 | **MR. BRUNO:**  AND THE SECOND THING IS:  I DON'T KNOW |
| 16:16 | 10 | THAT I HEARD THE SEWERAGE AND WATER BOARD PX-4751-1001, WHICH |
| 16:16 | 11 | IS *IN GLOBO* AND CONSISTS OF SIX PAGES.  I DON'T KNOW -- |
| 16:16 | 12 | **THE COURT:**  YOU'RE MOVING IT? |
| 16:16 | 13 | **MR. BRUNO:**  I MOVED IT INTO EVIDENCE. |
| 16:16 | 14 | **THE COURT:**  IT'S LABELED? |
| 16:16 | 15 | **MR. SMITH:**  NO OBJECTION. |
| 16:16 | 16 | **THE COURT:**  IT'S LABELED? |
| 16:16 | 17 | **MR. BRUNO:**  PX-4751-0001.  I COUNTED THE NUMBER OF |
| 16:16 | 18 | PAGES. |
| 16:16 | 19 | **THE COURT:**  BASED ON THE UNDERSTANDING AS ARTICULATED |
| 16:16 | 20 | BY MESSRS. BRUNO AND TREEBY AND BY VIRTUE OF THE OTHER EXHIBIT |
| 16:16 | 21 | THAT'S GOING TO COME IN WITHOUT OBJECTION THAT MR. TREEBY WILL |
| 16:16 | 22 | INTRODUCE AT THE APPROPRIATE TIME, LET THEM BE ADMITTED. |
| 16:16 | 23 | **MR. BRUNO:**  SCOTT JOANEN, JUDGE, IS GOING TO MOVE IN |
| 16:16 | 24 | THE EXHIBIT LIST SO HE CAN EXPLAIN TO YOU WHAT WE HAVE DONE |
| 16:17 | 25 | WITH THAT. |

16:17  1             **MR. JOANEN:**  GOOD AFTERNOON, YOUR HONOR.

16:17  2                     THE PARTIES HAVE WORKED TOGETHER TO DEVELOP A

16:17  3     MASTER EXHIBIT LIST, AND WE HAVE HAD IT SPREAD OUT IN A

16:17  4     SPREADSHEET FASHION.

16:17  5                     A NUMBER OF EXHIBITS HAVE NO OBJECTIONS, AND THE

16:17  6     PLAINTIFFS ARE GOING TO OFFER THOSE INTO EVIDENCE WITH NO

16:17  7     OBJECTION.

16:17  8                     A NUMBER OF EXHIBITS ALSO HAVE AN OBJECTION TO

16:17  9     CONDITIONAL RELEVANCE, AND WE WILL OFFER THOSE INTO EVIDENCE

16:17  10    PURSUANT TO THE AGREEMENTS WE HAVE WITH THE PARTIES.

16:17  11                    THEN THERE'S ALSO THE FINAL CHARACTERIZATION OF

16:17  12    IT WHICH WOULD BE UNDER AN OBJECTION 2, WHICH IS THE HEARSAY OR

16:17  13    LEARNED TREATISES DOCUMENTS, WHICH WOULD NECESSARILY BE

16:17  14    ADDRESSED THROUGH THE PRESENTATION OF THE TESTIMONY AND MAYBE

16:17  15    SOME POST-TRIAL BRIEFING AS TO WHETHER IT SHOULD BE DEEMED

16:17  16    ADMITTED.

16:17  17                    YOU CAN SEE, YOUR HONOR, IT'S FAIRLY THICK.  I

16:17  18    WOULD PREFER NOT TO HAVE TO READ IT INTO THE RECORD.  I HAVE AN

16:17  19    EXTRA COPY.  I CAN PROVIDE ONE OR TWO.

16:17  20             **THE COURT:**  IS THERE A LIST THAT SETS FORTH ALL OF

16:17  21    THE EXHIBIT NUMBERS?

16:17  22             **MR. JOANEN:**  YES.  IT'S BROKEN DOWN WITH THE EXHIBIT

16:18  23    NUMBERS, WHICH HAVE A JX-1 OR A PX, A DX.  IT HAS A TITLE THAT

16:18  24    WE HAVE TRIED TO COME UP WITH THAT WOULD BE EQUAL.  IT HAS THE

16:18  25    DATE OF THE DOCUMENT.  IT HAS THE BEGINNING BATES RANGES OR

16:18   1   OTHER IDENTIFIERS THAT WE WOULD HOPE TO TRY AND SHOW WITH AN

16:18   2   END-DATE RANGE.  AND THEN THE FINAL TWO COLUMNS WOULD BE EITHER

16:18   3   PLAINTIFFS' OBJECTIONS OR DEFENDANTS' OBJECTIONS.

16:18   4                 SO IT'S EASY TO SEE AS YOU GO THROUGH IT.

16:18   5             THE COURT:  LET'S MAKE SURE I UNDERSTAND WHAT WE ARE

16:18   6   DOING.

16:18   7                 ARE YOU INTRODUCING -- BECAUSE IT NEEDS TO BE

16:18   8   CLEAR -- IS THE FIRST SET YOU'RE INTRODUCING WITHOUT OBJECTION?

16:18   9   WHEN WE SEE THIS, SEEING ALL YOUR OBJECTIONS DON'T MEAN

16:18   10  ANYTHING.  TO ME, I'VE RULED ON THE OBJECTIONS THAT I THOUGHT I

16:18   11  WOULD NEED TO RULE ON IN LIMINE.

16:18   12                IS THERE A LIST OF EXHIBITS THAT ARE INTRODUCED

16:18   13  WITHOUT OBJECTION?

16:18   14            MR. JOANEN:  YES, SIR.  THERE'S THREE TABS.  ONE SAYS

16:18   15  "NO OBJECTION," ONE SAYS "OBJECTION 1," AND ONE SAYS

16:18   16  "OBJECTION 2."

16:18   17            THE COURT:  NOW, THE OBJECTION 1 DOCUMENTS, THOSE ARE

16:19   18  THE ONES THAT RELATE TO CONDITIONAL RELEVANCE?

16:19   19            MR. BRUNO:  YES.

16:19   20            MR. JOANEN:  YES, SIR, YOUR HONOR.  AND I WILL

16:19   21  EXPRESS TO THE COURT HAVING GONE THROUGH IT MANY, MANY, MANY

16:19   22  TIMES IN THE LAST COUPLE MONTHS, THERE ARE, I WOULD SAY,

16:19   23  99.9 PERCENT PROJECT DOCUMENTS.  BY THAT, I MEAN DOCUMENTS THAT

16:19   24  RELATE DIRECTLY TO TASK ORDER 26.

16:19   25                THEY ARE NOT NECESSARILY PRODUCED BY WGI OR THE

16:19  1  CORPS OF ENGINEERS DURING THE PROJECT.  IT MAY BE SOME OF THE

16:19  2  SUBCONTRACTORS OR THINGS OF THAT NATURE.

16:19  3  SO, YOUR HONOR, THE CONDITIONAL RELEVANCE

16:19  4  DOCUMENTS ARE, FOR THE MOST PART, I WOULD SAY, 99.9 PERCENT

16:19  5  PROJECT DOCUMENTS RELATED TO TASK ORDER 26 OR THE NEW LOCK AND

16:19  6  CONNECTING CHANNELS PROGRAM THAT LED INTO THAT.

16:19  7  THERE MAY BE A FEW EXCEPTIONS.

16:20  8  I WANT TO MAKE CLEAR THEY ARE NOT NECESSARILY

16:20  9  ALL PRODUCED BY EITHER WGI OR THE CORPS OF ENGINEERS, BUT THEY

16:20  10  MAY HAVE BEEN PRODUCED BY SOME OF THE SUBCONTRACTORS.

16:20  11  **THE COURT:**  I UNDERSTAND.  WHAT'S NOT CLEAR TO ME IS

16:20  12  WHICH ONES ARE OBJECTED TO AND WHICH ONES AREN'T.  I'M NOT

16:20  13  CLEAR.

16:20  14  **MR. JOANEN:**  THE CONDITIONAL RELEVANCE DOCUMENTS ARE

16:20  15  THE PROJECT DOCUMENTS THAT ARE OBJECTED TO WITH CONDITIONAL

16:20  16  RELEVANCE; FOR EXAMPLE, THE QARS, I THINK THERE'S A THOUSAND OF

16:20  17  THEM.  THOSE HAVE A CONDITIONAL RELEVANCE OBJECTION,

16:20  18  OBJECTION 1, PURSUANT TO --

16:20  19  **MR. BRUNO:**  WE ARE MOVING INTO EVIDENCE AT THIS

16:20  20  MOMENT EVERYTHING IN THIS BINDER LABELED "NO OBJECTION," WHICH

16:20  21  IS 35 PAGES OF EXHIBITS.

16:20  22  WE ARE MOVING INTO EVIDENCE AT THIS TIME THE

16:20  23  DOCUMENTS WHICH ARE LABELED "CATEGORY 1," WHICH IS 39

16:20  24  DOCUMENTS.

16:20  25  WE ARE SIMPLY DISCRIMINATING BETWEEN THE ZEROS,

16:21    1    THE NO OBJECTION, AND THOSE WHICH WGI AND THE GOVERNMENT

16:21    2    PERHAPS HAVE A CONDITIONAL OBJECTION, WHICH YOUR HONOR HAS

16:21    3    ALREADY RULED WILL GO IN.

16:21    4            WE ARE NOT MOVING INTO EVIDENCE AT THIS TIME THE

16:21    5    SO-CALLED "CATEGORY 2" DOCUMENTS.  WE ARE JUST GIVING THAT TO

16:21    6    YOU AS A REFERENCE POINT, FOR, AS YOU KNOW, THOSE MAY BE USED

16:21    7    ON CROSS-EXAMINATION.  THEY ARE LEARNED TREATISES.  SO I HOPE

16:21    8    THAT CLARIFIES IT.

16:21    9            **THE COURT:**  I UNDERSTAND, THEN, THAT I'M GOING TO --

16:21    10   YOU ARE OFFERING, INTRODUCING, AND FILING ALL OF THE EXHIBITS

16:21    11   EXCEPT FOR THE CATEGORY 2 DOCUMENTS.

16:21    12           **MR. JOANEN:**  THAT IS CORRECT, YOUR HONOR.

16:21    13           **THE COURT:**  AND THE COURT UNDERSTANDS THAT AS TO ONE

16:21    14   CATEGORY OF THE DOCUMENTS, THAT THERE HAVE BEEN -- THERE HAS

16:21    15   BEEN OBJECTIONS OF CONDITIONAL RELEVANCE.  AND SUBJECT TO THOSE

16:21    16   OBJECTIONS AND, I GUESS, IN THE EVENT THAT EITHER THE

16:21    17   GOVERNMENT OR WGI OR BOTH WANT TO ADDRESS THOSE RELEVANCE, THEY

16:21    18   CAN DO THAT IN BRIEFING.

16:22    19           IS THAT YOUR UNDERSTANDING, MR. TREEBY AND

16:22    20   MR. SMITH?

16:22    21           **MR. TREEBY:**  YES, YOUR HONOR.

16:22    22           **MR. SMITH:**  YES.

16:22    23           **THE COURT:**  SUBJECT TO THAT, LET THEM BE FILED INTO

16:22    24   EVIDENCE.

16:22    25           THANK YOU, COUNSEL.  AND THANK YOU, COUNSEL, FOR

*HOURLY TRANSCRIPT*

16:22    1    ALL THE, I KNOW, EXTRAORDINARILY HARD WORK IT TAKES TO DO THIS.

16:22    2                I USED TO MISS BEING A LAWYER FOR ABOUT 16 YEARS

16:22    3    OF THIS JOB, BUT I'M BEGINNING TO NOT MISS IT ANYMORE.  I KNOW

16:22    4    HOW HARD IT IS.

16:22    5            **MR. TREEBY:**  I WANTED TO ADDRESS THE BINDER JUST

16:22    6    BRIEFLY JUST FOR A SECOND.

16:22    7                WE AGREE WITH WHAT YOUR HONOR SAID BECAUSE YOU

16:22    8    DID RULE THOSE, BUT YOU DID ALLOW US TO HAVE A CONDITIONAL

16:22    9    RELEVANCE OBJECTION SUBJECT TO PROVING UP AFTER THE TRIAL

16:22    10   WHETHER THOSE DOCUMENTS HAVE ANYTHING TO DO WITH IT, WHICH WILL

16:22    11   BE SOMEWHAT BASED ON WHETHER OR NOT ANYTHING WAS EVER SAID

16:22    12   ABOUT A DOCUMENT.

16:22    13           **THE COURT:**  TRUE.

16:22    14           **MR. TREEBY:**  THE OTHER CATEGORY, THE ONE REMAINING

16:22    15   CATEGORY, THEY ARE NOT IN EVIDENCE UNLESS THEY HAVE BEEN -- AND

16:23    16   WE ARE GOING TO HAVE TO GO THROUGH THE TRANSCRIPT, AS I

16:23    17   EXPLAINED -- HAVE BEEN OFFERED AND PUT INTO EVIDENCE AND WE

16:23    18   TELL MS. SHEENA THAT THAT'S BEEN HAPPENING.

16:23    19           **MR. BRUNO:**  AT THE END OF THE DAY, THOSE ARE THE

16:23    20   DOCUMENTS, SHEENA AND BILL AND ROBIN, AT THE END OF EACH DAY WE

16:23    21   WILL SUPPLY SHEENA WITH A COPY OF THE CATEGORY 2 DOCUMENTS OR

16:23    22   PARTS THEREOF THAT WE HAVE MOVED IN ON THAT PARTICULAR DAY.

16:23    23           **THE COURT:**  NOW, THOSE THAT HAVE ALREADY BEEN MOVED

16:23    24   IN.

16:23    25           **MR. TREEBY:**  WE HAVEN'T DONE IT.

16:23   1              **THE COURT:**  WE DON'T HAVE A LIST OF THAT YET.

16:23   2              **MR. TREEBY:**  WE HAVE TO DO THAT LIST, AND WE ARE

16:23   3   GOING TO TRY TO GET THAT TO THE COURT MONDAY.

16:23   4              **THE COURT:**  I ASSUME MR. BRUNO, IF HE RESTS, IT'S

16:23   5   WITH THE CAVEAT THAT WE -- THOSE THAT HAVE ALREADY BEEN

16:23   6   INTRODUCED AND WILL BE IDENTIFIED, THOSE CATEGORY 2 DOCUMENTS

16:23   7   THAT THEY INTRODUCED, WILL BE IDENTIFIED AND GIVEN TO THE

16:23   8   COURT --

16:23   9              **MR. BRUNO:**  CORRECT.

16:23   10             **THE COURT:**  -- IS THAT CORRECT?

16:23   11             **MR. BRUNO:**  YES, JUDGE.  AND I APPRECIATE THAT

16:23   12  BECAUSE I THOUGHT WE WERE A LITTLE FURTHER ALONG ON THAT, BUT I

16:23   13  WOULD APPRECIATE 'TIL MONDAY IF YOU DON'T MIND.

16:24   14             AT THIS TIME, WHAT I WOULD LIKE TO DO IS SIMPLY

16:24   15  PUBLISH VERY BRIEFLY -- BECAUSE IT SORT OF FOLLOWS THE

16:24   16  TESTIMONY YOU JUST HEARD -- PX-4671, WHICH IS THE STIPULATION

16:24   17  BETWEEN THE PARTIES ABOUT DR. VRIJLING'S TESTIMONY.

16:24   18             AND CAN WE CALL THAT UP, PLEASE.

16:24   19             I JUST WANT THE SHOW THE COURT WE HAVE A

16:24   20  STIPULATION.

16:24   21             THEN, JUDGE, WE HAVE SOME DIGITAL VERSIONS OF

16:24   22  THE HYDROGRAPHS, WHICH ARE EASIER TO READ.  AND THOSE CAN BE

16:24   23  FOUND AT PX-4648 IS JUST A DIGITAL VERSION OF THAT; A LITTLE

16:25   24  CLEANER, A LITTLE EASIER TO SEE.  THERE IT IS.

16:25   25             **THE COURT:**  ALL RIGHT.

| | | |
|---|---|---|
| 16:25 | 1 | **MR. BRUNO:**  4649 -- |
| 16:25 | 2 | **THE COURT:**  IT'S PX-WHAT?  4648? |
| 16:25 | 3 | **MR. BRUNO:**  THE FIRST ONE WAS PX-4648, AND THAT WAS |
| 16:25 | 4 | THE ALL -- |
| 16:25 | 5 | **THE COURT:**  GOOD. |
| 16:25 | 6 | **MR. BRUNO:**  PX-4649 IS ON THE SCREEN RIGHT NOW, AND |
| 16:25 | 7 | THAT'S AN INDICATION OF THE COLORS, THE LEGEND FOR THE COLORS. |
| 16:25 | 8 | 4650, YOU CAN BLOW THIS THING UP PRETTY GOOD IF |
| 16:25 | 9 | YOU LIKE BECAUSE IT'S DIGITAL AND WE CAN SEE. |
| 16:25 | 10 | THIS IS THE LIVERS.  AND YOU CAN SEE, JUDGE, WE |
| 16:25 | 11 | HAVE AN ALL CAUSES -- |
| 16:25 | 12 | **THE COURT:**  RIGHT. |
| 16:25 | 13 | **MR. BRUNO:**  YOU SAW THAT.  I WON'T GO THROUGH THAT. |
| 16:25 | 14 | **THE COURT:**  I HAVE READ THAT.  DURING THE TESTIMONY, |
| 16:25 | 15 | I LOOKED AT ALL OF THE CATEGORIES AND THE COLORS. |
| 16:26 | 16 | **MR. BRUNO:**  AND WE HAVE THE TWO THAT SAY "NO IHNC," |
| 16:26 | 17 | BUT WITH THE MRGO IN THE NORTH SO YOU CAN COMPARE |
| 16:26 | 18 | DR. DALRYMPLE'S WITH OURS.  SO YOU HAVE THAT ABILITY AS WELL. |
| 16:26 | 19 | SO YOU HAVE ONE FOR ONLY THE NORTH; ONE FOR ONLY |
| 16:26 | 20 | THE SOUTH; ONE FOR ONLY BOTH NORTH AND SOUTH; YOU HAVE ONE FOR |
| 16:26 | 21 | ONLY THE MRGO; AND THEN YOU HAVE THE ONE WHERE -- WHAT |
| 16:26 | 22 | DR. DALRYMPLE DID, WHICH IS WHERE HE COMBINES NORTH AND MRGO |
| 16:26 | 23 | AND LEAVES OUT THE SOUTH.  THEN HE COMBINES THE SOUTH AND MRGO |
| 16:26 | 24 | AND LEAVES OUT THE NORTH.  SO WE'VE GOT ALL OF THOSE FOR YOU. |
| 16:26 | 25 | NEXT ONE IS 4652.  AND YOU'LL NOTICE I SKIPPED |

16:26    1    4651 BECAUSE THAT'S THAT OTHER WASHINGTON LOCATION, WHICH IS

16:26    2    OUT OF THE CASE.  THIS IS COATS.

