1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  KATRINA CANAL BREACHES*   CIVIL ACTION
     CONSOLIDATED LITIGATION        *
6                                    *   NO. 05-4182
                                     *
7                                    *   SECTION K(2)
     PERTAINS TO:  MRGO              *
8    ARMSTRONG NO. 10-CV-866         *   NEW ORLEANS, LOUISIANA
                                     *
9                                    *   SEPTEMBER 24, 2012
     * * * * * * * * * * * * * * * *

10
                        DAY NINE, AFTERNOON SESSION
11                        BENCH TRIAL BEFORE THE
                     HONORABLE STANWOOD R. DUVAL, JR.
12                    UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14
     FOR THE PLAINTIFFS:           BRUNO & BRUNO
15                                 BY: JOSEPH M. BRUNO, ESQ.
                                   855 BARONNE STREET
16                                 NEW ORLEANS, LOUISIANA 70113

17

18                                 THE ANDRY LAW FIRM
                                   BY: JONATHAN B. ANDRY, ESQ.
19                                 610 BARONNE ST.
                                   NEW ORLEANS, LOUISIANA 70113
20

21                                 BARON & BUDD
                                   BY: THOMAS SIMS, ESQ.
22                                 3102 OAK LAWN AVE.
                                   SUITE 1100
23                                 DALLAS, TEXAS 75219

24

25

1984

1  APPEARANCES CONTINUED:

2  FOR THE PLAINTIFFS:          DEGRAVELLES, PALMINTIER,
                                  HOLTHAUS & FRUGE
3                              BY: MICHAEL C. PALMINTIER, ESQ.
                               BY:  JOSHUA M. PALMINTIER, ESQ.
4                              618 MAIN STREET
                               BATON ROUGE, LOUISIANA 70801
5

6
                               DOMENGEAUX, WRIGHT, ROY & EDWARDS
7                              BY: ELLWOOD C. STEVENS, JR., ESQ.
                               BY: BONNIE KENDRICK, ESQ.
8                              P. O. BOX 3668
                               556 JEFFERSON ST.
9                              LAFAYETTE, LOUISIANA 70502

10

11                             THE DUDENHEFER LAW FIRM, LLC
                               BY: FRANK DUDENHEFER, JR., ESQ.
12                             601 POYDRAS ST.
                               SUITE 2655
13                             NEW ORLEANS, LOUISIANA 70130-6004

14

15                             FAYARD & HONEYCUTT
                               BY: CALVIN C. FAYARD, JR., ESQ.
16                             519 FLORIDA AVE., S.W.
                               DENHAM SPRINGS, LOUISIANA 70726
17

18
                               JOANEN LAW FIRM
19                             BY: SCOTT JOANEN, ESQ.
                               4905 FRERET ST.
20                             SUITE B
                               NEW ORLEANS, LOUISIANA 70115
21

22
                               LEVIN, PAPANTONIO, THOMAS,
23                               MITCHELL, RAFFERTY & PROCTOR
                               BY: MATTHEW D. SCHULTZ, ESQ.
24                             316 S. BAYLEN ST.
                               SUITE 600
25                             PENSACOLA, FLORIDA 32502

1985

1    APPEARANCES CONTINUED:

2    FOR THE PLAINTIFFS:           THE TRIAL LAW FIRM PC
                                   BY: ANDREW P. OWEN, ESQ.
3                                  800 WILTSHIRE BLVD.
                                   SUITE 500
4                                  LOS ANGELES, CALIFORNIA 90017

5

6                                  J. ROBERT WARREN, II, A PLC
                                   BY: J. ROBERT WARREN, II, ESQ.
7                                  1718 SHORT ST.
                                   NEW ORLEANS, LOUISIANA 70118

8

9                                  COTCHETT, PITRE & MCCARTHY, LLP
10                                 BY: PHILIP L. GREGORY, ESQ.
                                   840 MALCOLM ROAD, SUITE 200
11                                 BURLINGAME, CALIFORNIA 94010

12

13   FOR THE DEFENDANT WASHINGTON
     GROUP INTERNATIONAL, INC.:    STONE PIGMAN WALTHER WITTMANN
14                                 BY:  WILLIAM D. TREEBY, ESQ.
                                   BY:  JAMES C. GULOTTA, JR., ESQ.
15                                 BY:  HEATHER S. LONIAN, ESQ
                                   BY:  MAGGIE A. BROUSSARD, ESQ.
16                                 546 CARONDELET STREET
                                   NEW ORLEANS, LOUISIANA 70130
17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT – EASTERN DISTRICT OF LOUISIANA
** HOURLY TRANSCRIPT**

1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT WASHINGTON
     GROUP INTERNATIONAL, INC.:      JONES DAY
3                                    BY:  ADRIAN WAGER-ZITO, ESQ.
                                     BY:  DEBRA S. CLAYMAN, ESQ.
4                                    BY:  CHRISTOPHER N. THATCH, ESQ.
                                     BY:  CHRISTOPHER R. FARRELL, ESQ.
5                                    BY:  JULIA CRONIN, ESQ.
                                     BY:  BRIAN KERWIN, ESQ.
6                                    51 LOUISIANA AVENUE, N.W.
                                     WASHINGTON, D.C. 20001
7

8

9    FOR THE DEFENDANT UNITED
     STATES OF AMERICA:              U.S. DEPARTMENT OF JUSTICE
10                                   CIVIL DIVISION, TORTS BRANCH
                                     BY:  ROBIN D. SMITH, ESQ.
11                                   BY:  JAMES F. MCCONNON, JR., ESQ.
                                     BY:  RUPERT MITSCH, ESQ.
12                                   BY:  CONOR KELLS, ESQ.
                                     BY:  JOHN A. WOODCOCK, ESQ.
13                                   BENJAMIN FRANKLIN STATION
                                     P.O. BOX 888
14                                   WASHINGTON, D.C. 20044

15

16
     OFFICIAL COURT REPORTER:        JODI SIMCOX, RMR, FCRR
17                                   500 POYDRAS STREET
                                     ROOM HB-406
18                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7780
19                                   JODI_SIMCOX@LAED.USCOURTS.GOV

20

21   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

22   PRODUCED BY COMPUTER.

23

24

25

1          <u>I N D E X</u>

2                                                              <u>PAGE</u>

3

ALLEN MARR

4          CROSS-EXAMINATION BY MR. BRUNO:              1989
           CROSS-EXAMINATION BY MR. TREEBY:             2221

5          REDIRECT EXAMINATION BY MR. SMITH:           2223

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:56:42 | 1 | **AFTERNOON SESSION** |
| 12:56:42 | 2 | **(SEPTEMBER 24, 2012)** |
| 12:56:42 | 3 | * * * * * |
| 12:56:45 | 4 | **THE DEPUTY CLERK:**  ALL RISE. |
| 12:59:17 | 5 | COURT'S IN SESSION.  PLEASE BE SEATED. |
| 13:11:56 | 6 | **MR. BRUNO:**  GOOD AFTERNOON, YOUR HONOR. |
| 13:11:57 | 7 | CAN WE CALL BACK UP DX-02647 -- OH, YEAH. |
| 13:12:06 | 8 | YOUR HONOR, MAY WE APPROACH? |
| 13:12:08 | 9 | **THE COURT:**  YES. |
| 13:12:32 | 10 | **MR. BRUNO:**  THIS DOESN'T NEED TO BE ON THE RECORD. |
| 13:12:36 | 11 | **(OFF THE RECORD)** |
| 13:13:33 | 12 | (WHEREUPON, **ALLEN MARR,** HAVING BEEN PREVIOUSLY DULY |
| 13:13:33 | 13 | SWORN, TESTIFIED AS FOLLOWS.) |
| 13:13:33 | 14 | **CROSS-EXAMINATION** |
| 13:13:36 | 15 | BY MR. BRUNO: |
| 13:13:37 | 16 | **Q.**  ALL RIGHT.  WE -- AT THE BREAK I THINK THAT WHERE WE LEFT |
| 13:13:39 | 17 | OFF, DR. MARR, IS THAT YOU WERE AGREEING THAT A 3-FOOT WAVE |
| 13:13:44 | 18 | WOULD PROVIDE AN ADDITIONAL 1.5 FOOT OF WAVE ON TOP OF THE |
| 13:13:45 | 19 | STILL-WATER HEIGHT; CORRECT? |
| 13:13:47 | 20 | **A.**  YES, SIR. |
| 13:13:53 | 21 | **Q.**  AND AT PARAGRAPH 3, YOU SAY:  "WAVES WITH A SIGNIFICANT |
| 13:13:59 | 22 | WAVE HEIGHT OF 3 FEET WOULD HAVE BEGUN TO OVERTOP THE WALL AT |
| 13:14:03 | 23 | THE SOUTH BREACH WHEN THE STILL-WATER LEVEL WAS ABOUT 10, |
| 13:14:09 | 24 | 10 1/2 FEET." |
| 13:14:09 | 25 | SO IF YOU ADD A FOOT AND A HALF, YOU GET 10 1/2 FEET |

```
13:14:11    1   TO 12 FEET; RIGHT?

13:14:11    2   A.   YES.

13:14:11    3   Q.   OKAY.  AND THAT'S THE BASIS FOR YOUR OPINION IN THAT

13:14:13    4   REGARD; CORRECT?

13:14:15    5   A.   YES.  AND AGAIN, KEEP IN MIND THAT'S A SIGNIFICANT WAVE,

13:14:20    6   THE FOOT AND A HALF.  SO THERE ARE SOME THAT ARE A LITTLE

13:14:23    7   HIGHER AND WOULD SPLASH OVER AT -- AT 12 FEET EVEN THOUGH THE

13:14:26    8   WALL WAS 12.4 FEET.

13:14:29    9   Q.   AND THERE'S SOME THAT ARE LOWER?

13:14:30   10   A.   YES.

13:14:31   11   Q.   RIGHT?

13:14:32   12        IT'S AN AVERAGE; CORRECT?

13:14:33   13   A.   YES.

13:14:33   14   Q.   ALL RIGHT.  NOW --

13:14:34   15   A.   WELL, IT'S THE AVERAGE OF THE HIGHEST ONE-THIRD, AS WE

13:14:38   16   SAID THIS MORNING.

13:14:39   17   Q.   RIGHT.  NOW, AS A RESULT, YOU SAY YOU DECIDED TO CONDUCT

13:14:44   18   AN ADDITIONAL ANALYSIS; RIGHT?

13:14:49   19        THAT'S ABOVE YOUR PREVIOUS PARAGRAPH.

13:14:52   20        MR. BRUNO:  CAN YOU PULL THIS OFF?

13:14:54   21        RIGHT HERE.

13:15:02   22   BY MR. BRUNO:

13:15:02   23   Q.   YOU SAY RIGHT HERE:  "I CONDUCTED" -- "BECAUSE WAVES OF

13:15:05   24   THIS MAGNITUDE ARE FAR MORE POWERFUL, I CONDUCTED ADDITIONAL

13:15:10   25   ANALYSIS TO DETERMINE WHETHER THEY INITIATED SCOUR BEFORE SURGE
```

13:15:14   1   OVERTOPPING BEGAN."  RIGHT?

13:15:15   2   **A.**   YES, SIR.

13:15:15   3   **Q.**   AND WHEN DID YOU DO THIS?

13:15:24   4   **A.**   WOULD HAVE BEEN IN EARLY JULY.

13:15:29   5   **Q.**   ALL RIGHT.  AFTER YOUR ORIGINAL REPORT HAD BEEN SUBMITTED;

13:15:33   6   CORRECT?

13:15:33   7   **A.**   YES.

13:15:34   8   **Q.**   AND AFTER YOU HAD BEEN DEPOSED; ISN'T THAT CORRECT?

13:15:38   9   **A.**   YES.

13:15:39   10   **Q.**   OKAY.  SO DR. BEA DIDN'T HAVE A CHANCE TO SEE THIS BEFORE

13:15:46   11   JULY 24TH, 2012; ISN'T THAT CORRECT?

13:15:50   12   **A.**   YES.

13:15:50   13   **Q.**   AND CERTAINLY THE PLAINTIFFS DIDN'T HAVE AN OPPORTUNITY TO

13:15:52   14   SEE THIS BEFORE JULY 24TH, 2012; CORRECT?

13:15:56   15   **A.**   CORRECT.

13:15:56   16   **Q.**   ALL RIGHT.  SO LET'S TALK BRIEFLY ABOUT HOW YOU CONDUCTED

13:16:01   17   YOUR ANALYSIS.

13:16:10   18            **MR. BRUNO:**  LET'S GO TO PAGE 3 OF THE SAME DOCUMENT.

13:16:10   19   CAN WE BLOW UP THE CHART PART?

13:16:14   20   **BY MR. BRUNO:**

13:16:14   21   **Q.**   OKAY.  FIRST OF ALL, YOU ARE HERE DEMONSTRATING AN

13:16:23   22   ANALYSIS OF WAVES COMING OVER THE TOP OF THE WALL; CORRECT?

13:16:27   23   **A.**   YES.

13:16:28   24   **Q.**   ALL RIGHT.  AND, I'M SORRY, TO BE MORE SPECIFIC, BEFORE

13:16:33   25   7:00?

| | | |
|---|---|---|
| 13:16:34 | 1 | **A.**   YES. |
| 13:16:35 | 2 | **Q.**   ALL RIGHT.  NOW, WAVES, THEY HIT THE WALL AND THEY SPLASH; |
| 13:16:39 | 3 | RIGHT? |
| 13:16:40 | 4 | **A.**   YES. |
| 13:16:40 | 5 | **Q.**   SO THIS IS NOT FLOW OF WATER; ISN'T THAT CORRECT? |
| 13:16:50 | 6 | **A.**   IT'S -- IT'S WATER TO THE EXTENT THAT THE TOP OF THE WAVE |
| 13:16:53 | 7 | IS OVER THE TOP OF THE WALL.  IT IS FLOW OF THE EXCESS WATER. |
| 13:16:59 | 8 | **Q.**   WELL, IT'S NOT THE SAME QUANTITY OF FLOW AS ONE GETS WHEN |
| 13:17:01 | 9 | ONE IS CONSIDERING SURGE; RIGHT? |
| 13:17:04 | 10 | **A.**   THAT'S RIGHT. |
| 13:17:05 | 11 | **Q.**   YOU HAVE A CONTINUOUS FLOW OF WATER, OBVIOUSLY, WHEN THE |
| 13:17:09 | 12 | SURGE HEIGHT EXCEEDS THE WALL HEIGHT; RIGHT? |
| 13:17:12 | 13 | **A.**   YES. |
| 13:17:12 | 14 | **Q.**   AND WHEN YOU ARE CONSIDERING -- |
| 13:17:14 | 15 | **A.**   WELL, NO, NOT EXACTLY. |
| 13:17:17 | 16 | **Q.**   I'M SORRY.  IT'S NOT CONTINUOUS? |
| 13:17:18 | 17 | **A.**   WELL, NO, BECAUSE JUST LIKE YOU HAVE THE ADD OF THE WAVE, |
| 13:17:21 | 18 | YOU HAVE A NEGATIVE -- THE DOWNSIDE, TOO, SO THAT ONCE THE -- |
| 13:17:25 | 19 | THE SURGE WATER LEVEL WAS RIGHT AT THE TOP OF THE WALL FOR |
| 13:17:29 | 20 | THE -- FOR THE TIME THERE'S THE PEAK OF THE WAVE, YOU GET |
| 13:17:33 | 21 | OVERFLOW.  BUT AT THE NEGATIVE SIDE OF THE WAVE, THE SURGE |
| 13:17:37 | 22 | WOULD STOP FOR A BIT. |
| 13:17:38 | 23 | **Q.**   I WASN'T ASKING YOU ABOUT WAVES, AND PERHAPS I DIDN'T ASK |
| 13:17:41 | 24 | IT ARTFULLY.  I WAS TALKING ABOUT SURGE ONLY. |
| 13:17:44 | 25 | SO WHEN THE SURGE EXCEEDS THE TOP OF THE WALL, YOU |

13:17:47   1   HAVE A FLOW OF WATER?

13:17:48   2   **A.**   THAT'S WHAT I THINK I WAS TRYING TO SAY, THAT -- LET'S SAY

13:17:52   3   THE TOP OF THE WALL IS 12.4 FEET AND THE SURGE IS AT 12.5 FEET.

13:17:58   4   WHEN THE WAVE -- THE WAVE IS ADDED ON TO THE SURGE.  AND SO

13:18:02   5   WHEN THE WAVE IS HIGHER, YOU GET WATER GOING ACROSS, BUT WHEN

13:18:08   6   THE WAVE IS LOWER, WHEN THE TROUGH OF THE WAVE COMES, THE SURGE

13:18:11   7   ACTUALLY -- YOU DON'T GET FLOW AT FIRST, JUST THE TIME THAT

13:18:14   8   THAT WAVE IS SMALLER.

13:18:17   9        THEN WHEN THE SURGE GETS HIGHER, AT SOME POINT IT'S

13:18:20  10   CONTINUOUS.

13:18:20  11   **Q.**   I SEE.

13:18:20  12        **THE COURT:**  I REALIZE IN THIS CASE, MR. BRUNO, WE

13:18:22  13   HAVE, AND IN OTHER CASES, THE WORD "SURGE" FOR -- HAS MEANT THE

13:18:28  14   WATER LEVEL VIS-À-VIS THE FLOODWALL WITHOUT WAVES.  AND YOU'RE

13:18:33  15   ASKING, ONE, IF THE WATER LEVEL EXCEEDS THE FLOODWALL AND WE

13:18:38  16   ASSUME THERE ARE NO WAVES, IS THERE A CONTINUOUS FLOW OF WATER?

13:18:42  17        **MR. BRUNO:**  CORRECT.

13:18:42  18        **THE COURT:**  IS THAT CORRECT?

13:18:43  19        **THE WITNESS:**  THAT'S CORRECT.

13:18:44  20   BY MR. BRUNO:

13:18:47  21   **Q.**   ALL RIGHT.  BUT NOW THAT YOU'VE PIQUED MY CURIOSITY, LET'S

13:18:51  22   USE STILL-WATER HEIGHT AS AN INDICATOR OF WHAT WE HAVE

13:18:54  23   PREVIOUSLY REFERRED TO AS SURGE.  IS THAT FAIR?

13:18:56  24   **A.**   FAIR.

13:18:57  25   **Q.**   ALL RIGHT.  STILL-WATER HEIGHT IS THAT LEVEL OF PURE

| | | |
|---|---|---|
| 13:19:00 | 1 | WATER, NO WAVES. |
| 13:19:01 | 2 | AND ALL I'M TRYING TO ESTABLISH IS, WITH REGARD TO AN |
| 13:19:05 | 3 | UNDERSTANDING OF THE MODEL THAT YOU DID, WHEN THE STILL-WATER |
| 13:19:08 | 4 | HEIGHT EXCEEDS THE TOP OF THE WALL, WATER IS FLOWING OVER THE |
| 13:19:11 | 5 | TOP; CORRECT? |
| 13:19:11 | 6 | **A.** YES. |
| 13:19:13 | 7 | **Q.** NOW, WHEN WE ADD WAVES TO IT, WHAT I THINK YOU'RE SAYING |
| 13:19:16 | 8 | TO ME IS, IF THE STILL-WATER HEIGHT IS AT 13 AND YOU HAVE A |
| 13:19:21 | 9 | 3-FOOT WAVE, OCCASIONALLY YOU WILL HAVE WATER THAT IS |
| 13:19:25 | 10 | 11 1/2 FEET GOING -- PERHAPS NOT GOING OVER THE WALL -- IT MAY |
| 13:19:30 | 11 | BE RUNNING INTO THE WALL -- WHICH IS -- ACCOUNTS FOR THE BOTTOM |
| 13:19:34 | 12 | HALF OF THE 3-FOOT WAVE; IS THAT ACCURATE? |
| 13:19:37 | 13 | **A.** YES. |
| 13:19:38 | 14 | **Q.** OKAY. ALL RIGHT. I SEE NOW. |
| 13:19:40 | 15 | SO WHAT I'M CURIOUS TO KNOW IS: WHEN YOU MODELED -- |
| 13:19:44 | 16 | AND I HESITATE TO CALL IT "SURGE," BUT IN YOUR REPORT YOU |
| 13:19:48 | 17 | CALLED IT "SURGE," LET'S CALL IT STILL-WATER -- THE STILL-WATER |
| 13:19:54 | 18 | HEIGHT AT 7:00; THAT IS, THE WORK THAT YOU DID BEFORE THERE WAS |
| 13:19:59 | 19 | A CONCERN ABOUT THE TIMING OF THE BREACH. OKAY? |
| 13:20:04 | 20 | DID YOU MODEL THE FLOW OF WATER OVER THE WALL AT |
| 13:20:08 | 21 | 7:00, OR DID YOU ACCOUNT FOR THIS NEGATIVE 1.5 IN THAT MODEL? |
| 13:20:15 | 22 | **A.** NO. THE WORK IN MY EXPERT REPORT WAS WATER STARTS FLOWING |
| 13:20:22 | 23 | OVER THE WALL WHEN THE STILL-WATER GETS AT THE TOP OF THE WALL, |
| 13:20:25 | 24 | AND THEN IT FLOWS CONTINUOUSLY FROM THAT POINT ON OVER THE |
| 13:20:30 | 25 | WALL. |

| | | |
|---|---|---|
| 13:20:30 | 1 | **Q.**   AND THE REASON I'M ASKING THIS QUESTION IS NOW THAT WE'VE |
| 13:20:33 | 2 | INTRODUCED WAVES, DON'T YOU HAVE TO REDO THE WORK THAT YOU DID |
| 13:20:36 | 3 | WITH REGARD TO STILL-WATER HEIGHT BECAUSE THE WATER |
| 13:20:39 | 4 | OCCASIONALLY IS GOING TO BE A FOOT AND A HALF LOWER THAN YOU |
| 13:20:42 | 5 | ORIGINALLY ASSUMED IN CONNECTION WITH THE STILL-WATER |
| 13:20:48 | 6 | OVERTOPPING ANALYSES THAT YOU DID? |
| 13:20:50 | 7 | **A.**   YES. |
| 13:20:51 | 8 | **Q.**   ALL RIGHT.  AND DID YOU DO THAT? |
| 13:20:53 | 9 | **A.**   YES. |
| 13:20:53 | 10 | **Q.**   IN THIS ONE? |
| 13:20:54 | 11 | **A.**   YES. |
| 13:20:55 | 12 | **Q.**   OKAY.  SO THIS CURVE AT 7:00 IS DIFFERENT FROM THE CURVE |
| 13:21:02 | 13 | THAT YOU PRESENTED IN YOUR REPORT? |
| 13:21:05 | 14 | **A.**   I THINK THE CURVE AT 7:00 IS MEANT TO BE THE SAME AS IS IN |
| 13:21:10 | 15 | MY REPORT. |
| 13:21:10 | 16 | **Q.**   ALL RIGHT.  WELL, NOW YOU'VE GOT ME VERY CONFUSED BECAUSE |
| 13:21:13 | 17 | YOU'VE TOLD US THAT AT THE TIME THAT YOU DID YOUR REPORT, YOU |
| 13:21:17 | 18 | WEREN'T CONSIDERING WAVES. |
| 13:21:18 | 19 | **A.**   YES. |
| 13:21:20 | 20 | **Q.**   ISN'T THAT TRUE? |
| 13:21:20 | 21 | **A.**   YES. |
| 13:21:21 | 22 | **Q.**   ALL RIGHT.  AND YOU'VE JUST TOLD US THAT IF YOU ARE GOING |
| 13:21:23 | 23 | TO CONSIDER WAVES IN CONNECTION WITH THE STILL-WATER HEIGHT, |
| 13:21:27 | 24 | YOU DON'T HAVE 100 PERCENT OF THE WATER FLOWING OVER THE TOP AT |
| 13:21:31 | 25 | 7:00.  OCCASIONALLY YOU HAVE THAT LEVEL REDUCED BY 1.5 TO |

13:21:36    1    ACCOUNT FOR THIS 3-FOOT WAVE; RIGHT?

13:21:38    2    **A.**    YES.

13:21:39    3    **Q.**    ALL RIGHT.  SO TO ACCURATELY PORTRAY THIS DOTTED LINE, YOU

13:21:44    4    HAVE TO REDO THIS ANALYSIS TO ACCOUNT FOR THAT NEGATIVE 1.5;

13:21:48    5    RIGHT?

13:21:48    6    **A.**    YES.

13:21:48    7    **Q.**    AND YOU DIDN'T DO IT?

13:21:49    8    **A.**    I DID.

13:21:50    9    **Q.**    WELL, SO DOES THIS CURVE LOOK EXACTLY LIKE THE OTHER CURVE

13:21:54   10    OR NOT?

13:21:56   11    **A.**    WELL, THE REDONE ANALYSIS IS THE OTHER SET OF THE CURVES

13:21:58   12    THAT START EARLIER IN TIME.

13:21:59   13    **Q.**    OKAY.  SO THIS CURVE, THE DOTTED LINE, REPRESENTS WHAT YOU

13:22:03   14    DID IN CONNECTION WITH YOUR EXPERT REPORT, AND THIS SOLID LINE

13:22:06   15    REPRESENTS WHAT YOU DID INCLUDING WAVES; RIGHT?

13:22:09   16    **A.**    YES, SIR.

13:22:12   17    **Q.**    ALL RIGHT.  NOW, YOU MODELED THE WAVE AS FLOW, DID YOU

13:22:16   18    NOT?

13:22:16   19    **A.**    YES.

13:22:17   20    **Q.**    ALL RIGHT.  IF WE HAVE -- IF WE UNDERSTAND THAT WE ONLY

13:22:20   21    HAVE A FOOT AND A HALF AND WE DON'T HAVE A FOOT AND A HALF

13:22:24   22    CONTINUOUSLY BECAUSE WE ACCOUNT FOR THE PERIOD -- AND FOR THE

13:22:28   23    RECORD, THE PERIOD IS WHAT?

13:22:31   24    **A.**    TWO SECONDS FOR THE SIGNIFICANT WAVE.

13:22:33   25    **Q.**    I APOLOGIZE.  I MEANT, WHAT DOES IT MEAN?  I DIDN'T --

13:22:36   1   **A.**   THE PERIOD OF THE WAVE IS YOUR QUESTION, WHAT DOES THAT

13:22:39   2   MEAN?

13:22:39   3   **Q.**   YES.  WHAT DOES THE PERIOD INDICATE TO US MORTALS?

13:22:44   4   **A.**   THAT'S THE TIME -- IF WE STARTED AT THE PEAK OF ONE WAVE,

13:22:50   5   THE TIME IT TAKES TO GET THE ARRIVAL OF THE NEXT WAVE, THE PEAK

13:22:56   6   OF THE NEXT WAVE.

13:22:56   7   **Q.**   ALL RIGHT.  SO A WAVE HITS, WAIT TWO SECONDS; A WAVE HITS,

13:23:00   8   WAIT TWO SECONDS; A WAIVE HITS, WAIT TWO SECONDS.  ALL RIGHT.

13:23:02   9           SO A WAVE HITS, A FOOT AND A HALF GOES OVER THE TOP,

13:23:04   10   WAIT TWO SECONDS; A WAVE HITS, ONE AND A HALF -- WAIT TWO

13:23:08   11   SECONDS, ONE AND A HALF SPLASHES OVER.  AND THAT'S WHAT YOU

13:23:12   12   MODELED; RIGHT?

13:23:13   13   **A.**   YES.

13:23:17   14   **Q.**   ALL RIGHT.  NOW, HOW DID YOU -- HOW DID YOU THEN DETERMINE

13:23:19   15   WHAT AMOUNT OF FLOW WOULD REPRESENT THIS BUSINESS OF THE WAVE

13:23:22   16   HITTING, TAKING TIME, SPLASHING AGAIN?

13:23:26   17           HOW DID YOU DO THAT?

13:23:27   18   **A.**   THAT'S IN THE MODEL IN WHICH WE TAKE THE DIFFERENCE

13:23:30   19   BETWEEN THE TOP OF THE WAVE -- OR THE HEIGHT OF THE WAVE AND

13:23:35   20   THE TOP OF THE WALL FOR A SMALL AMOUNT OF TIME.  WE COMPUTE

13:23:39   21   THAT VOLUME OF WATER, AND THAT'S WHAT GOES OVER THE WALL.

13:23:42   22   **Q.**   OKAY.

13:23:42   23   **A.**   THAT SMALL -- THAT SMALL AMOUNT OF TIME IS VERY SMALL.

13:23:44   24   IT'S FRACTIONS OF A SECOND.

13:23:47   25   **Q.**   IT'S TWO SECONDS; RIGHT?

13:23:48  1   **A.**  NO, IT'S PARTS OF A SECOND BECAUSE WE'RE TRYING TO

13:23:51  2   MODEL -- THERE ARE TIMES WHEN THE WATER'S GOING -- THE WAVE IS

13:23:57  3   GOING OVER THE WALL AND THERE'S TIMES WHEN IT ISN'T.  SO WE

13:23:59  4   HAVE TO -- WE HAVE TO CAPTURE THAT PROPERLY.

13:24:02  5   **Q.**  WHAT MODEL DID YOU USE TO ACCOMPLISH THIS EVALUATION?

13:24:06  6   **A.**  IT WAS A SPREADSHEET CALCULATION.

13:24:09  7   **Q.**  MEANING YOU DID IT BY HAND?

13:24:11  8   **A.**  NO, WE DID IT IN A SPREADSHEET.

13:24:13  9   **Q.**  A SPREADSHEET.  OKAY.

13:24:14  10          DID YOU -- HAVE YOU PRODUCED THAT?

13:24:15  11  **A.**  I PRODUCED THEM FOR THE EXPERT REPORT FOR THAT SET OF

13:24:18  12  CURVES THAT START AT 7:00.

13:24:21  13  **Q.**  ALL RIGHT.  WELL, THAT'S WITHOUT WAVES.

13:24:24  14  **A.**  RIGHT.

13:24:25  15  **Q.**  SO DID YOU DO A SPREADSHEET TO CREATE THIS CURVE WITH

13:24:28  16  WAVES?

13:24:28  17  **A.**  YES.

13:24:29  18  **Q.**  ALL RIGHT.  DID YOU PRODUCE THAT SPREADSHEET?

13:24:33  19  **A.**  NO.

13:24:33  20  **Q.**  SO WE HAVE NO WAY OF EVALUATING THAT; CORRECT?

13:24:37  21  **A.**  YOU HAVE WHAT I HAVE ON THAT DIAGRAM.

13:24:40  22  **Q.**  ALL I'VE GOT IS THAT, ISN'T THAT TRUE, TO EVALUATE YOUR

13:24:44  23  WAVE OVERTOPPING?  ISN'T THAT CORRECT?

13:24:46  24  **A.**  CORRECT.

13:24:47  25  **Q.**  THAT'S IT.  OKAY.

13:24:54   1            NOW, HERE YOU SAY THAT AT 7:00 THE SCOUR DEPTH, IF

13:25:00   2   YOU ASSUME THIS HIGHLY ERODABLE CLAY, IS THREE FEET; RIGHT?

13:25:08   3   **A.**   WELL, IT'S NOT HIGHLY ERODABLE CLAY, SIR.  IT'S THE MORE

13:25:12   4   ERODABLE CL CLAY THAT'S BEING USED HERE.

13:25:14   5   **Q.**   ALL RIGHT.  SO THIS MORE ERODABLE CLAY, IS THAT MORE OR

13:25:20   6   LESS PERMEABLE THAN AVERAGE CLAY?

13:25:28   7   **A.**   WHAT DO YOU MEAN BY "AVERAGE CLAY"?

13:25:32   8   **Q.**   WELL, MAYBE I'M MISSING SOMETHING HERE.  BUT YOU WROTE

13:25:34   9   "AVERAGE CLAY."  I -- I DON'T -- IT'S RIGHT THERE.

13:25:39  10   **A.**   OKAY.  SO IF WE REFER TO THAT DIAGRAM, IS THE -- I

13:25:44  11   UNDERSTAND THE QUESTION TO BE, IS THE MORE ERODABLE CL CLAY

13:25:53  12   MORE PERMEABLE THAN THE AVERAGE ERODABLE CL CLAY?

13:25:58  13   **Q.**   CORRECT.

13:26:04  14   **A.**   COULD OR COULDN'T BE.  IT'S -- YOU CAN'T TELL FROM -- THE

13:26:09  15   ERODIBILITY DOESN'T DIRECTLY CORRELATE TO PERMEABILITY.

13:26:26  16   **Q.**   OKAY.  ALL RIGHT.  NOW, SO USING THE MOST ERODABLE CLAY ON

13:26:30  17   YOUR CHART, YOU GET 3 FEET OF SCOUR BY 7:00; RIGHT?

13:26:41  18   **A.**   YES.

13:26:41  19   **Q.**   NOW, IN YOUR EXPERT REPORT AND IN YOUR DEPOSITION, YOU

13:26:47  20   TOLD US YOU NEED 5.7 FEET OF SCOUR BEFORE THE WALL WILL TOPPLE

13:26:51  21   OVER; ISN'T THAT TRUE?

13:26:54  22   **A.**   I DON'T THINK I SAID THAT.

13:26:55  23   **Q.**   YOU DON'T THINK YOU SAID THAT.  OKAY.  WE'LL SHOW YOU YOUR

13:26:59  24   DEPOSITION IN A MOMENT.

13:27:01  25            IN ANY CASE, IF WE CONSIDER THE POSSIBILITY OR THE

13:27:05   1   POTENTIAL THAT THE AVERAGE CLAY IS WHAT WAS UTILIZED TO MAKE UP

13:27:10   2   THE LEVEE, WE ONLY HAVE A 1-FOOT SCOUR TRENCH; RIGHT?

13:27:15   3   **A.**   YES, SIR.

13:27:16   4   **Q.**   AND IF WE UTILIZE THE LESS ERODABLE, IT'S ON THE ORDER OF

13:27:25   5   A COUPLE OF INCHES; CORRECT?

13:27:27   6   **A.**   YES, SIR.

13:27:27   7   **Q.**   ALL RIGHT.  NOW -- THEN IF WE GO BACK TO PAGE 1.  YOU

13:27:45   8   SHOW -- OR AT LEAST YOU SAY HERE -- LET'S HIGHLIGHT THAT --

13:27:49   9   THAT YOU NEED A HOLE AS DEEP AS 4.6.

13:27:52  10            **THE COURT:**  DO YOU WANT IT POINT IT OUT SO WE CAN GET

13:27:54  11   IT QUICKLY?  THERE YOU GO.  "MY CALCULATIONS..." IT STARTS AT

13:27:59  12   "MY CALCULATIONS . . ."?

13:27:59  13   **BY MR. BRUNO:**

13:27:59  14   **Q.**   "MY CALCULATIONS SHOW THAT A HOLE AS DEEP AS 4.6 FEET DEEP

13:28:04  15   WOULD HAVE DEVELOPED WITHIN 130 MINUTES OF THE START OF WAVE

13:28:09  16   OVERTOPPING.  UNDER THESE CONDITIONS THE CALCULATED FACTOR OF

13:28:12  17   SAFETY IS.  9, INDICATING FAILURE."  RIGHT?

13:28:16  18   **A.**   YES.

13:28:16  19   **Q.**   IS THAT A NEW CALCULATION, OR WAS THAT CALCULATION IN YOUR

13:28:18  20   EXPERT REPORT?

13:28:30  21            **MR. BRUNO:**  AND I THINK, JUDGE, YOU'RE PUZZLED.  LET

13:28:32  22   ME ASK IT AGAIN.

13:28:32  23            **THE COURT:**  I'M NOT PUZZLED.  I'M ONLY WONDERING

13:28:35  24   WHICH EXPERT REPORT, IF ANY.

          25

| | | |
|---|---|---|
| 13:28:36 | 1 | BY MR. BRUNO: |
| 13:28:36 | 2 | **Q.**   OKAY.   THERE ARE -- THERE ARE TWO EXPERT REPORTS, DOCTOR, |
| 13:28:39 | 3 | ARE THERE NOT? |
| 13:28:40 | 4 | **A.**   YES. |
| 13:28:40 | 5 | **Q.**   ALL RIGHT.   THERE IS THE ORIGINAL MARCH 12TH, WHICH YOU |
| 13:28:42 | 6 | MADE SOME CORRECTIONS, MINOR REVISIONS; RIGHT? |
| 13:28:45 | 7 | **A.**   YES. |
| 13:28:46 | 8 | **Q.**   AND THEN THERE IS THIS ONE HERE, WHICH IS YOUR |
| 13:28:48 | 9 | JULY 24TH REPORT; CORRECT? |
| 13:28:50 | 10 | **A.**   YES. |
| 13:28:51 | 11 | **Q.**   TWO. |
| 13:28:51 | 12 |        AND WHAT I'M TRYING TO LEARN IS THE SENTENCE:   "MY |
| 13:28:56 | 13 | CALCULATIONS SHOW THAT A HOLE AS DEEP AS 4.6 FEET DEEP WOULD |
| 13:29:00 | 14 | HAVE DEVELOPED WITHIN 130 MINUTES OF THE START OF WAVE |
| 13:29:06 | 15 | OVERTOPPING.   UNDER THOSE CONDITIONS, THE CALCULATED FACTOR OF |
| 13:29:11 | 16 | SAFETY IS .9, INDICATING FAILURE." |
| 13:29:12 | 17 |        SO WHAT I WANT TO SPECIFICALLY ASK YOU IS:   THE |
| 13:29:15 | 18 | CALCULATED FACTOR OF SAFETY, OKAY, THAT CALCULATION, DID YOU DO |
| 13:29:22 | 19 | THAT FOR THIS REPORT, OR CAN I FIND THAT IN YOUR MARCH 2012 |
| 13:29:28 | 20 | REPORT? |
| 13:29:29 | 21 | **A.**   I THINK WE CAN FIND THAT IN THE MARCH REPORT. |
| 13:29:32 | 22 | **Q.**   WE CAN FIND IT? |
| 13:29:34 | 23 | **A.**   YES. |
| 13:29:35 | 24 | **Q.**   WILL WE FIND IT UNDER "SCOUR"? |
| 13:29:38 | 25 | **A.**   WE'LL FIND IT IN THE SECTION ON OVERTURNING CALCULATIONS. |

| | | |
|---|---|---|
| 13:29:45 | 1 | **Q.**  OVERTURNING CALCULATIONS. |
| 13:29:47 | 2 | WE WON'T FIND IT UNDER SCOUR, WILL WE? |
| 13:29:52 | 3 | **A.**  NO.  BUT THE SCOUR DIDN'T GIVE FACTORS OF SAFETY, I DON'T |
| 13:29:55 | 4 | BELIEVE. |
| 13:29:55 | 5 | **Q.**  WELL, DIDN'T YOU UTILIZE A FACTOR OF SAFETY TO ASCERTAIN |
| 13:30:00 | 6 | WHAT DEPTHS OF THE SCOUR TRENCH WOULD BE NECESSARY TO CAUSE |
| 13:30:05 | 7 | FAILURE? |
| 13:30:05 | 8 | **A.**  YES. |
| 13:30:07 | 9 | **Q.**  OKAY.  SO YOU DID USE FACTOR OF SAFETY CALCULATIONS IN |
| 13:30:11 | 10 | THAT APPENDIX, WHICH IS APPENDED TO YOUR REPORT, REGARDING ALL |
| 13:30:17 | 11 | THESE SCOUR CALCULATIONS, DID YOU NOT? |
| 13:30:18 | 12 | **A.**  YES. |
| 13:30:19 | 13 | **Q.**  OKAY.  AND SO WHAT I WANT TO JUST MAKE SURE OF, CLEAR IN |
| 13:30:23 | 14 | MY HEAD HERE, MY BRAIN, IS THAT THE .9 IS NOT FOUND IN THE |
| 13:30:26 | 15 | SECTION OF YOUR MARCH REPORT WHICH DETAILS THE METHODOLOGY THAT |
| 13:30:31 | 16 | YOU USED TO ASCERTAIN HOW DEEP A SCOUR TRENCH YOU WOULD NEED IN |
| 13:30:36 | 17 | ORDER TO CAUSE FAILURE. |
| 13:30:38 | 18 | IT'S NOT THERE; ISN'T THAT TRUE? |
| 13:30:40 | 19 | **A.**  THAT'S NOT TRUE. |
| 13:30:41 | 20 | **Q.**  IT'S IN THAT APPENDIX? |
| 13:30:42 | 21 | **A.**  YES. |
| 13:30:43 | 22 | **Q.**  THE ONE ABOUT SCOUR? |
| 13:30:45 | 23 | **A.**  IT'S IN MY REPORT. |
| 13:30:47 | 24 | **Q.**  THAT'S NOT MY QUESTION, DR. MARR. |
| 13:30:50 | 25 | IT MAY BE IN YOUR REPORT.  I'M LIMITING MY QUESTION |

13:30:54   1   TO THE SECTION OF YOUR REPORT THAT IS ENTITLED "SCOUR."

13:30:59   2            IN THAT SECTION YOU TALK ABOUT HOW YOU GOT TO THE

13:31:03   3   5.7.  DO YOU REMEMBER THAT?

13:31:06   4   **A.**   IN THAT SECTION I TALK ABOUT HOW WE CALCULATE DEPTHS OF

13:31:09   5   SCOUR.

13:31:10   6   **Q.**   AND YOU USED FACTORS OF SAFETY TO CALCULATE THE 5.7;

13:31:14   7   RIGHT?

13:31:14   8            **THE COURT:**  YOU KEEP SAYING 5.7.  I'M LOOKING AT 4.6.

13:31:19   9   SO YOU MAY WANT TO -- YOU WILL EDUCATE ME, I'M SURE, LATER ON.

13:31:23   10           **MR. BRUNO:**  YEAH.  I WAS TRYING TO -- MAYBE WE'LL

13:31:24   11  JUST JUMP TO IT.

13:31:26   12           **THE COURT:**  YEAH.  BECAUSE WE'RE -- IT'S JUST A

13:31:27   13  LITTLE CONFUSING WHEN YOU'RE LOOKING AT THAT FIGURE AND TALKING

13:31:31   14  ABOUT ANOTHER.

13:31:51   15           **MR. BRUNO:**  CAN WE GO, PLEASE, TO PX-4721-108?

13:32:03   16           AND LET THE RECORD REFLECT THAT THIS IS THE

13:32:05   17  REVISED REPORT, WHICH IS THE ONE WITH THE MINOR CORRECTIONS.

13:32:10   18           CAN WE BLOW UP THIS SECTION HERE?

13:32:16   19           APPENDIX O.  CAN WE HIGHLIGHT THAT SENTENCE?

13:32:26   20           **THE COURT:**  YOU'RE AT 6.3.4 -- 6.3.4 ON --

13:32:31   21           **MR. BRUNO:**  PAGE 108, YOUR HONOR.

13:32:33   22           **THE COURT:**  OKAY.

13:32:34   23           **MR. BRUNO:**  THAT'S PX NUMBER, FOR THE RECORD,

13:32:36   24  PX-4721-108.

           25

2003

13:32:39   1   **BY MR. BRUNO:**

13:32:39   2   **Q.**   NOW, I'M READING THIS SENTENCE CORRECTLY, AM I NOT:

13:32:43   3   "APPENDIX O CONTAINS THE CALCULATIONS TO SHOW THAT WHEN THE

13:32:45   4   DEPTH OF SCOUR REACHES ABOUT 5.7 FEET, THE WALL COMPLETELY

13:32:50   5   FAILS BY OVERTURNING."

13:32:52   6            THOSE ARE YOUR WORDS, ARE THEY NOT?

13:32:54   7   **A.**   YES, SIR.

13:32:54   8   **Q.**   ALL RIGHT.  AND THIS IS DIFFERENT FROM WHAT YOU PUT IN THE

13:32:57   9   SUBSEQUENT REPORT DATED JULY 2012, IS IT NOT?

13:33:04  10   **A.**   YES.

13:33:05  11   **Q.**   OKAY.  SO, IN FACT, APPENDIX O DOES NOT CONTAIN THE

13:33:13  12   CALCULATIONS THAT YOU RELY ON --

13:33:16  13            **MR. BRUNO:**  CAN WE GO BACK, FORGIVE ME, TO DX-2647-1?

13:33:27  14   IT'S ABOUT RIGHT HERE.

13:33:34  15   **BY MR. BRUNO:**

13:33:35  16   **Q.**   SO THIS REFERENCE TO "MY CALCULATIONS" IS IN A DIFFERENT

13:33:39  17   SECTION OF THE REPORT; CORRECT?

13:33:45  18   **A.**   IN APPENDIX O WE HAVE FACTOR OF SAFETY AS A FUNCTION OF

13:33:50  19   DEPTH OF SCOUR.

13:33:51  20   **Q.**   OKAY.

13:33:53  21   **A.**   THAT'S WHAT I'M REFERRING TO WHEN I SAY THERE ARE --

13:33:56  22   THERE'S INFORMATION THERE FOR ME TO DETERMINE SCOUR DEPTH.

13:34:02  23   **Q.**   OKAY.  ALL RIGHT.  I'M JUST, AS WE ALL KNOW, A MERE

13:34:08  24   LAWYER, AND NOT SO GOOD AT THAT.

13:34:11  25            BUT RIGHT HERE IT SAYS 4.6, AND WE JUST SHOWED YOU

13:34:15  1  5.7.

13:34:16  2        YOU'LL AGREE WITH ME THOSE ARE TWO DIFFERENT NUMBERS?

13:34:19  3  **A.**  YES.

13:34:19  4  **Q.**  OKAY.  NOW, LET'S TALK ABOUT THE ASSUMPTIONS THAT YOU

13:34:22  5  UTILIZED IN DOING THIS ANALYSIS -- THIS NEW ANALYSIS, OKAY,

13:34:25  6  THAT NONE OF US HAD A CHANCE TO EVALUATE.

13:34:29  7        FIRST OF ALL, WHAT WALL HEIGHT DID YOU USE?

13:34:36  8  **A.**  SEVEN FEET.  THAT'S JUST TO BE CLEAR.

13:34:42  9  **Q.**  YEAH.  I THINK WE'RE TALKING -- LET'S GO TO IT.  MY

13:34:46  10  APOLOGIES.  LET'S GO TO IT.

13:34:49  11        DX-02647-0003.

13:34:54  12        **THE COURT:**  WE'RE AT THE SOUTH BREACH RIGHT NOW, I

13:34:55  13  THINK; CORRECT?

13:34:56  14        **MR. BRUNO:**  RIGHT.

13:34:56  15        **THE COURT:**  OKAY.

13:34:56  16        **MR. BRUNO:**  YES.  AND I'M GLAD YOU ASKED THAT.

13:34:57  17        **THE COURT:**  I'D JUST LIKE TO PINPOINT THAT FOR THE

13:34:59  18  RECORD, IN CASE --

13:35:01  19        **MR. BRUNO:**  YEAH.

13:35:01  20  **BY MR. BRUNO:**

13:35:01  21  **Q.**  THE JUDGE ACTUALLY ASKED THE QUESTION THAT I ALMOST

13:35:05  22  FORGOT.  THIS REPORT, DOES IT MENTION IN ANY RESPECT THE NORTH

13:35:07  23  BREACH?

13:35:09  24        **THE COURT:**  THE JULY 24TH REPORT?

13:35:12  25        **MR. BRUNO:**  YES, YOUR HONOR.  YES.

13:35:14   1   **BY MR. BRUNO:**

13:35:14   2   **Q.**   THIS DX-02647-0001, DOES IT MENTION IN ANY RESPECT THE

13:35:21   3   NORTH BREACH?

13:35:22   4   **A.**   I DON'T RECALL.

13:35:23   5   **Q.**   LET'S LOOK AT IT.  TAKE YOUR TIME.  READ IT, PLEASE.

13:35:27   6              **THE COURT:**  HOW MANY PAGES IS IT?

13:35:29   7              **MR. BRUNO:**  TWO.  JUST TWO.  I WOULDN'T DO THAT TO

13:35:32   8   YOU -- I WOULD NOT DO THAT TO YOU.

13:35:35   9              **THE COURT:**  OH, OKAY.  I CAN HANDLE TWO PAGES.

13:35:37  10              **THE WITNESS:**  (WITNESS REVIEWS REPORT.)

13:35:45  11              **MR. SMITH:**  YOUR HONOR, I CAN DIRECT DR. MARR TO THE

13:35:48  12   FIRST SENTENCE, WHICH TALKS ABOUT SPILLING OVER THE TOP OF THE

13:35:51  13   LEVEE WALL FOR BOTH THE NORTH AND SOUTH BREACHES.

13:35:54  14              **THE COURT:**  I'M UNFORTUNATELY NOT --

13:35:54  15              **MR. SMITH:**  THE QUESTION IS, AS I UNDERSTAND IT,

13:35:57  16   WHETHER IT REFERS ANYWHERE TO THE NORTH BREACH.

13:36:00  17   **BY MR. BRUNO:**

13:36:01  18   **Q.**   WELL, WITH RESPECT, WHAT I'M ASKING SPECIFICALLY IS:  THE

13:36:05  19   OPINION THAT YOU OFFER HERE IS NOT RELATED TO THE NORTH BREACH,

13:36:07  20   IT IS ONLY RELATED TO THE SOUTH BREACH; ISN'T THAT TRUE?

13:36:14  21              **MR. TREEBY:**  I OBJECT TO THE QUESTION, YOUR HONOR.

13:36:16  22              IT'S JUST -- I DON'T KNOW, MAYBE I'M JUST NOT

13:36:17  23   PAYING ENOUGH ATTENTION, BUT I DON'T UNDERSTAND THE QUESTION.

13:36:19  24              **THE COURT:**  WELL, YOUR OBJECTION'S OVERRULED.  I

13:36:22  25   UNDERSTAND IT.  AND IF THE WITNESS DOESN'T UNDERSTAND IT, HE

```
13:36:24    1   CAN SAY HE WOULD LIKE IT REPEATED.

13:36:26    2           THE WITNESS:  I WOULD LIKE TO JUST SEE THE REST OF

13:36:28    3   THE DOCUMENT, I THINK, TO BE ABLE TO ANSWER.

13:36:31    4           MR. BRUNO:  DO YOU WANT ME TO GIVE YOU A COPY OF

13:36:32    5   THE --

13:36:33    6           THE WITNESS:  WELL, THAT WOULD BE VERY HELPFUL.

13:36:34    7           MR. BRUNO:  THAT WOULD PROBABLY BE EASIER FOR YOU.  I

13:36:34    8   DON'T LIKE TO --

13:36:36    9               MAY I APPROACH?

13:36:37   10           THE COURT:  YES, YOU MAY.

13:36:38   11           THE WITNESS:  THANK, YOU, YOUR HONOR.  I APPRECIATE

13:36:38   12   IT.

13:36:38   13           MR. BRUNO:  I CAN'T STAND READING A SCREEN EITHER.

13:36:41   14           THE COURT:  WELL, THE BOTTOM LINE IS:  "DID THIS

13:36:43   15   JULY 24TH TWO-PAGE SUPPLEMENTAL OPINION OPINE OR RENDER ANY

13:36:47   16   OPINIONS REFERENCING THE NORTH BREACH"?

13:36:49   17           MR. BRUNO:  EXACTLY.  I'M JUST TRYING TO --

13:36:51   18           THE COURT:  THAT'S THE QUESTION.

13:36:53   19           MR. BRUNO:  HAVING COME LATE, I JUST WANT TO KNOW IF

13:36:54   20   WE'RE EXPANDING NORTH AND SOUTH OR JUST SOUTH.

13:37:19   21           THE WITNESS:  WITH THE EXCEPTION OF THE FIRST

13:37:20   22   SENTENCE, IT IS -- IT IS DISCUSSING THE SOUTH BREACH --

13:37:23   23   CONDITIONS AT THE SOUTH BREACH SPECIFICALLY IN THE REPORT.

13:37:28   24               BUT THE SAME PHYSICS AND THE MECHANICS APPLY TO

13:37:30   25   THE NORTH BREACH.
```

13:37:33  1   **BY MR. BRUNO:**

13:37:33  2   **Q.**   THE SAME PHYSICS AND MECHANICS.  SO WHAT CONCLUSIONS DID

13:37:39  3   YOU REACH IN THIS REPORT RELATABLE TO THE NORTH BREACH?

13:37:45  4            **MR. BRUNO:**  MAY I GET THAT BACK, JUDGE?

13:37:51  5            **THE COURT:**  YES, YOU MAY.

13:37:53  6            **MR. BRUNO:**  THANK YOU, DR. MARR.

13:37:55  7   **BY MR. BRUNO:**

13:37:55  8   **Q.**   WHAT CONCLUSION IS IN THIS REPORT THAT TALKS ABOUT THE

13:37:58  9   NORTH BREACH?

13:37:59  10           **MR. BRUNO:**  LET'S GO TO DX-02647-003.

13:38:05  11           **THE COURT:**  AS I UNDERSTAND HIS TESTIMONY, HE SAID HE

13:38:06  12  GAVE NO OPINION ABOUT THE NORTH BREACH SPECIFICALLY, AND HE

13:38:09  13  MENTIONS THE FIRST SENTENCE.

13:38:10  14                THAT'S MY UNDERSTANDING OF THE TESTIMONY THUS

13:38:14  15  FAR.

13:38:14  16           **MR. BRUNO:**  AND THEN HE SAID -- HE OPINES SOMETHING,

13:38:17  17  SO I'M JUST TRYING TO ROUND IT OUT AND MOVE ON.

13:38:19  18           **THE COURT:**  ALL RIGHT.

13:38:19  19  **BY MR. BRUNO:**

13:38:19  20  **Q.**   TELL US -- I'M LOOKING AT IT, DR. MARR, IT SAYS "SOUTH

13:38:22  21  BREACH," IN BLACK AND WHITE.  IT DOESN'T SAY NORTH BREACH;

13:38:26  22  RIGHT?

13:38:27  23  **A.**   THAT'S RIGHT.

13:38:27  24  **Q.**   ARE YOU TELLING THE JUDGE THAT YOU REACHED SOME

13:38:29  25  CONCLUSIONS ABOUT THE NORTH BREACH FROM THIS DOCUMENT?

13:38:31  1  **A.**   YES.

13:38:32  2  **Q.**   OKAY.  ALL RIGHT.  BUT YOU CHOSE NOT TO SAY THE WORDS

13:38:35  3  "NORTH BREACH" DESPITE THAT; RIGHT?

13:38:39  4        **THE COURT:**  HE CHOSE NOT TO GET -- RENDER AN OPINION

13:38:41  5  ON THE NORTH BREACH IN THE TWO-PAGES REPORT.  THAT'S MY

13:38:45  6  UNDERSTANDING.

13:38:45  7        **MR. BRUNO:**  ALL RIGHT.  AND THAT ACCURATELY --

13:38:47  8        **THE COURT:**  I'LL ASK HIM DIRECTLY.

13:38:48  9        DID YOU OPINE AS TO ANY CAUSATION -- ANY

13:38:54  10  CAUSATION OPINION OR OTHER OPINION THAT WOULD BE RELEVANT TO

13:38:57  11  THE NORTH BREACH OTHER THAN MENTIONING IT IN THE FIRST

13:39:00  12  SENTENCE?

13:39:00  13        **THE WITNESS:**  I DID NOT.

13:39:02  14  BY MR. BRUNO:

13:39:02  15  **Q.**   ALL RIGHT.  NOW, LET'S JUST WALK THROUGH THIS.  THE SOUTH

13:39:05  16  BREACH IS WHAT'S PORTRAYED HERE.  THE SOUTH BREACH -- THE SOUTH

13:39:07  17  BREACH TOPPLE WALL FLOOD ELEVATION THAT YOU CHOSE TO USE IS

13:39:11  18  12.1; CORRECT?

13:39:14  19  **A.**   YES.

13:39:14  20  **Q.**   ALL RIGHT.  AND THAT IS, AS YOU'VE REPORTED IN YOUR

13:39:15  21  REPORT, THE LOWEST POINT OF THE SOUTH BREACH; CORRECT?

13:39:18  22  **A.**   YES.

13:39:19  23  **Q.**   THIS IS NOT THE ELEVATION OF THE NORTH BREACH.

13:39:22  24  **A.**   RIGHT.

13:39:23  25  **Q.**   RIGHT?

13:39:24   1           OKAY.  NOW, THE SECOND THING THAT I'M CURIOUS ABOUT

13:39:30   2   IS THE BUSINESS OF DETERMINING SCOUR IS DEPENDENT UPON THE JET

13:39:39   3   SPRAY, IS IT NOT?  IT IS THE JET OF WATER THAT'S PIERCING THE

13:39:44   4   MUD?

13:39:44   5   A.   YES.

13:39:44   6   Q.   I MEAN, YOU KNOW, KIND OF LIKE WHEN I'M AT HOME AND I'M

13:39:47   7   CLEANING MY SIDEWALK AND I HAVE MY HOSE ON THE LITTLE HARD

13:39:51   8   SPRAY, AND IF I GO TO THE DIRT AND IF I HOLD IT THERE LONG

13:39:55   9   ENOUGH, I'M GOING TO DEVELOP A LITTLE HOLE; RIGHT?

13:39:57  10   A.   YES, SIR.

13:39:57  11   Q.   AND THAT'S CONSIDERED A JET?

13:40:00  12   A.   YES.

13:40:01  13   Q.   AND THE WAY YOU MODELED THE SCOURING WAS YOU USED A JET,

13:40:05  14   JUST LIKE MY HOSE; RIGHT?

13:40:08  15   A.   WELL, IT WAS -- YOUR HOSE IS ROUND.  THIS IS MORE ALONG

13:40:11  16   THE COMPLETE WIDTH OF WATER ALONG THE LENGTH OF THE FLOODWALL.

13:40:17  17   Q.   WELL, IN YOUR REPORT YOU SAY YOU MODEL IT AS A JET.  AND

13:40:21  18   YOU SAY THAT THIS IS NECESSARILY GOING TO SHOW THE DEEPEST PART

13:40:24  19   OF SCOUR.

13:40:26  20           DO YOU RECALL THAT IN YOUR REPORT?

13:40:27  21   A.   YES.

13:40:28  22   Q.   OKAY.  SO WE ARE NOT MODELING IT AS A SHEET OF WATER

13:40:32  23   COMING DOWN INTO THE TRENCH, WE ARE MODELING IT AS A JET.

13:40:37  24   A.   I'M SORRY.  THAT'S A MISUNDERSTANDING OF THE USE OF "JET"

13:40:42  25   HERE.

13:40:42   1          THE MODEL IS LOOKING AT UNIT WIDTH, BUT ASSUMING THAT

13:40:49   2   ALONG -- ALONG THE LENGTH OF THE WALL WE HAVE WATER FLOWING

13:40:51   3   OVER THE TOP OF THE -- OF THE WALL.

13:40:55   4   **Q.**   HOW LONG THE LENGTH?

13:40:57   5   **A.**   IN THIS CASE IT'S ASSUMING THE LENGTH GOES IN EACH

13:41:00   6   DIRECTION FOR AN INFINITE LENGTH.  THAT'S THE WAY WE DO

13:41:05   7   ANALYSES.

13:41:05   8          WE'RE SAYING WE'RE JUST PICKING A TYPICAL 1-FOOT

13:41:10   9   SECTION AND ANALYZING HOW MUCH WATER'S GOING ACROSS THAT

13:41:14  10   1-FOOT, ASSUMING THAT THE FOOT NEXT TO IT IS IDENTICAL.

13:41:19  11   **Q.**   WELL, ALL THAT MEANS IS THAT THE RESULTS THAT YOU OBTAIN

13:41:23  12   FROM THIS PARTICULAR ANALYSIS CAN BE UTILIZED FOR EVERY SECTION

13:41:27  13   OF THE WALL THAT'S IDENTICAL TO THAT SECTION; CORRECT?

13:41:30  14   **A.**   YES.

13:41:30  15   **Q.**   ALL RIGHT.  BUT IN TERMS OF WHAT THE MODEL IS SEEING, IS

13:41:35  16   THE MODEL SEEING A CIRCULAR JET OF WATER OR IS IT SEEING A

13:41:41  17   LINEAR JET OF WATER?

13:41:42  18   **A.**   IT'S SEEING MORE LIKE A RECTANGLE OF WATER THAT HAS A

13:41:46  19   CERTAIN WIDTH AND A FOOT IN LENGTH.

13:41:49  20   **Q.**   ALL RIGHT.  WHAT IS ITS WIDTH?

13:41:51  21   **A.**   THAT DEPENDS ON HOW MUCH WATER IS GOING ACROSS THE TOP.

13:41:53  22   AND IT STARTS FROM VERY -- YOU KNOW, AN INCH OR TWO AND

13:41:57  23   BROADENS OUT INTO SEVERAL INCHES BY THE FULL -- FULL OVERFLOW

13:42:05  24   DEVELOPMENT.

13:42:05  25   **Q.**   SO THE COMPUTER CALCULATES THE JET WIDTH AND HEIGHT -- OR

2011

13:42:09   1   I SHOULD SAY LENGTH, PERHAPS?

13:42:11   2   **A.**   WELL, IT'S ASSUMING A UNIT LENGTH 1-FOOT WIDE.

13:42:15   3   **Q.**   OKAY.  SO IT'S A FOOT WIDE --

13:42:17   4   **A.**   YES.

13:42:17   5   **Q.**   -- AND THEN THE COMPUTER CALCULATES ITS WIDTH?

13:42:20   6   **A.**   YES.

13:42:20   7   **Q.**   I'M SORRY.  IF THIS IS LENGTH --

13:42:21   8   **A.**   YES.

13:42:22   9   **Q.**   -- IT'S CALCULATING ITS WIDTH; RIGHT?

13:42:24   10   **A.**   YES, SIR.

13:42:24   11   **Q.**   OKAY.  AND THE MORE WATER THAT GOES OVER, THE THICKER IT

13:42:27   12   GETS?

13:42:28   13   **A.**   YES.  THE WIDER IT GETS, YES.

13:42:29   14   **Q.**   SO IF IT'S A SMALL AMOUNT OF WATER, IT'S SMALL; AND LARGE

13:42:32   15   AMOUNT OF WATER, IT'S THICK?

13:42:34   16   **A.**   YES.

13:42:34   17   **Q.**   ALL RIGHT.  NOW, THE SECOND COMPONENT WE HAVE IS, HOW FAR

13:42:37   18   DID THE WATER FALL FROM THE TOP TO THE POINT WHERE IT HIT THE

13:42:39   19   CROWN; RIGHT?

13:42:41   20   **A.**   YES.

13:42:41   21   **Q.**   AND YOU ASSUMED 7 FEET?

13:42:42   22   **A.**   YES.  WE TOOK THAT OUT OF THE MEASUREMENTS FROM THE

13:42:46   23   SURVEYS.  IT WASN'T AN ASSUMPTION.  IT WAS BASED ON SURVEYS

13:42:51   24   THAT SHOWED US THE TOP OF THE WALL AS WELL AS THE TOP OF THE

13:42:55   25   LEVEE EMBANKMENT ON THE LAND SIDE.

2012

```
13:42:59   1   Q.   ALL RIGHT.  WELL, YOU'VE PRODUCED TO US A MAP WHICH

13:43:02   2   INDICATES THE LEVEE CROWN.  AND IT'S NOT ALL THE SAME, IS IT?

13:43:06   3   A.   NO, IT VARIES A FEW INCHES.  AND SO IN THIS CASE WE USED

13:43:10   4   IT AS A COMMON 7 FEET.

13:43:12   5   Q.   ALL RIGHT.  LEVEE CROWN, NOW.  YOU DIDN'T USE 7 FEET AS

13:43:15   6   THE LEVEE CROWN.  YOU USED 7 FEET TO SHOW THE DISTANCE THE

13:43:19   7   WATER TRAVELED FROM THE TOP OF THE WALL TO THE CROWN; CORRECT?

13:43:22   8   A.   YES, SIR.

13:43:22   9   Q.   ALL RIGHT.  I'M TALKING ABOUT LEVEE CROWN.  YOU HAVE

13:43:25  10   PRODUCED A MAP, WHICH WE'LL GET TO LATER, THAT SHOWS THAT LEVEE

13:43:29  11   CROWN IS DIFFERENT IN DIFFERENT LOCATIONS; RIGHT?

13:43:31  12   A.   YES, SIR.

13:43:32  13   Q.   ALL RIGHT.  IN THIS PARTICULAR LOCATION, AT 12.2, DID YOU

13:43:36  14   ASCERTAIN THE LEVEE CROWN?

13:43:37  15   A.   YES.

13:43:37  16   Q.   ALL RIGHT.  AND YOU CALCULATED IT TO BE 7 FEET LOWER THAN

13:43:41  17   12.1?

13:43:41  18   A.   APPROXIMATELY.

13:43:42  19   Q.   OKAY.  NOW, IF IT'S 6 FEET, WHAT DOES THAT DO TO YOUR

13:43:45  20   CALCULATIONS?

13:43:47  21   A.   THE ENERGY WOULD BE A LITTLE LESS, AND SO THE DEPTH OF

13:43:50  22   SCOUR WOULD BE A LITTLE LESS.

13:43:52  23   Q.   OKAY.  ALL RIGHT.  SO WE HAVE A COUPLE OF VARIABLES HERE.

13:44:01  24   WE HAVE THE HEIGHT OF THE WALL, CORRECT, WHICH RELATES TO TIME?

13:44:06  25   A.   BY "HEIGHT," WE MEAN THE ELEVATION OF THE TOP OF THE WALL?
```

13:44:08   1   **Q.**   YES.

13:44:09   2   **A.**   YES.

13:44:10   3   **Q.**   ELEVATION OF THE TOP OF THE WALL IS A VARIABLE; RIGHT?

13:44:14   4   **A.**   YES, SIR.

13:44:14   5   **Q.**   AND THE WAY YOU'VE CONSTRUCTED THIS THING, THE ELEVATION

13:44:17   6   OF THE TOP OF THE WALL RELATES TO TIME; THAT IS, THE TIME

13:44:22   7   AVAILABLE FOR WATER TO GO OVER THE TOP AND SCOUR THE BOTTOM

13:44:26   8   BEHIND THE WALL.  RIGHT?

13:44:29   9   **A.**   YOU MEAN CLOCK TIME HERE THAT -- I'M JUST TRYING TO MAKE

13:44:34   10   SURE WE'RE ON THE SAME PAGE.

13:44:37   11   **Q.**   NO, AMOUNT OF TIME.

13:44:39   12        BECAUSE WHAT WE HAVE HERE IS WE HAVE 7:00 AS A TIME

13:44:42   13   AND WE HAVE A TOP-OF-WALL ELEVATION OF 12.1.

13:44:45   14        AND SO FOR YOU TO DO THIS ANALYSIS, YOU'RE USING THE

13:44:48   15   HEIGHT OF THE WATER IN THE IHNC AT THAT TIME?

13:44:51   16   **A.**   YES.

13:44:52   17   **Q.**   SO THE TIME AT WHICH YOU DRAW YOUR LINE IS BASED UPON THE

13:45:02   18   HEIGHT OF THE WATER AT THAT TIME; CORRECT?

13:45:06   19   **A.**   YES.

13:45:07   20   **Q.**   AND THE HEIGHT OF THE WATER IS DEPENDENT UPON THE HEIGHT

13:45:12   21   OF THE WATER THAT OCCURRED DURING KATRINA.

13:45:17   22        AND SO THIS BUSINESS OF TIME IN YOUR ANALYSIS RELATES

13:45:21   23   TO THE HEIGHT OF THE WATER; CORRECT?

13:45:23   24   **A.**   WELL, THE TIME THERE IS THE ACTUAL TIME THAT -- IN CLOCK

13:45:30   25   TIME.

13:45:31    1          THE -- WE COULD GO BACK TO THE HYDROGRAPH AND SEE FOR

13:45:34    2   EACH OF THOSE TIMES WHAT WAS THE LEVEL OF WATER IN THE CANAL.

13:45:39    3          **THE COURT:**  AS I UNDERSTAND IT, THIS SPECIFIC GRAPH

13:45:42    4   WE'RE LOOKING AT DOES NOT INDICATE WATER HEIGHT AT VARIOUS

13:45:47    5   TIMES, OR DOES IT?

13:45:48    6          **THE WITNESS:**  DOES NOT.

13:45:49    7          **THE COURT:**  THANK YOU.

13:45:49    8   **BY MR. BRUNO:**

13:45:50    9   **Q.**   BUT WHAT YOU'VE PLUGGED INTO THIS MODEL ARE -- AND PERHAPS

13:45:54   10   I NEED TO ASK THAT.

13:45:55   11          WHAT WATER HEIGHT DID YOU USE?

13:45:57   12   **A.**   WE USED THE HYDROGRAPH PROVIDED BY IPET.

13:46:00   13   **Q.**   SO IT CHANGES OVER TIME?

13:46:02   14   **A.**   YES, SIR.

13:46:02   15   **Q.**   ALL RIGHT.  SO AS WE MOVE TOWARD 9:00, WE -- AT THIS POINT

13:46:06   16   THE WATER'S 14.2 FEET?

13:46:09   17   **A.**   YES, SIR.

13:46:09   18   **Q.**   OKAY.  SO AS TIME GOES BY, THERE'S MORE WATER POURING OVER

13:46:14   19   THE TOP OF THE WALL; RIGHT?

13:46:15   20   **A.**   YES, SIR.

13:46:16   21   **Q.**   OKAY.  ALL RIGHT.  NOW, IN TERMS OF WHAT OCCURRED NEXT,

13:46:23   22   THE NEXT THING THAT YOU DID AFTER YOU SENT US YOUR NEW REPORT

13:46:31   23   IS YOU SENT US CORRECTIONS TO YOUR DEPOSITION; CORRECT?

13:46:38   24          AND I BELIEVE WE GOT THOSE ON --

13:46:41   25          **THE COURT:**  AUGUST.

13:46:42   1   **BY MR. BRUNO:**

13:46:43   2   **Q.**   -- AUGUST 6TH, 2002.

13:46:46   3              **THE COURT:**  2002?

13:46:47   4              **MR. BRUNO:**  I'M SORRY.  2012.

13:46:48   5              **THE COURT:**  YEAH.  I THOUGHT I MIGHT HAVE BEEN IN A

13:46:50   6   TIME WARP, WHICH IS -- I WOULD LIKE IT TO BE 2002, THEN I COULD

13:46:53   7   HAVE RECUSED THESE CASES.

13:46:55   8                  BUT GO AHEAD.  I HAD EVERY OPPORTUNITY TO,

13:46:58   9   BUT . . .

13:47:00  10   **BY MR. BRUNO:**

13:47:01  11   **Q.**   SO THE NEXT THING YOU DID WAS SEND US THE CORRECTIONS TO

13:47:03  12   YOUR DEPOSITION.

13:47:06  13   **A.**   WELL, I PROVIDED THEM TO MR. SMITH.

13:47:13  14   **Q.**   AND IN THE CORRECTIONS, YOU SUBSTANTIVELY CHANGED YOUR

13:47:18  15   RESPONSES, DID YOU NOT?

13:47:20  16   **A.**   I CHANGED JUST THE WORDS THAT I THOUGHT DIDN'T TRANSCRIBE

13:47:23  17   MY TESTIMONY.

13:47:24  18              **MR. BRUNO:**  WELL, LET'S CALL UP PX-4706-2.

13:47:33  19   **BY MR. BRUNO:**

13:47:33  20   **Q.**   LET ME SEE IF I UNDERSTAND WHAT YOU JUST SAID.  AND LET'S

13:47:36  21   HIGHLIGHT THIS SECTION HERE, PAGE 37.

13:47:45  22              YOU SAY HERE -- WELL, FIRST OF ALL, ARE YOU

13:47:47  23   SUGGESTING TO ME THAT THESE WORDS ARE CORRECTIONS OF ACTUAL

13:47:51  24   WORDS THAT YOU SAID IN YOUR DEPOSITION?

13:47:54  25   **A.**   I NEED CONTEXT HERE.  SO THIS DOCUMENT WE'RE LOOKING AT IS

13:47:58   1   WHAT, NOW?

13:47:59   2   **Q.**   THIS IS WHAT YOU SENT US.  THIS IS YOUR CORRECTIONS TO THE

13:48:03   3   DEPOSITION OF ALLEN MARR TAKEN ON APRIL 23RD, 2012.

13:48:11   4        WHAT YOU SEE IS WHAT I RECEIVED.

13:48:13   5   **A.**   THIS IS A NOTE I ADDED, YES, IN THE CORRECTIONS TO MY

13:48:18   6   DEPOSITION.

13:48:18   7   **Q.**   ALL RIGHT.  SO YOUR INTENT WAS NOT TO -- NOT TO SUGGEST

13:48:21   8   THAT THE COURT REPORTER TOOK THE WORDS DOWN.  YOUR INTENT WAS

13:48:26   9   TO TELL THE READER, "I'M CHANGING MY WHOLE TESTIMONY WITH

13:48:29   10   REGARD TO PAGE 37 LINES 2 THROUGH 12"; CORRECT?

13:48:32   11   **A.**   I'M NOT CHANGING MY TESTIMONY.  I'M JUST EXPLAINING TO YOU

13:48:35   12   THAT THERE WAS A DIFFERENCE OR -- IN INFORMATION I HAD AT THE

13:48:39   13   TIME OF MY DEPOSITION, WITH NO WAVES, AND NOW I KNOW THAT THERE

13:48:42   14   ARE WAVES.

13:48:44   15        I'VE SAID, "I'VE REVISED MY OPINION TO INCLUDE

13:48:47   16   CONSIDERATION OF SCOUR DEVELOPMENT FROM WAVE OVERTOPPING."  I

13:48:50   17   DON'T THINK I'M CHANGING ANY TESTIMONY.

13:48:52   18   **Q.**   OKAY.  CAN I ACCEPT, THEN, THAT YOU'RE NOT CHANGING YOUR

13:48:55   19   TESTIMONY?

13:48:56   20   **A.**   I'M NOT CHANGING MY TESTIMONY.  I THINK I'M PRETTY CLEAR

13:48:59   21   HERE, SIR.

13:49:00   22   **Q.**   ALL RIGHT.  FAIR ENOUGH.  LET'S LOOK AT YOUR DEPOSITION.

13:49:04   23   LET'S SEE.

13:49:07   24        **MR. BRUNO:**  LET'S GO TO --

25

```
13:49:12   1   BY MR. BRUNO:

13:49:12   2   Q.   AND I'M GOING TO ASK YOU -- WE'LL JUST DO THIS THIS IN

13:49:15   3   ORDER AND COVER ALL THESE POINTS, IF THE COURT WILL INDULGE.

13:49:19   4            PX-4438-3.  THAT'S WHERE WE START, ONLY BECAUSE IT'S

13:49:24   5   THE FIRST ONE.

13:49:36   6            MR. BRUNO:  I HAVE PX-4438-3 AS A MINI SCRIPT.

13:49:42   7            THE COURT:  DO YOU WANT TO CONSULT WITH YOUR --

13:49:44   8            MR. BRUNO:  THE PAGE NUMBER IS 12.

13:49:48   9            THE COURT:  OKAY.

13:49:51  10   BY MR. BRUNO:

13:49:51  11   Q.   OKAY.  YOU WERE ASKED:  "THE TOP OF THE WALL WAS THE

13:49:55  12   LOWEST, REALLY, IN BOTH PLACES, NORTH AND SOUTH BREACH?"

13:50:05  13            ANSWER:  "YES."

13:50:06  14            "THE TWO LOWEST POINTS ALONG THE INDUSTRIAL CANAL,

13:50:10  15   EAST BANK; CORRECT?

13:50:12  16            "YES.

13:50:13  17            "AND THAT EXPLAINS WHY THE BREACHES HAPPENED" --

13:50:17  18            MR. BRUNO:  MOVE DOWN, PLEASE.

13:50:18  19            NO, MOVE THE PAGE SO I CAN CONTINUE TO READ IT.

13:50:20  20   BY MR. BRUNO:

13:50:21  21   Q.   "NOW, THAT -- THAT EXPLAINS WHY THE BREACHES HAPPENED

13:50:27  22   WHERE IT HAPPENED."

13:50:28  23            NOW, YOU DON'T SAY THAT ABOUT THE NORTH.  YOU DO SAY

13:50:32  24   THAT ABOUT THE SOUTH:  "THIS EXPLAINS WHY THE BREACH HAPPENED

13:50:34  25   WHERE IT DID."
```

13:50:36    1              **MR. BRUNO:**  CAN WE GO TO PAGE 13?

13:50:39    2    **BY MR. BRUNO:**

13:50:41    3    **Q.**   QUESTION:  "WOULD THAT ALSO BE TRUE FOR THE NORTH, THAT IT

13:50:45    4    BEING THE LOWER OR THE LOWEST PLACE ALONG THE FLOODWALL

13:50:47    5    EXPLAINS WHY IT HAPPENED WHERE IT HAPPENED?

13:50:50    6              "NO, NOT FOR THE NORTH."

13:50:54    7              SO, DR. MARR, WHAT I WANT TO KNOW IS -- BECAUSE I'M

13:50:56    8    CONFUSED -- ARE YOU CHANGING THAT OPINION IN THIS COURTROOM

13:51:00    9    TODAY?

13:51:00   10    **A.**   NO.

13:51:01   11    **Q.**   OKAY.  SO WE ALL CAN RELY ON THE FACT THAT YOU DON'T

13:51:08   12    BELIEVE THAT THE LOW ELEVATION OF THE NORTH WALL AT THE BREACH

13:51:13   13    HAD ANYTHING TO DO WITH ITS FAILURE; CORRECT?

13:51:17   14    **A.**   I DIDN'T MEAN TO IMPLY THAT.  THE FACT THAT THE NORTH WALL

13:51:26   15    WAS LOWER IS A FACTOR, AND I -- I'VE MADE THAT CLEAR IN MY

13:51:30   16    EXPERT REPORT.

13:51:32   17    **Q.**   WELL, I'M JUST READING WHAT YOU SAID:  "SO THE FACT, THEN,

13:51:35   18    THAT THE FLOODWALL WAS LOWER AT THE NORTH BREACH DIDN'T FACTOR

13:51:39   19    IN YOUR FAILURE ANALYSIS?"

13:51:42   20              ANSWER:  "CORRECT."

13:51:44   21              IS THAT WRONG?  IF IT IS, TELL US NOW.

13:51:52   22    **A.**   THE FACT THAT IT WAS LOWER -- IN MY EXPERT REPORT I DID

13:51:56   23    SAY THAT IT WAS LOWER AT THE NORTH.  AND I BELIEVE I -- OR I

13:52:01   24    DID SAY THAT AFTER THE STRUCTURAL FAILURE AT THE NORTH, THE

13:52:05   25    WALL CONTINUED TO -- THE FAILURE CONTINUED TO DEVELOP TO THE

```
13:52:09   1   SOUTH BY OVERTOPPING AND OVERTURNING.

13:52:14   2   Q.   YOU DIDN'T SAY THAT, BUT WE'LL GET TO THAT IN A MINUTE.

13:52:18   3        MR. BRUNO:   LET'S GO TO THE NEXT PAGE, PAGE 17, AT

13:52:22   4   LINE 6.

13:52:23   5   BY MR. BRUNO:

13:52:28   6   Q.   NOW, HERE YOU'RE ASKED:  "DR. SILVA-TULLA, AT PAGE 53 OF

13:52:35   7   HIS REPORT -- AND I DON'T HAVE IT IN FRONT OF ME, BUT I WILL

13:52:39   8   PARAPHRASE WHAT HE SAID AS WELL, AND HE AGREED WITH THIS.

13:52:42   9        "THAT IN HIS CONCLUSIONS HE SIMILARLY AGREED OR

13:52:44   10  CONCLUDED, IN A NUTSHELL, THAT, ONE, I-WALL DEFORMATIONS DUE TO

13:52:48   11  FORCES IMPOSED BY THE RISING STORM SURGE, COMBINED WITH LOSS OF

13:52:53   12  LATERAL SUPPORT AT THE LAND SIDE CREST FROM OVERTOPPING AND

13:52:56   13  SCOUR --

13:52:56   14       MR. BRUNO:   GO UP.  I DON'T NEED IT TO BE

13:52:58   15  HIGHLIGHTED.  IT'S TOO SLOW.  LET'S . . .

13:53:08   16       THE COURT:   YOU SAID "SCOUR."  "EROSION" WOULD BE

13:53:10   17  NEXT.

13:53:10   18  BY MR. BRUNO:

13:53:10   19  Q.   -- "EROSION" --

13:53:11   20       MR. BRUNO:   THANK YOU SO MUCH.

13:53:12   21  BY MR. BRUNO:

13:53:12   22  Q.   -- "TO CAUSE THE FAILURES OF THE FLOODWALL PROTECTION

13:53:15   23  STRUCTURES AT THE IHNC EBIA."

13:53:25   24       "SOUTH BREACH OR NORTH BREACH?" IS YOUR ANSWER.

13:53:29   25       AND THE QUESTION:  "HE APPEARS TO BE REFERRING TO
```

| | | |
|---|---|---|
| 13:53:29 | 1 | BOTH. |

13:53:29  2      "REPEAT."

13:53:30  3           **MR. BRUNO:**  LET'S GO DOWN, PLEASE.

13:53:31  4               ALL RIGHT.  READ IT AGAIN.  LET'S GO TO THE NEXT

13:53:31  5  PAGE.

13:53:31  6  **BY MR. BRUNO:**

13:53:31  7  **Q.**   "IT SAYS QUESTION AT 9 16 16?

13:53:35  8       "I-WALL DEFORMATIONS DUE TO FORCES IMPOSED BY THE

13:53:39  9  RISING STORM SURGE COMBINED WITH LOSS OF LATERAL SUPPORT AT THE

13:53:44  10  LANDSIDE CREST FROM OVERTOPPING AND SCOUR EROSION TO CAUSE THE

13:53:47  11  FAILURES OF THE FLOOD PROTECTION STRUCTURES AT THE IHNC EBIA?"

13:53:53  12       ANSWER:  "NOW, JUST SO I GET IT, BECAUSE IT'S A LONG

13:53:58  13  QUESTION --

13:53:59  14       "SURE.

13:54:01  15       "-- ARE YOU REPRESENTING THIS IS WHAT DR. SILVA

13:54:03  16  SAID --

13:54:05  17       "YES.

13:54:06  18       "-- THAT IT APPLIES TO BOTH THE NORTH AND THE SOUTH

13:54:09  19  BREACH?

13:54:10  20       "YEAH.  IT'S AT PAGE 53 OF HIS REPORT.

13:54:12  21       "WELL, YEAH, I AGREE WITH THAT.  AND YOUR QUESTION

13:54:15  22  IS, DO I AGREE WITH THAT?

13:54:17  23       QUESTION:  "YEAH, DO YOU AGREE WITH THAT?

13:54:20  24       "YEAH, I AGREE WITH THAT STATEMENT FOR THE SOUTH

13:54:22  25  BREACH.

13:54:22    1            "FOR THE NORTH BREACH, SCOUR DID OCCUR BUT THAT

13:54:22    2    FOLLOWED AN INITIATION EVENT OF THE CONCRETE SECTION OF THE

13:54:22    3    FLOODWALL" FALLING -- "FAILING" -- I'M SORRY -- "FIRST."

13:54:28    4            "IS IT YOUR OPINION THAT THE NORTH BREACH COULD NOT

13:54:30    5    HAVE OCCURRED WITHOUT SCOUR, WHICHEVER CAME FIRST?

13:54:33    6            "WELL, HERE WE NEED TO DEFINE 'BREACH.'"

13:54:36    7            **MR. BRUNO:**  KEEP GOING.

13:54:38    8    **BY MR. BRUNO:**

13:54:38    9    **Q.**   "ONE DEFINITION WE USE IN WATER RETENTION STRUCTURES IS

13:54:40   10    THAT ANY TIME WE LOSE CONTAINMENT OF WATER, ANY TIME WATER

13:54:44   11    STARTS FLOWING THROUGH A SYSTEM DIFFERENTLY THAN IT WAS

13:54:46   12    DESIGNED, WE CALL THAT A BREACH.  AND IN THIS CASE, ONCE THE

13:54:51   13    CONCRETE TOP ON THE WALL AT THAT INTERSECTION BROKE APART,

13:54:58   14    WATER GUSHED THROUGH, AND THAT WOULD BE CONSIDERED A BREACH AT

13:55:00   15    THAT POINT.

13:55:01   16            "OKAY.  AND WAS THERE ANY SCOUR BEFORE THE POINT WHEN

13:55:05   17    THE CONCRETE TOP BROKE?"

13:55:06   18            AND THEN I CAME INTO THE ROOM, WHICH IS SIGNIFICANT,

13:55:09   19    I SUPPOSE.

13:55:11   20            ANSWER:  "NOT ANYTHING OF SIGNIFICANCE."

13:55:13   21            IS THAT YOUR OPINION TODAY?

13:55:15   22    **A.**   YES.

13:55:16   23    **Q.**   OKAY.  A LITTLE BIT -- SO WE'RE VERY CLEAR ABOUT THIS, YOU

13:55:23   24    GAVE THIS DEPOSITION TESTIMONY BEFORE YOUR SUPPLEMENTAL REPORT?

13:55:25   25    **A.**   YES.

| | | |
|---|---|---|
| 13:55:26 | 1 | **Q.**   SO YOU CONSIDERED WAVES BEFORE YOUR SUPPLEMENTAL REPORT; |
| 13:55:30 | 2 | RIGHT? |
| 13:55:31 | 3 | **A.**   YES. |
| 13:55:31 | 4 | **Q.**   OKAY. |
| 13:55:32 | 5 | **A.**   I -- I'VE EXPLAINED THAT I CONSIDERED WAVES, THAT THEY |
| 13:55:35 | 6 | WERE SMALL AND, THEREFORE, I DIDN'T INCLUDE THEM IN THE SCOUR |
| 13:55:38 | 7 | ANALYSIS. |
| 13:55:38 | 8 | **Q.**   AND NOW THEY'RE BIG AND EVEN AFTER THEY'RE BIG, THEY STILL |
| 13:55:43 | 9 | DON'T HAVE A SIGNIFICANT ROLE AT THE NORTH BREACH; ISN'T THAT |
| 13:55:46 | 10 | TRUE? |
| 13:55:48 | 11 | **A.**   FOR THE INITIATION -- FOR THE INITIATING EVENT OF THE |
| 13:55:51 | 12 | STRUCTURAL FAILURE OF THE WALL.  BUT I'VE TRIED TO MAKE CLEAR |
| 13:55:54 | 13 | THIS MORNING THAT ONCE THAT -- THAT HAPPENED, WATER GUSHED |
| 13:55:58 | 14 | THROUGH THE WALL, SCOURED AWAY SOIL, AND THEN THE PROPAGATION |
| 13:56:03 | 15 | EVENT TO THE SOUTH WAS SCOUR AND OVERTURNING, AS THE |
| 13:56:06 | 16 | PHOTOGRAPHS THAT I SHOWED CLEARLY SHOW. |
| 13:56:09 | 17 | **THE COURT:**  THE COURT NEEDS TO ASK A QUESTION. |
| 13:56:12 | 18 | IT IS MY UNDERSTANDING THAT IF IT WERE NOT FOR |
| 13:56:17 | 19 | THE GLOBAL INSTABILITY YOU POINTED OUT AND THE STRUCTURAL |
| 13:56:24 | 20 | ISSUES CREATED BY THE JUXTAPOSITION OF THE VARYING SHEET PILE |
| 13:56:32 | 21 | LENGTHS AT THE NORTH END OF THE NORTH BREACH, THIS FAILURE |
| 13:56:33 | 22 | WOULD NOT HAVE OCCURRED.  IS THAT CORRECT? |
| 13:56:36 | 23 | **THE WITNESS:**  NO, YOUR HONOR. |
| 13:56:37 | 24 | **THE COURT:**  OKAY.  THEN I DID NOT UNDERSTAND YOUR |
| 13:56:39 | 25 | TESTIMONY ON DIRECT BECAUSE -- YOU'RE SAYING THE FAILURE WOULD |

13:56:45   1  HAVE OCCURRED WITHOUT THOSE THINGS?

13:56:46   2        **THE WITNESS:**  IF THE WALL HAD NOT HAVE FAILED AT THE

13:56:49   3  TIME IT DID, WATER WOULD HAVE STARTED FLOWING OVER THE TOP OF

13:56:52   4  THE WALL BECAUSE IT WAS LOW THERE, AND EVENTUALLY IT WOULD HAVE

13:56:56   5  SCOURED OUT AND FAILED BY OVERTURNING AS WELL.

13:57:00   6        **THE COURT:**  THAT WAS NOT IN YOUR OPINION YOU GAVE

13:57:01   7  THIS MORNING, IS THAT CORRECT --

13:57:02   8        **THE WITNESS:**  THAT'S CORRECT --

13:57:03   9        **THE COURT:**  -- ON THE SLIDE?

13:57:04  10        **THE WITNESS:**  -- YOUR HONOR.

13:57:06  11        **MR. BRUNO:**  OKAY.  I HAVE TO KEEP A RECORD OF THOSE.

13:57:08  12        **THE COURT:**  DID YOU DO AN ANALYSIS OF THAT?

13:57:12  13        **THE WITNESS:**  WE DID -- I DID AN ANALYSIS OF -- IN

13:57:16  14  THE -- AFTER MY EXPERT REPORT, I DID AN ANALYSIS OF WHAT WAVES

13:57:23  15  WOULD DO AT THE NORTH BREACH.

13:57:24  16        **THE COURT:**  NOW, THAT'S ASSUMING THERE WERE 3-FOOT

13:57:27  17  WAVES, YOU SAID?

13:57:28  18        **THE WITNESS:**  YES, SIR.

13:57:28  19        **THE COURT:**  ALL RIGHT.

13:57:28  20  **BY MR. BRUNO:**

13:57:28  21  **Q.**   AND THAT ANALYSIS IS EMBODIED IN THAT THING YOU CALL A

13:57:32  22  SOUTH BREACH; RIGHT?  YOU DON'T HAVE ONE FOR THE NORTH BREACH?

13:57:35  23  **A.**   I HAVE ONE.  I GAVE IT THIS MORNING IN ONE OF THE

13:57:39  24  DEMONSTRATIVES THAT I SHOWED THAT SHOWED AN APPROXIMATELY

13:57:41  25  1-FOOT --

13:57:41  1          **THE COURT:**  LET ME SAY THIS, THERE'S NO OPINION GIVEN

13:57:44  2    TO THIS COURT IN AN EXPERT REPORT OR, IN MY OPINION, DURING

13:57:47  3    DIRECT -- DURING HIS SUMMARY WHICH INDICATED THAT THIS FAILURE

13:57:50  4    WOULD HAVE OCCURRED WITHOUT THE OTHER TWO FAILURES THAT WE

13:57:52  5    TALKED ABOUT FOR ABOUT AN HOUR AND A HALF.

13:57:54  6          **MR. BRUNO:**  THANK YOU, JUDGE.

13:57:56  7              LET'S GO TO PAGE 26.

13:58:11  8    **BY MR. BRUNO:**

13:58:11  9    **Q.**   "OKAY.  BACK TO THE SOUTH BREACH.  YOU INDICATED A MINUTE

13:58:13  10   AGO THAT YOUR ANALYSIS SHOWED THAT SUFFICIENT SCOUR DEPTH COULD

13:58:17  11   OCCUR TO CAUSE THE WALL TO FAIL BY OVERTURNING.  AND THEN I

13:58:20  12   ASKED YOU, 'WELL, DID IT,' AND YOUR ANSWER WAS, 'YES.'

13:58:24  13              "WHAT IS SUFFICIENT OR HOW MUCH SCOUR DEPTH IS

13:58:27  14   SUFFICIENT TO CAUSE THE WALL TO FAIL BY OVERTURNING?"

13:58:31  15              ANSWER:  "YEAH.  I THINK WE DID THAT BY ANALYSIS.  WE

13:58:35  16   DETERMINED THAT IT WAS ON THE ORDER OF 5 TO 6 FEET."

13:58:41  17              IS THAT YOUR TESTIMONY TODAY?

13:58:44  18   **A.**   YES.

13:58:44  19   **Q.**   OKAY.  NOT 4, NOT 4 1/2, BUT 5 TO 6?

13:58:50  20   **A.**   WELL, I SAID IN MY REPORT THAT THIS CALCULATION OF SCOUR

13:58:54  21   WAS BEING DONE -- THAT IT WAS A VERY APPROXIMATE CALCULATION

13:58:59  22   AND IT'S BEING DONE JUST TO GET SOME -- SOME INSIGHT ON THE

13:59:03  23   MECHANISM OF SCOUR AND HOW IT DEVELOPED AND ESPECIALLY WHAT THE

13:59:07  24   EFFECT OF WATER COMING UP ON THE LAND SIDE WOULD BE ON STOPPING

13:59:13  25   SCOUR.

13:59:14   1            SO WHEN WE TALK ABOUT 5.7 FEET, FOR EXAMPLE, IN THE

13:59:17   2   NEXT LINE, THAT'S WHAT MY CALCULATION SHOWED FOR ONE CONDITION.

13:59:23   3   IT'S NOT MEANT TO IMPLY THAT I CAN PRECISELY TELL YOU THE DEPTH

13:59:27   4   OF SCOUR THAT OCCURS OR THE PRECISE DEPTH AT WHICH THE

13:59:33   5   OVERTURNING OCCURS.

13:59:35   6   Q.   WELL, LET'S GO TO PAGE 27 AT LINE 16 -- 18, I APOLOGIZE.

13:59:39   7   LINE 18.

13:59:41   8            "NOW, ACCORDING TO APPENDIX O OF YOUR REPORT, THE

13:59:45   9   CALCULATED DEPTH THAT WE JUST DISCUSSED OF 5.7 FEET WOULD BE

13:59:48   10  THE AMOUNT OF SCOUR NECESSARY TO CAUSE FAILURE; RIGHT?  THAT'S

13:59:52   11  WHAT YOUR CALCULATIONS SHOWED ACCORDING TO APPENDIX O?"

13:59:56   12           AND THEN YOU ASKED FOR A PAGE NUMBER.

13:59:59   13           **MR. BRUNO:**  LET'S GO TO THE NEXT ONE.

14:00:01   14           AND YOU SAY --

14:00:02   15           "NO, I DON'T.  I CAN FIND IT FOR YOU.

14:00:05   16           "I KNOW WE USED THE NUMBER 5.7."

14:00:09   17           THAT'S WHAT YOU SAID; RIGHT?

14:00:11   18  A.   YES.

14:00:11   19  Q.   THAT'S THE NUMBER YOU USED?

14:00:12   20  A.   YES.

14:00:13   21  Q.   OKAY.  I'M NOT FOR SURE WHERE IT IS.  "MAYBE YOU'RE

14:00:16   22  REFERRING TO TABLE" -- THIS IS YOU NOW.  "MAYBE YOU'RE

14:00:18   23  REFERRING TO TABLE O-7."  RIGHT?

14:00:21   24  A.   YES.

14:00:21   25  Q.   SO IF JUDGE DUVAL WANTS TO UNDERSTAND MORE ABOUT THE

14:00:27   1   CALCULATIONS THAT YOU DID TO COME UP TO THIS 5.7, HE GOES TO

14:00:31   2   APPENDIX O; CORRECT?

14:00:33   3   A.   YES.

14:00:33   4   Q.   THANK YOU.

14:00:35   5        NOW, LET'S GO TO PAGE 29.

14:00:42   6   A.   I'M NOT SURE IT GOES TO THAT PARTICULAR TABLE, BECAUSE IT

14:00:45   7   SEEMS LIKE I HAD A LITTLE BIT OF A DOUBT THERE, AND AT SOME

14:00:48   8   POINT MAYBE WE CAN REFER TO APPENDIX O AND SEE WHICH TABLE IT

14:00:51   9   SHOULD BE.

14:00:52   10  Q.   WE CAN ABSOLUTELY DO THAT.  WE'LL DO IT -- WE'LL DO IT ON

14:00:56   11  A BREAK, THOUGH.  WE WON'T DO IT RIGHT NOW, IF YOU DON'T MIND.

14:00:58   12       PAGE 29.  ALL RIGHT.  SO NOW MR. STEVENS IS ASKING

14:01:00   13  YOU QUESTIONS AND HE'S ESTABLISHED THE 5.7 FEET.

14:01:03   14       MR. BRUNO:  SO LET'S GO UP, PLEASE.

14:01:05   15       STOP.

14:01:05   16  BY MR. BRUNO:

14:01:06   17  Q.   "THE POINT OF THIS SECTION IS IT TO DEMONSTRATE THAT THE

14:01:08   18  PHYSICS OF SCOUR SUPPORT THE DEVELOPMENT OF SCOUR DEPTHS TO 6

14:01:13   19  TO 8 FEET OR MORE FOR THE EBIA FLOODWALL CONDITION, TRUE?"

14:01:19   20       AND YOUR ANSWER IS "TRUE."

14:01:20   21       THAT'S WHAT THE SECTION O IS -- OR WE THINK IT'S O,

14:01:21   22  BUT THAT SECTION, THAT'S WHAT YOU SAY IS TRUE; CORRECT?

14:01:23   23  A.   I'M REFERRING TO THE SECTION WHERE I'VE DISCUSSED THE

14:01:25   24  SCOUR CALCULATIONS AND THEIR MEANING.

14:01:27   25  Q.   WHICH MAY BE O, MAY NOT BE, BUT WE THINK IT'S O.  OKAY?

```
14:01:31   1            NOW, LET'S KEEP GOING.

14:01:32   2            "YOUR CALCULATION SHOWS IT WOULD BE 5.7 FEET IS THE

14:01:36   3   FAILURE POINT.  THE PHYSICS OF SCOUR INDICATED OR DEMONSTRATED

14:01:40   4   THAT SCOUR DEPTHS OF 6 TO 8 FEET OR MORE COULD OCCUR."

14:01:45   5            ANSWER:  "YES."

14:01:46   6            OKAY.  IS THAT YOUR OPINION TODAY?

14:01:47   7   A.   YES.

14:01:48   8   Q.   "BUT -- AND DID YOU SEE SCOUR ANYWHERE OF 6 TO 8 FEET

14:01:52   9   DEPTH?"

14:01:53  10            ANSWER:  "NO, SIR.  THE FLOODWALL WOULD HAVE FAILED

14:01:56  11   AND WE WOULDN'T HAVE HAD ANY EVIDENCE ANYMORE."

14:02:00  12            IS THAT YOUR TESTIMONY TODAY?

14:02:01  13   A.   YES.

14:02:01  14            MR. BRUNO:  KEEP GOING.

14:02:01  15   BY MR. BRUNO:

14:02:01  16   Q.   "DID YOU FIND ANY PHYSICAL EVIDENCE OF SCOUR DEPTH THAT

14:02:05  17   EVER REACHED 5.7 FEET?  ANYWHERE --"

14:02:10  18            ANSWER:  "NO, AGAIN --"

14:02:12  19            MR. BRUNO:  NEXT PAGE.

14:02:13  20   BY MR. BRUNO:

14:02:14  21   Q.   "-- AT THE NORTH OR SOUTH BREACH?"

14:02:16  22            "-- THOSE SECTIONS WOULD HAVE FAILED, BY THESE

14:02:18  23   CALCULATIONS, AND WE WOULDN'T SEE THEM."

14:02:20  24            "NOW, THERE WERE PHOTOGRAPHS TAKEN BY YOU OR USED BY

14:02:23  25   YOU IN YOUR REPORT OF SCOUR TRENCHES IMMEDIATELY SOUTH OF THE
```

| | | |
|---|---|---|
| 14:02:28 | 1 | SOUTH BREACH AND IMMEDIATELY NORTH OF THE SOUTH BREACH. |
| 14:02:30 | 2 | CORRECT?" |
| 14:02:31 | 3 | ANSWER:  "YES." |
| 14:02:32 | 4 | YOU'VE GOT SOME PHOTOGRAPHS.  YOU TALKED ABOUT THOSE |
| 14:02:34 | 5 | TODAY? |
| 14:02:34 | 6 | **A.**   YES. |
| 14:02:36 | 7 | **MR. BRUNO:**  ALL RIGHT.  KEEP GOING. |
| 14:02:36 | 8 | **BY MR. BRUNO:** |
| 14:02:36 | 9 | **Q.**   "DID YOU MEASURE ANY OF THOSE TRENCHES? |
| 14:02:39 | 10 | "WE SCALED THEM FROM PHOTOGRAPHS. |
| 14:02:40 | 11 | "AND WHAT DID YOUR SCALED PHOTOGRAPHS DEMONSTRATE THE |
| 14:02:43 | 12 | DEPTH OF THOSE STRETCHES TO BE?" |
| 14:02:44 | 13 | ANSWER:  "WE THINK -- AND AS BEST WE CAN TELL FROM |
| 14:02:47 | 14 | SCALING OFF OF PHOTOGRAPHS, THAT THEY GOT UP TO 4 TO POSSIBLY |
| 14:02:52 | 15 | 5 FEET." |
| 14:02:53 | 16 | DO YOU SEE THAT? |
| 14:02:54 | 17 | **A.**   YES. |
| 14:02:56 | 18 | **Q.**   NOW, THESE ARE -- THESE ARE WALLS THAT DID NOT FAIL; |
| 14:02:57 | 19 | CORRECT? |
| 14:02:57 | 20 | **A.**   YES. |
| 14:02:57 | 21 | **Q.**   ALL RIGHT.  SO IS YOUR TESTIMONY CORRECT TODAY THAT YOU |
| 14:03:01 | 22 | FOUND TRENCH DEPTHS AS DEEP AS 5 FEET AT LOCATIONS WHERE THE |
| 14:03:05 | 23 | WALLS DID NOT FAIL? |
| 14:03:08 | 24 | **A.**   YEAH, I THINK THAT'S RIGHT.  THAT'S IN THE DIAGRAM I |
| 14:03:11 | 25 | SHOWED YOU. |

14:03:11   1   Q.   VERY GOOD.  OKAY.

14:03:12   2              "AND DID YOU REPORT THAT IN YOUR REPORT?"

14:03:16   3              WELL, YOU DIDN'T PUT IT IN THE REPORT.  THAT'S ALL

14:03:18   4   RIGHT.  LET'S KEEP GOING.

14:03:20   5              SO "WHO SCALED IT AND WHICH PHOTOGRAPHS DID YOU USE

14:03:23   6   TO SCALE THE DEPTH?"

14:03:25   7              SOMEBODY IN YOUR OFFICE.

14:03:26   8              NEXT PAGE.

14:03:27   9              "AND DO YOU HAVE A COPY OF ANY REPORT FROM HIM TO

14:03:32  10   DEMONSTRATE THAT DEPTH?

14:03:32  11              "NO.  WE DID IT MORE JUST AS A COLLABORATION OF --

14:03:37  12   SEE IF YOU CAN FIND SOME PHOTOGRAPHS AND TELL ME WHAT THE

14:03:39  13   DEPTHS OF THOSE TRENCHES ARE.  I TOOK THAT INFORMATION AND USED

14:03:42  14   THAT AS A COLLABORATION OR SUPPORT FOR THE CALCULATIONS WE WERE

14:03:46  15   DOING.  BUT WE DIDN'T FORMALIZE THAT WORK."

14:03:49  16              DO YOU SEE THAT?

14:03:50  17   A.   YES.

14:03:51  18   Q.   OKAY.  NOW, IN YOUR PRESENTATION TO JUDGE DUVAL, YOU HAVE

14:03:58  19   NOW DONE A, QUOTE, FORMALIZATION OF THAT WORK, DID YOU NOT?

14:04:02  20   A.   I PREPARED DEMONSTRATIVE EXHIBITS THAT I PRESENTED TO THIS

14:04:06  21   COURT.

14:04:06  22   Q.   ALL RIGHT.  AND YOU'RE CALLING THAT A VALIDATION, AREN'T

14:04:10  23   YOU?

14:04:11  24   A.   WELL, WE VALIDATED IT WHEN WE WERE RUNNING THE MODEL.  I'M

14:04:15  25   JUST PRESENTING WHAT WE USED AS VALIDATION AT THAT TIME.

14:04:19   1   **Q.**   WELL, IT SAYS HERE, JUST TO SEE IF YOU COULD FIND SOME --

14:04:24   2   TELL ME WHAT DEPTHS OF THE TRENCHES ARE.  I TOOK THAT

14:04:28   3   INFORMATION AND USED IT AS A COLLABORATION OR SUPPORT FOR -- WE

14:04:31   4   DIDN'T FORMALIZE THE WORK.  THAT'S WHAT YOU PUT THERE.

14:04:32   5          SO IT'S NOT IN YOUR REPORT?

14:04:34   6   **A.**   IT'S NOT IN MY REPORT.

14:04:35   7   **Q.**   ALL RIGHT.  BUT YOU'VE GOT A 12-SLIDE PRESENTATION WHERE

14:04:38   8   YOU HAVE A PICTURE, YOU'VE GOT A -- YOU'VE GOT A LIDAR AND YOU

14:04:42   9   HAVE A MEASUREMENT, ALL THAT STUFF.  THAT'S ALL -- THAT WAS ALL

14:04:47   10  DONE SINCE YOUR REPORT AND SINCE YOUR DEPOSITION; ISN'T THAT

14:04:50   11  TRUE?

14:04:50   12  **A.**   THE PREPARATION OF THOSE WAS DONE, BUT THE USE OF THAT

14:04:53   13  APPROACH WAS A PART OF MY INITIAL WORK IN TRYING TO MAKE SURE

14:04:57   14  THAT OUR CALCULATIONS OF SCOUR DEPTH WERE REASONABLE.

14:05:00   15  **Q.**   OKAY.  ALL RIGHT.  LET'S KEEP GOING.

14:05:03   16  **A.**   IN FACT, I CAN JUST SAY ONE OF THE VERY EARLY THINGS THAT

14:05:05   17  MR. FULLER, WHO IS QUITE QUALIFIED IN CAD AND SURVEYING, ONE OF

14:05:11   18  THE FIRST THINGS HE DID WAS SOME OF THE SCALING OF DEPTHS OF

14:05:16   19  SCOUR TRENCHES.

14:05:17   20  **Q.**   OKAY.  LET'S KEEP GOING.

14:05:17   21          SO THEN MR. STEVENS SHOWS YOU AN EXHIBIT, NO. 2, A

14:05:20   22  COPY OF A PHOTOGRAPH WHICH IS CONTAINED AT PAGE 72 OF THE

14:05:23   23  REPORT.  "IT'S ALSO KNOWN AS FIGURE 30-A.  I BELIEVE THAT

14:05:27   24  PHOTOGRAPH IS CONTAINED IN YOUR REPORT."

14:05:30   25          NOW, LET'S LOOK, IF WE COULD -- LET'S PULL THAT

| | | |
|---|---|---|
| 14:05:35 | 1 | PICTURE, PX-3254-1. |
| 14:05:39 | 2 | RECOGNIZE THAT PICTURE? |
| 14:05:41 | 3 | **A.**   YES, SIR. |
| 14:05:41 | 4 | **Q.**   ALL RIGHT.  THAT'S DR. BEA? |
| 14:05:42 | 5 | **A.**   YES. |
| 14:05:42 | 6 | **Q.**   OKAY.  AND HE'S IN A SCOUR TRENCH? |
| 14:05:45 | 7 | **A.**   YES. |
| 14:05:45 | 8 | **Q.**   OKAY.  LET'S SEE WHAT YOU SAID ABOUT THAT PICTURE. |
| 14:05:48 | 9 | LET'S GO BACK TO THE DEPOSITION AT PAGE -- WHERE WE |
| 14:05:52 | 10 | LEFT OFF. |
| 14:05:59 | 11 | AT LINE 20:  "IS IT YOUR BELIEF THAT THAT TRENCH |
| 14:06:06 | 12 | MEASURES -- OR COULD BE SCALED TO SHOW DEPTHS OF 4 TO 5 FEET?" |
| 14:06:12 | 13 | ANSWER:  "YES, SIR." |
| 14:06:13 | 14 | DO YOU SEE THAT? |
| 14:06:14 | 15 | **A.**   YES. |
| 14:06:15 | 16 | **Q.**   AND THEN IT GOES THROUGH THIS -- |
| 14:06:18 | 17 | **MR. BRUNO:**  NEXT PAGE. |
| 14:06:20 | 18 | **BY MR. BRUNO:** |
| 14:06:24 | 19 | **Q.**   SO THEN YOU AND MR. STEVENS HAVE A DISCUSSION ABOUT |
| 14:06:27 | 20 | WHETHER IT'S REALLY THAT DEEP.  DO YOU SEE THAT THERE? |
| 14:06:29 | 21 | **A.**   YES. |
| 14:06:31 | 22 | **MR. BRUNO:**  KEEP GOING.  NOW GO BACK UP. |
| 14:06:32 | 23 | **BY MR. BRUNO:** |
| 14:06:39 | 24 | **Q.**   I THINK THAT'S ABOUT RIGHT.  WOULD YOU AGREE THAT IN THIS |
| 14:06:41 | 25 | PHOTOGRAPH WHERE HE'S STANDING, UM -- THE BOTTOM OF THE WALL, |

```
14:06:44   1  │ TOP OF THE DIRT, ARE AT ABOUT KNEE LEVEL?

14:06:47   2  │          "DON'T THINK SO.

14:06:48   3  │          "YOU THINK IT'S HIGHER?

14:06:50   4  │          "YES, SIR.

14:06:50   5  │          "HOW HIGH?

14:06:51   6  │          "IT'S ABOUT 2 FEET -- TOP OF THE DIRT WAS ABOUT

14:06:54   7  │ 2 FEET ABOVE WHERE HIS KNEE IS."

14:06:56   8  │          MR. BRUNO:  KEEP GOING.

14:06:57   9  │ BY MR. BRUNO:

14:06:57  10  │ Q.   AND SO MR. STEVENS SAYS:  ". . . HIS WAIST?"

14:07:02  11  │          "ALL RIGHT.  SO 6'2" MAN, RIGHT ELBOW WOULD BE -- I

14:07:05  12  │ DON'T KNOW WHAT HIS INSEAM IS.  35, 40 INCHES --

14:07:05  13  │          "YEAH.

14:07:05  14  │          " -- AT BEST?  SO THAT'S 3 1/2?"

14:07:08  15  │          MR. BRUNO:  NEXT PAGE.

14:07:08  16  │ BY MR. BRUNO:

14:07:08  17  │ Q.   "3 1/2 FEET.

14:07:08  18  │          "RIGHT."

14:07:10  19  │          QUESTION:  "40-INCHES, 3 FEET 4 INCHES, NOT 4 OR

14:07:12  20  │ 5 FEET."

14:07:13  21  │          SO IN THIS DIALOGUE HERE, MR. STEVENS IS

14:07:15  22  │ SUGGESTING --

14:07:16  23  │          MR. TREEBY:  OBJECTION, YOUR HONOR.  THIS IS IMPROPER

14:07:18  24  │ IMPEACHMENT, AND HE DIDN'T READ THE NEXT ANSWER, WHICH SAID THE

14:07:21  25  │ MAN WAS NOT AT THE BOTTOM OF A TRENCH.
```

14:07:24    1              **MR. BRUNO:**  EXACTLY MY POINT.

14:07:24    2              **MR. TREEBY:**  THAT'S NOT FAIR.

14:07:24    3              **MR. BRUNO:**  THAT'S EXACTLY WHERE I'M GOING.

14:07:25    4              **MR. TREEBY:**  AND THIS IS NOT PROPER IMPEACHMENT.

14:07:27    5              **THE COURT:**  OKAY.  YOU SAY IT'S NOT -- FIRST, TELL ME

14:07:30    6    WHY IT'S NOT PROPER IMPEACHMENT, AND THEN WE'LL MOVE --

14:07:32    7              **MR. TREEBY:**  YES.  IT'S NOT PROPER IMPEACHMENT

14:07:34    8    BECAUSE HE HASN'T ASKED A QUESTION.  HE GOT A CONTRARY ANSWER

14:07:37    9    FROM THIS WITNESS AND THEN SAID, DO YOU REMEMBER -- HE HASN'T

14:07:40   10    DONE A PROPER IMPEACHMENT.  HE'S BEEN READING THROUGH PAGES --

14:07:43   11    AND I'VE SAT HERE QUIET FOR A LONG TIME -- READING THROUGH

14:07:46   12    PAGES AND PAGES OF DEPOSITION TESTIMONY THAT ISN'T CONTRARY TO

14:07:49   13    WHAT THE WITNESS HAS SAID ON THE STAND TODAY.  IT'S NOT

14:07:51   14    IMPEACHMENT.

14:07:53   15              **THE COURT:**  WELL, WHETHER IT'S CONTRARY OR NOT, I'LL

14:07:56   16    DECIDE.  BUT YOUR POINT ABOUT IMPEACHMENT IS -- COULD BE

14:07:58   17    SOMEWHAT WELL TAKEN.  AND I'M NOT SURE WHAT QUESTION -- WE'RE

14:08:01   18    READING FROM A DEPOSITION, BUT I'M NOT SURE WHAT WE'RE -- I'VE

14:08:03   19    GOTTEN TO A POINT WHERE I'M NOT SURE WHAT WE'RE --

14:08:08   20              **MR. BRUNO:**  BECAUSE WE'RE NOT -- WE'RE NOT THERE YET,

14:08:09   21    AND I NEED TO LAY THE FOUNDATION IN ORDER FOR ME TO MAKE THE

14:08:13   22    QUESTION --

14:08:14   23              **MR. TREEBY:**  IF YOUR HONOR PLEASE, I DON'T THINK IT'S

14:08:15   24    PROPER TO LAY A FOUNDATION WITH A DEPOSITION.  YOU LAY THE

14:08:18   25    FOUNDATION WITH WHAT THE WITNESS SAYS ON THE STAND AND THEN, DO

```
14:08:22    1   YOU RECALL IN YOUR DEPOSITION SAYING SOMETHING CONTRARY TO

14:08:24    2   THAT?

14:08:25    3              AND WHAT'S BEEN GOING ON HERE -- AND I HAVE SAT

14:08:27    4   HERE FOR A WHILE, GOING THROUGH PAGE AFTER PAGE OF THIS

14:08:30    5   DEPOSITION TESTIMONY.  AND THEN WHEN HE GOT TO THE PENULTIMATE

14:08:33    6   POINT, HE DIDN'T READ THE NEXT ANSWER.

14:08:36    7              MR. BRUNO:  I WILL, NUMBER ONE.  NUMBER TWO --

14:08:40    8              THE COURT:  LET'S GET TO THE PENULTIMATE POINT HERE.

14:08:42    9   I'M GOING TO -- I'M GOING TO NOTE MR. TREEBY'S OBJECTION AND

14:08:45   10   HOPE WE -- AND WE CAN GET LOST IN THE WEEDS IF WE READ TOO MUCH

14:08:48   11   DEPOSITION TESTIMONY AND WE'RE NOT -- AND SOME OF US WHO DON'T

14:08:51   12   KNOW WHERE YOU'RE GOING -- YOU DO, BUT WE DON'T KNOW -- DON'T

14:08:55   13   KNOW PRECISELY WHAT'S BEING IMPEACHED.  BECAUSE THAT'S THE

14:08:58   14   PURPOSE OF THE DEPOSITION.

14:08:59   15              MR. BRUNO:  EXACTLY.

14:09:00   16              THE COURT:  SO LET'S FINISH THE TWO TO THREE --

14:09:03   17              MR. BRUNO:  ALL RIGHT.  SO WHERE WERE WE?

14:09:06   18              THE COURT:  WE HAVE RIGHT --

14:09:06   19              MR. TREEBY:  LINE 5 IS WHERE -- BEFORE LINE 5 IS

14:09:08   20   WHERE YOU STOPPED.

14:09:08   21   BY MR. BRUNO:

14:09:09   22   Q.   SO THE QUESTION IS:  "40 INCHES, 3 FEET, 4 INCHES, NOT

14:09:13   23   4 OR 5 FEET."

14:09:17   24              HE'S SUGGESTING TO YOU THAT IT'S NOT 4 OR 5 FEET.

14:09:19   25              AND YOUR ANSWER IS:  "WELL, BUT HE'S NOT STANDING AT
```

14:09:21   1   THE BOTTOM OF THE TRENCH.  HE'S A SMART GUY.  HE DOESN'T WANT

14:09:24   2   TO GET HIS FEET WET."

14:09:25   3            "AHH.

14:09:26   4            "HE'S STANDING ON SOME STUFF ABOVE THE TRENCH, LOOKS

14:09:29   5   LIKE CLUMPS OR -- UNLIKELY THEY'RE STONES."

14:09:32   6            **MR. BRUNO:**  KEEP GOING.

14:09:34   7            **MR. TREEBY:**  YOUR HONOR --

14:09:35   8            **MR. BRUNO:**  I'M -- I'M TEN LINES FROM HERE --

14:09:36   9            **THE COURT:**  I WANT MR. SMITH TO BE ABLE TO URGE HIS

14:09:40   10  OBJECTION.

14:09:42   11           **MR. SMITH:**  WELL, I GUESS I WANT TO REURGE

14:09:44   12  MR. TREEBY'S OBJECTION BECAUSE I THOUGHT WE WERE -- AT THE END

14:09:47   13  MR. BRUNO STOPPED AND THEN -- NOW WE'RE CONTINUING --

14:09:49   14           **THE COURT:**  AND WE'RE ON THE ISSUE OF THE DEPTH OF

14:09:51   15  THE TRENCH, HIS ESTIMATION OF THE DEPTH OF THE TRENCH, AND

14:09:55   16  DR. BEA'S HEIGHT AND WHETHER HE'S STANDING ON CLUMPS OR -- AND

14:10:01   17  I GUESS, TO FINISH IT ALL, NOW THAT WE'VE GONE THIS FAR, WE

14:10:05   18  MIGHT AS WELL GO TO THE END.

14:10:07   19           **MR. BRUNO:**  THANK YOU, JUDGE.

14:10:08   20  **BY MR. BRUNO:**

14:10:08   21  **Q.**   THE POINT IS THAT YOU AND MR. STEVENS HAD A DISAGREEMENT

14:10:11   22  ABOUT HOW TO INTERPRET THIS PHOTOGRAPH; ISN'T THAT CORRECT?

14:10:14   23  **A.**   WELL, I WAS POINTING OUT THAT HE WASN'T STANDING AT THE

14:10:18   24  BOTTOM OF THE TRENCH, AND SO THE TRENCH MUST BE A LITTLE DEEPER

14:10:20   25  THAN HIS INSEAM HEIGHT.

14:10:22   1   Q.   ALL RIGHT.  SO -- AND IN THE CONTEXT OF ALL OF THIS, WHAT

14:10:24   2   YOU GUYS WERE TALKING ABOUT IS WHETHER OR NOT THERE WAS

14:10:26   3   EVIDENCE OF TRENCHES THAT ARE AT LEAST 5 FEET DEEP, AND THIS IS

14:10:30   4   ALL IN THE CONTEXT OF THE 5' 7" NECESSARY TO CAUSE THE WALL TO

14:10:35   5   FALL OVER; RIGHT?  REMEMBER THAT?

14:10:36   6   A.   I DON'T -- THERE'S SO MUCH GOING ON HERE, I DON'T -- I

14:10:38   7   DON'T NECESSARILY LINK ALL THIS TO THE 5 FOOT 7, BUT . . .

14:10:42   8   Q.   ALL RIGHT.  WELL, THAT'S -- I GUESS THAT'S CONVENIENT.

14:10:46   9          LET'S GO TO D -- DEMONSTRATIVE, THEN, DX-DM-1006-27.

14:10:53   10   THIS IS SOMETHING YOU SHOWED THE JUDGE.  I DON'T RECALL WHETHER

14:10:54   11   IT WAS FRIDAY OR TODAY.

14:10:57   12          MR. TREEBY:  REPEAT THE NUMBER.

14:11:00   13          MR. BRUNO:  DX-DM-1006-27.

14:11:08   14   BY MR. BRUNO:

14:11:08   15   Q.   ALL RIGHT.  NOW, SAME PICTURE; RIGHT?

14:11:09   16   A.   YES.

14:11:10   17   Q.   BUT OUR 5 FEET HAS NOW DISAPPEARED AND WE'RE NOW AT 3.5?

14:11:18   18   A.   I MISSED THE 5 FEET.  FROM THAT -- ALL THE REST WE WENT

14:11:18   19   THROUGH, I THOUGHT WE HAD --

14:11:18   20   Q.   5 FEET --

14:11:20   21          THE COURT:  WHY DON'T WE JUST ESTABLISH -- THIS MIGHT

14:11:22   22   HELP THE COURT.  WHAT DOES -- WHAT DOES THIS FIGURE SHOW THE

14:11:26   23   DEPTH OF THE TRENCH IS?  AND I CAN FILL IN THE GAPS.

14:11:33   24          THE WITNESS:  THIS FIGURE IS -- IS THAT QUESTION TO

14:11:36   25   ME?

```
14:11:36    1              THE COURT:  YES.  YOU'RE THE ONLY ONE WHO CAN ANSWER

14:11:39    2    IT.

14:11:39    3              THE WITNESS:  THIS FIGURE IS SHOWING THAT

14:11:41    4    3 1/2-FEET-DEPTH IS WHAT WAS PICKED OFF FROM THIS PHOTOGRAPH.

14:11:44    5    BY MR. BRUNO:

14:11:45    6    Q.   ALL RIGHT.  AND THE POINT IS, DR. MARR, WHEN YOU WERE IN

14:11:52    7    THE DEPOSITION, YOU WERE HAVING A DISCUSSION WITH MR. STEVENS,

14:11:54    8    AND YOU WANTED TO MAKE THE POINT THAT THIS TRENCH WAS 5 FEET

14:11:59    9    DEEP; ISN'T THAT TRUE?

14:12:01   10    A.   WELL, I LEARNED IT -- I CAN'T -- AGAIN, I'M NOT SURE IF WE

14:12:03   11    GOT TO 5 FEET OR WE GOT TO 3 1/2 PLUS A FOOT, WHICH --

14:12:07   12    Q.   WE'LL GO BACK --

14:12:07   13    A.   -- WOULD BE 4 1/2 FEET.  BUT I THINK THE SAME THING HAS

14:12:10   14    HAPPENED IN THIS DEMONSTRATIVE.  SOMEONE -- WE'VE MEASURED OFF

14:12:13   15    THE DEPTH TO THE BOTTOM OF MR. BEA'S -- DR. BEA'S FEET, AND IT

14:12:18   16    DOES NOT INCLUDE AN ALLOWANCE FOR HOW DEEP IT IS UNDERNEATH THE

14:12:22   17    WATER THAT SHOWS UP IN THAT PHOTOGRAPH.

14:12:25   18    Q.   RIGHT.

14:12:26   19              BUT THE PROBLEM IS THAT YOU USED THIS AND OTHER

14:12:29   20    SLIDES TO DEMONSTRATE TO THE JUDGE THAT THE SCOUR AFTER KATRINA

14:12:33   21    AT THE WALLS WHERE THEY DIDN'T FAIL WASN'T THAT DEEP, AND IT

14:12:37   22    WASN'T THAT DEEP BECAUSE OF THE TAIL WATER.  THAT WAS THE POINT

14:12:41   23    THAT YOU TRIED TO MAKE.

14:12:41   24              AND NOW WE SEE THE SAME SLIDE IN THE CONTEXT OF

14:12:46   25    TRYING TO DEMONSTRATE WHETHER THERE'S CORROBORATION OF A HOLE
```

14:12:54   1   DEEP ENOUGH TO CAUSE OVERTURNING AND USING THE SAME DEPTH OF --

14:12:56   2           **THE COURT:**  CLEARLY I'M GOING TO OBJECT TO THIS

14:12:57   3   QUESTION.  YOU'VE GOT THAT WAY TOO LONG.  WAY TOO LONG.  YOU'VE

14:13:02   4   GOT TO -- YOU'VE GOT TO MAKE IT A LITTLE SHORTER SO --

14:13:05   5           **MR. BRUNO:**  ALL RIGHT.

14:13:06   6           **THE COURT:**  -- IT'S POSSIBLE FOR A HUMAN BEING TO

14:13:09   7   ANSWER.

14:13:09   8   **BY MR. BRUNO:**

14:13:09   9   **Q.**   WHEN YOU WERE IN YOUR DEPOSITION, YOU WERE MAKING THE

14:13:11  10   POINT THAT IT WAS 5 FEET; RIGHT?

14:13:12  11   **A.**   CAN WE GO LOOK?  BECAUSE I DON'T THINK --

14:13:14  12   **Q.**   SURE.

14:13:14  13   **A.**   -- YOU AND I AGREE ON THAT.

14:13:16  14           **THE COURT:**  HE WAS MAKING -- LET'S DO A GENERAL --

14:13:17  15   YOU WERE MAKING THE POINT THAT THE HOLE WAS DEEPER THAN -- THAN

14:13:20  16   MR. STEVENS WAS IMPLYING IT WAS, TO SOME DEGREE.

14:13:25  17           **MR. BRUNO:**  PAGE 33 -- PAGE 4438 -- I'M SORRY, THAT'S

14:13:31  18   THE EXHIBIT NUMBER.  PAGE 33, LINE 20.

14:13:42  19           **THE COURT:**  I'M LOOKING AT IT.  GO AHEAD.

14:13:44  20   **BY MR. BRUNO:**

14:13:44  21   **Q.**   RIGHT HERE.  "I THINK I SAID 4 TO 5 FEET WAS VERY POSSIBLE

14:13:49  22   IN THIS CONCLUSION OF SCOUR DEPTH IN THIS PHOTOGRAPH."

14:13:53  23           THAT'S WHAT YOU SAID; RIGHT?

14:13:53  24   **A.**   YES.  YES, SIR.

14:13:54  25   **Q.**   OKAY.  NOW, THE SLIDE WAS INTENDED TO DEMONSTRATE TO

14:13:59   1   JUDGE DUVAL THAT THE REASON WHY THE WALLS DIDN'T FAIL WAS

14:14:03   2   BECAUSE THE SCOUR TRENCHES DIDN'T GET DEEP ENOUGH TO CAUSE

14:14:08   3   FAILURE.  DO YOU REMEMBER THAT?  THAT'S YOUR -- YOUR

14:14:11   4   PRESENTATION TODAY.  ISN'T THAT WHAT YOU SAID?

14:14:14   5   **A.**   I -- I'M --

14:14:15   6            **MR. TREEBY:**  OBJECT.

14:14:16   7            **THE COURT:**  MR. TREEBY.

14:14:16   8            **MR. TREEBY:**  IF YOUR HONOR PLEASE, THIS IS NOT A

14:14:18   9   QUESTION.  HE'S TRYING TO MAKE AN ARGUMENT IN THE FORM OF A

14:14:21  10   QUESTION.

14:14:21  11            **THE COURT:**  OKAY.  YOU WANT TO SAY:  ISN'T IT TRUE

14:14:22  12   THAT YOUR PURPOSE IN DEMONSTRATING THE SLIDE TO THE COURT WAS

14:14:26  13   TO SHOW THAT THAT PARTICULAR SCOUR TRENCH WAS NOT DEEP ENOUGH

14:14:29  14   TO CAUSE FAILURE?

14:14:31  15            THAT'S THE QUESTION.  WHAT'S THE ANSWER?

14:14:34  16            **THE WITNESS:**  WELL, THAT'S OBVIOUS, IT DIDN'T FAIL.

14:14:37  17            **THE COURT:**  ALL RIGHT.

14:14:38  18   **BY MR. BRUNO:**

14:14:40  19   **Q.**   THERE'S A BIG DIFFERENCE BETWEEN 5 FEET AND 3.4, ISN'T

14:14:46  20   THERE?

14:14:47  21   **A.**   YEAH, THERE'S A FOOT AND A HALF DIFFERENCE BETWEEN 5 AND

14:14:50  22   3.5.  I BELIEVE I SAID, THOUGH, FROM THE DEPOSITION IT WAS 4 TO

14:14:53  23   5 FEET DEEP.  NOT 5 -- IT WAS 4 TO 5.  THAT'S NOT THE SAME AS

14:14:57  24   5.

14:14:58  25   **Q.**   AND WHEN YOU GAVE YOUR DEPOSITION, YOU DIDN'T MENTION

14:15:03   1   ANYTHING ABOUT TAIL WATER IN THE CONTEXT OF SCOUR, DID YOU?

14:15:11   2   **A.**   I CAN'T RECALL IF THAT WAS MENTIONED OR NOT.

14:15:14   3   **Q.**   AND IN YOUR REPORT DATED MARCH 12TH, 2012, YOU MENTIONED

14:15:20   4   NOTHING ABOUT TAIL WATER IN THE CONTEXT OF SCOUR; ISN'T THAT

14:15:25   5   TRUE?

14:15:25   6   **A.**   THAT'S ABSOLUTELY NOT CORRECT.

14:15:27   7   **Q.**   WELL, SHOW ME WHERE IT IS.  WHAT PAGE?

14:15:31   8           **THE COURT:**  WE'RE GOING TO TAKE -- I'LL TELL YOU

14:15:34   9   WHAT, BECAUSE I DON'T WANT TO HAVE TO LISTEN -- SO LET ME JUST

14:15:40  10   LAY THE FRAMEWORK.

14:15:41  11           THE COURT HAS HEARD TESTIMONY THAT IN THE EVENT

14:15:44  12   SCOURING OCCURS AND THEN A BREACH OCCURS OF THE FLOODWALL, THAT

14:15:47  13   THE SCOURING WILL BE MITIGATED -- AMELIORATED SUBSTANTIALLY

14:15:53  14   BECAUSE OF THE WATER THAT'S COMING IN THAT WOULD THEN SLOW DOWN

14:15:56  15   OR, IN FACT, ABORT THE -- THE SCOURING.

14:16:02  16           THAT'S MY -- AND THAT'S WHAT WE MEAN BY "TAIL

14:16:05  17   WATER."

14:16:05  18           **MR. BRUNO:**  YES, YOUR HONOR.

14:16:06  19           **THE COURT:**  AND THE QUESTION IS:  WAS THIS CONCEPT

14:16:07  20   DISCUSSED IN HIS MARCH REPORT?

14:16:09  21           **MR. BRUNO:**  IN THE SECTION ON SCOUR, YES.

14:16:11  22           **THE COURT:**  IN HIS MARCH REPORT?

14:16:13  23           **MR. BRUNO:**  YES.

14:16:14  24           **THE COURT:**  AND THEN WE CAN DETERMINE WHAT SECTION,

14:16:17  25   IF IT IS DISCUSSED.

14:16:18   1          **MR. BRUNO:**  THANK YOU, JUDGE.

14:16:18   2          **THE COURT:**  ALL RIGHT.  WE'LL TAKE LIKE A TEN-MINUTE

14:16:21   3    RECESS.  AND THEN AFTER THAT -- IF WE'RE GOING TO STAY LATE,

14:16:25   4    LET'S MAKE IT WORTH ALL OF OUR WHILE.  I UNDERSTAND THE CASE.

14:16:28   5    I JUST NEED TO GET TO THE POINT.

14:16:32   6          **THE DEPUTY CLERK:**  ALL RISE.

14:16:32   7          (WHEREUPON, THE COURT TOOK A RECESS.)

14:26:37   8          **THE DEPUTY CLERK:**  ALL RISE.

14:26:44   9           COURT'S IN SESSION.  PLEASE BE SEATED.

14:26:46  10          **THE COURT:**  YES, SIR.

14:26:47  11          **MR. BRUNO:**  OKAY.

14:26:48  12    BY MR. BRUNO:

14:26:48  13    **Q.**   SO WERE YOU ABLE TO FIND WHERE YOU DID AN ANALYSIS OF

14:26:51  14    SCOUR CONSIDERING TAIL WATER?

14:26:55  15    **A.**   WELL, IT'S IN -- IT'S A BUILT-IN PART OF THE SCOUR

14:27:01  16    ANALYSIS, SIR.

14:27:02  17    **Q.**   ALL RIGHT.  LET'S GO TO PX-4720-3.

14:27:10  18           SHOW US WHERE IT IS.  OKAY.  SO WHERE IS THE --

14:27:13  19          **THE COURT:**  ARE WE TALKING ABOUT THE MARCH REPORT?

14:27:17  20          **MR. BRUNO:**  I'M GOING TO DO THEM BOTH.

14:27:20  21          **THE COURT:**  OKAY.  I THOUGHT WE WERE TALKING ABOUT

14:27:21  22    THE MARCH REPORT.  I'M SORRY.

14:27:23  23    BY MR. BRUNO:

14:27:24  24    **Q.**   HERE'S YOUR MOST RECENT EFFORT.

14:27:25  25           WHERE'S THE TAIL WATER IN HERE?

14:27:27   1   **A.**   WELL, AS I'VE DESCRIBED EARLIER, WE DON'T SEE THE FLOOD

14:27:32   2   LEVEL IN THE CANAL ON THIS DIAGRAM EITHER.  BUT WE USED THE

14:27:36   3   HYDROGRAPH FOR BOTH THE CANAL SIDE, WHERE THE SURGES AND THE

14:27:39   4   WAVES ARE COMING UP, AND THE IPET WATER LEVEL FOR THE INSIDE IS

14:27:44   5   BUILT INTO THIS CALCULATION.

14:27:45   6        SO AS THE WATER LEVEL COMES UP ON THE INSIDE,

14:27:51   7   EVENTUALLY, IT'S HIGH ENOUGH THAT IT STOPS SCOUR.  AND THAT'S

14:27:56   8   WHERE, IN THOSE DIAGRAMS, THE RATE OF SCOUR STARTS TO SLOW DOWN

14:28:00   9   AND EVENTUALLY STOP.

14:28:01   10   **Q.**   YOUR TESTIMONY IS THAT THE GREEN LINE, WHICH IS WHAT

14:28:05   11   YOU'VE BEEN USING FOR THE PAST TWO DAYS TO DEMONSTRATE THE RATE

14:28:08   12   OF SCOUR, SLOWS DOWN BECAUSE OF TAIL WATER?

14:28:18   13   **A.**   YES, SIR.

14:28:18   14   **Q.**   OKAY.  THE WAY I READ IT, AT 9:00 THE HEIGHT OF THE WATER

14:28:21   15   IN IHNC IS 14.2.  THAT'S THE PEAK OF THE SURGE, IS IT NOT?

14:28:26   16   **A.**   YES.

14:28:27   17   **Q.**   AND I SEE THAT AT THAT POINT YOU'RE SUGGESTING THAT

14:28:32   18   THERE'S A SCOUR TRENCH OF 8 AND ALMOST 3/4 FEET DEEP.

14:28:36   19   **A.**   IF THE WALL HADN'T FAILED FROM -- BY SOME CAUSE, YES.

14:28:39   20   **Q.**   WELL, WE HAVE A WHOLE BUNCH OF WALLS THAT DIDN'T FAIL;

14:28:42   21   RIGHT?

14:28:45   22   **A.**   YES.

14:28:47   23   **Q.**   AND WE HAVE THIS NICE GRADUAL LINE WHICH, TO MY MIND,

14:28:53   24   DOESN'T SEEM TO SHOW ANY SLOWING DOWN.  IT'S A NICE CURVE.

14:28:57   25        DO YOU SEE THAT?

2043

| | | |
|---|---|---|
| 14:28:59 | 1 | **A.**  WELL, IT'S AFTER ABOUT -- I'M HAVING A HARD TIME SEEING. |
| 14:29:01 | 2 | BUT AFTER ABOUT 8:00 IN THE MORNING, IT DOES START TO SLOW |
| 14:29:05 | 3 | DOWN.  THAT'S WHEN THE CURVE STARTS TO BEND AROUND TO GO |
| 14:29:08 | 4 | SLOWER. |
| 14:29:09 | 5 | **Q.**  ALL RIGHT.  AND SO YOUR TESTIMONY IS THAT YOU BUILT TAIL |
| 14:29:12 | 6 | WATER INTO THIS ANALYSIS? |
| 14:29:24 | 7 | **A.**  YES. |
| 14:29:24 | 8 | **Q.**  OKAY.  SO WE HAVE NOTHING, OF COURSE, IN WRITING TO CHECK |
| 14:29:26 | 9 | THAT OUT, SO WE JUST HAVE TO TAKE YOUR WORD FOR IT; RIGHT? |
| 14:29:29 | 10 | **A.**  YES. |
| 14:29:30 | 11 | **Q.**  NOW, WE DO HAVE A REPORT FROM YOU ON MARCH THE 12TH; |
| 14:29:33 | 12 | RIGHT? |
| 14:29:33 | 13 | **A.**  YES. |
| 14:29:33 | 14 | **Q.**  AND SO IF YOU TOOK INTO CONSIDERATION TAIL WATER, IT |
| 14:29:37 | 15 | SHOULD BE DESCRIBED IN YOUR REPORT; RIGHT? |
| 14:29:38 | 16 | **A.**  YES. |
| 14:29:39 | 17 | **Q.**  IS IT? |
| 14:29:39 | 18 | **A.**  YES. |
| 14:29:40 | 19 | **Q.**  IT'S DESCRIBED IN THE SCOUR? |
| 14:29:42 | 20 | **A.**  IT'S DESCRIBED IN MY REPORT. |
| 14:29:44 | 21 | **Q.**  OKAY.  FAIR ENOUGH. |
| 14:29:45 | 22 | UNDER SCOUR? |
| 14:29:47 | 23 | **A.**  I DON'T RECALL THE EXACT SECTIONS.  BUT UNDER SCOUR WE DO |
| 14:29:50 | 24 | TALK ABOUT, IN THE DIAGRAM, THAT I ILLUSTRATE THE DIFFERENT |
| 14:29:54 | 25 | STAGES OF SCOUR. |

14:29:56  1        THE LAST OF THOSE FOUR ILLUSTRATIONS SHOWS TAIL WATER

14:30:01  2  BUILDING UP.  AND WE DESCRIBE HOW, WHEN THAT HAPPENS, THE RATE

14:30:05  3  OF SCOUR SLOWS AND EVENTUALLY STOPS.

14:30:10  4        **THE COURT:**  OKAY.  I HAVE A QUESTION.  MY QUESTION IS

14:30:12  5  GETTING TO THE TAIL WATER CONCEPT, BECAUSE IT WASN'T REALLY

14:30:14  6  CLEAR TO ME, THE COEFFICIENT OF DECLINE.

14:30:19  7        IS THERE A MATHEMATICAL EXPRESSION FOR THE

14:30:22  8  COEFFICIENT OF DECLINE?

14:30:24  9        BY LOOKING AT THE CURVE, COULDN'T YOU COMPUTE

14:30:26  10  THE MATHEMATICAL -- THE MATHEMATICAL EXPRESSION FOR THE AMOUNT

14:30:32  11  IT DECLINES WHEN IT -- FROM THE BEGINNING OF IT STARTING TO

14:30:36  12  SCOUR TO THE TIME IT ENDS?

14:30:38  13        **THE WITNESS:**  WELL, THERE IS -- IN THE SCOUR

14:30:40  14  CALCULATION ITSELF, YOUR HONOR, THERE IS A PROVISION THAT WHEN

14:30:44  15  WATER STARTS BUILDING UP IN THE TRENCH, IT DISSIPATES SOME OF

14:30:47  16  THE ENERGY.

14:30:48  17        **THE COURT:**  RIGHT.  I KNOW THAT.  I'VE GOT THAT

14:30:49  18  CONCEPT.  WE'VE TALKED ABOUT IT.

14:30:51  19        MY QUESTION IS, THOUGH:  SOME.  WHAT DEGREE?

14:30:55  20  10 PERCENT?  15?  20?  25 PERCENT?  THAT'S A CRUDE EXPRESSION

14:31:00  21  OF NUMBERS, BUT I'M WONDERING IF YOU CAN LOOK AT THAT SLOPE AND

14:31:03  22  TELL ME, FROM 7:00 TO 8:00, WHAT WAS THE PERCENTAGE IN DECLINE

14:31:07  23  OF EROSION?

14:31:08  24        **THE WITNESS:**  NOT VERY MUCH FROM THAT TIME BECAUSE

14:31:10  25  THERE WAS VERY LITTLE -- THE TAIL WATER HADN'T GOTTEN UP ENOUGH

14:31:14    1   TO REALLY BE DISSIPATING.

14:31:16    2              BUT FROM 8:00 TO 9:00 IT BECAME VERY

14:31:18    3   SIGNIFICANT.

14:31:18    4         **THE COURT:**  AND THE BREACH HAD ALREADY OCCURRED AT

14:31:21    5   THAT TIME, HAD IT NOT?

14:31:22    6         **THE WITNESS:**  YES.

14:31:23    7         **THE COURT:**  THANK YOU.

14:31:23    8   **BY MR. BRUNO:**

14:31:23    9   **Q.**   ALL RIGHT.  WHAT -- TO CONTINUE THAT LINE.

14:31:27   10              IF YOU HAVE 3 INCHES OF TAIL WATER AT THE CROWN, HOW

14:31:33   11   MUCH DOES THAT SLOW DOWN THE EROSION RATE?

14:31:35   12   **A.**   VERY LITTLE.

14:31:37   13   **Q.**   IF YOU HAVE 6 INCHES, HOW LONG -- HOW MUCH DOES THAT SLOW

14:31:39   14   DOWN THE EROSION RATE?

14:31:41   15   **A.**   WELL, THAT'S WHERE IT STARTS TO HELP SOME.

14:31:44   16   **Q.**   ALL RIGHT.  AND YOUR TESTIMONY IS I CAN GO TO YOUR REPORT

14:31:46   17   AND I CAN FIND OUT THOSE DETAILS; CORRECT?

14:31:49   18   **A.**   NO.  WE DON'T GIVE THOSE SPECIFIC DETAILS IN THE REPORT.

14:31:52   19   WE JUST GIVE THE RESULTS OF THE CALCULATION.

14:31:54   20   **Q.**   OKAY.  ALL RIGHT.  LET'S MOVE ON.

14:31:57   21              GO TO --

14:31:57   22   **A.**   AND WE PROVIDED YOU WITH THE SPREADSHEETS WITH -- FOR

14:32:01   23   THE -- FOR THE CALCULATIONS THAT WERE INCLUDED IN MY EXPERT

14:32:04   24   REPORT THAT CLEARLY SHOW THAT TAIL WATER WAS INCLUDED.

14:32:07   25   **Q.**   OKAY.

14:32:08    1            **MR. BRUNO:**  LET'S GO TO PX-3448-10, PAGE 37, LINE 8.

14:32:15    2   BY MR. BRUNO:

14:32:19    3   **Q.**   ALL RIGHT.  THIS IS THE FIRST LOCATION WHERE YOU CHANGE

14:32:20    4   YOUR TESTIMONY.  AND I CAN SHOW IT TO YOU IF YOU WANT TO --

14:32:24    5   BUT . . .

14:32:26    6            **MR. TREEBY:**  IF YOUR HONOR PLEASE, THIS IS --

14:32:28    7            **THE COURT:**  THAT'S NOT A QUESTION, THAT'S A

14:32:29    8   STATEMENT.

14:32:29    9            **MR. TREEBY:**  RIGHT.  THERE IS NO QUESTION.

14:32:31   10            **THE COURT:**  I SUSTAIN YOUR OBJECTION.

14:32:32   11   BY MR. BRUNO:

14:32:32   12   **Q.**   ALL RIGHT.  WELL, LET ME SHOW IT TO YOU.

14:32:34   13            **MR. BRUNO:**  MAY I APPROACH?

14:32:35   14            **MR. TREEBY:**  NO, YOUR HONOR.

14:32:35   15            **THE COURT:**  WELL, WE DON'T KNOW WHAT WE'RE TALKING

14:32:38   16   ABOUT RIGHT NOW.

14:32:39   17            **MR. BRUNO:**  JUDGE, WE'VE ALREADY ESTABLISHED THIS

14:32:41   18   DOCUMENT.

14:32:42   19            **THE COURT:**  OKAY.  JUST GIVE ME --

14:32:43   20            **MR. BRUNO:**  WE'VE ALREADY SHOWED YOU THE DOCUMENT.

14:32:45   21            **THE COURT:**  OKAY.  I'M NOT SURE WHAT DOCUMENT THAT

14:32:47   22   IS.

14:32:48   23            **MR. BRUNO:**  ALL RIGHT.  THIS IS THE CORRECTIONS TO

14:32:48   24   THE DEPOSITION OF ALLEN MARR.

14:32:51   25            **THE COURT:**  ALL RIGHT.  YOU'RE BACK TO THE

```
14:32:51   1   CORRECTIONS.

14:32:51   2              MR. BRUNO:  RIGHT.  WE'RE BACK TO THE CORRECTIONS.

14:32:51   3              THE COURT:  I DIDN'T KNOW THAT'S WHERE WE WERE.

14:32:53   4              MR. BRUNO:  I APOLOGIZE.

14:32:53   5              THE COURT:  THAT'S THE CORRECTIONS TO THE DEPOSITION.

14:32:54   6              MR. BRUNO:  ALL RIGHT.  AND THE WITNESS -- AND I'VE

14:32:56   7   SHOWED HIM UP ON THE SCREEN.

14:32:57   8              THE COURT:  RIGHT.

14:32:58   9              MR. BRUNO:  AND THE FIRST PLACE IS PAGE 37, LINES 2

14:33:02  10   THROUGH 12.  SO THERE'S LINE 2 AND THERE'S LINE 12.

14:33:08  11                  OKAY.

14:33:09  12   BY MR. BRUNO:

14:33:10  13   Q.   AND IN THESE CORRECTIONS, ARE YOU CHANGING THE COURT

14:33:15  14   REPORTER'S VERSION OF WHAT YOU SAID IN ANY WAY?

14:33:21  15   A.   YOU'LL HAVE TO SHOW ME WHAT YOU'RE REFERRING TO.

14:33:23  16   Q.   I WOULD LIKE TO, BUT I GET OBJECTIONS.

14:33:25  17              THE COURT:  NO, NO, NO.  YOU CAN SHOW HIM NOW.

14:33:27  18              MR. BRUNO:  ALL RIGHT.  LET ME APPROACH.

14:33:27  19              THE COURT:  I DIDN'T REALIZE -- NONE OF US REALIZED

14:33:28  20   YOU HAD THE ERRATA SHEET IN YOUR HAND.  ALL WE SAW WAS THE

14:33:34  21   DEPOSITION.

14:33:35  22   BY MR. BRUNO:

14:33:35  23   Q.   THIS IS WHERE YOU CHANGED YOUR TESTIMONY.

14:33:44  24              THE COURT:  YOU MEAN ON THE ERRATA SHEET HE MADE A

14:33:47  25   NOTATION, AND YOU'RE SAYING -- YOU'RE ASKING HIM, "ISN'T IT
```

```
14:33:49   1   TRUE THAT'S WHERE YOU CHANGED YOUR TESTIMONY?"

14:33:51   2            MR. BRUNO:  WELL, LET ME ASK IT THIS WAY.  THAT WAS

14:33:51   3   INARTFUL.

14:33:51   4            THE COURT:  WAIT, WAIT.

14:33:51   5            MR. TREEBY:  IF YOUR HONOR PLEASE, ALL -- THIS IS FOR

14:33:54   6   MY BENEFIT, BUT I'M ENTITLED TO THIS BENEFIT, I BELIEVE.

14:34:00   7            IF WE COULD SEE IN JUXTAPOSITION FIRST --

14:34:06   8   BECAUSE I'M NOT FAMILIAR WITH THIS ERRATA SHEET -- COULD SEE

14:34:08   9   THE ERRATA SHEET AND SEE WHAT COUNSEL SAYS HE'S CHANGING.

14:34:10  10            THE COURT:  THAT'S FAIR.

14:34:11  11            MR. BRUNO:  WE COULD DO THAT.

14:34:13  12            YOU'VE GOT MY NOTES.

14:34:15  13            THE COURT:  IS THAT THE ONLY -- DO YOU WANT US TO

14:34:16  14   MAKE --

14:34:16  15            MR. BRUNO:  NO, WE HAVE IT.

14:34:17  16            THE COURT:  OKAY.

14:34:18  17            MR. BRUNO:  COULD YOU CALL UP AND MAYBE PUT BOTH OF

14:34:20  18   THESE ON THE SCREEN FOR MR. TREEBY, PX 4438 -- I'M SORRY --

14:34:24  19   PX-4706-2.  I'VE GOT THE WRONG NUMBER.

14:34:31  20            LET'S LOOK AT IT SIDE BY SIDE.  OR MAYBE YOU

14:34:33  21   COULD PUT IT TOP TO BOTTOM.  I THINK TOP TO BOTTOM MIGHT WORK A

14:34:36  22   LITTLE BETTER.

14:34:39  23            THAT DIDN'T WORK BETTER, DID IT?  I TRIED.

14:34:48  24            THE COURT:  I'LL TAKE A BIRD IN THE HAND.

14:34:50  25            MR. BRUNO:  I KNOW.  I WAS . . .
```

```
14:35:02    1            THE COURT:  CAN WE GO BACK TO THE OTHER ONE,

14:35:03    2   MR. BRUNO?

14:35:04    3            MR. BRUNO:  CAN WE PUT THEM BOTH ON THE SCREEN?

14:35:08    4            THE COURT:  WHERE THEY WERE SIDE BY SIDE?

14:35:10    5            MR. BRUNO:  IT'S -- FOR YOUR -- IT'S PX-4438,

14:35:13    6   PAGE 37.

14:35:13    7            THE COURT:  ALL RIGHT.

14:35:16    8            MR. BRUNO:  NOW, IF WE CAN BLOW UP THIS PIECE HERE

14:35:18    9   AND RAISE IT UP.  AND THEN IF WE CAN BLOW UP LINES 2 THROUGH

14:35:22   10   12, WHICH I CANNOT SEE ON THIS THING.

14:35:25   11            THE COURT:  NO.  YOU AND NOBODY ELSE.

14:35:27   12            MR. BRUNO:  OKAY.  CAN YOU JUST DROP IT A LITTLE BIT?

14:35:30   13            THE COURT:  DROP THE TOP ONE.

14:35:40   14            MR. BRUNO:  YOU NEED TO GO UP.  THE TOP BOX NEEDS TO

14:35:44   15   GO UP AND THE BOTTOM BOX NEEDS TO GO DOWN.

14:35:46   16            THERE YOU GO.  ALL RIGHT.  NOW, WELL, WE LOST

14:35:48   17   THE . . .

14:35:49   18            THE COURT:  WELL, WE CAN AT LEAST WORK WITH THIS.  WE

14:35:51   19   CAN WORK WITH THIS.

14:35:52   20            YOU CAN READ THE QUESTION AND THEN GO RIGHT TO

14:35:54   21   THE . . .

14:35:56   22            MR. BRUNO:  ALL RIGHT.  SO . . .

14:35:57   23            MR. TREEBY:  DO THE TOP ONE FIRST.  WELL, I MEAN,

14:36:02   24   THAT'S WHAT WE'RE --

14:36:03   25            THE COURT:  YEAH.  I THOUGHT WE HAD BEEN THROUGH THIS
```

```
14:36:06   1   37 LINE 2 THROUGH 12, BUT LET'S GO AHEAD.

14:36:09   2            MR. BRUNO:  NO, WE HAVEN'T TOUCHED ON THIS YET.

14:36:11   3            THE COURT:  WELL, WHICH ONE DID WE GO THROUGH?

14:36:13   4   BECAUSE WE WENT THROUGH ONE OF THESE ERRATA SHEETS, AND IT WAS

14:36:17   5   SOMETHING VERY SIMILAR TO THIS.

14:36:17   6            MR. BRUNO:  WELL, BECAUSE -- BECAUSE HE'S

14:36:17   7   REPEATING --

14:36:17   8            THE COURT:  OH, I SEE.  5:00 A.M.  OKAY.  GO AHEAD.

14:36:23   9   ALL RIGHT.

14:36:23  10            MR. BRUNO:  HE REPEATS THIS --

14:36:23  11            THE COURT:  OKAY.  SEVERAL TIMES.  OKAY.  GO AHEAD.

14:36:23  12   BY MR. BRUNO:

14:36:23  13   Q.   SO THIS IS A -- AND LET ME ESTABLISH THAT FOR THE RECORD.

14:36:25  14            I KNOW YOU CAN'T READ THE WHOLE THING.  BUT,

14:36:28  15   DR. MARR, THIS PARAGRAPH -- THERE WE GO -- YOU REPEAT THIS

14:36:34  16   PARAGRAPH VERBATIM SEVERAL TIMES THROUGHOUT YOUR CORRECTIONS TO

14:36:41  17   THE DEPOSITION; CORRECT?

14:36:42  18   A.   I REPEATED IT.  I DON'T RECALL HOW MANY TIMES.

14:36:45  19   Q.   I DIDN'T ASK YOU HOW MANY TIMES.  YOU JUST REPEATED IT;

14:36:50  20   RIGHT?

14:36:50  21   A.   I REPEATED IT.

14:36:51  22   Q.   ALL RIGHT.  AND THIS WAS NOT INTENDED TO CHANGE A WORD OR

14:36:53  23   A COMMA OR THE SPELLING OF WHAT YOU TOLD US IN YOUR DEPOSITION;

14:36:57  24   CORRECT?

14:36:58  25   A.   THAT'S CORRECT.  IT WAS --
```

14:36:59  1  **Q.**   THIS WAS INTENDED TO CHANGE THE SUBSTANCE OF YOUR
14:37:01  2  TESTIMONY; ISN'T THAT TRUE?
14:37:02  3  **A.**   NO.   IT WAS INTENDED TO INFORM YOU THAT I HAD LEARNED
14:37:06  4  SOMETHING NEW AFTER MY DEPOSITION THAT I FELT WAS OF IMPORTANCE
14:37:09  5  TO THE FAILURES, MY INTERPRETATION OF THE FAILURES.   NOTHING
14:37:14  6  MORE, NOTHING LESS.
14:37:15  7  **Q.**   ALL RIGHT.   SO LET GO THROUGH, THEN.   I'M JUST CURIOUS TO
14:37:20  8  KNOW WHETHER THIS TESTIMONY, WHICH IS REFERRED TO BY THIS
14:37:21  9  PARAGRAPH, HAS CHANGED IN ANY WAY.
14:37:24  10          THE QUESTION:   "BUT IN YOUR ANALYSIS YOU EXCLUDED ANY
14:37:28  11  CONSIDERATION OF WAVE OVERTOPPING AT THE SOUTH BREACH."
14:37:32  12          ANSWER:   "YES, I DID."
14:37:34  13          "AND WHY DID YOU NOT INCLUDE THAT?"
14:37:39  14          AND HERE'S YOUR ANSWER:   "WELL, I'VE DONE WORK BEFORE
14:37:44  15  WHERE, IN FAILURES LIKE THIS, YOU KNOW, WAVES ARE A SMALL
14:37:50  16  CONTRIBUTORY FACTOR BUT NOT SOMETHING WE -- THAT I NORMALLY
14:37:54  17  WOULD CONSIDER SIGNIFICANT FOR THIS TYPE OF PROBLEM."
14:37:58  18          NOW, DR. MARR, WITH ALL DUE RESPECT, THAT DOES NOT
14:38:04  19  INDICATE TO ME, AS A READER OF THOSE WORDS, THAT YOU DIDN'T
14:38:08  20  KNOW THE WAVES WERE BIGGER THAN THEY WERE.   IT SOUNDS LIKE THIS
14:38:12  21  IS SOMETHING YOU'VE DONE BEFORE.
14:38:14  22          SO IN FACT, DR. MARR, YOU NEVER INTENDED TO INCLUDE
14:38:20  23  WAVES IN THIS ANALYSIS; ISN'T THAT TRUE?
14:38:23  24  **A.**   THIS IS ALL IN THE CONTEXT OF MY UNDERSTANDING FROM THE
14:38:27  25  IPET REPORT THAT THE WAVES IN THE IHNC/EBIA AREA WERE LESS THAN

14:38:32   1   1-FOOT SIGNIFICANT WAVE HEIGHTS, AND EVERYTHING I ANSWERED HERE

14:38:35   2   RELATIVE TO WAVES AND THEIR POTENTIAL IMPACT WAS FROM THAT

14:38:39   3   FRAME OF MIND.

14:38:42   4            1-FOOT-HIGH WAVES OR LESS, IN MY VIEW, WERE NOT --

14:38:46   5   WOULD NOT HAVE BEEN A SIGNIFICANT CONTRIBUTORY FACTOR.  BUT IN

14:38:50   6   ALL HONESTY, AT THE TIME I DID THAT REPORT, I WAS, AGAIN,

14:38:53   7   WORKING OFF THE PREMISE THAT THE WAVES WERE LESS THAN 1 FOOT.

14:38:58   8            I SUBSEQUENTLY LEARNED THAT THEY WERE SIGNIFICANTLY

14:39:02   9   HIGHER.  AND I TRIED TO BE TRUE TO MYSELF AND TELL YOU THAT,

14:39:05  10   THAT THAT WOULD THEN HAVE MORE IMPACT.  THE WAVES WOULD BE

14:39:10  11   IMPORTANT.

14:39:10  12   **Q.**   I GUESS I'M CONFUSED.  YOU SAID:  "IN FAILURES LIKE THIS,

14:39:12  13   YOU KNOW, WAVES ARE A SMALL CONTRIBUTORY FACTOR."

14:39:17  14            WHEN YOU SAID "LIKE THIS," FEATURES LIKE THIS -- I'M

14:39:23  15   SORRY -- "FAILURES LIKE THIS," WHAT WERE YOU THINKING ABOUT?

14:39:26  16   **A.**   THE SPECIFIC FAILURES OF THE NORTH AND SOUTH BREACH THAT I

14:39:29  17   WAS LOOKING AT WHERE WE HAD A WALL OF 7 FEET HIGH OR SO AND WE

14:39:34  18   HAD WAVES, AND WE HAD POTENTIALLY SCOUR -- WATER GOING OVER THE

14:39:37  19   TOP AS MUCH AS 2 FEET, AND WE HAD WAVES THAT WOULD BE SMALLER

14:39:41  20   THAN 1 FOOT.  THE SIGNIFICANT WAVE HEIGHT WOULD BE 1 FOOT OR

14:39:46  21   LESS.

14:39:47  22            THAT, IN THAT SETTING, WAS THAT WAVES WOULD BE --

14:39:50  23   HAVE A SMALL EFFECT IN THE BIGGER PICTURE OF THINGS.

14:39:52  24   **Q.**   ALL RIGHT.  WELL, IN YOUR ANSWER YOU REFERENCE WORK THAT

14:39:56  25   YOU'VE DONE BEFORE.  WERE YOU TALKING ABOUT THE NORTH AND SOUTH

14:39:58   1   BREACH?

14:40:00   2   **A.**   NO.   I WAS TALKING IN GENERAL, WITH MY -- MY GENERAL

14:40:05   3   KNOWLEDGE IN WORKING WITH WAVES IN ALL SORTS OF THINGS,

14:40:09   4   INCLUDING OFF THE COAST OF HOLLAND WHERE WE HAD TO DEAL WITH

14:40:13   5   50-FOOT-HIGH WAVES.   AND THERE, THOSE WAVES WERE VERY

14:40:17   6   SIGNIFICANT IN DESIGNING THE STRUCTURE.

14:40:18   7   **Q.**   ALL RIGHT.

14:40:20   8            **MR. BRUNO:**  LET'S GO TO PAGE 38 AT LINE 11.  38.

14:40:52   9               4438, LINE 38 [*SIC*].

14:40:55   10            **THE COURT:**  WE'RE ON THE WRONG EXHIBIT NUMBER.  WE'RE

14:40:59   11   BACK TO THE DEPOSITION.  YOU WANTED THE ERRATA SHEET; CORRECT?

14:41:08   12            **MR. BRUNO:**  NO, THIS IS WHERE I WANT TO GO.

14:41:11   13            **THE COURT:**  I'M SORRY.  I APOLOGIZE.

14:41:17   14   **BY MR. BRUNO:**

14:41:17   15   **Q.**   NOW, HERE YOU'RE ASKED -- AND I'M CURIOUS TO KNOW WHERE

14:41:21   16   THE --

14:41:22   17            **THE COURT:**  ALL RIGHT.  MR. TREEBY'S OBJECTING.

14:41:24   18               I'LL LET YOU OBJECT FIRST.  GO AHEAD.

14:41:26   19            **MR. TREEBY:**  YOUR HONOR, ONCE AGAIN, IN FACT, I DID

14:41:28   20   TRY TO MOVE THIS ALONG A LITTLE BIT BY GOING IN AND GETTING THE

14:41:32   21   ERRATA SHEET BECAUSE THAT'S SEEMINGLY WHERE WE WERE HEADED.

14:41:36   22   BUT THERE'S NOTHING ON THE ERRATA SHEET ON PAGE 38.

14:41:39   23               SO HERE WE'RE GOING TO A DEPOSITION WITHOUT A

14:41:41   24   QUESTION FOR THE -- TO IT WITNESS.

14:41:42   25            **MR. BRUNO:**  YOUR HONOR, WE HAVE TESTIMONY FROM THIS

14:41:43  1  WITNESS --

14:41:44  2          **THE COURT:**  OKAY.  YOU NEED TO TELL US WHAT YOU'RE

14:41:47  3  TRYING TO --

14:41:47  4          **MR. BRUNO:**  WELL, I'M TRYING TO SPEED IT ALONG, BUT

14:41:49  5  WE'LL DO IT THE HARD WAY.

14:41:51  6  **BY MR. BRUNO:**

14:41:51  7  **Q.**  SO, DR. MARR, HAVEN'T YOU TOLD US TODAY THAT IN YOUR

14:41:53  8  OPINION THE SOUTH BREACH FAILURE OCCURRED BETWEEN 7:00 AND

14:41:58  9  8:00?

14:41:59  10  **A.**  I DON'T BELIEVE I SAID THAT.

14:42:00  11  **Q.**  WHAT TIME DID YOU TELL US?

14:42:02  12  **A.**  I TRIED SPECIFICALLY TO STAY AWAY FROM GIVING A TIME ON

14:42:05  13  THE SOUTH BREACH BECAUSE I'VE NEVER BEEN ABLE TO BE CERTAIN OF

14:42:08  14  THAT TIME.

14:42:08  15  **Q.**  YOU CAN'T EVEN GIVE US A RANGE?

14:42:16  16  **A.**  WELL, I GAVE A RANGE IN MY EXPERT REPORT FROM 7:00 TO

14:42:23  17  9:00.

14:42:24  18  **Q.**  RIGHT.  SO IS THAT WHERE WE ARE, 9:00?

14:42:29  19          **THE COURT:**  7:00 TO 9:00.

14:42:30  20  **BY MR. BRUNO:**

14:42:30  21  **Q.**  7:00 TO 9:00.  ALL RIGHT.  WELL, IF YOU SAID 7:00 TO 9:00,

14:42:30  22  IS THIS TESTIMONY CONSISTENT WITH 7:00 TO 9:00?

14:42:33  23  **A.**  WELL, HERE WE GOT INTO A DISCUSSION WHERE IT'S BACK AND

14:42:35  24  FORTH, AND THE ATTORNEY DEPOSING ME ASKS:  "WHAT WAS THE TIME

14:42:39  25  IMPLIED IN MY SCOUR ANALYSIS FOR THE WATER REACHING 14.2?"

14:42:44   1          AND I SAID:  "9:00."

14:42:47   2          AND THAT IS A CONDITION WHERE I SHOWED YOU EARLIER

14:42:49   3   THIS MORNING WE DID AN OVERTURNING ANALYSIS FOR THAT CONDITION

14:42:53   4   AT 9:00, AND WE GOT A FACTOR OF SAFETY OF ABOUT .9.  AND I SAID

14:42:57   5   THESE CONDITIONS WOULD HAVE IMPLIED THAT THE FAILURE WOULD HAVE

14:43:00   6   OCCURRED BY THIS TIME.

14:43:02   7          AND THEN WE'LL GO ON.  I'M ASSUMING YOU'RE GOING TO

14:43:05   8   GO ON HERE WHERE HE TRIED TO GET ME TO SAY:  "WELL, WAS IT

14:43:10   9   EXACTLY 9:00?"

14:43:11   10          AND I SAID:  "WELL, I CAN'T BE CERTAIN."

14:43:13   11          AND THEN WE GOT INTO A DISCUSSION OF SOMETIME AROUND

14:43:16   12   BEFORE AND AFTER 9:00.

14:43:17   13   Q.   ALL RIGHT.

14:43:19   14   A.   I ENDED THAT WITH A POINT THAT I SAID:  "I HAVE NEVER

14:43:22   15   FOCUSED ON TRYING TO PREDICT THE TIME OF THE FAILURE FOR THE

14:43:26   16   SOUTH BREACH, AND I STILL TAKE THAT POSITION."

14:43:28   17          THE COURT:  JUST A QUICK QUESTION FROM THE COURT, AND

14:43:29   18   I DON'T WANT TO DISRUPT ANYBODY TOO MUCH, BUT I HAVE TO

14:43:33   19   UNDERSTAND THIS.

14:43:34   20              LET'S SAY, HYPOTHETICALLY, THE BREACH OCCURRED

14:43:36   21   AT 6:45.  WOULD THAT THEN RENDER YOUR SCOUR ANALYSIS INACCURATE

14:43:43   22   BASED ON WHEN THE PEAK WAS OF 14.2 FEET?

14:43:48   23          THE WITNESS:  NO.  THE ANALYSIS WOULD -- THERE WOULD

14:43:51   24   STILL HAVE BEEN SCOUR OCCURRING, GIVEN THAT THERE WERE WAVES.

14:43:56   25   IN MY ORIGINAL REPORT I HAD NO WAVES AND SCOUR DIDN'T START

14:44:00  1   UNTIL 7:00.

14:44:01  2            THE COURT:  OKAY.  AND SO YOU'RE SAYING IF THE BREACH

14:44:06  3   OCCURRED AT 6:45 THERE WAS TIME FOR IT TO GET A -- I DON'T WANT

14:44:11  4   TO USE ANY -- A 4.7 OR 5.7 TRENCH TO CAUSE FAILURE?

14:44:19  5            THE WITNESS:  IN ANY ANALYSES, NO, YOUR HONOR.  THE

14:44:21  6   ANALYSES THEMSELVES WOULD NOT HAVE GONE THAT DEEP BY 6:45.

14:44:25  7            THE COURT:  THANK YOU.

14:44:26  8            MR. BRUNO:  ALL RIGHT.  AND I DON'T --

14:44:28  9   BY MR. BRUNO:

14:44:28  10  Q.  WERE YOU TALKING WITH OR WITHOUT WAVES?

14:44:31  11  A.  THAT'S WITH -- WITH WAVES.

14:44:32  12  Q.  ALL RIGHT.  SO WITH WAVES, AT 6:45 THE WALL DOESN'T FAIL;

14:44:36  13  CORRECT?

14:44:37  14  A.  FROM MY ANALYSIS, THAT'S CORRECT.

14:44:38  15  Q.  AND IT CERTAINLY IT DOESN'T FAIL WITHOUT WAVES?

14:44:41  16  A.  CORRECT.

14:44:42  17  Q.  OKAY.  ALL RIGHT.

14:45:00  18            NOW, WE HAD SOME DISCUSSION FROM YOUR SLIDES ABOUT

14:45:05  19  THE MAKEUP OF THE SOIL AT THE LEVEE.  AND YOU SAID YOU COULDN'T

14:45:12  20  FIND ANYTHING WHICH WOULD HAVE HELPED YOU LEARN WHAT THE LEVEES

14:45:15  21  WERE MADE OF AT THE EBIA; CORRECT?

14:45:19  22  A.  I BELIEVE I SAID THAT -- THAT DURING MY FIELD

14:45:25  23  INVESTIGATION WE COULDN'T FIND MATERIALS BECAUSE THEY HAD ALL

14:45:28  24  BEEN LOST BY EITHER THE FAILURES OR BY THE RECONSTRUCTION.

14:45:33  25            I CAN'T REMEMBER IF IT'S HERE OR IN MY REPORT THAT I

14:45:36   1   SAID THAT WE HAD SOME INFORMATION FROM THE ORIGINAL DESIGN

14:45:39   2   MEMORANDUM OF WHAT THESE MATERIALS WERE TO BE AND WHAT THEIR

14:45:42   3   STRENGTHS HAD TO BE.

14:45:43   4   **Q.**   ALL RIGHT.  WELL, LET'S GO TO PAGE 56 OF YOUR DEPOSITION,

14:45:48   5   THAT SAME NUMBER, 4438.  LET'S SEE IF THIS IS CONSISTENT WITH

14:45:53   6   WHAT YOU JUST SAID.

14:45:59   7          YOU JUST TOLD US ON THE RECORD THAT YOU DID GO TO THE

14:46:01   8   CORPS AND THEY GAVE YOU SOME INFORMATION; RIGHT?  DIDN'T YOU

14:46:03   9   JUST TELL US YOU WENT TO THE CORPS AND THEY GAVE YOU

14:46:05  10   INFORMATION ABOUT THE MAKEUP OF THE LEVEES?

14:46:07  11   **A.**   NO.  I SAID -- I THOUGHT I SAID I WENT TO THE CORPS DESIGN

14:46:10  12   MEMORANDUM.

14:46:11  13   **Q.**   AND DID YOU FIND SOME INFORMATION?

14:46:12  14   **A.**   YES.

14:46:13  15   **Q.**   YOU DID.

14:46:14  16          ALL RIGHT.  LET'S LOOK AT YOUR ANSWER HERE:  "I ASKED

14:46:17  17   THE CORPS OF ENGINEERS AND I COULDN'T -- NO ONE SEEMED TO KNOW

14:46:19  18   FOR CERTAIN, JUST THAT -- JUST IN GENERAL THAT CLAYEY TYPE

14:46:23  19   MATERIALS WERE USED AND THAT SOMETIMES THEY HAD SOME SILTS IN

14:46:25  20   THEM, SOMETIMES THEY WERE LOWER PLASTICITY, SOMETIMES THEY

14:46:29  21   COULD GET INTO HIGHER PLASTICITY SOILS.  SO WE LOOKED AT THE

14:46:35  22   DOCUMENTS FOR THE CONSTRUCTION OF THE ORIGINAL 1969

14:46:36  23   CONSTRUCTION, AND THEY WERE NOT SPECIFIC AS TO WHICH FILL TYPE

14:46:39  24   WAS USED."

14:46:40  25          DO YOU SEE THAT?

```
14:46:40   1   A.   YES.

14:46:41   2   Q.   ALL RIGHT.  SO IS THAT THE SAME TESTIMONY YOU JUST GAVE?

14:46:46   3            MR. TREEBY:  YOUR HONOR, THAT'S NOT PROPER

14:46:47   4   IMPEACHMENT.

14:46:49   5            MR. BRUNO:  WITH ALL DUE RESPECT, I WOULD LIKE THE

14:46:50   6   WITNESS TO ANSWER THE QUESTION, NOT COUNSEL.

14:46:54   7            MR. TREEBY:  NO, I OBJECT, YOUR HONOR.  THIS WAS

14:46:55   8   SUPPOSEDLY FOR IMPEACHMENT PURPOSES, THAT WAS THE FIRST THING.

14:46:57   9   AND THE WITNESS JUST TESTIFIED TO EXACTLY WHAT'S IN HIS

14:46:59  10   DEPOSITION.

14:47:00  11            MR. BRUNO:  I DISAGREE, YOUR HONOR.

14:47:01  12            THE COURT:  ALL RIGHT.  I NOTE THE OBJECTION.  WE'LL

14:47:04  13   ASK THE WITNESS TO STRAIGHTEN IT OUT IF ANYTHING NEEDS

14:47:07  14   STRAIGHTENING OUT.

14:47:08  15   BY MR. BRUNO:

14:47:09  16   Q.   AM I READING THIS INCORRECTLY?

14:47:10  17            "THEY WERE NOT SPECIFIC AS TO WHAT FILL TYPE WAS

14:47:12  18   USED."

14:47:13  19   A.   THAT'S CORRECT.

14:47:13  20   Q.   IS THAT YOUR UNDERSTANDING TODAY?

14:47:16  21   A.   THAT'S CORRECT.

14:47:16  22   Q.   ALL RIGHT.  LET'S GO TO THE DESIGN MEMORANDUM, JX-01821,

14:47:20  23   PAGE 115, AND SEE HOW SPECIFIC THIS IS.

14:47:31  24            DO YOU SEE WHERE IT SAYS "SOURCES OF FILL MATERIAL"?

14:47:34  25   A.   I CAN'T READ IT.
```

14:47:35  1  **Q.**  WE'RE GOING TO BLOW IT UP.

14:47:37  2       "THE EARTH FILL FOR COMPLETING THE EXISTING LEVEE

14:47:40  3  PORTION OF THE PROTECTION BETWEEN THE IHNC LOCKS AND FLORIDA

14:47:45  4  AVENUE . . ."

14:47:46  5       FIRST OF ALL, ARE WE IN THE RIGHT PLACE?

14:47:51  6  **A.**  YES.

14:47:51  7  **Q.**  OKAY.  ". . . WILL BE OBTAINED FROM A BORROW AREA IN THE

14:47:56  8  BOTTOM OF LAKE PONTCHARTRAIN ALONG THE NORTH SHORE."

14:48:00  9       SO WE KNOW WHERE IT'S COMING FROM; RIGHT?

14:48:03  10  **A.**  THAT'S WHAT IT SAYS THERE.

14:48:04  11  **Q.**  OKAY.

14:48:06  12       **THE COURT:**  I'M SORRY.  DID SOMEBODY OBJECT?  I

14:48:12  13  WAS --

14:48:14  14       **MR. BRUNO:**  NO.

14:48:14  15       **THE COURT:**  I WAS TRYING TO MAKE NOTES OVER HERE.

14:48:14  16       **MR. BRUNO:**  I JUST LOST MY THOUGHT, AS MY SON WOULD

14:48:18  17  SAY.

14:48:20  18  **BY MR. BRUNO:**

14:48:20  19  **Q.**  "THIS MATERIAL CONSISTING OF STIFF" -- AND I'M NOT GOING

14:48:27  20  TO TRY -- "PLEISTOCENE CLAYS WILL BE TRANSPORTED TO THE PROJECT

14:48:34  21  ON BARGES."

14:48:35  22       THAT TELLS YOU PRETTY SPECIFICALLY WHAT THEY USED FOR

14:48:37  23  THE LEVEES AT THE EBIA INTO WHICH THE SHEET PILES WERE

14:48:41  24  INSERTED; ISN'T THAT TRUE?

14:48:43  25  **A.**  IS THIS THE 1960- -- THIS IS ABOUT THE 1966 CONSTRUCTION?

14:48:50   1   **Q.**   YES, SIR, IT IS.

14:48:51   2   **A.**   THIS IS OUT OF DESIGN MEMORANDUM NO. 3?

14:48:53   3   **Q.**   YES.  WE'LL SHOW YOU THE COVER PAGE IF YOU LIKE.

14:48:55   4            **THE COURT:**  NO, HE'S NOT -- HE'S NOT -- HE'S JUST

14:48:56   5   ASKING YOU TO --

14:49:06   6   **BY MR. BRUNO:**

14:49:06   7   **Q.**   IT IS.  DO YOU SEE THAT?  IT'S ONLY ONE SENTENCE.

14:49:11   8   **A.**   WELL, I'M READING THE WHOLE PARAGRAPH.  I'M SORRY.

14:49:12   9   **Q.**   WELL, THE REST OF IT IS, UNFORTUNATELY --

14:49:15  10            **THE COURT:**  HE'S ENTITLED TO, TO GET CONTEXT, IF HE

14:49:20  11   CAN FIGURE THAT OUT.  HE'S CERTAINLY ENTITLED TO READ THOSE.

14:49:21  12            **MR. BRUNO:**  WELL, GO AHEAD.

14:49:23  13            **THE COURT:**  SIR, YOU'RE ENTITLED IT READ WHAT YOU

14:49:24  14   NEED TO READ BEFORE YOU ANSWER THE QUESTION.

14:49:29  15            **THE WITNESS:**  ALL RIGHT.  I'VE READ IT.  I'M SORRY.

14:49:31  16   YOUR QUESTION AGAIN?

14:49:34  17   **BY MR. BRUNO:**

14:49:35  18   **Q.**   WELL, THIS GIVES YOU PRETTY SPECIFIC INFORMATION ABOUT THE

14:49:37  19   CLAY, DOESN'T IT?

14:49:39  20   **A.**   IT APPEARS TO, IF THAT'S WHAT WAS ACTUALLY CONSTRUCTED.  I

14:49:43  21   RELIED MOSTLY ON MY CONVERSATION WITH THE CORPS PEOPLE ABOUT

14:49:47  22   WHAT THEY COULD TELL ME ABOUT THE FILL MATERIALS ACTUALLY

14:49:50  23   PLACED THERE.  BECAUSE SOMETIMES THERE'S A DIFFERENCE BETWEEN

14:49:52  24   WHAT A DESIGN MEMORANDUM SAYS AND WHAT ACTUALLY GOT PLACED.

14:49:57  25   **Q.**   WELL, WE CAN AT LEAST AGREE THE DESIGN MEMORANDUM IS

14:50:00    1    SUPPOSED TO DESCRIBE WHAT THEY'RE SUPPOSED TO USE TO BUILD THE

14:50:03    2    LEVEE; RIGHT?  THAT'S WHY YOU DO A DESIGN MEMO?

14:50:06    3    **A.**   YEAH.  IT SHOWS INTENT, BUT THERE ARE MANY TIMES THAT

14:50:09    4    THINGS CHANGE.

14:50:10    5    **Q.**   OKAY.  WELL, LET'S ASSUME THAT THIS TIME THEY ACTUALLY

14:50:14    6    FOLLOWED THEIR DESIGN MEMO.  OKAY?

14:50:16    7        LET ME ASK YOU THIS:  IS THIS LESS ERODABLE CLAY,

14:50:23    8    AVERAGE CLAY, OR MORE ERODABLE CLAY?

14:50:25    9    **A.**   I CAN'T ANSWER THAT BECAUSE I DON'T REALLY KNOW THE

14:50:28   10    CHARACTER OF WHAT THEY'RE DESCRIBING HERE.

14:50:31   11    **Q.**   OKAY.  SO HOW DID YOU ASCERTAIN THE CHARACTER OF WHAT WAS

14:50:34   12    THERE?

14:50:35   13    **A.**   FROM THE DESCRIPTION YOU JUST READ EARLIER AND MY VERBAL

14:50:39   14    DISCUSSION WITH THE CORPS PEOPLE ON WHAT WAS TYPICAL OF FILL

14:50:43   15    MATERIALS USED TO CONSTRUCT THE EMBANKMENT LEVEES.

14:50:47   16    **Q.**   OKAY.  LET ME SEE IF I UNDERSTAND THIS.

14:50:49   17        YOU'VE GOT AN ACTUAL DESCRIPTION OF CLAY, AND THAT

14:50:51   18    DOESN'T ALLOW YOU TO ASCERTAIN WHETHER IT'S LESS ERODIBLE,

14:50:55   19    AVERAGE, OR MORE ERODIBLE.  BUT YOU HAD A CONVERSATION WITH

14:50:59   20    SOMEBODY, AND THAT CONVERSATION ALLOWED YOU TO CONCLUDE THAT

14:51:03   21    WHAT WAS USED WAS ACTUALLY MORE ERODIBLE CLAY; RIGHT?

14:51:07   22        IS THAT WHAT YOU'RE TELLING THE JUDGE?

14:51:08   23    **A.**   WELL, IT ALLOWED ME TO DEDUCE, PRIMARILY, THAT IT WAS A

14:51:12   24    CL-TYPE CLAY, A LOW PLASTICITY CLAY.  THAT'S THE MAIN POINT.

14:51:15   25    **Q.**   ALL THREE OF THESE ARE A CL-TYPE CLAY; RIGHT?

14:51:20   1   **A.**   THAT'S RIGHT.

14:51:20   2   **Q.**   ALL RIGHT.  SO ARE YOU NOW SAYING THAT YOUR CONVERSATIONS

14:51:23   3   WITH THE CORPS EMPLOYEE DO NOT ALLOW YOU TO CONCLUDE THAT IT

14:51:25   4   WAS LESS ERODIBLE CLAY OR MORE ERODIBLE CLAY OR AVERAGE CLAY?

14:51:30   5   **A.**   WELL, I THINK WHAT I TRIED TO SHOW IN MY REPORT WAS THAT

14:51:35   6   THERE WERE -- WE COULDN'T BE CERTAIN.  THAT'S WHY WE RAN MORE

14:51:37   7   ERODIBLE, AVERAGE ERODIBLE, AND LESS ERODIBLE, TO KIND OF SEE

14:51:42   8   HOW SENSITIVE THE SCOUR ANALYSIS WAS TO THESE DEGREES OF

14:51:45   9   ERODIBILITY.

14:51:46   10   AND THEN IN THE VALIDATION WE TOOK DEPTHS OFF OF

14:51:49   11   PHOTOGRAPHS TO VALIDATE THAT THE SCOUR DEPTHS IN THE FIELD

14:51:52   12   SEEMED TO MATCH PRETTY WELL WITH THE -- WHAT WAS CALLED THE

14:51:56   13   MORE ERODIBLE CL CLAY.  THAT WAS THE BEST WE COULD DO.

14:52:00   14   WE DIDN'T -- WE DIDN'T HAVE SAMPLES OF THE MATERIAL.

14:52:03   15   I ACTUALLY WENT TO THE FIELD, TRYING TO GET SOME, AND THERE WAS

14:52:06   16   NOTHING LEFT BECAUSE IT HAD ALL BEEN DISTURBED BY THE

14:52:09   17   RECONSTRUCTION.

14:52:11   18   **Q.**   RIGHT.  AND WE'VE ALREADY ESTABLISHED THAT THOSE NUMBERS

14:52:13   19   ARE DEPENDENT UPON CERTAIN VARIABLES LIKE HEIGHT OF THE WALL

14:52:16   20   AND DISTANCE TO THE TOP OF THE WALL TO THE TOP OF THE CROWN;

14:52:20   21   RIGHT?  ALL THOSE THINGS CAN INFLUENCE THOSE NUMBERS.

14:52:24   22   **A.**   THE NUMBERS MEANING THE DEPTH OF --

14:52:26   23   **Q.**   YES.

14:52:27   24   **A.**   YES.

14:52:27   25   **Q.**   YES.  ALL RIGHT.

14:52:27   1          SO -- AND I THINK YOU'VE SAID REPEATEDLY THROUGHOUT

14:52:28   2   THIS --

14:52:29   3          **THE COURT:**  I DIDN'T GET THAT.  THAT WAS A LITTLE

14:52:30   4   SHORTHAND, JUST FOR THE RECORD.

14:52:32   5              YOU ANTICIPATED -- YOU WANT TO --

14:52:36   6          **MR. BRUNO:**  WE'LL DO IT AGAIN.

14:52:37   7          **THE COURT:**  DO YOU WANT TO GIVE US AN UNDERSTANDING

14:52:40   8   OF WHAT YOU MEANT BY THAT?

14:52:41   9          **THE WITNESS:**  YES.  THERE ARE SEVERAL VARIABLES, LIKE

14:52:43  10   HEIGHT OF WALL AND AMOUNT OF WATER COMING OVER THE TOP AND THE

14:52:45  11   CONDITION OF THE SOIL, THAT AFFECT THE CALCULATION OF DEPTH OF

14:52:50  12   SCOUR.

14:52:51  13   **BY MR. BRUNO:**

14:52:52  14   **Q.**   AND I THINK -- WELL, YOU'VE CONCEDED THAT THESE -- THE

14:52:59  15   TESTIMONY THAT YOU GAVE ABOUT THE SCOUR DEPTHS IS NOT SPECIFIC

14:53:07  16   TO THE POINT WHERE YOU CAN TELL THE JUDGE THAT IT'S SO MUCH

14:53:11  17   DEPTH AT A CERTAIN POINT IN TIME.  THERE'S A LOT OF -- THERE'S

14:53:14  18   A LOT OF PLAY IN THESE NUMBERS?

14:52:56  19

14:53:18  20   **A.**   I THINK, GOING BACK TO WHAT MY REPORT SAYS, THAT THE WHOLE

14:53:21  21   PURPOSE OF THESE SCOUR CALCULATIONS WERE TO DEMONSTRATE IN A

14:53:26  22   GENERAL WAY THAT THE PHYSICS ARE THERE TO SUPPORT FOR THE WATER

14:53:30  23   CONDITIONS, THE DEPTH OF FALL AT THE EBIA, THAT SCOUR DEPTHS OF

14:53:37  24   SEVERAL FEET COULD OCCUR.

14:53:39  25              AND THE MORE IMPORTANT THING THAT I TRIED TO SAY IS

| | | |
|---|---|---|
| 14:53:42 | 1 | THE PHOTOGRAPHS ARE THE REAL EVIDENCE, THE PHOTOGRAPHS SHOWING |
| 14:53:45 | 2 | THAT SCOUR 4 TO 5 FEET DID, IN FACT, OCCUR.  THE SEPARATE |
| 14:53:51 | 3 | CALCULATIONS, TO SAY THAT WE WOULD GET OVERTURNING WITH THOSE |
| 14:53:55 | 4 | TYPES OF SCOUR DEPTHS AND THE PHYSICAL -- OR THE PHOTOGRAPHIC |
| 14:53:59 | 5 | EVIDENCE, THAT CLEARLY SHOWS OVERTURNING-TYPE FAILURES. |
| 14:54:03 | 6 | **Q.**   AND YOU ALSO DIDN'T CONSIDER THE GRASS IN YOUR ANALYSIS; |
| 14:54:06 | 7 | ISN'T THAT TRUE? |
| 14:54:08 | 8 | **A.**   NOT EXPLICITLY.  WE DID NOT. |
| 14:54:11 | 9 | **Q.**   NOW, JUST SO THE RECORD IS CLEAR ABOUT GRASS.  WHEN WE |
| 14:54:13 | 10 | TALK ABOUT GRASS, WE'RE NOT ONLY TALKING ABOUT THE GREEN STUFF |
| 14:54:15 | 11 | THAT YOU SEE, WE'RE TALKING ABOUT THE ROOT SYSTEMS AS WELL; |
| 14:54:18 | 12 | CORRECT? |
| 14:54:19 | 13 | **A.**   YES, SIR. |
| 14:54:20 | 14 | **Q.**   AND SO WHEN WE TALK ABOUT GRASS LIFTOFF, ABOUT WHICH WE |
| 14:54:24 | 15 | HEARD SO MUCH IN ANOTHER PLACE AND ANOTHER TIME, WE -- THERE |
| 14:54:29 | 16 | HAS TO BE SUFFICIENT TIME FOR THIS SCOUR TO REMOVE THE GREEN |
| 14:54:32 | 17 | STUFF AND TO ALSO REMOVE THE ROOT SYSTEMS; RIGHT? |
| 14:54:35 | 18 | **A.**   YES. |
| 14:54:35 | 19 | **Q.**   ALL RIGHT.  AND YOU DID NOT DO ANY EVALUATION AS TO HOW |
| 14:54:39 | 20 | LONG IT WOULD TAKE TO REMOVE THAT MATERIAL, DID YOU? |
| 14:54:41 | 21 | **A.**   NO.  I RELIED ON DR. GOVINDASAMY ON THIS CASE, WHO I |
| 14:54:45 | 22 | MENTIONED EARLIER.  WAS -- HIS EXPERTISE IS IN SCOUR, AND THAT |
| 14:54:50 | 23 | MOST OF THE DATA THAT TALK ABOUT THE IMPORTANCE OF GRASS AND |
| 14:54:53 | 24 | ROOTS IS WHERE WATER IS FLOWING OVER THE TOP OF THE LEVEE.  AND |
| 14:54:59 | 25 | THAT'S MUCH LESS DAMAGING TO THE GRASS THAN A JET IMPINGING |

14:55:04    1    DOWN ON TOP OF IT.

14:55:05    2              AND SO IT WAS HIS OPINION THAT GIVEN THE -- THAT WE

14:55:09    3    HAD WATER FALLING 7 FEET, THAT, YES, THE GRASS WOULD SLOW IT UP

14:55:14    4    A LITTLE BIT.  HE HAD NO WAY TO CALCULATE THAT, AND HE FELT IT

14:55:18    5    WAS OF SECONDARY IMPORTANCE TO THE OTHER FACTORS THAT WERE

14:55:21    6    INCLUDED IN HIS SCOUR MODELING.

14:55:24    7    **Q.**   SO HE HAD NO WAY TO CALCULATE IT.  AND WITHOUT A

14:55:29    8    CALCULATION TO SUPPORT HIS OPINION, HE SOMEHOW CAME TO THE

14:55:32    9    CONCLUSION THAT YOU SHOULD SIMPLY THROW IT OUT?  IS THAT WHAT

14:55:36   10    YOU'RE TELLING ME?

14:55:38   11    **A.**   NO, SIR.  I DIDN'T SAY THAT AT ALL.  DR. GOVINDASAMY ALSO

14:55:41   12    HAS ALL THE EXPERIENCE OF RUNNING NUMEROUS SCOUR TESTS IN THE

14:55:47   13    BIG FLUME AT TEXAS A&M TO PHYSICALLY OBSERVE HOW SCOUR DEVELOPS

14:55:49   14    WITH TIME FOR DIFFERENT GRASS COVERS.

14:55:51   15              AND SO I'M RELYING ON HIS JUDGMENT FROM THAT VAST

14:55:54   16    BODY OF EXPERIMENTAL EXPERTISE TO TELL ME THAT THE GRASS COVER

14:55:59   17    HERE, IN HIS VIEW, WOULD BE OF SECONDARY IMPORTANCE AND NOT

14:56:02   18    SOMETHING THAT WOULD NEED -- SHOULD BE -- OR COULD EVEN BE

14:56:06   19    INCLUDED IN THE ANALYSIS.

14:56:07   20    **Q.**   LET'S TALK ABOUT WAVES.  YOU'VE ALREADY TOLD US THAT

14:56:11   21    YOU'VE RELIED ON DR. DALRYMPLE.  AND YOU SAID TO US THAT HE DID

14:56:17   22    ALL THESE EVALUATIONS OF WAVES; RIGHT?

14:56:21   23    **A.**   I THINK I SAID HE DID SOME -- SOME ANALYSIS.  I FORGET THE

14:56:26   24    ADJECTIVE, BUT EXTENSIVE ANALYSIS.

14:56:29   25              **MR. BRUNO:**  LET'S GO TO JX-01713 AT PAGE 9 -- THAT'S

14:56:41   1  PAGE 7.  CAN WE GO TO 9?

14:56:44   2              **MR. TREEBY:**  IT'S 9, AT THE BOTTOM THERE.

14:56:51   3              **MR. BRUNO:**  ALL RIGHT.  CAN WE BLOW UP THIS

14:56:53   4  PARAGRAPH?

14:57:00   5  BY MR. BRUNO:

14:57:00   6  **Q.**   NOW, THIS IS DR. DALRYMPLE'S REPORT.  NOW, I KNOW THAT YOU

14:57:03   7  TOLD ME YOU'RE NOT AN EXPERT IN WAVES AND ALL THAT BUSINESS.

14:57:07   8  BUT I ASK YOU TO ASSUME THAT THIS IS THE ONLY PARAGRAPH WE

14:57:10   9  COULD FIND IN DR. DALRYMPLE'S REPORT WHICH DISCUSSES WAVES.

14:57:13  10  OKAY?  AND IF I'M WRONG, THEN YOUR ANSWERS WON'T BE HELD

14:57:19  11  AGAINST YOU.

14:57:21  12              IT SAYS HERE THAT "THE ELEVATION DATA PROVIDED BY

14:57:23  13  THESE SURVEYS, TAKEN TOGETHER WITH THE OBSERVED WATER LEVELS IN

14:57:27  14  THE IHNC DURING KATRINA, ARE IN HARMONY WITH AVAILABLE EVIDENCE

14:57:32  15  REGARDING THE OCCURRENCE OF OVERTOPPING AT THE IHNC.  FOR

14:57:35  16  EXAMPLE, MR. WILLIAM VILLAVASO, OPERATOR OF PUMP STATION OP-5,

14:57:43  17  SAW WATER SPLASHING OVER THE IHNC FLOODWALLS AND THE FLORIDA

14:57:47  18  AVENUE (40 ARPENT) LEVEE FLOODWALL AROUND 3:00."

14:57:50  19              AND HE CITES THE DEPOSITION.

14:57:52  20              "AT 3:00 THE WATER LEVEL IN THE IHNC WAS ABOUT

14:57:54  21  8.5 FEET, IMPLYING THAT THERE WERE 3-FOOT WAVES IN THE CANAL."

14:58:00  22              DO YOU SEE THAT?

14:58:00  23  **A.**   YES.

14:58:01  24  **Q.**   ALL RIGHT.  MY QUESTION TO YOU IS:  DR. MARR, DID YOU RELY

14:58:05  25  ON THE TESTIMONY OF MR. VILLAVASO IN ANY WAY WITH RESPECT TO

```
14:58:10   1   YOUR USE OF A 3-FOOT WAVE IN YOUR ANALYSES?

14:58:20   2   A.   I CAN TELL YOU THAT I -- I'M NOT SURE WHAT YOU -- WHAT

14:58:20   3   TESTIMONY COVERS, JUST AS A TECHNICAL MATTER.

14:58:24   4   Q.   WELL, THE WORDS THAT MR. VILLAVASO SAID UNDER OATH IN

14:58:29   5   DEPOSITION.  THAT'S WHAT WE MEAN BY TESTIMONY.

14:58:32   6   A.   IS THIS IS HIS DEPOSITION OR HIS REPORT?

14:58:33   7   Q.   THIS IS DR. DALRYMPLE'S REPORT.  AND DR. DALRYMPLE IS

14:58:38   8   WRITING THIS SENTENCE.  WELL, I GUESS YOU'VE NEVER READ

14:58:43   9   DR. DALRYMPLE'S REPORT?

14:58:44  10   A.   I HAVE.

14:58:44  11   Q.   ALL RIGHT.  SO YOU DON'T RECALL READING THIS SENTENCE?

14:58:48  12   A.   WELL, YOU SAID DR. DALRYMPLE'S DEPOSITION.  I'M NOT TRYING

14:58:51  13   TO BE DIFFICULT, BUT I DON'T BELIEVE I READ HIS DEPOSITION.

14:58:54  14   Q.   NO, I SAID MR. VILLAVASO'S DEPOSITION, NOT DR. DALRYMPLE.

14:58:59  15   A.   I MISUNDERSTOOD.

14:58:59  16   Q.   IF I MISSPOKE, I MISSPOKE.  I APOLOGIZE.

14:59:02  17          BUT RIGHT HERE:  "DEPOSITION OF WILLIAM" -- DO YOU

14:59:04  18   SEE THAT, "WILLIAM VILLAVASO"?

14:59:06  19   A.   YES.

14:59:07  20   Q.   AND IT SAYS:  "DR. DALRYMPLE SAYS AT 3:00 A.M. THE WATER

14:59:12  21   LEVEL IN THE IHNC WAS ABOUT 8.5 FEET, IMPLYING THAT THERE WERE

14:59:16  22   3-FOOT WAVES IN THE CANAL."

14:59:18  23          DO YOU SEE THAT?

14:59:18  24   A.   YES.

14:59:19  25   Q.   ALL RIGHT.  NOW, LET'S GO BACK TO MY QUESTION.
```

| | | |
|---|---|---|
| 14:59:21 | 1 | ARE YOU RELYING ON VILLAVASO IN ANY WAY WITH REGARD |
| 14:59:25 | 2 | TO YOUR USE OF THE 3-FOOT WAVE IN YOUR ANALYSES? |
| 14:59:27 | 3 | **A.**   YES.  I'VE SAID THAT. |
| 14:59:29 | 4 | **Q.**   OH.  YOU ARE USING VILLAVASO? |
| 14:59:30 | 5 | **A.**   I SAID THAT I GOT -- AFTER MY DEPOSITION, I LEARNED FROM |
| 14:59:38 | 6 | THE WORK OF DR. DALRYMPLE THAT THERE COULD BE 3-FOOT -- THERE |
| 14:59:42 | 7 | WERE WAVE HEIGHTS AS MUCH AS -- 3-FOOT SIGNIFICANT WAVE |
| 14:59:44 | 8 | HEIGHTS.  AND THAT WAS THE BASIS FOR ME TO GO BACK AND LOOK AT |
| 14:59:48 | 9 | WHAT THE EFFECT OF WAVES WOULD BE ON THE SCOUR DEPTH. |
| 15:00:12 | 10 | **Q.**   AT 3:00 IN THE MORNING, THE WAVE HEIGHT WAS ABOUT -- WELL, |
| 15:00:17 | 11 | IT WAS STIPULATED TO BE 8.1 FEET BETWEEN PLAINTIFFS AND |
| 15:00:21 | 12 | DEFENDANTS. |
| 15:00:22 | 13 | **MR. TREEBY:**  WAVE HEIGHT? |
| 15:00:22 | 14 | **THE COURT:**  8.1? |
| 15:00:24 | 15 | **MR. BRUNO:**  I'M SORRY.  WATER HEIGHT. |
| 15:00:26 | 16 | **THE COURT:**  WATER HEIGHT. |
| 15:00:27 | 17 | **MR. BRUNO:**  WATER HEIGHT. |
| 15:00:27 | 18 | **THE COURT:**  THE STILL -- LET'S SAY "THE STILL-WATER |
| 15:00:30 | 19 | HEIGHT." |
| 15:00:30 | 20 | **BY MR. BRUNO:** |
| 15:00:31 | 21 | **Q.**   THE STILL-WATER HEIGHT WAS STIPULATED TO BE 8.1; RIGHT? |
| 15:00:35 | 22 | **A.**   YES. |
| 15:00:35 | 23 | **Q.**   OKAY.  SO IF THERE'S A 3-FOOT WAVE, THAT WOULD BE 9.6; |
| 15:00:40 | 24 | ISN'T THAT TRUE? |
| 15:00:41 | 25 | **A.**   YES. |

15:00:41   1   **Q.**   AND SO 9.6 IS NOT LARGER THAN 11.1, IS IT?

15:00:46   2   **A.**   RIGHT.

15:00:47   3   **Q.**   OKAY.  SO A 3-FOOT WAVE AND AN 8.5-FOOT STILL-WATER -- I'M

15:00:58   4   SORRY -- VISUALIZING SPLASHING WHEN THE 8- -- WHEN THE

15:01:02   5   STILL-WATER HEIGHT IS 8.5 CANNOT IMPLY A 3-FOOT WAVE; ISN'T

15:01:09   6   THAT TRUE?

15:01:10   7        **THE COURT:**   YOU WENT FROM 8.1 TO 8.5.  DID YOU INTEND

15:01:14   8   TO DO THAT?

15:01:15   9        **MR. BRUNO:**   BECAUSE 8.1'S STIPULATED.

15:01:18  10        **THE COURT:**   I KNOW.  BUT YOU WENT TO 8.5.

15:01:20  11        **MR. BRUNO:**   I CHANGED -- I DIDN'T MEAN TO DO THAT.

15:01:22  12   LET ME TRY IT ONE MORE TIME.

15:01:24  13        **THE COURT:**   THAT'S WHAT I WAS TALKING ABOUT.

15:01:26  14        **MR. BRUNO:**   LET'S TRY IT ONE MORE TIME.

15:01:26  15   BY MR. BRUNO:

15:01:26  16   **Q.**   IF WE HAD STIPULATED THAT THE STILL-WATER HEIGHT IN THE

15:01:28  17   IHNC IS 8.1 FEET, AND MR. VILLAVASO CLAIMS HE SAW SPLASHING, WE

15:01:35  18   CANNOT CONCLUDE THAT THE WAVES ARE 3 FEET, CAN WE?

15:01:41  19   **A.**   WELL, THERE'S -- I DON'T KNOW WHAT PROFESSOR DALRYMPLE WAS

15:01:46  20   SAYING HERE.  I JUST CAN ADD THAT, FROM MY KNOWLEDGE OF WAVES,

15:01:50  21   THAT WHEN A 1.5-FOOT WAVE -- OR LET'S SAY A 3-FOOT WAVE HITS

15:01:56  22   THE WALL, IT ESSENTIALLY DOUBLES IN SIZE BECAUSE IT'S HITTING A

15:01:59  23   SOLID OBJECT, AND IT WILL POTENTIALLY GO UP OVER THE TOP OF THE

15:02:03  24   WALL AND BE APPARENT TO MR. VILLAVASO.

15:02:07  25   **Q.**   WHEN A 3-FOOT WAVE HITS THE WALL AND GOES UP, ALL THE

| | | |
|---|---|---|
| 15:02:17 | 1 | ENERGY IS DISSIPATED.  AND WHEN IT GOES UP, IT COMES BACK DOWN |
| 15:02:19 | 2 | ON THE WATER SIDE, DOESN'T IT? |
| 15:02:21 | 3 | **A.**   MUCH OF IT WOULD.  SOME OF IT COMES DOWN.  I ACTUALLY |
| 15:02:25 | 4 | ASKED MR. DALRYMPLE ABOUT THAT PARTICULAR EFFECT MYSELF. |
| 15:02:28 | 5 | **Q.**   OKAY.  WELL, MY POINT TO YOU IS, BASED UPON WHAT YOU'VE |
| 15:02:31 | 6 | SAID, YOU DON'T ADD THE 3 TO THE 8.5 TO GET 11.5, DO YOU? |
| 15:02:38 | 7 | **A.**   NO, SIR. |
| 15:02:38 | 8 | **THE COURT:**  YOU MEAN TO THE 8.1? |
| 15:02:40 | 9 | **MR. BRUNO:**  WELL, I'M NOW USING -- I'M GOING BACK TO |
| 15:02:44 | 10 | DR. DALRYMPLE. |
| 15:02:45 | 11 | **THE COURT:**  OKAY. |
| 15:02:46 | 12 | **MR. BRUNO:**  DR. DALRYMPLE DECIDED TO ADD -- |
| 15:02:47 | 13 | **THE COURT:**  OKAY.  I APOLOGIZE. |
| 15:02:47 | 14 | **MR. BRUNO:**  -- 8.5. |
| 15:02:50 | 15 | **THE COURT:**  OKAY.  I JUST WANTED TO MAKE SURE. |
| 15:02:50 | 16 | **MR. BRUNO:**  RIGHT. |
| 15:02:50 | 17 | **THE COURT:**  WE'RE GOING BACK TO DR. DALRYMPLE, 8.5. |
| 15:02:50 | 18 | BY MR. BRUNO: |
| 15:02:50 | 19 | **Q.**   HE DECIDED TO ADD 3 POINT -- 3 FEET TO 8.5, AND HE GOT |
| 15:02:54 | 20 | 11.5.  AND YOU DON'T DO THAT; RIGHT? |
| 15:02:57 | 21 | **MR. TREEBY:**  OBJECTION. |
| 15:02:57 | 22 | **THE COURT:**  NO, YOU DON'T DO THAT BECAUSE IT DOESN'T |
| 15:02:58 | 23 | ADD UP THERE. |
| 15:02:59 | 24 | **MR. TREEBY:**  BUT IT'S STILL 11.5 THERE.  SO IT'S -- |
| 15:03:01 | 25 | **MR. BRUNO:**  3 PLUS 8 IS 11, IS IT NOT? |

15:03:05   1            **MR. TREEBY:**  YOUR HONOR, PLEASE.  I AGREE THE

15:03:06   2   STIPULATION IS 8.1.  I JUST CHECKED IT.

15:03:09   3            **THE COURT:**  RIGHT.

15:03:09   4            **MR. TREEBY:**  MY POINT -- MY OBJECTION IS THAT HE'S

15:03:11   5   REPRESENTED THAT DR. DALRYMPLE SAID SOMETHING HERE THAT HE

15:03:14   6   DIDN'T SAY.

15:03:15   7            **MR. BRUNO:**  WELL, I --

15:03:15   8            **MR. TREEBY:**  HE DOES SAY 8.5, BUT HE DOESN'T SAY

15:03:19   9   11.5.

15:03:20  10            **MR. BRUNO:**  I DIDN'T REPRESENT ANYTHING LIKE THAT.

15:03:22  11   BY MR. BRUNO:

15:03:22  12   **Q.**   WHAT I'M SAYING TO YOU IS:  IS IT CORRECT?

15:03:25  13            **THE COURT:**  OKAY.  YOU'RE NOT REPRESENTING THAT

15:03:26  14   DR. DALRYMPLE OPINED THAT AT 3:00 A.M. ON AUGUST 29TH, I GUESS,

15:03:32  15   THAT THE WAVES WERE 11.5 FEET?

15:03:36  16                 IS THAT -- YOU'RE NOT IMPLYING THAT HE SAID

15:03:38  17   THAT?

15:03:40  18            **MR. BRUNO:**  NO.

15:03:40  19            **THE COURT:**  YOU OPINED TO THAT.

15:03:42  20   BY MR. BRUNO:

15:03:42  21   **Q.**   WHAT I'M SIMPLY ASKING YOU, BASED UP ALL THE TESTIMONY

15:03:46  22   THAT WE'VE HEARD TODAY, IT WOULD BE INCORRECT TO SIMPLY ADD

15:03:48  23   3 FEET TO 8.5 IF ONE WERE TRYING TO, IN THE BACK OF THEIR MIND,

15:03:55  24   WELL, I WANT TO GET A NUMBER THAT'S 11.5, BECAUSE IT'S HIGHER

15:04:02  25   THAN MY 11.2.

15:04:05  1          SO IT WOULD BE INAPPROPRIATE TO ADD THOSE TWO NUMBERS

15:04:07  2   TOGETHER TO MAKE IT HIGHER THAN THE WALL HEIGHT; ISN'T THAT

15:04:10  3   TRUE?

15:04:11  4   A.   OH, ABSOLUTELY.  THAT WOULD BE MISLEADING AND NOT

15:04:15  5   APPROPRIATE TO THE CONDITIONS.

15:04:16  6   Q.   NOT APPROPRIATE.  OKAY.

15:04:17  7          NOW, DID YOU EVALUATE MR. VILLAVASO'S TESTIMONY?  DID

15:04:19  8   YOU READ IT?

15:04:20  9   A.   YES.

15:04:20  10  Q.   ALL RIGHT.  DID YOU FIND IT -- DIDN'T YOU FIND THAT

15:04:24  11  MR. VILLAVASO SAID ON NUMEROUS OCCASIONS THAT HE WASN'T SURE

15:04:27  12  ABOUT THE TIME?

15:04:32  13  A.   CERTAIN -- A NUMBER OF THINGS HE RELAYED, HE SAID HE

15:04:38  14  WASN'T CERTAIN OF THE TIME.

15:04:39  15  Q.   SO YOU'RE REALLY NOT USING MR. VILLAVASO TO ESTABLISH THAT

15:04:42  16  THERE WAS SPLASHING OVER THE WALL AT 3:00, ARE YOU?

15:04:45  17  A.   I NEVER SAID I DID.  I SAID I RELIED ON MR. DAL- --

15:04:47  18  PROFESSOR DALRYMPLE.

15:04:49  19  Q.   FAIR ENOUGH.  I THOUGHT I ASKED SPECIFICALLY IF YOU WERE

15:04:51  20  RELYING ON VILLAVASO, AND I THOUGHT YOU SAID YES.  I APOLOGIZE.

15:04:55  21         SO YOU ARE NOT RELYING ON VILLAVASO AT ALL WITH

15:04:57  22  REGARD TO A 3-FOOT WAVE HEIGHT, CORRECT?

15:05:01  23  A.   THAT'S CORRECT, SIR.

15:05:01  24  Q.   THANK YOU.

15:05:01  25  A.   IF I MISSPOKE, I REALLY APOLOGIZE.

15:05:04    1    **Q.**   I'M SURE IT'S MY FAULT.

15:05:05    2              LET'S GO TO THE NEXT PART OF THIS.

15:05:08    3              IT SAYS:  "THIS WAVE HEIGHT IS CONSISTENT WITH THE

15:05:11    4    50-MILES-PER-HOUR WINDS BLOWING DOWN THE GIWW AND THE NORTHERN

15:05:16    5    BRANCH OF THE IHNC."

15:05:17    6              AND HE CITES THE COASTAL ENGINEERING MANUAL.

15:05:22    7              THEN HE SAYS:  "ON A RISING WATER LEVEL SUCH AS THE

15:05:23    8    SURGE IN THE IHNC, THE WAVE OVERTOPPING WILL BEGIN AS A SMALL

15:05:28    9    QUANTITY OF WATER ENTERING THE POLDER, AS JUST THE TOPS OF THE

15:05:32   10    WAVE CAN OVERTOP THE WALL.  BUT THEN AS THE WATER CONTINUES TO

15:05:35   11    RISE, MORE AND MORE OF THE WAVE CAN GO OVER THE WALL.  ALSO,

15:05:39   12    IPET ESTIMATED WAVES AND UTILIZED PHOTOGRAPHS NEAR THE LOCK

15:05:43   13    INDICATING THAT WAVES WERE ON THE ORDER OF 2.5 FEET TO 3.5 FEET

15:05:48   14    IN THE SOUTHERN PORTION OF THE IHNC."

15:05:50   15              AND THEY CITE TO IPET.  DO YOU SEE THAT?

15:05:52   16    **A.**   YES.

15:05:53   17    **Q.**   OKAY.  NOW, YOU TOLD US YOU CITED TO IPET WITH REGARD TO

15:05:57   18    YOUR ASSUMPTION THAT IT WAS A 1-FOOT WAVE, RIGHT?

15:06:00   19    **A.**   YES.

15:06:01   20    **Q.**   AND I DON'T KNOW IF I GOT THIS CLEAR OR NOT.

15:06:03   21              DID YOU READ THIS SECTION OF IPET THAT DR. DALRYMPLE

15:06:07   22    REFERS TO?

15:06:09   23    **A.**   I WOULD HAVE.  AND WHEN I READ THIS, I WENT BACK AND READ

15:06:12   24    IT AGAIN.  AND I REALIZED THAT I HAD MISSED A SECTION THAT I

15:06:15   25    HAD FOCUSED -- I HAD EITHER MISREAD IT OR MISSED IT.  I HAD

15:06:19   1   FOCUSED ON A SENTENCE THAT I THOUGHT APPLIED TO THE EBIA, WHERE

15:06:23   2   IT WAS ONLY 1 FOOT.

15:06:25   3   **Q.**   ALL RIGHT.  SO THEN I CAN CONCLUDE THAT YOU ARE NOW,

15:06:30   4   TODAY, BASING YOUR VIEW THAT THERE WAS A THREE-FOOT WAVE, IN

15:06:33   5   PART, ON THIS IPET REPORT, RIGHT?

15:06:35   6   **A.**   WELL, I USED PROFESSOR DALRYMPLE AND WHATEVER -- AND I'LL

15:06:40   7   LET HIM SPEAK FOR HIMSELF AS TO HOW HE CAME TO THE CONCLUSION

15:06:43   8   THAT THERE WERE 3-FEET-HIGH SIGNIFICANT WAVES.

15:06:48   9   **Q.**   WELL, THE QUESTION I HAVE FOR YOU IS, TODAY, AS YOU SIT IN

15:06:51  10   THIS COURTROOM, ARE YOU RELYING ON IPET SECTION VOLUME IV,

15:06:57  11   PAGE 226?  THAT'S ALL I WANT TO KNOW.

15:07:01  12   **A.**   ONCE I -- ONCE I HEARD PROFESSOR DALRYMPLE'S OPINION, I

15:07:05  13   DID GO BACK TO READ IPET AND I SAW THAT, YES, I COULD HAVE

15:07:08  14   MISREAD IT.  I MISSED THIS PORTION.

15:07:12  15          I HAD USED -- I HAD PICKED UP THE PART WHERE IT SAID

15:07:16  16   IT WAS LESS THAN 1 FOOT.

15:07:17  17   **Q.**   SO YOU ARE RELYING ON IT NOW?

15:07:20  18   **A.**   I THINK I ANSWERED THAT QUESTION.

15:07:23  19          **THE COURT:**  I WOULD RATHER -- I KNOW EXACTLY WHAT HE

15:07:25  20   DID AND --

15:07:26  21          **MR. BRUNO:**  OKAY.

15:07:26  22          **THE COURT:**  -- LET'S -- SO HE'S RELYING PRINCIPALLY

15:07:29  23   ON DR. DALRYMPLE'S REPORT, WHO IS THE EXPERT IN THIS MATTER.

15:07:32  24   HOWEVER, HE DID CHECK THE IPET REPORT, VOLUME IV, 226, AND HE

15:07:39  25   SAID HE MAY HAVE MISSED SOMETHING BY NOT READING THAT REPORT.

```
15:07:42   1              MR. BRUNO:  ALL RIGHT.

15:07:42   2              THE COURT:  SO WE CAN MAKE WHATEVER INFERENCE WE --

15:07:44   3   BY MR. BRUNO:

15:07:45   4   Q.  CAN WE GO, DR. MARR, TO THE SECTION OF IPET AND SEE IF WE

15:07:48   5   CAN UNDERSTAND WHAT YOU READ AND WHAT YOUR UNDERSTANDING WAS

15:07:50   6   WHICH ALLOWS YOU TO BELIEVE TODAY THAT THIS CORROBORATES YOUR

15:07:55   7   3-FOOT WAVE?  CAN WE DO THAT?

15:07:59   8   A.  SURE.

15:07:59   9              MR. BRUNO:  ALL RIGHT.  LET'S GO TO JX- --

15:07:59  10              THE COURT:  IT'S REALLY DR. DALRYMPLE'S 3-FOOT WAVE

15:08:02  11   THAT HE'S ADOPTED, SO -- JUST FOR THE RECORD.

15:08:05  12              MR. BRUNO:  WELL, LET'S DO IT THIS WAY.  LET'S GO TO

15:08:16  13   JX-02033-1814, JUST SO WE CAN REFERENCE THIS, SO WE DON'T SPEND

15:08:17  14   TOO MUCH TIME.

15:08:31  15              THE COURT:  OKAY.

15:08:33  16              MR. BRUNO:  SO JX-02033-1814.

15:08:33  17   BY MR. BRUNO:

15:08:33  18   Q.  IS THIS THE PAGE, DR. MARR?

15:08:37  19              THE COURT:  OF THE IPET REPORT WE'RE TALKING ABOUT?

15:08:39  20              MR. BRUNO:  YES.

15:08:40  21              THE WITNESS:  I'M NOT SURE.

15:08:41  22              THE COURT:  IT SAYS IV-226 AT THE BOTTOM.

15:08:49  23   BY MR. BRUNO:

15:08:49  24   Q.  THAT WOULD -- CAN WE AGREE THIS IS AT LEAST WHAT

15:08:52  25   DR. DALRYMPLE CITED?  LET'S AT LEAST DO THAT.
```

15:08:56   1   **A.**   WELL, I DON'T SEE THE 3-FOOT HERE.  I MEAN, THIS SEEMS TO

15:09:22   2   TALK ABOUT WAVES IN THE MRGO WITH WAVE HEIGHTS OF 4 FEET.

15:09:26   3   **Q.**   YEAH.  I AGREE.  I'M JUST ASKING YOU, CAN WE AGREE THAT

15:09:30   4   THIS IS THE PAGES -- THE PAGE THAT DR. DALRYMPLE CITES?  THAT'S

15:09:33   5   ALL.

15:09:34   6             **MR. SMITH:**  YOUR HONOR, I'M SORRY, BUT I BELIEVE THAT

15:09:36   7   COUNSEL'S ATTEMPTING TO IMPEACH DR. DALRYMPLE THROUGH THIS

15:09:40   8   WITNESS HERE TODAY.

15:09:41   9             **THE COURT:**  WELL, TO SOME EXTENT THAT'S TRUE.  BUT

15:09:44   10  THIS WITNESS DID SAY HE LOOKED AT THE PAGE CITED BY

15:09:47   11  DR. DALRYMPLE AND REALIZED HE MIGHT HAVE MISSED SOMETHING.

15:09:50   12             SO ONLY TO THAT LIMITED EXTENT THAT RELATES TO

15:09:54   13  HIS QUESTION AND HIS OWN OSTENSIBLE VIEWING OF IV-226 WILL I

15:10:00   14  ALLOW THE QUESTION.  AND IT WILL IN NO WAY IMPEACH

15:10:04   15  DR. DALRYMPLE AND HIS REPORT.

15:10:06   16  **BY MR. BRUNO:**

15:10:07   17  **Q.**   IS THIS THE PAGE?

15:10:09   18  **A.**   THIS IS NOT THE PAGE I WAS THINKING OF WHEN I SAID I

15:10:12   19  CHECKED THE IPET REPORT TO SEE WHAT -- SEE IF IPET TALKED ABOUT

15:10:17   20  3 TO 4-FOOT WAVES.

15:10:19   21  **Q.**   ALL RIGHT.  LET'S GO TO THE NEXT ONE.

15:10:21   22  **A.**   I DID NOT MEAN TO IMPLY THAT -- IN YOUR QUESTION, I DIDN'T

15:10:22   23  REALIZE YOU WERE ASKING ME ABOUT A SPECIFIC PAGE IN AN IPET

15:10:26   24  REPORT.

15:10:27   25             I WAS FOCUSED ON DID THE IPET REPORT MENTION 3-FOOT

| | | |
|---|---|---|
| 15:10:30 | 1 | WAVES. |
| 15:10:31 | 2 | Q.   WELL, LET'S GO TO THE NEXT PAGE, PAGE 227 ON WHAT'S 1815. |
| 15:10:46 | 3 | DOES THIS LOOK FAMILIAR?  SHALL WE BLOW IT UP FOR |
| 15:10:50 | 4 | YOU? |
| 15:10:51 | 5 | A.   YES, IF YOU COULD, PLEASE.  I'M HAVING A HARD TIME SEEING. |
| 15:10:54 | 6 | MR. BRUNO:  LET'S BLOW UP THIS ONE TO GET THE LARGEST |
| 15:10:56 | 7 | WAVES. |
| 15:10:57 | 8 | THE COURT:  AND IF COUNSEL FOR ANYBODY ELSE WANTS THE |
| 15:10:58 | 9 | OTHER SECTION BLOWN UP, WE'LL DO IT.  ALL RIGHT. |
| 15:11:03 | 10 | ARE WE GOING DOWN TO THE LAST -- LAST PARAGRAPH, |
| 15:11:06 | 11 | SIR? |
| 15:11:09 | 12 | MR. BRUNO:  NO, JUST ONE MORE AFTER THIS. |
| 15:11:11 | 13 | THE COURT:  NO, I MEAN -- |
| 15:11:12 | 14 | MR. BRUNO:  I'M SORRY.  BACK IT UP.  BACK IT UP. |
| 15:11:14 | 15 | RIGHT HERE. |
| 15:11:27 | 16 | THE COURT:  WHICH ONE DO YOU WANT BLOWN UP? |
| 15:11:28 | 17 | MR. BRUNO:  RIGHT HERE. |
| 15:11:33 | 18 | THE COURT:  THE ONE THAT -- THE PARTIAL PARAGRAPH AT |
| 15:11:34 | 19 | THE TOP? |
| 15:11:35 | 20 | BY MR. BRUNO: |
| 15:11:35 | 21 | Q.   DOES THAT REFRESH YOUR RECOLLECTION, DR. MARR? |
| 15:11:39 | 22 | A.   CAN I SEE JUST THE PREVIOUS PAGE JUST FOR A MOMENT, |
| 15:11:46 | 23 | PLEASE? |
| 15:11:47 | 24 | Q.   SURE. |
| 15:11:50 | 25 | THE COURT:  THE BEGINNING OF THAT PARAGRAPH WOULD BE |

15:11:50   1   ON THE PREVIOUS PAGE.

15:11:52   2             **MR. BRUNO:**  THE PREVIOUS PAGE IS 14.  14.  THERE WE

15:11:55   3   GO.  BLOW THIS UP AGAIN FOR THE DOCTOR.

15:12:01   4             **THE COURT:**  IT STARTS "RESULTS FROM THE ST WAVE..."

15:12:08   5             **THE WITNESS:**  I -- I CAN'T BE CERTAIN.  I JUST

15:12:11   6   REMEMBER READING IT AFTER I GOT DR. DALRYMPLE'S REPORT.  AND HE

15:12:13   7   SAID THAT THE -- THAT THE IPET REPORT HAD TALKED ABOUT 3-FOOT

15:12:19   8   WAVES.

15:12:20   9             I WENT BACK TO THE REPORT.  I WENT TO THE

15:12:21  10   SECTION WHERE I HAD SEEN 1-FOOT WAVES.  I FOUND WHERE IT

15:12:24  11   REFERRED TO 3-FOOT WAVES AND REALIZED THAT I HAD MISSED THAT

15:12:28  12   SECTION.  THAT'S AS FAR AS I CAN GO.

15:12:30  13   **BY MR. BRUNO:**

15:12:30  14   **Q.**  ALL RIGHT.

15:12:33  15             NOW, LET'S TALK ABOUT THE SECTION THAT YOU WENT TO,

15:12:35  16   BECAUSE --

15:12:35  17             **MR. BRUNO:**  LET'S GO TO THE NEXT PAGE, PLEASE.

15:12:39  18   BY MR. BRUNO:

15:12:40  19   **Q.**  NOW, WILL YOU AGREE WITH ME, AT THE VERY LEAST, THAT THE

15:12:43  20   PARAGRAPH THAT WE'VE JUST LOOKED AT DESCRIBED COMPUTER RUNS

15:12:47  21   USING STWAVE?

15:12:49  22   **A.**  YES.

15:12:49  23   **Q.**  OKAY.  AND WHAT YOU LOOKED AT FOR THE BASIS OF YOUR VIEW

15:12:52  24   THAT IT WAS ONLY 1-FOOT WAS A BOUSSINESQ MODEL, RIGHT?

15:12:59  25   **A.**  I'M NOT SURE.  I DIDN'T GET INTO THOSE DETAILS.

15:13:02    1    **Q.**   YOU DON'T REMEMBER WHERE YOU GOT YOUR 1-FOOT FROM NOW?

15:13:09    2    **A.**   IT WAS FROM THE IPET REPORT.  BUT I --I -- I CAN'T

15:13:19    3    REMEMBER WHICH SECTION OF THE IPET REPORT IT WAS IN.

15:13:22    4    **Q.**   ALL RIGHT.

15:13:59    5             **MR. BRUNO:**  WELL, LET'S GO TO JX-02033-2734.  CAN WE

15:14:00    6    BLOW UP THE SIMULATION RESULT SECTION HERE.

15:14:05    7    **BY MR. BRUNO:**

15:14:06    8    **Q.**   SO JUST SO YOU'LL KNOW, DR. MARR, I'VE GOT YOUR

15:14:09    9    SUPPLEMENTAL REPORT.  AND THIS IS THE CITE THAT YOU PUT IN YOUR

15:14:12   10    REPORT.

15:14:13   11             SO CAN WE AGREE THAT THIS IS WHERE YOU GOT THE

15:14:15   12    1 FOOT?

15:14:30   13             **THE COURT:**  ARE WE TALKING ABOUT THE -- OH, I SEE.

15:14:34   14    THAT LAST SENTENCE OF SIMULATION RESULTS.  IS THAT WHERE WE

15:14:38   15    ARE?

15:14:39   16             **MR. BRUNO:**  YES.

15:14:39   17             **THE WITNESS:**  YES.

15:14:40   18    **BY MR. BRUNO:**

15:14:40   19    **Q.**   THAT'S WHERE YOU GOT IT.

15:14:41   20             AND WHAT WE HAVE HERE IS JUST ANOTHER MODEL RUN THAT

15:14:45   21    IPET RAN; RIGHT?

15:14:47   22    **A.**   WELL, I THINK THERE'S ANOTHER PLACE IN THE REPORT THAT

15:14:50   23    TALKED ABOUT WAVE HEIGHTS, BECAUSE I NEVER REALLY READ MUCH IN

15:14:55   24    DETAIL ON THESE SIMULATIONS.

15:14:56   25             AND I'M SORRY I'M HAVING TROUBLE POINTING YOU TO WHAT

15:15:00   1   THAT SECTION WAS, BUT IT SPECIFICALLY TALKED ABOUT -- IN

15:15:05   2   SUMMARY FORM -- ABOUT BEST ESTIMATES OF WAVE HEIGHTS.

15:15:09   3        THIS APPEARS TO BE SOME MATERIALS FROM THE DETAIL

15:15:12   4   SECTION ON THE COMPUTER RUNS, AND I NEVER READ THOSE THIS

15:15:17   5   DETAIL.

15:15:17   6   Q.   OKAY.  WELL, I GUESS I'M VERY CONFUSED HERE, BECAUSE I'M

15:15:22   7   NOT SURE WHAT YOU DID TO ASCERTAIN WHAT THE WAVES WERE IN THAT

15:15:26   8   YEAR BEFORE YOU WROTE YOUR REPORT.

15:15:29   9        WHAT DID YOU DO TO ASK YOURSELF TO FIND THE ANSWER TO

15:15:31  10   THE QUESTION:  WHAT WERE THE WAVES IN THE IHNC?

15:15:35  11   A.   WELL, I TOLD YOU THAT I -- I HAD READ A SECTION OUT OF THE

15:15:37  12   IPET REPORT SUMMARIZING WAVE HEIGHTS.  AND IT WAS MY -- MY

15:15:44  13   UNDERSTANDING THAT WAVE HEIGHTS IN THE EBIA AREA WERE LESS THAN

15:15:46  14   1 FOOT OUT OF THE IPET REPORT.

15:15:48  15   Q.   ALL RIGHT.  BUT WHAT I'M TRYING TO UNDERSTAND IS, YOU

15:15:50  16   PURPOSEFULLY WENT TO THE IPET REPORT, CORRECT?  YES OR NO?

15:15:59  17   A.   YES.  YES.

15:16:00  18   Q.   DID YOU KNOW WHERE TO GO?

15:16:01  19   A.   I CAN'T TELL YOU RIGHT NOW WHERE I WENT.

15:16:03  20   Q.   WELL, HOW DID YOU END UP AT THIS PLACE IN THE IPET REPORT?

15:16:06  21   HOW DID YOU DO THAT?

15:16:08  22   A.   WELL, I THINK I'M TELLING YOU I'M NOT SURE THIS WAS THE

15:16:10  23   SECTION.  THIS SECTION DOESN'T LOOK FAMILIAR TO WHAT I RECALL

15:16:15  24   AS TO GETTING THE ONE-FOOT-HEIGHT WAVE THAT I ORIGINALLY USED.

15:16:20  25   Q.   DR. MARR, THAT'S FINE.  I DON'T CARE.  WHAT I'M TRYING TO

15:16:20   1   UNDERSTAND IS -- TELL US WHAT YOU DID TO DETERMINE WHAT THE

15:16:23   2   WAVE HEIGHTS WERE IN THE IHNC.  JUST WHAT DID YOU DO?

15:16:29   3                **THE COURT:**  I THINK HE DID.  HE SAID HE WENT TO

15:16:32   4   THE -- TO THE IPET REPORT AND SAW A SUMMARY THAT SAID 1 FOOT.

15:16:34   5   HE'S SAID THAT FOUR, FIVE, SIX, SEVEN TIMES.

15:16:37   6   **BY MR. BRUNO:**

15:16:37   7   **Q.**  WELL, DID YOU LOOK AT THE INDEX, AT LEAST, IN THE IPET

15:16:39   8   REPORT IN ORDER TO FIND THE SUMMARY?

15:16:41   9   **A.**  NO.  LET ME TRY TO EXPLAIN --

15:16:42  10                **THE COURT:**  I DON'T KNOW WHERE WE'RE GOING.  HE

15:16:44  11   SAID -- HE HASN'T SAID ANYTHING ELSE.

15:16:45  12                **MR. BRUNO:**  BUT, YOUR HONOR, THIS IS A SIX-VOLUME

15:16:48  13   SET.  IT'S THOUSANDS AND THOUSANDS AND THOUSANDS OF PAGES.

15:16:51  14                WHAT I'M CURIOUS NO KNOW IS, HOW?  HOW DID THIS

15:16:54  15   WITNESS FIND A SINGLE PAGE IN THOUSANDS AND THOUSANDS OF PAGES,

15:16:58  16   IF A -- HE'S A FORENSIC ENGINEER, AND HIS WHOLE REASON FOR

15:17:02  17   BEING HERE IS TO ASCERTAIN WHAT CAUSED THE FAILURE.  AND HE'S

15:17:08  18   ALREADY TESTIFIED THAT ONE OF THE CAUSES OF FAILURE HE

15:17:09  19   CONSIDERED IS WAVES.  THEREFORE, ONE HAS TO DO A WAVE

15:17:13  20   INVESTIGATION.

15:17:13  21                I WANT TO KNOW WHAT WAVE INVESTIGATION.  AND ALL

15:17:15  22   I'VE GOT FROM HIM IS, "WELL, I REMEMBER A PAGE.  I DON'T KNOW

15:17:17  23   HOW I GOT THERE."

15:17:18  24                **THE COURT:**  THAT'S ALL HE'S SAID.

15:17:18  25                **MR. BRUNO:**  IF THAT'S THE TESTIMONY, THEN WE'LL REST

15:17:20   1   WITH IT AND MOVE ON.

15:17:23   2            **MR. TREEBY:**  HE'S SAID IT ABOUT FIVE TIMES.

15:17:27   3            **THE COURT:**  RIGHT.  HE SAID -- THIS IS THE PAGE THAT

15:17:28   4   YOU'RE SHOWING HIM THAT IS SHOWN IN HIS REPORT.

15:17:32   5            **MR. BRUNO:**  AND I'M TRYING TO FIND OUT HOW HE GOT

15:17:34   6   THERE.  HE DOESN'T REMEMBER --

15:17:34   7            **THE COURT:**  IT MAKES NO DIFFERENCE IF HE GOT THERE BY

15:17:38   8   DIVINING LAW.

15:17:39   9            **MR. BRUNO:**  OKAY.  THAT'S FINE.

15:17:39  10            **THE COURT:**  THAT'S ALL HE USED.

15:17:40  11            **MR. BRUNO:**  THAT'S GOOD.  IF THAT'S ALL HE USED --

15:17:43  12            **THE COURT:**  THIS IS ALL HE'S SAID HE'S USED THUS FAR,

15:17:45  13   EXCEPT FOR THE ADDENDUM TO THE -- THE ADDENDUM, WHERE HE SAID

15:17:48  14   HE WENT BACK AND SAW SOMETHING ABOUT 3 FEET IN THE SUMMARY.

15:17:52  15   **BY MR. BRUNO:**

15:17:52  16   **Q.**  DR. MARR, IS THIS THE KIND OF FORENSIC EVALUATION THAT YOU

15:17:55  17   WOULD THINK APPROPRIATE FOR THE DETERMINATION OF SIGNIFICANT

15:17:58  18   WAVE HEIGHTS IN THE IHNC FOR THE PURPOSES OF ESTABLISHING

15:18:01  19   WHETHER OR NOT THEY HAD ANY ROLE IN OVERTOPPING?

15:18:05  20            WHAT YOU DID, IS THAT THE STANDARD OF CARE THAT ONE

15:18:07  21   WOULD UTILIZE FOR FORENSIC ENGINEERING?

15:18:10  22   **A.**  I TOLD YOU --

15:18:12  23            **MR. TREEBY:**  IF YOUR HONOR PLEASE.

15:18:13  24            HE'S NOT A DEFENDANT IN THIS CASE.  HE'S ASKING

15:18:15  25   HIM IF HE USED THE STANDARD OF CARE HE SHOULD USE FOR A

15:18:19   1  FORENSIC ENGINEER.  HE'S NOT A DEFENDANT IN THIS CASE.

15:18:21   2            **MR. BRUNO:**  I DON'T --

15:18:22   3            **THE COURT:**  I UNDERSTAND THAT.  BUT HE'S AN EXPERT,

15:18:23   4  AND I'M GOING TO ALLOW THE QUESTION.  HE CAN CERTAINLY ANSWER

15:18:26   5  IT, OR NOT.

15:18:29   6            **THE WITNESS:**  I THINK I HAVE TRIED TO ANSWER THIS, TO

15:18:30   7  SAY THAT MY EXPERTISE IS IN CIVIL ENGINEERING AND GEOTECHNICAL

15:18:33   8  ENGINEERING AND NOT IN WAVES.

15:18:35   9            I THINK I'VE TOLD YOU THAT I RELIED ON WHAT I

15:18:39  10  UNDERSTOOD TO BE A STRONG EXPERT IN THIS FIELD,

15:18:44  11  PROFESSOR DALRYMPLE, AND I CONTINUE TO TAKE THAT POSITION.

15:18:48  12  **BY MR. BRUNO:**

15:18:48  13  **Q.**   BUT YOU DIDN'T TALK TO DR. DALRYMPLE BEFORE YOU WROTE YOUR

15:18:52  14  REPORT.  SO AM I TO CONCLUDE THAT YOU DID NO EVALUATION OF

15:19:01  15  WAVES BEFORE YOU WROTE YOUR REPORT?

15:19:03  16  **A.**   OH, I'M SORRY.  NO, I ANSWERED THAT, TOO.

15:19:05  17            I'VE SAID THAT WE -- WE DID GIVE CONSIDERATION AND

15:19:05  18  THAT THE WAY -- WHEN WE WERE DOING THE SCOUR ANALYSIS AND I SAT

15:19:08  19  DOWN WITH DR. GOVINDASAMY AND WE WENT THROUGH THE THINGS THAT

15:19:14  20  COULD AFFECT THE SCOUR, ONE OF THEM WAS WAVES.

15:19:18  21            AND I SAID I RECALL READING THE IPET REPORT THAT THE

15:19:22  22  WAVE HEIGHTS IN THE EBIA WERE LESS THAN 1 FOOT.  SO WE DON'T

15:19:25  23  HAVE TO INCLUDE WAVES IN THIS ANALYSIS.

15:19:27  24            THAT'S EXACTLY THE WAY IT WENT DOWN.

15:19:30  25  **Q.**   ALL RIGHT.  SO IT'S BASED UPON YOUR MEMORY, RIGHT?

| | | |
|---|---|---|
| 15:19:32 | 1 | **A.**   YES. |
| 15:19:32 | 2 | **Q.**   AND YOU, AS A FORENSIC ENGINEER -- |
| 15:19:35 | 3 | **THE COURT:**  NOW, THIS IS GETTING ARGUMENTATIVE, |
| 15:19:36 | 4 | COUNSEL. |
| 15:19:38 | 5 | **MR. BRUNO:**  FAIR ENOUGH. |
| 15:19:39 | 6 | **BY MR. BRUNO:** |
| 15:19:39 | 7 | **Q.**   DID YOU CONSIDER THE LOCKMASTER'S TESTIMONY ABOUT WAVE |
| 15:19:42 | 8 | HEIGHT? |
| 15:19:45 | 9 | **A.**   I DON'T THINK SO, NO. |
| 15:19:48 | 10 | **MR. BRUNO:**  CALL UP JX-01887.  THIS IS A |
| 15:19:53 | 11 | DEMONSTRATIVE.  JX-01887. |
| 15:20:10 | 12 | CAN WE BLOW UP THIS SECTION HERE? |
| 15:20:14 | 13 | **BY MR. BRUNO:** |
| 15:20:15 | 14 | **Q.**   DR. MARR, DO YOU HAVE ANY EVIDENCE TO SUGGEST THAT THESE |
| 15:20:17 | 15 | WIND DIRECTIONS ARE INCORRECT OR INACCURATE IN ANY WAY? |
| 15:20:21 | 16 | **A.**   I KNOW NOTHING ABOUT WIND DIRECTIONS.  I DON'T KNOW |
| 15:20:23 | 17 | ANYTHING ABOUT THIS DIAGRAM, AND I CAN'T ANSWER ANY QUESTIONS |
| 15:20:26 | 18 | ABOUT IT. |
| 15:20:27 | 19 | **Q.**   OKAY.  AS PART OF YOUR FORENSIC ENGINEERING ANALYSIS OF |
| 15:20:33 | 20 | THE NORTH AND SOUTH BREACH, DID YOU ASCERTAIN WHAT DIRECTION |
| 15:20:36 | 21 | THE WIND WAS BLOWING IN THE EARLY MORNING HOURS, FROM |
| 15:20:41 | 22 | 1:00 UNTIL 10:00, ON THE DAY OF HURRICANE KATRINA? |
| 15:20:44 | 23 | **A.**   NO, SIR.  THAT DOESN'T ENTER INTO ANY OF THE KINDS OF |
| 15:20:47 | 24 | CONSIDERATIONS OR ANALYSES THAT WE DO FOR THE KIND OF FAILURES |
| 15:20:53 | 25 | THAT I EXAMINED HERE OR THAT HAPPENED HERE. |

15:20:56   1    **Q.**   WOULDN'T WIND DIRECTION BE RELEVANT TO AN INQUIRY ABOUT

15:21:00   2    WAVES?

15:21:01   3    **A.**   I DON'T KNOW.  THAT'S NOT MY EXPERTISE.  YOU'LL NEED TO

15:21:03   4    ASK PROFESSOR DALRYMPLE.

15:21:05   5    **Q.**   ALL RIGHT.  AND YOU CERTAINLY DIDN'T BOTHER TO CONSULT THE

15:21:08   6    WAVE EXPERT BEFORE YOU WROTE YOUR REPORT; ISN'T THAT TRUE?

15:21:12   7    **A.**   I DIDN'T NEED TO.  I WAS USING IPET, WHICH HAD HAD ON ITS

15:21:16   8    TEAM SOME OF THE BEST EXPERTISE IN THE WORLD.

15:22:18   9            **MR. BRUNO:**  LET'S GO TO PAGE PX-4721-091.

15:22:28   10   **BY MR. BRUNO:**

15:22:29   11   **Q.**   THIS IS YOUR EXPERT REPORT, IS IT NOT?

15:22:31   12   **A.**   YES.

15:22:32   13   **Q.**   AND IN THIS SECTION YOU IDENTIFY A SERIES OF POTENTIAL

15:22:36   14   CAUSES OF FAILURE OF THE SOUTH BREACH; RIGHT?

15:22:38   15   **A.**   YES.

15:22:39   16   **Q.**   ALL RIGHT.  AND THIS IS CONSISTENT WITH WHAT YOU TOLD US

15:22:42   17   THIS MORNING ABOUT YOUR ANALYSIS OF POTENTIAL EXPLANATIONS,

15:22:47   18   RIGHT?

15:22:47   19   **A.**   YES.

15:22:48   20   **Q.**   AND YOU CONSIDERED EACH OF THESE?

15:22:49   21   **A.**   YES.

15:22:49   22   **Q.**   AND YOU REJECTED THE POSSIBILITY THAT THE I-WALL WAS HIT

15:22:55   23   AND BURST BY A LARGE FLOATING OBJECT, NAMELY THE BARGE?

15:23:00   24   **A.**   YES.

15:23:00   25   **Q.**   AND THEN YOU HAVE A DISCUSSION OF EACH; RIGHT?

15:23:02  1    **A.**   YES.

15:23:02  2    **Q.**   ALL RIGHT.  AND THEN IN THE THIRD SECTION YOU HAVE

15:23:04  3    OVERTOPPING OF THE FLOODWALL CAUSING SCOUR AND OVERTURNING

15:23:08  4    FAILURE OF THE WALL; RIGHT?

15:23:09  5    **A.**   YES.

15:23:10  6    **Q.**   ALL RIGHT.  NOW, AT PAGE 106, IS WHERE WE CAN FIND YOUR

15:23:39  7    DISCUSSION ABOUT SCOUR.  IS THIS CORRECT?

15:23:51  8    **A.**   YES.

15:23:52  9    **Q.**   AND IT REFERS TO SUBSECTION O; RIGHT?

15:24:06  10   **A.**   I'M NOT SURE.  I KNOW SUBSECTION O HAS SOME ANALYSES IN IT

15:24:11  11   OF THE EFFECT OF SCOUR DEPTHS ON OVERTURNING.  I DON'T REMEMBER

15:24:17  12   IF WE DISCUSSED THAT IN 6.3.1.

15:24:18  13           **THE COURT:**  I DON'T SEE --

15:24:18  14   **BY MR. BRUNO:**

15:24:21  15   **Q.**   ALL RIGHT.  LET'S LOOK AT 6.3.

15:24:23  16           **MR. BRUNO:**  LET'S GO UP A LITTLE BIT PAST.  WE DON'T

15:24:26  17   HAVE ENOUGH UP ON THE PAGE.

15:24:28  18   **BY MR. BRUNO:**

15:24:31  19   **Q.**   "OVERTOPPING."  IT SAYS:  "THE HYDROGRAPH SHOWS THE CANAL

15:24:36  20   WATER LEVEL REACHED 14.2.  SECTION 3.2 DEMONSTRATED THE TOP OF

15:24:41  21   THE FLOODWALL WAS AT ELEVATION OF 12.1.  OVERTOPPING BY ITSELF

15:24:46  22   DID NOT CAUSE THE WALL TO FAIL."

15:24:48  23           THAT'S CORRECT?

15:24:49  24   **A.**   YES, SIR.

15:24:50  25   **Q.**   ALL RIGHT.  "APPENDIX O SHOWS THAT THE FLOODWALL HAS

15:24:54   1   ADEQUATE STABILITY AGAINST A STABILITY FAILURE AS LONG AS THE

15:24:58   2   FLOODWALL EMBANKMENT STAYS INTACT AND THE I-WALL DOES NOT

15:25:02   3   STRUCTURALLY FAIL."

15:25:02   4           RIGHT?

15:25:03   5   A.   YES.

15:25:04   6   Q.   OKAY.  NOW:  "FOR FAILURE TO OCCUR, OVERTOPPING MUST LAST

15:25:06   7   LONG ENOUGH TO ERODE AWAY THE TOP OF THE LAND SIDE FLOODWALL

15:25:10   8   EMBANKMENT AND TAKE AWAY THE LATERAL SUPPORT OF THE WALL

15:25:12   9   PROVIDED BY THAT SECTION OF THE FLOODWALL."

15:25:13  10           CORRECT?

15:25:14  11   A.   YES, SIR.

15:25:15  12   Q.   WHICH IS OUR WHOLE DISCUSSION ABOUT -- ABOUT SCOUR.

15:25:23  13           NOW, LET'S GO TO THE BOTTOM OF THE PAGE 106.  RIGHT

15:25:27  14   HERE.  "SINCE THE FLOODWALLS AT THE EBIA SITE EXPERIENCED WAVE

15:25:35  15   OVERTOPPING DURING HURRICANE KATRINA, IT CAN BE ASSUMED THAT

15:25:39  16   OMISSION OF WAVE OVERTOPPING SCOUR IN OUR STUDY WOULD RESULT IN

15:25:43  17   LOWER PREDICTED SCOUR DEPTHS THAN WHAT'S ACTUALLY DEVELOPED AT

15:25:47  18   THE FLOODWALLS DURING THE HURRICANE."

15:25:49  19           DO YOU SEE THAT?

15:25:49  20   A.   YES, SIR.

15:25:50  21   Q.   ALL RIGHT.  THERE'S NO INDICATION THERE ABOUT WHAT YOU

15:25:53  22   ASSUMED THE HEIGHT OF THE WAVES TO BE; ISN'T THAT TRUE?

15:25:57  23   A.   WELL, I THINK WE'VE ALREADY SAID THAT IN THE FIRST

15:26:00  24   SENTENCE THAT I DID NOT INCLUDE WAVE OVERTOPPING, SO I AM

15:26:04  25   ADDRESSING WAVES.  I'M SAYING THERE WEREN'T ANY.

15:26:07    1              AND THEN I'M DRAWING ATTENTION TO THE FACT THAT IF

15:26:10    2    THERE WERE WAVES LARGER, THAT THEY WOULD MAKE THE SCOUR

15:26:13    3    CONDITION WORSE; THAT IS THAT THE DEPTHS WOULD BE MORE.

15:26:17    4    **Q.**   ALL RIGHT.  THAT'S WHAT YOU SAY HERE IN THIS SENTENCE;

15:26:19    5    CORRECT?

15:26:19    6    **A.**   YES.

15:26:19    7    **Q.**   THOSE ARE CONSISTENT?

15:26:20    8    **A.**   YES.

15:26:21    9    **Q.**   ALL RIGHT.  LET'S GO TO PAGE 107, THE LAST PARAGRAPH.

15:26:45   10    NOW, HERE, WE SEE THAT YOU USED YOUR REVIEW OF POST-KATRINA

15:26:52   11    PHOTOGRAPHS TO DEMONSTRATE THAT THERE WAS SCOUR; ISN'T THAT

15:26:56   12    TRUE?

15:26:59   13    **A.**   YES, SIR.

15:27:00   14    **Q.**   THAT'S WHY YOU EVALUATED THOSE PHOTOGRAPHS?

15:27:02   15    **A.**   YES.

15:27:02   16    **Q.**   AND THEN YOU SAY:  "THE POINT OF THIS SECTION IS TO

15:27:05   17    DEMONSTRATE THAT THE PHYSICS OF SCOUR SUPPORT THE DEVELOPMENT

15:27:10   18    OF SCOUR DEPTHS OF 6 TO 8 FEET."  RIGHT?

15:27:14   19    **A.**   YES.  THAT'S FOR THE CASE IF THEY DON'T -- IF THESE WALLS

15:27:16   20    DON'T FAIL BY SOME OTHER MEANS.  SO THE SCOUR CALCULATIONS

15:27:19   21    ASSUMES THAT THE WALL DOESN'T OVERTURN, THAT IT'S STRONG ENOUGH

15:27:23   22    TO STAY IN PLACE AND THE WATER JUST KEEPS POUNDING OVER THE TOP

15:27:26   23    OF IT, AND ALSO THAT THE -- THAT THIS IS POTENTIALLY WHERE THE

15:27:32   24    WATER LEVEL ON THE LAND SIDE DOES NOT COME UP AND STOP IT.

15:27:36   25    **Q.**   ALL RIGHT.  NOW, LET'S GO TO PAGE 108 JUST SO WE CAN PUT

15:27:41   1   THIS ALL TOGETHER.  108, THE LAST PARAGRAPH.

15:27:48   2           HERE WE SEE -- NOW, WE'RE TALKING ABOUT OVERTURNING

15:27:52   3   FAILURE NOW.  AND IT SAYS:  "APPENDIX O CONTAINS THE

15:27:56   4   CALCULATIONS TO SHOW THAT WHEN THE DEPTH OF SCOUR REACHES ABOUT

15:27:59   5   5.7 FEET, THE WALL COMPLETELY FAILS BY OVERTURNING."  RIGHT?

15:28:06   6   **A.**   YES.

15:28:06   7   **Q.**   OKAY.  AND DOES THIS CONFIRM NOW THAT SECTION O IS WHERE

15:28:11   8   THE COURT NEEDS TO LOOK IN ORDER TO SEE THESE EVALUATIONS?

15:28:14   9   **A.**   YES.

15:28:15  10   **Q.**   OKAY.  THANK YOU.

15:28:17  11           AND, ONCE AGAIN, THE PHOTOGRAPHS WERE USED TO SHOW

15:28:22  12   SIMPLY THAT THERE WAS SCOUR AND THAT WAS CONSISTENT WITH YOUR

15:28:26  13   DETERMINATIONS THAT THE WATER WENT -- THE WATER WENT OVER THE

15:28:28  14   TOPPING AND CAUSED AN EROSION OF THE BACK SIDE OF THE WALL;

15:28:31  15   ISN'T THAT TRUE?

15:28:32  16   **A.**   YES.

15:28:32  17   **Q.**   YOU WEREN'T, AT THIS POINT IN TIME, LOOKING AT THOSE

15:28:35  18   PHOTOGRAPHS IN ORDER TO DEMONSTRATE ANYTHING ABOUT TAIL WATER;

15:28:38  19   ISN'T THAT TRUE?

15:28:47  20   **A.**   I HAVEN'T THOUGHT OF IT.  WE -- TAIL WATER WAS INCLUDED IN

15:28:53  21   THE CALCULATIONS IN THE ANALYSIS.  WE WERE LOOKING -- I WAS

15:28:58  22   LOOKING AT THE PHOTOGRAPHS JUST TO SEE WHAT WAS THE DEPTH OF

15:29:01  23   THE SCOUR TRENCH.  SO MAYBE I MISSED YOUR CONNECTION.

15:29:05  24   **Q.**   OKAY.  THAT'S ALL RIGHT.

15:29:06  25           IT SAYS THE SECTION -- APPENDIX O WILL SAY WHAT IT

15:29:10  1   SAYS; RIGHT?

15:29:11  2   A.   YES.

15:29:11  3             THE COURT:  WELL, THE COURT WILL ASSUME THAT.

15:29:13  4             MR. BRUNO:  EXACTLY.

15:29:14  5             THE COURT:  UNLESS IT'S MYSTICAL.

15:29:20  6   BY MR. BRUNO:

15:29:20  7   Q.   ALL RIGHT.  NOW, LET'S GO TO APPENDIX R.  THE FACT OF THE

15:29:41  8   MATTER IS, DR. MARR, THAT YOU WERE NOT -- YOU DID NOT VALIDATE

15:29:45  9   AT THE TIME OF YOUR REPORT ANY OF THESE SCOUR DEPTH

15:29:48  10  CALCULATIONS; ISN'T THAT TRUE?

15:29:49  11  A.   NO, THAT'S NOT TRUE.  I THINK I'VE ALREADY DESCRIBED TO

15:29:52  12  YOU THAT -- THAT WE LOOKED AT THE PHOTOGRAPHS, WE HAD SCALED

15:29:56  13  OFF SOME DISTANCES, JUST LIKE I SHOWED THE COURT EARLIER.  WE

15:30:02  14  ACTUALLY -- I SPENT QUITE A BIT OF TIME WITH MR. FULLER ABOUT

15:30:05  15  THAT TO MAKE SURE THAT THAT WAS A VALID WAY OF DOING THINGS.

15:30:09  16  WE JUST NEVER PUT THOSE INTO MY REPORT, THOSE SCALED DIAGRAMS.

15:30:16  17            NOW, I'M -- YOU KNOW, I'M THE KIND OF PERSON ALL MY

15:30:20  18  LIFE I'VE BEEN TAUGHT TO GO MORE THAN JUST A MODEL; THAT TO

15:30:23  19  LOOK FOR VALIDATION OF A MODEL, YOU LOOK FOR, MUCH LIKE

15:30:27  20  PROFESSOR BEA TALKED ABOUT, YOU LOOK FOR COLLABORATING

15:30:31  21  INFORMATION TO SAY THAT THIS MODEL IS GIVING ME RESULTS THAT

15:30:36  22  FIT NATURE, FIT REALITY.

15:30:40  23            THAT'S WHY WE -- THE PHOTOGRAPHS WERE VERY USEFUL TO

15:30:42  24  US.

15:30:45  25  Q.   PART OF THE CALCULATION METHOD THAT YOU USED WAS NEW, WAS

15:30:49   1   IT NOT?

15:30:50   2   **A.**   IT WAS -- WHAT WAS -- NO.  WHAT WAS NEW WAS PUTTING TWO

15:30:54   3   DIFFERENT CALCULATIONS THAT HAD BEEN DONE BEFORE TOGETHER INTO

15:30:57   4   ONE CALCULATION.

15:30:59   5              **MR. BRUNO:**  CAN WE GO TO PX-4733 AT PAGE 12?

15:31:12   6              **THE COURT:**  NOW, ARE WE TALKING ABOUT CALCULATIONS

15:31:14   7   REFERENCE THE DEPTH OF THE SCOUR TRENCH?

15:31:16   8              **MR. BRUNO:**  YES, JUDGE.

15:31:18   9              **THE COURT:**  AND WE'VE SCENE IN THE DEMONSTRATIVES

15:31:27  10   SOME CALIBRATION THAT WAS DONE IN THAT PICTORIAL.

15:31:30  11              **MR. BRUNO:**  WHICH WAS NOT INCLUDED IN THE REPORT DONE

15:31:31  12   AFTERWARDS.

15:31:32  13              **THE COURT:**  I UNDERSTAND.

15:31:42  14              **MR. BRUNO:**  4733, PX.  PAGE 12.

15:31:53  15   **BY MR. BRUNO:**

15:31:53  16   **Q.**   ALL RIGHT.  THE BOTTOM PARAGRAPH:  "PARTS OF CALCULATION

15:32:05  17   METHOD USED HERE ARE NEW."

15:32:11  18              **THE COURT:**  DO YOU WANT TO KEEP IT BLOWN UP?  YEAH.

15:32:16  19   **BY MR. BRUNO:**

15:32:16  20   **Q.**   "THEY WERE OBTAINED COMBINING A WELL-KNOWN METHOD TO

15:32:19  21   ESTIMATE THE HYDRAULIC SHEAR STRESS CAUSED BY FREE FALLING JET

15:32:24  22   WITH AN ESTABLISHED METHOD TO ESTIMATE SCOUR DEPTH RESULTING

15:32:27  23   FROM THE IMPOSED HYDRAULIC SHEAR STRESS.  HOWEVER, THE COMBINED

15:32:32  24   RESULT HAS NOT BEEN VERIFIED WITH FIELD MEASUREMENTS ON ACTUAL

15:32:35  25   CASES."

15:32:36   1                  IS THAT TRUE OR FALSE?

15:32:37   2    A.   THAT'S A TRUE STATEMENT.

15:32:39   3    Q.   OKAY.  SO AT LEAST WHEN THIS WAS WRITTEN, IT WASN'T VALID

15:32:42   4    DATED; RIGHT?

15:32:44   5    A.   WELL, THE NEXT SENTENCE GOES ON TO SAY THAT:  "THE RESULTS

15:32:47   6    APPEAR TO BE IN GENERAL AGREEMENT WITH OBSERVATIONS OF SCOUR

15:32:49   7    DEPTHS ON UNFAILED SECTIONS OF THE EBIA."

15:32:53   8                  WHAT I WAS SAYING IS THAT IT HADN'T -- PRIOR TO THIS

15:32:56   9    IT HADN'T BEEN VERIFIED WITH FIELD MEASUREMENTS ON ACTUAL

15:32:59  10    CASES.  WE DID HERE USE THE PHOTOGRAPHS TO SHOW US THAT IT WAS

15:33:01  11    GIVING REASONABLE RESULTS.

15:33:04  12                  AND I REMIND YOU AGAIN THAT, YOU KNOW, I KEEP SAYING

15:33:06  13    THIS:  THIS WAS JUST AN APPROXIMATE MODEL TO GIVE US AN IDEA OF

15:33:09  14    THE MECHANICS OF SCOUR.  IT WAS NEVER INTENDED TO GIVE US A

15:33:12  15    PRECISE PREDICTION OF SCOUR DEPTH.

15:33:15  16    Q.   ALL RIGHT.  LET'S GO TO THE NEXT PAGE, JUST TO BRING THAT

15:33:19  17    POINT HOME.

15:33:28  18                  IT SAYS:  "THE SOIL TYPE USED IN THE CONSTRUCTION OF

15:33:33  19    THE FLOODWALL EMBANKMENT MAY HAVE VARIED ALONG ITS LENGTH.  I

15:33:36  20    USED VISUAL OBSERVATIONS OF THE ORIGINAL FILL ALONG THE

15:33:39  21    UNFAILED PORTIONS OF THE LAND SIDE OF THE FLOODWALL TO

15:33:42  22    DETERMINE THAT THE EMBANKMENT FILL WOULD BEHAVE LIKE A CL

15:33:46  23    MATERIAL DURING OVERTOPPING."

15:33:47  24                  SO YOU USED YOUR VISUAL OBSERVATIONS AS WELL?

15:33:50  25    A.   WELL, THAT'S -- YEAH.  JUST TO BE A LITTLE CLEARER ON

15:33:53   1   THAT.  I WAS ABLE TO GET A SAMPLE DOWN TO THE SOUTH IN A

15:33:57   2   SECTION THAT -- OF THE LEVEE NEAR WHERE THE -- THE SOUTH PUMP

15:34:04   3   TEST WAS RUN THAT SEEMED TO BE SOME OF THE ORIGINAL LEVEE FILL.

15:34:10   4   OTHERWISE, I SAID EARLIER, WE DIDN'T REALLY HAVE MUCH

15:34:13   5   INFORMATION ON -- OTHER THAN WHAT I LEARNED FROM THE CORPS OF

15:34:15   6   ENGINEERS ON THAT EMBANKMENT FILL.

15:34:17   7   **Q.**   ALL RIGHT.  AND ONCE AGAIN, WE HAVE:  "THE MAIN POINT OF

15:34:23   8   THIS EFFORT IS TO DEMONSTRATE THAT THE PHYSICS OF SOIL EROSION

15:34:26   9   AND SCOUR SHOW THE POTENTIAL FOR DEVELOPMENT OF SIGNIFICANT

15:34:30   10  SCOUR DEPTHS OF SIX TO EIGHT FEET ON THE LAND SIDE.  AS SHOWN

15:34:35   11  ELSEWHERE IN THIS REPORT, THIS DEPTH OF SCOUR IS SUFFICIENT TO

15:34:37   12  CAUSE THE FLOODWALL TO FAIL BY OVERTURNING."

15:34:41   13           SO NOW WE'RE TALKING ABOUT SIX TO EIGHT FEET; RIGHT?

15:34:45   14  **A.**   YES.

15:34:46   15  **Q.**   OKAY.  NOW, LET'S GO TO PAGE -- BACK TO THE REPORT -- THE

15:35:07   16  MAIN, WHICH IS PX-4721-112.

15:35:16   17           **MR. BRUNO:**  CAN YOU PULL UP THE PICTURE?

15:35:17   18  **BY MR. BRUNO:**

15:35:17   19  **Q.**   NOW, DR. MARR, I THINK YOU'VE PREVIOUSLY TESTIFIED THAT

15:35:21   20  YOU'RE NOT ABLE TO EXPLAIN HOW THAT WALL TRAVELED 166 FEET AND

15:35:31   21  7 INCHES TO THE EAST; IS THAT CORRECT?

15:35:33   22  **A.**   I DIDN'T SAY THAT.

15:35:34   23  **Q.**   OKAY.  TELL US HOW THAT HAPPENED.

15:35:36   24  **A.**   WELL, I THINK I SAID THAT THE WATER FLOWING OVER THE TOP

15:35:38   25  OF IT PUT ENOUGH SHEAR FORCE ON IT TO CARRY IT THAT FAR.

15:35:44   1   **Q.**   ALL RIGHT.  SO THE WALL FALLS DOWN FLAT AND IT'S FLAT ON

15:35:49   2   THE GROUND; RIGHT?

15:35:50   3   **A.**   YES.

15:35:50   4   **Q.**   AND YOU'RE TELLING ME THAT THE WATER PUSHED IT ALONG -- IN

15:35:56   5   OTHER WORDS, THE FORCE AGAINST THE BOTTOM OF THE SHEET PUSHED

15:35:58   6   IT 166 FEET 7 INCHES TO THE EAST; RIGHT?

15:36:02   7   **A.**   NO.  THE WATER FLOWING OVER THE TOP OF THE SHEET AND ALSO

15:36:06   8   IMPACTING ON WHAT WAS REMAINING OF THE CONCRETE PORTION PUT A

15:36:10   9   DRAG ON IT AND DRAGGED IT LANDWARD.

15:36:14  10   **Q.**   WOULD YOU AGREE WITH ME THAT THE MORE VERTICAL IT IS, THE

15:36:18  11   MORE PRESSURE'S BROUGHT TO BEAR ON THE WALL TO PUSH IT TO THE

15:36:21  12   EAST?

15:36:24  13   **A.**   YES.

15:36:25  14   **Q.**   ALL RIGHT.  SO IF, IN FACT, THE WALL IS PUSHED OUT OF THE

15:36:32  15   GROUND, THAT SUPPLIES -- OR AT LEAST PROVIDES AN EXPLANATION,

15:36:37  16   MAYBE NOT ONE YOU AGREE WITH, FOR THAT WALL TO COME IN FULL

15:36:42  17   CONTACT WITH THE WATER SO THAT THE WATER CAN THEN PUSH IT

15:36:45  18   166.7 FEET TO THE EAST; ISN'T THAT TRUE?

15:36:54  19   **A.**   YEAH.  I'M TRYING TO FOLLOW YOUR VISUAL PICTURE THERE.

15:36:57  20   THE SHEETS HAD TO CLEARLY COME UP OUT OF THE GROUND.

15:37:00  21   **Q.**   RIGHT.  THAT'S MY POINT.

15:37:02  22   **A.**   AND THEN AS THEY ROTATED -- I THINK WE CAN SEE THIS IN THE

15:37:05  23   PHOTOGRAPHS.  AS THEY STARTED ROTATING TOWARDS THE HORIZONTAL,

15:37:11  24   THEY GOT DOWN TO A POINT WHERE WATER FLOWING OVER THE TOP OF

15:37:15  25   THEM HAD ENOUGH DRAG THAT IT WOULD PULL THE SHEETS OUT OF THE

15:37:19   1   GROUND.

15:37:20   2   **Q.**   WELL, I'M TRYING TO UNDERSTAND WHAT YOU'RE TALKING ABOUT.

15:37:23   3   WHAT I'M SAYING IS THAT THE SHEETS COME OUT AND THE PRESSURE OF

15:37:26   4   THE WATER CATCHES IT AND PULLS IT TO THE EAST?

15:37:29   5   **A.**   NO.   YOU'RE TALKING ABOUT A TRANSLATION OF -- THOUGH

15:37:32   6   THEY'RE STILL KIND OF STANDING UP IN THE AIR.

15:37:35   7   **Q.**   A LITTLE -- YEAH, A LITTLE.

15:37:36   8   **A.**   RIGHT.   BUT THAT WOULD MEAN THAT THE BOTTOM OF THE SHEET

15:37:38   9   WOULD STILL BE EMBEDDED IN THE GROUND, AND THERE'S NO EVIDENCE

15:37:43   10   THAT THERE WAS MOVEMENT OF THAT TYPE OCCURRING.

15:37:45   11   **Q.**   WELL, YOU SEE -- YOU SEE THE BOTTOM OF THE SHEETS DRAGGING

15:37:47   12   ALONG THE GROUND, DON'T YOU?

15:37:48   13   **A.**   WELL, IT'S MORE LIKE --

15:37:48   14   **Q.**   IN FACT,M THE LIDAR EVEN SHOWS THAT.

15:37:50   15   **A.**   IT'S MORE LIKE BEING DRUG ACROSS THE TOP OF THE GROUND

15:37:53   16   WHEN THEY'RE IN A PRONE POSITION.

15:37:55   17   **Q.**   ALL RIGHT.   SO --

15:37:57   18   **A.**   NOT THAT THEY'RE DRAGGING SOIL WITH THEM THEY'RE BITING

15:38:01   19   INTO THE SOIL TO DISPLACE SOIL, IF THAT'S WHAT YOU'RE

15:38:03   20   SUGGESTING.

15:38:04   21   **Q.**   NO.   I'M JUST TRYING TO GET A VISUAL PICTURE.   LET'S MAKE

15:38:07   22   A DIFFERENCE -- MAKE SURE YOU AND I ARE TALKING ABOUT DIFFERENT

15:38:09   23   THINGS.

15:38:10   24         I AM SUGGESTING THAT THE WALL IS VERTICAL FOR LONGER

15:38:13   25   THAN YOU ARE.   OKAY?   AND I'M TRYING TO GET AN UNDERSTANDING OF

15:38:17  1  WHAT YOU'RE TALKING ABOUT.

15:38:20  2          THE WALL, WHEN IT FAILS, ACCORDING TO DR. DALRYMPLE,

15:38:24  3  AT LEAST, I DON'T HAVE A TIME FROM YOU, BUT I'VE GOT A TIME

15:38:27  4  FROM HIM.  HE SAYS 6:45 TO 7:00, BEGINNING TO END, WALL IS FLAT

15:38:32  5  ON THE GROUND.

15:38:34  6          DO YOU AGREE -- I KNOW YOU DON'T GIVE ME A TIME, BUT

15:38:37  7  WHEN THE WALL FAILS, IS IT FLAT ON THE GROUND?

15:38:40  8  A.   WELL, I THINK I'VE ALREADY GIVEN THE SEQUENCE THAT WHEN IT

15:38:43  9  STARTS TO ROTATE OVER AND, YOU KNOW, TO MY MIND, WHEN IT'S

15:38:49  10 ROTATED 10 DEGREES OR SO, THE WALL HAS FAILED.  IT IS NO LONGER

15:38:53  11 CAPABLE OF HOLDING THE WATER BACK.

15:38:55  12 Q.   ALL RIGHT.  LET ME JUST -- SO IF THE WALL IS 10 DEGREES

15:38:59  13 OVER, IT'S FAILED?

15:39:00  14 A.   YES.

15:39:00  15 Q.   AND DOES THE FORCE OF THE WATER PUSH THE WALL TO THE

15:39:03  16 EAST --

15:39:04  17 A.   NO.  IT --

15:39:05  18 Q.   -- IN THAT 10-DEGREE OR DOES IT CONTINUE TO FALL DOWN?

15:39:08  19 A.   IN MY PICTURE, AND WHAT I'VE DESCRIBED HERE AND THE

15:39:13  20 OVERTURNING FAILURE MODE THAT'S BEING ANALYZED, IT CONTINUES TO

15:39:16  21 ROTATE WITHOUT MUCH HORIZONTAL TRANSLATION.

15:39:19  22 Q.   ROTATE MEANS IT'S MOVING TOWARD THE POSITION WHERE IT'S

15:39:24  23 GOING TO LAY DOWN ON THE GROUND; RIGHT?

15:39:26  24 A.   YES.

15:39:27  25 Q.   WELL, AGAIN, I'M JUST TRYING TO FIGURE THIS OUT.  THERE'S

15:39:30   1   A POINT AT WHICH IT'S FLAT ON THE GROUND; RIGHT?

15:39:33   2   **A.**   WELL, IT MAY NOT BE TOTALLY FLAT, IT MAY -- BUT IT'S DOWN

15:39:36   3   WHERE IT'S 10 OR 20 -- BETWEEN 0 AND 10 OR 20 DEGREES FROM THE

15:39:41   4   GROUND.

15:39:42   5   **Q.**   FAIR ENOUGH.

15:39:42   6         ALL RIGHT.  AND WHAT I'M TRYING TO UNDERSTAND IS THE

15:39:45   7   TIME IT TAKES FOR IT TO GO FROM THE VERTICAL TO THE POINT AT

15:39:53   8   WHICH IT'S AT IT'S LOWEST BEFORE IT STARTS TO MOVE, HOW MUCH

15:39:58   9   TIME DOES THAT TAKE?

15:39:59  10   **A.**   WE DON'T KNOW.

15:40:00  11   **Q.**   ALL RIGHT.  AND WOULD YOU AGREE WITH ME THAT THE LONGER

15:40:03  12   IT'S UP TO THE VERTICAL, THE MORE FORCE IS BROUGHT TO BEAR ON

15:40:08  13   THAT WALL PUSHING IT TO THE EAST?

15:40:11  14   **A.**   YEAH.  IN MY VIEW, ONCE IT STARTED TO ROTATE, BECAUSE OF

15:40:13  15   THE NATURE OF THIS FAILURE MECHANISM, IT WOULD HAVE GONE --

15:40:17  16   ONCE IT STARTED, IT WOULD HAVE ROTATED VERY QUICKLY.

15:40:20  17   **Q.**   VERY QUICKLY.

15:40:21  18         OKAY.  SO, ESSENTIALLY, THEN, WE HAVE THE WALL

15:40:26  19   ALMOST -- MAYBE NOT COMPLETELY, BUT ALMOST TO THE GROUND, AND

15:40:30  20   WHAT YOU'RE SAYING IS THAT THE FORCE OF THE WATER RUSHING OVER

15:40:33  21   THE TOP OF THIS WALL PUSHES IT ABOUT 166 FEET; RIGHT?

15:40:38  22   **A.**   YES, YES.

15:40:39  23   **Q.**   YES.  OKAY.  WE'RE CLEAR.

15:40:41  24         ALL RIGHT.  NOW, DID YOU DO ANY EVALUATIONS OR

15:40:44  25   ANALYSIS TO ASCERTAIN HOW MUCH FORCE WOULD BE NECESSARY TO PUSH

15:40:47   1   A WALL IN THAT DOWN POSITION 166 FEET?

15:40:51   2   **A.**   NO.

15:40:55   3   **Q.**   WOULD YOU ALSO AGREE WITH ME THAT IF THE -- THE HIGHER THE

15:40:59   4   WALL, THE MORE FORCE IS BROUGHT TO BEAR ON THAT WALL SO THAT IT

15:41:02   5   PUSHES IT TO THE EAST FASTER?

15:41:04   6   **A.**   NO.   I DON'T -- THAT'S A DIFFERENT -- YOU'RE GOING BACK TO

15:41:08   7   THE CASE WHERE THE WALL IS REMAINING UPRIGHT AND IS BEING

15:41:12   8   PUSHED, AND THAT'S NOT -- THAT'S NOT THE SCENARIO THAT

15:41:17   9   HAPPENED.

15:41:17   10  **Q.**   WELL, IT MAY NOT HAPPEN SLOWLY.   IF THE WALL FAILS FROM

15:41:21   11  HYDROSTATIC UPLIFT, IT'S BEING PUSHED UP; RIGHT?

15:41:24   12  **A.**   THE EMBANKMENT WAS BEING PUSHED UP, NOT THE WALL.

15:41:27   13  **Q.**   RIGHT.

15:41:27   14       WELL, THE EMBANKMENT IS PUSHED UP, SO THERE'S NOTHING

15:41:31   15  BEHIND THE WALL SO THAT IT CAN NOW MOVE TO THE EAST; RIGHT?

15:41:36   16  **A.**   IN, YOU'RE TALKING ABOUT DR. BEA'S SCENARIO OR --

15:41:40   17  **Q.**   YES.

15:41:41   18  **A.**   YES.   WITH THE UPLIFT PRESSURES, THAT'S CORRECT.

15:41:43   19  **Q.**   ALL RIGHT.   SO I'M JUST TRYING TO SEE, IN MY MIND, THAT

15:41:47   20  THE WAY YOU FIND THIS WALL, THE WAY IT ENDS UP IS CONSISTENT

15:41:49   21  WITH A HYDROSTATIC UPLIFT, A BLOWOUT OF THE WALL, BECAUSE IT'S

15:41:56   22  PUSHED BY THE FULL FORCE OF THAT WATER?   IT'S CONSISTENT, ISN'T

15:42:00   23  IT?

15:42:00   24  **A.**   NO.

15:42:01   25  **Q.**   IT'S NOT?   WHY NOT?

15:42:02  1  **A.**   NO.  BECAUSE IF IT HAD BEEN A TRANSLATION -- UPLIFT AND

15:42:05  2  TRANSLATION, WE WOULD HAVE HAD THE EARTHEN LEVEE EMBANKMENT

15:42:11  3  ITSELF MOVING TOGETHER WITH THE WALL LANDWARD AND WINDING UP AS

15:42:15  4  A MASS OF EARTHEN EMBANKMENT AND LEVEE WALL, LIKE I SHOWED FOR

15:42:19  5  THE 17TH STREET CANAL FAILURE.

15:42:22  6  **Q.**   WELL, FIRST OF ALL, YOU DIDN'T MENTION 17TH STREET CANAL

15:42:25  7  IN ANY OF YOUR REPORTS, DID YOU?

15:42:29  8       **MR. TREEBY:**  OBJECTION, YOUR HONOR.  HE TESTIFIED

15:42:31  9  ABOUT IT THIS MORNING.  THAT'S WHAT HE'S TALKING ABOUT.

15:42:34  10       **THE COURT:**  HE DID.

15:42:35  11       **MR. BRUNO:**  WAIT A MINUTE.  I HAVE A DIFFERENT

15:42:36  12  QUESTION.

15:42:36  13       **THE COURT:**  OKAY.

15:42:36  14  **BY MR. BRUNO:**

15:42:37  15  **Q.**   DID YOU PUT IT IN YOUR REPORT?

15:42:39  16       **THE COURT:**  IN OTHER WORDS, WERE THERE THINK

15:42:40  17  PHOTOGRAPHS OR ANYTHING ELSE --

15:42:40  18  **BY MR. BRUNO:**

15:42:41  19  **Q.**   WAS THERE ANYTHING IN YOUR EXPERT REPORT THAT TALKED ABOUT

15:42:43  20  THE 17TH STREET CANAL, PERIOD?

15:42:46  21       **MR. TREEBY:**  IF, YOUR HONOR, PLEASE, THIS IS GOING TO

15:42:48  22  COME UP AGAIN, SO WE MIGHT AS WELL TALK ABOUT IT NOW.

15:42:52  23       **MR. BRUNO:**  JUDGE --

15:42:52  24       **THE COURT:**  LET HIM MAKE HIS OBJECTION.

15:42:53  25       **MR. TREEBY:**  WAIT, WAIT.  I HAVE AN OBJECTION.  I

15:42:54   1  HAVE AN OBJECTION.

15:42:56   2          **THE COURT:**  GO AHEAD.

15:42:56   3          **MR. TREEBY:**  BECAUSE BY DEFINITION, THESE EXPERTS

15:42:59   4  FURNISHED A REPORT ON MARCH 12TH.  DR. BEA FURNISHED REBUTTAL

15:43:04   5  AND THEN SUPPLEMENTAL AFTER THAT AND THEN TESTIFIED TO EVEN NEW

15:43:07   6  THEORIES.

15:43:08   7              THEY'RE GOING TO HAVE TO BE ALLOWED TO TESTIFY

15:43:10   8  ABOUT WHY THAT'S NOT TRUE.

15:43:11   9          **THE COURT:**  WELL, THEY HAD A SUPPLEMENTAL REPORT I

15:43:14  10  LET THIS.

15:43:14  11          **MR. TREEBY:**  OH, THAT'S -- THAT'S RIGHT.

15:43:14  12          **THE COURT:**  THIS GENTLEMAN DID.

15:43:15  13          **MR. TREEBY:**  BUT I'M TALKING ABOUT REBUTTAL OF WHAT

15:43:18  14  DR. BEA HAS SAID EVEN AFTER THEIR LAST SUPPLEMENTAL.

15:43:23  15          **THE COURT:**  WELL, I'M NOT ABOUT -- I'M NOT SURE.  WE

15:43:23  16  DID DR. BEA -- THEY FILED THIS SUPPLEMENTAL IN AUGUST?

15:43:26  17          **MR. BRUNO:**  OH, NO.  MUCH EARLIER THAN THAT, JUDGE.

15:43:29  18              BUT MY POINT IS DIFFERENT.  MY POINT IS I HEARD

15:43:30  19  FOR A WHOLE WEEK CONSTANT CROSS-EXAMINATION BY DEFENDANTS, "WAS

15:43:35  20  THIS IN YOUR REPORT?  WAS THIS IN YOUR REPORT?"  AND NOW I

15:43:37  21  CAN'T ASK ONE OF THEIR WITNESSES WHETHER OR NOT THEY INCLUDED

15:43:40  22  SOMETHING IN THEIR REPORT?  I DON'T HAVE ANY OPPORTUNITY UNTIL

15:43:44  23  THE DAY OF TRIAL.

15:43:45  24          **MR. TREEBY:**  YOUR HONOR --

15:43:45  25          **THE COURT:**  I'M GOING TO ALLOW YOU TO ASK THAT.  I'M

15:43:47   1  GOING TO ALLOW YOU TO ASK THAT.

15:43:47   2                    THAT'S ALL I ASKED.

15:43:47   3  **BY MR. BRUNO:**

15:43:47   4  **Q.**   THERE'S NOTHING IN YOUR REPORT ABOUT THE 17TH STREET

15:43:48   5  CANAL; RIGHT?

15:43:50   6  **A.**   RIGHT.

15:43:50   7  **Q.**   ALL RIGHT.  NOW, THE DIFFERENCE BETWEEN THE 17TH STREET

15:43:53   8  CANAL AND THIS IS THAT YOU HAVE A WHOLE LOT MORE WATER GIVEN

15:43:58   9  THE WIDTH OF THE IHNC AND THE SUPPLY OF WATER THAT CAME FROM

15:44:02  10  THE LAKE AND THE INTERCOASTAL WATERWAY THAN YOU DID ON THE

15:44:08  11  17TH STREET CANAL; ISN'T THAT TRUE?

15:44:10  12  **A.**   THOSE DIFFERENCES WERE THERE, BUT THEY HAD NOTHING TO DO

15:44:12  13  WITH THE FAILURE OR HOW THE FAILURE DEVELOPED.

15:44:15  14  **Q.**   ALL I ASKED WAS WHETHER OR NOT THOSE DIFFERENCES WERE

15:44:17  15  THERE.  OKAY?

15:44:18  16                    NOW, SECOND POINT:  YOU TESTIFIED THAT THERE WERE

15:44:20  17  500,000 POUNDS OF PRESSURE THAT CAME FROM THAT WATER, DIDN'T

15:44:25  18  YOU?

15:44:26  19  **A.**   I TESTIFIED THAT EXPONENT CALCULATED THAT IT WOULD TAKE

15:44:32  20  500,000 POUNDS TO STRETCH THE SHEETS OUT TO THE MEASURED

15:44:35  21  DIMENSIONS.

15:44:36  22  **Q.**   DIDN'T THE SHEETS STRETCH?

15:44:38  23  **A.**   YES.

15:44:38  24  **Q.**   SO ARE WE NOT NOW CONCLUDING THAT THERE WAS 500,000 POUNDS

15:44:42  25  OF PRESSURE BROUGHT TO BEAR ON THOSE WALLS?

15:44:45   1   **A.**   NOT ALL AT ONCE.  AS I EXPLAINED THIS MORNING, IT WAS A

15:44:48   2   BIT OF A SEQUENTIAL FAILURE WHERE MORE FORCE CAME IN THE TOP

15:44:52   3   FIRST, STRETCHED IT, THE SHEETS TORE, AND THEN THE FORCE

15:44:57   4   TRANSFERRED TO THE BOTTOM.

15:44:58   5          SO I DON'T NEED THE FULL 500,000 POUNDS OF FORCE

15:45:01   6   DEVELOPING IN THE WALL.  IT DIDN'T HAPPEN ALL AT ONCE.

15:45:05   7   **Q.**   HOW MUCH FORCE DO YOU NEED TO GET THE WHOLE BUSINESS

15:45:07   8   STARTED?  I THOUGHT YOU TOLD US 500,000 POUNDS OF PRESSURE.

15:45:12   9   **A.**   WELL, I THINK I EXPLAINED WHAT I SAID.

15:45:14  10   **Q.**   OKAY.  WELL, LET ME ASK IT DIFFERENTLY THEN.

15:45:18  11          HOW MUCH PRESSURE DID YOU NEED TO START THE NORTH

15:45:21  12   BREACH TO -- WHATEVER IT WAS THAT STARTED IT, HOW MUCH PRESSURE

15:45:24  13   WAS BROUGHT TO BEAR ON IT BEFORE IT STARTED?

15:45:27  14          **THE COURT:**  YOU'RE TALKING -- LET ME SEE -- THE CRACK

15:45:31  15   THAT DEVELOPED, I'M TALKING ABOUT --

15:45:33  16          **MR. BRUNO:**  THE FIRST --

15:45:33  17   **BY MR. BRUNO:**

15:45:33  18   **Q.**   AS I UNDERSTAND THE WITNESS' TESTIMONY, THE FIRST THING

15:45:36  19   THAT HAPPENED WAS THAT THE CONCRETE BROKE AWAY; AM I CORRECT?

15:45:40  20   **A.**   THE FIRST THING THAT HAPPENED WAS THAT THE STEAL STARTED

15:45:43  21   TO ELONGATE.

15:45:46  22   **Q.**   ALL RIGHT.  WELL, HOW MUCH FORCE DID YOU NEED TO ELONGATE

15:45:48  23   THE STEAL?

15:45:50  24   **A.**   A VERY SMALL AMOUNT.  I DON'T HAVE IT IN FRONT OF ME.  BUT

15:45:54  25   IF YOU REMEMBER THE GRAPH PRODUCED BY EXPONENT, IT HAD A

15:45:58  1  RELATIVELY SMALL AMOUNT OF FORCE WAS REQUIRED TO STRETCH THOSE

15:46:02  2  SHEETS OUT BY AN INCH OR TWO, AND THAT INCH OR TWO ELONGATION

15:46:06  3  WAS ENOUGH TO CRACK UP THE CONCRETE.

15:46:08  4  **Q.**   ALL RIGHT.  AT WHAT POINT DID YOU NEED 500,000 POUNDS OF

15:46:13  5  PRESSURE IN THE SEQUENCE?

15:46:14  6  **A.**   WELL, AGAIN, I'M TRYING TO EXPLAIN THAT THE 500,000 POUNDS

15:46:17  7  CAME FROM EXPONENT'S CALCULATION, ASSUMING THAT THE SHEETS WERE

15:46:22  8  STRETCHED UNIFORMLY FROM TOP TO BOTTOM ALL AT ONCE, LIKE AN

15:46:25  9  ACCORDION BEING PULLED OUT.

15:46:27  10       THE WAY I THINK THIS ACTUALLY HAPPENED IS THAT WE HAD

15:46:31  11  SOME OUTWARD MOVEMENT AT THE TOP AND SOME ROTATION AT THE TOP

15:46:34  12  SO THAT THE SHEETS WERE STRETCHED MORE AT THE TOP TO BEGIN

15:46:37  13  WITH.  THAT MEANS THEY GOT MOST OF THE FORCE FIRST, AND THAT

15:46:42  14  WOULD HAVE BEEN ON THE ORDER OF 25,000 POUNDS PER FOOT LENGTH

15:46:46  15  OF WALL AT THE TOP TO STRETCH IT OUT 13 INCHES.

15:46:49  16  **Q.**   CAN WE GO --

15:46:56  17  **A.**   THERE WOULD HAVE BEEN PROBABLY, AND I DON'T KNOW, BUT JUST

15:46:59  18  TO TRY TO HELP ANSWER YOUR -- CLEAR UP YOUR -- THE CONFUSION

15:47:01  19  HERE A BIT, THERE MAY HAVE BEEN SEVERAL HUNDRED POUNDS 1-,

15:47:06  20  200,000 POUNDS OF FORCE DEVELOPED IN THE TOP OF THE WALL TO

15:47:09  21  START IT TO STRETCH OUT, THEN THE TEARS STARTED AND THE

15:47:12  22  STRETCHING STARTED WORKING IT'S WAY DEEPER.

15:47:15  23       **MR. BRUNO:**  MAY WE PLEASE CALL UP PX-4439-21?  OH,

15:47:20  24  AND I'M SORRY, PAGE 81.  AT LINE 19.

15:47:38  25       **THE COURT:**  I'M SORRY.  SOME OF OUR VERY IMPORTANT

15:47:43   1   STAFF NEED A BREAK.

15:47:45   2             **MR. BRUNO:**  OH, OKAY.

15:47:48   3                  AND WE WILL ACCEDE TO THAT REQUEST AND TAKE A

15:47:52   4   TEN-MINUTE RECESS.

15:47:54   5             **THE DEPUTY CLERK:**  ALL RISE.

15:47:55   6             (WHEREUPON, THE COURT TOOK A RECESS.)

15:55:53   7             **THE DEPUTY CLERK:**  ALL RISE.

15:55:54   8                  COURT'S IN SESSION.  PLEASE BE SEATED.

16:16:01   9             **MR. BRUNO:**  WE HAD 4439 ON THE --

16:16:04  10   BY MR. BRUNO:

16:16:05  11   **Q.**  ALL RIGHT.  MAYBE I'M CONFUSED ABOUT THE 500,000.  SO

16:16:08  12   LET'S SEE IF WE CAN CLEAR IT UP.

16:16:21  13             **MR. BRUNO:**  BACK IT UP A LITTLE BIT, PLEASE SO WE CAN

16:16:24  14   GET SOME CONTEXT.  I NEED LINE 7.  OKAY.  THAT'S IT.

16:16:39  15   BY MR. BRUNO:

16:16:43  16   **Q.**  "ALL RIGHT.  THEN I'M JUST GOING TO ASK YOU TO START OVER.

16:16:46  17   TELL US WHAT CAUSED, IN YOUR VIEW, THE TEAR OF THE SHEET PILING

16:16:50  18   AT THE OLD WELD.

16:16:51  19             "HIGH LATERAL FORCES IN THE SHEETING" WAS YOUR

16:16:54  20   ANSWER.

16:16:55  21             "WHAT LATERAL FORCES ARE YOU REFERRING TO?

16:16:58  22             "THE FORCES ACTING ALONG THE ALIGNMENT OF THE WALL IN

16:17:01  23   THE SHEETING.

16:17:01  24             "AND DID YOU --

16:17:03  25             "TENSILE FORCES ACTING ALONG THAT ALIGNMENT.

16:17:07  1        "AND DID YOU MEASURE THE TENSILE FORCES ACTING UPON

16:17:11  2   THE LEVEE?

16:17:12  3        "NO.

16:17:13  4        "DID YOU COMPUTE THE TENSILE FORCES ACTING UPON THAT

16:17:17  5   LEVEE?

16:17:17  6        "YES.

16:17:18  7        "AND WHAT WAS THE COMPUTED VALUE OF THE TENSILE

16:17:22  8   FORCES?"

16:17:22  9        AND YOUR ANSWER WAS:  "WELL, THE EXPONENT RESULTS

16:17:26  10  GAVE US 500,000 POUNDS ALONG THE FULL LENGTH OF THE WALL.  OR

16:17:30  11  THE FULL DEPTH OF THE WALL."

16:17:32  12       ALL RIGHT.  NOW, HELP ME UNDERSTAND.  IT'S

16:17:36  13  500,000 POUNDS PULLING THIS WAY; IS THAT CORRECT?

16:17:40  14  **A.**   YES.

16:17:41  15  **Q.**   AND IT'S 500,000 POUNDS PUSHING THIS WAY?

16:17:45  16  **A.**   NO.

16:17:46  17  **Q.**   ALL RIGHT.  WELL, HOW DO YOU -- WHEN YOU SAY THE FULL

16:17:48  18  DEPTH, ARE YOU JUST SIMPLY REFERRING FROM TOP TO BOTTOM?

16:17:53  19  **A.**   YES.

16:17:54  20  **Q.**   ALL RIGHT.  SO THERE'S SOMETHING CAUSING 500,000 POUNDS OF

16:18:00  21  PRESSURE ACROSS THE HORIZONTAL; RIGHT?

16:18:04  22  **A.**   YES.

16:18:05  23  **Q.**   ALL RIGHT.  NOW, WHAT WAS THAT?

16:18:06  24  **A.**   IT WAS THE FORCE OF THE WATER ACTING ON THE FLOOD SIDE OF

16:18:09  25  THE WALL.

16:18:10   1   **Q.**   ALL RIGHT.  SO WE HAVE THIS -- THIS BIG CONTAINER OF WATER

16:18:14   2   AND IT'S PUSHING AGAINST THAT WALL AND IT'S CAUSING

16:18:20   3   500,000 POUNDS OF PRESSURE.  ALL RIGHT.

16:18:22   4            NOW, DID YOU TRY TO ANALYZE WHETHER OR NOT THE WATER,

16:18:28   5   ACTING BY ITSELF, COULD CREATE THAT KIND OF PRESSURE, THAT IS,

16:18:34   6   THAT 500,000 POUNDS OF PRESSURE LATERALLY ACROSS THE WALL?

16:18:38   7   **A.**   YES.

16:18:39   8   **Q.**   ALL RIGHT.  WHAT DID YOU DO?

16:18:41   9   **A.**   WE DID WHAT WE CALL A THREE-DIMENSIONAL FINITE ELEMENT

16:18:47  10   ANALYSIS IN WHICH WE MODELED THE OLD WALL AND THE NEW WALL

16:18:53  11   AND -- IN THE COMPUTER, AND WE PUT ON THE FORCES OF THE WATER

16:18:59  12   FROM THE FLOOD SIDE AND EXAMINED HOW THE WALL WOULD DEFORM AND

16:19:07  13   WHAT AMOUNT OF FORCE WOULD DEVELOP IN THE WALL -- WHETHER LARGE

16:19:12  14   FORCES COULD DEVELOP TO THE WALL ALONG THE LENGTH OF THE WALL.

16:19:16  15   **Q.**   AND YOU COULD NEVER GET IT UP TO 500,000; CORRECT?

16:19:20  16   **A.**   NO.  I -- I TRIED TO EXPLAIN IN MY REPORT THAT THAT TYPE

16:19:23  17   OF ANALYSIS THAT WE WERE USING WAS INTENDED TO APPROACH

16:19:27  18   FAILURE, BUT IT CANNOT TELL US CONDITIONS EXACTLY AT FAILURE.

16:19:30  19   IT'S NOT DESIGNED TO DO THAT.

16:19:32  20            THE REASON FOR THE ANALYSIS WAS TO SHOW US HOW MUCH

16:19:37  21   TENDENCY THERE WAS FOR DIFFERENTIAL MOVEMENT OF THE OLDER,

16:19:43  22   SHORTER, LESS STIFF WALL RELATIVE TO THE STIFFER NORTHERN

16:19:47  23   PIECE.  AND THAT ANALYSIS SHOWED US THAT THERE WERE SEVERAL

16:19:51  24   INCHES OF DIFFERENTIAL MOVEMENT, MORE MOVEMENT IN THE SOUTH TO

16:19:55  25   THE LANDSIDE.  AND THAT KIND OF DIFFERENCE IN MOVEMENT IS

| | | |
|---|---|---|
| 16:19:57 | 1 | ENOUGH IT CAUSE LARGE FORCES IN THE SHEETING THAT WE'RE TALKING |
| 16:20:00 | 2 | ABOUT. |
| 16:20:00 | 3 | **Q.**   ALL RIGHT.  AGAIN, MAYBE I DIDN'T ASK MY QUESTION |
| 16:20:03 | 4 | ARTICULATELY ENOUGH.  THERE'S 500,000 POUNDS OF PRESSURE |
| 16:20:10 | 5 | LATERALLY.  NOW, ARE YOU TELLING THE JUDGE THAT THIS -- THE |
| 16:20:12 | 6 | 500,000 POUNDS IS ONLY ACTING ON ONE SHEET? |
| 16:20:16 | 7 | **A.**   IT'S ACTING ON THE SHEETS THAT WERE STRETCHED OUT AND |
| 16:20:24 | 8 | ELONGATED BY -- PLASTICALLY, LIKE I SHOWED BY THE 13 INCHES. |
| 16:20:30 | 9 | **Q.**   MORE THAN ONE SHEET? |
| 16:20:31 | 10 | **A.**   THERE WERE TWO SHEETS THERE IN THAT CASE. |
| 16:20:33 | 11 | **Q.**   ALL RIGHT.  SO THERE'S ONLY TWO SHEETS THAT WERE |
| 16:20:35 | 12 | ELONGATED?  THAT'S IT?  NOTHING ELSE? |
| 16:20:39 | 13 | **A.**   WELL, THERE ARE OTHER SHEETS -- IF YOU LOOK IN THE |
| 16:20:40 | 14 | PHOTOGRAPH, THERE ARE OTHER SHEETS THAT ARE ELONGATED.  WE |
| 16:20:43 | 15 | DON'T HAVE THOSE AND I CAN'T TELL YOU EXACTLY HOW MUCH THEY |
| 16:20:48 | 16 | WERE ELONGATED, BUT IT'S MORE THAN THOSE TWO. |
| 16:20:51 | 17 | **Q.**   FAIR ENOUGH.  ALL I'M TRYING TO UNDERSTAND IS, DID YOU |
| 16:20:53 | 18 | EVALUATE THE KIND OF PRESSURE THAT THE WATER -- YOU TOLD ME |
| 16:20:56 | 19 | THAT THIS PRESSURE WAS CAUSED BY THE WATER PUSHING AGAINST THE |
| 16:20:59 | 20 | WALL; RIGHT? |
| 16:21:00 | 21 | **A.**   YES. |
| 16:21:01 | 22 | **Q.**   ALL RIGHT.  DID YOU DO ANY ANALYSIS TO ASCERTAIN WHAT THE |
| 16:21:03 | 23 | AMOUNT OF THAT PRESSURE WAS? |
| 16:21:05 | 24 | **A.**   YES. |
| 16:21:06 | 25 | **Q.**   WHAT WAS THE AMOUNT OF THAT PRESSURE? |

16:21:08   1    **A.**   WELL, IT WOULD BE THE PRESSURE FROM WATER AT AN ELEVATION

16:21:14   2    OF 11.3 FEET --

16:21:17   3    **Q.**   AND --

16:21:17   4    **A.**   -- DOWN TO THE BOTTOM OF THE WALL.

16:21:20   5    **Q.**   AND WHAT IS THE NUMBER?  WHAT IS --

16:21:24   6    **A.**   I DON'T HAVE THAT IN MY HEAD.  I DON'T KNOW.

16:21:26   7    **Q.**   HOW DO WE KNOW THAT THAT LEVEL OF PRESSURE WAS SUSTAINED

16:21:28   8    BY THOSE -- BY THOSE SHEETS?

16:21:32   9    **A.**   IT'S IN -- BY THE FACT THAT THEY FLATTENED OUT.

16:21:39   10   **Q.**   OKAY.  LET ME SEE IF I GET THIS.  WE KNOW THE SHEETS

16:21:41   11   FLATTENED.  WE KNOW WE HAD WATER; RIGHT?  AND YOU'RE SIMPLY

16:21:48   12   DEDUCING THAT BECAUSE THE SHEETS FLATTENED, WE HAD ENOUGH FORCE

16:21:53   13   TO CREATE 500,000 POUNDS OF LATERAL PRESSURE; CORRECT?

16:21:56   14   **A.**   WELL, THAT HAS TO BE BECAUSE EXPONENT'S ANALYSIS TELLS US

16:22:00   15   TO FLATTEN THE SHEETS THAT MUCH REQUIRED 500,000 POUNDS.

16:22:04   16   **Q.**   THAT'S FINE.  ALL I'M TRYING TO UNDERSTAND IS THAT'S --

16:22:06   17   WHATEVER THAT IS, WE DON'T KNOW WHAT THAT NUMBER IS; RIGHT?

16:22:10   18   **A.**   I'M NOT FOLLOWING YOU.  WE KNOW IT FROM EXPONENT'S

16:22:13   19   ANALYSIS.

16:22:14   20   **Q.**   THE AMOUNT OF FORCE OR PRESSURE -- PERHAPS I'M ASKING IT

16:22:18   21   INCORRECTLY -- THAT IS BROUGHT TO BEAR ON THE WALL BY THE

16:22:21   22   WATER, WHAT IS THAT NUMBER?

16:22:25   23   **A.**   I DIDN'T CALCULATE THAT SPECIFIC NUMBER.  IT'S ENOUGH TO

16:22:27   24   CAUSE THE SHEETS TO FAIL.

16:22:29   25   **Q.**   IT'S A BIG NUMBER?

16:22:30   1   **A.**   YES.

16:22:30   2   **Q.**   IT'S A BIG NUMBER?

16:22:31   3   **A.**   YES.

16:22:31   4   **Q.**   OKAY.  NOW, LET'S GO BACK TO THE SOUTH BREACH.  WE'VE GOT

16:22:35   5   THIS BIG NUMBER THAT WE DON'T KNOW, BUT THIS BIG NUMBER IS BIG

16:22:38   6   ENOUGH TO CAUSE 500,000 POUNDS OF PRESSURE ACROSS THE -- A

16:22:45   7   COUPLE OF SHEETS ACROSS THE SOUTH BREACH.  SO IT'S A LOT OF

16:22:50   8   PRESSURE.

16:22:50   9          WHERE I WAS GOING WITH THIS IS THAT IF THE WALL AT

16:22:54   10   THE SOUTH BREACH FAILED FROM UPLIFT PRESSURES, THAT SAME BIG

16:22:57   11   NUMBER OF PRESSURE WOULD NOW BE BROUGHT AND BE PUSHED AGAINST

16:23:01   12   THAT SOUTH WALL AND WOULD PUSH IT EAST; ISN'T THAT TRUE?

16:23:07   13   **A.**   THE SAME PRESSURE -- WATER PRESSURE -- SIMILAR WATER

16:23:10   14   PRESSURE WOULD -- NOT THE SAME BUT A SIMILAR MAGNITUDE OF WATER

16:23:14   15   PRESSURE WOULD DEVELOP ON THE SOUTH.  BUT ITS EFFECTS ON THE

16:23:17   16   WALL WOULD NOT BE TO CREATE THE BIG 500,000-POUND FORCE THAT

16:23:22   17   EXPONENT CALCULATED FOR THE NORTH BECAUSE WE DON'T HAVE THIS

16:23:25   18   DIFFERENCE IN STIFFNESS BETWEEN THE OLD WALL AND THE NEW WALL

16:23:28   19   THAT OCCURRED AT THE NORTH.

16:23:30   20          IT'S THAT DIFFERENCE IN STIFFNESS THAT CREATES A

16:23:32   21   FORCE CONCENTRATION AT THAT INTERSECTION.  THAT DOESN'T EXIST

16:23:36   22   AT THE SOUTH WALL.

16:23:38   23   **Q.**   ALL RIGHT.  WELL, WE'LL TALK ABOUT THE NORTH BREACH IN A

16:23:41   24   SECOND.  BUT WE KNOW AT LEAST THIS MUCH, THAT THERE IS A LARGE

16:23:46   25   AMOUNT OF FORCE BEING BROUGHT TO BEAR ON THE WALL AT THE SOUTH

16:23:49   1   BREACH; RIGHT?

16:23:50   2   A.   YES, SIR.

16:23:51   3   Q.   I MEAN, THE INDUSTRIAL CANAL IS WIDE.  THERE'S A LOT OF

16:23:56   4   WATER COMING IN FROM THE NORTH, THERE'S A LOT OF WATER COMING

16:24:00   5   IN FROM THE MRGO AND THE INTERCOASTAL WATERWAY; RIGHT?

16:24:06   6   A.   YES.

16:24:06   7   Q.   ALL RIGHT.  AND THAT'S A LOT OF -- A LOT OF FORCE?

16:24:07   8   A.   WELL, THE FORCE THAT'S ON THE WALL IS NOT DEPENDENT ON HOW

16:24:09   9   MUCH WATER IS COMING IN OR WHERE IT'S COMING FROM, IT'S JUST

16:24:12  10   WHATEVER PRESSURE IS ACTING ON THE WALL --

16:24:14  11   Q.   WHICH IS --

16:24:15  12   A.   -- RIGHT IN THE VICINITY OF THE WALL.

16:24:16  13   Q.   WHICH IS -- WHICH IS INDICATED BY THE HEIGHT OF THE WATER?

16:24:18  14   A.   YES, SIR.

16:24:19  15   Q.   RIGHT.  THE HIGHER THE WATER, THE MORE THE PRESSURE?

16:24:22  16   A.   YES, SIR.

16:24:22  17   Q.   RIGHT.  AND ALL WE CAN SAFELY CONCLUDE IS THAT WHATEVER

16:24:25  18   THAT PRESSURE WAS, IT WAS ENOUGH TO CAUSE 500,000 POUNDS OF

16:24:29  19   PRESSURE AT THE NORTH BREACH WALL; CORRECT?

16:24:32  20   A.   IT WAS ENOUGH TO CAUSE -- AGAIN, YOU HAVE TO BE CAREFUL

16:24:36  21   HERE.  BECAUSE IT WAS 500,000 POUNDS IF IT WAS APPLIED ALL AT

16:24:42  22   ONCE ALONG THE FULL LENGTH OF THE WALL, AS IN EXPONENT'S

16:24:44  23   CALCULATION.  BUT I'VE TRIED TO BE CLEAR THAT I THOUGHT THE TOP

16:24:49  24   OF THE WALL STRETCHED OUT FIRST AND THE BOTTOM THEN CAUGHT UP

16:24:52  25   LATER.  SO IT REALLY DIDN'T SEE A FULL 500,000 POUNDS ALL AT

16:24:56   1   ONCE.

16:24:57   2   **Q.**   ALL RIGHT.  JUST TO WRAP THIS UP SO WE CAN MOVE ON, THIS

16:25:00   3   PRESSURE, SUCH AS IT WAS, WOULD BE SUFFICIENT TO PUSH THAT

16:25:05   4   SOUTH WALL TO THE EAST; RIGHT?

16:25:09   5   **A.**   TO CAUSE THE TOP OF IT TO ROTATE TOWARDS THE LAND.

16:25:14   6   **Q.**   WELL, AND IF IT -- IF IT -- THE LONGER IT STAYED VERTICAL,

16:25:19   7   THE MORE FORCE IS BROUGHT TO BEAR ON THE SHEET; ISN'T THAT

16:25:24   8   TRUE?

16:25:24   9   **A.**   YES.

16:25:25   10  **Q.**   ALL RIGHT.  I MEAN, THIS IS JUST LOGIC.  IF IT'S LEANING

16:25:29   11  LIKE THIS AND WATER'S HITTING IT HERE, IT'S BEING FORCED OVER

16:25:33   12  THE TOP.  IF IT'S MORE VERTICAL, THERE'S MORE FORCE BROUGHT TO

16:25:36   13  BEAR TO PUSH IT TO THE EAST; CORRECT?

16:25:38   14  **A.**   IF THE WALL IS VERTICAL, THERE'S MORE FORCE ACTING ON IT

16:25:42   15  THAN ONCE IT STARTS TO ROTATE.

16:25:45   16  **Q.**   ALL RIGHT.  NOW, JUST THIS LAST PIECE IS THAT YOU WERE NOT

16:25:52   17  ABLE TO CALCULATE -- I'M SORRY, YOUR -- YOUR THREE-DIMENSIONAL

16:25:56   18  ANALYSIS NEVER GOT TO THE 500,000 POUNDS OF PRESSURE, DID IT?

16:26:04   19  **A.**   NO.  AND AS I EXPLAINED, THE NATURE OF THAT KIND OF

16:26:06   20  ANALYSIS -- AT THAT LARGE FORCE, THE FORCE LARGE ENOUGH TO

16:26:09   21  FLATTEN THOSE SHEETS, WE WERE IN A FAILURE CONDITION.

16:26:12   22        THE METHOD OF ANALYSIS WE WERE USING CANNOT GO THAT

16:26:13   23  FAR.  IT STARTS TO BECOME NUMERICALLY UNSTABLE AS IT GETS CLOSE

16:26:18   24  TO FAILURE AND CAN'T GO ANY FURTHER.

16:26:20   25  **Q.**   ALL RIGHT.  WELL, IN YOUR DEPOSITION YOU SAID THEY STARTED

16:26:24   1   TO BREAK DOWN.  IS THAT WHAT YOU MEANT WHEN YOU SAID IT STARTED

16:26:29   2   TO BREAK DOWN?

16:26:30   3   **A.**   THE NUMERICAL -- YES, I MEANT BY THAT THAT THE NUMERICAL

16:26:34   4   ANALYSIS WAS BECOMING UNSTABLE, THE CALCULATIONS WERE BREAKING

16:26:36   5   DOWN, NOT WORKING.

16:26:38   6   **Q.**   ALL RIGHT.  AND THAT'S WHEN YOU USED YOUR JUDGMENT AND

16:26:48   7   EXPERIENCE TO SAY THAT, YES, IT'S FEASIBLE THAT THERE -- IF THE

16:26:51   8   PRESSURES CONTINUED TO BUILD -- TO BUILD, THAT THE FORCE COULD

16:26:54   9   DEVELOP IN THE WALL AND THAT YOU COULD DEVELOP THE

16:26:55  10   500,000 POUNDS OF PRESSURE; RIGHT?

16:26:58  11   **A.**   WELL, I USED THE OBSERVATIONS OF THE FAILED SEGMENTS OF

16:27:00  12   THE WALL THAT WERE FLATTENED OUT THAT -- AND EXPONENT'S

16:27:04  13   DETERMINATION OF HOW MUCH FORCE IT REQUIRED TO CAUSE THOSE

16:27:07  14   FLATTENED SHEETS, THOSE SHEETS TO BE FLATTENED.

16:27:10  15   **Q.**   AND YOUR ASSUMPTION WAS THAT ALL THE FORCE WAS LATERAL;

16:27:14  16   THERE WAS NO UPLIFT?

16:27:15  17   **A.**   THE ONLY WAY TO FLATTEN THOSE SHEETS IS STRETCHING THEM IN

16:27:18  18   THE LATERAL DIRECTION.

16:27:20  19   **Q.**   I MAY HAVE ASKED THIS QUESTION.  AT THE SOUTH BREACH, IF

16:27:27  20   UPLIFT WAS A COMPONENT CAUSE OF THE FAILURE, WOULD CAUSE THE

16:27:33  21   SHEETS TO COME OUT OF THE GROUND AND ALLOW THEM TO BE SUBJECTED

16:27:40  22   TO FULL FORCE OF THE WATER SUCH THAT THEY COULD HAVE PUSHED IT

16:27:45  23   TO THE EAST 160 FEET; ISN'T THAT TRUE?

16:27:50  24   **A.**   I WOULD NOT EXPECT TO SEE AN UPLIFT FAILURE PRODUCE -- NO,

16:27:55  25   A FAILURE IN WHICH UPLIFT PRESSURES CAUSED A LATERAL

16:28:00   1   TRANSLATION -- IF THAT WAS THE FAILURE MODE, I WOULD NOT HAVE

16:28:04   2   EXPECTED TO SEE WHAT WE SEE IN THAT PHOTOGRAPH.

16:28:06   3   **Q.**   NOW, YOU TALK A LOT ABOUT CONCRETE BREAKING.  WHEN YOU

16:28:10   4   BEND CONCRETE, IT BREAKS, DOESN'T IT?

16:28:14   5   **A.**   YES.

16:28:14   6   **Q.**   AND THE BENDING OF THE CONCRETE COULD EASILY EXPLAIN THE

16:28:19   7   SPALLING ON THE -- THAT YOU SHOWED US IN THOSE PHOTOGRAPHS,

16:28:25   8   COULDN'T IT?

16:28:31   9   **A.**   BENDING DOES CAUSE CONCRETE TO -- TO FAIL IN TENSION ON

16:28:36  10   ONE SIDE, BUT NOT ON THE OTHER SIDE.  WE HAD EVIDENCES OF

16:28:41  11   FAILURE OF THE CONCRETE SPALLING ON BOTH SIDES, WHICH IS MORE

16:28:44  12   INDICATIVE OF IT BEING PULLED APART IN TENSION THAN BENT.

16:29:24  13             **MR. BRUNO:**  LET'S GO TO PX-4721-63.

16:29:27  14   **BY MR. BRUNO:**

16:29:39  15   **Q.**   HERE AGAIN YOU IDENTIFY WHAT YOU THINK ARE THE POTENTIAL

16:29:44  16   CAUSES OF THE NORTH BREACH.

16:29:46  17             **MR. BRUNO:**  CAN YOU HIGHLIGHT THE TOP SECTION?

16:29:47  18   **BY MR. BRUNO:**

16:29:48  19   **Q.**   AGAIN, THE BARGE, UNDERSEEPAGE, OVERTOPPING, GLOBAL

16:29:54  20   INSTABILITY AND STRUCTURAL FAILURE; RIGHT?

16:29:56  21   **A.**   YES, SIR.

16:29:56  22   **Q.**   ALL RIGHT.

16:29:56  23             **MR. BRUNO:**  AND LET'S GO TO PAGE 73.  I'M SORRY.

16:30:04  24   **BY MR. BRUNO:**

16:31:25  25   **Q.**   OVERTOPPING BY ITSELF DID NOT INITIATE THE FAILURE OF THE

16:31:27   1    WALL; IS THAT CORRECT?

16:31:28   2    **A.**   YES, SIR.

16:31:28   3    **Q.**   AND THAT'S YOUR OPINION TODAY?

16:31:29   4    **A.**   YES.

16:31:30   5    **Q.**   ALL RIGHT.  NOW, LET ME GO TO MARR 4.  IT'S A

16:31:53   6    DEMONSTRATIVE.  I WANT TO SEE IF I CAN UNDERSTAND THE PRESSURE

16:31:58   7    THAT YOU'RE TALKING ABOUT, THIS 500,000 POUNDS AND WHERE IT'S

16:32:03   8    COMING FROM.

16:32:03   9            THIS IS A DRAWING THAT WE GOT FROM MR. DUNBAR, I

16:32:08  10    THINK.  WHERE IS THIS PRESSURE BEING APPLIED THAT STRETCHES THE

16:32:16  11    SHEETS?

16:32:17  12    **A.**   DIRECTLY AGAINST THE WALL.

16:32:21  13    **Q.**   ALL RIGHT.  SO THERE'S PRESSURE HERE AT THE TOP OF THE

16:32:24  14    WALL?

16:32:24  15    **A.**   IT STARTS AT THE TOP OF THE WALL AND --

16:32:25  16    **Q.**   THERE'S PRESSURE HERE AT THE MIDDLE OF THE CONCRETE?

16:32:29  17    **A.**   YES.

16:32:30  18    **Q.**   AND THERE'S PRESSURE WHERE THE CONCRETE TOUCHES THE CROWN

16:32:34  19    OF THE LEVEE?

16:32:38  20    **A.**   YES.

16:32:38  21    **Q.**   AND THERE'S PRESSURE UNDERNEATH THE GROUND?

16:32:40  22    **A.**   YES.

16:32:41  23    **Q.**   AND THERE'S PRESSURE ALL THE WAY DOWN TO THE SHEET PILE

16:32:43  24    TIP; RIGHT?

16:32:45  25    **A.**   YES.

16:32:45    1    **Q.**   OKAY.  NOW, WHAT'S CONFUSING TO ME IS -- YOU KNOW THE

16:32:50    2    LAYOUT, IF YOU WILL, OF THE NORTH BREACH; RIGHT?  THERE'S

16:32:54    3    SURKOTE ROAD RIGHT NEXT TO WHERE THIS BREACH OCCURRED?

16:32:59    4    **A.**   YES.

16:33:00    5    **Q.**   AND THEN THERE'S THIS BIG MIXED FILL THING RIGHT NEXT TO

16:33:04    6    SURKOTE ROAD; RIGHT?

16:33:06    7    **A.**   YES.

16:33:06    8    **Q.**   OKAY.  SO IN ORDER FOR THE PRESSURES TO BE DEVELOPED

16:33:12    9    ACROSS -- I MEAN, THIS IS THE HORIZONTAL, BUT IT'S A CUTAWAY,

16:33:21    10   OBVIOUSLY, AND IT'S NOT THE SAME HORIZONTAL THAT WE TALKED

16:33:24    11   ABOUT EARLIER.

16:33:25    12        SO WHAT YOU'RE SAYING TO ME IS THIS PRESSURE IS BEING

16:33:28    13   TRANSMITTED THROUGH ALL OF THIS EARTH TO THE BOTTOM OF THAT

16:33:32    14   SHEET PILE TIP; IS THAT CORRECT?

16:33:36    15   **A.**   NO.

16:33:36    16   **Q.**   ALL RIGHT.  WELL, HOW -- HOW ARE WE GETTING PRESSURE FROM

16:33:40    17   THE BOTTOM TO THE TOP OF THIS WALL THEN?

16:33:44    18   **A.**   THERE ARE TWO TYPES OF PRESSURE, SOURCES OF PRESSURE THAT

16:33:47    19   ACT AGAINST THAT.  ONE IS WATER PRESSURE AND --

16:33:49    20   **Q.**   AND NEXT?

16:33:50    21   **A.**   -- THERE'S WATER PRESSURE ALL THE WAY FROM THE TOP OF THE

16:33:54    22   WATER IN THE CANAL ALL THE WAY TO THE BOTTOM OF THE SHEET PILE

16:33:58    23   WALL.  THE WATER PRESSURE CONTINUES ACTUALLY ALL THE WAY DOWN,

16:34:03    24   DEEP -- DEEPER, YES.

16:34:04    25        AND THEN THERE'S SOIL PRESSURE -- INITIALLY, THERE'S

| | | |
|---|---|---|
| 16:34:07 | 1 | SOIL PRESSURE FROM THE EARTH ITSELF PRESSING AGAINST THE |
| 16:34:12 | 2 | CONCRETE AND AGAINST THE SHEETING. |
| 16:34:18 | 3 | **Q.**   ALL RIGHT.  LET ME UNDERSTAND THE WATER PRESSURE FIRST. |
| 16:34:22 | 4 | ARE YOU SAYING THAT THIS LEVEE FILL IS SATURATED WITH |
| 16:34:25 | 5 | WATER? |
| 16:34:25 | 6 | **A.**   YES, ESSENTIALLY SATURATED WITH WATER, YES. |
| 16:34:29 | 7 | **Q.**   AND THE CLAY AND THE ORGANIC CLAY, THAT'S ALSO SATURATED |
| 16:34:34 | 8 | WITH WATER? |
| 16:34:36 | 9 | **A.**   YES. |
| 16:34:36 | 10 | **Q.**   AND THE MIXED FILL IS SATURATED WITH WATER? |
| 16:34:37 | 11 | **A.**   YES. |
| 16:34:38 | 12 | **Q.**   IT'S FULLY SATURATED? |
| 16:34:39 | 13 | **A.**   YES. |
| 16:34:39 | 14 | **Q.**   ALL RIGHT.  AND SO THAT IS WHAT ALLOWS THIS PRESSURE TO BE |
| 16:34:44 | 15 | BROUGHT THIS WAY; RIGHT? |
| 16:34:45 | 16 | **A.**   NO, IT'S NOT BRINGING IT.  WE DON'T NEED ANY FLOW.  IT'S |
| 16:34:49 | 17 | JUST THE NATURE OF THE WEIGHT OF WATER FROM BELOW THE WATER |
| 16:34:55 | 18 | SURFACE EXERTING PRESSURE, AND THAT WATER PRESSURE INCREASES AS |
| 16:35:02 | 19 | YOU GO DEEPER. |
| 16:35:04 | 20 | JUST LIKE WHEN YOU DIVE INTO A SWIMMING POOL, YOU |
| 16:35:07 | 21 | KNOW, THE FIRST FEET YOU'RE DOWN, YOU DON'T FEEL ANY PRESSURE |
| 16:35:09 | 22 | ON YOUR EARS, BUT WHEN YOU GET TO 10 TO 12 FEET, YOU FEEL THE |
| 16:35:13 | 23 | PRESSURE.  THE PRESSURE'S INCREASING WITH DEPTH. |
| 16:35:15 | 24 | **Q.**   SO WE HAVE PRESSURE WITHOUT FLOW? |
| 16:35:17 | 25 | **A.**   THAT'S CORRECT.  IN FACT, THAT'S A VERY GOOD EXAMPLE.  IN |

16:35:20   1   A SWIMMING POOL OR EVEN WHEN YOU DIVE INTO THE OCEAN, THE

16:35:24   2   DEEPER YOU GO, THE HIGHER THE PRESSURE, BUT THERE IS NOT FLOW

16:35:28   3   OCCURRING FROM A POINT OF LOW PRESSURE TO HIGH PRESSURE.

16:35:34   4   **Q.**   SO IS THE PRESSURE EQUAL FROM THE TOP TO THE BOTTOM, THAT

16:35:38   5   IS, THESE -- I'M GOING TO CALL THEM LATERAL AGAIN BECAUSE IT'S

16:35:43   6   A CUTAWAY -- IS IT EQUAL FROM TOP TO BOTTOM?

16:35:47   7   **A.**   NO.

16:35:48   8   **Q.**   WHERE IS IT THE HIGHEST?

16:35:48   9   **A.**   AT THE BOTTOM.

16:35:49  10   **Q.**   AT THE BOTTOM.  THAT'S WHERE MOST OF YOUR PRESSURE IS

16:35:52  11   COMING FROM?

16:35:53  12   **A.**   THE PRESSURE IS THE HIGHEST AT THE BOTTOM OF THE WALL.

16:35:56  13   IT'S ZERO AT THE TOP OF THE WALL, ASSUMING THE WATER IS RIGHT

16:36:00  14   AT THE TOP OF THE WALL -- THE WATER SURFACE IS RIGHT AT THE TOP

16:36:02  15   OF THE WALL.

16:36:04  16   **Q.**   BECAUSE THERE'S NO PRESSURE ABOVE THE TOP OF THE WALL;

16:36:07  17   RIGHT?

16:36:09  18   **A.**   WELL, ASSUMING WATER'S NOT GOING OVER IT.  IF THE WATER

16:36:12  19   WAS GOING OVER THE TOP OF THE WALL, THERE WOULD BE SOME WATER

16:36:15  20   PRESSURE RIGHT AT THE TOP OF THE WALL.

16:36:17  21   **Q.**   OKAY.  ALL RIGHT.  AND THAT PRESSURE WE HAVEN'T MEASURED.

16:36:21  22   WE DON'T KNOW HOW MUCH FORCE THAT IS; CORRECT?

16:36:25  23   **A.**   NO, BUT THAT'S ONE OF THE THINGS WE CAN CALCULATE WITH

16:36:28  24   REASONABLE CERTAINTY.

16:36:29  25   **Q.**   BUT WE DIDN'T DO THAT?

| | | |
|---|---|---|
| 16:36:31 | 1 | **A.**  I HAVE, YES. |
| 16:36:32 | 2 | **Q.**  I THOUGHT I ASKED YOU THAT JUST A FEW MOMENTS AGO, HOW DID |
| 16:36:36 | 3 | YOU DEVELOP ENOUGH PRESSURE, ENOUGH FORCE TO GET TO |
| 16:36:38 | 4 | 500,000 POUNDS?  YOU SAID TO ME YOU DIDN'T DO IT. |
| 16:36:43 | 5 | **A.**  NO, I BELIEVE I SAID THAT I DID NOT CALCULATE THE -- I DID |
| 16:36:49 | 6 | NOT MAKE A CALCULATION OF WHAT THE WATER AND SOIL PRESSURES |
| 16:36:53 | 7 | WERE AGAINST THE WALL AT THE EXACT TIME OF THE FAILURE. |
| 16:37:06 | 8 | **Q.**  WELL, WOULDN'T THAT BE THE MOST RELEVANT PRESSURE TO |
| 16:37:10 | 9 | CALCULATE? |
| 16:37:13 | 10 | **A.**  IT'S MORE COMPLICATED THAN THAT.  BECAUSE THE -- EVEN IF I |
| 16:37:17 | 11 | KNOW THE PRESSURE ACTING AGAINST THE WALL, I CANNOT DIRECTLY |
| 16:37:24 | 12 | CALCULATE THE HORIZONTAL FORCE THAT'S ACTING IN THE WALL.  IT'S |
| 16:37:30 | 13 | NOT A SIMPLE ONE-TO-ONE COMPARISON. |
| 16:37:35 | 14 | **Q.**  ALL RIGHT.  NOW, IF THERE ARE HOLES HERE OR FURTHER OUT -- |
| 16:37:46 | 15 | **THE COURT:**  EXCUSE ME, I'M SORRY. |
| 16:37:46 | 16 | **BY MR. BRUNO:** |
| 16:37:46 | 17 | **Q.**  -- AND WE HAVE WATER, ISN'T THERE PRESSURE BEING APPLIED |
| 16:37:52 | 18 | DOWNWARD BY THE WEIGHT OF THE WATER? |
| 16:37:54 | 19 | **A.**  YES. |
| 16:37:54 | 20 | **Q.**  AND IF WE HAVE A HOLE WHICH IS MORE POROUS THAN THE SOIL |
| 16:38:02 | 21 | SURROUNDING IT, DON'T WE HAVE MORE TRANSMISSION OF PRESSURE |
| 16:38:05 | 22 | THROUGH THE HOLE THAT IS LESS WELL COMPACTED THAN THE AREA |
| 16:38:12 | 23 | AROUND IT? |
| 16:38:13 | 24 | **A.**  NO, SIR. |
| 16:38:13 | 25 | **Q.**  WE DON'T.  IT'S THE SAME PRESSURE? |

16:38:15   1   **A.**   SAME PRESSURE, YES.

16:38:17   2   **Q.**   OKAY.  IF WE HAVE WATER MOVING THROUGH THOSE SOILS,

16:38:22   3   THROUGH THE HOLE, CAN THE WATER, WHEN IT GETS TO THE BOTTOM OF

16:38:27   4   THE HOLE, HAVE ANY IMPACT ON THE PRESSURE DOWN HERE IN THIS

16:38:34   5   CLAY AND ORGANIC CLAY LAYERS?

16:38:44   6   **A.**   IT WOULD DEPEND ON THE CIRCUMSTANCES.  JUST AS YOU'VE SET

16:38:52   7   IT UP THERE, JUST YOU'VE GOT WATER STANDING IN THE CANAL, AND

16:38:56   8   WE CREATE -- CREATE A HOLE THAT TRANSMITS WATER DOWN TO THE

16:39:03   9   ORGANIC CLAY, THE PRESENCE OF THE HOLE WOULD NOT CHANGE THE

16:39:06   10   PRESSURE, WOULD NOT AFFECT THE PRESSURE.

16:39:08   11   **Q.**   ALL RIGHT.  NOW, YOU REPORTED THAT THERE WAS A WELD IN THE

16:39:18   12   SHEET THAT ULTIMATELY ENDED UP TEARING; IS THAT CORRECT?

16:39:23   13   **A.**   YES.

16:39:24   14   **Q.**   DID THAT WELD PLAY ANY ROLE IN THE FAILURE OF THE WALL?

16:39:29   15   **A.**   ONLY IN THAT IT SERVED AS A POINT OF WEAKNESS WHERE THE

16:39:33   16   SHEET STARTED TO TEAR.

16:39:35   17   **Q.**   ALL RIGHT.  IT DIDN'T CAUSE THE TEAR, DID IT?

16:39:37   18   **A.**   I DON'T BELIEVE IT DID, NO.

16:39:39   19   **Q.**   ALL RIGHT.  NOW, HAVE YOU COMPARED OR HAVE YOU DISCUSSED

16:39:42   20   WITH DR. SILVA-TULLA YOUR THEORY OF WHAT CAUSED THE NORTH

16:39:49   21   BREACH TO OCCUR?

16:39:51   22   **A.**   YES.

16:39:51   23   **Q.**   AND DO YOU AND HE HAVE THE SAME OPINION AS TO THE CAUSE OF

16:39:55   24   FAILURE OF THE NORTH BREACH?

16:39:56   25   **A.**   I BELIEVE THAT MY UNDERSTANDING IS HIS VIEW IS THAT THE --

16:40:01   1   THAT THE -- THE NORTH BREACH WALL FAILED BY OVERTURNING.

16:40:11   2   **Q.**   WHICH WAS INITIATED BY OVERTOPPING; ISN'T THAT TRUE?

16:40:17   3   **A.**   BY WAVES AND -- I BELIEVE IT'S BY WAVES -- WELL, SCOUR

16:40:21   4   CAUSED BY WATER FLOWING OVER THE TOP OF THE WALL.

16:40:24   5   **Q.**   OKAY.  SO YOU AND HE DON'T AGREE?

16:40:27   6   **A.**   WELL, I THINK WE DO; IT'S JUST I HAVE A LITTLE MORE DETAIL

16:40:29   7   TO IT THAN HE DOES.

16:40:30   8   **Q.**   ALL RIGHT.  WELL, I'M SORRY.  I THOUGHT WE JUST

16:40:32   9   ESTABLISHED A FEW MOMENTS AGO THAT YOU DID NOT BELIEVE THAT

16:40:36   10  OVERTOPPING SCOUR PLAYED A ROLE IN THE NORTH BREACH.  I JUST

16:40:39   11  SHOWED YOU -- I'LL DO IT AGAIN IF YOU'D LIKE.

16:40:40   12  **A.**   WELL, I THINK WHAT I'VE BEEN TRYING TO SAY IS THAT THE --

16:40:43   13  WHAT I'VE SAID IS THAT THE FAILURE -- THE FIRST PART OF THE

16:40:47   14  FAILURE, THE INITIATION OF THE FAILURE WAS A LOW FACTOR OF

16:40:53   15  SAFETY THAT CAUSED A STRUCTURAL FAILURE OF THE WALL AND THAT

16:40:57   16  WAS THEN FOLLOWED BY SCOUR, WATER FLOWING THROUGH THE WALL AND

16:41:03   17  THEN WITH A LITTLE MORE TIME OVER THE TOP OF THE WALL, SCOURING

16:41:07   18  AWAY AND RESULTING, THEN, IN OVERTURNING FAILURES THAT

16:41:11   19  PROPAGATED TO THE SOUTH.

16:41:12   20  **Q.**   DR. MARR, I'M REALLY NOT TRYING TO MAKE THIS DIFFICULT.

16:41:15   21  I'M TRYING TO GET OUT OF HERE.  I THOUGHT WE -- AFTER THIS

16:41:17   22  WHOLE DAY, DO WE NOT UNDERSTAND THE DIFFERENCE BETWEEN

16:41:20   23  OVERTOPPING AND THE SCOURING CAUSED BY OVERTOPPING AND SCOUR

16:41:22   24  THAT'S CAUSED BY WATER GOING THROUGH THE WALL YET?  DO WE

16:41:27   25  UNDERSTAND THE DIFFERENCE BETWEEN THOSE TWO THINGS?

16:41:29   1              **MR. TREEBY:**  YOUR HONOR, PLEASE, THAT'S

16:41:30   2    ARGUMENTATIVE.

16:41:31   3              **THE COURT:**  I'M GOING TO ALLOW THE QUESTION BECAUSE

16:41:33   4    THE COURT IS A BIT CONFOUNDED BY THIS LINE -- BY THIS -- I WANT

16:41:36   5    TO GET THIS STRAIGHT.  NOT THAT IT MAKES A HECK OF A LOT OF

16:41:44   6    DIFFERENCE IN THE GRAND SCHEME OF THINGS, BUT FOR ME IT DOES

16:41:47   7    AND WHEREVER IT GOES FROM HERE, GOD KNOWS.

16:41:51   8              BUT I GUESS IN YOUR -- IN THE REPORTS THAT YOU

16:41:53   9    RENDERED, IT'S MY UNDERSTANDING, AND IN THE DEMONSTRATIONS YOU

16:41:57  10    GAVE HERE, IT APPEARED TO ME THAT YOU REGARDED THE PRINCIPAL

16:42:01  11    MODE OF FAILURE OF THE NORTH BREACH TO BE, ONE -- WHICH I THINK

16:42:06  12    I UNDERSTOOD -- THE INHERENT GLOBAL INSTABILITY THAT WAS THERE,

16:42:10  13    THAT WAS EXACERBATED BY THE STRUCTURAL PROBLEMS THAT EXISTED.

16:42:23  14              AND, OF COURSE, THE WATER -- WITHOUT THE WATER,

16:42:26  15    NONE OF THIS WOULD HAVE HAPPENED, I UNDERSTAND THAT.  BUT THAT

16:42:30  16    THE PRINCIPAL CAUSE -- THAT YOU FOUND THOSE TO BE THE PRINCIPAL

16:42:36  17    ELEMENTS IN THE FAILURE OF THE NORTH BREACH.

16:42:38  18              THAT WAS MY UNDERSTANDING.

16:42:39  19              **THE WITNESS:**  THAT'S CORRECT, YOUR HONOR.

16:42:40  20              **THE COURT:**  OKAY.

16:42:42  21    **BY MR. BRUNO:**

16:42:42  22    **Q.**  ALL RIGHT.  AND YOU DISCOUNTED SCOUR FROM OVERTOPPING,

16:42:47  23    DIDN'T YOU?

16:42:48  24    **A.**  AT THAT TIME, YES.  THERE HAD NOT BEEN MUCH SCOUR AT THAT

16:42:51  25    POINT.

16:42:52   1   **Q.**   DR. SILVA-TULLA, ON THE OTHER HAND, HAS OPINED THAT THE

16:42:56   2   INITIAL BREAK WAS CAUSED BY OVERTOPPING SCOUR; ISN'T THAT TRUE?

16:43:01   3   **A.**   I'M NOT SURE IF HE USED THE WORD "INITIAL."   I KNOW THAT

16:43:06   4   HE -- HIS -- SCOUR OVERTOPPING AND SCOUR IS PART OF HIS

16:43:10   5   OPINION.

16:43:11   6           **THE COURT:**   WE CAN BRING THAT BEST UP TO

16:43:15   7   DR. SILVA-TULLA.

16:43:18   8           **MR. BRUNO:**   THAT'S FINE.

16:43:18   9           **THE COURT:**   UNLESS YOU FIND IT ESSENTIAL TO -- I'M

16:43:20  10   NOT TRYING TO SAY YOU CAN'T.

16:43:22  11           **MR. BRUNO:**   NO, NO, THAT'S FINE, JUDGE.   I

16:43:25  12   UNDERSTAND.

16:43:25  13   **BY MR. BRUNO:**

16:43:26  14   **Q.**   SO DOES DR. SILVA-TULLA AGREE WITH YOU THAT THE WALL BROKE

16:43:31  15   FROM THIS PRESSURE THAT YOU'VE DESCRIBED THAT CAUSED THE

16:43:36  16   500,000 POUNDS OF TENSILE FORCE TO PULL THE --

16:43:46  17           **THE COURT:**   MR. TREEBY.

16:43:47  18           **MR. TREEBY:**   YOUR HONOR, PLEASE.   I THINK YOUR

16:43:48  19   HONOR'S RIGHT.   HE CAN ASK THIS -- HE SHOULD ASK THIS WITNESS

16:43:52  20   EVERYTHING THAT HE BASED HIS OPINION ON, BUT WE HAVEN'T HEARD

16:43:55  21   DR. SILVA-TULLA YET, AND I THINK HE'S THE RIGHT ONE TO ASK THIS

16:43:58  22   KIND OF QUESTION AFTER DR. MARR HAS EXPRESSED HIS OPINION.

16:44:02  23           BUT I UNDERSTAND THERE'S A SLIGHT BIT OF

16:44:06  24   RELEVANCE HERE, BUT --

16:44:06  25           **THE COURT:**   I DO UNDERSTAND THAT THE PRINCIPAL

16:44:08   1   WITNESS IS GOING TO BE DR. SILVA-TULLA.  WHETHER

16:44:12   2   DR. SILVA-TULLA AGREES WITH HIM OR NOT, I GUESS, IS GOING TO BE

16:44:15   3   LAID OUT IN HIS REPORT AND HOPEFULLY DISCUSSED.

16:44:18   4            **MR. BRUNO:**  EXCEPT FOR THE FACT THAT THIS WITNESS AND

16:44:20   5   DR. SILVA-TULLA MAY HAVE DIFFERENCES OF OPINION WITH REGARD TO

16:44:22   6   THE FAILURE THAT WOULD BE EXTREMELY RELEVANT AS TO THIS COURT'S

16:44:27   7   UNDERSTANDING AS TO WHAT CAUSED THE NORTH BREACH TO FAIL.

16:44:30   8            IF MR. A HAS OPINION A AND MR. B HAS OPINION B,

16:44:36   9   I WOULD THINK THAT WOULD BE RELEVANT FOR THE COURT TO HEAR.

16:44:38  10            **THE COURT:**  I AGREE.  AND WE'RE GOING TO FIND THAT

16:44:39  11   OUT.

16:44:40  12            **MR. BRUNO:**  AND I'M ASCERTAINING OF THIS WITNESS -- I

16:44:42  13   HEARD THIS WITNESS TALK FOR TWO DAYS ABOUT HIS OPINIONS OF

16:44:45  14   DR. BEA.  AND I DON'T KNOW WHAT THE DIFFERENCE IS BETWEEN HIM

16:44:48  15   GIVING HIS OPINION ABOUT DR. BEA AND HIM GIVING HIS OPINIONS

16:44:52  16   ABOUT ANY OTHER PERSON WHO HAS AN OPINION IN THE CASE.

16:44:56  17            INDEED, WHEN HE STARTS HIS REPORT HE SAYS, THESE

16:44:59  18   ARE THE THINGS I CONSIDERED AND REJECTED.  IT GOES TO HIS

16:45:04  19   CREDIBILITY.  IT GOES TO --

16:45:06  20            **THE COURT:**  GOES TO WHOSE CREDIBILITY?  I'M SORRY.

16:45:09  21            **MR. BRUNO:**  HIS CREDIBILITY.  IT ALSO GOES TO --

16:45:12  22   BECAUSE IN HIS REPORT HE SAYS, I UNDERTOOK TO EVALUATE ALL OF

16:45:17  23   THE THEORIES OF CAUSATION.

16:45:21  24            **THE COURT:**  WELL, I THINK I'VE GOT HIS THEORY OF

16:45:24  25   CAUSATION AS WELL AS I CAN UNDERSTAND IT.

```
16:45:25   1              MR. BRUNO:  I UNDERSTAND THAT.

16:45:27   2              THE COURT:  AS I -- I HAVE HIS THEORY, AND YOU CAN

16:45:33   3   DEVELOP A --

16:45:34   4              MR. BRUNO:  WE'LL MOVE ON, JUDGE.

16:45:36   5              THE COURT:  -- DR. SILVA-TULLA AS TO WHETHER HE

16:45:39   6   THINKS THE INITIATING CAUSE WAS -- OR THE ONLY CAUSE WAS SCOUR.

16:45:42   7   BY MR. BRUNO:

16:45:42   8   Q.  IN YOUR CASE, THOUGH, WE'VE ESTABLISHED OVERTURNING

16:45:45   9   SCOUR -- OVERTOPPING SCOUR DID NOT INITIATE THE FAILURE OF THE

16:45:48  10   NORTH BREACH; RIGHT?

16:45:49  11   A.  YES, SIR.

16:45:49  12   Q.  IT'S THE PRESSURE.

16:45:51  13        ALL RIGHT.  THE PRESSURE CAUSED THE WALL TO MOVE;

16:45:55  14   RIGHT?

16:45:55  15   A.  YES, SIR.

16:45:55  16   Q.  AND YOU HAVE A NICE LITTLE DEMONSTRATION OF THAT AT

16:46:03  17   PAGE 87 OF YOUR REPORT.

16:46:06  18              MR. BRUNO:  IF WE CAN BRING THAT UP.  DO YOU NEED A

16:46:28  19   NUMBER?  PX-4701, PAGE 87.  87.  THAT'S NOT THE RIGHT PX

16:47:21  20   NUMBER.  IT'S DR. MARR'S REPORT.

16:47:32  21              MR. TREEBY:  IT WOULD BE JX, IT WOULDN'T BE PX.

16:47:43  22              MR. BRUNO:  4721.  IT'S 4721.  OKAY.  THERE WE GO.

16:47:53  23   CAN WE BLOW THAT UP?

16:47:55  24   BY MR. BRUNO:

16:47:55  25   Q.  ALL RIGHT.  HERE YOU DEMONSTRATE THE FORCES.  AND AS I
```

16:48:00   1   UNDERSTAND WHAT YOU'VE DONE HERE, THE RED IS WHERE -- IS MOST

16:48:04   2   OF THE FORCE, AND AS IT GETS A LIGHTER COLOR, IT'S LESS FORCE.

16:48:08   3   RIGHT?

16:48:08   4   **A.**   WELL, ACTUALLY THIS IS NOT FORCE, THIS IS DISPLACEMENT.

16:48:12   5   **Q.**   MOVEMENT?

16:48:12   6   **A.**   MOVEMENT, YES, SIR.

16:48:14   7   **Q.**   ALL RIGHT.  SO THE WALL'S MOVING MORE AS YOU GET AWAY FROM

16:48:18   8   WHERE THE JOINT IS; RIGHT?

16:48:28   9   **A.**   IN TERMS OF -- IN TERMS OF TOTAL MOVEMENT, THAT'S CORRECT.

16:48:31  10   **Q.**   TOTAL MOVEMENT?

16:48:32  11   **A.**   YES.

16:48:33  12   **Q.**   IN FACT, WHAT WE SEE HERE IS MUCH LIKE WHAT WE WOULD SEE

16:48:36  13   WITH REGARD TO A DOOR AND A DOOR HINGE.  THE DOOR, WHERE IT'S

16:48:43  14   HINGED, IS STRONGER THAN THE DOOR THAT YOU OPEN TO PASS THROUGH

16:48:48  15   THE SPACE; RIGHT?

16:48:48  16   **A.**   WELL, I DON'T THINK THAT ANALOGY IS REALLY APPROPRIATE

16:48:52  17   HERE.  IT'S MORE LIKE WHEN I TAKE THIS PAD OF PAPER AND I FORCE

16:48:56  18   ONE PIECE OF IT TO MOVE RELATIVE TO THE OTHER, THE MOST INTENSE

16:49:01  19   STRESSES ARE WHERE THE DIFFERENCES OCCUR, NOT WHERE THE

16:49:03  20   MOVEMENT IS THE LARGEST.

16:49:05  21   **Q.**   OKAY.  SO -- AND THAT COULD COME FROM HYDROSTATIC UPLIFT

16:49:11  22   AS WELL; ISN'T THAT TRUE?

16:49:27  23   **A.**   THE -- IF THERE WAS UPLIFT PRESSURES, THE WALL COULD MOVE

16:49:31  24   TOWARDS THE LAND ALSO.

16:49:39  25   **Q.**   OKAY.  AND IN YOUR DEPOSITION YOU SAID THAT'S A

16:49:40   1   POSSIBILITY, BUT IN FAIRNESS TO YOU, YOU SAID, I DON'T THINK

16:49:41   2   THAT HAPPENED; RIGHT?

16:49:42   3   **A.**   YES.  I DON'T THINK THAT THE -- THE UPLIFT PRESSURES NEVER

16:49:45   4   DEVELOPED, AND SO THE FACTOR OF SAFETY FOR THAT MODE OF FAILURE

16:49:47   5   WAS HIGH ENOUGH THAT MOVEMENTS WOULD NOT HAVE OCCURRED BY THAT

16:49:51   6   MEANS.

16:49:51   7   **Q.**   AND YOU DIDN'T EVALUATE HYDROSTATIC PRESSURE AT ALL, DID

16:49:57   8   YOU?

16:49:58   9   **A.**   I DID.  DO YOU MEAN UPLIFT PRESSURE?  I'M SORRY, JUST SO

16:50:04   10  WE'RE SURE, UPLIFT PRESSURES?

16:50:05   11  **Q.**   I'M SORRY?

16:50:06   12  **A.**   WE'RE TALKING ABOUT UPLIFT PRESSURES, RIGHT, IN YOUR

16:50:09   13  QUESTION?

16:50:10   14  **Q.**   YES.

16:50:37   15          I'M SORRY.  YOU DIDN'T DO ANY HYDRAULIC CONDUCTIVITY

16:50:42   16  SEEPAGE ANALYSIS; ISN'T THAT TRUE?

16:50:44   17  **A.**   THAT'S NOT TRUE.  I DID.

16:50:48   18          **MR. BRUNO:**  COULD WE GO TO PAGE 4438, PAGE 97, OF THE

16:50:55   19  DEPOSITION?  MAYBE I'M READING THIS WRONG.  I'M SURE I AM.

16:51:07   20  **BY MR. BRUNO:**

16:51:08   21  **Q.**   "IN ANY EVENT, WHATEVER YOU ARE, DR. MARR, YOUR HYDRAULIC

16:51:13   22  CONDUCTIVITY SEEPAGE ANALYSIS HAVE LED YOU TO CONCLUDE THAT

16:51:18   23  THERE ARE NO SIGNIFICANT SEEPAGE OR HYDRAULIC UPLIFT PRESSURE

16:51:21   24  EFFECTS THAT WERE IMPORTANT IN THE CAUSATION OF EITHER THE

16:51:25   25  NORTH OR SOUTH BREACH.  CORRECT?"

16:51:27   1                AND YOUR ANSWER:  "I DIDN'T DO HYDRAULIC CONDUCTIVITY

16:51:30   2    SEEPAGE ANALYSES."

16:51:32   3                THAT'S WHAT YOU SAID?

16:51:34   4    **A.**   CAN I EXPLAIN THE DIFFERENCE?

16:51:36   5    **Q.**   YOU CAN, ABSOLUTELY.

16:51:37   6    **A.**   MY ANSWER TO THIS QUESTION IS THAT THERE IS NO SUCH THING

16:51:39   7    KNOWN TO US AS HYDRAULIC CONDUCTIVITY SEEPAGE ANALYSIS.  WHAT

16:51:42   8    WE DID WAS FLOW ANALYSIS.  AND WHAT I JUST ANSWERED YOUR

16:51:47   9    QUESTION A COUPLE OF MINUTES -- YOU KNOW, A COUPLE OF QUESTIONS

16:51:52  10    AGO WAS THAT I DID FLOW ANALYSES TO DETERMINE THE EXTENT AND

16:51:54  11    MAGNITUDE OF UPLIFT PRESSURES, AND THOSE ANALYSES TOLD ME THAT

16:51:58  12    THERE WAS NOT ENOUGH TIME FOR SIGNIFICANT UPLIFT PRESSURES TO

16:52:02  13    DEVELOP DURING THE STORM.

16:52:08  14    **Q.**   DID YOU UTILIZE OR DID YOU DO ANY OF THE ANALYSES THAT ARE

16:52:12  15    OUTLINED IN THE UNITED STATES ARMY CORPS OF ENGINEERS

16:52:16  16    ENGINEERING MANUAL FOR SEEPAGE ANALYSIS AND CONTROL FOR DAMS?

16:52:22  17    **A.**   I DON'T QUITE UNDERSTAND THE QUESTION.  IT'S A LITTLE

16:52:24  18    AMBIGUOUS.

16:52:25  19    **Q.**   WELL, THERE IS AN ENGINEERING MANUAL.

16:52:29  20                **MR. BRUNO:**  CALL UP JX-41-1.  CAN YOU BLOW THAT UP?

16:52:50  21    **BY MR. BRUNO:**

16:52:51  22    **Q.**   HAVE YOU SEEN THIS?

16:52:52  23    **A.**   YES, SIR.  I'M FAMILIAR WITH THIS MANUAL.

16:52:55  24    **Q.**   ALL RIGHT.  AND DID YOU UTILIZE ANY OF THE FORMULAS THAT

16:52:58  25    ARE OUTLINED IN THIS MANUAL IN CONNECTION WITH YOUR STUDIES OF

| | | |
|---|---|---|
| 16:53:01 | 1 | THE NORTH AND SOUTH BREACH? |
| 16:53:02 | 2 | **A.**   YES. |
| 16:53:03 | 3 | **Q.**   OKAY. |
| 16:53:03 | 4 | **MR. BRUNO:**  COULD WE GO TO PAGE 62? |
| 16:53:15 | 5 | **BY MR. BRUNO:** |
| 16:53:15 | 6 | **Q.**   DO YOU SEE HERE THE BASIS OF LAPLACE'S EQUATION RIGHT |
| 16:53:19 | 7 | THERE? |
| 16:53:22 | 8 | **A.**   I'M HAVING A HARD TIME SEEING IT.  I'M SORRY. |
| 16:53:25 | 9 | **Q.**   OKAY.  HOW ABOUT THAT? |
| 16:53:29 | 10 | **A.**   I CAN READ THAT. |
| 16:53:31 | 11 | **Q.**   OKAY.  YOU CAN SEE HERE WHERE:  "THE DEVELOPMENT OF |
| 16:53:35 | 12 | LAPLACE'S EQUATION DEPENDS ON SIX ASSUMPTIONS."  DO YOU SEE |
| 16:53:40 | 13 | THAT? |
| 16:53:40 | 14 | **A.**   YES. |
| 16:53:41 | 15 | **Q.**   ONE OF THEM SAYS:  "WATER IS INCOMPRESSIBLE"? |
| 16:53:45 | 16 | **A.**   YES. |
| 16:53:45 | 17 | **Q.**   AND THEN THE OTHER ONE SAYS:  "VOLUME OF VOIDS DOES NOT |
| 16:53:48 | 18 | CHANGE, SOIL IS INCOMPRESSIBLE"? |
| 16:53:50 | 19 | **A.**   THAT'S TRUE FOR LAPLACE'S EQUATION, WHICH IS, AS I SHOWED |
| 16:53:54 | 20 | THIS MORNING, IS THE FLOW EQUATION FOR STEADY-STATE FLOW. |
| 16:54:00 | 21 | **Q.**   UNDERSTOOD.  SIMPLE QUESTION:  DID YOU USE THIS ANALYSIS? |
| 16:54:03 | 22 | **A.**   I USED THIS -- YES.  I USED THIS ANALYSIS FOR THE RESULTS |
| 16:54:05 | 23 | I SHOW FOR STEADY-STATE FLOW. |
| 16:54:08 | 24 | **Q.**   OKAY. |
| 16:54:20 | 25 | **MR. BRUNO:**  NOW, JUST AS A QUICK ASIDE, GO BACK TO |

16:54:24   1   PAGE -- GO BACK TO THE REPORT, WHICH -- THE REPORT, PX-4721,

16:54:38   2   PAGE 88.

16:54:44   3   **BY MR. BRUNO:**

16:54:45   4   **Q.**   WE'RE JUMPING AROUND A LITTLE BIT, BUT I WANTED TO COVER

16:54:48   5   TOTAL MOVEMENT.

16:54:48   6            **MR. BRUNO:**   THIS SPOT HERE.   THIS PART, THE LAST

16:54:53   7   PARAGRAPH.

16:54:53   8   **BY MR. BRUNO:**

16:54:54   9   **Q.**   IT SAYS:   "WHILE A WAVE OF WATER 20 FEET HIGH TRAVELING

16:54:57  10   DOWN THE CANAL SEEMS UNLIKELY, IT IS POSSIBLE THAT A SOLITARY

16:55:01  11   WAVE SEVERAL FEET IN HEIGHT DEVELOPED AND MOVED DOWN THE CANAL.

16:55:05  12   THIS WAS THE MOST INTENSE TIME OF THE STORM IN THE AREA.

16:55:08  13            "IF SUCH A WAVE OCCURRED, IT WOULD HAVE INCREASED THE

16:55:12  14   HORIZONTAL FORCE IN THE FLOODWALL AND HELPED TRIGGER THE WALL

16:55:15  15   FAILURE.   HOWEVER, THE COMPUTED FORCES IN THE WALL ARE

16:55:18  16   SUFFICIENT TO TRIGGER THE FAILURE WITHOUT THIS ADDITIONAL WAVE

16:55:22  17   FORCE."

16:55:23  18            WHY DID YOU PUT THAT IN THERE?

16:55:25  19   **A.**   I WAS JUST TRYING TO BE COMPLETE, AND I WAS -- HAD USED --

16:55:28  20   HAD NOTED MR. VILLAVASO'S OBSERVATIONS, AND THAT WAS ONE OF HIS

16:55:33  21   OBSERVATIONS.   AND I FELT I WOULD BE REMISS TO NOT AT LEAST SAY

16:55:38  22   SOMETHING ABOUT IT.

16:55:39  23   **Q.**   WERE YOU CONCERNED THAT YOU WERE NOT ABLE TO DEVELOP

16:55:41  24   ENOUGH FORCE ON THAT WALL TO GET TO THAT 500,000 POUNDS OF

16:55:47  25   PRESSURE?   IS THAT WHY YOU FELT LIKE YOU NEEDED TO ADD THAT

| | | |
|---|---|---|
| 16:55:50 | 1 | 20-FOOT WAVE? |
| 16:55:51 | 2 | **A.**  NOT AT ALL. |
| 16:55:52 | 3 | **Q.**  IS THAT THE -- |
| 16:55:52 | 4 | **A.**  NOT AT ALL.  I HAD NO CONCERNS.  AS I TRIED TO DESCRIBE |
| 16:55:57 | 5 | THE THREE-DIMENSIONAL ANALYSES WE WERE DOING, IT WAS TELLING ME |
| 16:56:01 | 6 | ENOUGH TO CONFIRM THAT THE WALL WAS EXPERIENCING LARGE TENSILE |
| 16:56:04 | 7 | FORCES, ENOUGH TO STRETCH THEM OUT, AS THEY WERE OBSERVED TO |
| 16:56:07 | 8 | HAVE BEEN STRETCHED. |
| 16:56:09 | 9 | **Q.**  JUST IN TERMS OF CONTEXT, THOUGH, THAT'S WHAT YOU'RE |
| 16:56:13 | 10 | REFERRING TO; RIGHT?  THE WAVE WOULD HAVE INCREASED THE |
| 16:56:16 | 11 | HORIZONTAL FORCE? |
| 16:56:17 | 12 | **A.**  IT'S KIND OF LIKE THE -- THE STRAW -- YOU KNOW, ONE MORE |
| 16:56:21 | 13 | STRAW ADDED TO THE CAMEL AS A POTENTIAL FACTOR. |
| 16:56:23 | 14 | I COULDN'T -- I COULDN'T BE -- I COULDN'T DETERMINE |
| 16:56:25 | 15 | WHETHER MR. VILLAVASO SAW THAT OR NOT.  I JUST WAS TRYING TO |
| 16:56:29 | 16 | SAY IF IT DID OCCUR, IT WOULD HAVE PUT MORE FORCE ON THE WALL |
| 16:56:33 | 17 | AND WOULD HAVE CONTRIBUTED. |
| 16:56:35 | 18 | **Q.**  ALL RIGHT.  NOW, LET'S GO TO PAGE 114 OF THE REPORT.  THIS |
| 16:56:43 | 19 | IS WHERE YOU TALK ABOUT THE EVALUATION OF THE NON-FAILED AREAS. |
| 16:56:57 | 20 | AND HERE'S WHERE YOU TALK A LITTLE BIT ABOUT TAIL |
| 16:57:00 | 21 | WATER; CORRECT? |
| 16:57:02 | 22 | **A.**  YES.  I THINK WE ALSO HAD TAIL WATER ACTING ON THE SOUTH |
| 16:57:07 | 23 | SIDE TOO, THOUGH, IN THIS REPORT. |
| 16:57:09 | 24 | **Q.**  OKAY.  BUT WE'RE TALKING SPECIFICALLY ABOUT THE WALLS THAT |
| 16:57:12 | 25 | DIDN'T FAIL.  OKAY? |

16:57:14  1  **A.**   YES.

16:57:15  2  **Q.**   ALL RIGHT.  AND YOU HAVE 13 SLIDES THAT YOU USED TO TALK

16:57:21  3  ABOUT TAIL WATER AS IT RELATES TO SCOUR WITH REGARD TO THE

16:57:25  4  WALLS THAT DIDN'T FAIL, RIGHT?

16:57:28  5  **A.**   WELL, I SHOWED -- I DON'T RECALL REALLY TALKING ABOUT TAIL

16:57:31  6  WATER MUCH IN THOSE SLIDES.  I SHOWED SLIDES THAT SHOWED THE

16:57:35  7  DEPTH OF SCOUR THAT ACTUALLY OCCURRED.

16:57:38  8          AND I DID MENTION THAT WITH TIME, WHEN -- ONCE THE --

16:57:42  9  ONCE THE WATER STARTED BUILDING UP IN THE LOWER NINTH WARD AND

16:57:46  10  GOT ABOVE THE TOP OF THE EARTHEN EMBANKMENT, IT WOULD SLOW

16:57:53  11  DOWN, SCOUR, AND EVENTUALLY STOP SCOUR.

16:57:57  12  **Q.**   ALL RIGHT.  THAT'S MY POINT.  THAT'S WHAT YOU SAID.

16:57:58  13          AND HERE IS THE SECTION OF YOUR REPORT WHERE YOU TALK

16:58:01  14  ABOUT THE WALLS THAT DIDN'T FAIL; RIGHT?

16:58:04  15  **A.**   I TALKED ABOUT SECTION 5, WHICH IS A -- ONE LOCATION THAT

16:58:07  16  DID NOT FAIL.

16:58:09  17  **Q.**   WELL, THE SUBTITLE IS "EVALUATION OF NON-FAILED AREAS";

16:58:13  18  RIGHT?

16:58:16  19          SHOULD WE GO BACK TO THE INDEX?  THIS IS THE ONLY

16:58:20  20  PLACE IN THE REPORT THAT I CAN FIND WHERE YOU TALK ABOUT

16:58:22  21  NON-FAILED AREAS.

16:58:24  22          IF THERE'S ANOTHER ONE, I WOULD BE HAPPY TO GO THERE.

16:58:27  23  **A.**   THIS IS THE ONLY SECTION WHERE I TALKED ABOUT IT, AND I

16:58:29  24  FOCUSED SPECIFICALLY ON SECTION 5.

16:58:31  25  **Q.**   THANK YOU.  ALL RIGHT.  I UNDERSTAND YOU FOCUSED ON

16:58:33   1    SECTION 5.  BUT THE ONLY THING YOU FOCUSED ON WAS GLOBAL

16:58:39   2    STABILITY; RIGHT?

16:58:40   3    **A.**   I DON'T RECALL.

16:58:40   4    **Q.**   WELL, HERE'S THE -- IT CONSISTS OF ONE PAGE, SO WE CAN

16:58:45   5    TAKE A LITTLE TIME.

16:58:48   6              **MR. BRUNO:**  LET'S BLOW UP THE TOP PART.

16:58:50   7    BY MR. BRUNO:

16:58:56   8    **Q.**   WOULD YOU READ THAT FOR ME, JUST TO YOURSELF.

16:59:00   9    **A.**   DO YOU WANT ME TO READ IT ALOUD?

16:59:03  10    **Q.**   IF YOU WOULD LIKE.

16:59:04  11    **A.**   (WITNESS REVIEWS EXHIBIT.)

16:59:10  12    **Q.**   LET ME KNOW WHEN YOU'RE DONE.

16:59:12  13    **A.**   I'M FINISHED.

16:59:13  14    **Q.**   ALL RIGHT.  WHAT YOU'VE DONE HERE IN THIS SECTION IS THAT

16:59:16  15    YOU EVALUATED GLOBAL STABILITY AT THE UNFAILED SECTIONS; RIGHT?

16:59:25  16    **A.**   ONE SECTION, SECTION 5.

16:59:29  17    **Q.**   AND YOU CONCLUDED HERE THAT THE WALLS DIDN'T FAIL.

16:59:33  18    **A.**   BY GLOBAL STABILITY IN THIS SECTION.

16:59:35  19    **Q.**   YES.

16:59:36  20              NOW, NOWHERE IN THIS SECTION DO YOU TALK ABOUT TAIL

16:59:38  21    WATER AND ITS RELATIONSHIP TO SCOUR WITH REGARD TO THE

16:59:42  22    NON-FAILED SECTIONS; ISN'T THAT TRUE?

16:59:46  23              IF YOU WANT TO LOOK THROUGH THE WHOLE SECTION, YOU

16:59:48  24    CAN.

16:59:51  25    **A.**   I DON'T RECALL THIS SECTION.  IF YOU SAY THAT'S THE CASE,

16:59:54   1   THAT MUST BE THE CASE.

16:59:55   2   **Q.**   ALL RIGHT.  SO WHERE WOULD I GO TO LOOK AT YOUR

16:59:59   3   EVALUATIONS OF HOW THIS TAIL WATER WOULD AFFECT THE NON-FAILED

17:00:04   4   AREAS WITH REGARD TO SCOUR?

17:00:06   5           WHERE DO I GO LOOK AT IT?

17:00:12   6           **MR. TREEBY:**  YOUR HONOR, PLEASE.  I KNOW IT'S GETTING

17:00:14   7   LATE, BUT I KNOW I'VE HEARD THIS BEFORE.  THIS WITNESS HAS

17:00:17   8   TESTIFIED ABOUT HIS -- THE MODEL THAT HE RAN.

17:00:19   9           **THE COURT:**  I DO RECALL THE LINES AND THE MODELS,

17:00:22  10   ET CETERA.  I GUESS WE'RE GETTING DOWN TO SPECIFICS.

17:00:25  11           IN ESSENCE, YOU'RE ASKING, DID HE DO ANY

17:00:29  12   ANALYSIS AS TO TAIL WATER, WE'RE TALKING ABOUT.  AND I KNOW --

17:00:34  13           **MR. BRUNO:**  CORRECT.

17:00:34  14           **THE COURT:**  -- THAT WE REFERRED TO THAT, ON THE

17:00:37  15   NON-FAILED PORTIONS OF THE WALL, I ASSUME, ALONG THE RELEVANT

17:00:40  16   PORTIONS OF THE EBIA.

17:00:42  17           **MR. BRUNO:**  CORRECT, YOUR HONOR.  AND WE SUBMIT THERE

17:00:45  18   ARE NONE IN THIS SECTION.  AND THERE IS NO OPINION IN THIS

17:00:49  19   REPORT WHATSOEVER THAT DEALS WITH THE FACT THAT THOSE WALLS

17:00:52  20   DIDN'T FAIL BECAUSE OF TAIL WATER.  IT'S NOT TO BE FOUND

17:00:57  21   ANYWHERE IN THIS REPORT.

17:00:58  22           **THE COURT:**  MR. SMITH?

17:00:59  23           **MR. SMITH:**  YOUR HONOR, I -- IF MR. BRUNO'S GOING TO

17:01:01  24   GIVE SPEECHES, I'LL GIVE MY OWN SPEECH.

17:01:03  25           IT IS FOUND IN HIS REPORT, AND ON REDIRECT I'LL

17:01:06   1   POINT OUT WHERE IT IS.

17:01:07   2            THE COURT:  ALL RIGHT.

17:01:09   3            MR. BRUNO:  FAIR ENOUGH.

17:01:10   4               LET'S GO TO THE NEXT -- LET'S GO TO JX-01879-41.

17:01:14   5   BY MR. BRUNO:

17:01:14   6   Q.   ALL RIGHT.  HERE --

17:01:27   7            THE COURT:  SAY THAT AGAIN?

17:01:27   8            MR. BRUNO:  JX-01879, PAGE 41.

17:01:43   9   BY MR. BRUNO:

17:01:44  10   Q.   ALL RIGHT.  HERE IS WHERE YOU SHOW THE TAIL WATER AGAINST

17:01:46  11   A 13.7-FOOT LEVEL OF WATER IN THE CANAL.

17:01:53  12       WE CAN -- WE KNOW THAT THIS IS AT 8:00 IN THE

17:01:55  13   MORNING, DON'T WE, BASED UPON THE LEVEL OF THE WATER IN THE

17:01:59  14   CANAL AT THAT TIME?

17:02:02  15   A.   WHAT WAS THE LEVEL AGAIN?  THIS --

17:02:05  16            MR. BRUNO:  CAN WE BLOW THIS UP?

17:02:05  17   BY MR. BRUNO:

17:02:10  18   Q.   I WANT TO MAKE SURE THAT YOU AGREE.  THIS IS WHAT YOU HAVE

17:02:14  19   WRITTEN DOWN, 13.7.

17:02:16  20   A.   THAT SOUNDS ABOUT RIGHT.

17:02:17  21   Q.   ABOUT RIGHT?

17:02:19  22   A.   LET ME -- CAN I JUST CHECK SOMETHING HERE?

17:02:21  23   Q.   YEAH.  I HAVE A CHART, TOO, IF YOU WANT TO LOOK AT IT.

17:02:37  24            MR. BRUNO:  13.8 BY STIPULATION, FOR THE RECORD.

17:02:40  25            THE WITNESS:  THAT'S CORRECT.  IT'S AROUND 8:00 IN

| | | |
|---|---|---|
| 17:02:42 | 1 | THE MORNING. |
| 17:02:44 | 2 | **BY MR. BRUNO:** |
| 17:02:44 | 3 | **Q.**   OKAY.  ALL RIGHT.  SO WE KNOW, AT LEAST FOR THIS HEIGHT OF |
| 17:02:52 | 4 | CROWN, THERE IS NO TAIL WATER WHICH COULD AFFECT THE SCOUR. |
| 17:02:57 | 5 | **A.**   THAT'S NOT TRUE, ACTUALLY.  THAT DIAGRAM IS SHOWING TAIL |
| 17:02:59 | 6 | WATER ELEVATION OF 5 FEET. |
| 17:03:04 | 7 | **Q.**   THIS IS SHOWING TAIL WATER THAT COVERS THE CROWN? |
| 17:03:09 | 8 | **A.**   YES. |
| 17:03:10 | 9 | **Q.**   OKAY.  ALL RIGHT. |
| 17:03:12 | 10 | **MR. BRUNO:**  LET'S GO TO THE NEXT DOCUMENT, WHICH IS |
| 17:03:14 | 11 | JX-01869-10. |
| 17:03:35 | 12 | THAT'S A TERRIBLE COPY, BUT LET'S SEE IF WE CAN |
| 17:03:38 | 13 | BLOW THIS UP.  IT'S VERY DIFFICULT TO SEE. |
| 17:03:51 | 14 | CAN YOU BLOW THIS UP, PLEASE? |
| 17:04:18 | 15 | IS THAT THE BEST WE HAVE? |
| 17:04:39 | 16 | **BY MR. BRUNO:** |
| 17:04:39 | 17 | **Q.**   HERE WE HAVE THE CANALSIDE CROWN.  DO YOU SEE THAT? |
| 17:04:43 | 18 | AND THEN ABOVE THAT WE HAVE -- THE 2005 CANALSIDE |
| 17:04:52 | 19 | CROWN IS SHOWN IN GREEN. |
| 17:05:01 | 20 | AND IF WE GO TO THE LEFT -- IT'S DIFFICULT TO SEE, |
| 17:05:06 | 21 | AND I MAY HAVE TO ASK THE COURT TO LOOK AT THIS ON ITS OWN. |
| 17:05:09 | 22 | BUT THERE ARE PLACES WHERE IT IS 8 FEET? |
| 17:05:12 | 23 | **MR. BRUNO:**  GO ALL THE WAY TO THE LEFT, HERE. |
| 17:05:23 | 24 | CAN WE MOVE THIS WAY?  I'M SORRY.  LET'S GO |
| 17:05:33 | 25 | BACK.  THAT'S WRONG.  SIX FEET. |

17:05:36   1   BY MR. BRUNO:

17:05:36   2   **Q.**   THERE ARE PLACES WHERE IT'S 6 FEET, OR A LITTLE BETTER

17:05:46   3   THAN 6 FEET.  AND THEN IT MOVES DOWN AND THEN UP AGAIN TO

17:05:56   4   6 FEET HERE.  IT GOES TO THE RIGHT.  AT SOME PLACES IT'S HIGHER

17:06:01   5   THAN 6 FEET AND THEN IT GOES DOWN.

17:06:08   6           I DON'T KNOW THIS NUMBER.  BUT THE POINT IS THERE ARE

17:06:12   7   POINTS OF THE CROWN WHICH ARE HIGHER THAN 6 FEET, CORRECT?

17:06:15   8   **A.**   ALONG THE LENGTH OF THE EBIA; THAT'S CORRECT.

17:06:17   9   **Q.**   ALL RIGHT.  AND ONLY TO ILLUSTRATE, THOSE LOCATIONS,

17:06:24   10  BECAUSE THEY'RE HIGHER, WOULD HAVE HAD -- WOULD NOT HAVE HAD

17:06:32   11  THE SAME EFFECT OF TAIL WATER; ISN'T THAT TRUE?

17:06:37   12  **A.**   FOR TAIL WATER AT THAT LEVEL; RIGHT.

17:06:40   13  **Q.**   YES.

17:06:40   14  **A.**   BUT THE TAIL WATER KEPT COMING UP MORE THAN PLUS 5 FEET.

17:06:43   15  **Q.**   OKAY.

17:06:43   16  **A.**   IT CAME ALL THE WAY UP TO PLUS 10 FEET.

17:06:46   17  **Q.**   WELL, IT WAS PLUS 5 FEET AT 8:00 IN THE MORNING.

17:06:49   18  **A.**   YES.

17:06:50   19  **Q.**   SO WE'RE ONLY TALKING ABOUT AN HOUR.

17:06:51   20  **A.**   YEAH, BUT AN HOUR IS A BIG DIFFERENCE HERE, SIR.  THERE

17:06:54   21  WAS ONE POINT WHERE, BY THE SCOURING CALCULATIONS, WE WERE

17:06:55   22  LOSING 1 FOOT -- THE TRENCH WAS GOING DEEPER 1 FOOT EVERY 15 TO

17:07:00   23  20 MINUTES.  SO AN HOUR IS A BIG DIFFERENCE WHEN WE'RE DOING

17:07:07   24  SCOUR CALCULATIONS.

17:07:08   25  **Q.**   SO THAT EVERY HOUR THAT YOU DON'T HAVE SCOUR WATER -- I'M

17:07:11   1   SORRY -- THAT YOU DON'T HAVE TAIL WATER, YOU'VE GOT MORE SCOUR

17:07:15   2   WATER; RIGHT?

17:07:16   3   **A.**   YES.

17:07:17   4   **Q.**   THAT'S RIGHT.  SO THAT'S GOING TO BE DEEPER, NOT

17:07:20   5   SHALLOWER?

17:07:21   6   **A.**   WELL, YOU HAVE TO KEEP EVERYTHING KIND OF GOING ALONG IN

17:07:24   7   TIME HERE.  YOU HAVE TO BE VERY CAREFUL NOT TO JUST PICK OUT

17:07:27   8   ONE BECAUSE -- BECAUSE THEY WERE OCCURRING TOGETHER, YOU KNOW.

17:07:30   9          SO AS THE WATER -- CANAL WATER LEVEL WAS COMING UP

17:07:34  10   AFTER THE BREACH OCCURRED, THE TAIL WATER WAS COMING UP VERY

17:07:39  11   RAPIDLY TOO.

17:07:40  12   **Q.**   AND THEN AFTER 8:00, OF COURSE, THE WALL IS GONE ANYWAY;

17:07:43  13   RIGHT?

17:07:44  14   **A.**   ONE PART OF THE WALL WAS GONE.

17:07:45  15   **Q.**   WELL, THE SOUTH WALL -- THE SOUTH BREACH AND THE NORTH

17:07:48  16   BREACH ARE GONE?

17:07:49  17   **A.**   YEAH.  BUT THERE'S STILL 3,000 FEET OF WALL THAT DIDN'T

17:07:53  18   FAIL.

17:07:53  19   **Q.**   IT DIDN'T FALL?

17:07:54  20   **A.**   RIGHT.

17:07:55  21   **Q.**   ALL RIGHT.  NOW, THE NORTH BREACH, JUST LIKE THE SOUTH

17:08:26  22   BREACH, CANNOT -- YOU CANNOT EXPLAIN HOW THE SHEET PILE ENDED

17:08:32  23   UP WHERE AND IN THE POSITION THAT IT ENDED UP BASED UPON YOUR

17:08:37  24   EXPLANATION OF MODE OF FAILURE; ISN'T THAT RIGHT?

17:08:40  25   **A.**   OH, NO.  I THINK I SAID THAT I FELT THAT ONCE IT ROTATED,

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 17:08:44 | 1  | THE -- IT WAS MY -- MY UNDERSTANDING WOULD BE THAT ONCE IT        |
| 17:08:48 | 2  | ROTATED, WATER FLOWING OVER THE TOP OF IT EXHIBITS A LARGE DRAG   |
| 17:08:54 | 3  | ON IT AND LITERALLY DRAGS IT TO THE LAND SIDE.                    |
| 17:08:58 | 4  | **Q.**   ALL RIGHT.  ONCE AGAIN, SAME EFFECT THAT WE TALKED ABOUT |
| 17:09:03 | 5  | THE SOUTH BREACH.  THE WALL FALLS FLAT, OR ALMOST FLAT --         |
| 17:09:07 | 6  | **A.**   YES.                                                    |
| 17:09:08 | 7  | **Q.**   -- AT THE NORTH BREACH; RIGHT?                          |
| 17:09:09 | 8  | **A.**   YES.                                                    |
| 17:09:10 | 9  | **Q.**   ALL RIGHT.  AND SO WE HAVE WATER GOING OVER THE TOP.  AND |
| 17:09:13 | 10 | YOUR TESTIMONY IS THAT THE WATER GOING OVER THE TOP IS DRAGGING   |
| 17:09:15 | 11 | IT TO THE EAST; RIGHT?                                            |
| 17:09:16 | 12 | **A.**   WELL, IT COULD BE FLOWING OVER THE TOP AND A LITTLE BIT  |
| 17:09:20 | 13 | UNDER THE BOTTOM OF IT, TOO.  BUT IT'S THE WATER FLOWING          |
| 17:09:23 | 14 | PAST --                                                          |
| 17:09:23 | 15 | **Q.**   ALL RIGHT.                                              |
| 17:09:23 | 16 | **A.**   -- THOSE SHEETS AT, YOU KNOW, VERY HIGH RATES -- HIGH    |
| 17:09:27 | 17 | VELOCITIES THAT'S PUTTING DRAG FORCES ON THE WALL ELEMENTS AND    |
| 17:09:30 | 18 | DRAGGING THEM TO THE LAND SIDE.                                  |
| 17:09:32 | 19 | **Q.**   ALL RIGHT.  NOW, IT'S -- JUST AS IT WAS POSSIBLE AT THE  |
| 17:09:37 | 20 | SOUTH BREACH, THE LONGER THE WALL STAYS VERTICAL, THE MORE        |
| 17:09:40 | 21 | FORCE IS BROUGHT TO BEAR ON THAT WALL; RIGHT?                    |
| 17:09:43 | 22 | **A.**   YES.                                                    |
| 17:09:43 | 23 | **Q.**   ALL RIGHT.  SO IF THE WALL IS FORCED OUT OF THE GROUND,  |
| 17:09:45 | 24 | YOU HAVE A LOT OF PRESSURE BEING BROUGHT TO BEAR, IT'S GOING TO   |
| 17:09:48 | 25 | MOVE IT TO THE EAST; RIGHT?                                      |

17:09:50   1  **A.**   WELL, AGAIN, YOU ADD PRESSURE THERE.  ONCE THE WALL STARTS

17:09:53   2  TO ROTATE, YOU KNOW, THE PRESSURE THAT'S PUSHING AGAINST THE

17:09:58   3  WALL THAT YOU'RE TALKING ABOUT, YOU KNOW, STARTS TO REDUCE, AND

17:10:01   4  IT CHANGES FROM A PRESSURE PUSHING AGAINST IT.  ONCE IT'S

17:10:05   5  ROTATED, IT'S NOW DRAG PRESSURE PULLING THE WALL TO THE LAND

17:10:09   6  SIDE.

17:10:09   7  **Q.**   RIGHT.  AGAIN, UNDER ANY HYPOTHESIS, THE WALL COMES OUT OF

17:10:13   8  THE GROUND AND IT STAYS VERTICAL LONGER THAN YOU WOULD HAVE

17:10:16   9  OPINED.  AND ALL I'M SAYING IS, IF THAT'S TRUE, YOU'VE GOT ALL

17:10:19  10  THIS FORCE PUSHING IT TO THE EAST; RIGHT?

17:10:22  11  **A.**   THAT'S IMPOSSIBLE.  ONCE THE WALL STARTS TO COME OUT OF

17:10:24  12  THE GROUND LIKE YOU SUGGEST, THAT MAKES THE ROTATION MODE OF

17:10:27  13  FAILURE EVEN MORE LIKELY TO OCCUR.  IT'S NO LONGER AN

17:10:31  14  EQUILLIBRUM AND IT WILL ROTATE IMMEDIATELY.

17:10:36  15  **Q.**   THAT'S EXACTLY MY POINT.  BECAUSE WHEN IT DOES THAT, IT'S

17:10:38  16  TOP HEAVY AND IT'S GOING TO ROTATE.  AND THE HIGHER OUT OF THE

17:10:41  17  GROUND IT IS, THE MORE LIKELY IT IS TO DO THIS BACKFLIP THING

17:10:45  18  THAT WE SEE; ISN'T THAT TRUE?  BECAUSE IT DOES DO A BACKFLIP,

17:10:49  19  DOESN'T IT?

17:10:51  20  **A.**   AGAIN, YOU'RE DOING SOMETHING NEW HERE, SO I WANT TO MAKE

17:10:55  21  SURE I'M FOLLOWING YOU.

17:10:56  22          YOU'RE TALKING ABOUT AT THE NORTH AREA WHERE IT NOT

17:11:00  23  ONLY ROTATED BUT IT THEN FLIPPED ONCE MORE?

17:11:02  24  **Q.**   YES.  IT ACTUALLY FLIPPED.

17:11:04  25  **A.**   YES.

17:11:04  1   **Q.**   AND ALL I'M SAYING TO YOU IS, IS THAT -- AND I'M JUST

17:11:07  2   TRYING TO BE LOGICAL.  IF, THROUGH GOD KNOWS HOW, THE WALL

17:11:16  3   COMES INTO FULL CONTACT WITH ALL THAT WATER THAT'S RUSHING TO

17:11:19  4   THE EAST, OKAY?  I'M JUST THINKING TO MYSELF IT'S GOING TO HAVE

17:11:22  5   A TENDENCY TO PUSH IT TO THE EAST; RIGHT?  I'M NOT SAYING HOW

17:11:27  6   FAR, BUT PUSH IT IN THE EAST.

17:11:28  7          BUT AT THAT POINT IT'S TOP HEAVY.  AND SO -- AND THE

17:11:32  8   REASON WHY IT'S TOP HEAVY IS BECAUSE IT'S NOT CONNECTED TO THAT

17:11:36  9   RIGID WALL ANYMORE THAT YOU TALKED ABOUT; RIGHT?

17:11:39 10          AND SO I'M WONDERING TO MYSELF.  IT'S TOP HEAVY AND

17:11:42 11   THE BOTTOM -- THE TOP FALLS FORWARD.  AND BECAUSE IT'S HEAVIER

17:11:46 12   AND BECAUSE YOU'VE GOT WATER PUSHING WHILE IT'S TURNING, THAT

17:11:51 13   WATER PUSHES IT AND IT CAUSES THE BACKFLIP THAT WE ACTUALLY

17:11:55 14   SEE.

17:11:55 15          ISN'T THAT A REASONABLE EXPLANATION?

17:11:57 16   **A.**   NO, IT'S NOT.  IT DOESN'T HAVE ANYTHING TO DO WITH TOP

17:12:01 17   HEAVY.  THE FORCES OF WATER AGAINST THAT WALL ARE MUCH, MUCH

17:12:06 18   LARGER THAN THE WEIGHT OF THE CONCRETE WHICH YOU'RE THINKING OF

17:12:10 19   MAKING IT TOP HEAVY.

17:12:13 20          THE WALL STARTED TO ROTATE WITH A POINT DOWN NEAR THE

17:12:18 21   BOTTOM OF THE WALL THAT WAS FIXED.  IT NEVER TRANSLATED.  IT

17:12:22 22   NEVER MOVED LANDWARD.

17:12:24 23          SO THE WALL, WHEN YOU -- WHEN YOU USE YOUR HAND TO

17:12:27 24   SHOW THE WALL MOVING AS A VERTICAL WALL TO THE LAND SIDE, THAT

17:12:33 25   NEVER OCCURRED.  IT ROTATED ABOUT A FIXED POINT LOCATED SOME 10

17:12:38    1   OR SO FEET BELOW THE GROUND SURFACE.  IT ROTATED TO THE POINT

17:12:44    2   THAT IT WAS MORE LIKE 30 OR 40 DEGREES AWAY FROM VERTICAL, AND

17:12:49    3   THEN THE FORCES OF WATER FLOWING OVER IT STARTED AS A DRAG

17:12:53    4   FORCE TO DRAG IT UP AND OUT OF THE NEW TRENCH THAT HAD BEEN

17:12:59    5   CREATED AND DISPLACE IT TOWARDS THE LAND SIDE.

17:13:04    6        THEN ONCE IT WAS HORIZONTAL, IT JUST TAKES A LITTLE

17:13:06    7   BIT OF THE BASE OF IT TO PICK UP A LITTLE BIT, WATER GETS

17:13:11    8   UNDERNEATH THAT, AND NOW YOU HAVE A WHOLE NEW FORCE DEVELOPING

17:13:13    9   ON THE UNDERNEATH SIDE OF THE SHEETING THAT CAUSED IT TO ROTATE

17:13:16   10   OVER.

17:13:17   11   **Q.**   NOW, THAT'S YOUR THEORY, AS I APPRECIATE IT.  RIGHT?

17:13:21   12        I'M ASKING YOU TO CONSIDER THAT IF THE SHEET IS

17:13:24   13   PUSHED OUT OF THE GROUND, THE SAME THING CAN HAPPEN.  AND

17:13:31   14   WHETHER YOU SAY THE FORCE IS NOT -- I'M SORRY.  WHETHER YOU SAY

17:13:36   15   IT OR NOT, THE FACT OF THE MATTER IS THAT THE CONCRETE TIP

17:13:39   16   WEIGHS MORE THAN THE BOTTOM, DOESN'T IT?

17:13:41   17   **A.**   YES.

17:13:43   18   **Q.**   THEY DON'T WEIGH THE SAME; RIGHT?  AND YOU'VE GOT ALL THIS

17:13:48   19   WATER, A LOT OF WATER, SO MUCH WATER IT'S ABLE TO CAUSE

17:13:51   20   500,000 POUNDS OF TENSILE STRENGTH, SO IT'S GOT TO BE A LOT OF

17:13:56   21   SOMETHING.

17:13:57   22        ALL I'M SUGGESTING TO YOU IS, IF THAT OCCURRED, IT'S

17:14:00   23   POSSIBLE THAT IT COULD CAUSE THAT WALL TO FLIP.  RIGHT?

17:14:05   24   **A.**   THE WATER WOULD HAVE CAUSED THE WALL TO FLIP, AS I

17:14:08   25   EXPLAINED.  BUT YOU KEEP PULLING THE WALL UP OUT OF THE GROUND

Case 2:05-cv-04182-SRD-JCW   Document 21138   Filed 01/22/13   Page 160 of 279
2142

17:14:12  1  IN A VERTICAL POSITION, AND I'M TELLING YOU THAT PHYSICALLY

17:14:15  2  COULD NOT POSSIBLY HAVE HAPPENED.  IT WOULD HAVE HAD TO HAVE

17:14:21  3  ROTATED.

17:14:39  4  **Q.**   ARE YOU FAMILIAR AT ALL WITH A GENTLEMAN NAMED JOHN

17:15:06  5  GRIESHABER?

17:15:09  6  **A.**   I DON'T RECALL THAT NAME.

17:15:11  7  **Q.**   HE IS AN EMPLOYEE OF THE CORPS OF ENGINEERS.  HIS

17:15:13  8  DEPOSITION WAS TAKEN IN THE CASE.

17:15:17  9       IF HE HAD TESTIFIED THAT THE FAILURE AT THE NINTH

17:15:25  10  WARD ON THE NORTH SIDE WAS MORE OF A BLOWOUT ROTATIONAL FAILURE

17:15:30  11  WHERE IT POPPED UP EARLY, YOU WOULD DISAGREE WITH THAT?

17:15:34  12  **A.**   I ABSOLUTELY WOULD.

17:15:35  13  **Q.**   OKAY.  BUT THE POPPING UP EARLY IS CONSISTENT WITH THE

17:15:38  14  HYDROSTATIC UPLIFT DESCRIBED BY DR. BEA?

17:15:42  15  **A.**   I'M NOT SURE WHAT HE MEANS WHEN HE SAYS "POPPING UP

17:15:45  16  EARLY."  I DON'T KNOW IF HE'S TALKING ABOUT SOIL, WALL,

17:15:47  17  CONCRETE, WHATEVER.

17:15:49  18  **Q.**   WELL, IF YOU HAVE PRESSURE FROM BELOW, IT'S GOING TO MAKE

17:15:51  19  IT GO UP.  CAN WE AGREE ON THAT?

17:15:53  20  **A.**   MAKE WHAT GO UP?

17:15:55  21  **Q.**   THE STUFF ABOVE IT.

17:15:56  22  **A.**   THE POPPING UP WOULD SUGGEST SOMETHING IS MOVING UPWARD

17:16:00  23  FROM THE GROUND SURFACE, YES.

17:16:01  24  **Q.**   ALL RIGHT.  OKAY.

17:16:03  25       **MR. BRUNO:**  FOR THE RECORD, THAT'S PX-4674-93, THE

UNITED STATES DISTRICT COURT - EASTERN DISTRICT OF LOUISIANA
** HOURLY TRANSCRIPT**

17:16:06  1  30(B)(6) DEPOSITION OF GRIESHABER AT LINES 195 TO LINES 196.

17:16:21  2            **MR. TREEBY:**  YOUR HONOR --

17:16:21  3            **MR. BRUNO:**  NOW, LET'S GO TO --

17:16:21  4            **MR. TREEBY:**  -- I WOULD JUST LIKE TO ASK COUNSEL IF

17:16:23  5  THAT'S PART OF MR. GRIESHABER'S TESTIMONY THAT WAS DESIGNATED.

17:16:27  6            **MR. BRUNO:**  YES.  I'LL SHOW IT TO YOU.

17:16:29  7            **MR. TREEBY:**  WELL, IT WOULDN'T BE A PX.  THAT'S --

17:16:32  8            **MR. BRUNO:**  YOU KNOW, I CAN ONLY RELY ON -- LET ME

17:16:34  9  JUST MAKE SURE.

17:16:45  10            **MR. TREEBY:**  I THINK ALL THE DESIGNATIONS WERE JX,

17:16:47  11  BUT I COULD BE WRONG.

17:16:49  12            **MR. BRUNO:**  I HAVE PX, BUT . . .

17:16:49  13            **MR. TREEBY:**  OKAY.  JUST SO IT'S THE DESIGNATED

17:16:51  14  PORTION.

17:16:52  15            **MR. BRUNO:**  DO I HAVE A CORRECT NUMBER ON THIS?

17:16:55  16            ANYWAY, I'M SHOWING IT'S PAGE 195, LINE 9, TO

17:16:59  17  PAGE 196, LINE 3, JUST FOR THE RECORD.  I'LL GIVE YOU A NUMBER

17:17:04  18  AT ANOTHER TIME.

17:17:05  19            ALL RIGHT.  LET'S RUN THROUGH THE SLIDES AND TRY

17:17:07  20  TO SEE IF WE CAN GET THIS DONE.

17:17:09  21            LET'S GO TO YOUR SLIDES, WHICH IS -- CAN I JUST

17:17:12  22  SAY SLIDE 8?

17:17:39  23            I'M TOLD THAT IT IS PX-4674.

17:17:44  24  **BY MR. BRUNO:**

17:17:44  25  **Q.**  ALL RIGHT.  DURING YOUR PRESENTATION, YOU DIDN'T TALK

17:17:48    1 | ABOUT THIS INDICATION HERE.

17:17:49    2 |              IS IT YOUR TESTIMONY THAT YOU BELIEVE THIS IS A SCOUR

17:17:51    3 | TRENCH?

17:17:55    4 | **A.**   WHAT'S SEEN THERE IS AFTER A SCOUR TRENCH HAD DEVELOPED

17:17:59    5 | AND THE WALL HAD ROTATED OVER AND FAILED, AND THERE HAS BEEN

17:18:02    6 | SOME ADDITIONAL EROSION FROM WATER FLOWING THROUGH THE FAILED

17:18:08    7 | AREA.

17:18:10    8 | **Q.**   SIR, I THOUGHT YOU TESTIFIED THAT THE SCOUR TRENCHES WERE

17:18:14    9 | ALL GONE AFTER KATRINA.   THAT IS, THAT THE FAILED -- THIS IS

17:18:16   10 | NOT A FAILED AREA, IS IT?   I MEAN, AM I MISSING SOMETHING HERE?

17:18:23   11 | **A.**   YES.   BUT I MEAN, YOU CAN'T SEE FROM THAT HOW DEEP THE

17:18:25   12 | SCOUR TRENCH WAS, IF THAT'S YOUR QUESTION.

17:18:28   13 | **Q.**   NO.   MY QUESTION IS, HOW DO WE KNOW THAT'S A SCOUR TRENCH?

17:18:32   14 |              **MR. TREEBY:**   IT SAYS IT IS.

17:18:35   15 |              **MR. BRUNO:**   OKAY.

17:18:36   16 |              **THE WITNESS:**   THANK YOU.

17:18:38   17 |              **MR. BRUNO:**   IF THAT WORKS, I'LL TRY IT TOO.

17:18:42   18 | **BY MR. BRUNO:**

17:18:42   19 | **Q.**   THERE'S NO WAY THAT YOU CAN ASCERTAIN WHETHER OR NOT

17:18:44   20 | THAT'S, IN FACT, A SCOUR TRENCH.

17:18:46   21 |              ISN'T THAT TRUE, DR. MARR?

17:18:48   22 | **A.**   WELL, NO.   I -- I KNOW THAT THAT'S WHERE THE SCOUR TRENCH

17:18:50   23 | HAD TO BE BY EXTRAPOLATION FROM WHAT WE SEE AT THE SOUTH AND

17:18:54   24 | THE NORTH OF THIS FAILED AREA.

17:18:56   25 | **Q.**   I UNDERSTAND THAT.   BUT THAT'S NOT THROUGH AN ANALYSIS OF

17:19:00   1   THE PHOTOGRAPH; THAT'S WHAT YOUR -- YOUR SUSPICION, BASED UPON

17:19:04   2   WHAT YOU EXPECT WAS THE CAUSE OF FAILURE; ISN'T THAT RIGHT?

17:19:08   3   **A.**   YES.

17:19:09   4   **Q.**   ALL RIGHT.  NUMBER 10.

17:19:13   5        WE WERE TALKING ABOUT THIS BRIEFLY.  THAT CONCRETE'S

17:19:17   6   BROKEN, BUT IT COULD JUST AS EASILY HAVE BEEN BROKEN BECAUSE

17:19:21   7   THE WALL IS BENT; ISN'T THAT TRUE?  THE CONCRETE IS BENT?

17:19:26   8   **A.**   NO.  AND IF YOU LOOK AT AREAS LIKE THIS, THERE'S NOT

17:19:31   9   BENDING OCCURRING; IT'S MORE STRETCHING.

17:19:33   10        AND THIS TYPE OF SPALLING FAILURE IS COMING MORE FROM

17:19:37   11   A TENSION PULLING ON THE REBAR THAN IT WOULD FROM A BENDING, IN

17:19:42   12   MY VIEW.

17:19:44   13   **Q.**   WELL, I MEAN, DR. MARR, I'M NO EXPERT.  BUT WHAT I SEE

17:19:48   14   HERE IS A CRACK THAT LOOKS LIKE IT'S BEING PULLED ALONG WITH

17:19:52   15   THE WALL BECAUSE IT'S BENT OVER.

17:19:56   16        ISN'T THAT WHAT WE'RE SEEING THERE?

17:19:58   17   **A.**   WELL, IT'S BEING PULLED -- YOU'RE CORRECT.  IT'S BEING

17:20:00   18   PULLED ALONG THE WALL AS -- AS . . .

17:20:02   19   **Q.**   OKAY.

17:20:02   20   **A.**   THERE IS SOME BENDING GOING ON HERE BECAUSE, OBVIOUSLY,

17:20:04   21   THE WALL IS ROTATING OVER.  SO THERE IS SOME BENDING

17:20:09   22   CONTRIBUTION THERE TOO.

17:20:10   23   **Q.**   ALL RIGHT.  NUMBER 16.

17:20:14   24        WHAT WE SEE HERE IN THE BOTTOM, THAT'S THE BOTTOM

17:20:17   25   SHEET THAT'S BENT OVER.  THAT'S ONE OF THE SHEETS THAT GOT

| | | |
|---|---|---|
| 17:20:21 | 1 | FLATTENED; RIGHT? |
| 17:20:23 | 2 | **A.**   YES. |
| 17:20:23 | 3 | **Q.**   AND IT'S BENT OVER CONSISTENT WITH BEING PULLED IN THAT |
| 17:20:26 | 4 | DIRECTION? |
| 17:20:26 | 5 | **A.**   WE'RE NOT SURE WHAT CAUSED IT TO BEND.  WE DON'T KNOW WHEN |
| 17:20:30 | 6 | THAT BEND ACTUALLY HAPPENED -- |
| 17:20:31 | 7 | **Q.**   ALL RIGHT. |
| 17:20:32 | 8 | **A.**   -- IN THOSE SHEETS. |
| 17:20:33 | 9 | **Q.**   BUT WE CANNOT ELIMINATE AS A POSSIBLE CAUSE OF BENDING |
| 17:20:36 | 10 | THAT IT WAS CAUSED IN THE FAILURE, CAN WE? |
| 17:20:44 | 11 | **A.**   NO.  AND THAT WOULD BE CONSISTENT WITH WHAT I'M SAYING |
| 17:20:48 | 12 | WITH THE WALL ROTATING AS IT -- AS THE FORCE BUILT UP IN IT AND |
| 17:20:52 | 13 | IT STARTED TRANSLATING TO THE LAND.  IT ALSO -- THE TOP ALSO |
| 17:20:56 | 14 | ROTATED TOWARDS THE LAND. |
| 17:20:58 | 15 | **MR. BRUNO:**  NUMBER 21, PLEASE. |
| 17:20:58 | 16 | **BY MR. BRUNO:** |
| 17:20:59 | 17 | **Q.**   THIS IS WHERE YOU START YOUR SCOUR VALIDATION.  THIS |
| 17:21:03 | 18 | WALL -- THIS WALL IS PERPENDICULAR WITH THE IHNC, IS IT NOT? |
| 17:21:13 | 19 | **A.**   YES. |
| 17:21:13 | 20 | **Q.**   ALL RIGHT.  AND WE KNOW, IN FACT -- WELL, I THINK WE |
| 17:21:16 | 21 | KNOW -- THAT THE WIND -- |
| 17:21:17 | 22 | **A.**   WAIT JUST ONE MOMENT. |
| 17:21:20 | 23 | I THINK THIS -- THIS PIECE OF WALL IS -- THIS SECTION |
| 17:21:23 | 24 | RUNNING ALONG HERE, WHICH IS ACTUALLY PARALLEL -- IT'S MEANT TO |
| 17:21:26 | 25 | BE PARALLEL WITH THE IHNC. |

17:21:31   1          THE COURT:  IT GETS PERPENDICULAR DOWN A WAYS, YOU

17:21:35   2   MEAN?

17:21:36   3          THE WITNESS:  YES.

17:21:36   4          THE COURT:  TOWARDS THE BRIDGE?

17:21:37   5          THE WITNESS:  YES.

17:21:39   6          THE COURT:  YOU CAN SEE THE PERPENDICULAR RIGHT ANGLE

17:21:42   7   IN THE PHOTOGRAPH.

17:21:42   8   BY MR. BRUNO:

17:21:42   9   Q.   AND HERE WE SEE GRASS COVER AND NO GRASS COVER?

17:21:45   10  A.   WELL, THE GRASS COVER'S BEEN REMOVED HERE FROM THE SCOUR

17:21:48   11  THAT HAS OCCURRED.

17:21:49   12  Q.   AND THAT GRASS COVER HASN'T BEEN REMOVED?

17:21:51   13  A.   YES.  THAT'S WHERE YOUR HONOR -- THE JUDGE ASKED ME ABOUT

17:21:54   14  THAT THE OTHER DAY.

17:21:56   15         MR. BRUNO:  LET'S GO TO 22.

17:21:57   16  BY MR. BRUNO:

17:21:59   17  Q.   THIS ONE IS PERPENDICULAR TO THE IHNC?

17:22:03   18  A.   YES.

17:22:04   19  Q.   AND WE KNOW THAT THE WIND CAME FROM THE NORTH FOR QUITE A

17:22:08   20  SUBSTANTIAL AMOUNT OF TIME.  SO WE CAN -- WE KNOW FOR A FACT

17:22:12   21  THAT THIS WAS SUBJECTED TO WAVE OVERTOPPING, DON'T WE?

17:22:18   22  A.   WELL, I THINK, FROM WHAT I UNDERSTAND FROM

17:22:20   23  PROFESSOR DALRYMPLE, THAT ALL THESE SECTIONS WERE SUBJECTED TO

17:22:23   24  WAVE OVERTOPPING.

17:22:24   25         AND AS I SAID BEFORE, I -- I DON'T -- I CAN'T REALLY

17:22:28   1   GIVE ANY OPINIONS AS TO THE EFFECT OF WIND DIRECTION ON

17:22:37   2   OVERTOPPING.

17:22:39   3   **Q.**   ALL RIGHT.  DO YOU SEE ANY DIFFERENCES, FROM YOUR

17:22:40   4   PERSPECTIVE AS A GEOTECHNICAL ENGINEER, BETWEEN THE SHAPE, THE

17:22:43   5   SIZE, THE WIDTH OF THIS SCOUR TRENCH AS OPPOSED TO SCOUR

17:22:48   6   TRENCHES THAT WERE ALONG -- PARALLEL TO THE IHNC?

17:22:52   7   **A.**   YOU KNOW, THE WIDTH IS A LITTLE WIDER HERE FOR THE GIVEN

17:22:56   8   DEPTH --

17:22:57   9   **Q.**   RIGHT.

17:22:58   10   **A.**   -- THAN IN OTHER LOCATIONS.

17:23:00   11   **Q.**   RIGHT.  AND ONE WOULD EXPECT, IF WAVES WERE BEING FORCED

17:23:04   12   OVER THE TOP, THAT THEY'D BE SPLAYED ALONG A WIDER DISTANCE

17:23:10   13   THAN IF THEY WERE JUST SIMPLY BEING POURED OVER THE WALL.

17:23:15   14   WOULDN'T YOU AGREE?

17:23:17   15   **A.**   I CAN'T REALLY SPEAK TO THAT.

17:23:18   16   **Q.**   ALL RIGHT.  LET'S LOOK AT 23.

17:23:20   17          THIS IS ANOTHER WALL.

17:23:22   18          THIS ONE IS ALSO PERPENDICULAR TO THE IHNC; ISN'T

17:23:27   19   THAT TRUE?

17:23:27   20   **A.**   YES.

17:23:27   21   **Q.**   AND IT'S ALSO MUCH WIDER THAN THE OTHER ONES THAT WE

17:23:33   22   SEE -- WE WILL SEE IN A MINUTE WHEN I PULL THEM UP -- ISN'T

17:23:36   23   THAT TRUE?

17:23:40   24   **A.**   WE NEVER ACTUALLY MEASURED THAT.  IT DOES -- I WOULD AGREE

17:23:43   25   WITH YOU THAT IT LOOKS IN THAT PICTURE THAT THE WIDTH IS MAYBE

```
17:23:48    1   A COUPLE TIMES THE DEPTH.
17:23:51    2   Q.   YOU KNOW, I MEAN, MAYBE IT'S JUST ME.  BUT I'M SEEING THAT
17:23:53    3   THE WATER THROWS OVER HERE IS CHEWING AWAY -- FURTHER AWAY, AND
17:23:58    4   IT'S ON AN ANGLE AS IF THE WAVE ACTION IS MAYBE DECREASING
17:24:03    5   AND -- AS THE POURING HAPPENS.  AND SO WE'VE GOT A NICE DEEP
17:24:09    6   TRENCH HERE LATER, BUT EARLIER AND WIDER FROM THE WAVES.
17:24:15    7            WOULDN'T THAT BE A REASONABLE EXPLANATION?
17:24:17    8            THE COURT:  YES, SIR?  OKAY.
17:24:18    9            THE WITNESS:  IT COULD BE.
17:24:19   10   BY MR. BRUNO:
17:24:19   11   Q.   IT COULD BE.  OKAY.
17:24:22   12            AND JUST FOR COMPARISON'S SAKE -- WELL, LET'S SEE.
17:24:26   13   JUST TO MAKE A POINT OF IT, NUMBER 25.
17:24:30   14            THIS LIDAR DOESN'T APPEAR ANYWHERE IN YOUR EXPERT
17:24:34   15   REPORT, DOES IT?
17:24:35   16   A.   NO.
17:24:36   17   Q.   OKAY.  THIS IS SOMETHING YOU DID AFTER YOU WERE DEPOSED?
17:24:40   18   A.   CORRECT.
17:24:41   19   Q.   AND IT WAS IN RESPONSE TO THE SUGGESTION THAT YOU HAD NOT
17:24:44   20   VALIDATED YOUR SCOUR WORK; ISN'T THAT TRUE?
17:24:49   21   A.   NO, SIR.
17:24:49   22   Q.   OKAY.  SO IT WAS DONE BEFORE AND JUST NOT REPORTED?
17:24:54   23   A.   NO.  WE HAD BEEN TRYING TO GET THIS DATA IN COMPLETE FORM
17:24:58   24   AND COULD NOT GET IT, DID NOT HAVE IT AT THAT TIME.  AND WHEN
17:25:03   25   IT CAME IN FINALLY, I MADE USE OF IT.
```

| | | |
|---|---|---|
| 17:25:06 | 1 | **Q.**  ALL RIGHT.  AND THAT WAS LONG AFTER YOU WERE DEPOSED; |
| 17:25:12 | 2 | RIGHT? |
| 17:25:13 | 3 | **A.**  IT WAS -- YES. |
| 17:25:14 | 4 | **Q.**  NO. 26. |
| 17:25:16 | 5 | NOW, HERE WE'RE AT A TRENCH THAT IS PARALLEL TO |
| 17:25:20 | 6 | THE IHNC.  WE SEE IT'S DEEPER AND A LITTLE NARROWER THAN THE |
| 17:25:25 | 7 | ONES WE SAW ON THE PERPENDICULAR; ISN'T THAT TRUE? |
| 17:25:28 | 8 | **A.**  WELL, I THINK THE WIDTH IS PROBABLY ABOUT THE SAME, |
| 17:25:30 | 9 | ACTUALLY.  IF YOU SCALE THAT OFF, I THINK YOU WOULD FIND IT'S |
| 17:25:33 | 10 | THE SAME OR MAYBE A LITTLE WIDER THAN WHAT YOU WERE LOOKING AT |
| 17:25:37 | 11 | BEFORE. |
| 17:25:37 | 12 | **Q.**  WELL, NOT IF YOU COMPARED DEPTH AND WIDTH; RIGHT? |
| 17:25:42 | 13 | **A.**  WELL, THE DEPTH-TO-WIDTH RATIO, IF THAT'S WHAT YOU'RE |
| 17:25:45 | 14 | TALKING ABOUT. |
| 17:25:46 | 15 | **Q.**  YES. |
| 17:25:47 | 16 | **A.**  YES.  BUT YOU ASKED ME ABOUT WIDTH, AND THAT'S QUITE |
| 17:25:51 | 17 | DIFFERENT. |
| 17:25:52 | 18 | **MR. BRUNO:**  ALL RIGHT.  NO. 28. |
| 17:25:52 | 19 | **BY MR. BRUNO:** |
| 17:25:52 | 20 | **Q.**  I THINK IN NO. 28 YOU SAID THAT THIS WAS A SCOUR TRENCH? |
| 17:25:56 | 21 | **A.**  I WAS POINTING BACK INTO THIS AREA RIGHT IN HERE. |
| 17:26:00 | 22 | **Q.**  OKAY.  WELL -- |
| 17:26:00 | 23 | **A.**  THE SCOUR -- THE SIGNS OF SCOUR FROM WATER FLOWING OVER |
| 17:26:08 | 24 | THE TOP. |
| 17:26:08 | 25 | **Q.**  WELL, THERE WOULD BE WATER FLOWING OVER THE TOP AFTER THE |

| | | |
|---|---|---|
| 17:26:11 | 1 | FAILURE, WOULDN'T THERE? |
| 17:26:12 | 2 | **A.**   YES. |
| 17:26:13 | 3 | **Q.**   AND THERE WOULD LIKELY BE SCOUR CAUSED FROM THAT ACTION AS |
| 17:26:16 | 4 | WELL, WOULD THERE NOT? |
| 17:26:18 | 5 | **A.**   YES. |
| 17:26:18 | 6 | **Q.**   AND THIS HERE, THAT'S WHERE THE BARGE HIT THE WALL, ISN'T |
| 17:26:21 | 7 | IT? |
| 17:26:21 | 8 | **A.**   YES. |
| 17:26:22 | 9 | **Q.**   AND THAT MIGHT EXPLAIN WHY THIS SECTION OF THE WALL HAS |
| 17:26:25 | 10 | THIS FUNNY KIND OF TAIL, IF YOU WILL, THAT BIG HUNK THAT'S |
| 17:26:31 | 11 | FINISHED OFF THE WALL HERE? |
| 17:26:34 | 12 | **A.**   I'M SORRY, COULD YOU ASK YOUR QUESTION AGAIN? |
| 17:26:36 | 13 | **Q.**   I SAID WOULD THE BARGE STRIKING THE LEVEE AT THIS LOCATION |
| 17:26:40 | 14 | EXPLAIN THAT TAIL, IF YOU WILL, OF THAT BULGE IN THE SOUTH |
| 17:26:43 | 15 | BREACH THAT WE SEE? |
| 17:26:49 | 16 | **THE COURT:**  I DON'T THINK HE UNDERSTANDS YOUR |
| 17:26:50 | 17 | QUESTION. |
| 17:26:51 | 18 | **MR. BRUNO:**  LET ME SEE IF I CAN FIND A PICTURE. |
| 17:27:00 | 19 | NO. 7. |
| 17:27:01 | 20 | **BY MR. BRUNO:** |
| 17:27:03 | 21 | **Q.**   WE HAVE THIS BIG BULGE, AND THEN WE HAVE THIS PIECE HERE, |
| 17:27:06 | 22 | WHICH DIDN'T GET PUSHED AS MUCH AS THIS PIECE; RIGHT? |
| 17:27:13 | 23 | **A.**   IT DIDN'T MOVE OUT AS FAR AS THIS PIECE. |
| 17:27:16 | 24 | **Q.**   RIGHT.  AND SO IF YOUR LOGIC IS CORRECT, THEN ALL THAT |
| 17:27:22 | 25 | WATER SHOULD HAVE PUSHED THIS SECTION TO THE EAST IN THE SAME |

17:27:25   1   WAY THAT IT PUSHED THIS SECTION; RIGHT?

17:27:28   2   **A.**   NOT -- NO, I DIDN'T SAY THAT AT ALL.

17:27:30   3   **Q.**   WELL, YOU SAID THAT THIS SECTION GOT PUSHED BY THE WATER,

17:27:35   4   DIDN'T YOU?

17:27:35   5   **A.**   YES.

17:27:35   6   **Q.**   AND WOULDN'T YOU EXPECT THIS SECTION TO BE PUSHED BY THE

17:27:39   7   WATER?

17:27:39   8   **A.**   YES, IT WAS.  IT JUST WASN'T PUSHED AS FAR.

17:27:43   9   **Q.**   HOW DO YOU ACCOUNT FOR THE DIFFERENCE?

17:27:44   10   **A.**   I DON'T KNOW.

17:27:44   11   **Q.**   YOU DON'T KNOW.

17:27:45   12   **A.**   YOU CAN SPECULATE THAT THIS SECTION FAILED LATER THAN

17:27:47   13   THIS, SO THIS WAS SUBJECTED TO WATER PUSHING IT LANDWARD FOR A

17:27:54   14   LONGER PERIOD OF TIME, BUT THAT'S SPECULATION.

17:27:55   15   **Q.**   ALL RIGHT.  ANY REASON WHY THIS WOULD FAIL LATER?

17:27:58   16   **A.**   WELL, WE -- YES.  THERE ARE A NUMBER OF THINGS THAT GO

17:28:01   17   INTO THE SCOUR CALCULATION THAT AFFECT WHEN OVERTURNING OCCURS,

17:28:06   18   AND I'VE TRIED TO MENTION THOSE.  SLIGHT DIFFERENCES IN SOIL

17:28:08   19   CONDITIONS, SLIGHT DIFFERENCES IN STRENGTH OF THE LEVEE

17:28:12   20   EMBANKMENT MATERIAL ITSELF.

17:28:14   21          WE ALL KNOW THAT -- GEOTECHNICAL ENGINEERS KNOW THAT

17:28:18   22   SOIL IS VERY VARIABLE FROM POINT TO POINT.  AND IT ONLY TAKES A

17:28:23   23   SMALL CHANGE IN SHEAR STRENGTH OF THE LEVEE MATERIALS AND THE

17:28:27   24   UNDERLYING ORGANIC SOILS TO CHANGE THE REQUIRED SCOUR TRENCH

17:28:32   25   DEPTH FOR IT TO OVERTURN.  SO IF THIS SOIL WAS JUST SLIGHTLY

17:28:38    1   STRONGER THAN UP HERE, IT WOULD HAVE FAILED A LITTLE BIT LATER.

17:28:42    2           AND THEN IT GOES TO PERHAPS WHY DIDN'T IT FAIL DOWN

17:28:44    3   HERE, WHY DID IT STOP HERE?  IT'S POSSIBLE THAT THIS SOIL IS A

17:28:48    4   LITTLE BIT STRONGER IN THIS LOCATION --

17:28:50    5   **Q.**   RIGHT.

17:28:50    6   **A.**   -- SO IT JUST DIDN'T GET TO THE FULL OVERTURNING FAILURE.

17:28:54    7   **Q.**   I SEE.  SO THE DIFFERENT SOILS WOULD EXPLAIN WHY SOME OF

17:28:57    8   THE OTHER WALLS DID NOT FAIL; RIGHT?

17:28:58    9   **A.**   IT COULD.

17:28:58   10   **Q.**   OKAY.

17:28:59   11   **A.**   THAT'S ONE EXPLANATION.  WE DID CHECK THAT.  AND JUST A

17:29:02   12   SIMPLE INCREASE IN SOIL STRENGTH OF ABOUT 100 POUNDS PER SQUARE

17:29:06   13   FOOT IS ENOUGH TO REQUIRE AN ADDITIONAL FOOT OF SCOUR DEPTH TO

17:29:09   14   CREATE OVERTURNING.  IT'S VERY SENSITIVE TO THE STRENGTH OF THE

17:29:13   15   SOIL.

17:29:22   16           **MR. BRUNO:**  ALL RIGHT.  LET'S GO TO 32 -- I'M SORRY,

17:29:25   17   31.  I'M WRONG.  31.

17:29:30   18           THAT'S 33.  31.

17:29:38   19   **BY MR. BRUNO:**

17:29:38   20   **Q.**   NOW, WE ALSO HAVE ANOTHER VARIABLE BEING INTRODUCED, AND

17:29:43   21   THAT'S THE LEAN OF THE WALL, RIGHT, IN TERMS OF CHANGING THE

17:29:47   22   DISTANCE THAT THE WATER HAS TO TRAVEL FROM THE TOP OF THE WALL

17:29:51   23   TO THE TOP OF THE CROWN TO CAUSE THE SCOUR?

17:29:55   24   **A.**   BY "LEAN" DO YOU MEAN THE WALL'S STARTING TO ROTATE --

17:30:00   25   **Q.**   YES.

```
17:30:01    1    A.    -- AS A RESULT --

17:30:02    2    Q.    YES.

17:30:02    3    A.    -- OF THE OVERTOPPING?

17:30:03    4    Q.    YES.

17:30:04    5    A.    SO NOW I UNDERSTAND WHAT YOU MEAN BY "LEAN."  PLEASE ASK

17:30:08    6    YOUR QUESTION AGAIN.

17:30:09    7    Q.    WELL, WHAT I'M SAYING IS, IF THE WALL IS PERFECTLY

17:30:13    8    VERTICAL, IT WILL HAVE HEIGHT X.  IF THE WALL LEANS EITHER WAY,

17:30:19    9    THE HEIGHT WILL BE REDUCED.

17:30:22   10    A.    VERY SLIGHTLY.  IT'S ACTUALLY LESS THAN AN INCH REDUCING

17:30:29   11    IN HEIGHT FOR SOME 5 TO 10 DEGREES OF ROTATION.

17:30:34   12    Q.    YOU MEASURED THAT?

17:30:36   13    A.    I CALCULATED THAT.

17:30:37   14    Q.    OKAY.  AND I THINK THAT YOU'VE INDICATED THAT JUST AN INCH

17:30:42   15    OR TWO MAKES A BIG DIFFERENCE WITH REGARD TO OVERTOPPING?

17:30:45   16    A.    I THINK I PUT IT MORE IN TERMS OF 6 INCHES MAKES A

17:30:49   17    DIFFERENCE.

17:30:49   18    Q.    WELL, IF WE NEED TO -- AND THE COURT CAN DO THIS, AND WE

17:30:52   19    CAN ARGUE IT LATER.  BUT IN YOUR OVERTOPPING CHART, WE CAN SEE

17:30:56   20    THE DEGREE TO WHICH 1 OR 2 INCHES AFFECTS THE DEPTH OF THE

17:31:00   21    SCOUR, CAN'T WE?

17:31:03   22    A.    YES.

17:31:03   23    Q.    BECAUSE YOU'VE GOT SHOWN ON THERE 12.1, 12.2, 12.3,

17:31:09   24    ET CETERA; CORRECT?

17:31:10   25    A.    YES.
```

17:31:10   1   **Q.**   ALL RIGHT.  SO IF WE INCREASE OR DECREASE THE WALL HEIGHT

17:31:12   2   BY LEAN, WE CAN ACTUALLY SEE THROUGH YOUR CHART HOW THAT

17:31:16   3   IMPLICATES SCOUR; RIGHT?

17:31:27   4   **A.**   YES, SIR.

17:31:27   5   **Q.**   NO. 38.  DO YOU SEE HERE WE'VE GOT THIS BERM SHOWN ON YOUR

17:31:43   6   ELEVATION, WHICH IS THE SURKOTE ROAD; RIGHT?

17:31:46   7   **A.**   YES.

17:31:46   8   **Q.**   AND THIS HERE.  SO FOR WAVES, IF THERE ARE ANY, TO GET TO

17:31:53   9   THE NORTH WALL, THEY HAVE TO GET OVER THIS BERM, DON'T THEY?

17:32:02   10  **A.**   TO THE EXTENT THAT IT WAS THERE, YOU'VE GOT TO -- WE'VE

17:32:04   11  GOT TO REMEMBER THAT IT WENT -- ONCE IT CROSSED OVER THE WALL,

17:32:07   12  IT WENT DOWN A PRETTY GOOD SLOPE, AND ONCE IT DROPPED DOWN

17:32:15   13  3 FEET OR MORE, IT WOULD NOT IMPACT THE WAVE.

17:32:21   14  **Q.**   SO YOU'RE SAYING THAT THIS BERM HERE WOULD NOT CAUSE THE

17:32:25   15  WAVE TO BREAK.  IS THAT WHAT YOU'RE SAYING?

17:32:30   16  **A.**   WELL, NO, I DIDN'T SAY THAT.

17:32:32   17  **Q.**   OKAY.  WELL, IF THE WAVE BREAKS, IN ORDER FOR IT TO

17:32:35   18  REGENERATE -- TO REGENERATE, YOU NEED A FETCH LONG ENOUGH TO DO

17:32:38   19  THAT, DON'T YOU?

17:32:40   20  **A.**   WE'RE GETTING INTO WAVES, AND THAT'S NOT MY EXPERTISE.

17:32:43   21  **Q.**   WELL, I'M SORRY, BUT YOU VOLUNTEERED THE ANSWER, SO I HAD

17:32:46   22  TO ASK.

17:32:48   23       NOW, NO. 41, THIS IS YOUR OVERTOPPING STAGES AND THIS

17:33:07   24  IS WHAT -- AND WE DIDN'T SEE THIS IN YOUR EXPERT REPORT, DID

17:33:17   25  WE?

17:33:17  1  **A.**   NO, THIS FIGURE IS IN MY EXPERT REPORT, I BELIEVE.

17:33:22  2  **Q.**   IT IS?  IN YOUR MARCH 2012?

17:33:24  3  **A.**   I THINK IT IS, OR A VERSION OF IT IS.

17:33:27  4  **Q.**   OKAY.  ALL RIGHT.  WELL, ISN'T IT TRUE THAT THE DEPTH OF

17:33:29  5  THE WATER HAS TO EQUAL EIGHT TO TEN TIMES THE WIDTH OF THE

17:33:32  6  IMPINGING JET OF THE WATER BEFORE THERE'S AN IMPORTANT EFFECT

17:33:36  7  ON SCOUR?

17:33:37  8  **A.**   THE DEPTH OF THE WATER HAS TO EQUAL -- I'M NOT SURE ABOUT

17:33:43  9  THAT.  HAVE TO ASK DR. GOVINDASAMY ABOUT THAT.

17:34:00  10  **Q.**   OKAY.  NOW, JUST SO WE'RE CLEAR, THE WATER -- THE JET HAS

17:34:03  11  TO GO THROUGH THIS WATER TO CONTINUE TO SCOUR EVEN THOUGH

17:34:04  12  THERE'S NO TAIL WATER; RIGHT?

17:34:06  13  **A.**   YES.

17:34:07  14          **THE COURT:**  WHEN YOU SAY "THIS WATER" --

17:34:08  15          **MR. BRUNO:**  THE WATER THAT'S COMING OVER THE TOP AND

17:34:11  16  PRODUCES THE JET.

17:34:12  17          **THE COURT:**  RIGHT.

17:34:12  18          **THE WITNESS:**  YES.  BUT THAT'S A SIMPLE PICTORIAL.

17:34:15  19  THAT'S THAT CHURNING ACTION GOING ON THERE WHERE THE TOP OF

17:34:18  20  THAT WATER SURFACE IS VERY VIOLENT AND, YOU KNOW, NOT AS SIMPLE

17:34:22  21  AS SHOWN IN THAT ILLUSTRATION.

17:34:24  22  **BY MR. BRUNO:**

17:34:24  23  **Q.**   WELL, I UNDERSTAND THAT.  BUT THE WATER STAYS IN THE HOLE,

17:34:27  24  DOESN'T IT?

17:34:27  25  **A.**   THERE ARE TIMES IN THAT CASE, WITH THE DYNAMICS INVOLVED,

17:34:31   1   THAT THAT HOLE IS NOT NECESSARILY FILLED WITH WATER.

17:34:34   2   **Q.**   AND THERE ARE TIMES WHEN IT IS FILLED WITH WATER; RIGHT?

17:34:36   3   **A.**   YES, YES.

17:34:37   4   **Q.**   AND THE WATER -- AND THE JET GOES THROUGH THE STANDING

17:34:40   5   WATER AND CAUSES CONTINUED SCOUR?

17:34:43   6   **A.**   WELL, IT GOES THROUGH WHATEVER'S THERE, AND THAT'S PART OF

17:34:45   7   THE EMPIRICISM THAT'S INVOLVED IN THE METHOD.

17:34:53   8           **THE COURT:**  DR. MARR, JUST -- AND IT IS LATE, SO

17:34:58   9   MAYBE I'M A BIT MUDDLED MYSELF.  BUT THE TAIL WATER IS NOT

17:35:07   10  NECESSARILY, JUST FROM THIS DIAGRAM, THE WATER IN THE

17:35:10   11  DEVELOPING TRENCH.  IT IS THE WATER THAT HAS OVERFLOWED FROM

17:35:15   12  THE TRENCHES AS WELL?  BY LOOKING AT THAT DIAGRAM I'M A

17:35:19   13  LITTLE -- NO. 3, I'M A LITTLE CONFUSED.

17:35:22   14          **THE WITNESS:**  I UNDERSTAND.  THE TAIL WATER, WHAT I

17:35:24   15  MEAN BY "TAIL WATER" IS WHERE THE WATER ON THE LAND SIDE HAS

17:35:28   16  BUILT UP ENOUGH THAT IT'S COME UP OVER TOP OF THE ORIGINAL --

17:35:33   17          **THE COURT:**  EXACTLY.  SO IT'S NOT -- IT'S NOT THE

17:35:34   18  WATER NECESSARILY IN THE TRENCH, BUT THE LAND WATER HAS GOTTEN

17:35:38   19  SUFFICIENTLY HIGH TO OVERTOP THE TRENCH; IS THAT CORRECT?

17:35:43   20          **THE WITNESS:**  YES, SIR.

17:35:43   21          **THE COURT:**  ALL RIGHT.  I UNDERSTAND IT A LITTLE

17:35:46   22  BETTER.  THANK YOU.

17:35:47   23          **THE WITNESS:**  THANK YOU.

17:36:03   24  **BY MR. BRUNO:**

17:36:03   25  **Q.**   NOW, IF WE GO TO PAGE 43.  MAKE SURE I'M UNDERSTANDING

17:36:08   1   THIS CORRECTLY.  WE'VE LOST OUR LINES.  I DON'T KNOW WHERE THE

17:36:15   2   LINES WENT.

17:36:16   3          BUT ANYWAY, THIS ASSUMES THAT WATER IS COMING OVER

17:36:19   4   THE TOP OF THE LOWEST PART OF THE SOUTH BREACH UNTIL 9:00;

17:36:23   5   ISN'T THAT TRUE?

17:36:25   6   A.   YES.  IT ACTUALLY GOES UNTIL 10:00.

17:36:29   7   Q.   WELL, THE PEAK SURGE IS AT 9:00, ISN'T IT, NOT 10:00?

17:36:36   8   A.   RIGHT.  BUT WE CONTINUED FOLLOWING THE HYDROGRAPH UNTIL

17:36:40   9   10:00.

17:36:40  10   Q.   WELL, THIS IS 14 -- WELL, WHAT'S THE HEIGHT OF THE WATER

17:36:43  11   AT 9:00?

17:36:45  12   A.   IT WAS 14.2.

17:36:46  13   Q.   AND WHAT DO WE HAVE HERE -- 14.2?

17:36:49  14   A.   YES, AT 9:00 IT WAS 14.2.  BUT I'M JUST TRYING TO BE

17:36:54  15   COMPLETE.  HERE IT SAYS THE CALCULATIONS ASSUME THE WALL STAYS

17:36:59  16   IN PLACE UP TILL 10:00 A.M.

17:37:01  17   Q.   WELL, EXCEPT THAT WHAT YOU'RE SHOWING US HERE IS THE WATER

17:37:05  18   STARTS COMING OVER THE TOP AT 14.2 FEET; RIGHT?

17:37:10  19   A.   NO.  THIS -- WE'RE SHOWING THAT -- WHAT THIS DIAGRAM IS

17:37:15  20   SHOWING IS THAT THERE IS NO EROSION IF THE TOP OF THE WALL IS

17:37:22  21   AT 14.2 FEET.

17:37:24  22   Q.   EXACTLY.  SO WHAT THAT MEANS IS THE HEIGHT OF THE WATER IS

17:37:28  23   AT 14.2 AND THE HEIGHT OF THE WALL IS AT 14.2; CORRECT?

17:37:33  24   A.   YES.

17:37:33  25   Q.   AND AT 10:00, THE WATER IS LOWER THAN 14.2; CORRECT?

| | | |
|---|---|---|
| 17:37:37 | 1 | **A.**   YES. |
| 17:37:37 | 2 | **Q.**   SO 10:00 IS MEANINGLESS IN THE CONTEXT OF OVERTOPPING, |
| 17:37:40 | 3 | RIGHT, BECAUSE THE WATER IS LOWER? |
| 17:37:44 | 4 | **A.**   YES. |
| 17:37:45 | 5 | **Q.**   OKAY.  SO AT 14.2, WE KNOW THAT'S 9:00 IN THE MORNING? |
| 17:37:50 | 6 | **A.**   WELL, IT'S ALSO 10:00 IN THE MORNING. |
| 17:37:55 | 7 | **Q.**   IT'S NOT 10:00 IN THE MORNING, BECAUSE THE WATER IS LOWER |
| 17:37:57 | 8 | THAN 14.2.  WE HAVE A STIPULATION.  IT'S NOT GOING OVER THE |
| 17:38:01 | 9 | TOP. |
| 17:38:01 | 10 | **A.**   WELL, THE POINT IS, WITH THE WALL AT 14.2, THERE WAS NEVER |
| 17:38:06 | 11 | ANY WATER GOING OVER THE TOP. |
| 17:38:07 | 12 | **Q.**   EXACTLY.  AND THAT'S WHY YOU SEE IT AT ZERO; RIGHT? |
| 17:38:10 | 13 | **A.**   YES, YES. |
| 17:38:11 | 14 | **Q.**   AND AS WE MOVE THIS WAY, WHAT WE'RE SEEING IS, WE SEE |
| 17:38:14 | 15 | TIME.  WE SEE THAT 14.20 AT 9:00.  AND WE HAVE -- HERE AT |
| 17:38:20 | 16 | 12.1 OR 2, WE KNOW THAT'S 7:00; RIGHT?  SO WE SEE A |
| 17:38:27 | 17 | REPRESENTATION OF TIME? |
| 17:38:30 | 18 | **A.**   YEAH.  INHERENTLY THERE'S TIME BEHIND THIS, YES. |
| 17:38:33 | 19 | **Q.**   OF COURSE.  AND WE HAVE ABOUT TWO HOURS THERE; RIGHT? |
| 17:38:38 | 20 | **A.**   YES. |
| 17:38:39 | 21 | **Q.**   OKAY.  AND SO WHAT YOU SEE HERE IS THAT IN TWO HOURS, |
| 17:38:43 | 22 | AFTER 7:00 IN THE MORNING, WE HAVE CREATED A TRENCH 5 FEET DEEP |
| 17:38:49 | 23 | USING THE WORST CLAY OR THE WORST -- MOST ERODABLE CLAY ON YOUR |
| 17:38:57 | 24 | CHART; RIGHT? |
| 17:38:57 | 25 | **A.**   OUT OF THOSE -- OUT OF THE CALCULATIONS, YES. |

17:38:59  1  **Q.**  ALL RIGHT.  5 FEET.  YOU SAID YOU NEED 5.7 FOR FAILURE?

17:39:03  2  **A.**  WELL, I CAN'T REALLY TELL THERE.  THAT MIGHT BE

17:39:06  3  5 1/2 FEET.  I CAN'T REALLY TELL FROM THE SCALE, OR --

17:39:08  4  **Q.**  WELL, ON THE PAPER COPY WE --

17:39:09  5  **A.**  IT MIGHT BE 5.3.

17:39:10  6  **Q.**  ON THE PAPER COPY WE SEE A LINE, AND IT GOES RIGHT THROUGH

17:39:14  7  5?

17:39:15  8  **A.**  YES.

17:39:16  9  **Q.**  ALL RIGHT.  LET'S GO TO NO. 45.  NOW, THIS IS AT 14.2, SO

17:39:29  10  THIS IS 9:00 AS WELL; ISN'T THAT RIGHT?

17:39:32  11  **A.**  YES.

17:39:32  12  **Q.**  NOT 7:00.  WHAT WE HAVE HERE IS A 4.7-FOOT SCOUR DEPTH AND

17:39:39  13  WE HAVE A GAP DEPTH OF 12.9 AND WE HAVE TAIL WATER OF 8.  AND

17:39:43  14  SO WHAT WE KNOW HERE IS THAT THE HIGHEST THE TAIL WATER EVER

17:39:47  15  GOT BEFORE -- OR I SHOULD SAY AT THE TIME THAT THE WATER

17:39:52  16  REACHED ITS PEAK WAS 8; CORRECT?

17:39:58  17  **A.**  WHAT THIS IS SAYING IS AT THE TIME THE WATER REACHED 14.2,

17:40:01  18  THE TAIL WATER WAS AT 8.

17:40:04  19  **Q.**  AND WE KNOW 14.2 IS THE HIGHEST ELEVATION THAT THE WATER

17:40:07  20  ACHIEVED DURING KATRINA?

17:40:09  21  **A.**  YES.

17:40:10  22  **Q.**  SO WE KNOW THAT THIS IS THE HIGHEST THE TAIL WATER WOULD

17:40:15  23  HAVE GOTTEN AT THAT POINT IN TIME; CORRECT?

17:40:17  24  **A.**  YES.

17:40:18  25  **Q.**  OKAY.  NOW, LET'S GO TO NO. 47.  WE HAVE THE SAME SORT OF

17:40:37   1   A CHART, AND INSTEAD OF THESE LINES STARTING AT ZERO, WE SEE

17:40:44   2   THEM STARTING AT A CERTAIN SCOUR DEPTH; CORRECT?

17:40:47   3   **A.**   YES.

17:40:48   4   **Q.**   AND THAT'S BECAUSE YOU HAVE OVERTOPPING THAT OCCURS WITH

17:40:54   5   THE 14.2 FEET OF WATER; RIGHT?

17:41:00   6   **A.**   YES.

17:41:01   7   **Q.**   IF WE WOULD HAVE -- IF YOU WOULD HAVE CONTINUED THESE

17:41:04   8   LINES TO ZERO, WE COULD FIGURE OUT HOW HIGH THE WATER OR HOW

17:41:10   9   LOW, DEPENDING UPON THE CASE, WOULD BE WHERE THE WAVES WOULD

17:41:14  10   HAVE NO IMPACT; RIGHT?

17:41:20  11   **A.**   MORE OR LESS.  YOU HAVE TO BE A LITTLE CAREFUL OF WHAT

17:41:23  12   SLOPE YOU PUT THESE AT.  BUT LET ME JUST BE CLEAR:  WHAT --

17:41:27  13   WHAT THIS IS IS THE EFFECT OF THE ADDITION OF WAVES ON SCOUR

17:41:32  14   DEPTH --

17:41:32  15   **Q.**   RIGHT.

17:41:32  16   **A.**   -- FOR THE CASE WHERE THE -- WHERE THE WALL WAS 14.2 FEET

17:41:35  17   HIGH.

17:41:41  18   **Q.**   EXACTLY.  SO AT 14.2 WE HAVE SOME WAVES, ACCORDING TO

17:41:44  19   YOUR -- IF YOU BELIEVE, THE 3 FEET --

17:41:47  20   **A.**   RIGHT.

17:41:47  21   **Q.**   -- COMING OVER THE WALL.  AND THOSE WAVES HAVE CREATED

17:41:51  22   THIS DEPTH OF SCOUR; RIGHT?

17:41:55  23   **A.**   YES.

17:41:55  24   **Q.**   AND SO WHAT'S INTERESTING IS THAT -- OH, I'M SORRY.  WE

17:42:08  25   DON'T HAVE WAVES ONLY IN THIS.  WE HAVE WAVES AND OVERTOPPING

| | | |
|---|---|---|
| 17:42:11 | 1 | IN THIS DIAGRAM, DON'T WE? |
| 17:42:14 | 2 | **A.**   YES. |
| 17:42:14 | 3 | **Q.**   OKAY.  AND THE DEEPEST TRENCH WE GET AT 12.3 IS ABOUT |
| 17:42:18 | 4 | 5.0 -- WHAT DO YOU GIVE THAT -- 5 1/2? |
| 17:42:27 | 5 | **A.**   THAT LOOKS ABOUT RIGHT. |
| 17:42:29 | 6 | **Q.**   5 1/2.  WHICH IS TWO-TENTHS OF A FOOT LOWER THAN THE 5.7 |
| 17:42:34 | 7 | THAT YOU SAID YOU NEEDED FOR FAILURE. |
| 17:42:36 | 8 | **THE COURT:**  AND MAY I ASK, WHAT TIME DOES THAT SHOW? |
| 17:42:40 | 9 | **MR. BRUNO:**  THIS IS 7:00. |
| 17:42:40 | 10 | **THE COURT:**  OKAY. |
| 17:42:41 | 11 | **BY MR. BRUNO:** |
| 17:42:42 | 12 | **Q.**   12.2 IS ALWAYS 7:00.  ISN'T THAT TRUE, DR. MARR? |
| 17:42:46 | 13 | **A.**   NO, THAT 12.2 IS THE TOP OF THE WALL. |
| 17:42:51 | 14 | **Q.**   RIGHT. |
| 17:42:51 | 15 | **A.**   THAT'S THE TOP OF THE WALL.  THAT'S NOT THE HEIGHT OF THE |
| 17:42:54 | 16 | WATER. |
| 17:42:54 | 17 | **THE COURT:**  CAN WE ASCERTAIN FROM THAT CHART WHAT THE |
| 17:43:02 | 18 | TIME IS ON AUGUST 29TH WHEN IT GOT TO 6 FEET OR 5-POINT |
| 17:43:07 | 19 | WHATEVER IT WAS? |
| 17:43:08 | 20 | **MR. BRUNO:**  YES. |
| 17:43:09 | 21 | **THE WITNESS:**  FROM THIS CHART -- |
| 17:43:10 | 22 | **BY MR. BRUNO:** |
| 17:43:10 | 23 | **Q.**   WE CAN, DR. MARR, CAN WE NOT? |
| 17:43:13 | 24 | **THE COURT:**  THAT'S WHAT I'M ASKING. |
| | 25 | |

| | | |
|---|---|---|
| 17:43:15 | 1 | **BY MR. BRUNO:** |
| 17:43:16 | 2 | **Q.**   LET'S BACK IT UP.  DO YOU RECALL WE JUST ESTABLISHED THIS |
| 17:43:19 | 3 | IS 14.2; RIGHT? |
| 17:43:21 | 4 | **A.**   YES. |
| 17:43:21 | 5 | **Q.**   AND YOU STARTED THERE BECAUSE THAT'S THE HIGHEST THE |
| 17:43:26 | 6 | STILL-WATER HEIGHT EVER GOT; RIGHT? |
| 17:43:29 | 7 | **THE COURT:**  SO, I GUESS AT WHAT TIME WAS THE -- WAS |
| 17:43:32 | 8 | IT 12.2? |
| 17:43:34 | 9 | **BY MR. BRUNO:** |
| 17:43:34 | 10 | **Q.**   WELL, WE KNOW THIS IS 9:00; CORRECT?  I'M TRYING TO WORK |
| 17:43:40 | 11 | BACKWARDS.  WE KNOW THIS IS 9:00.  ISN'T THAT TRUE, DR. MARR? |
| 17:43:46 | 12 | **A.**   WELL, AGAIN, THIS -- THIS IS A SET OF CALCULATIONS OF |
| 17:43:50 | 13 | WHAT -- HOW MUCH -- HOW DEEP COULD THE SCOUR HAVE GONE IF IT |
| 17:43:55 | 14 | DID NOT FAIL.  THAT'S ALL THIS IS CALCULATING.  IT'S NOT |
| 17:43:59 | 15 | CALCULATING OVERTURNING FACTOR OF SAFETY.  IT'S JUST SAYING -- |
| 17:44:03 | 16 | **Q.**   NOBODY'S SUGGESTING -- |
| 17:44:05 | 17 | **A.**   -- IF THE WALL STAYED IN PLACE, THIS IS HOW DEEP IT COULD |
| 17:44:07 | 18 | HAVE SCOURED BY 10:00 IN THE MORNING. |
| 17:44:10 | 19 | AND SINCE OVER HERE A WALL THIS HIGH, WATER WOULD |
| 17:44:15 | 20 | HAVE STOPPED GOING OVER IT AT 9:00 -- AT THIS POINT THIS IS THE |
| 17:44:18 | 21 | DEPTH AT 9:00 O'CLOCK.  BUT FOR A WALL THAT'S NOT AS HIGH, |
| 17:44:23 | 22 | WATER COULD HAVE CONTINUED TO FLOW OVER AFTER 9:00.  THAT'S -- |
| 17:44:27 | 23 | THAT'S WHAT'S -- BUT BY THIS POINT, TAIL WATER HAS COME UP, SO |
| 17:44:33 | 24 | THERE'S NOT MUCH MORE SCOUR OCCURRING. |
| 17:44:36 | 25 | **Q.**   EXCEPT THAT, DR. MARR, THE WAY THIS THING IS |

17:44:38   1   CONSTRUCTED -- WE UNDERSTAND THAT IT COULD CONTINUE OVER TIME.

17:44:41   2   BUT HERE WE ARE MOVING BACKWARDS, WE'RE GOING THIS WAY.  WE'RE

17:44:45   3   TALKING ABOUT WHAT HAPPENS OVER TIME.

17:44:46   4           SO WE KNOW HERE, AT 12.2 OR WHATEVER THAT IS, THAT'S

17:44:50   5   WHEN THE WATER AND WAVES -- I'M SORRY, THE WAVES START TO COME

17:44:54   6   OVER THE WALL; ISN'T THAT TRUE?

17:44:57   7   **A.**   NO, THAT'S NOT TRUE.

17:44:59   8   **Q.**   WELL --

17:45:01   9   **A.**   AT 12.1 -- AT A WALL HEIGHT OF 12.1, THE WAVES STARTED

17:45:07  10   COMING OVER IT WHEN THE CANAL WATER LEVEL WOULD HAVE BEEN

17:45:10  11   12.1 MINUS ABOUT A FOOT AND A HALF.

17:45:13  12   **Q.**   WHICH IS WHY YOU HAVE SOME SCOUR OVER HERE; ISN'T THAT

17:45:23  13   TRUE?

17:45:25  14   **A.**   NO, I DON'T -- I DON'T FOLLOW WHAT YOU'RE SAYING THERE.

17:45:30  15   **Q.**   WELL, I'M JUST TRYING TO UNDERSTAND WHAT YOU'RE SHOWING

17:45:33  16   US.  HERE'S THE WALL, 11.5 FEET WALL.  AND WHAT I'M SUPPOSED TO

17:45:37  17   BE SEEING HERE IS STILL-WATER HEIGHT PLUS WAVES; RIGHT?

17:45:41  18   **A.**   YES.

17:45:43  19   **Q.**   OKAY.  AND I HAVE TO ASSUME THAT AT THIS POINT IN TIME --

17:45:49  20   SINCE YOU'VE GOT THE WATER HERE -- LET ME BACK UP.

17:45:52  21           YOU DIDN'T USE 14.4 FEET OF WATER FOR THE WHOLE

17:45:55  22   CHART, DID YOU?

17:45:57  23   **A.**   YES.  WHAT THIS HAS IN IT IS THE FULL HYDROGRAPH OF WATER

17:46:01  24   BEING APPLIED TO WALLS OF THE DIFFERENT HEIGHTS.

17:46:06  25   **Q.**   WHEN YOU SAY "FULL HYDROGRAPH," YOU MEAN THE HYDROGRAPH

17:46:10   1   THAT GOES UP OVER TIME?

17:46:11   2   **A.**   YES.

17:46:12   3   **Q.**   SO WE KNOW THEN THAT -- WHEN THE WALL IS 12.2, WE KNOW HOW

17:46:16   4   HIGH THE WATER IS; CORRECT?

17:46:20   5   **A.**   WELL, WE KNOW -- FOR THE WALL THAT'S 12.2, WE'LL KNOW FROM

17:46:26   6   THE HYDROGRAPH WHEN THE WATER GOT TO THAT POINT.

17:46:30   7   **Q.**   AND THAT IS 7:00?

17:46:34   8   **A.**   OKAY.

17:46:36   9   **Q.**   SO WE'RE BACK WHERE WE STARTED.  THIS IS 7:00.

17:46:41   10   **A.**   NO.  WITH WAVES -- I'M SORRY.  WITH WAVES -- WE STARTED

17:46:49   11   GETTING EROSION AT ABOUT 5:00 IN THE MORNING WHEN THE WAVES

17:46:52   12   STARTED GOING ACROSS THE WALL --

17:46:54   13   **Q.**   OKAY.

17:46:58   14   **A.**   -- WITH THE TOP ELEVATION OF 12.1.

17:47:01   15   **Q.**   RIGHT.

17:47:03   16         WELL, THE CHART -- AND I DON'T WANT TO BRING IT UP

17:47:04   17   AGAIN -- STARTS AT 5:30, NOT 5:00.

17:47:07   18   **A.**   I'M SORRY.  WELL --

17:47:07   19   **Q.**   SO IT STARTED AT 5:30.

17:47:10   20   **A.**   WELL, THE EROSION STARTED AT 5:30 --

17:47:12   21   **Q.**   CORRECT.

17:47:12   22   **A.**   -- AND --

17:47:13   23   **Q.**   AND THE REASON WHY YOU START AT 5:30 IS BECAUSE THAT'S

17:47:16   24   WHEN THE STWAVES FROM THE IPET REPORT SHOWS THAT THE WAVES WERE

17:47:20   25   AT THEIR HIGHEST?

17:47:22   1   **A.**   NO, IT STARTS BECAUSE WE'RE TAKING THE FOOT AND A HALF TO

17:47:24   2   3-FOOT SIGNIFICANT WAVE HEIGHT AND -- AND COMBINING IT WITH THE

17:47:28   3   IPET HYDROGRAPH ON THE WATER LEVEL IN THE CANAL.

17:47:31   4   **Q.**   WHY DID YOU CHOOSE 5:30?

17:47:34   5   **A.**   I DIDN'T CHOOSE 5:30.  IT'S WHATEVER THE HYDROGRAPH PLUS

17:47:39   6   THE 3-FOOT SIGNIFICANT WAVE HEIGHT PRODUCES.  I DIDN'T --

17:47:42   7   THAT'S -- 5:30 -- I THINK, IF I RECALL RIGHT, THERE WAS WAVES

17:47:46   8   THAT STARTED GOING OVER AT 5:00, BUT THE EROSION THAT WAS A

17:47:49   9   RESULT -- THE SCOURING THAT WAS RESULTING FROM THAT DIDN'T

17:47:53   10   START TILL ABOUT 5:30.

17:47:55   11           **THE COURT:**  LET ME SEE IF I CAN GET SOMETHING CLEARED

17:47:57   12   UP, AND I DON'T WANT TO MUDDLE ANYTHING.

17:48:00   13           BUT EITHER FROM THIS CHART OR ANY OTHER CHART,

17:48:03   14   CAN THE COURT LOOK AND, ACCORDING TO YOUR OPINION, DETERMINE

17:48:07   15   HOW LONG -- IF THE WALL IS 12.2, HOW LONG IT TAKES TO DEVELOP A

17:48:13   16   5-FOOT TRENCH, BASED ON THE HYDROGRAPHS YOU'VE EXAMINED?

17:48:23   17           AND IT'S IMPORTANT TO ME, BUT --

17:48:26   18           **THE WITNESS:**  I DON'T RECALL IF THERE'S -- THAT PLOT

17:48:28   19   IS IN HERE.  IN MY SUPPLEMENTAL REPORT, I THINK I GAVE A

17:48:33   20   STATEMENT THAT IT TOOK ABOUT 130 MINUTES FOR THE SCOUR TRENCH

17:48:38   21   TO DEVELOP TO --

17:48:39   22   **BY MR. BRUNO:**

17:48:39   23   **Q.**   3 FEET.

17:48:40   24   **A.**   -- TO A CERTAIN DEPTH.

17:48:42   25           **THE COURT:**  OKAY.  I DO REMEMBER SEEING THAT.

| | | |
|---|---|---|
| 17:48:43 | 1 | **BY MR. BRUNO:** |
| 17:48:43 | 2 | **Q.**   YEAH.  SO WE HAVE A CHART THAT WE CAN LOOK AT; RIGHT? |
| 17:48:46 | 3 | **A.**   WELL, WE HAVE THAT. |
| 17:48:48 | 4 | **Q.**   WELL, IS THAT THE ONE WE SHOULD LOOK AT, OR SHOULD WE LOOK |
| 17:48:54 | 5 | SOMEWHERE ELSE? |
| 17:48:55 | 6 | **A.**   WELL, I THINK I JUST SAID I DON'T RECALL IF WE PUT A GRAPH |
| 17:48:57 | 7 | IN THE REPORT THAT SHOWS EROSION DEPTH WITH TIME. |
| 17:49:00 | 8 | **Q.**   WELL, IT COULDN'T BE IN THE REPORT BECAUSE YOUR REPORT |
| 17:49:03 | 9 | DIDN'T ADDRESS WAVES.  SO THE ONLY THING WE HAVE TO LOOK AT IS |
| 17:49:06 | 10 | THE CHART THAT'S ATTACHED TO YOUR SUPPLEMENTAL REPORT SO WE CAN |
| 17:49:09 | 11 | GET FOCUSED ON WHERE TO GO; RIGHT? |
| 17:49:12 | 12 | **A.**   CORRECT. |
| 17:49:14 | 13 | **Q.**   OKAY.  THANK YOU. |
| 17:49:15 | 14 | PAGE -- NO. 49.  YOU SAY FACTOR OF SAFETY AGAINST |
| 17:49:18 | 15 | OVERTURNING IS ONE.  BUT THIS WALL DIDN'T FAIL, DID IT? |
| 17:49:27 | 16 | **A.**   THIS IS ACTUALLY THE SOUTH BREACH, AN OVERTURNING ANALYSIS |
| 17:49:34 | 17 | WITH THE SOUTH BREACH WHERE WE HAVE INCLUDED THE EFFECT OF |
| 17:49:37 | 18 | WAVES. |
| 17:49:39 | 19 | **Q.**   ALL RIGHT.  SO THIS IS WITH THE WALL -- I DIDN'T SEE THE |
| 17:49:39 | 20 | WALL HEIGHT HERE.  I GUESS I READ THAT WRONG.  WHAT'S THE WALL |
| 17:49:43 | 21 | HEIGHT? |
| 17:49:43 | 22 | **A.**   THIS WOULD BE -- THE WALL HEIGHT IS 12.1 FEET. |
| 17:49:46 | 23 | **Q.**   AND HERE WE HAVE A SCOUR DEPTH OF 3.6? |
| 17:49:50 | 24 | **A.**   YES. |
| 17:49:51 | 25 | **Q.**   NOT THE 5.7? |

| | | |
|---|---|---|
| 17:49:52 | 1 | **A.** YES. |
| 17:49:54 | 2 | **Q.** SO IT CHANGED? |
| 17:49:54 | 3 | **A.** YES.  IT CHANGED FOR A VERY IMPORTANT REASON. |
| 17:49:56 | 4 | **Q.** AND WHY IS THAT? |
| 17:49:57 | 5 | **A.** THERE'S NO TAIL WATER HERE.  THIS -- THIS IS AN ANALYSIS |
| 17:50:02 | 6 | NOW.  THE OVERTOPPING -- THE OVERTURNING FAILURE IS OCCURRING |
| 17:50:07 | 7 | EARLIER -- WHEN WE CONSIDER WAVES, IT OCCURS EARLIER DURING |
| 17:50:11 | 8 | THIS -- THE -- IN THE MORNING BEFORE THERE ARE -- THERE IS TAIL |
| 17:50:18 | 9 | WATER OUT HERE.  AND SO WE DON'T HAVE THE BENEFIT OR THE |
| 17:50:21 | 10 | RESTRAINT OFFERED BY THE TAIL WATER, AND IT DOESN'T TAKE THE |
| 17:50:26 | 11 | 5-POINT -- OR THE DEEPER SCOUR TRENCH -- IT DOESN'T HAVE TO |
| 17:50:30 | 12 | DEVELOP TO THAT 5.7 FEET DEEP. |
| 17:50:33 | 13 | **Q.** OKAY.  SO I GUESS NOW WE KNOW THAT TAIL WATER WASN'T IN |
| 17:50:36 | 14 | YOUR CALCULATIONS WHEN YOU DID YOUR REPORT.  RIGHT? |
| 17:50:38 | 15 | **A.** NO.  THIS IS RECENT DONE WITH TAKING INTO ACCOUNT THE WAVE |
| 17:50:42 | 16 | CONSIDERATIONS.  IN MY REPORT, IT'S ABSOLUTELY THERE.  THAT'S |
| 17:50:47 | 17 | WHY -- THE TAIL WATER BEING THERE IS WHAT FORCES US TO HAVE TO |
| 17:50:51 | 18 | ERODE DEEPER IN ORDER TO DESTABILIZE IT. |
| 17:50:55 | 19 | **Q.** OKAY.  SO I'M CONFUSED.  YOU HAD THE TAIL WATER WHEN YOU |
| 17:50:59 | 20 | DID YOUR REPORT, BUT WHEN YOU DID YOUR FACTOR OF SAFETY |
| 17:51:01 | 21 | ANALYSIS, YOU DIDN'T USE TAIL WATER; RIGHT? |
| 17:51:03 | 22 | **A.** WELL, IN MY REPORT I DID A FACTOR OF SAFETY ANALYSIS WITH |
| 17:51:07 | 23 | TAIL WATER.  WITH TAIL WATER. |
| 17:51:08 | 24 | **Q.** WITH TAIL WATER.  IT FAILED? |
| 17:51:10 | 25 | **A.** AND IT FAILED AT THE DEPTH OF -- THAT YOU'RE USING, |

17:51:12   1   5.7 FEET.

17:51:14   2   **Q.**   RIGHT.

17:51:15   3   **A.**   HERE, WHEN I -- IN MY SUPPLEMENTAL REPORT, WHEN I TOOK

17:51:19   4   INTO ACCOUNT WAVE HEIGHTS, THE -- THE TRENCH DEVELOPED EARLIER,

17:51:25   5   DEVELOPED EARLIER IN THE MORNING.  SO THERE WASN'T TAIL WATER

17:51:28   6   OUT HERE, AND IT -- IT ACTUALLY DEVELOPS A FACTOR OF SAFETY

17:51:34   7   UNDER A LOWER WATER CONDITION --

17:51:36   8   **Q.**   ALL RIGHT.

17:51:36   9   **A.**   -- WITH LESS SCOUR BECAUSE THERE'S NOT THIS STABILIZING

17:51:39  10   FORCE OF TAIL WATER.

17:51:40  11   **Q.**   ALL RIGHT.  SO --

17:51:42  12          **THE COURT:**  AND YOU'RE TELLING ME -- AND THIS IS --

17:51:43  13   MAYBE I SHOULD HAVE GOTTEN THIS.  TAIL WATER INHIBITS THE -- TO

17:51:49  14   SOME EXTENT THE DELETERIOUS EFFECTS OF THE SCOUR TRENCH AND

17:51:54  15   THEREFORE PROLONGS THE TIME OF FAILURE?

17:51:56  16          **THE WITNESS:**  YES, FOR THOSE SECTIONS THAT DIDN'T

17:51:59  17   FAIL.

17:51:59  18          **THE COURT:**  SO INSTEAD OF HAVING -- HERE'S WHERE I --

17:52:03  19   I HAVE TO HAVE A 5.7 -- IT MAY NOT BE -- 5.7-INCH -- 5.7-INCH

17:52:10  20   TRENCH THAT -- TO REACH THE SAFETY FACTOR OF ONE WITH TAIL

17:52:16  21   WATER.  AND I HAVE TO HAVE A, ACCORDING TO THIS -- IS THAT A

17:52:20  22   4.38?

17:52:23  23          **THE WITNESS:**  3.6-FOOT DEEP.

17:52:25  24          **THE COURT:**  3.6, IT WOULD FAIL, ACCORDING TO THIS,

17:52:30  25   WITHOUT TAIL WATER?

17:52:31    1              **THE WITNESS:**  YES, YOUR HONOR.

17:52:32    2              **THE COURT:**  OKAY.

17:52:40    3    **BY MR. BRUNO:**

17:52:40    4    **Q.**  WELL, AND JUST -- THIS IS FIRST TIME WE ARE SEEING THIS;

17:52:46    5    ISN'T THAT TRUE?

17:52:48    6    **A.**  SEEING WHAT?

17:52:49    7    **Q.**  THIS CHART.

17:52:52    8    **A.**  YOU'VE SEEN SIMILAR THINGS IN MY REPORT.  THIS IS THE

17:52:55    9    FIRST ANALYSIS THAT WE'VE SHOWED YOU THAT INCLUDES THE EFFECT

17:52:59   10    OF THE 3-FOOT WAVES.

17:53:01   11    **Q.**  THIS IS THE FIRST ANALYSIS WHICH INCLUDES THE EFFECT OF

17:53:04   12    THE 3-FOOT WAVES AND DOESN'T INCLUDE THE TAIL WATER; ISN'T THAT

17:53:09   13    TRUE?  THIS IS THE FIRST TIME WE'RE SEEING THIS?

17:53:12   14    **A.**  I CAN'T RECALL IF IN MY EXPERT REPORT WHETHER WE HAD

17:53:15   15    ANALYSES WITHOUT TAIL WATER OR NOT.  I DON'T RECALL.

17:53:18   16    **Q.**  DR. MARR, YOU COULDN'T DO THIS IN YOUR FIRST REPORT

17:53:22   17    BECAUSE THERE WERE NO WAVES.

17:53:23   18    **A.**  YEAH, I COULDN'T DO AN ANALYSIS WITHOUT WAVES, THAT'S

17:53:27   19    TRUE.

17:53:27   20    **Q.**  EXACTLY.  SO THIS IS THE FIRST TIME WE'RE SEEING THIS.

17:53:30   21    **A.**  WELL, BUT YOU'RE MIXING UP -- YOU'RE ASKING ABOUT TAIL

17:53:33   22    WATER --

17:53:33   23    **Q.**  I'M ASKING YOU ABOUT THIS, THIS --

17:53:33   24              **MR. TREEBY:**  YOUR HONOR -- YOUR HONOR --

17:53:33   25              **THE COURT:**  OKAY.

17:53:35   1            **MR. TREEBY:**  -- OBJECT, ARGUMENT.

17:53:37   2            **THE COURT:**  WELL, IT'S NOT REAL CLEAR TO ME.  YOUR

17:53:41   3   QUESTION IS, HAS -- HAS THIS PARTICULAR GRAPH, WITH THE

17:53:44   4   ANALYSES SHOWN NOW ON IT, BEEN PROVIDED TO THE PLAINTIFFS

17:53:49   5   BEFORE THIS TRIAL?

17:53:51   6            **MR. BRUNO:**  THAT'S CORRECT, YOUR HONOR.

17:53:52   7            **THE COURT:**  THAT SPECIFIC ONE?

17:53:53   8            **MR. BRUNO:**  THAT SPECIFIC ONE.

17:53:54   9            **THE COURT:**  AND THEN YOU CAN EXPLAIN YOUR ANSWER.

17:53:56  10            **THE WITNESS:**  NO.

17:53:56  11            **MR. BRUNO:**  THANK YOU.

17:53:57  12            **THE COURT:**  IF YOU WANT TO EXPLAIN IT, YOU MAY.

17:54:00  13            **THE WITNESS:**  IT COMES OUT OF THE RECOGNITION THAT

17:54:03  14   THE WAVES -- THE RECOGNITION, AFTER I DID MY EXPERT REPORT AND

17:54:08  15   AFTER I DID MY DEPOSITION, THAT WAVES WERE HIGHER THAN I

17:54:11  16   THOUGHT BASED ON WHAT I HAD READ FROM DR. DALRYMPLE'S EXPERT

17:54:21  17   REPORT.  AND SO I DID A SUPPLEMENTAL ANALYSIS TO BE COMPLETE.

17:54:23  18            WE WERE GETTING SUPPLEMENTAL ANALYSES OF ALL

17:54:26  19   KINDS FROM THE OTHER SIDE, SO I JUST WAS TRYING TO BE COMPLETE

17:54:31  20   AND RESPONSIVE.

17:54:32  21   **BY MR. BRUNO:**

17:54:32  22   **Q.**   ALL RIGHT.  WELL, IT'S NOT ONLY THAT; IT'S THE ANALYSIS AS

17:54:34  23   WELL, ISN'T IT?  YOU DIDN'T DO THIS ANALYSIS BEFORE.

17:54:38  24   **A.**   WHICH ANALYSIS IS THAT?

17:54:39  25   **Q.**   THE ANALYSIS OF DETERMINING WHETHER OR NOT THIS WALL WOULD

17:54:42   1   FAIL UNDER THESE CONDITIONS, THAT ANALYSIS WAS DONE AFTER YOUR

17:54:46   2   REPORT ON MARCH 12TH OF THIS YEAR, AND IT WAS ALSO DONE AFTER

17:54:52   3   YOUR SECOND REPORT; ISN'T THAT TRUE?

17:54:56   4        THE ANALYSIS, THE FACTOR OF SAFETY ANALYSIS UTILIZING

17:54:58   5   THIS DEEP OF A SCOUR TRENCH AND NO TAIL WATER.

17:55:01   6   **A.**   WE HAD DONE FACTOR OF SAFETY ANALYSIS WITH VARIOUS

17:55:06   7   DEPTH -- TRENCH -- SCOUR TRENCH DEPTHS.

17:55:11   8        THIS VERY SPECIFIC SET OF CALCULATIONS HERE WAS DONE

17:55:15   9   AFTER MY DEPOSITION WHEN I WAS LOOKING AT THE EFFECT OF WAVES

17:55:24  10   ON THE DEPTH OF THE SCOUR TRENCH.

17:55:26  11        AND AT THE SAME TIME, WE WERE LOOKING AT THE

17:55:27  12   RESULT -- OR THE CONSEQUENCE ON FACTOR OF SAFETY BECAUSE TAIL

17:55:31  13   WATER WAS NO LONGER -- HAD NOT DEVELOPED YET FOR THIS

17:55:34  14   CONDITION.

17:55:35  15   **Q.**   OKAY.  AND SO, CLEARLY, IT WAS NOT IN YOUR MARCH REPORT;

17:55:38  16   RIGHT?

17:55:39  17   **A.**   CORRECT.

17:55:39  18   **Q.**   AND IT WASN'T IN YOUR SUPPLEMENTAL REPORT THAT YOU GAVE US

17:55:42  19   IN JULY; RIGHT?

17:55:44  20   **A.**   RIGHT.

17:55:45  21   **Q.**   OKAY.  SO THIS IS THE FIRST TIME WE'RE SEEING THIS

17:55:47  22   ANALYSIS; RIGHT?

17:55:48  23   **A.**   YES.

17:55:50  24   **Q.**   THANK YOU SO MUCH.

17:55:51  25        AND THIS ANALYSIS DOESN'T HAVE ANY GRASS LIFTOFF;

17:55:56   1   RIGHT?

17:55:57   2   **A.**   RIGHT.

17:56:05   3   **Q.**   AND IT ASSUMES THE -- I FORGOT THE NOMENCLATURE, BUT THE

17:56:08   4   MOST ERODIBLE OF THE CLAYS; RIGHT?   THAT'S THE ONE YOU CHOSE TO

17:56:11   5   USE?

17:56:12   6   **A.**   YES.   THAT WAS THE ONE THAT FIT THE EMPIRICAL DATA OUT OF

17:56:18   7   THE PHOTOGRAPHS.

17:56:18   8   **Q.**   SURE.   NUMBER 50.

17:56:20   9        ALL RIGHT.   I'M TRYING -- I'M HAVING A HARD TIME

17:56:24   10   UNDERSTANDING --

17:56:25   11        **THE COURT:**   EXCUSE ME.   I'M TALKING TO JANET.   I

17:56:27   12   APOLOGIZE.

17:56:27   13   **BY MR. BRUNO:**

17:56:27   14   **Q.**   I'M HAVING A HARD TIME WHERE YOU SAY THIS IS COMING FROM.

17:56:31   15        THIS PIECE OF PAPER THAT YOU ARE QUOTING FROM

17:56:34   16   DR. BEA, YOU'RE CALLING IT HIS SUPPLEMENTAL REPORT?

17:56:38   17   **A.**   YES.   AND IT'S -- I'M SORRY FOR THE SHORTHAND.   IT'S -- I

17:56:43   18   THINK THE TITLE PAGE OF IT'S SHOWN ON THE LEFT UPPER PART OF

17:56:47   19   THE SCREEN.

17:56:48   20   **Q.**   ALL RIGHT.   IN FACT, IT'S FROM HIS ONGOING ANALYSIS

17:56:50   21   REPORT, THE THIRD REPORT THAT HE AUTHORED FROM THE CASE; ISN'T

17:56:54   22   THAT TRUE?

17:56:55   23   **A.**   IT'S FROM THE ONE I SHOW THERE.

17:56:57   24   **Q.**   ALL RIGHT.   AND ON WHAT DO YOU BASE YOUR VIEWS AS TO WHAT

17:57:04   25   THIS SAYS?   DO YOU HAVE SOME DEPOSITION TESTIMONY THAT YOU'RE

17:57:07   1   RELYING ON?

17:57:08   2   **A.**   I COULDN'T HAVE.  WE DIDN'T HAVE THIS AT THE TIME OF MY

17:57:12   3   DEPOSITION.  IT CAME AFTERWARDS.

17:57:14   4   **Q.**   NOT YOUR DEPOSITION, HIS DEPOSITION.

17:57:19   5   **A.**   I -- THIS IS STRICTLY FROM REVIEWING THAT DOCUMENT.

17:57:23   6   **Q.**   ALL RIGHT.

17:57:27   7           **THE COURT:**  TRY KEEP THAT DOOR CLOSED SO WE WON'T

17:57:29   8   HEAR ANY NOISE OF THE INN OF COURT, WHICH I AM MISSING MY NICE

17:57:30   9   LITTLE MEAL OVER THERE, BUT GO AHEAD.  IT'S BEEN A GREAT DAY

17:57:36  10   FOR EVERYBODY.

17:57:39  11           GO AHEAD.

17:57:39  12   **BY MR. BRUNO:**

17:57:39  13   **Q.**   ALL RIGHT.  THESE ARE HAND CALCULATIONS, ARE THEY NOT?

17:57:42  14   **A.**   YES.  THESE ARE -- DR. BEA DESCRIBED THESE AS HAND

17:57:46  15   CALCULATIONS THAT HE PROVIDED TO SHOW -- TO VERIFY THAT HIS

17:57:52  16   OTHER CALCULATIONS IN HIS MAIN REPORT WERE ACCURATE.

17:57:55  17   **Q.**   THAT'S NOT TRUE, IS IT, DR. MARR?  THE FACT IS THAT THESE

17:57:59  18   WERE PROVIDED TO PROVIDE ORDER OF MAGNITUDE CORROBORATION OF

17:58:07  19   RESULTS FROM THE COMPLEX DIGITAL COMPUTER PROGRAM SEEP/W AND

17:58:10  20   SLOPE/W; ISN'T THAT TRUE?

17:58:14  21   **A.**   THAT SOUNDS SIMILAR TO WHAT I SAID, I THINK.

17:58:16  22   **Q.**   OKAY.

17:58:17  23   **A.**   NOT PRECISE WORD FOR WORD.  BUT MY MEMORY IS NOWHERE NEAR

17:58:20  24   GOOD ENOUGH TO REMEMBER PRECISELY WHAT DR. BEA SAID.

17:58:25  25   **Q.**   51.

17:58:26   1              YOU'RE ALSO GOING TO SOME HANDWRITTEN NOTES.  AND

17:58:28   2   THESE, AGAIN, ARE HAND CALCULATIONS MEANT TO APPROXIMATE THE

17:58:32   3   COMPLEX COMPUTER ANALYSES TO DEMONSTRATE THAT THE RESULTS FROM

17:58:34   4   THE COMPLEX ANALYSES ARE SENSIBLE.

17:58:36   5              THAT'S WHAT HE SAID THIS WAS; ISN'T THAT TRUE?

17:58:40   6   **A.**  WELL, HE SAYS RIGHT THERE ON THE SLIDE.  I COPIED IT WORD

17:58:44   7   FOR WORD, WHAT HE SAYS THESE CALCULATIONS MEAN.

17:58:46   8   **Q.**  YOU'RE SAYING THAT 33 APPLIES TO THAT HANDWRITTEN STUFF?

17:58:51   9   **A.**  YES.

17:58:52  10   **Q.**  OKAY.  DO YOU THINK THAT THIS IS DIFFERENT FROM WHAT

17:59:02  11   DR. BEA OPINED IN HIS INITIAL REPORT?

17:59:06  12   **A.**  I DON'T RECALL, IN HIS INITIAL REPORT, HIM SAYING MUCH

17:59:09  13   ABOUT AN OVERTOPPING ANALYSIS.  HE WAS -- HIS ANALYSES WERE

17:59:11  14   MOSTLY THAT HE UPLIFTED -- THE UPLIFT PRESSURE AND THE

17:59:17  15   TRANSLATIONAL STABILITY.

17:59:48  16              **MR. BRUNO:**  CAN WE GO TO 36 REAL QUICK?  BECAUSE I'M

17:59:51  17   STILL A LITTLE CONFUSED.  I SAID 36.  I MEANT 66.  66.  I'M

17:59:56  18   SORRY.

17:59:57  19   BY MR. BRUNO:

17:59:57  20   **Q.**  ALL RIGHT.  WHAT I'M CONFUSED BY, DR. MARR, YOU SAID THE

18:00:02  21   FIRST THING THAT HAPPENS IS THE WATER GUSHES THROUGH OPENING

18:00:05  22   AND ERODES AWAY SOIL EMBANKMENT.

18:00:09  23              HOW DOES THE WATER GET -- IF THAT'S THE FIRST THING

18:00:12  24   THAT HAPPENS, WHAT OPENING IS IT GUSHING THROUGH?

18:00:15  25   **A.**  I'M SORRY.  THIS SLIDE IS MEANT TO FOLLOW THE SLIDE BEFORE

18:00:19  1   IT.  I THINK IT'S THE SLIDE BEFORE IT.

18:00:23  2   **Q.**   WELL, LET'S GO TO 65.  MAYBE I'M MISSING SOMETHING.

18:00:27  3   **A.**   I MAY -- I MAY BE OFF --

18:00:27  4   **Q.**   THIS IS 65; AM I RIGHT?  65?

18:00:30  5   **A.**   WELL, I THINK I -- I WAS SAYING THAT -- THERE WERE SEVERAL

18:00:34  6   SLIDES HERE THAT GAVE KIND OF THE INITIATION OF WHAT I -- WHAT

18:00:39  7   I GAVE AS THE INITIATIVE CAUSE, AND THAT'S THE LOW FACTOR OF

18:00:45  8   SAFETY THAT ALLOWED THE WALL -- THE OLDER WALL TO DEFORM MORE

18:00:51  9   THAN THE NEWER WALL AND OVERSTRESS THE WALL TO THE POINT THAT

18:00:57 10   THE CONCRETE CRACKED OFF.

18:01:02 11          AND NOW I'M SAYING THAT WHEN THAT OCCURRED,

18:01:04 12   MR. VILLAVASO DESCRIBED THE EXPLOSION OR THE BOOM AND AN

18:01:07 13   OPENING THAT APPEARED, THAT LOOKED LIKE A MOUTH WITH A TOOTH

18:01:11 14   OUT OF IT.

18:01:12 15          FOLLOWING THAT, THEN, IS WHAT I MEANT TO INDICATE BY

18:01:15 16   THE NEXT SLIDE, THE SEQUENCE ON THE NEXT SLIDE.

18:01:18 17   **Q.**   OKAY.  I UNDERSTAND IT NOW.  AND ALL THAT --

18:01:21 18          **MR. BRUNO:**  LET'S GO TO 66.

18:01:21 19   BY MR. BRUNO:

18:01:22 20   **Q.**   ALL THAT HAPPENED WITHIN A FEW SECONDS OF EACH OTHER;

18:01:24 21   RIGHT?

18:01:25 22   **A.**   FAIRLY QUICKLY, YES.  AND THEN THIS SEQUENCE DEVELOPED.

18:01:42 23          **MR. BRUNO:**  GO TO 70.

18:01:43 24   BY MR. BRUNO:

18:01:44 25   **Q.**   NOW, YOU ARE CALLING THIS A CONTRIBUTION OF GAP AND HOLES

18:01:47   1   TO FLOW.

18:01:49   2           DR. BEA, IN FACT, SAID THIS SUMMATION WAS INTENDED TO

18:01:53   3   PROVIDE A BASIS TO DETERMINE THE SEEPAGE EFFECTS ON A

18:01:56   4   PERCENTAGE BASIS WITH PRIMARY CONCERN FOR PRESSURES, NOT

18:01:59   5   QUANTITIES OF FLOW.

18:02:00   6           ISN'T THAT WHAT HE SAID?

18:02:02   7   **A.**   I DON'T KNOW.

18:02:02   8   **Q.**   YOU DON'T KNOW.

18:02:03   9   **A.**   I CAN JUST GO BY WHAT'S HERE AND MY KNOWLEDGE OF

18:02:08   10  GEOTECHNICAL ENGINEERING THAT WHAT HE WAS REFERENCING -- WHAT

18:02:10   11  HE WAS SLOWING IN THESE CALCULATIONS WAS A CALCULATION OF FLOW

18:02:13   12  SHOWING THE CONTRIBUTION OF THE FLOW FROM EACH OF THE THREE

18:02:17   13  HOLES AND FROM THE GAP.

18:02:19   14  **Q.**   ALL RIGHT.

18:02:19   15           **MR. BRUNO:**  LET'S GO TO 71.

18:02:21   16           **THE WITNESS:**  AND I SHOULD ALSO ADD THAT THAT -- WHAT

18:02:23   17  IS SHOWN THERE IS THE CLASSIC SIMPLE DARCY'S LAW CALCULATION

18:02:27   18  THAT WE WOULD USE TO MAKE A FLOW COMPUTATION.

18:02:29   19  BY MR. BRUNO:

18:02:30   20  **Q.**   ON 71, THIS CHART HERE, THIS DOESN'T APPEAR IN ANY OF YOUR

18:02:34   21  REPORTS, DOES IT?

18:02:35   22  **A.**   NO.  ALTHOUGH MY REPORT WAS VERY CLEAR THAT THE QUANTITY

18:02:37   23  OF FLOW UNDERNEATH THE WALL WAS VERY SMALL.  I BELIEVE AT THAT

18:02:43   24  TIME I EXPRESSED IT ON THE ORDER OF ONE QUART PER DAY PER FOOT,

18:02:48   25  WHICH IS ROUGHLY THE SAME.

| | | |
|---|---|---|
| 18:02:50 | 1 | **MR. BRUNO:** 72.  SLIDE 72. |
| 18:02:54 | 2 | BY MR. BRUNO: |
| 18:02:55 | 3 | **Q.**   ALL RIGHT.  DR. BEA DOES NOT AT ALL TALK ABOUT PIPING, |
| 18:02:59 | 4 | DOES HE? |
| 18:03:00 | 5 | **A.**   HE TALKS ABOUT HIGH GRADIENTS, WHICH -- HIS CONCERN WITH |
| 18:03:04 | 6 | HIGH GRADIENTS WAS THAT THEY WOULD START MOVING SOIL PARTICLES |
| 18:03:08 | 7 | OUT OF THE -- OUT OF THE EMBANKMENT TOE, WHICH IS WHAT IS |
| 18:03:12 | 8 | REFERRED TO AS PIPING. |
| 18:03:17 | 9 | **Q.**   ALL RIGHT. |
| 18:03:18 | 10 | **MR. BRUNO:** LET'S GO TO 74.  I'M SORRY, 73. |
| 18:03:22 | 11 | BY MR. BRUNO: |
| 18:03:27 | 12 | **Q.**   THESE ARE ALL NEW MODEL RUNS, AREN'T THEY? |
| 18:03:30 | 13 | **A.**   THESE ARE -- YES.  I SAID THAT I TOOK DR. BEA'S HAND |
| 18:03:33 | 14 | CALCULATION, AND JUST TO CHECK IT, WE MADE A COMPUTER VERSION |
| 18:03:37 | 15 | OF IT. |
| 18:03:37 | 16 | BUT THE SAME MESSAGE IS -- CAN BE FOUND IN MY EXPERT |
| 18:03:42 | 17 | REPORT, IN THAT THE QUANTITIES OF FLOW UNDERNEATH THE FLOODWALL |
| 18:03:45 | 18 | ARE VERY SMALL. |
| 18:03:46 | 19 | **Q.**   BUT, AGAIN, THESE ARE NEW ANALYSES, AREN'T THEY? |
| 18:03:49 | 20 | **A.**   YES. |
| 18:03:50 | 21 | **Q.**   THEY'RE NOT IN YOUR REPORT OF MARCH 2012? |
| 18:03:53 | 22 | **A.**   THESE SPECIFIC ONES ARE NOT THERE. |
| 18:03:55 | 23 | **Q.**   THEY'RE NOT IN YOUR SUPPLEMENTAL REPORT EITHER, ARE THEY? |
| 18:03:58 | 24 | **A.**   NO. |
| 18:03:59 | 25 | **MR. BRUNO:** PAGE 74. |

| | | |
|---|---|---|
| 18:04:04 | 1 | BY MR. BRUNO: |
| 18:04:04 | 2 | **Q.**   THIS ANALYSIS HERE AT THE BOTTOM, THAT'S NOT IN YOUR |
| 18:04:07 | 3 | MARCH 2012 REPORT, IS IT? |
| 18:04:09 | 4 | **A.**   NO. |
| 18:04:09 | 5 | **Q.**   IT'S NOT IN YOUR SUPPLEMENTAL REPORT, IS IT? |
| 18:04:11 | 6 | **A.**   NO. |
| 18:04:14 | 7 | **MR. BRUNO:**  75. |
| 18:04:14 | 8 | BY MR. BRUNO: |
| 18:04:15 | 9 | **Q.**   NOW, YOU'RE AWARE OF DR. BEA'S TESTIMONY ABOUT THE |
| 18:04:25 | 10 | PIEZOMETERS? |
| 18:04:27 | 11 | **A.**   YOU'RE TALKING ABOUT THE PIEZOMETERS IN -- WHICH |
| 18:04:30 | 12 | PIEZOMETERS? |
| 18:04:31 | 13 | **Q.**   THE PIEZOMETERS THAT WERE INSTALLED IN THE EBIA WHICH |
| 18:04:36 | 14 | REFLECTED -- PIEZOMETERS MEASURE PRESSURE, DON'T THEY? |
| 18:04:44 | 15 | **A.**   THEY MEASURE PORE PRESSURE, YEAH, PORE WATER PRESSURE. |
| 18:04:47 | 16 | **Q.**   ALL RIGHT.  AND HAVE YOU EVALUATED THOSE PIEZOMETERS AT |
| 18:04:50 | 17 | ALL? |
| 18:04:50 | 18 | **A.**   YES. |
| 18:04:50 | 19 | **Q.**   AND YOU DIDN'T TALK ABOUT IT IN YOUR REPORT, DID YOU? |
| 18:04:53 | 20 | **A.**   I DID IN MY EXPERT REPORT, YES. |
| 18:04:57 | 21 | **Q.**   OKAY.  AND -- |
| 18:04:57 | 22 | **A.**   AND I CAME TO QUITE A DIFFERENT CONCLUSION THAN DR. BEA, |
| 18:05:00 | 23 | ACTUALLY.  I THINK PZ3 SIMPLY REFLECTS WATER COMING UP OVER THE |
| 18:05:05 | 24 | TOP OF THE SOIL AND THE INCREASING PRESSURE THAT THE PIEZOMETER |
| 18:05:08 | 25 | WOULD FEEL FROM FLOODWATER DEVELOPING IN THE CANAL.  THAT'S A |

18:05:14   1   VERY COMMON PHAENOMENON.  IN MY 4O YEARS OF PRACTICE, I'VE

18:05:19   2   DEALT WITH LITERALLY THOUSANDS OF PIEZOMETERS AND

18:05:24   3   INTERPRETATION OF THEM.

18:05:25   4             AND I SAW NOTHING IN THE RECORD FOR PZ3 OR PZ6 THAT

18:05:30   5   WAS ANYTHING BUT THE EFFECT OF FLOODWATER COMING UP INSIDE THE

18:05:34   6   CANAL.

18:05:35   7   Q.   WELL, BOTH INTERPRETATIONS WOULD BE AN INDICATION OF

18:05:38   8   ENGINEERING JUDGMENT; ISN'T THAT TRUE?

18:05:40   9   A.   NO, SIR.  IN THIS CASE, IT'S BASIC FUNDAMENTALS OF HOW

18:05:42  10   WATER AND WATER PRESSURE WORK IN SOILS.

18:05:44  11   Q.   YOU'RE RIGHT AND HE'S WRONG?

18:05:46  12   A.   WELL, I ANSWERED YOUR QUESTION.  I DON'T WANT TO ARGUE

18:05:48  13   WITH YOU.

18:05:48  14             IF WE GO TO BASIC FUNDAMENTALS OF SOIL MECHANICS,

18:05:52  15   WHEN I INCREASE PRESSURE -- WHEN I PUT WATER OVER THE TOP OF A

18:05:55  16   BODY OF SOIL THAT'S SATURATED, THE PORE PRESSURE IMMEDIATELY

18:06:00  17   GOES UP, AND THAT'S WHAT A PIEZOMETER REFLECTS.

18:06:03  18   Q.   SPEAKING OF -- SPEAKING OF WHO'S RIGHT AND WHO'S WRONG,

18:06:13  19   YOU SHOWED THE JUDGE A SOIL SAMPLE; RIGHT?

18:06:15  20   A.   YES, SIR.

18:06:15  21   Q.   WHAT WAS THE PURPOSE OF THAT?

18:06:17  22   A.   TO SHOW -- IT'S COMMON WHEN I -- WHEN I TALK ABOUT SOILS,

18:06:22  23   I LIKE FOR PEOPLE TO SEE WHAT I'M TALKING ABOUT.  AND THAT WAS

18:06:26  24   A -- AN EXAMPLE OF A SOIL SAMPLE SPECIFICALLY OBTAINED FROM THE

18:06:33  25   EBIA, OF THE ORGANIC CLAYS.  I THOUGHT IT MIGHT BE INSTRUCTIVE

| | | |
|---|---|---|
| 18:06:38 | 1 | TO THE JUDGE TO SEE WHAT THE ACTUAL MATERIALS WERE. |
| 18:06:41 | 2 | **Q.**   OKAY.  YOU WERE NOT MAKING A COMMENT ON DR. BEA'S |
| 18:06:45 | 3 | TESTIMONY REGARDING THE SOILS HE BROUGHT TO THE COURTROOM; |
| 18:06:47 | 4 | RIGHT? |
| 18:06:48 | 5 | **A.**   I DID MAKE A COMMENT THAT -- I SAID THIS WAS UNLIKE THE |
| 18:06:52 | 6 | SOILS THAT DR. BEA BROUGHT, IN WHICH HE HAD QUART JARS, OR |
| 18:07:00 | 7 | SMALL JARS OF SILT AND WATER AND REPRESENTED -- IT SEEMED TO -- |
| 18:07:04 | 8 | IN THOSE JARS IT WOULD SHOW THAT IF HE HAD EQUAL PARTS OF SOIL |
| 18:07:08 | 9 | AND WATER, THEY SEPARATED.  AND THAT'S NOT -- THAT'S BECAUSE IT |
| 18:07:10 | 10 | WAS A SILT.  THAT'S NOT THE CASE IN THE ORGANIC CLAYS OF THE |
| 18:07:13 | 11 | EBIA. |
| 18:07:15 | 12 | **Q.**   RIGHT. |
| 18:07:15 | 13 | **A.**   AS I INDICATED, THE SOIL SAMPLE I SHOWED TO YOUR HONOR WAS |
| 18:07:19 | 14 | 157THS PERCENT MOISTURE CONTENT. |
| 18:07:25 | 15 |         THAT MEANS THAT IF I HAD 100 OUNCES OF SOIL, IT HAD |
| 18:07:28 | 16 | 157 OUNCES OF WATER, AND IT WAS -- YET THE WATER WAS STILL A |
| 18:07:31 | 17 | VERY INTEGRAL PART OF THE SOIL AND NOT SEPARATING. |
| 18:07:38 | 18 | **Q.**   SO BY IMPLICATION, DR. BEA DOESN'T EVEN KNOW WHAT CLAY IS; |
| 18:07:41 | 19 | RIGHT? |
| 18:07:42 | 20 | **A.**   I DIDN'T SAY THAT. |
| 18:07:42 | 21 | **Q.**   WELL, DID HE SHOW THE JUDGE CLAY? |
| 18:07:45 | 22 | **A.**   HE HAD ANOTHER BAG SAMPLE OF MATERIAL THAT I UNDERSTOOD -- |
| 18:07:47 | 23 | I HAD SEEN BEFORE, AND I WAS TOLD THAT IT CAME FROM THE EBIA. |
| 18:07:53 | 24 | AND THAT SAMPLE, YOU KNOW, LOOKED LIKE IT POSSIBLY COULD HAVE |
| 18:08:00 | 25 | COME FROM THE EBIA. |

```
18:08:01    1             YOU'LL NOTICE I DIDN'T REALLY SAY ANYTHING ABOUT IT.

18:08:04    2    Q.   ALL RIGHT.

18:08:05    3             MR. BRUNO:   SLIDE 82.

18:08:05    4    BY MR. BRUNO:

18:08:10    5    Q.   ONCE AGAIN, BRAND-NEW SERIES OF EVALUATIONS.  ISN'T THAT

18:08:15    6    TRUE, DR. MARR?

18:08:16    7    A.   YES.  BUT EXACTLY THE SAME MESSAGE HERE IS COVERED IN MY

18:08:19    8    EXPERT REPORT BY A SERIES OF ANALYSES OF TRANSIENT FLOW, IN

18:08:23    9    WHICH I CLEARLY DESCRIBE THAT IT TAKES OVER HUNDREDS OF DAYS TO

18:08:28   10    GET TO STEADY-STATE SEEPAGE, AND THAT IT WAS JUST NOT POSSIBLE

18:08:32   11    FOR UPLIFT PRESSURES TO DEVELOP OF THE TYPE THAT DR. BEA TALKED

18:08:36   12    ABOUT DURING THE ONE TO TWO DAYS OF THE STORM.

18:08:42   13    Q.   WELL, IF YOUR REPORT HAD IT IN THERE, WHY DIDN'T YOU USE

18:08:45   14    WHAT YOU HAD IN YOUR REPORT --

18:08:46   15    A.   BECAUSE --

18:08:46   16    Q.   -- AT THAT POINT?

18:08:47   17    A.   I'M SORRY.

18:08:47   18             I THOUGHT THESE FIGURES WERE CLEARER AND EASIER TO

18:08:50   19    UNDERSTAND THAN THE ONES IN MY REPORT.

18:08:52   20    Q.   ALL RIGHT.  AND WHEN DID YOU DO THESE?

18:08:54   21    A.   THESE WERE DONE RIGHT AFTER I RECEIVED THE THIRD REPORT

18:09:02   22    FROM DR. BEA, WITHIN A COUPLE OF WEEKS.

18:09:05   23    Q.   ALL RIGHT.  SO, GOSH, YOU'VE BEEN HAVING THEM SINCE APRIL

18:09:08   24    OF THIS YEAR?

18:09:11   25    A.   I DON'T RECALL.
```

2183

```
18:09:12   1   Q.   WELL, MAY?

18:09:13   2   A.   THE ANALYSES THEMSELVES -- THE INITIAL ANALYSES WERE DONE.

18:09:17   3   THE GRAPHICS HERE WERE CREATED IN THE LAST SEVERAL WEEKS.

18:09:22   4   Q.   OKAY.  GRAPHICS, LAST SEVERAL WEEKS.  ANALYSES WERE DONE,

18:09:25   5   OH, FOUR, OR FIVE MONTHS AGO, AND YOU DIDN'T SUPPLEMENT YOUR

18:09:29   6   REPORT; RIGHT?

18:09:30   7   A.   NO.

18:09:30   8   Q.   OKAY.

18:09:31   9        MR. BRUNO:  HOW ABOUT 83?

18:09:31  10   BY MR. BRUNO:

18:09:32  11   Q.   SAME THING WITH 83.  THAT'S NEW ANALYSES AS WELL.

18:09:35  12   A.   THAT'S THE SAME ANALYSIS AS THE LAST PAGE, JUST RUN OUT

18:09:38  13   FOR LONGER TIME.

18:09:39  14   Q.   ALL RIGHT.

18:09:53  15        MR. BRUNO:  JUST 86, REAL QUICK.

18:09:54  16   BY MR. BRUNO:

18:09:57  17   Q.   YOU ARE AWARE OF THE DESIGN OF THE NEW FLOODWALL THAT'S AT

18:10:01  18   THE EBIA TODAY, AS WE SIT IN THIS COURTROOM; ISN'T THAT TRUE?

18:10:06  19   A.   YES.

18:10:14  20        THE COURT:  MR. BRUNO, NOT TO RUSH YOU, BUT I'M JUST

18:10:18  21   CURIOUS, FOR PLANNING OF MY OWN.  HOW MUCH MORE TIME DO YOU

18:10:23  22   THINK YOU HAVE WITH THIS WITNESS?

18:10:25  23        MR. BRUNO:  I WANT TO RUN THROUGH THE SLIDES, AND

18:10:27  24   THEN I HAVE MATERIALS ON GEOLOGY TO DEAL WITH, AND THEN I WILL

18:10:30  25   BE DONE.  SO I NEED ANOTHER HOUR.
```

18:10:32   1            **THE COURT:**  OKAY.  IT COMES TO A QUESTION OF

18:10:36   2   ATTENTION SPAN, YOU KNOW?

18:10:36   3            **MR. BRUNO:**  I KNOW, JUDGE.  LISTEN, I THINK ROB AND I

18:10:40   4   BOTH SAID IT'S YOUR CALL.  I HAVE TO DO WHAT I HAVE TO DO, AND

18:10:43   5   I APOLOGIZE FOR IT DRAGGING, AND I APOLOGIZE FOR IT NOT BEING

18:10:48   6   MORE INCISIVE.

18:10:49   7            **THE COURT:**  WE'LL GO ALONG AS LONG AS WE CAN.

18:10:52   8            BUT AGAIN, IF THE COURT REPORTER GETS EXHAUSTED,

18:11:07   9   IF SHE TELLS ME, WE'RE GOING TO STOP IT.

18:11:19  10            IN FACT, I'M GOING TO TAKE A TEN-MINUTE RECESS

18:11:21  11   RIGHT NOW.

18:11:24  12            **THE DEPUTY CLERK:**  ALL RISE.

18:11:24  13            (WHEREUPON, THE COURT TOOK A RECESS.)

18:23:35  14            **THE DEPUTY CLERK:**  ALL RISE, PLEASE.

18:23:48  15            COURT'S IN SESSION.

18:23:52  16            PLEASE BE SEATED.

18:23:53  17            **MR. BRUNO:**  JUDGE, I'M GOING TO CUT AS MUCH AS I CAN

18:23:57  18   AND JUST ASK FOR YOUR INDULGENCE.  I'LL TRY TO MOVE ALONG AS

18:23:57  19   FAST AS I CAN.

18:23:57  20            **THE COURT:**  YES, YES.

18:23:58  21   **BY MR. BRUNO:**

18:23:58  22   **Q.**   PX-4721-66.  THESE ARE YOUR CRITIQUES OF DR. BEA'S

18:24:06  23   UNDERSEEPAGE ANALYSIS.

18:24:08  24            LET'S SEE IF WE CAN KIND OF COMPARTMENTALIZE THIS.

18:24:19  25            **MR. BRUNO:**  PX-4721-66.  OKAY.  BLOW UP THIS, PLEASE,

18:24:36   1   REAL QUICK.

18:24:38   2   BY MR. BRUNO:

18:24:38   3   **Q.**   OKAY.  THESE ARE YOUR MAIN CRITIQUES OF DR. BEA'S

18:24:43   4   ASSUMPTIONS; ISN'T THAT CORRECT?  AND YOU'VE GOT THREE BULLET

18:24:47   5   POINTS.

18:24:47   6   **A.**   RELATIVE TO THE FLOW ANALYSES THAT WERE DONE FOR UPLIFT

18:24:51   7   PRESSURES, YES, SIR.

18:24:52   8   **Q.**   ALL RIGHT.  ASSUMPTION OF POROUS BACKFILL IN CONTACT WITH

18:24:55   9   ORGANIC CLAY SOIL WAS NOT THE CASE; RIGHT?

18:24:59   10  **A.**   RIGHT.

18:24:59   11  **Q.**   IT'S YOUR VIEW THAT THEY'RE -- I THINK AT THE SOUTH

18:25:03   12  BREACH, THERE WAS ONLY ONE EXCAVATION THAT COULD COME IN

18:25:07   13  CONTACT WITH THE ORGANIC CLAY SOIL?

18:25:10   14  **A.**   NO.  I DIDN'T SAY THAT.

18:25:13   15  **Q.**   IS THERE MORE THAN ONE?

18:25:14   16  **A.**   YEAH.  WE SHOWED SEVERAL -- THERE ARE SEVERAL EXCAVATIONS

18:25:18   17  THAT WENT DEEP ENOUGH TO BE IN CONTACT WITH THE ORGANIC SOIL.

18:25:21   18  **Q.**   ALL RIGHT.  AND -- BUT THE MODELING THAT YOU DID WAS ONLY

18:25:24   19  FOR ONE OF THOSE?

18:25:25   20  **A.**   YES.  I TOOK THE WORST CASE WHERE I TOOK THE DEEP -- A

18:25:32   21  DEEP EXCAVATION AND I -- I MOVED IT SO IT LINED UP WITH MY --

18:25:37   22  MY SOUTH BREACH GEOMETRY.

18:25:42   23  **Q.**   ALL RIGHT.  AND THAT WAS HOW FAR AWAY?

18:25:45   24  **A.**   I THINK IT WAS -- IF I RECALL RIGHT, IT WAS ABOUT 70 FEET,

18:25:48   25  75 FEET AWAY FROM THE WALL.

18:25:50  1  **Q.**   AND THEN YOU SAY HE'S SHOWING LOCATIONS OF EXCAVATIONS

18:25:53  2  MUCH CLOSER TO THE FLOODWALL THAN THE DATA SHOW?

18:25:57  3  **A.**   YES.  ONE OF DR. BEA'S CASES HAD -- HAD THIS SIMILAR TYPE

18:25:59  4  OF EXCAVATION, ONLY 14 FEET AWAY FROM THE FLOODWALL.

18:26:02  5  **Q.**   ALL RIGHT.  AT THE SOUTH BREACH?

18:26:04  6  **A.**   I THINK THAT'S RIGHT, YES.

18:26:05  7  **Q.**   ALL RIGHT.  IN FACT, THERE WAS AN ACTUAL EXCAVATION INTO

18:26:07  8  THE LEVEE BANK AT THAT WALL TO REMOVE A SEWER OR WATER LINE;

18:26:14  9  ISN'T THAT TRUE?

18:26:15  10  **A.**   BUT THERE WAS AN EXCAVATION.  I DON'T THINK IT WENT THAT

18:26:18  11  DEEP.  IT CERTAINLY WAS NOTHING OF THE SIZE THAT WAS SHOWN IN

18:26:21  12  HIS ANALYSIS.

18:26:21  13  **Q.**   ALL RIGHT.  AGAIN, YOU SAY THE LOCATIONS OF EXCAVATIONS IS

18:26:24  14  MUCH CLOSER TO THE FLOODWALL THAN THE DATA SHOW.  THERE WAS ONE

18:26:29  15  IN THE FACE OF THE LEVEE; RIGHT?

18:26:32  16  **A.**   BUT IT DIDN'T GO INTO IN THE ORGANIC CLAY, I DON'T THINK.

18:26:35  17  **Q.**   WELL, THAT'S YOUR -- YOUR VIEW, IN FAIRNESS; RIGHT?

18:26:37  18  **A.**   OKAY.

18:26:38  19  **Q.**   OKAY.  AND THE LAST PART WAS ASSUMPTION OF A VERY LOW

18:26:40  20  VALUE OF THE COEFFICIENT OF SOIL COMPRESSIBILITY.  AND WE'VE

18:26:45  21  TALKED ABOUT THAT; RIGHT?

18:26:46  22  **A.**   YES.  THAT'S A -- THAT'S REALLY THE CRUX OF THE DIFFERENCE

18:26:48  23  IN HIS ANALYSES THAT IS --

18:26:48  24  **Q.**   AND -- RIGHT.

18:26:49  25  **A.**   -- VERY UNREALISTIC --

```
18:26:53   1            THE COURT:  LET HIM FINISH.

18:26:56   2            THE WITNESS:  THANK YOU, SIR.

18:26:57   3            THE COURT:  YOU CAN FINISH.

18:26:57   4            THE WITNESS:  THIS VERY UNREALISTIC VALUE OF 10 TO

18:27:01   5   THE MINUS 9 IS LIKE CONCRETE, AS I THINK I SAID IN MY REPORT.

18:27:05   6   AND, YOU KNOW, THE SOILS THAT WE HAVE IN THE EBIA, THESE

18:27:11   7   ORGANIC CLAYS, ARE VERY COMPRESSIBLE.  WE SEE THAT BECAUSE THEY

18:27:15   8   SETTLED.  AS I SHOWED YOU EARLIER, THE SOUTH BREACH AREA HAD

18:27:18   9   SETTLED SOMETHING LIKE 2 FEET, INDICATING THAT THEY ARE

18:27:21  10   COMPRESSIBLE CLAYS.

18:27:22  11   BY MR. BRUNO:

18:27:22  12   Q.   THE FACT OF THE MATTER IS THAT WHAT DR. BEA OPINES CAN

18:27:27  13   HAPPEN, YOU JUST DON'T BELIEVE THERE'S ENOUGH TIME FOR IT TO

18:27:30  14   HAVE OCCURRED IN THIS CASE.  ISN'T THAT GENERALLY THE -- YOUR

18:27:35  15   OPINION?

18:27:36  16   A.   DR. BEA'S RESULTS ARE -- FOR THE GEOMETRY, THE CONDITIONS

18:27:43  17   HE ANALYZED, THE RESULTS ARE CORRECT FOR STEADY STATE

18:27:49  18   CONDITIONS THAT TAKE A LONG TIME TO ACTUALLY DEVELOP.

18:27:53  19   Q.   ALL RIGHT.

18:27:54  20            MR. BRUNO:  LET'S GO TO PX-4721, PAGE 41.  AND THE

18:28:15  21   LAST PART OF THIS PARAGRAPH.  ALL RIGHT.  THE LAST SENTENCE.

18:28:24  22   BY MR. BRUNO:

18:28:24  23   Q.   THE HISTORICAL EXPLORATIONS WERE SUFFICIENT TO

18:28:31  24   CHARACTERIZE THE DEEPER CLAY AND SAND LAYERS WHILE THE

18:28:34  25   SUPPLEMENTAL EXPLORATIONS HELPED TO BETTER DEFINE THE MORE
```

```
18:28:37   1    SHALLOW ORGANIC CLAY LAYERS.

18:28:40   2            FORGIVE ME.  I'M MOVING TOO QUICKLY.  LET ME GIVE

18:28:43   3    THIS CONTEXT.

18:28:44   4            WE ARE NOW TALKING ABOUT SUBSURFACE PROFILES, OKAY,

18:28:48   5    DR. MARR?  AND OBVIOUSLY, I'M QUOTING YOUR REPORT AT

18:28:52   6    SECTION 3.3, WHICH TALKS ABOUT SUBSURFACE PROFILES.  OKAY?

18:28:58   7            AND ALL I WANT TO SEE IF WE CAN AGREE ON IS THIS,

18:29:01   8    THAT IT WAS NOT SUFFICIENT FOR YOU TO SIMPLY GO BACK TO THE

18:29:06   9    1966 GENERALIZED SOIL AND GEOLOGIC PROFILE TO DO ALL OF THE

18:29:12   10   ANALYSIS THAT YOU DID IN THIS CASE; ISN'T THAT TRUE?

18:29:15   11   A.   THAT'S TRUE.

18:29:16   12   Q.   ALL RIGHT.  AND AS YOU INDICATE HERE, THAT STUFF -- AND

18:29:20   13   I'LL SHOW IT TO YOU IN JUST A MOMENT.  BUT I'M REFERRING TO THE

18:29:24   14   GEOLOGIC PROFILE WHICH IS A COMPONENT PART OF THE DM-3 AND THE

18:29:30   15   1966 DESIGN MEMO.

18:29:33   16           ALL RIGHT.  THAT BY ITSELF DID NOT GIVE YOU ENOUGH

18:29:37   17   INFORMATION IN ORDER TO PROPERLY CHARACTERIZE THE SOILS AT THE

18:29:41   18   EBIA; ISN'T THAT TRUE?

18:29:42   19   A.   AND FOR THE PURPOSES OF DOING AN IN-DEPTH ANALYSIS OF WHAT

18:29:46   20   CAUSED THESE FAILURES, THAT'S TRUE.

18:29:48   21   Q.   ALL RIGHT.  NOW, YOU LOCATED SOME OTHER INFORMATION;

18:29:56   22   RIGHT?

18:29:56   23   A.   YES.

18:29:57   24   Q.   AND SOME OF THE OTHER INFORMATION THAT YOU OBTAINED WAS

18:30:03   25   OBTAINED BY THE CORPS IN LATER YEARS; RIGHT?
```

```
18:30:07   1   A.   YES.

18:30:08   2   Q.   LET'S GO TO JX-6-137.  AND THIS IS FROM A 1980 DESIGN

18:30:21   3   MEMORANDUM THAT REGARDS THE CONSTRUCTION OF THE FLORIDA AVENUE

18:30:28   4   COMPLEX.  AND, INDEED, DR. MARR, AS YOU KNOW FROM YOUR STUDY,

18:30:32   5   IT IS THE CONSTRUCTION WHICH RESULTED IN THOSE DEEP PILES TO

18:30:36   6   WHICH THE NORTH -- TO WHICH THE PILES AT THE NORTH BREACH WERE

18:30:45   7   CONNECTED?

18:30:47   8   A.   YEAH.  I UNDERSTAND THAT WAS JUST ONE BIG PROJECT WITH

18:30:50   9   SEVERAL ELEMENTS.

18:30:51  10   Q.   I GOTCHA.

18:30:54  11        AND IN THIS -- THIS THING IS SO HARD TO READ -- BUT

18:31:01  12   IN THIS GEOLOGIC PROFILE, WE SEE SOMETHING THAT WE DID NOT SEE

18:31:07  13   IN THE GEOLOGIC PROFILE THAT THE CORPS DEVELOPED IN 1966.  WE

18:31:12  14   SEE SOMETHING THAT THEY REFER TO AS ML.

18:31:18  15        DO YOU KNOW WHAT ML IS?

18:31:20  16   A.   THAT STANDS FOR SILT.

18:31:21  17   Q.   SILT?

18:31:22  18   A.   THAT'S THE ASTM SYMBOL FOR SILT.

18:31:25  19   Q.   ALL RIGHT.

18:31:25  20        MR. BRUNO:  AND MAYBE WE CAN BLOW UP . . .

18:31:29  21   BY MR. BRUNO:

18:31:30  22   Q.   ALL RIGHT.  HERE'S AN EXAMPLE -- THIS IS A SILT LAYER

18:31:35  23   RIGHT HERE; RIGHT?

18:31:37  24   A.   I HAVE A REALLY HARD TIME SEEING IT.  BUT . . .

18:31:40  25        MR. BRUNO:  IF I CAN APPROACH.  MAY I APPROACH AND
```

| | | |
|---|---|---|
| 18:31:42 | 1 | GIVE YOU A PAPER COPY? |
| 18:31:45 | 2 | **THE COURT:**  YES, YOU MAY. |
| 18:31:47 | 3 | **BY MR. BRUNO:** |
| 18:31:48 | 4 | **Q.**   IT'S A LOUSY -- OH, IT'S BETTER ON YOURS.  I LIKE THIS |
| 18:31:53 | 5 | ONE.  ALL RIGHT.  WELL, ANYWAY, THE TV'S BETTER. |
| 18:31:59 | 6 | **MR. BRUNO:**  MAYBE, JUDGE, THE TV'S BETTER IF YOU'RE |
| 18:32:01 | 7 | LOOKING AT IT. |
| 18:32:02 | 8 | **THE COURT:**  OKAY. |
| 18:32:02 | 9 | **BY MR. BRUNO:** |
| 18:32:02 | 10 | **Q.**   SO DO YOU SEE SOME SILT LAYERS ON THERE? |
| 18:32:17 | 11 | **A.**   YES.  THEY'RE USING A SYMBOL -- SOME VERTICAL LINES TO |
| 18:32:20 | 12 | REPRESENT SILT AND I SEE SOME VERTICAL LINES NEAR A BORING |
| 18:32:26 | 13 | LABELED 5-EF. |
| 18:32:29 | 14 | IS THAT WHAT YOU'RE REFERRING TO? |
| 18:32:31 | 15 | **Q.**   YES.  WELL, THEY'RE IN MORE THAN ONE LOCATION -- |
| 18:32:33 | 16 | **A.**   YES, I MEAN -- |
| 18:32:33 | 17 | **Q.**   -- IN FAIRNESS -- |
| 18:32:34 | 18 | **A.**   YES. |
| 18:32:35 | 19 | **Q.**   ALL RIGHT.  THE ONLY POINT I WANT TO MAKE IS THIS GEOLOGIC |
| 18:32:42 | 20 | PROFILE IS -- INCLUDES THE GEOLOGIC PROFILE WHICH WAS A |
| 18:32:51 | 21 | COMPONENT PART OF THE 1966 DM; ISN'T THAT TRUE? |
| 18:32:56 | 22 | **A.**   I'M NOT SURE OF THAT.  THIS IS -- DOESN'T THIS OCCUR TO |
| 18:33:00 | 23 | THE NORTH? |
| 18:33:00 | 24 | **Q.**   WELL, LET'S BACK UP AGAIN. |
| 18:33:02 | 25 | **MR. BRUNO:**  LET'S PULL -- LET'S PULL JX-4-0193.  THIS |

```
18:33:14    1   IS THE 1966 PROFILE.

18:33:15    2             THE COURT:  AND THE EXHIBIT NUMBER ON THIS ONE?

18:33:18    3             MR. BRUNO:  THE ONE THAT'S UP ON THE SCREEN RIGHT AT

18:33:21    4   THE MOMENT I JUST GAVE TO DR. MARR.  I'M SORRY.

18:33:26    5                  DOCTOR, IF I COULD HAVE THAT BACK?  I APOLOGIZE.

18:33:29    6                  IT IS JX-6-0137.

18:33:34    7             THE COURT:  ALL RIGHT.  THANK YOU.

18:33:35    8             MR. BRUNO:  ALL RIGHT.  LET'S PULL THIS ONE UP.  THIS

18:33:36    9   IS 193, PAGE 193.

18:34:49   10             MR. TREEBY:  WE'VE GOT THE DOCUMENT IF YOU WANT IT,

18:34:53   11   JOE.

18:34:53   12             MR. BRUNO:  OKAY.  THANKS.

18:34:54   13             MR. TREEBY:  WE CAN PULL IT UP.  ERIC'S GOT IT.  BUT

18:34:57   14   THEY NEED TO SWITCH BACK THERE.

18:35:04   15             THE COURT:  WE APPRECIATE IT.

18:35:05   16             MR. BRUNO:  I APPRECIATE IT.  LET ME LET YOU HAVE

18:35:10   17   THIS.  IT'S PLATE 28.  OKAY.  THERE IT IS.  AND THEN THE

18:35:38   18   CORRECT NUMBER IS -- DOES THAT SAY 193?

18:35:41   19             MR. TREEBY:  YES.

18:35:41   20             MR. SMITH:  YES.

18:35:41   21             MR. BRUNO:  OKAY.

18:35:42   22   BY MR. BRUNO:

18:35:43   23   Q.  ALL RIGHT.  SO I'VE GOT THE RIGHT NUMBER, AT THE VERY

18:35:45   24   LEAST.  BUT IN ANY CASE, YOU CAN SEE HERE, DR. MARR, THIS IS TO

18:35:51   25   THE SOUTH AND THIS IS TO THE NORTH OVER HERE.  AND I ONLY MAKE
```

| | | |
|---|---|---|
| 18:36:03 | 1 | THE POINT THAT THE 1980 ONE IS FAR MORE DETAILED AND CONTAINS |
| 18:36:08 | 2 | MORE INFORMATION THAN THE 1966 VERSION. |
| 18:36:20 | 3 | **A.**   I THINK THEY BOTH SHOW GENERALIZED SUBSURFACE PROFILES |
| 18:36:23 | 4 | WITH THE PREDOMINANT LAYERS, AND THEY'RE ABOUT THE SAME LEVEL |
| 18:36:27 | 5 | OF DETAIL. |
| 18:36:28 | 6 | **Q.**   ALL RIGHT.  WELL, DO YOU SEE THE SILT LAYERS INDICATED IN |
| 18:36:31 | 7 | THE 1980 VERSION ON THE 1966 VERSION, WHICH WOULD BE SOMEWHERE |
| 18:36:33 | 8 | IN HERE? |
| 18:36:35 | 9 | **A.**   WELL, YES, IF WE LOOK -- I HAVEN'T LOOKED AT THIS BEFORE, |
| 18:36:42 | 10 | SO I'M DOING THIS TO TRY TO ACCOMMODATE YOU QUICKLY HERE. |
| 18:36:45 | 11 | **Q.**   RIGHT. |
| 18:36:46 | 12 | **A.**   BUT I BELIEVE THAT'S THE VERTICAL SYMBOL THAT THEY'RE |
| 18:36:49 | 13 | USING TO REPRESENT SILT. |
| 18:36:50 | 14 | **Q.**   EXACTLY.  AND MY POINT ONLY IS THERE'S FAR MORE DETAIL IN |
| 18:36:54 | 15 | THE 1980 VERSION.  THERE'S A LOT MORE SILT SHOWN IN THE |
| 18:36:59 | 16 | 1980 VERSION THAN THERE IS IN THE 1966 VERSION, THAT'S ALL. |
| 18:37:01 | 17 | **A.**   WELL, THIS IS THE 1966 VERSION. |
| 18:37:03 | 18 | **Q.**   AND THE ONLY SILT YOU SEE IS RIGHT THERE? |
| 18:37:06 | 19 | **THE COURT:**  WAIT, WAIT.  WHAT HE'S SAYING IS -- WHAT |
| 18:37:09 | 20 | HE'S LOOKING AT RIGHT NOW IS THE 1980 VERSION OR THE 1966 |
| 18:37:14 | 21 | VERSION? |
| 18:37:15 | 22 | **MR. BRUNO:**  WHAT WE'RE SHOWING IS THE 1966 VERSION. |
| 18:37:17 | 23 | **THE COURT:**  OKAY. |
| 18:37:18 | 24 | **MR. BRUNO:**  AND THE LINES THAT ARE VERTICAL ARE -- |
| 18:37:22 | 25 | THAT'S THE SILT THAT YOU SEE IN THE '66 VERSION.  OKAY? |

| | | |
|---|---|---|
| 18:37:26 | 1 | **THE COURT:** GOTCHA. OKAY. THANK YOU. |
| 18:37:28 | 2 | **BY MR. BRUNO:** |
| 18:37:28 | 3 | **Q.** AND THAT'S THE ONLY SILT YOU SEE WHERE IT SAYS I-TYPE AND |
| 18:37:31 | 4 | T-TYPE I-WALL, RIGHT THERE? |
| 18:37:35 | 5 | **A.** YES. |
| 18:37:35 | 6 | **Q.** OKAY. WHICH IS WHERE THE FLORIDA AVENUE COMPLEX IS; |
| 18:37:39 | 7 | RIGHT? |
| 18:37:40 | 8 | **A.** YES. |
| 18:37:40 | 9 | **Q.** OKAY. AND LET'S GO -- CAN WE SWITCH BACK TO THE OTHER ONE |
| 18:37:42 | 10 | NOW? |
| 18:37:43 | 11 | **A.** WELL, CAN WE STAY WITH THIS ONE JUST A SECOND, THOUGH? |
| 18:37:45 | 12 | **Q.** YES. |
| 18:37:45 | 13 | **A.** BECAUSE WE NEED TO KEEP THIS IN CONTEXT. |
| 18:37:50 | 14 | IF YOU GO OUT JUST A LITTLE BIT, THE 19- -- I'M |
| 18:37:51 | 15 | SORRY, YOU'VE GOT TO KEEP IT OUT SO I CAN SEE THE STATIONING. |
| 18:37:56 | 16 | THE 1966 WALL ENDED -- YOU'VE GOT TO GO OUT JUST A LITTLE BIT |
| 18:38:01 | 17 | MORE. |
| 18:38:01 | 18 | **THE COURT:** HE NEEDS TO SEE THE STATION. |
| 18:38:06 | 19 | **THE WITNESS:** I NEED TO SEE ON THE TOP -- |
| 18:38:06 | 20 | **THE COURT:** THERE YOU GO. |
| 18:38:06 | 21 | **THE WITNESS:** -- A LITTLE BIT MORE. I'M SORRY. I |
| 18:38:07 | 22 | CAN SEE THIS ONE, SO I'M HAVING TO -- IT ENDED ROUGHLY HERE. |
| 18:38:11 | 23 | **BY MR. BRUNO:** |
| 18:38:11 | 24 | **Q.** RIGHT. |
| 18:38:12 | 25 | **A.** 56. CAN SOMEONE TELL ME WHERE STATION -- IT'S ROUGHLY -- |

| | | |
|---|---|---|
| 18:38:16 | 1 | 56 IS ROUGHLY HERE, ISN'T IT? |
| 18:38:21 | 2 | **Q.**   YEAH.  RIGHT. |
| 18:38:21 | 3 | **A.**   AND SO -- |
| 18:38:22 | 4 | **Q.**   IN FACT, IT SHOWS T-WALL RIGHT THERE. |
| 18:38:23 | 5 | **A.**   RIGHT.  OKAY. |
| 18:38:24 | 6 | **Q.**   WE DON'T DISAGREE. |
| 18:38:26 | 7 | **A.**   OKAY. |
| 18:38:26 | 8 | **Q.**   AGAIN, I'M NOT -- I'M SIMPLY TRYING TO SHOW THAT THE 1980 |
| 18:38:28 | 9 | VERSION HAS MUCH MORE DETAIL THAN THE 1966 VERSION. |
| 18:38:32 | 10 | **A.**   I DON'T AGREE WITH THAT STATEMENT.  I THINK THEY'RE QUITE |
| 18:38:35 | 11 | SIMILAR.  IT'S -- THE 1980 VERSION SHOWS A SILT LAYER TO THE |
| 18:38:41 | 12 | NORTH THAT THEY DIDN'T FIND TO THE SOUTH. |
| 18:38:43 | 13 | **Q.**   ALL RIGHT.  LET'S GO TO THE 1980 VERSION.  THE NUMBER |
| 18:38:48 | 14 | IS -- DR. MARR? |
| 18:38:50 | 15 | **A.**   OH, SORRY. |
| 18:38:55 | 16 | **Q.**   JX-6-0137.  ALL RIGHT. |
| 18:39:08 | 17 | **THE COURT:**  WHOOPS.  WHAT HAPPENED TO IT? |
| 18:39:11 | 18 | **BY MR. BRUNO:** |
| 18:39:11 | 19 | **Q.**   ALL RIGHT.  THIS IS THE WEST SIDE AND THIS IS THE EAST |
| 18:39:17 | 20 | SIDE. |
| 18:39:17 | 21 | **MR. BRUNO:**  AND THEN CAN YOU BLOW IT UP? |
| 18:39:19 | 22 | **BY MR. BRUNO:** |
| 18:39:20 | 23 | **Q.**   WE SAW ONE INDICATION OF SILT.  AND HERE WE SEE SOMETHING |
| 18:39:23 | 24 | HERE, DO WE NOT?  AND WE SEE SOMETHING OVER HERE, DO WE NOT? |
| 18:39:28 | 25 | **THE COURT:**  DO YOU WANT TO GET AN ANSWER BEFORE YOU |

| | | |
|---|---|---|
| 18:39:30 | 1 | GO ON? |
| 18:39:30 | 2 | **THE WITNESS:**  YEAH.  YOU SEE SILT THERE THAT YOU'RE |
| 18:39:33 | 3 | POINTING TO, YES. |
| 18:39:34 | 4 | **BY MR. BRUNO:** |
| 18:39:35 | 5 | **Q.**   ALL RIGHT.  AND I SEE SILT OVER HERE; RIGHT? |
| 18:39:37 | 6 | **A.**   YES. |
| 18:39:38 | 7 | **Q.**   LET'S GO TO THE LEFT.  AND HERE'S THAT SORT OF |
| 18:39:44 | 8 | PERPENDICULAR OR VERTICAL IMAGE THAT WE SAW IN THE '66 VERSION; |
| 18:39:53 | 9 | RIGHT? |
| 18:39:54 | 10 | **A.**   WHERE'S THAT VERTICAL IMAGE? |
| 18:39:57 | 11 | **Q.**   RIGHT HERE.  AND WE SEE MORE SILT? |
| 18:39:59 | 12 | **A.**   AND THAT VERTICAL IMAGE -- I'M SORRY.  THAT VERTICAL IMAGE |
| 18:40:02 | 13 | REPRESENTS WHAT? |
| 18:40:04 | 14 | **Q.**   IT SAYS HOLOCENE -- HOLOCENE. |
| 18:40:09 | 15 | **A.**   WELL, THAT'S JUST -- THAT'S JUST A LABEL INDICATING THAT |
| 18:40:12 | 16 | THOSE -- THOSE DEPOSITS ARE YOUNGER GEOLOGICALLY. |
| 18:40:19 | 17 | **Q.**   RIGHT. |
| 18:40:19 | 18 | **A.**   THEY'RE OF THE HOLOCENE ERA. |
| 18:40:23 | 19 | **Q.**   ALL I'M SUGGESTING, DR. MARR, IS I'VE JUST POINTED OUT AT |
| 18:40:28 | 20 | LEAST TWO, IF NOT THREE, DIFFERENT SILT LAYERS.  AND ON THE '66 |
| 18:40:30 | 21 | VERSION WE ONLY SAW ONE. |
| 18:40:33 | 22 | **A.**   BUT I THINK THESE COVER DIFFERENT SECTIONS ALONG -- ALONG |
| 18:40:36 | 23 | THE WALL.  THE '66 VERSION IS SOUTH OF THE FLORIDA AVENUE |
| 18:40:41 | 24 | COMPLEX. |
| 18:40:41 | 25 | **Q.**   THE '66 VERSION GOES ALL THE WAY -- IF I HAVE TO HAUL THAT |

18:40:45   1   OUT, I GUESS I WILL.  BUT THE '66 VERSION GOES ALL THE WAY TO

18:40:50   2   THE INTERCOASTAL WATERWAY.

18:40:52   3   **A.**   I'M SORRY.  THE PART -- EBIA PART THAT IS INVOLVED IN

18:40:55   4   THESE FAILURES THAT I'M PAYING ATTENTION TO --

18:40:58   5   **Q.**   YOU'RE MAKING THE ASSUMPTION THAT I'M ASKING QUESTIONS

18:41:01   6   ABOUT THE EBIA AND I'M NOT.  SO, PLEASE, JUST ANSWER MY

18:41:04   7   QUESTIONS.  I DIDN'T ASK A SINGLE QUESTION ABOUT THE EBIA.

18:41:07   8          ALL I'M TRYING TO DO IS TO TALK ABOUT THE GEOLOGICAL

18:41:13   9   PROFILES.  OKAY?  I UNDERSTAND YOU WANT TO BE AN ADVOCATE, BUT

18:41:17   10  I JUST WANT TO ASK YOU ABOUT THE PROFILE.

18:41:20   11         NOW, MY SIMPLE QUESTION IS AGAIN:  THE '80 PROFILE

18:41:24   12  HAS MORE DETAIL THAN THE '66 PROFILE; ISN'T THAT TRUE?

18:41:28   13  **A.**   I DON'T AGREE WITH THAT STATEMENT.  IT HAS THE SAME SOIL

18:41:30   14  DESIGNATIONS, IT HAS THE SAME NUMBER OF SOIL CLASSIFICATIONS,

18:41:34   15  AND IT SHOWS A SIMILAR TYPE OF COLORING AND SHADING ON THE

18:41:37   16  DIAGRAMS.

18:41:38   17         THE DETAILS OF WHERE SILT IS LOCATED, YES, IT'S

18:41:41   18  DIFFERENT, BUT IT'S A DIFFERENT LOCATION.

18:41:46   19  **Q.**   ASSUME FOR THE SAKE OF THIS PRESENTATION THAT THIS DIAGRAM

18:41:55   20  REPRESENTS --

18:41:56   21             **THE COURT:**  WHICH ONE IS THIS?

18:41:58   22             **MR. BRUNO:**  1966.

18:41:59   23             **THE COURT:**  OKAY.

18:42:00   24             **MR. BRUNO:**  AND WE'LL ARGUE THIS IN BRIEF IF WE HAVE

18:42:02   25  TO.

| | | |
|---|---|---|
| 18:42:02 | 1 | **BY MR. BRUNO:** |
| 18:42:03 | 2 | **Q.**   -- SHOWS THE DETAIL FROM THE RIVER ALL THE WAY TO THE |
| 18:42:08 | 3 | INTERCOASTAL WATERWAY.  IT WAS DIVIDED IN SECTIONS.  DID YOU |
| 18:42:11 | 4 | LOOK AT THE '66 DESIGN MEMORANDUM? |
| 18:42:13 | 5 | **A.**   I DID. |
| 18:42:14 | 6 | **Q.**   DID YOU SEE HOW IT WAS DIVIDED? |
| 18:42:17 | 7 | **A.**   YES. |
| 18:42:17 | 8 | **Q.**   DID YOU SEE THAT THE DESIGN MEMORANDUM COVERED THE LEVEE |
| 18:42:20 | 9 | FROM THE RIVER ALL THE WAY TO THE INTERCOASTAL WATERWAY AND |
| 18:42:24 | 10 | CONTINUING DOWN TO THE MRGO ALL THE WAY TO VIOLET? |
| 18:42:28 | 11 | DID YOU SEE THAT? |
| 18:42:28 | 12 | **A.**   I SAW THAT IT COVERS A LONG DISTANCE, YES.  I DON'T |
| 18:42:31 | 13 | REMEMBER EXACTLY WHERE IT ENDED, BUT YES. |
| 18:42:34 | 14 | **Q.**   FAIR ENOUGH.  AND IT WAS DIVIDED IN SECTIONS.  THE FIRST |
| 18:42:37 | 15 | SECTION WAS THE RIVER TO THE -- I FORGOT THE NAME OF THAT |
| 18:42:42 | 16 | BAYOU -- BIENVENUE, RIGHT AT THE INTERCOASTAL WATERWAY.  OKAY? |
| 18:42:50 | 17 | SO IF THIS '66 PLAT REPRESENTS THAT SPAN OF |
| 18:42:56 | 18 | GEOGRAPHY, YOU WOULD AGREE WITH ME THAT THIS HAS MORE DETAIL IN |
| 18:43:00 | 19 | 1980; RIGHT? |
| 18:43:01 | 20 | **A.**   THOSE TWO, COMPARING JUST THOSE TWO WITH EACH OTHER, YES, |
| 18:43:04 | 21 | THERE'S MORE DETAIL THAN THE ONE IN YOUR LEFT HAND. |
| 18:43:07 | 22 | **Q.**   ALL RIGHT.  AND THEN AS WE GO FURTHER IN TIME TO TODAY, WE |
| 18:43:11 | 23 | CALL UP YOUR REPORT, PX-4724, NO. 8. |
| 18:43:24 | 24 | WE HAVE YOUR CENTERLINE INTERPRETATION OF THE EBIA, |
| 18:43:27 | 25 | WHICH IS A COMPONENT PART OF THE 1966 GEOLOGICAL PROFILE; ISN'T |

18:43:33  1   THAT TRUE?

18:43:34  2   **A.**   YES, SIR.

18:43:35  3   **Q.**   AND WE HAVE YOUR INDICATION OF WHAT YOU DESCRIBE TO BE THE

18:43:38  4   DIFFERENT LAYERS; RIGHT?

18:43:39  5   **A.**   YES.

18:43:40  6   **Q.**   OKAY.  AND IF WE LOOK VERY CAREFULLY, WE CAN DETERMINE THE

18:43:49  7   VARIOUS LOCATIONS OF THE LAYERS USING YOUR ELEVATION; RIGHT?

18:43:55  8   **A.**   YES.

18:43:56  9   **Q.**   AND WE HAVE ANOTHER ONE, WHICH IS 09, OKAY, WHICH SHOWS

18:44:12  10  US -- 09 IS THE NEXT ONE.  OKAY.

18:44:14  11          THIS IS THE CANAL SIDE.  AND WE HAVE ALL THESE

18:44:18  12  BORINGS WHICH GIVE US FAR, FAR MORE DETAIL THAN WE HAD ON THE

18:44:23  13  1966 GEOLOGICAL PROFILE; ISN'T THAT TRUE?

18:44:26  14  **A.**   YES.

18:44:27  15  **Q.**   AND FAR MORE DETAIL THAN WAS SHOWN ON THAT 1980 PROFILE?

18:44:33  16  **A.**   YES.

18:44:34  17  **Q.**   AND WHAT IT SHOWS US, WE CAN DETERMINE FROM THIS --

18:44:37  18          **MR. BRUNO:**  CAN WE BLOW THIS UP A LITTLE BIT?

18:44:39  19  **BY MR. BRUNO:**

18:44:41  20  **Q.**   OKAY.  SO WE HAVE HERE -- WHAT IS THIS GREEN THING WITH

18:44:43  21  THE DOTS?

18:44:47  22  **A.**   WELL, LET'S SEE.  WHERE ARE YOU POINTING?  THAT AREA,

18:44:51  23  THAT'S THE LOWER ORGANIC CLAY.

18:44:53  24  **Q.**   ALL RIGHT.  AND THAT GOES UP TO NEGATIVE 5 RIGHT HERE?

18:44:59  25  **A.**   I THINK IT WAS -- YES, MINUS 5, MINUS 6.

| | | |
|---|---|---|
| 18:45:02 | 1 | **Q.**   MINUS 5, MINUS -- AND THE UPPER ORGANIC GOES TO? |
| 18:45:06 | 2 | **A.**   UP TO, IN THIS LOCATION, ABOUT MINUS 3. |
| 18:45:09 | 3 | **Q.**   MINUS 3.  OKAY.  PRETTY CLOSE THERE. |
| 18:45:12 | 4 | **MR. BRUNO:**  AND THEN CAN WE MOVE TO SORT OF THE SOUTH |
| 18:45:14 | 5 | BREACH.  PUT THAT IN THE CENTER, IF WE COULD.  THIS IS THIS |
| 18:45:25 | 6 | AREA THERE. |
| 18:45:43 | 7 | IS THIS G-2?  THIS IS G-2? |
| 18:45:46 | 8 | **BY MR. BRUNO:** |
| 18:45:47 | 9 | **Q.**   ALL RIGHT.  WE HAVE AN INDICATION HERE OF -- WHAT IS THIS |
| 18:45:49 | 10 | RIGHT HERE?  THIS IS AGAIN THE LOWER ORGANIC? |
| 18:45:56 | 11 | THIS IS THE LOWER ORGANIC. |
| 18:46:00 | 12 | **A.**   THAT'S THE LOWER, YES. |
| 18:46:01 | 13 | **Q.**   AND THIS IS THE UPPER ORGANIC? |
| 18:46:03 | 14 | **A.**   I'M SORRY.  THE -- THE -- I THINK THAT'S THE CLAY FILL, |
| 18:46:12 | 15 | THE GRAY MATERIAL.  AND THEN THE YELLOWISH GREEN IS THE UPPER |
| 18:46:18 | 16 | ORGANIC AND THE GREEN IS THE LOWER ORGANIC, I THINK. |
| 18:46:24 | 17 | **Q.**   I'M SORRY.  WE'RE ON THE WRONG PLATE. |
| 18:46:27 | 18 | **MR. BRUNO:**  COULD YOU PLEASE GIVE ME 09?  THIS IS THE |
| 18:46:30 | 19 | NUMBER I HAVE, UNLESS IT'S WRONG.  I WANT THE CANAL SIDE, BUT |
| 18:46:37 | 20 | WE WERE JUST LOOKING AT THE OTHER ONE. |
| 18:46:39 | 21 | **BY MR. BRUNO:** |
| 18:46:40 | 22 | **Q.**   ALL RIGHT.  NOW, YOU SEE HERE THAT LIGHT GREEN.  WHAT IS |
| 18:46:44 | 23 | THAT?  THAT'S THE -- THAT'S THE -- |
| 18:46:45 | 24 | **A.**   THAT'S THE UPPER ORGANIC -- |
| 18:46:47 | 25 | **Q.**   -- UPPER ORGANIC? |

2200

18:46:49   1    **A.**    -- YES.

18:46:49   2    **Q.**    AND WE SEE IT MAKES A LITTLE BUMP UP RIGHT WHERE THE SOUTH

18:46:52   3    BREACH OCCURRED?

18:46:54   4    **A.**    YES.

18:46:55   5    **Q.**    DO YOU SEE THAT?

18:46:56   6    **A.**    YES.

18:46:56   7    **Q.**    AND THAT'S THE LOWER ORGANIC THERE?

18:46:58   8    **A.**    YES.

18:46:59   9    **Q.**    ALL RIGHT.  AND WE HAVE ALL THESE TUBES WITH ALL THESE

18:47:03  10    DIFFERENT LINES IN THERE.  THOSE ARE INDICATIONS OF DIFFERENT

18:47:07  11    TYPES OF MATERIAL FOUND WITHIN THESE LAYERS; CORRECT?

18:47:10  12    **A.**    YES.

18:47:11  13    **Q.**    OKAY.

18:47:11  14          **MR. BRUNO:**  ALL RIGHT.  LET'S GO TO JX-116-640.

18:47:38  15    **BY MR. BRUNO:**

18:47:38  16    **Q.**    ALL RIGHT.  SO THIS IS THE RECAP REPORT.  ARE YOU FAMILIAR

18:47:41  17    WITH THIS?

18:47:47  18    **A.**    NO.  NO, I'M NOT.

18:47:49  19    **Q.**    YOU'RE NOT.  WELL, THIS IS A DOCUMENT THAT WASHINGTON

18:47:51  20    GROUP PREPARED FOR THE CORPS OF ENGINEERS.  AND CAN YOU TELL ME

18:47:56  21    WHAT THESE -- WHAT THESE LINES REFER TO?

18:48:04  22    **A.**    YOU'RE --

18:48:05  23    **Q.**    BLUE, THE BLUE LINES.

18:48:06  24    **A.**    THE BLUE COLOR?  YEAH.  THE BLUE VERTICAL SAYS ML.  THAT'S

18:48:10  25    SILT.

18:48:11   1   **Q.**   THAT'S SILT?

18:48:11   2   **A.**   YES.

18:48:11   3   **Q.**   SILT HERE, SILT HERE, SILT HERE, SILT HERE, SILT.  A LOT

18:48:15   4   OF SILT; RIGHT?

18:48:17   5   **A.**   THAT'S WHAT THAT DIAGRAM SHOWS, YES.

18:48:19   6   **Q.**   AND IT'S ALL INSIDE OF THIS ORGANIC LAYER; RIGHT?

18:48:25   7   **A.**   WELL, THERE'S SILT IN PLACES AND THEN THERE'S ORGANIC

18:48:29   8   MATERIAL IN PLACES.

18:48:29   9   **Q.**   ALL RIGHT.  BUT I -- BUT IN TERMS OF --

18:48:31  10   **A.**   I'M SORRY.  HANG ON JUST ONE SECOND.  THE GREEN IS

18:48:34  11   DESCRIBED AS CL.  THAT'S A LOW PLASTICITY CLAY.

18:48:45  12   **Q.**   AND THIS IS --

18:48:46  13   **A.**   AND THEN THE -- I SEE WHAT YOU'RE POINTING TO.  THE UPPER

18:48:49  14   PART IS ORGANIC MATERIAL; IS THAT CORRECT?

18:48:51  15   **Q.**   IT SAYS FILL --

18:48:52  16   **A.**   NO, NO, NO.  I'M SORRY.

18:48:54  17   **Q.**   IT SAYS FILL TO ME.

18:48:56  18   **A.**   THAT SAYS FILL.  YOU'RE RIGHT.

18:48:57  19   **Q.**   I MEAN -- FILL.

18:48:57  20          SO THIS MUST BE THE UPPER ORGANIC; RIGHT?

18:49:01  21   **A.**   WELL, IT'S CALLED HERE --

18:49:03  22          **THE COURT:**  THERE'S A LOT OF LITTLE RED RUNNING

18:49:06  23   AROUND HERE.  WHY DON'T WE GET DIFFERENT COLORS?

18:49:12  24          **MR. BRUNO:**  WE CAN PLAY -- WE CAN DUAL.

18:49:12  25          **THE COURT:**  WELL, THAT MIGHT BE A --

```
18:49:13   1            THE WITNESS:  YOU'RE REFERRING TO --

18:49:14   2            THE COURT:  -- A MORE EFFICIENT SOLUTION THAN THE

18:49:15   3   JUDICIAL SYSTEM.

18:49:16   4   BY MR. BRUNO:

18:49:16   5   Q.  DR. MARR, I'M REFERRING TO THE LINE.  LET ME FOLLOW -- LET

18:49:18   6   ME USE MY POINTER AND FOLLOW THIS LINE.  OKAY?  EVERYTHING

18:49:22   7   BELOW THE LINE IS THE ORGANIC CLAY LAYER; ISN'T THAT TRUE?

18:49:31   8   A.  WELL, WHAT'S GIVING ME DIFFICULTY HERE IS IT'S ACTUALLY

18:49:34   9   LABELED AS "CL" ON THIS DIAGRAM.  IT'S A CLAY OF LOW

18:49:39  10   PLASTICITY.  IT DOESN'T CALL IT ORGANIC --

18:49:43  11   Q.  I DIDN'T DRAW IT.

18:49:43  12   A.  -- ON THIS DIAGRAM.

18:49:44  13   Q.  OKAY.  ALL RIGHT.  WELL, LET'S USE CLAY.  IT'S CLAY.  AND

18:49:48  14   THE SILT STUFF IS INSIDE -- OR THIS -- WHATEVER THIS THING IS,

18:49:51  15   THE SILT IS A COMPONENT PART OF IT; RIGHT?

18:49:53  16   A.  THERE'S SILT SHOWN IN PLACES WITH CL CLAY AROUND IT, YES.

18:49:57  17   Q.  ALL RIGHT.  AND IT'S NOT MIXED TOGETHER IN A SOUP -- AT

18:49:59  18   LEAST -- THE WAY THIS IS PORTRAYED -- IT COULD BE WRONG --

18:50:03  19   PORTRAYS SOME NICE DIVISIONS AS TO WHERE THE SILT IS AND TO

18:50:07  20   WHERE THE CL IS; RIGHT?

18:50:09  21   A.  YES, SIR.

18:50:09  22   Q.  ALL RIGHT.  AND THIS IS THE A.  ARE YOU FAMILIAR WITH

18:50:12  23   THESE BORINGS, A?  IN FACT, THAT'S THE FAMOUS -- THAT'S THE

18:50:14  24   FAMOUS 81-A RIGHT THERE.  DO YOU SEE IT?

18:50:17  25   A.  YES.
```

2203

18:50:17  1  **Q.**  AND YOU SEE IT GOES DOWN TO 22 FEET AND THEY'RE SHOWING

18:50:22  2  SILT FOR THE WHOLE LENGTH OF IT?

18:50:26  3        **MR. BRUNO:**  DID I SAY SILT?  I MEAN FILL.  YOU'RE

18:50:29  4  RIGHT.

18:50:29  5        **THE WITNESS:**  FILL, SHOWING FILL.

18:50:29  6        **MR. BRUNO:**  I'M SORRY, ROBIN.

18:50:31  7  **BY MR. BRUNO:**

18:50:31  8  **Q.**  I MEANT FILL.  FILL.  THIS IS ALL FILL FOR 21; RIGHT?

18:50:33  9  **A.**  YES.

18:50:33  10  **Q.**  AND WE HAVE ALL THESE OTHER BORINGS.

18:50:35  11        NOW, LET'S GO TO THE NEXT ONE, JX-641.  AND THIS IS

18:50:45  12  THE C SET OF BORINGS.  YOU KNOW WHERE THESE ARE, DR. MARR,

18:50:49  13  DON'T YOU?

18:50:51  14  **A.**  NOT REALLY.  I'M FAMILIAR WITH THE ONES THAT YOU HAVE

18:50:53  15  HERE, BUT THE C, I'VE KIND OF FORGOTTEN WHERE THEY ARE.

18:50:56  16  **Q.**  ALL RIGHT.

18:50:57  17        **MR. BRUNO:**  ROTATE.

18:50:58  18  **BY MR. BRUNO:**

18:50:58  19  **Q.**  ALL RIGHT.  C IS AS YOU'RE MOVING OUT TOWARDS THE WATER.

18:51:01  20  **A.**  THANK YOU.

18:51:02  21  **Q.**  AND HERE WE HAVE -- WHAT IS THIS STUFF HERE, THIS -- WITH

18:51:05  22  THESE LINES?  WHAT DOES THAT STAND FOR?

18:51:08  23  **A.**  THAT'S PEAT.

18:51:10  24  **Q.**  THAT'S PEAT.  SO I'VE GOT A PEAT SECTION IN HERE.  THIS IS

18:51:13  25  PEAT OVER HERE, TOO?

18:51:15    1    **A.**   YES.

18:51:15    2    **Q.**   AND WHAT IS THIS STUFF DOWN HERE?

18:51:18    3    **A.**   IT SAYS O --

18:51:22    4             **THE COURT:**  FOR THE RECORD --

18:51:23    5             **THE WITNESS:**  OH.

18:51:23    6             **THE COURT:**  -- THE PEAT BEING THE DARKER MARKED THING

18:51:27    7    ON THIS FIGURE ON THIS.  AND THE -- RIGHT UNDER THE PEAT IS A

18:51:32    8    MORE -- A WHITER LOOKING SUBSTANCE.  AND WHAT IS THAT, SIR?

18:51:37    9             **THE WITNESS:**  THE WHITER LOOKING SUBSTANCE IS ORGANIC

18:51:39   10    MATERIAL.

18:51:41   11             **THE COURT:**  OH?

18:51:42   12             **THE WITNESS:**  OH.

18:51:43   13    **BY MR. BRUNO:**

18:51:43   14    **Q.**   WHY DON'T WE DO THIS FOR THE RECORD?  THERE'S A LEGEND,

18:51:46   15    AND ANYBODY WHO COULD READ THIS COULD UNDERSTAND IF WE JUST

18:51:50   16    INTERPRET THE LEGEND.  SO FILL, WE KNOW WHAT THAT IS ALREADY.

18:51:54   17    WE'VE TALKED ABOUT THAT, HAVEN'T WE?

18:51:57   18    **A.**   YES.

18:51:58   19    **Q.**   OKAY.  WHAT IS THE SM?

18:51:59   20    **A.**   THAT STANDS FOR SAND.

18:52:01   21    **Q.**   OKAY.  SAND.  DO YOU SEE ANY SAND IN THERE?

18:52:05   22    **A.**   NO.

18:52:08   23    **Q.**   THIS CL, WE SAID, IS CLAY.  WE TALKED ABOUT THAT?

18:52:11   24    **A.**   YES.

18:52:12   25    **Q.**   WHAT'S CH?

2205

| | | |
|---|---|---|
| 18:52:14 | 1 | **A.** THAT'S CLAY OF HIGH PLASTICITY. |
| 18:52:16 | 2 | **Q.** THAT'S RIGHT HERE? |
| 18:52:17 | 3 | **A.** YES. |
| 18:52:17 | 4 | **Q.** AND THIS -- WELL, IT SAYS WOOD.  THAT'S WHAT IT IS. |
| 18:52:21 | 5 | WHAT IS THIS ONE RIGHT HERE? |
| 18:52:22 | 6 | **A.** THAT'S ORGANIC.  OH IS ORGANIC HIGH PLASTICITY. |
| 18:52:29 | 7 | **Q.** ALL RIGHT.  AND THIS -- WHAT IS THIS ONE HERE? |
| 18:52:31 | 8 | **A.** SAND COARSE GRADED. |
| 18:52:32 | 9 | **Q.** OKAY.  AND THIS ONE? |
| 18:52:34 | 10 | **A.** THAT'S ORGANIC, LOW PLASTICITY. |
| 18:52:37 | 11 | **Q.** THAT'S OL, FOR THE RECORD.  OL STANDS FOR ORGANIC OF LOW |
| 18:52:41 | 12 | PLASTICITY? |
| 18:52:42 | 13 | **A.** YES, SIR. |
| 18:52:42 | 14 | **Q.** AND THE PT STANDS FOR PEAT? |
| 18:52:44 | 15 | **A.** YES. |
| 18:52:44 | 16 | **Q.** AND THE ML STANDS FOR SILT? |
| 18:52:50 | 17 | **A.** SILT OF LOW PLASTICITY. |
| 18:52:52 | 18 | **Q.** OKAY.  I GOTCHA.  ALL RIGHT.  SO THE FACT IS, DOCTOR, EVEN |
| 18:52:55 | 19 | THOUGH WE MAY CALL A LAYER CLAY OR YOU MAY CALL IT ORGANIC |
| 18:53:00 | 20 | CLAY, IT DOESN'T MEAN THAT EVERY SQUARE INCH OF THAT ENTIRE |
| 18:53:05 | 21 | AREA IS EXACTLY THE SAME MATERIALS; RIGHT? |
| 18:53:08 | 22 | **A.** CORRECT. |
| 18:53:08 | 23 | **Q.** OKAY.  THERE MAY BE LENSES OF THESE MATERIALS GOING |
| 18:53:12 | 24 | THROUGHOUT; RIGHT? |
| 18:53:13 | 25 | **A.** THERE CAN BE. |

18:53:14  1  Q.   AND THESE THINGS MAY OR MAY NOT HAVE DIFFERENT

18:53:18  2  PERMEABILITIES; ISN'T THAT TRUE?

18:53:22  3  A.   YES.

18:53:23  4  Q.   OKAY.  NOW, LET'S SEE HOW THE CORPS DEALT WITH THEIR

18:53:38  5  FINDING THIS SILT UNDERNEATH THERE AT 1980.

18:53:42  6          MR. BRUNO:  LET'S GO TO JX-601-41.

18:54:05  7              OKAY.  I APOLOGIZE FOR THE POOR QUALITY OF

18:54:07  8  THESE.  WELL, THEY'RE NOT MINE.  I DON'T KNOW WHY I'M

18:54:10  9  APOLOGIZING.

18:54:11  10          THE COURT:  JUST IN GENERAL.

18:54:12  11          MR. BRUNO:  RIGHT HERE.  LET'S BLOW THAT UP.

18:54:12  12  BY MR. BRUNO:

18:54:13  13  Q.   OKAY.  THIS IS TALKING ABOUT THE DEPTH OF THE SHEET PILE

18:54:15  14  ANALYSIS.  AND TO CONNECT THE DOTS, DR. MARR, THIS IS A

18:54:18  15  STABILITY AND DEEP-SEATED ANALYSIS FOR THE WEST IHNC AND REFERS

18:54:27  16  TO THE PLATES THAT WE JUST LOOKED AT.  SO THEY DID A LANE'S

18:54:40  17  WEIGHTED CREEP ANALYSIS HERE.  DO YOU SEE THAT?

18:54:43  18  A.   YES.

18:54:43  19  Q.   AND THEY CAME UP WITH A SHEET PILE TIP DEPTH OF NEGATIVE

18:54:51  20  17.7?

18:54:53  21  A.   YES.

18:54:53  22  Q.   OKAY.  AND HERE'S WHAT THEY DID.  THEY EXTENDED THE SHEET

18:54:56  23  PILE CUTOFF TO ELEVATION NEGATIVE 25 TO PENETRATE THE SILT

18:55:00  24  LAYER.

18:55:00  25              AND THEN IT SAYS:  "SEE PLATE 73 FOR LOCATION OF THE

18:55:04   1   SILT LAYER."

18:55:05   2           THAT'S THE PLATE THAT WE JUST LOOKED AT, YOU AND I;

18:55:08   3   RIGHT?  YOU'LL GIVE ME THAT, I HOPE.

18:55:14   4   **A.**   YES.

18:55:14   5   **Q.**   IT'S LATE.

18:55:15   6   **A.**   YES.

18:55:15   7   **Q.**   NOW -- SO SOMEBODY AT THE CORPS OF ENGINEERS THOUGHT THAT

18:55:17   8   IT WAS NECESSARY TO CUT OFF THE SILT LAYER; RIGHT?

18:55:22   9   **A.**   THE SILT LAYERS SHOWING UP AT THE SECTION WHERE THIS

18:55:25  10   ANALYSIS IS BEING DONE.

18:55:26  11   **Q.**   RIGHT.  GOSH, IT'S WHERE IT IS.  IT'S NOWHERE -- IT'S AWAY

18:55:29  12   FROM THE EBIA.  BUT THE POINT IS, OKAY, SOMEBODY FELT COMPELLED

18:55:33  13   TO CUT OFF THE SILT LAYER THAT WAS INSIDE OF THIS ORGANIC

18:55:38  14   LAYER; RIGHT?

18:55:39  15   **A.**   YES.

18:55:39  16   **Q.**   OKAY.  NOW, WHY DO YOU CUT OFF -- I MEAN, WHAT -- THESE

18:55:46  17   WORDS, "CUT OFF," WHAT DOES THAT MEAN?

18:55:49  18   **A.**   YOU'RE TRYING TO INTERRUPT THE POSSIBILITY OF SEEPAGE

18:55:53  19   FLOWING -- FLOWING THROUGH THAT LAYER YOU'RE CUTTING OFF.

18:55:56  20   **Q.**   ALL RIGHT.  NOW, DR. MARR, THERE'S A NEW WALL OUT THERE AT

18:56:04  21   THE EBIA AS WE SIT HERE TODAY; ISN'T THAT TRUE?

18:56:07  22   **A.**   YES.

18:56:08  23           **MR. BRUNO:**  CAN WE CALL UP MARR 16?  IT'S A

18:56:45  24   DEMONSTRATIVE.

          25

18:56:45   1   BY MR. BRUNO:

18:56:46   2   **Q.**   DO YOU SEE THIS?  THIS YOU RECOGNIZE TO BE THE DESIGN FOR

18:56:48   3   THE T-WALL THAT IS AT THE EBIA TODAY?

18:56:50   4          IT WAS BUILT AFTER HURRICANE KATRINA; ISN'T THAT

18:56:53   5   TRUE?

18:56:53   6   **A.**   I CAN'T REALLY READ IT, BUT I ASSUME THAT'S WHAT YOU'RE

18:56:56   7   PUTTING UP THERE.

18:56:57   8          **MR. BRUNO:**  I'M GOING TO ASK THE JUDGE IF I CAN

18:56:59   9   APPROACH AND SHOW YOU, BECAUSE IT'S A VERY --

18:57:00  10          **THE COURT:**  YES, YOU MAY, SIR.

18:57:02  11          **MR. BRUNO:**  -- ANOTHER POOR QUALITY.  LET'S MAKE SURE

18:57:05  12   THAT WE'RE LOOKING AT THE RIGHT THING.

18:57:08  13          **THE COURT:**  IT DOES SHOW UP A LITTLE BETTER ON THE

18:57:11  14   TELEVISION, I MUST SAY.

18:57:16  15          **THE WITNESS:**  YES.  THIS IS SHOWING A SECTION

18:57:17  16   "REPLACEMENT AND MODIFICATIONS OF THE IHNC EAST SIDE, NORTH

18:57:22  17   CLAIBORNE AVENUE TO FLORIDA AVENUE."

18:57:24  18   BY MR. BRUNO:

18:57:24  19   **Q.**   ALL RIGHT.  SO WE'RE IN THE RIGHT LOCATION?

18:57:26  20   **A.**   YES, SIR.

18:57:26  21   **Q.**   ALL RIGHT.  TELL THE JUDGE HOW DEEP THE SHEET PILE TIP

18:57:29  22   GOES OUT THERE TODAY.

18:57:33  23          **MR. SMITH:**  YOUR HONOR, I WOULD LIKE TO OBJECT.  I

18:57:35  24   DON'T KNOW THE RELEVANCE OF THESE -- THIS LINE OF QUESTIONING

18:57:38  25   CONCERNING THE POST-KATRINA CONSTRUCTION.  THAT'S NOT REALLY AN

18:57:44   1   ISSUE IN THIS CASE.

18:57:44   2                    **THE COURT:**  OKAY.

18:57:45   3                         SIR, WHAT'S THE RELEVANCE?

18:57:48   4                    **MR. BRUNO:**  YES.  IT SHOWS KNOWLEDGE OF THE NEED TO

18:57:50   5   HAVE A SHEET PILE TIP CUT OFF BASED UPON NEWLY ACQUIRED

18:57:55   6   INFORMATION FROM ALL OF THE BORINGS THAT THEY HAD IN THEIR

18:57:58   7   POSSESSION AS A RESULT OF THE WASHINGTON GROUP EFFORTS.

18:58:02   8                    **THE COURT:**  THAT'S WHAT YOU CONTEND IT SHOWS.

18:58:04   9                    **MR. BRUNO:**  YES, I CONTEND.  IF WE NEED BRIEFING ON

18:58:07  10   IT, THEN I WOULD JUST SUGGEST THAT WE PROFFER IT AND WE BRIEF

18:58:11  11   IT AS PART OF OUR POST-TRIAL MEMORANDUM SO WE CAN GET THROUGH

18:58:15  12   THIS.

18:58:15  13                    **MR. TREEBY:**  I HAVE THE SAME OBJECTION, YOUR HONOR.

18:58:17  14   HE -- THE LINK HE'S TRYING TO MAKE HE HASN'T MADE.  UNTIL

18:58:19  15   THAT'S MADE, THIS IS SUBSEQUENT REMEDIAL MEASURES, ARGUABLY,

18:58:23  16   THAT ARE IRRELEVANT.

18:58:24  17                    **THE COURT:**  WELL, I'M GOING TO HAVE TO DEFER RULING

18:58:27  18   AS YOU -- AS YOU REQUESTED.  IN THE EVENT I FIND IT'S A

18:58:32  19   SUBSEQUENT REMEDIAL MEASURE, IT WILL BE EXCLUDED.

18:58:35  20                         IN THE EVENT THAT I AM CONVINCED THAT THERE IS

18:58:38  21   SOMETHING MORE TO IT TO SHOW KNOWLEDGE --

18:58:41  22                    **MR. BRUNO:**  EXACTLY.  EXACTLY.  I MEAN, THERE'S NO

18:58:44  23   QUESTION THAT IT'S A SUBSEQUENT REMEDIAL MEASURE.  IT'S NOT

18:58:47  24   BEING SHOWN FOR THAT PURPOSE.  IT'S BEING SHOWN TO SHOW

18:58:51  25   KNOWLEDGE.  SO --

18:58:51   1          **THE COURT:**  AND THE QUESTION IS WHEN THAT KNOWLEDGE

18:58:53   2   EXISTED.  AND I'M NOT --

18:58:55   3               YES, MR. SMITH, YOU WANT TO . . .

18:58:57   4          **MR. SMITH:**  I MEAN, I'M -- I'M ALSO GOING TO OBJECT

18:59:00   5   ON THE GROUNDS THAT IT CALLS FOR SPECULATION.  I MEAN, I -- I

18:59:04   6   DON'T KNOW WHOSE KNOWLEDGE HE THINKS DR. MARR IS SUPPOSED TO

18:59:09   7   KNOW ABOUT BASED ON THE DRAWING HE'S BEEN GIVEN HERE.  AND I

18:59:13   8   CERTAINLY DON'T THINK IT'S RELEVANT.

18:59:15   9          **THE COURT:**  YEAH.  I'M NOT SURE, AND I DON'T WANT TO

18:59:16  10   GET INTO IT TOO MUCH.  I'M NOT SURE, IF THE KNOWLEDGE WASN'T

18:59:21  11   PRESENT AT THE TIME -- I DON'T WANT TO START COMMENTING ON THIS

18:59:27  12   RIGHT AT THIS POINT.  I'M NOT SURE WHAT RELEVANCE THIS

18:59:31  13   KNOWLEDGE HAS IF IT WAS RECENTLY ACQUIRED.

18:59:35  14          **MR. BRUNO:**  JUDGE, WE'RE NOT -- FIRST OF ALL, IT

18:59:35  15   WASN'T RECENTLY ACQUIRED.  MY POINT IS, IS THAT THIS GOES TO

18:59:39  16   CAUSATION AND KNOWLEDGE OF THE FACT THAT THERE -- AND CAN I

18:59:43  17   FINISH MY LINE, AND THEN I'LL -- I DON'T WANT TO TELEGRAPH TO

18:59:48  18   THE -- WHERE WE'RE GOING.

18:59:49  19               WHAT I WOULD LIKE TO DO IS JUST ESTABLISH THE

18:59:52  20   SHEET PILE CUTOFF, WHICH IT SAYS RIGHT HERE WHAT THE DEPTH IS,

18:59:55  21   AND THEN I CAN -- I WILL ELUCIDATE.

18:59:56  22          **THE COURT:**  ARE YOU TRYING TO SHOW -- LOOK, WE CAN'T

18:59:59  23   JUST -- YOU DON'T NEED TO BE COY HERE.

19:00:01  24               ARE YOU TRYING TO SHOW THAT THESE LAYERS --

19:00:06  25   THESE LAYERS WERE MORE VULNERABLE -- I'LL JUST USE THAT WORD --

| 19:00:10 | 1 | I DON'T KNOW IF YOU WANT TO USE ANY -- THAN HAS BEEN TESTIFIED |

19:00:10  1  I DON'T KNOW IF YOU WANT TO USE ANY -- THAN HAS BEEN TESTIFIED

19:00:13  2  TO THUS FAR?

19:00:14  3          **MR. BRUNO:**  CORRECT.  YES, YOUR HONOR.

19:00:15  4          **THE COURT:**  FOR THAT LIMITED PURPOSE I'LL ALLOW YOU

19:00:17  5  TO PROCEED, AND WE'LL DETERMINE IN BRIEFING WHETHER IT'S . . .

19:00:23  6          **MR. BRUNO:**  PRECISELY.  AND I'LL --

19:00:24  7          **THE COURT:**  IF IT'S SIGNIFICANT.

19:00:25  8  **BY MR. BRUNO:**

19:00:26  9  **Q.**  WHAT IS THE SHEET PILE TIP DEPTH THAT THESE DESIGNS

19:00:29  10  INDICATE?

19:00:29  11  **A.**  WELL, THE DIAGRAM THAT'S SHOWN ON THE SCREEN SAYS "TYPICAL

19:00:33  12  T-WALL SECTION."  WHAT I'M SEEING ON THE SCREEN SHOWS THE

19:00:37  13  CENTER LINE OF THE SHEET PILE CUTOFF WALL MADE OF PZ22 SHEETING

19:00:42  14  WITH A TIP ELEVATION OF MINUS 23 FEET.

19:00:43  15  **Q.**  ALL RIGHT.  NOW, THAT'S NOT A STRUCTURAL COMPONENT, IS IT?

19:00:49  16  **A.**  YOU HAVE --

19:00:50  17  **Q.**  YOU'VE GOT ALL THESE PILINGS.  THAT'S WHAT'S HOLDING THIS

19:00:51  18  UP.

19:00:51  19  **A.**  YOU HAVE TO BE A LITTLE CAREFUL OF "STRUCTURAL."  IN THE

19:00:55  20  SENSE OF THE PART OF THE -- THE FACILITY THAT HOLDS IT IN PLACE

19:00:58  21  AND KEEPS IT STABLE, IT IS NOT A PART OF THE STRUCTURE.

19:01:02  22  **Q.**  ALL RIGHT.  IT'S PURPOSE IS AS INDICATED.  IT IS A CUTOFF.

19:01:08  23  IT'S INDICATED ON THE PLAN?

19:01:09  24  **A.**  IT'S LABELED AS A SHEET PILE CUTOFF.

19:01:14  25  **Q.**  ALL RIGHT.  NOW, OBVIOUSLY, SOMEBODY -- WE DON'T KNOW

19:01:17   1   WHO -- FELT IT NECESSARY TO INSTALL A SHEET PILE CUTOFF DOWN TO

19:01:23   2   23 FEET, CORRECT?

19:01:25   3   **A.**   THAT'S WHAT'S ON THE DRAWING.

19:01:27   4   **Q.**   ALL RIGHT.  AND WHILE WE'RE AT IT, THE NEW SHIP LOCK SHEET

19:01:40   5   PILE TIP, WHICH GOES ALONG THE PERPENDICULAR -- AND I'LL SHOW

19:01:46   6   YOU WHERE THAT IS, JUST TO MAKE IT ALL WORK.

19:02:17   7            **MR. BRUNO:**  MARR 15.

19:02:18   8   BY MR. BRUNO:

19:02:18   9   **Q.**   THAT RED LINE REPRESENTS WHERE THE PERPENDICULAR SHEET

19:02:21  10   WALL -- SHEET PILE TIP WALL WAS SUPPOSED TO BE INSTALLED;

19:02:24  11   RIGHT?

19:02:25  12   **A.**   I DON'T KNOW.  I'VE NEVER -- I'VE NEVER REALLY STUDIED

19:02:28  13   THIS DRAWING.

19:02:29  14   **Q.**   OKAY.  WELL, NEVER MIND.  I THOUGHT --

19:02:31  15            **THE COURT:**  THAT IS OUT OF THE SCOPE OF HIS

19:02:32  16   KNOWLEDGE.

19:02:33  17            **MR. BRUNO:**  ALL RIGHT.  THAT'S FINE.  I THOUGHT HE

19:02:33  18   WAS A CONSULTANT TO THE POST-KATRINA WORK.  THAT WAS INDICATED

19:02:37  19   IN HIS CV.

19:02:39  20            TAKE THAT DOWN.

19:02:43  21            ALL RIGHT.  I THINK THAT'S ENOUGH FOR NOW,

19:02:50  22   JUDGE.  WE'LL LET THE DEFENDANTS HAVE --

19:02:52  23            **THE COURT:**  I'M NOT TRYING TO RUSH YOU, MR. BRUNO.

19:02:54  24   DO YOU WANT TO CONSULT WITH YOUR . . .

19:02:59  25            **MR. BRUNO:**  I'M TOLD I HAVE TO CONSULT WITH THEM.

| | | |
|---|---|---|
| 19:03:01 | 1 | **THE COURT:**  ALL RIGHT.  I KNOW MR. TREEBY'S RARING TO |
| 19:03:03 | 2 | GO, AND I DON'T BLAME HIM. |
| 19:03:06 | 3 | **MR. TREEBY:**  TWO QUESTIONS. |
| 19:03:08 | 4 | **THE COURT:**  I'M RARING FOR YOU TO GO, TOO. |
| 19:03:08 | 5 | **MR. TREEBY:**  I'LL BE DONE VERY QUICKLY, JUDGE. |
| 19:03:11 | 6 | **THE COURT:**  I'M SURE DR. MARR IS, MORE THAN ALL OF |
| 19:03:12 | 7 | US, RARING TO GO. |
| 19:03:15 | 8 | **BY MR. BRUNO:** |
| 19:03:30 | 9 | **Q.**  CAN I -- I WANT TO DO THIS IN THE SHORTEST WAY POSSIBLE. |
| 19:03:34 | 10 | I WANT TO SHOW YOU SOME SLIDES.  OKAY? |
| 19:03:39 | 11 | AND THERE'S A LOT OF THEM:  88, 89, 90, 91, 97, 98, |
| 19:04:03 | 12 | 99, 101, 102, 103, 104, 106, AND 108. |
| 19:04:14 | 13 | IT'S A SIMPLE QUESTION.  EACH ONE OF THESE SLIDES |
| 19:04:20 | 14 | REPRESENTS A SLIDE AND AN ANALYSIS THAT YOU DID AFTER YOUR |
| 19:04:27 | 15 | MARCH 2012 REPORT.  THESE ARE THE ONES THAT I PUT ASIDE TO |
| 19:04:33 | 16 | SHORTEN THE EXAMINATION. |
| 19:04:35 | 17 | **A.**  SOME DO, SOME DON'T.  FOR EXAMPLE, 108 IS A -- |
| 19:04:40 | 18 | **Q.**  LET'S START FROM THE TOP SO WE CAN -- |
| 19:04:42 | 19 | **A.**  OKAY. |
| 19:04:42 | 20 | **Q.**  START FROM THE TOP AND JUST SAY "NEW" -- AND WHEN I SAY -- |
| 19:04:48 | 21 | LET'S BE CLEAR, DOCTOR. |
| 19:04:51 | 22 | IF YOU SAY, "IT WAS IN MY REPORT," I'M GOING TO |
| 19:04:54 | 23 | ASSUME THAT YOU'RE TELLING US THAT THE EXACT REPRESENTATION OF |
| 19:04:57 | 24 | WHAT WE SEE IN THE SLIDE CAN BE FOUND IN YOUR REPORT.  OKAY? |
| 19:05:03 | 25 | IF NOT, PLEASE TELL US. |

19:05:05   1            **MR. SMITH:**  OBJECTION, YOUR HONOR.  THIS IS JUST

19:05:06   2   TOTALLY IRRELEVANT.  THESE ARE DEMONSTRATIVES THAT WERE

19:05:11   3   PRESENTED -- PREPARED BY PEOPLE WE RETAINED TO HELP US PRESENT

19:05:17   4   DR. MARR'S OPINIONS TO THE COURT.

19:05:18   5            NONE OF THESE SLIDES, AS THEY EXIST, ARE IN HIS

19:05:21   6   REPORT.  THEY'VE ALL BEEN MODIFIED BY GRAPHIC CONSULTANTS, AND

19:05:26   7   THEY'RE BASED ON THINGS THAT ARE IN HIS REPORT.

19:05:28   8            AND MR. BRUNO DID NOT OBJECT WHEN DR. MARR

19:05:32   9   TESTIFIED ABOUT THESE ON DIRECT.

19:05:34  10            **MR. BRUNO:**  NOW, WAIT.  DON'T HOLD ME TO THAT.

19:05:37  11            **THE COURT:**  NOW, WAIT.  LET HIM FINISH HIS OBJECTION.

19:05:41  12            **MR. BRUNO:**  I DIDN'T OBJECT ON PURPOSE.

19:05:42  13            **MR. SMITH:**  AND THERE'S NO NEW ANAL- -- THERE ARE

19:05:44  14   OPINIONS HERE.  ALL HE HAS DONE IS ADDRESS THE THINGS THAT

19:05:46  15   DR. BEA PRESENTED IN HIS SUPPLEMENTAL AND REBUTTAL REPORTS,

19:05:49  16   WHICH WERE NOT PREPARED UNTIL AFTER DR. MARR'S REPORT WAS

19:05:54  17   COMPLETED.

19:05:58  18            HE ALSO PREPARED A SUPPLEMENTAL REPORT, AS

19:06:00  19   YOUR HONOR KNOWS, TO ADDRESS INFORMATION THAT WAS NOT AVAILABLE

19:06:03  20   WHEN HE DID HIS REPORT.  HE HAD A DEADLINE TO MEET.  HE MADE --

19:06:08  21   MET HIS DEADLINE.

19:06:09  22            THE PLAINTIFFS GAVE DR. DALRYMPLE ADDITIONAL

19:06:13  23   TIME.  DR. DALRYMPLE'S REPORT WASN'T EVEN PREPARED AT THE DATE

19:06:17  24   DR. MARR PREPARED HIS REPORT.  SO THAT COULDN'T HAVE BEEN IN

19:06:19  25   HIS INITIAL REPORT.

19:06:20   1           **MR. TREEBY:**  YOUR HONOR, MY OBJECTION IS THE SAME.

19:06:22   2   IT'S RELEVANCE OF THE QUESTION.  THE SLIDES ARE WHAT THEY ARE.

19:06:26   3   THEY'RE DEMONSTRATIVES.

19:06:27   4           BUT THE QUESTION WHETHER OR NOT THIS IS

19:06:29   5   SOMETHING ABSOLUTELY NEW THAT DIDN'T APPEAR IN THAT WAY IN YOUR

19:06:32   6   REPORT IS IRRELEVANT.

19:06:33   7           **THE COURT:**  WELL, THE FIRST THING -- THE FIRST

19:06:36   8   DECISION -- I'M GOING TO HAVE TO ULTIMATELY MAKE A DECISION

19:06:39   9   WHICH OF THE DEMONSTRATIVES -- IF THEY'RE ALL MOVED INTO

19:06:43  10   EVIDENCE.  I'M NOT SURE.

19:06:44  11           MR. SMITH, HAVE YOU MOVED ALL OF THESE INTO

19:06:47  12   EVIDENCE?

19:06:47  13           **MR. BRUNO:**  HE DID.

19:06:47  14           **THE COURT:**  ALL RIGHT.  I DON'T KNOW IF THOSE WERE

19:06:49  15   PART OF IT OR NOT.  I JUST DON'T REMEMBER.

19:06:51  16           **MR. SMITH:**  YES.  YES, I MOVED THEM, AND YOU

19:06:52  17   SUGGESTED THAT MR. BRUNO AND I TRY IT GET TOGETHER AND DECIDE

19:06:55  18   WHICH ONES WE COULD AGREE ON.

19:06:57  19           **THE COURT:**  RIGHT.  EXACTLY.

19:06:58  20   BY MR. TREEBY:

19:06:59  21   **Q.**   AND I THOUGHT THAT -- MAYBE I MISSED YOUR TESTIMONY,

19:07:05  22   DR. MARR.  BUT YOU SAID YOU DID SOME ANALYSES ON HERE.

19:07:07  23           YOU DID SOME ANALYSES?

19:07:08  24   **A.**   THESE ARE CHECKS OF DR. BEA'S -- THIS PARTICULAR ONE

19:07:11  25   YOU'RE POINTING AT, WHICH IS SLIDE 88, ISN'T IT?  I'M SORRY.

19:07:16   1   **Q.**   89?

19:07:17   2   **A.**   89.  THIS IS DR. BEA'S WORK, IN HIS THIRD REPORT, THAT

19:07:23   3   WE'VE SUMMARIZED ON THIS DEMONSTRATIVE SLIDE AND SHOWN THAT

19:07:27   4   THERE WAS AN ERROR IN HIS CALCULATIONS.

19:07:29   5   **Q.**   OKAY.  SO YOU DID SOME -- YOU DID A DIFFERENT ANAL- -- YOU

19:07:32   6   DID AN EVAL- -- YOU DID AN ANALYSIS OF WHAT HE PUT ON A PIECE

19:07:35   7   OF PAPER.

19:07:36   8   **A.**   WELL, IT'S HIS ANALYSIS, AND WE DID AN EVALUATION OF HIS

19:07:39   9   ANALYSIS.

19:07:39  10   **Q.**   ALL RIGHT.  YOUR EVALUATION DOESN'T APPEAR IN YOUR REPORT;

19:07:41  11   RIGHT?

19:07:42  12   **A.**   IT COULDN'T HAVE.  HE PRODUCED THIS WELL AFTER I PRODUCED

19:07:44  13   MY REPORT.

19:07:45  14         **THE COURT:**  IT'S A QUESTION OF WHETHER I'M GOING TO

19:07:47  15   ADMIT THIS OR NOT.  THAT'S WHAT IT BOILS DOWN TO.

19:07:49  16         **MR. TREEBY:**  ALL I'M TRYING TO DO IS ESTABLISH -- THE

19:07:51  17   JUDGE -- YOUR HONOR'S GOING TO RULE HOWEVER YOU WANT TO RULE.

19:07:53  18   BY MR. TREEBY:

19:07:54  19   **Q.**   FACTUALLY, I'M SIMPLY TRYING TO ESTABLISH WHAT OCCURRED.

19:07:57  20   EACH ONE OF THESE SLIDES WAS PREPARED AFTER YOUR REPORT; ISN'T

19:08:00  21   THAT TRUE?

19:08:02  22   **A.**   YES.  THEY'RE DEMONSTRATIVES.

19:08:03  23   **Q.**   AND YOU CHECKED -- TO EXTENT THAT YOU CHECKED DR. BEA'S

19:08:05  24   WORK, OR YOU REDID HIS WORK, YOU DID ALL OF THAT AFTER YOUR

19:08:08  25   REPORT; ISN'T THAT TRUE?

19:08:10   1   **A.**   WHERE IT'S CHECKING AND SHOWING WORK DONE BY DR. BEA AFTER

19:08:13   2   MY REPORT, IT HAS TO HAVE BEEN DONE AFTER MY REPORT.

19:08:17   3   **Q.**   WELL, YOU DIDN'T DO A SUPPLEMENTAL REPORT, DID YOU?

19:08:20   4   **A.**   NO.

19:08:20   5   **Q.**   IT IS A NEW ANALYSIS, ISN'T IT?

19:08:22   6   **A.**   IT'S AN ASSESSMENT DONE AFTER I RECEIVED DR. BEA'S REPORT.

19:08:25   7   **Q.**   ALL RIGHT.  YOU CALL IT AN ASSESSMENT.  THAT'S FINE.

19:08:28   8        YOU DID SOME MATHEMATIC -- YOU DID SOME STUFF TO GET

19:08:31   9   AN ANSWER; RIGHT?

19:08:33   10   **A.**   YES, SIR.

19:08:33   11   **Q.**   OKAY.

19:08:36   12        **THE COURT:**  WELL, WE -- YOU KNOW, THE TESTIMONY'S IN

19:08:38   13   EVIDENCE.  I MEAN, I'M NOT SURE HOW --

19:08:40   14        **MR. TREEBY:**  RIGHT.

19:08:41   15        **THE COURT:**  THE TESTIMONY'S ALREADY IN EVIDENCE, AND

19:08:42   16   THAT CAN'T BE EXCISED FROM THE RECORD.

19:08:48   17        **MR. TREEBY:**  RIGHT.  AND I THINK --

19:08:50   18   BY MR. TREEBY:

19:08:50   19   **Q.**   AND THAT WOULD BE -- YOUR ANSWERS WOULD BE THE SAME FOR

19:08:52   20   EACH OF THOSE SLIDES, THE ONES THAT I JUST ASKED YOU; ISN'T

19:08:55   21   THAT TRUE?

19:08:56   22   **A.**   THE ONES THAT ARE OF THE NATURE OF WHERE I'M ASSESSING

19:08:59   23   DR. BEA'S WORK PRESENTED IN HIS THIRD REPORT.

19:09:02   24   **Q.**   ALL RIGHT.  AND JUST TO END THE DAY, JUST FOR THE HELL OF

19:09:09   25   IT, JX-4798.  THIS IS AN EC.  I JUST THOUGHT THIS WAS

19:09:16   1   INTERESTING.  I FOUND THIS IN THE ENGINEERING.

19:09:20   2           WE DON'T KNOW WHAT EC IS, E-SOMETHING --

19:09:27   3           **MR. SCHULTZ:**  IT'S ENGINEERING CONSIDERATIONS.

19:09:29   4           **MR. TREEBY:**  THANK YOU.  GOT IT.  IT'S ENGINEERING

19:09:29   5   CONSIDERATIONS.  CAN WE PULL IT UP?  JX-4798, PAGE 98.

19:09:44   6           IT'S AN ENGINEERING CIRCULAR.

19:09:45   7           CAN WE JUST BLOW THIS UP?

19:09:45   8   **BY MR. BRUNO:**

19:09:46   9   **Q.**   FOR THE RECORD, IT IS AN ENGINEERING CIRCULAR, AND IT IS

19:09:50  10   DATED 1 APRIL 2011.  AND I JUST THOUGHT THIS WAS INTERESTING,

19:09:56  11   DR. MARR.

19:09:56  12           IT SAYS:  "THE INFLUENCE OF WAVES ON SCOUR HOLE

19:09:59  13   FORMATION.  FIGURES 4 THROUGH 28 SHOWS PHOTOS TAKEN AT SEVERAL

19:10:03  14   LOCATIONS ALONG THE HURRICANE PROTECTION SYSTEM OF SOUTHEAST

19:10:08  15   LOUISIANA FOLLOWING HURRICANE KATRINA.  FIGURES 4-28A AND 4-28B

19:10:13  16   SHOW SCOUR HOLE FORMATION AT LOCATIONS ALONG THE INNER HARBOR

19:10:16  17   NAVIGATION CANAL WHERE WAVES WERE RELATIVELY SMALL.  THE WIDTH

19:10:20  18   OF THE SCOUR HOLE IS RELATIVELY SMALL COMPARED TO THAT SEEN IN

19:10:24  19   OTHER PHOTOS."

19:10:25  20           AND THEN IT SHOWS SOME OTHER FIGURES.

19:10:27  21           AND LET'S JUST QUICKLY SHOW THE PICTURES, BECAUSE I

19:10:32  22   THINK THAT SOME OF THESE PICTURES YOU SHOWED THE JUDGE.  IT

19:10:36  23   TALKS ABOUT A AND B.  AND A YOU SHOWED THE JUDGE.  AND B YOU

19:10:43  24   SHOWED THE JUDGE.

19:10:46  25           SO THE UNITED STATES ARMY CORPS OF ENGINEERS CAME TO

| | | |
|---|---|---|
| 19:10:49 | 1 | THE CONCLUSION THAT THE WAVES IN THE INDUSTRIAL CANAL WERE |
| 19:10:52 | 2 | RELATIVELY SMALL; ISN'T THAT TRUE? |
| 19:10:55 | 3 | **A.**   THAT'S WHAT THEY SAY, BUT THAT'S -- WE DON'T KNOW NUMBERS. |
| 19:10:58 | 4 | THAT'S UNFORTUNATE ON THE USE OF ADJECTIVES.  YOU KNOW, |
| 19:11:00 | 5 | "RELATIVELY SMALL," WHAT DOES THAT MEAN?  CAN YOU TELL ME?  WAS |
| 19:11:03 | 6 | IT A 1-FOOT-HIGH WAVE?  WAS IT A 2-FOOT-HIGH WAVE? |
| 19:11:08 | 7 | **Q.**   HOW ABOUT THIS, DR. MARR?  WOULD YOU AGREE WITH ME, THEY |
| 19:11:09 | 8 | KNOW MORE THAN YOU? |
| 19:11:13 | 9 | **A.**   ABOUT WAVES? |
| 19:11:14 | 10 | **Q.**   YEAH.  NO, NO.  ABOUT -- ABOUT THE -- BECAUSE YOU ALREADY |
| 19:11:15 | 11 | TOLD ME YOU DEFERRED TO DR. DALRYMPLE. |
| 19:11:18 | 12 | SO THE ONE THING WE KNOW IS THAT THESE GUYS HAVE TO |
| 19:11:21 | 13 | KNOW MORE THAN YOU; ISN'T THAT TRUE? |
| 19:11:22 | 14 | **A.**   ABOUT WHAT? |
| 19:11:24 | 15 | **Q.**   ABOUT HOW HIGH THE WAVES WERE INSIDE THE IHNC. |
| 19:11:26 | 16 | **A.**   YES. |
| 19:11:27 | 17 | **Q.**   THANK YOU. |
| 19:11:30 | 18 | **THE COURT:**  DO YOU NOW -- |
| 19:11:32 | 19 | **MR. BRUNO:**  I'M GOING TO SIT DOWN. |
| 19:11:32 | 20 | **THE COURT:**  -- GRACEFULLY REST?  OR AT LEAST STOP? |
| 19:11:34 | 21 | **MR. BRUNO:**  PERHAPS, NOT GRACEFULLY. |
| 19:11:34 | 22 | **THE COURT:**  I UNDERSTAND.  ALL RIGHT. |
| 19:11:42 | 23 | AND IF ANYBODY WANTS TO SAY "UNCLE" -- I'M NOT, |
| 19:11:50 | 24 | BUT I -- I WILL YIELD.  I'M NOT GOING TO SAY "UNCLE." |
| 19:11:51 | 25 | GO AHEAD.  WE'VE GONE THIS FAR.  I MEAN, IF YOU |

| | | |
|---|---|---|
| 19:11:53 | 1 | FEEL LIKE YOU DON'T HAVE TIME OR SOMETHING.  I MEAN, I DON'T |
| 19:11:54 | 2 | WANT TO NOT -- |
| 19:11:56 | 3 | **MR. TREEBY:**  I'M ALMOST DONE.  I REALLY DON'T HAVE |
| 19:11:56 | 4 | VERY -- |
| 19:11:57 | 5 | **THE COURT:**  OKAY.  I DON'T WANT TO HAMPER ANYBODY'S |
| 19:11:59 | 6 | CASE. |
| 19:11:59 | 7 | **MR. TREEBY:**  IF I HAVE THREE MINUTES, THEN YOU CAN |
| 19:12:03 | 8 | SHOOT ME.  OKAY? |
| 19:12:03 | 9 | **THE COURT:**  I WON'T DO THAT, SIR. |
| 19:12:07 | 10 | **MR. BRUNO:**  OKAY.  CAN SOMEBODY GET ME A GUN? |
| 19:12:10 | 11 | **MR. TREEBY:**  I SAID HE COULD, NOT YOU. |
| 19:12:13 | 12 | **THE COURT:**  HE KNOWS I WON'T. |
| 19:12:19 | 13 | GO AHEAD. |
| 19:12:19 | 14 | AT LEAST YOU HAVE SENSE OF HUMOR, MR. TREEBY. |
| 19:12:19 | 15 | IT'S NOT ALWAYS EASY.  THIS IS A DIFFICULT BUSINESS WE'RE ALL |
| 19:12:19 | 16 | IN. |
| 19:12:19 | 17 | GO AHEAD. |
| 19:12:19 | 18 | **CROSS-EXAMINATION** |
| 19:12:22 | 19 | BY MR. TREEBY: |
| 19:12:23 | 20 | **Q.**  DR. MARR, ALL OF THESE DEMONSTRATIVES THAT YOU'VE BEEN |
| 19:12:27 | 21 | EXAMINED ON IN SOME GREAT DETAIL, BOTH IN YOUR DIRECT AND IN |
| 19:12:29 | 22 | YOUR CROSS-EXAMINATION, WERE THEY INTENDED, AND IN YOUR OPINION |
| 19:12:33 | 23 | DID THEY, TO ILLUSTRATE YOUR TESTIMONY? |
| 19:12:35 | 24 | **A.**  YES. |
| 19:12:40 | 25 | **Q.**  THE OTHER THING I WANTED TO ASK YOU, IT'S ABOUT TAIL |

| | | |
|---|---|---|
| 19:12:42 | 1 | WATER.  I JUST WANT TO MAKE SURE THERE'S NO CONFUSION ABOUT |
| 19:12:44 | 2 | TAIL WATER. |
| 19:12:46 | 3 | AS I APPRECIATE IT -- AND CORRECT ME IF I'M WRONG -- |
| 19:12:48 | 4 | THERE ARE TWO EFFECTS THAT YOU HAVE TESTIFIED ABOUT REGARDING |
| 19:12:50 | 5 | TAIL WATER. |
| 19:12:51 | 6 | ONE OF THOSE EFFECTS IS, WHEN TAIL WATER COVERED THE |
| 19:12:56 | 7 | CROWN OF THE LEVEE, IT IMPEDED EROSION SCOUR; IS THAT CORRECT? |
| 19:13:01 | 8 | **A.**   YES, SIR. |
| 19:13:04 | 9 | **Q.**   THE OTHER EFFECT IS, WHEN TAIL WATER COMES UP ON THE BACK |
| 19:13:07 | 10 | SLOPE, OR THE PROTECTED SIDE SLOPE OF THE LEVEE, THAT PROVIDES |
| 19:13:12 | 11 | STABILITY.  IT SUPPORTS THAT LEVEE; IS THAT CORRECT? |
| 19:13:15 | 12 | **A.**   YES, SIR. |
| 19:13:15 | 13 | **Q.**   AND, THEREFORE, AFFECTS THE DEPTH OF SCOUR REQUIRED BEFORE |
| 19:13:19 | 14 | IT OVERTURNS; IS THAT CORRECT? |
| 19:13:21 | 15 | **A.**   YES, SIR. |
| 19:13:21 | 16 | **MR. TREEBY:**  THAT'S ALL I HAVE. |
| 19:13:23 | 17 | **THE COURT:**  THANK YOU, MR. TREEBY.  THAT WAS |
| 19:13:26 | 18 | INCREDIBLY INCISIVE. |
| 19:13:28 | 19 | MR. SMITH, I KNOW THIS IS YOUR WITNESS, AND YOU |
| 19:13:31 | 20 | MIGHT HAVE A BIT MORE THAN MR. TREEBY. |
| 19:13:33 | 21 | **MR. SMITH:**  I DON'T KNOW IF I HAVE MUCH MORE. |
| 19:13:35 | 22 | I'M GOING TO LEAVE IT UP TO DR. MARR.  IF NOBODY |
| 19:13:35 | 23 | ELSE HAS AN OBJECTION TO GOING ON, I'LL BE HERE FOR, I DON'T |
| 19:13:35 | 24 | KNOW, HALF AN HOUR TO AN HOUR, I SUSPECT. |
| 19:13:35 | 25 | WOULD YOU LIKE TO PROCEED? |

| | | |
|---|---|---|
| 19:13:35 | 1 | **THE WITNESS:**  I CAN GO. |
| 19:13:36 | 2 | **THE COURT:**  ALL RIGHT. |
| 19:13:36 | 3 | **REDIRECT EXAMINATION** |
| 19:13:37 | 4 | BY MR. SMITH: |
| 19:13:53 | 5 | **Q.**  DR. MARR, DID YOU REVIEW ANY DOCUMENTS PRIOR TO YOUR |
| 19:13:58 | 6 | TESTIMONY TODAY? |
| 19:14:00 | 7 | **A.**  YES. |
| 19:14:02 | 8 | **Q.**  ONE OF THE THINGS YOU WERE ASKED ABOUT WAS THE IPET |
| 19:14:05 | 9 | REPORT.  WAS THAT ONE OF THE DOCUMENTS THAT YOU REVIEWED TO |
| 19:14:08 | 10 | PREPARE FOR YOUR TESTIMONY? |
| 19:14:13 | 11 | **A.**  I REVIEWED PARTS OF IT RELEVANT TO MY WORK. |
| 19:14:15 | 12 | **Q.**  DID YOU REVIEW THAT RECENTLY IN PREPARATION FOR YOUR |
| 19:14:18 | 13 | TESTIMONY TODAY? |
| 19:14:19 | 14 | **A.**  A LITTLE BIT OF IT.  THE PART DEALING WITH WAVES, FOR |
| 19:14:22 | 15 | EXAMPLE, I HAVE NOT READ IN A WHILE. |
| 19:14:28 | 16 | **Q.**  ALL RIGHT.  WELL, LET'S LOOK AT ONE OF THE PAGES THAT YOU |
| 19:14:30 | 17 | WERE ASKED ABOUT.  THAT'S JX-2033-1814. |
| 19:14:58 | 18 | YOU TESTIFIED, I BELIEVE, THAT -- |
| 19:14:58 | 19 | **MR. SMITH:**  NO, I'M SORRY.  IT'S 1814. |
| 19:14:58 | 20 | BY MR. SMITH: |
| 19:14:59 | 21 | **Q.**  YOU WERE ASKED WHETHER YOU WENT BACK TO THE IPET REPORT |
| 19:15:02 | 22 | AFTER YOU SAW DR. DALRYMPLE'S REPORT TO SEE WHETHER YOU COULD |
| 19:15:06 | 23 | FIND WHAT HE HAD -- WHAT HE HAD CITED IN HIS REPORT AS EVIDENCE |
| 19:15:12 | 24 | OF THE 3-FOOT WAVES. |
| 19:15:14 | 25 | AND MR. BRUNO SHOWED YOU THIS PAGE TODAY, AND I THINK |

19:15:17   1   HE GAVE YOU AN OPPORTUNITY TO READ WHAT'S AT THE BOTTOM OF THAT

19:15:19   2   PAGE TO SEE WHETHER YOU COULD FIND 3-FOOT WAVES.  AND I THINK

19:15:22   3   YOU TESTIFIED ON CROSS-EXAMINATION THAT YOU DIDN'T SEE IT

19:15:24   4   THERE.  IS THAT CORRECT?

19:15:25   5   **A.**   RIGHT.

19:15:27   6           **MR. SMITH:**  I'D LIKE TO, IF WE COULD, NOT DO WHAT

19:15:30   7   MR. BRUNO DID.  BUT I WONDER IF WE COULDN'T ENLARGE THE TOP

19:15:35   8   PART OF THIS PAGE.  BECAUSE ACTUALLY, DR. DALRYMPLE JUST CITED

19:15:39   9   TO THIS PAGE.  HE DIDN'T SAY IT WAS AT THE BOTTOM OF THIS PAGE.

19:15:42   10  HE SAID IT WAS ON THIS PAGE.

19:15:45   11  **BY MR. SMITH**

19:15:45   12  **Q.**   NOW, DO YOU SEE -- DOES THIS FIGURE 162, WHICH SHOWS THE

19:15:49   13  LINE OF MAXIMUM WAVE HEIGHTS ALONG THE IHNC -- DOES THIS

19:15:52   14  REFRESH YOUR RECOLLECTION AS TO WHETHER THIS MIGHT BE THE

19:15:55   15  FIGURE THAT DR. DALRYMPLE RELIED UPON FOR HIS ESTIMATE OF

19:15:59   16  3-FOOT WAVES?

19:16:01   17  **A.**   YEAH.  I UNDERSTOOD THAT IN THIS MODEL, THAT OUT HERE

19:16:09   18  TOWARD THE END WAS THE -- GETTING TO THE AREA WHETHER THE IHNC

19:16:12   19  WAS, AND THAT INDICATED THE 3-FOOT WAVES.

19:16:18   20  **Q.**   OKAY.  AND SO YOU DID GO TO THE IPET REPORT, AS YOU

19:16:21   21  TESTIFIED, AND YOU DID FIND EVIDENCE THAT IN THE IPET REPORT

19:16:24   22  THAT THEY CONCLUDED THAT THERE COULD BE WAVES AS LARGE AS

19:16:28   23  3 FEET IN THE VICINITY OF THE BREACHES THAT ARE AT ISSUE IN

19:16:31   24  THIS CASE; IS THAT CORRECT?

19:16:32   25  **A.**   YES, I DID.

| | | |
|---|---|---|
| 19:16:35 | 1 | **Q.**   AND IT'S ON THE PAGE THAT DR. DALRYMPLE REFERENCED IN HIS |
| 19:16:38 | 2 | REPORT; ISN'T THAT CORRECT? |
| 19:16:39 | 3 | **A.**   YES. |
| 19:16:46 | 4 | **Q.**   NOW, YOU WERE ASKED ABOUT THE IPET CONCLUSION, WHETHER |
| 19:16:50 | 5 | THEY CONCLUDED THAT OVERTOPPING WAS RESPONSIBLE FOR THE NORTH |
| 19:16:53 | 6 | BREACH. |
| 19:16:55 | 7 | AND YOU WERE ASKED WHETHER YOU REMEMBER WHAT THE ILIT |
| 19:16:57 | 8 | TEAM CONCLUDED WAS THE CAUSE OF THE NORTH BREACH AND WHAT TEAM |
| 19:17:02 | 9 | LOUISIANA. |
| 19:17:04 | 10 | AND AS I RECALL, YOU SAID YOU DON'T KNOW.  YOU DIDN'T |
| 19:17:06 | 11 | RECALL; IS THAT . . . |
| 19:17:07 | 12 | **A.**   FOR TEAM LOUISIANA, I DIDN'T RECALL. |
| 19:17:14 | 13 | **Q.**   IPET DID NOT CONCLUDE THAT OVERTOPPING WAS THE CAUSE OF |
| 19:17:15 | 14 | THE NORTH BREACH, DID IT? |
| 19:17:17 | 15 | **A.**   NO, IT DIDN'T. |
| 19:17:18 | 16 | **Q.**   DID IPET CONCLUDE THAT OVERTOPPING WAS THE CAUSE OF THE |
| 19:17:21 | 17 | SOUTH BREACH? |
| 19:17:22 | 18 | **A.**   YES. |
| 19:17:26 | 19 | **Q.**   IN THE IPET REPORT, DO YOU RECALL SEEING A NUMERICAL |
| 19:17:31 | 20 | ANALYSIS, SUCH AS DR. GOVINDASAMY DID FOR YOU, TO ANALYZE THE |
| 19:17:36 | 21 | RATE OF SCOUR TRENCH DEVELOPMENT? |
| 19:17:41 | 22 | DO YOU RECALL SEEING A SIMILAR MATHEMATICAL ANALYSIS |
| 19:17:44 | 23 | IN THE IPET REPORT? |
| 19:17:45 | 24 | **A.**   THERE WAS A CORPS OF ENGINEERING PROCEDURE THAT IS -- THAT |
| 19:17:51 | 25 | LOOKS AT THE WATER FLOWING OVER THE WALL AND IMPINGING ON |

19:17:55   1   THE -- THE JET IMPINGING ON THE SOIL.  I REMEMBER SEEING THAT

19:17:59   2   AS THE CORPS REPORT.

19:18:01   3        I DON'T RECALL IF THAT'S ACTUALLY IN THE IPET REPORT

19:18:05   4   OR NOT.  BUT THAT'S WHAT DR. GOVINDASAMY USED AS PART OF HIS

19:18:09   5   ANALYSIS.

19:18:10   6   Q.   DO YOU RECALL WHAT THE IPET ASSUMED THE TOP OF THE WALL TO

19:18:13   7   BE IN THE VICINITY OF THE SOUTH BREACH?

19:18:15   8   A.   YES.

19:18:15   9   Q.   AND WHAT DID THE IPET TEAM ASSUME THE TOP OF THE WALL

19:18:19   10  ELEVATION TO BE AT THE SOUTH BREACH?

19:18:21   11  A.   12 1/2 FEET.

19:18:23   12  Q.   AND DID YOU FIND THAT THE WALL THERE WAS LOWER?

19:18:25   13  A.   YES.

19:18:25   14  Q.   AND DID THE LOWER ELEVATION OF THE TOP OF THE WALL, IN

19:18:29   15  YOUR ANALYSIS, RESULT IN AN EARLIER INITIATION OF OVERTOPPING

19:18:37   16  AND SCOUR?

19:18:37   17  A.   YES.

19:18:52   18  Q.   MR. BRUNO ASKED YOU ABOUT -- HE USED THE ANALOGY OF

19:18:56   19  CLEANING HIS SIDEWALK WITH A HOSE, AND TALKED ABOUT TRYING TO

19:18:59   20  REMOVE THE DEBRIS THAT WAS ON HIS SIDEWALK WITH A JET COMING

19:19:05   21  OUT OF THE END OF THE HOSE.

19:19:06   22        DO YOU RECALL THAT ANALOGY?

19:19:08   23  A.   YES.

19:19:08   24  Q.   OKAY.  IN YOUR REPORT, WHEN YOU TALK ABOUT THE JET, YOU

19:19:14   25  REFER TO THIS AS A, QUOTE, FREE-FALLING JET; IS THAT CORRECT?

19:19:22   1   **A.**   YES.

19:19:23   2   **Q.**   WHAT DO YOU MEAN BY THE PHRASE "FREE-FALLING JET"?

19:19:26   3   **A.**   WELL, IT STARTS AT THE TOP, WHERE IT'S JUST COMING OVER

19:19:32   4   THE TOP OF THE WALL.  IT -- THERE'S LITTLE TO NO PRESSURE

19:19:37   5   THERE, AND IT HAS A -- A SLOW VELOCITY OF A FEW FEET PER

19:19:44   6   SECOND.

19:19:45   7           AND THEN AS THE WATER FALLS OVER, JUST LIKE ON A

19:19:47   8   WATERFALL, AS IT DROPS, IT GETS FASTER AND FASTER, FALLING

19:19:51   9   UNDER THE WEIGHT OF GRAVITY.  THAT'S DESCRIBED AS A FREE-FALL.

19:19:56  10   **Q.**   SO IF WE WERE GOING TO USE MR. BRUNO'S ANALOGY, WOULD THAT

19:19:59  11   BE ABOUT LIKE TRYING TO CLEAN YOUR SIDEWALK OFF BY HOLDING YOUR

19:20:02  12   HOSE UP IN THE AIR AND LETTING THE WATER FALL ONTO THE SIDEWALK

19:20:06  13   TO TRY TO REMOVE THE DEBRIS?

19:20:08  14   **A.**   YES.  EXCEPT THAT HIS HOSE IS VERY SMALL COMPARED TO THE

19:20:12  15   AMOUNT OF WATER THAT'S COMING OVER THE TOP OF THE FLOODWALL.

19:20:15  16           BUT THE -- BUT THE VELOCITY OF FALLING IS SIMILAR TO

19:20:20  17   THE HOSE.

19:20:21  18   **Q.**   WOULD THAT BE FREE-FALLING?

19:20:22  19   **A.**   THAT WOULD BE FREE-FALLING, YES.

19:20:23  20   **Q.**   AS OPPOSED TO A JET NOZZLE THAT YOU MIGHT USE TO ACTUALLY

19:20:27  21   CLEAN YOUR DRIVEWAY OFF?

19:20:28  22   **A.**   YES.

19:20:36  23   **Q.**   MR. BRUNO SPENT QUITE A BIT OF TIME TALKING ABOUT WHETHER

19:20:43  24   THERE WERE REFERENCES TO TAIL WATER IN YOUR REPORT.  AND I

19:20:47  25   THINK SEVERAL TIMES HE ASSERTED THAT IT'S NOT IN YOUR REPORT.

19:20:53   1              WOULD YOU AGREE WITH ME THAT THE PHRASE "LANDSIDE

19:20:59   2    FLOODWATER" IS A SYNONYM FOR TAIL WATER?

19:21:04   3    **A.**   YES.

19:21:05   4    **Q.**   IN FACT, THERE ARE A NUMBER OF REFERENCES IN YOUR REPORT,

19:21:08   5    AREN'T THERE, DR. MARR, THAT INDICATE THAT YOU DID EVALUATE THE

19:21:14   6    EFFECTS OF TAIL WATER IN YOUR OVERTOPPING SCOUR ANALYSIS; ISN'T

19:21:17   7    THAT CORRECT?

19:21:18   8    **A.**   YES.  AND THAT REMINDS ME THAT WHEN WE WERE WRITING THE

19:21:21   9    REPORT, I ACTUALLY ASKED THAT WE ACTUALLY CHANGE THE WORD "TAIL

19:21:25   10   WATER" TO "LANDSIDE WATER LEVEL" BECAUSE TAIL WATER IS

19:21:29   11   SOMETHING SPECIFIC TO DAMS AND NOT NORMALLY USED IN LEVEE

19:21:32   12   DESIGN.  AND I HAD FORGOTTEN THAT DURING HIS QUESTIONING.

19:21:36   13              **MR. SMITH:**  LET'S GO TO PX-4721.  PX, PLAINTIFFS'

19:21:41   14   EXHIBIT 4721.

19:21:42   15   BY MR. SMITH:

19:21:48   16   **Q.**   THIS IS YOUR REVISED REPORT WITH YOUR ERRATA CORRECTIONS

19:21:51   17   IN IT.  LET'S GO TO PAGE 106 IN THAT REPORT.

19:22:03   18              **MR. SMITH:**  LET'S LOOK AT FIGURE -- IF WE COULD BLOW

19:22:06   19   UP FIGURE 6-12.

19:22:13   20   BY MR. SMITH:

19:22:13   21   **Q.**   IS THERE ANYTHING IN THIS DIAGRAM THAT INDICATES THE

19:22:16   22   PRESENCE OF WHAT WE MIGHT CALL AS TAIL WATER OR FLOODSIDE-- I

19:22:23   23   MEAN LANDSIDE FLOODWATER?

19:22:29   24   **A.**   NO.  NO, NOT IN THIS DIAGRAM.

19:22:31   25   **Q.**   THERE'S NO WATER SURFACE INDICATED IN THAT DIAGRAM,

19:22:34   1   DR. MARR?

19:22:35   2   **A.**   WELL, THERE IS WATER SURFACE INDICATED, SHOWING WATER AT

19:22:39   3   THE TOP OF THE TRENCH.  THAT COULD ALSO REPRESENT IF THERE WAS

19:22:46   4   TAIL WATER RIGHT UP AT THE TOP OF THE LEVEE EMBANKMENT.

19:22:50   5   **Q.**   OKAY.

19:22:50   6           **MR. SMITH:**  WELL, LET'S GO TO THE NEXT PAGE THEN,

19:22:53   7   PAGE 107.

19:23:02   8           AND LET'S GO DOWN TO THE PARAGRAPH THAT BEGINS:  "THE

19:23:03   9   HYDROGRAPHS FOR OVERTOPPING."

19:23:06  10           AND I'LL JUST READ THE FIRST SENTENCE IN THAT

19:23:10  11   PARAGRAPH.  COULD WE CALL THAT OUT?  IT'S THE SECOND PARAGRAPH

19:23:14  12   UNDER 6.3.2.

19:23:16  13   BY MR. SMITH:

19:23:26  14   **Q.**   IT SAYS:  "THE HYDROGRAPHS FOR OVERTOPPING (CANAL

19:23:32  15   HYDROGRAPH) AND LANDSIDE FLOODWATER (INTERIOR HYDROGRAPH) USED

19:23:39  16   IN THE SCOUR CALCULATIONS FOR THIS STUDY WAS OBTAINED FROM

19:23:44  17   IPET, 2009."

19:23:46  18           DID I READ THAT CORRECTLY, DR. MARR?

19:23:48  19   **A.**   YES, SIR.

19:23:49  20   **Q.**   IS THERE A REFERENCE TO LANDSIDE FLOODWATER IN THAT

19:23:53  21   SENTENCE?

19:23:53  22   **A.**   YES.

19:23:53  23   **Q.**   AND TO AN INTERIOR HYDROGRAPH?

19:23:56  24   **A.**   YES.

19:23:57  25   **Q.**   WHAT DID YOU USE THE INTERIOR HYDROGRAPH FOR, DR. MARR?

19:24:00   1   **A.**   THAT GIVES US WHAT THE LANDSIDE FLOODWATER LEVEL IS.

19:24:04   2   **Q.**   WHY DID YOU NEED THAT, DR. MARR?

19:24:06   3   **A.**   WELL, BECAUSE, YOU KNOW, AS -- AS WE WERE -- WE SAW FROM

19:24:11   4   THE IPET REPORT THAT WATER WAS COMING UP ON THE INSIDE.   AND

19:24:16   5   THAT IF FOR -- IF A FAILURE HADN'T OCCURRED YET IN AN AREA THAT

19:24:21   6   WE WERE LOOKING AT, THAT WATER WOULD HAVE TWO EFFECTS, AS

19:24:26   7   MR. TREEBY JUST WENT THROUGH.

19:24:28   8        ONE IS, AS THE WATER RISES, IT PROVIDES A STABILIZING

19:24:32   9   FORCE TO RESIST THE HIGH WATER LEVEL ON THE OTHER SIDE.   AND IF

19:24:37   10  IT GETS HIGH ENOUGH, IT THEN SLOWS DOWN SCOUR.   AND WE WANTED

19:24:40   11  TO MAKE SURE WE INCLUDED THAT EFFECT, IF IT WAS PRESENT IN A

19:24:44   12  SECTION THAT WE WERE ANALYZING.

19:24:48   13  **Q.**   OKAY.   LET'S GO TO APPENDIX - OKAY.   LET'S STAY IN THIS

19:24:57   14  DOCUMENT BEFORE WE GO TO ANOTHER DOCUMENT.

19:25:02   15       LET'S GO TO PAGE 111.   AGAIN, THIS IS IN YOUR INITIAL

19:25:05   16  REPORT, AND WE'RE LOOKING AT DIFFERENT INSTANCES IN WHICH YOU

19:25:08   17  REFERENCED -- WHAT YOU CALLED LANDSIDE FLOODWATER, WHICH WE

19:25:11   18  AGREE IS A SYNONYM FOR TAIL WATER; CORRECT, DR. MARR?

19:25:15   19  **A.**   YES, SIR.

19:25:15   20  **Q.**   NOW, PREVIOUSLY ON THE PAGE WE JUST REFERENCED, YOU WERE

19:25:18   21  LOOKING AT THAT IN CONNECTION WITH SCOUR; IS THAT CORRECT?

19:25:21   22  **A.**   YES.

19:25:21   23  **Q.**   OKAY.   NOW, ON PAGE 111, YOU HAVE ALSO ANALYSIS FOR GLOBAL

19:25:28   24  STABILITY; ISN'T THAT CORRECT?

19:25:29   25  **A.**   YES.

19:25:30   1   Q.   AND CAN YOU TELL US WHETHER FIGURE 6-15 ALSO LOOKS AT THE

19:25:36   2   EFFECTS OF TAIL WATER OR, AS YOU REFER TO IT IN YOUR REPORT,

19:25:44   3   LANDSIDE FLOODWATER?

19:25:45   4   A.   YES, IT DOES.

19:25:47   5   Q.   OKAY.

19:25:47   6         MR. SMITH:   COULD WE JUST BRING UP THAT LEGEND A BIT?

19:25:51   7   BLOW UP THE LEGEND AT THE TOP.

19:25:59   8   BY MR. SMITH:

19:25:59   9   Q.   SO WHAT YOU'VE DONE HERE, IF I'M CORRECT, DR. MARR, IS

19:26:03  10   YOU'VE SHOWN THE EFFECTS OF HAVING THAT RISING WATER COMING UP

19:26:06  11   ON THE INSIDE OF THE FLOODWALL AND HOW THAT IMPACTS THE

19:26:10  12   STABILITY OF THE FLOODWALL; ISN'T THAT CORRECT?

19:26:12  13   A.   YES.

19:26:13  14   Q.   SO, IN FACT, IN A VARIETY OF WAYS YOU DID CONSIDER TAIL

19:26:16  15   WATER IN YOUR INITIAL REPORT.  ISN'T THAT CORRECT, DR. MARR?

19:26:19  16   A.   I CERTAINLY DID.

19:26:20  17   Q.   YOU CONSIDERED IT WITH RESPECT TO THE EFFECTS OF SCOUR;

19:26:23  18   ISN'T THAT CORRECT?

19:26:24  19   A.   YES.

19:26:24  20   Q.   AND YOU CONSIDERED IT WITH RESPECT TO THE STABILITY OF THE

19:26:27  21   LEVEE AND FLOODWALL?

19:26:29  22   A.   YES.

19:26:29  23   Q.   AND THAT'S IN YOUR INITIAL REPORT, ISN'T IT?

19:26:32  24   A.   YES.

19:27:03  25   Q.   LET'S GO TO APPENDIX R.  AND AGAIN, THIS IS SOMETHING THAT

| | | |
|---|---|---|
| 19:27:07 | 1 | YOU PRODUCED TO THE PLAINTIFFS WITH YOUR INITIAL REPORT; |
| 19:27:10 | 2 | CORRECT? |
| 19:27:10 | 3 | **A.**   YES. |
| 19:27:10 | 4 | **Q.**   THIS IS ONE OF THE APPENDICES THAT WAS ATTACHED TO YOUR |
| 19:27:16 | 5 | INITIAL REPORT? |
| 19:27:17 | 6 | **A.**   YES. |
| 19:27:17 | 7 | **Q.**   THAT'S JX-1882.  AND YOU CAN SEE THAT THIS IS THE APPENDIX |
| 19:27:20 | 8 | WHICH TALKS ABOUT OVERTOPPING AND SCOUR ANALYSIS OF THE SOUTH |
| 19:27:24 | 9 | BREACH; CORRECT, DR. MARR? |
| 19:27:26 | 10 | **A.**   YES, SIR. |
| 19:27:26 | 11 | **Q.**   LET'S GO TO PAGE -- IMAGE 6, PAGE 6 IN THIS REPORT. |
| 19:27:37 | 12 | DO WE SEE A REFERENCE IN THIS FIGURE TO YOUR R-5, |
| 19:27:41 | 13 | THIS SCHEMATIC THAT SHOWS THE IMPACT OF THE TAIL WATER HEIGHT |
| 19:27:46 | 14 | ON THE SCOUR ANALYSIS THAT YOU APPLIED IN THIS CASE? |
| 19:27:48 | 15 | **A.**   YES. |
| 19:27:49 | 16 | **Q.**   AND WHAT'S THAT INDICATED BY, DR. MARR? |
| 19:27:51 | 17 | **A.**   IT'S A LINE WITH A TRIANGLE OVER THE TOP OF IT THAT'S |
| 19:27:54 | 18 | LABELED "WATER SURFACE." |
| 19:27:56 | 19 | **Q.**   ALL RIGHT. |
| 19:27:57 | 20 | **MR. SMITH:**  AND LET'S -- LET'S BLOW UP THE PARAGRAPH |
| 19:28:02 | 21 | BELOW THAT, WHICH SHOWS HOW THE PARAMETER IS DEFINED, JUST TO |
| 19:28:07 | 22 | MAKE SURE THAT WE'RE CLEAR ABOUT THIS. |
| 19:28:09 | 23 | CAN WE BLOW UP THE PARAMETERS?  YEAH, THE BULLET |
| 19:28:13 | 24 | POINTS WOULD BE FINE. |
| | 25 | |

19:28:14   1   **BY MR. SMITH:**

19:28:15   2   **Q.**   DOES THAT INDICATE THAT $H_T$ IS THE TAIL WATER HEIGHT IN

19:28:21   3   THIS DIAGRAM?

19:28:23   4   **A.**   YES, SIR.

19:28:23   5   **Q.**   SO, IN FACT, YOU DID, IN THIS REPORT AND IN YOUR APPENDIX,

19:28:27   6   CONSIDER THE EFFECTS OF TAIL WATER ON SCOUR DEPTHS, DIDN'T YOU,

19:28:29   7   DR. MARR?

19:28:31   8   **A.**   YES, WE DID.

19:28:51   9   **Q.**   ALL RIGHT.  LET'S GO TO -- LET'S LOOK AT SOME OF THE

19:28:53   10  FIGURES THAT YOU WERE EXAMINED ON BY DR -- DR. BRUNO.

19:28:57   11            **MR. BRUNO:**   THANK YOU, SIR.

19:28:59   12            **THE COURT:**   JURIST DR. BRUNO.

19:29:03   13            **MR. SMITH:**   JURIST DR. BRUNO.

19:29:05   14            **MR. BRUNO:**   HE CALLED ME A DOCTOR.

19:29:08   15            **MR. SMITH:**   I'VE CALLED YOU A LOT OF THINGS, JOE, BUT

19:29:11   16  NOT A DOCTOR.

19:29:12   17            LET'S GO TO SLIDE -- LET'S JUST BEGIN WITH SLIDE 37,

19:29:17   18  IF WE COULD.

19:29:17   19  **BY MR. SMITH:**

19:29:24   20  **Q.**   I THINK WE MIGHT HAVE GOTTEN A LITTLE BIT CONFUSED WHEN WE

19:29:27   21  WERE LOOKING AT ONE OF THE OTHER FIGURES, AND I THINK -- IF WE

19:29:30   22  START WITH THIS FIGURE, I THINK IT WILL MAKE IT PERFECTLY CLEAR

19:29:32   23  WHAT THE OTHER FIGURE IS INTENDED TO SHOW.

19:29:36   24            COULD YOU EXPLAIN AGAIN TO THE COURT WHAT THIS SLIDE,

19:29:39   25  WHICH IS SLIDE -- WELL, IT'S DEFENDANT'S EXHIBIT DM -- IS IT --

```
19:29:47    1  | 1006-0037.  WHAT IS THAT INTENDED TO ILLUSTRATE, DR. MARR?
19:29:56    2  | A.   IT'S PULLING TOGETHER THE DEPTH OF SCOUR THAT WE
19:30:01    3  | DETERMINED FROM THE PHOTOGRAPHS AT DIFFERENT LOCATIONS ALONG
19:30:05    4  | THE WALL AND PLOTTING THOSE DEPTHS WITH THE ELEVATION OF THE
19:30:10    5  | TOP OF THE WALL.  AND THE POINT WAS, WHERE THE WALL IS LOWER,
19:30:17    6  | WATER WENT OVER THE WALL FOR LONGER AND CAUSED A DEEPER SCOUR
19:30:21    7  | DEPTH.
19:30:23    8  | Q.   OKAY.  BUT THE CORRELATION HERE -- THERE'S NOTHING ON THIS
19:30:30    9  | CHART, IS THERE, THAT EXPLICITLY REFERS TO TIME, DOES IT?
19:30:34   10  | A.   NO.
19:30:34   11  | Q.   THAT'S AN INFERENCE THAT YOU'RE DRAWING, ISN'T IT,
19:30:37   12  | DR. MARR?
19:30:39   13  | A.   WELL, IT'S FOR -- SOMEONE WOULD HAVE TO DRAW AN INFERENCE,
19:30:41   14  | YES.  THIS PLOT IS JUST SIMPLY HOW DEEP THE SCOUR WAS AT THE
19:30:44   15  | END OF THE STORM.
19:30:45   16  | Q.   SO YOU HAVE TWO AXES HERE IN THIS FIGURE; RIGHT?  YOU HAVE
19:30:49   17  | THE X-AXIS, WHICH IS HOW HIGH IS YOUR WALL.
19:30:52   18  | A.   YES.
19:30:52   19  | Q.   AND YOU HAVE YOUR Y-AXIS, WHICH IS HOW DEEP DID THE SCOUR
19:30:59   20  | HOLE DEVELOP IF THE WALL WAS SO HIGH; IS THAT CORRECT?
19:31:02   21  | A.   YES.
19:31:02   22  | Q.   YOU FOUND SOME CORRELATION; CORRECT?
19:31:04   23  | A.   YES.
19:31:04   24  | Q.   IF YOUR WALL WAS HIGHER, WHAT WAS THE IMPACT ON THE SCOUR
19:31:07   25  | DEPTH?
```

| | | |
|---|---|---|
| 19:31:08 | 1 | **A.**  YOU'D HAVE LESS SCOUR. |
| 19:31:09 | 2 | **Q.**  AND IF THE WALL WAS LOWER, WHAT WAS THE IMPACT OF THE |
| 19:31:13 | 3 | SCOUR DEPTH? |
| 19:31:15 | 4 | **A.**  YOU WOULD HAVE MORE SCOUR UNTIL THE WALL FELL OVER. |
| 19:31:18 | 5 | **Q.**  OKAY.  AND IT'S AN INFERENCE, THEN, THAT THAT'S A RESULT |
| 19:31:21 | 6 | OF A LONGER TIME FOR THAT TRENCH TO DEVELOP, ISN'T IT? |
| 19:31:24 | 7 | **A.**  YES. |
| 19:31:27 | 8 | **Q.**  NOW, LET'S GO TO THE FIGURE THAT YOU WERE EXAMINED AT AT |
| 19:31:30 | 9 | LENGTH BY MR. BRUNO, AND THAT'S FIGURE 44, SLIDE 44, IN THIS |
| 19:31:39 | 10 | SAME EXHIBIT. |
| 19:31:47 | 11 | NOW, HERE YOU'VE PLOTTED THOSE SAME SCOUR DEPTH DATA |
| 19:31:51 | 12 | POINTS, HAVEN'T YOU? |
| 19:31:53 | 13 | **A.**  YES. |
| 19:31:54 | 14 | **Q.**  WHY DID YOU TAKE THOSE SCOUR DEPTH DATA POINTS FROM THE |
| 19:31:58 | 15 | PRIOR SLIDE AND IMPOSE IT ON THIS FIGURE? |
| 19:32:04 | 16 | **A.**  IT WAS A WAY TO CHECK FIELD OBSERVATIONS WITH WHAT THIS |
| 19:32:09 | 17 | SCOUR MODEL WAS TELLING US AS A POSSIBLE DEPTH OF SCOUR.  SO IT |
| 19:32:13 | 18 | WAS A VALIDATION, A VERIFICATION THAT THE SCOUR MODEL WAS A |
| 19:32:17 | 19 | REASONABLE REPRESENTATION OF WHAT WAS HAPPENING IN THE EBIA. |
| 19:32:23 | 20 | **Q.**  NOW, MR. BRUNO'S MADE A BIG POINT ABOUT THINGS THAT ARE OR |
| 19:32:27 | 21 | ARE NOT IN YOUR REPORT.  AND THIS IS NOT IN YOUR REPORT, IS IT, |
| 19:32:31 | 22 | DR. MARR? |
| 19:32:32 | 23 | **A.**  NO, SIR.  IT WAS A DEMONSTRATIVE.  IT INTENDED TO TRY TO |
| 19:32:36 | 24 | SHOW -- OR PULL TOGETHER WHAT WE -- I WAS SEEING IN THE |
| 19:32:40 | 25 | PHOTOGRAPHS. |

19:32:40   1   **Q.**   BUT THERE IS A SIMILAR GRAPH IN YOUR REPORT, ISN'T THERE,

19:32:45   2   DR. MARR?

19:32:46   3   **A.**   YES.

19:32:47   4   **Q.**   LET'S GO TO YOUR REPORT, WHICH IS --

19:32:52   5            **MR. SMITH:**   LET'S USE THE PLAINTIFF'S EXHIBIT,

19:32:55   6   PX-4721.  LET'S GO TO PAGE 108, IF WE CAN.

19:33:12   7               AND LET'S JUST BLOW UP -- YEAH.  THAT'S GOOD.

19:33:15   8   RIGHT THERE.

19:33:15   9   **BY MR. SMITH:**

19:33:16  10   **Q.**   NOW, IS THIS ESSENTIALLY THE SAME GRAPH THAT YOU -- THAT

19:33:24  11   WE JUST LOOKED AT IN YOUR DEMONSTRATIVE EXHIBIT, DR. MARR?

19:33:27  12   **A.**   IT'S THE SAME RESULTS FROM THE SCOUR MODEL.  WE JUST

19:33:30  13   REVERSED THE X-AXIS SO IT HOPEFULLY WAS A LITTLE EASIER TO

19:33:34  14   UNDERSTAND.

19:33:35  15   **Q.**   YOU DIDN'T CHANGE -- YOU DIDN'T CHANGE THE RATES OF

19:33:37  16   EROSION ON HERE, DID YOU?

19:33:38  17   **A.**   NO, SIR.

19:33:39  18   **Q.**   YOU DIDN'T DO ANY NEW ANALYSIS BETWEEN THE TIME YOU DID

19:33:41  19   YOUR REPORT AND THE TIME YOU ISSUED YOUR SLIDES, DID YOU?

19:33:44  20   **A.**   NO, SIR.

19:33:44  21   **Q.**   OKAY.  NOW, DOES IT MAKE ANY DIFFERENCE FOR PURPOSES OF

19:33:47  22   ANALYZING THIS RELATIONSHIP WHETHER THE SLOPE IS SHOWN FROM

19:33:51  23   RIGHT TO LEFT OR LEFT TO RIGHT?

19:33:53  24   **A.**   NO, SIR.

19:33:55  25   **Q.**   OKAY.  SO YOU JUST CHANGED THAT FOR PURPOSES OF CLARITY?

19:33:58  1   **A.**  YES.

19:33:59  2   **Q.**  OKAY.  AND YOU ADDED TO THIS FIGURE SIMPLY SOME

19:34:08  3   OBSERVATIONS ABOUT PHOTOGRAPHS AND SCALED DEPTHS FROM

19:34:13  4   PHOTOGRAPHS.  ISN'T THAT CORRECT, DR. MARR?

19:34:17  5   **A.**  THAT'S RIGHT.  THAT'S WHAT THE RED DOTS WERE.

19:34:21  6           **MR. SMITH:**  AND IF WE COULD GO -- LET'S GO TO -- BACK

19:34:23  7   TO DX-DM-1006.  WE'LL GO BACK TO THE SLIDE WE JUST LEFT.

19:34:33  8   **BY MR. SMITH:**

19:34:38  9   **Q.**  THIS MIGHT BE A LITTLE BIT OF A CHICKEN-AND-EGG QUESTION

19:34:42  10  FOR YOU, DR. MARR, BUT WHICH CAME FIRST, DR. GOVINDASAMY'S

19:34:50  11  SCOUR DEPTH CALCULATIONS OR YOUR OPINION THAT THE SOUTH BREACH

19:34:54  12  WAS CAUSED BY OVERTOPPING, EROSION, AND OVERTURNING?

19:35:00  13  **A.**  MY OPINION THAT IT WAS CAUSED BY OVERTOPPING, AND THAT

19:35:03  14  CAME FROM STUDYING THE PHOTOGRAPHS AND THE -- THE -- THE SHAPES

19:35:12  15  THAT I WAS SEEING OF THE FAILED WALL IN THOSE PHOTOGRAPHS.

19:35:16  16  **Q.**  AND LET'S LOOK AT A FEW OF THOSE PHOTOGRAPHS --

19:35:19  17  **A.**  AND ALSO I SHOULD SAY THE DEPTHS OF SCOUR THAT I WAS

19:35:23  18  SEEING IN THE PHOTOGRAPHS.

19:35:25  19  **Q.**  OKAY.  NOW, IT'S UNCONTESTED IN THIS CASE, ISN'T IT,

19:35:27  20  DR. MARR, THAT THERE WERE SCOUR TRENCHES BEHIND THE FLOODWALL

19:35:31  21  AT THE IHNC?  ISN'T IT?

19:35:32  22  **A.**  I THINK THAT'S RIGHT.

19:35:33  23  **Q.**  IT'S UNCONTESTED THAT THERE WERE -- THAT THOSE SCOUR

19:35:36  24  TRENCH DEPTHS GOT DEEPER AS IT GOT CLOSER TO THE BREACH ZONES,

19:35:41  25  ISN'T IT, DR. MARR?

| | | |
|---|---|---|
| 19:35:42 | 1 | **A.**   THAT'S CORRECT. |
| 19:35:45 | 2 | **Q.**   LET'S LOOK AT SOME OF THE DEMONSTRATIVE EXHIBITS. |
| 19:35:48 | 3 | **MR. SMITH:**  LET'S GO TO DM -- LET'S GO TO SLIDE |
| 19:35:53 | 4 | NO. 9. |
| 19:35:55 | 5 | **BY MR. SMITH:** |
| 19:36:04 | 6 | **Q.**   IS THIS ONE OF THE PHOTOGRAPHS THAT YOU RELIED ON FOR |
| 19:36:08 | 7 | FORMING YOUR OPINION THAT THE SOUTH BREACH FAILURE WAS CAUSED |
| 19:36:12 | 8 | BY EROSION, SCOUR, AND OVERTURNING? |
| 19:36:16 | 9 | **A.**   YES. |
| 19:36:17 | 10 | **Q.**   OKAY.  LET'S GO TO THE NEXT SLIDE. |
| 19:36:21 | 11 | IS THIS ANOTHER SLIDE? |
| 19:36:22 | 12 | **A.**   YES. |
| 19:36:24 | 13 | **Q.**   AND THE NEXT SLIDE. |
| 19:36:28 | 14 | **A.**   YES. |
| 19:36:29 | 15 | **Q.**   ARE THESE ALL SLIDES THAT TO YOU ARE CONSISTENT WITH YOUR |
| 19:36:33 | 16 | OPINION THAT THE SOUTH BREACH WAS A RESULT OF EROSION, SCOUR, |
| 19:36:40 | 17 | AND THEN OVERTOPPING -- OVERTURNING OF THE FLOODWALL? |
| 19:36:44 | 18 | **A.**   YES. |
| 19:36:44 | 19 | **Q.**   AND THAT'S THE SOUTH BREACH? |
| 19:36:47 | 20 | **A.**   YES. |
| 19:36:54 | 21 | **Q.**   LET'S GO TO SLIDE -- LET'S GO TO SLIDE NO. 24. |
| 19:37:16 | 22 | NOW, AGAIN, CAN WE SEE ON THE LEFT-HAND SIDE OF THIS |
| 19:37:22 | 23 | FIGURE THE ORIENTATION -- WHERE IS THIS SCOUR TRENCH IN |
| 19:37:26 | 24 | RELATIONSHIP TO THE SOUTH BREACH, DR. MARR? |
| 19:37:27 | 25 | **A.**   IT'S SOUTH OF THE SOUTH BREACH, LOOKING TO THE SOUTH |

19:37:33  1  TOWARDS CLAIBORNE AVENUE.

19:37:39  2  **Q.**   AND LET'S GO TO SLIDE NO. 26.  IS THIS ANOTHER PHOTOGRAPH

19:37:47  3  THAT INDICATED TO YOU THE PHYSICAL EVIDENCE THAT SUPPORTS YOUR

19:37:52  4  OPINION THAT THE SOUTH BREACH WAS A RESULT OF OVERTOPPING,

19:37:56  5  EROSION, AND OVERTURNING OF THE FLOODWALL?

19:37:59  6  **A.**   YES, SIR.

19:38:00  7  **Q.**   AND IS THIS ALSO LOCATED ADJACENT TO THE SOUTH BREACH?

19:38:09  8  **A.**   IT'S SOUTH OF THE SOUTH BREACH, YES.

19:38:11  9  **Q.**   LET'S GO TO THE NEXT SLIDE.  HERE'S A PICTURE OF DR. BEA.

19:38:14  10  WE'VE SEEN IT MANY TIMES.

19:38:17  11        MR. BRUNO ASKED YOU EXTENSIVELY ABOUT HOW DEEP THAT

19:38:20  12  TRENCH WAS AND WHETHER IT WAS 3 1/2 FEET OR 5 FEET.  FOR

19:38:25  13  PURPOSES OF YOUR OPINION AS TO THE CAUSE OF THE SOUTH BREACH,

19:38:29  14  DOES THAT MATTER WHETHER THAT TRENCH IN THAT PHOTOGRAPH SCALES

19:38:32  15  OUT TO BE 3 1/2 FEET OR 5 FEET?

19:38:34  16  **A.**   NO, SIR.

19:38:35  17  **Q.**   IF THAT WAS ONLY 3 1/2 FEET, YOU WOULD STILL THINK THAT

19:38:40  18  THE SOUTH BREACH WAS CAUSED BY OVERTOPPING, EROSION, AND

19:38:44  19  OVERTURNING OF THE FLOODWALL?

19:38:45  20  **A.**   YES.

19:38:50  21        **MR. SMITH:**  LET'S GO TO SLIDE NO. 29.  BEFORE WE GO

19:38:57  22  TO 29, I'M SORRY, LET'S GO TO 30.

19:38:59  23  **BY MR. SMITH:**

19:39:01  24  **Q.**   AGAIN, IS THIS ANOTHER PHOTOGRAPH TAKEN ADJACENT TO THE

19:39:10  25  SOUTH BREACH?  DR. MARR, IS THIS ANOTHER PHOTOGRAPH TAKEN

| | | |
|---|---|---|
| 19:39:13 | 1 | ADJACENT TO THE SOUTH BREACH? |
| 19:39:14 | 2 | **A.**   YES.  THIS IS ON THE NORTH END OF THE SOUTH BREACH. |
| 19:39:17 | 3 | **Q.**   THIS IS LOOKING TOWARD THE SOUTH BREACH ITSELF, ISN'T IT? |
| 19:39:20 | 4 | **A.**   YES. |
| 19:39:20 | 5 | **Q.**   IS THAT A SCOUR TRENCH WE SEE IN THIS PHOTOGRAPH? |
| 19:39:23 | 6 | **A.**   YES. |
| 19:39:28 | 7 | **Q.**   DOES THAT SUPPORT YOUR OPINION REGARDING THE CAUSE OF THE |
| 19:39:30 | 8 | SOUTH BREACH, DR. MARR? |
| 19:39:32 | 9 | **A.**   YES. |
| 19:39:39 | 10 | **Q.**   LET'S GO TO THE NEXT PHOTOGRAPH.  IS THIS ALSO ADJACENT TO |
| 19:39:47 | 11 | THE SOUTH BREACH, DR. MARR? |
| 19:39:48 | 12 | **A.**   YEAH.  IT'S SIMILAR TO THE LAST PHOTOGRAPH, JUST LOOKING |
| 19:39:51 | 13 | AT IT FROM A DIFFERENT LOCATION AND ANGLE. |
| 19:39:54 | 14 | **Q.**   OKAY.  IS -- I'M SORRY. |
| 19:39:57 | 15 | **A.**   I'M SORRY.  IT'S A LITTLE BIT SOUTH -- IT'S A LITTLE BIT |
| 19:40:01 | 16 | DIFFERENT LOCATION, BUT SIMILAR. |
| 19:40:02 | 17 | **Q.**   I PICKED THE WRONG NUMBER MAYBE. |
| 19:40:04 | 18 | **THE COURT:**  WELL, I CAN LOOK AT THE BLUE ARROW AND |
| 19:40:08 | 19 | TELL THAT THAT'S THE LOCATION.  IS THAT CORRECT? |
| 19:40:13 | 20 | **THE WITNESS:**  YES, SIR. |
| 19:40:14 | 21 | **THE COURT:**  APPROXIMATE LOCATION. |
| 19:40:20 | 22 | **BY MR. SMITH:** |
| 19:40:20 | 23 | **Q.**   THAT'S 31. |
| 19:40:22 | 24 | **THE COURT:**  IT'S RIGHT AT THE VERY END OF THE SOUTH |
| 19:40:24 | 25 | BREACH LOOKING NORTH.  IS THAT RIGHT, SIR? |

19:40:28   1           THE WITNESS:  YES, SIR.

19:40:28   2   BY MR. SMITH:

19:40:29   3   Q.   AND THEN IS THERE ANOTHER PHOTOGRAPH TAKEN JUST A LITTLE

19:40:32   4   FARTHER NORTH -- THAT WOULD BE THE NEXT PHOTOGRAPH, WHICH WOULD

19:40:35   5   BE SLIDE 32?  IS THIS ALSO NORTH OF THE SOUTH BREACH, DR. MARR?

19:40:47   6   A.   YES, SIR.

19:40:48   7           MR. SMITH:  LET'S ALSO LOOK AT SLIDE NO. 28, IF WE

19:40:51   8   COULD.

19:40:51   9   BY MR. SMITH:

19:40:59  10   Q.   WHERE IS THE SCOUR TRENCH IN THIS PHOTOGRAPH, DR. MARR?

19:41:02  11   A.   IT'S A LITTLE HARD TO SEE IN THE DISPLAY, BUT IT'S BACK IN

19:41:04  12   THIS DARK AREA HERE.  AND IF I CAN LOOK ON A GOOD SCREEN, YOU

19:41:09  13   CAN SEE A LOT MORE DETAIL IN THAT AREA TO SEE THAT IT'S SCOURED

19:41:14  14   OUT.

19:41:16  15   Q.   NOW, IS THERE ANYTHING ABOUT THE WAY THE FLOODWALL IS

19:41:19  16   LYING IN THIS PHOTOGRAPH THAT SUPPORTS YOUR OPINION ABOUT THE

19:41:22  17   CAUSE OF THE SOUTH BREACH?

19:41:23  18   A.   WELL, THE FACT THAT IT'S ROTATED OVER AND, YOU KNOW, THE

19:41:27  19   BOTTOM OF THE SHEETS WOULD STILL -- THE SHEET -- THE SHEETING

19:41:30  20   WOULD STILL BE PRETTY CLOSE TO ITS ORIGINAL POSITION IN THE

19:41:36  21   GROUND, DOWN IN THE GROUND.

19:41:38  22   Q.   WHAT ABOUT ITS RELATIONSHIP TO THE NEXT CONCRETE MODEL

19:41:41  23   WIDTH?  IS THAT RELEVANT TO YOUR --

19:41:44  24   A.   WELL, THE FACT THAT AS IT'S GOING -- YOU KNOW, IT'S

19:41:45  25   VERTICAL HERE, AND EACH 30-FOOT SEGMENT IS ROTATED MORE AND

|          |    |                                                               |
|----------|----|---------------------------------------------------------------|
| 19:41:49 | 1  | MORE.  THAT'S SHOWING THE SEQUENTIAL DEVELOPMENT OF THE        |
| 19:41:55 | 2  | OVERTURNING.                                                   |
| 19:42:01 | 3  | **Q.**  LET'S GO TO SLIDE NO. 48.  NOW, THIS IS TAKEN -- THIS  |
| 19:42:13 | 4  | FIGURE IS AFTER THE FIGURE THAT'S IN YOUR SUPPLEMENTAL REPORT, |
| 19:42:17 | 5  | ISN'T IT?                                                      |
| 19:42:17 | 6  | **A.**  YES.                                                   |
| 19:42:19 | 7  | **Q.**  AND THIS IS A FIGURE IN WHICH YOU ANALYZED THE EROSION |
| 19:42:25 | 8  | RATES USING DR. GOVINDASAMY'S ANALYSIS WITH A SIGNIFICANT WAVE |
| 19:42:30 | 9  | HEIGHT OF 3 FEET; CORRECT?                                     |
| 19:42:33 | 10 | **A.**  YES.                                                   |
| 19:42:33 | 11 | **Q.**  AND IF WE LOOK ACROSS THE TOP AXIS -- WELL, LET'S JUST |
| 19:42:38 | 12 | LOOK AT THE VERY BOTTOM, THE NOTE:  "CALCULATIONS ASSUME THE   |
| 19:42:41 | 13 | WALL STAYS IN PLACE UP TO 10:00 A.M."                          |
| 19:42:43 | 14 | MR. BRUNO ASKED:  WHY WOULD YOU ASSUME THAT THE WALL           |
| 19:42:46 | 15 | STAYS IN PLACE UNTIL 10:00 A.M.?                               |
| 19:42:51 | 16 | ARE THESE DOTS THAT ARE LOCATED ON THIS FIGURE                 |
| 19:42:55 | 17 | INDICATIVE OF THE DEPTHS OF THE SCOUR TRENCH AT PARTICULAR     |
| 19:43:02 | 18 | LOCATIONS AT THE END OF THE EVENT?                             |
| 19:43:04 | 19 | **A.**  YES, SIR.                                              |
| 19:43:05 | 20 | **Q.**  SO, IN OTHER WORDS, THE SURGE ROSE UP TO A PEAK AT 9:00 |
| 19:43:08 | 21 | AND THEN IT BEGAN TO RECEDE AFTER 9:00?                        |
| 19:43:14 | 22 | **A.**  YES.                                                   |
| 19:43:15 | 23 | **Q.**  DOES YOUR NOTE AT THE BOTTOM INDICATE THAT THESE SCOUR |
| 19:43:21 | 24 | EROSION LINES THAT ARE ON HERE STOP THE OVERTOPPING EROSION AT |
| 19:43:27 | 25 | 10:00?  IN OTHER WORDS, IF THERE WERE PLACES WHERE THE WATER   |

| | | |
|---|---|---|
| 19:43:31 | 1 | COULD HAVE BEEN OVER THE FLOODWALL AFTER 10:00, YOU DIDN'T |
| 19:43:35 | 2 | ANALYZE THAT, DID YOU? |
| 19:43:38 | 3 | **A.**   RIGHT.  BECAUSE AT THAT POINT THE TAIL WATER HAD COME UP |
| 19:43:41 | 4 | TO THE POINT THAT THERE WAS NO FURTHER SCOUR. |
| 19:43:44 | 5 | **Q.**   OKAY.  SO IT WOULD HAVE BEEN IRRELEVANT TO GO ANY FARTHER |
| 19:43:46 | 6 | THAN 10:00; CORRECT, DR. MARR? |
| 19:43:49 | 7 | **A.**   YES, SIR. |
| 19:43:50 | 8 | **THE COURT:**  HOW FAR DOES THE TAIL WATER HAVE TO COME |
| 19:43:52 | 9 | UP UNTIL THERE'S NO FURTHER SCOUR? |
| 19:43:54 | 10 | **THE WITNESS:**  IT'S ABOUT -- ROUGHLY ABOUT ELEVATION |
| 19:43:58 | 11 | PLUS 6, WHICH IS, YOU KNOW, A FOOT OR SO OVER THE TOP OF THE |
| 19:44:03 | 12 | LANDSIDE LEVEE -- |
| 19:44:05 | 13 | **THE COURT:**  GOT IT.  THANK YOU. |
| 19:44:05 | 14 | **THE WITNESS:**  -- EMBANKMENT. |
| 19:44:08 | 15 | **THE COURT:**  THANK YOU. |
| 19:44:09 | 16 | BY MR. SMITH: |
| 19:44:10 | 17 | **Q.**   NOW, WHAT IS THE RELEVANCE OF PLOTTING THE DOTS ON TOP OF |
| 19:44:14 | 18 | THIS FIGURE?  BECAUSE I TAKE IT THOSE DOTS WERE NOT IN YOUR |
| 19:44:19 | 19 | SUPPLEMENTAL REPORT.  IS THAT CORRECT? |
| 19:44:21 | 20 | **A.**   THAT'S RIGHT. |
| 19:44:23 | 21 | **Q.**   SHOULD WE SHOW -- LET'S SHOW THE COURT HERE THE FIGURE |
| 19:44:28 | 22 | THAT'S IN YOUR SUPPLEMENTAL REPORT.  THAT'S DX-26-47. |
| 19:44:53 | 23 | **MR. SMITH:**  NO, LET'S -- I'M SORRY.  LET'S GO TO |
| 19:44:55 | 24 | PAGE 3.  IF YOU CAN BLOW THAT FIGURE UP AS MUCH AS WE CAN. |
| | 25 | |

| | | |
|---|---|---|
| 19:45:00 | 1 | BY MR. SMITH: |
| 19:45:01 | 2 | Q.   NOW, IN THIS FIGURE, DR. MARR, IF -- IT MIGHT BE A LITTLE |
| 19:45:05 | 3 | BIT HARD TO READ -- BUT ACROSS THE TOP, RATHER THAN HAVING -- |
| 19:45:09 | 4 | CORRELATING THIS WITH THE TOP OF WALL ELEVATION, YOU'RE |
| 19:45:14 | 5 | CORRELATING IT WITH TIMES; IS THAT CORRECT? |
| 19:45:15 | 6 | A.   YES, FOR THE SOUTH BREACH. |
| 19:45:17 | 7 | Q.   NOW, HOW DID YOU -- HOW DID YOU CHANGE OVER FROM |
| 19:45:20 | 8 | CORRELATING IT WITH TOP OF WALL ELEVATION TO TIMES? |
| 19:45:28 | 9 | A.   THIS IS -- THE PREVIOUS DIAGRAM SHOWS A BUNCH OF DIFFERENT |
| 19:45:34 | 10 | CALCULATIONS AT DIFFERENT WALL HEIGHTS.  THIS IS LOOKING AT |
| 19:45:37 | 11 | JUST ONE WALL HEIGHT AND HOW SCOUR DEPTH DEVELOPS WITH TIME. |
| 19:45:42 | 12 | Q.   SO DID YOU -- DID YOU TAKE, FOR PURPOSES OF THIS ANALYSIS, |
| 19:45:46 | 13 | THE TOP OF THE FLOODWALL AT THE SOUTH BREACH? |
| 19:45:48 | 14 | A.   YES. |
| 19:45:49 | 15 | Q.   AND YOU -- AND YOU PICKED THAT OFF OF THE ORLEANS LEVEE |
| 19:45:53 | 16 | DISTRICT SURVEYORS' NOTES AS 12.1 FEET? |
| 19:45:59 | 17 | A.   YES.  ACTUALLY, IT WAS A LITTLE BIT MORE THAN THAT, AND |
| 19:46:02 | 18 | THEN I ALLOWED FOR SOME CONTINUED SETTLEMENT TO OCCUR AT THE |
| 19:46:05 | 19 | RATE IT HAD BEEN OCCURRING TO GET ME FROM THEIR LAST READING UP |
| 19:46:10 | 20 | TO 2005, AND THAT GAVE ME THE 12.1. |
| 19:46:13 | 21 | THE COURT:  OKAY.  AND I KNOW WE'VE BEEN OVER THIS, |
| 19:46:15 | 22 | AND FORGIVE ME, MR. SMITH.  JUST BRIEFLY, THE -- THE DIFFERENT |
| 19:46:21 | 23 | LINES ARE THE VARIOUS CATEGORIES THAT SOILS ARE CLASSIFIED -- |
| 19:46:30 | 24 | MR. SMITH:  MAYBE WE CAN JUST BLOW THAT UP SO THE |
| 19:46:32 | 25 | JUDGE CAN SEE THE -- |

19:46:34   1         THE COURT:  YEAH.  I'VE GOT IT.  THE GREEN LINE, THE

19:46:37   2   FIRST GREEN LINE IS THE MORE ERODABLE, THEN YOU SEE AVERAGE AND

19:46:41   3   THE LESS ERODABLE.

19:46:43   4               THERE'S ONE OTHER -- THERE'S ONE OTHER LINE ON

19:46:44   5   THERE THAT I WASN'T QUITE SURE ABOUT -- OH, AVERAGE, NO WAVES.

19:46:50   6   THAT'S THE DOTTED LINE, CORRECT, AVERAGE, NO WAVES?

19:46:54   7         THE WITNESS:  YES.  THERE ARE SIX LINES.  THERE ARE

19:46:56   8   THREE THAT ARE WITH NO WAVES AND THREE WITH WAVES.

19:47:02   9         THE COURT:  I'VE GOTCHA.  THANK YOU.

19:47:03  10   BY MR. SMITH:

19:47:03  11   Q.   SO YOU'VE TAKEN BASICALLY WHAT WAS IN YOUR INITIAL REPORT

19:47:06  12   AND CONVERTED IT TO A SCOUR DEPTH EROSION OVER TIME WITHOUT ANY

19:47:11  13   WAVES?

19:47:11  14   A.   YES.

19:47:12  15   Q.   AND THEN YOU'VE ALSO PLOTTED WITH THAT YOUR SUBSEQUENT

19:47:17  16   ANALYSIS IN YOUR SUPPLEMENTAL REPORT THE RATES OF SCOUR DEPTH

19:47:20  17   DEVELOPMENT IF YOU WERE INCLUDING WAVES; CORRECT?

19:47:24  18   A.   YES.

19:47:26  19   Q.   AND, IN FACT, WHAT WE SEE IS -- IF I'M CORRECT, IS THAT

19:47:33  20   WHEN YOU INCLUDE WAVES, THE SCOUR DEPTH TRENCH DEVELOPS MORE

19:47:37  21   RAPIDLY; ISN'T THAT CORRECT?

19:47:38  22   A.   THAT'S CORRECT.  IT DEVELOPS EARLIER.

19:47:40  23   Q.   AND, IN FACT, YOU INDICATED THAT IN YOUR REPORT, DIDN'T

19:47:44  24   YOU, DR. MARR?

19:47:44  25   A.   YES.

19:47:45   1   **Q.**   LET'S FIND THAT IN YOUR REPORT BECAUSE WE'RE INTERESTED IN

19:47:48   2   WHAT YOU'VE -- WHAT YOU'VE MADE THE PLAINTIFFS AWARE OF ABOUT

19:47:50   3   YOUR OPINIONS IN YOUR INITIAL REPORT, SO LET'S GO BACK TO YOUR

19:47:54   4   INITIAL REPORT, PX-4721, PAGE 106.

19:48:08   5           **MR. SMITH:**   LET'S GO TO THE VERY LAST PARAGRAPH ON

19:48:08   6   THIS PAGE AND LET'S CALL THAT OUT, IF WE CAN, "THIS STUDY ONLY

19:48:10   7   ADDRESSED."

19:48:13   8   **BY MR. SMITH:**

19:48:14   9   **Q.**   I'M GOING IT READ THIS, AND YOU TELL ME IF I READ IT

19:48:17  10   CORRECTLY, DR. MARR.

19:48:18  11           "THIS STUDY ONLY ADDRESSED OVERTOPPING SCOUR DUE TO

19:48:20  12   STORM SURGE AND DID NOT INCLUDE SCOUR DUE TO WAVE OVERTOPPING.

19:48:28  13   IT SHOULD BE NOTED THAT WAVES CAN OVERTOP A FLOODWALL EVEN WHEN

19:48:32  14   THE STORM SURGE ELEVATION IS BELOW THE TOP ELEVATION OF THE

19:48:36  15   WALL," AND YOU'VE GOT A COUPLE CITATIONS.

19:48:39  16           "SINCE THE FLOODWALLS AT THE EBIA SITE EXPERIENCED

19:48:42  17   WAVE OVERTOPPING DURING HURRICANE KATRINA, IT CAN BE ASSUMED

19:48:47  18   THAT OMISSION OF WAVE OVERTOPPING SCOUR IN OUR STUDY WOULD

19:48:52  19   RESULT IN LOWER PREDICTED SCOUR DEPTHS THAN WHAT ACTUALLY

19:48:57  20   DEVELOPED AT THE FLOODWALLS DURING THE HURRICANE."

19:49:01  21           DID I READ THAT CORRECTLY, DR. MARR?

19:49:05  22   **A.**   YES, SIR.

19:49:05  23   **Q.**   WHY DID YOU PUT THAT PARAGRAPH IN YOUR REPORT?

19:49:08  24   **A.**   BECAUSE WE HAD NOT -- AS WE'VE TRIED TO SAY IN THE

19:49:11  25   REPORT -- AS I TRIED TO SAY, I HAD NOT INCLUDED WAVES.  I KNEW

19:49:15   1   THERE WERE WAVES, BUT I DIDN'T THINK THAT THEY WERE -- GIVEN

19:49:22   2   THAT THE -- MY READING OF THE REPORT WAS A 1-FOOT HIGH

19:49:26   3   SIGNIFICANT WAVE, I DIDN'T THINK THAT IT WOULD BE A SIGNIFICANT

19:49:29   4   FACTOR COMPARED TO THE AMOUNT OF WATER THAT WAS FLOWING OVER

19:49:33   5   THE WALLS FROM THE STILL-WATER LEVEL.

19:49:38   6   Q.   AND DID YOU SUBSEQUENTLY CONFIRM WHAT YOU PUT IN YOUR

19:49:42   7   REPORT, IN YOUR SUPPLEMENTAL REPORT?

19:49:45   8   A.   I -- I ADDED TO IT ONCE I LEARNED THAT THE WAVES WERE

19:49:48   9   HIGHER THAN WHAT I HAD USED IN MY PRIMARY -- MY MAIN EXPERT

19:49:54  10   REPORT.

19:49:55  11   Q.   SO THE GIST OF YOUR SUPPLEMENTAL REPORT IS ESSENTIALLY A

19:50:00  12   CONFIRMATION OF WHAT YOU STATE IN THIS PARAGRAPH IN YOUR

19:50:04  13   INITIAL REPORT.  ISN'T THAT TRUE, DR. MARR?

19:50:07  14   A.   EXACTLY.

19:50:08  15   Q.   THERE'S NOTHING NEW IN YOUR SUPPLEMENTAL REPORT OTHER THAN

19:50:11  16   SOME CALCULATIONS TO SUPPORT THE STATEMENT THAT WAS IN YOUR

19:50:14  17   INITIAL REPORT; ISN'T THAT TRUE?

19:50:16  18   A.   THAT IS CORRECT.

19:50:17  19   Q.   NOW, WITH RESPECT TO WHICH OF THE RATES OF EROSION WOULD

19:50:20  20   BE MOST RELEVANT TO THIS CASE, AS THE JUDGE JUST ASKED YOU

19:50:26  21   ABOUT THE FIGURE IN YOUR SUPPLEMENTAL REPORT, YOU CALCULATED

19:50:31  22   VARIOUS RATES DEPENDING UPON THE NATURE OF THE SOILS THAT ARE

19:50:33  23   IN THE LEVEE, DIDN'T YOU?

19:50:35  24   A.   YES.

19:50:35  25   Q.   AND SOME CLAYS HAVE -- ARE MORE PLASTIC THAN OTHERS;

19:50:41   1  CORRECT?

19:50:41   2  **A.**   YES.

19:50:42   3  **Q.**   AND THE MORE PLASTIC CLAYS ARE MORE RESISTANCE TO EROSION;

19:50:44   4  IS THAT CORRECT?

19:50:49   5  **A.**   YES.

19:50:49   6  **Q.**   AND WE DON'T KNOW AT ANY PARTICULAR POINT ALONG THAT

19:50:53   7  FLOODWALL THE EXACT PLASTICITY OF THAT CLAY THAT'S IN THAT

19:50:59   8  LEVEE, DO WE, DR. MARR?

19:51:00   9  **A.**   NO, WE DON'T.

19:51:02  10  **Q.**   WE MIGHT HAVE BORINGS THAT ARE TAKEN NEARBY, BUT WE DON'T

19:51:06  11  KNOW AT THAT PARTICULAR POINT THE NATURE OF THOSE SOILS, DO WE,

19:51:09  12  DR. MARR?

19:51:10  13  **A.**   NO, WE DON'T.

19:51:11  14  **Q.**   DID YOU ATTEMPT, THROUGH THE FIGURE IN YOUR DEMONSTRATIVE

19:51:14  15  TODAY THAT YOU SHOWED THE COURT, THAT WAS NOT IN YOUR EXPERT

19:51:17  16  REPORT -- BUT TO ILLUSTRATE YOUR OPINIONS, DID YOU PLOT THE

19:51:20  17  INDIVIDUAL SCOUR DEPTH POINTS THAT YOU PICKED OFF OF THOSE

19:51:23  18  PHOTOGRAPHS TO SHOW WHETHER THE ACTUAL SCOUR DEPTHS THAT YOU

19:51:28  19  OBSERVED IN THOSE PHOTOGRAPHS ARE CONSISTENT WITH

19:51:31  20  DR. GOVINDASAMY'S ANALYSIS?

19:51:34  21  **A.**   EXACTLY.  AND THAT'S WHY THAT EXHIBIT WAS PREPARED.

19:51:37  22  **Q.**   AND LET'S LOOK AT WHERE THEY FALL IN YOUR ANALYSIS WITHOUT

19:51:42  23  WAVE OVERTOPPING TO SEE HOW WRONG THAT ANALYSIS WAS, EVEN IF

19:51:47  24  THERE HADN'T BEEN ANY WAVES.  AND THAT'S SLIDE NO. 44 IN

19:51:51  25  DX-DM-1006.

| | | |
|---|---|---|
| 19:52:02 | 1 | WHAT DOES THIS TELL YOU, DR. MARR, ABOUT |
| 19:52:03 | 2 | DR. GOVINDASAMY'S CALCULATIONS IN HIS EROSION ANALYSIS? |
| 19:52:08 | 3 | **THE COURT:**  JUST A MINUTE. |
| 19:52:08 | 4 | **MR. BRUNO:**  I BELIEVE COUNSEL SUGGESTED THAT THIS IS |
| 19:52:11 | 5 | WITH WAVES AND THIS SAYS "NO WAVES." |
| 19:52:13 | 6 | **MR. SMITH:**  THIS IS WITHOUT WAVES.  IF I SAID "WITH |
| 19:52:15 | 7 | WAVES," I MISSPOKE AND I APOLOGIZE. |
| 19:52:17 | 8 | **MR. BRUNO:**  THEN I APOLOGIZE. |
| 19:52:18 | 9 | **MR. SMITH:**  I'M GOING TO LOOK AT THE WITH WAVES NEXT, |
| 19:52:20 | 10 | BUT THIS IS -- |
| 19:52:22 | 11 | **THE COURT:**  I UNDERSTOOD IT WAS WITHOUT WAVES.  GO |
| 19:52:23 | 12 | AHEAD. |
| 19:52:24 | 13 | **BY MR. SMITH:** |
| 19:52:24 | 14 | **Q.**  WHAT DO YOU TAKE AWAY FROM PLOTTING THESE DOTS ON THIS |
| 19:52:27 | 15 | EROSION CHART, WHICH I THINK WE'VE ESTABLISHED PREVIOUSLY WAS |
| 19:52:32 | 16 | IN YOUR INITIAL EXPERT REPORT? |
| 19:52:36 | 17 | **A.**  WELL, THE DOTS TELL US THAT THE MEASURED EROSION OR SCOUR |
| 19:52:42 | 18 | DEPTHS WERE SIMILAR TO WHAT THIS MODEL WAS PREDICTING USING A |
| 19:52:47 | 19 | MORE ERODABLE CL CLAY. |
| 19:52:51 | 20 | **Q.**  SO IF THERE HADN'T BEEN ANY WAVES AT ALL, AND YOU SAW |
| 19:52:57 | 21 | THESE POINTS ON THIS PLOT, WHAT WOULD YOU CONCLUDE ABOUT THE |
| 19:53:01 | 22 | NATURE OF THE SOILS ALONG THE LEVEE WHERE THE OVERTOPPING |
| 19:53:05 | 23 | EROSION BEGAN? |
| 19:53:06 | 24 | **A.**  THAT THEY BEHAVED LIKE A CL CLAY WITH -- THAT WAS MORE |
| 19:53:11 | 25 | ERODABLE. |

| | | |
|---|---|---|
| 19:53:12 | 1 | **Q.**   THE MORE ERODABLE. |
| 19:53:14 | 2 |         NOW, LET'S LOOK AT SLIDE NO. 48, AND LET'S SEE HOW |
| 19:53:17 | 3 | THIS FALLS WHEN YOU CONSIDER WAVES. |
| 19:53:20 | 4 |         NOW, WHEN YOU CONSIDER WAVES, WHAT DOES -- DOES THIS |
| 19:53:25 | 5 | AFFECT YOUR CONCLUSIONS YOU CAN DRAW FROM THESE DATA POINTS |
| 19:53:32 | 6 | THAT YOU PICKED OFF OF THOSE PHOTOGRAPHS? |
| 19:53:34 | 7 | **A.**   NOT SIGNIFICANTLY.  IT'S JUST WE'RE -- THE WAVES DO |
| 19:53:35 | 8 | PRODUCE MORE SCOUR, ESPECIALLY AT THE HIGHER WALL HEIGHTS. |
| 19:53:42 | 9 | BUT, YOU KNOW, THE DATA STILL PRETTY MUCH CONFIRM THAT THE |
| 19:53:44 | 10 | SCOUR MODEL RESULTS ARE REASONABLE. |
| 19:53:47 | 11 | **Q.**   NOW, YOU'RE AWARE, I BELIEVE, AREN'T YOU, DR. MARR, THAT |
| 19:53:51 | 12 | DR. BEA RELIED UPON THE OVERTOPPING -- THE EROSION SCOUR |
| 19:54:01 | 13 | ANALYSIS THAT WAS PERFORMED BY DR. BRIAUD, WHO WAS |
| 19:54:05 | 14 | DR. GOVINDASAMY'S PROFESSOR AT -- IS IT TEXAS? |
| 19:54:08 | 15 | **A.**   TEXAS A&M. |
| 19:54:09 | 16 | **Q.**   TEXAS A&M? |
| 19:54:11 | 17 | **A.**   THAT'S MY UNDERSTANDING, THAT HE HAD IN HIS REPORTS THE |
| 19:54:13 | 18 | DATA THAT WAS PRODUCED OUT OF THAT FACILITY'S TEST LABORATORY. |
| 19:54:19 | 19 | **Q.**   DID YOU LOOK AT -- DID HE PLOT -- HAVE A SIMILAR PLOT IN |
| 19:54:24 | 20 | HIS REPORT IN *ROBINSON*?  DO YOU RECALL SEEING THAT? |
| 19:54:28 | 21 | **A.**   NO, NOT A PLOT LIKE THIS.  HE HAD A PLOT OF SCOUR RATES |
| 19:54:30 | 22 | FOR SOIL TYPES AND THE SCOUR RATES THAT HE THOUGHT WERE |
| 19:54:33 | 23 | APPROPRIATE FOR THESE EMBANKMENT LEVEE SOILS. |
| 19:54:40 | 24 | **Q.**   AND DID YOU COMPARE THAT TO THE SOILS THAT YOU'VE ANALYZED |
| 19:54:43 | 25 | IN YOUR REPORT HERE, DR. MARR? |

| | | |
|---|---|---|
| 19:54:45 | 1 | **A.**   YES. |
| 19:54:45 | 2 | **Q.**   AND HOW DID THAT COMPARE WITH THE EROSION -- THE TYPES OF |
| 19:54:47 | 3 | SOILS THAT YOU'RE ANALYZING HERE? |
| 19:54:49 | 4 | **A.**   IT WAS VERY CONSISTENT WITH WHAT WE HAD -- WE USED FOR |
| 19:54:53 | 5 | THIS MORE ERODABLE CL CLAY. |
| 19:55:11 | 6 | **Q.**   OKAY.  I BELIEVE IT WAS BROUGHT OUT -- AND I DON'T THINK |
| 19:55:12 | 7 | THERE'S ANY DISPUTE ABOUT THE FACT -- THAT WHEN YOU WERE |
| 19:55:16 | 8 | DEPOSED IN THIS CASE YOU SUDDENLY BECAME AWARE OF THE |
| 19:55:21 | 9 | IMPORTANCE OF TIME IN CONSIDERING THE CAUSES OF THE SOUTH |
| 19:55:25 | 10 | BREACH. |
| 19:55:26 | 11 | WOULD THAT BE FAIR TO SAY, DR. MARR? |
| 19:55:28 | 12 | **A.**   YEAH.  THAT'S A FAIR STATEMENT. |
| 19:55:30 | 13 | **Q.**   WERE YOU ASKED BY ME OR BY ANY OF THE OTHER LAWYERS FOR |
| 19:55:33 | 14 | THE GOVERNMENT BEFORE YOU DID YOUR REPORT TO PROVIDE A TIME OF |
| 19:55:39 | 15 | FAILURE FOR EITHER OF THE BREACHES? |
| 19:55:41 | 16 | **A.**   NO. |
| 19:55:44 | 17 | **Q.**   SO YOU DID YOUR ANALYSIS OF THE CAUSES OF THE FAILURES |
| 19:55:47 | 18 | WITHOUT CONSIDERING THE TIME WHEN THOSE FAILURES MIGHT HAVE |
| 19:55:51 | 19 | OCCURRED. |
| 19:55:51 | 20 | WOULD BE FAIR TO SAY, DR. MARR? |
| 19:55:53 | 21 | **A.**   WELL, I THINK FOR THE NORTH BREACH I DID SAY A TIME |
| 19:55:56 | 22 | FAILURE.  BUT FOR THE SOUTH BREACH, I DID NOT. |
| 19:56:05 | 23 | **Q.**   NOW, IS THERE SOME REASON WHY -- AT YOUR REPORT -- AT YOUR |
| 19:56:09 | 24 | DEPOSITION, PARDON ME -- YOU WERE ASKED ABOUT PREDICTING TIMES |
| 19:56:17 | 25 | OF FAILURE BASED UPON YOUR GEOTECHNICAL ANALYSES. |

19:56:23   1          DO YOU RECALL THAT?

19:56:24   2    **A.**   YES.

19:56:24   3    **Q.**   AND DO YOU RECALL WHAT THE ANSWER YOU GAVE TO -- WAS TO

19:56:25   4    THE QUESTIONS THAT YOU WERE ASKED ABOUT PREDICTING TIME BASED

19:56:29   5    UPON GEOTECHNICAL ANALYSES?

19:56:30   6    **A.**   YES.

19:56:31   7    **Q.**   AND WHAT WAS THAT ANSWER?

19:56:33   8    **A.**   I SAID THAT THERE ARE ENOUGH UNCERTAINTIES ABOUT THESE

19:56:35   9    GEOTECHNICAL ANALYSES THAT IT REALLY WAS NOT POSSIBLE, FROM MY

19:56:39   10   PERSPECTIVE, TO PREDICT A TIME OF FAILURE FOR THE SOUTH BREACH.

19:56:42   11          AND I REALLY COULDN'T USE GEOTECHNICAL ANALYSES TO

19:56:45   12   PREDICT THE TIME OF FAILURE FOR THE NORTH BREACH EITHER.  I WAS

19:56:48   13   JUST CONVINCED BY DR -- BY MR. -- EVERYONE'S A DOCTOR NOW, I

19:56:53   14   GUESS -- MR. VILLAVASO'S OBSERVATIONS, WHEN HE WAS CALLED TO

19:56:59   15   THE CENTRAL STATION, OF THE WALL BREAKING.

19:57:02   16   **Q.**   I'D LIKE TO LOOK AT SOME OF DR. BEA'S REPORTS TO SEE IF

19:57:08   17   HIS ESTIMATES OF TIME OF FAILURE ARE CONSISTENT, IN THE SAME

19:57:11   18   SENSE THAT YOU JUST STATED, WITH NOT BEING ABLE TO PINPOINT A

19:57:16   19   PARTICULAR, PRECISE TIME OF FAILURE.

19:57:18   20          AND I WONDER IF WE COULD GO BACK TO HIS REPORT IN THE

19:57:26   21   JOURNAL -- THE *ELECTRONIC JOURNAL OF GEOTECHNICAL ENGINEERING*,

19:57:29   22   WHICH WAS PUBLISHED IN 2008.  THAT WOULD BE JX-1401.

19:57:35   23          **MR. BRUNO:**  YOUR HONOR, THIS IS INFORMATION I COVERED

19:57:39   24   ON DIRECT -- OR ON CROSS.  AND IN THE INTEREST OF TIME, JUST

19:57:45   25   SUGGEST THAT IT -- IT'S INAPPROPRIATE TO GO INTO IT NOW,

19:57:48    1    PARTICULARLY WITH THE LATENESS OF THE DAY.  AND I DON'T WANT TO

19:57:53    2    HAVE TO GO INTO REDIRECT ANYMORE -- OR RECROSS.

19:57:57    3              **THE COURT:**  IS IT IN EVIDENCE?  I'M JUST CURIOUS.

19:58:03    4              **MR. SMITH:**  IT'S A JX.  I DON'T KNOW WHETHER IT'S IN

19:58:05    5    EVIDENCE OR NOT.

19:58:06    6              **MR. BRUNO:**  WE WILL MOVE IT INTO EVIDENCE.

19:58:08    7              **THE COURT:**  I'M JUST SAYING THAT THE PERSONAL

19:58:10    8    KNOWLEDGE WOULD BE NOT HIS.  YOU CAN READ THAT, BUT HE COULD --

19:58:14    9              **MR. SMITH:**  I'M TRYING TO MAKE A POINT THAT SUPPORTS

19:58:16   10    DR. MARR'S TESTIMONY HERE THAT -- MR. BRUNO SPENT A LONG TIME

19:58:20   11    TALKING ABOUT TIME OF FAILURE AND WHETHER DR. MARR'S ANALYSES

19:58:25   12    WERE CONSISTENT WITH A 7:00 FAILURE AND DR. DALRYMPLE'S.

19:58:31   13              AND THE POINT I'M TRYING TO MAKE AND SUPPORT HIS

19:58:33   14    OPINION, WITH DR. BEA'S OWN ANALYSIS, IS TO SHOW THAT IT'S VERY

19:58:38   15    DIFFICULT TO PINPOINT A PARTICULAR TIME.  AND DR. BEA HAS

19:58:41   16    GENERALLY GIVEN RANGES OF TIME, WHICH CAN BE AS MANY AS TWO TO

19:58:45   17    FOUR HOURS.

19:58:46   18              AND I JUST WANT TO PUT SOME OF THOSE INSTANCES

19:58:48   19    INTO THE RECORD IF I COULD, YOUR HONOR.

19:58:50   20              **MR. BRUNO:**  THE PROBLEM, JUDGE, IS THAT THIS WITNESS

19:58:53   21    SAID TIME WASN'T IMPORTANT.  AND THEN HE GIVES A DEPOSITION,

19:58:56   22    AND ALL OF A SUDDEN TIME BECAME IMPORTANT.

19:58:59   23              THIS IS THE -- THE PURPOSE OF THIS IS SOMETHING

19:59:03   24    ELSE ENTIRELY.  IT WASN'T BROUGHT UP IN HIS DIRECT.  HE DIDN'T

19:59:06   25    TALK ABOUT IT.  I DIDN'T ASK HIM ABOUT IT.

| | | |
|---|---|---|
| 19:59:08 | 1 | IT'S BRAND-NEW, AND I HATE TO JUST GET INTO |
| 19:59:11 | 2 | SOMETHING BRAND-NEW AT 8:00 AT NIGHT WHEN WE'RE ALL TRYING TO |
| 19:59:14 | 3 | GET OUT OF HERE. |
| 19:59:15 | 4 | **MR. SMITH:** WELL, IT'S NOT BRAND-NEW AT ALL, |
| 19:59:17 | 5 | YOUR HONOR. I MEAN, THIS IS -- THIS IS ABOUT -- |
| 19:59:17 | 6 | **THE COURT:** WELL, I MEAN, THE COURT DOESN'T KNOW THE |
| 19:59:18 | 7 | CONTEXT -- ALL OF THESE OPINIONS HAVE BEEN -- WELL, A LOT OF |
| 19:59:23 | 8 | OPINIONS HAVE EVOLVED EITHER BECAUSE OF DIFFERENT KNOWLEDGE OR |
| 19:59:29 | 9 | DIFFERENT APPROACHES. AND SO I DON'T KNOW WHAT DR. BEA SAID IN |
| 19:59:38 | 10 | THIS CASE THAT'S REALLY MORE IMPORTANT TO ME, AND WHEN HE WAS |
| 19:59:41 | 11 | HERE FOR THREE DAYS, DID HE SAY WHAT TIME THE BREACHES WERE? |
| 19:59:45 | 12 | **MR. SMITH:** THIS IS NOT ABOUT THE EVOLUTION OF HIS |
| 19:59:48 | 13 | USE -- |
| 19:59:48 | 14 | **THE COURT:** OR DID HE SAY WHAT TIME THE BREACHES WERE |
| 19:59:50 | 15 | IN THIS CASE? |
| 19:59:50 | 16 | **MR. SMITH:** HE GAVE A LOT OF DIFFERENT TIMES IN THIS |
| 19:59:52 | 17 | CASE. |
| 19:59:53 | 18 | **THE COURT:** NO, IN THIS CASE. IN THIS CASE BEFORE ME |
| 19:59:54 | 19 | TODAY -- I MEAN -- EXCUSE ME -- IN THE THREE DAYS THAT HE WAS |
| 19:59:57 | 20 | HERE, DID HE OPINE? I JUST DON'T KNOW. |
| 19:59:59 | 21 | **MR. SMITH:** I DON'T RECALL WHETHER THAT WAS A FOCUS |
| 20:00:01 | 22 | OF HIS TESTIMONY. |
| 20:00:02 | 23 | **MR. SCHULTZ:** I DO RECALL -- |
| 20:00:02 | 24 | **THE COURT:** I KNOW IT'S 6:10 IN THE NORTH BREACH. |
| 20:00:04 | 25 | SOMEBODY'S -- I DON'T THINK THERE'S A LOT OF DISAGREEMENT ABOUT |

| | | |
|---|---|---|
| 20:00:07 | 1 | IT.  IT WAS AROUND THAT TIME. |
| 20:00:07 | 2 | **MR. SCHULTZ:**  AND 7:00 TO 7:15, THOSE WERE DISCRETE |
| 20:00:10 | 3 | QUESTIONS THAT I BUILT INTO THE OUTLINE TO ASK HIM, AND HE |
| 20:00:12 | 4 | DIDN'T GIVE SEVERAL TIMES.  HE ANSWERED TWO QUESTIONS, AND HE |
| 20:00:15 | 5 | GAVE THE TIME THE TIMES YOU COULD -- |
| 20:00:17 | 6 | **THE COURT:**  WELL, YOU HAD A CHANCE TO CROSS-EXAMINE |
| 20:00:18 | 7 | HIM ABOUT THAT. |
| 20:00:19 | 8 | AND THIS IS, IN MY OPINION, AGAIN, ASKING A |
| 20:00:22 | 9 | WITNESS WHO DIDN'T LOOK AT TIME, DIDN'T -- WELL, HE -- NOT THAT |
| 20:00:29 | 10 | IT WAS -- I'M NOT SAYING HE SHOULD HAVE.  HE'S LOOKING AT IT |
| 20:00:33 | 11 | FROM ANOTHER STANDPOINT. |
| 20:00:34 | 12 | THIS IS -- HE LOOKED AT THE TIME OF ERODIBILITY. |
| 20:00:41 | 13 | IT TAKES X HOURS TO GET 5 FEET, WHATEVER. |
| 20:00:43 | 14 | BUT DR. BEA -- WHATEVER DR. BEA SAID IN 2008 |
| 20:00:45 | 15 | REALLY DOESN'T MEAN MUCH TO ME.  DR. BEA WAS ON THE STAND FOR |
| 20:00:48 | 16 | THREE DAYS.  HE TESTIFIED AS TO WHAT THE TIME WAS.  HE COULD |
| 20:00:51 | 17 | HAVE BEEN CROSSED ABOUT IT, SO I'M NOT GOING TO ALLOW THIS IN. |
| 20:00:54 | 18 | **MR. SMITH:**  ALL RIGHT. |
| 20:00:56 | 19 | BY MR. SMITH: |
| 20:00:58 | 20 | **Q.**   LET'S DEAL WITH IT THIS WAY, THEN.  MAYBE WE CAN CUT THIS |
| 20:01:05 | 21 | PRETTY QUICKLY THIS WAY. |
| 20:01:08 | 22 | DOES OTHER TESTIMONY, OTHER INVESTIGATIVE REPORTS |
| 20:01:16 | 23 | THAT CONCLUDED THAT THE SOUTH BREACH OCCURRED AT 7:00 A.M., |
| 20:01:23 | 24 | DOES THAT AFFECT YOUR OPINION THAT THE SOUTH BREACH WAS CAUSED |
| 20:01:29 | 25 | BY OVERTOPPING, EROSION, AND OVERTURNING OF THE FLOODWALL? |

| | | |
|---|---|---|
| 20:01:36 | 1 | **A.**  NO. |
| 20:01:38 | 2 | **THE COURT:**  THAT'S CERTAINLY SOMETHING HE COULD |
| 20:01:39 | 3 | TESTIFY TO. |
| 20:01:41 | 4 | **BY MR. SMITH:** |
| 20:01:50 | 5 | **Q.**  YOU WERE ASKED ABOUT THIS, AS I RECALL, ON |
| 20:01:52 | 6 | CROSS-EXAMINATION, WHETHER -- YOU WERE SHOWN DR. DALRYMPLE'S |
| 20:01:55 | 7 | OPINION ABOUT THE TIMES OF THE FAILURES. |
| 20:01:57 | 8 | DO YOU KNOW WHETHER DR. DALRYMPLE RELIED ON |
| 20:02:04 | 9 | GEOTECHNICAL ANALYSIS FOR HIS ESTIMATE OF THE TIMES OF |
| 20:02:06 | 10 | BREACHES? |
| 20:02:06 | 11 | **A.**  I DON'T KNOW. |
| 20:02:20 | 12 | **Q.**  DR. MARR, YOU WERE ASKED BY MR. BRUNO ABOUT A VARIETY OF |
| 20:02:25 | 13 | THE THINGS THAT ARE -- THERE'S SOME UNCERTAINTY ABOUT.  THERE'S |
| 20:02:29 | 14 | EITHER CONFLICTING EVIDENCE OR DIFFERENCES OF OPINION AMONG THE |
| 20:02:32 | 15 | EXPERTS.  AND I'D LIKE TO GO THROUGH SOME OF THOSE WITH YOU AND |
| 20:02:36 | 16 | SEE WHETHER THOSE WOULD AFFECT YOUR OPINIONS ABOUT |
| 20:02:40 | 17 | UNDERSEEPAGE. |
| 20:02:41 | 18 | FIRST OF ALL, IS YOUR OPINION THAT UNDERSEEPAGE WAS |
| 20:02:51 | 19 | NOT A CAUSE OF EITHER THE NORTH BREACH OR THE SOUTH BREACH, IS |
| 20:02:57 | 20 | THAT DEPENDENT UPON YOUR CONCLUSION THAT THESE BREACHES WERE |
| 20:03:02 | 21 | CAUSED BY STRUCTURAL PROBLEMS AT THE NORTH WITH WEAK SOILS AND |
| 20:03:09 | 22 | FOUNDATIONS? |
| 20:03:11 | 23 | **A.**  NO. |
| 20:03:12 | 24 | **Q.**  AND WITH RESPECT TO THE SOUTH BREACH, IS THAT DEPENDENT |
| 20:03:17 | 25 | UPON YOUR OPINION THAT THE SOUTH BREACH WAS A RESULT OF |

| | | |
|---|---|---|
| 20:03:23 | 1 | OVERTOPPING, SCOUR, AND OVERTURNING OF THE FLOODWALL? |
| 20:03:26 | 2 | **A.** NO. THE UNDERSEEPAGE ANALYSIS ASSESSMENT IS TOTALLY |
| 20:03:29 | 3 | INDEPENDENT OF THE OVERTOPPING/OVERTURNING. |
| 20:03:35 | 4 | **Q.** DOES UNCERTAINTY ABOUT THE QUALITY OF THE GRASS COVER AT |
| 20:03:41 | 5 | THE NORTH BREACH OR THE SOUTH BREACH UNDERMINE YOUR OPINION IN |
| 20:03:46 | 6 | ANY WAY THAT UNDERSEEPAGE WAS NOT A CAUSE OF EITHER OF THOSE |
| 20:03:51 | 7 | FAILURES? |
| 20:03:51 | 8 | **A.** NO. |
| 20:03:53 | 9 | **Q.** DOES ANY UNCERTAINTY OR CONFLICT OF EVIDENCE ABOUT THE |
| 20:03:59 | 10 | NATURE -- THE ERODIBILITY OF THE SOILS, WHETHER THEY WERE |
| 20:04:02 | 11 | HIGHLY ERODIBLE, OF AVERAGE ERODIBILITY, OR OF LOW ERODIBILITY, |
| 20:04:09 | 12 | DOES ANY OF THAT UNCERTAINTY IMPINGE IN ANY WAY ON YOUR OPINION |
| 20:04:14 | 13 | THAT UNDERSEEPAGE WAS NOT A CAUSE OF EITHER OF THESE BREACHES? |
| 20:04:18 | 14 | **A.** NO. |
| 20:04:20 | 15 | **Q.** DOES UNCERTAINTY ABOUT THE DIRECTION OF THE WIND PRIOR TO |
| 20:04:25 | 16 | AND AT THE TIME OF EITHER OF THESE BREACHES AFFECT YOUR OPINION |
| 20:04:28 | 17 | IN ANY WAY THAT THESE BREACHES WERE NOT CAUSED BY UNDERSEEPAGE? |
| 20:04:32 | 18 | **A.** NO. |
| 20:04:33 | 19 | **Q.** AND WOULD THE SAME BE SAFE TO SAY ABOUT THE WAVE HEIGHTS? |
| 20:04:38 | 20 | WOULD UNCERTAINTY ABOUT THE WAVE HEIGHTS IMPACT YOUR OPINION |
| 20:04:41 | 21 | ABOUT UNDERSEEPAGE IN THIS CASE? |
| 20:04:42 | 22 | **A.** NO. |
| 20:04:45 | 23 | **Q.** WOULD THE SAME THING BE TRUE WITH RESPECT TO THE HEIGHT, |
| 20:04:48 | 24 | THE TOP OF THE LEVEE WALL, AT EITHER LOCATION? |
| 20:04:53 | 25 | **A.** NO. |

20:04:56  1  **Q.**  WOULD IT BE SAFE TO SAY THAT UNCERTAINTIES ABOUT THE

20:04:59  2  HEIGHT OF THE LEVEE WALL WOULD NOT AFFECT YOUR OPINION ABOUT

20:05:03  3  UNDERSEEPAGE?

20:05:03  4  **A.**  THAT'S THE SAME QUESTION, ISN'T IT, I THINK.

20:05:07  5  **Q.**  WELL, I TURNED THE QUESTION AROUND ON YOU AND I GOT A NO.

20:05:11  6          **THE COURT:**  WELL, BUT I KNEW WHAT THE "NO" MEANT.

20:05:14  7          **MR. SMITH:**  ALL RIGHT.

20:05:14  8          **THE COURT:**  IT WOULD NOT AFFECT --

20:05:14  9  **BY MR. SMITH:**

20:05:14  10  **Q.**  NO, IT WOULD NOT AFFECT --

20:05:17  11          **THE COURT:**  NO, IT WOULD NOT AFFECT HIS OPINION.

20:05:17  12          **MR. SMITH:**  THANK YOU.  I SHOULD --

20:05:18  13          **THE WITNESS:**  IT'S GETTING LATE FOR ME, TOO.

         14  **BY MR. SMITH:**

20:05:23  15  **Q.**  DR. MARR, IF THE QUESTION COMES DOWN TO THIS COURT AS TO

20:05:27  16  WHETHER DR. GOVINDASAMY'S EROSION SCOUR RATE ANALYSIS IS WRONG

20:05:35  17  OR WHETHER YOUR OPINION ABOUT UNDERSEEPAGE BEING A SUPPLEMENTAL

20:05:41  18  CAUSE OF THESE BREACHES -- IF IT HAS TO BE ONE OR THE OTHER OF

20:05:46  19  THOSE TWO, WHICH ONE OF THOSE GIVES WAY?

20:05:54  20  **A.**  GIVES WAY?  THE UNDERSEEPAGE ANALYSIS IS ABSOLUTE AND

20:05:58  21  CLEAR THAT UNDERSEEPAGE WAS NOT A CONTRIBUTOR TO THIS FAILURE.

20:06:02  22          DR. GOVINDASAMY'S SCOUR CALCULATIONS, AS I'VE SAID,

20:06:05  23  ARE APPROXIMATE.

20:06:07  24          THE MORE -- I GIVE A LOT MORE WEIGHT TO THE

20:06:10  25  PHOTOGRAPHS -- PHOTOGRAPHIC EVIDENCE SHOWING THAT THE -- THE

| | | |
|---|---|---|
| 20:06:15 | 1 | SOUTH BREACH FAILURE WAS CLEARLY OVERTURNING.  THE ONLY PURPOSE |
| 20:06:19 | 2 | FOR HIS CALCULATIONS WERE TO GIVE US, YOU KNOW, SOME SEPARATE |
| 20:06:26 | 3 | INDICATION THAT THE SCOUR DEPTHS COULD DEVELOP. |
| 20:06:34 | 4 | AND AS I SAID BEFORE, TOO, TO TELL US WHAT THE EFFECT |
| 20:06:36 | 5 | OF LANDSIDE TAIL WATER WOULD BE ON SLOWING DOWN OR STOPPING |
| 20:06:42 | 6 | SCOUR. |
| 20:06:50 | 7 | **MR. SMITH:**  I HAVE NOTHING ELSE, YOUR HONOR. |
| 20:06:51 | 8 | **THE COURT:**  VERY GOOD JOB, SIR. |
| 20:06:53 | 9 | **MR. BRUNO:**  I JUST FORGOT TO MOVE INTO EVIDENCE ALL |
| 20:06:54 | 10 | OF THE STUFF THAT WE -- |
| 20:06:56 | 11 | **THE COURT:**  MR. BRUNO, YOU LOOK EXHAUSTED.  BUT DO |
| 20:06:59 | 12 | YOU HAVE ANY -- |
| 20:07:00 | 13 | **MR. BRUNO:**  OH, NO, NO, NO.  I WOULDN'T PUT MYSELF AT |
| 20:07:02 | 14 | RISK.  I DON'T KNOW WHO WOULD SHOOT ME FIRST.  BUT, NO, I DO |
| 20:07:05 | 15 | NOT. |
| 20:07:06 | 16 | I JUST WANT TO MOVE INTO EVIDENCE THE DEPOSITION |
| 20:07:08 | 17 | OF DR. MARR, THE FULL DEPOSITION.  AND I WOULD MOVE -- |
| 20:07:11 | 18 | **THE COURT:**  ANY OBJECTION TO THAT? |
| 20:07:17 | 19 | **MR. TREEBY:**  IF YOUR HONOR PLEASE, I JUST THINK THE |
| 20:07:20 | 20 | PAGES THAT WERE REFERRED TO SHOULD BE MOVED INTO EVIDENCE.  AND |
| 20:07:23 | 21 | THERE WERE MANY, BUT WE CAN DO THAT -- I THINK WE CAN SORT THAT |
| 20:07:26 | 22 | OUT. |
| 20:07:27 | 23 | BUT TO START MOVING IN TOTAL DEPOSITIONS WHEN |
| 20:07:30 | 24 | THEY'RE NOT DESIGNATED AND THE WITNESS IS ON THE STAND, IT |
| 20:07:32 | 25 | WOULD BE A MISTAKE. |

20:07:33   1              **THE COURT:**  THE COURT WILL ADMIT INTO EVIDENCE THE

20:07:36   2    PAGES REFERRED TO BY MR. JUNEAU AND -- MR. BRUNO AND COUNSEL

20:07:46   3    FOR DEFENSE.

20:07:48   4              **MR. BRUNO:**  I WOULD ALSO MOVE INTO EVIDENCE

20:07:50   5    DR. MARR'S COMPLETE EXPERT REPORT WITH ALL APPENDIXES,

20:07:53   6    ESPECIALLY IN VIEW OF WHAT WE PERCEIVE TO BE A LATE CHANGE OF

20:07:59   7    OPINION.

20:08:01   8              **MR. SMITH:**  NO OBJECTION, YOUR HONOR.

20:08:02   9              **THE COURT:**  NO OBJECTION?

20:08:03  10              **MR. SMITH:**  NO OBJECTION.

20:08:05  11              **THE COURT:**  LET THAT BE ADMITTED.

20:08:06  12              **MR. BRUNO:**  TO THE EXTENT THAT THERE ARE OTHER

20:08:08  13    NUMBER 2S, WE'LL JUST LIST THOSE AND TRY TO WORK THAT OUT

20:08:09  14    WITH -- YOU KNOW WHAT I MEAN BY NUMBER 2S.

20:08:12  15              **THE COURT:**  YES.  I'M HOPING TO GET THE NUMBER 2S

20:08:14  16    STRAIGHT AT SOME POINT IN THIS TRIAL.  I KNOW THAT'S STILL --

20:08:19  17    YOUR CASE IS STILL OPEN FOR THAT PURPOSE.

20:08:23  18              **MR. SMITH:**  YOUR HONOR, I THINK WE'VE GOT ONE THING

20:08:26  19    LEFT, THEN.

20:08:27  20                   JOE, DO YOU WANT TO MOVE IN HIS SUPPLEMENTAL

20:08:29  21    REPORT AS WELL?

20:08:30  22              **MR. BRUNO:**  OH, YES.  YES, I DO.  I DO.  THANK YOU,

20:08:33  23    ROBIN.

20:08:34  24                   AND TO THE EXTENT THAT DR. BEA'S REPORTS ARE NOT

20:08:36  25    ALL IN, I WANT TO MOVE ALL THOSE IN.  I THINK SOMEBODY DID THAT

```
20:08:41   1   ALREADY.

20:08:41   2            THE COURT:  I THINK THAT'S --

20:08:43   3            MR. SMITH:  I KNEW THE MAIN REPORT WAS IN, BUT WE

20:08:45   4   DON'T HAVE ANY OBJECTION TO ALL OF THEM COMING IN.

20:08:48   5            THE COURT:  ALL RIGHT.  LET THEM BE ADMITTED.

20:08:50   6            MR. BRUNO:  TO BE PRECISE, WE'RE GOING TO -- DIDN'T

20:08:54   7   WE -- DIDN'T DR. MARR SUPPLY US WITH A CORRECTED -- SO WE DON'T

20:08:58   8   HAVE TO MOVE IN THE ERRATA SHEET?

20:09:01   9            MR. BRUNO:  I MEAN ALSO THE ERRATA SHEET TO THE

20:09:05  10   DEPOSITION.  I APOLOGIZE, JUDGE.  IT'S LATE.

20:09:08  11            THE COURT:  LET THAT BE ADMITTED.

20:09:10  12            MR. BRUNO:  AND I GAVE -- I THINK I HAVE NUMBERS.

20:09:11  13   SHEENA WILL GET YOU SOME NUMBERS, AS WE PROMISED.

20:09:14  14            THE COURT:  I REALIZE IT'S LATE IN THE EVENING TO

20:09:15  15   GIVE NUMBERS, BUT WE'LL LET THEM BE ADMITTED PENDING YOU

20:09:18  16   APPROPRIATELY DOCUMENTING THEM FOR THE COURT AND THE COURT OF

20:09:21  17   APPEALS.

20:09:22  18            MR. BRUNO:  ALL RIGHT.  I THINK -- IS THERE ANYTHING

20:09:23  19   ELSE I MISSED?

20:09:26  20                 IF NOT, WE'LL DO IT TOMORROW.  THANK YOU, JUDGE.

20:09:30  21            MR. SMITH:  MAY THE WITNESS BE EXCUSED, JUDGE?

20:09:32  22            THE COURT:  DR. MARR, YOU MAY STEP DOWN.  AND YOU'RE

20:09:38  23   EXCUSED, SIR.

20:09:39  24                 WELL, I HAVE NOTICED THAT THE CURVE, MY -- THE

20:09:44  25   STATISTICAL CURVE OF ABSORPTION OF KNOWLEDGE DOES TEND TO
```

```
20:09:50   1   DECLINE A LITTLE BIT AFTER A CERTAIN POINT.  BUT I THINK WE'VE

20:09:54   2   GOT A -- YOU'VE ALL MADE YOUR POINTS, AND I DID GET THEM.

20:09:59   3                 BEFORE WE ADJOURN TODAY, FIRST, I WANTED TO TELL

20:10:02   4   ALL OF YOU, I KNOW WHAT A DIFFICULT JOB THIS IS.  I'VE SAID IT

20:10:06   5   MANY TIMES.  YOU HAVE AN EXTRAORDINARILY DIFFICULT JOB.  I

20:10:09   6   THINK I'M THE ONLY ONE HERE WORKING FOR FREE, UNLESS -- IF YOU

20:10:15   7   INCLUDE THE PLAINTIFFS.  THAT'S ALSO A BIG POSSIBILITY.

20:10:17   8                 AT LEAST I WOULDN'T BE NEGATIVE, SINCE I'M

20:10:21   9   SENIOR STATUS.  BUT IT'S A REALLY DIFFICULT JOB.

20:10:24  10                 MR. BRUNO, I WANT TO PARTICULARLY COMPLIMENT YOU

20:10:27  11   FOR HAVING A LOT OF GRIT AND BEING HERE TODAY AND GOING THROUGH

20:10:31  12   WITH YOUR CROSS-EXAMINATION, BASED ON THE NEWS YOU GOT FRIDAY

20:10:35  13   AND THE NEWS I KNOW YOU PROBABLY RECEIVED SOMETIME THIS

20:10:38  14   AFTERNOON.

20:10:42  15          MR. SCHULTZ:  WELL, HE DIDN'T, BUT THAT . . .

20:10:44  16          THE COURT:  BUT SORRY ABOUT THAT.

20:10:47  17                 OFF THE RECORD.

20:10:48  18                    (OFF THE RECORD)

20:10:48  19                         *****

20:10:48  20                       CERTIFICATE

20:10:48  21          I, JODI SIMCOX, RMR, FCRR, OFFICIAL COURT REPORTER
20:10:48       FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF
20:10:48  22   LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND
20:10:48       CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND
20:10:48  23   UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE
20:10:48       ABOVE-ENTITLED AND NUMBERED MATTER.
20:10:48  24
20:10:48                        S/ JODI SIMCOX, RMR, FCRR
20:10:48  25                       JODI SIMCOX, RMR, FCRR
                                   OFFICIAL COURT REPORTER
```