1                 UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  KATRINA CANAL BREACHES*   CIVIL ACTION
    CONSOLIDATED LITIGATION       *
6                                  *   NO. 05-4182
                                   *
7                                  *   SECTION K(2)
    PERTAINS TO:  MRGO             *
8   ARMSTRONG NO. 10-CV-866        *   NEW ORLEANS, LOUISIANA
                                   *
9                                  *   SEPTEMBER 27, 2012
    * * * * * * * * * * * * * * * *

10                DAY TWELVE, AFTERNOON SESSION
11                 BENCH TRIAL BEFORE THE
            HONORABLE STANWOOD R. DUVAL, JR.
12            UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14
    FOR THE PLAINTIFFS:          BRUNO & BRUNO
15                               BY: JOSEPH M. BRUNO, ESQ.
                                 855 BARONNE STREET
16                               NEW ORLEANS, LOUISIANA 70113

17

18                               THE ANDRY LAW FIRM
                                 BY: JONATHAN B. ANDRY, ESQ.
19                               610 BARONNE ST.
                                 NEW ORLEANS, LOUISIANA 70113
20

21                               BARON & BUDD
                                 BY: THOMAS SIMS, ESQ.
22                               3102 OAK LAWN AVE.
                                 SUITE 1100
23                               DALLAS, TEXAS 75219

24

25

1  APPEARANCES CONTINUED:

2  FOR THE PLAINTIFFS:          DEGRAVELLES, PALMINTIER,
                                 HOLTHAUS & FRUGE
3                               BY: MICHAEL C. PALMINTIER, ESQ.
                                BY:  JOSHUA M. PALMINTIER, ESQ.
4                               618 MAIN STREET
                                BATON ROUGE, LOUISIANA 70801
5

6
                                DOMENGEAUX, WRIGHT, ROY & EDWARDS
7                               BY: ELLWOOD C. STEVENS, JR., ESQ.
                                BY: BONNIE KENDRICK, ESQ.
8                               P. O. BOX 3668
                                556 JEFFERSON ST.
9                               LAFAYETTE, LOUISIANA 70502

10

11                              THE DUDENHEFER LAW FIRM, LLC
                                BY: FRANK DUDENHEFER, JR., ESQ.
12                              601 POYDRAS ST.
                                SUITE 2655
13                              NEW ORLEANS, LOUISIANA 70130-6004

14

15                              FAYARD & HONEYCUTT
                                BY: CALVIN C. FAYARD, JR., ESQ.
16                              519 FLORIDA AVE., S.W.
                                DENHAM SPRINGS, LOUISIANA 70726
17

18
                                JOANEN LAW FIRM
19                              BY: SCOTT JOANEN, ESQ.
                                4905 FRERET ST.
20                              SUITE B
                                NEW ORLEANS, LOUISIANA 70115
21

22
                                LEVIN, PAPANTONIO, THOMAS,
23                               MITCHELL, RAFFERTY & PROCTOR
                                BY: MATTHEW D. SCHULTZ, ESQ.
24                              316 S. BAYLEN ST.
                                SUITE 600
25                              PENSACOLA, FLORIDA 32502

1    APPEARANCES CONTINUED:

2    FOR THE PLAINTIFFS:            THE TRIAL LAW FIRM PC
                                    BY: ANDREW P. OWEN, ESQ.
3                                   800 WILTSHIRE BLVD.
                                    SUITE 500
4                                   LOS ANGELES, CALIFORNIA 90017

5

6                                   J. ROBERT WARREN, II, A PLC
                                    BY: J. ROBERT WARREN, II, ESQ.
7                                   1718 SHORT ST.
                                    NEW ORLEANS, LOUISIANA 70118

8

9                                   COTCHETT, PITRE & MCCARTHY, LLP
10                                  BY: PHILIP L. GREGORY, ESQ.
                                    840 MALCOLM ROAD, SUITE 200
11                                  BURLINGAME, CALIFORNIA 94010

12

13   FOR THE DEFENDANT WASHINGTON
     GROUP INTERNATIONAL, INC.:     STONE PIGMAN WALTHER WITTMANN
14                                  BY:  WILLIAM D. TREEBY, ESQ.
                                    BY:  JAMES C. GULOTTA, JR., ESQ.
15                                  BY:  HEATHER S. LONIAN, ESQ
                                    BY:  MAGGIE A. BROUSSARD, ESQ.
16                                  546 CARONDELET STREET
                                    NEW ORLEANS, LOUISIANA 70130

17

18

19

20

21

22

23

24

25

1   APPEARANCES CONTINUED:

2   FOR THE DEFENDANT WASHINGTON
    GROUP INTERNATIONAL, INC.:      JONES DAY
3                                   BY:  ADRIAN WAGER-ZITO, ESQ.
                                    BY:  DEBRA S. CLAYMAN, ESQ.
4                                   BY:  CHRISTOPHER N. THATCH, ESQ.
                                    BY:  CHRISTOPHER R. FARRELL, ESQ.
5                                   BY:  JULIA CRONIN, ESQ.
                                    BY:  BRIAN KERWIN, ESQ.
6                                   51 LOUISIANA AVENUE, N.W.
                                    WASHINGTON, D.C. 20001
7

8

9   FOR THE DEFENDANT UNITED
    STATES OF AMERICA:              U.S. DEPARTMENT OF JUSTICE
10                                  CIVIL DIVISION, TORTS BRANCH
                                    BY:  ROBIN D. SMITH, ESQ.
11                                  BY:  JAMES F. MCCONNON, JR., ESQ.
                                    BY:  RUPERT MITSCH, ESQ.
12                                  BY:  CONOR KELLS, ESQ.
                                    BY:  JOHN A. WOODCOCK, ESQ.
13                                  BENJAMIN FRANKLIN STATION
                                    P.O. BOX 888
14                                  WASHINGTON, D.C. 20044

15

16
    OFFICIAL COURT REPORTER:        JODI SIMCOX, RMR, FCRR
17                                  500 POYDRAS STREET
                                    ROOM HB-406
18                                  NEW ORLEANS, LOUISIANA 70130
                                    (504) 589-7780
19                                  JODI_SIMCOX@LAED.USCOURTS.GOV

20

21  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

22  PRODUCED BY COMPUTER.

23

24

25

2891

1                              I N D E X

2                                                          PAGE

3
PATRICK LUCIA
4        DIRECT EXAMINATION BY MR. KELLS:              2893
         VOIR DIRE BY MR. GREGORY:                     2899
5        DIRECT EXAMINATION BY MR. KELLS:              2903
         CROSS-EXAMINATION BY MR. GREGORY:             2955
6        CROSS-EXAMINATION BY MS. WAGER-ZITO:          3017
         REDIRECT EXAMINATION BY MR. KELLS:            3021
7        RECROSS-EXAMINATION BY MR. GREGORY:           3036

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 13:00:01 | 1 | |
| 13:00:53 | 2 | **AFTERNOON SESSION** |
| 13:00:53 | 3 | **(SEPTEMBER 27, 2012)** |
| 13:00:53 | 4 | * * * * * |
| 13:01:05 | 5 | **THE DEPUTY CLERK:** ALL RISE. |
| 13:01:07 | 6 | COURT'S IN SESSION. PLEASE BE SEATED. |
| 13:21:21 | 7 | **MR. KELLS:** GOOD AFTERNOON, YOUR HONOR. THE UNITED |
| 13:21:21 | 8 | STATES IS READY TO PROCEED WITH ITS NEXT WITNESS. |
| 13:21:27 | 9 | **THE COURT:** THANK YOU, SIR. |
| 13:21:28 | 10 | (WHEREUPON, **PATRICK LUCIA**, HAVING BEEN DULY SWORN, |
| 13:21:28 | 11 | TESTIFIED AS FOLLOWS.) |
| 13:21:39 | 12 | **THE DEPUTY CLERK:** PLEASE STATE YOUR FULL NAME AND |
| 13:21:39 | 13 | CORRECT SPELLING FOR THE RECORD. |
| 13:21:39 | 14 | **THE COURT:** DO WE HAVE HIS NAME FOR THE RECORD? |
| 13:21:42 | 15 | **MR. KELLS:** SURE. IT'S DR. PATRICK LUCIA. |
| 13:21:45 | 16 | **THE COURT:** AND WILL YOU SPELL THE LAST NAME SO WE |
| 13:21:47 | 17 | GET IT RIGHT? |
| 13:21:49 | 18 | **MR. KELLS:** L-U-C-I-A. |
| 13:21:50 | 19 | **THE COURT:** THANK YOU. FOR THE COURT REPORTER. |
| 13:21:53 | 20 | **MR. KELLS:** YOUR HONOR, AS A PRELIMINARY MATTER, I |
| 13:21:55 | 21 | SPOKE WITH MR. GREGORY, WHO WOULD LIKE TO ASK ABOUT 10 |
| 13:21:59 | 22 | PRELIMINARY QUESTIONS FOLLOWING MY INTRODUCTION OF THE WITNESS |
| 13:22:00 | 23 | AND LAYING SOME FOUNDATION. |
| 13:22:02 | 24 | I HAVE NO OBJECTION TO HIM DOING THAT BEFORE WE |
| 13:22:04 | 25 | GET INTO DR. LUCIA'S PRESENTATION OF HIS SUMMARY OPINIONS. |

13:22:08   1              **THE COURT:**  THANK YOU VERY MUCH, COUNSEL.

13:22:08   2                      **DIRECT EXAMINATION**

13:22:09   3   BY MR. KELLS:

13:22:10   4   **Q.**   GOOD MORNING -- OR GOOD AFTERNOON, RATHER, DR. LUCIA.  I

13:22:13   5   THOUGHT YOU WOULD BE GOING THIS MORNING.

13:22:16   6           GOOD AFTERNOON, DR. LUCIA.  I HAVE A FEW QUESTIONS

13:22:18   7   THAT I WOULD LIKE YOU TO ASK YOU, TO LAY SOME OF YOUR

13:22:21   8   BACKGROUND, EDUCATION, AND PROFESSIONAL EXPERIENCE.

13:22:25   9           I UNDERSTAND THAT PRESENTLY YOU'RE EMPLOYED A

13:22:27  10   PRINCIPAL AND CHAIRMAN EMERITUS FOR GEOSYNTEC CONSULTANTS.  IS

13:22:33  11   THAT CORRECT?

13:22:34  12   **A.**   YES, THAT'S CORRECT.

13:22:35  13   **Q.**   YOU'VE BEEN EMPLOYED BY GEOSYNTEC SINCE 1993?

13:22:38  14   **A.**   CORRECT.

13:22:39  15   **Q.**   PLEASE TELL THE COURT A LITTLE BIT ABOUT GEOSYNTEC

13:22:42  16   CONSULTANTS AND WHAT YOU DO FOR GEOSYNTEC.

13:22:45  17   **A.**   GEOSYNTEC CONSULTANTS IS AN ENVIRONMENTAL AND GEOTECHNICAL

13:22:51  18   CONSULTING FIRM.  IT WAS ACTUALLY STARTED BY A NUMBER OF MY

13:22:54  19   CLASSMATES.  IT'S ABOUT A THOUSAND PEOPLE IN FIVE DIFFERENT

13:22:58  20   COUNTRIES, DOES WORK ALL OVER THE UNITED STATES.  IT HAS

13:23:02  21   OFFICES IN ALMOST EVERY STATE, INCLUDING LOUISIANA.

13:23:05  22           I WAS CHAIRMAN OF THE BOARD FOR MANY YEARS, AND A

13:23:08  23   COUPLE OF YEARS AGO I STEPPED DOWN TO JUST FOCUS ON DOING

13:23:12  24   TECHNICAL WORK.

13:23:13  25   **Q.**   NOW, DR. LUCIA, I UNDERSTAND YOU HAVE A BACHELOR OF

| | | |
|---|---|---|
| 13:23:15 | 1 | SCIENCE IN CIVIL ENGINEERING FROM THE UNIVERSITY OF CALIFORNIA |
| 13:23:18 | 2 | AT BERKELEY? |
| 13:23:19 | 3 | **A.**   THAT'S CORRECT. |
| 13:23:21 | 4 | **Q.**   AND YOU ALSO RECEIVED A MASTER'S DEGREE FROM BERKELEY IN |
| 13:23:26 | 5 | GEOTECHNICAL ENGINEERING? |
| 13:23:26 | 6 | **A.**   THAT'S CORRECT. |
| 13:23:27 | 7 | **Q.**   AND AS WELL, YOU HAVE A PH.D. IN GEOTECHNICAL ENGINEERING |
| 13:23:30 | 8 | FROM THE UNIVERSITY OF CALIFORNIA AT BERKELEY WITH MINORS IN |
| 13:23:35 | 9 | GEOLOGY AND ENGINEERING GEOLOGY? |
| 13:23:37 | 10 | **A.**   THAT'S CORRECT. |
| 13:23:39 | 11 | **Q.**   DR. LUCIA, ARE YOU A LICENSED CIVIL ENGINEER IN THE STATE |
| 13:23:42 | 12 | OF CALIFORNIA? |
| 13:23:43 | 13 | **A.**   I AM. |
| 13:23:44 | 14 | **Q.**   ARE YOU REGISTERED AS A GEOTECHNICAL ENGINEER IN THE STATE |
| 13:23:45 | 15 | OF CALIFORNIA? |
| 13:23:47 | 16 | **A.**   I AM. |
| 13:23:47 | 17 | **Q.**   ARE THOSE LICENSES UP TO DATE AND ACTIVE? |
| 13:23:50 | 18 | **A.**   THEY ARE. |
| 13:23:50 | 19 | **Q.**   I UNDERSTAND YOU'VE ALSO TAUGHT SOME ENGINEERING COURSES |
| 13:23:53 | 20 | AT THE UNIVERSITY OF CALIFORNIA AT BERKELEY.  THOSE COURSES |
| 13:23:59 | 21 | INCLUDED GEOTECHNICAL ENGINEERING? |
| 13:24:01 | 22 | **A.**   BOTH UNDERGRADUATE AND GRADUATE COURSES IN GEOTECHNICAL |
| 13:24:05 | 23 | ENGINEERING. |
| 13:24:05 | 24 | **Q.**   ARE YOU STILL INVOLVED WITH THE GEOTECHNICAL ENGINEERING |
| 13:24:08 | 25 | PROGRAM AT BERKELEY? |

| | | |
|---|---|---|
| 13:24:09 | 1 | **A.**   I'VE BEEN INVOLVED ONE WAY OR ANOTHER ALMOST CONTINUOUSLY |
| 13:24:12 | 2 | FOR 35 YEARS.  I WAS A MEMBER OF THE FACULTY FOR A NUMBER OF |
| 13:24:18 | 3 | YEARS, AND LECTURING ONE OR TWO TIMES A YEAR ALMOST EVERY YEAR |
| 13:24:23 | 4 | AND SUPPORTING THEIR PROGRAMS AND PARTICIPATING IN MEETINGS |
| 13:24:27 | 5 | EVERY YEAR WITH FACULTY AND OTHER ENGINEERS. |
| 13:24:31 | 6 | **Q.**   PROFESSOR BEA, ONE OF THE PLAINTIFFS' EXPERTS IN THIS |
| 13:24:33 | 7 | CASE, IS ALSO ACTIVE AT BERKELEY, FROM MY UNDERSTANDING. |
| 13:24:36 | 8 | HAVE YOU EVER MET DR. BEA? |
| 13:24:41 | 9 | **A.**   NO, I'VE NEVER MET HIM. |
| 13:24:42 | 10 | **Q.**   I ALSO UNDERSTAND THAT YOU HAVE BEEN INVITED TO LECTURE ON |
| 13:24:46 | 11 | GEOTECHNICAL ENGINEERING AT SEVERAL OTHER UNIVERSITIES, |
| 13:24:47 | 12 | INCLUDING VIRGINIA TECH, GEORGIA TECH, UNIVERSITY OF WISCONSIN, |
| 13:24:50 | 13 | AND STANFORD.  IS THAT CORRECT? |
| 13:24:53 | 14 | **A.**   THAT'S CORRECT. |
| 13:24:55 | 15 | **Q.**   AND LEST I FORGET ONE, I BELIEVE YOU'RE ALSO AN ADJUNCT AT |
| 13:25:01 | 16 | THE UNIVERSITY OF CALIFORNIA DAVIS? |
| 13:25:03 | 17 | **A.**   BEGINNING IN JANUARY, I'VE ACCEPTED A POSITION ON THE |
| 13:25:06 | 18 | FACULTY -- GEOTECHNICAL FACULTY AT THE UNIVERSITY OF CALIFORNIA |
| 13:25:09 | 19 | DAVIS, WHERE I'LL BE AN ADJUNCT PROFESSOR. |
| 13:25:12 | 20 | **Q.**   I ALSO UNDERSTAND THAT EARLIER THIS YEAR YOU WERE THE |
| 13:25:15 | 21 | AMERICAN SOCIETY OF CIVIL ENGINEERS' INVITED LECTURER ON THE |
| 13:25:19 | 22 | STATE OF THE PRACTICE FORENSIC ENGINEERING AT THE GEO-CONGRESS. |
| 13:25:25 | 23 | IS THAT CORRECT? |
| 13:25:25 | 24 | **A.**   THAT'S CORRECT. |
| 13:25:26 | 25 | **Q.**   JUST BRIEFLY FOR THE COURT, WHAT IS THE GEO-CONGRESS? |

13:25:29  1  **A.**   THE GEO-CONGRESS IS THE LARGEST MEETING OF GEOTECHNICAL

13:25:32  2  ENGINEERS IN THE COUNTRY.  SOMETHING BETWEEN, SAY, 1200 AND

13:25:36  3  1500 GEOTECHNICAL ENGINEERS MEET FOR ABOUT FOUR DAYS.

13:25:41  4  **Q.**   I ALSO UNDERSTAND THAT YOU HAVE MORE THAN 35 YEARS OF

13:25:45  5  PROFESSIONAL EXPERIENCE IN THE FIELD DOING GEOTECHNICAL

13:25:47  6  ENGINEERING WORK.  IS THAT CORRECT?

13:25:48  7  **A.**   THAT'S CORRECT.

13:25:51  8  **Q.**   HAVE YOU DONE WORK IN SEVERAL PARTS OF THE UNITED STATES?

13:25:56  9  **A.**   I'VE WORKED ALL OVER THE UNITED STATES.

13:25:58  10  **Q.**   YOU'VE WORKED IN SOME OTHER COUNTRIES AS WELL?

13:26:01  11  **A.**   I'VE WORKED IN PORTUGAL, PANAMA, MALAYSIA.

13:26:08  12  **Q.**   I ALSO UNDERSTAND THAT YOU WERE ON THE ENGINEERING

13:26:10  13  CRITERIA REVIEW BOARD FOR THE SAN FRANCISCO BAY CONSERVATION

13:26:15  14  AND DEVELOPMENT COMMISSION.  TELL US JUST A LITTLE BIT ABOUT

13:26:18  15  THAT.

13:26:19  16  **A.**   THE SAN FRANCISCO BAY HAS A COMMISSION THAT REVIEWS ALL

13:26:24  17  PROJECTS THAT MIGHT IMPACT THE BAY.  THEY HAVE A 12 -- EXCUSE

13:26:27  18  ME -- 11-MEMBER BOARD OF ENGINEERS WHOSE RESPONSIBILITY IS TO

13:26:31  19  REVIEW EVERY PROJECT WITHIN 100 FEET OF THE SHORELINE OF THE

13:26:36  20  ENTIRE BAY, AND -- FOR GEOTECHNICAL, SEISMIC, AND SAFETY

13:26:42  21  FEATURES.  IT'S A POSITION APPOINTED BY THE GOVERNOR OF THE

13:26:47  22  STATE.

13:26:47  23  **Q.**   AND YOU ALSO PROVIDED SOME GEOTECHNICAL ANALYSIS AND

13:26:50  24  SUPPORT TO THE PANAMA CANAL COMMISSION; IS THAT CORRECT?

13:26:56  25  **A.**   THAT'S CORRECT.  THE PANAMA CANAL HAS BEEN UNDERGOING A

13:26:59    1    MULTI-BILLION-DOLLAR WIDENING PROJECT.

13:27:02    2              EARLY IN THAT PROJECT THEY HAD SOME STABILITY ISSUES

13:27:04    3    ASSOCIATED WITH WIDENING OF THE GAILLARD CUT PORTION OF THE

13:27:07    4    CANAL.  I WAS ASKED TO REVIEW THOSE FAILURES AND DETERMINE

13:27:11    5    WHETHER THEY WERE CONSTRUCTION DEFECTS OR DESIGN PROBLEMS AND

13:27:17    6    GIVE THEM SOME GUIDANCE ON -- GOING FORWARD WITH THOSE -- THOSE

13:27:21    7    EXCAVATIONS.

13:27:22    8    **Q.**  I SEE WE HAVE A SLIDE UP ALREADY.  BUT I UNDERSTAND THAT

13:27:26    9    YOU HAVE SOME EXPERIENCE WITH LARGE INFRASTRUCTURE PROJECTS

13:27:32   10    INVOLVING THE EAST BAY AREA IN CALIFORNIA.

13:27:35   11              ONE OF THOSE PROJECTS INVOLVED A PG&E GAS LINE.

13:27:40   12    COULD YOU JUST TELL THE COURT A LITTLE BIT ABOUT THAT PROJECT?

13:27:44   13    **A.**  YES.  MOST OF THE NATURAL GAS THAT COMES INTO THE

13:27:46   14    SAN FRANCISCO BAY AREA COMES THROUGH THE DELTA IN PIPELINES.

13:27:51   15    PREVIOUSLY, THOSE PIPELINES HAVE BEEN BUILT THROUGH LEVEES AND

13:27:54   16    VERY CLOSE TO THE SURFACE.

13:27:58   17              I WAS A PEER REVIEWER FOR PG&E IN RELOCATING THOSE

13:28:06   18    PIPELINES TO DEPTHS AND LOCATIONS THAT WOULD HAVE NO IMPACT ON

13:28:11   19    THE LEVEES AND INCREASE THE SAFETY AND SECURITY OF THAT

13:28:13   20    PIPELINE.

13:28:14   21    **Q.**  I ALSO UNDERSTAND YOU WERE A PROJECT MANAGER EVALUATING

13:28:16   22    THE CONSEQUENCES OR POTENTIAL CONSEQUENCES OF THE LEVEE FAILURE

13:28:20   23    ON THE MOKELUMNE AQUEDUCT IN THE SAN JOAQUIN DELTA REGION IN

13:28:30   24    CALIFORNIA.

13:28:31   25              TELL THE COURT A LITTLE BIT THAT PROJECT, IF YOU

13:28:33  1  WOULD.

13:28:34  2  **A.**   90 PERCENT OF THE WATER SUPPLY FOR THE EAST BAY OF THE

13:28:38  3  SAN FRANCISCO BAY AREA, REPRESENTING PROBABLY 3 TO 4 MILLION

13:28:43  4  PEOPLE, COMES THROUGH THREE PIPELINES THROUGH THE SAN JOAQUIN

13:28:48  5  DELTA REGION.  THOSE PIPELINES GO THROUGH THE LEVEES AND UNDER

13:28:51  6  THE SLOUGHS AND THEN COME BACK UP ABOVE GROUND ON THE OTHER

13:28:55  7  SIDE.

13:28:56  8          WE WERE EVALUATING THE STABILITY OF THOSE LEVEES IN

13:28:59  9  THE EVENT OF A POTENTIAL FAILURE AND POTENTIAL IMPACTS ON THE

13:29:02  10 SUPPLY SYSTEM AND ALSO FOR EARTHQUAKE EFFECTS.

13:29:11  11 **Q.**   VERY GOOD.

13:29:11  12         APPROXIMATELY HOW MANY EVALUATIONS OF STANDARD OF

13:29:14  13 CARE HAVE YOU PERFORMED IN YOUR CAREER?

13:29:20  14 **A.**   PROBABLY, OVER THE LAST 25 YEARS, I HAVE REPRESENTED

13:29:27  15 GEOTECHNICAL ENGINEERS IN STANDARD OF CARE ISSUES ABOUT

13:29:31  16 50 TIMES.

13:29:34  17 **Q.**   DO YOU HAVE A GENERAL METHODOLOGY THAT YOU USE FOR

13:29:36  18 EVALUATING THE STANDARD OF CARE?

13:29:44  19 **A.**   YES, I DO.  IT INVOLVES LOOKING AT LOCAL PRACTICE, LOOKING

13:29:50  20 AT THE TIME AT WHICH THE WORK WAS DONE, LOOKING AT BASIC

13:29:53  21 ENGINEERING PRINCIPLES AND EVALUATING THOSE AGAINST ANY KINDS

13:29:59  22 OF GUIDANCE OR REGULATIONS THAT MIGHT EXIST RELATIVE TO THE

13:30:03  23 WORK BEING DONE.

13:30:05  24 **Q.**   HAVE YOU BEEN ACCEPTED AS AN EXPERT ON GEOTECHNICAL

13:30:09  25 ENGINEERING IN OTHER COURTS IN THIS COUNTRY?

13:30:11   1   **A.**   I HAVE.

13:30:13   2            **MR. KELLS:**  YOUR HONOR, AT THIS TIME, THE

13:30:15   3   UNITED STATES WOULD TENDER DR. LUCIA AS AN EXPERT IN

13:30:20   4   GEOTECHNICAL ENGINEERING AND TO ASSIST THE COURT IN EVALUATING

13:30:23   5   THE STANDARD OF CARE ISSUES, SUBJECT TO MR. GREGORY'S BRIEF

13:30:27   6   QUESTIONING.

13:30:28   7            AND AFTER HE'S DONE, I WILL STAND UP AND PRESENT

13:30:31   8   DR. LUCIA'S PRESENTATION FOR THE COURT.

13:30:33   9            **THE COURT:**  THANK YOU, SIR.

13:30:41  10            **MR. BRUNO:**  I JUST WANTED TO INTRODUCE MR. GREGORY TO

13:30:42  11   THE COURT.  HE'S NOT BEEN INTRODUCED FORMALLY BEFORE.

13:30:45  12            THIS IS MR. PHIL GREGORY.  HE'S A MEMBER OF OUR

13:30:48  13   TEAM, A MEMBER OF COCHETT FIRM FROM CALIFORNIA.

13:30:54  14            **MR. GREGORY:**  GOOD AFTERNOON, YOUR HONOR.

13:30:56  15            **THE COURT:**  GOOD AFTERNOON.

13:30:56  16                          **VOIR DIRE**

13:30:59  17   BY MR. GREGORY:

13:31:00  18   **Q.**   GOOD AFTERNOON, DR. LUCIA.

13:31:02  19            HAVE YOU EVER -- I'M GOING TO CALL IT BEEN ON THE

13:31:05  20   GROUND WITH BOOTS ON DOING DEMOLITION WORK AROUND A LEVEE

13:31:11  21   PROTECTION STRUCTURE?

13:31:14  22   **A.**   NOT PHYSICALLY.  I MEAN, MY WORK FOR PG&E IN THE DELTA WAS

13:31:19  23   TO REPLACE AN EXISTING PIPELINE GOING THROUGH LEVEES AND LOOK

13:31:23  24   AT THE DESIGN OF A NEW PIPELINE.

13:31:27  25            DURING THE MOKELUMNE AQUEDUCT WORK, I WAS PHYSICALLY

| | | |
|---|---|---|
| 13:31:36 | 1 | INVOLVED IN DOING ALL THE INVESTIGATIONS IN THE LEVEES AND IN |
| 13:31:38 | 2 | THE ISLANDS IN THE DELTA REGION. |
| 13:31:41 | 3 | **Q.** AND, SIR, HAVE YOU EVER DONE ON-THE-GROUND WORK FOR A |
| 13:31:44 | 4 | REMEDIATION PROJECT WHERE FLOODWALLS SERVED AS ONE OF THE |
| 13:31:50 | 5 | BOUNDARIES? |
| 13:32:02 | 6 | **A.** I CAN'T RECALL THAT EXACT SITUATION, NO. |
| 13:32:04 | 7 | **Q.** AND, SIR, AS I UNDERSTAND IT, YOU DON'T BELIEVE YOU HAVE |
| 13:32:07 | 8 | THE EXPERTISE TO OFFER AN OPINION ABOUT WHETHER OR NOT ONE OF |
| 13:32:12 | 9 | THE PARTIES TO THIS LITIGATION COMPLIED IN ANY RESPECT WITH A |
| 13:32:17 | 10 | CONTRACT. CORRECT? |
| 13:32:23 | 11 | **A.** I WAS NOT ASKED DO THAT, AND I AM NOT A CONTRACT |
| 13:32:27 | 12 | SPECIALIST, SO I WOULDN'T OFFER AN OPINION ON A CONTRACT AS A |
| 13:32:32 | 13 | LEGAL DOCUMENT BETWEEN TWO PARTIES. |
| 13:32:35 | 14 | **Q.** AND, SIR, YOU DON'T VIEW YOURSELF AS OFFERING EXPERT |
| 13:32:40 | 15 | TESTIMONY TODAY ON ADMINISTERING A CONTRACT; IS THAT CORRECT? |
| 13:32:49 | 16 | **A.** AGAIN, AS -- IN REGARDS TO THESE SORT OF LEGAL |
| 13:32:53 | 17 | REQUIREMENTS OF ADMINISTERING A CONTRACT, I -- I DON'T OFFER AN |
| 13:32:59 | 18 | OPINION ON THAT. |
| 13:33:00 | 19 | AS IT REGARDS THE GEOTECHNICAL AND ENGINEERING WORK |
| 13:33:04 | 20 | DONE IN THE FIELD, I CAN OFFER AN OPINION ON THAT. |
| 13:33:09 | 21 | **Q.** AND, SIR, PRIOR TO YOU -- YOU WERE FIRST RETAINED TO DO |
| 13:33:16 | 22 | WORK IN THIS CASE ABOUT A YEAR AGO; CORRECT? |
| 13:33:19 | 23 | **A.** I WOULD SAY APPROXIMATELY LAST SEPTEMBER, YES. |
| 13:33:22 | 24 | **Q.** AND PRIOR TO THAT TIME, YOU HADN'T VISITED THE PROJECT |
| 13:33:29 | 25 | SITE IN ANY RESPECT, HAD YOU? |

| | | |
|---|---|---|
| 13:33:31 | 1 | **A.**   PRIOR TO THAT, NO, I HAD NOT VISITED THE PROJECT SITE. |
| 13:33:34 | 2 | **Q.**   AND YOU, PRIOR TO YOUR DEPOSITION IN THIS CASE, HADN'T |
| 13:33:36 | 3 | READ THE IPET REPORT, FOR EXAMPLE, HAD YOU? |
| 13:33:39 | 4 | **A.**   I HAD LOOKED AT IT.  I HAD NOT READ IT IN DETAIL, NO. |
| 13:33:46 | 5 | **Q.**   AND, SIR, YOU'RE NOT OFFERING ANY OPINION AS TO WHY THE |
| 13:33:50 | 6 | FLOODWALL AT THE NORTH BREACH FAILED; CORRECT? |
| 13:33:54 | 7 | **A.**   NO.  MY OPINIONS RELATE TO THE WORK DONE BY THE CORPS |
| 13:33:59 | 8 | PRIOR TO THE FAILURES. |
| 13:34:00 | 9 | **Q.**   AND YOU'RE NOT OFFERING ANY OPINION AS TO WHY THE |
| 13:34:04 | 10 | FLOODWALL AT THE SOUTH BREACH FAILED; CORRECT? |
| 13:34:08 | 11 | **A.**   I'D GIVE YOU THE SAME ANSWER. |
| 13:34:09 | 12 | **Q.**   SIR, HAVE YOU EVER -- DO YOU VIEW YOURSELF AS QUALIFIED IN |
| 13:34:15 | 13 | DOING WHAT I'M GOING TO CALL A TRANSIENT SEEPAGE ANALYSIS? |
| 13:34:22 | 14 | **A.**   I BELIEVE I'M QUALIFIED TO DO ALL TYPES OF ANALY- -- |
| 13:34:25 | 15 | SEEPAGE ANALYSIS, TRANSIENT OR STEADY STATE, IN TERMS OF |
| 13:34:38 | 16 | APPLICA- -- HOW YOU WOULD GO ABOUT DOING IT.  IT'S JUST THAT I |
| 13:34:42 | 17 | DON'T BELIEVE TRANSIENT SEEPAGE ANALYSIS ARE -- ARE |
| 13:34:45 | 18 | PARTICULARLY USEFUL OR APPROPRIATE. |
| 13:34:47 | 19 | **Q.**   WELL, YOU'VE NEVER DONE ONE IN PRACTICE, HAVE YOU? |
| 13:34:52 | 20 | **A.**   NO.  NO, I'VE NEVER DONE ONE IN PRACTICE. |
| 13:34:56 | 21 | **Q.**   AND YOUR EXPERT REPORT CONTAINS NO REFERENCE TO WHAT WAS |
| 13:35:02 | 22 | DONE OR NOT DONE IN CALIFORNIA AT A PLACE CALLED SHERMAN |
| 13:35:05 | 23 | ISLAND; CORRECT? |
| 13:35:08 | 24 | **A.**   MY REPORT DOES NOT DISCUSS SHERMAN ISLAND. |
| 13:35:11 | 25 | **Q.**   AND THAT SUBJECT WASN'T DISCUSSED AT YOUR DEPOSITION; |

```
13:35:14    1  CORRECT?

13:35:17    2  A.   MY -- OTHER ISLANDS WERE DISCUSSED, BUT SHERMAN ISLAND

13:35:22    3  WASN'T DISCUSSED.

13:35:23    4  Q.   AND YOU DID NO SUPPLEMENTAL EXPERT REPORT; CORRECT?

13:35:27    5  A.   THERE'S NO SUPPLEMENTAL EXPERT REPORT.

13:35:32    6        MR. GREGORY:  THE PLAINTIFFS HAVE NO OBJECTION TO

13:35:34    7  DR. LUCIA.

13:35:35    8        THE COURT:  AND YOU WANT TO GIVE ME THE EXACT TENDER,

13:35:37    9  SIR, SO I CAN . . .

13:35:39   10        MR. KELLS:  INDEED, I WILL.  THANK YOU, YOUR HONOR.

13:35:42   11            AND TO MAYBE CLEAR UP CONFUSION, I KNOW THAT WE

13:35:46   12  PROVIDED THE COURT A DEMONSTRATIVE SET OF SLIDES --

13:35:53   13        THE COURT:  YES, SIR.

13:35:53   14        MR. KELLS:  -- THAT WOULD, IN FACT, GO OUTSIDE THE

13:35:55   15  SCOPE OF DR. LUCIA'S REPORT.  AND WE DID NOT INTEND ON USING

13:35:59   16  THEM UNLESS THE PLAINTIFFS CROSS-EXAMINE DR. LUCIA IN SOME WAY

13:36:03   17  ON THOSE TOPICS.  WE DON'T INTEND ON GETTING INTO THAT --

13:36:05   18        THE COURT:  IF THEY OPEN THE DOOR, YOU'RE READY.

13:36:07   19        MR. KELLS:  INDEED.  THAT'S THE ENTIRE POINT OF IT.

13:36:11   20        THE COURT:  I UNDERSTAND.

13:36:12   21        MR. KELLS:  DR. LUCIA'S REPORT WAS, IN FACT, LIMITED

13:36:15   22  TO THE GEOTECHNICAL ENGINEERING THAT TOOK PLACE ON THE TASK

13:36:21   23  ORDER 26 PROJECT.  SO AT THIS TIME WE WOULD PROFFER HIM AS A

13:36:26   24  GEOTECHNICAL ENGINEER, AND DR. LUCIA --

13:36:27   25        THE COURT:  AND I WILL ACCEPT HIM AS SUCH.
```

| | | |
|---|---|---|
| 13:36:29 | 1 | **DIRECT EXAMINATION** |
| 13:36:32 | 2 | BY MR. KELLS: |
| 13:36:32 | 3 | **Q.**   DR. LUCIA, I UNDERSTAND THAT IN PREPARATION TO TESTIFY AS |
| 13:36:34 | 4 | TO THE OPINIONS AND CONCLUSIONS THAT YOU'VE REACHED IN THIS |
| 13:36:36 | 5 | CASE, YOU PREPARED A PRESENTATION TO ASSIST THE COURT IN |
| 13:36:42 | 6 | SUMMARIZING THOSE OPINIONS, CONCLUSIONS, AND THE REASONS |
| 13:36:45 | 7 | THEREFOR.  IS THAT CORRECT? |
| 13:36:46 | 8 | **A.**   THAT'S CORRECT. |
| 13:36:48 | 9 | **MR. KELLS:**  AND, DON, I BELIEVE WE CAN BRING THAT |
| 13:36:51 | 10 | PRESENTATION THAT WAS SEMI-STARTED.  IT'S DX-DM-1005. |
| 13:37:01 | 11 | WITH YOUR PERMISSION, YOUR HONOR, I WOULD ASK |
| 13:37:04 | 12 | THAT DR. LUCIA BE PERMITTED TO PROVIDE HIS SUMMARY TESTIMONY TO |
| 13:37:06 | 13 | THE COURT. |
| 13:37:09 | 14 | WITH YOUR PERMISSION, I'LL SIT DOWN WHILE HE |
| 13:37:11 | 15 | DOES THAT.  BUT PLEASE FEEL FREE TO ASK ANY QUESTIONS OF HIM |
| 13:37:16 | 16 | DURING HIS PRESENTATION. |
| 13:37:18 | 17 | **THE COURT:**  THANK YOU, SIR. |
| 13:37:19 | 18 | FRANKLY, I FOUND THIS EFFECTIVE IN MY BASIC |
| 13:37:23 | 19 | UNDERSTANDING OF THE EXPERT'S OPINION AS SUMMARIZED.  IT HAS |
| 13:37:26 | 20 | BEEN HELPFUL TO ME.  SO THANK YOU. |
| 13:37:30 | 21 | **THE WITNESS:**  THANK YOU, YOUR HONOR.  I'LL PROCEED. |
| 13:37:33 | 22 | THERE'S ABOUT 45 SLIDES HERE.  I SUSPECT IT WILL |
| 13:37:36 | 23 | TAKE ME ABOUT AN HOUR TO GO THROUGH THEM, NOT COUNTING |
| 13:37:42 | 24 | POTENTIAL QUESTIONS AND -- THAT MAY COME UP DURING THE COURSE |
| 13:37:46 | 25 | OF THAT. |

13:37:47    1            **THE COURT:**  WELL, THANK YOU FOR THAT HEADS-UP, SIR.

13:37:50    2    THANK YOU.

13:37:51    3            **THE WITNESS:**  WHEN INITIALLY ENGAGED IN THIS -- IN

13:37:54    4    THIS LITIGATION CASE ABOUT A YEAR AGO, I WAS ASKED TO LOOK AT

13:38:01    5    THE STANDARD OF CARE AS IT REALLY RELATED TO GEOTECHNICAL

13:38:08    6    ISSUES AT THE SITE AND THE IMPACTS OF THAT, THAT WERE ON THE

13:38:12    7    ULTIMATE FAILURE OF THE LEVEES -- NOT ON THE ULTIMATE FAILURE

13:38:18    8    BUT, YOU KNOW, WHETHER THOSE PRACTICES WERE WITHIN THE STANDARD

13:38:21    9    OF CARE.

13:38:22   10            THE FIRST THING I DID WAS I HAD MEETINGS WITH

13:38:27   11    SEVERAL CORPS FOLKS.  I MET WITH MR. GUILLORY HERE IN

13:38:37   12    NEW ORLEANS TO DISCUSS WITH HIM THE FACT -- THE THINGS THAT

13:38:38   13    HAPPENED OUT THERE ON THE PROJECT.  I ALSO TALKED TO

13:38:43   14    MR. GUILLORY ON THE PHONE ONE OR MORE TIMES AFTER THAT.

13:38:46   15            I MET WITH DR. JOHN GRIESHABER, WHO WAS A SENIOR

13:38:53   16    GEOTECHNICAL ENGINEER WITHIN THE CORPS DISTRICT AND IS NOW

13:38:57   17    RETIRED, AND WAS RETIRED AT THE TIME I DISCUSSED THE PROJECT

13:39:06   18    WITH HIM.

13:39:07   19            I ALSO MET WITH -- EXCUSE ME.  I DIDN'T MEET

13:39:09   20    WITH -- I TALKED TO MR. RICHARD PINNER SEVERAL TIMES OVER THE

13:39:14   21    PHONE.  MR. PINNER IS ALSO ANOTHER SENIOR GEOTECHNICAL ENGINEER

13:39:16   22    WITHIN THE CORPS DISTRICT HERE AND IS STILL WORKING, IS NOT

13:39:21   23    RETIRED.  SO I HAD SEVERAL CONVERSATIONS WITH HIM TO TRY AND

13:39:26   24    UNDERSTAND THE LOCAL ENGINEERING PRACTICES AND PROCEDURES THAT

13:39:30   25    WERE USED IN THE ANALYSIS.

13:39:33   1                    I ALSO HAD SEVERAL MEETINGS WITH MR --

13:39:39   2    DR. DUNBAR, UNDERSTANDING THE GEOLOGY -- THE CORPS'

13:39:42   3    INTERPRETATION OF THE GEOLOGY AT THE SITE.

13:39:45   4                    ONE THING I'LL SAY ABOUT GEOTECHNICAL

13:39:47   5    ENGINEERING, IT'S REALLY AN EMPIRICAL SCIENCE.  IT'S BASED

13:39:51   6    GREATLY ON YOUR KNOWLEDGE OF THE GEOLOGY AND THE CONDITIONS

13:39:53   7    THAT YOU ARE LIKELY TO EXPECT WHEN YOU GO ON TO A PARTICULAR

13:39:57   8    SITE.

13:40:01   9                    BORINGS THAT ARE DONE AT THE SITE IN PREPARATION

13:40:03  10    FOR ACTUAL ENGINEERING CONSTRUCTION OFTENTIMES ARE JUST A

13:40:06  11    CONFIRMATION OF THE KNOWLEDGE THAT YOU WOULD GAIN BY

13:40:10  12    UNDERSTANDING THE GEOLOGY.

13:40:14  13                    SO IF THOSE BORINGS SHOWED SOMETHING DIFFERENT

13:40:16  14    THAN YOU ANTICIPATED, YOU MIGHT THINK YOU NEEDED MORE BORINGS

13:40:20  15    OR SOMETHING MORE TO FIGURE OUT THE DIFFERENCES.  BUT IF THEY

13:40:23  16    CONFIRMED WHAT YOU BELIEVED THAT YOU WERE GETTING AND WHAT THE

13:40:27  17    GEOLOGY TOLD YOU, THEN YOU MIGHT DECIDE THAT YOU HAD SUFFICIENT

13:40:30  18    INFORMATION TO MOVE FORWARD WITH THE WORK.

13:40:32  19                    BEYOND JUST THE LOCAL PRACTICES, IN MY PRACTICE,

13:40:35  20    I FIND THAT I NEED TO COMPARE THE WORK THAT'S DONE TO WHAT I

13:40:39  21    CONSIDER WIDELY ACCEPTED STANDARDS OF GOOD ENGINEERING AND

13:40:42  22    ENGINEERING JUDGMENT.

13:40:43  23                 IN THIS PARTICULAR CASE, THERE'S TWO ENGINEERING

13:40:49  24    METHODOLOGIES THAT ARE -- THAT I THINK IMPACT MY OPINION ON

13:40:53  25    THIS CASE:  THE METHODS BY WHICH THE CORPS USES TO DO SEEPAGE

13:41:00   1   ANALYSIS AND THE METHODS BY WHICH THE CORPS DOES SOIL STABILITY

13:41:05   2   ANALYSIS, AND I FIND BOTH OF THOSE METHODS ARE CONSISTENT WITH

13:41:09   3   GOOD ENGINEERING PRACTICE.

13:41:11   4            AS IT'S OFTEN SAID, YOU KNOW, GRAVITY AND THE

13:41:14   5   PRINCIPLES OF PHYSICS, PRINCIPLES OF FLOW THROUGH COARSE MEDIA

13:41:21   6   APPLY REGARDLESS OF WHERE YOU ARE IN THE WORLD.

13:41:25   7            I ALSO LOOKED AT THE GUIDANCE DOCUMENTS.  AND ONE

13:41:29   8   THING THAT'S KEY TO ME, AND I THINK WILL BE KEY TO MY TESTIMONY

13:41:34   9   THROUGHOUT THIS, IS THE APPLICATION OF ENGINEERING JUDGMENT.

13:41:38  10   IT'S CLEAR THE GUIDANCE DOCUMENTS THAT ARE IN MY REPORT ALL

13:41:42  11   REFER TO THE USE OF ENGINEERING JUDGMENT AND THE APPLICATION OF

13:41:48  12   DOING ANALYSIS FOR A PARTICULAR PROJECT.

13:41:52  13            THAT USE OF JUDGMENT IS IMPORTANT BECAUSE, YOU KNOW,

13:41:54  14   AS I SAID EARLIER, THE GEOLOGY AND THE INTERPRETATION OF THE

13:42:00  15   SUBSURFACE CONDITION COMES FROM BROAD KNOWLEDGE OF THE GEOLOGY

13:42:03  16   AND LOCALIZED PIECES OF INFORMATION FROM BORINGS, THEN

13:42:09  17   APPLICATION OF YOUR EXPERIENCE IN WORKING IN THAT ENVIRONMENT

13:42:12  18   OVER MANY DECADES.  WHETHER IT'S INSTITUTIONAL OR INDIVIDUAL, A

13:42:20  19   GEOTECHNICAL ENGINEER HAS TO APPLY ALL OF THESE THINGS:  GOOD

13:42:21  20   SCIENCE PLUS AN EMPIRICAL KNOWLEDGE OF THE SAME.

13:42:25  21            NEXT SLIDE.

13:42:26  22            THESE ARE A NUMBER OF THE DOCUMENTS THAT I REFERRED

13:42:30  23   TO IN MY REPORT.

13:42:33  24            AND THE NEXT SLIDE.

13:42:35  25            ONE OF THE THINGS THAT'S COMMON IS THAT YOU'LL FIND

13:42:38  1   IN THESE DOCUMENTS THAT THEY PROVIDE POLICY GUIDANCE TO USE

13:42:44  2   WITH PROFESSIONAL ENGINEERING JUDGMENT.

13:42:45  3           THE NEXT SLIDE.

13:42:47  4           THIS ONE IN PARTICULAR STATES THAT THE OBJECTIVE OF

13:42:51  5   THIS MANUAL IS TO DEVELOP A GUIDE FOR DESIGN AND CONSTRUCTION

13:42:54  6   OF LEVEES.  THE MANUAL IS GENERAL IN NATURE AND NOT INTENDED TO

13:42:58  7   SUPPLANT THE JUDGMENT OF THE DESIGN ENGINEER ON A PARTICULAR

13:43:01  8   PROJECT.

13:43:02  9           AND, AGAIN, THIS COMES FROM THE FACT THAT THE

13:43:06  10  GEOTECHNICAL ENGINEER, UNLIKE A STRUCTURAL ENGINEER OR SOME

13:43:08  11  OTHER KIND OF ENGINEER, SEES ONLY A SMALL PERCENTAGE OF THE

13:43:12  12  SOILS ON WHICH HE'S REQUIRED TO BUILD UPON.

13:43:15  13          AND IF YOU LOOKED AT BORINGS, SOMETIMES IT'S LESS

13:43:19  14  THAN 1 PERCENT OF THE MATERIAL THAT IS AVAILABLE TO HIM.  AND

13:43:23  15  SO HE HAS TO EXTRAPOLATE THAT INFORMATION IN CONJUNCTION WITH

13:43:31  16  HIS KNOWLEDGE OF THE GEOLOGY AND HIS KNOWLEDGE OF THE STRUCTURE

13:43:35  17  AND THE REQUIREMENTS OF THE DESIGN TO DEVELOP WHAT WILL BE A

13:43:36  18  SUITABLE PROJECT BASED ON HIS EXPERIENCE.

13:43:45  19          NEXT SLIDE.

13:43:46  20          AS I SAID, THE TWO MAIN ISSUES THAT I HAVE FOCUSED ON

13:43:50  21  IS THE APPLICATION OF THE SEEPAGE ANALYSIS AND STABILITY

13:43:56  22  ANALYSIS.  I KNOW THE ISSUE, AT LEAST AS I UNDERSTAND IT, IS

13:44:03  23  THAT THERE WERE MANY, MANY EXCAVATIONS DUG IN THE EBIA, AND

13:44:08  24  WHAT WAS THE EFFECT OF THOSE EXCAVATIONS ON THE SEEPAGE

13:44:14  25  CONDITIONS AND THE STABILITY AS THOUGHT OF AT THE TIME AND AS

13:44:18    1    KNOWN AT THE TIME THIS WAS DONE.

13:44:20    2              AND I WOULD SAY EARLY ON HERE THAT IN MY REVIEW I SAW

13:44:30    3    NO DOCUMENTATION THAT WAS CONTEMPORANEOUS WITH THE EXCAVATIONS

13:44:35    4    THAT SAID THAT EXCAVATION NUMBER 2 IN THE BOLAND MARINE AREA

13:44:40    5    WAS EVALUATED FOR SEEPAGE.

13:44:43    6              HOWEVER, HAVING SAID THAT, I WILL GO THROUGH THE --

13:44:48    7    MY PRESENTATION AND SHOW HOW THE APPLICATION OF SEEPAGE -- OR

13:44:55    8    THE EVALUATION OF SEEPAGE ISSUES IN THE 1966 REPORT DID

13:44:59    9    CONSIDER THIS PROBLEM, AND I WILL GO THROUGH AND LOOK AT THE

13:45:05   10    JUDGMENTS AND HOW THOSE JUDGMENTS WOULD HAVE BEEN MADE.  AND

13:45:10   11    WHY WOULD SOMEBODY DO THIS AND NOT WRITE IT DOWN, I THINK, IS

13:45:14   12    AN IMPORTANT QUESTION.

13:45:16   13              AND HOPEFULLY, AS I GO THROUGH EACH OF THESE

13:45:20   14    INDIVIDUAL METHODOLOGIES, WE'LL SEE HOW THE ENGINEERS MIGHT

13:45:23   15    HAVE THOUGHT ABOUT THIS AS THEY WENT THROUGH THIS PROJECT.

13:45:26   16              NEXT SLIDE.

13:45:30   17              THE ALLEGATIONS, AT LEAST AS I UNDERSTAND THEM, FALL

13:45:34   18    INTO THESE CATEGORIES, THE FIRST BEING THAT THE EXCAVATIONS IN

13:45:38   19    THE EBIA WERE IMPROPERLY BACKFILLED.

13:45:43   20              THE ORIGINAL SPECIFICATION FOR HOW THESE HOLES WERE

13:45:47   21    TO BE BACKFILLED IS WHAT WE WOULD CALL A METHOD SPECIFICATION,

13:45:51   22    IN THAT IT PRESCRIBED THAT SOIL WOULD BE PUT IN IN 2-FOOT LIFTS

13:45:58   23    AND COMPACTED; THAT THE INTENT WAS THAT THE SURFACE OF THESE

13:46:02   24    EXCAVATIONS WOULD -- AFTER BEING FILLED WOULD DRAIN FROM THE

13:46:06   25    FLOODWALL TO THE -- TO THE CANAL AT 1 TO 2 PERCENT SLOPES.

13:46:12   1          THERE WAS NOT SUPPOSED TO BE ANY SUBSIDENCE BECAUSE

13:46:15   2   THEY DIDN'T WANT PUDDLES OF WATER AND DIDN'T WANT TO MAKE IT

13:46:21   3   DIFFICULT TO GET AROUND THE SITE.

13:46:23   4          LATER ON, I KNOW THAT SOME MORE QUANTITATIVE

13:46:29   5   SPECIFICATIONS CAME INTO EFFECT.  BUT I THINK THE ORIGINAL

13:46:32   6   SPECIFICATIONS WERE PROPER AND CONSISTENT WITH THE INTENT OF

13:46:35   7   THE PROJECT IN THAT THIS WAS PREPARATORY TOWARDS A LARGE

13:46:40   8   EXCAVATION PROJECT TO BE DONE AT A LATER DATE.

13:46:44   9          **MR. GREGORY:**  EXCUSE ME, YOUR HONOR.  I DON'T MEAN TO

13:46:46   10  INTERRUPT THE WITNESS.  BUT IT WOULD HELP FOR FUTURE

13:46:49   11  CROSS-EXAMINATION IF THE WITNESS PLACED A TIME FRAME WHEN HE

13:46:52   12  SAYS, FOR EXAMPLE, "THE ORIGINAL SPECIFICATIONS," BECAUSE I

13:46:56   13  BELIEVE HE COULD BE TALKING FROM AS FAR BACK AS 1966 THROUGH

13:47:02   14  2005.

13:47:03   15         **THE COURT:**  OKAY.

13:47:05   16         **THE WITNESS:**  YES.  THIS PROJECT WAS NOT CONTEMPLATED

13:47:11   17  IN 1966, SO IT WOULD BE IN THE DOCUMENTS THAT WGI HAD, THE NINE

13:47:20   18  DOCUMENTS OR SO THAT WERE PART OF TASK ORDER 26.

13:47:26   19         **THE COURT:**  THANK YOU, SIR.  I THINK THAT BENCHMARKS

13:47:27   20  IT FINE.

13:47:28   21         **THE WITNESS:**  OKAY.

13:47:28   22         **THE COURT:**  THANK YOU.

13:47:29   23         **THE WITNESS:**  NEXT SLIDE.

13:47:29   24         SO I DON'T BELIEVE THE EXCAVATIONS WERE

13:47:32   25  IMPROPERLY BACKFILLED.  AND I'LL GO THROUGH -- WE WENT THROUGH

13:47:35    1    THE QARS TO LOOK AT WHAT WAS PLACED IN EVERY BACKFILL, EVERY

13:47:39    2    EXCAVATION, TO THE EXTENT THAT WE COULD FIGURE THAT OUT, AND

13:47:43    3    I'LL SUMMARIZE THAT.

13:47:44    4              THE NOTION THAT THERE WAS A PRESSURE TRANSFER OF

13:47:47    5    SURGE WATER PRESSURE RESULTING IN UPLIFT PRESSURES THAT PLAYED

13:47:50    6    A SUBSTANTIAL ROLE IN THE FAILURE.

13:47:57    7              THIS WAS DISCUSSED IN THE 1966 REPORT IN TERMS

13:48:00    8    OF WHAT THEY CALL HYDRAULIC UPLIFT PRESSURES, WHICH I WOULD

13:48:04    9    EQUATE TO SURGE WATER PRESSURES.  I THINK THE WORD "HYDRAULIC"

13:48:08   10    AND "SURGE WATER" HAVE ALL BEEN USED SIMULTANEOUSLY.

13:48:11   11              AND I'LL DISCUSS LATER HOW I BELIEVE THE TESTING

13:48:14   12    THAT WAS DONE IN 1966 AND THE SOIL STABILITY ANALYSIS IN 1966

13:48:21   13    ACTUALLY ADDRESSED THIS PROBLEM.  SO I DON'T . . .

13:48:25   14              NEXT SLIDE.

13:48:26   15              INDUSTRY PRACTICE AND CUSTOM WERE NOT FOLLOWED

13:48:28   16    UP AND PLAYED A ROLE IN THE FLOODWALL FAILURES.

13:48:32   17              I WILL GO THROUGH THE -- THROUGH THE SEEPAGE AND

13:48:36   18    STABILITY ISSUES AS THEY WOULD HAVE BEEN EVALUATED OR WERE

13:48:40   19    EVALUATED AND LOOK AT THE IMPACTS ON THE WALL AND HOW THE

13:48:46   20    ENGINEERS AT THE TIME WOULD HAVE PERCEIVED THIS.

13:48:50   21              NEXT SLIDE.

13:48:52   22              I BELIEVE THE 1966 REPORT DOES PROVIDE AN

13:48:58   23    EVALUATION, ALTHOUGH -- OF THE IMPACT OF THE EXCAVATIONS --

13:49:01   24    ALTHOUGH THE EXCAVATIONS WERE NOT CONTEMPLATED AT THE TIME THAT

13:49:05   25    THAT REPORT WAS DONE.  AND I'LL SHOW HOW THAT REPORT COULD BE

13:49:10   1   USED AND HOW THE THINKING OF THE ENGINEERS, AND BASED ON THEIR

13:49:14   2   EXPERIENCE, CAME FORWARD THROUGH THE PROJECT, I BELIEVE.

13:49:17   3                   NEXT SLIDE.

13:49:20   4                   THAT SOIL CONDITIONS BENEATH THE EBIA LED TO

13:49:24   5   UNDERSEEPAGE AND INCREASED HYDRAULIC PRESSURES.

13:49:27   6                   AT THE TIME THAT THE WORK WAS DONE, THE TASK

13:49:30   7   ORDER 26 WORK WAS DONE AND THE 1966 REPORT, YOU KNOW, THERE WAS

13:49:37   8   NO INDICATION THAT THERE WAS ANY SOIL CONDITION THAT WOULD

13:49:41   9   TRANSMIT WATER OR HYDRAULIC PRESSURES IN A WAY THAT WOULD HAVE

13:49:48  10   BEEN -- WOULD HAVE -- THAT ANYONE WOULD HAVE CONTEMPLATED AT

13:49:53  11   THAT TIME THAT WOULD HAVE HAD AN IMPACT ON THE WALL.

13:49:55  12                   NEXT SLIDE.

13:49:59  13                   THE LAST ONE, A VIOLATION OF THE DUTY TO

13:50:02  14   IMPLEMENT PRUDENT ENGINEERING PRACTICES AND JUDGMENT.

13:50:05  15                   I FIND NONE OF THAT.  I THINK THE PEOPLE THAT --

13:50:07  16   AS THEY MOVED THROUGH THIS PROJECT DID USE PRUDENT ENGINEERING

13:50:11  17   PRACTICES AND JUDGMENT.  AND THAT WILL BE DISCUSSED IN GOING

13:50:17  18   THROUGH THIS PRESENTATION, THE SUMMARY OF MY OPINIONS.

13:50:20  19                   NEXT SLIDE.

13:50:23  20            **MR. GREGORY:**  EXCUSE ME, YOUR HONOR.  I WOULD OBJECT

13:50:24  21   TO THE PRIOR SLIDE BECAUSE -- IT WON'T BE APPARENT ON THE

13:50:28  22   RECORD, BUT THERE WERE A NUMBER OF STATEMENTS IN A SLIDE WHERE

13:50:32  23   THE WORD "NO" WAS THEN PLACED.

13:50:35  24                   AND THIS WITNESS TESTIFIED ON VOIR DIRE THAT HE

13:50:38  25   WAS NOT OFFERING WHAT I'M GOING TO CALL ANY CAUSATION OPINION

13:50:41  1  ON EITHER THE NORTH BREACH OR THE SOUTH BREACH.

13:50:45  2           AND BASED ON THE SLIDE WE JUST SAW, IT STATES

13:50:51  3  THAT --

13:50:52  4           **THE COURT:**  UNDER NUMBER 2, PRESSURE TRANSFER OF

13:50:54  5  SURGE WATER PRESSURE?

13:50:56  6           **MR. GREGORY:**  YES, YOUR HONOR.

13:50:56  7           AND IN HIS DEPOSITION, HE TESTIFIED THAT HE

13:50:59  8  WASN'T OFFERING ANY OPINION, AND I'M GOING TO CALL IT A

13:51:02  9  CAUSATION OPINION.  AND AS A RESULT, IT'S PLAINTIFFS' POSITION

13:51:06  10  THAT THIS IS A NEW OPINION AT LEAST TO THE EXTENT THEY'RE

13:51:11  11  CAUSATIVE.  THEY'RE NEW --

13:51:11  12           **THE COURT:**  ARE YOU TALKING IN PARTICULAR ABOUT

13:51:13  13  NUMBER 2?

13:51:14  14           **MR. GREGORY:**  YES, YOUR HONOR.  AND THEN THE PART --

13:51:18  15  THE THIRD ONE, WHERE HE TALKS ABOUT -- IF HE TALKS ABOUT TO THE

13:51:23  16  EXTENT WHAT INDUSTRY PRACTICE AND CUSTOM PLAYED A ROLE IN THE

13:51:26  17  FAILURE, IT WOULD ALSO IMPACT THAT ONE AS WELL.

13:51:30  18           **THE COURT:**  WELL, THAT MAY BE WITHIN HIS STANDARD OF

13:51:32  19  CARE SCOPE, AND WE WILL HAVE TO LET THAT DEVELOP.

13:51:39  20           BUT NUMBER 2 DOES, AT LEAST FACIALLY, SEEM LIKE

13:51:42  21  HE'S STATING THAT DR. BEA'S WRONG AND THAT DID NOT CAUSE IT.

13:51:45  22  THAT SEEMS TO BE A CAUSATION OPINION, BUT YOU MIGHT BE ABLE TO

13:51:48  23  ENLIGHTEN ME, COUNSEL.

13:51:50  24           **MR. KELLS:**  YOUR HONOR, AS I UNDERSTAND DR. LUCIA'S

13:51:53  25  PRESENTATION AND HIS REPORT AND HIS TESTIMONY, THE THRUST OF

13:51:55  1  WHAT HE'S GETTING AT IS THAT THERE WAS NO INDICATION THAT THIS

13:51:58  2  TYPE OF FAILURE WOULD HAVE BEEN FORESEEABLE TO ANY ENGINEER

13:52:02  3  REVIEWING THE PROJECT AND THE DOCUMENT.  AND THAT IS RELEVANT

13:52:04  4  TO WHETHER OR NOT THERE WAS A BREACH OF THE STANDARD OF CARE OR

13:52:08  5  A NEGLIGENT ACT OF JUDGMENT OUT ON THE PROJECT WHEN IT WAS

13:52:11  6  BEING EVALUATED.

13:52:13  7                THAT'S WHAT IT GOES TO, NOT TO CAUSATION; JUST

13:52:15  8  THE FORESEEABILITY, WHETHER OR NOT REASONABLE JUDGMENT WAS

13:52:19  9  EXERCISED, OR WHETHER IT COULD HAVE BEEN FORESEEN AND

13:52:21  10  PREVENTED.

13:52:23  11          **THE COURT:**  IN OTHER WORDS, YOU'RE SAYING THAT USING

13:52:24  12  THE STANDARD OF CARE PARADIGM, HE'S TALKING ABOUT THAT IT

13:52:30  13  WAS -- EVEN IF DR. BEA IS CORRECT, IT WAS NOT NEGLIGENCE -- IT

13:52:36  14  WAS NOT NEGLIGENCE NOT TO -- NOT TO FORESEE THAT POSSIBILITY.

13:52:43  15                ALL RIGHT.  NOW, IF HE'S SAYING THERE WAS NO

13:52:46  16  POSSIBILITY, THEN THAT'S BORDERING ON CAUSATION.  SO IT'S A

13:52:50  17  FINE LINE.

13:52:51  18          **MR. KELLS:**  I AGREE.  I BELIEVE IT'S GOING TO BE HIS

13:52:53  19  OPINION -- AND I'LL LET HIM DO THE OPINING.

13:52:55  20          **THE COURT:**  RIGHT.

13:52:56  21          **MR. KELLS:**  -- BUT I BELIEVE IT'S GOING TO BE HIS

13:52:58  22  OPINION THAT IN THE DESIGN DOCUMENTS THEY CONTEMPLATED A

13:53:00  23  LOADING CONDITION, IT WAS EVALUATED FOR A CERTAIN CONDITION,

13:53:04  24  AND THAT BASED ON EVERYTHING THAT THEY KNEW --

13:53:05  25          **THE COURT:**  THAT WAS STANDARD PRACTICE.

13:53:05    1              **MR. KELLS:**  -- THERE WAS -- THERE WASN'T -- THAT WAS

13:53:05    2    STANDARD AND THAT CONTINUED TO BE THE STANDARD, AND THAT THIS

13:53:08    3    WAS NOT A FORESEEABLE TYPE OF FAILURE.

13:53:12    4              **THE COURT:**  OKAY.

13:53:13    5              **MR. GREGORY:**  IF I MAY, YOUR HONOR, LET'S TAKE A

13:53:16    6    THIRD EXAMPLE, POINT 5 THAT'S ON THAT SLIDE.

13:53:19    7                   TO THE EXTENT THE WITNESS SAYS, WELL, SOIL

13:53:22    8    CONDITIONS DID NOT LEAD TO UNDERSEEPAGE OR INCREASED HYDRAULIC

13:53:26    9    PRESSURE SUCH THAT THAT HAD NOTHING TO DO -- THE SOIL

13:53:31   10    CONDITIONS HAD NOTHING TO DO WITH THE FAILURE OF EITHER -- THE

13:53:33   11    WALL AT EITHER THE NORTH OR THE SOUTH BREACH, THAT, AGAIN,

13:53:37   12    WOULD BE A CAUSATION OPINION AS OPPOSED TO, WELL, THEY

13:53:42   13    BACKFILLED HERE AND THEY PROPERLY BACKFILLED AND THEY KNEW WHAT

13:53:45   14    THEY WERE DOING; AND, THEREFORE, THERE WAS GOOD BACKFILLING.

13:53:50   15                   THAT DOESN'T GO TO CAUSATION.

13:53:52   16              **THE COURT:**  WELL, HE'S PUTTING -- WHAT'S THERE IS THE

13:53:55   17    PLAINTIFFS' ALLEGATION, AND HE'S TRANSLATING THAT TO THE

13:53:58   18    STANDARD OF CARE, IS MY UNDERSTANDING.  AND THAT'S -- AS WE GO

13:54:03   19    ALONG, I WILL BE ALERTED AND YOU CAN OBJECT.

13:54:07   20                   THE "NO'S," AS FAR AS I'M CONCERNED, ARE ONLY

13:54:11   21    RELATED TO THE STANDARD OF CARE THUS FAR.

13:54:14   22              **MR. GREGORY:**  THANK YOU, YOUR HONOR.

13:54:14   23              **THE COURT:**  IS THAT FAIR ENOUGH?

13:54:16   24              **MR. KELLS:**  AND THAT'S MY UNDERSTANDING AS WELL,

13:54:18   25    YOUR HONOR.

13:54:18   1          **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU.

13:54:19   2               AND YOUR OBJECTION IS NOTED AND IT CERTAINLY CAN

13:54:23   3  BE URGED AGAIN IF WE GET INTO TESTIMONY THAT GETS INTO

13:54:27   4  CAUSATION.

13:54:28   5          **MR. GREGORY:**  THANK YOU, YOUR HONOR.

13:54:29   6          **THE WITNESS:**  AND JUST TO ADD TO THAT, I MEAN, THOSE

13:54:31   7  ARE THE PLAINTIFFS' ALLEGATIONS.  I MEAN, THE STANDARD OF CARE

13:54:35   8  EVALUATION THAT WAS DONE IS REALLY AIMED AT DEFINING FAILURE

13:54:43   9  CONDITIONS AND EVALUATING ALL THE CONDITIONS THAT COULD LEAD TO

13:54:46  10  A POTENTIAL FAILURE AND WHETHER THEY PROPERLY CONSIDERED ALL OF

13:54:51  11  THOSE.

13:54:52  12               SO ULTIMATELY, I HAVE TO USE THE WORD "FAILURE,"

13:54:58  13  BECAUSE AN EVALUATION OF THE STANDARD OF CARE AT THE TIME THE

13:55:00  14  PEOPLE DID THE WORK, SEEPAGE, SLOPE STABILITY, WHATEVER, IS

13:55:05  15  DONE IN THE CONTEXT OF WHAT IS THE MARGIN OF SAFETY AGAINST

13:55:09  16  FAILURE.

13:55:11  17               SO MY VIEW, AND AS I GO THROUGH THIS NOW, TO

13:55:15  18  SAY, YES, THOSE THINGS WERE ALL DONE IN THE CONTEXT OF THE

13:55:20  19  STANDARD OF CARE AND WERE ALL DONE PROPERLY FOR THE INFORMATION

13:55:23  20  THAT THEY HAD AND THE WAY IN WHICH THEY DID IT AT THE TIME THEY

13:55:27  21  DID IT.

13:55:28  22          **THE COURT:**  OKAY.  SIR.

13:55:29  23          **THE WITNESS:**  NEXT SLIDE, PLEASE.

13:55:33  24               AS WE ALL KNOW, THIS IS JUST A SLIDE OF THE

13:55:38  25  EXISTING CONDITIONS.

```
13:55:38    1            THE INTENT OF THIS PROJECT, REALLY, WAS TO

13:55:40    2   REMOVE THE EBIA ESSENTIALLY TO A DISTANCE PROBABLY AROUND 140,

13:55:47    3   150 FEET AWAY FROM THE EXISTING FLOODWALL.  SO AT THE TIME THIS

13:55:51    4   WORK WAS CONTEMPLATED, THESE EXCAVATIONS WOULD -- MOST OF THESE

13:55:56    5   EXCAVATIONS WOULD ULTIMATELY BE REMOVED AND -- AND ULTIMATELY A

13:56:04    6   NEW LOCK WOULD BE COMPLETED TO -- TO PROVIDE MISSISSIPPI RIVER

13:56:09    7   FLOOD PROTECTION ON ONE SIDE OF THE LOCK AND LAKE PONTCHARTRAIN

13:56:15    8   FLOOD LEVELS ON THE OTHER SIDE.

13:56:17    9            NEXT SLIDE.

13:56:23   10            SO THE EBIA FLOODWALL -- EXCUSE ME -- OF COURSE,

13:56:28   11   RUNS DOWN ALONG HERE.

13:56:30   12            THE 1966 ANALYSIS CONSIDERED AND ASSESSED

13:56:35   13   STABILITY AND SEEPAGE FOR THAT ENTIRE FLOODWALL, AND I'LL TALK

13:56:41   14   ABOUT THAT IN MORE DETAIL.

13:56:44   15            NEXT SLIDE.

13:56:45   16            AT THE TIME TASK ORDER 26 WAS IMPLEMENTED, THE

13:56:51   17   1966 ANALYSIS STILL APPLIED TO THE ENTIRE FLOODWALL.  NONE OF

13:56:56   18   THE IMPROVEMENTS HAD YET BEEN COMPLETED, AND SO ALL OF THE

13:57:02   19   ENGINEERING WORK THAT WAS DONE IN 1966 WAS STILL APPLICABLE AT

13:57:08   20   THE TIME TASK ORDER 26 STARTED.

13:57:10   21            NEXT SLIDE.

13:57:13   22            THE FUTURE PROJECT HAS -- AND THERE WERE

13:57:17   23   ANALYSES DONE IN 2002 WHICH LOOKED AT A NEW FLOODWALL SYSTEM

13:57:21   24   AND LOCK SYSTEM TO THE SOUTH.  BUT THE 1966 ANALYSIS WOULD

13:57:26   25   STILL APPLY TO THE NORTHERN PORTION OF THE EBIA BOLAND MARINE
```

13:57:31    1    AREA WHERE IT CONNECTED UP, YOU KNOW, WITH THE NEW PROJECT WORK

13:57:36    2    TO BE DONE.

13:57:39    3                    AND NO ADDITIONAL ANALYSES THAT I'M AWARE OF

13:57:42    4    WERE DONE ON THAT NORTHERN PORTION THAT WAS TO REMAIN IN PLACE

13:57:45    5    ONCE THE NEW PORTION WAS COMPLETED.

13:57:48    6                    NEXT SLIDE.

13:57:53    7                    WGI'S ACTIVITIES, BASICALLY, IS JUST TO REMOVE

13:57:58    8    ALL THE CONCRETE STRUCTURES AND CONTAMINATED SOIL IN THIS AREA

13:58:05    9    TO ALLOW DREDGING AND FACILITATE THAT THIS DREDGING COULD TAKE

13:58:09   10    PLACE AND THOSE SOILS COULD BE USED AS BACKFILL AT SOME OTHER

13:58:14   11    LOCATION, AND THEY WOULD NOT BE CONTAMINATED.

13:58:17   12                    MANY STRUCTURES WERE REMOVED OUT OF THAT, AND

13:58:20   13    MANY CONTAMINATED -- THERE WERE LOTS OF CONTAMINATED SOILS

13:58:23   14    REMOVED.

13:58:24   15                    NEXT SLIDE.

13:58:25   16                    IN MY REPORT, I HAVE A SUMMARY OF ALL THE

13:58:28   17    SIGNIFICANT EXCAVATIONS FOR THE SAUCER MARINE AREA AND THE

13:58:33   18    BOLAND MARINE AREA.

13:58:35   19                    AND ALSO IN MY REPORT THERE'S A SUMMARY OF ALL

13:58:38   20    THE QARS THAT WE REVIEWED TO TRY AND FIGURE OUT WHAT MATERIALS

13:58:44   21    WENT INTO THE -- THE EXCAVATIONS AT THOSE LOCATIONS.

13:58:51   22                    AND FOR SAUCER, BASICALLY, WE FOUND OUT THAT

13:58:55   23    NATIVE SOILS WERE PLACED AND -- OR WHAT WAS PLACED WAS NOT

13:59:02   24    KNOWN.  I FOUND LITTLE, IF ANY, RECORD OF RIVER SANDS BEING

13:59:06   25    PLACED.

13:59:09   1              SEWER LIFT STATION AT THE TOP HERE, NATIVE

13:59:11   2    BACKFILL CLAY MATERIAL WAS PLACED IN 2-FOOT LIFTS AND COMPACTED

13:59:16   3    UP TO A DEPTH OF ABOUT 8 TO 9 FEET.  AND THEN FROM THAT DEPTH

13:59:21   4    UP TO THE GROUND SURFACE, IT WAS A COMBINATION OF SAND AND

13:59:25   5    SPOIL MATERIALS, "SPOIL MATERIAL" BEING NATIVE ON-SITE

13:59:31   6    MATERIAL.

13:59:34   7              IN ADDITION, IN MY REPORT, THERE'S A SUMMARY,

13:59:37   8    WHICH I'LL GET INTO LATER, THAT GIVES THE DEPTHS AND THE

13:59:41   9    DISTANCES OF EACH ONE OF THESE EXCAVATIONS FROM THE FLOODWALL.

13:59:46   10             NEXT SLIDE.

13:59:50   11             THE BOLAND MARINE AREA DID HAVE A NUMBER OF

13:59:54   12   PLACES WHERE RIVER SAND BACKFILL WAS PLACED, AND YOU'LL SEE

13:59:58   13   THOSE NOTED ON THE SLIDE.

14:00:02   14             IN ADDITION, THERE WAS A FAIRLY LARGE

14:00:04   15   EXCAVATION, THE WEDDING CAKE EXCAVATION, WHICH MOSTLY SPOIL AND

14:00:11   16   BORROW PIT MATERIAL -- BORROW PIT MATERIAL COMING FROM THE

14:00:15   17   MCDONOUGH BACKFILL MATERIAL WAS PLACED.

14:00:18   18             ALL OF THE SAND BACKFILL MATERIALS WERE

14:00:21   19   RELATIVELY SHALLOW AND ALL LOCATED AT DISTANCES 120 TO 560 FEET

14:00:27   20   FROM THE NORTH BREACH.

14:00:31   21             NEXT SLIDE.

14:00:35   22             THE TWO LARGE EXCAVATIONS THAT WERE DONE, ONE AT

14:00:41   23   BOLAND AND ONE AT SAUCER, IN BOTH CASES, WGI, SUBCONTRACTORS, I

14:00:48   24   BELIEVE, HAD THIS DESIGNED BY A LOUISIANA LICENSED PROFESSIONAL

14:00:54   25   ENGINEER, WITH A COFFERDAM SYSTEM PLACED AROUND IT.

14:00:57    1              THE COFFERDAM SYSTEM ESSENTIALLY ALLOWS THE

14:01:00    2    EXCAVATION TO TAKE PLACE.  AND THE SOILS AROUND THE COFFERDAM

14:01:03    3    REALLY HAVE NO IDEA THAT THERE'S AN EXCAVATION GOING ON

14:01:07    4    ADJACENT TO IT.  IT HAS NO IMPACT ON THE ADJACENT SOILS.  IT

14:01:11    5    ALLOWS FOR A MORE EXPEDITIOUS EXCAVATION WITHOUT HAVING TO

14:01:18    6    SLOPE BACK THE SLOPES TO BE ABLE TO GET IN AND OUT OF THE HOLE.

14:01:23    7              SO BOTH OF THESE DEEPER EXCAVATIONS WERE

14:01:27    8    DESIGNED BY LICENSED PROFESSIONAL ENGINEERS.

14:01:30    9              NEXT SLIDE.

14:01:36   10              THE MCDONOUGH BORROW PIT LOCATION AND THE

14:01:45   11    SUREKOTE ROAD EXCAVATIONS WERE THE ONE TIME IN THE PROJECT WHEN

14:01:48   12    MR. GUILLORY, I BELIEVE, WENT TO THE GEOTECHNICAL FOLKS AND

14:01:52   13    ASKED FOR SOME GUIDANCE ON THIS AND RECEIVED BACK GUIDANCE ON

14:01:58   14    COMPACTION REQUIREMENTS AND BACKFILL CRITERIA AND ON THE

14:02:03   15    EXCAVATION OF THE BORROW PIT.

14:02:08   16              IN BOTH THESE CASES -- IN THE SURKOTE ROAD

14:02:13   17    EXCAVATIONS, THERE'S PHOTOGRAPHS SHOWING THAT THE MATERIAL THAT

14:02:17   18    BASICALLY FILLED OUT THE SLOPE OF THE LEVEE WERE BACKFILLED

14:02:20   19    WITH CLAYEY MATERIAL.  AND SOME GUIDANCE WAS GIVEN ON THE

14:02:25   20    EXCAVATION OF THE MCDONOUGH BORROW PIT.  THE MCDONOUGH BORROW

14:02:29   21    PIT WAS ABOUT 50 FEET, I BELIEVE, FROM THE FLOODWALL, AND THEY

14:02:32   22    WERE GIVEN A RECOMMENDATION OF A 6 1/2-TO-1 SLOPE COMING FROM

14:02:39   23    THE GROUND SURFACE DOWN TO THE BOTTOM OF THE MCDONOUGH BORROW

14:02:44   24    PIT.

14:02:48   25              THAT SLOPE ISN'T CONSIDERED A MINIMUM CONTROL

14:02:51    1    LINE.  IT IS REALLY A SLOPE THAT ALLOWS THE SOFTER SOILS

14:02:54    2    UNDERNEATH THE MCDONOUGH BORROW PIT TO REMAIN STABLE.  AND THE

14:03:00    3    GEOTECH FOLKS ALSO KNEW THAT THAT WAS GOING TO BE A LARGE HOLE

14:03:04    4    IN THE GROUND THAT REMAINED FILLED WITH WATER.

14:03:08    5            SO TO THE BEST OF MY KNOWLEDGE, ALL OF THOSE

14:03:11    6    RECOMMENDATIONS WERE CARRIED OUT.

14:03:19    7            ONE OF THE ASPECTS OF JUDGMENT, I BELIEVE, THAT

14:03:21    8    COMES UP IN THIS PARTICULAR APPLICATION HERE IS THAT THESE ARE

14:03:24    9    EXCAVATIONS THAT START TO APPROACH NEAR THE WALL.  AND

14:03:28   10    MR. GUILLORY, I BELIEVE, IN THIS CASE IS EXERCISING HIS

14:03:31   11    ENGINEERING JUDGMENT THAT AT SOME POINT, YOU KNOW, THESE

14:03:34   12    EXCAVATIONS NEED TO BE ADDRESSED BY GEOTECHNICAL ENGINEERS.

14:03:40   13    WE'LL TALK A LITTLE BIT MORE LATER ABOUT THE CONCEPT OF A

14:03:42   14    MINIMUM CONTROL LINE, BUT I THINK MR. GUILLORY'S ACTIONS SPEAK

14:03:47   15    FOR THEMSELVES HERE AS HE ASKED FOR HELP ON THESE PARTICULAR

14:03:52   16    EXCAVATIONS TO BE DONE.

14:03:56   17            NEXT SLIDE.

14:03:59   18            SO THE GLOBAL STABILITY ANALYSIS CONDUCTED IN

14:04:02   19    1966 DEFINES THE AREAS WHERE THE EXCAVATIONS CAN HAPPEN SAFELY

14:04:08   20    WITHOUT IMPACTING THE WALL.  AND I'LL GO THROUGH THAT.  AND

14:04:14   21    MR. GUILLORY'S ACTIONS WERE CONSISTENT WITH THE CONCEPT OF

14:04:16   22    THESE TYPES OF STABILITY ANALYSIS, AND I'LL GO THROUGH THIS IN

14:04:20   23    MORE DETAIL LATER.

14:04:22   24            NEXT SLIDE.

14:04:23   25            SEEPAGE EVALUATION.  I'M GOING TO DISCUSS THE

14:04:27  1   SEEPAGE EVALUATIONS THAT WERE DONE.

14:04:30  2             NEXT SLIDE.

14:04:32  3             1966, IN THE REPORT IT SAYS:  "BASED ON THE SOIL

14:04:35  4   CONDITIONS ALONG THIS PART OF THE PROJECT AND THE SHORT

14:04:39  5   DURATION OF HURRICANE FLOODS, HAZARDOUS SEEPAGE OR HYDROSTATIC

14:04:44  6   UPLIFT ON THE PROTECTED SIDE IS NOT ANTICIPATED."

14:04:48  7             SO, IN ESSENCE, THE GEOTECHNICAL ENGINEERS AT

14:04:53  8   THE TIME ARE MAKING A JUDGMENT BECAUSE NO ANALYSIS WAS

14:04:58  9   INCLUDED, THAT I'VE BEEN ABLE TO FIND, AS PART OF THIS REPORT.

14:05:02  10  THE SOIL CONDITIONS THAT EXISTED, AS WE'LL SEE IN A MINUTE, ARE

14:05:06  11  PRIMARILY CLAYS.

14:05:11  12            AND THE ASPECT OF A SHORT DURATION, THAT THE

14:05:14  13  STORM COMES UP AND THEN IT GOES DOWN WITHIN A DAY, PLUS OR

14:05:18  14  MINUS, DOESN'T ALLOW STEADY-STATE SEEPAGE CONDITIONS TO OCCUR

14:05:24  15  AND WOULD NOT ALLOW A STEADY-STATE SEEPAGE CONDITION TO OCCUR

14:05:28  16  UNDER THE WALL.

14:05:30  17            AND WHEN THEY SAY ON THE PROTECTED SIDE -- THAT

14:05:33  18  SEEPAGE OR HYDROSTATIC UPLIFT ON THE PROTECTED SIDE IS NOT

14:05:38  19  ANTICIPATED -- WHAT I'LL GO THROUGH IS TALKING ABOUT LANE'S

14:05:41  20  WEIGHTED CREEP RATIO ANALYSIS AND METHODOLOGY -- IT'S ALWAYS

14:05:45  21  THE SOIL CONDITIONS ON THE PROTECTED SIDE THAT ARE IMPORTANT.

14:05:48  22  WHAT'S ON THE FLOOD SIDE IS NOT THAT IMPORTANT TO STABILITY OF

14:05:52  23  THE WALL, IS NOT A CONCERN TO THE PEOPLE WHEN THEY LOOKED AT

14:05:56  24  THIS PROJECT, AND I THINK THAT'S WHY THIS STATEMENT WAS

14:06:04  25  INCLUDED.

14:06:05    1                      NEXT SLIDE.

14:06:06    2                      THE NEXT SLIDE IS A BLOWUP OF THIS SLIDE.

14:06:10    3                      THESE ARE THE CROSS SECTIONS OF THE LEVEE AND

14:06:15    4    THE FLOODWALL CONDITIONS IN THE 1966 REPORT THAT SHOW AN

14:06:18    5    ELEVATION OF 15 FEET AND MINUS 8 FEET.  OF COURSE,

14:06:21    6    SUBSEQUENTLY, WE KNOW SETTLEMENT HAS OCCURRED OF THAT AS A

14:06:24    7    RESULT OF PLACEMENT OF THE FILL AND CONSTRUCTION OF THE LEVEE.

14:06:27    8    AND THERE'S BEEN A CHANGE IN DATUM THAT HAS OCCURRED THAT WOULD

14:06:34    9    MAKE THAT 15-FOOT ELEVATION CLOSER TO 11 FEET NOW AND THE

14:06:38   10    BOTTOM OF THE -- THE SHEET PILE WALL GO DOWN APPROXIMATELY THE

14:06:46   11    SAME AMOUNT.

14:06:51   12                      NEXT SLIDE.

14:06:52   13                      THIS IS A CROSS SECTION THAT'S TAKEN OUT OF THE

14:06:54   14    1966 REPORT, AND IT SHOWS THE SOIL CONDITIONS THAT WERE KNOWN

14:06:59   15    TO THE PEOPLE AT THE TIME THEY DID THE WORK.  YOU CAN SEE THAT

14:07:03   16    THE YELLOW LINE ACROSS THERE SHOWS THE SHEET PILE TIP.  AND

14:07:09   17    EVERY INDICATION THAT THESE FOLKS HAD WAS THAT THERE WAS CLAY

14:07:14   18    OR ORGANIC CLAY AT THE SHEET PILE TIP; AND THAT, I BELIEVE, IS

14:07:18   19    THE BASIS FOR THEIR CONCLUSION THAT SEEPAGE CONDITIONS WOULD

14:07:23   20    NOT DEVELOP.

14:07:26   21                      NEXT SLIDE.

14:07:27   22                      OH, AT THIS PRESENT -- THERE'S NO PERMEABLE SOIL

14:07:30   23    HERE THAT THESE -- THESE FOLKS WOULD KNOW ABOUT AT THE TIME.

14:07:34   24    AND THIS IS CONSISTENT WITH THE GEOLOGY OF THAT AREA AS WELL.

14:07:38   25             **THE COURT:**  LET ME MAKE SURE I UNDERSTAND WHAT YOU'RE

| | | |
|---|---|---|
| 14:07:39 | 1 | SAYING, DOCTOR, THAT IN YOUR OPINION, THE STANDARD OF CARE |
| 14:07:45 | 2 | OPINION, ARE WE TALKING ABOUT ALSO SEEPAGE CONDITIONS THAT |
| 14:07:49 | 3 | WOULD -- THAT WOULD PERHAPS SUGGEST BELOW THE SHEET PILE TIP AS |
| 14:07:54 | 4 | WELL? |
| 14:07:55 | 5 | **THE WITNESS:**  YES, SIR. |
| 14:07:56 | 6 | **THE COURT:**  OKAY. |
| 14:07:57 | 7 | **THE WITNESS:**  YES, SIR, YOUR HONOR. |
| 14:07:59 | 8 | THIS IS -- THE OTHER LINE SHOWS THE BOTTOM OF |
| 14:08:01 | 9 | THE SHEET PILE, AND BELOW THAT SHEET-PILED WALL ARE ALSO SOILS |
| 14:08:06 | 10 | THAT ARE CONSIDERED FAT CLAYS. |
| 14:08:09 | 11 | ALL OF THESE SOILS, DOWN TO WHERE YOU SEE THOSE |
| 14:08:12 | 12 | YELLOW SANDY SILTS -- I KEEP DOING THAT -- DOWN IN HERE OR DOWN |
| 14:08:20 | 13 | IN THERE, ALL OF THOSE SOILS UP ABOVE THERE WOULD BE CONSIDERED |
| 14:08:25 | 14 | SOILS WITH LOW PERMEABILITY. |
| 14:08:30 | 15 | **THE COURT:**  OKAY. |
| 14:08:32 | 16 | **THE WITNESS:**  COMBINED WITH THE KNOWLEDGE THAT A |
| 14:08:34 | 17 | FLOOD CONDITION IS BASICALLY A 24-HOUR, PLUS OR MINUS, LOADING |
| 14:08:38 | 18 | CONDITION AND THAT -- THEIR KNOWLEDGE, TRAINING AND EXPERIENCE |
| 14:08:44 | 19 | WOULD TELL THEM THAT A SEEPAGE CONDITION WOULD NOT DEVELOP ON |
| 14:08:47 | 20 | THE PROTECTED SIDE IN THESE SOIL CONDITIONS.  AND I'LL COVER |
| 14:08:51 | 21 | THAT IN SOME MORE DETAILED ANALYSIS. |
| 14:08:57 | 22 | DOES THAT ANSWER YOUR QUESTION? |
| 14:08:59 | 23 | **THE COURT:**  YES, SIR.  THANK YOU. |
| 14:08:59 | 24 | **THE WITNESS:**  NEXT SLIDE, PLEASE. |
| 14:09:04 | 25 | THIS IS A DRAWING OF THE NEW 2002 LOCK.  AND |

14:09:12   1   I'LL SHOW YOU THAT ACROSS THE NORTH -- THIS IS THE EBIA OVER

14:09:16   2   HERE, AND GOING THEN EAST/WEST IS NEW LEVEES TO BE CONSTRUCTED

14:09:20   3   HERE FOR BOTH OF THESE.

14:09:22   4                    NEXT SLIDE.

14:09:23   5                    THE NEW FLOODWALLS WILL COME INTO HERE AND

14:09:25   6   CONNECT INTO THE EBIA.  THIS WAS THE INTENT OF THE PROJECT.

14:09:30   7   ALL OF THE EXISTING FLOODWALLS ALONG HERE, SOUTH OF THIS AREA,

14:09:35   8   WHICH GOES SOUTH OF THE BOLAND AREA, THOSE WOULD ALL BE

14:09:38   9   REPLACED.

14:09:41  10                    NEXT SLIDE.

14:09:42  11                    SO THE EXISTING FLOODWALLS WOULD REMAIN IN PLACE

14:09:46  12   AS PART OF THE -- AS PART OF THE NEW PROJECT.

14:09:50  13                    NEXT SLIDE.

14:09:52  14                    NEXT SLIDE.

14:09:55  15                    SO WE'RE LOOKING AT A CROSS SECTION RIGHT ACROSS

14:09:57  16   HERE.

14:09:59  17                    NEXT SLIDE.

14:10:03  18                    THIS IS SORT OF THE STANDARD CORPS METHOD FOR

14:10:06  19   DOING SLOPED STABILITY ANALYSIS, PERFECTLY CONSISTENT.

14:10:10  20                    BUT IN THE NEXT SLIDE YOU'LL SEE THAT THIS NEW

14:10:15  21   LEVEE, WHICH CROSSES THE EBIA IN AN EAST/WEST FASHION, IS BEING

14:10:23  22   CONSTRUCTED OUT OF SAND.

14:10:25  23                    SO DOWN HERE IN THE NEXT SLIDE -- OH, EXCUSE

14:10:28  24   ME -- WE SEE NOW THAT WE HAVE THE PRESENCE OF A PERMEABLE SOIL.

14:10:32  25                    NEXT SLIDE.

14:10:32   1                    AND THEN THE NEXT SLIDE.

14:10:34   2                    THEN WE SEE THE LANE'S WEIGHTED CREEP RATIO

14:10:40   3   ANALYSIS.

14:10:41   4                    THIS IS WHAT MR. PINNER AND DR. GRIESHABER TOLD

14:10:47   5   ME, THAT IT WAS THE CORPS' METHODOLOGY THAT WHEN THEY HAD SANDY

14:10:50   6   SOILS, THAT THEY WERE GOING TO DO A LANE'S WEIGHTED CREEP RATIO

14:10:55   7   ANALYSIS.  AND THIS IS AN ANALYSIS THAT DETERMINES THE LENGTH

14:10:59   8   OF THE SHEET PILE WALL BASED UPON THE SOIL CONDITIONS AND

14:11:02   9   THE -- THE DESIGNED FLOOD CONDITION, THAT IF YOU HAD A CLAY

14:11:09   10  SOIL, WHERE YOU WEREN'T EXPECTING IT, SOMETIMES THEY DO IT,

14:11:13   11  SOMETIMES THEY DIDN'T.  AND IN THIS CASE THEY DIDN'T DO IT FOR

14:11:17   12  THE EBIA AREA.  THEY DID IT FOR THE NEW LOCKS PROJECT.

14:11:23   13                    NEXT SLIDE.

14:11:29   14                    SO THE FOLKS -- AT THE TIME THEY WERE DOING

14:11:31   15  THIS, THE SOILS WERE KNOWN TO HAVE A SIGNIFICANT CLAY CONTENT

14:11:34   16  WITH LOW PERMEABILITY.  COMBINED WITH THIS SHORT DURATION

14:11:39   17  LOADING PERIOD, THERE WOULD BE NO EXPECTATION THAT THERE WOULD

14:11:43   18  BE DEVELOPMENT OF FLOW OR SIGNIFICANT HYDRAULIC PRESSURES UNDER

14:11:49   19  THIS BECAUSE OF ALL THOSE CONDITIONS.  THERE WAS NO KNOWLEDGE

14:11:50   20  AT THAT TIME THAT THERE WAS A PERMEABLE LAYER CAPABLE OF

14:11:53   21  TRANSMITTING WATER UNDERNEATH THE FLOODWALL.

14:11:57   22                    I THINK THIS WAS A PROPER EXERCISE OF

14:11:59   23  ENGINEERING JUDGMENT, GIVEN THE LOCAL KNOWLEDGE THAT EXISTED

14:12:02   24  AND THE KNOWLEDGE OF THE BEHAVIOR OF THESE SOILS IN THE EBIA.

14:12:08   25                    NEXT SLIDE.

14:12:12    1           SO ONE OF THE PROBLEMS WITH EXERCISING JUDGMENT

14:12:16    2   IS THAT A GOOD JUDGMENT IS NOT A GOOD JUDGMENT.  SO I'M GOING

14:12:21    3   TO TAKE A DEEPER LOOK AT THE KNOWLEDGE THAT THE PEOPLE HAD AT

14:12:24    4   THE TIME IN TERMS OF HOW THEY DID SEEPAGE ANALYSIS AND HOW THEY

14:12:29    5   MIGHT ARRIVE AT THIS JUDGMENT.

14:12:31    6           TYPICALLY, THEY USE A METHODOLOGY CALLED LANE'S

14:12:34    7   WEIGHTED CREEP RATIO.  IT'S BEEN AROUND FOR A LONG TIME.  IT'S

14:12:38    8   A FUNDAMENTALLY CORRECT METHOD BASED UPON DARCY'S LAW AND THE

14:12:45    9   EVALUATION OF A HUGE NUMBER OF ACTUAL FIELD SITES TO DEVELOP A

14:12:52   10   FUNDAMENTALLY-BASED EMPIRICAL APPROACH TO EVALUATING SEEPAGE

14:12:58   11   CONDITIONS, AND IT LOOKS AT FAILURES DUE TO UPLIFT PRESSURES OR

14:13:03   12   FAILURES DUE TO JUST SEEPAGE EROSION ISSUES.

14:13:12   13           NEXT SLIDE.

14:13:12   14           THIS IS A TYPICAL DESIGN CONSIDERATION.  THE

14:13:15   15   FLOODWALL GETS A FLOOD UP AGAINST IT, SORT OF INSTANTANEOUSLY,

14:13:18   16   AND THEN WHAT HAPPENS?

14:13:20   17           NEXT SLIDE.

14:13:24   18           LANE'S METHOD APPLIES TO THE SOIL ON THE

14:13:26   19   PROTECTED SIDE OF THE LEVEE.  EVERY FAILURE IN THE CASE HISTORY

14:13:32   20   THAT YOU CAN FIND THAT'S RELATED TO A SEEPAGE FAILURE RESULTS

14:13:36   21   AS -- STARTS A FAILURE ON THE PROTECTED SIDE, WHETHER IT'S A

14:13:41   22   DAM, A LEVEE, OR ANY -- ANY SOIL STRUCTURE CONTAINING WATER.

14:13:51   23           LANE'S METHOD REALLY IS A MEASURE OF THE

14:13:55   24   CAPABILITY OF SOILS TO RESIST SEEPAGE FORCES, WHETHER THOSE BE

14:13:59   25   HYDROSTATIC, UPLIFT FORCES, OR FLOW DUE TO -- FLOW THAT'S

14:14:05  1  INCONSISTENT WITH THE ABILITY OF THE SOIL TO PROTECT IT.

14:14:07  2                    NEXT SLIDE.

14:14:11  3            **THE COURT:**  BY "FLOW" DO YOU MEAN OVERFLOW OR -- WHY

14:14:13  4  DON'T YOU TELL ME WHAT YOU MEAN BY "FLOW" AS OPPOSED TO SEEPAGE

14:14:17  5  AND UPLIFT.

14:14:17  6            **THE WITNESS:**  I'M TALKING ABOUT THE FLOW THROUGH THE

14:14:19  7  SOIL, SEEPAGE FLOW.  WHEN I USE THE TERM "FLOW" HERE, I'M --

14:14:23  8  BECAUSE I NEVER DID ANY OVERTOPPING ANALYSIS.

14:14:25  9            **THE COURT:**  OH, NO, I UNDERSTAND THAT.  WHEN YOU USE

14:14:27  10  "UNDERSEEPAGE" OR "SEEPAGE," IS FLOW JUST ANOTHER FORM OF

14:14:30  11  SEEPAGE?

14:14:31  12            **THE WITNESS:**  YES.  "FLOW" AND "SEEPAGE" ARE

14:14:34  13  INTERCHANGEABLE TERMS.

14:14:36  14            **THE COURT:**  OKAY.  SO THAT'S --

14:14:38  15            **THE WITNESS:**  IT'S FLOW OF THE WATER THROUGH THE

14:14:39  16  SOIL.

14:14:39  17            **THE COURT:**  OKAY.  I UNDERSTAND.

14:14:45  18            **THE WITNESS:**  SO THE METHODOLOGY IS BASED UPON THE

14:14:47  19  SOIL ON THE PROTECTED SIDE.  SOIL ON THE FLOOD SIDE REALLY HAS

14:14:53  20  NO EFFECT ON THE CAPACITY OF THE PROTECTED SIDE TO RESIST THESE

14:14:57  21  SEEPAGE FORCES.

14:14:59  22                    I THINK ONE OF THE THINGS -- WHEN MR. GUILLORY

14:15:06  23  WENT TO THE GEOTECHNICAL FOLKS, HE ASKED THEM TO DO -- TO DO A

14:15:10  24  STABILITY ANALYSIS AND TO CHECK OUT THE MCDONOUGH PIT.  WELL,

14:15:14  25  THEY DIDN'T DO A SEEPAGES ANALYSIS; THEY GAVE HIM A STABILITY

```
14:15:20    1   ANALYSIS.
14:15:20    2                BUT THESE ARE TRAINED GEOTECHNICAL ENGINEERS.
14:15:21    3   THEY WOULD KNOW THAT YOU COULD DIG A HOLE 50 FOOT DEEP OR --
14:15:24    4   EXCUSE ME -- 50 FEET AWAY FROM THE FLOODWALL 10, 12 FEET DEEP,
14:15:27    5   FILL IT UP WITH WATER, AND IT WOULD HAVE NO EFFECT ON THE --
14:15:30    6           MR. GREGORY:  OBJECTION, YOUR HONOR.  THAT'S
14:15:32    7   SPECULATION ON WHAT THE GEOTECHNICAL ENGINEERS KNEW FOR THE
14:15:34    8   BORROW PIT.  THE WITNESS HAS NO EVIDENCE THAT THESE ENGINEERS
14:15:39    9   KNEW THAT.
14:15:40   10           THE COURT:  WELL, I'M NOT SURE IF HE KNEW THAT UNDER
14:15:44   11   NO CIRCUMSTANCES -- HE'S SAYING THEY KNEW A -- A 12-FOOT HOLE
14:15:54   12   COULD NOT RESULT IN SEEPAGE IF IT WAS X FEET AWAY FROM THE -- I
14:16:02   13   DON'T --
14:16:03   14           MR. GREGORY:  IF I MAY, YOUR HONOR --
14:16:04   15           THE COURT:  I DON'T KNOW -- I DON'T KNOW IF HE CAN
14:16:05   16   SAY WHAT THEY KNEW.  HE CAN SAY, LOOKING AT THE GEOLOGY, THAT
14:16:08   17   SEEMED TO BE A REASONABLE ASSUMPTION.  OTHER THAN THAT, I
14:16:12   18   AGREE.
14:16:12   19           MR. GREGORY:  THANK YOU, YOUR HONOR.
14:16:14   20           THE COURT:  SO I'M GOING TO STRIKE THAT PORTION OF
14:16:15   21   THE ANSWER, SIR.
14:16:16   22           MR. KELLS:  MAY I BE HEARD?
14:16:17   23           THE COURT:  YOU MAY.
14:16:18   24           MR. KELLS:  DR. LUCIA IS AN EXPERT IN GEOTECHNICAL
14:16:21   25   ENGINEERING, AND WHAT HE HAS JUST DONE IS LAID THE FOUNDATION
```

14:16:23  1  FOR HOW THE CORPS DOES, IN FACT, ANALYZE SEEPAGE.

14:16:27  2          **THE COURT:**  OH, I UNDERSTAND THAT.  BUT HE SAID THEY

14:16:29  3  KNEW.  HE SAID THEY KNEW.  THAT'S GOING BEYOND.  I'M GOING

14:16:32  4  TO -- WHAT I'M SAYING IS THAT I'M NOT GOING TO ALLOW HIM TO SAY

14:16:36  5  WHAT THEY KNEW.

14:16:38  6          I'M GOING TO ALLOW HIM TO SAY, BASED ON THE

14:16:39  7  GEOLOGY, IT WAS PRUDENT NOT TO DO A SEEPAGE ANALYSIS BECAUSE IT

14:16:45  8  WOULD APPEAR UNLIKELY.  I DON'T THINK -- I DON'T WANT TO HEAR,

14:16:50  9  FRANKLY, ANY OPINION THAT SAYS SOMETHING IS IMPOSSIBLE.  AND

14:16:54  10  THIS KATRINA STUFF IS -- I'M SKEPTICAL WHETHER IT'S PLAINTIFF,

14:16:58  11  DEFENDANT -- OR UNLESS IT'S GOD ALMIGHTY.

14:17:01  12          **MR. KELLS:**  I UNDERSTAND.  AND I UNDERSTOOD

14:17:03  13  DR. LUCIA'S ANSWER TO BE THAT THEY EXERCISED SOME FORM OF

14:17:06  14  JUDGMENT.  OBVIOUSLY IT IS SPECULATION AS TO WHAT THEY ALL

14:17:10  15  THOUGHT.  I UNDERSTAND THAT.

14:17:10  16          **THE COURT:**  YEAH.  THAT'S ALL I -- I'M SAYING HE --

14:17:11  17          **MR. KELLS:**  IT'S HIS OPINION.

14:17:13  18          **THE COURT:**  BUT, LIKE I SAID, AS I UNDERSTAND HIS

14:17:15  19  OPINION, THEY WERE PERFECTLY REASONABLE IN NOT DOING THIS

14:17:19  20  EVALUATION BASED ON THE SOIL CONDITIONS AT THAT -- THAT EXISTED

14:17:23  21  AT THE EBIA, AS HE UNDERSTOOD THEM AND AS THEY UNDERSTOOD THEM.

14:17:30  22  AND I HAVE THAT, AND I UNDERSTAND IT.

14:17:32  23          OTHER THAN THAT, I DON'T KNOW IF WE HAVE TO GO

14:17:35  24  ANY FURTHER ABOUT WHAT THEY KNEW WAS POSSIBLE OR IMPOSSIBLE.

14:17:40  25          **MR. GREGORY:**  THANK YOU, YOUR HONOR.

| | | |
|---|---|---|
| 14:17:48 | 1 | **THE WITNESS:**  NEXT SLIDE, PLEASE. |
| 14:17:51 | 2 | DR. LANE, MANY YEARS AGO, DEVELOPED HIS CRITERIA |
| 14:17:56 | 3 | THAT THE CORPS USES, AND HE BASICALLY MADE A PLOT OF MANY, MANY |
| 14:17:59 | 4 | WATER-RETAINING STRUCTURES, DID ANALYSIS USING DARCY'S LAW TO |
| 14:18:03 | 5 | FIGURE OUT WHERE THEY -- HOW THIS COULD FIT INTO A CHART THAT |
| 14:18:07 | 6 | HE EVENTUALLY DEVELOPED. |
| 14:18:09 | 7 | AND THE WAY THIS CHART IS, ACROSS THE BOTTOM IS |
| 14:18:12 | 8 | DIFFERENT SOIL TYPE, AND THE AXIS TO THE LEFT IS LANE'S |
| 14:18:14 | 9 | WEIGHTED CREEP RATIO THAT YOU GET OUT OF THIS FORMULA.  SO IF A |
| 14:18:20 | 10 | POINT FALLS ABOVE THAT LINE, IT'S NOT SUSCEPTIBLE TO SEEPAGE |
| 14:18:24 | 11 | ISSUES.  IF IT FALLS BELOW THAT LINE, IT IS SUSCEPTIBLE TO |
| 14:18:29 | 12 | SEEPAGE ISSUES. |
| 14:18:30 | 13 | BUT IN HIS METHODOLOGY, THERE ARE POINTS BELOW |
| 14:18:33 | 14 | THE LINE THAT DIDN'T FAIL, BUT HE CONSERVATIVELY DREW THE LINE |
| 14:18:38 | 15 | TO ACCOUNT FOR THAT. |
| 14:18:40 | 16 | NEXT SLIDE, PLEASE. |
| 14:18:46 | 17 | ON THE PROTECTED SIDE, I ASSUMED, BASED ON A |
| 14:18:50 | 18 | REVIEW OF THE DATA, THAT THE MATERIAL WOULD HAVE BEEN A MEDIUM |
| 14:18:53 | 19 | CLAY. |
| 14:18:56 | 20 | NEXT SLIDE. |
| 14:19:03 | 21 | SO IF WE LOOK AT THE ORIGINAL 1966 DESIGN -- |
| 14:19:07 | 22 | NEXT SLIDE -- ONE FACTOR IS THE DISTANCE IN WHICH THE WATER |
| 14:19:10 | 23 | FLOWS, HERE TO HERE.  THAT'S LANE'S WEIGHTED CREEP LENGTH. |
| 14:19:15 | 24 | THE REASON IT'S CALLED "WEIGHTED" IS BECAUSE |
| 14:19:19 | 25 | SOIL FLOWS AT DIFFERENT RATES, HORIZONTALLY AND VERTICALLY. |

```
14:19:26   1   TYPICALLY IT WILL FLOW MORE QUICKLY HORIZONTALLY AND SLOWER

14:19:31   2   VERTICALLY.

14:19:32   3                  SO LANE WEIGHTS THOSE TO TRY TO GIVE A CORRECT

14:19:36   4   DISTANCE AS TO HOW FAR THE PATH OF SEEPAGE WILL BE.

14:19:44   5                  NEXT SLIDE.

14:19:44   6                  NEXT SLIDE.

14:19:45   7                  THE OTHER FACTOR IS THE HEAD DIFFERENCE.  AND SO

14:19:48   8   THESE TWO FACTORS REALLY ARE WHAT WE TYPICALLY CALL A GRADIENT.

14:19:55   9   LANE CREATED WHAT'S CALLED AN "INVERSE GRADIENT," AND THAT'S

14:19:59  10   HOW HE EVALUATED ALL THE CASE HISTORIES THAT HE LOOKED AT AND

14:20:02  11   DEVELOPED HIS METHODOLOGY, WHICH I SAID HAS BEEN AROUND FOR

14:20:05  12   80 YEARS.

14:20:07  13                  NEXT SLIDE.

14:20:08  14                  SO IT'S THE VERTICAL DISTANCE PLUS A THIRD OF

14:20:11  15   THE HORIZONTAL DISTANCE, AND THAT'S BECAUSE HE WEIGHTS THIS

14:20:17  16   BECAUSE SOIL TRAVELS FASTER IN A HORIZONTAL DIRECTION THAN A

14:20:20  17   VERTICAL DIRECTION.

14:20:23  18                  NEXT SLIDE.

14:20:23  19                  SO IF WE LOOK AT THIS CONFIGURATION, WE CAN

14:20:25  20   SEE -- NEXT SLIDE -- THAT THE DISTANCE -- NEXT SLIDE -- AND THE

14:20:32  21   HEAD DIFFERENCE -- NEXT SLIDE -- GIVES US A FACTOR OF ABOUT

14:20:37  22   2.6.

14:20:39  23                  GO TO THE NEXT SLIDE.

14:20:43  24                  SO WE CAN SEE 2.6 FALLS JUST ABOVE OUR -- OUR

14:20:49  25   LINE THAT LANE HAD DEVELOPED AND USED BY THE CORPS.
```

14:20:56   1               NOW, I NEVER FOUND THIS ANALYSIS IN THE

14:21:00   2   '66 REPORT, BUT WHEN I WENT THROUGH IT, THIS IS HOW I CAME UP

14:21:07   3   WITH IT.

14:21:09   4               NEXT SLIDE.

14:21:10   5               SO I LOOKED AT EVERY EXCAVATION THAT WAS DONE IN

14:21:15   6   SAUCER -- AND THE NEXT SLIDE -- AND THE BOLAND MARINE SITES,

14:21:20   7   AND I USED THAT SAME METHODOLOGY TO SEE, YOU KNOW, WHAT THE

14:21:27   8   LANE'S WEIGHTED CREEP RATIOS WOULD BE.  THIS IS IN MY REPORT.

14:21:31   9   THERE'S A TABLE THAT SHOWS ALL OF THESE RESULTS.  AND YOU'LL

14:21:34  10   SEE I'VE SHOWN IT AS A BAR BECAUSE THE RESULTS RANGE FROM HERE

14:21:41  11   UP TO, IN THIS CASE, 9.8, WHICH WOULD BE UP HERE, AND FOR

14:21:44  12   BOLAND THE VALUE WOULD BE SOMEWHERE UP HERE.

14:21:47  13               **THE COURT:**  JUST SO I UNDERSTAND IT -- AND I WON'T GO

14:21:49  14   INTO IT A LOT -- IS THIS BASED ON THE ASSUMPTION THAT THE SOILS

14:21:51  15   THAT FILLED THE EXCAVATION WERE EXACTLY OR VERY SIMILAR TO THE

14:21:57  16   SOILS THAT WERE THERE BEFORE THE EXCAVATION?

14:22:04  17               **THE WITNESS:**  IN THIS METHODOLOGY, THE SOILS THAT

14:22:07  18   WENT INTO THE EXCAVATION HAVE NO IMPACT BECAUSE IT'S REALLY

14:22:11  19   MEASURING THE ABILITY OF THE LEVEE AND THE FLOODWALL SYSTEM TO

14:22:15  20   RESIST THE UPLIFT PRESSURES AND THE SEEPAGE PRESSURES.

14:22:23  21               IF YOU GO BACK A SLIDE, PLEASE.

14:22:25  22               **THE COURT:**  ARE YOU SAYING -- I'M NOT QUITE SURE I

14:22:29  23   UNDERSTAND -- THAT -- AND YOU DID POINT OUT THAT IT'S THE

14:22:34  24   LEVEES -- THE LEVEE, ON THE PROTECTED SIDE -- THE SOILS OF THE

14:22:39  25   LEVEE ON THE PROTECTED SIDE.  SO, THEN, IT MAKES NO DIFFERENCE

14:22:45 1  IN THIS CREEP ANALYSIS WHAT THE SOILS WERE ON THE WATER SIDE?

14:22:49 2     **THE WITNESS:**  IT MAKES NO DIFFERENCE, YOUR HONOR,

14:22:50 3  WHAT THE SOILS ARE ON THE WATER SIDE.  WHAT MATTERS IS WHAT THE

14:22:54 4  SOILS ARE UNDERNEATH THE LEVEE AND ON THE PROTECTED SIDE OF THE

14:23:02 5  FLOODWALL.

14:23:03 6     **THE COURT:**  OKAY.  WHY WOULD THERE BE A GEOTECHNICAL

14:23:06 7  ANALYSIS AT ALL ON THE MCDONOUGH PIT?  WHY WOULD THERE BE ANY

14:23:10 8  GEOTECHNICAL ANALYSIS AT ALL DONE ON ANY SOILS IN ANY

14:23:12 9  EXCAVATION DONE ON THE WATER SIDE OF THE PIT?

14:23:16 10     **THE WITNESS:**  BECAUSE, YOUR HONOR, IF THERE WAS SOILS

14:23:19 11  OVER HERE OR A PERMEABLE LAYER JUST BELOW THE WALL, THEN THAT

14:23:24 12  WOULD CHANGE THE RESULTS OF THE ANALYSIS.

14:23:26 13     **THE COURT:**  I UNDERSTAND.

14:23:26 14     **THE WITNESS:**  IF, FOR EXAMPLE, YOU CALCULATED THIS --

14:23:28 15  AND THERE'S A -- A 1980 REPORT.  THERE'S A CALCULATION THAT

14:23:33 16  SHOWS THE FLOODWALL COMING DOWN 17 FEET AND THEN A PERMEABLE

14:23:38 17  LAYER BELOW THAT, AND THE SHEET PILE WALL WAS EXTENDED DOWN

14:23:42 18  THROUGH THE PERMEABLE LAYER THAT WAS BELOW THE SHEET PILE WALL.

14:23:48 19  SO YOU WOULD CUT THAT OFF.

14:23:50 20     HERE, THERE WAS NO KNOWLEDGE, IN 1966 OR IN

14:23:52 21  2000, THAT THERE WERE ANY PERMEABLE ZONES HERE.  IF I WERE TO

14:23:57 22  DIG A HOLE OUT HERE, THEN EVERY HOLE THAT I DIG FARTHER OUT

14:24:01 23  HERE, THIS VALUE HERE JUST GETS CONTINUALLY LARGER.

14:24:06 24     AND SO THE FARTHER --

14:24:08 25     **THE COURT:**  I GUESS I'M STILL A LITTLE CONFUSED.

14:24:10    1   THEN WHY DO -- WHY TAKE THE TIME TO DO A GEOTECHNICAL ANALYSIS

14:24:14    2   ON THE EBIA -- ON THE WATER SIDE OF ANY EXCAVATION, INCLUDING

14:24:20    3   THE MCDONOUGH MARINE PIT AND -- WHY?

14:24:25    4        **MR. KELLS:**  YOUR HONOR, I MIGHT BE ABLE TO HELP.  HE

14:24:27    5   HAD THE SLIDE ON MCDONOUGH MARINE --

14:24:29    6        **THE COURT:**  WELL, I --

14:24:29    7        **MR. KELLS:**  -- THAT HE COULD BRING UP AND TELL YOU --

14:24:31    8        **THE COURT:**  I -- I WANT THE GENERAL CONCEPT.  I'M

14:24:33    9   USING MCDONOUGH MARINE SIMPLY AS AN EXAMPLE.

14:24:36   10             I'M SAYING, SO IT MAKES NO DIFFERENCE, THEN, HOW

14:24:39   11   DEEP ANY HOLE WAS ON THE -- ACCORDING TO WHAT YOU'RE SAYING,

14:24:43   12   ALONG THE -- IF I'M -- PLEASE, I KNOW YOU WILL CORRECT ME -- ON

14:24:50   13   ANY -- ON THE WATER SIDE?  IS THAT --

14:24:53   14        **THE WITNESS:**  YES, YOUR HONOR.  IF YOU LOOK AT WHERE

14:24:54   15   THE CORPS DOES THEIR BORINGS, IN THE CENTER OF THE LEVEE AND ON

14:24:58   16   THE -- ON THE PROTECTED SIDE, YOU'LL SEE NOT MANY BORINGS, IF

14:25:02   17   ANY, OUT IN THE EBIA BECAUSE IN THIS -- IN THESE SEEPAGE

14:25:08   18   ANALYSES, THESE SOIL CONDITIONS, YOU KNOW, DON'T MATTER.

14:25:10   19             LIKE, WE COULD SAY AT MCDONOUGH, WE WOULD JUST

14:25:13   20   REPLACE THAT -- TAKE ALL THAT SOIL OUT; IT WON'T CHANGE THIS

14:25:17   21   ANALYSIS.

14:25:18   22             BECAUSE WHAT HAPPENS IS THE FLOODWATERS ARE

14:25:20   23   ALWAYS HERE.  THIS IS THE MOST CRITICAL CONDITION THAT THIS

14:25:24   24   WILL FACE, THIS WATER UP AGAINST THE FLOODWALL.  IF WE START TO

14:25:29   25   THINK ABOUT PATHS FARTHER AND FARTHER AWAY, WHAT HAPPENS IS --

14:25:31    1   AND THIS IS BASIC TO DARCY'S LAW -- THE HEAD REMAINS THE SAME,

14:25:38    2   BUT THE PATH OF THE WATER GETS GREATER.

14:25:41    3                  AND AS THAT NUMBER GETS SMALLER AND SMALLER,

14:25:44    4   LESS AND LESS FLOW OCCURS.  THAT'S THE FUNDAMENTAL APPLICATION

14:25:47    5   OF DARCY'S LAW, WHICH IS THE APPLICATION OF ALL FLUID FLOWS

14:25:53    6   THROUGH A POROUS MEDIUM.

14:25:55    7            **THE COURT:**  SO, AGAIN, WAS THERE A NEED TO DO A

14:25:57    8   GEOTECHNICAL EVALUATION OF ANY OF THESE HOLES?

14:26:01    9            **MR. KELLS:**  YOUR HONOR --

14:26:02   10            **THE COURT:**  I'M JUST ASKING HIM, SIR, NOT YOU.  I'M

14:26:05   11   ASKING HIM RIGHT NOW.  SO YOU CAN STAND UP FOR TIME IMMEMORIAL.

14:26:08   12                  I'M ASKING YOU RIGHT NOW:  WAS THERE A NEED TO

14:26:12   13   DO ANY GEOTECHNICAL EVALUATION OF ANY EXCAVATION ON THE WATER

14:26:17   14   SIDE OF THE FLOODWALL?

14:26:20   15            **THE WITNESS:**  THE ANSWER, SIR, IS NO.  AND THE REASON

14:26:23   16   FOR THAT --

14:26:24   17            **THE COURT:**  OKAY.

14:26:24   18            **THE WITNESS:**  -- IS THAT THE CONSTRUCTION ENGINEER

14:26:27   19   OUT THERE AT THE SITE, MR. GUILLORY, AND ANY ENGINEER OUT THERE

14:26:31   20   AT THE SITE WOULD KNOW THAT IN DESIGNING THE FLOODWALL SYSTEM

14:26:35   21   AND THE SHEET PILE DEPTH, THAT THE SEEPAGE CONDITIONS WOULD

14:26:39   22   HAVE BEEN ACCOUNTED FOR, FOR THE MOST CRITICAL CASE.

14:26:42   23                  AND BECAUSE OF THE WAY SEEPAGE ANALYSIS WORKS,

14:26:45   24   THE FARTHER AWAY YOU MAKE -- YOU PUT THAT WATER INTO THE

14:26:49   25   SUBSURFACE, THE SAFER IT GETS.  AS ALL OF THESE ANALYSES THAT I

14:26:54   1   DID FOR BOLAND AND SAUCER, YOU SEE THAT THE NUMBERS START GOING

14:27:00   2   FARTHER AND FARTHER UP.  BECAUSE IN SOME CASES, IF I ASSUME THE

14:27:05   3   WATER GOES INTO THAT EXCAVATION, WHETHER IT'S RIVER SAND OR

14:27:08   4   BORROW PIT MATERIAL, IT'S 500 FEET AWAY.

14:27:10   5           **THE COURT:**  OKAY.  I WASN'T ASKING ABOUT 500 FEET

14:27:12   6   AWAY.  MY QUESTION WAS -- WAS UP TO THE FLOODWALL, AND I'M NOT

14:27:17   7   SAYING THERE WAS ONE THERE.  I'M JUST TRYING TO UNDERSTAND THIS

14:27:20   8   PRINCIPLE, AND THAT'S ALL I'M TRYING TO DO.  I'M NOT TRYING

14:27:23   9   TO -- AND I NEED TO UNDERSTAND IT AS BEST I CAN.

14:27:29   10          AND SO MY QUESTION WAS:  IS THERE A NEED TO DO

14:27:33   11  AN EXCAVATION -- A GEOLOGICAL EVALUATION ON A 12- TO 15-FOOT

14:27:39   12  HOLE 2 FEET FROM THE FLOODWALL?  IS THERE A NEED TO, AND YOU

14:27:44   13  CAN EXPLAIN IT TO ME.

14:27:46   14          FROM WHAT I UNDERSTAND, BASED ON WHAT YOU

14:27:48   15  SAID -- I DON'T THINK THERE IS, BASED ON YOUR TESTIMONY, BUT I

14:27:52   16  MAY BE COMPLETELY MISUNDERSTANDING YOUR TESTIMONY, AND I DON'T

14:27:55   17  WANT TO DO THAT.

14:27:56   18          **THE WITNESS:**  WELL, SIR, NO, THAT'S A GOOD QUESTION.

14:27:58   19          **MR. KELLS:**  CAN I --

14:28:00   20          **THE COURT:**  SIR, I'M ASKING THIS QUESTION.  YOU CAN

14:28:02   21  OBJECT TO IT ON THE RECORD.  IT'S OVERRULED.

14:28:05   22          **MR. KELLS:**  I JUST WANTED TO ASK A CLARIFYING

14:28:06   23  QUESTION, YOUR HONOR.

14:28:07   24          **THE COURT:**  NO, I WANT HIM TO ANSWER THIS BEFORE YOU

14:28:10   25  ASK HIM ANYTHING.  I WANT HIM TO ANSWER THAT QUESTION.

14:28:11   1                 **MR. KELLS:**  I JUST WANT TO UNDERSTAND FOR MYSELF --

14:28:13   2                 **THE COURT:**  THE QUESTION IS REAL SIMPLE:  IS A 12- TO

14:28:16   3    15-FOOT HOLE 2 FEET AWAY FROM THE FLOODWALL, DO WE NEED TO DO

14:28:20   4    AN ANALYSIS -- A LANE'S CREEP ANALYSIS?

14:28:23   5                 **THE WITNESS:**  IF YOU REMOVE THE LEVEE, THEN YOU --

14:28:23   6                 **THE COURT:**  YOU SAID "REMOVE THE LEVEE."  YOU DO NOT

14:28:26   7    REMOVE THE LEVEE.  YOU'RE 2 FEET AWAY FROM LEVEE, AND IT'S A

14:28:29   8    12- TO 15-FOOT WELL.

14:28:32   9                 **THE WITNESS:**  SO OUT HERE AT THE TOE OF THE LEVEE --

14:28:35  10                 **THE COURT:**  YES, THAT'S CORRECT.

14:28:35  11                 **THE WITNESS:**  NO.

14:28:35  12                 **THE COURT:**  OKAY.  HE JUST ANSWERED MY QUESTION.

14:28:36  13                 **MR. KELLS:**  OKAY.  AND I -- MY CLARIFICATION --

14:28:39  14                 **THE COURT:**  I QUIT.  IT'S UP -- YOU CAN DO WHATEVER

14:28:39  15    YOU WANT NOW.  IT'S YOUR --

14:28:40  16                 **MR. KELLS:**  ALL I WANTED TO ASK WAS -- I HAD HEARD

14:28:42  17    YOUR QUESTION AS ANY STABILITY ANALYSIS IN MCDONOUGH MARINE.

14:28:45  18    AND AT PLATE 19 HE DID TALK ABOUT THE STABILITY ANALYSIS THAT

14:28:49  19    WAS DONE THERE, AND SO I JUST WANTED TO CLARIFY WHETHER YOUR

14:28:52  20    QUESTION WAS WHETHER A SEEPAGE ANALYSIS NEEDED TO BE DONE -- A

14:28:57  21    GEOTECHNICAL ANALYSIS GENERALLY MIGHT INCLUDE BOTH.  I WANTED

14:28:59  22    TO CLARIFY --

14:29:02  23                 **THE COURT:**  THAT'S TRUE.  THAT'S A FAIR -- THAT'S A

14:29:02  24    FAIR COMMENT, AND I'LL LET YOU CLARIFY.  ANY TIME YOU DEEM YOU

14:29:10  25    WANT TO --

| | | |
|---|---|---|
| 14:29:11 | 1 | **MR. KELLS:**  THAT WAS ALL THE CLARIFICATION I WANTED. |
| 14:29:11 | 2 | **THE COURT:**  IF YOU WANT TO ASK HIM ABOUT THAT, YOU |
| 14:29:12 | 3 | CAN TO THAT NOW, YOU CAN DO IT LATER.  I'LL LEAVE IT UP TO YOU. |
| 14:29:15 | 4 | YOU CAN DO IT RIGHT NOW IF YOU WANT, BECAUSE I DON'T WANT TO |
| 14:29:17 | 5 | CONFUSE THE RECORD. |
| 14:29:18 | 6 | **MR. KELLS:**  NO, NO.  I UNDERSTAND.  I HEARD YOUR |
| 14:29:21 | 7 | QUESTION TO BE:  DID ANY GEOTECHNICAL -- |
| 14:29:22 | 8 | **THE COURT:**  YES. |
| 14:29:23 | 9 | **MR. KELLS:**  -- ANALYSIS NEED TO BE DONE AT -- |
| 14:29:24 | 10 | **THE COURT:**  YES. |
| 14:29:25 | 11 | **MR. KELLS:**  -- MCDONOUGH MARINE. |
| 14:29:25 | 12 | BY MR. KELLS: |
| 14:29:26 | 13 | Q.   AND, DR. LUCIA, AT PLATE 19 IN YOUR PRESENTATION -- |
| 14:29:32 | 14 | **MR. KELLS:**  DAWN, IF YOU WANT TO PULL THAT UP REAL |
| 14:29:34 | 15 | QUICK FOR US, PLEASE. |
| 14:29:35 | 16 | **THE COURT:**  IF YOU CAN CLARIFY THAT, PLEASE DO SO. |
| 14:29:36 | 17 | YOU'RE ABSOLUTELY ENTITLED TO DO IT AND YOU SHOULD DO IT. |
| 14:29:38 | 18 | BY MR. KELLS: |
| 14:29:38 | 19 | Q.   AND AT PLATE 19 -- WAS, IN FACT, A GEOTECHNICAL ANALYSIS |
| 14:29:41 | 20 | DONE FOR THE MCDONOUGH BORROW PIT AND THE SUREKOTE ROAD |
| 14:29:45 | 21 | EXCAVATIONS? |
| 14:29:47 | 22 | A.   FOR STABILITY ANALYSIS, YES. |
| 14:29:48 | 23 | Q.   BUT NOT FOR SEEPAGE? |
| 14:29:50 | 24 | A.   NO. |
| 14:29:50 | 25 | Q.   AND THAT'S -- WE DON'T HAVE A RECORD THAT IT WAS DONE, BUT |

14:29:53  1  IT WAS -- IN YOUR OPINION, AS I HEARD IT, IT WAS A REASONABLE

14:29:57  2  EXERCISE OF JUDGMENT THAT ONE WAS NOT REQUIRED, IS THAT BECAUSE

14:30:02  3  OF THE TESTIMONY YOU JUST GAVE ABOUT HOW LANE'S WEIGHTED CREEP

14:30:06  4  RATIO WORKS?

14:30:07  5  **A.**   EXACTLY.

14:30:08  6          **THE COURT:**  I UNDERSTAND IT, AND YOUR POINT WAS WELL

14:30:10  7  MADE.

14:30:12  8          **MR. KELLS:**  THANK YOU, YOUR HONOR.  I'LL LET -- I

14:30:14  9  WILL ALLOW DR. LUCIA TO CONTINUE WITH THE SLIDE THAT HE WAS AT.

14:30:17  10         **THE COURT:**  AND I WANTED TO GET MY THING THROUGH, AND

14:30:20  11 I WAS GOING TO GIVE YOU EVERY OPPORTUNITY TO CLEAR IT UP, WHICH

14:30:23  12 YOU DID.

14:30:24  13         **MR. KELLS:**  THANK YOU, YOUR HONOR.

14:30:24  14         **THE COURT:**  AT LEAST BY MY LIKES.  I'M NOT -- WE'LL

14:30:29  15 SEE IF THE OTHER SIDE PROBES FURTHER.

14:30:30  16              GO AHEAD.  AND SORRY TO GET OFF TRACK, SIR.  GO

14:30:33  17 AHEAD.

14:30:34  18         **THE WITNESS:**  WELL, I BELIEVE I WAS ON THIS SLIDE A

14:30:36  19 WHILE AGO.

14:30:38  20              AGAIN, I'LL JUST SUMMARIZE THIS, AS THAT THIS IS

14:30:41  21 AN EVALUATION DONE BY ME ON THE LANE'S WEIGHTED CREEP RATIOS

14:30:47  22 FOR THE EXCAVATIONS.

14:30:51  23              AND PART OF THE POINT I'M TRYING TO MAKE IS

14:30:54  24 THAT -- THAT TRYING TO ASSESS SOMEBODY'S JUDGMENT AT THE TIME

14:30:59  25 THEY DID THE WORK, I BELIEVE THAT AT THE TIME THEY WERE DOING

14:31:04   1   THIS WORK, THAT THIS -- THE SOIL CONDITIONS, THE FLOOD

14:31:08   2   CONDITIONS ALL WOULD HAVE ALLOWED THE GEOTECHNICAL ENGINEER TO

14:31:14   3   KNOW THAT THESE NUMBERS WERE GOING TO BE LARGE AND THAT THIS

14:31:18   4   WOULD NOT BE A SEEPAGE PROBLEM BECAUSE THESE CALCULATIONS WOULD

14:31:22   5   NOT FALL BELOW THIS LINE.

14:31:25   6            NOW, IN '66, THEY DID THAT.  THEY ARRIVED AT

14:31:29   7   THAT CONCLUSION WITHOUT ANY DOCUMENTED ANALYSIS.  BUT THEY MAY

14:31:34   8   HAVE DONE IT.  I DON'T KNOW, I JUST NEVER FOUND ANY.  BUT THEY

14:31:38   9   WERE CLOSE TO THE LINE, AND IT FELL INTO THE SAFE CATEGORY.

14:31:42  10            SO I THINK THIS REFLECTS JUDGMENT ON THE PART OF

14:31:47  11   PROFESSIONAL ENGINEERS, PEOPLE INVOLVED IN THE PROJECT, THAT

14:31:50  12   YOU KNOW, THIS WAS NOT A PROBLEM.

14:31:52  13            **THE COURT:**  I UNDERSTAND.

14:31:53  14            **THE WITNESS:**  AND HAD THEY DONE AN ANALYSIS AT THE

14:31:56  15   TIME, THIS IS WHAT THEY WOULD HAVE GOTTEN.

14:31:58  16            **THE COURT:**  I UNDERSTAND THAT AS WELL.

14:31:59  17            **THE WITNESS:**  NEXT SLIDE, PLEASE.

14:32:05  18            SO I THINK THE RESULTS OF THIS CONFIRM THE

14:32:06  19   JUDGMENTS.  I THINK THIS RESULT IS INTUITIVE TO A GEOTECHNICAL

14:32:11  20   ENGINEER, GIVEN THE SHORT DURATION OF THE LOADING CONDITION,

14:32:14  21   THE SOIL TYPES.  YOU KNOW, BASED ON MY OWN PERSONAL EXPERIENCE

14:32:19  22   OF THE FAILURE OF A LEVEE, SEEPAGE CONDITIONS DEVELOP OVER A

14:32:23  23   PERIOD OF MONTHS, NOT HOURS.

14:32:25  24            AND SO I WOULD SAY THAT -- THEIR JUDGMENTS ARE

14:32:29  25   CONFIRMED BY MY EXPERIENCE, MY KNOWLEDGE, AND TRAINING.

| | | |
|---|---|---|
| 14:32:31 | 1 | **THE COURT:**  I UNDERSTAND. |
| 14:32:31 | 2 | **THE WITNESS:**  AND I THINK THIS WAS AN ENTIRELY |
| 14:32:34 | 3 | APPROPRIATE EXERCISE, CONSISTENT WITH THE STANDARD OF CARE. |
| 14:32:38 | 4 | NEXT SLIDE, PLEASE. |
| 14:32:41 | 5 | **MR. GREGORY:**  EXCUSE ME, YOUR HONOR.  I'D MOVE TO -- |
| 14:32:42 | 6 | IF WE COULD GO BACK TO THE PRIOR SLIDE WHERE HE TALKS ABOUT THE |
| 14:32:47 | 7 | FAILURE OF A LEVEE. |
| 14:32:50 | 8 | HE IS -- |
| 14:32:51 | 9 | **THE COURT:**  WAIT, WAIT.  I'M NOT . . . |
| 14:32:53 | 10 | **MR. GREGORY:**  IT SAYS:  "BASED ON MY EXPERIENCE, |
| 14:32:54 | 11 | FAILURE OF A LEVEE AND ORGANIC SOILS DUE TO SEEPAGE WOULD |
| 14:33:02 | 12 | DEVELOP OVER A PERIOD OF MONTHS, NOT 30 HOURS." |
| 14:33:05 | 13 | **THE COURT:**  WELL, ONE, LET ME -- LET ME -- MAYBE IT'S |
| 14:33:09 | 14 | A GOOD TIME FOR ME TO -- AND I'M SORRY TO TAKE UP YOUR TIME |
| 14:33:12 | 15 | DOING THIS, SIR. |
| 14:33:13 | 16 | BUT AS I UNDERSTAND IT -- NO EXPERT HAS OPINED |
| 14:33:16 | 17 | THAT UNDERSEEPAGE WAS THE CAUSE OF THIS FAILURE, AS I |
| 14:33:18 | 18 | UNDERSTAND IT. |
| 14:33:20 | 19 | AM I CORRECT?  DOES THE PLAINTIFF AGREE? |
| 14:33:24 | 20 | **MR. GREGORY:**  YOUR HONOR, I -- WE KNOW WHAT DR. BEA |
| 14:33:27 | 21 | TESTIFIED TO. |
| 14:33:28 | 22 | **THE COURT:**  AND AS I UNDERSTAND IT, IT WAS NOT |
| 14:33:30 | 23 | UNDERSEEPAGE.  IN FACT, HE CLEARLY STATED THAT IN HIS FIRST |
| 14:33:35 | 24 | SLIDE.  BUT -- |
| 14:33:41 | 25 | **MR. SMITH:**  YOUR HONOR, THAT -- THE PLAINTIFFS' |

14:33:41  1   THEORY OF THIS CASE HAS BEEN UNDERSEEPAGE, I GUESS, UNTIL

14:33:48  2   DR. BEA PUT UP HIS FIRST SLIDE.

14:33:50  3          **THE COURT:**  WELL, I DON'T KNOW.  WE'LL HAVE TO --

14:33:51  4   AGAIN, THE UPLIFT PRESSURES IS WHAT I'M TALKING ABOUT.

14:33:54  5          **MR. GREGORY:**  YES, YOUR HONOR.

14:33:56  6          **MR. SMITH:**  WELL, DR. BEA HAS NOW DEFINED

14:33:57  7   UNDERSEEPAGE NOT TO INCLUDE FLUID TRANSMISSION.

14:34:00  8               BUT AS EVERY WIT- -- EVERY GOVERNMENT WITNESS

14:34:04  9   CERTAINLY WILL TESTIFY, EVERY GEOTECHNICAL EXPERT, AND I

14:34:08  10  BELIEVE WGI'S, WILL TESTIFY UNDERSEEPAGE INCLUDES BOTH FORCES.

14:34:13  11         **THE COURT:**  I DIDN'T WANT TO GET INTO THIS.  WE CAN

14:34:15  12  CERTAINLY ARGUE THAT.

14:34:15  13              I GUESS WHAT I'M WONDERING IS -- THIS ISN'T -- I

14:34:17  14  WAS JUST TRYING TO SHORTCUT THE FACT -- THE FACT IS THIS AN

14:34:21  15  OPINION ON UNDERSEEPAGE OR NOT?  IS THIS AN OPINION ON

14:34:24  16  CAUSATION?

14:34:25  17              SO WHY ISN'T IT AN OPINION ON CAUSATION THAT --

14:34:29  18  THAT IT TAKES 30 -- SINCE UNDERSEEPAGE IS AN ISSUE -- I THOUGHT

14:34:30  19  MAYBE IT WASN'T.  IT SAYS:  "FAILURE OF A LEVEE AND ORGANIC

14:34:34  20  SOILS DUE TO SEEPAGE WOULD DEVELOP OVER A PERIOD OF MONTHS, NOT

14:34:41  21  30 HOURS."

14:34:41  22         **MR. SMITH:**  I'LL DEFER TO MR. KELLS BECAUSE IT'S HIS

14:34:44  23  WITNESS, AND I THINK HE CAN EXPLAIN IT.

14:34:44  24         **THE COURT:**  ALL RIGHT.  YES, SIR.

14:34:45  25         **MR. KELLS:**  DR. LUCIA'S OPINIONS ABOUT THE STANDARD

14:34:49   1   OF CARE ARE BASED IN PART ON THE DESIGN CONDITION THAT THE

14:34:53   2   CORPS TAKES INTO CONSIDERATION WHEN DESIGNING THE LEVEE.

14:34:56   3              DR. LUCIA HIMSELF HAS EXPERIENCE WORKING IN AND

14:34:59   4   AROUND LEVEES, AND I DID THAT WITH THE FOUNDATIONAL TESTIMONY.

14:35:02   5              **THE COURT:**  I KNOW YOU DID.  IS THIS A CAUSATION

14:35:03   6   OPINION?  IF YOU'RE TELLING ME THIS IS NOT A CAUSATION --

14:35:05   7              **MR. KELLS:**  NO.  THIS IS BASED ON HIS EXPERIENCE,

14:35:06   8   BASED ON THE JUDGMENT THAT GEOTECHNICAL ENGINEERS WOULD

14:35:11   9   EXERCISE.

14:35:11  10              **THE COURT:**  WELL, LET ME SAY THAT BASED ON MY

14:35:14  11   EXPERIENCE IN THIS COURT, A LOT OF LEVEES IN THIS CITY -- A LOT

14:35:16  12   OF LEVEES FAILED IN THIS CITY NOT BECAUSE THEY WERE OVERTOPPED;

14:35:20  13   BECAUSE THEY BROKE.  AND A LOT OF ASSUMPTIONS WERE MADE AND A

14:35:23  14   LOT OF CALCULATIONS WERE MADE THAT WERE WRONG.

14:35:26  15              SO LET ME -- LET ME JUST BITCH.  THERE'S A LOT

14:35:29  16   OF -- SO -- SO I DON'T TAKE ANYTHING AS GOSPEL FROM ANYBODY IN

14:35:33  17   THIS COURTROOM, INCLUDING DR. BEA OR ANYONE ELSE.

14:35:38  18              DO YOU UNDERSTAND THAT?

14:35:38  19              **MR. KELLS:**  I UNDERSTAND THAT.

14:35:39  20              **THE COURT:**  BECAUSE THERE WERE A LOT OF -- A LOT OF

14:35:40  21   GOSPEL GIVEN HERE THAT WASN'T GOSPEL.  SO I AM A SKEPTIC --

14:35:45  22              **MR. KELLS:**  I UNDERSTAND, YOUR HONOR.

14:35:45  23              **THE COURT:**  -- AND RIGHTFULLY SO.

14:35:47  24              BUT THE BOTTOM LINE IS -- I JUST WANT TO GET

14:35:48  25   THAT ON THE RECORD.

14:35:50    1              THE BOTTOM LINE IS:  IS THIS A CAUSATION OPINION

14:35:53    2    OR NOT?

14:35:53    3              I'M GOING TO IGNORE IT, WHATEVER IS UP THERE.

14:35:55    4    HOW ABOUT THAT?

14:35:56    5         **MR. KELLS:**  I UNDERSTAND, YOUR HONOR.

14:35:56    6         **THE COURT:**  I'M SAYING -- HE'S SAYING THE BOTTOM LINE

14:36:00    7    OF HIS OPINION, AS A VERY WELL-QUALIFIED GEOTECHNICAL ENGINEER,

14:36:03    8    IS THAT THESE ENGINEERS IN THIS CASE EXERCISED GOOD ENGINEERING

14:36:07    9    JUDGMENT BASED ON THESE SOIL CONDITIONS.

14:36:09   10              AND I'M GOING TO LET THIS SLIDE COME IN AND I'LL

14:36:12   11    GIVE IT THE WEIGHT THAT I GIVE IT.  SO I'M GOING TO LET IT COME

14:36:17   12    IN.

14:36:18   13              SO YOUR OBJECTION'S OVERRULED.  HOW'S THAT?

14:36:21   14              LET'S MOVE ON.

14:36:21   15         **MR. GREGORY:**  THANK YOU, YOUR HONOR.

14:36:22   16         **THE WITNESS:**  THANK YOU, YOUR HONOR.

14:36:23   17              NEXT SLIDE, PLEASE.

14:36:25   18              WE'RE GOING TO LOOK A LITTLE BIT AT THE

14:36:28   19    STABILITY ANALYSIS.

14:36:29   20              NEXT SLIDE.

14:36:32   21              ACCORDING TO WHAT WE CALL THE METHOD OF PLANES

14:36:34   22    DEFINES THOSE AREAS.  AND THEY DO THIS TO DEFINE WHAT WE CALL A

14:36:38   23    MINIMUM CONTROL LINE, THOSE AREAS WHERE EXCAVATIONS CAN IMPACT

14:36:41   24    THE WALL AND THOSE AREAS WHERE EXCAVATIONS HAVE NO IMPACT.

14:36:45   25              NEXT SLIDE.

14:36:47   1                    IT'S VERY SIMPLE.  THIS CONTAINS ALL THE THINGS

14:36:53   2   THAT ALL SOIL STABILITY ANALYSES HAVE.  THEY LOOK AT -- THIS

14:36:57   3   SOLID RED LINE HERE, THERE'S WEIGHT DRIVING DOWN, INCLUDING

14:37:01   4   THIS WATER UP HERE, BECAUSE THIS IS A FLOOD CONDITION.  YOU

14:37:04   5   HAVE WEIGHT HERE AND SHEAR FORCES HERE, WEIGHT HERE AND SHEAR

14:37:07   6   FORCES HERE.

14:37:08   7                    AND THEY TRY TO FIND THAT SURFACE WHICH HAS THE

14:37:11   8   LOWEST FACTOR OF SAFETY.  FOR THE CORPS, THAT HAS TO BE 1.3.

14:37:18   9                    NEXT SLIDE.

14:37:20  10                    SO THIS IS THE ACTUAL 1966 ANALYSIS OF THE EBIA

14:37:26  11   LEVEE.  THERE'S A COPY OF THIS IN MY REPORT.

14:37:29  12                    AND SO THEY LOOKED AT A NUMBER OF POTENTIAL

14:37:33  13   FAILURE SURFACES AND FOUND -- A FACTOR OF SAFETY, MINIMUM

14:37:37  14   TYPICALLY FOR THE CORPS, IS 1.3.  LOWER FACTORS OF SAFETY ARE

14:37:42  15   USED FOR FLOOD CONDITIONS, FOR MANY SOIL CONDITIONS.

14:37:47  16                    AND ONE OF THE CRITERIA -- ALL THE PEOPLE I

14:37:50  17   TALKED TO IN THE CORPS IS THAT WORK OUTSIDE THE MCL -- AND THIS

14:37:54  18   IS THE MINIMUM CONTROL LINE HERE, THE MCL.  AND THIS IS WHERE

14:37:58  19   THIS POTENTIAL -- THIS SURFACE WITH THE LOWEST FACTOR OF SAFETY

14:38:02  20   EXITS THIS SLOPE.

14:38:05  21                    SO ANY WORK OUTSIDE OF HERE WILL GENERALLY NOT

14:38:08  22   AFFECT THE STABILITY OF THE FLOODWALL.

14:38:10  23            THE COURT:  "OUTSIDE OF HERE," I'M NOT -- WHAT'S THE

14:38:13  24   DISTANCE YOU'RE TALKING?

14:38:14  25            THE WITNESS:  I'M SORRY, YOUR HONOR?

14:38:15   1              **THE COURT:**  WHAT'S THE DISTANCE?  YOU SAID "OUTSIDE

14:38:17   2    OF HERE."  I'M NOT QUITE SURE WHAT . . .

14:38:20   3              **THE WITNESS:**  THIS LINE HERE IS ABOUT 15 TO 20 FEET

14:38:23   4    AWAY FROM THE FLOODWALL.  AND -- AND SO THIS -- THIS SURFACE

14:38:29   5    HERE HAS THE LOWEST FACTOR OF SAFETY FOR GLOBAL STABILITY OF

14:38:35   6    ANY OTHER SURFACE IN HERE.

14:38:38   7                   AND SO THE CORPS' REQUIREMENTS ARE THAT THE

14:38:41   8    MINIMUM CONTROL LINE IS THE LINE AT WHICH YOU CAN'T DO THINGS

14:38:47   9    INSIDE THAT LINE.

14:38:51  10              **THE COURT:**  ALL RIGHT.  AND WHAT'S THAT LINE?

14:38:54  11              **THE WITNESS:**  IT'S CALLED THE MINIMUM CONTROL LINE.

14:38:57  12              **THE COURT:**  NO, NO, NO.  WHAT'S THE DISTANCE OF THAT

14:38:57  13    LINE?

14:38:57  14              **THE WITNESS:**  OH.  AND THIS IS ABOUT 15 TO 20 FEET

14:38:57  15    AWAY FROM THE FLOODWALL.

14:38:57  16              **THE COURT:**  WELL, YOU KNOW THAT I'VE READ DEPOSITIONS

14:38:58  17    THAT THE CORPS -- SOME PEOPLE IN THE CORPS IN THIS CASE

14:39:02  18    TESTIFIED THEY'RE CONCERNED IF IT'S 300 FEET.

14:39:08  19              **THE WITNESS:**  I HAD DISCUSSIONS WITH MR. COLLETTI,

14:39:09  20    AND --

14:39:11  21              **THE COURT:**  BUT HE TESTIFIED HERE IN COURT UNDER

14:39:13  22    OATH.

14:39:13  23              **THE WITNESS:**  I UNDERSTAND THAT.

14:39:14  24              **THE COURT:**  AND SO THAT'S GOING TO BE THE TESTIMONY.

14:39:16  25    YOUR DISCUSSIONS ARE NOT GOING TO BE TESTIMONY.  I'M SAYING HE

14:39:20   1   TESTIFIED UNDER OATH HERE.

14:39:21   2            **THE WITNESS:**  I UNDERSTAND THAT, YOUR HONOR.

14:39:24   3            **THE COURT:**  YOU'D BETTER LEAVE IT AT THAT.

14:39:26   4            **THE WITNESS:**  AND MR -- THE 300-FOOT IS -- MY

14:39:31   5   UNDERSTANDING IS THAT ANY WORK DONE IN THERE BY THIRD PARTIES,

14:39:35   6   THE CORPS WANTS TO REVIEW.

14:39:36   7            **THE COURT:**  WELL, I'M INTRIGUED WHY NON-THIRD PARTIES

14:39:39   8   ARE -- WHY STABILITY IS DIFFERENT FOR NON-THIRD PARTIES THAN

14:39:44   9   THIRD PARTIES.  I'M VERY INTERESTED IN THE ENGINEERING

14:39:47  10   EXPLANATION FOR THAT.

14:39:48  11            **THE WITNESS:**  BECAUSE THE CORPS DOES ITS OWN

14:39:50  12   EVALUATION THROUGH THIS PARTICULAR METHODOLOGY RIGHT HERE.

14:39:53  13            **THE COURT:**  OKAY.  THAT'S FINE.  THANK YOU, SIR.

14:39:54  14            **THE WITNESS:**  AND SO WHEN THEY'RE DOING WORK LIKE

14:39:57  15   THEY DID IN THE EBIA HERE, THIS IS THEIR EVALUATION OF THE

14:40:02  16   DISTANCE IN WHICH IT WILL HAVE AN EFFECT ON THE FLOODWALL.

14:40:09  17            **THE COURT:**  THUS FAR, NO ONE WITH THE CORPS HAS MADE

14:40:11  18   THAT -- GIVEN THAT TESTIMONY IN THIS COURT UNDER OATH.

14:40:16  19                  AND I READ THE DEPOSITION.  SO WHATEVER YOU

14:40:18  20   TALKED -- AND WE HEARD MR. COLLETTI.

14:40:22  21                  SO LET'S MOVE ON.

14:40:23  22            **THE WITNESS:**  BUT THIS IS NOT AN ABSOLUTE.

14:40:29  23            **THE COURT:**  I'M GLAD, BECAUSE I DON'T -- I SEE VERY

14:40:31  24   FEW ABSOLUTES IN THIS WORLD.

14:40:33  25            **THE WITNESS:**  YES, SIR.

| | | |
|---|---|---|
| 14:40:33 | 1 | AN EXCAVATION ADJACENT TO THIS, DEPENDING ON THE |
| 14:40:37 | 2 | SIZE AND THE DEPTH OF THAT EXCAVATION, CAN HAVE AN EFFECT ON |
| 14:40:41 | 3 | THIS. |
| 14:40:42 | 4 | **THE COURT:**  AND I WANT YOU TO KNOW, SIR, I'M NOT |
| 14:40:44 | 5 | CHALLENGING YOUR STANDARD OF CARE TESTIMONY AT ALL.  THAT'S |
| 14:40:47 | 6 | NOT -- I JUST GET THROWN OFF BY SOME OTHER THINGS.  SO -- NOT |
| 14:40:53 | 7 | RELATING TO YOUR BASIC -- THE THRUST OF YOUR TESTIMONY, WHICH I |
| 14:40:56 | 8 | UNDERSTAND AND IT'S BEEN WELL STATED. |
| 14:40:59 | 9 | GO AHEAD, SIR. |
| 14:41:02 | 10 | **THE WITNESS:**  AND, YOUR HONOR, THIS IS -- THIS IS AN |
| 14:41:08 | 11 | ABSOLUTELY TECHNICAL ARGUMENT RELATED TO STABILITY AND EFFECTS |
| 14:41:12 | 12 | OF ANY WORK -- EXCAVATIONS OR FILL THAT ARE PLACED ON THERE ON |
| 14:41:17 | 13 | A PARTICULAR SURFACE WHERE THAT SURFACE'S STABILITY CAN BE |
| 14:41:23 | 14 | IMPACTED. |
| 14:41:24 | 15 | IN FACT, ANY SURFACE THAT WENT FARTHER OUT -- |
| 14:41:26 | 16 | SAY WE WENT OUT TO 300 FEET, FOR EXAMPLE. |
| 14:41:29 | 17 | **THE COURT:**  ALL RIGHT. |
| 14:41:29 | 18 | **THE WITNESS:**  THE FACTOR OF SAFETY MIGHT BE AS HIGH |
| 14:41:31 | 19 | AS 5 OR 10 AS WE MOVE FARTHER OUT HERE. |
| 14:41:35 | 20 | I UNDERSTAND THE CORPS' DESIRE TO -- TO KNOW |
| 14:41:40 | 21 | THINGS WITHIN SOME DISTANCE FROM THE -- FROM THE FLOODWALL. |
| 14:41:46 | 22 | AND THAT 300 FEET, I'VE HEARD THAT NUMBER, AND I |
| 14:41:48 | 23 | UNDERSTAND THAT NUMBER.  AND I -- IF I WERE THE CORPS, I WOULD |
| 14:41:53 | 24 | HAVE SOME NUMBER LIKE THAT. |
| 14:41:57 | 25 | BUT WHEN YOU EVALUATE THE ACTUAL PROJECT AND THE |

14:41:59   1   WORK TO BE DONE AGAINST THE IMPACT ON THE FLOODWALL SYSTEM,

14:42:03   2   THEN YOU WOULD DO SOME TYPE OF ANALYSIS LIKE THIS THAT YOU

14:42:06   3   WOULD SAY, I'M GOING TO DIG A 50-FOOT HOLE HERE, OR A 100-FOOT

14:42:12   4   HOLE -- DEEP HOLE HERE, YOU KNOW, 25 FEET AWAY FROM THAT, THAT

14:42:17   5   MIGHT HAVE AN IMPACT EVEN THOUGH IT'S OUTSIDE THE MINIMUM

14:42:20   6   CONTROL LINE.

14:42:21   7           **THE COURT:**  DO YOU KNOW IF SUCH A CALCULATION WAS

14:42:22   8   DONE HERE BY THE CORPS?

14:42:26   9           **THE WITNESS:**  THIS IS A CALCULATION THAT WAS DONE FOR

14:42:29  10   THE EBIA IN 1966.

14:42:30  11           **THE COURT:**  OKAY.  ALL RIGHT.  I UNDERSTAND.

14:42:33  12           **THE WITNESS:**  AND IN MY OPINION, SIR, THIS APPLIES TO

14:42:36  13   THE TASK ORDER 26 WORK.

14:42:37  14           **THE COURT:**  I UNDERSTAND THAT TOO.

14:42:41  15           **THE WITNESS:**  SO WHEN MR. GUILLORY SENT HIS MCDONOUGH

14:42:47  16   MARINE EXCAVATIONS AND SUREKOTE ROAD EXCAVATIONS TO THE CORPS

14:42:52  17   AND THEY CAME BACK WITH THIS, WITH SOMETHING THAT WAS -- YOU

14:42:56  18   KNOW, A PROPER EXCAVATION TO BE DONE, THAT EXCAVATION STARTS

14:43:00  19   RIGHT OUT OVER IN THIS HERE, 50 FEET AWAY FROM THE FLOODWALL

14:43:05  20   AND THEN GOES DOWN AT A 6-1/2-TO-1 SLOPE.

14:43:08  21           AND THEY APPROVED THAT EXCAVATION AS NOT HAVING

14:43:12  22   AN IMPACT ON THE FLOODWALL SYSTEM.

14:43:14  23           **THE COURT:**  OKAY.  I UNDERSTAND THAT.

14:43:17  24           **THE WITNESS:**  OKAY.

14:43:17  25           **THE COURT:**  THANK YOU.

14:43:17    1            THE WITNESS:  NEXT SLIDE, PLEASE.

14:43:21    2                 THESE ARE THE ACTUAL CALCULATIONS FROM THE 1966

14:43:27    3    REPORT AND THE CORPS' EVALUATION OF THAT, AND I WON'T DISCUSS

14:43:31    4    THOSE AGAIN.

14:43:32    5                 NEXT SLIDE.

14:43:35    6                 WHAT'S IMPORTANT IS THAT AT THE TIME THEY DID

14:43:40    7    THIS WORK, THAT THERE'S TWO TYPES OF ANALYSIS THAT, AS

14:43:47    8    GEOTECHNICAL ENGINEERS, WE CAN DO.

14:43:49    9                 WE EITHER KNOW WHAT THE PORE PRESSURES OR

14:43:54   10    HYDRAULIC PRESSURES ARE OR WE DON'T.  AND WHEN WE DON'T KNOW,

14:43:57   11    WE USE UNDRAINED STRENGTHS AND UNDRAINED ANALYSIS.

14:44:00   12                 NOW, HOW DOES THAT -- THE QUESTION IS, HOW DOES

14:44:03   13    THAT TELL US HOW THE SOIL WILL BEHAVE WHEN THESE HYDRAULIC

14:44:07   14    PRESSURES ARE APPLIED?

14:44:10   15                 NOW, IN THE '66 REPORT THERE WAS A STATEMENT TO

14:44:13   16    THE EFFECT THAT THESE TYPES OF PRESSURES WEREN'T ANTICIPATED,

14:44:17   17    BUT THAT DOESN'T MEAN THEY DIDN'T EVALUATE FOR THAT.

14:44:22   18                 THE WAY THIS WORKS IS THAT AS THAT FLOOD FLOW

14:44:26   19    COMES ON, IT PUTS PRESSURE ONTO THE SOIL.  AND WHAT WE NEED TO

14:44:31   20    KNOW IS THE ABILITY OF THE SOIL TO RESIST THAT PRESSURE.

14:44:34   21                 THE WAY YOU DO IT IS YOU TAKE A SAMPLE OF THE

14:44:37   22    SOIL AND YOU DON'T ALLOW IT TO DRAIN.  YOU TEST ITS STRENGTH

14:44:44   23    UNDRAINED.

14:44:45   24                 AND AS YOU FAIL THAT SAMPLE, WHAT HAPPENS IS

14:44:49   25    PRESSURES BUILD UP INSIDE THE SAMPLE, SO IT REPLICATES THE

14:44:56    1    STABILITY CONDITION THAT OCCURS DUE TO A SUDDEN LOAD, BUT WE

14:45:01    2    DON'T KNOW WHAT THOSE PRESSURES ARE.  YOU KNOW, WE JUST KNOW

14:45:04    3    THAT THEY OCCUR WHEN YOU SHEAR THOSE MATERIALS.  AND SO --

14:45:08    4                        THE NEXT SLIDE.

14:45:09    5                        SO THE CORPS USED UNDRAINED SHEAR STRENGTHS IN

14:45:12    6    THAT ANALYSIS.  IN MY OPINION, THAT'S THE APPROPRIATE

14:45:17    7    METHODOLOGY TO USE AND IT'S THE APPROPRIATE STRENGTHS TO USE.

14:45:20    8    THEY USED UNDRAINED SHEAR STRENGTHS TO MODEL UNDRAINED FLOODING

14:45:26    9    CONDITIONS BECAUSE HYDRAULIC PRESSURES ARE JUST UNKNOWN AND NOT

14:45:30   10    PREDICTABLE IN THESE TYPES OF SOILS.

14:45:32   11                 **THE COURT:**  THANK YOU, SIR.

14:45:33   12                 **THE WITNESS:**  NEXT SLIDE.

14:45:34   13                        SO THESE GLOBAL STABILITY EVALUATIONS INDICATE

14:45:39   14    THERE WAS A SUFFICIENT FACTOR OF SAFETY FOR THE DESIGN, AND

14:45:42   15    THAT ESTABLISHED THOSE LOCATIONS WHERE, AS YOU GOT NEAR THAT

14:45:48   16    MC- -- MINIMUM CONTROL LINE, YOU NEEDED TO TAKE A CLOSER LOOK.

14:45:54   17                        I BELIEVE THAT'S WHAT MR. GUILLORY DID.  HE

14:45:56   18    DIDN'T -- I DON'T BELIEVE HE SAW THESE EXACT DRAWINGS, BUT I

14:45:59   19    THINK ANYBODY WHO'S WORKING IN THE CORPS, THIS IS THE TYPE OF

14:46:02   20    ANALYSIS AND RESULTS YOU COULD GET WHEN YOU EVALUATED ANY TYPE

14:46:05   21    OF FLOODWALL.  I THINK THESE ARE JUST INTUITIVE TO PEOPLE.

14:46:11   22                        NEXT SLIDE.

14:46:17   23                        SO OUT OF MY REPORT, THAT -- LOOKING BACK, RIVER

14:46:22   24    SAND OR MOSTLY RIVER SAND BACKFILL WAS PLACED IN A LIMITED

14:46:26   25    NUMBER OF EXCAVATIONS AT RELATIVELY SHALLOW DEPTHS AND AT

14:46:30   1   SUBSTANTIAL DISTANCES FROM THE WALL.

14:46:35   2                      AND I SHOWED EARLIER IN THE ANALYSIS HOW THIS

14:46:35   3   REALLY HAS NO EFFECT ON THE STABILITY OF THE FLOODWALL.

14:46:39   4                      THESE SOILS WERE PLACED IN SOILS CLASSIFIED AS

14:46:44   5   FAT CLAYS, BASICALLY A CLAY TUB.  THERE WAS NO KNOWLEDGE OF A

14:46:49   6   PERMEABLE LAYER THAT EXISTED AT THE SITE, BASED ON ALL THE

14:46:51   7   INFORMATION THAT THESE PEOPLE HAD.

14:46:54   8                      NEXT SLIDE.

14:46:57   9                      THEY KNEW AND BELIEVED THAT THE SOILS IN THE

14:47:01  10   EBIA HAD A VERY LOW PERMEABILITY AND WERE UNLIKELY TO SERVE AS

14:47:08  11   A CONDUIT FOR SEEPAGE.  THEY HAD NO INFORMATION TO CONSIDER

14:47:13  12   ANYTHING ELSE.  THEY CONSIDERED THE SHORT-TERM DURATION OF

14:47:13  13   STORM LOADING, AND THEY ASSESSED THE SEEPAGE CONDITIONS IN 1966

14:47:18  14   FOR THE EBIA 2002 -- FOR THE NEW FLOOD PROJECTS.

14:47:25  15                      I THINK THAT JUDGMENT, KNOWLEDGE OF THE SOIL,

14:47:27  16   LOADING CONDITIONS, AND THE INSTITUTIONAL EXPERIENCE IN THERE

14:47:31  17   WAS SUFFICIENT TO REACH THE CONCLUSION THAT SEEPAGE ANALYSES

14:47:34  18   WERE NOT REQUIRED.

14:47:36  19                      NOW, DID THEY WRITE IT DOWN?  THEY DIDN'T WRITE

14:47:38  20   IT DOWN THAT THEY -- THEY DIDN'T DO SEEPAGE ANALYSIS, BECAUSE

14:47:42  21   THEY WERE -- THEY WERE -- THEY HAD LOOKED AT THESE OTHER

14:47:46  22   REPORTS.

14:47:48  23                      WHEN I EVALUATED THAT, I THOUGHT ABOUT THAT

14:47:51  24   ISSUE OF DOCUMENTATION OF A -- OF A CONCLUSION THAT SOMETHING

14:47:57  25   WAS NOT A PROBLEM.

```
14:48:01    1            I DON'T FIND THAT TO BE A NEGLIGENT ACT.  I
14:48:05    2    THINK IF THEY HAD NOT -- IF THEY HAD SOILS THAT WERE PERMEABLE
14:48:10    3    BY CLASSIFICATION, OR KNOWLEDGE WHERE THEY HAD A LOADING
14:48:14    4    CONDITION THAT COULD LEAD TO DEVELOPMENT OF THESE PROBLEMS AND
14:48:17    5    THEY DID NOTHING ABOUT IT, THAT WOULD BE NEGLIGENT.
14:48:20    6            THE COURT:  I UNDERSTAND.
14:48:22    7            THE WITNESS:  BUT THEY HAD NONE OF THAT.  EVERYTHING
14:48:24    8    THEY HAD WAS CONSISTENT WITH THE ACTIONS THAT THEY TOOK, AND I
14:48:30    9    FIND THOSE ACTIONS NOT TO BE NEGLIGENT.
14:48:33   10            IT WOULD HAVE BEEN GOOD ENGINEERING TO WRITE
14:48:35   11    THEM DOWN AND DOCUMENT IT.  BUT FAILURE TO DOCUMENT, TO ME, WAS
14:48:39   12    NOT NEGLIGENT.
14:48:39   13            NEXT SLIDE.
14:48:42   14            SO I THINK THESE FLOODWALLS WERE PROPERLY
14:48:44   15    EVALUATED FOR STABILITY AND DESIGN STORM EVENTS AND SUFFICIENT
14:48:49   16    ANALYSES AND JUDGMENTS WERE UTILIZED IN THEIR EVALUATION OF THE
14:48:53   17    IMPACTS FOR THE EXCAVATION IN THE EBIA.
14:48:57   18            THAT'S THE END OF MY PRESENTATION.
14:48:58   19            THE COURT:  THANK YOU, SIR.
14:48:59   20            AND I'M GOING TO SUBTRACT 20 MINUTES FROM THE
14:49:05   21    GOVERNMENT'S TIME DUE TO MY QUESTIONS.  HOPEFULLY, YOU WON'T
14:49:10   22    NEED IT, BUT YOU GOT IT.
14:49:11   23            MR. KELLS:  I APPRECIATE IT, YOUR HONOR.
14:49:12   24            THE COURT:  AGAIN, MY QUESTIONS WEREN'T REALLY --
14:49:15   25    DIDN'T GO TO THIS STANDARD OF CARE.  I DON'T WANT ANYBODY TO
```

14:49:18   1   START WORRYING ABOUT THAT.  THEY'RE GOING TO THINGS THAT I

14:49:22   2   NEEDED CLEARING UP IN MY OWN MIND, WHICH MAY OR MAY NOT HAVE

14:49:26   3   ANYTHING TO DO WITH THE CASE.

14:49:28   4            BUT OTHER THAN THAT, THAT'S THAT.  I'LL HAVE TO

14:49:32   5   MAKE IT 25 MINUTES IF I KEEP GOING.

14:49:34   6            GO AHEAD.

14:49:35   7       **MR. TREEBY:**  I'M JUST STANDING UP.

14:49:37   8       **THE COURT:**  OH, I KNOW THE FEELING, BELIEVE ME.

14:49:40   9            ALL RIGHT.  I THINK THE GOOD DOCTOR DESERVES A

14:49:44  10   RECESS HERE, AND WE'LL TAKE A 10-MINUTE RECESS.

14:49:46  11       **THE WITNESS:**  THANK YOU, YOUR HONOR.

14:49:47  12       **THE DEPUTY CLERK:**  ALL RISE.

14:49:48  13       (WHEREUPON, THE COURT TOOK A RECESS.)

15:06:56  14       **THE DEPUTY CLERK:**  ALL RISE, PLEASE.

15:07:03  15            COURT'S IN SESSION.  PLEASE BE SEATED.

15:07:05  16       **THE COURT:**  JUST A BRIEF COMMENT THAT -- AND I WOULD

15:07:07  17   LIKE THE COURT REPORTER TO NOTE THAT IT WILL NOT BE ANYBODY'S

15:07:09  18   TIME BUT MINE, JUDGE TIME.  IT DOESN'T GO TO THE 60 HOURS.  AND

15:07:14  19   IT WILL BE QUICK.

15:07:17  20            FIRST, I WANTED TO LET ABLE COUNSEL FOR THE

15:07:20  21   GOVERNMENT KNOW THAT ANY -- ANY PERCEIVED WRATH FROM THE COURT

15:07:28  22   WAS CERTAINLY NOT DIRECTED AT YOU, AND I THOUGHT YOU HANDLED

15:07:31  23   YOURSELF QUITE WELL UNDER THE CIRCUMSTANCES, FAR BETTER THAN I

15:07:35  24   DID AT YOUR STAGE IN MY LEGAL CAREER.  AND YOU GOT IT CLEARED

15:07:44  25   UP.  SO I WANTED TO LET YOU KNOW THAT.

15:07:48    1             TWO, I THINK I MAY HAVE MISSTATED DR. BEA'S

15:07:51    2   OPINION, WHICH I THINK DID REQUIRE SOME UNDERSEEPAGE IN ORDER

15:07:53    3   TO GET THE UPWARD PRESSURE.  I THOUGHT ABOUT THAT AS I WALKED

15:07:57    4   OUT.

15:07:59    5             AND, THREE, THAT ANY COMMENT I MADE ABOUT OTHER

15:08:05    6   LEVEES BREACHING ONLY HAS -- IT ONLY ACCENTUATES MY SKEPTICISM

15:08:15    7   FOR A LOT OF THINGS AND, QUITE FRANKLY, I WAS A SKEPTIC

15:08:20    8   PROBABLY AT FIVE, SO -- AND NONE OF THAT GOES TO THE WEIGHT I'M

15:08:24    9   GOING TO GIVE TO ANY STANDARD OF CARE OPINION GIVEN BY THIS

15:08:28   10   GOOD DOCTOR HERE.

15:08:30   11             AND I'D JUST LIKE THE RECORD -- MY PURPOSE IS TO

15:08:37   12   KEEP THE RECORD STRAIGHT AND KEEP MY OWN UNDERSTANDING OF WHAT

15:08:40   13   HAPPENED AND WHAT PROTOCOL EXISTED WITH THE CORPS IN MIND, EVEN

15:08:49   14   THOUGH IT MAY ULTIMATELY HAVE NO EFFECT ON THE OPINIONS I

15:08:54   15   RENDER HERE AS TO NEGLIGENCE OR CAUSATION, BECAUSE I CERTAINLY

15:08:59   16   AM NOT EVEN CLOSE TO MAKING UP MY MIND, AS I SHOULD -- AS I

15:09:01   17   SHOULDN'T BE.  NOT EVEN CLOSE.  AND I CAN YOU TELL I'M GOING TO

15:09:11   18   WANT SOME REALLY GOOD BRIEFINGS IN THIS CASE, AS I'M SURE I'LL

15:09:14   19   GET.

15:09:15   20             SO WITH ALL THAT SAID, WE'LL MOVE ON.

15:09:21   21        **MR. GREGORY:**  THANK YOU, YOUR HONOR.

15:09:21   22                    **CROSS-EXAMINATION**

15:09:23   23   BY MR. GREGORY:

15:09:23   24   **Q.**   DR. LUCIA, IS IT CORRECT THAT IN YOUR VIEW, THE STANDARD

15:09:29   25   OF CARE FOR A GEOTECHNICAL ENGINEER IS WHAT A GEOTECHNICAL

15:09:31   1   ENGINEER WOULD DO IN SIMILAR CIRCUMSTANCES AT A SIMILAR

15:09:35   2   LOCATION AT A SIMILAR TIME?

15:09:38   3   **A.**   GENERALLY, YES, I AGREE WITH THAT.

15:09:41   4   **Q.**   SO, IF, FOR EXAMPLE, SAY, A GEOTECHNICAL ENGINEER DOES

15:09:46   5   SOMETHING IN 1934 AND YOU'RE COMPARING THAT CONDUCT TO WHAT A

15:09:53   6   GEOTECHNICAL ENGINEER DOES IN 2004, THE GEOTECHNICAL ENGINEER

15:09:57   7   PROBABLY WOULDN'T DO THINGS LIKE COMPUTERIZED QUANTITATIVE

15:10:01   8   ANALYSIS, BUT THAT MIGHT BE EXPECTED OF THE GEOTECHNICAL

15:10:05   9   ENGINEER IN 2004?

15:10:09   10   **A.**   WELL, IT WOULDN'T BE A QUESTION OF WHETHER THEY USED

15:10:13   11   COMPUTERIZED ANALYSIS OR NOT, IT WOULD BE A QUESTION OF WHETHER

15:10:17   12   THE ANALYSIS THAT THEY USED INCORPORATED BASIC PRINCIPLES.  AND

15:10:24   13   WHEN COMPUTERS FIRST CAME OUT, WE USED TO CHECK ALL THE RESULTS

15:10:28   14   WITH HAND CALCULATIONS JUST BECAUSE WE DIDN'T BELIEVE IT.

15:10:31   15        SO I WOULD SAY A COMPUTER ANALYSIS BASED ON BASIC

15:10:35   16   PRINCIPLES COMPARED TO A HAND CALCULATION BASED ON BASIC

15:10:38   17   PRINCIPLES WOULD BE SIMILAR STANDARDS.

15:10:41   18   **Q.**   SURE.  AND IF A GEOTECHNICAL ENGINEER IS INVOLVED IN A

15:10:47   19   PROJECT, YOU WANT TO KNOW WHAT ANALYSIS, TO USE YOUR TERM, HE

15:10:52   20   OR SHE HAS DONE ON THAT PROJECT; CORRECT?

15:10:55   21   **A.**   YES.  THAT'S WHAT I DID IN THIS CASE.

15:10:56   22   **Q.**   AND THAT'S HOW YOU WOULD EVALUATE THE STANDARD OF CARE?

15:11:00   23   **A.**   THAT'S ONE COMPONENT, YES.

15:11:03   24   **Q.**   AND ANOTHER THING YOU MIGHT LOOK AT IS THE BACKGROUND OF

15:11:12   25   THE GEOTECHNICAL ENGINEER OR ENGINEERS INVOLVED IN THE PROJECT;

15:11:15   1   CORRECT?

15:11:22   2   **A.**   WELL, THAT MIGHT BE ONE FACTOR, BUT A YOUNG ENGINEER COULD

15:11:26   3   DO A PROPER ANALYSIS AND AN OLD, EXPERIENCED ENGINEER COULD DO

15:11:31   4   AN IMPROPER ONE.  SO WHAT'S MORE IMPORTANT IS HOW THEY

15:11:38   5   INCORPORATE THE REGIONAL KNOWLEDGE, PER SE, THE GEOLOGY AND

15:11:43   6   THEIR UNDERSTANDING OF SORT OF THE BASICS OF THAT AREA INTO

15:11:48   7   THEIR ANALYSIS.

15:11:50   8   **Q.**   SURE.  AND ONE -- ANOTHER COMPONENT OF THEIR ANALYSIS IS

15:11:54   9   BEING CONSCIOUS OF HOW LOCAL CONDITIONS CHANGE; CORRECT?

15:12:02  10   **A.**   WELL, THAT WOULD BE INCORPORATED IN A KNOWLEDGE OF LOCAL

15:12:05  11   CONDITIONS AND THE VARIABILITY OF THEM.

15:12:07  12   **Q.**   SIR, IN EXAMINING THE STANDARD OF CARE, DID YOU CONSIDER

15:12:19  13   CANON 1 OF THE AMERICAN SOCIETY OF CIVIL ENGINEERS GUIDELINES

15:12:24  14   OF PRACTICE?

15:12:26  15   **A.**   SINCE I CAN'T RECITE IT AS I SIT HERE, I -- YOU KNOW, I

15:12:29  16   DON'T THINK IT WAS DIRECTLY A PART OF MY . . .

15:12:37  17   **Q.**   SIR, I'VE ASKED KARL TO PUT UP ON THE SCREEN PX-4761-0001.

15:12:46  18   DO YOU SEE THERE THE AMERICAN SOCIETY OF CIVIL ENGINEERS CODE

15:12:49  19   OF ETHICS?  DO YOU SEE THAT?

15:12:52  20          **MR. TREEBY:**  OBJECTION.

15:12:53  21          **THE COURT:**  WE HAVE AN OBJECTION.

15:12:54  22          **MR. TREEBY:**  RIGHT.  MAYBE NOT MY OBJECTION, BUT I AM

15:12:57  23   THE ONE MONITORING, AT LEAST, THE RECEIPT OF NEW THINGS.  THIS

15:13:02  24   WAS A BRAND-NEW THING LAST NIGHT.  IT'S AN EXHIBIT.  IT'S

15:13:07  25   PROPOSED TO BE AN EXHIBIT.  IT'S NOT PROPOSED TO BE A

15:13:10   1   DEMONSTRATIVE.  WE RECEIVED IT FOR THE VERY FIRST TIME LAST

15:13:13   2   NIGHT.

15:13:14   3            THIS WITNESS MAY BE -- I HAVEN'T WORKED WITH

15:13:16   4   THIS WITNESS.  HE MAY BE FULLY CAPABLE OF DOING IT.  BUT I

15:13:19   5   WANTED TO NOTE FOR THE RECORD THAT THIS IS A BRAND-NEW EXHIBIT,

15:13:22   6   AS WERE TWO OTHERS.

15:13:24   7            **THE COURT:**  IT'S A PROPOSED EXHIBIT.  IT'S NOT IN

15:13:26   8   YET.

15:13:27   9            **MR. TREEBY:**  RIGHT.

15:13:27  10            **THE COURT:**  YES, SIR.

15:13:29  11            **MR. KELLS:**  I DO ECHO MR. TREEBY'S OBJECTION.  WE

15:13:31  12   DIDN'T RECEIVE IT UNTIL LAST NIGHT.  IT'S NOT PART OF THE

15:13:34  13   MATERIALS, TO MY KNOWLEDGE, THAT DR. LUCIA RELIED UPON IN

15:13:38  14   FORMULATING HIS OPINIONS.  I DON'T KNOW WHERE THEY PLAN ON

15:13:40  15   GOING WITH IT, BECAUSE I'M NOT SURE EVEN ONE OF THEIR OWN

15:13:43  16   WITNESSES TESTIFIED THAT THIS WAS RELEVANT TO THE STANDARD OF

15:13:46  17   CARE IN ANY WAY.

15:13:47  18            SO I'M WILLING TO LET THEM HAVE A LITTLE

15:13:50  19   LATITUDE, BUT I DO QUESTION THE RELEVANCE OF IT.  AND I THINK

15:13:52  20   THERE SHOULD BE A SHORT LEASH ON EXAMINING THIS WITNESS ON THE

15:13:55  21   CODE OF ETHICS FOR THE CODE OF ENGINEERS -- I'M NOT EVEN SURE

15:14:00  22   WHAT IT IS, TRUTH BE TOLD.

15:14:02  23            **THE COURT:**  EACH OF YOU HAVE A RIGHT TO OBJECT AT ANY

15:14:05  24   POINT FROM THIS POINT ON, ON THIS ISSUE.  YOU'VE GIVEN THE

15:14:11  25   COURT A MARKER, AND I APPRECIATE IT.

|           |    |                                                                    |
|-----------|----|--------------------------------------------------------------------|
| 15:14:14  | 1  | **BY MR. GREGORY:**                                                |
| 15:14:17  | 2  | **Q.**  SIR, ARE YOU FAMILIAR WITH THE AMERICAN SOCIETY OF CIVIL    |
| 15:14:18  | 3  | ENGINEERS CODE OF ETHICS?                                           |
| 15:14:24  | 4  | **A.**  I WOULDN'T SAY I'M FAMILIAR WITH IT IN THE SENSE THAT I,    |
| 15:14:27  | 5  | YOU KNOW, READ IT IN GREAT DETAIL.  I'M FAMILIAR THAT IT            |
| 15:14:33  | 6  | EXISTS, YES.                                                        |
| 15:14:35  | 7  | **Q.**  DO YOU -- DO YOU USE THE CODE OF ETHICS AT ALL IN           |
| 15:14:38  | 8  | DETERMINING THE APPROPRIATE STANDARD OF CARE FOR A GEOTECHNICAL     |
| 15:14:40  | 9  | ENGINEER?                                                           |
| 15:14:44  | 10 | **A.**  WELL, IF I JUST LOOK AT WHAT YOU HAVE UP ON THE SCREEN      |
| 15:14:47  | 11 | THERE IN TERMS OF, YOU KNOW, FUNDAMENTAL PRINCIPLES, I SEE          |
| 15:14:54  | 12 | NOTHING THAT WAS DONE IN THIS PROJECT THAT WOULD VIOLATE ANY OF     |
| 15:14:57  | 13 | THOSE PRINCIPLES.                                                   |
| 15:15:00  | 14 |         **MR. GREGORY:**  KARL, IF WE COULD MOVE DOWN A LITTLE      |
| 15:15:02  | 15 | BIT, THE FIRST FUNDAMENTAL CANON ON THAT PAGE.                      |
| 15:15:05  | 16 | **BY MR. GREGORY:**                                                 |
| 15:15:05  | 17 | **Q.**  DO YOU SEE THAT NUMBER 1 STATES, "ENGINEERS SHALL HOLD      |
| 15:15:12  | 18 | PARAMOUNT THE SAFETY, HEALTH, AND WELFARE OF THE PUBLIC AND         |
| 15:15:17  | 19 | SHALL STRIVE TO COMPLY WITH THE PRINCIPLES OF SUSTAINABLE           |
| 15:15:19  | 20 | DEVELOPMENT IN THE PERFORMANCE OF THEIR PROFESSIONAL DUTIES"?       |
| 15:15:24  | 21 |         DID I READ THAT CORRECTLY, SIR?                             |
| 15:15:28  | 22 | **A.**  I BELIEVE SO.                                               |
| 15:15:29  | 23 | **Q.**  AND DO YOU BELIEVE THAT AN ENGINEER, ESPECIALLY A           |
| 15:15:32  | 24 | GEOTECHNICAL ENGINEER, SHOULD HOLD PARAMOUNT THE SAFETY,            |
| 15:15:34  | 25 | HEALTH, AND WELFARE OF THE PUBLIC?                                  |

15:15:37   1    **A.**    I BELIEVE ALL ENGINEERS SHOULD.

15:15:39   2    **Q.**    SIR, IS IT AN OBLIGATION OF AN ENGINEER --

15:15:44   3           **MR. GREGORY:**    THANK YOU, KARL. YOU CAN TAKE THAT

15:15:46   4    DOWN.

15:15:47   5    **BY MR. GREGORY:**

15:15:47   6    **Q.**    SIR, IS IT THE RESPONSIBILITY OF AN ENGINEER TO ANALYZE,

15:15:54   7    ANTICIPATE, EVEN, FAILURE MODES?

15:16:02   8    **A.**    CERTAINLY, "TO ANALYZE" IS A BROAD TERM IN THE CONTEXT OF

15:16:06   9    OUR DISCUSSIONS HERE, OF COURSE. BUT "ANTICIPATE" IS

15:16:10  10    ABSOLUTELY CORRECT.

15:16:11  11    **Q.**    AND SHOULDN'T A GEOTECHNICAL ENGINEER ALSO PROVIDE

15:16:14  12    MEASURES TO PREVENT THOSE FAILURE MODES FROM DEVELOPING?

15:16:20  13    **A.**    IF THEY BELIEVE THEY'RE GOING TO OCCUR.

15:16:24  14    **Q.**    IF THEY BELIEVE THEY'RE GOING TO OCCUR OR IF THEY BELIEVE

15:16:27  15    THEY MIGHT OCCUR?

15:16:30  16    **A.**    IF THEY BELIEVE THERE'S A POSSIBILITY THEY COULD OCCUR.

15:16:32  17    **Q.**    OKAY. AND IF THERE'S A POSSIBILITY THAT A FLOODWALL WOULD

15:16:37  18    COLLAPSE DURING A HURRICANE AND FLOOD A RESIDENTIAL AREA,

15:16:43  19    THAT'S A POSSIBILITY THAT AN ENGINEER HAS TO TAKE VERY

15:16:46  20    SERIOUSLY; CORRECT?

15:16:47  21    **A.**    YES.

15:16:56  22    **Q.**    SIR, HAVE YOU SEEN EVIDENCE THAT PRIOR TO HURRICANE

15:16:59  23    KATRINA, THAT WGI SENT OUT A WGI GEOTECHNICAL ENGINEER TO THE

15:17:07  24    SITE?

15:17:11  25    **A.**    I CAN'T SAY I'M AWARE THAT WGI HAD ANY GEOTECHNICAL

15:17:15   1   ENGINEERS INVOLVED IN THEIR WORK.

15:17:17   2   Q.   HAVE YOU SEEN ANY EVIDENCE, SIR, THAT PRIOR TO HURRICANE

15:17:21   3   KATRINA, AND LET'S SAY FROM -- STARTING IN 1999, THAT THE CORPS

15:17:27   4   SENT OUT A GEOTECHNICAL ENGINEER TO THE SITE?

15:17:36   5        THE COURT:  YOU SAID PRIOR TO 1999?

15:17:38   6        MR. GREGORY:  NO, NO, I'M SORRY.  FROM 1999 UP TO

15:17:41   7   HURRICANE KATRINA.

15:17:41   8        THE COURT:  OH, OKAY.  I MISUNDERSTOOD YOU.  I'M

15:17:47   9   SORRY.

15:17:48  10        THE WITNESS:  I DON'T KNOW THE ANSWER TO THAT.

15:17:49  11   BY MR. GREGORY:

15:17:49  12   Q.   WELL, SO YOU -- AS YOU SIT THERE RIGHT NOW, YOU CAN'T

15:17:53  13   RECALL ANY EVIDENCE THAT THE CORPS SENT OUT A GEOTECHNICAL

15:17:54  14   ENGINEER TO THE SITE DURING THAT PERIOD OF TIME?

15:18:00  15   A.   I DON'T HAVE PERSONAL KNOWLEDGE OF THAT, NO.

15:18:05  16   Q.   AND, SIR, YOU'RE AWARE OF A GENTLEMAN BY THE NAME OF LEE

15:18:08  17   GUILLORY; CORRECT?

15:18:09  18   A.   YES, I AM.

15:18:10  19   Q.   AND WHAT IS YOUR UNDERSTANDING OF HIS ROLE IN THE

15:18:13  20   CORPS/WGI PROJECT?

15:18:17  21   A.   MY UNDERSTANDING IS THAT HE WAS ULTIMATELY CHARGED WITH

15:18:21  22   THE TASK ORDER 26 WORK, MANAGING THAT ON BEHALF OF THE CORPS.

15:18:27  23   Q.   SIR, I'M GOING TO ASK YOU A HYPOTHETICAL.  IT'S A

15:18:32  24   HYPOTHETICAL YOU WERE ASKED AT YOUR DEPOSITION.

15:18:33  25        I WANT YOU TO ASSUME THAT WGI CAME UP WITH A WORK

15:18:39   1   PLAN THAT CONTAINS SUBSTANTIAL ERRORS, ERRORS THAT COULD AFFECT

15:18:46   2   THE CITIZENS OF NEW ORLEANS, AND LEE GUILLORY AND HIS PROJECT

15:18:53   3   TEAM FAILED TO FIND THE ERRORS IN THE WORK PLAN.

15:18:56   4        WOULD THAT FAILURE FALL BELOW THE STANDARD OF CARE IN

15:18:59   5   ENGINEERING?

15:19:00   6   A.   SO YOUR HYPOTHETICAL IS THAT -- IS THEY'RE GOING TO DO

15:19:04   7   SOMETHING -- AS AN EXAMPLE, DIG A HOLE 50-FOOT DEEP NEXT TO THE

15:19:09   8   WALL, SAY -- AND EVERYONE SHOULD KNOW THAT WOULD -- COULD

15:19:14   9   POTENTIALLY CAUSE A WALL FAILURE, SOMETHING OF THAT NATURE?  IS

15:19:17  10   THAT WHAT --

15:19:18  11   Q.   YES.

15:19:19  12   A.   I THINK THAT THAT WOULD BE SOMETHING THAT THEY WOULD, YOU

15:19:22  13   KNOW, BE REQUIRED TO CATCH OR TO SAY -- AT LEAST, YOU KNOW,

15:19:27  14   INQUIRE ABOUT AND DECIDE WHETHER ADDITIONAL ANALYSIS IS

15:19:33  15   NECESSARY.

15:19:34  16   Q.   SIR, I'M GOING TO NOW TURN TO YOUR EXPERT REPORT.  IT'S

15:19:38  17   DX-2299, AT PAGE 6.

15:19:58  18        MR. GREGORY:  AND, KARL, WHAT I'D LIKE YOU TO DO IS

15:20:01  19   GO TO THE BOTTOM OF THAT AND BLOW UP THE LAST PARAGRAPH,

15:20:04  20   PARTICULARLY WHERE IT STARTS "AN EVALUATION."

15:20:06  21   BY MR. GREGORY:

15:20:07  22   Q.   AND, SIR, YOUR REPORT STATES:  "AN EVALUATION OF THE

15:20:11  23   STANDARD OF CARE AND ANY POTENTIAL NEGLIGENCE WOULD INCLUDE AN

15:20:16  24   EVALUATION OF THE PERFORMANCE OF THE FLOODWALLS UNDER THE

15:20:20  25   DESIGN LOADS AND WHETHER ANY CONSTRUCTION DURING THE EBIA

| | |
|---|---|
| 15:20:23 | 1 |
| 15:20:26 | 2 |
| 15:20:30 | 3 |
| 15:20:35 | 4 |
| 15:20:53 | 5 |
| 15:20:57 | 6 |
| 15:20:59 | 7 |
| 15:21:04 | 8 |
| 15:21:10 | 9 |
| 15:21:14 | 10 |
| 15:21:17 | 11 |
| 15:21:19 | 12 |
| 15:21:26 | 13 |
| 15:21:30 | 14 |
| 15:21:33 | 15 |
| 15:21:35 | 16 |
| 15:21:38 | 17 |
| 15:21:40 | 18 |
| 15:21:42 | 19 |
| 15:21:43 | 20 |
| 15:21:44 | 21 |
| 15:21:49 | 22 |
| 15:21:52 | 23 |
| 15:21:59 | 24 |
| 15:22:02 | 25 |

REMEDIATION WOULD ULTIMATELY AFFECT THE PERFORMANCE OF THE
FLOODWALLS DURING THE DESIGN LOADING EVENT."

AND THEN WE'RE GOING TO MOVE ON TO THE NEXT PAGE AT
THE VERY TOP.

"IF THE WORK CONDUCTED UNDER THE TASK 26 EBIA
REMEDIATION COULD ULTIMATELY AFFECT THE PERFORMANCE OF THE
FLOODWALLS ALONG THE EBIA, AND THE EFFECTS WERE NOT EVALUATED
FOR THE FLOODWALL AND LEVEES UNDER THE DESIGN LOAD, THEN, IN MY
OPINION, THAT WOULD CONSTITUTE NEGLIGENCE."

THAT'S IN YOUR REPORT; CORRECT, SIR?

A.   THAT'S CORRECT.

Q.   NOW, SIR, YOU SPENT A LOT OF TIME TALKING ABOUT THE 1966
REPORT; CORRECT?

A.   I DON'T KNOW IF IT WAS A LOT OR NOT, BUT, YEAH, I TALKED
ABOUT IT.

THE COURT:  WHENEVER WE'RE USING AN ADJECTIVE, IT
BECOMES A PROBLEM.

MR. GREGORY:  THANK YOU FOR REMINDING, YOUR HONOR.

THE COURT:  YES, THAT'S ALWAYS A PROBLEM.

BY MR. GREGORY:

Q.   SIR, DID YOU SEE ANY EVIDENCE, ANY EVIDENCE THAT LEE
GUILLORY OR ANY MEMBER OF HIS PROJECT DEVELOPMENT TEAM LOOKED
AT THAT 1966 REPORT?

A.   I DON'T RECALL SEEING THAT THEY LOOKED AT IT, NO.

Q.   DID YOU SEE ANY EVIDENCE, I MEAN ANY EVIDENCE, THAT WGI,

| | | |
|---|---|---|
15:22:07 | 1 | PRIOR TO HURRICANE KATRINA, LOOKED AT THAT 1966 REPORT?
15:22:14 | 2 | **A.**   I DON'T HAVE ANY EVIDENCE OF THAT.
15:22:17 | 3 | **Q.**   SIR, I'D NEXT LIKE TO TURN TO YOUR REPORT AT --
15:22:26 | 4 |          **MR. GREGORY:**  SAME, PAGE 5, 0006.
15:22:37 | 5 | **BY MR. GREGORY:**
15:22:38 | 6 | **Q.**   AND, SIR, AT ABOUT --
15:22:48 | 7 |          **MR. GREGORY:**  I'M SORRY, KARL.  THAT'S ONE MORE PAGE.
15:22:53 | 8 | **BY MR. GREGORY:**
15:22:54 | 9 | **Q.**   AND, SIR, AT THE END OF THE FIRST PARAGRAPH --
15:22:57 | 10 |         **THE COURT:**  HE'LL BLOW IT UP.
15:22:59 | 11 | **BY MR. GREGORY:**
15:23:02 | 12 | **Q.**   -- DO YOU SEE -- SIR, IF YOU'VE GOT YOUR REPORT WITH YOU
15:23:04 | 13 | AND IT'S EASIER FOR YOU TO READ YOUR REPORT, I'M HAPPY FOR YOU
15:23:07 | 14 | TO DO THAT RATHER THAN LOOK AT THE SCREEN.
15:23:10 | 15 | **A.**   I HAVE THIS GREAT SCREEN OVER HERE, SO . . .
15:23:14 | 16 | **Q.**   DO YOU SEE, SIR, THERE'S A REFERENCE HERE TO WHAT YOU
15:23:19 | 17 | TESTIFIED ABOUT IN YOUR PRESENTATION, A MINIMUM CONTROL LINE,
15:23:22 | 18 | WHAT YOU CALL MCL?
15:23:24 | 19 | **A.**   YES.
15:23:24 | 20 | **Q.**   AND HAVE YOU EVER HEARD OF A TERM "STABILITY CONTROL
15:23:28 | 21 | LINE"?
15:23:30 | 22 | **A.**   YES.
15:23:31 | 23 | **Q.**   HOW IS "MINIMUM CONTROL LINE" DIFFERENT THAN "STABILITY
15:23:35 | 24 | CONTROL LINE"?
15:23:36 | 25 | **A.**   WELL, IN MY EXPERIENCE TALKING WITH THE CORPS FOLKS,

15:23:41  1  THEY'RE USED THE SAME.

15:23:42  2  **Q.**  THEY'RE SYNONOMOUS?

15:23:44  3  **A.**  THEY'RE SYNONOMOUS.  IT'S DERIVED FROM STABILITY ANALYSIS,

15:23:47  4  AND SO I THINK THAT'S WHY SOME PEOPLE USE THAT TERM.

15:23:54  5  **Q.**  NOW, SIR, IS -- WHEN YOU DO THE MINIMUM CONTROL LINE OR

15:23:57  6  THE STABILITY CONTROL LINE, THAT'S ONLY ONE OF THE FAILURE

15:24:05  7  MODES THAT COULD TAKE A LEVEE DOWN; CORRECT?

15:24:08  8  **A.**  CORRECT.

15:24:09  9  **Q.**  CAN YOU GIVE ME EXAMPLES OF OTHERS?

15:24:17  10  **A.**  WELL, OBVIOUSLY, THE OTHER ONE WOULD BE SEEPAGE.  I MEAN,

15:24:20  11  YOU COULD HAVE A SEEPAGE CONDITION WHERE YOU HAVE THE TYPE OF

15:24:24  12  SOILS THAT COULD BE AFFECTED IN THE SHORT TERM, THE VERY

15:24:32  13  PERMEABLE SANDS, SILTS OR -- THAT COULD -- COULD LEAD TO

15:24:36  14  SEEPAGE PROBLEMS ON THE PROTECTED SIDE OF THE LEVEE.

15:24:39  15  **Q.**  I'M GOING TO POINT OUT, PERHAPS, ANOTHER FAILURE MODE.

15:24:50  16  **MR. GREGORY:**  IF YOU COULD, KARL, GO A LITTLE FURTHER

15:24:52  17  DOWN.

15:24:53  18  **BY MR. GREGORY:**

15:24:53  19  **Q.**  DO YOU SEE THE PARAGRAPH THAT BEGINS "THE NLCC PROJECT"?

15:24:56  20  **THE COURT:**  HE'LL GO DOWN.

15:24:57  21  **MR. GREGORY:**  THANK YOU, KARL.

15:24:57  22  **BY MR. GREGORY:**

15:24:57  23  **Q.**  SIR, WHAT YOU'RE CALLING THIS PROJECT IS -- IN YOUR REPORT

15:24:59  24  IS THE NLCC PROJECT; IS THAT CORRECT?

15:25:02  25  **A.**  YES.

15:25:02   1   **Q.**   AND YOU WRITE THERE:   "THE NLCC PROJECT REQUIRED AN

15:25:08   2   ASSESSMENT OF THE GLOBAL STABILITY OF THE FLOOD PROTECTION FOR

15:25:12   3   EXISTING FLOODWALLS TO REMAIN IN PLACE AND NEW FLOODWALLS TO BE

15:25:16   4   CONSTRUCTED."   I'M GOING TO STOP THERE.

15:25:20   5          AND, SIR, WAS THERE AN ASSESSMENT IN 19 -- THE TIME

15:25:26   6   FRAME 1997 THROUGH HURRICANE KATRINA OF THE GLOBAL STABILITY OF

15:25:31   7   THE FLOOD PROTECTION FOR THE EXISTING FLOODWALLS?

15:25:38   8   **A.**   THE EBIA WALLS IS WHAT YOU'RE TALKING ABOUT.   YEAH, THERE

15:25:43   9   WAS ONE IN 1966.

15:25:46  10   **Q.**   NO, I'M SORRY.   FROM THE TIME FRAME 1999 THROUGH 2005.

15:25:52  11   **A.**   OH, THERE WAS NO ADDITIONAL ANALYSIS OF THOSE FLOODWALLS.

15:25:59  12   **Q.**   AND THE NEW FLOODWALLS THAT WERE GOING TO BE CONSTRUCTED,

15:26:03  13   SIR, YOU TALKED ABOUT THOSE, AND -- BUT THEY WERE GOING TO BE

15:26:06  14   CONSTRUCTED.   BUT THE EXISTING FLOODWALLS, THEY WERE GOING TO

15:26:11  15   REMAIN IN PLACE; CORRECT?

15:26:11  16   **A.**   AS IT WAS SHOWN ON MY -- MY -- MY SLIDES AND IN THE PLANS,

15:26:15  17   YEAH, THERE'S A PORTION ALONG THE NORTH PART OF THE EBIA WHERE

15:26:18  18   THEY WERE TO REMAIN IN PLACE.

15:26:21  19   **Q.**   AND THEY WERE GOING TO REMAIN IN PLACE DURING THE ENTIRE

15:26:24  20   TIME FRAME THAT A TEMPORARY BYPASS CHANNEL WAS BUILT AND THEN

15:26:30  21   USED AND THEN A NEW LOCK CONSTRUCTED; CORRECT?

15:26:34  22   **A.**   THAT WAS MY UNDERSTANDING.

15:26:36  23   **Q.**   AND, SIR, IF THERE WASN'T A GLOBAL STABILITY ANALYSIS

15:26:41  24   DURING THAT TIME FRAME -- ASSESSMENT DURING THAT TIME FRAME,

15:26:46  25   DID THAT MEET THE STANDARD OF CARE FOR A GEOTECHNICAL ENGINEER,

15:26:51   1   GIVEN THAT THERE WAS GOING TO BE A BYPASS CHANNEL PUT IN PLACE

15:26:58   2   AND THAT FLOODWALLS WERE GOING TO CONTINUE TO EXIST FOR AN

15:27:02   3   UNKNOWN PERIOD OF TIME?

15:27:05   4   **A.**   AS LONG AS THAT BYPASS CHANNEL DIDN'T INFRINGE ON THE

15:27:09   5   CRITERIA THAT THE -- OF EXCAVATIONS AND THE MINIMUM CONTROL

15:27:17   6   LINE OR AS IT APPROACHED THE MINIMUM CONTROL LINE, THAT THE

15:27:19   7   BYPASS CHANNEL WOULD REALLY HAVE NO AFFECT -- THAT BYPASS

15:27:23   8   CHANNEL, I THINK, WAS MORE THAN 150 FEET AWAY FROM THE

15:27:29   9   FLOODWALLS, SO I DON'T BELIEVE IT WOULD HAVE ANY EFFECT ON THE

15:27:31  10   EXISTING FLOODWALLS.

15:27:32  11   **Q.**   WELL, SIR, IS IT YOUR TESTIMONY, SIR, THAT THE STABILITY

15:27:36  12   CONTROL LINE, THE MINIMUM CONTROL LINE, WAS ONLY 15 FEET THERE?

15:27:42  13   **A.**   MINIMUM CONTROL LINE -- YOU MEAN FOR THE 1966 EBIA REPORT?

15:27:49  14   **Q.**   NO, SIR.  FOR THE TIME FRAME OF THE NLCC PROJECT, FROM

15:27:55  15   WHEN IT STARTED THROUGH THE TIME THE NEW LOCK WAS GOING TO BE

15:28:01  16   CONSTRUCTED.

15:28:02  17   **A.**   AS IT RELATES TO THE EBIA FLOODWALLS, YEAH, THE MINIMUM

15:28:08  18   CONTROL LINE, I THINK IT'S 15 TO 20 FEET -- I DON'T REMEMBER

15:28:11  19   THE EXACT DISTANCE, BUT IT'S IN THAT NEIGHBORHOOD.

15:28:15  20   **Q.**   AND IF IT WAS DETERMINED TO BE OVER 150 FEET, THAT WOULD

15:28:19  21   CHANGE YOUR OPINION; CORRECT?

15:28:24  22   **A.**   IF -- IF FOR SOME REASON NOT -- THAT I'M NOT AWARE OF AS

15:28:30  23   IT RELATES TO THE FLOODWALL, THEN, YEAH, THAT WOULD CHANGE MY

15:28:34  24   OPINION IF SOME ANALYSIS SHOWS 150 FEET AWAY.

15:28:40  25   **Q.**   SIR, I'M -- I'D NOW LIKE TO -- THAT'S A -- SIR, IF WE

15:28:55   1   COULD TURN --

15:28:56   2          **MR. GREGORY:**  I'M SORRY, KARL, IF WE COULD GO TO

15:28:59   3   PAGE 0008, AND DOWN TO THE FIRST BULLET POINT.

15:29:15   4   **BY MR. GREGORY:**

15:29:15   5   **Q.**   AND YOU SAID THE ARMY CORPS PERFORMED AN ASSESSMENT TO

15:29:18   6   DETERMINE THE LOCATION OF THE MINIMUM CONTROL LINE.

15:29:24   7          DO YOU SEE THAT?

15:29:24   8   **A.**   YES.

15:29:24   9   **Q.**   AND WHEN WAS THAT ASSESSMENT DONE?

15:29:34  10   **A.**   THAT WOULD HAVE BEEN THE 1966 ASSESSMENT.

15:29:37  11   **Q.**   AND YOU GO ON TO SAY TWO SENTENCES LATER:  "IN THOSE

15:29:41  12   LIMITED CASES WHERE THE EXCAVATIONS WERE MORE SUBSTANTIAL THAN

15:29:45  13   ORIGINALLY ASSUMED" -- AND "ORIGINALLY ASSUMED" WOULD BE 1966;

15:29:50  14   CORRECT, SIR?

15:29:54  15   **A.**   NO.

15:29:56  16          **THE COURT:**  NO.

15:29:56  17          **THE WITNESS:**  I'M TALKING ABOUT THAT THE TASK

15:29:59  18   ORDER 26 HAD SOME ORIGINAL EXCAVATIONS THAT WERE CONTEMPLATED

15:30:06  19   FOR REMEDIATION, BUT THOSE DEPTHS WERE OBVIOUSLY BASED UPON

15:30:11  20   FINDING CLEAN SOIL CONDITIONS.

15:30:13  21          SO SOME OF THE PROPOSED EXCAVATIONS IN BOLAND

15:30:16  22   AND -- AND SAUCER WERE LARGER THAN ORIGINALLY ASSUMED BECAUSE

15:30:24  23   THERE WAS MORE CONTAMINATION FOUND.

15:30:26  24   **BY MR. GREGORY:**

15:30:26  25   **Q.**   AND THEN YOU WRITE:  "ADDITIONAL ANALYSES WERE PERFORMED

| | | |
|---|---|---|
| 15:30:30 | 1 | TO MITIGATE ANY IMPACTS ON THE FLOODWALL."  CORRECT? |
| 15:30:37 | 2 | **A.**   YES. |
| 15:30:37 | 3 | **Q.**   AND DID WGI SUBCONTRACT OUT ANY OF THOSE ANALYSES? |
| 15:30:44 | 4 | **A.**   YEAH.  I THINK IN MY PRESENTATION I DISCUSSED THE WEDDING |
| 15:30:48 | 5 | CAKE AND THE SEWER -- THE LIFT STATION AND THAT IT WAS SUBBED |
| 15:30:54 | 6 | OUT TO A PROFESSIONAL ENGINEER IN LOUISIANA TO DESIGN, |
| 15:30:57 | 7 | ESSENTIALLY, A SOIL-RETAINING SYSTEM. |
| 15:31:01 | 8 | **Q.**   AND HOW MANY GEOTECHNICAL ANALYSES DID THE CORPS DO DURING |
| 15:31:06 | 9 | THE ENTIRE LIFE OF THE PROJECT? |
| 15:31:12 | 10 | **A.**   WELL, THE ONLY ONES I CAN RECALL AND WERE IN MY |
| 15:31:16 | 11 | PRESENTATION WERE THE SUREKOTE ROAD AND THE MCDONOUGH PIT |
| 15:31:20 | 12 | ANALYSES, WHICH WERE THE ONES REQUESTED BY MR. GUILLORY. |
| 15:31:24 | 13 | **Q.**   SIR, AND -- AND -- |
| 15:31:34 | 14 | **MR. GREGORY:**  I'M GOING TO NEXT ASK, KARL, TO BRING |
| 15:31:38 | 15 | UP JX-01286. |
| 15:31:46 | 16 | **BY MR. GREGORY:** |
| 15:31:46 | 17 | **Q.**   AND, SIR, THIS IS A COVER FAX WITH A DRAWING FROM JIM |
| 15:31:51 | 18 | MONTEGUT TO LEE GUILLORY DATED JUNE 10TH, 2002. |
| 15:31:56 | 19 | DO YOU SEE THAT? |
| 15:31:57 | 20 | **A.**   YES, I SEE THAT. |
| 15:31:59 | 21 | **Q.**   HAVE YOU SEEN THIS DOCUMENT BEFORE? |
| 15:32:01 | 22 | **A.**   YES. |
| 15:32:03 | 23 | **Q.**   AND, SIR, IF YOU'D GO TO THE THIRD PAGE OF THIS EXHIBIT. |
| 15:23:36 | 24 | **A.**   (WITNESS COMPLIES.) |
| 15:32:18 | 25 | **Q.**   IS THERE A MINIMUM -- OR A GLOBAL STABILITY LINE DISPLAYED |

15:32:26   1   ON THIS PAGE?

15:32:27   2            **THE COURT:**  WE'RE USING THE TERM "MINIMAL GLOBAL

15:32:32   3   STABILITY" -- THE ONLY REASON I'M INTERRUPTING YOU, COUNSEL, IS

15:32:36   4   WE'VE HEARD ABOUT A MINIMAL CONTROL LINE AND A STABILITY LINE.

15:32:40   5   THIS IS A NEW TERM.  I JUST DIDN'T KNOW IF IT'S ON THE MAP

15:32:43   6   OR --

15:32:44   7            **MR. GREGORY:**  THANK YOU, YOUR HONOR.  I'LL JUST ASK

15:32:45   8   IT AS A MINIMUM CONTROL LINE.

15:32:48   9            **THE COURT:**  THANK YOU.

15:32:52  10            **THE WITNESS:**  WELL, THE MINIMUM CONTROL LINE I DON'T

15:32:54  11   THINK IS ACTUALLY SHOWN ON THIS FIGURE.

15:32:57  12   **BY MR. GREGORY:**

15:32:57  13   **Q.**   IT'S NOT?

15:32:59  14   **A.**   NO.

15:33:00  15   **Q.**   COULD YOU CALCULATE IT?

15:33:01  16   **A.**   WELL, IT WOULD BE WHERE IT WAS SHOWN ON THE DRAWINGS, THE

15:33:06  17   1966 DRAWINGS, APPROXIMATELY 15 TO 20 FEET AWAY FROM THE EDGE

15:33:12  18   OF THE FLOODWALL.

15:33:13  19            WHAT YOU SEE HERE, THIS 6 1/2-TO-1 SLOPE -- AND I'VE

15:33:20  20   HEARD TESTIMONY IN THE COURT HERE THAT INDICATES THAT SOMEBODY

15:33:23  21   THINKS THAT'S THE MINIMUM CONTROL LINE.  THAT'S NOT A MINIMUM

15:33:27  22   CONTROL LINE.

15:33:29  23            THAT'S A SLOPE, AND IT'S EXAGGERATED SCALE HERE, SO

15:33:32  24   IT DOESN'T SHOW YOU EXACTLY HOW FLAT IT IS.  BUT THAT'S A SLOPE

15:33:40  25   THAT WOULD PROVIDE A STABLE SLOPE IN THE MCDONOUGH BORROW PIT

15:33:44    1    ON WOULD BE THE EAST SIDE THERE, AND IT DOESN'T REALLY HAVE ANY

15:33:48    2    EFFECT ON THE WALL.  IT'S OUTSIDE THE MINIMUM CONTROL LINE.

15:33:53    3    **Q.**    SO THIS IS THE SCHEMATIC FOR WHAT BECAME THE MCDONOUGH

15:33:57    4    BORROW PIT; CORRECT?

15:33:58    5    **A.**    CORRECT.

15:33:59    6    **Q.**    AND IT'S YOUR TESTIMONY, SIR, THAT THIS DOES NOT DISPLAY,

15:34:02    7    OR YOU CAN'T USE THIS TO CALCULATE THE MINIMUM CONTROL LINE?

15:34:08    8    **A.**    WELL, THE MINIMUM CONTROL LINE, AS I SAID, IS 15 TO

15:34:11    9    20 FEET AWAY FROM THE WALL, YOU KNOW, BASED ON STABILITY

15:34:15   10    ANALYSIS UNDER THE DESIGN FLOOD CONDITION, WHICH WHEN THE FLOOD

15:34:20   11    COMES UP TO THE DESIGN LEVEL, IT LOOKS AT A FAILURE INTO THE

15:34:24   12    PROTECTED SIDE.

15:34:25   13            THIS MERELY IS -- AND THIS IS CONSISTENT WITH OTHER

15:34:32   14    THINGS I'VE SEEN IN SOFT SOILS -- IS A LINE WHICH TELLS YOU

15:34:36   15    THAT YOU CAN HAVE A SAFE SLOPE IN THE MCDONOUGH BORROW PIT, AND

15:34:42   16    THAT THAT SLOPE WON'T FAIL.

15:34:43   17            AND THE ONE ON THE LEFT SIDE OF THE FIGURE THERE,

15:34:45   18    WHERE IT SAYS 1-TO-7, THE SAME THING THERE.  THAT'S A SLOPE

15:34:49   19    DESIGNED TO HAVE A SAFE SLOPE THAT DOESN'T FAIL IN THESE SOFT

15:34:55   20    SOILS.  IT HAS NO IMPACT ON THE -- THE WALL ITSELF.

15:35:00   21            THE ONLY WAY IT COULD HAVE AN IMPACT ON THE WALL IS

15:35:05   22    IF FOR -- SOMEHOW THEY DESIGNED A SLOPE THAT WAS AS TOO STEEP

15:35:07   23    AND IT KEPT FAILING BACK AND BACK TOWARDS THE WALL.

15:35:11   24            **THE COURT:**  WE HATE TO INTERRUPT YOU, SIR, BUT WE

15:35:13   25    WANTED TO MAKE SURE EVERYBODY COULD HEAR YOUR TESTIMONY.

15:35:16  1          IF YOU GET TOO CLOSE TO THAT DOGGONE THING, IT

15:35:19  2  CAUSES A REVERBERATION.

15:35:23  3          **THE WITNESS:**  I THOUGHT EVERYONE WAS JUST LOOKING

15:35:24  4  IRRITATED BY WHAT I WAS SAYING.

15:35:26  5          **THE COURT:**  WELL, IT WOULD BE DOING THAT ALL THE

15:35:28  6  TIME, WHOEVER WAS THERE, INCLUDING ME, SO IT'S NOT THAT.

15:35:30  7          **THE WITNESS:**  SO TO ANSWER YOUR QUESTION, THAT'S NOT

15:35:32  8  A MINIMUM CONTROL LINE.  THAT'S JUST A DESIGNED SLOPE FOR THE

15:35:38  9  MCDONOUGH BORROW PIT.

15:35:39  10  **BY MR. GREGORY:**

15:35:40  11  **Q.**   AND IT'S YOUR TESTIMONY, SIR, THAT YOU CAN'T USE THE

15:35:43  12  DRAWING DEPICTED BY THIS EXHIBIT TO CALCULATE THE MINIMUM

15:35:47  13  CONTROL LINE; CORRECT?

15:35:49  14  **A.**   NO, BECAUSE IT'S ALREADY BEEN CALCULATED.

15:35:52  15          **THE COURT:**  I'VE GOTTEN THAT.  THAT'S WHAT HE SAID.

15:35:54  16  HE KEEPS -- HE'S BEEN CONSISTENT IN HIS ANSWERS, SIR.

15:36:03  17  **BY MR. GREGORY:**

15:36:04  18  **Q.**   SIR, DO YOU HAVE ANY EVIDENCE THAT MR. GUILLORY OR

15:36:06  19  MR. MONTEGUT KNEW OF YOUR MINIMUM CONTROL LINE?

15:36:12  20          **THE COURT:**  WHEN YOU SAY "YOUR," YOU MEAN THE CONTROL

15:36:15  21  LINE HE STATES WAS ESTABLISHED IN 1966?

15:36:19  22          **MR. GREGORY:**  YES, SIR.

15:36:20  23          **THE COURT:**  THANK YOU.

15:36:22  24          **MR. KELLS:**  YEAH.  I GUESS I WOULD OBJECT TO THE

15:36:24  25  CHARACTERIZATION OF BEING HIS CONTROL LINE.

15:36:27    1              **THE COURT:**  I --

15:36:28    2              **MR. KELLS:**  I UNDERSTAND IT'S HIS OPINION.

15:36:29    3              **THE COURT:**  BUT I AGREE IT'S NOT HIS.  IT'S HIS -- HE

15:36:32    4    HAS OPINED AS TO WHERE THAT CONTROL LINE WAS AND WHAT IT'S

15:36:38    5    GENESIS WAS.  BUT I CONCUR WITH -- HE HAS NOT TAKEN OWNERSHIP

15:36:44    6    OF IT YET.

15:36:45    7              OKAY.

15:36:47    8              **THE WITNESS:**  I'M SORRY.  I FORGOT WHAT YOUR QUESTION

15:36:50    9    WAS.

15:36:50   10    BY MR. GREGORY:

15:36:51   11    **Q.**   DO YOU HAVE ANY EVIDENCE THAT MR. GUILLORY OR MR. MONTEGUT

15:36:57   12    KNEW OF A 15- TO 20-FOOT MINIMUM CONTROL LINE AS OF 2002?

15:37:04   13    **A.**   I HAVE NO EVIDENCE -- I THINK I ANSWERED THIS BEFORE --

15:37:08   14    THAT MR. GUILLORY LOOKED AT THE 1966 REPORT.

15:37:17   15    **Q.**   SIR, NOW WE'RE GOING TO GO BACK TO YOUR EXPERT REPORT,

15:37:22   16    DX-2299-0009.  AND THE PART WE'RE GOING TO STATE IS THE FIRST

15:37:41   17    BULLET POINT.

15:37:51   18              DO YOU SEE THAT, SIR?

15:37:52   19    **A.**   YES, I DO.

15:37:53   20    **Q.**   AND IT SAYS:  "A DETAILED REVIEW OF THE QUALITY ASSURANCE

15:37:57   21    REPORTS AND OTHER FIELD DOCUMENTS PREPARED DAILY DURING

15:38:01   22    CONSTRUCTION INDICATES THAT IN A LIMITED NUMBER OF EXCAVATIONS

15:38:03   23    RIVER SAND OR MOSTLY RIVER SAND BACKFILL WAS PLACED."

15:38:09   24              I'M GOING TO STOP RIGHT THERE.

15:38:11   25              YOU WRITE "A LIMITED NUMBER OF EXCAVATIONS."

```
15:38:13    1              HOW MANY EXCAVATIONS, SIR?

15:38:16    2    A.    THERE'S A TABLE IN MY REPORT THAT GIVES THAT INFORMATION

15:38:20    3    FOR BOTH SAUCER AND BOLAND MARINE.  I CAN'T TELL YOU OFF THE

15:38:27    4    TOP OF MY HEAD HOW MANY THERE ARE, BUT THERE'S A TABLE THAT

15:38:31    5    SUMMARIZES THAT.

15:38:32    6    Q.    AND, SIR, YOU WOULD AGREE WITH ME, WOULD YOU NOT, THAT IT

15:38:35    7    TAKES ONLY ONE INSTANCE OF IMPROPERLY PLACING SAND BACKFILL TO

15:38:41    8    PRESENT A FAILURE MODE FOR A LEVEE WALL OR FLOODWALL?

15:38:48    9    A.    WELL, I WOULDN'T AGREE WITH THAT.

15:38:51   10    Q.    YOU DON'T -- YOU DON'T BELIEVE THAT IT TAKES -- THAT IF

15:38:55   11    RIVER SAND IS IMPROPERLY PLACED IN AN EXCAVATION, IT COULD

15:39:01   12    RESULT IN A PROBLEM, INCLUDING THE COLLAPSE OF A FLOODWALL?

15:39:07   13    A.    NO.  I -- I WENT AT GREAT LENGTHS TO TRY AND EXPLAIN HOW

15:39:11   14    THE SEEPAGE ANALYSIS METHODOLOGY WORKS.  IT'S REALLY RELATED TO

15:39:15   15    THE SOILS ON THE PROTECTED SIDE, YOU KNOW, BENEATH THE

15:39:20   16    PROTECTED SIDE OF THE LEVEE.

15:39:22   17              IF YOU LOOK AT THE ANALYSIS AND THE SLIDES THAT I

15:39:33   18    PREVIOUSLY SHOWED, EACH -- ALL OF THESE EXCAVATIONS WERE AT 100

15:39:36   19    TO 5- OR 600 FEET AWAY FROM THE FLOODWALLS.

15:39:39   20              AND AS YOU MOVE FARTHER AND FARTHER AWAY, THE FACTOR

15:39:41   21    OF SAFETY, AS YOU MAY -- THE LANE'S WEIGHTED CREEP RATIO NUMBER

15:39:43   22    KEEPS GOING UP AND UP AND UP.

15:39:48   23              SO MY STATEMENT EARLIER -- MY TESTIMONY EARLIER WAS

15:39:51   24    IT DOESN'T MATTER WHAT YOU PUT IN THERE, EVEN TO THE EXTENT OF

15:39:56   25    THE MCDONOUGH BORROW PIT.  IT'S JUST A BIG OPEN HOLE IN THE
```

15:39:59   1   GROUND 5O FEET AWAY FROM THE FLOODWALL.

15:40:02   2   **Q.**   SIR, YOU SAID THE LANE'S WEIGHTED CREEP ANALYSIS STATES TO

15:40:11   3   THE EFFECT IT DOESN'T MATTER WHAT YOU PUT THERE, IT'S --

15:40:16   4   WHATEVER YOU PUT THERE IS NOT GOING TO HAVE AN EFFECT ON THE

15:40:19   5   STABILITY OF THE FLOODWALL?

15:40:20   6   **A.**   THAT'S EXACTLY WHAT I SAID.

15:40:23   7        **MR. KELLS:**  I JUST WANT TO MAKE CLEAR THAT I THOUGHT

15:40:27   8   HE WAS ASKING A QUESTION ABOUT SEEPAGE, AND THEN HE JUMPED TO

15:40:30   9   STABILITY.  WE HAD THAT CONFUSION BEFORE, AND I --

15:40:32  10        **THE COURT:**  WE DID.  AND I WANT TO MAKE SURE WE

15:40:34  11   SEPARATE OUT -- AS I UNDERSTAND LANE'S -- THE CREEP ANALYSIS IS

15:40:39  12   A SEEPAGE ANALYSIS.

15:40:41  13        **THE WITNESS:**  YES, YOUR HONOR.

15:40:42  14        **THE COURT:**  AS WAS MADE CLEAR DURING -- EARLIER.  SO

15:40:48  15   IF WE CAN JUST DISTINGUISH BETWEEN THEM.

15:40:52  16        **MR. GREGORY:**  SURE.

15:40:53  17   **BY MR. GREGORY:**

15:40:53  18   **Q.**   AND TO GO TO THE LANE'S WEIGHTED CREEP, YOU HAVE NO

15:40:57  19   EVIDENCE THAT IN THE 1966 ANALYSIS, LANE'S WEIGHTED CREEP RATIO

15:41:02  20   WAS PERFORMED FOR THIS FLOODWALL; CORRECT?

15:41:05  21   **A.**   I FOUND NO COMPUTATIONS THAT WERE DONE AT THAT TIME, OTHER

15:41:09  22   THAN THE STATEMENT IN THE REPORT THAT IT WAS NOT ANTICIPATED TO

15:41:14  23   BE A PROBLEM.

15:41:16  24   **Q.**   BUT THAT STATEMENT DOESN'T POINT TO LANE'S WEIGHTED CREEP;

15:41:19  25   CORRECT?

15:41:23  1  **A.**   THE STATEMENT REALLY REFLECTS THE JUDGMENTS OF THE

15:41:29  2  ENGINEERS AT THE TIME THEY WERE DOING THIS WALL, BASED UPON THE

15:41:32  3  SOIL CONDITIONS AND THE EXPECTED LOADING CONDITION.  AND THEY

15:41:37  4  DISCUSS WHAT WAS IMPORTANT AND WHAT WAS NOT IMPORTANT.

15:41:41  5          AND THEY -- I CAN'T RECALL EXACTLY HOW IT'S WORDED,

15:41:45  6  BUT IT SAYS NO SEEPAGE ANALYSIS WAS REQUIRED, OR WORDS TO THAT

15:41:48  7  EFFECT.

15:41:50  8  **Q.**   NOW, SIR, LANE'S WEIGHTED CREEP, WAS THAT USED BY THE

15:41:55  9  CORPS IN CONNECTION WITH ITS WORK ON THE LONDON CANAL?

15:42:01  10  **A.**   I HAVE NO KNOWLEDGE OF THE LONDON CANAL.  I DIDN'T -- IT'S

15:42:08  11  NOT PART OF MY SCOPE OF WORK.

15:42:13  12  **Q.**   DID YOU READ THE TEAM LOUISIANA REPORT WHERE IT SPOKE

15:42:17  13  ABOUT LANE'S WEIGHTED CREEP?

15:42:19  14  **A.**   IN DOING -- THE ANSWER'S NO.

15:42:22  15          AND IN DOING MY ANALYSIS, I'VE TRIED TO STAY AWAY

15:42:25  16  FROM ALL OF THE POST-FAILURE EVALUATIONS, BECAUSE IT'S

15:42:30  17  IMPORTANT, IN DOING A STANDARD OF CARE CASE, TO EVALUATE WHAT

15:42:33  18  THE PEOPLE KNEW AT THE TIME, NOT WHAT MANY PEOPLE HAVE

15:42:39  19  HYPOTHESIZED SINCE THAT TIME.

15:42:41  20          SO AS IT RELATES TO MANY OF THOSE REPORTS, I -- I

15:42:45  21  SKIMMED THE IPET REPORT ONCE, LONG BEFORE I WAS INVOLVED IN

15:42:50  22  THIS, BUT I HAVE NOT READ ANY OTHER REPORTS.

15:42:52  23          I HAVE NOT READ ANY OF THE OTHER EXPERTS' REPORTS IN

15:42:55  24  THIS CASE.

15:42:55  25  **Q.**   SIR, LET'S TURN TO DX-2299-0018.  AND THAT'S FIGURE 1-6.

15:43:11   1          **MR. GREGORY:**  AND IT MIGHT BE BETTER -- I'M GOING TO

15:43:14   2   ASK WE -- JX-01821 AT 193.  CAN YOU BLOW THAT UP?

15:43:48   3   **BY MR. GREGORY:**

15:43:48   4   **Q.**  NOW, SIR, THIS IS THE 1966 SOIL PROFILE ALONG THE EBIA;

15:43:54   5   CORRECT?

15:43:56   6   **A.**  THAT'S CORRECT.

15:43:56   7   **Q.**  OKAY.  AND I BELIEVE YOU STATE THAT THE BOTTOM OF THE

15:44:00   8   SHEET PILE IS SHOWN AT MINUS 8 FEET.  IS THAT CORRECT?

15:44:06   9   **A.**  THAT'S CORRECT.

15:44:08  10   **Q.**  AND YOU THEN SAY THAT BECAUSE IT'S AT MINUS 8 FEET, IT'S

15:44:16  11   IN SOILS CLASSIFIED AS FAT CLAY MARSH SOILS; CORRECT?

15:44:21  12   **A.**  THAT'S CORRECT.  I CAN'T REALLY READ THE LEGEND ON THIS,

15:44:23  13   BUT . . .

15:44:24  14   **Q.**  OH.

15:44:25  15          **MR. GREGORY:**  CAN WE BLOW THAT UP?

15:44:26  16          **THE COURT:**  I WANT YOU TO BE ABLE TO SEE IT, SIR.  WE

15:44:32  17   DEFINITELY CAN'T SEE IT NOW.

15:44:35  18              OKAY.  THAT'S THE LEGEND.

15:44:37  19   **BY MR. GREGORY:**

15:44:37  20   **Q.**  AND I'M HAPPY, SIR, TO GIVE YOU A COPY -- A BETTER COPY OF

15:44:44  21   THAT.

15:45:04  22          **THE COURT:**  WELL, THE LEGEND'S UP THERE NOW.

15:45:09  23   **BY MR. GREGORY:**

15:45:09  24   **Q.**  CAN YOU READ IT, SIR?

15:45:11  25          **THE COURT:**  CAN YOU READ THE LEGEND?

15:45:13   1              **THE WITNESS:**  I THINK I CAN READ IT.  I'LL GIVE IT A

15:45:15   2   SHOT TO SAVE MYSELF SOME TIME.

15:45:17   3              **THE COURT:**  AND IF YOU WANT TO GET UP OUT OF THE

15:45:19   4   WITNESS STAND, YOU CAN CERTAINLY DO THAT, IF YOU FIND IT

15:45:22   5   NECESSARY.

15:45:23   6              **THE WITNESS:**  I'M NOT SURE, YOUR HONOR, THAT GETTING

15:45:25   7   CLOSER TO IT IS GOING TO HELP ME.

15:45:27   8              **THE COURT:**  OKAY.  I UNDERSTAND THAT, BELIEVE ME.

15:45:29   9   **BY MR. GREGORY:**

15:45:29  10   **Q.**   AND, SIR, CAN YOU READ WHAT WOULD HAPPEN, IF THE SHEET

15:45:33  11   PILE TIP AT ALL SUBSIDES, WHERE IT WOULD GO?

15:45:44  12   **A.**   IT WOULD GO DOWN.

15:45:45  13   **Q.**   AND WHAT LAYERS DOWN?

15:45:49  14   **A.**   WELL, YOU'RE MAKING THE ASSUMPTION THAT SOMEHOW THE SOIL

15:45:52  15   REMAINS IN PLACE AND THE SHEET PILE'S GOING TO KNIFE THROUGH IT

15:45:56  16   DOWN INTO A LOWER LAYER.

15:45:59  17              BUT THE REASON THE SHEET PILE WALLS IN THE LEVEE ARE

15:46:01  18   SUBSIDING IS BECAUSE THE LAYERS BELOW ARE COMPRESSING.  AND SO

15:46:06  19   THE SHEET PILE WALL IS REALLY REMAINING IN THE SAME SPOT.  IT

15:46:11  20   CAN'T MOVE.  I MEAN, THERE'S NO PHYSICAL WAY IT CAN MOVE

15:46:14  21   INDEPENDENT OF THE SOILS BELOW THE -- THE FOUNDATION OF THE

15:46:19  22   LEVEE.  SO IT WOULD REMAIN IN THE SAME SOILS.

15:46:23  23              THOSE SOILS WOULD JUST BE DENSER, AND THE SOILS BELOW

15:46:26  24   THEM WOULD BE DENSER AS A RESULT OF THE SETTLEMENT THAT

15:46:29  25   OCCURRED.  IT DOESN'T KNIFE ITS WAY THROUGH.  THAT'S NOT WHAT

15:46:34   1   HAPPENS.

15:46:35   2   **Q.**   IT DOESN'T -- IT DOESN'T GO FURTHER DOWN, SO TO SPEAK?

15:46:38   3   **A.**   THAT WOULD -- THAT WOULD ONLY OCCUR IF SOMEHOW THE

15:46:41   4   FOUNDATION SOIL WAS TO REMAIN IN PLACE AND THE LEVEE AND THE

15:46:43   5   SHEET PILE WALL WERE TO SLICE THROUGH IT.

15:46:46   6          BUT THE REASON THE LEVEE AND THE SHEET PILE ARE GOING

15:46:48   7   DOWN IS BECAUSE THOSE SOILS ARE SETTLING.  THE SOILS BELOW THE

15:46:52   8   SHEET PILE ARE SETTLING, AND SO IT'S JUST GOING DOWN WITHIN THE

15:46:56   9   SOILS THAT IT'S PLACED IN.

15:46:59  10   **Q.**   AND CAN YOU TELL, SIR -- DO YOU SEE THE MARSH LAYER THERE?

15:47:05  11   **A.**   YES, SIR, I SEE THAT.

15:47:07  12   **Q.**   AND IS IT -- HOW FAR -- CAN YOU TELL FROM THIS DIAGRAM HOW

15:47:12  13   FAR AWAY FROM THE MARSH LAYER THE SHEET PILE IS?

15:47:17  14   **A.**   IT'S PROBABLY A COUPLE OF FEET.

15:47:23  15   **Q.**   SIR, IF WE COULD TURN TO -- GOING BACK TO YOUR REPORT NOW.

15:47:41  16   AND NOW WE'RE AT PAGE 20.

15:47:43  17          AND, SIR, IN THERE, THE FIRST PARAGRAPH, YOU TALK

15:47:54  18   ABOUT THE LEVEE EMBANKMENTS WERE CONSTRUCTED -- AND I'M GOING

15:47:59  19   ABOUT TWO THIRDS OF WAY DOWN IN THE PARAGRAPH, SIR.

15:48:02  20          "THE LEVEE EMBANKMENTS WERE TO BE CONSTRUCTED WITH

15:48:05  21   SIDE SLOPES 1 VERTICAL ON 3 HORIZONTAL OR FLATTER, USING

15:48:11  22   COHESIVE CLAY SOILS AS FILL.  THESE COHESIVE SOILS ARE TO BE

15:48:18  23   COMPACTED TO 90 PERCENT OF THE MAXIMUM DRY DENSITY AS

15:48:23  24   DETERMINED BY ASTM D698".

15:48:30  25          AND THEN IT GOES ON.

| | | |
|---|---|---|
| 15:48:31 | 1 | MY FIRST QUESTION, SIR, IS, WHAT IS ASTM D698? |
| 15:48:39 | 2 | A.   IT IS A COMPACTION CRITERIA. |
| 15:48:42 | 3 | Q.   WHAT DOES THE ASTM STAND FOR? |
| 15:48:45 | 4 | A.   AMERICAN SOCIETY OF TESTING MATERIALS. |
| 15:48:46 | 5 | Q.   AND WHAT'S D698 MEAN? |
| 15:48:50 | 6 | A.   D698 CORRESPONDS TO A PARTICULAR METHODOLOGY.  THERE'S |
| 15:48:56 | 7 | SEVERAL DIFFERENT METHODOLOGIES FOR COMPACTING SOIL.  BUT WHEN |
| 15:48:59 | 8 | YOU WANT TO GET A SOIL COMPACTED TO 90 PERCENT OF THE MAXIMUM |
| 15:49:04 | 9 | DRY DENSITY, WELL, D698 TELLS YOU HOW TO FIND OUT WHAT THAT |
| 15:49:09 | 10 | MAXIMUM DENSITY IS. |
| 15:49:12 | 11 | Q.   AND WHAT DOES TO MEAN TO COMPACT SOILS TO 90 PERCENT OF |
| 15:49:19 | 12 | THE MAXIMUM DRY DENSITY? |
| 15:49:21 | 13 | A.   IT MEANS TO ACHIEVE A DRY DENSITY WHICH IS 90 PERCENT OF A |
| 15:49:27 | 14 | DENSITY DETERMINED BY AN ASTM TEST SUCH AS THIS. |
| 15:49:31 | 15 | Q.   AND WAS IT APPROPRIATE TO COMPACT THESE SOILS TO |
| 15:49:35 | 16 | 90 PERCENT OF THE MAXIMUM DRY DENSITY? |
| 15:49:37 | 17 | A.   I THINK THAT'S APPROPRIATE.  I MEAN, THESE ARE SLOPES |
| 15:49:40 | 18 | LEADING UP TO A FLOODWALL.  SO COMPACTION OF -- IT'S PART OF A |
| 15:49:46 | 19 | STRUCTURAL SYSTEM FOR THE CONTAINMENT OF THE FLOODWALL AND |
| 15:49:48 | 20 | SUPPORT OF THE FLOODWALL.  AND IT'S INTENDED TO PROVIDE SOME |
| 15:49:53 | 21 | EROSION PROTECTION AS WELL, BECAUSE THESE ARE NOT ERODIBLE |
| 15:49:59 | 22 | SOILS. |
| 15:50:01 | 23 | Q.   SIR, WE'RE NEXT GOING TO GO TO EXHIBIT NUMBER -- PAGE 40 |
| 15:50:04 | 24 | OF YOUR REPORT.  DO YOU SEE, SIR, YOU REFERENCE THERE |
| 15:50:20 | 25 | "UNDERGROUND UTILITY REMOVAL"? |

15:50:48   1            **MR. GREGORY:**  OH, I'M SORRY.  I WANT TO GO BACK UP

15:50:50   2   ONE.

15:50:51   3                  KARL, CAN WE GO BACK UP TO A DIFFERENT PART OF

15:50:54   4   THAT PAGE?

15:51:05   5                  THANK YOU, KARL.

15:51:05   6   **BY MR. GREGORY:**

15:51:05   7   **Q.**   AND ABOUT TWO SENTENCES DOWN THERE'S A REFERENCE TO WGI,

15:51:09   8   BEGINNING "BACKFILLING THE LIFT STATION EXCAVATION WITH SPOIL.

15:51:20   9   SPOIL BACKFILL WAS PLACED IN 2-FOOT LIFTS AND COMPACTED UP TO

15:51:27  10   THE WHALERS AT APPROXIMATELY NEGATIVE 8.6 FEET.  THE MATERIAL

15:51:32  11   USED TO BACKFILL THE REMAINDER OF THE COFFERDAM EXCAVATION

15:51:36  12   APPEARS TO BE A COMBINATION OF SAND AND SOIL."

15:51:38  13            DO YOU SEE THAT?

15:51:39  14            **THE COURT:**  "SPOIL."

15:51:41  15   **BY MR. GREGORY:**

15:51:41  16   **Q.**   "SPOIL."  I'M SORRY.  I MISREAD THAT.

15:51:43  17            DO YOU SEE THAT, SIR?

15:51:44  18   **A.**   I SEE THAT.

15:51:45  19   **Q.**   AND THEN IT GOES ON THAT "THIS IS SUGGESTED BY A WGI DPR

15:51:50  20   FROM 8 NOVEMBER 2001, WHICH NOTES THAT SAND DELIVERED FROM ITT

15:51:55  21   ON 7 NOVEMBER 2001 WAS ADDED TO THE PREVIOUSLY STOCKPILED

15:52:05  22   BACKFILL MATERIAL."

15:52:07  23            WAS THAT STOCKPILE FILL THE SAME STOCKPILE FROM THE

15:52:11  24   SEWER'S LIFT STATION EXCAVATION?

15:52:20  25   **A.**   YOU MEAN WHERE IT SAYS "PREVIOUSLY STOCKPILED"?

| | | |
|---|---|---|
| 15:52:23 | 1 | **Q.**   YES, SIR. |
| 15:52:24 | 2 | **A.**   I DON'T KNOW THAT. |
| 15:52:24 | 3 | **Q.**   AND, THEN, IF IT HAD BEEN, SIR, WOULD IT HAVE BEEN USED |
| 15:52:29 | 4 | FOR BACK- -- I'M SORRY. |
| 15:52:33 | 5 | IF -- WAS -- WGI WAS ADDING SAND TO EXTEND THEIR |
| 15:52:38 | 6 | STORES OF STOCKPILE, WOULD THAT IMPACT EVERY HOLE THAT WAS DUG? |
| 15:52:44 | 7 | **A.**   WELL, MY UNDERSTANDING FOR THIS WAS THAT THE ITT SITE HAD |
| 15:52:48 | 8 | A LOT OF SAND FROM PREVIOUS SANDBLASTING, AND FOR SOME REASON |
| 15:52:53 | 9 | IT WAS BROUGHT OVER AS COMPACTING -- YOU KNOW, TO BE USED AS |
| 15:52:58 | 10 | BACKFILL. |
| 15:53:00 | 11 | THIS PARTICULAR NOTATION REALLY ONLY REFERS TO THE |
| 15:53:05 | 12 | UPPER 8 1/2 FEET OF THE LIFT STATION EXCAVATION. |
| 15:53:11 | 13 | **Q.**   BUT THIS, SIR, IS IN 2001, BEFORE THE BORROW PIT WAS |
| 15:53:15 | 14 | EXHAUSTED, CORRECT? |
| 15:53:17 | 15 | **A.**   I DON'T REMEMBER THE DAY WHEN THE BORROW PIT WAS |
| 15:53:21 | 16 | EXHAUSTED. |
| 15:53:21 | 17 | **Q.**   WELL, WHY DON'T WE TURN TO PAGE 50- -- 0053 OF YOUR |
| 15:53:29 | 18 | REPORT, AND THEN IF YOU GO DOWN TO -- OH, I'M SORRY. |
| 15:53:45 | 19 | YOU TALK ABOUT "PHASE 2 OF THE TRANSITE REMOVAL |
| 15:53:49 | 20 | ACTIVITIES WAS PERFORMED DURING THE AREA EXCAVATIONS." |
| 15:53:54 | 21 | AND IT TALKS ABOUT THAT "THE BACKFILL MATERIAL USED |
| 15:53:57 | 22 | IN THESE AREAS APPEARS TO BE A COMBINATION OF CLEAN FILL |
| 15:54:01 | 23 | MATERIAL FROM BOLAND MARINE BORROW PIT MATERIAL AND IMPORTED |
| 15:54:05 | 24 | RIVER SAND FILL." |
| 15:54:06 | 25 | DO YOU SEE THAT? |

| | | |
|---|---|---|
| 15:54:08 | 1 | **A.**   YES, SIR. |
| 15:54:08 | 2 | **MR. GREGORY:**  AND THEN IF YOU GO BACK TO 51, KARL. |
| 15:54:18 | 3 | **BY MR. GREGORY:** |
| 15:54:18 | 4 | **Q.**   PHASE 2 OF THE ACM TRANSITE.  DO YOU SEE AT THE BOTTOM |
| 15:54:24 | 5 | THERE, UNDER 3.2.6, THAT WAS DONE FROM NOVEMBER 2004 TO |
| 15:54:29 | 6 | APRIL 2005? |
| 15:54:32 | 7 | DO YOU SEE THAT? |
| 15:54:32 | 8 | **A.**   I SEE THOSE DATES, YEAH. |
| 15:54:34 | 9 | **Q.**   SO IN 2001, THE BORROW PIT WAS STILL OPERATIONAL, SO TO |
| 15:54:39 | 10 | SPEAK? |
| 15:54:44 | 11 | **A.**   I CAN'T REMEMBER THE DATES FOR THE BORROW PIT.  I'M NOT |
| 15:54:48 | 12 | EVEN SURE IT'S IN MY REPORT.  I JUST DON'T REMEMBER WHAT DAYS |
| 15:54:53 | 13 | THE MCDONOUGH BORROW PIT, BEGINNING AND ENDS, IN OPERATION. |
| 15:55:15 | 14 | **Q.**   SIR, LET'S TURN TO PAGE 35 OF YOUR REPORT. |
| 15:23:36 | 15 | **A.**   (WITNESS COMPLIES.) |
| 15:55:28 | 16 | **Q.**   AND YOU HAVE -- UNDER DFOW 9, DO YOU SEE THAT YOU ESTIMATE |
| 15:55:39 | 17 | THAT -- OR SOMEONE HAS ESTIMATED THAT 29,500 TONS OF |
| 15:55:44 | 18 | CONTAMINATED SOILS WOULD REQUIRE REMOVAL, BUT ADDITIONAL |
| 15:55:48 | 19 | TESTING IDENTIFIED AN ADDITIONAL 56,297 TONS OF CONTAMINATED |
| 15:55:55 | 20 | SOIL, FOR A TOTAL OF 85,797 TONS OF SOIL? |
| 15:56:01 | 21 | DO YOU SEE THAT? |
| 15:56:03 | 22 | **A.**   YES, SIR. |
| 15:56:03 | 23 | **Q.**   AND YOU WOULD AGREE, SIR, WOULD YOU NOT, THAT THAT'S A LOT |
| 15:56:06 | 24 | OF SOIL? |
| 15:56:07 | 25 | **A.**   THAT'S A LOT OF SOIL. |

15:56:09   1   **Q.**   HOW MANY TRUCKLOADS, ABOUT, WOULD THAT BE?

15:56:21   2   **A.**   I COULDN'T TELL YOU.  A LOT.

15:56:23   3   **Q.**   A LOT.

15:56:24   4          OKAY.  AND LET'S TURN TO THE NEXT PAGE, SIR, 36.

15:56:28   5          DO YOU SEE IN THERE AT -- IF WE GO DOWN TO DFOW 12.

15:23:36   6   **A.**   (WITNESS COMPLIES.)

15:56:46   7   **Q.**   AND DO YOU SEE A TOTAL OF 72,790 TONS OF ACM WERE

15:56:51   8   EXCAVATED AND TRANSPORTED OFFSITE FOR DISPOSAL?

15:56:56   9   **A.**   YES, I SEE THAT.

15:56:58   10  **Q.**   AND NOW, SIR, I'D LIKE TO TURN TO PAGE -- AT THE BOTTOM OF

15:57:16   11  PAGE 39 IN YOUR REPORT.

15:57:29   12         DO YOU SEE, PRIOR TO REMOVING THE LIFT STATION, THERE

15:57:38   13  WERE -- I'M SORRY, SIR.

15:57:42   14         **MR. GREGORY:**  KARL, COULD YOU BACK UP?

15:57:43   15             IT'S PAGE 40, KARL.  I WROTE DOWN THE WRONG

15:57:53   16  PAGE.  I'M SORRY.

15:57:54   17  **BY MR. GREGORY:**

15:57:57   18  **Q.**   "UNDERGROUND UTILITY REMOVAL."

15:58:01   19         AND NOW DO YOU SEE IN THIS SECTION OF YOUR REPORT

15:58:04   20  YOU'RE TALKING ABOUT UNDERGROUND UTILITIES THAT WERE REMOVED

15:58:07   21  FROM SAUCER AT THE BEGINNING AND END PHASES OF THE PROJECT?

15:58:10   22  **A.**   YES, I SEE THAT.

15:58:17   23         **MR. GREGORY:**  AND THEN IF WE TURN TO THE NEXT PAGE,

15:58:19   24  KARL.

15:58:21   25             AND AT THE TOP OF THAT PAGE, CAN YOU BLOW UP

15:58:24    1  THAT PARAGRAPH?

15:58:30    2  **BY MR. GREGORY:**

15:58:32    3  **Q.**   RIGHT THERE:  "THERE IS NO MENTION IN THE FIELD DOCUMENTS

15:58:36    4  ABOUT WHAT TYPE OF BACKFILL MATERIAL WAS USED DURING THIS

15:58:41    5  OPERATION."

15:58:41    6          AND THEN IT STATES:  "HOWEVER, THE QARS DO MENTION

15:58:47    7  THAT NO HARM WAS CAUSED TO THE FLOODWALL DURING THE LINE

15:58:52    8  REMOVAL ACTIVITIES."

15:58:53    9          DO YOU SEE THAT?

15:58:55   10  **A.**   YES, SIR.

15:58:55   11  **Q.**   NOW, SIR, THEN YOU GO ON TO TALK ABOUT THE "UNDERGROUND

15:59:00   12  UTILITIES AT SAUCER MARINE WERE EXCAVATED TO THEIR TERMINATION,

15:59:06   13  AND BACKFILL MATERIAL WAS PLACED IN THE RESULTING TRENCHES."

15:59:12   14          DO YOU SEE THAT?

15:59:12   15  **A.**   YES.

15:59:12   16  **Q.**   AND THE TYPE OF BACKFILL THAT WAS USED WAS NOT MENTIONED

15:59:15   17  IN THE FIELD REPORTS; CORRECT?

15:59:17   18  **A.**   THAT'S CORRECT.

15:59:17   19  **Q.**   AND IS IT APPROPRIATE NOT TO DOCUMENT THE TYPE OF MATERIAL

15:59:22   20  USED FOR BACKFILL?

15:59:28   21  **A.**   I THINK, GIVEN THE -- THE NATURE OF THIS PROJECT, I WOULD

15:59:31   22  SAY IT'S NOT NECESSARY TO DOCUMENT THE TYPE OF BACKFILL.

15:59:36   23          AND THIS IS NOT A SITE THAT'S BEING EXCAVATED AND

15:59:40   24  RECOMPACTED IN WHICH WE'RE GOING TO BUILD CONDOMINIUMS OR

15:59:45   25  SOMETHING LIKE THIS.  THIS IS A SITE THAT'S GOING TO BE

15:59:48  1  EXCAVATED, FILLS BEING PLACED INTO THE EXCAVATIONS FOR THE

15:59:53  2  EVENTUAL DREDGING OF A GREAT MAJORITY OF THESE EXCAVATIONS AS

15:59:58  3  PART OF THE FUTURE PROJECT.

16:00:00  4  **Q.**   BUT, SIR, HOW LONG IS THIS PROJECT GOING TO REMAIN

16:00:03  5  UNTIL -- AND THE FLOODWALL BE THERE?  DO YOU KNOW?

16:00:11  6  **A.**   WELL, I BELIEVE THAT'S UNKNOWN BECAUSE THAT'S A FEDERAL

16:00:14  7  FUNDING ISSUE THAT THESE PEOPLE HAVE NO CONTROL OVER.

16:00:18  8  **Q.**   AND HOW MANY NAMED HURRICANES WOULD GO THROUGH BEFORE THAT

16:00:23  9  WORK WAS ALL COMPLETED?

16:00:26  10  **A.**   WELL, I'M NOT HERE TODAY TO OFFER PREDICTIONS ON

16:00:30  11  HURRICANES, SO I DON'T KNOW THE ANSWER TO THAT.

16:00:36  12  **Q.**   SIR, WHAT I WANT TO DO NOW IS TURN TO SOME OF YOUR SLIDES.

16:00:45  13          **THE COURT:**  AND I HATE TO GO BACK TO THIS, BUT I'M --

16:00:50  14  I'M SORT OF DOGGED IN MY ABILITY TO TRY TO UNDERSTAND

16:00:55  15  EVERYTHING AS MUCH AS I CAN.  AND I'M GOING BACK TO SOMETHING

16:01:00  16  THAT WE HAVEN'T TALKED ABOUT IN A WHILE AND I'VE TALKED TO YOU

16:01:07  17  ABOUT IN A WHILE.

16:01:12  18          IS THE ONLY WAY THAT -- I'LL USE EXCAVATION

16:01:17  19  OR -- ON THE WATER SIDE OF THE LEVEE WOULD AFFECT A SEEPAGE

16:01:20  20  ANALYSIS LIKE THE CREEP ANALYSIS WOULD BE IF IT WERE DEEP

16:01:25  21  ENOUGH TO COMMUNICATE WITH THE -- WITH THE SOILS THAT WERE --

16:01:30  22  WERE PERMEABLE ON THE OTHER SIDE OF THE LEVEE?  IS THAT FAIR

16:01:34  23  ENOUGH?

16:01:34  24          **THE WITNESS:**  THAT'S FAIR ENOUGH, YOUR HONOR.

16:01:36  25          **THE COURT:**  OKAY.  I UNDERSTAND YOUR -- YOUR -- IT

16:01:41  1   HELPS ME UNDERSTAND IT A LITTLE BIT BETTER.

16:01:47  2               THANK YOU.

16:01:50  3          MR. GREGORY:  KARL, WE'LL GO TO SLIDE 0005.

16:01:53  4   BY MR. GREGORY:

16:01:56  5   Q.   SIR, WHEN YOU TALK AT THE SECOND BULLET POINT ABOUT

16:01:59  6   "COMPLIANCE WITH WIDELY ACCEPTED STANDARDS OF GOOD ENGINEERING

16:02:07  7   AND ENGINEERING JUDGMENT," THERE YOU'RE TALKING ABOUT SEEPAGE

16:02:11  8   AND SLOPE STABILITY; IS THAT CORRECT?

16:02:14  9   A.   I'M TALKING ABOUT THE METHODS THAT THE CORPS WAS USING.

16:02:16  10  THE LANE'S WEIGHTED CREEP RATIO AND THE METHOD OF PLANES HAS

16:02:20  11  TWO METHODS TO EVALUATE THE SEEPAGE AND STABILITY OF THE EBIA

16:02:26  12  AND THE JUDGMENTS THAT WERE APPLIED.

16:02:34  13  Q.   WELL, SIR, I THOUGHT IN YOUR TESTIMONY YOU SAID THAT

16:02:36  14  THAT'S WHAT YOU WERE REFERRING TO, SEEPAGE AND SLOPE STABILITY.

16:02:41  15  A.   I'M SORRY, I THOUGHT THAT WAS WHAT I JUST SAID.

16:02:44  16  Q.   OKAY.  MAYBE I MISUNDERSTOOD YOUR ANSWER.

16:02:46  17              AND THEN, SIR, WHEN YOU ARE LOOKING AT GUIDANCE

16:02:52  18  DOCUMENTS -- DO YOU SEE THERE, "GUIDANCE DOCUMENTS ARE TO BE

16:02:56  19  USED WITH PROFESSIONAL ENGINEERING JUDGMENT"?  IF YOU HAVE

16:03:00  20  GUIDANCE DOCUMENTS AVAILABLE, YOU SHOULD USE THEM; CORRECT?

16:03:07  21  A.   WELL, THIS IS AN ISSUE THAT I FEEL STRONGLY ABOUT, THAT

16:03:10  22  GUIDANCE DOCUMENTS ARE JUST THAT, GUIDANCE DOCUMENTS.

16:03:16  23  GEOTECHNICAL ENGINEERING IS -- THERE ARE BASIC PRINCIPLES, BUT

16:03:20  24  THERE'S LOCAL CONDITIONS THAT APPLY.  I MEAN, IF YOU TOOK AN

16:03:23  25  ENGINEER FROM NEW ORLEANS AND STUCK HIM IN NEW YORK OR

16:03:27   1   VICE VERSA, TOTALLY DIFFERENT SUBSURFACE CONDITIONS THAT THEY

16:03:33   2   DEAL WITH.

16:03:34   3        SO UNDERSTANDING THE SOIL CONDITIONS AND WHAT YOU'RE

16:03:38   4   LIKELY TO GET AND THE THINGS THAT YOU NEED TO DO TO MITIGATE

16:03:42   5   THE PROBLEMS THAT CAN ARISE FROM THOSE ARE IMPORTANT ASPECTS OF

16:03:47   6   OUR PROFESSION.  AND THIS IS AN EMPIRICALLY BASED SCIENCE, AND

16:03:56   7   WE HAVE TO HAVE EXPERIENCE IN THIS AREA WITH THESE TYPES OF

16:04:00   8   SOILS AND THESE TYPES OF PROJECTS TO KNOW WHAT WORKS AND

16:04:03   9   DOESN'T WORK.

16:04:05   10   Q.   WELL, SIR, YOU CAN'T LET THE GUIDANCE DOCUMENTS JUST SIT

16:04:09   11   IN THE FILE CABINET, CAN YOU?

16:04:10   12   A.   WELL, THAT'S NOT THE POINT I'M MAKING AT ALL.  THE

16:04:12   13   GUIDANCE DOCUMENTS ARE PART OF THAT, YOU KNOW, BUT THEY ARE NOT

16:04:15   14   RIGID REQUIREMENTS OF HOW YOU'RE SUPPOSED TO DO YOUR WORK.

16:04:20   15   THEY MAY HAVE REQUIRED -- THEY MAY HAVE PROCEDURES IN THEM OR,

16:04:24   16   YOU KNOW, METHODS OF ANALYSIS, BUT THERE ARE MANY INSTANCES IN

16:04:28   17   EVERY ANALYSIS THAT YOU DO OR JUDGMENT THAT YOU MAKE THAT'S

16:04:36   18   BASED UPON YOUR KNOWLEDGE OF LOCAL CONDITIONS AND THE

16:04:40   19   EXPERIENCE THAT YOU GAIN OVER 30 OR 40 YEARS WORKING IN THAT

16:04:43   20   AREA.

16:04:45   21   Q.   SIR, THAT NEXT SLIDE, SLIDE 6, IS THIS AN EXAMPLE OF A

16:04:51   22   GUIDANCE DOCUMENT?

16:04:57   23   A.   THAT IS AN EXAMPLE, YES.

16:04:59   24   Q.   AND YOU'RE REFERRING TO ER, THAT'S AN ENGINEERING

16:05:01   25   REGULATION?

16:05:05   1   **A.**   YES.  THAT'S WHAT'S ON THE SLIDE, YES.

16:05:08   2                **MR. GREGORY:**  AND IF WE COULD GO TO JX-44 AT PAGE 1.

16:05:18   3   **BY MR. GREGORY:**

16:05:18   4   **Q.**   THAT'S A COPY OF THE SAME DOCUMENT, IS IT NOT, SIR?

16:05:25   5   **A.**   IT APPEARS SO.

16:05:27   6   **Q.**   OKAY.  AND IF WE COULD TURN TO PAGE 0010 AT THE -- IT

16:05:39   7   TALKS ABOUT ENGINEERING DURING FEASIBILITY PHASE.  DO YOU SEE

16:05:44   8   THAT, SIR?

16:05:44   9   **A.**   YES, I SEE IT.

16:05:47   10               **THE COURT:**  NOW HE CAN SEE IT.

16:05:49   11               **MR. GREGORY:**  OKAY.  AND THEN IF WE GO DOWN TO 13.2,

16:05:52   12   WHICH IS RIGHT THERE, KARL.  AND THE REST TO THE BOTTOM OF

16:06:01   13   PAGE.  SORRY.

16:06:02   14   **BY MR. GREGORY:**

16:06:02   15   **Q.**   IT TALKS ABOUT "ENGINEER ELEMENTS OF A FEASIBILITY STUDY.

16:06:07   16   THE ENGINEERING EFFORT DURING FEASIBILITY SHALL . . ."

16:06:09   17            SO THAT'S NOT A GUIDANCE DOCUMENT, IS IT, SIR?

16:06:14   18   THAT'S A -- "SHALL" IS A MANDATORY?

16:06:16   19   **A.**   WELL, THE PREFACE TO THIS WHOLE DOCUMENT IS THAT THIS

16:06:21   20   NEEDS TO BE USED IN CONJUNCTION WITH ENGINEERING JUDGMENT.  SO

16:06:26   21   I -- THERE'S A LOT OF THINGS THAT YOU CAN DO.  MAYBE YOUR

16:06:30   22   JUDGMENT OF ONE OF THESE BULLET POINTS IS NOT APPROPRIATE, OR

16:06:35   23   IT CAN BE COVERED BY -- BY THE JUDGMENT OF THE INDIVIDUAL, JUST

16:06:38   24   BY AN ASSESSMENT THAT THEY WOULD MAKE.

16:06:40   25            SO THERE'S A LOT DIFFERENT WAYS TO LOOK AT THIS, SIR.

| | | |
|---|---|---|
| 16:06:44 | 1 | I'M NOT SURE OF THE POINT HERE. |
| 16:06:45 | 2 | **THE COURT:**  LET'S NOT ARGUE OVER THE WORD "SHALL." |
| 16:06:48 | 3 | YOU'RE GOING TO MOVE ON, RIGHT, COUNSEL? |
| 16:06:51 | 4 | **MR. GREGORY:**  YES. |
| 16:06:51 | 5 | **THE COURT:**  WE'LL ARGUE OVER THAT ANOTHER -- |
| 16:06:53 | 6 | **BY MR. GREGORY:** |
| 16:06:53 | 7 | **Q.**  AND, SIR, IF WE TURN TO THE NEXT PAGE, WHICH TALKS ABOUT |
| 16:06:55 | 8 | "DURING FEASIBILITY SHALL INCLUDE." |
| 16:06:57 | 9 | **MR. GREGORY:**  AND GO AT THE TOP.  BLOW THAT UP. |
| 16:07:03 | 10 | **BY MR. GREGORY:** |
| 16:07:03 | 11 | **Q.**  DO YOU SEE -- |
| 16:07:05 | 12 | **THE COURT:**  YES, SIR. |
| 16:07:05 | 13 | **MR. KELLS:**  YOUR HONOR, I WOULD KIND OF OBJECT AT |
| 16:07:07 | 14 | THIS POINT TO RELEVANCE, SINCE WE'RE NOT HERE ON A FEASIBILITY |
| 16:07:11 | 15 | STUDY RIGHT NOW.  AND TO THE EXTENT THIS IS APPLICABLE TO A |
| 16:07:15 | 16 | FEASIBILITY STUDY, I'M NOT -- I'M NOT SURE WHERE WE'RE GOING |
| 16:07:18 | 17 | WITH IT. |
| 16:07:20 | 18 | WE'LL STIPULATE THAT THE DOCUMENT SAYS WHAT IT |
| 16:07:21 | 19 | SAYS.  DR. LUCIA'S POINT WAS THAT WHEN IT CAME TO GEOTECHNICAL |
| 16:07:26 | 20 | ASSESSMENTS AND EVALUATIONS, PROFESSIONAL |
| 16:07:29 | 21 | ENGINEERING IMPORTANT -- PROFESSIONAL ENGINEERING JUDGMENT WAS |
| 16:07:30 | 22 | IMPORTANT.  I'M NOT SURE WHAT THE REST OF THIS IS ABOUT OR |
| 16:07:34 | 23 | WHERE HE'S GOING WITH IT, BUT . . . |
| 16:07:37 | 24 | **THE COURT:**  COUNSEL, DO YOU WANT TO RESPOND? |
| 16:07:40 | 25 | **MR. GREGORY:**  YES, YOUR HONOR.  THERE'S DOCUMENTS |

16:07:41   1   THAT DR. LUCIA REFERS TO THAT GIVES YOU GUIDANCE THAT YOU CAN

16:07:45   2   CHOOSE TO FOLLOW OR NOT TO FOLLOW.  BUT THERE'S OTHER

16:07:49   3   DOCUMENTS -- IN FACT, THE VERY DOCUMENT HE USED TO SUPPORT HIS

16:07:52   4   SLIDE -- THAT SAYS WHAT YOU SHALL DO.

16:07:54   5            **THE COURT:**  OKAY.  AND THIS GOES, I ASSUME, TO HIS

16:07:56   6   ULTIMATE STANDARD OF CARE OPINION?

16:07:59   7            **MR. GREGORY:**  YES, YOUR HONOR.

16:07:59   8            **THE COURT:**  YOU NEED TO MAKE THAT CLEAR, IF POSSIBLE.

16:08:05   9            **MR. GREGORY:**  SURE.

16:08:05  10   **BY MR. GREGORY:**

16:08:05  11   **Q.**  AND IT TALKS -- AND THIS IS WHY WE'RE ON THE NEXT PAGE --

16:08:08  12            **THE COURT:**  TO THAT EXTENT, I'LL OVERRULE YOUR

16:08:11  13   OBJECTION AND LET HIM GO ON.

16:08:12  14            **MR. KELLS:**  I UNDERSTAND.  I'LL WAIT FOR THE

16:08:13  15   CONNECTION, YOUR HONOR.

16:08:14  16   **BY MR. GREGORY:**

16:08:14  17   **Q.**  AND, SIR, IT TALKS HERE ABOUT THE DEVELOPMENT OF

16:08:17  18   GEOTECHNICAL INFORMATION; CORRECT?

16:08:19  19   **A.**  CORRECT.

16:08:19  20   **Q.**  AND THAT'S SOMETHING THAT'S REQUIRED TO BE DONE; CORRECT?

16:08:23  21   **A.**  CORRECT.

16:08:24  22   **Q.**  OKAY.  AND THEN WHEN DOING AN --

16:08:28  23            **MR. GREGORY:**  AND LET'S GO TO A LOWER PAGE ON THE

16:08:30  24   SAME PAGE, KARL.

16:08:35  25            I'M SORRY, AT 14.  NO, NO, I'M SORRY, 0014.

| | | |
|---|---|---|
| 16:08:47 | 1 | **BY MR. GREGORY:** |
| 16:08:50 | 2 | **Q.**   DO YOU SEE, AT 13.6.7, HTRW?  DO YOU SEE THAT? |
| 16:09:04 | 3 | AND, DO YOU SEE, SIR -- FIRST OFF, THIS WAS AN HTRW |
| 16:09:10 | 4 | PROJECT; CORRECT? |
| 16:09:11 | 5 | **A.**   I'M NOT SURE I KNOW THAT -- WHAT DOES "HTRW" STAND FOR? |
| 16:09:14 | 6 | WHAT'S THAT AN ACRONYM FOR? |
| 16:09:17 | 7 | **Q.**   YOU'RE NOT FAMILIAR WITH THE TERM "HTRW"? |
| 16:09:23 | 8 | **A.**   I CAN'T RECALL THAT RIGHT NOW, BUT . . . |
| 16:09:24 | 9 | **Q.**   OKAY.  YOU DON'T -- YOU'RE NOT FAMILIAR WITH THE |
| 16:09:27 | 10 | REMEDIATION ASPECTS OF THIS PROJECT? |
| 16:09:29 | 11 | **A.**   OH, YES, I AM.  I MEAN, GENERALLY, I AM.  I SPENT MORE |
| 16:09:33 | 12 | TIME ON THE GEOTECHNICAL. |
| 16:09:36 | 13 | **Q.**   AND THIS WAS AN HTRW PROJECT.  IT INVOLVED REMEDIATION; |
| 16:09:41 | 14 | CORRECT? |
| 16:09:42 | 15 | **THE COURT:**  IT WAS A REMEDIATION PROJECT.  HE SAYS |
| 16:09:44 | 16 | HE'S NOT FAMILIAR WITH THE ACRONYM. |
| 16:09:48 | 17 | **THE WITNESS:**  WHAT DOES "HTRW" STAND FOR? |
| 16:09:50 | 18 | **THE COURT:**  JUST ASK IF THAT -- THIS IS A REMEDIATION |
| 16:09:53 | 19 | PROJECT. |
| 16:09:53 | 20 | **THE WITNESS:**  YES. |
| 16:09:54 | 21 | **THE COURT:**  OKAY.  AND WE CAN ASSUME THAT "HTRW" |
| 16:09:55 | 22 | APPLIES TO REMEDIATION PROJECT, AND LET'S MOVE FROM THERE, |
| 16:09:59 | 23 | BECAUSE AT THE PACE WE'RE GOING -- UNFORTUNATELY, I WAS NOT |
| 16:10:06 | 24 | BLESSED WITH INFINITE PATIENCE, ALTHOUGH I PROMISE I TRY TO |
| 16:10:14 | 25 | HARNESS MY NATURAL IMPATIENCE, BUT EVERY NOW AND THEN IT REARS |

| | | |
|---|---|---|
| 16:10:18 | 1 | ITS UGLY FACE.  SO LET'S TRY TO GET A LITTLE RHYTHM IN THE |
| 16:10:27 | 2 | CROSS-EXAMINATION. |
| 16:10:28 | 3 | **MR. GREGORY:**  OKAY.  YES, YOUR HONOR. |
| 16:10:31 | 4 | AT SECTION 8, AND WE'RE GOING TO GO -- IT'S |
| 16:10:35 | 5 | 0006.  8.2. |
| 16:10:41 | 6 | **BY MR. GREGORY:** |
| 16:10:42 | 7 | **Q.**  DO YOU SEE "DESIGN DOCUMENTATION REPORT"? |
| 16:10:46 | 8 | **A.**  I CAN SEE IT, YEAH.  OKAY. |
| 16:10:48 | 9 | **Q.**  OKAY.  WAS THERE A DESIGN DOCUMENTATION REPORT PREPARED |
| 16:10:52 | 10 | FOR THIS PROJECT? |
| 16:10:53 | 11 | **A.**  YES, THERE WAS. |
| 16:10:54 | 12 | **Q.**  AND WHEN WAS IT PREPARED? |
| 16:10:59 | 13 | **A.**  2002, I BELIEVE. |
| 16:11:03 | 14 | **Q.**  AND THE -- IF WE TURN NOW, DO YOU SEE, SIR, IT REFERS TO, |
| 16:11:09 | 15 | AT THE BOTTOM "THE CONTEXT AND FORMAT FOR THE DESIGN |
| 16:11:12 | 16 | DOCUMENTATION REPORT IS DISCUSSED IN APPENDIX D"? |
| 16:11:17 | 17 | IF WE COULD NOW TURN TO APPENDIX D, WHICH IS AT -- |
| 16:11:23 | 18 | **MR. GREGORY:**  KARL, IT'S AT -- |
| 16:11:26 | 19 | **THE COURT:**  YES, SIR.  WE HAVE AN OBJECTION. |
| 16:11:27 | 20 | **MR. KELLS:**  I JUST -- NOT AN OBJECTION, MORE A |
| 16:11:29 | 21 | CLARIFICATION.  THE RECORD'S A LITTLE VAGUE ABOUT WHICH PROJECT |
| 16:11:33 | 22 | WE'RE REFERRING TO.  IS COUNSEL REFERRING TO THE NEW LOCK -- |
| 16:11:36 | 23 | CONNECTING CHANNEL, NEW LOCK REPLACEMENT PROJECT OR SIMPLY TASK |
| 16:11:41 | 24 | ORDER 26 OF THE TERC? |
| 16:11:43 | 25 | **THE COURT:**  ALL RIGHT.  WERE YOU REFERRING TO THE |

16:11:46  1   TASK ORDER 26, WHICH WAS THE TASK ORDER THAT WGI WAS INVOLVED

16:11:50  2   IN, OR ARE WE INVOLVED IN SOMETHING ELSE?

16:11:54  3        **MR. GREGORY:**  TASK ORDER 26, YOUR HONOR.

16:11:55  4        **THE COURT:**  ALL RIGHT.  THANK YOU.

16:11:56  5   **BY MR. GREGORY:**

16:11:56  6   **Q.**   AND DO YOU SEE, SIR, THERE'S A REFERENCE TO APPENDIX D?

16:12:01  7   AND THEN YOU TURN TO 0045.  AND THAT'S APPENDIX D, CONTENT AND

16:12:15  8   FORMAT OF DESIGN DOCUMENT REPORT.  DO YOU SEE THAT?

16:12:18  9   **A.**   I SEE IT.

16:12:19  10        **MR. GREGORY:**  OKAY.  IF YOU TURN TO 0047.  AND GO TO

16:12:31  11  D-711.  RIGHT THERE, KARL.

16:12:37  12  **BY MR. GREGORY:**

16:12:38  13  **Q.**   "RESULTS OF GEOTECHNICAL INVESTIGATIONS WHICH SUPPLEMENT

16:12:41  14  PREVIOUS STUDIES BUT ARE LIMITED IN EXTENT TO THE AREA

16:12:44  15  REPRESENTED OF THE SUBJECT DDR."

16:12:47  16        WAS THAT -- WERE THOSE RESULTS INCLUDED IN THE

16:12:52  17  DESIGN -- THE DDR?

16:13:05  18  **A.**   WELL, THE DDR IS FOR THE NEW PROJECT.  I MEAN, THAT DIDN'T

16:13:11  19  INCLUDE ANALYSIS FOR -- FOR THE EBIA WALLS THAT WERE TO BE LEFT

16:13:14  20  IN PLACE.  NOW, WHETHER THEY'RE REFERENCED SOMEWHERE IN THE

16:13:18  21  DOCUMENT, I -- I CAN'T RECALL, SITTING HERE.  BUT CLEARLY, IT

16:13:23  22  WAS INTENDED BY THE PEOPLE WHO PUT THIS PROJECT TOGETHER THAT

16:13:26  23  THOSE WALLS WOULD REMAIN IN PLACE.

16:13:31  24        I DON'T KNOW IF THE GEOTECHNICAL INVESTIGATIONS

16:13:35  25  THEMSELVES WERE INCORPORATED INTO THIS, BUT THEY DID SOME

16:13:39   1   ADDITIONAL GEOTECHNICAL INVESTIGATIONS AS PART OF THESE DDRS.

16:13:44   2   **Q.**   SIR, LET'S GO BACK NOW TO YOUR SLIDES.  WE'RE GOING TO GO

16:13:47   3   TO SLIDE 1 -- 0008.

16:14:00   4           LANES' WEIGHTED CREEP RATIO, IS THAT RATIO MENTIONED

16:14:12   5   OR CITED IN ANY OF THE CORPS GUIDELINES FOR ANALYSIS OF

16:14:17   6   I-WALLS?

16:14:18   7   **A.**   I CAN'T TELL YOU WHICH ONES, BUT I HAVE SEEN IT.

16:14:20   8   **Q.**   BUT IT'S NOT CITED IN YOUR REPORT; IS THAT CORRECT?

16:14:24   9   **A.**   WHAT'S NOT CITED?

16:14:26  10   **Q.**   WHERE IT IS PLACED, WHERE IT'S REFERENCED IN THE CORPS

16:14:30  11   GUIDELINES.

16:14:37  12   **A.**   OH, NOT IN THE PARTICULAR -- I KNOW IT'S IN ONE OF THE

16:14:39  13   DOCUMENTS CITED IN MY REPORT.  WHICH DOCUMENT AND WHERE IT IS

16:14:43  14   AT THE MOMENT, I CAN'T TELL YOU.  SO, DOES THAT ANSWER YOUR

16:14:51  15   QUESTION THEN?

16:14:53  16   **Q.**   WELL, SIR, DON'T THE CORPS GUIDELINES DIRECT SPECIFICALLY

16:14:54  17   TO DIFFERENT ANALYSIS FOR SEEPAGE THAN LANE'S WEIGHTED CREEP,

16:15:00  18   THE CURRENT CORPS GUIDELINES?

16:15:02  19   **A.**   CURRENT CORPS GUIDELINES?

16:15:05  20   **Q.**   YES.

16:15:05  21   **A.**   OR THE GUIDELINES IN PLACE AT THE TIME THE WORK WAS DONE?

16:15:09  22   **Q.**   CURRENT.

16:15:09  23   **A.**   WELL, I DON'T KNOW IF THE CURRENT GUIDELINES ARE DIFFERENT

16:15:12  24   THAN THE GUIDELINES THAT WERE IN PLACE WHEN THE WORK WAS DONE.

16:15:15  25   **Q.**   AND BY "THE WORK," DO YOU MEAN THE 1966 WORK?

| | | |
|---|---|---|
| 16:15:19 | 1 | **A.**   THE 2002 DDRS. |
| 16:15:21 | 2 | **Q.**   UH-HUH.  AND WAS THE USE OF LANE'S WEIGHTED CREEP SEEPAGE |
| 16:15:28 | 3 | ANALYSIS PART OF THE STANDARD CORPS GUIDELINES IN THE '70S? |
| 16:15:36 | 4 | **A.**   I THINK IT'S -- AT LEAST FOR 40 YEARS, THAT I KNOW OF, |
| 16:15:39 | 5 | IT'S BEEN AROUND, YES. |
| 16:15:58 | 6 | **Q.**   SIR, THE NEXT SLIDE I'D LIKE TO POINT TO IS THE -- THIS |
| 16:16:01 | 7 | SLIDE, 11. |
| 16:16:02 | 8 | SIR, I BELIEVE YOU TERMED WHAT'S GOING TO TAKE PLACE |
| 16:16:05 | 9 | FROM THE EXISTING IN 2000 TO THE REMOVAL OF THE EBIA DREDGE |
| 16:16:09 | 10 | BYPASS CHANNEL, THAT THERE'S GOING TO BE EXCAVATIONS DONE AND |
| 16:16:13 | 11 | SACRIFICIAL MATERIAL IS GOING TO BE PLACED DOWN THERE.  IS THAT |
| 16:16:17 | 12 | CORRECT? |
| 16:16:18 | 13 | **A.**   IT'S MY UNDERSTANDING OF THE PROJECT THAT THEY WERE |
| 16:16:21 | 14 | EXCAVATING THINGS THAT THEY DIDN'T WANT TO DREDGE AND REPLACING |
| 16:16:24 | 15 | THEM WITH CLEAN BACKFILL FOR FUTURE DREDGING. |
| 16:16:39 | 16 | **Q.**   LET'S GO NOW, SIR, TO SLIDE 14.  THE 2002 DDR, THAT |
| 16:16:44 | 17 | ANALYSIS ONLY EVALUATED THE TEMPORARY BYPASS CHANNEL; CORRECT? |
| 16:16:58 | 18 | **A.**   THE 2002 ANALYSIS? |
| 16:17:00 | 19 | **Q.**   YES. |
| 16:17:07 | 20 | **A.**   I DON'T THINK SO.  I THINK THE DRAWINGS THAT I HAVE SHOW |
| 16:17:09 | 21 | THE FLOODWALLS FOR THE NEW LOCK SYSTEM.  I THINK IF WE GO |
| 16:17:14 | 22 | FORWARD A COUPLE OF SLIDES -- |
| 16:17:15 | 23 | **Q.**   WELL, SIR, IT DIDN'T ACCOUNT FOR ANY OF THE EXISTING |
| 16:17:19 | 24 | FLOODWALL -- |
| 16:17:20 | 25 | **THE COURT:**  YOUR QUESTION IS:  ISN'T IT TRUE THE 2002 |

16:17:23  1  DDR DID NOT DO A STABILITY OR SEEPAGE STUDY ON THE EBIA -- EBIA

16:17:32  2  PROJECT THAT'S THE SUBJECT OF THIS LAWSUIT?  IS THAT WHAT

16:17:35  3  YOU'RE ASKING?

16:17:36  4            **MR. GREGORY:**  YES, YOUR HONOR.

16:17:37  5            **THE WITNESS:**  I THINK, IF YOU GO FORWARD IN MY

16:17:39  6  PRESENTATION A COUPLE OF SLIDES, YOU'LL SEE ACTUALLY I SHOWED A

16:17:43  7  STABILITY ANALYSIS AND A SEEPAGE ANALYSIS FOR THE NEW LOCK

16:17:48  8  PROJECT AS PART OF THAT.

16:17:49  9  **BY MR. GREGORY:**

16:17:49 10  **Q.**   THAT WAS DONE IN THIS REGION HERE, SIR?

16:17:54 11            **THE COURT:**  "THIS REGION" BEING?

16:17:56 12            **THE WITNESS:**  THE NEW LOCKS, YEAH.

16:17:57 13  **BY MR. GREGORY:**

16:17:58 14  **Q.**   NO, THE -- LET'S GO -- THE REGION NORTH OF WHAT'S THE

16:18:02 15  GREEN LINE ON SLIDE 14.

16:18:05 16  **A.**   WELL, IF YOU -- IF YOU MOVE FORWARD IN MY PRESENTATION --

16:18:09 17  **Q.**   SURE, LET'S MOVE FORWARD.

16:18:11 18            **THE COURT:**  WELL, I GUESS I'M CONFUSED.  ARE YOU

16:18:13 19  SAYING THAT THERE WAS A STABILITY AND SEEPAGE ANALYSIS DONE FOR

16:18:15 20  THE AREA WHERE THESE BREACHES OCCURRED IN 2002?

16:18:21 21            **THE WITNESS:**  NO, IN 2002, YOUR HONOR, IT WAS JUST

16:18:23 22  DONE FOR THE NEW LOCK, THE PROJECT TO BE BUILT.

16:18:26 23            **THE COURT:**  THAT'S WHAT I UNDERSTOOD, AND THAT'S WHAT

16:18:27 24  HE'S TESTIFIED TO PREVIOUSLY.

         25

| | | |
|---|---|---|
| 16:18:38 | 1 | **BY MR. GREGORY:** |
| 16:18:39 | 2 | **Q.**   AND, SIR, IT DIDN'T DO ANY ANALYSIS FOR WHAT WE'LL CALL |
| 16:18:42 | 3 | THE 160-FOOT AREA WHERE THEY -- THAT WASN'T GOING TO BE THE |
| 16:18:47 | 4 | TEMPORARY BYPASS CHANNEL; CORRECT? |
| 16:18:51 | 5 | **A.**   I'M NOT CLEAR ON YOUR QUESTION. |
| 16:18:57 | 6 | **Q.**   SURE, SURE. |
| 16:18:57 | 7 |         THERE'S A FLOODWALL WHERE THE PROJECT'S BEING |
| 16:18:59 | 8 | CONDUCTED? |
| 16:19:01 | 9 | **A.**   THE EXISTING EBIA WALL AT THAT TIME, YES. |
| 16:19:03 | 10 | **Q.**   YES. |
| 16:19:04 | 11 |         AND THEN IT'S GOING TO GO OUT 160-FEET; AND THEN AT |
| 16:19:08 | 12 | THAT 160-FOOT POINT, THEY'RE GOING TO START WORKING ON |
| 16:19:11 | 13 | TEMPORARY BYPASS CHANNEL.  CORRECT? |
| 16:19:14 | 14 | **A.**   THAT'S CORRECT. |
| 16:19:14 | 15 | **Q.**   AND FOR THAT 160-FOOT RANGE, THERE WAS NO ANALYSIS DONE IN |
| 16:19:20 | 16 | 2002; CORRECT? |
| 16:19:21 | 17 | **A.**   FOR THE SLOPE THAT GOES FROM THE FLOODWALL INTO THE |
| 16:19:25 | 18 | CHANNEL? |
| 16:19:26 | 19 | **Q.**   YES. |
| 16:19:26 | 20 | **A.**   OH, THERE IS AN ANALYSIS. |
| 16:19:28 | 21 | **Q.**   IN 2002? |
| 16:19:30 | 22 | **A.**   YES.  IT'S -- IT'S NOT IN MY PRESENTATION.  I DON'T |
| 16:19:35 | 23 | REMEMBER IF IT'S IN MY REPORT OR NOT.  BUT, YES, THERE WAS AN |
| 16:19:39 | 24 | ANALYSIS LOOKING AT WHAT THE FUTURE EXCAVATIONS WOULD BE TO -- |
| 16:19:43 | 25 | TO GET TO THE BYPASS CHANNEL.  THAT'S WHERE I CAME UP WITH THE |

16:19:49   1   NUMBER OF ABOUT 140 OR 50, WHATEVER THE NUMBER IS, DISTANCE

16:19:53   2   FROM THE FLOODWALL AND THEN, YOU KNOW, EXCAVATIONS OUT INTO THE

16:19:59   3   CHANNEL, TO CREATE THAT BYPASS CHANNEL.

16:20:03   4            SO THAT WAS PART OF THAT WORK.

16:20:04   5   **Q.**   YOUR TESTIMONY IS THAT FOR THE AREA FROM THE FLOODWALL

16:20:07   6   WHERE THE PROJECT WAS 160 FEET OUT, THAT 2002 REPORT DID AN

16:20:12   7   ANALYSIS?

16:20:14   8   **A.**   I'VE SEEN A FIGURE THAT SHOWS THAT, AND THEY DID STABILITY

16:20:18   9   ANALYSIS OF THEIR PROPOSED CUTS OUT INTO THE -- THE NEW BYPASS

16:20:25  10   CHANNEL THAT -- SO I KNOW THAT FIGURE EXISTS.  I DON'T KNOW

16:20:30  11   WHERE IT IS AT THE MOMENT.

16:20:34  12   **Q.**   AND THE -- OKAY.  SIR, WE'RE GOING TO MOVE ON.

16:20:37  13            SIR --

16:20:38  14   **A.**   I THINK I -- WHEN THERE'S A GOOD POINT TO TAKE A BREAK,

16:20:45  15   CAN WE TAKE A BREAK?

16:20:47  16            **THE COURT:**  YEAH, SURE.  THIS IS A GOOD POINT.

16:20:51  17            ABOUT HOW -- I'M JUST ASKING.  ABOUT HOW MUCH

16:20:54  18   LONGER DO YOU HAVE?

16:20:56  19            **MR. GREGORY:**  15, 20 MINUTES, YOUR HONOR.

16:20:59  20            **THE COURT:**  THANK YOU.

16:21:00  21            **THE DEPUTY CLERK:**  ALL RISE.

16:21:06  22            (WHEREUPON, THE COURT TOOK A RECESS.)

16:35:55  23            **THE DEPUTY CLERK:**  ALL RISE.

16:35:56  24            COURT'S IN SESSION.  PLEASE BE SEATED.

16:36:06  25            **THE COURT:**  YES, SIR.

| | | |
|---|---|---|
| 16:36:08 | 1 | **MR. GREGORY:**  THANK YOU, YOUR HONOR. |
| 16:36:08 | 2 | **THE COURT:**  YOU MAY RESUME. |
| 16:36:12 | 3 | BY MR. GREGORY: |
| 16:36:12 | 4 | **Q.**  WE LEFT OFF, DR. LUCIA, WITH YOUR SLIDES, AND I'D LIKE TO |
| 16:36:24 | 5 | GO TO SLIDE 17. |
| 16:36:43 | 6 | SIR, DO YOU SEE, SIR, THE REFERENCE IN THE FIRST |
| 16:36:43 | 7 | BULLET POINT THAT ALL EXCAVATIONS BACKFILLED WITH RIVER SAND |
| 16:36:48 | 8 | BACKFILL WERE SHALLOW? |
| 16:36:52 | 9 | DO YOU SEE THAT? |
| 16:36:54 | 10 | **A.**  YES, SIR. |
| 16:36:54 | 11 | **Q.**  AND WHAT AREA ARE YOU TALKING ABOUT FOR PURPOSES OF THAT |
| 16:36:57 | 12 | BULLET POINT? |
| 16:36:59 | 13 | **A.**  THE BOLAND MARINE AREA. |
| 16:37:02 | 14 | **Q.**  OKAY.  AND, SIR, DOES THAT ACCOUNT FOR THE FOUNDATION |
| 16:37:06 | 15 | BLOCKS AND THE PILES ON BOLAND MARINE? |
| 16:37:14 | 16 | **A.**  YOU SAID "FOUNDATION BLOCKS."  I MEAN, I'M NOT SURE WHAT |
| 16:37:17 | 17 | YOU'RE REFERRING TO THERE. |
| 16:37:18 | 18 | **Q.**  YOU DON'T REMEMBER ANY FOUNDATION BLOCKS BEING EXCAVATED |
| 16:37:23 | 19 | AT BOLAND MARINE? |
| 16:37:24 | 20 | **A.**  WELL, THE WEDDING CAKE WAS A PRETTY SUBSTANTIAL |
| 16:37:30 | 21 | FOUNDATION, AND SO THAT'S -- THAT'S WHAT I'M FAMILIAR WITH. |
| 16:37:38 | 22 | IS THERE ANOTHER ONE THAT -- I'M NOT FAMILIAR WITH |
| 16:37:39 | 23 | THAT TERM. |
| 16:37:40 | 24 | **Q.**  OKAY.  WHAT ABOUT THE TRANSITE EXCAVATIONS?  ARE YOU |
| 16:37:45 | 25 | FAMILIAR WITH THOSE? |

| | | |
|---|---|---|
| 16:37:46 | 1 | **A.**  OH, YES. |
| 16:37:47 | 2 | **Q.**  AND THEY WERE FILLED WITH SAND AT THE NORTH END OF BOLAND; |
| 16:37:51 | 3 | CORRECT? |
| 16:37:51 | 4 | **A.**  RIGHT.  AND I -- I THINK THERE'S A SECTION IN MY REPORT |
| 16:37:55 | 5 | THAT TALKS ABOUT THAT, AND I THINK THOSE WERE SHALLOW AS WELL. |
| 16:37:59 | 6 | I MEAN, I'D HAVE TO REFER TO MY REPORT FOR THE EXACT |
| 16:38:05 | 7 | DIMENSIONS OF THOSE -- OR DEPTHS. |
| 16:38:10 | 8 | **Q.**  SIR, LET'S TURN TO SLIDE 19. |
| 16:38:19 | 9 | AND, SIR, THAT'S THE BORROW PIT.  AND THE WALL, TO |
| 16:38:23 | 10 | YOUR KNOWLEDGE, DID NOT FAIL IN THE AREA FOR MCDONOUGH MARINE; |
| 16:38:27 | 11 | CORRECT? |
| 16:38:29 | 12 | **A.**  CORRECT. |
| 16:38:29 | 13 | **Q.**  AND THAT'S THE AREA THAT MR. GUILLORY CALLED IN THE |
| 16:38:37 | 14 | GEOTECHNICAL ENGINEERING GROUP TO DO AN EVALUATION OF THE |
| 16:38:39 | 15 | EXCAVATION THERE; CORRECT? |
| 16:38:41 | 16 | **A.**  CORRECT. |
| 16:38:51 | 17 | **Q.**  SIR, I'D LIKE TO NEXT GO TO SLIDE 22.  AND THAT'S YOUR -- |
| 16:39:05 | 18 | THE SEEPAGE EVALUATION IN THE 1966 REPORT. |
| 16:39:12 | 19 | DO YOU SEE THAT, SIR? |
| 16:39:13 | 20 | **A.**  YES. |
| 16:39:13 | 21 | **Q.**  AND THIS PARAGRAPH THAT YOU DISPLAY HERE, THAT'S THE ONLY |
| 16:39:18 | 22 | PARAGRAPH IN THE 1966 REPORT DISCUSSING SEEPAGE; CORRECT? |
| 16:39:23 | 23 | **A.**  I BELIEVE SO, YES. |
| 16:39:25 | 24 | **Q.**  AND TO YOUR KNOWLEDGE, THERE WAS NO ANALYSIS OF SEEPAGE |
| 16:39:29 | 25 | DONE BEYOND WHAT'S IN THIS STATEMENT? |

16:39:33   1   **A.**   I DIDN'T FIND ANY.

16:39:41   2   **Q.**   AND, SIR, IF WE COULD NEXT GO TO SLIDE 25.

16:40:05   3        AND, SIR, I MAY HAVE INARTFULLY BEEN ASKING YOU

16:40:10   4   QUESTIONS ABOUT THIS, BUT THE AREA IN SLIDE 25, IN THE LOWER

16:40:15   5   RIGHT HAND, THERE'S AN AREA HIGHLIGHTED IN YELLOW.

16:40:22   6        DO YOU SEE THAT AREA?

16:40:24   7   **A.**   YES, I DO.

16:40:24   8   **Q.**   AND THAT AREA WAS GOING TO GO OUT APPROXIMATELY 160 FEET,

16:40:28   9   IS THAT CORRECT, FOR THE TEMPORARY BYPASS CHANNEL?

16:40:32  10   **A.**   I'M NOT SURE I UNDERSTAND YOUR QUESTION.

16:40:35  11   WHAT'S OUTLINED IN YELLOW IS THE FLOODWALL.

16:40:37  12   **Q.**   RIGHT.

16:40:38  13   **A.**   AND THEN OUT APPROXIMATELY 160 FEET, YES, WOULD BE THE --

16:40:46  14   THE TEMPORARY BYPASS -- WOULD BE A CUT MADE IN THERE.

16:40:59  15   **Q.**   SIR, IF WE CAN NEXT GO TO 28.

16:41:07  16        IN THE THIRD BULLET POINT YOU TALK ABOUT -- NO --

16:41:11  17   THIS IS ON YOUR SEEPAGE EVALUATION.

16:41:13  18        AND YOU TALK ABOUT "NO KNOWLEDGE OF ANY PERMEABLE

16:41:18  19   LAYER CAPABLE OF TRANSMITTING WATER BENEATH THE FLOODWALL."

16:41:23  20        SIR, ARE YOU AWARE OF THE CONCEPT OF THE ABILITY OF

16:41:26  21   TRANSMISSION OF PRESSURE WITHOUT WATER?

16:41:33  22   **A.**   I'M SORRY.  COULD YOU ASK ME THAT AGAIN?

16:41:39  23   **Q.**   SURE.

16:41:39  24        IN DOING THE SEEPAGE EVALUATION, ARE YOU -- DID YOU

16:41:43  25   CONSIDER TRANSMITTING PRESSURE, OR THE TRANSMISSION OF

16:41:48  1  PRESSURE, WITHOUT WATER?

16:42:04  2  **A.**   I DON'T THINK YOU CAN TRANSMIT PRESSURES WITHOUT WATER.

16:42:09  3  **Q.**   OKAY.  OH, AND, SIR, NOW WE'RE GOING TO GO TO THE LANE'S

16:42:21  4  WEIGHTED CREEP, SLIDE 32.

16:42:28  5          **THE COURT:**  IT'S CREEPING UP AGAIN.

16:42:31  6  **BY MR. GREGORY:**

16:42:31  7  **Q.**   AND, SIR, YOU TALK HERE ABOUT THE HEAD DIFFERENTIAL.

16:42:37  8  **A.**   YES.

16:42:38  9  **Q.**   HOW DO YOU -- HOW DO YOU GET THE -- TO THE HEAD

16:42:42  10  DIFFERENTIAL?  WHAT'S THAT?

16:42:45  11  **A.**   WELL, ON THE PROTECTED SIDE, THE BLUE UP THERE ON THE

16:42:48  12  SCREEN, THAT'S THE DESIGN FLOOD.

16:42:53  13          SO IN '66, THIS WAS AT ELEVATION 13, SO IT'S THE

16:42:59  14  PROJECT STORM FOR LAKE PONTCHARTRAIN.

16:43:02  15          ON THE INTERIOR, ON THE PROTECTED SIDE, WATER IS

16:43:06  16  CONTROLLED DOWN TO -- CLOSE TO THE GROUND SURFACE.  SO IT'S THE

16:43:12  17  DIFFERENCE BETWEEN THOSE TWO TERMS.  SO IT'S A -- IT'S JUST AN

16:43:16  18  ELEVATION DIFFERENCE.  UNDER DARCY'S LAW, THAT'S HOW YOU GET

16:43:23  19  THE GRADIENT.

16:43:26  20  **Q.**   WELL, SIR, HOW DO YOU GET TO 16?  YOU HAVE THE -- FIRST

16:43:29  21  OFF, YOU'VE GOT 12 HERE, CORRECT, FOR THE 17 MINUS 5?

16:43:39  22  **A.**   LET'S SEE.  17 MINUS 5 IS 12.

16:43:43  23  **Q.**   AND YOU'RE SAYING YOU HAVE 4 FEET HERE?

16:43:46  24  **A.**   4 FEET OF WATER ABOVE THE TOP OF THE LEVEE.

16:43:52  25  **Q.**   OKAY.  SO IN YOUR CALCULATION, IT'S 12 FOR THE TOP OF THE

16:43:54   1   LEVEE, BUT AN ADDITIONAL 4 FEET FOR THE TOP OF THE WALL?

16:43:59   2   **A.**   CORRECT.

16:44:00   3   **Q.**   OKAY.  AND THEN WHY ISN'T THIS NUMBER -- INSTEAD OF BEING

16:44:03   4   16, WHY ISN'T IT 4?  THAT'S THE HEIGHT OF THE WATER AT THIS

16:44:13   5   POINT; CORRECT, SIR?

16:44:20   6   **A.**   THAT'S TRUE.  BUT IN APPLYING DARCY'S LAW TO SEEPAGE

16:44:23   7   CALCULATIONS, IT'S THE WA- -- HEAD DIFFERENCE, THE DIFFERENCE

16:44:26   8   IN ELEVATION BETWEEN THE POINT AT WHICH YOU START SEEPAGE TO

16:44:29   9   THE POINT AT THE END OF THE SEEPAGE.  SO IN THAT CASE IT'S 16.

16:44:36   10          SO DARCY'S LAW, WHICH IS Q IS EQUAL TO KIA.  AND I IS

16:44:42   11   REALLY THE HEAD DIFFERENCE OVER THE LENGTH.  SO WHAT WE'RE

16:44:46   12   REALLY CONCERNED ABOUT IS WATER PRESSURE, YOU KNOW, THAT'S

16:44:50   13   DRIVING WATER MOVEMENT THROUGH THE SOIL.  AND THAT WOULD BE 16,

16:44:54   14   NOT 4.

16:44:56   15   **Q.**   BUT, SIR, ISN'T THE -- ISN'T THE HEAD DIFFERENCE THE

16:45:00   16   DIFFERENCE BETWEEN THE HEIGHT OF THE WATER AND THE TOP OF THE

16:45:04   17   LAND?

16:45:05   18   **A.**   NO.  THAT'S -- THAT WOULD TELL YOU THE WATER PRESSURE AT

16:45:09   19   THE TOP OF THE LAND, WHICH WOULD BE 4 FEET, SO 240 POUNDS OF

16:45:16   20   PRESSURE.

16:45:16   21          BUT FLUID FLOW IS DRIVEN BY THE TOTAL WATER

16:45:21   22   DIFFERENCE.  AND THIS -- THIS CALCULATION AND THIS FIGURE HERE

16:45:26   23   MAKES THE ASSUMPTION THAT THIS IS ALL SATURATED, SO THERE'S

16:45:29   24   WATER PRESSURE ALL THE WAY THROUGH TO THE BOTTOM OF THE LEVEE

16:45:33   25   ACROSS TO THE -- WHEREVER THE WATER WILL EXIT AND WHAT THE HEAD

16:45:38   1   DIFFERENCE IS AT THAT POINT.

16:45:41   2          THAT'S KNOWN AS THE GRADIENT IN -- IN CALCULATING

16:45:45   3   FLUID FLOW.

16:45:46   4   **Q.**   WELL, SIR, ARE YOU SAYING THAT, FOR EXAMPLE, WHEN THE

16:45:50   5   ANALYSIS WAS DONE USING LANE'S WEIGHTED CREEP IN LONDON CANAL

16:45:56   6   OR OTHER POINTS, THAT THEY -- WHAT THEY WERE CONSIDERING IS THE

16:46:05   7   ENTIRE -- 16, MEANING A HEIGHT HIGHER FROM THE TOP OF THE -- SO

16:46:12   8   YOU'RE SAYING IT'S THE TOP OF THE LEVEE WALL TO EVEN BELOW THE

16:46:17   9   BOTTOM OF THE LEVEE WALL -- FLOODWALL?

16:46:20   10   **A.**   IT'S THE DIFFERENCE IN THE HEAD ON THE FLOOD SIDE, THE

16:46:26   11   HEAD BEING THE WATER ELEVATION AT THE TOP OF THAT BLUE STUFF

16:46:30   12   THERE TO THE WATER LEVEL ON THE PROTECTED SIDE, LIKE WHERE THAT

16:46:36   13   LITTLE RED LINE COMES OUT, ASSUMING THE WATER'S OUT ABOUT THE

16:46:39   14   SURFACE, NEAR THE SURFACE.   THE DIFFERENCE IN WATER ELEVATION

16:46:42   15   BETWEEN THOSE TWO POINTS IS WHAT -- IS THE HEAD.

16:46:47   16          THE WAY YOU CALCULATE FLOW IS YOU TAKE THAT NUMBER

16:46:53   17   TIMES THE LENGTH.   AND THEN THE WAY IN DARCY'S LAW THAT THIS

16:46:59   18   GETS FACTORED INTO IT IS THROUGH THE PERMEABILITY FACTOR THAT

16:47:03   19   TELLS YOU THE RATE AT WHICH IT GOES THROUGH THERE AND THEN THE

16:47:06   20   AREA.

16:47:06   21          IN LANE'S WEIGHTED -- LANE'S WEIGHTED CREEP RATIO, HE

16:47:12   22   TAKES THAT SAME PRINCIPLE AND LOOKS AT IT FROM THE EFFECT OF

16:47:18   23   DIFFERENT TYPES OF SOILS.   AND HE TAKES THOSE SAME PRINCIPLES

16:47:22   24   AND APPLIES IT TO A CERTAIN SOIL TYPE.   BUT IT'S ALL THE SAME

16:47:27   25   THING; IT'S JUST A DIFFERENT WAY OF USING DARCY'S LAW.

| | | |
|---|---|---|
| 16:47:32 | 1 | SO HEAD IS THE DIFFERENCE BETWEEN THAT POINT UP THERE |
| 16:47:35 | 2 | AND THAT POINT IN THE -- ON THE PROTECTED SIDE.  THAT'S ALWAYS |
| 16:47:42 | 3 | CONSIDERED THE HEAD, THE WATER ELEVATION DIFFERENCES. |
| 16:47:45 | 4 | **THE COURT:**  AND THE WATER ELEVATION DIFFERENCE ON THE |
| 16:47:49 | 5 | PROTECTED SIDE, IS THAT THE GROUNDWATER?  IS THAT WHAT WE'RE |
| 16:47:54 | 6 | TALKING ABOUT?  OR HOW DO WE GET THAT WATER ELEVATION THERE? |
| 16:47:58 | 7 | **THE WITNESS:**  I'M SORRY, YOUR HONOR? |
| 16:48:00 | 8 | **THE COURT:**  I'M SORRY.  I'M LOOKING AT THE MAP. |
| 16:48:05 | 9 | **MR. GREGORY:**  IS IT THIS LINE, YOUR HONOR? |
| 16:48:06 | 10 | **THE COURT:**  YEAH.  LET ME -- IN OTHER WORDS, THE LINE |
| 16:48:08 | 11 | THAT HAS -- IS THAT 61 ON IT? |
| 16:48:13 | 12 | **MR. GREGORY:**  YES, YOUR HONOR. |
| 16:48:14 | 13 | **THE COURT:**  THE LINE THAT HAS 61 ON IT, IS THAT THE |
| 16:48:18 | 14 | WATER LEVEL ON THE PROTECTED SIDE? |
| 16:48:20 | 15 | **THE WITNESS:**  61 IS THE LENGTH THAT THE WATER TRAVELS |
| 16:48:22 | 16 | UNDER THERE. |
| 16:48:23 | 17 | **THE COURT:**  RIGHT.  OKAY.  BUT WHERE IS THE WATER |
| 16:48:24 | 18 | LEVEL ON THE PROTECT- -- |
| 16:48:25 | 19 | **THE WITNESS:**  WELL, IT WOULD BE COINCIDENT WITH THAT |
| 16:48:31 | 20 | RED LINE. |
| 16:48:32 | 21 | **THE COURT:**  YEAH, THAT'S WHAT I MEANT.  AND HOW DO WE |
| 16:48:32 | 22 | DETERMINE -- IS THAT THE GROUNDWATER -- BECAUSE THE WATER |
| 16:48:34 | 23 | HASN'T YET COME OVER THE FLOODWALL?  IS THAT THE GROUNDWATER? |
| 16:48:37 | 24 | **THE WITNESS:**  THIS IS THE PRE-FAILURE CONDITION. |
| 16:48:41 | 25 | **THE COURT:**  SO WHAT I'M -- |

```
16:48:41    1            THE WITNESS:  THAT'S THE GROUNDWATER --

16:48:41    2            THE COURT:  OKAY.  I UNDERSTAND.  IT'S THE DIFFERENCE

16:48:41    3   BETWEEN THE GROUNDWATER AND THE -- AND THE WATER -- AND THE

16:48:42    4   HEIGHT OF THE WATER ON THE OTHER SIDE.  REAL SIMPLE.

16:48:48    5                  NOW I UNDERSTAND.

16:48:50    6   BY MR. GREGORY:

16:48:50    7   Q.   TURN TO SLIDE 34.

15:23:36    8   A.   (WITNESS COMPLIES.)

16:49:00    9   Q.   AND YOU SAY, SIR, THE RESULTS OF THE LANE'S WEIGHTED CREEP

16:49:04   10   RATIO, AT THE FIRST BULLET POINT HERE, CONFIRM THE JUDGMENTS

16:49:09   11   EXERCISED BY THE CORPS PERSONNEL WERE REASONABLE.

16:49:13   12            WHAT JUDGMENTS THERE, SIR?

16:49:14   13   A.   THE JUDGMENT THAT SEEPAGE WAS NOT A PROBLEM.

16:49:17   14   Q.   THE JUDGMENT BACK IN 1966?

16:49:18   15   A.   THE JUDGMENT AT ANY TIME THAT THESE EXCAVATIONS WERE GOING

16:49:21   16   ON.  BECAUSE WHAT I'M SAYING IS THAT DURING THE COURSE OF THESE

16:49:25   17   EVENTS, YOU HAVE ENGINEERS OUT THERE WHO ARE NOT RAISING A FLAG

16:49:29   18   ABOUT SEEPAGE, WHO ARE NOT SAYING THAT THIS IS A PROBLEM.

16:49:34   19            AND MY CONTENTION IS THAT THIS TYPE OF ANALYSIS, DONE

16:49:38   20   ALL THE TIME IN CORPS OFFICES -- IT'S INTUITIVE TO A TRAINED

16:49:46   21   ENGINEER THAT IF -- IN THE DESIGN OF A FLOODWALL SYSTEM, THE

16:49:49   22   MOST -- THAT'S THE MOST CRITICAL SEEPAGE CONDITION.

16:49:53   23            AND SO 1966, THAT THE FLOODWALL AND LEVEE SYSTEM WAS

16:49:59   24   DESIGNED, THAT ANY EXCAVATION THAT GOES AWAY FROM THAT IS MORE

16:50:08   25   SAFE -- LET ME USE THE TERM "SAFE" -- BUT THERE'S LESS
```

16:50:14   1   PROBABILITY OF A SEEPAGE CONDITION, EITHER SEEPAGE COMING UP

16:50:17   2   THROUGH AND CAUSING EROSION OR HYDRAULIC PRESSURES DEVELOPING,

16:50:21   3   THE FARTHER AWAY WE GET.

16:50:22   4         SO IT'S FAIR TO SAY THAT AN ENGINEER OUT IN THE FIELD

16:50:25   5   HAS RELIED ON THE DESIGN, AND THAT THOSE CONSIDERATIONS WERE

16:50:30   6   MADE IN THE ORIGINAL DESIGN.  SO WHEN I SAY JUDGMENTS, I'M

16:50:35   7   REFERRING TO THE FACT THAT PEOPLE DIDN'T TAKE ACTIONS THAT ARE

16:50:41   8   VISIBLE OR EVEN WRITTEN DOWN, FOR THAT MATTER, BUT THEY DID NOT

16:50:44   9   SEE THIS AS A PROBLEM.

16:50:47  10   Q.   SO -- AND THIS ANALYSIS ASSUMES, SIR, THAT MR. GUILLORY

16:50:51  11   AND HIS PROJECT TEAM TESTIFIED THAT THEY CONSIDERED SEEPAGE AND

16:50:56  12   DETERMINED IT WASN'T A PROBLEM?

16:50:58  13   A.   NO, IT DOESN'T -- IT DOESN'T ASSUME THAT AT ALL.  LIKE I

16:51:01  14   SAID, IN FACT, NOBODY WROTE THIS DOWN, YOU KNOW.

16:51:05  15         AND ONE OF MY JUDGMENTS -- ONE OF MY OPINIONS I'M

16:51:09  16   HAVING HERE IS THAT BY DOING THIS, DOING THE EXACT ANALYSIS

16:51:13  17   THAT THEY WOULD HAVE DONE, THAT THESE WOULD HAVE -- THEY WOULD

16:51:16  18   HAVE GOTTEN THESE SAME RESULTS IN 2002 OR WHENEVER THESE

16:51:20  19   EXCAVATIONS WERE FINISHED, THAT IT SHOWED IT WAS SAFE.

16:51:26  20         SO THE QUESTION IS -- THAT WAS NOT A NEGLIGENT ACT ON

16:51:28  21   THEIR PART, BECAUSE THAT'S THE RESULTS THEY WOULD HAVE GOT.

16:51:32  22         SO THEN THE QUESTION IS:  DOES THE FAILURE TO WRITE

16:51:35  23   IT ALL DOWN -- IS THAT A NEGLIGENT ACT?

16:51:40  24         AND I'VE THOUGHT ABOUT THAT A LOT.  IT'S NOT A

16:51:44  25   NEGLIGENT ACT BECAUSE WHAT THEY DID WASN'T NEGLIGENT.

16:51:46   1   **Q.**   WELL, SIR, YOU'RE SAYING THAT EVEN IF THERE'S NO EVIDENCE

16:51:49   2   MR. GUILLORY OR HIS TEAM CONSIDERED SEEPAGE, THEY EXERCISED

16:51:56   3   JUDGMENT?

16:51:59   4   **A.**   THERE'S -- THERE'S NO WRITTEN EVIDENCE.  THERE'S NOTHING

16:52:02   5   IN WRITING ANYWHERE THAT I'VE SEEN THAT SAYS ANYBODY THOUGHT

16:52:06   6   ABOUT THIS.  AND, YOU KNOW, CERTAINLY, IT WOULD HAVE BEEN

16:52:13   7   BETTER.

16:52:14   8          BUT ON THE OTHER HAND, THERE'S NO EVIDENCE, FROM MY

16:52:18   9   POINT OF VIEW, OF LOOKING AT THE ACTIONS THAT THEY TOOK, THAT

16:52:23   10   THEIR -- THEIR ACTIONS, I THINK, SPEAK FOR THEMSELVES.

16:52:26   11          YOU KNOW, HE DID TAKE THIS TO -- TO THE GEOTECHNICAL

16:52:32   12   GROUP TO ANALYZE A 12-FOOT-DEEP HOLE IN THE GROUND 50 FEET AWAY

16:52:37   13   FROM THE FLOODWALL.

16:52:38   14          NOW, HE ASKED THEM FOR A STABILITY ANALYSIS; HE

16:52:40   15   DIDN'T ASK THEM FOR A SEEPAGE ANALYSIS.

16:52:43   16          SO THAT -- THE CONDUCT OF THOSE PEOPLE THEMSELVES

16:52:46   17   TELL ME THAT THEY DIDN'T THINK IT WAS A PROBLEM.

16:52:49   18          NOW, I NEVER TALKED TO THEM, I DON'T HAVE ANY WRITING

16:52:51   19   TO PROVE THAT.  BUT A TRAINED GEOTECHNICAL ENGINEER WHO'S DOING

16:52:56   20   A STABILITY ANALYSIS ON A HOLE 50 FEET AWAY FROM A FLOODWALL IS

16:53:01   21   GOING TO LOOK AT IT, AND IF IT'S A PROBLEM, THEY WOULD -- IT

16:53:06   22   WOULD RISE TO THEIR ATTENTION.  AND IT NEVER ROSE TO ANYBODY'S

16:53:09   23   ATTENTION.

16:53:09   24          AND THE REASON IS, I THINK IT WAS SO INTUITIVELY

16:53:13   25   APPARENT THAT IT WAS SAFE, THAT'S WHY IT DIDN'T RISE TO

| 16:53:16 | 1 | ANYBODY'S ATTENTION. |

16:53:16  1  ANYBODY'S ATTENTION.

16:53:17  2  **Q.**   WELL, BUT, SIR, THERE WASN'T A TRAINED GEOTECHNICAL

16:53:20  3  ENGINEER OUT THERE FROM '99 TO 2005; CORRECT?

16:53:22  4  **A.**   NO, BUT THERE WAS WHEN THEY DID THE MCDONOUGH -- THEY

16:53:25  5  WEREN'T OUT AT THE SITE, I DON'T BELIEVE.  I DON'T KNOW WHETHER

16:53:27  6  THEY WERE OUT AT THE SITE, OR NOT.

16:53:32  7          BUT THEY DID LOOK WHAT WAS A FAR WORSE CONDITION THAN

16:53:34  8  ANY OF THE EXCAVATIONS THAT WERE DONE OUT THERE IN TERMS OF

16:53:36  9  POTENTIAL SEEPAGE IMPACTS ON THE FLOODWALL SYSTEM.

16:53:40 10          AT THE MCDONOUGH MARINE SITE THERE'S, LIKE, A HUGE

16:53:42 11  HOLE IN THE GROUND THAT NEVER GOT FILLED, AND NOT ONE PERSON

16:53:45 12  RAISED THIS AS AN ISSUE.

16:53:46 13  **Q.**   AND MCDONOUGH MARINE DIDN'T FAIL; CORRECT?

16:53:50 14  **A.**   CORRECT.

16:53:50 15  **Q.**   AND IT'S THE ONLY AREA THAT -- WHERE THE CORPS DID AN

16:53:56 16  EXTENSIVE GEOTECHNICAL ANALYSIS, CORRECT?

16:53:59 17  **A.**   STABILITY ANALYSIS.

16:53:59 18  **Q.**   AND, SIR, THEY DIDN'T DO THAT ANALYSIS OUT IN BOLAND OR IN

16:54:04 19  SAUCER; CORRECT?

16:54:06 20  **A.**   THEY DIDN'T DO AN ANALYSIS ON SMALLER EXCAVATIONS AT A

16:54:09 21  GREATER DISTANCE FROM THE FLOODWALL; THAT IS CORRECT.

16:54:15 22          **THE COURT:**  IT'S MY UNDERSTANDING, JUST FOR THE

16:54:16 23  RECORD, THAT -- JUST TO LET EVERYBODY KNOW WHAT MY

16:54:21 24  UNDERSTANDING IS, WHICH COULD WELL BE WRONG -- THAT THE ONLY

16:54:25 25  GEOTECHNICAL EVALUATIONS WERE DONE ON THE MCDONOUGH MARINE AND

| | | |
|---|---|---|
| 16:54:27 | 1 | THE TWO EXCAVATIONS THAT ACTUALLY ENCROACHED INTO THE LEVEE. |
| 16:54:32 | 2 | THAT'S MY UNDERSTANDING. |
| 16:54:47 | 3 | I GUESS A LOT OF THAT WOULD HAVE TO DO WITH HOW |
| 16:54:50 | 4 | DEEP THE EXCAVATION IS. |
| 16:54:52 | 5 | **THE WITNESS:**  YES, SIR.  AND HOW CLOSE TO THE WALL IT |
| 16:54:54 | 6 | IS. |
| 16:54:54 | 7 | **THE COURT:**  AND HOW CLOSE TO THE WALL.  ALL RIGHT. |
| 16:55:01 | 8 | BY MR. GREGORY: |
| 16:55:01 | 9 | Q.   SIR, LET'S TURN TO SLIDE 41. |
| 16:55:10 | 10 | NOW, I WANT TO MAKE SURE I'M CLEAR ON THE BULLET |
| 16:55:13 | 11 | POINT.  YOU HAVE "GLOBAL STABILITY CALCULATIONS WERE PERFORMED |
| 16:55:17 | 12 | IN 1966 FOR" -- LET'S JUST STAY WITH '66.  LET'S GET RID OF -- |
| 16:55:28 | 13 | FOR WHAT?  WHAT WAS IT PERFORMED FOR IN '66? |
| 16:55:33 | 14 | A.   FOR THE EXISTING EBIA FLOODWALL SYSTEM. |
| 16:55:35 | 15 | Q.   WELL, IT HADN'T BEEN -- IT WASN'T IN EXISTENCE THEN, WAS |
| 16:55:37 | 16 | IT, SIR? |
| 16:55:39 | 17 | A.   WELL, IT WAS PERFORMED IN 1966 FOR THE FLOODWALL THAT |
| 16:55:42 | 18 | EXISTED AT THE TIME AND EXISTS TODAY -- WELL, NOT FOR THE |
| 16:55:47 | 19 | REPAIRED SECTIONS, BUT AS IT EXISTED AT THE TIME TASK ORDER 26 |
| 16:55:51 | 20 | WAS BEING CONDUCTED. |
| 16:55:52 | 21 | Q.   AND WERE GLOBAL STABILITY CALCULATIONS PERFORMED IN 2002 |
| 16:55:57 | 22 | FOR THE EXISTING FLOODWALL SYSTEM? |
| 16:55:59 | 23 | A.   NO; FOR THE PROPOSED FLOODWALL SYSTEM. |
| 16:56:03 | 24 | Q.   OKAY.  SO IT SHOULD -- IT WOULD READ, "GLOBAL STABILITY |
| 16:56:06 | 25 | CALCULATIONS WERE PERFORMED IN 1966 FOR THE EXISTING FLOODWALL |

| | | |
|---|---|---|
| 16:56:09 | 1 | SYSTEM, AND GLOBAL STABILITY CALCULATIONS WERE PERFORMED IN |
| 16:56:12 | 2 | 2002 FOR THE PROPOSED FLOODWALL SYSTEM"? |
| 16:56:15 | 3 | **A.**   I ACCEPT THAT EDIT. |
| 16:56:18 | 4 | **Q.**   OKAY.  AND THERE WERE NO GLOBAL STABILITY CALCULATIONS |
| 16:56:25 | 5 | PERFORMED ON THE EXISTING FLOODWALL SYSTEMS FROM 1966 TO |
| 16:56:28 | 6 | AUGUST 2005, THAT YOU'RE AWARE OF? |
| 16:56:31 | 7 | **A.**   THAT I'M AWARE OF. |
| 16:56:47 | 8 | **Q.**   AND, SIR, ARE -- ARE YOU AWARE OF A -- AN E-MAIL -- |
| 16:56:55 | 9 | **MR. GREGORY:**  LET'S BRING UP JX-1827. |
| 16:56:59 | 10 | **BY MR. GREGORY:** |
| 16:57:05 | 11 | **Q.**   THIS IS AN E-MAIL STRING, SIR.  IT'S IN AUGUST OF 2005. |
| 16:57:11 | 12 | HAVE YOU SEEN THIS E-MAIL STRING BEFORE? |
| 16:57:16 | 13 | **A.**   I MAY HAVE.  I WOULD HAVE TO REFRESH MY MEMORY. |
| 16:57:20 | 14 | **Q.**   OKAY.  LET'S TURN TO PAGE 2 OF THIS EXHIBIT. |
| 16:57:25 | 15 | **MR. GREGORY:**  AND THE E-MAIL DOWN HERE, KARL.  IT'S |
| 16:57:32 | 16 | THE E-MAIL OF 5:18 P.M. |
| 16:57:35 | 17 | **BY MR. GREGORY:** |
| 16:57:35 | 18 | **Q.**   NOW, GEORGE BACUTA, HE WAS THE CORPS GEOLOGIST; CORRECT? |
| 16:57:40 | 19 | **A.**   CORRECT. |
| 16:57:41 | 20 | **Q.**   AND RICHARD LESSER, HE WAS AN ENGINEERING MANAGER FOR WGI. |
| 16:57:47 | 21 | DO YOU KNOW THAT? |
| 16:57:48 | 22 | **A.**   I DON'T RECALL THAT NAME. |
| 16:57:50 | 23 | **Q.**   AND MR. GUILLORY, HE WAS THE PROJECT MANAGER FOR THE |
| 16:57:53 | 24 | CORPS; CORRECT? |
| 16:57:55 | 25 | **A.**   CORRECT. |

16:57:55    1   **Q.**   AND THEN DO YOU SEE, SIR, THERE, ABOUT MIDWAY IN THE

16:57:59    2   PARAGRAPH IT STARTS:  "NOTE THAT THE 1997 REPORT GROUNDWATER

16:58:06    3   FLOW INFORMATION (ACTUALLY THE GROUNDWATER DATA WAS COLLECTED

16:58:12    4   IN '93/'92?) INDICATE THE INFLUENCE OF THE STRUCTURES,

16:58:18    5   FOUNDATIONS OF BUILDINGS, CANAL DRAINAGE, ET CETERA, PRESENT AT

16:58:22    6   THAT TIME ON THE SHALLOW GW FLOW."

16:58:26    7            "GW" TYPICALLY STANDS FOR GROUNDWATER; CORRECT, SIR?

16:58:32    8   **A.**   THAT'S CORRECT.

16:58:33    9   **Q.**   "AFTER REMEDIATION, THE STRUCTURES ARE GONE, THE SOIL

16:58:36   10   SUBSURFACE HAD BEEN MODIFIED ON ACCOUNT OF

16:58:39   11   EXCAVATION/REMOVAL/NEW FILL, THE CURRENT GROUNDWATER FLOW

16:58:45   12   INFORMATION (TAKEN BY WGI IN MAY/JUNE 2005) POINTS TO A FLOW

16:58:53   13   AWAY FROM THE CANAL."

16:58:55   14            DO YOU SEE THAT?

16:58:55   15   **A.**   I SEE THAT.

16:58:56   16   **Q.**   SIR, DOES THIS INDICATE TO YOU THAT THE

16:59:01   17   EXCAVATION/REMOVAL/NEW FILL WAS AFFECTING THE GROUNDWATER AT

16:59:10   18   THE SITE?

16:59:11   19   **A.**   WELL, I THINK LOCALLY IT MAY HAVE HAD AN EFFECT.  YOU

16:59:17   20   KNOW, IF YOU DIG A HOLE IN THE GROUND AND YOU TAKE ALL THE

16:59:21   21   WATER OUT AND YOU PUT SOIL BACK IN AND IT'S GOT -- FILLED BACK

16:59:24   22   UP WITH WATER AGAIN.

16:59:26   23            I ALSO THINK THAT, YOU KNOW, IT'S A RELATIVELY FLAT

16:59:29   24   GRADIENT ACROSS HERE AND, YOU KNOW, THE CANAL CAN GO UP AND

16:59:34   25   DOWN DEPENDING UPON TIDES AND THAT SORT OF THING.

16:59:38    1          AND GIVEN A RATHER FLAT GRADIENT, CANAL LEVELS COULD

16:59:41    2   GO UP, AND IT COULD MAKE IT APPEAR THAT THE FLOW IS TO THE EAST

16:59:45    3   TOWARDS THE FLOODWALL, THE CANAL LEVEL COULD GO DOWN AND THE

16:59:50    4   FLOW COULD GO BACK.

16:59:51    5          BUT I WOULD SAY THAT THE OVERALL GROUNDWATER IN THE

16:59:57    6   EBIA AREA WOULD NOT BE SUBSTANTIALLY AFFECTED BY THE

16:59:59    7   EXCAVATIONS; AND IF THEY DID, IT WAS A SHORT-TERM EFFECT DUE TO

17:00:04    8   EXCAVATION AND BACKFILLING.

17:00:05    9   **Q.**   AND THE GROUNDWATER'S NOW FLOWING UNDER THE FLOODWALL

17:00:15   10   TOWARDS JOURDAN AVENUE; CORRECT?

17:00:18   11   **A.**   WELL, I DON'T KNOW THAT IT SAYS THAT.  IT JUST SAYS THAT

17:00:20   12   WHEREVER THIS POINT IS, IT POINTS TO A FLOW AWAY FROM THE

17:00:33   13   CANAL.  I DON'T SEE WHERE IT SAYS UNDER THE --

17:00:36   14          **THE COURT:**  UNDER THE FLOODWALL TOWARDS THE JOURDAN

17:00:36   15   CANAL.  YOU DON'T SEE WHERE IT SAYS THAT.

17:00:43   16          **THE WITNESS:**  MAYBE I --

17:00:43   17          **THE COURT:**  IT DOESN'T.  IT DOESN'T.

17:00:43   18          **THE WITNESS:**  OH, IT DOESN'T.

17:00:44   19          **THE COURT:**  NO.

17:00:44   20          **THE WITNESS:**  OKAY.

17:00:45   21          **THE COURT:**  I WANTED TO ASK YOU, SIR, AND I KNOW IT'S

17:00:49   22   HARD FOR YOU TO READ, AND I REALIZE THAT.

17:00:52   23          I NEVER DID GET THE ANSWER.  HAVE YOU EVER SEEN

17:00:55   24   THIS?  ARE YOU FAMILIAR WITH THIS?  IS THIS THE --

17:00:56   25          **THE WITNESS:**  NO, SIR, I'VE SEEN THIS BEFORE.

| | | |
|---|---|---|
| 17:00:58 | 1 | **THE COURT:**  OH, OKAY.  I JUST WASN'T CLEAR.  THANK |
| 17:01:00 | 2 | YOU. |
| 17:01:00 | 3 | **THE WITNESS:**  SURE. |
| 17:01:01 | 4 | BY MR. GREGORY: |
| 17:01:03 | 5 | **Q.**  AND, SIR, LET'S GO BACK UP TO PAGE 1 OF THIS EXHIBIT, THE |
| 17:01:07 | 6 | TOP E-MAIL.  AND THAT'S FROM MR. BACUTA TO MR. LESSER. |
| 17:01:18 | 7 | DO YOU SEE THAT? |
| 17:01:18 | 8 | **A.**  YES, I DO. |
| 17:01:19 | 9 | **Q.**  AND IT'S AUGUST 4, 2005, AT 10:27 P.M.? |
| 17:01:23 | 10 | **A.**  YES. |
| 17:01:23 | 11 | **Q.**  AND IT SAYS:  "ANOTHER INFO ON THE GROUNDWATER AND |
| 17:01:28 | 12 | DRAINAGE, JOURDAN" -- IT'S SPELLED J-O-U-R-D-A-N -- "AVENUE |
| 17:01:31 | 13 | ACROSS THE FLOODWALL." |
| 17:01:36 | 14 | DO YOU SEE THAT? |
| 17:01:37 | 15 | **A.**  YES, I DO. |
| 17:01:45 | 16 | **Q.**  AS A GEOTECHNICAL ENGINEER, DOESN'T THAT INDICATE TO YOU, |
| 17:01:47 | 17 | SIR, THAT THE GROUNDWATER IS FLOWING, AS WE -- AS I EARLIER |
| 17:01:51 | 18 | ASKED YOU, UNDER THE FLOODWALL? |
| 17:01:57 | 19 | **A.**  WELL, HE SAYS IT'S FLOWING ACROSS THE FLOODWALL.  I ASSUME |
| 17:02:02 | 20 | HE MEANS UNDER THE FLOODWALL.  I HAVE TO TAKE HIM AT HIS WORD. |
| 17:02:10 | 21 | THAT'S WHAT HE SAID. |
| 17:02:10 | 22 | **Q.**  OKAY.  SO GROUNDWATER FLOW UNDER THE FLOODWALL? |
| 17:02:14 | 23 | **THE COURT:**  THAT'S WHAT HE SAID, COUNSEL. |
| 17:02:17 | 24 | **THE WITNESS:**  I JUST SAID THAT. |
| 17:02:17 | 25 | **THE COURT:**  YOU KNOW, WHEN YOU GET AN ANSWER LIKE |

```
17:02:19   1    THAT, I THINK I'D BE QUIET.

17:02:21   2              MR. GREGORY:  THAT'S RIGHT, AND THAT'S WHAT I'M GOING

17:02:22   3    TO DO, YOUR HONOR.

17:02:24   4              THANK YOU VERY MUCH, DR. LUCIA.

17:02:25   5              THE COURT:  NOT THAT IT MAY HAVE A THING TO DO WITH

17:02:28   6    THIS CASE.  IT'S JUST THE ANSWER YOU WERE TRYING TO ELICIT.

17:02:32   7              I'VE SEEN A LOT -- I HAVEN'T MADE A LOT OF

17:02:36   8    COMMENT BECAUSE I'M GIVING EACH OF YOU 60 HOURS.  BUT SOME OF

17:02:39   9    YOU HAVE DONE A MARVELOUS JOB IN USING YOUR TIME; SOME OF YOU,

17:02:43  10    IT COULD DEFINITELY BE IMPROVED.  JUST POINT THAT OUT.  I'M NOT

17:02:47  11    GOING TO SAY WHO.

17:02:52  12              AND, BY THE WAY, BY MY COMMENT, I HAVE NO IDEA

17:02:59  13    AT THIS POINT IF THAT HAS ANY SIGNIFICANCE TO THIS CASE OR NOT,

17:03:02  14    AND MAYBE SOME DAY I'LL KNOW.  I PROMISE YOU I DON'T NOW.

17:03:07  15              OKAY.  SIR?

17:03:10  16              MR. KELLS:  YEAH, BEFORE I BEGIN MY REDIRECT, I MIGHT

17:03:13  17    ALLOW THE ATTORNEY FROM WASHINGTON GROUP TO ASK HER DIRECT

17:03:18  18    EXAMINATION QUESTION FIRST, AND THEN I'LL DO MY REDIRECT

17:03:23  19    EXAMINATION OF DR. LUCIA -- REDIRECT.  IT'S TECHNICALLY

17:03:25  20    REDIRECT AT THIS POINT, BUT I'LL LET HER ASK HER VERY FEW

17:03:29  21    QUESTIONS, AND THEN I HAVE A FEW THINGS, AND THEN I'LL ASK --

17:03:32  22              THE COURT:  OH, YOU MUST HAVE ALREADY TALKED TO HIM,

17:03:34  23    I HOPE.  GO AHEAD.

17:03:35  24              MS. WAGER-ZITO:  TWO QUESTIONS, MAYBE, DEPENDING ON

17:03:36  25    THE ANSWERS.
```

17:03:38   1            ONE OF THEM IS FOUNDATIONAL, SO THAT ONE

17:03:41   2    SHOULDN'T COUNT AGAINST ME.

17:03:41   3                   **CROSS-EXAMINATION**

17:03:43   4    **BY MS. WAGER-ZITO:**

17:03:44   5    **Q.**   DR. LUCIA, YOU WERE ASKED ON CROSS-EXAMINATION IF YOU SAW

17:03:48   6    ANY EVIDENCE OF WASHINGTON GROUP SENDING OUT A GEOTECHNICAL

17:03:51   7    ENGINEER TO THE EBIA DURING THE COURSE OF THE PROJECT UP TO THE

17:03:55   8    TIME OF KATRINA.  DO YOU RECALL THAT?

17:03:56   9    **A.**   YES.

17:03:56   10   **Q.**   AND YOUR ANSWER WAS NO?

17:03:57   11   **A.**   I WAS NOT AWARE OF ANY.

17:04:00   12   **Q.**   HAVE YOU REACHED AN OPINION AS TO WHETHER OR NOT

17:04:04   13   WASHINGTON GROUP HAD ANY RESPONSIBILITY TO SEND A GEOTECH TO

17:04:07   14   THE SITE OR TO PROVIDE ANY GEOTECHNICAL ENGINEERING IN

17:04:10   15   CONNECTION WITH TASK ORDER 26?

17:04:13   16           **MR. GREGORY:**  OBJECTION, YOUR HONOR.  THAT'S OUTSIDE

17:04:15   17   BOTH HIS PRESENTATION AND MY EXAMINATION.

17:04:17   18           **THE COURT:**  IF IT'S IN HIS REPORT, HE CAN TESTIFY TO

17:04:20   19   IT, AT LEAST -- UNLESS IT'S SUBJECT TO ANOTHER -- IF IT'S IN

17:04:24   20   HIS REPORT.  IF IT'S NOT IN HIS REPORT, AN OPINION RENDERED IN

17:04:30   21   HIS REPORT, THAT WOULD BE BEYOND THE SCOPE.

17:04:33   22           **MS. WAGER-ZITO:**  I THINK IT WAS RAISED ON DIRECT --

17:04:34   23   ON CROSS-EXAMINATION.  IT WAS ALSO ASKED AT LEAST FOUR

17:04:37   24   DIFFERENT TIMES AT HIS DEPOSITION.

17:04:39   25           **THE COURT:**  WELL, NO.  THE QUESTION ABOUT DID ANY

17:04:41   1   GEOTECHNICAL ENGINEER.  BUT THE RESPONSIBILITY, THAT'S GOING TO

17:04:43   2   BE -- THAT'S A STANDARD OF CARE QUESTION, AND HE SAID HE WASN'T

17:04:47   3   GOING TO ASK QUESTIONS ABOUT INTERPRETING THE CONTRACT, AND

17:04:49   4   THAT REALLY GOES TO MORE OF A LEGAL MATTER.

17:04:54   5                 AND IF HE DIDN'T OPINE THAT ON HIS REPORT, WE'RE

17:04:56   6   NOT GOING TO GET ANOTHER OPINION.  I'VE GOT TO TRY TO BE AS

17:04:59   7   CONSISTENT AS I CAN ON THAT, COUNSEL.  SO I'M --

17:05:03   8            MS. WAGER-ZITO:  WELL, IT IS PRESENTED AS A STANDARD

17:05:05   9   OF CARE QUESTION AND DIVIDING THE RESPONSIBILITIES BETWEEN

17:05:09  10   WASHINGTON GROUP AND THE CORPS AND IT WAS ASKED AT LEAST FOUR

17:05:12  11   TIMES IN HIS DEPOSITION.

17:05:13  12            THE COURT:  HE WAS ASKED IN -- OH, IN HIS DEPOSITION.

17:05:14  13   WELL, THAT'S -- THAT'S -- I'M TALKING ABOUT WHAT'S HAPPENING

17:05:18  14   RIGHT HERE.  DEPOSITIONS DO NOT EXPAND EXPERT REPORTS, OR WE'D

17:05:22  15   BE HERE FOREVER AND I'D NEVER BE ABLE TO MOVE ON.  SO --

17:05:26  16            MS. WAGER-ZITO:  AND I UNDERSTAND THAT.  BUT IT WAS

17:05:29  17   ALSO ASKED ON CROSS-EXAMINATION WHETHER OR NOT WASHINGTON GROUP

17:05:31  18   HAD A GEOTECH.  I ASSUME THAT COUNSEL HAD A PURPOSE IN ASKING

17:05:35  19   THAT QUESTION, AND I THINK HE SHOULD BE ABLE TO ANSWER THE

17:05:37  20   QUESTION ABOUT WHETHER OR NOT THERE WAS -- IN HIS OPINION

17:05:41  21   WASHINGTON GROUP SHOULD HAVE HAD A GEOTECH OUT THERE.

17:05:44  22            MR. GREGORY:  YOUR HONOR, HE TESTIFIED AT -- I'M

17:05:46  23   SORRY.

17:05:46  24            THE COURT:  NO, GO AHEAD.

17:05:48  25            MR. GREGORY:  CONTRACT INTERPRETATION, AND HE

| | | |
|---|---|---|
| 17:05:49 | 1 | TESTIFIED ON VOIR DIRE THAT HE WASN'T OPINING AT ALL ABOUT |
| 17:05:53 | 2 | THAT. |
| 17:05:53 | 3 | **THE COURT:**  I'M GOING TO SUSTAIN THE OBJECTION.  YOU |
| 17:05:54 | 4 | CAN PROFFER THE ANSWER IF YOU WANT. |
| 17:05:58 | 5 | **MS. WAGER-ZITO:**  I CAN PROFFER THE ANSWER? |
| 17:06:00 | 6 | **THE COURT:**  CERTAINLY YOU CAN. |
| 17:06:02 | 7 | **MS. WAGER-ZITO:**  RIGHT NOW? |
| 17:06:02 | 8 | **THE COURT:**  YOU CAN DO IT RIGHT NOW JUST TO SAVE |
| 17:06:04 | 9 | TIME.  YOU MIGHT NOT HAVE ANOTHER CHANCE. |
| 17:06:06 | 10 | **MS. WAGER-ZITO:**  MIGHT NOT HAVE ANOTHER OPPORTUNITY. |
| 17:06:06 | 11 | **THE COURT:**  YEAH, YEAH. |
| 17:06:06 | 12 | **MS. WAGER-ZITO:**  THE ANSWER TO THAT QUESTION IS THAT |
| 17:06:09 | 13 | THEY HAD NO RESPONSIBILITY, IN HIS OPINION. |
| 17:06:11 | 14 | **THE COURT:**  OKAY.  YOU CAN GET IT FROM HIM UNDER OATH |
| 17:06:14 | 15 | IN A PROFFER.  WE'LL MAKE IT PROFFER NO. 1. |
| 17:06:16 | 16 | **MR. BRUNO:**  YOU KNOW THE ANSWER WITHOUT ASKING HIM? |
| 17:06:18 | 17 | OKAY. |
| 17:06:20 | 18 | **MS. WAGER-ZITO:**  WELL, IF HE TESTIFIES IN ACCORDANCE |
| 17:06:21 | 19 | WITH HIS DEPOSITION. |
| 17:06:22 | 20 | **MR. BRUNO:**  NO. |
| 17:06:22 | 21 | **BY MS. WAGER-ZITO:** |
| 17:06:23 | 22 | **Q.**  DR. LUCIA, WOULD YOU ANSWER THE QUESTION AND -- |
| 17:06:25 | 23 | **THE COURT:**  THIS WILL BE PROFFER NO. 1. |
| 17:06:30 | 24 | **THE WITNESS:**  I'M PROBABLY THE ONLY PERSON HERE |
| 17:06:31 | 25 | THAT'S CONFUSED AT THE MOMENT. |

| | | |
|---|---|---|
| 17:06:34 | 1 | **THE COURT:**  YOU SHOULD BE BECAUSE IT'S PROBABLY TO |
| 17:06:36 | 2 | YOU LIKE YOUR -- ALTHOUGH IT'S NOT NEARLY COMPLEX AS YOUR |
| 17:06:43 | 3 | SCIENCE, BUT IT'S LEGAL STUFF THAT YOU SHOULDN'T BE FAMILIAR |
| 17:06:47 | 4 | WITH.  BUT YOU MAY ANSWER -- COUNSEL'S GOING TO ASK YOU A |
| 17:06:49 | 5 | QUESTION, AND YOU MAY ANSWER THE QUESTION. |
| 17:06:52 | 6 | BY MS. WAGER-ZITO: |
| 17:06:53 | 7 | **Q.**   DR. LUCIA, HAVE YOU FORMED AN OPINION AS TO WHETHER OR NOT |
| 17:06:55 | 8 | WASHINGTON GROUP HAD ANY RESPONSIBILITY TO HAVE A GEOTECH AT |
| 17:06:57 | 9 | THE SITE ON TASK ORDER 26 OR TO PERFORM ANY GEOTECHNICAL |
| 17:07:03 | 10 | ENGINEERING IN CONNECTION WITH THEIR WORK ON TASK ORDER 26? |
| 17:07:06 | 11 | **THE COURT:**  NO NEED TO OBJECT TO THE PROFFER. |
| 17:07:08 | 12 | **THE WITNESS:**  YES, I HAVE. |
| 17:07:10 | 13 | BY MS. WAGER-ZITO: |
| 17:07:10 | 14 | **Q.**   AND WHAT IS THAT OPINION? |
| 17:07:13 | 15 | **A.**   THAT THEY HAD NO GEOTECHNICAL RESPONSIBILITIES ON THIS |
| 17:07:17 | 16 | PROJECT, THAT I CAN SEE. |
| 17:07:19 | 17 | **MS. WAGER-ZITO:**  THANK YOU. |
| 17:07:20 | 18 | **THE COURT:**  THANK YOU, COUNSEL.  THAT WAS QUICK. |
| 17:07:21 | 19 | **MS. WAGER-ZITO:**  I TOLD YOU IT WOULD BE. |
| 17:07:24 | 20 | **THE COURT:**  YOU'RE A WOMAN OF YOUR WORD. |
| 17:07:27 | 21 | **MS. WAGER-ZITO:**  AFTER THAT -- AFTER WHAT YOU SAID |
| 17:07:29 | 22 | JUST BEFORE THAT, I WASN'T GOING TO GO MUCH FURTHER THAN THAT. |
| 17:07:31 | 23 | **THE COURT:**  ALL RIGHT.  COUNSEL, IT'S YOUR TURN. |
| 17:07:46 | 24 | **MR. KELLS:**  THANK YOU, YOUR HONOR.  I CAN'T GUARANTEE |
| 17:07:47 | 25 | THAT I'LL BE QUITE AS QUICK AS MS. WAGER-ZITO, BUT -- |

17:07:50   1          **THE COURT:**  YOU DO WHATEVER YOU THINK YOU HAVE TO DO.

17:07:50   2          **MR. KELLS:**  -- I WILL TRY TO BE AS INCISIVE AS I CAN.

17:07:50   3                    **REDIRECT EXAMINATION**

17:07:53   4  **BY MR. KELLS:**

17:07:54   5  **Q.**  DR. LUCIA, JUST TO FOLLOW UP, BECAUSE THE JUDGE ASKED AN

17:07:56   6  INTERESTING QUESTION, AND I'M PIQUED AS WELL.

17:07:59   7          **MR. KELLS:**  IF WE COULD BRING UP, DON, THE LAST

17:08:01   8  EXHIBIT, THE JX-1827, THE E-MAIL ABOUT GROUNDWATER FLOW.

17:08:11   9  **BY MR. KELLS:**

17:08:12  10  **Q.**  DR. LUCIA, WHAT IS THE RELATIONSHIP, IF ANY, BETWEEN

17:08:16  11  GROUNDWATER FLOW ON A SITE AND SEEPAGE UNDER A FLOODWALL?

17:08:27  12  **A.**  I WOULD SAY THAT, YOU KNOW, UNDER NORMAL CONDITIONS, NOT A

17:08:31  13  CONSTRUCTION CONDITION, GROUNDWATER CAN FLOW FROM ONE SIDE TO

17:08:35  14  THE OTHER.  SOIL IS A POROUS MEDIA, SO IT CAN GO ANYWHERE, BUT

17:08:40  15  IT REQUIRES SOME HEAD OR RAISED -- AN INCREASE IN GROUNDWATER

17:08:44  16  IN SOME AREA OR A DECREASE IN ANOTHER AREA.

17:08:47  17          SO IF -- FOR EXAMPLE, TIDES, THE GRAVITY OF THE MOON

17:08:52  18  CAN AFFECT GROUNDWATER FLOW UP AND DOWN AND CAN AFFECT

17:08:58  19  GROUNDWATER FLOW FROM ONE DIRECTION TO ANOTHER, AND THOSE ARE

17:09:01  20  ALL JUST NATURAL EVENTS THAT OCCUR.  LIKE I SAID EARLIER,

17:09:06  21  DIFFERENCES IN GROUNDWATER IN THE CANAL COMING UP WITH WATER

17:09:08  22  LEVEL HIGHER UP INTO THE EBIA AREA CAN ALSO AFFECT GROUNDWATER

17:09:13  23  FLOW.

17:09:13  24          SEEPAGE WOULD BE SOMETHING I WOULD RELATE TO, SAY, A

17:09:17  25  FLOOD CONDITION WHERE WE HAVE A SUBSTANTIAL DIFFERENTIAL HEAD

| | | |
|---|---|---|
| 17:09:23 | 1 | BETWEEN ONE SIDE AND ANOTHER, AND IT'S A -- IT'S A SITUATION |
| 17:09:26 | 2 | DIFFERENT THAN SORT OF THE NORMAL EVERYDAY THING THAT'S OUT |
| 17:09:30 | 3 | THERE.  AND THEN AS A RESULT OF THAT INCREASED HEAD AT SOME |
| 17:09:33 | 4 | POINT DUE TO, SAY, A FLOOD CONDITION, SEEPAGE WOULD OCCUR FROM |
| 17:09:38 | 5 | THE PROTECTED SIDE -- I MEAN, FROM THE FLOOD SIDE TO THE |
| 17:09:41 | 6 | PROTECTED SIDE. |
| 17:09:42 | 7 | **Q.**   AND IN YOUR OPINION, IF A GEOTECHNICAL ENGINEER RECEIVED |
| 17:09:45 | 8 | AN E-MAIL SUGGESTING THAT GROUNDWATER FLOW AT THE SITE HAD |
| 17:09:51 | 9 | POSSIBLY CHANGED DIRECTION, WOULD THAT RAISE ANY KIND OF ALARM |
| 17:09:57 | 10 | ABOUT THE POTENTIAL FOR UNDERSEEPAGE DURING A FLOOD CONDITION |
| 17:09:59 | 11 | AT THE SITE? |
| 17:10:00 | 12 | **A.**   NO. |
| 17:10:13 | 13 | **Q.**   WHY NOT? |
| 17:10:13 | 14 | **A.**   WELL, ABSENT SOME EXTRAORDINARY EVENT AT A SITE LIKE THIS |
| 17:10:16 | 15 | WHERE IT'S REALLY QUITE FLAT, CHANGES IN GROUNDWATER FLOW ARE |
| 17:10:20 | 16 | GOING TO BE PRETTY MINIMAL.  AND SO IT -- I JUST CAN'T IMAGINE |
| 17:10:26 | 17 | SOMETHING OCCURRING THAT -- OF SUCH A NATURE THAT IT WOULD |
| 17:10:30 | 18 | RAISE ISSUES OR CONCERNS, GIVEN THE SORT OF NORMAL EVENTS THAT |
| 17:10:35 | 19 | OCCUR OUT HERE. |
| 17:10:41 | 20 | **Q.**   I WANTED TO ASK YOU ONE QUESTION, AND THIS CAME UP VERY |
| 17:10:44 | 21 | EARLY ON IN YOUR TESTIMONY, SO PERHAPS I'LL GET IT WRONG.  BUT |
| 17:10:49 | 22 | IF I RECALL, MR. GREGORY ASKED YOU A COUPLE OF QUESTIONS ABOUT |
| 17:10:53 | 23 | THE UTILITY OF A TRANSIENT SEEPAGE ANALYSIS. |
| 17:10:57 | 24 | AND IF I RECALL, YOUR ANSWER WAS THAT A TRANSIENT |
| 17:10:59 | 25 | SEEPAGE ANALYSIS WOULDN'T BE THAT USEFUL TO YOU IN YOUR |

17:11:04    1  ANALYSIS IN THIS CASE.

17:11:05    2          IS THAT A CORRECT UNDERSTANDING OF -- OF YOUR

17:11:09    3  TESTIMONY?  I COULDN'T RECALL BECAUSE I DIDN'T HAVE IT UP ON MY

17:11:13    4  SCREEN.

17:11:13    5  A.   RIGHT.  I DON'T CONSIDER IT PART OF THE STANDARD OF CARE

17:11:15    6  TO DO A TRANSIENT SEEPAGE ANALYSIS AS PART OF A DESIGN

17:11:19    7  CONDITION LIKE THIS WHERE YOU HAVE PARTIALLY SATURATED SOILS

17:11:23    8  AND A SHORT-TERM LOADING CONDITION.

17:11:26    9          SO I WOULDN'T CONSIDER TRANSIENT -- TRANSIENT SEEPAGE

17:11:29   10  ANALYSIS TO BE PARTICULARLY USEFUL FOR DESIGN APPLICATION.

17:11:34   11  Q.   IF YOU HAD BEEN ASKED TO ANALYZE CAUSATION IN THIS CASE,

17:11:38   12  WHICH YOU WERE NOT, WOULD A TRANSIENT SEEPAGE ANALYSIS BE

17:11:41   13  RELEVANT AND USEFUL?

17:11:42   14  A.   I THINK IT WOULD BE USEFUL UNDER THOSE CONDITIONS BECAUSE

17:11:46   15  NOW YOU'RE TRYING TO FIGURE OUT WHY IT FAILED AND WHETHER THE

17:11:49   16  SOILS TRULY ARE A LOW PERMEABILITY AND, YOU KNOW, CONSIDER ALL

17:11:53   17  THE FACTORS AS THEY EXISTED AT THE TIME THE STORM EVENT

17:11:57   18  OCCURRED AND, YOU KNOW, WHICH ONE OF THOSE PLAYED A SIGNIFICANT

17:12:00   19  ROLE IN THE FAILURE.

17:12:01   20          SO I WOULD CONSIDER IT, AS A CAUSATION ANALYSIS, TO

17:12:06   21  BE A USEFUL TOOL.

17:12:10   22  Q.   MR. GREGORY ASKED YOU A QUESTION ABOUT WHETHER OR NOT YOU

17:12:17   23  COULD TRANSMIT PRESSURE WITHOUT WATER, AND YOUR ANSWER WAS THAT

17:12:23   24  YOU DID NOT THINK THAT IT WAS POSSIBLE TO TRANSMIT PRESSURE

17:12:27   25  WITHOUT WATER FLOW.

17:12:29   1          AND HE DIDN'T ASK YOU WHY NOT, BUT I AM CURIOUS WHY,

17:12:33   2   IN YOUR OPINION, WOULD IT BE SOMEWHAT IMPOSSIBLE -- MAYBE IT

17:12:37   3   WASN'T IMPOSSIBLE -- VERY UNLIKELY THAT YOU WOULD BE ABLE TO

17:12:41   4   TRANSMIT PRESSURE THROUGH THAT LEVEE WITHOUT WATER FLOW.

17:12:44   5   **A.**   WELL, WHAT HE ASKED ME WAS, CAN YOU TRANSMIT PRESSURE

17:12:47   6   WITHOUT WATER?  HE DIDN'T ASK ME ABOUT WATER FLOW.

17:12:52   7          HE -- SO WITHOUT ANY WATER IN THE SOIL, IF THE SOIL

17:12:55   8   WAS PARTIALLY SATURATED AND YOU PUT PRESSURE ON ONE SIDE, IT

17:12:58   9   WOULD JUST COLLAPSE THE SOIL.  SO I'M ASSUMING HIS QUESTION WAS

17:13:03   10  THERE'S NO SOIL IN THE WATER -- I MEAN, THERE'S NO WATER IN THE

17:13:08   11  SOIL.

17:13:18   12  **Q.**   DR. LUCIA, YOU WERE ASKED A COUPLE OF QUESTIONS ABOUT THE

17:13:21   13  DDRS.  TO YOUR KNOWLEDGE, WAS THERE A SPECIFIC DDR FOR THE WORK

17:13:27   14  PERFORMED AS PART OF TASK ORDER 26?

17:13:38   15  **A.**   AS I RECALL, THE WORK UNDER TASK ORDER 26 CONTAINED, LIKE,

17:13:42   16  NINE REPORTS OF VARIOUS THINGS THAT WERE TO BE DONE ON THE

17:13:49   17  PROJECT, BUT I DON'T --

17:13:51   18  **Q.**   THE PROJECT WORK PLANS?

17:13:52   19  **A.**   WORK PLANS, HEALTH AND SAFETY PLANS, QUALITY ASSURANCE

17:13:56   20  PLANS.  I CAN'T REMEMBER ALL THE NAMES OF THEM, BUT THERE WAS

17:13:59   21  EIGHT OR NINE.  I CAN'T REMEMBER THE NUMBER.

17:14:01   22          I DON'T KNOW IF THAT WAS TECHNICALLY CLASSIFIED AS A

17:14:04   23  DDR, BUT, YEAH, I ALWAYS JUST THOUGHT OF IT AS THE TASK

17:14:10   24  ORDER 26, YOU KNOW, STATEMENT OF WORK OR WHATEVER.

17:14:13   25  **Q.**   RIGHT.  AND ACTUALLY, THE REASON I WAS ASKING YOU IS, YOU

17:14:17   1   KNOW, WE'VE SEEN THAT THERE WAS A DDR NO. 3 FOR THE NEW LOCK

17:14:21   2   FOUNDATION REPORT AS PART OF THE NEW LOCK PROJECT.

17:14:25   3          I THINK YOU'VE REVIEWED IT, IN FACT.

17:14:28   4   A.   YES.

17:14:28   5   Q.   AND THERE WAS A DDR NO. 2 THAT DEALT WITH THE LATERAL

17:14:33   6   FLOOD PROTECTION, THE NEW FLOOD PROTECTION THAT WOULD GO IN AS

17:14:36   7   PART OF THE NEW LOCK REPLACEMENT; IS THAT CORRECT?

17:14:39   8   A.   THAT'S CORRECT.

17:14:39   9   Q.   AND THERE WAS A DDR NO. 1 THAT DETAILED WHAT THE CORPS

17:14:43   10  UNDERSTOOD THE SITE TO LOOK LIKE AND WHAT STRUCTURES NEEDED TO

17:14:46   11  BE REMOVED AND WHAT LIMITED INFORMATION THEY HAD TO BE

17:14:50   12  REMEDIATED?

17:14:55   13  A.   CORRECT.

17:14:56   14  Q.   BUT THERE WAS NOT, IN ANYTHING THAT YOU'VE REVIEWED, A

17:14:58   15  SPECIFIC DDR THAT APPLIED TO JUST TASK ORDER 26?

17:15:01   16  A.   I CAN'T RECALL THAT.

17:15:25   17          MR. KELLS:  DON, IF YOU COULD BRING UP THE SLIDE FROM

17:15:25   18  DR. LUCIA'S REPORT.  IT IS DX-DM-1005-0014.

17:15:42   19  BY MR. KELLS:

17:15:43   20  Q.   DR. LUCIA, YOU WERE ASKED A COUPLE OF QUESTIONS ABOUT

17:15:48   21  WHICH SETS OF ANALYSES FOR STABILITY OR SEEPAGE APPLIED AND IN

17:15:54   22  WHICH DIRECTIONS THEY APPLIED, AND I WANTED TO CLARIFY FOR MY

17:15:58   23  OWN SAKE JUST A COUPLE OF THINGS ABOUT THIS PARTICULAR SLIDE

17:16:01   24  AND WHAT IT SHOWS.

17:16:03   25          MY UNDERSTANDING IS THAT THE ARROW POINTING NORTH

| | | |
|---|---|---|
| 17:16:08 | 1 | THAT SAYS "1966 ANALYSES" MEANS THAT THE STABILITY AND SEEPAGE |
| 17:16:14 | 2 | EVALUATIONS FOR THE EXISTING EBIA FLOODWALL APPLIED FROM THAT |
| 17:16:20 | 3 | GREEN LINE HEADING NORTHWARD AFTER THE NEW LOCK WAS IN PLACE. |
| 17:16:25 | 4 | IS THAT CORRECT? |
| 17:16:27 | 5 | **A.**   THAT'S MY UNDERSTANDING, YES. |
| 17:16:28 | 6 | **Q.**   AND SO THEY DID NOT INCORPORATE IN THE 2002 DDR A NEW |
| 17:16:35 | 7 | ANALYSIS FOR STABILITY AND SEEPAGE OF THE FLOODWALL THAT WAS |
| 17:16:38 | 8 | STILL GOING TO BE IN PLACE AND WAS NOT GOING TO BE TOUCHED OR |
| 17:16:44 | 9 | AFFECTED BY THE WORK? |
| 17:16:45 | 10 | **A.**   THAT'S CORRECT. |
| 17:16:45 | 11 | **Q.**   WHAT I DON'T UNDERSTAND, AND MAYBE YOU CAN EXPLAIN IT FOR |
| 17:16:49 | 12 | ME, IS WHY WOULD THE 1966 STABILITY AND SEEPAGE ANALYSIS STILL |
| 17:16:54 | 13 | BE VALID SOME 30 OR 40 YEARS LATER? |
| 17:16:58 | 14 | **A.**   IT'S ALL BASED ON THE SUBSURFACE CONDITIONS THAT EXIST AT |
| 17:17:02 | 15 | THE EBIA.  SOILS HAVEN'T CHANGED.  IN FACT, IF ANYTHING, |
| 17:17:09 | 16 | BECAUSE OF THE SETTLEMENT THAT'S TAKEN PLACE, THE SOILS ARE |
| 17:17:12 | 17 | ACTUALLY STRONGER AND DENSER BY THE COMPRESSION THAT'S PLACED |
| 17:17:18 | 18 | FROM THE LEVEE ON TOP. |
| 17:17:19 | 19 | BUT LACKING ANY SUBSTANTIAL RECONSTRUCTION OR MAJOR |
| 17:17:23 | 20 | EVENTS THAT WOULD HAVE CHANGED THE SOIL CONDITIONS, WHAT WAS |
| 17:17:27 | 21 | DONE IN '66 WOULD APPLY TO 2002. |
| 17:17:31 | 22 | **Q.**   NOW, WHEN YOU SAY THAT THE SOILS MIGHT HAVE BEEN STRONGER, |
| 17:17:35 | 23 | YOU'RE TALKING ABOUT THE STABILITY ANALYSIS THAT THEY PERFORMED |
| 17:17:38 | 24 | FOR THAT FLOODWALL, NOT NECESSARILY THE SEEPAGE ANALYSIS, WHICH |
| 17:17:43 | 25 | IS A SEPARATE PART OF THE ANALYSIS? |

17:17:47   1   **A.**   BOTH.   YOU KNOW, THE SOILS HAVE SETTLED MAYBE A FOOT AND A

17:17:50   2   HALF OR 2 FEET.   STRENGTH IS A FUNCTION OF VOID RATIO.   IN

17:17:54   3   ORDER TO GET SETTLEMENT TO OCCUR, YOU'RE DECREASING THE VOID

17:17:58   4   RATIO IN THE SOILS.   SO THEY BECOME STRONGER.   THEY ALSO BECOME

17:18:02   5   LESS PERMEABLE AS WELL.

17:18:04   6   **Q.**   SO IF I UNDERSTAND YOU CORRECTLY, THE REASON THE 1966

17:18:08   7   ANALYSES FOR STABILITY AND SEEPAGE REMAIN VALID EVEN AT THE

17:18:12   8   TIME THAT THEY WERE CONTEMPLATING PUTTING THE NEW LOCK IN WAS

17:18:16   9   THAT THE SOIL CONDITIONS, PARTICULARLY ON THE PROTECTED SIDE,

17:18:21  10   HAD NOT BEEN CHANGED IN MY MATERIAL WAY FOR SEEPAGE PURPOSES.

17:18:27  11   IS THAT ACCURATE?

17:18:29  12   **A.**   THAT'S ACCURATE.   THE JOURDAN CANAL HAD BEEN FILLED IN

17:18:34  13   SUBSEQUENTLY, BUT THAT ONLY SERVED TO MAKE THINGS BETTER OVER

17:18:36  14   TIME.   BUT THAT WOULD HAVE BEEN THE ONLY CHANGE ON THE

17:18:39  15   PROTECTED SIDE.

17:18:39  16   **Q.**   AND I GUESS THE GEOMETRY, FOR PURPOSES OF THE STABILITY

17:18:43  17   ANALYSIS, ALSO REMAINED THE SAME AS IT HAD BEEN IN 1966?

17:18:47  18   **A.**   APPROXIMATELY, YES.

17:18:56  19   **Q.**   YOU WERE ALSO ASKED A COUPLE OF QUESTIONS BY MR. GREGORY

17:19:01  20   ABOUT THE CORPS' USE OF THE LANE'S WEIGHTED CREEP RATIO IN THE

17:19:07  21   PAST AND WHETHER OR NOT IT HAD BEEN USED IN DESIGNS.   IN FACT,

17:19:11  22   I THINK YOU SHOWED IN YOUR PRESENTATION THAT THEY HAD USED THE

17:19:14  23   LANE'S WEIGHTED CREEP RATIO TO DESIGN OR DETERMINE HOW DEEP TO

17:19:18  24   DRIVE THE SHEET PILE AS PART OF THE NEW FLOOD PROTECTION THAT

17:19:22  25   WAS GOING TO BE IN PUT IN PLACE WITH THE NEW LOCK.   IS THAT

17:19:25   1   CORRECT?

17:19:25   2   **A.**   THAT'S CORRECT.

17:19:26   3   **Q.**   AND THERE'S ACTUALLY BEEN SOME PRESENTATION OF AN EXHIBIT

17:19:29   4   EARLIER IN THIS TRIAL, AND I'D LIKE IT BRING IT UP BECAUSE I

17:19:33   5   ALSO THINK IT BEARS ON THIS QUESTION.  IT'S THE GDM FOR THE

17:19:40   6   FLORIDA AVENUE FLOODWALL THAT RAN SORT OF EAST TO WEST AT THE

17:19:44   7   NORTH END OF THE EBIA SITE, AND THAT WAS CONSTRUCTED IN 1980.

17:19:47   8          YOU'VE SEEN THIS DOCUMENT BEFORE?

17:19:50   9   **A.**   I HAVE.  I DID REVISIT THE 1980 PLANS.

17:19:57  10          **MR. KELLS:**  IF WE COULD BRING UP JX-06, DON.  AND

17:20:03  11   SPECIFICALLY I THINK IT'S GOING TO BE PAGE 145, PLATE 81.

17:20:12  12   LET'S SEE IF WE CAN TURN THIS -- IS THIS PLATE 81?  YEAH.  BLOW

17:20:26  13   UP THAT UPPER RIGHT-HAND QUADRANT RIGHT THERE.

17:20:36  14          WELL, ACTUALLY, I SUPPOSE THE FIRST THING WOULD

17:20:38  15   BE TO ASK DR. LUCIA, YOU KNOW, WHAT THIS PLATE IS SHOWING, IF

17:20:41  16   HE KNOWS.

17:20:43  17          **THE WITNESS:**  THAT'S A TYPICAL CORPS, YOU KNOW, PLAN

17:20:45  18   THAT SHOWS THE -- MUCH LIKE THE 2002 DRAWINGS THAT SHOW A

17:20:50  19   STABILITY ANALYSIS, AND THEY SHOW A SEEPAGE ANALYSIS ON THE

17:20:53  20   SAME DRAWING.

17:20:54  21   **BY MR. KELLS:**

17:20:57  22   **Q.**   DO YOU KNOW WHY THEY ARE SHOWING THE LANE'S WEIGHTED CREEP

17:21:03  23   RATIO METHOD ON THIS PARTICULAR PLATE FOR THE 1980 FLOODWALL

17:21:09  24   THAT RAN EAST AND WEST?

17:21:09  25   **A.**   THAT PARTICULAR ANALYSES, IT LOOKS LIKE THEY'VE SELECTED A

17:21:13   1   LANE'S WEIGHTED CREEP RATIO OF 3, WHICH CORRESPONDS TO A SOFT

17:21:17   2   CLAY.  AND WHAT THEY'RE ATTEMPTING TO DO IS -- NOT ATTEMPTING.

17:21:21   3   WHAT THEY'RE DOING IS CALCULATING, USING THE LANE'S FORMULA

17:21:27   4   TO -- TO DETERMINE THE DEPTH OF THE SHEET PILE WALL TO GET A

17:21:31   5   LANE'S WEIGHTED CREEP RATIO OF 3.

17:21:35   6            SO IT LOOKS LIKE THEY CAME UP WITH THE NUMBER OF

17:21:40   7   APPROXIMATELY 21 FEET, OR AN ELEVATION MINUS 27 FEET, WHICH

17:21:47   8   WOULD GIVE THEM A LENGTH OF CREEP OF THE WATERS THROUGH THE

17:21:51   9   SOIL SO THAT AT THE EXIT POINT THEY WOULD HAVE A LANE'S

17:21:57  10   WEIGHTED CREEP RATIO OF 3, WHICH WOULD CORRESPOND TO THAT

17:22:03  11   CLAYEY MATERIAL.

17:22:04  12   Q.   AND THE CORPS DID THIS AS PART OF ITS DESIGN PROCESS FOR

17:22:06  13   THAT FLOODWALL; CORRECT?

17:22:08  14   A.   THAT'S MY UNDERSTANDING.

17:22:09  15   Q.   AND, IN FACT, THE REASON THAT THEY WERE DOING THIS WAS TO

17:22:12  16   CUT OFF A POTENTIAL PERVIOUS PATHWAY FOR SEEPAGE AT THAT

17:22:18  17   FLOODWALL?

17:22:25  18            THE COURT:  IF HE KNOWS.

17:22:26  19   BY MR. KELLS:

17:22:26  20   Q.   IF YOU KNOW.

17:22:27  21   A.   WELL, I'VE SEEN THIS DRAWING BEFORE, SO IF YOU COULD BACK

17:22:30  22   IT UP AND PUT THE TOTAL DRAWING UP THERE.

17:22:37  23            MR. KELLS:  CAN YOU DO THAT, PLEASE?

17:22:54  24            THE WITNESS:  SO IT WENT DOWN TO MINUS -- WELL, IN

17:22:56  25   THIS PARTICULAR DRAWING -- I MEAN, THEY'RE GOING DOWN TO

17:22:59   1   MINUS 27 -- ELEVATION 27.  I MEAN, I DON'T SEE A -- A PERMEABLE

17:23:06   2   LAYER THERE.

17:23:07   3   **BY MR. KELLS:**

17:23:07   4   **Q.**   WELL, LET'S BACK IT UP, ACTUALLY.  BECAUSE I THINK ONE OF

17:23:11   5   THE -- ONE OF THE PLATES, PLATE 73 AT PAGE 137, SHOWS THE

17:23:16   6   STRATIGRAPHY THAT THEY USED TO COME UP WITH THE DESIGN FOR THIS

17:23:22   7   FLOODWALL.  IT MIGHT BE INSTRUCTIVE.

17:23:39   8           IS THERE A SECTION OF THIS THAT WE CAN BLOW UP FOR

17:23:43   9   YOU?  BECAUSE WE DON'T HAVE A VERY GOOD CLEAN PAPER COPY

17:23:46   10  PRINTED OUT TO BE ABLE TO SHOW YOU.

17:23:48   11  **A.**   WELL, IF YOU COULD MOVE IT TO THE LEFT A LITTLE BIT SO I

17:23:51   12  COULD SEE THE -- OH, YEAH, THERE'S THE LEGEND.

17:23:54   13          SO YOU SEE THE VERTICAL LINES ARE SILT.

17:23:56   14          SO IF YOU GO BACK UP TO THE TOP -- OR TO THE LEFT.

17:23:59   15          SO I THINK THERE WAS A SILT LAYER IN HERE.

17:24:01   16          IF YOU -- YOU CAN'T SEE IT ON THERE, BUT THERE SEEMS

17:24:05   17  LIKE A FAIRLY CONTINUOUS SILT LAYER.  YEAH, ALL THROUGH HERE

17:24:11   18  THERE'S A FAIRLY CONTINUOUS SILT LAYER.  AND THEN IF YOU GO --

17:24:16   19  THAT'S THE WEST SIDE, YEAH.

17:24:17   20          SO, YEAH, THERE IS A SILT LAYER.  I DON'T -- CAN'T

17:24:22   21  SEE THE ELEVATION FROM THIS POINT.

17:24:25   22          **MR. KELLS:**  DON, IF YOU COULD EITHER SLIDE IT OR BACK

17:24:29   23  IT UP A LITTLE BIT SO WE CAN SEE THE ELEVATION MARKING ON THE

17:24:34   24  LEFT.

17:24:34   25          **THE COURT:**  IS THAT -- I REALLY DON'T WANT TO BELABOR

17:24:37   1   THIS BECAUSE, OBVIOUSLY, THEY DIDN'T DO THE 27 FEET BECAUSE --

17:24:40   2   OBVIOUSLY, THEY HAD SOME REASON.  BUT DOES THAT SAY WEST SIDE

17:24:43   3   UP THERE?  OR IS THAT TRYING TO SHOW THE WEST SIDE, OR IS THAT

17:24:47   4   OF THE WEST SIDE?  IT DOES SAY "WEST SIDE," AND I JUST DON'T

17:24:50   5   WANT THE RECORD TO BE -- AND YOU CAN HELP ME --

17:24:54   6           **MR. KELLS:**  WE CAN -- WE CAN ACTUALLY SHOW -- I HAVE

17:24:57   7   THE PLATES FOR BOTH THE EAST SIDE AND THE WEST SIDE.

17:25:01   8           **THE COURT:**  BECAUSE THEY SAY IT IS 27 FEET FROM THE

17:25:02   9   EAST SIDE AS WELL --

17:25:06  10           **MR. KELLS:**  THAT PLATE HAS BOTH.  THAT ONE PLATE HAS

17:25:06  11   BOTH.

17:25:07  12           **THE COURT:**  OKAY.  ALL RIGHT.  I GOTCHA.  I SEE THAT.

17:25:09  13           **MR. KELLS:**  THIS STRATIGRAPHY, IF YOU BACK IT OUT,

17:25:13  14   DON.

17:25:13  15           **THE COURT:**  I JUST CAN'T SEE IT.  I'M SORRY.

17:25:16  16           **MR. KELLS:**  THERE'S THE ELEVATION, AS SEEN --

17:25:16  17           **THE COURT:**  I SEE THE --

17:25:16  18           **MR. KELLS:**  -- ON THE LEFT.

17:25:16  19           **THE COURT:**  -- EAST SIDE OF IT --

17:25:17  20           **MR. KELLS:**  THEN THE WEST SIDE.

17:25:19  21           AND, IN FACT, IF WE BRING UP PLATE 77, WHICH IS

17:25:25  22   PAGE 141 OF THIS SAME EXHIBIT.

17:25:30  23           **MS. DALEY:**  AND THE EXHIBIT NUMBER IS?

17:25:33  24           **MR. KELLS:**  JX-06.

17:25:35  25           **MS. DALEY:**  THANK YOU.

17:25:49   1          **MR. KELLS:**  DON, IF YOU COULD SHOW THE BOTTOM

17:25:50   2   RIGHT-HAND CORNER OF THIS FIRST.

17:25:52   3              AND THIS WOULD BE THE WEST SIDE -- I NEED YOU TO

17:25:55   4   BACK IT OUT.

17:25:57   5          **THE COURT:**  COUNSEL, IS THE MAIN PART OF YOUR -- AND

17:25:59   6   DON'T LET ME -- DON'T LET -- IS THE MAIN PART OF YOUR

17:26:03   7   EXAMINATION TO SHOW THAT IF, IN FACT, THE CREEP ANALYSIS WAS

17:26:06   8   DONE FOR THE CONSTRUCTION OF THE 1980 FLOODWALL AND AS A RESULT

17:26:11   9   THEREOF FOR THE DESIGN -- IS THIS SOMETHING ELSE?  YOU MAY HAVE

17:26:16  10   ANOTHER POINT.

17:26:16  11          **MR. KELLS:**  NO, I MEAN, MY POINT WAS TO DEMONSTRATE

17:26:18  12   THAT, IN FACT, THEY'VE USED THE LANE'S WEIGHTED CREEP RATIO IN

17:26:21  13   THE PAST FOR THE DESIGN --

17:26:22  14          **THE COURT:**  RIGHT, AND YOU --

17:26:22  15          **MR. KELLS:**  -- OF FLOODWALLS.

17:26:23  16          **THE COURT:**  -- HAVE CERTAINLY DONE THAT.

17:26:24  17          **MR. KELLS:**  AND THE -- THE OTHER POINT WAS THAT THEY

17:26:26  18   USED IT TO CALCULATE THE SHEET PILE DEPTH TO CUT OFF KNOWN

17:26:34  19   PERVIOUS LAYERS WHEN THE STRATIGRAPHY SHOWS THEM.

17:26:42  20          **THE COURT:**  IS THAT CORRECT, SIR?  IS IT?

17:26:44  21          **THE WITNESS:**  ACTUALLY, ON THIS ONE, IF YOU SCAN IN

17:26:45  22   ON THIS PART RIGHT UP HERE, YOU'LL SEE THE CALCULATED DEPTH.

17:26:48  23   AND THEN THEY SAY:  "EXTEND THE SHEET PILE CUTOFF TO PENETRATE

17:26:53  24   THE SOIL LAYER."

17:26:55  25              SO WHILE THE LANE'S WEIGHTED CREEP RATIO HERE

17:26:57   1   WAS 3, CALCULATED DEPTH FOR THAT, BUT JUST BELOW THAT WAS A

17:27:04   2   PERMEABLE LAYER, SO THEY WENT DEEPER.

17:27:06   3   **BY MR. KELLS:**

17:27:06   4   **Q.**   AND I SUPPOSE THAT THE LOGICAL QUESTION IS, THERE WAS NO

17:27:10   5   PERVIOUS LAYER AT THE 1966 STRATIGRAPHY FOR THAT EBIA FLOODWALL

17:27:14   6   THAT WOULD HAVE SUGGESTED NEEDING TO DRIVE A DEEPER SHEET PILE?

17:27:20   7   THEY DIDN'T RUN A LANE'S WEIGHTED CREEP RATIO, AND THEY DIDN'T

17:27:23   8   FIND A PERVIOUS LAYER WITH WHICH TO EVEN CALCULATE IT?

17:27:27   9   **A.**   THAT'S CORRECT.

17:27:37  10   **Q.**   OKAY.  DR. LUCIA, THIS IS THE LAST THING I'M GOING TO

17:27:40  11   COVER, AND I PROMISE WE'LL BE OUT OF HERE.

17:27:46  12            **MR. KELLS:**  I JUST WANT TO BRING UP, IF WE CAN --

17:27:47  13            **THE COURT:**  I DON'T WANT TO RUSH YOU UNNECESSARILY.

17:27:48  14            **MR. KELLS:**  NO, NO.  NO, THAT TOOK MUCH LONGER THAN I

17:27:50  15   ANTICIPATED, AND THAT WAS MY OWN FAULT.

17:27:54  16            IF WE COULD BRING UP DX-DM-1005-0019, WHICH IS

17:28:05  17   DR. LUCIA'S PRESENTATION.

17:28:07  18            **THE COURT:**  UNLIKE A PLAY, UNFORTUNATELY, A TRIAL IS

17:28:08  19   NOT SCRIPTED AS WELL AS A -- IT MAKES IT INTERESTING, BUT IT --

17:28:16  20            **MR. KELLS:**  THE BEST LAID PLANS.

17:28:16  21            **THE COURT:**  -- SOMETIMES MAKES IT LONGER THAN THE

17:28:16  22   THIRD AND FOURTH ACTS COME -- ABSOLUTELY TOO LONG.

17:28:17  23            **MR. KELLS:**  THE BEST LAID PLANS.

17:28:21  24            **THE COURT:**  ABSOLUTELY.  GO AHEAD.

17:28:22  25            **MR. KELLS:**  SLIDE 19.

17:28:32   1        **THE COURT:**  AND ALL I'M DOING RIGHT NOW IS MISSING A

17:28:33   2  BOOK CLUB MEETING OF JUDGES WHERE I DIDN'T READ THE BOOK, SO --

17:28:36   3  AND I WOULD PROBABLY STILL COMMENT, WHICH WOULD THEN SHOW MY

17:28:40   4  REAL NATURE.

17:28:42   5                    GO AHEAD.

17:28:43   6  **BY MR. KELLS:**

17:28:44   7  **Q.**   OKAY.  DR. LUCIA, I JUST WANT TO ASK A COUPLE OF QUICK

17:28:49   8  CLARIFYING QUESTIONS ABOUT A FEW THINGS THAT CAME UP DURING

17:28:52   9  YOUR EXAMINATION.

17:28:55   10       THE MCDONOUGH MARINE BORROW PIT HAD A STABILITY

17:29:01   11  ANALYSIS DONE FOR IT BY THE GEOTECHNICAL FOLKS AT THE CORPS;

17:29:07   12  CORRECT?

17:29:08   13  **A.**   CORRECT.

17:29:09   14  **Q.**   THEY DID NOT DO A SEEPAGE ANALYSIS AT THE SAME TIME THAT

17:29:15   15  THEY WERE DOING THE STABILITY ANALYSIS; IS THAT CORRECT?

17:29:20   16  **A.**   THAT'S CORRECT.

17:29:21   17  **Q.**   WOULD IT BE FAIR TO SAY THAT DIFFERENT SITES MIGHT REQUIRE

17:29:24   18  A SEEPAGE ANALYSIS BUT NOT A SEEPAGE ANALYSIS?  AND VICE VERSA,

17:29:27   19  THAT THE SITES ARE DIFFERENT AND THE NEED FOR DIFFERENT

17:29:30   20  ANALYSES DEPENDS ON THE SITE ITSELF?

17:29:34   21  **A.**   OKAY.  YES.

17:29:35   22  **Q.**   WOULD YOU AGREE THAT THAT'S TRUE?

17:29:37   23  **A.**   WELL, YEAH, AND I MAKE THAT POINT IN MY -- DIFFERENT SITES

17:29:42   24  MIGHT REQUIRE DIFFERENT TYPES OF ANALYSIS DEPENDING UPON THE

17:29:45   25  CONDITIONS -- SOIL CONDITIONS AND SUCH.

17:29:47   1   **Q.**   SO IF THE CORPS HAS A, YOU KNOW, POLICY GUIDANCE THAT

17:29:51   2   SUGGESTS THAT GEOTECHNICAL EVALUATIONS BE DONE WHEN THEY'RE

17:29:55   3   WITHIN 300 FEET OF A FLOODWALL, THAT DOESN'T SAY EXACTLY WHAT

17:29:58   4   TYPE OF ANALYSIS OR EVALUATION NEEDS TO BE DONE EVERY TIME,

17:30:02   5   DOES IT?

17:30:04   6           **MR. GREGORY:**  OBJECTION.  VAGUE AND AMBIGUOUS.

17:30:06   7           **THE COURT:**  I UNDERSTOOD THE QUESTION.  I'M GOING TO

17:30:08   8   OVERRULE THE OBJECTION.

17:30:08   9               IF THE WITNESS DOESN'T UNDERSTAND IT, THAT'S

17:30:10  10   MORE IMPORTANT AND HE CAN SAY SO.  I UNDERSTOOD IT.

17:30:14  11           **THE WITNESS:**  MY UNDERSTANDING IS THAT WITHIN THAT

17:30:17  12   300 FEET, WHEN THE CORPS WANTS TO HAVE A REVIEW, THEY WANT TO

17:30:21  13   REVIEW IT TO LOOK AT THE IMPACTS ON THE FLOODWALL.

17:30:25  14   **BY MR. KELLS:**

17:30:26  15   **Q.**   TO LOOK AT THE IMPACT ON THE FLOODWALL.

17:30:28  16               AND TO DO THAT, YOU WOULD TURN TO THE DESIGN

17:30:30  17   MEMORANDUM FOR THAT FLOODWALL TO SEE WHAT CONDITIONS THEY

17:30:34  18   DESIGNED IT TO WITHSTAND; IS THAT CORRECT?

17:30:39  19   **A.**   THAT WOULD BE PART OF THE INFORMATION YOU WOULD HAVE.

17:30:41  20   **Q.**   CORRECT.  AND, IN FACT, IN YOUR PRESENTATION TODAY, WHAT

17:30:45  21   YOU'VE ESSENTIALLY DONE IS TO WALK THROUGH WHAT THE CORPS OF

17:30:51  22   ENGINEERS' GEOTECHNICAL FOLKS WOULD HAVE LOOKED AT TO VERIFY

17:30:55  23   WHETHER OR NOT ANY OF THE EXCAVATIONS ALONG TASK ORDER 26 WOULD

17:30:59  24   HAVE IMPACTED STABILITY OR SEEPAGE AT THE EBIA FLOODWALL?

17:31:04  25   **A.**   CORRECT.

17:31:11   1   **Q.**   AND AS I THINK YOU WERE ASKED, IN YOUR EVALUATION TO

17:31:14   2   EMPIRICALLY VERIFY WHETHER OR NOT THE JUDGMENT EXERCISED WAS

17:31:19   3   GOOD IN APPROVING THE WORK, YOU CONFIRMED FOR YOURSELF THAT, IN

17:31:25   4   YOUR OPINION, THOSE EXCAVATIONS DID NOT HAVE AN IMPACT ON

17:31:27   5   STABILITY OR SEEPAGE AT THAT EBIA FLOODWALL FOR THE FLOOD

17:31:31   6   CONDITION THAT IT WAS DESIGNED AND BUILT FOR?

17:31:34   7   **A.**   BASED ON ALL THE METHODS OF ANALYSIS THAT WERE AVAILABLE

17:31:38   8   AT THAT TIME, I SEE -- AS I WENT THROUGH ALL THOSE ANALYSES,

17:31:45   9   THE CONCLUSION WOULD HAVE BEEN THAT THOSE EXCAVATIONS WOULD

17:31:48   10   HAVE NO IMPACT.

17:31:58   11           **MR. KELLS:**   YOUR HONOR, I HAVE NO FURTHER QUESTIONS

17:31:59   12   FOR DR. LUCIA.

17:32:01   13           **THE COURT:**   AS I'VE DONE, I'M GOING TO ALLOW RECROSS

17:32:03   14   LIMITED TO WHAT WAS BROUGHT OUT.  AND THEN I'LL ALLOW, IN MY

17:32:07   15   NEW -- MY NEW PARADIGM HERE, THE LAST -- YOU'LL HAVE THE LAST

17:32:14   16   WORD, BUT IT WILL BE LIMITED TO WHAT'S BROUGHT OUT HERE.

17:32:17   17           **MR. KELLS:**   I UNDERSTAND.  I HOPE I WON'T NEED IT,

17:32:20   18   YOUR HONOR.

17:32:20   19                        **RECROSS-EXAMINATION**

17:32:23   20   **BY MR. GREGORY:**

17:32:24   21   **Q.**   SIR, YOU WERE ASKED SOME QUESTIONS ABOUT THE SOILS NOT

17:32:26   22   CHANGING FROM 1966 TO 2002.

17:32:28   23           DO YOU REMEMBER THOSE QUESTIONS?

17:32:29   24   **A.**   YES.

17:32:30   25   **Q.**   AND WERE YOU TALKING ABOUT THE SOILS ON THE PROTECTED

| | | |
|---|---|---|
| 17:32:33 | 1 | SIDE? |
| 17:32:36 | 2 | **A.**   I'M -- YES.  I'M TALKING ABOUT SOILS UNDER THE |
| 17:32:38 | 3 | FLOODWALL -- THE FLOODWALL AND LEVEE SYSTEM AND THE PROTECTED |
| 17:32:40 | 4 | SIDE. |
| 17:32:41 | 5 | **Q.**   OKAY.  SO YOU WEREN'T TALKING ABOUT THE SOILS BETWEEN THE |
| 17:32:45 | 6 | CANAL AND THE FLOODWALL? |
| 17:32:48 | 7 | **A.**   I WAS NOT REFERRING TO THE EXCAVATIONS PART OF THE TASK |
| 17:32:54 | 8 | ORDER 26. |
| 17:32:55 | 9 | **Q.**   AND THEN -- AND SO YOU'RE SAYING, BECAUSE THERE WASN'T ANY |
| 17:33:00 | 10 | CHANGE FROM THE FLOODWALL OUT TO JOURDAN, THERE WASN'T ANY NEED |
| 17:33:06 | 11 | TO GO A NEW LANE'S WEIGHTED -- LANE'S WEIGHTED CREEP RATIO, FOR |
| 17:33:12 | 12 | EXAMPLE? |
| 17:33:12 | 13 | **A.**   THAT'S CORRECT. |
| 17:33:13 | 14 | **Q.**   AND THEN, SIR, YOU WERE SHOWED -- AND I'M GOING TO TURN TO |
| 17:33:19 | 15 | EXHIBIT JX-6, THE DESIGN -- THE 1980 DESIGN MEMORANDUM THAT YOU |
| 17:33:33 | 16 | WERE SHOWN SLIDES FROM.  AND WHAT I'D LIKE TO ASK YOU TO LOOK |
| 17:33:38 | 17 | AT IS 29, 00029.  THANK YOU. |
| 17:33:54 | 18 |         **MR. GREGORY:**  AND, KARL, I -- IF YOU COULD SEE AT THE |
| 17:33:57 | 19 | BOTTOM IT SAYS "T-WALLS"? |
| 17:34:07 | 20 | **BY MR. GREGORY:** |
| 17:34:07 | 21 | **Q.**   AND DO YOU SEE, SIR, IT TALKS ABOUT T-WALLS AND GATES, AND |
| 17:34:11 | 22 | IT SAYS SHEET -- "STEEL SHEET PILE CUTOFFS," AND IT REFERS TO |
| 17:34:15 | 23 | PLATES 77 AND 81. |
| 17:34:17 | 24 |         DO YOU SEE THAT? |
| 17:34:19 | 25 | **A.**   YES, SIR. |

17:34:19  1  **Q.**  AND YOU WERE SHOWN PLATES 77 AND 81; CORRECT?

17:34:26  2  **A.**  I DON'T REMEMBER THE NUMBERS, BUT, OKAY.

17:34:29  3  **Q.**  OKAY.  AND WE CAN GET TO THAT.

17:34:31  4         AND THOSE WERE FOR T-WALLS.  AND ON THOSE PLATES --

17:34:36  5         **MR. GREGORY:**  AND I'LL JUST -- I'M TRY TRYING TO

17:34:41  6  SHORTCUT THINGS, YOUR HONOR.

17:34:42  7         **THE COURT:**  SURE.

17:34:43  8  **BY MR. GREGORY:**

17:34:43  9  **Q.**  I'D LIKE TO ESTABLISH THAT PLATES 77 AND 81 WERE THE ONES

17:34:45 10  THAT HAD THE LANE'S WEIGHTED CREEP RATIO ON IT.

17:34:48 11         AND, SIR, IF WE COULD TURN TO THE NEXT PAGE, PAGE 30.

17:34:56 12  THERE'S -- AT THE BOTTOM OF 29, THERE'S AN ANALYSIS FOR

17:34:59 13  I-WALLS.

17:35:00 14         DO YOU SEE THAT?

17:35:03 15         **THE COURT:**  DOWN AT THE BOTTOM.

17:35:07 16         NOW HE DOES.

17:35:09 17  **BY MR. GREGORY:**

17:35:09 18  **Q.**  OKAY.  AND NOW WE'RE GOING TO TURN TO THE NEXT PAGE, 31.

17:35:14 19         AND RIGHT IN HERE, DO YOU SEE THE CANTILEVERED I-WALL

17:35:22 20  ANALYSIS?  IT REFERS TO PLATES 76 AND 82.

17:35:26 21         DO YOU SEE THAT?

17:35:29 22         **THE COURT:**  DOWN AT THE BOTTOM.

17:35:30 23         **THE WITNESS:**  YEAH.  I ASSUME YOU DON'T WANT ME TO

17:35:33 24  READ IT, BUT I DO SEE THE 76 AND 82.

         25

17:35:36   1   **BY MR. GREGORY:**

17:35:36   2   **Q.**   AND THOSE WERE THE PLATES FOR THE I-WALL ANALYSIS AS

17:35:41   3   OPPOSED TO THE T-WALL ANALYSIS; CORRECT?

17:35:44   4           **THE COURT:**   HE DIDN'T SEE PLATES 76 AND 82, DID HE?

17:35:48   5           **MR. GREGORY:**   NO.   AND THAT'S WHAT WE'RE GOING TO GO

17:35:50   6   TO RIGHT NOW.

17:35:50   7           SO PLATE 76 IS AT JX-140.

17:36:04   8           I'M SORRY.   I'M SORRY.   I DIDN'T SEE IT.   JX-006

17:36:11   9   AT 0140.

17:36:16  10   **BY MR. GREGORY:**

17:36:18  11   **Q.**   SIR, WHAT I'M GOING TO ASK YOU TO LOOK AT ON THIS PLATE IS

17:36:21  12   TO SEE IF YOU SEE A LANE'S WEIGHTED CREEP RATIO FOR THE I-WALL.

17:36:28  13   **A.**   NOT IN THAT.   IT'S KIND OF SMALL FOR ME TO READ, SO I

17:36:35  14   DON'T . . .

17:36:36  15           **THE COURT:**   YEAH.   WELL, IT'S IMPOSSIBLE RIGHT NOW.

17:36:38  16           NOW YOU MIGHT BE ABLE TO, SIR.

17:36:40  17           **THE WITNESS:**   I CAN SEE THE STABILITY ANALYSIS THAT

17:36:42  18   THEY DID.

17:36:43  19   **BY MR. GREGORY:**

17:36:43  20   **Q.**   OKAY.   BUT YOU DON'T SEE --

17:36:46  21           **MR. GREGORY:**   AND, YOUR HONOR, MAY I APPROACH AND

17:36:49  22   JUST SHOW HIM PAPER COPIES?   IT MIGHT BE QUICKER.

17:36:53  23           **THE COURT:**   YOU MIGHT -- YOU MAY.   AS LONG AS COUNSEL

17:36:54  24   IS FOLLOWING ALONG WITH YOU AND THEN WE GET SOMETHING ON THE

17:36:55  25   BOARD.

17:36:57   1           **MR. GREGORY:**  YEAH.  IF YOU COULD JUST SHOW THE --

17:36:59   2   **BY MR. GREGORY:**

17:37:00   3   **Q.**   MY QUESTION IS FOR PLATE 76.

17:37:02   4           **THE COURT:**  ARE YOU SHOWING HIM PLATE 76, AND THAT'S

17:37:05   5   THE ONE THAT'S ON THE BOARD?

17:37:06   6           **MR. GREGORY:**  YES, YOUR HONOR.

17:37:07   7           **THE COURT:**  ALL RIGHT.  ON THE SCREEN.

17:37:09   8   **BY MR. GREGORY:**

17:37:09   9   **Q.**   AND MY QUESTION IS, SIR, DO YOU SEE A LANE'S WEIGHTED

17:37:13  10   CREEP ANALYSIS THERE?

17:37:17  11   **A.**   NO, I DON'T.

17:37:17  12   **Q.**   OKAY.  AND THEN 82 WAS THE NEXT ONE.

17:37:23  13           **MR. GREGORY:**  AND IF YOU COULD PUT THAT UP, KARL.

17:37:31  14   THAT'S AT PAGE 0146.

17:37:41  15   **BY MR. GREGORY:**

17:37:41  16   **Q.**   DO YOU SEE A LANE'S WEIGHTED CREEP RATIO THERE?

17:37:47  17   **A.**   NO, I DON'T.

17:37:50  18   **Q.**   AND THOSE WERE THE PLATES FOR THE I-WALLS, AND THAT'S --

17:37:55  19   IT WAS I-WALL CONSTRUCTION THAT WAS AT THE EBIA INVOLVED WITH

17:38:04  20   THE TERC PROJECT; CORRECT?

17:38:09  21   **A.**   YEAH.  THERE WERE I-WALLS AT THE EBIA, YES.

17:38:14  22   **Q.**   OKAY.  AND SO THE -- LET'S GO BACK TO THIS ONE FINAL BIT

17:38:23  23   OF QUESTIONING.

17:38:24  24           THE SOIL STRATA THAT YOU WERE SHOWN, THAT WAS AT

17:38:31  25   PLATE 0137.

```
17:38:47   1              SIR, HAVE YOU EVER DONE AN ANALYSIS OF THIS SOIL
17:38:50   2   STRATA FOR PURPOSES OF YOUR REPORT?
17:38:54   3   A.   NOT REALLY.  I LOOKED AT IT, BUT I HAVEN'T REALLY -- IT'S
17:38:58   4   NOT THE SITE WE'RE LOOKING AT.  SO, NO, I'VE NOT REALLY DONE AN
17:39:02   5   ANALYSIS OF IT.
17:39:03   6   Q.   SIR, YOU'RE SAYING THAT THIS -- THIS ANALYSIS THAT COUNSEL
17:39:07   7   SHOWED YOU IS NOT THE SAME AREA AS THE 1966 --
17:39:13   8   A.   THAT'S RIGHT.
17:39:14   9   Q.   -- DESIGN MEMO?
17:39:15  10   A.   THAT'S RIGHT, IT'S NOT THE SAME AREA.
17:39:19  11   Q.   AND IF IT WAS, SIR, WOULD IT BE MORE APPROPRIATE TO HAVE
17:39:25  12   DONE YOUR ANALYSES ON THE 1980 REPORT AS OPPOSED TO THE 1966
17:39:31  13   REPORT?
17:39:34  14   A.   IF THAT 1980 WALL WAS, YOU KNOW, THE WALL IN QUESTION,
17:39:38  15   YEAH, THAT WOULD HAVE BEEN THE ONE THAT WOULD HAVE BEEN MORE
17:39:42  16   APPROPRIATE.
17:39:43  17            THE COURT:  COUNSEL, I'M NOT SURE THAT -- DO YOU MEAN
17:39:48  18   IF THE SOIL CONDITIONS -- I DON'T WANT TO ASK THE QUESTION.
17:39:55  19   IT'S VERY TEMPTING.  I JUST WANT TO BE CLEAR.
17:39:59  20            MR. GREGORY:  I'M SORRY IF I WAS AMBIGUOUS.
17:40:02  21   BY MR. GREGORY:
17:40:02  22   Q.   IF THE 1966 GEOLOGY IS INCLUDED --
17:40:05  23            MR. BRUNO:  OTHER WAY AROUND.
17:40:06  24   BY MR. GREGORY:
17:40:06  25   Q.   I'M SORRY.
```

17:40:06   1        IF THIS IS INCLUDED IN THE 1966 GEOLOGY, WOULD IT BE

17:40:09   2  APPROPRIATE TO HAVE USED THIS ANALYSIS FOR YOUR REPORT?

17:40:18   3  **A.**  I'M SORRY.

17:40:20   4        **THE COURT:**  THE QUESTION IS, IF THIS PLATE WOULD

17:40:29   5  DEPICT -- DEPICT THE AREA COVERED BY THE SUBJECT WALL OF THIS

17:40:38   6  LAWSUIT IN 1980, WOULD IT HAVE BEEN MORE APPROPRIATE FOR YOU TO

17:40:43   7  EXAMINE THIS PLATE IN DETERMINING YOUR STANDARD OF CARE OPINION

17:40:46   8  THAN THE '66 PLATE?

17:40:49   9        IS THAT FAIR?

17:40:50  10        **MR. GREGORY:**  AND YOU SAID IT WOULD BE A PORTION,

17:40:52  11  YOUR HONOR.

17:40:53  12        **THE COURT:**  I UNDERSTAND.

17:40:55  13        **MR. GREGORY:**  BUT, YES.

17:40:57  14        **THE WITNESS:**  IF THIS WAS DONE FOR THE EBIA, THE

17:41:01  15  NORTH/SOUTH SECTION OF THE WALL AND IT CONTAINED NEW

17:41:06  16  INFORMATION, THEN IT CERTAINLY WOULD HAVE BEEN APPROPRIATE TO

17:41:10  17  LOOK AT IT.

17:41:11  18        **MR. GREGORY:**  THANK YOU VERY MUCH.

17:41:15  19        **THE COURT:**  OKAY.  ARE YOU FINISHED, SIR?

17:41:20  20        **MR. GREGORY:**  YES.

17:41:20  21        **THE COURT:**  YOU HAVE THE LAST WORD, SIR.

17:41:22  22        **MR. KELLS:**  I THINK IT'S TIME TO GO HOME FOR THE DAY.

17:41:24  23        **THE COURT:**  ALL RIGHT.  WELL, YOUR WORD IS GOLDEN, IN

17:41:28  24  THAT CASE.

17:41:29  25        AND, DOCTOR, THANK YOU.  AND I HOPE YOU ENJOY

17:41:37   1   YOUR EVENING HERE IN NEW ORLEANS, UNLESS YOU'RE FLYING OUT

17:41:40   2   TONIGHT.  OTHER THAN THAT, THANK YOU.

17:41:42   3           **THE WITNESS:**  THANK YOU, YOUR HONOR.

17:41:42   4           **MR. TREEBY:**  DOES THAT MEAN WE'RE DONE FOR THE DAY,

17:41:45   5   YOUR HONOR?

17:41:47   6           **THE COURT:**  WELL, YOU KNOW, UNLESS MR. SMITH HAS SOME

17:41:49   7   PRESSING PROBLEMS, I WILL TRY TO ACCOMMODATE, ALTHOUGH I'LL BE

17:41:53   8   KILLED BY SOME OTHER PEOPLE.

17:41:55   9           **MR. SMITH:**  I DO NOT, YOUR HONOR.

17:41:55  10           **MR. TREEBY:**  I HAVE ONE JUST MINOR MATTER.  AND IT'S

17:41:57  11   SOMEWHAT PROCEDURAL, BUT IT'S NOT -- BUT WE DID RUN INTO IT

17:42:02  12   RIGHT HERE A LITTLE BIT AND WANT IT CLEARED UP.

17:42:07  13              WHEN -- IN THIS INSTANCE WE HAVE A SEPARATE

17:42:11  14   STANDARD OF CARE EXPERT FROM THE GOVERNMENT'S STANDARD OF CARE

17:42:14  15   EXPERT.

17:42:14  16           **THE COURT:**  I SEE.

17:42:14  17           **MR. TREEBY:**  AND THEY ARE APPROACHING IT DIFFERENTLY.

17:42:18  18   I MEAN, IN OTHER WORDS, WE -- AT LEAST OUR THEORY IS, AND OUR

17:42:23  19   CASE IS, THAT OUR STANDARD OF CARE IS NOT THE SAME AS THE

17:42:27  20   GOVERNMENT'S STANDARD OF CARE.

17:42:28  21           **THE COURT:**  OH, I UNDERSTAND.

17:42:28  22           **MR. TREEBY:**  AND IN THAT INSTANCE, I WOULD ASK THE

17:42:30  23   COURT'S PERMISSION TO TREAT THE EXAMINATION WE BRING TO THE

17:42:39  24   WITNESS AS CROSS-EXAMINATION AND NOT REDIRECT.

17:42:42  25           **THE COURT:**  I THINK THAT'S FAIR.

17:42:43   1                **MR. TREEBY:**  AND THAT HAS AN EFFECT ON THE PROFFER

17:42:46   2    THAT WAS MADE, AND THAT'S THE ONLY PURPOSE OF MY BRINGING IT --

17:42:47   3                **THE COURT:**  THAT'S FAIR, AND I CONCUR.

17:42:52   4                **MR. BRUNO:**  SYKORA IS HIS WITNESS.  HE'S NOT GOING TO

17:42:57   5    CROSS-EXAMINE HIS OWN WITNESS.

17:42:59   6                **THE COURT:**  NO, NO, NO.  HE'S TALKING ABOUT THE

17:43:02   7    WITNESS WHO JUST TESTIFIED.

17:43:03   8                **MR. TREEBY:**  RIGHT.

17:43:03   9                **MR. BRUNO:**  WELL, THERE'S NOBODY ELSE.  THE NEXT

17:43:06  10    WITNESS IS SYKORA, AND THAT'S THEIR EXPERT.  SO WHY WOULD HE --

17:43:07  11                **THE COURT:**  WELL, NO, NO.  THAT'S WHAT HE WAS SAYING.

17:43:07  12    BUT I -- THIS IS REALLY NOT WORTH ARGUING ABOUT --

17:43:08  13                **MR. TREEBY:**  I WAS TRYING TO INFORM THE COURT'S

17:43:11  14    PROFFER.

17:43:11  15                **THE COURT:**  AND I CONCUR.  IN OTHER WORDS, THIS WAS

17:43:13  16    THE CORPS' WITNESS AND THE CORPS' STANDARD OF CARE, NOT WGI'S.

17:43:17  17                **MR. BRUNO:**  CORRECT.

17:43:17  18                **THE COURT:**  AND SO I WILL ALLOW HIM, IN THAT

17:43:21  19    INSTANCE, AND MAYBE THAT -- THAT MAY BE ONLY ONE OF THE FEW, TO

17:43:24  20    CROSS.

17:43:25  21                **MR. TREEBY:**  AND SO WE WOULD SUGGEST THAT WHAT WAS A

17:43:28  22    PROFFER SHOULD NOT BE TREATED AS A PROFFER BUT, RATHER, AS

17:43:30  23    EVIDENCE.

17:43:30  24                **THE COURT:**  OKAY.

17:43:31  25                **MR. TREEBY:**  BECAUSE THAT QUESTION RELATED

17:43:33   1   SPECIFICALLY TO WHAT WOULD BE TYPICAL CROSS-EXAMINATION BECAUSE

17:43:36   2   IT WAS TAKING A WITNESS WHO HAD LOOKED AT STANDARD OF CARE

17:43:38   3   FROM -- THE PURPOSE IN ASKING HIM -- YOUR HONOR HAS RULED

17:43:41   4   CONSISTENTLY THAT CROSS-EXAMINATION IS NOT LIMITED.

17:43:46   5             **THE COURT:**  ABSOLUTELY.  IT WAS MORE TO THE OPINION

17:43:48   6   NOT BEING IN HIS REPORT MORE THAN ANYTHING ELSE.

17:43:50   7             **MR. TREEBY:**  RIGHT.

17:43:50   8             **THE COURT:**  I DIDN'T WANT YOU TO ELICIT -- THAT'S THE

17:43:51   9   PRIMARY REASON, BUT I -- I DO UNDERSTAND YOUR POINT.

17:43:54  10             **MR. BRUNO:**  I UNDERSTAND.

17:43:57  11             **MR. TREEBY:**  THANK YOU, YOUR HONOR.

17:44:00  12             **THE COURT:**  ALL RIGHT.  WELL, I GUESS WE'RE COMING

17:44:04  13   ALONG.

17:44:05  14             MR. SMITH, TOMORROW WE HAVE -- SO I'LL BE ALERT.

17:44:10  15             **MR. SMITH:**  WE'RE RUNNING ABOUT A DAY LATE, FRANKLY,

17:44:13  16   LATER THAN WE THOUGHT WE WOULD BE.

17:44:14  17             **THE COURT:**  OKAY.

17:44:15  18             **MR. SMITH:**  I THOUGHT I WOULD GET ONE OF MY TWO

17:44:17  19   REMAINING GEOTECHS UP TODAY, BUT WE STILL HAVE GOT DR. SYKORA,

17:44:22  20   WHO'S WGI'S STANDARD OF CARE EXPERT, TO GET ON THE STAND

17:44:27  21   TOMORROW.

17:44:27  22             **THE COURT:**  RIGHT.

17:44:27  23             **MR. SMITH:**  I DON'T THINK WE CAN DO THREE EXPERTS IN

17:44:29  24   ONE DAY, YOUR HONOR.

17:44:30  25             **THE COURT:**  I TEND TO AGREE WITH YOU.

| | | |
|---|---|---|
| 17:44:33 | 1 | **MR. TREEBY:**  YOUR HONOR, WE -- |
| 17:44:34 | 2 | **THE COURT:**  UNLESS, YOU KNOW -- |
| 17:44:35 | 3 | **MR. TREEBY:**  -- JUST FOR TODAY, I MEAN, I JUST -- I'M |
| 17:44:36 | 4 | THE TIMEKEEPER FOR US, AND I KNOW IT'S NOT THE OFFICIAL TIME. |
| 17:44:39 | 5 | **THE COURT:**  RIGHT.  I KNOW, BUT I WOULD BE DOING THE |
| 17:44:42 | 6 | SAME THING YOU'RE DOING. |
| 17:44:43 | 7 | **MR. TREEBY:**  AND WE GOT TWO HOURS OUT OF THE DAY -- |
| 17:44:48 | 8 | **THE COURT:**  WELL, YOU'VE -- |
| 17:44:48 | 9 | **MR. TREEBY:**  -- THE DEFENSE. |
| 17:44:48 | 10 | **THE COURT:**  -- YOU'VE GOT TIME THEN. |
| 17:44:49 | 11 | **MR. TREEBY:**  THE DEFENSE GOT TWO HOURS.  BUT I'M MORE |
| 17:44:52 | 12 | CONCERNED ABOUT THE COURT'S TIME RIGHT NOW.  WE'RE NOT GOING TO |
| 17:44:55 | 13 | USE UP OUR TIME.  I'M MORE CONCERNED ABOUT THE COURT'S TIME. |
| 17:44:58 | 14 | **THE COURT:**  RIGHT.  WHAT WITNESS -- IS IT LOOKING |
| 17:44:59 | 15 | LIKE -- |
| 17:44:59 | 16 | **MR. SMITH:**  WELL, THE PROBLEM IS WE'RE PUSHING NEXT |
| 17:45:03 | 17 | WEEK, I THINK. |
| 17:45:04 | 18 | **THE COURT:**  OH, ABSOLUTELY.  YEAH.  BUT YOU'RE |
| 17:45:06 | 19 | CONVINCED -- NOT CONVINCED.  THE WAY WE'RE GOING, YOU THINK YOU |
| 17:45:10 | 20 | COULD FINISH BY WEDNESDAY AND/OR THURSDAY.  IS THAT . . . |
| 17:45:13 | 21 | **MR. TREEBY:**  WELL, I THINK -- WE HAD HOPED -- I WAS |
| 17:45:15 | 22 | REALLY -- BEFORE TODAY, I THOUGHT WE'D BE DONE -- |
| 17:45:17 | 23 | **THE COURT:**  FRIDAY IS THE LAST DAY. |
| 17:45:18 | 24 | **MR. TREEBY:**  -- TUESDAY. |
| 17:45:19 | 25 | **THE COURT:**  FRIDAY WE'RE GOING TO HAVE MORE THAN 120 |

```
17:45:24   1   HOURS, SO SOMEBODY'S GOING TO --
17:45:25   2           MR. TREEBY:  NO, I DON'T -- I DON'T THINK SO, YOUR
17:45:26   3   HONOR.
17:45:26   4           THE COURT:  BY NEXT FRIDAY.  A WHOLE WEEK --
17:45:27   5           MR. TREEBY:  THEY MAY HAVE MORE THAN THEIR 60.
17:45:27   6           THE COURT:  -- FROM MONDAY TO FRIDAY?
17:45:30   7           MR. TREEBY:  NO, NO.  WE'RE NOT -- WE'RE JUST --
17:45:32   8   OKAY.
17:45:33   9           THE COURT:  I'M TALKING ABOUT NEXT FRIDAY.
17:45:34  10           MR. TREEBY:  YEAH.  OH, NO.  WE'RE NOT GOING -- WE'RE
17:45:36  11   NOT GOING -- YOUR HONOR'S OUT OF HERE ON THE 4TH AND WE'RE OUT
17:45:38  12   OF HERE ON THE 4TH.  I'M JUST -- WHAT I'M COMMENTING ON --
17:45:43  13           THE COURT:  OH, ABSOLUTELY.
17:45:44  14           MR. TREEBY:  WHAT I'M COMMENTING ON --
17:45:44  15           THE COURT:  AND I WOULD STAY.  I MEAN, LOOK, I'M
17:45:45  16   GOING TO LET YOU FINISH YOUR TRIAL, BUT . . .
17:45:47  17           MR. TREEBY:  I HAD TOLD THE COURT THAT WE THOUGHT
17:45:50  18   TUESDAY OR WEDNESDAY, AND I WAS -- NOW I WAS -- BEFORE TODAY I
17:45:52  19   THOUGHT TUESDAY WAS IT.
17:45:53  20           THE COURT:  IT MAY BE WEDNESDAY OR THURSDAY NOW?
17:45:55  21           MR. TREEBY:  YEAH, RIGHT.
17:45:56  22           THE COURT:  OKAY.  I GOT IT.  I'M SORRY.
17:45:58  23           MR. SMITH:  WE'RE JUST CONCERNED, THAT'S ALL.  WE
17:46:00  24   DON'T WANT YOUR HONOR TO BE UPSET WITH US.
17:46:03  25           THE COURT:  OH, NO, NO, NO, NO.  NO, NO.  BUT, NO,
```

17:46:04   1   IT'S NOT YOUR FAULT.  AND I'M GOING TO BE HERE TO HEAR THE END

17:46:07   2   OF THE CASE.

17:46:07   3              AND I REALLY THINK IT'S IMPORTANT THAT EVERYBODY

17:46:11   4   GET AS MUCH WITHIN THE TIME WE'VE ALLOTTED.  THAT'S WHY I

17:46:16   5   HAVEN'T -- I HAVEN'T SAID "MOVE ALONG" LIKE I WOULD NORMALLY

17:46:21   6   DO, BECAUSE I'VE RESTRICTED YOU ALREADY.

17:46:23   7              SO I'M KIND OF LETTING EVERYBODY TRY THEIR CASE

17:46:26   8   THE WAY THEY WANT IN THEIR 60 HOURS.  SOMETIMES I'VE GOTTEN A

17:46:30   9   POINT AND SOMETIMES I HAVEN'T.

17:46:34   10             SO, NO, I THINK YOU'RE -- THAT'S FINE.  DO NOT

17:46:36   11  BE CONCERNED ABOUT THAT.

17:46:38   12         **MR. SMITH:**  THANK YOU, YOUR HONOR.

17:46:38   13         **THE COURT:**  AND I'M GOING TO TRY TO COME UP WITH A

17:46:41   14  GOOD PROTOCOL FOR BRIEFING SO AT LEAST THAT I CAN TELL YOU THE

17:46:47   15  THINGS THAT I'M GOING TO BE -- OBVIOUSLY, YOU KNOW --

17:46:50   16  OBVIOUSLY, YOU KNOW, IMMUNITY AND ALL OF THOSE ISSUES.  BUT I'M

17:46:54   17  TALKING ABOUT THE CAUSATION ISSUES.

17:46:57   18         **MR. SMITH:**  THE MERITS, THE FACTS.

17:46:58   19         **THE COURT:**  YEAH, RIGHT.  THE FACTS, THAT I KIND OF

17:46:59   20  LIKE -- THE WAY -- I CAN TELL YOU WHAT I WOULD LIKE TO SEE.

17:47:01   21  I'M NOT GOING TO ORDER YOU TO DO THAT, BUT WHAT I'D LIKE TO

17:47:04   22  SEE.

17:47:04   23         **MR. SMITH:**  WE WANT TO GIVE YOU WHAT YOU WANT TO SEE.

17:47:07   24         **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.

17:47:09   25         **MR. BRUNO:**  THANK YOU, JUDGE.

```
17:47:10   1              THE COURT:  ALL RIGHT.  HAVE A GOOD THURSDAY EVENING.

17:47:14   2              THE DEPUTY CLERK:  ALL RISE.

17:47:20   3              (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

17:47:20   4                              *****

17:47:20   5                           CERTIFICATE

17:47:20   6              I, JODI SIMCOX, RMR, FCRR, OFFICIAL COURT REPORTER

17:47:20   7   FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF

17:47:20   8   LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

17:47:20   9   CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND

17:47:20  10   UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE

17:47:20  11   ABOVE-ENTITLED AND NUMBERED MATTER.

17:47:20  12
17:47:20
17:47:20  13
17:47:20
17:47:20  14                      S/ JODI SIMCOX, RMR, FCRR
17:47:20                             JODI SIMCOX, RMR, FCRR
17:47:20  15                          OFFICIAL COURT REPORTER

13:59:56  16

13:29:56  17

          18

          19

          20

          21

          22

          23

          24

          25
```

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA