1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  KATRINA CANAL BREACHES*   CIVIL ACTION
    CONSOLIDATED LITIGATION        *
6                                  *   NO. 05-4182
                                   *
7                                  *   SECTION K(2)
    PERTAINS TO:  MRGO             *
8   ARMSTRONG NO. 10-CV-866        *   NEW ORLEANS, LOUISIANA
                                   *
9                                  *   SEPTEMBER 28, 2012
    * * * * * * * * * * * * * * * * *

10                  DAY THIRTEEN, AFTERNOON SESSION
11                     BENCH TRIAL BEFORE THE
                  HONORABLE STANWOOD R. DUVAL, JR.
12                  UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14
    FOR THE PLAINTIFFS:           BRUNO & BRUNO
15                                BY: JOSEPH M. BRUNO, ESQ.
                                  855 BARONNE STREET
16                                NEW ORLEANS, LOUISIANA 70113

17

18                                THE ANDRY LAW FIRM
                                  BY: JONATHAN B. ANDRY, ESQ.
19                                610 BARONNE ST.
                                  NEW ORLEANS, LOUISIANA 70113
20

21                                BARON & BUDD
                                  BY: THOMAS SIMS, ESQ.
22                                3102 OAK LAWN AVE.
                                  SUITE 1100
23                                DALLAS, TEXAS 75219

24

25

                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA

1    APPEARANCES CONTINUED:

2    FOR THE PLAINTIFFS:              DEGRAVELLES, PALMINTIER,
                                        HOLTHAUS & FRUGE
3                                    BY: MICHAEL C. PALMINTIER, ESQ.
                                     BY:  JOSHUA M. PALMINTIER, ESQ.
4                                    618 MAIN STREET
                                     BATON ROUGE, LOUISIANA 70801
5

6
                                     DOMENGEAUX, WRIGHT, ROY & EDWARDS
7                                    BY: ELLWOOD C. STEVENS, JR., ESQ.
                                     BY: BONNIE KENDRICK, ESQ.
8                                    P. O. BOX 3668
                                     556 JEFFERSON ST.
9                                    LAFAYETTE, LOUISIANA 70502

10

11                                   THE DUDENHEFER LAW FIRM, LLC
                                     BY: FRANK DUDENHEFER, JR., ESQ.
12                                   601 POYDRAS ST.
                                     SUITE 2655
13                                   NEW ORLEANS, LOUISIANA 70130-6004

14

15                                   FAYARD & HONEYCUTT
                                     BY: CALVIN C. FAYARD, JR., ESQ.
16                                   519 FLORIDA AVE., S.W.
                                     DENHAM SPRINGS, LOUISIANA 70726
17

18
                                     JOANEN LAW FIRM
19                                   BY: SCOTT JOANEN, ESQ.
                                     4905 FRERET ST.
20                                   SUITE B
                                     NEW ORLEANS, LOUISIANA 70115
21

22
                                     LEVIN, PAPANTONIO, THOMAS,
23                                     MITCHELL, RAFFERTY & PROCTOR
                                     BY: MATTHEW D. SCHULTZ, ESQ.
24                                   316 S. BAYLEN ST.
                                     SUITE 600
25                                   PENSACOLA, FLORIDA 32502

3147

1   APPEARANCES CONTINUED:

2   FOR THE PLAINTIFFS:          THE TRIAL LAW FIRM PC
                                 BY: ANDREW P. OWEN, ESQ.
3                                800 WILTSHIRE BLVD.
                                 SUITE 500
4                                LOS ANGELES, CALIFORNIA 90017

5

6                                J. ROBERT WARREN, II, A PLC
                                 BY: J. ROBERT WARREN, II, ESQ.
7                                1718 SHORT ST.
                                 NEW ORLEANS, LOUISIANA 70118

8

9                                COTCHETT, PITRE & MCCARTHY, LLP
10                               BY: PHILIP L. GREGORY, ESQ.
                                 840 MALCOLM ROAD, SUITE 200
11                               BURLINGAME, CALIFORNIA 94010

12

13  FOR THE DEFENDANT WASHINGTON
    GROUP INTERNATIONAL, INC.:    STONE PIGMAN WALTHER WITTMANN
14                                BY:  WILLIAM D. TREEBY, ESQ.
                                  BY:  JAMES C. GULOTTA, JR., ESQ.
15                                BY:  HEATHER S. LONIAN, ESQ
                                  BY:  MAGGIE A. BROUSSARD, ESQ.
16                                546 CARONDELET STREET
                                  NEW ORLEANS, LOUISIANA 70130

17

18

19

20

21

22

23

24

25

1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT WASHINGTON
     GROUP INTERNATIONAL, INC.:      JONES DAY
3                                    BY:  ADRIAN WAGER-ZITO, ESQ.
                                     BY:  DEBRA S. CLAYMAN, ESQ.
4                                    BY:  CHRISTOPHER N. THATCH, ESQ.
                                     BY:  CHRISTOPHER R. FARRELL, ESQ.
5                                    BY:  JULIA CRONIN, ESQ.
                                     BY:  BRIAN KERWIN, ESQ.
6                                    51 LOUISIANA AVENUE, N.W.
                                     WASHINGTON, D.C. 20001
7

8

9    FOR THE DEFENDANT UNITED
     STATES OF AMERICA:              U.S. DEPARTMENT OF JUSTICE
10                                   CIVIL DIVISION, TORTS BRANCH
                                     BY:  ROBIN D. SMITH, ESQ.
11                                   BY:  JAMES F. MCCONNON, JR., ESQ.
                                     BY:  RUPERT MITSCH, ESQ.
12                                   BY:  CONOR KELLS, ESQ.
                                     BY:  JOHN A. WOODCOCK, ESQ.
13                                   BENJAMIN FRANKLIN STATION
                                     P.O. BOX 888
14                                   WASHINGTON, D.C. 20044

15

16
     OFFICIAL COURT REPORTER:        JODI SIMCOX, RMR, FCRR
17                                   500 POYDRAS STREET
                                     ROOM HB-406
18                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7780
19                                   JODI_SIMCOX@LAED.USCOURTS.GOV

20

21   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

22   PRODUCED BY COMPUTER.

23

24

25

1                          <u>I N D E X</u>

2                                                    <u>PAGE</u>

3

   THOMAS LYLE BRANDON
4       DIRECT EXAMINATION BY MR. SMITH:            3151
        CROSS-EXAMINATION BY MR. JOANEN:            3232
5       REDIRECT EXAMINATION BY MR. SMITH:          3265

6  JAMES R. DANNER, JR.
        DIRECT EXAMINATION BY MR. GULOTTA:          3293
7       VOIR DIRE BY MR. PALMINTIER:                3303
        DIRECT EXAMINATION BY MR. GULOTTA:          3311
8       CROSS-EXAMINATION BY MR. PALMINTIER:        3369

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:49:24 | 1 | **AFTERNOON SESSION** |
| 12:49:24 | 2 | **(SEPTEMBER 28, 2012)** |
| 12:49:24 | 3 | * * * * * |
| 12:49:26 | 4 | **THE DEPUTY CLERK:**  ALL RISE. |
| 13:02:46 | 5 | COURT'S IN SESSION.  PLEASE BE SEATED. |
| 13:02:49 | 6 | **THE COURT:**  YES, SIR. |
| 13:02:50 | 7 | **MR. SMITH:**  THANK YOU, YOUR HONOR.  I PREVIOUSLY |
| 13:02:50 | 8 | ANNOUNCED THAT DR. BRANDON WOULD BE OUR NEXT WITNESS, AND HE |
| 13:02:55 | 9 | HAS NOT BEEN SWORN YET. |
| 13:02:58 | 10 | (WHEREUPON, **THOMAS LYLE BRANDON**, HAVING BEEN DULY |
| 13:02:58 | 11 | SWORN, TESTIFIED AS FOLLOWS.) |
| 13:02:59 | 12 | **THE DEPUTY CLERK:**  PLEASE STATE YOUR FULL NAME AND |
| 13:02:59 | 13 | CORRECT SPELLING FOR THE RECORD. |
| 13:03:10 | 14 | **THE WITNESS:**  THOMAS LYLE BRANDON, T-H-O-M-A-S, |
| 13:03:14 | 15 | L-Y-L-E, B-R-A-N-D-O-N. |
| 13:03:22 | 16 | **THE COURT:**  YOU MAY PROCEED, SIR. |
| 13:03:23 | 17 | **MR. SMITH:**  YOUR HONOR, THIS IS DR. THOMAS L. |
| 13:03:26 | 18 | BRANDON.  HE IS THE DIRECTOR OF THE W.C. ENGLISH GEOTECHNICAL |
| 13:03:28 | 19 | ENGINEERING RESEARCH LABORATORY AND AN ASSISTANT ASSOCIATE |
| 13:03:35 | 20 | PROFESSOR OF CIVIL AND ENVIRONMENTAL ENGINEERING AT THE |
| 13:03:38 | 21 | VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY COMMONLY |
| 13:03:42 | 22 | KNOWN AS VIRGINIA TECH. |
| 13:03:45 | 23 | DR. BRANDON IS WELL QUALIFIED TO TESTIFY IN THIS |
| 13:03:47 | 24 | COURT.  FOR NEARLY THREE DECADES, HE HAS TAUGHT SEEPAGE AND |
| 13:03:53 | 25 | SLOPE STABILITY ANALYSIS AT VIRGINIA TECH. |

13:03:55  1                DURING THIS SAME PERIOD, HE HAS CONSULTED ON

13:03:58  2   MORE THAN A SCORE OF DAM AND LEVEE PROJECTS IN NORTH AND SOUTH

13:04:01  3   AMERICA AND ASIA AS WELL.  BECAUSE OF HIS EXPERTISE IN THE AREA

13:04:06  4   OF SEEPAGE AND SLOPE STABILITY, HE WAS SELECTED TO PERFORM

13:04:10  5   SLOPE STABILITY ANALYSES FOR THE IPET INVESTIGATION.  AND AT

13:04:13  6   THIS TIME, SINCE THEN AND TO THE PRESENT DAY, THE ARMY CORPS OF

13:04:17  7   ENGINEERS REGULARLY CALLS ON HIM TO PERFORM LEVEE AND FLOODWALL

13:04:20  8   ASSESSMENTS.

13:04:24  9                CURRENTLY, HE IS ADVISING IN THE CORPS' REVISION

13:04:27  10  OF PROCEDURES FOR ANALYZING AND DESIGNING I-WALLS.  DR. BRANDON

13:04:32  11  IS A PROFESSIONAL ENGINEER LICENSED BY THE COMMONWEALTH OF

13:04:36  12  VIRGINIA.

13:04:38  13                NEXT YEAR, AT THE ASCE'S PLENARY GATHERING OF

13:04:44  14  GEOTECHNICAL SPECIALISTS, DR. BRANDON WILL PRESENT HIS VIEWS ON

13:04:48  15  SHEAR STRENGTH FOR SLOPE STABILITY AS A KEYNOTE SPEAKER AT THE

13:04:53  16  GEO-CONGRESS FOR 2013.

13:04:54  17                        **DIRECT EXAMINATION**

13:04:57  18  **BY MR. SMITH:**

13:04:57  19  **Q.**   DR. BRANDON, DOES THAT ACCURATELY SUMMARIZE YOUR

13:05:00  20  QUALIFICATIONS AND EXPERIENCE?

13:05:01  21  **A.**   YES, IT DOES.

13:05:02  22            **MR. SMITH:**  AT THIS TIME, THEN, YOUR HONOR, THE

13:05:04  23  UNITED STATES WOULD TENDER DR. BRANDON AS AN EXPERT IN

13:05:08  24  GEOTECHNICAL ENGINEERING, AND WE WOULD ALSO MOVE HIS CURRICULUM

13:05:11  25  VITAE INTO EVIDENCE, WHICH IS JX-1835.

13:05:16   1          **THE COURT:**  YES, SIR.

13:05:16   2          **MR. JOANEN:**  YOUR HONOR, WE HAVE NO OBJECTION TO THE

13:05:19   3   INTRODUCTION OF HIS CURRICULUM VITAE, NOR DO WE HAVE ANY

13:05:22   4   OBJECTION TO DR. BRANDON BEING DESIGNATED AS A GEOTECHNICAL

13:05:27   5   ENGINEER AND AUTHORIZED TO GIVE OPINIONS IN THIS CASE.

13:05:29   6          I DO HAVE OBJECTIONS REGARDING A NUMBER OF HIS

13:05:31   7   SLIDES.  IN PARTICULAR, THIS IS GOING TO BE SLIDES 33 THROUGH

13:05:34   8   77.  AND I WAS CURIOUS TO KNOW IF THE COURT WOULD LET ME TAKE

13:05:39   9   THAT UP NOW AND ALLOW US TO GET THROUGH IT OR IF YOU'D LIKE ME

13:05:42  10   TO DO IT WHEN HE GETS TO SLIDE 33.

13:05:46  11          **THE COURT:**  WELL, WHY DON'T WE TAKE IT UP NOW.

13:05:49  12          **MR. JOANEN:**  YES, YOUR HONOR.  DR. BRANDON, IN HIS

13:05:50  13   REPORT, ONLY MENTIONS DR. BEA THREE TIMES.

13:05:53  14          ON PAGE 1 HE INDICATES THAT HE GIVES SPECIAL

13:05:56  15   ATTENTION TO DR. BEA'S REPORT AND APPENDICES.

13:06:00  16          ON PAGE 9 HE INDICATES THAT WHEN HE'S -- WHEN

13:06:02  17   DR. BRANDON IS TALKING ABOUT SITE CONDITIONS, HE CITES TO

13:06:05  18   DR. BEA'S VALUE OF PERMEABILITY.  AND BASICALLY AS A TRANSITION

13:06:08  19   HE SAYS, "I'M GOING TO TALK NOW ABOUT SITE CONDITIONS."  HE

13:06:14  20   MENTIONS THAT DR. BEA'S POSITION IS THIS, AND THEN DR. BRANDON

13:06:18  21   PRESENTS HIS OWN POSITION.

13:06:20  22          SIMILARLY, ON PAGES 19 AND 22, WHEN DR. BRANDON

13:06:23  23   TALKS ABOUT HIS METHOD OF ANALYSIS, HE MENTIONS THAT DR. BEA

13:06:27  24   DESIGNED DRAINED STRENGTH PARAMETERS VERSUS UNDRAINED, WHICH IS

13:06:31  25   WHAT DR. BRANDON OPINED IS THE APPROPRIATE CONSIDERATION.

13:06:34    1              AND THEN AT THE END, ON PAGE 44 OF HIS

13:06:36    2   CONCLUSION, HE JUST KIND OF BRINGS THOSE TWO PARTS TOGETHER AND

13:06:39    3   SAYS, THIS IS WHAT DR. BEA HAS SAID.  AND SO FOR THE SLIDES

13:06:44    4   LEADING UP THROUGH 32, THOSE ALL DEAL, AS I UNDERSTAND IT, WITH

13:06:47    5   HIS REPORT.

13:06:48    6              NOW, 33 THROUGH 77 ARE ALL CRITIQUES OF DR. BEA,

13:06:52    7   WHICH DR. BRANDON REALLY DID NOT DO IN HIS -- IN HIS REPORT.

13:06:57    8   SO I THINK THAT HIS CRITIQUES OF 33 -- SLIDES 33 THROUGH 37 ARE

13:07:02    9   OUTSIDE THE SCOPE OF HIS REPORT, PURSUANT TO RULE 26.

13:07:06   10              IN CONJUNCTION WITH THAT, WE ALSO HAVE PENDING A

13:07:09   11   MOTION IN LIMINE WHICH INDICATES -- WHICH WE'VE ASKED THE COURT

13:07:14   12   TO PRECLUDE CERTAIN WITNESSES FROM GIVING CUMULATIVE EVIDENCE

13:07:18   13   ABOUT THE SAME TOPICS AND --

13:07:18   14         **THE COURT:**  IT SHOULDN'T BE PENDING.  I HOPE I RULED

13:07:21   15   ON IT.

13:07:26   16         **MR. JOANEN:**  OKAY.

13:07:26   17         **THE COURT:**  I DON'T REMEMBER.  BUT I KNOW I DIDN'T

13:07:27   18   GRANT IT, PER SE, BUT I CAN FIND IT.

13:07:31   19         **MR. JOANEN:**  NO, YOUR HONOR, I'LL TAKE YOUR WORD ON

13:07:32   20   THAT.

13:07:33   21              WE WOULD REURGE BASED UPON NOW THE SLIDES THAT

13:07:35   22   HAVE BEEN PRESENTED BY DR. BRANDON.  AND I HAVE -- MY

13:07:39   23   COLLEAGUE, MR. ANDY OWEN, HAS PUT THINGS A LITTLE -- MY LITTLE

13:07:44   24   CHEAT SHEET, I'M GLAD TO SHOW HOW DR. BRANDON'S SLIDES ARE, IF

13:07:50   25   NOT IDENTICAL, ON THE SAME TOPICS THAT DR. MARR TESTIFIED TO.

13:07:53   1  AND I CAN PROVIDE COPIES TO THE COURT AND OTHER SIDE.  I'M

13:07:57   2  GOING TO JUST EXPLAIN WHY I THINK THOSE PARTICULAR SLIDES ARE

13:07:59   3  DUPLICATIVE.  AND I'LL PROVIDE TWO COPIES TO THE COURT --

13:08:04   4           **MR. SMITH:**  YOUR HONOR, THAT MOTION WAS ALREADY

13:08:06   5  DENIED.

13:08:06   6           **THE COURT:**  THAT'S WHAT I RECALL.  I DON'T KNOW IF I

13:08:11   7  HAD ANY CAVEAT.  I DON'T REMEMBER THE EXACT WORDS, BUT I DON'T

13:08:14   8  THINK -- I DON'T THINK THERE WAS A CAVEAT.  I THINK I --

13:08:18   9           **MR. SMITH:**  YEAH.  YOU SAID WE HAVE OUR TIME, WE CAN

13:08:21  10  USE IT AS WE WISH, AND WE PROMISED YOU WE WOULDN'T WASTE THE

13:08:24  11  COURT'S TIME, YOUR HONOR.  THIS IS --

13:08:26  12           **THE COURT:**  I THINK THAT'S WHAT MY RULING WAS.  I

13:08:27  13  KNOW THAT I DID NOT GRANT THE MOTION IN LIMINE.  I'M NOT SURE

13:08:30  14  IF I PUT ANY -- I HAVE THEM HERE.  LET ME BE CAUTIOUS AND LET

13:08:34  15  ME FIND IT.  OKAY.

13:08:35  16                      **(OFF THE RECORD)**

13:10:01  17           **MR. JOANEN:**  YOUR HONOR, FOR THE RECORD, I COULD DRAW

13:10:03  18  YOUR ATTENTION TO THE DOCUMENT NUMBER.

13:10:05  19           **THE COURT:**  WELL, LET ME -- LET ME . . .

13:10:10  20           I'M SORRY TO TAKE UP YOUR TIME WITH THIS.  THIS

13:10:13  21  IS SUPPOSED TO BE ORGANIZED.

13:10:14  22           **MR. JOANEN:**  I HAVE A COPY RIGHT HERE, YOUR HONOR.  I

13:10:16  23  COULD PROVIDE IT TO THE COURT.

13:10:17  24           **THE COURT:**  ALL RIGHT.

13:10:20  25           **MR. JOANEN:**  UNFORTUNATELY, IT'S THE NO. 2 -- IT'S ON

13:10:24   1   PAGE 1 AND 2 OF THE DOCUMENT.

13:10:26   2           **THE COURT:**  DO WE HAVE --

13:10:26   3           **MR. JOANEN:**  AND IN LOOKING AT IT, YOUR HONOR, I READ

13:10:28   4   IT AND I THINK WE READ IT AS THE COURT DENIES THE MOTION;

13:10:32   5   HOWEVER, IF THINGS APPEAR TO BE DUPLICATIVE AND CUMULATIVE,

13:10:38   6   PLAINTIFFS COULD REURGE THEIR OBJECTION, AND THAT'S WHERE WE'RE

13:10:41   7   COMING TO NOW.

13:10:42   8           CLEARLY, AS I STATED, WE DIDN'T THINK THAT

13:10:45   9   DR. BRANDON WAS ATTACKING DR. BEA AS MUCH.  NOW, WITH THE

13:10:48  10   SLIDES THAT WERE PRODUCED JUST IN THE LAST COUPLE OF DAYS . . .

13:11:42  11           **THE COURT:**  SORRY WE'RE TAKING SO MUCH TIME.

13:11:42  12           WE THOUGHT WE WERE ORGANIZED, BUT . . .

13:11:42  13           HERE IT IS, RIGHT HERE.  I DENIED THE MOTION.  I

13:11:43  14   SAID THE:  "THE COURT HAS PREVIOUSLY IMPOSED TIME LIMITS THAT

13:11:44  15   WILL BE STRICTLY ENFORCED ON ALL PARTIES.  MOREOVER, DURING THE

13:11:46  16   TRIAL, THE COURT WILL CONTROL TESTIMONY ONLY IF IT BECOMES

13:11:50  17   UNNECESSARILY CUMULATIVE AND PLAINTIFF MAY OBJECT AT THAT TIME,

13:11:52  18   IF THE TESTIMONY IS TRULY DUPLICATIVE AND NOT COMPLIMENTARY."

13:11:58  19           I SAID A FEW OTHER THINGS, BUT DON'T SQUANDER

13:12:00  20   YOUR TIME.

13:12:02  21           SO I REALLY HAVE NO WAY OF DOING THAT UNTIL WE

13:12:04  22   GET INTO IT, FRANKLY.

13:12:06  23           **MR. JOANEN:**  YESTERDAY, I'LL BE GLAD TO --

13:12:08  24           **THE COURT:**  BUT ON THE FIRST ISSUE, IF IT'S BEYOND

13:12:11  25   THE SCOPE OF -- LET'S STICK TO ONE THING AT A TIME.  YOU HAVE

13:12:14   1   URGED THAT SOME OF THE CRITICISMS OF DR. BEA ARE NOT IN HIS

13:12:21   2   REPORT.

13:12:21   3            **MR. JOANEN:**  YES, SIR, YOUR HONOR.

13:12:23   4            **THE COURT:**  AND YOU SAY THAT'S IN PARTICULAR

13:12:25   5   SLIDES 33 THROUGH 7 --

13:12:29   6            **MR. JOANEN:**  77.  YES, YOUR HONOR.

13:12:31   7            **THE COURT:**  77.  OKAY.  I HAVE NOT, OBVIOUSLY, LOOKED

13:12:32   8   AT THE SLIDES.  THESE ARE ONE REASON I HAVE MOTIONS IN LIMINE

13:12:37   9   AND DAUBERT HEARINGS, ET CETERA, AND ONE REASON THESE TRIALS

13:12:40  10   TAKE LONGER, BUT THAT'S THE NATURE OF THE BEAST.

13:12:45  11            SO, MR. SMITH, IF YOU COULD --

13:12:47  12            **MR. SMITH:**  YES, YOUR HONOR.

13:12:48  13            **THE COURT:**  I THINK IT'S PROBABLY BETTER TO TAKE IT

13:12:49  14   UP NOW, JUST TO --

13:12:54  15            **MR. SMITH:**  WELL, YOUR HONOR, YES.  I'M A LITTLE BIT

13:12:55  16   PUZZLED, FRANKLY, BY THE NOTION THAT HE'S ONLY MENTIONED

13:12:59  17   DR. BEA THREE TIMES IN HIS REPORT.

13:13:01  18            BECAUSE HE MAY HAVE ONLY MENTIONED DR. BEA AS A

13:13:03  19   PERSON THREE TIMES IN HIS REPORT.  HIS REPORT IS SUFFUSED WITH

13:13:07  20   CRITICISMS OF DR. BEA'S REPORT AND PARTICULARLY HOW

13:13:11  21   DR. BRANDON'S ANALYSIS DIFFERS FROM DR. BEA'S ANALYSIS.  AND

13:13:15  22   WHAT WE HAVE PREPARED FOR THE COURT IN DR. BRANDON'S TESTIMONY

13:13:19  23   ARE A NUMBER OF ILLUSTRATIONS OF PLACES WHERE DR. BEA'S

13:13:23  24   STABILITY AND SEEPAGE ANALYSES ARE FLAWED.

13:13:28  25            THOSE FLAWS -- SOME OF THEM, NOT ALL OF THEM --

| | | |
|---|---|---|
| 13:13:32 | 1 | ARE IN DR. BRANDON'S REPORT.  WE COULDN'T POSSIBLY HAVE |
| 13:13:35 | 2 | INCLUDED EVERY -- |
| 13:13:36 | 3 | **THE COURT:**  I'M GOING TO SAY IT'S WITHIN THE SCOPE OF |
| 13:13:38 | 4 | HIS REPORT.  AND BY THE WAY, I'M GOING TO LET YOU KNOW DR. BEA |
| 13:13:40 | 5 | WILL BE ALLOWED TO TESTIFY ON REBUTTAL.  THERE IS NO QUESTION |
| 13:13:45 | 6 | THAT HE'S GOING TO BE ABLE TO TESTIFY ON REBUTTAL. |
| 13:13:47 | 7 | **MR. SMITH:**  THANK YOU, YOUR HONOR. |
| 13:13:48 | 8 | **THE COURT:**  SO -- BUT I'M GOING TO ALLOW THESE IN ON |
| 13:13:50 | 9 | THE BASIC GROUND THEY'RE WITHIN THE AMBIT OF THE REPORT. |
| 13:13:55 | 10 | **MR. SMITH:**  THANK YOU, YOUR HONOR. |
| 13:13:56 | 11 | WE HAVE A TENDER IN DR. BRANDON'S -- I DON'T |
| 13:13:59 | 12 | KNOW IF YOUR HONOR'S RULED YET. |
| 13:14:01 | 13 | **THE COURT:**  NO, I HAVEN'T. |
| 13:14:03 | 14 | I WILL CERTAINLY ACCEPT, AS DOES COUNSEL FOR THE |
| 13:14:05 | 15 | PLAINTIFF -- |
| 13:14:05 | 16 | **MR. JOANEN:**  YES, YOUR HONOR. |
| 13:14:07 | 17 | **THE COURT:**  -- DR. BRANDON AS AN EXPERT IN |
| 13:14:08 | 18 | GEOTECHNICAL ENGINEERING. |
| 13:14:09 | 19 | **MR. SMITH:**  THANK YOU, YOUR HONOR. |
| 13:14:10 | 20 | DR. BRANDON, LIKE OUR OTHER EXPERTS, HAS |
| 13:14:14 | 21 | PREPARED A SUMMARY OF HIS OPINIONS, AND MR. JOANEN HAS ALLUDED |
| 13:14:21 | 22 | TO THAT.  SO WITH YOUR HONOR'S PERMISSION, HE WILL PROCEED AT |
| 13:14:24 | 23 | THIS TIME. |
| 13:14:24 | 24 | **THE COURT:**  YES.  AND ON THE REBUTTAL ISSUE, THE |
| 13:14:27 | 25 | COURT WANTS TO BE AS EMINENTLY FAIR AS IT IS CAPABLE OF TO BOTH |

13:14:32   1   SIDES.  AND I THINK THIS IS FAIR FOR THE DEFENSE TO GET THESE

13:14:35   2   IN UNDER THE CIRCUMSTANCES, ESPECIALLY IN LIGHT OF DR. BEA'S

13:14:41   3   ABILITY TO COME IN AND REBUT, SUBJECT TO WHATEVER OBJECTIONS

13:14:44   4   WOULD BE URGED DURING HIS REBUTTAL.

13:14:47   5            **MR. JOANEN:**  THANK YOU, YOUR HONOR.

13:14:47   6            **THE COURT:**  I'M NOT GIVING HIM CARTE BLANCHE, BUT

13:14:52   7   WE'LL SEE HOW IT PLAYS IN PEORIA.

13:14:56   8            **MR. SMITH:**  THANK YOU, YOUR HONOR.

13:14:57   9            AND I KNOW YOU WILL, YOUR HONOR, BUT I TOLD

13:14:59  10   DR. BRANDON, IF YOU HAVE QUESTIONS, HE CAN EXPECT YOU TO

13:15:03  11   INTERRUPT HIM AT ANY TIME.

13:15:05  12            **THE COURT:**  THANK YOU, COUNSEL.

13:15:06  13            AND, FRANKLY, I HAVE BENEFITED FROM THIS TYPE OF

13:15:09  14   PRESENTATION.  I HOPE.  I THINK I HAVE.

13:15:15  15            GO AHEAD, SIR.

13:15:19  16            **THE WITNESS:**  I WOULD LIKE TO START BY GIVING A

13:15:21  17   SUMMARY OF MY MAIN POINTS, AND THEN I'LL GO ON TO GIVE MORE

13:15:25  18   DETAILS.

13:15:27  19            BUT BASED ON MY ANALYSES, I THINK THE NORTH AND

13:15:29  20   THE SOUTH FAILURES CAN BE ASSESSED USING CONVENTIONAL THEORIES

13:15:35  21   OF SOIL MECHANICS.  I DON'T THINK ANY NEW THEORIES NEED TO BE

13:15:37  22   DEVELOPED TO ADDRESS THE BEHAVIOR.

13:15:39  23            IN MY OPINION, THE NORTH WALL PERFORMANCE IS

13:15:43  24   CONSISTENT WITH A SLOPE STABILITY OR SHEAR FAILURE OCCURRING

13:15:47  25   PRIOR TO THE WATER HITTING THE TOP OF THE WALL.

13:15:49  1        THE SOUTH WALL FAILED AFTER OVERTOPPING, BASED

13:15:53  2  ON MY ANALYSIS, BECAUSE THE FACTOR OF SAFETY, OWING TO THE

13:15:59  3  SHEAR STRENGTH, WAS MUCH HIGHER THAN 1.2 AT THE TIME WATER WAS

13:16:03  4  AT THE TOP OF THE WALL.

13:16:04  5        AND THESE FAILURES, BOTH THE NORTH AND THE SOUTH

13:16:06  6  BREACH, WERE NOT CAUSED BY UNDERSEEPAGE, EROSION, PIPING OR

13:16:11  7  HEAVE.  AND IN MY OPINION, ACTIVITIES ON THE CANAL SIDE OF WALL

13:16:15  8  DID NOT CONTRIBUTE TO THE FAILURE.

13:16:17  9        **THE COURT:**  OKAY.

13:16:18  10        **THE WITNESS:**  NOW, THERE'S TWO MAJOR CATEGORIES OF

13:16:21  11  ANALYSES DONE WHEN WE'RE ANALYZING LEVEES AND I-WALLS.  AND

13:16:26  12  THERE'S A LOT OF SUBSETS OF THESE ANALYSIS, BUT THE TWO MAJOR

13:16:30  13  CATEGORIES ARE SEEPAGE AND SLOPE STABILITY.  AND TO THE RIGHT

13:16:33  14  OF THIS, I'VE GOT -- I GUESS YOU WOULD CALL THEM FAILURE MODES

13:16:38  15  THAT OCCUR WITH THESE ANALYSES.  AND WE DO SEEPAGE ANALYSES FOR

13:16:41  16  FAILURE MODES LIKE EROSION, HEAVE, PIPING AND BLOWOUT.

13:16:47  17        ON SLOPE STABILITY ANALYSES, IT'S BEEN CALLED IN

13:16:50  18  THIS TRIAL DIFFERENT THINGS:  LATERAL STABILITY, SHEAR

13:16:54  19  STABILITY, TRANSLATIONAL STABILITY.  BUT THOSE HAVE TO DO WITH

13:16:58  20  THE SHEAR STRENGTH OF THE SOIL.  BUT THESE ANALYSES NORMALLY

13:17:01  21  DON'T STAND COMPLETELY ALONE AND THAT SEEPAGE ANALYSES IN SOME

13:17:05  22  CASES FEED INTO SLOPE STABILITY ANALYSES.

13:17:10  23        TO GIVE YOU JUST A QUICK DESCRIPTION OF WHAT

13:17:14  24  THESE ARE, IF WE LOOK AT A SEEPAGE-RELATED ANALYSES LIKE

13:17:20  25  EROSION, HEAVE, PIPING AND BLOWOUT, THE CLASSIC SOLUTION WOULD

13:17:24    1   BE IF WE HAVE A SAND LAYER, AND THAT SAND LAYER ALLOWS UPLIFT

13:17:30    2   PRESSURES TO DEVELOP ON THE BASE OF THIS CLAY LAYER.  THE CLAY

13:17:35    3   LAYER IS MUCH LESS PERVIOUS.

13:17:37    4                  AND WHAT HAPPENS IS, ASSUMING YOU HAVE ADEQUATE

13:17:40    5   FLOW, THE CLAY LAYER WILL ACTUALLY HEAVE UPWARD.  AND THEN

13:17:44    6   SOILS DON'T TAKE TENSION VERY WELL, AND THIS UPWARD HEAVE

13:17:48    7   NORMALLY CAN CAUSE FISSURES TO OCCUR WITHIN THE CLAY TOP

13:17:53    8   STRAND.

13:17:53    9                  AND WITH ENOUGH FLOW, YOU CAN ERODE OR PIPE THE

13:17:57   10   SAND THROUGH THESE FISSURES TO BE DEPOSITED ON THE GROUND

13:18:00   11   SURFACE.  AND THAT'S WHERE WE GET THE TERM OF SAND BOILS OR

13:18:04   12   SAND VOLCANOS.  IT'S A PHYSICAL MANIFESTATION OF A SEEPAGE

13:18:09   13   ISSUE.

13:18:13   14                  SLOPE STABILITY ISSUE, WITH A SIMILAR CROSS

13:18:14   15   SECTION HERE, HAS TO DO WITH FAILURE NORMALLY ON SOME CURVED

13:18:20   16   PLANE WHERE WE DEAL WITH THE SHEAR STRENGTH OF THE SOIL ON THAT

13:18:24   17   PLANE.  AND YOU DO GET TRANSLATION ON THAT PLANE.  BUT THE WAY

13:18:33   18   THAT THE FAILURE LOOKS CAN VARY ACCORDING TO SOIL TYPES AND

13:18:35   19   LOADING AND OTHER THINGS.

13:18:36   20                  WHAT I SHOW IN THIS LITTLE CARTOON IS SORT OF A

13:18:39   21   ROTATIONAL FAILURE.

13:18:40   22                  BUT, YOU KNOW, IT'S POSSIBLE FOR THE SHEET PILE

13:18:43   23   TO DEFLECT IN THE OTHER DIRECTION.  IT'S POSSIBLE TO HAVE JUST

13:18:47   24   A LINEAR MOTION OF THE MATERIALS.

13:18:49   25                  BUT I GUESS THE KEY POINTS ARE YOU HAVE MOVEMENT

13:18:53    1    OR TRANSLATION OF THE SOIL DUE TO SHEAR FAILURE ON A GIVEN

13:18:59    2    CIRCULAR OR NON-CIRCULAR SURFACE.

13:19:02    3             NOW, THESE ARE THE MAJOR CATEGORIES OF ANALYSES.

13:19:06    4    AND WHAT ANALYSES CONTROL, SOMETIMES IT'S AS SIMPLE AS WHETHER

13:19:12    5    OR NOT WE HAVE A SAND OR A CLAY.  IN GEOTECHNICAL ENGINEERING,

13:19:16    6    WE TREAT THESE MATERIALS COMPLETELY DIFFERENT.

13:19:19    7             SANDS HAVE LARGE GRAINS, AT LEAST RELATIVE TO

13:19:22    8    CLAYS, AND THEY HAVE LARGE PORES.  AND THESE LARGE PORES ALLOW

13:19:27    9    THE WATER TO FLOW VERY EASILY THROUGH THE MATERIAL.

13:19:31   10             CLAYS ARE VERY, VERY SMALL PARTICLES.  IT -- THE

13:19:35   11    LARGEST CLAY PARTICLE IS ABOUT A 50TH OF THE DIAMETER OF THE

13:19:45   12    HUMAN HAIR.  AND ASSOCIATED WITH THESE VERY SMALL PARTICLES YOU

13:19:48   13    HAVE SMALL PORES, AND IT'S VERY DIFFICULT FOR WATER TO FLOW

13:19:51   14    THROUGH CLAYS.  WE CONSIDER THESE TO BE A PRACTICALLY

13:19:54   15    IMPERVIOUS MATERIAL.

13:19:56   16             SO SANDS WE CONSIDER TO BE PERVIOUS; CLAYS IS

13:19:59   17    PRACTICALLY IMPERVIOUS.

13:20:02   18             AND THE TYPE OF ANALYSIS WE OFTEN DO IS BASED ON

13:20:04   19    IF WE HAVE SAND OR CLAY.  MR. SMITH USED MY SLIDE HERE THAT

13:20:09   20    SHOWS A FUNDAMENTAL DIFFERENCE ON THE WAY THAT WE TREAT SANDS

13:20:15   21    VERSUS CLAYS.  AND THIS ANALOGY OF THE SPRING-LOADED HYDRAULIC

13:20:19   22    CYLINDER IS ONE THAT'S FOUND IN ABOUT EVERY UNDERGRADUATE

13:20:23   23    TEXTBOOK OF GEOTECHNICAL ENGINEERING.

13:20:24   24             AND WHAT WE TRY TO MODEL HERE, IT'S A -- IT'S A

13:20:28   25    LITTLE COMPLICATED, AT LEAST IT WAS TO ME THE FIRST TIME I SAW

13:20:31    1   IT -- IS THAT THERE'S THE SOIL UP HERE, AND THIS MODEL IS

13:20:35    2   SUPPOSED TO BE A MECHANICAL ANALOGY OF THE SOIL THERE.

13:20:39    3                    AND SO FOR THE SAND, WE HAVE IT COMPLETELY

13:20:43    4   SATURATED AND WE HAVE PORE WATER, OR JUST PLAIN WATER, IN THE

13:20:47    5   PORES OF THE SAND AND ALSO IN THE CLAY.

13:20:51    6                    FOR THIS MODEL RIGHT HERE, THIS SPRING THAT

13:20:54    7   SUPPORTS THE PISTON, THAT SPRING IS SUPPOSED TO SIMULATE THE

13:20:59    8   SOIL SKELETON.  THE SOIL SKELETON CAN TAKE SOME STRESS, AND

13:21:03    9   THAT'S WHAT THE SPRING IS SUPPOSED TO SIMULATE.

13:21:05   10                    LIKEWISE, THE WATER IN HERE IS SUPPOSED TO

13:21:07   11   REPRESENT THE PORE WATER IN THE SAMPLE.

13:21:11   12                    I GUESS THE KEY ELEMENT IN THIS ANALOGY HERE IS

13:21:14   13   THIS OPENING THAT WE'VE GOT INTO THE BOTTOM OF THE PISTON.  THE

13:21:18   14   SAND, WHICH HAS LARGE PORES, ALLOWS EASY FLOW OF WATER, HAS A

13:21:24   15   BIG HOLE DRILLED IN THE SIDE OF THE CYLINDER.

13:21:27   16                    CLAYS, HAVING SUCH SMALL PORES, HAVE A VERY

13:21:30   17   SMALL HOLE DRILLED IN THE SIDE OF THE CYLINDER.

13:21:33   18                    NOW, WHEN IT COMES TO BEHAVIOR, WE'D LIKE TO SEE

13:21:35   19   WHAT HAPPENS WHEN WE APPLY STRESS TO THESE; IN PARTICULAR, YOU

13:21:38   20   KNOW, HOW THE PRESSURES INCREASE IN THIS WATER WITHIN THE PORES

13:21:42   21   OF THE MATERIALS AND HOW QUICK THIS PORE WATER PRESSURE IS

13:21:45   22   DISSIPATED.

13:21:47   23                    SO IF YOU WOULD LOOK AT THE SAND FIRST, YOU'LL

13:21:49   24   SEE IT COMPRESSES VERY QUICKLY.  BUT IT TAKES A WHILE FOR THE

13:21:53   25   CLAY HERE TO COMPRESS BECAUSE IT TAKES A WHILE FOR THE CLAY TO

3163

13:21:57  1   FLOW THROUGH THAT LITTLE HOLE, AND IT TAKES A WHILE FOR IT TO

13:22:00  2   DISSIPATE THESE PORE PRESSURES.

13:22:02  3            SO PART OF THIS HAS TO DO WITH THE WATER

13:22:05  4   PRESSURE FIRST INCREASING THE LOADS APPLIED AND THEN

13:22:08  5   DISSIPATING OR DECREASING OVER TIME.

13:22:10  6            AND BECAUSE OF THAT, WE HAVE A FUNDAMENTAL

13:22:14  7   DISTINCTION WE MAKE BETWEEN SANDS AND CLAYS.  SANDS, WE TALK

13:22:18  8   ABOUT THEM AS BEING DRAIN MATERIALS.  AND WE ASSIGN THEM DRAIN

13:22:23  9   STRENGTHS OR ALSO WHAT WE CALL EFFECTIVE STRESS STRENGTHS.

13:22:26  10  THOSE TERMS --

13:22:27  11           **THE COURT:**  OKAY.  I'M GOING TO ASK YOU REAL QUICKLY,

13:22:28  12  WHY ARE SANDS REFERRED TO AS DRAINED MATERIALS?  THAT'S AT ALL

13:22:33  13  TIMES?

13:22:33  14           **THE WITNESS:**  THAT IS AT ALL TIMES EXCEPT FOR THE ONE

13:22:35  15  CASE OF EARTHQUAKE LOADING.  IF YOU HAVE VERY, VERY RAPID

13:22:39  16  LOADING, SOMETIMES SANDS COULD BEHAVE AS AN UNDRAINED MATERIAL.

13:22:43  17  BUT FOR THE 99 PERCENT OF THE OTHER CASES, WE TREAT IT AS A

13:22:47  18  DRAINED MATERIAL.

13:22:48  19           **THE COURT:**  WHY IS IT A DRAINED MATERIAL?

13:22:51  20           **THE WITNESS:**  BECAUSE THE PORES ARE SO LARGE, IT

13:22:52  21  ALLOWS WATER PRESSURES TO QUICKLY ESCAPE WHEN YOU LOAD THEM.

13:22:58  22           **THE COURT:**  THAT'S A EASILY UNDERSTOOD.  IT'S A

13:23:02  23  DRAINED MATERIAL BECAUSE IT'S ASSUMING THAT PRESSURE HAS BEEN

13:23:06  24  APPLIED THERETO.  AND BECAUSE OF THE LARGE PORES AND THE

13:23:11  25  DISTANCE BETWEEN THE SAND AND THE -- THE VARIOUS SAND PARTICLES

13:23:17    1    AND THE WATER, IT DRAINS RELATIVELY EASILY COMPARED TO CLAY.

13:23:23    2    SO YOU REGARD IT AS DRAINED WHEN PRESSURES ARE APPLIED TO IT?

13:23:27    3              **THE WITNESS:**  CORRECT.

13:23:27    4              **THE COURT:**  I UNDERSTAND.

13:23:31    5              **THE WITNESS:**  LIKEWISE, CLAYS ARE CONSIDERED TO BE

13:23:32    6    UNDRAINED MATERIALS BECAUSE OF THEIR SMALL PORES.  IT TAKES A

13:23:36    7    VERY LONG TIME TO DISSIPATE THE PRESSURE THAT GOES TO THE WATER

13:23:41    8    WHEN YOU APPLY A STRESS.  AND SO JUST ON THE -- ON THE OUTSET

13:23:47    9    HERE, SANDS ARE DRAINED, CLAYS ARE UNDRAINED, AND THAT'S WHAT

13:23:49   10    WE USE IN OUR ANALYSES.

13:23:51   11              SO FIRST, I'D LIKE TO QUICKLY JUST ADDRESS

13:23:54   12    EROSION, PIPING AND HEAVE.  I THINK IT CAN BE DISPENSED WITH

13:23:58   13    FAIRLY QUICKLY RIGHT HERE.

13:24:01   14              BUT JUST A REMINDER THAT THE PHENOMENON, THAT'S

13:24:05   15    WHEN YOU HAVE AN UPLIFT PRESSURE THAT CAUSES A FISSURING OR A

13:24:09   16    CRACKING OF THAT TOP CLAY, AND YOU GET MATERIAL ON THE TOP.

13:24:13   17              FOR THIS TO BE AN IMPORTANT MODE OF FAILURE,

13:24:15   18    FIRST OF ALL, YOU NEED TO HAVE SIGNIFICANT FLOW.  YOU KNOW, THE

13:24:17   19    WAY IT WORKS, YOU HAVE TO FEED THE SYSTEM WITH WATER.

13:24:21   20              TO HAVE SIGNIFICANT FLOW, YOU NEED TO HAVE A

13:24:23   21    PERVIOUS SOIL.  THE CLASSIC CASE USED FOR THESE TYPES OF

13:24:26   22    ANALYSES, VERY COMMON WITH MISSISSIPPI RIVER LEVEES, IS THIS

13:24:30   23    LAYER OF CLAY OVER A CLEAN SAND.  AND ALSO, YOU NEED TO HAVE AN

13:24:35   24    ERODIBLE SOIL, BECAUSE THIS FLOW OF WATER HAS GOT TO FLUSH THIS

13:24:40   25    SAND UP THROUGH THE FISSURES.  SANDS ARE ERODIBLE AND CLAYS

13:24:44    1   AREN'T.

13:24:44    2                   AND SO IT'S USEFUL TO LOOK AT IHNC AND SEE, YOU

13:24:47    3   KNOW, IF THESE CRITERIA ARE MET FOR EROSION BEING A PROBLEM.

13:24:52    4                   NOW, FIRST OF ALL, IT TAKES FLOW TO ERODE SOILS.

13:24:55    5   THE GENESIS OF THIS TABLE, ONE OF THE -- A DIFFERENT VERSION OF

13:24:59    6   THIS TABLE IS IN MY REPORT, BUT IT COMES FROM A 1956 CORPS OF

13:25:04    7   ENGINEERS SEEPAGE MANUAL.  IT'S TM-3-424.

13:25:08    8                   AND WE'VE RECENTLY MODIFIED IT -- PROFESSOR MIKE

13:25:12    9   DUNCAN AND I -- THE DATE SECTION IS PRETTY SMALL DOWN THERE --

13:25:15   10   WE'VE RECENTLY WRITTEN AN ENGINEERING REPORT ON SEEPAGE BENEATH

13:25:19   11   LEVEES.

13:25:20   12                   BUT THERE'S A WAY TO QUANTIFY WHETHER OR NOT YOU

13:25:23   13   HAVE A SEEPAGE ISSUE BASED ON THE FLOW.  AND THE ORIGINAL

13:25:28   14   NUMBERS HERE COME FROM THE '50S CORPS WORK, AND IT QUAL- -- IT

13:25:32   15   PUTS SEVERITY OF SEEPAGE IN FOUR DIFFERENT CATEGORIES BASED

13:25:36   16   ON -- THIS IS ACTUALLY THE FLOW.

13:25:38   17                   THEY PUT IT ON TOUGH-TO-UNDERSTAND UNITS.  IT'S

13:25:42   18   REALLY THE FLOW DIVIDED BY THE CHANGE IN WATER FROM CANAL SIDE

13:25:46   19   TO LAND SIDE, AND IT'S IN GALLONS PER MINUTE PER FOOT OF HEAD

13:25:53   20   PER 100 FEET OF LEVEE.  BUT --

13:25:54   21           **THE COURT:**  THAT'S THE 1-TO-5 I'M LOOKING AT, OR THE

13:25:57   22   LESS THAN 1, IS THE GALLONS PER WHAT?

13:26:02   23           **THE WITNESS:**  GALLONS PER MINUTE.

13:26:05   24           **THE COURT:**  GALLONS PER MINUTE.  I DIDN'T WANT TO SAY

13:26:06   25   THE WRONG UNIT.  GALLONS PER MINUTE PER FOOT OF HEAD, BASED ON

13:26:11   1   100 FEET OF LEVEE.  I UNDERSTAND.

13:26:12   2              SO IF I SEE 5, THAT'S 5 -- THAT WOULD REFER TO

13:26:14   3   5 GALLONS PER MINUTE PER FOOT OF HEAD FOR 100 FEET OF LEVEE.

13:26:20   4              **THE WITNESS:**  THAT'S CORRECT.

13:26:23   5              BUT THIS IS A WAY TO QUANTIFY WHETHER OR NOT YOU

13:26:25   6   HAVE SEEPAGE PROBLEMS.

13:26:27   7              **THE COURT:**  I UNDERSTAND.

13:26:27   8              **THE WITNESS:**  SO WHAT I DID, WITHOUT PROVIDING ALL

13:26:30   9   THE DETAILS, IS I DID SEEPAGE ANALYSES ON THE NORTH AND THE

13:26:34  10   SOUTH FAILURE AREAS.  AND THIS IS MY CROSS SECTION RIGHT HERE

13:26:40  11   FOR THE NORTH FAILURE AREA.

13:26:43  12              AND I ENDED UP DOING A STEADY-STATE SEEPAGE

13:26:45  13   ANALYSIS.  AND WHAT I DID IN MY ANALYSIS IS, ANY TIME I HAD

13:26:51  14   THE -- TO MAKE A CHOICE OF A PARAMETER OR ANALYSIS CONDITION, I

13:26:56  15   ALWAYS CHOSE THE PARAMETER TO GIVE ME THE MAXIMUM POSSIBLE

13:27:00  16   FLOW.  I DIDN'T WANT TO BE ACCUSED OF TRYING TO LOWBALL THE

13:27:04  17   FLOW.

13:27:04  18              SO, YOU KNOW, I ASSUMED THAT THE WATER LEVEL WAS

13:27:07  19   AT THE TOP OF THE WALL IMMEDIATELY, THAT IT TOOK NO TIME FOR IT

13:27:11  20   TO RISE.

13:27:11  21              I ASSUMED THE SOILS WERE COMPLETELY SATURATED.

13:27:15  22              I ASSUMED THAT THIS GAP BETWEEN THE I-WALL AND

13:27:18  23   THE EMBANKMENT FIELD WAS THERE AT THE BEGINNING.

13:27:22  24              BUT EVERYTHING I COULD DO, I DID TO MAXIMIZE THE

13:27:25  25   FLOW, TO GET AN UPPER BOUND, IF YOU WILL, OF THE FLOW.

13:27:29  1          AND THE VALUES I CALCULATED WERE, FOR THE NORTH

13:27:32  2   BREACH .003, AND THAT'S IN GALLONS PER MINUTE PER FOOT OF HEAD

13:27:37  3   PER 100 FEET OF LEVEE.  AND FOR THE SOUTH I GOT .002.

13:27:42  4          **THE COURT:**  SO IT WOULD BE LESS THAN 1, AS SHOWN ON

13:27:45  5   YOUR CHART, OBVIOUSLY.

13:27:45  6          **THE WITNESS:**  YES, SIR.

13:27:46  7          **THE COURT:**  OBVIOUSLY, A GREAT DEAL LESS THAN 1.

13:27:49  8          DO YOU DO -- IN ASCERTAINING, LET'S SAY, A

13:27:52  9   GLOBAL STABILITY ANALYSIS OR ANY STABILITY ANALYSIS, THAT WOULD

13:28:01  10  OBVIOUSLY -- DOES THAT TAKE INTO CONSIDERATION THE -- THE

13:28:06  11  FACTORS YOU USE IN THE SEEPAGE ANALYSIS, OR IS IT COMPLETELY

13:28:11  12  SEPARATE?

13:28:11  13         **THE WITNESS:**  NO.  IT DOES -- A GLOBAL STABILITY

13:28:14  14  ANALYSIS INCORPORATES THE RESULTS OF THE SEEPAGE ANALYSIS ONLY

13:28:20  15  IN THE CASE IF YOU'RE USING DRAIN STRENGTH PARAMETERS AS ONE

13:28:23  16  WOULD WITH SANDS.

13:28:24  17         **THE COURT:**  ALL RIGHT, SIR.

13:28:25  18         **THE WITNESS:**  NOW, I TOOK THESE VALUES HERE AND I

13:28:28  19  PLOTTED THEM ON THAT CHART YOU JUST SAW.  AND THEY REALLY FALL

13:28:31  20  WITHIN THE WIDTH OF THAT ZERO LINE.  AND IT'S NOT SURPRISING,

13:28:36  21  THERE'S NOT ENOUGH FLOW FOR THIS TO CLASSIFY AS A SEVERE

13:28:40  22  SEEPAGE ISSUE BASED ON MY ANALYSIS, WHICH GIVES AN UPPER BOUND

13:28:45  23  VALUE OF FLOW.

13:28:47  24         OKAY?  SO THAT'S ONE PART OF DETERMINING IF

13:28:53  25  SEEPAGE IS AN ISSUE.

13:28:54    1              A SECOND PART IS IF YOU HAVE AN ERODIBLE SOIL.

13:28:57    2    I THINK YOU'VE ALREADY BEEN INTRODUCED TO LANE'S CREEP RATIO.

13:29:02    3              **THE COURT:**  RIGHT.  YES, SIR.

13:29:05    4              **THE WITNESS:**  WELL, YOU KNOW, I'M USING IT SO SIMPLY

13:29:07    5    HERE.   IT'S THE NUMBER THEY PUT NEXT TO THE SOIL TYPE GIVES YOU

13:29:11    6    AN IDEA OF THE ERODIBILITY OF THE SOIL.

13:29:15    7              AT IHNC WE MAINLY HAVE SOFT CLAYS AND MEDIUM

13:29:15    8    CLAYS, WHICH HAVE A LOW NUMBER.

13:29:18    9              THE MATERIALS THAT ARE MOST ERODIBLE ARE FINE

13:29:21   10    SANDS AND SILTS.  THEY'VE HIGH NUMBER.

13:29:23   11              SO BASED UPON JUST THE NUMBERS REPORTED BY

13:29:25   12    MR. LANE, WE DON'T HAVE ERODIBLE SOILS AT THE SITE.

13:29:30   13              SO IN TERMS OF THE CRITERIA TO ASSESS IF SEEPAGE

13:29:35   14    IS AN ISSUE, YOU KNOW, THE FIRST QUESTION:  IS THIS A THICK

13:29:38   15    PERVIOUS LAYER?  WELL, WE DON'T HAVE A THICK PERVIOUS LAYER.

13:29:43   16              DO WE HAVE HIGH PERMEABILITY ALLOWING

13:29:45   17    SIGNIFICANT FLOW?  NO, WE DON'T.

13:29:47   18              AND DO WE HAVE SAND AVAILABLE FOR SAND BOILS?

13:29:49   19    WE DON'T.

13:29:52   20              YOU KNOW, IT TAKES A LOT OF FLOW TO TRY TO GET

13:29:54   21    SAND ALL THE WAY TO THAT -- 40 FEET UP TO THE GROUND SURFACE.

13:29:58   22              SO KIND OF BASED ON MOST MEASURES, IT SEEMS

13:30:00   23    THAT, YOU KNOW, SEEPAGE CAN BE RULED OUT AS -- AS THE SOLE

13:30:05   24    REASON FOR FAILURE AT THESE SITES.

13:30:07   25              **THE COURT:**  YOU'RE PROBABLY GOING TO GET TO THIS

13:30:11  1  RIGHT NOW TO SOME DEGREE, BUT I'D LIKE TO -- WHEN I HAVE A

13:30:13  2  QUESTION, I MIGHT FORGET IT, SO I'M GOING TO BE A LITTLE

13:30:17  3  NONLINEAR.

13:30:18  4          IN DOING, LET'S SAY -- IS ASCERTAINING UPLIFT

13:30:24  5  PRESSURES A COROLLARY TO A PART OF A STABILITY ANALYSIS, OR IS

13:30:33  6  IT A SEPARATE ANALYSIS?

13:30:36  7          **THE WITNESS:**  THE UPLIFT PRESSURES ARE DETERMINED

13:30:38  8  FROM A SEEPAGE ANALYSIS.  BUT UPLIFT PRESSURES ARE MERELY THE

13:30:44  9  PORE WATER PRESSURE.  IT'S REALLY THE WATER IN THAT CYLINDER

13:30:47  10  THAT WE LOOKED AT IN THOSE PREVIOUS EXAMPLES.

13:30:50  11          **THE COURT:**  AND YOU CALCULATE THE UPLIFT PRESSURES --

13:30:52  12  IN OTHER WORDS, YOU HAVE TO DETERMINE -- YOU HAVE TO DO THE

13:30:54  13  SEEPAGE ANALYSIS FIRST BEFORE YOU CAN DETERMINE WHAT THE UPLIFT

13:30:58  14  PRESSURES ARE TO QUANTIFY THE UPLIFT PRESSURES?

13:31:02  15          **THE WITNESS:**  YES, SIR.

13:31:07  16          THE NEXT THING I'D LIKE TO DISCUSS IS THE SLOPE

13:31:11  17  STABILITY ANALYSIS.  IT WAS A FOCAL POINT OF MY ANALYSIS.

13:31:17  18          ONCE AGAIN, IN DOING STABILITY ANALYSES, WE

13:31:20  19  TREAT MATERIALS DIFFERENTLY IF THEY'RE SANDS VERSUS CLAYS.  AS

13:31:24  20  I SAID BEFORE, SANDS ARE DRAINED MATERIALS.  WE ASSIGN THEM

13:31:29  21  DRAIN STRENGTHS IN THE ANALYSES.  CLAYS ARE UNDRAINED MATERIALS

13:31:32  22  FOR LOADS THAT AT LEAST LAST TO DAYS OR MONTHS, AND SO WE

13:31:37  23  ASSIGN CLAYS UNDRAINED STRENGTHS FOR DOING STABILITY ANALYSES.

13:31:42  24          OKAY.  NOW, THE QUESTION THAT COMES UP TO A

13:31:44  25  GEOTECHNICAL ENGINEER IS, DO YOU USE DRAINED OR UNDRAINED

13:31:49   1   STRENGTHS?

13:31:50   2             WELL, IN MOST CASES FOR PRACTICING GEOTECHS,

13:31:55   3   ENGINEERING JUDGMENT'S GOOD ENOUGH.  YOU CAN ASSIGN DRAINED

13:31:59   4   STRENGTH STRENGTHS TO SANDS, UNDRAINED STRENGTHS TO CLAYS, AND

13:32:02   5   YOU'RE PROBABLY OKAY.

13:32:03   6             IF YOU CAN'T EXERCISE THE JUDGMENT, YOU CAN

13:32:06   7   ACTUALLY DO CALCULATIONS TO DETERMINE IT.  AND THE MAIN

13:32:11   8   PARAMETER THAT A SOIL HAS THAT WE USE TO DETERMINE IF IT'S

13:32:14   9   DRAINED OR UNDRAINED IS THIS PARAMETER C SUB V.  AND IT'S

13:32:20  10   CALLED THE COEFFICIENT OF CONSOLIDATION, BUT IT'S DARN CLOSE TO

13:32:24  11   PERMEABILITY.

13:32:24  12             YOU KNOW, IF YOU LOOK AT WHAT C SUB V IS EQUAL

13:32:28  13   TO, IT'S PROPORTIONAL TO PERMEABILITY.  SO IF PERMEABILITY

13:32:31  14   INCREASES, C SUB V INCREASES.  BUT IT IS A SEPARATE PARAMETER

13:32:38  15   THAT WE GET OUT OF A SPECIAL TEST CALLED A CONSOLIDATION TEST.

13:32:41  16             NOW, DURING OUR TESTING LAST SUMMER, WE RAN LOTS

13:32:45  17   OF CONSOLIDATION TESTS.  WE HAD TWO DIFFERENT FLAVORS.  WE RAN

13:32:49  18   CONSTANT RATE OF STRAIN AND INCREMENTAL STRESS TESTS.  AND

13:32:53  19   THESE TESTS WERE RUN AT TWO DIFFERENT LABS.

13:32:56  20             THE GTX HERE IS GEOTESTING EXPRESS.  IT'S A LAB

13:33:01  21   IN MASSACHUSETTS.

13:33:01  22             THE FUGRO LAB IN ST. ROSE ALSO DID TESTS.

13:33:08  23             THIS SHOWS THE EXTREME RANGE OF OUR VALUES.  AND

13:33:11  24   I THINK TO NON-GEOTECHS, HAVING A RANGE OF PARAMETERS THAT BIG

13:33:17  25   CAN LOOK ALARMING.  BUT C SUB V CHANGES WITH APPLIED STRENGTHS,

13:33:21    1    AND SO IT'S NOT REALLY SURPRISING THAT WE GET BIG RANGES.

13:33:21    2                    BUT FOR VALUES HERE, LET'S SAY A RANGE IS FROM

13:33:24    3    AROUND 10, AS A LOW, UP TO ABOUT 2,000, YOU KNOW, JUST --

13:33:28    4    THAT'S GOOD ENOUGH FOR DETERMINING IF WE WANT TO LOOK AT

13:33:31    5    WHETHER DRAINED OR UNDRAINED ANALYSES ARE APPLICABLE.

13:33:35    6                    TO DETERMINE IF THEY'RE APPLICABLE, YOU CAN USE

13:33:39    7    A CHART LIKE THIS, AND THIS SPECIFIC CHART CAME FROM MIKE

13:33:46    8    DUNCAN AND STEVE WRIGHT'S TEXTBOOK, WHICH IS *SOIL STRENGTH AND*

13:33:52    9    *SLOPE STABILITY*.

13:33:52   10                    AND TO DESCRIBE THIS CHART, I WOULD SAY ITS

13:33:55   11    PURPOSE IS TO TELL YOU IF A DRAINED ANALYSIS IS APPLICABLE.

13:33:59   12                    AND WE HAVE TWO AXES HERE.  THIS FIRST ONE IS

13:34:02   13    THE TOUGH ONE TO UNDERSTAND.  THAT'S THE DRAINAGE PATH LENGTH.

13:34:06   14                    AND WHAT THAT IS, PHYSICALLY, IT'S ONE-HALF THE

13:34:11   15    DISTANCE FROM THE GROUND SURFACE TO THE SAND LAYER.

13:34:15   16                    SO FOR IHNC, THE DRAINAGE PATH LENGTH, IT'S

13:34:19   17    PROBABLY ON THE ORDER OF, I DON'T KNOW, 20 TO 30 FEET.  THE

13:34:23   18    SAND LAYER IS ABOUT 40 FEET DEEP.  AND SO THE DRAINAGE PATH

13:34:27   19    LENGTH WOULD BE AROUND 20 FEET.

13:34:29   20                    NOW, THIS Y AXIS RIGHT HERE IS THE TIME OF

13:34:33   21    LOADING, WHETHER OR NOT YOUR LOADING IS -- HAPPENS OVER A

13:34:36   22    PERIOD OF HOURS OR A PERIOD OF YEARS.

13:34:39   23                    SO FOR IHNC TO BE CONSIDERED TO BE A DRAINED

13:34:44   24    CASE, THEN THOSE C SUB V VALUES SHOULD PLOT RIGHT HERE.

13:34:49   25                    I APOLOGIZE FOR THAT BEING KIND OF DIFFICULT TO

13:34:52    1    SEE THE ZONE.  BUT YOU KNOW, YOU CAN SEE A LITTLE POLYGON HERE

13:34:56    2    THAT FOR A DRAINAGE PATH LENGTH ON THE ORDER OF 20 TO 30, AND

13:35:01    3    FOR A TIME TO FAILURE OF NORMALLY 10 TO ABOUT 30 HOURS HERE,

13:35:05    4    THE C SUB V VALUES WOULD BE THERE.

13:35:16    5                    SO, YOU KNOW, TO PUT IT CLEARLY, I GUESS, IS, WE

13:35:16    6    WOULD HAVE TO HAVE C SUB V VALUES FROM THOSE CONSOLIDATED TESTS

13:35:16    7    PLOTTING THIS AREA FOR A DRAINED ANALYSIS TO BE JUSTIFIED.

13:35:23    8                    NOW, IF YOU PLOT THE VALUES THAT WE MEASURED,

13:35:25    9    EVEN THAT EXTREME RANGE FROM THOSE CONSOLIDATION TESTS, THEY

13:35:29   10    PLOT UP HERE, WHICH CLEARLY TELLS ME THAT A DRAINED ANALYSIS IS

13:35:33   11    NOT APPROPRIATE FOR IHNC.  YOU NEED TO DO AN UNDRAINED

13:35:37   12    ANALYSIS.

13:35:39   13                    BUT FRANKLY, JUST LOOKING AT THE LABELS ON THIS

13:35:42   14    PLOT, IT MAKES SOME SENSE.  I MEAN, YOU LOOK IN THIS AREA, YOU

13:35:47   15    KNOW, SANDS AND GRAVELS WOULD PLOT IN THE AREA THAT WE WOULD

13:35:50   16    CONSIDER TO BE DRAINED, YOU KNOW.  SO FOR A LOADING OF, YOU

13:35:55   17    KNOW, SAY 10 TO 30 HOURS, IT WOULD TAKE A SAND OR A GRAVEL TO

13:36:00   18    BE ABLE TO DISSIPATE THE PRESSURES TO BE USED FOR A DRAINED

13:36:02   19    ANALYSIS.

13:36:03   20                    ALL OF OUR DATA PLOT UP HERE IN THE CLAY ZONE,

13:36:06   21    WHICH -- WHICH YOU WOULD HOPE TO BE THE CASE, BECAUSE THEY'RE

13:36:09   22    CLAY MATERIALS THAT WE FOUND AT IHNC.

13:36:11   23                    SO BASED ON A -- ON A QUALITATIVE ANALYSIS USING

13:36:15   24    THIS CHART FROM DUNCAN AND WRIGHT, IT SEEMS CLEAR THAT DRAINED

13:36:19   25    PARAMETERS ARE THE APPROPRIATE PARAMETERS FOR IHNC.

13:36:28   1              **THE COURT:**  THE -- WAIT A SECOND.  DOES THE

13:36:34   2    COMPRESSIBILITY OF THE MATERIAL HAVE ANY EFFECT IN THIS

13:36:40   3    CALCULATION?

13:36:40   4              **THE WITNESS:**  IT DOES, IN THAT ONE THING THAT

13:36:44   5    DETERMINES C SUB V IS THE COMPRESSIBILITY.  IT'S ONE OF THE

13:36:48   6    THREE PARAMETERS THAT C SUB V IS EQUAL TO.  SO AS

13:36:54   7    COMPRESSIBILITY INCREASES, C SUB V ENDS UP -- LET'S SEE -- LET

13:37:02   8    ME GET THIS RIGHT -- YEAH.  C SUB V'S INVERSIVE.  SO AS

13:37:10   9    COMPRESSIBILITY INCREASES, C SUB V DECREASES.

13:37:14   10             **THE COURT:**  WHICH WOULD MEAN AS COMPRESSIBILITY

13:37:16   11   INCREASES, THE SOIL WOULD BE MORE DRAINED THAN IF IT WERE

13:37:26   12   LESS -- IF IT WERE LESS COMPRESSIBLE?

13:37:31   13             **THE WITNESS:**  WELL, LET ME SEE.  THE --

13:37:33   14             **THE COURT:**  TO PUT IT IN THE PARLANCE WE'VE BEEN

13:37:36   15   USING IN THIS CASE, WHAT EFFECT WOULD IT HAVE ON -- WHEN YOU

13:37:39   16   SAY LOWER OR HIGHER -- I GUESS MAYBE YOU SHOULD EXPLAIN TO ME,

13:37:42   17   WHAT DO YOU MEAN BY LOWER OR HIGHER?

13:37:45   18             **THE WITNESS:**  OKAY.  LET ME -- IF I CAN -- I'M HAVING

13:37:48   19   TROUBLE RECALLING THE EQUATION RIGHT OFF THE BAT.

13:37:53   20             C SUB V, I BELIEVE, IS EQUAL TO THE PERMEABILITY

13:37:56   21   DIVIDED BY M SUB V TIMES THE GAMMA OF WATER.

13:38:01   22             SO AS YOU INCREASE M SUB V, AS IT GETS TO BE A

13:38:07   23   BIGGER NUMBER, THE VALUE OF C SUB V DECREASES.  SO THAT MEANS

13:38:11   24   YOU WOULD BE GOING UP ON THIS CHART RIGHT HERE.

13:38:14   25             **THE COURT:**  OH.  DOES IT MEAN IT WOULD TAKE LONGER --

13:38:15  1            **THE WITNESS:**  EXCUSE ME.  NO, NO.  YOU WOULD BE GOING

13:38:17  2  DOWN.

13:38:18  3            **THE COURT:**  DOWN.  THAT'S WHAT I THOUGHT.

13:38:19  4            **THE WITNESS:**  C SUB V INCREASES, GOING DOWN.

13:38:20  5            **THE COURT:**  THAT'S WHAT I THOUGHT I UNDERSTOOD, AND

13:38:22  6  NOW I'M CERTAIN I UNDERSTAND IT AT LEAST IN AN EXTRAORDINARILY

13:38:25  7  RUDIMENTARY WAY.

13:38:28  8            **THE WITNESS:**  NOW, WE USE THE EXACT SAME TEST TO

13:38:31  9  MEASURE C SUB V AS WE DO MEASURING M SUB V.  BOTH OF THOSE CAN

13:38:35  10  BE DETERMINED FROM A CONSOLIDATION TEST.

13:38:38  11            SO BASED ON THIS ASSESSMENT, UNDRAINED STRENGTHS

13:38:41  12  SHOULD BE APPLIED AS OPPOSED TO DRAINED STRENGTHS.

13:38:44  13            NOW, JUST TO TRY TO SUMMARIZE SOME OF THIS AND

13:38:47  14  TO SHOW PRACTICALLY WHAT IT MEANS IS, YOUR STRATIGRAPHY

13:38:56  15  CONTROLS A LOT OF WHAT YOU HAVE TO DO TO DO AN ANALYSIS.

13:38:59  16            AND IF YOU JUST LOOK THE SOME EXAMPLES HERE, IF

13:39:01  17  YOU HAVE A SAND LAYER CLOSE TO THE SURFACE AND THIS IS OVERLAIN

13:39:03  18  BY A CLAY LAYER, IF ONE'S TO DO A PRUDENT ANALYSIS, THEY WOULD

13:39:07  19  ASSIGN UNDRAINED STRENGTHS TO THE CLAYS UP HERE, DRAINED

13:39:12  20  STRENGTH PARAMETERS TO THE SAND.  THEY WOULD PERFORM A SEEPAGE

13:39:16  21  ANALYSIS TO LOOK AT ISSUES RIGHT HERE.

13:39:19  22            AND ALSO, THE RESULTS OF THIS SEEPAGE ANALYSIS

13:39:22  23  WOULD GO INTO THE STABILITY ANALYSIS BECAUSE WE NEED THAT FOR

13:39:28  24  THE SANDS, BECAUSE WE'RE APPLYING DRAINED STRENGTH PARAMETERS.

13:39:34  25            SO TO APPLY DRAINED STRENGTH PARAMETERS, YOU

13:39:37   1   HAVE TO CALCULATE PORE PRESSURES.  TO CALCULATE PORE PRESSURES,

13:39:40   2   YOU HAVE TO DO SEEPAGE ANALYSES.

13:39:42   3            IF YOU HAVE SAND THAT'S VERY DEEP OR THIN LAYERS

13:39:45   4   OF SAND, THEN YOU HAVE AN EASIER TASK TO PERFORM.  YOU ASSIGN

13:39:50   5   UNDRAINED STRENGTH PARAMETERS TO EVERYTHING.  IT'S NOT

13:39:54   6   NECESSARY TO ASSIGN PARAMETERS TO THIS SAND, BECAUSE IT'S NOT A

13:39:59   7   PLAYER IN THIS ISSUE.

13:40:00   8            IT'S ALSO NOT IMPORTANT OR NOT USEFUL TO DO

13:40:03   9   SEEPAGE ANALYSES.  BECAUSE IF YOU'RE DOING UNDRAINED STRENGTHS,

13:40:08  10   YOU DON'T NEED TO CALCULATE PORE PRESSURES.  YOU DON'T NEED TO

13:40:11  11   DO A SEEPAGE ANALYSIS.  YOU JUST NEED TO DO A STABILITY

13:40:14  12   ANALYSIS.

13:40:15  13            AND THESE DIFFERENT GENERAL CROSS SECTIONS RIGHT

13:40:18  14   HERE CAN BE FOUND IN A FAIRLY NARROW GEOGRAPHIC AREA IN

13:40:24  15   NEW ORLEANS.  AND THESE ARE -- THESE ARE ALL CROSS SECTIONS

13:40:28  16   THAT I'VE GOT FROM ANALYSES THAT I'VE DONE BOTH DURING THE IPET

13:40:35  17   ANALYSES AND ELSEWHERE.

13:40:35  18            AND I'D JUST LIKE TO SHOW YOU A FEW OF THESE.

13:40:38  19   I'M NOT GOING TO SHOW YOU ALL -- OR I MIGHT NOT SHOW YOU ANY.

13:40:50  20   LET'S SEE HERE . . .

13:40:51  21       **THE COURT:**  THAT'S PRETTY INTERESTING, HOWEVER.

13:41:02  22       **THE WITNESS:**  LET ME CHECK ONE THING HERE.  THIS --

13:41:04  23       **THE COURT:**  ALTHOUGH, JUST BECAUSE THE COURT FINDS

13:41:07  24   SOMETHING INTERESTING DOESN'T MEAN IT'S PARTICULARLY RELEVANT.

13:41:10  25   IT'S JUST INTERESTING.

13:41:12  1              **THE WITNESS:**  CORRECT.

13:41:13  2              **THE COURT:**  I DIDN'T MEAN THAT FOR YOU.  SO THE

13:41:15  3    LAWYERS WON'T . . .

13:41:17  4              **THE WITNESS:**  THIS SHOWS THE 17TH STREET

13:41:18  5    CROSS SECTION.  THIS IS WHERE A FAILURE OCCURRED.  YOU CAN SEE

13:41:21  6    THAT WE'VE GOT A RELATIVELY DEEP SAND LAYER RIGHT THERE.  IT'S

13:41:26  7    30 OR 40 FEET BELOW THE TOE OF THE LEVEE.

13:41:30  8                   FOR THIS TYPE OF ANALYSIS, YOU DON'T NEED TO DO

13:41:32  9    A SEEPAGE ANALYSIS BECAUSE YOU'D BE ASSIGNING UNDRAINED

13:41:35  10   STRENGTH TO ALL OF THESE MATERIALS UP HERE.  AND SO JUST A

13:41:41  11   STABILITY ANALYSIS, NOT A SEEPAGE ANALYSIS.

13:41:43  12             **THE COURT:**  AND LET ME UNDERSTAND WHILE WE'RE LOOKING

13:41:46  13   AT THE 17TH STREET CANAL, WHICH IS NOT A PART OF THIS CASE

13:41:49  14   BECAUSE WE'VE ALREADY DEALT WITH IT.

13:41:52  15                   THE -- THE STABILITY ANALYSIS, WHY DON'T YOU

13:41:58  16   TELL ME WHAT THE STABILITY ANALYSIS SHOWS AND WHY ONE HAS TO DO

13:42:02  17   IT EVEN IF THE SOILS ARE RELATIVELY IMPERVIOUS.

13:42:06  18             **THE WITNESS:**  WELL, THE STABILITY ANALYSES DONE BY

13:42:10  19   BOTH ILIT AND IPET, AND ALSO BY MORE RECENTLY THE ENGINEERS

13:42:15  20   THAT HAVE BEEN WORKING ON THE SAFE WATER ELEVATION, HAVE ALL

13:42:19  21   INCORPORATED UNDRAINED STRENGTHS FOR 17TH STREET, AND THEY

13:42:23  22   HAVEN'T HAD TO DO SEEPAGE ANALYSES.

13:42:26  23             **THE COURT:**  RIGHT.  I UNDERSTAND.  I'M JUST ASKING

13:42:27  24   YOU WHAT PRECISELY DOES ONE -- WHY IS IT NECESSARY TO DO A

13:42:32  25   STABILITY ANALYSIS -- NOT A SEEPAGE ANALYSIS, BUT A STABILITY

13:42:37   1   ANALYSIS -- WHEN THE SOILS ARE RELATIVELY IMPERVIOUS?

13:42:42   2            **THE WITNESS:**  OH.  WELL, EVEN IF THE SOILS ARE

13:42:45   3   IMPERVIOUS, YOU CAN HAVE A SHEAR FAILURE, AND 17TH STREET IS A

13:42:50   4   GOOD EXAMPLE OF THAT.  BECAUSE --

13:42:50   5            **THE COURT:**  EXPLAIN THAT TO ME A LITTLE BIT.

13:42:52   6            **THE WITNESS:**  WELL, BECAUSE EVEN THOUGH THE SOILS ARE

13:42:54   7   RELATIVELY IMPERVIOUS, THEY STILL HAVE A DEFINED SHEAR

13:42:57   8   STRENGTH.  AND QUITE OFTEN CLAY SOILS CAN HAVE A LOW SHEAR

13:43:01   9   STRENGTH.

13:43:02  10            AND SO AS WATER RISES ON THE WALL, YOU STILL CAN

13:43:06  11   HAVE THE SOIL TO SHEAR AND DISPLACE ON A PLANE.

13:43:08  12            **THE COURT:**  SO HOW DOES ONE AMELIORATE A LOW SHEAR

13:43:12  13   STRENGTH IF ONE IS DESIGNING A LEVEE?

13:43:14  14            **THE WITNESS:**  IF YOU'RE DESIGNING AN I-WALL -- A

13:43:15  15   LEVEE PARTICULARLY, OR AN I-WALL?

13:43:21  16            **THE COURT:**  WELL, EITHER ONE.  LET'S SAY AN I-WALL.

13:43:24  17            **THE WITNESS:**  ALL RIGHT.  FOR AN I-WALL, ONE SOLUTION

13:43:27  18   TO BE WOULD BE TO DRIVE YOUR SHEET PILE DEEPER.

13:43:29  19            **THE COURT:**  MAKING IT MORE STABLE AS A RESULT OF THE

13:43:32  20   DEPTH?

13:43:34  21            **THE WITNESS:**  YES, THAT'S ONE WAY.

13:43:34  22            OR IN THE CASE OF 17TH STREET, IF YOU'VE SEEN

13:43:37  23   THE CONSTRUCTION, THEY'RE DOING DEEP SOIL MIXING OUT THERE.

13:43:41  24   AND SO THEY'VE GOT A LARGE MACHINE THAT'S MIXING SOIL WHILE

13:43:44  25   ADDING CEMENT TO IT.  WITH DEPTH, THAT INCREASES THE STRENGTH.

13:43:50    1            **THE COURT:**  THE NEXT QUESTION WAS THAT -- AND BY THE

13:43:51    2   WAY, IF THE COURT GOES ON A CURIOSITY BINGE, I'M NOT GOING TO

13:43:57    3   MAKE YOU PAY FOR THAT IN TIME, ANYBODY.

13:43:59    4            THE SHEAR STRENGTH -- WE MIGHT HAVE THE SAME

13:44:01    5   CLASSIFICATION OF STRATIGRAPHY BUT YET DIFFERENT SHEAR

13:44:05    6   STRENGTHS.

13:44:06    7            **THE WITNESS:**  CORRECT.

13:44:06    8            **THE COURT:**  WHY?

13:44:08    9            **THE WITNESS:**  THERE'S -- THAT'S -- ONE OF THE TRICKY

13:44:11   10   THINGS ABOUT SOILS, IT'S SO DIFFICULT TO DEFINE THE SHEAR

13:44:14   11   STRENGTH.  BUT ONE EASY THING IS, IF YOU APPLIED A LARGE

13:44:19   12   FIELD -- LET'S SAY 40 FEET OF EARTH ON TOP OF IT AND THEN YOU

13:44:24   13   REMOVED IT, YOU WOULD HAVE A MUCH HIGHER SHEAR STRENGTH OWING

13:44:29   14   TO THE EFFECTS, WHAT WE'VE CALLED CONSOLIDATION, DUE TO THAT

13:44:33   15   EARTH BEING THERE.

13:44:35   16            SO IF YOU JUST LOOKED AT THE STRATIGRAPHY FOR

13:44:36   17   SOIL TYPES, YOU KNOW, THE CLAYS WOULD STILL BE CLAYS AND THE

13:44:40   18   SANDS WOULD STILL BE SANDS, BUT THIS VERY HIGH STRESS THAT THEY

13:44:43   19   WERE EXPOSED TO WOULD GIVE YOU A BIG DIFFERENCE IN STRENGTH.

13:44:47   20            **THE COURT:**  OKAY.  THE HIGH STRESS -- SO IF -- IF WE

13:44:52   21   HAVE NO STRESS, ARE THE SHEAR STRENGTHS OF THOSE SOILS

13:44:59   22   DIFFERENT EVEN THOUGH THE STRATIGRAPHY LOOKS THE SAME?  WOULD

13:45:06   23   THE -- IF WE LEAVE STRESS -- YOU'RE TALKING ABOUT STRESS ON TOP

13:45:10   24   OF THE SOIL.

13:45:10   25            **THE WITNESS:**  YES.

13:45:11   1            **THE COURT:**  IF WE DON'T HAVE ANY, THEN ARE THE SHEAR

13:45:13   2   STRENGTHS FAIRLY UNIFORM?  OR IS -- OR IS LOADING THIS SOIL THE

13:45:22   3   ONLY WAY THE SHEAR STRENGTHS ARE -- ARE DIFFERENTIATED?

13:45:27   4            **THE WITNESS:**  WELL, THERE'S OTHER THINGS.  AGING CAN

13:45:29   5   INCREASE THE SHEAR STRENGTH OF THE SOIL.  IF IT'S A VERY OLD

13:45:32   6   CLAY, IT CAN BE STRONGER THAN A RECENTLY DEPOSITED CLAY.

13:45:38   7            **THE COURT:**  SO THERE'S MULTIPLE FACTORS THAT GO INTO

13:45:41   8   SHEAR STRENGTH.  SO IF YOU'RE BUILDING AN I-WALL, HOW DOES ONE

13:45:44   9   KNOW THAT THE SHEAR STRENGTH IS APPROPRIATE?  THAT'S WHY YOU DO

13:45:50  10   A STABILITY ANALYSIS?

13:45:51  11            **THE WITNESS:**  YES.  THAT'S THE REASON WE WOULD TAKE

13:45:53  12   SAMPLES AND RUN LABORATORY TESTS AND THEN RUN PROBABLY FIELD

13:45:57  13   TESTS, USE THOSE MEASURED STRENGTHS IN A STABILITY ANALYSIS

13:46:01  14   JUST TO MAKE SURE WE GET AN ADEQUATE FACTOR OF SAFETY.

13:46:08  15            **THE COURT:**  AND HOW DEEP DO YOU HAVE TO GO DOWN TO

13:46:11  16   ASCERTAIN THE STABILITY?

13:46:11  17            **THE WITNESS:**  FOR GENERAL LEVEES AND I-WALLS,

13:46:13  18   40 FEET'S AN ADEQUATE LENGTH.

13:46:16  19            **THE COURT:**  OKAY.

13:46:16  20            **THE WITNESS:**  JUST THE CORPS ALWAYS DRILLS TO 80 FEET

13:46:19  21   ON ANY PROJECTS.

13:46:20  22            **THE COURT:**  ALL RIGHT.  THANK YOU.

13:46:22  23            **THE WITNESS:**  SHOW YOU JUST A COUPLE OF MORE

13:46:24  24   CROSS SECTIONS HERE.  YOU KNOW, THESE ARE KIND OF INTERESTING

13:46:28  25   IN THAT THE NORTH AREA OF ORLEANS AVENUE LOOKS A LOT LIKE

13:46:36  1  | 17TH STREET.  YOU HAVE CLAYS; YOU HAVE A SAND LAYER, BUT THE

13:46:40  2  | SAND LAYER IS 30 TO 40 FEET DEEP.

13:46:42  3  | BUT THE SOUTH AREA OF ORLEANS AVENUE, YOU HAVE A

13:46:45  4  | VERY THICK SAND LAYER AND A THIN CLAY LAYER.  AND NEITHER OF

13:46:49  5  | THESE SECTIONS FAILED DURING HURRICANE KATRINA.  THE SECTIONS

13:46:54  6  | ON ORLEANS AVENUE SUFFERED NO DISTRESS.

13:46:58  7  | LONDON AVENUE HAD THREE DIFFERENT FAILURES.  THE

13:47:03  8  | NORTH FAILURE, WE HAD A VERY LOOSE SAND, WHICH IS AN IMPORTANT

13:47:07  9  | PLAYER.  WE HAD A THIN LAYER OF CLAY.  AND SO SEEPAGE WAS AN

13:47:11  10  | IMPORTANT ISSUE, AND SEEPAGE ANALYSES WOULDN'T BE REQUIRED FOR

13:47:14  11  | BOTH THE NORTH FAILURE OF LONDON AND ALSO THE SOUTH FAILURE

13:47:19  12  | AREA OF LONDON OWING TO THE LARGE SAND LAYER.

13:47:23  13  | **THE COURT:**  I UNDERSTAND.

13:47:24  14  | **THE WITNESS:**  NOW, I'M GOING TO SKIP BACK AND SEE.

13:47:25  15  | WE -- I'VE ANALYZED THE FAILURES THE WEST BANK.  BUT IF WE LOOK

13:47:32  16  | AT THE CURRENT SECTION WE'RE DEALING WITH ON THIS LITIGATION,

13:47:35  17  | THIS IS THE NORTHEAST SECTION.  AND YOU CAN SEE WE HAVE A SAND

13:47:43  18  | LAYER THAT'S AT DEPTH.  WE HAVE NOTHING BUT CLAY MATERIALS

13:47:46  19  | ABOVE IT.

13:47:47  20  | SO REALLY ONE JUST NEEDS TO ASSIGN UNDRAINED

13:47:50  21  | STRENGTHS TO THE CLAY MATERIALS, NOT TO PERFORM A SEEPAGE

13:47:53  22  | ANALYSIS.  AND THAT WOULD BE ALL THAT'S REQUIRED.

13:47:57  23  | LIKEWISE, FOR THE SOUTHEAST AREA, THE SAND LAYER

13:48:00  24  | IS AT DEPTH, AND SO A SEEPAGE ANALYSIS ISN'T REQUIRED.

13:48:04  25  | **THE COURT:**  I UNDERSTAND.

13:48:05   1          **THE WITNESS:**  OKAY.  SO, GENERALLY, THAT JUST SHOWS

13:48:07   2   YOU, AT LEAST IN THE NEW ORLEANS AREA, HOW MANY DIFFERENT

13:48:11   3   STRATIGRAPHIC SECTIONS YOU CAN GET WITHOUT GOING VERY FAR.

13:48:17   4              SO I'LL JUST QUICKLY TELL YOU WHAT MADE UP MY

13:48:20   5   STABILITY ANALYSIS, AND IT'S KIND OF A THREE-PART SYSTEM.

13:48:26   6              I DETERMINED THE STRATIGRAPHY AND THE GEOMETRY,

13:48:30   7   I ASSIGNED THE SHEAR STRENGTHS; AND THEN I PERFORMED MY

13:48:35   8   ANALYSIS, WHICH IS CRANKING OUT THE NUMBERS.

13:48:37   9              IN TERMS OF MY STRATIGRAPHY, I'VE ALREADY SHOWED

13:48:40  10   ONE OF MY SECTIONS.  THESE ARE BOTH OF THEM.  IT SHOWS THE

13:48:43  11   NORMAL, I GUESS, ORDERING OF SOILS WITH A FILL ON TOP THAT'S

13:48:48  12   UNDERLAIN BY AN UPPER ORGANIC CLAY AND THEN A LOWER ORGANIC

13:48:55  13   CLAY.  BELOW THAT IS AN INTERDISTRIBUTARY CLAY, AND THEN

13:49:00  14   THERE'S THE SAND AT DEPTH.  AND SO BOTH THE NORTH AND THE SOUTH

13:49:03  15   SECTION GENERALLY CONTAIN THESE LAYERS.

13:49:06  16              THESE ARE THE ACTUAL SECTIONS THAT I USED IN MY

13:49:08  17   STABILITY ANALYSES.  THEY'RE -- THE PROGRAM I USED GENERATES

13:49:13  18   THESE SECTIONS, AND SO . . .

13:49:18  19              NOW, THE NEXT PART OF MY ANALYSIS IS I ASSIGN

13:49:23  20   SHEAR STRENGTHS.  AND I ONLY HAVE A SLIDE OR TWO ABOUT THAT,

13:49:25  21   BUT THIS WAS A BIG PART OF MY EFFORT, AND IT'S A VERY, VERY

13:49:30  22   IMPORTANT PART OF DOING STABILITY ANALYSES OF LEVEES AND

13:49:35  23   I-WALLS.

13:49:37  24          **THE COURT:**  AND YOU'VE EXPLAINED WHY IN ANSWERING

13:49:41  25   SOME OF MY QUESTIONS EARLIER.  BUT GO AHEAD.  I WANT YOU TO GO

13:49:45   1   AHEAD, BUT I UNDERSTAND WHY IT'S IMPORTANT.

13:49:47   2               **THE WITNESS:**  YES, SIR.

13:49:54   3               AND WHAT I'VE DONE HERE IS I'VE COMPARED WHAT I

13:49:56   4   USED IN MY ANALYSIS AND ALSO WHAT PROFESSOR BEA USED IN HIS

13:49:59   5   ANALYSIS.  AND IN THESE CASES THEY'RE QUITE CLOSE.

13:50:02   6               IF YOU LOOK AT THE LEVEE FILL AND OTHER FILL

13:50:02   7   MATERIALS, I USED THE VALUE OF 500 POUNDS PER SQUARE FOOT.  AND

13:50:07   8   IT'S IMPORTANT TO NOTE THAT THESE ALL ARE UNDRAINED STRENGTH

13:50:09   9   PARAMETERS.  I USED 500, BUT PROFESSOR BEA USED 342 FOR THE

13:50:15  10   NORTH FAILURE AND 555 FOR THE SOUTH FAILURE.  SO OUR VALUES

13:50:21  11   THERE AREN'T TOO FAR OFF.

13:50:24  12               IF WE JUMP DOWN TO THE BOTTOM HERE, WHICH IS

13:50:27  13   THIS INTERDISTRIBUTARY CLAY, THIS -- BOTH PROFESSOR BEA AND I

13:50:30  14   USED THESE PARAMETERS RIGHT HERE, WHICH WE CALL THOSE AN

13:50:35  15   UNDRAINED STRENGTH RATIO, BUT IT'S NOTHING MORE THAN KIND OF A

13:50:39  16   SHORTCUT WAY TO CALCULATE UNDRAINED STRENGTHS.  AND IT'S

13:50:43  17   PROBABLY DIFFICULT TO SEE, BUT IT'S THE UNDRAINED STRENGTH, THE

13:50:46  18   SAME AS THIS COLUMN, JUST DIVIDED BY THE STRESS RIGHT THERE.

13:50:50  19               AND THE REASON WE USE AN UNDRAINED STRENGTH

13:50:53  20   RATIO IS IT ALLOWS US TO CONVENIENTLY LOOK AT HOW STRENGTHS

13:50:56  21   VARY WITH DEPTH, YOU KNOW, CLAYS, NORMALLY THE STRENGTHS VARY

13:51:02  22   WITH DEPTH.  IT ALSO ALLOWS US TO LOOK AT VARIATION OF

13:51:05  23   STRENGTHS LATERALLY AS WELL.

13:51:07  24               **THE COURT:**  I SEE WHERE THE RUB IS.

13:51:08  25               **THE WITNESS:**  YES, SIR.  IT'S THE UPPER AND LOWER

13:51:16   1   ORGANIC CLAY.  I USED UNDRAINED STRENGTHS IN MY VALUES.  I USED

13:51:19   2   DIFFERENT STRENGTHS UNDER THE TOE VERSUS THE CREST OF THE

13:51:23   3   LEVEE.

13:51:24   4             IF YOU MIGHT RECALL, ONE OF THE BIG CRITICISMS

13:51:27   5   OF THE CORPS, BOTH FROM ILIT AND IPET, WAS THAT FOR SOME CROSS

13:51:32   6   SECTIONS, LIKE 17TH STREET, THEY DIDN'T LOOK AT VARIATIONS OF

13:51:37   7   STRENGTH ALONG THE LEVEE.  THEY USED THE SAME STRENGTH VALUE.

13:51:40   8   BUT FOR MINE, I USED 650 UNDER THE CREST, 500 UNDER THE TOE AND

13:51:44   9   BEYOND.  AND FOR THE LOWER ORGANIC CLAY, I USED 325 UNDER THE

13:51:48  10   CREST AND 225 UNDER THE TOE AND BEYOND.

13:51:51  11             **THE COURT:**  YES, SIR.

13:51:52  12             **THE WITNESS:**  AND THERE'S THE DIFFERENCE RIGHT HERE.

13:51:54  13   FOR THESE ANALYSES, PROFESSOR BEA USED DRAINED OR EFFECTIVE

13:52:00  14   STRESS STRENGTH PARAMETERS.  AND HE DID NOT USE THOSE IN HIS

13:52:06  15   2008 AND 2009 REPORTS, NOR DID HE IN HIS 17TH STREET ANALYSIS

13:52:11  16   THAT HE TALKED ABOUT DURING HIS TESTIMONY.

13:52:13  17             BUT THIS IS A VERY BIG DIFFERENCE IN OUR

13:52:17  18   ANALYSES AND RESULTS.

13:52:19  19             **THE COURT:**  SO YOU SAY, AT LEAST ACCORDING TO YOUR

13:52:24  20   TESTIMONY, HE'S TREATING THE UPPER ORGANIC CLAY AND LOWER

13:52:27  21   ORGANIC CLAY AS IF IT WERE SAND?

13:52:30  22             **THE WITNESS:**  THAT'S CORRECT.

13:52:36  23             ANOTHER IMPORTANT PART OF THE ANALYSIS IS THE

13:52:37  24   GAP.  I WASN'T SURE HOW MUCH PEOPLE WOULD HAVE SAID ABOUT THIS

13:52:40  25   BY NOW, BUT IT'S REALLY -- IT'S AN IMPORTANT PART OF THE

13:52:45   1   ANALYSIS IN THAT IT'S A VOID CREATED BETWEEN THE I-WALL AND THE

13:52:48   2   CANALSIDE LEVEE FILL.

13:52:49   3                AND I THINK THIS WAS ONE OF THE BIG THINGS THAT

13:52:53   4   CAME OUT OF THE POST-KATRINA INVESTIGATIONS, BOTH THE ILIT AND

13:53:00   5   IPET AGREED THAT THE GAP WAS A VERY IMPORTANT FACTOR IN THE

13:53:05   6   BEHAVIOR OF I-WALLS.

13:53:07   7                UNFORTUNATELY, THE GAP WAS NOT CONSIDERED IN ANY

13:53:10   8   OF THE I-WALL DESIGNS, BUT IN ALL CURRENT NEW DESIGNS, THE

13:53:15   9   GAP'S CONSIDERED.

13:53:17  10            **THE COURT:**  AND, AGAIN, THIS IS MORE OF A CURIOSITY

13:53:23  11   QUESTION.  WHAT DOES AN ENGINEER DO TO ADDRESS THE GAP ISSUE,

13:53:30  12   WHICH, AS YOU POINT OUT, IS THE VOID CREATED BETWEEN THE I-WALL

13:53:33  13   AND THE CANALSIDE LEVEE?  HOW DO YOU ADDRESS THAT ISSUE?

13:53:41  14            **THE WITNESS:**  YOU CAN ACCOMMODATE IT IN YOUR

13:53:43  15   STABILITY ANALYSIS.

13:53:44  16                AND REALLY, IF YOU HAVE A THICK SAND LAYER

13:53:47  17   BENEATH YOUR I-WALL, YOU ALSO CAN ACCOMMODATE IT IN YOUR

13:53:50  18   SEEPAGE ANALYSIS.  WHAT WE PHYSICALLY DO IS WE MODEL IT IN OUR

13:53:54  19   ANALYSIS.

13:53:55  20                A CLEVER WAY THAT YOU CAN USE --

13:53:57  21            **THE COURT:**  SO IF IT SHOWS A GAP, THEN YOU GO MORE

13:54:01  22   SHEET PILE?  IS THAT HOW YOU -- IF THERE'S A TENDENCY TO GAP --

13:54:05  23            **THE WITNESS:**  YES.

13:54:05  24            **THE COURT:**  -- HOW DOES ONE COUNTERACT THAT TENDENCY?

13:54:09  25            **THE WITNESS:**  A DEEPER SHEET PILE.

13:54:11   1                    **THE COURT:**  OKAY.  I GOT IT.

13:54:13   2                    **THE WITNESS:**  IF I CAN EXPLAIN IT JUST A BIT FURTHER.

13:54:16   3                    **THE COURT:**  SURE.

13:54:16   4                    **THE WITNESS:**  IF YOU ARE -- THE GAP CAN ONLY FORM AS

13:54:18   5    DEEP AS THE SOIL IS STRONG ENOUGH TO SUSTAIN THE GAP.

13:54:22   6                    YOU KNOW, AFTER A WHILE -- IT'S LIKE AN

13:54:24   7    UNSUPPORTED SLOPE NEXT TO A HIGHWAY.  YOU KNOW, YOU CAN CUT A

13:54:28   8    VERTICAL SLOPE, BUT AT SOME DEPTH THE SOIL'S GOING TO FAIL AND

13:54:32   9    YOU'LL HAVE A STABILITY FAILURE.  WELL, THE GAP IS THAT WAY.

13:54:35   10   YOU CAN ONLY SUSTAIN A GAP AS A FUNCTION OF THE SHEAR STRENGTH

13:54:38   11   OF THE SOIL NEXT TO THE GAP.

13:54:41   12                   OKAY.  THIS IS A LITTLE SLIDE HERE THAT SHOWS

13:54:49   13   YOU HOW THE GAP OPERATES.  AS WATER CLIMBS UP ON THE I-WALL,

13:54:55   14   THE I-WALL DEFLECTS, THEN WATER FILLS THIS INTERSTITIAL PORTION

13:55:02   15   BETWEEN THE I-WALL AND THE BACKFILL, AND YOU END UP HAVING A

13:55:06   16   FAILURE.

13:55:07   17                   NOW, THERE'S ONE REAL IMPORTANT THING ABOUT THE

13:55:13   18   GAP AS IT FIGURES INTO ANALYSES, AND I THINK THIS WAS ON

13:55:16   19   NEW ORLEANS TELEVISION.  BUT RAY SEED OF THE ILIT GROUP

13:55:20   20   DESCRIBED THIS GAP AS LIKE IF YOU HAVE A CAKE AND YOU CUT THE

13:55:24   21   CAKE WITH A KNIFE AND IT SEPARATES THE CAKE INTO TWO PIECES.

13:55:29   22   HE DESCRIBED THIS GAP AS DOING THAT TO LEVEES.  IT WAS LIKE

13:55:32   23   CUTTING THE LEVEE INTO TWO PIECES.

13:55:34   24                   AND ONE THING IT DOES, IT MAKES THE FAILURE

13:55:38   25   PLANE START FROM THE TIP OF THE SHEET PILE AND GO TOWARD THE

13:55:41   1   LAND SIDE.  AND SO NUMERICALLY WHAT HAPPENS IS THE STRENGTHS

13:55:46   2   THAT ARE IMPORTANT ARE THE STRENGTHS THAT ARE ON THIS FAILURE

13:55:50   3   PLANE.

13:55:50   4              THE STRENGTHS OVER HERE DON'T INFLUENCE YOUR

13:55:53   5   STABILITY, ONLY THE STRENGTHS THERE.

13:55:59   6          **THE COURT:**  AND AS YOU STATED, THE LONGER SHEET PILE

13:56:02   7   WOULD GIVE IT MORE -- MORE STRENGTH, IN ESSENCE.  IF THERE'S

13:56:04   8   A -- DEPENDING ON THE SHEAR STRENGTH OF THE SOILS, THAT WOULD

13:56:07   9   NATURALLY CORRELATE TO THE LENGTH OF THE SHEET PILE?

13:56:12  10          **THE WITNESS:**  YES, SIR.

13:56:13  11              AND ONE THING THAT COMES OUT OF DOING A GAP

13:56:16  12   ANALYSIS, IF YOU'RE DOING UNDRAINED ANALYSES, AS YOU SHOULD

13:56:18  13   RIGHT HERE, THEN ACTIVITIES ON THE CANAL SIDE IN OUR CASE DON'T

13:56:23  14   INFLUENCE THESE STRENGTHS RIGHT HERE.  THE UNDRAINED SHEAR

13:56:27  15   STRENGTHS YOU ASSIGN WOULD BE THE SAME REGARDLESS OF ACTIVITIES

13:56:31  16   ON THE CANAL SIDE.  SO USING THE GAP IN YOUR ANALYSIS FOCUSES

13:56:37  17   YOUR ATTENTION TO THE PROPERTIES OF THESE SOILS RIGHT HERE AND

13:56:40  18   THEIR STRENGTHS.

13:56:41  19          **THE COURT:**  SO IF THIS WERE A STABILITY FAILURE

13:56:47  20   RATHER THAN AN UNDERSEEPAGE FAILURE --

13:56:49  21          **THE WITNESS:**  YES, SIR.

13:56:49  22          **THE COURT:**  AND I'M LEAVING OUT THE UPLIFT PRESSURE

13:56:54  23   ISSUE, BUT IF THERE WERE SIMPLY A STABILITY FAILURE, THEN IT

13:56:58  24   WOULD HAVE TO BE A FAILURE RELATED TO THE LAND SIDE OF THE --

13:57:06  25   OF THE FLOODWALL, IN ESSENCE -- OR THE I-WALL?

13:57:09    1              **THE WITNESS:**  YES, SIR.

13:57:11    2              **THE COURT:**  AND THE STRENGTHS -- THE STRENGTHS

13:57:15    3    THAT ARE -- THE STRENGTH THAT IS PRESENT THERE IS WHAT WOULD

13:57:18    4    INHIBIT IT BECOMING UNSTABLE, THE FLOODWALL?

13:57:24    5              **THE WITNESS:**  CORRECT.  THOSE ARE THE IMPORTANT

13:57:26    6    STRENGTHS.

13:57:28    7              **THE COURT:**  OKAY.

13:57:28    8              **THE WITNESS:**  OKAY.

13:57:29    9              NOW, THE LAST PART OF MY ANALYSIS WAS DOING THE

13:57:32   10    NUMBER CRUNCHING.  I USED A PROGRAM CALLED SLIDE; I USED

13:57:38   11    VERSION 6.0.  PROFESSOR BEA USED SEEP/W AND SLOPE/W, WHICH ARE

13:57:44   12    BOTH GOOD PROGRAMS.

13:57:46   13              I DID MY ANALYSIS FOR CIRCULAR AND NON-CIRCULAR

13:57:50   14    FAILURE SURFACES.  I'LL SHOW YOU JUST A BIT MORE ABOUT THAT.  I

13:57:52   15    DID ANALYSES USING A GAP AND NO GAP JUST FOR CLARITY, BUT IT'S

13:57:58   16    CLEAR THAT THE GAP CASE IS THE CRITICAL CASE.

13:58:01   17              AND AN IMPORTANT PART OF THE ANALYSES ARE

13:58:02   18    SEARCHING FOR THE CRITICAL FAILURE SURFACE, AND I'LL SAY A BIT

13:58:07   19    MORE ABOUT THAT.

13:58:08   20              NOW, I THINK I CAN SUMMARIZE ALL OF MY ANALYSES

13:58:10   21    JUST ON THIS ONE SLIDE.  THERE ARE OTHER ANALYSES REPORTED IN

13:58:14   22    MY REPORT FOR OTHER CANAL WATER ELEVATIONS, FOR CONDITIONS OF

13:58:17   23    NO GAP, BUT THESE ARE THE IMPORTANT ONES.

13:58:22   24              WHAT WE HAVE HERE IS A FACTOR OF SAFETY FOR

13:58:24   25    STABILITY OF AROUND 1.  THAT CORRESPONDS TO CANAL WATER LEVELS

13:58:33   1   OF ABOUT 10 TO 10 1/2 FEET.  AND THIS IS FOR THE NORTH SECTION.

13:58:34   2                   SO MY CONCLUSION, BASED UPON THESE ANALYSES, IS

13:58:36   3   THAT YOU CAN HAVE FAILURE BEFORE WATER REACHES THE TOP OF THE

13:58:41   4   WALL OWING TO EXCEEDING THE SHEAR STRENGTH OF THE SOIL.

13:58:45   5                   SIMILARLY, FOR THE SOUTH SECTION, FOR EVERY

13:58:48   6   CANAL WATER LEVEL I ANALYZED, I GOT HIGH FACTORS OF SAFETY --

13:58:54   7             **THE COURT:**  LET ME ASK YOU A QUESTION.  ON THE NORTH

13:58:55   8   BREACH -- THE NORTH SECTION, WHY WAS THE STABILITY LESS, THE

13:59:03   9   FACT THAT -- BASED ON THE FACTOR OF SAFETY THAN ON THE SOUTH

13:59:06  10   SECTION?

13:59:09  11             **THE WITNESS:**  THE MOST IMPORTANT ISSUE IS THE LOWER

13:59:11  12   ELEVATION OF THE TOE.  THE -- AND --

13:59:14  13             **THE COURT:**  ON THE PROTECTED SIDE?

13:59:16  14             **THE WITNESS:**  YES, SIR.  THE --

13:59:19  15             **THE COURT:**  WHICH WOULD BE WHERE THE TOE IS?

13:59:21  16             **THE WITNESS:**  IF THE TOE WAS -- IF THE TOE WAS ABOUT

13:59:23  17   4 FEET TALLER, THEN WE PROBABLY WOULDN'T HAVE HAD AN ISSUE.

13:59:29  18   BUT THE TOE IN THE NORTH SECTION IS ABOUT 4 FEET LOWER

13:59:33  19   ELEVATION THAN THE TOE IN THE SOUTH SECTION.

13:59:36  20             **THE COURT:**  WAS THAT DESIGNED THAT WAY?

13:59:38  21             **THE WITNESS:**  TO THE BEST OF MY KNOWLEDGE, THE DESIGN

13:59:39  22   CALLED FOR A HIGHER ELEVATION OF THE TOE THAN WHAT WAS BUILT.

13:59:43  23             **THE COURT:**  OKAY.

13:59:48  24             **THE WITNESS:**  SO IN SUMMARY, THE NORTH SECTION BEFORE

13:59:51  25   THE WATER HIT THE TOP OF THE WALL, THE SOUTH AFTER WATER HIT

13:59:55   1   THE TOP OF THE WALL.

13:59:57   2          **THE COURT:**  JUST AS A NOTE, ONE REASON THE COURT --

13:59:58   3   THAT I ASK SOME OF THESE QUESTIONS -- OKAY -- SOME OF THEM

14:00:02   4   DON'T RELATE NECESSARILY TO THE SPECIFIC ISSUES HERE -- IS THAT

14:00:06   5   I THINK IT'S VERY IMPORTANT THAT WE HAVE AT LEAST SOME ACTUAL

14:00:10   6   TRIALS ON THIS MATTER WHERE A LOT OF THINGS ARE DISCUSSED.

14:00:14   7   THIS WOULD BE THE THIRD LONG TRIAL, ONE BEING THE BARGE.

14:00:18   8          AND I THINK IT'S REALLY IMPORTANT TO HAVE

14:00:22   9   EVERYBODY, ALL THESE EXPERTS OPINE.  AND I THINK WE ALL LEARN A

14:00:29   10  LOT FROM IT.  I THINK IT'S VERY HEALTHY, WHATEVER HAPPENS TO

14:00:36   11  THE CASE AS IT MATRICULATES UPWARD.

14:00:40   12          AND I MEAN THAT -- I DON'T MEAN THAT IN ANY KIND

14:00:42   13  OF A PEJORATIVE WAY.  I THINK IT REALLY IS REALLY SIGNIFICANT.

14:00:50   14  AND SO I THINK THAT WE ALL BENEFIT FROM THESE TRIALS, PERHAPS

14:00:53   15  NOT MONETARILY, BUT FROM A -- FROM A -- FOR THE COMMON GOOD.

14:01:02   16          YES, SIR, PLEASE, GO ON.

14:01:05   17          **THE WITNESS:**  SO THE NEXT SECTION I LOOKED AT WAS THE

14:01:10   18  ERRORS IN PROFESSOR BEA'S ANALYSES.

14:01:14   19          **THE COURT:**  AND THAT'S SUBJECT TO YOUR OBJECTION,

14:01:17   20  SIR.  IT'S PRESERVED.

14:01:19   21          **MR. JOANEN:**  THANK YOU, YOUR HONOR.

14:01:20   22          **THE COURT:**  GO AHEAD.

14:01:20   23          **THE WITNESS:**  AND BASED ON MY ASSESSMENT -- AND THESE

14:01:22   24  PREDOMINANTLY ARE BASED ON HIS COMPUTER FILES -- HIS ANALYSES

14:01:26   25  ARE RIFE WITH ERRORS, AND I THINK THE ERRORS ARE SO SUBSTANTIAL

14:01:31   1   THAT HIS CONCLUSIONS AREN'T SUPPORTED -- SUPPORTED FROM THE

14:01:34   2   ANALYSES.

14:01:36   3              AND I'VE GOT A LIST OF ERRORS HERE.  I HAVEN'T

14:01:39   4   LISTED THEM ALL AND I'M CERTAINLY NOT GOING TO TALK ABOUT THEM

14:01:44   5   ALL, BUT THERE ARE SOME THAT ARE EXTREMELY IMPORTANT.

14:01:47   6              AND I SHOULD SAY HERE THAT I SAY ERRORS IN

14:01:52   7   PROFESSOR BEA'S ANALYSIS.  WELL, IT'S CLEAR THAT PROFESSOR BEA

14:01:56   8   EMPLOYED A STUDENT AT U.C. BERKELEY, DIEGO COBOS-ROA, TO DO

14:02:00   9   THESE ANALYSES FOR HIM.

14:02:07   10             AND PROFESSOR BEA IN HIS DEPOSITIONS SAID THAT

14:02:09   11  THE ANALYSES ARE HIS RESPONSIBILITY, BUT TRUTHFULLY, IT MIGHT

14:02:12   12  BE MORE HONEST TO SAY ERRORS IN COBOS-ROA'S ANALYSIS.  BECAUSE

14:02:16   13  THE WAY I LOOKED AT THESE ANALYSES HERE, I'M NOT POINTING OUT

14:02:20   14  PROBLEMS IN ENGINEERING JUDGMENT OR SHEAR STRENGTH ASSESSMENT

14:02:22   15  OR CROSS SECTIONS.  I'M JUST POINTING OUT ERRORS IN CALCULATING

14:02:26   16  THE VALUES.

14:02:27   17             **THE COURT:**  I UNDERSTAND.

14:02:31   18             **THE WITNESS:**  AND SO THE MAJOR ONES ARE THE

14:02:32   19  INCOMPLETE SEARCH FOR CRITICAL FAILURE SURFACE, AND I'LL

14:02:36   20  EXPLAIN THAT.  THERE'S A VOID IN HIS NORTH FAILURE SECTION THAT

14:02:40   21  SHOULDN'T BE THERE.

14:02:41   22             I TALKED ABOUT THE IMPORTANCE OF THE GAP, AND HE

14:02:43   23  APPLIED THE INCORRECT WATER PRESSURE FORCE IN THE GAP.

14:02:48   24             **THE COURT:**  CAN YOU GO OVER -- THE FIRST THING YOU

14:02:50   25  MENTIONED, ARE YOU GOING TO GO OVER IT -- BECAUSE I DIDN'T

14:02:52   1   QUITE UNDERSTAND -- THE INCOMPLETE SEARCH FOR CRITICAL FAILURE?

14:02:57   2             **THE WITNESS:**  I'M GOING INTO THAT IN DETAIL.

14:02:59   3             **THE COURT:**  OH, OKAY.  GOOD.  GOOD.

14:02:59   4             **THE WITNESS:**  THE FOURTH ONE, I TALKED EARLIER ABOUT

14:03:02   5   THE USE OF THIS UNDRAINED STRENGTH RATIO TO CALCULATE UNDRAINED

14:03:06   6   STRENGTHS.  AND THE PROGRAM THAT HE USED, UNFORTUNATELY,

14:03:09   7   DOESN'T CALCULATE IT CORRECTLY.  IT GIVES YOU A WARNING THAT IT

14:03:13   8   DOESN'T CALCULATE IT CORRECTLY, BUT I'LL DISCUSS THAT.

14:03:16   9             AND THERE'S SOME OTHER ONES HERE THAT I WON'T GO

14:03:18  10   INTO DETAIL.  BUT, YOU KNOW, THE JOURDAN AVENUE FILL MATERIAL,

14:03:21  11   HE USES DIFFERENT PERMEABILITIES FOR THE NO-FAIL SECTIONS THAN

14:03:27  12   THE NORTH OR SOUTH SECTIONS.

14:03:31  13             I THINK THERE'S A PROBLEM -- AND THIS IS

14:03:33  14   DOCUMENTED AS WELL IN MY REPORT -- ABOUT THE INCONSISTENCY OF

14:03:36  15   HIS ENGINEERING PARAMETERS.  WE HAVE PARAMETERS STATED IN HIS

14:03:41  16   REPORT AND E-MAILS FROM THE PLAINTIFFS' ATTORNEYS AND IN THE

14:03:43  17   COMPUTER FILES, AND IN SOME CASES IT'S EXTREMELY DIFFICULT TO

14:03:47  18   FIND OUT WHAT VALUE HE USED IN THE ANALYSIS.

14:03:50  19             SOME OTHER ISSUES ARE THE IMPROPER USE OF THE

14:03:53  20   GAP AND MATERIALS THAT CAN'T SUSTAIN A GAP AND THE WAY THAT THE

14:03:56  21   GAP WAS MODELED.

14:03:58  22             I'M JUST GOING TO TALK ABOUT THE FIRST FEW OF

14:04:01  23   THEM HERE.

14:04:02  24             **THE COURT:**  ALL RIGHT.

14:04:03  25             **THE WITNESS:**  ONE THING THAT'S PART OF DOING A SLOPE

14:04:06   1   STABILITY OR SHEAR STABILITY ANALYSIS IS TO FIND THE CRITICAL

14:04:09   2   FAILURE SURFACE.  AND ONE THING THAT MAKES THE DIFFERENT

14:04:13   3   PROGRAMS POPULAR OR NOT POPULAR HAS TO DO WITH THEIR SEARCH

14:04:18   4   ROUTINES.

14:04:20   5           AND WHAT I'VE SHOWN HERE IS THIS IS ACTUALLY

14:04:23   6   THE -- THE SLOPE HERE, I BELIEVE, THIS IS MY NORTH FAILURE

14:04:31   7   SLOPE.  JUST AS AN EXAMPLE, I SHOWED 1,681 DIFFERENT CIRCLES.

14:04:38   8   NOW, ONE SEARCH ROUTINE THAT THESE COMPUTERS WILL DO IS -- YOU

14:04:42   9   CAN SEE THIS VERY FINE GRID HERE.  IT PUTS THE CENTER OF THE

14:04:47   10   CIRCLE AT ONE OF THOSE GRID POINTS, AND THEN IT TRIES DIFFERENT

14:04:50   11   CIRCLES TO FIND OUT WHICH CIRCLE HAS THE LOWEST FACTOR OF

14:04:53   12   SAFETY.

14:04:54   13           IT'S -- IT'S DIFFICULT TO READ ON THE SCREEN

14:04:58   14   THERE, BUT FOR THIS PARTICULAR EXAMPLE, THE LOWEST FACTOR OF

14:05:02   15   SAFETY WAS DETERMINED FOR THIS CIRCLE AND IT CAME OUT TO BE A

14:05:05   16   VALUE OF 1.057.  NOW, IN THIS CASE RIGHT HERE, I'M SHOWING

14:05:12   17   ABOUT 1700 CIRCLES JUST BECAUSE IF I SHOWED MORE, YOU WOULDN'T

14:05:16   18   BE ABLE TO SEE ANYTHING IN THE FIGURE.

14:05:18   19           BUT WHEN WE'RE DOING SLOPE STABILITY ANALYSES,

14:05:22   20   WE MIGHT ANALYZE 30 TO 50,000 DIFFERENT FAILURE SURFACES.  AND

14:05:26   21   THE COMPUTERS HAVE THESE AUTOMATIC SEARCH ROUTINES, BUT IT

14:05:30   22   REQUIRES OPERATOR ASSISTANCE TO TELL THE COMPUTER WHERE TO

14:05:35   23   SEARCH FOR THE CRITICAL CIRCLE.

14:05:38   24           AND THE CRITICAL CIRCLE THAT ONE REPORTS -- AND

14:05:41   25   THAT'S THE FACTOR OF SAFETY THAT WE TALK ABOUT -- IS THE

14:05:44   1   SURFACE THAT HAS THE MINIMUM FACTOR OF SAFETY, AND THAT'S WHAT

14:05:50   2   WE CONSIDER TO BE THE TRUE FACTOR OF SAFETY.

14:05:53   3          **THE COURT:**  AND WHAT TYPE OF SURFACE WOULD SHOW,

14:05:56   4   SHALL WE SAY, A WEAK LINK?

14:05:59   5          **THE WITNESS:**  IT WOULD BE -- VERY OFTEN IF YOU HAVE A

14:06:01   6   WEAK SEAM WITHIN THE SOIL, THE PROGRAMS WILL SEARCH OUT THAT

14:06:05   7   WEAK SEAM AND GIVE YOU A SURFACE RIGHT IN THAT WEAK SEAM.

14:06:09   8          **THE COURT:**  AND HOW DOES THE -- THIS MAY BE -- HOW

14:06:12   9   DOES THE PROGRAM -- WHAT DOES IT UTILIZE THIS DATA AND INPUT TO

14:06:18  10   SEEK OUT THE WEAK SEAM IN THE SOIL?  IN OTHER WORDS, WHAT IS

14:06:22  11   PLACED INTO THE COMPUTER THAT ENABLES THE PROGRAM -- EXCUSE ME,

14:06:28  12   WHAT IS PLACED INTO THE PROGRAM THAT ENABLES THE PROGRAM TO AT

14:06:31  13   LEAST ATTEMPT TO ASCERTAIN THAT WEAK LINK YOU TALKED ABOUT,

14:06:36  14   THAT SEAM?

14:06:38  15          **THE WITNESS:**  IN THIS PARTICULAR SEARCH THING, THE

14:06:40  16   USER WOULD SPECIFY THE BOUNDARIES OF THIS SQUARE AND HOW MANY

14:06:44  17   CENTER POINTS IN IT AND THE VARIATION OF RADIUS.

14:06:47  18          BUT EACH PROGRAM MIGHT HAVE FIVE OR SIX

14:06:51  19   DIFFERENT SEARCH ROUTINES.

14:06:52  20          **THE COURT:**  WELL, I UNDERSTAND THAT, YOU KNOW, THAT

14:06:54  21   THERE ARE PROBABLY A TREMENDOUS NUMBER OF VARYING PROTOCOLS

14:07:00  22   WITHIN THE SAME PROGRAM.  BUT WHAT I'M WONDERING IS WHAT

14:07:03  23   SOIL -- HOW -- WHAT'S PROGRAMMED INTO THE DATA FOR IT TO FIND A

14:07:11  24   WEAK SEAM IN THE SOIL?

14:07:12  25          **THE WITNESS:**  OH, YOU -- FOR EVERY LAYER HERE, YOU

14:07:15    1   WOULD ASSIGN IT A VALUE OF SHEAR STRENGTH AND A VALUE OF UNIT

14:07:19    2   WEIGHT, AND IT ALSO WOULD ACCOMMODATE THESE WATER PRESSURES

14:07:23    3   ACTING ON THE SURFACE OF THE LEVEE RIGHT THERE --

14:07:26    4          **THE COURT:**  THAT'S EVERY LAYER ON BOTH SIDES OF THE

14:07:28    5   FLOODWALL?

14:07:28    6          **THE WITNESS:**  YES.  EVERYTHING WITHIN THE ENTIRE

14:07:30    7   PROBLEM HAS TO BE ASSIGNED A STRENGTH.

14:07:32    8          **THE COURT:**  AT WHAT GRADIENT?  EVERY INCH, EVERY

14:07:35    9   MILLI-INCH, EVERY -- IS THERE --

14:07:38   10          **THE WITNESS:**  IN SOME CASES YOU MIGHT ASSIGN ONE

14:07:40   11   SINGLE STRENGTH TO THE ENTIRE LAYER.  IN OTHER CASES, AS

14:07:45   12   THIS -- IN THIS ANALYSIS, ACTUALLY, THE INTERDISTRIBUTARY

14:07:50   13   LAYER, I ASSIGNED SHEAR STRENGTHS TO ABOUT 6,000 POINTS THAT GO

14:07:56   14   INTO THAT, AND IT INTERPOLATES BETWEEN THE POINTS.

14:07:59   15          **THE COURT:**  ALL RIGHT.  THAT HELPS.  THANK YOU.

14:08:01   16          **THE WITNESS:**  AND SEARCHING FOR THIS CRITICAL CIRCLE

14:08:06   17   HERE -- CRITICAL SURFACE IS -- TAKES EXPERIENCE.

14:08:08   18                AND WHEN I TEACH CLASSES BOTH TO STUDENTS AND

14:08:11   19   ALSO TO ENGINEERS ON SLOPE STABILITY, WE SPEND QUITE A BIT OF

14:08:14   20   TIME ON HOW TO SEARCH FOR THE CRITICAL FACTORS OF SAFETY.

14:08:20   21                AND SO WHAT I'VE GOT HERE, THESE ARE

14:08:23   22   PROFESSOR BEA'S REPORTED VALUES OF FACTOR OF SAFETY FOR A CANAL

14:08:27   23   WATER LEVEL OF 14 FEET.  AND THIS SHOWS HIS TEN MAIN SECTIONS

14:08:32   24   RIGHT HERE.  THE LEFT FOR BARGE, YOU SEE, ARE FOR HIS CASE 1

14:08:39   25   AND CASE 2.

14:08:40   1              THE COURT:  RIGHT.

14:08:41   2              THE WITNESS:  NORTH BREACH SECTIONS.

14:08:42   3              THE COURT:  YES.

14:08:42   4              THE WITNESS:  AND THEN IF YOU'LL RECALL, HE HAS AN

14:08:45   5    UPPER BOUND AND A LOWER BOUND, WHICH HE CALLS INDUCTIVE AND

14:08:50   6    DEDUCTIVE SECTION.

14:08:51   7              THE COURT:  RIGHT.

14:08:52   8              THE WITNESS:  AND SO I THINK THE -- THE WAY IT WORKS

14:08:53   9    IS THE UPPER BOUND ANALYSIS HAS THE THICKER ORGANIC CLAY LAYER

14:08:57  10    AND THE LOWER BOUND ANALYSIS HAS THE THINNER ORGANIC CLAY

14:09:02  11    LAYER.

14:09:02  12              THE COURT:  RIGHT.

14:09:03  13              THE WITNESS:  AND SO THE CRITICAL THING HERE IS THIS

14:09:05  14    FACTOR OF SAFETY OF 1.  WE THINK OF ABOVE 1 AS BEING NO

14:09:09  15    FAILURE, BELOW 1 AS BEING FAILURE.  AND SO WHEN I --

14:09:13  16              THE COURT:  AND I REALIZE THERE'S SOME SUBJECTIVITY

14:09:15  17    IN THAT.

14:09:17  18              THE WITNESS:  YES, SIR.

14:09:17  19                   BUT WHAT I DID IS I TOOK PROFESSOR BEA'S

14:09:20  20    FILES -- I DID NOT CHANGE ANYTHING, THE SAME SHEAR STRENGTHS,

14:09:23  21    THE SAME -- SAME STRATIGRAPHY, SAME GEOMETRY.  THE ONLY THING I

14:09:29  22    DID WAS SPEND JUST A LITTLE TIME SEARCHING FOR A CRITICAL

14:09:41  23    FACTOR OF SAFETY.  AND THESE ARE THE VALUES THAT I GOT.

14:09:44  24                   AND IF I WERE TRYING TO TRULY FIND THE CRITICAL

14:09:46  25    FACTOR OF SAFETY, I WOULD INVEST QUITE A BIT MORE TIME ON IT.

14:09:50   1   I COULD JUST CALL THIS A CURSORY SEARCH.  YOU KNOW, I'M

14:09:51   2   NORMALLY USING CIRCULAR FAILURE SURFACES, BUT YOU CAN SEE IN

14:09:52   3   EVERY CASE I GOT MUCH LOWER FACTORS OF SAFETY THAN HE DID.

14:09:57   4             AND I ATTRIBUTE THIS SOLELY TO THE INEXPERIENCE

14:10:00   5   OF COBOS-ROA IN USING THIS PROGRAM.  AND YOU CAN SEE THAT

14:10:04   6   THERE'S --

14:10:05   7             **THE COURT:**  THIS IS NOT NECESSARILY A CALCULATION SO

14:10:08   8   MUCH AS AN OBSERVATION?  WHAT YOU'VE DONE HERE IS AN

14:10:12   9   INTERPRETATION OF THE -- OF WHAT THE PROGRAM -- TELL ME WHY --

14:10:19  10   WHAT WAS THE INEXPERIENCE?  WAS IT IN THE ACTUAL CALCULATION,

14:10:23  11   HIS INPUT, OR WAS IT IN OBSERVING WHAT THE PROGRAM ALLEGEDLY

14:10:28  12   MANIFESTED AFTER IT WAS RUN?

14:10:31  13             **THE WITNESS:**  WELL, THE PROGRAM ENDS UP GIVING YOU

14:10:33  14   JUST ONE NUMBER, WHICH IS FACTOR OF SAFETY.  BUT IF YOU'RE USED

14:10:37  15   TO RUNNING THIS, YOU'LL SEE WHERE IT DRAWS A CIRCLE AND YOU'LL

14:10:41  16   SEE IF IT SEEMS LIKE A REASONABLE CIRCLE, AND YOU MIGHT ASK THE

14:10:45  17   PROGRAM TO SEARCH IN ANOTHER AREA THAT ALSO COULD BE

14:10:47  18   REASONABLE.

14:10:49  19             THE PROGRAM CAN'T SEARCH FOR ALL, SAY, 50,000

14:10:54  20   SURFACES AUTOMATICALLY.  YOU KIND OF HAVE TO INSTRUCT IT TO

14:10:58  21   SEARCH IN THIS AREA, THEN SEARCH IN THAT AREA, THEN SEARCH IN

14:11:02  22   ANOTHER AREA.

14:11:02  23             AND I COULD TELL BY LOOKING AT HIS, SOME OF HIS

14:11:06  24   FAILURE SURFACES WERE, YOU KNOW, THREE- OR FOUR-LINE SEGMENTS,

14:11:10  25   AND IT WAS IMMEDIATELY APPARENT TO ME THAT IT DIDN'T APPEAR TO

14:11:14   1   BE A CRITICAL SURFACE.

14:11:17   2                   AND SO I ENDED UP DOING A MORE THOROUGH SEARCH,

14:11:20   3   AND I WAS AMAZED AT THE DIFFERENCE.  BECAUSE FOR CASES LIKE

14:11:22   4   THIS NORTH BREACH CASE 1 LOWER BOUND, YOU CAN SEE THE

14:11:27   5   DIFFERENCE HERE IS, YOU KNOW, A FACTOR OF SAFETY OF 1.3, WHICH

14:11:30   6   MEANS NO FAILURE AT ALL.  ACTUALLY, IT MEANS IT'S AN ACCEPTABLE

14:11:36   7   DESIGN VERSUS .9.

14:11:38   8                   AND SO, YOU KNOW, BASED UPON THIS ANALYSIS --

14:11:41   9   AND ACTUALLY, ANOTHER IMPORTANT THING IS THESE NO-BREACH

14:11:45  10   SECTIONS RIGHT HERE WENT FROM ABOVE 1 TO FAIRLY CLOSE TO 1 IN

14:11:50  11   THAT CASE.

14:11:53  12                   SO I THINK THAT THIS MEANS THAT HIS REPORTED

14:11:55  13   FACTORS OF SAFETY ARE MUCH, MUCH HIGHER THAN ONE WOULD

14:11:59  14   DETERMINE USING A MORE ACCURATE SEARCH FOR THE CRITICAL

14:12:02  15   SURFACE.

14:12:05  16             THE COURT:  ALL RIGHT.

14:12:07  17             THE WITNESS:  ANOTHER PROBLEM I FOUND -- AND THIS WAS

14:12:10  18   ONE DIFFICULT TO FIND -- IS IN CERTAIN ONES OF HIS NORTH

14:12:14  19   FAILURE SECTION, THERE'S A PHYSICAL VOID THAT EXISTS.

14:12:18  20                   AND IT'S EXTREMELY HARD TO SHOW IT ON THIS

14:12:21  21   DIAGRAM.  THERE'S A REALLY THIN, WHITE SLIT THAT'S BETWEEN THIS

14:12:27  22   COLOR AND THAT COLOR THAT YOU COULD BARELY SEE.  THE REASON

14:12:33  23   THAT THIS WAS NOTICEABLE IN THE RESULTS IS THAT THE -- HIS

14:12:36  24   SEEPAGE ANALYSES, YOU COULD SEE KIND OF ANOMALIES IN THE FLOW

14:12:42  25   LINES AND THE PRESSURES AROUND THIS AREA.

14:12:44    1              AND SO IF YOU ZOOM IN ON IT, YOU SEE THAT

14:12:47    2    THERE'S A PHYSICAL VOID THAT'S THERE.  IT'S AN AIR-FILLED VOID

14:12:51    3    LOCATED WITHIN THE DOMAIN.

14:12:53    4              NOW, TO A LAYPERSON, YOU MIGHT LOOK AT THAT TINY

14:12:58    5    LITTLE SLIT AND SAY, WELL, GOD, I CAN'T MAKE A REAL BIG

14:13:02    6    DIFFERENCE IN THE RESULTS.

14:13:03    7              WELL, IN NUMERICAL ANALYSES, IT CAN MAKE A

14:13:05    8    PRETTY BIG DIFFERENCE.  IF YOU FIX THIS PROBLEM, YOU'LL END UP

14:13:10    9    GETTING A DIFFERENT VALUE OF UPLIFT PRESSURE AND A DIFFERENT

14:13:13   10    VALUE OF FACTOR OF SAFETY.  THIS VOID INCREASES THE UPLIFT

14:13:17   11    PRESSURE AND DECREASES THE FACTOR OF SAFETY.

14:13:19   12         **THE COURT:**  AND THE VOID RESULTS NOT NECESSARILY FROM

14:13:21   13    AN ANOMALY OR DEFECT IN THE PROGRAM BUT IN THE INFORMATION

14:13:29   14    PLACED INTO THE PROGRAM?

14:13:30   15         **THE WITNESS:**  YES, SIR.

14:13:31   16         **THE COURT:**  AND SOMEHOW THE INFORMATION PLACED IN DID

14:13:36   17    NOT ACCOUNT FOR -- HE DID NOT ACCOUNT FOR THAT SLIVER OR ELSE

14:13:41   18    WAS -- IF IT WAS REGARDED BY THE INPUT -- WHOEVER'S MAKING THE

14:13:49   19    INPUT, AS A VOID BEING THERE, FOR WHATEVER REASON.  WOULD THAT

14:13:52   20    BE THE ONLY --

14:13:54   21         **THE WITNESS:**  YES, SIR.

14:13:55   22         **THE COURT:**  OKAY.  GOT IT.

14:13:56   23         **THE WITNESS:**  ANOTHER ISSUE IS THIS GAP ANALYSIS.

14:14:02   24    AND WHAT I'M SHOWING HERE IS THAT THERE'S THE GAP FORMED.

14:14:05   25    THERE'S WATER PRESSURE IN THERE.  THESE HORIZONTAL ARROWS

14:14:09   1   REPRESENT THE PRESSURE ACTING ON THE WALL.

14:14:12   2              WELL, WHEN I FIRST OBSERVED PROFESSOR BEA'S

14:14:15   3   OUTPUTS, I NOTICED THAT FOR HIS GAP, HE MODELS IT AS THAT

14:14:20   4   TRENCH RIGHT THERE.  AND YOU CAN SEE ARROWS ACTING BOTH TO THE

14:14:24   5   RIGHT AND TO THE LEFT.  AND THAT WAS A CLUE TO ME THAT HIS GAP

14:14:27   6   FORCES OR THE PRESSURES APPLIED WOULD NOT BE CORRECT.

14:14:30   7              AND SO I WENT AND LOOKED IN HIS COMPUTER DATA

14:14:34   8   FILES TO SEE WHAT VALUES HE APPLIED.  THE CALCULATION FOR THIS

14:14:38   9   IS PRETTY EASY.  I MEAN, YOU CALCULATE IT BY -- IT'S THE

14:14:41  10   EQUATION FOR THE AREA OF A TRIANGLE.

14:14:44  11              THE ONLY PARAMETER IS THE WATER DENSITY, WHICH

14:14:47  12   IS ABOUT 62.4 POUNDS PER CUBIC FOOT.  THAT'S THE SAME VALUE

14:14:51  13   THEY USED IN THEIR ANALYSES.  AND ALSO THE WALL HEIGHT, WHICH

14:14:55  14   WOULD BE THE -- THE MAXIMUM WATER LEVEL, WHICH IN HIS ANALYSIS

14:15:00  15   WAS 14 FEET, MINUS THE TIP ELEVATION OF THE SHEET PILE, WHICH

14:15:05  16   IN HIS ANALYSIS FOR ALL SECTIONS WERE MINUS 9.5 FEET.  SO THE

14:15:09  17   CORRECT FORCE TO APPLY WHEN YOU'RE ACCOMMODATING THE GAP IS

14:15:13  18   17,230 POUNDS.

14:15:15  19              I LOOKED AT THE VALUES HE USED IN HIS ANALYSIS.

14:15:18  20   AND FOR ALL HIS NORTH BREACH SECTIONS, HE USED A GAP FORCE IN

14:15:23  21   EXCESS OF 17,230 POUNDS, WHICH MEANS THE FACTOR OF SAFETY HE

14:15:28  22   CALCULATED WOULD HAVE BEEN TOO LOW.

14:15:31  23              FOR ALL THE SOUTH SECTIONS AND FOR THE

14:15:33  24   NEAR-BREACH SECTIONS, HE USED A FORCE THAT WAS TOO LOW, SO HIS

14:15:37  25   FACTOR OF SAFETY WOULD BE TOO HIGH.

3200

14:15:39    1                AND SO THESE DIFFERENT MISTAKES HERE WOULD

14:15:43    2    RADICALLY INFLUENCE HIS REPORTED VALUES OF FACTOR OF SAFETY.

14:15:50    3                I THINK PROBABLY THE BIGGEST ERROR AND -- IS THE

14:15:55    4    WAY THAT THE PROGRAM ACCOMMODATES THE USE OF THIS TERM HERE,

14:15:59    5    THIS UNDRAINED STRENGTH RATIO.  MY VALUE WAS .28; HIS VALUE WAS

14:16:05    6    .26.  THEY'RE REALLY CLOSE.  THEY'RE ESSENTIALLY THE SAME.

14:16:09    7                BUT WHAT THIS IS, IT'S A SHORTCUT WAY TO

14:16:12    8    CALCULATE THE STRENGTH IN THIS BIG INTERDISTRIBUTARY CLAY

14:16:16    9    LAYER.  AND WHAT IT DOES IS IT CALCULATES THE STRENGTH AS A

14:16:19   10    FUNCTION OF STRESS.  AND THE ABILITY OF THIS PROGRAM TO

14:16:26   11    CALCULATE IT, THE PROGRAM THAT HE USED, IS A RELATIVELY NEW

14:16:29   12    FEATURE OF THE PROGRAM.

14:16:31   13                IN THE MANUAL IT WARNS YOU TO BE VERY CAREFUL

14:16:36   14    USING THIS FEATURE.  AND WHAT IT'S SUPPOSED TO DO IS YOU PICK

14:16:39   15    ONE WATER LEVEL, AND THIS WOULD BE A PRE-KATRINA STATIC WATER

14:16:44   16    LEVEL.

14:16:45   17                AND BOTH PROFESSOR BEA AND I PICKED ONE THAT'S

14:16:48   18    ABOUT ELEVATION 0 ON THE CANAL SIDE AND ABOUT ELEVATION MINUS 4

14:16:52   19    OR SO ON THE LAND SIDE.  THEN YOU CALCULATE THE STRESSES IN

14:16:58   20    THIS LAYER AND MULTIPLY THEM BY THIS FACTOR, AND THAT GIVES YOU

14:17:02   21    THE UNDRAINED STRENGTH.

14:17:03   22                YOU APPLY THOSE SAME UNDRAINED STRENGTHS TO

14:17:06   23    EVERY SUBSEQUENT CANAL WATER LEVEL IN YOUR ANALYSIS.  THE

14:17:09   24    UNDRAINED STRENGTH DOESN'T CHANGE DURING THE ANALYSIS BECAUSE

14:17:13   25    THE VOID RATIO OF THE SOIL DOESN'T CHANGE.  SO THIS IS THE WAY

14:17:17   1   THAT IT'S SUPPOSED TO BE DONE.

14:17:21   2               FRANKLY, WHEN I'M CALCULATING THIS, I USE

14:17:24   3   SOMETHING LIKE A SPREADSHEET.  I'LL CALCULATE ALL THE STRENGTHS

14:17:27   4   HERE, AND THEN I'LL IMPORT THEM IN THERE TO MAKE SURE IT'S

14:17:30   5   CORRECT.

14:17:31   6               PROFESSOR BEA USED A FEATURE OF THE PROGRAM, AND

14:17:35   7   WHAT IT DID INCORRECTLY IS IT CALCULATED A DIFFERENT STRENGTH

14:17:38   8   IN THAT CLAY FOR EVERY CANAL WATER ELEVATION.  AND SO IT ENDED

14:17:45   9   UP, AS HIS CANAL WATER ELEVATION INCREASED, THE PROGRAM WOULD

14:17:50   10  CALCULATE A DIFFERENT STRENGTH IN THIS CLAY LAYER FOR EVERY

14:17:53   11  CANAL WATER ELEVATION.

14:17:54   12              AND THE NET EFFECT OF THIS IS PROFESSOR BEA'S

14:17:58   13  INTENTION WAS TO USE UNDRAINED STRENGTHS IN THIS

14:18:03   14  INTERDISTRIBUTARY CLAY.  BUT THIS ERROR, IN EFFECT, TURNED HIS

14:18:07   15  UNDRAINED STRENGTHS INTO DRAINED STRENGTHS, BECAUSE HIS

14:18:09   16  STRENGTHS HERE ARE A FUNCTION OF PORE PRESSURES ON THIS CANAL

14:18:13   17  WATER LEVEL.

14:18:14   18          **THE COURT:**  WHAT EFFECT DOES THAT HAVE ON THE .26 AND

14:18:17   19  THE .28?  IN ESSENCE, YOU'RE SUPPOSED TO APPLY THAT ONLY -- AS

14:18:24   20  A -- AT ONE LEVEL.  THE LEVEL, YOU STARTED OFF ZERO AT THE --

14:18:30   21  ZERO AT THE CANAL AND MINUS 4 ON THE OTHER SIDE.

14:18:33   22          **THE WITNESS:**  YES, SIR.

14:18:34   23          **THE COURT:**  AND IF YOUR PROGRAM APPLIES THAT SAME

14:18:37   24  RATIO -- THAT SAME DECIMAL, .26 -- HIS IS .26, WAS IT?

14:18:45   25          **THE WITNESS:**  YES, SIR.

14:18:45   1          **THE COURT:**  IF YOU APPLY THAT .26 TO VARYING LEVELS,

14:18:50   2   IT HAS THE EFFECT OF MAKING THE UNDRAINED STRENGTH RATIO

14:18:57   3   INCORRECT?

14:18:58   4          **THE WITNESS:**  YES, SIR.  AND THE NET EFFECT OF IT IN

14:19:03   5   THE ANALYSES IS IT GIVES YOU -- IN THE INTERDISTRIBUTARY CLAY

14:19:05   6   IT GIVES YOU STRENGTHS THAT ARE TOO LOW.

14:19:07   7          **THE COURT:**  RIGHT.

14:19:07   8          **THE WITNESS:**  AND SO -- SO IT'S CLEAR TO SEE, BASED

14:19:09   9   ON HIS RATIO, WHAT STRENGTHS HE INTENDED TO APPLY.  BUT THE

14:19:13  10   PROGRAM ITSELF USED STRENGTHS THAT WERE LOWER.

14:19:19  11          AND SO BASED UPON THESE ERRORS RIGHT HERE, YOU

14:19:22  12   KNOW, I THINK HIS ANALYSES -- THERE'S MANY, MANY ERRORS, AND

14:19:28  13   ONES I DIDN'T MENTION.  AND IT WOULD TAKE CONSIDERABLE EFFORT

14:19:33  14   TO CORRECT ALL THESE ERRORS.

14:19:35  15          AND I THINK THAT THE FACTORS OF SAFETY WOULD BE

14:19:37  16   COMPLETELY DIFFERENT, AND I DON'T THINK THAT THEY WOULD SUPPORT

14:19:39  17   HIS CONCLUSIONS HERE.  I THINK IT WOULD CHANGE THINGS QUITE A

14:19:44  18   BIT.

14:19:44  19          SHALL I CONTINUE OR . . .

14:19:46  20          **THE COURT:**  YES, SIR.

14:19:47  21          **THE WITNESS:**  OKAY.  SO THE NEXT THING IS THOSE

14:19:50  22   ERRORS AND ALL THAT I JUST SHOWED WERE BASED UPON -- YOU KNOW,

14:19:54  23   I WASN'T CRITIQUING HIS ENGINEERING JUDGMENT.  I WAS JUST

14:19:58  24   CRITIQUING THE CALCULATIONS DONE.

14:20:00  25          **THE COURT:**  I UNDERSTAND.

14:20:01   1            **THE WITNESS:**  I THINK THERE'S SOME ENGINEERING

14:20:03   2   JUDGMENT ERRORS HERE AS WELL.

14:20:04   3            I THINK THE FIRST AND FOREMOST -- AND I KNOW

14:20:07   4   YOU'VE HEARD THIS -- IS MODELING THE ORGANIC CLAY AS A DRAINED

14:20:11   5   MATERIAL --

14:20:12   6            **THE COURT:**  RIGHT.

14:20:12   7            **THE WITNESS:**  -- IS A CONSIDERABLE ERROR.

14:20:14   8            ANOTHER THING THAT'S ALSO IN MY REPORT IS THAT

14:20:16   9   HE APPLIED THEORIES FOR EROSION, HEAVE, AND PIPING TO PROFILES

14:20:20  10   NOT HAVING THIS THICK SAND LAYER.

14:20:23  11            I DON'T THINK HE'S USING THOSE SAME ARGUMENTS

14:20:27  12   NOW, BUT IN HIS REPORT THAT WAS AN ISSUE.

14:20:31  13            MY REPORT CONCENTRATES ON ARE THERE LARGE SAND

14:20:35  14   AND SHELL DEPOSITS IN THE EBIA BASED ON OUR RECENT EXPLORATION?

14:20:39  15   AND I DON'T THINK THERE ARE.

14:20:40  16            I BELIEVE THAT PROFESSOR BEA IGNORED THE ROLE OF

14:20:44  17   FLOW IN SEEPAGE-RELATED FAILURES, BUT I THINK HE'S BACKED OFF

14:20:49  18   OF THE SEEPAGE AS A FAILURE MECHANISM --

14:20:51  19            THERE'S CERTAINLY SOME CONFUSION REGARDING

14:20:53  20   STEADY STATE VERSUS TRANSIENT SEEPAGE ANALYSIS.

14:20:57  21            I'VE DOCUMENTED THAT IN MY REPORT.  BUT WHEN I

14:20:59  22   WROTE MY REPORT, I THOUGHT THAT PROFESSOR BEA DID TRANSIENT

14:21:03  23   SEEPAGE ANALYSES, BECAUSE THAT'S WHAT HE SAID IN HIS REPORT.

14:21:06  24   IT'S ONLY LATER THAT I UNDERSTAND THAT HE DID STEADY-FLOW

14:21:10  25   ANALYSES, WHICH ARE EQUIVALENT TO STEADY-STATE SEEPAGE

14:21:12   1   ANALYSES.

14:21:14   2            I THINK YOU'VE HEARD QUITE A BIT ABOUT THESE

14:21:17   3   M SUB V VALUES AND HOW THEY AFFECT TRANSIENT ANALYSES.

14:21:22   4            I THINK, GENERALLY SPEAKING, EVEN WITH CORRECT

14:21:26   5   M SUB VS, HIS APPROACH IS INCORRECT BECAUSE EVEN USING

14:21:30   6   TRANSIENT PORE PRESSURES CALCULATED CORRECTLY, THOSE AREN'T THE

14:21:34   7   RIGHT PORE PRESSURES TO BE USED IN A SHORT-TERM LOADING

14:21:38   8   CONDITION LIKE WE'VE GOT HERE.

14:21:40   9            AND I GUESS ALSO WHAT WOULD CLASSIFY AS

14:21:43  10   ENGINEERING JUDGMENT IS -- I'VE POINTED OUT SOME SERIOUS ERRORS

14:21:47  11   IN THEIR 2D SEEPAGE ANALYSES.

14:21:50  12            THERE'S ALSO SOME ERRORS IN THEIR 3D ANALYSES

14:21:53  13   THAT THEY SHOWED SOME RESULTS FOR.  WE WEREN'T ABLE IT GET IN

14:21:56  14   THE FILES.

14:21:57  15            BUT, YOU KNOW, I WOULD THINK THAT WITH ADEQUATE

14:21:59  16   ENGINEERING JUDGMENT, ONE WOULD IDENTIFY THESE ERRORS PRIOR TO

14:22:02  17   PRODUCING THE ENGINEERING REPORT.

14:22:04  18            NOW, OF THESE, THE MAIN ONE I JUST WANT TO TALK

14:22:08  19   ABOUT IS THIS MODELING ORGANIC CLAY AS A DRAINED MATERIAL.  AND

14:22:15  20   I THINK I MIGHT CAN CLEAR UP THIS DRAINED VERSUS UNDRAINED.

14:22:17  21         **THE COURT:**  I PRETTY WELL UNDERSTAND AT THIS POINT.

14:22:20  22         **THE WITNESS:**  YOU KNOW, THERE CAN -- IN SOILS THERE'S

14:22:21  23   TWO MAIN MECHANISMS FOR PORE PRESSURE CHANGE.  ONE IS A CHANGE

14:22:24  24   IN PORE PRESSURE DUE TO THE CHANGE IN STRESS.  THE OTHER IS A

14:22:28  25   CHANGE IN PORE PRESSURE DUE TO HYDRAULIC BOUNDARY CONDITIONS.

14:22:31   1            AND I TRIED TO THINK OF A WAY TO DEMONSTRATE

14:22:34   2   THIS FIRST ONE.  BUT THE ONLY THING I CAN THINK OF THAT'S --

14:22:40   3   THAT'S KIND OF CLEAR IS, IMAGINE THAT YOU'VE GOT A SATURATED

14:22:44   4   SOIL, AND THIS SATURATED SOIL IS ENCASED IN A RUBBER MEMBRANE,

14:22:49   5   LIKE A BALLOON WITH A KNOT TIED ON TOP.

14:22:53   6            AND SO IF YOU ENDED UP SQUEEZING THIS SATURATED

14:22:56   7   SOIL IN YOUR HANDS AND YOU HAD SOME WAY TO MEASURE THIS PORE

14:23:00   8   PRESSURE OF THE WATER WITHIN THE VOIDS OF THE SOIL, THEN IT

14:23:04   9   SEEMS LIKE YOU WOULD EXPECT THE PRESSURE TO INCREASE AS YOU

14:23:08  10   SQUEEZED IT.  AND THAT'S WHAT I MEAN BY A CHANGE IN PORE

14:23:13  11   PRESSURE DUE TO A CHANGE IN STRESS.

14:23:15  12            THIS IS THE MECHANISM OF PORE PRESSURE CHANGE

14:23:19  13   THAT'S ACCOMMODATED BY AN UNDRAINED ANALYSIS, BUT THIS IS NOT

14:23:22  14   THE MECHANISM OF PORE PRESSURE CHANGE THAT PROFESSOR BEA

14:23:27  15   INCLUDES IN HIS ANALYSIS.

14:23:32  16            NOW, I THINK IT'S UNDERSTAND- -- IT'S EASY TO

14:23:34  17   UNDERSTAND THE APPLICABILITY OF THIS MECHANISM BY LOOKING AT

14:23:38  18   WHAT WE HAVE HERE AT IHNC OR, REALLY, AN I-WALL SITUATION.

14:23:42  19            BUT IF YOU LOOK AT AN ELEMENT OF SOIL -- I SHOW

14:23:45  20   IT RIGHT HERE, BUT IT COULD BE ANYWHERE.  AS YOU END UP HAVING

14:23:49  21   THIS WALL PRESS IN AGAINST THE LEVEE FILL, THEN YOU WOULD

14:23:52  22   EXPECT TO HAVE A CHANGE IN STRESS ON THIS ELEMENT.

14:23:55  23            SINCE IT'S A CLAY AND DOESN'T HAVE ADEQUATE TIME

14:23:57  24   TO DISSIPATE THESE PORE PRESSURES, YOU'RE GOING TO HAVE A

14:24:00  25   CHANGE IN PORE PRESSURE.  THAT'S THE IMPORTANT CHANGE IN PORE

14:24:04    1   PRESSURE THAT YOU GET FROM AN UNDRAINED LOADING THAT'S A

14:24:09    2   RELATIVELY SHORT-TERM LOADING ON THE HOUR -- ON THE ORDER OF

14:24:14    3   30 HOURS OR SO.

14:24:15    4           IF YOU JUST LOOK AT -- FROM THIS BOOK, "SOIL

14:24:18    5   STRENGTH AND SLOPE STABILITY," PROFESSORS DUNCAN AND WRIGHT

14:24:23    6   ACKNOWLEDGE THAT ESTIMATING THE -- "ESTIMATING THE DISTRIBUTION

14:24:28    7   OF PORE WATER PRESSURE THAT RESULTS FROM UNDRAINED LOADING

14:24:31    8   REQUIRES CONSIDERABLE EFFORT AND IS DIFFICULT TO DO

14:24:35    9   ACCURATELY."

14:24:36   10           IT SAYS:  "THE MOST STRAIGHTFORWARD WAY OF

14:24:39   11   ESTIMATING THESE STRESS CHANGES IS BY USING ELASTIC THEORY."

14:24:43   12           AND SO ONE CAN CALCULATE THIS CHANGE IN PORE

14:24:46   13   PRESSURES DUE TO CHANGES IN STRESS.  IT'S QUITE DIFFICULT TO.

14:24:49   14   BUT IF WE USE UNDRAINED STRENGTHS, IT ACCOMMODATES THESE

14:24:53   15   CHANGES IN PORE PRESSURES AUTOMATICALLY.

14:24:56   16           THE SECOND MECHANISM OF A CHANGE IN PORE

14:24:59   17   PRESSURE IS BY CHANGING YOUR HYDRAULIC BOUNDARY CONDITIONS.

14:25:01   18   AND THAT'S WHEN YOU, YOU KNOW, INCREASE THE PRESSURE IN ONE

14:25:05   19   END, DECREASE THE PRESSURE AT THE OTHER END, YOU HAVE WATER

14:25:08   20   FLOWING THROUGH THE SOIL.

14:25:10   21           THIS IS THE MECHANISM THAT PROFESSOR BEA

14:25:12   22   INCLUDES IN HIS ANALYSIS; NOT THE CHANGE IN STRESS, BUT THE ONE

14:25:15   23   DUE TO THE CHANGE IN HYDRAULIC BOUNDARY CONDITIONS.

14:25:19   24           AND THERE'S A DIFFERENCE IN THE WAY THAT THESE

14:25:23   25   RATES OF PORE PRESSURE CHANGE OCCUR VERSUS TIME.  IF YOU LOOK

3207

14:25:28    1    AT -- NOW, THESE -- THESE ARE JUST DEMONSTRATIVES HERE.  YOU

14:25:32    2    CAN SEE I DON'T HAVE NUMBERS ON PORE PRESSURE.  IT SHOWS THE

14:25:36    3    GENERAL TREND VERSUS TIME.

14:25:39    4                      BUT FOR THIS TYPE OF EXAMPLE, I'M ASSUMING THAT

14:25:42    5    THE WATER GOES UP TO THE TOP OF THE WALL AND STAYS THERE FOR AN

14:25:46    6    ENTIRE YEAR.

14:25:46    7                      AND SO IF YOU LOOK AT THE PORE PRESSURE DUE TO

14:25:49    8    CHANGE IN STRESS, IT HAPPENS PRETTY INSTANTANEOUSLY.  AND OVER

14:25:53    9    TIME, AS THIS CLAY ALLOWS PORE PRESSURES TO DISSIPATE, YOUR

14:25:58   10    PRESSURES GET SMALLER AND SMALLER UNTIL IT REACHES A RESIDUAL

14:26:03   11    VALUE.

14:26:04   12                      THIS IS THE PORE PRESSURE CHANGE THAT'S

14:26:06   13    ACCOMMODATED IN AN UNDRAINED ANALYSIS SUCH AS THOSE THAT I

14:26:10   14    PERFORMED AND ALSO DR. MARR AND DR. SILVA.

14:26:14   15                      THE PORE PRESSURE CHANGE THAT PROFESSOR BEA

14:26:16   16    MODELED WOULD BE ONE DUE TO THIS CHANGE IN HYDRAULIC BOUNDARY

14:26:20   17    CONDITIONS.  AND IF DONE CORRECTLY, IT WOULD SHOW NO PORE

14:26:24   18    PRESSURE CHANGE FOR THE SHORT PERIOD, AND THEN IT WOULD

14:26:26   19    INCREASE AND INCREASE OVER TIME.  TO SOMETIME BETWEEN A HALF A

14:26:30   20    YEAR TO A YEAR YOU WOULD REACH A STEADY-STATE VALUE.

14:26:34   21                      THIS IS THE TYPE OF PORE PRESSURE CHANGE THAT

14:26:37   22    PROFESSOR BEA PUT IN HIS ANALYSIS, EXCEPT THAT BY USING THIS

14:26:40   23    VERY, VERY LOW VALUE OF M SUB V, HE MADE THIS RELATIONSHIP

14:26:46   24    APPEAR LIKE THAT.

14:26:47   25                      **THE COURT:**  DOES THAT GET INTO INCOMPRESSIBILITY AND

14:26:51   1   COMPRESSIBILITY?

14:26:53   2                    **THE WITNESS:**  YES, SIR.

14:26:53   3                    **THE COURT:**  ALL RIGHT.  I UNDERSTAND NOW.

14:26:56   4                    **THE WITNESS:**  I THINK I HAVE AN EXPLANATION OF WHY

14:26:58   5   THIS MIGHT BE INCORRECT.  AND IF YOU'LL ALLOW ME, THERE'S AN

14:27:04   6   ANALOGY I THINK I CAN USE THAT ALL KIDS WOULD UNDERSTAND.  AND

14:27:09   7   THIS REALLY DEMONSTRATES THE DIFFERENCE BETWEEN A STEADY-STATE

14:27:12   8   ANALYSIS, WHICH WOULD BE THIS VALUE HERE, OR A TRANSIENT

14:27:17   9   ANALYSIS.

14:27:17  10                    AND THE WAY IT WORKS, IN GEOTECHNICAL

14:27:23  11   ENGINEERING WE OFTEN USE HEAT FLOW ANALOGIES FOR SEEPAGE

14:27:26  12   BECAUSE YOU HAVE, REALLY, THE IDENTICAL THING GOING ON.

14:27:29  13                     IN SEEPAGE, WE LOOK AT WATER FLOWING FROM A

14:27:32  14   LOCATION OF HIGH HEAD TO LOW HEAD, AND WE LOOK AT THE RATE OF

14:27:36  15   FLOW BEING CONTROLLED BY THE HYDRAULIC CONDUCTIVITY, AND WE USE

14:27:41  16   DARCY'S LAW TO CALCULATE FLOWS.

14:27:44  17                    WELL, IN HEAT FLOW WE USE FOURIER'S LAW, WHICH

14:27:50  18   LOOKS ALMOST IDENTICAL TO DARCY'S LAW.  HEAT FLOWS FROM HIGH

14:27:53  19   TEMPERATURE TO LOW TEMPERATURE, AND THE FLOW RATE'S DEPENDENT

14:27:56  20   UPON THE THERMAL CONDUCTIVITY OF THE MATERIAL.

14:28:00  21                    WELL, AS LITTLE KIDS, OFTEN YOU'LL ROAST

14:28:02  22   MARSHMALLOWS IN CUB SCOUT CAMPS OR CHURCH CAMPS OR COOKOUTS

14:28:09  23   WITH YOUR PARENTS.  IN MY DAY WE USED TO USE THESE OLD THICK

14:28:13  24   COAT HANGERS, MUCH THICKER THAN WE HAVE NOW, BUT AS A LITTLE

14:28:15  25   KID, IT TAKES SOME EFFORT TO STRAIGHTEN IT OUT.

14:28:16    1              **THE COURT:**  YOU'RE GETTING INTO MY AREA OF EXPERTISE.

14:28:18    2              **THE WITNESS:**  AND AS YOU STRAIGHTEN OUT THIS COAT

14:28:20    3    HANGER, YOU KNOW, THE FLAKES OF PAINT THAT PROBABLY HAD LEAD IN

14:28:24    4    THEM WOULD, YOU KNOW, COME OFF AND GET INTO YOUR MARSHMALLOWS,

14:28:27    5    BUT THAT'S NOT PART OF ANALOGY.

14:28:29    6              SO YOU STRAIGHTEN OUT THIS COAT HANGER, PUT YOUR

14:28:32    7    MARSHMALLOWS ON THE END, YOU PUT IT IN THE FIRE, AND YOU MIGHT

14:28:37    8    PUT A LOOP IN THERE TO HOLD ON TO IT.

14:28:39    9              BUT EVEN AS I KID, YOU REALIZE THAT, YOU KNOW,

14:28:41   10    IF YOU HOLD YOUR MARSHMALLOWS IN THERE, OVER TIME WHEN YOU'RE

14:28:44   11    HOLDING IT, IT GETS HOTTER AND HOTTER, AND SOON IT WILL GET TOO

14:28:49   12    HOT SO YOU CAN'T HOLD IT ANYMORE.

14:28:51   13              AND WHAT THAT IS, IT'S THE SAME THING AS A

14:28:54   14    TRANSIENT SEEPAGE ANALYSIS.  IF YOU PUT YOUR COAT HANGER IN

14:28:56   15    THERE, YOU'VE GOT A HIGH TEMPERATURE AT ONE END AND LOW

14:29:00   16    TEMPERATURE AT THE ANOTHER END.  THE TEMPERATURE AT THE LOW END

14:29:05   17    INCREASES.

14:29:05   18              AND IF YOU WERE TO LOOK AT THIS PLOT RIGHT HERE

14:29:07   19    AND INSTEAD OF PORE PRESSURE YOU APPLIED TEMPERATURE; AND

14:29:11   20    INSTEAD OF TIME, I GUESS INSTEAD OF DAYS, WE'RE LOOKING FOR A

14:29:15   21    FOR A COAT HANGER, WE'RE LOOKING ON THE ORDER OF MINUTES TO

14:29:19   22    TENS OF MINUTES; WELL, YOU START OFF BEING ABLE TO HOLD THE

14:29:22   23    COAT HANGER, AND THEN IT GETS HOTTER AND HOTTER.

14:29:25   24              SO THAT'S A PERFECT EXAMPLE OF WHAT TRANSIENT

14:29:27   25    SEEPAGE ANALYSIS IS.  AND PRACTICALLY SPEAKING, YOU KNOW, EVEN

14:29:31   1   GETTING RID OF THESE VALUES OF COMPRESSIBILITY, ONE WOULDN'T

14:29:35   2   EXPECT THE PORE PRESSURES AT THE TOE OF THE LEVEE TO INCREASE

14:29:38   3   INSTANTANEOUSLY LIKE SHOWN BY THIS.  IT WOULD TAKE SOME TIME IN

14:29:44   4   THE SAME WAY IT TAKES SOME TIME FOR THIS COAT HANGER TO HEAT

14:29:47   5   UP.

14:29:48   6            LIKEWISE, IF YOU PUT THE COAT HANGER --

14:29:51   7        **THE COURT:**  SO YOU'RE SAYING EVEN IF THE MATERIAL WAS

14:29:54   8   REGARDED AS INCOMPRESSIBLE, THE EFFECT OF -- AND USING A

14:30:02   9   DRAINED ANALYSIS, THAT THE PRESSURE -- THE EFFECT OF THE

14:30:09  10   PRESSURES ON THE PROTECTED SIDE SHOULD NOT BE INSTANTANEOUS?

14:30:15  11        **THE WITNESS:**  YES, SIR.  AND I GUESS WHAT I'M SAYING

14:30:17  12   IS THAT --

14:30:19  13        **THE COURT:**  APPARENTLY THE PROGRAM -- NOT COMMENTING

14:30:25  14   ON THE VALUES HE USED -- BUT THE PROGRAM INDICATED -- WHATEVER

14:30:29  15   PROGRAM HE USED -- INDICATED -- OR HIS ASSISTANT OR WHOEVER --

14:30:33  16   INDICATED THE FAILURE USING -- USING INCOMPRESSIBILITY AND

14:30:40  17   DRAINED AS BEING VIRTUALLY INSTANTANEOUS?

14:30:44  18        **THE WITNESS:**  YES, SIR.  YEAH.  THE M SUB V, WHAT IT

14:30:46  19   DOES IS, IT GIVES YOU THIS DOTTED LINE CURVE HERE WHERE YOU

14:30:50  20   WOULD IMMEDIATELY BURN YOUR HAND AS SOON AS YOU PUT YOUR

14:30:52  21   MARSHMALLOWS IN THE FIRE VERSUS THIS CURVE RIGHT HERE, WHICH IS

14:30:57  22   WHAT ONE WOULD EXPECT TO OCCUR.

14:30:59  23        **THE COURT:**  ALL RIGHT.  I UNDERSTAND.

14:31:00  24        **THE WITNESS:**  OKAY.

14:31:05  25            AND SO IF YOU TOOK THE COAT HANGER AND STUCK IT

14:31:08   1   IN THE FIRE AND YOU LEFT IF THERE THEN, YOU KNOW, YOU'RE DOING

14:31:11   2   TO REACH SOME MAXIMUM TEMPERATURE, AND IT'S GOING TO BE STEADY,

14:31:14   3   AND THAT'S WHAT STEADY STATE IS.

14:31:15   4               SO I THINK THAT EITHER ANALOGY IS A GOOD WAY TO

14:31:17   5   UNDERSTAND TRANSIENT VERSUS STEADY STATE.

14:31:22   6         **THE COURT:**  I UNDERSTAND.

14:31:22   7         **THE WITNESS:**  AND SO IN KIND OF SUMMARY OF THESE

14:31:23   8   RIGHT HERE, YOU KNOW, USING UNDRAINED STRENGTHS, WHICH WERE

14:31:26   9   DONE BY MYSELF AND DR. MARR AND DR. SILVA, IT ACCOMMODATES THIS

14:31:31  10   CHANGE IN PORE PRESSURE DUE TO CHANGE IN STRESSES.  IT'S BUILT

14:31:34  11   INTO OUR UNDRAINED STRENGTH PARAMETERS.

14:31:37  12               YOU KNOW, IT HAS TO DO WITH WE RUN THE TEST

14:31:41  13   SIMULATING THE STRESSES THAT OCCUR IN-SITU, AND THEN THE

14:31:46  14   STRENGTH WE GET OUT OF IT, YOU KNOW, TAKES CARE OF THESE PORE

14:31:49  15   PRESSURES.

14:31:50  16               PROFESSOR BEA'S EFFECTIVE STRESS OR DRAINED

14:31:53  17   ANALYSIS DOESN'T CONSIDER THESE PORE PRESSURE CHANGES THAT ARE

14:31:55  18   DUE TO CHANGES IN STRESS.  IT JUST CONSIDERS THESE CHANGES IN

14:31:59  19   PORE PRESSURE DUE TO THE CHANGE IN HYDRAULIC BOUNDARY

14:32:05  20   CONDITIONS WHICH ARE MODIFIED BY THIS M SUB V VALUE.

14:32:09  21         **THE COURT:**  I UNDERSTAND.

14:32:14  22         **THE WITNESS:**  IS IT POSSIBLE WE COULD TAKE A BREAK

14:32:16  23   RIGHT NOW?

14:32:17  24         **THE COURT:**  YES, SIR, IT IS.

14:32:19  25               WE WILL TAKE A TEN-MINUTE RECESS.

```
14:32:21   1              DO WE -- IS IT THE PLAN -- I DON'T KNOW ABOUT

14:32:25   2   FROM THE PLAINTIFFS' STANDPOINT OR WGI.  IS IT THE PLAN THAT

14:32:30   3   YOU WOULD ATTEMPT TO FINISH THIS WITNESS TODAY, OR DO YOU THINK

14:32:33   4   THAT'S EVEN CONCEIVABLE?

14:32:36   5              MR. JOANEN:  I DON'T KNOW HOW MUCH LONGER HE HAS.  I

14:32:38   6   DO NOT HAVE --

14:32:39   7              THE COURT:  ABOUT HOW MUCH LONGER DO YOU HAVE, SIR?

14:32:41   8              THE WITNESS:  30 MINUTES.

14:32:41   9              THE COURT:  OH, OKAY.

14:32:46  10              WE'LL SEE.  WE'LL SEE.

14:32:47  11              MR. JOANEN:  I WOULD CERTAINLY BE FINISHED WELL

14:32:50  12   BEFORE THEN.

14:32:50  13              MR. TREEBY:  WE WERE HOPING TO GET ONE OTHER WITNESS

14:32:51  14   ON TODAY, SO WE MAY GET -- WE MAY DO IT.

14:32:55  15              THE COURT:  I WOULDN'T COUNT ON IT.

14:32:57  16              MR. TREEBY:  HOPE SPRINGS ETERNAL.

14:33:02  17              THE COURT:  I KNOW.  FOR ME TOO.  THAT'S THE WAY IT

14:33:05  18   IS.  ALL RIGHT.  THANK YOU.

14:33:07  19              THE DEPUTY CLERK:  ALL RISE.

14:33:07  20              (WHEREUPON, THE COURT TOOK A RECESS.)

14:47:36  21              THE DEPUTY CLERK:  ALL RISE.

14:47:38  22              COURT'S IN SESSION.  PLEASE BE SEATED.

14:47:46  23              THE COURT:  OKAY.  WHERE ARE WE?

14:47:49  24              OH, YES, SIR.  GO AHEAD.

14:47:50  25              THE WITNESS:  THIS WAS MY LAST MAJOR SECTION HERE.
```

14:47:53   1   AND IT'S JUST ADDRESSING PROFESSOR BEA'S HAND CALCULATIONS THAT

14:47:57   2   HE SUBMITTED AFTER HE SUBMITTED HIS FINDINGS FOR IT.  AND THESE

14:48:13   3   WERE DONE WITH THE PURPOSES OF VALIDATED COBOS-ROA'S COMPUTER

14:48:20   4   ANALYSES AND ASSESSING THE EFFECTS ON THE ELEVATED LANDSIDE

14:48:25   5   WATER LEVEL.

14:48:26   6                   AN IMPORTANT ONE IS TO SHOW IN HIS MIND THAT THE

14:48:29   7   DRAINED AND UNDRAINED STABILITY ANALYSES ARE THE SAME AND TO

14:48:33   8   CALCULATE THE CONTRIBUTIONS OF THE EXCAVATIONS TO FLOW.

14:48:36   9                   AND SO HE SUBMITTED FIVE OR SIX DIFFERENT

14:48:40  10   SEPARATE APPENDICES.  I'M ONLY GOING TO ADDRESS TWO OF THEM OR

14:48:44  11   LOOK AT TWO OF THEM.  ONE IS APPENDIX B.  APPENDIX B WAS

14:48:52  12   SUBMITTED.  IT SAYS:  "IN RESPONSE TO THE DEFENSE'S REQUEST FOR

14:48:55  13   ME TO JUSTIFY THE APPROPRIATENESS OF EFFECTIVE STRESS...AND

14:48:55  14   TOTAL STRESS, I PROVIDE THE QUANTITATIVE ANALYSES WHICH I

14:49:00  15   PERFORMED USING HAND CALCULATIONS."

14:49:03  16                   THIS IS WHERE HE COMPARES USING THE EFFECT OF

14:49:07  17   THE TOTAL STRESS ANALYSIS.

14:49:08  18                   AND HE FURTHERMORE SAYS THAT BOTH THE TOTAL

14:49:09  19   STRESS AND EFFECTIVE STRESS SOIL SHEAR STRENGTH

14:49:14  20   CHARACTERIZATIONS METHODS REQUIRE EXPLICIT ANALYSIS OF THE

14:49:17  21   EFFECTS OF UPLIFT PRESSURES EXERTED BY THE BURIED SWAMP-MARSH

14:49:23  22   DEPOSITS.

14:49:24  23                   THAT STATEMENT THERE IS NOT TRUE, AND I THINK I

14:49:26  24   CAN SHOW THAT.  AND IT TURNS OUT THAT THE UPLIFT PRESSURES DO

14:49:31  25   NOT FACTOR INTO AN UNDRAINED ANALYSIS.

14:49:35    1            AND ANOTHER THE POINT IS THESE CORPS OF

14:49:38    2    ENGINEERS MANUALS HE CITES, THEY DON'T REQUIRE THE ANALYSIS

14:49:42    3    THAT HE'S SAYING.

14:49:43    4            BUT JUST TO GO THROUGH HIS -- HIS HAND

14:49:48    5    CALCULATIONS -- THIS IS A SCAN OF HIS CALCULATIONS.  AND IT

14:49:53    6    TOOK ME QUITE A WHILE TO UNDERSTAND THE DIFFERENT ELEMENTS, AND

14:49:58    7    I DON'T THINK I'D BE SUCCESSFUL IN TRYING TO EXPLAIN IT ALL,

14:50:02    8    BUT I CAN POINT OUT A COUPLE OF THE KEY ELEMENTS, I THINK, THAT

14:50:04    9    ARE IMPORTANT FOR UNDERSTANDING THESE.

14:50:08   10            AND FIRST OF ALL, THIS TRIANGLE THERE,

14:50:13   11    PROFESSOR BEA USES A GAP OR CRACK CONDITION FOR HIS ANALYSES.

14:50:19   12    AND IT'S JUST AS I TALKED ABOUT BEFORE WHERE YOU HAVE A VOID

14:50:23   13    BETWEEN YOUR SHEET PILE AND YOUR CANALSIDE LEVEE EMBANKMENT.

14:50:29   14    SO IN ALL HIS ANALYSES HE INCLUDES A GAP WITH A PRESSURE AT THE

14:50:34   15    BOTTOM OF 1260 PSF.

14:50:39   16            HE USES TWO DIFFERENT UPLIFT PRESSURES.  HE USES

14:50:43   17    ONE UPLIFT PRESSURE THAT HE CALLS THE NO-GAP OR NO-CRACK UPLIFT

14:50:47   18    PRESSURE, WHICH HAS A MAXIMUM VALUE OF 800 AND THEN DECREASES

14:50:51   19    TO THE TOE.

14:50:52   20            HE ALSO -- AT THE VERY FAR RIGHT HERE, HE USES A

14:50:56   21    DIFFERENT UPLIFT PRESSURE, WHICH HE CALLS HIS GAP OR CRACK

14:51:01   22    UPLIFT PRESSURE.  AND SO HE USES THE WATER PRESSURE FROM A GAP

14:51:07   23    ALL THE TIME, BUT HE USES EITHER THE NO-GAP OR THE GAP UPLIFT

14:51:12   24    PRESSURE ACTING ON THE SOIL.

14:51:17   25            SO IN DOING THIS REVIEW, I WAS LOOKING AT HIS

14:51:21   1   FIGURES HERE WHERE IT LOOKED LIKE HE WAS APPLYING AN UPLIFT

14:51:24   2   PRESSURE RANGING FROM 1260 TO 0.  AND IF YOU LOOK AT THE

14:51:30   3   CALCULATIONS RIGHT HERE, YOU CAN SEE THERE'S A 1260 THERE, AND

14:51:33   4   I THINK THAT'S A 315 THAT'S DIVIDED BY 2, MULTIPLIED BY 40.

14:51:38   5   BUT IF YOU FOLLOW THE MATH HERE AS BEST YOU CAN, YOU DON'T GET

14:51:42   6   31,500.

14:51:43   7             AND SO I HAD TO KIND OF WORK THIS BACKWARDS.

14:51:47   8   AND I ENDED UP DETERMINING THAT FOR HIS UNDRAINED ANALYSIS, HE

14:51:52   9   USED A WATER PRESSURE DISTRIBUTION, WHAT HE SAID CORRESPONDED

14:51:58  10   TO THE NO-GAP OR NO-CRACK CASE.

14:52:02  11             AND SO IT'S NOT A FULL WATER PRESSURE AT THE

14:52:04  12   BOTTOM OF THE I-WALL, BUT IT'S ONE THAT'S REDUCED.  I REALLY

14:52:09  13   COULDN'T FIND THE SOURCE OF HIM REDUCING IT FROM 1260 TO 800 IN

14:52:14  14   HIS HAND CALCULATIONS.

14:52:16  15             THERE IS AN ISSUE WITH REDUCING IT NOT BEING

14:52:19  16   CORRECT.  EVEN AS SHOWN BY THIS DRAWING, RIGHT AT THIS POINT

14:52:23  17   RIGHT THERE, HE USES TWO DIFFERENT WATER PRESSURES.  HE USES A

14:52:28  18   HORIZONTAL WATER PRESSURE OF 1260 AND A WATER PRESSURE AT AN

14:52:32  19   ANGLE OF 800.

14:52:33  20             WELL, ONE THING ABOUT WATER IS IT APPLIES EQUAL

14:52:37  21   PRESSURES IN ALL DIRECTIONS.  AND SO IT'S NOT POSSIBLE TO HAVE

14:52:41  22   DIFFERENT WATER PRESSURES AT THE SAME POINT.

14:52:46  23             ANOTHER SMALLER ISSUE, THAT IF HE'S DOING THESE

14:52:50  24   CALCULATIONS TO COMPARE TO COBOS-ROA'S COMPUTER ANALYSES, HE

14:52:54  25   REALLY NEEDS TO ANALYZE THE EXACT SAME FAILURE SURFACE.  AND

14:52:59   1   FOR THIS ANALYSIS RIGHT HERE, HE CHOSE THIS FAILURE SURFACE,

14:53:03   2   WHICH IS NOT, TO MY KNOWLEDGE, ONE THAT'S EVEN ANALYZED IN HIS

14:53:07   3   COMPUTER ANALYSES.

14:53:09   4            AND, YOU KNOW, I DISCUSSED BEFORE ABOUT THE

14:53:11   5   IMPORTANCE OF FINDING THE CRITICAL FAILURE SURFACE.  THAT'S

14:53:15   6   VERY DIFFICULT TO DO IN HAND CALCULATIONS.  THAT'S ONE OF THE

14:53:19   7   BENEFITS OF DOING -- OF USING THE COMPUTER.

14:53:22   8            ANOTHER ODD ISSUE RIGHT HERE IS THIS VALUE OF --

14:53:25   9   THIS S SUB U1 WITH A SUBSCRIPT H.  WHAT THAT IS -- YOU CAN SEE

14:53:31  10   IT RIGHT THERE -- IT'S THE HORIZONTAL WATER PRESSURE ACTING ON

14:53:35  11   THAT FIRST ELEMENT.  IF YOU FOLLOW HIS CALCULATIONS, HE CLEARLY

14:53:40  12   SHOWS S SUB U1 H IS 3700 THERE.

14:53:44  13            IF YOU GO DOWN TO THIS EQUATION HERE, HE HAS

14:53:47  14   SOMETHING PLUS S SUB U1 H, AND IT'S 2700 THERE.

14:53:53  15            BUT THE VALUE ACTUALLY USED IS HIDDEN RIGHT

14:53:56  16   HERE.  IT'S THAT 3900, AND I KNOW THAT BECAUSE THIS EQUATION

14:53:59  17   HERE EQUALS 15,000.  THAT'S WHAT HE INITIALLY HAD HERE.  BUT

14:54:04  18   THEN HE -- HE MARKED OVER IT WITH 16,200.

14:54:08  19            SO IN REALLY THIS HALF OF THE PAGE, YOU'VE GOT

14:54:11  20   THREE DIFFERENT VALUES FOR THIS ONE HORIZONTAL WATER PRESSURE,

14:54:15  21   AND I'M JUST NOT CERTAIN ABOUT THE SOURCE OF ALL OF IT.

14:54:19  22            I THINK THE IMPORTANT THING, THOUGH, IS, YOU

14:54:21  23   KNOW, HE'S TRYING TO COMPARE A GAP AND NO GAP -- EXCUSE ME.

14:54:26  24   HE'S TRYING TO COMPARE AN UNDRAINED AND A DRAINED ANALYSIS, BUT

14:54:31  25   HE USES DIFFERENT UPLIFT WATER PRESSURES FOR HIS ANALYSES.

14:54:35   1    THIS SHOWS HIS UPLIFT WATER PRESSURES FOR HIS

14:54:39   2  DRAINED OR EFFECTIVE STRESS ANALYSIS.  HE USES A FULL PRESSURE

14:54:42   3  OF 1260, A TRIANGULAR LOAD, WHERE HE USED 800 BEFOREHAND.

14:54:49   4    AND SO THE RESULTS OF ALL OF THESE CALCULATIONS

14:54:51   5  WERE THAT HE GETS THE SAME ANSWER, 1.1 VERSUS .99.  BUT THE

14:54:59   6  PROBLEM IS HE USES TWO DIFFERENT UPLIFT PRESSURES FOR HIS

14:55:02   7  DRAINED AND HIS UNDRAINED ANALYSIS, AND THEN HE ALSO ACTUALLY

14:55:08   8  USES TWO DIFFERENT FAILURE PLANES AS WELL.  HE DOESN'T ANALYZE

14:55:11   9  FAILURE ON THE SAME FAILURE PLANE BETWEEN THESE TWO ANALYSES.

14:55:16   10    IF YOU GO THROUGH AND YOU STILL USE HIS GEOMETRY

14:55:17   11  AND HIS SHEAR STRENGTH BUT YOU JUST CORRECT SOME ERRORS, YOU

14:55:22   12  END UP HAVING A FACTOR OF SAFETY FOR THE DRAINED OR EFFECTIVE

14:55:26   13  STRESS ANALYSIS BEING .44 AND THE FACTOR OF SAFETY FOR THE

14:55:29   14  UNDRAINED OR TOTAL STRESS ANALYSIS BEING 1.48.

14:55:34   15    AND SO I THINK THAT KIND OF USING HIS OWN

14:55:37   16  CALCULATIONS, IT SHOWS THAT YOU'D GET A DIFFERENCE IN DRAINED

14:55:40   17  AND UNDRAINED ANALYSES EVEN USING THE ASSUMPTIONS THAT HE'S GOT

14:55:45   18  THERE.  NOW --

14:55:52   19    **THE COURT:**  LET'S GO BACK TO THAT.  ARE YOU SAYING IT

14:55:57   20  WAS DR. BEA'S OPINION THAT EITHER IN THE DRAINED OR UNDRAINED

14:56:01   21  STATE, THE FACTOR OF SAFETY WOULD BE BELOW 1?

14:56:03   22    **THE WITNESS:**  WELL, ON THIS PARTICULAR EXAMPLE, I'M

14:56:05   23  NOT CERTAIN THAT HE'S CALCULATING A DISCRETE VALUE OF THE

14:56:10   24  FACTOR OF SAFETY.  HE'S TRYING TO SHOW THAT YOU GET THE SAME

14:56:13   25  FACTOR OF SAFETY FOR BOTH DRAINED AND UNDRAINED ANALYSES.

14:56:16    1            **THE COURT:**  I GUESS THAT WAS MY -- THE GENERAL TENOR

14:56:18    2   OF MY QUESTION.

14:56:19    3            SO YOU -- YOU'RE SAYING IN THIS CALCULATION HE'S

14:56:22    4   TRYING TO DEMONSTRATE THROUGH THESE EQUATIONS THAT WHETHER IT'S

14:56:28    5   DRAINED OR UNDRAINED, THE FACTOR OF SAFETY IS VIRTUALLY THE

14:56:31    6   SAME?  THAT'S --

14:56:31    7            **THE WITNESS:**  YES, SIR.

14:56:31    8            **THE COURT:**  -- WHAT HE'S TRYING TO SAY?

14:56:32    9            **THE WITNESS:**  YES, SIR.

14:56:34   10            I DON'T THINK HE'S ACTUALLY TRYING TO

14:56:35   11   CALCULATE -- I MEAN, HE HAS THIS LABELED "NORTH BREACH, LATERAL

14:56:38   12   STABILITY," BUT IF YOU PLOT THIS SECTION HERE WITH HIS

14:56:44   13   DIMENSIONS ON TOP OF HIS NORTH BREACH FAILURE SECTIONS, YOU CAN

14:56:47   14   SEE THAT THEY'RE NOT A MATCH.

14:56:49   15            I MEAN, AN EXAMPLE, THE DISTANCE FROM THE SHEET

14:56:51   16   PILE TO THE TOE PROFESSOR BEA SHOWS IS 60 FEET IN THIS DRAWING,

14:56:56   17   AND ACTUALLY THAT'S 60 RIGHT THERE.

14:56:59   18            IF YOU LOOK AT HIS COMPUTER FILES, THAT'S ABOUT

14:57:01   19   80 FEET.  AND SO THIS IS, I GUESS, SORT OF CLOSE TO HIS NORTH

14:57:05   20   BREACH SECTIONS, BUT IT'S NOT A ONE-TO-ONE COMPARISON BASED

14:57:09   21   UPON GEOMETRY.  AND SO I THINK THAT -- YOU KNOW, EVEN THOUGH I

14:57:14   22   THINK HE HAS AN INTENTION TO VALIDATE HIS COMPUTER ANALYSES,

14:57:18   23   THERE'S MANY DIFFERENT THINGS BETWEEN THESE HAND CALCS VERSUS

14:57:23   24   WHAT HE HAS IN HIS COMPUTER ANALYSIS.

14:57:26   25            NOW, I'VE TRIED TO DO GO THROUGH THE EXACT SAME

14:57:29   1   THING JUST TO KIND OF SIMPLIFY HIS ANALYSIS.  WHAT I'VE SHOWN

14:57:33   2   HERE IS REALLY THE SAME ASSUMPTIONS, JUST PUT IN A LITTLE BIT

14:57:37   3   CLEARER WAY.  AND THIS IS HIS METHOD OF ANALYSIS WHERE IN

14:57:42   4   ENGINEERING WE'D CALL THIS A FREE-BODY DIAGRAM.

14:57:47   5              AND THIS ACTUAL METHOD OF ANALYSIS HERE DATES

14:57:51   6   BACK TO THE 1700S TO A FRENCHMAN NAMED CUGNOT.  HE'S THE ONE

14:57:56   7   THAT STARTED DOING THESE.

14:57:57   8              AND WE LOOK AT OUR WEDGE OF SOIL AND THEN WE

14:57:59   9   ANALYZE THE FORCES ACTING ON THIS WEDGE OF SOIL.  AND SO WE'D

14:58:03   10  HAVE THE WEIGHT ACTING DOWN; WE'D HAVE THIS WATER PRESSURE

14:58:06   11  FORCE ACTING FROM THE GAP; WE'D HAVE THIS T-FORCE ACTING ALONG

14:58:12   12  THE FAILURE PLANE, WHICH IS DUE TO THE SHEAR STRENGTH OF THE

14:58:14   13  SOIL.  AND THEN ACTING UPWARD WE HAVE -- REALLY IT'S ONE FORCE,

14:58:19   14  N, BUT THAT FORCE IS MADE UP OF TWO PIECES.

14:58:22   15             ONE IS THE PORE PRESSURE FORCE, AND THIS IS WHAT

14:58:25   16  PROFESSOR BEA CALLS "UPLIFT."  BUT ALL UPLIFT IS, IS THE PORE

14:58:31   17  PRESSURE ON THE FAILURE PLANE.  AND THE OTHER ONE IS THE

14:58:34   18  EFFECTIVE NORMAL FORCE SUCH THAT THIS PLUS THIS EQUALS N.

14:58:40   19             NOW, THE WAY WE SOLVE THIS IS JUST WE ASSUME

14:58:45   20  IT'S AN EQUILLIBRUM.  WE DRAW A FIGURE CALLED A FORCE POLYGON.

14:58:52   21  BUT FOR THIS TO BE EQUILLIBRUM, IT MEANS ALL THE ARROW HEADS

14:58:58   22  MEET THE TAILS, AND IT ALLOWS US TO CALCULATE THE FACTORS OF

14:59:02   23  SAFETY.  AND IF WE'RE USING THE SAME ASSUMPTIONS PROFESSOR BEA

14:59:05   24  HAD IN HIS DRAWING, I CAME UP WITH AN EQUATION USING AN

14:59:08   25  UNDRAINED OR TOTAL STRESS ANALYSIS USING AN UNDRAINED SHEAR

14:59:13    1   STRENGTH WHERE THE FACTOR OF SAFETY IS EQUAL TO THIS STUFF.

14:59:16    2               THE IMPORTANT THING ABOUT THIS EQUATION HERE IS

14:59:18    3   THE UPLIFT PRESSURE U DOESN'T APPEAR ANYWHERE IN THIS EQUATION.

14:59:24    4   IT'S NOT A FACTOR IN CALCULATING THE FACTOR OF SAFETY.  AND,

14:59:31    5   THEREFORE, IT'S NOT EVEN NECESSARY TO CALCULATE UPLIFT

14:59:34    6   PRESSURES.  IF ONE IS DOING AN UNDRAINED ANALYSIS, IT'S NOT A

14:59:38    7   PART OF THE CALCULATION FOR FACTOR OF SAFETY.

14:59:40    8               AND EVEN USING HIS ASSUMPTIONS THERE, IT'S AN

14:59:46    9   EASY THING TO PROVE.

14:59:47   10               AND THIS IS A WELL-KNOWN THING IN GEOTECHNICAL

14:59:49   11   ENGINEERING.  IF YOU'RE DOING UNDRAINED ANALYSES, YOU DON'T

14:59:52   12   NEED TO DO SEEPAGE ANALYSES BECAUSE SEEPAGE ANALYSES ALREADY

14:59:57   13   CALCULATE U.

14:59:58   14               NOW, THE SAME GEOMETRY, YOU CAN DO THE SAME

15:00:02   15   THING FOR A DRAINED OR EFFECTIVE STRESS ANALYSIS.  I GUESS THE

15:00:06   16   KEY THING IS YOU'VE GOT THIS VALUE OF FEET PRIME, WHICH

15:00:10   17   PROFESSOR BEA USED AS 25-DEGREES.  AND IN THIS EQUATION U DOES

15:00:16   18   APPEAR.  SO IF YOU'RE DOING AN EFFECTIVE STRESS OR USING

15:00:20   19   DRAINED STRENGTH PARAMETERS, THEN UPLIFT PRESSURES DO NEED TO

15:00:25   20   BE CALCULATED, AND THE UPLIFT PRESSURES BASED ON

15:00:28   21   PROFESSOR BEA'S ASSUMPTION THERE WOULD DEPEND UPON CHANGES IN

15:00:31   22   CANAL WATER LEVEL.

15:00:32   23               AND SO IF YOU'RE DOING DRAINED ANALYSES, YOU DO

15:00:35   24   HAVE TO DO A SEEPAGE ANALYSIS TO CALCULATE PORE PRESSURE.  AND

15:00:40   25   SO SIMPLY PUT, REALLY, FOR UNDRAINED ANALYSES, THE UNDRAINED

15:00:45   1   STRENGTH IS NOT A FUNCTION OF THE WATER LEVEL, AND THE UPLIFT

15:00:49   2   FORCE DOESN'T AFFECT FACTOR OF SAFETY.

15:00:51   3            FOR DRAINED ANALYSES, YOUR DRAIN STRENGTH IS A

15:00:53   4   FUNCTION OF WATER LEVEL, AND THE UPLIFT FORCE DOES AFFECT

15:00:57   5   FACTOR OF SAFETY.

15:00:58   6            AND THESE REASONS RIGHT HERE, YOU KNOW, TELL YOU

15:01:01   7   THAT YOUR RESULTS SHOULD BE DIFFERENT.  ONE CAN'T EXPECT TO

15:01:04   8   HAVE THE SAME RESULT WITH THESE DIFFERENCES RIGHT HERE.

15:01:08   9            **THE COURT:**  I UNDERSTAND.

15:01:14  10            **THE WITNESS:**  NOW, THE NEXT SLIDE IS ONE THAT

15:01:16  11   PROFESSOR BEA HAD IN HIS TESTIMONY, AND IT'S FROM HIS ANALYSIS

15:01:19  12   OF THE 17TH STREET CANAL BREACH.  AND HE DISCUSSED THIS, AND I

15:01:24  13   THINK HE DESCRIBED THIS AS A PART OF HIS EUREKA MOMENT WHERE HE

15:01:29  14   FELT THAT THE UPLIFT PRESSURE DID AFFECT FACTOR OF SAFETY.

15:01:34  15            AND I THINK THAT THIS ANALYSIS IS INCORRECT.  I

15:01:39  16   THINK HIS FORCE POLYGON IS WRONG HERE.  IF YOU COMPARE IT TO

15:01:43  17   THE ONE THAT I HAD DRAWN EARLIER, THERE'S FORCES THAT ARE

15:01:47  18   MISSING HERE AND THERE'S FORCES ACTUALLY THAT ARE ADDED TWICE.

15:01:51  19            HE SHOWS A WATER PRESSURE OF FORCE RIGHT HERE,

15:01:55  20   BUT THAT WATER PRESSURE OF FORCE WOULD NUMERICALLY BE INCLUDED

15:01:59  21   IN THIS ONE.  ALSO, HE SHOWS A WATER PRESSURE FORCE GREATER

15:02:03  22   THAN O THERE.  FOR THAT TO BE THE CASE, YOU'D HAVE TO HAVE A

15:02:07  23   WATER LEVEL UP HERE.  HE'S ALSO MISSING THE EFFECTIVE NORMAL

15:02:12  24   FORCE THAT WOULD BE ON THE BASE OF THE SLIDE.

15:02:20  25            MY OPINION IS, IS THAT THE REASON HE HAS THESE

15:02:22   1   DIFFERENCES IN HIS ANALYSIS IS DUE TO NUMERICAL ERROR.  THIS

15:02:27   2   FORCE POLYGON IS INCORRECT; HIS CALCULATED VALUES OF FACTOR OF

15:02:31   3   SAFETY ARE INCORRECT.

15:02:32   4            LIKE I HAD BEFORE, IF DONE CORRECTLY, HIS FACTOR

15:02:35   5   OF SAFETY SHOULD NOT BE A FUNCTION OF THIS HYDRAULIC UPLIFT,

15:02:38   6   AND YOU SHOULD GET THE SAME ANSWER.  BECAUSE, FRANKLY, THE

15:02:42   7   UNDRAINED STRENGTH NOR THE FACTOR OF SAFETY DEPEND ON THE VALUE

15:02:47   8   OF HYDRAULIC UPLIFT.

15:02:49   9            **MR. JOANEN:**  YOUR HONOR, IF I COULD, YOUR HONOR, I'M

15:02:50  10   TRYING TO LOOK AT NUMBER, 67.  I DON'T BELIEVE WE'VE BEEN

15:02:54  11   PROVIDED THAT.

15:02:56  12            **MS. DALEY:**  THE GOVERNMENT HAS NOT EITHER.

15:02:59  13            **THE COURT:**  THAT'S DR. BEA'S SLIDE.

15:03:00  14            **THE WITNESS:**  THAT'S IN DR. BEA'S TESTIMONY THAT HE

15:03:03  15   SHOWED THAT WE WERE GIVEN AS HIS DEMONSTRATIVES.

15:03:06  16            **MS. DALEY:**  BUT, JUDGE, IT'S NUMBERED AS 67 IN THE

15:03:09  17   SLIDES AND --

15:03:10  18            **THE COURT:**  OKAY.  AND SO WHAT'S THE -- LET ME

15:03:11  19   GET THE -- YOU NEED HIM TO HAVE A NUMBER?

15:03:12  20            **MS. DALEY:**  NO, IT'S MISSING.

15:03:14  21            **MR. JOANEN:**  I'M TRYING TO SEE WHETHER I EVEN HAVE

15:03:17  22   IT.

15:03:18  23            **THE COURT:**  OH, OH.  IT'S NOT IN THE DEMONSTRATIVES

15:03:20  24   YOU WERE PROVIDED; IS THAT CORRECT?

15:03:22  25            **MS. DALEY:**  IT'S MISSING FROM THE COURT'S COPY.

15:03:24    1          **MR. SMITH:**  YES.  YOUR HONOR, WE'LL SUPPLEMENT

15:03:26    2   THOSE --

15:03:26    3          **THE COURT:**  THANK YOU.

15:03:26    4          **MR. SMITH:**  -- AND PROVIDE IT TO THE COURT.

15:03:27    5          **THE COURT:**  OKAY.  THANK YOU.  AND IT IS A

15:03:29    6   DEMONSTRATIVE REMOVED FROM DR. BEA'S REPORT.

15:03:32    7          **MR. TREEBY:**  WHICH HAS BEEN ADMITTED, I BELIEVE.

15:03:33    8          **THE COURT:**  WELL, I UNDERSTAND.  I'M JUST SAYING --

15:03:37    9          **MR. JOANEN:**  I MEAN, I JUST WOULD LIKE TO HAVE KNOWN

15:03:39   10   ABOUT IT BEFORE HE SAYS IT.  THAT'S ALL.

15:03:41   11          **THE COURT:**  ALL RIGHT.  I UNDERSTAND.

15:03:44   12          **MR. SMITH:**  IT'S IN EVIDENCE.  IT'S AN EXHIBIT.

15:03:46   13          **THE COURT:**  OKAY.  HE WOULD LIKE TO HAVE KNOWN IT.

15:03:47   14   THAT'S FINE.  EVERYBODY'S MADE THAT GRIPE.

15:03:50   15              AND I WANT EVERYBODY TO CLEARLY UNDERSTAND WE'RE

15:03:52   16   GOING TO HAVE A REBUTTAL FROM DR. BEA, BECAUSE I'VE GIVEN

15:03:57   17   LEEWAY HERE, AND THEN YOU CAN HAVE AT HIM AGAIN.

15:04:01   18          **MR. SMITH:**  THANK YOU, YOUR HONOR.

15:04:10   19          **THE COURT:**  BECAUSE TO MAKE IT -- AND MY JOB IS -- I

15:04:12   20   WANT TO BE -- TO STICK TO OUR PROTOCOL, BUT I WANTED THIS TO

15:04:18   21   COME IN BECAUSE I WANTED TO GET TO THE TRUTH OF THE MATTER THAT

15:04:21   22   SOMETIMES CAN IN SOME WAYS TRUMP THE PROTOCOL TO SOME DEGREE,

15:04:25   23   BECAUSE I THINK IT'S WITHIN THE EVIDENCE REPORT, AND I WANTED

15:04:32   24   TO GIVE DR. BEA AN OPPORTUNITY TO COME -- TO SAY WHY THIS IS

15:04:35   25   INCORRECT.

15:04:36   1          **MR. JOANEN:**  AND I UNDERSTAND, YOUR HONOR.  I JUST

15:04:38   2   WANTED TO MAKE SURE THAT I WASN'T MISSING IT BECAUSE THE

15:04:41   3   NUMBERS HAVE BEEN OFF, BECAUSE THERE WERE TWO EARLIER.  SO THAT

15:04:41   4   WAS ONE OF THE THINGS I WAS CLARIFYING, BUT ALSO I WANT TO MAKE

15:04:43   5   SURE I GET IT SO THAT --

15:04:44   6          **THE COURT:**  RIGHT.  YOU'VE BEEN -- IT'S COMING.

15:04:47   7          **MR. JOANEN:**  THANK YOU, YOUR HONOR.

15:04:48   8          **THE COURT:**  YES, SIR.

15:04:53   9          **THE WITNESS:**  THE NEXT APPENDIX I'LL LOOK AT IS

15:04:58  10   APPENDIX F.  DR. MARR HAD A BIT ABOUT THIS AS WELL.  I TOOK A

15:05:02  11   PRETTY SIMPLE APPROACH TO THIS.

15:05:04  12          BUT PROFESSOR BEA SAID, IN RESPONSE TO DEFENSE'S

15:05:07  13   REQUEST FOR ME TO PROVIDE THE HAND CALCULATIONS I PERFORMED TO

15:05:10  14   EVALUATE THE HYDRAULIC CONDUCTIVITY EFFECTS OF MULTIPLE POORLY

15:05:14  15   BACKFILLED EXCAVATIONS ON THE EBIA, "I PROVIDE THESE ANALYSES

15:05:17  16   HEREIN."

15:05:19  17          AND THAT'S THE FIGURE WITHIN HIS APPENDIX.  AND

15:05:25  18   I THINK WE'VE LOOKED AT THIS BEFORE.  THE KEY ELEMENTS HERE,

15:05:29  19   HE'S GOT A 10-FOOT THICK ORGANIC CLAY LAYER.  WE HAVE A GAP

15:05:35  20   NEXT TO THE I-WALL.  WE'VE GOT THREE EXCAVATIONS LOCATED

15:05:40  21   50 FEET APART, AND THEN WE HAVE A WATER PRESSURE AT THE TOE.

15:05:43  22          AND THE CANAL WATER LEVEL IS 13.  THE WATER

15:05:46  23   LEVEL AT THE TOE IS MINUS 4, SO THERE'S A VARIATION OF 17.

15:05:51  24          AND HE LABELS THIS "MULTI EXCAVATIONS AND

15:05:55  25   TENSION CRACK SEEPAGE QUANTITY CONTRIBUTIONS TO TOTAL FLOWS."

15:06:01   1        HE CALCULATES THESE VALUES OF FLOW USING DARCY'S

15:06:04   2   LAW.  I'LL LOOK AT THAT QUICKLY IN A SECOND.  BUT HE COMES UP

15:06:08   3   WITH THESE PERCENTAGES HERE FOR THESE VALUES OF FOUR FLOWS.

15:06:13   4   THIS LAST FLOW, Q4, IS FOR THE GAP.  THESE OTHER THREE ARE

15:06:17   5   THESE EXCAVATIONS.

15:06:19   6        AND THE WAY HE INTERPRETS HIS NUMBERS HERE, HE

15:06:22   7   SAYS:  THE RESULTS FROM THESE ANALYSES SHOW THAT THE TENSION

15:06:24   8   CRACK AT BOTH THE NORTH AND SOUTH BREACHES CONTRIBUTED

15:06:27   9   48 PERCENT OF THE TOTAL.  THE EXCAVATION LOCATED 50 FEET FROM

15:06:31  10   THE FLOODWALL CONTRIBUTED AN ADDITIONAL 24 PERCENT.  THE

15:06:35  11   EXCAVATION AT 150 FEET, 16 PERCENT -- THIS ACTUALLY SHOULD BE

15:06:41  12   200 -- IS 12 PERCENT.

15:06:44  13        AND THESE CALCULATIONS ARE WRONG.  I THINK IT'S

15:06:47  14   EASY TO SHOW WITH THE SAME LITTLE FIGURE THAT THE EXCAVATIONS

15:06:52  15   DON'T CONTRIBUTE TO FLOW UNDER THE LEVEE, NOR DO THEY

15:06:55  16   CONTRIBUTE TO PRESSURE UNDERNEATH THE TOE.

15:06:58  17        THIS IS THE SAME THING AS HIS DRAWING; IT'S JUST

15:07:01  18   TRANSLATED, I THINK, INTO A LITTLE EASIER WAY TO UNDERSTAND.

15:07:06  19   WE'VE GOT A PIPE HERE, AND THIS PIPE IS FULL OF ORGANIC CLAY.

15:07:09  20   IT'S GOT AN END AREA OF 10 SQUARE FEET.  SO IT COULD BE 10 FEET

15:07:14  21   TALL BY 1 FOOT DEEP.

15:07:16  22        WE'VE GOT FIVE RISERS ATTACHED TO THIS PIPE, AND

15:07:20  23   WE'VE GOT ONE AT THE TOE HERE; WE'VE GOT THESE OTHER FOUR RIGHT

15:07:25  24   THERE.  AND THE DIFFERENCE IN HEIGHT OF WATER FROM THESE RISERS

15:07:28  25   HERE VERSUS THE TOE IS 17 FEET.

15:07:32     1                    AND SIMILAR TO HIS FIGURE, ALL THESE DISTANCES

15:07:34     2    ARE 50 FEET APART.  BUT, YOU KNOW, IN TERMS OF PLUMBING, THIS

15:07:39     3    SITUATION SHOWN HERE IS IDENTICAL TO THE FIGURE THAT HE SHOWED

15:07:43     4    EARLIER.

15:07:44     5                    AND SO FLOW CALCULATIONS THROUGH SOILS ARE DONE

15:07:48     6    USING DARCY'S LAW, WHERE THE FLOW THAT WE CALCULATE, WHICH IS

15:07:53     7    Q, IT'S EQUAL TO REALLY THREE DIFFERENT TERMS.  ONE WE'VE HEARD

15:07:57     8    SO MUCH ABOUT IS PERMEABILITY.

15:08:00     9                    AND FOR THIS LITTLE EXAMPLE, I USED A

15:08:02    10    PERMEABILITY THAT WE'VE SEEN SO OFTEN, WHICH IS 10 TO THE

15:08:07    11    MINUS 5 CENTIMETERS PER SECOND.

15:08:09    12                    THE NEXT TERM IS -- WE CALL THIS THE HYDRAULIC

15:08:12    13    GRADIENT, BUT IT'S THE CHANGE IN WATER ELEVATION OVER THE

15:08:16    14    LENGTH WHERE THIS WATER ELEVATION OCCURS.  AND WE CALL THIS I.

15:08:20    15    THE LAST ONE IS THE AREA OF FLOW.  AND SO IN -- IN NORMAL

15:08:28    16    TERMINOLOGY, WE ALWAYS SAY Q EQUALS KIA.  THAT'S DARCY'S LAW.

15:08:35    17                    SO IF WE ANALYZE THIS CASE, FORGETTING ABOUT THE

15:08:38    18    EXCAVATIONS, JUST LOOKING AT THE GAP IN THE LEVEE TOE HERE,

15:08:42    19    WELL, THE PERMEABILITY WE KNOW IS 10 TO THE MINUS 5 CENTIMETERS

15:08:46    20    PER SECOND.  THAT COMES OUT TO BE 2.8 TIMES 10 TO THE

15:08:51    21    MINUS 2 FEET PER DAY.

15:08:53    22                    SO THE CRITICAL PART, I GUESS, IS THE HYDRAULIC

15:08:53    23    GRADIENT.  IT'S CHANGE IN THE HEIGHT OF WATER, WHICH IS

15:08:55    24    17 FEET.  THIS IS PLUS 13, THAT'S MINUS 4, SO IT'S 17 FEET.

15:09:01    25                    THAT CHANGE IN HEIGHT OF WATER OCCURS OVER

15:09:03   1   50 FEET, WHICH IS THE DISTANCE FROM B TO A.  AND THAT MEANS THE

15:09:07   2   HYDRAULIC GRADIENT IS .34.  AND THEN THE AREA OF THIS PIPE AT

15:09:11   3   THE BOTTOM HERE IS 10 SQUARE FEET.

15:09:16   4              SO IF YOU END UP DOING THE CALCULATION, YOU

15:09:18   5   CALCULATE A FLOW OF .1 CUBIC FEET PER DAY PER FOOT.  IT'S JUST

15:09:25   6   A DIRECT APPLICATION OF DARCY'S LAW.

15:09:28   7              IF YOU END UP ADDING ONE EXCAVATION AND YOU GO

15:09:30   8   THROUGH THE CALCULATIONS AGAIN, THE K IS THE SAME.  THIS

15:09:35   9   HYDRAULIC GRADIENT LOOKS STILL 17 DIVIDED BY 50.  IT'S THE

15:09:41  10   CHANGE IN THE HEIGHT OF WATER OVER THE DISTANCE WHERE THAT

15:09:43  11   CHANGE IN HEIGHT OCCURS.

15:09:45  12              THERE IS NO CHANGE IN HEIGHT OF WATER FROM THERE

15:09:47  13   TO THERE, SO IT DOESN'T FACTOR INTO IT.  THE GRADIENT'S STILL

15:09:52  14   .34.  YOU CALCULATE FLOW, AND IT'S STILL .1.  AND SO THE FLOW

15:09:57  15   IS THE SAME WITH OR WITHOUT THIS EXCAVATION.  AND I THINK THAT

15:10:02  16   THAT KIND OF BECOMES COMMON SENSE BECAUSE YOU WOULDN'T EXPECT

15:10:07  17   FLOW FROM POINT B TO C HERE, WHICH IS THERE TO THERE, OR FROM

15:10:11  18   C TO B, BECAUSE THE HYDRAULIC GRADIENT IS EQUAL TO 0.

15:10:16  19              THEY ALWAYS SAY WATER FLOWS DOWNHILL.  WELL,

15:10:19  20   THIS ISN'T DOWNHILL BETWEEN THESE TWO POINTS; IT'S LEVEL.  AND

15:10:24  21   YOU END UP CALCULATING 0 GRADIENT, THERE ISN'T ANY FLOW BETWEEN

15:10:30  22   THOSE POINTS IF YOU DON'T HAVE GRADIENTS.  ALL THE FLOW IS FROM

15:10:32  23   B TO A.

15:10:33  24              AND SO ANOTHER WAY TO LOOK AT THIS IS TO -- IF

15:10:35  25   YOU JUST HAD A U-TUBE.  IF YOU HAD A U-TUBE WITH NO PART OVER

3228

15:10:41  1   HERE, ONE WOULDN'T EXPECT TO HAVE WATER FLOWING IN THAT

15:10:43  2   DIRECTION OR IN THAT DIRECTION BECAUSE THE WATER LEVEL IS THE

15:10:46  3   SAME.

15:10:47  4            SO IF YOU EXTEND THIS OUT TO HIS COMPLETE

15:10:50  5   DRAWING, IT'S CLEAR THAT THE FLOW YOU GET RIGHT HERE, Q, IS THE

15:10:54  6   SAME WITH OR WITHOUT THESE THREE EXCAVATIONS.  LIKEWISE, THE

15:10:58  7   PRESSURE DOWN HERE IS THE SAME WITH OR WITHOUT THESE THREE

15:11:03  8   EXCAVATIONS.

15:11:04  9            AND SO THE REASON FOR THESE ERRORS, HIS

15:11:07  10  CALCULATIONS ARE WRONG.  THESE EXCAVATIONS DO NOT CONTRIBUTE TO

15:11:12  11  FLOW UNDERNEATH THE LEVEE.  THEY CERTAINLY DON'T CONTRIBUTE TO

15:11:14  12  PRESSURE UNDERNEATH THE TOE.  AND HE MISAPPLIED DARCY'S LAW IN

15:11:21  13  HIS CALCULATIONS.

15:11:22  14            BUT I THINK IT'S STILL INSTRUCTIVE TO USE A

15:11:24  15  SIMPLE MODEL LIKE THAT TO DEMONSTRATE THAT THESE EXCAVATIONS

15:11:27  16  DON'T CHANGE FLOWS NOR PRESSURES UNDERNEATH THE TOE.

15:11:31  17            **THE COURT:**  OKAY, SIR.

15:11:32  18            **THE WITNESS:**  ALL RIGHT.  SO I CAN SUMMARIZE MY MAIN

15:11:35  19  POINTS NOW.

15:11:37  20            IT IS MY OPINION THAT IT TAKES DEVELOPMENT OF NO

15:11:39  21  NEW THEORIES TO ANALYZE NORTH AND SOUTH FAILURES.  THEY CAN BE

15:11:43  22  ANALYZED WITH CONVENTIONAL SOIL MECHANICS.

15:11:46  23            I THINK THE NORTH WALL PERFORMANCE IS CONSISTENT

15:11:47  24  WITH THE SLOPE STABILITY OR SHEAR FAILURE, AND THAT THE LOW

15:11:51  25  SHEAR STRENGTH COUPLED WITH THE GEOMETRY, PARTICULARLY HAVING A

15:11:56    1    TOE THAT'S 4 FEET TOO LOW, GIVES YOU A FACTOR OF SAFETY LESS

15:12:01    2    THAN 1 FOR WATER LEVELS BELOW THE TOP OF THE WALL.

15:12:04    3                 THE SOUTH WALL FAILED, IN MY ESTIMATION, AFTER

15:12:07    4    OVERTOPPING BECAUSE I HAD HIGH FACTORS OF SAFETY FOR WATER AT

15:12:11    5    THE TOP OF THE WALL.

15:12:14    6                 THE FAILURES WERE NOT CAUSED BY EROSION, PIPING,

15:12:16    7    HEAVE, UNDERSEEPAGE, AND SITE SOILS WERE NOT ERODABLE.

15:12:20    8                 I THINK I'VE SHOWED THAT THE FLOWS WERE WAY TOO

15:12:23    9    SMALL TO HAVE CAUSED SEEPAGE ISSUES AND THE FLOOD LOADING WAS

15:12:28   10    WAY TOO SHORT TO OBTAIN STEADY-STATE FLOW CONDITIONS.  WE HAD A

15:12:32   11    TOTAL LOADING OF ONLY ABOUT 30 HOURS.

15:12:35   12                 I THINK IT'S INCORRECT TO APPLY THE RESULTS OF

15:12:37   13    TRANSIENT SEEPAGE ANALYSES WITH STABILITY ANALYSES FOR THIS

15:12:43   14    ORGANIC CLAY.  I THINK EVEN IF YOU CORRECTLY APPLIED YOUR

15:12:47   15    TRANSIENT ANALYSIS USING APPROPRIATE VALUES OF M SUB V, YOU'RE

15:12:52   16    STILL NOT GOING TO GET THE RIGHT STABILITY BECAUSE THAT STILL

15:12:57   17    DOESN'T INCLUDE STRESS-INDUCED PORE PRESSURE CHANGES, WHICH ARE

15:13:01   18    THE IMPORTANT PART OF THIS ANALYSIS.

15:13:03   19                 AND THOSE PORE PRESSURE CHANGES ARE INCLUDED IN

15:13:07   20    UNDRAINED STRENGTHS, AND THE ORGANIC CLAY SHOULD HAVE MODELED

15:13:10   21    AS AN UNDRAINED MATERIAL.  IT'S COMPLETELY, IN MY OPINION,

15:13:14   22    INCORRECT TO MODEL THE ORGANIC CLAY AS A DRAINED MATERIAL FOR

15:13:18   23    SHORT-TERM LOADING LIKE THIS.

15:13:20   24                 IF YOU CORRECTLY APPLY UNDRAINED STRENGTHS, THEN

15:13:23   25    SEEPAGE ANALYSES ARE NOT EVEN NEEDED.  AND IF YOU DO TRANSIENT

15:13:27   1   SEEPAGE ANALYSES, YOU'RE NOT GOING TO EVEN GET THE RIGHT

15:13:29   2   ANSWERS APPLICABLE TO STABILITY ANALYSES.

15:13:31   3             THE PORE PRESSURES THAT WE HAVE IN THE SOILS

15:13:34   4   THAT ARE IMPORTANT ARE NOT MODELED IN TRANSIENT SEEPAGE

15:13:37   5   ANALYSIS.  THEY'RE MODELED BY MORE COMPLEX ANALYSES LOOKING AT

15:13:41   6   CHANGES IN PORE PRESSURE WITH CHANGES IN TOTAL STRESS.  BUT WE

15:13:46   7   CAN ACCOMMODATE THEM BY USING UNDRAINED STRENGTH PARAMETERS.

15:13:50   8   AND LIKEWISE, ACTIVITIES ON THE CANAL SIDE OF THE I-WALL HAD NO

15:13:56   9   IMPACT ON THE BEHAVIOR DURING THE FLOOD.

15:13:59  10             I THINK PROFESSOR BEA'S ANALYSIS, I THINK IT'S

15:14:02  11   IMPORTANT THAT HE USE AN EFFECTIVE STRESS OR DRAINED SHEAR

15:14:07  12   STRENGTH PARAMETER BECAUSE IT REQUIRES A SEEPAGE ANALYSIS TO

15:14:11  13   LINK PERFORMANCE OF THE I-WALL TO ACTIVITIES BY THE CORPS AND

15:14:16  14   WGI ON THE CANAL SIDE OF THE WALL.

15:14:19  15             WITHOUT THIS SEEPAGE ANALYSIS, YOU CAN'T LINK

15:14:23  16   THE EBIA ACTIVITIES WITH THE PERFORMANCE.  AND WITHOUT THIS

15:14:29  17   CONTRIVED SEEPAGE ANALYSIS, I DON'T THINK YOU COULD LINK THE

15:14:32  18   ACTIVITIES WITH THE FAILURES.  AND I THINK -- BASED ON THE

15:14:35  19   ERRORS THAT PROFESSOR BEA'S MADE, BOTH IN TERMS OF THE

15:14:39  20   CALCULATIONS AND THE ENGINEERING JUDGMENT ERRORS, I THINK THAT

15:14:43  21   HIS CONCLUSIONS ARE NOT VALID.

15:14:50  22             THAT SUMMARIZES MY PRESENTATION.

15:14:52  23             **THE COURT:**  THANK YOU, SIR.  JUST ONE QUESTION, AND

15:14:56  24   IT'S NOT NECESSARILY RELATED TO THIS CASE.  WE'LL SEE.  BUT THE

15:14:59  25   SHEAR STRENGTH ON THE NORTH BREACH, YOU SAID IT WAS A

15:15:01   1   COMBINATION OF THE LOWER -- THE LOWER TOE AND THE LOW SHEAR --

15:15:07   2   THE LOWER SHEAR STRENGTH OF THE MATERIALS; IS THAT CORRECT?

15:15:11   3             **THE WITNESS:**  YES, SIR.

15:15:13   4             **THE COURT:**  WHY WERE THOSE MATERIALS LOWER THERE THAN

15:15:16   5   ELSEWHERE ALONG THE WALLS?

15:15:18   6             **THE WITNESS:**  WELL, YOU KNOW, THEY'RE -- THEY ARE NOT

15:15:23   7   SUPER LOW COMPARED TO OTHER SITES IN NEW ORLEANS.  PARTICULARLY

15:15:26   8   IN THE INTERDISTRIBUTARY CLAY, THE UNDRAINED STRENGTH RATIO OF

15:15:30   9   .28 IS A COMMON UNDRAINED STRENGTH RATIO THAT ONE WOULD USE ON

15:15:35  10   OTHER PLACES.

15:15:36  11             THE LOWER ORGANIC CLAY, IT DOES HAVE A FAIRLY

15:15:40  12   LOW SHEAR STRENGTH COMPARED REALLY TO THE SAME ORGANIC CLAYS

15:15:47  13   YOU MIGHT HAVE AT 17TH STREET AND OTHER AREAS.

15:15:50  14             AND SO THE SHEAR STRENGTHS THERE AREN'T AS

15:15:52  15   PARTICULARLY LOW, BUT THE GEOMETRY IS -- CAUSES THE PROBLEM.  I

15:15:56  16   MEAN, WITH A DIFFERENT GEOMETRY, EVEN WITH THOSE LOW SHEAR

15:16:00  17   STRENGTHS, AND WITH A DEEPER SHEET PILE, PERHAPS YOU'D GET

15:16:04  18   ADEQUATE FACTORS OF SAFETY.

15:16:07  19             **THE COURT:**  OKAY.

15:16:07  20             **THE WITNESS:**  IF IN NEW ORLEANS YOU COULDN'T BUILD

15:16:09  21   THINGS BECAUSE OF LOW SHEAR STRENGTHS, YOU WOULDN'T BE ABLE TO

15:16:13  22   BUILD VERY MUCH.

15:16:14  23             **THE COURT:**  AND THE GEOMETRY THERE WAS DIFFERENT --

15:16:16  24   "THE GEOMETRY" MEANING THE WAY -- WHAT WAS JUXTAPOSED TO WHAT

15:16:21  25   FROM A THREE-DIMENSIONAL STANDPOINT, WHAT GEOMETRY?

15:16:25   1              **THE WITNESS:**  WELL, IT'S THE SLOPE OF THE LEVEE, THE

15:16:26   2   ELEVATION OF THE TOE.  YOU KNOW, SOME LEVEES ARE MORE GENEROUS

15:16:31   3   IN TERMS OF THEIR CROSS SECTIONS, SUCH AS ORLEANS AVENUE CANAL.

15:16:34   4              **THE COURT:**  OKAY.  YOU MEAN THE WHOLE GEOMETRY OF THE

15:16:35   5   SHAPE OF THE LEVEE THEN?

15:16:37   6              **THE WITNESS:**  YES, SIR.

15:16:37   7              **THE COURT:**  ALL RIGHT.  I UNDERSTAND.  OKAY.  THAT'S

15:16:38   8   IT.

15:16:40   9              ALL RIGHT, SIR.

15:16:42  10              **MR. JOANEN:**  THANK YOU, YOUR HONOR.

15:16:47  11              SCOTT JOANEN FOR THE PLAINTIFFS.

15:16:49  12                          **CROSS-EXAMINATION**

15:16:49  13   BY MR. JOANEN:

15:16:50  14   **Q.**  GOOD AFTERNOON, DR. BRANDON.  WE MET AT SOME OF THE

15:16:54  15   PREVIOUS DEPOSITIONS.  I WAS NOT PRESENT AT YOUR DEPOSITION

15:16:56  16   EXCEPT FOR JUST A FEW MOMENTS.

15:16:58  17              IF I ASK YOU ANY QUESTIONS DEALING WITH SHEAR

15:17:00  18   STRENGTHS AND THOSE TOPICS, IF I GET THE VERNACULAR WRONG,

15:17:04  19   PLEASE JUST ASK ME TO REPEAT IT, OR LET'S TRY AND WORK TO GET

15:17:09  20   THAT OUT SO I CAN UNDERSTAND WHAT YOU'RE TAKING AND YOU CAN

15:17:12  21   UNDERSTAND WHAT I'M SAYING.  AND SO I APOLOGIZE ON THE FRONT

15:17:14  22   END IF I DON'T QUITE GET THE VERNACULAR CORRECT.

15:17:17  23              DESPITE ALL THIS, THE ONE THING I WANTED TO JUST

15:17:19  24   CLARIFY, YOU WOULD AGREE, WOULDN'T YOU, THAT THE

15:17:22  25   COMPRESSIBILITY OF WATER, WATER WOULD BE VIRTUALLY

15:17:23    1    INCOMPRESSIBLE; CORRECT?

15:17:26    2    **A.**    I WOULD AGREE WITH THAT.

15:17:27    3    **Q.**    NOW, IN ORDER TO PERFORM YOUR ANALYSIS THAT YOU WENT

15:17:29    4    THROUGH IN YOUR REPORT, YOU DEVELOPED CROSS SECTIONS IN

15:17:33    5    CONJUNCTION WITH DR. DUNBAR; CORRECT?

15:17:35    6    **A.**    YES, SIR.

15:17:35    7    **Q.**    OKAY.  AND I UNDERSTAND FROM YOUR DEPOSITION TESTIMONY

15:17:37    8    THAT YOU-ALL TOOK CONSIDERABLE EFFORT TO MAKE SURE THAT THEY

15:17:41    9    WERE ACCURATE.  CORRECT?

15:17:42   10    **A.**    YES.

15:17:43   11    **Q.**    IF I COULD, BECAUSE I'M GOING TO ASK YOU SOME QUESTIONS

15:17:45   12    ABOUT THOSE CROSS SECTIONS.

15:17:47   13            **MR. JOANEN:**  CARL, IF WE CAN CALL UP -- AND I THINK

15:17:49   14    IT'S GOING TO BE SLIDE 37, WHICH IS THE SLIDE OF YOUR CROSS

15:17:54   15    SECTIONS.  I THINK THAT'S THE NUMBER YOU -- THE ADDED SLIDES

15:18:00   16    HAD ME OFF A LITTLE BIT.

15:18:02   17            THIS IS THE CROSS SECTIONS FOR BOTH THE NORTH AND

15:18:05   18    SOUTH THAT YOU RELIED UPON FOR YOUR LIMITED EQUILLIBRUM SLOPE

15:18:10   19    STABILITY ANALYSIS IN YOUR REPORT; CORRECT?

15:18:11   20    **A.**    CORRECT.

15:18:11   21    **Q.**    OKAY.  NOW, FOR THE NORTH SECTION, WHERE YOU HAVE THE FILL

15:18:17   22    LAYER AND THE LOWER ORGANIC CLAY AND THE UPPER ORGANIC CLAY,

15:18:21   23    WHERE DID YOU DEVELOP THAT INFORMATION ORIGINALLY FROM, THE

15:18:24   24    ELEVATION FOR THAT?

15:18:28   25    **A.**    WOULD YOU REPEAT THAT?

15:18:29   1   **Q.**   YOU HAVE ELEVATION -- IF WE COULD MAYBE -- DO WE HAVE THE

15:18:32   2   CAPABILITY OF ENLARGING THIS AREA?

15:18:37   3        YOUR ELEVATIONS -- THESE ELEVATIONS WHERE THESE

15:18:39   4   LAYERS ARE?

15:18:40   5   **A.**   THE GROUND SURFACE ELEVATIONS?

15:18:42   6   **Q.**   WELL, THAT'S MY QUESTION.  WHAT DOES THIS --

15:18:46   7   **A.**   ALL RIGHT.  THAT'S ELEVATIONS.

15:18:47   8   **Q.**   OKAY.  AND SO YOUR ELEVATIONS OF YOUR UPPER ORGANIC CLAY

15:18:50   9   AND THEN THE LOWER ORGANIC CLAY --

15:18:53   10  **A.**   THOSE WERE DONE BY GOING THROUGH THE AVAILABLE BORING

15:18:56   11  LOGS.

15:18:56   12  **Q.**   OKAY.  AND WAS THAT DONE BY -- FOR THE IPET TEAM?

15:19:01   13  **A.**   IT WAS DONE -- WELL, THESE CROSS SECTIONS ARE DIFFERENT

15:19:05   14  THAN THE IPET CROSS SECTIONS.  WE HAD ADDITIONAL EXPLORATION

15:19:11   15  DATA AS A RESULT OF OUR SUMMER EXPLORATION EFFORTS.

15:19:17   16  **Q.**   AND SO IS THIS AN ACCURATE DEPICTION OF THE SOIL

15:19:22   17  STRATIGRAPHY PRIOR TO HURRICANE KATRINA, OR WAS IT AFTER?

15:19:26   18  **A.**   TO THE BEST OF MY KNOWLEDGE, IT IS.

15:19:26   19  **Q.**   AND THAT WOULD BE PRIOR?

15:19:28   20  **A.**   YES.

15:19:28   21  **Q.**   OKAY.

15:19:30   22        **MR. JOANEN:**  IF WE COULD CLOSE THIS, CARL, PLEASE.

15:19:33   23  **BY MR. JOANEN:**

15:19:33   24  **Q.**   AND THEN THE BACK SIDE, WHERE DID THE INFORMATION FOR THE

15:19:37   25  SOIL STRATIGRAPHY OF THE LAYERS THERE COME FROM?

15:19:40   1   **A.**   THOSE CAME FROM THE BORINGS AVAILABLE, PREDOMINANTLY

15:19:47   2   PRE-KATRINA BORINGS.

15:19:50   3   **Q.**   OKAY.  AND FOR THE SOUTH BREACH, WOULD THE -- MY QUESTIONS

15:19:53   4   WOULD BE THE SAME, AND YOUR ANSWERS WOULD BE THE SAME AS WELL?

15:19:54   5   **A.**   YES.

15:19:55   6   **Q.**   THE SOIL BORINGS THAT YOU EVALUATED IN ORDER TO COME UP

15:19:57   7   WITH THESE CROSS SECTIONS FOR THE NORTH SECTION, WERE YOU ABLE

15:19:59   8   TO DETERMINE WHERE THE PHREATIC SURFACE, OR WATER TABLE, WOULD

15:20:04   9   BE IN RELATIONSHIP TO THIS SOIL STRATIGRAPHY?

15:20:08   10   **A.**   YES, I DID.

15:20:10   11   **Q.**   AND WHERE WOULD IT BE GENERALLY IN RELATIONSHIP TO THE

15:20:13   12   FILL AND THE UPPER ORGANIC CLAY LAYER?

15:20:17   13   **A.**   TO THE BEST OF MY RECOLLECTION, ON THE CANAL SIDE IT OFTEN

15:20:25   14   WAS AN ELEVATION AROUND MINUS 2 OR SO.

15:20:28   15   **Q.**   OKAY.

15:20:29   16   **A.**   ON THE LAND SIDE, IT VARIED.  IT COULD BE AS DEEP AS

15:20:33   17   MINUS 6, MINUS 7.

15:20:40   18   **Q.**   AND FOR THE SOUTH BREACH, WHERE WOULD THE PHREATIC SURFACE

15:20:44   19   BE?  WOULD IT BE SIMILAR?

15:20:46   20   **A.**   IT WOULD BE -- YEAH, SIMILAR.

15:20:51   21   **Q.**   THAT BEING THE CASE, WOULD IT BE TRUE, BASED UPON YOUR

15:20:55   22   ANALYSIS, THAT THE LOWER ORGANIC CLAY LAYER WAS ESSENTIALLY

15:21:00   23   SATURATED?

15:21:01   24   **A.**   IT WOULD BE TRUE.

15:21:01   25   **Q.**   OKAY.  AND SO ALSO, TOO, THE UPPER ORGANIC CLAY LAYER

15:21:06    1    WOULD BE ESSENTIALLY SATURATED TO AN ELEVATION LESS THAN

15:21:10    2    MINUS 2, OR THEREABOUTS; CORRECT?

15:21:17    3    **A.**    CORRECT.

15:21:17    4    **Q.**    OKAY.  NOW, IN YOUR MODELING, AS I UNDERSTAND IT, YOU DID

15:21:21    5    NOT MODEL ANY EXCAVATION ON THE FLOOD SIDE OF EITHER OF YOUR

15:21:25    6    CROSS SECTIONS; CORRECT?

15:21:26    7    **A.**    I DID NOT.

15:21:27    8    **Q.**    AND LIKEWISE, IN YOUR MODELING, YOU DID NOT ADD ANY TAIL

15:21:30    9    WATER OR GROUNDWATER TO THE PROTECTED SIDE OF THE LEVEE;

15:21:33   10    CORRECT?

15:21:34   11    **A.**    I DID NOT.

15:21:35   12    **Q.**    AND SO FOR YOUR SHEAR STRENGTHS, YOU WENT WITH THE

15:21:42   13    ANTICIPATED STRENGTHS OF THE SOILS ON THE PROTECTED SIDE; IS

15:21:49   14    THAT CORRECT?

15:21:49   15    **A.**    I GUESS THE WORD "ANTICIPATED" IS . . .

15:21:56   16    **Q.**    OKAY.  WELL, I -- THAT WAS A POORLY PHRASED QUESTION.

15:21:58   17    I'LL WITHDRAW IT.

15:21:59   18            WHEN YOU ARE GOING TO DETERMINE WHAT THE SOIL SHEAR

15:22:04   19    STRENGTHS WOULD BE ON THE PROTECTED SIDE, HOW DID YOU COME UP

15:22:07   20    WITH THAT VALUE?

15:22:08   21    **A.**    THOSE WERE DETERMINED BY A COMBINATION OF LOOKING AT THE

15:22:11   22    STRENGTH RESULTS DONE PRE-KATRINA, ALSO SOME STRENGTH TEST THAT

15:22:17   23    WAS DONE IMMEDIATELY POST-KATRINA, PREDOMINANTLY BY IPET.

15:22:22   24            I LOOKED AT THE VANE SHEAR TEST WE RAN LAST SUMMER.

15:22:27   25    I LOOKED AT CONE PENETRATION TESTS THAT WERE RUN BOTH

15:22:31  1   POST-KATRINA, IMMEDIATELY, AS PART OF THE INVESTIGATIVE EFFORT,

15:22:34  2   AND ALSO VANE SHEAR TESTS THAT WERE DONE DURING THE SUMMER.

15:22:40  3          AND SO USING A SYNTHESIS OF ALL THESE DIFFERENT DATA

15:22:45  4   SOURCES, I CAME UP WITH WHAT I FELT TO BE REASONABLE SHEAR

15:22:48  5   STRENGTHS FOR THE DIFFERENT LAYERS.

15:22:49  6   **Q.**   AND SO A SHEAR STRENGTH OF THE SOIL LAYER ON THE PROTECTED

15:22:52  7   SIDE, THAT'S GOING TO BE A -- ONE OF YOUR INPUTS TO AN EQUATION

15:22:56  8   THAT WOULD ULTIMATELY DETERMINE THE SLOPE STABILITY EQUATION

15:22:59  9   YOU'RE GOING TO COME UP WITH -- OR CALCULATIONS YOU'RE GOING TO

15:23:02  10  COME UP WITH; CORRECT?

15:23:04  11  **A.**   IT'S A LITTLE MORE COMPLICATED THAN THAT, IN THAT IT'S NOT

15:23:07  12  A SINGLE EQUATION WITH DISCRETE PARAMETERS.  BUT IT'S ONE OF

15:23:12  13  THE INPUTS THAT ARE USED TO CALCULATE FACTOR OF SAFETY.

15:23:15  14  **Q.**   AND THAT IT'S NOT THAT SIMPLE DOES NOT SURPRISE ME OR

15:23:19  15  ANYBODY ELSE IN THE COURTROOM.

15:23:19  16          BUT THAT IS WHERE YOUR SHEAR STRENGTH ANALYSIS COMES

15:23:23  17  FROM, RIGHT, THE NUMBERS YOU COME UP WITH IN YOUR TESTIMONY;

15:23:26  18  CORRECT?

15:23:26  19  **A.**   CORRECT.

15:23:28  20  **Q.**   WHAT IS THE VARIABILITY FOR THE SHEAR STRENGTH WHEN YOU

15:23:30  21  ARE GOING THROUGH THE TESTS?  I MEAN, YOU'VE USED THE TERM

15:23:33  22  "ENGINEERING JUDGMENT."

15:23:34  23          WHAT IS THE VARIABILITY OR RATE OF ERROR THAT YOU

15:23:37  24  WOULD BUILD INTO IT TO COME UP WITH THOSE MORE COMPLEX

15:23:41  25  CALCULATIONS?

15:23:43   1   **A.**   THAT'S A VERY DIFFICULT QUESTION TO ANSWER, IN THAT YOU

15:23:48   2   HAVE DIFFERENT AMOUNTS OF VARIABILITY DEPENDING UPON THE TYPES

15:23:52   3   OF TESTS YOU RUN.

15:23:54   4        SOME OF THE SHEAR STRENGTH DATA THAT WERE USED TO

15:23:57   5   COME UP WITH STRENGTHS WERE DONE WITH UNCONFINED COMPRESSION

15:24:01   6   TESTS.  THOSE HAVE A GREAT AMOUNT OF VARIABILITY.

15:24:04   7        A LOT OF THE MORE RECENT DATA WAS DONE USING A VERY

15:24:09   8   NICE ELECTRONIC VANE SHEAR APPARATUS.  THOSE HAVE A LOT LOWER

15:24:14   9   VARIABILITY THAN THE OTHER ONE.

15:24:16  10        AND SO IT'S -- THAT'S A DIFFICULT QUESTION TO ANSWER.

15:24:22  11   **Q.**   I GUESS MAYBE IF I CAN JUST SIMPLIFY IT A LITTLE BIT.

15:24:25  12        IS THIS A RATE OF ERROR OR A DIFFERENCE OF WHAT A

15:24:28  13   PRECISE NUMBER WOULD BE?

15:24:29  14   **A.**   YES.  THERE COULD BE SOME VARIABILITY.

15:24:31  15   **Q.**   OKAY.  ON THE OTHER PART OF THE ANALYSIS YOU WOULD DO, YOU

15:24:36  16   WOULD BE INPUTTING, I UNDERSTAND IT, THE PRESSURES OF THE WATER

15:24:40  17   ON THE FLOOD SIDE AS IT'S GOING UP ON THE WALL; CORRECT?

15:24:45  18   **A.**   NO.

15:24:45  19   **Q.**   OKAY.  HOW IS IT THAT YOU HAVE THE CALCULATION OF THE

15:24:49  20   DRIVING FORCE PUSHING -- PUTTING PRESSURE ON THE SOILS ON THE

15:24:53  21   BACK SIDE, ON THE PROTECTED SIDE?

15:24:55  22   **A.**   I GUESS I NEED TO CORRECT MY PREVIOUS ANSWER.

15:24:57  23        IS IF YOU'RE ANALYZING IT FOR A CONDITION -- A

15:25:00  24   CONDITION OF NO GAP, THEN YOU DO LOOK AT THE BOUNDARY WATER

15:25:04  25   PRESSURES ACTING ON THE LEVEE ITSELF.

15:25:07  1          BUT THE BULK OF MY ANALYSES WERE DONE ASSUMING THAT A

15:25:10  2   GAP EXISTED BETWEEN THE LEVEE FILL AND THE SHEET PILE.  AND

15:25:17  3   DOING THAT, YOU CALCULATE A HYDROSTATIC FORCE TO APPLY TO THE

15:25:25  4   SHEET PILE, AND THAT'S THE DRIV- -- ONE OF THE DRIVING FORCES.

15:25:27  5   **BY MR. JOANEN:**

15:25:28  6   **Q.**   AND SO IF I UNDERSTAND YOUR ANSWER, THE DRIVING FORCE IS

15:25:31  7   ONE OF THE PARTS OF YOUR EQUATION THAT WOULD LEAD TO YOUR FINAL

15:25:35  8   CONCLUSION.  CORRECT?

15:25:39  9   **A.**   IN A GENERAL SENSE.  IT IS -- IT IS -- DRIVING FORCES DO

15:25:44  10  FACTOR INTO AN EVALUATION OF YOUR FACTOR OF SAFETY.

15:25:47  11  **Q.**   OKAY.  SO -- AND I KNOW THIS IS GOING TO BE SIMPLIFIED, SO

15:25:52  12  YOU'RE GOING TO HAVE TO HELP ME THROUGH THIS.

15:25:54  13          THERE'S GOING TO BE A DRIVING FORCE AND THERE'S GOING

15:25:56  14  TO BE A RESISTING FORCE ON THE PROTECTED SIDE IN THE SLOPE

15:25:58  15  STABILITY ANALYSIS; CORRECT?

15:26:00  16  **A.**   THAT'S SIMPLIFIED, YES.

15:26:02  17  **Q.**   I MIGHT JUST LEAVE IT AT THAT AND SIT DOWN, BUT I'LL -- I

15:26:05  18  HAVE TO MOVE ON.

15:26:07  19          SO WHEN YOU CALCULATE THAT THERE'S NO EXCAVATIONS ON

15:26:10  20  THE PROTECTED SIDE, YOU'RE LIMITING YOURSELF -- AND THIS IS AN

15:26:16  21  OPEN-ENDED QUESTION -- ARE YOU LIMITING YOURSELF TO WHAT THE

15:26:22  22  DRIVING FORCE IS ON THE FLOOD SIDE VERSUS WHAT THE RESISTING

15:26:25  23  FORCES ARE ON THE PROTECTED SIDE?

15:26:29  24          IN ESSENCE, ARE YOU NOT CALCULATING ANY UNDERSEEPAGE

15:26:32  25  EFFECTS?

15:26:34   1   **A.**   IN ESSENCE, I'M NOT CALCULATING UNDERSEEPAGE EFFECTS.  AND

15:26:38   2   COULD I EXPLAIN WHY?

15:26:41   3   **Q.**   SURE.  YEAH.

15:26:42   4   **A.**   IT'S BECAUSE I'M USING UNDRAINED SHEAR STRENGTHS, AND PORE

15:26:46   5   PRESSURES DON'T AFFECT THE -- EITHER FOR THAT CASE, THE -- THE

15:26:51   6   DRIVING FORCES OR THE RESISTING FORCES.

15:26:55   7        THE PORE PRESSURES DON'T CHANGE UNDRAINED SHEAR

15:27:00   8   STRENGTHS.  THEY'RE INDEPENDENT OF PORE PRESSURE AND ALSO

15:27:02   9   NORMAL FORCE AS WELL.

15:27:03   10  **Q.**   OKAY.

15:27:04   11  **A.**   THE NORMAL STRESS.

15:27:04   12  **Q.**   IF WE -- IF WE LOOK AT THE -- ANY VALUES YOU WOULD TAKE --

15:27:08   13  AND THIS IS SOMEWHAT HYPOTHETICAL.  ANY VALUES YOU TAKE ON THE

15:27:11   14  PROTECTED SIDE OF THE STRENGTH OF THE SOIL, WHY WOULD A SOIL

15:27:16   15  BE -- HAVE A DIFFERENT STRENGTH IF YOU'RE LOOKING AT IT FROM A

15:27:19   16  DRAINED VERSUS AN UNDRAINED ANALYSIS?

15:27:24   17        BECAUSE IN MY MIND, WHATEVER IT IS -- WHATEVER CLUMP

15:27:28   18  OF SOIL YOU HAVE, IT IS WHAT IT IS.

15:27:30   19  **A.**   IT'S -- THE ISSUE HERE IS IT'S THE PORE PRESSURES.

15:27:33   20  BECAUSE WHEN YOU LOOK AT THE UNDRAINED STRENGTH OF THE

15:27:37   21  MATERIAL, YOU'RE -- YOU'RE NOT ALLOWING -- DURING THE TEST YOU

15:27:41   22  DON'T ALLOW DRAINAGE.

15:27:43   23        AND SO THE RESISTANCE OF THE SOIL TO SHEAR IS A

15:27:46   24  COMBINATION BOTH OF AN EFFECTIVE STRESS AND OF PORE PRESSURE AS

15:27:53   25  WELL.

| | | |
|---|---|---|
| 15:27:54 | 1 | IF YOU'RE DOING A DRAINED TEST, THEN YOU ALLOW |
| 15:27:57 | 2 | COMPLETE DRAINAGE.  AS YOU'RE DOING THE TEST, YOU HAVE ZERO |
| 15:28:01 | 3 | PORE PRESSURE, AND SO THE PORE PRESSURE DOESN'T WITHSTAND ANY |
| 15:28:04 | 4 | LOAD APPLIED DURING THE TEST. |
| 15:28:05 | 5 | BUT THEY'RE COMPLETELY DIFFERENT STRENGTHS. |
| 15:28:07 | 6 | **Q.**  AND SO IF I UNDERSTAND YOUR ANSWER, BECAUSE YOU RAN AN |
| 15:28:10 | 7 | UNDRAINED ANALYSIS, YOU DID NOT FACTOR INTO YOUR EQUATION PORE |
| 15:28:15 | 8 | PRESSURE.  IS THAT CORRECT? |
| 15:28:16 | 9 | **A.**  NO.  PORE PRESSURES ARE INCLUDED IN THE STRENGTH |
| 15:28:18 | 10 | PARAMETERS. |
| 15:28:19 | 11 | **THE COURT:**  SO THE ANSWER WAS, YES, YOU DO?  OR, NO, |
| 15:28:22 | 12 | YOU DON'T? |
| 15:28:23 | 13 | **THE WITNESS:**  I'M SORRY? |
| 15:28:25 | 14 | **MR. JOANEN:**  THEY'RE BUILT IN.  THEY'RE BUILT IN. |
| 15:28:28 | 15 | **THE COURT:**  THAT'S WHAT I THOUGHT THE ANSWER -- |
| 15:28:31 | 16 | **THE WITNESS:**  SO -- |
| 15:28:32 | 17 | **THE COURT:**  MAKE SURE -- I NEED TO UNDERSTAND IT, AND |
| 15:28:35 | 18 | I DON'T LIKE TO INTERFERE WITH THE EXAMINATION TOO MUCH.  BUT |
| 15:28:40 | 19 | IN THIS JUDGE TRIAL, I MUST. |
| 15:28:46 | 20 | AND THE QUESTION IS, DO PORE PRESSURES -- LET ME |
| 15:28:51 | 21 | MAKE SURE.  DO PORE PRESSURES COME INTO THE -- THE STABILITY OF |
| 15:28:56 | 22 | THE SEEPAGE ANALYSIS YOU'RE TALKING ABOUT, COUNSEL? |
| 15:29:00 | 23 | **MR. JOANEN:**  I'M ASKING -- I WAS ASKING HIM IF HE WAS |
| 15:29:04 | 24 | INTERPRETING SEEPAGE -- PORE PRESSURES INTO HIS ANALYSIS OF THE |
| 15:29:08 | 25 | SOIL STRENGTH. |

3242

15:29:10   1               **THE COURT:**  OKAY.

15:29:11   2               **THE WITNESS:**  PORE PRESSURES ARE IMPLICITLY

15:29:13   3   CONSIDERED IN THE ANALYSIS AS PART OF THE STRENGTHS YOU ASSIGN.

15:29:19   4               **THE COURT:**  SO WHEN YOU ASSIGN A STRENGTH, THAT WOULD

15:29:24   5   NECESSARILY INTRINSICALLY TAKE INTO CONSIDERATION PORE

15:29:29   6   PRESSURE?

15:29:30   7               **THE WITNESS:**  YES, SIR.

15:29:30   8               **THE COURT:**  OKAY.

15:29:31   9   BY MR. JOANEN:

15:29:31   10  **Q.**   AND AS I UNDERSTAND YOUR -- BOTH YOUR REPORT AND YOUR

15:29:35   11  DEPOSITION TESTIMONY, FOR THE NORTH BREACH, AT LEAST, YOU FELT

15:29:43   12  THAT SHEAR FAILURE WAS LIKELY THE CAUSE OF FAILURE AT THE NORTH

15:29:47   13  BREACH?

15:29:47   14  **A.**   YES.

15:29:48   15  **Q.**   OKAY.  AND SO AS I UNDERSTAND WHAT THAT MEANS, IS THAT THE

15:29:50   16  SOILS THEMSELVES ARE HOLDING TOGETHER -- THE NATURE OF THE

15:29:54   17  SOIL, I GUESS, WILL HOLD ITSELF TOGETHER -- AND THAT FORCES

15:29:58   18  PUSHED THOSE SOILS APART, OR SLID THEM ACROSS EACH OTHER.  IS

15:30:03   19  THAT CORRECT?

15:30:03   20  **A.**   THAT WOULD BE CORRECT.

15:30:05   21  **Q.**   NOW, THERE WAS A -- AND I WAS STRUGGLING WITH THIS.  BUT

15:30:07   22  ONE OF ANALOGIES THAT SOMEONE GAVE ME, IT WOULD BE LIKE A CAKE

15:30:12   23  WITH TWO LAYERS.  AND YOU HAVE WHATEVER THE CAKE MATERIAL WOULD

15:30:15   24  BE, AND THEN YOU WOULD HAVE ICING IN THE MIDDLE.

15:30:16   25               AND SO WHEN YOU HAVE THOSE TWO PIECES OF CAKE

15:30:19   1   TOGETHER, IF THERE'S NO ICING, THEY MAY SICK A LITTLE BETTER

15:30:22   2   TOGETHER; BUT IF YOU HAVE ICING IN THEM, THEY MAY BE MORE

15:30:26   3   LIKELY TO SLIDE IF YOU'RE PUSHING ON THE TOP SIDE OF THE CAKE

15:30:28   4   AND THE BOTTOM SIDE STAYS STATIONARY.

15:30:34   5            IS THAT SOMEWHAT ACCURATE FOR ANALOGIZING THE SHEAR

15:30:37   6   EFFECTS?

15:30:38   7            **MR. TREEBY:**  YOUR HONOR, I THINK WE NEED A DOBERGE

15:30:43   8   CAKE.

15:30:44   9            **THE COURT:**  EXACTLY.  I THINK THAT IS A -- I

15:30:47  10   COMPLETELY CONCUR.

15:30:49  11            **MR. TREEBY:**  WITH ALL THE LAYERS.

15:30:49  12            **THE COURT:**  I CAN TELL YOU --

15:30:49  13            **MR. TREEBY:**  IT WOULD BE APPROPRIATE.

15:30:50  14            **MR. JOANEN:**  I'M STUCK -- I'M STUCK WITH TWO LAYERS

15:30:53  15   RIGHT NOW, BECAUSE I'M HAVING TROUBLE.  WITH MANY LAYERS, IT

15:30:53  16   MAY BE MORE ANALYSIS THAN I CAN HANDLE.

15:30:58  17            **THE WITNESS:**  WELL, YOU KNOW --

15:31:01  18            **THE COURT:**  NO NAPOLEONS AND DOBERGE.  OKAY.

15:31:05  19            SO THE QUESTION IS, HE'S TRYING TO GET, IN

15:31:10  20   ESSENCE, AN ANALOGY OR A PICTORIAL OR A GRAPHICAL IMAGE OF

15:31:19  21   SHEAR STRENGTH THAT A MERE LAYPERSON CAN COMPREHEND.

15:31:22  22            **THE WITNESS:**  RIGHT.  I THINK THE CAKE IS PROBABLY

15:31:23  23   NOT A GOOD ANALOGY.

15:31:25  24   **BY MR. JOANEN:**

15:31:26  25   **Q.**   OKAY.

| | | |
|---|---|---|
|15:31:27|1|**A.**  MY WIFE ACTUALLY IS A PROFESSOR OF CAKES.  SHE TEACHES|
|15:31:30|2|CAKE DECORATING.|
|15:31:31|3|          **THE COURT:**  OH, I SEE.|
|15:31:31|4|          **THE WITNESS:**  IF YOU PUT ICING BETWEEN LAYERS, IN|
|15:31:34|5|EFFECT, IT KIND OF CEMENTS THEM TOGETHER.|
|15:31:36|6|**BY MR. JOANEN:**|
|15:31:36|7|**Q.**  OKAY.|
|15:31:36|8|**A.**  SO IF YOU HAVE A LAYER OF CAKE, YOU HAVE TO MAKE SURE YOU|
|15:31:39|9|HAVE YOUR LAYERS CONCENTRIC WHEN YOU SET THEM DOWN, BECAUSE|
|15:31:44|10|THERE'S NO MOVING THEM AFTERWARDS.|
|15:31:46|11|**Q.**  OKAY.|
|15:31:46|12|**A.**  SO I THINK A BETTER ANALOGY MIGHT BE A BLOCK ON A PLANE.|
|15:31:49|13|THAT'S THE ONE WE OFTEN USE FOR SHEAR DISPLACEMENT.|
|15:31:53|14|**Q.**  CAN YOU REPEAT THAT?|
|15:31:54|15|**A.**  A BLOCK ON A PLANE.|
|15:31:55|16|**Q.**  A BLOCK ON A . . .|
|15:31:56|17|**A.**  IF YOU HAD A BLOCK OF WOOD ON A BOARD --|
|15:31:58|18|**Q.**  OKAY.|
|15:31:59|19|**A.**  -- THE -- YOU KNOW, YOU CAN -- THE BLOCK WOULD SLIDE|
|15:32:01|20|DOWN --|
|15:32:01|21|**Q.**  OKAY.|
|15:32:01|22|**A.**  -- THE BOARD.  AND THAT'S AKIN TO A SHEAR FAILURE.|
|15:32:04|23|**Q.**  OKAY.  WHERE IT MOVES, WHERE THE ONE SURFACE MOVES RELATED|
|15:32:07|24|TO ANOTHER, WOULD THAT BE THE SHEAR PLANE OR THE SLIP PLANE?|
|15:32:12|25|**A.**  YES.|

15:32:13   1   **Q.**   OKAY.

15:32:13   2           **THE COURT:**   THERE YOU GO.

15:32:13   3   **BY MR. JOANEN:**

15:32:14   4   **Q.**   AND THAT'S WHERE I'M TRYING TO GET TO, HOW DO WE

15:32:16   5   UNDERSTAND WHAT THE SHEAR PLANE IS.

15:32:18   6           RELATED TO YOUR ANALYSIS OF THE NORTH BREACH, WHERE

15:32:22   7   WAS YOUR SHEAR PLANE?  IF I LOOK AT IT FROM A SIMPLISTIC VIEW,

15:32:28   8   LEVEE FILL AND UPPER ORGANIC CLAY, LOWER ORGANIC CLAY, AND

15:32:34   9   INTERDISTRIBUTARY?

15:32:36   10  **A.**   FRANKLY, I DON'T RECALL EXACTLY, BECAUSE I DID MANY

15:32:39   11  DIFFERENT ANALYSES WITH DIFFERENT CANAL WATER LEVELS, BOTH WITH

15:32:42   12  GAP AND NO GAP.  AND SO I THINK THE POSITION OF SHEAR PLANE

15:32:46   13  COULD VARY.  BUT I THINK PREDOMINANTLY IT WAS IN THE LOWER

15:32:50   14  ORGANIC CLAY.

15:32:51   15  **Q.**   OKAY.  AND WOULD THE SHEAR PLANE BE WITHIN THE LOWER

15:32:55   16  ORGANIC CLAY, OR WOULD IT BE WHERE THE LOWER ORGANIC CLAY AND

15:32:59   17  UPPER ORGANIC CLAY MEET?

15:33:02   18  **A.**   IT WOULD DEPEND UPON THE OTHER GEOMETRICAL FACTORS IN THE

15:33:09   19  ANALYSIS.  SO IT'S HARD TO SAY THAT THERE'S EXACTLY ONE SHEAR

15:33:12   20  PLANE.

15:33:12   21  **Q.**   WOULD LIQUID LIMIT BETWEEN THE TWO SOIL LAYERS PLAY INTO

15:33:17   22  CONSIDERATION OF WHERE THE SHEAR PLANE WOULD BE?

15:33:19   23  **A.**   NO, IT WOULDN'T.

15:33:20   24  **Q.**   OKAY.  AND WHY WOULD THAT BE?

15:33:22   25  **A.**   LIQUID LIMIT IS A MEASURE OF THE WATER CONTENT OF THE SOIL

15:33:26    1    WHEN IT HAS A CERTAIN SHEAR STRENGTH.  IT'S AN INDEX TEST, AND

15:33:31    2    IT'S USED FOR CLASSIFICATION OF SOILS TO TELL, YOU KNOW, HIGHLY

15:33:38    3    PLASTIC SOILS TO LOW PLASTICITY SOILS.

15:33:44    4              AND SO IT'S NOT A PARAMETER THAT FACTORS INTO,

15:33:46    5    REALLY, STRENGTHS NOR STABILITY ANALYSES.

15:33:49    6              **THE COURT:**  SO DOES PLASTIC OR NOT HAS PLASTIC HAVE

15:33:51    7    AN EFFECT ON SHEAR STRENGTH?

15:33:52    8              **THE WITNESS:**  THAT DOES HAVE AN EFFECT ON THE SHEAR

15:33:55    9    STRENGTH.

15:33:55   10              **THE COURT:**  AND THE MORE PLASTIC?

15:33:57   11              **THE WITNESS:**  IN TERMS OF WHEN WE LOOK AT UNDRAINED

15:34:00   12    STRENGTH RATIOS, IT INCREASES WITH INCREASING SOIL PLASTICITY.

15:34:05   13              **THE COURT:**  PLASTICITY INCREASES SHEAR STRENGTH?

15:34:07   14              **THE WITNESS:**  YES.

15:34:09   15    BY MR. JOANEN:

15:34:09   16    **Q.**   SO IF WE WERE TO LOOK AT BORE LOGS, IF -- I WAS TRYING TO

15:34:13   17    FIGURE THIS OUT.  IF WE WERE TO LOOK AT BORE LOGS ON THE

15:34:16   18    PROTECTED SIDE AND I KNEW THAT THERE WAS A PLASTICITY INDEX OF

15:34:19   19    THE UPPER ORGANIC CLAY AT SOME POINT AND A PLASTICITY INDEX OF

15:34:23   20    THE LOWER ORGANIC CLAY, COULD I LOOK AT THAT AND DETERMINE

15:34:26   21    MAYBE WHERE THE SHEAR PLANE WOULD LIKELY BE BASED UPON THE

15:34:30   22    PLASTICITY?

15:34:32   23    **A.**   NO, I DON'T THINK SO.

15:34:34   24    **Q.**   OKAY.  IS THERE ANY WAY THAT ONE CAN CALCULATE WHERE THEY

15:34:36   25    THINK THAT THE SHEAR PLANE WOULD BE BASED UPON AN ANALYSIS OF

15:34:40   1   BORE LOGS?

15:34:41   2   **A.**   ONLY IF ONE FINDS EVIDENCE OF A SHEAR PLANE WITHIN THE

15:34:46   3   SOIL SAMPLE AS YOU EXTRUDE IT.  VERY OFTEN, IF YOU DO HAVE A

15:34:53   4   SHEAR FAILURE, WE'LL DRILL LOTS OF HOLES AND EXTRUDE THE

15:34:58   5   SAMPLES AND CAREFULLY LOOK AND TRY TO FIND A PLANE OF

15:35:02   6   DISPLACEMENT.  AND SO USING -- AND YOU WOULD INDICATE THAT

15:35:04   7   OFTEN ON YOUR BORING LOGS.

15:35:06   8          SO IT IS POSSIBLE TO LOCATE A PREEXISTING SHEAR PLANE

15:35:10   9   BY LOOKING AT THE SAMPLE AS YOU EXTRUDE IT.

15:35:13   10  **Q.**   WITH THAT ANSWER, IT SEEMS TO ME THAT IPET WOULD HAVE DONE

15:35:17   11  THAT WHEN THEY WERE EVALUATING THE NORTH FAILURE.

15:35:22   12          WAS THAT DONE?

15:35:23   13  **A.**   YOU KNOW, IT'S -- I DON'T -- TO THE BEST OF MY KNOWLEDGE,

15:35:27   14  NO.  BECAUSE AS I RECALL, IT WAS VERY DIFFICULT TO DRILL IN THE

15:35:33   15  AREA WHERE THE FAILURE OCCURRED IMMEDIATELY AFTER KATRINA.  AND

15:35:35   16  A LOT OF BORINGS WERE DONE IN AREAS NEAR THE FAILURES, BUT IT

15:35:39   17  WAS DIFFICULT TO GET NICE HIGH-QUALITY UNDISTURBED SAMPLES

15:35:43   18  RIGHT WITHIN THE FAILED AREA.

15:35:45   19  **Q.**   WITH THE DEFENSE EFFORT FOR THIS TESTING PROTOCOL THAT

15:35:49   20  TOOK PLACE LAST SUMMER, WERE THE BORINGS AVAILABLE TO YOU OR

15:35:54   21  ANYONE ELSE ON THE DEFENSE TEAM, TO EVALUATE WHERE THE SHEAR

15:35:57   22  PLANE WOULD HAVE BEEN FOR THE NORTH BREACH?

15:36:01   23  **A.**   THERE -- THE BORINGS WERE CERTAINLY AVAILABLE.  BUT TO MY

15:36:05   24  RECOLLECTION, THERE AREN'T MANY BORINGS THAT WOULD BE WITHIN

15:36:10   25  THE FOOTPRINT OF WHERE THAT FAILURE OCCURRED, AND IT MIGHT BE

15:36:16   1   DIFFICULT TO DISCERN A SHEAR PLANE FROM THESE BORINGS, YOU

15:36:20   2   KNOW, SEVEN YEARS LATER IN THAT AREA.

15:36:23   3   **Q.**   OKAY.  MOVING NOW TO THE SOUTH BREACH.  AS I UNDERSTAND

15:36:28   4   YOUR REPORT AND YOUR TESTIMONY, YOU'RE NOT REALLY SURE WHAT

15:36:30   5   CAUSED THE SOUTH BREACH.  YOU CAN'T SAY WITH CERTAINTY WHAT

15:36:33   6   CAUSED IT, BECAUSE AS I UNDERSTAND YOUR -- THE WAY YOUR

15:36:38   7   ANALYSIS WORKS, YOU RAN THE NUMBERS CONSIDERING YOUR FACTORS

15:36:42   8   FOR PROTECTED SIDE VERSUS THE DRIVING FORCES; AND AT A CERTAIN

15:36:47   9   WATER LEVEL -- WHICH, AS I UNDERSTAND, YOU HAD THE TOP OF THE

15:36:49   10  WALL -- YOU INDICATED THAT THE WALL WAS STILL STANDING BECAUSE

15:36:52   11  THE SHEAR FORCES WERE NOT -- THE SHEAR STRENGTH FORCES WERE NOT

15:36:56   12  OVERCOME BY THE DRIVING FORCES.  IS THAT CORRECT?

15:36:59   13  **A.**   THAT'S CORRECT.

15:37:01   14  **Q.**   ALSO ON THAT, IF YOU WERE TO CHANGE ANY OF THE

15:37:10   15  STRATIGRAPHY OF THE PROTECTED SIDE, THAT WOULD CHANGE YOUR

15:37:13   16  ANALYSIS, CORRECT, AS YOU RAN IT ON THE -- YOUR LIMITED SLIP --

15:37:19   17  SLOPE STABILITY ANALYSIS?

15:37:21   18  **A.**   TO SOME DEGREE.  IT'S -- YOU KNOW, YOU COULD CERTAINLY

15:37:24   19  MAKE SUBTLE CHANGES THAT WOULD MAKE A DIFFERENCE.

15:37:28   20          OBVIOUSLY, IF YOU MADE BIG CHANGES, IT WOULD MAKE A

15:37:31   21  DIFFERENCE.

15:37:31   22  **Q.**   HYPOTHETICALLY, I'D LIKE TO JUST ASK YOU IF -- WELL, LET

15:37:35   23  ME JUMP A LITTLE AHEAD, AND THEN I'LL COME BACK TO THIS.

15:37:38   24          **MR. JOANEN:**  IF WE COULD SWITCH TO SLIDE -- I THINK

15:37:41   25  IT'S GOING TO BE 37.  I'M TRYING TO KEEP UP WITH THE NUMBER

| | | |
|---|---|---|
| 15:37:45 | 1 | CHANGES. |
| 15:37:58 | 2 | OR IT MIGHT BE 15.  TRY 15. |
| 15:38:02 | 3 | **BY MR. JOANEN:** |
| 15:38:02 | 4 | **Q.**   THIS IS SOME OF THE FACTORS YOU HAVE FOR YOUR ERODIBILITY |
| 15:38:07 | 5 | ISSUE. |
| 15:38:07 | 6 | WHEN YOU WERE RUNNING YOUR -- YOUR STABILITY |
| 15:38:10 | 7 | ANALYSIS, WERE YOU CONCERNED ABOUT ERODIBILITY OF SOILS? |
| 15:38:13 | 8 | **A.**   NO, I WAS NOT. |
| 15:38:14 | 9 | **Q.**   OKAY.  IF YOU ARE NOT WORRIED ABOUT ERODIBILITY OF SOILS |
| 15:38:20 | 10 | TO RUN YOUR MODEL, DOES THAT MEAN THAT YOU HAD ONE TYPE OF SOIL |
| 15:38:23 | 11 | FOR EACH STRATIGRAPHIC LAYER?  FILL, UPPER CLAY, LOWER CLAY? |
| 15:38:32 | 12 | **A.**   REPEAT THAT. |
| 15:38:34 | 13 | **Q.**   THE QUESTION I'M COMING TO.  THE UPPER ORGANIC LAYER THAT |
| 15:38:41 | 14 | YOU'VE TALKED ABOUT, YOU HAVE GIVEN IT A FACTOR, I'M ASSUMING, |
| 15:38:44 | 15 | OF SOFT CLAY OR MEDIUM CLAY. |
| 15:38:46 | 16 | WOULD THAT BE CORRECT? |
| 15:38:48 | 17 | **A.**   YES.  I MUST HAVE MISREPRESENTED THIS.  I USED THIS CHART |
| 15:38:51 | 18 | ONLY TO SHOW RELATIVE ERODIBILITIES FOR DIFFERENT SOIL TYPES. |
| 15:38:56 | 19 | **Q.**   OKAY. |
| 15:38:57 | 20 | **A.**   I DIDN'T PERSONALLY PERFORM A LANE'S WEIGHTED CREEP RATIO |
| 15:39:02 | 21 | ANALYSIS.  I WAS JUST TRYING TO DEMONSTRATE THAT AT IHNC, WE |
| 15:39:07 | 22 | HAD SOILS OF LOW ERODIBILITY AS OPPOSED TO SOILS OF HIGH |
| 15:39:12 | 23 | ERODIBILITY. |
| 15:39:13 | 24 | **Q.**   I MISUNDERSTOOD YOUR TESTIMONY. |
| 15:39:14 | 25 | YOU DO INDICATE HERE THAT THE SILTS, IN PARTICULAR, |

| | | |
|---|---|---|
| 15:39:19 | 1 | ARE -- HAVE MORE -- A HIGHER ERODIBILITY FACTOR; CORRECT? |
| 15:39:25 | 2 | **A.**   THAT'S CORRECT.  WELL, I -- IT'S SHOWN IN THIS CHART, BUT |
| 15:39:29 | 3 | THIS IS LANE'S VALUES, NOT MINE. |
| 15:39:31 | 4 | **Q.**   OKAY.  WELL, AS YOU'RE PRESENTING IN COURT, DO YOU BELIEVE |
| 15:39:35 | 5 | THAT THIS IS CORRECT OR INCORRECT? |
| 15:39:37 | 6 | **A.**   I BELIEVE IT'S CORRECT. |
| 15:39:38 | 7 | **Q.**   OKAY.  IF WE WERE -- IF I WERE TO ASK YOU -- AND I DON'T |
| 15:39:41 | 8 | SEE IT ON HERE -- AN ORGANIC MATERIAL IN A SOIL SUCH AS A PEAT, |
| 15:39:48 | 9 | WHERE WOULD THAT FALL IN RELATIONSHIP TO ALL THE VARIETY OF |
| 15:39:51 | 10 | THINGS YOU HAVE LISTED HERE? |
| 15:39:53 | 11 | **A.**   I COULD ONLY SPECULATE.  BUT BASED ON WHAT I'VE DONE |
| 15:39:58 | 12 | BEFORE, IT'S VERY -- IT'S VERY -- IT'S NOT ERODIBLE.  IT'S GOT |
| 15:40:04 | 13 | LOW ERODIBILITY. |
| 15:40:05 | 14 | **Q.**   SO YOU THINK THAT A PEAT WOULD BE CLOSER TO A SOFT CLAY |
| 15:40:10 | 15 | THAN A SILT? |
| 15:40:11 | 16 | **A.**   YES. |
| 15:40:16 | 17 | **MR. JOANEN:**  IF WE CAN GO BACK TO THE PREVIOUS SLIDE. |
| 15:40:18 | 18 | **BY MR. JOANEN:** |
| 15:40:25 | 19 | **Q.**   I UNDERSTAND FROM YOUR REPORT, AT THE SOUTH BREACH YOU |
| 15:40:28 | 20 | HAD -- AT 8:00 WATER STARTED OVERTOPPING THE LEVEE, AND THAT |
| 15:40:31 | 21 | WOULD HAVE CAUSED BACKSIDE SCOUR? |
| 15:40:35 | 22 | **A.**   I THINK YOU'LL FIND A TIME IN MY REPORT LIKE THAT. |
| 15:40:39 | 23 | **Q.**   OKAY.  IS THERE -- IS THERE ANY TIME CONSIDERATIONS IN |
| 15:40:44 | 24 | YOUR NORTH BREACH ANALYSIS? |
| 15:40:51 | 25 | **A.**   IN MY REPORT, I STATE THAT I GET A FACTOR OF SAFETY OF 1 |

15:40:55   1   WHICH, ACCORDING TO THE HYDROGRAPH, WOULD PERHAPS BE -- OH, I

15:41:04   2   CAN'T REMEMBER EXACTLY -- BETWEEN, I BELIEVE, 5:00 AND

15:41:06   3   6:00 A.M.

15:41:07   4         BUT I ALSO STATE THAT I DON'T THINK USING

15:41:09   5   TWO-DIMENSIONAL SLOPE STABILITY ANALYSES ARE AN ACCURATE MEANS

15:41:12   6   TO PREDICT EXACTLY WHEN TIME OF FAILURE IS.  AND WITHIN MY

15:41:16   7   REPORT, I LIST OTHER FACTORS THAT COULD, YOU KNOW, EITHER

15:41:22   8   SHORTEN OR EXTEND WHEN FAILURE OCCURRED.

15:41:24   9         I THINK THAT IT'S -- IT'S DIFFICULT TO EXPECT

15:41:30   10   GEOTECHNICAL ENGINEERS TO CALCULATE STABILITY TO THAT POINT.

15:41:35   11   **Q.**   SO IF I UNDERSTAND YOUR TESTIMONY, THE RATE OF OVERTOPPING

15:41:41   12   OR THE TIME OF OVERTOPPING AT THE SOUTH BREACH HAD NOTHING TO

15:41:45   13   DO WITH YOUR ANALYSIS.  IS THAT CORRECT?

15:41:48   14   **A.**   NO, AND IT'S NOT IN MY REPORT AT ALL.

15:41:57   15   **Q.**   YOU'VE INDICATED THAT YOU BELIEVE THAT DR. BEA MODELED THE

15:42:03   16   SUBTERRANEAN LAYERS AS A SAND.  THAT'S YOUR UNDERSTANDING;

15:42:08   17   CORRECT?

15:42:10   18   **A.**   EFFECTIVELY, BY USING DRAINED STRENGTH PARAMETERS, THAT'S

15:42:13   19   THE RESULT OF WHAT HE DID.

15:42:14   20   **Q.**   AND IS THAT BECAUSE YOU BELIEVE, AS I UNDERSTAND YOUR

15:42:16   21   TESTIMONY, WAS THAT A WATER MOLECULE WOULD BE ABLE TO MOVE

15:42:20   22   UNDER THE FLOODWALL AND THEN GET TO SOMEPLACE ON THE PROTECTED

15:42:24   23   SIDE?

15:42:25   24   **A.**   NO.  I THINK MORE ACCURATELY WHAT HE DID, BY USING DRAINED

15:42:30   25   STRENGTH PARAMETERS IN CONJUNCTION WITH HIS ANALYSIS, HE

15:42:33   1   ASSUMES THAT ALL PORE PRESSURE'S DUE TO CHANGES IN STRESS WERE

15:42:36   2   DISSIPATED AT THE TIME OF FAILURE.

15:42:38   3   **Q.**   OKAY.  NOW, IF YOU TAKE HIS ANALYSIS, AND INSTEAD OF

15:42:42   4   CONSIDERING IT TO BE ACTING AS A SAND, USING -- TO UTILIZE IT

15:42:46   5   AS A CLAY, AND HE'S GOING TO SAY THAT THE CLAY LAYER ITSELF IS

15:42:52   6   COMPLETELY SATURATED SUCH THAT ANY PRESSURE TRANSMISSION WHICH

15:42:56   7   IS BEING BROUGHT TO BEAR ON THE UPPER AND LOWER ORGANIC CLAY

15:43:00   8   AREAS, IS GOING TO BE TRANSMITTED UNDER THE LEVEE.

15:43:02   9           IF THAT'S THE CASE WHERE IN YOUR ANALYSIS DO YOU

15:43:05   10   THINK THAT THAT PRESSURE TRANSMISSION WOULD LEAD TO, AND WOULD

15:43:10   11   THAT BE THE AREA OF THE LEAST OVERBURDENED ON YOUR BACKSIDE

15:43:14   12   STRATIGRAPHY, IN PARTICULAR AT THE TOE OF THE LEVEE?

15:43:20   13   **A.**   THAT'S A VERY LONG QUESTION.

15:43:22   14           **THE COURT:**  IT IS.

15:43:23   15           **THE WITNESS:**  COULD YOU REPEAT THAT?

15:43:24   16   BY MR. JOANEN:

15:43:25   17   **Q.**   LET ME ASK YOU, IF THERE IS A -- I'LL BREAK IT DOWN.

15:43:27   18           IF THERE IS A PRESSURE TRANSMISSION AT THE SOIL

15:43:35   19   STRATIGRAPHY IN THE ORGANIC CLAY LAYER, AND THAT PRESSURE

15:43:40   20   TRANSMISSION, OF COURSE, IS GOING TO BE MOVING AT SOME RATE,

15:43:43   21   BUT IT'S GOING TO LOOK FOR -- THE UPLIFT PRESSURE IS GOING TO

15:43:46   22   BE INHIBITED BY THE OVERBURDENED STRESS OF WHATEVER LAYERS

15:43:51   23   ABOVE IT; CORRECT?

15:43:52   24           IT'S KIND OF LIKE YOUR ANALYSIS WHERE YOU HAD THE

15:43:55   25   SAND AND THEN YOU HAD THE IMPERMEABLE CLAY UNDER IT.  THE

15:44:00   1   UPLIFT PRESSURE IS GOING TO BE LOOKING FOR A WEAK LINK, SO TO

15:44:04   2   SPEAK; CORRECT?

15:44:05   3   **A.**   OKAY.  SO FIRST -- I'M SORRY.  BUT I'M FIRST TO ASSUME

15:44:07   4   THAT THERE'S A PRESSURE TRANSMISSION IN THE ORGANIC CLAY?

15:44:11   5   **Q.**   YES.  LET'S ASSUME THERE IS A -- THERE IS AN UPLIFT

15:44:14   6   PRESSURE SOMEWHERE ON THE PROTECTED SIDE.

15:44:16   7   **A.**   OKAY.

15:44:16   8   **Q.**   JUST ASSUME THAT.

15:44:18   9   **A.**   OKAY.  YES, SIR.

15:44:19   10  **Q.**   IF THERE IS GOING TO BE AN UPLIFT PRESSURE, THAT UPLIFT

15:44:23   11  PRESSURE, I'M ASSUMING, WOULD BE INHIBITED BY THE OVERBURDEN OF

15:44:26   12  THE LEVEE FILL CLOSEST TO THE WALL; IS THAT CORRECT?

15:44:29   13  **A.**   WELL, SEE -- AND SO THIS TOTALLY ASSUMES THAT THERE'S NO

15:44:33   14  OTHER MECHANISMS OF PORE PRESSURE CHANGE, LIKE, DUE TO STRESS?

15:44:38   15  **Q.**   CORRECT.

15:44:39   16  **A.**   OKAY.  I GUESS, TO ME, IT'S A HYPOTHETICAL SCENARIO, THAT

15:44:45   17  I'M NOT SURE, FOR ONE, THAT THIS UPLIFT PRESSURE -- THE STRESS

15:44:52   18  COMPONENT OF THIS UPLIFT PRESSURE, I'M NOT CERTAIN WHAT'S MEANT

15:44:57   19  BY THAT.

15:45:03   20           **THE COURT:**  ARE YOU TRYING TO SAY IN YOUR

15:45:06   21  HYPOTHETICAL -- WHICH OF COURSE THE GOOD DOCTOR DOES AGREE WITH

15:45:10   22  THE BASIC PREMISE.

15:45:13   23             BUT ASSUMING THAT UPLIFT PRESSURES GOT UNDER THE

15:45:17   24  FLOODWALL AND WERE ACTING ON THE SOILS ON THE OTHER SIDE OF THE

15:45:23   25  FLOODWALL, WHERE WOULD THOSE PRESSURES -- WHAT WOULD BE THE

15:45:31    1    MOST VULNERABLE AREA TO THE UPLIFT PRESSURE?

15:45:35    2             IS THAT A FAIR QUESTION, COUNSEL?  I DON'T WANT

15:45:35    3    TO MESS IT UP.

15:45:35    4    **BY MR. JOANEN:**

15:45:36    5    **Q.**   YES.  WELL, I'LL TELL YOU, WHEN YOU GET TO, LIKE, PAGE 39

15:45:43    6    YOUR REPORT, ONE OF THE COMMENTS YOU HAVE IS THAT THE BLOWOUT

15:45:44    7    MECHANISM REQUIRES ADEQUATE -- WELL, YOU'RE TALKING ABOUT THE

15:45:44    8    BLOWOUT HEAVE ON THE BACK SIDE.  AND YOU INDICATE THAT THE

15:45:49    9    CANAL WATER INCREASE LEADS TO PORE PRESSURE INCREASE AT THE TOE

15:45:52   10    OF THE LEVEE.

15:45:54   11    **A.**   UH-HUH.

15:45:54   12    **Q.**   AND SO MY QUESTION IS:  WHENEVER THERE'S THIS UPLIFT

15:45:58   13    PRESSURE BEING BROUGHT TO BEAR ON THE PROTECTED SIDE, IS THE

15:46:01   14    TOE OF THE LEVEE WHERE THE UPLIFT PRESSURE IS MOST LIKELY TO BE

15:46:05   15    ABLE TO REVEAL ITSELF?

15:46:07   16    **A.**   YEAH.  THAT'S THE CRITICAL -- IF YOU HAVE A SAND LAYER AND

15:46:09   17    YOU HAVE AN UPLIFT OR A HEAVE SITUATION GOING ON, THAT'S THE

15:46:16   18    CRITICAL AREA, BECAUSE THE OVERBURDEN STRESS IS LOWEST THERE.

15:46:20   19    **Q.**   THAT'S WHAT I WAS TRYING TO GET TO.  I'M TRYING TO GET

15:46:22   20    THERE.

15:46:23   21             SO IN YOUR ANALYSIS, WHEN YOU DISCUSS IN YOUR REPORT

15:46:25   22    THAT THERE IS A TRANSMISSION OF PRESSURE IF THERE IS SUFFICIENT

15:46:30   23    HYDRAULIC CONDUCTIVITY ON THE PROTECTED -- ON THE FLOOD SIDE --

15:46:33   24    FOR EXAMPLE, A HOLE IN THIS FILL LAYER, THIS CAP -- THAT WOULD

15:46:39   25    ALLOW THE RISING STORM SURGE TO THEN SEEP INTO THIS CLAY LAYER.

15:46:47   1            ASSUMING THAT THERE IS A SAND OR A CLAY, EITHER WAY,

15:46:51   2   IF IT'S STEADY STATE, AS I UNDERSTAND DR. MARR TESTIFIED, THAT

15:46:55   3   IT'S POSSIBLE, IF YOU HAVE ENOUGH TIME, THAT THERE WOULD BE A

15:46:59   4   TRANSMISSION OF PRESSURE, AN UPLIFT PRESSURE TO THE PROTECTED

15:47:04   5   SIDE, AND THAT THE TOE OF THE LEVEE WOULD BE THE LOCATION WHERE

15:47:10   6   IT WOULD COME TO THE TOP.  IS THAT CORRECT?

15:47:11   7   **A.**   THAT'S CORRECT.

15:47:24   8   **Q.**   AND AS I UNDERSTAND YOUR EXPLANATION IN YOUR REPORT, IN

15:47:30   9   ORDER FOR THE HEAVE TO BE MAINTAINED, YOU WOULD HAVE TO HAVE

15:47:34  10   WATER TAKING -- FILL IN THE SPOTS AS THE SOIL IS BEING PUSHED

15:47:40  11   UP; IS THAT CORRECT?

15:47:41  12   **A.**   YES.

15:47:42  13   **Q.**   NOW, IF THERE IS A -- IN YOUR ANALYSIS, WHEN YOU WERE

15:47:46  14   FIGURING OUT THE DRIVING FORCES VERSUS THE RESISTING FORCES, I

15:47:49  15   WOULD ASSUME YOU WERE TAKING DIFFERENT NUM- -- YOU WERE GETTING

15:47:55  16   DIFFERENT NUMBERS AS THE SURGE WAS INCREASING; CORRECT?

15:47:59  17   **A.**   CORRECT.

15:48:01  18   **Q.**   IT WAS AN ONGOING ANALYSIS, AS YOU SAW THE TIME FRAME OF

15:48:05  19   THE HYDROGRAPH GO UP?

15:48:07  20   **A.**   NO, IT'S -- SEE, NOT IN MY ANALYSIS.  SINCE I'M USING

15:48:10  21   UNDRAINED STRENGTHS, THEN IT'S ANALYZED.  THE HYDROGRAPH

15:48:15  22   DOESN'T FACTOR INTO IT EXCEPT FOR THE FACT THAT IT DOES HAVE

15:48:18  23   DIFFERENT CANAL WATER LEVELS.

15:48:19  24            BUT IF YOU'RE DOING A STEADY-STATE ANALYSIS, TIME IS

15:48:23  25   NOT A FACTOR.  SO MY ANALYSIS GIVES YOU DISCRETE VALUES OF

15:48:27   1   FACTOR OF SAFETY FOR DIFFERENT CANAL WATER ELEVATIONS, AND THE
15:48:31   2   HYDROGRAPH ISN'T PART OF THE CALCULATION.
15:48:34   3   **Q.**   OKAY.  IF THERE IS AN -- HYPOTHETICALLY, IF THERE'S AN
15:48:39   4   EXCAVATION IN YOUR EITHER NORTH OR SOUTH BREACH ON THE FLOOD
15:48:43   5   SIDE, AND THERE'S STORM SURGE COMING UP TO THIS LEVEL, AND THAT
15:48:49   6   EXCAVATION WOULD ALLOW SOME HYDRAULIC CONDUCTIVITY INTO THE
15:48:53   7   BURIED SWAMP MARSH LAYER, YOUR LOWER, UPPER ORGANIC CLAY, WOULD
15:48:58   8   THERE BE PRESSURE TRANSMITTED INTO THAT SATURATED LAYER?
15:49:02   9   **A.**   WELL, I DON'T -- THE WAY IT WORKS IS THAT IF YOU HAVE AN
15:49:10   10  INCREASE IN STRESS, YOU CAN HAVE AN INCREASE IN PORE PRESSURE.
15:49:15   11          NOW, ON THE FLOOD SIDE THERE, IF YOU PUT A RUBBER
15:49:19   12  MEMBRANE ON THE GROUND SURFACE AND THEN YOU HAD THE FLOOD
15:49:22   13  LOADING ON TOP OF IT, JUST THE WEIGHT OF THAT WATER INCREASING
15:49:25   14  STRESS ON THE MATERIALS BELOW CAUSES AN INCREASE IN PORE
15:49:31   15  PRESSURE.
15:49:31   16          AND SO YOU WOULD HAVE THAT -- YOU CAN HAVE A
15:49:34   17  STRESS-INDUCED INCREASE IN PORE PRESSURE WITH OR WITHOUT AN
15:49:38   18  EXCAVATION, BECAUSE THE MEMBRANE PREVENTS ALL FLOW.  IT REALLY
15:49:41   19  IS A CASE OF A CHANGE IN PORE PRESSURE DUE TO A CHANGE IN TOTAL
15:49:47   20  STRESS.
15:49:47   21  **Q.**   OKAY.  IF WE DON'T HAVE ANY STORM SURGE IN YOUR MODEL, BUT
15:49:52   22  WE PUT A PIEZOMETER IN THE -- THROUGH THE FILL LAYER, AND THE
15:49:58   23  PIEZOMETER HAS THE READING CAPABILITY TO READ THE PRESSURES
15:50:02   24  THAT WOULD BE IN THE UPPER OR LOWER ORGANIC CLAY --
15:50:05   25  **A.**   OKAY.

15:50:05  1   **Q.**   -- ARE YOU WITH ME ON THAT?

15:50:09  2          THEN WE HAVE A STORM SURGE THAT COMES UP OVER THE --

15:50:11  3   NO EXCAVATIONS -- AND THERE IS A STORM SURGE THAT COMES UP OVER

15:50:16  4   THE EBIA AREA.

15:50:16  5   **A.**   YES, SIR.

15:50:17  6   **Q.**   AS IT GETS TO A LEVEL ABOVE THE SURFACE OF THE EBIA, WOULD

15:50:20  7   THE PIEZOMETER READ THE INCREASING PRESSURE THAT WAS BROUGHT TO

15:50:24  8   BEAR BY THE RISING WATERS?

15:50:25  9   **A.**   YES.  AND EVEN IF YOU HAD A RUBBER MEMBRANE ON THE GROUND

15:50:29  10  SURFACE, YOU WOULD MEASURE THAT INCREASE IN PRESSURE BECAUSE

15:50:32  11  IT'S A STRESS-INDUCED INCREASE IN PRESSURE.

15:50:35  12  **Q.**   AND THAT STRESS-INDUCED INCREASE IN PRESSURE IN THE LOWER

15:50:40  13  ORGANIC CLAY OR UPPER ORGANIC CLAY IS GOING TO LOOK FOR A

15:50:43  14  PATHWAY TO DISSIPATE; IS THAT CORRECT?

15:50:46  15  **A.**   OVER TIME, YES.

15:50:47  16  **Q.**   OKAY.  WHEN YOU MEAN "OVER TIME," WHAT KIND OF TIME ARE

15:50:50  17  YOU TALKING ABOUT, JUST FOR PRESSURE?

15:50:52  18  **A.**   WELL, CLAYS HAVE VERY LOW PERMEABILITY.  THESE PARTICULAR

15:50:57  19  CLAYS ARE QUITE COMPRESSIBLE.  AND SO YOU'RE -- YOU KNOW, IT

15:51:01  20  WOULD TAKE TIME FOR THAT PRESSURE TO DISSIPATE, DEPENDING

15:51:05  21  UPON -- IT GOES BACK TO THE COEFFICIENT OF CONSOLIDATION OF THE

15:51:08  22  SOIL.

15:51:09  23  **Q.**   WELL, I WANT YOU TO ASSUME THAT THE CLAY LAYER ITSELF IS

15:51:12  24  100 PERCENT SATURATED SO THAT THE PRESSURE IS ACTING NOT ON THE

15:51:15  25  CLAY MOLECULE BUT ON THE WATER ITSELF.

15:51:17   1            WOULD THAT TRANSMISSION OF PRESSURE STILL TAKE ALL OF

15:51:20   2   THIS TIME THAT YOU'RE TALKING ABOUT?

15:51:22   3   **A.**   IT STILL -- IT WOULD TAKE A WHILE FOR THE WATER -- FOR THE

15:51:25   4   PORE PRESSURES TO DISSIPATE, AND THAT WOULD BE A FUNCTION OF

15:51:28   5   THE C SUB V VALUE OF THE CLAY AND ITS COEFFICIENT OF

15:51:31   6   COMPRESSIBILITY AND THE DRAINAGE PATHWAY.

15:51:35   7   **Q.**   AND SO IT'S YOUR TESTIMONY THAT WHEN THIS SATURATED CLAY

15:51:40   8   LAYER GETS ACTED UPON BY A FORCE, THAT FORCE -- THAT PRESSURE

15:51:43   9   FORCE IS NOT TRANSMITTED BY THE WATER ITSELF, BUT IT'S ACTUALLY

15:51:47   10   TRANSMITTED BY THE -- OR ABSORBED BY THE SOIL ITSELF?

15:51:51   11   **A.**   NO.   THE FORCE IMMEDIATELY WHEN YOU HAVE AN INCREASE IN

15:51:55   12   PORE PRESSURE THAT'S EQUAL TO YOUR INCREASE IN TOTAL VERTICAL

15:51:58   13   STRESS.   BUT OVER TIME, AS PORE PRESSURES DISSIPATE AND GO BACK

15:52:01   14   DO THEIR ORIGINAL HYDROSTATIC CONDITION, THE CHANGE IN PORE

15:52:07   15   PRESSURE IS TRANSFERRED TO CHANGE IN EFFECTIVE STRESS.

15:52:10   16   **Q.**   AND SO THIS STRESS LOAD THAT YOU'RE TALKING ABOUT, THAT IS

15:52:13   17   INCREASING AS THE HEIGHT OF THE STORM SURGE COMES UP OVER THE

15:52:16   18   EBIA AREA; CORRECT?

15:52:17   19   **A.**   YES.

15:52:17   20   **Q.**   AND SO AS THE STORM SURGE IS GOING UP, THE PRESSURE'S

15:52:22   21   BEING INCREASED -- INCREASINGLY SENT DOWN INTO THE UNDERLYING

15:52:28   22   LAYER; CORRECT?

15:52:30   23   **A.**   THE PORE PRESSURE WOULD INCREASE PROPORTIONAL TO THE

15:52:35   24   HEIGHT OF WATER ON THE CANAL SIDE.

15:52:36   25   **Q.**   OKAY.   AND SO THE PORE PRESSURE IS LOOKING FOR SOMEPLACE

15:52:39   1  IT GO; RIGHT?  IT'S LOOKING TO GO SOMEWHERE; CORRECT?

15:52:43   2             AND IF IT -- THE PORE PRESSURE --

15:52:43   3             **THE COURT:**  WAIT, WAIT.  LET ME GET AN ANSWER.

15:52:46   4             DID YOU NOD "YES," SIR?

15:52:46   5         **MR. JOANEN:**  HE NODDED HIS HEAD, YES.

15:52:46   6         **THE COURT:**  I'M SORRY.

15:52:47   7         **THE WITNESS:**  YES, SIR.

15:52:47   8  **BY MR. JOANEN:**

15:52:48   9  **Q.**   AND SO IF THE PORE PRESSURE HAS BEEN TRANSMITTED TO THE

15:52:51  10  BACK SIDE, THE PROTECTED SIDE, THEN THE WEAKEST AREA, I GUESS,

15:52:55  11  BASED UPON WHAT I UNDERSTAND YOU TO SAY, WOULD BE AT THE TOE OF

15:52:58  12  THE LEVEE; CORRECT?

15:53:01  13  **A.**   WITHIN THAT QUESTION, DOES IT ASSUME SOME TRANSMISSION OF

15:53:04  14  PORE PRESSURE FROM ONE SIDE TO THE OTHER?  I COULDN'T

15:53:07  15  QUITE . . .

15:53:08  16  **Q.**   NO.  I WAS -- I THOUGHT I WAS ASKING YOU IF THERE WAS A

15:53:11  17  SATURATED LAYER, AND THE PRESSURE'S BEING TRANSMITTED THROUGH

15:53:15  18  THE WATER MOLECULE AND NOT THE SOIL MOLECULE, THAT IT WOULD BE

15:53:20  19  TRANSMITTED TO THE PROTECTED SIDE; THAT PRESSURE WOULD BE

15:53:22  20  MOVING SOMEWHERE, AND IT WOULD MOVE TO BECOME A PRESSURE THAT'S

15:53:25  21  GOING TO LOOK FOR THE PATH OF LEAST RESISTANCE.

15:53:28  22  **A.**   OKAY.  NOW, THAT WOULD BE THE SLOPE PROCESS.  I MEAN, WE

15:53:34  23  WOULD HAVE A LOCALIZED INCREASE IN PORE PRESSURE ON THE CANAL

15:53:37  24  SIDE.

15:53:37  25             BUT THAT -- IT'S NOT REALLY FELT AT THE TOE OF THE

3260

15:53:39   1   OTHER SIDE, YOU KNOW, BECAUSE IT WOULD TAKE A LONG TIME TO

15:53:42   2   DISSIPATE PORE PRESSURES.

15:53:44   3          **THE COURT:**  AND IS THAT BECAUSE OF THE FIRST DIAGRAM

15:53:47   4   YOU SHOWED ME, BECAUSE OF THE -- PLEASE TELL ME IF I'M WRONG --

15:53:55   5   THE DIAGRAM WHERE THE CLAY HAD VERY LITTLE SPACE BETWEEN THE

15:54:04   6   PARTICLES OF CLAY AND THE WATER, WHEREAS SOMETHING LIKE SAND

15:54:07   7   WOULD HAVE MORE SPACE BETWEEN THE PARTICLES OF SAND AND THE

15:54:11   8   WATER?

15:54:12   9          IS THAT PART OF THE COMPONENT OF PORE PRESSURE?

15:54:16  10          **THE WITNESS:**  THAT'S MOST OF THE COMPONENT THAT WE'RE

15:54:19  11   TALKING ABOUT.

15:54:20  12          **THE COURT:**  ALL RIGHT.

15:54:21  13   **BY MR. JOANEN:**

15:54:22  14   **Q.**   AND SO JUST SO I UNDERSTAND YOUR TESTIMONY, IF THERE IS --

15:54:29  15   AND AGAIN, I'M GOING BACK TO YOUR REPORT WHERE YOU INDICATED

15:54:33  16   THAT INCREASE IN PORE PRESSURE TAKES PLACE VERY QUICKLY IN A

15:54:37  17   SATURATED SYSTEM OWING TO LOW COMPRESSIBILITY OF WATER.

15:54:41  18          AND WE'VE ALREADY ESTABLISHED THAT THE UPPER AND

15:54:46  19   LOWER ORGANIC CLAYS ARE SATURATED; CORRECT?

15:54:48  20   **A.**   YES.

15:54:50  21   **Q.**   OKAY.

15:54:50  22   **A.**   BUT THE QUOTE THAT YOU STARTED WITH, THAT YOU ATTRIBUTED

15:54:53  23   TO MY REPORT, I DON'T THINK IS CORRECT.

15:54:56  24   **Q.**   WHAT, THAT THERE'S A -- THAT WATER HAS A VERY LOW

15:54:58  25   COMPRESSIBILITY?

15:54:59  1  **A.**   NO.   I HAD AN EXAMPLE WHERE I TALKED ABOUT THAT PORE

15:55:04  2  PRESSURES CAN CHANGE RAPIDLY IN SANDS.

15:55:05  3  **Q.**   OKAY.

15:55:07  4  **A.**   AND THAT WAS AN IMPORTANT ELEMENT MISSING IN YOUR

15:55:10  5  QUESTION.

15:55:11  6  **Q.**   WELL -- AND I UNDERSTAND THAT.   BUT STILL, WITH A

15:55:14  7  SATURATED SYSTEM AND YOU HAVE A LOW COMPRESSIBILITY OF WATER,

15:55:19  8  ISN'T IT TRUE THAT PRESSURE IS TRANSMITTED THROUGH THE WATER,

15:55:23  9  OR AS A RESULT OF WATER, AND NOT THROUGH THE SOIL SKELETON?

15:55:28  10  **A.**   NO.   IT'S A FUNCTION OF THE COMPRESSIBILITY OF THE SOIL

15:55:32  11  SKELETON.   IT'S -- THAT'S PART OF THE EQUATION FOR THE -- FOR

15:55:36  12  TRANSIENT ANALYSIS FOR SATURATED SYSTEMS.

15:55:38  13  **Q.**   OKAY.

15:55:39  14  **A.**   THE EXAMPLE I USED IN MY REPORT WAS SPECIFICALLY FOR A

15:55:43  15  THICK LAYER OF HIGH PERMEABILITY SAND.   AND THOSE CAN TRANSFER

15:55:49  16  WATER PRESSURES FAIRLY QUICKLY BECAUSE THEY HAVE A VERY HIGH

15:55:53  17  PERMEABILITY.

15:55:54  18  **Q.**   AND SO IF YOU HAVE A CLAY THAT HAS A LOW PERMEABILITY,

15:55:57  19  LIKE WE HAVE HERE --

15:55:58  20  **A.**   YES, SIR.

15:55:59  21  **Q.**   -- YEAH.   IT'S SATURATED WITH 100 PERCENT SATURATION AND

15:56:03  22  NO AIR VOIDS, IT'S YOUR TESTIMONY THAT PRESSURE WOULD NOT BE

15:56:07  23  TRANSMITTED AS A RESULT OF THE WATER AND ONLY THROUGH THE

15:56:12  24  COMPRESSION OF THE SOIL SKELETON?

15:56:14  25  **A.**   TRANSMITTED HOW FAR?   I MEAN, THAT'S AN IMPORTANT PART.   I

15:56:19   1   WOULD -- I WOULD SAY THAT THE CLAY WOULD BEHAVE ACCORDING TO

15:56:22   2   THE EQUATIONS THAT ONE HAS FOR -- FOR TRANSIENT SEEPAGE

15:56:29   3   ANALYSIS, WHICH A FUNCTION OF THE PERMEABILITY AND THE

15:56:31   4   COMPRESSIBILITY.

15:56:33   5           AND IT'S KIND OF HARD TO COME UP WITH A BLANKET

15:56:37   6   STATEMENT, LIKE YOU SAY.  I MEAN, IT WOULD BE TRANSMITTED OVER

15:56:40   7   A CERTAIN PERIOD OF TIME OVER A CERTAIN DISTANCE.  THERE STILL

15:56:45   8   WOULD BE VOLUME CHANGE OCCURRING IN THE CLAY BECAUSE, YOU KNOW,

15:56:49   9   YOU HAVE VOLUME CHANGE ASSOCIATED WITH THE CHANGE IN EFFECTIVE

15:56:52   10   STRESS.

15:56:53   11   Q.   AND SO MY QUESTION IS, YOU WOULD NOT AGREE THAT PRESSURE

15:56:55   12   IS TRANSMITTED THROUGH THE UPPER OR LOWER ORGANIC CLAY AS A

15:57:02   13   RESULT OF THE WATER; JUST SIMPLY THE WATER, AS IS DISCUSSED IN

15:57:05   14   DR. BEA'S STEADY-FLOW ANALYSIS.  CORRECT?

15:57:07   15   A.   AS A RULE, I WOULD NOT AGREE WITH THAT.

15:57:10   16   Q.   AND HAVE YOU READ DR. MARR'S APPENDIX T OF HIS REPORT?

15:57:16   17   A.   I PRESUME I HAVE SOME TIME AGO.  I DON'T -- I COULDN'T

15:57:20   18   TELL YOU THE TITLE OF HIS APPENDIX T.

15:57:24   19   Q.   YOU WOULDN'T HAVE ANY POSITION, I GUESS, AS YOU SIT HERE

15:57:26   20   TODAY, AS TO WHETHER HE BELIEVES THAT PRESSURE CAN BE

15:57:28   21   TRANSMITTED THROUGH THE SATURATED SOIL SYSTEM ACTING UPON THE

15:57:31   22   SOIL AND NOT THE -- ACTING UPON THE WATER AND NOT THE SOIL

15:57:34   23   SKELETON?

15:57:35   24   A.   I DON'T RECALL READING THAT IN DR. MARR'S REPORT.

15:57:49   25   Q.   FOR YOUR REPORT -- I JUST WANT TO ASK YOU A FEW MORE

15:57:49   1   QUESTIONS.

15:57:49   2           FOR YOUR REPORT AND YOUR ANALYSIS, YOU INDICATE THAT

15:57:50   3   AS YOU INCREASE SHEAR STRENGTH, YOU INCREASE THE FACTOR OF

15:57:53   4   SAFETY; IS THAT CORRECT?

15:57:54   5   **A.**   GENERALLY SPEAKING, YES.

15:57:56   6   **Q.**   OKAY.  IS THE INVERSE OF THAT ALSO TRUE?  IF YOU DECREASE

15:57:59   7   THE SHEAR STRENGTH, YOU DECREASE THE FACTOR OF SAFETY?

15:58:04   8   **A.**   AS A GENERAL RULE, YES.

15:58:06   9   **Q.**   OKAY.  ON YOUR ANALYSIS, WHEN YOU HAVE SHEAR STRENGTH

15:58:10   10   BUILT INTO YOUR -- I'M GOING TO USE THE WORD "EQUATION."  IS

15:58:14   11   THAT PROPER, OR "CALCULATION"?

15:58:16   12   **A.**   IT'S BUILT INTO THE ANALYSIS.

15:58:17   13   **Q.**   IT'S BUILT INTO THE ANALYSIS.  IF THERE IS -- I GUESS

15:58:20   14   GIVEN SUFFICIENT TIME, BASED UPON YOUR POSITION THAT PORE

15:58:24   15   PRESSURE HAS TO BUILD UP -- IF THERE IS UPLIFT PRESSURE THROUGH

15:58:28   16   THE SOILS RESULTING FROM THIS FLOW, DOES THAT REDUCE YOUR SHEAR

15:58:36   17   STRENGTH?

15:58:36   18   **A.**   IF THERE'S ADEQUATE TIME FOR THE SOIL TO CHANGE VOLUME,

15:58:40   19   YES.

15:58:41   20   **Q.**   OKAY.  SO IF THERE'S A FORCE PUSHING UP AND THAT'S

15:58:48   21   COUNTERACTED BY A FORCE PUSHING DOWN, EVENTUALLY, IF THE FORCE

15:58:52   22   PUSHING UP IS GREATER THAN THE FORCE PUSHING DOWN AND YOU HAVE

15:58:56   23   A FORCE -- DRIVING FORCE THAT WILL CREATE THE SHEAR THAT YOU

15:59:00   24   TALK ABOUT IN THE SHEAR PLANE?

15:59:07   25   **A.**   I'M -- I DON'T THINK I FOLLOWED YOU COMPLETELY.

15:59:10   1   **Q.**   IF THE FORCE -- IF YOU HAVE A FORCE PUSHING UP --

15:59:13   2   **A.**   OKAY.

15:59:13   3   **Q.**   -- AND A FORCE PUSHING DOWN, YOU HAVE SOME, I GUESS,

15:59:19   4   EQUILLIBRUM, I GUESS; RIGHT?

15:59:20   5   **A.**   UH-HUH.

15:59:21   6   **Q.**   AND PERHAPS NOT AT EQUILLIBRUM, IF THE FORCE PUSHING DOWN

15:59:24   7   IS GREATER THAN THE FORCE PUSHING UP, THE SOILS ARE GOING TO

15:59:28   8   STAY WHERE THEY ARE; CORRECT?

15:59:29   9   **A.**   YES.

15:59:29   10   **Q.**   NOW, IF YOU HAVE A FORCE PUSHING UP THAT BECOMES GREATER

15:59:34   11   THAN THE FORCE PUSHING DOWN --

15:59:37   12   **A.**   UH-HUH.

15:59:37   13   **Q.**   -- IT CHANGES YOUR SHEARABILITY IF SOMETHING'S PUSHING

15:59:41   14   AGAINST IT; CORRECT?

15:59:42   15   **A.**   IT DOES.  BUT THAT IS -- ONE PART THAT'S THE SAME IS THAT

15:59:46   16   HEAVE FAILURE MECHANISM THAT'S ASSOCIATED WITH SEEPAGE I WAS

15:59:49   17   TALKING ABOUT BEFORE.

15:59:50   18   **Q.**   I UNDERSTAND.

15:59:52   19   **MR. JOANEN:**  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

15:59:53   20   **THE COURT:**  THANK YOU, SIR.

15:59:55   21   WHERE ARE WE?

15:59:56   22   MR. SMITH, IS IT?

15:59:58   23   **MR. SMITH:**  I HAVE A FEW QUESTIONS, YOUR HONOR.

16:00:01   24   I WONDER IF WE SHOULD A TAKE A BREAK BEFORE

16:00:02   25   WE . . .

| | | |
|---|---|---|
| 16:00:04 | 1 | **THE COURT:**  IT'S UP TO YOU.  IF YOU WANT TO TAKE A |
| 16:00:08 | 2 | BREAK, WE'LL DO IT. |
| 16:00:09 | 3 | THANK YOU. |
| 16:00:09 | 4 | **MR. SMITH:**  ALL RIGHT. |
| 16:00:10 | 5 | **THE COURT:**  TEN MINUTES. |
| 16:00:11 | 6 | **THE DEPUTY CLERK:**  ALL RISE. |
| 16:00:12 | 7 | (WHEREUPON, THE COURT TOOK A RECESS.) |
| 16:12:36 | 8 | **THE DEPUTY CLERK:**  ALL RISE, PLEASE. |
| 16:12:38 | 9 | COURT'S IN SESSION.  PLEASE BE SEATED. |
| 16:12:43 | 10 | **THE COURT:**  YES, SIR. |
| 16:12:43 | 11 | **REDIRECT EXAMINATION** |
| 16:12:46 | 12 | BY MR. SMITH: |
| 16:12:46 | 13 | **Q.**  DR. BRANDON, I WOULD LIKE TO REVIEW A FEW OF THE SLIDES |
| 16:12:49 | 14 | THAT YOU WERE QUESTIONED ABOUT, AND TO CLEAR UP ANY AMBIGUITIES |
| 16:12:53 | 15 | ABOUT YOUR PRIOR TESTIMONY. |
| 16:12:54 | 16 | **MR. SMITH:**  IF WE COULD LOOK AT SLIDE NUMBER 37 -- |
| 16:12:56 | 17 | I'M SORRY.  LET'S START WITH 36, PLEASE. |
| 16:13:05 | 18 | BY MR. SMITH: |
| 16:13:11 | 19 | **Q.**  JUDGE DUVAL ASKED YOU, IN CONNECTION WITH SLIDE 36 AND THE |
| 16:13:17 | 20 | SEARCH FOR THE CRITICAL FAILURE SURFACE, WHAT IT WAS THAT |
| 16:13:23 | 21 | DETERMINES WHERE THAT CRITICAL FAILURE SURFACE WOULD LIE. |
| 16:13:28 | 22 | AND YOU TALKED ABOUT -- I BELIEVE YOU TALKED ABOUT |
| 16:13:30 | 23 | THE GEOMETRY OF THE SOIL -- OF THE SITE.  IS THAT CORRECT? |
| 16:13:34 | 24 | **A.**  CORRECT. |
| 16:13:35 | 25 | **Q.**  AND ALSO THE SOIL PROPERTIES, IS THAT ANOTHER FACTOR? |

16:13:40  1  **A.**   YES.

16:13:41  2  **Q.**   AND ARE THOSE TWO ATTRIBUTES THAT ARE DEPENDENT UPON THE

16:13:48  3  OPERATOR OF THE SOFTWARE TO INPUT INTO THE PROGRAM?

16:13:53  4  **A.**   YEAH.   THOSE ARE TWO THINGS THAT THE OPERATOR MUST INPUT;

16:13:56  5  CORRECT.

16:13:58  6  **Q.**   YOU HAVE TO SPECIFY THAT; IN OTHER WORDS, YOU HAVE TO TELL

16:14:02  7  THE SOFTWARE PROGRAM AND THE SITE GEOMETRY LOOKS LIKE AND WHAT

16:14:08  8  THE PARTICULAR SOIL PROPERTIES ARE?

16:14:09  9  **A.**   YES.

16:14:09  10  **Q.**   AND THEN, AFTER YOU'VE SPECIFIED ALL THOSE THINGS AT

16:14:13  11  OUTSET, AS I UNDERSTAND IT, THEN YOU ALSO HAVE TO DIRECT THE

16:14:19  12  COMPUTER WHERE TO BEGIN ITS SEARCH FOR THE CRITICAL FAILURE

16:14:22  13  SURFACE.   IS THAT CORRECT?

16:14:23  14  **A.**   THAT'S CORRECT.

16:14:24  15  **Q.**   AND THAT TAKES SOME EXPERIENCE, TO KNOW WHERE THE CRITICAL

16:14:28  16  FAILURE PLANE IS MOST LIKELY TO LIE; IS THAT CORRECT?

16:14:31  17  **A.**   YES.

16:14:31  18  **Q.**   AND THAT'S BASED UPON PRIOR EXPERIENCE NOT ONLY WITH THE

16:14:34  19  SOFTWARE, BUT ALSO PRIOR EXPERIENCE IN INVESTIGATING SLOPE

16:14:40  20  FAILURES; CORRECT?

16:14:41  21  **A.**   THAT'S CORRECT.

16:14:47  22  **Q.**   IN THIS SLIDE, YOU TALK ABOUT -- MAYBE IT'S NOT THIS

16:14:50  23  SLIDE.   BUT YOU DID TALK ABOUT, IN CONNECTION WITH THIS, THAT

16:14:55  24  WHAT YOU'RE SEARCHING FOR IS THE FAILURE PLANE THAT WILL

16:15:01  25  PRODUCE THE LOWEST FACTOR OF SAFETY; IS THAT CORRECT?

16:15:05    1   **A.**   THAT IS CORRECT.

16:15:05    2   **Q.**   WHY ARE YOU SEARCHING FOR THE FAILURE PLANE THAT WILL GIVE

16:15:09    3   YOU THE LOWEST FACTOR OF SAFETY?

16:15:10    4   **A.**   BECAUSE THAT WOULD BE THE FAILURE PLANE WHERE FAILURE

16:15:13    5   WOULD BE MOST LIKELY TO OCCUR.  IN THE SAME INSTANCES -- I HAD

16:15:18    6   IT LISTED THERE, THE WEAKEST LINK OF A CHAIN.  IF YOU

16:15:22    7   TENSION-TEST A CHAIN, ONE WOULD EXPECT THE CHAIN TO FAIL AT THE

16:15:26    8   WEAKEST LINK.

16:15:27    9   **Q.**   NOW, IN CONNECTION WITH THE NEXT SLIDE, 37, THE JUDGE

16:15:31   10   ASKED YOU WHETHER THESE FAC- -- THESE FACTORS OF SAFETY -- I

16:15:37   11   THINK IT WAS ACTUALLY IN CONNECTION WITH BOTH SIDES.  THAT'S

16:15:40   12   WHY I'M COMING BACK.

16:15:42   13          BUT HE ASKED YOU ABOUT WHERE THIS -- THE FACTORS OF

16:15:45   14   SAFETY THAT YOU DESCRIBED HERE, AND YOU'RE COMPARING THE ONES

16:15:47   15   THAT YOU CALL CORRECTED VALUES.  AND I TAKE IT THOSE GREEN --

16:15:54   16          **MR. SMITH:**  IF WE COULD HIGHLIGHT IT.

16:15:54   17          **THE COURT:**  I THINK YOU WANTED THE ONE WITH THE --

16:15:56   18          **MR. SMITH:**  YOU DON'T HAVE THE POWERPOINT UP?

16:16:10   19          **THE COURT:**  THE ONE WITH THE GREEN COMPARISONS?

16:16:13   20          **MR. SMITH:**  YEAH, THE ONE WITH THE GREEN COMPARISONS.

16:16:13   21          **THE COURT:**  YEAH, I KNOW --

16:16:13   22          **MR. SMITH:**  WE DON'T NEED TO SHOW IT.  YOUR HONOR

16:16:16   23   KNOWS WHAT I'M TALKING ABOUT.

16:16:17   24          **THE COURT:**  IT'S UP.

16:16:18   25          **MR. SMITH:**  THANK YOU.

16:16:19   1   BY MR. SMITH:

16:16:19   2   Q.   THE QUESTION WAS, ARE THESE -- HOW MUCH SUBJECTIVITY IS

16:16:22   3   THERE IN THESE -- IN THIS COMPARISON?  IN OTHER WORDS, ARE

16:16:25   4   THESE -- WHAT YOU'RE SHOWING HERE, ARE THESE COMPUTED BY THE

16:16:28   5   SOFTWARE PROGRAM?

16:16:31   6   A.   THEY ARE.  BUT IF YOU HAVE TWO EXPERIENCED USERS, THEY GET

16:16:35   7   THE SAME VALUE.

16:16:36   8        AS AN EXAMPLE, WHEN I'VE DONE OTHER ANALYSES IN THE

16:16:41   9   NEW ORLEANS AREA, I'LL COME UP WITH WHAT I'VE FOUND TO BE THE

16:16:47  10   CRITICAL FACTOR OF SAFETY, THE LOWEST -- THE LOWEST FACTOR OF

16:16:49  11   SAFETY.  I'LL SEND MY FILE OR MY GEOMETRY TO PROFESSOR STEVE

16:16:55  12   WRIGHT AT THE UNIVERSITY OF TEXAS.  HE USES A DIFFERENT PROGRAM

16:16:58  13   AND DOES HIS OWN SEARCH, AND WE'RE BOTH ONLY SATISFIED WHEN WE

16:17:01  14   ARRIVE AT THE SAME VALUE.  AND SO IT'S NOT SUBJECTIVE IN THAT

16:17:05  15   SENSE.

16:17:06  16        BASED UPON YOUR -- YOUR INPUT SHEAR STRENGTHS AND

16:17:11  17   YOUR GEOMETRY, THERE TRULY IS ONE CIRCLE THAT GIVES YOU THE

16:17:21  18   LOWEST FACTOR OF SAFETY, WHICH IS SOFTWARE-INDEPENDENT.

16:17:25  19   Q.   SO IF I UNDERSTAND IT, THEN, IN OTHER WORDS, THE FACTOR OF

16:17:27  20   SAFETY IS A CALCULATED VALUE BASED UPON THE WEAKEST LINK IN THE

16:17:31  21   CHAIN?

16:17:32  22   A.   CORRECT.

16:17:33  23   Q.   AND THAT -- WHEN YOU DO A THOROUGH SEARCH, THE LOWEST

16:17:38  24   FACTOR OF SAFETY THAT THE COMPUTER COMPUTES FOR YOU, YOU

16:17:42  25   ASSUME, IS THE CORRECT FACTOR OF SAFETY?

16:17:45  1   **A.**   THAT'S TRUE.

16:17:46  2   **Q.**   THE BEST YOU CAN DO, IN OTHER WORDS?

16:17:47  3   **A.**   YES.

16:17:48  4   **Q.**   BUT IF SOMEONE ELSE CAN DO BETTER, IN OTHER WORDS, BY -- I

16:17:52  5   SAY DOING BETTER, PROPERLY USE THE SOFTWARE TO COME UP WITH A

16:17:55  6   LOWER FACTOR OF SAFETY, THEN HE'S SHOWN THAT YOUR FACTOR OF

16:17:58  7   SAFETY WAS INCORRECT?

16:17:59  8   **A.**   THAT'S TRUE.

16:18:00  9   **Q.**   AND SO WHEN PROFESSOR WRIGHT TAKES YOUR FILE AND DOES --

16:18:05  10  USES A DIFFERENT SOFTWARE AND COMES UP WITH A LOWER FACTOR OF

16:18:09  11  SAFETY, YOU DON'T ARGUE WITH HIM AND SAY, I THINK MY FACTOR OF

16:18:12  12  SAFETY IS RIGHT AND YOURS IS WRONG; IS THAT -- AM I CORRECT IN

16:18:15  13  UNDERSTANDING WHAT GOES ON IN THAT INTERPLAY?

16:18:18  14  **A.**   THAT'S -- THAT'S TRUE, AND YOU CAN ALWAYS RESOLVE THE

16:18:21  15  ISSUE.  IF HE FINDS A MORE CRITICAL SURFACE WITH HIS SOFTWARE,

16:18:24  16  I CAN REANALYZE MINE FOR THE SAME SURFACE AND GET THE SAME

16:18:28  17  FACTOR OF SAFETY THAT HE GETS, YES.

16:18:32  18  **Q.**   IN OTHER WORDS, YOU CAN CONFIRM THAT HE'S OPERATED HIS

16:18:35  19  SOFTWARE CORRECTLY BY TELLING YOUR COMPUTER, LOOK AT THIS

16:18:38  20  FAILURE PLANE AND TELL ME WHAT THE FACTOR OF SAFETY WILL BE?

16:18:43  21  **A.**   THAT'S TRUE, YES, SIR.

16:18:44  22  **Q.**   AND IT WILL BE THE SAME?

16:18:45  23  **A.**   YES.

16:18:45  24  **Q.**   IF YOU'RE BOTH USING THE SOFTWARE CORRECTLY?

16:18:48  25  **A.**   YES.

| | | |
|---|---|---|
| 16:18:58 | 1 | **Q.**  I'D LIKE TO GO TO SLIDE 40, IF WE CAN. |
| 16:19:01 | 2 | THIS SLIDE 40 IN WHICH YOU SHOW WATER PRESSURES |
| 16:19:05 | 3 | ACTING IN BOTH DIRECTIONS, IS THIS -- IS THIS A SLIDE THAT -- |
| 16:19:10 | 4 | JUST TELL US WHAT THIS SLIDE IS.  IN OTHER WORDS, WHAT'S THE |
| 16:19:14 | 5 | ORIGIN OF THIS SLIDE?  DID YOU HAVE SOMEONE DRAW THIS FOR YOU, |
| 16:19:16 | 6 | OR WHERE DID THIS SLIDE COME FROM? |
| 16:19:18 | 7 | **A.**  THAT'S JUST -- |
| 16:19:19 | 8 | **MR. JOANEN:**  YOUR HONOR, IF I COULD JUST POSE AN |
| 16:19:20 | 9 | OBJECTION HERE.  I DIDN'T GO OVER THIS SLIDE IN MY |
| 16:19:23 | 10 | CROSS-EXAMINATION.  I THINK IT'S OUTSIDE THE SCOPE OF WHAT |
| 16:19:25 | 11 | WE -- |
| 16:19:26 | 12 | **THE COURT:**  I'M GOING TO GIVE MR. SMITH LATITUDE |
| 16:19:29 | 13 | BECAUSE OF THE METHODOLOGY WE'VE BEEN USING IN THIS EXPERT |
| 16:19:36 | 14 | PRESENTATION. |
| 16:19:37 | 15 | GO AHEAD, SIR. |
| 16:19:38 | 16 | **MR. SMITH:**  THANK YOU, YOUR HONOR. |
| 16:19:38 | 17 | **THE WITNESS:**  THAT'S A SCREEN CAPTURE OF THAT FILE |
| 16:19:43 | 18 | THAT'S SHOWN THERE.  IT SAYS "BEA DATA FILE, NORTH BREACH |
| 16:19:47 | 19 | CASE II, LOWER BOUND, K EQUALS 1 E MINUS 5." |
| 16:19:52 | 20 | **BY MR. SMITH:** |
| 16:19:52 | 21 | **Q.**  SO THIS IS ESSENTIALLY A SCREEN CAPTURE SHOT USING |
| 16:19:55 | 22 | PROFESSOR BEA'S OWN FILES? |
| 16:19:56 | 23 | **A.**  YES, THIS SHOWN ON THE SCREEN, YES. |
| 16:19:59 | 24 | **THE COURT:**  GO AHEAD. |
| 16:20:01 | 25 | **MR. SMITH:**  I'M SORRY.  I -- |

16:20:01   1              **THE COURT:**  I THOUGHT WE DID TALK ABOUT THIS EARLIER,

16:20:04   2    BUT IT DOESN'T MAKE ANY DIFFERENCE.  I'LL LET IT IN.

16:20:07   3              **MR. SMITH:**  ALL RIGHT.  THANK YOU, YOUR HONOR.

16:20:07   4              **THE COURT:**  I SAW SOMETHING WITH BLUE ARROWS AND

16:20:09   5    SOMETHING ABOUT THE FORCE SHOULDN'T BE ACTING IN BOTH

16:20:12   6    DIRECTIONS.  BUT GO AHEAD.

16:20:13   7              **MR. SMITH:**  ALL RIGHT.  WELL, I WAS GOING TO MOVE ON

16:20:14   8    TO ANOTHER SLIDE.  I JUST WANTED TO MAKE CLEAR WHAT THE SOURCE

16:20:18   9    OF THIS SLIDE WAS.

16:20:19  10              **THE COURT:**  RIGHT.  AND I MAY BE -- BELIEVE ME --

16:20:19  11                   THAT'S ALL I WANTED TO DO.

16:20:19  12              **THE COURT:**  -- I COULD BE CROSSWALKING.  GO AHEAD.

16:20:20  13              **MR. SMITH:**  SLIDE 43, PLEASE.

16:20:26  14    **BY MR. SMITH:**

16:20:26  15    **Q.**   NOW, AS I RECALL YOUR DESCRIPTION OF THIS SLIDE, YOU SAID

16:20:30  16    YOU THOUGHT THIS WAS A SIGNIFICANT ERROR, MAYBE MORE

16:20:32  17    SIGNIFICANT THAN SOME OF THE ERRORS.  DO I REMEMBER THAT

16:20:35  18    CORRECTLY?

16:20:36  19    **A.**   YES.  IT'S VERY SIGNIFICANT.

16:20:37  20    **Q.**   WELL, I DIDN'T HEAR YOU EXPLAIN WHY YOU THINK THIS IS A

16:20:40  21    SIGNIFICANT ERROR.

16:20:41  22    **A.**   WELL, IT'S BECAUSE IF YOU'RE DOING AN APPROPRIATE ANALYSIS

16:20:46  23    IN ASSIGNING AN UNDRAINED SHEAR STRENGTH, THE UNDRAINED SHEAR

16:20:52  24    STRENGTH THAT YOU ASSIGN PRE-KATRINA, BEFORE THE STORM SURGE

16:20:58  25    RISES, SHOULD BE THE SAME UNDRAINED SHEAR STRENGTH FOR EVERY

16:21:02   1   CANAL WATER LEVEL.

16:21:04   2          THE PROBLEM WITH THIS ERROR HERE IS IT CALCULATES A

16:21:10   3   DIFFERENT UNDRAINED SHEAR STRENGTH FOR EVERY CANAL WATER LEVEL.

16:21:14   4          **THE COURT:**  YEAH, I RECALL HIS TESTIMONY WELL.

16:21:16   5          **MR. SMITH:**  AND I RECALL THE ANSWER.

16:21:17   6   BY MR. SMITH:

16:21:17   7   **Q.**   I THINK YOU'RE GIVING US THE TECHNICAL ANSWER, BUT I'M

16:21:20   8   TRYING TO GET THE APPLICATION ANSWER.

16:21:22   9          IN OTHER WORDS, WHY DOES IT MATTER IN TERMS OF

16:21:24   10   ANALYZING THE FAILURE HERE?  DOES THIS HAVE SOMETHING TO DO

16:21:28   11   WITH THE SEARCH FOR THE CRITICAL FAILURE PLANE?

16:21:31   12   **A.**   WELL, WHAT YOU'RE DOING IS YOU'RE ASSIGNING A SHEAR -- THE

16:21:34   13   PROGRAM'S USING A SHEAR STRENGTH LOWER THAN YOU INTENDED FOR

16:21:37   14   THE PROGRAM TO USE.  PROFESSOR BEA INTENDED FOR THE PROGRAM TO

16:21:42   15   USE A SHEAR STRENGTH THAT WAS ROUGHLY A QUARTER OF THE VERTICAL

16:21:46   16   STRESS.  BUT BECAUSE OF THIS ERROR, IT USES A SHEAR STRENGTH

16:21:49   17   THAT'S MOST OFTEN LESS THAN A QUARTER OF THE APPLICABLE

16:21:57   18   VERTICAL STRESS.

16:21:57   19   **Q.**   AND WHAT WOULD THE IMPACT OF THAT MISTAKE BE ON YOUR

16:22:01   20   ULTIMATE -- THE OUTCOME OF YOUR ANALYSIS?

16:22:02   21   **A.**   IT COULD DO DIFFERENT THINGS.  FOR ONE, IT WOULD GIVE YOU,

16:22:07   22   PERHAPS -- IF THE FAILURE PLANE WAS LOCATED IN THE

16:22:11   23   INTERDISTRIBUTARY CLAY, IT WOULD GIVE YOU TOO LOW A FACTOR OF

16:22:14   24   SAFETY.  BUT THEN IF YOU -- IF DONE CORRECTLY, THE FAILURE

16:22:18   25   PLANE MIGHT HAVE BEEN IN THE LOWER ORGANIC CLAY, BUT THIS ERROR

16:22:22   1   WOULD FORCE THE PROGRAM TO CALCULATE A LOWER FACTOR OF SAFETY

16:22:25   2   FOR A FAILURE PLANE IN A COMPLETELY DIFFERENT MATERIAL.

16:22:31   3         BECAUSE IT MIGHT MAKE THE FAILURE PLANE SEEK OUT THE

16:22:33   4   INTERDISTRIBUTARY CLAY BECAUSE THE UNDRAINED -- THE

16:22:36   5   STRENGTHS -- THE UNDRAINED STRENGTHS THE PROGRAM'S ASSIGNING TO

16:22:40   6   IT ARE LOWER THAN DESIRED.

16:22:43   7         **MR. SMITH:**  SO IF WE COULD GO BACK AND LOOK AT

16:22:44   8   SLIDE 36.

16:22:45   9   **BY MR. SMITH:**

16:22:52   10  **Q.**   ARE YOU SAYING THAT THE MISTAKE THAT WE JUST LOOKED AT

16:22:55   11  MIGHT AFFECT THE OUTCOME OF YOUR SEARCH USING THE SOFTWARE FOR

16:22:58   12  THE CRITICAL FAILURE PLANE?

16:23:00   13  **A.**   CERTAINLY, IT'S LIKELY TO, YES.

16:23:02   14  **Q.**   AND IN EXAMINING DR. BEA'S FILES, DID YOU EVER SEE WHETHER

16:23:07   15  SOME OF THE CRITICAL FAILURE PLANES RAN THROUGH THE

16:23:09   16  INTERDISTRIBUTARY CLAY?

16:23:10   17  **A.**   YES, SOME OF THEM DID.

16:23:12   18  **Q.**   AND WOULD THAT HAVE AFFECTED THE OUTCOME OF THOSE COMPUTER

16:23:14   19  ANALYSES?  THE INCORRECT USE OF THE UNDRAINED STRENGTH RATIO --

16:23:20   20  **A.**   YES, SIR.

16:23:20   21  **Q.**   -- WOULD THAT AFFECT THE OUTCOME OF THOSE ANALYSES?

16:23:25   22  **A.**   YES, IT WOULD.

16:23:35   23         **MR. SMITH:**  LET'S GO TO SLIDE -- AND MY NUMBERS MIGHT

16:23:39   24  BE OFF BECAUSE DR. BRANDON INSERTED A COUPLE OF -- AND I KNEW

16:23:46   25  HE DID, BUT I DIDN'T GET A COPY LIKE ANYBODY ELSE.

16:23:48   1            GO TO SLIDE 5O, PLEASE.  IT MIGHT BE 51. I'M NOT

16:23:50   2   SURE.

16:23:50   3            THAT IS THE ONE I WANTED TO LOOK AT.

16:23:50   4   **BY MR. SMITH:**

16:23:51   5   **Q.**   MR. JOANEN HAD ASKED YOU SOME QUESTIONS ABOUT PRESSURE

16:23:54   6   TRANSMISSION.  AND SINCE DR. BEA'S OPINIONS RELY A LOT ON

16:23:58   7   PRESSURE TRANSMISSION, I THINK IT'S IMPORTANT TO BE VERY CLEAR

16:24:01   8   ABOUT THE PRESSURE CHANGES THAT YOU'RE ILLUSTRATING IN THIS

16:24:06   9   PARTICULAR SLIDE.

16:24:07   10           AS I UNDERSTAND YOUR TESTIMONY DURING DIRECT AND

16:24:10   11  CROSS-EXAMINATION, YOU DO BELIEVE USING EVEN AN UNDRAINED

16:24:18   12  ANALYSIS, THERE WOULD BE A PORE PRESSURE CHANGE IN THAT LITTLE

16:24:22   13  RED BOX THAT YOU SHOW THERE ON THE PROTECTED SIDE OF LEVEE.  IS

16:24:26   14  THAT CORRECT?

16:24:26   15  **A.**   THAT IS CORRECT.

16:24:27   16  **Q.**   IS THAT A RESULT OF WATER SEEPING THROUGH THE SOILS ALL

16:24:31   17  THE WAY OVER TO THAT LITTLE BOX?

16:24:32   18  **A.**   NO, IT'S A RESULT OF WATER PRESSURES ACTING ON THE WALL.

16:24:35   19  **Q.**   WATER PRESSURES ACTING ON THE WALL.  BUT HOW DO WATER

16:24:38   20  PRESSURES ACTING ON THE WALL CHANGE THE PORE PRESSURE IN THAT

16:24:43   21  LITTLE RED BOX?

16:24:43   22  **A.**   THE WALL PUSHES ON THE SOIL AND INCREASES THE STRESS IN

16:24:48   23  THE SOIL.

16:24:49   24  **Q.**   SO THIS, THEN, IS RELATED TO THE TWO DIFFERENT KINDS OF --

16:24:52   25  OF PRESSURE CHANGES THAT YOU DESCRIBED IN THE CHART -- SLIDE

16:25:01   1   NO. 52, IF I'M CORRECT.  AND I JUST WANT TO MAKE -- SEE IF I'M

16:25:04   2   CORRECT IN UNDERSTANDING THIS.

16:25:05   3            **MR. SMITH:**  OKAY.  THIS IS WHERE WE GOT THE ADDITION.

16:25:09   4   SO LET'S GO TO PROBABLY 54 THEN.

16:25:11   5   **BY MR. SMITH:**

16:25:19   6   **Q.**   IS THAT RELATED, THEN, TO THIS PRESSURE RISE?

16:25:22   7   **A.**   YEAH.  THAT PORE PRESSURE CHANGE SHOWN ON THAT SLIDE IS

16:25:25   8   THE ONE ON THE LEFT HERE.

16:25:26   9   **Q.**   SO THAT'S A PORE PRESSURE CHANGE JUST DUE TO THE WATER

16:25:29  10   LEANING ON THE WALL?

16:25:30  11   **A.**   JUST DUE TO THE CHANGE IN STRESS, WHICH HAPPENS BECAUSE OF

16:25:33  12   THE WATER PUSHING AGAINST THE WALL.

16:25:35  13   **Q.**   SO AS THAT WALL DEFLECTS, THAT EXERTS PRESSURE ON THE SOIL

16:25:39  14   THAT'S ON THE PROTECTED SIDE; IS THAT CORRECT?

16:25:41  15   **A.**   THAT'S CORRECT.

16:25:41  16   **Q.**   AND THAT -- THAT COMPRESSION, IF YOU WILL, THE PRESSURE ON

16:25:46  17   THAT SOIL IS EFFECTIVE DOWN THROUGH THAT SOIL LATERALLY TO THAT

16:25:52  18   RED BOX WE JUST SAW ON THAT OTHER SLIDE; IS THAT CORRECT?

16:25:55  19   **A.**   YES.

16:25:55  20   **Q.**   AND THAT PRESSURE HAPPENS RELATIVELY QUICKLY, IF I

16:25:58  21   UNDERSTAND THIS DIAGRAM.  IS THAT CORRECT?

16:26:01  22   **A.**   THAT'S CORRECT.

16:26:01  23   **Q.**   BUT THEN AFTER THAT PRESSURE RISES, IT BEGINS TO

16:26:06  24   DISSIPATE; IS THAT CORRECT?

16:26:07  25   **A.**   YES.

16:26:07   1   **Q.**   OVER TIME.

16:26:08   2           NOW, WHAT DR. BEA HAS DESCRIBED IS NOT THAT PRESSURE.

16:26:13   3   IN HIS ANALYSES, HE'S NOT CALCULATING THAT PRESSURE CHANGE.   AM

16:26:17   4   I CORRECT IN UNDERSTANDING THAT?

16:26:19   5   **A.**   YOU'RE CORRECT.

16:26:19   6   **Q.**   WHAT DR. BEA IS CALCULATING IN HIS STEADY FLOW CALCULATION

16:26:25   7   WOULD BE THE CHANGE IN PORE PRESSURE IF WE WAITED LONG

16:26:31   8   ENOUGH --

16:26:31   9           **MR. SMITH:**   AND LET'S GO BACK -- LET'S GO BACK TO

16:26:35   10   THAT SLIDE, SLIDE 50.

16:26:38   11   **BY MR. SMITH:**

16:26:38   12   **Q.**   THE PORE PRESSURE IN THAT LITTLE RED BOX -- OR IF WE MOVED

16:26:41   13   THAT LITTLE RED BOX OUT TO THE TOE -- BUT AT ANY RATE, THE PORE

16:26:47   14   PRESSURE IN THAT LITTLE RED BOX THAT DR. BEA'S ANALYSES ARE

16:26:50   15   DESCRIBING ARE THE PORE PRESSURES THAT WOULD RESULT AT THAT

16:26:56   16   LOCATION IF WE WAITED LONG ENOUGH FOR THE WATER TO FLOW DOWN

16:27:00   17   THROUGH THAT SOIL, UNDER THE TIP OF SHEET PILE, AND LATERALLY,

16:27:02   18   HORIZONTALLY ALL THE WAY OVER TO THAT LOCATION OF THAT LITTLE

16:27:07   19   RED BOX; IS THAT CORRECT?

16:27:08   20   **A.**   IT'S CORRECT.   BUT HIS ANALYSIS WOULD ALSO ASSUME THAT THE

16:27:11   21   CHANGE IN PORE PRESSURE DUE TO THE CHANGE IN STRESS WAS FULLY

16:27:15   22   DISSIPATED AS WELL.

16:27:16   23           **THE COURT:**   IS THAT ONE OF THE -- I NEED TO

16:27:19   24   UNDERSTAND THIS.   I DID UNDERSTAND THAT IN YOUR DIRECT

16:27:24   25   TESTIMONY THAT DR. BEA, ONE OF HIS PREMISES IS THAT IT'S

16:27:29   1   VIRTUALLY -- I'M SAYING VIRTUALLY INSTANTANEOUS, THE

16:27:34   2   TRANSMISSION OF PRESSURE FROM ONE SIDE TO THE OTHER; WHEREAS IN

16:27:38   3   YOUR OPINION, IT WOULD BE MUCH SLOWER FOR THE REASONS YOU

16:27:40   4   ARTICULATED?

16:27:41   5              **THE WITNESS:**  YES.

16:27:43   6              **THE COURT:**  AM I CORRECT THAT YOU'RE ALSO SAYING THAT

16:27:48   7   THE FLOW OF WATER IS ALSO A COMPONENT IN THIS CALCULATION?

16:27:55   8   THAT'S WHERE I -- MR. SMITH, WHY DON'T I LET YOU CLEAR THAT UP.

16:28:01   9              **MR. SMITH:**  I PROBABLY SHOULD LOOK AT THE MONITOR

16:28:08  10   THEN AND SEE WHAT THE QUESTION WAS.

16:28:10  11              **THE COURT:**  I UNDERSTAND THE INSTANTANEOUS --

16:28:12  12              **MR. SMITH:**  YEAH, LET ME TRY -- LET ME SEE IF I CAN

16:28:14  13   HELP CLARIFY THIS BECAUSE I THINK IT MIGHT BE WORTH SPENDING

16:28:17  14   ANOTHER MINUTE OR TWO ON IT.

16:28:19  15   **BY MR. SMITH:**

16:28:22  16   **Q.**   ARE YOU ASSUMING IN THIS ANALYSIS THAT ALL THOSE SOILS ARE

16:28:24  17   FULLY SATURATED?

16:28:25  18   **A.**   YES.

16:28:28  19   **Q.**   AND ARE YOU ASSUMING, THEN, THAT THIS STRESS-INDUCED

16:28:33  20   PRESSURE CHANGE WOULD HAPPEN RELATIVELY QUICKLY AS A RESULT OF

16:28:36  21   THE INCOMPRESSIBILITY OF THE WATER IN THOSE SOILS?

16:28:41  22   **A.**   WELL, NOT -- TRUE -- THAT'S GENERALLY TRUE.  BUT THE

16:28:45  23   ANALYSIS ITSELF DOESN'T CALCULATE THE CHANGE IN PORE PRESSURE.

16:28:47  24   THOSE ARE BUILT INTO THE WAY WE MEASURE THE STRENGTH

16:28:50  25   PROPERTIES.

16:28:52   1          AND SO IN OUR GEOTECHNICAL ANALYSES, THAT'S WHAT

16:28:56   2   WE'VE ASSUMED TO HAPPEN; BUT WE DON'T EXPLICITLY CALCULATE

16:29:00   3   THEM, NOR DO WE CALCULATE ANY TIME-BASED CHANGE IN THE PORE

16:29:04   4   PRESSURES.  WE ASSUME THAT THEY'RE REFLECTED IN THE WAY WE

16:29:07   5   MEASURE OUR STRENGTHS AND IN THE STRENGTHS WE USE IN OUR

16:29:10   6   ANALYSIS.

16:29:10   7   **Q.**   I WAS TRYING TO DRAW A DISTINCTION BETWEEN STRESS-INDUCED

16:29:15   8   PORE PRESSURE CHANGES AND HYDRAULIC BOUNDARY CONDITION CHANGES

16:29:18   9   THAT INDUCE PORE PRESSURE CHANGES.

16:29:22   10          AND I GUESS WHAT I'M ASKING IS, IN YOUR ANALYSIS

16:29:26   11   HERE, YOU ARE ASSUMING ALL THOSE -- THOSE SOILS ARE FULLY

16:29:30   12   SATURATED?

16:29:31   13   **A.**   YES.

16:29:31   14   **Q.**   AND EVEN THOUGH THEY'RE ALL FULLY SATURATED, THE PORE

16:29:35   15   PRESSURE CHANGES THAT OCCUR IN THAT LITTLE RED BOX UNDER THE

16:29:38   16   FOUNDATION ARE NOT A RESULT OF THE CHANGE IN BOUNDARY

16:29:42   17   CONDITIONS; IN OTHER WORDS, SEEPAGE THAT'S FLOWING THROUGH THAT

16:29:47   18   SOIL, BUT THEY'RE A RESULT OF THE WEIGHT OF THAT WATER ON THE

16:29:50   19   WALL.  AM I CORRECT?

16:29:52   20   **A.**   THAT'S CORRECT.

16:30:04   21          **THE COURT:**  IS IT YOUR UNDERSTANDING THAT DR. BEA'S

16:30:08   22   OPINION THAT THERE WAS ACTUAL COMMUNICATION, NOT JUST IN THE

16:30:16   23   WATER MOLECULES IN THE SOIL, AN ACTUAL COMMUNICATION OF WATER

16:30:22   24   MIGRATING ONCE THE WATER IS OUT OF THE CANAL TO THE -- TO THE

16:30:25   25   PROTECTED SIDE?  IS IT YOUR UNDERSTANDING?

16:30:28   1          **THE WITNESS:**  THAT WOULD BE -- THAT WOULD BE -- IN

16:30:31   2   HIS ANALYSIS, THAT REALLY HAS TO HAPPEN.  THAT'S DOING SEEPAGE

16:30:35   3   ANALYSES.  AND WHAT IT ACTUALLY ASSUMES IS THAT YOU DO HAVE

16:30:38   4   FLOW AND YOU CAN CALCULATE THE VALUE AND THAT YOU HAVE THE

16:30:42   5   SOILS FREE TO CHANGE VOLUME UNTIL WE'D REACH AN EQUILLIBRUM

16:30:46   6   CONDITION.  THAT'S THE LAPLACE EQUATION THAT --

16:30:50   7          **THE COURT:**  RIGHT.  I UNDERSTAND.

16:30:54   8   **BY MR. SMITH:**

16:30:54   9   **Q.**  I'D LIKE TO -- MR. JOANEN HAD ASKED YOU SOME QUESTIONS

16:30:58  10   ABOUT PIEZOMETERS READING INCREASES IN PRESSURE.  AND I'D LIKE

16:31:01  11   TO GO TO THE -- ONE OF THE NEW SLIDES YOU DID ADD FROM

16:31:05  12   DR. BEA'S DEMONSTRATIVES.

16:31:07  13          **MR. SMITH:**  IF YOU COULD BRING THAT UP FOR US, DAWN.

16:31:16  14   **BY MR. SMITH:**

16:31:16  15   **Q.**  AS YOU EXPLAIN IN YOUR DIRECT TESTIMONY, DR. BEA USED THIS

16:31:20  16   ILLUSTRATION TO EXPLAIN HIS EUREKA MOMENT.  AND YOU WERE IN THE

16:31:25  17   COURTROOM, RIGHT, AND YOU HEARD DR. BEA'S TESTIMONY?

16:31:28  18   **A.**  YES.

16:31:28  19   **Q.**  AND IF I MISREPRESENT IT -- AND I MAY BECAUSE I MAY NOT

16:31:33  20   UNDERSTAND IT -- YOU'LL CORRECT ME?

16:31:34  21          **THE COURT:**  WE KNOW IT WILL BE UNINTENTIONAL.

16:31:37  22          **MR. SMITH:**  YEAH.  I'M ASKING DR. BRANDON TO HELP ME

16:31:41  23   IF I GET IT WRONG.

16:31:41  24   **BY MR. SMITH:**

16:31:42  25   **Q.**  BUT AS I UNDERSTOOD IT, DR. BEA WAS LOOKING AT VARIOUS

16:31:46   1   DATA THAT HE COULD NOT UNDERSTAND WITHOUT IMPORTING SOME PORE

16:31:54   2   PRESSURES FROM SOME PIEZOMETER READINGS THAT HE HAD AT THE

16:31:59   3   17TH STREET SITE.  DO I RECALL THAT CORRECTLY?

16:32:04   4   **A.**   THAT'S WHAT I RECALL AS WELL.

16:32:07   5   **Q.**   AND IN DR. BEA'S TESTIMONY, AS I UNDERSTAND IT, HE

16:32:11   6   EXPLAINED THAT WHEN HE WAS -- WHEN HE INSTRUCTED MR. COBOS-ROA

16:32:14   7   TO APPLY THOSE PORE PRESSURES FROM THE PIEZOMETER INTO THE

16:32:19   8   CALCULATIONS, THAT SUDDENLY THE DATA MADE SENSE AND HE HAD AN

16:32:25   9   EXPLANATION FOR THE FAILURE.

16:32:26   10          WAS THAT HIS TESTIMONY AS YOU UNDERSTOOD IT?

16:32:28   11   **A.**   YES.

16:32:31   12   **Q.**   DO YOU KNOW WHETHER THERE'S BEEN SUBSEQUENT WORK DONE AT

16:32:34   13   THE 17TH STREET SITE AND USE OF THOSE PIEZOMETERS TO EXPLAIN

16:32:41   14   THE PORE PRESSURE READINGS THAT THOSE PIEZOMETERS ARE PRODUCING

16:32:46   15   AT THAT SITE?

16:32:47   16   **A.**   YES.  I HAD SOME INVOLVEMENT WITH THE SAFE WATER ELEVATION

16:32:54   17   WORK FOR THE 17TH STREET, AND THAT'S -- DURING PROFESSOR BEA'S

16:32:58   18   TESTIMONY, THAT'S WHAT HE SAID WAS THE SOURCE OF HIS PIEZOMETER

16:33:03   19   READINGS AND DATA.

16:33:04   20          AND I DO KNOW THAT A YEAR OR A YEAR AND A HALF AGO,

16:33:10   21   URS CONSULTANTS AND BLACK & VEATCH CONSULTANTS, WHO ARE TWO

16:33:14   22   ENGINEERING FIRMS ASSIGNED TO LOOK AT SAFE WATER ELEVATION --

16:33:19   23          **MR. JOANEN:**  YOUR HONOR, IF I COULD RAISE AN

16:33:21   24   OBJECTION.  THIS IS WELL OUTSIDE THE SCOPE OF HIS EXPERT

16:33:25   25   REPORT.  IT'S ONLY COMING --

16:33:25   1              **THE COURT:**  IT IS.  IT'S NOT IN THE SLIDE, IT'S NOT

16:33:28   2   IN THE EXPERT REPORT, IT'S NOT A CALCULATION.

16:33:30   3              TELL ME WHY I SHOULD ALLOW IT IN, SIR.

16:33:32   4              **MR. SMITH:**  WELL, YOUR HONOR, THIS IS RESPONDING TO

16:33:34   5   THE TESTIMONY THAT DR. BEA GAVE IN THIS CASE.  I MEAN,

16:33:38   6   OBVIOUSLY, WE DIDN'T -- WE DIDN'T HAVE THAT UNTIL WE HEARD IT

16:33:40   7   IN COURT.  AND WE HEARD IT IN COURT AND -- I MEAN, WE'VE GOT TO

16:33:46   8   BE ALLOWED TO RESPOND TO THE THINGS --

16:33:47   9              **THE COURT:**  IT WAS NOT IN ANY OF HIS REPORTS OR

16:33:49  10   DEPOSITION?

16:33:49  11              **MR. SMITH:**  NO, THAT'S NOT SOMETHING WE'VE HEARD

16:33:51  12   BEFORE, YOUR HONOR.

16:33:52  13              **MR. JOANEN:**  YOUR HONOR, IF I COULD JUST RESPOND.

16:33:53  14   THE PIEZOMETER DATA THAT DR. BEA RELIES UPON IS IN APPENDIX C

16:34:00  15   OF HIS EXPERT REPORT --

16:34:00  16              **MR. SMITH:**  BUT THE EUREKA MOMENT --

16:34:01  17              **MR. JOANEN:**  -- CLEARLY -- CLEARLY PROVIDED TO THE

16:34:02  18   DEFENSE AND DR. BRANDON -- I APOLOGIZE SIR -- BEFORE HE

16:34:04  19   PRODUCED HIS OWN REPORT.

16:34:07  20              **MR. SMITH:**  IT'S TRUE, HE MENTIONED THAT, BUT WE DID

16:34:10  21   NOT GET THE EXPLANATION OF THE WAY THAT HE APPLIES THAT TO

16:34:14  22   SUPPORT HIS OPINIONS, YOUR HONOR, UNTIL HE TESTIFIED TO IT.

16:34:20  23   AND WE -- IT'S UP TO YOUR HONOR.  I MEAN --

16:34:22  24              **THE COURT:**  SINCE I'M GOING TO GIVE HIM ROBUST

16:34:25  25   REBUTTAL, I'LL ALLOW HIM TO ANSWER THE QUESTION.

16:34:28   1   **BY MR. SMITH:**

16:34:29   2   **Q.**   THANK YOU, DR. BRANDON.

16:34:30   3   **A.**   THESE FIRMS, URS AND BLACK & VEATCH, WERE ASSIGNED TO COME

16:34:34   4   UP WITH AN ANALYSIS FOR THE SAFE WATER ELEVATION.  AND THEY,

16:34:38   5   TOO, HAD A CONCERN ABOUT THE RESULTS OF THAT PIEZOMETER.  AND

16:34:44   6   URS COMPLETED A REPORT FOR THE CORPS THAT PERFORMED THE SAME

16:34:50   7   TYPE OF ANALYSIS, EXPLAINING A WAY THAT PIEZOMETER RESULTS AS A

16:34:55   8   FUNCTION OF SOIL PROPERTIES.

16:34:56   9        AND IN THEIR ANALYSIS, THEY DIDN'T HAVE TO USE AN

16:35:00   10  INCOMPRESSIBLE SOIL.  THEY USED A COMPRESSIBILITY ON THE ORDER

16:35:09   11  OF 10 TO THE MINUS 5 FEET SQUARED PER POUND.  THEY USED A

16:35:10   12  PERMEABILITY OF THE ORGANIC CLAY OF 10 TO THE

16:35:12   13  MINUS 5 CENTIMETERS PER SECOND.  AND THEY FULLY EXPLAINED THAT

16:35:16   14  CHANGE IN PIEZOMETER READING.

16:35:19   15       THEY FURTHERMORE CONCLUDED THAT AT 17TH STREET, IT

16:35:25   16  TAKES SIX MONTHS TO ACHIEVE STEADY-STATE CONDITIONS AS WELL.

16:35:29   17  **Q.**   SO AS YOU UNDERSTAND THE SUBSEQUENT STUDY, THERE IS AN

16:35:34   18  EXPLANATION FOR THE PIEZOMETER READINGS AT THE 17TH STREET

16:35:37   19  CANAL USING CONVENTIONAL SOIL MECHANICS?

16:35:40   20  **A.**   YES.

16:35:41   21  **Q.**   AND DID YOU UNDERSTAND DR. BEA TO BE -- TO BE INSTRUCTING

16:35:46   22  MR. COBOS-ROA TO USE UNCONVENTIONAL SOIL MECHANICS FOR HIS

16:35:51   23  ANALYSIS?

16:35:55   24  **A.**   I CAN'T RECALL EXACTLY WHAT -- WHAT PROFESSOR BEA SAID

16:35:59   25  ABOUT INSTRUCTING COBOS-ROA.

16:36:00  1  **Q.**  WELL, AS I RECALL THE TESTIMONY, DR. BEA SAID, "ARE YOU

16:36:05  2  USING THOSE PORE PRESSURES IN YOUR ANALYSIS?"

16:36:07  3         AND MR. COBOS-ROA SAID, "NO, WE DON'T NORMALLY DO IT

16:36:11  4  THAT WAY."

16:36:12  5         AND DR. BEA SAID, "WELL, IN THIS CASE GOD WANTS

16:36:16  6  YOU -- SHE WANTS YOU TO DO IT DIFFERENTLY."

16:36:20  7         DO YOU RECALL THAT TESTIMONY NOW?

16:36:20  8  **A.**  IT SEEMS LIKE I WOULD, BUT I DON'T.

16:36:25  9  **Q.**  OKAY.  I'M NOT GOING TO ASK ANY MORE ABOUT THAT.  ALL

16:36:28  10  RIGHT.  I'LL JUST MOVE ON.

16:36:34  11         **MR. SMITH:**  I WONDER IF WE COULD CALL UP --

16:36:38  12         **THE COURT:**  BY THE WAY, WHEN I SAID ROBUST, SUBJECT

16:36:41  13  TO THE TIME LIMITS I'VE IMPOSED ON THIS TRIAL.  SO --

16:36:44  14         **MR. SMITH:**  COULD WE CALL UP JX --

16:36:44  15         **THE COURT:**  -- SAVE YOUR TIME.

16:37:00  16         **MR. SMITH:**  -- JX-1836, PLEASE?

16:37:03  17         WE MAY NEED AN ADDITIONAL 60 HOURS, YOUR HONOR.

16:37:04  18         **THE COURT:**  YOU'RE GOING TO HAVE TO ASK HER, WITH

16:37:05  19  A CAPITAL H.

16:37:05  20         **MR. SMITH:**  WE'LL BE DONE, YOUR HONOR.

16:37:08  21         **THE COURT:**  HIM WITH A LITTLE H AND JUDGE WITH A

16:37:11  22  LITTLE J, IT'S GOING TO BE A HARD ROAD.

16:37:29  23         **MR. SMITH:**  COULD YOU CALL UP THE "MY OPINION"

16:37:31  24  PARAGRAPH, PLEASE?

25

16:37:32   1   **BY MR. SMITH:**

16:37:35   2   **Q.**   DR. BRANDON, IN YOUR REPORT, YOU STATE:  "IT IS MY

16:37:38   3   OPINION, TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY, THAT

16:37:43   4   WGI'S SITE-CLEARING ACTIVITIES DID NOT CAUSE OR CONTRIBUTE IN

16:37:47   5   ANY WAY TO THE BREACHES IN THE FLOODWALL AT THE EASTERN EDGE OF

16:37:50   6   THE EBIA."

16:37:52   7           IS THAT STILL YOUR OPINION HERE TODAY?

16:37:53   8   **A.**   THAT'S MY OPINION, YES.

16:37:58   9   **Q.**   AND IS IT ALSO YOUR OPINION, AS YOU STATE IN THE NEXT

16:38:05   10   PARAGRAPH, PLEASE, THAT "NO SIGNIFICANT FLOW COULD HAVE

16:38:10   11   TRAVELED THROUGH THE SOIL DEPOSITS DURING THE BRIEF TIME

16:38:12   12   BETWEEN THE ONSET OF STORM SURGE LOADING AND FLOODWALL

16:38:17   13   FAILURE"?

16:38:18   14   **A.**   YES.

16:38:19   15   **Q.**   "FLOW VOLUMES WERE FAR TOO SMALL TO HAVE CAUSED A BLOWOUT,

16:38:23   16   OR EVEN HEAVING, ON THE EASTERN SIDE OF THE FLOODWALL."

16:38:26   17           IS THAT YOUR OPINION HERE TODAY?

16:38:28   18   **A.**   THAT IS MY OPINION.

16:38:28   19   **Q.**   DR. BRANDON, WHEN YOU USED THE TERM "FLOW" THERE, ARE YOU

16:38:32   20   DISTINGUISHING BETWEEN THE MOVEMENT OF VOLUMES OF FLUID THROUGH

16:38:35   21   THE SOIL AND PRESSURE TRANSMISSION?

16:38:38   22   **A.**   THEY'RE INEXTRICABLY LINKED IN THE EQUATIONS FOR FLOW, BUT

16:38:43   23   IN PARTICULAR, IN TERMS OF VOLUMES, I'M LOOKING AT CUBIC

16:38:46   24   CENTIMETERS OF WATER.

16:38:49   25   **Q.**   DOES YOUR OPINION IN THIS CASE ENCOMPASS THE EFFECTS OF

16:38:53   1   PRESSURE TRANSMISSION FROM THE FLOOD SIDE OF THE FLOODWALL TO

16:38:58   2   THE PROTECTED SIDE OF THE FLOODWALL?

16:39:03   3   **A.**   THAT'S STILL -- THAT'S DIFFICULT TO ANSWER DIRECTLY.  IT'S

16:39:08   4   THE -- I DID NOT HAVE CALCULATIONS REGARDING PRESSURE

16:39:13   5   TRANSMISSION.  I DID SEEPAGE ANALYSIS.

16:39:16   6   **Q.**   WELL, DID YOUR SEEPAGE ANALYSIS INCLUDE PRESSURE

16:39:17   7   TRANSMISSIONS?  WE JUST WENT THROUGH SOME SLIDES WHERE YOU

16:39:22   8   TALKED ABOUT PORE PRESSURE CHANGES.  DIDN'T YOU INCORPORATE

16:39:26   9   PORE PRESSURE CHANGES IN YOUR ANALYSES?

16:39:28   10  **A.**   BY VIRTUE OF THE FACT THAT I USED UNDRAINED STRENGTH

16:39:31   11  PARAMETERS, THAT'S WHAT INCLUDES THE CHANGE IN PORE PRESSURES

16:39:35   12  DUE TO CHANGE IN STRESS.

16:39:37   13  **Q.**   SO DID YOU TAKE INTO ACCOUNT ALL THE PRESSURE CHANGES THAT

16:39:40   14  OCCURRED ON THE PROTECTED SIDE OF THE FLOODWALL AS A RESULT OF

16:39:42   15  THE EFFECTS OF THE STORM SURGE IN YOUR ANALYSES, SIR?

16:39:46   16  **A.**   THEY'RE ACCOUNTED FOR IN MY SHEAR STRENGTH PARAMETERS,

16:39:50   17  YES.

16:39:51   18  **Q.**   AND IS YOUR OPINION BASED UPON THOSE CHANGES?

16:39:55   19  **A.**   YES.

16:39:56   20           **MR. SMITH:**  THANK YOU.

16:39:59   21           **THE COURT:**  THANK YOU, MR. SMITH.

16:40:00   22               DOES WGI HAVE ANYTHING?

16:40:01   23           **MR. TREEBY:**  NO, YOUR HONOR.

16:40:03   24           **THE COURT:**  OKAY.  THANK YOU, MR. TREEBY.

16:40:05   25           **MR. JOANEN:**  NOTHING MORE, YOUR HONOR.

16:40:07   1           **THE COURT:**  NOTHING MORE.  SIR, YOU ARE FREE TO GO,

16:40:10   2   STAND DOWN, STAY IN THE COURTROOM.  OR GO HAVE A DRINK, WHICH

16:40:14   3   IS WHAT I WOULD DO IF I WERE YOU.

16:40:16   4           I WAS GOING TO BE AT THE MUSEUM TONIGHT FOR A

16:40:26   5   FREE MEAL AND A DRINK, BUT DUTY CALLS.

16:40:30   6                     **(OFF THE RECORD)**

16:40:30   7           **MR. GULOTTA:**  MAY WE APPROACH THE BENCH, YOUR HONOR?

16:40:30   8           **THE COURT:**  YES, SIR.

16:40:30   9                     **(OFF THE RECORD)**

16:41:12  10           **MR. GULOTTA:**  JAY GULOTTA FOR WASHINGTON GROUP.

16:41:14  11           **THE COURT:**  YES, SIR.

16:41:15  12           **MR. GULOTTA:**  WE'VE BEEN OPERATING UNDER THE RULES

16:41:17  13   WHEREBY 48 HOURS BEFORE CALLING A WITNESS, WE DELIVER

16:41:21  14   DEMONSTRATIVES FOR THE DIRECT, AND THEN THE NIGHT BEFORE OR 24

16:41:26  15   HOURS AHEAD OF TIME, THE OPPOSING PARTY IS SUPPOSED TO DELIVER

16:41:32  16   CROSS-EXAMINATION DEMONSTRATIVES.

16:41:33  17           WE'VE NOT RECEIVED ANY CROSS-EXAMINATION

16:41:37  18   DEMONSTRATIVES FROM THE PLAINTIFFS FOR MR. DANNER, WHO IS OUR

16:41:40  19   NEXT WITNESS.  BUT I'VE BEEN TOLD THAT THERE ARE NO

16:41:43  20   DEMONSTRATIVES, THAT WE'LL ONLY BE SEEING EXHIBITS WHICH -- AND

16:41:47  21   I THINK THAT'S OKAY.  THAT'S WITHIN THE PROCEDURE THAT WE'VE

16:41:49  22   BEEN OPERATING UNDER.

16:41:51  23           BUT I'VE ALSO BEEN TOLD THAT THERE WILL BE AN

16:41:54  24   IMPEACHMENT EXHIBIT THAT'S NOT PREVIOUSLY BEEN LISTED ON ANY

16:41:58  25   EXHIBIT LIST THAT I UNDERSTAND FROM MR. PALMINTIER HE CONSIDERS

16:42:06   1   TO BE IMPEACHMENT.

16:42:07   2                  NOW, I DO KNOW THAT THERE ARE IN CERTAIN CASES

16:42:11   3   IMPEACHMENT EXHIBITS THAT ARE APPROPRIATE.  DON'T KNOW WHETHER

16:42:15   4   THIS WILL BE ONE.

16:42:16   5                  BUT I THINK MR. TREEBY -- I'LL TURN TO

16:42:19   6   MR. TREEBY NOW.  HE HAS SOME ADDITIONAL INFORMATION ABOUT WHAT

16:42:22   7   WE'RE EXPECTING AND HE CAN COMMENT.

16:42:23   8              **MR. TREEBY:**  WELL, UNFORTUNATELY, JOE -- IS JOE BACK

16:42:27   9   THERE?

16:42:27  10              **MR. STEVENS:**  NO, BUT I WAS A PART OF THIS

16:42:27  11   CONVERSATION.

16:42:28  12              **MR. TREEBY:**  OKAY.  ELWOOD WAS THERE.

16:42:29  13                  BASICALLY, YOU KNOW, THE RULE WAS ALL EXHIBITS

16:42:31  14   ARE LISTED.  NOW, WE'VE HAD SOME EXHIBITS THAT WEREN'T LISTED,

16:42:34  15   AND WE'VE SHARED THEM WITH EACH OTHER WHEN WE FOUND THEM.

16:42:37  16                  WE HAD SOME OF THAT TODAY AND -- YOU KNOW, AND

16:42:40  17   WE'VE HAD SOME SO-CALLED LEARNED TREATISES GIVEN TO US THE

16:42:44  18   NIGHT BEFORE WHERE, YOU KNOW, THEY WEREN'T ON THE EXHIBIT LIST,

16:42:46  19   BUT THEY WERE NEW THINGS.  AND, YOU KNOW, WE HAD SOME OF THAT

16:42:51  20   LAST NIGHT.

16:42:52  21                  I WAS TOLD BY MR. BRUNO THAT WHAT WE'RE TALKING

16:42:54  22   ABOUT IS WHAT HE CALLS A LEARNED TREATISE.

16:42:59  23                  IN FAIRNESS TO THE WITNESS AND TO THE SYSTEM,

16:43:01  24   EXHIBITS SHOULD BE LISTED.  WE UNDERSTAND THERE ARE SITUATIONS

16:43:06  25   WHERE YOU'LL LEARN ABOUT SOMETHING, AND WE'VE WORKED WITH EACH

16:43:10   1   OTHER AND NOT HAD A PROBLEM WITH THAT.

16:43:11   2              BUT THIS IS NOT LISTED AND COUNSEL REFUSES TO

16:43:14   3   GIVE IT TO US.

16:43:15   4        **MR. GULOTTA:**  WELL, AND WE DO A CATEGORY, CATEGORY 2,

16:43:17   5   I THINK WHERE AMONGST US WE DO HAVE SOME LEARNED TREATISES

16:43:20   6   LISTED THAT WE ANTICIPATED USING.  THAT WAS PART OF THE

16:43:23   7   CONDITIONAL OBJECTION PROCEDURE THAT WE USED IF IT WERE GOING

16:43:28   8   TO BE USED, IF IT WERE LISTED AND USED, IT WOULD BE ADMITTED

16:43:31   9   INTO EVIDENCE.

16:43:31   10             BUT IN THIS CASE, I THINK -- APPARENTLY WE HAVE

16:43:33   11  SOMETHING THAT HASN'T BEEN LISTED, WHICH IS OF SOME CONCERN TO

16:43:37   12  US.

16:43:37   13       **THE COURT:**  OKAY.  YOUR TURN.

16:43:40   14       **MR. PALMINTIER:**  JUDGE, MIKE PALMINTIER OF

16:43:43   15  DEGRAVELLES PALMINTIER, HOLTHAUS AND FRUGE, REPRESENTING THE

16:43:44   16  PLAINTIFFS.  IT'S IMPEACHMENT.  IT'S A LEARNED TREATISE.  IT'S

16:43:50   17  A FEMA DOCUMENT.  IT'S A BULLETIN FROM FEMA.

16:43:55   18             I'M -- IT'S NOT GAG TO BE INTRODUCED AS AN

16:44:00   19  EXHIBIT.  IT'S PART OF THE CODE OF FEDERAL REGULATIONS.  IT'S

16:44:03   20  GOT ALL KINDS OF LEGAL IMPLICATIONS.  IT CERTAINLY IS NOT AN

16:44:07   21  EXHIBIT AND IT'S NOT SOMETHING, UNLIKE WHAT MR. TREEBY SAYS

16:44:10   22  THAT WE'VE BEEN EXCHANGING.

16:44:12   23             I MEAN, IF I HAD -- IF I WAS USING A LEARNED

16:44:16   24  TREATISE AS AN EXHIBIT FOR MY PRIMARY WITNESS, FOR A WITNESS I

16:44:19   25  WAS CALLING, I WOULD HAVE TO TELL THEM ABOUT IT.

16:44:22   1                   BUT THIS IS TO IMPEACH A WITNESS WHO HAS SAID X.
16:44:24   2   AND IF I GIVE IT TO HIM, HOW DO I IMPEACH HIM?  HE GETS TO
16:44:29   3   EXPLAIN IT AWAY.  HE GETS TO DEAL WITH THE VERY NATURE OF
16:44:33   4   IMPEACHMENT IN A WAY THAT ISN'T CONTEMPLATED UNDER THE RULES,
16:44:37   5   UNDER 803.
16:44:39   6                   WE THINK WE OUGHT TO BE ABLE TO USE THIS AS AN
16:44:41   7   IMPEACHMENT VEHICLE.
16:44:43   8             **THE COURT:**  WELL, SINCE I DON'T KNOW WHAT IT IS, IT'S
16:44:44   9   HARD FOR ME TO MAKE AN INFORMED -- IT'S NOT A LEARNED TREATISE,
16:44:49  10   THOUGH, IS IT?
16:44:52  11             **MR. PALMINTIER:**  IT IS A LEARNED TREATISE IN THE
16:44:53  12   SENSE THAT IT'S A FEMA BULLETIN THAT TALKS ABOUT DURATION.
16:44:57  13             **THE COURT:**  WELL, WHATEVER -- HOWEVER WE CALL IT,
16:45:00  14   THAT'S WHAT IT IS.  I'M NOT SURE THAT ANY FEMA BULLETIN'S A
16:45:05  15   LEARNED TREATISE, BUT GO AHEAD.
16:45:07  16             **MR. TREEBY:**  DOES YOUR HONOR OCCUPY THE COURTROOM AND
16:45:09  17   THE CHAMBERS THAT JUDGE ALVIN REUBEN ONCE OCCUPIED?  DO YOU
16:45:16  18   KNOW?
16:45:18  19             **MR. GULOTTA:**  I THINK HE WAS ON 2, I BELIEVE.
16:45:20  20             **THE COURT:**  YEAH, I THINK HE WAS ON 2.  I WISH HIS
16:45:21  21   SPIRIT WOULD INVEST IN ME NOW.  HE WAS A VERY INCISIVE MAN.
16:45:28  22             **MR. TREEBY:**  HE WAS.  I HAD A PLAINTIFF'S CASE BEFORE
16:45:31  23   HIM WITH THIS SAME ISSUE, ONLY WORSE.  I HAD DR. KEN BOUDREAUX
16:45:35  24   SAYING HE HAD NEVER USED A DIFFERENT DISCOUNT RATE THAN WHAT IT
16:45:38  25   WAS.  I THINK IT WAS 6 PERCENT.

| | | |
|---|---|---|
| 16:45:40 | 1 | AND I SAID, "ARE YOU SURE?" AND I HAD ASKED HIM |
| 16:45:43 | 2 | DURING THE DEPOSITION, "HAVE YOU EVER REPRESENTED A PLAINTIFF?" |
| 16:45:44 | 3 | AND HE GAVE ME ONE. |
| 16:45:46 | 4 | I FINALLY GOT THAT LAWYER ON THE FRIDAY BEFORE, |
| 16:45:48 | 5 | EASTER SUNDAY IN BETWEEN, MONDAY TRIAL, A JURY TRIAL, AND HE -- |
| 16:45:53 | 6 | HE WOULD NOT LET -- I SET THE WITNESS UP, HE WOULDN'T LET ME |
| 16:45:57 | 7 | USE IT BECAUSE I HADN'T GIVEN IT TO THE OTHER SIDE. |
| 16:46:00 | 8 | I THINK IT'S FAIR TO THE WITNESS, I DON'T THINK |
| 16:46:01 | 9 | IT'S FAIR TO -- |
| 16:46:04 | 10 | **MR. PALMINTIER:** JUDGE, MR. TREEBY, AND I'VE GOT TWO |
| 16:46:06 | 11 | GUYS ARGUING AGAINST ME. I WOULD LIKE TO BE ABLE TO GET A WORD |
| 16:46:07 | 12 | IN EDGEWISE ON THESE WAR STORIES. LET ME GIVE YOU AN EXAMPLE |
| 16:46:09 | 13 | OF WHAT I WOULD SAY. |
| 16:46:10 | 14 | PROFESSOR IRVING YOUNGER, WITH WHOM I CONSULTED |
| 16:46:13 | 15 | BEFORE HE DIED, ALWAYS SAID IMPEACHMENT IS IMPEACHMENT -- |
| 16:46:15 | 16 | **THE COURT:** I'M GOING TO TELL YOU SOMETHING -- |
| 16:46:15 | 17 | **MR. PALMINTIER:** -- WAR STORY. |
| 16:46:18 | 18 | **THE COURT:** -- AS MUCH AS I RESPECT BOTH OF THOSE TWO |
| 16:46:20 | 19 | PEOPLE, IT WOULD HAVE NOTHING TO DO WITH HOW I RULE ON THIS |
| 16:46:23 | 20 | CASE. BUT I -- ONE, MAYBE I NEED TO SEE THE THING, TO LOOK AT |
| 16:46:29 | 21 | IT. AND IS IT -- IT'S GOING TO -- IS IT RELATED TO THE |
| 16:46:40 | 22 | INACCURACY OR THE ACTUAL VERACITY OF THE WITNESS? |
| 16:46:44 | 23 | **MR. PALMINTIER:** BOTH. IT DEALS WITH VERACITY IN THE |
| 16:46:48 | 24 | SENSE THAT HE HAS MADE A STATEMENT THAT DURATION ISN'T |
| 16:46:52 | 25 | RELEVANT, AND IT DEALS WITH ACCURACY IN THAT HE TALKS IN TERMS |

16:46:56    1    OF DURATION OF 1O OR MORE DAYS BEING INSIGNIFICANT.

16:47:02    2                    AND, OF COURSE, THIS DOCUMENT SAYS OTHERWISE.

16:47:07    3            **MR. GULOTTA:**  WELL, YOUR HONOR, I THINK THE ISSUE OF

16:47:10    4    DURATION -- THIS IS ALL VERY INTERESTING.

16:47:12    5            **THE COURT:**  DURATION AS TO WHAT, IF I MAY?

16:47:14    6            **MR. PALMINTIER:**  HOW LONG THE WATER STAYED IN THE

16:47:16    7    PLACE.

16:47:16    8            **MR. GULOTTA:**  HOW THE LONG THE WATER WAS IN THE

16:47:16    9    RESIDENCE.

16:47:16   10            **THE COURT:**  OH, OKAY.

16:47:16   11            **MR. PALMINTIER:**  I MEAN, IF HE'LL STIPULATE THAT HE

16:47:18   12    WAS HE WAS WRONG ABOUT THAT, I'M FINE WITH THAT.  I WON'T NEED

16:47:20   13    TO IMPEACH HIM.

16:47:21   14            **MR. GULOTTA:**  YOUR HONOR, WHAT'S INTERESTING ABOUT

16:47:22   15    THIS IS IS THAT THE WORD "DURATION" DID NOT APPEAR IN EITHER

16:47:25   16    MR. CRAWFORD OR MR. TAYLOR'S ORIGINAL REPORT.

16:47:29   17                    AND IT WAS ONLY AFTER MR. DANNER DELIVERED HIS

16:47:31   18    REPORT.  AND THIS RELATES SIMPLY TO THE QUESTION OF WHETHER OR

16:47:37   19    NOT OPINIONS OF THE EXPERTS, ON ONE THE HAND, THE PLAINTIFFS'

16:47:41   20    EXPERTS SAY THAT ALL OF THE RESIDENCES, IN ESSENCE, SHOULD HAVE

16:47:46   21    BEEN DEMOLISHED AND BE TOTALLY REPLACED.

16:47:49   22                    MR. DANNER WILL TESTIFY THAT IT'S HIS OPINION

16:47:50   23    THAT THEY COULD HAVE BEEN REPAIRED.

16:47:52   24                    AND THERE WAS NOT A WORD ABOUT DURATION IN THE

16:47:55   25    PLAINTIFF --

16:47:56   1          **MR. PALMINTIER:**  THAT'S SIMPLY NOT TRUE, YOUR HONOR.

16:47:58   2   IT WAS TALKED ABOUT IT THROUGHOUT THE REPORTS AND THE

16:47:59   3   DEPOSITIONS.

16:48:00   4          **MR. GULOTTA:**  WELL, I DON'T THINK IT WAS.  BUT IN ANY

16:48:02   5   EVENT, MR. DANNER DID RENDER HIS OPINION ABOUT CERTAIN THINGS,

16:48:06   6   AND THEN WE GET A SUPPLEMENTAL REPORT WHERE DURATION IS

16:48:09   7   MENTIONED.

16:48:10   8          WE DIDN'T OBJECT.  WE UNDERSTAND WHAT THE

16:48:12   9   ARGUMENT IS.  THIS HAS BEEN A KNOWN ISSUE SINCE THE TIME --

16:48:17  10          **MR. PALMINTIER:**  WHAT DOES THIS HAVE TO DO --

16:48:17  11          **MR. GULOTTA:**  THIS HAS BEEN A KNOWN ISSUE -- WELL,

16:48:19  12   BECAUSE IT RELATES TO WHY WE DON'T HAVE AN EXHIBIT NOW THAT'S

16:48:23  13   GOING TO BE USED AGAINST OUR WITNESS.

16:48:25  14          **MR. PALMINTIER:**  IT'S NOT AN EXHIBIT.  YOU'RE

16:48:28  15   MISSTATING THAT.

16:48:29  16          **MR. GULOTTA:**  WELL, I THINK IT SHOULD BE AN EXHIBIT.

16:48:31  17   IT SHOULD BE AN EXHIBIT.

16:48:33  18          SO IT CAME UP AFTER MR. DANNER'S REPORT, DURING

16:48:36  19   HIS DEPOSITION, THE ISSUE OF DURATION.  WE'RE NOT AFRAID OF

16:48:40  20   DISCUSSING DURATION, WORK WAS DISCUSSED.  AND NOW WE'RE

16:48:43  21   CONFRONTED WITH SOMETHING THAT SHOULD HAVE BEEN --

16:48:46  22          **MR. PALMINTIER:**  YOUR HONOR, IT'S THE SHEER VOLUME.

16:48:48  23          **THE COURT:**  I'M GOING TO ALLOW YOU TO USE IT.

16:48:50  24          THANK YOU.

16:48:50  25          **MR. GULOTTA:**  THANK YOU, YOUR HONOR.

16:48:50   1        (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN

16:48:50   2   OPEN COURT.)

16:49:28   3        **THE COURT:**  OKAY.  ARE WE READY?

16:49:32   4        **MR. GULOTTA:**  WE ARE READY, YOUR HONOR.

16:49:33   5        DEFENDANTS CALL MR. JAMES DANNER.

16:49:58   6        **THE COURT:**  BY THE WAY, ALL OBJECTIONS MADE ARE

16:49:59   7   PRESERVED FOR THE RECORD.  THEY DO NOT HAVE TO BE

16:50:03   8   REARTICULATED.

16:50:05   9        (WHEREUPON, **JAMES R. DANNER, JR.**, HAVING BEEN DULY

16:50:05  10   SWORN, TESTIFIED AS FOLLOWS.)

09:20:43  11        **THE DEPUTY CLERK:**  PLEASE STATE YOUR FULL NAME AND

09:20:43  12   CORRECT SPELLING FOR THE RECORD.

16:50:16  13        **THE WITNESS:**  JAMES R. DANNER, JR.  D-A-N-N-E-R.

16:50:24  14                 **DIRECT EXAMINATION**

16:50:27  15   BY MR. GULOTTA:

16:50:28  16   **Q.**  GOOD AFTERNOON, MR. DANNER.

16:50:29  17        COULD YOU TELL THE COURT, PLEASE, BY WHOM ARE YOU

16:50:32  18   CURRENTLY EMPLOYED?

16:50:34  19   **A.**  DENSON ENGINEERS, INCORPORATED.

16:50:35  20   **Q.**  AND WHERE DO YOU RESIDE, CURRENTLY?

16:50:37  21   **A.**  I LIVE AT 3233 URSULINES AVENUE, HERE IN NEW ORLEANS.

16:50:41  22   **Q.**  MR. DANNER, WERE YOU ENGAGED BY WASHINGTON GROUP

16:50:45  23   INTERNATIONAL AND THE GOVERNMENT OF THE UNITED STATES TO RENDER

16:50:48  24   DAMAGE ASSESSMENT CONSULTING SERVICES IN THIS CASE?

16:50:50  25   **A.**  YES, SIR.

16:50:54   1   **Q.**   AS PART OF THE ENGAGEMENT, WERE YOU ASKED TO DETERMINE THE

16:50:57   2   EXTENT OF THE WIND DAMAGE SUSTAINED BY THE PLAINTIFFS AT THEIR

16:51:01   3   RESIDENCES DURING HURRICANE KATRINA?

16:51:02   4   **A.**   YES, SIR.

16:51:04   5   **Q.**   WERE YOU ALSO ASKED TO DETERMINE THE EXTENT OF FLOOD

16:51:07   6   DAMAGE SUSTAINED BY THE PLAINTIFF RESIDENCES DURING HURRICANE

16:51:10   7   KATRINA?

16:51:10   8   **A.**   YES, SIR.

16:51:15   9           **MR. PALMINTIER:**   YOUR HONOR, ARE WE GOING TO HAVE --

16:51:17   10   EXCUSE ME -- A STATEMENT FROM COUNSEL, AS WE'VE BEEN DOING, A

16:51:22   11   SUMMARY?

16:51:24   12           **MR. GULOTTA:**   NO.  NO, YOUR HONOR.  THIS WILL BE --

16:51:28   13           **THE COURT:**   I THINK IN THE DAMAGE WITNESSES WE'VE --

16:51:31   14   WE HAVE -- HAVEN'T USED THAT PROTOCOL TO THE EXTENT --

16:51:38   15           **MR. GULOTTA:**   THE REPORTS ARE ADMITTED, YOUR HONOR.

16:51:40   16   WE'LL GET TO THAT IN A MOMENT.

16:51:43   17           **THE COURT:**   RIGHT.

16:51:43   18   **BY MR. GULOTTA:**

16:51:43   19   **Q.**   MR. DANNER, DO YOU HAVE PREVIOUS EXPERIENCE IN MAKING

16:51:45   20   ASSESSMENTS OF WIND AND/OR FLOOD DAMAGE TO RESIDENCES CAUSED BY

16:51:49   21   HURRICANES OR STORM EVENTS?

16:51:51   22   **A.**   YES, SIR.

16:51:52   23   **Q.**   LET'S LOOK AT SOME OF YOUR QUALIFICATIONS.

16:51:54   24           **MR. GULOTTA:**   THE NEXT SLIDE, PLEASE.

          25

| | | |
|---|---|---|
| 16:51:55 | 1 | **BY MR. GULOTTA:** |
| 16:51:57 | 2 | **Q.**   MR. DANNER, STARTING WITH YOUR EDUCATIONAL EXPERIENCE. |
| 16:52:01 | 3 | WE SEE, OF COURSE, THAT BEFORE GETTING ON THE |
| 16:52:03 | 4 | ENGINEERING TRACK YOU ACQUIRED A BACHELOR OF SCIENCE DEGREE IN |
| 16:52:08 | 5 | MANAGEMENT AT LOUISIANA STATE UNIVERSITY IN NEW ORLEANS. |
| 16:52:10 | 6 | CORRECT? |
| 16:52:11 | 7 | **A.**   YES, SIR. |
| 16:52:12 | 8 | **Q.**   CURRENTLY KNOWN AS UNO. |
| 16:52:15 | 9 | AT THE TIME -- SOMETIME LATER IN 1977, YOU ACQUIRED |
| 16:52:20 | 10 | YOUR CIVIL ENGINEERING DEGREE FROM TULANE UNIVERSITY? |
| 16:52:23 | 11 | **A.**   YES, SIR. |
| 16:52:23 | 12 | **Q.**   NOW, AFTER ACQUIRING YOUR BACHELOR OF SCIENCE DEGREE IN |
| 16:52:28 | 13 | ENGINEERING -- CIVIL ENGINEERING AT TULANE -- DID YOU UNDERTAKE |
| 16:52:31 | 14 | ANY GRADUATE STUDIES? |
| 16:52:34 | 15 | **A.**   YES, SIR.  I ENTERED INTO GRADUATE STUDIES IN CIVIL |
| 16:52:41 | 16 | ENGINEERING AT TULANE UNIVERSITY. |
| 16:52:42 | 17 | **Q.**   AND WHAT DID YOUR GRADUATE STUDIES CONSIST OF? |
| 16:52:45 | 18 | **A.**   IN THIS CIRCUMSTANCE, MOST OF THE STUDIES I DID WERE |
| 16:52:51 | 19 | GEOTECHNICAL PRECAST CONCRETE HYDROLOGY -- |
| 16:52:55 | 20 | **Q.**   DID YOU ACQUIRE A GRADUATE DEGREE? |
| 16:52:58 | 21 | **A.**   -- IN SOLVENT FOUNDATION. |
| 16:52:58 | 22 | NO, I DIDN'T.  THE WORKLOAD OF MY JOB AT THAT PERIOD |
| 16:53:02 | 23 | OF TIME PRECLUDED ME FROM CONTINUING ON. |
| 16:53:05 | 24 | **Q.**   NOW, AFTER ACQUIRING YOUR BS IN CIVIL ENGINEERING, YOU |
| 16:53:12 | 25 | BECAME A LICENSED AND REGISTERED ENGINEER, DID YOU NOT? |

| | | |
|---|---|---|
| 16:53:15 | 1 | **A.**   YES, SIR. |
| 16:53:16 | 2 | **Q.**   AND THIS LISTS YOUR REGISTRATIONS FIRST, OF COURSE, OF |
| 16:53:21 | 3 | LOUISIANA; CORRECT? |
| 16:53:22 | 4 | **A.**   LOUISIANA CIVIL AND ENVIRONMENTAL ENGINEER.  THE |
| 16:53:25 | 5 | MISSISSIPPI, ARKANSAS, AND OKLAHOMA WERE ALL PROFESSIONAL |
| 16:53:30 | 6 | ENGINEERS.  HOWEVER, OKLAHOMA DOES REQUIRE THAT YOU CERTIFY A |
| 16:53:36 | 7 | PARTICULAR DISCIPLINE.  IN THIS CASE, IT WAS CIVIL ENGINEERING |
| 16:53:42 | 8 | BY A TEST. |
| 16:53:43 | 9 | **Q.**   ALL RIGHT. |
| 16:53:43 | 10 | **A.**   I ALSO HAVE A -- |
| 16:53:45 | 11 | **Q.**   GO AHEAD. |
| 16:53:46 | 12 | **A.**   I HAD A LICENSE IN MISSOURI, BUT IT'S NOT CURRENT. |
| 16:53:50 | 13 | **Q.**   OKAY.  NOW, THE NATIONAL COUNCIL OF EXAMINERS FOR |
| 16:53:54 | 14 | ENGINEERING AND SURVEYING, WHAT DOES THAT REGISTRATION CONSIST |
| 16:53:58 | 15 | OF? |
| 16:53:58 | 16 | **A.**   THEY DO TWO FUNCTIONS, ONE OF WHICH -- THEY ACTUALLY |
| 16:54:02 | 17 | PREPARE AND ADMINISTER, GIVE THE TESTS AND GRADE THE TESTS, THE |
| 16:54:06 | 18 | PE TESTS THAT ARE USED THROUGHOUT THE COUNTRY.  AND THEY DO |
| 16:54:10 | 19 | THAT FOR SURVEYING AS WELL. |
| 16:54:13 | 20 | THEIR SECOND FUNCTION IS THEY MAINTAIN RECORDS FOR |
| 16:54:16 | 21 | PEOPLE WHO QUALIFY THAT -- TO HAVE THAT.  SO THAT IF YOU WANT |
| 16:54:20 | 22 | TO GET REGISTRATION IN ANOTHER STATE AND YOU HAVE -- HAVE |
| 16:54:28 | 23 | ACCOMMODATED, IF -- BASED ON YOUR CREDENTIALS.  THEY MAINTAIN |
| 16:54:33 | 24 | YOUR CREDENTIALS AT THAT LOCATION AND WILL SUBMIT IT TO THAT |
| 16:54:37 | 25 | STATE FOR CONSIDERATION. |

16:54:38   1   **Q.**   NOW, YOU LIST HERE -- OF COURSE, THIS IS AN EXTRACT FROM

16:54:41   2   YOUR CV, IS THAT CORRECT, THE QUALIFICATIONS THAT WE HAVE

16:54:44   3   LISTED HERE?

16:54:45   4   **A.**   YES, SIR.

16:54:45   5   **Q.**   YOU LIST A NUMBER OF MEMBERSHIPS.  TELL US ABOUT YOUR

16:54:50   6   MEMBERSHIP IN THE ROOF CONSULTANTS INSTITUTE.

16:54:55   7   **A.**   WELL, ON THE ROOF CONSULTANTS?

16:54:58   8   **Q.**   YES.

16:54:58   9   **A.**   YES, SIR.  THAT'S ESSENTIALLY AN ORGANIZATION OF

16:55:01   10   PROFESSIONALS WHO ARE INVOLVED WITH CONSULTING IN ROOF, EITHER

16:55:07   11   FOR DESIGN OR EVALUATION OF DAMAGES FOR REPAIRS.  IT'S PRETTY

16:55:15   12   HEAVILY ON THE SCIENCE SIDE, QUITE A BIT OF TRAINING INVOLVED

16:55:18   13   WITH THAT.

16:55:19   14   **Q.**   APPROXIMATELY HOW LONG HAVE YOU BEEN A MEMBER OF THE ROOF

16:55:21   15   CONSULTANTS INSTITUTE?

16:55:24   16   **A.**   GEE, I'M GOING TO SAY PROBABLY ABOUT EIGHT, NINE YEARS.

16:55:28   17   MAYBE LONGER.  SOMETIME AFTER 2000.

16:55:30   18   **Q.**   OKAY.  PLEASE TELL THE COURT ABOUT YOUR MEMBERSHIP IN THE

16:55:33   19   STRUCTURAL ENGINEERING INSTITUTE AND YOUR OFFICE -- FULL NAME

16:55:39   20   AND EXPERIENCE.

16:55:40   21   **A.**   HERE IN NEW ORLEANS, AND EVERYWHERE ELSE, THE STRUCTURAL

16:55:43   22   ENGINEERING INSTITUTE ACTUALLY IS A SUBSET OF THE AMERICAN

16:55:46   23   SOCIETY OF CIVIL ENGINEERS.

16:55:47   24        HERE IN NEW ORLEANS WE -- ME AND ANOTHER STRUCTURAL

16:55:52   25   ENGINEER FORMED THE LOCAL STRUCTURES COMMITTEE IN THIS.  I'VE

16:55:55    1    BEEN PAST CHAIRMAN TWICE, AND THE TREASURER.

16:56:01    2            WHAT WE DO IS PUT ON EDUCATIONAL TRAINING, NORMALLY

16:56:04    3    ON A QUARTERLY BASIS, FOR ENGINEERS AS FAR AS CONTINUING

16:56:07    4    EDUCATION IS CONCERNED.

16:56:09    5            AND WE ALSO ARE INVOLVED WITH PUTTING ON ANNUAL

16:56:16    6    CONFERENCES AT THE PONTCHARTRAIN CENTER, WHICH IS ABOUT 600

16:56:20    7    ATTENDEES.

16:56:21    8    Q.   AND HOW LONG AGO WERE YOU THE LOCAL CHAIRMAN OF THE

16:56:26    9    STRUCTURAL ENGINEERING INSTITUTE?

16:56:28   10    A.   THE FIRST TIME WOULD HAVE BEEN ABOUT 20 YEARS AGO, AND THE

16:56:30   11    SECOND TIME PROBABLY ABOUT FOUR OR FIVE YEARS AGO.

16:56:33   12    Q.   NOW, WITH REFERENCE TO THE TRAINING COURSES THAT YOU

16:56:35   13    MENTIONED PUT ON BY THE STRUCTURAL ENGINEERING INSTITUTE, DO

16:56:41   14    YOU PARTICIPATE IN THOSE COURSES EITHER AS A TRAINER,

16:56:45   15    INSTRUCTOR OR STUDENT OR BOTH?

16:56:48   16    A.   YES, SIR.  I TRY TO GO TO ALL OF THOSE THAT AT LEAST HAVE

16:56:49   17    SOME INTEREST TO ME.  SOMETIMES YOU GET THINGS LIKE, SUCH --

16:56:52   18    THE LAST ONE WAS -- I WENT TO WAS THE CHANGES IN THE CURRENT

16:56:58   19    BUILDING CODE REFERENCED AT ASCE 7, CONCERNING WIND AND WIND

16:57:04   20    LOADING.

16:57:05   21            I'VE ALSO GIVEN A NUMBER OF SEMINARS, MOST LIFE

16:57:13   22    SAFETY CODE; DESIGN OF WOOD STRUCTURES FOR HIGH WINDS, IN

16:57:17   23    PARTICULAR TORNADOES; AND ASSESSMENT OF CAUSATION OF CRACKS IN

16:57:22   24    MASONRY.

16:57:25   25    Q.   ALL RIGHT.  WE'LL GO TO THE NEXT SLIDE HERE.

16:57:28    1            NOW, THIS UP HERE, OF COURSE, REPORTS YOUR PRESENT

16:57:31    2    EMPLOYMENT, DENSON ENGINEERS, VICE PRESIDENT, PRINCIPAL CIVIL

16:57:34    3    ENGINEER.  AND YOU'VE BEEN EMPLOYED THERE SINCE 1983; IS THAT

16:57:40    4    CORRECT?

16:57:40    5    **A.**   YES, SIR.

16:57:41    6    **Q.**   NOW, IN CONNECTION WITH YOUR ENGINEERING PRACTICE,

16:57:46    7    ITEMS 2 -- 1 AND 2, WHERE YOU REFER TO RESPONSIBLE FOR CIVIL

16:57:52    8    AND STRUCTURAL ENGINEERING DESIGN AND ANALYSIS FOR A VARIETY OF

16:57:54    9    DOMESTIC AND INTERNATIONAL CLIENTS, AND DESIGN EXPERIENCE

16:57:57   10    INCLUDES STRUCTURAL AND FOUNDATION ANALYSIS, BUILDING

16:58:00   11    RENOVATIONS, SITE IMPROVEMENTS, UTILITY SYSTEMS, AND MARINE

16:58:04   12    DESIGNS; CORRECT?

16:58:04   13    **A.**   YES, SIR.

16:58:05   14    **Q.**   NOW, WITH RESPECT TO THOSE TWO ITEMS, IS IT -- AM I TO

16:58:11   15    UNDERSTAND AND IS THE COURT TO UNDERSTAND THAT IN YOUR

16:58:14   16    ENGINEERING PRACTICE, YOU STILL ACTUALLY DESIGN THINGS?  YOU

16:58:17   17    DON'T JUST -- ARE ENGAGED AS A CONSULTANT OR WITNESS; IS THAT

16:58:22   18    CORRECT?

16:58:22   19    **A.**   THAT'S THE REAL FUN PART, IS YOU GET TO DO A LOT OF

16:58:26   20    DESIGNS.  WE DO CONSULTING SOME ON THE MORE HIGH-PROFILE, THE

16:58:33   21    LOUISIANA SUPERDOME OR THE ARENA OUT IN ZEPHYR FIELD, DO ALL

16:58:41   22    THE WIND ANALYSIS ON ALL THE STRUCTURES AND STAGES AND TENTS

16:58:44   23    FOR THE FAIRGROUNDS AND OTHER FESTIVALS THAT HAVE GONE ON.

16:58:49   24            AT THE SAME TIME, I'M QUITE OFTEN CALLED IN TO DO

16:58:53   25    ANALYSIS AND DESIGN, SOMETIMES FROM RESIDENTIAL BUILDINGS UP TO

16:58:59  1  HIGHRISE.

16:59:01  2          RECENTLY, LAST YEAR, I DID AN ANALYSIS OF THE FLOW

16:59:06  3  SYSTEM AT THE ENTERGY BUILDING AT ONE POYDRAS PLAZA, I BELIEVE

16:59:13  4  THE NAME OF IT IS.

16:59:15  5  **Q.**  NOW, IN THE NEXT TWO BULLET POINTS YOU REFER TO YOUR

16:59:20  6  FORENSIC ASSIGNMENTS AND THEN YOUR QUALIFICATION AS AN EXPERT

16:59:24  7  WITNESS IN VARIOUS COURTS.

16:59:26  8          NOW, YOU'VE ALREADY MENTIONED TO THE JUDGE -- WELL,

16:59:30  9  MAYBE NOT.  MAYBE I DIDN'T COVER THAT QUESTION.

16:59:33  10          PRIOR TO YOUR ENGAGEMENT BY WASHINGTON GROUP

16:59:36  11  INTERNATIONAL AND THE GOVERNMENT OF THE UNITED STATES IN

16:59:38  12  CONNECTION WITH THIS CASE, HAD YOU PREVIOUSLY BEEN INVOLVED IN

16:59:45  13  CONSULTING FOR EITHER CLAIMANTS OR DEFENDANTS IN LEGAL

16:59:52  14  PROCEEDINGS REGARDING WIND AND FLOOD DAMAGE?

16:59:55  15  **A.**  WELL, WHEN KATRINA STARTED, THIS WASN'T -- WASN'T MY FIRST

16:59:59  16  RODEO.  I HAD GONE BACK TO DOING THIS TYPE OF WORK WITH

17:00:03  17  HURRICANE ANDREW AND PROBABLY EVERY STORM THAT -- HURRICANE OR

17:00:09  18  TROPICAL STORM, INCLUDING -- I'M TRYING TO THINK OF THE NAME OF

17:00:17  19  IT -- ISIDORE, IKE.

17:00:23  20          BUT WITH KATRINA, I BECAME VERY MUCH ENGAGED WORKING

17:00:28  21  FOR BOTH INSURANCE COMPANIES AND PROPERTY OWNERS AND

17:00:32  22  HOMEOWNERS, AND PROBABLY DID IN EXCESS OF 500 EVALUATIONS, IN

17:00:35  23  WHICH -- PRINCIPALLY INVOLVED WAS MAKING DETERMINATION OF WIND

17:00:40  24  VERSUS WATER AND DETERMINE WHAT -- WHAT WAS DAMAGED AND WHY IT

17:00:44  25  WAS DAMAGED AND IN MANY RESPECTS WHAT NEEDED TO BE DONE TO

| | | |
|---|---|---|
| 17:00:49 | 1 | REPAIR THOSE DAMAGES. |
| 17:00:53 | 2 | **Q.**   SO IS IT FAIR TO SAY THAT ASSESSMENTS OF DAMAGE OF |
| 17:00:57 | 3 | STRUCTURES FROM WIND AND/OR FLOOD HAS BEEN A SIGNIFICANT PART |
| 17:01:01 | 4 | OF YOUR FORENSIC ENGAGEMENT SINCE KATRINA, CERTAINLY? |
| 17:01:07 | 5 | **A.**   IT'S STILL KEEPING ME BUSY, AND I'M STILL DOING IT.  NOW |
| 17:01:10 | 6 | WE HAVE ISIDORE -- ISAAC TO DEAL WITH.  SO . . . |
| 17:01:17 | 7 | **Q.**   CAN YOU ESTIMATE FOR THE BENEFIT OF THE COURT HOW MANY |
| 17:01:20 | 8 | STRUCTURES YOU ACTUALLY PHYSICALLY INSPECTED AND EVALUATED FOR |
| 17:01:24 | 9 | STORM DAMAGE? |
| 17:01:26 | 10 | **A.**   HUNDREDS.  OVER A THOUSAND.  I MEAN, THAT'S KIND OF WHAT I |
| 17:01:34 | 11 | DO, SO I'M OUT IN THE FIELD A LOT.  SO I HAVE QUITE A BIT OF |
| 17:01:38 | 12 | EXPERIENCE IN THIS AREA. |
| 17:01:39 | 13 | **Q.**   OKAY.  NOW, I THINK IT CAME UP, BUT JUST SO THE RECORD'S |
| 17:01:42 | 14 | CLEAR, THE ENGAGEMENTS IN WHICH YOU'VE BEEN INVOLVED TO DO |
| 17:01:46 | 15 | STORM ASSESSMENT -- STORM DAMAGE ASSESSMENTS -- HAVE BEEN ON |
| 17:01:50 | 16 | BEHALF OF BOTH HOMEOWNERS, CLAIMANTS, AS WELL AS EITHER |
| 17:01:55 | 17 | INSURERS OR DEFENDANTS AND CLAIMS? |
| 17:01:58 | 18 | **A.**   YES, SIR.  NORMALLY, WE DON'T REALLY KEEP TRACK OF THAT, |
| 17:02:01 | 19 | OTHER THAN KEEP A FILE, A CONTRACT-TYPE FILE ON THAT. |
| 17:02:09 | 20 | THERE WAS ONE LITIGATION ABOUT A YEAR OR SO AFTER |
| 17:02:13 | 21 | KATRINA IN WHICH WE WERE SUBPOENAED TO SUPPLY IT, AND WE DID GO |
| 17:02:16 | 22 | OUT AND FOUND THAT ABOUT -- A LITTLE LESS THAN 50 PERCENT OF |
| 17:02:20 | 23 | THE WORK WAS FOR PROPERTY OWNERS AND A LITTLE OVER 50 PERCENT |
| 17:02:25 | 24 | WAS FOR INSURANCE COMPANIES, OR PEOPLE ON THE OTHER SIDE, I |
| 17:02:29 | 25 | GUESS YOU COULD SAY. |

3302

| | | |
|---|---|---|
| 17:02:35 | 1 | **Q.**  HAVE YOU PREVIOUSLY BEEN QUALIFIED AS AN EXPERT BY ANY |
| 17:02:40 | 2 | COURT? |
| 17:02:40 | 3 | **A.**  YES, SIR. |
| 17:02:46 | 4 | **Q.**  APPROXIMATELY HOW MANY COURT PROCEEDINGS HAVE YOU |
| 17:02:49 | 5 | TESTIFIED IN AT TRIALS AS AN EXPERT WITNESS? |
| 17:02:55 | 6 | **A.**  THE LAST TIME I COUNTED, IT WAS OVER 35. |
| 17:02:56 | 7 | **Q.**  NOW, IN THIS -- EXCUSE ME -- WRONG BUTTON. |
| 17:03:02 | 8 | IN THIS LAST BULLET POINT YOU MENTION THAT YOU'VE |
| 17:03:04 | 9 | BEEN RECOGNIZED BY SEVERAL BY FEDERAL AND STATE COURTS AS AN |
| 17:03:07 | 10 | EXPERT IN CIVIL AND STRUCTURAL ENGINEERING, INCLUDING THE |
| 17:03:11 | 11 | EASTERN DISTRICT OF LOUISIANA; CORRECT? |
| 17:03:11 | 12 | **A.**  YES, SIR. |
| 17:03:12 | 13 | **Q.**  IN ADDITION TO THE EASTERN DISTRICT OF LOUISIANA, COULD |
| 17:03:15 | 14 | YOU -- DO YOU RECALL SOME OF THE OTHER COURTS IN WHICH YOU'VE |
| 17:03:17 | 15 | BEEN QUALIFIED AS AN EXPERT? |
| 17:03:19 | 16 | **A.**  WELL, WESTERN DISTRICT I WAS QUALIFIED, AND IT WAS A |
| 17:03:24 | 17 | HURRICANE RITA CASE, SIMILAR. |
| 17:03:27 | 18 | BUT IN STATE COURTS, I'VE QUALIFIED IN ORLEANS, |
| 17:03:31 | 19 | JEFFERSON, ST. BERNARD, PLAQUEMINES, ST. TAMMANY, WASHINGTON, |
| 17:03:38 | 20 | EAST BATON ROUGE, AND TERREBONNE, AND MAYBE ONE OR TWO OTHERS. |
| 17:03:44 | 21 | **Q.**  NOW, WITH REFERENCE TO THE UNITED STATES DISTRICT COURT |
| 17:03:47 | 22 | FOR THE EASTERN DISTRICT OF LOUISIANA, BY WHICH JUDGE SITTING |
| 17:03:51 | 23 | HERE IN THIS COURT HAVE YOU PREVIOUSLY BEEN QUALIFIED AS AN |
| 17:03:55 | 24 | EXPERT? |
| 17:03:56 | 25 | **A.**  QUALIFIED TWICE.  ONCE IN MARINE COLLISION, I DON'T |

| | | |
|---|---|---|
| 17:04:03 | 1 | REMEMBER, A FEW YEARS AGO, IN THE EASTERN DISTRICT.  MORE |
| 17:04:05 | 2 | RECENTLY, SUBSEQUENT TO KATRINA, I QUALIFIED IN JUDGE BARBIER'S |
| 17:04:10 | 3 | COURT.  AND THAT WAS A WIND VERSUS WATER, HOMEOWNER SUING AN |
| 17:04:16 | 4 | INSURANCE COMPANY. |
| 17:04:17 | 5 | **Q.**   AND ON BEHALF OF WHICH PARTY DID YOU SUPPLY YOUR SERVICES? |
| 17:04:23 | 6 | **A.**   I WAS WORKING FOR THE INSURANCE COMPANY ON THAT ONE. |
| 17:04:27 | 7 | THERE WAS ANOTHER CASE THAT WENT AGAINST |
| 17:04:31 | 8 | JUDGE AFRICK.  BUT AFTER THE PLAINTIFF TESTIFIED, JUDGE AFRICK |
| 17:04:37 | 9 | TOLD THE JURY TO DISREGARD WHAT THE -- THEIR EXPERT SAID AND |
| 17:04:44 | 10 | GAVE THEM MY REPORT FOR CONSIDERATION, SO I DIDN'T HAVE TO |
| 17:04:48 | 11 | TESTIFY. |
| 17:04:49 | 12 | **MR. GULOTTA:**  YOUR HONOR, AT THIS TIME, DEFENDANTS |
| 17:04:52 | 13 | TENDER MR. DANNER AS AN EXPERT IN CIVIL ENGINEERING WITH THE |
| 17:04:55 | 14 | FOCUS ON ASSESSMENT OF STORM DAMAGE. |
| 17:04:59 | 15 | **THE COURT:**  THANK YOU, SIR. |
| 17:04:59 | 16 | **MR. GULOTTA:**  MR. DANNER, MR. PALMINTIER MAY HAVE |
| 17:04:59 | 17 | SOME QUESTIONS FOR YOU. |
| 17:04:59 | 18 | **VOIR DIRE** |
| 17:05:10 | 19 | BY MR. PALMINTIER: |
| 17:05:11 | 20 | **Q.**   MR. DANNER, I'M MICHAEL PALMINTIER.  GOOD TO MEET YOU. |
| 17:05:14 | 21 | **A.**   GOOD AFTERNOON, SIR. |
| 17:05:17 | 22 | **Q.**   WE'VE NEVER MET BEFORE; CORRECT? |
| 17:05:18 | 23 | **A.**   NO, SIR. |
| 17:05:18 | 24 | **Q.**   BUT YOU'VE HAD AN OPPORTUNITY TO BE DEPOSED BY MY SON |
| 17:05:22 | 25 | JOSHUA.  IS THAT THE -- |

17:05:22   1   **A.**   AND WE GOT TO SPEND SOME TIME TOGETHER AT SOME

17:05:25   2   INSPECTIONS.

17:05:26   3   **Q.**   ONE OF THE THINGS I WANT TO TRY TO DO TODAY THROUGHOUT

17:05:28   4   YOUR TESTIMONY, IF THE JUDGE QUALIFIES YOU, IS TO MEET ONE

17:05:31   5   BASIC REQUEST.

17:05:32   6           **MR. PALMINTIER:**   I'D ASK THAT THE JUDGE BE INVOLVED

17:05:35   7   IN THIS.

17:05:35   8   **BY MR. PALMINTIER:**

17:05:35   9   **Q.**   AND THAT IS, ANSWER THE QUESTION, AND THEN YOU CAN GIVE AN

17:05:38  10   EXPLANATION.

17:05:39  11           THE PROBLEM IS THE RECORD DOESN'T SHOW WHETHER YOU

17:05:42  12   SAID YES OR NO JUST NOW, AND SO I'M GOING TO ASK YOU TO DO

17:05:44  13   THAT.

17:05:46  14           CAN WE AGREE TO THAT?

17:05:46  15   **A.**   I WILL DILIGENTLY TRY TO DO THAT.  YES, SIR.

17:05:49  16   **Q.**   SO THAT'S A YES?

17:05:50  17   **A.**   AND I KNOW YOU'LL CORRECT ME IF I DON'T.

17:05:53  18   **Q.**   EITHER I OR THE COURT WILL.

17:05:54  19   **A.**   YES, SIR.

17:05:55  20   **Q.**   SO YOU'RE NOT A WIND ENGINEER, ARE YOU?

17:06:04  21   **A.**   I GUESS I'M AS MUCH OF A WIND ENGINEER AS -- YES.

17:06:04  22           TO ANSWER YOUR QUESTION, I'D HAVE TO ANSWER THAT YES,

17:06:08  23   TO . . .

17:06:08  24   **Q.**   NOW, WHAT CERTIFICATION DO YOU HAVE TO BE A WIND ENGINEER?

17:06:13  25   **A.**   WELL, IT'S NOT AMONG THE CERTIFICATIONS.  IT'S THE TYPE OF

17:06:15   1   WORK YOU DO, AND IT'S THE TYPE OF TRAINING, AS FAR AS TAKING

17:06:16   2   THAT WIND AND WHAT YOU DO WITH THE WIND.  THAT'S THE PART THAT

17:06:20   3   I AM AN ENGINEER.

17:06:21   4           AS FAR AS DETERMINING THE FORMULAS OR TO DETERMINING

17:06:26   5   HOW YOU -- YOU TAKE A WIND SPEED, COME UP WITH THE PRESSURE AS

17:06:32   6   FAR AS THE ACTUAL FORMULA IS CONCERNED IN WIND TESTING.  THAT'S

17:06:36   7   MOSTLY DONE AT A NUMBER OF UNIVERSITIES.

17:06:39   8           BUT TO TAKE THE ACTUAL WIND AND APPLY IT TO A

17:06:42   9   STRUCTURE, THAT'S WHAT I'M AN EXPERT IN.

17:06:43  10   Q.   FINE.  BUT YOU'RE NOT -- THERE'S NO SPECIAL CERTIFICATION,

17:06:47  11   IS THERE, MR. DANNER, FOR WIND ENGINEERING?

17:06:49  12   A.   THAT'S CORRECT.  NOT THAT I KNOW OF, ANYWAY.

17:06:53  13   Q.   AND YOU'RE NOT A METEOROLOGIST, ARE YOU?

17:06:55  14   A.   NO, SIR, I'M NOT.

17:06:56  15   Q.   AND YOU'RE NOT A HYDROLOGIST OR HYDROLOGY ENGINEER, ARE

17:06:59  16   YOU, SIR?

17:07:00  17   A.   NO, SIR.  AND, AGAIN, I WILL GO AHEAD AND QUALIFY THAT.

17:07:03  18           I HAVE TAKEN HYDROLOGY IN SCHOOL.  I'VE TAKEN

17:07:06  19   METEOROLOGY IN SCHOOL.  AND AS FAR AS THE METEOROLOGICAL PARTS

17:07:10  20   IS THAT I AM NOT CAPABLE OF BEING ABLE TO FORECAST THE WEATHER.

17:07:16  21   BUT ONCE THE WEATHER DOES OCCUR -- ONCE THE WIND OR WATER

17:07:20  22   EFFECTS OCCUR AND HOW THEY ARE APPLIED TO A STRUCTURE, THAT IS

17:07:23  23   THE PART THAT I'M INVOLVED IN.  IN OTHER WORDS, ONCE THE WIND

17:07:26  24   OCCURS, IT'S STRUCTURAL ENGINEERING.

17:07:29  25           AND THE HYDROLOGY STANDPOINT, AS FAR AS MODELING AND

17:07:36   1  DETERMINING THE -- IN THIS CASE THE HYDROGRAPHS, I DON'T DO THE

17:07:43   2  HYDROGRAPHS.  I WOULD TAKE THE DATA FROM THE HYDROGRAPHS AND

17:07:47   3  APPLY IT TO THE STRUCTURE.

17:07:48   4  **Q.**   AND WHAT YOU APPLY IT TO IS DETERMINING HIGH-WATER MARK --

17:07:50   5  USE THOSE HYDROGRAPHS TO DETERMINE HIGH-WATER MARK SO YOU CAN

17:07:56   6  TALK ABOUT FLOODING; ISN'T THAT TRUE, SIR?

17:07:59   7  **A.**   NO.  I THINK THE -- I DIDN'T USE THE WORD "HIGH-WATER

17:08:01   8  MARKS," SO . . .

17:08:04   9  **Q.**   WELL, YOU MAY NOT HAVE USED IT, BUT THAT'S WHAT YOU --

17:08:08  10  **A.**   NO, I -- I SAID I DIDN'T USE THE WORD "HIGH-WATER MARKS"

17:08:13  11  JUST NOW.  IN FACT, I THINK YOU'RE PROBABLY REFERRING TO STATIC

17:08:17  12  WATER MARKS VERSUS HIGH-WATER MARKS.  BUT NORMALLY --

17:08:22  13  **Q.**   I'M SORRY.  NOT TO CUT YOU OFF, BUT I'M ASKING YOU --

17:08:24  14          **MR. GULOTTA:**  I THINK HE JUST DID CUT HIM OFF,

17:08:26  15  YOUR HONOR.  I OBJECT.

17:08:26  16          **THE COURT:**  WHAT'S THAT, SIR?

17:08:28  17          **MR. GULOTTA:**  I THINK HE DID JUST CUT HIM OFF.

17:08:29  18          **THE COURT:**  BY THE WAY, I'M GOING TO CUT EVERYBODY

17:08:31  19  OFF AT 7:00.  I'M OUT OF HERE, SO YOU-ALL -- OR THEREABOUTS.

17:08:34  20  SO, YOU KNOW, JUST KEEP THAT IN MIND.  THERE'S ONLY SO MUCH OF

17:08:40  21  THIS I CAN HEAR.

17:08:41  22  **BY MR. PALMINTIER:**

17:08:41  23  **Q.**   SO, MR. DANNER, YOU'RE NOT A HYDROLOGIST.  YOU'VE

17:08:45  24  INDICATED THAT.

17:08:46  25  **A.**   THERE -- THERE ARE --

17:08:46   1          **THE COURT:**  I KNOW HE'S NOT A HYDROLOGIST.  I KNOW

17:08:49   2   IT.  I KNOW HE ISN'T.

17:08:49   3   **BY MR. PALMINTIER:**

17:08:49   4   **Q.**   BUT YOU ARE A STRUCTURAL ENGINEER?

17:08:51   5   **A.**   YES, SIR.

17:08:51   6   **Q.**   AND YOU USE THE HYDROGRAPHS TO DETERMINE WHETHER OR NOT

17:08:55   7   THERE WAS STRUCTURAL DAMAGES TO BUILDINGS; CORRECT?

17:08:58   8   **A.**   NO, SIR.  I ACTUALLY USED THE STRUCTURE ITSELF TO

17:09:01   9   DETERMINE WHETHER OR NOT THERE WAS DAMAGE.

17:09:04  10   **Q.**   VERY GOOD.

17:09:04  11   **A.**   THE PHYSICAL EVIDENCE.

17:09:10  12          **MR. PALMINTIER:**  YOUR HONOR, TO THE EXTENT THAT HE

17:09:11  13   HE'S BEING TENDERED ONLY AS A CIVIL ENGINEER AND NOT AS ALL THE

17:09:14  14   OTHER THINGS THAT WE JUST TALKED ABOUT, WE HAVE NO OBJECTION TO

17:09:17  15   THE INTRODUCTION OF THIS WITNESS AS A STRUCTURAL AND CIVIL

17:09:19  16   ENGINEER.

17:09:22  17          **THE COURT:**  MR. GULOTTA, DO YOU WANT TO DO MAKE YOUR

17:09:23  18   FORMAL TENDER?

17:09:25  19          **MR. GULOTTA:**  YES, YOUR HONOR.  THE DEFENDANTS TENDER

17:09:27  20   MR. DANNER AS AN EXPERT IN CIVIL ENGINEERING WITH A FOCUS ON

17:09:31  21   STORM DAMAGE ASSESSMENT.

17:09:33  22          **THE COURT:**  ANY OBJECTION?

17:09:34  23          **MR. PALMINTIER:**  WE ACCEPT HIM WITH THOSE

17:09:36  24   LIMITATIONS, YOUR HONOR, AS WE DID IN OUR VOIR DIRE.

17:09:40  25          **THE COURT:**  THE COURT ACCEPTS HIM AS TENDERED.

17:09:43    1                **MR. GULOTTA:**  THANK YOU, YOUR HONOR.

17:09:48    2                **MR. PALMINTIER:**  AND, YOUR HONOR, BEFORE WE GET

17:09:49    3    STARTED, WE'VE BEEN PROVIDED WITH A SLIDE PRESENTATION, AND

17:09:52    4    THERE ARE ELEMENTS OF THAT SLIDE PRESENTATION WITH WHICH WE --

17:09:56    5    WE WILL VISIT OBJECTIONS.

17:09:57    6                I WONDER IF THE COURT WOULD ENTERTAIN OUR DOING

17:09:59    7    SO NOW BEFORE THAT SLIDE GETS PRESENTED.

17:10:03    8                **THE COURT:**  I THINK IT'S PROBABLY BETTER.  BECAUSE

17:10:08    9    THEN WE'LL HAVE TO GO THROUGH EACH AND EVERY ONE.  LET ME DO IT

17:10:12   10    IN GLOBO, COUNSEL.  I KNOW IT DISRUPTS YOUR EXAMINATION, BUT IT

17:10:14   11    ALSO MIGHT BE LESS DISRUPTIVE WE OBJECT TO EACH ONE AS WE GO

17:10:14   12    ALONG THEN HAVE TO HARANGUE OVER IT.

17:10:22   13                **MR. GULOTTA:**  YOUR HONOR, I WOULD POINT OUT THAT

17:10:23   14    NEARLY -- I CAN'T SAY EVERY ONE, BUT NEARLY EVERY ONE OF THESE

17:10:28   15    SLIDES IS SIMPLY A PREPRODUCTION OF STATEMENTS FROM HIS REPORT

17:10:31   16    OR SUMMARIES FROM HIS REPORT.

17:10:33   17                **THE COURT:**  TO THE EXTENT THEY'RE IN HIS REPORT,

17:10:36   18    THERE'S BEEN NO *DAUBERT* HEARING WHERE I STRUCK IT, THAT IS FAIR

17:10:40   19    GAME.

17:10:41   20                **MR. GULOTTA:**  IN FACT, HIS REPORT, AS WE'VE AGREED,

17:10:44   21    ON COUNSEL --

17:10:45   22                **THE COURT:**  IS IN EVIDENCE.

17:10:46   23                **MR. GULOTTA:**  -- IS IN EVIDENCE.

17:10:47   24                **THE COURT:**  OKAY.  SO . . .

17:10:48   25                **MR. PALMINTIER:**  YES, SIR.  BUT, YOUR HONOR, WHAT

17:10:49   1   WE'RE REFERRING TO IS THE COURT IN ITS MOTION IN LIMINE -- IN

17:10:52   2   ITS RESPONSE TO PLAINTIFFS' MOTION IN LIMINE, SAID THE

17:10:55   3   FOLLOWING:  "THE COURT WILL NOT ALLOW THE ADMISSION OF

17:10:58   4   ADJUSTERS' OPINIONS, REPORTS AND OTHER SUCH DATA."

17:11:00   5            AND THAT IS THE RULE OF THIS CASE, AS WE

17:11:04   6   UNDERSTAND IT.  AND WE -- AND ONE OF THE -- ONE OF THE VERY

17:11:08   7   REFERENCES THAT WE'RE OBJECTING TO SAYS "AVAILABLE INSURANCE

17:11:12   8   CLAIMS FILES."

17:11:13   9            WE OBJECT TO THAT INTRODUCTION.  THE COURT HAS

17:11:15   10  RULED IT CAN'T BE INTRODUCED.

17:11:17   11        **THE COURT:**  IT DEPENDS ON WHAT IT IS.  IF IT'S A

17:11:20   12  PHOTOGRAPH, I SAID IT COULD.  I'M NOT SURE WHAT IT IS.  BUT NO,

17:11:24   13  I DON'T WANT AN ADJUSTER'S OPINION COMING THROUGH THE BACK

17:11:27   14  DOOR.

17:11:28   15            AND WE HAVE AN EXPERT HERE.  HE OUGHT TO -- I'M

17:11:30   16  ASSUMING HE'S -- IF HE'S RELYING ON AN ADJUSTER'S OPINION, THAT

17:11:32   17  WOULD BE SOMETHING ELSE.  I HOPE THAT'S NOT THE CASE.

17:11:35   18        **MR. GULOTTA:**  THAT'S NOT THE CASE, YOUR HONOR.  AND

17:11:37   19  IF I MAY BE HEARD ON THAT.

17:11:38   20            MR. DANNER, AS YOU WILL LEARN, DID TAKE INTO

17:11:42   21  CONSIDERATION ADJUSTER REPORTS.  HE LISTED THEM AS REFERENCE OR

17:11:46   22  CONSIDERED ITEMS OR RELIANCE MATERIALS IN HIS EXPERT REPORT.

17:11:50   23  HIS EXPERT REPORT IS NOW IN EVIDENCE.

17:11:52   24            ALSO, YOUR HONOR, AN EXPERT, AS YOU KNOW, UNDER

17:11:55   25  RULE 703 -- AND IT'S NOT IMPORTANT, BUT I THINK IF WE'RE

17:11:58   1   TALKING ABOUT THE RULES, LET'S TALK ABOUT THE RULES.

17:12:00   2                    UNDER EVIDENCE RULE 703 AN EXPERT MAY CONSIDER

17:12:04   3   EVIDENCE THAT WOULD OTHERWISE BE --

17:12:06   4            **THE COURT:**  YOU HAVE TO ESTABLISH THAT AN ENGINEER

17:12:07   5   RELIES ON AN ADJUSTER'S REPORT TO DERIVE HIS OPINION.

17:12:12   6            **MR. GULOTTA:**  THAT'S CORRECT, IF IT'S SOMETHING THAT

17:12:13   7   HE REASONABLY RELIES UPON.

17:12:15   8            **MR. PALMINTIER:**  BUT, JUDGE, YOU'VE ALREADY RULED ON

17:12:18   9   THAT.

17:12:19  10            **THE COURT:**  OKAY.  I UNDERSTAND.  I UNDERSTAND.  IT

17:12:22  11   WASN'T NECESSARILY -- BUT LET ME SAY THIS.

17:12:24  12                    TO THE EXTENT THAT IT'S RELYING ON AN ADJUSTER'S

17:12:27  13   REPORT, IT'S NOT GOING TO HELP HIM ANY.  YOU MIGHT WANT IT TO

17:12:31  14   COME IN.

17:12:31  15            **MR. GULOTTA:**  AND I THINK THAT WHAT I'LL ELICIT FROM

17:12:33  16   MR. DANNER IS HE'S RELIED ON PHOTOS TAKEN AT CONTEMPORANEOUS

17:12:35  17   TIMES --

17:12:36  18            **THE COURT:**  PHOTOS I'M NOT CONCERNED ABOUT.

17:12:38  19            **MR. PALMINTIER:**  THAT'S NOT THE NATURE OF OUR

17:12:39  20   OBJECTION EITHER, YOUR HONOR.

17:12:41  21            **THE COURT:**  I'M NOT CONCERNED ABOUT THE PHOTOS.

17:12:43  22            **MR. GULOTTA:**  OKAY.  ALL RIGHT.

17:12:44  23            **THE COURT:**  I'M INTERESTED IN HIS OPINION ON HIS

17:12:46  24   OBSERVATIONS BASED ON THE FORENSIC EVIDENCE HE LOOKED AT,

17:12:52  25   INCLUDING PHOTOGRAPHS.

17:12:53   1            **MR. GULOTTA:**  MAY I PROCEED?

17:12:58   2            **MR. PALMINTIER:**  WELL, SUBJECT TO THE OBJECTION

17:13:00   3   HAVING BEEN SUSTAINED.

17:13:04   4            **THE COURT:**  YES, YES, YOU MAY PROCEED.  THE OBJECTION

17:13:04   5   IS MADE -- I HAVEN'T -- I HAVEN'T SUSTAINED ANY SPECIFIC

17:13:10   6   OBJECTIONS TO ANY SPECIFIC SLIDE.  I JUST -- AND AS I

17:13:16   7   UNDERSTAND IT, WE'RE NOT GOING TO BE LOOKING AT ADJUSTERS'

17:13:18   8   OPINIONS.

17:13:19   9            **MR. GULOTTA:**  WE WILL NOT.

17:13:20  10            **THE COURT:**  ALL RIGHT.  LET'S MOVE ON.

17:13:26  11            **MR. GULOTTA:**  OKAY.

17:13:27  12            **THE COURT:**  I AM INDULGING YOU IN BEING HERE UNTIL

17:13:31  13   7:00, SO I EXPECT EVERYBODY TO BE -- GET ON THE BALL AND GET TO

17:13:34  14   IT.  THIS IS NOT ROCKET SCIENCE.  IT'S NOT NEARLY AS

17:13:40  15   COMPLICATED AS THE OTHER STUFF WE'VE BEEN THROUGH.

17:13:43  16            **MR. GULOTTA:**  YES, YOUR HONOR.

17:13:43  17            **THE COURT:**  HOUSES GOT A LOT OF WATER IN THEM, WHAT

17:13:46  18   HAPPENED, AND THERE WAS A LOT OF WIND.  HOW MUCH DAMAGE?

17:13:48  19            **MR. GULOTTA:**  THAT'S CORRECT, YOUR HONOR.  THAT'S

17:13:49  20   EXACTLY WHERE WE'RE GOING.

17:13:49  21                         **DIRECT EXAMINATION**

          22   BY MR. GULOTTA:

17:13:51  23   **Q.**   IN FACT, MR. DANNER, LOOKING AT THIS NEXT SLIDE, IT DOES

17:13:55  24   LIST THE ITEMS OF INFORMATION THAT YOU CONSIDERED IN

17:13:58  25   FORMULATING YOUR OPINIONS AND COMPLETING YOUR REPORTS IN THIS

3312

| | | |
|---|---|---|
| 17:14:01 | 1 | CASE; IS THAT CORRECT? |
| 17:14:02 | 2 | **A.**   YES, SIR. |
| 17:14:08 | 3 | **Q.**   NOW, WITH RESPECT TO SITE INSPECTIONS, YOU PHYSICALLY AND |
| 17:14:12 | 4 | PERSONALLY INSPECTED EACH ONE OF THE PLAINTIFF RESIDENT SITES; |
| 17:14:19 | 5 | ISN'T THAT CORRECT? |
| 17:14:20 | 6 | **A.**   YES, SIR.  IN SOME CASES THERE WAS MORE TO INSPECT THAN |
| 17:14:23 | 7 | OTHERS. |
| 17:14:24 | 8 | TWO OF THE RESIDENCES WERE IN FAIRLY GOOD CONDITION. |
| 17:14:31 | 9 | ONE OF THEM WAS IN -- ONE WAS GONE.  ONE, AT THE TIME I |
| 17:14:37 | 10 | INSPECTED, THERE WAS STILL A SLAB, WHICH IS THE ARMSTRONG |
| 17:14:41 | 11 | RESIDENCE. |
| 17:14:41 | 12 | AND THE WASHINGTON RESIDENCE HAD BEEN REPLACED.  BUT |
| 17:14:45 | 13 | I WAS ABLE IT GET A PRETTY GOOD INSPECTION ON THE COATS |
| 17:14:49 | 14 | RESIDENCE AND THE LIVERS RESIDENCE. |
| 17:14:53 | 15 | **Q.**   OKAY.  VERY GOOD. |
| 17:14:54 | 16 | NOW, WITH RESPECT TO -- EXCUSE ME -- AVAILABLE |
| 17:14:59 | 17 | PHOTOGRAPHS, WHAT WERE THE SOURCES OF THE PHOTOGRAPHS THAT YOU |
| 17:15:01 | 18 | USED? |
| 17:15:03 | 19 | **A.**   I USED PHOTOGRAPHS THAT WERE SUPPLIED BY THE HOMEOWNERS, |
| 17:15:08 | 20 | SOME OF THE PHOTOGRAPHS SUPPLIED BY INSURANCE ADJUSTERS, PEOPLE |
| 17:15:13 | 21 | THAT HAD BEEN OUT THERE BEFORE -- EXCUSE ME, AFTER THE STORM. |
| 17:15:18 | 22 | SOME OF THEM -- MR. TAYLOR SUPPLIED PHOTOGRAPHS.  AND, OF |
| 17:15:23 | 23 | COURSE, MY OWN. |
| 17:15:29 | 24 | **Q.**   NOW, WE DO HAVE LISTED HERE, OF COURSE, YOUR AVAILABLE |
| 17:15:35 | 25 | INSURANCE CLAIM FILES. |

17:15:38   1          JUST TO GET THIS OUT OF THE WAY, IN REVIEWING THE

17:15:41   2   INSURANCE CLAIM FILES, YOU EXERCISED YOUR OWN PROFESSIONAL

17:15:43   3   JUDGMENT, DID YOU NOT?

17:15:45   4   **A.**   YES, SIR.

17:15:46   5              **MR. PALMINTIER:**  OBJECTION, YOUR HONOR.

17:15:47   6              **MR. GULOTTA:**  I'M TRYING TO SOLVE THE OBJECTION.

17:15:50   7              **THE COURT:**  RIGHT.  I UNDERSTAND.  I UNDERSTAND.

17:15:54   8              **THE WITNESS:**  IN THIS CASE, I -- I TRY TO LOOK AT

17:15:55   9   WHATEVER'S AVAILABLE.  AND IN THIS CASE -- AND WE HAD PLAINTIFF

17:15:59  10   DEPOSITIONS, WE HAD ESTIMATES THAT WERE DONE FOR THE

17:16:05  11   HOMEOWNERS.  INSURANCE ADJUSTERS HAD COME OUT.  AND WE TRIED TO

17:16:10  12   DETERMINE WHAT DAMAGE WAS THERE, WHAT DID SOMEBODY ELSE SEE, TO

17:16:15  13   GET AN IDEA WHETHER -- WHAT IS THE ACTUAL WIND DAMAGE OR

17:16:19  14   EVIDENCE OF WIND DAMAGE?

17:16:22  15              AND NOT ALWAYS DO I AGREE WITH AN INSURANCE

17:16:24  16   ADJUSTER.  SOMETIMES I MIGHT AGREE WITH SOME OF IT, BUT NOT ALL

17:16:28  17   OF IT.  IT'S JUST HIS ASSESSMENTS OR THEIR ASSESSMENT USED JUST

17:16:32  18   OF -- LIKE, I'M GOING TO LOOK AT EVERYBODY ELSE'S ASSESSMENTS

17:16:37  19   IN EVIDENCE.

17:16:38  20   **BY MR. GULOTTA:**

17:16:38  21   **Q.**   DID YOU BLINDLY ACCEPT ANY INSURANCE ADJUSTER'S ASSESSMENT

17:16:45  22   IN FORMULATING YOUR OPINIONS IN THIS CASE?

17:16:47  23              **MR. PALMINTIER:**  I'LL MAKE IN GENERAL, YOUR HONOR.

17:16:48  24              **THE COURT:**  YOU MADE IT, GENERAL.

17:16:49  25              **THE WITNESS:**  I'VE -- NO.  TO ANSWER YOUR QUESTION,

17:16:51   1   I'VE LOOKED AT WAY TOO MANY ADJUSTERS' ESTIMATES OVER THE

17:16:54   2   YEARS, AND THEY'RE -- FROM BOTH THE INSURANCE STANDPOINT OR A

17:17:00   3   PUBLIC ADJUSTER.  AND QUITE OFTEN I GET A LOT OF INFORMATION

17:17:05   4   OUT OF IT, BUT I HAVE TO MAKE ANY OWN DETERMINATION OPINION OF

17:17:10   5   WHAT IS ACTUALLY IN EVIDENCE -- OR WHAT WAS ACTUALLY DAMAGED.

17:17:17   6   **BY MR. GULOTTA:**

17:17:17   7   **Q.**   OKAY.  ALL RIGHT.  AND, OF COURSE, YOU WROTE AND ISSUED

17:17:22   8   REPORTS ON ALL OF THE PLAINTIFF RESIDENCES IN THIS CASE; IS

17:17:25   9   THAT CORRECT?

17:17:25  10   **A.**   YES, SIR.

17:17:27  11   **Q.**   AND WE'VE LISTED HERE, FOR THE BENEFIT OF THE COURT, BY

17:17:34  12   EXHIBIT NUMBER -- ALL OF THE REPORTS THAT YOU ISSUED IN THIS

17:17:39  13   CASE BY EXHIBIT NUMBER.

17:17:44  14           **MR. GULOTTA:**  AND BY PRIOR AGREEMENT, YOUR HONOR, ALL

17:17:46  15   OF THESE ITEMS HAVE PREVIOUSLY BEEN ADMITTED INTO EVIDENCE.

17:17:49  16           **THE COURT:**  YES, SIR.  YES, SIR.

17:17:51  17           **MR. PALMINTIER:**  YES, SIR.

17:17:52  18   **BY MR. GULOTTA:**

17:17:52  19   **Q.**   OKAY.  NOW, MR. DANNER, WE'VE GOT A GOOGLE MAP HERE WHICH

17:17:55  20   IS SUPERIMPOSED WITH SOME PUSHPINS TO INDICATE LOCATIONS.

17:18:01  21           NOW, DID YOU PERSONALLY VISIT ALL OF THESE LOCATIONS?

17:18:07  22   **A.**   YES, SIR.

17:18:08  23   **Q.**   NOW, WE HAVE HERE, UNDER MR. WASHINGTON'S NAME, A PUSHPIN

17:18:14  24   WHICH IS THE RESIDENCE LOCATED ON DERBIGNY STREET; IS THAT

17:18:20  25   RIGHT?

17:18:21   1   **A.**   YES, SIR.

17:18:22   2   **Q.**   OKAY.  NOW, YOU DID, IN THE COURSE OF THIS CASE,

17:18:26   3   PERSONALLY VISIT DERBIGNY, BUT IT'S NOW NO LONGER AT ISSUE IN

17:18:30   4   THE CASE.  IS THAT YOUR UNDERSTANDING?

17:18:32   5   **A.**   YES, SIR.

17:18:33   6   **Q.**   NOW, LOCATION NO. 6 HERE, THIS PUSHPIN IS ACTUALLY THE

17:18:38   7   WASHINGTON RESIDENCE LOCATED AT CHARBONNET STREET; IS THAT

17:18:46   8   CORRECT?

17:18:47   9   **A.**   YES, SIR.

17:18:47  10   **Q.**   OKAY.  AND YOU VISITED THE WASHINGTON CHARBONNET LOCATION

17:18:50  11   AND PERSONALLY INSPECTED THAT IN CONNECTION WITH YOUR

17:18:53  12   ENGAGEMENT, DID YOU NOT?

17:18:55  13   **A.**   YES, SIR.

17:18:55  14   **Q.**   I SEEM TO RECALL JUDGE DUVAL ASKING MR. CRAWFORD WHEN HE

17:19:02  15   TESTIFIED WHAT THE APPROXIMATE DISTANCE OF THE WASHINGTON

17:19:05  16   CHARBONNET DISTANCE WAS FROM THE IHNC.  CAN YOU HELP

17:19:09  17   JUDGE DUVAL OUT WITH THAT ESTIMATE?

17:19:13  18   **A.**   IT'S APPROXIMATELY ABOUT 3600 FEET OR .7 MILES OR 12 CITY

17:19:19  19   BLOCKS.

17:19:21  20   **Q.**   12 BLOCKS.  OKAY.  THAT WOULD HELP ME.

17:19:23  21              **THE WITNESS:**  THEY'RE SMALL BLOCKS, NOT THE BIG ONES,

17:19:25  22   JUDGE.

17:19:26  23              **THE COURT:**  RIGHT.  I GOTCHA.

17:19:31  24   **BY MR. GULOTTA:**

17:19:31  25   **Q.**   COULD YOU TELL THE COURT BRIEFLY WHAT YOUR INSPECTIONS

17:19:37  1  CONSISTED OF WHEN YOU INSPECTED EACH OF THESE SITES?

17:19:39  2  **A.**   NORMALLY, I GO OUT AND PHOTOGRAPH THE AREA, LOOK AT THE --

17:19:44  3  LOOK AT THE OTHER BUILDINGS AND STRUCTURES -- WHEN I SAY

17:19:48  4  STRUCTURES, I MEAN RESIDENCE, COMMERCIAL, EVERYTHING, SIGNS,

17:19:52  5  WHATEVER, TO GET AN IDEA OF THE TYPE OF DAMAGE THAT THEY MAY

17:19:57  6  HAVE.  WHETHER IT'S WIND DAMAGE OR WATER DAMAGE, YOU TYPICALLY

17:20:02  7  GET A -- WHEN YOU FIRST COME OUT, YOU REALLY DON'T KNOW WHAT

17:20:07  8  THE ELEVATIONS ARE.

17:20:08  9       SO YOU GET AN IDEA OF THE TOPOGRAPHY, WHERE YOU'RE AT

17:20:13  10  RELATIVE TO SOMEWHERE BETWEEN THE RIVER, WHICH IS HIGH, AND IN

17:20:15  11  THIS CASE I THINK THEY CALL IT THE MIDDLE GROUND OR FLORIDA

17:20:23  12  AVENUE TO GET AN IDEA OF WHAT'S HIGH AND WHAT'S LOW RELATIVE TO

17:20:27  13  THE ELEVATION.

17:20:28  14       ONCE I GET TO THE SITE ITSELF, I, AGAIN, TAKE

17:20:31  15  PICTURES OF THE HOUSE, TAKE PICTURES OF ANY SURROUNDING HOUSES.

17:20:35  16  NORMALLY I FIND I'LL -- IF THERE'S SOMETHING THERE, I WILL MAKE

17:20:43  17  A FLOOR PLAN OF IT, WHICH IS A DIAGRAM WHICH ALLOWS ME TO MARK

17:20:50  18  DOWN, DEPICT WHERE THE DAMAGES ARE OR NOT.  THEN I WILL GO

17:20:57  19  THROUGH AND LOOK FOR THE DAMAGES AND THEN TAKE THEM DOWN AND

17:21:01  20  THEN TAKE PICTURES OF THEM.

17:21:03  21       IN THIS PARTICULAR CASE, I ALSO LOOKED TO TRY TO

17:21:07  22  DETERMINE IF THERE'S ANY STATIC WATER MARKS OR EVIDENCE OF HOW

17:21:13  23  HIGH THE WATER GOT.  AND WHEN I DID THE -- THESE, I ACTUALLY

17:21:19  24  BROUGHT A -- AT LEAST FOR THE ONES I DID IN '07 AND THE ONES I

17:21:26  25  DID LAST YEAR, I BROUGHT A SURVEYOR OUT, BECAUSE EVEN THOUGH I

17:21:30   1   CAN -- AND I'LL MEASURE THE DISTANCE FROM THE STATIC WATER MARK

17:21:34   2   DOWN TO THE FLOOR OF THE GROUND.  HE CAN ACTUALLY GIVE ME THE

17:21:39   3   ELEVATION.

17:21:40   4   **Q.**   THAT WOULD BE THE ELEVATION OF THE NATURAL SITE ON WHICH

17:21:46   5   THE HOUSE IS --

17:21:46   6   **A.**   HE'LL GIVE ME THE ELEVATION OF THE ADJACENT GROUND AND A

17:21:50   7   HIGH -- A HIGH -- THE HIGHEST ADJACENT GROUND, LOWEST ADJACENT

17:21:55   8   GROUND.  HE GIVES THE ELEVATION OF THE LOWEST FLOOR, THE

17:22:00   9   HIGHEST FLOOR.  AND IN THIS CASE I ASKED HIM ACTUALLY IF WE

17:22:05   10   FOUND SOMETIME THE ELEVATION OF ANY STATIC WATER MARKS.

17:22:10   11   **Q.**   OKAY.  NOW, YOU MENTIONED YOU DEVELOPED FLOOR PLANS IN

17:22:13   12   CONNECTION WITH YOUR ENGAGEMENT.  HOW DID YOU DO THAT IN THE

17:22:16   13   CASE OF, SAY, THE HOLMES OR THE ARMSTRONG RESIDENCE, WHICH WERE

17:22:22   14   DEMOLISHED BY THE TIME YOU FIRST VISITED THEM?

17:22:25   15   **A.**   ARMSTRONG WAS A LOT EASIER BECAUSE WHEN I WENT OUT THERE

17:22:27   16   IN 2007, THE SLAB WAS THERE, THE FOUNDATION, FLOOR SLAB.  AND I

17:22:30   17   WAS ABLE TO MEASURE THAT FLOOR SLAB.  IN ADDITION, EVEN THOUGH

17:22:37   18   THE WALL FRAMING HAD BEEN REMOVED, YOU COULD CLEARLY SEE WHERE

17:22:40   19   THE WALLS WERE.  SO YOU COULD ACTUALLY -- YOU COULD SEE WHERE

17:22:44   20   THE BATHROOMS ARE, YOU COULD SEE WHERE THE KITCHEN IS AND WHERE

17:22:48   21   THE DOORS ARE.  TOOK SOME SIMPLE MEASUREMENTS.

17:22:55   22        NOW, HOLMES WAS A LOT MORE DIFFICULT BECAUSE BY THE

17:22:58   23   TIME I GOT THERE, THERE WAS NOTHING THERE BUT A GRASSY FIELD.

17:23:03   24   SO I RELIED ON SKETCHES THAT WERE DONE BY INSURANCE ADJUSTERS,

17:23:06   25   DETERMINATIONS AND TESTIMONY FROM MR. HOLMES IN HIS DEPOSITION,

3318

17:23:11  1   SATELLITE PHOTOGRAPHS TO -- AND KNOWLEDGE OF A RESIDENCE OF

17:23:19  2   ABOUT THAT NATURE.  SO I WAS ABLE TO PUT IT TOGETHER.

17:23:25  3           OBVIOUSLY, FLOOR PLAN FOR THE COATS RESIDENCE.

17:23:28  4           SO THE LIVERS RESIDENCE IS GOING TO BE A LOT MORE

17:23:31  5   ACCURATE THAN THE ONE I WOULD HAVE DONE FOR HOLMES, WHICH IS ME

17:23:34  6   JUST USING FORENSIC TECHNIQUES.

17:23:40  7   Q.   OKAY.  NOW, THIS IS A SLIDE, MR. DANNER, THAT I GUESS I

17:23:46  8   MAY HAVE GILDED THE LILY BY OVER -- OVER-DESCRIBING THE TERM

17:23:55  9   "METHODOLOGY," BUT WHAT WE'VE GOT HERE IS WE'VE GOT A

17:23:58  10  PHOTOGRAPH OF THE COATS RESIDENCE WITH SOME BOXES SUPERIMPOSED

17:24:02  11  ON THIS -- THESE BOXES -- WIND, ALL CAUSES OF FLOODING, IHNC

17:24:08  12  FLOODWATERS.

17:24:08  13           IS IT FAIR TO SAY THAT WHAT'S REPRESENTED HERE ARE

17:24:10  14  THE PARTS -- THREE PARTS OR COMPONENTS OF YOUR ENGAGEMENT IN

17:24:15  15  THIS CASE?

17:24:16  16  A.   YES, SIR.

17:24:17  17  Q.   AND IS IT FAIR TO SAY THAT ONE OF THE FIRST THINGS THAT

17:24:20  18  YOU WERE ASKED TO LOOK AT AND THAT YOU LOOKED AT WAS THE DEGREE

17:24:23  19  OF WIND DAMAGE SUSTAINED BY THESE RESIDENCES?  CORRECT?

17:24:28  20  A.   YES, SIR.

17:24:29  21  Q.   AND THEN AFTER THAT OR SIMULTANEOUSLY, YOU MADE AN EFFORT

17:24:32  22  TO DETERMINE THE ELEMENTS OR COMPONENTS OF THE RESIDENCES THAT

17:24:38  23  WERE DAMAGED FROM -- ALL CAUSES OF THE FLOODING, OR ANOTHER WAY

17:24:41  24  OF STATING IT, THE ACTUAL FLOODING THAT OCCURRED AS A RESULT OF

17:24:44  25  KATRINA?

17:24:45   1   **A.**   YES, SIR.

17:24:46   2   **Q.**   AND THEN LATER ON WHEN YOU WERE IN POSSESSION OF

17:24:51   3   HYDROLOGICAL REPORTS FROM BOTH THE PLAINTIFFS' EXPERTS AND

17:24:59   4   MR. DALRYMPLE, THE DEFENSE HYDROLOGY EXPERT, YOU WERE ASKED TO

17:25:03   5   TRY TO DISTINGUISH THOSE ELEMENTS OF DAMAGE CAUSED BY FLOOD,

17:25:07   6   THOSE WHICH WERE CAUSED BY IHNC FLOODWATERS AS DISTINGUISHED

17:25:11   7   FROM ALL CAUSES?

17:25:13   8   **A.**   YES, SIR.  THAT'S WHEN I USED THE HYDROGRAPHS.

17:25:25   9   **Q.**   NOW, YOU MENTIONED THAT YOU DID TAKE INTO CONSIDERATION

17:25:29  10   METEOROLOGICAL REPORTS IN YOUR ANALYSIS.  HOW DID YOU USE

17:25:34  11   THOSE?

17:25:35  12   **A.**   MOSTLY WHAT -- I USED THOSE TO DETERMINE WHETHER OR NOT IN

17:25:39  13   THIS PARTICULAR CASE WHAT CAME FIRST, THE WIND OR THE FLOODING

17:25:43  14   AND HOW MUCH WAS THE WIND.

17:25:49  15         AGAIN, WHEN YOU'RE OUT DOING THIS FIELDWORK, UP UNTIL

17:25:56  16   THIS STUFF -- THE PARTICULAR EVIDENCE OR WHATEVER, UNTIL IT GOT

17:25:59  17   INTO SOME TYPE OF LITIGATION OR SOMETHING, YOU WOULDN'T HAVE

17:26:02  18   HAD METEOROLOGICAL REPORTS.

17:26:04  19         OTHER THAN THE METEOROLOGICAL REPORTS, THE TROPICAL

17:26:08  20   CYCLONE REPORTS ARE THE TYPE OF STUFF THAT I GET FROM THE

17:26:11  21   NATIONAL HURRICANE CENTER, WHICH WOULD ASCERTAIN THE AMOUNT OF

17:26:16  22   WIND.  LATER ON I USED THE SITE-SPECIFIC REPORTS TO BE ABLE TO

17:26:25  23   DETERMINE WHETHER OR NOT THE WIND OCCURRED AND THEN THE

17:26:29  24   FLOODING OCCURRED AND AT WHAT VELOCITIES AND ESSENTIALLY AT

17:26:35  25   WHAT TIME.

17:26:36  1  **Q.**  DID YOU OBTAIN SITE-SPECIFIC METEOROLOGICAL REPORTS FOR

17:26:40  2  EACH ONE OF THE RESIDENCES IN THIS CASE?

17:26:41  3  **A.**  YES, I DID.

17:26:41  4  **Q.**  FROM WHOM DID YOU OBTAIN THOSE REPORTS?

17:26:44  5  **A.**  DR. BARRY KEIM, LOUISIANA STATE CLIMATOLOGIST AT LSU.

17:26:49  6  **Q.**  AND ARE HIS REPORTS ATTACHED TO YOUR REPORTS --

17:26:51  7  **A.**  YES, SIR.

17:26:52  8  **Q.**  -- IN THIS CASE?

17:27:05  9  AND NOW AT THIS POINT WE BEGIN TO SUMMARIZE WITH

17:27:08  10  VARIOUS BULLET POINTS THE CONCLUSIONS YOU REACHED IN CONNECTION

17:27:11  11  WITH THIS ENGAGEMENT.

17:27:13  12  THE FIRST BULLET POINT SAYS:  "THE DAMAGE TO ALL

17:27:17  13  PLAINTIFFS' RESIDENCES RELATED TO THE PASSAGE OF HURRICANE

17:27:19  14  KATRINA WAS CAUSED BY A COMBINATION OF FLOODING, WIND, AND

17:27:22  15  RAIN."

17:27:23  16  IS THAT YOUR -- ONE OF YOUR OPINIONS?

17:27:26  17  **A.**  YES, SIR.

17:27:26  18  **Q.**  AND THAT APPLIES TO ALL PLAINTIFF RESIDENCES; CORRECT?

17:27:29  19  **A.**  YES, SIR.

17:27:29  20  **Q.**  SO ALL RESIDENCES SUSTAINED AT LEAST SOME WIND DAMAGE?

17:27:32  21  **A.**  BASED ON EVERYTHING I LOOKED AT, YES, SIR.

17:27:37  22  **Q.**  AND THE ELEMENTS DAMAGED BY WIND THAT YOU WERE ABLE TO

17:27:42  23  DETERMINE AT EACH RESIDENCE ARE IDENTIFIED IN YOUR REPORTS; IS

17:27:46  24  THAT CORRECT?

17:27:46  25  **A.**  YES, SIR.

17:27:46   1   **Q.**   NOW, BY ELEMENTS, MR. DANNER, WERE YOU ASKED TO ACTUALLY

17:27:51   2   PRICE THE COST OF REPAIRS OF ANY OF THE ELEMENTS OF DAMAGE BY

17:27:57   3   WIND OR FLOOD THAT YOU DETERMINED?

17:27:59   4   **A.**   NO, SIR.  I DETERMINED WHAT'S DAMAGED AND THE EXTENT OF

17:28:03   5   THE DAMAGES, AND THEN SOMEBODY ELSE WILL ACTUALLY RUN THE

17:28:07   6   NUMBERS.

17:28:08   7   **Q.**   OKAY.  AND JUDGE --

17:28:10   8   **A.**   COST ESTIMATES.  I'M SORRY.

17:28:11   9   **Q.**   JUDGE DUVAL WILL HEAR FROM MR. DU PLESSIS LATER ON.  HE

17:28:15   10  WAS ONE WHO, FOR THE DEFENDANTS, PRICED THE REPAIRS.

17:28:20   11  **A.**   YES, SIR.

17:28:21   12  **Q.**   ALL RIGHT.  THIRD BULLET POINT IN YOUR SUMMARY CONCLUSIONS

17:28:24   13  IS:  "ALL PLAINTIFF RESIDENCES COULD HAVE BEEN REPAIRED, AND

17:28:28   14  NONE REQUIRED TOTAL DEMOLITION."

17:28:29   15       IS THAT CORRECT?

17:28:30   16  **A.**   YES, SIR.

17:28:56   17  **Q.**   NOW, MR. DANNER, IT IS A FACT, IS IT NOT, THAT BY THE TIME

17:29:00   18  YOU INSPECTED THE -- FOR EXAMPLE, THE HOLMES -- HOLMES,

17:29:05   19  ARMSTRONG, AND EVEN THE WASHINGTON RESIDENCE, ALL THREE OF

17:29:09   20  THOSE RESIDENCES WERE DEMOLISHED?  IS THAT RIGHT?

17:29:13   21  **A.**   WITH THE EXCEPTION THAT ARMSTRONG DID HAVE A FOUNDATION

17:29:16   22  SLAB WHEN I LOOKED AT IT.

17:29:17   23  **Q.**   BUT IT IS YOUR, NONETHELESS, OPINION THAT -- BASED ON THE

17:29:20   24  INFORMATION THAT YOU REVIEWED, IT'S YOUR OPINION THAT THOSE --

17:29:24   25  EACH OF THOSE HOMES COULD HAVE BEEN REPAIRED AND NEED NOT HAVE

17:29:27  1   BEEN TOTALLY DEMOLISHED; IS THAT CORRECT?

17:29:31  2   **A.**   BASED ON EVERYTHING I LOOKED AT AND ALL OF THE RELIANCE

17:29:34  3   MATERIALS AND SIMILAR RESIDENCES IN THAT AREA AND THE SIMILAR

17:29:38  4   DAMAGES THROUGHOUT SOUTHEAST LOUISIANA, I SAW NOTHING THAT

17:29:43  5   WOULD HAVE PRECLUDED THOSE RESIDENCES FROM BEING REBUILT.

17:29:47  6   **Q.**   NOW, YOU WERE PRESENT IN THE COURT LAST WEEK WHEN

17:29:50  7   MR. TAYLOR AND MR. CRAWFORD TESTIFIED ON BEHALF OF THE

17:29:54  8   PLAINTIFFS IN THIS CASE; IS THAT CORRECT?

17:29:55  9   **A.**   YES, SIR.

17:29:56  10  **Q.**   DO YOU RECALL HEARING BOTH OF THOSE GENTLEMEN EXPRESSING

17:29:59  11  THE OPINION THAT BECAUSE OF THE DURATION OF STANDING

17:30:03  12  FLOODWATERS IN, FOR EXAMPLE, THE ARMSTRONG AND HOLMES

17:30:07  13  RESIDENCES, THOSE RESIDENCES REQUIRED TOTAL DEMOLITION AND

17:30:11  14  COULD NOT BE REPAIRED?

17:30:12  15  **A.**   YES, SIR.  ESSENTIALLY THAT, YES, SIR.

17:30:17  16  **Q.**   DO YOU AGREE WITH THE OPINIONS OF MR. CRAWFORD AND

17:30:20  17  MR. TAYLOR?

17:30:21  18  **A.**   NO, SIR.  NO, SIR.

17:30:21  19  **Q.**   WHY NOT?

17:30:22  20  **A.**   BECAUSE TAKING OUT THE ELEMENTS OF THE WALL AND CEILING

17:30:27  21  COVERINGS AND REMOVING ALL OF THAT STUFF THAT WAS WETTED AND

17:30:30  22  LEAVING ONLY THE WOOD FRAMING AND WALLS AND CEILING AND ROOF

17:30:37  23  RAFTERS, SOME SHEETING, BRICK VENEER, ALL OF THESE ELEMENTS ARE

17:30:42  24  RELATIVELY DURABLE AND CAN WITHSTAND RELATIVELY LONG-TERM

17:30:49  25  EXPOSURE TO MOISTURE AND WETTING.

17:30:53   1            SOME OF THE ELEMENTS THAT THEY TALKED ABOUT, FOR

17:30:56   2   INSTANCE, THE BRICK TIES, IN A RESIDENCE A BRICK TIE IS

17:31:00   3   TYPICALLY CORRUGATED SHEET METAL THAT'S GALVANIZED TO PROTECT

17:31:05   4   IT AGAINST CORROSION.

17:31:07   5            BUT, AGAIN, YOU MAY HAVE HAD TO DO SOME -- SOME

17:31:10   6   REPAIRS.  YOU MAY HAVE HAD TO REMOVE AND REPLACE SOME OF THE

17:31:14   7   ROOF SHEETING DOWN INTO THE LOWER EDGES, BUT GENERALLY

17:31:17   8   SPEAKING, THE RESIDENCES COULD HAVE BEEN REPAIRED.

17:31:20   9   Q.   IN YOUR REVIEW OF THE PHOTOGRAPHS, FOR EXAMPLE, OF THE

17:31:23  10   ARMSTRONG AND HOLMES RESIDENCES, DID YOU SEE ANY EVIDENCE OF A

17:31:27  11   BUCKLING BRICK VENEER AS A RESULT OF CORRODED BRICK TIE STRAPS?

17:31:33  12   A.   NO, SIR.

17:31:33  13   Q.   NOW, THE LIVERS AND COATS RESIDENCES WERE SUBJECTED TO

17:31:36  14   SIMILAR QUANTITIES OF STANDING WATER FOR SIMILAR PERIODS OR

17:31:40  15   DURATIONS AS THE ARMSTRONG AND HOLMES RESIDENCES, WERE THEY

17:31:43  16   NOT?

17:31:44  17   A.   TO SOME EXTENT, YES, SIR.

17:31:45  18   Q.   AND THEY WERE NOT DEMOLISHED, WERE THEY?

17:31:49  19   A.   THAT'S CORRECT.

17:31:49  20   Q.   AND, IN FACT, THE COATS RESIDENCE WAS REPAIRED, RENOVATED,

17:31:52  21   AND IS CURRENTLY REOCCUPIED AT THIS TIME?

17:31:53  22   A.   YES, SIR.

17:31:59  23   Q.   DID YOU HEAR MR. TAYLOR TESTIFY THAT EVEN IF ONE OF THESE

17:32:04  24   RESIDENCES COULD HAVE PHYSICALLY BEEN REPAIRED, THAT THE DAMAGE

17:32:10  25   WAS SO EXTENSIVE THAT IT WOULD HAVE COST MORE TO REPAIR THE

17:32:14  1  RESIDENCE THAN TO REPLACE IT?  DO YOU RECALL THAT TESTIMONY?

17:32:17  2  **A.**   YES, SIR.

17:32:17  3  **Q.**   DO YOU AGREE WITH MR. TAYLOR'S OPINION IN THAT REGARD?

17:32:21  4  **A.**   NO, SIR, I DON'T.

17:32:23  5  **Q.**   WHY NOT?

17:32:26  6  **A.**   JUST LIKE THE INITIAL ASSESSMENTS THAT WERE DONE BY

17:32:29  7  MR. CRAWFORD THAT ONCE THESE RESIDENCES WERE ESSENTIALLY GUTTED

17:32:34  8  AND CLEANED, THEY COULD HAVE BEEN REPAIRED.  BOTH OF THOSE

17:32:37  9  HOMES, WHERE THEY'RE LOCATED, MORE LIKELY THAN NOT ARE

17:32:41  10  TIMBER-PILE SUPPORTED, AND SO --

17:32:43  11  **Q.**   BY BOTH THE HOMES YOU'RE REFERRING TO THE HOLMES --

17:32:44  12  **A.**   HOLMES AND ARMSTRONG.

17:32:46  13  **Q.**   -- IN CHALMETTE --

17:32:48  14  **A.**   AND --

17:32:49  15  **Q.**   ONE IN ARABI AND ONE IN CHALMETTE?

17:32:54  16  **A.**   YES, SIR.  AND THOSE HOMES, TO REMOVE AND REPLACE A

17:32:55  17  PILE-SUPPORTED CONCRETE SLAB, THAT'S A RELATIVELY EXPENSIVE

17:33:00  18  ENDEAVOR.

17:33:00  19  **Q.**   SO IS IT YOUR OPINION THAT THE SLABS OF THOSE TWO HOMES,

17:33:02  20  HOLMES AND ARMSTRONG, WERE UNAFFECTED BY THE FLOOD?

17:33:05  21  **A.**   TO ANSWER YOUR QUESTION, THEY WERE NOT -- I DOUBT EITHER

17:33:08  22  ONE OF THOSE SLABS OR FOUNDATION EVEN KNEW THERE WAS A STORM.

17:33:11  23  **Q.**   SO IN A TOTAL DEMOLITION AND REPLACEMENT LIKE MR. TAYLOR

17:33:17  24  AND MR. CRAWFORD ARE TALKING ABOUT, THAT WOULD INCLUDE BREAKING

17:33:22  25  UP, REMOVING THE SLAB, ANY PILINGS UNDERNEATH IT, AND THEN

17:33:25   1   POURING IT AGAIN FOR RECONSTRUCTION OF A NEW RESIDENCE?

17:33:29   2   **A.**   AND POSSIBLY ADDING MORE PILINGS IF NECESSARY.

17:33:32   3   **Q.**   AND THAT'S A RELATIVELY EXPENSIVE UNDERTAKING IN

17:33:36   4   RESIDENCES OF THIS SIZE AND CHARACTER, IS THAT --

17:33:40   5   **A.**   YEAHS.

17:33:41   6   **Q.**   AND IN YOUR OPINION, THAT WOULD NOT HAVE BEEN NECESSARY?

17:33:43   7   **A.**   NO, SIR.

17:33:43   8   **Q.**   AND TO DO THAT WOULD HAVE ADDED TO THE COST OVER A

17:33:47   9   REPAIR-COMPARISON ESTIMATE; CORRECT?

17:33:48  10   **A.**   YES, SIR.

17:33:58  11   **Q.**   NOW, YOU WERE ALSO PRESENT IN COURT, WERE YOU NOT, WHEN

17:34:00  12   MR. ARMSTRONG TESTIFIED?

17:34:01  13   **A.**   YES, SIR.

17:34:02  14   **Q.**   DO YOU RECALL HIS TESTIMONY REGARDING THE DEGREE TO WHICH

17:34:05  15   HIS FORMER NEIGHBORS ON HAMLET PLACE AND IN THE NEIGHBORHOOD IN

17:34:10  16   WHICH HE RESIDED AT THE TIME OF KATRINA IN CHALMETTE -- THE

17:34:16  17   EXTENT TO WHICH THEY DID NOT REBUILD IN HIS NEIGHBORHOOD?  DO

17:34:19  18   YOU RECALL HIS TESTIMONY?

17:34:20  19   **A.**   YES, SIR.

17:34:20  20   **Q.**   DO YOU RECALL THAT HE MAY HAVE GIVEN THE IMPRESSION --

17:34:24  21          **MR. GULOTTA:**  AND, YOUR HONOR, I DON'T MEAN TO

17:34:25  22   SUGGEST THAT HE INTENDED THIS LITERALLY.

17:34:28  23   **BY MR. GULOTTA:**

17:34:28  24   **Q.**   BUT HE MAY HAVE GIVEN THE IMPRESSION THAT NONE OF HIS

17:34:31  25   NEIGHBORS REBUILT OR SOMETHING LIKE THAT.

| | | |
|---|---|---|
| 17:34:33 | 1 | AND, MR. DANNER, MY QUESTION IS, IN YOUR SITE VISITS |
| 17:34:37 | 2 | TO THE ARMSTRONG RESIDENCE, DID YOU MAKE ANY OBSERVATIONS |
| 17:34:41 | 3 | REGARDING WHETHER OR NOT ANY OF THE NEIGHBORS IN THAT |
| 17:34:44 | 4 | NEIGHBORHOOD HAD, IN FACT, REBUILT? |
| 17:34:46 | 5 | **A.**   THERE WAS A RESIDENCE ACROSS THE STREET THAT WAS REBUILT |
| 17:34:52 | 6 | AND -- |
| 17:34:53 | 7 | **THE COURT:**  YES, SIR. |
| 17:34:54 | 8 | **MR. PALMINTIER:**  IT'S NONRESPONSIVE, YOUR HONOR.  I |
| 17:34:56 | 9 | KNOW THAT HE'S -- HE JUST DOESN'T LIKE TO SAY YES OR NO, BUT |
| 17:35:00 | 10 | IT'S NONRESPONSIVE. |
| 17:35:01 | 11 | **THE COURT:**  YEAH, I'M NOT -- I'M NOT SURE WHAT THE |
| 17:35:03 | 12 | NUMBER OF HOMES THAT ARE -- IN THE PARISH OF ST. BERNARD WERE |
| 17:35:12 | 13 | REBUILT OR NOT.  I REALLY DON'T KNOW. |
| 17:35:13 | 14 | **MR. GULOTTA:**  IT'S NOT THE NUMBER, YOUR HONOR.  AND |
| 17:35:15 | 15 | IT'S NOT MR. ARMSTRONG'S EXPRESSION OF HIS -- |
| 17:35:18 | 16 | **THE COURT:**  I GOT YOU.  YEAH. |
| 17:35:19 | 17 | **MR. GULOTTA:**  THE QUESTION IS, WERE OTHER SIMILAR |
| 17:35:20 | 18 | STRUCTURES, IF ANY, WITH SIMILAR -- |
| 17:35:22 | 19 | **THE COURT:**  OKAY.  THAT'S -- |
| 17:35:22 | 20 | **MR. GULOTTA:**  -- CONSTRUCTION WERE, IN FACT, REBUILT. |
| 17:35:25 | 21 | THAT'S ALL.  PHYSICALLY. |
| 17:35:26 | 22 | **THE COURT:**  OKAY. |
| 17:35:27 | 23 | **THE WITNESS:**  YEAH.  THE ANSWER TO THE QUESTION IS |
| 17:35:28 | 24 | YES, THE HOUSE ACROSS THE STREET AND THE HOUSE DOWN THE STREET, |
| 17:35:31 | 25 | WHICH WERE REBUILT AND REOCCUPIED. |

17:35:32   1   **BY MR. GULOTTA:**

17:35:33   2   **Q.**   AND THE HOUSES THAT YOU OBSERVED THAT HADN'T BEEN REBUILT

17:35:38   3   WERE -- TO YOUR UNDERSTANDING AND YOUR EXPERIENCE, SUFFERED THE

17:35:40   4   SAME OR SIMILAR FLOOD CONDITIONS AS THE ARMSTRONG RESIDENCE?

17:35:46   5   **A.**   I WOULD -- YES.  I'M TRYING TO SAY YES, YES, SIR, A LOT.

17:35:55   6           **MR. PALMINTIER:**   I APPRECIATE IT.

17:35:57   7   **BY MR. GULOTTA:**

17:35:57   8   **Q.**   ALL RIGHT.  LET'S CONTINUE WITH YOUR OPINIONS.

17:36:00   9           **MR. GULOTTA:**   NEXT SLIDE.

17:36:03   10           **MR. PALMINTIER:**   YOUR HONOR, THIS SLIDE EMBODIES -- I

17:36:05   11   APOLOGIZE FOR INTERRUPTING, BUT THIS SLIDE EMBODIES OPINIONS

17:36:12   12   WHICH ARE BEYOND THE SCOPE OF THE OPINIONS THAT CAN BE GIVEN BY

17:36:16   13   A STRUCTURAL ENGINEER.

17:36:19   14           IT GETS INTO HYDROLOGY.  HE'S NOT QUALIFIED.

17:36:24   15   HE'S ACKNOWLEDGED HE'S NOT QUALIFIED TO GIVE HYDROLOGY

17:36:28   16   OPINIONS.  WE OBJECT TO THE INTRODUCTION AND TO THE TESTIMONY.

17:36:30   17           **THE COURT:**   LET ME LOOK AT IT BEFORE I -- AND THEN

17:36:31   18   I'LL LET YOU RESPOND, SO I'LL BE A LITTLE BIT INFORMED BY THE

17:36:38   19   TIME YOU RESPOND.

17:36:43   20           OKAY.  SIR, YOU WISH TO RESPOND?

17:36:46   21           **MR. GULOTTA:**   YES, YOUR HONOR.  THIS IS NOTHING MORE

17:36:46   22   THAN THE PART OF THE OPINION -- THE THIRD PART OF THE OPINION

17:36:51   23   WE ASKED MR. DANNER TO MAKE, WHICH IS TO ATTEMPT TO SEPARATE,

17:36:55   24   AS BEST HE COULD, THE DAMAGE OF THOSE -- TO THOSE ELEMENTS OF

17:36:59   25   THE RESIDENCE THAT WAS CAUSED BY IHNC FLOODWATERS AS

17:37:04   1   DISTINGUISHED FROM ALL FLOODWATERS.

17:37:05   2          **THE COURT:**  THIS IS WHERE HE USED THE HYDROGRAPH

17:37:07   3   PROVIDED BY YOUR SIDE AND --

17:37:10   4          **MR. GULOTTA:**  AND DR. VRIJLING AS WELL.

17:37:15   5          **THE COURT:**  DR. VRIJLING AS WELL, TO MAKE THOSE

17:37:17   6   DECISIONS RATHER THAN RELY ON HIS OWN HYDROLOGICAL --

17:37:22   7          **MR. GULOTTA:**  THAT'S CORRECT.  YES, YOUR HONOR.

17:37:24   8          **THE COURT:**  BASED ON THAT, I'M GOING TO ALLOW HIM TO

17:37:26   9   TESTIFY.

17:37:27  10          **MR. GULOTTA:**  THANK YOU, YOUR HONOR.

17:37:28  11          **MR. PALMINTIER:**  THANK YOU, YOUR HONOR.

17:37:32  12   **BY MR. GULOTTA:**

17:37:33  13   **Q.**   SO WITH RESPECT TO THIS PART OF YOUR ENGAGEMENT, THE

17:37:37  14   EFFECTS OR THE RELATIVE EFFECTS OF THE IHNC FLOODWATERS AND THE

17:37:42  15   FLOODWATERS FROM ALL CAUSES, BASED ON THE HYDROLOGICAL REPORTS

17:37:47  16   THAT YOU LOOKED, IT VARIED SOMEWHAT; CORRECT?

17:37:50  17   **A.**   YES, SIR.

17:37:50  18   **Q.**   OKAY.  SO THE FIRST PART OF YOUR OPINION IN THIS REGARD --

17:37:56  19   IN THIS BULLET POINT YOU REFER TO THE COATS, LIVERS AND

17:38:01  20   WASHINGTON RESIDENCES.  AND WITH RESPECT TO THOSE RESIDENCES,

17:38:07  21   THOSE WERE THE THREE IN THE LOWER NINTH WARD CLOSEST TO THE

17:38:09  22   CANAL?

17:38:09  23   **A.**   YES, SIR.

17:38:10  24   **Q.**   OKAY.  AND IT'S YOUR OPINION, IS IT NOT, THAT FLOOD DAMAGE

17:38:16  25   CAUSED BY THE EARLIER-ARRIVING IHNC FLOODWATERS WAS LESS THAN

17:38:22    1  THE TOTAL DAMAGE CAUSED BY THE FLOODWATERS FROM ALL CAUSES --

17:38:26    2          **THE COURT REPORTER:**  I'M SORRY, I CAN'T HEAR YOU.

17:38:26    3  YOU NEED TO KEEP YOUR VOICE UP.

17:38:26    4          **MR. GULOTTA:**  I'M SORRY.

17:38:26    5          **THE COURT:**  YEAH.  WHEN YOU GET AWAY FROM THE MIC,

17:38:28    6  UNFORTUNATELY IT'S A LITTLE DIFFICULT.

17:38:32    7          **MR. GULOTTA:**  I KNOW.  THAT'S WELL TAKEN.

17:38:32    8  **BY MR. GULOTTA:**

17:38:37    9  **Q.**   I'LL START OVER AGAIN, MR. DANNER.

17:38:39   10          **THE COURT:**  NO, I MEAN, IF YOU WANT THE HAND MIC.

17:38:40   11  IT'S DIFFICULT TO LOOK AT THE BOARD AND BE AT THE MIC, SO --

17:38:46   12          **MR. GULOTTA:**  AS I THINK SOMEBODY ELSE SAID, IT WOULD

17:38:47   13  BE MUCH WORSE IF I STAND HERE WITH THE PORTABLE MIC.

17:38:51   14          **THE COURT:**  I UNDERSTAND.

17:38:52   15  **BY MR. GULOTTA:**

17:38:52   16  **Q.**   OKAY.  SO WE'LL START AGAIN ON THIS BULLET POINT,

17:38:56   17  MR. DANNER.  THAT PART OF YOUR OPINION WITH REFERENCE TO THE

17:39:00   18  COATS, LIVERS, AND WASHINGTON RESIDENCES, IN WHICH YOU SAID

17:39:03   19  THAT THE FLOOD DAMAGE CAUSED BY THE EARLIER-ARRIVING IHNC

17:39:06   20  FLOODWATERS WAS LESS THAN THE TOTAL DAMAGE CAUSED BY THE

17:39:10   21  FLOODWATERS FROM ALL CAUSES, INCLUDING THE LATER-ARRIVING

17:39:12   22  FLOODWATERS FROM THE MRGO; CORRECT?

17:39:15   23  **A.**   YES, SIR.

17:39:16   24  **Q.**   OKAY.  AND IN GENERAL, HOW DID YOU REACH THAT CONCLUSION?

17:39:20   25  **A.**   WELL, THE -- IT'S IN MY REPORT.  THE -- THE IHNC

| | | |
|---|---|---|
| 17:39:28 | 1 | FLOODWATERS CAME IN EARLIER.  THEY DID NOT GO UP AS HIGH, AND |
| 17:39:37 | 2 | THEY BEGAN GOING -- RECEDING RELATIVELY FASTER AND -- AT A |
| 17:39:44 | 3 | FASTER RATE THAN THE ALL CAUSES, WHICH INCLUDED THOSE |
| 17:39:50 | 4 | FLOODWATERS FROM THE IHNC AS WELL. |
| 17:39:53 | 5 | MR. PALMINTIER:  AGAIN, YOUR HONOR, THAT'S |
| 17:39:54 | 6 | NONRESPONSIVE, AND IT CALLS FOR AN OPINION THAT IS IN THE AMBIT |
| 17:39:58 | 7 | OF HYDROLOGY AND NOT WITHIN THE AMBIT OF HIS CIVIL ENGINEERING |
| 17:40:03 | 8 | STATUS. |
| 17:40:04 | 9 | MR. GULOTTA:  MAY I BE HEARD, YOUR HONOR? |
| 17:40:06 | 10 | THE COURT:  YES, YOU MAY. |
| 17:40:07 | 11 | MR. GULOTTA:  AGAIN, IT'S SIMPLY HIS REFERENCE, WHICH |
| 17:40:10 | 12 | HE'S QUALIFIED TO DO, TO THE HYDROLOGICAL OPINIONS OF THE OTHER |
| 17:40:14 | 13 | EXPERTS TO MAKE THE DETERMINATION THAT HE WAS ASKED TO MAKE TO |
| 17:40:18 | 14 | TRY TO -- |
| 17:40:18 | 15 | THE COURT:  THE OBJECTION'S OVERRULED. |
| 17:40:20 | 16 | MR. GULOTTA:  OKAY.  WE'LL MOVE ON. |
| 17:40:22 | 17 | BY MR. GULOTTA: |
| 17:40:22 | 18 | Q.  NOW, THE SECOND BULLET POINT, MR. DANNER, WE'RE TALKING |
| 17:40:27 | 19 | NOW ABOUT THE HOLMES RESIDENCE.  I THINK THE PLAINTIFFS |
| 17:40:30 | 20 | WOULDN'T MIND THIS OPINION. |
| 17:40:33 | 21 | IN HERE YOU SAY THAT IT WAS YOUR CONCLUSION IN THE |
| 17:40:37 | 22 | CASE OF HOLMES RESIDENCE THAT THE EARLIER-ARRIVING IHNC |
| 17:40:41 | 23 | FLOODWATERS CAUSED VIRTUALLY ALL OF THE FLOOD-RELATED DAMAGE TO |
| 17:40:45 | 24 | THE RESIDENCE, NOTWITHSTANDING THE LATER ARRIVAL OF EVEN HIGHER |
| 17:40:48 | 25 | WATER CONTRIBUTED BY THE MRGO; IS THAT CORRECT? |

17:40:50   1   **A.**   YES, SIR, THAT'S CORRECT.

17:40:51   2   **Q.**   OKAY.  NOW, WHY DON'T YOU EXPLAIN TO THE COURT WHAT THE

17:40:53   3   BASIS OF THAT CONCLUSION IS, AS DISTINGUISHED, IF YOU'D LIKE,

17:40:58   4   FROM THE OTHERS THAT WE JUST TALKED ABOUT.

17:41:00   5   **A.**   IN THE CASE OF THE HOLMES RESIDENCE, THE WATER COMING IN

17:41:04   6   BECAUSE -- FROM THE IHNC CAME IN EARLIER THAN THE WATER FROM

17:41:06   7   THE MRGO.

17:41:09   8          THE FACT THAT THE HOLMES RESIDENCE WAS -- COULD HAVE

17:41:13   9   BEEN LOWER IN ELEVATION THAN THE COATS, LIVERS, AND WASHINGTON,

17:41:17  10   AND ALSO IT WAS ON A SLAB, UNLIKE COATS AND WASHINGTON.  MY

17:41:24  11   RECOLLECTION, YOU HAD 8 OR 9 FEET OF WATER IN THAT RESIDENCE

17:41:28  12   BEFORE MRGO WATER EVER GOT THERE.

17:41:45  13   **Q.**   OKAY.  LET'S LOOK AT THE LAST BULLET POINT HERE WITH

17:41:49  14   REFERENCE TO THE ARMSTRONG RESIDENCE, AND YOUR CONCLUSION THERE

17:41:51  15   WAS -- AND AGAIN I CAN'T SEE WHERE THIS WOULD BE CONTROVERSIAL.

17:41:56  16          BASED ON THE HYDROLOGICAL REPORTS, FLOODWATERS FROM

17:42:02  17   THE IHNC AND MRGO ARRIVED AT NEARLY THE SAME TIME AND

17:42:06  18   CONTRIBUTED APPROXIMATELY EQUALLY TO THE DAMAGE TO THE

17:42:09  19   RESIDENCE CAUSED BY THE FLOOD.

17:42:10  20          IS THAT YOUR OPINION?

17:42:11  21   **A.**   YES, SIR.

17:42:11  22   **Q.**   IN THIS CASE, REALLY, THIS IS -- REALLY NO EXPERTISE

17:42:14  23   BROUGHT TO BEAR BY YOU ON THIS.  THIS IS MORE A QUESTION FOR

17:42:16  24   THE JUDGE TO DETERMINE; IS THAT RIGHT?  I MEAN, YOU MADE NO

17:42:18  25   EFFORT TO DISTINGUISH ELEMENTS AT ALL, DID YOU?

17:42:22    1    **A.**   YES, SIR.   BASED ON THE HYDROGRAPHS OF BOTH THE DUTCH AND

17:42:25    2    DALRYMPLE, THE WATERS SEEM ALL TO HAVE GOTTEN THERE AT THE SAME

17:42:28    3    TIME.

17:42:28    4    **Q.**   SO THERE WAS NO WAY FOR YOU TO TELL WHICH PHYSICAL

17:42:31    5    ELEMENTS WOULD HAVE BEEN DAMAGED BY ONE SET OF FLOODWATERS

17:42:35    6    FIRST AS OPPOSED TO ANOTHER, WAS THERE?

17:42:37    7    **A.**   NO, SIR.   I'M NOT THAT SKILLED.

17:42:41    8    **Q.**   OKAY.   ALL RIGHT.   SO WE'LL GO QUICKLY THROUGH SOME OF THE

17:42:46    9    PHOTOGRAPHS, MR. DANNER, AND THEN WE'LL HOPEFULLY BE DONE.

17:42:50   10              WE'LL LOOK AT SOME OF YOUR ELEVATION CALCULATIONS.

17:42:54   11              THIS IS THE ARMSTRONG RESIDENCE, IS IT NOT, BEFORE

17:42:57   12    THE STORM?

17:42:59   13    **A.**   YES, SIR.

17:43:01   14    **Q.**   AND THIS IS A RESTATEMENT OF YOUR BASIC OPINION REGARDING

17:43:05   15    THE SOURCES OF DAMAGE TO THIS RESIDENCE?

17:43:08   16    **A.**   YES, SIR.

17:43:10   17    **Q.**   IT'S TRUE IN CASES OF ALL THE RESIDENCES, FLOOD, WIND, AND

17:43:14   18    RAIN; CORRECT?

17:43:15   19    **A.**   THAT'S GOOD FOR ALL OF THEM.

17:43:16   20    **Q.**   OKAY.   ALL RIGHT.   WHEN WE GET -- WE'LL GET TO THOSE.

17:43:19   21    WE'LL MOVE FAST AFTER THAT SLIDE PRETTY QUICKLY.

17:43:31   22              OKAY.   NOW, THIS IS FROM YOUR REPORT REGARDING THOSE

17:43:33   23    ELEMENTS THAT YOU WERE ABLE TO DETERMINE IN YOUR OPINION WERE

17:43:37   24    DAMAGED BY WIND, AND WE'LL JUST FOCUS ON THE FIRST SENTENCE --

17:43:41   25    WHOOPS.   EXCUSE ME.

17:43:42   1              THE FIRST SENTENCE HERE:  "DAMAGES TO THE ROOF,

17:43:44   2    INCLUDING GUTTERS, DOWNSPOUTS, VENTS AND FLUES AND DAMAGE TO

17:43:48   3    THE WOOD FENCE, WERE MOST LIKELY CAUSED BY WIND."

17:43:53   4              WE'LL GO ON TO THE NEXT SENTENCE.

17:43:55   5              "THE PHOTOGRAPHS OF MISSING ROOF SHINGLES OF THE

17:43:57   6    ARMSTRONG REFERENCE INDICATE THAT THE SHINGLES WERE REMOVED AS

17:43:59   7    A RESULT OF WIND."

17:44:01   8              DID I READ THAT CORRECTLY?

17:44:02   9    A.   YES, SIR.

17:44:03   10   Q.   OKAY.  LET'S LOOK AT SOME OF THOSE PHOTOS.

17:44:08   11             WELL, I GUESS I HAVE ANOTHER SLIDE BEFORE THE PHOTOS.

17:44:13   12   THIS IS A REPRODUCTION OF -- OR A SUMMARY OF PART OF DR. KEIM'S

17:44:18   13   REPORT THAT WAS SITE-SPECIFIC FOR ARMSTRONG?

17:44:20   14   A.   YES, SIR.

17:44:20   15   Q.   THIS IS AN EXAMPLE ALL OF THE -- ALL OF THE SITE-SPECIFIC

17:44:25   16   REPORTS THAT YOU OBTAINED FROM DR. KEIM WERE OF THIS TIME; IS

17:44:32   17   THAT CORRECT?

17:44:32   18   A.   YES, SIR.

17:44:33   19   Q.   WHERE HE FURNISHED YOU WITH MAXIMUM WINDS, HIGHEST GUSTS,

17:44:42   20   AND AN ESTIMATE OF THE TIME THAT THE MAXIMUM WINDS OCCURRED

17:44:46   21   NEAR THE ARMSTRONG RESIDENCE; CORRECT?

17:44:49   22   A.   YES, SIR.

17:44:49   23   Q.   OKAY.  WHAT DOES THIS PHOTOGRAPH DEPICT?

17:44:52   24   A.   THIS SHOWS THE -- MY UNDERSTANDING, THIS IS THE ARMSTRONG

17:44:55   25   ROOF.  AND WHAT YOU'RE LOOKING AT, THE LITTLE BLACK

17:44:59   1   RECTANGULARS, ARE WHERE THESE THREE-TAB SINGLES ARE MISSING.

17:45:04   2   THE VERTICAL PATTERN THAT YOU'RE SEEING THERE GOING UP AND DOWN

17:45:08   3   IS VERY INDICATIVE OF WIND.

17:45:13   4          WE ALSO -- BASED ON EVIDENCE I SAW, INCLUDING THE --

17:45:21   5   NOT ONLY ON THE HYDROGRAPHS, BUT ALSO THE VIDEO TAKEN BY THE

17:45:25   6   FIREMEN WHILE THE WATER CAME -- FLOODWATER CAME WELL UP ABOVE

17:45:30   7   THAT GUTTER, IT DIDN'T COME ANYWHERE NEAR GOING ALL THE WAY TO

17:45:35   8   THE TOP OF THE ROOF ITSELF.

17:45:37   9          SO BASED ON THE -- MY EXPERIENCE THAT EVERY TIME I

17:45:41  10   SEE THIS TYPE OF PATTERN, IT'S WIND VERSUS THE TYPE OF DAMAGE

17:45:45  11   THAT YOU NORMALLY SEE FROM WATER, IT'S QUITE DIFFERENT.  AND

17:45:49  12   YOU WOULD EXPECT TO SEE THAT DAMAGE DOWN AT THE BOTTOM WHERE

17:45:51  13   THE WATER ACTUALLY WAS.

17:45:53  14          AT LEAST IN THIS PHOTOGRAPH, YOU DON'T SEE ANY

17:45:56  15   DEFINITIVE DAMAGE DOWN THERE TO THE SHINGLES.

17:46:00  16   Q.   NOW, WHEN YOU SAID "THE TOP OF THE ROOF," IS THAT ALSO

17:46:03  17   SOMETIMES REFERRED TO AS THE "ROOF PEAK"?

17:46:05  18   A.   YEAH, THE TOP OF THE ROOF -- WELL, YOU'D CALL IT "THE

17:46:07  19   RIDGE," BUT IT WOULD BE THE PEAK BEING THE HIGHEST PORTION ON

17:46:10  20   THE RIDGE.

17:46:11  21   Q.   OKAY.  ALL RIGHT.  THE NEXT PHOTO, IS THIS ANOTHER PHOTO

17:46:16  22   OF WHAT YOU CONSIDERED OR DETERMINED TO BE WIND DAMAGE AT THE

17:46:20  23   ARMSTRONG RESIDENCE?

17:46:21  24   A.   YES, SIR.  PARTICULARLY, THEY GOT SOME RIDGE SHINGLES

17:46:25  25   MISSING, AND YOU CAN ALSO -- THAT'S ANOTHER VIEW OF WHAT WE'RE

| | | |
|---|---|---|
| 17:46:27 | 1 | LOOKING AT BEFORE.  YOU CAN SEE SOME OF THOSE WINDBLOWN TABS |
| 17:46:33 | 2 | OFF TO THE RIGHT. |
| 17:46:40 | 3 | **Q.**   OKAY.  NOW, THIS IS THE PART OF YOUR REPORT WHERE YOU'RE |
| 17:46:43 | 4 | REPORTING ON THE ELEMENTS OF DAMAGE TO THE ARMSTRONG RESIDENCE |
| 17:46:46 | 5 | CAUSED BY FLOODING FROM ALL SOURCES AS DISTINGUISHED FROM WIND; |
| 17:46:50 | 6 | CORRECT? |
| 17:46:50 | 7 | **A.**   YES, SIR. |
| 17:46:51 | 8 | **Q.**   AND THE FLOODING-DAMAGED PORTION OF THE ARMSTRONG |
| 17:46:54 | 9 | RESIDENCE WAS QUITE EXTENSIVE, WAS IT NOT? |
| 17:46:56 | 10 | **A.**   YES, SIR. |
| 17:46:57 | 11 | **Q.**   OKAY. |
| 17:46:57 | 12 | **A.**   VERY TYPICAL OF A RESIDENCE IN THAT AREA THAT RECEIVED |
| 17:47:01 | 13 | THIS EXTENT OF WATER FROM FLOODING. |
| 17:47:03 | 14 | **Q.**   OKAY.  AND AS WE SEE HERE -- WELL, IN THE FIRST PART OF |
| 17:47:05 | 15 | YOUR STATEMENT YOU SAY, "THE RESIDENCE MAY HAVE BEEN REPAIRED |
| 17:47:07 | 16 | BY REMOVING AND REPLACING," AND THEN THESE ARE ALL THE ELEMENTS |
| 17:47:11 | 17 | THAT, IN FACT, WERE DAMAGED BY FLOOD; IS THAT CORRECT? |
| 17:47:13 | 18 | **A.**   YES, SIR. |
| 17:47:13 | 19 | **Q.**   THAT INCLUDED WALLS, CEILINGS, FLOOR COVERINGS, |
| 17:47:17 | 20 | WOODWORK AND ELECTRICAL, PLUMBING AND THE HVAC -- |
| 17:47:20 | 21 | **THE COURT REPORTER:**  I'M SORRY, I CAN'T UNDERSTAND |
| 17:47:20 | 22 | YOU. |
| 17:47:21 | 23 | **MR. GULOTTA:**  OKAY.  I'M SORRY. |
| 17:47:24 | 24 | **THE WITNESS:**  YOU'VE GOT TO SPEAK SLOWLY, COUNSEL. |
| | 25 | |

17:47:25   1   BY MR. GULOTTA:

17:47:25   2   Q.   THOSE ELEMENTS INCLUDE REPLACING INTERIOR WALLS, CEILING,

17:47:30   3   FLOOR COVERINGS, WOODWORK AND ELECTRICAL, PLUMBING AND HVAC

17:47:36   4   ELEMENTS; IS THAT CORRECT?

17:47:36   5   A.   YES, SIR.   ESSENTIALLY, YOU'RE GUTTING THE RESIDENCE.

17:47:40   6   Q.   BUT YOU ARE PREPARING AND CLEANING, IN YOUR ESTIMATE, THE

17:47:44   7   EXPOSED WOOD FRAMING; CORRECT?

17:47:46   8   A.   THAT'S CORRECT.

17:47:53   9   Q.   AND HERE AGAIN YOU REPEAT YOUR CONCLUSION THAT NO EVIDENCE

17:47:55   10  WAS REVIEWED THAT INDICATED THE FLOODWATER ROSE ABOVE THE ROOF

17:47:57   11  PEAK?

17:47:59   12  A.   THAT'S CORRECT.

17:48:01   13  Q.   OKAY.   NOW, THIS IS THE PART OF YOUR ANALYSIS WHERE YOU

17:48:10   14  BEGIN TO TRY TO DISTINGUISH BETWEEN THE ELEMENTS DAMAGED BY

17:48:15   15  IHNC FLOODWATERS FROM FLOODWATERS FROM ALL CAUSES.

17:48:22   16           AND IS THIS A REFERENCE TO YOUR RELIANCE UPON THE

17:48:26   17  HYDROLOGICAL REPORTS?

17:48:34   18  A.   YES, SIR.

17:48:35   19           MR. PALMINTIER:   YOUR HONOR, WE UNDERSTAND THAT OUR

17:48:36   20  OBJECTION TO BOTH THE SLIDE AND THE TESTIMONY WOULD BE

17:48:38   21  CONTINUING.   WE WOULD MAKE IT CONTINUING.

17:48:43   22           THE COURT:   YES.   IN REFERENCE TO THE -- WHEN THE

17:48:45   23  FLOODWATERS ARRIVED, YES.   THAT IS A CONTINUING OBJECTION.

17:48:49   24           MR. PALMINTIER:   THANK YOU.

17:48:50   25           THE COURT:   AND I'M ASSUMING HE'S RELYING ON THE

17:48:52   1   HYDROGRAPHS AND THAT'S WHAT HE STATED.

17:48:54   2            **MR. GULOTTA:**  YES.

17:48:55   3   **BY MR. GULOTTA:**

17:48:56   4   **Q.**   AND YOU ALSO RELY UPON DR. DALRYMPLE'S -- NOT ONLY HIS

17:49:00   5   HYDROGRAPHS, BUT HIS NARRATIVE DESCRIPTION OF THESE EVENTS; IS

17:49:04   6   THAT CORRECT?

17:49:04   7   **A.**   YES, SIR.  AND THAT AS WE -- AS THEY TESTIFIED, GIVE OR

17:49:10   8   TAKE 15 MINUTES.  THEY GOT 9:10.  IT MIGHT HAVE BEEN 9:00 A.M.

17:49:16   9   ON THOSE.

17:49:21  10   **Q.**   OKAY.  LET'S SEE.  MAYBE I MISSED SOMETHING HERE.

17:49:27  11            OKAY.  NO.  OKAY.

17:49:28  12            ON TO THE NEXT SLIDE.  AND THIS IS A RESTATEMENT OF

17:49:34  13   YOUR OPINION THAT THE ARMSTRONG RESIDENCE NEED NOT HAVE BEEN

17:49:37  14   DEMOLISHED AND COULD HAVE BEEN REPAIRED; IS THAT CORRECT?

17:49:43  15   **A.**   YES, SIR.

17:49:44  16   **Q.**   AND WITH SPECIFIC REFERENCE TO SOME OF THESE ELEMENTS, YOU

17:49:48  17   ARE RESPONDING TO SOME OF THE STATEMENTS MADE BY MR. TAYLOR IN

17:49:53  18   HIS REPORT REGARDING ELEMENTS THAT HE DETERMINED WERE DAMAGED

17:49:59  19   BUT YOU DID NOT; IS THAT CORRECT?

17:50:01  20   **A.**   I SAW NO EVIDENCE OF THAT, NOT BASED ON EVERYTHING I

17:50:06  21   LOOKED AT, AND WHERE THIS RESIDENCE IS LOCATED WOULD I EXPECT

17:50:12  22   TO SEE THAT.

17:50:13  23   **Q.**   IN PARTICULAR YOU DIDN'T SEE BUCKLED ROOF LINES, ROOF

17:50:17  24   SECTIONS WITH BRICK WORK THAT MAY HAVE BEEN NOTED BY

17:50:21  25   MR. TAYLOR, DID YOU?

17:50:24    1    **A.**   YES, SIR, I DID NOT SEE THAT.

17:50:25    2    **Q.**   WHAT'S THIS A PHOTO OF?

17:50:28    3    **A.**   THAT'S A PHOTO I TOOK OF THE ARMSTRONG SLAB BACK IN 2007,

17:50:33    4    LOOKING FROM THE -- I BELIEVE FROM THE FRONT TO THE REAR.

17:50:37    5             THE SPECKLING YOU SEE IS -- ACTUALLY, IT WAS

17:50:42    6    BEGINNING TO RAIN, SO THIS DOESN'T HAVE CHICKEN POX.

17:50:47    7             LOOKING FROM AROUND THE LIVING ROOM AREA, DINING ROOM

17:50:52    8    AREA TOWARDS THE KITCHEN, WITH BEDROOMS OFF TO THE LEFT.

17:50:54    9             AND YOU CAN ALSO SEE IN THIS PHOTOGRAPH SOME OF THE

17:50:59   10    INDICATIONS OF WHERE THE FLOOR FRAMING USED TO BE.

17:51:09   11    **Q.**   IS IT YOUR OPINION THAT THE SLAB NEED NOT BE REPLACED?

17:51:12   12    **A.**   NO, SIR.  I WOULD HAVE LIKED IT NOT TO BE TORN UP AS WELL,

17:51:14   13    WHEN THEY DID THE CLEARING.  WE SEE SOME OF THE CERAMIC TILE.

17:51:19   14    BUT, YEAH, YOU COULD STILL USE THE SLAB.

17:51:21   15    **Q.**   AND THIS IS THE SLAB AGAIN; CORRECT?

17:51:22   16    **A.**   YES, SIR.

17:51:23   17    **Q.**   OKAY.  WHAT'S -- WHAT'S DEPICTED HERE?

17:51:26   18    **A.**   WELL, THIS IS A PICTURE TAKEN BY SOMEONE, BASICALLY

17:51:29   19    LOOKING FOR AN INDICATION, AT LEAST ANY VISUAL, THAT THERE'S A

17:51:35   20    PROBLEM WITH THE BRICK.  THE FACT THAT THEY NOTICE THAT THERE

17:51:40   21    MAY BE ONE OR TWO OF THE WINDOWS ARE BROKEN, BUT THE REST OF

17:51:45   22    THE WINDOWS ARE NOT EVEN BROKEN.

17:51:47   23    **Q.**   AND HERE?

17:51:48   24    **A.**   NOW, YOU'VE GOT BROKEN WINDOWS.  BUT, AGAIN, I DON'T SEE

17:51:52   25    ANY DAMAGE TO THE BRICKS.

| | | |
|---|---|---|
| 17:51:56 | 1 | THERE WERE A LOT OF RESIDENCES IN ST. BERNARD AND THE |
| 17:52:02 | 2 | LOWER NINTH WARD THAT DID HAVE BRICK DAMAGE, BUT IT WAS A |
| 17:52:05 | 3 | TOTALLY DIFFERENT SITUATION THAN HERE. |
| 17:52:08 | 4 | **Q.**   OKAY.  ON TO THE COATS RESIDENCE. |
| 17:52:16 | 5 | AND, AGAIN, THIS IS YOUR GENERAL OPINION WITH RESPECT |
| 17:52:17 | 6 | TO ALL OF THE RESIDENCES, WE SEE WITH EACH ONE OF THE PLAINTIFF |
| 17:52:22 | 7 | RESIDENCES. |
| 17:52:26 | 8 | AND THIS IS THE PART OF YOUR OPINION WHERE YOU'RE |
| 17:52:28 | 9 | REFERRING TO THE ELEMENTS OF THE COATS RESIDENCE DAMAGED BY |
| 17:52:32 | 10 | WIND. |
| 17:52:33 | 11 | YOU STATE IT IN THE NEGATIVE HERE.  YOU SAY THAT "NO |
| 17:52:37 | 12 | FLOOD-RELATED DAMAGES WERE NOTED TO THE ROOF, FIREPLACE, |
| 17:52:41 | 13 | CHIMNEY, OR CHIMNEY FLASHING.  MR. TAYLOR'S CONCLUSIONS TO THE |
| 17:52:45 | 14 | CONTRARY ARE NOT SUPPORTED BY THE EVIDENCE." |
| 17:52:47 | 15 | IS THAT ANOTHER WAY OF SAYING THAT DAMAGE TO THE |
| 17:52:49 | 16 | ROOF, FIREPLACE, THE CHIMNEY, AND CHIMNEY FLASHING WERE CAUSED |
| 17:52:53 | 17 | BY WIND, IN YOUR OPINION? |
| 17:52:55 | 18 | **A.**   MOST LIKELY CAUSED BY WIND.  AND I ACTUALLY DID OBSERVE |
| 17:52:58 | 19 | THAT DAMAGE. |
| 17:52:58 | 20 | **Q.**   WELL, LET'S LOOK AT THE PHOTO. |
| 17:53:01 | 21 | WHAT DOES THIS PHOTO DEPICT? |
| 17:53:03 | 22 | **A.**   THAT'S LOOKING AT THE ROOF.  THE ORANGE THING, THE ROUND |
| 17:53:09 | 23 | HALF CYLINDER ORANGE, IS ACTUALLY A TERRACOTTA RIDGE TILE.  YOU |
| 17:53:14 | 24 | CAN NOTICE THEY'RE ALL MISSING TO THE LEFT OF THE BRICK |
| 17:53:18 | 25 | CHIMNEY.  THERE'S A COUPLE OF THEM STILL EXISTING ON THE RIGHT |

17:53:23   1   SIDE.

17:53:24   2           THAT'S A -- YOU CAN ALSO NOTE THAT THE TOP OF THE

17:53:26   3   CHIMNEY BRICKS ARE MISSING.

17:53:32   4           THAT'S A CLOSE-UP VIEW OF THAT.

17:53:35   5   **Q.**   OKAY.

17:53:36   6   **A.**   THIS IS ANOTHER VIEW LOOKING --

17:53:37   7   **Q.**   NOW, THIS IS THE COATS RESIDENCE HERE?

17:53:38   8   **A.**   THAT'S THE COATS RESIDENCE ON THE RIGHT.

17:53:40   9   **Q.**   THIS RESIDENCE HERE IS NOT THE COATS RESIDENCE?

17:53:44  10   **A.**   NO, SIR.

17:53:44  11           AGAIN YOU CAN SEE ONE OF THE TERRACOTTA RIDGE TILES

17:53:47  12   DOWN.  IN FACT, I THINK IT WAS STILL DOWN WHEN I WENT IN 2011.

17:54:00  13   **Q.**   OKAY.  NOW, THIS IS A PART OF YOUR OPINION WITH RESPECT TO

17:54:01  14   THE COATS RESIDENCE, WHERE YOU'RE DISCUSSING FLOOD DAMAGE FROM

17:54:02  15   ALL CAUSES.  AND, AGAIN, IT WAS EXTENSIVE; CORRECT?

17:54:06  16   **A.**   YES, SIR.  THAT'S WHAT WE SAW.

17:54:07  17   **Q.**   OKAY.  AND YOU REPORT HERE THAT THE FLOOD DAMAGE TO THE

17:54:10  18   COATS RESIDENCE APPEARED TO BE LIMITED TO THE FIRST FLOOR

17:54:12  19   INTERIOR WALLS, CEILING, FLOOR COVERINGS, WOODWORK, AND

17:54:17  20   ELECTRICAL, PLUMBING, AND HVAC ELEMENTS; CORRECT?

17:54:21  21   **A.**   YES, SIR.

17:54:22  22   **Q.**   OKAY.  NOW, THIS IS A REPRODUCTION FROM A PART OF YOUR

17:54:32  23   SUPPLEMENTAL REPORT, WHICH ARE THE ELEVATION CALCULATIONS THAT

17:54:37  24   YOU MADE; CORRECT?

17:54:38  25   **A.**   YES, SIR.

17:54:40   1   **Q.**   AND YOU DID THIS FOR THE COATS, LIVERS, AND WASHINGTON

17:54:47   2   RESIDENCES?

17:54:48   3   **A.**   YES, SIR.

17:54:49   4   **Q.**   OKAY.  EXPLAIN TO THE COURT, PLEASE, WHAT YOU WERE ASKED

17:54:52   5   TO DO AND WHAT YOU WERE EXPRESSING HERE IN THIS -- IN THIS PART

17:54:57   6   OF YOUR REPORT.

17:54:58   7   **A.**   WELL, IN HERE, I TRIED TO DETERMINE WHAT WOULD -- BASED ON

17:55:02   8   THE DIFFERENT SCENARIOS, AS THE BEST I COULD PUT TOGETHER FROM

17:55:06   9   THE TWO SETS OF HYDROGRAPHS, THAT DAMAGE -- EXCUSE ME.  NOT THE

17:55:11  10   DAMAGE, BUT THE ACTUAL HEIGHT OF THE WATER ABOVE THE FLOOR THAT

17:55:16  11   YOU WOULD EXPECT ON THOSE TWO SCENARIOS.

17:55:19  12         IN SOME CASES, I COULD USE THE -- TOOK THE -- WAS

17:55:24  13   ABLE TO PULL OFF OF THE DALRYMPLE HYDROGRAPHS THE INFORMATION;

17:55:30  14   IN SOME CASES I COULDN'T.

17:55:32  15         WHERE I DID, I ACTUALLY AVERAGED THOSE IN WITH THE --

17:55:38  16   WITH THE VRIJLING HYDROGRAPHS.  GENERALLY SPEAKING, THE

17:55:44  17   VRIJLING HEIGHTS WERE LOWER WATER HEIGHTS.

17:55:49  18         BUT I TRIED TO PUT THE TWO OF THEM TOGETHER TO GIVE A

17:55:57  19   BEST ESTIMATE ON ALL THE INFORMATION THAT WAS AVAILABLE.

17:55:59  20         THE NUMBERS THAT YOU'RE LOOKING AT ON THE RIGHT, THE

17:56:00  21   FIRST ONE KIND OF GIVES AN INDICATION THAT WITH THE IHNC NORTH

17:56:05  22   BREACH ONLY, WE WOULD HAVE EXPECTED TO SEE WATER .2 FEET ABOVE

17:56:09  23   THE FLOOR.

17:56:09  24         AND THAT IS BASED ON THE HEIGHT OF THE WATER BEING

17:56:16  25   4.5 FEET MINUS THE HEIGHT OF THE FLOOR SLAB.  SO WHEN YOU TAKE

17:56:23   1   4.5 MINUS 4.3, YOU COME UP WITH .2, OBVIOUSLY.

17:56:28   2            AND THE -- ALL THE OTHER ONES THERE ARE THE SAME, IN

17:56:32   3   WHICH WE WENT IN AND -- AND AS THE CALCULATIONS BACKED US UP,

17:56:36   4   WE TOOK THE BEST GUESS.  AND IN MOST CASES -- THAT BEST GUESS

17:56:41   5   WAS ABLE TO TAKE THE HYDROGRAPHS AND COME UP WITH A MAXIMUM

17:56:46   6   WATER ELEVATION BASED ON THAT SCENARIO, AND SUBTRACTED THE

17:56:50   7   HEIGHT OF THE FLOOR TO COME UP WITH THIS NUMBER.

17:56:53   8   **Q.**   OKAY.  SO THIS 4.3-FEET FIGURE HERE IS THE FLOOR LEVEL OF

17:56:58   9   THE COATS RESIDENCE; CORRECT?

17:57:01  10   **A.**   YES, SIR.

17:57:03  11   **Q.**   OKAY.  AND THAT'S CONSTANT THROUGH ALL THESE ELEVATIONS --

17:57:06  12   FLOOD ELEVATIONS THAT YOU CALCULATED FOR ALL THE SCENARIOS?

17:57:10  13   **A.**   YES, SIR.

17:57:11  14   **Q.**   AND SO CONSISTENT WITH -- WHAT THE METHODOLOGY CONSISTED

17:57:13  15   OF WAS TAKING AN AVERAGE OF THE ELEVATIONS IN EACH OF THESE

17:57:17  16   SCENARIOS, AS REPORTED BY VRIJLING AND DALRYMPLE, COMING UP

17:57:23  17   WITH AN ELEVATION -- AVERAGE ELEVATION FIGURE, AND SUBTRACTING

17:57:28  18   FROM THAT THE 4.3?

17:57:29  19   **A.**   WHERE I COULD.  THAT'S WHERE THE ASTERISK IS.  WHERE I WAS

17:57:32  20   NOT ABLE TO GET THAT INFORMATION FROM THE DALRYMPLE, I WOULD

17:57:36  21   STRICTLY USE THE VRIJLING ESTIMATES.

17:57:46  22   **Q.**   OKAY.  VERY GOOD.

17:57:47  23            OKAY.  SO NOW, BASED ON THAT EXERCISE THAT YOU

17:57:50  24   APPLIED IN THE COATS RESIDENCE, YOU CAME UP WITH A

17:57:52  25   DETERMINATION OR AN OPINION REGARDING THE ELEMENTS OF THE COATS

17:57:55   1   RESIDENCE THAT WOULD HAVE BEEN DAMAGED FROM IHNC FLOOD WATERS

17:58:02   2   ONLY, THAT IS, THE NORTH AND SOUTH BREACH TOGETHER; CORRECT?

17:58:07   3   **A.**   YES, SIR.

17:58:07   4   **Q.**   AND THAT'S REPORTED IN THIS EXCERPT FROM YOUR OPINION,

17:58:10   5   YOUR SUPPLEMENTAL OPINION AT THIS SLIDE NUMBER 31; CORRECT?

17:58:13   6   **A.**   YES, SIR.

17:58:20   7   **Q.**   SO IN THE IHNC-ONLY SCENARIO, THE MAXIMUM WATER LEVEL

17:58:25   8   WOULD HAVE REACHED ABOUT 4 FEET, WOULD HAVE DROPPED RELATIVELY

17:58:27   9   QUICKLY TO ABOUT .9 FEET, OR 10 3/4 INCHES ABOVE THE MAIN FLOOR

17:58:33  10   SURFACE.  AND THIS WOULD HAVE LIKELY RESULTED IN ONLY 48 INCHES

17:58:36  11   OF WALL COVERING REMOVAL, ALONG WITH ASSOCIATED ELECTRICAL

17:58:39  12   WIRING, BASE CABINETRY, AND WOODWORK AND REPAIRS; IS THAT

17:58:43  13   CORRECT?

17:58:43  14   **A.**   YES, SIR.

17:58:44  15   **Q.**   OKAY.  SO, NOW, IN THIS SCENARIO, THE IHNC -- IHNC-ONLY

17:58:48  16   SCENARIO, THE ELEMENTS OF DAMAGE TO THE COATS RESIDENCE, IN

17:58:53  17   YOUR OPINION, WOULD HAVE EXTENDED ONLY UP TO ABOUT 4 FEET?

17:58:58  18   **A.**   YES, SIR.  THE WATER WOULD HAVE CAME UP TO ABOUT 4 FEET,

17:59:04  19   BUT IT WOULD HAVE QUICKLY GONE DOWN.  SO IN THIS CASE, WE WOULD

17:59:07  20   PULL OUT 48 INCHES.

17:59:09  21         **MR. PALMINTIER:**  YOUR HONOR, THAT'S HYDROLOGY HE'S

17:59:15  22   TALKING ABOUT THERE.  THE WATER WOULD HAVE QUICKLY GONE DOWN.

17:59:15  23   THAT'S BEYOND HIS EXPERTISE.

17:59:16  24         **THE COURT:**  WELL, I DON'T KNOW IF THE HYDROGRAPH

17:59:17  25   SHOWS THAT OR NOT.

17:59:19   1            **MR. GULOTTA:**  THE NEXT SLIDE.

17:59:20   2            **THE WITNESS:**  ASSUMING THAT THE HYDROGRAPH SHOWS IT,

17:59:22   3   WHICH DR. VRIJLING DOES, SO I'LL LET THE JUDGE DECIDE.

17:59:26   4            **MR. GULOTTA:**  WE'LL SEE IT ON THE NEXT SLIDE.

17:59:26   5            **THE COURT:**  OKAY.  I'M ASSUMING, THEN, THAT YOU'RE

17:59:29   6   RELYING ON ONE OF THE HYDROGRAPHS TO MAKE THAT DETERMINATION.

17:59:32   7            **THE WITNESS:**  YES, SIR.

17:59:32   8            **THE COURT:**  OKAY.

17:59:33   9            **THE WITNESS:**  THE VRIJLING, BECAUSE THE OTHER ONE YOU

17:59:35   10   CAN'T REALLY -- HE DIDN'T GO FAR ENOUGH OUT TO BE ABLE TO MAKE

17:59:39   11   THAT DETERMINATION.

17:59:40   12            **THE COURT:**  OKAY.

17:59:40   13   **BY MR. GULOTTA:**

17:59:40   14   **Q.**  SO LET'S LOOK AT IT.  THIS IS THE VRIJLING HYDROGRAPH OF

17:59:45   15   THE COATS RESIDENCE; CORRECT, MR. DANNER?

17:59:47   16   **A.**  YES, SIR.

17:59:47   17   **Q.**  OKAY.  AND THIS RED LINE CURVE REPRESENTS, I THINK, IN THE

17:59:55   18   PARLANCE THAT YOU AND I HAVE BEEN USING, THE IHNC-ONLY

17:59:59   19   SCENARIO.  I THINK DR. VRIJLING REFERS TO IT AS "COATS NO MRGO

18:00:07   20   BREACHES."

18:00:07   21            SO YOU HAVE NO MRGO BREACHES, WE'VE GOT NORTH AND

18:00:10   22   SOUTH BREACH, IHNC ONLY.

18:00:12   23   **A.**  I ATTEMPTED TO TRANSLATE FROM HYDROGRAPH TO CIVIL --

18:00:17   24   HYDROLOGY TO CIVIL ENGINEERING.  IT MAKES MORE SENSE TO BE ABLE

18:00:22   25   TO SAY WITH THE IHNC ONLY WOULD BE THAT RED LINE.

18:00:26  1  **Q.**  OKAY.  SO WHAT IS IT ABOUT THIS RED LINE THAT SUGGESTS TO

18:00:29  2  YOU THAT THE WATER IN THE IHNC-ONLY SCENARIO WOULD HAVE DROPPED

18:00:33  3  RELATIVELY QUICKLY?

18:00:34  4  **A.**  WELL, IT GOES UP PRETTY QUICKLY, AND IT PEAKS OUT ABOUT

18:00:39  5  9:00, AND THEN IT STARTS GOING DOWN.  THERE'S NO LITTLE HUMP IN

18:00:46  6  THERE.  A SMALL HUMP AND THEN A BIG HUMP.  AND THEN AROUND --

18:00:50  7  **Q.**  WELL, THIS IS HARD TO READ.  BUT THIS LINE HERE, IF THE --

18:01:03  8  **THE COURT:**  WHEN YOU TURN AWAY FROM THE MIC -- AGAIN,

18:01:05  9  WE'RE WILLING TO GIVE YOU THE ELMO IF IT WILL HELP YOU.  BUT

18:01:05  10  IT'S DIFFICULT BECAUSE YOU'RE LOOKING THAT WAY.

18:01:07  11  **MR. GULOTTA:**  RIGHT.

18:01:09  12  **THE WITNESS:**  ABOUT 3:00 ON THE 29TH IT BEGINS GOING

18:01:12  13  DOWN, AND IT GOES DOWN STEADILY.

18:01:15  14  **BY MR. GULOTTA:**

18:01:15  15  **Q.**  AND THIS HYDROGRAPH CARRIES THIS VIEW OUT TO MIDNIGHT ON

18:01:21  16  THE 29TH.

18:01:22  17  **A.**  YES, SIR.

18:01:23  18  **Q.**  AND AT THAT TIME, THE RED LINE REPRESENTING THE IHNC-ONLY

18:01:28  19  BREACH --

18:01:29  20  **THE COURT:**  YOU KEEP -- I MAY BE COLOR-BLIND, BUT

18:01:33  21  IT'S THE RED LINE UP THERE; RIGHT?

18:01:36  22  **MR. GULOTTA:**  IT'S THE RED LINE RIGHT HERE, YES, SIR.

18:01:36  23  **THE COURT:**  YEAH.  OKAY.

18:01:36  24  **MR. GULOTTA:**  YES.  THERE'S ANOTHER ONE DOWN HERE

18:01:38  25  THAT -- I DON'T KNOW WHAT THAT IS.

18:01:39  1          **THE COURT:**  YEAH.  NO.  OKAY.  I UNDERSTAND.

18:01:42  2          **MR. GULOTTA:**  YES.

18:01:43  3  **BY MR. GULOTTA:**

18:01:43  4  **Q.**  IT APPEARS TO GO DOWN BY MIDNIGHT TO ABOUT WHAT LEVEL,

18:01:47  5  ACCORDING TO THIS HYDROGRAPH, MR. DANNER?

18:01:50  6  **A.**  THAT'S WHERE IT'S DOWN AROUND 5.2 FEET, I THINK.

18:01:55  7  **Q.**  OKAY.

18:01:59  8  **A.**  AND THEN YOU'VE GOT TO TAKE OUT THE -- SUBTRACT THE FLOOR

18:02:03  9  HEIGHT.

18:02:06  10  **Q.**  WHICH IS THE 4.3 FEET?

18:02:08  11  **A.**  THE 5.2-FEET LEVEL MINUS THE 4.3-FEET FLOOR HEIGHT.

18:02:13  12  **Q.**  OKAY.  AND THAT'S HOW YOU ARRIVED AT THE WATER LEVEL AFTER

18:02:16  13  THE WATER WENT DOWN, ACCORDING TO THIS HYDROGRAPH?

18:02:19  14  **A.**  YES, SIR.

18:02:22  15  **Q.**  OKAY.  NOW, REFERRING AGAIN TO MR. CRAWFORD AND

18:02:38  16  MR. TAYLOR'S TESTIMONY IN COURT LAST WEEK, DO YOU RECALL THEIR

18:02:43  17  TESTIMONY THAT BECAUSE, IN THEIR OPINION OF WICKING AND

18:02:48  18  STATIONARY WATER REMAINING IN THE COATS RESIDENCE, THE FLOOD

18:02:53  19  DAMAGE TO THE COATS RESIDENCE, EVEN FROM AN IHNC-ONLY SCENARIO,

18:02:58  20  WOULD HAVE BEEN NEARLY COMPLETE; THAT ALL WALLS, ALL CEILINGS,

18:03:02  21  AND VIRTUALLY THE ENTIRE INTERIOR WOULD HAVE TO BE REPLACED?

18:03:07  22  **A.**  YES, SIR, I REMEMBER THAT.

18:03:08  23  **Q.**  DO YOU AGREE WITH THAT OPINION?

18:03:10  24  **A.**  NO, SIR.

18:03:10  25  **Q.**  WHY NOT?

18:03:10   1   **A.**   WELL, THE WATER IS -- THE WATER'S GOING TO COME UP, AND

18:03:14   2   IT'S GOING TO WET THE SHEETROCK -- AND I'M GOING TO USE THE

18:03:17   3   WORD "SHEETROCK" EVEN THOUGH IT'S GYPSUM BOARD.  JUST BECAUSE

18:03:22   4   GYPSUM BOARD GETS WET DOESN'T MEAN IT NEEDS TO BE REPLACED.  IT

18:03:28   5   HAS A CERTAIN AMOUNT OF DURATION.

18:03:32   6          TYPICALLY, IT COMES UP AND STAYS UP.  IT'S GOING TO

18:03:34   7   SATURATE.  THERE IS SOME WICKING.  MY EXPERIENCE IS THE WICKING

18:03:40   8   IS NORMALLY ABOUT A FOOT OR SO.  IT COMES UP, STAYS UP.  AGAIN,

18:03:49   9   THE WICKING IS BASED ON ABSORPTION OF THE WATER GOING UP.  AT

18:03:52   10  THE SAME TIME THE GRAVITY, THE WEIGHT OF THE WATER IS PULLING

18:03:55   11  IT DOWN, SO IT ACTUALLY REACHES AN EQUILLIBRUM.

18:03:59   12         MOST OF THE TIME YOU GO AHEAD AND ALLOW FOR

18:04:03   13  ANOTHER -- AN ADDITIONAL 2 FEET ABOVE WHERE THE WATER GOT AND

18:04:06   14  REPLACE THAT.

18:04:08   15         THOSE PORTIONS OF THE -- SAY, FOR INSTANCE, THE

18:04:11   16  CEILING AND THE UPPER PORTIONS OF WALLS WHICH WOULD NOT HAVE

18:04:15   17  BEEN WETTED, THEY -- THOUGH THEY -- THEY MAY GET SOME DAMAGE TO

18:04:20   18  THEM, GENERALLY SPEAKING, THEY CAN BE CLEANED BECAUSE THEY'RE

18:04:24   19  NOT -- THEY'RE NOT WETTED.  THEY DON'T GET WET, THEY DON'T

18:04:27   20  SATURATE.

18:04:28   21         SO YOU DO HAVE SOME WICKING, BUT THE WICKING IS

18:04:31   22  LIMITED.

18:04:32   23  **Q.**   NOW, WITH REFERENCE TO THE DURATION OF WATER IN THE COATS

18:04:36   24  RESIDENCE IN AN IHNC-ONLY SCENARIO, THAT DURATION WAS NOTHING

18:04:43   25  LIKE -- OR WOULD NOT HAVE BEEN ANYTHING LIKE THE 9 OR 10 DAYS

18:04:46   1   THAT MR. CRAWFORD AND MR. TAYLOR REFERRED TO; CORRECT?

18:04:51   2   **A.**   THAT'S CORRECT.

18:04:51   3   **Q.**   OKAY.

18:04:52   4   **A.**   AGAIN, THIS IS EXPERIENCE OF WORKING WITH --

18:04:58   5   **Q.**   WITH A -- I'M SORRY.

18:04:59   6   **A.**   -- WITH STORMS.  IN THIS CASE THE WATER CAME IN, AND THE

18:05:02   7   WATER WAS ABLE TO GO BACK OUT WITH -- WATER LEVEL IN THE H --

18:05:15   8   **Q.**   IF YOU NEED IT FINISH YOUR ANSWER.

18:05:17   9   **A.**   -- IHNC.

18:05:19  10         AS IT WENT DOWN, THAT WATER WOULD HAVE BEEN -- WOULD

18:05:20  11   HAVE GONE DOWN.  AND THE CIRCUMSTANCE OF EVERYTHING I LOOKED

18:05:25  12   AT, WITH THE ADDITION OF THE MRGO, THE MRGO WATER DIDN'T HAVE

18:05:29  13   ANYWHERE TO GO.  SO ESSENTIALLY, IT HAD TO GO OUT THE SAME WAY.

18:05:33  14         **MR. PALMINTIER:**  WELL, YOUR HONOR, IF THAT'S NOT

18:05:35  15   HYDROLOGY, I DON'T KNOW WHAT IS.  AND HE'S GOING WAY BEYOND HIS

18:05:39  16   AREA, AND IT'S GOING TO EXTEND THROUGHOUT EVENING IF WE LET HIM

18:05:42  17   EXPAND.

18:05:43  18         **THE COURT:**  NO, THE EVENING IS NIGH.

18:05:49  19         **MR. GULOTTA:**  YOUR HONOR, MY QUESTION WAS WHAT THE

18:05:50  20   DURATION OF WATER IN THE RESIDENCE -- OF THE COATS RESIDENCE IN

18:05:54  21   THE IHNC-ONLY SCENARIO.  AND THAT WAS NOT THE DURATION OF THE

18:06:00  22   ALL CAUSES.  THAT WAS MY -- THE POINT OF MY QUESTION.

18:06:04  23         **MR. PALMINTIER:**  THE POINT OF MY OBJECTION IS THAT HE

18:06:06  24   HASN'T ANSWERED THAT.  HE GAVE THAT ANSWER AND THEN HE WENT WAY

18:06:10  25   BEYOND --

18:06:10   1           **MR. GULOTTA:**  SO I GUESS HE'S OBJECTING TO THE

18:06:12   2   ANSWER.  I'LL JUST REASK THE QUESTION.

18:06:16   3           **THE COURT:**  ALL RIGHT.  WELL, TO MAKE IT SIMPLE,

18:06:17   4   WE'LL STRIKE THAT ANSWER, AND YOU REASK THE QUESTION.

18:06:20   5   **BY MR. GULOTTA:**

18:06:22   6   **Q.**   OKAY.  MR. DANNER, LET'S TRY THE QUESTION AGAIN.

18:06:25   7           MY QUESTION IS, THE DURATION OF THE WATER IN THE

18:06:29   8   COATS RESIDENCE, UP TO ABOUT 4 FEET, WAS NOT ANYTHING LIKE THE

18:06:36   9   9 OR 10 DAYS THAT THE COATS RESIDENCE OR OTHER RESIDENCES

18:06:40   10   ACTUALLY ENDURED AS A RESULT OF FLOODING FROM KATRINA FROM ALL

18:06:45   11   CAUSES.

18:06:46   12           **MR. PALMINTIER:**  WELL, THE OBJECTION IS, FIRST OF

18:06:48   13   ALL, FAILURE TO LAY A PROPER FOUNDATION, IF HE'S ASKING HIM

18:06:51   14   WHETHER OR NOT THAT'S WHAT HE GOT FROM THE -- FROM THE --

18:06:53   15           **THE COURT:**  THE HYDROGRAPH.  RIGHT.  I DON'T KNOW IF

18:06:55   16   A HODOGRAPH GOES THAT FAR, SO I DON'T KNOW THAT --

18:06:59   17           **MR. GULOTTA:**  I THINK WE LAID A FOUNDATION WITH THE

18:07:01   18   EXAMINATION OF THE HYDROGRAPH.

18:07:02   19           **THE COURT:**  WELL, IT DOESN'T GO 9 DAYS OR 10 DAYS.

18:07:05   20   IT GOES -- THE HYDROGRAPH DOESN'T.

18:07:06   21           **MR. GULOTTA:**  THAT'S RIGHT.  BECAUSE THIS IS THE

18:07:07   22   IHNC-ONLY SCENARIO.

18:07:08   23           **THE COURT:**  RIGHT.

18:07:08   24           **MR. GULOTTA:**  AND I WAS CONTRASTING THIS HYDROGRAPH

18:07:11   25   WITH MR. TAYLOR AND MR. CRAWFORD'S TESTIMONY REGARDING THE

18:07:14   1   DURATION FROM ALL CAUSES.

18:07:16   2             **MR. PALMINTIER:**  AND THAT'S THE POINT, YOUR HONOR.

18:07:16   3   IT ONLY GOES OUT 24 HOURS.  AND --

18:07:19   4             **THE COURT:**  WELL, HE'S SAYING THAT -- I GUESS WE'LL

18:07:22   5   GO TO THE "SAUCE FOR THE GOOSE THING."  IF MR. TAYLOR COULD

18:07:26   6   TESTIFY WHAT THE DURATION WAS -- AND I DON'T REMEMBER EXACTLY

18:07:31   7   WHAT THAT TESTIMONY WAS OR WHAT HE BASED IT ON.

18:07:34   8             A LOT OF IT WAS BASED NOT ONLY HOW LONG THE

18:07:37   9   WATER WAS THERE, BUT ON OTHER FACTORS, AS I RECALL THE

18:07:40  10   TESTIMONY.  THAT IF WATER IS THERE FOR A CERTAIN AMOUNT OF

18:07:43  11   TIME, THEN OTHER DELETERIOUS EFFECTS OCCUR.

18:07:51  12             I'M NOT GOING TO GO INTO THE SPECIFIC NATURE OF

18:07:52  13   THE TESTIMONY.  IT WASN'T NECESSARILY WATER WAS STANDING THERE

18:07:54  14   THE ENTIRE TIME.

18:07:55  15             **MR. GULOTTA:**  THAT'S RIGHT.  AND --

18:07:57  16             **THE COURT:**  I DON'T RECALL THAT THEY SAID THE WATER

18:07:59  17   WAS THERE IN ALL THE RESIDENCES FOR 10 DAYS.  I'M TALKING ABOUT

18:08:02  18   THE OTHER SIDE.

18:08:04  19             BUT WHATEVER THEY SAY, UNLESS IT'S BASED ON A

18:08:07  20   PHOTOGRAPH OR A HYDROGRAPH, IT'S PRETTY -- IT -- I MIGHT AS

18:08:10  21   WELL BE --

18:08:13  22   **BY MR. GULOTTA:**

18:08:13  23   **Q.**   LET ME TRY THE QUESTION THIS WAY, MR. DANNER.

18:08:15  24             WITH REFERENCE TO THE VRIJLING HYDROGRAPH THAT WE

18:08:24  25   JUST LOOKED AT INDICATING THE DROPPING RATE OF THE WATER IN THE

| | | |
|---|---|---|
| 18:08:28 | 1 | IHNC-ONLY SCENARIO, DOES IT APPEAR TO YOU THAT THE DURATION OF |
| 18:08:33 | 2 | THE WATER IN THE COATS RESIDENCE, IN THE CASE OF THE |
| 18:08:37 | 3 | HYPOTHETICAL IHNC-ONLY SCENARIO, WOULD HAVE BEEN 9 OR 10 DAYS? |
| 18:08:43 | 4 | **THE COURT:**  THAT'S -- YOUR OBJECTION IS SUSTAINED. |
| 18:08:45 | 5 | **MR. PALMINTIER:**  THANK YOU, YOUR HONOR. |
| 18:08:45 | 6 | **THE COURT:**  NO ONE KNOWS.  MAYBE THE SHADOW DOES, BUT |
| 18:08:49 | 7 | THAT'S ABOUT IT. |
| 18:08:50 | 8 | GO AHEAD. |
| 18:08:52 | 9 | **MR. GULOTTA:**  ALL RIGHT. |
| 18:09:00 | 10 | **THE COURT:**  THE DURATION WAS -- HE'S ALREADY SAID |
| 18:09:01 | 11 | THAT THE DAMAGE WAS -- THE DURATION WAS THAT MANY FEET.  SO I |
| 18:09:04 | 12 | DON'T THINK THE DAMAGE WOULD HAVE GOTTEN LESS HAD THE -- |
| 18:09:06 | 13 | **MR. GULOTTA:**  I'M NOT -- |
| 18:09:07 | 14 | **THE COURT:**  -- HAD THE WATER GOTTEN LESS.  HE'S |
| 18:09:08 | 15 | ALREADY LIMITED THE TOP. |
| 18:09:10 | 16 | **MR. GULOTTA:**  THAT'S RIGHT. |
| 18:09:10 | 17 | **THE COURT:**  ALL RIGHT.  SO LOGICALLY, WE DON'T REALLY |
| 18:09:13 | 18 | NEED -- ALL RIGHT. |
| 18:09:16 | 19 | **MR. GULOTTA:**  AND LET ME GET TO ANOTHER QUESTION |
| 18:09:17 | 20 | THAT'S RELATED TO THIS, AND WE'LL SEE IF IT'S OKAY WITH |
| 18:09:20 | 21 | MR. PALMINTIER AND YOUR HONOR. |
| 18:09:25 | 22 | **THE COURT:**  I'M JUST SAYING LOGICALLY IT MAKES NO |
| 18:09:27 | 23 | DIFFERENCE UNLESS HE'S GOING INTO THE EFFECTS OF WATER. |
| 18:09:31 | 24 | **MR. GULOTTA:**  AND THAT'S MY NEXT QUESTION. |
| | 25 | |

18:09:32   1   **BY MR. GULOTTA:**

18:09:32   2   **Q.**   IN THE IHNC-ONLY SCENARIO, MR. DANNER, WOULD THERE HAVE

18:09:38   3   BEEN SUBSTANTIAL WICKING OR DAMAGE TO THE WALL COVERINGS ABOVE

18:09:44   4   THE 4-FEET HEIGHT THAT THE WATER REACHED, ACCORDING TO YOUR

18:09:51   5   ESTIMATE?

18:09:52   6   **A.**   NO MORE THAN I TALKED ABOUT EARLIER.

18:09:54   7            **THE COURT:**  WELL, HE SAID ABOUT A FOOT.

18:09:56   8            **THE WITNESS:**  ABOUT A FOOT.  AND NORMALLY, WE TAKE

18:09:58   9   2 FEET OUT.

18:10:00  10            **THE COURT:**  AND HE SAID THIS TO BE CONSERVATIVE.

18:10:02  11   YOU'D TAKE OUT 2 FEET.

18:10:06  12            **THE WITNESS:**  YES, SIR.

18:10:07  13            **THE COURT:**  I DON'T KNOW WHAT YOU DO TO THE REMAINING

18:10:09  14   WALL, BUT . . .

18:10:10  15            **MR. GULOTTA:**  OKAY.  LET'S GO ON.

18:10:10  16   **BY MR. GULOTTA:**

18:10:11  17   **Q.**   OKAY.  I THINK WE CAN SKIP THIS SLIDE.  LET'S GO ON.

18:10:20  18            THIS IS THE PHOTOGRAPH OF THE INTERIOR OF THE COATS

18:10:23  19   RESIDENCE AFTER IT WAS GUTTED; IS THAT CORRECT?

18:10:25  20   **A.**   YES, SIR.

18:10:27  21   **Q.**   AND AN ADDITIONAL PHOTOGRAPH?

18:10:30  22   **A.**   YES, SIR.

18:10:37  23   **Q.**   AND THE THIRD ONE?

18:10:38  24   **A.**   YES, SIR.

18:10:39  25   **Q.**   AND IN THE CASE OF THE COATS RESIDENCE, IT HAS, IN FACT,

18:10:42   1   BEEN RENOVATED AND REOCCUPIED; CORRECT?

18:10:45   2   **A.**   YES, SIR.

18:10:49   3   **Q.**   OKAY.  ON TO THE HOLMES RESIDENCE.

18:11:01   4           **THE COURT:**  YOU'VE GOT THAT ONE.

18:11:02   5           **MR. GULOTTA:**  WE'VE GOT THAT ONE.

18:11:04   6   **BY MR. GULOTTA:**

18:11:05   7   **Q.**   SO WITH REFERENCE TO THE FIRST PART OF YOUR ANALYSIS OF

18:11:07   8   THE ELEMENTS OF WIND DAMAGE TO THE HOLMES RESIDENCE, THIS IS

18:11:10   9   YOUR OPINION HERE IN THIS SLIDE, NUMBER 39.

18:11:13   10          "DAMAGE TO THE ROOF, FASCIA, SOFFIT, AND GUTTERS, AS

18:11:17   11  NOTED IN THE ASU GROUP ESTIMATE, WERE MOST LIKELY CAUSED BY

18:11:22   12  WIND"; CORRECT?

18:11:23   13  **A.**   YES, SIR.

18:11:23   14  **Q.**   OKAY.  ALL RIGHT.  LET'S SEE WHAT WE'VE GOT HERE.

18:11:26   15          WHAT DOES THAT PHOTO DEPICT?

18:11:29   16  **A.**   THAT'S A PICTURE OF WHAT YOU JUST DISCUSSED, AS FAR AS THE

18:11:38   17  SOFFIT IS CONCERNED.

18:11:41   18  **Q.**   OKAY.  ON TO ELEMENTS OF DAMAGE FROM ALL SOURCES OF

18:11:45   19  FLOODING.

18:11:46   20          AND, AGAIN, THE DAMAGE TO THE HOLMES RESIDENCE BY

18:11:49   21  FLOODING WAS QUITE EXTENSIVE, WAS IT NOT?

18:11:51   22  **A.**   YES, SIR.

18:11:57   23  **Q.**   BUT HERE AGAIN, YOU EXPRESSED THE OPINION THAT THE EXPOSED

18:11:58   24  WOOD FRAMING MAY HAVE BEEN CLEANED AND DECONTAMINATED PRIOR TO

18:12:01   25  REBUILDING THE RESIDENCE; RIGHT?

3354

| | | |
|---|---|---|
| 18:12:01 | 1 | **A.**   YES, SIR. |
| 18:12:02 | 2 | **Q.**   SO THIS IS CONSISTENT WITH YOUR OPINION THAT THIS |
| 18:12:04 | 3 | RESIDENCE COULD HAVE BEEN REPAIRED AND NEED NOT BE DEMOLISHED? |
| 18:12:08 | 4 | **A.**   YES, SIR. |
| 18:12:11 | 5 | **Q.**   OKAY.  AND THIS IS THE EXPLANATION I THINK YOU ALREADY |
| 18:12:17 | 6 | GAVE TO YOUR HONOR, IN SLIDE NUMBER 42, OF WHY THE ELEMENTS OF |
| 18:12:23 | 7 | THE HOLMES RESIDENCE DAMAGED BY THE IHNC FLOODWATERS, AS FAR AS |
| 18:12:29 | 8 | THE FLOOD DAMAGE, WAS -- ALL THE FLOOD DAMAGE WAS VIRTUALLY |
| 18:12:37 | 9 | CAUSED BY IHNC FLOODWATERS BECAUSE OF THE LOW ELEVATION OF THE |
| 18:12:44 | 10 | RESIDENCE. |
| 18:12:45 | 11 | **A.**   YES, SIR.  AND THE LOCATION. |
| 18:12:47 | 12 | **Q.**   OKAY.  AND HERE AGAIN, ADDITIONAL OPINIONS.  THIS IS A |
| 18:12:56 | 13 | REFERENCE TO YOUR OPINION THAT THE HOLMES RESIDENCE DID NOT |
| 18:12:59 | 14 | SHOW SIGNS, BASED ON YOUR ANALYSIS OF THE PHOTOGRAPHS, THAT IT |
| 18:13:04 | 15 | NEEDED TO BE DEMOLISHED; CORRECT? |
| 18:13:05 | 16 | **A.**   WITH THE POSSIBLE EXCEPTION OF THE SCREENED PORCH AND |
| 18:13:08 | 17 | SHED. |
| 18:13:09 | 18 | **Q.**   THE SCREEN PORCH IS IN THE BACK OF THE RESIDENCE? |
| 18:13:11 | 19 | **A.**   IN THE BACK.  IT LOOKED LIKE THE SHED ACTUALLY FLOATED AND |
| 18:13:16 | 20 | DAMAGED THE SCREENED PORCH. |
| 18:13:17 | 21 | **Q.**   OKAY.  AND, AGAIN, YOU SAW NO EVIDENCE OF BOWED WALLS, |
| 18:13:23 | 22 | BUCKLED ROOFLINES, LOOSE SECTIONS OF BRICKWORK NOTED BY |
| 18:13:26 | 23 | MR. TAYLOR; IS THAT CORRECT? |
| 18:13:30 | 24 | **A.**   THAT'S CORRECT, YES, SIR. |
| 18:13:31 | 25 | **Q.**   OKAY.  AND HERE'S A PHOTO OF THE HOLMES RESIDENCE FROM |

3355

| 18:13:33 | 1 | ANOTHER ANGLE; RIGHT? |

18:13:33  1  ANOTHER ANGLE; RIGHT?

18:13:34  2  **A.**   YES, SIR.

18:13:36  3  **Q.**   AND THE NEXT SLIDE, 45, IS THE SIDE OF THE HOLMES

18:13:40  4  RESIDENCE?

18:13:40  5  **A.**   YES, SIR.

18:13:41  6  **Q.**   OKAY.  AND THIS IS THE -- THIS IS THE BRICK VENEER AND

18:13:45  7  BRICKWORK?

18:13:46  8  **A.**   YES, SIR.

18:13:49  9  **Q.**   OKAY.  ON TO THE LIVERS RESIDENCE.

18:13:54  10         NOW, WE CAN'T SEE IT VERY WELL.  I THINK THE JUDGE

18:13:57  11  HAS SEEN BETTER PHOTOS.  BUT THE LIVERS RESIDENCE ORIGINALLY

18:14:00  12  WAS A SINGLE-STORY SLAB-ON-GRADE CONSTRUCTION IN THE ORIGINAL

18:14:05  13  PART OF THE HOUSE; IS THAT RIGHT?

18:14:06  14  **A.**   YES, SIR.  THAT'S A CAMELBACK.

18:14:08  15  **Q.**   AND BEHIND THAT WAS AN ADD-ON CAMELBACK?

18:14:12  16  **A.**   YES, SIR.

18:14:13  17  **Q.**   AND WE CAN JUST BARELY SEE THE ROOFLINE OF THE CAMELBACK

18:14:16  18  IN THIS PHOTO; CORRECT?

18:14:17  19  **A.**   YES, SIR.

18:14:27  20  **Q.**   OKAY.  ALL RIGHT.  SAME OPINION, BUT DAMAGE FROM ALL

18:14:31  21  CAUSES, CORRECT --

18:14:31  22  **A.**   YES, SIR.

18:14:31  23  **Q.**   -- WITH RESPECT TO LIVERS?

18:14:35  24  **A.**   YES, SIR.

18:14:35  25         **MR. PALMINTIER:**  HERE IS A REFERENCE TO AN INSURANCE

18:14:39   1   ESTIMATE, YOUR HONOR, THAT WE WOULD ASK AND MOVE TO BE STRUCK.

18:14:43   2               MR. GULOTTA:  HERE IN THIS ONE, SLIDE 48?

18:14:47   3               MR. PALMINTIER:  YES.

18:14:47   4               THE COURT:  "NO FLOOD-RELATED DAMAGE NOTED TO THE

18:14:49   5   ROOF. . . . IS INDICATED IN MR. TAYLOR'S ESTIMATE."  I SEE MR

18:14:52   6   -- OH, I SEE, THE STATE FARM.   "BUT LIKELY THE DAMAGE IS NOTED

18:14:58   7   IN THE STATE FARM INSURANCE ESTIMATE."

18:15:00   8               AGAIN, IF HE RELIED ON THAT, HE RELIED ON IT.

18:15:03   9   IT'S NOT COMING IN, AND YOU CAN PROBE IT ON CROSS-EXAMINATION

18:15:07  10   IF YOU WISH.  AND YOU CAN -- YOU CAN ASK WHAT ELSE DID HE USE

18:15:12  11   OTHER THAN, IF ANYTHING, THE STATE FARM INSURANCE ESTIMATE.

18:15:16  12               THE WITNESS:  I DID SEE THE STRUT -- THE LOOSE STRUT

18:15:16  13   BRACE, YOUR HONOR.

18:15:17  14               MR. PALMINTIER:  NO, THAT'S NOT --

18:15:21  15               THE COURT:  SIR, I'M SORRY.

18:15:21  16               THE WITNESS:  I'M SORRY.  I DID SEE THE LOOSE STRUT

18:15:26  17   BRACE UP IN THE --

18:15:27  18               THE COURT:  OKAY.  IT'S NOT SHOWN ON THE --

18:15:28  19               THE WITNESS:  I KIND OF GO MORE INTO THAT IN MY

18:15:31  20   REPORT OF WHAT I ACTUALLY SAW.

18:15:32  21               THE COURT:  OKAY.  SO, THEN, YOUR REPORT IS WHAT YOU

18:15:34  22   ACTUALLY OBSERVED?

18:15:35  23               THE WITNESS:  YES, SIR.

18:15:36  24   BY MR. GULOTTA:

18:15:38  25   Q.   OKAY.  AND THIS IS A PHOTO, SLIDE 49, OF -- THIS WAS A

| | | |
|---|---|---|
| 18:15:46 | 1 | DAMAGED FENCE; IS THAT CORRECT? |
| 18:15:46 | 2 | **A.**   YES, SIR. |
| 18:15:47 | 3 | **Q.**   WAS THAT ONE OF THE ITEMS THAT WAS DAMAGED BY WIND, IN |
| 18:15:50 | 4 | YOUR OPINION? |
| 18:15:51 | 5 | **A.**   MY -- YES, SIR.  I FOUND THAT MOST OF THE WOOD FENCES |
| 18:15:55 | 6 | DON'T DO VERY WELL WITH WIND. |
| 18:15:59 | 7 | **THE COURT:**  THEY DON'T DO VERY WELL WITH WIND? |
| 18:16:01 | 8 | **THE WITNESS:**  THEY DON'T DO VERY WELL. |
| 18:16:05 | 9 | **THE COURT:**  RIGHT. |
| 18:16:07 | 10 | **THE WITNESS:**  ISAAC EVEN GOT A BUNCH. |
| 18:16:09 | 11 | **BY MR. GULOTTA:** |
| 18:16:09 | 12 | **Q.**   OKAY.  SLIDE NUMBER 50 OF THE LIVERS RESIDENCE, WHAT DOES |
| 18:16:09 | 13 | THAT DEPICT, MR. DANNER? |
| 18:16:12 | 14 | **A.**   AGAIN, IT'S JUST A DOWNWARD VIEW OF A MISSING -- A LOOSE |
| 18:16:15 | 15 | ROOF HALF-SHINGLE. |
| 18:16:19 | 16 | I THINK THAT'S PART OF THE T1-11 THAT MR. LIVERS WAS |
| 18:16:22 | 17 | TALKING ABOUT IN THE BACK, THAT WOOD PANELING. |
| 18:16:29 | 18 | **Q.**   OKAY.  THIS IS THE BACK OF THE ROOF OF THE LIVERS |
| 18:16:32 | 19 | RESIDENCE? |
| 18:16:34 | 20 | **A.**   YES, SIR. |
| 18:16:34 | 21 | **Q.**   IS THIS MORE WIND DAMAGE? |
| 18:16:36 | 22 | **A.**   YES, SIR. |
| 18:16:36 | 23 | **Q.**   OKAY. |
| 18:16:36 | 24 | **A.**   AND THAT'S TYPICAL OF WIND DAMAGE. |
| 18:16:38 | 25 | **Q.**   WHAT'S TYPICAL ABOUT IT? |

18:16:39  1    **A.**   JUST THE EDGES.  IT'S -- BECAUSE TYPICALLY ALONG THE EDGES

18:16:42  2    YOU'RE GOING TO HAVE THE GREATER FORCES FROM THE VORTEX

18:16:46  3    SHEDDING AS THE WIND COMES OVER THE TOP OF THAT EAVE.  AND THAT

18:16:56  4    IS WIND ENGINEERING.

18:16:59  5    **Q.**   OKAY.  ALL RIGHT.  AND THIS IS YOUR OPINION REGARDING THE

18:17:07  6    ELEMENTS OF DAMAGE BY WIND, WHICH WE'VE LOOKED AT IN THE

18:17:13  7    PROCEEDING PHOTOGRAPHS, CORRECT, SLIDE NUMBER 52?

18:17:15  8    **A.**   YES, SIR.  BASED ON, IN THIS PARTICULAR CASE, MY ACTUAL

18:17:19  9    OBSERVATIONS ON MY INSPECTION.

18:17:25  10   **Q.**   OKAY.  NOW, HERE WE'RE ON THE SECOND FLOOR OF THE LIVERS

18:17:27  11   RESIDENCE, AND WE HAVE SEVERAL PHOTOS.  SO LIVERS RESIDENCE.

18:17:31  12   THIS IS THE SECOND FLOOR OF THE CAMELBACK; CORRECT?

18:17:33  13   **A.**   YES, SIR.

18:17:33  14   **Q.**   DID THIS RECEIVE ANY FLOOD DAMAGE AT ALL?

18:17:36  15   **A.**   NO, SIR.  WATER -- FLOODWATER, FROM THE BEST I COULD

18:17:39  16   INDICATE, LOOKING, CAME UP TO ABOUT THE MIDDLE OF THE CEILING

18:17:45  17   JOIST IN THE ORIGINAL RESIDENCE, BUT IT DID NOT COME ALL THE

18:17:49  18   WAY UP TO THE CEILING OF THE ADDITION DOWNSTAIRS.  THE CEILING

18:17:55  19   DOWNSTAIRS IS HIGHER IN THE ADDITION THAN IT IS IN THE FRONT

18:18:00  20   PART, AND THE FLOODWATERS DID NOT GET UP HERE, AND ESSENTIALLY

18:18:05  21   THIS IS WHAT YOU SAW IN 2007.

18:18:07  22   **Q.**   AND BY "THE ADDITION" --

18:18:08  23   **A.**   IN 2011.

18:18:09  24   **Q.**   BY "THE ADDITION," YOU'RE REFERRING TO THE -- THE

18:18:12  25   CAMELBACK, WHICH CONSISTED OF BOTH A FIRST FLOOR PART OF IT AND

18:18:18   1   THEN THE SECOND FLOOR ON TOP OF IT; IS THAT CORRECT?

18:18:21   2   **A.**   YES, SIR.  AND IT APPEARED, WHEN THEY RENOVATED IT, THEY

18:18:24   3   TOOK ALL THE BEDROOMS AND MOVED THEM UPSTAIRS AND THEN -- ON

18:18:28   4   THE SECOND FLOOR OF THE ADDITION.  THE FIRST FLOOR OF THE

18:18:32   5   ADDITION WAS A LARGE DEN AREA.  THAT'S WHERE THE FIREPLACE THAT

18:18:37   6   MR. LIVERS WAS TALKING ABOUT.

18:18:38   7   **Q.**   AND THAT FIRST FLOOR ADDITION -- THE CEILING OF THAT

18:18:42   8   FIRST-FLOOR ADDITION THAT WAS ADDED LATER WAS A LITTLE HIGHER

18:18:45   9   THAN THE ORIGINAL CEILING OF THE ORIGINAL ONE-STORY

18:18:48   10  SLAB-ON-GRADE RESIDENCE THAT WE --

18:18:49   11  **A.**   YES, SIR.

18:18:49   12  **Q.**   -- SAW IN THE PHOTO?

18:18:50   13  **A.**   YES, SIR.

18:18:52   14  **Q.**   ALL RIGHT.  OKAY.  SECOND FLOOR AGAIN.  WAS THERE ANY MOLD

18:18:57   15  DAMAGE THAT YOU DETECTED ON THE SECOND FLOOR?

18:19:02   16  **A.**   NOT THAT I COULD SEE WHEN I WAS THERE OR A SMELL WHEN I

18:19:11   17  WAS ON THE SECOND FLOOR.

18:19:13   18  **Q.**   AND THE STAIRWELL IN THE LAST --

18:19:13   19  **A.**   THAT'S THE VIEW GOING DOWN FROM THE SECOND FLOOR TO THE --

18:19:15   20  FIRST FLOOR GOING TOWARDS THE REAR OF THE RESIDENCE.  IT LOOKS

18:19:19   21  LIKE A WALL COVERING IN THE SECOND FLOOR OF THE ADDITION.

18:19:30   22  **Q.**   ALL RIGHT.  AND THIS IS THE ELEMENTS OF DAMAGE FROM ALL

18:19:39   23  SOURCES OF FLOODING TO THE LIVERS RESIDENCE.

18:19:41   24       HERE YOU SAY IT APPEARED TO BE LIMITED TO THE FIRST

18:19:44   25  FLOOR INTERIOR WALL, CEILING AND FLOOR COVERING, WOODWORK AND

| | | |
|---|---|---|
| 18:19:48 | 1 | ELECTRICAL, PLUMBING AND HVAC ELEMENTS; CORRECT? |
| 18:19:52 | 2 | **A.**   YES, SIR.  AS WE SAW IN THE PHOTOGRAPHS AND THE DAMAGE, |
| 18:19:54 | 3 | THAT'S CONSISTENT TO WHAT WE'RE SEEING DOING THE INSPECTION AND |
| 18:19:59 | 4 | THE PHOTOGRAPHS. |
| 18:20:01 | 5 | **Q.**   OKAY.  ALL RIGHT.  AND HERE'S THE REPRODUCTION OF YOUR |
| 18:20:06 | 6 | FLOOD ELEVATION ANALYSIS FOR THE LIVERS RESIDENCE BASED ON THE |
| 18:20:10 | 7 | VARIOUS SCENARIOS; CORRECT? |
| 18:20:12 | 8 | **A.**   YES, SIR. |
| 18:20:12 | 9 | **Q.**   AND YOU EMPLOYED THE SAME METHODOLOGY HERE THAT YOU |
| 18:20:16 | 10 | EMPLOYED -- THAT YOU DESCRIBED WITH REFERENCE TO THE COATES |
| 18:20:20 | 11 | RESIDENCE? |
| 18:20:22 | 12 | **A.**   YES, SIR. |
| 18:20:22 | 13 | **Q.**   NOW, WITH REFERENCE TO THE IHNC-ONLY SCENARIO, THE WATER |
| 18:20:29 | 14 | LEVEL WHICH YOU CALCULATED IN THE LIVERS RESIDENCE WAS 7 FEET; |
| 18:20:34 | 15 | IS THAT CORRECT? |
| 18:20:35 | 16 | **A.**   ABOVE THE FLOOR. |
| 18:20:37 | 17 | **Q.**   ABOVE THE FLOOR, YES.  OKAY. |
| 18:20:39 | 18 | **A.**   ABOVE THE FIRST FLOOR. |
| 18:20:40 | 19 | **Q.**   RIGHT. |
| 18:20:42 | 20 |        AND THAT INFORMED YOUR OPINION REGARDING THE DEGREE |
| 18:20:46 | 21 | OF DAMAGE TO THE LIVERS RESIDENCE FROM IHNC-ONLY CAUSES? |
| 18:20:50 | 22 | **A.**   YES, SIR. |
| 18:20:51 | 23 | **Q.**   ALL RIGHT.  LET'S LOOK AT THAT. |
| 18:20:53 | 24 |        AND THIS IS YOUR OPINION, SLIDE NO. 58, REGARDING THE |
| 18:20:56 | 25 | IHNC-ONLY SCENARIO DAMAGE.  AND, AGAIN, IT'S STILL QUITE |

```
18:21:00    1   EXTENSIVE.

18:21:03    2           WHAT COULD HAVE BEEN SAVED IN THE IHNC-ONLY SCENARIO

18:21:08    3   THAT WAS ALSO DAMAGED IN THE ALL-CAUSES SCENARIO, ACCORDING TO

18:21:13    4   YOUR OPINION?

18:21:15    5   A.   AGAIN, BASED ON THE HYDROGRAPHS, THE IHNC-ONLY SCENARIO,

18:21:20    6   THE WATER WOULD HAVE COME UP TO 7 FEET ABOVE THE FLOOR, OR

18:21:26    7   ABOUT A FOOT FROM THE CEILING, AND THEN WOULD HAVE GONE DOWN

18:21:29    8   RELATIVELY QUICKLY, AGAIN, COMPARED ON THE HYDROGRAPHS, DOWN TO

18:21:34    9   ABOUT 3.7 FEET OR 44 1/2 INCHES.

18:21:39   10           THIS PUTS YOU KIND OF IN A NO MAN'S LAND IF IT'S

18:21:44   11   STAYING THERE, SO I SAID, GO AHEAD AND TAKE OUT ALL OF THE WALL

18:21:48   12   COVERINGS UP TO ABOUT 8 FEET.  I THINK YOU WOULD HAVE BEEN ABLE

18:21:52   13   TO SAVE THE CEILING AND THE LIGHT FIXTURES IN THE CEILING.

18:21:55   14   Q.   AND THEN THIS IS THE LIVERS RESIDENCE HYDROGRAPH THAT YOU

18:21:59   15   REFERRED TO, THE VRIJLING HYDROGRAPH; CORRECT?

18:22:02   16   A.   YES, SIR.

18:22:03   17   Q.   OKAY.  WASHINGTON CHARBONNET RESIDENCE.  THIS IS A

18:22:08   18   PHOTOGRAPH OF THE EXTERIOR OF THE WASHINGTON CHARBONNET

18:22:11   19   RESIDENCE?

18:22:11   20   A.   YES, SIR.

18:22:15   21   Q.   AND YOUR OPINION REGARDING SOURCES OF ALL DAMAGE?

18:22:19   22   A.   THE SAME.

18:22:19   23   Q.   OKAY.  AND THE ELEMENTS OF THE WASHINGTON PROPERTY DAMAGED

18:22:24   24   BY WIND, THIS IS YOUR OPINION REGARDING THAT; IS THAT CORRECT?

18:22:27   25   A.   YES, SIR, BASED ON EVERYTHING I COULD LOOK AT.
```

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 18:22:31 | 1  | **Q.**   OKAY.  NOW, AGAIN, THERE IS A REFERENCE TO THE RIMKUS            |
| 18:22:34 | 2  | CONSULTING GROUP REPORT.  BUT YOUR OPINION REGARDING THE WIND             |
| 18:22:38 | 3  | DAMAGE WAS YOUR OWN EVALUATION; IS THAT CORRECT?                          |
| 18:22:40 | 4  | **A.**   BASED ON PHOTOGRAPHS THAT I HAD SEEN, YES, SIR.                  |
| 18:22:43 | 5  | **Q.**   OKAY.  LET'S LOOK AT THOSE PHOTOS.  SLIDE 63 IS THE FIRST        |
| 18:22:50 | 6  | ONE.  IS THAT A PICTURE OF THE ROOF?                                      |
| 18:22:52 | 7  | **A.**   YEAH.  YOU'VE GOT SOME LOWER DAMAGE, COULD HAVE ACTUALLY         |
| 18:22:58 | 8  | BEEN FROM FLOODING, BUT ANYTHING ABOVE THAT WOULD HAVE BEEN               |
| 18:23:02 | 9  | FROM -- YOU'LL SEE MORE OF THAT FROM WIND.                                |
| 18:23:06 | 10 | **Q.**   OKAY.  AND IS THIS ANOTHER VIEW OF THE ROOF?                     |
| 18:23:10 | 11 | **A.**   YES, SIR.  AGAIN, THE UPPER PORTION'S MOST LIKELY WIND.          |
| 18:23:15 | 12 | THE LOWER PORTION COULD BE -- COULD BE EITHER/OR.                         |
| 18:23:34 | 13 | **THE COURT:**  SOME PEOPLE GET TOO CLOSE.  YOU'RE FINE                   |
| 18:23:36 | 14 | RIGHT THERE.                                                             |
| 18:23:36 | 15 | **BY MR. GULOTTA:**                                                       |
| 18:23:37 | 16 | **Q.**   OKAY, MR. DANNER.  SO WE'RE ON TO SLIDE 65.  IS THIS THE         |
| 18:23:41 | 17 | SOFFIT AND FACIA?                                                         |
| 18:23:43 | 18 | **A.**   YES, SIR.                                                        |
| 18:23:43 | 19 | **Q.**   AND DOES THAT APPEAR TO BE WIND DAMAGE TO YOU AS WELL?           |
| 18:23:46 | 20 | **A.**   TYPICALLY, IT IS.  IF YOU NOTICE, THERE'S DAMAGE TO IT BUT       |
| 18:23:49 | 21 | NOT DAMAGE TO THAT MUCH SIDING, TO THE LOWER PORTION OF THE --            |
| 18:23:55 | 22 | OF THE WALL.                                                             |
| 18:24:04 | 23 | **Q.**   AND SLIDE NO. 66 IS A PICTURE OF WHAT?                           |
| 18:24:06 | 24 | **A.**   THE SAME THERE.                                                  |
| 18:24:07 | 25 | **Q.**   I'M SORRY, SAY AGAIN.                                            |

| | | |
|---|---|---|
| 18:24:08 | 1 | **A.** SAME THERE.  YOU PROBABLY GOT A COMBINATION OF WIND AND |
| 18:24:11 | 2 | SOME -- AND WATER DAMAGE. |
| 18:24:13 | 3 | **Q.** NOW, THIS IS SOME SIDING? |
| 18:24:15 | 4 | **A.** YES, SIR. |
| 18:24:16 | 5 | **Q.** SLIDE NO. 67; CORRECT? |
| 18:24:17 | 6 | **A.** YES, SIR. |
| 18:24:18 | 7 | **Q.** AND THAT APPEARS TO BE WHAT KIND OF DAMAGE, IN YOUR |
| 18:24:22 | 8 | OPINION? |
| 18:24:22 | 9 | **A.** LOOKING AT THAT, TYPICALLY I WOULD SAY THAT'S WIND DAMAGE. |
| 18:24:26 | 10 | **Q.** AND WHY IS THAT? |
| 18:24:27 | 11 | **A.** IT'S JUST ON THAT WALL.  AND THE SIDING GETS TENDENCIES TO |
| 18:24:32 | 12 | BLOW AWAY.  IT'S NOT THAT YOU DIDN'T HAVE WATER UP THERE, IT'S |
| 18:24:37 | 13 | JUST THAT THAT TYPE OF DAMAGE TYPICALLY WOULD BE FROM WIND. |
| 18:24:40 | 14 | **Q.** OKAY.  NOW, WITH REFERENCE TO THE PART OF YOUR OPINION |
| 18:24:43 | 15 | REGARDING ELEMENTS OF THE PROPERTY DAMAGE FROM ALL SOURCES OF |
| 18:24:48 | 16 | FLOODING, AGAIN, FLOODING DAMAGE WAS EXTENSIVE FROM ALL CAUSES. |
| 18:24:52 | 17 | AND WE HAVE HERE THE ELEMENTS THAT YOU REFER TO THAT COULD HAVE |
| 18:24:58 | 18 | BEEN REPAIRED, WHICH CONSISTED OF REMOVING AND REPLACING |
| 18:25:01 | 19 | INTERIOR WALLS, CEILINGS, FLOOR COVERINGS, WOODWORK AND |
| 18:25:06 | 20 | ELECTRICAL, PLUMBING AND HVAC ELEMENTS. |
| 18:25:10 | 21 | THE EXPOSED WOOD FRAMING COULD HAVE BEEN CLEANED AND |
| 18:25:12 | 22 | DECONTAMINATED PRIOR TO REHABILITATING THE RESIDENCE; CORRECT? |
| 18:25:16 | 23 | **A.** YES, SIR.  AND THIS ONE, THE RESIDENCE MOVED LATERALLY ON |
| 18:25:22 | 24 | ITS FOUNDATION.  BASED ON THE EVIDENCE, IT DIDN'T MOVE OFF THE |
| 18:25:25 | 25 | FOUNDATION, SO IT WOULD ALSO HAVE TO BE REPOSITIONED. |

18:25:28    1   **Q.**   RIGHT.  SO THAT'S THE FIRST SENTENCE IN THIS PART OF YOUR

18:25:31    2   OPINION.  YOU REFER TO AFTER REPOSITIONING IT -- THAT'S THE

18:25:34    3   RESIDENCE ON ITS FOUNDATION -- AND REPAIRING THE ROOF AND

18:25:37    4   EXTERIOR WALL COVERINGS, IT COULD HAVE BEEN REPAIRED; CORRECT?

18:25:41    5   **A.**   YES, SIR.

18:25:42    6   **Q.**   OKAY.  SO LET'S LOOK AT THE -- WELL, THIS IS YOUR

18:25:46    7   ELEVATION ANALYSIS.  AND THE IHNC-BREACHES-ONLY SCENARIO WERE

18:25:53    8   STILL QUITE HIGH IN THE WASHINGTON RESIDENCE, 7.3 FEET ABOVE

18:25:58    9   THE FLOOR; CORRECT?

18:25:59   10   **A.**   YES, SIR.

18:25:59   11   **Q.**   ALL RIGHT.  AND THIS IS THE -- THE -- WELL, ACTUALLY, THIS

18:26:05   12   IS THE WASHINGTON HYDROGRAPH WITH REFERENCE TO THE DERBIGNY

18:26:14   13   RESIDENCE; CORRECT?

18:26:14   14   **A.**   THAT'S CORRECT.  THAT'S THE DERBIGNY ONE.  I DID THIS --

18:26:18   15   **Q.**   LET'S GO FORWARD HERE.  THIS IS LOCATION 6, WHICH IS THE

18:26:22   16   WASHINGTON CHARBONNET RESIDENCE; CORRECT?

18:26:23   17   **A.**   YES, SIR.

18:26:23   18   **Q.**   OKAY.  NOW, THE REASON I'M DISPLAYING BOTH OF THOSE, WHEN

18:26:29   19   YOU ACTUALLY DID YOUR ELEVATION CALCULATIONS FOR WASHINGTON,

18:26:36   20   YOU USED THE WASHINGTON DERBIGNY HYDROGRAPH INSTEAD OF THE

18:26:41   21   WASHINGTON CHARBONNET, THE LOCATION NO. 6 HYDROGRAPH?

18:26:44   22   **A.**   YES, SIR.

18:26:45   23   **Q.**   OKAY.  AND THAT'S BECAUSE YOUR COUNSEL NEGLECTED TO GIVE

18:26:49   24   YOU THE CORRECT HYDROGRAPH; IS THAT CORRECT?

18:26:52   25   **A.**   YES, SIR.

18:26:54   1   **Q.**   SO IN LOOKING AT THE TWO HYDROGRAPHS, COMPARING WASHINGTON

18:26:58   2   CHARBONNET LOCATION NO. 6 WITH WASHINGTON DERBIGNY, DOES THE

18:27:06   3   WASHINGTON CHARBONNET NO. 6 HYDROGRAPH ALTER IN ANY MATERIAL

18:27:13   4   WAY YOUR CALCULATIONS FROM THE VARIOUS SCENARIOS?

18:27:15   5   **A.**   IT ACTUALLY LOWERS IT A PERCENTAGE OF A FOOT.

18:27:20   6   **Q.**   OKAY.  AND HOW IS THAT?

18:27:21   7        **MR. PALMINTIER:**  WELL, JUDGE, HE'S ATTEMPTING TO

18:27:22   8   REHABILITATE A REPORT.  I HATE TO MAKE A GREAT ISSUE OF IT, BUT

18:27:26   9   IT DOES SEEM THAT THIS IS CHANGING, AND SINCE IT'S CHANGING FOR

18:27:30   10   THE WORSE, WE OBJECT.

18:27:33   11        **THE COURT:**  I UNDERSTAND.

18:27:34   12        **MR. GULOTTA:**  THE ONLY QUESTION I REALLY WANT, YOUR

18:27:36   13   HONOR -- IT'S NOT MATERIAL.

18:27:37   14        **THE COURT:**  OKAY.

18:27:39   15        **MR. GULOTTA:**  I DON'T NEED --

18:27:40   16        **THE COURT:**  AT LEAST THE AREA HAS BEEN POINTED OUT.

18:27:42   17        **MR. GULOTTA:**  THANK YOU.

18:27:43   18        **THE COURT:**  BUT IT'S APPARENTLY -- AS I'M

18:27:46   19   UNDERSTANDING, GENERALLY A NO HARM/NO FOUL ERROR.

18:27:51   20   **BY MR. GULOTTA:**

18:27:52   21   **Q.**   AND IF I MAY ASK, MR. DANNER, IS THAT -- THE FACT THAT

18:27:54   22   IT'S NOT MATERIAL, IS THAT BECAUSE -- AGAIN FOCUSING ON THE RED

18:27:58   23   LINE, THIS IS WASHINGTON DERBIGNY, THE IHNC-ONLY SCENARIO, AND

18:28:01   24   THEN, AGAIN, THE RED LINE --

18:28:06   25        **THE COURT:**  PRETTY CLOSE.

| | | |
|---|---|---|
| 18:28:06 | 1 | **BY MR. GULOTTA:** |
| 18:28:06 | 2 | **Q.**   -- AND WASHINGTON CHARBONNET IS CLOSE? |
| 18:28:10 | 3 | **A.**   YES, SIR.  THE ALL-CAUSES DIDN'T CHANGE MUCH, JUST ONE OR |
| 18:28:15 | 4 | TWO OF THE GRAPHS DID. |
| 18:28:17 | 5 | **Q.**   THANK YOU, MR. DANNER.  OKAY. |
| 18:28:19 | 6 | **A.**   AND I USED THE WORST-CASE SCENARIO. |
| 18:28:21 | 7 | **Q.**   OKAY.  AND THEN THIS IS A COMPARISON SIDE-BY-SIDE, SLIDE |
| 18:28:27 | 8 | NO. 72. |
| 18:28:33 | 9 | AND THIS IS YOUR ELEVATION OF THE ELEMENTS OF DAMAGE |
| 18:28:35 | 10 | BY IHNC-ONLY FLOODWATERS BASED ON THE 7.3 FEET OF WATER IN THE |
| 18:28:38 | 11 | WASHINGTON RESIDENCE; CORRECT? |
| 18:28:39 | 12 | **A.**   YES, SIR. |
| 18:28:45 | 13 | **Q.**   AND, AGAIN, WHAT'S THE DIFFERENCE BETWEEN THAT IN TERMS OF |
| 18:28:47 | 14 | ELEMENTS DAMAGED BETWEEN THE IHNC-ONLY SCENARIO AND THE |
| 18:28:49 | 15 | ALL-CAUSES SCENARIO? |
| 18:28:52 | 16 | **A.**   THE BOTTOM LINE IS YOU WOULD MORE LIKELY NOT HAVE BEEN |
| 18:28:55 | 17 | ABLE TO SAVE THE CEILINGS AND COVERINGS IN THE IHNC SCENARIO |
| 18:29:01 | 18 | ONLY. |
| 18:29:02 | 19 | **Q.**   YOU WOULD NOT BE ABLE TO SAVE -- |
| 18:29:02 | 20 | **A.**   YOU WOULD HAVE BEEN ABLE TO SAVE IT. |
| 18:29:05 | 21 | **Q.**   IN THE IHNC-ONLY SCENARIO? |
| 18:29:06 | 22 | **A.**   YES, SIR.  YOU WOULD HAVE TAKEN OUT ALL THE CHIPBOARD UP |
| 18:29:08 | 23 | THE WHOLE 96 INCHES TO THE CEILING.  SIMILAR TO WHAT WE HAD IN |
| 18:29:12 | 24 | THE LIVERS RESIDENCE. |
| 18:29:16 | 25 | **Q.**   OKAY.  NOW, THIS -- THESE LAST COUPLE OF SLIDES REFER TO |

18:29:21   1   THE REPOSITIONING.  AGAIN, OMITTING ANY REFERENCE TO THE RIMKUS

18:29:27   2   REPORT, DID YOU LOOK AT PHOTOGRAPHS OF THE ACTUAL DISPLACEMENT

18:29:31   3   OF THE RESIDENCE ON ITS PIERS?

18:29:33   4   **A.**   YES, SIR.

18:29:34   5   **Q.**   OKAY.  LET'S LOOK AT SOME OF THEM.

18:29:36   6           THIS IS THE RESIDENCE, ANOTHER SHOT FROM THE SIDE.

18:29:39   7   AND WHAT DOES THIS DEPICT HERE?

18:29:44   8   **A.**   YOU'RE LOOKING AT THE FRAMING, IT'S WHERE THE FLOOR JOISTS

18:29:47   9   AND THE FRAMING MEET THE WOOD SILLS --

18:29:50  10   **Q.**   NOW, BASED ON THIS PHOTOGRAPH AND OTHER --

18:29:50  11   **A.**   -- FROM THE CRAWL SPACE.

18:29:52  12   **Q.**   I'M SORRY?

18:29:53  13   **A.**   FROM THE CRAWL SPACE IN THE FOUNDATION.

18:29:55  14   **Q.**   OKAY.  NOW, BASED ON THIS PHOTOGRAPH AND OTHERS -- AND

18:29:58  15   OTHER EVALUATIONS THAT YOU MADE, DID YOU DETECT ANY RACKING OF

18:30:02  16   THE RESIDENCE FRAME OR DISTORTION OF THE JOISTS OF THE

18:30:08  17   RESIDENCE?

18:30:09  18   **A.**   BASED ON WHAT I OBSERVED, NO, SIR.

18:30:15  19   **Q.**   WHAT IS THIS A PHOTO OF?

18:30:17  20   **A.**   IT'S SHOWING THE MOVEMENT OF THE SILL VERSUS THE

18:30:25  21   FOUNDATION PIER DOWN BELOW.

18:30:26  22   **Q.**   DOES THIS DEPICT THE MAGNITUDE OF THE MOVEMENT OF THIS

18:30:29  23   STRUCTURE ON ITS PIER?

18:30:31  24   **A.**   IN THIS PARTICULAR CASE, IT SHOWS THAT IT'S STILL UP

18:30:35  25   THERE.  IT LOOKS LIKE IT MIGHT HAVE MOVED MAYBE 2 INCHES,

18:30:39  1  3 INCHES.

18:30:42  2  **Q.**   IT DID NOT FALL COMPLETELY OFF THE PIERS?

18:30:45  3  **A.**   NOTHING THAT I SAW SAID IT FELL COMPLETELY OFF, ON ANY

18:30:50  4  TESTIMONY.

18:30:52  5  **Q.**   OKAY.

18:31:30  6  **MR. GULOTTA:**  OKAY.  MR. DANNER, THANK YOU VERY MUCH

18:31:31  7  FOR YOUR PATIENCE.

18:31:35  8  MR. MCCONNON FOR THE GOVERNMENT MAY HAVE SOME

18:31:38  9  QUESTIONS FOR YOU.  AND WHETHER HE DOES OR NOT, I'M SURE

18:31:39  10  MR. PALMINTIER WILL.

18:31:39  11  **THE COURT:**  THANK YOU, COUNSEL.

18:31:46  12  **MR. MCCONNON:**  THE UNITED STATES HAS NO QUESTIONS FOR

18:31:48  13  THIS WITNESS, YOUR HONOR.

18:31:48  14  **THE COURT:**  THANK YOU, COUNSEL.

18:31:48  15  I ASSUME YOU DO, SIR?

18:31:48  16  **MR. PALMINTIER:**  I DO, YOUR HONOR.  MAY IT PLEASE THE

18:31:49  17  COURT.  WE HAVE HALF AN HOUR LEFT.

18:31:51  18  **THE COURT:**  HOW LONG DO YOU THINK IT'S GOING TO TAKE?

18:31:53  19  LET ME JUST SAY THIS.  IT'S FRIDAY NIGHT, I'VE GOT -- IT SOUNDS

18:31:58  20  LIKE A SONG, BUT ANYWAY, I DIDN'T JUST GET PAID -- THAT'S GOING

18:32:09  21  WAY BACK -- SORRY.

18:32:10  22  AND, YOU KNOW, I WANT THIS TRIAL TO BE AS FAIR

18:32:15  23  AS IT CAN BE, AND THERE COMES A TIME CONSIDERING, FRANKLY,

18:32:19  24  EVERYBODY'S CONDITION, BUT MINE WHO'S LISTENING TO THIS AND IS

18:32:23  25  THE FACT-FINDER, I JUST DON'T WANT TO BE SO RAGGED THAT I'M NOT

18:32:29   1   GETTING YOUR POINT.

18:32:31   2              HOW LONG DO YOU THINK YOUR CROSS IS GOING TO

18:32:32   3   TAKE?

18:32:33   4         **MR. PALMINTIER:**  IT COULD TAKE ANYWHERE FROM HALF AN

18:32:35   5   HOUR TO AN HOUR.

18:32:37   6         **THE COURT:**  ALL RIGHT.  LET'S TAKE A SHOT AND GET

18:32:38   7   THIS THING FINISHED.

18:32:39   8         **MR. PALMINTIER:**  YES, SIR.

18:32:40   9         **THE COURT:**  MY NIGHT'S ALREADY RUPTURED.  I'M SURE

18:32:43  10   EVERYBODY'S IS.  SO WE'LL GO ALONG WITH IT.

18:32:49  11         **MR. PALMINTIER:**  I WILL TRY TO GO QUICKLY, YOUR

18:32:51  12   HONOR.

18:32:51  13         **THE COURT:**  YES, SIR.

18:32:51  14                    **CROSS-EXAMINATION**

18:32:53  15   **BY MR. PALMINTIER:**

18:32:55  16   **Q.**   MR. DANNER, YOU'RE A CIVIL AND STRUCTURAL ENGINEER.  AND

18:32:58  17   ONE OF THE THINGS THAT YOU DID FOR THE DEFENDANT IS TO USE YOUR

18:33:05  18   OWN METHODOLOGY TO GIVE THE OPINIONS THAT YOU'VE JUST TOLD THE

18:33:13  19   COURT ABOUT; CORRECT?

18:33:14  20   **A.**   IN GENERAL, YES, SIR.

18:33:16  21   **Q.**   OKAY.  AND THAT METHODOLOGY INCLUDES THE LIST OF THE

18:33:19  22   VARIOUS THINGS THAT YOU MENTIONED IN YOUR REPORTS; CORRECT?

18:33:27  23   **A.**   ALONG -- ALONG WITH A LOT OF OTHER --

18:33:30  24   **Q.**   IS THAT CORRECT?

18:33:31  25   **A.**   YES, SIR.

18:33:31   1   **Q.**   AND THEN THE METHODOLOGY INCLUDES SUCH THINGS AS LOOKING

18:33:37   2   AT LAWSUITS; RIGHT?

18:33:41   3   **A.**   NOT AS FAR AS DETERMINING THE TYPE OF DAMAGES THAT -- WHEN

18:33:47   4   YOU HAVE SOMETHING, BUT IT'S NOT A MATTER OF LAWSUITS, JUST

18:33:52   5   LOOKING AT THE TESTIMONY OF ANY OTHER EVIDENCE THAT MAY BE OUT

18:33:53   6   THERE THAT CAN HELP YOU MAKE A DETERMINATION.

18:33:55   7   **Q.**   SO IN TERMS OF THAT LIST OF THINGS THAT YOU DEPENDED ON,

18:33:58   8   WE CAN STRIKE THAT FROM THE LIST; RIGHT?  YOU DON'T RELY ON IT?

18:34:01   9   **A.**   THE DEPOSITIONS I WOULD HAVE LOOKED AT IN THERE.

18:34:05   10  **Q.**   PLEASE ANSWER THE QUESTION.  AS FAR AS THE LAWSUITS ARE

18:34:07   11  CONCERNED, WE CAN STRIKE --

18:34:07   12          **THE COURT:**  WELL, HE SAID "THE DEPOSITIONS."  HE DID

18:34:09   13  ANSWER.

18:34:09   14          **MR. PALMINTIER:**  I UNDERSTAND, YOUR HONOR, BUT IT'S

18:34:10   15  THE LAWSUITS WE'RE TALKING ABOUT NOW.

18:34:12   16  **BY MR. PALMINTIER:**

18:34:12   17  **Q.**   YOU SAID WE CAN STRIKE THE LAWSUITS; RIGHT?

18:34:16   18          **MR. GULOTTA:**  OBJECTION, YOUR HONOR.

18:34:18   19          **THE COURT:**  IF WE WANT TO GET -- IF WE WANT TO MAKE

18:34:20   20  HEADWAY AND REALLY GET TO IT, DO YOU AGREE THAT THE ONLY THING

18:34:25   21  THAT WE WOULD RELY ON IS THE DEPOSITION TESTIMONY OF THE

18:34:28   22  PLAINTIFFS IN THE LAWSUIT?  IS THAT FAIR?

18:34:32   23          **MR. PALMINTIER:**  I'LL ADOPT THAT AS MY QUESTION, YOUR

18:34:35   24  HONOR.

18:34:35   25          **THE COURT:**  IF THAT'S FAIR, YOU CAN ANSWER THAT --

| | | |
|---|---|---|
| 18:34:38 | 1 | **THE WITNESS:** I AGREE NOW, YES. |
| 18:34:39 | 2 | **THE COURT:** OKAY. |
| 18:34:40 | 3 | BY MR. PALMINTIER: |
| 18:34:40 | 4 | **Q.** OKAY. NOW, WHEN YOU -- YOU DID USE THE DEPOSITIONS, |
| 18:34:43 | 5 | THOUGH; CORRECT? |
| 18:34:44 | 6 | **A.** YES, SIR. |
| 18:34:44 | 7 | **Q.** YOU DIDN'T SELECT -- LET ME ASK YOU THIS: DID YOU |
| 18:34:47 | 8 | SELECTIVELY USE THEM, OR DID YOU USE THE ENTIRE DEPOSITIONS? |
| 18:34:52 | 9 | **A.** I READ THE WHOLE DEPOSITION AND TOOK IT UNDER |
| 18:34:56 | 10 | CONSIDERATION. |
| 18:34:56 | 11 | **Q.** WHO GAVE YOU THOSE? |
| 18:34:57 | 12 | **A.** SAY AGAIN. |
| 18:34:58 | 13 | **Q.** WHO GAVE YOU THE DEPOSITIONS? |
| 18:34:59 | 14 | **A.** COUNSEL. |
| 18:35:00 | 15 | **Q.** AND WHICH COUNSEL WOULD THAT HAVE BEEN? |
| 18:35:03 | 16 | **A.** STONE PIGMAN. |
| 18:35:06 | 17 | **Q.** AND WERE YOU GIVEN ANY INSTRUCTIONS ABOUT HOW TO READ |
| 18:35:08 | 18 | THOSE DEPOSITIONS? |
| 18:35:09 | 19 | **A.** NO, SIR. |
| 18:35:10 | 20 | **Q.** ALL RIGHT. WERE YOU POINTED OUT ANY AREAS IN THOSE |
| 18:35:13 | 21 | DEPOSITIONS TO FOCUS ON? |
| 18:35:14 | 22 | **A.** NOT THAT I KNOW OF, NO, SIR. |
| 18:35:16 | 23 | **Q.** IS THAT YOU DON'T REMEMBER OR YOU DON'T KNOW? |
| 18:35:19 | 24 | **A.** WELL, I WASN'T GIVEN INSTRUCTIONS. I WAS GIVEN ALL -- ALL |
| 18:35:22 | 25 | AVAILABLE CASE OR CLAIM MATERIAL TO REVIEW AND TO SEE IF I |

| | | |
|---|---|---|
| 18:35:28 | 1 | COULD PICK OUT SOMETHING IN THERE WHICH WOULD HELP ME, ASSIST |
| 18:35:31 | 2 | ME IN DETERMINING THE DIFFERENTIATION BETWEEN WIND VERSUS THE |
| 18:35:40 | 3 | FLOODING DAMAGE. |
| 18:35:40 | 4 | **Q.**   RIGHT.   WHAT I'M ASKING:   DID YOU DO THAT ON YOUR OWN, OR |
| 18:35:44 | 5 | DID SOMEBODY DO THAT FOR YOU? |
| 18:35:46 | 6 | **A.**   I DID THAT. |
| 18:35:46 | 7 | **Q.**   ALL RIGHT.   IN DOING THAT, DID YOU SELECTIVELY USE THINGS |
| 18:35:49 | 8 | THAT YOU FOUND?   FOR EXAMPLE, WHEN YOU HEARD FROM ONE OF THE |
| 18:35:52 | 9 | PLAINTIFFS THAT THEY HAD WIND DAMAGE, YOU USED THAT; RIGHT? |
| 18:35:55 | 10 | **A.**   YES, SIR. |
| 18:35:56 | 11 | **Q.**   AND WHEN YOU HEARD FROM ONE OF THE PLAINTIFFS THAT THEIR |
| 18:36:02 | 12 | HOUSE WAS 20 FEET UNDER WATER, YOU IGNORED THAT; RIGHT? |
| 18:36:05 | 13 | **A.**   NO, I ALREADY KNEW THAT.   AT LEAST I KNEW IT WAS UP TO |
| 18:36:08 | 14 | WHERE IT WAS. |
| 18:36:08 | 15 | **Q.**   OKAY.   SO YOU ACCEPTED WHAT THEY TOLD YOU ABOUT 20 FEET? |
| 18:36:13 | 16 | **A.**   WELL, I ACCEPTED -- I DON'T REMEMBER ANYBODY SAYING |
| 18:36:14 | 17 | 20 FEET, BUT ACCEPTED THE FACT THAT THEY HAD SIGNIFICANT WATER |
| 18:36:19 | 18 | DAMAGE OF THE -- AND WATER DAMAGE THAT THEY SAID THEY HAD AS |
| 18:36:24 | 19 | FAR AS -- EXCUSE ME, THE HEIGHT OF THE WATER IS CONSISTENT WITH |
| 18:36:26 | 20 | THE EVIDENCE. |
| 18:36:28 | 21 | **Q.**   OKAY.   LET'S USE THE ARMSTRONG RESIDENCE AS AN EXAMPLE. |
| 18:36:31 | 22 | THAT HOUSE WAS INUNDATED WITH WATER FOR DAYS.   IS THAT CORRECT |
| 18:36:36 | 23 | OR NOT CORRECT? |
| 18:36:38 | 24 | **A.**   THEY HAD WATER UP PAST THE EAVES. |
| 18:36:41 | 25 | **Q.**   FOR DAYS; RIGHT? |

3373

18:36:42   1   **A.**   FOR DAYS, YES, SIR.

18:36:43   2   **Q.**   RIGHT.  AND THAT'S IMPORTANT, ISN'T IT, THAT IT WAS UNDER

18:36:47   3   WATER FOR DAYS?  ISN'T THAT IMPORTANT TO YOU AS A STRUCTURAL

18:36:53   4   ENGINEER, SIR?

18:36:53   5   **A.**   WELL, OF COURSE.

18:36:54   6   **Q.**   RIGHT.  BECAUSE WHAT HAPPENS WHEN A WATER -- WHEN A HOUSE

18:36:57   7   IS UNDER WATER FOR DAYS IS THAT THE ENTIRE HOUSE GETS

18:37:02   8   UNDERMINED IN TERMS OF STRUCTURAL INTEGRITY.

18:37:05   9   **A.**   NOT NECESSARILY.

18:37:05   10  **Q.**   BUT IN THIS CASE IT DID, DIDN'T IT?

18:37:07   11  **A.**   NOT BASED ON WHAT I OBSERVED AND WHAT I SAW.

18:37:10   12  **Q.**   RIGHT.

18:37:11   13  **A.**   IT HAD DAMAGES, OBVIOUSLY LOTS OF DAMAGES, AS I CATALOGED.

18:37:17   14  **Q.**   LET'S GO TO THAT -- FIRST, LET ME ASK YOU THIS:  IN ALL

18:37:23   15  THE WORK THAT YOU DO, EVALUATING A HOUSE FOR WHETHER IT CAN BE

18:37:28   16  RECONSTRUCTED OR WHY IT HAS TO BE TORN DOWN, PART OF WHAT YOU

18:37:34   17  USE IS COMMON SENSE; RIGHT?

18:37:35   18  **A.**   WELL, WE ALL HAVE A LITTLE BIT OF COMMON SENSE, BUT I'VE

18:37:38   19  GOT ABOUT 30 YEARS OF COMMON SENSE.

18:37:40   20  **Q.**   THE ANSWER IS, YES, YOU LOOK AT COMMON SENSE; CORRECT?

18:37:44   21  **A.**   BUT IT'S MY COMMON SENSE.

18:37:46   22  **Q.**   UNDERSTOOD.

18:37:48   23           AND COMMON SENSE TELLS YOU THAT THE LONGER SOMETHING

18:37:50   24  STAYS UNDER WATER, THE MORE DIFFICULT IT IS TO REHABILITATE IT;

18:37:54   25  ISN'T THAT TRUE?

18:37:55   1   **A.**   DEPENDS WHAT IT IS, WHAT THE MATERIAL IS.

18:37:57   2   **Q.**   ALL RIGHT.  AND IT ALSO DEPENDS WHAT'S IN THE WATER,

18:38:01   3   DOESN'T IT?

18:38:01   4   **A.**   SAY AGAIN, COUNSEL.

18:38:03   5   **Q.**   IT ALSO DEPENDS ON WHAT WAS IN THE WATER.

18:38:05   6   **A.**   THAT'S WHAT I JUST SAID.  THE MATERIAL BEING IF IT --

18:38:10   7   **Q.**   I'M NOT TALKING ABOUT THAT.  I'M SORRY I DIDN'T MAKE

18:38:12   8   MYSELF CLEAR.

18:38:19   9          DO WE RECOGNIZE TOGETHER, SIR, THAT THE WATERS OF THE

18:38:24   10   FLOOD THAT WE'VE BEEN TALKING ON THESE FIVE RESIDENCES WAS

18:38:28   11   FILLED WITH CONTAMINATION?  DO YOU RECOGNIZE THAT?

18:38:32   12   **A.**   INITIALLY IT WAS SEAWATER, WHICH IS PRETTY CLEAN.

18:38:35   13   HOWEVER, OBVIOUSLY, BUT AS TIME WENT ON, WE GOT -- CRANKCASE

18:38:43   14   OIL GOT INVOLVED AND PESTICIDES AND LOTS OF OTHER STUFF AND

18:38:47   15   THINGS.

18:38:47   16   **Q.**   IT WAS A CHEMICAL SOUP.  IS THAT A FAIR STATEMENT?

18:38:50   17   **A.**   WELL, NOW I THINK YOU'RE GETTING OUTSIDE MY AREA OF

18:38:52   18   EXPERTISE.

18:38:53   19   **Q.**   I UNDERSTAND.

18:38:55   20   **A.**   I'M AN ENVIRONMENTAL ENGINEER, BUT AS FAR AS -- I'VE HEARD

18:38:59   21   LOTS OF PEOPLE TALK ABOUT WHAT WAS IN THAT WATER.

18:39:01   22   **Q.**   WELL, FOR EXAMPLE, THE WITNESS THAT WILL BE PRESENTED ON

18:39:05   23   MONDAY, MR. SCHNEIDER, HE'S -- HE CALLED IT A

18:39:10   24   CLASS III CONTAMINATED SOUP.  DO YOU REMEMBER THAT?  OR A

18:39:16   25   CLASS III LEVEL CONTAMINATED FLOOD?

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 18:39:18 | 1  | **A.**   I'M NOT FAMILIAR WITH THAT TERMINOLOGY.             |
| 18:39:19 | 2  | **Q.**   OKAY.  BUT YOU DO RECOGNIZE THAT IT WAS FILLED WITH |
| 18:39:21 | 3  | CHEMICALS WHEN IT DID INUNDATE ALL THESE HOUSES?             |
| 18:39:25 | 4  | **A.**   AND WHETHER IT'S CHEM- --                           |
| 18:39:27 | 5  | **Q.**   PLEASE ANSWER AND THEN YOU CAN --                   |
| 18:39:28 | 6  | **A.**   NO, I -- YEAH.                                       |
| 18:39:31 | 7  | **Q.**   YOU DO RECOGNIZE THAT IT WAS FILLED WITH CHEMICALS WHEN IT |
| 18:39:34 | 8  | INUNDATED AND --                                             |
| 18:39:35 | 9  | **THE WITNESS:**  I'M GOING TO HAVE TO ANSWER THAT AS NO, |
| 18:39:37 | 10 | YOUR HONOR, BECAUSE I DON'T KNOW WHAT CHEMICALS --           |
| 18:39:40 | 11 | **THE COURT:**  SURE.  YOU'RE ONLY SPEAKING TO YOUR OWN   |
| 18:39:41 | 12 | KNOWLEDGE.  ALL RIGHT.                                       |
| 18:39:46 | 13 | **BY MR. PALMINTIER:**                                       |
| 18:39:47 | 14 | **Q.**   NOW, DO YOU BELIEVE THAT IT DOESN'T MAKE A DIFFERENCE -- |
| 18:39:52 | 15 | WHEN IT COMES TO THE WOODEN STRUCTURAL ELEMENTS OF THE VARIOUS |
| 18:39:56 | 16 | HOUSES WE HAVE BEEN LOOKING AT IT, IT DOESN'T MAKE A DIFFERENCE |
| 18:40:00 | 17 | HOW LONG THAT WOOD IS UNDER WATER.  DO YOU BELIEVE THAT?     |
| 18:40:05 | 18 | **A.**   IN SOME RESPECT, THAT'S CORRECT.  OBVIOUSLY, IF NOT, WE |
| 18:40:08 | 19 | WOULDN'T HAVE MANY HOUSES AROUND HERE BECAUSE OF HOUSES BY   |
| 18:40:12 | 20 | CAMPS OR ANYTHING ELSE, BECAUSE WOOD -- WOOD IS A LOT MORE   |
| 18:40:16 | 21 | DURABLE AND A LOT MORE RESILIENT THAN MANY OF THESE OTHER    |
| 18:40:19 | 22 | MATERIALS THAT WE'RE TALKING ABOUT -- THE WALL, CEILING      |
| 18:40:23 | 23 | COVERINGS, FLOOR COVERINGS, FURNITURE -- ALL OF THOSE THINGS |
| 18:40:27 | 24 | THAT NEED TO BE REPLACED, A LOT MORE RESILIENT.             |
| 18:40:34 | 25 | **Q.**   AND THAT'S ONE OF THE REASONS WHY YOU TOLD THIS COURT THAT |

18:40:36   1   YOU DIDN'T NEED TO TEAR DOWN THESE HOUSES THAT HAVE BEEN TORN

18:40:38   2   DOWN, ISN'T IT?  BECAUSE THE WOOD, AS YOU SAY, WAS RESILIENT?

18:40:40   3   **A.**   WOOD IS RESILIENT AND IT'S MUCH MORE DURABLE.

18:40:44   4   **Q.**   I DIDN'T GET AN ANSWER, THOUGH.  IS THAT ONE OF THE

18:40:46   5   REASONS WHY YOU TOLD THIS COURT THAT THESE HOUSES DIDN'T NEED

18:40:50   6   TO BE TORN DOWN?  THAT WOOD IS RESILIENT?

18:40:54   7   **A.**   BECAUSE THE WATER DIDN'T DAMAGE THE WOOD.

18:40:58   8   **Q.**   ANSWER THE QUESTION AND THEN YOU CAN EXPLAIN.

18:41:01   9   **A.**   I'M NOT SURE WHAT YOUR QUESTION IS NOW.

18:41:04   10   **Q.**   ONE OF THE REASONS YOU TOLD THE JUDGE THAT THE HOUSES

18:41:08   11   DIDN'T HAVE TO BE TORN DOWN IS BECAUSE YOU BELIEVE WOOD IS

18:41:11   12   RESILIENT?

18:41:13   13   **A.**   WELL, THE "RESILIENT" WORD JUST CAME OUT, BUT THAT'S ONE

18:41:16   14   OF THE -- THE WOOD IS RESILIENT AND IT IS MORE DURABLE THAN

18:41:18   15   THESE OTHER MATERIALS.

18:41:20   16          YES, IN SHORT-TERM, EXPOSURE TO WOOD DOES NOT CAUSE

18:41:23   17   IT TO LOSE STRENGTH.  LONG-TERM EXPOSURE, VERY LONG EXPOSURE,

18:41:29   18   YOU DO -- YOU CAN DAMAGE WOOD, BUT THERE'S A FACTOR PUT IN

18:41:32   19   THERE.

18:41:33   20   **Q.**   OKAY.  BUT THAT IS NOT WHAT THE -- FOR EXAMPLE, THE CODE

18:41:37   21   OF FEDERAL REGULATIONS, AS A STRUCTURAL ENGINEER -- LET ME

18:41:40   22   UNDERLINE -- LET ME LAY SOME FOUNDATION HERE.

18:41:43   23          ARE YOU FAMILIAR WITH THE CODE OF FEDERAL

18:41:45   24   REGULATIONS, SIR?

18:41:46   25   **A.**   YES, SIR.

18:41:46   1  **Q.**   TITLE 44?

18:41:48   2  **A.**   I MEAN, I CAN'T SPIT OUT, YOU KNOW, SPECIFIC ONES.

18:41:51   3  **Q.**   YOU'RE FAMILIAR WITH TITLE 44 AND THE USE OF FLOOD-DAMAGE-

18:41:58   4  RESISTANT MATERIALS?

18:42:00   5           **MR. GULOTTA:**  YOUR HONOR, I KNOW YOU WERE KIND ENOUGH

18:42:02   6  TO SAY THAT I DIDN'T HAVE TO PRESERVE MY OBJECTION AT THIS

18:42:04   7  POINT, BUT I WOULD LIKE TO MAKE MY OBJECTION CONTINUING TO THIS

18:42:09   8  QUESTIONING ON THIS SUBJECT.

18:42:10   9           **THE COURT:**  YOUR OBJECTION IS PRESERVED.  I'VE

18:42:13  10  ALLOWED IT THUS FAR.  YOU CAN ALWAYS OBJECT AGAIN IF IT GOES --

18:42:19  11  IF YOU THINK YOU NEED TO DO SO.

18:42:20  12           **MR. GULOTTA:**  THANK YOU, YOUR HONOR.

18:42:20  13           **THE COURT:**  I NEVER WANT TO SAY ANYBODY CAN'T GET UP

18:42:24  14  FOR ANY REASON.

18:42:25  15           OKAY.  SO TITLE 44 IS THE QUESTION --

18:42:28  16  **BY MR. PALMINTIER:**

18:42:29  17  **Q.**   ARE YOU FAMILIAR WITH IT?

18:42:29  18  **A.**   NO, SIR.

18:42:30  19  **Q.**   ALL RIGHT.  LET ME -- LET ME REMIND YOU OF WHAT IT SAYS.

18:42:34  20  "IF A PROPOSED BUILDING SITE IS IN A FLOODPRONE AREA, ALL NEW

18:42:40  21  CONSTRUCTION AND SUBSTANTIAL IMPROVEMENTS SHALL BE CONSTRUCTED

18:42:43  22  WITH MATERIALS RESISTANT TO FLOOD DAMAGE."

18:42:45  23           DOES THAT REFRESH YOUR MEMORY?

18:42:48  24           **MR. GULOTTA:**  OBJECTION, YOUR HONOR.  THERE'S BEEN NO

18:42:50  25  INDICATION THAT THIS IS A MEMORY ISSUE.

18:42:52    1              **THE COURT:**  I AGREE.  HE HASN'T SAID HE EVER KNEW IT

18:42:55    2   EVER, TO BEGIN WITH.

18:42:57    3   **BY MR. PALMINTIER:**

18:42:57    4   **Q.**   HAVE YOU EVER HEARD THAT?

18:42:59    5   **A.**   WELL, IT MAKES SENSE, IF YOU'RE FIXING TO DESIGN SOMETHING

18:43:02    6   THAT'S GOING TO BE IN A FLOOD-PRONE AREA, THAT YOU WOULD DESIGN

18:43:05    7   IT -- BUT JUST BECAUSE YOU HAD SOMETHING THAT WAS MADE OF WOOD

18:43:10    8   AND IT GOT WET DOESN'T MEAN IT HAS TO BE REMOVED.  AND THERE'S

18:43:13    9   THOUSANDS OF RESIDENCES OUT THERE THAT ARE IN THAT SITUATION

18:43:17   10   HERE, INCLUDING MY OWN.

18:43:20   11   **Q.**   ALL RIGHT, SIR.  WAS YOUR HOME SOMETHING THAT YOU

18:43:22   12   CONSIDERED WHEN YOU EVALUATED THE LOSSES THAT THE ARMSTRONGS

18:43:26   13   AND OTHERS SUFFERED?

18:43:28   14   **A.**   NO, BUT IT'S MY BELIEF AS FAR AS THE FACT THAT JUST

18:43:32   15   BECAUSE WOOD GET WET, IT NEEDS TO BE RIPPED OUT.

18:43:35   16   **Q.**   RIGHT.  BUT IF WOOD STAYS UNDER WATER FOR A LONGER PERIOD

18:43:39   17   OF TIME, IT SHOULD BE RIPPED OUT.  ISN'T THAT FAIR?

18:43:42   18   **A.**   NO.

18:43:43   19   **Q.**   ALL RIGHT.  AND THE REASON --

18:43:44   20   **A.**   IT HAS TO BE DAMAGED.  OKAY?

18:43:45   21   **Q.**   ABSOLUTELY.

18:43:46   22   **A.**   YOU'VE GOT TO HAVE PHYSICAL DAMAGE TO THE WOOD FOR

18:43:48   23   WHATEVER REASON.  BUT THE -- EVEN IN DURATIONS OF 10 TO 14 DAYS

18:43:54   24   INVOLVED WITH THIS IS NOT ANYWHERE NEAR THE TYPE OF DURATION

18:43:57   25   THAT YOU WOULD EXPECT TO FIND DAMAGED WOOD.

| 18:44:01 | 1 | **Q.** UNDERSTOOD. |
| 18:44:02 | 2 | NOW, DOES THAT CHANGE IF THE WOOD IS EXPOSED TO |
| 18:44:05 | 3 | CHEMICAL CONTAMINATES? |
| 18:44:09 | 4 | **A.** IT ALL DEPENDS ON WHAT THE CHEMICAL CONTAMINANTS ARE. |
| 18:44:13 | 5 | **Q.** SUCH AS WHAT WE HAD HERE IN THE KATRINA FLOODING. |
| 18:44:16 | 6 | **A.** I DON'T KNOW WHAT CONTAMINATES THAT YOU'RE SPEAKING OF. |
| 18:44:19 | 7 | **Q.** ALL RIGHT. |
| 18:44:19 | 8 | **A.** WE HAD CONTAMINATES.  THAT'S THE REASON WHY IN MY REPORT I |
| 18:44:23 | 9 | TALK ABOUT DECONTAMINATING OR CLEANING ANY WOOD. |
| 18:44:28 | 10 | **Q.** UNDERSTOOD.  BUT YOU JUST SAID THAT YOU DON'T KNOW WHAT |
| 18:44:29 | 11 | THE CONTAMINATES WERE, DIDN'T YOU, SIR? |
| 18:44:32 | 12 | **A.** NOT AS FAR AS -- |
| 18:44:32 | 13 | **Q.** DIDN'T YOU JUST SAY THAT? |
| 18:44:35 | 14 | **A.** NOT AS FAR AS THIS CHEMICAL SOUP THAT YOU'RE SPEAKING OF. |
| 18:44:37 | 15 | **Q.** ALL RIGHT.  SO YOU DON'T KNOW WHETHER OR NOT THE CHEMICALS |
| 18:44:40 | 16 | IN THE WOOD WERE COMPLETELY DESTRUCTIVE OF THE STRUCTURAL |
| 18:44:44 | 17 | INTEGRITY OF THE WOOD, DO YOU? |
| 18:44:46 | 18 | **A.** I SAW NO EVIDENCE OF THAT. |
| 18:44:47 | 19 | **Q.** BUT YOU DIDN'T SEE THESE HOUSES.  THEY WERE TORN DOWN.  SO |
| 18:44:50 | 20 | YOU DIDN'T PHYSICALLY SEE THEM; CORRECT? |
| 18:44:52 | 21 | **A.** NO, SIR. |
| 18:44:53 | 22 | **Q.** YOU DIDN'T SEE THEM; RIGHT? |
| 18:44:56 | 23 | **A.** I DID NOT PHYSICALLY SEE THEM. |
| 18:44:57 | 24 | **Q.** ALL RIGHT.  AND DIDN'T GET ANY INFORMATION ABOUT WHAT THE |
| 18:45:00 | 25 | CHEMICALS WERE THAT INVADED THESE HOUSES; RIGHT?  YOU DIDN'T |

18:45:04   1   FIND OUT WHAT CHEMICALS WERE IN THE WOOD; CORRECT?

18:45:07   2   A.   NO, SIR, I DON'T KNOW WHAT CHEMICALS WERE IN THE WOOD.

18:45:10   3   Q.   RIGHT.  SO IF SOMEONE SAYS IT WAS INFESTED WITH DANGEROUS

18:45:14   4   CHEMICALS AND NEEDED TO BE TORN DOWN, YOU WOULDN'T BE ABLE TO

18:45:17   5   DISAGREE WITH THAT, WOULD YOU, SIR?

18:45:20   6         MR. GULOTTA:  OBJECTION, YOUR HONOR.  NOW WE'RE

18:45:22   7   SPECULATING ON WHAT SOMEONE SAID.

18:45:25   8         MR. PALMINTIER:  HE'S A -- HE'S AN EXPERT AND IT'S A

18:45:25   9   HYPOTHETICAL.

18:45:25   10        THE COURT:  THAT'S TRUE, HE IS AN EXPERT.  HE CAN ASK

18:45:25   11  HIM A HYPOTHETICAL QUESTION.

18:45:27   12        MR. PALMINTIER:  IT'S A HYPOTHETICAL.

18:45:29   13        THE COURT:  THAT MEANS -- OF COURSE, I KNOW YOU KNOW

18:45:31   14  WHAT IT MEANS.  GO AHEAD.

18:45:32   15  BY MR. PALMINTIER:

18:45:32   16  Q.   ALL RIGHT.  NOW, SO WE DON'T KNOW ABOUT CONTAMINATION.

18:45:37   17  YOU JUST IGNORED THAT FACTOR; CORRECT?

18:45:40   18  A.   NO, I DIDN'T IGNORE IT.  IF I HAD REASON TO BELIEVE THAT

18:45:42   19  THERE WERE CONTAMINATES IN IT THAT COULD NOT BE REMOVED NOR

18:45:45   20  CLEANED NOR DECONTAMINATED FROM THAT WOOD, THEN OF COURSE I

18:45:50   21  WOULD SAY, DOWN IT COMES.

18:45:52   22  Q.   VERY GOOD.

18:45:52   23        NOW, ALSO YOU WOULD SAY, DOWN IT COMES, IF THE

18:45:55   24  METALLIC ASPECTS OF STRUCTURE WERE RUSTED AND RUINED; CORRECT?

18:46:01   25  A.   IF I HAD EVIDENCE THAT THEY WERE RUINED, YES, OR WE WOULD

18:46:06   1   GO AHEAD AND RENAIL THEM.

18:46:07   2   **Q.**   OKAY.  BUT YOU HAVE TO PULL THE RUSTED NAILS OUT BEFORE --

18:46:10   3   IF YOU'RE PROPERLY REHABILITATING A HOUSE, DON'T YOU?

18:46:14   4   **A.**   NO.

18:46:14   5   **Q.**   YOU LEAVE RUSTY NAILS IN?

18:46:16   6   **A.**   WELL, THEY'RE NOT HURTING ANYTHING.

18:46:17   7   **Q.**   OKAY.  AND WHAT ABOUT RUSTY METALLIC SUPPORTS FOR WALLS --

18:46:25   8   SOMETHING OTHER THAN NAILS -- BRACKETS AND SO FORTH?

18:46:29   9   **A.**   AGAIN, THOSE ARE TYPICALLY GALVANIZED AND THEY CAN TAKE

18:46:33  10   SOME EXPOSURE TO MOISTURE, WATER.  CERTAINLY, THE ENVIRONMENT

18:46:38  11   THAT A BRICK TIE IS AND THE AIR GAP BETWEEN THE BRICK AND THE

18:46:43  12   VAPOR BARRIER IS A MOIST ENVIRONMENT.

18:46:47  13   **Q.**   RIGHT.

18:46:49  14        BUT IN THE FIVE HOUSES THAT YOU SAW, DID YOU SEE

18:46:54  15   WHETHER OR NOT THE NAILS AND BRACKETS AND OTHER METALLIC

18:46:57  16   ASPECTS OF THE WALLS WERE RUSTED?

18:46:59  17   **A.**   THE TWO HOUSES THAT I WENT INTO, THE LIVERS RESIDENCE AND

18:47:02  18   THE COATS RESIDENCE, I DIDN'T SEE ANY SIGNIFICANT DAMAGE TO

18:47:07  19   THOSE RESIDENCES FROM THOSE -- FROM THAT.

18:47:10  20   **Q.**   OKAY.  BUT IN THE THREE -- IT'S AN OBVIOUS QUESTION:  IN

18:47:13  21   THE THREE THAT YOU DIDN'T SEE, YOU HAVE NO EVIDENCE TO INDICATE

18:47:15  22   TO THIS COURT WHETHER THE METAL WAS BEYOND SAVING AND NEEDED TO

18:47:18  23   BE TORN DOWN?

18:47:19  24   **A.**   NO, I HAVEN'T EVEN SAID THERE WAS ANY.

18:47:21  25   **Q.**   OKAY.  AND NONE TO THE --

18:47:23  1  **A.**   THAT WOULD BE SPECULATION.  NOR DID I NORMALLY SEE THAT IN

18:47:26  2  ALL THE OTHER RESIDENCES I LOOKED AT, AND THAT IS SOMETHING I'M

18:47:29  3  LOOKING FOR.

18:47:31  4  **Q.**   SO YOU JUDGED THOSE FIVE HOUSES BASED ON WHAT YOU SAW IN

18:47:34  5  OTHER HOUSES?

18:47:37  6  **A.**   NO.  THOSE HOUSES ARE BASED ON WHAT I SAW IN TYPICAL FLOOD

18:47:41  7  SITUATIONS IN KATRINA IN THE AREAS AND LOCATIONS THAT THESE

18:47:44  8  HOUSES WERE LOCATED IN.

18:47:46  9  **Q.**   SIR, YOU'VE TOLD THE COURT IN YOUR REPORTS THAT ALL OF

18:47:52  10  THESE HOUSES ARE DIFFERENT; CORRECT?

18:47:54  11  **A.**   THAT'S CORRECT.

18:47:55  12  **Q.**   IN THE 2007 REPORT, IN FACT, THAT WAS A REASON WHY YOU

18:47:59  13  WERE HIRED, WAS TO SAY THAT THEY WERE ALL DIFFERENT.

18:48:02  14  **A.**   BUT THERE IS --

18:48:02  15  **Q.**   ISN'T THAT TRUE?

18:48:04  16  **A.**   BUT THERE IS COMMONALITY.

18:48:05  17  **Q.**   ISN'T THAT TRUE?

18:48:06  18  **A.**   YES, SIR.  BUT THAT'S ACROSS THE WHOLE SPECTRUM OF THE

18:48:09  19  FLOOD.  AND IN THAT REPORT I SPECIFICALLY BRING OUT SOME OF

18:48:13  20  THOSE DIFFERENCES.

18:48:14  21       IN THIS CASE, PARTICULARLY THE HOLMES RESIDENCE AND

18:48:16  22  THE ARMSTRONG RESIDENCE, THEY'RE VERY SIMILAR IN DESIGN AND

18:48:19  23  CONSTRUCTION.

18:48:23  24  **Q.**   VERY SIMILAR.  ARMSTRONG AND COATS ARE SIMILAR IN

18:48:26  25  CONSTRUCTION AND DESIGN?

| | | |
|---|---|---|
| 18:48:28 | 1 | **THE COURT:**  ARMSTRONG AND HOLMES. |
| 18:48:29 | 2 | **THE WITNESS:**  NO, ARMSTRONG AND HOLMES. |
| 18:48:30 | 3 | BY MR. PALMINTIER: |
| 18:48:31 | 4 | **Q.**  ARMSTRONG AND HOLMES ARE SIMILAR IN DESIGN AND |
| 18:48:34 | 5 | CONSTRUCTION? |
| 18:48:34 | 6 | **A.**  YES, SIR.  THEY'RE BOTH CONCRETE SLAB, THEY'RE BOTH |
| 18:48:38 | 7 | TWO-BY-FOUR STUD CONSTRUCTION AND WOOD. |
| 18:48:41 | 8 | **Q.**  AND THEY WERE BOTH TORN DOWN; CORRECT? |
| 18:48:43 | 9 | **A.**  YES, SIR. |
| 18:48:45 | 10 | **Q.**  THESE WEREN'T RENTAL PROPERTIES.  NONE OF THEM WERE, WERE |
| 18:48:48 | 11 | THEY? |
| 18:48:49 | 12 | **A.**  NOT TO MY KNOWLEDGE. |
| 18:48:51 | 13 | **Q.**  THESE WERE ALL OWNED BY THE OWNERS -- BY THE HOMEOWNERS |
| 18:48:53 | 14 | WHO BROUGHT THIS SUIT, WEREN'T THEY? |
| 18:48:55 | 15 | **A.**  YES, SIR.  AND THAT'S THE KIND OF STUFF I GET OUT OF |
| 18:48:57 | 16 | READING ALL THESE DEPOSITIONS. |
| 18:48:58 | 17 | **Q.**  OKAY.  AND SINCE YOU KNOW THAT, YOU KNOW THAT THEY HAD A |
| 18:49:05 | 18 | PERSONAL REASON FOR WANTING TO RETURN TO THEIR HOMES; CORRECT? |
| 18:49:08 | 19 | **A.**  YES, SIR. |
| 18:49:09 | 20 | **Q.**  NOW, LET'S LOOK AT SOME OF THE OTHER THINGS THAT YOU |
| 18:49:14 | 21 | DEPENDED ON.  I'M CURIOUS ABOUT THE AVERAGING PHENOMENON THAT |
| 18:49:23 | 22 | YOU DID ON THE HYDROGRAPHS. |
| 18:49:25 | 23 | YOU MENTIONED THAT YOU TOOK -- SOMETIMES YOU TOOK |
| 18:49:28 | 24 | DALRYMPLE AND VRIJLING AND AVERAGED THEM AND CAME UP WITH |
| 18:49:31 | 25 | NUMBERS; CORRECT? |

18:49:31  1   **A.**   WHEN I HAD TO, YES, SIR.

18:49:33  2   **Q.**   ALL RIGHT.  AND WHEN YOU DID, HOW DID YOU DO THAT?  JUST

18:49:44  3   ADD THEM TOGETHER AND DIVIDE THEM BY 2?

18:49:46  4   **A.**   WHEN I WAS ABLE TO FIND SOME COMMONALITY, THAT'S WHAT I

18:49:50  5   DID.

18:49:50  6   **Q.**   ALL RIGHT.  DID YOU SELECT THE HIGHER OR THE LOWER OF THE

18:49:53  7   NUMBERS WHEN YOU WERE DOING THAT?

18:49:54  8   **A.**   NO.  I JUST TOOK THE TWO AND AVERAGED THEM TOGETHER.

18:50:07  9          **MR. PALMINTIER:**  I'M TRYING TO GET THROUGH SOME

18:50:09  10  THINGS QUICKLY, JUDGE.

18:50:20  11          **THE COURT:**  ALL RIGHT.  HOW ARE YOU DOING?

18:50:22  12          **THE WITNESS:**  YEAH, 10 MINUTES.

18:50:24  13          **MR. PALMINTIER:**  I'M SORRY.  WHAT DID YOU SAY?

18:50:26  14          **THE COURT:**  LET'S NOT WASTE ONE MINUTE TALKING ABOUT

18:50:28  15  THAT.  LET'S MOVE ON.

18:50:32  16          IT'S BEST NOT TO RESPOND UNLESS A QUESTION IS

18:50:35  17  ASKED.

18:50:37  18          **THE WITNESS:**  I'M SORRY, COUNSEL.

18:50:59  19  **BY MR. PALMINTIER:**

18:50:59  20  **Q.**   I WANT TO ASK YOU ABOUT MOLD.

18:51:04  21          I SAW THE PHOTOGRAPH OF THE LIVERS CAMELBACK, THE

18:51:07  22  SECOND STORY.  AND WHILE YOU WERE BEING ASKED ABOUT THAT, YOU

18:51:10  23  WERE ASKED WHETHER THERE WAS ANY MOLD IN THAT.

18:51:13  24          FIRST OF ALL, DID YOU KNOW WHAT TIME -- WHAT THE DATE

18:51:16  25  OF THAT PHOTOGRAPH WAS?

18:51:18   1   **A.**   YES, SIR.  I TOOK THAT PHOTOGRAPH.

18:51:19   2   **Q.**   YES.  WHAT WAS THE DATE?

18:51:21   3   **A.**   2011.

18:51:22   4   **Q.**   RIGHT.  SO HOW MANY YEARS HAD PASSED SINCE THE TIME OF THE

18:51:25   5   WATER CONTAMINATION OF THAT HOUSE?

18:51:27   6   **A.**   APPROXIMATELY FOUR.

18:51:28   7   **Q.**   BUT YOU RELIED ON YOUR FOUR?  SIX?

18:51:33   8   **A.**   WELL, IF THERE IS ANY MOLD, AT LEAST DOWNSTAIRS IT WAS

18:51:37   9   CLEANED UP OR SHOULD BE CLEANED UP.

18:51:40   10   **Q.**   OKAY.  SO YOU ASSUMED THAT -- BUT UPSTAIRS IT WOULDN'T

18:51:44   11   HAVE BEEN CLEANED UP; CORRECT?

18:51:46   12   **A.**   I DIDN'T SEE ANY EVIDENCE OF MOLD UPSTAIRS.

18:51:48   13   **Q.**   YES.  BUT YOU SAID YOU DIDN'T SMELL ANY EITHER, DIDN'T

18:51:52   14   YOU?

18:51:52   15   **A.**   THAT'S CORRECT.

18:51:53   16   **Q.**   AND YOU'RE RELYING ON YOUR SENSE OF SMELL TO MAKE THESE

18:51:56   17   REPORTS, TO SAY THAT THERE'S NO MOLD?

18:51:58   18   **A.**   IT'S AN INDICATOR.  IF YOU WERE GOING TO REALLY GO

18:52:01   19   DETERMINE MOLD, YOU WOULD HAVE TO TAKE MOLD SWABS AND TAKE

18:52:04   20   TESTING.  BUT BASED ON WHAT I SAW, NO.

18:52:06   21   **Q.**   SIX YEARS LATER YOU SAID IT DIDN'T SMELL LIKE THERE WAS

18:52:09   22   MOLD; CORRECT?

18:52:09   23   **A.**   THAT'S CORRECT.

18:52:10   24   **Q.**   AND THAT'S PART OF THE FOUNDATION OF YOUR OPINIONS IN THIS

18:52:13   25   ENTIRE CASE; IS THAT CORRECT?

18:52:14   1   **A.**   NOR DO I HAVE REASON TO BELIEVE THERE WAS MOLD UP THERE.

18:52:19   2   THERE COULD HAVE BEEN SOME FROM WHEN THE WINDOW WAS BROKEN

18:52:21   3   OPEN.

18:52:22   4   **Q.**   ANSWER THE QUESTION AND THEN YOU CAN EXPLAIN.

18:52:23   5   **A.**   I THINK I SAID -- WELL, ASK THE QUESTION.

18:52:25   6   **Q.**   I DIDN'T HEAR YOU SAY --

18:52:35   7   **A.**   ASK THE QUESTION.

18:52:35   8              **MR. PALMINTIER:**  MADAM REPORTER, COULD YOU READ BACK

18:52:35   9   THE PREVIOUS QUESTION?

18:52:35   10             (WHEREUPON, THE REQUESTED PORTION OF THE RECORD WAS

18:52:35   11   READ BY THE COURT REPORTER.)

18:52:35   12             **THE WITNESS:**  I CAN'T.

18:52:37   13   **BY MR. PALMINTIER:**

18:52:37   14   **Q.**   THAT'S PART OF THE FOUNDATION FOR YOUR OPINIONS IN THIS

18:52:40   15   ENTIRE CASE, YOUR SENSE OF SMELL AS A WAY OF DETECTING MOLD SIX

18:52:46   16   YEARS LATER?

18:52:47   17   **A.**   NO.  I SAID I DIDN'T SMELL ANY MOLD.  THAT'S NOT MY ENTIRE

18:52:50   18   MEANS OF DOING THAT.

18:52:52   19   **Q.**   I DIDN'T ASK THAT.  BUT IT'S PART OF WHAT YOU RELIED ON;

18:52:54   20   CORRECT?

18:52:55   21             **MR. GULOTTA:**  OBJECTION, YOUR HONOR.  THAT'S EXACTLY

18:52:56   22   WHAT HE ASKED.

18:52:57   23             **THE COURT:**  LET ME GET RIGHT TO THE CHASE.

18:53:00   24             YOU DIDN'T MAKE A MOLD -- A THOROUGH MOLD

18:53:02   25   INVESTIGATION AT THAT HOUSE; IS THAT CORRECT?

18:53:04  1      **THE WITNESS:**  THAT'S CORRECT, YOUR HONOR.

18:53:05  2      **THE COURT:**  OKAY.

18:53:06  3      **THE WITNESS:**  AND IF THERE IS ANY MOLD, CLEAN IT UP.

18:53:28  4   BY MR. PALMINTIER:

18:53:28  5   **Q.**  WOULD YOU CONSIDER 72 HOURS OF EXPOSURE TO THESE

18:53:35  6   FLOODWATERS AS PROLONGED CONTACT?

18:53:41  7   **A.**  TO WHAT?

18:53:43  8   **Q.**  FOR -- FOR EXAMPLE, THE STRUCTURAL ELEMENTS OF THESE

18:53:45  9   HOUSES.

18:53:47  10  **A.**  YOU'RE TALKING ABOUT THE WOOD?

18:53:49  11  **Q.**  YES.

18:53:49  12  **A.**  NO.

18:53:50  13  **Q.**  OKAY.  SO 72 HOURS, FROM YOUR PERSPECTIVE AS AN EXPERT, IS

18:53:54  14  NOT SIGNIFICANT?

18:53:55  15  **A.**  NO.

18:53:56  16  **Q.**  WHAT PERIOD OF TIME WOULD YOU SAY BECOMES SIGNIFICANT IN

18:54:00  17  TERMS OF STRUCTURAL INTEGRITY OF THE FRAMING, THE WOOD?

18:54:05  18  **A.**  OF THE WOOD ITSELF, IT WOULD REQUIRE A CONTINUOUSLY MOIST

18:54:12  19  ENVIRONMENT SO THAT WOOD FUNGUSES COULD COME IN OR

18:54:17  20  WOOD-DESTROYING INSECTS.  MOLD DOES NOT ATTACK WOOD.

18:54:21  21  **Q.**  HOW LONG -- TELL THE JUDGE HOW LONG YOU WOULD THINK THAT

18:54:25  22  IT WOULD HAVE TO BE EXPOSED TO WATER BEFORE YOU WOULD THINK IT

18:54:27  23  MADE A DIFFERENCE.

18:54:28  24      **THE WITNESS:**  TYPICALLY, JUDGE, THE ROT BEGINS IN A

18:54:30  25  TWO-BY-FOUR, ON PERFECT CONDITIONS, IN FOUR TO SIX MONTHS.

18:54:35   1              THE COURT:  OKAY.

18:54:35   2    BY MR. PALMINTIER:

18:54:36   3    Q.   HOW LONG IS THAT, THOUGH?

18:54:37   4              THE COURT:  HE SAID FOUR TO SIX MONTHS.

18:54:40   5              MR. PALMINTIER:  OH, I DIDN'T HEAR THAT.

18:54:41   6              THE COURT:  BECAUSE HIS MIC DIDN'T PICK IT UP.  FOUR

18:54:43   7    TO SIX MONTHS, HE SAYS.

18:54:44   8              THE WITNESS:  YOU TOLD ME TO TELL THE JUDGE.

18:54:45   9              THE COURT:  AND HE DID.

18:54:47  10              MR. PALMINTIER:  AND I APPRECIATE THAT.

18:54:49  11    BY MR. PALMINTIER:

18:54:53  12    Q.   ARE YOU FAMILIAR WITH BULLETINS PUBLISHED BY FEMA THAT ARE

18:54:59  13    ROUTINELY GENERATED AND SENT OUT TO PEOPLE IN YOUR PROFESSION?

18:55:03  14    A.   I GET THEM, AND I HAVE BEEN TRAINED IN SUCH.  BUT AS FAR

18:55:06  15    AS ME RECALLING A SPECIFIC ONE AS I SIT IN THIS COURT, NO, SIR.

18:55:12  16    Q.   BUT YOU WOULD AGREE WITH ME THAT THEY ARE MATERIALS UPON

18:55:15  17    WHICH YOU, AS AN ENGINEER, ROUTINELY RELY; CORRECT?

18:55:22  18    A.   WELL, I DON'T HAVE A -- I DON'T WANT TO GO THERE.

18:55:28  19         ARE YOU ASKING ME WHETHER OR NOT I RELY ON FEMA, THE

18:55:31  20    FEDERAL -- IT'S A --

18:55:33  21    Q.   FEMA BULLETINS TALKING ABOUT STRUCTURAL INTEGRITY AND

18:55:39  22    STRUCTURES IN FLOOD ZONES.

18:55:44  23    A.   I HAVE BEEN TRAINED IN DESIGN AND CONSTRUCTION OF

18:55:47  24    BUILDINGS IN FLOOD ZONES.  I RECALL SOME OF THE FEMA STUFF MAY

18:55:51  25    HAVE BEEN IN THERE.  BUT -- AND I HAVE USED FEMA IN THE PAST.

18:55:59   1   **Q.**   OKAY.  AND, IN FACT, YOU'VE TESTIFIED REGARDING FEMA

18:56:01   2   REGULATIONS AND FEMA GUIDELINES BEFORE, HAVEN'T YOU?

18:56:07   3   **A.**   IF YOU SAY SO.  I DON'T RECALL.

18:56:10   4   **Q.**   RIGHT.  AND ONE OF THE THINGS THAT FEMA HAS SAID IS THAT

18:56:14   5   72 HOURS IN A FLOOD ZONE -- EXPOSURE TO STRUCTURES -- LET ME

18:56:24   6   REPHRASE THAT.

18:56:27   7        **MR. PALMINTIER:**  IT'S GETTING LATE, JUDGE.

18:56:28   8   **BY MR. PALMINTIER:**

18:56:29   9   **Q.**   ONE OF THE THINGS THAT FEMA HAS TOLD YOU IS THAT WHEN WOOD

18:56:33  10   IS EXPOSED TO 72 HOURS, THAT'S CONSIDERED PROLONGED CONTACT;

18:56:39  11   CORRECT?

18:56:40  12        **MR. GULOTTA:**  OBJECTION, YOUR HONOR.  WE'RE TALKING

18:56:41  13   ABOUT A FEMA REGULATION.  AND COUNSEL OWES IT, MOSTLY TO THE

18:56:43  14   COURT, BUT CERTAINLY TO THE WITNESS, TO REFER TO THE

18:56:47  15   REGULATION.

18:56:48  16        **THE COURT:**  ALL RIGHT.  I THINK THAT'S FAIR.

18:56:50  17   **BY MR. PALMINTIER:**

18:56:50  18   **Q.**   I'M GOING TO ASK YOU TO ASSUME WITH ME THAT SECTION 60.3A3

18:56:59  19   OF THE CODE OF FEDERAL REGULATIONS ESTABLISHES THAT

18:57:03  20   CONSTRUCTIONS WITH MATERIAL RESISTANT TO FLOOD DAMAGE IS TO BE

18:57:08  21   GOVERNED BY REGULATION.

18:57:10  22        **MR. GULOTTA:**  NOW, YOUR HONOR, MY OBJECTION IS THAT I

18:57:12  23   THINK, AS COUNSEL, I'M ENTITLED TO SEE WHAT COUNSEL'S REFERRING

18:57:15  24   TO.

18:57:15  25        **THE COURT:**  YES, YOU ARE.

18:57:16  1            **MR. PALMINTIER:**  DO YOU HAVE IT?

18:57:16  2            **MR. GULOTTA:**  WHICH PART ARE YOU REFERRING TO?

18:57:16  3            **THE COURT:**  YOU WANT TO GET ON THE SAME -- LET HIM

18:57:16  4  GET ON THE SAME PAGE, SO TO SPEAK.

18:57:16  5                  THANK YOU.

18:57:16  6                  SHEENA, IF YOU'D GIVE IT TO ME.  THANK YOU.

18:57:16  7            **MR. GULOTTA:**  WELL, THE WITNESS PROBABLY NEEDS TO SEE

18:57:16  8  ONE, TOO.

18:57:52  9            **THE COURT:**  IF DON'T HAVE ONE -- I'LL GIVE HIM -- IF

18:57:52  10  YOU NEED THAT, LET ME GIVE THE WITNESS -- THE WITNESS IS MORE

18:57:52  11  IMPORTANT THAN I AM IN ASPECT.

18:57:58  12  **BY MR. PALMINTIER:**

18:57:58  13  **Q.**   HAVE YOU EVER SEEN THIS DOCUMENT BEFORE?

18:58:00  14            **THE COURT:**  LET HIM LOOK AT IT.  GIVE HIM A SECOND.

18:58:03  15            **THE WITNESS:**  I DON'T HAVE AN INDEPENDENT

18:58:04  16  RECOLLECTION OF LOOKING AT IT.

18:58:05  17  **BY MR. PALMINTIER:**

18:58:05  18  **Q.**   BUT YOU DO RECOGNIZE IT AS A FEMA TECHNICAL BULLETIN FROM

18:58:10  19  AUGUST OF 2008; CORRECT?

18:58:11  20  **A.**   YES, SIR.

18:58:13  21  **Q.**   AND I WANT YOU TO TURN TO PAGE 2.  AND I WANT YOU TO READ

18:58:25  22  FOR THE COURT THE PARAGRAPH THAT BEGINS "FLOOD DAMAGE-RESISTANT

18:58:29  23  MATERIAL..."

18:58:30  24            **MR. GULOTTA:**  OBJECTION, YOUR HONOR.  WE'RE DEALING

18:58:31  25  WITH A TECHNICAL BULLETIN DATED AUGUST 2008, WHICH POSTDATES

3391

| | | |
|---|---|---|
| 18:58:35 | 1 | THE EVENTS RELATING TO -- |
| 18:58:41 | 2 | **THE COURT:**  IT DOES NOT POSTDATE HIS EXPERT REPORT, |
| 18:58:44 | 3 | HOWEVER, OR HIS TESTIMONY.  I'M GOING TO ALLOW IT.  I'M NOT |
| 18:58:49 | 4 | SURE . . . |
| 18:58:50 | 5 | **MR. PALMINTIER:**  WE'LL GET TO THE POINT OF IT, |
| 18:58:52 | 6 | YOUR HONOR. |
| 18:58:53 | 7 | **MR. GULOTTA:**  AND I'M SORRY, COUNSEL.  WHAT PAGE ARE |
| 18:58:55 | 8 | YOU ON, PLEASE? |
| 18:58:56 | 9 | **MR. PALMINTIER:**  2. |
| 18:58:57 | 10 | **MR. GULOTTA:**  2?  THANK YOU. |
| 18:59:06 | 11 | **BY MR. PALMINTIER:** |
| 18:59:07 | 12 | **Q.**   COULD YOU READ PARAGRAPH "FLOOD DAMAGE-RESISTANT MATERIAL" |
| 18:59:07 | 13 | TO THE COURT? |
| 18:59:09 | 14 | **A.**   OPEN QUOTE:  FLOOD DAMAGE-RESISTANT MATERIAL, CLOSE QUOTE, |
| 18:59:11 | 15 | IS DEFINED BY NFIP AS ANY BUILDING MATERIAL COMPONENT OR SYSTEM |
| 18:59:16 | 16 | CAPABLE OF WITHSTANDING -- |
| 18:59:23 | 17 | **MR. PALMINTIER:**  I CAN READ IT FOR YOU, IF YOU'D |
| 18:59:25 | 18 | LIKE. |
| 18:59:25 | 19 | **THE COURT:**  WHY DON'T YOU DO THAT. |
| 18:59:26 | 20 | **BY MR. PALMINTIER:** |
| 18:59:26 | 21 | **Q.**   I'M GOING TO READ IT FOR YOU. |
| 18:59:26 | 22 | "FLOOD DAMAGE-RESISTANT MATERIAL" -- |
| 18:59:28 | 23 | **THE COURT:**  READ IT SLOWLY. |
| 18:59:29 | 24 | **BY MR. PALMINTIER:** |
| 18:59:30 | 25 | **Q.**   "'FLOOD DAMAGE-RESISTANT MATERIAL' IS DEFINED BY THE NFIP |

18:59:35  1  AS ANY BUILDING PRODUCT (MATERIAL, COMPONENT OR SYSTEM) CAPABLE

18:59:41  2  OF WITHSTANDING DIRECT AND PROLONGED CONTACT WITH FLOODWATERS

18:59:47  3  WITHOUT SUSTAINING SIGNIFICANT" CHANGE -- I MEAN "SIGNIFICANT

18:59:51  4  DAMAGE."

18:59:51  5          DID I READ THAT PART CORRECTLY?

18:59:53  6  **A.**   YES, SIR.

18:59:56  7  **Q.**   I SEE THAT YOU'RE READING THROUGH THE DOCUMENT, AND I

18:59:58  8  CERTAINLY WOULD NOT PREVENT YOU FROM DOING THAT.  BUT I WANT TO

19:00:02  9  BE SURE THAT YOU'RE HEARING WHAT I'M READING.

19:00:05  10  **A.**   TO SAVE TIME, COUNSEL, YOU'RE GIVING ME A DOCUMENT AND

19:00:10  11  YOU'RE PULLING OUT ONE LITTLE PART.  I MEAN, I -- YOU KNOW.

19:00:15  12  **Q.**   WELL, THERE'S NO OBJECTION STANDING.  AND WHAT I'M ASKING

19:00:17  13  YOU IS, DID I READ IT CORRECTLY, SIR?

19:00:21  14  **A.**   YOU HAVE TO -- I DON'T KNOW.  WHATEVER YOU -- BECAUSE I

19:00:22  15  WAS BASICALLY LOOKING AT SOMETHING ELSE IN HERE AS YOU WERE

19:00:25  16  READING IT.

19:00:26  17  **Q.**   WELL, THEN, I'M GOING TO ASK YOU TO FOLLOW ALONG WITH ME,

19:00:28  18  BECAUSE I'M READING THIS.

19:00:30  19          **THE COURT:**  LET'S ALL GET IN STEP HERE.  LET'S GO.

19:00:32  20  **BY MR. PALMINTIER:**

19:00:32  21  **Q.**   AND LITERALLY ON THE SAME PAGE.

19:00:35  22          PAGE 2, AND WE CONTINUE:  "THE TERM 'PROLONGED

19:00:38  23  CONTACT' MEANS AT LEAST 72 HOURS, AND THE TERM 'SIGNIFICANT

19:00:42  24  DAMAGE' MEANS ANY DAMAGE REQUIRING MORE THAN COSMETIC REPAIR."

19:00:49  25          DO YOU SEE THAT?

| | | |
|---|---|---|
| 19:00:50 | 1 | **A.**   YES, SIR. |
| 19:00:54 | 2 | **Q.**   NOW, THAT COSMETIC REPAIR WOULD BE THE KIND OF COSMETIC |
| 19:00:59 | 3 | REPAIR THAT YOU WERE TALKING ABOUT DOING WHEN YOU MERELY REMOVE |
| 19:01:01 | 4 | WALL COVERINGS; CORRECT? |
| 19:01:04 | 5 | **A.**   NO, SIR.  I'M TALKING ABOUT, IN THIS CASE, CLEANING, |
| 19:01:07 | 6 | SANITIZING, AND RESURFACING OF THE WOOD ITSELF.  THE WALL |
| 19:01:11 | 7 | COVERING'S GONE. |
| 19:01:13 | 8 | **Q.**   OKAY.  SO WOULD YOU AGREE WITH ME THAT THE POINT OF THIS |
| 19:01:19 | 9 | IS THAT STRUCTURAL MATERIAL MUST BE ABLE TO WITHSTAND WATER FOR |
| 19:01:25 | 10 | NO MORE THAN 72 HOURS TO BE FLOOD-RESISTANT -- I'M SORRY, FOR |
| 19:01:31 | 11 | NO LESS THAN 72 HOURS. |
| 19:01:33 | 12 | **A.**   I DON'T -- I DON'T READ THAT IN HERE. |
| 19:01:35 | 13 | **Q.**   OKAY. |
| 19:01:37 | 14 | **THE COURT:**  WELL, LET'S -- YOU CAN PUT IT INTO |
| 19:01:40 | 15 | EVIDENCE, AND WE CAN MOVE ON. |
| 19:01:41 | 16 | **MR. PALMINTIER:**  AND WE DO, YOUR HONOR.  WE OFFER, |
| 19:01:44 | 17 | FILE, AND INTRODUCE THIS. |
| 19:01:45 | 18 | **THE COURT:**  IT'S -- I KNOW THERE'S AN OBJECTION.  BUT |
| 19:01:48 | 19 | BECAUSE WE -- I'M GOING IT ALLOW IT IN SUBJECT TO YOUR |
| 19:01:51 | 20 | OBJECTION. |
| 19:01:51 | 21 | **MR. GULOTTA:**  THANK YOU, YOUR HONOR. |
| 19:01:51 | 22 | **MR. PALMINTIER:**  THANKS, JUDGE. |
| 19:01:52 | 23 | **THE COURT:**  GOD KNOWS HOW MUCH WEIGHT IT WILL HAVE, |
| 19:01:54 | 24 | BUT I WANT TO LOOK AT IT. |
| 19:01:55 | 25 | **MR. PALMINTIER:**  AS PX NEXT. |

| | | |
|---|---|---|
| 19:01:57 | 1 | **THE COURT:** AND THE GOVERNMENT OBJECTS AS WELL? |
| 19:02:10 | 2 | **MR. MCCONNON:** YES, YOUR HONOR. |
| 19:02:11 | 3 | **THE COURT:** THE UNITED STATES. OKAY. AND NOTED. |
| 19:02:14 | 4 | **MR. PALMINTIER:** ONE MOMENT, YOUR HONOR. |
| 19:02:34 | 5 | **BY MR. PALMINTIER:** |
| 19:02:35 | 6 | **Q.** FINALLY, WE WERE PROVIDED WITH YOUR SLIDE SHOW. AND I'M |
| 19:02:41 | 7 | NOT GOING TO CALL THE EXHIBITS UP AGAIN, BECAUSE TIME IS OF THE |
| 19:02:45 | 8 | ESSENCE. WE'RE ALREADY TWO MINUTES PAST 7:00. |
| 19:02:52 | 9 | BUT LOOK WITH ME -- OR LET ME JUST REFER YOU TO -- |
| 19:02:56 | 10 | **THE COURT:** I WANT TO MAKE SURE ALL COUNSEL HAVE A |
| 19:02:58 | 11 | COPY OF THE SLIDES. OKAY. |
| 19:03:05 | 12 | ONE OF THE PROBLEMS IN A CASE LIKE THIS AND |
| 19:03:07 | 13 | GOING THIS FAR IS THAT WE ALL -- WE ALL DON'T OPERATE AS WELL |
| 19:03:11 | 14 | AS WE SHOULD. SO IF WE HAVE -- THAT'S WHY I'M TRYING TO AVOID |
| 19:03:14 | 15 | TOO MANY LONG DAYS. |
| 19:03:16 | 16 | THIS IS AN IMPORTANT CASE. I WANT TO |
| 19:03:19 | 17 | ACCOMMODATE YOU, BUT I CAN TELL BY MY OBSERVATION OF MYSELF AND |
| 19:03:24 | 18 | ALL OF YOU THAT WE ARE NOT AT PEAK EFFICIENCY. |
| 19:03:31 | 19 | A SIGNIFICANT CONSCIOUSNESS HAS DIMINISHED. |
| 19:03:45 | 20 | **BY MR. PALMINTIER:** |
| 19:03:46 | 21 | **Q.** NOW, I'M JUST GOING TO GET IT -- PART OF WHAT YOU PROVIDED |
| 19:03:52 | 22 | TO US WERE DOCUMENTS PERTAINING TO -- OR RATHER, OPINIONS |
| 19:03:56 | 23 | PERTAINING TO THE ARMSTRONG RESIDENCE; CORRECT? |
| 19:03:59 | 24 | **A.** YES, SIR. |
| 19:04:00 | 25 | **Q.** AND YOU SAW THIS VIDEO, DID YOU NOT? |

19:04:02   1   **A.**   YES, SIR.

19:04:02   2   **Q.**   AND YOU SAW THE ROOF OF THIS RESIDENCE THAT YOU HAVE SAID

19:04:09   3   DIDN'T NEED TO BE RECONSTRUCTED, DID YOU NOT?

19:04:13   4   **A.**   I'M SAYING THAT THE --

19:04:15   5           **MR. PALMINTIER:**  CAN YOU GO BACK?

19:04:18   6           **MR. GULOTTA:**  WELL, LET HIM ANSWER THE QUESTION.

19:04:19   7           **THE COURT:**  IF HE DOESN'T --

19:04:20   8           **MR. PALMINTIER:**  I'M NOT ASKING HIM.  I'M ASKING

19:04:22   9   MR. TREEBY.  I'M ASKING --

19:04:23  10           **THE COURT:**  BUT HE WAS IN THE MIDDLE -- HE WAS IN THE

19:04:26  11   MIDDLE OF AN ANSWER.  YOU ARE CORRECT.

19:04:28  12               WHAT WAS YOUR ANSWER, SIR?

19:04:29  13           **THE WITNESS:**  WELL, WHAT I WAS -- I THINK HE WAS

19:04:31  14   SAYING ABOUT REPLACING.

19:04:32  15           **THE COURT:**  YES, HE WAS.

19:04:34  16           **THE WITNESS:**  I THINK THAT THE WOOD -- BASED ON WHAT

19:04:35  17   I'M SEEING HERE, THE WOOD FRAME WOULD NOT HAVE TO BE REPLACED.

19:04:40  18   CERTAINLY, YOU'VE GOT A LOT OF FLOOD DAMAGE.  AND WHEN YOU GET

19:04:44  19   TO THAT -- THE ARMSTRONG -- ACTUAL ARMSTRONG RESIDENCE, IT'S --

19:04:50  20   NOT ONLY IS THE WATER PAST THE EAVES, THERE'S AN INDICATION

19:04:54  21   THAT IT WAS ABOUT 2 TO 3 FEET HIGHER THAN THAT.

19:04:58  22   **BY MR. PALMINTIER:**

19:04:58  23   **Q.**   AND I APPRECIATE YOUR CANDOR.

19:05:00  24               SO WHEN WE SEE THIS VIDEOTAPE, WE'RE ACTUALLY SEEING

19:05:04  25   WATER THAT IS LESS IN DEPTH THAN IT WAS WHEN IT FIRST INUNDATED

19:05:09  1  THIS HOUSE; CORRECT?

19:05:10  2  **A.**   YES, SIR.

19:05:11  3  **Q.**   SO THAT THE ENTIRE ATTIC WAS FULL OF WATER; CORRECT?

19:05:14  4  **A.**   NO, SIR.  IT WAS -- IF WE GO TO THAT PHOTOGRAPH -- I THINK

19:05:19  5  I ALSO TALK ABOUT THAT IN MY REPORT.  AT THE TIME, IT WAS

19:05:22  6  GREATER.

19:05:22  7  **Q.**   OKAY.  BUT AT LEAST AS FAR AS THIS VIDEO IS CONCERNED, AND

19:05:26  8  THIS WATER BEING, AS YOU SAY, 2 FEET HIGHER THAN IT SHOWS IN

19:05:28  9  THE VIDEO, THAT -- TO THE EXTENT THAT IT INUNDATED AREAS ABOVE

19:05:35  10  THE CEILING OF THE HOUSE, IT WOULD HAVE ENTERED INTO THE ATTIC

19:05:40  11  AT LEAST TO SOME EXTENT?

19:05:40  12  **A.**   I AGREE, IT ENTERED INTO THE ATTIC.  YES, SIR.

19:05:44  13  **Q.**   ALL RIGHT.

19:05:59  14        NOW, ANOTHER PHENOMENA THAT THIS VIDEO TEACHES IS

19:06:03  15  THAT IT WAS VERY DIFFICULT TO GET INTO THE NEIGHBORHOOD THAT

19:06:07  16  THE ARMSTRONGS WERE IN AND REALLY, WITH REGARD TO ALL OF THESE

19:06:11  17  FIVE HOMES, DIFFICULT TO GET INTO THERE QUICKLY; CORRECT?

19:06:16  18  **A.**   BASED ON ALL THE THINGS THAT HAPPENED, THAT'S CORRECT.

19:06:19  19  **Q.**   AND THAT'S NOT GOOD FOR REHABILITATION OF PROPERTIES.

19:06:23  20  ISN'T THAT FAIR?  IT'S COMMON SENSE, BUT . . .

19:06:26  21  **A.**   MOST OF THE ELEMENTS THAT -- THAT I SPOKE OF THAT WOULD

19:06:31  22  HAVE HAD TO HAVE BEEN REPLACED, YES, SIR.

19:06:34  23  **Q.**   AND PART OF THE PROBLEM WITH NOT BEING ABLE TO GET THERE

19:06:36  24  IS THAT EVEN IF IT WASN'T CAUSED BY FLOOD -- FOR EXAMPLE, IF

19:06:40  25  THERE WAS SOME RAIN DAMAGE IN THE BUILDING -- THE FLOOD ITSELF

| | | |
|---|---|---|
| 19:06:43 | 1 | PREVENTED MITIGATION OF THAT RAIN DAMAGE. |
| 19:06:47 | 2 | IS THAT A FAIR STATEMENT? |
| 19:06:48 | 3 | **A.**  YES, SIR. |
| 19:06:50 | 4 | **MR. PALMINTIER:**  THOSE ARE ALL THE QUESTIONS I HAVE, |
| 19:06:51 | 5 | YOUR HONOR. |
| 19:07:01 | 6 | **THE COURT:**  MR. TREEBY? |
| 19:07:02 | 7 | OH, WAIT.  OH, THOSE ARE THE EXHIBIT NUMBERS? |
| 19:07:07 | 8 | MR. TREEBY, DO YOU HAVE A QUESTION, SIR? |
| 19:07:08 | 9 | **MR. TREEBY:**  NO, YOUR HONOR.  WE'RE GOING TO |
| 19:07:10 | 10 | INTRODUCE SOME EXHIBITS.  I DON'T THINK WE HAVE ANY -- BUT THEN |
| 19:07:12 | 11 | I HAVE ONE THING I WANT TO ASK THE COURT, WHICH YOU TOLD ME TO |
| 19:07:15 | 12 | REMIND YOU, AND I'M GOING TO. |
| 19:07:16 | 13 | **THE COURT:**  THAT'S OKAY.  THAT'S WHAT I GET.  ALL |
| 19:07:16 | 14 | RIGHT. |
| 19:07:17 | 15 | **MR. GULOTTA:**  I HAVE NO QUESTIONS, YOUR HONOR.  THERE |
| 19:07:19 | 16 | ARE SOME EXHIBITS IN CONNECTION WITH THE TESTIMONY THAT I'D |
| 19:07:21 | 17 | LIKE TO OFFER. |
| 19:07:22 | 18 | **THE COURT:**  CERTAINLY. |
| 19:07:24 | 19 | **MR. GULOTTA:**  THESE ARE ALL ITEMS OF MINE THAT WERE |
| 19:07:26 | 20 | ON THE SLIDES.  FOR THE MOST PART THEY WERE ALL JX EXHIBITS |
| 19:07:32 | 21 | THAT PREVIOUSLY HAD BEEN OFFERED INTO EVIDENCE BY BOTH PARTIES. |
| 19:07:36 | 22 | I HAVE SOME DX NUMBERS THAT I'D LIKE TO -- |
| 19:07:39 | 23 | THEY'RE ALL PHOTOS THAT YOU SAW, AND I'LL GO AHEAD AND READ |
| 19:07:42 | 24 | THOSE NUMBERS AND OFFER THEM. |
| 19:07:44 | 25 | **MR. PALMINTIER:**  ARE THEY IN THE REPORTS? |

3398

19:07:45  1              **MR. GULOTTA:**  THEY'RE ACTUALLY ON THE SLIDES, YES.

19:07:48  2              **MR. PALMINTIER:**  WELL, THEY'RE NEW EXHIBITS OR . . .

19:07:50  3              **MR. GULOTTA:**  NO.  NO.  NO, THESE ARE THE PHOTOS YOU

19:07:53  4  SAW ON THE SLIDES.

19:07:55  5              **MR. PALMINTIER:**  FROM THE REPORTS?

19:07:56  6              **MR. GULOTTA:**  YES.

19:07:58  7              **MR. PALMINTIER:**  NO OBJECTION, YOUR HONOR.

19:07:59  8              **THE COURT:**  ALL RIGHT.

19:07:59  9              **MR. GULOTTA:**  OKAY.  SO DEFENDANTS OFFER EXHIBITS

19:08:01  10  DX-01780, DX-02118, DX-02702.

19:08:10  11              AND THEN IN THAT GROUP THERE WERE SUB-NUMBERS.

19:08:16  12  SO DX-02702-2, 3, 25, 26, 27, 28, AND 61.

19:08:28  13              THEN IN THE NEXT SERIES, DX-02703, NUMBERS 2, 3,

19:08:36  14  4, 5, AND 6.

19:08:39  15              AND THEN DX-02704-8 AND 22.

19:08:45  16              AND DX-02717.

19:08:50  17              I'D LIKE TO OFFER THOSE INTO EVIDENCE.

19:08:51  18              **THE COURT:**  LET THEM BE ADMITTED.

19:08:53  19              **MR. GULOTTA:**  THANK YOU, YOUR HONOR.

19:08:55  20              **THE COURT:**  THANK YOU, COUNSEL.

19:08:55  21              MR. TREEBY?

19:08:55  22              **MR. TREEBY:**  YES.  IF YOUR HONOR PLEASE, THE CLOSING

19:08:58  23  ARGUMENTS ISSUE.  YOU WERE GOING TO TELL US SOMETHING TODAY, IF

19:09:01  24  YOU WANTED TO HAVE CLOSING ARGUMENT.

19:09:03  25              **THE COURT:**  NO, I DON'T.

| | | |
|---|---|---|
| 19:09:05 | 1 | **MR. TREEBY:**  I THOUGHT THIS WAS A GREAT TIME -- |
| 19:09:08 | 2 | **THE COURT:**  I REALLY HAVE -- I'VE COME A LONG WAY |
| 19:09:11 | 3 | SINCE THEN, SO -- AND I KNOW HOW GOOD YOUR BRIEFS WILL BE.  AND |
| 19:09:14 | 4 | I'M AFRAID WE CERTAINLY WILL HAVE TO EXPAND A GOOD DEAL THE |
| 19:09:20 | 5 | STANDARD BRIEFING PAGE LIMIT IN THIS, NO QUESTION.  THERE ARE A |
| 19:09:25 | 6 | NUMBER OF ISSUES. |
| 19:09:26 | 7 | **MR. TREEBY:**  AND ONE OTHER THING, YOUR HONOR, JUST TO |
| 19:09:29 | 8 | TELL COUNSEL AND THE COURT.  IN LIGHT OF THE LONGER SCHEDULE |
| 19:09:32 | 9 | THAT WE'VE HAD, AND IT WOULD BE DUPLICATIVE, WE'RE GOING TO |
| 19:09:37 | 10 | JUST STAND WITH ALL OF MR. BRUNO'S QUESTIONS OF MR. STAGGS. |
| 19:09:41 | 11 | AND WE'VE DESIGNATED THAT DEPOSITION, AND WE'RE NOT GOING TO |
| 19:09:44 | 12 | CALL HIM LIVE. |
| 19:09:45 | 13 | **MR. BRUNO:**  GREAT. |
| 19:09:45 | 14 | **THE COURT:**  ALL RIGHT. |
| 19:09:46 | 15 | **MR. BRUNO:**  THANK YOU. |
| 19:09:46 | 16 | **THE COURT:**  THANK YOU. |
| 19:09:46 | 17 | **MR. BRUNO:**  YOU MADE MY DAY. |
| 19:09:48 | 18 | **THE COURT:**  MR. SMITH, I NEVER DID ASK YOU.  NOBODY |
| 19:09:50 | 19 | WANTS TO -- WE'RE DONE WITH THIS WITNESS, I ASSUME.  BECAUSE |
| 19:09:53 | 20 | YOU DID HAVE A RIGHT. |
| 19:09:55 | 21 | **MR. SMITH:**  YES. |
| 19:09:55 | 22 | **THE COURT:**  ALL RIGHT, SIR.  THANK YOU VERY MUCH.  I |
| 19:09:57 | 23 | APPRECIATE IT. |
| 19:09:58 | 24 | AND I HOPE ALL OF YOU HAVE A LOVELY FRIDAY |
| 19:10:01 | 25 | EVENING IN NEW ORLEANS.  THERE'S A LOT OF GREAT RESTAURANTS. |

| | | |
|---|---|---|
| 19:10:03 | 1 | TRY TO ENJOY THEM IF YOU'RE GOING TO HAVE TO GO THROUGH THIS. |
| 19:10:05 | 2 | I WAS THINKING ABOUT ALL OF US AND HOW MANY |
| 19:10:17 | 3 | INTERESTING DECISIONS THIS CASE PRESENTS.  SO IT WILL TAKE US A |
| 19:10:20 | 4 | WHILE. |
| 19:10:21 | 5 | ALL RIGHT.  THANK YOU. |
| 19:10:23 | 6 | **THE DEPUTY CLERK:**  ALL RISE. |
| 19:10:25 | 7 | (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.) |
| 19:10:25 | 8 | ***** |

## CERTIFICATE

| | | |
|---|---|---|
| 19:10:25 | 10 | I, JODI SIMCOX, RMR, FCRR, OFFICIAL COURT REPORTER |
| 19:10:25 | 11 | FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF |
| 19:10:25 | 12 | LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND |
| 19:10:25 | 13 | CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND |
| 19:10:25 | 14 | UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE |
| 19:10:25 | 15 | ABOVE-ENTITLED AND NUMBERED MATTER. |

S/ JODI SIMCOX, RMR, FCRR
JODI SIMCOX, RMR, FCRR
OFFICIAL COURT REPORTER