1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

3    **********************************************************

IN RE:  KATRINA CANAL BREACHES
4    CONSOLIDATED LITIGATION          DOCKET NO. 05-CV-4182
                                      NEW ORLEANS, LOUISIANA
5    PERTAINS TO:  MRGO              MONDAY, OCTOBER 1, 2012
          *ARMSTRONG NO. 10-CV-866*
6

7    **********************************************************

8              DAY 14, AFTERNOON SESSION
           TRANSCRIPT OF TRIAL PROCEEDINGS
9      HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
              UNITED STATES DISTRICT JUDGE
10

11

APPEARANCES:
12

FOR THE PLAINTIFFS:           BRUNO & BRUNO
13                            BY:  JOSEPH M. BRUNO, ESQ.
                              855 BARONNE ST.
14                            NEW ORLEANS, LA 70113

15

                              THE ANDRY LAW FIRM
16                            BY:  JONATHAN B. ANDRY, ESQ.
                              610 BARONNE ST.
17                            NEW ORLEANS, LA 70113

18

                              BARON & BUDD
19                            BY:  THOMAS SIMS, ESQ.
                              3102 OAK LAWN AVE., SUITE 1100
20                            DALLAS, TX 75219

21

                              DEGRAVELLES, PALMINTIER,
22                            HOLTHAUS & FRUGE
                              BY:  MICHAEL C. PALMINTIER, ESQ.
23                                 JOSHUA M. PALMINTIER, ESQ.
                              618 MAIN STREET
24                            BATON ROUGE, LA 70801

25

───────────HOURLY COPY TRANSCRIPT───────────

```
 1
                              DOMENGEAUX, WRIGHT, ROY & EDWARDS
 2                            BY:  ELLWOOD C. STEVENS, JR., ESQ.
                                   BONNIE KENDRICK, ESQ.
 3                            P. O. BOX 3668
                              556 JEFFERSON ST.
 4                            LAFAYETTE, LA 70502

 5
                              THE DUDENHEFER LAW FIRM, LLC
 6                            BY:  FRANK C. DUDENHEFER, JR., ESQ.
                              601 POYDRAS ST., SUITE 2655
 7                            NEW ORLEANS, LA 70130-6004

 8
                              FAYARD & HONEYCUTT
 9                            BY:  CALVIN C. FAYARD, JR., ESQ.
                              519 FLORIDA AVE., S.W.
10                            DENHAM SPRINGS, LA 70726

11
                              JOANEN LAW FIRM
12                            BY:  SCOTT JOANEN, ESQ.
                              4905 FRERET ST., SUITE B
13                            NEW ORLEANS, LA 70115

14
                              LEVIN, PAPANTONIO, THOMAS,
15                            MITCHELL, RAFFERTY & PROCTOR
                              BY:  MATTHEW D. SCHULTZ, ESQ.
16                            316 S. BAYLEN ST., SUITE 600
                              PENSACOLA, FL 32502
17

18                            THE TRIAL LAW FIRM PC
                              BY:  ANDREW P. OWEN
19                            800 WILTSHIRE BLVD., SUITE 500
                              LOS ANGELES, CA 90017
20

21                            J. ROBERT WARREN, II, A PLC
                              BY:  J. ROBERT WARREN, II, ESQ.
22                            1718 SHORT ST.
                              NEW ORLEANS, LA 70118
23

24                            COTCHETT, PITRE & MCCARTHY, LLP
                              BY:  PHILIP L. GREGORY, ESQ.
25                            840 MALCOLM ROAD, SUITE 200
                              BURLINGAME, CA 94010
```

```
1

2    FOR THE DEFENDANT WASHINGTON
     GROUP INTERNATIONAL, INC.:          STONE PIGMAN WALTHER WITTMANN
3                                        BY:   WILLIAM D. TREEBY, ESQ.
                                               JAMES C. GULOTTA, JR., ESQ.
4                                              HEATHER S. LONIAN, ESQ
                                               MAGGIE A. BROUSSARD, ESQ.
5                                        546 CARONDELET STREET
                                         NEW ORLEANS, LA 70130
6

7                                                 - AND -

8
                                         JONES DAY
9                                        BY:   ADRIAN WAGER-ZITO, ESQ.
                                               DEBRA S. CLAYMAN, ESQ.
10                                             CHRISTOPHER N. THATCH, ESQ.
                                               CHRISTOPHER R. FARRELL, ESQ.
11                                             JULIA CRONIN, ESQ.
                                               BRIAN KERWIN, ESQ.
12                                       51 LOUISIANA AVENUE, N.W.
                                         WASHINGTON, D.C. 20001
13

14

15   FOR THE DEFENDANT UNITED
     STATES OF AMERICA:                  U.S. DEPARTMENT OF JUSTICE
16                                       CIVIL DIVISION, TORTS BRANCH
                                         BY:   ROBIN D. SMITH, ESQ.
17                                             JAMES F. MCCONNON, JR., ESQ.
                                               RUPERT MITSCH, ESQ.
18                                             CONOR KELLS, ESQ.
                                               JOHN A. WOODCOCK, ESQ.
19                                       BENJAMIN FRANKLIN STATION
                                         P.O. BOX 888
20                                       WASHINGTON, D.C. 20044

21

22   OFFICIAL COURT REPORTER:           KAREN A. IBOS, CCR, RPR, CRR, RMR
                                         500 POYDRAS STREET, ROOM HB-406
23                                       NEW ORLEANS, LOUISIANA 70130
                                         (504) 589-7776
24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
     PRODUCED BY COMPUTER.
```

```
 1                        I N D E X

 2

 3    WITNESSES FOR WGI:                        PAGE/LINE:

 4

 5    JEAN-PRIEUR DUPLESSIS

 6

 7     VOIR DIRE EXAMINATION BY MS. LONIAN       3534/9

 8     TRAVERSE EXAMINATION BY MR. PALMINTIER    3540/18

 9     DIRECT EXAMINATION BY MS. LONIAN          3542/2

10     CROSS-EXAMINATION BY MR. PALMINTIER       3562/15

11     REDIRECT EXAMINATION BY MS. LONIAN        3584/7

12

13

14    KARL SCHNEIDER

15

16     VOIR DIRE EXAMINATION BY MS. LONIAN       3587/5

17     TRAVERSE EXAMINATION BY MR. PALMINTIER    3592/17

18     DIRECT EXAMINATION BY MS. LONIAN          3597/7

19     CROSS-EXAMINATION BY MR. PALMINTIER       3623/2

20     REDIRECT EXAMINATION BY MS. LONIAN        3642/11

21

22

23

24

25
```

P R O C E E D I N G S

(MONDAY, OCTOBER 1, 2012)

(AFTERNOON SESSION)


(OPEN COURT.)

01:40:03    THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE BE SEATED.

01:40:05    MR. JOANEN:  GOOD AFTERNOON, YOUR HONOR.  SCOTT JOANEN.

01:40:07 TO CONCLUDE THE MORNING'S PRESENTATION WITH DR. STARK, PLAINTIFFS

01:40:12 WOULD OFFER TO FILE AND INTRODUCE INTO THE RECORD ALL OF THE

01:40:14 EXHIBITS THAT WERE REFERENCED DURING THE CROSS-EXAMINATION.  AND

01:40:17 ALSO WE HAVE -- I MET WITH MR. SMITH.  THE SLIDES THAT I

01:40:23 REFERENCED, WE ARE GOING TO CORRELATE THEM.  I CAN READ WHATEVER

01:40:27 THE ONES THAT ARE TURNED IN OR I THINK MR. SMITH IS GOING TO BE

01:40:31 ABLE TO SAY WHICH ONES WERE ON THE FIRST SET VERSUS ON THE SECOND

01:40:34 SET.

01:40:38    MR. SMITH:  YES, YOUR HONOR, I HAVE NO OBJECTIONS TO

01:40:41 THOSE EXHIBITS BEING ADMITTED, AND I CAN READ INTO THE RECORD THE

01:40:43 CORRELATION IF THE COURT WOULD LIKE.

01:40:45    THE COURT:  YES, I WOULD.  WE APPRECIATE IT.

01:40:49    MS. WAGER-ZITO:  MR. TREEBY IS NOT HERE.  ARE YOU

01:40:51 OFFERING INTO EVIDENCE ALL OF PHOTOGRAPHS?

01:40:53    MR. JOANEN:  NO.  TO CLARIFY, WE ARE NOT OFFERING INTO

01:40:55 THE RECORD THE PHOTOGRAPH THAT IS PX 4766, AND THAT A PHOTOGRAPH --

01:41:01 THE WHOLE SET OF PHOTOGRAPHS THAT WERE TAKEN BY MR. YOUNTS.  WE ARE

01:41:04 NOT OFFERING THOSE INTO EVIDENCE.

01:41:07  1          MS. WAGER-ZITO:  WITH THAT, NO OBJECTION.

01:41:08  2          THE COURT:  THANK YOU.

01:41:22  3          MR. SMITH:  YOUR HONOR, JUST FOR THE RECORD, WHEN

01:41:26  4  MR. JOANEN WAS CROSS-EXAMINING DR. STARK, HE WAS READING OFF

01:41:31  5  CERTAIN SLIDE NUMBERS WHICH WERE FROM AN EARLIER VERSION OF

01:41:36  6  DR. STARK'S PRESENTATION.  AND WITH THE COURT'S PERMISSION, I WILL

01:41:41  7  READ OUT THE OLD NUMBER THAT MR. JOANEN CALLED OUT AND THEN GIVE

01:41:45  8  THE NEW EXHIBIT REFERENCE.

01:41:46  9          THE COURT:  THANK YOU.  THAT WOULD BE GOOD.  THANK YOU.

01:41:49 10          MR. SMITH:  MR. JOANEN CALLED OUT SLIDE 3, THAT SLIDE IS

01:41:53 11  DM DX 1009-0003.  MR. JOANEN CALLED OUT SLIDE 20, THAT IS NOW DM DX

01:42:10 12  1009-0019.  MR. JOANEN CALLED OUT SLIDE 34, THAT IS DM DX

01:42:31 13  1009-0026.  AND MR. JOANEN CALLED OUT SLIDE 40, AND THAT IS NOW --

01:42:48 14  I APOLOGIZE.  HE CALLED OUT SLIDE 34 -- NO, THAT'S THE NEW NUMBER.

01:42:56 15  HE CALLED OUT SLIDE 40, AND THAT IS NOW DM DX 1009-0034.

01:43:48 16  MR. JOANEN CALLED OUT SLIDE 47, AND THAT IS NOW DM DX 1009-0047.  I

01:44:08 17  BELIEVE THAT'S ALL.

01:44:09 18          THE COURT:  THANK YOU VERY MUCH, MR. SMITH.  WE

01:44:11 19  APPRECIATE IT.

01:44:11 20          MR. JOANEN:  THANK YOU, YOUR HONOR.

01:44:12 21          THE COURT:  THANK YOU.  OKAY.  NEXT WITNESS.

01:44:19 22          MS. LONIAN:  AFTERNOON, YOUR HONOR.  HEATHER LONIAN FROM

01:44:22 23  STONE PIGMAN.  THE DEFENDANTS CALL JP DUPLESSIS.

01:44:26 24          AS A PRELIMINARY MATTER, THE PLAINTIFFS PROVIDED US WITH

01:44:29 25  AN EXHIBIT THAT WAS ACTUALLY ADDED TO THE EXHIBIT LIST TODAY AT

01:44:33  1    1:26 P.M., THAT IS PX 4767, AND WE WOULD JUST OBJECT TO THE USE ON

01:44:40  2    THE GROUNDS THAT WE WERE NOT PROVIDED IT WITH ADEQUATE TIME.  IT

01:44:44  3    WAS NOT EVEN ADDED TO THE EXHIBIT LIST UNTIL THIS AFTERNOON.

01:44:49  4         MR. JOSH PALMINTIER:  YOUR HONOR, IT IS A LEARNED

01:44:51  5    TREATISE AND IT IS ACTUALLY USED BY KARL SCHNEIDER IN HIS -- AS ONE

01:44:55  6    OF HIS RELIANCE MATERIALS.

01:44:58  7         MS. LONIAN:  AND I WOULD JUST NOTE, YOUR HONOR, THAT TO

01:45:00  8    THE EXTENT THAT IT WAS USED IN HIS RELIANCE MATERIAL, THAT'S ALL OF

01:45:03  9    THE MORE REASON WHY THEY SHOULD HAVE ADDED TO THE EXHIBIT LIST LONG

01:45:07 10    BEFORE TODAY.  BUT ON THAT NOTE I WOULD JUST LIKE --

01:45:12 11         MR. JOSH PALMINTIER:  YOUR HONOR, AS WAS THE CASE AT THE

01:45:15 12    SIDE BAR ON FRIDAY, IT'S OUR BELIEF THAT THE LEARNED TREATISE IS

01:45:20 13    USED FOR IMPEACHMENT PURPOSES AND, THEREFORE, WE SHOULD BE ABLE TO

01:45:24 14    USE THAT IF, IN FACT, WE DECIDE TO.

01:45:26 15         THE COURT:  WELL, I WILL -- I AM ON NOTICE AND I WILL

01:45:32 16    WAIT UNTIL WE GET THERE.

01:45:34 17         MS. LONIAN:  AND I NOTE FROM PRIOR EXPERTS THAT DAMAGES

01:45:37 18    ARE NOT THE MOST EXCITING PART OF THIS CASE.  I AM GOING TO DO MY

01:45:42 19    BEST TO PROCEED QUICKLY WHILE BUILDING AN ADEQUATE RECORD, YOUR

01:45:46 20    HONOR.

01:45:46 21         THE COURT:  THANK YOU.  THE REPORTS ARE IN EVIDENCE AS

01:45:48 22    WELL, AS I UNDERSTAND.  HAVE BEEN OR WILL BE INTRODUCED.  I THINK

01:45:52 23    THEY HAVE BEEN INTRODUCED INTO EVIDENCE.

01:45:53 24         MR. JOSH PALMINTIER:  YES, YOUR HONOR.

01:45:54 25         THE COURT:  ALL RIGHT.

01:45:57  1          THE DEPUTY CLERK:  PLEASE RAISE YOUR RIGHT HAND.

01:45:59  2      (WHEREUPON, JEAN-PRIEUR DUPLESSIS, WAS SWORN IN AND TESTIFIED

01:46:01  3      AS FOLLOWS:)

01:46:01  4          THE DEPUTY CLERK:  PLEASE BE SEATED.  STATE YOUR NAME AND

01:46:08  5   SPELL IT FOR THE RECORD, SIR.

01:46:10  6          THE WITNESS:  JEAN-PRIEUR DUPLESSIS, J-E-A-N-P-R-I-E-U-R,

01:46:17  7   LAST NAME D-U SPACE P-L-E-S-S-I-S.

01:46:22  8                     VOIR DIRE EXAMINATION

01:46:23  9   BY MS. LONIAN:

01:46:25 10   Q.  MR. DUPLESSIS, WHAT'S YOUR ADDRESS?

01:46:27 11   A.  717 WOOD RIDGE BOULEVARD IN MANDEVILLE, LOUISIANA.

01:46:31 12   Q.  AND YOU'RE A CERTIFIED PROFESSIONAL ESTIMATOR, CORRECT?

01:46:34 13   A.  YES.

01:46:34 14   Q.  IN THAT CAPACITY, YOU HAVE ISSUED REPORTS OPINING ON THE REPAIR

01:46:38 15   AND/OR REPLACEMENT COSTS FOR THE PROPERTIES AT ISSUE IN THIS

01:46:41 16   LITIGATION, CORRECT?

01:46:42 17   A.  CORRECT.

01:46:43 18   Q.  I WOULD LIKE TO DISCUSS YOUR QUALIFICATIONS.  YOU'VE RECEIVED A

01:46:46 19   NATIONAL HIGHER DIPLOMA IN CIVIL ENGINEERING FROM TECHNIKON

01:46:50 20   PRETORIA IN SOUTH AFRICA, AND THAT'S SOUTH AFRICA'S EQUIVALENT TO A

01:46:54 21   BACHELOR'S DEGREE, CORRECT?

01:46:55 22   A.  CORRECT.

01:46:55 23   Q.  AND UPON RECEIVING THAT DEGREE, YOU WORKED AS A SITE ENGINEER

01:47:00 24   AT MURRAY & ROBERTS IN SOUTH AFRICA WHERE YOU SPENT APPROXIMATELY

01:47:03 25   SIX YEARS AS A SITE ENGINEER AND PROJECT SUPERVISOR.  IN THAT ROLE

01:47:07  1   YOU WOULD ALSO SUPERVISE CONSTRUCTION PROJECTS THAT RANGED FROM

01:47:10  2   NUCLEAR FACILITIES TO RESIDENTIAL CONSTRUCTION.  AND AFTER LEAVING

01:47:13  3   MURRAY & ROBERTS IN SOUTH AFRICA, YOU WENT TO WORK FOR QUANTITY

01:47:17  4   SURVEY FIRM, ALSO IN SOUTH AFRICA, NAMED C.P. DE LEEUW & PARTNERS.

01:47:23  5   AND AT THAT POSITION YOU WORKED ON HIGH-RISE COMMERCIAL

01:47:26  6   CONSTRUCTION PROJECTS.

01:47:27  7           AFTER LEAVING THAT FIRM YOU WENT TO WORK IN ANOTHER SOUTH

01:47:31  8   AFRICAN CIVIL ENGINEERING FIRM, KEEVE STEYN.  AND THEN YOU WENT TO

01:47:34  9   WORK AT ANOTHER SOUTH AFRICAN FIRM, VORSTER, VAN DER WESTHUIZEN &

01:47:39 10   PARTNERS, WHERE YOU ALSO HAD THE POSITION OF CLERK OF WORKS AND

01:47:44 11   SUPERVISED LARGE SCALE AGRICULTURAL CONSTRUCTION PROJECTS.  IS THAT

01:47:46 12   AN ACCURATE SUMMARY OF YOUR WORK HISTORY THROUGH 1985?

01:47:49 13   A.  YES.

01:47:49 14   Q.  AND CAN YOU PLEASE EXPLAIN TO THE COURT WHAT A CLERK OF WORKS

01:47:51 15   DOES?  DID YOU HEAR ME?

01:47:56 16   A.  YES, I DID.  THE CLERK OF WORKS IS THE PERSON WHO WOULD

01:47:59 17   REPRESENT THE OWNER AND WORKING WITH THE CONTRACTOR INSURING THAT

01:48:06 18   THE QUALITY OF THE WORK HAS BEEN PERFORMED ACCORDING TO THE

01:48:09 19   CONTRACT, AS WELL AS PREPARE MONTHLY CERTIFICATES OF PAYMENTS FOR

01:48:15 20   THE CONTRACTOR BASED ON THE PROGRESS OF THE WORK AT WHAT STAGE OF

01:48:21 21   THE WORK HAS BEEN PERFORMED.

01:48:21 22   Q.  AND IN ALL OF YOUR WORK POSITIONS THAT WE DISCUSSED UP TO THIS

01:48:25 23   POINT, WAS IT AN INTEGRAL PART OF YOUR REGULAR DUTIES TO PREPARE

01:48:28 24   AND REVIEW COST ESTIMATES?

01:48:30 25   A.  YES, COST WAS ALWAYS INVOLVED.

01:48:32  1   Q.  AND IN DOING SO, DID YOU USE THE SAME TECHNIQUES AND ANALYSIS

01:48:35  2   THAT YOU USED IN THIS CASE?

01:48:36  3   A.  YES.

01:48:37  4   Q.  AND REGARDLESS OF WHETHER YOU'RE PREPARING A COST ESTIMATE FOR

01:48:40  5   A HIGH-RISE BUILDING OR SINGLE FAMILY RESIDENCE, THE UNDERLYING

01:48:43  6   PRINCIPLES ARE STILL THE SAME, CORRECT?

01:48:45  7   A.  CORRECT.

01:48:45  8   Q.  YOU TEMPORARILY LEFT THE CONSTRUCTION INDUSTRY TO PURSUE

01:48:50  9   ANOTHER CAREER PATH, BUT YOU ULTIMATELY RETURNED TO THE FIELD IN

01:48:53 10   THIS COUNTRY; IS THAT CORRECT?

01:48:54 11   A.  YES, I DID.

01:48:54 12   Q.  IN 2002 YOU BECAME A COST ESTIMATOR AND PROJECT MANAGER AT

01:48:58 13   ARCHITECTURAL CONCRETE.  IN 2005 YOU BEGAN TO WORK AS AN ESTIMATOR

01:49:02 14   AT MADSEN, KNEPPERS & ASSOCIATES WHERE YOU HELD -- WHERE YOU WERE

01:49:06 15   ULTIMATELY PROMOTED TO THE POSITION OF SENIOR ESTIMATOR.  IS THAT

01:49:09 16   THE POSITION YOU HOLD TODAY?

01:49:11 17   A.  YES, I DO.

01:49:11 18   Q.  IS THAT, WHAT I JUST SAID, BE AN ACCURATE SUMMARY OF YOUR WORK

01:49:14 19   HISTORY THROUGH THE -- SINCE FROM 2002 TO THE PRESENT DAY?

01:49:18 20   A.  THAT IS CORRECT.

01:49:18 21   Q.  AND THESE PAST TWO POSITIONS, WAS IT ALSO AN INTEGRAL PART OF

01:49:25 22   YOUR REGULAR DUTIES TO PREPARE COST ESTIMATES?

01:49:27 23   A.  YES, IT WAS.

01:49:28 24   Q.  AND IN DOING SO, DID YOU USE THE SAME TECHNIQUES AND ANALYSIS

01:49:32 25   THAT YOU'VE USED IN THIS CASE?

01:49:33  1    A.   YES.

01:49:33  2    Q.   AND AT MKA YOU'VE WORKED ON HUNDREDS OF KATRINA-RELATED CASES

01:49:39  3    IN LOUISIANA AND MISSISSIPPI, CORRECT?

01:49:41  4    A.   THAT'S CORRECT.

01:49:41  5    Q.   AND THAT INCLUDES RESIDENTIAL, COMMERCIAL, AND INDUSTRIAL

01:49:43  6    PROPERTIES?

01:49:44  7    A.   YES.

01:49:44  8    Q.   IN THE CASE OF MULTI-FAMILY AND UNIVERSITY PROPERTIES, WITHIN A

01:49:50  9    SINGLE ESTIMATE THERE MIGHT BE SINGLE DOZEN INDIVIDUAL ROOMS AND

01:49:53 10    RESIDENCES, CORRECT?

01:49:54 11    A.   YES.

01:49:54 12    Q.   FOR EXAMPLE, FOLLOWING HURRICANE KATRINA YOU WERE RETAINED TO

01:49:59 13    PREPARE COST ESTIMATES FOR WIND AND FLOOD DAMAGE AT A UNIVERSITY ON

01:50:02 14    THE GULF COAST OF MISSISSIPPI, CORRECT?

01:50:04 15    A.   AMONGST A LOT OF OTHER ONES, YES.

01:50:05 16    Q.   AND AS PART OF THAT ASSIGNMENT, YOU PREPARED ESTIMATES FOR AT

01:50:08 17    LEAST 34 DIFFERENT BUILDINGS FROM DORMS, TO LIBRARIES, TO

01:50:13 18    CLASSROOMS, TO OFFICE BUILDINGS TO GYMNASIUMS; IS THAT CORRECT?

01:50:16 19    A.   CORRECT.

01:50:16 20    Q.   AND YOU ALSO PREPARED A COST ESTIMATE FOR WIND AND FLOOD DAMAGE

01:50:20 21    AT A CASINO IN BILOXI, MISSISSIPPI, CORRECT?

01:50:22 22    A.   YES.

01:50:23 23    Q.   AND THAT PROJECT NOT ONLY INVOLVED THE CASINO ITSELF, BUT THE

01:50:28 24    ADJACENT HIGH-RISE HOTEL AND ALSO THE PARKING LOT, CORRECT?

01:50:31 25    A.   YES.   THAT PROPERTY PRIMARILY LOOKED AT WIND AND RAIN DAMAGE,

01:50:34  1   THAT'S WHAT OUR WORK ENTAILED.

01:50:37  2   Q.   AND FOR THAT PROJECT, THE TOTAL ESTIMATE WAS APPROXIMATELY

01:50:40  3   $140 MILLION WORTH OF CONSTRUCTION COSTS, CORRECT?

01:50:43  4   A.   THAT WAS A TOTAL WORTH OF THE CONTRACT, YES.

01:50:45  5   Q.   AND AFTER HURRICANE KATRINA, YOU WERE ALSO HIRED AS PART OF A

01:50:49  6   TEAM OF COST ESTIMATORS TO PREPARE COST ESTIMATES FOR REPAIR TO 23

01:50:54  7   PROPERTIES INVOLVING A LOUISIANA TELECOMMUNICATIONS COMPANY,

01:50:57  8   CORRECT?

01:50:57  9   A.   CORRECT.

01:50:57 10   Q.   AND THAT RANGED FROM SUBSTATIONS TO HEADQUARTERS?

01:51:00 11   A.   YES.

01:51:00 12   Q.   AND AFTER HURRICANE IKE, YOU WERE ALSO RETAINED TO PREPARE A

01:51:06 13   COST ESTIMATE FOR WIND AND FLOOD DAMAGE TO AN APARTMENT COMPLEX

01:51:09 14   THAT CONTAINED APPROXIMATELY 500 INDIVIDUAL APARTMENTS, CORRECT?

01:51:12 15   A.   YES, I WAS THE LEAD ESTIMATOR ON THAT PROJECT.

01:51:15 16   Q.   AND AGAIN, REGARDLESS OF THE SIZE OF THE PROPERTY OR THE TYPE

01:51:19 17   OF THE DAMAGE, THE PRINCIPLES OF COST ESTIMATING ARE THE SAME?

01:51:22 18   A.   YES.

01:51:22 19   Q.   AND IN SEVERAL OF THESE HURRICANE-RELATED CASES FOR WHICH

01:51:27 20   YOU'VE PREPARED COST ESTIMATES, YOU'VE BEEN ASKED TO SEGREGATE THE

01:51:30 21   COSTS ASSOCIATED WITH WIND DAMAGE FROM THE COSTS ASSOCIATED WITH

01:51:33 22   FLOOD DAMAGE, CORRECT?

01:51:34 23   A.   YES.

01:51:34 24   Q.   AND IN DOING SO, YOU WOULD CONSULT AN ENGINEER, AN ARCHITECT OR

01:51:38 25   SOME OTHER TYPE OF RELEVANT CONSULTANT WHO WOULD ULTIMATELY MAKE

01:51:41  1    THE DETERMINATION OF CAUSATION, CORRECT?

01:51:43  2    A.   THAT IS CORRECT.

01:51:43  3    Q.   AND THAT WOULD BE SIMILAR TO THE WAY YOU WORKED WITH MR. DANNER

01:51:45  4    IN THIS CASE, CORRECT?

01:51:46  5    A.   YES.

01:51:46  6    Q.   AND COULD YOU PLEASE, WHEN YOU USE THE TERM "SCOPE OF YOUR

01:51:52  7    ESTIMATE," COULD YOU PLEASE DEFINE THAT TERM FOR THE COURT?

01:51:54  8    A.   SCOPE CAN BE DEFINED AS A LIST OF TASKS TO BE PERFORMED BY THE

01:52:00  9    GENERAL CONTRACTOR, IN THIS CASE, AS LAID OUT IN THE CONTRACT

01:52:05 10    DOCUMENT ALONG WITH A COST OF EACH ITEM AND THE DESCRIPTION OF EACH

01:52:10 11    TASK TO BE PERFORMED.  THAT'S THE SCOPE OF WORK.

01:52:12 12    Q.   SO AS I UNDERSTAND IT, WHEN THERE WAS A DISPUTE AS TO

01:52:16 13    CAUSATION, THE PERSON WITH WHOM YOU CONSULT, THE ENGINEER, THE

01:52:19 14    ARCHITECT, OR THE ROOFER, WHATEVER THE CASE MAY BE, YOU WOULD SAY

01:52:23 15    THIS INDIVIDUAL TYPE OF DAMAGE -- OR THIS ITEM IN THE ESTIMATE WAS

01:52:26 16    DAMAGED BY A PARTICULAR TYPE OF DAMAGE, SUCH AS WIND OR RAIN OR

01:52:31 17    FLOOD AS THE CASE MAY BE.  AND YOUR JOB IS SIMPLY TO PREPARE

01:52:34 18    ESTIMATES BASED ON THE DETERMINATIONS OF SCOPE REACHED BY THE

01:52:38 19    ENGINEER?

01:52:39 20    A.   YES.

01:52:40 21    Q.   AND IN ADDITION TO THE KATRINA CASES, YOU'VE ALSO PREPARED

01:52:45 22    HUNDREDS OF CONSTRUCTION COST ESTIMATES AT MKA, CORRECT?

01:52:49 23    A.   YES.

01:52:50 24    Q.   AND YOU TESTIFIED EARLIER THAT YOU'RE A CERTIFIED PROFESSIONAL

01:52:53 25    ESTIMATOR.  IS THAT A NATIONAL CERTIFICATION?

01:52:55  1    A.  YES.

01:52:55  2    Q.  AND DID YOU HAVE TO PASS AN EXAM IN ORDER TO OBTAIN THAT

01:52:59  3    QUALIFICATION?

01:53:00  4    A.  YES, I DID.  IT'S A FOUR-HOUR EXAM AND AN EIGHT-HOUR EXAM.

01:53:03  5    Q.  AND DID YOU ALSO HAVE TO SUBMIT A WRITTEN PAPER?

01:53:05  6    A.  YES, I DID.

01:53:06  7    Q.  AND IS IT NECESSARY TO FULFILL A CONTINUING EDUCATION

01:53:09  8    REQUIREMENT IN ORDER TO MAINTAIN THAT CERTIFICATION?

01:53:11  9    A.  YES, IT IS.

01:53:12  10   Q.  AND YOU'RE ALSO A MEMBER OF THE AMERICAN SOCIETY OF

01:53:15  11   PROFESSIONAL ESTIMATORS, CORRECT?

01:53:16  12   A.  YES, CORRECT.

01:53:17  13   Q.  IN FACT, YOU HOLD AN OFFICE IN THAT ORGANIZATION, CORRECT?

01:53:20  14   A.  YES, I'M THE PRESIDENT OF THE LOCAL CHAPTER.

01:53:23  15        MS. LONIAN:  I TENDER THE EXPERT AS -- I TENDER THE

01:53:26  16   WITNESS AS AN EXPERT IN CONSTRUCTION COST ESTIMATING.

01:53:31  17                  TRAVERSE EXAMINATION

01:53:32  18   BY MR. JOSH PALMINTIER:

01:53:35  19   Q.  GOOD AFTERNOON.  JOSH PALMINTIER, DEGRAVELLES, PALMINTIER,

01:53:39  20   HOLTHAUS & FRUGE ON BEHALF OF THE PLAINTIFFS IN THIS MATTER.  GOOD

01:53:41  21   TO SEE YOU AGAIN, MR. DUPLESSIS.

01:53:43  22   A.  GOOD TO SEE YOU.

01:53:45  23   Q.  JUST HAVE A FEW QUESTIONS FOR YOU.  YOU'RE NOT TESTIFYING AS AN

01:53:49  24   ENGINEER, ARE YOU?

01:53:49  25   A.  NO.

01:53:50  1    Q.  YOU DO NOT CARRY A LICENSE AS A PUBLIC ADJUSTER, PRIVATE

01:53:54  2    ADJUSTER, INDEPENDENT ADJUSTER, DO YOU?

01:53:57  3    A.  NO, I DO NOT.

01:53:58  4    Q.  AND YOU'RE NOT TESTIFYING AS AN ADJUSTER IN THIS MATTER,

01:54:01  5    CORRECT?

01:54:01  6    A.  NO.

01:54:02  7    Q.  AND DURING YOUR WORK FOR MKA HAVE YOU -- YOU'VE NEVER BEEN

01:54:06  8    ASKED TO WORK AS A COST ESTIMATOR FOR A PLAINTIFF HOMEOWNER; IS

01:54:10  9    THAT CORRECT?

01:54:11  10   A.  NOT THAT I CAN RECALL, NO.

01:54:15  11   Q.  AND YOU WON'T BE MAKING A DETERMINATION AS TO CAUSATION IN THIS

01:54:19  12   MATTER.  THAT'S LEFT UP TO SOMEONE ELSE; IS THAT CORRECT?

01:54:22  13   A.  THAT IS CORRECT.

01:54:24  14   Q.  AND TO THE EXTENT THAT YOUR REPORTS MAKE A DISTINCTION BETWEEN

01:54:30  15   FLOOD VERSUS WIND AND RAIN DAMAGE TO THESE HOMES, YOU'VE RELIED ON

01:54:35  16   SOMEONE ELSE'S REPORTS, RIGHT?

01:54:37  17   A.  YES.

01:54:41  18           MR. JOSH PALMINTIER:  YOUR HONOR, WE DON'T HAVE A PROBLEM

01:54:43  19   WITH HIM BEING OFFERED AS -- IN THE LIMITED CAPACITY AS A COST

01:54:50  20   ESTIMATOR.

01:54:50  21           THE COURT:  THANK YOU.  COUNSEL, YOU ARE TENDERING THE

01:54:58  22   WITNESS AS AN EXPERT IN AND I'LL LET YOU TELL ME.

01:55:02  23           MS. LONIAN:  I AM TENDERING HIM AS AN EXPERT IN

01:55:04  24   CONSTRUCTION COST ESTIMATING.

01:55:05  25           THE COURT:  THE COURT ACCEPTS HIM AS TENDERED.

DIRECT EXAMINATION

BY MS. LONIAN:

Q.  AM I CORRECT, MR. DUPLESSIS, THAT IN THIS CASE YOU WERE ASKED
TO PREPARE A REPLACEMENT AND/OR REPAIR COSTS FOR EACH OF THE
PLAINTIFFS' HOMES AND ALSO TO REVIEW SCOTT TAYLOR'S REPORTS IN THIS
MATTER?

A.  YES.

Q.  AND WHAT MATERIALS DID YOU REVIEW IN THE COURSE OF PREPARING
YOUR ESTIMATES?

A.  I USED ANY PHOTOGRAPHS, FIRST OF ALL, THAT I COULD GET MY HANDS
ON.  I USED THE EXPERT REPORTS OF MR. JIM DANNER, HE IS -- HIS
ENGINEERING REPORT AS TO CAUSATION.  AND I LOOK -- ALSO LOOKED AT
FLOOR PLANS THAT MR. DANNER PROVIDED, AND THOSE ARE PRIMARILY THE
MAJOR PORTIONS OF THE INFORMATION THAT I USED.

Q.  AND YOU DID REVIEW THEIR INSURANCE FILES, BUT AM I CORRECT THAT
IN DOING SO YOU WERE LOOKING PRIMARILY FOR INFORMATION REGARDING
THE FIXTURES AND THE MATERIALS OF THE PLAINTIFFS' HOMES TO THE
EXTENT SUCH DETAILS WERE MENTIONED WITHIN THE FILES, CORRECT?

A.  YES, CORRECT.

Q.  AND IS IT YOUR UNDERSTANDING THAT THE HOUSES FOR WHICH YOU DID
NOT PREPARE A REPLACEMENT COST ESTIMATES ARE STILL STANDING?

A.  YES.

Q.  AND YOU -- FOR CERTAIN PLAINTIFFS, YOU'VE PREPARED BOTH A
REPAIR AND REPLACEMENT COST ESTIMATE.  WHAT'S THE DIFFERENCE
BETWEEN A REPAIR AND A REPLACEMENT COST ESTIMATE?

01:56:24  1    A.  WELL, A REPAIR ESTIMATE IN THIS CASE WOULD BE WHERE THE HOUSE

01:56:28  2    CAN STILL BE SALVAGED.  THE MAJORITY PART OF THE STRUCTURE IS STILL

01:56:32  3    EXISTS AND YOU CAN, YOU KNOW, RIP OUT ALL OF THE DRYWALL, ALL OF

01:56:39  4    THE DAMAGED ELEMENTS IN THE BUILDING LIKE CARPETING, DRYWALL, SO

01:56:43  5    FORTH AND REPLACE THAT.  AND THAT'S A REPAIR ESTIMATE.  AND THE

01:56:47  6    REPLACEMENT ESTIMATE I GO FROM THE VIEW THAT THE BUILDING WILL BE

01:56:51  7    TOTALLY DEMOLISHED AND STARTED AS A NEW CONSTRUCTION BUILDING FROM

01:56:55  8    SCRATCH.

01:56:55  9    Q.  AM I CORRECT THAT WHENEVER A DETERMINATION WAS MADE AS TO

01:56:59 10    WHETHER OR NOT A HOUSE COULD, IN FACT, BE REPAIRED, IT WAS

01:57:01 11    MR. DANNER WHO MADE THAT DETERMINATION?

01:57:02 12    A.  ABSOLUTELY, YES.

01:57:03 13    Q.  AND YOU RELIED ON HIS OPINION IN THAT MATTER?

01:57:06 14    A.  CORRECT.

01:57:06 15    Q.  AND IN YOUR REPAIR ESTIMATES FOR WHICH YOU SEGREGATED WIND

01:57:11 16    DAMAGE AND REPAIR -- I MEAN, WIND DAMAGE AND FLOOD DAMAGE, YOU ALSO

01:57:15 17    RELIED ON MR. DANNER TO MAKE THE DETERMINATION AS TO WHETHER ANY

01:57:18 18    ITEM WAS DAMAGED BY WIND OR FLOOD AS THE CASE MAY BE?

01:57:22 19    A.  YES.

01:57:22 20    Q.  AND YOU DID THE SAME BOTH FOR YOUR REPAIR AND REPLACEMENT

01:57:26 21    ESTIMATES, CORRECT?

01:57:26 22    A.  YES.

01:57:27 23    Q.  AND WOULD IT BE FAIR TO SAY THAT IN THE CASE OF A REPLACEMENT

01:57:32 24    COST ESTIMATE THAT THE ALLOCATION OF FLOOD COSTS VERSUS WIND COSTS

01:57:37 25    IS REALLY MORE OF A COUNTING EXERCISE, CORRECT?

01:57:41  1   A.   YES.  IN THIS CASE IT WAS, YES.

01:57:43  2   Q.   AND THAT'S BECAUSE SOMEONE WHO TEARS DOWN THEIR HOUSE ISN'T

01:57:46  3   GOING TEAR OUT THE WIND DAMAGE AND THEN TEAR OUT THE FLOOD DAMAGE,

01:57:49  4   THEY'RE JUST GOING TO BULLDOZE THE ENTIRE HOUSE ONCE AND REBUILD

01:57:53  5   FROM SCRATCH, CORRECT?

01:57:54  6   A.   CORRECT.

01:57:54  7   Q.   AND SO YOUR GOAL IN DOING THAT WAS MORE TO SORT OF ALLOCATE THE

01:57:59  8   RELATIVE COSTS FOR THE ENTIRE ENTERPRISE TO WIND AS VERSUS FLOOD,

01:58:04  9   CORRECT?

01:58:04  10  A.   YES.  I WAS TRYING TO DETERMINE WHICH PART OF THE DAMAGE WAS

01:58:09  11  ATTRIBUTABLE TO THE FLOOD AND WHICH PART OF THE HOUSE WAS, YOU

01:58:13  12  KNOW, ATTRIBUTABLE TO WIND AND RAIN.  ACCORDING TO MR. DANNER'S

01:58:18  13  REPORT.

01:58:18  14  Q.   AND FOR SOME OF THE PLAINTIFFS YOU ALSO PREPARED ESTIMATES FOR

01:58:22  15  THE COST TO REPAIR AND REPLACEMENTS THAT ARE ATTRIBUTABLE TO THE

01:58:24  16  IHNC BREACHES.  AND FOR -- IN THAT ENTERPRISE YOU ALSO RELIED ON

01:58:28  17  MR. DANNER TO MAKE THE DETERMINATIONS REGARDING WATER HEIGHT AND

01:58:34  18  REVIEWING THE HYDROGRAPHS AND SO FORTH, AM I CORRECT?

01:58:37  19  A.   YES, I REVIEWED THE CONCLUSIONS IN MR. DANNER'S REPORT.  I

01:58:41  20  DIDN'T STUDY THE HYDROGRAPHS, I JUST REVIEWED THE CONCLUSIONS PER

01:58:44  21  MR. DANNER'S REPORT, CORRECT.

01:58:46  22  Q.   AM I CORRECT YOU DIDN'T MAKE ANY INDEPENDENT DETERMINATIONS ON

01:58:49  23  THOSE, YOU RELIED SOLELY ON MR. DANNER, CORRECT?

01:58:52  24  A.   YES, CORRECT.

01:58:53  25  Q.   AND GENERALLY SPEAKING, WOULD IT BE FAIR TO SAY THAT THE MAJOR

01:58:56   1   COMPONENTS OF A COST ESTIMATE FOR CONSTRUCTION JOB ARE MATERIALS,

01:59:00   2   LABOR, EQUIPMENT, GENERAL CONDITIONS, BONDS AND INSURANCE,

01:59:05   3   CONSULTANTS, PERMITS, AND OVERHEAD AND PROFIT?

01:59:08   4   A.  YES.  THAT'S CORRECT.

01:59:09   5   Q.  AND WITH REGARD TO -- SPECIFICALLY, WITH REGARD TO LABOR.  AM I

01:59:14   6   CORRECT THAT YOU WOULD FIND A BASE LABOR RATE USING DAVIS BACON OR

01:59:18   7   SOME OTHER LABOR DATABASE AND THEN MAKE WHATEVER ADJUSTMENT YOU

01:59:22   8   DEEMED APPROPRIATE BASED ON THE CONDITION OF THE LOCAL LABOR

01:59:25   9   MARKET?

01:59:25  10   A.  CORRECT.

01:59:26  11   Q.  AND YOU MADE THAT ADJUSTMENT IN RELYING UPON YOUR PROFESSIONAL

01:59:29  12   EXPERIENCE AND JUDGMENT, CORRECT?

01:59:31  13   A.  YES.

01:59:31  14   Q.  AND YOU VALIDATED YOUR ADJUSTMENTS BY CALLING LOCAL CONTRACTORS

01:59:35  15   AND ESTIMATORS IN THE NEW ORLEANS AREA AND ASKING THEM WHAT THE

01:59:37  16   GOING RATES WERE, CORRECT?

01:59:38  17   A.  YEAH, I DO THAT AS A ROUTINE OF THE WORK THAT I DO EVERY DAY.

01:59:42  18   Q.  IN FACT, IN YOUR EXPERIENCE, THE COST ESTIMATES YOU PRODUCED

01:59:46  19   USING YOUR METHOD ARE TYPICALLY WITHIN FIVE PERCENT OF THE FINAL

01:59:49  20   COSTS FOR WHICH THE WORK IS ULTIMATELY PERFORMED?

01:59:52  21   A.  THAT'S MY EXPERIENCE ON AVERAGE, CORRECT.

01:59:54  22   Q.  AND WITH REGARD TO THE METHODOLOGY YOU USED TO DETERMINE LABOR

01:59:59  23   COST, IS THAT THE SAME METHODOLOGY YOU'VE USED OVER THE COURSE OF

02:00:02  24   YOUR CAREER?

02:00:02  25   A.  YES.

02:00:03 1  Q.  AND WITH REGARD TO MATERIAL COSTS, GENERALLY SPEAKING, YOU

02:00:07 2  WOULD DETERMINE LOCAL MATERIAL COSTS BY CHECKING WITH A RETAILER

02:00:10 3  SUCH AS HOME DEPOT OR LOWES AND THEN MAKING WHATEVER ADJUSTMENTS

02:00:14 4  YOU THOUGHT WERE APPROPRIATE BASED ON THE MARKET, CORRECT?

02:00:16 5  A.  CORRECT.

02:00:16 6  Q.  AND IN YOUR OPINION FOR A RESIDENTIAL PROJECT FOR THE TYPE

02:00:20 7  THAT'S AT ISSUE IN THIS LITIGATION, THAT WOULD BE THE TYPE OF STORE

02:00:23 8  WHERE A CONTRACTOR WOULD USUALLY BUY MATERIALS, CORRECT?

02:00:27 9  A.  YES, BUT THAT'S A GOOD PLACE WHERE WE FIND OUR MATERIAL COSTS,

02:00:31 10  YES.

02:00:31 11  Q.  BUT YOU ALSO HAVE TO MAKE AN ADJUSTMENT TO MATERIAL COSTS

02:00:34 12  BECAUSE A CONTRACTOR IS GOING TO APPLY CERTAIN ADD-ONS TO MATERIAL

02:00:37 13  THAT THEY'RE THEN GOING TO PASS ONTO THE HOMEOWNER, CORRECT?

02:00:41 14  A.  CORRECT, YES.

02:00:41 15  Q.  AND EXAMPLES OF THAT MIGHT BE WASTAGE OR PROFIT?

02:00:46 16  A.  WASTAGE, PROFIT, YES.  TAX, DELIVERY COSTS, SO FORTH.

02:00:51 17  Q.  AND WHEN YOU SAY "PROFIT," THE PROFIT YOU'RE TALKING ABOUT IS

02:00:56 18  DISTINCT FROM THE OVERHEAD AND PROFIT THAT WE'RE GOING TO TALK

02:00:58 19  ABOUT LATER, CORRECT?

02:00:59 20  A.  YES, THAT'S THE PROFIT FOR THE SUBCONTRACTOR THAT WE'RE TALKING

02:01:02 21  ABOUT.

02:01:02 22  Q.  AND ANY ADJUSTMENT YOU MAKE TO THE MATERIAL COSTS ARE MADE

02:01:06 23  USING YOUR PROFESSIONAL EXPERIENCE AND JUDGMENT, CORRECT?

02:01:08 24  A.  YES.

02:01:09 25  Q.  AND IS THAT THE SAME METHODOLOGY YOU'VE USED OVER THE COURSE OF

02:01:12  1    YOUR CAREER FOR MATERIAL COSTS?

02:01:13  2    A.  YES.

02:01:14  3    Q.  AND GENERALLY SPEAKING, THE ESTIMATES YOU PREPARED IN THIS CASE

02:01:20  4    DON'T HAVE SIGNIFICANT COSTS ASSOCIATED WITH EQUIPMENT RENTAL,

02:01:23  5    CORRECT?

02:01:23  6    A.  NO.

02:01:23  7    Q.  AND THAT'S BECAUSE A CONTRACTOR DOING THIS TYPE OF WORK IS

02:01:26  8    USUALLY GOING TO OWN ALL OF THE EQUIPMENT THAT THEY'RE GOING TO USE

02:01:30  9    TO PERFORM THE WORK, CORRECT?

02:01:32  10   A.  THE SMALL TOOLS, YES.  NORMALLY, THE SUBCONTRACTORS WILL HAVE

02:01:35  11   THEIR OWN SMALL TOOLS.  THE ONLY EQUIPMENT WOULD BE IF YOU NEEDED A

02:01:39  12   MAN LIFT OR, YOU KNOW, A CRANE OR SOMETHING LIKE THAT.  THE

02:01:44  13   EQUIPMENT IN MY ESTIMATES IS THE DUMPSTER, THAT IS IN MY CATEGORY

02:01:50  14   OF EQUIPMENT.

02:01:50  15   Q.  AND WHAT METHODOLOGY DID YOU USE TO DETERMINE THE LOCAL

02:01:54  16   EQUIPMENT COSTS?

02:01:55  17   A.  IF THERE WAS EQUIPMENT NECESSARY, THE SAME THING.  I'LL CALL

02:02:01  18   THE LOCAL VENDOR LIKE HERTZ OR ONE OF THOSE COMPANIES THAT RENT OUT

02:02:05  19   EQUIPMENT.

02:02:06  20   Q.  AND THAT'S THE SAME METHODOLOGY EMPLOYED OVER THE COURSE OF

02:02:09  21   YOUR CAREER FOR DETERMINING EQUIPMENT COSTS, CORRECT?

02:02:11  22   A.  YES.

02:02:11  23   Q.  AND GENERALLY SPEAKING, ARE THE GENERAL CONDITION COSTS THE

02:02:15  24   COSTS OF A TYPICALLY BE ASSOCIATED WITH HAVING A GENERAL CONTRACTOR

02:02:19  25   SUCH AS SUPERVISION OR UTILITIES AT THE SITE, THINGS OF THAT

02:02:25  1    NATURE?

02:02:25  2    A.  YES.  GENERAL CONDITIONS WOULD NORMALLY I WOULD INCLUDE THE

02:02:31  3    SUPERVISION THAT -- PORTABLE TOILETS, THE TEMPORARY UTILITIES,

02:02:36  4    ELECTRICITY, THE PICKUP TRUCK THAT THE SUPERVISOR MAY USE, THINGS

02:02:41  5    OF THAT NATURE THAT'S NECESSARY TO PERFORM THE WORK.

02:02:43  6    Q.  AND ARE CONSULTANTS FEES THE COSTS THAT ARE TYPICALLY INCURRED

02:02:48  7    BY HIRING AN ARCHITECT OR ANOTHER TYPE OF NECESSARY CONSULTANT TO

02:02:52  8    CONSTRUCT A HOUSE?

02:02:53  9    A.  YES.  NORMALLY YOU WOULD WANT TO USE AN ARCHITECT OR AN

02:02:56  10   ENGINEER TO PREPARE THE DRAWINGS TO SUBMIT THEM FOR PERMITTING.

02:03:01  11   Q.  AND BONDS AND INSURANCE ARE PRETTY SELF-EXPLANATORY, THAT'S THE

02:03:04  12   TYPES OF INSURANCE THAT A CONTRACTOR NEEDS IN ORDER TO PERFORM THE

02:03:08  13   WORK, AND BONDS WOULD BE SIMILARLY THE TYPE OF BONDS THAT NEED TO

02:03:11  14   BE INCURRED?

02:03:11  15   A.  CORRECT.

02:03:12  16   Q.  AND SIMILARLY WITH PERMITS, THEY'RE LOCAL CONSTRUCTION PERMITS

02:03:15  17   FOR A RESIDENTIAL HOUSE, CORRECT?

02:03:17  18   A.  YES, THAT'S LIABILITY INSURANCE, FOR EXAMPLE.  YES, AND THE

02:03:25  19   LICENSE, CORRECT.

02:03:26  20   Q.  IN THIS CASE, YOU DETERMINED THAT A 13.5 PERCENT OVERHEAD

02:03:29  21   PROFIT WAS APPROPRIATE BECAUSE AT THE TIME YOU PREPARED YOUR

02:03:31  22   ESTIMATES THE CONSTRUCTION MARKET WAS SLIGHTLY DEPRESSED, CORRECT?

02:03:35  23   A.  YES, THAT IS MY JUDGMENT AT THE TIME.

02:03:37  24   Q.  AND IT'S YOUR EXPERIENCE THAT A CONTRACTOR MIGHT WORK FOR A

02:03:39  25   LOWER PERCENTAGE OF OVERHEAD AND PROFIT IN A SLOW MARKET JUST TO

02:03:43  1   KEEP HIS WORK CREWS BUSY, CORRECT?

02:03:45  2   A.  I'VE OFTEN COME ACROSS THAT, YES.

02:03:47  3   Q.  AND YOU MADE THAT DETERMINATION RELYING ON YOUR PROFESSIONAL

02:03:50  4   EXPERIENCE AND JUDGMENT, CORRECT?

02:03:51  5   A.  YES.

02:03:52  6   Q.  AND THAT'S THE SAME METHODOLOGY YOU'VE TYPICALLY EMPLOYED FOR

02:03:54  7   OVERHEAD AND PROFIT OVER THE COURSE OF YOUR CAREER IS TO LOOK AT

02:03:57  8   WHAT THE LOCAL CONDITIONS ARE AND MAKE A JUDGMENT AS OPPOSED TO

02:04:00  9   JUST SIMPLY ALWAYS APPLYING THE SAME FLAT RATE EVERY TIME, CORRECT?

02:04:04 10   A.  EXACTLY.

02:04:05 11   Q.  AND YOU WERE HERE WHEN SCOTT TAYLOR TESTIFIED IN COURT IN THIS

02:04:15 12   CASE, WEREN'T YOU?

02:04:16 13   A.  YES, I WAS.

02:04:16 14   Q.  AND YOU HEARD HIM TESTIFY THAT IT WOULD HAVE COST LESS TO

02:04:19 15   DEMOLISH AND REBUILD THE PLAINTIFFS' HOUSES THEN IT WOULD HAVE TO

02:04:24 16   REPAIR THEM.  IS THAT YOUR OPINION IN THIS CASE?

02:04:27 17   A.  NO.

02:04:27 18   Q.  WE'LL GO THROUGH THE NUMBERS ON A CASE-BY-CASE BASIS, BUT IN

02:04:30 19   EACH CASE, YOU FOUND THAT WHEN YOU MADE A COMPARISON IT WOULD HAVE

02:04:33 20   BEEN CHEAPER TO REPAIR EACH OF THE PLAINTIFFS' HOUSES THAN TO

02:04:37 21   REPLACE THEM, CORRECT?

02:04:38 22   A.  CORRECT, YES.

02:04:39 23   Q.  AND WE ALSO HEARD A LOT OF TESTIMONY FROM THE PLAINTIFFS AND

02:04:45 24   THE DEFENSE EXPERTS ABOUT THE EFFECTS OF STANDING WATER AND, I

02:04:48 25   GUESS, WHAT'S CALLED THE WICKING.  AND GENERALLY SPEAKING, DID THE

02:04:51  1  ESTIMATES THAT YOU PREPARED IN THIS CASE TAKE SUCH DAMAGES INTO

02:04:55  2  ACCOUNT?

02:04:55  3  A.   YES.

02:04:56  4  Q.   AND HOW IS THAT?

02:04:57  5  A.   IF WATER WOULD COME TO A CERTAIN LEVEL, YOU WOULD HAVE AT LEAST

02:05:02  6  MAYBE THREE OR FOUR INCHES OF WICKING, WHAT THEY CALL WICKING, THAT

02:05:07  7  THE INSULATION BEHIND THE DRYWALL SUCKS UP THE WATER, AND SO YOU

02:05:13  8  NEED TO GO PAST -- WHEN YOU DEMOLISH THE DRYWALL, YOU NEED TO GO

02:05:17  9  PAST THAT LEVEL WHERE THE WATER ACTUALLY ENDED UP BEING.

02:05:20 10  Q.   SO AM I CORRECT THAT, SAY, FOR EXAMPLE, YOU HAVE A FOOT OF

02:05:24 11  WATER IN A HOUSE THAT WHAT YOU'RE SAYING IS THAT YOU WOULD

02:05:27 12  OBVIOUSLY REMOVE ONE AND BELOW, BUT YOU WOULD ALSO GO ABOVE THE ONE

02:05:31 13  TO WHATEVER POINT YOU DETERMINED THAT THE EFFECTS WERE NO LONGER BE

02:05:35 14  FELT AND THEN JUST REMOVE EVERYTHING BELOW, CORRECT?

02:05:38 15  A.   CORRECT.

02:05:38 16  Q.   AND YOU CAN DO THAT WITH INSULATION, WHICH IS GOING TO ABSORB

02:05:43 17  THE WATER, CORRECT?

02:05:44 18  A.   CORRECT.

02:05:44 19  Q.   YOU CAN EVEN DO THAT WITH WIRING IN A HOUSE, CORRECT?

02:05:47 20  A.   SAY THAT --

02:05:48 21  Q.   YOU CAN EVEN DO THAT WITH ELECTRICAL WIRING IN A HOUSE,

02:05:52 22  CORRECT?

02:05:52 23  A.   YES.   IF THE WIRING GETS WET AND THE RECEPTACLES GET WET, YOU

02:05:57 24  NEED TO REMOVE THEM.

02:05:57 25  Q.   BUT THE EFFECT IS -- AT A CERTAIN POINT THE EFFECT IS GOING TO

02:06:01  1   BE CUT OFF, CORRECT?

02:06:02  2   A.  YES.

02:06:02  3   Q.  AND EVERYTHING ABOVE THE POINT AT WHICH THE EFFECT IS CUT OFF

02:06:05  4   DOESN'T NEED TO BE REPLACED, CORRECT?

02:06:07  5   A.  CORRECT.

02:06:07  6   Q.  AND SO IT'S YOUR OPINION THAT FOR ALL OF THE ESTIMATES YOU

02:06:11  7   PREPARED IN THIS CASE, ANY EFFECTS, REGARDLESS OF HOW LONG THE

02:06:17  8   WATER WAS THERE, ANY EFFECTS OF STANDING WATER WILL BE ADDRESSED IN

02:06:20  9   YOUR ESTIMATES, CORRECT?

02:06:21 10   A.  YES.

02:06:21 11   Q.  YOU KNOW THAT FROM PERSONAL EXPERIENCE, CORRECT?

02:06:28 12   A.  YES, CORRECT.  WITH ISAAC I HAD THREE-FOOT, NINE INCHES OF

02:06:32 13   WATER IN MY HOME AT THE BOTTOM.  AND I REMOVED THE WALL AND I HAD

02:06:36 14   TO REMOVE THE INSULATION UP TO FOUR FEET.  AND NOW I CAN BUILD IT

02:06:44 15   BACK AGAIN, TO GO REPAIR MY HOME.

02:06:48 16   Q.  AND HOW LONG WAS THE WATER IN YOUR HOUSE?

02:06:51 17   A.  AS I UNDERSTAND IT, THREE DAYS.  I WAS NOT THERE, BUT FROM

02:06:54 18   SPEAKING TO MY NEIGHBORS, I UNDERSTAND IT WAS ABOUT THREE DAYS

02:06:57 19   AFTER ISAAC.

02:06:58 20   Q.  AND LET'S MOVE ON, I GUESS, NOW TO THE INDIVIDUAL NUMBERS THAT

02:07:05 21   YOU PREPARED FOR EACH PLAINTIFF.  AND GENERALLY SPEAKING, DID YOU

02:07:08 22   USE FOR ALL OF THE PLAINTIFFS THE SAME METHODOLOGIES THAT YOU JUST

02:07:12 23   DESCRIBED TO THE COURT?

02:07:13 24   A.  CORRECT, YES.

02:07:14 25   Q.  AND YOUR -- IN THE CASE OF THE ARMSTRONGS, THE TOTAL

02:07:18  1   REPLACEMENT COST ESTIMATES FOR ALL OF THE HOUSES -- ACTUALLY, LET

02:07:23  2   ME START OVER.

02:07:24  3          AND AS WE SEE IN THIS CASE, PARTICULARLY WITH REGARD TO

02:07:33  4   THE ARMSTRONGS, THAT FOR ALL OF THE CASES FOR WHICH YOU'VE PREPARED

02:07:37  5   REPLACEMENT COST ESTIMATES, YOUR NUMBERS WERE ACTUALLY HIGHER THAN

02:07:41  6   SCOTT TAYLOR'S, CORRECT?

02:07:41  7   A.  YES.

02:07:42  8   Q.  AND GENERALLY SPEAKING, THAT'S BECAUSE IN ADDITION TO THE MINOR

02:07:45  9   DIFFERENCES IN FLOOR PLANS, MR. TAYLOR'S REPLACEMENT ESTIMATES

02:07:48  10  DON'T INCLUDE COSTS ASSOCIATED WITH GENERAL CONDITIONS AND THEY

02:07:51  11  DON'T INCLUDE COSTS ASSOCIATED WITH CONSULTANTS, CORRECT?

02:07:54  12  A.  THAT'S WHAT I SAW, YES.

02:07:55  13  Q.  AND IN YOUR OPINION, WOULD ANY OF THE PLAINTIFFS HAVE BEEN ABLE

02:07:58  14  TO REBUILD THEIR HOUSES FROM SCRATCH WITHOUT INCURRING GENERAL

02:08:01  15  CONDITIONS COSTS AND CONSULTANT COSTS?

02:08:04  16  A.  NO.  I ALWAYS ALLOW THAT IN MY ESTIMATE.

02:08:06  17  Q.  AND YOU DIDN'T INCLUDE MICROBIAL COATING IN YOUR PLACEMENT

02:08:11  18  ESTIMATE FOR THE ARMSTRONGS BECAUSE, IN YOUR OPINION, A CONTRACTOR

02:08:13  19  WOULD SIMPLY REBUILD WITH TREATED LUMBER, CORRECT?

02:08:16  20  A.  CORRECT.

02:08:17  21  Q.  AND TREATED LUMBER DOESN'T REQUIRE MICROBIAL COATING?

02:08:20  22  A.  ARE YOU REFERRING TO THE REPLACEMENT?

02:08:22  23  Q.  YES.

02:08:23  24  A.  YES, MA'AM.

02:08:24  25  Q.  AND ARE THESE -- AM I CORRECT THAT YOUR REPLACEMENT COST

02:08:27 1  ESTIMATES FOR THE ARMSTRONGS WAS $224,294.89?

02:08:33 2  A.  YES.

02:08:33 3  Q.  AND YOUR REPLACEMENT COST ESTIMATE ATTRIBUTABLE TO FLOOD WAS

02:08:38 4  $174,177.53, CORRECT?

02:08:43 5  A.  CORRECT.

02:08:43 6  Q.  AND UNLIKE SCOTT TAYLOR, YOU'VE ACTUALLY PREPARED A REPLACEMENT

02:08:50 7  COST ESTIMATE THAT SEPARATED WIND FROM FLOOD DAMAGE, CORRECT?

02:08:53 8  A.  YES.

02:08:54 9  Q.  AND UNLIKE SCOTT TAYLOR, YOU'VE ALSO PREPARED A REPAIR ESTIMATE

02:09:00 10  FOR THE ARMSTRONGS THAT WAS INCLUDED IN YOUR REPORTS?

02:09:03 11  A.  YES.

02:09:03 12  Q.  AND THAT'S BECAUSE AS YOU TESTIFIED AND MR. DANNER TESTIFIED,

02:09:08 13  HE WAS OF THE OPINION THAT THE ARMSTRONG HOUSE COULD HAVE BEEN

02:09:11 14  REPAIRED, CORRECT?

02:09:12 15  A.  CORRECT.

02:09:12 16  Q.  AND DO YOU OPINE THAT THE TOTAL REPAIR COSTS FOR THE ARMSTRONG

02:09:17 17  HOUSE WAS $141,273.67, CORRECT?

02:09:23 18  A.  CORRECT.

02:09:23 19  Q.  AND AGAIN HERE, THIS IS AN EXAMPLE WHERE WE SEE YOUR REPAIR

02:09:26 20  COST IS LOWER THAN YOUR REPLACEMENT COST.  IF YOU CAN MOVE ON.  AND

02:09:32 21  HERE ARE THE NUMBERS AGAIN AND THE COMPARISON.  AND YOUR FLOOD --

02:09:36 22  THE ESTIMATE THAT YOU PREPARED FOR THE FLOOD DAMAGE FOR THE

02:09:39 23  ARMSTRONG HOUSE WAS $90,442.51, CORRECT?

02:09:44 24  A.  CORRECT, YES.

02:09:45 25  Q.  AND WITH REGARD TO MS. COATS, YOU DIDN'T PREPARE A REPLACEMENT

02:09:50  1   ESTIMATE BECAUSE THE HOUSE IS OBVIOUSLY STILL STANDING, CORRECT?

02:09:53  2   A.  YES.

02:09:54  3   Q.  AND FOR ONE OF THE REASONS THAT YOUR REPAIR COST NUMBER IS

02:09:59  4   SIGNIFICANTLY LOWER THAN SCOTT TAYLOR'S IS THAT MR. TAYLOR REPLACES

02:10:09  5   THE ENTIRE ROOF AND ALSO INCLUDES OAK FLOORING THROUGHOUT THE

02:10:12  6   ENTIRE HOUSE, EVEN THOUGH MR. MORGAN TESTIFIED IN HIS DEPOSITION

02:10:15  7   THAT THERE WAS LINOLEUM IN AT LEAST SOME PARTS OF THE HOUSE.  AND

02:10:19  8   HE ALSO -- MR. TAYLOR ALSO ASSUMES THAT THERE WERE PLASTER WALLS

02:10:23  9   INSTEAD OF DRYWALL, EVEN THOUGH MR. MORGAN TESTIFIED IN HIS

02:10:27 10   DEPOSITION THAT THE PLASTER WALLS HAD BEEN REMOVED PRIOR TO

02:10:30 11   KATRINA, CORRECT?

02:10:31 12   A.  CORRECT.

02:10:33 13   Q.  IN FACT, JUST THE INCLUSION OF PLASTER WALLS WITHIN SCOTT

02:10:38 14   TAYLOR'S -- LET ME START OVER.

02:10:40 15        IN FACT, JUST THE INCLUSION OF PLASTER WALLS ALONE WITHIN

02:10:43 16   SCOTT TAYLOR'S ESTIMATE ACCOUNTS FOR $47,000, CORRECT?

02:10:46 17   A.  THAT'S CORRECT.  IF I RECALL CORRECTLY, YES.

02:10:48 18   Q.  AND IN YOUR OPINION, IT WOULD HAVE COST $97,703.41 TO REPAIR

02:10:54 19   ALL OF THE FLOOD DAMAGE TO THE COATS HOUSE, CORRECT?

02:10:56 20   A.  CORRECT.

02:10:57 21   Q.  AND IN YOUR OPINION, IT WOULD HAVE COST $59,713.54 TO REPAIR

02:11:02 22   THE FLOOD DAMAGE THAT WAS ATTRIBUTABLE TO THE IHNC BREACHES,

02:11:05 23   CORRECT?

02:11:06 24   A.  YES.

02:11:06 25   Q.  AND SO EVEN WHEN THE SOURCE OF WATER IS LIMITED TO THE IHNC

02:11:10  1    BREACHES, YOUR REPAIR ESTIMATE IS STILL SIGNIFICANTLY LOWER THAN

02:11:13  2    SCOTT TAYLOR'S, CORRECT?

02:11:15  3    A.   CORRECT.

02:11:15  4    Q.   AND MOVING ON TO MR. HOLMES, YOUR OPINION THE FLOOD ONLY

02:11:19  5    REPLACEMENT COST FOR MR. HOLMES IS $200,886.84, CORRECT?

02:11:24  6    A.   CORRECT.

02:11:25  7    Q.   AND THIS IS ANOTHER EXAMPLE WHERE YOUR NUMBER IS HIGHER THAN

02:11:28  8    SCOTT TAYLOR'S, AND THAT WOULD BE FOR THE GENERAL REASONS WE SPOKE

02:11:30  9    ABOUT EARLIER THAT HE DID NOT INCLUDE CONSULTANT FEES OR GENERAL

02:11:33 10    CONDITIONS FEES IN HIS ESTIMATES, CORRECT?

02:11:35 11    A.   YES.

02:11:36 12    Q.   AND IT WAS ALSO, AGAIN, MR. DANNER'S OPINION THAT THIS HOUSE

02:11:40 13    COULD HAVE BEEN REPAIRED?

02:11:41 14    A.   YES.

02:11:41 15    Q.   AND IT WAS YOUR OPINION THAT THE FLOOD ONLY DAMAGE TO THE HOUSE

02:11:47 16    COULD HAVE BEEN REPAIRED FOR $106,537.28, CORRECT?

02:11:53 17    A.   YES, THAT'S CORRECT.

02:11:53 18    Q.   AND AGAIN, THAT'S SIGNIFICANTLY LESS THAN IT WOULD HAVE COST TO

02:11:56 19    REPLACE THE ENTIRE HOUSE?

02:11:58 20    A.   YES.

02:11:58 21    Q.   AND MOVING ON TO MR. LIVERS, THIS IS, AGAIN, A CASE WHERE THE

02:12:02 22    HOUSE IS STILL STANDING SO YOU DIDN'T PREPARE A REPLACEMENT

02:12:05 23    ESTIMATE.  AND IT WAS YOUR OPINION THAT THE TOTAL REPAIR COSTS IS

02:12:09 24    $144,419.66, CORRECT?

02:12:13 25    A.   YES.

02:12:14  1    Q.  AND IT'S YOUR OPINION THAT THE AMOUNT OF REPAIR COST

02:12:19  2    ATTRIBUTABLE TO THE IHNC BREACHES IS $108,320.88, CORRECT?

02:12:25  3    A.  CORRECT.

02:12:25  4    Q.  AND ONE OF THE REASONS THAT MR. TAYLOR'S REPAIR COST ESTIMATE

02:12:29  5    IS HIGHER THAN YOURS IS THAT MR. TAYLOR INCLUDES A ROOF FOR THE

02:12:32  6    SECOND FLOOR AND YOU DON'T, CORRECT?

02:12:33  7    A.  YES, THAT'S ONE OF THE REASONS.

02:12:35  8    Q.  AND THAT ROOF ACCOUNTS FOR APPROXIMATELY $32,000 OF HIS

02:12:39  9    ESTIMATE, CORRECT?

02:12:39  10   A.  YES.

02:12:40  11   Q.  AND MOVING ON TO MR. WASHINGTON.  IT'S YOUR OPINION THAT THE

02:12:44  12   REPLACEMENT COST ATTRIBUTABLE TO THE IHNC IS $90,516.84?

02:12:53  13   A.  YES.

02:12:53  14   Q.  AND AM I CORRECT THAT THE REASON YOUR TOTAL REPLACEMENT COST IS

02:12:56  15   HIGHER THAN HIS TOTAL IS, AGAIN, FOR THE REASONS WE DISCUSSED THAT

02:12:59  16   HE DID NOT INCLUDE GENERAL CONDITIONS OR CONSULTANT FEES IN HIS

02:13:04  17   ESTIMATE, CORRECT?

02:13:04  18   A.  IN GENERAL, YES.

02:13:05  19   Q.  IN ADDITION TO THE MINOR DIFFERENCES --

02:13:09  20   A.  YES.

02:13:09  21   Q.  -- IN THE FLOOR PLANS, CORRECT?

02:13:10  22   A.  CORRECT.

02:13:11  23   Q.  AND IT'S ALSO YOUR OPINION THAT THE FLOOD DAMAGE ATTRIBUTABLE

02:13:16  24   TO THE IHNC BREACHES COULD HAVE BEEN REPAIRED FOR $84,705.04,

02:13:23  25   CORRECT?

02:13:23  1   A.  CORRECT.

02:13:23  2   Q.  NOW, WE TOUCHED ON THIS A LITTLE BIT ALREADY, BUT IS IT FAIR TO

02:13:29  3   SAY THAT THE MAJOR DIFFERENCE IN YOUR ESTIMATE -- YOUR ESTIMATE AND

02:13:33  4   SCOTT TAYLOR'S IS REALLY ONE OF SCOPE RATHER THAN PRICING, CORRECT?

02:13:36  5   A.  YES, YES.

02:13:37  6   Q.  AND, ERIC, CAN YOU PULL UP JX 1604-0029 AND JX 1604-0028.  AND

02:13:49  7   I'LL REPRESENT TO YOU AND TO THE COURT THAT THESE ARE DIAGRAMS

02:13:53  8   TAKEN FROM SCOTT TAYLOR'S REPORT FOR THE ARMSTRONG PROPERTY.  AND

02:14:02  9   CAN YOU SEE THOSE?

02:14:04 10   A.  I CAN SEE IT, BUT I CAN'T READ THE DIMENSIONS.

02:14:58 11   Q.  NOW, ONE THING THAT I NOTICED AND THAT YOU NOTICED IN LOOKING

02:15:03 12   AT THESE FLOOR PLANS AND COMPARING THEM SIDE BY SIDE IS THAT THE

02:15:07 13   DIAGRAM ON THE RIGHT, WHICH IS BASICALLY THE FOUNDATION OF THE

02:15:13 14   FLOOR, OF THE FIRST FLOOR IS 52-FEET LONG AND THAT THE DIAGRAM FOR

02:15:18 15   THE ROOF IS 63 -- CLOSE TO 64-FEET LONG, CORRECT?

02:15:25 16   A.  CORRECT.

02:15:26 17        MR. JOSH PALMINTIER:  YOUR HONOR, IF I MIGHT.  I BELIEVE

02:15:29 18   THAT HE WOULD BE TESTIFYING RIGHT NOW TO SCOPE, AND I WOULD JUST

02:15:33 19   OBJECT THAT THAT'S OUTSIDE OF HIS AREA OF EXPERTISE.  HE'S ALREADY

02:15:37 20   TESTIFIED THAT HE GOT THE SCOPE FROM MR. DANNER.  SO TO THE EXTENT

02:15:42 21   THAT HE HAS AN ISSUE WITH THE SCOPE, I DON'T SEE WHY THAT'S

02:15:45 22   SOMETHING THAT HE WOULD BE TESTIFYING TO.

02:15:47 23        MS. LONIAN:  I THINK THAT THIS IS GOING TO BECOME PRETTY

02:15:51 24   SELF-EVIDENT WHAT THE PROBLEM IS.  IT'S NOT SO MUCH WHAT CAUSED THE

02:15:54 25   DAMAGE TO THE ROOF, IT'S THE ACTUAL DIMENSIONS THAT WERE IMPORTED

02:15:57  1    INTO THAT --

02:15:58  2              THE COURT:  HE CAN TESTIFY ON WHAT DIMENSIONS HE UTILIZED

02:16:03  3    IN HIS COST ESTIMATION AND WHY.  IS THAT WHERE HE IS GOING?

02:16:07  4              MS. LONIAN:  OR, I GUESS, THE MAIN POINT I AM TRYING TO

02:16:11  5    MAKE IS, IS IT CLEAR FROM LOOKING AT THESE TWO DIAGRAMS SIDE BY

02:16:16  6    SIDE THAT MR. TAYLOR ESTIMATED THAT THE ARMSTRONG ROOF HAS

02:16:19  7    APPROXIMATELY A FIVE-FOOT OVERHANG ON EACH SIDE.

02:16:21  8              MR. JOSH PALMINTIER:  YOUR HONOR, I DO BELIEVE THAT THIS

02:16:23  9    IS OUTSIDE OF HIS AREA OF EXPERTISE.  I BELIEVE THAT WHAT HE IS

02:16:26 10    ABOUT TO DO OR WHAT SHE IS TRYING TO GET HIM TO DO IS TO TESTIFY AS

02:16:29 11    TO SCOPE, WHICH IS NOT WITHIN HIS AREA OF EXPERTISE.

02:16:33 12              THE COURT:  I AM INTERESTED, FIRST, IN WHAT HE BASED --

02:16:37 13    IF HE BASED HIS ESTIMATE ON SOMETHING ELSE, HE CAN SAY WHY HE DID

02:16:42 14    SO.

02:16:43 15              MS. LONIAN:  OKAY.

02:16:44 16    BY MS. LONIAN:

02:16:44 17    Q.  DID YOU USE THE SAME CALCULATIONS IN YOUR ESTIMATE FOR THE

02:16:47 18    ARMSTRONG ROOF, MR. DUPLESSIS?

02:16:49 19    A.  CAN I JUST CLARIFY THAT MR. DANNER DIDN'T PROVIDE ME WITH

02:16:54 20    QUANTITIES.

02:16:55 21              MR. JOSH PALMINTIER:  I AM GOING TO OBJECT AGAIN, YOUR

02:16:57 22    HONOR.  HE GOT HIS SCOPE FROM JIM DANNER --

02:16:59 23              THE COURT:  LOOK, HE CAN TESTIFY HOW HE MADE HIS ESTIMATE

02:17:02 24    AND ON WHAT FIGURES HE MADE IT ON.  LET'S GET TO THAT POINT FIRST

02:17:08 25    AND THAT'S WHAT'S IN EVIDENCE.  UNLESS HE'S ALTERING HIS OPINION.

02:17:14   1          MS. LONIAN:  NO.  I THINK THIS IS MORE JUST A GENERAL

02:17:16   2   ISSUE OF, YOU KNOW, PART OF WHAT HE HAS TO DETERMINE.  REGARDLESS

02:17:20   3   OF WHAT CAUSED THE DAMAGE TO THE ARMSTRONG ROOF, HE HAS TO

02:17:23   4   DETERMINE HOW TO REPLACE IT BECAUSE HE DOES PREPARE, IN SOME CASES,

02:17:28   5   REPLACEMENT AND REPAIR COSTS.  AND PART OF DETERMINING HOW TO

02:17:31   6   REPLACE IS IT IS TO DETERMINE THE QUALITIES OF THE ROOF, HOW MANY

02:17:34   7   SHINGLES DO YOU NEED, AND THAT'S PART OF HIS ESTIMATE FOR MATERIAL

02:17:37   8   COSTS.  YOU ALSO HAVE TO DETERMINE QUANTITY, AND YOU HAVE TO

02:17:39   9   DETERMINE, YOU KNOW, HOW MUCH TIME IT'S GOING TO REPLACE A ROOF,

02:17:45  10   AND THAT'S ALL WHAT HE DOES.

02:17:46  11          I MEAN, DANNER, I THINK, TYPICALLY OR AN ENGINEER IN HIS

02:17:50  12   CASE WOULD DETERMINE THE CAUSE OF THE DAMAGE, BUT IT'S MORE OF AN

02:17:54  13   ESTIMATOR'S ROLE TO DETERMINE HOW MUCH IT COSTS TO COMPLETELY

02:17:57  14   REPLACE A ROOF.

02:17:58  15          THE COURT:  I UNDERSTAND ALL OF THAT.  AND, BOY, THIS

02:18:00  16   IS -- I AM GOING TO TELL YOU.  WE ARE -- MAKING A TEMPEST OF THIS

02:18:08  17   IS SOMETHING ELSE.

02:18:10  18          I AM INTERESTED, IN MAKING YOUR COST ESTIMATE, DID YOU

02:18:14  19   UTILIZE THE 52 FEET OR THE 63 FEET?

02:18:22  20          THE WITNESS:  I DIDN'T USE THIS DIMENSION ON THIS

02:18:25  21   DIAGRAM.  I JUST WANTED TO POINT OUT I SAW THE DIMENSIONING AND IT

02:18:28  22   APPEARS TO BE OVERSTATED.

02:18:32  23          MR. JOSH PALMINTIER:  THE OBJECTION IS THAT IT'S OUT OF

02:18:33  24   HIS AREA OF EXPERTISE AND OUTSIDE OF HIS REPORT AS WELL.

02:18:36  25          THE COURT:  WELL, THE EXHIBIT IS IN EVIDENCE AND COULD BE

02:18:41  1   NOTED IN BRIEFING.  I DON'T KNOW WHAT SIGNIFICANCE THIS HAS ON

02:18:47  2   EITHER PARTY'S OPINION AS TO THE REPLACEMENT COST.  THAT'S WHERE I

02:18:51  3   HAVE TO GO ULTIMATELY.

02:18:52  4           MS. LONIAN:  I GUESS --

02:18:53  5           THE COURT:  I CAN'T PULL THE NUMBER OUT OF A HAT,

02:18:56  6   ALTHOUGH SOMETIMES -- SO IF IT DOESN'T HAVE A NUMBER, I HAVE A

02:19:01  7   PROBLEM.

02:19:01  8           MS. LONIAN:  AND I GUESS, THE MAIN POINT THAT THE

02:19:03  9   DEFENDANTS WERE TRYING TO MAKE WITH THIS CASE IS THAT, AGAIN,

02:19:06  10  REGARDLESS OF WHAT CAUSED THE DAMAGE TO THE ARMSTRONG ROOF, IS

02:19:10  11  MR. TAYLOR'S ESTIMATE AN ACCURATE REFLECTION OF WHAT IT WOULD

02:19:14  12  REALISTICALLY COST TO REPAIR THIS?  AND TO THE EXTENT THAT HE IS

02:19:16  13  SAYING THAT THE QUANTITY -- BECAUSE MR. TAYLOR EFFECTIVELY

02:19:19  14  CALCULATED A FIVE-FOOT OVERHANG FOR THIS ROOF, THAT THAT WOULD NOT

02:19:22  15  BE AN ACCURATE QUANTITY FOR REPLACEMENT.  AND IT'S SOMETHING -- WE

02:19:26  16  CAN MOVE ON --

02:19:27  17          THE COURT:  YES, PLEASE, LET'S DO.

02:19:29  18          MS. LONIAN:  -- IT'S NOT THAT MUCH.

02:19:31  19  BY MS. LONIAN:

02:19:36  20  Q.  AND YOU WERE HERE WHEN MR. TAYLOR AND MR. CRAWFORD TESTIFIED

02:19:39  21  ABOUT SELECTIVE DEMOLITION, CORRECT?

02:19:42  22  A.  YES.

02:19:42  23  Q.  AND THE REPLACEMENT COST PREPARED BY SCOTT TAYLOR INCLUDES

02:19:46  24  SELECT DEMOLITION BECAUSE HE HAS REMOVE AND REPLACEMENT COST IN HIS

02:19:49  25  ESTIMATE WHEN IN PRACTICAL TERMS A HOMEOWNER WOULD SIMPLY DEMOLISH

02:19:54  1    THE ENTIRE HOUSE?

02:19:54  2    A.  YES.

02:19:55  3    Q.  AND WOULD IT BE FAIR TO SAY THAT THE -- A COMMON PROBLEM WITH

02:20:00  4    THESE XACTIMATE ESTIMATE IS THAT -- YOU'VE ENCOUNTERED IS THAT THEY

02:20:04  5    APPLY WASTE TO BOTH LABOR AND MATERIALS, CORRECT?

02:20:06  6    A.  I'VE OFTEN NOTICED THAT WHEN ANALYZING AN XACTIMATE ESTIMATE

02:20:11  7    FROM SOMEONE ELSE.

02:20:11  8    Q.  AND THAT, IN YOUR OPINION, WOULDN'T BE A CORRECT APPROACH

02:20:14  9    BECAUSE YOU'RE ESSENTIALLY DUPLICATING WASTE WITHIN AN ESTIMATE

02:20:20 10    WHEN, IN REALITY, IT SHOULD BE EITHER LABOR OR WASTE, CORRECT?

02:20:22 11    A.  THE WASTE SHOULD ONLY BE APPLIED TO THE COST OF THE MATERIALS

02:20:26 12    BECAUSE THE MATERIAL IS WHAT YOU'RE WASTING.  YOU'RE NOT WASTING

02:20:29 13    THE LABOR TO INSTALL IT.

02:20:30 14    Q.  AND YOU WERE HERE WHEN MR. TAYLOR TESTIFIED THAT IN ORDER TO

02:20:35 15    SEGREGATE WIND DAMAGE FROM FLOOD DAMAGE IN HIS ESTIMATES, TO THE

02:20:38 16    EXTENT THE COURT DEEMED IT NECESSARY, THE COURT COULD SIMPLY DEDUCT

02:20:41 17    A LINE ITEM FROM THE TOTAL OF HIS ESTIMATES.  IN YOUR OPINION,

02:20:44 18    WOULD THAT BE A CORRECT METHODOLOGY OR WOULD THAT CREATE OTHER

02:20:47 19    PROBLEMS WITHIN THE ESTIMATE?

02:20:48 20    A.  NO, THERE'S OTHER FACTORS YOU NEED, BELOW-THE-LINE FACTORS THAT

02:20:54 21    YOU NEED TO ACCOUNT FOR; FOR EXAMPLE, OVERHEAD PROFIT, GENERAL

02:20:57 22    CONDITIONS, CONSULTANTS, AND SO FORTH, YES.

02:21:00 23    Q.  AM I CORRECT THAT WHAT YOU'RE SAYING IS ESSENTIALLY THAT

02:21:03 24    BECAUSE THESE BELOW-THE-LINE ITEMS ARE PERCENTAGES OF THE ENTIRE

02:21:07 25    WHOLE, THAT THAT'S SOMETHING THAT THE COURT WOULD NEED TO BE

02:21:11 1  COGNIZANT OF AS WELL, THAT STEP THAT YOU'RE CHANGING THE BASELINE

02:21:15 2  TOTAL YOU ALSO HAVE TO MAKE ADJUSTMENTS TO THESE FACTORS AS WELL,

02:21:18 3  CORRECT?

02:21:19 4  A.  CORRECT.  AND EVEN IF YOU COMPLETE YOUR ESTIMATE AND THE AMOUNT

02:21:24 5  IS SIGNIFICANTLY MORE OR LESS, THE CONTRACTOR MAY HAVE A DIFFERENT

02:21:30 6  VIEW ON OVERHEAD AND PROFIT BECAUSE THE CONTRACT MAY INCREASE IN

02:21:32 7  SIZE OR THE CONTRACT MAY SIGNIFICANTLY BE REDUCED IN SIZE.

02:21:40 8         MS. LONIAN:  I DON'T HAVE ANYTHING FURTHER ON DIRECT,

02:21:44 9  YOUR HONOR.

02:21:45 10        THE COURT:  VERY CONCISE.

02:21:49 11        MR. MCCONNON:  THE UNITED STATES HAS NO QUESTIONS FOR

02:21:51 12 THIS WITNESS.

02:21:51 13        THE COURT:  OH, I APOLOGIZE.  I APOLOGIZE.  THANK YOU.

02:21:59 14                    CROSS-EXAMINATION

02:22:00 15 BY MR. JOSH PALMINTIER:

02:22:04 16 Q.  MR. DUPLESSIS, YOU DID NOT RELY ON ANY INSURANCE DOCUMENTS

02:22:07 17 EXCEPT TO MAYBE HELP THE MATERIAL AND SQUARE FOOTAGE IN TERMS OF

02:22:12 18 YOUR RELIANCE ON THAT; IS THAT CORRECT?

02:22:14 19 A.  NOT SQUARE FOOTAGE, NO, JUST THE MATERIAL FINISH.

02:22:17 20 Q.  JUST THE MATERIALS?

02:22:18 21 A.  YES.

02:22:18 22 Q.  AND YOU DIDN'T RELY ON THE ROAD HOME DOCUMENTS?

02:22:22 23 A.  ONLY IF I CAN FIND SOME PHOTOGRAPHS IN THERE.

02:22:24 24 Q.  YOU DIDN'T RELY ON COURT DOCUMENTS, DID YOU?

02:22:29 25 A.  NOT THAT I RECALL, NO.

02:22:32  1   Q.  AND YOU DIDN'T READ THE DEPOSITIONS OF THE PLAINTIFFS, DID YOU?

02:22:38  2   A.  NO, I DID NOT.

02:22:39  3   Q.  AND YOU DIDN'T USE THE DEPOSITIONS OF THE PLAINTIFFS AS

02:22:44  4   RELIANCE MATERIALS, CORRECT?

02:22:45  5   A.  NOT DIRECTLY, NO.  I USED THEM THROUGH MR. SCHNEIDER WHO READ

02:22:52  6   THEM, AND IF THERE WAS ANY INFORMATION HE COULD GIVE ME REGARDING

02:22:56  7   THE FINISHES, WHAT KIND OF FLOORS, ET CETERA, HE WOULD RELATE THOSE

02:23:00  8   TO ME.  BUT I DIDN'T READ THEM AND I DIDN'T COME TO THOSE

02:23:04  9   CONCLUSIONS.

02:23:05 10   Q.  DID YOU PROVIDE THOSE SUMMARIES TO COUNSEL?

02:23:11 11   A.  WHICH SUMMARIES?

02:23:12 12   Q.  SUMMARIES OF THE DEPOSITIONS THAT SCHNEIDER HAD GIVEN TO YOU?

02:23:15 13   A.  HE DIDN'T GIVE ME THE DEPOSITION.  HE JUST DISCUSSED WITH ME

02:23:19 14   THE FINISHES IN THE RESIDENCES.

02:23:20 15   Q.  AND YOU DIDN'T RELY ON THE WATER ELEVATION REPORTS EITHER, DID

02:23:27 16   YOU?

02:23:27 17   A.  WHO WERE THEY PREPARED BY?  I'M SORRY.

02:23:28 18   Q.  BY CHAD MORRIS.

02:23:30 19   A.  NO, I DID NOT.

02:23:30 20   Q.  AND YOU DID NOT DETERMINE THE SCOPE OF DAMAGE IN ANY OF YOUR

02:23:38 21   REPORTS IN THIS CASE, DID YOU?

02:23:40 22   A.  CAN YOU PLEASE REPHRASE THAT?

02:23:44 23   Q.  WELL, YOU DIDN'T CREATE THE SCOPE, YOU WERE GIVEN THE SCOPE BY

02:23:48 24   SOMEONE ELSE, CORRECT?

02:23:49 25   A.  I WAS GIVEN -- YES, I WAS GIVEN THE SCOPE BY MR. DANNER OF WHAT

02:23:54  1   PART OF THE HOME WAS DAMAGED.  I THEN CALCULATED THAT SCOPE, THE

02:23:58  2   SQUARE FOOTAGES AND SO FORTH, SQUARES FOR ROOFS BASED ON WHAT HE

02:24:03  3   HAD TOLD ME WHAT WAS DAMAGED IN THE HOUSE.  BUT HE DID NOT QUANTIFY

02:24:06  4   THE SCOPE FOR ME.

02:24:08  5   Q.  HE GAVE YOU A GENERAL SCOPE, DIDN'T HE?

02:24:10  6   A.  CORRECT.

02:24:11  7   Q.  AND THEN YOU HAD TO MAKE JUDGMENT CALLS AS TO WHAT WOULD BE

02:24:14  8   INCLUDED IN THAT GENERAL SCOPE, CORRECT?

02:24:15  9   A.  CORRECT.

02:24:15 10   Q.  AND IN THAT REGARD OR TO THAT EXTENT YOU WERE MAKING A DECISION

02:24:23 11   AS TO WHAT WAS GOING TO BE COVERED UNDER WIND AND RAIN, CORRECT?

02:24:26 12   A.  NO.

02:24:32 13   Q.  SO YOU RELIED COMPLETELY ON JIM DANNER'S REPORTS AS FAR AS THE

02:24:36 14   SCOPE OF THE DAMAGE IS CONCERNED, THAT'S RIGHT?

02:24:39 15   A.  CORRECT.

02:24:40 16   Q.  AND HE DIDN'T GIVE YOU QUANTIFICATION OF THOSE ITEMS, DID HE?

02:24:50 17   A.  NO.  ONLY AS FAR AS THE HEIGHT OF WHERE THE WATER WAS AND WHAT

02:24:50 18   WAS DAMAGED -- WHAT ELEMENTS OF THE BUILDING HAD BEEN DAMAGED, HE

02:24:56 19   WOULD REFER TO THAT IN THE CONCLUSION OF HIS REPORT.  I WOULD THEN

02:25:00 20   TAKE THAT AND QUANTIFY THE SCOPE OF WORK.

02:25:04 21   Q.  SO THE GENERALLY SPEAKING, THAT SCOPE OF WORK WAS BASED UPON

02:25:15 22   JIM DANNER'S REPORT AND SO YOU HEAVILY RELIED UPON JIM DANNER'S

02:25:21 23   WORK, CORRECT?

02:25:21 24   A.  YES.

02:25:21 25   Q.  AND TO THE EXTENT THAT HIS REPORT IS WRONG, THEN YOU'RE GOING

02:25:27   1    TO HAVE SOME ISSUES WITH YOUR REPORT AS WELL, CORRECT?

02:25:29   2            MS. LONIAN:  OBJECTION, YOUR HONOR.  I THINK THAT'S KIND

02:25:32   3    OF AN IMPROPER --

02:25:33   4            THE COURT:  MAYBE YOU CAN USE THE MIC.  IT'S ONE OF THE

02:25:37   5    LITTLE FALLACIES WE HAVE.

02:25:38   6            MS. LONIAN:  I OBJECT, YOUR HONOR.  IT'S ARGUMENTATIVE.

02:25:40   7            THE COURT:  OKAY.

02:25:42   8            MR. JOSH PALMINTIER:  I DON'T KNOW HOW ELSE --

02:25:44   9            THE COURT:  I AM GOING TO OVERRULE THE OBJECTION.  IN THE

02:25:46  10    EVENT THAT MR. DANNER'S REPORT IS INCORRECT AS VIS-À-VIS SCOPE,

02:25:51  11    THEN HIS REPORT WOULD BE INCORRECT, LIKEWISE, VIS-À-VIS HIS COST

02:25:57  12    ESTIMATE?

02:25:57  13            MR. JOSH PALMINTIER:  CORRECT, YOUR HONOR.

02:25:59  14            THE WITNESS:  IF THE COURT SO DETERMINES, OBVIOUSLY, YES,

02:26:01  15    IT WILL BE DIFFERENT, YES.  BUT I DIDN'T MAKE THAT DETERMINATION.

02:26:06  16    BY MR. JOSH PALMINTIER:

02:26:15  17    Q.  NOW, AS TO THE PROPERTIES IN THIS CASE, YOU DIDN'T INSPECT ANY

02:26:20  18    OF THE PROPERTIES, DID YOU?

02:26:21  19    A.  ONLY THE COATS PROPERTY.

02:26:24  20    Q.  ONLY THE COATS PROPERTY.  NONE OF THE OTHER FOUR, CORRECT?

02:26:27  21    A.  YES, CORRECT.

02:26:28  22    Q.  MR. DANNER DID NOT HAVE IN HIS INITIAL REPORTS A MAX WATER

02:26:34  23    HEIGHT OR MAX STANDING WATER MARK, DID HE?

02:26:37  24    A.  CAN YOU SHOW ME?  I AM NOT SURE --

02:26:43  25    Q.  THESE ARE THE REPORTS YOU RELIED ON.  SO MY QUESTION TO YOU IS:

02:26:47  1    DID JIM DANNER'S REPORTS, HIS INITIAL REPORTS, DID THEY HAVE A HIGH

02:26:51  2    WATER MARK WITHIN THE REPORT?

02:26:53  3    A.  I BELIEVE THEY DID, YES.  I'LL HAVE TO SEE IT BEFORE I CAN

02:27:04  4    ANSWER IT.  I DIDN'T MEMORIZE ALL OF HIS REPORTS.

02:27:06  5    Q.  UNDERSTOOD.  SO YOU HAD TO USE YOUR OWN JUDGMENT WHEN IT CAME

02:27:15  6    TO THE AMOUNTS OF WATER IN THE HOMES, CORRECT?

02:27:17  7    A.  NO, HE PROVIDED THE AMOUNT OF WATER IN THE HOMES, IN THE

02:27:20  8    RESIDENCES.

02:27:26  9              MR. JOSH PALMINTIER:  HOLD ON FOR ONE SECOND.  CARL, CAN

02:27:52  10   YOU PULL UP JX 01742, AND THAT'S GOING TO BE -- WE'RE GOING TO GO

02:28:14  11   TO PAGE 6.

02:28:14  12   BY MR. JOSH PALMINTIER:

02:28:29  13   Q.  NOW, MR. DUPLESSIS, CAN YOU SHOW ME ON THIS PAGE, AND THIS IS

02:28:32  14   ONE EXAMPLE OF THE 2011 REPORTS, THESE ARE THE INITIAL REPORTS THAT

02:28:37  15   WE DISCUSSED WHERE HE GIVES A HIGH WATER MARK OR A MAX WATER HEIGHT

02:28:43  16   IN HIS CONCLUSIONS OF HIS REPORT.

02:28:49  17              MS. LONIAN:  YOUR HONOR --

02:28:51  18              THE WITNESS:  I AM TRYING TO SEE THAT.

02:28:52  19              MS. LONIAN:  TO THE EXTENT THAT I BELIEVE MR. DUPLESSIS

02:28:54  20   HAS ALREADY REQUESTED TO SEE THE DOCUMENT, I THINK THAT THE

02:28:56  21   PLAINTIFF SHOULD AT LEAST ALLOW HIM TO READ THE ENTIRE REPORT.

02:29:00  22              THE COURT:  ALL RIGHT.  WE WILL TAKE OUR PRECIOUS TIME TO

02:29:03  23   DO THAT.  GO AHEAD.  BECAUSE IF YOU'RE GOING TO ASK HIM IF IT'S IN

02:29:07  24   THE REPORT AT ALL, I GUESS, HE WOULD HAVE TO LOOK AT THE REPORT.

02:29:12  25   THANK GOD IT'S ONLY SIX PAGES.

02:30:22  1            THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)  I'VE READ THE

02:30:23  2   CONCLUSIONS.  WHAT IS THE QUESTION AGAIN, PLEASE?

02:30:25  3   BY MR. JOSH PALMINTIER:

02:30:26  4   Q.  YOU HAD ANSWERED THAT IN THE INITIAL DANNER REPORTS THAT HE HAD

02:30:30  5   GIVEN A MAX WATER HEIGHT OR MAX STANDING WATER HEIGHT WITHIN HIS

02:30:34  6   REPORTS AND THAT YOU BASED YOUR OPINIONS ON THAT MAX WATER HEIGHT,

02:30:40  7   CORRECT?

02:30:40  8   A.  YES.

02:30:40  9   Q.  AND I AM JUST ASKING FOR YOU TO TELL ME WHERE YOU SEE THE MAX

02:30:44 10   WATER HEIGHT OR MAX STANDING HEIGHT WITHIN THESE REPORTS.

02:30:47 11   A.  I DON'T SEE IT IN THIS PARTICULAR ONE FOR THE COATS RESIDENCE.

02:30:50 12   I DON'T SEE IT.

02:30:52 13            MR. JOSH PALMINTIER:  YOUR HONOR, WE CAN GO THROUGH EACH

02:30:54 14   ONE OF THESE.

02:30:55 15            MS. LONIAN:  YOUR HONOR, I WOULD ALSO JUST LIKE TO

02:30:57 16   CLARIFY FOR THE RECORD.  HE KEEPS REFERRING TO THE OCTOBER 2011

02:31:00 17   REPORT AS THE INITIAL REPORT.  MR. DANNER DID PREPARE IN THIS CASE

02:31:04 18   A 2007 REPORT AT THE CLASS CERTIFICATION STAGE, SO THIS REPORT THAT

02:31:10 19   HE IS SHOWING MR. DUPLESSIS IS NOT THE INITIAL REPORT.

02:31:14 20            MR. JOSH PALMINTIER:  THAT'S FAIR.  THESE ARE THE 2011

02:31:16 21   REPORTS, YOUR HONOR, NOT THE 2007 REPORTS THAT MR. DANNER PREPARED

02:31:21 22   FOR THE ARMSTRONG AND COATS PROPERTIES.

02:31:28 23   BY MR. JOSH PALMINTIER:

02:31:29 24   Q.  SO YOU DO NOT SEE THAT THERE IS A MAX WATER HEIGHT, CORRECT?

02:31:32 25   A.  NO, THAT'S CLEAR, IT'S NOT THERE, NO.  I DON'T SEE IT IN THIS

02:31:37  1    CONCLUSION ON PAGE 6.  AT LEAST, I DON'T SEE IT.

02:31:41  2              THE COURT:  WE ARE GOING TO MOVE ON, COUNSEL.  IF YOU

02:31:43  3    WANT ME TO LOOK AT THESE LATER, I WILL.

02:31:46  4              MR. JOSH PALMINTIER:  OKAY.

02:31:46  5    BY MR. JOSH PALMINTIER:

02:31:46  6    Q.  TO THE EXTENT THAT THEY DO NOT, THAT THERE ISN'T A MAX WATER

02:31:49  7    HEIGHT, YOU'VE SAID THAT YOU'VE RELIED UPON A MAX WATER HEIGHT THAT

02:31:53  8    YOU GOT FROM THE REPORTS; IS THAT CORRECT?

02:31:55  9    A.  AND CONVERSATIONS WITH MR. DANNER, YES.

02:32:06 10    Q.  SO TO THE EXTENT THAT THERE WASN'T A MAX WATER HEIGHT OR

02:32:09 11    STAGNANT WATER MARK, YOU HAD TO USE YOUR OWN JUDGMENT WITH THIS

02:32:12 12    LIMITED GENERALIZED SCOPE THAT WAS GIVEN TO YOU BY MR. DANNER IN

02:32:15 13    HIS REPORTS WITH NO MAX WATER HEIGHT OR A MAX STANDING WATER

02:32:21 14    HEIGHT; IS THAT CORRECT?

02:32:22 15    A.  FOR EACH OF THESE RESIDENCES, I EITHER READ IT IN MR. DANNER'S

02:32:30 16    REPORTS OR I HAD CONVERSATIONS WITH HIM AND HE PROVIDED ME WITH A

02:32:33 17    CONCLUSION AS TO AT WHAT LEVEL THE FINISHES OUGHT TO BE REMOVED

02:32:39 18    BASED ON HIS RESEARCH OF THE WATER HEIGHTS.  SO HIM AND I CAME TO A

02:32:47 19    DETERMINATION THAT IN THIS CASE THE WATER LEVEL WAS, FOR EXAMPLE,

02:32:51 20    AT THREE FEET AND I WOULD REMOVE THE DRYWALL FINISHES IN INCREMENTS

02:32:58 21    OF FOUR FEET.

02:32:59 22    Q.  IS IT IN YOUR REPORT THAT YOU HAD DISCUSSIONS MR. DANNER IN

02:33:02 23    REFERENCE TO THE MAX WATER HEIGHT?

02:33:03 24    A.  I CAN'T REMEMBER.  I BELIEVE IT IS, YES.

02:33:07 25    Q.  LET'S TALK ABOUT YOUR UNIT COST.  IT IS THE MATERIAL RATE PLUS

02:33:14 1    THE LABOR RATE PLUS THE EQUIPMENT RATE, IF THERE IS A NEED FOR

02:33:20 2    EQUIPMENT, AND THAT IS DIVIDED BY THE NUMBER OF ITEMS WITHIN THAT

02:33:24 3    GROUP TO GET A UNIT COST; IS THAT CORRECT?

02:33:27 4    A.  NO, DIVIDED BY WHAT NUMBER OF ITEMS?

02:33:34 5    Q.  WHATEVER NUMBER IS WITHIN THAT UNIT THAT YOU DETERMINED THAT

02:33:37 6    YOU NEED TO USE.

02:33:39 7    A.  NO.  THE UNIT COST IS THE UNIT THAT YOU MEASURE THE ITEM IN AND

02:33:44 8    YOU WILL DETERMINE WHAT THE UNIT COST IS FOR EACH, SAY, FOR

02:33:49 9    EXAMPLE, SQUARE FOOT OR SQUARES IN THE CASE OF ROOFING, YES.

02:33:52 10   Q.  SO YOU DIVIDE THAT DOWN, RIGHT?

02:33:55 11   A.  DIVIDE WHAT DOWN?  YOU'LL HAVE TO SHOW ME THE FORMULA FOR ME TO

02:34:00 12   UNDERSTAND WHAT YOU'RE SAYING.

02:34:01 13   Q.  THE MATERIAL PLUS THE LABOR RATE PLUS THE EQUIPMENT RATE?

02:34:04 14   A.  YES.

02:34:05 15   Q.  AND THEN YOU DIVIDE IT INTO THE UNIT COSTS OR THE UNIT,

02:34:09 16   CORRECT?

02:34:10 17   A.  NO.  THE MATERIAL RATE AND THE LABOR RATE, UNIT RATE AND THE

02:34:17 18   EQUIPMENT RATE, IF ANY, WILL BE ADDED TOGETHER AND THAT WILL BE

02:34:20 19   YOUR TOTAL UNIT RATE.  TOTAL UNIT RATE MEANS THE UNIT THAT THAT

02:34:26 20   TASK WAS MEASURED; FOR EXAMPLE, DRYWALL IS MEASURED IN SQUARE FEET

02:34:30 21   AND THAT UNIT COSTS WOULD BE APPLIED TO THE QUANTITY OF SQUARE FEET

02:34:34 22   OF DRYWALL THAT HAD BEEN REMOVED OR REPLACED OR CONSTRUCTED.  AND

02:34:43 23   THAT UNIT RATE WILL BE MY UNIT.  IT'S IN MY REPORT.

02:34:47 24   Q.  THANKS FOR THE CORRECTION.  I BELIEVE THAT THAT'S PRETTY MUCH

02:34:51 25   WHAT I SAID.

02:34:52  1              BUT YOU BELIEVE IN ORDER TO DO THIS PROPERLY, YOU HAVE TO

02:34:55  2    CONSIDER SITE SPECIFIC LABOR RATES, CORRECT?  AND YOU HAVE TO

02:34:59  3    CONSIDER MATERIAL PRICES AS WELL AS WHAT LOCAL CONTRACTORS WILL

02:35:02  4    CHARGE TO GET THE WORK DONE, DON'T YOU?

02:35:05  5    A.  YES.

02:35:06  6    Q.  YOU BELIEVE THAT YOU DETERMINE THE COST BASED ON WHAT IS IN

02:35:11  7    REAL LIFE, NOT WHAT'S IN -- NOT WHAT'S IN A DATABASE?

02:35:17  8    A.  I DON'T UNDERSTAND YOUR QUESTION.  I DO THAT -- I DETERMINE

02:35:25  9    LABOR RATES, MATERIAL RATES AS A DAILY ROUTINE IN MY WORK THAT I

02:35:30 10    DO.  I GATHER INFORMATION, I HAVE EXPERIENCE IN THAT HAVING DONE

02:35:34 11    THAT OVER THE YEARS, AND I KEEP RECORD OF IT OR I CHECK ON IT, YES.

02:35:40 12    Q.  BUT YOU DID NOT STUDY OR DO SPECIFIC RESEARCH PROJECTS TO

02:35:45 13    DETERMINE PRICING FLUCTUATION WITHIN THE LOCAL MARKET IN TERMS OF

02:35:48 14    LOCAL COSTS OF MATERIAL, LOCAL COSTS OF LABOR, LOCAL COSTS OF

02:35:54 15    EQUIPMENT, DID YOU?

02:35:55 16    A.  OVER THE YEARS I HAVE, YES, BUT MAYBE NOT SPECIFICALLY FOR THIS

02:35:58 17    STUDY.  I DIDN'T GO AND MAKE A STUDY OF IT, NO.  IS THAT WHAT

02:36:02 18    YOU'RE ASKING, SIR?

02:36:03 19    Q.  THAT'S WHAT I ASKED, YES.  YOU DIDN'T DO IT, DID YOU?

02:36:07 20    A.  NO.

02:36:08 21    Q.  YOU DIDN'T CONTACT LOCAL VENDORS, DID YOU?

02:36:11 22    A.  I DID, YES.

02:36:11 23    Q.  DO YOU REMEMBER GIVING YOUR DEPOSITION?

02:36:14 24    A.  YES.

02:36:15 25    Q.  DO YOU REMEMBER SAYING SOMETHING DIFFERENTLY IN YOUR

```
02:36:20   1   DEPOSITION?
02:36:20   2   A.  OH, I DID, OKAY.
02:36:23   3          THE COURT:  YOU SAY YOU DID OR DID NOT CONTACT LOCAL
02:36:25   4   VENDORS?
02:36:26   5          THE WITNESS:  I DON'T HAVE MY DEPOSITION IN FRONT OF ME,
02:36:28   6   I'M SORRY.
02:36:29   7          THE COURT:  I DIDN'T QUITE HEAR YOUR ANSWERS.  DID YOU OR
02:36:32   8   DID YOU NOT CONTACT LOCAL VENDORS IN MAKING YOUR DAMAGE ESTIMATES
02:36:36   9   HERE?
02:36:37  10          THE WITNESS:  I DID IN THE PAST AND I'VE GOT IT WRITTEN
02:36:40  11   DOWN SOMEWHERE, YOUR HONOR, AND I REFER TO WHAT I'VE WRITTEN DOWN
02:36:43  12   IN THE PAST, YES.
02:36:44  13          THE COURT:  AND DID YOU DO IT FOR THIS CASE?
02:36:46  14          THE WITNESS:  I DIDN'T DO IT SPECIFICALLY FOR EACH ITEM
02:36:48  15   OF THIS CASE.
02:36:48  16   BY MR. JOSH PALMINTIER:
02:36:49  17   Q.  AND THAT WAS THE QUESTION.  DID YOU DO IT FOR THIS CASE?  SO
02:36:51  18   YOUR ANSWER IS NO?
02:36:53  19   A.  I DID NOT DO IT FOR EACH AND EVERY ITEM ON THIS CASE.  THIS IS
02:36:57  20   JUST SOME REGULAR RESIDENCES THAT ARE SIMPLE CONSTRUCTION.  IF
02:36:59  21   THERE IS AN OUT-OF-THE-ORDINARY ITEM IN THE CONSTRUCTION, I WOULD
02:37:01  22   DEFINITELY RESEARCH THAT.
02:37:03  23   Q.  SO YOU DIDN'T THINK THIS WAS A BIG ENOUGH CASE TO GO TO LOCAL
02:37:08  24   VENDORS AND FIND OUT WHAT THE PRICE WAS?
02:37:10  25          MS. LONIAN:  I OBJECT, YOUR HONOR.  THAT MISCHARACTERIZES
```

```
02:37:12  1    HIS TESTIMONY.

02:37:13  2            THE COURT:  YES.  COUNSEL, DON'T FORGET.  IT'S NOT A

02:37:16  3    JURY, IT'S A JUDGE.  I CAN PERCEIVE WHAT ACTUALLY IS HAPPENING.

02:37:16  4    BY MR. JOSH PALMINTIER:

02:37:23  5    Q.  THE FACT OF THE MATTER IS YOU DIDN'T CONTACT ANY LABOR UNIONS,

02:37:28  6    ANY LABOR GROUPS TO FIND OUT ABOUT LABOR COSTS; IS THAT CORRECT?

02:37:31  7    A.  NO, I JUST REFERRED TO MY OWN MATERIAL THAT I'VE GATHERED OVER

02:37:35  8    THE YEARS.

02:37:36  9    Q.  AND YOU WENT TO WEB SITES AND YOU WENT TO DATABASES LIKE

02:37:39 10    SALARY.COM AND DAVIS BACON FOR LABOR PRICES, CORRECT?

02:37:42 11    A.  CORRECT, YES.  I DO THAT AS A ROUTINE IN THE WORK THAT I DO.

02:37:46 12    Q.  AND THEN LIKE HOME DEPOT FOR --

02:37:49 13    A.  YEAH.

02:37:49 14    Q.  -- FOR MATERIAL COSTS, RIGHT?

02:37:51 15    A.  CORRECT.

02:37:51 16    Q.  BUT YOU DID NOT RELY ON THESE WEB SITES, YOU JUST REFERENCED

02:38:02 17    THE WEB SITES; IS THAT RIGHT?

02:38:05 18            MS. LONIAN:  OBJECTION, YOUR HONOR.  MISCHARACTERIZES HIS

02:38:07 19    TESTIMONY.

02:38:08 20            THE COURT:  WELL, I'LL ASK HIM TO -- I AM GOING TO

02:38:11 21    OVERRULE YOUR OBJECTION, I THINK HE CAN ANSWER IT AND SAY YES, NO,

02:38:15 22    OR I DON'T KNOW.

02:38:15 23            THE WITNESS:  YES, I RELY ON THE PRICE LIST PROVIDED BY

02:38:18 24    HOME DEPOT, CORRECT, I DO RELY ON THAT.

02:38:21 25    BY MR. JOSH PALMINTIER:
```

02:38:22  1    Q.  WHAT ABOUT THE SALARY.COM, DAVIS BACON, DID YOU RELY ON THOSE?

02:38:28  2    A.  YES, I DID, YES.

02:38:29  3    Q.  DO YOU REMEMBER GIVING YOUR DEPOSITION?  DO YOU REMEMBER GIVING

02:38:33  4    YOUR DEPOSITION?

02:38:34  5    A.  I REMEMBER GIVING MY DEPOSITION.

02:38:35  6    Q.  DO YOU REMEMBER SAYING SOMETHING DIFFERENTLY IN YOUR

02:38:38  7    DEPOSITION?

02:38:38  8    A.  IF YOU WOULD READ IT FOR ME AND I CAN -- IF YOU SAY I DID,

02:38:43  9    THEN.

02:38:43 10          THE COURT:  HE DOESN'T REMEMBER, SO IF YOU'RE GOING TO

02:38:46 11    IMPEACH HIM, SHOW IT UP.

02:38:48 12          MR. JOSH PALMINTIER:  RIGHT.  PLEASE, CARL, IF YOU COULD

02:38:51 13    PULL UP -- YES, AND IT'S AT PAGE -- JUST ONE SECOND.  THIS IS PAGE

02:39:20 14    140, LINES SIX THROUGH 11.  THAT'S 146, IT'S PAGE 140, CARL.

02:39:20 15    BY MR. JOSH PALMINTIER:

02:39:56 16    Q.  "WAS ONE OF THE SOURCES THAT YOU USED IN THE PARTICULAR

02:39:58 17    PROJECT?  YES.  AS A REFERENCE POINT -- AS A REFERENCE -- NOT AS A

02:40:02 18    RELIANCE AT ALL."  DO YOU REMEMBER MAKING THAT STATEMENT?

02:40:08 19    A.  I DON'T REMEMBER IT OFF THE TOP OF MY HEAD, BUT I SEE IT

02:40:11 20    WRITTEN THERE.  I MUST HAVE MADE THE STATEMENT, YES.

02:40:13 21    Q.  IS THAT RIGHT OR IS WHAT YOU'RE SAYING NOW CORRECT?  THE

02:40:24 22    QUESTION IS WITHDRAWN.

02:40:25 23          YOU MAINLY RELIED UPON YOUR OWN MIND AND MEMORY OF

02:40:29 24    HISTORICAL PRICING DATA, KIND OF FROM THE MIND OF DUPLESSIS, IF YOU

02:40:34 25    WILL; IS THAT CORRECT?

02:40:35  1    A.  NO.  AND THAT'S MY EXPERIENCE, YES; I RELIED ON MY EXPERIENCE,

02:40:41  2    YES.

02:40:41  3    Q.  IS THE ANSWER NO?  I'M SORRY.  YOU SAID NO AND THEN YOU SAID

02:40:46  4    YES, SO I AM NOT --

02:40:48  5    A.  I RELY ON VARIOUS REFERENCE SOURCES FOR MY INFORMATION,

02:40:54  6    INCLUDING MY EXPERIENCE, AND I RELY ON SPREADSHEETS THAT I'VE BUILT

02:40:58  7    OVER THE YEARS AND UPDATE.

02:40:59  8    Q.  AGAIN, AND I DON'T MEAN TO CUT YOU OFF, I DON'T THINK YOU'VE

02:41:03  9    ANSWERED MY QUESTION.  LET ME STATE IT ONE MORE TIME.  YOU MAINLY

02:41:06 10    RELIED UPON YOUR OWN MIND AND MEMORY OF HISTORICAL PRICING DATA,

02:41:10 11    THIS CAME FROM THE MIND OF DUPLESSIS; IS THAT CORRECT?

02:41:12 12    A.  PART OF IT, YES, THAT'S CORRECT.

02:41:15 13    Q.  BUT COSTS DO FLUCTUATE, DON'T THEY?

02:41:20 14    A.  IT DOES, YES, THEY DO.

02:41:22 15    Q.  AND IT'S IMPORTANT TO HAVE UP-TO-DATE DATA, RIGHT?

02:41:25 16    A.  YES.

02:41:25 17    Q.  AND YOU HAVE NO RECORD OF WHERE YOUR DATA COMES FROM, CORRECT?

02:41:32 18    A.  I HAVE RECORDS, YEAH, IN MY COMPUTER, YES.

02:41:35 19    Q.  DID YOU PROVIDE THOSE RECORDS TO US?

02:41:37 20    A.  NO, I WAS NOT ASKED TO DO IT.

02:41:39 21    Q.  FOR MATERIAL COSTS YOU DIDN'T SPEAK TO ANY MATERIAL VENDORS,

02:41:49 22    CORRECT?

02:41:50 23    A.  I DID VISIT THE HOME DEPOT WEB SITE, YES, I DID.

02:41:54 24    Q.  BUT YOU DIDN'T SPEAK TO ANY MATERIAL VENDORS, CORRECT?

02:41:57 25    A.  NOT THAT I CAN RECALL FOR THIS PROJECT, NO.

02:41:59  1    Q.  AND SOMETHING ELSE THAT I NOTICED AND YOU ACTUALLY DISCUSSED IT

02:42:03  2    A LITTLE BIT IN YOUR DIRECT, AND THIS IS THE 13.5 PERCENT FOR

02:42:07  3    OVERHEAD AND PROFIT.  BUT THAT ISN'T THE INDUSTRY STANDARD, IS IT?

02:42:12  4    A.  NO.  IT'S -- THERE IS NO STANDARD.  THERE IS NO INDUSTRY

02:42:17  5    STANDARD FOR OVERHEAD AND PROFIT, AS FAR AS I'M CONCERNED.

02:42:19  6    Q.  YOU BELIEVE THAT 20 PERCENT IS A REASONABLE AMOUNT AS WELL,

02:42:23  7    DON'T YOU?

02:42:23  8    A.  DEPENDING ON THE KIND OF WORK, YES, IT IS REASONABLE, YES.

02:42:26  9    Q.  WELL, LET'S TALK ABOUT THIS KIND OF WORK.

02:42:29 10    A.  YEAH.

02:42:30 11    Q.  IS 20 PERCENT REASONABLE?

02:42:31 12    A.  IT'S REASONABLE DEPENDING ON THE SIZE OF THE PROJECT AND WHAT

02:42:36 13    OTHER -- DEPENDING ON IF THE SCOPE IS CORRECT, THEN IT COULD BE

02:42:40 14    REASONABLE, YES.

02:42:41 15    Q.  LET'S DISCUSS THE INDIVIDUAL PROPERTIES A LITTLE BIT.

02:42:47 16    SPECIFICALLY, LET'S TALK ABOUT THE ARMSTRONG RESIDENCE.  YOU

02:42:50 17    BELIEVE THAT IF HYPOTHETICALLY THE WATER HAD REACHED INTO THE ATTIC

02:42:54 18    AND ABOVE A PORTION OF THE ROOF LINE THAT YOU WOULD CHANGE OR BREAK

02:42:58 19    OUT DAMAGES AND COMPUTATION OF DAMAGES, WOULDN'T YOU?

02:43:03 20    A.  THAT WAS A LONG QUESTION.  CAN YOU SAY THAT AGAIN, PLEASE, SIR?

02:43:09 21    Q.  YES.

02:43:10 22    A.  I APOLOGIZE.

02:43:11 23    Q.  HYPOTHETICALLY SPEAKING, IF YOU HAD EVIDENCE THAT THE WATER WAS

02:43:15 24    ABOVE THE EAVES, THAT IT WAS -- THAT IT WAS COVERING PORTIONS OF

02:43:19 25    THE ROOF, THAT WOULD CHANGE YOUR BREAK OUT AND YOUR COMPUTATION OF

02:43:23  1    THE DAMAGES IN THIS CASE, WOULDN'T IT?

02:43:25  2    A.  AS OPPOSED TO WHAT?  AS OPPOSED TO IF THE --

02:43:28  3    Q.  WHAT YOU HAVE?

02:43:30  4    A.  OF WHAT I HAVE?

02:43:31  5    Q.  YES.

02:43:31  6    A.  YES.  IF I HAVE IT AT FIVE FEET AND YOU'RE TELLING ME IT'S TEN

02:43:39  7    FEET, WILL I CHANGE?  YES, I WILL CHANGE IT IF IT'S PROVEN.

02:43:42  8    Q.  AND THE WAY YOU WOULD CHANGE THIS IS YOU WOULD REPLACE THE

02:43:45  9    CEILINGS, THE INSULATION IN THE CEILINGS, REPLACE PLYWOOD ROOF

02:43:49 10    DECKING, REPLACE SHINGLES, REPLACE FIBERGLASS INSULATION, THE DRIP

02:43:53 11    EDGE, THE VALLEY FLASHING, THE RIDGE CAP, AND PRACTICALLY SPEAKING,

02:43:57 12    THE ENTIRE ROOF; IS THAT CORRECT?

02:44:00 13    A.  NO, IF IT JUST REACHED THE EAVES AND THE WATER DIDN'T SATURATE

02:44:06 14    THE ROOF --

02:44:07 15    Q.  THE HYPOTHET IS THAT IT'S COVERING PORTIONS OF THE ROOF LEAVING

02:44:10 16    OUT ABOUT TWO TO THREE FEET ABOVE THE WATER.

02:44:13 17    A.  OKAY.  I UNDERSTAND BETTER NOW, SORRY, YES.

02:44:17 18    Q.  EVERYTHING I JUST SAID YOU WOULD INCLUDE IN YOUR BREAKOUT FOR

02:44:20 19    FLOOD DAMAGES; IS THAT CORRECT?

02:44:22 20    A.  I'LL HAVE TO LOOK AT IT.  I'LL HAVE TO LOOK AT THE EVIDENCE AND

02:44:27 21    SEE IF IT WAS WARPED OR SATURATED OR WATERLOGGED, I WILL HAVE TO

02:44:31 22    LOOK AT THAT.  IT'S HARD FOR ME TO SAY WOULD I JUST REPLACE IT IF I

02:44:37 23    DIDN'T SEE THE DAMAGE.

02:44:38 24    Q.  DO YOU REMEMBER GIVING YOUR DEPOSITION?

02:44:39 25    A.  YES, I DO.

02:44:40  1    Q.  OKAY.  PULL UP THE DEPOSITION, PAGE 257 -- WELL, ACTUALLY LET'S

02:44:52  2    START AT 256, LINE 23.  AND CAN YOU ZOOM IN -- THERE WE GO.  "AND

02:45:04  3    IN FACT, THE FLOOD WATER DID REACH ABOVE THE CEILING AND INTO THE

02:45:07  4    ATTIC SPACE, WOULD YOUR BREAK OUT CHANGE AT ALL?  YES, I'LL PULL

02:45:11  5    THE CEILING IN.  I'LL REPLACE THE CEILINGS."

02:45:15  6         OKAY.  GO TO LINE FOUR.  "THE INSULATION IN THE CEILINGS.

02:45:23  7    I'LL SPRAY THE -- YOU KNOW, I'LL SPRAY THE CEILING FRAMING LIKE I

02:45:27  8    DID THERE FOR THE WIND AND RAIN."

02:45:30  9         OKAY.  LET'S GO FURTHER DOWN.  LET'S GO DOWN TO -- IS

02:45:40 10    THIS THE NEXT PAGE, CARL?  OKAY.  GO TO THE NEXT PAGE.  "THEN I

02:46:02 11    WOULD CONSIDER, YOU KNOW, LIKE I SAID EARLIER AFTER A DISCUSSION

02:46:04 12    WITH THE ENGINEER HOW LONG THE WATER WAS THERE.  I WOULD CONSIDER

02:46:06 13    REPLACING THE PLYWOOD BECAUSE IT CAN BE SATURATED, THE PLYWOOD ROOF

02:46:10 14    DECK."

02:46:11 15         DO YOU REMEMBER MAKING THESE STATEMENTS?

02:46:13 16    A.  YES, I WOULD CONSIDER IT, YES.

02:46:18 17         MS. LONIAN:  EXCUSE ME, YOUR HONOR.  I DON'T EVEN THINK

02:46:20 18    THIS IS PROPER IMPEACHMENT.  I DON'T REALLY SEE ANY INCONSISTENCIES

02:46:25 19    WITH WHAT THE WITNESS HAS TESTIFIED TO.

02:46:30 20         MR. JOSH PALMINTIER:  IT'S THE EXACT OPPOSITE OF WHAT HE

02:46:32 21    TESTIFIED TO.

02:46:33 22         THE COURT:  JUST A MINUTE, COUNSEL.  WELL, IT'S NOT AS

02:46:47 23    GLARING AS I THINK THERE'S A LITTLE BIAS PROBABLY ON EACH SIDE, BUT

02:46:54 24    I NOTE YOUR OBJECTION, AND I THINK WE CAN MOVE ON.

02:46:59 25         MR. JOSH PALMINTIER:  OKAY.

02:47:01   1   BY MR. JOSH PALMINTIER:

02:47:01   2   Q.  YOU BELIEVE THAT AN 80-GALLON HOT WATER HEATER IS SOMETHING

02:47:05   3   THAT WOULD NEED TO BE REPLACED, TOO, DON'T YOU?

02:47:07   4   A.  IF IT GOT WET, CORRECT.

02:47:09   5   Q.  THE ELECTRICAL COMPONENTS HAVE TO BE REPLACED?

02:47:12   6   A.  YES, HYPOTHETICALLY, OR --

02:47:14   7   Q.  HYPOTHETICALLY, THROUGHOUT THE ENTIRE HOUSE IF THERE WAS, IN

02:47:17   8   FACT, WATER PAST THE ROOF LINE.

02:47:19   9   A.  ARE WE SPEAKING HYPOTHETICALLY?

02:47:22  10   Q.  YES.

02:47:22  11   A.  YES.

02:47:31  12   Q.  CERTAIN PLACES WITHIN YOUR REPORT YOU ATTEMPT TO APPORTION A

02:47:35  13   PERCENTAGE TO AN ITEM THAT CANNOT BE BROKEN OUT.  FOR INSTANCE, IN

02:47:41  14   REFERENCE TO THE HOLMES REPLACEMENT COST ESTIMATE.  YOU GAVE AN

02:47:49  15   AMOUNT FOR TOTAL DEMOLITION ATTRIBUTABLE TO WIND AND RAIN, A TOTAL

02:47:52  16   DEMOLITION THAT CANNOT IN REALITY BE PARSED OUT; IS THAT CORRECT?

02:47:57  17   A.  YES.  IT WOULD -- IT'S DIFFICULT TO.

02:48:00  18   Q.  WHAT YOU DID IS IS YOU APPORTIONED A PERCENTAGE TO WIND AND

02:48:08  19   RAIN, DIDN'T YOU?

02:48:09  20   A.  YES.

02:48:09  21   Q.  IN FACT, IN ALL OF THE REPLACEMENT COST REPORTS, TO SOME EXTENT

02:48:19  22   YOU DID THIS, YOU DID IT FOR TOTAL DEMOLITION AND YOU DID IT WITH

02:48:23  23   SOME OTHER MATERIALS OR SOME OTHER JOBS; IS THAT CORRECT?

02:48:25  24   A.  YES.

02:48:25  25   Q.  AND YOU'RE APPORTIONING FAULT OR GIVING A PERCENTAGE FOR WIND

```
02:48:30   1    AND RAIN DAMAGE IN THAT SITUATION, CORRECT?

02:48:32   2    A.   YES.

02:48:35   3              MS. LONIAN:   I WOULD OBJECT, YOUR HONOR.  I DON'T THINK

02:48:37   4    THAT -- I MEAN, FAULT IS A LEGAL TERM.  I DON'T THINK THAT

02:48:39   5    MR. DUPLESSIS IS --

02:48:41   6              THE COURT:   I UNDERSTAND THE WORD "FAULT."  IT WOULD BE

02:48:43   7    CAUSE.

02:48:46   8              MR. JOSH PALMINTIER:   CAUSE.

02:48:47   9    BY MR. JOSH PALMINTIER:

02:48:48  10    Q.   DID YOU UNDERSTAND?

02:48:49  11    A.   NO, COULD YOU REPEAT THAT LAST QUESTION, PLEASE?

02:48:52  12    Q.   YOU APPORTIONED A PERCENTAGE FOR CAUSE HERE WHETHER IT BE WIND

02:48:55  13    AND RAIN OR FLOOD, CORRECT?

02:48:57  14    A.   YES, CORRECT.

02:49:00  15    Q.   SOME INSTANCES YOU ATTRIBUTED YARD CLEAN UP TO WIND AND RAIN,

02:49:06  16    DIDN'T YOU?

02:49:07  17    A.   YES.  I COULD HAVE.  I DON'T HAVE THE REPORTS RIGHT IN FRONT OF

02:49:11  18    ME.  IF YOU COULD POINT TO THE PAGE AND THE QUANTITIES, I CAN

02:49:14  19    CERTAINLY --

02:49:16  20    Q.   WE CAN MOVE ON.

02:49:20  21    A.   MY REPORTS -- IT'S IN MY REPORTS.  WHATEVER I STATED THERE IS

02:49:23  22    THE WAY I UNDERSTOOD THIS TO COME FROM MR. DANNER, AND THAT'S

02:49:28  23    WHAT'S IN MY REPORTS.  I DIDN'T MEMORIZE EACH -- I HAVE 27

02:49:34  24    ESTIMATES IN THERE WITH MULTIPLE ITEMS, I DIDN'T MEMORIZE EACH ONE

02:49:38  25    OF THEM.  BUT IF YOU CAN SHOW TO ME, I CAN DO A CALCULATION, AND I
```

02:49:41 1    CAN ANSWER THAT.

02:49:42 2    Q.  IT WAS.  THEY WERE VOLUMINOUS YOUR REPORTS WERE.  YOU DID NOT

02:49:46 3    CONSIDER CONTAMINATES IN THE WATER THAT CAN CAUSE DAMAGE TO THE

02:49:49 4    STRUCTURE IF THERE WAS A PROLONGED PERIOD OF TIME, DID YOU?

02:49:52 5    A.  I DIDN'T HEAR THAT.

02:49:52 6    Q.  YOU DIDN'T CONSIDER CONTAMINANTS THAT COULD HAVE BEEN IN THE

02:49:56 7    WATER AND COULD HAVE CONTAMINATED THE MATERIALS IF THE WATER, IN

02:50:00 8    FACT, WAS THERE FOR A PROLONGED PERIOD, DID YOU?

02:50:03 9    A.  NO, I EXCLUDED THAT AND IN MY EXCLUSIONS FOR REMEDIATION AND

02:50:07 10   EMERGENCY WORKERS IS NOT INCLUDED IN MY REPORTS.  HOWEVER, I DID --

02:50:16 11   I APOLOGIZE.

02:50:17 12   Q.  GO AHEAD.

02:50:17 13   A.  HOWEVER, I DID APPLY A SEAL COAT, SPRAY COAT, YOU KNOW, FOR --

02:50:26 14   ON STUDS AND FRAME WORK IN MY ESTIMATES, IF I RECALL CORRECTLY.

02:50:30 15   Q.  NO MOLD REMEDIATION, CORRECT?

02:50:32 16   A.  NO.

02:50:32 17   Q.  AND YOU DIDN'T CONSIDER DURATION OF THE AMOUNT OF TIME THERE

02:50:38 18   WAS STANDING WATER IN THE HOMES, DID YOU?

02:50:39 19   A.  I RELIED ON THE CONCLUSIONS IN MR. DANNER'S REPORT OF WHAT

02:50:42 20   NEEDS TO BE REMOVED, WHAT FINISHES NEEDS TO BE REMOVED BASED ON HIS

02:50:47 21   CONCLUSIONS.

02:50:47 22   Q.  NOW, YOU DO RECOGNIZE THAT THE ST. BERNARD POLDER IS CONSIDERED

02:50:59 23   TO BE A SPECIALIZED FLOOD HAZARD AREA AS DEFINED BY THE CODE OF

02:51:04 24   FEDERAL REGULATIONS, ARTICLE 44, DON'T YOU?

02:51:05 25          MS. LONIAN:  I OBJECT, YOUR HONOR.  THERE IS NO

02:51:06  1   FOUNDATION FOR THIS QUESTION.  IT SEEMS TO BE BEYOND THE SCOPE OF

02:51:09  2   HIS OPINIONS IN THIS CASE.

02:51:10  3          THE COURT:  COUNSEL, HE DIDN'T ATTRIBUTE THE DAMAGE, THE

02:51:14  4   OTHER GENTLEMAN DID.

02:51:17  5          MR. JOSH PALMINTIER:  UNDERSTOOD.  THIS GOES DIRECTLY TO

02:51:20  6   THE APPROPRIATENESS OF CHOOSING CERTAIN MATERIALS.

02:51:23  7          THE COURT:  ALL RIGHT.  TO THE EXTENT THAT IS THE CASE,

02:51:29  8   PROCEED.

02:51:31  9          THE WITNESS:  I HAVE NO IDEA WHAT YOU'RE TALKING ABOUT,

02:51:33 10   I'M SORRY.

02:51:33 11   BY MR. JOSH PALMINTIER:

02:51:34 12   Q.  YOU DON'T KNOW ABOUT THE CODE OF FEDERAL REGULATION THAT DEALS

02:51:37 13   WITH ARTICLE 44 AND -- ARE YOU FAMILIAR WITH THE NFIP, NATIONAL

02:51:46 14   FLOOD INSURANCE PROGRAM?

02:51:46 15   A.  I NORMALLY REFER TO A CONSULTANT IN THAT AREA IF I NEED TO

02:51:50 16   ADDRESS THOSE CODE ISSUES.  IS THAT WHAT YOU'RE ASKING ABOUT?

02:51:53 17   Q.  YES, I AM.  SO YOU DON'T KNOW ANYTHING SPECIFICALLY ABOUT THE

02:51:57 18   NFIP, NATIONAL FLOOD INSURANCE PROGRAM?

02:51:59 19   A.  NO.

02:51:59 20   Q.  AND YOU DON'T KNOW ANYTHING IN PARTICULAR ABOUT CERTAIN TYPES

02:52:03 21   OF MATERIALS THAT MUST BE USED IN ORDER TO BE IN COMPLIANCE WITH

02:52:08 22   THE NATIONAL FLOOD INSURANCE PROGRAM; IS THAT CORRECT?

02:52:12 23   A.  I AM AWARE OF IT, YES; I AM AWARE OF IT, BUT I DON'T MAKE THAT

02:52:16 24   DETERMINATION.  NOT IN THIS CASE.  SPECIFICALLY, IN THIS CASE I DID

02:52:22 25   NOT MAKE THAT DETERMINATION SPECIFICALLY.

02:52:23  1    Q.   SOMEONE TOLD YOU WHAT TO DO IN THAT REGARD?

02:52:25  2         THE COURT:  NO, I DON'T THINK HE EVEN INCLUDED ANY TYPE

02:52:30  3    REGULATION IN HIS REPORT NOR DID YOU CONSULT WITH ANYONE

02:52:33  4    SPECIFICALLY IN REGARD TO THE REPORTS IN THIS CASE; IS THAT

02:52:36  5    CORRECT?

02:52:36  6         THE WITNESS:  THAT'S CORRECT, YOUR HONOR.

02:52:38  7         MR. JOSH PALMINTIER:  OKAY.

02:52:39  8    BY MR. JOSH PALMINTIER:

02:52:40  9    Q.   IN REFERENCE TO CERTAIN TYPES OF MATERIALS, SHEATHING, FOR

02:52:48 10    INSTANCE, SHEATHING, PLYWOOD, OR OSB IS THE SHEATHING THAT WAS MOST

02:52:54 11    PROBABLY USED IN THESE HOMES, CORRECT?

02:52:56 12    A.   YES.  THAT IS WHAT I USED IN MY REPORTS, YES.

02:52:58 13    Q.   AND IN THOSE ITEMS, ARE THOSE ITEMS -- ARE THEY FLOOD RESISTANT

02:53:05 14    FOR LONG DURATIONS?

02:53:06 15    A.   I AM NOT AN EXPERT IN THAT AREA, IN MATERIAL RESISTANCE.

02:53:11 16    Q.   YOU CREATED AN ESTIMATE FOR THESE HOMES AND YOU DON'T KNOW IF

02:53:14 17    YOU HAD THE RIGHT MATERIALS IN TERMS OF WHAT NEEDED TO BE USED FOR

02:53:18 18    FLOOD RESISTANCE?

02:53:19 19         MS. LONIAN:  OBJECT, YOUR HONOR.  MISCHARACTERIZES HIS

02:53:21 20    TESTIMONY.

02:53:24 21         THE COURT:  THE QUESTION CAN BE -- THE INFORMATION CAN BE

02:53:27 22    ELICITED IN ANOTHER WAY, BUT I AM GOING TO OVERRULE YOUR OBJECTION

02:53:31 23    AND ALLOW HIM TO ANSWER THE QUESTION.

02:53:35 24         THE WITNESS:  I USED STANDARD BUILDING MATERIALS FOR A

02:53:38 25    RESIDENCE OF THIS TYPE.

02:53:41  1    BY MR. JOSH PALMINTIER:

02:53:41  2    Q.  AND YOU DIDN'T TAKE INTO ACCOUNT THAT IT WAS IN A FLOODPLAIN?

02:53:46  3    A.  NO -- AS FAR AS WHAT IS CONCERNED?  AS FAR AS THE MATERIALS?

02:53:52  4    Q.  AS FAR AS THE MATERIALS ARE CONCERNED.

02:53:54  5    A.  NO, I DID NOT, NO.

02:53:56  6    Q.  AND TO THE EXTENT THAT FLOOD RESISTANT MATERIALS NEEDED TO BE

02:54:02  7    USED, YOU DID NOT REFERENCE ANYTHING NOR DID YOU KNOW IF THEY EVEN

02:54:07  8    NEEDED TO BE USED IN THIS SITUATION; IS THAT CORRECT?

02:54:09  9    A.  I DID NOT CONSIDER THOSE, NO, I DID NOT.

02:54:11 10    Q.  ISN'T IT TRUE THAT MASS DEMOLITION IS LESS EXPENSIVE THAN

02:54:39 11    SELECTIVE DEMOLITION?

02:54:41 12    A.  IN GENERAL, YES.  I WOULD HAVE TO MAKE A STUDY ON EACH

02:54:52 13    SPECIFIC, BUT IN GENERAL I WOULD SAY IT WOULD BE MORE

02:54:52 14    COST-EFFECTIVE TO DEMOLISH THE ENTIRE BUILDING RATHER THAN

02:54:54 15    SELECTIVELY DEMOLISH EACH ITEM, IF, IN FACT, IT IS REQUIRED TO BE

02:55:01 16    TOTALLY DEMOLISHED.

02:55:03 17    Q.  WOULD YOU CONSIDER SHEATHING TO BE A STRUCTURAL COMPONENT OF A

02:55:07 18    BUILDING?

02:55:08 19    A.  YES.  I AM NOT AN ENGINEER, BUT JUST FROM MY GENERAL

02:55:13 20    EXPERIENCE, YES, SHEATHING IS IMPORTANT, YES.

02:55:15 21    Q.  AND IF THAT SHEATHING IS WARPED, YOU WOULD REPLACE THAT

02:55:18 22    SHEATHING, CORRECT?

02:55:19 23    A.  YES.

02:55:20 24    Q.  AND TO THE EXTENT THAT THAT SHEATHING HAS FINISHES ON IT, YOU

02:55:27 25    WOULD HAVE TO REPLACE THE FINISHES AS WELL, WOULDN'T YOU?

02:55:29  1    A.  IF ON TOP OF THE SHEATHING?

02:55:31  2    Q.  YES.

02:55:32  3    A.  CORRECT, YES, ABSOLUTELY.

02:55:36  4         MR. JOSH PALMINTIER:  NO FURTHER QUESTIONS.

02:55:37  5         THE COURT:  THANK YOU, COUNSEL.

02:55:41  6                    REDIRECT EXAMINATION

02:55:41  7    BY MS. LONIAN:

02:55:48  8    Q.  ERIC, CAN YOU PULL UP JX 1742.  THIS IS A DOCUMENT THAT I

02:55:54  9    BELIEVE YOU WERE SHOWN EARLIER BY OPPOSING COUNSEL REGARDING WATER

02:55:57 10    HEIGHTS AT A GIVEN HOME.  CAN YOU PULL OUT PARAGRAPH 4 AND BLOW

02:56:02 11    THAT UP.  I'LL GIVE YOU A MOMENT TO REVIEW THIS PARAGRAPH.

02:56:11 12    A.  (WITNESS READS DOCUMENT.)  OH, THERE IT IS.

02:56:17 13    Q.  WOULD THIS BE AN EXAMPLE OF MR. DANNER PROVIDING YOU WITH THE

02:56:20 14    WATER HEIGHT IN THE HOME ON WHICH YOU THEN INCORPORATED INTO YOUR

02:56:24 15    ANALYSIS?

02:56:24 16    A.  YES, IT WOULD.  I WAS LOOKING FOR THAT -- I WAS LOOKING FOR

02:56:27 17    THAT AND I COULDN'T FIND IT THAT QUICKLY IN THE REPORT.  THANK YOU.

02:56:30 18    Q.  UNDERSTANDABLE.  I HAD SOME HELP MYSELF ACTUALLY.

02:56:36 19         AND IN PREPARING YOUR REPLACEMENT ESTIMATES, AM I CORRECT

02:56:39 20    THAT IT WAS YOUR GOAL TO DO YOUR BEST TO REPLACE WHAT YOU BELIEVE

02:56:45 21    THE PLAINTIFFS HAD PRIOR TO THE STORM IN TERMS OF TYPE AND KIND OF

02:56:50 22    MATERIAL, CORRECT?

02:56:51 23    A.  ABSOLUTELY.

02:56:52 24    Q.  AND IN FACT, THAT'S ONE OF THE REASONS WHY YOU REVIEWED

02:56:54 25    PHOTOGRAPHS, YOU REVIEWED MR. SCHNEIDER'S SUMMARIES OF THE

02:56:59  1   DEPOSITIONS, YOU REVIEWED INSURANCE FILES IN ORDER TO GET AN IDEA

02:57:01  2   OF WHAT TYPE OF FIXTURES AND MATERIALS THEY ACTUALLY HAD IN THEIR

02:57:06  3   HOUSE AT THE TIME OF KATRINA, CORRECT?

02:57:08  4   A.  FROM THAT INFORMATION, CORRECT.

02:57:09  5   Q.  AND THE -- THERE WAS A LOT OF TESTIMONY ON CROSS-EXAMINATION

02:57:13  6   ABOUT HYPOTHETICALS AND WITH REGARDS TO BREAK OUTS OF -- OR WHAT

02:57:19  7   WOULD HAPPEN TO A ROOF IF WATER GOT ABOVE A CERTAIN HEIGHT.  IN THE

02:57:23  8   CASE OF THE ARMSTRONGS YOU, IN FACT, DID A BREAK OUT OF THE ROOF

02:57:26  9   AND THE TYPES OF REPAIRS OR REPLACEMENTS THAT WOULD BE NECESSARY IN

02:57:30 10   THAT CASE, CORRECT?

02:57:31 11   A.  YES, I DID, YES.

02:57:33 12   Q.  AND THAT'S IN YOUR REPORT, CORRECT?

02:57:35 13   A.  IT'S IN MY REPORT.

02:57:41 14        MS. LONIAN:  I HAVE NO FURTHER QUESTIONS FOR THIS

02:57:43 15   WITNESS.

02:57:43 16        THE COURT:  THANK YOU, MA'AM.

02:57:46 17        MR. MCCONNON:  THE GOVERNMENT HAS NO QUESTIONS.

02:57:50 18        THE COURT:  YOUR RECROSS WOULD BE LIMITED TO WHATEVER

02:57:53 19   SHE --

02:57:53 20        MR. JOSH PALMINTIER:  NO NEED FOR RECROSS.

02:57:54 21        THE COURT:  OH, THANK YOU VERY MUCH.

02:57:54 22        MS. LONIAN:  AS A HOUSEKEEPING MATTER, THERE WERE SOME

02:57:56 23   CHARTS.  I BELIEVE YOU HAVE COPIES OF THE CHARTS THAT HAVE NUMBERS.

02:58:02 24        MR. JOSH PALMINTIER:  YES, YOU'RE TALKING ABOUT THE

02:58:04 25   DEMONSTRATIVES?

02:58:06  1          MS. LONIAN:  I WOULD JUST LIKE TO MOVE THE DEMONSTRATIVES

02:58:09  2    INTO EVIDENCE, YOUR HONOR.

02:58:10  3          THE COURT:  ANY OBJECTION FROM ANYONE?

02:58:11  4          MR. JOSH PALMINTIER:  NO OBJECTION.

02:58:13  5          MS. LONIAN:  I THINK THEY WERE PROVIDED TO THE COURT.

02:58:17  6          THE COURT:  DO WE HAVE NUMBERS FOR THEM?

02:58:28  7          MS. LONIAN:  YES.  THE FIRST ONE IS DX DM-0010, THE

02:58:38  8    ENTIRE DEMONSTRATIVE.  AND THE SECOND DEMONSTRATIVE DX DM-009,

02:58:45  9    AGAIN, THE ENTIRE DEMONSTRATIVE.

02:58:48 10          THE COURT:  THANK YOU.

02:58:51 11          MR. MCCONNON:  THE UNITED STATES HAS NO OBJECTIONS, YOUR

02:58:52 12    HONOR.

02:58:52 13          THE COURT:  THANK YOU, LET THEM BE ADMITTED.  OKAY.  I

02:58:59 14    ASSUME, BASED ON OUR PREVIOUS CONVERSATIONS, THAT -- OR DID YOU

02:59:05 15    HAVE ANYTHING ELSE?

02:59:06 16          MS. LONIAN:  WE HAVE ONE MORE WITNESS.

02:59:08 17          THE COURT:  OKAY.  GO AHEAD.

02:59:10 18          MR. LONIAN:  THE DEFENDANTS CALL MR. KARL SCHNEIDER TO

02:59:12 19    THE STAND.  AND, AGAIN, YOUR HONOR, I WILL DO MY BEST --

02:59:16 20          THE COURT:  I JUST THOUGHT THERE WAS ONE MORE WITNESS.

02:59:19 21    I'M SORRY, I APOLOGIZE.

02:59:32 22          THE DEPUTY CLERK:  PLEASE, RAISE YOUR RIGHT HAND.

02:59:33 23       (WHEREUPON, KARL SCHNEIDER, WAS SWORN IN AND TESTIFIED AS

02:59:39 24       FOLLOWS:)

02:59:39 25          THE DEPUTY CLERK:  PLEASE BE SEATED.  WOULD YOU STATE

02:59:45  1    YOUR NAME AND SPELL IT FOR THE RECORD.

02:59:47  2            THE WITNESS:  KARL SCHNEIDER, K-A-R-L, SCHNEIDER,

02:59:53  3    S-C-H-N-E-I-D-E-R.

02:59:59  4                    VOIR DIRE EXAMINATION

03:00:00  5    BY MS. LONIAN:

03:00:02  6    Q.  GOOD AFTERNOON, MR. SCHNEIDER.  WHAT'S YOUR ADDRESS?

03:00:04  7    A.  3222 CLEAR LAKE DRIVE, ONTARIO, CALIFORNIA.

03:00:11  8    Q.  AND, MR. SCHNEIDER, YOU'RE A CONTENTS RESTORATION CONSULTANT,

03:00:16  9    CORRECT?

03:00:16 10    A.  YES.

03:00:17 11    Q.  AND YOU'RE CURRENTLY EMPLOYED BY MADSEN, KNEPPERS & ASSOCIATES,

03:00:21 12    AS A CONSTRUCTION AND RESTORATION CONSULTANT, CORRECT?

03:00:23 13    A.  CORRECT.

03:00:24 14    Q.  AND YOU HOLD A GENERAL ADJUSTER'S LICENSE IN THE STATE OF

03:00:29 15    CALIFORNIA, CORRECT?

03:00:30 16    A.  CORRECT.

03:00:30 17    Q.  YOU'VE HELD THAT LICENSE FOR 26 YEARS?

03:00:33 18    A.  YES.

03:00:34 19    Q.  YOU HAD TO PASS AN EXAM IN ORDER TO OBTAIN THAT LICENSE,

03:00:36 20    CORRECT?

03:00:36 21    A.  YES.

03:00:36 22    Q.  AND YOU ARE CURRENTLY APPROVED TO HOLD A NONRESIDENT ADJUSTER'S

03:00:41 23    LICENSE IN THE STATE OF LOUISIANA, CORRECT?

03:00:42 24    A.  THAT IS TRUE.

03:00:43 25    Q.  AND YOU WERE ALSO LICENSED AS AN INDEPENDENT ADJUSTER IN THE

03:00:46  1    STATE OF NEW YORK, ALTHOUGH YOU ALLOWED THAT LICENSE TO LAPSE ONCE

03:00:49  2    YOU MOVED AWAY FROM NEW YORK, CORRECT?

03:00:51  3    A.   THAT IS TRUE.

03:00:52  4    Q.   AND YOU HAD TO PASS AN EXAM IN ORDER TO OBTAIN THAT LICENSE,

03:00:55  5    CORRECT?

03:00:55  6    A.   YES.

03:00:55  7    Q.   AND YOU HOLD A NUMBER OF CERTIFICATIONS; FOR EXAMPLE, YOU HOLD

03:00:57  8    THE NATIONAL FLOOD INSURANCE PROGRAM CERTIFICATE, CORRECT?

03:00:59  9    A.   YES.

03:01:00 10    Q.   AND YOU HOLD A RESTORATION INDUSTRY ASSOCIATION CERTIFICATE FOR

03:01:04 11    CONTENTS RESTORATION, CORRECT?

03:01:06 12    A.   YES, I DO.

03:01:07 13    Q.   ALL OF THESE LICENSES AND CERTIFICATES HAVE A CONTINUING

03:01:11 14    EDUCATION REQUIREMENT, CORRECT?

03:01:12 15    A.   YES, THEY DO.

03:01:13 16    Q.   LET'S DISCUSS YOUR RELEVANT WORK HISTORY.  IN 1973 YOU WORKED

03:01:17 17    AS AN EXECUTIVE ASSISTANT FOR THE EDWIN D. WEINSTOCK ADJUSTING FIRM

03:01:23 18    IN THE STATE OF NEW YORK, RIGHT?

03:01:23 19    A.   YES.

03:01:24 20    Q.   IN 1978 YOU WENT TO WORK AT A PUBLIC ADJUSTING FIRM IN NEW

03:01:27 21    YORK, THE DIETZ INTERNATIONAL AS A GENERAL ADJUSTER?

03:01:30 22    A.   YES.

03:01:30 23    Q.   AND IN 1986, WHILE STILL WORKING AT DIETZ, YOU MOVED OUT TO

03:01:36 24    CALIFORNIA TO ASSUME THE POSITION OF REGIONAL ADJUSTER, CORRECT?

03:01:40 25    A.   THAT IS CORRECT.

03:01:40 1    Q.  IN 1989 YOU LEFT DIETZ AND FORMED YOUR OWN COMPANY, CONSUMER

03:01:45 2    ADJUSTING SERVICES, ALSO IN CALIFORNIA, CORRECT?

03:01:48 3    A.  CORRECT.

03:01:48 4    Q.  IN 1992 YOU BECAME A GENERAL ADJUSTER AND SUPERVISOR FOR

03:01:52 5    TRI-COUNTY ADJUSTERS IN CALIFORNIA, CORRECT?

03:01:53 6    A.  YES.

03:01:54 7    Q.  AND IN 1998 YOU MADE IT INTO THE INSURANCE INDUSTRY, BUT YOU

03:02:00 8    WORKED GENERAL COMMERCIAL LIABILITY CLAIMS, CORRECT?

03:02:03 9    A.  YES.

03:02:04 10   Q.  IN 1999 YOU WENT TO WORK AS A LARGE LOSS GENERAL ADJUSTER FOR

03:02:09 11   ADJUSTER'S INTERNATIONAL, CORRECT?

03:02:10 12   A.  YES.

03:02:11 13   Q.  AND WITH THE EXCEPTION OF THE PERIOD OF TIME WHEN YOU WERE

03:02:13 14   WORKING LIABILITY CLAIMS, YOU HAD OCCASION AT ALL OF THESE JOBS TO

03:02:17 15   PREPARE AND REVIEW INVENTORIES OF CONTENTS DAMAGED BY VARIOUS

03:02:22 16   PERILS, CORRECT?

03:02:22 17   A.  YES.

03:02:22 18   Q.  REGARDLESS OF THE TYPE OF PERIL, THE PROCESS OF PREPARING A

03:02:26 19   CONTENTS INVENTORY IS STILL THE SAME, CORRECT?

03:02:28 20   A.  YES.

03:02:29 21   Q.  IN PREPARING THOSE INVENTORIES, DID YOU USE THE SAME ANALYSIS

03:02:32 22   AND TECHNIQUES THAT YOU EMPLOYED IN CONNECTION WITH THIS CASE?

03:02:34 23   A.  YES, I DID.

03:02:35 24   Q.  DID YOU ALSO HAVE OCCASION TO COMPUTE ADDITIONAL LIVING

03:02:38 25   EXPENSES AS PART OF YOUR REGULAR DUTIES?

03:02:40   1   A.  YES, I DID.

03:02:40   2   Q.  AND DID YOU USE THE SAME TECHNIQUES AND ANALYSIS THAT YOU'VE

03:02:44   3   USED IN THIS CASE?

03:02:45   4   A.  YES.

03:02:45   5   Q.  AND AS PART OF THE ANALYSIS FOR ADDITIONAL LIVING EXPENSES, YOU

03:02:48   6   ALSO HAVE TO CALCULATE THE ESTIMATED TIME OF REPAIR, CORRECT?

03:02:51   7   A.  YES.

03:02:52   8   Q.  AND WHY IS THAT?

03:02:53   9   A.  THE ESTIMATED TIME OF REPAIR IS THE BENCHMARK FOR THE CONTINUED

03:03:02  10   ADDITIONAL LIVING EXPENSES UP UNTIL THE POINT THAT THE RESIDENCE IS

03:03:08  11   DEEMED HABITABLE.

03:03:10  12   Q.  AM I CORRECT THAT YOU'RE BASICALLY ESTABLISHING THE TIME FOR

03:03:14  13   WHICH A HOMEOWNER WOULD RECEIVE ADDITIONAL LIVING EXPENSES,

03:03:17  14   CORRECT?

03:03:17  15   A.  YES, THAT'S THE ESTIMATED TIME OF REPAIR.

03:03:19  16   Q.  AND GOING BACK TO YOUR WORK HISTORY IN 2000, YOU WENT TO WORK

03:03:23  17   WITH YOUR THEN FIANCEE, NOW YOUR WIFE, AT A CONTENTS RESTORATION

03:03:27  18   FIRM PRIS RESTORATION AS THE DIRECTOR OF SERVICES, CORRECT?

03:03:30  19   A.  YES.

03:03:30  20   Q.  CAN YOU PLEASE EXPLAIN TO THE COURT WHAT THE DIFFERENCE BETWEEN

03:03:33  21   A CONTENTS RESTORATION CONSULTANT AND AN ADJUSTER IS?

03:03:36  22   A.  WELL, AN INSURANCE ADJUSTER REPRESENTS THE INSURER AND HAS A

03:03:42  23   FIDUCIARY RESPONSIBILITY TO EVALUATE THE DAMAGES ON BEHALF OF THE

03:03:47  24   CARRIER TO BE SURE THAT THE POLICYHOLDER IS COMPENSATED.  AS A

03:03:53  25   RESTORATION CONSULTANT, CONTENT S CONSULTANT, WE ARE A VENDOR THAT

PROVIDES THE SERVICES WHERE WE GET REFERRED TO OR CALLED IN BY

CONTRACTORS TO GO IN AND PHYSICALLY REMOVE THE SALVAGEABLE CONTENTS

FROM THE HOME, PHOTOGRAPH IT, INVENTORY IT, ASSESS THE DAMAGES, FIX

THE COSTS OF THE REPAIRS TO THE CONTENTS, AND IF NEED BE, ESTABLISH

THE REPLACEMENT VALUE OF THE CONTENTS.  IN ADDITION, WE WOULD ALSO

ASSIST IN PREPARATION OF TOTAL LOSS OF INVENTORY.

Q.  SO I TAKE IT FROM YOUR ANSWER THAT WHEN AN ITEM YOU DEEM OR

DETERMINE THAT ITEM -- OR RATHER WHEN IT'S DETERMINED THAT AN ITEM

IS SALVAGEABLE, YOU, IN FACT, DETERMINE THE COST TO REPLACE IT AS

THE APPROPRIATE MEANS OF COMPENSATION IN THAT?

A.  WITH THE ASSISTANCE OF THE HOMEOWNER, YES.

Q.  AND WHILE WORKING AS A CONTENTS RESTORATION CONSULTANT, YOU

CONTINUED TO PREPARE AND REVIEW INVENTORIES OF CONTENTS DAMAGED BY

VARIOUS PERILS, CORRECT?

A.  CORRECT.

Q.  IN THE CONTEXT OF A CONTENT RESTORATION, IT'S THE SAME ANALYSIS

AND TECHNIQUE THAT YOU USED AS AN ADJUSTER?

A.  YES.

Q.  THAT'S ALSO THE ANALYSIS AND TECHNIQUES THAT YOU USED IN THIS

CASE, CORRECT?

A.  YES.

Q.  AND IN 2010 YOU WENT TO WORK IN THE CALIFORNIA OFFICE OF

MADSEN, KNEPPERS & ASSOCIATES.  AND AM I CORRECT THAT THAT WAS TO

ASSIST THEM WITH THE WORKING OF HURRICANE IKE CLAIMS?

A.  IT STARTED OUT WITH HURRICANE IKE, YES.

03:05:16 1   Q.  AND THAT WAS YOUR FIRST EXPERIENCE ADJUSTING HURRICANE-RELATED

03:05:20 2   CLAIMS, WASN'T IT?

03:05:21 3   A.  NO, I WAS ALSO INVOLVED IN HURRICANE ANDREW AND VARIOUS

03:05:24 4   TROPICAL STORMS OR HURRICANES THAT WOULD HAVE COME UP THE EAST

03:05:27 5   COAST WHEN IT WAS AN INDEPENDENT ADJUST.

03:05:29 6   Q.  AND OVER THE COURSE OF YOUR CAREER, APPROXIMATELY HOW MANY

03:05:33 7   CASES HAVE YOU WORKED ON THAT INVOLVED FLOOD DAMAGE?

03:05:36 8   A.  I WOULD SAY HUNDREDS.

03:05:38 9   Q.  AND OVER THE COURSE OF YOUR CAREER, BOTH AS AN ADJUSTER AND AS

03:05:44 10  A CONTENTS RESTORATION CONSULTANT, YOU'VE WORKED FOR BOTH INSURANCE

03:05:47 11  COMPANIES AND HOMEOWNERS, CORRECT?

03:05:48 12  A.  YES, AS AN INSURANCE ADJUSTER AND PUBLIC ADJUSTER.

03:05:53 13          MS. LONIAN:  I TENDER THE WITNESS AS AN EXPERT IN

03:05:55 14  RESTORATION CONSULTANT; SPECIFICALLY, IN THE FIELDS OF CONTENTS AND

03:05:57 15  ADDITIONAL LIVING EXPENSES.

03:06:04 16                      TRAVERSE EXAMINATION

03:06:04 17  BY MR. JOSH PALMINTIER:

03:06:11 18  Q.  GOOD AFTERNOON, MR. SCHNEIDER.  YOU CURRENTLY DON'T HOLD NOR

03:06:17 19  HAVE YOU EVER HELD A LOUISIANA LICENSE REGARDING THE TESTIMONY

03:06:21 20  YOU'RE ABOUT TO GIVE; IS THAT CORRECT?

03:06:23 21  A.  I'VE BEEN ACCEPTED BY THE LOUISIANA STATE DEPARTMENT OF

03:06:28 22  INSURANCE.  I AM WAITING FOR THE LICENSE TO COME IN THE MAIL, BUT I

03:06:31 23  PRESENTLY DO NOT HOLD ONE.

03:06:33 24  Q.  AT THE TIME OF YOUR DEPOSITION, YOU DIDN'T HAVE ONE; IS THAT

03:06:36 25  CORRECT?

03:06:36  1    A.  THAT'S CORRECT.

03:06:36  2    Q.  AND AT THE TIME OF YOUR DEPOSITION, YOU DIDN'T KNOW WHETHER OR

03:06:43  3    NOT THERE WAS EVEN A LICENSE FOR WHAT YOU DO AS A CONSULTANT IN

03:06:48  4    THIS REGARD; IS THAT CORRECT?

03:06:48  5    A.  WELL, YOU HAVE TO DEFINE THE APPLICATION OF A LICENSE.  ARE YOU

03:07:00  6    TALKING AN INSURANCE LICENSE OR --

03:07:02  7    Q.  JUST AS YOU ARE HERE TODAY TO TESTIFY, THE LICENSE THAT YOU

03:07:10  8    BELIEVE YOU NEED IN ORDER TO TESTIFY HERE TODAY, YOU DIDN'T KNOW

03:07:13  9    THAT YOU NEEDED THAT LICENSE AT YOUR DEPOSITION; IS THAT CORRECT?

03:07:17 10            MS. LONIAN:  I OBJECT, YOUR HONOR.  THIS IS -- I MEAN, HE

03:07:20 11    DOESN'T NEED A LICENSE.  THERE'S REALLY BEEN NO -- OR TO THE EXTENT

03:07:24 12    THAT HE DOES REQUIRE A LICENSE, PLAINTIFF'S COUNSEL HAS NOT

03:07:27 13    ESTABLISHED THAT.  SO I OBJECT TO THE WORDING OF THE QUESTION TO

03:07:31 14    THE EXTENT --

03:07:32 15            MR. JOSH PALMINTIER:  I'LL REWORD IT, YOUR HONOR.

03:07:34 16            THE COURT:  ALL RIGHT.  THANK YOU.

03:07:34 17    BY MR. JOSH PALMINTIER:

03:07:35 18    Q.  YOU DON'T KNOW WHETHER THERE'S A SPECIFIC LICENSE OR

03:07:37 19    CERTIFICATION FOR CONSULTING AND RESTORATION CONTENTS INVENTORY

03:07:41 20    EVALUATION AND/OR COMPUTATION OF ALE, DO YOU?

03:07:44 21    A.  I CAN TELL YOU THAT THERE'S NO LICENSE THAT'S REQUIRED TO DO

03:07:47 22    RESTORATION CONTENTS, ALTHOUGH THERE ARE CERTIFICATIONS.  IF YOU

03:07:51 23    WANT TO PUT YOURSELF OUT AS AN EXPERT, YOU SHOULD HAVE THOSE

03:07:53 24    CERTIFICATIONS WHICH COME THROUGH THE IICRC WHICH IS NATIONWIDE, SO

03:08:01 25    IT'S IRRELEVANT ON WHAT STATE I DO BUSINESS IN, THE PRINCIPLES ARE

03:08:04   1    RELATIVELY THE SAME.

03:08:05   2    Q.   UNDERSTOOD.   FROM HERE ON OUT, IF YOU DON'T MIND GIVING ME A

03:08:08   3    YES OR NO ANSWER BEFORE AND THEN YOU CAN EXPLAIN YOUR ANSWER, THAT

03:08:10   4    WILL BE GREAT.

03:08:11   5    A.   I'LL DO MY BEST.

03:08:12   6    Q.   YOU DON'T HAVE ANY PUBLISHED WORKS WITHIN THE AREA THAT YOU'RE

03:08:15   7    HERE TO GIVE AN OPINION ON, CORRECT?

03:08:16   8    A.   NO.

03:08:17   9    Q.   YOU DON'T HAVE EXPERIENCE WITH PRICING CONTENTS IN THE LOCAL

03:08:21  10    MARKET, THAT BEING SOUTHERN LOUISIANA, DO YOU?

03:08:23  11    A.   WELL, WE HAVE THE INTERNET TODAY.

03:08:25  12    Q.   COULD YOU PLEASE ANSWER THE QUESTION AND THEN GIVE A RESPONSE,

03:08:29  13    GIVE AN EXPLANATION.

03:08:30  14    A.   NO.   NO.

03:08:30  15    Q.   YOU'RE NOT BEING ASKED TO TESTIFY AS AN EXPERT IN ADJUSTING,

03:08:37  16    CORRECT?

03:08:38  17    A.   CORRECT.

03:08:38  18    Q.   YOU WILL NOT BE TESTIFYING AS AN ECONOMIST IN THIS PROCEEDING,

03:08:49  19    CORRECT?

03:08:49  20    A.   CORRECT.

03:08:49  21    Q.   YOU WILL NOT BE TESTIFYING AS AN ENGINEER, CORRECT?

03:08:51  22    A.   CORRECT.

03:08:52  23    Q.   OR A PSYCHOLOGIST OR SOCIOLOGIST, CORRECT?

03:08:56  24    A.   CORRECT.

03:09:00  25    Q.   YOU'VE NEVER BEEN ACCEPTED AS AN EXPERT IN ANY COURT OF LAW; IS

03:09:03  1    THAT CORRECT?

03:09:04  2    A.  CORRECT.

03:09:04  3    Q.  AND YOU'RE NOT TESTIFYING -- I FIND THIS INTERESTING.  YOU ARE

03:09:14  4    NOT TESTIFYING AS A CONSTRUCTION AND RESTORATION CONSULTANT HERE

03:09:16  5    TODAY, ARE YOU?

03:09:17  6    A.  NOT CONSTRUCTION.

03:09:23  7    Q.  ARE YOU TESTIFYING HERE TODAY AS A CONSTRUCTION AND RESTORATION

03:09:27  8    CONSULTANT?

03:09:27  9    A.  AS A RESTORATION CONTENTS CONSULTANT, I BELIEVE I AM.

03:09:35  10   Q.  CAN YOU PULL UP PX 0682.  DO YOU REMEMBER GIVING YOUR

03:09:40  11   DEPOSITION?  THIS IS PAGE 96.  DO YOU REMEMBER GIVING YOUR

03:09:44  12   DEPOSITION?

03:09:44  13   A.  YES, I DO.  YES, I DO, THANK YOU.

03:09:47  14   Q.  DO YOU REMEMBER SAYING SOMETHING DIFFERENT WHEN ASKED THE

03:09:50  15   QUESTION OF WHAT YOU WERE GOING TO TESTIFY TO?

03:09:53  16   A.  I BELIEVE IT HAD TO DO WITH CAUSE AND ORIGIN OR WATERLINES.

03:10:02  17   Q.  PX 0682, PAGE 96.

03:10:13  18   A.  IT'S NOT THAT CLEAR.

03:10:14  19   Q.  THE QUESTION IS, "AND THAT BRINGS ME TO THE NEXT QUESTION WHICH

03:10:17  20   IS YOUR JOB AS CONSULTANT, IS THAT THE AREA OF EXPERTISE WITHIN

03:10:20  21   WHICH YOU WILL BE TESTIFYING IF THIS CASE DOES GO TO COURT AND THAT

03:10:25  22   IS CONSTRUCTION RESTORATION CONSULTANT?"  YOUR ANSWER:  "NO."

03:10:28  23   A.  AND I AGREE WITH YOU WHEN IT COMES TO CONSTRUCTION AND

03:10:32  24   RESTORATION CONSULTANT BECAUSE THAT PORTION OF RESTORATION HAS TO

03:10:36  25   DO WITH CONSTRUCTION.  RESTORATION IS A VERY BROAD TERM.

03:10:43  1              MR. JOSH PALMINTIER:  YOUR HONOR --

03:10:44  2              THE COURT:  OKAY.  HE IS SAYING HE IS NOT GOING TO

03:10:46  3   TESTIFY ABOUT CONSTRUCTION RESTORATION.  CONTENTS RESTORATION IS

03:10:50  4   WHAT WE'RE FOCUSSING ON HERE AS I UNDERSTAND IT.

03:11:07  5   BY MR. JOSH PALMINTIER:

03:11:07  6   Q.  YOU'RE NOT GIVING AN OPINION HERE TODAY ABOUT CAUSATION WHETHER

03:11:11  7   IT IS CAUSATION REGARDING WATER OR CAUSATION REGARDING WIND AND

03:11:15  8   RAIN VERSUS FLOOD; IS THAT CORRECT?

03:11:17  9   A.  REFERENCING CAUSATION, THAT'S CORRECT.

03:11:19 10   Q.  AND YOU HAVEN'T WORKED ON ANY PROJECTS REGARDING THE VALUATION

03:11:28 11   AND/OR COMPUTATION OF CONTENTS AND/OR ALE IN THE STATE OF

03:11:33 12   LOUISIANA; IS THAT CORRECT?

03:11:33 13   A.  CORRECT.

03:11:34 14   Q.  AND YOU'VE NEVER BEEN QUALIFIED AS AN EXPERT IN ANY COURT OF

03:11:47 15   LAW; IS THAT CORRECT?

03:11:48 16              THE COURT:  YOU SAID THAT.

03:11:49 17              THE WITNESS:  I ANSWERED THAT ALREADY.

03:11:51 18              THE COURT:  HE DID.  HE HAS NOT.

03:11:56 19              MR. JOSH PALMINTIER:  YOUR HONOR, WE, FOR THE LIMITED

03:12:01 20   PURPOSE OF CONTENTS CONSULTANT, WE'RE OKAY.

03:12:08 21              THE COURT:  ALL RIGHT.  DO YOU WANT TO MAKE YOUR FORMAL

03:12:12 22   TENDER?

03:12:12 23              MS. LONIAN:  YES, SIR.  JUST TO CLARIFY, WE'RE ALSO

03:12:15 24   ASKING IN ADDITION -- CONTENTS -- WE ARE TENDERING MR. SCHNEIDER AS

03:12:20 25   AN EXPERT AS A RESTORATION CONSULTANT IN CONTENTS AND ADDITIONAL

03:12:25  1    LIVING EXPENSES, YOUR HONOR.

03:12:27  2              MR. JOSH PALMINTIER:  NO OBJECTION.

03:12:28  3              MR. MCCONNON:  THE UNITED STATES HAS NO OBJECTION, YOUR

03:12:29  4    HONOR.

03:12:29  5              THE COURT:  ACCEPT HIS TENDER.

03:12:32  6                          DIRECT EXAMINATION

03:12:32  7    BY MS. LONIAN:

03:12:33  8    Q.  AM I CORRECT THEN, YOU WERE ASKED TO REVIEW SCOTT TAYLOR'S

03:12:36  9    REPORTS AND PREPARE YOUR OWN REASONABLE ESTIMATES FOR PLAINTIFFS'

03:12:39 10    CONTENTS AND ADDITIONAL REASONABLE LIVING EXPENSES?

03:12:41 11    A.  YES.

03:12:42 12    Q.  AND WHAT MATERIALS DID YOU CONSIDER?

03:12:43 13    A.  I USED THE AVAILABLE PHOTOGRAPHS, AVAILABLE RECEIPTS,

03:12:51 14    DEPOSITION TESTIMONY FROM THE PLAINTIFFS' CONTENTS LIST PREPARED BY

03:12:55 15    THE PLAINTIFFS, AVAILABLE INSURANCE CLAIMS WITH RESPECT TO

03:13:00 16    HANDWRITTEN CONTENTS LISTS, THE DENSON ENGINEERING REPORT, JP

03:13:07 17    DUPLESSIS'S ESTIMATE, REPORTS FROM JOHN CRAWFORD, AND THE REPORTS

03:13:14 18    OF SCOTT TAYLOR.

03:13:15 19    Q.  AND WITH REGARD TO THE CONTENTS LIST CONTAINED IN THE INSURANCE

03:13:19 20    FILES THAT YOU JUST MENTIONED, I TAKE IT THOSE ARE CONTENTS LISTS

03:13:23 21    THAT WERE PREPARED BY PLAINTIFFS AND SUBMITTED TO THE INSURANCE

03:13:25 22    COMPANIES, CORRECT?

03:13:26 23    A.  WELL, ACTUALLY BOTH, BECAUSE YOU HAD CONTENTS LISTS THAT WERE

03:13:29 24    PREPARED -- HANDWRITTEN LISTS PREPARED BY THE PLAINTIFFS.  IN

03:13:34 25    ADDITION, IT APPEARED THAT THE INSURANCE ADJUSTERS MAY HAVE HELPED

| | | |
|---|---|---|
| 03:13:38 | 1 | THE HOMEOWNERS WITH THE LISTS AND PREPARED THEM ON THEIR BEHALF. |
| 03:13:41 | 2 | Q.  AND YOU USED THESE LISTS BECAUSE YOU BELIEVED THAT PLAINTIFFS' |
| 03:13:44 | 3 | MEMORIES ABOUT THE CONTENTS OF THEIR HOME WOULD HAVE BEEN BETTER |
| 03:13:47 | 4 | CLOSER TO THE DATE OF LOSS THAN SEVERAL YEARS LATER, CORRECT? |
| 03:13:49 | 5 | A.  THAT'S TRUE. |
| 03:13:50 | 6 | Q.  BUT IN USING THESE LISTS, YOU DIDN'T ACCEPT THE VALUES THAT ANY |
| 03:13:55 | 7 | INSURANCE COMPANY MAY HAVE DECIDED ON THE PLAINTIFFS' BELONGINGS, |
| 03:13:58 | 8 | CORRECT? |
| 03:13:58 | 9 | A.  THAT IS CORRECT. |
| 03:13:59 | 10 | Q.  AND YOU HEARD MR. DUPLESSIS TALK ABOUT THIS, BUT YOU REVIEWED |
| 03:14:03 | 11 | THE PLAINTIFFS' DEPOSITIONS AND INFORMED HIM OF ANY INFORMATION IN |
| 03:14:07 | 12 | THE DEPOSITION TRANSCRIPTS REGARDING THE FIXTURES AND MATERIALS IN |
| 03:14:09 | 13 | THE PLAINTIFFS' HOUSE, CORRECT? |
| 03:14:11 | 14 | A.  THAT'S TRUE.  IF I FOUND AN ITEM THAT APPEARED TO BE A |
| 03:14:14 | 15 | STRUCTURAL COMPONENT, I REFERRED THAT INFORMATION ON TO JP. |
| 03:14:19 | 16 | Q.  AND WHILE YOU WERE ACTUALLY PREPARING YOUR REPORTS, YOU WERE |
| 03:14:22 | 17 | BASED HERE IN THE NEW ORLEANS OFFICE, CORRECT? |
| 03:14:23 | 18 | A.  THAT'S TRUE. |
| 03:14:24 | 19 | Q.  AND YOU WERE JUST DOWN THE HALLWAY FROM HIM AND COULD SPEAK TO |
| 03:14:28 | 20 | HIM PRETTY MUCH ANY TIME THAT YOU WERE THERE? |
| 03:14:30 | 21 | A.  YES. |
| 03:14:30 | 22 | Q.  AND IN PREPARING YOUR REPORTS, YOU ALSO CONSULTED WITH |
| 03:14:35 | 23 | MR. DANNER TO GET INFORMATION REGARDING THE HEIGHT AND THE DURATION |
| 03:14:37 | 24 | OF THE WATER IN PLAINTIFFS' HOUSES, CORRECT? |
| 03:14:39 | 25 | A.  CORRECT. |

03:14:40 1   Q.  AND YOU DETERMINED THAT BASED ON THE HEIGHT AND THE DURATION OF

03:14:43 2   THE WATER IN PLAINTIFFS' HOUSES, ALL OF THE CONTENTS ON THE FIRST

03:14:45 3   FLOOR OF THE HOUSES WOULD HAVE NEEDED TO BE REPLACED, CORRECT?

03:14:48 4   A.  CORRECT.

03:14:48 5   Q.  AND FOR -- BECAUSE MOST OF THESE HOUSES WITH THE EXCEPTION OF

03:14:51 6   THE LIVERS WERE SINGLE STORY HOUSES, YOU EFFECTIVELY -- TALKING

03:14:55 7   ABOUT ALMOST ALL OF THE PLAINTIFFS' CONTENTS, CORRECT?

03:14:59 8   A.  FROM A CONTENTS STANDPOINT, WHETHER YOU HAVE ONE-FOOT, TWO-FOOT

03:15:04 9   OR FIVE FEET OF WATER IN A HOME, THE MAJORITY OF YOUR CONTENTS

03:15:10 10  WOULD HAVE BEEN IMPACTED BY THAT EVENT.

03:15:12 11  Q.  AND THAT'S BECAUSE WHEN YOU'RE TALKING ABOUT CONTENTS OF A

03:15:15 12  HOME, YOU'RE TALKING ABOUT FURNITURE, YOU'RE TALKING ABOUT

03:15:18 13  ELECTRONICS AND BOOKS.  AND IN YOUR OPINION, THESE TYPES OF ITEMS

03:15:22 14  ARE ACTUALLY VERY SUSCEPTIBLE TO DAMAGE FOR THE TYPE OF WATER THAT

03:15:25 15  WAS IN PLAINTIFFS' HOUSES?

03:15:26 16  A.  TO MOISTURE, YES.

03:15:27 17  Q.  AND AM I CORRECT THAT UNLESS PLAINTIFFS SPECIFICALLY STATED IN

03:15:33 18  THEIR DEPOSITIONS THAT THEY WERE ABLE TO SALVAGE ANY PARTICULAR

03:15:36 19  ITEM IN THEIR HOUSE, YOU ASSUMED THAT ALL OF THE ITEMS ON THEIR

03:15:38 20  CONTENTS LIST WERE, IN FACT, DAMAGED BY FLOODWATERS?

03:15:41 21  A.  I ASSUMED IT WAS ALL A TOTAL LOSS.

03:15:43 22  Q.  AND WE'LL TALK ABOUT SOME OTHER SPECIFIC EXAMPLES WHEN IT COMES

03:15:48 23  TO THE HOMES AND THE ARMSTRONGS LATER ON.

03:15:49 24  A.  SURE.

03:15:50 25  Q.  THAT WAS GENERALLY YOUR CONCLUSION BASED ON YOUR EVALUATION OF

03:15:54  1    THE HEIGHT AND THE WATER?

03:15:55  2    A.  THAT WAS MY OPINION.

03:15:56  3    Q.  AND AM I CORRECT THAT WITH REGARD TO CONTENTS, ONE OF THE FIRST

03:16:01  4    STEPS IN YOUR EVALUATION IS TO PREPARE A CONTENTS INVENTORY WITH

03:16:04  5    THE HOMEOWNER, CORRECT?

03:16:05  6    A.  IT'S ONE OF THE FIRST STEPS.  ONE OF THE FIRST STEPS, IF

03:16:08  7    POSSIBLE, IS TO ACTUALLY WALK THROUGH THE PREMISES WITH THE

03:16:11  8    HOMEOWNER AND GET AN UNDERSTANDING OF THE HOME.

03:16:14  9    Q.  BUT IN THIS CASE WHERE IT'S BEEN SEVERAL YEARS SINCE THE DAMAGE

03:16:18 10    OCCURRED, HOW DO YOU GO ABOUT STIMULATING THE HOMEOWNER'S MEMORIES

03:16:23 11    WITH REGARD TO THE CONTENTS OF THEIR HOME?

03:16:24 12    A.  AFTER GATHERING THEIR HANDWRITTEN LISTS, AN AREA DIAGRAM OF THE

03:16:29 13    HOME IS IMPORTANT.  I AM ABLE TO TAKE THE HOMEOWNER INTO EACH

03:16:34 14    SPECIFIC ROOM, ONE ROOM AT A TIME, AND ACTUALLY WALK THE HOMEOWNER

03:16:39 15    AROUND THE ROOM ASKING OR STIMULATING THEIR MEMORY BY ASKING

03:16:42 16    CERTAIN QUESTIONS REGARDING FURNITURE, ITEMS HANGING ON THE WALL,

03:16:47 17    SENTIMENTAL ITEMS.

03:16:48 18    Q.  AND WITH REGARD TO AN INDIVIDUAL ITEM, THE TYPE OF INFORMATION

03:16:52 19    YOU SEEK TO -- OR YOU SEEK TO GATHER WOULD INCLUDE BUT NOT BE

03:16:56 20    LIMITED TO THE AGE, LIFE EXPECTANCY, FUNCTIONAL USE, MAKE AND BRAND

03:17:01 21    OF THE ITEM, CORRECT?

03:17:02 22    A.  CORRECT.

03:17:02 23    Q.  AND YOU WOULD ALSO SEEK INFORMATION ABOUT THE HOMEOWNERS

03:17:07 24    SHOPPING HABITS, CORRECT?

03:17:08 25    A.  YES.  WHAT DEPARTMENT STORES THEY SHOP AT ARE IMPORTANT TO

03:17:11  1    ESTABLISH -- TO HELP ESTABLISH VALUE.

03:17:13  2    Q.   AND ALSO TO THE EXTENT THAT A REPLACEMENT COST IS APPROPRIATE,

03:17:17  3    WOULD IT HELP YOU DETERMINE WHAT SORT OF LIKE AND KIND WOULD BE

03:17:21  4    THAT THEY WOULD TYPICALLY SEEK TO BUY IF THEY WERE SEEKING TO

03:17:24  5    REPLACE THAT ITEM, CORRECT?

03:17:26  6    A.   THOSE ARE THE KEY WORDS, LIKE KIND AND QUALITY.

03:17:30  7    Q.   YOU MENTIONED SENTIMENTAL VALUE JUST NOW.  HOW DO YOU ADDRESS

03:17:34  8    ITEMS WHEN THEY HAVE SENTIMENTAL VALUE TO A HOMEOWNER?

03:17:37  9    A.   THAT'S A VERY SENSITIVE SUBJECT WHEN YOU'RE DEALING WITH

03:17:40  10   SO-CALLED STUFF BELONGING TO A HOMEOWNER.  USUALLY, I WOULD SIT AND

03:17:45  11   LISTEN TO THE STORY ABOUT THE SENTIMENTAL VALUE OF THE ITEM, BUT

03:17:49  12   WHEN ALL IS SAID AND DONE, I AM STILL LEFT WITH THE BURDEN OF

03:17:51  13   ESTABLISHING THE REPLACEMENT VALUE OF THE ITEM BASED ON THE

03:17:55  14   DESCRIPTION AND AGE.

03:17:56  15   Q.   IN THE CASE OF THE ARMSTRONGS, THEY HAD LISTED SEVERAL ITEMS OF

03:18:01  16   BABY CLOTHING AND FURNITURE AND SOME REPLACEMENT COST VALUES TO

03:18:06  17   THOSE ITEMS, CORRECT?

03:18:07  18   A.   YES.

03:18:07  19   Q.   AND YOU REVIEWED THE ARMSTRONGS' DEPOSITION, CORRECT?

03:18:10  20   A.   YES.

03:18:10  21   Q.   AND IS IT YOUR UNDERSTANDING THAT ALL OF THESE ITEMS BELONGED

03:18:13  22   TO THEIR CHILDREN WHO ARE ALL IN THEIR TEENS AND EARLY 20S AT THE

03:18:16  23   TIME OF KATRINA, CORRECT?

03:18:18  24   A.   IT'S MY UNDERSTANDING.

03:18:18  25   Q.   IN YOUR OPINION, WOULD THAT BE AN EXAMPLE OF A HOMEOWNER

03:18:22  1    ATTACHING SENTIMENTAL VALUE TO AN ITEM THAT MAY, IN FACT, PRECEDE

03:18:25  2    ITS PRACTICAL WORTH?

03:18:27  3    A.  CORRECT.

03:18:28  4    Q.  WHEN YOU ARE PREPARING A CONTENTS INVENTORY WITH THE HOMEOWNER,

03:18:31  5    HOW MUCH TIME DID YOU TYPICALLY SPEND WITH THEM THROUGH THIS

03:18:34  6    PROCESS?

03:18:35  7    A.  THAT COULD BE ANYWHERE FROM SEVERAL DAYS, TO WEEKS, TO A MONTH.

03:18:38  8    Q.  AND YOU WERE HERE WHEN THE PLAINTIFFS TESTIFIED, CORRECT?

03:18:42  9    A.  YES, I WAS.

03:18:43  10   Q.  WERE YOU HERE WHEN SCOTT TAYLOR TESTIFIED, CORRECT?

03:18:45  11   A.  YES.

03:18:46  12   Q.  AND IN YOUR OPINION, DID SCOTT TAYLOR SPEND ENOUGH TIME WITH

03:18:50  13   THE PLAINTIFFS TO GET A SUFFICIENT CONTENTS INVENTORY FOR THEIR

03:18:54  14   HOME?

03:18:54  15   A.  IN MY PROFESSIONAL OPINION, REVIEWING SCOTT TAYLOR'S REPORT

03:18:57  16   REFERENCING THE CONTENTS, IT APPEARS THAT NOT SUFFICIENT OR

03:19:00  17   ADEQUATE TIME WAS SPENT IN THE PREPARATION OF THE INVENTORY.

03:19:04  18   Q.  AND IN YOUR OPINION, DID SCOTT TAYLOR GET SUFFICIENT DETAIL

03:19:06  19   FROM THE PLAINTIFFS REGARDING THE CONTENTS OF THEIR HOME?

03:19:09  20   A.  NO.

03:19:09  21   Q.  AND THAT'S EVEN WHEN YOU MAKE ALLOWANCES FOR THE AMOUNT OF TIME

03:19:13  22   THAT'S PASSED SINCE KATRINA, CORRECT?

03:19:15  23   A.  CORRECT.

03:19:16  24   Q.  AND AM I CORRECT THAT THE LIST PREPARED BY THE HOMEOWNERS IS

03:19:20  25   JUST THE BEGINNING RATHER THAN THE END OF YOUR EVALUATION, CORRECT?

03:19:22  1    A.   YES.

03:19:23  2    Q.   IN FACT, YOU PREPARE A SUMMARY MATRIX, CORRECT?

03:19:26  3    A.   YES, I DID.

03:19:27  4    Q.   AND WHAT IS A SUMMARY MATRIX?

03:19:29  5    A.   THE SUMMARY MATRIX IS THE ACCUMULATION OF ALL OF THE DATA THAT

03:19:34  6    WAS AVAILABLE, HANDWRITTEN LISTS OF BOTH FROM THE PLAINTIFFS, FROM

03:19:39  7    THE VARIOUS FILES, DOCUMENTS, INCLUDING SCOTT TAYLOR'S CONTENTS

03:19:43  8    REPORT, ITEMIZING ALL OF THE ITEMS OUT ACCORDING TO CATEGORY, HARD

03:19:49  9    FURNITURE, SOFT FURNITURE, ET CETERA; ASSIGNING THE ACTUAL CASH

03:19:54 10    VALUE OR REPLACEMENT VALUE THAT THE HOMEOWNER OR SCOTT TAYLOR MAY

03:19:58 11    HAVE PLACED AND LOOKING FOR DUPLICATIONS, LOOKING FOR PROPERTY OF

03:20:06 12    OTHERS, LOOKING FOR ITEMS THAT MAY APPEAR TO BE STRUCTURAL

03:20:09 13    COMPONENTS, AND PUTTING THOSE ASIDE TO GET A TRUE UNDERSTANDING OF

03:20:15 14    THE VALUE OF THE CONTENTS.

03:20:17 15    Q.   ERIC, CAN YOU PULL UP JX 0756, PAGE 17.  AND JUST FOR THE

03:20:25 16    COURT'S REFERENCE, IS THIS AN EXAMPLE OF THE SUMMARY MATRIX THAT

03:20:30 17    YOU'RE DESCRIBING?

03:20:31 18    A.   YES.

03:20:31 19    Q.   AND HOW DO YOU DETERMINE THE REPLACEMENT COST VALUE OF ANY

03:20:36 20    GIVEN ITEM?

03:20:36 21    A.   WELL, CONSIDERING OBVIOUSLY THE MORE INFORMATION THAT'S GIVEN,

03:20:44 22    DESCRIPTIVE INFORMATION THAT IS GIVEN ABOUT A PARTICULAR ITEM, IT

03:20:50 23    MAKES IT LESS DIFFICULT IN MY RESEARCH IN ESTABLISHING THE

03:20:56 24    REPLACEMENT VALUE.  IF SOMEONE JUST LISTS A TABLE AND CHAIRS

03:21:00 25    WITHOUT THE ORNATE DETAILS OR THE TYPE OF WOOD, I AM LEFT WITH THE

03:21:07  1    BURDEN OF TRYING TO ESTABLISH WHAT I DEEM TO BE A FAIR AND

03:21:10  2    REASONABLE PRICE FOR THE TABLE AND CHAIRS.  AND IN THAT RESEARCH, I

03:21:14  3    WOULD RESEARCH FURNITURE, WHETHER IT BE SEARS OR ANY OF THE

03:21:21  4    PARTICULAR DEPARTMENT STORES TODAY THAT YOU CAN PULL UP ON THE

03:21:24  5    INTERNET; AND YOU PUT IN TABLE AND CHAIRS AND SEE WHAT THE VALUE OR

03:21:28  6    WHAT THE REPLACEMENT VALUE OR THE PURCHASE PRICE IS.

03:21:31  7    Q.  AND WHY DO YOU NOT TYPICALLY ACCEPT THE REPLACEMENT COST VALUE

03:21:37  8    ASSIGNED BY THE HOMEOWNER AS THE FINAL NUMBER THAT YOU USE IN YOUR

03:21:41  9    SUMMARY MATRIX?

03:21:42 10    A.  IT'S BEEN MY EXPERIENCE OVER THE YEARS THAT HOMEOWNERS HAVE A

03:21:50 11    TENDENCY TO EITHER UNDERVALUE AN ITEM OR OVERVALUE AN ITEM BECAUSE

03:21:56 12    THEY'RE RELYING ON THEIR MEMORY, AND YOU'RE DEALING WITH A

03:22:01 13    HOMEOWNER WHOSE BEEN SUBJECTED TO A DISASTER AND THAT'S THE LAST

03:22:06 14    THING ON THEIR MIND.

03:22:07 15    Q.  SO EVEN IF A HOMEOWNER IS MAKING A GOOD FAITH EFFORT TO ASSIGN

03:22:12 16    VALUES TO THEIR ITEMS, IT MAY BE DIFFICULT FOR THEM TO DO SO IN AN

03:22:15 17    ACCURATE MANNER?

03:22:16 18    A.  UNLESS IT'S SOMETHING THAT THEY JUST RECENTLY PURCHASED BEFORE

03:22:18 19    THE EVENT, YES.

03:22:19 20    Q.  AND IN THE CASE OF ELECTRONICS, WOULD THAT BE ANOTHER REASON

03:22:24 21    WHY A REPLACEMENT COST VALUE WOULD NOT BE ACCURATE IF THE PLAINTIFF

03:22:29 22    OR THE HOMEOWNER IN THIS CASE IS SPEAKING SPECIFICALLY OF WHAT THEY

03:22:33 23    PAID FOR AN ITEM?

03:22:35 24    A.  ELECTRONICS IS VERY INTERESTING IN THAT IF YOU HAVE, SAY, A

03:22:39 25    LAPTOP THAT YOU BOUGHT TEN YEARS AGO AND YOU PAID 2,000 - $2,500

03:22:43  1    FOR IT AND TODAY YOU WANT TO GO OUT AND BUY A LIKE KIND SIMILAR

03:22:47  2    PRODUCT, YOU MAY END UP SPENDING $1,000 FOR THAT ITEM.  THE

03:22:49  3    HOMEOWNER MAY LIST THE $2,500 DOWN AS A REPLACEMENT VALUE, BUT THAT

03:22:54  4    BRINGS US BACK TO LIKE KIND AND QUALITY WHERE THE REPLACEMENT VALUE

03:22:58  5    MAY BE $1,000.

03:22:59  6    Q.  SO THE ULTIMATE GOAL OF YOUR INQUIRY IS TO PUT THE HOMEOWNER IN

03:23:04  7    THE POSITION THEY WOULD HAVE BEEN AT THE TIME OF THE LOSS, CORRECT?

03:23:07  8    A.  YES.

03:23:07  9    Q.  SO FOR -- IF I BOUGHT A DVD PLAYER THREE YEARS AGO FOR $100, I

03:23:14 10    COULD GET AN EQUIVALENT DVD PLAYER FOR $30 TODAY PROBABLY, BUT I

03:23:20 11    WOULD STILL HAVE THE SAME LIKE KIND AND QUALITY THAT I HAD AT THE

03:23:25 12    TIME OF THE LOSS, CORRECT?

03:23:26 13    A.  IF YOU DIDN'T PROVIDE ME A BRAND NAME, I WOULD SAY YES.

03:23:30 14    Q.  HOW DO YOU GO ABOUT VERIFYING YOUR REPLACEMENT COST VALUES?

03:23:38 15    A.  RESEARCHING ON THE INTERNET.  BEFORE THE INTERNET I USED TO

03:23:43 16    WALK AROUND WITH NUMEROUS CATALOGS FROM VARIOUS DEPARTMENT STORES,

03:23:46 17    AND ACTUALLY SIT DOWN WITH THE HOMEOWNER AND GO PAGE BY PAGE AND

03:23:51 18    HAVE THEM IDENTIFY ITEMS THAT WERE SIMILAR IN NATURE AND THEN PUT

03:23:55 19    DOWN THE RETAIL VALUE, NOT THE SALE VALUE, THE RETAIL VALUE OF THE

03:23:59 20    ITEM.

03:23:59 21    Q.  AND YOU ALSO CALCULATE THE ACTUAL CASH VALUE FOR ITEMS ON

03:24:03 22    YOUR -- IN YOUR MATRIX, CORRECT?

03:24:05 23    A.  CORRECT.

03:24:05 24    Q.  AND HOW DO YOU GO ABOUT DOING THAT?

03:24:08 25    A.  THE ACTUAL CASH VALUE IS DERIVED FROM ESTABLISHING THE

3606

03:24:12  1    REPLACEMENT VALUE AND THEN APPLYING DEPRECIATION, WHICH IS THE USE

03:24:17  2    INTEREST THAT THE HOMEOWNER HAD IN THE PRODUCT AT THE TIME OF THE

03:24:21  3    EVENT, THUS ESTABLISHING THE ACTUAL CASH VALUE OF THE ITEM.

03:24:24  4    Q.  IN YOUR OPINION, IT'S PREFERABLE TO APPLY DEPRECIATION ON AN

03:24:28  5    ITEM-BY-ITEM BASIS WHERE POSSIBLE, CORRECT?

03:24:30  6    A.  IT'S BENEFICIAL TO THE HOMEOWNER, YES.

03:24:32  7    Q.  AND THAT'S BECAUSE CERTAIN ITEMS SUCH AS CLOTHING, FOR EXAMPLE,

03:24:36  8    DEPRECIATE AT A FASTER ITEM -- AT A FASTER RATE THAN OTHERS,

03:24:40  9    CORRECT?

03:24:40  10   A.  YES, TEXTILES DO DEPRECIATE QUICKLY.

03:24:43  11   Q.  IN YOUR REPORT YOU APPLY A BLANKET 50 PERCENT DEPRECIATION,

03:24:53  12   CORRECT?

03:24:53  13   A.  YES.

03:24:53  14   Q.  AND YOU APPLY THE 50 PERCENT DEPRECIATION BECAUSE YOU BELIEVE

03:24:53  15   YOU LACK SUFFICIENT INFORMATION TO APPLY A DEPRECIATION ON AN

03:24:55  16   ITEM-BY-ITEM BASIS, CORRECT?

03:24:56  17   A.  YES.

03:24:56  18   Q.  AND IS THE 50 PERCENT DEPRECIATION IN THIS SITUATION A COMMON

03:25:00  19   INDUSTRY PRACTICE IN THE CONTENTS RESTORATION INDUSTRY?

03:25:02  20   A.  IT'S A COMMON PRACTICE WHEN YOU ARE FACED WITH AN INVENTORY

03:25:07  21   LACKING ADEQUATE DESCRIPTION.

03:25:09  22   Q.  BUT IN THE IDEAL SITUATION, YOU WOULD SIMPLY GO BACK TO THE

03:25:13  23   HOMEOWNERS AND TRY TO GET MORE INFORMATION IN THAT CASE RATHER

03:25:16  24   THAN --

03:25:17  25   A.  IF GIVEN THE OPPORTUNITY, YES.

03:25:18   1    Q.  AND IT'S POSSIBLE ALSO THAT A HOMEOWNER'S PROPERTY MIGHT

03:25:26   2    ACTUALLY APPRECIATE IN VALUE, CORRECT?

03:25:28   3    A.  YES.

03:25:28   4    Q.  FOR EXAMPLE, FURNITURE, EVEN HIGH-END FURNITURE THAT YOU BUY

03:25:32   5    TODAY, BUILT IN A DIFFERENT MANNER THAN IT WAS SAY 50 YEARS AGO,

03:25:36   6    CORRECT?

03:25:36   7    A.  CORRECT.

03:25:37   8    Q.  SO IF A HOMEOWNER HAD AN ITEM OF FURNITURE THAT WAS SEVERAL

03:25:41   9    DECADES OLD, THAT ITEM MIGHT, IN FACT, HAVE APPRECIATED IN VALUE

03:25:44  10    OVER THE YEARS?

03:25:45  11    A.  YES.

03:25:45  12    Q.  IN YOUR OPINION, DID SCOTT TAYLOR GET SUFFICIENT INFORMATION

03:25:47  13    FROM THE PLAINTIFFS TO DETERMINE WHETHER ANY OF THE PLAINTIFFS'

03:25:51  14    PROPERTY HAD ACTUALLY APPRECIATED IN VALUE?

03:25:53  15    A.  NO.

03:25:53  16    Q.  AM I CORRECT THAT AS A -- PRIOR TO FINALIZING ANY CONTENTS

03:26:00  17    INVENTORY, YOU ALWAYS SEND IT TO THE HOMEOWNER TO REVIEW PRIOR TO

03:26:05  18    INCLUDING IT IN YOUR REPORT, CORRECT?

03:26:06  19    A.  YES.

03:26:06  20    Q.  AND WHY IS THAT?

03:26:07  21    A.  IT'S TWOFOLD.  ONE, IT GIVES THE HOMEOWNER THE OPPORTUNITY TO

03:26:10  22    REVIEW THE PAPERWORK, THE INVENTORY AS I PREPARED IT; AND IF THERE

03:26:15  23    ARE ANY ERRORS OR ANY CORRECTIONS THAT NEED TO BE MADE, THEY GET

03:26:18  24    MADE.  AND THEN THE SECOND POINT IS IT ALLOWS THE HOMEOWNER A

03:26:22  25    SECOND OPPORTUNITY TO ADD ITEMS THAT THEY MAY HAVE FORGOTTEN ABOUT;

03:26:26  1   BUT GOING THROUGH THE PROCESS STIMULATED THEIR MIND AND SO THEY GET

03:26:29  2   TO ADD THAT INTO THE INVENTORY FOR THE FINAL PRODUCT.

03:26:32  3   Q.  AND JUST ON THIS PAGE YOU HAVE PULLED UP, YOU FIND LIKE KIND

03:26:38  4   AND QUALITY HAND MIXER.  IT MAY BE THAT THE PLAINTIFF COULD CLICK

03:26:42  5   ON THAT LINK AND SAY, YOU KNOW, THAT'S NOT THE TYPE OF HAND MIXER I

03:26:46  6   HAD AT THE TIME OF THE KATRINA.  I HAD A DIFFERENT TYPE OF HAND

03:26:49  7   MIXER, RIGHT?

03:26:50  8   A.  THAT'S A VALID POINT THAT YOU MAKE THERE AND THAT'S THE REASON

03:26:53  9   WE PUT THAT INFORMATION ON SO THAT YOU CAN GO -- THE HOMEOWNER CAN

03:26:56 10   GET TO THE NEXT STEP, AND, YES, IDENTIFY OR SAY, "NO, I HAD THE

03:26:59 11   NEXT ONE."

03:27:00 12   Q.  AND YOU HEARD SCOTT TAYLOR TESTIFY THAT HE DIDN'T, IN FACT,

03:27:03 13   SEND THESE INVENTORIES TO THE PLAINTIFFS PRIOR TO FINALIZING HIS

03:27:07 14   REPORTS, CORRECT?

03:27:07 15   A.  YES, I DID.

03:27:08 16   Q.  IN YOUR OPINION, IS THAT A SOUND PRACTICE?

03:27:10 17   A.  NO.

03:27:11 18   Q.  AND WITH REGARD TO ALL OF THE PLAINTIFFS' SUMMARY MATRIXES FOR

03:27:19 19   THEIR CONTENTS, DID YOU PREPARE THEM IN THE SAME MANNER THAT YOU

03:27:22 20   JUST DESCRIBED TO THE COURT?

03:27:23 21   A.  I USED THE SAME PRINCIPLES, YES.

03:27:25 22   Q.  AND FOR ALL OF YOUR PLAINTIFFS, YOUR REPLACEMENT COSTS VALUE

03:27:29 23   WAS LOWER THAN MR. TAYLOR'S.  GENERALLY SPEAKING, WHY WAS THAT?

03:27:32 24   A.  MY REPLACEMENT VALUE BEING LOWER THAN SCOTT TAYLOR'S IS BECAUSE

03:27:42 25   I REMOVED THOSE ITEMS, PROPERTY OF OTHERS, DUPLICATE ITEMS WHICH

03:27:48  1    WOULD APPEAR, ITEMS THAT THE HOMEOWNERS MAY HAVE LISTED AS WIND

03:27:53  2    STORM DAMAGE AND STILL APPEARED ON THE SCOTT TAYLOR INVENTORY AS

03:27:58  3    FLOOD AND STRUCTURAL COMPONENT ITEMS.

03:28:03  4    Q.  AND WE'LL GET TO SOME OF THE SPECIFIC REASONS FOR EACH OF THE

03:28:07  5    PLAINTIFFS, BUT THOSE WOULD BE THE GENERAL REASONS FOR ALL OF THE

03:28:09  6    PLAINTIFFS?

03:28:10  7    A.  CORRECT.

03:28:10  8    Q.  IN THE SPECIFIC CASE OF THE ARMSTRONGS, THE REPLACEMENT COST

03:28:13  9    VALUE OF THEIR CONTENTS THAT YOU CALCULATED IS $107,289.11,

03:28:20 10    CORRECT?

03:28:20 11    A.  YES.

03:28:20 12    Q.  IN YOUR VIEW, THE HANDWRITTEN CONTENTS LIST THE ARMSTRONG'S

03:28:24 13    PREPARED AND SUBMITTED TO THEIR INSURANCE COMPANY CONTAINED ITEMS

03:28:26 14    THAT THEY STATED HAD BEEN DAMAGED BY WIND AND RAIN, CORRECT?

03:28:30 15    A.  YES, I DID.

03:28:30 16    Q.  AND YOU REVIEWED THE INVENTORY CONTAINED IN MR. TAYLOR'S REPORT

03:28:33 17    FOR THE ARMSTRONGS, CORRECT?

03:28:35 18    A.  YES, I DID.

03:28:36 19    Q.  AND IN YOUR OPINION, ARE THERE DUPLICATE ITEMS ON BOTH LISTS?

03:28:40 20    A.  YES, THERE ARE.

03:28:40 21    Q.  AND THE ACTUAL CASH VALUE THAT YOU CALCULATED FOR THE

03:28:43 22    ARMSTRONGS IS $53,644.56, CORRECT?

03:28:48 23    A.  YES.

03:28:48 24    Q.  AND ALTHOUGH MR. TAYLOR REFERS TO AN ACTUAL CASH VALUE IN HIS

03:28:52 25    REPORT, IN REALITY HE DIDN'T CALCULATE ONE BECAUSE HE DIDN'T APPLY

03:28:56  1    DEPRECIATION, CORRECT?

03:28:56  2    A.  NO.

03:28:57  3    Q.  AND IN THE CONTEXT OF PROPERTY FOR OTHERS THAT YOU MENTIONED

03:29:01  4    EARLIER, YOU'RE REFERRING SPECIFICALLY TO THE ARMSTRONGS' SON WHO

03:29:05  5    WAS AN ADULT AT THE TIME OF THE KATRINA, CORRECT?

03:29:07  6    A.  YES, I AM.

03:29:07  7    Q.  AND IN YOUR MATRIX YOU HAVE A COLUMN WHICH SPECIFICALLY

03:29:10  8    IDENTIFIES ITEMS THAT THEY TESTIFIED IN THEIR DEPOSITION WERE --

03:29:13  9    BELONGED TO THEIR SON, CORRECT?

03:29:15 10    A.  YES.  IN MY COMMENT SECTION OF MY MATRIX I DENOTE PROPERTY OF

03:29:21 11    OTHERS.

03:29:21 12    Q.  MOVING ON TO MRS. COATS.  THE REPLACEMENT COST VALUE CALCULATED

03:29:26 13    FOR HER IS $127,841.20, CORRECT?

03:29:31 14    A.  YES.

03:29:32 15    Q.  AND THAT WOULD BE LESS THAN MR. TAYLOR'S NUMBER FOR THE GENERAL

03:29:35 16    REASONS YOU DESCRIBED EARLIER, CORRECT?

03:29:36 17    A.  CORRECT.

03:29:37 18    Q.  AND THE ACTUAL CASH VALUE IS $63,920.60, CORRECT?

03:29:43 19    A.  YES.

03:29:43 20    Q.  IN THE CASE OF MRS. COATS, THERE WAS A LOT OF CLOTHING ON HER

03:29:47 21    LIST AND THAT TENDS TO HAVE A HIGHER DEPRECIATION RATE THAN OTHER

03:29:50 22    TYPES OF ITEMS --

03:29:51 23    A.  YES, IT DOES.

03:29:52 24    Q.  -- AS WE DISCUSSED EARLIER.  AND IN THE CONTEXT OF THIS REPORT,

03:29:55 25    THE PROPERTY OF OTHERS, IT SPECIFICALLY REFERS TO PROPERTY

03:29:58  1  BELONGING TO MS. COATS' FIANCEE, NATHAN MORGAN, AND ALSO HER ADULT

03:30:02  2  CHILDREN AND ADULT GRANDCHILDREN, CORRECT?

03:30:04  3  A.  YES.

03:30:05  4  Q.  REFERRING -- MOVING ON TO MR. HOLMES, THE REPLACEMENT COST

03:30:08  5  VALUE YOU CALCULATED IS $80,306.52, CORRECT?

03:30:14  6  A.  YES.

03:30:15  7  Q.  AND AGAIN, THAT WOULD BE LESS THAN MR. TAYLOR FOR THE GENERAL

03:30:17  8  REASONS YOU STATED BEFORE, CORRECT?

03:30:18  9  A.  YES.

03:30:18 10  Q.  AND THE ACTUAL CASH VALUE IS $40,153.26, CORRECT?

03:30:23 11  A.  YES.

03:30:24 12  Q.  IN YOUR READING OF THE CONTENTS OF CONTAINING ITEMS THE HOLMES

03:30:29 13  PREPARED AND SUBMITTED TO THEIR INSURANCE COMPANY STATING THAT THEY

03:30:32 14  HAD BEEN DAMAGED BY WIND AND RAIN, CORRECT?

03:30:33 15  A.  CORRECT.

03:30:34 16  Q.  AND YOU PREPARE -- YOU'VE REVIEWED THE INVENTORY CONTAINED IN

03:30:37 17  MR. TAYLOR'S REPORT, CORRECT?

03:30:39 18  A.  YES, I DID.

03:30:39 19  Q.  AND IN YOUR OPINION THERE ARE DUPLICATE ITEMS ON BOTH LISTS,

03:30:42 20  CORRECT?

03:30:42 21  A.  YES, THERE ARE.

03:30:43 22  Q.  AND MR. LIVERS -- IN THE CASE OF MR. LIVERS, THE REPLACEMENT

03:30:50 23  COST VALUE OF HIS CONTENTS IS $38,756.28, CORRECT?

03:30:54 24  A.  YES.

03:30:55 25  Q.  AND THAT'S LOWER THAN MR. TAYLOR'S FOR THE GENERAL REASONS WE

03:30:58  1    STATED BEFORE.

03:30:59  2            NOW, IN THIS CASE, IT WAS SLIGHTLY DIFFERENT BECAUSE THE

03:31:02  3    LIVERS DID PROVIDE AGES FOR THE ITEMS ON THEIR LIST, CORRECT?

03:31:06  4    A.  YES, THEY DID.

03:31:07  5    Q.  BUT IN THEIR LIST THEY STATED THAT ALL OF THE CONTENTS IN THEIR

03:31:11  6    HOUSE WERE LESS THAN FIVE YEARS OLD, EVEN THOUGH THEY HAD LIVED

03:31:14  7    THERE IN THEIR HOUSE FOR 30 YEARS, CORRECT?

03:31:16  8    A.  CORRECT.

03:31:16  9    Q.  AND YOU FOUND THAT UNUSUAL, CORRECT?

03:31:18 10    A.  YES, I DID.

03:31:20 11    Q.  WHY IS THAT?

03:31:22 12            MR. JOSH PALMINTIER:  I AM GOING TO OBJECT IF HE IS GOING

03:31:24 13    TO TESTIFY -- I THINK IT GOES BEYOND THE SCOPE OF HIS EXPERTISE IF

03:31:29 14    HE IS GOING TO TESTIFY AS AN ECONOMIST.

03:31:31 15            THE COURT:  I GUESS HE IS JUST TESTIFYING WHY HE APPLIED

03:31:33 16    THE DEPRECIATION FACTOR HE DID.  SINCE HE APPLIED ONE, HE CAN GIVE

03:31:37 17    HIS REASONS.  IF THE REASONS ARE BEYOND HIS EXPERTISE, THE COURT

03:31:40 18    WILL THEN CERTAINLY REALIZE WE'RE IN THE GESTALT METHOD, WHICH

03:31:48 19    SOMETIMES THAT'S WHERE WE ARE.  GO AHEAD.

03:31:50 20            THE WITNESS:  COULD YOU REPEAT THE QUESTION AGAIN,

03:31:52 21    PLEASE?

03:31:53 22    BY MS. LONIAN:

03:31:53 23    Q.  WHY DID YOU FIND IT UNUSUAL THAT THE LIVERS' AGES FOR THEIR

03:31:57 24    ITEMS WERE ALL LESS THAN FIVE YEARS OLD?

03:32:00 25    A.  I WENT THROUGH THE STUDY OF BREAKING DOWN THE SCOTT TAYLOR

03:32:08  1   WORKSHEET, WHEREAS 35 ITEMS WERE PURCHASED WITHIN A THREE-YEAR

03:32:16  2   PERIOD AT A $30,000 VALUE, 31 ITEMS WERE A YEAR OLD, HAD A VALUE OF

03:32:22  3   $7,500, NINE ITEMS THAT WERE PURCHASED FIVE YEARS AGO HAD A VALUE

03:32:27  4   OF $22,000.

03:32:29  5          THE OTHER POINT WAS THERE WERE MULTIPLE INCONSISTENCIES

03:32:35  6   BETWEEN THE SCOTT TAYLOR INVENTORY AND THE INVENTORIES SUBMITTED BY

03:32:41  7   THE PLAINTIFF.  WHERE THE PLAINTIFF MAY HAVE LISTED AN ITEM AS

03:32:45  8   BEING SEVEN YEARS OLD -- WHERE THE PLAINTIFFS MAY HAVE LISTED AN

03:32:52  9   ITEM BEING PURCHASED IN 1998, SCOTT TAYLOR LISTED THE ITEM AS BEING

03:32:56 10   SEVEN YEARS OLD.  SO THERE WAS MULTIPLE DISCREPANCIES.

03:33:00 11   Q.  GENERALLY SPEAKING, I GUESS, ABSENT UNUSUAL CIRCUMSTANCES, IT

03:33:06 12   WOULD BE UNCOMMON IN YOUR EXPERIENCE FOR SOMEONE WHOSE LIVED IN A

03:33:11 13   HOUSE FOR 30 YEARS TO NOT HAVE ANY ITEMS THAT WERE MORE THAN A FEW

03:33:16 14   YEARS OLD?

03:33:16 15          THE COURT:  THIS DOESN'T TAKE AN EXPERT.  YOU CAN ARGUE

03:33:18 16   THAT IN A BRIEF.

03:33:19 17          MS. LONIAN:  OKAY.

03:33:21 18   BY MS. LONIAN:

03:33:21 19   Q.  AM I CORRECT THAT DOESN'T NECESSARILY --

03:33:23 20          THE COURT:  MR. LIVERS WAS ON THE STAND.  YOU COULD HAVE

03:33:25 21   ASKED HIM ABOUT IT.  MR. LIVERS -- HAD AN OPPORTUNITY TO CROSS HIM,

03:33:32 22   I DON'T WANT TO GET IT THROUGH THIS GENTLEMAN.  LET'S MOVE ON.

03:33:35 23          MS. LONIAN:  I AM CORRECT THAT YOU'RE NOT NECESSARILY

03:33:37 24   CONCLUDING THAT THE LIVERS WERE BEING DISHONEST, BUT THIS IS

03:33:40 25   SOMETHING --

03:33:40   1          THE COURT:  I AM SAYING, COUNSEL, THE OBJECTION IS

03:33:42   2   SUSTAINED.  YOU HAD A CHANCE TO CROSS-EXAMINE MR. LIVERS.  I DON'T

03:33:47   3   WANT TO HEAR HIS TESTIMONY ON THIS.

03:33:49   4          MS. LONIAN:  I JUST WANTED TO ESTABLISH --

03:33:50   5          THE COURT:  I DON'T WANT TO HEAR HIS TESTIMONY ON WHETHER

03:33:52   6   HE THINKS IT'S UNUSUAL OR NOT.

03:33:54   7          MS. LONIAN:  OKAY.

03:33:55   8          THE COURT:  I HOPE THAT'S CLEAR, COUNSEL.

03:34:05   9   BY MS. LONIAN:

03:34:05  10   Q.  BUT BECAUSE YOU DID GET AGES, YOU WERE ABLE TO DETERMINE

03:34:08  11   LINE-BY-LINE DEPRECIATION AND DETERMINE WHAT YOU CONSIDERED TO BE

03:34:11  12   FAIR MARKET VALUE, CORRECT?

03:34:12  13   A.  YES.

03:34:12  14   Q.  AND THAT NUMBER IS $29,287.44, CORRECT?

03:34:17  15   A.  YES.

03:34:17  16   Q.  AND THE BLANKET -- THE NUMBER FOR WHICH YOU GOT AFTER YOU

03:34:22  17   APPLIED 50 PERCENT BLANKET DEPRECIATION WAS $19,378.14, CORRECT?

03:34:27  18   A.  YES.

03:34:28  19   Q.  AND BY COMPARISON OF THIS NUMBER -- OF THESE TWO NUMBERS, THIS

03:34:32  20   WOULD BE EVIDENCE OF THE FACT THAT IF YOU HAD APPLIED LINE-BY-LINE

03:34:36  21   DEPRECIATION, YOU WOULD HAVE ACTUALLY GET A HIGHER NUMBER THAN

03:34:39  22   BLANKET DEPRECIATION, CORRECT?

03:34:40  23   A.  DEFINITELY.

03:34:41  24   Q.  AND IN YOUR OPINION, WOULD THAT HAVE PROBABLY BEEN TRUE FOR ALL

03:34:43  25   OF THE PLAINTIFFS, CORRECT?

03:34:44  1    A.  THE PLAINTIFFS WOULD HAVE BENEFITED FROM THAT PROCESS.

03:34:47  2    Q.  AND IN YOUR OPINION --

03:34:49  3         THE COURT:  WOULD THE PLAINTIFFS HAVE BENEFITTED FROM

03:34:52  4    WHAT PROCESS?

03:34:53  5         THE WITNESS:  FROM THE PROCESS OF HAVING MORE INFORMATION

03:34:54  6    PROVIDED SUCH AS AGE AND DESCRIPTION.

03:34:56  7         THE COURT:  I UNDERSTAND.

03:34:58  8    BY MS. LONIAN:

03:35:00  9    Q.  BUT IT'S YOUR OPINION SCOTT TAYLOR'S REPORTS DON'T ACTUALLY

03:35:04 10    CONTAIN ENOUGH INFORMATION FOR YOU TO CALCULATE THE FAIR MARKET

03:35:07 11    VALUE FOR THE REST OF THE PLAINTIFFS, CORRECT?

03:35:08 12    A.  CORRECT.

03:35:09 13         MR. JOSH PALMINTIER:  OBJECTION.  IT SEEMS LIKE THE ONLY

03:35:12 14    REASON FOR HIM TO BE UP ON THE STAND RIGHT NOW IS FOR A CRITIQUE OF

03:35:16 15    SCOTT TAYLOR'S OPINIONS, AND I THINK THAT'S BEYOND THE SCOPE OF HIS

03:35:20 16    EXPERTISE.

03:35:20 17         THE COURT:  I AM GOING TO OVERRULE YOUR OBJECTION.

03:35:23 18    BY MS. LONIAN:

03:35:24 19    Q.  AND MR. WASHINGTON WAIVED HIS CLAIMS FOR ALE CONTENTS, SO WE'RE

03:35:28 20    NOT GOING TO DISCUSS THAT FOR HIM.

03:35:31 21    A.  RIGHT.

03:35:31 22    Q.  WITH REGARD TO ADDITIONAL LIVING EXPENSES, WHAT IS YOUR

03:35:36 23    DEFINITION OF ADDITIONAL LIVING EXPENSES?

03:35:37 24    A.  ADDITIONAL LIVING EXPENSES ARE THOSE EXPENSES THAT ARE INCURRED

03:35:41 25    OVER AND ABOVE THE NORMAL AND USUAL AND CUSTOMARY EXPENSES

PRE-EVENT.

Q.  HOW DO YOU GO ABOUT DETERMINING A HOMEOWNER'S TYPICAL PRE-LOSS

HOUSEHOLD EXPENSES ON A MONTHLY BASIS?

A.  NORMALLY, I WOULD SIT DOWN WITH THEM AND ASK THEM ABOUT THEIR

MONTHLY BUDGET, MORTGAGE, UTILITIES, FOOD, ENTERTAINMENT, REPAIRS

TO THEIR HOME, AND ESTABLISH A MONTHLY BUDGET.  THEN I WOULD LOOK

AT THE ESTIMATED TIME OF REPAIR FOR THE DWELLING.  ALSO, CALCULATE

OUT THOSE EXPENSES THAT THEY ARE NOW GOING TO INCUR BECAUSE THEY'VE

LOST THE USE OF THEIR HOME.

Q.  AND I TAKE IT YOU WOULD EMPLOY A SIMILAR PRACTICE FOR

DETERMINING THEIR POST-LOSS NUMBERS AS WELL?

A.  CORRECT.

Q.  AND IN REVIEWING THE INSURANCE FILES, YOU WERE LOOKING FOR

INVOICES OR REPRESENTATIONS THE PLAINTIFFS MADE TO THEIR INSURANCE

COMPANIES REGARDING THEIR POST-LOSS EXPENSES, CORRECT?

A.  DEFINITELY.

Q.  AND THAT'S BECAUSE YOU BELIEVE THAT THEIR MEMORY ABOUT THESE

ISSUES WOULD HAVE BEEN BETTER CLOSER TO THE EVENT THAN THEY ARE

NOW?

A.  CORRECT.

Q.  AND YOU'RE ALSO LOOKING FOR INFORMATION THAT THEY MAY HAVE

RECEIVED REGARDING ANY PAYMENTS THAT THEY GOT FOR GRANTED ALE,

CORRECT?

A.  CORRECT.

Q.  I TAKE IT IN YOUR ANALYSIS YOU DON'T ACTUALLY EXPECT THE

03:37:02  1    PLAINTIFFS TO HAVE KEPT ALL OF THEIR INVOICES AND RECEIPTS SIX OR

03:37:05  2    SEVEN YEARS LATER, CORRECT?

03:37:06  3    A.  NO, I DON'T.

03:37:07  4    Q.  BUT YOU DO USE ANY INVOICES OR RECEIPTS THAT THEY DID PROVIDE

03:37:11  5    TO EXTRAPOLATE A REASONABLE FIGURE AND TO FILL IN ANY GAPS IN THE

03:37:15  6    INVOICES OR RECEIPTS, CORRECT?

03:37:17  7    A.  CORRECT.

03:37:18  8    Q.  AND YOU ALSO RELY ON THEIR -- YOU'VE RELIED ON THEIR DEPOSITION

03:37:22  9    TESTIMONY REGARDING THEIR BEST RECOLLECTION OF WHAT THEIR PRE- AND

03:37:25 10    POST-KATRINA EXPENSES WERE, CORRECT?

03:37:26 11    A.  YES, I DID.

03:37:27 12    Q.  AND GOING SPECIFICALLY TO THE ARMSTRONGS.  YOU CALCULATED AN

03:37:32 13    ALE -- ACTUALLY, FOR THE ARMSTRONGS AND FOR ALL THE PLAINTIFFS, YOU

03:37:35 14    CALCULATED ALE USING THE TECHNIQUES AND ANALYSIS YOU JUST

03:37:38 15    DESCRIBED, CORRECT?

03:37:39 16    A.  YES.

03:37:39 17    Q.  AND YOU REVIEWED THE ARMSTRONGS' INSURANCE FILE AND YOU SAW THE

03:37:44 18    ARMSTRONGS ACTUALLY DID PROVIDE RECEIPTS TO THEIR HOMEOWNERS

03:37:48 19    INSURANCE COMPANY, RIGHT?

03:37:49 20    A.  YES, THEY DID SUPPLY SOME RECEIPT.

03:37:51 21    Q.  YOU USED THE INVOICES TO GET A BETTER SENSE OF WHAT THEIR

03:37:54 22    POST-KATRINA NORMAL HOUSEHOLD EXPENSES WERE, CORRECT?

03:37:57 23    A.  REPEAT THAT QUESTION, COUNSEL.

03:37:58 24    Q.  YOU USED THOSE INVOICES TO GET A BETTER SENSE OF WHAT THEIR

03:38:02 25    NORMAL HOUSEHOLD EXPENSES WERE AFTER KATRINA, CORRECT?

03:38:05  1    A.   AFTER KATRINA, YES.

03:38:07  2    Q.   AND YOU CALCULATED ALE FOR THE ARMSTRONGS FOR A PERIOD OF SIX

03:38:11  3    MONTHS.   IS THAT BECAUSE YOU DETERMINED THAT THE ARMSTRONGS HAD

03:38:14  4    PERMANENTLY RELOCATED AFTER SIX MONTHS, CORRECT?

03:38:16  5    A.   CORRECT.

03:38:17  6    Q.   AND WHY DOES THE ALE STOP ONCE A HOMEOWNER PERMANENTLY

03:38:21  7    RELOCATES?

03:38:22  8    A.   THEY HAVE THE OPTION OF -- AGAIN, I SAID EARLIER, THE ESTIMATED

03:38:25  9    TIME OF REPAIR WHEN THE HOME IS AVAILABLE FOR THEM TO MOVE IN OR

03:38:28 10    RELOCATION, BECAUSE AT THE POINT OF RELOCATION, THEIR CUSTOMARY AND

03:38:34 11    USUAL -- USUAL AND CUSTOMARY EXPENSES COMMENCE AT THAT POINT.

03:38:37 12    Q.   AND IT'S YOUR OPINION THAT THE ADDITIONAL LIVING EXPENSES FOR

03:38:40 13    THE ARMSTRONGS TOTALED $1,215.01 WHICH IS THE TOTAL AMOUNT OF THEIR

03:38:46 14    ALE MINUS THE AMOUNT THAT THEY WERE PAID FOR THEIR HOMEOWNERS

03:38:50 15    INSURER FOR WHEN IT GRANTED ALE, CORRECT?

03:38:53 16    A.   THAT'S MY CALCULATION, YES.

03:38:54 17         THE COURT:   WHERE DOES THE SIX-MONTH PERIOD COME FROM?

03:38:57 18         THE WITNESS:   THE SIX-MONTH PERIOD COMES FROM THE TIME

03:38:59 19    WHEN THEY RENTED AN APARTMENT, I BELIEVE, ALL THE WAY UP THROUGH --

03:39:04 20    FROM DECEMBER THROUGH MAY OF 2006.   AND IN MAY OF 2006, THEY

03:39:10 21    ESTABLISHED A PERMANENT RESIDENCY FOR THEIR DAUGHTER, FOR ONE OF

03:39:13 22    THEIR CHILDREN'S SCHOOLING TO CONTINUE SCHOOLING.

03:39:16 23         THE COURT:   ALL RIGHT.   GO AHEAD.

03:39:18 24    BY MS. LONIAN:

03:39:19 25    Q.   IN MOVING ON TO MRS. COATS.   YOU CONCLUDED THAT MS. COATS

03:39:22  1   DIDN'T INCUR ANY ALE AS A RESULT OF KATRINA, CORRECT?

03:39:25  2   A.  CORRECT.

03:39:25  3   Q.  AND REVIEWING HER DEPOSITION TESTIMONY AND THAT OF MR. MORGAN,

03:39:32  4   CONCLUDED THAT MRS. COATS' EXPENSES AND HER CHARBONNET HOUSE DIDN'T

03:39:37  5   CONTINUE AFTER KATRINA, CORRECT?

03:39:38  6   A.  THAT'S MY UNDERSTANDING.

03:39:39  7   Q.  AND IT'S YOUR OPINION THAT MS. COATS ESTABLISHED A PERMANENT

03:39:42  8   RESIDENCE IN MAY 2006 IN NEW ORLEANS, CORRECT?

03:39:44  9   A.  YES.

03:39:45 10   Q.  AND IT'S YOUR UNDERSTANDING, BASED ON YOUR REVIEW OF THE

03:39:47 11   DEPOSITION TESTIMONY, THAT THE HOUSE THAT -- OR THE CONDO THAT SHE

03:39:50 12   MOVED INTO IN MAY 2006, WAS STILL HER ADDRESS AT THE TIME HE PASSED

03:39:55 13   AWAY IN 2009, CORRECT?

03:39:56 14   A.  THAT'S MY UNDERSTANDING.

03:39:57 15   Q.  AND MOVING ON TO MR. HOLMES --

03:39:59 16           THE COURT:  LET ME ASK YOU A QUESTION.  DOES PURCHASING

03:40:02 17   CLOTHES COUNT AS ADDITIONAL LIVING EXPENSES, ADDITIONAL GASOLINE?

03:40:06 18           THE WITNESS:  YES, YOUR HONOR.

03:40:07 19           THE COURT:  OKAY.  GO AHEAD.

03:40:10 20   BY MS. LONIAN:

03:40:10 21   Q.  AND MOVING ON TO MR. HOLMES.  IT'S YOUR OPINION THAT THE

03:40:15 22   HOLMES' INCURRED SIX -- SORRY, $6,550 IN ALE, CORRECT?

03:40:21 23   A.  YES.

03:40:22 24   Q.  IT'S YOUR OPINION THAT THE HOLMES' UTILITY EXPENSES FOR THE

03:40:25 25   PERRIN DRIVE ADDRESS DID NOT CONTINUE AFTER KATRINA, CORRECT?

03:40:28  1    A.   YES.

03:40:28  2    Q.   AND IT'S YOUR CONCLUSION, BASED ON YOUR REVIEW OF THEIR

03:40:31  3    DEPOSITION TESTIMONY AND ALSO THEIR TESTIMONY HERE IN COURT, THAT

03:40:33  4    THE HOLMES' PERMANENT RELOCATED IN JANUARY OF 2006, CORRECT?

03:40:37  5    A.   YES.

03:40:38  6    Q.   AND IS IT YOUR UNDERSTANDING THAT THE HOUSE THAT THEY MOVED

03:40:41  7    INTO IN JANUARY OF 2006 OR THEREABOUTS IN SPRING TEXAS IS THE SAME

03:40:46  8    HOUSE THAT THEY LIVE IN TODAY?

03:40:46  9    A.   IT IS MY UNDERSTANDING, YES.

03:40:48 10    Q.   AND WITH REGARD TO MR. LIVERS, IS IT YOUR OPINION THAT

03:41:00 11    MR. LIVERS' ADDITIONAL LIVING EXPENSES TOTALLED $5,396.89, YOUR

03:41:05 12    HONOR -- I'M SORRY.   EXCUSE ME, MR. SCHNEIDER?

03:41:07 13    A.   YES.

03:41:07 14    Q.   AND YOU DETERMINED THAT IN JANUARY 2006, THE LIVERS, BASED ON

03:41:12 15    THEIR DEPOSITION TESTIMONY, HAD DETERMINED NOT TO RETURN TO THEIR

03:41:15 16    PRE-KATRINA ADDRESS, CORRECT?

03:41:16 17    A.   YES.

03:41:17 18    Q.   AND IN ANY EVENT, YOU DETERMINED THAT THE LIVERS PERMANENTLY

03:41:20 19    RELOCATED IN APRIL 2006, CORRECT?

03:41:23 20    A.   YES.

03:41:23 21    Q.   AND IT'S YOUR UNDERSTANDING, BASED ON THEIR DEPOSITION

03:41:26 22    TESTIMONY AND MR. LIVERS' TESTIMONY IN COURT, THAT THE HOUSE THAT

03:41:29 23    THEY MOVED INTO IN APRIL OF 2006 IS THE SAME HOUSE THAT THEY'RE

03:41:33 24    LIVING IN TODAY?

03:41:33 25    A.   THAT'S MY UNDERSTANDING.

03:41:34   1   Q.  AND IS IT YOUR OPINION THAT THE -- THAT ANY OF THE PLAINTIFFS

03:41:39   2   ACTUALLY INCURRED THE AMOUNT OF ALE THAT SCOTT TAYLOR CALCULATED ON

03:41:43   3   THEIR BEHALF?

03:41:43   4   A.  IT'S MY OPINION THAT THE SCOTT TAYLOR ADDITIONAL LIVING EXPENSE

03:41:51   5   20 PERCENT APPLICATION IS MORE FOR UNDERWRITING PURPOSES AS A

03:41:55   6   PERCENTAGE OF THE VALUE OF COVERAGE A AND NOT NECESSARILY --

03:42:00   7            MR. JOSH PALMINTIER:  OBJECTION, YOUR HONOR.

03:42:01   8            THE WITNESS:  -- REPRESENTING EXPENSES INCURRED.

03:42:04   9            THE COURT:  YES, SIR.

03:42:05  10            MR. JOSH PALMINTIER:  I THINK THIS GOES WELL BEYOND HIS

03:42:07  11   AREA OF EXPERTISE AS A CONSULTANT IN CONTENTS WHEN HE STARTS

03:42:10  12   TALKING ABOUT INSURANCE POLICIES AND WHAT AMOUNTS GO TO CERTAIN

03:42:16  13   PORTIONS OF THOSE POLICIES.

03:42:19  14            THE COURT:  COUNSEL, DO YOU WANT TO RESPOND?

03:42:20  15            MS. LONIAN:  YES, YOUR HONOR.  I THINK HE SPECIFICALLY

03:42:22  16   TESTIFIED EARLIER HE WAS ASKED TO ADDRESS MR. TAYLOR'S OPINIONS

03:42:27  17   AND, FRANKLY, YOUR HONOR, I WAS ABOUT TO REASK THE QUESTION BECAUSE

03:42:29  18   THE QUESTION WAS ACTUALLY WHETHER OR NOT THERE WAS ANY EVIDENCE

03:42:31  19   BASED ON HIS REVIEW OF THE DOCUMENTS THAT THE PLAINTIFFS HAD

03:42:34  20   ACTUALLY INCURRED THE AMOUNTS THAT MR. TAYLOR CALCULATED ON THEIR

03:42:39  21   BEHALF.

03:42:41  22            MR. JOSH PALMINTIER:  I DON'T KNOW IF I HAVE AN OBJECTION

03:42:42  23   TO THAT QUESTION.

03:42:43  24            THE COURT:  WELL, IF YOU DO, IT WOULD BE OVERRULED.  SHE

03:42:46  25   MAY HAVE ASKED THAT ALREADY, BUT DO YOU WANT TO ASK THAT AGAIN?

03:42:48  1          MS. LONIAN:  YES.

03:42:50  2   BY MS. LONIAN:

03:42:50  3   Q.  MR. SCHNEIDER, IS THERE ANY EVIDENCE THAT YOU WERE ABLE TO FIND

03:42:52  4   THAT ANY OF THE PLAINTIFFS ACTUALLY INCURRED THE ALE EXPENSE THAT

03:42:56  5   MR. TAYLOR CALCULATED ON THEIR BEHALF?

03:42:57  6   A.  NO.

03:42:58  7   Q.  AND DID YOU FIND ANY EVIDENCE THAT ANY OF THE PLAINTIFFS HAD

03:43:09  8   ACTUALLY BEEN DISPLACED FOR A YEAR AS MR. TAYLOR ASSUMES IN HIS ALE

03:43:13  9   CALCULATIONS OR PERMANENTLY DISPLACED FOR A YEAR -- LET ME REDO

03:43:19 10   THAT.

03:43:20 11          DID YOU FIND ANY EVIDENCE THAT ANY OF THESE PLAINTIFFS

03:43:23 12   HAD ACTUALLY BEEN DISPLACED FOR A YEAR AS MR. TAYLOR ASSUMES IN HIS

03:43:27 13   CALCULATION?

03:43:27 14   A.  NO.

03:43:28 15   Q.  AND --

03:43:34 16          MS. LONIAN:  ACTUALLY, I'LL WITHDRAW THE QUESTION.  I

03:43:36 17   HAVE NO MORE QUESTIONS ON DIRECT.

03:43:38 18          THE COURT:  THANK YOU VERY MUCH, COUNSEL.  DOES THE

03:43:40 19   UNITED STATES HAVE ANY QUESTIONS?

03:43:41 20          MR. MCCONNON:  NO, YOUR HONOR.

03:43:42 21          THE COURT:  I THINK WE WILL TAKE -- IT'S QUARTER TO FOUR,

03:43:46 22   WE WILL TAKE JUST A BRIEF RECESS.  TEN MINUTES AT THE MOST.

03:43:50 23      (WHEREUPON, A RECESS WAS TAKEN.)

03:53:11 24          THE DEPUTY CLERK:  COURT'S IN SESSION, PLEASE BE SEATED.

03:53:18 25          THE COURT:  YES, SIR.

CROSS-EXAMINATION

BY MR. JOSH PALMINTIER:

Q.  MR. SCHNEIDER, TO START OFF I WOULD LIKE TO GO OVER SOMETHING

YOU JUST MENTIONED IN YOUR DIRECT IN TERMS OF ONE OF THE CONTENTS

LISTING IN THE LIVERS, SOMETHING ABOUT AN ITEM BEING SEVEN YEARS

OLD ON SCOTT TAYLOR'S REPORT AND LISTED AS 1998 FROM THE CONTENTS

LIST THAT WAS GIVEN TO SCOTT TAYLOR BY THE LIVERS.  IS THAT

CORRECT?

A.  YES.

Q.  AND IF THE ITEM WAS LOST IN 2005, DOESN'T THAT MAKE IT SEVEN

YEARS OLD?

A.  NO, I WAS REFERRING TO THE PURCHASE TIME WHERE THE HOMEOWNER

LISTED THE ITEM AS PURCHASED IN -- WELL, YEAH, I GUESS YOU'RE

RIGHT, SEVEN YEARS OLD.

Q.  I JUST WANTED TO CLARIFY THAT.

A.  GOOD POINT.

Q.  NOW, IN ADDITION TO THAT I HEARD IN YOUR DIRECT THAT YOU FOUND

THE 50 PERCENT DEPRECIATION RULE TO BE USUAL AND CUSTOMARY IN YOUR

INDUSTRY; IS THAT CORRECT?

A.  CORRECT.

Q.  NOW, DO YOU REMEMBER GIVING YOUR DEPOSITION, APRIL 16TH, 2012?

A.  I KNOW EXACTLY WHAT YOU'RE GOING TO REFER TO, GO AHEAD.

Q.  CARL, PX 0682, AND THIS IS PAGE 119.  "SO IN A SITUATION WHERE

THERE'S NO DOCUMENTATION, NO REASONABLE DOCUMENTATION, YOU BELIEVE

THAT IT IS NOT USUAL AND CUSTOMARY, BUT REASONABLE TO DEPRECIATE

03:55:24 1   CONTENTS BY 50 PERCENT ACROSS THE BOARD?  IS THAT CORRECT?

03:55:33 2   A.  I SEE I SAID THAT, YES.

03:55:34 3   Q.  DO YOU THINK THAT IT'S REASONABLE OR DO YOU THINK IT'S USUAL

03:55:38 4   AND CUSTOMARY NOW?  ARE YOU CHANGING YOUR TESTIMONY IS WHAT I'M

03:55:43 5   ASKING?

03:55:44 6   A.  IF I SAID THAT IT'S REASONABLE THEN IT'S REASONABLE.

03:55:49 7   Q.  IS IT USUAL AND CUSTOMARY WITHIN YOUR INDUSTRY?  WE CAN MOVE

03:56:00 8   ON.

03:56:01 9   A.  WELL I -- THANK YOU.

03:56:04 10  Q.  YOU REVIEWED A NUMBER OF DOCUMENTS, ONE WAS THE DENSON

03:56:11 11  ENGINEERING REPORT, BUT THIS WAS ONLY A DOCUMENT THAT YOU REVIEWED,

03:56:13 12  YOU DIDN'T RELY ON IT FOR PURPOSES OF FINAL DETERMINATION OF

03:56:18 13  DAMAGES TO CONTENTS OR ALE; IS THAT CORRECT?

03:56:22 14  A.  I DIDN'T RELY ON IT, CORRECT.

03:56:23 15  Q.  NOW, LET'S CONCENTRATE ON YOUR METHODOLOGY FOR THE CONTENTS

03:56:31 16  FIRST.  YOU DIDN'T MAKE AN INDEPENDENT DETERMINATION AS TO

03:56:35 17  CAUSATION OF DAMAGES TO CONTENTS BEING WIND AND RAIN AS OPPOSED TO

03:56:38 18  FLOOD, DID YOU?

03:56:39 19  A.  I RELIED ON MATERIAL THAT WAS SUPPLIED TO ME.

03:56:43 20  Q.  YOU, GENERALLY SPEAKING, WHAT YOU DID IS YOU TOOK VARIOUS WIND

03:56:49 21  AND RAIN INSURANCE FILES, COURT PROCEEDINGS, AND POSSIBLY

03:56:54 22  STATEMENTS MADE BY PLAINTIFFS CONCERNING WHETHER AN ITEM WAS

03:56:58 23  DAMAGED BY WIND AND RAIN AND THEN YOU REDACTED THOSE FROM THE SCOTT

03:57:02 24  TAYLOR CONTENTS LIST; IS THAT CORRECT?

03:57:04 25  A.  YES.

03:57:04  1   Q.  AND YOU DID THIS ALTHOUGH YOU KNEW THE HOMEOWNERS WERE NOT

03:57:12  2   PRESENT DURING KATRINA OR CLOSE AFTER THE TIME OF LOSS; IS THAT

03:57:15  3   CORRECT?

03:57:16  4   A.  I RELIED ON THE HOMEOWNERS --

03:57:18  5   Q.  CAN YOU GIVE ME A YES OR NO FIRST.  THANK YOU.

03:57:21  6   A.  REPEAT THE QUESTION, PLEASE.

03:57:22  7   Q.  OKAY.  YOU DID THIS EVEN THOUGH YOU KNEW THAT THE HOMEOWNERS

03:57:26  8   WERE NOT PRESENT DURING KATRINA OR SHORTLY THEREAFTER AT THE TIME

03:57:30  9   OF THE LOSS; IS THAT CORRECT?

03:57:32 10   A.  YES.

03:57:40 11   Q.  AND YOU DID THIS REGARDLESS OF WHETHER THE HOMEOWNER RECEIVED

03:57:43 12   PAYMENT FOR THE ITEM LISTED FROM THEIR WIND AND RAIN CARRIER; IS

03:57:46 13   THAT CORRECT?

03:57:47 14   A.  NOT NECESSARILY.

03:57:50 15   Q.  CAN YOU EXPLAIN THAT?

03:57:52 16   A.  THE ITEMS THAT THE HOMEOWNERS MAY HAVE LISTED AS WIND AND RAIN

03:58:01 17   OR CLAIMED THE ITEMS AS WIND AND RAIN IN REVIEWING THE INSURANCE

03:58:06 18   FILES I DID ATTEMPT TO VERIFY IF THE HOMEOWNERS DID, IN FACT, GET

03:58:13 19   PAID FOR THE WIND AND RAIN ITEM AS THEY CLAIMED.

03:58:16 20   Q.  DO YOU REMEMBER GIVING YOUR DEPOSITION?

03:58:18 21   A.  GO AHEAD.

03:58:19 22   Q.  PX 0682, PAGE 253.  "DID YOU ALSO TAKE INTO CONSIDERATION THE

03:58:50 23   FACT THAT THOSE HOMEOWNER INSURERS ACTUALLY PAID THESE CLAIMANTS

03:58:54 24   POLICY PROCEEDS ON THEIR CLAIM S FOR WIND AND RAIN?  I AM AWARE OF

03:58:57 25   THE FACT THAT THEY RECEIVED FUNDS FOR ITEMS CLAIMED UNDER WIND AND

03:59:00  1    RAIN, BUT I BELIEVE FROM FOR MY PURPOSES IN ESTABLISHING FLOOD

03:59:04  2    DAMAGE I BROKE OUT THOSE ITEMS CLAIMED FOR WIND AND RAIN REGARDLESS

03:59:07  3    OF WHETHER THEY GOT PAID BY THEIR INSURANCE CARRIER OR NOT."  IS

03:59:12  4    THAT A TRUE STATEMENT?

03:59:13  5    A.  I SAID THAT, YES.

03:59:14  6    Q.  AND YOU DIDN'T HAVE ANY KNOWLEDGE ABOUT THE HOMEOWNER AND THE

03:59:28  7    HOMEOWNER'S ABILITY TO DETERMINE CAUSATION IN THIS MATTER, DID YOU?

03:59:32  8    A.  NO.

03:59:33  9    Q.  AND YOU DID THIS WITHOUT CONSIDERATION OF THE SAME ITEMS THAT

03:59:42 10    WERE LISTED IN THE TAYLOR REPORT AS DAMAGED BY FLOOD WATER; IS THAT

03:59:47 11    CORRECT?

03:59:47 12    A.  DID WHAT?

03:59:51 13    Q.  YOU DIDN'T GIVE CONSIDERATION TO THE FACT THAT SOME OF THESE

03:59:54 14    SAME ITEMS WERE ACTUALLY LISTED IN THE TAYLOR REPORT AS BEING

03:59:58 15    DAMAGED BY FLOOD, DID YOU?

03:59:59 16    A.  CONSIDERATION IN THE FACT THAT THEY WERE FIRST LISTED AS WIND

04:00:04 17    AND RAIN AND THEN LISTED AS FLOOD?

04:00:06 18    Q.  WELL, IT SEEMS THAT YOU ARE CHERRY PICKING THOSE ITEMS OR THOSE

04:00:14 19    STATEMENTS BY PLAINTIFFS IN REFERENCE TO CONTENTS LISTS; IS THAT

04:00:17 20    CORRECT?

04:00:17 21    A.  I WOULDN'T CALL IT CHERRY PICKING, I WOULD CALL IT RELYING ON

04:00:21 22    HANDWRITTEN DOCUMENTATION THAT THE HOMEOWNERS SUPPLIED.

04:00:24 23    Q.  AND THE SCOTT TAYLOR CONTENTS LIST, THOSE WERE SUPPLIED BY THE

04:00:29 24    HOMEOWNERS AS WELL, WEREN'T THEY, SIR?

04:00:31 25    A.  I AM SURE THEY WERE.

04:00:33  1    Q.  YOU ASSUMED THAT THE DECISION WHICH ITEMS WERE DAMAGED BY FLOOD

04:00:45  2    AND WHICH ITEMS WERE DAMAGED BY WIND AND RAIN HAD ALREADY BEEN

04:00:49  3    MADE; IS THAT CORRECT?

04:00:50  4    A.  I DIDN'T ASSUME, I MADE THAT DETERMINATION AFTER REVIEWING

04:00:57  5    DOCUMENTATION.

04:00:58  6    Q.  DID YOU MAKE THE DETERMINATION OF CAUSATION IN THIS MATTER?

04:01:01  7    A.  I DIDN'T MAKE THE DETERMINATION OF CAUSATION, BUT I RELIED

04:01:04  8    SOLELY ON WHAT THE PLAINTIFFS CLAIMED, HOW THEY PRESENTED THEIR

04:01:09  9    CLAIM, BOTH TO THE INSURANCE COMPANY AND TO SCOTT TAYLOR.

04:01:11  10   Q.  AND, IN FACT, THE MERE FACT THAT THE HOMEOWNER LISTED AN ITEM

04:01:14  11   ON A CLAIM FOR WIND AND RAIN, THAT WAS ENOUGH FOR YOU TO REDACT IT

04:01:17  12   FROM THE SCOTT TAYLOR REPORT, CORRECT?

04:01:19  13   A.  WHY WOULDN'T I BELIEVE THE PLAINTIFF?

04:01:21  14   Q.  YES OR NO ANSWER FIRST.

04:01:23  15   A.  REPEAT THE QUESTION, PLEASE.

04:01:27  16   Q.  THE MERE FACT THAT THE HOMEOWNERS LISTED AN ITEM ON A WIND AND

04:01:33  17   RAIN LIST WAS ENOUGH FOR YOU TO REDACT IT FROM THE SCOTT TAYLOR

04:01:37  18   REPORT, CORRECT?

04:01:38  19   A.  YES.

04:01:38  20   Q.  AFTER YOU HAD REDACTED CERTAIN ITEMS BASED ON WIND AND RAIN,

04:01:51  21   YOU THEN TOOK YOUR LIST OF CATEGORIZED ITEMS AND PERFORMED WHAT YOU

04:01:57  22   CALL A VERIFICATION OF PRICES AS GIVEN BY THE HOMEOWNER TO SCOTT

04:02:01  23   TAYLOR; IS THAT CORRECT?

04:02:02  24   A.  CORRECT.

04:02:03  25   Q.  IN THIS CATEGORIZATION, JUST FOR THE RECORD, THIS

04:02:10  1   CATEGORIZATION OF THESE ITEMS, THAT'S NOT AN INDUSTRY STANDARD IS

04:02:15  2   IT?

04:02:15  3   A.  WHEN YOU SAY CATEGORIZATION, WHAT ARE YOU REFERRING TO?

04:02:18  4   Q.  I AM REFERRING TO THAT WHICH IS WITHIN YOUR REPORTS WHERE YOU

04:02:22  5   CATEGORIZED CERTAIN ITEMS INTO CERTAIN CLASSES OF ITEMS.

04:02:27  6   A.  LIKE HARD FURNITURE, SOFT FURNITURE?

04:02:29  7   Q.  CORRECT.  BUT DIDN'T YOU TAKE, YOU TOOK CERTAIN PORTIONS FROM

04:02:33  8   THE IICRC S500 AND THEN YOU ALSO TOOK CERTAIN CATEGORIES FROM OTHER

04:02:39  9   PLACES AND YOU COMBINED THEM ALL; IS THAT CORRECT?

04:02:42 10   A.  YES.

04:02:42 11   Q.  AND IS THAT AN INDUSTRY STANDARD?

04:02:45 12   A.  IT'S MY STANDARD.

04:02:46 13   Q.  FAIR ENOUGH.  IN FACT, YOUR VERIFICATION PROCESS WAS TO TAKE

04:02:56 14   THE THING, WHATEVER IT WAS, AND EITHER DECIDE ON YOUR OWN HOW MUCH

04:03:00 15   THAT THING WOULD COST OR YOU WENT TO WEB SITES TO FIND OUT HOW MUCH

04:03:03 16   THE THING WOULD COST AND THIS WAS DONE WITHOUT DISCUSSING THE ITEM

04:03:07 17   WITH THE HOMEOWNER WHATSOEVER; IS THAT CORRECT?

04:03:09 18   A.  YES.

04:03:10 19   Q.  SO YOU INITIALLY SUBTRACTED NUMEROUS ITEMS DUE TO STATEMENTS

04:03:16 20   FROM HOMEOWNERS AND/OR CONTENTS LISTS, YOU TOOK, AS STIPULATIONS

04:03:22 21   AND MADE BY THE PLAINTIFFS AS BEING DAMAGED BY WIND AND RAIN;

04:03:25 22   THAT'S CORRECT, ISN'T IT?

04:03:27 23   A.  IF THEY CLAIMED IT TO BE WIND AND RAIN I USED THAT INFORMATION,

04:03:32 24   YES.

04:03:32 25   Q.  YOU THEN DIMINISHED VALUE OF THE ITEMS LISTED IN SCOTT TAYLOR'S

04:03:40  1    REPORTS FURTHER BY PUTTING THE ITEM THROUGH YOUR SO-CALLED

04:03:44  2    VERIFICATION PROCESS, WHICH IN THE OVERWHELMING MAJORITY OF THE

04:03:47  3    CASES WAS LESS, SOMETIMES A GREAT DEAL LESS THAN WHAT WAS IN SCOTT

04:03:51  4    TAYLOR'S REPORT, CORRECT?

04:03:51  5    A.  WELL, IT'S INTERESTING THAT YOU USED THE WORD DIMINISH BECAUSE

04:03:56  6    THE PROCESS IS, IF IT WAS LACKING DESCRIPTION AND BASED -- AGAIN,

04:04:01  7    IF I SAY I HAVE A TABLE AND CHAIR, IT COULD BE $100, IT COULD BE

04:04:05  8    $1,000.  SO DIMINISH, IT WAS NOT A DELIBERATE ACT, IT WAS A

04:04:09  9    PROFESSIONAL APPROACH TO EVALUATION OF AN INFERIOR INVENTORY.

04:04:17 10    Q.  YOU HAVEN'T ANSWERED MY QUESTION.  DID YOU DIMINISH IT IN MOST

04:04:22 11    CASES GREATLY FROM THE ITEM -- PRICE ON SCOTT TAYLOR'S CONTENTS

04:04:33 12    LIST?

04:04:33 13    A.  YES.

04:04:33 14    Q.  IN YOUR METHODOLOGY THAT YOU USED IN YOUR VERIFICATION PROCESS

04:04:45 15    IS NOT AN INSURANCE INDUSTRY STANDARD, IS IT?

04:04:48 16    A.  IT GOES BEYOND THE SCOPE OF MY EXPERTISE.

04:04:55 17         MS. LONIAN:  I AM JUST GOING TO OBJECT TO THE EXTENT THAT

04:04:58 18    THEY'RE ASKING HIM QUESTIONS ABOUT THE INSURANCE INDUSTRY, THEY

04:05:01 19    OBJECTED ON REDIRECT WHICH HE ATTEMPTED TO OFFER A TESTIMONY ABOUT

04:05:05 20    THE INSURANCE INDUSTRY, HE IS A CONTENTS RESTORATION CONSULTANT AND

04:05:10 21    THEY'RE ASKING HIM ABOUT WHAT IS THE STANDARD OF THE INSURANCE

04:05:14 22    INDUSTRY.

04:05:15 23         THE COURT:  THE COURT NOTES THE OBJECTION, HE'S ANSWERED

04:05:17 24    THE QUESTIONS, SO MOVE ON.

04:05:22 25    BY MR. JOSH PALMINTIER:

04:05:23  1    Q.  NEXT YOU APPLIED WHAT YOU CALLED THE MK DEPRECIATED VALUE, BUT

04:05:28  2    THAT WAS JUST THIS 50 PERCENT BLANKET DEPRECIATION; ISN'T THAT

04:05:33  3    CORRECT?

04:05:33  4    A.  CORRECT.

04:05:35  5    Q.  AND THAT 50 PERCENT BLANKET DEPRECIATION WAS ON ALL ITEMS WITH,

04:05:42  6    IN REFERENCE TO EVERY PLAINTIFF; IS THAT CORRECT?

04:05:45  7    A.  THAT'S NOT CORRECT.

04:05:51  8    Q.  YOU DID IT FOR THE LIVERS AS WELL, DIDN'T YOU, THE 50 PERCENT

04:05:54  9    DEPRECIATION?  THAT WAS ONE OPTION, CORRECT?

04:05:58  10   A.  THERE WERE CERTAIN --

04:05:59  11   Q.  IN REFERENCE TO THE LIVERS REPORT.

04:06:01  12   A.  WELL, THE COATS ALSO WITH REFERENCE TO CLOTHING, THAT HAS A

04:06:05  13   LIFE EXPECTANCY, CHILDREN'S CLOTHING, OF ABOUT THREE YEARS, I

04:06:09  14   APPLIED A HIGHER PERCENTAGE OF DEPRECIATION THAN 50 PERCENT.

04:06:12  15   Q.  A HIGHER DEPRECIATION?

04:06:14  16   A.  SURE.

04:06:14  17   Q.  NOW THIS 50 PERCENT, IT WAS AN ARBITRARY FIGURE THAT YOU

04:06:26  18   APPLIED ACROSS THE BOARD ON CONTENTS, OTHER THAN THE COATS

04:06:31  19   CLOTHING; IS THAT CORRECT?

04:06:33  20   A.  CORRECT.

04:06:34  21   Q.  AND IN FACT THERE IS NO 50 PERCENT DEPRECIATION RULE IN THE

04:06:39  22   INDUSTRY FOR THOSE ITEMS THAT ARE UNSUBSTANTIATED, CORRECT?

04:06:43  23   A.  WHAT INDUSTRY ARE YOU REFERRING TO?

04:06:48  24   Q.  THE INSURANCE INDUSTRY.

04:06:49  25   A.  IT GOES BEYOND THE SCOPE OF MY EXPERTISE.

04:06:52  1              THE COURT:  HE DID IT, SO WITHIN HIS -- HOW ABOUT WITHIN

04:06:55  2    WHATEVER HIS EXPERTISE IS.

04:06:57  3    BY MR. JOSH PALMINTIER:

04:06:57  4    Q.  WELL, WITHIN CONSULTANT -- CONTENTS CONSULTANT?

04:07:01  5              THE COURT:  YES, WHERE DID IT COME FROM.

04:07:04  6              THE WITNESS:  WITHIN MY FIELD THAT'S THE APPLICATION,

04:07:06  7    YES, 50 PERCENT.

04:07:11  8              THE COURT:  AND IS THERE ANY LITERATURE ON THAT?  HOW DO

04:07:19  9    YOU DERIVE AT THE TERM 50 PERCENT?

04:07:20 10              THE WITNESS:  WELL, YOUR HONOR, 50 PERCENT REALLY IS A

04:07:24 11    MEDIUM OF ESTABLISHING SOMEWHAT OF A VALUE LACKING ADEQUATE

04:07:32 12    INFORMATION TO COME UP WITH A TRUE VALUE, PRE-LOSS VALUE.  AND IT'S

04:07:38 13    USUALLY TO STIMULATE THE HOMEOWNER INTO PROVIDING ADDITIONAL

04:07:43 14    INFORMATION.  SO IT'S A BENCHMARK.

04:07:45 15              THE COURT:  ALL RIGHT.  OKAY.

04:07:45 16    BY MR. JOSH PALMINTIER:

04:07:46 17    Q.  AND, IN FACT, IT'S MORE OF A NEGOTIATING PLOY OR NEGOTIATING

04:07:49 18    TOOL, ISN'T IT?

04:07:50 19    A.  IT CAN BE.

04:07:51 20    Q.  AND YOU WOULD USE THIS 50 PERCENT OFFER OF CLAIM AS A MEANS OF

04:08:00 21    EXPEDITING A SETTLEMENT, CORRECT?

04:08:03 22    A.  AM I ANSWERING THAT AS A CONSULTANT, A CONTENTS CONSULTANT?

04:08:17 23    Q.  YES.

04:08:17 24    A.  I DON'T SETTLE LOSSES AS A CONSULTANT, CONTENTS CONSULTANT.

04:08:22 25    Q.  DO YOU REMEMBER GIVING YOUR DEPOSITION?

```
04:08:23   1    A.  SURE.

04:08:25   2    Q.  PX 0682, PAGE 216.

04:08:44   3            THE COURT:  YOU'RE REFERRING HIM TO LINES FOUR THROUGH --

04:08:48   4            MR. JOSH PALMINTIER:  YES.  HAVE YOU LOOKED AT A CONTENTS

04:08:53   5    CLAIM DEPENDING ON THE ITEMS INVOLVED WHETHER THEY BE SOFT GOODS,

04:08:56   6    HARD GOODS.

04:08:57   7            MS. LONIAN:  YOUR HONOR, TO THE EXTENT, I WOULD JUST

04:08:59   8    REQUEST THAT HE ACTUALLY SHOW THE QUESTION TO WHICH THE WITNESS IS

04:09:04   9    RESPONDING.

04:09:04  10            THE COURT:  ALL RIGHT.  OKAY.  DO THAT FOR HIM.

04:09:08  11            MR. JOSH PALMINTIER:  215.

04:09:15  12    BY MR. JOSH PALMINTIER:

04:09:16  13    Q.  "AND AS A NEGOTIATING TOOL, WOULD IT BE -- IT COULD BE -- IT

04:09:21  14    COULD VERY WELL BE USED TO BRING THE HOMEOWNER CLOSER TO -- IN YOUR

04:09:24  15    EXPERIENCE, WOULD YOU USE THE 50 PERCENT AS KIND OF AN INITIAL

04:09:28  16    OFFER FOR PURPOSES OF NEGOTIATING?  AND LET THE CONTENTS CLAIM --"

04:09:34  17            MS. LONIAN:  YOUR HONOR, I AM JUST GOING TO OBJECT FOR

04:09:36  18    THE RECORD.  IF YOU COULD BLOW UP THE ENTIRE SCREEN, IT'S CLEAR

04:09:40  19    FROM THE PRIOR QUESTION THAT HE IS REFERRING TO A HOMEOWNER'S

04:09:42  20    POLICY, SO I THINK THE ENTIRE QUESTION IS THE CONTEXT OF AN

04:09:47  21    INSURANCE AGENCY.

04:09:48  22            THE COURT:  OVERRULED.  IT'S EITHER THAT OR I'M GOING TO

04:09:50  23    FIND THAT IT'S COMPLETELY MADE UP, ONE OF THE TWO.

04:09:50  24    BY MR. JOSH PALMINTIER:

04:09:52  25    Q.  "THE CONTENTS CLAIM DEPENDING ON ITEMS INVOLVED WHETHER THEY BE
```

04:09:55  1   SOFT, GOOD, TEXTILES, CERAMICS, WHATEVER, KNOWING THAT CERTAIN

04:10:00  2   ITEMS DEPRECIATE FASTER THAN OTHER ITEMS, I WOULD BE INCLINED TO

04:10:03  3   USE THE 50 PERCENT DEPRECIATION OR 50 PERCENT OFFER OF CLAIM AS A

04:10:06  4   MEANS OF EXPEDITING THE SETTLEMENT OR THE NEGOTIATIONS OF THE

04:10:10  5   CLAIM."  DO YOU REMEMBER STATING THAT?

04:10:13  6   A.  YOU KNOW, COUNSEL, IN ALL FAIRNESS, WHEN YOU GAVE ME THIS

04:10:16  7   DEPOSITION YOU CROSSED BACK AND FORTH BETWEEN MY BEING A CONTENTS

04:10:19  8   RESTORER AND AN INSURANCE ADJUSTER.

04:10:22  9          THE COURT:  I'VE HEARD ENOUGH.  I'VE GOT IT.  YOU CAN

04:10:24 10   MOVE ON.

04:10:25 11          MR. JOSH PALMINTIER:  YES, YOUR HONOR.

04:10:28 12          THE COURT:  FIFTY PERCENT IS GOING TO BE DECIDED BY ME

04:10:31 13   NOW.  ASSUMING I EVER GET TO IT.  DON'T BE OPTIMISTIC BECAUSE I

04:10:36 14   SAID THAT.

04:10:41 15          MR. BRUNO:  JUDGE, I LOST MY OPTIMISM LAST WEEK.

04:10:43 16          THE COURT:  ALL RIGHT.  GO AHEAD.

04:10:52 17   BY MR. JOSH PALMINTIER:

04:10:53 18   Q.  NOW YOUR REPORTS, THEY GAVE GENERAL CATEGORIES, FOR INSTANCE,

04:10:57 19   POROUS AND SEMI-POROUS AND NONPOROUS AND POROUS OR NONPOROUS AND

04:11:02 20   THEN POROUS AND SEMI-POROUS, CORRECT?  YOU DISCUSSED THEM WITH

04:11:08 21   WITHIN YOUR REPORTS?

04:11:09 22   A.  YES, I DISCUSSED IT WITHIN MY REPORTS.

04:11:11 23   Q.  AND IN THAT -- YOU GATHERED THAT INFORMATION FROM THE IICRC,

04:11:20 24   THE S500; IS THAT CORRECT?

04:11:22 25   A.  CORRECT.

04:11:23  1    Q.  AND THAT'S SOMETHING THAT IS SOMETHING THAT YOU RELY ON ON A

04:11:29  2    REGULAR BASIS, CORRECT?

04:11:30  3    A.  YES, I DO.

04:11:30  4    Q.  NOW, ALTHOUGH YOU DID INCLUDE COMMENTS ABOUT THESE DIFFERENT

04:11:43  5    CATEGORIES THAT YOU HAD GATHERED FROM THE S500, YOU DIDN'T

04:11:48  6    CATEGORIZE OR IT DIDN'T HAVE ANY BEARING ON YOUR FINAL

04:11:52  7    DETERMINATION OF COST DAMAGES FOR THE CONTENTS; IS THAT CORRECT?

04:11:59  8    A.  WELL, COUNSELOR, I'LL ANSWER THAT.  IT DID HAVE A BEARING IN

04:12:04  9    THAT AS A RESTORATION CONSULTANT, CONTENTS CONSULTANT RELYING ON

04:12:10 10    THE S500, TO ME IT WAS IRRELEVANT AS TO THE LINE OF WATER WITHIN

04:12:19 11    THE HOME.  LOOKING AT THE VARIOUS CONTENT ITEMS THAT WERE LISTED ON

04:12:24 12    THE VARIOUS INVENTORY FORMS, I TOOK THE POSITION THAT THOSE ITEMS

04:12:28 13    WERE DEEMED A LOSS.  AND SO I PUT THAT INFORMATION IN MY REPORT SO

04:12:32 14    THOSE WHO WERE TO READ IT BEYOND A SHADOW OF A DOUBT WOULD

04:12:36 15    UNDERSTAND THAT FLOODWATERS BEING CLASSIFIED A CATEGORY 3, THE

04:12:43 16    UPHOLSTERED ITEMS OF FURNITURE AND SO ON, BOOKS AND SO ON,

04:12:47 17    AUTOMATICALLY WOULD HAVE BEEN A LOSS, SO THERE WOULD BE NO

04:12:50 18    QUESTION.

04:12:50 19    Q.  UNDERSTOOD.  AND THAT'S FROM THE S500, CORRECT?

04:12:55 20    A.  YES, CHAPTER 16.

04:12:57 21    Q.  CHAPTER 16.  AND THE S500 CATEGORIZES DIFFERENT WATER TYPES?

04:13:02 22    A.  YES, IT DOES.

04:13:03 23    Q.  AND THIS WATER TYPE IS CATEGORY 3 WATER, CORRECT?

04:13:06 24    A.  YES, ACCORDING TO THE IICRC.

04:13:08 25    Q.  CAN YOU TELL THE COURT WHAT CATEGORY 3 WATER IS?

04:13:12  1  A.  CATEGORY 3 WATER IS HURRICANE, HURRICANE WATER FLOODS, STREAMS,

04:13:20  2  RIVERS, CONTAMINANT WATER, AND IT COULD ALSO BE SEWAGE WATER.

04:13:32  3  Q.  AND THIS IS, AGAIN, THAT'S A DOCUMENT YOU RELY ON --

04:13:36  4  A.  YES.

04:13:36  5  Q.  -- QUITE OFTEN.  CATEGORY 3 WATERS ARE WATER IS GROSSLY

04:13:40  6  CONTAMINATED AND CAN CONTAIN PATHOGENIC, TOXIGENIC, OR OTHER

04:13:45  7  HARMFUL AGENTS; IS THAT CORRECT?

04:13:46  8  A.  YES.

04:13:47  9  Q.  AND THE S500, THE S500 ACTUALLY DISCUSSES STRUCTURES,

04:13:59 10  MATERIALS, AS WELL AS CONTENTS, CORRECT?

04:14:01 11       MS. LONIAN:  I OBJECT, YOUR HONOR.  MR. SCHNEIDER AS WE

04:14:08 12  DISCUSSED EARLIER IS NOT A CONSTRUCTION RESTORATION --

04:14:10 13       THE COURT:  HE DID NOT TESTIFY ABOUT STRUCTURE.

04:14:12 14       MR. JOSH PALMINTIER:  AND WE ARE NOT GOING THERE, YOUR

04:14:14 15  HONOR.  I JUST WANT TO MAKE SURE THAT FOR THE RECORD AND FOR THE

04:14:17 16  COURT THAT THE S500 DOES CONTAIN BOTH.  BUT WE'RE NOT GOING ANY

04:14:23 17  FURTHER THAN THAT -- I'LL WITHDRAW THE QUESTION, IT'S NOT THAT

04:14:26 18  IMPORTANT.

04:14:26 19       THE COURT:  ALL RIGHT.  MOVE ON.

04:14:32 20       COUNSEL, MAYBE YOU CAN LIFT UP THAT MIC SO YOU WON'T HAVE

04:14:37 21  TO BEND DOWN EVERY TIME.  I DON'T KNOW IF YOU CAN MAKE THAT HIGHER.

04:14:40 22  WE'RE GOING TO DO SOMETHING ABOUT THAT SO WE WON'T HAVE TO HAVE

04:14:43 23  COUNSEL HUNCH OVER.  IT'S NOT A REALLY GREAT SITUATION FOR YOU.  I

04:14:47 24  THINK WE CAN HEAR YOU WHEN YOU STAND UP AND DO THAT.

04:14:50 25       MS. LONIAN:  OKAY.

04:14:50  1          THE COURT:  I JUST HATE TO PUT YOU IN A TORTIOUS

04:14:54  2   POSITION, IT'S DIFFICULT ENOUGH WHAT WE'RE DOING.  GO AHEAD.

04:14:57  3          MR. JOSH PALMINTIER:  THANK YOU, YOUR HONOR.

04:14:58  4   BY MR. JOSH PALMINTIER:

04:15:01  5   Q.  NOW, YOU'VE ALSO CREATED CERTAIN CHARTS BUT THOSE DID NOT HAVE

04:15:09  6   A DETERMINATION, PRIMARY DETERMINATION ON THE FINAL OUTCOME IN

04:15:15  7   REFERENCE TO YOUR COMPUTATION OF CONTENTS, COMPUTATION OF CONTENTS,

04:15:21  8   CORRECT?

04:15:22  9   A.  CORRECT.

04:15:23 10   Q.  LET'S TURN TO ALE AND TO YOUR METHODOLOGY REGARDING ALE,

04:15:30 11   ADDITIONAL LIVING EXPENSES.  YOU ONLY GAVE ALE FOR WHAT YOU CALLED

04:15:35 12   ACTUAL EXPENSES INCURRED, CORRECT?

04:15:37 13   A.  CORRECT.

04:15:38 14   Q.  THIS ACTUALLY MEANS ONLY THOSE EXPENSES WHERE SUPPORTIVE

04:15:42 15   DOCUMENTS EXISTED, AND THAT BEING RECEIPTS, CORRECT?

04:15:47 16   A.  NO, NOT TRUE.  BECAUSE I ALSO CALCULATED ON ONE PARTICULAR

04:15:53 17   PLAINTIFF WHERE I ONLY HAD INFORMATION FOR ONE-MONTH STAY AT A

04:15:58 18   HOTEL AND PROJECTED IT OUT KNOWING THAT THEY DID STAY IN THE HOTEL.

04:16:03 19   Q.  WAS THAT THE ONLY SITUATION WHERE YOU ACTUALLY GAVE ADDITIONAL

04:16:12 20   LIVING EXPENSES WHERE, IN FACT, THERE WAS NO RECEIPT?

04:16:31 21   A.  AT THE PRESENT MOMENT I WOULD PROBABLY HAVE TO SAY YES.

04:16:34 22   Q.  AND YOU'RE NOT GIVING AN OPINION THAT THE PLAINTIFF DID NOT

04:16:42 23   HAVE ADDITIONAL LIVING EXPENSES, JUST THAT YOU'RE NOT -- YOU DON'T

04:16:47 24   FEEL THEY SHOULD BE PAID FOR IT; IS THAT CORRECT?

04:16:53 25   A.  NO.  MY OPINION ISN'T THAT THEY SHOULDN'T BE PAID FOR IT, I

04:16:56  1    TOOK A FAIR AND REASONABLE APPROACH BASED ON THE REVIEW OF ALL OF

04:17:01  2    THE DOCUMENTATION FOR THE PLAINTIFFS IN EACH PARTICULAR CASE TO

04:17:05  3    ARRIVE AT WHAT I BELIEVED WAS THEIR EXPENSES INCURRED.

04:17:09  4    Q.  WELL, SIR, DID YOU GIVE THEM ANY ADDITIONAL LIVING EXPENSES IN

04:17:14  5    REFERENCE TO GAS?

04:17:19  6    A.  IF IT WAS CLAIMED.

04:17:21  7    Q.  IF THERE WAS A RECEIPT FOR IT?

04:17:23  8    A.  IF IT WAS CLAIMED, YES.

04:17:25  9    Q.  WELL, BECAUSE I THINK THOSE ARE TWO DIFFERENT THINGS.  OTHER

04:17:32 10    THAN THE ONE EXAMPLE THAT YOU JUST GAVE TO THE COURT, ISN'T IT TRUE

04:17:40 11    THAT IF THERE WAS NO RECEIPT YOU DID NOT GIVE ADDITIONAL LIVING

04:17:43 12    EXPENSES?

04:17:44 13             THE COURT:  HE'S ESTABLISHED YES FOR THAT AT LEAST IN HIS

04:17:47 14    PRESENT, HE QUALIFIED IT AS HE PRESENTLY RECALLS.

04:17:52 15    BY MR. JOSH PALMINTIER:

04:17:52 16    Q.  BUT ISN'T IT ALSO QUITE CUSTOMARY FOR YOU AS A CONTENTS

04:18:00 17    CONSULTANT TO GIVE AN AMOUNT UNDER $25, FOR INSTANCE, FOR FOOD?

04:18:10 18    WITHOUT RECEIPTS.

04:18:11 19    A.  YOU'RE REFERRING TO LIKE A PER DIEM?

04:18:14 20    Q.  WELL, I AM REFERRING TO A PER DIEM, SURE, LIKE A PER DIEM,

04:18:18 21    ISN'T THAT SOMETHING THAT YOU USUALLY DO?

04:18:21 22    A.  IF THE PLAINTIFF OR THE HOMEOWNER MAKES A CLAIM OR ITEMIZES IT

04:18:31 23    OUT, THEN IT'S CONSIDERED.

04:18:38 24    Q.  IS IT USUAL FOR YOU TO GIVE A $25 PER DIEM FOR ITEMS SUCH AS

04:18:44 25    FOOD WHERE THERE IS NO RECEIPT?

04:18:47  1   A.  NO.

04:18:48  2   Q.  CARL, IF YOU COULD, PULL UP PX 0682, PAGE 162.  "IT'S POSSIBLE

04:19:10  3   FOR A HOMEOWNER TO INCUR EXPENSES FOR FOOD AND NOT KEEP RECEIPTS

04:19:14  4   AND IT'S ALSO POSSIBLE FOR EXPENSES LESS THAN $25 NOT TO ASK FOR

04:19:18  5   RECEIPTS."  DO YOU REMEMBER THAT?

04:19:26  6   A.  YES, BUT I PREFERENCED MY ANSWER THAT THE PLAINTIFF OR THE

04:19:30  7   HOMEOWNER HAS TO MAKE THE CLAIM FOR IT, IT'S NOT SOMETHING I

04:19:34  8   ARBITRARILY WOULD GIVE.  IF THEY MADE OUT A CALENDAR AND PUT $20

04:19:39  9   EVERY DAY FOR FOOD, THEN IT'S A CONSIDERATION.  BUT THIS WASN'T THE

04:19:43 10   CASE.

04:19:43 11   Q.  BUT THE HOMEOWNERS HAD TO EAT, DIDN'T THEY?

04:19:46 12   A.  AGAIN, IT'S ACTUAL EXPENSES INCURRED.

04:19:50 13   Q.  IF THEY DON'T HAVE A RECEIPT THEN THEY DON'T GET THAT --

04:19:54 14   A.  THAT'S NOT WHAT I SAID.

04:19:56 15        MR. JOSH PALMINTIER:  I'LL WITHDRAW.

04:20:00 16   BY MR. JOSH PALMINTIER:

04:20:01 17   Q.  NOW, IF YOU DID GIVE IT, HYPOTHETICALLY IF YOU DID GIVE $25 PER

04:20:06 18   DAY FOR THE UP TO A YEAR THAT YOU BELIEVE THAT YOU CAN GIVE

04:20:10 19   ADDITIONAL LIVING EXPENSES --

04:20:11 20        THE COURT:  SIX MONTHS I THINK HE SAID.  HE SAID SIX

04:20:13 21   MONTHS EARLIER.

04:20:14 22        THE WITNESS:  SIX MONTHS.

04:20:15 23   BY MR. JOSH PALMINTIER:

04:20:15 24   Q.  YOUR TESTIMONY IS THAT IT'S SIX MONTHS, YOU CAN'T GET ALE FOR

04:20:19 25   MORE THAN SIX MONTHS?

04:20:20  1    A.  NO, I DIDN'T SAY THAT.

04:20:21  2    Q.  WHAT IS THE USUAL CUSTOMARY FOR CONTENTS -- WELL, FOR A

04:20:26  3    CONSULTANT OF ADDITIONAL LIVING EXPENSES, WHAT'S THE FURTHEST OUT

04:20:32  4    THAT YOU CAN EXTEND ADDITIONAL LIVING EXPENSES IN YOUR OPINION?

04:20:35  5    A.  WELL, I'VE SEEN 12 MONTHS AND I'VE SEEN SITUATIONS WHERE

04:20:43  6    24 MONTHS.  DEPENDS ON THE --

04:20:51  7    Q.  AND IF THERE WAS A FAMILY OF FOUR FOR A YEAR, THAT COULD BE

04:20:54  8    $36,000 IN ADDITIONAL LIVING EXPENSES FOR THAT FOOD PER DIEM ALONE,

04:20:59  9    HYPOTHETICALLY; IS THAT CORRECT?

04:21:00 10    A.  AND HYPOTHETICALLY, YES, AND HYPOTHETICALLY YOU WOULD HAVE TO

04:21:05 11    DEDUCT THE NORMAL AND CUSTOMARY EXPENSES THAT THEY'RE NOT

04:21:09 12    INCURRING.

04:21:10 13    Q.  UNDERSTOOD.  NOW, IN REFERENCE TO THE ARMSTRONG CONTENTS LIST,

04:21:22 14    YOU DIMINISHED THE VALUE OF THAT -- YOU ACTUALLY HAD A MORE

04:21:30 15    SPECIALIZED DESCRIPTION REGARDING THE TWO DUCKS UNLIMITED AND BLUE

04:21:33 16    DOG ART GIVEN IN THE KENNY ARMSTRONG DEPOSITION; IS THAT CORRECT?

04:21:37 17    A.  CORRECT.

04:21:39 18    Q.  SO EVEN TOUGH THEY HAD GIVEN YOU MORE SPECIALIZED INFORMATION

04:21:46 19    YOU STILL DEPRECIATED IT?

04:21:49 20    A.  (NO RESPONSE.)

04:21:50 21    Q.  NOW, YOU THEN ARBITRARILY DEPRECIATED IT BY 50 PERCENT?

04:21:57 22         MR. GULOTTA:  I CAN'T TAKE IT ANYMORE, YOUR HONOR, I HAVE

04:21:58 23    TO OBJECT, HE DIDN'T EVEN LET HIM ANSWER THE QUESTION.

04:22:00 24         THE COURT:  THIS IS TRUE, YOU HAVE TO LET HIM ANSWER THE

04:22:03 25    QUESTION.  FIRST GO BACK TO THE DUCKS UNLIMITED AND BLUE DOG

04:22:07  1   QUESTION, THERE WAS NO ANSWER.

04:22:10  2            MR. JOSH PALMINTIER:  OKAY.

04:22:12  3   BY MR. JOSH PALMINTIER:

04:22:12  4   Q.  YOU DIMINISHED THE VALUE OF THOSE EVEN THOUGH YOU WERE GIVEN

04:22:15  5   MORE SPECIALIZED KNOWLEDGE, CORRECT?

04:22:16  6   A.  CORRECT.

04:22:19  7   Q.  AND YOU THEN ARBITRARILY DEPRECIATED IT AGAIN BY 50 PERCENT

04:22:28  8   EVEN THOUGH ART, GENERALLY SPEAKING, APPRECIATES, CORRECT?

04:22:32  9   A.  YOU HAVE TO HAVE A WILLING SELLER AND A WILLING BUYER FOR ART.

04:22:39 10   Q.  UNDERSTOOD.  IS THAT YES OR NO?

04:22:44 11            THE COURT:  DOES ART GENERALLY APPRECIATE?

04:22:48 12            THE WITNESS:  WELL, I THINK I SAID IN MY DEPOSITION ART

04:22:52 13   APPRECIATES WHEN THE ARTIST DIES.  AND WHEN I TALKED ABOUT DUCKS

04:22:57 14   UNLIMITED, I ALSO MENTIONED TO YOU BECAUSE I TOO COLLECT DUCKS

04:23:01 15   UNLIMITED AND THERE ARE STAMPS ON THE DUCKS UNLIMITED.  AND THAT

04:23:05 16   ADDS TO THE VALUE.  IF THEY'RE --

04:23:08 17   BY MR. JOSH PALMINTIER:

04:23:08 18   Q.  YOU DIDN'T KNOW IF THEY HAD STAMPS ON THEM?

04:23:10 19   A.  I DON'T KNOW.  AND YOU'RE REFERRING TO A DESCRIPTION TWO DUCKS

04:23:14 20   UNLIMITED PRINTS, THAT'S WHERE IT ENDS.

04:23:18 21   Q.  I STILL DON'T THINK YOU'VE ANSWERED MY QUESTION.

04:23:21 22   A.  LET ME TRY AGAIN, GO AHEAD.

04:23:22 23   Q.  YOU DID DEPRECIATE THAT BY 50 PERCENT AFTER YOU HAD ALREADY

04:23:27 24   DIMINISHED THE VALUE OF IT, YOU DEPRECIATED IT BY 50 PERCENT EVEN

04:23:33 25   THOUGH ART, GENERALLY SPEAKING, APPRECIATES?

04:23:36  1    A.   GENERALLY SPEAKING, YES.

04:23:37  2    Q.   NOW, IN REFERENCE TO THE HOLMES CONTENTS LIST, THERE WAS A 1998

04:23:45  3    TOYOTA COROLLA THAT YOU STATED, AND YOU STATED THAT THE AMOUNT

04:23:49  4    PREVIOUSLY PAID BY GEICO OF $5,641 WAS A FAIR AND REASONABLE

04:23:53  5    BENCHMARK FOR THE VALUE OF THE VEHICLE, CORRECT?

04:23:56  6    A.   YES.

04:23:57  7    Q.   YOU DIDN'T DO ANY INDEPENDENT RESEARCH INTO THAT VALUE OF THE

04:24:02  8    VEHICLE, DID YOU?

04:24:03  9    A.   NO.

04:24:07  10   Q.   I WANT TO DISCUSS A LITTLE BIT MORE ABOUT THE S500 AND THE

04:24:23  11   CATEGORY 3 TOXICITY LEVEL OF THE WATER.  THIS IS HIGHLY TOXIC WATER

04:24:33  12   AND I BELIEVE THAT -- WELL, YOU BELIEVE THAT IF THE WATER TOUCHES

04:24:38  13   THE ITEM, IT'S DONE, IT NEEDS TO BE REPLACED; IS THAT CORRECT?

04:24:43  14   A.   WITH RESPECT TO THE ITEM, THE TYPE OF ITEM WHETHER IT BE

04:24:52  15   POROUS, NONPOROUS OR SEMI-POROUS, YES.

04:24:52  16   Q.   WELL, BUT FOR PURPOSES OF THIS CASE, YOU BELIEVED THAT BECAUSE

04:24:58  17   IT'S CATEGORY 3 WATER THAT THE -- WHETHER IT'S POROUS, SEMI-POROUS,

04:25:05  18   OR A COMBINATION OF POROUS, SEMI-POROUS THAT YOU WOULD STILL, IF

04:25:08  19   THE WATER COMES IN CONTACT WITH THE ITEM THAT IN FACT IT NEEDS TO

04:25:13  20   BE REPLACED; ISN'T THAT CORRECT?

04:25:14  21   A.   YES.

04:25:15  22   Q.   AND YOU ALSO WOULD AGREE, WOULDN'T YOU, THAT THE INABILITY TO

04:25:37  23   GET BACK INTO THE PROPERTY TO MITIGATE THE DAMAGE COULD CAUSE MORE

04:25:42  24   DAMAGE TO CONTENTS AND THAT CERTAIN BIO-ORGANISMS COULD THEN

04:25:46  25   CONTAMINATE THE CONTENTS EVEN IN REFERENCE TO ITEMS THAT DID NOT

04:25:49  1  NECESSARILY COME IN DIRECT CONTACT WITH THE WATER?

04:25:55  2  A.  WELL, I AM NOT A HYGIENIST TO ACTUALLY DETERMINE THE TYPE OF

04:26:04  3  PATHOGENS OR MICROBIALS.  BUT IT'S BEEN MY EXPERIENCE IN DEALING

04:26:09  4  WITH WATER LOSSES, DEPENDING ON THE EXTENT OF TIME THAT THE CONTENT

04:26:17  5  ITEM IS EXPOSED TO THE WATER AND THE SOURCE OF THE WATER GENERALLY

04:26:20  6  WOULD RENDER THE ITEM A LOSS.

04:26:24  7         MR. JOSH PALMINTIER:  THANK YOU.  I APPRECIATE IT.  NO

04:26:26  8  FURTHER QUESTIONS.

04:26:27  9         THE COURT:  THANK YOU.

04:26:29 10                     REDIRECT EXAMINATION

04:26:30 11  BY MS. LONIAN:

04:26:47 12  Q.  NOW, MR. SCHNEIDER, YOUR DEFINITION OF ALE IS THE CONCEPT THAT

04:26:53 13  THE POST LOSS EXPENSES MUST EXCEED THE PRE-LOSS EXPENSES, CORRECT?

04:27:00 14  A.  YES.

04:27:01 15  Q.  AND THAT'S BECAUSE EVEN IF THE LOSS HAD NEVER OCCURRED, A

04:27:04 16  HOMEOWNER IS GOING TO HAVE TO SPEND A CERTAIN AMOUNT OF MONEY EVERY

04:27:08 17  MONTH ON FOOD, ON GAS, ON DRY CLEANING, ON WHATEVER THEIR TYPICAL

04:27:13 18  EXPENSES ARE, CORRECT?

04:27:14 19  A.  CORRECT.

04:27:14 20  Q.  SO THE RELEVANT ISSUE HERE IS WHETHER OR NOT WHAT THEY WERE

04:27:18 21  SPENDING ON FOOD, WHETHER IT WAS $20 A DAY, $25 A DAY ACTUALLY

04:27:23 22  EXCEEDED WHAT THEY WERE SPENDING BEFORE THE LOSS, CORRECT?

04:27:26 23  A.  CORRECT.

04:27:26 24  Q.  AND THAT'S TRUE FOR UTILITIES AND HOUSING, ANYTHING THAT'S

04:27:30 25  INHERENT WITHIN THE CONCEPT OF ADDITIONAL LIVING EXPENSES, CORRECT?

04:27:34  1    A.   CORRECT.

04:27:35  2              MS. LONIAN:  I DON'T HAVE ANYTHING FURTHER.

04:27:37  3              THE COURT:  THANK YOU.  ANYTHING FROM THE UNITED STATES?

04:27:39  4              MR. MCCONNON:  THE UNITED STATES HAS NO QUESTIONS, YOUR

04:27:40  5    HONOR.

04:27:40  6              THE COURT:  I ASSUME NOTHING ELSE.  SIR, YOU MAY STEP

04:27:43  7    DOWN.  THANK YOU VERY MUCH.

04:27:44  8              THE WITNESS:  THANK YOU, YOUR HONOR.

04:27:51  9              MR. GULOTTA:  YOUR HONOR, YOU WOULD BE HAPPY TO KNOW THAT

04:27:53 10    ON BEHALF OF THE DEFENDANTS, WE HAD ANOTHER DAMAGE EXPERT THAT

04:27:56 11    WOULD HAVE BEEN MR. TRUAX ON THE ROMAN CATHOLIC CHURCH ISSUE OF

04:28:01 12    APPRAISALS, WE'VE BEEN ABLE TO STIPULATE WITH THE PLAINTIFFS AS TO

04:28:05 13    WHAT HE WOULD TESTIFY TO TO OBVIATE THE NEED OF CALLING HIM, AND IF

04:28:10 14    I MAY, JUST CALL ON --

04:28:12 15              THE COURT:  I AM HAPPY.

04:28:14 16              MR. GULOTTA:  IF I MAY CALL ON MY COLLEAGUE

04:28:16 17    MS. BROUSSARD, SHE CAN PRESENT THE STIPULATION.

04:28:18 18              THE COURT:  ABSOLUTELY.  I WOULD APPRECIATE IT.

04:28:24 19              MR. GULOTTA:  THANK YOU, YOUR HONOR.

04:28:25 20              THE COURT:  AND APPRECIATE ALL OF YOU FOR THE

04:28:27 21    STIPULATION.

04:28:27 22              MR. JOSH PALMINTIER:  YOUR HONOR, THE ONLY THING I WOULD

04:28:29 23    LIKE TO ADD IS THAT WE WOULD LIKE TO OFFER INTO EVIDENCE THE IICRC

04:28:36 24    S500 THAT WAS REFERENCED BY THE WITNESS ON THE STAND, WE BELIEVE

04:28:40 25    THAT IT HAS -- IT IS GOING TO BE HAVE GOOD VALUE FOR THE TRIER OF

04:28:46   1    FACT HERE IN REFERENCE TO THE INFORMATION THAT THE -- THAT

04:28:51   2    MR. SCHNEIDER DISCUSSED IN HIS TESTIMONY.

04:28:55   3         MS. LONIAN:  YOUR HONOR, THE DEFENDANTS HAVE NO OBJECTION

04:28:57   4    TO THE SPECIFIC CHAPTER, I BELIEVE IT WAS 16, THAT MR. SCHNEIDER

04:29:00   5    DISCUSSED; BUT TO THE EXTENT THAT THERE ARE PORTIONS OF THAT

04:29:03   6    DOCUMENT -- I FRANKLY HAVEN'T HAD TIME TO REVIEW IT -- TO

04:29:06   7    STRUCTURES AND OTHER ELEMENTS TO WHICH MR. SCHNEIDER DID NOT

04:29:08   8    TESTIFY, THE DEFENDANTS OBJECT TO ITS INCLUSION IN THE RECORD.

04:29:11   9         MR. JOSH PALMINTIER:  UNDERSTOOD.  WE ARE NOT TRYING TO

04:29:13  10    SNEAK ANY EVIDENCE IN THAT WE SHOULDN'T.  THE ONLY TWO AREAS THAT I

04:29:18  11    WANT IN WOULD BE THE EVIDENCE IN REFERENCE OR THE PORTION IN

04:29:22  12    REFERENCE TO THE WATER -- IN OTHER WORDS, WHAT HE HAS DISCUSSED

04:29:26  13    HERE ON THE STAND.

04:29:27  14         THE COURT:  SHOW IT TO COUNSEL SO SHE CAN GET A

04:29:30  15    COMPLETE -- YOU DON'T HAVE TO DO IT RIGHT NOW.

04:29:33  16         MS. LONIAN:  I'LL WORK WITH MR. PALMINTIER.  BEFORE

04:29:39  17    MR. BROUSSARD, I WOULD JUST LIKE TO MOVE THESE TWO EXHIBITS INTO

04:29:41  18    EVIDENCE.  THAT WOULD BE DX DM-011, AND DX DM-0012, AND THAT WOULD

04:29:50  19    BE THE ENTIRE DEMONSTRATIVE OF EACH PAGE.

04:29:53  20         THE COURT:  NO OBJECTION, LET IT BE ADMITTED.  IF YOU

04:29:58  21    WANT TO READ THE STIPULATION THEN MAYBE, WE'LL GO BACK TO THE OTHER

04:30:03  22    ISSUE.

04:30:04  23         MS. BROUSSARD:  YOUR HONOR, GOOD AFTERNOON, MY NAME IS

04:30:06  24    MAGGIE BROUSSARD, I'M WITH STONE PIGMAN REPRESENTING WASHINGTON

04:30:10  25    GROUP.

04:30:11  1          ALL PARTIES HAVE AGREED TO A JOINT STIPULATION REGARDING

04:30:15  2   EXPERT WITNESS MR. MICHAEL TRUAX, SR.  IT IS STIPULATED BY AND

04:30:18  3   BETWEEN THE PARTIES THAT MR. MICHAEL W. TRUAX, SR., IS AN EXPERT IN

04:30:21  4   THE FIELD OF REAL ESTATE APPRAISAL.  AND THAT IF HE WERE TO TESTIFY

04:30:25  5   LIVE AT TRIAL, HE WOULD TESTIFY SUBSTANTIALLY IN ACCORDANCE WITH

04:30:28  6   HIS EXPERT REPORTS AND THE ATTACHED DEMONSTRATIVE -- WHICH I WILL

04:30:31  7   GIVE YOUR HONOR -- REGARDING THE REAL ESTATE APPRAISAL VALUES OF

04:30:35  8   THE ARMSTRONG HOMES AND LIVERS RESIDENCES PRIOR TO AND SUBSEQUENT

04:30:39  9   TO THE DAMAGES CAUSED BY THE PASSAGE OF HURRICANE KATRINA.

04:30:42  10          THE EXPERT REPORTS OF MR. TRUAX HAVE BEEN PREVIOUSLY

04:30:45  11   MARKED AND ADMITTED INTO EVIDENCE AS EXHIBITS JX 1761, JX 1762, JX

04:30:53  12   1763, JX 1764, JX 1765, AND JX 1766.  THE ATTACHED DEMONSTRATIVE IS

04:31:04  13   ENTITLED *DIMINUTION IN VALUE ESTIMATES* AND IS LABELED DX DM-0014.

04:31:10  14   AND THE DEMONSTRATIVE, YOUR HONOR, IS A CHART WITH ALL OF

04:31:13  15   MR. TRUAX'S ESTIMATES ON ONE PAGE FOR YOUR CONVENIENCE.

04:31:16  16          THE COURT:  VERY HELPFUL.  AND THE COURT APPRECIATES IT.

04:31:19  17   LET IT BE ADMITTED INTO EVIDENCE AND REGARDED AS A STIPULATION.

04:31:26  18          OKAY.  NOW, WE'LL TRY TO LET YOU WORK THAT OUT.  YES,

04:31:30  19   SIR.

04:31:30  20          MR. SMITH:  WE HAVE SOME MORE HOUSEKEEPING, YOUR HONOR.

04:31:33  21          THE COURT:  OH, ABSOLUTELY.

04:31:34  22          MR. SMITH:  THIS WOULD BE A GOOD TIME TO TAKE CARE OF A

04:31:37  23   FEW THINGS.  I WOULD LIKE TO MOVE INTO EVIDENCE SOME OF THE

04:31:42  24   DEMONSTRATIVE EXHIBITS THAT DR. MARR USED, THESE ARE THE ONES THAT

04:31:47  25   THE PLAINTIFFS HAVE NO OBJECTION TO.  THOSE ARE DX DM 1006-0007,

04:32:00  1    AND THE SAME DEMONSTRATIVE EXHIBIT 1006-0009 THROUGH 0019.  THE

04:32:15  2    SAME DEMONSTRATIVE EXHIBIT 1006, PAGE 0055.  AND FINALLY, DX  DM

04:32:30  3    1006-0058 THROUGH 0061.

04:32:40  4            THE COURT:  LET THEM BE ADMITTED.

04:32:42  5            MR. SMITH:  THANK YOU, YOUR HONOR.

04:32:45  6            MR. GULOTTA:  AND, YOUR HONOR, ONE ADDITIONAL

04:32:47  7    HOUSEKEEPING MATTER.  THIS WAS WITH REFERENCE TO MR. DANNER'S

04:32:59  8    TESTIMONY ON FRIDAY.  AND WE'VE ALREADY COMMUNICATED THIS TO THE

04:33:07  9    PLAINTIFFS, BUT I APPRECIATE JOSH SHOULD BE LISTENING TO THIS, AND

04:33:13 10    THIS IS FOR MOSTLY FOR THE BENEFIT OF THE COURT.

04:33:19 11            WITH REFERENCE TO THE DX EXHIBITS THAT I READ OUT AS

04:33:26 12    BEING OFFERED AND ADMITTED INTO EVIDENCE ON FRIDAY, THE

04:33:32 13    PLAINTIFFS -- EXCUSE ME, THE DEFENDANTS WISH TO WITHDRAW THREE

04:33:36 14    ITEMS, AND THOSE ITEMS ARE -- BECAUSE THEY REALLY WERE NOT SHOWN AS

04:33:42 15    PHOTOGRAPHS, I GAVE SOME ADDITIONAL NUMBERS THAT WERE NOT ACTUALLY

04:33:46 16    SHOWN.  AND THOSE THREE ITEMS ARE DX 02702-0026, AND DX 02703-0004,

04:34:04 17    AND 0005.  SO THOSE WERE READ BY ME AS BEING INCLUDED AND THEY

04:34:10 18    SHOULD HAVE BEEN EXCLUDED.

04:34:13 19            AND THEN WITH REFERENCE TO DX 01780, IT TURNS OUT THE WAY

04:34:21 20    THAT THAT'S LISTED ON THE EXHIBIT LIST, THAT'S AN ENTIRE REPORT,

04:34:24 21    AND WE ONLY MEANT TO INTRODUCE THE PHOTOGRAPHS IN THAT REPORT; SO

04:34:28 22    SPECIFICALLY THE EXHIBIT NUMBERS THAT WERE OFFERED AND SHOULD BE

04:34:34 23    ADMITTED INTO EVIDENCE UNDER DX 01780 ARE SIMPLY PHOTOGRAPH NUMBERS

04:34:41 24    343, 344, 345, 348, AND 349.

04:34:49 25            THE COURT:  YES, SIR.  LET THE RECORD REFLECT.

04:34:55  1          MR. JOSH PALMINTIER:  YES, YOUR HONOR.  I WAS JUST ASKING

04:34:57  2     AS TO WHAT EXACTLY WERE THESE EXHIBITS OF, THAT'S ALL.  AND

04:35:01  3     APPARENTLY SHE HAD SENT ME AN E-MAIL BUT I HAVEN'T LOOKED AT IT

04:35:05  4     YET.

04:35:05  5          MR. GULOTTA:  IT'S PHOTOGRAPHS, JOSH, IT'S THE SAME ONES

04:35:08  6     WE SHOWED, AND I MISSPOKE ON FRIDAY, GAVE THE WRONG NUMBERS.  SOME

04:35:12  7     I INCLUDED THAT I SHOULDN'T HAVE AND A COUPLE OTHERS NOT LISTED.

04:35:17  8          MR. JOSH PALMINTIER:  UNDERSTOOD.  NO OBJECTION.

04:35:18  9          THE COURT:  OKAY.

04:35:19 10          MR. GULOTTA:  THANK YOU.

04:35:21 11          THE COURT:  YES, SIR, THE UNITED STATES HAS SOMETHING?

04:35:22 12          MR. MCCONNON:  GOOD AFTERNOON, YOUR HONOR, JIM MCCONNON

04:35:25 13     FOR THE UNITED STATES.  THE UNITED STATES WOULD LIKE TO MAKE AN

04:35:27 14     OFFER OF PROOF WITH RESPECT TO FEDERAL EMERGENCY MANAGEMENT AGENCY

04:35:30 15     LOUISIANA ROAD HOME PROGRAM FILES.  MAY I PROCEED?

04:35:33 16          THE COURT:  YES, SIR, YOU MAY.

04:35:34 17          MR. MCCONNON:  THANK YOU, YOUR HONOR.  I GOT REAL

04:35:37 18     PROBLEMS WITH ALLERGIES THIS AFTERNOON, SO IF YOU CAN'T UNDERSTAND

04:35:40 19     SOMETHING PLEASE SAY.

04:35:42 20          THE COURT:  I REALLY UNDERSTAND, TRUST ME.

04:35:43 21          MR. MCCONNON:  THE PLAINTIFFS FILED A MOTION IN LIMINE TO

04:35:46 22     EXCLUDE EVIDENCE OF OR REFERENCE TO PAYMENTS FROM COLLATERAL

04:35:48 23     SOURCES, THIS IS AT DOCUMENT NO. 20956.  THE PLAINTIFF'S MOTION

04:35:54 24     SOUGHT TO EXCLUDE AS ALLEGED COLLATERAL SOURCES OF FEDERAL BENEFITS

04:35:57 25     THEY RECEIVED FROM THE FEDERAL EMERGENCY MANAGEMENT AGENCY, OR

04:36:01  1  FEMA, AND THE LOUISIANA ROAD HOME PROGRAM FOR FLOOD DAMAGE

04:36:04  2  SUSTAINED DURING HURRICANE KATRINA.

04:36:06  3        THE UNITED STATES RESPONDED TO THEIR MOTION IN LIMINE

04:36:09  4  ARGUING THAT THEIR FEDERAL BENEFITS ARE NOT COLLATERAL AS TO THE

04:36:12  5  UNITED STATES, AND POINT OUT THE SUPREME COURT'S ADMONITION THAT

04:36:15  6  THE UNITED STATES NOT BE COMPELLED TO PAY TWICE FOR THE SAME

04:36:18  7  INJURY.  THAT'S AT DOCUMENT NO. 21001.

04:36:22  8        ACCORDINGLY, THE FEDERAL BENEFITS RECEIVED BY THE

04:36:24  9  PLAINTIFFS FOR THE LOSSES CLAIMED IN THIS CASE MUST BE DEDUCTED

04:36:27 10  FROM ANY AWARD OF DAMAGES.  ON SEPTEMBER 4TH --

04:36:30 11        THE COURT:  OFFER OF PROOF --

04:36:33 12        MR. BRUNO:  IS THIS A PROFFER?

04:36:35 13        THE COURT:  YES.

04:36:36 14        MR. BRUNO:  IT'S A PROFFER, I'M SORRY.

04:36:38 15        THE COURT:  EXCUSE ME.

04:36:39 16        MR. MCCONNON:  ON SEPTEMBER 4, 2012, THE COURT GRANTED

04:36:42 17  THE PLAINTIFF'S MOTION IN LIMINE IN PART HOLDING THAT THE

04:36:45 18  DEFENDANTS ARE NOT ENTITLED AN OFFSET FOR THE ASSISTANCE PLAINTIFFS

04:36:48 19  RECEIVED FROM CHARITABLE, GOVERNMENT, OR INSURANCE PROCEEDS

04:36:51 20  RECOVERED UNLESS THE FUNDS OR INSURANCE FUNDS FOR DAMAGES OTHER

04:36:55 21  THAN THE FLOOD DAMAGES CLAIMED HEREIN.  THAT'S AT DOCUMENT

04:36:59 22  NO. 21021 AT PAGE SEVEN.

04:37:02 23        THEREFORE THE UNITED STATES MAKES AN OFFER OF PROOF

04:37:04 24  PURSUANT TO FEDERAL RULES OF EVIDENCE 103(A)(2) WITH REGARD TO THE

04:37:10 25  FOLLOWING AUTHENTICATED EXHIBITS FROM THE LOUISIANA ROAD HOME

04:37:13  1   PROGRAM AND FEMA FILES REGARDING PAYMENTS TO PLAINTIFFS KENNETH AND

04:37:18  2   JEANNINE ARMSTRONG, SUCCESSION OF ETHEL MAY COATS, FRED HOLMES,

04:37:23  3   ALVIN LIVERS, AND CLIFFORD WASHINGTON.

04:37:27  4          IF THE UNITED STATES WERE PERMITTED TO PRESENT EVIDENCE

04:37:29  5   CONCERNING THE PAYMENTS MADE TO THE PLAINTIFFS UNDER THE LOUISIANA

04:37:33  6   ROAD HOME PROGRAM AND FEMA, THE EVIDENCE WOULD DEMONSTRATE THAT

04:37:38  7   ETHEL MAY COATS RECEIVED $2,000 FOR EXPEDITED HOUSING ASSISTANCE ON

04:37:43  8   SEPTEMBER 2005, RENTAL ASSISTANCE OF $2,358 ON SEPTEMBER 2005, AND

04:37:50  9   1,593 FOR RENTAL ASSISTANCE IN JANUARY OF 2006, FOR A TOTAL AMOUNT

04:37:55 10   OF $5,951 RECEIVED FROM FEMA.

04:37:59 11          THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

04:38:03 12   EVIDENCED BY EXHIBITS DX 02465-0001, AND PAGE 0002, AND PAGE 0044,

04:38:20 13   AND PAGE 0047, AND PAGE 0068, AND PAGE 0072.

04:38:29 14          AND IN ADDITION, ETHEL MAY COATS RECEIVED GRANT MONEYS

04:38:33 15   UNDER OPTION 1 OF THE LOUISIANA ROAD HOME PROGRAM FOR HER PROPERTY

04:38:37 16   AT 1020 CHARBONNET STREET IN NEW ORLEANS, LOUISIANA IN THE AMOUNTS

04:38:41 17   OF $29,761.79 FOR A COMPENSATION GRANT AND $50,000 FOR AN

04:38:49 18   AFFORDABLE LOAN IN JUNE OF 2007, FOR A TOTAL AMOUNT OF $79,761.79

04:38:58 19   RECEIVED FROM THE LOUISIANA ROAD HOME PROGRAM.

04:39:00 20          THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

04:39:03 21   EVIDENCED BY EXHIBIT DX 01772, PAGE 0001, AND PAGE 0005, AND PAGE

04:39:18 22   0007, AND PAGE 0023, AND PAGE 0031, AND PAGES 0057 THROUGH 0060,

04:39:32 23   AND 0113 THROUGH PAGES 0125, AND PAGE 0128, AND PAGE 0129, AND PAGE

04:39:43 24   0131, AND PAGE 0132.

04:39:49 25          AND KENNETH ARMSTRONG RECEIVED $2,000 FOR EXPEDITED

04:39:53  1   HOUSING ASSISTANCE IN SEPTEMBER OF 2005, $2,358 FOR RENTAL

04:39:58  2   ASSISTANCE IN OCTOBER 2005, $2,865 FOR RENTAL ASSISTANCE IN

04:40:03  3   JANUARY 2006, AND $2,670 FOR RENTAL ASSISTANCE IN JUNE 2006, FOR A

04:40:10  4   TOTAL AMOUNT OF $9,893 RECEIVED FROM FEMA.

04:40:15  5         THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

04:40:18  6   EVIDENCED BY EXHIBITS DX 02467 AT PAGE ONE, AND PAGE 0003, AND PAGE

04:40:30  7   0113, AND PAGE 0167, AND PAGE 0168, AND PAGE 0170.

04:40:41  8         IN ADDITION, KENNETH AND JEANNINE ARMSTRONG RECEIVED A

04:40:44  9   COMPENSATION GRANT IN THE AMOUNT OF $75,370.89 UNDER OPTION 2 OF

04:40:51 10   THE LOUISIANA ROAD HOME PROGRAM AFTER THEY SOLD THEIR HOME AT 4016

04:40:57 11   HAMLET PLACE, CHALMETTE, LOUISIANA, TO THE ROAD HOME CORPORATION IN

04:41:01 12   OCTOBER OF 2007.

04:41:04 13         THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

04:41:06 14   EVIDENCED BY EXHIBITS DX 01771 AT PAGE 0001, AND 0023, AND 0032,

04:41:20 15   AND 0090 THROUGH 0092, AND 0100 THROUGH 0104, AND 0160 THROUGH

04:41:36 16   0172, AND 0183, AND 0184.

04:41:41 17         AND FRED HOLMES RECEIVED $2,000 FOR EXPEDITED HOUSING

04:41:46 18   ASSISTANCE IN SEPTEMBER 2005 AND $2,358 FOR RENTAL ASSISTANCE IN

04:41:52 19   SEPTEMBER OF 2005, FOR A TOTAL AMOUNT OF $4,258 RECEIVED FROM FEMA.

04:41:59 20         THE PAYMENTS RECORDS AND SUPPORTING DOCUMENTATION ARE

04:42:02 21   EVIDENCED BY EXHIBITS DX 02466 AT PAGE 0001, AND PAGE 0002, AND

04:42:17 22   PAGE 0033, AND PAGE 0039, AND PAGE 0040, AND PAGE 009 -- EXCUSE ME,

04:42:32 23   AND PX 4752 AT PAGE 009 AND PX 4752 AT PAGE 010.

04:42:46 24         AND IN ADDITION, FRED HOLMES RECEIVED A COMPENSATION

04:42:50 25   GRANT IN THE AMOUNT OF $34,608.18 UNDER OPTION 3 OF THE LOUISIANA

ROAD HOME PROGRAM AFTER HE SOLD HIS HOME AT 1205 PERRIN DRIVE,

ARABI, LOUISIANA, TO THE ROAD HOME CORPORATION IN MARCH 2009.

THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

EVIDENCED BY EXHIBITS DX 01773 AT PAGE 0001, AND PAGE 0021 THROUGH

0030, AND PAGE 0066 THROUGH 0069, AND PAGE 0117 THROUGH 0121, AND

PAGE 0135, AND PAGE 0136, AND PAGES 0144 THROUGH 01437, AND PAGE

0154, AND PAGE 0155.

AND ALVIN LIVERS RECEIVED $2,000 FOR EXPEDITED HOUSING

ASSISTANCE IN SEPTEMBER OF 2005, $2,358 FOR RENTAL ASSISTANCE IN

SEPTEMBER OF 2005, $10,500 FOR REPLACEMENT HOUSING IN

NOVEMBER 2005, AND $11,342 FOR PERSONAL PROPERTY IN NOVEMBER 2005,

FOR A TOTAL AMOUNT OF $26,200 RECEIVED FROM FEMA.

THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

EVIDENCED BY EXHIBITS DX 02710 AT PAGE 0001, AND PAGE 0002, AND

PAGE 0070, AND PAGE 0084, AND PAGE 0126, AND PAGE 0128, AND PAGE

0129, AND PX 4752-11 AND PX 4752-012.

AND IN ADDITION, ALVIN LIVERS SOLD HIS HOME AT 4924

ST. CLAUDE, NEW ORLEANS, LOUISIANA, TO THE ROAD HOME CORPORATION ON

APRIL 18TH, 2007 UNDER OPTION 2 OF THE LOUISIANA ROAD HOME PROGRAM

AND RECEIVED COMPENSATION GRANTS IN THE AMOUNTS OF $70,552.07 IN

MAY OF 2007, AND $3,239.45 IN MARCH OF 2010, AND AN ADDITIONAL

AFFORDABLE COMPENSATION LOAN FOR $50,000 IN MAY 2007 FOR A TOTAL

AMOUNT OF $123,791.52, RECEIVED FROM THE LOUISIANA ROAD HOME

PROGRAM.

THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

04:45:53  1    EVIDENCED BY EXHIBITS DX 01774 AT PAGE 0001, AND PAGE 0025, AND

04:46:05  2    PAGES 0028 THROUGH 0037, AND PAGES 0076 THROUGH 0079, AND PAGE

04:46:17  3    0149, AND PAGES 0154 THROUGH 0166, AND PAGE 0178, AND PAGE 0179.

04:46:29  4          AND CLIFFORD WASHINGTON RECEIVED COMPENSATION GRANTS IN

04:46:33  5    THE AMOUNTS OF $16,538.12 AND $44,500 AND AN ELEVATION ALLOWANCE OF

04:46:45  6    $30,000 AND ADDITIONAL COMPENSATION GRANTS OF $50,000 AND

04:46:50  7    $8,961.88, FOR A TOTAL AMOUNT RECEIVED OF $150,000 UNDER ROAD HOME

04:46:58  8    OR THE LOUISIANA ROAD HOME PROGRAM FOR HIS PROPERTY AT 1910 AND

04:47:04  9    1910-B CHARBONNET STREET, NEW ORLEANS, LOUISIANA, WITH PAYMENTS

04:47:09 10    MADE IN JULY 2007, SEPTEMBER 2008, AND DECEMBER 2009.

04:47:14 11          THE PAYMENT RECORDS AND SUPPORTING DOCUMENTATION ARE

04:47:17 12    EVIDENCED BY EXHIBITS DX 01775 AT PAGE 0001, AND 0005, AND 0006,

04:47:32 13    AND 0012, AND 0027, AND 0031 THROUGH 0040, PAGES 0082 THROUGH 0084,

04:47:48 14    AND PAGE 0096, AND PAGE 0097, AND PAGES 0111 THROUGH 0113, AND 0124

04:48:02 15    THROUGH 0137, AND PAGE 0139, AND PAGE 0140.

04:48:10 16          THE PAYMENT AMOUNTS REFERENCED SHOULD BE DEDUCTED FROM

04:48:14 17    ANY AWARD OF DAMAGE TO THESE PLAINTIFFS.  THE EVIDENCE SHOULD BE

04:48:16 18    ADMITTED SHOULD LIABILITY ATTACH OR REST UPON THE UNITED STATES FOR

04:48:20 19    ANY DAMAGES SUSTAINED BY THE PLAINTIFFS FROM OR BY FLOODWATERS.

04:48:24 20          AND THAT CONCLUDES THE UNITED STATES' OFFER

04:48:27 21          THE COURT:  AND WE WILL LABEL THAT UNITED STATES OFFER OF

04:48:35 22    PROOF IN REFERENCE --

04:48:38 23          MR. BRUNO:  IT'S THE FIRST ONE, JUDGE.

04:48:39 24          THE COURT:  IT IS NUMBER ONE?

04:48:42 25          MR. STEVENS:  IT'S THE SECOND ONE, THE WASHING GROUP HAD

04:48:45  1   ONE.

04:48:46  2            THE COURT:  I THINK IT'S UNITED STATES' FIRST OFFER.

04:48:48  3            MR. MCCONNON:  YES, FIRST FOR THE UNITED STATES.

04:48:51  4            THE COURT:  THE UNITED STATES OFFER OF PROOF NO. 1.

04:48:56  5   THANK YOU, COUNSEL.

04:48:57  6            MR. MCCONNON:  THANK YOU, YOUR HONOR.

04:49:02  7            MR. BRUNO:  JUDGE, JUST TO LET YOU KNOW, WE HAVE PENDING

04:49:05  8   AT THE MOMENT WE HAVE SUBMITTED TO THE DEFENDANTS OUR LIST OF

04:49:11  9   EXHIBITS WHICH FALL IN THE CATEGORY OF TWO FOR THEIR REVIEW.  THESE

04:49:16 10   WOULD HAVE BEEN USED IN CONNECTION WITH THE DIRECT OR

04:49:18 11   CROSS-EXAMINATION, WE'RE WAITING FOR THEM TO RESPOND.

04:49:21 12            WE HAVE ALSO PENDING AT THE CLOSE OF THE TESTIMONY OF

04:49:27 13   DR. DALRYMPLE I MOVED INTO EVIDENCE A SUMMARY CHART WHICH SHOWED

04:49:30 14   THE TIMES OF WAVE HEIGHTS, SURGE HEIGHTS, AND THE LIKE.  WHICH WE

04:49:37 15   CAN'T AGREE ON.  I AM SIMPLY GOING TO PROPOSE THAT WE SUBMIT IT TO

04:49:41 16   YOUR HONOR IN CAMERA WITH THE DEFENDANTS SIMPLY HIGHLIGHTING IN

04:49:45 17   YELLOW WHAT THEIR PROBLEMS ARE, AND THEN YOU CAN DECIDE IF THERE'S

04:49:49 18   ADVOCACY THERE.  I THINK IT'S JUST A SIMPLE SUMMARY CHART.  IF THAT

04:49:53 19   WORKS FOR YOU.

04:49:55 20            THE COURT:  AND WHAT IS THE CHART?

04:49:59 21            MR. BRUNO:  AT THE CLOSE OF -- WE HAD DR. DALRYMPLE WAS

04:50:03 22   ON THE STAND AND WE HAD, AS YOU RECALL, STIPULATIONS AS TO WATER

04:50:08 23   HEIGHT OVER TIMES, SO WE USED 3 O'CLOCK, 4 O'CLOCK, 5 O'CLOCK AND

04:50:13 24   6 O'CLOCK.  SO WE CREATED A LITTLE CHART THAT AT 3 O'CLOCK WE HAVE

04:50:16 25   THE SURGE HEIGHT, WE HAVE THE WIND DIRECTION BASED UPON THE

04:50:18  1    STIPULATION, AND WE HAVE THE WAVE REFERENCE THAT CAME OUT OF IPET,

04:50:24  2    AND WE JUST PUT IT IN A NICE LITTLE ONE PACKAGE DEAL FOR 3 O'CLOCK,

04:50:28  3    4 O'CLOCK, 5 O'CLOCK, 6 O'CLOCK, 7 O'CLOCK 8 O'CLOCK 9 O'CLOCK AND

04:50:33  4    10 O'CLOCK.  AND THE DEFENDANTS OBJECTED, WHICH IS FINE.  AND I

04:50:36  5    JUST THINK THE EASIEST WAY TO RESOLVE IT WOULD BE TO LET YOU LOOK

04:50:38  6    AT IT AND --

04:50:39  7              THE COURT:  YOU CAN'T ATTACH IT TO YOUR BRIEF?

04:50:41  8              MR. BRUNO:  I CAN, I CAN.

04:50:42  9              MR. FARRELL:  THAT WAS OUR POINT, YOUR HONOR.

04:50:44 10              THE COURT:  WHY DON'T YOU DO THAT.

04:50:45 11              MR. BRUNO:  I'LL DO THAT, NOT A PROBLEM.

04:50:47 12              THE COURT:  IT WON'T BE EVIDENCE, IT WILL BE ARGUMENT.

04:50:51 13              MR. BRUNO:  IT'S NOT THAT BIG A DEAL, JUDGE; IF THEY WANT

04:50:53 14    TO MAKE A BIG DEAL, THAT'S FINE.

04:50:55 15              AND FINALLY JUST AS A MATTER OF PLANNING, I JUST HAVE TO

04:50:59 16    ASK THE QUESTION.  WOULD THE COURT HAVE OBJECTION IF MR. SCHULTZ

04:51:03 17    AND I SPLIT THE DIRECT OF THE REBUTTAL TESTIMONY OF DR. BEA ON

04:51:08 18    WEDNESDAY?

04:51:10 19              THE COURT:  FIRST LET ME FIND OUT IF THE OPPOSITION HAS

04:51:16 20    ANY OBJECTION.

04:51:19 21              MR. SMITH:  WE OBJECT, YOUR HONOR, WE THINK ONE LAWYER

04:51:22 22    SHOULD HANDLE THE WITNESS.

04:51:24 23              MR. TREEBY:  YES, YOUR HONOR, WE DO AS WELL.  AND IT DOES

04:51:27 24    RAISE ANOTHER ISSUE RELATED TO THE REBUTTAL CASE, AND I KNOW YOUR

04:51:31 25    HONOR HAS MADE IT CLEAR ON NUMEROUS OCCASIONS THAT THERE WILL BE

04:51:36  1   ROBUST REBUTTAL --

04:51:37  2          THE COURT:  THERE'S A GOOD FIFTH CIRCUIT CASE, BUT GO

04:51:40  3   AHEAD, SIR.

04:51:41  4          MR. TREEBY:  AND GIVEN THAT, GIVEN THAT, WE THINK THAT

04:51:45  5   STILL THE COURT WOULD HAVE, WE THINK, THE COURT WOULD HAVE SOME

04:51:48  6   PARAMETERS IN MIND FOR THE REBUTTAL.  AND WE --

04:51:52  7          THE COURT:  TRUE.

04:51:53  8          MR. TREEBY:  IF IT ANYTHING GOES, NEW STUFF, NEW

04:51:56  9   OPINIONS --

04:51:56  10         THE COURT:  NO, NO, OF COURSE NOT.

04:51:58  11         MR. BRUNO:  CAN WE JUST ANSWER THIS BASIC QUESTION, WE

04:52:01  12   CAN FIGHT ABOUT THE SCOPE.  I JUST WANT TO KNOW FOR MY PURPOSES

04:52:03  13   WHETHER THE COURT WOULD HAVE A REAL PROBLEM -- AND TO BE CANDID

04:52:06  14   WITH YOU JUDGE, MR. SCHULTZ IS MORE KNOWLEDGEABLE ABOUT THE SOILS

04:52:10  15   PART AND I AM MORE KNOWLEDGEABLE ABOUT THE WAVE PART.  SO IT'S NOT

04:52:14  16   THAT WE'RE DOUBLING UP, IT JUST FRANKLY MAKES MORE SENSE TO US.

04:52:18  17   BUT IF IT'S A BIG PROBLEM FOR YOUR HONOR.

04:52:19  18         THE COURT:  NOT A BIG PROBLEM FOR ME AT ALL.  I

04:52:26  19   UNDERSTAND THE OBJECTION, BUT I DO HAVE CONTROL OF THE TRIAL AND I

04:52:30  20   AM GOING TO ALLOW YOU TO DO IT.

04:52:31  21         MR. BRUNO:  THANK YOU, JUDGE.  AND OBVIOUSLY I AM AN

04:52:34  22   OFFICER OF THE COURT, I UNDERSTAND, I THINK I UNDERSTAND WHAT

04:52:38  23   REBUTTAL IS, I DON'T AGREE WITH THEM BUT I CAN PROMISE YOU -- WE'RE

04:52:40  24   NOT GOING TO GO BEYOND.  AND AS I TOLD YOU BEFORE --

04:52:43  25         THE COURT:  IF WE DO I'M SURE YOU WILL GET ROBUST

04:52:46  1    OBJECTIONS.

04:52:47  2         MR. BRUNO:  WE GET ROBUST OBJECTIONS REGARDLESS OF WHAT

04:52:50  3    WE DO.  BUT WE WILL BE USING THE DEMONSTRATIVES THAT THEY USED IN

04:52:54  4    CONNECTION WITH THEIR DIRECT.  SO PURPOSEFULLY SO THAT YOU CAN SEE

04:52:58  5    WE'RE STAYING WITHIN THE FRAME WORK OF WHAT'S BEEN OFFERED.

04:53:02  6         THE COURT:  ALL RIGHT.

04:53:03  7         MR. BRUNO:  THANK YOU, JUDGE, THANK YOU SO MUCH.

04:53:03  8         MR. FARRELL:  ONE OTHER QUICK POINT MR. BRUNO MENTIONED.

04:53:06  9    OUR COMMUNICATIONS MAY HAVE CROSSED.  MR. BRUNO MENTIONED THAT WE

04:53:09  10   HAD RECEIVED A LIST OF CATEGORY 2 EXHIBITS THAT THE PLAINTIFFS WERE

04:53:12  11   SEEKING TO ADMIT.  I HAVEN'T GOTTEN THAT COPY YET, IT COULD BE ON

04:53:16  12   ITS WAY, BUT I HAVEN'T SEEN IT YET.

04:53:18  13        MR. BRUNO:  IT'S HIS FAULT.

04:53:20  14        MR. FARRELL:  WE MAY WELL BE TALKING ABOUT THIS AS SOON

04:53:22  15   AS WE ADJOURN HERE.

04:53:24  16        THE COURT:  MAY BE A GOOD IDEA BECAUSE TIME IS RUNNING

04:53:26  17   OUT.

04:53:26  18        MR. FARRELL:  AND WE SUBMITTED A SIMILAR LIST TO THE

04:53:29  19   PLAINTIFFS OVER THE WEEKEND AND WE'RE WAITING FOR THEIR RESPONSE.

04:53:32  20   AGAIN, I THINK WE'RE GOING TO TRY TO HAMMER IT OUT THIS AFTERNOON.

04:53:34  21        THE COURT:  ALL RIGHT.  GOOD.  ANYTHING ELSE?

04:53:36  22        MR. BRUNO:  NOT THAT I CAN THINK OF, YOUR HONOR.

04:53:38  23        MR. TREEBY:  THE ONLY OTHER ISSUE THAT I KNOW OF AND

04:53:40  24   WHENEVER THE COURT WOULD LIKE TO TAKE IT UP, THE SUMMARY, A LITTLE

04:53:46  25   PIECE ACTUALLY OF THE SUMMARY, THE SO-CALLED SUMMARY EVIDENCE.

04:53:51  1  THAT'S STILL UP IN THE AIR.

04:53:53  2           THE COURT:  IT IS.

04:53:54  3           MR. BRUNO:  WE ALREADY AGREED TO TAKE IT UP AT THE CLOSE

04:53:57  4  OF THE DEFENDANT'S CASE, WE TALKED ABOUT THIS.

04:54:00  5           MR. TREEBY:  I THOUGHT YOUR HONOR SAID --

04:54:03  6           THE COURT:  I'LL DO WHENEVER YOU BOTH AGREE.

04:54:06  7           MR. BRUNO:  I ASKED YOU THAT ON FRIDAY EVENING WHEN WE

04:54:09  8  CLOSED AND YOU SAID LET THE DEFENDANTS CLOSE AND WE WILL DO IT ALL

04:54:12  9  ON ONE DAY.

04:54:13 10           THE COURT:  ALL RIGHT.

04:54:16 11           MR. TREEBY:  WELL, THAT DOES -- I GUESS, I DON'T KNOW

04:54:19 12  WHAT THAT DOES.  WE TALKED ABOUT THIS I THOUGHT AROUND NOON TODAY

04:54:23 13  ABOUT -- I DON'T KNOW WHEN WE TALKED ABOUT IT, YESTERDAY OR NOON

04:54:27 14  TODAY, WE TALKED ABOUT WHETHER MAYBE WE CAN DO IT TODAY OR FIRST

04:54:29 15  THING TOMORROW MORNING BECAUSE IT ALSO IMPLICATES THE ISSUE OF THEM

04:54:33 16  CALLING A WITNESS, FRANKLY, THAT IS NOT ON THE WITNESS LIST AND WE

04:54:37 17  DON'T THINK SHOULD BE ALLOWED.  AND THOSE ARE TWO --

04:54:40 18           THE COURT:  WELL, I TELL YOU WHAT I AM GOING TO DO.

04:54:42 19  LET'S ARGUE IT RIGHT NOW.

04:54:44 20           MR. BRUNO:  WELL, MR. SIMS IS NOT HERE.  MR. TREEBY DOES

04:54:53 21  THIS TO ME ALL THE TIME.  THE FACT OF THE MATTER IS WE HAVE A

04:54:53 22  WITNESS IN TOWN AVAILABLE TO TAKE THE STAND --

04:54:55 23           THE COURT:  LET ME TELL YOU WHAT I AM GOING TO DO.  I AM

04:54:57 24  GOING TO MAKE IT SIMPLE.  I AM GOING TO ADMIT THE SUMMARY EXHIBIT.

04:54:59 25  I AM GOING TO ADMIT IT AND LET YOU ARGUE IT IN BRIEF WHAT'S WRONG

04:55:03  1   WITH IT.  THAT'S THE ONLY WAY I CAN EVER GET THROUGH THIS.  I

04:55:06  2   ADMITTED IT IN MY ORIGINAL HEARING, HE SAID THERE WAS NO 3D OR NEW

04:55:09  3   OPINION, THAT WAS MY OPINION, I AM NOT GOING TO GO BACK ON IT.  I'M

04:55:12  4   GOING TO ADMIT IT, AND YOU CAN POINT OUT ON BRIEFING THE THINGS

04:55:15  5   THAT ARE WRONG WITH IT.

04:55:17  6            MR. BRUNO:  THANK YOU, JUDGE.  WE WILL MOVE --

04:55:19  7            THE COURT:  I HIGHLY DOUBT IF IT WILL PLAY ANY ROLE IN MY

04:55:23  8   CAUSATION DETERMINATION.  FRANKLY, I AM GOING TO BE LISTENING TO

04:55:27  9   THE WITNESSES AND NOT NECESSARILY A CONTRIVED EXHIBIT.  BUT JUST TO

04:55:34 10   GET IT DONE, I AM GOING TO LET IT IN, AND ALL OF IT, AND I AM GOING

04:55:40 11   LET YOU PICK AT IT WHATEVER YOU THINK IS IMPORTANT AND THAT'S

04:55:44 12   WRONG.  OTHERWISE WE WILL BE HERE FOREVER.

04:55:47 13            MR. BRUNO:  THANK YOU, JUDGE, WE WILL DEAL WITH THE

04:55:48 14   NUMBERS WEDNESDAY.

04:55:49 15            THE COURT:  I WILL LET IT IN.

04:55:51 16            MR. BRUNO:  THANK YOU.

04:56:11 17         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

         18

         19                 *  *  *  *  *  *

         20

         21

         22

         23

         24

         25

1

2                        REPORTER'S CERTIFICATE

3

4          I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED

5    STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY

6    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE

7    BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE

8    PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER.

9

10

11    _____

12                        KAREN A. IBOS, CCR, RPR, CRR, RMR

13                        OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25