1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA

2

    ************************************************************

3

IN RE:  KATRINA CANAL BREACHES

4  CONSOLIDATED LITIGATION          DOCKET NO. 05-CV-4182
                                NEW ORLEANS, LOUISIANA

5  PERTAINS TO:  MRGO            TUESDAY, OCTOBER 2, 2012
        *ARMSTRONG NO. 10-CV-866*

6

    ************************************************************

7

8               DAY 15, AFTERNOON SESSION
           TRANSCRIPT OF TRIAL PROCEEDINGS

9     HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL
            UNITED STATES DISTRICT JUDGE

10

11

APPEARANCES:

12

FOR THE PLAINTIFFS:         BRUNO & BRUNO

13                      BY:  JOSEPH M. BRUNO, ESQ.
                      855 BARONNE ST.

14                      NEW ORLEANS, LA 70113

15

                      THE ANDRY LAW FIRM

16                      BY:  JONATHAN B. ANDRY, ESQ.
                      610 BARONNE ST.

17                      NEW ORLEANS, LA 70113

18

                      BARON & BUDD

19                      BY:  THOMAS SIMS, ESQ.
                      3102 OAK LAWN AVE., SUITE 1100

20                      DALLAS, TX 75219

21

                      DEGRAVELLES, PALMINTIER,

22                      HOLTHAUS & FRUGE
                      BY:  MICHAEL C. PALMINTIER, ESQ.

23                          JOSHUA M. PALMINTIER, ESQ.
                      618 MAIN STREET

24                      BATON ROUGE, LA 70801

25

```
 1
                          DOMENGEAUX, WRIGHT, ROY & EDWARDS
 2                        BY:  ELLWOOD C. STEVENS, JR., ESQ.
                               BONNIE KENDRICK, ESQ.
 3                        P. O. BOX 3668
                          556 JEFFERSON ST.
 4                        LAFAYETTE, LA 70502

 5
                          THE DUDENHEFER LAW FIRM, LLC
 6                        BY:  FRANK C. DUDENHEFER, JR., ESQ.
                          601 POYDRAS ST., SUITE 2655
 7                        NEW ORLEANS, LA 70130-6004

 8
                          FAYARD & HONEYCUTT
 9                        BY:  CALVIN C. FAYARD, JR., ESQ.
                          519 FLORIDA AVE., S.W.
10                        DENHAM SPRINGS, LA 70726

11
                          JOANEN LAW FIRM
12                        BY:  SCOTT JOANEN, ESQ.
                          4905 FRERET ST., SUITE B
13                        NEW ORLEANS, LA 70115

14
                          LEVIN, PAPANTONIO, THOMAS,
15                        MITCHELL, RAFFERTY & PROCTOR
                          BY:  MATTHEW D. SCHULTZ, ESQ.
16                        316 S. BAYLEN ST., SUITE 600
                          PENSACOLA, FL 32502
17

18                        THE TRIAL LAW FIRM PC
                          BY:  ANDREW P. OWEN
19                        800 WILTSHIRE BLVD., SUITE 500
                          LOS ANGELES, CA 90017
20

21                        J. ROBERT WARREN, II, A PLC
                          BY:  J. ROBERT WARREN, II, ESQ.
22                        1718 SHORT ST.
                          NEW ORLEANS, LA 70118
23

24                        COTCHETT, PITRE & MCCARTHY, LLP
                          BY:  PHILIP L. GREGORY, ESQ.
25                        840 MALCOLM ROAD, SUITE 200
                          BURLINGAME, CA 94010
```

3781

```
 1

 2    FOR THE DEFENDANT WASHINGTON
      GROUP INTERNATIONAL, INC.:       STONE PIGMAN WALTHER WITTMANN
 3                                     BY:  WILLIAM D. TREEBY, ESQ.
                                            JAMES C. GULOTTA, JR., ESQ.
 4                                          HEATHER S. LONIAN, ESQ
                                            MAGGIE A. BROUSSARD, ESQ.
 5                                     546 CARONDELET STREET
                                       NEW ORLEANS, LA 70130
 6

 7                                            - AND -

 8
                                       JONES DAY
 9                                     BY:  ADRIAN WAGER-ZITO, ESQ.
                                            DEBRA S. CLAYMAN, ESQ.
10                                          CHRISTOPHER N. THATCH, ESQ.
                                            CHRISTOPHER R. FARRELL, ESQ.
11                                          JULIA CRONIN, ESQ.
                                            BRIAN KERWIN, ESQ.
12                                     51 LOUISIANA AVENUE, N.W.
                                       WASHINGTON, D.C. 20001
13

14

15    FOR THE DEFENDANT UNITED
      STATES OF AMERICA:              U.S. DEPARTMENT OF JUSTICE
16                                     CIVIL DIVISION, TORTS BRANCH
                                       BY:  ROBIN D. SMITH, ESQ.
17                                          JAMES F. MCCONNON, JR., ESQ.
                                            RUPERT MITSCH, ESQ.
18                                          CONOR KELLS, ESQ.
                                            JOHN A. WOODCOCK, ESQ.
19                                     BENJAMIN FRANKLIN STATION
                                       P.O. BOX 888
20                                     WASHINGTON, D.C. 20044

21

22    OFFICIAL COURT REPORTER:         KAREN A. IBOS, CCR, RPR, CRR, RMR
                                       500 POYDRAS STREET, ROOM HB-406
23                                     NEW ORLEANS, LOUISIANA 70130
                                       (504) 589-7776
24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
      PRODUCED BY COMPUTER.
```

1                          I N D E X

2

3    WITNESS FOR WGI:                           PAGE/LINE:

4

5    FRANCISCO SILVA-TULLA

6

7      CONTINUED DIRECT EXAMINATION BY MR. TREEBY    3783/11

8      CROSS-EXAMINATION BY MR. SCHULTZ             3828/14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(TUESDAY, OCTOBER 2, 2012)

(AFTERNOON SESSION)

(OPEN COURT.)

THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE BE SEATED.

MR. TREEBY:  YOUR HONOR, PLEASE, I WANTED TO TOUCH ON A COUPLE OF SLIDES AND THEN CONTINUE ON, JUST FOR SOME THINGS.

THE COURT:  ALL RIGHT.

CONTINUED DIRECT EXAMINATION

BY MR. TREEBY:

Q.  DR. SILVA, I'VE CALLED UP SLIDE 52 THAT YOU TESTIFIED ABOUT AT ABOUT 11:35 ACTUALLY.  AND IN THE COURSE OF RESPONDING, YOU SAID ABOUT THE NFAATT AREA WHICH IS THE AREA THAT'S ON THE SAUCER MARINE THAT'S OUTLINED IN BLUE.  IT'S ENTITLED "NFAATT EXCAVATIONS WITH DEPTHS REACHING OR EXTENDING BELOW THE TOP OF ORGANIC CLAY."  AND YOU SAID, IF I REMEMBER CORRECTLY, EIGHT FEET.  DO YOU RECALL THAT?

A.  YES, SIR, I DO.

Q.  AND WAS THAT CORRECT?

A.  WELL, ACTUALLY MY MEMORY WAS NOT CORRECT.  IT WAS NINE FEET DEEP.  I SHOULD HAVE SAID 13 FEET.  AND THAT IS REPRESENTATIVE ELEVATION.  OR I'M SORRY, REPRESENTATIVE DEPTH.

Q.  AND THEN I WANT TO REFER YOU TO SLIDE 58, WHICH I THINK THIS IS AN ERROR THAT WE MAY HAVE MADE, BUT I WANT TO GET IT CORRECTED ON THE SLIDE ITSELF, IF I CAN FIND IT.  THERE IT IS.  IT SAYS, "PLUS

01:38:26  1    2.3 SOUTH BREACH," I THINK THAT'S SUPPOSED TO BE REFERRING TO THE

01:38:31  2    TOP OF WALL; IS THAT CORRECT?

01:38:32  3    A.   THAT IS CORRECT.

01:38:33  4    Q.   THAT'S NOT CORRECT, IS IT?

01:38:34  5    A.   THAT IS NOT THE RIGHT NUMBER.  IT SHOULD BE 12.1.

01:38:38  6    Q.   AND THAT'S REFLECTED THROUGHOUT OTHER SLIDES IN THE REPORT?

01:38:41  7    A.   WELL, THE OTHER SLIDES HAVE THE CORRECT NUMBER.

01:38:45  8    Q.   RIGHT.  AND FINALLY, IF YOU WOULD PUT UP SLIDE --

01:38:53  9         MR. TREEBY:  AND COULD WE PRINT THAT PERHAPS TO SHOW THE

01:38:55 10    CORRECTION?

01:38:55 11         THE COURT:  YOU MAY, YOU MAY.

01:38:57 12         MR. TREEBY:  I DON'T KNOW HOW TO DO THAT.

01:38:59 13         THE COURT:  SHEENA IS DOING IT.  I DON'T EITHER, SO WE'RE

01:39:05 14    IN THE SAME BOAT.

01:39:07 15    BY MR. TREEBY:

01:39:14 16    Q.   GO TO SLIDE 69.  THIS WAS THE AERIAL PHOTOGRAPH THAT YOU

01:39:20 17    TESTIFIED FROM, AND I JUST WANTED TO -- IT OCCURRED TO ME AT THE

01:39:25 18    TIME, AND I SHOULD HAVE GOTTEN UP.  FOCUSSING IN ON THE BLOWN UP

01:39:29 19    PORTION OF THE SCOUR TRENCH THAT IS REFLECTED, WOULD YOU -- AND YOU

01:39:35 20    TESTIFIED ABOUT -- WOULD YOU PUT AN ARROW MAYBE FROM THE LANDSIDE

01:39:42 21    WHERE THE WATER IS OVER TO THE SCOUR TRENCH YOU WERE REFERRING TO

01:39:47 22    JUST SOUTH OF THE SOUTH END OF THE NORTH BREACH?  CAN YOU DO THAT?

01:39:53 23    A.   (WITNESS COMPLIES.)

01:40:01 24    Q.   OKAY.  AND THEN YOU SAID THAT -- I BELIEVE YOU TESTIFIED THAT

01:40:05 25    YOU BELIEVED THAT YOUR OPINION WAS THAT THE -- ONCE THE BREACH

01:40:08 1    HAPPENED, THE WATER WOULD HAVE BEEN DEPRESSED FOR ABOUT 100 FEET

01:40:13 2    SOUTH OF THE SOUTH END OF THE NORTH BREACH.  WOULD YOU JUST DRAW A

01:40:17 3    LINE ON THE CANAL SLIDE TO REFLECT THAT?  I KNOW IT WON'T BE TO

01:40:21 4    SCALE, BUT THE AREA YOU'RE TALKING ABOUT.

01:40:36 5    A.  (WITNESS COMPLIES.)  WELL, THAT'S PROBABLY A BIT TOO LONG.  LET

01:40:40 6    ME CLEAR IT.

01:40:43 7    Q.  IT'S 100 FEET APPROXIMATELY.  I AM NOT TRYING TO GET IT TO

01:40:46 8    SCALE.  BUT THAT'S THE LOCATION THAT YOU WERE TALKING ABOUT, IS

01:40:48 9    THAT CORRECT, WITH THE GREEN MARK?

01:40:51 10   A.  THAT IS THE LOCATION THAT I WAS TALKING ABOUT, CORRECT.

01:40:54 11          MR. TREEBY:  AND IF WE COULD PRINT THAT?

01:40:57 12          THE WITNESS:  WAIT A MINUTE BECAUSE I ERASED THE ARROW,

01:41:00 13   SO I HAVE TO PUT IT BACK.

01:41:01 14          THE COURT:  OKAY.

01:41:02 15          THE WITNESS:  THAT IS CORRECT.  AND I MEAN, THAT'S

01:41:05 16   INFORMATION -- YES, THAT IS CORRECT, THAT IS THE AREA THAT I WAS

01:41:09 17   TALKING ABOUT.

01:41:11 18   BY MR. TREEBY:

01:41:12 19   Q.  IF WE COULD CONTINUE WITH YOUR PRESENTATION BEGINNING WITH

01:41:14 20   SLIDE 81.

01:41:34 21   A.  IF YOU CAN GO TO SLIDE 25 I HAVE ONE THING THAT I WOULD LIKE TO

01:41:39 22   MENTION THAT I THINK I FORGOT.  THIS IS VERY BRIEF COMMENT.

01:41:47 23          YOUR HONOR, WHEN WE WERE TALKING ABOUT THE SOIL SAMPLE

01:41:51 24   ILLUSTRATED HERE, I INTENDED TO MENTION THAT WE HAVE THE SOIL

01:41:56 25   DRAINS AND WE HAVE THE LIQUID, WHICH IS WATER IN OUR CASE, AND WE

01:42:01  1   HAVE HEARD DURING THE LAST TWO WEEKS A LOT OF TALK ABOUT DRAIN

01:42:05  2   CONDITIONS.  AND I JUST WANTED TO POINT OUT WHEN GEOTECHNICAL

01:42:10  3   ENGINEERS TALK ABOUT DRAIN CONDITION, IT DOESN'T MEAN THAT WE

01:42:14  4   REMOVE THE WATER FROM THESE PORES, IT'S NOT THAT WE DRAIN THAT

01:42:18  5   ELEMENT AS SUCH.  IT SIMPLY MEANS THAT WATER CAN FLOW IN OR OUT OF

01:42:24  6   THOSE PORES EASILY WHEN YOU APPLY A LOAD OR PRESSURE.  SO IT'S A

01:42:31  7   LITTLE BIT CONFUSING BECAUSE IT DOESN'T MEAN THAT WE DRAIN THE

01:42:35  8   SOIL, THIS DRAIN CONDITION.  THE SOIL CAN STILL BE FULLY SATURATED

01:42:39  9   AND YOU HAVE DRAIN CONDITIONS.

01:42:41 10          THE COURT:  OKAY.  I APPRECIATE THAT.  AND TELL ME WHY

01:42:46 11   THE WATER COULD FLOW THROUGH, SAY, A MOLECULE OF SOIL, THAT

01:42:55 12   REPRESENTS A MOLECULE OF SOIL, HYPOTHETICALLY, THAT IS FULLY

01:42:59 13   SATURATED, WHAT WOULD MAKE IT DRAIN IF NOT THE REDUCTION IN WATER

01:43:06 14   CONTENT?

01:43:07 15          THE WITNESS:  YEAH, THAT'S -- THIS IS AN ELEMENTAL SOIL

01:43:12 16   SO WE HAVE MANY DRAINS AND WATER, AND WHAT MAKES IT CONDITIONS

01:43:20 17   DRAIN IS SIMPLY THAT THE LOAD IS BEING APPLIED -- THE LOAD OR THE

01:43:24 18   PORE PRESSURE AS THE CASE MAY BE, CAN BE EITHER ONE, BUT IT IS

01:43:28 19   BEING APPLIED SLOWLY WITH RESPECT TO THE SPEED THAT WATER CAN FLOW

01:43:33 20   OUT OR IN OF THAT ELEMENT.  IT HAS NOTHING TO DO -- IT CAN REMAIN

01:43:39 21   COMPLETELY SATURATED THROUGH THIS OR DRAIN.  IT'S NOT A VERY GOOD

01:43:43 22   TERM FROM OUR PART, FRANKLY, AND I CAN APPRECIATE THAT.  BUT

01:43:46 23   BECAUSE WHEN I -- EVEN WHEN I TALK ABOUT DRAINING SOMETHING IT

01:43:51 24   MEANS TAKE THE WATER OUT OF IT.

01:43:53 25          THE COURT:  SO IS IT A FUNCTION OF THE SPEED WITH WHICH

01:43:56  1   PRESSURE CAN BE TRANSMITTED THROUGH THE I'LL CALL IT THE PARTICLE

01:44:00  2   WE'RE TALKING ABOUT?

01:44:01  3          THE WITNESS:  WELL, THE SPEED WITH WHICH PRESSURE CAN BE

01:44:09  4   TRANSMITTED, IT WOULD BE RELATED TO THAT BECAUSE IF YOU HAVE -- IF

01:44:15  5   YOU CAN HAVE FLOW THROUGH THAT ELEMENT EASILY, PRESSURES DUE TO ANY

01:44:20  6   CHANGES AHEAD DUE TO THAT FLOW COULD COME QUICKLY.

01:44:24  7          THE COURT:  WHAT WOULD RENDER THE FLOW EASIER THAN NOT

01:44:28  8   EASIER?  NOT CHANGING THE SOIL SKELETON, IN ESSENCE.  WHAT WOULD

01:44:33  9   MAKE IT BECOME EASIER?

01:44:35 10          THE WITNESS:  FOR A GIVEN ELEMENT OF SOIL, SO THE SOIL

01:44:41 11   DOESN'T CHANGE, WHAT MAKES IT EASY OR NOT IS THE RATE OF

01:44:45 12   APPLICATION OF THE LOAD.  IF I HAVE A SAND ELEMENT AND I SQUEEZE IT

01:44:53 13   WITH MY HANDS GENTLY, THE WATER CAN EASILY FLOW OUT.  THAT SAME

01:44:59 14   SOIL, NOTHING CHANGES, THAT SAME SOIL IF IT IS SUBJECTED TO AN

01:45:03 15   EARTHQUAKE OR A BLAST, THE LOAD IS APPLIED SO QUICKLY THAT THE

01:45:09 16   WATER DOESN'T HAVE TO GET OUT AND THAT WOULD BE UNDRAINED CONDITION

01:45:14 17   FOR THIS SOIL ELEMENT WOULD BE MADE OUT OF SAND.  SO THAT'S ONE

01:45:22 18   EXTREME.

01:45:23 19          ON THE OTHER SPECTRUM OF THE PERMEABILITY, WE HAVE A CLAY

01:45:27 20   ELEMENT.  IF I APPLY THE LOAD, YOU KNOW, IN A DAY OR SO THAT IS TOO

01:45:32 21   FAST FOR WATER TO FLOW OUT OF THE CLAY.  IN ORDER TO HAVE DRAIN

01:45:37 22   CONDITIONS IN A CLAY ELEMENT, I WILL HAVE TO APPLY THE LOAD VERY,

01:45:41 23   VERY SLOWLY.  SOME OF THE TESTS IN CLAY MATERIALS THAT I RUN IN

01:45:49 24   UNDRAINED CONDITIONS WITHOUT MEMBRANES WE HAVE TO APPLY THE -- WE

01:45:54 25   HAVE TO APPLY THE LOAD, YOU KNOW, IN MAYBE WEEKS OR EVEN MONTHS IN

01:45:59  1   ORDER TO ASSURE DRAIN CONDITIONS.  BY "DRAIN" MEANING THAT WE DO

01:46:04  2   NOT DEVELOP EXCESS PORE PRESSURE FROM THAT LOAD.  IN OTHER WORDS,

01:46:07  3   THE LOAD IS APPLIED SO SLOWLY THAT ANY PRESSURE THAT WANTS TO

01:46:11  4   DEVELOP IN THAT SOIL CAN BE DISSIPATED BY FLOW.

01:46:16  5        THE COURT:  SO DRAINAGE RELATES TO THE DRAIN OR UNDRAIN,

01:46:21  6   THE TIME WITH WHICH THE SOIL DRAINS OR UNDRAINS DEPENDS MORE ON ITS

01:46:26  7   PERMEABILITY THAN ITS SATURATION?

01:46:30  8        THE WITNESS:  IT HAS NOTHING TO DO -- WELL, I SHOULDN'T

01:46:32  9   SAY NOTHING TO DO.  BUT THE ANSWER IS, YES, IT DEPENDS.  IT

01:46:36 10   ACTUALLY DEPENDS NOT ON THE SATURATION --

01:46:39 11        THE COURT:  BUT ON THE PERMEABILITY.

01:46:42 12        THE WITNESS:  -- BUT ON THE PERMEABILITY AND THE

01:46:44 13   COMPRESSIBILITY BOTH.  SO IT DEPENDS ON THE COEFFICIENT OF

01:46:47 14   CONSOLIDATION REALLY, AND THAT'S THE PARAMETER THAT WE USE TO

01:46:52 15   COMPARE FASTER OR SLOW.  FAST OR SLOW DEPENDING -- COMPARED TO THE

01:46:58 16   TIME REQUIRED FOR WATER TO FLOW IN OR OUT.

01:47:00 17        THE COURT:  AND THE MAGNITUDE OF THE LOAD WOULD MAKE SOME

01:47:03 18   DIFFERENCE, WOULD IT NOT?

01:47:05 19        THE WITNESS:  WELL, THE MAGNITUDE OF THE LOAD MAKES A

01:47:07 20   DIFFERENCE IN THE MAGNITUDE OF THE PRESSURES THAT GET GENERATED,

01:47:11 21   BUT THE CONSOLIDATION PROCESS ITSELF WOULD TAKE THE SAME TIME.  SO

01:47:17 22   IT TAKES -- I MEAN, YOU WILL END UP -- IF YOU APPLY IT IN SMALLER

01:47:23 23   LOAD, YOU HAVE A LOWER PRESSURE IN THE PORES INITIALLY AND IT START

01:47:29 24   DISSIPATING, BUT THE DISSIPATION WOULD TAKE THE SAME TIME.

01:47:34 25        THE COURT:  OKAY.

01:47:35 1        THE WITNESS:  THE DISSIPATION IS A FUNCTION OF THE SOIL

01:47:38 2   PROPERTIES, AND ALSO, IT'S A FUNCTION OF THE -- WHAT WE CALL THE

01:47:43 3   DRAINAGE PATH, WHICH IS THE LENGTH OF THE TRAJECTORY THAT WATER

01:47:49 4   NEEDS TO TAKE TO FIND A FREE DRAINING SURFACE.  SO IF THE WATER HAS

01:47:53 5   TO GO THROUGH TEN FEET OF SOIL, IT WOULD TAKE A CERTAIN AMOUNT OF

01:47:56 6   TIME.  IF IT HAS TO GO THROUGH 20 FEET OF SOIL TO DRAIN, TO GET --

01:48:01 7   FIND A FREE DRAINING SURFACE, IT WOULD TAKE MUCH LONGER.

01:48:04 8        THE COURT:  ALL RIGHT, SIR.

01:48:07 9        THE WITNESS:  ANYWAY, I JUST WANTED TO MENTION THAT

01:48:10 10  CLARIFICATION BECAUSE IT IS USED IN GEOTECHNICAL ENGINEERING WHICH

01:48:13 11  IS CONTRARY TO WHAT THE DAILY USE OF THE WORD IS.

01:48:16 12       THE COURT:  SO I UNDERSTAND THE BASIC PRINCIPLE, AT

01:48:18 13  LEAST, THAT DRAIN DOES NOT MEANS THAT IT IS FREE OF WATER.

01:48:22 14       THE WITNESS:  EXACTLY.

01:48:23 15       THE COURT:  IT MAY HAVE THE SAME WATER CONTENT IT DID

01:48:25 16  PRIOR TO BEING DRAINED.

01:48:27 17       THE WITNESS:  CORRECT.

01:48:27 18       THE COURT:  AND SO DRAIN IS A FUNCTION OF SEVERAL THINGS,

01:48:34 19  AS I UNDERSTAND IT, BUT IT RELATES TO HOW RAPIDLY THE WATER CAN

01:48:41 20  FLOW THROUGH THE SOIL SKELETON, IN ESSENCE.

01:48:44 21       THE WITNESS:  CORRECT.  HOW RAPIDLY IT CAN FLOW THROUGH

01:48:47 22  THE SOIL SKELETON COMPARED TO THE RATE OF APPLICATION OF THE LOAD

01:48:51 23  OR PRESSURE.  SO VERY QUICK LOADS LIKE EARTHQUAKES CAN CAUSE

01:48:56 24  UNDRAINED CONDITIONS IN SOIL WITH HIGH PERMEABILITY, AND THE CLAYS

01:49:00 25  JUST ABOUT ANYTHING WE DO IS UNDRAIN FOR QUITE AWHILE.

01:49:05  1              THE COURT:  ALL RIGHT, SIR.

01:49:07  2              THE WITNESS:  THANK YOU, SIR.

01:49:19  3              OKAY.  SO BEFORE THE BREAK, WE WERE TALKING ABOUT LOOKING

01:49:24  4    AT DR. BEA'S FAILURE ANALYSIS AND, IN ESSENCE, I JUST WANT TO GO

01:49:31  5    THROUGH A FEW OF THE REASONS WHY I CONCLUDE THAT THIS ANALYSIS DO

01:49:36  6    NOT REALLY REFLECT ACTUAL FIELD CONDITIONS DURING THE KATRINA STORM

01:49:42  7    SURGE.

01:49:44  8              THE MAIN POINT I WANT TO MAKE, AND I DID MENTION IT

01:49:50  9    EARLIER THIS MORNING, IS THAT FLOW OR PORE PRESSURES DO NOT TRAVEL

01:49:55 10    VERY FAR DURING THE 30 HOURS TO FAILURE.  IF WE LOOK AT THE NORTH

01:50:02 11    BREACH AND WE USE SITE SPECIFIC PERMEABILITY, WHICH IS LOWER CASE

01:50:09 12    "K" AND SIGHT SPECIFIC COMPRESSIBILITY, WHICH IS THE $M_V$, I HAVE

01:50:16 13    DEFINED HERE PENETRATION DISTANCE AND THE PENETRATION DISTANCE IS

01:50:20 14    PRESSURE HAD INCREASE OF ONE INCH OF WATER.  IT'S A TINY AMOUNT OF

01:50:25 15    PRESSURE INCREASE, SO IT'S A PRESSURE HEAD INCREASE OF ONE INCH OF

01:50:31 16    WATER IN 30 HOURS.

01:50:32 17              AND IF WE LOOK AT THE WHOLE PROPERTIES IN THE NORTH

01:50:35 18    BREACH WE FIND THAT IN THE 30 HOURS THAT IT TOOK THE FAILURE TO

01:50:40 19    OCCUR AFTER THE STORM SURGE STARTED, THE WATER PENETRATES ONLY FIVE

01:50:46 20    TO NINE FEET.  LET'S CALL IT TEN FEET.  SO WE HAVE A TEN-FOOT

01:50:51 21    PENETRATION.  TEN FEET AWAY FROM THE FACE OF AN OPEN EXCAVATION

01:50:55 22    NOW, MIND YOU, AND WE HAVE TO KEEP IN MIND THAT ALL OF THESE

01:51:00 23    EXCAVATIONS, NOT ALL OF THEM, BUT MOST OF THEM WERE BACKFILL, AND

01:51:04 24    THE ONES THAT WERE NOT BACKFILLED WERE NOT ANYWHERE NEAR THE

01:51:07 25    FAILURES.

01:51:10  1          SO KEEPING THAT IN MIND, TEN FEET DISTANCE, AND AFTER
01:51:16  2  THAT DISTANCE THE SOIL DOESN'T FEEL THE PRESSURE DURING THE
01:51:22  3  30 HOURS.  IF WE USE DR. BEA'S SOIL PROPERTIES, PERMEABILITY AND
01:51:26  4  COMPRESSIBILITY, THAT DISTANCE TURNS OUT TO BE ALMOST 3,000 FEET.
01:51:32  5  IF WE GO TO THE SOUTH BREACH, AGAIN THE SITE-SPECIFIC SOIL
01:51:37  6  PROPERTIES GIVE ME FROM 9 TO 16, SO LET'S JUST USE 16.  NINE IS
01:51:45  7  WITHOUT THE APPLICATION OF THE HYDROGRAPH LOAD GENTLY, SO APPLYING
01:51:51  8  A TRANSIENT LOAD UNTIL IT REACHES THE PEAK JUST BEFORE FAILURE, AND
01:51:55  9  THE 16 IS WHAT I GET IF I APPLIED THE LOAD SOLIDLY.
01:52:06  10         AND AGAIN, WE USE DR. BEA'S PARAMETERS, WE GET ABOUT
01:52:11  11 3,000 FEET, AND THIS EFFECT THAT GOES OUT ABOUT 3,000 FEET HAPPENS
01:52:20  12 ALMOST IMMEDIATELY.  IN MY ANALYSIS IN THIS LOW PERMEABILITY SOIL,
01:52:27  13 THE TIME FOR A MOLECULE OR WATER OR PRESSURE INCREASE OF ONE INCH
01:52:35  14 TO REACH THE FLOODWALL WOULD BE ABOUT 1,000 DAYS IN NORTH BREACH
01:52:39  15 AND ABOUT 100 DAYS FOR THE SOUTH BREACH.  LIKEWISE, I MEAN, ALONG
01:52:45  16 THE FLOODWALL, WE'RE STILL NOT IMPACTING AT ALL THE LANDSIDE WHICH
01:52:50  17 IS WHERE THE FAILURE ACTUALLY HAS TO BE.  IF WE LOOK AT THE TIME
01:52:56  18 THAT IT TAKES TO GET TO THE JOURDAN AVENUE CULVERT, I GET 2,000
01:53:00  19 DAYS FOR THE NORTH BREACH PROPERTIES AND 250 DAYS FOR THE SOUTH
01:53:04  20 BREACH PROPERTIES.
01:53:08  21         SO HERE WE SEE VERY IMPORTANT DIFFERENCE JUST FROM
01:53:13  22 LOOKING AT THE NUMBERS.  WE GET VERY, VERY, DIFFERENT RESULTS.
01:53:20  23 IT'S WORTH REPEATING.  I AM TALKING HERE, THE PENETRATION DISTANCE
01:53:24  24 IS THE DISTANCE FOR PRESSURE HEAD INCREASE OF ONE INCH OF WATER.
01:53:28  25 SO BEYOND THAT PENETRATION DISTANCE, THE INCREASE IS SO SMALL THAT

01:53:32  1    IT'S LESS THAN ONE INCH OF WATER.

01:53:35  2         I TRIED TO SHOW HERE GRAPHICALLY WHAT THAT MEANS BY USING

01:53:42  3    THE WEDDING CAKE EXCAVATION.  NOW, HERE IS THE EXCAVATION AND THIS

01:53:48  4    COMPUTATION WAS MADE WITH THIS EXCAVATION ACTING AS A SWIMMING

01:53:54  5    POOL, COMPLETELY OPEN.  THAT'S NOT WHAT WE HAVE AND WE CAN'T FORGET

01:53:59  6    THAT.  THESE EXCAVATIONS WERE BACKFILLED.  THEY WERE BACKFILLED

01:54:03  7    WITH ACTUAL NATIVE MATERIALS, THEY WERE COMPACTED TO A CONDITION

01:54:07  8    SIMILAR TO THE SURROUNDING SOILS.  SO AS FAR AS THE FLOODWATERS,

01:54:13  9    THAT EXCAVATION REALLY DID NOT EXIST WHEN THE FLOODWATERS CAME OVER

01:54:18 10    THE EBIA.  BUT LET'S KEEP THAT IN THE BACK OF OUR MINDS, AND I

01:54:22 11    MIGHT REMIND OURSELF A NUMBER OF TIMES OF THAT BECAUSE SOMETIMES WE

01:54:26 12    START WORKING WITH THIS HYPOTHETICAL SITUATIONS AND WE START

01:54:30 13    BELIEVING THEM.

01:54:31 14         THE COURT:  I CLEARLY UNDERSTAND IT'S HYPOTHETICAL AND

01:54:33 15    THAT THE WEDDING CAKE EXCAVATION WAS BACKFILLED.  BUT IN THIS

01:54:38 16    ANALYSIS IT IS PRESUMED TO BE NOT BACKFILLED.

01:54:41 17         THE WITNESS:  EXACTLY, PRESUMED TO BE OPEN.  SO IF IT IS

01:54:43 18    OPEN, WE WILL HAVE 16 FEET IS AS FAR AS THE WATER WOULD GET, AS FAR

01:54:49 19    AS ANY INCREASE IN PRESSURE, ANY MEANINGFUL INCREASE IN PRESSURE

01:54:53 20    WOULD GET DURING THE STORM SURGE.  SO THAT'S IT.

01:54:56 21         SO WHAT DOES THAT TELL US?  WELL, IT REALLY DOESN'T

01:55:00 22    MATTER AS LONG AS THE EXCAVATION IS 16 FEET FROM THE FLOODWALL, IT

01:55:07 23    REALLY DOESN'T MATTER WHERE THE EXCAVATION IS.  THE EFFECTS WILL

01:55:12 24    NOT BE FELT.  IT REALLY DOESN'T MATTER WHAT IS THE DEPTH OF THE

01:55:15 25    EXCAVATION, BECAUSE AS I MENTIONED EARLIER, THERE'S NOTHING MAGICAL

01:55:20  1    ABOUT THE ORGANIC CLAY.  I MEAN, THE ORGANIC CLAY HAS SOMEWHAT

01:55:24  2    HIGHER PERMEABILITY, BUT IT'S NOT THAT MUCH HIGHER THAN THE CLAYS

01:55:28  3    ABOVE AND BELOW.  AND THE FLOW WILL OCCUR THROUGHOUT THE ENTIRE

01:55:34  4    CROSS SECTION.

01:55:35  5         I MEAN, THAT'S THE WAY I MODELED IT.  THAT'S THE WAY

01:55:40  6    DR. BEA MODELED IT.  THE FLOW OCCURS EVERYWHERE, NOT JUST IN THE

01:55:43  7    ORGANIC CLAY.  IT SIMPLY OCCURS VERY SLOWLY, AND THERE IS NO IMPACT

01:55:48  8    FROM ANY OF THESE EXCAVATIONS IF YOU MOVE 16 FEET AWAY FROM THE

01:55:52  9    FACE OF AN OPEN EXCAVATION.  SO WE COULD DRAW HERE A LINE 16 FEET

01:55:59  10   FROM THE FLOODWALL AND DURING THE STORM SURGE ANY EXCAVATION THAT

01:56:06  11   IS BEHIND THAT LINE REALLY HAS NO EFFECT ON THE CAUSE OF FAILURE.

01:56:13  12        THE COURT:  THANK YOU.

01:56:19  13        THE WITNESS:  NOW, NEVERTHELESS, WE TRY TO MODEL THE

01:56:25  14   EXCAVATIONS AS ACCURATELY AS POSSIBLE IN TERMS OF THE LOCATION AND

01:56:29  15   THE GEOMETRY.  AND IN EXAMINING DR. BEA'S ANALYSIS, WE QUICKLY

01:56:36  16   CONCLUDED THAT THE EXCAVATIONS THAT HE USED FOR HIS PORE PRESSURE

01:56:40  17   TRANSMISSION MODEL NEVER EXISTED.  WE SAW THEM FOR THE NORTH BREACH

01:56:47  18   HERE THE CASE 1-1 AND THE SOUTH BREACH CASE 1-1.  AND I SHOULD

01:56:53  19   POINT THIS OUT WE CROPPED THESE FIGURES SO WE CAN SHOW THEM WITH A

01:56:57  20   LARGER IMAGE.

01:57:00  21        AND THAT WAS HIS TESTIMONY HERE EARLIER THIS MONTH OR

01:57:04  22   LAST MONTH.  HE WAS ASKED, "IN FACT, YOU HAVE -- WELL, IS IT TRUE

01:57:10  23   YOU DON'T HAVE ANY EVIDENCE PRE-KATRINA THAT WASHINGTON GROUP

01:57:14  24   PERFORMED SUCH AN EXCAVATION.  I DON'T THINK WE WERE ABLE TO TRACE

01:57:19  25   THE CASE 1 EXCAVATION TO A SPECIFIC DOCUMENT CONCERNING WGI'S WORK

01:57:23  1    AT THAT LOCATION.  THE DOCUMENT TRAIL WENT COLD."  WAS THE

01:57:28  2    QUOTATION FROM THE DEPOSITION.  AND THE QUESTION WAS:  "IS THAT

01:57:31  3    STILL YOUR ANSWER?"  AND THE ANSWER FROM DR. BEA WAS, "YES."

01:57:35  4         SO THERE'S NO EVIDENCE FOR THIS EXCAVATIONS.  AND I THINK

01:57:46  5    THIS IS A SIMILAR EXAMPLE FROM THE TRIAL TESTIMONY.  "ISN'T IT TRUE

01:57:49  6    THAT YOU HAVE NO EVIDENCE PRE-KATRINA FOR ANY BACKFILLED EXCAVATION

01:57:53  7    AT THAT LOCATION OF THAT CROSS SECTION YOU SHOW IN CASE 1-1 OR 1-2,

01:57:58  8    NORTH BREACH, THAT HAS THOSE DIMENSIONS AS SHOWN ON THAT FIGURE?

01:58:02  9    BECAUSE THAT'S WHAT I WAS ASKING YOU ABOUT, WAS THE FIGURE.  WELL,

01:58:08 10    THE ANSWER TO THAT IS YES."  IS THE REPLY.

01:58:11 11         SO CLEARLY, THERE'S NO BASIS FOR THIS EXCAVATIONS AS

01:58:18 12    SHOWN HERE AT THE TOE OF UPSTREAM OR THE CANAL SIDE TOE OF THE

01:58:25 13    LEVEE.  I SHOULD POINT OUT THAT THIS BLACK COLUMNS REPRESENT

01:58:32 14    LOCATIONS OF SOIL BORINGS (INDICATING).

01:58:37 15         I MEAN, WE HAVE OTHER IRREGULARITIES LIKE THIS SHELL FILL

01:58:43 16    HERE WHICH EXTENDS ALL THE WAY DOWN TO THE TIP OF THE PILE, AND WE

01:58:47 17    COULDN'T FIND ANY EVIDENCE ANYWHERE THAT WAS THE CASE.

01:58:56 18         WE ALSO PUT -- WE ADDED TO THIS CROSS SECTION JUST TO SEE

01:59:00 19    THE RELATIONSHIP TO THE EXCAVATION, WE HAVE DRAINAGE DITCH THAT WAS

01:59:07 20    DISCUSSED EARLIER IN THIS TRIAL AND THE SEWER LINE THAT WAS ALSO

01:59:10 21    DISCUSSED EARLIER IN THIS TRIAL, AND THIS IS HOW THEY RELATE.  I

01:59:13 22    MEAN, THEY WERE QUITE REMOVED FROM THE EXCAVATION.  I SHOULD POINT

01:59:18 23    OUT BOTH OF THESE EXCAVATIONS ARE MUCH FARTHER AWAY FROM THE

01:59:23 24    FLOODWALL THAN 16 FEET, WHICH WOULD BE ABOUT HERE OR SO

01:59:27 25    (INDICATING).  SO REALLY, IN TERMS OF AFFECTING THE PERFORMANCE OF

01:59:31  1   THE STRUCTURE DURING KATRINA, THEY DON'T PLAY A ROLE.  THEY'RE JUST

01:59:35  2   TOO FAR AWAY FOR ANY FLOW THROUGH THOSE EXCAVATIONS, EVEN IF THEY

01:59:40  3   HAD BEEN LEFT OPEN, COMPLETELY OPEN TO REACH THE FLOODWALL.

01:59:49  4          AND HERE SIMILARLY FOR THE SOUTH BREACH, WE HAVE THE

01:59:53  5   DRAINAGE DITCH AND THE SEWER LINE TO GET AN IDEA.  AND THIS IS THE

01:59:56  6   CASE 2-1 WHERE WE HAVE A DRENCH BACKFILL APPROACHING THE WALL.  I

02:00:02  7   SHOULD POINT OUT THAT THIS TRENCH IS ONLY ABOUT TWO-FEET DEEP.  SO

02:00:07  8   WE HAVE TO BE VERY CAREFUL WHEN WE MODEL IT IN TWO DIMENSIONS

02:00:13  9   BECAUSE, IN ESSENCE, WE WILL BE MODELING THIS TRENCH AS BEING VERY,

02:00:16 10   VERY, WIDE.  BUT WE HAVE FOUND NO EVIDENCE THAT ANY OF THESE

02:00:21 11   UTILITY TRENCHES WERE AS DEEP AS SHOWN HERE, EXCEPT MENTIONED IN

02:00:27 12   THE SIGNED DOCUMENT FROM A DECADE AND A HALF BEFORE, I GUESS IT WAS

02:00:34 13   A 1966 DOCUMENT, SIGNED MEMORANDUM, THAT INDICATED THAT SOME OF THE

02:00:39 14   TRENCHES MIGHT HAVE TO REACH THAT DEEP, BUT, IN FACT, NONE OF THEM

02:00:44 15   EVER DID ACCORDING TO THE WGI DOCUMENTS DURING CONSTRUCTION.

02:00:51 16          NOW, SO THAT'S IN TERMS OF GEOMETRY.  SO THE GEOMETRY

02:00:57 17   DOES NOT REPRESENT ACTUAL FIELD CONDITIONS, AND I THINK THERE'S --

02:01:01 18   I GUESS THAT IS NOT DISPUTED.

02:01:09 19          SO LET'S MOVE ON TO SOME OF THE SOIL PROPERTIES THAT

02:01:13 20   DR. BEA USED.  AND ONE OF THE IMPORTANT PROPERTIES, AS WE MENTIONED

02:01:16 21   EARLIER, IS PERMEABILITY.  AND HERE IS A PLOT OF THE PERMEABILITY

02:01:20 22   DR. BEA USED VERSUS A DATE OR TIME.  NOW, INITIALLY THE ILIT REPORT

02:01:29 23   THE PERMEABILITY FOR THE ORGANIC CLAY -- AND WE'RE TALKING ABOUT

02:01:33 24   ORGANIC CLAY HERE.  THE PERMEABILITY WAS REPORTED AS TEN TO THE

02:01:35 25   MINUS TWO CENTIMETERS PER SECOND.  THAT ACTUALLY WAS SURPRISING.  I

02:01:43  1    MEAN, THESE CLAYS WERE THOUGHT TO HAVE A MUCH LOWER PERMEABILITY.

02:01:48  2    AND AS TIME WENT BY, DR. BEA CONCLUDED THAT IT WAS REALLY MUCH

02:01:55  3    LOWER THAN THAT, THAT IT WAS A TEN TO MINUS THREE, RIGHT AROUND

02:02:00  4    THIS POINT.

02:02:01  5          HE ALSO CONCLUDED THAT SOME PERTINENT PARAMETRIC ANALYSIS

02:02:05  6    AND IT TURNS OUT THE PERMEABILITY DOESN'T MATTER MUCH.  BUT AT ANY

02:02:12  7    RATE, HE WAS USING AROUND 2008 A PERMEABILITY OF TEN TO THE MINUS

02:02:19  8    THREE, AND SO ON.  IF WE MOVE ON TO PRESENT DAY, DR. BEA NOW AGREES

02:02:26  9    THAT THE PERMEABILITY OF THIS ORGANIC CLAY IS IN THE ORDER OF TEN

02:02:30 10    TO THE MINUS FIVE WHICH IS MORE APPROPRIATE FOR A CLAY.  YOU KNOW,

02:02:35 11    THE TEN TO THE MINUS TWO CORRESPONDS TO THE SAND-TYPE MATERIAL, AND

02:02:40 12    EVEN SOME OF THESE INTERMEDIATE POINTS CORRESPOND TO MATERIALS THAT

02:02:44 13    ARE NOT WHAT WE HAVE AT THE EBIA.

02:02:50 14          THIS VARIATION OF PERMEABILITY PER SE, I GUESS, REFLECTS

02:02:58 15    CONVERGENT TOWARDS OUR UNDERSTANDING OF THE SOIL PROPERTIES WHICH

02:03:02 16    IS FINE.  BUT WHAT'S A LITTLE BIT SURPRISING WAS THAT MOVING FROM

02:03:05 17    THE TEN TO MINUS TWO PERMEABILITY TO TEN TO THE MINUS FIVE

02:03:10 18    PERMEABILITY, DR. BEA'S CONCLUSIONS REMAIN ESSENTIALLY UNCHANGED.

02:03:18 19          AND THE OTHER THING THAT IS IMPORTANT TO MENTION IN THIS

02:03:25 20    REGARD IS THAT SINCE WE STARTED HERE AT TEN TO THE MINUS TWO FOR

02:03:29 21    THE ORGANIC CLAY, THAT MEANT THAT THE ORGANIC CLAYS COULD CARRY A

02:03:33 22    LOT OF FLOW, AND, IN FACT, THE ILIT REPORT TALKS ABOUT A LOT OF

02:03:37 23    FLOW THROUGH THE ORGANIC CLAY.  THEY THOUGHT THE ORGANIC CLAYS

02:03:41 24    WOULD CARRY SO MUCH FLOW THAT IT WOULD HAVE CONTRIBUTED TO THE

02:03:44 25    FLOODING OF THE NINTH WARD.

02:03:47  1          NOW, MOVING ONTO THE PRESENT WHERE WE HAVE TEN TO THE

02:03:50  2  MINUS FIVE, THE ORGANIC CLAYS CAN NO LONGER CARRY A LOT OF FLOW,

02:03:55  3  BUT THAT IMAGE OF THE ORGANIC CLAY SERVING AS A CONDUCT FOR FLOW

02:04:00  4  HAS REMAINED.  AND THAT'S WHERE I SAY THERE'S NO MAGIC ABOUT

02:04:04  5  GETTING TO THE ORGANIC CLAY BECAUSE THEY ARE RELATIVELY IMPERVIOUS,

02:04:10  6  THEY ARE NOT MUCH DIFFERENT FROM THE SURROUNDING CLAYS, AND WE

02:04:14  7  HAVE -- AND I AM AS GUILTY AS ANYBODY ELSE, BUT WE KEEP FOCUSSING

02:04:17  8  ON THIS ORGANIC CLAYS.  I THINK THAT'S A RELIC OF DR. BEA'S USE OF

02:04:23  9  TEN TO THE MINUS TWO AND THE ORGANIC CLAYS SERVING AS A CONDUCT OF

02:04:27  10  FLOW.  WHEN WE HAVE THIS PERMEABILITY OF TEN TO THE MINUS FIVE,

02:04:32  11  THAT MODEL DOESN'T MAKE ANY SENSE ANY LONGER.  AND WE SHOULD KEEP

02:04:37  12  THAT IN MIND.

02:04:44  13          NOW, DR. BEA NOW STATES THAT THERE IS PRESSURE

02:04:48  14  TRANSMISSION WITHOUT FLOW.  AND THE TRIAL TESTIMONY HERE GOES AS

02:04:54  15  FOLLOWS:  THE QUESTION WAS:  "YOU ALSO TESTIFIED, DID YOU NOT, IN

02:04:59  16  THIS CASE, THAT YOU RECOGNIZED THAT YOUR ANALYSIS OF THE UPLIFT

02:05:02  17  PRESSURE WAS RELATIVELY INSENSITIVE TO CHANGES IN HYDRAULIC

02:05:07  18  CONDUCTIVITY.  CORRECT"?  AND THE ANSWER WAS, "CORRECT."  THE

02:05:11  19  QUESTION:  "IN FACT, YOU HAVE TESTIFIED THAT YOU'RE NOT TALKING

02:05:13  20  ABOUT FLOWS; YOU'RE TALKING ABOUT CONDUCT OF PRESSURE.  RIGHT?"

02:05:16  21  AND THE ANSWER WAS "CORRECT."  SO IT'S NOT REALLY FLOW, IT IS

02:05:22  22  PRESSURE.

02:05:25  23          NOW, IF THERE IS NO FLOW, THERE IS NO SEEPAGE.  I MEAN, I

02:05:30  24  WENT TO THE WESTERN DICTIONARY AND THE DEFINITION OF SEEPAGE IS A

02:05:34  25  QUANTITY OF FLUID THAT HAS SEEPED THROUGH A POROUS MATERIAL.  AND

02:05:39  1   THE DEFINITION OF SEEPAGE IS TO FLOW OR PASS.  SO CLEARLY, IF

02:05:42  2   THERE'S NO FLOW, THERE'S NO SEEPAGE.  AND IF THERE'S NO SEEPAGE,

02:05:45  3   THERE'S NO UNDERSEEPAGE; SO WE'RE NOT TALKING ABOUT UNDERSEEPAGE

02:05:49  4   ANYMORE I GATHER FROM THIS PROGRESSION OF EVENTS BECAUSE THERE IS

02:05:53  5   NO FLOW.

02:05:59  6        SO WE'RE NOT TALKING ABOUT UNDERSEEPAGE, IT IS PRESSURE.

02:06:05  7   AND THEN WE HAVE TO FIGURE OUT, WELL, IF IT IS PRESSURE, HOW DOES

02:06:09  8   THE PRESSURE GET FROM THE CANAL SIDE TO THE LANDSIDE TO REALLY

02:06:12  9   AFFECT THE PERFORMANCE OF THE SOILS SO THAT THE FLOOD PROTECTION

02:06:19 10   SYSTEM FAILS?  DR. BEA USED SEEP/W.  SEEP/W IS A FLOW MODELING

02:06:29 11   PROGRAM, AND HE USED SEEP/W TO DETERMINE THE PRESSURES TRANSMITTED

02:06:35 12   TO THE LANDSIDE.  HE PERFORMED A TRANSIENT FLOW ANALYSIS USING

02:06:38 13   SEEP/W THAT REQUIRES GEOMETRY.

02:06:40 14        WE KNOW THAT GEOMETRY DOESN'T REFLECT ACTUAL CONDITIONS,

02:06:46 15   AND IT REQUIRES THREE KEY PARAMETERS:  PERMEABILITY, AND WE HAVE

02:06:49 16   TALKED ABOUT PERMEABILITY ALREADY; THE COEFFICIENT OF VOLUME CHANGE

02:06:54 17   OR COMPRESSIBILITY, $M_V$; AND POROSITY.  SO WE KNOW THAT THE

02:07:00 18   PERMEABILITY IN DR. BEA'S ANALYSIS DOESN'T MAKE MUCH DIFFERENCE.

02:07:04 19   AND THE REASON IT DOESN'T MAKE MUCH DIFFERENCE IS BECAUSE OF THE

02:07:08 20   CHOICE OF COMPRESSIBILITY, $M_V$.  AND WE REALIZED THIS EARLY IN THE

02:07:14 21   PROCESS, SO THAT THE $M_V$ WAS THE KEY TO ALL OF THIS, BUT WE DIDN'T

02:07:20 22   KNOW WHAT THE $M_V$ THAT HE WAS USING WAS AND WE TRIED TO FIND OUT.

02:07:24 23        THE FIRST SIX YEARS OF DR. BEA'S WORK WITH THIS EBIA

02:07:27 24   FAILURE, $M_V$ IS NOT MENTIONED ANYWHERE.  I COULDN'T FIND A SINGLE

02:07:31 25   MENTION OF $M_V$ IN ANY PROFESSIONAL PAPER, OR COURT DOCUMENTS, OR

02:07:36    1   REPORTS.  MAYBE THERE'S ONE SOMEWHERE, BUT I HAVEN'T SEEN IT.

02:07:43    2          NOW, A COMPREHENSIVE REVIEW OF HIS WORK IS IMPOSSIBLE

02:07:47    3   WITHOUT INFORMATION ABOUT $M_V$.  DR. BEA, HIMSELF, RECOGNIZES THAT $M_V$

02:07:53    4   IS A CRITICAL PARAMETER TO ANALYZE TRANSIENT FLOW.  AND IN THE

02:07:58    5   TRIAL TESTIMONY HE WAS ASKED, "AND HAVE YOU AGREED, HAVE YOU NOT,

02:08:03    6   THAT $M_V$ IS A CRUCIAL PARAMETER?"  AND THE ANSWER WAS YES.  SO NO

02:08:08    7   QUESTION THAT IT IS A CRUCIAL PARAMETER.  NEVERTHELESS, NO MENTION

02:08:12    8   OF $M_V$ IN ANY OF THE WORK FOR SIX YEARS.  AND IN TERMS OF THE

02:08:18    9   PUBLISHED PAPERS, I DON'T KNOW HOW THE REVIEWERS WERE ABLE TO

02:08:21   10   REVIEW HIS WORK WITHOUT THAT KEY PIECE OF INFORMATION.

02:08:30   11          SO INITIALLY NO MENTION, THEN WE ASKED -- WELL, I

02:08:38   12   ACTUALLY ASKED MR. TREEBY.  SAID WE NEED TO GET SOME INFORMATION

02:08:42   13   ABOUT $M_V$.  WE DON'T FIND ANYTHING AND, YOU KNOW, WE ARE NOT SURE

02:08:48   14   WHAT VALUE WAS USED.  SO WE WENT TO THE PLAINTIFFS' ATTORNEYS TO

02:08:55   15   REQUEST THIS INFORMATION, AND WE GET -- WE GOT A RESPONSE BACK IN

02:09:00   16   AN E-MAIL IN FEBRUARY OF 2012 FROM ONE OF THE PLAINTIFFS'

02:09:05   17   ATTORNEYS.  IT WAS AN E-MAIL ATTACHMENT WHICH TOLD US THAT THE

02:09:11   18   INPUT VALUE OF THE COEFFICIENT OF COMPRESSIBILITY WAS DEPENDENT ON

02:09:17   19   THE SOIL SKELETON ITSELF.

02:09:19   20          THEY WERE KIND ENOUGH TO MAKE THIS CLARIFICATION.  WE

02:09:22   21   KNEW THIS WAS THE CASE.  THE PROGRAMERS THAT PREPARED SEEP/W KNOW

02:09:29   22   THIS IS THE CASE.  KEEP THIS IN MIND BECAUSE THIS IS A VERY

02:09:32   23   IMPORTANT CONCEPT.  THE $M_V$ THAT WE NEED FOR THE SEEP/W ANALYSIS IS

02:09:36   24   DEPENDENT ON THE COMPRESSIBILITY OF THE SOIL SKELETON ITSELF.

02:09:39   25          NOW, THE E-MAIL SAID, "GIVEN THE ABSENCE OF THE

02:09:45  1    SITE-SPECIFIC DATA, A VALUE OF A TENTH TO THE MINUS FIVE TO

02:09:49  2    KILOPASCAL IS RECOMMENDED BY THE SOFTWARE PACKAGE."  WE CONVERTED

02:09:54  3    THAT TO THE UNITS THAT WE WILL BE USING FROM NOW ON WHICH IS ONE

02:09:58  4    OVER PSF.  IT'S A COMPRESSIBILITY OF 4.8 TIMES TEN TO THE MINUS

02:10:04  5    SEVEN, 1/PSF.  SO WE THOUGHT THAT THIS WAS THE $M_V$ THAT DR. BEA HAD

02:10:11  6    USED FOR AWHILE.  SO WE WENT BACK, REANALYZED EVERYTHING TRYING TO

02:10:14  7    UNDERSTAND HIS ANALYSIS BASED ON THIS COMPRESSIBILITY AND, YOU

02:10:23  8    KNOW, AND IT DIDN'T REALLY MAKE SENSE TO US.  WE COULDN'T REPRESENT

02:10:29  9    ANY SOILS THAT HE WAS GETTING.

02:10:31 10        SO THEN WE, YOU KNOW, WE HAD -- WE COME TO THE SECOND

02:10:36 11    EVOLUTION OF THE $M_V$ WHEN WE -- AT A DEPOSITION FOR MR. COBOS ROA,

02:10:44 12    DIEGO COBOS ROA WAS MENTIONED EARLIER, A STUDENT AT BERKELEY THAT

02:10:48 13    HELPED DR. BEA RUN THE FLOW ANALYSIS AND PERHAPS OTHER THINGS AS

02:10:52 14    WELL.  BUT WE LEARNED AT HIS DEPOSITION THAT IN ORDER TO GET PORE

02:11:02 15    PRESSURE RESPONSE, CERTAIN DESIRED PORE PRESSURE RESPONSE, DR. BEA

02:11:06 16    ASKED HIM TO SEE WHAT HE COULD DO IN THE PROGRAM TO GET THAT

02:11:11 17    RESPONSE.  AND COBOS ROA CAME UP WITH THIS VALUE OF ONE TO TEN TO

02:11:17 18    THE MINUS NINE 1/PSF IN ORDER TO GET THE PRECONCEIVED RESPONSE.

02:11:24 19    AND HERE IS HOW THAT WENT:

02:11:24 20        (WHEREUPON, THE FOLLOWING VIDEO CLIP WAS PLAYED:)

02:11:29 21        MR. TREEBY:  SEVERAL QUESTIONS RAISED BY WHAT YOU JUST

02:11:30 22    SAID.  WE CHOSE, WHO CHOSE, WHO IS "WE"?

02:11:35 23        THE WITNESS:  I'M SO SORRY.  GEOESTUDIOS INTERACTED WITH

02:11:40 24    DR. BEA IN THE SELECTION OF THIS PARAMETER.  DR. BEA ASKED

02:11:47 25    GEOESTUDIOS TO FIND A WAY HOW WE CAN MODEL THIS -- I'M SORRY,

02:11:57  1   INCOMPRESSIVE RESPONSE OF THE SOILS.  SO GEOSTUDIOS ESSENTIALLY

02:12:07  2   LOOKED FOR A NUMBER THAT WAS REPRESENTATIVE OF THE CONDITION AND

02:12:11  3   THAT'S WHEN WE CAME BACK TO DR. BEA AND SAID, HEY, IF WE USE THIS

02:12:19  4   VALUE OF TEN TO THE MINUS NINE, IT SEEMS LIKE WE GET THIS RESPONSE.

02:12:23  5   HE ACCEPTED AND SO WE WENT WITH THOSE VALUES.

02:12:29  6          MR. TREEBY:  DID DR. BEA TELL YOU TO USE THOSE VALUES OR

02:12:32  7   DID YOU DECIDE WITH SOMEBODY ELSE AT GEOSTUDIOS TO USE THAT VALUE?

02:12:40  8          THE WITNESS:  ONCE AGAIN, WE DECIDED TO MOVE WITH THIS

02:12:44  9   LOWER VALUE OF COMPRESSIBILITY AFTER A REQUEST BY DR. BEA TO TRY

02:12:49 10   AND CAPTURE THIS INCOMPRESSIBILITY RESPONSE.  SO WE CAME BACK TO

02:12:56 11   DR. BEA AND SAID, IF WE USE TEN TO THE MINUS NINE, AND WE FEEL WE

02:13:00 12   CAN, WE DO GET THIS RESPONSE, ESSENTIALLY DO YOU ACCEPT OR DO YOU

02:13:06 13   NOT ACCEPT AND CAN WE MOVE FORWARD?  SO DR. BEA DID NOT TELL US USE

02:13:11 14   TEN TO THE MINUS NINE, HOWEVER, HE DID APPROVE THE USE OF TEN TO

02:13:16 15   THE MINUS NINE."

02:13:16 16      (END OF VIDEO CLIP.)

02:13:31 17          THE WITNESS:  OKAY.  SO THAT'S THE SECOND EVOLUTION OF $M_V$

02:13:35 18   IT WAS DETERMINED -- GEOSTUDIOS, BY THE WAY, IT ESSENTIALLY DIEGO

02:13:39 19   COBOS ROA AS FAR AS WE WERE ABLE TO ASCERTAIN.

02:13:45 20          OKAY.  SO TEN TO THE MINUS NINE WAS SELECTED TO OBTAIN AN

02:13:49 21   INCOMPRESSIBLE RESPONSE.  SO WE SAID, OKAY.  LET'S GO BACK AND LOOK

02:13:53 22   AT THAT.  AND THEN CAME DR. BEA'S APRIL 2012 DEPOSITION, AND DURING

02:14:03 23   THIS DEPOSITION DR. BEA, FOR THE FIRST TIME, EXPLAINED TO US HOW $M_V$

02:14:11 24   WAS OBTAINED BY HIMSELF BASED ON THE DILATATIONAL MODULUS OF

02:14:18 25   SATURATED MARINE CLAYS.  DR. BEA HAS NEVER EXPLAINED WHY IF THE $M_V$

02:14:22  1    WAS, IN FACT, BASED ON THE DILATATIONAL MODULUS, HE USED THE VALUES

02:14:26  2    OF ZERO AND TEN TO THE MINUS NINE INSTEAD OF THE ACTUAL VALUE FOR

02:14:30  3    SATURATED CLAYS, WHICH IS CLOSER TO TEN TO THE MINUS -- TEN TO THE

02:14:34  4    MINUS EIGHT, 1/PSF.

02:14:38  5            THE DIFFERENCE IS NOT INSIGNIFICANT.  I MEAN, THE VALUE

02:14:41  6    ZERO, OF COURSE, IS INFINITELY SMALLER THAN HIS VALUE, AND THE

02:14:48  7    VALUE OF TEN TO THE MINUS NINE IS 20 TIMES SMALLER THAN -- I'M

02:14:52  8    SORRY.  THE VALUE OF ZERO IS INFINITELY SMALLER THAN THE VALUE THAT

02:14:57  9    SHOULD HAVE BEEN USED FOR SATURATED CLAYS.  AND THE VALUE OF TEN TO

02:15:01 10    THE MINUS NINE IS ABOUT 20 TIMES SMALLER THAN THE VALUE THAT SHOULD

02:15:05 11    HAVE BEEN USED FOR SATURATED CLAYS.

02:15:09 12            AND THIS IS HOW THAT ONE:

02:15:13 13        (WHEREUPON, A VIDEO CLIP WAS PLAYED AS FOLLOWS:)

02:15:22 14        THE WITNESS:  I KNOW THE REASON FOR THE TEN TO THE MINUS

02:15:25 15    NINE PER 1/PSF.  THAT NUMBER WAS IDENTIFIED BASED ON PERFORMING THE

02:15:39 16    ANALYSIS IN STEADY FLOW CONDITIONS.  THE TEN TO THE MINUS NINE WAS

02:15:48 17    DETERMINED BASED ON THE SOIL-WATER DILATATIONAL MODULUS.

02:15:48 18        (END OF VIDEO CLIP.)

02:16:16 19        THE WITNESS:  SO THE THIRD EVOLUTION OF THE $M_V$ WAS THE

02:16:19 20    DILATATIONAL MODULUS OF THE SATURATED MARINE CLAYS.  NOW, THE

02:16:25 21    PROBLEM WITH THIS, THE VALUE HADN'T CHANGED, BUT HOW HE WAS

02:16:29 22    DETERMINING WAS DIFFERENT.  THE PROBLEM IS THAT THE DILATATIONAL

02:16:35 23    MODULUS OF SATURATED CLAYS DOESN'T REALLY TELL YOU VERY MUCH ABOUT

02:16:40 24    THE COMPRESSIBILITY OF THE SOIL SKELETON.  THE DILATATIONAL MODULUS

02:16:47 25    OF THE MARINE CLAYS DEPENDS, REFLECTS LARGELY THE COMPRESSIBILITY

02:16:50  1   OF THE PORE FLUID, AND THAT IS NOT WHAT YOU USED IN SEEP/W WHEN YOU

02:16:56  2   DO A TRANSIENT FLOW ANALYSIS.  SO THE VALUE REMAINED THE SAME BUT

02:17:04  3   THE ORIGIN THEY CHANGED.

02:17:06  4        AND THEN WE MOVE ON TO DR. BEA'S JUNE 2012 DEPOSITION,

02:17:11  5   AND FOR THE FIRST TIME HE EXPLAINED DURING THE DEPOSITION THAT

02:17:17  6   DR. BEA AND HIS TEAM HAD DETERMINED THIS VALUE OF ONE TO TEN TO THE

02:17:21  7   MINUS NINE BASED ON PARAMETRIC ANALYSIS.  AS IT TURNS OUT, WE WERE

02:17:28  8   NEVER ABLE TO CHECK THIS CALCULATIONS SINCE THE TWO PIECES OF

02:17:32  9   EQUIPMENT THAT CONTAINED THE ONLY COPIES OF THE FILES WERE STOLEN

02:17:35 10   OR LOST OR DAMAGED AND THIS INFORMATION WAS NEVER PRODUCED.

02:17:42 11        SO AGAIN, THE NUMBER STAYS THE SAME.  I MEAN, EVERY TIME

02:17:46 12   WE LEARN ONE, YOU KNOW, EITHER A CHANGE IN THE VALUE OR THE ORIGIN

02:17:52 13   OF THE VALUE WE HAVE TO GO BACK AND REDO OUR ANALYSIS AND FIGURE

02:17:56 14   OUT HOW WE CAN BEST UNDERSTAND WHAT THEY MEANT.

02:18:00 15        AND THIS IS AN EXCERPT FROM THE DEPOSITION WHERE DR. BEA

02:18:09 16   IS ASKED:  "NOW, WE HAVE NOT BEEN PROVIDED THIS NUMERICAL

02:18:13 17   EXPERIMENTS -- DOCUMENTS THAT YOU HAVE DESCRIBED.  ARE THERE SUCH

02:18:15 18   DOCUMENTS?  DO YOU HAVE THESE NUMERICAL EXPERIMENTS?  DO YOU HAVE

02:18:20 19   THE DOCUMENTATION FOR THEM?"  AND THE ANSWER WAS:  "I DON'T THINK

02:18:23 20   SO.  DR. COBOS ROA RETAINED THE ELECTRONIC FILES AND, AS HAS BEEN

02:18:27 21   EXTENSIVELY DISCUSSED, THOSE FILES ARE NO LONGER AVAILABLE."

02:18:31 22        AND THE FINAL EVOLUTION, AT LEAST UP TO NOW, THE FINAL

02:18:36 23   EVOLUTION OF THE $M_v$ PARAMETERS USED BY DR. BEA WAS FIRST PRESENTED

02:18:41 24   DURING THIS TRIAL.  AND BASICALLY, THE CONCEPT WAS THAT THE ORGANIC

02:18:45 25   CLAY IS A FLUID AND THE $M_v$ OF THE ORGANIC CLAY SHOULD BE EQUAL TO

02:18:51  1   THE $M_v$ OF WATER.  IT WAS ALSO SOMEWHAT SURPRISING STATEMENT THAT

02:18:57  2   THE ANALYSES ARE NOT INTENDED TO REPRESENT ACTUAL FIELD CONDITIONS

02:19:01  3   DURING KATRINA.

02:19:03  4         NOW, AGAIN, THE NUMBER HASN'T CHANGED MUCH BECAUSE EVEN

02:19:10  5   THOUGH IT IS SUPPOSED TO BE THE $M_v$ OF WATER, DR. BEA HASN'T CHANGED

02:19:14  6   THE TEN TO THE MINUS NINE, WHICH IS NOT THE $M_v$ OF WATER, BUT

02:19:18  7   SETTING THAT ASIDE, I STARTED THINKING, WELL, HOW DO I UNDERSTAND

02:19:22  8   WHAT'S GOING ON HERE?  AND THE ANSWER IS I REALLY CAN'T BECAUSE IF

02:19:27  9   THE ORGANIC CLAY IS A FLUID, THE LEVEE COULD NOT HAVE BEEN BUILT.

02:19:32 10   UNDER THE BEST CONDITIONS, THE FACTOR OF SAFETY WOULD BE LESS THAN

02:19:36 11   ONE.  ON A SUNNY DAY THE FACTOR OF SAFETY WOULD BE LESS THAN .9.

02:19:41 12   THAT IS NOT VERY HIGH KEEP IN MIND.

02:19:42 13         IF YOU THINK THAT YOU HAVE A FLUID LEVEL UNDER THE LEVEE,

02:19:45 14   YOU CAN'T PILE UP THE SOIL THERE.  IT'S JUST GOING TO SLIDE.  THE

02:19:50 15   FLUID HAS VERY LOW OR NEARLY ZERO SHEAR STRENGTH, SO ANY LOAD THAT

02:19:57 16   YOU PLACE IS GOING TO DISRUPT THE EQUILIBRIUM.  AND HE DECIDED NOT

02:20:02 17   TO GO ANY DEEPER ON THAT BECAUSE OBVIOUSLY EVEN ON THE BASIS OF A

02:20:09 18   GLOBAL STABILITY THIS, TO ME, WAS AN IMPOSSIBLE SITUATION.

02:20:12 19         THE COURT:  IS $M_v$ USED TO DETERMINE COMPRESSIBILITY OF

02:20:16 20   SOIL?

02:20:17 21         THE WITNESS:  $M_v$?  WELL, $M_v$ REFLECTS THE COMPRESSIBILITY

02:20:21 22   OF SOIL.  THE $M_v$ IS ACTUALLY DETERMINED IN LABORATORY TESTS.  SO

02:20:26 23   IT'S DETERMINED IN A CONSOLIDATION TEST.

02:20:29 24         THE COURT:  IT'S A RESULT OF A CONSOLIDATION TEST?

02:20:31 25         THE WITNESS:  RESULT OF A CONSOLIDATION TEST.

02:20:33 1          THE COURT:  WHICH IS DONE TO, AMONG OTHER THINGS, I

02:20:36 2   ASSUME, BUT PRIMARILY TO ASCERTAIN THE COMPRESSIBILITY, THE STATE

02:20:41 3   OF COMPRESSIBILITY THE SOIL IS IN AT THE TIME OF THE TEST?

02:20:44 4          THE WITNESS:  CORRECT, YEAH.  AND THE TEST ALSO GIVES YOU

02:20:47 5   AN IDEA OF HOW FAST YOU GET TO THE EQUILIBRIUM POSITION.  IT ALSO

02:20:51 6   GIVES YOU A MEASURE OF HOW EASILY THE WATER CAN FLOW OUT OF THE

02:20:56 7   SOIL PORES, SO THAT IS WHAT A CONSOLIDATION TEST DOES.

02:21:01 8          THE COURT:  ALL RIGHT.  AND OF COURSE, THE BOTTOM LINE

02:21:05 9   IS, YOU TAKE EXCEPTION WITH USING TEN TO THE MINUS NINE FOR THE

02:21:12 10  COMPRESSIBILITY FACTOR THAT IS THIS, IN ESSENCE, CLOSE TO BEING

02:21:21 11  INCOMPRESSIBLE; IS THAT CORRECT?

02:21:22 12         THE WITNESS:  YES, SIR, THAT IS EXACTLY, YOU'RE READING

02:21:25 13  MY MIND BECAUSE THAT IS EXACTLY THE POINT OF THE NEXT SLIDE.  THE

02:21:29 14  SOIL PROPERTIES THAT DR. BEA USED FOR HIS ANALYSIS CORRESPOND TO A

02:21:33 15  POROUS ROCK.  AND, IN FACT, WE TRIED TO FIGURE OUT THE MATERIAL

02:21:40 16  THAT WAS BE SIMILAR.  WE HAVE TEN TO THE MINUS FIVE PERMEABILITY

02:21:44 17  AND A COMPRESSIBILITY OF TEN TO THE MINUS NINE, AND WE IDENTIFIED

02:21:50 18  SANDSTONE IN OHIO, AND I BROUGHT A SAMPLE HERE, AND IF I MAY GIVE

02:21:55 19  YOU A SMALL VERSION.

02:21:57 20         THE COURT:  SURE.

02:22:02 21         THE WITNESS:  THIS IS THE BEREA SANDSTONE WHICH IS FROM

02:22:06 22  OHIO, AND IT'S VERY WELL STUDIED, AND THAT'S WHY WE COULD FIGURE

02:22:11 23  OUT THAT COMPRESSIBILITY WAS TEN TO THE MINUS NINE AND THE

02:22:14 24  PERMEABILITY TEN TO THE MINUS FIVE.  IT IS USED EXTENSIVELY IN THE

02:22:18 25  PETROLEUM INDUSTRY AS A STANDARD TO TEST FLUIDS TO ENHANCE THE

02:22:25  1   RECOVERY OF PETROLEUM PRODUCTS FROM THE RESERVOIRS.  SO THE BEREA

02:22:31  2   SANDSTONE IS, IN FACT, TEN TO THE MINUS NINE COMPRESSIBILITY AND

02:22:35  3   TEN TO THE MINUS FIVE PERMEABILITY.

02:22:38  4          NOW, YOU CAN COMPARE THAT WITH THE EBIA CLAY, AND WE

02:22:46  5   BROUGHT YOU A LITTLE THING SO YOU CAN DO THE COMPARISON WITHOUT

02:22:51  6   HAVING TO --

02:22:53  7          THE COURT:  THE COURT IS COGNIZANT THAT THE SANDSTONE IS

02:22:57  8   FAR LESS -- IT'S MUCH MORE STIFF THAN THE CLAY.

02:23:02  9          THE WITNESS:  MUCH STIFFER THAN THE CLAY, EXACTLY.

02:23:05  10         THE COURT:  I DON'T WANT TO USE ANY SCIENTIFIC TERMS.

02:23:07  11         THE WITNESS:  EXACTLY THAT IS A PRETTY GOOD TERM TO USE.

02:23:09  12   "STIFFNESS" IS A SCIENTIFIC TERM THAT WE USE A LOT.

02:23:12  13         BUT, IN ESSENCE, WHAT DR. BEA DOES WHEN HE PERFORMED HIS

02:23:17  14   ANALYSIS IS HE HAS THE CLAY THERE, AND THIS IS A SAMPLE OF THE

02:23:21  15   ORGANIC CLAY, SO IS THE ONE THAT YOU HAVE.  SO HE HAS THE CLAY, THE

02:23:27  16   ORGANIC CLAY IN PLACE, THE FLOODWATERS COME AND INUNDATE THE EBIA,

02:23:39  17   AND HE WANTS -- YOU KNOW, YOU GET PORE PRESSURE INCREASE DUE TO THE

02:23:43  18   LOAD ON TOP OF THE CLAY.  WE DISCUSSED THAT.  BUT NOW DR. BEA WOULD

02:23:48  19   LIKE TO HAVE -- TO SEE HOW THIS PORE PRESSURES MOVE TO THE

02:23:52  20   LANDSIDE.

02:23:52  21         SO IN ESSENCE, WHAT HE DOES IS HE TAKES THE CLAY OUT OF

02:23:56  22   THE EBIA PROFILE AND SUBSTITUTES THE SANDSTONE AND COMPUTES THE

02:24:03  23   TRANSMISSION OF PORE PRESSURE BASED ON FLOW THROUGH THIS RIGID

02:24:08  24   MATERIAL.  THIS IS LIKE THE STEADY FLOW SIMULATOR THAT WE SAW

02:24:11  25   OUTSIDE THIS MORNING.  SO HE COMPUTES THE PORE PRESSURE BASED ON

02:24:16  1   THIS MATERIAL, BUT NOW THAT, OF COURSE, THE PORE PRESSURE BY

02:24:20  2   THEMSELF DID NOT CAUSE ANY PROBLEM IN THE SANDSTONE.  SO IN ORDER

02:24:27  3   TO WEIGH THE FAILURE, HE KEEPS THE PORE PRESSURE THAT HE GETS IN

02:24:30  4   THE SANDSTONE, BUT THIS SANDSTONE IS VERY STRONG, SO IT WOULDN'T

02:24:33  5   FAIL.  SO TO GET THE SAFETY FACTOR, HE TAKES THE SANDSTONE OUT AND

02:24:38  6   PUTS THE CLAY BACK IN AND COMPUTES THE FACTOR OF SAFETY BASED ON

02:24:45  7   THE STRENGTH OF THIS MATERIAL, WHICH IS A LOT LESS RESISTANT, BUT

02:24:49  8   THE PORE PRESSURE IS BASED ON THIS MATERIAL (INDICATING).

02:24:52  9        NOW, THAT TO ME ILLUSTRATES THE NATURE OF THE ANALYSIS,

02:24:58 10   AND IT WAS VERY HARD FOR ME TO AGREE THAT THAT SENSIBLE WAY TO LOOK

02:25:03 11   AT THIS PROBLEM.

02:25:07 12        MR. SCHULTZ:  CAN WE GET AN IDENTIFICATION, DR. SILVA,

02:25:09 13   PLEASE, OF THE DEPTH AND BORE HOLE FOR THAT PARTICULAR PIECE OF

02:25:12 14   SOIL?

02:25:12 15        THE WITNESS:  LET'S SEE, TO DO THAT I NEED TO PUT ON MY

02:25:16 16   READING GLASSES.  AND THIS IS EBIA B-23, SAMPLE 5A, AND IT WAS 16

02:25:25 17   TO 17 FEET DEEP.

02:25:28 18        MR. SCHULTZ:  THANK YOU.

02:25:29 19        THE WITNESS:  IT'S JUST A TYPICAL ORGANIC CLAY SAMPLE.

02:25:33 20   NOTHING PARTICULARLY SPECIAL ABOUT IT.

02:25:39 21        NOW, SINCE WE'RE DEALING WITH THE SAMPLES, SEVERAL WEEKS

02:25:46 22   AGO DR. BEA -- WHEN DR. BEA WAS HERE, HE SHOWED YOUR HONOR SOME

02:25:53 23   MASON JARS WITH SOIL SAMPLES AND WATER, WHICH I DON'T BELIEVE THAT

02:25:59 24   SOIL AND THAT WATER EVER EXISTED TOGETHER AS SOIL, BUT HE HAD

02:26:04 25   PROPORTIONED, A PROPORTION OF SOIL AND WATER THAT INDICATED A

02:26:09  1    SPECIFIC WATER CONTENT.  AND IN FACT, THE JARS ARE STILL HERE AND

02:26:16  2    THE WATER CONTENTS RANGE FROM 50 PERCENT TO 200 PERCENT, AND YOU

02:26:21  3    REMEMBER THAT.  AND I MEAN, SOME OF THEM LOOK PRETTY LIQUID.  IT'S

02:26:30  4    ESSENTIALLY A FLUID.  AND THIS WAS PART OF HIS CONCEPT OF THIS

02:26:34  5    FLUID LAYER MECHANISM THAT HE WAS PRESENTING FOR THE FIRST TIME

02:26:38  6    DURING THIS TRIAL.

02:26:39  7         I BROUGHT HERE -- AND I WILL SHOW YOU VERY BRIEFLY --

02:26:44  8    ACTUAL SOIL SAMPLES FROM THE EBIA WITH WATER CONTENTS THAT ARE

02:26:48  9    APPROXIMATELY SIMILAR TO THE ONES IN THE JARS.  JUST TO -- THIS ONE

02:26:56 10    HERE HAS A 50 PERCENT, 50 PERCENT WATER CONTENT.  THIS IS THE

02:27:03 11    ORGANIC CLAY AND THIS IS EBIA B-10, AND THE SAMPLE IS FROM 13 TO

02:27:09 12    14 FEET DEPTH, AND THE NATURAL WATER CONTENT IS 51 PERCENT VERSUS

02:27:16 13    50 PERCENT IN THE JAR.  SO ANYWAY, THIS IS THE ACTUAL SOIL.

02:27:36 14         THIS IS A SAMPLE FROM EBIA B-21, 10 TO 11 FEET,

02:27:40 15    100 PERCENT WATER CONTENT WHICH CORRESPONDS, I GUESS, TO THE ONE

02:27:50 16    THAT I WAS SHAKING.  THE ACTUAL CLAY, IT'S REALLY A SOIL, IT'S NOT

02:27:54 17    A LIQUID.  I MEAN, IT REALLY IS A SOIL.  IT CAN TAKE LOAD, IT HAS

02:28:00 18    THE PROPERTIES THAT ARE MEASURED IN THE LABORATORY AND SO ON.

02:28:03 19         AND WE CAN EVEN GO TO A SPECIMEN THAT HAS 200 PERCENT

02:28:09 20    NATURAL WATER CONTENT, AND THIS IS EBIA B-10, SAMPLE 6B, FROM 21 TO

02:28:15 21    22 FEET.  AND THE NATURAL WATER CONTENT OF 210.  AND TYPICALLY,

02:28:21 22    WHEN WE HAVE THIS HIGHER WATER CONTENT, WE HAVE A LOT OF ORGANIC

02:28:24 23    MATERIAL AND THAT'S WHAT GIVES IT THE HIGH WATER CONTENT.  IT'S NOT

02:28:27 24    THAT THE CLAY IS A LIQUID -- IT'S NOT THAT THE CLAY IS A LIQUID

02:28:37 25    LIKE SUGGESTED BY THIS JARS.  IT IS STILL CLAY THAT YOU CAN WORK

02:28:42  1    WITH AND FEELS QUITE SOFT AS THE WATER CONTENT INCREASES, BUT IT IS

02:28:49  2    NOT A FLUID.  I JUST WANTED TO CLARIFY THAT.

02:28:51  3            THE COURT:  YES, SIR.  THANK YOU.

02:29:14  4            THE WITNESS:  NOW, WITH REGARDS TO $M_V$.  SO THE MAIN

02:29:21  5    EFFECT THAT THIS $M_V$ HAS IS THAT WHEN YOU SUBSTITUTE AN $M_V$ THAT IS

02:29:28  6    ZERO LIKE DR. BEA HAS DONE OR CLOSE TO ZERO LIKE HE HAS DONE WITH

02:29:33  7    SO MANY OF THE MATERIAL LIKE TEN TO THE MINUS NINE, THE EFFECT IS

02:29:37  8    THAT YOU, IN ESSENCE, TRANSFORM THE PREFERENTIAL EQUATION OF FLOW,

02:29:45  9    FOR TRANSIENT FLOW INTO THE EQUATION FOR STEADY STATE FLOW, SO IT'S

02:29:50 10    DONE TENUOUSLY BY USING THE SANDSTONE.  YOU GET STEADY FLOW BECAUSE

02:29:54 11    THE RIGHT-HAND SIDE OF THE EQUATION IS EQUAL TO ZERO, AND THAT'S

02:29:58 12    WHY THE PERMEABILITY DIDN'T MAKE ANY DIFFERENCE IN TERMS OF THE END

02:30:03 13    RESULT.  BECAUSE WHEN YOU GET THIS UNREASONABLY LOW $M_V$, IT DOESN'T

02:30:08 14    MATTER WHAT PERMEABILITY YOU USE, YOU'RE GOING TO GET STEADY FLOW

02:30:12 15    IN A VERY SHORT TIME.

02:30:16 16            THERE WERE OTHER THINGS THAT FOR COMPUTATION IN DR. BEA'S

02:30:24 17    ANALYSIS.  DR. BEA USES A 30 PERCENT PORE PRESSURE INCREASE DUE TO

02:30:27 18    DILATATIONAL EFFECTS, AND THIS WAS SURPRISING TO US.  I MEAN, HE

02:30:31 19    QUOTED WORK BY MS. MOONIE -- MONEY RATHER, WHERE IN A PAPER THAT

02:30:39 20    SHE WROTE FOR THE ASCE GEOCONGRESS IN 2006.  SHE WAS LOOKING AT

02:30:48 21    LEVEES IN THE SACRAMENTO RIVER, AND SO THIS WAS ONE SUCH LEVEE IN

02:30:52 22    THE SACRAMENTO DELTA.  AND SHE WAS LOOKING AT THE THREE DIMENSIONAL

02:30:56 23    EFFECTS FOR FLOW FROM THE CANAL SIDE TOWARDS AN EXCAVATION OF

02:31:02 24    LIMITED SIZE ON THE LANDSIDE.  AND HER PAPER CONSIDERED TWO

02:31:09 25    CONDITIONS, ONE THAT HAD A LONG TRENCH AND ONE THAT HAD AN

02:31:14  1   EXCAVATION WHICH WAS ACTUALLY SIMULATING A SWIMMING POOL, ONE OF

02:31:19  2   THE RESIDENCES ON THE LANDSIDE OF THE LEVEE.

02:31:24  3        AND HER CONCLUSION WAS THAT FLOW TOWARDS AN EXCAVATION OF

02:31:29  4   THIS TYPE WHEN ANALYZED IN THREE DIMENSIONS PRODUCED GRADINGS THAT

02:31:36  5   WERE 30 PERCENT HIGHER THAN IF YOU USED TWO DIMENSIONAL ANALYSIS.

02:31:45  6        I PREPARED THIS CARTOON TO SHOW THE DIFFERENCE BETWEEN

02:31:49  7   WHAT MS. MONEY WAS DOING, WHICH IS, YOU HAVE THE FLOOD SIDE OR THE

02:31:55  8   CANAL SIDE HERE, THE LEVEE AND FLOW TOWARDS THE EXCAVATION, AND

02:32:00  9   THIS IS OUR FLOW LINES.  AS WE SAW EARLIER, WHEN YOU HAVE THIS FLOW

02:32:04 10   LINES CONVERGING, THE GRADIENTS ARE HIGH.  AND THEN MS. MONEY FOUND

02:32:10 11   THAT THE FACT THE GRADIENTS WERE HIGHER HERE THAN IF SHE DIDN'T

02:32:14 12   HAVE THIS THREE-DIMENSIONAL EFFECTS.  IF YOU WERE ANALYZING THIS IN

02:32:17 13   TWO DIMENSIONS, ALL OF THE FLOW LINES WOULD GO STRAIGHT TO THE

02:32:21 14   RIGHT.  SO SHE FOUND THAT THE GRADIENT IS INCREASED WHEN YOU USED

02:32:27 15   THREE-DIMENSIONAL ANALYSIS.

02:32:28 16        DR. BEA'S SITUATION WAS ESSENTIALLY THE COMPLETE OPPOSITE

02:32:32 17   OF THAT.  THE SMALL EXCAVATION HE WAS LOOKING AT WAS ACTUALLY A

02:32:36 18   TRENCH FOR A UTILITY REMOVAL, AND THE TRENCH WAS IN THE CANAL SIDE,

02:32:42 19   IN THE FLOOD SIDE, AND THE FLOW WAS TOWARD THE NINTH WARD, WHICH IS

02:32:47 20   REALLY AN OPEN FIELD.  SO THE FLOW LINES INSTEAD OF CONVERGING LIKE

02:32:53 21   MS. MONEY HAD THEM IN HER ANALYSIS, THEY ARE DIVERGING.  THEY'RE

02:32:57 22   GETTING FARTHER AND FARTHER APART.

02:32:59 23        SO IN FACT, TO ME, I HAVEN'T DONE THE DETAILED ANALYSIS,

02:33:05 24   BUT COMMONSENSE TELLS ME THAT, IN FACT, THE GRADIENT SHOULD BE

02:33:08 25   LOWER IN THIS CONDITION THAN THEY WOULD BE -- CERTAINLY, IN THIS

02:33:13  1    CONDITION, BUT IT SHOULD BE LOWER THAN THEY WOULD BE IN THE

02:33:18  2    TWO-DIMENSIONAL CONDITION, THE DISTANCE BETWEEN THE LINES WOULD NOT

02:33:22  3    CHANGE AT ALL.

02:33:24  4         NEVERTHELESS, THIS 30 PERCENT FACTOR WAS APPLIED, AND

02:33:29  5    WE'VE NEVER BEEN ABLE TO CHECK THIS CALCULATION BECAUSE, AGAIN,

02:33:33  6    THEY WERE PERFORMED AND THE EQUIPMENT WAS STOLEN AND THERE WERE NOT

02:33:39  7    COPIES AND THE INFORMATION WAS NEVER PRODUCED.

02:33:41  8         SO THAT ASIDE, IF WE FOR THE MOMENT FORGET ABOUT THE

02:33:52  9    30 PERCENT CORRECTION AND ITS ORIGINS AND WE FORGET ABOUT THE $M_V$

02:33:57 10    WHICH GIVES YOU STEADY STATE FLOW IMMEDIATELY, WE HAVE A CHANCE TO

02:34:03 11    LOOK AT DR. BEA'S HAND CALCULATIONS.  AND I WOULD DO THIS RATHER

02:34:07 12    SIMPLY AND RATHER QUICKLY BECAUSE THIS HAS BEEN PRESENTED IN, AT

02:34:11 13    LEAST, BY ONE OTHER PERSON OR MAYBE TWO BEFORE ME.

02:34:15 14         THE COURT:  IT HAS.

02:34:17 15         THE WITNESS:  BUT THE HEIGHT CALCULATIONS SHOW FLOODWALL,

02:34:24 16    HERE IS THE LEVEE, IT SHOWS THE GAP WHICH, IN ESSENCE, ACTS LIKE AN

02:34:31 17    EXCAVATION RIGHT NEXT TO THE WALL.  AND THEY SHOW THREE EXCAVATIONS

02:34:34 18    AT 50, 100, AND 150 FEET FROM THE FLOODWALL.  AND ATTEMPTS TO

02:34:41 19    COMPUTE THE CONTRIBUTION OF EACH OF THESE EXCAVATIONS TO THE

02:34:44 20    OVERALL FLOW.  AND THE COMPUTATIONS WERE SUMMARIZED IN THE DOCUMENT

02:34:49 21    WE RECEIVED.

02:34:50 22         NOW, WE TALKED EARLIER ABOUT FLOW TAKING PLACE FROM AREAS

02:34:54 23    OF HIGH TOTAL HEAD TO AREAS OF LOW TOTAL HEAD.  THE TOTAL HEAD IS

02:35:01 24    THE ELEVATION THE WATER WILL RISE IN THE PIEZOMETER.  IF I INSTALL

02:35:05 25    A PIEZOMETER RIGHT HERE AND THIS EXCAVATION IS OPEN, AND WE ARE A

02:35:07  1   DEALING WITH OPEN EXCAVATIONS, THE TOTAL HEAD -- THE WATER IN THE

02:35:12  2   PIEZOMETER WOULD REACH THE TOP OF THE WATER LEVEL HERE.  SO WE WILL

02:35:16  3   HAVE A TOTAL HEAD OF PLUS 13 FEET.

02:35:20  4        THE SAME WOULD BE TRUE FOR ANY OF THESE POINTS WHERE WE

02:35:23  5   HAVE A TOTAL HEAD OF 13 FEET AT EACH ONE OF THESE POINTS.  THERE'S

02:35:28  6   NO CHANGE IN TOTAL HEAD, SO THERE SHOULD BE NO FLOW BETWEEN THIS

02:35:32  7   POINT AND THIS POINT, OR THIS POINT AND THIS POINT, AND THERE

02:35:35  8   SHOULD BE NO FLOW BETWEEN THIS POINT AND THE GAP.  AND I GUESS I

02:35:42  9   SHOULDN'T BE SAYING THIS POINT BECAUSE YOU CAN'T RECORD WHAT I SAY.

02:35:50 10   I SHOULD MARK IT, YES, THAT'S RIGHT.  SO WE WILL CALL THIS POINT 1

02:36:00 11   AND I AM MARKING HERE POINT 2, I AM MARKING POINT 3 AND POINT 4,

02:36:10 12   AND WE WILL HAVE POINT 5 BE THE LANDSIDE.

02:36:19 13        NOW, CLEARLY, THERE WOULDN'T BE FLOW BETWEEN POINT 4 AND

02:36:25 14   POINT 5 BECAUSE HERE THE TOTAL HEAD OF 13 AND HERE THE TOTAL HEAD

02:36:29 15   IS MINUS FOUR, SO THERE'S A TOTAL HEAD DIFFERENCE, SO THERE WILL BE

02:36:35 16   FLOW ALONG THIS PART OF THE CLAY.  OVER HERE THERE SHOULD BE NO

02:36:39 17   FLOW, AND ONE EASY WAY TO UNDERSTAND THIS IS TO SUPERIMPOSE OUR

02:36:47 18   CUPS IN THIS EXCAVATION.  IF WE PLACE THE CUPS THERE, IT'S PRETTY

02:36:51 19   EASY TO SEE THAT THERE WILL BE NO FLOW.  LIKEWISE, IF WE MOVE THEM

02:36:56 20   BETWEEN POINTS TWO AND THREE, THERE SHOULD BE NO FLOW.  THE

02:36:59 21   PREVIOUS STATEMENT RELATED TO POINTS ONE AND TWO.

02:37:02 22        IF WE MOVE IT BETWEEN POINT 3 AND 4, THE EXCAVATION 50

02:37:08 23   FEET AWAY FROM THE FLOODWALL AND THE GAP, STILL THERE SHOULD BE NO

02:37:11 24   FLOW BECAUSE THERE'S NO TOTAL HEAD DIFFERENCE TO DRIVE THE FLOW.

02:37:15 25   WE ONLY GOT FLOW WHEN WE POSITIONED THE CUPS AT THE GAP AND THE

02:37:20  1   LANDSIDE BETWEEN POINT 4 AND 5 AND THERE WE WOULD HAVE FLOW.  THE

02:37:24  2   AMOUNT OF FLOW, OF COURSE, WOULD DEPEND ON THE PERMEABILITY OF THE

02:37:28  3   MATERIAL.

02:37:32  4          SO THE CALCULATIONS WE FOUND WERE REALLY NOT VALID.  ALL

02:37:38  5   OF THE FLOW TOWARDS THE LAND SLIDE ORIGINATES IN THE GAP.  THE

02:37:42  6   AMOUNT OF FLOW IS REALLY INSIGNIFICANT GIVEN THE -- IT'S

02:37:48  7   INSIGNIFICANT GIVEN THE LOW PERMEABILITY, BUT REALLY MORE

02:37:51  8   IMPORTANTLY, GIVEN THE SHORT TIME OF THE STORM SURGE, THERE'S NO

02:37:57  9   TIME FOR ANY OF THIS TO HAPPEN.  BUT EVEN IF YOU'RE GOING TO EXTEND

02:38:05 10   THIS UP TO THE STEADY STATE CONDITIONS, THE ONLY EXCAVATION THAT

02:38:08 11   REALLY MATTERS IS THE GAP.  ANYTHING BEHIND THE GAP IS ISOLATED

02:38:12 12   FROM THIS SCENARIO AND DOESN'T ENTER INTO THE FAILURE MECHANISM,

02:38:17 13   AND WGI REALLY HAD NOTHING TO DO WITH THE GAP.

02:38:51 14          THE COURT:  I GUESS IT'S GOING TO BE UP TO MR. TREEBY TO

02:38:54 15   MOVE THESE INTO EVIDENCE, IF YOU WISH.

02:38:58 16          MR. TREEBY:  YES, WE WOULD LIKE TO MOVE THAT IN, ALL OF

02:39:01 17   THOSE.

02:39:01 18          THE COURT:  AND THE OTHER PRINTED MATERIAL AS WELL?

02:39:03 19          MR. TREEBY:  YES, PLEASE, IF WE COULD MOVE THOSE INTO

02:39:05 20   EVIDENCE, I'D APPRECIATE IT.  WE'LL NEED TO MARK THEM.

02:39:09 21          THE COURT:  NO OBJECTION?

02:39:11 22          MR. SCHULTZ:  NO OBJECTION, YOUR HONOR.

02:39:12 23          THE COURT:  LET THEM BE SUBMITTED INTO EVIDENCE AND THEY

02:39:14 24   WILL BE LABELED --

02:39:18 25          MR. TREEBY:  YOUR HONOR, WE CALL IT RANDOM, I DON'T KNOW.

02:39:20  1          THE COURT:  MARKED HOWEVER.

02:39:22  2          MR. TREEBY:  MARKED, NUMBERED.

02:39:24  3          THE COURT:  AT SOME LATER TIME.

02:39:26  4          MR. TREEBY:  YES.

02:39:33  5          THE COURT:  UNLESS YOU HAVE THEM NOW.

02:39:40  6          MR. TREEBY:  IF YOUR HONOR PLEASE, SOMEBODY MADE A VERY

02:39:42  7  GOOD SUGGESTION.

02:39:44  8          THE COURT:  YES.

02:39:46  9          MR. TREEBY:  MS. WAGER-ZITO MADE A VERY GOOD SUGGESTION.

02:39:48 10  IF WE COULD NUMBER -- THERE IS A NUMBER ON THAT DOCUMENT, IF WE

02:39:51 11  WOULD MARK THAT JUST .1, THE SAME EXHIBIT NUMBER BUT JUST .1 FOR

02:39:57 12  EACH OF THEM.  I AM NOT LOOKING AT THEM RIGHT NOW, BUT I CAN LOOK

02:40:01 13  AT THEM AND READ IT INTO THE RECORD.

02:40:05 14          THE COURT:  ALL RIGHT.  GOOD IDEA.

02:40:09 15          MR. TREEBY:  THE FIRST ONE, YOUR HONOR, WE WOULD MARK DX

02:40:13 16  DM-0015-00.1, THE NEXT ONE WOULD BE -- WHICH WOULD BE THE DR. BEA'S

02:40:27 17  FLOW HAND CALCULATIONS, DO NOT ADHERE TO THE FUNDAMENTALS WOULD BE

02:40:32 18  DX DM-0015-00 -- THEY WANT ME TO PUT THE SLIDE NUMBER ON IT, 109.1.

02:40:45 19  AND THEN THE FIRST ONE WOULD BE DX, WHICH IS THE SCOUR TRENCH

02:40:50 20  AERIAL PHOTO, WOULD BE DX DM-0015-0069.1.  AND I HAVE TO AMEND THE

02:40:59 21  FIRST ONE, I DID IT WRONG.  THIS IS THE STORM SURGE DEVELOP

02:41:05 22  FAILURES OCCUR AFTER ABOUT 30 HOURS, AND WE'LL MARK IT DX

02:41:12 23  DM-0015-0058.1.

02:41:16 24          THE COURT:  THANK YOU, SIR.  LET THEM BE ADMITTED INTO

02:41:18 25  EVIDENCE.

02:41:28  1            ALL RIGHT.

02:41:30  2            THE WITNESS:  THERE WAS SORT OF ALL OF THIS, AND I

02:41:33  3   PRESENTED THIS, I GUESS, QUICKLY WITH THIS TESTIMONY, BUT IT

02:41:42  4   INVOLVED A LOT OF ANALYSIS AND IT ACTUALLY TAKES QUITE A BIT OF

02:41:46  5   TIME TO GO THROUGH ALL OF THIS.  MY CONCLUSION WAS THAT DR. BEA

02:41:50  6   INCORRECTLY USED THE SEEP/W, WHICH IS A FLOW MODELING PROGRAM, TO

02:41:54  7   EVALUATE HIS PORE PRESSURE TRANSMISSION THEORY, A PHENOMENON THAT

02:41:59  8   IS CONTROLLED BY STRESS CHANGES THAT SHOULD BE ANALYZED USING A

02:42:03  9   STRESS INFORMATION MODELING PROGRAM.  SO CLEARLY SOMETHING IS

02:42:07 10   WRONG, BUT NEVERTHELESS, AND, I GUESS, I SHOULD SAY THAT WE ASKED

02:42:14 11   DIEGO COBOS ROA ABOUT THESE, AND HE AGREED THAT -- HE WAS ASKED:

02:42:21 12   "YOU PREVIOUSLY WERE ASKED ABOUT HYDRAULIC PRESSURE CONDUCTIVITY

02:42:26 13   ANALYSIS AS A PHRASE, AND THAT ONE OF THE GOALS OF YOUR MODELING,

02:42:30 14   YOUR SEEPAGE MODELING FOR DR. BEA WAS TO DEMONSTRATE THE

02:42:33 15   POSSIBILITY OF PRESSURE TRANSMISSIONS FROM THE FLOOD SIDE TO THE

02:42:35 16   PROTECTED SIDE."  AND THE QUESTION -- FINAL QUESTION WAS:  "WOULD

02:42:41 17   YOU AGREE THAT A STRESS INFORMATION FINITE ELEMENT ANALYSIS IS

02:42:45 18   BETTER SUITED TO THIS SORT OF INVESTIGATION THAN SEEP/W?"  AND THE

02:42:49 19   ANSWER SIMPLY WAS "YES" AND THAT WAS THE CORRECT ANSWER.  THIS IS A

02:42:53 20   STRESS DISTRIBUTION PROBLEM, NOT A FLOW PROBLEM.

02:42:57 21            SO BE AS IT MAY, WE DECIDED TO TRY TO UNDERSTAND THIS

02:43:04 22   HYDRAULIC CONDUCTIVITY PRESSURE TRANSMISSION MODEL.  AND AS BEST AS

02:43:09 23   I COULD FIGURE IT OUT, WE HAVE, AGAIN, THE FAMOUS OPEN EXCAVATION.

02:43:16 24   SO WE ARE MAKING THAT CONCESSION, IT'S AN OPEN EXCAVATION, SO WE'RE

02:43:21 25   THINKING -- I GUESS WE'RE THINKING THAT BORROW PIT TYPE EXCAVATION,

02:43:27  1    OPEN, FULL OF WATER, THE STORM SURGE GOES UP, THE WATER GOES INTO

02:43:31  2    THE EXCAVATION AND IT APPLIES A PRESSURE AGAINST THE CLAY, AND THAT

02:43:36  3    PRESSURE SOMEHOW IS GOING TO GET TRANSMITTED.  AND WE'RE, AGAIN,

02:43:40  4    FOCUSSING ON THE ORGANIC CLAY.  THIS I SAID WAS A RELIC OF

02:43:43  5    DR. BEA'S USE OF TEN TO THE MINUS TWO.  IN ACTUALITY, ALL OF THESE

02:43:47  6    CLAYS WOULD BEHAVE IN A VERY SIMILAR MANNER.

02:43:51  7            SO IN ACTUALITY, THE EXCAVATION WAS BACKFILL; BUT LET'S

02:43:56  8    KEEP IT OPEN FOR THIS, FOR TRYING TO UNDERSTAND WHAT IS HAPPENING.

02:44:00  9            SO WE HAVE THIS PRESSURE WORKING AGAINST THE SIDE OF THE

02:44:07 10    EXCAVATION, AND THIS IS NOT UNLIKE HAVING SNOOPY ON THE BOARD,

02:44:15 11    EXCEPT THAT NOW SNOOPY IS SIDEWAYS AND THE PLATFORM IS VERTICAL.

02:44:17 12    SO HE IS STANDING ON THE EDGE OF THE EXCAVATION AND SOMEHOW DEFYING

02:44:21 13    GRAVITY AND APPLYING THE PRESSURE AGAINST THE CLAY, AND WE KNOW

02:44:23 14    THAT WE DEVELOP A STRESS FROM THAT.  AND THAT STRESS WOULD

02:44:27 15    PROPAGATE, IN SOME WAY, BUT IT HAS TO PROPAGATE IN ACCORDANCE TO A

02:44:35 16    REASONABLE DISTRIBUTION EITHER BASED ON ELASTIC THEORY, OR ONE

02:44:40 17    COULD BASE IT ON MORE COMPLICATED MODELS, BUT ELASTIC THEORY

02:44:45 18    USUALLY GIVES A PRETTY GOOD SOLUTION.

02:44:49 19            AND PROPAGATES IN THIS FASHION.  AND YOU START RIGHT AT

02:44:52 20    THE EDGE OF THE EXCAVATION HERE.  IT'S PRETTY HIGH, THE PRESSURE OF

02:44:57 21    THE WATER, AND THEN IT DECAYS RATHER QUICKLY WHEN YOU ARE ABOUT

02:45:02 22    60 FEET AWAY FROM THIS FACE OF THE EXCAVATION, YOU HAVE MUCH OF AN

02:45:08 23    INCREASE IN PRESSURE.

02:45:11 24            IF YOU COMPARE THAT WITH THE DISTRIBUTION THAT DR. BEA

02:45:16 25    ARRIVE AT USING THE FLOW MODEL, YOU CAN SEE THAT THIS IS THE

DISTRIBUTION BASED ON FLOW MODEL AND THIS IS THE DISTRIBUTION BASED

ON STRESS DISTRIBUTION, THERE IS AN ENORMOUS DIFFERENCE.  I BELIEVE

DR. BEA USED THE WRONG ANALYTICAL TOOL TO LOOK AT THIS PROBLEM.  IF

HE HAD DECIDED TO TAKE A LOOK AT IT IN THIS FASHION.

WE ASKED DR. BEA ABOUT HOW FAR THIS PRESSURE WOULD

TRANSMIT, AND THE CHANGE WENT LIKE THIS IN HIS AUGUST 10

DEPOSITION.  "YOU'VE POSTULATED THIS THEORY OF INSTANTANEOUS

PRESSURE TRANSMISSION?"  AND THE ANSWER WAS "CORRECT."  HE WAS

ASKED:  "FROM THE LOADED EBIA TO THE EAST -- I MEAN, WEST OF THE

FLOODWALL, OKAY.  AND THE QUESTION TO THE LANDSIDE.  INSTANTANEOUS

PORE PRESSURE TRANSMISSION.  "GIVEN YOUR THEORIES ABOUT IT, HOW FAR

DID IT TRANSMIT?  WOULD IT BE TO INFINITY?"  AND THE ANSWER WAS,

"WELL, WE HAVE DATA THAT INDICATES WE'RE OF THE ORDER OF HUNDREDS

OF FEET, BUT GIVEN THE SATURATED AND CONFINED AND FRICTIONLESS, IT

WOULD GO TO INFINITY.  AND IN FACT, IF YOU'RE MAKING THE

COMPUTATION IN ONE DIMENSION, IT WOULD INDEED GO TO INFINITY IN THE

MODEL."

SO IN EFFECT FOR THIS PRESSURE MECHANISM, IF YOU ACCEPT

THAT THIS IS THE WAY IT IS, IT EXTENDS HUNDREDS OF FEET, IF NOT TO

INFINITY, REALLY WE DON'T HAVE TO WORRY ABOUT ANY OF THE

EXCAVATION.  THIS FAILURE FROM THAT MECHANISM WAS INEVITABLE

BECAUSE WE HAVE HERE THE CANAL, WHICH IS THE BIGGEST AND DEEPEST

EXCAVATION ANYWHERE AROUND THERE OR WE COULD SAY HOLE, I GUESS IT

WAS EXCAVATED BY NATURAL FORCES PARTLY AND THEN ENLARGED BY HUMANS.

BUT AS THE FLOODWATERS INCREASE OVER THE EBIA, THEY WOULD ALSO

02:47:19   1   INCREASE OVER THE CANAL.  AND THAT WATER PRESSURE WOULD BE APPLIED

02:47:23   2   TO THAT ORGANIC CLAY AT THIS POINT AND IT WOULD TRAVEL HUNDREDS OF

02:47:27   3   FEET, IF NOT TO INFINITY, AND THE LEVEE IS AT 450 FEET, SO

02:47:34   4   DR. BEA'S HIGH PRESSURE WOULD DEVELOP REGARDLESS OF ANY EXCAVATIONS

02:47:37   5   AT THE EBIA.  SO IF WE FOLLOW THAT MODEL, AGAIN, THE EXCAVATIONS

02:47:46   6   BECOME IRRELEVANT.

02:48:00   7           THE COURT:  ALL RIGHT, SIR.

02:48:06   8           THE WITNESS:  NOW, MY CONCLUSION ON THIS WAS THAT

02:48:10   9   DR. BEA'S RUNNING FLOW ANALYSIS REALLY HAD NO RELEVANCE TO THE

02:48:15  10   EVENT OF THE EBIA DURING THE KATRINA STORM SURGE.  THEY USED AN

02:48:18  11   INCORRECT GEOMETRY, LIKE THOSE NON-EXISTENT EXCAVATIONS; THEY USE

02:48:23  12   PERMEABILITY THAT HAVE CHANGED FOUR ORDERS OF MAGNITUDE; THE

02:48:27  13   COMPRESSIBILITY CORRESPOND TO SOLID ROCK INSTEAD OF SOIL, SO IT

02:48:31  14   CORRESPONDS TO THE SANDSTONE INSTEAD OF THE ORGANIC CLAY; AND THEN

02:48:37  15   WE HAVE THE VERY IMPORTANT ISSUE OF USING A FLOW EQUATION TO SOLVE

02:48:43  16   A PRESSURE PROBLEM WITH NO FLOW.

02:48:45  17           THE ANALYTICAL TOOLS THAT HE USED SIMPLY CAN'T GIVE HIM

02:48:48  18   ANSWERS FOR THE PROBLEM HE IS TRYING TO SOLVE.  I DON'T THINK THIS

02:48:51  19   TYPE OF ANALYSIS CAN PROVIDE THE BASIS FOR RATIONAL CONCLUSIONS.

02:49:01  20           WE'RE NOW -- WE'RE ALMOST FINISHED.  I JUST WANTED TO

02:49:05  21   CLARIFY A NUMBER OF ISSUES THAT I THINK ARE IMPORTANT, AND SOME OF

02:49:09  22   THESE CAME FROM DR. BEA'S PRESENTATION THROUGH HIS TESTIMONY.

02:49:15  23   DR. BEA SHOWED US THIS PORE PRESSURE OR TOTAL HEAD CONTOURS OF THE

02:49:23  24   EAST BANK INDUSTRIAL AREA AND WAS REFERRING TO THESE AS BRINGING

02:49:27  25   WATER TO THE LEVEE TOW.  I JUST WANTED TO MENTION WATER HAS ALWAYS

02:49:31 1   BEEN AT THE LEVEE TOW.  I MEAN, THE EAST BANK INDUSTRIAL AREA HAS A

02:49:35 2   VERY HIGH WATER TABLE.  THE CONTOURS SHOW WATER ELEVATIONS A FOOT

02:49:42 3   OR TWO HIGHER THAN THE ADJACENT SECTIONS.

02:49:46 4        IT'S IMPORTANT TO REALIZE THAT THIS CONTOURS ARE A

02:49:48 5   SNAPSHOT IN TIME.  THERE WAS ONE SET OF READINGS WITH WELLS THAT

02:49:55 6   WERE INSTALLED FOR ENVIRONMENTAL PURPOSES AND QUICKLY ABANDONED AND

02:50:00 7   REMOVED.

02:50:01 8        BUT THE MOST IMPORTANT THING THAT -- THIS PICTURE HERE

02:50:05 9   HAS NO IMPLICATIONS OF UNSATISFACTORY PERFORMANCE.  THE LEVEE, IN

02:50:13 10  FACT, IS DESIGNED TO HAVE WATER AGAINST IT.  THAT'S THE WHOLE

02:50:17 11  PURPOSE OF THIS STRUCTURE.  SO TO IMPLY THAT TO HAVE WATER AGAINST

02:50:21 12  THE LEVEE TOW IS A BAD THING, I DON'T KNOW.  YOU COULD THINK AS IF

02:50:28 13  YOU HAVE A PICKUP TRUCK AND YOU GO TO THE GARDEN STORE AND PUT A

02:50:32 14  BAG OF MULCH IN THE BACK OF THE TRUCK, YOU KNOW, PEOPLE WOULD BE

02:50:38 15  ASTONISHED OR DISTURBED BY THAT FACT.  IN FACT, THAT WAS THE PICKUP

02:50:43 16  TRUCK DESIGNED FOR, TO CARRY STUFF.

02:50:44 17        AND THAT'S WHAT THE LEVEE IS FOR.  THE LEVEE IS SUPPOSED

02:50:47 18  TO HOLD WATER AND, YOU KNOW, THE EBIA IS NOT PART OF THE STRUCTURE.

02:50:54 19  SO THE EXCAVATIONS IN THE AREA OF THE EBIA THAT WERE NOT IN THE

02:51:00 20  STRUCTURE ITSELF REALLY SHOULD NOT BE CONSIDERED AS AFFECTING THE

02:51:06 21  LEVEE AS SUCH.  AND AS A MATTER OF FACT, OUR ANALYSIS SHOW VERY

02:51:11 22  CLEARLY AND VERY EARLY IN THE PROCESS WE CONCLUDED THAT THIS

02:51:14 23  EXCAVATION HAD NO IMPACT ON THE FAILURES OF THE EAST BANK

02:51:22 24  INDUSTRIAL AREA.

02:51:24 25        WE ALSO SAW A CHARACTERIZATION THAT IMPLIED A ONE-TO-ONE

02:51:29   1    RELATIONSHIP BETWEEN WATER CONTENT AND HORIZONTAL HYDRAULIC

02:51:36   2    CONDUCTIVITY.  I WAS A LITTLE BIT SURPRISED ABOUT THIS.  I MEAN,

02:51:40   3    THIS, OBVIOUSLY, HAS THE SCHOOL SITE HERE WHICH WAS A SITE AWAY

02:51:45   4    FROM THE EBIA THAT, TO MY MIND, PRODUCED MISLEADING RESULTS BECAUSE

02:51:51   5    THE WELL HAPPENED TO BE INSTALLED IN THE MIDDLE OF AN OLD STUMP, OR

02:51:56   6    WHAT SEEMED TO BE THE REMNANTS OF AN OLD STUMP, AND THE TEST MOSTLY

02:52:01   7    REFLECTED THE WATER THAT WAS STORED IN THAT PART OF THE ZONE.

02:52:06   8         BUT AT ANY RATE, I HAVE NEVER SEEN SUCH A RELATIONSHIP

02:52:12   9    BETWEEN WATER CONTENT AND HYDRAULIC CONDUCTIVITY.  AND ONE WAY TO

02:52:16  10    CHECK IT IS TO LOOK AT SODIUM AND BENTONITE.  THIS IS THE MATERIALS

02:52:24  11    THAT WE USED TO SEAL THE PIEZOMETERS.  THE CLAY, IT IS A NATURALLY

02:52:26  12    OCCURRING CLAY, IT HAS A NATURAL WATER CONTENT OF AROUND 900 AND

02:52:29  13    THE PERMEABILITY THAT IT'S WELL BLOW TEN TO MINUS SEVEN.  SO HERE

02:52:35  14    WE HAVE 400, SO 900 IS GOING TO BE ABOUT THERE.  AND TEN TO THE

02:52:41  15    MINUS SEVEN IS RIGHT AROUND THAT LINE BETWEEN THE PANELS, SO IT

02:52:45  16    WOULD PLOT HERE, CLEARLY NOT ALONG THIS RELATIONSHIP.

02:52:54  17         TO FURTHER LOOK INTO THIS, I TOOK THE PERMEABILITY TESTS

02:52:56  18    RESULTS THAT WERE RUN BY FURGO DURING THE JOINT EXPLORATION AND

02:53:00  19    SAMPLING PROGRAM LAST YEAR IN THE SUMMER OF 2011.  I JUST PLOTTED

02:53:06  20    ALL OF THE VALUES HERE FROM THE VARIOUS TESTS, INCLUDING THE SCHOOL

02:53:09  21    SITE, WHICH IS THE OUTLIER OUT HERE.  AND YOU CAN SEE THAT, YOU

02:53:13  22    KNOW, FOR A GIVEN VALUE OF PERMEABILITY, LIKE TEN TO THE MINUS SIX,

02:53:17  23    YOU HAVE A WIDE, WIDE RANGE OF WATER CONTENTS.  CERTAINLY NOT A

02:53:21  24    ONE-TO-ONE RELATIONSHIP.  OR YOU CAN LOOK AT IT THE OTHER WAY.  FOR

02:53:26  25    A GIVEN WATER CONTENT, YOU CAN HAVE PERMEABILITIES THAT VARY BY

02:53:33  1    ORDERS OF MAGNITUDE.  SO THIS RELATIONSHIP, FRANKLY, I DON'T THINK

02:53:38  2    IT EXISTS.

02:53:42  3         I WAS PUZZLED BY DR. BEA'S CAR LIFT ANALOGY BECAUSE WHILE

02:53:48  4    I AGREE THAT YOU CAN TRANSMIT PRESSURES INSTANTANEOUSLY IN THIS

02:53:54  5    SYSTEM, ONE MUST NOT FORGET THAT THIS SYSTEM DEPENDS ON HAVING A

02:53:59  6    VERY RIGID CONDUIT FOR THIS PRESSURES.  I MEAN, THIS SYSTEMS USE

02:54:05  7    EITHER STEEL PIPES OR REINFORCED HYDRAULIC HOSES WHICH HAVE RESIST

02:54:14  8    EXPANSION FROM THIS PRESSURES.

02:54:16  9         BUT THAT'S NOT REALLY THE MAIN POINT.  THE MAIN POINT IS

02:54:20 10    THAT WHILE IT IS TRUE THAT YOU CAN TRANSMIT A PRESSURE ALMOST

02:54:25 11    IMMEDIATELY TO THE CAR LIFT, TO LIFT THE CAR EVEN A MINUSCULE

02:54:31 12    AMOUNT REQUIRES FLOW.  IF YOU DON'T HAVE FLOW, THE CAR DOESN'T

02:54:38 13    MOVE.  IF THERE'S NO FLOW, THERE'S NO LIFT.  AND THIS WOULD BE

02:54:43 14    EQUIVALENT AT THE EBIA OF HAVING NO DEFORMATIONS AND THEREFORE NO

02:54:49 15    SATISFACTORY LEVEE PERFORMANCE.  IF THERE'S NO FLOW, THERE CAN BE

02:54:52 16    NO HARM DONE.

02:54:56 17         ANOTHER WAY TO SEE THIS IS THAT IF YOU APPLY THE PRESSURE

02:55:01 18    INSTANTLY, THE PRESSURE WOULD ARRIVE HERE; BUT THE SMALLEST

02:55:06 19    MAGNITUDE OF UPWARD MOVEMENT OF THIS LIFT WOULD REDUCE THE UPLIFT

02:55:10 20    PRESSURE TO ZERO.  THE TINIEST AMOUNT OF MOVEMENT UPWARD WITHOUT AN

02:55:16 21    INCREASE, WITH NO FLOW GOING THROUGH THE SYSTEM, WOULD DECREASE

02:55:20 22    THIS AVERAGE TO ZERO.  SO IN EFFECT, IT IS A SELF-HEALING SYSTEM.

02:55:25 23    THE PRESSURE GETS OVER THERE BECAUSE IT IS VERY RIGID LIKE THE

02:55:29 24    SANDSTONE -- IT WOULDN'T HAPPEN IN THE CLAY, BUT IT WOULD HAPPEN IN

02:55:32 25    THE SANDSTONE -- BUT AS SOON AS YOU START GETTING DEFORMATIONS

02:55:35 1  WHICH WILL BE THE MANIFESTATION OF UNSATISFACTORY PERFORMANCE, THE

02:55:41 2  PRESSURE WOULD DISAPPEAR AND THE SYSTEM WOULD HEAL ITSELF.  SO THIS

02:55:46 3  ENTIRE ANALOGY TO ME REALLY HAS NOTHING TO DO WITH WHAT HAPPENED ON

02:55:51 4  THE EAST BANK INDUSTRIAL AREA.

02:55:57 5          WE TALKED ABOUT THE PIEZOMETERS, PZ-3, AND SOME OTHER

02:56:03 6  PIEZOMETERS AND HOW THESE WERE VIEWED AS VALIDATING THE HYDRAULIC

02:56:07 7  CONDUCTIVITY PRESSURE TRANSMISSION.  BECAUSE DURING ONE OF THE

02:56:14 8  RECENT STORM EVENTS HERE IN 2008, THE CANAL WATER WENT UP, ON THE

02:56:22 9  PIEZOMETER WENT UP.  WE ALSO HAD, IN ANOTHER DEPICTION OF THIS, THE

02:56:26 10 PIEZOMETER FOLLOWING THE TIDE VARIATIONS.  I THINK IN THIS CASE WE

02:56:36 11 HAD THE PIEZOMETER FOLLOWING THE TIDE VARIATIONS AND, I MEAN, THIS

02:56:41 12 IS WELL-KNOWN TO HYDROLOGISTS AND GEOTECHNICAL ENGINEERS.  THESE

02:56:47 13 ARE EARTH TIDES AND THEY HAPPEN IN GROUND WATER JUST AS THE TIDES

02:56:51 14 HAPPEN AT SEA OR IN THE NAVIGATIONAL CANALS FOR THAT MATTER.

02:57:02 15          HERE IS PZ-2 WHICH IS ON THE LANDSIDE AND THAT ONE DIDN'T

02:57:08 16 RESPOND AND THE RECENT ONES, WELL, NOW THE PILINGS ARE DEEPER SO

02:57:12 17 THAT'S WHY IT DOESN'T RESPOND.  THE PROBLEM WAS FIXED THE WAY IT

02:57:15 18 SHOULD HAVE BEEN DONE BEFORE.  BUT IF WE GO TO THE SAME PLOT THAT

02:57:19 19 WE LOOKED AT BEFORE, AND WE PLOT PZ-3 AND PZ-6, THEY WOULD BE HERE.

02:57:25 20 THIS IS THE FLOODWALL AND THEY WOULD PLOT NOT WHERE YOU GET THE

02:57:30 21 FULL RESPONSE OF THE PORE PRESSURES, BUT THEY PLOT WHERE YOU WOULD

02:57:33 22 GET ABOUT HALF OF THE PORE PRESSURE, MAYBE TWO-THIRDS.  I GUESS

02:57:36 23 IT'S NOT HALF, MAYBE TWO-THIRDS OF THE PORE PRESSURE.

02:57:39 24          AND THAT'S NOT UNLIKE WHAT WE SEE IN THE PLOT HERE.  IT

02:57:45 25 DOESN'T GO ALL THE WAY UP, IT FOLLOWS THESE.  WHAT WE SEE HERE IS

02:57:50  1   THE INCREASE IN PORE PRESSURE DUE TO THE INCREASE IN VERTICAL

02:57:56  2   STRESS.  AND THESE TWO QUANTITIES ARE RELATED BY THE PORE PRESSURE

02:58:01  3   PARAMETER C, WHICH FOR SATURATED CLAYS SHOULD BE ONE.  SO IF WE

02:58:09  4   HAVE PLACED THE PIEZOMETER UNDER -- IN THE CENTER OF THE EBIA, THE

02:58:14  5   EXPECTATION WOULD BE THAT THIS PORE PRESSURE WOULD HAVE REACHED THE

02:58:18  6   PEAK HERE.  IT WOULD BE -- THE PORE PRESSURE WOULD HAVE BEEN THE

02:58:21  7   SAME AS INCREASING IN TOTAL HEAD.

02:58:25  8        AS THE PIEZOMETER IS INSTALLED NEAR THE EDGE OF THE LOAD,

02:58:29  9   IT DOESN'T GO ALL THE WAY UP, BUT IT GOES UP.  AND ALL OF THIS IS

02:58:33  10  VERY WELL EXPLAINED BY THE SOIL MECHANICS FROM THE ENGINEERS USED

02:58:41  11  DAY IN AND DAY OUT.

02:58:45  12       THE PIEZOMETER RESPONSE REALLY IS DUE TO TOTAL STRESS

02:58:48  13  INCREASE FROM THE WATER LOAD, NOT TO A RIGID HYDRAULIC CONNECTION

02:58:52  14  OF ANY KIND.  IN FACT, IF IT WAS BECAUSE WE HAD A RIGID CONNECTION

02:58:59  15  WITH THE CANAL, IT WOULD TAKE A LONG, LONG TIME FOR THAT WATER TO

02:59:02  16  FLOW, AND WE NOW KNOW THAT YOU HAVE TO HAVE FLOW OF WATER IN THE

02:59:06  17  PIEZOMETER IN ORDER TO REGISTER THE READING.

02:59:09  18       THE OTHER THING THAT WE HAVE TO KEEP IN MIND IS THAT THIS

02:59:12  19  PIEZOMETERS WERE UNDER WATER AT THE TIME OF THIS EVENT, SO THE CAP

02:59:19  20  IS NOT A TIGHT-FITTING CAP.  SO THIS IS -- THE MEASUREMENTS THAT WE

02:59:24  21  GET IN THESE TYPES OF EVENT WITH THESE TYPE OF INSTRUMENTS ARE NOT

02:59:28  22  VERY GOOD.  BUT NEVERTHELESS, YOU CAN EXPLAIN THIS BEHAVIOR AND NOT

02:59:32  23  WITH PRESSURE TRANSMISSION OF ANY KIND OTHER THAN THE RESPONSE OF

02:59:38  24  THE SOIL TO THE INCREASE LOAD FROM THE WATER STANDING ON TOP.

02:59:54  25  OKAY.

02:59:54   1          IN CONCLUSION OF THIS, WE PREPARED AN ANIMATION HERE THAT

02:59:58   2     KIND OF CAPTURES, IN ESSENCE, WHAT I HAD BEEN DISCUSSING FOR THE

03:00:02   3     LAST SEVERAL HOURS, IN FACT.  WE'RE GOING BACK TO MY ASSESSMENT OF

03:00:07   4     WHAT HAPPENED ON THE EAST BANK INDUSTRIAL AREA.  AND THIS ANIMATION

03:00:13   5     SHOWS THE NORTH BREACH.  AND WHY DON'T WE GET IT STARTED THEN.

03:00:13   6          (WHEREUPON, THE ANIMATION WAS BEGUN.)

03:00:25   7          THE WITNESS:  WE START PRE-KATRINA WITH THE 1969

03:00:28   8     FLOODWALL.  LOWER ELEVATION, LOWER SHORT PILES, IN CONNECTION HERE

03:00:32   9     THAT WAS NOT VERY FAVORABLE, AND ON TOP OF THAT WE HAVE THE 17-INCH

03:00:36  10     REPAIR WELD.  THE WELD HIDDEN BY THE CONCRETE CAP, BY THE WAY, SO

03:00:46  11     NOBODY KNEW THAT IT WAS THERE.

03:00:48  12          AND THEN COME AUGUST 29, 2005, HURRICANE KATRINA ARRIVES.

03:00:55  13     SOMETIME AFTER THREE, ACCORDING TO EYEWITNESS OBSERVATIONS, THERE'S

03:01:00  14     QUITE A BIT OF WATER COMING OVER THE WALL.  THIS 3:24 IS REALLY AN

03:01:06  15     INDICATION THAT IT'S SOMETIME AFTER THREE.  THE OVERTOPPING BY THE

03:01:12  16     WAVES START TO ERODE THE SOIL AT THE CREST, OF THE LANDSIDE CREST

03:01:18  17     OF THE LEVEE.  AND WE TALKED EARLIER THAT WHEN THESE WAVES HIT THE

03:01:27  18     WALL, THERE'S AMPLIFICATION EVENT THAT DOUBLES THE HEIGHT OF THE

03:01:32  19     WAVE SO THAT MAKES THIS WAVE OVERTOPPING.  ESSENTIALLY, START

03:01:38  20     EARLIER THAN WHAT YOU WOULD SUSPECT IF YOU SIMPLY ADD HALF OF THE

03:01:43  21     HEIGHT OF THE WAVE TO THE STILL WATER ELEVATION.

03:01:49  22          SO WE HAVE WAVES IMPACTING THE WALL AND GOING OVER, SOME

03:01:53  23     OF THE WATER GOES OVER.  THE EROSION STARTS BECAUSE OF THE SCOUR

03:01:57  24     EROSION POWER OF THIS WATER JETTING DOWN TOWARDS THE SOIL.  AS THIS

03:02:08  25     PROCESS CONTINUES, WE START DEVELOPING THE SCOUR TRENCH.  THE SCOUR

03:02:12  1    TRENCH, IN ESSENCE, REDUCES THE LATERAL SUPPORT THAT THE SOIL

03:02:16  2    PROVIDES TO THE FLOODWALL, AND WE START TO GET DEFORMATIONS OF THE

03:02:22  3    FLOODWALL.  THE DEFORMATIONS RESOLVED IN AN ELONGATION, OVERALL

03:02:26  4    ELONGATION OF THE WALL, AND THIS IS JUST AN ILLUSTRATION THAT THE

03:02:30  5    PROGRESSION OF THE SCOUR CONTINUES WITH THE OVERTOPPING.

03:02:41  6              AND SO THE LACK OF LATERAL SUPPORT RESULTS IN

03:02:46  7    DEFORMATIONS.  EVENTUALLY, THE SCOUR TRENCH GETS DEEP ENOUGH THAT

03:02:50  8    THE CONCRETE CRACKS BADLY FROM THIS TENSILE STRESSES THAT THE

03:02:57  9    CONCRETE'S UNABLE TO SUPPORT.  AND AT THE NORTH LOCATION, THE

03:03:02 10    LOCATION OF THE NORTH BREACH, REMEMBER OUR BAD WELD HERE, WE HAVE

03:03:06 11    THE CRACKED CONCRETE, WE HAVE THE DEEPER NOW SCOUR TRENCH, SO THIS

03:03:13 12    IS A VERY UNSTABLE STRUCTURE AT THIS POINT.

03:03:16 13              AND ONLY TOOK TO FIGURE THE FAILURE IN THIS CONDITION WAS

03:03:20 14    THE FAILURE OF THAT, THE HIDDEN WELD WHICH THEN RESULTED IN THE

03:03:25 15    TEAR WHICH MADE THE WHOLE SYSTEM COLLAPSE IN A RATHER DRAMATIC

03:03:32 16    FASHION AS WAS OBSERVED BY MR. VILLAVASO WITH A LOT OF WATER

03:03:37 17    RUSHING TOWARDS HIS DIRECTION AS HE REPORTED.

03:03:52 18              JUST DEVELOPING THIS ANIMATION GAVE ME A GOOD SENSE FOR

03:03:55 19    THE ORDER OF THIS EVENT, AND I FIGURED IT MIGHT BE HELPFUL TO

03:03:59 20    OTHERS AS WELL.

03:04:02 21              WELL, TO CONCLUDE MY PRESENTATION, YOUR HONOR, I LIST

03:04:05 22    HERE A SUMMARY OF MY OPINIONS.  THE FIRST ONE IS THAT THE

03:04:09 23    EXCAVATIONS PERFORMED BY WGI DURING THE ENVIRONMENTAL REMEDIATION

03:04:13 24    OF THE EBIA DID NOT CONTRIBUTE IN ANYWAY TO THE FAILURE OF THE EBIA

03:04:19 25    FLOODWALLS.  YOU KNOW, EXCAVATIONS ARE FREQUENTLY TROUBLESOME.  IN

03:04:28  1   A CASE LIKE THE EBIA, THE MAIN CONCERN WOULD BE ABOUT A LAND SLIDE

03:04:34  2   OR FAILURE OF THE EXCAVATION, WHY THE EXCAVATION WAS OPEN DURING

03:04:39  3   CONSTRUCTION.  ONCE THAT EXCAVATION IS BACKFILLED -- AND I SHOULD

03:04:44  4   POINT OUT, THIS DID NOT HAPPEN AT THE EBIA DURING TASK ORDER 26,

03:04:48  5   NONE OF THESE EXCAVATIONS FAILED.

03:04:51  6           BUT THAT WOULD HAVE BEEN THE PROBLEM WITH THIS

03:04:53  7   EXCAVATION IF THERE WAS GOING TO BE A PROBLEM WITH IT.  THEY COULD

03:04:57  8   HAVE BEEN TOO CLOSE TO THE LEVEE AND THE LAND SLIDE COULD HAVE

03:05:01  9   OCCURRED INTO ONE OF THE EXCAVATIONS DURING CONSTRUCTION AND AFFECT

03:05:06 10   THE LEVEE, YOU KNOW, STRUCTURE ITSELF.  THAT DID NOT HAPPEN.

03:05:11 11           AS IT WAS, THIS EXCAVATION WERE BACKFILLED.  ONCE

03:05:15 12   BACKFILLED, YOU KNOW, THEY WOULD BEHAVE IN TERMS OF FLOW THROUGH

03:05:19 13   THE SOIL PRETTY MUCH LIKE ANY OTHER ELEMENTAL SOIL IN THE EBIA.

03:05:26 14   AND EVEN UNDER THE WORSE CONDITIONS, THE BORROW PIT, FOR EXAMPLE,

03:05:30 15   WHERE THE EXCAVATION WAS LEFT OPEN DURING THE STORM SURGE, THE

03:05:34 16   WATER FROM WOULD NOT ADVANCE MORE THAN 16 FEET IN THE EBIA.  SO ANY

03:05:40 17   EXCAVATION MORE THAN 16 FEET FROM THE FLOODWALL HAS ABSOLUTELY NO

03:05:47 18   IMPACT ON THE PERFORMANCE OF THE STRUCTURE DURING A STORM SURGE

03:05:52 19   LIKE THE KATRINA STORM SURGE.

03:05:54 20           I CONCLUDE THAT THE SHEAR SLIDE DID NOT CAUSE THE EBIA

03:05:57 21   FAILURES, AND I MENTION THE REASON FOR THIS CONCLUSION EARLIER.

03:06:01 22   THERE'S NO EVIDENCE THAT THIS EVER OCCURRED.  AND I ATTRIBUTE THE

03:06:05 23   FAILURES TO THE HYDRAULIC LOADING FROM THE KATRINA STORM SURGE THAT

03:06:12 24   EXCEEDED A DESIGN CRITERIA.

03:06:14 25           AND FLOODWALL TOP ELEVATION WAS BELOW THE DESIGN

03:06:18   1    ELEVATION.  LACK OF SCOUR PROTECTION ON THE LANDSIDE CREST OF THE

03:06:25   2    EARTHEN LEVEE.  WE ALSO KNOW THAT THE STANDARD HURRICANE WAS

03:06:35   3    UNDERESTIMATED, AND WE HAD A SUBSTANDARD FIELD WELD THAT DID NOT

03:06:37   4    COMPLY WITH ACCEPTED PRACTICE, AND WE HAVE A SUDDEN TRANSITION IN

03:06:41   5    PIPE LENGTH THAT ALSO DOES NOT COMPLY WITH ACCEPTED PRACTICE.

03:06:47   6           AND IN ADDITION TO ALL OF THESE, AT THE LOCATION OF THE

03:06:50   7    NORTH BREACH, THE LANDSIDE SURFACE WAS LOWER THAN THE SIGN AND THAT

03:06:55   8    REDUCED THE LATERAL SUPPORT.  SO THERE ARE MANY REASONS FOR THIS

03:06:58   9    FAILURE.  NONE OF THEM REALLY RELATE TO THE EXCAVATION PERFORMED BY

03:07:02   10   WGI.

03:07:04   11          THE LOCATION OF THE NORTH BREACH HAD THE LOWEST TOP WALL

03:07:08   12   ELEVATION IN THE EBIA, AND IT FAILED FIRST BY OVERTURNING DUE TO

03:07:13   13   OVERTOPPING AND SCOUR.

03:07:14   14          THE LOCATION OF THE SOUTH BREACH HAD THE SECOND LOWEST

03:07:19   15   ELEVATION IN THE EBIA, AND IT FAILED NEXT, AGAIN, BY OVERTOPPING --

03:07:24   16   I'M SORRY, OVERTURNING DUE TO OVERTOPPING AND SCOUR.

03:07:28   17          AND FINALLY, I BELIEVE DR. BEA REACHING INCORRECT AND

03:07:32   18   INVALID CONCLUSIONS ABOUT THE CAUSE OF THE EBIA FAILURE BASED ON

03:07:36   19   INCORRECT FLOW ANALYSIS.

03:07:40   20          WITH THAT, I THANK YOU VERY MUCH FOR LISTENING TO ALL OF

03:07:44   21   THIS, AND THAT CONCLUDES MY PRESENTATION.

03:07:46   22          THE COURT:  THANK YOU.  WOULD YOU LIKE MAYBE A TEN-MINUTE

03:07:50   23   RECESS BEFORE WE START?  EXCUSE ME, MR. SMITH, IS THE GOVERNMENT

03:07:55   24   GOING TO HAVE ANYTHING?

03:07:57   25          MR. SMITH:  WE DON'T HAVE ANY QUESTIONS FOR THIS WITNESS.

03:07:59  1            THE COURT:  TEN-MINUTE RECESS THEN?

03:08:02  2            MR. SCHULTZ:  I'M FINE WITH A RECESS, I'M FINE WITH

03:08:04  3     GOING, EITHER WAY.

03:08:05  4            THE COURT:  WE'LL GIVE THE WITNESS A BIT OF A BREAK.

03:08:07  5     WE'LL TAKE TEN MINUTES.

03:08:11  6            THE DEPUTY CLERK:  ALL RISE, PLEASE.

03:08:13  7         (WHEREUPON, A RECESS WAS TAKEN.)

03:22:05  8         (OPEN COURT.)

03:22:05  9            THE DEPUTY CLERK:  COURT'S IN SESSION.  PLEASE BE SEATED.

03:22:08 10            THE COURT:  YES, SIR.

03:22:09 11            MR. SCHULTZ:  THANK YOU, YOUR HONOR.

03:22:10 12            THE COURT:  WHENEVER YOU'RE READY TO PROCEED.

03:22:12 13                          CROSS-EXAMINATION

03:22:12 14     BY MR. SCHULTZ:

03:22:15 15     Q.  I WAS LOOKING FOR A REFERENCE, DR. SILVA, FORGIVE ME.  I MAY BE

03:22:19 16     A LITTLE SCATTERED AT THE FIRST BECAUSE YOU TAKE A LOT OF NOTES

03:22:23 17     DURING THE PRESENTATION, WHICH I COMPLIMENT YOU ON BY THE WAY.

03:22:25 18     A.  THANK YOU, SIR.

03:22:26 19     Q.  THE WELD YOU TALKED ABOUT SEVERAL TIMES, YOU SAID IN YOUR

03:22:29 20     DEPOSITION, I PRESUME YOU'LL SAY HERE, THE WELD WAS NOT A CAUSE OF

03:22:32 21     THE FAILURE, CORRECT?

03:22:34 22     A.  THE WELD IS NOT THE CAUSE OF THE FAILURE.  THE WELD IS PART OF

03:22:38 23     THE MECHANISM OF FAILURE, BUT I WOULD NOT CALL IT A CAUSE OF THE

03:22:43 24     FAILURE.  THE CAUSE OF THE FAILURE WAS -- I ATTRIBUTE THE FAILURE

03:22:49 25     TO THE STORM SURGE, MUCH HIGHER THAN DESIGNED FOR; TO A NUMBER OF

03:22:55  1   DEFICIENCIES IN THE WALL, INCLUDING THE LACK OF A SCOUR PROTECTION;

03:23:05  2   BUT I MEAN, THE WELD BY ITSELF I WOULDN'T CALL A CAUSE OF THE

03:23:08  3   FAILURE.

03:23:08  4   Q.  A COUPLE OF POINTS JUST FROM WHAT YOU MENTIONED.  THERE WAS

03:23:12  5   SOME SCOUR PROTECTION ON THE BACK OF THE LEVEE, CORRECT?  THERE WAS

03:23:15  6   A GRASS COVER, RIGHT?

03:23:16  7   A.  THERE WAS GRASS COVER AND I SUPPOSE THAT PROVIDES SOME SCOUR

03:23:21  8   PROTECTION.  BUT GRASS, WHILE IT IS USED AS A SCOUR PROTECTION FOR

03:23:32  9   FLOW PATTERN TO THE GROUND SURFACE, IT'S NOT NEARLY AS EFFECTIVE

03:23:37 10   FROM THE PLUNGING FLOW THAT WE HAVE OF OVERTOPPING OF A WALL.  THE

03:23:43 11   PLUNGING -- THE PLUNGING FLOW THAT WE HAVE.  BUT IT DOES PROVIDE

03:23:46 12   SOME PROTECTION, YEAH.

03:23:47 13        NOW, THE LEVEL OF PROTECTION THAT WAS NEEDED HERE WAS

03:23:50 14   FROM A HARD SURFACE SUCH AS REINFORCED CONCRETE.  THAT'S REALLY

03:23:55 15   WHAT IT WOULD HAVE TAKEN TO PREVENT THE SCOUR TRENCH TO FORM.

03:23:58 16   Q.  AND THE PLUNGING FLOW YOU'RE TALKING ABOUT IS FROM THE WAVES

03:24:01 17   COMING OVER THE TOP?

03:24:02 18   A.  FROM THE WAVES AND THE SURGE WATERS COMING OVER THE TOP OF THE

03:24:06 19   WALL.

03:24:06 20   Q.  THERE WAS NO SURGE OVERTOPPING BEFORE EITHER OF THESE BREACHES,

03:24:10 21   CORRECT?

03:24:10 22   A.  WELL, I MEAN, LIKE I SAID, MY ANALYSIS REALLY DID NOT ATTEMPT

03:24:15 23   TO SYNCHRONIZE MINUTE BY MINUTE OF WHAT WAS HAPPENING, AND WHAT I

03:24:21 24   CONCLUDE IS THAT THE FAILURE OCCURRED AS THE SURGE LEVEL REACHED

03:24:29 25   THE TOP OF THE WALL.  I MEAN -- BUT I DON'T THINK THAT I CAN DO --

03:24:34  1    I MEAN, IF I WAS GOING TO QUANTIFY THE UNCERTAINTY THERE, I WOULD

03:24:39  2    BE HAPPY IF I WAS WITHIN A FOOT OR SO OF THAT.  SO I THINK THAT

03:24:43  3    COULD HAVE BEEN SOME FULL OVERTOPPING JUST BEFORE THE FAILURE AT

03:24:46  4    BOTH OF THESE LOCATIONS.  I DON'T KNOW WITH ENOUGH PRECISION TO

03:24:51  5    TELL YOU IF THAT WAS THE CASE OR NOT.

03:24:53  6    Q.  RIGHT.  THE REASON I ASK THE QUESTION, DR. SILVA, IS BECAUSE

03:24:56  7    YOU SAID SURGE OVERTOPPING WHEREAS IN YOUR REPORT YOU SAID, THE

03:25:00  8    FAILURE PROBABLY OCCURRED AS THE WATER REACHED THE TOP OF THE WALL,

03:25:03  9    AND THAT'S STILL YOUR POSITION TODAY, BUT YOU'RE CLARIFYING FOR US

03:25:07  10   THAT THERE IS SOME IMPRECISION THERE; IS THAT A FAIR

03:25:09  11   CHARACTERIZATION?

03:25:10  12   A.  I SAID, REACHED THE TOP OF THE WALL, AND AT THAT POINT YOU

03:25:13  13   WOULD HAVE SOME SURGE OVERTOPPING, SO WHETHER IT HAPPENED JUST

03:25:16  14   BEFORE OR JUST AFTER, I DON'T KNOW.  BUT IT'S RIGHT AT THAT POINT

03:25:23  15   WHERE YOU COULD EASILY ENVISION THAT YOU WOULD HAVE FULL

03:25:27  16   OVERTOPPING.  NOT THAT IT WOULD MAKE MUCH DIFFERENCE.  AT THAT

03:25:30  17   POINT, THE WAVES ESSENTIALLY ALL OF THE WAVES ARE COMING OVER THE

03:25:34  18   WALL ANYWAY SO.

03:25:34  19   Q.  LIKE THE PICTURE WE SAW?

03:25:36  20   A.  WELL, THAT PICTURE WAS -- I DON'T BELIEVE THE LEVEL OF THE

03:25:41  21   WATER WAS AT THE TOP OF THE WALL THERE.  I THINK IT WAS --

03:25:45  22   Q.  I THINK THAT'S WHAT DR. BEA TESTIFIED TO, BUT I AM ASKING IF

03:25:49  23   THAT'S WHAT YOU ENVISION OR WHAT YOU MEAN WHEN YOU TALK ABOUT THE

03:25:52  24   WAVES POURING OVER THE TOP OF THE WALL?

03:25:54  25   A.  WELL, THAT CAN BE ONE EXAMPLE.

03:25:57 1          THE COURT:  YOU'RE SAYING "THAT PICTURE."  IS THAT THE

03:25:58 2   ONE ON THE WEST BANK OF THE INDUSTRIAL CANAL THAT'S BEEN SHOWN

03:26:01 3   TWICE OR THREE TIMES?

03:26:02 4   BY MR. SCHULTZ:

03:26:04 5   Q.  YES, SIR.  THAT'S MY NEXT QUESTION.  THE PHOTOGRAPH THAT YOU

03:26:06 6   PUT IN YOUR SLIDE PRESENTATION WITH THE STICK COMING OVER THE WALL

03:26:09 7   WAS ON THE OPPOSITE SIDE FROM THE FAILURES THAT WE'RE TALKING

03:26:12 8   ABOUT?

03:26:12 9   A.  THAT'S WHAT I STATED DURING MY PRESENTATION, I BELIEVE.

03:26:15 10  Q.  YOU MENTIONED ALSO, IN TERMS OF CAUSE JUST A MOMENT AGO AND YOU

03:26:20 11  LIST THE DESIGN, THE ORIGINAL DESIGN VERSUS THE STORM THAT WAS

03:26:26 12  EXPERIENCED OUT THERE.  AND EARLY IN YOUR TESTIMONY YOU DESCRIBED

03:26:30 13  THERE BEING A FOUR-FOOT DIFFERENCE, AS I UNDERSTOOD IT, BETWEEN THE

03:26:34 14  STORM KATRINA AND WHAT IT WAS DESIGNED FOR?

03:26:36 15  A.  OKAY.  NO.  WHAT I SHOWED IN MY SLIDE 16, WE CAN BRING IT UP IF

03:27:07 16  THAT HELPS, IS THAT THERE WAS A DIFFERENCE OF ABOUT 2.7 FEET

03:27:12 17  BETWEEN THE STORM SURGE AND THE MAXIMUM DESIGN STORM SURGE, 2.7 NOT

03:27:19 18  FOUR.

03:27:19 19  Q.  SO IF I HEARD A REFERENCE TO FOUR, THAT WAS AN ERROR ON MY

03:27:22 20  PART.  YOU NEVER SAID THAT, RIGHT?

03:27:23 21  A.  WELL, I DID SAY FOUR BUT NOT WITH REGARD TO THE DIFFERENCE

03:27:28 22  BETWEEN THE DESIGNED STORM AND THE STORM SURGE OF THE ACTUAL

03:27:33 23  KATRINA STORM SURGE.

03:27:34 24  Q.  TELL ME AGAIN WHAT THE FOUR IS, PLEASE.

03:27:36 25  A.  WHY DON'T WE GET -- ERIC, CAN WE GET THE SLIDES UP?  IT MIGHT

03:27:40  1   BE HELPFUL FOR THIS DISCUSSION TO GET SLIDE 16.  BE EASY FOR ME TO

03:27:47  2   EXPLAIN THIS WAY.  MR. SCHULTZ, I HAVE SLIDE 16 HERE AND IT

03:27:53  3   SUMMARIZES WHAT WE'RE DISCUSSING, AND YOU CAN SEE HERE THAT WE HAVE

03:27:56  4   THE MAXIMUM DESIGNED STORM SURGE, 2.7 FEET BELOW THE ACTUAL KATRINA

03:28:02  5   STORM SURGE, SO WE HAVE 2.7 FEET.  NOW, WE ALSO HAVE THE ACTUAL

03:28:07  6   HIGH DURING KATRINA FOR THIS WALL WAS 1.2 FEET BELOW, BELOW THE

03:28:16  7   DESIGNED ELEVATION.  SO WE HAVE A DEFICIT THERE OF 1.2.

03:28:24  8         BUT I WAS SAYING THAT IF YOU INTEGRATE ALL OF THAT, YOU

03:28:27  9   HAVE 2.9 FEET DIFFERENCE BETWEEN THE TOP OF THE WALL AND THE STORM

03:28:32 10   SURGE, NOT CONSIDERING THE WAVES MIND YOU, BUT YOU HAVE 2.9 FEET

03:28:38 11   DIFFERENCE.  AND THEN I INDICATED THAT I WAS GOING TO RUN THAT UP

03:28:42 12   TO THREE JUST FOR SIMPLICITY.  AND THEN I INDICATED THAT THE

03:28:48 13   DESIGNER OF THIS STRUCTURE CONTEMPLATED A ONE-FOOT FREEBOARD, SO

03:28:54 14   THE STRUCTURE WAS DESIGNED AS IF THE FLOODWATERS COULD NEVER REACH

03:28:59 15   THE TOP, BUT THEY WOULD STAY A FOOT BELOW THE TOP.  SO IF YOU

03:29:02 16   CONSIDERED THAT FOOT OF FREEBOARD, YOU HAVE A FOUR-FOOT DEFICIENCY.

03:29:06 17   Q.  AND WHEN YOU SAY "THE WATERS," AND THIS REALLY WAS THE POINT I

03:29:10 18   WAS TRYING TO GET TO -- LET ME ASK IT THIS WAY.  THE STANDARD

03:29:14 19   PROJECT HURRICANE PRESUMED 13 FEET FROM IHNC TO PARIS ROAD,

03:29:21 20   CORRECT?

03:29:21 21   A.  SAY THAT -- CAN YOU RESTATE THE QUESTION?

03:29:23 22   Q.  THE STANDARD PROJECT HURRICANE AND THE DESIGN OF THE LEVEES ON

03:29:27 23   THE EAST SIDE OF THE IHNC, AND I AM HOLDING UP DESIGN MEMORANDUM

03:29:30 24   NO. 3, PRESUMED A 13-FOOT STILL WATER HEIGHT OR STORM SURGE FROM

03:29:37 25   IHNC TO PARIS ROAD, CORRECT?  I'LL PUT WHAT I AM REFERRING TO --

03:29:45  1   A.   WHY DON'T YOU PUT THAT IN THERE.

03:29:49  2   Q.   -- ON TOP OF THE ELMO.   THIS IS JX 0004-0104.   MAXIMUM WIND

03:29:58  3   TIDE LEVELS AS FOLLOWS:   IHNC TO PARIS ROAD, 13 FEET.   AND THERE'S

03:30:02  4   YOUR REFERENCE TO FREEBOARD.   THEY DON'T BELIEVE THAT WAVES ARE

03:30:06  5   GOING TO BE A FACTOR?

03:30:07  6   A.   THIS IS FROM WHICH DOCUMENT?

03:30:10  7   Q.   THIS IS FROM DESIGN MEMORANDUM NO. 3.

03:30:14  8   A.   SO WHAT ARE YOU USING FOR THAT?

03:30:19  9   Q.   I'M SORRY?

03:30:20 10   A.   SO WHAT REFERENCE COULD YOU USE FOR THAT ELEVATION?

03:30:22 11   Q.   THAT I DON'T KNOW.   I WOULD ASSUME IT WOULD NGVD.   IS THAT --

03:30:25 12   A.   IT'S VERY DIFFICULT TO MAKE COMPARISONS WITHOUT KNOWING WHAT IT

03:30:31 13   IS.

03:30:31 14   Q.   LET'S GO AT IT THIS WAY.   YOUR SLIDE WAS COMPARING MAXIMUM

03:30:35 15   SURGE EXPERIENCED DURING THE ENTIRE HURRICANE, CORRECT?

03:30:37 16   A.   IT WAS A KATRINA STORM SURGE AT 14.2 FEET ELEVATION.

03:30:42 17   Q.   RIGHT.   AND THE WALL FAILED AT THE NORTH BREACH WITH THE SURGE

03:30:47 18   HEIGHT AT ROUGHLY 11.2, CORRECT?   I THINK THAT'S THE STIPULATED

03:30:56 19   WATER HEIGHT.

03:30:57 20   A.   IT FAILED AT 11 -- ABOUT 11 -- I GUESS THE HEIGHT OF THE WALL

03:31:02 21   WAS ELEVATION 11.3, SO IT FAILED AROUND THERE.

03:31:05 22   Q.   THE WALL FAILED BEFORE THE WATER GOT TO THE TOP OF THE WALL,

03:31:08 23   AND THAT WAS ALSO TRUE, THE SURGE HEIGHT GOT TO THE TOP OF THE

03:31:10 24   WALL, AND THAT WAS ALSO TRUE FOR THE SOUTH BREACH, CORRECT?

03:31:12 25   A.   WELL, THAT'S NOT WHAT I SAY.   I SAY THAT IT FAILED AS THE SURGE

03:31:17   1   GET TO THE TOP OF THE WALL, SO IT'S NOT BEFORE IT GETS TO THE TOP

03:31:21   2   OF THE WALL, BUT MY NUMBERS, WHEN YOU PUT THEM ALL TOGETHER, AND

03:31:28   3   FRANKLY, I PUT THIS TOGETHER WITH THE TIME OF FAILURE THAT

03:31:34   4   DR. DALRYMPLE DETERMINED.  I DIDN'T DETERMINE THE TIME OF FAILURE

03:31:37   5   MYSELF.

03:31:38   6        JUST AS A CHECK, I PUT THE TIME OF FAILURE AND LOOK AT

03:31:41   7   THE WATER HEIGHT IN THE HYDROGRAPH AND THAT'S WHAT I GOT FOR BOTH

03:31:45   8   THE NORTH AND THE SOUTH, THAT THE HYDROGRAPH -- THE WATER LEVEL TO

03:31:52   9   PRODUCE THE FORCES THAT WOULD HAVE CAUSED THIS INSTABILITY OF THE

03:31:59  10   STRUCTURE WAS, IN BOTH CASES, THE LEVEL WAS AT THE TOP OF THE WALL.

03:32:03  11   Q.  RIGHT.  AND IT'S PROBABLY PUTTING TOO FINE A POINT ON IT AT

03:32:06  12   THIS POINT, DR. SILVA, BUT THE FOUR FEET NUMBER -- AT THE END OF

03:32:10  13   THE DAY, WHAT I'M TRYING TO POINT OUT IS THAT THE FOUR-FOOT NUMBER

03:32:13  14   THAT YOU USED, THE FIGURE THAT YOU USED INVOLVES A 14.2 FOOT STORM

03:32:18  15   SURGE, MAXIMUM STORM SURGE WHEREAS THE WALL HAD ALREADY FAILED

03:32:21  16   HOURS BEFORE, THE NORTH BREACH HAD FAILED HOURS BEFORE AND THE

03:32:25  17   SOUTH BREACH AT LEAST TWO HOURS BEFORE THE STORM SURGE EVER REACHED

03:32:28  18   THAT HEIGHT?

03:32:29  19   A.  THERE'S NO QUESTION ABOUT THAT.  I WAS USING THIS COMPARISON

03:32:32  20   JUST TO EXPLAIN THE DEFICIENCY IN THE SYSTEM AS COMPARED TO THE

03:32:38  21   STORM SURGE.

03:32:41  22   Q.  I UNDERSTAND.  THE REFERENCES TOWARD THE END OF YOUR

03:32:51  23   PRESENTATION TO THE EVOLUTION OF DR. BEA'S THEORY, I WANTED TO

03:32:54  24   ADDRESS BY ASKING YOU THIS:  YOU REVIEWED DR. BEA'S ORIGINAL REPORT

03:32:59  25   FROM BACK IN MARCH OF 2012, CORRECT?

A.  LET'S SEE.  THERE WERE THREE REPORTS, THE FIRST ONE WAS IN

FEBRUARY.

Q.  OH, I THINK YOU'RE RIGHT.  I THINK I'M THINKING OF YOUR REPORT.

A.  YOU'RE THINKING OF MINE, THAT'S CORRECT.  OKAY.

Q.  IT STATES AT PARAGRAPH 29 THAT:  "THE FAILURE WAS INITIATED

WITH SURGE WATER PRESSURES DEVELOPED ON THE WATER SIDE OF THE FLOOD

PROTECTION STRUCTURES (CONCRETE FLOODWALL AND SUPPORTING SHEET

PILING) COUPLED WITH HYDRAULIC SEEPAGE AND UPLIFT PRESSURES."  SO

DR. BEA DIDN'T INTRODUCE THE IDEA OF PRESSURE INTO THIS DURING THIS

TRIAL, DID HE?

A.  WELL, WHEN YOU SAY THAT HE DIDN'T INTRODUCE PRESSURES IN THIS

TRIAL, YOU MEAN --

Q.  LET ME ASK THIS QUESTION:  WHEN YOU READ HIS REPORT IN

FEBRUARY, YOU SAW THAT UPLIFT PRESSURES WERE A PART OF HIS

CAUSATION OPINION, CORRECT?

A.  I SAW THAT.

Q.  AND YOU SAW THAT HYDRAULIC SEEPAGE WAS PART OF HIS FAILURE

OPINION, CORRECT?

A.  I SAW THAT.

Q.  HE ADDRESSED IT, HE MODELLED IT, AND HE CONCLUDED, LIKE YOU

DID, THAT SEEPAGE WAS NOT A CAUSE OF THE FAILURE, CORRECT?

A.  LET ME THINK BACK TO MY -- I KNOW HE NOW STATES THAT SEEPAGE IS

NOT A CAUSE OF THE FAILURE, RIGHT.  I WASN'T SO SURE AT THE TIME OF

THE REPORT, BUT I KNOW THAT HE NOW STATES THAT SEEPAGE -- THERE'S

NO FLOW, SO OBVIOUSLY SEEPAGE IS NOT THE CAUSE OF THE FAILURE.

03:34:37  1   Q.   THAT'S ACTUALLY THE POINT IN MY RAISING THIS.  DR. BEA HAS

03:34:41  2   NEVER SAID THERE WAS NO FLOW OUT THERE ON THE KATRINA SITE,

03:34:45  3   CORRECT?  HE'S ONLY SAID THAT YOU DON'T HAVE TO HAVE FLOW TO

03:34:48  4   TRANSMIT PRESSURE, THOSE ARE TWO DIFFERENT THINGS.  CAN YOU

03:34:51  5   APPRECIATE THE DISTINCTION?

03:34:51  6   A.   I APPRECIATE THE DISTINCTION.  MY UNDERSTANDING IS THAT HE HAS

03:35:00  7   STATED THAT THERE WAS NO FLOW IN ONE OF THE DEPOSITIONS.  THERE

03:35:05  8   WERE THREE DAYS OF DEPOSITIONS.  I COULDN'T TELL YOU EXACTLY WHERE

03:35:10  9   IT IS, BUT MY UNDERSTANDING WAS THAT DR. BEA HAD STATED THAT THERE

03:35:14 10   WAS NO FLOW.

03:35:15 11         I MEAN, I UNDERSTAND WHEN HE SAYS THAT, IT DOESN'T MEAN

03:35:20 12   THAT THERE'S ABSOLUTELY NO FLOW ANYWHERE IN THAT AREA.  WE HAD FLOW

03:35:24 13   THERE BEFORE KATRINA.  WE HAD SOME FLOW RHYTHM THAT HAD BEEN

03:35:30 14   ESTABLISHED THERE OVER TIME, SO THERE'S FLOW OCCURRING, BUT I

03:35:35 15   PRESUME THAT HE WAS SAYING THE FLOW DUE TO THE STORM SURGE.

03:35:40 16   Q.   AND YOU KNEW, AT LEAST AT THE TIME THAT YOU HEARD DR. BEA'S

03:35:46 17   DIRECT EXAMINATION, THAT HE DIDN'T HOLD THE OPINION THAT FLOW

03:35:49 18   UNDERNEATH THE LEVEE CAUSED THE FAILURE OF THE LEVEE, RIGHT?  AND

03:35:56 19   YOU HEARD HIM GIVE THAT OPINION IN COURT, CORRECT?

03:35:58 20   A.   WELL, THE REASON I TAKE TIME, I REALLY GOT QUITE CONFUSED ABOUT

03:36:05 21   THIS.  AND DR. BEA STATES IT'S PRESSURE NOT FLOW, YET HE IS USING A

03:36:13 22   FLOW ANALYSIS TO COMPUTE THE PRESSURES, AND THE FLOW ANALYSIS HAS

03:36:16 23   FLOW.  SO THAT'S WHY I GET CONFUSED ABOUT WHAT HIS REAL POSITION IS

03:36:22 24   FRANKLY.

03:36:24 25   Q.   BUT IN ANSWER TO THE QUESTION THAT I ASKED, VERY SPECIFIC

03:36:27  1    QUESTION, YOU UNDERSTOOD, AT LEAST AS OF THE TIME DR. BEA GAVE HIS

03:36:36  2    TESTIMONY IN THIS COURT, HIS OPINION WAS THAT UNDERSEEPAGE IN TERMS

03:36:36  3    OF FLOW OF WATER FROM MOLECULE FROM POINT A TO POINT B WAS NOT A

03:36:39  4    CAUSE OF THE FAILURE OF EITHER BREACH, RIGHT?

03:36:41  5    A.  THAT WAS MY UNDERSTANDING, YES, THAT IT WAS NOT UNDERSEEPAGE.

03:36:44  6    Q.  NOW, BEFORE YOU WROTE YOUR REPORT IN MARCH OF THIS YEAR, YOU

03:36:54  7    HAD TAKEN A SUBSET OF THE DATA FROM DR. BEA'S PRODUCTION, OUR

03:36:59  8    PRODUCTION TO YOUR TEAM, AND RUN THOSE USING DR. BEA'S VALUES,

03:37:03  9    CORRECT?

03:37:03  10   A.  WE DID THAT, CORRECT.  WE RAN FLOW ANALYSIS USING DR. BEA'S

03:37:11  11   VALUES.

03:37:12  12   Q.  AND THE RESULTS THAT YOU ACHIEVED USING DR. BEA'S VALUES WERE

03:37:17  13   CONSISTENT WITH THE RESULTS THAT DR. BEA ACHIEVED, CORRECT?

03:37:19  14   A.  THAT IS CORRECT.  I USED THE SAME PROGRAM AND I USED THE SAME

03:37:23  15   PARAMETERS, SO WE GOT THE SAME RESULTS.

03:37:26  16   Q.  AND BETWEEN THE TIME OF WRITING YOUR INITIAL REPORT AND GIVING

03:37:31  17   YOUR FIRST DEPOSITION IN THE CASE ON APRIL 12TH, YOU DID SOME MORE

03:37:35  18   ANALYSES OF DR. BEA'S -- USING DR. BEA'S INPUTS AND YOU ACHIEVED

03:37:40  19   CONSISTENT RESULTS WITH WHAT DR. BEA ACHIEVED, CORRECT?

03:37:43  20   A.  FOR USING THE SAME PROGRAM, THAT IS CORRECT.  USING THE SAME

03:37:46  21   PROGRAM AND THE SAME PARAMETERS, WE GET THE SAME RESULTS, AS YOU

03:37:51  22   WOULD EXPECT, YES.

03:37:51  23   Q.  SO YOU UNDERSTAND THAT ALTHOUGH CLEARLY YOU DISAGREE WITH THE

03:37:55  24   CHOICE OF THE INPUTS THAT THESE ARE NOT SOME HAPHAZARD RESULT,

03:38:00  25   THESE WERE INTENTIONAL, DELIBERATE CHOICES BY DR. BEA IN TERMS OF

03:38:04  1   MODELING THIS STORM WHETHER YOU AGREE WITH THOSE CHOICES OR NOT,

03:38:07  2   CORRECT?

03:38:07  3   A.  THE QUESTION IS IF THEY ARE HAPHAZARD?  WHAT IS THE QUESTION

03:38:18  4   EXACTLY?

03:38:19  5   Q.  WHEN YOU RAN DR. BEA'S ANALYSES USING DR. BEA'S INPUT, YOU GOT

03:38:23  6   THE SAME RESULTS, RIGHT?

03:38:24  7   A.  I DID GET THE SAME RESULTS.

03:38:25  8   Q.  SO DR. BEA IS NOT -- MY POINT, DR. SILVA, IS DR. BEA IS NOT, TO

03:38:32  9   BORROW A PHRASE, "COOKING THE BOOKS" IN TERMS OF RUNNING HIS

03:38:36 10   MODELS, YOU CHECKED THOSE RUNS AND THEY WERE CONSISTENT WITH THE

03:38:39 11   INPUTS, RIGHT?

03:38:41 12   A.  IT IS TRUE THAT I CHECKED.  I MEAN, I RUN THE SAME PROGRAM WITH

03:38:50 13   THE SAME PARAMETERS HE USED AND I GET THE SAME RESULTS.  THAT IS A

03:38:54 14   TRUE STATEMENT.

03:38:55 15        NOW, IT IS NOT -- THE ANSWER BECOMES DIFFERENT IS THAT

03:39:04 16   WHAT YOU FIND IN DR. BEA'S ANALYSIS DOES NOT NECESSARILY CORRESPOND

03:39:09 17   TO WHAT YOU READ IN DR. BEA'S REPORT OR WHAT YOU HEAR IN DR. BEA'S

03:39:14 18   TESTIMONY.  AND THAT IS WHERE THIS WHOLE COMPARISON BECOMES VERY

03:39:19 19   COMPLICATED BECAUSE IT IS NOT ENOUGH TO READ THE REPORT.  IF YOU GO

03:39:24 20   TO THE ANALYSIS, THERE'S NO CONCORDANCE BETWEEN THE REPORT AND THE

03:39:30 21   ANALYSIS.  AND, YOU KNOW, I LEARNED DURING THE TRIAL THAT DR. BEA

03:39:35 22   WASN'T REALLY INTENDING TO MODEL THE KATRINA EVENT FOR HIS

03:39:39 23   ANALYSIS.

03:39:39 24        SO THAT WAS NEWS FOR ME, FRANKLY, BECAUSE I HAD BEEN

03:39:44 25   ANALYZING -- LOOKING AT ALL OF THESE AS IF HE WAS TRYING TO FIGURE

03:39:47  1    OUT WHAT'S THE CAUSE OF THE FAILURE USING THE ANALYSIS, BUT THAT

03:39:51  2    WAS NOT THE CASE.

03:39:55  3            SO OBVIOUSLY, IF I RUN THE SAME PROGRAM, THE SAME INPUT,

03:40:01  4    I GET THE SAME RESULTS; BUT DR. BEA TELLS ALL THROUGH HIS REPORTS

03:40:07  5    AND TESTIMONY THAT HE USES THE DILATATIONAL WAVE VELOCITY OR

03:40:14  6    DILATIONAL MODELS FOR $M_v$, AND IMMEDIATELY I WOULD SAY THAT MUST BE

03:40:18  7    TEN TO THE MINUS EIGHT.  BUT THAT'S NOT WHAT HE USES.  HE USES TEN

03:40:22  8    TO THE MINUS NINE, SO THERE IS A DISCONNECT IN ALL OF THESE THINGS.

03:40:26  9    AND FROM DIEGO COBOS ROA'S TESTIMONY, WE HEAR THAT THEY WERE

03:40:32 10    TRYING -- THEY SELECTED THE $M_v$ TO GET A PRECONCEIVED RESULT.  I

03:40:37 11    MEAN, YOU USED THE TERM "COOKING THE BOOKS," I DID NOT --

03:40:41 12    Q.  MR. TREEBY, FOR THE RECORD, USED THAT TERM ORIGINALLY.

03:40:43 13    A.  WELL, I HEARD IT FROM YOU.  BUT I MEAN, THIS IS NOT THE WAY I

03:40:50 14    WOULD APPROACH A FAILURE INVESTIGATION.  I WOULD NOT APPROACH A

03:40:52 15    FAILURE INVESTIGATION BY HAVING A PRECONCEIVED RESULT AND THEN

03:40:58 16    ADJUST THE PARAMETERS IN THE ANALYSIS TO GET THOSE RESULTS.

03:41:00 17            TYPICALLY, WHAT I DO IS I TRY TO ESTABLISH A MODEL THAT

03:41:06 18    MODELS AS BEST AS I CAN THE ACTUAL FIELD CONDITIONS USING

03:41:11 19    SITE-SPECIFIC SOIL PROPERTIES, AND THEN WE RUN THIS ANALYSIS, AND

03:41:14 20    THEN WE TRY TO UNDERSTAND WHAT THEY ARE TELLING US ABOUT THE

03:41:17 21    PERFORMANCE OF THE STRUCTURE.

03:41:18 22    Q.  AND WHEN DR. BEA CHOSE TEN TO THE MINUS NINE, YOU UNDERSTAND HE

03:41:23 23    WAS TRYING TO MODEL THE INCOMPRESSIBILITY OF WATER, CORRECT?  HE

03:41:29 24    WAS LOOKING FOR INCOMPRESSIBILITY?

03:41:31 25    A.  WELL, I UNDERSTAND HE WAS LOOKING FOR COMPRESSIBILITY BECAUSE

THE COMPRESSIBILITY OF WATER IS A VERY WELL-KNOWN NUMBER, AND IF

YOU'RE GOING TO MODEL THE COMPRESSIBILITY OF WATER, YOU OUGHT TO

USE THE NUMBER FOR THE COMPRESSIBILITY OF WATER.  YOU SHOULD NOT BE

USING SOMETHING DIFFERENT.  FRANKLY, JUST LIKE IF YOU'RE TRYING TO

MODEL THE BEHAVIOR OF THE ORGANIC CLAY, YOU SHOULD USE THE

COMPRESSIBILITY OF THE ORGANIC CLAY.  YOU SHOULD NOT USE THE

COMPRESSIBILITY OF SOMETHING LIKE THIS SANDSTONE.  SO, NO, I DON'T

UNDERSTAND THAT.

Q.  IS WATER LESS, MORE, OR AS COMPRESSIBLE AS THAT SANDSTONE?

A.  WATER IS MORE COMPRESSIBLE THAN THE SANDSTONE.

Q.  AND YOU AGREE, DR. SILVA, THAT, AT LEAST IN PRINCIPLE, THAT IF

YOU HAVE HIGHER UPLIFT PRESSURES ON THE LANDSIDE TOW OF THE LEVEE,

IF YOU HAVE THOSE HIGHER PRESSURES ON THE LANDSIDE TOW OF THE

LEVEE, THEN THE STABILITY OF THE LEVEE IS COMPRISED AND YOU BRING

THE LEVEE CLOSER TO THE FAILURE CONDITION, CORRECT?

A.  WELL, THE ANSWER TO YOUR QUESTION HAS TO BE NO.  BECAUSE IF I

THINK OF UPLIFT PRESSURES OF THE TYPE THAT DR. BEA TALKS ABOUT

WITHOUT FLOW, THOSE PRESSURES CANNOT CAUSE ANY HARM.  BECAUSE IF

YOU CAN MAGICALLY GET THEM ACROSS -- AND I JUST TRIED TO EXPLAIN

ONE WAY THAT YOU WOULD GET THEM ACROSS, BUT IF YOU CAN MAGICALLY

GET THEM ACROSS WITHOUT FLOW, THE MINUTE YOU GET THE TINIEST

DEFORMATION, WHICH WOULD BE REQUIRED TO CAUSE ANY DAMAGE TO THE

LEVEE, THE PRESSURE WOULD GO BACK TO ZERO IN THE INCOMPRESSIBLE

SYSTEM.  SO IT'S A SELF-HEALING SYSTEM.

SO, NO, IF YOU POSTULATE THOSE PRESSURES OR MAGICALLY GET

03:43:12 1   THEM THERE, THEY CANNOT CAUSE ANY HARM.  THE MINUTE YOU GET

03:43:15 2   DEFORMATIONS, THE PRESSURES GO BACK TO ZERO AND THE SYSTEM COMES

03:43:18 3   BACK TO A STABLE CONDITION.

03:43:21 4   Q.  LET'S PULL UP, IF WE COULD, PX 0583.0 AT PAGE 30.  THIS IS YOUR

03:43:29 5   DEPOSITION AT PAGE 38, LINES 13 TO 39 AND 39, LINES 18 -- EXCUSE

03:43:37 6   ME, 118, LINES 14 TO 24.

03:43:40 7            MR. SMITH:  WHICH DEPOSITION?

03:43:43 8            MR. SCHULTZ:  VOLUME 1, APRIL 12.

03:43:44 9   BY MR. SCHULTZ:

03:43:45 10  Q.  WHERE YOU SAID, "IF YOU HAVE HIGH PORE PRESSURES IN THE

03:43:48 11  LANDSIDE, THE LEVEL OF THE STABILITY OF THE LEVEE WOULD BE LOWER.

03:43:53 12  THE SOILS WOULD BE CLOSER TO THE FAILURE ENVELOPE FOR THE FAILURE

03:43:55 13  CONDITION.  WE CAN BLOW IT UP AND READ THE ENTIRE EXCHANGE, BUT IF

03:43:59 14  WE MAGICALLY PUT THOSE PRESSURES THERE, DR. SILVA, AND MY QUESTION

03:44:03 15  WAS:  IF THOSE PRESSURES ARE THERE -- AND I UNDERSTAND THERE'S A

03:44:06 16  DISPUTE, THE WHOLE TRIAL IS ABOUT A DISPUTE OF WHETHER THE

03:44:09 17  PRESSURES WERE THERE -- BUT IF THE PRESSURES ARE THERE, YOU AGREE

03:44:11 18  IN PRINCIPLE, DON'T YOU, THAT THEY COMPROMISE THE STABILITY OF THE

03:44:17 19  LEVEE?

03:44:17 20  A.  NO.  AND IT'S NOT INCONSISTENT WITH MY ANSWER IN THE

03:44:20 21  DEPOSITION.  AND THAT QUESTION -- AND I HAVEN'T READ THE GENERAL

03:44:25 22  THREAD OF THE QUESTIONS -- BUT, I MEAN, IF WE'RE THINKING ABOUT

03:44:30 23  PORE PRESSURES IN REAL LIFE WHICH HAPPEN BECAUSE THROUGH A

03:44:37 24  MECHANISM THAT IS CONSISTENT WITH THE WAY SOIL BEHAVIOR -- THE WAY

03:44:44 25  WE UNDERSTAND SOIL BEHAVIOR, HIGH PORE PRESSURES MEAN LOWER

03:44:49 1    STRENGTH, AND YES, THAT COMPROMISES THE STABILITY.

03:44:52 2         BUT IF I ANSWERED YOUR QUESTION, THINKING ABOUT THE HIGH

03:44:56 3    PORE PRESSURE THAT DR. BEA IS POSTULATING IN THE LANDSIDE, THE

03:44:59 4    ANSWER HAS TO BE NO BECAUSE THESE ARE PORE PRESSURES THAT GET THERE

03:45:03 5    WITH NO FLOW, AND WITH NO FLOW, THE DEFORMATIONS -- THE DEFORMATION

03:45:11 6    SIMPLY CANNOT HAPPEN.  IF WE PUT, YOU KNOW, IF YOU HAVE A HIGH PORE

03:45:17 7    PRESSURES AND YOU START HAVING DEFORMATIONS AND THE FLOW ALLOWS THE

03:45:24 8    DEFORMATIONS TO TAKE PLACE OR YOU HAVE -- YOU KNOW, YOU CAN HAVE

03:45:32 9    SHEAR FAILURE AS WELL, YOU CAN HAVE THEN UNDESIRABLE PERFORMANCE.

03:45:37 10   Q.  LET ME SHOW YOU THIS, IF WE CAN GO TO THE ELMO.  THIS IS ONE OF

03:45:41 11   YOUR SLIDES, AND YOU WILL SEE MY HANDWRITING ON IT WHICH IS FINE

03:45:45 12   BECAUSE IT'S THE QUESTION I AM ABOUT TO ASK YOU.  YOU DESCRIBED

03:45:48 13   THIS THIS MORNING TO THE COURT AS, I BELIEVE YOU SAID PRESSURES

03:45:52 14   FROM THE LEVEE COMING DOWN.  WOULDN'T YOU HAVE THE POTENTIAL FOR

03:45:56 15   THE SAME SCENARIO IF YOU HAVE PRESSURES FROM THE BOTTOM COMING UP?

03:45:59 16   A.  PRESSURES FROM THE LEVEE COMING DOWN, I DON'T UNDERSTAND THAT.

03:46:05 17   CAN YOU CLARIFY?

03:46:06 18   Q.  THE JUDGE ASKED YOU A QUESTION, AND IT'S NOT REALLY PERTINENT

03:46:09 19   TO MY QUESTION, BUT TO PUT IT IN MY CONTEXT, MY APPRECIATION OF IT

03:46:14 20   WAS THIS.  THE JUDGE ASKED ABOUT WHERE THE PRESSURE WAS COMING

03:46:17 21   FROM, AND YOU SAID, "WELL, FOR EXAMPLE, YOU COULD HAVE PRESSURES

03:46:19 22   FROM THE WEIGHT OF THE LEVEE TOP OF THIS."

03:46:21 23   A.  OH, THAT'S TO CREATE A SHEAR FORCE.  YEAH, YOU CAN HAVE THE

03:46:25 24   WEIGHT OF THE SOIL CREATING A SHEAR FORCE ALONG THE POTENTIAL

03:46:30 25   SLIDING SURFACE, YES, SIR.

03:46:31  1    Q.  AND I GUESS MY QUESTION IS THIS, DR. SILVA, THIS PHENOMENON

03:46:35  2    THAT YOU'RE DESCRIBING IN THE SLIDE DOESN'T ONLY OCCUR IF YOU HAVE

03:46:38  3    PRESSURES COMING FROM ON TOP, IT CAN OCCUR IF YOU HAVE PRESSURES

03:46:41  4    COMING FROM UNDERNEATH AS WELL, CORRECT?

03:46:42  5    A.  WELL, THE PRESSURES WE'RE TALKING ARE DIFFERENT.  WHEN WE WERE

03:46:46  6    TALKING ABOUT -- TALKING WITH JUDGE DUVAL WAS HE WAS ASKING:  WHERE

03:46:51  7    DOES THE SHEAR FORCE COME FROM?  AND I GAVE HIM THE EXAMPLE OF THE

03:46:55  8    SHEAR FORCE CAN COME FROM THE WEIGHT OF THE LEVEE -- THE WEIGHT OF

03:47:02  9    THE LEVEE EXERTING A FORCE ALONG A SLIDING PLAIN.

03:47:08  10   Q.  AND IF YOU HAVE PRESSURES COMING FROM UNDERNEATH AND THOSE

03:47:11  11   PRESSURES BRING YOU INTO UNITY OR IMBALANCE, THEN YOU WILL HAVE A

03:47:15  12   SHEAR FAILURE, WOULDN'T YOU?

03:47:17  13   A.  WELL, IT'S NOT RELATED TO A SHEAR FORCE HOWEVER.  I MEAN, IF

03:47:21  14   YOU INCREASE THE PORE PRESSURES, YOU CAN INCREASE THE PORE

03:47:23  15   PRESSURES ENOUGH TO WHERE YOU GET FAIL TO A FAILURE CONDITION AS

03:47:29  16   WELL.

03:47:29  17   Q.  AND THAT'S WHY THE CORE MANUAL THAT WE SHOWED IN DR. BEA'S

03:47:32  18   TESTIMONY IS CONCERNED ABOUT UPLIFT PRESSURES AND HEAT, THOSE ARE

03:47:37  19   REAL WORLD PHENOMENA THAT CAN COMPROMISE SYSTEMS LIKE DAMS AND

03:47:40  20   LEVEES, CORRECT?

03:47:43  21   A.  IT IS CORRECT ONLY IN CERTAIN CIRCUMSTANCES, MR. SCHULTZ.  THE

03:47:48  22   CORE MANUAL THAT YOU SHOWED WAS REFERRING TO MATERIALS WITH HIGH

03:47:52  23   PERMEABILITY AND WAS REFERRING TO STEADY FLOW.  SO IT WAS EITHER

03:48:00  24   HIGH PERMEABILITY MATERIALS OR IT WAS AFTER LONG, LONG, TIME AFTER

03:48:04  25   YOU APPLY THE LOADS.  SO YOU CANNOT MAKE THE BLANKET ASSUMPTION

03:48:11  1   THAT THAT APPLIES TO ANY SOIL CONDITION BECAUSE IT DOES NOT.

03:48:15  2   Q.  BUT THAT'S A POINT OF CONTENTION, ISN'T IT, DR. SILVA, THE

03:48:18  3   POINT OF SHOWING THAT WAS DR. BEA USES STEADY FLOW, AND I

03:48:22  4   UNDERSTAND YOU DISAGREE WITH THAT, BUT IF STEADY FLOW IS THE PROPER

03:48:26  5   MODEL THEN THAT IS A PHENOMENON THAT STEADY FLOW WOULD DEMONSTRATE,

03:48:30  6   CORRECT, THESE UPLIFT PRESSURES AND HEAVE?  WHETHER YOU AGREE THE

03:48:34  7   MODEL IS THE APPROPRIATE MODEL OR NOT?

03:48:36  8   A.  WELL, YOU CAN USE THAT IN CONDITIONS THAT HAVE NO RELEVANCE TO

03:48:40  9   THE EBIA, BUT NOT FOR THE EBIA.

03:48:44 10   Q.  AND YOU STATED IN A DECLARATION TO THIS COURT THAT USING

03:48:49 11   GEOPHYSICAL TECHNIQUES TO MEASURE SATURATED CLAYS LIKE THOSE AT THE

03:48:53 12   EBIA GENERALLY YIELD DILATATIONAL WAVE VELOCITY IN THE VICINITY OF

03:48:58 13   THE VELOCITY OF SOUND AND WATER OR APPROXIMATELY 5,000 FEET PER

03:49:02 14   SECOND, CORRECT?

03:49:03 15   A.  THAT IS CORRECT.

03:49:03 16   Q.  NOW, YOU MENTIONED A MOMENT AGO -- ACTUALLY, LET ME ASK YOU ONE

03:49:09 17   OTHER QUESTION BEFORE I GO THERE.  IF I COULD HAVE THE ELMO AGAIN.

03:49:13 18   I DON'T KNOW THE ANSWER TO THIS QUESTION, THEY SAY NEVER DO THAT ON

03:49:16 19   CROSS-EXAMINATION, BUT I WANT TO KNOW THE ANSWER.

03:49:20 20        DID I UNDERSTAND YOUR TESTIMONY TO BE THAT AS LONG AS YOU

03:49:25 21   HAVE -- LET'S NUMBER THESE CUPS FULL OF WATER FROM LEFT TO RIGHT,

03:49:30 22   ONE, TWO, THREE AND FOUR, THAT IF YOU HAVE NUMBER FOUR -- AS LONG

03:49:38 23   AS NUMBER FOUR IS THERE THAT'S THE ONLY ONE THAT'S GOING TO

03:49:41 24   CONTRIBUTE TO THE HEAD ON THE LANDSIDE, OR DO ALL OF FOUR OF THESE

03:49:46 25   CONTRIBUTE?

03:49:46  1    A.   TO THE HEAD?

03:49:47  2    Q.   TO PRESSURE, EXCUSE ME.

03:49:48  3    A.   TO PRESSURES.  YOU DON'T NEED THE OTHERS IF YOU HAVE FOUR.

03:49:51  4    Q.   AND SO YOU'RE SAYING THAT IF WE HAVE FOUR EXCAVATIONS, ONE OUT

03:49:56  5    ON THE CANAL, ONE A LITTLE BIT CLOSER, ONE A LITTLE BIT CLOSER, AND

03:50:00  6    ONE RIGHT UP NEXT TO THE WALL, THE ONLY ONE THAT WOULD EXERT ANY

03:50:04  7    PRESSURE AT ALL IS THE ONE NEXT TO THE WALL?

03:50:07  8    A.   WHEN I SAY THE ONE THAT WILL CONTRIBUTE THE FLOW AND WHEN WE

03:50:15  9    SAY -- WHEN YOU SAY "PRESSURE" I GUESS, I PRESUME YOU'RE TALKING

03:50:18 10    ABOUT PRESSURE FROM GROUND WATER FLOW; IS THAT CORRECT?

03:50:21 11    Q.   IF THAT'S WHAT YOU WERE TALKING ABOUT, THAT'S WHAT I'M TALKING

03:50:24 12    ABOUT.  THAT'S WHAT I'M TRYING TO FIGURE OUT.

03:50:26 13    A.   YES, THAT'S RIGHT.

03:50:27 14    Q.   SO WE WERE TALKING ABOUT FLOW?

03:50:28 15    A.   YEAH, WE WERE TALKING ABOUT FLOW.

03:50:30 16    Q.   THANK YOU.  YOU MENTIONED YOUR SITE GEOMETRY AND YOU ECHOED

03:50:37 17    SOMETHING THAT YOU WERE VERY CLEAR ABOUT IN YOUR DEPOSITION

03:50:40 18    TESTIMONY.  WHEN YOU'RE EVALUATING FAILURES LIKE THE FAILURE AT THE

03:50:45 19    EBIA, YOU TRY AND MODEL FIELD CONDITIONS AS CLOSELY AS POSSIBLE TO

03:50:49 20    THE ACTUAL FIELD CONDITIONS, CORRECT?

03:50:51 21    A.   GENERALLY, THAT'S WHAT WE TRY TO DO, YES.

03:50:54 22    Q.   AND THAT INCLUDES THE SITE-SPECIFIC SOIL PROPERTIES AND THE

03:50:57 23    SITE-SPECIFIC GEOMETRY, CORRECT?

03:50:59 24    A.   THAT IS CORRECT.

03:50:59 25    Q.   AND YOU ATTEMPTED, IN THIS CASE, TO TRY AND REPRESENT IN YOUR

03:51:02  1  MODEL AS CLOSELY AS POSSIBLE THE CONDITIONS EXISTING IN THE FIELD

03:51:07  2  AT THE TIME.  AND IN THIS CASE, AT THE TIME OF THE STORM SURGE EVEN

03:51:10  3  ENGAGING, I THINK, YOU TOLD US THIS MORNING, ONE OF THE BEST

03:51:13  4  MODELERS IN THE WORLD TO ASSIST YOU, RIGHT?

03:51:15  5  A.  THAT IS CORRECT.

03:51:16  6  Q.  AND THE REASON YOU DO THAT IS BECAUSE IF YOU DON'T CORRECTLY

03:51:21  7  REFLECT WHAT'S OUT IN THE FIELD, THE RESULTS WOULD HAVE NO REAL

03:51:24  8  VALUE FOR THE COURT?

03:51:26  9  A.  THAT IS NOT CORRECT.

03:51:28 10  Q.  LET'S TAKE A LOOK AT YOUR DEPOSITION -- OR EXCUSE ME, YOUR

03:51:31 11  REPORT AT PAGE 25.  IT'S JX 01672 AT PAGE 36.  AND YOU STATE IN

03:51:44 12  YOUR REPORT UNDER GEOMETRY AND COMPOSITION, "THE GEOTECHNICAL

03:51:48 13  ENGINEER MUST DETERMINE THE SOIL PROFILE.  HE CAN USE TOOLS LIKE

03:51:54 14  CONE PENETROMETER, VEIN AND HAND PENETROMETER, PIEZOCONE, STRESS

03:51:59 15  METER, ET CETERA, TO OBTAIN DATA FOR ENGINEERING ANALYSES.  THE

03:52:02 16  ENGINEER MUST MAKE APPROPRIATE FIELD MEASUREMENTS AND RUN

03:52:05 17  APPROPRIATE LAB TESTS.  UNLESS HE USES CORRECT DATA, THESE ANALYSES

03:52:08 18  HAVE LITTLE VALUE."  THAT WAS MY QUESTION, IF YOU GET IT WRONG THEN

03:52:11 19  DOESN'T HAVE MUCH VALUE, RIGHT?

03:52:13 20  A.  WELL, I MEAN, IT IS TRUE THAT YOU MUST USE THE APPROPRIATE --

03:52:24 21  YOU MUST USE THE APPROPRIATE SOIL PROPERTIES.  THE REASON I TOLD

03:52:27 22  YOU IT WAS NOT CORRECT IS THAT TAKE, FOR EXAMPLE, OUR WORK HERE FOR

03:52:34 23  THE EBIA.  VERY EARLY ON, OUR ANALYSIS DEMONSTRATED CLEARLY THAT

03:52:41 24  THE EXACT GEOMETRY OF THE EXCAVATIONS WAS NOT REALLY VERY

03:52:48 25  IMPORTANT, WHETHER IT REACHED THE CLAY, THE ORGANIC CLAY, WHETHER

```
03:52:51  1    IT WAS 100 FEET AWAY OR TEN FEET AWAY.  WELL, NOT TEN FEET AWAY,
03:52:59  2    100 FEET AWAY OR 50 FEET AWAY, IT REALLY DIDN'T MAKE ANY DIFFERENCE
03:53:02  3    BECAUSE DURING THE TIME OF THE STORM SURGE, THE WATER FRONT WOULD
03:53:06  4    PENETRATE ONLY ABOUT 16 FEET.
03:53:09  5         SO AS AN EXAMPLE, I NEVER GOT TERRIBLY EXCITED ABOUT THE
03:53:17  6    EXCAVATION.  WE SPENT AN AWFUL LOT OF TIME DETAILING THE GEOMETRY
03:53:23  7    OF THIS EXCAVATIONS, AND IT WAS TRULY AMAZING TO ME THAT, YOU KNOW,
03:53:28  8    SEVERAL YEARS, ALMOST TEN YEARS AFTER THE PROJECT WAS FINISHED --
03:53:32  9    WELL, NOT QUITE TEN, BUT MANY YEARS AFTER THE PROJECT WAS FINISHED,
03:53:36 10    WE WERE ABLE TO RECONSTRUCT THE DETAILS OF WHERE THIS EXCAVATIONS
03:53:41 11    WERE -- WERE PERFORMED IN TERMS OF PLAN VIEW AND DEPTH WITH THE
03:53:49 12    LEVEL OF DETAIL THAT WE WERE ABLE TO ACHIEVE.  SO THAT WAS, I
03:53:52 13    THOUGHT, REMARKABLE, BUT FRANKLY, LARGELY IRRELEVANT BECAUSE NO
03:54:00 14    MATTER WHICH OF THESE EXCAVATIONS WE CHOSE TO PUT BEFORE THE
03:54:04 15    FLOODWALL, IF THEY WERE MORE THAN 16 FEET AWAY, THE WATER WOULDN'T
03:54:07 16    GET THERE.
03:54:09 17         SO MY POINT IS, OKAY.  OBVIOUSLY, IF I HAVE THE WRONG
03:54:15 18    SOIL PROPERTIES, I AM ANALYZING SOME OTHER SITE AND THAT'S A
03:54:18 19    PROBLEM.  BUT IF MY EXCAVATION IS, YOU KNOW, SHALLOWER OR DEEPER
03:54:25 20    THAN IT ACTUALLY WAS, OR IT WAS FARTHER APART -- FARTHER AWAY THAN
03:54:29 21    IT ACTUALLY WAS, THAT REALLY HAS NO BEARING ON THE ULTIMATE
03:54:32 22    CONCLUSION WHICH WAS THAT THE WATER WON'T GET THERE.  I MEAN --
03:54:36 23    Q.  SO I HAVE YOUR -- THE GEOMETRY THAT YOU ACTUALLY PUT IN YOUR
03:54:40 24    REPORT THAT YOU DID YOUR SEEPAGE AND SLOPE STABILITY ANALYSES BASED
03:54:45 25    ON, AND YOU'RE TELLING ME, AS I UNDERSTAND IT, IF IT'S MORE THAN
```

03:54:49  1   16 FEET AWAY FROM THE FLOODWALL, IT WON'T HAVE ANY EFFECT?

03:54:52  2   A.   THAT'S WHAT I AM SAYING.

03:54:53  3   Q.   YOU MODELLED STUFF 250 FEET AWAY FROM THE FLOODWALL, DR. SILVA?

03:54:57  4   A.   WE MODELLED THAT BECAUSE THERE WAS AN ACTUAL SIGNIFICANT

03:55:00  5   EXCAVATION AT THAT LOCATION.  AND WE HAD TO RUN -- WE DID PERFORM

03:55:06  6   FLOW ANALYSES AT THE BREACH, AND WHEN WE DO THAT, WE RUN THIS

03:55:11  7   ANALYSIS WITH THE GEOMETRY THAT EXISTED AT THAT TIME.  NOW, THOSE

03:55:17  8   ANALYSES REFLECT SORT OF EXTREME CONDITIONS.  FOR EXAMPLE, IN THAT

03:55:24  9   ONE THAT, I THINK, THAT WAS THE NORTH BREACH THAT YOU WERE SHOWING

03:55:27 10   ME?

03:55:28 11   Q.   YES, SIR.

03:55:28 12   A.   YEAH.  IN THE NORTH BREACH CROSS SECTION, WE DECIDED TO MODEL

03:55:34 13   THE PILES, WHICH, AS I MENTIONED, THE PILES WERE CLOSE AND THEY

03:55:41 14   WOULD NOT BE A VOID LEFT BEHIND.  WE MODELLED THE PILES AS IF THEY

03:55:46 15   WERE AN OPEN EXCAVATION, RATHER EXTREME CONDITION.  NOT BECAUSE I

03:55:53 16   BELIEVE THAT WE HAD AN OPEN EXCAVATION THERE AT THE TIME OF

03:55:55 17   KATRINA.  I HAVE TOLD YOU SEVERAL TIMES IN THE PRESENTATION THAT,

03:55:58 18   IN FACT, THIS EXCAVATIONS WERE BACKFILLED, AND THEY REALLY, YOU

03:56:04 19   KNOW, AS FAR AS THE SOIL WAS CONCERNED IN TERMS OF FLOW, IT WAS

03:56:07 20   LIKE AS IF THEY HAD NEVER EXISTED.

03:56:10 21        BUT WE DID THAT TO TAKE THAT EXTREME CONDITION AND SEE

03:56:14 22   WHAT WOULD BE THE EFFECT, AND THE EFFECT, OF COURSE, IS THAT THE

03:56:17 23   WATER FRONT DOESN'T ADVANCE MORE THAN 16 FEET FROM THAT EXCAVATION

03:56:21 24   REPRESENTED BY THE OPEN PILES, WHICH IS, I FORGET THE DEPTH NOW,

03:56:24 25   THE BOTTOM ELEVATION, BUT IT'S MUCH DEEPER ON ANY OF THE OTHER

03:56:28  1    EXCAVATIONS THAT WERE PERFORMED.

03:56:29  2         SO WE DO THIS SORT OF THING TO EXAMINE WHAT IS THE IMPACT

03:56:37  3    OF DIFFERENT CONDITIONS.

03:56:38  4    Q.  LET ME TAKE -- IN YOUR DEPOSITION YOU DIDN'T SAY THAT YOU RAN

03:56:43  5    IT FOR THOSE REASONS.  YOU SAID THAT YOU TOOK THE CLOSEST

03:56:45  6    EXCAVATION TO THE NORTH BREACH AND THE CLOSEST EXCAVATION TO THE

03:56:50  7    SOUTH BREACH.  WHAT I DON'T FIND IN YOUR REPORT, DR. SILVA, IS THAT

03:56:54  8    THE GEOMETRY ALL NICELY LAID OUT LIKE THIS FOR THE ONE 16 FEET AWAY

03:56:59  9    OR THE WEDDING CAKE SHOWING 16 FEET OF FLOW.  THAT'S NOT IN YOUR

03:57:03 10    REPORT, RIGHT, THIS IS WHAT'S IN YOUR REPORT?

03:57:05 11    A.  WELL, THE WEDDING CAKE APPEARS IN THE REPORT AS WELL.  SIMPLY

03:57:10 12    TOO FAR AWAY FROM THAT BREACH TO BE CONSIDERED IN THE ANALYSIS.

03:57:13 13    Q.  LET ME BE SPECIFIC.  YOU DON'T HAVE A GEOMETRY IN YOUR REPORT

03:57:18 14    SHOWING THE WEDDING CAKE EXCAVATED AS YOU'VE SHOWN THIS GEOMETRY

03:57:23 15    FROM WHICH YOU RAN SLOPE STABILITY AND SEEPAGE ANALYSES.  THESE ARE

03:57:28 16    THE ONES IN YOUR REPORT, RIGHT, THE NORTH BREACH HERE?

03:57:29 17    A.  WE DID THE ANALYSIS OF THE NORTH BREACH AND SOUTH BREACH, AND

03:57:33 18    WE DID NOT DO AN ANALYSIS ON THE WEDDING CAKE -- AT THE WEDDING

03:57:41 19    CAKE LOCATION, NO.

03:57:42 20    Q.  THAT'S RIGHT.  THE FIRST TIME THAT CAME UP WAS IN THE COURTROOM

03:57:46 21    TODAY.  I WANT TO TALK TO YOU ABOUT THE ONES YOU DID IN YOUR

03:57:48 22    REPORT, WHICH IS THE ONLY THING I WANT AN OPPORTUNITY TO PREPARE

03:57:51 23    FOR, OKAY.

03:57:51 24         I WANT TO UNDERSTAND THOUGH, ARE YOU SAYING THAT AT THE

03:57:54 25    TIME YOU DID THESE ANALYSES YOU KNEW, BEFORE YOU RAN THESE

03:57:58 1   ANALYSES, THAT IF THEY WERE MORE THAN 16 FEET AWAY FROM THE

03:58:01 2   FLOODWALL THEY WOULD HAVE NO IMPACT?

03:58:02 3   A.  WELL, I STATE IN MY REPORT AS MUCH.  THE WATER DOESN'T

03:58:06 4   PENETRATE THE FACE OF THE EXCAVATION, ANY OF THOSE EXCAVATIONS MORE

03:58:12 5   THAN 16 FEET.  SO IT REALLY DOESN'T MATTER.  I DON'T NEED TO DO --

03:58:16 6   THERE WERE 100 EXCAVATIONS AS I MENTIONED.  I DON'T NEED TO DO 100

03:58:22 7   ANALYSES TO GET FOR EACH ONE OF THESE ANALYSES THAT THE WATER WON'T

03:58:27 8   PENETRATE MORE THAN 16 FEET.  WE DID SEVERAL OF THEM AND IT'S CLEAR

03:58:31 9   THAT THE OTHERS WOULD BE THE SAME ANALYSIS.  SO OKAY, INSTEAD OF

03:58:35 10  SIX FEET, IT'S EIGHT FEET DEEP, OR INSTEAD OF EIGHT FEET, IT'S

03:58:38 11  20 FEET DEEP.  IT DOESN'T MAKE ANY DIFFERENCE BECAUSE --

03:58:40 12  Q.  YOU DID FOUR OUT OF THE HUNDRED, RIGHT, TWO AT NORTH BREACH AND

03:58:43 13  TWO AT THE SOUTH BREACH, RIGHT?  ISN'T THAT'S WHAT IN YOUR REPORT?

03:58:47 14  A.  THAT'S RIGHT.

03:58:49 15         MR. SCHULTZ:  MAY I APPROACH, YOUR HONOR?  THESE ARE FIVE

03:58:50 16  FEET LONG.  WE'VE TRIED TO PUT THEM IN A FORM THAT'S MANAGEABLE.

03:58:57 17         THE COURT:  YOU MAY.

03:58:58 18         MR. SCHULTZ:  I HAVE A COPY FOR YOU AND A COPY FOR

03:59:01 19  DR. SILVA AND COPIES FOR DEFENSE COUNSEL.  AND I DO HAVE AN EXTRA

03:59:09 20  COPY FOR THE COURT.  CAN YOU PULL UP PAGE 36 OF THE DR. SILVA'S

03:59:26 21  REPORT.  THAT WOULD BE 1672 AT PAGE 36 I BELIEVE.  I'M SORRY, IT

03:59:37 22  SHOULD BE -- IT WILL BE 11 PAGES PAST THIS SO 47.

03:59:37 23  BY MR. SCHULTZ:

03:59:46 24  Q.  NOW, YOU WERE ASKED IN DEPOSITION, DR. SILVA -- BY THE WAY,

03:59:51 25  THIS IS PAGE 36 OF YOUR REPORT, CORRECT?

03:59:53  1    A.  CORRECT.

03:59:54  2    Q.  THAT WE SEE ON THE SCREEN AND WHAT WE HAVE A BLOW UP OF IS THE,

03:59:57  3    I BELIEVE, THE TOP ONE --

04:00:00  4    A.  CORRECT.

04:00:00  5    Q.  -- OF NORTH BREACH, RIGHT?

04:00:01  6    A.  THE NORTH BREACH, THAT'S CORRECT.

04:00:02  7    Q.  AND YOU WERE ASKED IN DEPOSITION WHY YOU CHOSE THE GEOMETRY

04:00:07  8    THAT YOU DID, AND YOU SAID, "WE TOOK THE CLOSEST EXCAVATION TO THE

04:00:10  9    NORTH BREACH AND THE CLOSEST EXCAVATION TO THE SOUTH BREACH AND

04:00:13 10    THEY APPEAR ON PAGE 36."  CORRECT?

04:00:15 11    A.  WELL, I DON'T REMEMBER EXACTLY WHAT MY ANSWER WAS, BUT THAT

04:00:22 12    SOUNDS LIKE A REASONABLE.

04:00:23 13    Q.  ANY TIME, THAT'S PERFECTLY REASONABLE.  LET'S LOOK PLEASE AT PX

04:00:28 14    583 AT PAGE 13.  THE SPECIFIC REFERENCE WOULD BE PAGE 51, LINES 9

04:00:39 15    THROUGH 13.  LET'S GET THE QUESTION SO WE CAN PUT IT IN CONTEXT,

04:00:52 16    PLEASE, CARL.

04:01:00 17            "DID YOU EVER IDENTIFY BY, YOU KNOW, CIRCLING ON A MAP --

04:01:04 18    DO YOU HAVE A DIAGRAM OR CHART THAT SHOWS WHICH OF THESE

04:01:06 19    EXCAVATIONS YOU'RE REFERRING TO IN THIS STATEMENT WHEN YOU LIMIT

04:01:09 20    THE EXCAVATIONS TO JUST THOSE TWO SITES?  I BELIEVE THEY APPEAR IN

04:01:12 21    A CROSS SECTION.  WE TOOK THE CLOSEST EXCAVATION TO THE NORTH

04:01:15 22    BREACH AND THE CLOSEST EXCAVATION TO THE SOUTH BREACH, AND THEY

04:01:18 23    APPEAR ON PAGE 36."

04:01:20 24    A.  CORRECT.

04:01:20 25    Q.  AND THAT'S WHAT WE'RE LOOKING AT HERE, THE NORTH BREACH

04:01:23  1  SECTION?

04:01:23  2  A.  CORRECT.

04:01:23  3  Q.  NOW, IF WE LOOK AT THE NORTH BREACH SECTION, THE ARROW PULLING

04:01:28  4  OUT SAYS IT COMES FROM NFAATT EXCAVATION AREA 6 FROM NFAATT

04:01:33  5  SUBMITTAL REPORT.  THAT'S THE SHALLOWER OF THE TWO EXCAVATIONS WE

04:01:36  6  SEE, CORRECT?

04:01:38  7  A.  CORRECT.

04:01:38  8  Q.  AND THE REASON, BY THE WAY, THAT YOU WANTED TO USE WHAT YOU

04:01:43  9  DEEMED AT THE TIME THE CLOSEST EXCAVATIONS IS THAT EXCAVATIONS FAR

04:01:49 10  AWAY FROM THE FAILURES REALLY HAVE NO INFLUENCE ON WHAT HAPPENED

04:01:52 11  DURING KATRINA.  THAT WAS YOUR BELIEF AT THE TIME YOU WERE DOING

04:01:54 12  THIS MODELING, CORRECT?

04:01:56 13  A.  THAT IS NOT A CORRECT STATEMENT.

04:01:58 14  Q.  WELL, LET'S TAKE A LOOK IF WE COULD --

04:02:00 15  A.  WAIT, LET ME EXPLAIN.  I MEAN, THE REASON WE SELECTED THESE

04:02:04 16  EXCAVATIONS, THESE EXCAVATIONS HERE BECAUSE THEY WERE THE CLOSEST

04:02:09 17  EXCAVATION -- THE CLOSEST EXCAVATION OF A SIGNIFICANT SHAPE IN

04:02:15 18  TERMS OF DEPTH AND SIZE NEAR THE NORTH BREACH.  SO FOR THE MODEL

04:02:22 19  THAT WE HAVE HERE, WE SELECTED THOSE TWO, YOU KNOW, THOSE TWO

04:02:27 20  EXCAVATIONS.  I MEAN, IT'S ONE OF THEM IS NOT EVEN AN EXCAVATION,

04:02:30 21  IT'S PILE.

04:02:31 22  Q.  AND WE WILL LOOK AT IT.  AT THE TIME YOU GAVE YOUR DEPOSITION,

04:02:34 23  DR. SILVA, IT WAS YOUR BELIEF AND YOUR PROFESSIONAL OPINION, WAS IT

04:02:38 24  NOT, THAT EXCAVATIONS FAR AWAY FROM THE FAILURES REALLY HAVE NO

04:02:41 25  INFLUENCE ON WHAT HAPPENED DURING KATRINA?  YOU'VE TOLD US THAT

04:02:44 1  TODAY, RIGHT?

04:02:45 2  A.  I TOLD YOU THAT TODAY, BUT I THOUGHT YOU HAVE MISMATCHED THAT

04:02:48 3  STATEMENT WITH THE QUESTION YOU ASKED ME BEFORE.

04:02:49 4  Q.  I AM ASKING IF THAT'S YOUR OPINION, DOCTOR?  DO EXCAVATIONS FAR

04:02:53 5  AWAY HAVE AN EFFECT ON THE FLOODWALL OR DO THEY NOT?  YOU TOLD US

04:02:57 6  TODAY THEY DON'T, RIGHT?

04:02:58 7  A.  EXCAVATIONS FAR AWAY DON'T HAVE AN EFFECT.  EXCAVATION 16 FEET

04:03:04 8  AWAY, WHICH WE CONSIDERED VERY CLOSE, DON'T HAVE AN EFFECT EITHER.

04:03:09 9  Q.  LET'S TAKE A LOOK, IF WE COULD -- FIRST OF ALL, LET ME ASK YOU

04:03:13 10 THIS, AND THIS IS IN YOUR DEPOSITION I THINK YOU'LL -- YOU CAN TELL

04:03:16 11 IT FROM HERE THOUGH, THE EASTERN-MOST EDGE OF THE SHALLOW

04:03:19 12 EXCAVATION ON THE BLOW UP THAT WE HAVE HERE IS ABOUT 250 FEET FROM

04:03:24 13 THE FLOODWALL, CORRECT?  I BELIEVE YOU USED 660 FEET FOR THE

04:03:36 14 FLOODWALL AND 405 FOR THE EASTERN EDGE OF THE --

04:03:39 15 A.  THAT LOOKS ABOUT RIGHT.

04:03:41 16 Q.  YES, SIR.

04:03:50 17 A.  SO THE ANSWER IS YES.

04:03:51 18 Q.  THANK YOU.  NOW, AND THIS IS 60 FEET WIDE, CORRECT, GOING

04:03:55 19 TOWARD THE CANAL, SO IT GOES OUT TO ABOUT 310 FEET AWAY FROM THE

04:04:00 20 FLOODWALL?

04:04:06 21 A.  CORRECT.

04:04:08 22 Q.  AND THE REFERENCE TO THE NFAATT, THE NFAATT IS THE NO FURTHER

04:04:12 23 ACTION AT THIS TIME REPORT SUBMITTED BY WGI AT THE END OF THE

04:04:16 24 PROJECT OR THE END OF THE WORK TO THE LDEQ, CORRECT, TO DESCRIBE

04:04:21 25 THESE RECAP EXCAVATIONS?

04:04:22   1    A.   THAT IS CORRECT.

04:04:23   2    Q.   AND IN THAT REPORT THERE WAS A TABLE OF EXCAVATION DEPTHS,

04:04:26   3    WE'VE SEEN ONE IN THE TRIAL ALREADY, AND THAT'S THE TABLE FROM

04:04:29   4    WHICH YOU OBTAINED YOUR INFORMATION FOR THE GEOMETRY OF THIS

04:04:33   5    PARTICULAR EXCAVATION, CORRECT?

04:04:35   6    A.   I BELIEVE THAT'S CORRECT.

04:04:36   7    Q.   LET'S TAKE A LOOK, IF WE COULD, AT JX 122-0041.  YOU MENTIONED

04:04:44   8    FIGURE 2 AS ONE SOURCE OUT OF THE NFAATT AND TABLE 2.  THIS IS

04:04:50   9    FIGURE 2 OUT OF THE NFAATT, AND IF WE LOOK UP AT THE NORTH END, IF

04:04:55  10    WE BLOW UP JUST THE TOP HALF, WE CAN SEE -- FIRST OF ALL, BOLAND 8

04:05:00  11    IS ACTUALLY THE EXCAVATION THAT'S CLOSEST OUT OF THESE RECAP

04:05:03  12    EXCAVATIONS, BETWEEN BOLAND 6 AND BOLAND 8, CORRECT?

04:05:07  13    A.   IT'S THE AREA, I BELIEVE, TO RECONSTRUCT MY RATIONALE FOR

04:05:30  14    SELECTING THESE, I MEAN, I DIDN'T TRY TO PUT IN HERE SHALLOWER

04:05:36  15    EXCAVATION.  I WAS LOOKING FOR A SUBSTANTIAL EXCAVATION WITH SOME

04:05:39  16    DEPTH, AND THERE ARE SOME THAT ARE CLOSER, BUT I THOUGHT THEY WERE

04:05:43  17    TOO SHALLOW TO BE OF ANY INTEREST.

04:05:45  18    Q.   SO BOLAND 8 IS CLOSER BUT YOU CHOSE BOLAND 6 BECAUSE IT'S

04:05:49  19    DEEPER; IS THAT CORRECT?

04:05:50  20    A.   I WOULD HAVE TO LOOK AT THE TABLE TO ANSWER THAT QUESTION,

04:05:53  21    MR. SCHULTZ.

04:05:54  22    Q.   LET'S LOOK AT THE TABLE.  IT'S AT PAGE 23 OF THIS JX 00122.  WE

04:06:10  23    SEE BOLAND 6 IS REPORTED AS A VERTICAL EXCAVATION DEPTH OF EIGHT

04:06:13  24    FEET, CORRECT?

04:06:25  25    A.   LET'S SEE.  THE EXCAVATION DEPTH FOR AREA 8 HERE IS NOT EIGHT

04:06:36  1    FEET, IT'S SEVEN.

04:06:36  2    Q.  I'M SORRY.  BOLAND 6 IS REPORTED HERE AS EIGHT FEET, BOLAND 8

04:06:38  3    IS REPORTED HERE AT SEVEN FEET, CORRECT?

04:06:40  4    A.  YES, CORRECT.

04:06:40  5    Q.  BUT RATHER THAN THESE BEING VERTICAL EXCAVATION DEPTHS, THESE

04:06:44  6    ARE REPRESENTATIVE DEPTHS, RIGHT, AVERAGES?

04:06:48  7    A.  IN THIS PARTICULAR REPORT, WE FOUND THAT ALMOST ALL OF THEM

04:06:52  8    WERE AVERAGE DEPTHS.

04:06:53  9    Q.  AND IF WE LOOK AT THE ACTUAL EXCAVATION FIGURE, AND WE CAN IF

04:06:58 10    YOU WOULD LIKE, FOR THE BOLAND AREA 6, IT'S ACTUALLY NINE FEET DEEP

04:07:03 11    RATHER THAN EIGHT FEET DEEP, RIGHT?

04:07:04 12    A.  WELL, I WOULD LIKE TO SEE THE FIGURE.

04:07:06 13    Q.  SURE.  LET'S TAKE A LOOK, IT'S AT PAGE 30 OF JX 00122.  AND IF

04:07:23 14    WE BLOW THIS TABLE UP, THESE ARE SAMPLING LOCATIONS WITHIN THE

04:07:27 15    ACTUAL EXCAVATION, CORRECT?  AND WE SEE THAT SAMPLING LOCATION

04:07:31 16    NO. 9 -- EXCUSE ME, NO. 12, LOCATION 12 IS TO A DEPTH OF NINE FEET,

04:07:37 17    LOCATIONS 14 AND 15 ARE A DEPTH OF NINE FEET, RIGHT?

04:07:42 18    A.  CORRECT.

04:07:43 19    Q.  SO BOLAND, ALTHOUGH IT WAS REPORTED AS A VERTICAL EXCAVATION

04:07:47 20    DEPTH OF EIGHT FEET IN THAT TABLE, THE ACTUAL EXCAVATION DEPTH IS

04:07:51 21    NINE FEET AS REPORTED HERE, RIGHT?

04:07:52 22    A.  WELL, I WOULDN'T CALL IT THE ACTUAL EXCAVATION DEPTH.  I GUESS

04:07:56 23    WE HAVE TO REALIZE THAT THESE EXCAVATIONS WERE FAIRLY UNIFORM, BUT

04:08:02 24    THE WGI HAD TO CONFIRM THAT THE SOILS BELOW THERE WERE NOT

04:08:07 25    CONTAMINATED, SO THEY HAVE TO GET SAMPLES BELOW THE EXCAVATION

04:08:11  1    DEPTH AND THAT'S WHERE I THINK YOU'RE SEEING HERE.

04:08:15  2    Q.  OKAY.  LET'S TAKE A LOOK AT PX 4707 AT PAGE 1.  DID WGI GIVE

04:08:21  3    YOU THE NFAATT NOTES ALONG WITH THE NFAATT WHEN YOU WERE PREPARING

04:08:26  4    YOUR SITE GEOMETRY?

04:08:28  5    A.  THE NFAATT NOTES, WHAT DOCUMENT IS THIS FROM?

04:08:35  6    Q.  THIS IS BOLAND MARINE AREA 6 NFAATT NOTES AND YOU WILL SEE A

04:08:40  7    WGI BATES STAMP AT THE BOTTOM IF YOU WOULD LIKE ME TO SHOW IT TO

04:08:43  8    YOU.  THIS WAS PRODUCED TO US BY WGI.  LET ME ASK YOU THIS

04:08:47  9    QUESTION, DR. SILVA:  WHERE DID YOU GET THE DOCUMENTS THAT YOU

04:08:49 10    USED, THE NFAATT REPORT, FOR EXAMPLE, FOR YOUR SITE GEOMETRY?

04:08:52 11    A.  YES, I GOT IT THROUGH -- I GOT IT FROM THE WGI ATTORNEYS.

04:08:56 12    Q.  IF WE LOOK HERE ON THE NOTES IT SAYS, "BOLAND MARINE AREA 6,

04:09:00 13    SEE DIAGRAM FOR EXCAVATION DIMENSIONS," AND THEN IT HAS SOME

04:09:05 14    DISCUSSION ABOUT SAMPLING AT LOCATIONS AT FIVE, SEVEN, AND NINE.

04:09:09 15    IF WE TURN TO THE NEXT PAGE, WE WILL SEE THE DIAGRAM THAT THEY

04:09:12 16    REFER TO.

04:09:12 17    A.  YOU DO THAT.  I MIGHT RECOGNIZE IT THEN.

04:09:17 18    Q.  DO YOU RECOGNIZE IT?

04:09:18 19    A.  YES, I'VE SEEN MANY OF THESE, YEAH.

04:09:20 20    Q.  AND IN FACT, IF WE LOOK BACK AND WE WILL, AT FIGURE 1-F, THIS

04:09:24 21    IS THE SAME DIAGRAM THAT'S IN THE NFAATT REPORT EXCEPT THEY'VE

04:09:27 22    TAKEN OUT THE DEPTH TEN FEET THERE, DO YOU SEE THAT?  DO YOU AGREE

04:09:33 23    NOW LOOKING AT THE NOTE, DR. SILVA, THAT BOLAND 6 IS ACTUALLY

04:09:36 24    TEN-FOOT DEEP NOT THE EIGHT-FOOT DEEP?

04:09:47 25    A.  GIVE ME A MINUTE TO UNDERSTAND THIS SKETCH.

04:09:50 1   Q.  SURE.  YES, SIR.

04:09:53 2   A.  (WITNESS REVIEWS DOCUMENT.)  IS THERE ANYMORE CONTEXT ON THIS

04:10:33 3   SKETCH THAT YOU CAN LOOK AT?

04:10:34 4   Q.  YOU GOT WHAT WGI GAVE US.  THAT'S THE NFAATT NOTE AND THE

04:10:37 5   ATTACHED DIAGRAM REFERRED TO THE NFAATT NOTE.  MY QUESTION, AND IF

04:10:41 6   YOU CAN'T TELL ME THAT'S FINE, IS:  DO YOU BELIEVE, LOOKING AT THIS

04:10:44 7   NOW, THAT BOLAND 6 YOU INACCURATELY MODELLED AS EIGHT INSTEAD OF

04:10:50 8   TEN FEET?

04:10:51 9   A.  I DON'T BELIEVE THAT YET, BUT IF YOU -- I MEAN, I WOULD LIKE TO

04:10:56 10  LOOK AT THE NOTE AND SEE WHAT IT SAYS.  I MEAN, THIS DIAGRAM IS NOT

04:11:02 11  ALL THAT CLEAR TO ME.

04:11:04 12  Q.  ARE YOU AWARE -- AND WE CAN LOOK BACK AT THE NOTE, PLEASE, IF

04:11:07 13  YOU'LL PULL THAT UP, CARL -- YOU'RE AWARE, DR. SILVA, OF WGI HAVING

04:11:11 14  A POLICY OF OVER EXCAVATING THESE HOLES BY ONE FOOT.  WERE YOU

04:11:16 15  PROVIDED THE DOCUMENTS THAT SHOW YOU THAT?

04:11:18 16  A.  WELL, THE INFORMATION THAT WE USED FOR THE DEPTHS WERE THE

04:11:24 17  ACTUAL RECORDED DEPTHS.  WHATEVER EXCAVATION DEPTH THEY REACHED,

04:11:28 18  THAT'S WHAT THEY RECORDED.

04:11:29 19  Q.  SO THEY REPORTED TO LDEQ IN TABLE 2, THAT'S CORRECT, THAT'S

04:11:35 20  WHERE YOU GOT YOUR DEPTHS?

04:11:36 21  A.  RIGHT.

04:11:37 22  Q.  AND I THINK, HAVING HEARD YOUR TESTIMONY, TO YOU WHETHER IT'S

04:11:42 23  EIGHT FEET OR TEN FEET, IT DOESN'T REALLY MAKE ANY DIFFERENCE?

04:11:43 24  A.  IT DOESN'T MAKE ANY DIFFERENCE.

04:11:45 25  Q.  AND IT DOESN'T MATTER.  YOU KNEW WHEN YOU WROTE YOUR REPORT

04:11:48  1    THESE WERE AVERAGE REPRESENTATIVE DEPTHS AS YOU CALL THEM?

04:11:50  2    A.  I KNEW THEY WERE AVERAGE DEPTH.

04:11:52  3    Q.  AND YOU TOLD ME IN YOUR DEPOSITION -- WELL, I DIDN'T GIVE THE

04:11:56  4    DIMENSIONS, BUT IF WE TOOK THIS ENTIRE COURTROOM AND HALF OF IT WAS

04:11:59  5    AN EXCAVATION OF ONE FOOT AND HALF OF IT WAS AN EXCAVATION OF

04:12:03  6    29 FEET, A 15-FOOT REPRESENTATIVE DEPTH WOULD BE A FAIR

04:12:06  7    CHARACTERIZATION OF THE EXCAVATION, CORRECT?

04:12:08  8    A.  WELL, VOLUMETRICALLY SPEAKING, LET ME EXPLAIN WHAT THE CONCEPT

04:12:18  9    IS BECAUSE I SENSE THAT -- I SENSE THAT THERE MAY BE SOME

04:12:24 10    CONFUSION.  CAN I DRAW HERE ON THIS SCREEN?

04:12:27 11    Q.  ABSOLUTELY.

04:12:29 12             THE COURT:  YES.  YOU TAKE THIS OUT.

04:12:35 13             MR. SCHULTZ:  YOU NEED TO TAKE IT DOWN SO DR. SILVA CAN

04:12:39 14    DRAW.

04:12:46 15             THE WITNESS:  WHAT WE HAVE IS THIS SHOWS, FOR EXAMPLE,

04:12:51 16    THIS.  AN EXCAVATION WHICH IS -- THE OVERALL DEPTH OF THE

04:13:03 17    EXCAVATION IS FROM HERE TO HERE, AND THEN YOU HAVE A SAMPLE TRENCH

04:13:08 18    IN ONE PARTICULAR PLACE, AND LET'S SAY THAT THIS IS TEN FEET DEEP,

04:13:18 19    AND LET'S SAY THAT THIS IS 15 FEET DEEP.

04:13:22 20             NOW, INITIALLY, WHEN I STARTED WORKING WITH THIS

04:13:36 21    EXCAVATIONS, WE HAD THE MAXIMUM DEPTH AND WE HAVE THIS

04:13:42 22    REPRESENTATIVE DEPTHS.  AND INITIALLY, I ACTUALLY STARTED WORKING

04:13:47 23    WITH THE MAXIMUM DEPTH.  I KNEW BY THEN THAT IT DIDN'T MAKE ANY

04:13:51 24    DIFFERENCE IN TERMS OF THE PERFORMANCE OF THE STRUCTURE BECAUSE WE

04:13:55 25    HAVE ALREADY DONE FLOW ANALYSIS, AND WE ALREADY KNEW THAT THE WATER

04:13:59  1    WASN'T GOING TO PENETRATE.  SO WHETHER IT WAS TEN OR 15 OR 20,

04:14:03  2    WHATEVER, AND I ALSO KNEW THAT NONE OF THE LEVEE FAILED DURING

04:14:07  3    CONSTRUCTION.  SO IT WASN'T THE CASE THAT THE EXCAVATION WAS TOO

04:14:09  4    DEEP TO AFFECT THE STABILITY OF THE LEVEE ON THE CANAL SIDE.

04:14:12  5         SO I STARTED USING THE MAXIMUM DEPTH.  SO I WOULD GO TO

04:14:18  6    THAT POINT AND I WOULD SAY, "WELL, I AM GOING TO USE THAT AS THE

04:14:21  7    DEPTH OF THE EXCAVATION," WHICH, OBVIOUSLY, WAS AN EXTREME

04:14:26  8    REPRESENTATION.  BUT I WAS FINE WITH THAT AND I THOUGHT IT WOULD

04:14:31  9    SAVE ME FROM HAVING CONVERSATIONS LIKE THE ONE WE'RE HAVING NOW.

04:14:36 10    BY MR. SCHULTZ:

04:14:37 11    Q.  IT MIGHT HAVE.

04:14:37 12    A.  IT MIGHT HAVE.  BUT LET ME TELL YOU, MAYBE IT CAN STILL SAVE ME

04:14:42 13    FROM HAVING THE CONVERSATION.

04:14:43 14         BECAUSE WHAT HAPPENED, WE HAD DAVE SYKORA WHO WAS HERE A

04:14:51 15    FEW DAYS AGO.  HE TOOK MY TABLE WITH THE MAXIMUM DEPTHS AND HE

04:14:55 16    STARTED COMPUTING THE VOLUME OF THE EXCAVATIONS TO RELATE THEM TO

04:15:00 17    THE VOLUMES OF THE BACKFILL.  WHEN I REALIZED HE WAS DOING THIS, I

04:15:04 18    SAID, WELL, WAIT A MINUTE.  THAT IS NOT CORRECT.  I MEAN THE DEPTH

04:15:09 19    THAT I SHOW HERE MIGHT BE THE DEPTHS OF ONLY A HOLE, AND IF YOU'RE

04:15:14 20    GOING TO COMPUTE VOLUMES OF EXCAVATION, YOU CANNOT USE THAT DEPTH

04:15:20 21    BECAUSE YOU CAN GET THE WRONG RESULTS.

04:15:22 22         I NEED TO GIVE YOU AN AVERAGE DEPTH SO YOU CAN COMPUTE

04:15:24 23    THE CORRECT VOLUME FOR THE EXCAVATION."  SO HERE WE ARE NOW WORKING

04:15:29 24    WITH EXCAVATION VOLUMES AND NOT THE DEPTH.  SO TO ME THE DEPTH

04:15:32 25    DIDN'T MAKE ANY DIFFERENCE.  I KNOW I KNEW THE WATER WAS NOT GOING

04:15:36 1    TO GO MORE THAN 16 FEET AWAY, BUT TO HIM IT MADE A WORLD OF

04:15:40 2    DIFFERENCE BECAUSE IT COULD MEAN ERRORS OF 100 PERCENT IN HIS

04:15:44 3    CALCULATION.

04:15:45 4           SO I CHANGED MY TABLE, AND I REMEMBER CLEARLY AT THE TIME

04:15:49 5    CONSIDERING KEEPING BOTH OF THE NUMBERS, THE MAXIMUM DEPTH AND THE

04:15:54 6    REPRESENTATIVE DEPTH, BUT I MADE THE DECISION TO USE THE

04:16:01 7    REPRESENTATIVE DEPTH TO AVOID CONFUSION ABOUT WHAT IT WAS THE SIZE

04:16:05 8    OF THE EXCAVATION.  SO THE REPRESENTATIVE DEPTH WORKED FOR ME FINE,

04:16:12 9    AND IT CERTAINLY WORKED A LOT BETTER FOR HIM BECAUSE THEN HE COULD

04:16:16 10   COMPUTE VOLUMES THAT MADE SENSE.

04:16:17 11          AND THAT IS REALLY THE PROBLEM THAT WE FACE HERE.  I

04:16:22 12   MEAN, IN TERMS OF MY OPINION, IT DOESN'T MAKE A BIT OF DIFFERENCE

04:16:26 13   WHETHER THIS EXCAVATION WAS 10 FEET OR 15 FEET.  IN TERMS OF THE

04:16:30 14   AMOUNTS OF BACKFILL VOLUMES MAKES A WORLD OF DIFFERENCE, AND I

04:16:35 15   DECIDED THAT TO USE THE REPRESENTATIVE DEPTH FOR THAT REASON.

04:16:39 16   Q.  AND IF THE --

04:16:42 17          THE COURT:  MR. TREEBY.

04:16:42 18          MR. TREEBY:  YOUR HONOR, I DON'T MEAN TO INTERRUPT.  I

04:16:45 19   WOULD LIKE TO PRINT THIS.

04:16:46 20          THE COURT:  OKAY.  MY STAFF IS WOUNDED.  LET ME PUT IT

04:16:50 21   THAT WAY.  WE'VE HAD A COUPLE OF CASUALTIES DUE TO A LITTLE VIRUS

04:16:55 22   THAT'S GOING AROUND.  LET ME GET SOMEONE.

04:17:27 23   BY MR. SCHULTZ:

04:17:27 24   Q.  LET ME ASK, WHILE WE'RE WAITING, DR. SILVA.  WAS THIS SITE

04:17:30 25   GEOMETRY IN YOUR REPORT INTENDED TO RESPOND TO THE ALLEGATIONS

04:17:33  1   PLAINTIFFS WERE MAKING OR -- I MEAN, IT WAS RESPONSIVE, WAS IT NOT,

04:17:38  2   TO OUR THEORY OF THE CASE?

04:17:41  3   A.  I DON'T UNDERSTAND YOUR QUESTION, SIR.

04:17:42  4   Q.  SURE.  LET ME ASK IT THIS WAY:  WOULD YOU HAVE DONE THIS ANY

04:17:46  5   DIFFERENTLY IF YOU WERE DOING IT JUST AS AN ACADEMIC EXERCISE, OR

04:17:49  6   WAS IT INFLUENCED BY THE FACT THAT WE HAD ALLEGATIONS ABOUT THE

04:17:53  7   DEPTH OF THE ORGANIC CLAYS, THE SWAMP MARSH LAYER, THE FACT THAT

04:17:57  8   EXCAVATIONS PENETRATED INTO THAT SWAMP MARSH, I MEAN, THAT'S WHAT

04:18:01  9   YOU WERE TRYING TO TEST, WEREN'T YOU?

04:18:02 10   A.  WELL, ACTUALLY I WAS JUST TRYING TO DETERMINE THE IMPACT, IF

04:18:07 11   ANY, OF THIS EXCAVATION ON THE CAUSE OF FAILURE.  AND I, FAIRLY

04:18:11 12   EARLY IN THE PROCESS, DETERMINED THERE WAS NO IMPACT.  AND THEN

04:18:23 13   WE -- WE WENT TO TRY TO FIGURE OUT, WELL, IF THE EXCAVATION HAD NO

04:18:30 14   IMPACT, WHAT CAUSED THE FAILURES?  AND IT WAS IN REGARD TO THIS

04:18:35 15   CAUSE OF FAILURE INVESTIGATION THAT WE DID MOST OF THE ANALYSIS.

04:18:38 16   Q.  WELL, YOU UNDERSTAND, AT LEAST ACCORDING TO THE PLAINTIFFS'

04:18:43 17   THEORY OF THE CASE, THAT THE SWAMP MARSH LAYER IS HERE, LET'S SAY

04:18:50 18   AT 11 FEET OR 12 FEET, THEN THAT EXCAVATION, PUTTING DISTANCE ASIDE

04:18:54 19   BECAUSE YOU MODELLED SOMETHING 250 FEET AWAY, THAT EXCAVATION MIGHT

04:18:59 20   MAKE A DIFFERENCE IF THE SWAMP MARSH IS AT 12 FEET VERSUS THE SWAMP

04:19:02 21   MARSH BEING AT 20 FEET, FOR EXAMPLE, CORRECT?  THAT DIFFERENCE OF

04:19:05 22   FIVE FEET WOULD THEN BE IMPORTANT, WOULDN'T IT?

04:19:08 23   A.  WELL, MY ANSWER IS NO.  LIKE I SAID EARLIER, THERE'S NOTHING

04:19:13 24   MAGIC ABOUT REACHING THE ORGANIC CLAY.  I MEAN, THE ORGANIC CLAY

04:19:17 25   IS -- HERE IS A SAMPLE OF ORGANIC CLAY.  AND THIS IS -- THE SOIL

04:19:22  1    PROPERTY FOR THIS MATERIAL IS WHAT WE USE WHEN WE DETERMINE THAT

04:19:25  2    THE WATER PENETRATION WON'T BE MORE THAN 16 FEET DURING THE ENTIRE

04:19:31  3    EVENT LEADING TO THE FAILURE.  SO THERE'S NOTHING ABOUT THE ORGANIC

04:19:36  4    CLAY TO ME THAT HAS ANY PARTICULAR SIGNIFICANCE.  I THINK THAT AS I

04:19:43  5    MENTION EARLIER IN THE TESTIMONY, I THINK THAT CONCEPT DATES BACK

04:19:47  6    TO THE TEN TO THE MINUS TWO TO THE ORGANIC CLAY WHICH SERVED AS A

04:19:53  7    CONDUIT AND EVERYBODY WAS FOCUSSING ON THAT.  BUT WHEN I STARTED TO

04:19:56  8    DOING THIS ANALYSIS, DR. BEA WAS NO LONGER USING THE TEN TO THE

04:20:00  9    MINUS TWO.

04:20:01  10   Q.  IF I UNDERSTAND YOU, DR. SILVA, IN YOUR REPORT YOU COULD HAVE

04:20:04  11   PUT IN TESTS THAT YOU RAN THAT SHOWS THE WATER GOES ONLY 16 FEET,

04:20:08  12   YOU COULD HAVE PUT IT ON IN THE MIDDLE OF SUREKOTE ROAD, I GUESS,

04:20:12  13   OR ON THE EASTERN ROAD AND DEMONSTRATED OR ON THE EASTERN EDGE OF

04:20:14  14   SUREKOTE ROAD AND DEMONSTRATED THAT, BUT INSTEAD, HAVING DRAWN

04:20:17  15   THOSE MODELS AND DRAWN THAT CONCLUSION, YOU GAVE US THIS SITE

04:20:19  16   GEOMETRY WITH THESE SITES SHALLOW AND 250 FEET AWAY FROM THE CANAL.

04:20:23  17   THAT'S THE SEQUENCE OF EVENTS AS I APPRECIATE THEM.

04:20:25  18   A.  LET'S SEE, IS THERE A QUESTION THERE?

04:20:29  19   Q.  ISN'T THAT THE SEQUENCE OF EVENTS YOU JUST DESCRIBED?  YOU RAN

04:20:32  20   A BUNCH OF MODEL S THAT SHOWED THE WATER ONLY GOES 16 FEET, DECIDED

04:20:36  21   I AM NOT GOING TO SHARE ANY OF THAT WITH ANYONE, I'LL GIVE YOU THE

04:20:39  22   SITE GEOMETRY WITH THE SITE INFORMATION 250 FEET AWAY?

04:20:42  23   A.  THAT IS INCORRECT.  IN FACT, YOU HAVE ALL OF MY ANALYSIS.

04:20:46  24   THEY'RE ALL IN THE MATTERS CONSIDERED.  SO YOU HAVE EVERYTHING.

04:20:52  25   AND YOU ALSO HAVE ALL 100 EXCAVATIONS OR MAYBE YOU HAVE 100, MAYBE

04:20:59   1   YOU HAVE 98, BUT WHATEVER WE KNEW AT THAT TIME WAS THE NUMBER, YOU

04:21:05   2   HAVE ALL OF THAT AND IT APPEARS IN THE REPORT.

04:21:07   3   Q.  LET ME ASK YOU THEN, WHAT PAGE OF YOUR REPORT IS THE

04:21:12   4   BEAUTIFULLY LAID OUT SITE GEOMETRY FOR THE WEDDING CAKE SHOWING

04:21:16   5   16 FEET OF FLOW AND WHY DIDN'T YOU MENTION THAT IN THE DEPOSITION

04:21:19   6   INSTEAD OF MENTIONING THESE, WHICH ARE, IN FACT, YOUR SITE

04:21:22   7   GEOMETRY, RIGHT?

04:21:23   8   A.  THAT'S A CROSS SECTION.  I MEAN, AS I MENTIONED, WE ORGANIZE

04:21:27   9   ALL OF THESE WITH THE GIS, AND WHENEVER WE DO A CROSS SECTION WE GO

04:21:33  10   THERE.  BUT THE REPORT -- I HAVE TO LOOK AT THE COPY OF THE REPORT

04:21:37  11   TO TELL YOU WHERE IT IS.

04:21:40  12            MR. SCHULTZ:  CAN WE PULL THIS DOWN, JUDGE?

04:21:42  13            THE COURT:  YES.  IT'S PRINTED.

04:21:48  14            MR. SCHULTZ:  AND IN THE MEANTIME, I WOULD LIKE TO PULL

04:21:50  15   UP A PAGE FROM THE REPORT, JX 1672, PAGES 45 TO 46.

04:21:56  16            THE WITNESS:  I BELIEVE YOU LOOK AT PAGE 7 OF THE REPORT

04:22:04  17   YOU HAVE A PLAN VIEW WITH ALL OF THE EXCAVATIONS.

04:22:11  18   BY MR. SCHULTZ:

04:22:11  19   Q.  WE DON'T HAVE A CROSS SECTION OF ALL OF THE EXCAVATIONS?

04:22:14  20   A.  I ONLY DO CROSS-SECTIONS OF THE TWO LOCATIONS, YES.  I COULD

04:22:17  21   HAVE DONE CROSS SECTIONS EVERY FOOT AND I WOULD END UP WITH 1,000

04:22:21  22   CROSS-SECTIONS.  BUT THERE WAS REALLY NO POINT TO DO THAT.

04:22:24  23   Q.  WELL, WE WOULD HAVE BEEN ABLE TO TALK ABOUT THEM AT LEAST.

04:22:29  24   A.  I'M SURE, BUT.

04:22:31  25   Q.  IN YOUR REPORT WHAT YOU SAID WAS, "ALTHOUGH EXCAVATIONS MADE

04:22:34 1  FOR THE ENVIRONMENTAL RESTORATION AT THE EBIA HAD IRREGULAR

04:22:38 2  SURFACES -- I'M DOWN AT THE BOTTOM OF THE PAGE -- THIS REPORT

04:22:40 3  CONSERVATIVELY PORTRAYS EXCAVATIONS WITH UNIFORM DEPTHS AT THEIR

04:22:44 4  DEEPEST ELEVATIONS.  THIS SIMPLIFICATION FOR PURPOSES OF ANY

04:22:48 5  ANALYSES WOULD INCREASE THE CALCULATED IMPACT OF THE EXCAVATIONS ON

04:22:53 6  THE PERFORMANCE OF THE EBIA LEVEES.

04:22:54 7          SO WHAT YOU TOLD US WHEN YOU GAVE US YOUR REPORT AND TOLD

04:22:57 8  THE COURT WAS THAT YOU, IN FACT, WERE USING THE 15 AND NOT THE TEN

04:23:00 9  IN YOUR DIAGRAM, THE DEEPEST ELEVATIONS, CORRECT?

04:23:03 10 A.  I MEAN, THAT SEEMS TO BE THE CASE AND THAT MIGHT BE MY ERROR IN

04:23:10 11 ADJUSTING THAT WORKING FOR WHEN WE SWITCHED FROM THE MAXIMUM DEPTH

04:23:15 12 TO THE REPRESENTATIVE DEPTH.

04:23:16 13 Q.  AND THAT SIMPLIFICATION WOULD ONLY INCREASE THE CALCULATED

04:23:21 14 IMPACT ON THE LEVEES IF DEPTH MATTERS, RIGHT?

04:23:24 15 A.  BUT IT TURNED -- IT WOULD, BUT IT TURNED OUT IT DIDN'T, SO IT

04:23:28 16 MAKES NO DIFFERENCE.

04:23:29 17 Q.  BUT YOU KNEW THAT BEFORE YOU WROTE THE REPORT?

04:23:31 18 A.  I KNEW THAT.

04:23:32 19 Q.  LET'S TAKE A LOOK -- OR LET ME JUST ASK YOU THE QUESTION

04:23:35 20 BECAUSE WE TALKED ABOUT THIS IN YOUR SUPPLEMENTAL DEPOSITION.  YOU

04:23:38 21 KNOW TODAY THAT BOLAND 8, THE AREA THAT WE JUST SAW, IS CLOSER TO

04:23:41 22 THE LEVEE -- TO THE FLOODWALL THAN BOLAND 6 WAS ALSO DEEPER.  IT

04:23:45 23 WENT DOWN TO 14 FEET, CORRECT?

04:23:47 24 A.  I DON'T REMEMBER -- OBVIOUSLY, I DON'T REMEMBER ALL OF THE

04:23:52 25 NUMBERS.

04:23:52  1   Q.  AND I DON'T BLAME YOU, IT'S TOUGH.   JX 122, PAGE 32.  I HOPE

04:24:01  2   THIS WILL BLOW UP WITH SOME RESOLUTION, BUT WE NEED TO ROTATE IT

04:24:04  3   AND THIS IS AREA 8 TO BEGIN WITH, CORRECT, DR. SILVA?  LET'S TURN

04:24:10  4   IT BACK, CARL AND TAKE A LOOK.  THIS IS TWO PAGES BACK WE SAW THE

04:24:14  5   FIGURE FOR FIGURE 6 AND IF WE GO DOWN --

04:24:17  6   A.  BOLAND AREA 8.

04:24:18  7   Q.  IF WE ROTATE IT, WE SEE A SIMILAR TABLE FOR EXCAVATIONS AND

04:24:24  8   SOIL SAMPLES TAKEN?

04:24:27  9   A.  CORRECT.

04:24:27 10   Q.  AND WE SEE, FOR EXAMPLE, THERE'S A 14 AND NO. 35 -- SAMPLE

04:24:38 11   NO. 35, PT MEANS PIT BOTTOM, CORRECT?  WE TALKED ABOUT THAT IN YOUR

04:24:43 12   DEPOSITION.  THEY WILL GIVE -- SOMETIMES THEY WILL GIVE SO.  THAT

04:24:47 13   WOULD MEAN SOUTH WALL, AND NO WOULD BE NORTH BALL, BO IS BOTTOM,

04:24:51 14   THERE'S A 14, AN 11, AN 11, 11, 12, 11.  SO BOLAND 8 WAS DEEPER

04:24:58 15   THAN BOLAND 6 AND CLOSER TO THE WALL, CORRECT?

04:25:00 16   A.  WHEN YOU GO TO THE SUMMARY TABLE, WHAT IS THE DEPTH THAT THEY

04:25:10 17   HAVE THE REPORT FOR THIS EXCAVATION?

04:25:12 18   Q.  LET'S GO BACK AND LOOK.  IT WAS SEVEN FEET BY MY RECOLLECTION,

04:25:15 19   SO THE TABLE REPORTED TO LDEQ, WHICH YOU USED, SHOWS BOLAND 8 BEING

04:25:20 20   MORE SHALLOW UNDER THE VERTICAL EXCAVATION DEPTH.

04:25:22 21   A.  YES, THAT'S WHAT WE USED.

04:25:24 22   Q.  NOW, IF WE LOOK -- I WANT TO VISIT ONE MORE TIME YOUR NORTH

04:25:36 23   BREACH GEOMETRY.  LOOKING AT DEEP THE EXCAVATION, THIS WAS PILINGS,

04:25:39 24   CORRECT?

04:25:40 25   A.  THOSE WERE PILINGS, CORRECT.

04:25:42  1    Q.  AND THOSE WERE PILINGS UNDERNEATH BUILDING 5, RIGHT?  YOU REFER

04:25:48  2    TO IT AS STRUCTURE NO. 5 OF THE LOCK REPLACEMENT PROJECT.  THAT'S

04:25:53  3    BUILDING 5 OUT ON THE CANAL AT BOLAND MARINE, RIGHT?

04:25:57  4    A.  THAT IS CORRECT.

04:25:58  5    Q.  AND BUILDING 5 DID HAVE PILINGS UNDERNEATH IT, BUT YOU'RE

04:26:02  6    AWARE, AREN'T YOU, DR. SILVA, THAT THERE WAS A FOUNDATION,

04:26:05  7    FOUNDATION 009, THAT HAD PILINGS UNDERNEATH IT THAT WAS MUCH CLOSER

04:26:09  8    TO THE FLOODWALL THAN THE PILINGS YOU MODELLED HERE, CORRECT?

04:26:13  9    A.  WELL, I WOULD HAVE TO LOOK.

04:26:14  10   Q.  WELL, LET'S TAKE A LOOK AT -- GIVE ME A MOMENT.  LET'S TAKE A

04:26:25  11   LOOK AT JX 00382 AT PAGE 17.  THIS, I THINK, WILL BE ENOUGH TO HELP

04:26:36  12   US.  BASED ON YOUR REVIEW, YOU REVIEWED ALL OF THE QARS, CORRECT?

04:26:41  13   A.  WELL, I REVIEWED A LOT OF THEM.  MY TEAM REVIEWED ALL OF THEM,

04:26:45  14   BUT I CAN'T SAY THAT I SAW EVERY ONE.

04:26:48  15   Q.  AND DID YOUR TEAM REVIEW ALL OF THE QARS BECAUSE YOU FELT IT

04:26:52  16   WAS NECESSARY TO REVIEW ALL OF THE QARS TO GET A COMPREHENSIVE

04:26:55  17   PICTURE OF WHAT HAPPENED OUT ON THE SITE?

04:26:57  18   A.  WELL, WE REVIEWED THEM TO CAPTURE THE GEOMETRY THAT WAS

04:27:04  19   PORTRAYED IN MY REPORT AND THE LOCATION OF THE EXCAVATIONS.  I

04:27:07  20   REVIEWED TESTIMONY FOR DIFFERENT PURPOSES, I MEAN, TO LOOK AT THE

04:27:11  21   COMPOSITION OF THE -- HOW THESE WERE DONE IN THE BACKFILL.  SO, YOU

04:27:16  22   KNOW, TO CAPTURE THE DETAILS OF THE WORK THAT WAS PERFORMED.

04:27:19  23   Q.  SURE.  YOU COULDN'T HAVE -- IN YOUR JUDGMENT, YOU COULD NOT

04:27:22  24   HAVE ADEQUATELY CONSIDERED THE ISSUES THAT YOU WERE PRESENTED TO

04:27:26  25   CONSIDER WITHOUT REVIEWING ALL OF THE QARS.  YOU COULDN'T HAVE JUST

04:27:29  1    LOOKED AT ONE-THIRD OF THEM, FOR EXAMPLE, AND FELT YOU HAD DONE A

04:27:32  2    SUFFICIENT JOB?

04:27:33  3    A.  WELL, IN HINDSIGHT, I COULD HAVE.  BECAUSE --

04:27:36  4    Q.  DO YOU KNOW HOW YOU WOULD HAVE PICKED THEM?

04:27:38  5    A.  WELL, YOU KNOW, EARLY ON WHEN WE LOOK AT THIS PROBLEMS, WE

04:27:47  6    START SOLVING THE PROBLEM BY APPROXIMATION.  YOU KNOW, WE SOLVED IT

04:27:53  7    MANY TIMES, AND THE MORE WE KNOW ABOUT THE PROBLEM, THE BETTER WE

04:27:58  8    FEEL ABOUT THE SOLUTION.  EARLY ON IN THIS PROCESS WE PUT AN

04:28:02  9    EXCAVATION AND DID A FLOW ANALYSIS AND DETERMINED THAT THE WATER

04:28:08  10   DIDN'T PENETRATE MORE THAN A LITTLE BIT, A FEW FEET, 16 FEET.  SO

04:28:13  11   WE KNEW THAT THAT WAS THE RESULT THAT WE --

04:28:21  12   Q.  EXCUSE ME, DR. SILVA.

04:28:23  13   A.  WE KNEW THAT WAS THE RESULT AT THAT POINT IN TIME, AND WE KEPT

04:28:26  14   LOOKING FOR MORE INFORMATION AND TRYING TO REFINE THAT ANALYSIS,

04:28:33  15   BUT IN EFFECT, THE RESULTS DIDN'T CHANGE VERY MUCH.  SO, I MEAN,

04:28:39  16   IT'S NOT RELATED TO YOUR QUESTION, BUT AT END OF THE DAY, WE DON'T

04:28:44  17   NEED THE DETAILS OF THE HUNDRED EXCAVATIONS TO SOLVE THIS PROBLEM.

04:28:47  18   Q.  IT WAS A MATTER OF HAVING ENOUGH INFORMATION TO KNOW THAT YOU

04:28:50  19   DIDN'T NEED ALL OF THE INFORMATION, IS THAT A FAIR?

04:28:54  20   A.  IT'S A MATTER OF COVERING ALL BASES.

04:28:57  21   Q.  QAR -- I BELIEVE THIS IS QAR NO. 224.  THIS IS A MAP.  FOR

04:29:02  22   ORIENTATION, IT SAYS IT'S A BOLAND MARINE CONCRETE FOUNDATION

04:29:06  23   REMOVAL FOUNDATION MAP.  THIS IS I BELIEVE -- THERE IT IS,

04:29:10  24   NOVEMBER 13TH OF 2001.  AND WE HAVE -- I DON'T THINK THIS PURPORTS

04:29:14  25   TO BE TO SCALE, BUT WE HAVE NORTH INDICATING THAT NORTH WOULD BE AT

04:29:18  1   THE BOTTOM OF THE PAGE, RIGHT?

04:29:20  2   A.  CORRECT.

04:29:21  3   Q.  AND SO THE CANAL WOULD BE ON THE RIGHT-HAND SIDE OF THE PAGE,

04:29:26  4   RIGHT HERE (INDICATING), AND THE FLOODWALL WOULD BE ON THE

04:29:31  5   LEFT-HAND SIDE OF THE PAGE?

04:29:32  6   A.  THAT'S RIGHT.

04:29:32  7   Q.  AND I MISSPOKE A FEW MINUTES AGO.  I SAID FOUNDATION BLOCK

04:29:36  8   NO. 9 WAS THE ONE CLOSER TO THE FALL, ACTUALLY FIVE AND SIX.  DO

04:29:40  9   YOU REMEMBER THAT PAIR OF FOUNDATION BLOCKS BY THE TRAILERS BY

04:29:43 10   SUREKOTE ROAD?  WE'VE SEE A PHOTOGRAPH OF IT IN THE TRIAL WITH

04:29:48 11   DR. BEA ON DIRECT EXAMINATION.  IF THIS DOESN'T RING A BELL, WE CAN

04:29:54 12   LOOK AT THE PHOTO.

04:29:57 13   A.  LET'S LOOK AT THE PHOTO.

04:29:59 14   Q.  SURE.  LET'S PULL UP JX -- LET'S LOOK AT JX 383 FIRST, PAGE 1.

04:30:11 15   A.  I AM ORIENTED NOW.  I SAW IT IN MY FIGURES.  I KNOW WHERE

04:30:15 16   YOU'RE TALKING ABOUT.

04:30:16 17   Q.  LET ME SEE IF I HAVE A HARD COPY OF THIS, DR. SILVA, BEFORE WE

04:30:19 18   GO FURTHER.  SURE.  IF WE LOOK, THIS IS DATED NOVEMBER 13TH, 2001,

04:30:27 19   SAME DATE WE JUST LOOKED AT, CORRECT, FOR THE MAP?

04:30:31 20   A.  CORRECT.

04:30:32 21   Q.  AND THEY INDICATE REMOVED -- DOWN IN THE FULL PARAGRAPH THERE,

04:30:38 22   REMOVED WOOD PILINGS FROM BELLOW CONCRETE FOUNDATIONS AT BOLAND

04:30:43 23   MARINE, CORRECT?

04:30:43 24   A.  CORRECT.

04:30:44 25   Q.  IF WE TURN TO PAGE 2, WE'LL SEE THE PV 400 EXCAVATOR PULLING

04:30:49 1  630 LINEAR FEET OF WOOD PILINGS FROM BELOW CONCRETE FOUNDATION 005,

04:30:53 2  006.  THOSE WERE THE FOUNDATIONS WE JUST SAW IN THE SCHEMATICS,

04:30:58 3  RIGHT?  THE TWO THAT WERE ON THE EASTERN EDGE OF THAT MAP -- HAND

04:31:03 4  DRAWN MAP?

04:31:13 5  A.  WELL, I CANNOT ANSWER YOUR QUESTION BECAUSE I KIND OF LOST

04:31:21 6  TRACK WHAT YOU WERE SAYING WITH THE FIGURES.  BUT MAYBE WE WILL

04:31:25 7  NEED TO --

04:31:26 8  Q.  RIGHT.  LET ME ASK YOU THIS:  I AM JUST TRYING TO LAY A

04:31:29 9  FOUNDATION FOR THE LOCATION OF THESE EXCAVATIONS.  THIS IS QAR

04:31:33 10 DATED THE SAME DATE AS THE MAP.  THE MAP SHOWED US CONCRETE

04:31:36 11 FOUNDATIONS WITH PILINGS 005, 006, WE SEE ON THE SAME DATE PULLING

04:31:41 12 CONCRETE FOUNDATIONS?

04:31:41 13 A.  YES.

04:31:42 14 Q.  AND PILINGS 005, 006, RIGHT?

04:31:44 15 A.  OKAY.  CORRECT.

04:31:45 16 Q.  DOES THAT REFRESH YOUR RECOLLECTION OF THOSE TWO BIG CONCRETE

04:31:48 17 BLOCKS THAT WERE IN PROXIMITY TO THE TRAILERS IN THE PHOTOGRAPHS?

04:31:52 18 A.  THAT DOESN'T, BUT MY FIGURE DOES.

04:31:56 19 Q.  YOUR FIGURE, APPENDIX B?

04:31:59 20 A.  I CANNOT SAY.  WHAT APPENDIX IS THIS?  APPENDIX B, YEAH.

04:32:06 21 Q.  WHICH I BELIEVE WOULD BE 1674.  WHAT PAGE ARE YOU ON?

04:32:10 22 A.  I AM ON FIGURE 2.

04:32:11 23 Q.  SO LET'S LOOK AT 1674 -- JX 1674, FIGURE 2, PAGE 2.  AND THESE

04:32:25 24 FOUNDATION BLOCKS WERE UNDER BUILDING 7A, CORRECT?

04:32:28 25 A.  I COULDN'T TELL YOU AS I SIT HERE IF THAT WAS THE BUILDING

04:32:39    1    NUMBER.

04:32:42    2    Q.  YOU SAY YOU THOUGHT YOU SAID THIS MIGHT HELP LOCATE THEM?

04:32:47    3    A.  FIGURE -- IS THAT 2.3?  DOESN'T LOOK LIKE FIGURE 2.

04:32:58    4    Q.  THAT'S FIGURE --

04:33:04    5    A.  THAT'S FIGURE 1.

04:33:06    6    Q.  SO LET'S GO TO THE NEXT PAGE.  THIS MAY BE A LONG ROAD TO A NOT

04:33:13    7    FAR AWAY PLACE, DR. SILVA.  ALL I'M TRYING TO ESTABLISH IS THAT

04:33:17    8    THERE ARE PILINGS CLOSER TO THE WALL THAN THE ONES YOU EXCAVATED

04:33:20    9    HAD YOU TOLD US YOU CHOSE THE PILINGS YOU CHOSE BECAUSE THEY WERE

04:33:23   10    THE CLOSEST TO THE WALL?

04:33:24   11    A.  LET'S SEE.  WHERE ARE THEY CLOSER TO THE WALL?  CAN YOU POINT

04:33:29   12    THE LOCATION THAT YOU'RE TALKING ABOUT?

04:33:31   13    Q.  I PULLED THIS UP BECAUSE YOU SAID YOU THOUGHT IT MIGHT HELP US

04:33:35   14    LOCATE THEM, AND THE FACT IS, YOU DON'T HAVE THEM ON ANY OF YOUR

04:33:38   15    APPENDICES TO MY KNOWLEDGE, BUT I CAN SHOW YOU A PHOTOGRAPH?

04:33:41   16    A.  OKAY.  LET'S LOOK AT THE PHOTOGRAPH.

04:33:43   17    Q.  PX 3393-342.  I'M AFRAID THAT'S NOT GOING TO HELP.  LET'S GO TO

04:33:58   18    THE NEXT PAGE.  ALL RIGHT.  DR. SILVA, THIS IS -- I AM NOT HELPING

04:34:08   19    VERY MUCH.  I OBVIOUSLY WROTE DOWN THE WRONG REFERENCE.  LET'S LOOK

04:34:17   20    AT 3394-11.  MY APOLOGIES, DOCTOR.  FIRST, LET'S GO TO THE --

04:34:29   21          HERE WE GO.  THIS IS THE PHOTOGRAPH WE SHOWED WITH

04:34:31   22    DR. BEA.  DO YOU RECOGNIZE THESE, DR. SILVA, AS FOUNDATION BLOCKS

04:34:36   23    AT BOLAND MARINE THAT HAD PILINGS BENEATH THEM?

04:34:38   24    A.  I RECOGNIZE THOSE, BUT THOSE ARE FURTHER SOUTH.

04:34:43   25    Q.  THEY ARE.  THEY'RE -- IN FACT, IF YOU LOOK, YOU SEE THE SINGLE

04:34:47  1    TRAILER --

04:34:47  2    A.  YEAH.

04:34:47  3    Q.  -- TO THE SOUTH OF THEM, BUT YOU DON'T SEE THE TWO TRAILERS.

04:34:51  4    IF WE GO BACK TO YOUR APPENDIX, WE CAN SEE THE TRAILERS IN YOUR

04:34:54  5    APPENDIX, CORRECT?

04:34:55  6    A.  YES.

04:34:56  7    Q.  AND THAT WILL HELP US LOCATE THEM ON THE NORTH SIDE AXIS.  AND

04:34:59  8    WE CAN SEE IN THE PHOTOGRAPH THE PROXIMITY TO THE TRAILERS, RIGHT?

04:35:02  9    A.  I SEE THE PROXIMITY TO THE TRAILER, YEAH.

04:35:06 10    Q.  AND YOU'LL AGREE WITH ME THAT THE PROXIMITY TO THE TRAILERS OF

04:35:11 11    THESE FOUNDATION PILINGS THAT WERE REMOVED IS MUCH CLOSER THAN OUR

04:35:17 12    BLOW UP WHERE YOU HAVE FOUNDATION PILINGS ALL THE WAY OUT BASICALLY

04:35:20 13    ON THE CANAL?

04:35:20 14    A.  WELL, BUT THOSE STRUCTURES ARE NOT IN THAT CROSS SECTION.

04:35:23 15    Q.  THAT'S MY POINT.

04:35:26 16    A.  SO WHY SHOULD THEY APPEAR THERE IF THEY ARE NOT IN THAT CROSS

04:35:30 17    SECTION?

04:35:30 18    Q.  DR. SILVA, BECAUSE WHEN WE TOOK YOUR DEPOSITION, YOU SAID YOU

04:35:33 19    CHOSE THESE BECAUSE THEY WERE THE CLOSEST TO THE FLOODWALL, AND SO

04:35:35 20    WE LOOKED TO SEE IF THERE WERE ANY CLOSER.

04:35:37 21    A.  RIGHT, BUT I WAS TALKING ABOUT THAT CROSS SECTION.  I MEAN, I

04:35:42 22    WASN'T TALKING FOR THE WHOLE SITE.  IF YOU'RE TALKING -- IF YOU PUT

04:35:45 23    IN FRONT OF ME A DRAWING OF A CROSS SECTION, I AM TALKING ABOUT

04:35:49 24    THAT LOCATION, NOT SOME OTHER LOCATION.

04:35:51 25    Q.  WE TOOK THE CLOSEST EXCAVATION TO THE NORTH BREACH AND THE

04:35:54  1   CLOSEST EXCAVATION TO THE SOUTH BREACH.

04:35:57  2   A.  IN THAT CROSS SECTION, NOT SOMEWHERE ELSE.

04:35:59  3   Q.  OKAY.  LET'S TAKE A LOOK THEN AT YOUR SOUTH BREACH GEOMETRY FOR

04:36:05  4   A MOMENT.  AND I WILL NOT, I PROMISE, WALK THROUGH THIS WITH THE

04:36:10  5   SAME PAINSTAKING DETAIL THAT WE WALKED THROUGH THE ONE ON THE NORTH

04:36:16  6   BREACH, BUT I DO WANT TO LOOK AT IT.

04:36:18  7   A.  THANK YOU, SIR.

04:36:19  8   Q.  LET ME SEE WHAT I'VE GOT.

04:36:29  9            MR. SCHULTZ:  MAY I APPROACH, YOUR HONOR?

04:36:37 10            THE COURT:  YES, YOU MAY.

04:36:38 11            MR. SCHULTZ:  A COPY FOR YOU, DR. SILVA.

04:36:58 12            THE WITNESS:  MAY WE -- THAT'S ALL RIGHT.

04:37:04 13   BY MR. SCHULTZ:

04:37:05 14   Q.  MAY BE ABLE TO HANDLE THIS IN ONE OR TWO QUESTIONS.  BASED ON

04:37:08 15   THE GEOMETRY WE'RE LOOKING AT OF THE SOUTH BREACH, YOU MODELLED

04:37:12 16   SAUCER MARINE 5, CORRECT?

04:37:14 17   A.  AREA 5, YES, SIR.

04:37:17 18   Q.  AND YOU GAVE AREA 5 AN EIGHT-FOOT DEPTH BECAUSE THAT'S WHAT WGI

04:37:22 19   TOLD THE LDEQ IN TABLE 2 OF THE SAUCER MARINE NFAATT, CORRECT?

04:37:26 20   A.  IT WAS IN THE NFAATT REPORT AND THAT'S WHAT WE USED, YES, SIR.

04:37:29 21   Q.  AND WE'VE SEEN ALREADY SEVERAL TIMES WITH MR. GUILLORY, WITH

04:37:33 22   DR. BEA, SAUCER 5 ACTUALLY WENT DOWN TO 22 FEET AT LEAST?

04:37:37 23   A.  WELL, THEY HAD SOME SAMPLES DEEP, SOME DEEP SAMPLES, YES.

04:37:41 24   Q.  PRECISELY.

04:37:45 25   A.  YES.

04:37:46  1    Q.  SO INSTEAD OF A DEPTH OF EIGHT FEET, IT GOES DOWN TO 22; BUT I

04:37:50  2    TAKE IT FROM YOUR TESTIMONY THAT DOESN'T MAKE ANY DIFFERENCE,

04:37:52  3    RIGHT?

04:37:52  4    A.  IF AREA 5 HAD BEEN WHATEVER DEPTH YOU MENTIONED, 20 FEET, IT

04:37:58  5    WOULDN'T HAVE MADE ANY DIFFERENCE IN THE PERFORMANCE OF THE

04:38:01  6    FLOODWALL DURING THE KATRINA STORM SURGE.

04:38:03  7    Q.  AND YOU TOLD US IN YOUR DEPOSITION, I BELIEVE, THAT YOU

04:38:07  8    EXCLUDED WHAT YOU TERMED SURFICIAL EXCAVATIONS, MEANING ANYTHING

04:38:12  9    MORE SHALLOW THAN FIVE FEET OR FIVE FEET OR SHALLOWER, CORRECT?

04:38:16 10    A.  THAT IS CORRECT, YES.

04:38:17 11    Q.  SO WHEN YOU MODELLED -- THESE ARE FOR SLOPE STABILITY AND FOR

04:38:22 12    SEEPAGE ANALYSIS, CORRECT?

04:38:23 13    A.  THAT IS CORRECT.

04:38:24 14    Q.  AND BY THE WAY, LET ME TAKE A QUICK DETOUR HERE.  YOU

04:38:31 15    MODELLED -- WHEN YOU MODELLED YOUR SLOPE STABILITY, YOU'VE GOT --

04:38:38 16    LET ME BACK UP.  YOU'VE GOT IN YOUR PRESENTATION, YOUR SLIDE

04:38:41 17    PRESENTATION OF THE COURT TODAY SEVERAL MENTIONS OF THE GAP, AND

04:38:43 18    YOU REFER TO THE GAP AS PLAYING A CAUSATIVE ROLE AND YOU REFER TO

04:38:47 19    THE GAP AS AN OPEN EXCAVATION AT THE FACE OF THE FLOODWALL,

04:38:51 20    CORRECT?

04:38:52 21    A.  WELL, I REFER TO THE GAP AS -- YES, I REFER TO THE GAP IN TERMS

04:39:03 22    OF THE FAILURE MECHANISM, YES.

04:39:06 23    Q.  RIGHT.  YOUR SLIDE NO. 16 -- 18, EXCUSE ME, "CANAL SIDE GAP

04:39:11 24    FURTHER REDUCED LEVEL OF STABILITY."

04:39:13 25    A.  THAT IS CORRECT.

04:39:13  1  Q.  AND IN FACT, THE NEXT SLIDE 19 IS ENTITLED "CANAL SIDE GAP AND

04:39:18  2  SCOUR TRENCH FURTHER REDUCED LEVEL OF STABILITY."  IF WE LOOK AT JX

04:39:24  3  1680 AT PAGE 35, IF WE CAN BLOW THIS UP, OR I CAN DO IT ON THE ELMO

04:39:33  4  IF IT HELPS, THESE ARE COMPUTED FACTORS OF SAFETY COMPARED TO

04:39:37  5  KATRINA HYDROGRAPH FOR NORTH BREACH SECTION AND FOR SOUTH BREACH

04:39:42  6  SECTION, CORRECT?

04:39:42  7  A.  THAT IS CORRECT.

04:39:43  8  Q.  AND THESE ARE -- IF WE LOOK DOWN IN THE LEGEND, WHAT YOU'VE

04:39:48  9  DONE, IF I HAVE IT CORRECT, IS YOU'VE TAKEN -- I'M LOOKING AT

04:39:52 10  FIGURE E-47 RIGHT NOW FOR THE SOUTH BREACH, YOU'VE TAKEN CANAL

04:39:55 11  WATER LEVEL, THOSE ARE THE BLACK TRIANGLES GOING UP AND DOWN,

04:39:59 12  RIGHT?

04:40:00 13  A.  YES.

04:40:01 14  Q.  THEN YOU HAVE NFAATT AREA 5 WITH GAP.  THAT'S THE AREA 5 WE

04:40:06 15  JUST TALKED ABOUT THAT YOU MODELLED AT EIGHT FEET THAT WAS ACTUALLY

04:40:10 16  WENT DOWN TO 22, RIGHT?

04:40:11 17  A.  YES.

04:40:11 18          MR. TREEBY:  OBJECT, YOUR HONOR.  THIS GOT CORRECTED.  IT

04:40:13 19  WASN'T EIGHT FEET.  IT WAS 13 AND THE WITNESS CORRECTED THAT.  I

04:40:17 20  WAS GOING TO BRING IT UP IN REDIRECT.  IF HE HADN'T REPEATED, I

04:40:20 21  WOULDN'T HAVE PROCEEDED.

04:40:22 22          MR. SCHULTZ:  I'LL GO THROUGH THE QARS SO WE CAN

04:40:25 23  RE-ESTABLISH --

04:40:26 24          THE COURT:  ARE YOU TALKING ABOUT THE BOLAND MARINE?

04:40:27 25          MR. TREEBY:  NO, THE SAUCER MARINE AREA 5.  AND WHEN I

04:40:30  1    CAME BACK AFTER THE FIRST BREAK, DR. SILVA SAID -- HE HAD SAID

04:40:33  2    INCORRECTLY, IF I REMEMBER CORRECTLY EIGHT FEET, AND WE CORRECTED

04:40:37  3    IT.  IT WAS 13 FEET AVERAGE REPRESENTATIVE DEPTH, NOT EIGHT FEET.

04:40:41  4          MR. SCHULTZ:  NOW, I UNDERSTAND YOUR OBJECTION AND YOU'RE

04:40:43  5    RIGHT, MR. TREEBY, I KEEP SAYING EIGHT.  YOU MODELLED IT AT 13.

04:40:47  6          THE WITNESS:  THIRTEEN, CORRECT.

04:40:48  7    BY MR. SCHULTZ:

04:40:48  8    Q.  MY APOLOGIES.  IT WAS ACTUALLY 22.

04:40:50  9    A.  YOU HAD A SAMPLE DEPTH OF 22.  I THINK IT'S INACCURATE TO SAY

04:40:54  10   THAT THE EXCAVATION WAS ACTUALLY 22 FEET DEEP.

04:41:00  11   Q.  DR. STARK SAID THAT WOULD BE THE WIDTH OF AN EXCAVATOR BUCKET,

04:41:04  12   RIGHT?

04:41:05  13   A.  RIGHT.  IN SOME CASES IT WAS THE WIDTH OF AN EXCAVATOR BUCKET.

04:41:10  14   IN OTHER CASES, IT WAS THE DIAMETER OF A PIPE THAT WAS PUSHED INTO

04:41:14  15   THE GROUND.

04:41:14  16   Q.  AND WHEN YOU WERE BEING CONSERVATIVE IN MODELING THESE WITH THE

04:41:18  17   DEEPEST POSSIBLE EXCAVATION, DID YOU DO SOME WORK TO FIGURE OUT IF

04:41:21  18   IT WAS THE WIDTH OF EXCAVATOR BUCKET OR THE WIDTH OF A PIPE?

04:41:24  19   A.  I DID NOT.

04:41:24  20   Q.  IF WE LOOK BACK AT FIGURE E-47, YOU'VE GOT NFAATT AREA 5 WITH

04:41:29  21   GAP AND YOU HAVE NFAATT AREA 5 WITH NO GAP, THAT'S THE BLUE AND THE

04:41:33  22   RED DIAMONDS.  AND IF I UNDERSTAND THIS, DR. SILVA, WHAT WE'RE

04:41:37  23   LOOKING AT IS FACTOR OF SAFETY, AND IF YOU GET ALL THE WAY DOWN TO

04:41:42  24   ONE AND FACTOR OF SAFETY DOWN AT THE BOTTOM OF THE GRID THEN YOU

04:41:46  25   HAVE PROBLEMS WITH THE STABILITY OF THE WALL, CORRECT?

04:41:48  1    A.  THAT IS NOT CORRECT.

04:41:53  2    Q.  OKAY.  HELP ME OUT.

04:41:55  3    A.  THIS SAFETY FACTOR THAT WE HAVE HERE -- LET ME TAKE A LOOK AT

04:42:05  4    THIS.  THE SAFETY FACTOR THAT WE HAVE HERE IS THE SAFETY FACTOR --

04:42:16  5    IS THE SAFETY FACTOR FOR SHEAR SLIDE, WHICH, AS I MENTIONED DURING

04:42:21  6    MY PRESENTATION, I DON'T BELIEVE IT OCCURRED.  SO WE CANNOT CONFUSE

04:42:27  7    THESE WITH THE SAFETY FACTOR LINKED TO THE FAILURE MECHANISM THAT

04:42:36  8    DETERMINES THE STABILITY OF THE FLOODWALL ITSELF.  THE ONLY USE WE

04:42:42  9    MAKE OF THIS SAFETY FACTOR WAS GET AN APPRECIATION FOR THE LEVEL OF

04:42:47 10    SHEAR STRESS IN THE CROSS SECTION.

04:42:51 11    Q.  AND FOR THESE SHEAR STRESS TESTS, AND THIS IS UNDER SECTION 6

04:42:57 12    STABILITY LIMITED EQUILIBRIUM 2D ANALYSIS, CORRECT?

04:43:02 13    A.  WHAT PAGE ARE YOU LOOKING AT?

04:43:03 14    Q.  AT THE PRECEDING PAGE.  LET'S PULL THAT UP, PLEASE, CARL.

04:43:10 15    PRECEDING PAGE.  PAGE -- I DON'T KNOW THE JX PAGE, SORRY.  IT WOULD

04:43:15 16    BE PAGE 34 OF THE REPORT.

04:43:18 17    A.  YES, I SEE THAT.

04:43:19 18    Q.  THIS IS THE PRECEDING PAGE AND THE HEADING IS "STABILITY

04:43:22 19    LIMITED EQUILIBRIUM 2-D ANALYSIS"?

04:43:27 20    A.  YES.

04:43:27 21    Q.  AND THAT IS SHEAR SLIDE ANALYSIS?

04:43:28 22    A.  THAT'S CORRECT, SHEAR SLIDE.

04:43:30 23    Q.  AND WHEN WE GO TO THE NEXT PAGE WE SEE -- AND I THINK I CAN

04:43:34 24    MAKE SHORT WORK OF THIS.  YOU CAN LOOK AT YOUR ANALYSIS HERE AS

04:43:38 25    REPORTED BY YOU WITH THE GAP, AND WITH THE GAP WITH EACH OF THESE

04:43:44  1  EXCAVATIONS MODELLED DOESN'T MAKE ANY DIFFERENCE IN TERMS OF FACTOR

04:43:47  2  OF SAFETY, ANY MEANINGFUL DIFFERENCE, CORRECT?

04:43:50  3  A.   FACTOR OF SAFETY FOR SHEAR SLIDE AND LET'S KEEP MAKING THAT

04:43:57  4  DISTINCTION.  AND WHY DOES IT MAKE ANY DIFFERENCE?  BECAUSE THIS

04:44:00  5  GAP IS ALSO IN THE CASE, AND JUST LIKE WITH THE EXCAVATIONS, THE

04:44:05  6  WATER IN THE 30 HOURS THAT IT TOOK TO FAIL CANNOT TRAVEL VERY FAR.

04:44:09  7  SO THE PORE PRESSURE FROM THAT GAP DOESN'T GO VERY FAR IN TERMS OF

04:44:13  8  THE SHEAR SLIDE.  IT DOES MAKE A DIFFERENCE IN THE FACTOR OF SAFETY

04:44:18  9  OF THE FLOODWALL ITSELF, WHICH IS A DIFFERENT DISCUSSION

04:44:21 10  ALTOGETHER.

04:44:22 11  Q.   OKAY.  AND I WANT TO HAVE THAT DISCUSSION OR I WANT TO ASK YOU

04:44:25 12  WHERE IT IS IN YOUR REPORT.  MAYBE YOU CAN TELL ME THAT NOW.  WHERE

04:44:28 13  IS THE CORRESPONDING ANALYSIS IN YOUR REPORT FOR THE FACTOR OF

04:44:33 14  SAFETY WITH AND WITHOUT GAP MODELING THE EXCAVATIONS FOR STABILITY?

04:44:39 15  A.   WELL, WE HAVE -- LET'S SEE, IT'S ACTUALLY -- I DON'T HAVE IT

04:44:47 16  HERE, BUT -- I MEAN -- IT MIGHT ACTUALLY BE THE VERY LAST PAGE OF

04:44:57 17  THE REPORT IF I RECALL CORRECTLY.

04:44:58 18  Q.   I THINK THE LAST PAGE IS YOUR CWALSHT.

04:45:02 19  A.   THAT'S RIGHT, YES, THAT'S WHERE IT IS.

04:45:03 20  Q.   THAT'S YOUR FACTOR OF SAFETY?

04:45:04 21  A.   THAT'S WHERE WE COMPUTE THE FACTOR OF SAFETY FOR THE WALL.

04:45:07 22  Q.   AND WE'RE GOING TO TALK ABOUT THAT.  I DID NOT SEE WITH

04:45:11 23  GAP/WITHOUT GAP IN THAT?

04:45:12 24  A.   NO, WE DIDN'T DO THAT WITH GAP AND WITHOUT GAP.

04:45:14 25  Q.   OKAY.  YOU DID THAT HERE AND IT DIDN'T MAKE ANY DIFFERENCE TO

04:45:17  1    THE FACTORS OF SAFETY, CORRECT?

04:45:19  2    A.  FOR THE SHEAR SLIDE THAT WE KNOW DIDN'T TAKE PLACE, IT DIDN'T

04:45:24  3    MAKE ANY DIFFERENCE; AND IT DIDN'T MAKE ANY DIFFERENCE BECAUSE THE

04:45:26  4    GAP IS WITHIN AN IMPERVIOUS CLAY AND WATER COULDN'T FLOW VERY FAR

04:45:32  5    DURING THE 30 HOURS.

04:45:32  6    Q.  IN FACT, THE WAY YOU MODELLED THESE AS I APPRECIATE IT, YOU

04:45:36  7    HAVE TWO EXCAVATIONS AT EACH OF THE NORTH AND THE SOUTH.  YOU'VE

04:45:40  8    GOT YOUR PILING, YOUR DEEP PILING EXCAVATION, AND YOUR RELATIVELY

04:45:43  9    MORE SHALLOW RECAP SOIL REMEDIATION EXCAVATION.  THAT'S IN THE

04:45:47 10    GEOMETRY WE JUST SAW, CORRECT?

04:45:49 11    A.  WELL, IT IS BUT IT HAS NOTHING TO DO WITH THIS.

04:45:52 12    Q.  WELL, THIS IS MODELING FOR SHEAR SLIDE, IS IT NOT?  THE NFAATT

04:45:56 13    AREA WITH THE GAP, NFAATT AREA WITHOUT THE GAP, STRUCTURE WITH A

04:45:59 14    GAP, STRUCTURE WITHOUT A GAP, RIGHT?

04:46:02 15    A.  RIGHT.

04:46:02 16    Q.  BUT YOU DID NOT, AT LEAST AS I CAN SEE IT, MODEL BOTH THE

04:46:07 17    STRUCTURE AND THE NFAATT AREA WITH AND WITHOUT GAP, MUCH LESS

04:46:13 18    MODELING ALL OF THE OTHER EXCAVATIONS OR ANY OF THE OTHER

04:46:16 19    EXCAVATIONS SIMULTANEOUSLY, CORRECT?

04:46:18 20    A.  NO, YOU CAN SEE THAT ALL OF THIS ANALYSIS FALL ON TOP OF EACH

04:46:22 21    OTHER.

04:46:25 22    Q.  IS THAT WHY YOU DIDN'T PERFORM THE ANALYSIS?

04:46:27 23    A.  WELL, WE PERFORMED THIS ANALYSIS TO GET AN APPRECIATION FOR THE

04:46:38 24    SHEAR STRESS LEVEL, AND THIS PROVIDED ME WITH ENOUGH INFORMATION

04:46:45 25    ABOUT THAT.

04:46:48  1    Q.  AND SO I UNDERSTAND YOUR TESTIMONY, AND WE'RE TALKING ABOUT

04:46:51  2    SHEAR SLIDE HERE, BY MODELING ONE AREA WITH A GAP AND WITHOUT A GAP

04:46:55  3    AND ONE BUILDING STRUCTURE PILINGS ACTUALLY WITH A GAP AND WITHOUT

04:46:58  4    A GAP, YOU'VE DRAWN CONCLUSIONS ABOUT THE ENTIRE AREA WITH ALL

04:47:01  5    EXCAVATIONS WITH A GAP AND WITHOUT A GAP?

04:47:04  6    A.  THAT IS NOT CORRECT.

04:47:09  7    Q.  OKAY.  SO YOU'RE NOT DRAWING CONCLUSIONS ABOUT THE ENTIRE AREA

04:47:12  8    ALL EXCAVATIONS WITH GAP AND WITHOUT A GAP, CORRECT?

04:47:15  9    A.  WELL, WE ACTUALLY MODELLED ONLY THE NORTH BREACH AND THE SOUTH

04:47:22  10   BREACH.

04:47:23  11   Q.  I MEAN, ALL EXCAVATIONS IN EACH BREACH AREA.  IN SAUCER MARINE,

04:47:27  12   ALL EXCAVATIONS IN BOLAND THAT ANALYSIS WAS NOT DONE, CORRECT?

04:47:31  13   A.  LET'S SEE.  LET'S MAKE SURE WHEN YOU TELL ME THAT IT WAS NOT

04:47:45  14   DONE, I'M TALKING IN TERMS OF THE CROSS SECTION THAT WE ANALYZED.

04:47:48  15   EXCAVATIONS WERE NOT IN THAT CROSS SECTION WE DID NOT INCLUDE AND

04:47:52  16   WOULDN'T HAVE THOUGHT OF INCLUDING.

04:47:54  17   Q.  AND THEY ARE NOT IN YOUR REPORT.  SO LET ME ASK YOU --

04:47:57  18   A.  THEY ARE IN THE REPORT.

04:47:58  19   Q.  IF YOU DID AN ANALYSIS FOR SHEAR SLIDE THAT SHOWS EVERY

04:48:01  20   EXCAVATION AT SAUCER MARINE WITH GAP AND WITHOUT A GAP, YOU DIDN'T

04:48:04  21   PUT IT IN YOUR REPORT, RIGHT?

04:48:07  22   A.  WELL, BECAUSE WE DIDN'T DO THAT BECAUSE THERE WAS REALLY NO

04:48:12  23   NEED TO DO THAT.  WE RAN AN ANALYSIS FOR NORTH BREACH WITH THE

04:48:18  24   EXCAVATIONS THAT WERE IN THE CROSS SECTION USED FOR THAT ANALYSIS.

04:48:22  25   WE DID NOT INCLUDE THEIR EXCAVATIONS THAT WERE 200 FEET AWAY, OR

04:48:26  1    300 FEET AWAY, OR A MILE AWAY BECAUSE DID NOT CONSIDER THAT TO BE A

04:48:32  2    NECESSARY THING.

04:48:34  3    Q.  YOU'RE BOLAND EXCAVATIONS THAT YOU MODELLED WERE 200 AND 300

04:48:39  4    FEET AWAY.  WE ALREADY ESTABLISHED THAT.

04:48:40  5    A.  I AM TALKING IN TERMS OF DISTANCE FROM THE CROSS SECTION, SOUTH

04:48:44  6    OF THE CROSS SECTION.  I MEAN, THESE ARE TWO-DIMENSIONAL ANALYSES,

04:48:49  7    AND WE MODELLED THE EXCAVATIONS THAT WERE ALONG THE CROSS SECTION.

04:48:57  8    BUT NOT EVERY OTHER EXCAVATION FAR AWAY.

04:49:00  9    Q.  YOU DIDN'T KNOW ABOUT THE SEWER LINE AT THE TIME YOU RAN THESE

04:49:04 10    ANALYSES, CORRECT?

04:49:04 11    A.  I DID NOT.

04:49:05 12    Q.  I WANT TO TALK A LITTLE BIT ABOUT VOLUME OF EXCAVATIONS.  YOU

04:49:11 13    TALKED ABOUT VOLUMETRIC EQUATIONS OR ANALYSES WITH DR. SYKORA.

04:49:15 14    HAVE YOU DONE ANY ANALYSIS OF THE VOLUME OF EXCAVATIONS PERFORMED

04:49:18 15    AT THE EBIA AS COMPARED TO THE VOLUME OF EXCAVATIONS WGI THOUGHT

04:49:23 16    THEY WERE GOING TO DO AT THE EBIA?

04:49:25 17    A.  I HAVE NOT.

04:49:26 18    Q.  LET'S TAKE A LOOK, IF WE COULD -- LET ME ASK YOU THIS:  DO YOU

04:49:30 19    KNOW, JUST IN GENERAL TERMS, WHETHER WGI ENDED UP TAKING OUT A LOT

04:49:33 20    MORE SOIL THAN THEY THOUGHT THEY WERE GOING TO TAKE OUT WHEN THEY

04:49:36 21    STARTED THIS PROJECT?

04:49:38 22    A.  I KNOW THEY HAD TO BRING SOME SOIL FROM THE OUTSIDE.  I MEAN,

04:49:45 23    THAT'S A COMBINATION OF -- I GUESS A REFLECTION OF HOW MUCH

04:49:50 24    CONTAMINATION THEY TOOK OUT.

04:49:53 25    Q.  LET'S TAKE A LOOK, PLEASE.  ON YOUR RELIANCE LIST, DR. SILVA,

04:49:56 1  IS THE TECHNICAL COMPLETION REPORT.  YOU HAVE REVIEWED THAT

04:49:59 2  DOCUMENT, CORRECT?

04:49:59 3  A.  I HAVE.  I DID, AT ONE TIME, LOOK AT THAT DOCUMENT, YES.

04:50:04 4  Q.  AND THAT'S SORT OF A SUMMARY DOCUMENT THAT SUMS UP EVERYTHING

04:50:08 5  THEY DID OUT ON THE SITE; IS THAT RIGHT?

04:50:10 6  A.  THAT IS CORRECT.  THE COMPLETION REPORT IS SORT OF THE END OF

04:50:13 7  THE PROJECT.

04:50:13 8  Q.  AND THAT'S JX 01364.  I WANT TO LOOK AT PAGE 14, PLEASE, CARL.

04:50:20 9  PARTICULARLY, JUST TO GIVE US A FRAME OF REFERENCE, THIS IS IN THE

04:50:26 10 EXECUTIVE SUMMARY, I BELIEVE, AND THERE'S AN INDICATION -- THE

04:50:34 11 SECOND BULLET POINT, AT PROJECT COMPLETION, MORE THAN 190,000 TONS

04:50:42 12 OF MATERIALS WERE SHIPPED OFF SITE FOR DISPOSAL OR RECYCLING.  AND

04:50:46 13 JUST DOING ROUGH MATH THAT WOULD BE ABOUT 380 MILLION POUNDS OF

04:50:49 14 MATERIALS THAT WGI TOOK OUT OF THE EBIA, CORRECT?

04:50:53 15 A.  190,000 THAT'S WHAT IT SAYS THERE, YES.

04:50:55 16 Q.  190,000 TONS.

04:50:58 17 A.  190,000 TONS, YES.

04:51:00 18 Q.  IF WE LOOK OVER AT THE RECAP REPORT WHICH IS JX 001 -- EXCUSE

04:51:05 19 ME.  BOLAND RECAP, JX 00117.  NOW, THE RECAPS WERE SORT OF PLANNING

04:51:13 20 DOCUMENTS FOR THE SOIL EXCAVATION AND REMEDIATION, CORRECT?  THESE

04:51:19 21 ARE ON YOUR RELIANCE LIST AS WELL, I BELIEVE, DR. SILVA.

04:51:21 22 A.  THE RECAP ACTION PLAN WAS THE PLANNING DOCUMENT.

04:51:24 23 Q.  RIGHT.

04:51:25 24 A.  YEAH.

04:51:25 25 Q.  AND WE HAVE HERE THE RECAP CORRECTIVE ACTION PLAN.  SO THIS IS

04:51:29  1   A PLANNING DOCUMENT DONE BACK IN 2002 BEFORE THEY DID THE

04:51:32  2   EXCAVATIONS, RIGHT?

04:51:33  3   A.  THAT IS CORRECT.

04:51:33  4   Q.  AND IF WE LOOK OVER AT PAGE 47 OF THIS REPORT, LET'S BLOW UP

04:51:40  5   THE TABLE ALONG WITH FOOTNOTE 1.  THESE ARE THE PROPOSED AREAS OF

04:51:48  6   EXCAVATION, CORRECT, INCLUDING THE ONE YOU MODELLED, AREA 6, AND

04:51:51  7   THE ONE WE TALKED ABOUT AREA 8, AT BOLAND MARINE, RIGHT?

04:51:55  8   A.  AREA 6 IS THERE AND THE OTHER ONE WAS AREA 5?

04:52:00  9   Q.  AREA 8.

04:52:01 10   A.  AREA 8, YES.

04:52:03 11   Q.  YES, SIR.

04:52:04 12   A.  BOTH OF THEM.

04:52:05 13   Q.  AND IF WE LOOK DOWN AT THE TOTAL VOLUME ESTIMATE IN CUBIC FEET,

04:52:10 14   THE TOTAL VOLUME THEY ESTIMATED REMOVING FROM BOLAND WAS

04:52:14 15   111,194 CUBIC FEET, CORRECT?

04:52:21 16   A.  THAT IS CORRECT.

04:52:22 17   Q.  NOW, YOU'LL HAVE TO TRUST ME OR I CAN PULL OUT A CALCULATOR, I

04:52:26 18   DID A LITTLE MATH ON THIS.  105 POUNDS PER CUBIC FOOT IS A FAIR

04:52:31 19   NUMBER TO USE FOR THE EXCAVATED FILL, CORRECT?  THAT'S WHAT YOU

04:52:35 20   USED IN YOUR SHEAR STRENGTH ANALYSIS?

04:52:37 21   A.  FOR THE TOTAL WEIGHT, YES, THAT'S FINE.

04:52:40 22   Q.  AND IF WE TAKE THIS 111,194 AND MULTIPLY IT BY 105, WE GET

04:52:47 23   11,675,370 POUNDS OF FILL OF SOIL THAT THEY EXPECTED TO EXCAVATE

04:52:54 24   OUT OF BOLAND, WHICH IF YOU DIVIDE BY 2,000, IS 5,838 TONS.  WILL

04:53:00 25   YOU TRUST MY MATH ON THAT OR I CAN WALK THROUGH IT IF YOU WANT TO.

04:53:03 1            THE COURT:  IT SOUNDS CLOSE ENOUGH.

04:53:05 2            THE WITNESS:  IF IT'S CLOSE ENOUGH FOR THE JUDGE, IT'S

04:53:08 3    CLOSE ENOUGH FOR ME.

04:53:09 4    BY MR. SCHULTZ:

04:53:10 5    Q.  IN 2002, WE HAVE 5,838 TONS THEY EXPECT TO PULL OUT OF SOILS IN

04:53:16 6    BOLAND MARINE.  IF WE GO TO THE TECHNICAL COMPLETION REPORT, THAT

04:53:22 7    WOULD BE 1364 AT PAGE 41, AND BLOW UP THE TABLE, PLEASE.  THE TABLE

04:53:37 8    AT THE TOP, WE CAN SEE THE RECAP TONS THAT BOLAND WERE ACTUALLY

04:53:42 9    12,259, SO THEY ENDED UP TAKING OUT TWICE AS MUCH SOIL AT BOLAND

04:53:46 10   MARINE AS THEY ANTICIPATED BACK IN 2002 BY TONNAGE, CORRECT?

04:53:53 11           MR. TREEBY:  I'LL DO IT ON REDIRECT.

04:53:55 12           THE WITNESS:  I FORGOT WHAT THE OTHER NUMBER WAS.

04:54:00 13   BY MR. SCHULTZ:

04:54:00 14   Q.  5,838.

04:54:01 15   A.  WHAT WAS IT?

04:54:02 16   Q.  5,838 TONS?

04:54:05 17   A.  AND YOU HAVE 12,000, OKAY.  SO THEY TOOK A LOT MORE SOIL OUT

04:54:09 18   THAN THEY THOUGHT.

04:54:09 19   Q.  RIGHT, MORE THAN TWICE AS MUCH, RIGHT?

04:54:11 20   A.  CORRECT.

04:54:12 21   Q.  AND IF WE LOOK DOWN IN ACM -- PULL THE TABLE BACK UP, IF YOU

04:54:23 22   WOULD, CARL.  THEY ALSO PULLED OUT 72,790 TONS OF ASBESTOS

04:54:28 23   CONTAINING MATERIALS.  THAT'S AT TRANSITE AMONG OTHER THINGS, THE

04:54:32 24   TRANSITE WE'VE BEEN HEARING ABOUT, RIGHT?

04:54:34 25   A.  YES, SIR.

04:54:34  1    Q.  WHEN WGI CAM TO THE SITE, THEY DIDN'T EXPECT TO PULL ANY

04:54:38  2    TRANSITE OUT OF BOLAND OR ANY OTHER SITE, DID THEY?

04:54:41  3    A.  THAT'S MY UNDERSTANDING.

04:54:41  4    Q.  THAT'S IN THE TECHNICAL COMPLETION REPORT, IN FACT, IF WE WANT

04:54:44  5    TO SEE IT.

04:54:44  6    A.  THAT'S FINE, THAT'S MY UNDERSTANDING AS WELL.

04:54:46  7    Q.  THEY ENDED UP TAKING OUT TWICE AS MUCH SOIL OF BOLAND AS THEY

04:54:49  8    EXPECTED TO, PLUS 73,000 TONS OF ASBESTOS CONTAINING MATERIALS,

04:54:55  9    RIGHT?

04:54:55  10   A.  ROUNDING OUT.

04:54:56  11   Q.  AND IF WE LOOK BACK AT THE RECAP, I WANT TO DO THE SAME

04:55:01  12   EXERCISE, DR. SILVA, FOR SAUCER MARINE, AND THAT RECAP REPORT JX

04:55:06  13   0011.

04:55:06  14   A.  IF YOU'RE GOING TO DO THE SAME EXERCISE, I AM GOING TO REQUEST

04:55:09  15   A BREAK.

04:55:10  16        THE COURT:  YOU GOT IT.  TEN MINUTES.

04:55:15  17     (WHEREUPON, A RECESS WAS TAKEN.)

05:07:28  18     (OPEN COURT.)

05:07:28  19        THE DEPUTY CLERK:  COURT'S IN SESSION, PLEASE BE SEATED.

05:07:32  20        MR. SCHULTZ:  JUDGE, I DON'T KNOW HOW TO ESTIMATE HOW

05:07:35  21   MUCH TIME I HAVE LEFT.  I TOLD YOU I WOULDN'T BE FOUR OR FIVE HOURS

05:07:37  22   AND IT'S NOT GOING TO BE, I'VE BEEN GOING ABOUT 90 MINUTES.  I AM

05:07:41  23   HAVING TO PULL OUT DOCUMENTS WHERE I COULD HAVE OR MAYBE DIDN'T

05:07:43  24   HAVE TO, AND THAT'S CERTAINLY DR. SILVA'S RIGHT.  IF I KEEP GOING

05:07:48  25   DOWN THAT PATH, IT'S GOING TO BE A COUPLE OF HOURS.

05:07:50  1          THE COURT:  WE ARE NOT GOING TO MAKE IT A COUPLE OF

05:07:52  2   HOURS, THAT'S NOT GOING TO HAPPEN.  I'VE GOT SICK STAFF, ET CETERA.

05:07:56  3          MR. TREEBY:  I'LL TRY TO SHORT CIRCUIT THIS.  I WAS

05:07:59  4   HAVING TROUBLE FOLLOWING, BUT -- WE WERE HAVING TROUBLE GETTING

05:08:03  5   APPLES AND APPLES OUT OF THIS, BUT IF COUNSEL -- I WILL STIPULATE

05:08:08  6   THAT MORE MATERIAL WAS TAKEN OUT -- I AM LOOKING AT APPLES AND

05:08:13  7   APPLES HERE, NOT WHAT WE WERE LOOKING AT, BOLAND MARINE EXCAVATION

05:08:17  8   INFORMATION MORE MATERIAL WAS TAKEN OUT THAN WAS ORIGINALLY PLANNED

05:08:20  9   TO BE TAKEN OUT, AND I'LL EVEN GIVE HIM THE CUBIC YARDS OF THE

05:08:25 10   DIFFERENCE MORE WAS TAKEN OUT.  BUT MORE WAS PUT BACK THAN WAS

05:08:30 11   PLANNED TO PUT BACK AS WELL.  AND IF THAT'S THE POINT.

05:08:35 12          MR. SCHULTZ:  HE'S ALREADY SAID MORE WAS TAKEN OUT.  IF

05:08:37 13   YOU WANT TO STIPULATE THAT WGI TOOK OUT 70 TIMES MORE SOIL AT

05:08:41 14   SAUCER MARINE ALONE THAN THEY INTENDED TO WHEN THEY WENT INTO IT,

05:08:45 15   THEN I'LL SKIP THAT LINE OF QUESTIONING.

05:08:45 16          MR. TREEBY:  SEVENTY TIMES, I THINK THAT'S NOT ACCURATE.

05:08:47 17   I'M LOOKING AT BOLAND, WHICH I'LL LOOK AT SAUCER, BOLAND WAS

05:08:51 18   PLANNED TO TAKE OUT 7,050 CUBIC YARDS AND THEY TOOK OUT

05:08:57 19   16,188 CUBIC YARDS.  BUT OF COURSE THEY PUT MORE BACK, TOO.  AND

05:09:01 20   I'LL LOOK AT SAUCER AND I'LL BE WILLING TO STIPULATE THE ACTUAL

05:09:04 21   COMPARISON NUMBERS, NOT WHAT COUNSEL IS USING.

05:09:08 22          MR. SCHULTZ:  IT'S CALLED CROSS-EXAMINATION, BILL.

05:09:10 23          THE COURT:  GO AHEAD AND PROCEED.  BUT AGAIN, BUT

05:09:18 24   HOPEFULLY YOU'RE GOING SOMEWHERE THAT MEANS SOMETHING.

05:09:21 25          MR. SCHULTZ:  IF IT MATTERS, YOUR HONOR, DR. BEA

05:09:24  1    CERTAINLY ISN'T GOING TO TAKE THE DAY ALL DAY TOMORROW SO I AM

05:09:27  2    HAPPY TO PLOW THROUGH IT.

05:09:29  3            THE COURT:  YOU MAY BE HAPPY TO PLOW THROUGH, BUT WE ARE

05:09:31  4    NOT GOING TO PLOW THROUGH, JUST AS SIMPLE AS THAT.  WE'RE NOT GOING

05:09:36  5    TO GO TO SEVEN O'CLOCK, I'M NOT DOING IT, WE HAVE SICK PEOPLE AND I

05:09:40  6    AM NOT DOING IT.

05:09:41  7            MR. SCHULTZ:  THAT'S WHY I BRING IT UP, YOUR HONOR.

05:09:42  8            THE COURT:  LET'S GET ON WITH A QUESTION AND LET'S SEE

05:09:44  9    WHERE WE GO.  SO WHAT?  SO WHAT ABOUT THE POUNDAGE?  SO WHAT,

05:09:52 10    COUNSEL, I MEAN, IF IT WASN'T AT THE BREACH SITES.  WE TALKED ABOUT

05:09:56 11    BOLAND AND SAUCER.  I AM JUST NOT SURE WHERE WE'RE GOING.

05:10:00 12            THIS WITNESS IS PRIMARILY TESTIFYING AS TO SCIENTIFIC

05:10:03 13    THEORY, NOT THE VOLUME OF EXCAVATION.  AND SO FAR WE HAVEN'T GOTTEN

05:10:08 14    TO ANY OF THAT, YET WHICH IS WHAT I AM INTERESTED IN.  BUT GO

05:10:11 15    AHEAD.  LIKE, YOU KNOW, MOVEMENT OF WATER AND DILATATIONAL THEORY,

05:10:25 16    SEEPAGE ANALYSIS, HOW DID THE WATER GET FROM ONE SIDE TO THE OTHER,

05:10:29 17    HOW LONG WOULD IT TAKE, THAT'S WHAT'S GOING TO WIN OR LOSE THIS

05:10:33 18    CASE.

05:10:34 19            MR. SCHULTZ:  ALL RIGHT, I UNDERSTAND, YOUR HONOR.  I'LL

05:10:37 20    DO THIS.  I'LL SKIP THE 70 TIMES AS MUCH SOIL AT SAUCER MARINE.

05:10:37 21    BY MR. SCHULTZ:

05:10:42 22    Q.  LET ME ASK YOU THIS, TO LAY IT OUT VERY SIMPLY, DR. SILVA.  YOU

05:10:45 23    DON'T BELIEVE SEEPAGE CAUSED THIS FAILURE AND DR. BEA DOESN'T

05:10:49 24    BELIEVE SEEPAGE CAUSED THIS FAILURE, CORRECT, FLOW OF WATER FROM

05:10:52 25    POINT A TO POINT B?

05:10:53  1          THE COURT:  I THINK WE'VE BEEN THROUGH THIS ALREADY.  I

05:10:59  2  KNOW THAT DR. SILVA DOES NOT THINK SO, WE HEARD DR. BEA'S

05:11:03  3  TESTIMONY.  SO WHATEVER -- HE'S ALREADY OPINED A LITTLE BIT ABOUT

05:11:11  4  THAT, BUT IF YOU WANT TO GO AHEAD AND NARROW THAT YOU CAN.

05:11:15  5          MR. SCHULTZ:  I JUST WANT TO CRYSTALIZE THAT ISSUE, YOUR

05:11:19  6  HONOR, WE'VE HEARD A LOT OF DEFENSE TESTIMONY ON SEEPAGE AND BOB

05:11:21  7  BEA HAS NEVER SAID SEEPAGE WAS THE CAUSE, I JUST WANTED TO MAKE IT

05:11:24  8  CLEAR ON THE RECORD.

05:11:25  9          THE WITNESS:  IN MY MIND I KNOW THAT MY OPINION IS THAT

05:11:29 10  SEEPAGE DID NOT CAUSE THE FAILURE, AND TO BE PERFECTLY HONEST WITH

05:11:34 11  YOU, I AM NOT 100 PERCENT SURE WHAT DR. BEA THINKS.

05:11:38 12  BY MR. SCHULTZ:

05:11:45 13  Q.  LET ME ASK YOU -- I WANT TO ASK YOU A FEW MORE QUESTIONS ABOUT

05:11:48 14  YOUR SITE GEOMETRY WHICH WAS THE BASIS FOR YOUR SEEPAGE AND SLOPE

05:11:52 15  STABILITY AND SHEAR ANALYSIS, CORRECT, THE SITE GEOMETRY THAT WE'VE

05:11:58 16  LOOKED AT?

05:11:59 17  A.  AND THE QUESTION IS?

05:12:00 18  Q.  THE SITE GEOMETRY AT PAGE 36 OF YOUR REPORT, I WANT TO ASK YOU

05:12:04 19  A FEW MORE QUESTIONS ABOUT THAT SO WE'RE CLEAR ABOUT WHAT IS IN IT

05:12:07 20  AND WHAT IS NOT IN IT.  YOU DID NOT INCLUDE ANYTHING THAT YOU

05:12:09 21  DEEMED TO BE SHALLOWER THAN FIVE FEET IN YOUR SITE GEOMETRY,

05:12:12 22  CORRECT?

05:12:13 23  A.  WELL, IN THE CROSS SECTION FOR THE FLOW ANALYSIS OR THE

05:12:21 24  STABILITY ANALYSIS WE DID NOT.

05:12:22 25  Q.  RIGHT.  AND YOU HAVE SEEN QARS -- YOU WERE HERE FOR DR. BEA'S

05:12:27  1    TESTIMONY, CORRECT?

05:12:27  2    A.  I WAS.

05:12:28  3    Q.  AND YOU KNOW THAT GRID TRENCHING UP TO SUREKOTE ROAD AT SAUCER

05:12:33  4    MARINE AT THE BREACH LOCATION WENT DEEPER THAN FIVE FEET, CORRECT?

05:12:36  5    A.  WELL, THAT MIGHT NOT BE CORRECT.  WE KNOW THAT IT WENT TO FIVE

05:12:39  6    FEET AND THAT IT WAS REPORTED AS EXCEEDED FIVE FEET, BUT MY

05:12:48  7    INTERPRETATION IS THAT IT REALLY WENT TO A VALUE OF AROUND FIVE

05:12:53  8    FEET.

05:12:53  9    Q.  SO WE'RE CLEAR, WHEN YOU HAVE SEEN THE QARS, YOU KNOW WHAT I AM

05:12:58 10    REFERRING TO, THE QARS THAT SHOWED GRID TRENCHING NORTH AND SOUTH

05:13:01 11    AT THE BREACH SECTION AT SAUCER MARINE THAT STATE THAT ALL

05:13:04 12    TRENCHING EXCEEDED FIVE FEET; AND YOUR INTERPRETATION OF THAT IS

05:13:07 13    THAT IT WENT TO FIVE FEET AND NO DEEPER, CORRECT?

05:13:09 14    A.  WELL, IT WENT TO FIVE FEET PLUS A LITTLE BIT, BUT NOT TO TEN

05:13:13 15    FEET.

05:13:15 16    Q.  OR SEVEN FEET?

05:13:16 17    A.  OR SEVEN FEET FOR THAT MATTER.

05:13:18 18    Q.  AND YOU'VE SEEN THE PHOTOGRAPHS OF THE PILES OF OBSTRUCTIONS

05:13:22 19    THEY PULLED OUT OF THOSE GRID TRENCHES.  IS IT YOUR OPINION THAT

05:13:24 20    THOSE PILES ARE NOT REPRESENTATIVES OF OR YOU COULD NOT INFER FROM

05:13:28 21    THOSE PHOTOGRAPHS THAT THEY WENT DEEPER THAN FIVE FEET DURING GRID

05:13:31 22    TRENCHING?

05:13:32 23    A.  I COULD NOT INFER THAT FROM THE PHOTOGRAPHS.

05:13:34 24    Q.  AND I TAKE IT THEN YOU WOULD NOT INFER FROM THE BIG PILES OF

05:13:38 25    OBSTRUCTIONS PULLED OUT DURING THE GEOPHYSICAL SURVEY THAT WE

05:13:41  1    SHOWED DURING DR. BEA'S TESTIMONY, YOU DON'T INFER FROM THAT THAT

05:13:44  2    THERE WERE EXCAVATIONS -- EXCUSE ME, EXCAVATIONS DEEPER THAN FIVE

05:13:47  3    FEET DURING THE GEOPHYSICAL SURVEY EITHER, CORRECT?

05:13:49  4    A.  THAT IS CORRECT.  IT'S DIFFICULT FOR ME TO INFER THE DEPTH OF A

05:13:56  5    TRENCH FROM THE PILE OF DEBRIS ON A PHOTOGRAPH WHICH MIGHT OR MIGHT

05:14:00  6    NOT BE RELATED TO THE EXCAVATION.

05:14:02  7    Q.  WELL, THE PHOTOGRAPHS -- AND WE CAN LOOK AT THEM -- SHOW PILES

05:14:05  8    OF OBSTRUCTIONS TAKEN OUT DURING GRID TRENCHING AND GEOPHYSICAL

05:14:08  9    SURVEY.  LET'S LOOK AT ONE SO THAT WE'RE TALKING ABOUT THE SAME

05:14:11 10    THING.

05:14:12 11    A.  LET'S LOOK AT ONE.

05:14:13 12    Q.  LET'S LOOK AT PX 3393-215, PLEASE.  THESE PHOTOGRAPHS,

05:14:25 13    DR. SILVA, THE TOP ONE SHOWS DEBRIS PILES FROM GRID TRENCHING AND

05:14:28 14    GEOPHYSICAL SURVEY.  DO YOU DRAW THE SAME CONCLUSION I DO THAT THAT

05:14:32 15    PILE OF MATERIALS CAME OUT OF THE GRID TRENCHES AND GEOPHYSICAL

05:14:36 16    SURVEY EXCAVATIONS?

05:14:38 17    A.  WELL, THAT'S WHAT IT STATES IN THE CAPTION.  THEY CAME FROM THE

05:14:42 18    TRENCHES, THAT IS CORRECT.

05:14:45 19    Q.  AND THE PHOTOGRAPH BELOW THAT ALSO SHOWS A PILE OF

05:14:49 20    OBSTRUCTED -- OBSTRUCTIONS OR DEBRIS PULLED OUT FROM GRID TRENCHING

05:14:52 21    AND GEOPHYSICAL SURVEY.  AND MY QUESTION TO YOU IS, DO YOU STILL

05:14:56 22    MAINTAIN DESPITE THE QARS THAT WE JUST DISCUSSED AND THESE

05:14:59 23    PHOTOGRAPHS THAT GRID TRENCHING DID NOT EXCEED FIVE FEET IN DEPTH?

05:15:04 24    A.  FROM A PILE OF TRASH I CANNOT TELL THE DEPTH OF A TRENCH.  IF

05:15:07 25    THIS PILE WAS FOUND IN A TRENCH THAT WAS TWO FEET DEEP THE TRENCH

05:15:12  1    WOULD HAVE BEEN, I DON'T KNOW WHAT THE VOLUMES ARE, BUT IT COULD

05:15:17  2    HAVE BEEN 100 FEET DEEP.  IF THIS PILE OF TRASH WAS EXTRACTED FROM

05:15:21  3    A TRENCH THAT WAS 1,000 FEET DEEP, THE TRENCH COULD HAVE BEEN EIGHT

05:15:25  4    INCHES DEEP.  I SIMPLY CANNOT TELL FROM THIS TWO PHOTOGRAPHS HOW

05:15:31  5    DEEP A TRENCH THAT I AM NOT EVEN SEEING IN THE PHOTOGRAPH IS.

05:15:34  6    Q.  THERE WAS A DRAINAGE DITCH THAT WE'VE SEEN DISCUSSION OF

05:15:38  7    RUNNING PARALLEL TO SUREKOTE ROAD THE LENGTH OF THE SAUCER BREACH

05:15:42  8    SITE THAT MR. GUILLORY TESTIFIED WAS SIX FEET DEEP, DR. BEA

05:15:47  9    ESTIMATED WAS EIGHT TO TEN FEET DEEP.  YOU DIDN'T INCLUDE THAT IN

05:15:50 10    ANY OF YOUR GEOMETRY OR YOUR ANALYSES, CORRECT?

05:15:53 11    A.  I DID NOT.  THIS DITCH WAS BACKFILLED AND IT WAS SHALLOW AND I

05:16:03 12    DID NOT INCLUDE IT IN THE FLOW ANALYSIS BECAUSE, YOU KNOW, THE

05:16:08 13    NORTH BREACH WAS -- DIDN'T REACH AS FAR AS THE NORTH BREACH AND I

05:16:13 14    DID NOT INCLUDE IT IN THE SOUTH BREACH.

05:16:15 15    Q.  AND THE SEWER LINE YOU TOLD US YOU LEARNED ABOUT FOR THE FIRST

05:16:18 16    TIME IN THE TRIAL, CORRECT?

05:16:19 17    A.  THAT IS CORRECT.

05:16:22 18    Q.  SO OBVIOUSLY YOU DIDN'T INCLUDE THAT ALTHOUGH IT WAS REPORTED

05:16:25 19    AS BEING DUG OUT AT LEAST 12 FEET DEEP IN FRONT OF THE SAUCER

05:16:29 20    MARINE BREACH SITE, CORRECT, YOU'VE SEEN THAT QAR WITH DR. BEA?

05:16:33 21    A.  I'VE SEEN THAT AND THAT -- I AM NOT SURE ABOUT THAT DEPTH

05:16:39 22    BECAUSE THE DEPTH VARIES.

05:16:40 23    Q.  IT SAID 12 FEET GOING DEEPER INTO THE SEWER LIFT STATION, DO WE

05:16:46 24    NEED TO LOOK AT THE QAR?

05:16:48 25    A.  DEPENDS ON WHAT YOU'RE GOING TO ASK ME.

05:16:50  1   Q.  WHETHER YOU MODELLED A 12-FOOT TRENCH RUNNING IN FRONT OF THE

05:16:53  2   BREACH SITE SOME 60 TO 70 FEET AWAY?

05:16:56  3   A.  I DID NOT MODEL THE SEWER LINE AS I MENTIONED EARLIER.

05:16:58  4   Q.  IF WE LOOK AT JX 1674, AND I WANT TO LOOK SPECIFICALLY AT

05:17:14  5   SAUCER MARINE AT FIGURE 9 -- WHICH I BELIEVE WILL BE PAGE TEN,

05:17:23  6   CARL.  IF WE BLOW THIS UP, DR. SILVA, YOU SHOW ON YOUR GIS PLAN

05:17:32  7   VIEW OF SAUCER MARINE RIGHT IN FRONT OF THE BREACH SECTION A BLUE

05:17:36  8   LINE THAT REPRESENTS A WATERLINE, CORRECT?

05:17:42  9   A.  THIS IS -- WHAT FIGURE NUMBER IS THIS?  I HAVE A BETTER COPY

05:17:45  10  HERE, I CANNOT READ THIS.

05:17:46  11  Q.  IT'S FIGURE NO. 9.

05:17:49  12  A.  I'M SORRY, WHAT WAS THE FIGURE NUMBER?  NINE, OKAY.  AND THE

05:18:04  13  QUESTION?

05:18:04  14  Q.  WE MAY BE ABLE TO SEE IS EASIER IN ANOTHER FIGURE.  YOU

05:18:07  15  MODELLED A WATERLINE RUNNING PARALLEL TO THE SUREKOTE ROAD INTO THE

05:18:16  16  BREACH SECTION IN SAUCER MARINE, CORRECT, THAT SHOWS UP IN YOUR

05:18:19  17  PLAN VIEW, YOU WERE AWARE THAT IT WAS THERE AND YOU FED THAT DATA

05:18:22  18  INTO YOUR DATABASE, CORRECT?

05:18:23  19  A.  WHEN YOU ASKED ME DID I MODEL, WHAT DO YOU MEAN BY THAT?

05:18:27  20  Q.  YOU REPRESENTED, YOU ENTERED IT INTO YOUR GIS DATABASE, YOU

05:18:31  21  KNEW THAT WATERLINE WAS THERE AND YOU GRAPHICALLY REPRESENTED IT,

05:18:34  22  CORRECT?

05:18:34  23  A.  LET ME SEE WHERE IT IS.

05:18:47  24          MR. TREEBY:  YOUR HONOR PLEASE, THAT'S THE BYPASS CHANNEL

05:18:50  25  OVERLAY, THAT'S NOT A WATERLINE.

05:18:53  1            MR. SCHULTZ:  I'M SORRY, THEN, LET'S LOOK AT FIGURE 8,

05:18:55  2   THE PRECEDING PAGE.

05:18:56  3            THE COURT:  OKAY.  GET THE RIGHT ONE.

05:18:58  4            MR. SCHULTZ:  THE BLUE LINE DR. SILVA, IF YOU LOOK AT ONE

05:19:01  5   PAGE BACK, ONE PAGE BACK.

05:19:05  6            THE WITNESS:  THE WATERLINE, I SEE IT IN MY DRAWING,

05:19:08  7   CORRECT.

05:19:10  8   BY MR. SCHULTZ:

05:19:10  9   Q.  THE BLUE LINE RUNNING THROUGH THE YELLOW EXCAVATION, WHICH IS

05:19:13  10  DR. BEA'S EXCAVATION, CORRECT, THE YELLOW BOX?

05:19:15  11  A.  I SEE THE WATERLINE IN MY DRAWING.

05:19:17  12  Q.  THAT'S THE WATERLINE, THAT WATERLINE RUNS DOWN THE LENGTH, A

05:19:21  13  PORTION OF THE BREACH SECTION --

05:19:22  14            THE COURT:  DO YOU WANT TO POINT TO IT TO MAKE SURE HE IS

05:19:25  15  LOOKING AT THE SAME THING?

05:19:26  16  BY MR. SCHULTZ:

05:19:27  17  Q.  YES, SIR.  HERE (INDICATING).

05:19:30  18  A.  THE WATERLINE IS THERE.

05:19:34  19  Q.  AND HERE AND HERE.  YOU'RE DRAWING ARROWS TO THE WATERLINE,

05:19:48  20  CORRECT?

05:19:48  21  A.  CORRECT.

05:19:49  22  Q.  THAT WATERLINE, DR. SILVA, IF WE LOOK AT THE QARS AND THE

05:19:53  23  PHOTOGRAPHS COMES OUT OF THE SAME TRENCH AS THE 12-FOOT SEWER LINE,

05:19:56  24  AND MY QUESTION TO YOU IS, I DON'T UNDERSTAND, AND I WOULD LIKE FOR

05:20:00  25  YOU TO EXPLAIN, HOW IT IS THAT YOU COULD MODEL THE WATERLINE

05:20:04  1    ACCURATELY ON YOUR GIS WHEN IT CAME OUT OF THE SAME TRENCH OR A

05:20:08  2    PARALLEL TRENCH TO THE 12-FOOT SEWER LINE THAT RUNS IN FRONT OF THE

05:20:12  3    WALL?

05:20:12  4    A.  WELL, TO ANSWER THAT QUESTION I WOULD HAVE TO GO BACK AND SEE

05:20:18  5    WHERE WE GOT THE INFORMATION FOR THE WATERLINE.  QUITE OBVIOUSLY

05:20:24  6    THAT INFORMATION DID NOT INCLUDE A SEWER LINE AS WELL OR ELSE WE

05:20:27  7    WOULD HAVE INCLUDED IT THERE.

05:20:29  8    Q.  AND IT'S YOUR OPINION, AS I APPRECIATE IT, DR. SILVA, THAT

05:20:33  9    WITHOUT DOING ANY ANALYSIS OF THE 12-FOOT SEWER TRENCH RUNNING

05:20:36 10    ALONGSIDE PARALLEL TO THE BREACH SECTION THAT PLAYED NO CAUSATIVE

05:20:40 11    ROLE?

05:20:40 12    A.  THAT IS MY OPINION.  AND LET ME CLARIFY SOMETHING.  I MEAN, ALL

05:20:47 13    OF THIS EXCAVATIONS WERE BACKFILLED.  SO IT IS A LITTLE BIT CURIOUS

05:20:57 14    TO ME TO BE TALKING ABOUT MODELING EXCAVATIONS THAT ARE BACKFILLED

05:21:01 15    WHEN, IN FACT, IF ONE WAS DOING AN ANALYSIS OF THIS SITE THOSE

05:21:07 16    EXCAVATIONS WOULD BE OF THE SAME SOIL THAT WAS AROUND THEM.  YOU

05:21:13 17    KNOW, FOR THAT REASON ALONE AND NO OTHER REASON, THERE IS NO NEED

05:21:18 18    TO INCLUDE THESE EXCAVATIONS IN THE FLOW ANALYSIS OR STABILITY

05:21:23 19    ANALYSIS.

05:21:25 20         BUT IF WE WANT TO EXAMINE WHAT WOULD BE THE EFFECT OF AN

05:21:32 21    OPEN EXCAVATION AT THAT LOCATION, WE HAVE DONE ANALYSES THAT ALLOWS

05:21:36 22    US TO STATE WITHOUT ANY DOUBT THAT AN EXCAVATION THAT WAS, THAT THE

05:21:45 23    WATER PENETRATION FROM THAT EXCAVATION WOULD NOT BE -- I SHOULDN'T

05:21:50 24    SAY WITHOUT ANY DOUBT, I SAY WITH ENGINEERING CERTAINTY THAT WE CAN

05:21:54 25    CONCLUDE THAT THE WATER MOVEMENT FROM THAT PHASE OF THE EXCAVATION

05:22:00  1    COULD NOT EXCEED 16 FEET DURING THE STORM SURGE.

05:22:05  2         SO, YOU KNOW, YES, I CAN TELL YOU THAT AN EXCAVATION

05:22:12  3    FARTHER AWAY THAN 16 FEET IS NOT GOING TO BE FELT BY THE SOILS

05:22:15  4    UNDERNEATH THE WALL.  AND I DON'T NEED TO EVALUATE EACH ONE OF THE

05:22:20  5    HUNDRED EXCAVATIONS PLUS THE THOUSANDS OF FEET OF TRENCH TO BE ABLE

05:22:26  6    TO CONCLUDE THAT.

05:22:28  7    Q.  AND I GUESS THAT'S REALLY THE ONLY QUESTION I HAVE TO ASK IS

05:22:31  8    THIS, DR. SILVA.  AT NO POINT DID YOU DO AN ANALYSIS, ANY KIND OF

05:22:35  9    ANALYSIS THAT ACTUALLY SHOWS WITH AND WITHOUT THE GAP THE

05:22:39 10    EXCAVATIONS THAT SAUCER MARINE AND THE EXCAVATIONS AT BOLAND

05:22:43 11    MARINE, ALL OF THE EXCAVATIONS AND WHATEVER IMPACT THEY WOULD HAVE,

05:22:47 12    YOU DID NOT ANALYZE THAT, CORRECT?

05:22:49 13    A.  WELL, THAT QUESTION IS ESSENTIALLY IMPOSSIBLE TO ANSWER,

05:22:56 14    BECAUSE WHEN WE'RE DOING AN ANALYSIS, WE'RE DOING TWO-DIMENSIONAL

05:22:59 15    ANALYSIS AND WE SELECT A CROSS SECTION AND YOU SELECT THE

05:23:03 16    EXCAVATIONS THAT ARE ALONG YOUR CROSS SECTION.  YOU DON'T SELECT

05:23:06 17    ALL OF THE EXCAVATIONS.  I MEAN, WE DON'T BRING ALL OF THE

05:23:09 18    EXCAVATIONS TO ONE PLACE AND ANALYZE THEM ALL ONE ON TOP OF EACH

05:23:13 19    OTHER.  THAT ANALYZE DIDN'T MAKE GOOD SENSE.

05:23:18 20         WHAT I DID DO IS FOR THE NORTH BREACH AND THE SOUTH

05:23:21 21    BREACH WAS SELECTED A CROSS SECTION, WE SELECTED A SIGNIFICANT

05:23:25 22    EXCAVATIONS THAT FELL IN THAT CROSS SECTION, AND WE PERFORMED AN

05:23:29 23    ANALYSIS AND WITH THAT, WITH THAT GEOMETRY.

05:23:36 24    Q.  I THINK I UNDERSTAND YOUR ANSWER.  THERE WAS NOT AN ANALYSIS

05:23:40 25    DONE, STABILITY SEEPAGE OR OTHERWISE, THAT INCLUDED ALL OF THE GRID

05:23:44  1    TRENCHING, INCLUDED THE SEWER LINE, INCLUDED THE DRAINAGE DITCH,

05:23:47  2    INCLUDED SUREKOTE REMOVAL, ALL OF THOSE THINGS WITH OR WITHOUT A

05:23:51  3    GAP, CORRECT, FOR WHATEVER REASON THAT WASN'T DONE, GOOD REASONS OR

05:23:54  4    BAD REASONS YOU DIDN'T DO IT?

05:23:58  5            THE COURT:  YOU CAN ANSWER YES OR NO, SIR.

05:24:00  6            THE WITNESS:  I DID NOT DO IT.

05:24:02  7    BY MR. SCHULTZ:

05:24:03  8    Q.  I WANT TO TALK ABOUT, AND THIS WILL SHORT CIRCUIT, YOUR HONOR,

05:24:07  9    BUT YOU OPINED DID CAUSE THE FAILURE.  I WANT TO START BY LOOKING

05:24:10  10   AT --

05:24:12  11           THE COURT:  LOOK, I DON'T WANT TO DISRUPT YOU.  IF YOU

05:24:14  12   HAVE MORE AND WE CAN'T GO, YOU KNOW, WE CAN GO TO SIX, SOMETHING

05:24:18  13   LIKE THAT.  IF YOU HAVE MORE, I AM NOT GOING TO CUT YOU OFF I AM

05:24:22  14   JUST GOING TO HAVE TO SAY YOU START IN THE MORNING, KEEP THAT IN

05:24:26  15   MIND.

05:24:26  16           MR. SCHULTZ:  YOUR HONOR, FOR THE RECORD, I DIDN'T MEAN

05:24:27  17   TO IMPLY THAT.

05:24:27  18   BY MR. SCHULTZ:

05:24:28  19   Q.  WE ARE GOING TO DEAL WITH DR. BEA'S -- THEORIES OF DR. BEA I

05:24:32  20   WANT TO DEAL WITH HIS THEORIES WITH HIM AND YOU'VE GIVEN ME AMPLE

05:24:35  21   OPPORTUNITY TO ASK THE QUESTIONS I'VE NEEDED TO ASK SO FAR.  I WANT

05:24:39  22   TO TALK AND MOVE TO YOUR FAILURE ANALYSIS.

05:24:43  23           STARTING WITH YOUR CWALSHT MODEL.  THE CWALSHT MODEL, AS

05:24:49  24   I APPRECIATE IT, DR. SILVA, IS -- WELL, LET'S PULL UP JX 1680 AT

05:24:54  25   PAGE 41.  THIS IS OUT APPENDIX E TO YOUR REPORT, CORRECT?

05:24:58  1   A.  YES.

05:24:58  2   Q.  CAN WE BLOW THIS UP TO JUST SEE THE TEXT PLEASE.  I'M SORRY,

05:25:06  3   THE TEXT AND THE GRAPHIC.

05:25:10  4        AS I UNDERSTAND IT, DR. SILVA, WHAT YOU'VE DONE HERE, YOU

05:25:13  5   RAN A COMPUTER MODEL AND IN THE COMPUTER MODEL YOU HAVE A CROSS

05:25:18  6   SECTION, YOU GIVE SHEAR STRENGTHS TO THE VARIOUS TYPES OF SOILS

05:25:21  7   SUCH AS THE LEVEE FILL, THE UPPER ORGANICS, THE LOWER ORGANICS, THE

05:25:26  8   INTERDISTRIBUTARY CLAYS, CORRECT?

05:25:28  9   A.  THAT IS CORRECT.

05:25:33  10  Q.  YOU HAVE THE WATER UP TO THE TOP OF THE FLOODWALL, IS THAT

05:25:35  11  CORRECT, IS THAT WHAT THE BLUE LINE REPRESENTS?

05:25:38  12  A.  THAT'S WHAT IT REPRESENTS.

05:25:39  13  Q.  SO YOU HAVE WATER IN THE CANAL UP TO THE WALL, YOU HAVE THE

05:25:42  14  SHEAR STRENGTHS, GIVEN THEY'RE THE SAME ON THE LANDSIDE AND THE

05:25:46  15  CANAL SIDE; IS THAT RIGHT?

05:25:48  16  A.  THAT'S CORRECT, THE SAME STRENGTH ON BOTH SIDES.

05:25:51  17  Q.  AND THIS IS SECTION DD WHICH IS SOUTH BREACH SECTION, RIGHT?

05:25:55  18  A.  SECTION DD LOOKS LIKE -- I MEAN, IT LOOKS LIKE THE SOUTH BREACH

05:26:06  19  BUT I DON'T REMEMBER, I HAVE TO LOOK.

05:26:10  20  Q.  WELL, I GUESS MY POINT IS THIS, YOU DIDN'T DO A SEPARATE NORTH

05:26:13  21  BREACH AND SOUTH BREACH, YOU USED ONE MODEL FOR BOTH BREACHES?

05:26:16  22  A.  WE USED THIS, CORRECT.

05:26:17  23  Q.  AND YOUR ANALYZING FOR STABILITY BY, AS I UNDERSTAND IT, WITHIN

05:26:21  24  THESE PARAMETERS TAKING SCOUR AT VARIOUS DEPTHS, YOU INPUT THAT

05:26:26  25  INTO THE MODEL, CORRECT?

05:26:27 1    A.   CORRECT.

05:26:28 2    Q.   AND SO YOU TRIED ONE FOOT AND YOU SEE WHAT THE FACTOR OF SAFETY

05:26:32 3    IS, YOU TEN GO TO TWO, THREE, FOUR, FIVE AND CALCULATE FACTORS OF

05:26:36 4    SAFETY AS YOU GO DOWN, RIGHT?

05:26:37 5    A.   CORRECT.

05:26:38 6    Q.   WHEN YOU'RE DOING THAT ANALYSIS, THESE RED LINES ARE THE SCOUR,

05:26:41 7    CORRECT?

05:26:42 8    A.   CORRECT.

05:26:42 9    Q.   ARE THE RED LINES IN THE MODEL REPRESENTATIVE OF WHAT IS

05:26:46 10   ACTUALLY SCOURED AWAY IN THE MODEL?  IN OTHER WORDS, DOES THE SCOUR

05:26:50 11   TAKE OUT THE WHOLE --

05:26:51 12   A.   IT TAKES THE LATERAL SUPPORT BASICALLY, YES.

05:26:54 13   Q.   RIGHT MY QUESTION IS, AND MAYBE IT WASN'T VERY ARTFUL, IS THIS:

05:26:58 14   THE RED LINE GOES ALL THE WAY OUT AS IF IT SHEARS OFF THAT ONE FOOT

05:27:02 15   AT TOP OF THE LEVEE, IS THAT HOW IT'S MODEL, IS THAT GEOMETRY?

05:27:06 16   A.   IT'S NOT SHEARED OFF, IT'S ERODED AWAY, SO TO SPEAK.

05:27:11 17   Q.   BUT THIS WHOLE SECTION --

05:27:12 18   A.   YES, THAT'S RIGHT, OR YOU CAN HAVE A TRENCH WHICH IS ONLY, YOU

05:27:18 19   KNOW, A FOOD WIDE AND IT WOULD BE THE SAME RESULT, YES.

05:27:21 20   Q.   AND THAT'S MY QUESTION, SO YOUR OPINION IS EVEN IF YOU, IF YOU

05:27:25 21   HAD A TRENCH ONE FOOT WIDE DOWN TO FIVE FEET THAT WOULD BE NO

05:27:30 22   DIFFERENT THAN SHEARING, THAN ROLLING AWAY OR PEELING AWAY,

05:27:33 23   WHATEVER PHRASE YOU USED, ALL OF THIS SOIL ON THE BACK END?

05:27:35 24   A.   WELL, IN TERMS OF THE LATERAL SUPPORT FOR THE PILES, IT WOULD

05:27:43 25   BE THE SAME.  YES, IN TERMS OF THE LATERAL SUPPORT FOR THE PILES IT

05:27:48  1    WOULD BE THE SAME.  IF YOU WERE LOOKING AT A STABILITY OF THE

05:27:52  2    LEVEE, IT WOULD NOT BE THE SAME.

05:27:53  3    Q.  WELL, I AM INTERESTED IN WHETHER IT LOWERS THE FACTOR OF

05:27:59  4    SAFETY -- LET ME ASK YOU THIS QUESTION.  LET'S GO DOWN FIVE FEET.

05:28:04  5    IF YOU DON'T TAKE AWAY THIS ENTIRE LAYER OF SOIL FROM THE BOTTOM

05:28:07  6    RED LINE ALL THE WAY BACK UP TO THE TOP AND YOU ONLY TAKE AWAY ONE

05:28:10  7    FOOT OF IT, IS IT YOUR OPINION THAT WOULD HAVE NO EFFECT, THE

05:28:15  8    FACTOR OF SAFETY WOULD BE THE SAME IN EITHER ANALYSIS?

05:28:17  9    A.  WELL, THE CALCULATIONS WILL GIVE YOU THE SAME FACTOR OF SAFETY.

05:28:21 10    THESE TRENCHES WERE A LOT WIDER THAN A FOOT.  I SAID A FOOT AS AN

05:28:25 11    ILLUSTRATION, BUT THE TRENCHES WERE WIDER THAN A FOOT.  AND THE

05:28:29 12    CALCULATION FOR THE LATERAL SUPPORT, AS SOON AS YOU REMOVE THE SOIL

05:28:34 13    AGAINST THE WALL WOULD GIVE YOU THE SAME RESULT, YES, SIR.

05:28:37 14    Q.  SO ALL OF THE SOIL WHETHER IT'S WE USE A FOOT OR TWO FEET OR

05:28:41 15    WHATEVER THE ACTUAL SCOUR TRENCH WIDTH MIGHT HAVE BEEN, IT'S YOUR

05:28:44 16    OPINION THAT ALL OF THE SOIL EAST OF THAT REPRESENTED BY THESE RED

05:28:47 17    LINES OFFERS NO LATERAL FORCE OR SUPPORT TO HELP HOLD THE WALL

05:28:52 18    UPRIGHT?

05:28:52 19    A.  THE WAY THIS IS ANALYZED, THAT IS CORRECT.

05:28:55 20    Q.  WHAT ABOUT IN THE REAL WORLD?  I UNDERSTAND THAT'S HOW THE

05:29:00 21    COMPUTER'S MODELING IT, BUT OUT IN THE REAL WORLD IF YOU HAVE A ONE

05:29:03 22    FOOT SCOUR TRENCH, ONE FOOT WIDE FROM THE WALL, DOES THAT

05:29:07 23    COMPROMISE THE WALL TO THE SAME EXTENT AS IF YOU HAVE A FIVE FOOT

05:29:10 24    SCOUR TRENCH THAT GOES OUT?

05:29:11 25    A.  THE MODEL IS ADEQUATE FOR THE REAL WORLD IN MY OPINION.  IT'S

05:29:15  1    AN APPROXIMATION BUT, YES, THE FACTOR OF SAFETY FOR THE WALL

05:29:21  2    ITSELF.  I MEAN, BEFORE WE HAVE SOME, THE REASON I SAY FOR THE WALL

05:29:24  3    ITSELF IS BEFORE ONE OF YOUR QUESTIONS HAD A CONFUSION BETWEEN THE

05:29:29  4    SAFETY FACTOR FOR THE SHEAR FAILURE OF THE LEVEE VERSUS THE SAFETY

05:29:33  5    FACTOR FOR THE FLOODWALL.  THOSE ARE TWO DIFFERENT THINGS.

05:29:36  6    Q.  RIGHT.  AND THAT WAS A POOR CHOICE OF WORDS ON MY PART, WHEN I

05:29:39  7    SAID YOU SHEAR AWAY THAT SOIL, SO YOU'VE MADE IT CLEAR IN THE

05:29:43  8    MODEL.

05:29:43  9    A.  OKAY.

05:29:43 10    Q.  BUT MY QUESTION IS THIS:  IS IT YOUR OPINION IN THE REAL WORLD

05:29:45 11    THAT A SCOUR TRENCH THAT GOES DOWN FIVE FEET ONE FOOT WIDE ON THE

05:29:49 12    BACK SIDE OF THE WALL GIVES YOU THE SAME FACTOR OF SAFETY AS THE

05:29:54 13    SCOUR TRENCH THAT GOES OUT TEN FEET FROM THE WALL?

05:29:56 14    A.  I MEAN, THAT'S -- IT WILL GIVE YOU THE SAME FACTOR OF SAFETY,

05:30:03 15    YES.

05:30:03 16    Q.  HOW ABOUT WATER IN THE TRENCH ITSELF, THE SCOUR TRENCH, IF THIS

05:30:10 17    MODEL TAKES AWAY ALL OF THAT SOIL SHOWN BY THE RED LINES, THERE'S

05:30:14 18    NO WATER THERE EITHER, CORRECT, IN YOUR MODEL, AS IT'S OVERTOPPING?

05:30:18 19    A.  THAT IS CORRECT.

05:30:18 20    Q.  BUT THAT WATER WOULD OFFER LATERAL FORCE AGAINST THE WALL,

05:30:22 21    WOULDN'T IT?

05:30:22 22    A.  IT WOULD OFFER SOME LATERAL, BUT IT WOULD OFFER SOME PRESSURE,

05:30:26 23    CORRECT.

05:30:27 24    Q.  AND DR. MARR TOLD US THAT WITH THESE SOILS THAT 100 POUNDS PER

05:30:34 25    SQUARE FOOT CHANGE IN STRENGTH IS ENOUGH TO REQUIRE AN ADDITIONAL

05:30:37  1   FOOT OF SCOUR DEPTH TO REQUIRE OVERTURNING OF THE WALL; IS THAT A

05:30:42  2   FAIR STATEMENT, DO YOU AGREE WITH THAT?

05:30:43  3   A.  I HAVE NOT DONE THOSE CALCULATIONS.

05:30:47  4   Q.  BUT IF YOU TOOK A SCOUR TRENCH, LET'S SAY IT'S -- HOW WIDE WERE

05:30:52  5   THE SCOUR TRENCHES, APPROXIMATELY?

05:30:54  6   A.  I MEAN, THEY WERE -- I MEAN, AS MUCH AS SIX FEET WIDE, MAYBE

05:31:02  7   FOUR TO SIX FEET.

05:31:03  8   Q.  AND IF YOU FILLED THOSE FOUR TO SIX FEET WITH WATER THE LENGTH

05:31:07  9   OF THAT WALL, THAT'S GOING TO OFFER HUNDREDS, IF NOT THOUSANDS, OF

05:31:11 10   POUNDS PER SQUARE FOOT OF FORCE RESISTING THE OVERTURNING, CORRECT?

05:31:16 11   A.  YOU WOULD HAVE A FORCE THERE THAT WOULD RESIST THE OVERTURNING

05:31:18 12   AND THE WIDTH OF THE TRENCH WOULD HAVE NO IMPORTANCE AS TO THAT

05:31:22 13   FORCE, YOU CAN HAVE IT IN AN INCH WIDE AND IT WOULD BE THE SAME AS

05:31:27 14   FOUR FEET WIDE.

05:31:28 15   Q.  AND ANY LATERAL FORCE, ANY SIGNIFICANT LATERAL FORCE

05:31:31 16   REPRESENTED BY EITHER SOILS THAT ARE TAKEN AWAY IN THIS MODEL OR

05:31:34 17   THE WATER THAT WOULD BE IN THE TRENCH IN THE REAL WORLD WOULD

05:31:36 18   INCREASE THE FACTOR OF SAFETY AS THE TRENCH GOES DOWN LIKE DR. MARR

05:31:40 19   SAID, CORRECT?

05:31:41 20   A.  ANY FORCE YOU APPLY WOULD INCREASE THE FACTORS OF SAFETY SOME.

05:31:46 21   I DON'T KNOW IF IT WOULD INCREASE IT AS DR. MARR SAID, BUT IT WILL

05:31:50 22   INCREASE IT SOME.

05:31:50 23   Q.  AND WHAT YOUR MODEL SHOWS IS IF YOU TAKE AWAY ALL OF THAT SOIL

05:31:55 24   AND DON'T PUT ANY WATER THERE, THEN YOU GET OVERTURNING AT FOUR

05:31:58 25   FEET?  EXCEEDING FOUR FEET ACTUALLY.

05:32:01 1    A.  WELL, THIS ANALYSIS SHOWS IS THAT WITH THE CANAL WATER ON THE

05:32:06 2    LEFT, SCOUR OF ABOUT FOUR FEET WILL GIVE YOU A SAFETY FACTOR OF

05:32:11 3    ONE, WHICH TO ME INDICATES THAT YOU ARE GETTING TO A CONDITION

05:32:14 4    WHERE YOU COULD EXPECT UNSATISFACTORY PERFORMANCE.

05:32:21 5         I MEAN, THIS IS A -- I GUESS I MENTIONED THIS EARLIER,

05:32:24 6    BUT I WILL MENTION IT AGAIN.  THIS ANALYSIS WAS DONE NOT IN AN

05:32:31 7    ATTEMPT TO MODEL THE SCOURING PROCESS AND DETERMINE THE LEVEL OF

05:32:37 8    STABILITY VERSUS DEPTH OF TRENCH, SO MUCH AS IT WAS DONE TO

05:32:42 9    ASCERTAIN THAT THE DEPTH OF THE TRENCHES WHERE IN THE ORDER, YOU

05:32:49 10   KNOW, OF THE SIZE THAT WOULD CAUSE CONCERN FOR THE STABILITY OF THE

05:32:52 11   STRUCTURE.  I THINK THAT'S MORE OR LESS HOW I STATED IT IN MY

05:32:56 12   REPORT.  SO I WANT TO CLARIFY THAT.  THAT'S THE WAY I USED IT.  I

05:33:01 13   AM NOT TRYING TO MODEL THE DEPTH OF SCOUR VERSUS SAFETY FACTOR.

05:33:07 14        THE COURT:  JUST A FOLLOW-UP.  DOES THE WIDTH OF THE

05:33:12 15   SCOUR TRENCH AFFECT THE FACTOR OF SAFETY OR IS IT MERELY THE DEPTH?

05:33:19 16        THE WITNESS:  IT WOULD BE THE DEPTH THAT AFFECTS THE

05:33:24 17   FACTOR OF SAFETY.

05:33:25 18        THE COURT:  SO IF I HAD A SIX INCH WIDTH AND A FOUR-FOOT

05:33:30 19   DEPTH, WOULD IT BE THE SAME AS A THREE-FOOT WIDTH AND A FOUR-FOOT

05:33:36 20   DEPTH, WOULD THE FACTOR OF SAFETY REMAIN CONSTANT?

05:33:39 21        THE WITNESS:  TO CALCULATE THE FACTOR OF SAFETY WOULD

05:33:41 22   REMAIN CONSTANT.  IF YOU HAVE A VERY NARROW TRENCH AND A WALL

05:33:45 23   STARTS TO DEFORM AND HITS THE OTHER SIDE OF THE TRENCH, THEN YOU

05:33:50 24   CAN SEE THAT THERE WILL BE AN AFFECT THERE THAT MIGHT STOP THE

05:33:54 25   MOVEMENT.  SO, I MEAN, IF WE'RE DISCUSSING --

05:33:58  1          THE COURT:  WHEN YOU SAY THE FACTOR OF SAFETY, THE FACTOR

05:34:00  2  OF SAFETY MEANING THAT THE WALL CAN MOVE?

05:34:03  3          THE WITNESS:  THE WALL CAN MOVE.

05:34:05  4          THE COURT:  BUT IT WON'T NECESSARILY COMPLETELY FAIL IF

05:34:09  5  THE TRENCH IS NARROWER?

05:34:12  6          THE WITNESS:  EXACTLY.  THE FACTOR OF SAFETY AGAINST

05:34:14  7  LATERAL MOVEMENT OF THE WALL, CORRECT.  IT IS NOT A FACTOR OF

05:34:17  8  SAFETY AGAINST THE WHOLE, A COMPLETE SHEAR FAILURE OF THAT SECTION.

05:34:21  9          THE COURT:  WE'RE LOOKING AT THE FACTOR OF SAFETY

05:34:23 10  VIS-À-VIS THE MOVEMENT OF THE WALL AND THE TRENCH?

05:34:28 11          THE WITNESS:  THE MOVEMENT OF THE WALL TOWARDS THE

05:34:30 12  TRENCH.

05:34:30 13          THE COURT:  TOWARDS THE TRENCH.

05:34:32 14          THE WITNESS:  RIGHT.

05:34:33 15          THE COURT:  AND THE FACTOR OF SAFETY OF ONE, JUST

05:34:35 16  ISOLATING THAT ONE FREEZE FRAME IN ESSENCE, DOES NOT NECESSARILY

05:34:40 17  MEAN THAT THE ENTIRE LEVEE WILL FAIL?

05:34:45 18          THE WITNESS:  THAT'S CORRECT.  AND THAT'S WHAT I WAS

05:34:47 19  TRYING TO MAKE THE DISTINCTION BETWEEN THE SHEAR FAILURE AND WHAT

05:34:53 20  YOU EXPRESS IN TERMS OF FACTOR OF SAFETY AS WELL AND THE FACTOR OF

05:34:58 21  SAFETY AGAINST THE PERFORMANCE OF THE FLOODWALL.

05:34:59 22          THE COURT:  SO WHEN A SCOUR TRENCH CAUSES A LEVEE TO

05:35:04 23  ACTUALLY FAIL, IT IS AFFECTING NOT ONLY THE FACTOR OF SAFETY

05:35:10 24  VIS-À-VIS THE WALL BUT THE SOILS -- YOU MIGHT TELL ME SO IT WILL BE

05:35:18 25  EXPRESSED PROPERLY.

05:35:19   1            THE WITNESS:  WHAT REALLY HAPPENS IS THE SCOUR TRENCH

05:35:22   2   ALLOWS THE WALL TO DEFORM.  ONCE THE WALL DEFORMS, THE FLOW

05:35:25   3   INCREASES, YOU GET MORE EROSION ON THE OTHER SIDE AND THAT EROSION

05:35:30   4   THEN, YOU KNOW, TYPICALLY WASHES AWAY THE LEVEE AND IT'S --

05:35:36   5            THE COURT:  THAT I UNDERSTAND.  ALL RIGHT.

05:35:40   6   BY MR. SCHULTZ:

05:35:41   7   Q.  AND SO WE'RE CLEAR.  IF YOU TAKE THAT TRENCH, HOWEVER WIDE IT

05:35:46   8   IS, AND YOU FILL IT UP WITH WATER THAT WATER IS GOING TO OFFER SOME

05:35:49   9   OPPOSING FORCE OR RESISTANCE TO OVERTURNING?

05:35:53  10   A.  YES, IT WOULD DO THAT.

05:35:54  11   Q.  AND THAT WOULD INCREASE THE FACTOR OF SAFETY BUT THIS MODEL

05:35:57  12   DOES NOT INCLUDE THAT WATER THERE ACTING AS --

05:36:00  13   A.  THIS IS A SIMPLIFIED MODEL, THAT DOES NOT INCLUDE THAT WATER.

05:36:03  14   AND BY THE WAY, IF I RECALL DR. MARR'S TESTIMONY CORRECTLY, HE WAS

05:36:07  15   TALKING ABOUT -- HE WAS TALKING ABOUT DIFFERENCE OF 100 POUNDS PER

05:36:13  16   SQUARE FOOT IN THE STRENGTH OF THE SOIL BUT NOT IN THE -- I DON'T

05:36:18  17   THINK IT WAS THE PRESSURE THAT HE WAS TALKING ABOUT.

05:36:21  18   Q.  RIGHT.  THE PRINCIPLE IS IF YOU HAVE SOIL THERE OR WATER IT

05:36:24  19   ACTS AS AN OPPOSING FORCE; IF YOU TAKE IT AWAY, IT'S NOT THERE TO

05:36:28  20   ACT AS AN OPPOSING FORCE?

05:36:30  21   A.  THAT IS CORRECT.

05:36:30  22   Q.  AND IN YOUR MODEL IT TAKES ALL OF THE SOIL AWAY AND PUTS NO

05:36:37  23   WATER THERE?

05:36:37  24   A.  RIGHT.  BUT THERE IS ANOTHER DIFFERENCE BECAUSE THE WATER

05:36:38  25   CANNOT SUSTAIN A SHEAR STRESS.  SO THE WATER APPLIES A PRESSURE

05:36:42  1    THAT YOU NEED TO CONSIDER, BUT IT DOESN'T HAVE THE SAME EFFECT AS

05:36:47  2    IF YOU HAD SOIL THERE.

05:36:48  3    Q.  I UNDERSTAND.  NOW, YOU DID, YOU JUST SAID THAT THIS MODEL

05:36:54  4    DOESN'T TRY AND DO A SORT OF SCOUR DEPTH BY TIME ANALYSIS, BUT YOU

05:36:59  5    DID LOOK AT DR. MARR'S WORK AND YOU FELT LIKE IT WAS CLOSE ENOUGH

05:37:02  6    THAT IT CORROBORATED, MADE YOU FEEL COMFORTABLE WITH THIS MODEL,

05:37:06  7    CORRECT?

05:37:06  8    A.  I WAS PLENTY COMFORTABLE BEFORE SEEING DR. MARR'S WORK.  AND

05:37:11  9    THE ONLY THING THAT I WAS TRYING TO GET WITH THIS MODEL IS TO

05:37:16 10    CONVINCE MYSELF THAT THE SIZE OF TRENCHES THAT WE OBSERVED AT THESE

05:37:22 11    EAST BANK INDUSTRIAL AREA WERE DEEP ENOUGH TO AFFECT THE

05:37:27 12    PERFORMANCE OF THE FLOODWALL.  THAT'S ALL I WAS TRYING TO DO WITH

05:37:30 13    THIS.

05:37:30 14    Q.  YOU TESTIFIED THAT YOU WERE AWARE OF DR. MARR'S CALCULATIONS

05:37:34 15    AND HE WAS GETTING FOR THE TIME OF THE STORM AT THESE LOCATES

05:37:37 16    SOMETHING AROUND FIVE TO SIX FEET OF SCOUR.  SO I MEAN THESE

05:37:40 17    NUMBERS ARE IN RELATIVE PROXIMITY TO EACH OTHER, THE FOUR FEET, AND

05:37:44 18    WE FIGURED, WELL, CERTAINLY FOUR FEET OF SCOUR DURING THAT TIME IS

05:37:47 19    A REASONABLE AMOUNT.  AND THAT'S YOUR TESTIMONY AND THAT'S TRUE,

05:37:51 20    CORRECT?

05:37:52 21    A.  THAT'S RIGHT.  I CONCLUDED THAT IT WAS REASONABLE TO, IT WOULD

05:38:01 22    NOT BE UNREASONABLE TO HAVE A SCOUR TRENCH FOUR TO FIVE FEET DEEP

05:38:06 23    AT THE TIME OF THE FAILURE.

05:38:08 24    Q.  LET'S TAKE A LOOK, PLEASE, AT PX 4720-003.  THIS IS THAT WORK

05:38:13 25    BY DR. MARR, WHICH WE'VE SEEN WITH DR. MARR'S TESTIMONY.  YOU WERE

05:38:16  1   HERE FOR THAT, CORRECT?

05:38:18  2   A.  YES, SIR, I WAS HERE FOR THAT.

05:38:19  3   Q.  NOW, DR. MARR'S MODEL INCLUDES THREE FOOT SIGNIFICANT WAVE

05:38:24  4   HEIGHT WITH A PERIOD OF TWO SECONDS, CORRECT, THAT'S ALREADY BUILT

05:38:27  5   INTO THE MODEL?

05:38:28  6   A.  THAT IS CORRECT.

05:38:31  7   Q.  AND YOU RECALL DR. MARR'S TESTIMONY THAT ALTHOUGH THIS IS A

05:38:34  8   SOUTH BREACH ANALYSIS, THE MECHANICS AND PHYSICS INVOLVED APPLY TO

05:38:41  9   THE NORTH BREACH AS WELL?

05:38:43  10  A.  I DON'T RECALL HIS TESTIMONY ON THAT, BUT THAT WOULD BE THE

05:38:47  11  CASE, YES.

05:38:47  12  Q.  AND HE MENTIONED THAT THIS INCLUDES THE TAIL WATER, WHAT I

05:38:52  13  WOULD CALL THE CUSHIONING AFFECT OF TAIL WATER AS IT RISES ON THE

05:38:55  14  BACK SIDE OF THE LEVEE, CORRECT?

05:38:57  15  A.  HE MENTIONED THAT.

05:38:58  16  Q.  NOW, THIS LINE, I AM LOOKING -- I AM GOING TO USE THE LINE THAT

05:39:04  17  DR. MARR USED, THE GREEN LINE THAT WE SEE HERE, AND THAT'S THE MORE

05:39:09  18  ERODIBLE CLAYS, CORRECT?

05:39:10  19  A.  THAT IS CORRECT.

05:39:13  20  Q.  AND IF THIS MODEL IS INCLUDING THE TAIL WATER EFFECT, ALTHOUGH

05:39:17  21  HE TESTIFIED THAT IT WOULD SLOW DOWN SCOUR FOR THE SECTIONS OF THE

05:39:21  22  WALL THAT REMAINED STANDING, IT DOESN'T ACTUALLY FLAT LINE UNTIL

05:39:25  23  ABOUT 9:30 IN THE MORNING, CORRECT, MAYBE 9:20 IN THE MORNING,

05:39:29  24  THAT'S WHEN THE SCOUR LEVELS OUT?

05:39:32  25  A.  IN HIS PLOT IT IS, YES.

05:39:34 1  Q.  AND SO THE PORTIONS OF THE WALL THAT ARE STILL STANDING AT

05:39:39 2  7:00 A.M., 8:00 A.M., 9:00 A.M. ARE STILL EXPERIENCING SCOUR

05:39:43 3  ACCORDING TO THIS MODEL AS OPPOSED, OF COURSE, TO THE PORTIONS OF

05:39:48 4  THE WALL THAT HAVE FAILED THAT ARE NO LONGER EXPERIENCING SCOUR,

05:39:50 5  RIGHT?

05:39:50 6  A.  WELL, THE PORTION OF THE WALL THAT DIDN'T FAIL WOULD CONTINUE

05:40:00 7  TO EXPERIENCE SOME SCOUR.

05:40:02 8  Q.  RIGHT.  AND THIS SHOWS THAT, IT SLOWS DOWN AND IT EVENTUALLY

05:40:05 9  FLAT LINES SOMETIME AFTER 9 O'CLOCK, RIGHT?

05:40:08 10 A.  WELL, I MEAN FLATTENS.  I DON'T WORK WITH THOSE TIMES SO I AM

05:40:16 11 NOT SURE WHEN YOU SAY 9 O'CLOCK, I DON'T BRING THOSE TIMES INTO MY

05:40:21 12 ANALYSIS.

05:40:21 13 Q.  NO, I UNDERSTAND.  THIS IS 9:00 A.M. AND IF WE LOOK OVER AT SAY

05:40:27 14 9:15 IT'S DEEPER THAN IT IS AT NINE, SO WE ARE STILL GETTING SOME

05:40:31 15 SCOUR EFFECT EVEN WITH THE TAIL WATER ACCORDING TO DR. MARR?

05:40:34 16 A.  CORRECT.

05:40:34 17 Q.  AND DR. MARR STATED IN TESTIMONY THAT THERE WAS VIRTUALLY NO

05:40:39 18 TAIL WATER AFFECT BEFORE 8:00 A.M. BUT THAT IT BECAME VERY

05:40:42 19 SIGNIFICANT AFTER 8:00 A.M., DO YOU REMEMBER THAT?

05:40:44 20 A.  I DON'T, BUT.

05:40:45 21 Q.  WOULD YOU LIKE TO SEE THE TESTIMONY?

05:40:47 22 A.  SURE.

05:40:48 23 Q.  LET'S PULL UP IF WE COULD, PLEASE, TRIAL TRANSCRIPT 2044, LINE

05:40:52 24 19.  MY QUESTION IS: "THOUGH, SOME.  WHAT DEGREE?  TEN PERCENT?

05:41:04 25 15?  20?  25 PERCENT?  THAT'S A CRUDE EXPRESSION OF NUMBERS, BUT I

05:41:07 1    AM WONDERING IF YOU CAN LOOK AT THAT SLOPE REFERRING TO THAT LINE,

05:41:10 2    AND TELL ME FROM SEVEN TO EIGHT WHAT WAS THE PERCENTAGE IN DECLINE

05:41:13 3    OF EROSION?  A. NOT VERY MUCH AT ALL FROM THAT TIME BECAUSE THERE

05:41:17 4    WAS VERY LITTLE, THE TAIL WATER HADN'T GOTTEN UP ENOUGH, AND IF --"

05:41:21 5    BY THE WAY, I THINK THIS WAS A QUESTION -- NO, IT WAS MR. BRUNO.

05:41:24 6          IF WE GO TO THE NEXT PAGE.  HE SAYS, "BUT FROM EIGHT TO

05:41:28 7    NINE IT BECAME VERY SIGNIFICANT."  SO THAT TAIL WATER AFFECT

05:41:31 8    REDUCING THE SCOUR BECOMES SIGNIFICANT AFTER 8 O'CLOCK, RIGHT?

05:41:34 9    A.  THAT IS WHAT HE SAYS THERE.

05:41:38 10   Q.  AND IF THERE'S NOT VERY MUCH TAIL WATER EFFECT BEFORE 8 O'CLOCK

05:41:43 11   AND IT BECOMES SIGNIFICANT AFTER 8 O'CLOCK AND YOU PUT THAT

05:41:46 12   TOGETHER WITH DR. MARR'S TESTIMONY THAT THERE WAS A POINT IN TIME

05:41:50 13   IN WHICH THERE WAS A RATE OF EROSION OF ONE FOOT EVERY 15 TO

05:41:54 14   20 MINUTES, DO YOU REMEMBER THAT TESTIMONY?

05:41:55 15   A.  NOT PRECISELY, BUT.

05:41:59 16   Q.  LET'S TAKE A LOOK, IF WE COULD, AT TRIAL TRANSCRIPT 2136, LINE

05:42:03 17   20.  DR. MARR TESTIFIES, "BUT AN HOUR IS A BIG DIFFERENCE HERE,

05:42:14 18   SIR.  THERE WAS ONE POINT WHERE BY THE SCOURING CALCULATION WE WERE

05:42:17 19   LOSING ONE FOOT , THE TRENCH WAS GOING TO BE DEEPER ONE FOOT EVERY

05:42:20 20   15 TO 20 MINUTES.  SO AN HOUR IS A DIG DIFFERENCE WHEN WE'RE DOING

05:42:24 21   SCOUR CALCULATIONS."  DO YOU RECALL THAT NOW?

05:42:27 22   A.  I JUST READ IT, YES, SIR.

05:42:30 23   Q.  IF WE GO BACK TO THE GRAPH AT 4720-003.  IF WE CAN BLOW THAT UP

05:42:54 24   AND LOOK BETWEEN SEVEN AND 8 O'CLOCK, IF WE LOOK AT 7 O'CLOCK

05:42:59 25   YOU'RE AT TWO FEET AND IF YOU GO DOWN TO 8 O'CLOCK -- EXCUSE ME.

05:43:06 1  AT 7 O'CLOCK YOU'RE AT THREE FEET AND IF YOU GO OVER TO 8 O'CLOCK

05:43:11 2  AND COME DOWN YOU'RE AT SIX AND A HALF FEET, SO THAT'S THREE AND A

05:43:16 3  HALF FEET OF SCOUR IN THAT ONE HOUR BETWEEN 7 O'CLOCK AND

05:43:19 4  8 O'CLOCK, AND THAT WOULD BE CONSISTENT WITH WHAT WE JUST READ FROM

05:43:22 5  DR. MARR'S TESTIMONY, CORRECT?

05:43:23 6  A.  YES, IN HIS MODEL THAT'S WHAT THAT CURVE SHOWS.

05:43:26 7  Q.  AND AT 7:00 A.M. FOR THAT HOUR OF SCOUR OF THREE AND A HALF

05:43:34 8  FEET, THE NORTH BREACH AND THE SOUTH BREACH HAD ALREADY HAPPENED,

05:43:37 9  CORRECT?

05:43:38 10  A.  WELL, LET ME TAKE EXCEPTION TO THAT.  I DON'T RELATE TO THE

05:43:44 11  TIMES OF DR. MARR HAS IN THIS MODEL, AND I DON'T KNOW HOW THOSE

05:43:48 12  TIMES RELATE, IF AT ALL, WITH WHAT I DID.  I GOT MY TIMES OF

05:43:53 13  FAILURE FROM DR. DALRYMPLE, SO WHEN WE'RE TALKING ABOUT TIMES, I

05:44:01 14  CANNOT TRANSFER THAT INFORMATION TO WHAT I DID.

05:44:04 15  Q.  RIGHT.  YOUR ANALYSIS WAS, IF WE ASSUME NO SOIL AND NO WATER

05:44:09 16  BEHIND THE WALL ON THE PROTECTED SIDE OF THE WALL AT A GIVEN DEPTH

05:44:13 17  ONE FOOT, TWO FOOT, THREE FOOT, FOUR FOOT, WHEN DO WE LOSE UNITY,

05:44:19 18  WHEN IS THE WALL JEOPARDIZED THAT'S ALL YOUR ANALYSIS DID?

05:44:23 19  A.  MY ANALYZE WAS TO ASCERTAIN WHAT DEPTH OF SCOUR WAS REQUIRED TO

05:44:29 20  GET THE STRUCTURE IN AN UNSTABLE CONDITION WHERE YOU WOULD GET

05:44:32 21  UNSATISFACTORY PERFORMANCE.

05:44:33 22  Q.  WELL, I WANT TO TAKE A LOOK AT, IF WE COULD, ONE OTHER ITEM

05:44:38 23  FROM DR. MARR, AND THAT IS DX DM-1006-0037.  YOU WERE HERE FOR

05:44:52 24  DR. MARR'S TESTIMONY ABOUT THIS PLOT, CORRECT?

05:44:54 25  A.  YES, SIR.

05:44:56  1    Q.  AND IF WE'RE LOOKING, WE SEE FOR THE RECORD A GRAPH THAT SHOWS

05:45:01  2    WALL HEIGHT ON THE TOP STARTING AT 15 FEET ON THE LEFT AND

05:45:04  3    DESCENDING DOWN TO 11 ON THE RIGHT, CORRECT?

05:45:07  4    A.  THAT IS CORRECT.

05:45:07  5    Q.  AND SO THE WALL HEIGHT AT THE BREACH SECTION FOR THE NORTH

05:45:10  6    WOULD BE IN-BETWEEN THE 11 AND THE 12 OVER ON THE RIGHT-HAND SIDE

05:45:14  7    AT 11.3, RIGHT?

05:45:16  8    A.  THAT IS CORRECT.

05:45:17  9    Q.  AND THE WALL HEIGHT AT THE SOUTH BREACH WOULD BE 12.1 AT ITS

05:45:22 10    LOWEST POINT, WHICH IS OF COURSE JUST LEFT OF THE 12, CORRECT?

05:45:25 11    A.  CORRECT.

05:45:26 12    Q.  AND BY THE WAY, BOTH YOU AND DR. MARR HAVE TALKED ABOUT THE

05:45:30 13    LOWEST POINT AT THE SOUTH BREACH RELATIVE TO THE DESIGN HEIGHT OF

05:45:34 14    THE WALL, BUT THE LOWEST POINT AT THE SOUTH BREACH AT 12.1 WAS ONLY

05:45:38 15    TWO TENTHS OF A FOOT LOWER THAN THE HEIGHT OF THE WALL AT EITHER

05:45:41 16    END OF THE SOUTH BREACH, CORRECT?

05:45:43 17    A.  I WILL HAVE TO LOOK AT THE CROSS SECTION THAT WE HAVE.  BUT WE

05:45:48 18    HAVE THAT INFORMATION.

05:45:49 19    Q.  I WILL DIG THAT UP FOR YOU, I'VE GOT IT AND WE'RE LOOKING FOR

05:45:54 20    IT.  BUT DO YOU BELIEVE -- ASSUME FOR ME THAT THAT'S WHAT THE

05:45:59 21    GEOMETRY SHOWS, AND I'LL TRY AND PUT THAT ON THE RECORD WITH YOU

05:46:02 22    HERE, IS IT YOUR OPINION THAT IF YOU HAVE 12.3 ON THE SOUTH END OF

05:46:09 23    THE SOUTH BREACH AND 12.3 ON THE NORTH END OF THE SOUTH BREACH THAT

05:46:13 24    12.1, TWO TENTHS OF A FOOT, 2.4 INCHES DIFFERENCE IN WALL HEIGHT IS

05:46:18 25    CAUSATIVE OF THE FAILURE; THAT'S YOUR OPINION, CORRECT?

05:46:21  1   A.  NO.  MY OPINION IS THAT THE SOUTH BREACH WAS, HAD THE SECOND

05:46:25  2   LOWEST, THE SECOND LOWEST POINT ALONG THE -- THE SECOND LOWEST

05:46:32  3   ELEVATION ALONG THE EAST BANK INDUSTRIAL AREA WALL AND IT FAILED

05:46:39  4   AFTER THE NORTH BREACH, THAT'S MY OPINION.

05:46:41  5   Q.  AND MCDONOUGH WAS THE THIRD LOWEST AND IT WAS IN THE PROCESS OF

05:46:44  6   FAILING WHEN THE OTHERS FAILED, CORRECT?

05:46:47  7   A.  I MADE THE OBSERVATION THAT THE AREA NORTH OF THE BORROW PIT

05:46:53  8   HAD THE THIRD LOWEST POINT IN THE WALL, AND THE OBSERVATION WAS

05:46:57  9   THAT NOT THAT IT WAS IN THE PROCESS OF FAILURE BUT WE SAW FROM THE

05:47:01 10   PHOTOGRAPH THAT IT SHOWED A VERY WIDE SCOUR TRENCH, THAT WAS THE

05:47:06 11   OBSERVATION THAT I MADE.

05:47:08 12   Q.  IF WE GO BACK TO THE GRAPHIC UP HERE, THESE 12 TO 13-FOOT

05:47:13 13   SECTIONS OF WALL ON DR. MARR'S SLIDE THAT SHOW THREE TO ALMOST FIVE

05:47:18 14   FEET OF SCOUR DEPTH -- AND THAT'S WHAT THOSE POINTS REPRESENT,

05:47:22 15   CORRECT?

05:47:22 16   A.  THAT IS --

05:47:23 17   Q.  THE SCOUR DEPTH AT WALL HEIGHT?

05:47:27 18   A.  THAT'S WHAT IT IS, YES.

05:47:28 19   Q.  THOSE SECTIONS OF WALL ARE ALL ABOUT 12.1, THOSE SECTIONS OF

05:47:31 20   WALL ALL EXPERIENCE SCOUR UNTIL THAT 9:30 WHEN THE TAIL WATER TOOK

05:47:36 21   FULL EFFECT AND STOPPED THE SCOURING, CORRECT?

05:47:38 22   A.  THAT IS CORRECT.

05:47:39 23   Q.  AND SO THAT WOULD BE THREE AND A HALF HOURS LONGER THAT THEY

05:47:43 24   EXPERIENCED SCOUR THAN THE SOUTH -- NORTH BREACH AND TWO AND A HALF

05:47:46 25   HOURS APPROXIMATELY LONGER THAT THEY EXPERIENCED SCOUR THAN THE

05:47:49   1   SOUTH BREACH, CORRECT?

05:47:50   2   A.   LET ME SEE.

05:48:09   3   Q.   NORTH BREACH WAS AT APPROXIMATELY 6:00 A.M., DR. SILVA?

05:48:12   4   A.   IT WAS APPROXIMATELY 6:00 A.M., THE NORTH BREACH.

05:48:14   5   Q.   AND FROM SIX TO 9:30 IS THREE AND A HALF HOURS?

05:48:16   6   A.   THAT IT IS.

05:48:17   7   Q.   AND THE SOUTH BREACH WAS AT APPROXIMATELY SEVEN AND FROM SEVEN

05:48:20   8   TO 9:30 IS APPROXIMATELY TWO HOURS?

05:48:22   9   A.   OKAY.

05:48:22  10   Q.   EXCUSE ME, TWO AND A HALF HOURS.

05:48:24  11           SO TO BRING THIS TO A POINT, IF FROM SEVEN TO 8:00 A.M.

05:48:31  12   DR. MARR IS CORRECT THAT THESE SECTIONS EXPERIENCED THREE AND A

05:48:35  13   HALF FEET OF SCOUR, THEN YOU COULD TAKE THESE DOTS AND REPRESENT

05:48:38  14   THE SCOUR TRENCH AT THE NORTH AND SOUTH BREACH SECTION BY BRINGING

05:48:42  15   THEM UP THREE AND A HALF FEET AND MOVING THEM OVER TO THE WALL

05:48:45  16   HEIGHT, CORRECT?  AND IF WE DID THAT --

05:48:50  17   A.   WAIT, WAIT.

05:48:51  18           THE COURT:  WAIT, HE DIDN'T ANSWER.

05:48:52  19           THE WITNESS:  I HAVEN'T ANSWERED BECAUSE I AM NOT SURE I

05:48:54  20   AGREE WITH YOU.

05:48:55  21           MR. SCHULTZ:  OKAY.

05:48:56  22           THE WITNESS:  LET'S SEE.  YOU SEE, THIS IS ALL -- YOU'RE

05:49:06  23   TALKING ABOUT DR. MARR'S TIMES AND MY ANALYSIS AND THAT GIVES ME

05:49:11  24   SOME PAUSE BECAUSE THEY DON'T RELATE.  I MEAN, DR. MARR WAS SHOWING

05:49:19  25   A RELATIONSHIP BETWEEN TOP FLOW ELEVATION AND SCOUR DEPTH, AND IT

05:49:24  1   WENT KIND OF LIKE THIS.  SO IF I WANT TO GET, YOU KNOW, IF I WANT

05:49:34  2   TO GET AT 11.2 ELEVATION, I GUESS I WOULD COME DOWN HERE AND GET A

05:49:42  3   POINT SOMEWHERE DOWN THERE.  AND THAT'S -- BASED ON THAT ANALYSIS,

05:49:50  4   WHICH HAS, AS DR. MARR EXPLAINED, A LOT OF UNCERTAINTY.  AND IF I

05:49:56  5   SHOW YOU THAT AREA IN PHOTOGRAPH, WE CAN SEE SCOUR TRENCHES THAT

05:50:01  6   EVIDENTLY FROM OBSERVATION VARY GREATLY IN SIZE.  SO BASED ON THAT

05:50:07  7   ANALYSIS, YOU WOULD GET A SCOUR DEPTH FOR THAT AND FOR, I DON'T

05:50:11  8   KNOW, SEVEN FEET OR SO.

05:50:12  9   BY MR. SCHULTZ:

05:50:12  10  Q.  SO IF I UNDERSTAND WHAT YOU'RE SAYING, THESE AREAS THAT WERE

05:50:16  11  STANDING, THE WALLS BETWEEN 12 AND 13 FEET THAT WERE STANDING

05:50:19  12  BETWEEN SEVEN AND EIGHT AND EXPERIENCED THAT THREE AND A HALF FEET

05:50:23  13  OF SCOUR THAT HIS MODEL SHOWED, THEY ONLY WENT DOWN TO FIVE BUT THE

05:50:26  14  AREA THAT HAD ALREADY BREACHED AT 6:00 A.M. GOES ALL THE WAY DOWN

05:50:31  15  TO SEVEN OR EIGHT?

05:50:32  16  A.  I DON'T THINK, I DON'T THINK I SAID THAT.  I SAID THAT IF YOU

05:50:35  17  LOOK AT A WALL WITH THE TOP ELEVATION OF 11.2, FROM THAT

05:50:39  18  RELATIONSHIP CONCLUDE THAT YOU WOULD GET A SCOUR OF SEVEN FEET OR

05:50:43  19  SO.

05:50:44  20  Q.  IF IT HAD BEEN STANDING AT THE END OF THE STORM LIKE THESE --

05:50:47  21  A.  EXACTLY.  BUT THAT'S ALL THE RELATIONSHIP IS TRYING TO PORTRAY,

05:50:52  22  NOTHING ELSE.

05:50:52  23  Q.  BUT IT WAS NOT STANDING AND THESE SECTIONS, THE TIGHT GROUPING

05:50:55  24  OF SCOUR DEPTHS, EXPERIENCED THREE AND A HALF FEET OF SCOUR AFTER

05:50:59  25  THESE SECTIONS OF 11 TO 12 FEET HAD FAILED, RIGHT?

05:51:02 1   A.   THE SECTION BETWEEN 12 AND 13 EXPERIENCED, ACCORDING TO THAT,

05:51:11 2   YEAH, ABOUT FOUR TO FIVE FEET, YES.

05:51:13 3   Q.   AND IF WE GO BACK, IN FACT, LET'S JUST LOOK AT PX 4720-003 ONE

05:51:20 4   MORE TIME.   AND WE CAN SEE, IN FACT, WHAT DR. MARR MODELLED.   YOU

05:51:27 5   TOLD US AT WHAT DEPTH IF YOU HAVE NO SOIL AND NO WATER ON THE

05:51:31 6   PROTECTED SIDE OF THE WALL YOU GET A FACTOR SAFETY OF ONE, AND YOUR

05:51:35 7   OPINION WAS WHEN IT EXCEEDS FOUR FEET THE SCOUR TRENCH, RIGHT,

05:51:39 8   THAT'S ALL YOUR MODELLED SHOWED?   HIS MODEL IS TRYING TO TELL US

05:51:41 9   WHEN THE SCOUR TRENCH GETS TO FOUR FEET, RIGHT?

05:51:44 10   A.   WELL, NOT UNLESS YOU TAKE IT -- I MEAN, DR. MARR TESTIFIED HERE

05:51:51 11   THAT HE ALSO RAN THIS ANALYSIS ON APPROXIMATION AND HE MENTIONED

05:51:57 12   THAT THIS NUMBERS VARY GREATLY DEPENDING ON THE NUMBER OF

05:52:02 13   CONDITIONS, INCLUDING THE VEGETATION, INCLUDING THE STRENGTH; AND I

05:52:10 14   THINK IT'S A MISTAKE TO TRY TO TAKE THIS TYPE OF COMPUTATION AND

05:52:17 15   SYNCHRONIZE IT WITH YOUR CLOCK AND BELIEVE WHAT THE RESULTS GIVE.

05:52:22 16          LET ME GIVE YOU AN EXAMPLE.   EPA HAS AN EROSION MODEL

05:52:30 17   THAT IS USED THROUGHOUT THE UNITED STATES TO COMPUTE THE AMOUNT OF

05:52:35 18   EROSION FROM LANDFILL COVERS, AND THAT MODEL, THAT MODEL ASSUMES

05:52:43 19   THAT AN EROSION OCCURS UNIFORMLY ON A SLOPE AND EVERYBODY USES

05:52:49 20   THESE BUT NOBODY BELIEVES THAT EROSION OCCURS UNIFORMLY ON A SLOPE.

05:52:56 21   EVERYBODY KNOWS THAT EROSION OCCURS IN EROSION GAUNTLETS, AND THIS

05:53:04 22   EQUATION HERE IS SIMILAR.   WE SAW CLEAR EVIDENCE THAT THE SCOUR

05:53:06 23   TRENCH VARIES GREATLY FROM LOCATION TO LOCATION, EVEN ALONG THE

05:53:12 24   EBIA WALL.   SO DR. MARR WAS TRYING TO GET AN IDEA OF, AGAIN, OF THE

05:53:19 25   REASONABLENESS OF THE OBSERVATIONS COMPARED TO THE CALCULATIONS.

05:53:24  1    BUT I THINK IT'S A MISTAKE TO TREAT THIS ANALYSIS THE WAY YOU'RE

05:53:29  2    TREATING THEM IN THESE QUESTIONS.

05:53:31  3    Q.  THAT'S RIGHT, BECAUSE IF WE TREAT THIS ANALYSIS AS PERFECTLY

05:53:35  4    ACCURATE, YOU WOULD HAVE BY 9 O'CLOCK IN THE MORNING EIGHT AND A

05:53:40  5    HALF FOOT SCOUR TRENCHES OUT AT THE IHNC AND THERE WEREN'T ANY

05:53:43  6    EIGHT AND A HALF SCOUR TRENCHES OUT THERE, RIGHT?

05:53:45  7    A.  I DIDN'T SEE ANY.

05:53:46  8    Q.  RIGHT.  SO IT'S ACTUALLY OVERESTIMATING, IF ANYTHING, THE

05:53:51  9    SCOUR, CORRECT?

05:53:51  10   A.  WELL, I WOULDN'T SAY THAT FROM THAT STATEMENT.  WHAT I WILL SAY

05:53:56  11   IS WHAT I JUST MENTIONED THAT THESE ARE VERY APPROXIMATE AND THAT

05:53:59  12   WE CANNOT TAKE THIS, THESE COMPUTATIONS AND TRY TO SYNCHRONIZE THEM

05:54:04  13   WITH A CLOCK AND TRY TO PUT THEM, LOOK AT THEM IN THAT PERSPECTIVE.

05:54:09  14   I THINK THAT WOULD BE AN ERROR.

05:54:10  15   Q.  YOU KNOW THAT THIS MODEL, FOR WHATEVER IT TELLS US, DO YOU

05:54:17  16   THINK IT HAS ANY VALUE AT ALL?

05:54:18  17   A.  YES, IT HAS VALUE IN TRYING TO UNDERSTAND THE PROCESS AND IT IS

05:54:24  18   JUST LIKE WHAT I DID, IT GIVES US A SENSE THAT THE NUMBERS THAT

05:54:28  19   WE'RE USING ARE CONSISTENT WITH THE FIELD OBSERVATIONS.  BUT IF WE

05:54:34  20   START MAKING THIS ANALYSIS AND WE START BELIEVING THAT WE CAN

05:54:38  21   PREDICT THE SCOUR DEPTH TO THE MINUTE, WE'RE DREAMING.

05:54:44  22   Q.  I AM TRYING TO PREDICT IT WITHIN THREE AND A HALF HOURS,

05:54:48  23   DR. SILVA.  IT'S YOUR OPINION, AS I UNDERSTAND IT, THAT THE NORTH

05:54:50  24   BREACH NECESSARILY HAD A SCOUR TRENCH EXCEEDING FOUR FEET, BASED ON

05:54:54  25   YOUR CWALSHT MODEL, AND ACCORDING TO DR. MARR'S MODEL THERE

05:54:59  1    WOULDN'T BE A FOUR-FOOT SCOUR TRENCH AT THE NORTH BREACH, RIGHT?

05:55:03  2    A.  NO.  MY OPINION IS NOT THAT.  MY OPINION IS THAT THE NORTH

05:55:07  3    BREACH HAD A SCOUR DEPTH OF ABOUT FOUR FEET AND THAT WAS SUFFICIENT

05:55:12  4    TO CAUSE UNSATISFACTORY PERFORMANCE.  DR. MARR DID AN ANALYSIS TO

05:55:18  5    SATISFY HIMSELF THAT THE SCOUR DEPTH THAT WAS THE NORTH BREACH OR

05:55:22  6    THE SOUTH BREACH WAS CONSISTENT WITH HIS ANALYSIS AS WELL.  AND WE

05:55:26  7    WENT ABOUT IT IN TWO DIFFERENT WAYS.

05:55:29  8            BUT LET ME TELL YOU THAT IF YOU THINK YOU'RE GOING TO USE

05:55:32  9    THIS MODEL AND PREDICT THE SCOUR TRENCH WITHIN THREE AND A HALF

05:55:35  10   HOURS, YOU'RE DREAMING, TOO.

05:55:37  11           THE COURT:  COUNSEL, I REALLY HAVE THE POINT ON THIS.

05:55:39  12           MR. SCHULTZ:  I GOT IT, JUDGE.  I APPRECIATE IT.

05:55:42  13   BY MR. SCHULTZ:

05:55:43  14   Q.  LET'S TAKE A LOOK, PLEASE, AT PX 3376-0016.  WHEN YOU TALK

05:55:49  15   ABOUT VARIABILITY OUT THERE, THE SCOUR THAT'S BASED ON DIFFERING

05:55:53  16   CONDITIONS SUCH AS SOIL PROPERTIES, WATER HEIGHT, THAT SORT OF

05:55:56  17   THING, RIGHT, AMONG OTHER THINGS?

05:55:58  18   A.  AMONG OTHERS.

05:55:59  19   Q.  AND WHEN YOU MODELLED CWALSHT YOU MODELLED THE NORTH AND SOUTH

05:56:03  20   BREACH SIMULTANEOUSLY USING ONE MODEL, CORRECT?

05:56:06  21   A.  ONE MODEL.  THE MODEL WAS APPROXIMATE AND I USED IT AS SUCH.

05:56:09  22   Q.  AND IF WE LOOK AT 3376-16, THIS IS A PHOTOGRAPH -- LET'S LOOK

05:56:14  23   AT THE TOP PHOTOGRAPH, PLEASE.  THIS IS A PHOTOGRAPH OF SUREKOTE

05:56:19  24   ROAD OVERPASS, AND WILL YOU AGREE, DOCTOR, THAT WHAT WE SEE HERE IS

05:56:23  25   THE NORTH BREACH SECTION?

05:56:25  1   A.  WELL, WE SEE THE LOCATION, THE LOCATION WHERE THE NORTH BREACH

05:56:32  2   OCCURRED.

05:56:33  3   Q.  AND THAT NORTH BREACH SECTION RUNS FROM THE LEFT OF THE

05:56:36  4   PHOTOGRAPH WHERE WE SEE THE HIGH WALL AND THE LOW WALL ADJOIN, IT

05:56:40  5   RUNS DOWN TOWARD THE RIGHT HAND END OF THE PHOTOGRAPH, CORRECT,

05:56:43  6   TOWARD THAT TRUCK?

05:56:45  7   A.  THAT IS CORRECT.

05:56:45  8   Q.  AND SUREKOTE ROAD -- YOU'VE TALKED A LOT ABOUT DR. DALRYMPLE.

05:56:52  9   DR. DALRYMPLE AGREED THE SUREKOTE ROAD COULD ACT AS WAVE BREAK FOR

05:56:56 10   THE NORTH BREACH.  DID YOU ACCOUNT FOR THAT IN ANY WAY IN YOUR

05:56:58 11   MODELING IS THE DIFFERENCE BETWEEN THE NORTH AND THE SOUTH BREACH?

05:57:01 12   A.  AS I MENTIONED EARLIER, I RELIED ON DR. DALRYMPLE TO PROVIDE ME

05:57:09 13   THE INPUT, THE HYDRAULIC INPUT FOR MY CALCULATIONS.  AND

05:57:14 14   DR. DALRYMPLE GAVE ME THE STORM SURGE AND HE GAVE ME THE WAVE

05:57:19 15   HEIGHT, HOW HE GOT THOSE NUMBERS, I DIDN'T REALLY -- I DID NOT

05:57:25 16   REALLY GO INTO DETAILS ABOUT HOW HE GOT THOSE NUMBERS.

05:57:28 17   Q.  SO YOU HAD AN ACTUAL WAVE HEIGHT IN YOUR CWALSHT MODEL?

05:57:32 18   A.  NOT IN THE CWALSHT MODEL, IN THE OVER ALL CALCULATION.

05:57:34 19   Q.  WHAT WAS THE WAVE HEIGHT?

05:57:36 20   A.  LET ME CHECK.

05:57:40 21   Q.  SURE.

05:58:03 22   A.  WE HAVE WAVES TWO TO THREE FEET HIGH.

05:58:06 23   Q.  AND ARE THOSE SIGNIFICANT OR MAXIMUM WAVE HEIGHTS?

05:58:09 24   A.  THIS WOULD BE SIGNIFICANT WAVE HEIGHT.

05:58:14 25   Q.  SO FROM WHEN TO WHEN, FROM THREE UNTIL FAILURE?

05:58:18   1   A.  WELL, LET ME SAY THAT I DID NOT USE, I MEAN, I DID NOT USE THE

05:58:29   2   WAVE HEIGHT -- I DID NOT VARY THE WAVE HEIGHT NOR DID I USE THE

05:58:34   3   WAVE HEIGHT IN ANY OTHER WAY THAN TO ASCERTAIN THAT THERE WAS

05:58:38   4   OVERTOPPING.  SO IT WAS, I WAS NOT ATTEMPT, BECAUSE I DON'T THINK

05:58:43   5   WE CAN DO THIS RELIABLY, TO TRY TO MODEL WAVE HEIGHT VERSUS TIME

05:58:47   6   AND THEN COMPUTE AMOUNT OF EROSION VERSUS TIME FOR THE SCOUR

05:58:55   7   TRENCH.

05:58:56   8        ALL I DID WAS THE WAVE HEIGHT IS ESTABLISH THAT THERE WAS

05:59:00   9   WAVE OVERTOPPING.  I KNEW FROM MY PERSONAL OBSERVATIONS THAT THERE

05:59:05  10   HAD BEEN A SCOUR TRENCH THAT HAD DEVELOPED ON THE LANDSIDE.  I KNEW

05:59:11  11   WHAT THE APPROXIMATE DIMENSIONS OF THAT SCOUR TRENCH WAS, AND I

05:59:15  12   DETERMINED FROM ANALYSIS THAT SCOUR TRENCHES OF THAT, THOSE

05:59:19  13   DIMENSIONS WERE SUFFICIENT TO COMPROMISE THE STABILITY OF THE WALL.

05:59:25  14   I MEAN, THAT'S HOW I WENT ABOUT THIS.

05:59:27  15   Q.  WHAT I AM TRYING TO UNDERSTAND, DR. SILVA, IS YOUR TWO TO

05:59:31  16   THREE-FOOT WAVE HEIGHT AND THE ROLE THAT IT PLAYED IN YOUR CWALSHT

05:59:35  17   ANALYSIS.  AND IF IT PLAYED ANY ROLE, I WOULD LIKE TO KNOW FROM

05:59:37  18   WHAT POINT IN TIME UNTIL FAILURE YOU HAVE THE WAVES AT TWO TO THREE

05:59:41  19   FEET, SIGNIFICANT WAVE HEIGHT?

05:59:42  20   A.  THE CWALSHT ANALYSIS DOESN'T CONSIDER WAVES.

05:59:46  21   Q.  IN WHAT WAY DID YOU CONSIDER WAVES?  YOU JUST GAVE ME A TWO TO

05:59:50  22   THREE-FOOT SIGNIFICANT WAVE HEIGHT, HOW DID THAT ENTER YOUR

05:59:52  23   ANALYSIS?

05:59:53  24   A.  I THOUGHT I JUST TOLD YOU, I USED THAT TO ASCERTAIN THAT THERE

05:59:56  25   WAS WAVE OVERTOPPING THAT WOULD HAVE CAUSED SCOUR EROSION.

05:59:59  1    Q.  FROM 3:00 A.M. UNTIL FAILURE THERE WERE THREE FOOT SIGNIFICANT

06:00:03  2    WAVE, THAT'S WHAT SUPPORTS YOUR OPINION AND YOUR SUBSEQUENT

06:00:08  3    CONCLUSIONS ABOUT WAVE OVERTOPPING, CORRECT?

06:00:10  4    A.  THAT IS NOT CORRECT, THAT IS NOT WHAT I SAID.  WHAT I SAID, AND

06:00:14  5    IT'S STATED IN MY REPORT HERE, WHAT I SAID WAS THAT, YOU KNOW, THE

06:00:20  6    WAVE OVERTOPPING BEGINS -- LET'S SEE.  I SAY THAT THE WAVE

06:00:43  7    OVERTOPPING AND SPLASHING STARTS WHEN THE CANAL WATER SURFACE WAS

06:00:50  8    AT MINUS THREE, AND THAT WAS ROUGHLY ACCORDING TO THE HYDROGRAPH AT

06:00:54  9    3:30 OR SO.  THAT'S WHAT I SAY.

06:00:57  10   Q.  SO AS I UNDERSTAND, IS THAT CORROBORATIVE OF YOUR CONCLUSION

06:01:02  11   THAT WHILE THAT MAKE SENSES OF A FOUR-FOOT SCOUR TRENCH BECAUSE

06:01:05  12   THERE WERE TWO TO THREE FOOT SIGNIFICANT WAVE HEIGHTS FROM

06:01:08  13   3:00 A.M., DO I UNDERSTAND IT PROPERLY?

06:01:09  14   A.  YOU ARE NOT UNDERSTANDING PROPERLY.

06:01:11  15   Q.  I AM SORRY, DR. SILVA.

06:01:13  16   A.  ALL I AM SAYING IS THAT AFTER 3:00 A.M. THERE WAS WAVE

06:01:17  17   OVERTOPPING, THAT'S ALL I AM SAYING.

06:01:19  18   Q.  AND THAT'S -- IF I UNDERSTAND IT THAT'S BASED ON THERE BEING

06:01:23  19   THREE-FOOT WAVES AND THE WATER IS THREE-FOOT BELOW THE WALL,

06:01:26  20   CORRECT?

06:01:27  21   A.  WELL, THAT'S PARTLY BASED ON OBSERVATIONS FROM MR. VILLAVASO AS

06:01:38  22   HE TESTIFIED, AND IT'S -- LET ME SEE.

06:01:43  23        THE COURT:  LET ME ASK YOU THIS, DR. SILVA, AND I MAY BE

06:01:46  24   GETTING A LITTLE MUDDLED.  IT IS YOUR OPINION THAT WAVE OVERTOPPING

06:01:51  25   WAS CAUSATIVE OF THE NORTH BREACH OR WAS IT SOMETHING ELSE?

06:01:54  1          THE WITNESS:  IT IS MY OPINION THAT WAVE OVERTOPPING

06:01:57  2   CONTRIBUTED TO THE FAILURE, YES, SIR.  IT CONTRIBUTED TO THE SCOUR,

06:02:01  3   DEVELOPMENT OF THE SCOUR TRENCH, WHICH CONTRIBUTED TO THE FAILURE.

06:02:04  4          THE COURT:  ALL RIGHT.

06:02:05  5   BY MR. SCHULTZ:

06:02:06  6   Q.  AND DID YOU CONSIDER THE SUREKOTE ROAD OVERPASS IN THAT

06:02:09  7   ANALYSIS SERVING AS A WAVE BREAK?

06:02:11  8          MR. TREEBY:  OBJECTION, ASKED AND ANSWERED, YOUR HONOR.

06:02:14  9          THE COURT:  I THINK HE DID, I THINK HE DID ASK IT.

06:02:17 10   BY MR. SCHULTZ:

06:02:17 11   Q.  DO YOU KNOW HOW HIGH THE SUREKOTE ROAD OVERPASS IS?

06:02:23 12   A.  I DO NOT AS WE SIT HERE.  BUT I HAVE THE INFORMATION.

06:02:27 13   Q.  DO YOU RECALL MR. TREEBY'S CROSS-EXAMINATION OF DR. BEA ON BORE

06:02:31 14   HOLE 81-A AND DISCUSSING THAT IF BORE HOLE 81-A WAS ADJACENT TO THE

06:02:35 15   ROAD IT WOULD HAVE BEEN AT APPROXIMATELY 11 FEET?

06:02:37 16   A.  I REMEMBER THAT, YES.

06:02:39 17   Q.  AND IF SUREKOTE ROAD WAS AT 11 FEET AT THE OVERPASS IT WOULD

06:02:43 18   HAVE SERVED AN AS WAVE BREAK UP UNTIL 11 FEET OF WATER IN THE

06:02:46 19   CANAL, CORRECT?

06:02:47 20   A.  I DON'T KNOW THAT.  LIKE I SAID, I RELIED ON DR. DALRYMPLE AND

06:02:52 21   HE GAVE ME THE WAVE HEIGHTS TO USE FOR MY ANALYSIS.  AND I DIDN'T

06:02:55 22   ASK HIM WHERE THE WAVES WERE COMING FROM OR HOW THEY DEVELOPED OR,

06:03:01 23   I MEAN, I JUST USED THE INPUT FROM THE HYDROLOGIST AS THE FORCES

06:03:09 24   THAT WE USE FOR THE STARTING POINT FOR OUR ANALYSIS.

06:03:13 25   Q.  AT THE END OF THE DAY YOU KNOW DR. MARR IS OF THE OPINION THAT

06:03:17  1   OVERTOPPING INDUCED SCOUR TRENCH WAS NOT A CAUSE OF THE BREACH,

06:03:20  2   CORRECT, YOU AND HE DISAGREE ON THAT POINT?

06:03:24  3   A.  I BELIEVE DR. MARR'S ANALYSIS -- LET ME TRY TO RECALL WHAT HE

06:03:34  4   SAID.

06:03:35  5   Q.  WHY DON'T WE PULL UP TRIAL TRANSCRIPT 2124.

06:03:42  6           THE COURT:  COUNSEL, I KNOW, BUT AND I AM NOT PUSHING

06:03:47  7   YOU, I JUST NEED TO KNOW THE ESTIMATE SO THAT I MIGHT MAKE A

06:03:50  8   DECISION THAT WE START TOMORROW.  I JUST WANT TO KNOW, HOW MUCH?

06:03:56  9           MR. SCHULTZ:  FIVE, TEN MINUTES.

06:03:57 10           THE COURT:  ALL RIGHT.  I'LL TRUST YOU.

06:03:57 11   BY MR. SCHULTZ:

06:04:01 12   Q.  IN YOUR CASE, THOUGH, DR. MARR WE'VE ESTABLISHED OVERTURNING

06:04:05 13   SCOUR, OVERTOPPING SCOUR DID NOT INITIATE THE FAILURE OF THE NORTH

06:04:08 14   BREACH, RIGHT?  A. YES, SIR.  AND YOU BELIEVE THAT OVER TOPPING

06:04:12 15   SCOUR DID, CORRECT?

06:04:14 16   A.  WELL, I MUST SAY THAT IN MY SHADE OF THE FAILURE, THAT IT WAS A

06:04:20 17   CONTRIBUTED TO THE FAILURE.

06:04:22 18   Q.  NO FOUR-FOOT SCOUR TRENCH AT THE NORTH BREACH, NO FAILURE,

06:04:26 19   CORRECT?

06:04:26 20   A.  THAT IS CORRECT.  NO FAILURE AT THAT TIME.

06:04:32 21   Q.  WELL, IT FAILED WHEN IT FAILED, SO IF THERE'S NOT A FOUR-FOOT

06:04:37 22   SCOUR TRENCH THERE THEN YOU HAVE A PROBLEM WITH YOUR CAUSATION

06:04:40 23   THEORY; IS THAT FAIR TO SAY?

06:04:41 24   A.  IF THERE'S NO SCOUR TRENCH, THEN THAT'S RIGHT, I CONSIDER THE

06:04:47 25   SCOUR TRENCH.  I WOULD POINT OUT THAT WE SAW THE SCOUR TRENCH RIGHT

06:04:51  1    NEXT TO THE FAILURE.  OF COURSE THE EVIDENCE RIGHT AT THE FAILURE

06:04:55  2    LOCATION WAS GONE?

06:04:57  3    Q.  RIGHT.  AND THE SECTION NEXT TO THE SECTION THAT FAILED

06:05:01  4    EXPERIENCED THREE AND A HALF HOURS OF OVERTOPPING THAT THE FAILED

06:05:04  5    SECTION DIDN'T EXPERIENCE?

06:05:06  6    A.  IT DID NOT.

06:05:07  7    Q.  WE JUST CUSSED THAT?

06:05:08  8    A.  NO, NO, DID NOT.  THAT'S NOT CORRECT.  I MENTIONED IN MY

06:05:13  9    PRESENTATION THAT, AGAIN, AND I RELIED ON DR. DALRYMPLE FOR THIS

06:05:19 10    INPUT FOR MY ANALYSIS, HE INDICATED AT THAT TIME THAT FOR A LENGTH

06:05:26 11    OF WALL THAT HE ESTIMATED FOR ME USING -- THIS WAS NOT AN OFF THE

06:05:32 12    CUFF, I WORKED WITH HIM ON THIS FOR ABOUT THREE WEEKS, HE ESTIMATED

06:05:36 13    FOR ME THAT FOR A LENGTH OF 100 TO 150 FEET, ONCE THE BREACH OCCURS

06:05:43 14    THE HEIGHT OF WATER WOULD HAVE DECREASED IN SUCH A WAY THAT IT

06:05:46 15    WOULD BE BELOW THE TOP OF THE WALL.

06:05:49 16         SO FROM THAT, STARTING FROM THAT POINT WHICH HE TELLS ME

06:05:52 17    THAT'S THE WAY IT IS, AND I RELIED ON THAT, STARTING FROM THAT

06:05:58 18    POINT I CONCLUDE THAT THE SCOUR TRENCHES THAT ARE, YOU KNOW, ABOUT

06:06:04 19    100 FEET FROM THE BREACH, THEY DON'T EXPERIENCE ANY FURTHER EROSION

06:06:08 20    AFTER THE FAILURE.  OR AT LEAST NOT SIGNIFICANT.

06:06:12 21    Q.  IS IT FAIR TO SAY THIS, DR. SILVA, IF YOU ONLY HAVE A TWO-FOOT

06:06:16 22    SCOUR TRENCH, ASSUME FOR ME AT THE TIME OF FAILURE THERE WAS A

06:06:20 23    TWO-FOOT SCOUR TRENCH OR ONE FOOT SCOUR TRENCH AT THE NORTH BREACH,

06:06:23 24    THE PRESSURE FROM THE SOILS AND THE WATER ON THE CANAL SIDE PUSHING

06:06:27 25    AGAINST THAT WALL IS NOT ENOUGH TO FAIL THE WALL, ACCORDING TO YOUR

06:06:30  1   MODEL THAT SCOUR TRENCH HAS TO EXCEED FOUR FEET, CORRECT?

06:06:38  2   A.  OUR ANALYSIS INDICATED THAT AFTER FOUR FEET THE WALL BECAME

06:06:52  3   UNSTABLE.  IF YOU HAVE LESS THAN FOUR FEET IT WOULD BE MORE STABLE.

06:07:01  4   AND I GUESS WHAT YOU'RE ASKING IS WHETHER IT'S GOING TO FAIL OR

06:07:04  5   NOT, AND I CANNOT GAVE YOU A BLANKET ANSWER RIGHT AWAY, BUT I COULD

06:07:07  6   LOOK AT CERTAIN THINGS AND DEVELOP AN OPINION ABOUT THAT.

06:07:12  7   Q.  AT TWO FEET OF SCOUR, ACCORDING TO YOUR MODEL, THERE'S A FACTOR

06:07:16  8   OF SAFETY OF ABOUT 1.6 AND IT'S YOUR OPINION THAT WALL WOULD NOT

06:07:19  9   FAIL AT A FACTOR OF SAFETY AT 1.6 CORRECT, FROM OVER TURNING DUE TO

06:07:26 10   REDUCED LATERAL INSTABILITY?

06:07:27 11   A.  IF THERE WAS NO, THE SCOUR TRENCH WAS TWO FEET DEEP YOU WOULD

06:07:34 12   BE A LOT MORE STABLE, THAT IS CORRECT?

06:07:37 13           MR. SCHULTZ:  THANK YOU, DR. SILVA.

06:07:43 14           THE COURT:  THAT'S IT, SIR?

06:07:44 15           MR. SCHULTZ:  YES, SIR.

06:07:45 16           THE COURT:  THANK YOU.  MR. TREEBY.  WE MIGHT AS WELL.

06:07:49 17           MR. TREEBY:  YOUR HONOR PLEASE, WE HAVE NO REDIRECT.

06:07:51 18           THE COURT:  YOU DO NOT.  THANK YOU.  UNITED STATES?

06:07:57 19           MR. SMITH:  NONE, YOUR HONOR.

06:07:58 20           THE COURT:  YOU ARE, SIR, FREE TO GO HAVE A GREAT DINNER.

06:08:01 21           THE WITNESS:  THANK YOU VERY MUCH AND THANK YOU FOR

06:08:02 22   LISTENING.

06:08:03 23           THE COURT:  UNLIKE YOUR LEGAL CONFERS OVER HERE.

06:08:09 24           MR. TREEBY:  YOUR HONOR, I'M ALWAYS OVERLOOKING

06:08:12 25   HOUSEKEEPING.

06:08:13  1                THE COURT:  WELL, I DO THAT, TOO.

06:08:27  2                MR. TREEBY:  I WOULD LIKE TO MOVE INTO EVIDENCE THE SHEET

06:08:30  3   THAT SHEENA IS HOLDING THERE.

06:08:32  4                THE COURT:  YES, SIR.

06:08:33  5                MR. TREEBY:  AS DX 02722.

06:08:38  6                THE COURT:  LET IT BE ADMITTED.  I ASSUME THERE'S NO

06:08:40  7   OBJECTION?

06:08:40  8                MR. SCHULTZ:  NO OBJECTION, YOUR HONOR.

06:08:46  9                MR. TREEBY:  AND I WOULD LIKE TO MOVE INTO EVIDENCE THE

06:08:48 10   POWERPOINT PRESENTATION THAT DR. SILVA PRESENTED.  LET ME LET

06:09:00 11   SOMEBODY THAT KNOWS WHAT THEY'RE DOING DO IT.  MR. FARRELL IS GOING

06:09:05 12   TO TAKE OVER.

06:09:05 13                MR. FARRELL:  YOUR HONOR, IF I MAY, TO PICK UP WHERE

06:09:07 14   MR. TREEBY LEFT OFF, WE WOULD LIKE TO MOVE INTO EVIDENCE

06:09:11 15   DR. SILVA'S POWERPOINT PRESENTATION.  I DON'T HAVE THE NUMBER OF IT

06:09:14 16   IN FRONT OF ME.  IT'S DX DM-0015, PAGE 1 THROUGH 134.

06:09:25 17                MR. SCHULTZ:  JUDGE I DON'T KNOW WHAT THE PRACTICE HAS

06:09:27 18   BEEN.  I WOULD OBJECT TO THAT IN ANY OTHER TRIAL BECAUSE MOST OF IT

06:09:31 19   IS DEMONSTRATIVES AND HEARSAY.  BUT IF THE PRACTICE HAS BEEN TO

06:09:35 20   ADMIT THESE, I AM NOT GOING TO GET IN THE WAY OF THAT.

06:09:38 21                THE COURT:  WE HAVEN'T ESTABLISHED.  I AM TRYING TO

06:09:41 22   REMEMBER.  I DON'T REMEMBER IF WE'VE MOVED IN EVERY ONE.  IF WE

06:09:46 23   HAVE --

06:09:46 24                MR. SCHULTZ:  FIRST, I KNOW DR. BEA'S, FOR EXAMPLE,

06:09:49 25   WASN'T ADMITTED; WE DIDN'T SEEK TO ADMIT IT BECAUSE WE DIDN'T THINK

06:09:53  1    IT WAS ADMISSIBLE.  I KNOW WITH DR. MARR WE HAD SOME SLIDES WHERE

06:09:56  2    HE SAID DR. BEA IS CRAZY AND WE DIDN'T THINK THAT SHOULD BE

06:09:58  3    SUBSTANTIVE EVIDENCE.  I THINK WE WOULD HAVE THE SAME CONCERNS

06:10:00  4    HERE.

06:10:00  5         MR. TREEBY:  I KNOW DALRYMPLE --

06:10:06  6         UNIDENTIFIED SPEAKER:  I DON'T KNOW IF SYKORA WAS IN,

06:10:07  7    MAYBE I AM PICKING UP LUCIA, BUT PHIL GREGORY HAD A VERY SPECIFIC

06:10:11  8    OBJECTION TO THAT.  DR. DUNBAR'S DEMONSTRATIVES ARE NOT ADMITTED

06:10:14  9    IN, SO THERE'S NO BLANKET PRACTICE TO ADMITTING THOSE IN.

06:10:17 10         MR. SCHULTZ:  LET ME SAY THIS, JUDGE.  WE OBJECT FOR THE

06:10:19 11    MOMENT, LET US TALK ABOUT IT, I AM SURE WE CAN AGREE ON SOME AND

06:10:23 12    THE ONES WE CAN'T WE'LL FIGURE IT OUT.

06:10:25 13         THE COURT:  I THINK WE WILL HAVE TO DO IT THAT WAY.  I

06:10:28 14    HAVE TO GIVE THEM A CHANCE TO OBJECT.

06:10:29 15         MR. FARRELL:  SUBJECT TO THEIR OBJECTION.

06:10:31 16         MR. SCHULTZ:  ONE OTHER POINT, IF IT'S NOT AN ISSUE, WE

06:10:34 17    WOULD LIKE TO KEEP THE SOIL SAMPLES IN CASE DR. BEA WANTS TO OPINE

06:10:39 18    ON THEM IN REBUTTAL TOMORROW.

06:10:41 19         THE COURT:  DOES ANYBODY HAVE AN OBJECTION TO THAT?

06:10:41 20         MR. TREEBY:  TO WHAT?

06:10:42 21         THE COURT:  TO KEEP THE OIL SAMPLES.

06:10:44 22         MR. TREEBY:  KEEP THEM THERE?

06:10:45 23         THE COURT:  THOSE ARE YOURS, ARE THEY NOR, OR WHOSE ARE

06:10:47 24    THEY?

06:10:48 25         THE WITNESS:  THOSE BELONG TO THEM.

06:10:49  1            THE COURT:  WE WOULD HAVE TO GET THE PERMISSION OF THE --

06:10:55  2            MR. TREEBY:  YEAH, I HAVE NO PROBLEM LEAVING THEM THERE.

06:10:57  3            THE COURT:  ALL RIGHT.  THANK YOU, THANK YOU VERY MUCH.

06:10:59  4  DR. SILVA, I THINK THAT IS IT, YOU CAN STAND DOWN.

06:11:03  5            MR. FARRELL:  DR. SILVA IS FINISHED.

06:11:05  6            THE COURT:  THAT'S WHAT I WAS TRYING TO SAY.

06:11:07  7            THE WITNESS:  SO I CAN GO?

06:11:08  8            THE COURT:  YES.

06:11:10  9            MR. FARRELL:  MOVING ALONG THEN, YOUR HONOR, I BELIEVE IT

06:11:13 10  HAS BEEN THAT THE PARTIES' PRACTICE, I KNOW IT HAPPENED WITH

06:11:16 11  DR. BEA, DR. MARR, DR. DALRYMPLE TO MOVE THE EXPERT REPORTS INTO

06:11:20 12  EVIDENCE AND THE APPENDICES, I HAVE A LIST OF THOSE NUMBERS HERE, I

06:11:25 13  CAN READ OFF.

06:11:25 14            THE COURT:  ANY OBJECTION?

06:11:27 15            MR. SCHULTZ:  IF THAT'S WHAT WE'VE BEEN DOING, JUDGE, NO

06:11:29 16  OBJECTION.

06:11:29 17            THE COURT:  WE'VE HAD NO OBJECTION WHEN IT'S BEEN DONE.

06:11:33 18  IT'S SOMETHING WE DID IN PREVIOUS CASES.

06:11:36 19            MR. SCHULTZ:  WE ASKED TO DO IT PRETRIAL.

06:11:39 20            THE COURT:  I KNOW, I KNOW.

06:11:41 21            MR. FARRELL:  I KNOW DR. BEA IS IN.

06:11:43 22            MR. TREEBY:  WE OBJECTED, YOUR HONOR, BUT THEY'VE BEEN

06:11:45 23  ROLLING IN.

06:11:46 24            MR. FARRELL:  DESPITE OUR EFFORTS, YES.  I WILL JUST READ

06:11:46 25  DOWN MY LIST.

06:11:49  1        JX 1672 IS DR. SILVA'S EXPERT REPORT; JX 1673 IS APPENDIX

06:11:58  2   A; JX 1674 IS APPENDIX B; JX 1675 IS APPENDIX C; JX 1676 IS

06:12:08  3   APPENDIX D, AND IT WILL GET TRICKY JX 1677 IS APPENDIX D ANNEX D-1;

06:12:19  4   JX 1678 IS APPENDIX D ANNEX D-2; AND THEN JX 1679 IS APPENDIX D

06:12:28  5   ANNEX D-3; THEN JX 1680 IS APPENDIX E; AND DX 02648 IS DR. SILVA'S

06:12:42  6   SUPPLEMENTAL REPORT.

06:12:46  7        THEN THE LAST HOUSEKEEPING ISSUE, WE ARE MOVING THE

06:12:49  8   ADMISSION OF THE CATEGORY 2 EXHIBITS THAT ARE REFERENCED IN

06:12:56  9   DR. SILVA'S EXPERT REPORT.  THERE ARE MANY OF THE PHOTOGRAPHS IN

06:13:00 10   HERE AND PROJECT DOCUMENTS ARE ALREADY IN EVIDENCE AS NO OBJECTION

06:13:03 11   OR CATEGORY 1, BUT THIS IS JUST TO CLOSE THE LOOP ON THE REMAINING

06:13:07 12   DOCUMENTS.  WE WILL TALK ABOUT IT, WE CAN DO THESE IN THE MORNING.

06:13:13 13        THE COURT:  ALL RIGHT.  NOW THE EXPERT REPORT?

06:13:17 14        MR. SCHULTZ:  NO OBJECTION, YOUR HONOR.

06:13:18 15        THE COURT:  LET THE EXPERT REPORT AND AS ITERATED BY

06:13:22 16   COUNSEL IN ITS VARIOUS EXHIBIT NUMBERS BE ADMITTED.  EXPERT

06:13:28 17   REPORTS.

06:13:29 18        MR. SCHULTZ:  AND IF I UNDERSTAND, JUDGE, WHAT I USED WE

06:13:32 19   WILL DEAL WITH IN PUTTING TOGETHER A GLOBAL LIST OF ADMITTING

06:13:35 20   EXHIBITS?

06:13:36 21        THE COURT:  THAT IS CORRECT.

06:13:37 22        MS. WAGER-ZITO:  ONE LAST THING WE HAVE IS THE VIDEO WE

06:13:39 23   TOOK OF THE DEMONSTRATION.  WE CAN PUT A NUMBER ON THAT IF YOU

06:13:44 24   WOULD LIKE.  WE HAVE COPIES FOR EVERYBODY.

06:13:47 25        THE COURT:  YOU MAY.

06:13:48  1            MS. WAGER-ZITO:  SHOULD WE JUST GO TO THE NEXT NUMBER FOR

06:13:51  2    THAT ONE?

06:13:52  3            THE COURT:  I THINK SO.

06:13:53  4            MS. WAGER-ZITO:  WHICH WOULD BE DX 2723.

06:13:56  5            THE COURT:  ANY OBJECTION?

06:13:57  6            MR. SCHULTZ:  NO, YOUR HONOR.

06:13:58  7            THE COURT:  LET IT BE ADMITTED.

06:14:00  8            MS. WAGER-ZITO:  I WILL JUST WRITE THE NUMBER ON THIS AND

06:14:03  9    THEN GIVE IT TO EVERYBODY.

06:14:05  10           THE COURT:  THANK YOU, VERY MUCH.  YES, SIR.

06:14:06  11           MR. STEVENS:  I HAVE ONE LITTLE BIT --

06:14:08  12           MR. FARRELL:  I'M SORRY, I DON'T MEAN TO HOG THE PODIUM.

06:14:11  13   ONE OTHER HOUSEKEEPING ISSUE, AGAIN, THIS HAS FALLEN TO ME AND I

06:14:14  14   SHOULD HAVE GONE THIS A COUPLE OF DAYS AGO.

06:14:16  15           THE PLAINTIFFS HAVE READ THE EXHIBIT NUMBERS OF THEIR

06:14:18  16   DEPOSITION DESIGNATIONS INTO THE RECORD, AND I UNDERSTAND FROM

06:14:21  17   TALKING TO SHEENA THAT THE DEFENDANTS NEED TO DO THE SAME, I HAVE A

06:14:24  18   LIST OF ALL OF THOSE AS WELL.

06:14:26  19           MS. WAGER-ZITO:  IF PEOPLE AREN'T FEELING WELL, WE CAN DO

06:14:28  20   THAT IN THE MORNING.

06:14:29  21           MR. FARRELL:  WE CAN DO THAT MORNING AS WELL.  THERE'S A

06:14:32  22   DOZEN OF THEM.

06:14:32  23           THE COURT:  HOW LONG WILL THAT TAKE?

06:14:34  24           MR. FARRELL:  I'LL READ IT QUICKLY AS I CAN.

06:14:44  25           THE COURT:  BECAUSE WE REALLY ARE --

06:14:54  1                 THE LAW CLERK:  DO WE HAVE TO READ IT?

06:14:56  2                 MR. FARRELL:  THE ONLY REASON I BRING IT UP --

06:14:58  3                 THE COURT:  SHEENA, WHY CAN'T WE JUST HAVE THAT

06:15:00  4    INTRODUCED?

06:15:01  5                 MR. FARRELL:  WE CAN DO THAT.  MR. JOANEN HAD READ DOWN

06:15:04  6    THE LIST ON THE SECOND DAY OF TRIAL, WE JUST WEREN'T SURE IF WE HAD

06:15:07  7    TO.

06:15:07  8                 THE COURT:  IF THERE'S NO OBJECTION TO THOSE EXHIBITS,

06:15:09  9    LET THEM BE ADMITTED AND AS ITEMIZED ON THE LIST.  LET'S DO IT THAT

06:15:14 10    WAY.

06:15:14 11                 MR. FARRELL:  MAKE SENSE TO ME, YOUR HONOR.

06:15:17 12                 THE COURT:  THANK YOU.  LET THEM BE ADMITTED.

06:15:19 13                 MR. FARRELL:  AND I THINK NOW I AM FINISHED.

06:15:21 14                 MR. STEVENS:  YOUR HONOR, I WANT TO OFFER INTO EVIDENCE

06:15:22 15    TWO ADDITIONAL PLAINTIFF EXHIBITS, THEY WERE THE SUMMARIES THAT YOU

06:15:27 16    RULED YESTERDAY ARE NOW B AND C, ARE PX 4748, 4748.1, 4749, AND

06:15:37 17    4749.1.

06:15:41 18                 THE COURT:  SUBJECT TO THE OBJECTIONS OF COUNSEL, WHICH

06:15:45 19    ARE PRESERVED FOR THE RECORD, LET THEM BE ADMITTED.

06:15:49 20                 MR. STEVENS:  AND WE PREVIOUSLY ADMITTED AN INDEX OF ALL

06:15:52 21    OF THOSE SUMMARIES.  THANK YOU VERY MUCH.

06:15:54 22                 THE COURT:  ALL RIGHT.  AND I WANT TO THANK ALL OF YOU

06:15:56 23    FOR CONDUCTING THIS TRIAL AS WELL AS POSSIBLY CAN BE CONDUCTED.

06:16:00 24    IT'S DIFFICULT AND TEDIOUS, SO I THINK YOU'RE DOING A GREAT JOB.

06:16:05 25    UNFORTUNATELY YOU DON'T HAVE TO DECIDE IT.

06:16:16  1          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

2

3                        *  *  *  *  *  *

4

5                        REPORTER'S CERTIFICATE

6

7          I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED

8    STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY

9    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE

10   BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE

11   PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER.

12

13

14   _____

15          KAREN A. IBOS, CCR, RPR, CRR, RMR

16          OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25