16:26    3              THE NEXT ONE IS 4653.  THIS IS HOLMES.

16:27    4              4654, ARMSTRONG.

16:27    5              4655, NOW, I WANTED YOU TO SEE THAT.  IT SAYS

16:27    6    "LOCATION 6" BECAUSE WE WEREN'T ABLE TO PUT THE CLIFFORD

16:27    7    WASHINGTON NAME ON THERE.  SO JUST FOR YOUR RECORDS, LOCATION 6

16:27    8    IS THE CLIFFORD WASHINGTON OTHER LOCATION.

16:27    9              JUDGE, THANK YOU SO MUCH FOR ALLOWING ME TO DO

16:27   10    THAT.

16:27   11         **MR. TREEBY:**  NO OBJECTION.

16:27   12              YOUR HONOR, NO OBJECTION.  WE HAVE SEEN THEM,

16:27   13    AND THEY JUST SIMPLY ARE EASIER TO SEE.

16:27   14         **THE COURT:**  THANK YOU, SIR.

16:27   15         **MR. SMITH:**  NO OBJECTION, YOUR HONOR.

16:27   16         **MR. BRUNO:**  WE WOULD LIKE TO AT THIS TIME MOVE IN THE

16:27   17    DEPO CUTS.

16:27   18         **MR. JOANEN:**  YOUR HONOR, SCOTT JOANEN FOR THE

16:27   19    PLAINTIFFS.

16:27   20              AT THIS TIME, WE WOULD LIKE TO DRAW THE --

16:27   21    MOSTLY FOR THE RECORD -- THERE'S BEEN SOME REFERENCES REGARDING

16:27   22    WEATHER DATA, WIND STIPULATIONS, AND STORM SURGE ELEVATIONS IN

16:27   23    THE INDUSTRIAL CANAL.  AND WE WOULD JUST DRAW THE COURT'S

16:28   24    ATTENTION THAT THOSE ARE CONTAINED IN THE PRETRIAL ORDER WHICH

16:28   25    ULTIMATELY, IF THIS CASE WERE TO GO TO APPEAL, WOULD BE PART OF

16:28    1   THE APPELLATE RECORD.

16:28    2              **THE COURT:**  YES, SIR.

16:28    3              **MR. JOANEN:**  IN CONJUNCTION WITH THE INTRODUCTION OF

16:28    4   THE EXHIBITS ON BEHALF OF THE PLAINTIFFS, WE WOULD LIKE TO

16:28    5   INTRODUCE THE DEPOSITION TESTIMONY OF MS. ARLENE SMITH.  THIS

16:28    6   IS GOING TO BE EXHIBIT PX-4648.

16:28    7              FRANCIS ARLENE SMITH WAS A CONTRACTING

16:28    8   SPECIALIST EMPLOYED BY THE CORPS OF ENGINEERS IN ITS TULSA

16:28    9   OFFICE.  AMONG HER DUTIES, SHE WAS RESPONSIBLE FOR FUNDING

16:28   10   MODIFICATIONS ASSOCIATED WITH TASK ORDER 26.

16:28   11              **THE COURT:**  THANK YOU.

16:28   12              **MR. JOANEN:**  THE TERC CONTRACT WAS DIFFERENT THAN

16:28   13   OTHER HTRW PROJECTS AS IT WAS A COST-REIMBURSABLE CONTRACT.

16:28   14   MS. SMITH WAS UNAWARE OF THE ORIGIN OF THE FUNDS FOR

16:28   15   TASK ORDER 26 OR IF THERE WAS ENOUGH MONEY TO COMPLETE THE

16:28   16   PROJECT ONCE IT BEGAN, BUT SHE COULD CONFIRM THERE WAS NOT A

16:29   17   SPECIFIC AMOUNT OF MONEY ALLOTTED FOR TASK ORDER 26.

16:29   18              THE SCOPE OF TASK ORDER 26 CONTRACT WAS WRITTEN

16:29   19   IN NEW ORLEANS; THEREFORE, NEW ORLEANS WAS TASKED WITH

16:29   20   ASCERTAINING THE TIME AND MONEY THE PROJECT WOULD ENTAIL.

16:29   21              BECAUSE NEW ORLEANS DISTRICT WOULD DEVELOP AN

16:29   22   EXPECTATION OF HOW MUCH MONEY WAS NEEDED FOR TASK ORDER 26 AND

16:29   23   SEEK THE TULSA OFFICE'S APPROVAL, THE TULSA OFFICE WAS

16:29   24   IDENTIFIED AS THE CONTRACTING OFFICE, AND THE NEW ORLEANS

16:29   25   OFFICE MANAGED THE CONTRACT.

16:29  1        WE WOULD OFFER THAT THAT BE INTRODUCED INTO THE

16:29  2  RECORD.

16:29  3        **THE COURT:**  HEARING NO OBJECTION, LET IT BE ADMITTED.

16:29  4        **MR. TREEBY:**  NO OBJECTION.

16:29  5        **MR. SMITH:**  NONE, YOUR HONOR.

16:29  6        **THE COURT:**  THE COURT DOES HAVE THE CUT WITH THE

16:29  7  DESIGNATIONS OF ALL PARTIES AND HAS READ THE SAME.

16:29  8        **MR. JOANEN:**  NEXT, YOUR HONOR, AT THIS TIME,

16:29  9  PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO EVIDENCE THE

16:29  10 DEPOSITION TESTIMONY OF JOHN SAIA, IDENTIFIED AS PX-4690.

16:30  11        YOUR HONOR, MR. SAIA FIRST CAME TO THE

16:30  12 NEW ORLEANS DISTRICT IN JULY OF 2000 AND WAS THE CHIEF OF

16:30  13 PLANNING PROGRAMS AND PROJECT MANAGEMENT.  PART OF HIS JOB

16:30  14 RESPONSIBILITY INVOLVED THE LOCK REPLACEMENT PROJECT.  MR. SAIA

16:30  15 RECALLED THAT THE LOCK REPLACEMENT PROJECT WAS A CONSTRUCTION

16:30  16 PROJECT.  THE PROJECT MANAGER WAS RESPONSIBLE FOR THE PROJECT

16:30  17 AND REPORTED TO MR. SAIA.

16:30  18        AS PART OF HIS JOB RESPONSIBILITIES, MR. SAIA

16:30  19 WOULD QUESTION THE TECHNICAL ASPECTS OF THE PROJECT.  THE

16:30  20 RESPONSIBILITY FOR MANAGING THE CONTRACT FELL ON THE

16:30  21 CONTRACTING OFFICER.

16:30  22        MR. SAIA WAS NOT INVOLVED IN THE PERMITTING

16:30  23 PROCESS, AS THIS WAS A RESPONSIBILITY OF THE PROJECT MANAGER.

16:30  24 HE WOULD REPORT TO THE BRANCH CHIEF.  PERMITTING FROM THE LEVEE

16:30  25 BOARD WOULD GO THROUGH OPERATIONS.

| | | |
|---|---|---|
| 16:30 | 1 | MR. SAIA DID NOT RECALL ANY DISCUSSIONS OF THE |
| 16:30 | 2 | POSSIBILITY IMPACT OF THE CONSTRUCTION WORKS ON THE EBIA |
| 16:30 | 3 | HURRICANE PROTECTION STRUCTURE.  HOWEVER, HE DID NOT KNOW THE |
| 16:31 | 4 | SHEET PILE TIP OF THE DEPTH OF THE EBIA.  HE DID NOT KNOW IF |
| 16:31 | 5 | THE PROJECT MANAGER KNEW WHAT THE SHEET PILE TIP DEPTH WAS, NOR |
| 16:31 | 6 | DID HE RECALL IF UNDERSEEPAGE WAS EVER DISCUSSED AT HIS MONTHLY |
| 16:31 | 7 | MEETINGS. |
| 16:31 | 8 | WITH THAT, YOUR HONOR, WE WOULD ASK THAT BE |
| 16:31 | 9 | INTRODUCED INTO THE RECORD. |
| 16:31 | 10 | **THE COURT:**  LET IT BE ADMITTED. |
| 16:31 | 11 | **MR. TREEBY:**  SUBJECT TO THE SAME.  I HOPE OUR |
| 16:31 | 12 | OBJECTION IS CONTINUING TO THE SUMMARIES. |
| 16:31 | 13 | **THE COURT:**  ABSOLUTELY.  THE COURT UNDERSTANDS THE |
| 16:31 | 14 | SUMMARIES ARE SIMPLY, IN ESSENCE, ARGUMENT OF COUNSEL, AND |
| 16:31 | 15 | THAT'S HOW IT'S REGARDED. |
| 16:31 | 16 | **MR. JOANEN:**  THANK YOU, YOUR HONOR. |
| 16:31 | 17 | MOVING ON, YOUR HONOR, AND QUICKLY, AT THIS TIME |
| 16:31 | 18 | PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO EVIDENCE THE |
| 16:31 | 19 | DEPOSITION TESTIMONY OF THE DEFENDANT WASHINGTON GROUP |
| 16:31 | 20 | INTERNATIONAL THROUGH ITS RULE 30(B)(6) DESIGNEE, MR. PHILLIP |
| 16:31 | 21 | STAGGS.  THIS IS IDENTIFIED AS PX-4677. |
| 16:31 | 22 | YOUR HONOR, MR. STAGGS WAS WGI'S CONSTRUCTION |
| 16:31 | 23 | MANAGER FOR TASK ORDER 26 AND WAS PRESENTED ON BEHALF OF WGI TO |
| 16:31 | 24 | PROVIDE TESTIMONY RELATIVE TO THE DAY-TO-DAY OPERATIONS OF TASK |
| 16:32 | 25 | ORDER 26.  FROM THIS TESTIMONY THE COURT IS INFORMED THAT WGI |

16:32   1   DEVELOPED THE WORK PLANS THAT WERE SUBMITTED FOR APPROVAL FROM

16:32   2   THE CORPS.  WGI'S PROJECT WORK PLAN DESCRIBED THE DEMOLITION

16:32   3   ACTIVITIES AND THE ENVIRONMENTAL CONCERNS IN THE BUILDINGS AND

16:32   4   STRUCTURES.

16:32   5            THE RECAP REPORTS IDENTIFIED THE RESULTS OF THE

16:32   6   SITE CHARACTERIZATION AND THE AREAS TO BE REMEDIATED.  THESE

16:32   7   RECAP REPORTS WERE ENVIRONMENTAL WORK PLANS GEARED TOWARD THE

16:32   8   REMOVAL OF CONTAMINATED SOILS.  WGI ACKNOWLEDGED THAT THIS WAS

16:32   9   TO IDENTIFY ANY DATA GAPS THAT MIGHT NEED TO BE FILLED BY

16:32   10  SAMPLING OR OTHER INVESTIGATIONS.  HOWEVER, WGI DID NOT KNOW

16:32   11  WHAT THE SHEET PILE TIP DEPTH OF THE FLOODWALL WAS BECAUSE IT

16:32   12  WAS NOT RELEVANT TO THEM AT THE TIME.  WGI DID NOT BELIEVE IT

16:32   13  HAD ANY RESPONSIBILITY FOR GEOTECHNICAL ISSUES AND SO WOULDN'T

16:32   14  HAVE CALLED ANYBODY AT THEIR HOME OFFICE FOR HELP TO GET

16:32   15  GEOTECHNICAL ENGINEERING SUPPORT.

16:33   16           WGI INDICATED IT HAD NO KNOWLEDGE OR BELIEF THAT

16:33   17  ANY OF THE WORK PERFORMED BY IT WOULD IMPACT THE FLOODWALL,

16:33   18  ALTHOUGH GENERAL CONSTRUCTION KNOWLEDGE DICTATES THAT

16:33   19  EXCAVATIONS COULD HAVE A POTENTIAL TO IMPACT THE STABILITY OF

16:33   20  THE FLOODWALL.

16:33   21           WGI ASSUMED THAT MR. MONTEGUT WAS KNOWLEDGEABLE

16:33   22  ABOUT THE POTENTIAL FOR EXCAVATIONS TO AFFECT THE FLOODWALL.

16:33   23  WGI CLAIMED THAT BECAUSE IT WAS NOT RESPONSIBLE FOR

16:33   24  GEOTECHNICAL ASPECTS OF THE JOB, IT DID NOT HAVE TO UNDERSTAND

16:33   25  POTENTIAL CONDUIT FOR FLOODWATERS.  WGI SIMPLY ASSUMED THAT THE

16:33    1    CORPS WAS GOING TO EVALUATE THE WORK PLANS TO ASCERTAIN WHETHER

16:33    2    OR NOT THE CONTEMPLATED WORK WAS GOING TO DAMAGE THE FLOOD

16:33    3    WALL.

16:33    4           WITH THAT, YOUR HONOR, WE WOULD OFFER INTO

16:33    5    EVIDENCE THE DEPOSITION TESTIMONY OF MR. PHILLIP STAGGS.

16:33    6           **THE COURT:**  SUBJECT TO THE SAME OBJECTION REFERENCING

16:33    7    THE CHARACTERIZATION OF THE SUMMARY REPORT, ADMIT THE

16:34    8    DEPOSITION INTO EVIDENCE.

16:34    9           JUST A NOTE.  I'M NOT GOING TO WANT A LOT OF

16:34   10    CLOSING ARGUMENT.  I'M GOING TO LIMIT THE TIME TO MAYBE

16:34   11    30 MINUTES EACH, I WILL TELL YOU.  I WILL TELL YOU NOW, IN

16:34   12    READING MR. STAGGS' DEPOSITION -- AND IT'S BEEN AWHILE SINCE I

16:34   13    HAVE READ IT, BUT I'M LOOKING AT MY OWN SUMMARY -- I WASN'T

16:34   14    QUITE SURE IF THE -- HE TALKED ABOUT THE GEOTECHNICAL

16:34   15    EVALUATION OF THE BORROW SITE.  THERE WAS A CORRECTIVE ACTION

16:34   16    PLAN AND THAT THE CORPS APPROVED THE SPECIFICATIONS.

16:34   17           I NEED TO KNOW IN ARGUMENT WHAT EVIDENCE EACH

16:34   18    PARTY FEELS RELATES TO ANY GEOTECHNICAL ENGINEERING, IF ANY,

16:34   19    THAT WAS DONE IN REFERENCE TO THE BORROW PIT OR SOME OTHER

16:34   20    EXCAVATION IN THE VICINITY OF THE BORROW PIT.

16:34   21           THAT'S ALL.  MINOR POINT.

16:35   22           **MR. JOANEN:**  YES, YOUR HONOR.

16:35   23           YOUR HONOR, I MAY HAVE MISSPOKEN ON THAT.  THAT

16:35   24    TESTIMONY -- THE CUT ON THAT IS NOT OF MR. STAGGS; IT'S

16:35   25    ACTUALLY OF WGI THROUGH ITS 30(B)(6) DESIGNEE, MR. PHILLIP

16:35    1    STAGGS.  WITH THAT PROVISO, I WOULD OFFER THAT DEPOSITION

16:35    2    TESTIMONY INTO THE RECORD.

16:35    3              **THE COURT:**  ADMITTED.

16:35    4              **MR. JOANEN:**  MOVING ON, YOUR HONOR -- AND THE REST

16:35    5    WILL BE MUCH QUICKER -- THE DEPOSITION TESTIMONY OF DR. GEORGE

16:35    6    BACUTA.  THIS IS PX-4684.

16:35    7              YOUR HONOR, DR. BACUTA WAS A CORPS EMPLOYEE

16:35    8    ASSIGNED TO THE NEW ORLEANS DISTRICT IN 1992 TO BECOME A MEMBER

16:35    9    OF THE NEW LOCK AND CONNECTING CHANNELS PROJECT TEAM AS A

16:35    10   GEOLOGIST.  IN HIS ROLE HE PARTICIPATED IN THE DEVELOPMENT OF

16:35    11   THE 1997 NEW LOCK AND CONNECTING CHANNELS EVALUATION REPORT,

16:35    12   PROVIDING CONTRIBUTIONS RELATIVE TO THE ENVIRONMENTAL ASPECTS.

16:35    13   IN PARTICULAR, THIS IS VOLUME 5 OF 9.

16:35    14             THEREAFTER, HE PARTICIPATED IN THE DEVELOPMENT

16:35    15   OF THE FEBRUARY 1999 INNER HARBOR NAVIGATIONAL CANAL LOCK

16:36    16   REPLACEMENT PROJECT DESIGN DOCUMENT REPORT NO. 1.  VOLUME 6 OF

16:36    17   8 ARE THE ONES HE WAS FOCUSED ON PRIMARILY.  WE CALL THAT THE

16:36    18   DDR, THE DESIGN DOCUMENT REPORT.

16:36    19             THE DDR WAS TO GIVE BETTER SPECIFICATIONS THAN

16:36    20   THE '97 REPORT FOR PARTICULAR ASPECTS.  THE PURPOSE OF THIS

16:36    21   VOLUME WAS TO IDENTIFY THE MATERIALS OF THE EBIA BETWEEN ZERO

16:36    22   AND 5 FEET BELOW GROUND SURFACE THAT WERE SUBJECT TO

16:36    23   ENVIRONMENTAL AND SAFETY REGULATIONS.

16:36    24             SPECIFICALLY, DR. BACUTA INSISTED THAT THE

16:36    25   CONTAMINATION WOULD BE INCLUDED IN THE UPPER SOILS, OR

| | | |
|---|---|---|
| 16:36 | 1 | CARAPACE, AS HE REFERRED TO IT, BECAUSE, QUOTE, THEY DON'T |
| 16:36 | 2 | MIGRATE VERY MUCH.  HE ADMITTED THAT HE WAS NOT A GEOTECHNICAL |
| 16:36 | 3 | EXPERT.  BUT DR. BACUTA DID UNDERSTAND THAT THE SHEET PILE |
| 16:36 | 4 | CURTAIN AT THE EBIA WAS A FEATURE THAT COULD PRECLUDE |
| 16:36 | 5 | CONTAMINATES FROM MIGRATING INTO THE NEIGHBORHOOD OR TO THE |
| 16:37 | 6 | PROTECTED SIDE OF THE FLOODWALL.  DR. BACUTA EVEN WENT SO FAR |
| 16:37 | 7 | TO EXPRESS CONCERN TO WGI'S ENVIRONMENTAL TEAM TO BE AWARE THAT |
| 16:37 | 8 | SUBSURFACE GROUNDWATER FLOW WOULD PASS UNDER THE FLOODWALL. |
| 16:37 | 9 | AND I THINK YOU HAVE SEEN SOME OF THE EXHIBITS RELATIVE TO THAT |
| 16:37 | 10 | ALREADY. |
| 16:37 | 11 | BASED UPON THE KNOWLEDGE HE HAD OF THE PROJECT, |
| 16:37 | 12 | DR. BACUTA BELIEVED THAT TASK ORDER 26 WAS A SIMPLE, |
| 16:37 | 13 | STRAIGHTFORWARD ENVIRONMENTAL PROJECT. |
| 16:37 | 14 | WITH THAT, YOUR HONOR, I WOULD OFFER THAT |
| 16:37 | 15 | DEPOSITION TESTIMONY INTO EVIDENCE. |
| 16:37 | 16 | **THE COURT:**  SUBJECT TO THE PREVIOUS OBJECTIONS, LET |
| 16:37 | 17 | IT BE ADMITTED. |
| 16:37 | 18 | **MR. JOANEN:**  MOVING ON, YOUR HONOR, WE WOULD AT THIS |
| 16:37 | 19 | TIME OFFER AND FILE AND INTRODUCE INTO EVIDENCE THE DEPOSITION |
| 16:37 | 20 | TESTIMONY OF MR. JAMES MONTEGUT.  THIS WILL BE PX-4685. |
| 16:37 | 21 | MR. MONTEGUT WAS THE CORPS' CONTRACTING OFFICER |
| 16:37 | 22 | REPRESENTATIVE ASSIGNED TO THE EBIA PROJECT IN 2001, TO BE |
| 16:37 | 23 | PRESENT AT THE JOB SITE ON A DAILY BASIS.  BECAUSE THE TERC -- |
| 16:38 | 24 | YOU KNOW WHAT THAT IS NOW, YOUR HONOR -- WAS A COST- |
| 16:38 | 25 | REIMBURSABLE CONTRACT AS OPPOSED TO A FIRM FIXED-PRICE |

| | | |
|---|---|---|
| 16:38 | 1 | CONTRACT, WGI WAS OBLIGATED TO PROVIDE SUBSTANTIATION OF THE |
| 16:38 | 2 | PROOF OF EVERY EXPENDITURE MADE IN CONJUNCTION WITH THAT WORK. |
| 16:38 | 3 | EXPENSE SHEETS AND EMPLOYEE TIME SHEETS WOULD BE INCLUDED IN A |
| 16:38 | 4 | MONTHLY SUBMISSION WHICH MR. MONTEGUT WAS OBLIGATED TO EVALUATE |
| 16:38 | 5 | AND APPROVE FOR PAYMENT.  IN FACT, WHEN STARTING THE EBIA |
| 16:38 | 6 | PROJECT, HE ADMITTED THAT HIS PRIMARY PURPOSE WAS ON ENSURING |
| 16:38 | 7 | THAT WGI WAS SPENDING MONEY CORRECTLY, AND THAT THE WORK WAS |
| 16:38 | 8 | BEING DONE IN AN EFFICIENT AND EFFECTIVE MANNER. |
| 16:38 | 9 | MR. MONTEGUT BELIEVED THAT NEITHER THE CORPS NOR |
| 16:38 | 10 | WGI KNEW WHAT THE DEEPEST EXCAVATION WOULD BE WHEN THE PROJECT |
| 16:38 | 11 | WAS FIRST GETTING STARTED.  THE CONTRACTING MECHANISM OF THE |
| 16:38 | 12 | IDIQ, WHICH IS A INDEFINITE DELIVERY-INDEFINITE QUANTITY |
| 16:38 | 13 | CONTRACT, SUCH AS THE TERC WAS AN EFFECTIVE WAY, IN HIS BELIEF, |
| 16:39 | 14 | TO ADDRESS THE SCOPE OF THE PROJECT BECAUSE IT WAS UNKNOWN AT |
| 16:39 | 15 | THE TIME, AS THEY WERE GETTING INTO IT, AND IT WOULD ALLOW SOME |
| 16:39 | 16 | CONTRACTUAL FLEXIBILITY IN THAT THE CONTRACTOR CAN WORK AND YOU |
| 16:39 | 17 | DON'T -- AS HE SAYS, YOU DON'T HAVE TO GIVE THEM SPECIFIC |
| 16:39 | 18 | OBJECTIVES TO BID ON. |
| 16:39 | 19 | DESPITE BEING A PROJECT ENGINEER, MR. MONTEGUT |
| 16:39 | 20 | DID NOT REVIEW THE SOIL STRATIGRAPHY AT THE EBIA.  ALSO, HE DID |
| 16:39 | 21 | NOT KNOW IF MR. LEE GUILLORY UNDERSTOOD THE SOIL STRATIGRAPHY |
| 16:39 | 22 | AND DIDN'T KNOW WHETHER ANYONE ASSIGNED TO THE CORPS TO THE |
| 16:39 | 23 | EBIA PROJECT UNDERSTOOD THE SOIL STRATIGRAPHY. |
| 16:39 | 24 | MR. MONTEGUT DIDN'T CONSIDER HIMSELF AN EXPERT |
| 16:39 | 25 | IN FOUNDATIONS, SUBSIDENCE, OR SEEPAGE, AND DID NOT KNOW HOW |

*HOURLY TRANSCRIPT*

| | | |
|---|---|---|
| 16:39 | 1 | DEEP THE SHEET PILE AT THE EBIA FLOODWALL WAS. |
| 16:39 | 2 | HE DOES SAY THAT WITH 33 YEARS OF EXPERIENCE |
| 16:39 | 3 | WITH THE CORPS, HE BELIEVED THAT ALL THE STRUCTURES REMOVED |
| 16:39 | 4 | PROBABLY IMPROVED THE POTENTIAL FOR SEEPAGE. |
| 16:40 | 5 | WITH THAT, YOUR HONOR, WE WOULD OFFER THAT -- |
| 16:40 | 6 | MOVE TO HAVE THAT DEPOSITION TESTIMONY ENTERED INTO EVIDENCE. |
| 16:40 | 7 | THE COURT:  SUBJECT TO THE SAME OBJECTION, LET IT BE |
| 16:40 | 8 | ADMITTED. |
| 16:40 | 9 | MR. JOANEN:  MOVING ON, YOUR HONOR, AT THIS TIME |
| 16:40 | 10 | PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO EVIDENCE THE |
| 16:40 | 11 | DEPOSITION TESTIMONY OF MR. ALVIN CLOUATRE.  MR. CLOUATRE BEGAN |
| 16:40 | 12 | HIS EMPLOYMENT -- THIS IS PX-4689. |
| 16:40 | 13 | MR. CLOUATRE BEGAN HIS EMPLOYMENT WITH THE CORPS |
| 16:40 | 14 | IN 1988 AS A CONSTRUCTION INSPECTOR.  HE WAS A PROCTOR |
| 16:40 | 15 | INSPECTOR FOR THE EBIA PROJECT.  AS A PROJECT INSPECTOR, HE WAS |
| 16:40 | 16 | TO ENSURE THAT THE CONTRACTS PERFORMED WERE ACCORDING TO THE |
| 16:40 | 17 | WORK PLAN REQUIREMENTS.  HE DID KNOW THAT MR. MONTEGUT WAS THE |
| 16:40 | 18 | RANKING CORPS OFFICIAL IN THE FIELD ON A DAY-TO-DAY BASIS. |
| 16:40 | 19 | AS PART OF HIS JOB RESPONSIBILITIES, |
| 16:40 | 20 | MR. CLOUATRE WAS MONITORING -- ADMITTED THAT MONITORING FOR |
| 16:40 | 21 | UNDERSEEPAGE WAS NOT SOMETHING HE CONSIDERED, EVEN THOUGH HE |
| 16:41 | 22 | SAYS THAT IF YOU DIG A HOLE ANYWHERE AROUND THE EBIA YOU COME |
| 16:41 | 23 | ACROSS WATER.  PREVENTING UNDERSEEPAGE, SAND BOILS, AND |
| 16:41 | 24 | FAILURES OF FLOODWALLS WAS NOT PART OF THE JOB DESCRIPTION OF |
| 16:41 | 25 | AN INSPECTOR FOR THE EBIA PROJECT, IN HIS OPINION; AND IN FACT, |

16:41    1    HE ADMITTED THAT HE HAD NO IDEA WHETHER THERE WERE SHEET PILE

16:41    2    CUTOFFS IN THE EBIA UNDER THE FLOODWALL.

16:41    3              WITH THAT, YOUR HONOR, WE WOULD OFFER THAT

16:41    4    DEPOSITION TESTIMONY INTO EVIDENCE.

16:41    5         **THE COURT:**  SUBJECT TO THE OBJECTION, LET IT BE

16:41    6    ADMITTED.

16:41    7         **MR. JOANEN:**  THANK YOU, YOUR HONOR.

16:41    8              MOVING ON, YOUR HONOR, NOW WE WILL OFFER, FILE,

16:41    9    AND INTRODUCE INTO EVIDENCE THE DEPOSITION TESTIMONY OF

16:41   10    MR. DENNIS O'CONNER.  THIS WILL BE JX-1648.

16:41   11              YOUR HONOR, MR. O'CONNER WAS WGI'S PROJECT

16:41   12    MANAGER FOR TASK ORDER 26, MAKING HIM THE RANKING WGI OFFICIAL

16:41   13    IN THE FIELD FOR MUCH OF THE EBIA PROJECT UNTIL HE WAS REPLACED

16:41   14    BY WGI'S CONSTRUCTION MANAGER, PHILLIP STAGGS.

16:41   15              MR. O'CONNER BECAME INVOLVED WITH THE PROJECT

16:42   16    ALMOST AT THE OUTSET WHEN HE WAS ASSIGNED THE TASK OF PREPARING

16:42   17    A COMPREHENSIVE REPORT RECOMMENDING THE SCOPE AND DURATION OF

16:42   18    THE REMEDIATION AND DEMOLITION THAT WOULD BE REQUIRED AS WELL

16:42   19    AS ANY DATA GAPS THAT MAY NEED TO BE FILED -- MAY NEED TO BE

16:42   20    FILLED BY SAMPLING OR OTHER INVESTIGATIONS.

16:42   21              FROM THAT POINT MR. O'CONNER WAS RESPONSIBLE FOR

16:42   22    OVERSEEING ALL ASPECTS OF THE PROJECTS, INCLUDING THE

16:42   23    EXCAVATION AND BACKFILL.  HE WAS AWARE THAT EXCAVATIONS NEAR A

16:42   24    STRUCTURE MAY HAVE AN EFFECT ON THE INTEGRITY OF THAT

16:42   25    STRUCTURE.  LIKEWISE, HE ADMITTED THAT UNDERSEEPAGE MAY BE

*HOURLY TRANSCRIPT*

16:42    1    CAUSED BY SOME GEOLOGIC CONDITION OF THE SOILS ACTING AS A

16:42    2    CONDUIT FOR FLUIDS MOVING FROM ONE AREA TO ANOTHER.

16:42    3              MR. O'CONNER WAS ASSIGNED THE RESPONSIBILITY OF

16:42    4    OBTAINING EVERY PERMIT THAT WAS REQUIRED FOR WORK AT THE EBIA

16:42    5    AND WAS THE PRIMARY INTERFACE WITH THE ORLEANS LEVEE DISTRICT

16:42    6    AND THE CORPS OF ENGINEERS.  THE OPERATIONS DIVISION OF THE

16:43    7    CORPS OF ENGINEERS WAS THE INTERACTION HE WOULD HAVE HAD WITH

16:43    8    THE CORPS OF ENGINEERS REGARDING THE OLD PERMIT, BUT

16:43    9    MR. O'CONNER DID NOT KNOW THAT THE PERMIT THAT WAS ULTIMATELY

16:43   10    MAILED BY OLD TO THE LOCAL OFFICE OF WGI HAD GOTTEN TO THE HOME

16:43   11    OFFICE, BUT HE DID ADMIT THAT WGI NEVER DID SECURE A SIGNED

16:43   12    PERMIT FROM THE ORLEANS LEVEE DISTRICT.

16:43   13              WITH THAT, YOUR HONOR, WE WOULD OFFER, FILE, AND

16:43   14    INTRODUCE INTO THE RECORD THAT DEPOSITION TESTIMONY.

16:43   15         **THE COURT:**  SUBJECT TO THE OBJECTION, LET IT BE

16:43   16    FILED.

16:43   17         **MR. JOANEN:**  NEXT, YOUR HONOR, WE WOULD -- JUST ONE

16:43   18    MOMENT, YOUR HONOR.

16:43   19              NEXT, YOUR HONOR, WE WOULD OFFER, FILE, AND

16:43   20    INTRODUCE INTO THE RECORD THE DEPOSITION TESTIMONY OF THE

16:43   21    DEFENDANT UNITED STATES OF AMERICA THROUGH ITS RULE 30(B)(6)

16:43   22    DESIGNEE, MR. LEE GUILLORY.  YOUR HONOR, THIS IS JX-1709.

16:44   23              MR. GUILLORY WAS ASSIGNED TO WHAT WAS TO BECOME

16:44   24    KNOWN AS TASK ORDER 26 PROJECT DELIVERY TEAM IN 1998 AS A

16:44   25    CONSTRUCTION MANAGER.  HE WROTE THE STATEMENTS OF WORK FOR THE

16:44   1   CORPS AND ISSUED THEM TO WGI REGARDING A REQUEST FOR

16:44   2   PROPOSAL -- HE WAS SEEKING A REQUEST FOR PROPOSAL -- I

16:44   3   APOLOGIZE.

16:44   4           AT THE PRELIMINARY STAGE WHEN THE RECOMMENDATION

16:44   5   REPORT WAS ISSUED, THE ANTICIPATED DEPTHS OF REMEDIATION WERE

16:44   6   5 FEET BELOW GROUND SURFACE.  THE CORPS FELT IT WAS

16:44   7   REASONABLE -- MR. GUILLORY TESTIFIED THAT THE CORPS FELT IT WAS

16:44   8   REASONABLE THAT THE TERC CONTRACT REQUIRED THE TERC CONTRACTOR

16:44   9   TO HAVE AVAILABLE A GEOTECHNICAL ENGINEER.  THE CORPS BELIEVED

16:44  10   THAT IN THE PERFORMANCE OF THE OBLIGATIONS OF THE CONTRACT, THE

16:45  11   CONTRACTOR WAS OBLIGATED NOT TO DO ANY DAMAGE TO PEOPLE OR

16:45  12   PROPERTY IN THE PROCESS OF EXECUTING THE CONTRACT.  THE CORPS

16:45  13   ACTIVITY HAZARD ANALYSIS REQUIRED WGI TO AVOID INJURY TO PEOPLE

16:45  14   AND PROPERTY.

16:45  15           THE CORPS TASKED WGI TO MAKE INQUIRIES OF ALL

16:45  16   AGENCIES IN THE AREA AND FIND OUT WHAT THOSE PERMIT

16:45  17   REQUIREMENTS ARE.  BECAUSE THE OWNER OF THE FLOODWALL WAS THE

16:45  18   OLD, THE CORPS CONTEMPLATED THAT WGI WOULD CONTACT THE OLD TO

16:45  19   FIND OUT WHAT PERMITS WERE NECESSARY AND THEN MAKE APPLICATION

16:45  20   FOR ANY PERMIT THAT WAS DEEMED NECESSARY BY THE OLD.  IF THE

16:45  21   OLD REQUIRED A PERMIT, WGI WAS EXPECTED TO APPLY FOR IT ON

16:45  22   BEHALF OF THE CORPS.  IT WAS NOT THE INTENT OF THE CORPS TO

16:45  23   IGNORE THE PERMITTING REQUIREMENTS IN PLACE OF OLD.

16:45  24           ULTIMATELY NO OLD PERMIT WAS OBTAINED, WITH WGI

16:45  25   INFORMING GUILLORY THAT INQUIRIES HAD BEEN MADE OF THE OLD AND

16:46   1    THAT NO OLD PERMIT WAS REQUIRED.  MR. GUILLORY ACCEPTED WGI'S

16:46   2    REPRESENTATION WITHOUT FURTHER INQUIRY.

16:46   3                ALSO, YOUR HONOR, THE CORPS AND WGI MOBILIZED ON

16:46   4    THE SITE IN JANUARY OF 2001.  AT THAT TIME THE CORPS EXPECTED

16:46   5    GEOTECH SUPPORT FROM WGI IN THAT THEY HAD A STAFF AT HOME

16:46   6    OFFICES IN DENVER THAT COULD BE CALLED UPON FOR ANY

16:46   7    GEOTECHNICAL SUPPORT.  THE CORPS HAD AN EXPECTATION THAT WGI

16:46   8    WOULD ADVISE THE CORPS ABOUT THE PARTICULARITIES AND NUANCES OF

16:46   9    THE SITE AND THAT THEY WOULD ADVISE THE CORPS OF ANY

16:46   10   GEOTECHNICAL ISSUES THEY ENCOUNTERED.

16:46   11               FOR EXCAVATIONS WITHIN 300 FEET OF THE

16:46   12   FLOODWALL, THE CORPS DEPENDED UPON WGI TO ADVISE AND DESIGN FOR

16:46   13   SHALLOW DRAFT HOLES.  FOR DEEPER EXCAVATIONS THE CORPS REQUIRED

16:46   14   THEY USED A LICENSED PROFESSIONAL ENGINEER TO EVALUATE THE

16:46   15   RAISED COFFERDAMS.

16:46   16               AT THE MCDONOUGH BORROW PIT, MR. GUILLORY DID

16:46   17   SPECIFICALLY REQUEST GEOTECH SUPPORT AND STABILITY ANALYSIS

16:46   18   BECAUSE OF THE PROXIMITY OF SOME OF THE WORK ON THE CENTER LINE

16:47   19   OF THE FLOODWALL.  BEING A CIVIL ENGINEER, MR. GUILLORY KNEW

16:47   20   THAT THE BORROW PIT HAD TO BE EVALUATED TO KNOW -- THE

16:47   21   EXCAVATION OF THE BORROW PIT HAD TO BE EVALUATED TO KNOW IF IT

16:47   22   WOULD HAVE EFFECT ON THE STABILITY OF THAT LEVEE.

16:47   23               IN THIS INSTANCE THE GEOTECHNICAL DIVISION

16:47   24   REITERATED THE ISSUE WITH MR. GUILLORY AT THE LEVEE STABILITY

16:47   25   CONTROL LINE AND DEVELOPED A STABILITY CONTROL LINE ELEVATION

16:47    1    TO MAINTAIN A FACTOR OF SAFETY OF GREATER THAN 1, WHICH

16:47    2    USUALLY, IN CORPS TERMINOLOGY, IS ABOUT 1.3.  THAT'S THE FACTOR

16:47    3    OF SAFETY YOU HEARD DR. BEA TESTIFY TO.

16:47    4            FOR THE EBIA AREA, THE STABILITY CONTROL LINE

16:47    5    WOULD BEGIN AT THE CENTER LINE OF THE LEVEE EMBANKMENT ITSELF,

16:47    6    WHICH ON THE FLOOD SIDE GOES DOWN ON A 1 ON 1.65 VERTICAL SLOPE

16:47    7    DOWN TO, AS MR. GUILLORY TESTIFIED, AT MINUS 12 FEET, WHEN YOU

16:47    8    GET 143 FEET TO THE CANAL SIDE OF THE CENTER LINE OF THE LEVEE.

16:48    9    THIS 12-FOOT ELEVATION WOULD GO ALL THE WAY OUT TO THE 229-FOOT

16:48   10    DISTANCE AWAY FROM THE CENTER LINE OF THE LEVEE.

16:48   11            THIS IS IMPORTANT BECAUSE THIS MEANS THAT AT

16:48   12    143 FEET FROM THE CENTER LINE -- IT WAS THE GEOTECHNICAL

16:48   13    DEPARTMENT'S POSITION, AND MR. GUILLORY UNDERSTOOD IT TO BE,

16:48   14    THAT YOU SHOULDN'T DIG DEEPER THAN 12 FEET IN THAT RANGE

16:48   15    BECAUSE YOU WOULD VIOLATE THE INTEGRITY OF THE FLOODWALL.

16:48   16            MR. GUILLORY WAS NOT AN EXPERT ON UNDERSEEPAGE

16:48   17    ISSUES, AND IT WAS NOT HIS JOB TO OVERSEE THE POTENTIAL FOR

16:48   18    UNDERSEEPAGE CAUSING DAMAGE TO THE LEVEE, AS HE PUT IT.  IN

16:48   19    FACT, EVERY TIME HE -- HE ADMITTED THAT EVERY TIME HE ACCEPTED

16:48   20    A DOCUMENT FOR A WORK THAT WAS PERFORMED BY WGI, HE WAS NOT

16:48   21    APPROVING OR AGREEING THAT WHATEVER WORK WAS DONE WAS NOT

16:48   22    HAVING AN IMPACT ON THE POTENTIAL FOR UNDERSEEPAGE TO AFFECT

16:48   23    THAT FLOODWALL.

16:48   24            THERE WERE -- AS MR. GUILLORY PUT IT, THERE WERE

16:48   25    NO REAL SPECIFICATIONS FOR BACKFILL IN TERMS OF WHAT COULD BE

16:49  1   USED OR THE DEGREE OF COMPACTION.  THE TERM *BACKFILLING*, AS HE

16:49  2   USED IT, IS A VERY GENERAL TERM OR A GENERAL SPECIFICATION,

16:49  3   MEANING THAT WGI COULD USE OFFSITE MATERIALS, INCLUDING SAND,

16:49  4   IF IT SO CHOOSE.

16:49  5           WITH THAT, YOUR HONOR, WE WOULD OFFER, FILE, AND

16:49  6   INTRODUCE INTO THE RECORD THE DEPOSITION TESTIMONY OF THE

16:49  7   UNITED STATES THROUGH ITS 30(B)(6) DESIGNEE, LEE GUILLORY.

16:49  8           **THE COURT:**  AGAIN, SUBJECT TO THE OBJECTION REFERENCE

16:49  9   TO THE SUMMATION, I WILL LET IT BE INTRODUCED INTO EVIDENCE.

16:49  10          **MR. JOANEN:**  ALMOST FINISHED, YOUR HONOR.

16:49  11          NEXT, YOUR HONOR, THE PLAINTIFFS WOULD OFFER,

16:49  12   FILE, AND INTRODUCE INTO THE RECORD THE DEPOSITION TESTIMONY OF

16:49  13   THE SEWERAGE AND WATER BOARD OF NEW ORLEANS THROUGH ITS

16:49  14   RULE 30(B)(6) DESIGNEE, MR. JACK HEUERKAMP.

16:49  15          MR. HEUERKAMP WAS DESIGNATED BY THE SEWERAGE AND

16:49  16   WATER BOARD -- I SHOULD SAY, FIRST OF ALL, THE SEWERAGE AND

16:49  17   WATER BOARD OPERATES THE PUMPING SYSTEMS IN NEW ORLEANS, WHICH

16:50  18   IS WHY WE WERE INTERESTED IN THAT TESTIMONY.

16:50  19          MR. HEUERKAMP WAS DESIGNATED BY THE BOARD TO

16:50  20   DISCUSS THE BOARD'S PUMPING CAPACITIES DURING HURRICANE KATRINA

16:50  21   AND SHORTLY THEREAFTER, AND HOW THAT CAPACITY WOULD RELATE TO

16:50  22   THE FLOOD-FIGHTING CAPABILITY OF THE SEWERAGE AND WATER BOARD

16:50  23   IN THE CITY DURING THE STORM.

16:50  24          PUMP STATION 5 IS THE ONE WE ARE ADDRESSING, FOR

16:50  25   THE MOST PART, BECAUSE THAT WAS LOCATED IN THE LOWER NINTH

| 16:50 | 1 | WARD, AT THE INTERSECTION OF FLORIDA AVENUE AND JOURDAN ROAD. |
| 16:50 | 2 | THAT PARTICULAR PUMP STATION WAS MANNED BY MR. WILLIAM |
| 16:50 | 3 | VILLAVASO DURING THE STORM.  PUMP STATION 19 WAS DIRECTLY |
| 16:50 | 4 | ACROSS THE CANAL AND JUST NORTH OF THE BLUE BRIDGE, THE FLORIDA |
| 16:50 | 5 | AVENUE BRIDGE, AND THAT'S THE NEAREST PUMPING STATION TO PUMP |
| 16:50 | 6 | STATION 5.  LIKE I SAID, JUST ACROSS THE CANAL.  THIS WAS |
| 16:50 | 7 | MANNED BY MR. PHILLIP JOYCE DURING THE STORM. |
| 16:50 | 8 | PUMP STATION 19 WAS UNIQUE IN THAT IT WAS KEPT |
| 16:50 | 9 | OPERATIONAL DURING THE ENTIRE STORM EVENT.  IN FACT, IT |
| 16:50 | 10 | PRODUCED ITS OWN POWER.  THE PUMPS WERE LUBRICATED THROUGH |
| 16:51 | 11 | CANAL WATER, SO IT WAS ABLE TO STAY OPERATIONAL FOR THE ENTIRE |
| 16:51 | 12 | TIME. |
| 16:51 | 13 | BECAUSE IT WAS OPERATIONAL THE ENTIRE TIME, |
| 16:51 | 14 | MR. JOYCE WAS ABLE TO KEEP ACCURATE RECORDS OF WHAT WAS GOING |
| 16:51 | 15 | ON DURING THE STORM, AND THAT'S WHERE THOSE PUMP LOGS COME IN, |
| 16:51 | 16 | TO GIVE THE COURT, AND ANYONE ELSE INTERESTED, AN UNDERSTANDING |
| 16:51 | 17 | OF THE RAINFALL RATES THAT WERE RECORDED AT THAT PUMP |
| 16:51 | 18 | STATION 19. |
| 16:51 | 19 | THOSE RECORDS INDICATE THAT THERE WERE |
| 16:51 | 20 | .44 INCHES OF RAIN ON SUNDAY, AUGUST 28, AND THAT THERE WERE |
| 16:51 | 21 | 8.52 INCHES OF RAIN ON MONDAY, AUGUST 29, 2005.  AND, AGAIN, |
| 16:51 | 22 | YOUR HONOR, THAT'S RIGHT ACROSS THE CANAL. |
| 16:51 | 23 | MR. HEUERKAMP WENT ON TO SAY THAT HURRICANE |
| 16:51 | 24 | KATRINA AS A RAIN EVENT PRODUCED AMOUNTS OF RAIN THAT WOULD |
| 16:51 | 25 | HAVE BEEN EFFECTIVELY REMOVED FROM THE CITY IN SHORT ORDER, |

| | | |
|---|---|---|
| 16:51 | 1 | BASED UPON THE PUMPING LOGS AND PUMPING CAPACITY.  THEREFORE, |
| 16:51 | 2 | PLAINTIFFS ASSERT THAT THE CITY OF NEW ORLEANS AND, IN |
| 16:51 | 3 | PARTICULAR, THE PLAINTIFFS IN THIS CASE THAT RESIDED IN |
| 16:52 | 4 | ORLEANS PARISH WOULD NOT HAVE FLOODED SIMPLY BECAUSE OF |
| 16:52 | 5 | RAINFALL PRODUCED BY HURRICANE KATRINA. |
| 16:52 | 6 | I MAY HAVE SKIPPED, YOUR HONOR, THAT THAT WAS |
| 16:52 | 7 | PX-4679. |
| 16:52 | 8 | **THE COURT:**  ALL RIGHT, SIR. |
| 16:52 | 9 | **MR. JOANEN:**  I WOULD OFFER THAT DEPOSITION TESTIMONY |
| 16:52 | 10 | INTO THE RECORD. |
| 16:52 | 11 | **THE COURT:**  LET IT BE ADMITTED UNDER THE SAME |
| 16:52 | 12 | CONDITION AS WE HAVE DONE THE OTHERS. |
| 16:52 | 13 | **MR. JOANEN:**  MOVING A LITTLE EAST, YOUR HONOR, AT |
| 16:52 | 14 | THIS TIME PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO |
| 16:52 | 15 | EVIDENCE THE DEPOSITION TESTIMONY OF THE ST. BERNARD PARISH |
| 16:52 | 16 | DEPARTMENT OF PUBLIC WORKS THROUGH ITS 30(B)(6) DESIGNEES, |
| 16:52 | 17 | MR. HILLARY J. NUNEZ, MS. TERRI DOSKEY, AND MR. LOUIS D. POMES. |
| 16:52 | 18 | YOUR HONOR, I'LL TELL YOU THAT MS. DOSKEY IN HER |
| 16:52 | 19 | DEPOSITION -- I DON'T KNOW IF HER CUTS MADE IT IN --DOSKEY SHE |
| 16:52 | 20 | WAS ADMINISTRATIVE.  SHE WAS JUST TELLING US WHERE RECORDS |
| 16:52 | 21 | COULD BE FOUND IF WE NEEDED THEM.  THE PRIMARY PEOPLE WHO |
| 16:52 | 22 | PROVIDED PERTINENT INFORMATION WERE MR. NUNEZ AND MR. POMES. |
| 16:52 | 23 | THEIR INFORMATION INFORMED US THAT THE |
| 16:52 | 24 | ST. BERNARD DEPARTMENT OF PUBLIC WORKS OPERATES THE INNER |
| 16:52 | 25 | POLDER PUMPING SYSTEM IN ST. BERNARD PARISH.  MR. NUNEZ AND |

| | | |
|---|---|---|
| 16:53 | 1 | MR. POMES WERE DESIGNATED TO DISCUSS THE PARISH'S PUMPING |
| 16:53 | 2 | CAPACITIES DURING HURRICANE KATRINA AND SHORTLY THEREAFTER AND |
| 16:53 | 3 | HOW THAT CAPACITY RELATED TO THE FLOOD-FIGHTING CAPABILITY |
| 16:53 | 4 | WITHIN ST. BERNARD PARISH DURING THE STORM. |
| 16:53 | 5 | THE TESTIMONY OF MR. NUNEZ AND MR. POMES |
| 16:53 | 6 | INDICATED THAT IN PREPARATION FOR THE APPROACHING HURRICANE, |
| 16:53 | 7 | BOTH THE LAKE BORGNE LEVEE DISTRICT AND THE ST. BERNARD |
| 16:53 | 8 | DEPARTMENT OF PUBLIC WORKS PUMPED TOWN THEIR DRAINAGE SYSTEM. |
| 16:53 | 9 | THIS MEANS THAT THE CATCH BASINS WITHIN THE DRAINAGE CANAL WERE |
| 16:53 | 10 | LOWERED TO INCREASE THE AMOUNT OF RAINFALL THAT COULD BE STORED |
| 16:53 | 11 | AS THE PUMPS REMOVED WATER. |
| 16:53 | 12 | ALL THE PUMPING STATIONS WERE IN WORKING ORDER |
| 16:53 | 13 | AS HURRICANE KATRINA APPROACHED, AND THE DRAINAGE CANALS WERE |
| 16:53 | 14 | WELL MAINTAINED.  THAT MEANS THEY DIDN'T HAVE JUNK IN THEM AND |
| 16:53 | 15 | GRASS OVERGROWING SO IT WOULD INHIBIT FLOW.  ST. BERNARD'S |
| 16:53 | 16 | PUMPING CAPACITY WAS OPERATIONAL UNTIL ABOUT 4:00 A.M., MONDAY, |
| 16:53 | 17 | AUGUST 29, WHEN THE POWER FEEDS FROM ENTERGY WENT OUT.  THEY |
| 16:54 | 18 | WERE NOT ABLE TO PRODUCE THEIR OWN POWER. |
| 16:54 | 19 | THE ST. BERNARD PARISH DEPARTMENT OF PUBLIC |
| 16:54 | 20 | WORKS IS OF THE OPINION, THROUGH THE TESTIMONY OF BOTH MR. POME |
| 16:54 | 21 | AND MR. NUNEZ, THAT RAINFALL HAD NOT OVERWHELMED THE PARISH'S |
| 16:54 | 22 | PUMPING CAPACITIES BY THE TIME KATRINA'S EYE PASSED OVER THE |
| 16:54 | 23 | STORM AND THAT THE RAINFALL ALONE WOULD NOT HAVE OVERWHELMED |
| 16:54 | 24 | THE PARISH'S PUMPING CAPACITIES AND WOULD HAVE BEEN |
| 16:54 | 25 | INSUFFICIENT TO FLOOD PLAINTIFFS' HOMES. |

16:54    1            YOUR HONOR, THAT WAS PX-4680.  WE WOULD OFFER

16:54    2    THAT DEPOSITION TESTIMONY INTO THE RECORD.

16:54    3            **THE COURT:**  LET IT BE ADMITTED SUBJECT TO THE

16:54    4    OBJECTION PREVIOUSLY URGED.

16:54    5            **MR. JOANEN:**  YOUR HONOR, GOING BACK TO THE WEST A

16:54    6    LITTLE BIT, AT THIS TIME WE WOULD LIKE TO OFFER, FILE, AND

16:54    7    INTRODUCE INTO EVIDENCE THE DEPOSITION TESTIMONY OF MR. WILLIAM

16:54    8    VILLAVASO.  AS I INDICATED BEFORE, MR. VILLAVASO, WHO WAS A

16:54    9    23-YEAR EMPLOYEE OF THE NEW ORLEANS SEWERAGE AND WATER BOARD,

16:54   10    WAS THE CHIEF PUMP PLANT OPERATOR ASSIGNED TO PUMP STATION 5 ON

16:54   11    FLORIDA AVENUE RIGHT OFF THE INDUSTRIAL CANAL DURING HURRICANE

16:54   12    KATRINA.

16:55   13            MR. VILLAVASO REPORTED FOR DUTY AT PUMP

16:55   14    STATION 5 ON SUNDAY, AUGUST 28, 2005, AT NOON.  HE SAYS THAT IN

16:55   15    PREPARATION FOR THE STORM'S ARRIVAL, THEY MAINTAINED A CONSTANT

16:55   16    CONTACT WITH THE BOARD'S CENTRAL CONTROL, WHICH REGULATED THE

16:55   17    POWER ROUTED TO THE STATION TO OPERATE THE PUMPS.

16:55   18            UNSURE OF PARTICULAR TIMES, MR. VILLAVASO

16:55   19    RECALLED THAT HEAVY RAIN STARTED AROUND 3:00 A.M. IN THE

16:55   20    MORNING, MONDAY, AUGUST 29, 2005, AND THAT THE STATION WAS SET

16:55   21    UP FOR SUCH A RAIN LOAD, AS IT WAS BEING HIT WITH BY THE STORM;

16:55   22    AND DESPITE SOME WATER SPLASHING OVER THE BACK LEVEE AT

16:55   23    BAYOU BIENVENUE, WHICH WAS TO THE NORTH, THE PUMPS WERE EASILY

16:55   24    HANDLING THE WATER ON THE GROUND AT THE TIME.

16:55   25            AS THE MORNING PROGRESSED, MR. VILLAVASO WOULD

| | | |
|---|---|---|
| 16:55 | 1 | PERIODICALLY LOOK AT THE NEARBY EBIA FLOODWALL NEAR THE NORTH |
| 16:55 | 2 | BREACH AREA.  HE OBSERVED ERRATIC SPLASHING OF WATER INTO THE |
| 16:55 | 3 | STREET FROM OVER THE WALL, BUT THE BUILDUP OF WATER WAS MINOR |
| 16:55 | 4 | AND THE PUMPS WERE ABLE TO HANDLE THIS AMOUNT OF WATER THAT |
| 16:56 | 5 | SPLASHED OVER THE WALL. |
| 16:56 | 6 | AS HE WAS LOOKING THROUGH THE DOORS THAT WERE |
| 16:56 | 7 | FACING TOWARD THE EBIA CANAL, AT WHAT HE APPROXIMATED TO BE |
| 16:56 | 8 | 3:00 OR 4:00 A.M. IN THE MORNING, THE WIND RIPPED ONE OF THE |
| 16:56 | 9 | DOORS OFF ITS HINGE, AND THE TRANSFORMER IN THE NEIGHBORHOOD |
| 16:56 | 10 | BLEW UP.  FROM THIS POSITION HE WAS WATCHING THE WATER CONTINUE |
| 16:56 | 11 | TO SPLASH OVER THE FLOODWALL, AS HE HEARD THE EXPLOSION. |
| 16:56 | 12 | HE THEN SAID -- UPON HEARING THE EXPLOSION, |
| 16:56 | 13 | MR. VILLAVASO SAW THE NORTH BREACH FLOODWALL FAIL ALMOST |
| 16:56 | 14 | INSTANTANEOUSLY AND WATER POUR INTO THE AREA.  FEARFUL OF BEING |
| 16:56 | 15 | ELECTROCUTED WITH WATER RISING INTO THE PUMP STATION, |
| 16:56 | 16 | MR. VILLAVASO CONTACTED THE CENTRAL CONTROL OF THE SEWERAGE AND |
| 16:56 | 17 | WATER BOARD TO HAVE THEM CUT OFF THE ELECTRICITY TO THE |
| 16:56 | 18 | STATION.  OBVIOUSLY HIS CONCERN WAS THAT IF WATER RISES IN THE |
| 16:56 | 19 | STATION, HE'S IN THERE, AND THE ELECTRICITY GETS TO HIM, HE'LL |
| 16:56 | 20 | BE KILLED.  AND SO HE CALLID AND URGENTLY ASKED THEM TO CUT OFF |
| 16:56 | 21 | THE POWER.  THEY DO SO.  COME TO FIND OUT, THE RECORDS INDICATE |
| 16:57 | 22 | THAT WAS AT 6:10 A.M. IN THE MORNING.  SO IT'S THE PLAINTIFFS' |
| 16:57 | 23 | POSITION THAT THAT TIME FRAME IS WHAT THE COURT SHOULD LOOK FOR |
| 16:57 | 24 | TO UNDERSTAND THE TIME FRAME.  YOU WILL SEE THAT IN THE |
| 16:57 | 25 | DEPOSITION TESTIMONY. |

16:57    1          YOUR HONOR, THAT WAS PX-4683.  AND WE WOULD

16:57    2    OFFER THAT INTO THE RECORD, THAT DEPOSITION TESTIMONY.

16:57    3       **THE COURT:**  AGAIN, SUBJECT TO THE OBJECTION

16:57    4    PREVIOUSLY URGED, LET IT BE ADMITTED.

16:57    5       **MR. JOANEN:**  YOUR HONOR, NEXT MOVING -- WE OFFER --

16:57    6    THIS WOULD BE PX-4678.  THIS IS THE DEPOSITION UPON WRITTEN

16:57    7    QUESTIONS TO THE LAKE BORGNE BASIN LEVEE DISTRICT.  YOUR HONOR,

16:57    8    THAT'S BASICALLY QUESTIONS WE PRESENTED TO THEM TO ESTABLISH

16:57    9    WHO MAINTAINED THE 40 ARPENT CANAL, AND IT GIVES THE COURT

16:57   10    INFORMATION ABOUT THAT PARTICULAR LEVEE THAT WAS -- YOU ARE

16:57   11    FAMILIAR WITH FROM THE *ROBINSON* CASE.

16:57   12         WITH THAT, YOUR HONOR, WE WOULD OFFER, FILE, AND

16:57   13    INTRODUCE THAT INTO THE RECORD.

16:57   14       **THE COURT:**  AGAIN, ALL OF THESE ARE SUBJECT TO THE

16:57   15    IN LIMINE OBJECTIONS AND SUBJECT TO THE OBJECTIONS URGED TO THE

16:58   16    NARRATIVE.  LET IT BE ADMITTED.

16:58   17       **MR. JOANEN:**  FINALLY, YOUR HONOR, THE LAST ONE.  AT

16:58   18    THIS TIME THE PLAINTIFFS WOULD OFFER, FILE, AND INTRODUCE INTO

16:58   19    THE RECORD THE DEPOSITION OF MS. ETHEL MAE COATS.  MS. COATS IS

16:58   20    UNABLE TO APPEAR AT TRIAL, AS SHE HAS PASSED AWAY, AS I'M SURE

16:58   21    THE COURT KNOWS.  WE WANT TO MAKE THAT POINT FOR THE COURT OF

16:58   22    APPEAL OR ANYONE ELSE READING THE RECORD.

16:58   23         YOUR HONOR, PRIOR TO HER DEATH, MS. COATS

16:58   24    PROVIDED DEPOSITION TESTIMONY EXPLAINING THAT SHE AND HER

16:58   25    HUSBAND, JIMMIE LEE COATS SR., PURCHASED THEIR HOME AT

| | | |
|---|---|---|
| 16:58 | 1 | 1020 CHARBONNET STREET IN 1994.  THIS WAS LOCATED ABOUT SIX |
| 16:58 | 2 | BLOCKS FROM THE INDUSTRIAL CANAL. |
| 16:58 | 3 | PRIOR TO HURRICANE KATRINA, MRS. COATS HAD |
| 16:58 | 4 | COMPLETED SEVERAL IMPROVEMENTS TO HER HOME, INCLUDING ENLARGING |
| 16:58 | 5 | THE KITCHEN, THE LIVING ROOM, RENOVATING THE BATHROOMS AND |
| 16:58 | 6 | BEDROOMS, AS WELL AS BUILDING AN ADDITION TO THE BACK OF THE |
| 16:58 | 7 | HOME. |
| 16:58 | 8 | MRS. COATS AND MANY OF HER FAMILY MEMBERS |
| 16:58 | 9 | EVACUATED TO HAMMOND, LOUISIANA, PRIOR TO HURRICANE KATRINA'S |
| 16:58 | 10 | LANDFALL, BRINGING WITH THEM ONLY TWO OR THREE DAYS' WORTH OF |
| 16:58 | 11 | CLOTHING, LIKE SO MANY OTHER PEOPLE DID.  THEREFORE, |
| 16:59 | 12 | MRS. COATS, WITH THE FLOODING, STAYED WITH HER SISTER IN |
| 16:59 | 13 | HAMMOND, LOUISIANA, FOR ABOUT THREE TO FIVE MONTHS. |
| 16:59 | 14 | MRS. COATS WAS ABLE TO RETURN TO HER HOME FOR |
| 16:59 | 15 | THE FIRST TIME IN MAY OF 2006.  SHE FOUND EVERYTHING IN HER |
| 16:59 | 16 | HOME HAD BEEN RUINED, AND SHE WAS UNABLE TO SAVE ANYTHING, AS |
| 16:59 | 17 | SHE SAYS, INCLUDING, MOST IMPORTANTLY TO HER, IRREPLACEABLE |
| 16:59 | 18 | FAMILY MEMENTOS.  AFTER THIS EXPERIENCE, MRS. COATS BEGAN TO |
| 16:59 | 19 | SUFFER SUBSTANTIAL PHYSICAL AND PSYCHOLOGICAL EFFECTS, AS THE |
| 16:59 | 20 | COURT WILL SEE IN REVIEWING THE DEPOSITION TESTIMONY. |
| 16:59 | 21 | MRS. COATES' ATTORNEY DID FILE ON HER BEHALF AN |
| 16:59 | 22 | SF95 FORM.  THROUGH THAT MRS. COATES SOUGHT RELIEF FOR PROPERTY |
| 16:59 | 23 | DAMAGE TO HER HOME AT 1020 CHARBONNET STREET, DAMAGE TO |
| 16:59 | 24 | PERSONAL BELONGINGS, AND MENTAL DISTRESS.  THAT'S |
| 16:59 | 25 | EXHIBIT DX-02676.  AND WITH THAT, WE WOULD OFFER THAT |

| | | |
|---|---|---|
| 17:00 | 1 | DEPOSITION TESTIMONY INTO EVIDENCE. |
| 17:00 | 2 | **THE COURT:**  SUBJECT TO THE PREVIOUS OBJECTION, LET IT |
| 17:00 | 3 | BE ADMITTED. |
| 17:00 | 4 | **MR. JOANEN:**  WITH THAT, YOUR HONOR, I HAVE NOTHING |
| 17:00 | 5 | MORE ON THAT. |
| 17:00 | 6 | **MR. BRUNO:**  YOUR HONOR, IF I MAY ASK A SMALL -- TWO |
| 17:00 | 7 | FAVORS OF YOU. |
| 17:00 | 8 | FIRST, I HAVE TO ATTEND THE FIRST BOARD MEETING |
| 17:00 | 9 | AS PRESIDENT OF THE NEW ORLEANS CENTER FOR THE CREATIVE ARTS IN |
| 17:00 | 10 | A LITTLE WHILE AND WOULD ASK IF YOU MIND IF I BE PERMITTED TO |
| 17:00 | 11 | LEAVE IN ABOUT FIVE MINUTES. |
| 17:00 | 12 | THE SECOND FAVOR IS, AS YOU KNOW, THE ONLY THING |
| 17:00 | 13 | WE HAVE LEFT TO DO IS OFFER THE CHART OF EVIDENCE, WHICH WILL |
| 17:00 | 14 | INVOLVE SOME ARGUMENT OF COUNSEL.  AND AFTER THAT, WE'LL BE |
| 17:00 | 15 | PREPARED TO REST. |
| 17:00 | 16 | I WOULD ASK, YOUR HONOR, IF WE MIGHT HAVE THIS |
| 17:00 | 17 | EVENING TO CONFER WITH MY TEAM TO MAKE SURE WE HAVE NOT LEFT |
| 17:00 | 18 | SOMETHING OUT.  TOMORROW WE WILL REST, IF THAT'S OKAY WITH YOU. |
| 17:00 | 19 | **THE COURT:**  APPROXIMATELY WHEN DO YOU ENVISION THE |
| 17:00 | 20 | DEFENDANT WOULD BE ABLE TO CALL THEIR -- BY 10:00 OR 9:30? |
| 17:01 | 21 | **MR. BRUNO:**  NO, NO.  I'M FULLY ANTICIPATING THAT |
| 17:01 | 22 | WE'VE COVERED ALL THE -- |
| 17:01 | 23 | **THE COURT:**  YOU'RE GOING TO MOVE IN THE SUMMARY |
| 17:01 | 24 | EVIDENCE.  WE WILL HAVE WHATEVER ARGUMENT WE ARE GOING TO |
| 17:01 | 25 | HAVE -- |

17:01    1          **MR. BRUNO:**  RIGHT NOW?  IF YOU DON'T MIND, IT'S 5:00.

17:01    2    I GUESS IT'S UP TO YOU.

17:01    3          **MR. TREEBY:**  IT WON'T BE A LONG ARGUMENT.

17:01    4          **THE COURT:**  IT'S FINE WITH ME.  THAT'S FINE.

17:01    5          **MR. BRUNO:**  SO I WOULD EXPECT THAT TOMORROW MORNING

17:01    6    AT 9:00, WE WILL SIMPLY RISE AND BE PREPARED TO SAY THAT WE

17:01    7    REST.

17:01    8          I JUST WANT THE EVENING TO MAKE SURE THAT ONCE

17:01    9    AGAIN I HAVEN'T MESSED SOMETHING UP.

17:01   10          **THE COURT:**  YOU HAVEN'T LEFT SOMETHING OUT.  ALL

17:01   11    RIGHT.  THAT'S FAIR ENOUGH.

17:01   12          **MR. BRUNO:**  MR. STEVENS IS GOING TO MOVE THE SUMMARY

17:01   13    EVIDENCE IN.  THANK YOU, JUDGE.

17:01   14          **THE COURT:**  THANK YOU.

17:01   15          **MR. STEVENS:**  YOUR HONOR, ON BEHALF OF PLAINTIFFS, WE

17:01   16    WOULD MOVE INTO EVIDENCE A SUMMARY CHART MARKED AS PX-4747.

17:01   17    IT'S A SUMMARY CHART OF THE EVIDENCE THAT WE RELIED UPON FOR

17:02   18    THE FOLLOWING SUMMARIES.

17:02   19          ANY OBJECTION?

17:02   20          **THE COURT:**  HE'S GOING TO WAIT UNTIL YOU'VE FINISHED.

17:02   21          **MR. STEVENS:**  WE ALSO MOVE INTO EVIDENCE

17:02   22    EXHIBIT 4747-05 THROUGH 09.  IT'S A SUMMARY OF THE EBIA

17:02   23    EXCAVATIONS SUMMARY TABLE.

17:02   24          NEXT, BOLAND MARINE EXCAVATION SUMMARY PX-4748

17:02   25    ALONG WITH -- 4748 HAS 18 INDIVIDUAL SLIDES, 001 THROUGH 0018.

17:02   1          PLUS 4748.1, WHICH IS ALL OF THE PDF INDIVIDUAL

17:02   2   LAYERS TOGETHER, AND IT'S ACTIVE, OR IT'S LIVE.  YOU CAN TURN

17:02   3   ON OR TURN OFF ANY LAYER YOU WANT, YOUR HONOR.  YOU CAN LOOK AT

17:02   4   ALL OF THEM, SOME OF THEM, OR PUT THEM ON IN INTERVALS.  I CAN

17:03   5   DEMONSTRATE THAT TO THE COURT IF YOU WANT TO DO THAT NOW.

17:03   6          CARL, IF YOU WOULD JUST GO DOWN THE LIST AND

17:03   7   CLICK "OFF" AS YOU GO.  IT'LL TURN OFF.

17:03   8          THERE'S AN AERIAL IMAGE AT FIRST; THEN THERE'S A

17:03   9   NORTH ARROW ADDED; THEN PILINGS; THE BORROW PIT.

17:03   10          JUST DO 14, FOR EXAMPLE, SEWERAGE AND WATER

17:03   11   BOARD.  THAT WOULD BE THE SEWERAGE AND WATER BOARD PLUMBING, IF

17:03   12   YOU WILL, THE DRAINAGE FOR THE BOLAND MARINE SITE.  THIS IS THE

17:03   13   NORTH SITE.

17:03   14          IF YOU WOULD ADD NOPSI NO. 12.  HERE IS THE

17:03   15   NOPSI UTILITY LINE.  IF YOU WOULD ADD GRID TRENCHING, NO. 9,

17:03   16   THE GRID TRENCHING WILL COME ON AS A LAYER.  IF YOU WANTED TO

17:03   17   ADD THE EGRIDS NO. 5 FOR LOCATION PURPOSES, THOSE ARE THE

17:03   18   EGRIDS THAT START AT THE SOUTH AND GO ALL THE WAY TO THE NORTH,

17:03   19   FROM 1 TO 83.  IF YOU WANTED TO START SOMETHING, SOMEBODY MIGHT

17:04   20   SAY IT'S BETWEEN 70 AND 71 OR 80 AND 82.

17:04   21          TURN THAT ONE OFF, CARL.

17:04   22          **THE COURT:**  WHAT IS THE DIFFERENCE BETWEEN THE EGRIDS

17:04   23   AND THE GRID TRENCHING?

17:04   24          **MR. STEVENS:**  WELL, THE EGRIDS WERE SET UP ORIGINALLY

17:04   25   FOR THE NFAATT TESTING.

17:04   1              **THE COURT:**  THE SOIL BORINGS?

17:04   2              **MR. STEVENS:**  YES, SIR.

17:04   3              **THE COURT:**  I'VE LOOK AT THAT A LOT.

17:04   4              **MR. STEVENS:**  YOU LOOK AT THE SOIL BORING NUMBERS AND

17:04   5   YOU SEE THE EGRIDS, THAT'S GOING TO GIVE THE SAME NUMBER --

17:04   6              **THE COURT:**  I UNDERSTAND WHAT KIND OF GRID IT IS.

17:04   7   IT'S NOT AN EXCAVATION SO MUCH AS A SOIL --

17:04   8              **MR. STEVENS:**  THAT IS CORRECT.  THE YELLOW SOIL

17:04   9   TRENCHING, THAT IS ACTUALLY A TRENCH THAT DOESN'T NECESSARILY

17:04   10  MATCH BUT LINES UP PRETTY CLOSELY WITH THE EGRIDS.

17:04   11             IF YOU WOULD TURN THE EGRIDS OFF, CARL, AND TURN

17:04   12  ON PILINGS, 03.

17:04   13             IF YOU WANT TO LOOK AT PILINGS, JUST WHERE THERE

17:04   14  WERE PILINGS, TURN OFF THE GRID TRENCHING, NO. 9; AND YOU CAN

17:04   15  TURN OFF THE SEWERAGE AND WATER BOARD, NO. 14, AND NOPSI.  THAT

17:04   16  MEANS THE ONLY THING LEFT IS THE AERIAL IMAGE AND THE PILINGS

17:04   17  IN THE BOLAND MARINE AREA.

17:04   18             SO WE WOULD MOVE THAT INTO EVIDENCE, YOUR HONOR,

17:05   19  AS PX-4748.1, IS THE LIVE, INTERACTIVE PDF LAYERS.

17:05   20             NEXT WE WILL INTRODUCE SAUCER MARINE EXCAVATION

17:05   21  SUMMARY, PX-4749, PAGES 001 THROUGH 0018, EACH OF WHICH ARE

17:05   22  LAYERS.  YOU WILL GET A SUMMARY LIKE THIS ONE, WHICH IS JUST A

17:05   23  SCREEN CAPTURE OF THE WHOLE THING, BUT IT'S NOT LIVE.  TO GO TO

17:05   24  THE LIVE VERSION OF THAT LIKE WE DID BEFORE --

17:05   25             **MR. TREEBY:**  IF YOUR HONOR PLEASE, I DIDN'T EXPECT WE

17:05   1   WERE GOING TO SHOW ALL OF THIS BEFORE WE EVEN GOT TO ARGUE

17:05   2   WHETHER IT SHOULD BE IN EVIDENCE.  THAT'S WHAT'S GOING ON HERE.

17:05   3         YOUR HONOR MAY VERY WELL RULE IT IN EVIDENCE

17:05   4   AND, OF COURSE, YOU CAN.  BUT I THINK THE COURT OUGHT TO HEAR

17:05   5   OUR ARGUMENT ABOUT IT.  HE OUGHT TO MOVE IT, WE OUGHT TO

17:05   6   OBJECT; THEN HE CAN DO WHATEVER HE WANTS.

17:05   7         **THE COURT:**  IF I DON'T SEE IT, IT'S SORT OF HARD FOR

17:05   8   ME TO RULE, IS MY ONLY PROBLEM.  I MAY NOT UNDERSTAND YOUR -- I

17:06   9   CERTAINLY WANT TO DO WHATEVER IS APPROPRIATE, BUT --

17:06   10        **MR. TREEBY:**  WE CAN SHOW YOU THE HARD COPY.  IN OTHER

17:06   11  WORDS, HE IS CLICKING THROUGH LAYERS IN A GIS DATABASE THAT

17:06   12  YOUR HONOR RULED --

17:06   13        **THE COURT:**  THAT'S WHY IT'S BEST FOR ME TO SEE IT, SO

17:06   14  YOU CAN POINT IT OUT TO ME WHY THAT IS.

17:06   15        **MR. TREEBY:**  OKAY.  VERY GOOD.

17:06   16        **THE COURT:**  YOU DON'T HAVE TO DO EVERY CLIP.

17:06   17        **MR. STEVENS:**  THANK YOU, YOUR HONOR.

17:06   18        4749.1 IS THE SAME THING WE JUST WENT THROUGH,

17:06   19  EXCEPT IT'S FOR SAUCER MARINE.  SAME LAYERS, 1 THROUGH 17, AND

17:06   20  THEY ARE LIVE JUST LIKE THE OTHER WAS.  YOU CAN TURN ON

17:06   21  ANYTHING YOU WANT OR TURN OFF ANYTHING YOU WANT.  YOU CAN LOOK

17:06   22  AT ONE LAYER AT A TIME OR SEVERAL.

17:06   23        **THE COURT:**  OKAY.

17:06   24        **MR. STEVENS:**  WE WOULD ALSO OFFER PX-4744, A SUMMARY

17:06   25  LIST OF THE EBIA EXCAVATION PROJECT PHOTOGRAPHS.  IT TOTALS

| | | |
|---|---|---|
| 17:06 | 1 | 85 PAGES AND LISTS, AS MUCH AS WE CAN MAKE IT CHRONOLOGICALLY, |
| 17:07 | 2 | 85 PAGES OF PHOTOGRAPHS WITH A DESCRIPTOR AND A DATE.  AND IT |
| 17:07 | 3 | ALSO PROVIDES THE PX NUMBER AND THE BATES NUMBER THAT |
| 17:07 | 4 | ORIGINALLY WAS ASSIGNED TO THAT PHOTOGRAPH.  WE WOULD OFFER |
| 17:07 | 5 | THAT INTO EVIDENCE AS WELL.  AGAIN, IT'S NOT 100 PERCENT |
| 17:07 | 6 | CHRONOLOGICAL, BUT IT'S AS CLOSE AS WE COULD MAKE IT. |
| 17:07 | 7 | THE COURT:  OKAY. |
| 17:07 | 8 | MR. STEVENS:  THE NEXT IS PX-4750--0001 THROUGH 24, |
| 17:07 | 9 | AND IT IS OF A SEWER EXCAVATION SUMMARY, WHICH ALSO -- JUST FOR |
| 17:07 | 10 | THE RECORD, TO AVOID CONFUSION -- WE MARKED EXHIBITS JUST A |
| 17:07 | 11 | LITTLE WHILE AGO, THE UNCONTESTED NOW CERTIFIED COPIES OF THE |
| 17:07 | 12 | FIELD NOTES FROM THE SEWERAGE AND WATER BOARD.  THEY WERE GIVEN |
| 17:07 | 13 | A NUMBER:  4751-001.  THOSE CERTIFIED COPIES HAVE THEIR OWN |
| 17:08 | 14 | PX NUMBER. |
| 17:08 | 15 | YOU WILL SEE IN SOME OF THESE SLIDES IN |
| 17:08 | 16 | CONNECTION WITH THIS SUMMARY OF THE SEWER EXCAVATION SYSTEM |
| 17:08 | 17 | THAT THOSE SAME FIELD NOTES WERE ASSIGNED OTHER NUMBERS:  4745 |
| 17:08 | 18 | AND 4746.  YOU WILL NOTICE THEY WERE GIVEN A DIFFERENT NUMBER, |
| 17:08 | 19 | BUT IT'S THE SAME DOCUMENT. |
| 17:08 | 20 | YOUR HONOR, WE WOULD OFFER, FILE, AND INTRODUCE |
| 17:08 | 21 | INTO EVIDENCE EACH OF THOSE FIVE SUMMARIES THAT I JUST |
| 17:08 | 22 | DESCRIBED -- |
| 17:08 | 23 | THE COURT:  ALL RIGHT. |
| 17:08 | 24 | MR. STEVENS:  -- PURSUANT TO RULE 1006. |
| 17:08 | 25 | THE COURT:  THERE ARE OBJECTIONS, AND THE COURT WILL |

17:08    1    HEAR THE OBJECTIONS.

17:08    2            **MR. TREEBY:**  IF YOUR HONOR PLEASE, I THINK TO --

17:08    3            **THE COURT:**  ARE WE GOING TO DO THEM *SERIATIM* OR

17:08    4    DISCRETELY?

17:08    5            GO AHEAD.

17:08    6            **MR. TREEBY:**  NO, I DON'T THINK SO, BUT I MAY.

17:08    7            THIS IS JUST SOME PAGES FROM THE TRIAL

17:08    8    TRANSCRIPT YESTERDAY THAT I THINK WILL HELP THE COURT --

17:09    9            **THE COURT:**  ALL RIGHT.

17:09    10           **MR. TREEBY:**  -- UNDERSTAND OUR ARGUMENT.

17:09    11           **THE COURT:**  ALL RIGHT, SIR.

17:09    12           **MR. TREEBY:**  WE VERY WELL KNOW THAT YOUR HONOR HAS

17:09    13   DONE TWO THINGS WITH REGARD TO THIS MATERIAL:  FIRST, THE COURT

17:09    14   RULED THAT THE GIS DATABASE COULD NOT COME INTO EVIDENCE; BUT

17:09    15   THEN THE COURT RULED THAT A SUMMARY COULD COME INTO EVIDENCE.

17:09    16           THAT'S THE LAST RULING OF THE COURT, AND WE

17:09    17   UNDERSTAND THAT.

17:09    18           **THE COURT:**  WELL, THE SUMMARY DID SAY, THOUGH --

17:09    19   EXCUSE ME.  MY RULING DID SAY -- LET ME GET MY RULING.

17:09    20           **MR. TREEBY:**  HERE'S A COPY.

17:09    21           **THE COURT:**  I HAVE IT RIGHT HERE.  I HAVE IT RIGHT

17:09    22   HERE.

17:09    23           **MR. TREEBY:**  DOCUMENT 21019.

17:10    24           **THE COURT:**  I HAVE IT HERE.  I'M LOOKING AT IT.

17:10    25           I DID HAVE A CAVEAT.  BASICALLY, THE CAVEAT WAS:

*HOURLY TRANSCRIPT*

| | | |
|---|---|---|
| 17:10 | 1 | "THE COURT HAS MADE CLEAR AND REITERATES TO ALL PARTIES THAT |
| 17:11 | 2 | ALL EXPERTS WILL BE LIMITED TO TESTIMONY WITHIN THE BOUNDS OF |
| 17:11 | 3 | THEIR RESPECTIVE REPORTS, AND ANY NEW OPINIONS THAT ARE NOT |
| 17:11 | 4 | CONTAINED IN EXPERT REPORTS WILL BE ALLOWED TO BE PROFFERED BY |
| 17:11 | 5 | ANY EXPERT DURING THE TRIAL." |
| 17:11 | 6 | I SAY *PROFFERED*; THAT SHOULD BE *OFFERED*. |
| 17:11 | 7 | "THE COURT WILL NOT CONDONE TRIAL BY AMBUSH AND |
| 17:11 | 8 | WILL NOT PRESIDE OVER ANY SEMBLANCE THEREOF." |
| 17:11 | 9 | SO TO THE EXTENT THAT THE COURT DID NOT INTEND |
| 17:11 | 10 | TO MODIFY ITS RULING STRIKING DR. BEA'S SO-CALLED REBUTTAL |
| 17:11 | 11 | REPORT, THE PORTION THAT I STRUCK, IT'S DEFINITELY NOT MY |
| 17:11 | 12 | INTENT. |
| 17:11 | 13 | **MR. TREEBY:**  I UNDERSTAND, YOUR HONOR, AND I THINK, |
| 17:11 | 14 | IF YOUR HONOR WILL LOOK -- LIGHTS WENT ON ON OUR SIDE.  I WON'T |
| 17:11 | 15 | SAY IT WAS AN EPIPHANY, BUT LIGHTS WENT ON YESTERDAY WHEN |
| 17:11 | 16 | MR. SMITH -- HE DIDN'T, I THINK BY HIS OWN ADMISSION, DIDN'T |
| 17:12 | 17 | CATCH THIS.  WE WERE SITTING BACK THERE LOOKING AT IT.  IT'S |
| 17:12 | 18 | ONE OF THE BENEFITS OF BEING DISTANT. |
| 17:12 | 19 | HE ASKED THIS QUESTION OF DR. BEA:  "SO YOUR |
| 17:12 | 20 | TESTIMONY IS" -- WE HAVE HIGHLIGHTED THIS SECTION OF THE |
| 17:12 | 21 | TRANSCRIPT. |
| 17:12 | 22 | **THE COURT:**  I HAVE IT. |
| 17:12 | 23 | **MR. TREEBY:**  AT THE BOTTOM OF PAGE 1410, AT LINE 25: |
| 17:12 | 24 | **"QUESTION:**  SO YOUR TESTIMONY IS THAT THE DOCUMENTS |
| 17:12 | 25 | THAT YOU HAVE DISPLAYED IN THIS COURT ARE ALL THE EVIDENCE |

17:12    1          THAT YOU HAVE OF PERSISTENT UNDERSEEPAGE PROBLEMS AND

17:12    2          DEWATERING PROBLEMS IN THE EXCAVATIONS BY WGI FOR THE WORK

17:12    3          PERFORMED UNDER TASK ORDER 26?

17:12    4               **"ANSWER:** NO."

17:12    5               **MR. TREEBY:**  AND THEN YOU SEE THE OBJECTION OF

17:12    6    COUNSEL:

17:12    7               "YOUR HONOR, I WOULD LIKE TO OBJECT, YOUR HONOR,

17:12    8    ONLY BECAUSE I DON'T BELIEVE THAT DR. BEA IS COMPETENT TO MAKE

17:12    9    THAT DETERMINATION.  WE HAVE A SUMMARY EXHIBIT, FOR EXAMPLE,

17:12   10    THAT IS AT ISSUE THAT IS GOING TO INVOLVE" --

17:12   11               AND THEN THE COURT INTERJECTED.

17:12   12               AND THEN GO DOWN TO THE NEXT QUESTION BECAUSE

17:12   13    AFTER THE COURT RULED ON THE OBJECTION, THE QUESTION WAS ASKED

17:13   14    BY MR. SMITH:

17:13   15               **"QUESTION:**  WHAT WOULD THAT EVIDENCE BE, DR. BEA?

17:13   16               **"ANSWER:**  OTHER INFORMATION IN THE DOCUMENTATION I

17:13   17          HAVE REVIEWED.  ONE OF THE LATEST ARTICULATIONS OF WHAT'S

17:13   18          BEEN A MULTIYEAR EFFORT WAS INCLUDED IN MY REBUTTAL

17:13   19          REPORT, AND THE COURT DECIDED TO EXCLUDE IT."

17:13   20               **THE COURT:**  CAN I ASK YOU SOMETHING?  AND I HATE TO

17:13   21    INTERRUPT YOU WHEN YOU ARE ARGUING, BUT WE ARE TALKING IN

17:13   22    PARTICULAR RIGHT NOW -- AND YOU MAY WANT TO TALK ABOUT OTHER

17:13   23    THINGS -- THE GRAPHICS --

17:13   24               **MR. TREEBY:**  THE GRAPHICS, MAINLY THE GRAPHICS,

17:13   25    YOUR HONOR, BECAUSE THOSE GRAPHICS, IT'S A CLASSIC -- THE

| | |
|---|---|
| 17:13 | 1 | BEGINNINGS OF A CLASSIC GIS DATABASE, WHICH REQUIRES THAT THE |
| 17:13 | 2 | EXPERTS GO IN AND TAKE THE DATA. |
| 17:13 | 3 | AND I UNDERSTAND THERE'S A LINE HERE BETWEEN |
| 17:13 | 4 | SUMMARY, SO -- FRANKLY, WE'LL BE SATISFIED -- AS LONG AS THE |
| 17:13 | 5 | COURT UNDERSTANDS -- I HAVE TO MAKE THE OBJECTION AND BE |
| 17:13 | 6 | SATISFIED WITH WHATEVER THE COURT RULES. |
| 17:13 | 7 | BUT WE HAVE HAD A CHANCE TO DIG DOWN THOSE |
| 17:14 | 8 | LAYERS, SOME OF WHICH HE WAS CLICKING FOR YOUR HONOR, AND |
| 17:14 | 9 | THERE'S SIGNIFICANT MISTAKES. |
| 17:14 | 10 | I HAVE HAD A TEAM, DR. SILVA'S TEAM BACK IN |
| 17:14 | 11 | BOSTON, WORKING TRYING TO GO THROUGH IT BECAUSE THERE'S A LOT |
| 17:14 | 12 | OF DATA UNDER THERE.  AND IT HAS TO CITE -- IT SHOULD HAVE TO |
| 17:14 | 13 | CITE TO ACTUAL DOCUMENTS THAT ARE REALLY BEING SUMMARIZED AND |
| 17:14 | 14 | ACCURATELY SO. |
| 17:14 | 15 | AND WE FIND THAT IT'S NOT.  AND THERE HAS BEEN |
| 17:14 | 16 | NO WITNESS, BECAUSE -- THE PLAINTIFFS ARE AT THE END OF THEIR |
| 17:14 | 17 | CASE.  I THOUGHT THEY WERE GOING TO TRY TO QUALIFY THIS THROUGH |
| 17:14 | 18 | DR. BEA.  THEN COUNSEL STOOD UP AND SAID:  "HE IS NOT COMPETENT |
| 17:14 | 19 | TO DO THIS." |
| 17:14 | 20 | WELL, THAT MEANS SOMEBODY ELSE DID THIS. |
| 17:14 | 21 | YOUR HONOR HAS NOT HAD A CHANCE TO HEAR THAT OTHER PERSON, AND |
| 17:14 | 22 | WE HAVE NOT HAD A CHANCE TO CROSS-EXAMINE THAT PERSON.  SO THAT |
| 17:14 | 23 | LEAVES US -- WE CAN'T EVEN CROSS-EXAMINE THE PERSON WHO PUT |
| 17:14 | 24 | THIS TOGETHER TO SEE AND TO POINT OUT ERRORS. |
| 17:15 | 25 | IF IT HAD BEEN IN SOME OPINION, WE WOULD HAVE |

17:15  1  BEEN ABLE -- THAT'S WHY YOUR HONOR STRUCK THAT OPINION.  AND SO

17:15  2  WE JUST THINK THIS IS IMPROPER.

17:15  3          NOW, WE ARE PREPARED, IF WE HAVE TO, BUT IT WILL

17:15  4  REQUIRE US GOING BEYOND ANY OPINIONS WE HAVE GIVEN, OUR EXPERTS

17:15  5  HAVE GIVEN, TO TRY TO SPEND THE NEXT -- WHILE WE ARE PUTTING

17:15  6  WITNESSES ON AND EVERYTHING ELSE -- TO TRY TO DIG THROUGH THIS.

17:15  7  OR I GUESS ONE ALTERNATIVE IS, TELL US WHO DID THIS.  LET US GO

17:15  8  TAKE A DEPOSITION.  I DON'T WANT TO DO THAT.  I DON'T WANT TO

17:15  9  DELAY THIS TRIAL.  AND I'M NOT EVEN GOING TO ASK THE COURT TO

17:15  10  DO THAT.  I DON'T THINK I SHOULD HAVE TO ASK THE COURT TO DO

17:15  11  THAT WITH THE RULINGS THIS COURT HAS MADE.

17:15  12          BUT THAT'S WHAT THAT IS.  THOSE GRAPHICS -- I

17:15  13  WISH THEY HAD PRESENTED IT.  WE COULD HAVE VETTED IT, AND THEY

17:15  14  PROBABLY COULD HAVE MADE ANY CORRECTIONS, PERHAPS, IF THIS HAD

17:15  15  ALL BEEN DONE BACK IN THE TIME THAT WE HAD TO DO IT.

17:15  16          THE DOCUMENTS WERE ALL AVAILABLE, DESPITE

17:15  17  DR. BEA'S PROTESTATIONS.  THE DOCUMENTS HAVE BEEN AVAILABLE FOR

17:15  18  FIVE YEARS TO DO THIS.  WE DID IT.  SO I KNOW IT'S POSSIBLE.

17:15  19  BUT IT'S NOT POSSIBLE TO DO IT ON THE FLY.  I CAN POINT OUT A

17:16  20  FEW ERRORS, BUT I DON'T THINK THAT'S THE POINT.  I CAN POINT

17:16  21  THOSE OUT, THE ONES WE HAVE SEEN SO FAR.

17:16  22          **THE COURT:**  I AM GOING TO ACCEPT THE FACT THAT YOUR

17:16  23  TEAM HAS ESSENTIALLY FOUND ERRORS.

17:16  24          **MR. TREEBY:**  IT'S JUST THOSE GRAPHICS.

17:16  25          **THE COURT:**  IN REFERENCE TO THE GRAPHICS, IN ANY

17:16    1    WAY -- NOT NECESSARILY PORTENDING MY RULING -- BUT DO THE

17:16    2    GRAPHICS SHOW A LOCATION OR DEPTH OR ANYTHING?  EXCUSE ME, I

17:16    3    KNOW THEY SHOW LOCATION.  DO THEY SHOW DEPTH OR EXTENT OF THE

17:16    4    ALLEGED EXCAVATIONS?

17:16    5         **MR. TREEBY:**  THEY ATTEMPT TO IN SOME INSTANCES, AND

17:16    6    IT'S IN THOSE INSTANCES WE FOUND ERRORS.

17:16    7              THAT'S ALL I HAVE, YOUR HONOR, ALTHOUGH COUNSEL

17:16    8    MAY HAVE SOMETHING.

17:16    9         **THE COURT:**  GO AHEAD.  YES, SIR, FOR THE UNITED

17:16   10    STATES.

17:16   11         **MR. KELLS:**  CONOR KELLS ON BEHALF OF THE

17:17   12    UNITED STATES.  WE JOIN MR. TREEBY'S WELL-REASONED OBJECTION

17:17   13    AND POINT OUT AS WELL SOMETHING ELSE THAT WAS MADE CLEAR IN

17:17   14    DR. BEA'S TESTIMONY.

17:17   15              WITH RESPECT TO THE QARS AND THE PHOTOS THAT THE

17:17   16    PLAINTIFFS ARE CITING, IT'S NOT JUST CONTENT; IT'S

17:17   17    INTERPRETATION AND INFERENCES THAT GO INTO SOME OF THE

17:17   18    SO-CALLED SUMMARY.  AND THE RULE CONTEMPLATES CONTENT, BUT IT

17:17   19    DOESN'T CONTEMPLATE INTERPRETATION.  AND THAT'S ANOTHER PROBLEM

17:17   20    THE UNITED STATES HAS WITH THE SO-CALLED CONTENT OF THE SUMMARY

17:17   21    EXHIBIT.

17:17   22         **THE COURT:**  THAT'S PARTICULARLY -- AS I UNDERSTAND

17:17   23    IT, THE SUMMARY EXHIBIT HAS A LOT OF STUFF IN IT, BUT WE ARE

17:17   24    RIGHT NOW TALKING ABOUT THOSE GRAPHICS ITEMS THAT WERE SHOWN,

17:17   25    AND I UNDERSTAND THAT.

*HOURLY TRANSCRIPT*

```
17:17    1              SO MAYBE WE CAN -- IN RESPONSE, YOU CAN --
17:17    2         MR. STEVENS:  YOUR HONOR, FIRST --
17:17    3         THE COURT:  THEY ALWAYS GIVE YOU THE EASY THINGS,
17:17    4    DON'T THEY?
17:17    5         MR. STEVENS:  I FEEL LIKE KING SISYPHUS.
17:18    6         THE COURT:  I UNDERSTAND.  I FEEL THAT WAY ABOUT
17:18    7    KATRINA.  I'VE BEEN PUSHING THAT ROCK UP AND GOING OUT A BUNCH
17:18    8    MYSELF.
17:18    9              GO AHEAD, SIR.
17:18   10         MR. STEVENS:  I WOULD SAY FOR THE RECORD YOU ARE MUCH
17:18   11    CLOSER TO BEING A KING THAN I AM.
17:18   12         THE COURT:  I DON'T THINK SO.  GO AHEAD.
17:18   13         MR. STEVENS:  YOUR HONOR, THE RULE SPECIFICALLY SAYS
17:18   14    THAT THE PROPONENT MAY USE A SUMMARY CHART OR CALCULATION TO
17:18   15    PROVE THE CONTENT OF VOLUMINOUS WRITINGS, RECORDINGS, OR
17:18   16    PHOTOGRAPHS THAT CANNOT BE CONVENIENTLY EXAMINED IN COURT.
17:18   17              TO THE EXTENT -- AND IT'S VERY MINIMAL -- THERE
17:18   18    ARE ANY CALCULATIONS OR ESTIMATIONS ABOUT WHERE TO PUT
17:18   19    SOMETHING ON A MAP, THE FACT IS DERIVED FROM THE UNDERLYING
17:18   20    EVIDENCE -- THE QAR, THE PHOTOGRAPH, THE NFAATT REPORT -- EVERY
17:18   21    DOCUMENT.  I HATE TO SAY EVERY AS AN ABSOLUTE, MAYBE THERE'S
17:18   22    ONE OR TWO; BUT FOR THE MOST PART, IF NOT COMPLETELY ACCURATE,
17:18   23    EVERYTHING CONTAINED IN THE SUMMARIES IS A WGI OR U.S. ARMY
17:19   24    CORPS OF ENGINEERS DOCUMENT OR IT'S AN EXCERPT FROM SOMETHING
17:19   25    THAT'S ALREADY BEEN IN EVIDENCE.
```

*HOURLY TRANSCRIPT*

17:19    1              **THE COURT:**  THE GRAPHICS, AS YOU RECALL -- AND I KNOW

17:19    2    YOU RECALL IT REAL WELL SINCE YOU HAD --

17:19    3              WE'LL LET HIM FINISH.  YOU WILL GET ANOTHER

17:19    4    CHANCE, MR. TREEBY.

17:19    5              WHEN WE WERE DISCUSSING IN THE *DAUBERT* HEARING,

17:19    6    WE HAD -- AND YOU HAD THE DIFFICULT TASK OF -- AND I APPRECIATE

17:19    7    THAT -- OF TALKING ABOUT SOME OF THIS SO-CALLED SWISS-CHEESE

17:19    8    GRAPHICS.  AND THE COURT STRUCK ANY REBUTTAL REPORT OR

17:19    9    ANTICIPATED REBUTTAL REPORT FOR THE VERY -- ONE REASON, BECAUSE

17:19    10   IT WAS NOT COMPLETED -- THAT WOULD THEN BE SOMETHING THAT WOULD

17:19    11   SHOW BY GIS MODELING THE DEPTH AND THE EXTENT OF THE

17:20    12   EXCAVATION, ET CETERA.

17:20    13              THAT WAS MY UNDERSTANDING OF WHAT THOSE WERE

17:20    14   GOING TO SHOW, AND THE COURT STRUCK IT.

17:20    15             **MR. STEVENS:**  YOU HIT IT ON THE HEAD.

17:20    16             **THE COURT:**  TELL ME WHY THIS ISN'T CONTRARY TO THAT

17:20    17   RULING.

17:20    18             **MR. STEVENS:**  YOUR HONOR NAILED IT IN THE ORDER AND

17:20    19   REASONS OF SEPTEMBER 4.  THE SWISS-CHEESE MODEL WAS GOING TO BE

17:20    20   A 3D -- BASED UPON 3-DIMENSIONAL GIS DATA THAT WOULD HAVE

17:20    21   ENABLED DYNAMIC EXAMINATION OF NOT ONLY DEPTHS, BUT THE

17:20    22   RELATIONS TO LOCAL GROUND ELEVATION ASSOCIATED WITH EACH

17:20    23   EXCAVATION.

17:20    24              THAT SISYPHEAN TASK WAS NEVER COMPLETED

17:20    25   BECAUSE -- OR IT WASN'T TIMELY COMPLETED.  THEY HAVE SINCE HAD

17:20    1    THESE SAME SLIDES, IF YOU WILL, THESE SAME IMAGES WHICH ARE PDF

17:20    2    SLIDES -- THEY HAVE HAD IT FOR 40 DAYS NOW.  WE GAVE IT TO THEM

17:20    3    AUGUST 10, 32 DAYS BEFORE THE ACTUAL START OF THIS TRIAL, AND

17:20    4    NOW ANOTHER 10.  AND IT'S THEIR DOCUMENTS.  THEY HAVE NOT ONLY

17:21    5    HAD IT FOR 40 DAYS, THEY CREATED IT BACK IN --

17:21    6            **THE COURT:**  SO YOU'RE SAYING THIS IS NOT A

17:21    7    THREE-DIMENSIONAL GRAPH.

17:21    8            **MR. STEVENS:**  NO, SIR.  IT'S BASED UPON THE FACTUAL

17:21    9    INFORMATION CONTAINED IN THE LISTED DOCUMENTS THAT WE ATTEMPT

17:21   10    TO SUMMARIZE IN CHART FASHION AND PRESENT ON A MAP.

17:21   11            IF THERE'S ANYTHING WRONG -- AND MR. BRUNO

17:21   12    APPROVED THIS BEFORE HE LEFT AS LEAD COUNSEL -- WE STIPULATE

17:21   13    THAT IF THE DEFENDANTS CAN DEMONSTRATE ANY ITEM THAT IS SHOWN

17:21   14    IN GRAPHIC FORM THAT IS IN THE WRONG LOCATION OR IT REPRESENTS

17:21   15    A DEPTH OR A MEASUREMENT THAT IS INACCURATE, WE WILL REVISE

17:21   16    THAT GRAPHIC FOR THIS COURT BECAUSE THE QUEST IS TO HELP YOU

17:21   17    DETERMINE WHERE IT REALLY IS.

17:21   18            THERE ARE ISSUES OF FACT.  THERE ARE DISPUTES

17:21   19    ABOUT SOME OF WHAT THE QAR REALLY MEANS.  AND TO THAT EXTENT,

17:21   20    THIS DOCUMENT ALLOWS YOU TO GO TO THE QAR, FIND IT ON A MAP,

17:21   21    WEIGH AND BALANCE THE TWO COMPETING ARGUMENTS, AND DECIDE WHERE

17:22   22    IT BEST FITS:  SHOULD IT BE BETWEEN GRID LINE 79 AND 80 OR 77

17:22   23    AND 78.

17:22   24            THAT'S A DETERMINATION YOU CAN ULTIMATELY MAKE.

17:22   25    AND THEN DOES THAT REALLY MAKE A DIFFERENCE IN THE OVERALL

| | | |
|---|---|---|
| 17:22 | 1 | SCHEME OF THINGS, WHICH IS, DID THE EXCAVATIONS BY WGI PLAY A |
| 17:22 | 2 | SUBSTANTIAL PART IN CAUSING EITHER THE NORTH AND/OR THE SOUTH |
| 17:22 | 3 | BREACHES ALONG THE IHNC? |
| 17:22 | 4 | BUT THIS IS NOT SWISS CHEESE.  THIS IS PDF |
| 17:22 | 5 | LAYERS PRINTED ONE AT A TIME IN LAYERS, WITH A COMPOSITE OF ALL |
| 17:22 | 6 | 18 PDFS THAT YOU CAN TURN ON OR OFF.  THAT'S ALL IT IS.  WE |
| 17:22 | 7 | COULD SUBMIT THEM TO YOU INDIVIDUALLY, AND THEY CAN EXAMINE |
| 17:22 | 8 | THEM.  WE HAVE DONE IT BOTH WAYS. |
| 17:22 | 9 | SO, YOUR HONOR, THE BOTTOM LINE IS, UNDER 1006, |
| 17:22 | 10 | IS IT REASONABLY RELIABLE?  YES. |
| 17:22 | 11 | IS IT RELEVANT?  YES. |
| 17:22 | 12 | IS IT PERMITTED UNDER THE RULES?  YES. |
| 17:22 | 13 | WE SUBMIT IT WOULD NEITHER BE ERROR NOR AN ABUSE |
| 17:22 | 14 | OF DISCRETION FOR YOU TO ALLOW THAT IN. |
| 17:23 | 15 | **THE COURT:**  I WANT TO MAKE CERTAIN, WHATEVER IT IS, |
| 17:23 | 16 | THAT IT'S NOT AN END-RUN AROUND MY PREVIOUS RULING. |
| 17:23 | 17 | **MR. STEVENS:**  NO, SIR.  IT CERTAINLY WAS NOT. |
| 17:23 | 18 | **THE COURT:**  THAT CERTAINLY WAS IMPLICIT IN MY |
| 17:23 | 19 | OPINION, BASICALLY ALLOWING -- NOT GRANTING THE MOTION IN |
| 17:23 | 20 | LIMINE IN REFERENCE TO SUMMARY OF EVIDENCE. |
| 17:23 | 21 | JUST HOLD ON JUST A MINUTE, MR. TREEBY.  YOU ARE |
| 17:23 | 22 | GOING TO HAVE A TURN HERE. |
| 17:23 | 23 | TELL ME WHENEVER YOU ARE THROUGH, SIR. |
| 17:23 | 24 | **MR. STEVENS:**  I'M DONE, YOUR HONOR. |
| 17:23 | 25 | **THE COURT:**  THAT'S WHAT I THOUGHT. |

*HOURLY TRANSCRIPT*

17:23  1          MR. TREEBY, JUST TO LET YOU KNOW, I HAVE A

17:23  2  DOCTOR'S APPOINTMENT AT 6:00.  I KNOW YOU SAID YOU WEREN'T

17:23  3  GOING TO BE LONG.

17:23  4          **MR. TREEBY:**  I'M GOING TO BE VERY QUICK.

17:23  5          **THE COURT:**  I'M GOING TO LET YOU, I WILL LET YOU

17:23  6  ARGUE TOMORROW, TOO, IF YOU WANT.

17:23  7          **MR. TREEBY:**  I DON'T THINK THAT WILL BE NECESSARY.

17:23  8          **THE COURT:**  ALL RIGHT.

17:23  9          **MR. TREEBY:**  ONE OF THE THINGS THAT I THINK

17:23  10  MR. STEVENS SAID IS THAT THIS IS SIMPLE.  IT'S NOT PROFESSIONAL

17:24  11  WORK; IT'S JUST REALLY SIMPLE.

17:24  12          OUR TEAM SPENT THOUSANDS OF HOURS DEVELOPING A

17:24  13  THOROUGH GIS DATABASE.  EVERYTHING HAS TO BE GEOREFERENCED, AND

17:24  14  THIS REQUIRES A TREMENDOUS AMOUNT OF PROFESSIONAL WORK; AND TO

17:24  15  CHECK IT REQUIRES A TREMENDOUS AMOUNT OF PROFESSIONAL WORK.

17:24  16          AND YOU HEARD DR. BEA TALK ABOUT THAT BOTH IN

17:24  17  HIS DEPOSITION ON APRIL 16 WHEN HE TRIED TO INTRODUCE THIS

17:24  18  STUFF -- AND WE DIDN'T EVEN TRY TO GO INTO IT BECAUSE WE KNEW

17:24  19  WHAT WOULD BE INVOLVED.  THIS ISN'T 3D?  I SAW LAYERS BEING

17:24  20  CLICKED THERE GOING DOWN THROUGH.  THIS IS -- IT IS, IN MY

17:24  21  ESTIMATION, 3D.

17:24  22          SECOND, HERE ARE JUST SOME -- I FEEL LIKE I HAVE

17:24  23  TO DO THIS.  THEY GAVE US SOME EXHIBIT NUMBERS WHEN THEY

17:24  24  ORIGINALLY GAVE US THIS.  C7, THE EDGE OF CHANNEL, THEY PULLED

17:24  25  AN EDGE OF CHANNEL FROM THE ORIGINAL DDR.  WE KNOW THAT THE

17:25  1   EXPANSION PLAN GOT MODIFIED.  PLATES 24, 28, AND 29 INCLUDED
17:25  2   USACE GEOTECHNICAL ANALYSIS THAT'S NOT IN THIS.  THESE ARE THE
17:25  3   ONES WE HAVE ALREADY FOUND DIGGING THROUGH IT, AND THERE'S A
17:25  4   LOT MORE.
17:25  5            LITERALLY, IT WOULD TAKE THIS TEAM THE WHOLE
17:25  6   LENGTH OF THIS TRIAL AND BEYOND TO REALLY FULLY VET WHAT THEY
17:25  7   HAVE GIVEN US.
17:25  8            C7 ALSO, THE LEVEE CROWN AND EDGE OF THE FUTURE
17:25  9   LEVEE THAT THEY SHOW IN THEIR FIGURE DO NOT REFER TO THE ACTUAL
17:25  10  PRE-KATRINA CONDITIONS.  THE DRAWING, INSTEAD, THAT THEY HAVE
17:25  11  LAID ON THERE AS A LEVEE IS THE NEW LEVEE WALL AFTER THE LOCK
17:25  12  REPLACEMENT, AFTER THIS HAD BEEN DONE AND WHEN THE LOCK WAS
17:25  13  BEING BUILT.  AND IT WAS THE NEW LEVEE THAT WAS GOING TO GO
17:25  14  ABOUT HALF OF THIS SITE.
17:25  15           C9, THE LEGEND CONTAINS A SYMBOL -- THEY HAVE
17:25  16  BEEN WORKING ON THIS FOR A LONG TIME.  THEY STARTED TOO LATE,
17:25  17  APPARENTLY, AND DIDN'T GET IT FINISHED.  IT CONTAINS A SYMBOL
17:25  18  FOR PREDOMINANTLY SAND BACKFILL AREAS.  THERE ARE NO AREAS WITH
17:25  19  THAT SYMBOL IN THE WHOLE EXHIBIT.
17:25  20           C6, IT SAYS NFAATT AREA 15 AND SAYS THAT'S THE
17:26  21  REFERENCE.  BUT THIS -- THEY CALL IT A RECAP INVESTIGATION, BUT
17:26  22  IT COMES FROM NFAATT AREA 15.
17:26  23           NFAATT AREA 12, THEY REPRESENTED -- AND THIS IS
17:26  24  ONE OF THE DEPTHS -- AS BEING GREATER THAN 8 FEET, NFAATT
17:26  25  AREA 12.  BUT, IN FACT, THE REPRESENTATIVE DEPTH IS 5 FEET.

17:26  1           NFAATT AREA 13, THEY SHOW IN THIS GRAPHIC AS --
17:26  2    THIS IS ALSO C12 -- AS 5 TO 8 FEET.  THE REPRESENTATIVE DEPTH
17:26  3    IS REALLY 4 1/2 FEET.
17:26  4           AREA 16 THAT THEY LIST AS AN EXCAVATION IN C12
17:26  5    WAS NEVER EXCAVATED.  IF THEY PUT ALL THE DOCUMENTS IN IT, WE
17:26  6    CAN SHOW THAT IT WAS NEVER EXCAVATED.  THESE ARE, AGAIN, JUST
17:26  7    EXAMPLES.
17:26  8           C14, THEY HAVE A YELLOW BOX AROUND THE SEWER
17:26  9    LIFT STATION.  THEY HAD TO DO A DEGRADE AREA BEFORE THEY DID
17:26  10   THE EXCAVATION WITH THE COFFERDAM.  THEY SHOW THAT DEGRADE AREA
17:26  11   AROUND THE SEWER LIFT STATION AS 5 TO 8 FEET DEGRADE ELEVATION.
17:27  12   IN FACT, THE COFFERDAM DESIGN DOCUMENTS FOR THE SEWER LIFT
17:27  13   STATION REMOVAL INDICATE THIS AREA WAS A DEGRADE AREA ONLY
17:27  14   3-FOOT DEEP, NOT 5 TO 8 FEET.
17:27  15           EXHIBIT C15 -- AND THIS APPLIES TO ACTUALLY ALL
17:27  16   THE WAY --
17:27  17          **THE COURT:**  I'M A LITTLE CONFUSED.  HOW MANY OF THE
17:27  18   EXHIBITS -- I GUESS I NEED TO UNDERSTAND WHAT WE ARE TALKING
17:27  19   ABOUT, AND THAT'S WHY THIS MAY TAKE A LITTLE WHILE.
17:27  20           WHICH ONE OF THESE -- AND FORGIVE ME FOR NOT
17:27  21   KNOWING.  I'M LOOKING AT THE NOTICE OF INTENT TO FILE SUMMARY
17:27  22   EVIDENCE.  WHICH ONE OF THESE RELATES TO THE GRAPHICS?  WHICH
17:27  23   ONE OF THESE ARE THE GRAPHICS?
17:27  24          **MR. STEVENS:**  B AND C.
17:27  25          **THE COURT:**  EXHIBIT B AND EXHIBIT C; IS THAT CORRECT?

*HOURLY TRANSCRIPT*

17:27   1          **MR. STEVENS:**  YES, SIR.  B IS BOLAND MARINE.  AND I

17:27   2    HAVE AN INDEX, YOUR HONOR, WITH A PRINTED COPY, IF I MIGHT --

17:27   3          **MR. TREEBY:**  HERE'S A WHOLE PRINTED COPY.

17:27   4          **THE COURT:**  SO B AND C.  I THINK I HAVE THE NUMBERS

17:27   5    UNDER B AND C.

17:27   6          **MR. STEVENS:**  THE NUMBERS I RECITED TODAY, FOR THE

17:28   7    RECORD, LET'S MAKE SURE WE USE THOSE.

17:28   8          **THE COURT:**  B, I HAVE A PDF FILE WITH LAYERS.  THIS

17:28   9    IS IN YOUR NOTICE OF INTENT.

17:28   10         **MR. STEVENS:**  IS IT THE REVISED NOTICE OF INTENT OR

17:28   11   THE MOTION TO -- REMEMBER, IT WAS --

17:28   12         **THE COURT:**  IT'S THE ONLY NOTICE OF INTENT THAT I

17:28   13   HAVE.

17:28   14         **MR. STEVENS:**  THAT WAS BACK IN AUGUST.  THEN THEY DID

17:28   15   A MOTION TO PUT --

17:28   16         **THE COURT:**  THE WAS AUGUST 10.

17:28   17         **MR. TREEBY:**  THE INTENT LETTER YOU'RE LOOKING AT,

17:28   18   THAT'S COMPLETELY DIFFERENT THAN THIS THAT WE ARE BEING GIVEN

17:28   19   TODAY.  LOOK AT IT.  DOES THAT LOOK THE SAME?  HERE.  LET ME

17:28   20   SHOW YOU.  THESE ARE THE COPIES OF WHAT YOU JUST GAVE ME.

17:28   21         **MR. STEVENS:**  THAT'S WHY I WANT TO -- I RECITED THE

17:28   22   NUMBERS IN THE RECORD.  I DON'T WANT ANYBODY LOOKING AT THE

17:28   23   WRONG STUFF.  IT'S THE SAME STUFF.  THEY WERE NOT LABELED AT

17:28   24   THE BOTTOM OF EACH SLIDE.  THEY WERE ORIGINALLY SUBMITTED

17:28   25   WITHOUT CAPTIONS.

17:28  1          **MR. TREEBY:**  AND WITHOUT ALL THESE GRID LINES AND
17:28  2   WITHOUT ALL THESE NUMBERS --
17:28  3          **MR. STEVENS:**  THE COURT ASKED THAT WE RESUBMIT IT
17:28  4   CORRECTED, AND WE DID.
17:28  5          **THE COURT:**  I DID?  WAIT A MINUTE.  I DON'T KNOW IF I
17:28  6   ASKED YOU TO RESUBMIT IT.
17:29  7          **MR. STEVENS:**  I THOUGHT WE GOT AN ORDER THAT SAID --
17:29  8          **THE COURT:**  NO, I DIDN'T GIVE ANY ORDER TO THAT
17:29  9   EFFECT UNLESS I HAD A MOMENTARY AMNESIA, WHICH IS CERTAINLY
17:29 10   POSSIBLE.  BUT I DON'T REMEMBER ANY SUCH ORDER.
17:29 11          I GOT A NOTICE OF INTENT AND AN OPPOSITION, AND
17:29 12   I MADE A RULING.
17:29 13          **MR. TREEBY:**  ON THAT.
17:29 14          **THE COURT:**  ON THAT.
17:29 15          **MR. TREEBY:**  ON THE NOTICE OF INTENT.  HERE.
17:29 16          **THE COURT:**  THAT'S RIGHT.  THAT'S ALL I HAVE DONE.
17:29 17          **MR. TREEBY:**  HERE'S WHAT WE GOT LAST NIGHT.
17:29 18          **MR. STEVENS:**  YOUR HONOR, MAY I SUBMIT THAT --
17:29 19          **MR. TREEBY:**  GIVE HIM THAT TOO.
17:29 20          **MR. STEVENS:**  THIS IS THE INDEX WITH THE NUMBERS ON
17:29 21   IT.  I HAVE ONE EACH FOR YOU.  SO IF YOU WANT TO KNOW WHICH ONE
17:29 22   IS A, B, OR C OR WHICH ONE HAS THE GRAPHICS, THAT WOULD TELL
17:29 23   YOU EXACTLY.
17:29 24          **THE COURT:**  WELL, YOU KNOW WHAT -- GO AHEAD,
17:29 25   MR. TREEBY.

| | |
|---|---|
| 17:29 | 1 |
| 17:29 | 2 |

**MR. TREEBY:** I JUST HAVE TWO, THREE MORE POINTS TO MAKE, BECAUSE THIS IS ALL I'VE BEEN ABLE TO DO.

EXHIBIT C15, IF YOU LOOK AT THAT, IT APPLIES -- WHAT I'M GOING TO SAY RIGHT NOW APPLIES TO C2 THROUGH C17.

**THE COURT:** RIGHT.

**MR. TREEBY:** PLAINTIFFS' SUMMARY SHOWS PILINGS THERE WHERE NONE EXIST UNDER DDR01129. AND THE REFERENCE TO -- THEY MAKE A BIG DEAL ABOUT THIS IS ALL REFERENCING WGI DOCUMENTS. THE REFERENCE THAT WE FIND FOR THAT IN THE CROSS TABLE THAT THEY GAVE US IS A LITTLE SUMMARY PAGE -- BEFORE THEY KNEW WHAT WAS ON THE SITE, THEY SAID, "WE CAN EXPECT TO SEE ABOUT 3,000 PILINGS. WE THINK THERE'S SOME HERE, WE THINK THERE'S SOME THERE."

BUT WHEN YOU GO BACK AND LOOK WHERE THEY REALLY WERE, THAT THEY DETERMINED IN THE JOB, IT SHOWS -- IT ENDS UP THEIR EXHIBIT SHOWS PILINGS WHERE NONE EXIST. SO, FOR EXAMPLE, THERE'S A PROPERTY LINE BETWEEN SAUCER AND INDIAN TOWING. IT SHOWS -- THEIR FIGURE SHOWS A LINE OF PILES RIGHT ON THAT PROPERTY LINE. THERE WERE NO SUCH PILES. ANYWAY, THAT'S IT. I JUST -- IF YOUR HONOR PLEASE --

**THE COURT:** CAN I ASK YOU ONE QUESTION? I'M A LITTLE -- THE ONLY THING I KNOW ABOUT IS THE ONE WE RECEIVED ON AUGUST -- THAT WAS FILED AUGUST 10, THAT THE DEFENDANTS, THE UNITED STATES AND WGI FILED AN OPPOSITION TO. YOU'RE TELLING ME THERE'S BEEN ANOTHER ITERATION OF THAT --

17:31  1      **MR. TREEBY:**  YES.

17:31  2      **THE COURT:**  WHEN DID YOU RECEIVE THE SECOND ONE?

17:31  3      **MR. TREEBY:**  LAST NIGHT.  WE GOT IT LAST NIGHT.  WE

17:31  4  GOT IT YESTERDAY, AND THEN WE ASKED FOR IT IN DIGITAL FORM.  WE

17:31  5  GOT THE DIGITAL FORMAT LAST NIGHT.  THAT'S WHAT WE HAVE BEEN

17:31  6  DIGGING ON SINCE LATE LAST NIGHT.

17:31  7      **THE COURT:**  YOU SAY THE ONE YOU GOT LATE LAST NIGHT

17:31  8  WAS DIFFERENT THAN WHAT WAS IN THE ORIGINAL -- MODIFIED TO SOME

17:31  9  DEGREE THAN THE ORIGINAL.

17:31  10      **MR. TREEBY:**  RIGHT.  IT WAS DIGITAL, AND WE COULD

17:31  11  EXAMINE IT.

17:31  12      LET ME JUST -- I PROMISE YOU I'M FINISHED.

17:31  13  RULE 1006, SUMMARIES ARE EVIDENCE.  THEY ARE EVIDENCE.  THEY

17:31  14  ARE NOT DEMONSTRATIVES; THEY ARE EVIDENCE.  AND LIKE ANY OTHER

17:31  15  EVIDENCE, THEY REQUIRE A PROPER FOUNDATION, INCLUDING A SHOWING

17:31  16  OF RELEVANCE AND AUTHENTICITY.  AND IT REQUIRES COMPETENT PROOF

17:32  17  SUFFICIENT TO SUPPORT A FINDING OF AT LEAST TWO THINGS.  AND I

17:32  18  KNOW THE FIFTH CIRCUIT IS VERY -- AS YOUR HONOR POINTED OUT IN

17:32  19  YOUR RULING -- IS PRETTY LENIENT ON THIS, MORE SO THAN OTHER

17:32  20  CIRCUITS, AND I UNDERSTAND THAT.

17:32  21      IT REQUIRES AT LEAST TWO THINGS:  THAT THE

17:32  22  SOURCE MATERIALS ARE WHAT THE PROPONENT CLAIMS THEM TO BE; AND

17:32  23  THAT THE SUMMARY ACCURATELY DESCRIBES THE SOURCE MATERIAL.

17:32  24      SOMEBODY HAS TO SAY THAT.  SOMEBODY ON THAT

17:32  25  WITNESS STAND HAS TO SAY THAT.  SOMEBODY WE BELIEVE THAT WE HAD

| | | |
|---|---|---|
| 17:32 | 1 | AN OPPORTUNITY TO CROSS-EXAMINE ABOUT IT NEEDS TO SAY THAT.  IF |
| 17:32 | 2 | THEY HAD PUT SOMEBODY ON THE STAND THAT SAYS, "LOOK, I DID THIS |
| 17:32 | 3 | AND I CAN TELL YOU IT'S ACCURATE" -- I MIGHT FIND A BUNCH OF |
| 17:32 | 4 | INACCURACIES IN IT, THAT'S FINE, I MIGHT.  BUT THEY NEED TO BE |
| 17:32 | 5 | A WITNESS ON THE WITNESS LIST THAT WE WERE ABLE TO |
| 17:32 | 6 | CROSS-EXAMINE ON THE STAND ABOUT IT.  AND THAT HAS NOT |
| 17:32 | 7 | HAPPENED.  AND THAT'S OUR OBJECTION. |
| 17:32 | 8 | **THE COURT:**  I COMPLETELY UNDERSTAND YOUR OBJECTION. |
| 17:32 | 9 | DOES THE UNITED STATES WANT TO SAY SOMETHING? |
| 17:32 | 10 | **MR. KELLS:**  YES. |
| 17:32 | 11 | **THE COURT:**  I'M REALLY GOING TO HAVE TO GO HERE IN A |
| 17:33 | 12 | MINUTE. |
| 17:33 | 13 | **MR. KELLS:**  I UNDERSTAND.  I WILL BE BRIEF. |
| 17:33 | 14 | **THE COURT:**  I'M SORRY ABOUT THAT. |
| 17:33 | 15 | **MR. KELLS:**  THE UNITED STATES JOINS IN EVERYTHING |
| 17:33 | 16 | MR. TREEBY SAID.  WE WOULD ADD THAT THERE WAS AN IMPLICATION IN |
| 17:33 | 17 | THIS THAT SOMEHOW THEY'RE PROVIDING A SUMMARY EVIDENCE CHART AS |
| 17:33 | 18 | EVIDENCE AND PUTTING THE BURDEN OF PROOF ON US TO SOMEHOW SHOW |
| 17:33 | 19 | THAT IT IS NOT ACCURATE.  MR. TREEBY COVERED IT WELL, THAT THEY |
| 17:33 | 20 | ARE THE PROPONENT OF IT. |
| 17:33 | 21 | DR. BEA HAS PUT A THEORY UP, BUT HE WASN'T |
| 17:33 | 22 | COMPETENT TO CORRELATE THE EVIDENCE, AND THEY ARE ASKING THIS |
| 17:33 | 23 | CHART TO LITERALLY DO THAT WITHOUT A SINGLE WITNESS THAT WE CAN |
| 17:33 | 24 | CROSS-EXAMINE ABOUT IT.  WE THINK THAT'S VERY PREJUDICIAL TO |
| 17:33 | 25 | THE UNITED STATES AND WGI. |

17:33    1              **THE COURT:**  THANK YOU, SIR.  WHAT I'M GOING TO DO IS

17:33    2   I'M GOING TO ALLOW EXHIBIT A AND EXHIBIT D AS APPROPRIATE

17:33    3   SUMMARY EVIDENCE.  ON EXHIBIT B AND C, I AM GOING TO TAKE THAT

17:33    4   UNDER ADVISEMENT.  I UNDERSTAND YOUR ARGUMENTS.  I'M GOING TO

17:34    5   RULE ON THAT FIRST THING IN THE MORNING.

17:34    6              IS THAT GOING TO PUT YOU AT A -- I REALLY THINK

17:34    7   I NEED TO --

17:34    8              **MR. TREEBY:**  WE'LL DO WHAT WE CAN, YOUR HONOR.

17:34    9              **THE COURT:**  ALL RIGHT.  I'LL RULE ON THAT FIRST THING

17:34   10   IN THE MORNING.

17:34   11              YOU WANTED TO SAY SOMETHING BEFORE I LEAVE.  SAY

17:34   12   IT QUICK.

17:34   13              **MR. STEVENS:**  I HAVE THE CD WITH THE DIGITAL VERSIONS

17:34   14   OF WHAT WE GAVE YOU FOR THE COURT AND FOR COUNSEL.  ALL I WOULD

17:34   15   ADD IS THAT ONE PROPER WAY OF LAYING A FOUNDATION FOR IT IS TO

17:34   16   ADMIT THE EVIDENCE.  VIRTUALLY EVERYTHING, IF NOT EVERYTHING,

17:34   17   THAT THOSE SUMMARIES DEPICT OR DESCRIBE ARE ALREADY IN

17:34   18   EVIDENCE.

17:34   19              **THE COURT:**  IT WOULD HAVE BEEN NICE TO HAVE A WITNESS

17:34   20   SAY, "HEY, THIS IS WHAT I DID," ON THE GRAPHICS.  THE OTHER

17:34   21   STUFF IS DEFINITELY SUMMARY EVIDENCE.  I'M VERY CONCERNED ABOUT

17:34   22   IT.

17:34   23              **MR. STEVENS:**  ONE FINAL COMMENT.  THEY HAVE HAD

17:34   24   40 DAYS.  DR. STORESUND WAS HERE --

17:34   25              **THE COURT:**  YOU GAVE THEM SOMETHING LAST NIGHT THAT'S

| | | |
|---|---|---|
| 17:34 | 1 | DIFFERENT.  I'LL TAKE IT UNDER ADVISEMENT.  I'M GOING TO RULE |
| 17:34 | 2 | IN ABOUT 30 SECONDS TOMORROW MORNING AT 9:00.  I WILL THINK |
| 17:35 | 3 | ABOUT IT. |
| 17:35 | 4 | WE ARE ADJOURNED FOR THE DAY. |
| 17:35 | 5 | (PROCEEDINGS ADJOURNED.) |
| 17:35 | 6 | * * * |
| | 7 | **CERTIFICATE** |
| | 8 | I, TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT |
| | 9 | REPORTER FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT |
| | 10 | OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE |
| | 11 | AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND |
| | 12 | UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE |
| | 13 | ABOVE-ENTITLED MATTER. |
| | 14 | |
| | 15 | |
| | 16 | S/ TONI DOYLE TUSA |
| | 17 | TONI DOYLE TUSA, CCR, FCRR OFFICIAL COURT REPORTER |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |