1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3
      * * * * * * * * * * * * * * * * * * * * * * * * * * * *
4

5   IN RE:  KATRINA CANAL BREACHES     DOCKET 05-CV-4182
    CONSOLIDATED LITIGATION
6                                      SECTION K

7   PERTAINS TO:  MRGO                 NEW ORLEANS, LOUISIANA
         *ARMSTRONG NO. 10-CV-866*
8                                      OCTOBER 3, 2012

9      * * * * * * * * * * * * * * * * * * * * * * * * * * * *

10
                   DAY 16, AFTERNOON SESSION
11              TRANSCRIPT OF TRIAL PROCEEDINGS
           BEFORE THE HONORABLE STANWOOD R. DUVAL JR.
12              UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15  FOR THE PLAINTIFFS:          BRUNO & BRUNO
                                 BY:  JOSEPH M. BRUNO, ESQ.
16                               855 BARONNE STREET
                                 NEW ORLEANS, LOUISIANA 70113
17
    FOR THE PLAINTIFFS:          THE ANDRY LAW FIRM
18                               BY:   JONATHAN B. ANDRY, ESQ.
                                 610 BARONNE STREET
19                               NEW ORLEANS, LOUISIANA 70113

20  FOR THE PLAINTIFFS:          BARON & BUDD, PC
                                 BY:  THOMAS SIMS, ESQ.
21                               3102 OAK LAWN AVENUE, SUITE 1100
                                 DALLAS, TEXAS 75219
22
    FOR THE PLAINTIFFS:          DEGRAVELLES PALMINTIER
23                                 HOLTHAUS & FRUGÉ
                                 BY:  MICHAEL C. PALMINTIER, ESQ.
24                                    JOSHUA M. PALMINTIER, ESQ.
                                 618 MAIN STREET
25                               BATON ROUGE, LOUISIANA 70801

                      *DAILY TRANSCRIPT*

```
1   APPEARANCES:

2
    FOR THE PLAINTIFFS:        DOMENGEAUX WRIGHT ROY
3                                & EDWARDS, LLC
                               BY:  ELWOOD C. STEVENS JR., ESQ.
4                                   BONNIE KENDRICK, ESQ.
                               556 JEFFERSON STREET, SUITE 500
5                              POST OFFICE BOX 3668
                               LAFAYETTE, LOUISIANA 70502
6
    FOR THE PLAINTIFFS:        THE DUDENHEFER LAW FIRM
7                              BY:  FRANK C. DUDENHEFER JR., ESQ.
                               601 POYDRAS STREET, SUITE 2655
8                              NEW ORLEANS, LOUISIANA 70130

9   FOR THE PLAINTIFFS:        FAYARD & HONEYCUTT, APC
                               BY:  CALVIN C. FAYARD JR., ESQ.
10                             519 FLORIDA AVENUE, S.W.
                               DENHAM SPRINGS, LOUISIANA 70726
11
    FOR THE PLAINTIFFS:        JOANEN LAW FIRM
12                             BY:  SCOTT JOANEN, ESQ.
                               4905 FRERET STREET, SUITE B
13                             NEW ORLEANS, LOUISIANA 70115

14  FOR THE PLAINTIFFS:        LEVIN PAPANTONIO THOMAS
                                 MITCHELL RAFFERTY & PROCTOR
15                             BY:  MATTHEW D. SCHULTZ, ESQ.
                               316 SOUTH BAYLEN STREET, SUITE 600
16                             PENSACOLA, FLORIDA 32502

17  FOR THE PLAINTIFFS:        THE TRIAL LAW FIRM, PC
                               BY:  ANDREW P. OWEN, ESQ.
18                             800 WILTSHIRE BLVD., SUITE 500
                               LOS ANGELES, CALIFORNIA 90017
19
    FOR THE PLAINTIFFS:        J. ROBERT WARREN II, APLC
20                             BY:  J. ROBERT WARREN II, ESQ.
                               1718 SHORT STREET
21                             NEW ORLEANS, LOUISIANA 70118

22  FOR THE PLAINTIFFS:        COTCHETT PITRE & MCCARTHY, LLP
                               BY:  PHILIP L. GREGORY, ESQ.
23                             840 MALCOLM ROAD, SUITE 200
                               BURLINGAME, CALIFORNIA 94010
24

25
```

```
 1   APPEARANCES:

 2
     FOR THE DEFENDANT,              STONE PIGMAN WALTHER WITTMANN, LLC
 3   WASHINGTON GROUP               BY:  WILLIAM D. TREEBY, ESQ.
     INTERNATIONAL, INC.:                JAMES C. GULOTTA JR., ESQ.
 4                                       HEATHER S. LONIAN, ESQ.
                                         MAGGIE A. BROUSSARD, ESQ.
 5                                   546 CARONDELET STREET
                                     NEW ORLEANS, LOUISIANA 70130
 6
     FOR THE DEFENDANT,              JONES DAY (WASHINGTON)
 7   WASHINGTON GROUP               BY:  ADRIAN WAGER-ZITO, ESQ.
     INTERNATIONAL, INC.:                DEBRA S. CLAYMAN, ESQ.
 8                                       CHRISTOPHER N. THATCH, ESQ.
                                         CHRISTOPHER R. FARRELL, ESQ.
 9                                       JULIA CRONIN, ESQ.
                                         BRIAN KERWIN, ESQ.
10                                   51 LOUISIANA AVENUE, N.W.
                                     WASHINGTON, D.C. 20001
11
     FOR THE DEFENDANT,              U.S. DEPARTMENT OF JUSTICE
12   UNITED STATES OF AMERICA:       CIVIL RIGHTS DIVISION-TORTS BRANCH
                                     BY:  ROBIN D. SMITH, ESQ.
13                                        JAMES F. MCCONNON JR., ESQ.
                                          RUPERT MITSCH, ESQ.
14                                        CONOR KELLS, ESQ.
                                          JOHN A. WOODCOCK, ESQ.
15                                   BENJAMIN FRANKLIN STATION
                                     POST OFFICE BOX 888
16                                   WASHINGTON, DC 20044

17   OFFICIAL COURT REPORTER:        TONI DOYLE TUSA, CCR, FCRR
                                     500 POYDRAS STREET, ROOM HB-406
18                                   NEW ORLEANS, LOUISIANA 70130
                                     (504) 589-7778
19                                   TONI_TUSA@LAED.USCOURTS.GOV

20

21
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
22   COMPUTER-AIDED TRANSCRIPTION SOFTWARE.

23

24

25
```

*DAILY TRANSCRIPT*

1                          <u>I N D E X</u>

2                                                  <u>PAGE</u>

3    Robert G. Bea, Ph.D.

4         Direct Examination By Mr. Bruno              4019

5         Cross-Examination By Mr. Treeby             4049

6         Cross-Examination By Mr. Smith              4094

7         Redirect Examination By Mr. Bruno           4147

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      AFTERNOON SESSION

2                      (OCTOBER 3, 2012)

3          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT.)

4          THE COURT:  YES, SIR.

5          MR. BRUNO:  THANK YOU, JUDGE.  WE'RE ALMOST DONE, I

6  TRULY BELIEVE.

7                  DR. ROBERT G. BEA, PH.D.,

8  HAVING BEEN PREVIOUSLY DULY SWORN, TESTIFIED AS FOLLOWS:

9                    DIRECT EXAMINATION

10  BY MR. BRUNO:

11  Q.   DR. BEA, I THINK IT WOULD BE HELPFUL AT THIS POINT SINCE

12  WE'RE GOING TO TALK ABOUT SLIDE 81 OF DR. SILVA-TULLA'S SLIDE

13  SHOW.

14          OKAY.  HERE DR. SILVA-TULLA SAYS THAT YOUR FAILURE

15  ANALYSES DON'T REFLECT ACTUAL FIELD CONDITIONS DURING THE

16  KATRINA STORM SURGE.  NOW, I THINK IT WOULD BE HELPFUL IF WE

17  COULD REVISIT FOR THE COURT THE THREE PRESSURES AND THE

18  PRESSURE THAT YOU BELIEVE EXPLAINS THE FAILURE ONE MORE TIME SO

19  THAT WE CAN SHOW WHETHER OR NOT THESE CRITIQUES RELATE TO YOUR

20  EXPLANATION.

21          WE ESTABLISHED THAT THERE ARE THREE TOTAL STRESS,

22  WHICH IS THE STRESS FROM ABOVE MOVING DOWN, RIGHT?

23  A.   CORRECT.

24  Q.   AND THERE'S NO -- NOT NECESSARILY FLOW, AND YOU'RE NOT

25  SUGGESTING THAT THAT'S CAUSATIVE OF THE BREACH, RIGHT?
```

ROBERT G. BEA - DIRECT

13:12  1   **A.**   THAT'S CORRECT.

13:12  2   **Q.**   THEN YOU HAVE THIS PORE PRESSURE FROM FLOW, WHICH IS THAT

13:12  3   MOVEMENT UNDERNEATH.  AND THAT'S A LOW FLOW, AND YOU'RE NOT

13:12  4   SUGGESTING THAT'S CAUSATIVE OF THE BREACH, RIGHT?

13:12  5   **A.**   THAT'S CORRECT.

13:12  6   **Q.**   AND THE THIRD IS UPLIFT PRESSURE, WHICH WE TALKED A LOT

13:12  7   ABOUT.  NO FLOW IS REQUIRED, THERE MAY BE SOME FLOW, BUT IT IS

13:12  8   CAUSATIVE OF THE BREACH.  RIGHT?

13:12  9   **A.**   THAT'S CORRECT.  THE NO. 2 IS DETAILED IN MY EXPERT

13:12  10  REPORT, APPENDIX D.

13:12  11       AND NO. 3, THE UPLIFT PRESSURE EFFECTS, ARE ADDRESSED

13:13  12  IN APPENDIX C.  AND IN ADDITION, THE TOTAL STRESS EFFECTS ARE

13:13  13  ADDRESSED IN APPENDIX C.

13:13  14  **Q.**   OBVIOUSLY, AS A GOOD FORENSIC ENGINEER WOULD DO, YOU

13:13  15  CONSIDERED ALL THREE AS PART OF YOUR ANALYSIS?

13:13  16  **A.**   THAT'S CORRECT.

13:13  17  **Q.**   AND YOU ELIMINATED TWO?

13:13  18  **A.**   THAT'S CORRECT.

13:13  19  **Q.**   TWO OF THE THREE, NOT NO. 2.

13:13  20  **A.**   RIGHT.

13:13  21  **Q.**   LET'S GO TO SLIDE 82.  HERE DR. SILVA-TULLA SAYS:  "FLOW

13:13  22  OR PORE PRESSURES DID NOT TRAVEL VERY FAR DURING THE 30 HOURS

13:13  23  OF FAILURE."

13:13  24       IS HE ADDRESSING THE SAME PRESSURE THAT YOU ARE

13:13  25  SUGGESTING IS CAUSATIVE OF THE BREACH?

ROBERT G. BEA - DIRECT

13:13   1   **A.**   NO.

13:13   2   **Q.**   IS THERE ANYTHING ELSE YOU WANT TO ADD TO THIS SLIDE?

13:13   3   **A.**   NO.

13:13   4   **Q.**   WELL, LET'S SKIP TO 84.  HERE HE SAYS -- AND IT GOES ON

13:13   5   FOR SEVERAL SLIDES.  AT 84, HE IS TALKING ABOUT YOUR CASE 1 AND

13:14   6   YOUR CASE 2-1 EXCAVATIONS.  SO WE CAN ADDRESS ALL THESE SLIDES

13:14   7   AT THE SAME TIME.

13:14   8        IT SAYS:  "THE EXCAVATION USED BY DR. BEA FOR HIS

13:14   9   PORE PRESSURE TRANSMISSION MODEL SIMPLY NEVER EXISTED."

13:14   10       WOULD YOU CARE TO COMMENT ON THAT, DR. BEA?

13:14   11  **A.**   WELL, IN POLITE LANGUAGE, THAT IS NOT TRUE.

13:14   12  **Q.**   WHY IS IT NOT TRUE?  HELP US UNDERSTAND WHY THAT'S NOT

13:14   13  ACCURATE.

13:14   14  **A.**   WELL, WE HAVE GOOD INFORMATION TO SUBSTANTIATE THE

13:14   15  EXISTENCE OF EXCAVATIONS BACKFILLING THAT ARE APPROXIMATED WITH

13:14   16  THE TWO YELLOW SQUARES SHOWN IN THIS ILLUSTRATION.  AS I

13:14   17  DETAILED, IN FACT, EXTENSIVELY IN MY EXPERT REPORT, THOSE

13:15   18  YELLOW SQUARES ARE IDEALIZATIONS, SIMPLIFICATIONS OF THE ACTUAL

13:15   19  EXCAVATIONS, AND THAT INCLUDES GEOMETRY AND APPROXIMATE

13:15   20  LOCATION.

13:15   21  **Q.**   ALL RIGHT.  LET'S GO TO 91.  91, WE HAVE A SLIDE PREPARED

13:15   22  BY DR. SILVA-TULLA WHICH SAYS "PERMEABILITY VERSUS TIME."  AND

13:15   23  THE SUGGESTION HERE IS THAT YOU'VE BEEN ALL OVER THE MAP.

13:15   24       FIRST OF ALL, LET'S LOOK AT THE FIRST POINT.  IT SAYS

13:15   25  "ILIT REPORT 2006."  IS THAT YOUR NUMBER?

ROBERT G. BEA - DIRECT

13:15   1   **A.**   NO.

13:15   2   **Q.**   WHERE DOES IT COME FROM?

13:15   3   **A.**   IT CAME FROM THE ILIT TEAM, AND IT IS DOCUMENTED IN THE

13:16   4   ILIT REPORT.  A PRINCIPAL SOURCE OF INFORMATION IS DR. RAYMOND

13:16   5   SEED, DR. JUAN PESTANA, AND DR. JONATHAN BRAY.

13:16   6   **Q.**   NOW, I DON'T KNOW WHICH WAY.  WHICH WAY SHOULD WE GO

13:16   7   FIRST, THE RED LINE OR THE GREEN LINE?

13:16   8   **A.**   EITHER ONE.

13:16   9   **Q.**   LET'S GO TO THE RED LINE.  THIS POINT HERE ON THE DIAGRAM,

13:16   10   WHAT DOES THAT REFLECT?

13:16   11   **A.**   WELL, THAT'S REFLECTED IN ADDITIONAL INFORMATION THAT THE

13:16   12   ILIT TEAM RECEIVED AS OF 2008 AS IT REGARDED PERMEABILITY,

13:16   13   WHICH IS THE -- OR HYDRAULIC CONDUCTIVITY, WHICH IS THE

13:16   14   VERTICAL SCALE SHOWN IN THIS DIAGRAM.

13:16   15        NOW, AT THE TIME THAT PAPER CAME OUT, THEY WERE

13:17   16   INVESTIGATING A RANGE OF PERMEABILITIES, WHICH MEANS IT'S NOT A

13:17   17   SINGLE-POINT ESTIMATE.  WE ARE, THROUGH PARAMETRIC STUDIES,

13:17   18   ATTEMPTING TO LEARN HOW PERMEABILITY AFFECTS BREACH CAUSATION.

13:17   19   **Q.**   WELL, WAS THAT A PERMEABILITY THAT YOU ADOPTED AND

13:17   20   UTILIZED WITH REGARD TO YOUR OPINIONS IN THIS CASE?

13:17   21   **A.**   NO.

13:17   22   **Q.**   WELL, IS IT RELEVANT AT ALL TO YOUR OPINIONS IN THIS CASE?

13:17   23   **A.**   WELL, IT IS IN THE SENSE OF THE HISTORY OF DEVELOPMENT OF

13:17   24   INSIGHT CONCERNING THIS IMPORTANT PARAMETER.

13:17   25   **Q.**   THEN WE HAVE THE *BARGE*.  IS THIS AN ACCURATE REFLECTION OF

ROBERT G. BEA - DIRECT

13:17    1    YOUR OPINIONS IN *BARGE* AS TO THE PERMEABILITY?

13:17    2    **A.**   FOR SANDY MATERIAL, YES.

13:18    3    **Q.**   SO YOU WERE TALKING ABOUT SANDY MATERIAL, RIGHT?

13:18    4    **A.**   THAT'S CORRECT.

13:18    5    **Q.**   YOU WERE TALKING ABOUT THE SILT OR THE CLAYS AS INDICATED

13:18    6    HERE?

13:18    7    **A.**   THAT'S CORRECT.

13:18    8    **Q.**   SO THAT'S AN ACCURATE NUMBER?

13:18    9    **A.**   THAT'S CORRECT.

13:18   10    **Q.**   AND IN THE SUPPLEMENTAL REPORT FROM *BARGE*, DID YOU CHANGE

13:18   11    IT?

13:18   12    **A.**   WELL, YES, AND IT'S CHANGING IN THE SENSE THAT WE ARE NOW

13:18   13    LOOKING AT A FILL THAT IS A CULMINATION OF SHELLS AND SAND.  SO

13:18   14    THE PERMEABILITY SENSIBLY SHOULD BE LOWER, LESS.

13:18   15    **Q.**   SO THE FACT OF THE MATTER IS YOU'RE TALKING ABOUT

13:18   16    DIFFERENT MATERIAL?

13:18   17    **A.**   THAT'S CORRECT.

13:18   18    **Q.**   SO IT IS INACCURATE TO TAKE FROM THIS SLIDE THAT YOU'RE

13:18   19    JUMPING ALL OVER THE PLACE WITH REGARD TO THE PERMEABILITY OF A

13:18   20    SINGLE SUBSTANCE?

13:18   21    **A.**   THAT'S CORRECT.  AND THAT'S IDENTIFIED, ACTUALLY, ON THE

13:18   22    RIGHT HAND OF THIS SLIDE.

13:18   23    **Q.**   WE'LL TALK ABOUT THAT IN A SECOND.  LET'S JUST FINISH OUT

13:18   24    THESE LAST FEW DOTS HERE.  THESE TWO HERE AT THE BOTTOM:

13:18   25    "DR. BEA REPORTS THAT THE RESULTS ARE RELATIVELY INSENSITIVE TO

**ROBERT G. BEA - DIRECT**

13:19  1   A PLAUSIBLE RANGE OF HYDRAULIC CONDUCTIVITY, BEA AND COBOS-ROA,

13:19  2   2008, PAGE 20."

13:19  3           ARE THESE TWO POINTS -- I DON'T KNOW WHY THERE ARE

13:19  4   TWO POINTS, BUT ARE THEY INTENDED TO REFLECT A PERMEABILITY OF

13:19  5   10 TO THE MINUS, I GUESS, 6.5?

13:19  6   A.   WELL, THAT'S THE DOTS THAT WERE SHOWN, BUT THAT'S NOT THE

13:19  7   FULL RANGE THAT WE STUDIED.

13:19  8   Q.   WHAT DID YOU STUDY?

13:19  9   A.   WE STUDIED FROM 10 TO THE MINUS 4 TO 10 TO THE MINUS 6.

13:19  10  Q.   WELL, THIS DOT HERE DOESN'T HAVE ANY INDICATION WHERE IT

13:19  11  CAME FROM, BUT I GUESS -- IS THAT SUPPOSED TO BE A REFLECTION

13:19  12  OF THE RANGES OF PERMEABILITY THAT YOU STUDIED?

13:19  13  A.   YES, BUT IT'S NOT A RANGE; IT'S A POINT.

13:19  14  Q.   DO YOU HAVE ANY IDEA WHAT THAT IS REFERRING TO?

13:19  15  A.   NO.   THERE'S NO LABEL, SO I CAN'T TELL.   PERHAPS THAT'S

13:19  16  WHERE THEY ARE RECOGNIZING THE RANGE ACCURATE WITH THAT GREEN

13:20  17  LINE.

13:20  18  Q.   DR. BEA, THE FACT OF THE MATTER IS THAT DIFFERENT

13:20  19  MATERIALS HAVE DIFFERENT PERMEABILITIES, CORRECT?

13:20  20  A.   YES.

13:20  21  Q.   BUT THE THING THAT'S A LITTLE BIT TROUBLING ABOUT THE WAY

13:20  22  DR. SILVA-TULLA PUT THIS TOGETHER IS THAT HE IS LUMPING CLAY

13:20  23  WITH A BUNCH OF OTHER MATERIALS.

13:20  24  A.   YES, THAT'S PART OF THE PROBLEM.

13:20  25  Q.   WELL, CAN YOU -- IS THAT AGAIN -- I DON'T WANT TO BELABOR

ROBERT G. BEA - DIRECT

13:20  1  THIS, BUT THAT WOULD ASSUME THAT YOU PUT EVERYTHING IN THE
13:20  2  MIXMASTER; YOU BLEND IT TOGETHER TO MAKE A CAKE BATTER.  AND
13:20  3  THAT'S NOT REPRESENTATIVE OF THE SOILS AT THE EBIA.  ISN'T THAT
13:20  4  TRUE?
13:20  5  **A.**   THAT'S CORRECT.
13:20  6  **Q.**   THEY ARE SEPARATE AND DISTINCT, AND WE SEE ON THE DIAGRAMS
13:20  7  THAT THE WGI CREATED, THERE ARE LEDGES OF SILT, LEDGES OF PEAT,
13:20  8  ETC., RIGHT?
13:20  9  **A.**   YES.
13:20  10  **Q.**   AND EACH OF THOSE THINGS HAS A DIFFERENT PERMEABILITY
13:20  11  VALUE.
13:20  12  **A.**   THAT'S CORRECT.
13:20  13  **Q.**   AND THE FACT OF THE MATTER IS THAT SILT, WHICH WE SEE A
13:20  14  LOT OF ON THIS SITE, IS BETWEEN 10 TO THE MINUS 3 AND
13:20  15  10 TO THE MINUS 5, IF I'M READING IT CORRECT.  IS THAT
13:20  16  ACCURATE?
13:20  17  **A.**   YES.
13:20  18  **Q.**   THAT'S DR. SILVA-TULLA'S INFORMATION, NOT YOURS.
13:21  19  **A.**   YES, THAT'S CORRECT.
13:21  20          **MR. TREEBY:**  IF YOUR HONOR PLEASE, THAT'S FROM A
13:21  21  RECOGNIZED TEXTBOOK THAT THIS WITNESS -- THAT IS NOT -- AND IF
13:21  22  YOU'D LISTEN TO THE TESTIMONY, YOU WOULD KNOW THIS.  THIS
13:21  23  REPRESENTATION OVER HERE IS NOT SOMETHING THAT DR. SILVA
13:21  24  INVENTED; IT'S FROM A RECOGNIZED TEXTBOOK, AND HE SAID SO.
13:21  25          **MR. BRUNO:**  I DIDN'T MEAN TO SUGGEST THAT HE INVENTED

ROBERT G. BEA - DIRECT

13:21    1    IT.

13:21    2    **BY MR. BRUNO:**

13:21    3    **Q.**   IT'S CERTAINLY SOMETHING THAT HE ENDORSED.  ISN'T THAT

13:21    4    TRUE?

13:21    5    **A.**   YES.

13:21    6    **Q.**   HE DOESN'T DISAGREE.  I CAN'T IMAGINE DR. SILVA-TULLA

13:21    7    PUTTING THIS ON THE SCREEN FOR ALL TO SEE AND SAYING, "I DON'T

13:21    8    AGREE WITH THAT."  RIGHT?

13:21    9    **A.**   YES.

13:21   10             **MR. TREEBY:**  IT'S THE ASTM CLASSIFICATION RIGHT THERE

13:21   11    ON THE SIDE OF IT.

13:21   12             **MR. BRUNO:**  WITH WHICH DR. SILVA-TULLA FULLY AGREES.

13:21   13             **MR. TREEBY:**  YOUR HONOR, IT'S UNFAIR TO CHARACTERIZE

13:21   14    THIS AS DR. SILVA'S OPINION WHEN THE ASTM CLASSIFICATION DOES

13:21   15    EXACTLY THAT.  THAT'S STRAIGHT FROM THE ASTM CLASSIFICATION.

13:21   16             **MR. BRUNO:**  I'M NOT SURE I UNDERSTAND THE OBJECTION.

13:21   17             **THE COURT:**  MAYBE WE CAN EXPLORE IT MORE IN

13:21   18    CROSS-EXAMINATION.  I'M NOT SURE IF ANYBODY IS SAYING THIS IS

13:21   19    CORRECT OR INCORRECT.

13:21   20             **MR. BRUNO:**  THAT'S RIGHT.

13:21   21             **MR. TREEBY:**  THE TESTIMONY BY MR. BRUNO WAS THAT THIS

13:22   22    WAS A BLENDING, THAT DR. TULLA -- SILVA-TULLA BLENDED THOSE

13:22   23    VALUES.  THOSE VALUES ARE DIRECTLY FROM THE ASTM CLASSIFICATION

13:22   24    STANDARD.

13:22   25             **MR. BRUNO:**  AND MR. TREEBY'S TESTIMONY, I GUESS, IS

ROBERT G. BEA - DIRECT

13:22  1  CONTRARY TO MY TESTIMONY, SO WE WILL JUST HAVE TO AGREE TO
13:22  2  DISAGREE.  LET'S MOVE ON.
13:22  3       THE COURT:  AS I UNDERSTAND IT -- AND I'M HOPING IT'S
13:22  4  GOING TO BE CLEAR WHEN THIS IS ALL OVER -- I THINK EVERYONE
13:22  5  AGREES THAT DIFFERENT SOILS HAVE DIFFERENT PERMEABILITIES.
13:22  6       MR. BRUNO:  YES.
13:22  7       THE COURT:  AND ARRIVING AT A UNIFORM PERMEABILITY
13:22  8  FOR THE ENTIRE PROJECT IS DIFFICULT SINCE THERE ARE LAYERS THAT
13:23  9  MAY NOT HAVE THAT SAME DEGREE OF PERMEABILITY.
13:23  10      MR. BRUNO:  ABSOLUTELY.  SURE.
13:23  11      THE COURT:  THAT'S WHAT I UNDERSTAND.
13:23  12      MR. BRUNO:  WE ARE ON THE SAME PAGE.
13:23  13 BY MR. BRUNO:
13:23  14 Q.  LET'S GO TO SLIDE 94.  THIS QUOTE, IS THAT YOURS?
13:23  15 A.  YES.
13:23  16 Q.  NOW, HELP US UNDERSTAND.  THE CRITICISM HERE IS THAT YOU
13:23  17 OUGHT NOT USE SEEP/W, BECAUSE IT'S A FLOW MODEL, TO ADDRESS
13:23  18 QUESTIONS OF PRESSURE.  SO ARE YOU NOT UNDERSTANDING HOW TO
13:23  19 PROPERLY USE THE SEEP/W PROGRAM?
13:23  20 A.  NO.
13:23  21 Q.  WELL, EXPLAIN TO THE COURT WHY YOU FELT IT WHOLLY AND
13:23  22 COMPLETELY APPROPRIATE TO UTILIZE THE SEEP/W PROGRAM IN ORDER
13:23  23 TO HAVE SOME APPRECIATION OF THE PRESSURES THAT WOULD DEVELOP.
13:24  24 A.  THE SEEP/W USER'S MANUAL IN THE INTRODUCTION SPECIFICALLY
13:24  25 ADDRESSES HYDRAULIC CONDUCTIVITY FLOWS AND PRESSURES, AND IT

4028

**ROBERT G. BEA - DIRECT**

13:24  1   SPECIFICALLY CAUTIONS THE ENGINEER NOT TO FOCUS ON FLOWS BUT TO
13:24  2   FOCUS FIRST ON PRESSURES AND VALIDATE THAT THOSE PRESSURES ARE
13:24  3   CORRECT.
13:24  4   **Q.**   AS YOU SIT HERE TODAY, DO YOU BELIEVE THAT YOU MADE A
13:24  5   MISTAKE IN UTILIZING THE SEEP/W TO LEARN OR GET INFORMATION
13:24  6   ABOUT PRESSURE?
13:24  7   **A.**   NO.
13:24  8   **Q.**   NOW, THE NEXT SERIES OF SLIDES, 95 THROUGH 105, ALL TALK
13:25  9   ABOUT M SUB V, AND WE HAVE DISCUSSED THAT.  DO YOU SEE ANY NEED
13:25  10  TO GO THROUGH THAT ANY MORE?
13:25  11  **A.**   ONLY IF THE COURT SEES A NEED.
13:25  12  **Q.**   WELL, IF THE COURT HAS QUESTIONS, I'M CERTAIN WE WILL HEAR
13:25  13  FROM THE COURT.
13:25  14       LET'S GO TO -- AND M SUB V, AGAIN, IS THAT
13:25  15  COMPRESSIBILITY ISSUE, JUST SO WE ARE ALL REMINDED OF WHAT IT
13:25  16  IS.
13:25  17  **A.**   THAT'S CORRECT.
13:25  18  **Q.**   LET'S GO TO SLIDE 106, WHICH I THINK COVERS ANOTHER TWO
13:25  19  SLIDES, 107 AND 108.
13:25  20       DR. BEA, DOES THIS HAVE ANYTHING TO DO WITH YOUR
13:25  21  OPINIONS IN THE CASE?
13:25  22  **A.**   PART OF MY CAUSATION ANALYSIS INCLUDED CONSIDERATION OF
13:25  23  THE THREE-DIMENSIONAL EFFECTS ASSOCIATED WITH NARROW
13:25  24  EXCAVATIONS ON THE FLOOD SIDE OF THE I-WALL AT THE LOWER NINTH
13:26  25  WARD.

ROBERT G. BEA - DIRECT

13:26  1  **Q.**   DID YOU LEARN ANYTHING FROM THESE INVESTIGATIONS?

13:26  2  **A.**   YES.

13:26  3  **Q.**   IS IT TRUE THAT THE 3-D EFFECTS CONTRADICT COMMON SENSE?

13:26  4  **A.**   NO.

13:26  5  **Q.**   DOES THE RESULT IMPACT YOUR OPINION ONE WAY OR THE OTHER?

13:26  6  **A.**   WELL, IN FACT, THAT'S EXPLICITLY ADDRESSED IN MY REPORT,

13:26  7  EXPERT REPORT, AND THE ANSWER IS NO.  WITH OR WITHOUT THE 3-D

13:26  8  EFFECT, THE CAUSATION ANALYSIS REMAINS TO THE SAME CONCLUSION.

13:26  9  **Q.**   ALL RIGHT.  THE NEXT SERIES OF SLIDES, STARTING WITH 109

13:26  10  AND FINISHING WITH 114, FIRST OF ALL, REGARD THE HAND FLOW

13:26  11  CALCULATIONS.  NOW, FIRST OF ALL, DR. BEA, SHARE WITH THE COURT

13:26  12  THE ORIGIN OF THIS PIECE OF PAPER.

13:27  13  **A.**   JUST BEFORE I CAME FOR MY REBUTTAL REPORT DEPOSITION, I

13:27  14  WANTED TO EXPLORE, USING HAND CALCULATIONS, THE EFFECTS OF

13:27  15  MULTIPLE EXCAVATIONS ON THE EAST BANK INDUSTRIAL AREA.  AND

13:27  16  FOLLOWING WHAT I TESTIFIED IN THIS COURT TO, I PERFORMED HAND

13:27  17  CALCULATIONS TO HELP INFORM THAT INSIGHT.

13:27  18       THE DEFENSE EXPERTS HAVE TAKEN THIS HAND CALCULATION

13:27  19  THAT MR. TREEBY INSISTED DURING MY DEPOSITION I CALL MY WIFE

13:28  20  AND HAVE HER SEND -- HAVE TAKEN AND COMPLETELY MISCONSTRUED IT,

13:28  21  MISUSED IT, AND I ADDRESSED THE MISCONSTRUING DURING MY THIRD

13:28  22  DEPOSITION IN SAN FRANCISCO.

13:28  23       SO IT'S MEANT TO INFORM MY INSIGHT.  IT WAS

13:28  24  PRELIMINARY.  AND AS PROJECTED BY THE DEFENSE, IT'S BECOME,

13:28  25  WE'LL CALL IT, A FINAL EVALUATION.

ROBERT G. BEA - DIRECT

13:28    1        THIS DID NOT AFFECT MY CAUSATION ANALYSES IN ANY WAY.

13:28    2            **MR. TREEBY:**  IMPROPER REBUTTAL, YOUR HONOR.  THIS WAS

13:28    3    OBVIOUSLY WELL GONE INTO, AVAILABLE TO HIM IN HIS DIRECT CASE.

13:28    4    BUT I'M PRESERVING THE OBJECTION.

13:28    5            **MR. BRUNO:**  JUDGE, HE'S ALREADY --

13:28    6            **THE COURT:**  AS THE CASE LAW SAYS, IT DOESN'T HAVE TO

13:28    7    BE BRAND-NEW.

13:28    8                GO AHEAD.  GO AHEAD.

13:28    9    **BY MR. BRUNO:**

13:29   10    **Q.**  LET'S GO TO THE NEXT SLIDE VERY QUICKLY SO WE CAN SEE

13:29   11    WHAT'S BEEN SUGGESTED HERE.

13:29   12        ON THIS SLIDE, WHAT DR. SILVA-TULLA HAS DONE IS HE

13:29   13    HAS CONNECTED THE TWO EXCAVATIONS.  DID YOU DO THAT?

13:29   14    **A.**  NO.

13:29   15    **Q.**  DID YOU INTEND TO DO THAT?

13:29   16    **A.**  NO.  I EXPLICITLY STATED IN MY THIRD DEPOSITION THESE

13:29   17    EXCAVATIONS WERE ACTING INDEPENDENTLY.

13:29   18    **Q.**  WELL, IN FACT, LET'S GO TO THE NEXT SLIDE.

13:29   19        HE DOES IT AGAIN.

13:29   20        DO IT AGAIN.  NEXT SLIDE.

13:29   21        HE DOES IT AGAIN.

13:29   22        NEXT SLIDE.

13:29   23        SO WHAT HE IS PORTRAYING THERE IS ABSOLUTELY

13:29   24    ACCURATE, RIGHT?  IF YOU HAVE -- I MEAN, I REMEMBER AS A CHILD,

13:29   25    IF YOU HAVE -- WHICH WASN'T A LONG TIME AGO -- YOU HAVE A

Case 2:05-cv-04182-SRD-JCW   Document 21151   Filed 01/22/13   Page 17 of 160

## ROBERT G. BEA - DIRECT

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
| 13:29  | 1  | BEAKER AND YOU HAVE A BEAKER AND YOU HAVE A HOSE CONNECTED.  IF       |
| 13:29  | 2  | YOU RAISE THEM OR LOWER, IT'S GOING TO MAKE THE WATER COME OUT        |
| 13:29  | 3  | OF THE OTHER THING, RIGHT?                                            |
| 13:29  | 4  | A.   RIGHT.                                                           |
| 13:29  | 5  | Q.   IN FACT, THAT'S HOW WE USED TO SIPHON GAS OUT OF THE CAR         |
| 13:29  | 6  | WHEN WE DIDN'T HAVE ANY MONEY, RIGHT?                                 |
| 13:29  | 7  | A.   WELL, I DIDN'T SIPHON GAS.                                       |
| 13:29  | 8  | Q.   WELL, YOU KNOW, SOME OF US ARE BORN BETTER OFF THAN              |
| 13:30  | 9  | OTHERS.                                                               |
| 13:30  | 10 |        IN ANY CASE, YOU SPECIFICALLY TOLD DEFENSE COUNSEL           |
| 13:30  | 11 | THAT THESE THINGS WERE NOT CONNECTED.                                 |
| 13:30  | 12 | A.   THAT'S CORRECT.                                                  |
| 13:30  | 13 | Q.   SO THIS IS A BLATANT MISREPRESENTATION OF WHAT YOU TOLD          |
| 13:30  | 14 | EVERYONE IN YOUR DEPOSITION, ISN'T IT?                                |
| 13:30  | 15 | A.   YES.                                                             |
| 13:30  | 16 |      MR. TREEBY:  I OBJECT, YOUR HONOR.  THAT IS                    |
| 13:30  | 17 | ABSOLUTELY THE KIND OF POLEMIC THAT YOUR HONOR HAS WARNED US          |
| 13:30  | 18 | AGAINST.                                                              |
| 13:30  | 19 |      MR. BRUNO:  HOW IS IT --                                       |
| 13:30  | 20 |      MR. TREEBY:  IT'S CLAIMING THAT THERE WAS A                    |
| 13:30  | 21 | MISREPRESENTATION OF ANYTHING.  IT WAS SUBJECT TO --                  |
| 13:30  | 22 |      THE COURT:  IT WOULD BE THE "BLATANT                           |
| 13:30  | 23 | MISREPRESENTATION."  "IS THAT AN ACCURATE PORTRAYAL?" IS             |
| 13:30  | 24 | SUFFICIENT.                                                           |
|        | 25 |                                                                      |

*DAILY TRANSCRIPT*

ROBERT G. BEA - DIRECT

| | | |
|---|---|---|
| 13:30 | 1 | **BY MR. BRUNO:** |
| 13:30 | 2 | **Q.**   IS THIS AND THESE PREVIOUS DIAGRAMS AN ACCURATE PORTRAYAL |
| 13:30 | 3 | OF THE TESTIMONY ELICITED BY LEARNED OPPOSING COUNSEL, |
| 13:30 | 4 | MR. TREEBY, DURING HIS DEPOSITION OF YOU SO MANY MONTHS AGO? |
| 13:30 | 5 | **A.**   NO. |
| 13:30 | 6 | **Q.**   THANK YOU. |
| 13:30 | 7 | NEXT SLIDE, NO. 115:  "DR. BEA INCORRECTLY USES |
| 13:30 | 8 | SEEP/W, A FLOW MODELING PROGRAM."  IS IT ACCURATE TO CALL IT A |
| 13:30 | 9 | FLOW MODELING PROGRAM? |
| 13:30 | 10 | **A.**   NO, SEEP/W SPECIFICALLY SAYS GET THE PRESSURES RIGHT |
| 13:31 | 11 | FIRST, AND THIS IS AN ACCEPTABLE ANALYTICAL MODEL TO FOCUS ON |
| 13:31 | 12 | PRESSURES. |
| 13:31 | 13 | **Q.**   NEXT SLIDE, 117.  HERE ANOTHER SLIDE IS ENTITLED |
| 13:31 | 14 | "HYDRAULIC CONDUCTIVITY PRESSURE TRANSMISSION MODEL." |
| 13:31 | 15 | IS THAT WHAT THIS IS? |
| 13:31 | 16 | **A.**   WELL, THAT'S WHAT IT PURPORTS TO BE, BUT I NEVER DEVELOPED |
| 13:31 | 17 | SUCH A MODEL, AND THE SUCCEEDING SLIDE PROCEEDS THROUGH AN |
| 13:31 | 18 | ANALYSIS.  I NEVER USED ANY MODEL I NEVER CREATED. |
| 13:31 | 19 | **Q.**   JUST TO FOLLOW THAT THROUGH, 118.  DOES THIS DEPICT |
| 13:31 | 20 | ANYTHING THAT YOU HAVE DONE? |
| 13:31 | 21 | **A.**   NO. |
| 13:31 | 22 | **Q.**   119, DOES THAT DEPICT ANYTHING YOU HAVE DONE? |
| 13:31 | 23 | **A.**   WELL, IT SHOWS THE DATA POINTS ASSOCIATED WITH THESE |
| 13:32 | 24 | CALCULATIONS.  THE COMPARISON IS A CONTRIVED COMPARISON.  I |
| 13:32 | 25 | WOULD NEVER USE AN ELASTIC MODEL TO DESCRIBE A HIGHLY |

ROBERT G. BEA - DIRECT

13:32   1   NONLINEAR, INELASTIC PROBLEM.  THIS IS A RESULT FROM AN ELASTIC
13:32   2   ANALYSIS.
13:32   3   Q.   YOU'LL HAVE TO HELP ME BECAUSE NOW YOU HAVE INTRODUCED A
13:32   4   NEW TERM, WHICH IS WELL BEYOND MY CAPACITY TO COMPREHEND.
13:32   5        WHAT DO YOU MEAN, *ELASTIC*?
13:32   6   A.   WELL, THE JUDGE ASKED THAT QUESTION.  A RUBBER BAND --
13:32   7   WHEN YOU STRETCH THE RUBBER BAND, WHEN YOU REMOVE THE STRESS,
13:32   8   THE RUBBER BAND WILL COME BACK TO ITS ORIGINAL SHAPE.  IF THAT
13:32   9   RUBBER BAND WAS COMPOSED OF NOT RUBBER BUT SILLY PUTTY, WHEN
13:33  10   YOU STRETCHED IT, WHEN YOU LET IT GO, IT STAYS STRETCHED.
13:33  11   THAT'S NONLINEAR, INELASTIC.
13:33  12        THE COURT:  IS THAT WHY YOU DETERMINED -- DON'T LET
13:33  13   ME GET OFF.  IS THAT WHY YOU DETERMINED THAT THE STEADY-STATE
13:33  14   ANALYSIS WOULD BE APPROPRIATE, BECAUSE OF THE MORE -- BECAUSE
13:33  15   YOU DETERMINED THAT THE STRUCTURE WAS NOT ELASTIC BUT SOMEWHAT
13:33  16   RIGID?
13:33  17        THE WITNESS:  THE SOIL STRUCTURE IS NONLINEAR, WHICH
13:33  18   MEANS -- COULD I CLEAR THE SCREEN?
13:33  19        MR. BRUNO:  YES.
13:33  20        THE WITNESS:  AND I WILL DRAW A PICTURE TO HELP.
13:33  21        MR. BRUNO:  GIVE US A WHITE SCREEN, PLEASE.
13:33  22        THE WITNESS:  I'M PICTURE-FOCUSED JUST IN MY HEAD.
13:34  23        MR. BRUNO:  OKAY.  YOU'VE GOT IT.
13:34  24        THE WITNESS:  THANK YOU.
13:35  25        1 IS ELASTIC; 2 IS NONLINEAR, INELASTIC.

ROBERT G. BEA - DIRECT

13:35    1    BY MR. BRUNO:
13:35    2    Q.   WHAT ARE WE SEEING?  WHAT IS THE P-VALUE?
13:35    3    A.   I SHOW HERE, IT COULD BE A BLOCK OF SANDSTONE OR THIS
13:35    4    BLOCK OF SOIL.
13:35    5    Q.   OKAY.
13:35    6    A.   AND I'M GOING TO PUT A VERTICAL FORCE ON IT, AND I'M GOING
13:35    7    TO MEASURE THE RESPONSE OF THE SOIL TO THAT VERTICAL FORCE, AND
13:35    8    THE RESPONSE QUANTITY IS DELTA.  SO THE PLOT IS THE FORCE
13:35    9    VERSUS THE DISPLACEMENT.
13:35    10        IN THE ELASTIC, YOU ASSIGNED A SPECIFIC FORCE
13:35    11   DISPLACEMENT THAT GOES UP TO INFINITY.  THE SOIL BEHAVES
13:36    12   ELASTICALLY ONLY AT VERY, VERY SMALL FORCE AND DISPLACEMENT.
13:36    13   IT IS HIGHLY NONLINEAR AND, WHEN YOU ALLOW IT TO REBOUND,
13:36    14   INELASTIC.  SO EVEN WHEN YOU BRING THE FORCE BACK TO ZERO,
13:36    15   THERE IS A LOCKED-IN DEFORMATION.  IT DOESN'T REBOUND.
13:36    16   Q.   HOW DOES THAT SHOW THAT THE MODEL THAT DR. SILVA-TULLA
13:36    17   CHOSE TO PUT UP AGAINST YOUR MODELING IS NOT AN APPROPRIATE
13:36    18   COMPARISON?
13:36    19   A.   WELL, HE USES AN ELASTIC SOLUTION AND I'M WORKING WITH NOT
13:36    20   LINEAR, INELASTIC.  THE COMPARISON IS FALSE.
13:36    21   Q.   IT'S NOT SUSCEPTIBLE TO A COMPARISON?
13:36    22   A.   CORRECT.
13:36    23        THE COURT:  I DON'T WANT TO GET THINGS CONFUSED,
13:36    24   BECAUSE YOU'RE GOING TO BE SUBJECTED TO SOME EXCELLENT
13:37    25   CROSS-EXAMINATION.  MY PURPOSE IS SIMPLY TO TRY TO UNDERSTAND

ROBERT G. BEA - DIRECT

13:37    1  EVERYTHING AFTER ALL IS SAID AND DONE.

13:37    2          THE WITNESS:  YES, SIR.

13:37    3          THE COURT:  DOES THIS IN ANY WAY RELATE TO A

13:37    4  STEADY-FLOW VERSUS A TRANSIENT-FLOW ANALYSIS?

13:37    5          THE WITNESS:  NO.

13:37    6          MR. BRUNO:  CAN WE PRINT THIS, YOUR HONOR?

13:37    7          THE COURT:  YES.

13:37    8          MR. BRUNO:  BR-005.

13:37    9             CAN WE PLEASE GO TO SLIDE 121.

13:37   10  BY MR. BRUNO:

13:37   11  Q.   NOW, HERE IS A SLIDE WHERE DR. SILVA-TULLA SUGGESTED THAT

13:37   12  THERE WOULD BE SOME PRESSURE TRANSMISSION FROM THE BODY OF THE

13:37   13  WATER IN THE INDUSTRIAL CANAL ITSELF.  DO YOU HAVE AN OPINION

13:37   14  AS TO WHETHER OR NOT THAT IS LIKELY TO HAVE OCCURRED?

13:37   15  A.   YES, I DO.

13:37   16  Q.   WHAT IS THAT OPINION?

13:38   17  A.   IT DID NOT OCCUR.

13:38   18  Q.   WHY NOT?

13:38   19  A.   WELL, THE CANAL WALLS ARE COATED OVER A LONG PERIOD OF

13:38   20  TIME, IN FACT, SINCE IT WAS CONSTRUCTED, BY A CONSTANT RAINFALL

13:38   21  OF SILT AND CLAYS THAT ARE IN THE CANAL WATERS.  IT FORMS AN

13:38   22  IMPERVIOUS SKIN ON THE WALLS OF THAT CANAL.  THAT PROVIDES AN

13:38   23  IMPERMEABLE BOUNDARY SEPARATING THE ORGANIC CLAYS FROM THE

13:38   24  INDUSTRIAL CANAL WATERS.

13:38   25             THE FATHOMETER SURVEYS WE HAVE OF THE CROSS SECTION

4036

ROBERT G. BEA - DIRECT

13:38    1   IN THE INDUSTRIAL CANAL AT THE LOWER NINTH WARD, THE

13:39    2   SO-IDENTIFIED POINT SURVEYS SHOWS SLUMPING FEATURES IN THE

13:39    3   INDUSTRIAL CANAL, AND THAT'S LIKE THE SLUMPS YOU SEE HAPPEN IN

13:39    4   A SKI AREA WHEN THE SNOW BUILDS UP TOO MUCH ON A SLOPE.

13:39    5            SO IN ADDITION, WE HAVE MEASUREMENTS DONE HERE IN

13:39    6   OTHER CANALS THAT HAVE DEMONSTRATED THIS INSULATING BLANKET

13:39    7   BEHAVIOR; AND MOST RECENTLY AT LONDON CANAL, DR. BRANDON

13:39    8   PERFORMED STEADY-FLOW ANALYSES TO DEMONSTRATE THE EFFECTIVENESS

13:39    9   OF THE SILTS IN INHIBITING FLOWS INTO THE PERMEABLE SANDS.

13:39   10            MR. BRUNO:  CAN WE CALL UP JX-01330-0002, WHICH IS A

13:39   11   SLIDE THAT WAS FURNISHED TO US BY THE DEFENDANTS TO BRIEFLY

13:39   12   ILLUSTRATE WHAT THIS IS.

13:39   13   BY MR. BRUNO:

13:39   14   Q.   IS THAT ILLUSTRATED HERE ON THE SLIDE, THE TOP ONE?

13:40   15   A.   YES.  THE CORPS' CANAL AND THE MOORING BUOY TO THE

13:40   16   BACKGROUND, AND YOU'VE GOT A VERY THIN WALL HERE SEPARATING

13:40   17   THIS, AND THERE'S NO FLOW COMING THROUGH OR EVEN UNDER THAT

13:40   18   EXCAVATION.  IT'S INSULATED.

13:40   19   Q.   SO WE HAVE A WALL THAT PREVENTS THE WATER IN THE IHNC FROM

13:40   20   COMING ON TO THE -- AT LEAST AT THIS LEVEL, AND THEN WE ALSO

13:40   21   HAVE A BARRIER THAT KEEPS WHAT'S INSIDE THE EBIA INSIDE THE

13:40   22   EBIA?

13:40   23   A.   CORRECT.

13:40   24   Q.   THE NEXT SLIDE BRINGS US TO THE NEXT SECTION AT 123,

13:40   25   SLIDE 123, WHAT DR. SILVA-TULLA CALLED POINTS OF CLARIFICATION.

ROBERT G. BEA - DIRECT

13:40   1   I THINK WE CAN RUN THROUGH THIS RELATIVELY QUICKLY.

13:41   2           THE NEXT SLIDE, WE TALKED ABOUT THIS ALREADY?

13:41   3   A.   YES.

13:41   4   Q.   THE NEXT SLIDE, 125.  NOW, DID YOU WANT TO MAKE A COMMENT

13:41   5   ON THIS SLIDE, DR. BEA?

13:41   6   A.   WELL, I HEARD DR. SILVA-TULLA YESTERDAY TESTIFY THAT HE

13:41   7   HAD NEVER SEEN A CORRELATION MADE BETWEEN THE HYDRAULIC

13:41   8   CONDUCTIVITY IN THE MARSH SWAMP OR SOILS WATER CONTENT.  I

13:41   9   FOUND THAT A REMARKABLE STATEMENT BECAUSE THE VERY LAMBE AND

13:41   10  WHITMAN TEXTBOOK THAT HE IS PURPORTED TO BE COAUTHORING HAS AN

13:41   11  ILLUSTRATION VERY MUCH LIKE THIS SHOWN ON PAGE 286,

13:42   12  FIGURE 19.5, TITLED "PERMEABILITY TEST DATA."

13:42   13  Q.   THANK YOU, DOCTOR.  LET'S GO TO THE NEXT SLIDE, 126.

13:42   14          IT SAYS HERE "HORIZONTAL AND VERTICAL HYDRAULIC

13:42   15  CONDUCTIVITY VERSUS WATER."  HE SAYS, "NO UNIQUE RELATIONSHIP

13:42   16  EXISTS."  IS THAT ACCURATE, IN YOUR VIEW?

13:42   17  A.   NO, IT'S NOT, AND IT'S BECAUSE WE HAVE A PRETTY SOLID

13:42   18  CORRELATION.  HE HAS COMBINED LABORATORY PERMEABILITY TESTS,

13:42   19  WHICH ARE WELL RECOGNIZED BY EXPERTS IN THIS FIELD, INCLUDING

13:42   20  INCREMENTAL CONSOLIDATION AND CONSTANT RATE, AND HE HAS

13:42   21  COMBINED THOSE WITH FIELD TEST DATA.

13:43   22          WELL, OF COURSE YOU GET A SCATTER BECAUSE THOSE TWO

13:43   23  THINGS ARE MEASURING, AGAIN, SOIL RESPONSE UNDER DRAMATICALLY

13:43   24  DIFFERENT CONDITIONS.  SO NO UNIQUE RELATIONSHIP EXISTS BECAUSE

13:43   25  WE HAVE USED THE DATA INCORRECTLY.

ROBERT G. BEA - DIRECT

13:43  1    Q.   WELL, IN FACT, THOUGH, WE DO HAVE DR. NAYMIK, WHO SAYS
13:43  2    THERE IS A CONNECTION, RIGHT?
13:43  3    A.   YES.  IN THE FIELD TEST DATA SHOWN IN THE PLOT, THE
13:43  4    TRIANGLES SHOW A VERY STRONG RELATIONSHIP BETWEEN WATER CONTENT
13:43  5    AND HYDRAULIC CONDUCTIVITY.  THAT'S EXACTLY WHAT I SHOWED IN
13:43  6    THE PREVIOUS SLIDE.
13:43  7    Q.   THE NEXT SUBJECT I WOULD LIKE TO ADDRESS IS THE
13:43  8    PIEZOMETERS.  THESE WOULD BE -- DR. SILVA-TULLA'S COMMENTS ON
13:44  9    THE PIEZOMETERS ARE FOUND AT 128, SLIDE 128, 129, 130, AND 131.
13:44  10        FIRST OF ALL, YOU HAVE ADDRESSED THIS IN YOUR REPORT,
13:44  11   HAVE YOU NOT?
13:44  12   A.   YES.  THIS IS ADDRESSED EXTENSIVELY IN APPENDIX C OF MY
13:44  13   EXPERT REPORT.
13:44  14   Q.   DO YOU WANT TO CALL IT UP NOW?
13:44  15   A.   IF WE COULD.
13:44  16        MR. BRUNO:  LET'S CALL UP JX-01392-0001.
13:44  17   BY MR. BRUNO:
13:44  18   Q.   AT PAGE 11 OF THIS SECTION, YOU TALK ABOUT THE
13:44  19   PIEZOMETERS, CORRECT?
13:44  20   A.   THIS IS THE ANALYTICAL CROSS SECTION I USED TO ANALYZE
13:44  21   PIEZOMETERS 3, 2, AND 1.  SO WE ARE TOWARD THE SOUTH END OF THE
13:45  22   EAST BANK INDUSTRIAL AREA WITH THIS ARRAY OF PIEZOMETERS.  THE
13:45  23   LOCATION OF THE SHEET PILE I HAVE SHOWN WITH THAT PURPLE ARROW.
13:45  24        NOW, THIS ANALYTICAL -- THANK YOU VERY MUCH.  THIS
13:45  25   ANALYTICAL MODEL CAPTURES CORRECTLY THE TYPE STRESS, NUMBER

13:45  1  ONE, TOTAL STRESS.  THERE ARE NO IDENTIFIED EXCAVATIONS, AND

13:45  2  THE STRESSES THAT PIEZOMETERS 3, 2, AND 1 ARE GOING TO PICK UP

13:45  3  ARE COMING DIRECTLY FROM THAT TOTAL STRESS IMPOSED AT THE EBIA

13:46  4  SIDE OF THE FLOODWALL.

13:46  5  Q.   WELL, YESTERDAY WE HEARD DR. SILVA-TULLA CRITICIZE THESE

13:46  6  RESULTS AND THE IMPLICATIONS OF THESE RESULTS.  YOU WERE HERE

13:46  7  FOR THAT?

13:46  8  A.   YES.

13:46  9  Q.   WHAT STRUCK ME WAS, INSTEAD OF CRITICIZING THE

13:46  10 INTERPRETATION, HE CHOSE TO SUGGEST THAT THE PIEZOMETERS

13:46  11 THEMSELVES WEREN'T MEASURING ACCURATELY.  I GUESS IT CONFUSED

13:46  12 ME BECAUSE, FIRST OF ALL, DO WE KNOW WHO PUT THE PIEZOMETERS

13:46  13 THERE?

13:46  14 A.   YES.

13:46  15 Q.   WHO PUT THEM THERE?

13:46  16 A.   UNITED STATES ARMY CORPS OF ENGINEERS, AND THE

13:46  17 INSTALLATION WAS EXTENSIVELY TESTIFIED TO BY MR. RICHARD

13:46  18 VARUSO, U.S. ARMY CORPS OF ENGINEERS, NEW ORLEANS DISTRICT,

13:47  19 YEAR 2008.

13:47  20 Q.   BUT THE LARGER PICTURE HERE IS THAT THESE ARE THE CORPS'

13:47  21 PIEZOMETERS.  I MEAN, WE CAN AT LEAST ASSUME THAT THE CORPS

13:47  22 KNOWS HOW TO INSTALL AND MONITOR A PIEZOMETER, CAN WE NOT?

13:47  23 A.   YES.  AND THEY'VE GOT EXTENSIVE GUIDELINES, PRACTICES FOR

13:47  24 CORRECT INSTALLATION AND INTERPRETATION OF RESULTS FROM

13:47  25 PIEZOMETERS.

ROBERT G. BEA - DIRECT

13:47  1   **Q.**  WELL, DR. SILVA-TULLA DREW THIS CONCLUSION THAT THESE

13:47  2   THINGS COULD BE WRONG IF THE CAP WASN'T SCREWED ON TIGHT.  AND

13:47  3   I'M JUST CURIOUS --

13:47  4           **MR. TREEBY:**  OBJECTION, YOUR HONOR.  HE DIDN'T SAY

13:47  5   THAT; HE SAID THEY WERE VENTED.

13:47  6           **THE COURT:**  HE DID.  HE SAID VENTED.

13:47  7           **MR. BRUNO:**  WELL, MY MEMORY WAS THAT THERE WAS ONE

13:47  8   CAP, HE SAID, THAT HAD TO BE TIGHT AND ALL THIS BUSINESS.

13:47  9   MAYBE I HEARD IT DIFFERENTLY THAN THE COURT.

13:47  10          **THE COURT:**  MAYBE YOU'RE CORRECT.  I CANNOT SAY -- I

13:47  11  REMEMBER THE WORD *VENTED*.  HE DID QUESTION THE ACCURACY OR THE

13:47  12  VALIDITY OF THE PIEZOMETERS.  THAT, I DO REMEMBER.

13:47  13          **MR. TREEBY:**  WHEN THE WATER WAS OVER THE TOP BECAUSE

13:47  14  THE CAP WAS VENTED.

13:48  15          **THE COURT:**  THAT IS CORRECT.  I DO REMEMBER THAT.

13:48  16          **MR. BRUNO:**  I ALSO HEARD HIM SAY THAT THEY WEREN'T

13:48  17  PROPERLY FASTENED.

13:48  18          **THE COURT:**  WELL, WHATEVER --

13:48  19          **MR. BRUNO:**  WELL, THE RECORD WILL BEAR IT OUT.

13:48  20  MR. TREEBY IS TESTIFYING AGAIN.

13:48  21          **MR. TREEBY:**  I DON'T WANT HIM ASSUMING --

13:48  22          **THE COURT:**  THAT'S ENOUGH.  HE QUESTIONED THE

13:48  23  ACCURACY.  CONTINUE.

13:48  24  **BY MR. BRUNO:**

13:48  25  **Q.**  ALL I'M SAYING IS THE RECORD IS GOING TO SAY WHAT IT SAYS.

ROBERT G. BEA - DIRECT

13:48   1   AND WHAT I'M TRYING TO FIGURE OUT IS, TO THE EXTENT THAT THERE
13:48   2   MAY HAVE BEEN THE TOP NOTCH SCREWED ON OR WHATEVER, WE WOULD
13:48   3   ANTICIPATE THAT THE CORPS OF ENGINEERS WOULD MONITOR ITS OWN
13:48   4   PIEZOMETERS AND MAKE SURE THAT THEY WERE FUNCTIONING PROPERLY
13:48   5   AND ACCURATELY.
13:48   6            CAN WE DRAW THAT CONCLUSION?
13:48   7   A.   WELL, YES, BUT I FURTHER BOLSTERED THAT CONCLUSION BECAUSE
13:48   8   THE PIEZOMETERS FOLLOWED THE WATER OVER THE TOP OF THE TUBE AND
13:48   9   THE SURGE IN THE CANAL DROPPED AND THE DROP FOLLOWED IT.  WELL,
13:49   10  IF THE TUBE HAD BEEN FILLED WITH WATER, HOW COULD IT FOLLOW IT
13:49   11  INSTANTLY?  THAT WAS, I'LL CALL IT, THE FINAL CONFIRMING
13:49   12  INFORMATION THAT THOSE RECORDS WERE RELIABLE.
13:49   13           THE COURT:  SO I WON'T GET LOST IN THE WEEDS, WHICH
13:49   14  RIGHT NOW I MAY BE A LITTLE BIT, ASSUMING THESE PIEZOMETERS
13:49   15  WERE ACCURATE, WHAT DID THEY HAVE TO DO WITH YOUR THEORY OF
13:49   16  CAUSATION?  IF YOU CAN GIVE ME THAT IN A NUTSHELL.
13:49   17           THE WITNESS:  WELL, MY THEORY OF CAUSATION -- AND
13:49   18  IT'S NOT MY THEORY.
13:49   19           THE COURT:  OR YOUR TESTIMONY HERE ABOUT CAUSATION.
13:49   20           THE WITNESS:  IS THAT THE ANALYTICAL MODELING I HAD
13:49   21  DONE HAS INCLUDED ALL THREE.  WHAT I'M DOING IS USING ALL OF
13:49   22  THE AVAILABLE FIELD INFORMATION TO VALIDATE AND CORROBORATE
13:50   23  THOSE THREE CONTRIBUTORS.
13:50   24           THIS SET OF TEST DATA IS PARTICULARLY IMPORTANT
13:50   25  TO HELP ME BE SURE I'M GETTING THE TOTAL STRESS EFFECTS THAT WE

*DAILY TRANSCRIPT*

ROBERT G. BEA - DIRECT

13:50    1   ADDRESSED IN MRGO AND *ROBINSON*.

13:50    2           THE MEASUREMENTS AT 17TH STREET CANAL, LONDON

13:50    3   CANAL, AND THE OTHERS I DOCUMENTED IN MY REBUTTAL REPORT DONE

13:50    4   IN OUR SUPPLEMENTAL DELTA, THOSE GO AT THE UPLIFT PRESSURES,

13:50    5   NO. 3.  THE SEEPAGE PRESSURES ARE NOT WELL CAPTURED EXCEPT AT

13:50    6   THE LONDON CANAL TEST SITE.

13:50    7           SO THE VALIDATION IS INVOLVING A LARGE NUMBER OF

13:50    8   FIELD TESTS, AND WE ARE CAREFULLY PARSING OR BEING SURE THAT WE

13:51    9   ARE APPROPRIATELY TREATING PRESSURE SOURCES 1, 2, AND 3, AND

13:51   10   THE CRITICAL ONE IS 3.

13:51   11           **THE COURT:**  WHY IS 3 THE CRITICAL ONE?

13:51   12           **THE WITNESS:**  WELL, IT'S THE ONE THAT HELPS -- OR IT

13:51   13   DOES EXPLAIN THE TIMING AND NATURE OF THE BREACHES AT NORTH AND

13:51   14   SOUTH AND THE NONBREACH AREA.

13:51   15           **THE COURT:**  ALL RIGHT.

13:51   16   **BY MR. BRUNO:**

13:51   17   **Q.**   I HAVE IN FRONT OF ME THE TRANSCRIPT FROM YESTERDAY'S

13:51   18   TESTIMONY FROM DR. SILVA-TULLA AT 2:59:09 AT LINE 18 OF PAGE --

13:51   19   MAKE SURE I'VE GOT THE PAGE.

13:51   20           BUT HE SAYS HERE:  "THE OTHER THING THAT WE HAVE TO

13:51   21   KEEP IN MIND IS THAT THIS PIEZOMETERS WERE UNDER WATER AT THE

13:51   22   TIME OF THIS EVENT, SO THE CAP IS NOT A TIGHT-FITTING CAP.  SO

13:51   23   THIS IS -- THE MEASUREMENTS THAT WE GET IN THESE TYPE OF EVENTS

13:51   24   WITH THESE TYPE OF INSTRUMENTS ARE NOT VERY GOOD."

13:51   25           HE SAYS:  "BUT NEVERTHELESS, YOU CAN EXPLAIN THIS

|  |  |  |
|--|--|--|

13:51    1   BEHAVIOR AND NOT WITH PRESSURE TRANSMISSION OF ANY KIND OTHER

13:52    2   THAN THE RESPONSE OF THE SOIL TO THE INCREASED LOAD FROM THE

13:52    3   WATER STANDING ON TOP.  OKAY."

13:52    4        DO YOU AGREE WITH DR. SILVA-TULLA?

13:52    5   A.   NO.

13:52    6   Q.   WHY NOT?

13:52    7   A.   HIS REASONING IS DEEPLY FLAWED.

13:52    8   Q.   WHY IS HIS REASONING DEEPLY FLAWED?

13:52    9   A.   WELL, AS I EXPLAINED, IT'S THE INFORMATION WHEN THE WATER

13:52   10   LEVEL DROPS, AND HIS THINKING MECHANICS WOULD NOT ALLOW THE

13:52   11   WATER LEVEL IN THE PIEZOMETER TO FOLLOW DIRECTLY THE DROP IN

13:52   12   WATER LEVEL SURROUNDING IT.  THERE'S A DECOUPLING OF HIS

13:52   13   THEORY.

13:52   14   Q.   ALL RIGHT.  WE ARE ALMOST DONE.  LET'S TALK ABOUT

13:52   15   MCDONOUGH AS A BORROW PIT SITE FOR JUST A MOMENT.

13:53   16        MR. BRUNO:  LET'S CALL UP DX-00119-0448.  THIS COMES

13:53   17   FROM -- CAN WE SHOW PAGE 1.  AH, NOW I KNOW WHERE THIS COMES

13:53   18   FROM.

13:53   19        THIS COMES FROM THE RECAP SUBMITTAL REPORT,

13:53   20   MCDONOUGH MARINE, INNER HARBOR NAVIGATIONAL CANAL, EAST BANK

13:53   21   INDUSTRIAL AREA, NEW ORLEANS, LOUISIANA.  WE SHOWED THE JUDGE

13:53   22   THIS SAME REFERENCE.  WE SHOWED ONE OF THESE WITH REGARD TO

13:53   23   BOLAND.  IT HAD A NICE, PRETTY COLOR PICTURE.  I WILL SHARE

13:53   24   WITH YOU THAT ALL I HAVE IS BLACK AND WHITE.  THERE MAY BE A

13:53   25   COLOR.  I'M NOT USING BLACK AND WHITE TO MISLEAD, IS ALL I WANT

ROBERT G. BEA - DIRECT

13:53    1    TO SAY.  AND BY THE WAY, WE COULD NOT FIND ONE OF THESE FOR

13:53    2    SAUCER, SO WE ARE NOT HIDING THE BALL.

13:54    3         GO BACK TO 48 -- OKAY.  THIS IS NOT A TERRIBLY GOOD

13:54    4    COPY TO LOOK AT.  JUDGE, WOULD YOU WANT TO SEE --

13:54    5         **THE COURT:**  I CAN SEE IT RIGHT HERE.

13:54    6    **BY MR. BRUNO:**

13:54    7    **Q.**   NOW, DR. BEA, YOU CAN SEE THAT THIS IS A WEST-TO-EAST

13:54    8    ALIGNMENT OF THE BORINGS, CORRECT?

13:54    9    **A.**   THAT'S CORRECT.

13:54   10    **Q.**   IF WE GO VERY QUICKLY TO -- JUST KEEP IN MIND THIS IS

13:54   11    55 K, I, G, E, C, AND A.  AND SO THAT IF WE LOOK AT PX-0847-17.

13:54   12    PX-0847-17.

13:55   13         WE CAN SEE WHERE THE 55 -- I'M SORRY.  THERE IT IS.

13:55   14         SO WE ARE SEEING THIS IS A NICE SLICE THROUGH

13:55   15    MCDONOUGH, RIGHT DOWN THE MIDDLE, CORRECT, DR. BEA?

13:55   16    **A.**   CORRECT.

13:55   17         **MR. BRUNO:**  CAN WE GO BACK TO THE PREVIOUS SLIDE.

13:56   18         THERE WE GO.

13:56   19    **BY MR. BRUNO:**

13:56   20    **Q.**   NOW, DR. BEA, WE SEE THAT'S PRETTY HOMOGENEOUS THERE,

13:56   21    ISN'T IT?

13:56   22    **A.**   NO.

13:56   23    **Q.**   WELL, IN TERMS OF THESE BIG BLOCKS.  IN OTHER WORDS, IF I

13:56   24    WAS GOING TO LOCATE A BORROW PIT, WOULD THIS BE A PRETTY GOOD

13:56   25    CANDIDATE FOR A BORROW PIT?

ROBERT G. BEA - DIRECT

13:56   1   **A.**   YES.  IT'S PREDOMINANTLY CLAY MATERIAL.

13:56   2   **Q.**   WE SEE THAT IT'S PREDOMINANTLY CLAY, BUT WE HAVE A BUNCH

13:56   3   OF SILT IN THERE TOO?

13:56   4   **A.**   THAT'S CORRECT.

13:56   5   **Q.**   SO ONE OF THE THINGS WE KNOW IS NICE CLAY BOTTOM AT -- I

13:56   6   CAN'T READ THESE NUMBERS, BUT NEGATIVE 12 -- IS THAT NEGATIVE

13:56   7   12?

13:56   8   **A.**   THIS IS NEGATIVE 12.  HERE'S NEGATIVE 15.

13:56   9   **THE COURT:**  NEGATIVE OF?

13:56   10   **THE WITNESS:**  BELOW GROUND LEVEL.

13:56   11   **BY MR. BRUNO:**

13:56   12   **Q.**   SO WE HAVE A NICE LOCATION FOR OUR BORROW PIT.  WE HAVE A

13:57   13   LOT OF CLAY, HAVE A LOT OF SILT?

13:57   14   **A.**   YES.

13:57   15   **MR. BRUNO:**  I WILL JUST ASK THE COURT TO REMEMBER THE

13:57   16   PICTURE IN -- I WON'T CALL IT UP RIGHT NOW -- THE PICTURE OF

13:57   17   BOLAND, WHICH HAD LOTS OF COLORS AND LOTS OF DIFFERENT

13:57   18   MATERIALS SHOWN ALL OVER THE PLACE.

13:57   19   **BY MR. BRUNO:**

13:57   20   **Q.**   NOW, YOU MODELED THIS AREA, DID YOU NOT?

13:57   21   **A.**   YES.

13:57   22   **Q.**   BY THE WAY, WE HAVE ALSO HAD ANOTHER PIECE OF INFORMATION

13:57   23   WHICH INDICATED THROUGH A MAP OF THIS BORROW PIT WHERE THE

13:57   24   BOTTOM WAS RELATIVE TO THE ORGANIC LAYERS, RIGHT?

13:57   25   **A.**   YES.

**ROBERT G. BEA - DIRECT**

13:57  1   **Q.**   AND THAT WAS A MAP THAT WAS PRODUCED BY DR. MARR?

13:57  2   **A.**   THAT'S CORRECT.

13:57  3   **Q.**   AND YOU EVALUATED THAT MAP?

13:57  4   **A.**   YES.

13:57  5   **Q.**   DID YOU SEE WHETHER OR NOT THE BOTTOM OF THE BORROW PIT --

13:57  6   AT LEAST WITH REGARD TO DR. MARR'S INTERPRETATION OF THE

13:57  7   GEOLOGY, DID IT GET INTO THE ORGANIC LAYER?

13:57  8   **A.**   NO.

13:57  9   **Q.**   IS THAT WHY YOU CHOSE THIS AS A NEAR BREACH PLACE TO

13:58  10  MODEL?

13:58  11  **A.**   WELL, IT WAS NOT BECAUSE OF DR. MARR'S, BUT BECAUSE OF

13:58  12  EARLIER EVALUATIONS THAT I MADE CONCERNING MCDONOUGH.

13:58  13  DR. MARR'S EVALUATION CORROBORATED THE EVALUATION I DEVELOPED.

13:58  14         **THE COURT:**  AS I RECALL, DR. BEA, YOU USED THIS AS

13:58  15  YOUR COMPARATOR IN ASCERTAINING THE RELATIVE FACTORS OF SAFETY

13:58  16  VIS-À-VIS THE BREACHES AND THIS AREA.

13:58  17         **THE WITNESS:**  YES.

13:58  18         **THE COURT:**  YOU CAME UP WITH A HIGHER FACTOR OF

13:58  19  SAFETY AT THE NEAR BREACH AREA THAN YOU DID AT THE SOUTH BREACH

13:58  20  OR THE NORTH BREACH?

13:58  21         **THE WITNESS:**  YES.

13:58  22         **THE COURT:**  AT THE SOUTH BREACH AND THE NORTH BREACH,

13:58  23  YOU MODELED CERTAIN EXCAVATIONS, WHICH I'M SURE WILL BE

13:59  24  EXPLORED ON CROSS-EXAMINATION.  CORRECT?

13:59  25         **THE WITNESS:**  YES.

ROBERT G. BEA - DIRECT

13:59  1        THE COURT:  ALL RIGHT.  THAT'S IT.

13:59  2        THE WITNESS:  THE BASIC MYSTERY THAT WE HAVE BEEN

13:59  3   TRYING TO SOLVE SINCE WE STARTED THE WORK HERE IN 2005 WAS TO

13:59  4   ANSWER THE QUESTION COHERENTLY, WHY DID THE NORTH BREACH OCCUR

13:59  5   WHERE IT DID AND HOW IT DID?  AND THEN WE HAD TO EXPLAIN, WELL,

13:59  6   WHY DID THE SOUTH BREACH OCCUR WHERE IT DID AND HOW IT DID?

13:59  7   THEN WE HAD TO CONFRONT WHAT'S IN BETWEEN BECAUSE IT DIDN'T

13:59  8   BREACH.

13:59  9        WE THEN SAID, WELL, IT WAS SEVERELY OVERTOPPED

13:59  10  DURING THE ENTIRE STORM, AND IF THE ENTIRE WALL HAD BEHAVED

13:59  11  THAT WAY, THEN I WOULD NOT HAVE THE PLEASURE OF BEING HERE

13:59  12  TODAY.

13:59  13       THE COURT:  YES, SIR.

14:00  14       MR. BRUNO:  SO JUST A FEW MORE.  LET'S GET TO

14:00  15  DR. STARK.  WOULD YOU PLEASE PULL UP DR. STARK'S SLIDE 46.

14:00  16  BY MR. BRUNO:

14:00  17  Q.   NOW, I KNOW YOU WEREN'T HERE, BUT I WANT YOU TO ASSUME

14:00  18  THAT DR. STARK TESTIFIED THAT HE TOOK YOUR NEAR BREACH ANALYSIS

14:00  19  AND THAT HE RERAN ON HIS COMPUTER YOUR NEAR BREACH ANALYSIS.

14:00  20  OKAY?

14:00  21  A.   YES.

14:00  22  Q.   NOW, FIRST OF ALL, DOES DR. STARK'S REPORT REFER TO ANY

14:00  23  SUCH EXERCISE?

14:00  24  A.   NO.

14:00  25  Q.   DID YOU HAVE THE OPPORTUNITY TO REVIEW THE ANALYSES THAT

ROBERT G. BEA - DIRECT

14:01  1   DR. STARK, IF HE SO TESTIFIED ABOUT, BEFORE THIS TRIAL?

14:01  2   **A.**   NO.

14:01  3   **Q.**   HAVE YOU UP UNTIL THIS DAY HAD A CHANCE TO SEE DR. STARK'S

14:01  4   RERUNS OF YOUR ANALYSIS AT ALL?

14:01  5   **A.**   NO.

14:01  6   **Q.**   NOW, IN YOUR ORIGINAL REPORT YOU SHOWED AN INCREASE IN THE

14:01  7   PRESSURE GRADIENT AT THE NEAR BREACH FROM 0.0 TO 0.05; IS THAT

14:01  8   CORRECT?

14:01  9   **A.**   THAT'S CORRECT.

14:01  10  **Q.**   NOW, EVEN IF YOU ASSUME, AS DR. STARK ASSERTED, WE

14:01  11  BELIEVE -- I'M GOING TO ASK YOU TO ASSUME -- THAT THE INCREASE

14:01  12  IN THE PRESSURE GRADIENT WAS .3 AND NOT .05, IS IT TRUE THAT

14:02  13  THERE WOULD STILL BE NO FAILURE AT THE NEAR BREACH LOCATION?

14:02  14  **A.**   YES.

14:02  15  **Q.**   THERE STILL WOULD BE NO FAILURE?

14:02  16  **A.**   CORRECT.

14:02  17  **Q.**   IS THAT BECAUSE THE INITIAL GRADIENT AT THE NEAR BREACH

14:02  18  LOCATION IS 0.0?

14:02  19  **A.**   YES.

14:02  20  **Q.**   NOW, THAT'S DIFFERENT THAN THE NORTH BREACH LOCATION WHERE

14:02  21  THE INITIAL GRADIENT IS IN EXCESS OF 0.2; ISN'T THAT RIGHT?

14:02  22  **A.**   CORRECT.

14:02  23  **Q.**   SO WHY IS THERE A DIFFERENCE IN THE INITIAL PRESSURE

14:02  24  GRADIENTS AT THE NORTH BREACH AND THE NEAR BREACH LOCATIONS?

14:02  25  **A.**   THE NEAR BREACH IS NOT IN CONTACT -- OR THE NEAR BREACH

ROBERT G. BEA - DIRECT

14:02  1    EXCAVATION IS NOT IN CONTACT WITH THE SWAMP MARSH DEPOSIT.
14:02  2    THAT'S THE SOLE DIFFERENCE.
14:03  3            MR. BRUNO:  DR. BEA AND YOUR HONOR, THANK YOU VERY
14:03  4    MUCH.
14:03  5            THE COURT:  MR. TREEBY, WOULD YOU LIKE A RECESS
14:03  6    BEFORE YOU COMMENCE?  THAT'S PROBABLY A GOOD IDEA.  10 MINUTES?
14:03  7    IS THAT SUFFICIENT?
14:03  8            MR. TREEBY:  SURE.
14:03  9            THE COURT:  I DON'T KNOW WHO IS GOING TO GO FIRST,
14:03  10   BUT WHICHEVER ONE.
14:03  11           MR. BRUNO:  I CAN BET.
14:03  12           (RECESS.)
14:18  13           THE COURT:  ARE YOU READY TO PROCEED?
14:18  14           MR. TREEBY:  I AM.  THIS IS GOING TO BE, IF
14:18  15   YOUR HONOR PLEASE, A LITTLE DISORGANIZED BECAUSE I AM
14:18  16   ADDRESSING THINGS SOMETIMES THAT I HADN'T PLANNED, SOME THINGS
14:18  17   I HAD.
14:19  18           THE COURT:  QUITE WELL UNDERSTOOD.
14:19  19           MR. TREEBY:  I'LL DO THE BEST I CAN.
       20                    **CROSS-EXAMINATION**
14:19  21   BY MR. TREEBY:
14:19  22   Q.  FIRST, DR. BEA, I'M GLAD TO SEE YOU ARE LOOKING WELL.
14:19  23   A.  THANK YOU.
14:19  24   Q.  I DON'T HAVE THE TRANSCRIPT TO REFER TO, BUT I THINK YOU
14:19  25   WILL REMEMBER IT BECAUSE IT WAS JUST WITHIN THE LAST FEW HOURS,

ROBERT G. BEA - CROSS

14:19  1  AT LEAST.  IN FACT, I THINK IT'S BEEN SINCE LUNCH THAT YOU

14:19  2  TESTIFIED ABOUT -- LET'S PULL UP THE SLIDE.  THAT'S THE WAY TO

14:19  3  DO THIS, WHICH IS THE SLIDE -- IF I CAN FIND IT -- YES,

14:19  4  SLIDE 121 THAT YOU COMMENTED ON FROM DR. SILVA-TULLA'S REPORT.

14:19  5  SLIDE 121 FROM HIS SLIDE PRESENTATION, I SHOULD SAY.

14:19  6        THE COURT:  RIGHT.

14:19  7  BY MR. TREEBY:

14:19  8  Q.   YOU COMMENTED, IN RESPONSE TO MR. BRUNO'S QUESTION, THAT

14:19  9  IT DIDN'T SURPRISE YOU -- THAT YOU WOULDN'T EXPECT -- EVEN

14:19  10  UNDER THE THEORY THAT YOU ARE ESPOUSING IN THIS CASE, YOU

14:20  11  WOULDN'T EXPECT THOSE PRESSURES THAT WOULD BE TRANSMITTED FROM

14:20  12  THIS VERY DEEP EXCAVATION CALLED THE CANAL BECAUSE IT WAS

14:20  13  PROTECTED BY SEDIMENTS THAT ACCUMULATED OVER YEARS AND YEARS

14:20  14  AND YEARS, RIGHT, AT THE BANK?

14:20  15  A.   YES.

14:20  16  Q.   WOULD YOUR OPINION CHANGE IF I TOLD YOU THAT -- AND I'M

14:20  17  ASKING YOU TO ASSUME THAT -- AT THE SAUCER MARINE SITE, THE

14:20  18  BANK BEFORE THE REMEDIATION STARTED WAS 324 FEET FROM THE

14:20  19  FLOODWALL, BUT THE BANK IN 2005 AFTER THE REMEDIATION WAS

14:20  20  COMPLETED WAS ONLY 242 FEET FROM THE FLOODWALL; IN OTHER WORDS,

14:20  21  THAT THE BANK HAD BEEN REMOVED BY 82 FEET?

14:20  22  A.   YES.

14:20  23  Q.   WOULD THAT CHANGE YOUR OPINION HERE?

14:20  24  A.   WELL, THAT WORK WOULD REMOVE THAT SKIN UNTIL SUFFICIENT

14:20  25  TIME HAD PASSED FOR THE SKIN TO REFORM AT THE NEW BANK.

ROBERT G. BEA - CROSS

14:21  1  **Q.**  SIMILARLY AT BOLAND -- IN FACT, WE HAVE SEEN A LOT OF
14:21  2  PICTURES ABOUT THIS -- THE BANK WAS ORIGINALLY -- IF I TELL YOU
14:21  3  TO ASSUME THE BANK WAS ORIGINALLY 242 FEET FROM THE FLOODWALL
14:21  4  BUT -- NO, I'M SORRY -- 297 FEET FROM THE FLOODWALL, BUT IT
14:21  5  ENDED UP BEING REMOVED BY 109 FEET BACK TOWARD THE FLOODWALL SO
14:21  6  THAT IT WAS ONLY 188 FEET FROM THE FLOODWALL, WOULDN'T THAT
14:21  7  AFFECT YOUR CONCLUSION THAT THE SEDIMENT BUILT UP OVER YEARS AT
14:21  8  THAT BANK WOULD SOMEHOW PROTECT IT, BE A SLEEVE OR SOME KIND OF
14:21  9  A MEMBRANE OR SURFACE THAT WOULD PROTECT IT FROM THESE PRESSURE
14:21  10  TRANSMISSIONS?
14:21  11  **A.**  WELL, AGAIN, IT'S A FUNCTION OF THE TIME INTERVAL FOR THE
14:21  12  SKIN TO REFORM.  THE AVAILABLE INFORMATION INDICATES THESE
14:21  13  SKINS FORM QUICKLY, AND THAT'S BECAUSE OF THE HIGH SUSPENDED
14:21  14  SEDIMENT CONTENT IN THE WATER, IS WHY THE WATER IS MURKY, ONE
14:22  15  OF THE REASONS.
14:22  16      **MR. TREEBY:**  IF YOUR HONOR PLEASE, I'M NOT VERY
14:22  17  SKILLFUL WITH ELMO, AND I WOULD JUST AS SOON NOT USE IT.  SO
14:22  18  I'M GOING TO HAND OUT SOME PAPER OF A PAGE THAT WAS REFERRED TO
14:22  19  IN DR. BEA'S TESTIMONY.
14:22  20  **BY MR. TREEBY:**
14:22  21  **Q.**  BUT BEFORE I DO, YOU REFERRED TO PAGE 286 IN LAMBE AND
14:22  22  WHITMAN.  DO YOU HAVE YOUR LAMBE AND WHITMAN THERE?
14:22  23  **A.**  I HAVE THE PAGES THAT I REFERRED TO.
14:22  24  **Q.**  SO PAGE 286 -- AND YOU REFERRED TO IT -- I BELIEVE YOU
14:22  25  REFERRED TO IT TO SAY THAT THIS WOULD SUBSTANTIATE YOUR

ROBERT G. BEA - CROSS

14:22  1  RELATION BETWEEN WATER CONTENT AND PERMEABILITIES.  RIGHT?
14:22  2  **A.**   THAT'S CORRECT.
14:22  3  **Q.**   BUT, IN FACT -- AND THIS IS DOCUMENT JX-1696 AT PAGE 286.
14:23  4          **MR. TREEBY:**  LET ME GIVE THIS TO THE COURT AS WELL.
14:23  5  MAYBE I WILL HAND THIS ONE THAT'S MARKED WITH THE NUMBER TO THE
14:23  6  COURT, AND HERE'S AN EXTRA ONE.  I HAVE IT MARKED WITH THE SAME
14:23  7  PAGE NUMBER.
14:23  8  **BY MR. TREEBY:**
14:23  9  **Q.**   IN THIS FIGURE, DR. BEA, PERMEABILITY IS ACROSS THE
14:23 10  BOTTOM, RIGHT?
14:23 11  **A.**   THAT'S CORRECT.
14:23 12  **Q.**   WATER CONTENT CANNOT BE FOUND ANYWHERE ON THIS DOCUMENT;
14:23 13  ISN'T THAT TRUE?
14:23 14  **A.**   WELL, THE VERTICAL SCALE SHOWN HERE IS VOID RATIO, AND THE
14:23 15  VOID --
14:23 16  **Q.**   I'M GOING TO TRY TO DO THIS JUST TO SHORTEN IT.
14:23 17          **MR. BRUNO:**  I'M GOING TO OBJECT.
14:23 18          **MR. TREEBY:**  I DON'T MIND AN EXPLANATION, BUT I WOULD
14:23 19  ASK THE COURT, WHEN I ASK IT VERY PLAINLY, TO BE A YES-OR-NO
14:23 20  ANSWER.
14:23 21          **THE COURT:**  THAT'S BEEN DONE BEFORE, AND YOU MAY DO
14:23 22  THAT.
14:23 23  **BY MR. TREEBY:**
14:23 24  **Q.**   I DON'T MIND A LONG EXPLANATION YOU WANT TO GIVE, BUT I
14:23 25  WANT TO FIRST HEAR, DOES *WATER CONTENT* -- DO THOSE WORDS APPEAR

ROBERT G. BEA - CROSS

14:24  1  ANYWHERE ON THIS DOCUMENT?

14:24  2  **A.**   NO.

14:24  3  **Q.**   WHAT APPEARS ON THE VERTICAL IS VOID RATIO, RIGHT?

14:24  4  **A.**   THAT'S CORRECT.  AND VOID RATIO IS RELATED TO WATER

14:24  5  CONTENT.

14:24  6  **Q.**   IT IS RELATED, BUT IT'S NOT THE SAME THING, IS IT?

14:24  7  **A.**   IT'S DIRECTLY RELATED.

14:24  8  **Q.**   IN FACT, WATER CONTENT IS ABOUT WEIGHT, RIGHT?

14:24  9  **A.**   YES.

14:24  10  **Q.**   VOID RATIO IS ABOUT VOLUME, RIGHT?

14:24  11  **A.**   YES.  VOLUME INVOLVES WATER, AND THAT'S WEIGHT, AND SOIL

14:24  12  HAS WEIGHT.

14:24  13         **MR. TREEBY:**  WHILE WE'RE ON THE SUBJECT, PULL UP

14:24  14  SLIDE 125, WHICH WAS ACTUALLY DR. SILVA-TULLA'S REPORT, BUT IT

14:24  15  CAME FROM YOUR TESTIMONY OR YOUR REPORT.  SLIDE 125.

14:24  16  **BY MR. TREEBY:**

14:24  17  **Q.**   THIS WAS TO ILLUSTRATE WHAT YOU SAID WAS THIS RELATIONSHIP

14:24  18  BETWEEN PERMEABILITY AND WATER CONTENT, RIGHT?

14:24  19  **A.**   YES, SIR.

14:24  20  **Q.**   "BUT I NOTICE YOU DID NOT INCLUDE BENTONITE ON THIS, DID

14:25  21  YOU?"  THAT'S WHAT DR. SILVA-TULLA HAS ADDED; ISN'T THAT

14:25  22  CORRECT.

14:25  23  **A.**   YES, SIR.

14:25  24  **Q.**   "YOU KNOW, DO YOU NOT, THAT BENTONITE HAS A NATURAL WATER

14:25  25  CONTENT OF 900 PERCENT, BUT A PERMEABILITY OF 10 TO THE

**ROBERT G. BEA - CROSS**

14:25  1   MINUS 7?"

14:25  2   **A.**   WELL, BENTONITE WHEN IT'S DRY DOESN'T HAVE A NATURAL WATER

14:25  3   CONTENT.

14:25  4   **Q.**   ISN'T IT TRUE THAT BENTONITE HAS A NATURAL WATER CONTENT

14:25  5   OF 900 PERCENT, FIRST?  TAKE THAT FIRST.

14:25  6   **A.**   NO.

14:25  7   **Q.**   OH, THAT'S NOT TRUE?

14:25  8   **A.**   THAT'S CORRECT.

14:25  9   **Q.**   OKAY.

14:25  10  **A.**   BENTONITE IS USED IN DRILL MUD, AND IT COMES IN BAGS.

14:25  11  IT'S DRY.  IT HAS A ZERO WATER CONTENT.

14:25  12  **Q.**   WHEN IT'S DRY, IT'S EXTREMELY RIGID, ISN'T IT?

14:25  13  **A.**   NO.  IN FACT, I USED TO WORK IN THE MUD ROOM ON RIGS.

14:26  14  IT'S POWDERY STUFF.  WE DUMP IT IN LIKE FLOUR BINS, INTO A

14:26  15  HOPPER.  IT'S NOT RIGID.

14:26  16  **Q.**   I'M NOT SAYING THE WHOLE MASS IS RIGID; I'M SAYING EACH

14:26  17  GRAIN IS RIGID.  IS IT NOT?

14:26  18  **A.**   NO.  THEY ARE PLATELETS.  THEY LOOK LIKE THIS IN A MICRO

14:26  19  SCALE.  THEY ARE FLEXIBLE.  THEY DO THIS.

14:26  20  **Q.**   THANK YOU.

14:26  21        **MR. TREEBY:**  LET'S CALL UP SLIDE 59, PLEASE.

14:26  22  **BY MR. TREEBY:**

14:26  23  **Q.**   YOU COMMENTED ON THIS PARTICULAR SLIDE, AND MR. BRUNO

14:26  24  ASKED YOU A QUESTION, THAT THIS HAS NO HOLES ON IT.  THAT WAS

14:26  25  HIS TERMINOLOGY, NO HOLES.

ROBERT G. BEA - CROSS

14:26  1          LET ME ASK YOU THIS -- AND YOU TESTIFIED YES, IF IT
14:27  2   WAS PUNCTURED -- I THINK YOU SAID "PUNCTURED" OR "PIERCED."
14:27  3   I'M NOT SURE WHICH OF THE TWO WORDS YOU USED.  BUT IF PUNCTURED
14:27  4   OR PIERCED, THEN TO GET DOWN TO THE ORGANIC CLAY, THAT WOULD BE
14:27  5   DIFFERENT THAN THIS ILLUSTRATION.  IS THAT ROUGHLY CORRECT?
14:27  6   **A.**   YES.
14:27  7   **Q.**   OKAY.  NOW, I WANT YOU TO ASSUME IF ANY HOLES IN THAT
14:27  8   SURFACE -- IF THEY WERE BACKFILLED AND COMPACTED TO THE SAME
14:27  9   DENSITY AS THE SURROUNDING SOILS, ISN'T IT TRUE THAT THIS WOULD
14:27  10  BE AN ACCURATE REPRESENTATION OF THESE PRESSURES?
14:27  11  **A.**   YES, SIR.  THAT'S WHAT WE MODELED IN OUR PIEZOMETER
14:27  12  STUDIES.  THAT'S WHY I COMMENTED THAT WE SHOWED NO EXCAVATIONS,
14:27  13  BECAUSE THE AREAS IN THE AREA OF THE PIEZOMETERS HAD BEEN
14:27  14  APPROPRIATELY BACKFILLED.
14:28  15  **Q.**   DID YOU EVER REVIEW THE PLANS AND SPECS FOR THE CONNECTION
14:28  16  BETWEEN THE EXISTING WALL, WHAT WE HAVE CALLED THE 1980S
14:28  17  WALL -- I MEAN THE 1960S WALL -- AND THE 1980S WALL THAT WAS
14:28  18  MADE RIGHT AT THE NORTH END OF THE NORTH BREACH?  HAVE YOU EVER
14:28  19  LOOKED AT THOSE PLANS AND SPECS?
14:28  20  **A.**   I DON'T THINK SO.  I KNOW DR. STORESUND AND DR. ROGERS
14:28  21  DID, BUT I DON'T RECALL I ACTUALLY STUDIED THAT PLAN.
14:28  22  **Q.**   MAYBE YOU WILL STILL BE ABLE TO ANSWER THIS QUESTION.  YOU
14:28  23  TALKED ABOUT -- I THINK WHAT COUNSEL WAS TALKING ABOUT, HE
14:28  24  TALKED ABOUT PANELS BEING GLUED TOGETHER.  DO YOU REMEMBER THAT
14:28  25  DISCUSSION?

ROBERT G. BEA - CROSS

14:28  1  **A.**   YES.  YES.

14:28  2  **Q.**   HE WAS SAYING THAT THERE WERE CONCRETE PANELS ALONG THE

14:29  3  FLOODWALL AND THAT, TO USE HIS WORD, THEY WERE GLUED TOGETHER.

14:29  4  **A.**   OKAY.  THAT'S THE CONNECTING JOINT BETWEEN THE CONCRETE

14:29  5  EXPOSED SIDES.

14:29  6  **Q.**   RIGHT.  IN FACT, THAT CONNECTING JOINT IS SOMETHING

14:29  7  BASICALLY CALLED A "THREE-BULB WATERSTOP"; ISN'T THAT CORRECT?

14:29  8  **A.**   NO, THAT IS NOT THE JOINT THAT WE WERE DISCUSSING.  THE

14:29  9  JOINT THAT WE WERE DISCUSSING IS EXTENSIVELY DISCUSSED AND

14:29  10  ILLUSTRATED IN DR. MARR'S REPORT.

14:29  11      THAT'S THE DIRECT CONCRETE CONNECTION BETWEEN THE OLD

14:29  12  WALL AND THE NEW WALL.  AS YOU MOVE DOWN, THEN WE HAVE THE

14:29  13  WATERSTOP JOINTS THAT ARE PUT IN THERE SPECIFICALLY SO WE DON'T

14:29  14  HAVE A STRUCTURAL CONNECTION BETWEEN THE PANELS.  WE HAVE A

14:30  15  DOWEL -- PARDON ME -- A MITER JOINT TYPE OF CONNECTION LIKE I'M

14:30  16  ILLUSTRATING WITH MY HANDS.

14:30  17  **Q.**   HOW WOULD YOU KNOW THAT IF YOU NEVER LOOKED AT THE

14:30  18  DRAWINGS?

14:30  19  **A.**   BECAUSE I USED TO WORK FOR THE U.S. ARMY CORPS OF

14:30  20  ENGINEERS IN THE CONSTRUCTION OF THESE KINDS OF THINGS.

14:30  21  **Q.**   I THINK THIS DOCUMENT IS IN EVIDENCE.  IT MAY NOT BE ON

14:30  22  THE LIST.  THIS IS A DRAWING OF THE EXISTING-WALL-TO-NEW-WALL

14:30  23  JOINTS FOR REACH C AND REACH D, TYPICAL SECTIONS AND WALL

14:30  24  JOINTS, AND IT HAS THAT JOINT.

14:30  25      **MR. BRUNO:**  WELL, THAT BEING THE CASE, SINCE

*DAILY TRANSCRIPT*

**ROBERT G. BEA - CROSS**

14:30   1   MR. TREEBY HAS FOR THE PAST THREE WEEKS JUMPED UP AND SCREAMED

14:30   2   EVERY TIME --

14:30   3          **THE COURT:**  MR. BRUNO, PLEASE, PLEASE.

14:30   4          **MR. BRUNO:**  WE OBJECT.  IT'S NOT ON THE LIST.  WE

14:30   5   HAVEN'T SEEN IT.

14:30   6          **THE COURT:**  HE HAS NOT SCREAMED OR JUMPED UP.

14:31   7   MR. TREEBY HAS OBJECTED.  I DON'T NEED THE OTHER STUFF.  IT'S

14:31   8   SO UNHELPFUL.

14:31   9          **MR. BRUNO:**  JUDGE, WE KNOW THAT.  IT'S THE LAST DAY

14:31  10   OF THE TRIAL, AND YOU'LL FORGIVE --

14:31  11          **THE COURT:**  I UNDERSTAND.  LET'S HOPE THAT I LIKEWISE

14:31  12   DON'T CAVE IN TO MY NATURAL TEMPERAMENT.

14:31  13          **MR. BRUNO:**  FOR THAT, I APOLOGIZE.  OBVIOUSLY, WE

14:31  14   OBJECT TO EVEN SHOWING THIS TO THE WITNESS.  IT'S NOT ON THE

14:31  15   EXHIBIT LIST.  IT'S NOWHERE -- I DON'T KNOW HOW WE EVEN TALK

14:31  16   ABOUT IT.

14:31  17          **THE COURT:**  THERE'S AN OBJECTION NOW.  MR. TREEBY, DO

14:31  18   YOU CARE TO RESPOND TO THE OBJECTION?

14:31  19          **MR. TREEBY:**  YES.  FOR THE FIRST TIME, WE HAVE HEARD

14:31  20   WHAT WE DO NOT BELIEVE TO BE TRUE TODAY, THAT THIS CONNECTION

14:31  21   IS SOMEHOW MADE WITH REBAR, WHICH THAT TERM WASN'T USED, BUT

14:31  22   THAT'S ESSENTIALLY WHAT I'VE HEARD.

14:31  23          HAVING PERSONALLY EXAMINED IT AND KNOWING ABOUT

14:31  24   THESE PLANS, I KNOW THAT CONNECTION WAS NOT MADE WITH REBAR AND

14:31  25   I KNOW THAT THERE WAS A WATERSTOP AT THAT CONNECTION AND I KNOW

ROBERT G. BEA - CROSS

14:31    1   THAT MEANS THAT THOSE TWO WALLS ARE NOT CONNECTED RIGIDLY, AS

14:32    2   HAS BEEN SUGGESTED HERE.

14:32    3           THE COURT:  LET HIM FINISH.

14:32    4           MR. TREEBY:  THIS DOCUMENT, I BELIEVE, WILL

14:32    5   DEMONSTRATE THAT.  WE HAVE MARKED IT DX -- AND I GAVE THE ONLY

14:32    6   ONE THAT WAS NUMBERED AWAY -- 2738.

14:32    7           THE COURT:  I HAVE IT RIGHT HERE.  LET ME GIVE THIS

14:32    8   ONE TO THE --

14:32    9           THE LAW CLERK:  SHEENA HAS THE CORRECT NUMERAL.

14:32   10           MR. TREEBY:  I'M FINISHED.

14:32   11           THE COURT:  MR. BRUNO.

14:32   12           MR. BRUNO:  FIRST OF ALL, WHAT I DESCRIBED WAS A

14:32   13   DOWEL.  THE DOWEL CAN BE SEEN IN THE PHOTOGRAPH THAT

14:32   14   DR. SILVA-TULLA AND DR. MARR SHOWED THE COURT.  THAT'S NUMBER

14:32   15   ONE.

14:32   16           NUMBER TWO, WHAT WE ARE BEING SHOWN HERE IS FROM

14:32   17   1963.

14:32   18           MR. TREEBY:  '83.

14:32   19           MR. BRUNO:  MAYBE I'M BLIND.

14:32   20           THE COURT:  I'LL TELL YOU WHAT.  Y'ALL MAY NEED TO

14:32   21   CLUE ME IN AS TO WHAT -- DOES THIS HAVE TO DO WITH THE FAILURE

14:33   22   MECHANISM OF THE NORTH BREACH, IN ESSENCE?  IS THAT WHAT WE ARE

14:33   23   TALKING ABOUT?

14:33   24           MR. TREEBY:  IT'S ROUGHLY CONNECTED.  IT WAS JUST --

14:33   25   I'M NOT TRYING TO MAKE THIS MORE OF A POINT THAN IT IS, YOUR

*DAILY TRANSCRIPT*

ROBERT G. BEA - CROSS

14:33   1   HONOR.  I JUST WOULD NOTE THAT I SAW THAT WALL CONNECTION
14:33   2   MYSELF.
14:33   3            THE COURT:  I'M GOING TO LET HIM EXPLORE IT FOR
14:33   4   WHATEVER IT'S WORTH.
14:33   5            MR. BRUNO:  THE SECOND POINT I MIGHT HAVE TO MAKE,
14:33   6   BECAUSE I AM NOT AN EXPERT ON THIS, AND THAT IS I DON'T KNOW
14:33   7   THAT I HAVE GOT THE RIGHT DRAWING THAT WILL ALLOW ME TO
14:33   8   ASCERTAIN WHAT THE CONNECTION IS.
14:33   9            THE COURT:  WELL, DR. BEA, BEING THE EXPERT, CAN MAKE
14:33   10  THAT --
14:33   11           MR. BRUNO:  THANK YOU, JUDGE.
14:33   12           THE COURT:  -- ASSESSMENT.
14:33   13  BY MR. TREEBY:
14:33   14  Q.  DR. BEA, LET'S MAKE AN ASSUMPTION.  IF, IN FACT, THERE
14:33   15  IS -- I UNDERSTAND THERE'S A CONCRETE PANEL THAT WAS POURED
14:33   16  RIGHT THERE, AND PART OF THAT CONCRETE PANEL RIGHT AT THE NORTH
14:33   17  END OF THE NORTH BREACH WAS HIGHER, AND IT DROPPED DOWN -- THE
14:33   18  SAME CONCRETE PANEL WITH REBAR IN IT -- AND UNDERNEATH, INSIDE
14:34   19  IT, IT HAD SHEET PILE.  ONE SHEET PILE IN PART OF THAT TALLER
14:34   20  PANEL WAS THE TALLER SHEET PILE, AND IN THE SAME CONCRETE PIECE
14:34   21  WAS A SHORTER SHEET PILE, AND THERE WAS REBAR THERE.
14:34   22  A.  YES, SIR.
14:34   23  Q.  THAT'S WHAT I'M TALKING ABOUT.  BUT THEN THERE WAS A
14:34   24  WATERSTOP RIGHT NEXT TO THAT.
14:34   25  A.  THAT'S CORRECT.

ROBERT G. BEA - CROSS

14:34   1   Q.   THAT WATERSTOP IS NOT A CONNECTION; IN FACT, IT'S DESIGNED
14:34   2   TO HOLD WATER FROM GOING THROUGH THOSE PANELS.
14:34   3   A.   WELL, THE CONCRETE KEEPS THE WATER FROM GOING THROUGH.
14:34   4   THAT JOINT IS PROVIDING FLEXIBILITY BETWEEN THE PANELS, AND
14:34   5   THAT'S SO WE DON'T TRANSFER EXCESSIVE FORCES BETWEEN ADJACENT
14:34   6   PANELS THAT ARE TRYING TO MOVE EITHER VERTICALLY OR
14:34   7   HORIZONTALLY.
14:34   8         MR. TREEBY:   I WANT TO CALL UP SLIDE 85 FROM
14:34   9   DR. SILVA-TULLA'S PRESENTATION.   I HOPE I KNOW WHEN IT GETS UP
14:35   10  TO WHAT I WAS PLANNING TO ASK.
14:35   11        YES, I DO.
14:35   12  BY MR. TREEBY:
14:35   13  Q.   I HEARD SOME TESTIMONY, AND I'M SURE THE COURT IS
14:35   14  PROBABLY -- I HOPE I'M NOT GILDING THE LILY, BUT I JUST HEARD
14:35   15  WHAT I THOUGHT WAS SOMETHING DIFFERENT THAN YOU SAID BEFORE.
14:35   16        DR. BEA, YOU HAVE -- IT'S TRUE THAT YOU DON'T HAVE
14:35   17  ANY EVIDENCE PRE-KATRINA THAT WASHINGTON GROUP PERFORMED THE
14:36   18  EXCAVATION DESCRIBED ON YOUR SOUTH BREACH CASE 1 BACKFILLED
14:36   19  EXCAVATION.   ISN'T THAT TRUE?
14:36   20  A.   WHAT'S YOUR QUESTION?
14:36   21  Q.   THAT'S IT.
14:36   22  A.   WELL, THE ANSWER IS SITTING THERE, AND THE EXCAVATION YOU
14:36   23  ARE REFERRING TO WAS THAT IDEALIZED YELLOW BLOCKS.   THE
14:36   24  QUESTION WAS SPECIFIC TO THAT IDEALIZED SECTION.   OF COURSE,
14:36   25  THERE'S NOT A WAY TO TRACE DIRECTLY THAT IDEALIZED BLOCKS, BUT

ROBERT G. BEA - CROSS

14:36  1  I HAVE OPINED RELATIVE TO THE EXCAVATION ACTIVITY THAT HELPED

14:36  2  EXPLAIN THAT BOX.

14:36  3  Q.   AND THE SAME IS TRUE FOR THE NORTH BREACH, ISN'T IT, THAT

14:36  4  YOU HAVE NO EVIDENCE PRE-KATRINA FOR ANY BACKFILLED EXCAVATION

14:37  5  AT THE LOCATION OF YOUR CROSS SECTION SHOWN IN CASE 1-1 OR

14:37  6  CASE 1-2 THAT HAS THOSE DIMENSIONS SHOWN ON THAT FIGURE?  ISN'T

14:37  7  THAT TRUE?

14:37  8  A.   YES.

14:37  9  Q.   THERE'S SOME TESTIMONY THAT WAS ELICITED BY MR. BRUNO

14:37  10  ABOUT PIEZOMETERS, AND THESE ARE ORDINARY STANDPIPE PIEZOMETERS

14:37  11  INSTALLED, AS MR. BRUNO SAID, BY THE CORPS OF ENGINEERS.

14:37  12       ISN'T IT TRUE THAT THE CORPS OF ENGINEERS DID NOT

14:37  13  INSTALL THESE PIEZOMETERS TO MEASURE TOTAL HEAD LOADS WHEN THE

14:37  14  PIEZOMETERS ARE SUBMERGED, WHEN THE TOP OF THEM IS SUBMERGED?

14:37  15  THAT WASN'T THEIR PURPOSE, WAS IT?

14:38  16  A.   I HAVE SEEN NO TESTIMONY THAT CORROBORATES THAT ASSERTION.

14:38  17  THEY WENT TO GOOD PRACTICE TO PROVIDE ACCIDENTAL WATER

14:38  18  INTRUSION INTO THE TUBES, TWO OF THEM, AND SIMILARLY FOR WATER

14:38  19  INTRUSION AROUND THE OUTSIDE OF THE PIEZOMETER, AND THAT

14:38  20  FOLLOWED TRADITIONAL CORPS OF ENGINEERS GUIDELINES FOR

14:38  21  PIEZOMETERS.

14:38  22  Q.   I'M NOT TALKING ABOUT ANYTHING EXCEPT WHEN THE WATER IS

14:38  23  OVER THE TOP OF THE PIEZOMETER, STANDPIPE PIEZOMETER.  SURELY

14:39  24  YOU ARE AWARE THAT AN ORDINARY STANDPIPE PIEZOMETER, IF THE TOP

14:39  25  WERE TOTALLY SEALED WITHOUT A VENT, IT WOULDN'T FUNCTION

ROBERT G. BEA - CROSS

14:39    1    PROPERLY BECAUSE OF THE AIR PRESSURE IN THAT TUBE.  ISN'T THAT

14:39    2    RIGHT?

14:39    3    **A.**    WELL, THAT'S ONE -- YES.

14:39    4    **Q.**    THANK YOU.

14:39    5    **A.**    THAT'S ONE OF THE REASONS.

14:39    6    **Q.**    NOW, DR. BEA, YOU USED A DEVICE CALLED *NEWTON'S CRADLE* AS

14:39    7    A DEMONSTRATIVE HERE FOR THE COURT, RIGHT?

14:39    8    **A.**    YES, SIR.

14:39    9    **Q.**    I USED TO PLAY WITH ONE OF THOSE.

14:39    10           ISN'T IT TRUE THAT THE SPEED OF THE FIRST BALL WHEN

14:39    11   IT STRIKES THE SECOND BALL IS AN IMPORTANT CONSIDERATION

14:39    12   BECAUSE IT INTRODUCES A SHOCK WAVE TO THE SECOND BALL?

14:39    13   **A.**    WELL, I CAN DO IT WITH DIFFERENT SPEEDS; I GET THE SAME

14:39    14   RESPONSE.

14:39    15   **Q.**    IT INTRODUCES A SHOCK WAVE TO THE SECOND BALL; ISN'T THAT

14:39    16   TRUE?

14:39    17   **A.**    IT INTRODUCES A TRANSFER OF FORCE, AND THERE'S AN EQUAL

14:39    18   AND OPPOSITE REACTION, THANKS TO NEWTON.

14:40    19   **Q.**    ISN'T IT CORRECT TO CALL THAT, IN ENGINEERING TERMS, A

14:40    20   *SHOCK WAVE*?

14:40    21   **A.**    IT CAN BE CALLED THAT.

14:40    22   **Q.**    AND WITHOUT BEING TOO PRECISE, DR. BEA, YOU WOULD AGREE

14:40    23   THAT THE STRIKE SPEED OF YOUR NEWTON'S CRADLE FIRST BALL WOULD

14:40    24   BE SOMETHING CLOSE TO ONE MILLISECOND, RIGHT?

14:40    25   **A.**    I HAVEN'T MEASURED IT.

ROBERT G. BEA - CROSS

14:40    1    **Q.**   HAVE YOU LOOKED UP -- I HATE TO CONFESS THIS -- I PROBABLY
14:40    2    SHOULDN'T IN FRONT OF THIS DISTINGUISHED CROWD -- BUT THAT'S
14:40    3    WHAT WIKIPEDIA SAYS.
14:40    4    **A.**   AS A FORENSIC ENGINEER, I WOULD NEVER USE WIKIPEDIA TO
14:40    5    TESTIFY TO ANYTHING.
14:40    6    **Q.**   GLAD TO HEAR THAT.
14:40    7         **THE COURT:**  CONSIDERING -- I'VE GOT TO SAY,
14:40    8    CONSIDERING -- THIS IS AN ASIDE.  A FRIEND OF MINE PLACED IN
14:41    9    WIKIPEDIA HE IS A BURDEN TO HIS FRIENDS AND FAMILY, WHICH MAY
14:41   10    BE TRUE, BUT NONETHELESS, HE'S CERTAINLY UPSET.
14:41   11    **BY MR. TREEBY:**
14:41   12    **Q.**   WOULD IT SURPRISE YOU, DR. BEA, TO KNOW THAT DR. ROGERS
14:41   13    RELIED ON WIKIPEDIA IN THIS CASE?
14:41   14    **A.**   IN THIS CASE, NOTHING HAS CEASED TO SURPRISE ME.
14:41   15    **Q.**   JUST WANTED TO LET EVERYBODY IN ON THE JOKE.
14:41   16         WOULD YOU AGREE ALSO THAT THE INERTIA OF THOSE BALLS
14:41   17    IN NEWTON'S CRADLE IS AN IMPORTANT FACTOR IN THAT MODEL?
14:41   18    **A.**   YES.
14:41   19    **Q.**   IN OTHER WORDS, YOUR EXPERIMENT IS A DYNAMIC PROBLEM, ONE
14:41   20    IN WHICH THE INERTIA IS IMPORTANT AND THE LOADS ARE APPLIED
14:41   21    RAPIDLY?
14:41   22    **A.**   YES, AND I TRANSFER THE FORCE WITHOUT SIGNIFICANT MOVEMENT
14:41   23    OF THE CENTER THREE BALLS.
14:41   24    **Q.**   NOW, TO GET MORE SERIOUS, THE KATRINA EVENT THAT WE ARE
14:41   25    HERE ABOUT, THAT WAS SUCH A TRAGEDY IN THIS CITY FOR ALL OF US,

ROBERT G. BEA - CROSS

14:42    1    FROM BEGINNING TO THE FAILURE OF THE WALLS IN THE EAST BANK

14:42    2    INDUSTRIAL AREA TOOK ABOUT THE ORDER OF 30 HOURS; ISN'T THAT

14:42    3    RIGHT?

14:42    4    A.   YES, SIR.

14:42    5    Q.   AND ISN'T IT TRUE THAT THE TIME FOR THE STORM SURGE TO

14:42    6    BUILD UP IS MUCH, MUCH LONGER THAN THE TIMES ASSOCIATED WITH

14:42    7    THE SPEED OF SOUND THROUGH WATER?  ISN'T THAT RIGHT?

14:42    8    A.   PLEASE REPEAT YOUR QUESTION.

14:42    9    Q.   ISN'T IT TRUE THAT THE TIME FOR THE KATRINA STORM SURGE TO

14:42   10    BUILD UP, 30 HOURS, IS MUCH, MUCH LONGER THAN THE TIMES

14:42   11    ASSOCIATED WITH THE SPEED OF SOUND THROUGH WATER?  ISN'T THAT

14:42   12    RIGHT?

14:42   13    A.   WELL, HOW MUCH WATER ARE WE PROPAGATING THROUGH?  THE

14:42   14    ENTIRE CIRCUIT OF THE EARTH?  ONE IS HOURS; THE OTHER IS FEET

14:42   15    PER SECOND OR MILES PER HOUR.

14:42   16    Q.   WHY DON'T WE TALK ABOUT THE DISTANCE FROM THE CANAL TO THE

14:43   17    FLOODWALL.  WOULDN'T YOU AGREE WITH ME, AT THE SPEED OF SOUND

14:43   18    IN WATER, THAT WAS MUCH, MUCH SHORTER THAN THE 30-HOUR TIME

14:43   19    SURGE?

14:43   20    A.   YES, SIR.

14:43   21    Q.   AND I THINK YOU'VE ALREADY AGREED WITH ME YOUR

14:43   22    DEMONSTRATION WITH NEWTON'S CRADLE IS A DYNAMIC PHENOMENON,

14:43   23    RIGHT?

14:43   24    A.   WELL, YES.  AND DR. MARR ATTRIBUTED MY HYDRAULIC PRESSURE

14:43   25    CONDUCTIVITY -- HE INSERTED AN ADDITIONAL WORD, AND HE

ROBERT G. BEA - CROSS

14:43   1   ATTRIBUTED IT TO PRESSURE WAVE TRANSMISSION AND PROCEEDED TO

14:43   2   DEMONSTRATE THAT PRESSURE WAVE TRANSMISSION WAS NOT INVOLVED.

14:43   3   I WAS NOT THE AUTHOR OF THAT INSERTED WORD *WAVES*.

14:44   4   **Q.**   I WANT TO CHANGE THE SUBJECT, DIFFERENT KIND OF WAVE.

14:44   5        DR. BEA, IT WAS YOUR TESTIMONY LAST WEEK THAT YOU

14:44   6   CONSIDERED WAVES IN FORMING THE OPINIONS IN YOUR EXPERT REPORT;

14:44   7   IS THAT CORRECT?

14:44   8   **A.**   PLEASE DESCRIBE WHICH KIND OF WAVES YOU'RE ASKING ABOUT.

14:44   9   **Q.**   I WAS TOO SHORT IN THE WAY I MADE MY TRANSITION.  SO I'M

14:44   10   NOW TALKING ABOUT THE WAVES THAT WERE CREATED BY WIND AND SURGE

14:44   11   IN THE KATRINA EVENT.

14:44   12   **A.**   YES, SIR.

14:44   13   **Q.**   THAT'S THE KIND OF WAVES.  I'M NO LONGER ON THE OTHER

14:44   14   KINDS OF WAVES.  THAT'S THE WATER WAVES I'M TALKING ABOUT.

14:44   15   **A.**   THANK YOU.

14:44   16   **Q.**   IT WAS YOUR TESTIMONY LAST WEEK THAT YOU CONSIDERED WAVES,

14:44   17   THOSE KINDS OF WAVES, IN FORMING THE OPINIONS IN YOUR EXPERT

14:44   18   REPORT, RIGHT?

14:44   19   **A.**   YES, SIR.

14:44   20   **Q.**   AND YOU ACTUALLY INCLUDED A DISCUSSION OF WAVES IN THAT

14:44   21   REPORT; ISN'T THAT CORRECT?

14:44   22   **A.**   THAT'S CORRECT.

14:44   23   **Q.**   IN FACT, YOUR DISCUSSION OF THOSE WAVES IS SET OUT IN

14:45   24   TABLE 1 OF YOUR FEBRUARY 1, 19 -- FEBRUARY 1, 2012 EXPERT

14:45   25   REPORT, WHICH IS AT JX-01389-0023; ISN'T THAT CORRECT?

**ROBERT G. BEA - CROSS**

14:45    1    **A.**    YES, SIR.

14:45    2    **Q.**    AND YOU DO NOT ADDRESS OR REVISE THIS TABLE OF WAVES IN

14:45    3    YOUR SUPPLEMENTAL REPORTS, RIGHT?

14:45    4    **A.**    THAT'S CORRECT.

14:45    5    **Q.**    IN TABLE 1 OF YOUR FEBRUARY 1 REPORT, YOU INCLUDE A COLUMN

14:45    6    LABELED "SIGNIFICANT WAVE HEIGHT"; IS THAT CORRECT?

14:45    7    **A.**    YES, SIR.

14:45    8    **Q.**    AND YOU AGREE THAT THE TERM *SIGNIFICANT WAVE HEIGHT* HAS A

14:45    9    DEFINED MEANING, CORRECT?

14:45   10    **A.**    YES, SIR.

14:45   11    **Q.**    IN FACT, YOU TESTIFIED LAST MONTH THAT IT REFERS TO THE

14:45   12    AVERAGE OF THE HIGHEST ONE-THIRD OF THE WAVES IN A PARTICULAR

14:45   13    SEA STATE, RIGHT?

14:45   14    **A.**    YES.  I ALSO ADDED IT'S THE WAVE HEIGHT BEST ASSOCIATED

14:45   15    WITH THE KINETIC AND POTENTIAL ENERGY IN THAT PROGRESSIVE WAVE.

14:46   16    **Q.**    BY DEFINITION, WHERE A SIGNIFICANT WAVE HEIGHT IS GIVEN,

14:46   17    THERE WILL BE WAVES LARGER THAN THE SIGNIFICANT WAVE HEIGHT,

14:46   18    INCLUDING A MAXIMUM WAVE HEIGHT; ISN'T THAT CORRECT?

14:46   19    **A.**    RIGHT.

14:46   20    **Q.**    AND IF YOU KNOW THE HEIGHT OF THE SIGNIFICANT WAVE IN A

14:46   21    PARTICULAR SEA STATE, YOU CAN DETERMINE THE HEIGHT OF THE

14:46   22    MAXIMUM WAVE IN THAT SEA STATE; IS THAT RIGHT?

14:46   23    **A.**    WELL, SOME ASSUMPTIONS HAVE TO BE MADE ON THE DISTRIBUTION

14:46   24    OF AMPLITUDES.  IT'S NOT A GIVEN THAT THE AMPLITUDES ARE

14:46   25    RAYLEIGH DISTRIBUTED.  SO IT DOES DEPEND UPON SPECIFICS

ROBERT G. BEA - CROSS

14:46   1   CONCERNING THE GENERATION OF THE WAVES.  IT'S NOT A GIVEN
14:46   2   RELATIONSHIP.
14:46   3   **Q.**   WELL, I'LL TRY ONE MORE TIME BEFORE I PULL UP YOUR TRIAL
14:46   4   TESTIMONY.  BUT, FOR EXAMPLE, IF YOU HAVE A SIGNIFICANT WAVE
14:47   5   HEIGHT OF 2 FEET, THEN OVER THE COURSE OF AN HOUR OF THAT SEA
14:47   6   STATE, YOU WOULD HAVE A MAXIMUM HEIGHT OF 1.7 TIMES THAT
14:47   7   SIGNIFICANT WAVE HEIGHT, OR 3.4 FEET; ISN'T THAT CORRECT?
14:47   8   **A.**   THAT'S CONDITIONAL ON RAYLEIGH DISTRIBUTION OF AMPLITUDE,
14:47   9   THAT IS CORRECT.
14:47   10   **Q.**   I DIDN'T HEAR THAT -- AND THERE MAY BE A MEANING IN YOUR
14:47   11   DISTINCTION, AND I'M NOT QUARRELING WITH THAT, BUT THAT'S NOT
14:47   12   WHAT YOU TESTIFIED AT TRIAL.  DO YOU RECALL THAT?
14:47   13   **A.**   YES, SIR.
14:47   14   **Q.**   DO YOU RECALL THAT'S NOT WHAT YOU TESTIFIED AT TRIAL?
14:47   15   **A.**   YES, SIR.
14:47   16   **Q.**   I WON'T GO ANY FURTHER THEN.
14:47   17        LET'S GO TO JX-1414-061.
14:47   18   **A.**   IS IT PERMISSIBLE FOR ME TO ADD TESTIMONY CONCERNING THAT
14:47   19   COLUMN?
14:47   20        **THE COURT:**  YES, SIR.  GO AHEAD.
14:47   21        **THE WITNESS:**  THE COLUMN REFERS TO THE WAVE HEIGHTS
14:47   22   IN THE CLAIBORNE TO FLORIDA AVENUE STRETCH, AND -- BUT THOSE
14:48   23   ARE THE WAVES IN THAT SEA STATE AND LOCATION, NOT CONDITIONAL
14:48   24   ON DIRECTION.
14:48   25        **THE COURT:**  OKAY.

ROBERT G. BEA - CROSS

14:48    1    BY MR. TREEBY:
14:48    2    Q.   OKAY.  LET'S GO TO JX-1414, PAGE 061, WHICH IS PART OF
14:48    3    YOUR APRIL 3, 2012 REBUTTAL REPORT.  THREE LINES DOWN, YOU
14:48    4    STATE -- AND I'M -- YOU KNOW WHAT?  LET ME BACK OFF OF THIS.  I
14:48    5    SEE I WANTED TO USE THIS LATER.  I'LL COME BACK TO THIS.
14:48    6    SORRY.
14:48    7           SAME DOCUMENT, PAGE 061 -- PAGE 075.  I'M SORRY.  NO.
14:48    8    WELL, I THINK IT'S 075.  PARAGRAPH 109.  IS THAT WHAT IT IS?
14:48    9    OKAY.
14:48   10    A.   I'M CONFUSED.  WHICH REPORT ARE YOU --
14:49   11    Q.   THIS IS YOUR APRIL 3, 2012 REBUTTAL REPORT.  IF YOU NEED
14:49   12    TO LOOK AT IT, I'LL WAIT UNTIL YOU GET IT.
14:49   13    A.   YES, SIR.  WHAT PAGE?
14:49   14    Q.   PAGE 109.  I'M SORRY.  PAGE 75, PARAGRAPH 109.
14:49   15           74, PARAGRAPH 109.  I HAVE ALL KIND OF WRONG
14:49   16    REFERENCES HERE.
14:49   17           HAVE WE FOUND IT YET?  IT'S PAGE 74, PARAGRAPH 109.
14:49   18    A.   THE ANSWER IS MY COPY IS MISSING PAGE 74.
14:49   19           THE COURT:  WE'LL LOOK AT IT ON THE -- JUST LOOK AT
14:49   20    IT ON THE SCREEN.
14:49   21    BY MR. TREEBY:
14:49   22    Q.   CAN YOU SEE IT ON THE SCREEN?
14:49   23    A.   I CAN SEEN THE BLOWN-UP PART.  I CAN'T SEE THE --
14:50   24    Q.   THAT'S ALL I WANT TO LOOK AT, IS THE BLOWN-UP PART.
14:50   25    A.   YES.

ROBERT G. BEA - CROSS

14:50  1   **Q.**   AND THIS STATES, DOES IT NOT, THAT "LIDAR SURVEYS

14:50  2   PERFORMED BEFORE (2002) AND AFTER (2005) HURRICANE KATRINA

14:50  3   INDICATE THE SCOUR TRENCH DEPTHS NORTH AND SOUTH OF THE SOUTH

14:50  4   BREACH ARE APPROXIMATELY 2 TO 3 FEET," AND YOU CITE FOR THAT

14:50  5   FIGURE 32, MARINO 2010.

14:50  6   **A.**   YES, SIR.

14:50  7   **Q.**   DO YOU SEE THAT?

14:50  8   **A.**   YES.

14:50  9   **Q.**   DR. BEA, YOU DIDN'T ACTUALLY RELY ON A REPORT FROM

14:50  10  DR. MARINO DATED IN 2010, DID YOU?

14:50  11  **A.**   WELL, YES.  I THINK IT'S DATED 2010.  HE HAD TWO REPORTS,

14:50  12  ONE DRAFT FINAL AND ONE FINAL.  THERE'S A SEPARATION IN DATES,

14:50  13  BUT --

14:50  14  **Q.**   THE ONLY ONE IN YOUR REFERENCE MATERIAL AND THE ONLY ONE

14:50  15  WE KNOW ABOUT IS IN 2009, AND IT'S CITED, IN FACT, IN YOUR

14:51  16  REFERENCES ON PAGE 0123 OF YOUR REBUTTAL REPORT.

14:51  17          **MR. TREEBY:**  CAN YOU PULL THAT UP?  RIGHT THERE.

14:51  18  **BY MR. TREEBY:**

14:51  19  **Q.**   THIS IS THE REFERENCES IN THE SAME REPORT, MARINO 2009

14:51  20  FAILURE INVESTIGATION OF THE NORTH AND SOUTH BREACHES.  SO THIS

14:51  21  MUST BE THE REPORT YOU WERE REFERRING TO SINCE IT'S IN YOUR

14:51  22  REFERENCES, RIGHT?

14:51  23  **A.**   YES, BUT I MAY HAVE MISTYPED, WORD-PROCESSED THAT DATE.

14:51  24  IT SHOULD BE THE SAME AS QUOTED HERE, AND MY MEMORY IS TELLING

14:51  25  ME IT'S 2010, ASSOCIATED WITH *BARGE*.

ROBERT G. BEA - CROSS

14:51   1   **Q.**   WE DON'T HAVE ANY OTHER REPORT FROM MARINO BESIDE THIS

14:51   2   ONE, WHICH I'M GOING TO PULL UP NOW BECAUSE IT'S DX-02735-0001.

14:52   3   YOU SEE THE FRONT PAGE.  THIS IS THE REPORT.

14:52   4   **A.**   YES, SIR.

14:52   5   **Q.**   IT'S THE ONLY ONE WE HAVE.

14:52   6          **MR. TREEBY:**  AND IF YOU WOULD TURN, ERIC, TO

14:52   7   PAGE 0003, SECOND PARAGRAPH, SECOND LINE, I THINK.

14:52   8          I'M SORRY.  IT'S THE THIRD PARAGRAPH.  NO, I

14:52   9   DON'T KNOW WHAT PARAGRAPH IT IS.

14:52   10         THERE WE GO.  THAT'S WHAT I WANT.

14:52   11  **BY MR. TREEBY:**

14:52   12  **Q.**   THIS IS MARINO'S REPORT.  HE SAYS:  "FURTHERMORE,

14:52   13  OVERTOPPING OF THE REMAINING ADJACENT I-WALL SECTIONS DID NOT

14:53   14  RESULT IN FAILURE WITH REPORTED SCOUR TRENCH DEPTHS AND WIDTHS

14:53   15  OF 4 FEET AND 5 FEET FOR SIGNIFICANT LENGTHS.  SEE FIGURE 4.4."

14:53   16         IS THAT WHAT YOU WERE REFERRING TO?

14:53   17  **A.**   NO.

14:53   18  **Q.**   WE DON'T HAVE ANY OTHER REPORT, DR. BEA.

14:53   19  **A.**   I'M REFERRING TO THE LIDAR SURVEYS THAT HE SPECIFICALLY

14:53   20  INCLUDED IN HIS REPORT.  I REPRODUCED THOSE IN MY REPORT.

14:53   21  **Q.**   LET'S LOOK AT THE NEXT PAGE, WHICH IS THE FIGURE THAT

14:53   22  MARINO REFERS TO.  AND THIS IS --

14:53   23         **MR. TREEBY:**  WE NEED TO BLOW IT UP.  BLOW UP THE

14:53   24  BOTTOM PART OF THE MAP WHERE IT HAS THE EBIA -- THERE WE GO --

14:53   25  BETWEEN FLORIDA AVENUE -- FLORIDA AVENUE BRIDGE THERE AND

ROBERT G. BEA - CROSS

14:53   1   CLAIBORNE AVENUE BRIDGE.
14:53   2   BY MR. TREEBY:
14:53   3   Q.   THIS IS WHAT HE IS REFERRING TO.  AND YOU CAN SEE THE RED
14:53   4   LINE.
14:53   5        I THINK, IF YOU LOOK OVER HERE, IT SAYS *SCOUR* IN THE
14:54   6   LEGEND ON THE LEFT.  DO YOU SEE THAT?
14:54   7   A.   YES, SIR.
14:54   8   Q.   AND THAT'S THE SCOUR HE IS TALKING ABOUT ON THE PRIOR PAGE
14:54   9   IN THE REPORT; IS THAT RIGHT?
14:54  10   A.   YES, SIR.
14:54  11   Q.   NOW, GO TO THE NEXT PAGE, 0005.
14:54  12        IS THIS THE NEXT PAGE?  OKAY.
14:54  13        THIS IS THE NEXT PAGE, AND THE ONLY REASON I'M
14:54  14   CALLING IT UP IS FOR THE TABLE.
14:54  15        MR. TREEBY:  AND WE ARE GOING TO NEED TO REALLY BLOW
14:54  16   THIS UP.  IT'S REALLY HARD TO SEE.
14:54  17   BY MR. TREEBY:
14:54  18   Q.   LOOK AT LINES FOR IHNC 2 AND IHNC 3.  CAN YOU READ THAT
14:54  19   NOW?
14:54  20   A.   YES, SIR.
14:54  21   Q.   AND IT SAYS 4 FEET DEEP, RIGHT, AND 5 FEET WIDE, RIGHT?
14:54  22   AT THOSE STATIONS 16.09 -- AND THAT HAPPENS TO BE AT THE
14:54  23   CORNER; WE HAVE ALREADY ESTABLISHED THAT IN THIS CASE -- TO
14:55  24   22 PLUS, WHICH IS RIGHT AT THE SOUTH END OF THE SOUTH BREACH.
14:55  25   A.   YES, SIR.

ROBERT G. BEA - CROSS

14:55  1   **Q.**   AND THEN FROM STATION 31, WHICH IS RIGHT AT THE NORTH END

14:55  2   OF THE SOUTH BREACH, TO 54, 4-FOOT-DEEP SCOUR TRENCH.

14:55  3        DO YOU SEE THAT?

14:55  4   **A.**   YES, SIR.

14:55  5   **Q.**   NOW, I WANT TO LOOK AT -- WE WERE PUZZLED BY THIS, AND I'M

14:55  6   SURE THERE'S AN EXPLANATION, BUT I'M ANXIOUS TO HEAR IT --

14:55  7   JX-01393-0022, WHICH IS PAGE 22 OF APPENDIX D TO YOUR

14:55  8   FEBRUARY 1, 2012 REPORT IN THIS CASE.

14:55  9        AND I WANT TO ENLARGE THE BOTTOM PARAGRAPH, SECOND

14:55  10  LINE DOWN.  AT THE END, IT STARTS:  "AFTER THE CANAL WATER

14:55  11  ELEVATION AND WAVE ELEVATIONS EXCEEDED PLUS 13 FEET (NAVD88),

14:55  12  THE SCOUR TRENCH WAS ERODED TO A DEPTH OF APPROXIMATELY 3 TO

14:56  13  4 FEET."  AND THEN YOU HAVE A STRING OF CITATIONS -- WE CALL

14:56  14  THOSE *STRING CITES* IN THE LEGAL BUSINESS -- "IPET 2007,

14:56  15  ILIT 2006, BEA" -- YOURSELF -- "2008," AND "MARINO 2009."

14:56  16        DO YOU SEE THAT?

14:56  17  **A.**   YES.

14:56  18  **Q.**   SO AT LEAST IN FEBRUARY 2012 YOU UNDERSTOOD, DID YOU

14:56  19  NOT -- WELL, LET ME GO BACK NOW AND ASK THE QUESTION I STARTED

14:56  20  WITH, BECAUSE IF WE GO BACK TO JX-1414, PAGE 61, WHICH IS PART

14:56  21  OF YOUR APRIL 3, 2012 REBUTTAL REPORT, THREE LINES DOWN, YOU

14:56  22  STATE:  "DR. SILVA-TULLA PROVIDES NO INFORMATION CONCERNING

14:56  23  UNDER WHAT CONDITIONS, HOW OR WHEN THE DEPTH OF SCOUR EQUALS

14:56  24  4 FEET."

14:56  25        DO YOU SEE THAT?

ROBERT G. BEA - CROSS

14:56    1   **A.**   YES.  THAT WAS THE CONDITION --

14:57    2   **Q.**   SO AT LEAST IN --

14:57    3   **A.**   -- AS OF THE TIME OF DR. SILVA-TULLA'S EXPERT REPORT.

14:57    4   **Q.**   SO AT LEAST IN FEBRUARY 2012, YOU UNDERSTOOD WHERE AND HOW

14:57    5   HE GOT THE 4-FOOT SCOUR TRENCH AT THE EBIA; ISN'T THAT TRUE?

14:57    6              **MR. BRUNO:**  OBJECTION.

14:57    7              **THE WITNESS:**  NO, THAT'S NOT TRUE.

14:57    8              **THE COURT:**  I'M GOING TO LET HIM ANSWER THE QUESTION.

14:57    9                   GO AHEAD, SIR.  EXPLAIN YOUR ANSWER.

14:57   10              **THE WITNESS:**  WELL, DR. SILVA-TULLA IN HIS EXPERT

14:57   11   REPORT HYPOTHESIZES DEPTHS OF EROSION TRENCH.  HE DOES NOT

14:57   12   DEVELOP ANALYSES TO DEFINE THE SCOUR DEPTHS.  THERE WAS NO

14:57   13   CONNECTION PROVIDED BETWEEN THE PHYSICS OF THE SCOURING PROCESS

14:57   14   AND THE NUMBERS INCLUDED IN HIS REPORT.  THE FIRST EXPLANATION

14:57   15   THAT I HEARD WAS YESTERDAY.

14:57   16              **MR. BRUNO:**  AND MY OBJECTION, JUDGE, WAS GOING TO BE

14:58   17   AND STILL IS THAT MR. TREEBY JUST SHOWED DR. BEA THE SECTION OF

14:58   18   THE EBIA WHICH DID NOT FAIL, AND HE IS ASKING THE DOCTOR TO

14:58   19   COMPARE THE SECTION WHICH DID NOT FAIL WITH THE SECTION THAT

14:58   20   DR. SILVA-TULLA OPINES DID FAIL.

14:58   21              I DON'T KNOW HOW ANYBODY COULD MAKE THAT

14:58   22   CONNECTION.  I WANT TO MAKE THAT CLEAR THAT IT WAS NOT A FAIR

14:58   23   QUESTION TO BEGIN WITH.

14:58   24              **THE COURT:**  WELL, CROSS-EXAMINATION DOESN'T HAVE TO

14:58   25   BE FAIR.

ROBERT G. BEA - CROSS

14:58    1            GO AHEAD.

14:58    2            **MR. TREEBY:**  I AGREE WITH YOUR HONOR'S ASSESSMENT,

14:58    3    BUT I DO WANT TO BE FAIR.

14:58    4            **THE COURT:**  I KNOW YOU DO.

14:58    5    **BY MR. TREEBY:**

14:58    6    **Q.**   IN FACT, THE ONLY REMAINING EVIDENCE OF SCOUR TRENCH AFTER

14:58    7    KATRINA WAS AT THE ENDS OF THE BREACHES, RIGHT?

14:58    8    **A.**   NO.

14:58    9    **Q.**   BECAUSE THE BREACHES WERE WIPED OUT, RIGHT?

14:58   10    **A.**   WELL, THERE WAS EVIDENCE OF SCOUR TRENCHES ALONG THE

14:59   11    ENTIRE FRONTAGE, BOTH EAST AND WEST SIDES.

14:59   12    **Q.**   OKAY.  I'LL ACCEPT THAT.

14:59   13            THE COURT ASKED YOU DURING YOUR TESTIMONY ON

14:59   14    SEPTEMBER 19, WHICH WAS THREE WEEKS AGO, WHETHER YOU HAD DONE

14:59   15    ANY MODELING THAT WOULD SHOW WHAT THE UPLIFT PRESSURES WOULD

14:59   16    HAVE BEEN IN THE EBIA WITHOUT WGI'S EXCAVATIONS.

14:59   17            DO YOU REMEMBER THAT?

14:59   18    **A.**   YES.

14:59   19            **MR. TREEBY:**  I WOULD, JUST FOR THE RECORD, REFERENCE

14:59   20    TRANSCRIPT PAGE 12 -- I'M NOT GOING TO CALL IT UP.  I DON'T

14:59   21    WANT TO CALL IT UP BECAUSE HE REMEMBERS IT.  I DON'T WANT TO

14:59   22    CALL IT UP.

14:59   23            **THE WITNESS:**  YES.

14:59   24            **MR. TREEBY:**  TRANSCRIPT PAGE 1292, SEPTEMBER 19,

14:59   25    2012, IN THE MORNING.  SO I CAN SKIP ALL OF THAT.

ROBERT G. BEA - CROSS

14:59  1    BY MR. TREEBY:

14:59  2    Q.   THEN I ASKED YOU, AND I BELIEVE YOU ANSWERED ME:  "ISN'T

14:59  3    IT TRUE YOU DID NOT MODEL THE NORTH BREACH WITHOUT ANY

15:00  4    EXCAVATIONS?"

15:00  5         I'M ASKING YOU THAT NOW.

15:00  6    A.   THAT'S CORRECT.

15:00  7    Q.   AND ISN'T IT TRUE THAT YOU ALSO DID NOT MODEL THE SOUTH

15:00  8    BREACH WITHOUT ANY EXCAVATIONS?

15:00  9         MR. BRUNO:  JUDGE, WITH RESPECT, THIS IS REALLY NOT

15:00  10   SUPPOSED TO BE ABOUT A LAWYER REREADING TO THE COURT THE ACTUAL

15:00  11   QUESTION AND THE ACTUAL ANSWER THAT YOU HEARD THREE WEEKS AGO.

15:00  12   I'M JUST CONFUSED.  I DON'T MIND LATITUDE, BUT IF WE ARE JUST

15:00  13   GOING TO HAVE A REGURGITATION OF THE PREVIOUS POINTS THAT

15:00  14   MR. TREEBY MADE, THAT'S BETTER DONE IN BRIEFING, WITH ALL DUE

15:00  15   RESPECT.

15:00  16        THE COURT:  I UNDERSTAND, AND OVERRULED.

15:00  17        MR. TREEBY:  DID I GET AN ANSWER?  I'M SORRY.

15:00  18        THE COURT:  NO, SIR.  I DON'T THINK YOU DID.  DR. BEA

15:00  19   MAY HAVE ANSWERED.  I DON'T REMEMBER.

15:00  20   BY MR. TREEBY:

15:00  21   Q.   ISN'T IT TRUE THAT YOU ALSO DID NOT MODEL THE SOUTH BREACH

15:00  22   WITHOUT ANY EXCAVATIONS?

15:00  23   A.   THAT'S CORRECT.

15:00  24   Q.   INSTEAD, YOU MODELED THE NEAR BREACH SCENARIO, WHICH

15:01  25   INVOLVED A LARGE, DEEP, AND OPEN EXCAVATION KNOWN AS THE BORROW

**ROBERT G. BEA - CROSS**

15:01  1  PIT, RIGHT?

15:01  2  **A.**   YES.

15:01  3  **Q.**   AND YOU CLAIMED THAT THE BORROW PIT SOMEHOW WAS, QUOTE,

15:01  4  NOT IN CONTACT WITH THE BURIED SWAMP MARSH DEPOSIT THAT IS

15:01  5  TRANSMITTING THESE UPLIFT PRESSURE FORCES AND, THEREFORE, IS

15:01  6  EMPIRICAL EVIDENCE IN THE FIELD THAT IF YOU DON'T HAVE ANY

15:01  7  UPLIFT PRESSURE, YOU DON'T HAVE FAILURE.  RIGHT?

15:01  8  **A.**   YES.  NOW, THE MCDONOUGH BORROW PIT --

15:01  9  **Q.**   I'M SORRY.  I MAY HAVE MISUNDERSTOOD YOU.  WHAT WAS THE

15:01  10  ANSWER FIRST?

15:01  11              **THE COURT:**  HE SAID YES.

15:01  12              **MR. TREEBY:**  HE SAID YES?

15:01  13              **THE COURT:**  YES.

15:01  14              **MR. TREEBY:**  OKAY.

15:01  15              **THE COURT:**  BUT HE IS ALLOWED TO EXPLAIN HIS ANSWER.

15:01  16              **MR. BRUNO:**  HE IS EXPLAINING.

15:01  17              **MR. TREEBY:**  I DIDN'T HEAR THE FIRST.

15:01  18              **THE COURT:**  WE HAVE GOT IT.  LET'S MOVE ON.

15:01  19              **THE WITNESS:**  MY FURTHER EXPLANATION TO YOU IS MY

15:01  20  ANALYSIS OF THE PIEZOMETERS THAT WERE IN THE IMMEDIATE VICINITY

15:02  21  OF SOUTH BREACH AND NORTH BREACH I MODELED WITHOUT EXCAVATIONS.

15:02  22  **BY MR. TREEBY:**

15:02  23  **Q.**   I KNOW YOU HAVE CALLED IT DIFFERENT THINGS AT DIFFERENT

15:02  24  TIMES, BUT THIS NEAR -- YOU HAVE BEEN CONSISTENT TO LOOK AT THE

15:02  25  MCDONOUGH MARINE BORROW PIT, RIGHT, IN YOUR STUDIES OF THIS

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 15:02 | 1 | PROBLEM? |
| 15:02 | 2 | **A.**   DURING THIS CASE, YES. |
| 15:02 | 3 | **Q.**   AND SOMETIMES YOU HAVE CALLED IT *NEAR BREACH*; SOMETIMES |
| 15:02 | 4 | YOU HAVE CALLED IT *NO FAIL*.  RIGHT? |
| 15:02 | 5 | **A.**   YES, SIR.  YES. |
| 15:02 | 6 | **Q.**   OTHER THAN -- DR. BEA, LET ME BACK UP.  YOU HAVE USED WHAT |
| 15:02 | 7 | YOU ARE CALLING THE NEAR BREACH ANALYSES TO DO WHAT YOU CALL A |
| 15:02 | 8 | VALIDATION OF YOUR CONCLUSIONS REGARDING THE NORTH AND SOUTH |
| 15:02 | 9 | BREACHES; ISN'T THAT CORRECT? |
| 15:02 | 10 | **A.**   IT'S ONE OF THEM, YES, SIR. |
| 15:02 | 11 | **Q.**   ISN'T IT TRUE THAT YOU CLAIM THAT YOUR MODELING OF THE |
| 15:03 | 12 | NEAR BREACH, CASE 1-1, AMOUNTS TO A MODEL OF THE NORTH AND |
| 15:03 | 13 | SOUTH BREACHES WITHOUT EXCAVATIONS INASMUCH AS IT IS IDENTICAL |
| 15:03 | 14 | TO THOSE EXCEPT THAT THE ONLY VARIABLE IS THAT YOU DON'T HAVE |
| 15:03 | 15 | AN EXCAVATION PIERCING WHAT YOU CALL THE *SWAMP MARSH* AT THE |
| 15:03 | 16 | NEAR BREACH?  AM I REMEMBERING THAT CORRECTLY? |
| 15:03 | 17 | **A.**   YES, SIR. |
| 15:03 | 18 | **Q.**   IN FACT, DR. BEA, ISN'T IT TRUE THAT IF YOU MODELED A |
| 15:03 | 19 | PERMEABILITY FOR THE JOURDAN AVENUE FILL MATERIAL FOR YOUR NEAR |
| 15:03 | 20 | BREACH SECTION THAT WAS ONE WHOLE ORDER OF MAGNITUDE MORE |
| 15:03 | 21 | PERMEABLE THAN YOU USED FOR THE SAME JOURDAN AVENUE FILL |
| 15:03 | 22 | SECTION AT THE NORTH AND SOUTH BREACHES, THAT WOULD BE A |
| 15:03 | 23 | SIGNIFICANT ERROR IN YOUR ANALYSIS OF THE NEAR BREACH? |
| 15:03 | 24 | **A.**   WELL, IT'S A HYPOTHETICAL I THINK YOU'RE POSING, AND YES, |
| 15:04 | 25 | THAT WOULD BE A SIGNIFICANT ERROR.  BUT I DIDN'T MAKE THAT |

ROBERT G. BEA - CROSS

15:04  1   ERROR.

15:04  2   **Q.**   AND THAT DIFFERENCE OF MORE THAN A WHOLE ORDER OF

15:04  3   MAGNITUDE HIGHER PERMEABILITY FOR YOUR WHAT YOU CALL *NEAR*

15:04  4   *BREACH SECTION* WOULD EXPLAIN WHY, USING YOUR OTHER SOIL

15:04  5   PARAMETERS, THE NEAR BREACH WOULD NOT HAVE FAILED.  ISN'T THAT

15:04  6   WHAT YOUR ANALYSIS IS INTENDED TO SHOW?

15:04  7   **A.**   NO.

15:04  8   **Q.**   WELL, LET ME ASK IT THIS WAY.  IF THAT DIFFERENCE OF

15:04  9   MORE -- I'M ASKING YOU TO ASSUME A DIFFERENCE OF AN ORDER OF

15:04  10  MAGNITUDE HIGHER PERMEABILITY FOR YOUR NEAR BREACH SECTION AT

15:04  11  THE JOURDAN AVENUE FILL WOULD EXPLAIN WHY, USING YOUR ORIGINAL

15:04  12  SOIL PARAMETERS FOR THE NORTH AND SOUTH BREACH, THE NEAR BREACH

15:04  13  WOULD RESULT IN HAVING LOWER LANDSIDE PORE PRESSURES AND THUS A

15:05  14  HIGHER LEVEL OF STABILITY THAN THE FAILED SECTIONS.  ISN'T THAT

15:05  15  CORRECT?

15:05  16  **A.**   THE QUESTION AS YOU POSED IT IS NOT CORRECT.

15:05  17  **Q.**   HAVE YOU GONE BACK TO YOUR COMPUTER MODEL FILES TO SEE

15:05  18  THAT, IN FACT, YOU USED 4 TIMES 10 TO THE MINUS 5 CENTIMETERS

15:05  19  PER SECOND FOR YOUR PERMEABILITY AT THE SO-CALLED NEAR BREACH

15:05  20  JORDAN AVENUE CANAL SECTION?

15:05  21  **A.**   WELL, YOUR QUESTION IS AGAIN INCORRECT.

15:05  22  **Q.**   ACTUALLY, I WANT TO APOLOGIZE.  I GOT THAT BACKWARDS.  SO

15:05  23  LET ME REPEAT IT.  LET ME JUST FIRST TAKE IT ONE STEP AT A

15:05  24  TIME.

15:05  25       HAVE YOU GONE BACK TO YOUR COMPUTER MODEL FILES TO

ROBERT G. BEA - CROSS

15:05  1  SEE WHAT YOU USED FOR PERMEABILITY AT THE JOURDAN AVENUE FILL

15:05  2  SECTIONS NORTH BREACH, SOUTH BREACH, NEAR BREACH?

15:05  3  **A.**   I REVISITED THAT INFORMATION SEVERAL WEEKS AGO.  AT THE

15:05  4  NEAR BREACH LOCATION, THERE ARE TWO CASES THAT I ANALYZED.  AND

15:05  5  THOSE TWO CASES EXAMINED THE RANGE IN PERMEABILITY AT JOURDAN

15:06  6  AVENUE CANAL, AND THE RESULTS ARE IN MY EXPERT REPORT AND SHOW

15:06  7  THERE IS NO SIGNIFICANT DIFFERENCE IN THE RESULTS.

15:06  8         **MR. TREEBY:**  WELL, IF YOUR HONOR PLEASE, THIS IS AN

15:06  9  IMPEACHMENT EXHIBIT.  IT'S MARKED DX-02737-0001 THROUGH 0010,

15:06  10  AND IT IS A COPY OF ALL OF THE JOURDAN AVENUE PERMEABILITY

15:06  11  FILES, MODELS RUN DOWN FROM YOUR RELIANCE MATERIALS -- PROVIDE

15:06  12  IT TO COUNSEL, PLEASE, IF YOU WOULD -- AND WE HAVE MARKED IT --

15:06  13  GIVE ME A COPY TOO.  WE HAVE MARKED IT DX-02737-0001 THROUGH

15:07  14  10.

15:07  15         **MR. BRUNO:**  I NEED TO JUST UNDERSTAND.  THIS IS A

15:07  16  LITTLE BIT OVER MY HEAD.  SO THIS IS JUST A PRINTOUT FROM

15:07  17  DR. BEA'S --

15:07  18         **MR. TREEBY:**  THE OUTPUT FILES FROM THE COMPUTER

15:07  19  MODELS THAT WE WERE GIVEN AS RELIANCE MATERIALS FOR THESE

15:07  20  SECTIONS.

15:07  21         **MR. SCHULTZ:**  CAN WE GET ANOTHER COPY, PLEASE, SO WE

15:07  22  CAN HAVE ONE MORE --

15:07  23         **MR. BRUNO:**  IF YOU DON'T MIND, CAN I HAVE SOMEBODY

15:07  24  WHO KNOWS FAR BETTER THAN I WHAT TO LOOK FOR?

15:07  25         **THE COURT:**  YES.

ROBERT G. BEA - CROSS

15:07    1          THE WITNESS:  CAN I HAVE A COPY, PLEASE?

15:07    2          MR. TREEBY:  OH, DR. BEA NEEDS ONE.

15:07    3          THE COURT:  DO WE HAVE IT ON THE SCREEN?

15:07    4          MR. TREEBY:  CAN YOU SHARE ONE OF YOURS WITH HIS --

15:07    5          MR. BRUNO:  YEAH, YEAH, YEAH.  BUT HERE'S WHAT I'M

15:07    6    TOLD BY -- I HAVE MY EXPERTS IN THE COURTROOM.  THERE'S

15:07    7    ABSOLUTELY NO WAY I CAN ASCERTAIN WHAT THIS IS AS I'M SITTING

15:07    8    HERE.  SO I HAVE TO OBJECT.  I HAVE NO CHOICE.  I DON'T KNOW

15:07    9    WHAT THIS IS, WHERE IT COMES FROM.  I JUST --

15:07   10          MR. TREEBY:  THIS IS A SCREEN PRINT FROM HIS -- THE

15:07   11    WITNESS CAN SAY WHETHER HE --

15:08   12          MR. BRUNO:  YOU CAN ASK THE WITNESS.  I DON'T KNOW.

15:08   13          THE COURT:  YOU OBJECT BECAUSE YOU DON'T KNOW WHAT IT

15:08   14    IS.

15:08   15          MR. BRUNO:  AND MY EXPERT DOESN'T KNOW.  I UNDERSTAND

15:08   16    YOU CAN PROCEED.  I'M JUST MAKING MY OBJECTION FOR THE RECORD,

15:08   17    JUDGE.

15:08   18          THE COURT:  THE OBJECTION IS NOTED, AND WE WILL SEE

15:08   19    WHAT DR. BEA SAYS ABOUT IT.

15:08   20          THE WITNESS:  YOUR QUESTION FOR ME AGAIN, PLEASE,

15:08   21    SIR, NOW THAT I HAVE THE EXHIBIT?

15:08   22          MR. TREEBY:  WE CAN PUT THIS UP.  I DON'T KNOW IF WE

15:08   23    HAVE A COPY FOR YOUR HONOR, BUT WE'RE ABLE TO --

15:08   24          THE COURT:  I DO HAVE A COPY.

15:08   25          MR. TREEBY:  EVERYBODY HAS A COPY.  I KNOW THAT THIS

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 15:09 | 1 | IS A SLIDE.  WE NOW HAVE THE FIRST ONE UP ON THE SCREEN. |
| 15:09 | 2 | **BY MR. TREEBY:** |
| 15:09 | 3 | **Q.**   FIRST, I GUESS, THE MOST IMPORTANT -- THE FIRST QUESTION |
| 15:09 | 4 | TO ASK IS:  CAN YOU TELL US WHETHER OR NOT THIS IS A SCREENSHOT |
| 15:09 | 5 | FROM YOUR MODEL? |
| 15:10 | 6 | **A.**   NO, I CAN'T. |
| 15:10 | 7 | **Q.**   YOU CAN'T? |
| 15:10 | 8 | **A.**   I CANNOT. |
| 15:10 | 9 | **Q.**   IF YOU ASSUME THAT IT IS -- I WANT YOU TO LOOK AT A COUPLE |
| 15:10 | 10 | OF THINGS WITH ME.  AT THE VERY TOP LEFT-HAND CORNER, IT SAYS |
| 15:10 | 11 | "NO FAIL SECTION," AND IT SAYS "K," WHICH IS TYPICALLY A SYMBOL |
| 15:10 | 12 | FOR HYDRAULIC CONDUCTIVITY, RIGHT? |
| 15:10 | 13 | **A.**   YES. |
| 15:10 | 14 | **Q.**   1 TIMES 5 -- 10 TO THE MINUS 5 I THINK IS WHAT THAT MEANS. |
| 15:10 | 15 | RIGHT? |
| 15:10 | 16 | **A.**   WELL, IT DOESN'T SAY THAT. |
| 15:10 | 17 | **Q.**   DO YOU KNOW THAT'S WHAT IT MEANS IN ENGINEERING |
| 15:10 | 18 | TERMINOLOGY? |
| 15:10 | 19 | **A.**   IT SAYS "JOURDAN CANAL FILL IS K EQUALS 4E MINUS |
| 15:10 | 20 | 05 CENTIMETERS PER SECOND." |
| 15:10 | 21 | **Q.**   WE ARE LOOKING TWO DIFFERENT PLACES.  AT THE VERY TOP, |
| 15:10 | 22 | VERY, VERY TOP, "NO FAIL SECTION."  DO YOU SEE THAT?  VERY TOP. |
| 15:11 | 23 | **A.**   YES, SIR. |
| 15:11 | 24 | **Q.**   DO YOU SEE IT NOW? |
| 15:11 | 25 | **A.**   YES, SIR. |

ROBERT G. BEA - CROSS

15:11  1  **Q.**   IT SAYS "K 1 TIMES 10 TO THE MINUS 5," RIGHT?

15:11  2  **A.**   YES, SIR.

15:11  3  **Q.**   THIS IS GEOSTUDIO 2007 SEEP/W DEFINITION.

15:11  4      IN THE FIRST PLACE, THESE ARE STATED IN FEET PER

15:11  5  SECOND, RIGHT?  YEAH.

15:11  6      **MR. TREEBY:**  FEET PER SECOND; IS THAT RIGHT?

15:11  7  CENTIMETERS?

15:11  8  **BY MR. TREEBY:**

15:11  9  **Q.**   NOT THERE.  OKAY.  THERE IT'S STATED IN CENTIMETERS PER

15:11  10  SECOND.  BUT IF YOU WOULD GO DOWN TO THE K FUNCTION -- WE WILL

15:11  11  HIGHLIGHT IT.  ACTUALLY, I GUESS IT'S -- RIGHT HERE, HYDRAULIC,

15:12  12  K -- THIS IS STATED IN FEET PER SECOND.  DO YOU SEE THAT?

15:12  13  **A.**   YES.

15:12  14  **Q.**   YES.  SO IN ORDER TO BE EQUIVALENT, YOU HAVE TO TRANSLATE

15:12  15  THAT TO CENTIMETERS PER SECOND TO MAKE IT MATCH WHAT WAS AT THE

15:13  16  TOP THAT WE LOOKED AT A MINUTE AGO; IS THAT RIGHT?

15:13  17  **A.**   YES.

15:13  18  **Q.**   DO YOU KNOW HOW TO DO THAT?

15:13  19  **A.**   YES.

15:13  20  **Q.**   WHAT WOULD IT BE?

15:13  21  **A.**   I WOULD HAVE TO GET OUT MY HAND CALCULATOR FROM MY

15:13  22  BRIEFCASE AND STEP THROUGH THE CONVERSION.

15:13  23      **THE COURT:**  I THINK SINCE THERE'S A VOID, I'M GOING

15:13  24  TO TAKE A RECESS FOR 10 MINUTES.

15:13  25      (RECESS.)

*DAILY TRANSCRIPT*

ROBERT G. BEA - CROSS

15:26   1         **MR. TREEBY:**  IF YOUR HONOR PLEASE, I HOPE I HAVE MY

15:26   2   ACT TOGETHER BETTER THAN I DID.  AND I'M ALMOST FINISHED.  THIS

15:26   3   IS ACTUALLY THE LAST AREA I'M GOING TO COVER.

15:26   4         **THE COURT:**  PLEASE PROCEED.

15:26   5   **BY MR. TREEBY:**

15:26   6   **Q.**   DR. BEA, YOU'VE HAD A LITTLE CHANCE NOW TO LOOK AT THIS,

15:26   7   AND I REALIZE THAT YOU SAID YOU NEVER -- I GUESS YOU ARE NOT

15:26   8   FAMILIAR WITH THE SCREENSHOTS FROM SEEP/W.  RIGHT?

15:26   9   **A.**   THAT'S CORRECT.

15:26   10  **Q.**   BUT YOU ARE CAPABLE OF TRANSLATING PERMEABILITIES THAT ARE

15:26   11  IN FEET PER SECOND TO PERMEABILITIES THAT ARE CENTIMETERS PER

15:26   12  SECOND.  WHAT I WANT TO DO -- AND I WILL GIVE YOU -- WE HAVE

15:26   13  DONE IT, AND I'M GOING TO GIVE IT TO YOU, AND MAYBE YOU CAN DO

15:27   14  A QUICK CHECK AND SEE IF YOU AGREE WITH IT OR NOT.

15:27   15        WE HAVE MARKED THIS DX-02736-0001.

15:27   16        **MR. TREEBY:**  MAY I APPROACH?

15:27   17        **THE COURT:**  YES, SIR, YOU MAY.

15:27   18  **BY MR. TREEBY:**

15:27   19  **Q.**   I WILL REPRESENT TO YOU THAT WE HAVE TRIED TO CALCULATE

15:27   20  FEET PER SECOND FROM THESE TEN FILES TO CENTIMETERS PER SECOND,

15:27   21  AND WHAT WE ARE CONVERTING IS THE ACTUAL -- I'LL SHOW YOU.

15:27   22        **MR. TREEBY:**  GO BACK TO THE PRIOR SLIDE.  HIGHLIGHT

15:28   23  THAT K SECTION.  THERE WE GO.

15:28   24  **BY MR. TREEBY:**

15:28   25  **Q.**   THAT HIGHLIGHTED SECTION -- THIS HIGHLIGHTED SECTION RIGHT

ROBERT G. BEA - CROSS

15:28   1   HERE, I REPRESENT TO YOU, IS THE ACTUAL INPUT IN THE SYSTEM IN
15:28   2   FEET PER SECOND FOR THE JOURDAN CANAL FILL.  UP AT THE TOP IT'S
15:28   3   LABELED DIFFERENTLY.  THAT'S JUST A FILE NAME.  THIS IS THE
15:28   4   ACTUAL INPUT.  THAT'S WHAT I'M -- I'M REPRESENTING THAT TO YOU
15:28   5   SINCE YOU HAVEN'T SEEN THIS BEFORE.
15:28   6            MR. TREEBY:  AND JUST SO WE ORIENT THE COURT AND
15:28   7   EVERYBODY ELSE, TAKE DOWN THE CHART -- WELL, NO, YOU DON'T NEED
15:28   8   TO.
15:28   9   BY MR. TREEBY:
15:28   10  Q.   YOU SEE THIS SECTION RIGHT OVER HERE THAT'S GRAY, THIS BOX
15:28   11  THAT'S GRAY?
15:28   12  A.   YES, SIR.
15:28   13  Q.   THAT'S WHAT WE ARE TALKING ABOUT MODELING THERE.  THAT'S
15:28   14  WHAT THE JOURDAN AVENUE -- YOU DO KNOW THAT -- THE JOURDAN
15:29   15  CANAL FILL IS, RIGHT?
15:29   16  A.   YES, SIR.
15:29   17  Q.   IN THE CROSS SECTION, THIS IS WHAT THAT PERMEABILITY
15:29   18  RELATES TO.
15:29   19            NOW, IF YOU COULD, PLEASE, JUST DO A QUICK CHECK TO
15:29   20  SATISFY YOURSELF -- QUICK OR LONG -- TO SATISFY YOURSELF THAT
15:29   21  WE HAVE PROPERLY REPRESENTED THE PERMEABILITIES CONVERTED TO
15:29   22  CENTIMETERS PER SECOND.  WE HAVE TAKEN THE FEET PER SECOND
15:29   23  DIRECTLY OFF THESE INPUT FILES -- OUTPUT FILES THAT SHOW THE
15:29   24  INPUTS, ACTUALLY, AND WE'VE TRANSLATED IT TO CENTIMETERS PER
15:29   25  SECOND.  AND JUST, IF YOU WOULD, DO A QUICK CHECK TO SATISFY

ROBERT G. BEA - CROSS

15:29   1   YOURSELF THAT'S A CORRECT CONVERSION.

15:30   2            THE COURT:  SPECIFICALLY, YOU ARE TALKING ABOUT THE

15:30   3   FIRST OF THE 1.31, CORRECT?

15:30   4            MR. TREEBY:  YES.  YES.

15:30   5            THE COURT:  "NO FAIL SECTION," THE FIRST.

15:30   6            MR. TREEBY:  TIMES 10 TO THE MINUS 6, IT CONVERTS TO

15:30   7   3.99 OR I GUESS ONE MIGHT BE ABLE TO SAY 4 TIMES 10 TO THE

15:30   8   MINUS 5.

15:30   9   BY MR. TREEBY:

15:31   10  Q.  FRANKLY, I THINK IF YOU CHECK TWO OF THEM, YOU WILL HAVE

15:31   11  THEM ALL BECAUSE THEY ARE ALL THE SAME.  IN OTHER WORDS, THE

15:31   12  TWO FOR THE NO FAIL SECTION ARE THE SAME, AND ALL OF THE ONES

15:31   13  FOR THE NORTH AND SOUTH BREACH CASES ARE THE SAME.  SO IF YOU

15:31   14  CHECK ONE OF THOSE, YOU WILL HAVE IT.

15:33   15  A.  YES, SIR.  YOUR QUESTION?

15:33   16  Q.  MY QUESTION IS:  ARE THE CONVERSIONS CORRECT FROM THE --

15:33   17  A.  NO.

15:33   18  Q.  WHAT?

15:33   19  A.  NO.

15:33   20  Q.  WHAT WOULD BE A CORRECT CONVERSION OF THESE FEET PER

15:33   21  SECOND TO CENTIMETERS PER SECOND?

15:33   22  A.  WELL, THE 1.31 TIMES 10 TO THE MINUS 6 FEET PER SECOND IS

15:34   23  APPROXIMATELY 8 TIMES 10 TO THE MINUS 4 CENTIMETERS PER SECOND;

15:34   24  AND 1.64 TIMES 10 TO THE MINUS 7 IS APPROXIMATELY 8 TIMES 10 TO

15:34   25  THE MINUS 5 CENTIMETERS PER SECOND, SIR.

ROBERT G. BEA - CROSS

15:34  1  **Q.**  I'M NOT GOING TO TRY TO ARGUE WITH YOUR MATH, SO WE WON'T
15:34  2  GO THERE.  BUT I DON'T --
15:34  3  **A.**  I'M USING LAMBE AND WHITMAN'S CONVERSION TABLE.
15:34  4  **Q.**  I'M NOT GOING TO ARGUE WITH YOUR MATH.  LET'S JUST TALK
15:34  5  ABOUT THE SUBSTANCE OF THIS MATTER.
15:34  6       YOU WOULD AGREE, WOULD YOU NOT, THAT BY MAKING THIS
15:34  7  CANAL FILL AT THE TOE OF THE LAND SIDE OF THE LEVEE MORE
15:34  8  PERMEABLE -- RIGHT?  I MEAN -- I'M SORRY -- MORE PERMEABLE.
15:34  9       BY MAKING IT MORE PERMEABLE THAN THE SAME JOURDAN
15:34  10  AVENUE CANAL FILL AT THE NORTH AND SOUTH BREACHES, IT HAS THE
15:35  11  EFFECT OF INCREASING THE FACTOR OF SAFETY FOR THE NEAR BREACH
15:35  12  SECTION IN COMPARISON TO THE NORTH AND SOUTH BREACHES?
15:35  13  **A.**  THAT'S INCORRECT.
15:35  14  **Q.**  THAT'S NOT CORRECT?
15:35  15  **A.**  THAT'S CORRECT.  THE ISSUE IS ADDRESSED IN MY REBUTTAL
15:35  16  REPORT STARTING ON PAGE 100, PARAGRAPH 137.  AND THE EFFECT ON
15:35  17  THE NEAR BREACH SIDE IS ADDRESSED IN TERMS OF PERMEABILITY
15:35  18  RANGES FOR JOURDAN CANAL IN CASES 1.1 AND 1.2.  AND THOSE CASES
15:36  19  PLOT DIRECTLY ON TOP OF EACH OTHER AND INDICATE THERE IS NO
15:36  20  SIGNIFICANT EFFECT; AND THEREFORE WE HAVE ANALYTICAL RESULTS
15:36  21  THAT AGREE WITH THE OBSERVATION THAT THE WALL AT THE NEAR
15:36  22  BREACH IS NEAR FAILURE, AND THE ANALYSIS CORROBORATES THAT
15:36  23  OBSERVATION.
15:36  24  **Q.**  MY QUESTION, THOUGH, WAS LIMITED -- AND I THINK YOU HAVE
15:36  25  AGREED WITH ME THAT BY MAKING THIS SECTION RIGHT HERE MORE

ROBERT G. BEA - CROSS

15:36   1    PERMEABLE IN THE NEAR BREACH SECTION, ESSENTIALLY YOU RELIEVE
15:36   2    THE EXIT GRADIENT.  YOU MAKE IT EASIER FOR THE SOILS NOT TO BE
15:36   3    BLOCKED RIGHT THERE; IS THAT RIGHT?
15:36   4    A.   I THINK SO.  DR. STARK OPINED, I BELIEVE -- I WASN'T HERE
15:37   5    TO HEAR HIS TESTIMONY -- THAT IT WOULD INCREASE THE GRADIENTS
15:37   6    FROM A SMALL NUMBER, LESS THAN .05, TO A NUMBER ON THE ORDER OF
15:37   7    .3.  THAT CHANGE DOES NOT INDICATE WE HAVE MOVED FROM NO
15:37   8    FAILURE TO FAILURE.
15:37   9    Q.   IT JUST MEANS THAT THAT PARAMETER WAS INCORRECTLY
15:37   10   ORIGINALLY ENTERED IN YOUR ANALYSES THAT WE ARE SHOWING IN THIS
15:37   11   MODEL; ISN'T THAT RIGHT?
15:37   12   A.   NO, I DON'T THINK SO.
15:37   13   Q.   WELL, IT'S DIFFERENT BETWEEN THE NORTH, SOUTH, AND THE
15:37   14   NEAR.
15:37   15   A.   WELL, I CAN'T OPINE TO THAT LEVEL OF DETAIL SINCE I HAVE
15:37   16   JUST RECEIVED AND SEEN THESE SCREENSHOTS PURPORTEDLY CORRECTLY
15:37   17   CORRELATED TO THE CASES YOU HAVE SHOWN.  I'M SORRY, I CAN'T
15:37   18   ANSWER THAT QUESTION.
15:37   19   Q.   BUT YOU DID OPINE -- WE JUST GOT THAT TESTIMONY FROM YOU
15:38   20   THAT EXCEPT FOR NOT HAVING SOMETHING THAT PENETRATED THE
15:38   21   ORGANIC CLAY OR THE SWAMP MARSH, WHATEVER YOU WANT TO CALL IT,
15:38   22   ON THE CANAL SIDE, THAT WAS THE ONLY DIFFERENCE IN THESE
15:38   23   MODELS.
15:38   24   A.   NO.
15:38   25   Q.   THAT WAS A VALIDATION FACTOR.

**ROBERT G. BEA - CROSS**

15:38  1  **A.**   NO.   THE DIFFERENCE IS THE INSULATION PROVIDED BY THE

15:38  2  SWAMP MARSH LAYER.   THE CROSS SECTIONS AT THE NORTH AND SOUTH

15:38  3  BREACHES -- NEAR BREACHES ARE DIFFERENT.   THAT'S THE EXCEPTION.

15:38  4  **Q.**   WELL, I GUESS -- BECAUSE THIS GOT FUZZY, AND IT'S MY FAULT

15:38  5  IT GOT FUZZY; BUT JUST SO WE GET IT CLEAR, LET ME FIND IT

15:38  6  HERE -- 1292 AND 1293 AT THIS TRIAL.

15:38  7         "YOU MODELED THE NEAR BREACH SCENARIO, WHICH INVOLVED

15:38  8  A LARGE, DEEP, OPEN EXCAVATION KNOWN AS THE BORROW PIT, AND YOU

15:38  9  CLAIM THAT THE BORROW PIT WAS NOT IN CONTACT AND, THEREFORE,

15:38  10  IT'S EMPIRICAL EVIDENCE IN THE FIELD THAT YOU DON'T HAVE ANY

15:39  11  UPLIFT PRESSURE."

15:39  12         YOU TESTIFIED TO THAT.

15:39  13  **A.**   YES, SIR.

15:39  14  **Q.**   THEN YOU TESTIFIED THAT YOU CLAIM -- YOU JUST TESTIFIED TO

15:39  15  THIS -- THAT YOUR MODELING OF THE NEAR BREACH CASE 1-1 AMOUNTED

15:39  16  TO A MODEL OF THE NORTH AND SOUTH WITHOUT EXCAVATIONS INASMUCH

15:39  17  AS IT IS IDENTICAL TO THOSE, EXCEPT THAT THE ONLY VARIABLE IS

15:39  18  THAT YOU DON'T HAVE AN EXCAVATION PIERCING WHAT YOU CALL THE

15:39  19  SWAMP MARSH AT THE NEAR BREACH.

15:39  20         THAT'S WHAT YOU JUST TESTIFIED TO; ISN'T THAT RIGHT?

15:39  21  **A.**   THE CROSS SECTIONS, MR. TREEBY, ARE DOCUMENTED IN MY

15:39  22  EXPERT REPORT.   THOSE HAVE NOT CHANGED.   THE DIFFERENCE I WAS

15:39  23  REFERRING TO WAS THE INSULATION OF THE NEAR BREACH SITE FROM

15:39  24  THE BURIED SWAMP MARSH LAYER, AND THAT ANALYSIS RESULT IN TERMS

15:40  25  OF CROSS SECTION WAS CORROBORATED BY DR. MARR.

ROBERT G. BEA - CROSS

15:40  1  **Q.**  I WON'T SAY THAT'S NONRESPONSIVE.  IT WAS AN EXPLANATION;
15:40  2  I WILL TAKE IT AS THAT.

15:40  3       I'M NOT A MATH MAJOR, BUT IT HAS BEEN POINTED OUT TO
15:40  4  ME -- AND I THANK COUNSEL FOR POINTING IT OUT TO ME -- SOMEONE
15:40  5  ON THIS INPUT FILE CONVERTED THE FEET PER SECOND TO CENTIMETERS
15:40  6  PER SECOND ON THIS VERY FILE, DIDN'T THEY?  AND IT AGREES WITH
15:40  7  THE MATH ON THE TABLE THAT WE HAVE GIVEN YOU THAT WE MARKED
15:40  8  AS -- I'LL GET THAT IN A MINUTE -- DX-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; ISN'T THAT
15:40  9  CORRECT?
15:40  10  **A.**  TO THE BEST OF MY KNOWLEDGE, THIS SHOWN -- AND I'LL
15:40  11  BRACKET IT WITH THE TWO SQUARE DOTS -- IS ENTERED DIRECTLY BY
15:41  12  DIEGO COBOS-ROA TO IDENTIFY THIS RUN.  THAT IS NOT AN INPUT
15:41  13  VALUE USED IN THE ANALYSIS.
15:41  14  **Q.**  NO, IT'S, IN FACT, A CONVERSION FROM FEET PER SECOND TO
15:41  15  CENTIMETERS PER SECOND; ISN'T THAT CORRECT?
15:41  16  **A.**  NO, I DON'T THINK SO.  AND IT'S BECAUSE OF WHAT I SAT HERE
15:41  17  AT YOUR REQUEST AND DID AS THE CALCULATION.  THIS IS THE
15:41  18  IDENTIFIER HE USED IN THIS INPUT FILE FOR THIS RUN.
15:41  19  **Q.**  I WOULD ASK THAT YOUR CALCULATION -- IT'S HANDWRITTEN,
15:41  20  RIGHT?
15:41  21  **A.**  I HAVE THE RESULTS ON THE SHEET YOU GAVE ME.
15:41  22  **Q.**  THEN YOU DID A HANDWRITTEN CALCULATION, RIGHT?
15:41  23  **A.**  NO.
15:41  24  **Q.**  OH, YOU DIDN'T.  OKAY.  I THOUGHT YOU DID.
15:41  25       SO YOU DID IT IN -- HOW DID YOU DO IT?

**ROBERT G. BEA - CROSS**

15:41   1   **A.**   LAMBE AND WHITMAN PROVIDE A GRAPH THAT GIVES YOU THE

15:42   2   ABILITY --

15:42   3   **Q.**   WHAT PAGE IS THAT?

15:42   4   **A.**   PAGE 288, FIGURE 19.6, TITLED "PERMEABILITY CONVERSION

15:42   5   CHART."

15:42   6   **Q.**   LET ME ASK YOU THIS:  DO YOU KNOW WHY THE INPUTS FOR THAT

15:42   7   JOURDAN AVENUE CANAL FILL WERE CHANGED IN YOUR -- IF THEY WERE.

15:42   8   IF THIS IS A FAIR REPRESENTATION OF YOUR ACTUAL MODELS, WHICH I

15:42   9   HAVE REPRESENTED TO YOU IT IS FROM YOUR RELIANCE MATERIALS, CAN

15:42   10  YOU EXPLAIN WHY YOU WOULD HAVE USED A DIFFERENT PERMEABILITY

15:42   11  FOR THAT FILL --

15:42   12  **A.**   SURE.

15:42   13  **Q.**   -- BETWEEN THE NORTH AND SOUTH BREACH AND THE NEAR BREACH?

15:42   14  **A.**   WELL, WE WERE STUDYING RANGES IN PERMEABILITY TO DETERMINE

15:43   15  THE EFFECTS OF THE RANGES ON THE CAUSATION ANALYSES.  THOSE

15:43   16  DETAILS ARE INCLUDED IN THE CASES 1.1, 1.2, 2.1, AND 2.2.  SO

15:43   17  THOSE ARE THE PARAMETRIC RANGES, AND THOSE ARE DOCUMENTED IN MY

15:43   18  EXPERT REPORT.

15:43   19          **MR. TREEBY:**  ONE MOMENT, YOUR HONOR.

15:43   20              YOUR HONOR, RATHER THAN BELABOR THIS ANY MORE,

15:43   21  WE ARE GOING TO MOVE INTO EVIDENCE THE PAGE THAT WAS CITED FROM

15:43   22  LAMBE AND WHITMAN AS THE CONVERSION THAT DR. BEA USED.  AND

15:43   23  THEN IT'S A SIMPLE MATHEMATIC CALCULATION.

15:44   24          **MR. BRUNO:**  NO OBJECTION, YOUR HONOR.

15:44   25          **THE COURT:**  LET IT BE ADMITTED.

ROBERT G. BEA - CROSS

15:44   1          **MR. TREEBY:**  YOUR HONOR, WE WOULD OFFER THE REBUTTAL
15:44   2   EXHIBITS THAT WE HAVE MARKED DX-02737-0001 THROUGH 0010 AND THE
15:44   3   ONE I KEEP DROPPING, DX-02736-0001.  AND THEN WE WILL MARK THAT
15:44   4   PAGE FROM LAMBE AND WHITMAN AS DX-02738-0001.
15:44   5          **THE COURT:**  MR. BRUNO.
15:44   6          **MR. BRUNO:**  YES, YOUR HONOR.  WITH RESPECT,
15:44   7   UNFORTUNATELY -- I WOULD LOVE TO BE COOPERATIVE HERE, BUT I
15:44   8   MUST OBJECT TO THIS EXHIBIT, HAVING NEVER SEEN IT BEFORE IN MY
15:44   9   LIFE.  IT'S DX-02737-0001.  WE STILL HAVEN'T SEEN DR. STARK'S
15:45   10  NEW MODEL RUNS, SO IT'S REALLY TOUGH FOR ME TO ALLOW THIS TO GO
15:45   11  IN.
15:45   12         (DISCUSSION OFF THE RECORD.)
15:45   13         **MR. BRUNO:**  WELL, I'M NOT GOING TO GET INTO WHEN WE
15:45   14  COULD HAVE GOTTEN IT.  I DIDN'T HEAR.
15:45   15             WHAT ELSE DID YOU MOVE IN?
15:45   16         **MR. TREEBY:**  I JUST MOVED IN A PAGE OF LAMBE AND
15:45   17  WHITMAN.
15:45   18         **MR. BRUNO:**  I AGREE WITH THAT.
15:45   19         **MR. TREEBY:**  AND I MOVED IN THE TABLE THAT TOOK THE
15:45   20  SCREENSHOTS AND JUST PUT A TABLE THAT HAD THE CONVERSIONS ON
15:45   21  IT.  THAT'S ALL IT WAS.
15:45   22         **MR. BRUNO:**  THAT'S OKAY.  I WON'T OBJECT TO THAT.
15:45   23             DID YOU ALSO MOVE IN SOME DEPOSITION TESTIMONY?
15:45   24  AM I CONFUSED?
15:45   25         **THE COURT:**  I DON'T THINK HE DID.

*DAILY TRANSCRIPT*

ROBERT G. BEA - CROSS

15:45  1           **MR. BRUNO:**  THEN I APOLOGIZE.  NO.

15:45  2           **THE WITNESS:**  COULD I ASK OR MAKE A REQUEST?  THERE

15:45  3   ARE DIFFERENT EDITIONS OF LAMBE AND WHITMAN.  TO KEEP THE

15:45  4   RECORD CLEAR, I THINK WE NEED TO BE CLEAR THAT THE TABLE AND

15:45  5   PAGE I CITED DO IN FACT HAVE THE GRAPH I USED TO MAKE THE

15:46  6   CONVERSION.

15:46  7           **MR. BRUNO:**  WHY DON'T YOU SHARE WITH US THE EDITION

15:46  8   SO THAT WE'RE ALL ON THE SAME PAGE.

15:46  9           **MR. TREEBY:**  THERE IS ONLY ONE EDITION.

15:46  10          **MR. BRUNO:**  I DON'T KNOW THAT, BILL.

15:46  11          **MR. TREEBY:**  WELL, I'M REPRESENTING IT TO YOU.

15:46  12          **MR. BRUNO:**  BUT HE'S GOT IT IN FRONT OF HIM.  JUST

15:46  13  GIVE IT TO ME.

15:46  14          **THE COURT:**  LET'S NOT ARGUE ABOUT THE EDITION.

15:46  15          **MR. TREEBY:**  WAIT.  WE ARE NOT GOING TO HAVE A

15:46  16  PROBLEM WITH THAT.

15:46  17              IF YOUR HONOR PLEASE, WHAT I WOULD REQUEST --

15:46  18  AND MAYBE THIS IS CONSISTENT WITH WHAT DR. BEA JUST SAID -- WE

15:46  19  WANT TO ACTUALLY MARK AS OUR EXHIBIT THE PAGE THAT HE HAS,

15:46  20  BECAUSE HE HAS MARKED IT UP SOMEWHAT.

15:46  21          **MR. BRUNO:**  WE AGREE.

15:46  22          **THE WITNESS:**  HERE IT IS.

15:46  23          **THE COURT:**  THIS IS NOT -- LET ME SAY THAT SOON, SOON

15:46  24  MY PATIENCE IS GOING TO RUN OUT.  EVERYBODY, I WAS NOT BLESSED

15:46  25  AT BIRTH WITH THAT GREAT VIRTUE.  I HAVE WORKED VERY HARD TO

ROBERT G. BEA - CROSS

15:46  1  IMPROVE IT.

15:46  2           MR. TREEBY:  I MADE A MISTAKE, SO LET ME CORRECT IT.

15:46  3  I WANT TO MARK THAT BECAUSE WE ALREADY HAD THE NUMBER I GAVE

15:47  4  YOUR HONOR.  THE PAGE FROM LAMBE AND WHITMAN THAT DR. BEA HAS

15:47  5  MARKED THAT WE HAVE AGREEMENT WILL BE MOVED INTO EVIDENCE IS

15:47  6  DX-2739.

15:47  7           THE COURT:  THANK YOU.

15:47  8           MR. JOANEN:  YOUR HONOR, WITH YOUR PERMISSION, SCOTT

15:47  9  JOANEN.  IF I WILL GRAB THAT FROM DR. BEA, I WILL MAKE A COPY

15:47 10  SO WE DON'T HAVE TO WORRY ABOUT IT LATER.

15:47 11           THE COURT:  ABSOLUTELY.

15:47 12             IS THAT FINE WITH YOU, MR. TREEBY?

15:47 13           MR. TREEBY:  SURE.

15:47 14           MR. BRUNO:  I GUESS, JUDGE, YOU WILL TAKE IT UNDER

15:47 15  ADVISEMENT, AND WE WILL BRIEF IT?

15:47 16           THE COURT:  YOU KNOW, AT THIS POINT I'M GOING TO LET

15:47 17  IT COME IN.  THEN WE CAN FIND OUT WHAT SIGNIFICANCE IT HAS, AND

15:47 18  YOU CAN TELL ME WHY I SHOULDN'T REALLY LOOK AT IT.

15:47 19           MR. BRUNO:  SURE.  THANK YOU, JUDGE.  I APPRECIATE

15:47 20  THAT.

15:47 21           MR. SMITH:  YOUR HONOR, I KNOW IT HASN'T BEEN LONG

15:47 22  SINCE WE HAD A BREAK, BUT I THINK IT MIGHT GO SMOOTHER IF I

15:47 23  COULD HAVE A FEW MINUTES TO SET UP.

15:48 24           THE COURT:  I UNDERSTAND.  WE WILL TAKE 10 MINUTES.

15:48 25             (RECESS.)

*DAILY TRANSCRIPT*

ROBERT G. BEA - CROSS

15:56  1      **MR. TREEBY:**  WILLIAM TREEBY FOR WASHINGTON GROUP.

15:56  2            WE -- MR. JOANEN HAS.  WE HAVE ADJUSTED -- WE

15:56  3  THOUGHT THAT DR. BEA HAD ACTUALLY DONE HIS HANDWRITTEN MARKING

15:56  4  OR CALCULATIONS ON THE TABLE FROM LAMBE AND WHITMAN; BUT, IN

15:56  5  FACT, HE HAD DONE THEM ON THE DOCUMENT THAT WAS THE TABLE OF

15:56  6  CONVERSIONS THAT WE HAD MADE.  SO WE HAVE AGREED TO MARK THE

15:56  7  ONE HE MARKED ON THE SAME EXHIBIT NUMBER AS THE TABLE WHICH IS

15:56  8  DX-2736-0001, AND WE'VE DECIDED TO MARK THE ONE HE MARKED ON AS

15:56  9  2736-0001.1.

15:56  10           **THE COURT:**  THANK YOU.

15:56  11           **MR. SMITH:**  I WILL WAIT, YOUR HONOR, FOR THE WITNESS.

15:56  12           **THE COURT:**  I THINK THAT WOULD PROBABLY BE BEST.

15:57  13           TAKE YOUR TIME, DR. BEA.  TAKE YOUR TIME.

15:57  14  MR. SMITH IS USUALLY VERY INCISIVE.

15:57  15           **MR. BRUNO:**  YES, HE IS, AND I HAVE TOLD HIM THAT.

15:57  16           **MR. SMITH:**  THIS IS MY LAST CHANCE TO BLOW IT,

15:57  17  YOUR HONOR.

15:57  18           **THE COURT:**  WELL, YOU HAVE THAT RIGHT.

15:57  19           **MR. SMITH:**  WELL, I THOUGHT MY LAST CHANCE WAS THREE

15:57  20  YEARS AGO.  I WAS WRONG ABOUT THAT, AND I MIGHT BE WRONG AGAIN.

       21           THANK YOU, YOUR HONOR.

       22                      **CROSS-EXAMINATION**

15:57  23  BY MR. SMITH:

15:57  24  **Q.**   ROBIN SMITH FOR THE UNITED STATES.  GOOD AFTERNOON,

15:57  25  DR. BEA.

ROBERT G. BEA - CROSS

15:57  1   **A.**   GOOD AFTERNOON, SIR.

15:57  2   **Q.**   DR. BEA, ON YOUR DIRECT EXAMINATION THIS MORNING, THERE

15:57  3   WERE SOME QUESTIONS MADE ABOUT WHETHER YOU HAD BEEN ATTACKED

15:57  4   PERSONALLY.

15:57  5   **A.**   YES, SIR.

15:57  6   **Q.**   I'M GOING TO ASK YOU SOME QUESTIONS THAT GO TO YOUR

15:58  7   CREDIBILITY.

15:58  8   **A.**   THANK YOU.

15:58  9   **Q.**   I DON'T WANT YOU TO VIEW THESE AS PERSONAL ATTACKS, BUT

15:58  10  FRANKLY, THIS COURT IS THE ONLY COURT THAT HAS AN OPPORTUNITY

15:58  11  TO JUDGE YOUR DEMEANOR AND TO RULE ON YOUR CREDIBILITY, AND SO

15:58  12  WE NEED TO MAKE A RECORD ABOUT THAT.

15:58  13  **A.**   YES, SIR.

15:58  14  **Q.**   I WOULD LIKE TO BEGIN BY DISPLAYING JX-1389-0001.

15:58  15       DR. BEA, THIS IS THE COVER OF THE REPORT THAT YOU --

15:58  16  YOUR EXPERT REPORT THAT YOU ISSUED IN THIS CASE, ISN'T IT?

15:58  17  **A.**   YES, SIR.

15:58  18  **Q.**   ON THE COVER OF THIS REPORT, YOU DESCRIBE YOURSELF AS

15:58  19  HAVING A PH.D. AND A PROFESSIONAL ENGINEER LICENSE, DON'T YOU?

15:58  20  **A.**   THAT'S CORRECT.

15:58  21  **Q.**   BUT YOU DON'T HAVE A PROFESSIONAL ENGINEER LICENSE, DO

15:58  22  YOU, DR. BEA?

15:58  23  **A.**   YES, I DO.  I HAVE THE CERTIFICATES IN MY STUDY, ON THE

15:59  24  WALL TO THE LEFT-HAND SIDE OF MY DESK.  I STOPPED DUES

15:59  25  PAYMENTS, MY WIFE INFORMED ME, IN THE YEAR 2000 AND AT THE SAME

ROBERT G. BEA - CROSS

15:59   1   TIME APPLIED FOR RETIRED STATUS.

15:59   2   Q.   WE WENT OVER THIS PREVIOUSLY, BUT YOU UNDERSTAND IN THE

15:59   3   STATE OF CALIFORNIA THAT TO HOLD YOURSELF OUT AS HAVING RETIRED

15:59   4   STATUS, YOU HAVE TO REGISTER, AND YOU HAVE TO INDICATE -- WHEN

15:59   5   YOU LIST "P.E." AFTER YOUR NAME, YOU HAVE TO PUT IN PARENTHESES

15:59   6   "RETIRED."  DO YOU UNDERSTAND THAT, DR. BEA?

15:59   7   A.   YES, SIR.  AND IN THIS REPORT I DID, SIR.

15:59   8   Q.   NOWHERE IN YOUR REPORT, DR. BEA, DO YOU SAY "I AM A

15:59   9   RETIRED PROFESSIONAL ENGINEER."

16:00   10   A.   COULD I HAVE THE --

16:00   11   Q.   NO.  DR. BEA, I WITHDRAW THAT.

16:00   12        YOU HAVE LISTED YOURSELF AS A P.E. ON THE COVER OF

16:00   13   THIS REPORT AND EVERY OTHER REPORT YOU HAVE ISSUED IN THIS

16:00   14   CASE.  YOU HAVE NEVER LISTED ON THE COVER OF YOUR REPORT AFTER

16:00   15   YOUR NAME THAT YOU ARE RETIRED; ISN'T THAT CORRECT?

16:00   16   A.   THAT'S CORRECT.

16:00   17   Q.   IN FACT, YOU ARE NOT REGISTERED WITH THE STATE OF

16:00   18   CALIFORNIA TO USE THE DESIGNATION "P.E. RETIRED," ARE YOU?

16:00   19   A.   I APPLIED FOR THAT.  I WAS NOT ABLE TO CONFIRM THAT I

16:00   20   RECEIVED IT.  I DID CHECK THAT AFTER OUR LAST DISCUSSION.

16:00   21   Q.   THROUGHOUT THE COURSE OF THIS CASE, YOU HAVE REFERRED TO

16:00   22   THE TWO MODELING ASSISTANTS WHO ASSISTED YOU IN DETERMINING

16:00   23   SEEPAGE AND STABILITY.  AND THOSE TWO INDIVIDUALS ARE

16:00   24   MR. XAVIER GRUNAUER AND MR. DIEGO COBOS-ROA; ISN'T THAT

16:01   25   CORRECT?

ROBERT G. BEA - CROSS

16:01   1   **A.**   YES, SIR.  THERE WAS ALSO A DR. RUNE STORESUND.

16:01   2   **Q.**   YOU HAVE REPEATEDLY REFERRED TO THESE GENTLEMEN AS

16:01   3   DOCTORS, HAVEN'T YOU?

16:01   4   **A.**   YES, AND I EXPLAINED THE REASON I DID THAT OR -- YES, HAVE

16:01   5   DONE THAT AND DO THAT DURING MY DEPOSITIONS.

16:01   6          **MR. SMITH:**  COULD WE SEE JX-1553-0001.

16:01   7   **BY MR. SMITH:**

16:01   8   **Q.**   THIS WAS ONE OF THE REPORTS THAT WAS PREPARED FOR YOUR

16:01   9   USE, ISN'T THAT CORRECT, DR. BEA, BY MR. COBOS-ROA AND MR. VERA

16:01   10  GRUNAUER?

16:01   11  **A.**   YES, SIR.

16:01   12  **Q.**   IN JANUARY OF THIS YEAR; ISN'T THAT CORRECT?

16:01   13  **A.**   YES, SIR.

16:01   14  **Q.**   DO YOU SEE THAT MR. GRUNAUER HAS LISTED HIMSELF AS A PH.D.

16:01   15  ON THE COVER OF THIS DOCUMENT?

16:02   16  **A.**   YES, SIR.

16:02   17  **Q.**   YOU KNOW, AS A MATTER OF FACT, THAT MR. GRUNAUER DOES NOT

16:02   18  HAVE A PH.D., DOES HE?

16:02   19  **A.**   I DON'T KNOW THAT FOR A FACT.

16:02   20  **Q.**   WELL, WE INQUIRED WITH THE UNIVERSITY OF CALIFORNIA AT

16:02   21  BERKELEY WHETHER THEY HAD EVER ISSUED A DEGREE TO MR. VERA, AND

16:02   22  WE RECEIVED INFORMATION FROM THE UNIVERSITY REGISTRAR

16:02   23  INDICATING THAT MR. XAVIER VERA GRUNAUER HAS NOT RECEIVED ANY

16:02   24  DEGREES FROM THE UNIVERSITY OF CALIFORNIA AT BERKELEY.

16:02   25          DO YOU KNOW WHETHER OR NOT THAT IS TRUE, TO BE THE

ROBERT G. BEA - CROSS

16:02    1   CASE?
16:02    2   **A.**   NO.
16:02    3            **MR. BRUNO:**   I JUST HAVE TO OBJECT BECAUSE COUNSEL IS
16:02    4   TESTIFYING NOW.  AND I UNDERSTAND --
16:02    5            **MR. SMITH:**   WE CAN MAKE THIS AN EXHIBIT, YOUR HONOR.
16:03    6            **MR. BRUNO:**   I DON'T KNOW HOW THEY CAN MAKE IT AN
16:03    7   EXHIBIT.  BESIDES THAT, IF THE UNIVERSITY OF CALIFORNIA DIDN'T
16:03    8   GIVE HIM A PH.D., HE MIGHT HAVE GOT A PH.D. FROM SOME OTHER
16:03    9   PLACE.  THERE'S MORE THAN ONE INSTITUTION THAT GIVES PH.D.S.  I
16:03   10   DON'T KNOW THE MAN, AND I DON'T REALLY CARE, BUT I DON'T
16:03   11   KNOW -- I'LL JUST SIT DOWN.
16:03   12            **THE COURT:**   GO AHEAD.
16:03   13   BY MR. SMITH:
16:03   14   **Q.**   YOU KNOW, AS A MATTER OF FACT, THAT MR. COBOS-ROA HAS NOT
16:03   15   RECEIVED A PH.D., DON'T YOU, DR. BEA?
16:03   16   **A.**   YES.  HE IS TO BE AWARDED HIS PH.D. AT THE END OF THIS
16:03   17   YEAR.
16:03   18   **Q.**   WELL, I GUESS IF YOU'RE GOING TO TESTIFY TO THAT, WE WILL
16:03   19   HAVE TO TAKE YOUR WORD FOR IT.  SOMETIMES PEOPLE INTEND TO GET
16:03   20   PH.D.S, AND IT TAKES THEM A LONG TIME.  I NOTE THAT
16:03   21   MR. GRUNAUER WASN'T EVEN REGISTERED WITH THE UNIVERSITY FOR THE
16:03   22   LAST FIVE YEARS AS A STUDENT.
16:03   23   **A.**   I THINK WE WERE DISCUSSING DIEGO COBOS-ROA.  I HAD THIS
16:04   24   DISCUSSION SPECIFICALLY WITH HIS PH.D. DIRECTOR, AND HE OPINED
16:04   25   HE WILL RECEIVE HIS PH.D. AT THE CONCLUSION OF THIS FALL

ROBERT G. BEA - CROSS

16:04    1    SEMESTER.

16:04    2    **Q.**   WE ASKED YOU DURING YOUR DEPOSITION, YOUR VERY FIRST

16:04    3    DEPOSITION IN THIS CASE -- AND THIS WAS THE QUESTION YOU WERE

16:04    4    ASKED:  "TELL US WHAT QUALIFICATIONS YOU PERSONALLY KNOW OF

16:04    5    THAT WOULD ALLOW MR. COBOS-ROA TO PERFORM ELECTRONIC SEEPAGE

16:04    6    ANALYSES."

16:04    7             DO YOU RECALL BEING ASKED THAT QUESTION?

16:04    8    **A.**   YES, SIR.

16:04    9    **Q.**   DO YOU RECALL YOUR ANSWER AT THAT TIME?

16:04   10    **A.**   YES.

16:04   11    **Q.**   WHAT WAS YOUR ANSWER AT THAT TIME?

16:04   12    **A.**   WELL, THAT HE HAD TAKEN GEOTECHNICAL COURSES AT THE

16:04   13    UNIVERSITY OF CALIFORNIA AT BERKELEY AND ELSEWHERE, AND MY

16:04   14    EVALUATIONS OF HIS QUALIFICATIONS AS A GRADUATE STUDENT AND AS

16:04   15    AN INVESTIGATOR OF THE BREACHES HERE, THAT HE WAS APPROPRIATELY

16:04   16    QUALIFIED.

16:05   17    **Q.**   WELL, LET'S SEE EXACTLY WHAT YOU SAID, BECAUSE THAT'S NOT

16:05   18    EXACTLY WHAT YOU SAID.  YOU SAID SOMETHING A LITTLE BIT

16:05   19    DIFFERENT ABOUT HIS QUALIFICATIONS.

16:05   20             **MR. SMITH:**  COULD WE GO TO JX-1394.  I THINK WE HAVE

16:05   21    A VIDEO CLIP BEGINNING AT LINE 64 WITH THE QUESTION "TELL US

16:05   22    WHAT QUALIFICATIONS YOU PERSONALLY KNOW OF."

16:05   23    **BY MR. SMITH:**

16:05   24    **Q.**   "TELL US WHAT QUALIFICATIONS YOU PERSONALLY KNOW OF."

16:06   25             THE ANSWER TO THE QUESTION YOU GAVE ON THAT OCCASION

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:06 | 1 | WAS:  "HE'S TAKEN THE FULL SUITE OF COURSES AT THE UNIVERSITY |
| 16:06 | 2 | OF CALIFORNIA AT BERKELEY." |
| 16:06 | 3 | YOU KNOW, IN FACT, HE HASN'T TAKEN ANY COURSES FOR |
| 16:06 | 4 | CREDIT AT THE UNIVERSITY OF CALIFORNIA AT BERKELEY DEALING WITH |
| 16:06 | 5 | SEEPAGE, HAS HE, DR. BEA? |
| 16:07 | 6 | A.   I DON'T HAVE THE TRANSCRIPT HERE.  MY TESTIMONY IS |
| 16:07 | 7 | RECORDED HERE. |
| 16:07 | 8 | Q.   WELL, YOU WERE AT HIS DEPOSITION.  YOU DON'T RECALL THE |
| 16:07 | 9 | ANSWER HE GAVE WHEN HE WAS ASKED THAT QUESTION? |
| 16:07 | 10 | A.   NO. |
| 16:07 | 11 | Q.   LET'S GO TO JX-1551, THE DEPOSITION OF DIEGO COBOS-ROA. |
| 16:07 | 12 | (VIDEO PLAYED.) |
| 16:07 | 13 | "QUESTION:  ARE YOU A GEOSTUDIOS EMPLOYEE AT THIS |
| 16:07 | 14 | TIME? |
| 16:08 | 15 | "ANSWER:  I PERFORM WORK FOR GEOSTUDIOS.  I DO NOT |
| 16:08 | 16 | HAVE A MONTHLY SALARY.  WE -- IF THERE'S A PROJECT WHERE |
| 16:08 | 17 | THEY NEED MY HELP, WE COME TO AN AGREEMENT, PERFORM THE |
| 16:08 | 18 | TASKS THAT ARE NEEDED. |
| 16:08 | 19 | "QUESTION:  HAVE YOU TAKEN ANY SEEPAGE COURSES? |
| 16:08 | 20 | "ANSWER:  I AUDITED ONE.  I HAD ALREADY TAKEN MY |
| 16:08 | 21 | SEEPAGE CLASSES AS AN UNDERGRAD. |
| 16:08 | 22 | "QUESTION:  AND THAT WAS IN COLOMBIA? |
| 16:08 | 23 | "ANSWER:  YES, SIR. |
| 16:08 | 24 | "QUESTION:  SO SINCE YOU HAVE BEEN IN THE |
| 16:08 | 25 | UNITED STATES, YOU HAVE NOT TAKEN ANY SEEPAGE COURSES FOR |

ROBERT G. BEA - CROSS

16:08   1        CREDIT; IS THAT CORRECT?

16:08   2             "ANSWER:  THAT'S CORRECT.

16:08   3             "QUESTION:  DO YOU RECALL WHO TAUGHT THE CLASS THAT

16:08   4        YOU AUDITED?

16:09   5             "ANSWER:  PROFESSOR PATSICK.

16:09   6             "QUESTION:  AS PART OF THAT SEEPAGE COURSE THAT YOU

16:09   7        AUDITED, DID YOU PERFORM ANY OF THE CLASSWORK ASSIGNMENTS?

16:09   8             "ANSWER:  YES.

16:09   9             "QUESTION:  DID YOU HAVE ANY STEADY-STATE SEEPAGE

16:09   10       ASSIGNMENTS AS PART OF THAT CLASS?

16:09   11            "ANSWER:  YES.

16:09   12            "QUESTION:  AND JUST WHAT SEMESTER, WHAT YEAR WAS

16:09   13       THAT COURSE THAT YOU AUDITED?

16:09   14            "ANSWER:  FALL SEMESTER 2005.

16:09   15            "QUESTION:  DO YOU RECALL WHETHER YOU DID ANY

16:09   16       TRANSIENT SEEPAGE ANALYSES AS PART OF THAT SEEPAGE COURSE

16:09   17       THAT YOU AUDITED?

16:09   18            "ANSWER:  NO.

16:09   19            "QUESTION:  PRIOR TO THAT CLASS IN 2005, HAD YOU

16:09   20       PERFORMED A STEADY-STATE SEEPAGE ANALYSIS AS PART OF ANY

16:10   21       OF THE PROJECTS THAT YOU WERE INVOLVED IN IN COLOMBIA?

16:10   22            "ANSWER:  NO."

16:10   23            (VIDEO STOPPED.)

16:10   24   BY MR. SMITH:

16:10   25   Q.   DR. BEA, YOU WERE -- WELL, LET'S CONTINUE ON.  I THINK WE

ROBERT G. BEA - CROSS

16:10  1   ARE NOT QUITE THERE.  I APOLOGIZE.

16:10  2              (VIDEO PLAYED.)

16:10  3              "QUESTION:  PRIOR TO YOUR INVOLVEMENT WITH THE ILIT

16:10  4          INVESTIGATION IN 2006, HOW MANY STEADY-STATE SEEPAGE

16:10  5          ANALYSES, IF ANY, HAD YOU PERFORMED?

16:10  6              "ANSWER:  OUTSIDE THE CLASS, NONE.

16:10  7              "QUESTION:  PRIOR TO YOUR INVOLVEMENT WITH ILIT IN

16:10  8          2006, HAD YOU EVER PERFORMED A TRANSIENT SEEPAGE ANALYSIS?

16:10  9              "ANSWER:  NO."

16:11  10             (VIDEO STOPPED.)

16:11  11             MR. SMITH:  ALL RIGHT.  THANKS.  THAT'S GOOD.

16:11  12  BY MR. SMITH:

16:11  13  Q.   DR. BEA, DOES THAT REFRESH YOUR RECOLLECTION AS TO

16:11  14  MR. COBOS-ROA'S QUALIFICATIONS TO PERFORM ELECTRONIC SEEPAGE

16:11  15  ANALYSES FOR YOU IN THIS LITIGATION?

16:11  16  A.   YES.

16:11  17  Q.   HE HADN'T TAKEN THE FULL SUITE OF COURSES AT UC BERKELEY,

16:11  18  HAD HE?

16:11  19  A.   WELL, I THINK WE ARE TALKING ABOUT HIS SEEPAGE COURSES

16:11  20  SOLELY HERE.

16:11  21  Q.   THAT'S WHAT MY QUESTION TO YOU IN YOUR DEPOSITION WAS

16:11  22  ABOUT, WAS HIS QUALIFICATIONS TO PERFORM ELECTRONIC SEEPAGE

16:11  23  ANALYSES, AND YOUR ANSWER AT THAT TIME WAS HE HAS TAKEN THE

16:11  24  FULL SUITE OF COURSES.  IN FACT, HE HADN'T TAKEN ANY COURSES

16:11  25  FOR CREDIT, HAD HE?

ROBERT G. BEA - CROSS

16:11  1    A.   WELL, THE RECORD HE REFERRED TO WAS WITH

16:11  2    PROFESSOR PATSICK.  HE'S AT THE UNIVERSITY OF CALIFORNIA.

16:11  3    Q.   LET'S LOOK AT SOME OF MR. COBOS-ROA'S WORK FOR YOU.

16:12  4    MR. TREEBY SHOWED SOME OF THE EXAMPLES OF THAT, AND I HAVE SOME

16:12  5    SCREENSHOTS AS WELL.  THESE ARE FILES THAT WERE CREATED BY

16:12  6    MR. COBOS-ROA FOR YOU AT YOUR DIRECTION.

16:12  7         MR. SMITH:  I HAVE COPIES FOR COUNSEL AND THE COURT.

16:12  8    BY MR. SMITH:

16:12  9    Q.   MR. TREEBY WENT OVER THIS, AND I'M GOING TO TRY TO MOVE

16:12  10   THROUGH IT QUICKLY.  BUT YOU DID TESTIFY IN THE PLAINTIFFS'

16:12  11   CASE IN CHIEF THAT THE MCDONOUGH MARINE, WHAT YOU'VE STYLED

16:12  12   YOUR NEAR BREACH SECTION, WAS YOUR BASE CASE, YOUR CONTROL CASE

16:12  13   THAT YOU COULD USE FOR COMPARING WHAT THE DIFFERENCE WAS

16:13  14   BETWEEN THE EFFECTS OF EXCAVATIONS AND THE EFFECTS OF HAVING NO

16:13  15   EXCAVATIONS IN CONTACT WITH THE ORGANIC CLAY LAYER.  ISN'T THAT

16:13  16   CORRECT?

16:13  17   A.   THAT'S CORRECT.

16:13  18   Q.   AS MR. TREEBY REMINDED US ALL, YOU TESTIFIED THAT THEY

16:13  19   WERE IDENTICAL, THOSE MODELS WERE IDENTICAL IN ALL RESPECTS

16:13  20   EXCEPT FOR THAT ONE ASPECT; ISN'T THAT TRUE?

16:13  21   A.   IF I TESTIFIED THAT THEY WERE IDENTICAL IN ALL RESPECT,

16:13  22   THAT IS AN ERROR IN MY TESTIMONY.  THEY WERE NOT.  AND THE

16:13  23   DIFFERENCES ARE ALL DETAILED IN MY EXPERT REPORT AND REBUTTAL

16:13  24   REPORT.

16:13  25   Q.   WELL, THEY ARE NOT DETAILED THERE, BUT LET'S GO THROUGH

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:13 | 1 | SOME OF THE DIFFERENCES. |
| 16:13 | 2 | **MR. SMITH:**  AND IF WE COULD SEE THE SCREENSHOTS. |
| 16:14 | 3 | **THE COURT:**  CAN WE GO FASTER WITH THE ELMO? |
| 16:15 | 4 | **MR. SMITH:**  WE PROBABLY COULD, YOUR HONOR. |
| 16:15 | 5 | SHE'S GOT IT, YOUR HONOR. |
| 16:15 | 6 | **THE COURT:**  THAT'S ALL I NEEDED TO DO, WAS INVOKE |
| 16:15 | 7 | ELMO. |
| 16:15 | 8 | **MR. SMITH:**  EVERYBODY SEEMS TO BE ALLERGIC TO ELMO. |
| 16:15 | 9 | **BY MR. SMITH:** |
| 16:15 | 10 | **Q.**  HERE ARE TWO SCREENSHOTS, DR. BEA, TAKEN FROM THE FILES |
| 16:15 | 11 | CREATED BY MR. COBOS-ROA FOR YOU.  THERE IS A DIFFERENCE IN |
| 16:15 | 12 | THESE TWO SCREENSHOTS.  THE NORTH BREACH SHOWS A NO-FLOW |
| 16:15 | 13 | BOUNDARY INDICATED BY THE BLUE TRIANGLES THAT RUN ALL ACROSS |
| 16:15 | 14 | THE SURFACE OF THE LEVEE SOIL UNIT, THE CLAY AT THE TOE, AND |
| 16:15 | 15 | THEN THE JOURDAN AVENUE BOX CULVERT AND EXTENDING ONTO THE END |
| 16:16 | 16 | OF THAT CROSS SECTION. |
| 16:16 | 17 | WHEN YOU LOOK AT YOUR NEAR BREACH CROSS SECTION, YOU |
| 16:16 | 18 | CAN SEE THAT THERE'S AN OPEN BOUNDARY CONDITION ABOVE THE |
| 16:16 | 19 | JOURDAN AVENUE BOX CULVERT.  DO YOU SEE THAT DIFFERENCE, |
| 16:16 | 20 | DR. BEA? |
| 16:16 | 21 | **A.**  YES. |
| 16:16 | 22 | **Q.**  IN FACT, YOU TESTIFIED PREVIOUSLY IN YOUR DEPOSITION THAT |
| 16:16 | 23 | THE PROPERTY VALUES FOR THE BOX CULVERT DID AFFECT YOUR FLOW |
| 16:16 | 24 | ANALYSES.  DO YOU RECALL GIVING THAT TESTIMONY? |
| 16:16 | 25 | **A.**  YES, SIR. |

ROBERT G. BEA - CROSS

| | | |
|---|---|---|
| 16:16 | 1 | **Q.**   SO THOSE CHANGES DO MATTER, DON'T THEY, IN TERMS OF |
| 16:16 | 2 | ANALYZING YOUR FLOW? |
| 16:16 | 3 | **A.**   YES. |
| 16:16 | 4 | **Q.**   THE EFFECT OF NOT PUTTING A NO-FLOW BOUNDARY OVER THE |
| 16:16 | 5 | JOURDAN BOX CULVERT WOULD HAVE THE EFFECT OF ALLOWING FLOW TO |
| 16:16 | 6 | ESCAPE THROUGH THAT BOX CULVERT; ISN'T THAT TRUE? |
| 16:16 | 7 | **A.**   WELL, IF THAT'S TRUE, THAT'S ACCURATE; BUT I HAVE NO WAY |
| 16:16 | 8 | TO CORROBORATE THE MEANING OF THESE TRIANGLES SHOWN IN THESE |
| 16:17 | 9 | PHOTOGRAPHS. |
| 16:17 | 10 | **Q.**   WELL, THAT'S INTERESTING BECAUSE YOU WERE ASKED ABOUT -- |
| 16:17 | 11 | OR MR. COBOS-ROA WAS ASKED ABOUT YOUR INVOLVEMENT IN THE |
| 16:17 | 12 | MODELING THAT HE DID, AND YOU TESTIFIED HERE THIS MORNING THAT |
| 16:17 | 13 | YOU WEREN'T FAMILIAR WITH THESE SCREENSHOTS. |
| 16:17 | 14 | **A.**   AND I'M NOT. |
| 16:17 | 15 | **Q.**   BUT MR. COBOS-ROA TESTIFIED THAT THEY -- YOU APPROVED ALL |
| 16:17 | 16 | OF THE BOUNDARY CONDITIONS THAT THEY USED IN THEIR MODELING. |
| 16:17 | 17 | **A.**   YES. |
| 16:17 | 18 | **Q.**   YOU'RE AGREEING WITH THAT? |
| 16:17 | 19 | **A.**   YES. |
| 16:17 | 20 | **Q.**   YOU JUST DON'T KNOW WHAT THAT WOULD LOOK LIKE IN A SEEP/W |
| 16:17 | 21 | FILE.  IS THAT YOUR TESTIMONY? |
| 16:17 | 22 | **A.**   THAT IS CORRECT, SIR. |
| 16:17 | 23 | **Q.**   SO YOU HAVE NO WAY TO KNOW, THEN, WHEN HE WAS DOING THE |
| 16:17 | 24 | MODELING WHETHER HE WAS DOING IT CORRECTLY BY LOOKING AT HIS |
| 16:17 | 25 | FILES, DID YOU? |

ROBERT G. BEA - CROSS

16:17    1    **A.**   I DID NOT LOOK AT HIS FILES.  I DESCRIBED TO YOU THE WAYS

16:17    2    THAT I INDEPENDENTLY VALIDATED HIS RESULTS.

16:18    3    **Q.**   RIGHT.  AND THE WAYS THAT YOU INDEPENDENTLY VALIDATED

16:18    4    THOSE RESULTS WAS WITH YOUR HAND CALCULATIONS, CORRECT,

16:18    5    DR. BEA?

16:18    6    **A.**   THAT'S ONE OF THEM, YES.

16:18    7    **Q.**   WE ARE GOING TO GET TO YOUR HAND CALCULATIONS LATER.

16:18    8    **A.**   GOOD.

16:18    9    **Q.**   LET'S GO TO THE THIRD -- MR. TREEBY HAS ALREADY COVERED

16:18   10    THE SECOND SCREENSHOT.  BUT THAT ALSO SHOWS A CHANGE IN THE

16:18   11    HYDRAULIC CONDUCTIVITY OF THE JOURDAN AVENUE CANAL.  MR. TREEBY

16:18   12    HAS COVERED THAT, SO WE WILL SKIP THROUGH THAT.

16:18   13            LET'S GO TO THE THIRD PAGE.  HERE AGAIN, WE HAVE

16:18   14    JUXTAPOSED SCREENSHOTS FROM THE NORTH BREACH AND THE NEAR

16:18   15    BREACH FROM YOUR FILES.  WHAT I WANT TO CALL YOUR ATTENTION TO

16:18   16    ARE THE LITTLE BLUE CIRCLES -- DOTS, IF YOU WILL, SINCE THEY

16:19   17    ARE FILLED IN -- THAT ARE AT THE TOP OF THE SOIL UNIT FROM THE

16:19   18    LEFT-HAND EDGE OF THIS CROSS SECTION RUNNING ALL THE WAY TO THE

16:19   19    FLOODWALL.  DO YOU SEE THAT AT THE NORTH BREACH?

16:19   20    **A.**   YES, SIR.

16:19   21    **Q.**   THEN YOU SEE IN THE NEAR BREACH CROSS SECTION, THOSE

16:19   22    LITTLE FILLED BLUE DOTS STOP SHORT OF THE FLOODWALL, DON'T

16:19   23    THEY, DR. BEA?

16:19   24    **A.**   YES, SIR.

16:19   25    **Q.**   THAT'S ANOTHER DIFFERENCE.  WOULD YOU KNOW WHETHER THOSE

ROBERT G. BEA - CROSS

16:19    1    BLUE DOTS ARE INDICATIVE OF ANOTHER BOUNDARY CONDITION, THE
16:19    2    TOTAL HEAD BOUNDARY CONDITION?
16:19    3    A.    NO.
16:19    4    Q.    WELL, I'M GOING TO REPRESENT TO YOU THAT THEY ARE.
16:19    5          AND DO YOU KNOW WHAT THE EFFECT OF STOPPING THE TOTAL
16:19    6    HEAD SHORT OF THE FLOODWALL IN THE NEAR BREACH CROSS SECTION
16:19    7    WOULD BE ON YOUR FLOWS UNDER THE FLOODWALL TO THE PROTECTED
16:19    8    SIDE OF THE LEVEE?
16:19    9    A.    IT WOULD CHANGE IT.
16:19   10    Q.    IT WOULD CHANGE IT.
16:20   11          IN FACT, IT WOULD REDUCE THOSE FLOWS SUBSTANTIALLY,
16:20   12    WOULDN'T IT, DR. BEA?
16:20   13    A.    IT WOULD REDUCE IT SUBSTANTIALLY AS A QUANTITATIVE
16:20   14    EXPRESSION.  I CANNOT ANSWER THAT QUESTION YES OR NO WITHOUT
16:20   15    ACCESS TO THE INFORMATION TO ANSWER THAT QUESTION.
16:20   16          MR. SMITH:  CAN WE GO TO STARK DEMONSTRATIVE
16:20   17    SLIDE 41.
16:20   18    BY MR. SMITH:
16:21   19    Q.    WHILE WE ARE LOOKING AT THIS, BEFORE WE GET THIS UP, I
16:21   20    JUST WANT TO ASK YOU:  MR. COBOS-ROA TESTIFIED THAT WHEN HE DID
16:21   21    THE MODELING, HE OPENED UP THE GAP, THE TENSION GAP, ON THE
16:21   22    CANAL SIDE OF THE FLOODWALL AT THE BEGINNING OF HIS MODEL AND
16:21   23    KEPT IT OPEN THE WHOLE TIME.
16:21   24          DO YOU KNOW THAT TO BE TRUE OR NOT?
16:21   25    A.    THAT'S WHAT HE TESTIFIED.  I DID NOT CHECK THE INPUT FILES

ROBERT G. BEA - CROSS

16:21    1    TO ENSURE THAT WAS DONE, BUT WE HAD SEVERAL DISCUSSIONS OVER

16:21    2    THE FULL TENSION GAP ANALYSIS.

16:22    3    Q.   IF YOU BROUGHT THAT WATER ALL THE WAY UP TO THE FLOODWALL,

16:22    4    AS HE DID AT THE NORTH BREACH, IT WOULD FILL THAT GAP, WOULDN'T

16:22    5    IT, DR. BEA?

16:22    6    A.   YES, SIR.

16:22    7    Q.   BECAUSE THAT GAP IS AN OPEN SPACE, RIGHT?

16:22    8    A.   YES, SIR.

16:22    9    Q.   THAT WATER WOULD PENETRATE IMMEDIATELY TO THE TIP OF THE

16:22   10    SHEET PILE, WOULDN'T IT?

16:22   11    A.   YES.

16:22   12    Q.   IT WOULD BEGIN TO MIGRATE IMMEDIATELY TO THE PROTECTED

16:22   13    SIDE OF THE SHEET PILE, WOULDN'T IT?

16:22   14    A.   THAT'S CORRECT.

16:22   15    Q.   BUT IF HE STOPPED THAT SHORT AT THE MCDONOUGH MARINE, THEN

16:22   16    IT WOULDN'T BE ABLE TO FILL THAT GAP, WOULD IT, DR. BEA, UNTIL

16:22   17    THE SURGE BEGAN TO RISE IN HIS MODEL?  ISN'T THAT CORRECT?

16:22   18    A.   I HAVE NOT BEEN ABLE TO FOLLOW THE HYPOTHETICAL IN YOUR

16:22   19    QUESTION.  PLEASE REPEAT IT.

16:22   20    Q.   I DON'T WANT IT TO BE A HYPOTHETICAL.

16:22   21         MR. SMITH:  LET'S GO BACK TO THE LAST SLIDE, THE ONE

16:22   22    WE JUST HAD UP THERE.  IT SHOULD BE PAGE 3.

16:22   23    BY MR. SMITH:

16:22   24    Q.   WE ARE LOOKING AT THE BLUE DOTS THAT REPRESENT THE TOTAL

16:23   25    HEAD.  THAT'S BEFORE THE SURGE IS RISING.  THERE'S NO SURGE

ROBERT G. BEA - CROSS

16:23   1   INDICATED IN THIS SCREENSHOT, IS THERE, DR. BEA?

16:23   2   **A.**   NO, THERE ISN'T.

16:23   3   **Q.**   SO THERE WOULDN'T BE ANY WATER FILLING THAT GAP AT THE

16:23   4   NEAR BREACH WITHOUT BRINGING THAT TOTAL HEAD ALL THE WAY TO THE

16:23   5   FLOODWALL, WOULD THERE, UNTIL THE SURGE GETS THERE?  ISN'T THAT

16:23   6   CORRECT?

16:23   7   **A.**   THAT'S CORRECT.

16:23   8   **Q.**   SO THIS IS WHAT WE ARE TALKING ABOUT.  IT'S NOT A

16:23   9   HYPOTHETICAL.  WE ARE COMPARING HIS NORTH BREACH AND HIS NEAR

16:23   10  BREACH MODEL.

16:23   11          **MR. SMITH:**  LET'S GO BACK TO WHERE WE WERE, IF WE CAN

16:23   12  FOR A SECOND.

16:23   13  **BY MR. SMITH:**

16:23   14  **Q.**   DR. STARK COMPARED TWO FIGURES FROM YOUR REPORT IN WHICH

16:23   15  YOU SHOW PRESSURE GRADIENTS WHICH YOU SAY ARE KEY TO

16:23   16  UNDERSTANDING ONE OF THE CAUSES OF THE BREACHES.  CORRECT?  THE

16:23   17  EXCESS HYDRAULIC GRADIENTS AT THE LEVEE TOE YOU CITE AS ONE OF

16:23   18  THE REASONS FOR THE BREACHES; ISN'T THAT CORRECT?

16:24   19  **A.**   I THINK THAT'S NOT CORRECT.  THIS MORNING I SUMMARIZED FOR

16:24   20  THE COURT THESE THREE PRESSURE CONTRIBUTORS: ONE, TOTAL STRESS;

16:24   21  NUMBER TWO, THE FLOW-RELATED PRESSURE ELEMENT; AND THE THIRD

16:24   22  ONE BEING THE HYDRAULIC CONDUCTIVITY PRESSURES.  THE GRADIENTS

16:24   23  ARE REFERRING TO NUMBER TWO, WHICH WAS NOT A KEY CAUSATIVE

16:24   24  ELEMENT IN THE BREACHES.

16:24   25  **Q.**   FIGURE 54, THAT'S THEIR NEAR BREACH.  APPENDIX D YOU LABEL

ROBERT G. BEA - CROSS

16:25  1   AS "CRITICAL VERTICAL UPLIFT HYDRAULIC GRADIENTS AT PROTECTED

16:25  2   SIDE LEVEE TOE AT THE NEAR BREACH SITE, CASE 1-1 AND CASE 2-1."

16:25  3        DO YOU RECALL THAT?

16:25  4   **A.**   NO.

16:25  5   **Q.**   YOU DON'T RECALL THAT FIGURE.  WELL, I WILL REPRESENT TO

16:25  6   YOU IT'S THE FIGURE THAT YOU SEE ON THE RIGHT HERE.  THAT'S THE

16:25  7   FIGURE YOU HAD IN APPENDIX D ON PAGE 41 AS FIGURE 54, AND YOU

16:25  8   LIST THESE AS "CRITICAL VERTICAL UPLIFT HYDRAULIC GRADIENTS AT

16:25  9   PROTECTED SIDE LEVEE TOE."

16:25  10       AND YOU SEE THAT AT THE NEAR BREACH, THEY START OUT

16:25  11  IN YOUR MODEL AND MR. COBOS-ROA'S MODEL -- PERHAPS WE SHOULD

16:25  12  CALL IT HIS SINCE YOU WEREN'T ABLE TO REVIEW IT -- AS ZERO,

16:25  13  DON'T THEY?

16:26  14  **A.**   APPENDIX D, WHAT PAGE?

16:26  15  **Q.**   PAGE 41.

16:26  16  **A.**   YES, SIR.

16:26  17  **Q.**   YOU SEE THAT THOSE CRITICAL VERTICAL UPLIFT HYDRAULIC

16:26  18  GRADIENTS, THEY STAY AT ZERO FROM THE BEGINNING OF THE MODEL

16:26  19  FOR 24 HOURS, ALMOST 24 HOURS, FROM 6:00 A.M. ON THE 28TH UNTIL

16:26  20  5:00 A.M. ON THE 29TH, DON'T THEY?  THEY DON'T MOVE AT ALL.  NO

16:26  21  PRESSURE AT ALL IS BEING COMPUTED IN THIS MODEL IN YOUR NEAR

16:26  22  BREACH CROSS SECTION, IS IT?

16:27  23  **A.**   THE SCALE DOES NOT PERMIT ME TO CONCLUDE IT IS EQUAL TO

16:27  24  0.0, BUT IT CERTAINLY IS SMALL AND LOW.

16:27  25  **Q.**   YOU CAN'T DISCERN ANY CHANGE, CAN YOU?

**ROBERT G. BEA - CROSS**

| | | |
|---|---|---|
| 16:27 | 1 | **A.**   I CAN'T HEAR. |
| 16:27 | 2 | **Q.**   YOU CANNOT DISCERN ANY CHANGE, CAN YOU? |
| 16:27 | 3 | **A.**   THAT'S CORRECT. |
| 16:27 | 4 | **Q.**   WE CAN CONTRAST THAT WITH YOUR NORTH BREACH COMPUTED |
| 16:27 | 5 | VERTICAL UPLIFT GRADIENTS ACTING NEAR THE LANDSIDE TOE OF THE |
| 16:27 | 6 | NORTH BREACH SITE FOR CASES 1-1 AND 1-2, WHICH APPEARS ON THE |
| 16:27 | 7 | LEFT SIDE OF THE DEMONSTRATIVE WHICH IS BEFORE US, AND THAT IS |
| 16:27 | 8 | FIGURE 7 ON PAGE 7 OF APPENDIX D, IF YOU WOULD LIKE TO TURN |
| 16:27 | 9 | THERE AND VERIFY THAT FOR YOURSELF. |
| 16:28 | 10 | **A.**   YOU SAID FIGURE 7? |
| 16:28 | 11 | **Q.**   FIGURE 7 ON PAGE 7, APPENDIX D. |
| 16:28 | 12 | **A.**   YES, SIR, I'M THERE NOW. |
| 16:28 | 13 | **Q.**   YOU CAN SEE IN THAT FIGURE THAT MR. COBOS-ROA HAS COMPUTED |
| 16:28 | 14 | A VERTICAL UPLIFT PRESSURE AT 6:00 A.M. ON THE 28TH OF AUGUST, |
| 16:28 | 15 | MORE THAN 24 HOURS BEFORE THE NORTH BREACH OCCURRED, THAT |
| 16:28 | 16 | CRITICAL VERTICAL UPLIFT GRADIENT NEAR THE LANDSIDE TOE OF THE |
| 16:28 | 17 | NORTH BREACH SITE WAS ALREADY AT FOUR-TENTHS WHEN HE JUST |
| 16:29 | 18 | TURNED THE MODEL ON AND STARTED IT RUNNING.  DOESN'T IT SHOW |
| 16:29 | 19 | THAT? |
| 16:29 | 20 | **A.**   NO. |
| 16:29 | 21 | **Q.**   IT SHOWS THAT, DOESN'T IT, DR. BEA? |
| 16:29 | 22 | **A.**   NO, NO. |
| 16:29 | 23 | **Q.**   WHAT DOES THAT LITTLE BLUE DIAMOND INDICATE IF IT DOES NOT |
| 16:29 | 24 | INDICATE THAT? |
| 16:29 | 25 | **A.**   WHICH DIAMOND ARE YOU REFERRING TO? |

ROBERT G. BEA - CROSS

16:29  1  **Q.**  CASE 1-1, THE BLUE DIAMOND.

16:29  2  **A.**  THERE'S A WHOLE ROW OF BLUE DIAMONDS.  WHICH ONE ARE --

16:29  3  **Q.**  THE VERY FIRST ONE THAT HE REVEALS WHEN HE BEGAN RUNNING

16:29  4  HIS MODEL.  6:00 A.M. ON THE 28TH, BEFORE THE STORM SURGE EVEN

16:29  5  BEGAN TO MOVE OVER THE EBIA, WHAT IS THE CRITICAL VERTICAL

16:29  6  HYDRAULIC GRADIENT SHOWN IN HIS MODEL -- IN YOUR TABLE -- IN

16:29  7  YOUR FIGURE?  THIS IS NOW YOUR REPORT.

16:29  8  **A.**  .4.

16:29  9  **Q.**  YOU CAN'T EXPLAIN WHY THAT'S 0.4, CAN YOU, THAT CRITICAL

16:29  10  VERTICAL HYDRAULIC GRADIENT BEFORE THE SURGE EVEN BEGAN TO MOVE

16:30  11  INTO THE EBIA?

16:30  12  **A.**  NO, THAT'S NOT TRUE.  THE SURGE BEGAN TO MOVE INTO THE

16:30  13  EBIA APPROXIMATELY 6:00 A.M. ON THE 28TH.  BY THAT TIME WE HAD

16:30  14  ENOUGH WATER TO INUNDATE THE EBIA.

16:31  15  **Q.**  I'M SORRY.  YOUR TESTIMONY IS THAT THE EBIA WAS INUNDATED

16:31  16  AT 6:00 A.M. ON THE 28TH?

16:31  17  **A.**  THAT'S WHEN WE REACH AN ELEVATION OF -- THE WATER IN THE

16:31  18  INDUSTRIAL CANAL REACHES AN ELEVATION NAVD88 (2004.65) OF PLUS

16:31  19  2 FEET.  THAT IS THE AVERAGE ELEVATION OF THE EBIA THAT I CITED

16:31  20  EARLIER.  I THINK I CITED A RANGE OF PLUS 2 TO PLUS 3 FEET.

16:31  21  AND THAT WAS CORROBORATED WITH THE ANALYSIS OF DATA DONE BY

16:31  22  DR. MARR.

16:31  23  **Q.**  THAT'S YOUR EXPLANATION FOR WHY THE COMPUTED VERTICAL

16:31  24  HYDRAULIC GRADIENT 24 HOURS BEFORE THE BREACH AT THE NORTH

16:32  25  BREACH SITE WAS ALREADY AT 0.4?

ROBERT G. BEA - CROSS

16:32   1   **A.**   WELL, WHAT'S HAPPENING IS THE WATER IS INUNDATING THE EBIA
16:32   2   SITE EARLY BECAUSE OF ITS ABILITY TO QUICKLY CONDUCT THROUGH
16:32   3   THE SAND BACKFILL AND THEN BEGAN THE CHARGING CONNECTION OF THE
16:32   4   SWAMP MARSH LAYER THAT IS CONDUCTING THESE GRADIENTS TO THE
16:32   5   PROTECTED SIDE.  WE ARE FOLLOWING THAT --
16:32   6   **Q.**   YOU DON'T KNOW, BECAUSE YOU DON'T UNDERSTAND HOW THE
16:32   7   SEEPAGE MODELS WORK, WHETHER THAT'S THE REASON WHY THAT'S SHOWN
16:32   8   IN MR. COBOS-ROA'S MODELING, DO YOU?
16:32   9   **A.**   THAT'S AN INCORRECT STATEMENT.  I DO UNDERSTAND HOW THE
16:32   10   ANALYSES WORK.
16:32   11   **Q.**   YOU DON'T UNDERSTAND, THOUGH, WHY THE TOTAL HEAD BOUNDARY
16:33   12   IS STOPPED SHORT OF THE GAP IN HIS NEAR BREACH SCENARIO, DO
16:33   13   YOU?
16:33   14   **A.**   I'M NOT EVEN SURE THAT'S FACTUAL.
16:33   15   **Q.**   BUT IF IT IS FACTUAL, YOU DON'T KNOW THE REASON WHY THAT
16:33   16   WOULD BE, DO YOU?
16:33   17   **A.**   THAT'S CORRECT.
16:33   18   **Q.**   IN FACT, WE ASKED YOU AT YOUR DEPOSITION ABOUT VARIATIONS
16:33   19   AT THE JOURDAN AVENUE BOX CULVERT; AND YOU INDICATED THAT THERE
16:33   20   SHOULD NOT BE ANY DIFFERENCES; IT SHOULD BE MODELED UNIFORMLY.
16:33   21   NORTH BREACH, MCDONOUGH MARINE, SOUTH BREACH SHOULD ALL BE THE
16:33   22   SAME, CORRECT?
16:33   23        DO YOU REMEMBER THAT AT YOUR DEPOSITION?
16:33   24   **A.**   WELL, LET'S REVIEW THAT IN THE CONTEXT IN WHICH THAT
16:33   25   PURPORTED STATEMENT WAS MADE.

ROBERT G. BEA - CROSS

16:33    1   **Q.**   ALL RIGHT.  LET'S REVIEW THAT.

16:33    2            **MR. SMITH:**  LET'S GO TO -- LET'S SHOW THE VIDEO,

16:33    3   THEN, FROM JX-1395, PAGE 282.

16:34    4            **THE COURT:**  I DON'T KNOW HOW WE ARE DOING IN TOTAL

16:34    5   TIME OF 60 HOURS EACH, BUT I'M GOING TO CHECK SOON.  WE HAVE A

16:35    6   LOT OF DEAD TIME HERE.

16:35    7            (VIDEO PLAYED.)

16:35    8            "QUESTION:  NOW, YOU DID INDICATE THAT PROPERTY

16:35    9       VALUES FOR THE BOX CULVERT DID AFFECT YOUR FLOW, CORRECT?

16:35   10            "ANSWER:  IT DOES.

16:35   11            "QUESTION:  AND YOU'VE TESTIFIED THAT AT THE NORTH

16:35   12       BREACH, YOU MODELED IT AS A WATER COLUMN.  IS THAT

16:35   13       CORRECT?

16:35   14            "ANSWER:  BASICALLY AS THAT.  I'D HAVE TO REFRESH MY

16:35   15       MEMORY ABOUT THE DETAILS THAT WE PUT INTO THAT BOX

16:35   16       CULVERT.

16:35   17            "QUESTION:  NOW, THE DETAILS THAT YOU PUT INTO THAT

16:35   18       BOX CULVERT WERE BASED UPON YOUR UNDERSTANDING OF THE

16:35   19       MATERIALS SURROUNDING THE BOX CULVERT AND THE NATURE OF

16:35   20       THE CULVERT ITSELF, CORRECT?

16:35   21            "ANSWER:  AND THE NATURE OF THE MATERIALS INSIDE THE

16:35   22       CULVERT AND THE PENETRATIONS WITHIN THE CULVERT.  SO ALL

16:36   23       OF THOSE THINGS HAVE TO BE -- OR SHOULD BE TAKEN INTO

16:36   24       ACCOUNT.

16:36   25            "QUESTION:  AND WOULD THOSE PROPERTIES -- THOSE

*DAILY TRANSCRIPT*

ROBERT G. BEA - CROSS

16:36  1    PROPERTY VALUES THAT YOU'VE JUST DESCRIBED, WOULD THOSE BE

16:36  2    UNIFORM FROM THE NORTH TO THE SOUTH END OF JOURDAN AVENUE

16:36  3    CANAL AS IT RUNS PARALLEL TO THE EBIA FLOODWALL?

16:36  4         "ANSWER:  FUNDAMENTALLY.

16:36  5         "QUESTION:  IN OTHER WORDS, YOU DON'T HAVE ANY

16:36  6    PARTICULAR INFORMATION ABOUT THE JOURDAN AVENUE CANAL THAT

16:36  7    WOULD LEAD YOU TO MODEL IT ONE WAY AT THE NORTH BREACH AND

16:36  8    A DIFFERENT WAY AT THE SOUTH BREACH AND A DIFFERENT WAY AT

16:36  9    THE NEAR BREACH, DO YOU?

16:36  10        "ANSWER:  THAT'S CORRECT.

16:36  11        "QUESTION:  SO IF WE FOUND THAT YOU MODELED THE

16:36  12   JOURDAN AVENUE CANAL DIFFERENTLY AT EACH OF THOSE THREE

16:36  13   LOCATIONS THAT YOU'VE ANALYZED IN YOUR REPORT, THAT WOULD

16:36  14   BE A MISTAKE, WOULDN'T IT?

16:36  15        "ANSWER:  WELL, I'D HAVE TO FIND OUT THE REASON FOR

16:36  16   THE DIFFERENCES.  IF THOSE REASONS ARE TRACEABLE, THEN IT

16:37  17   COULD BE CORRECT.  IF THOSE REASONS ARE NOT TRACEABLE, IT

16:37  18   COULD BE INCORRECT.  AND AT THIS TIME I DON'T KNOW WHAT

16:37  19   THE SITUATION IS.

16:37  20        "QUESTION:  BUT YOU'VE TESTIFIED PREVIOUSLY THAT YOU

16:37  21   ULTIMATELY HAD TO APPROVE ALL THE INPUTS THAT WENT INTO

16:37  22   YOUR SEEP MODEL, CORRECT?

16:37  23        "ANSWER:  THAT IS CORRECT.

16:37  24        "QUESTION:  AND SO IF THOSE WOULD VARY FROM PLACE TO

16:37  25   PLACE, YOU APPROVED THOSE CHANGES, DIDN'T YOU?

ROBERT G. BEA - CROSS

16:37   1            "ANSWER:  THAT'S CORRECT.

16:37   2            "QUESTION:  BUT AS YOU SIT HERE TODAY, YOU HAVE NO

16:37   3       REASON -- YOU DON'T RECALL ANY BASIS FOR VARYING THOSE

16:37   4       FROM PLACE TO PLACE.

16:37   5            "ANSWER:  THAT'S CORRECT.

16:37   6            "QUESTION:  BUT THERE MAY BE SOME REASON THAT YOU

16:37   7       JUST DON'T RECALL TODAY.

16:37   8            "ANSWER:  THAT'S CORRECT."

16:37   9            (VIDEO STOPPED.)

16:37   10  BY MR. SMITH:

16:37   11  Q.   DOES THAT REFRESH YOUR MEMORY, DR. BEA?

16:37   12  A.   YES, SIR.  THANK YOU.

16:37   13  Q.   DO YOU HAVE DIFFERENT TESTIMONY TO GIVE TO THIS COURT

16:37   14  TODAY?

16:37   15  A.   NO.

16:37   16  Q.   I WOULD LIKE TO GO, THEN, TO THE FINAL SCREENSHOT WE HAVE,

16:37   17  WHICH SHOWS ONE OTHER DIFFERENCE BETWEEN JOURDAN AVENUE BOX

16:38   18  CULVERT, NORTH BREACH, SOUTH BREACH, AND THE NEAR BREACH.

16:38   19            DR. BEA, WHEN WE EXAMINED MR. COBOS-ROA'S MODELING

16:38   20  FILES, WE DISCOVERED THAT THE JOURDAN AVENUE CANAL WAS MODELED

16:38   21  8 FEET CLOSER TO THE FLOODWALL AT THE NEAR BREACH THAN IT WAS

16:38   22  AT THE NORTH OR THE SOUTH BREACHES.

16:38   23            YOU DON'T HAVE ANY EXPLANATION FOR THAT CHANGE -- IF

16:38   24  IT'S TRUE, YOU WOULDN'T HAVE ANY EXPLANATION TO GIVE TO THE

16:38   25  COURT FOR THAT DIFFERENCE IN MR. COBOS-ROA'S MODELING FILES,

**ROBERT G. BEA - CROSS**

16:38   1   WOULD YOU?

16:38   2   **A.**   NO, OTHER THAN IF THAT CHANGE IN DISTANCE WAS DUE TO

16:39   3   CHANGE IN THE ALIGNMENT OF THE JOURDAN AVENUE CANAL RELATIVE TO

16:39   4   THE FLOODWALL.

16:39   5   **Q.**   I WANT TO MOVE ON TO A DIFFERENT TOPIC NOW.  I WOULD LIKE

16:39   6   TO MOVE ON TO A QUESTION OF HOW THE ORGANIC CLAYS WERE MODELED,

16:39   7   WHETHER THEY WERE MODELED AS BEING DRAINED OR UNDRAINED.  THIS

16:39   8   IS A FAMILIAR TOPIC TO US.  I KNOW WE HAVE BEEN OVER THIS QUITE

16:39   9   A BIT.

16:39   10         BUT YOU WERE ASKED AGAIN AT YOUR DEPOSITION, THE

16:39   11   FOLLOWING DAY, THE SECOND DAY OF YOUR FIRST DEPOSITION, WHETHER

16:39   12   THE LOWER ORGANIC CLAY WAS MODELED IN A -- WHICH OF THOSE TWO

16:39   13   CONDITIONS IT WAS MODELED IN, AND YOU TESTIFIED IT WAS MODELED

16:39   14   IN AN UNDRAINED CONDITION.  WE WENT THROUGH A SERIES OF

16:40   15   QUESTIONS ABOUT THAT.

16:40   16         AND THEN I SHOWED YOU A FIGURE FROM YOUR REPORT IN

16:40   17   WHICH YOU INDICATED THAT YOU HAD USED DRAINED STRENGTH TO MODEL

16:40   18   THAT.

16:40   19         AND YOU SAID:  "THAT'S CORRECT.  WHAT'S SHOWN IN MY

16:40   20   REPORT IS THE WAY WE DID IT."

16:40   21         DO YOU RECALL THAT?

16:40   22   **A.**   WELL, THERE ARE SEVERAL REPORTS INVOLVED.  AND I HAVE

16:40   23   MODELED THE SHEAR STRENGTH BEHAVIOR OF THE ORGANIC MATERIAL

16:40   24   IDENTIFIED AS SWAMP MARSH DEPOSIT AS BOTH -- NOT AT THE SAME

16:40   25   TIME, BUT AS A DRAINED CONDITION, MEANING EFFECTIVE STRESS,

ROBERT G. BEA - CROSS

16:40    1    SHEAR STRENGTH EVALUATION; AND IN AN UNDRAINED CONDITION,
16:40    2    MEANING A TOTAL STRESS, EVALUATION OF SHEAR STRENGTH.
16:41    3    **Q.**   JUST TO BE CLEAR, THOUGH, YOUR OPINIONS ABOUT THE
16:41    4    BREACHING AT THE NORTH BREACH AND THE SOUTH BREACH IN THIS CASE
16:41    5    ARE BASED UPON YOUR ASSIGNMENT OF DRAINED STRENGTH TO THE
16:41    6    ORGANIC CLAYS, THE SWAMP MARSH, AS YOU TERM THEM; ISN'T THAT
16:41    7    TRUE?
16:41    8    **A.**   NOT QUITE BECAUSE IN MY REBUTTAL REPORT, I SHOWED THE
16:41    9    RESULTS FROM THE TWO SETS OF SHEAR STRENGTH CHARACTERIZATIONS I
16:41   10    USED, AND THE DIFFERENCE AT NORTH AND SOUTH BREACHES WAS LESS
16:41   11    THAN 12 INCHES IN WATER ELEVATION.
16:41   12    **Q.**   WELL, I UNDERSTAND, AND WE ARE GOING TO GET THERE.  WE ARE
16:41   13    GOING TO GET TO WHAT YOU DID IN YOUR REBUTTAL REPORT.
16:41   14          **THE COURT:**  BY THE WAY, I DON'T WANT TO GO OVER WHAT
16:41   15    WE DID FOR THREE DAYS, MR. SMITH.  I WANT THIS TO BE FOCUSED ON
16:41   16    WHAT HE BROUGHT OUT IN REBUTTAL.
16:41   17          **MR. SMITH:**  THIS HAS TO DO WITH HIS TESTIMONY,
16:42   18    YOUR HONOR, AND WHETHER HE IS CHANGING HIS TESTIMONY.
16:42   19          **THE COURT:**  I DON'T REMEMBER DRAINED AND UNDRAINED
16:42   20    BEING MENTIONED, BUT I'M GOING TO GIVE YOU SOME LEEWAY.  WE HAD
16:42   21    THREE DAYS OF DR. BEA.  SO I DON'T WANT THIS TO BE A WAY TO
16:42   22    HAVE FOUR DAYS OF CROSS WHEN WE -- I WANT YOU TO HAVE A LOT OF
16:42   23    LATITUDE WITH WHAT HE'S DONE ON REBUTTAL, BUT I'M NOT QUITE
16:42   24    SURE HOW MUCH WE WENT INTO REBUTTAL ON DRAINED AND UNDRAINED.
16:42   25          **MR. BRUNO:**  WE DID NOT, FOR THE RECORD.

ROBERT G. BEA - CROSS

16:42    1          **THE COURT:**  I'M GOING TO GIVE YOU SOME LEEWAY, BUT IT
16:42    2    IS NOT GOING TO BE UNLIMITED.
16:42    3          **MR. SMITH:**  THIS IS ABOUT HIS MODELING, YOUR HONOR.
16:42    4          **THE COURT:**  I KNOW WHAT IT'S ABOUT, BUT IT'S NOT
16:42    5    ABOUT THE REBUTTAL TESTIMONY.
16:42    6          DID HE MENTIONED DRAINED OR UNDRAINED IN HIS
16:42    7    REBUTTAL TESTIMONY?
16:42    8          **MR. BRUNO:**  NO.
16:42    9          **MR. SMITH:**  HE MENTIONED HIS MODELING AND HOW HE --
16:42   10          **THE COURT:**  WHEN YOU SAY *MODELING*, THAT OPENS THE
16:42   11    DOOR TO EVERYTHING, BUT WE HAVE TO LIMIT IT SOMEWHAT.
16:42   12          I'M NOT GOING TO LET YOU CROSS-EXAMINE HIM
16:42   13    CARTE BLANCHE.  I WILL LET YOU UNDERSTAND THAT RIGHT NOW.  I'M
16:42   14    GOING TO GIVE YOU A LITTLE LEEWAY HERE.  YOU HAD THREE DAYS.
16:42   15    BOTH OF YOU HAVE HAD THREE DAYS.  ALL OF YOU HAD THREE DAYS.
16:42   16          GO AHEAD.
16:43   17    BY MR. SMITH:
16:43   18    Q.   IN YOUR REPORT, JX-1389, TABLE 5, PAGE 34.
16:43   19          **MR. SMITH:**  I'M SORRY.  THIS IS IN APPENDIX C,
16:43   20    PAGE 34.  IF WE BLOW UP THE TOP BOX, PLEASE, TABLE 5.
16:44   21    BY MR. SMITH:
16:44   22    Q.   TABLE 5 -- THIS IS IN THE EXPERT REPORT YOU PREPARED IN
16:44   23    THIS CASE -- IT LISTS YOUR BEST ESTIMATE SOIL PROPERTIES USED
16:44   24    IN LATERAL STABILITY ANALYSES.
16:44   25          DO YOU SEE THAT, DR. BEA?

ROBERT G. BEA - CROSS

16:44  1   **A.**   YES, SIR.

16:44  2   **Q.**   YOU DO NOT HAVE ANY UNDRAINED STRENGTHS IN THIS TABLE FOR

16:44  3   THE SWAMP MARSH, DO YOU, DR. BEA?

16:44  4   **A.**   NO.

16:44  5   **Q.**   SO YOU DID NOT USE UNDRAINED STRENGTHS IN FORMING YOUR

16:44  6   OPINIONS ABOUT THE BREACHES AT THE NORTH AND SOUTH BREACH.  WE

16:44  7   CAN GO TO THE SOUTH BREACH TABLE AND SEE IT'S THE SAME AS THIS

16:44  8   ONE.  YOU DID NOT USE UNDRAINED STRENGTHS, DID YOU?  YOU USED

16:44  9   DRAINED STRENGTHS, DIDN'T YOU, DR. BEA?

16:44  10  **A.**   YOUR QUESTION IS DID I USE DRAINED AND UNDRAINED IN

16:44  11  FORMING MY OPINION, AND THE ANSWER IS I USED BOTH.

16:44  12  **Q.**   WELL, YOU DON'T INDICATE THAT IN THIS TABLE, DO YOU?

16:44  13  THESE ARE YOUR BEST ESTIMATE VALUES USED, ACCORDING TO THIS

16:44  14  TABLE, IN YOUR LATERAL STABILITY ANALYSES.  AND THERE IS NO

16:44  15  ENTRY FOR DRAINED -- UNDRAINED STRENGTH, IS THERE?

16:45  16  **A.**   NO, AND THAT'S BECAUSE THIS IS FOCUSED ON THE UNDRAINED OR

16:45  17  THE -- PARDON ME -- THE DRAINED EFFECTIVE STRESS

16:45  18  CHARACTERIZATION.

16:45  19        I ALSO PERFORMED AN UNDRAINED STRENGTH

16:45  20  CHARACTERIZATION.  IT'S DOCUMENTED IN MY EXPERT REPORT.  I USED

16:45  21  BOTH IN DEVELOPING MY OPINIONS CONCERNING CAUSATION, AND THE

16:45  22  EFFECT OF THIS VARIANCE WAS INSIGNIFICANT.  AND THAT'S NOT

16:45  23  ACCIDENTAL.

16:45  24  **Q.**   WELL, DR. BEA, HIS HONOR IS LOSING HIS PATIENCE, BUT I

16:45  25  GUESS I'M GOING TO HAVE TO SHOW YOUR TESTIMONY AGAIN BECAUSE

ROBERT G. BEA - CROSS

16:45  1    YOU WERE ASKED ABOUT THIS IN YOUR DEPOSITION, AND YOU WERE

16:45  2    QUITE CLEAR THAT WHAT -- I SHOWED YOU THIS TABLE, AND AFTER I

16:45  3    SHOWED YOU THIS TABLE, YOU CHANGED YOUR TESTIMONY.

16:45  4          MR. SMITH:  OKAY.  LET'S PLAY THE VIDEO THEN.  IT IS

16:46  5    THE SECOND DAY OF HIS DEPOSITION.  THAT'S THE 29TH -- 28TH, I

16:46  6    GUESS, WHICHEVER IS THE SECOND DAY.

16:46  7          THE COURT:  JUST A NOTE.  IT'S NOT SO MUCH PATIENCE

16:46  8    AS THE PROTOCOL OF CROSS-EXAMINATION ON REBUTTAL.  AND LET ME

16:46  9    MAKE IT CLEAR THAT I'M GIVING LATITUDE TO SOME DEGREE, BUT WE

16:46  10   HAD A LOT OF CROSS-EXAMINATION OF THIS WITNESS PREVIOUSLY.

16:46  11         NOTHING ON REBUTTAL NECESSARILY PROMPTED THIS.

16:46  12   IT COULD HAVE BEEN DONE UNDER CROSS-EXAMINATION AFTER DIRECT

16:46  13   EXAMINATION.  THAT IS MY CONCERN, THAT WE ARE EXPANDING

16:47  14   CROSS-EXAMINATION BEYOND THE SCOPE OF REBUTTAL.  I'M GIVING YOU

16:47  15   SOME LEEWAY, BUT THAT IS WHAT I'M STATING.  THESE WERE NOT

16:47  16   SHOWN DURING REBUTTAL --

16:47  17         MR. SMITH:  LET'S GO TO --

16:47  18         THE COURT:  -- DURING HIS REBUTTAL TESTIMONY.

16:47  19         MR. SMITH:  PAGE 34, I THINK IT IS.  I APOLOGIZE.

16:47  20   THAT'S NOT THE RIGHT PAGE.  LET ME SEE IF I CAN FIND THE RIGHT

16:47  21   PAGE.

16:48  22         THE COURT:  WE BETTER MOVE THIS ALONG.  I'M TELLING

16:48  23   YOU, IT HAS TO GO FASTER -- I'M GIVING YOU LATITUDE -- BECAUSE

16:48  24   THESE ARE THINGS THAT WERE NOT MENTIONED IN REBUTTAL.  WHETHER

16:48  25   YOU USED THE WORD *MODEL* OR NOT, WE DID NOT GET INTO THE

ROBERT G. BEA - CROSS

16:48   1   SPECIFICITY OF THIS.  THIS COULD HAVE BEEN DONE DURING REGULAR

16:48   2   CROSS-EXAMINATION.

16:48   3          MR. SMITH:  OKAY, YOUR HONOR.  HE CITED HIS HAND

16:48   4   CALCULATION, SO WE WILL MOVE ON TO HIS HAND CALCULATIONS.

16:48   5          THE COURT:  THAT HE DID.

16:48   6          MR. SMITH:  LET'S GO TO APPENDIX B OF HIS REBUTTAL.

16:48   7   I CALL THIS HIS SUPPLEMENTAL REPORT.  IT'S DX-1625.  LET'S GO

16:49   8   TO APPENDIX B, PAGE 15.

16:49   9          THIS IS NOT THE FIRST PAGE.  THE FIRST PAGE SAYS

16:49   10  APPENDIX B.  I GUESS ALL THE APPENDICES MUST BE IN A SINGLE

16:50   11  FILE APPARENTLY.  PAGE 20.

16:50   12         (DISCUSSION OFF THE RECORD.)

16:50   13  BY MR. SMITH:

16:50   14  Q.   THIS IS THE COMPARISON YOU ALLUDED TO JUST PREVIOUSLY,

16:50   15  ISN'T IT, DR. BEA?

16:50   16  A.   NO.  THESE ARE HAND CALCULATIONS I PERFORMED TO

16:51   17  CORROBORATE THE COMPUTER-BASED ANALYTICAL WORK.  THESE DO NOT

16:51   18  FORM THE BASIS FOR MY OPINIONS.

16:51   19  Q.   YOU USED -- YOU INCLUDED APPENDIX B -- WE ASKED YOU ABOUT

16:51   20  THIS AT YOUR DEPOSITION, AND YOU STATED -- I SAID:  "IN OTHER

16:51   21  WORDS, USING BOTH A DRAINED STRENGTH AND AN UNDRAINED STRENGTH

16:51   22  GIVE EQUIVALENT RESULTS, CORRECT?"

16:51   23         AND YOUR ANSWER WAS:  "CORRECT."

16:51   24  A.   AND THAT'S STILL CORRECT.

16:51   25  Q.   I ASKED YOU IF YOU RECALL WHY YOU USED -- YOU ASSIGNED AN

ROBERT G. BEA - CROSS

16:51  1    UNDRAINED STRENGTH OF 300 PSF TO THE ORGANIC CLAY IN THIS

16:52  2    APPENDIX.  DO YOU RECALL THAT?

16:52  3    **A.**   YES.

16:52  4    **Q.**   YOU TESTIFIED THAT YOU GOT THAT FROM WORK THAT YOU HAD

16:52  5    DONE IN 2008 FOR THE *ROBINSON* CASE.  DO YOU RECALL THAT?

16:52  6    **A.**   YES, SIR.

16:52  7    **Q.**   THIS IS NOT THE SAME STRENGTH THAT YOU REPORTED IN THIS

16:52  8    CASE, IS IT?

16:52  9    **A.**   WELL, WE ARE DOING TWO DIFFERENT MODELING APPROACHES TO

16:52  10   CHARACTERIZE SOIL SHEAR STRENGTH.  GIVEN THE AVAILABLE DATA, TO

16:52  11   USE THE TWO APPROACHES, YOU DON'T GET EXACTLY THE SAME RESULT;

16:52  12   BUT IN TERMS OF CAUSATION, YOU GET EXACTLY THE SAME RESULTS.

16:52  13   **Q.**   WELL, YOU DON'T GET THE SAME RESULT IF YOU USE THE VALUE

16:52  14   THAT'S IN YOUR EXPERT REPORT IN THIS CASE.

16:52  15   **A.**   WHICH EXPERT REPORT?

16:52  16   **Q.**   THE FIRST EXPERT REPORT YOU GAVE US IN THIS CASE, IN

16:52  17   TABLE 6.

16:52  18   **A.**   THAT'S ALL BASED ON DRAINED CONDITIONS.

16:53  19   **Q.**   YOU REPORTED -- LET'S GO BACK.

16:53  20           **MR. SMITH:**  I'M SORRY THIS IS SO CUMBERSOME,

16:53  21   YOUR HONOR, BUT I HAVE TO SHOW HIM EVERY DOCUMENT.

16:53  22           **THE COURT:**  I UNDERSTAND.

16:53  23           **MR. SMITH:**  WE ARE BACK IN APPENDIX D.

16:53  24           **THE WITNESS:**  B OR D?

16:53  25           **MR. SMITH:**  D AS IN DOG -- OR IS IT C?  THIS IS IN C.

ROBERT G. BEA - CROSS

16:53   1   I'M SORRY.  WE ARE BACK IN APPENDIX C OF HIS MAIN REPORT.  IT
16:53   2   WILL BE 1392.  IT'S PAGE 34.  WE WERE ON THIS PAGE BEFORE.  WE
16:53   3   ARE GOING TO GO TO THE TABLE AT THE BOTTOM NOW, TABLE 6.  BLOW
16:53   4   UP THE BOTTOM OF THE PAGE.
16:53   5   BY MR. SMITH:
16:53   6   Q.   FOR THE SWAP MARSH -- IT'S A TYPO.  I ASSUME THAT'S *SWAMP*
16:53   7   *MARSH*.
16:53   8          FOR THE SWAMP MARSH, THE MEDIAN UNDRAINED SHEAR
16:53   9   STRENGTH YOU LIST IS 442.  AM I RIGHT?  IS THAT NOT CORRECT?
16:54   10   A.   YES, SIR.
16:54   11   Q.   NOW, THAT'S NOT EVEN CLOSE TO 300, IS IT?
16:54   12   A.   WELL, THE 300 IS AVERAGING THROUGH THE LAYERS BEING CUT BY
16:54   13   THE FAILURE SURFACE IN MY HAND CALCULATION.
16:54   14   Q.   YOU DID NOT USE IN THIS VALIDATION THAT YOU DID -- THIS
16:54   15   COMPARISON, YOU DID NOT USE THE SAME VALUES THAT YOU REPORTED
16:54   16   IN YOUR EXPERT REPORT IN THIS CASE, DID YOU, SIR?
16:54   17   A.   THAT'S CORRECT.  I SHOULDN'T BECAUSE IF I DID, IT WOULD BE
16:54   18   WRONG.
16:54   19   Q.   IT WOULD BE WRONG; IT WOULD BE WAY WRONG.  I AGREE.
16:54   20          SO YOU WENT BACK TO WORK YOU HAD DONE IN 2008 TO FIND
16:54   21   A NUMBER THAT WOULD WORK AND COME OUT, GIVE YOU THE RESULT YOU
16:54   22   NEEDED, DIDN'T YOU, DR. BEA?
16:54   23   A.   NO.  YOUR QUESTION IMPLIES -- AND PLEASE CORRECT ME IF I'M
16:54   24   WRONG -- THAT I'M CONTRIVING NUMBERS TO DEVELOP A PRECONCEIVED
16:55   25   RESULT.  THAT IS NOT WHAT I DID.

ROBERT G. BEA - CROSS

16:55  1    **Q.**   WELL, I DID CALL YOUR ATTENTION TO THIS.  GO BACK TO THE
16:55  2    HAND CALCULATION.
16:55  3             **MR. SMITH:**  WE CAN GO BACK THERE.  IT'S APPENDIX B TO
16:55  4    HIS SUPPLEMENTAL REPORT DATED APRIL 11, 2012, DX-1625, PAGE 22.
16:55  5    **BY MR. SMITH:**
16:55  6    **Q.**   22:  I CALLED YOUR ATTENTION TO THE SU -- IF WE COULD
16:55  7    HIGHLIGHT TOTAL STRESS ABOUT TWO-THIRDS OF THE WAY DOWN THE
16:55  8    PAGE -- "TOTAL STRESS, SU, EQUALS 300 PSF."
16:55  9             YOU PUT "AVERAGE" BESIDE THAT.  AND I ASKED YOU -- I
16:55  10   SAID:  "IT APPEARS THAT YOU HAVE OVERWRITTEN ANOTHER NUMBER
16:55  11   THERE, DR. BEA.  IT LOOKS LIKE YOU INITIALLY HAD 250 THERE."
16:55  12            AND YOU AGREED WITH ME.  DO YOU RECALL THAT?
16:56  13   **A.**   I THINK THAT'S TRUE, SIR.
16:56  14   **Q.**   DO YOU RECALL EXPLAINING TO ME AT THAT TIME THAT YOU WENT
16:56  15   BACK TO THE *ROBINSON* CASE AND FOUND THE VALUE YOU USED IN
16:56  16   *ROBINSON* AND APPLIED THAT VALUE HERE?  DO YOU RECALL GIVING
16:56  17   THAT TESTIMONY?
16:56  18   **A.**   TO GET THE AVERAGE, THAT'S CORRECT, SIR.
16:56  19   **Q.**   WELL, I WENT TO THE ROBINSON REPORT TO FIND THAT VALUE,
16:56  20   AND I COULDN'T FIND IT.  WHAT I FOUND IN ROBINSON WAS THE SAME
16:56  21   VALUE THAT YOU REPORTED IN THIS TABLE, TABLE 6, IN YOUR REPORT
16:56  22   APPENDIX D IN THIS CASE, 442.
16:56  23   **A.**   UH-HUH.
16:56  24   **Q.**   I'M NOT GOING TO TAKE THE TIME TO GO THERE BECAUSE I THINK
16:56  25   WE -- LET'S TAKE THE TIME TO GO THERE.  I THINK IT'S WORTH

ROBERT G. BEA - CROSS

16:56  1    TAKING THE TIME TO GO THERE.
16:56  2              THE COURT:  ALL RIGHT, SIR.
16:56  3              MR. SMITH:  LET'S GO TO THE ROBINSON REPORT.  THIS IS
16:57  4    JX-1379.  IT SHOULD BE 0070.
16:57  5              THE COURT:  MR. SMITH, NOT TO INTERRUPT YOU RIGHT
16:57  6    NOW, BUT IS IT ANYBODY'S NOTION THAT WE ARE GOING TO TRY TO
16:57  7    FINISH DR. BEA?
16:57  8              MR. SMITH:  I'M NOT GOING TO BE HERE FOREVER,
16:57  9    YOUR HONOR.  I KNOW IT SEEMS THAT WAY.
16:57  10             THE COURT:  I'M GOING TO TRY TO ACCOMMODATE YOU.
16:57  11             MR. SMITH:  I'M GOING AS QUICKLY AS I CAN.
16:57  12             THE COURT:  I'M TRYING TO ACCOMMODATE YOU TO DO SO.
16:57  13             MR. SMITH:  I APOLOGIZE THAT IT'S TAKEN LONGER.
16:57  14             THE COURT:  LOOK, IT'S NOT ALL YOUR FAULT.  GO AHEAD.
16:57  15   WE ARE PREPARED TO DO THAT.
16:58  16   BY MR. SMITH:
16:58  17   Q.   HERE IS THE TABLE "MEDIAN SOIL PROPERTIES IDENTIFIED FOR
16:58  18   SOIL LAYERS USED IN STABILITY ANALYSES FOR THE NORTH BREACH."
16:58  19             DO YOU SEE THE VALUE THAT YOU GAVE FOR THE MARSH
16:58  20   UNDER THE LEVEE?
16:58  21   A.   THERE ARE TWO VALUES.
16:58  22   Q.   NEITHER ONE OF THEM IS 300.  BUT THE MARSH UNDER THE LEVEE
16:58  23   IS WHAT WE ARE TALKING ABOUT, ISN'T IT, DR. BEA?  WHEN WE ARE
16:58  24   DOING A LATERAL STABILITY ANALYSIS, YOU NEED TO KNOW THE SOIL
16:58  25   STRENGTH UNDER THE LEVEE, DON'T YOU?

ROBERT G. BEA - CROSS

16:58   1   **A.**   OF COURSE.

16:58   2   **Q.**   THAT'S 442, ISN'T IT?

16:58   3   **A.**   NO.

16:58   4   **Q.**   THE UNDRAINED STRENGTH MARSH UNDER LEVEE IS NOT 442?

16:58   5   **A.**   I'M CUTTING SOILS WITH THE FAILURE SURFACE IN MY HAND

16:58   6   CALCULATIONS BETWEEN MINUS 10 FEET AND MINUS 15 FEET.  SO I'M

16:58   7   NOT JUST CUTTING THAT MARSH UNDER THE LEVEE.  THE FAILURE

16:58   8   SURFACE CUTS THROUGH AN AVERAGING OF THE MARSH UNDER THE LEVEE

16:59   9   IN MARSH-FREE FIELD.  THAT'S SHOWN, THE FAILURE SURFACE, IN MY

16:59   10   THIRD REPORT, APPENDIX B AS IN BOB.  THE FAILURE SURFACE

16:59   11   EXTENDS 60 FEET FROM THE FLOODWALL.  IT'S AN AVERAGING ACROSS

16:59   12   THAT FAILURE SURFACE, SIR.

16:59   13   **Q.**   YOU DON'T SHOW THAT IN YOUR HAND CALCULATIONS, DO YOU,

16:59   14   DR. BEA?

16:59   15   **A.**   OH, I DO SHOW IT.  THAT'S INCORRECT, SIR.

16:59   16   **Q.**   WELL, LET'S GO BACK, THEN, TO YOUR HAND CALCULATION.

16:59   17          **THE COURT:**  WHEN YOU SAY YOU DO SHOW IT, IS IT

16:59   18   BECAUSE YOU PUT THE TERM *AVERAGE* THERE?

16:59   19          **THE WITNESS:**  YES.

16:59   20          **MR. SMITH:**  ALL RIGHT.  WE UNDERSTAND THAT THEN.

16:59   21   **BY MR. SMITH:**

16:59   22   **Q.**   BUT THE WAY YOU GOT THAT AVERAGE IS NOT SHOWN THERE, IS

17:00   23   IT, DR. BEA?

17:00   24   **A.**   NO.

17:00   25   **Q.**   IN FACT, THE FILES THAT WERE USED TO PRODUCE THE ROBINSON

**ROBERT G. BEA - CROSS**

17:00  1   REPORT, THE 442 VALUE THAT YOU SAID YOU WENT BACK TO, WHICH WAS

17:00  2   THE SAME AS THE VALUE THAT YOU REPORTED IN THIS CASE --

17:00  3   **A.**   YES.

17:00  4   **Q.**   -- THOSE FILES ARE ALSO LOST FILES, AREN'T THEY?

17:00  5   **A.**   THERE'S BEEN TOO MUCH TIME WASTED ON THIS STORY OF A

17:00  6   DOUBLE LOSS, AND THE RECORD IS FULL OF PROPER EXPLANATION OF

17:00  7   THAT PROCESS.  IT WAS NOT CONTRIVED, AND I DID NOTHING TO

17:00  8   WITHHOLD INFORMATION FROM YOU.  IF I HAD INFORMATION, YOU WOULD

17:00  9   HAVE IT.

17:00  10  **Q.**   ALL I'M ASKING, DR. BEA, IS WHETHER THE FILES THAT

17:00  11  SUPPORTED THE VALUE IN THE ROBINSON REPORT IN 2008 WERE LOST

17:01  12  BEFORE YOU DID YOUR APPENDICES IN THIS CASE.  ISN'T THAT TRUE?

17:01  13  **A.**   YES, SIR.

17:01  14  **Q.**   SO YOU COULD NOT GO BACK TO THOSE FILES TO GET THE

17:01  15  UNDERLYING DATA, COULD YOU, DR. BEA?

17:01  16  **A.**   NO.

17:01  17  **Q.**   ALL YOU HAD WAS A NUMBER, 442, IN A TABLE IN THE ROBINSON

17:01  18  REPORT, WHICH WAS THE SAME NUMBER THAT WAS IN THIS REPORT?

17:01  19  **A.**   THAT IS INCORRECT.

17:01  20  **Q.**   WELL, WE WILL LET THE RECORD REFLECT WHAT IT REFLECTS.

17:01  21       I BELIEVE YOU DID TALK TODAY IN YOUR DIRECT

17:01  22  EXAMINATION ABOUT WHETHER YOUR OPINION IN THIS CASE IS BASED

17:01  23  UPON PRESSURE TRANSMISSION, NOT FLOW OF WATER.

17:01  24       **THE COURT:**  THAT'S FOR SURE.

25

ROBERT G. BEA - CROSS

17:01    1    BY MR. SMITH:
17:01    2    Q.    ISN'T IT TRUE, DR. BEA, THAT PRIOR TO THIS CASE BEGINNING
17:01    3    WITH THE ILIT REPORT IN 2006, CONTINUING WITH THE *ELECTRONIC*
17:02    4    *JOURNAL OF GEOTECHNICAL ENGINEERING* REPORT IN 2008 AND IN THE
17:02    5    ROBINSON REPORT IN 2008 AND 2009 AND IN THE *BARGE* CASE IN
17:02    6    2010 -- IN ALL OF THOSE CASES, YOUR OPINIONS ABOUT THE BREACHES
17:02    7    THAT WE ARE FOCUSING ON IN THIS CASE INVOLVED THE FLOW OF
17:02    8    WATER?
17:02    9    A.    AS ONE OF THE THREE ELEMENTS, THAT'S CORRECT, SIR.
17:02   10    Q.    IN FACT, COPIOUS AMOUNTS OF WATER.
17:02   11    A.    THAT DEPENDS ON THE PERMEABILITY CHARACTERIZATION
17:02   12    ATTRIBUTED TO THE SWAMP MARSH LAYER, AND THERE'S BEEN
17:02   13    SUFFICIENT TESTIMONY TO TRACK THAT AS A FUNCTION OF TIME AND
17:02   14    KNOWLEDGE.
17:02   15    Q.    WELL, BY THE TIME YOU GOT TO THE *BARGE* TRIAL TWO YEARS
17:03   16    AGO, YOU WERE MODELING THE PERMEABILITY OF THE ORGANIC CLAY AT
17:03   17    10 TO THE MINUS 4; IN OTHER WORDS, ONLY 10 TIMES LESS PERMEABLE
17:03   18    THAN WHAT IT'S STIPULATED WE ARE MODELING IT IN THIS CASE,
17:03   19    CORRECT?
17:03   20    A.    NO.
17:03   21    Q.    YOU WERE NOT USING 10 TO THE MINUS 4 IN THE *BARGE* CASE?
17:03   22    A.    IT'S NOT 10 TIMES LESS.  IT'S 10 TIMES GREATER.
17:03   23    Q.    10 TIMES GREATER.  I STAND CORRECTED.  10 TIMES.
17:03   24          YET IN THE *BARGE* CASE, YOU SHOWED THE COURT GEYSERS
17:03   25    BURSTING OUT OF THE GROUND 20, 30 FEET IN THE AIR TO ILLUSTRATE

ROBERT G. BEA - CROSS

17:03   1   THE EFFECTS OF THESE UPLIFT PRESSURES.

17:03   2           YOU LOOK AGHAST, DR. BEA.  AM I MISREPRESENTING WHAT

17:03   3   YOU PRESENTED TO THIS COURT IN THE *BARGE* CASE?

17:03   4   **A.**   YES.

17:03   5   **Q.**   THEN LET'S SEE WHAT YOU DID SHOW THE COURT.

17:04   6           **THE COURT:**  THIS IS DEFINITELY A *GROUNDHOG DAY* FOR

17:04   7   ME.  I ONLY MEAN THAT FROM THE MOVIE.

17:04   8           **MR. BRUNO:**  DO YOU HAVE A WHOLE LOT MORE?  IT'S 5:00.

17:04   9           **MR. TREEBY:**  CAN WE TAKE A BREAK?

17:04   10          **MR. BRUNO:**  IF WE ARE CRUISING, WE MIGHT AS WELL TAKE

17:04   11  IT EASY.

17:04   12          **THE COURT:**  10 MINUTES.

17:04   13          (RECESS.)

17:18   14          **MR. SMITH:**  THANK YOU, YOUR HONOR.

17:18   15  BY MR. SMITH:

17:18   16  **Q.**   DR. BEA, IN *BARGE* YOU DESCRIBED SEEPAGE AS WATER

17:18   17  TRANSMISSION THROUGH THE SOIL LIKE HEAT TRANSMISSION THROUGH

17:18   18  METALS, DIDN'T YOU?

17:18   19  **A.**   YES, SIR.

17:18   20  **Q.**   THAT'S THE SAME ANALOGY DR. BRANDON USED IN THIS CASE?

17:18   21  **A.**   I WASN'T HERE.

17:18   22  **Q.**   IN *BARGE* YOU TESTIFIED THAT IF THE SEEPAGE FLOWS ARE GREAT

17:18   23  ENOUGH, YOU CAN DEVELOP WHAT'S CALLED PIPING; ISN'T THAT

17:19   24  CORRECT*?*

17:19   25  **A.**   CORRECT.

ROBERT G. BEA - CROSS

17:19    1    **Q.**   THAT PIPING, WHEN IT GETS TO THE SURFACE, EXPRESSES ITSELF
17:19    2    AS SAND BOILS?
17:19    3    **A.**   CORRECT.
17:19    4    **Q.**   AND SAND BOILS ARE THE RESULT OF THE MOVEMENT -- FLOW OF
17:19    5    WATER THROUGH SOIL?
17:19    6    **A.**   AND SOIL.
17:19    7    **Q.**   IN *BARGE* YOU TESTIFIED UNDERSEEPAGE ASSUMES THAT WATER
17:19    8    COMMUNICATES WITH THE SOIL, DIDN'T YOU*?*
17:19    9    **A.**   CORRECT.
17:19   10    **Q.**   YOU SAID ASSUMING, THEN, THAT SHEET PILE DOESN'T CUT IT
17:19   11    OFF, THE WATER DIRECTLY COMMUNICATES UNDER THE FLOODWALL TO THE
17:19   12    PROTECTED SOIL.
17:19   13           YOU TESTIFIED TO THAT IN *BARGE,* DIDN'T YOU, DR. BEA?
17:19   14    **A.**   YES, SIR.
17:19   15    **Q.**   LET'S GO TO SLIDE 26 OF YOUR *BARGE* PRESENTATION.
17:20   16           **MR. SMITH:**  I'M SORRY, DX-1589-0031.
17:20   17    **BY MR. SMITH:**
17:20   18    **Q.**   THESE ARE SOME PHOTOGRAPHS OF THE EBIA, CORRECT?
17:20   19    **A.**   YES, SIR.
17:20   20    **Q.**   THE PHOTOGRAPH AT THE BOTTOM HERE IS A PHOTOGRAPH OF THE
17:20   21    MCDONOUGH BORROW PIT, ISN'T IT?
17:20   22    **A.**   IT'S A PORTION OF IT DURING ITS DEVELOPMENT.
17:20   23    **Q.**   IN THE FOREGROUND THERE YOU SEE CYPRESS TREE STUMPS, DON'T
17:20   24    YOU?
17:20   25    **A.**   YES, SIR.

ROBERT G. BEA - CROSS

17:20  1  **Q.**   YOU TESTIFIED IN *BARGE* THAT THIS IS A CLEAR INDICATION
17:21  2  THAT YOU HAVE REACHED THE BURIED SWAMP MARSH LAYER.  DO YOU
17:21  3  RECALL THAT TESTIMONY?
17:21  4  **A.**   THAT'S CORRECT.  IT'S UNDER THOSE STUMPS.
17:21  5  **Q.**   AND SO IN THIS CASE, THE MCDONOUGH BORROW PIT IS NOT A
17:21  6  NO-EXCAVATION SCENARIO, IS IT, DR. BEA?
17:21  7  **A.**   WELL, IT HASN'T BEEN FULLY DEVELOPED.  THE DEEPEST PART IS
17:21  8  THE STUMPS THAT ARE IN THE FOREGROUND.
17:21  9  **Q.**   IN THE *BARGE* CASE YOU SHOWED AN ILLUSTRATION OF THE
17:21  10  HYDRAULIC UPLIFT PRESSURES, AND THAT WOULD BE DX-1589-0037.
17:22  11         **MR. SMITH:**  CAN WE GO TO DX-1589-0037.
17:22  12  **BY MR. SMITH:**
17:22  13  **Q.**   IN THIS YOU USED -- THIS IS YOUR FAMILIAR CAR LIFT
17:22  14  ANALOGY, WHICH I THINK YOU'VE AGREED THE CAR WON'T MOVE UNLESS
17:22  15  THERE'S MOVEMENT OF FLUID IN IT.  ISN'T THAT CORRECT?
17:22  16  **A.**   I THINK THAT'S BASICALLY CORRECT, WITH THE PROVISO THAT I
17:22  17  PUT THAT BEFORE ANY SIGNIFICANT MOVEMENT, THE CAR'S EFFECTIVE
17:22  18  DOWNWARD WEIGHT HAS BECOME ZERO AND THAT'S BECAUSE IT'S BEING
17:23  19  COUNTERBALANCED BY THE UPWARD FORCE.
17:23  20         **MR. SMITH:**  IF WE COULD GO TO DX-1589-0109.
17:23  21  **BY MR. SMITH:**
17:23  22  **Q.**   IN THE *BARGE* CASE YOU TESTIFIED THAT EVIDENCE OF THE
17:23  23  INSTANTANEOUS COMMUNICATION AT THE LOWER NINTH WARD WAS
17:23  24  EVIDENCED BY WATER SQUIRTING OUT OF BOREHOLES, WASN'T IT,
17:23  25  DR. BEA?

ROBERT G. BEA - CROSS

17:23    1    **A.**   CORRECT.

17:23    2    **Q.**   THAT WOULD INVOLVE THE MOVEMENT OF FLUIDS THROUGH SOIL,

17:23    3    DIDN'T IT?

17:23    4    **A.**   THAT'S CORRECT.  AND THE CAPTION HERE IS "DRILLING OF ILIT

17:23    5    BORINGS AT THE 17TH STREET CANAL."

17:23    6    **Q.**   RIGHT.  YOU CORRECTED YOUR TESTIMONY HERE AND --

17:23    7    **A.**   THAT'S CORRECT.

17:23    8    **Q.**   -- MADE IT CLEAR THAT THAT DID NOT OCCUR.

17:23    9         WE DIDN'T SEE ANYTHING LIKE THAT DURING OUR

17:23   10    EXPLORATION TESTING PROGRAM IN THE LOWER NINTH WARD LAST

17:23   11    SUMMER, DID WE, DR. BEA?

17:23   12    **A.**   I DON'T THINK SO.  I DIDN'T RECEIVE ANY REPORTS THAT

17:23   13    INDICATED THAT.

17:24   14         **THE COURT:**  IF YOU GENTLEMEN WANT TO CONFER, IT'S

17:24   15    QUITE ALL RIGHT.

17:24   16    **BY MR. SMITH:**

17:24   17    **Q.**   I JUST WANT TO MAKE SURE.  I MIGHT NOT HAVE HEARD YOUR

17:24   18    TESTIMONY CORRECTLY.

17:24   19         ISN'T IT TRUE, DR. BEA, THAT IN YOUR PRIOR

17:24   20    PUBLICATIONS YOU HAVE USED THIS PHOTOGRAPH THAT WE JUST

17:24   21    PREVIOUSLY SAW OF THE BURIED CYPRESS TREE STUMPS ENCOUNTERED IN

17:24   22    THE BORROW PIT AT MCDONOUGH MARINE AS AN ILLUSTRATION OF YOUR

17:24   23    ASSERTION THAT THE EXCAVATIONS PERFORMED BY WASHINGTON GROUP

17:24   24    CONSISTENTLY ENCOUNTERED A BURIED SWAMP AT AN ELEVATION BETWEEN

17:24   25    APPROXIMATELY MINUS 15 FEET AND MINUS 25 FEET?

ROBERT G. BEA - CROSS

17:25  1   **A.**   THAT DEPTH RANGE IS NOT CORRECT.  THE CONSISTENTLY

17:25  2   ENCOUNTERED IS CORRECT.

17:25  3   **Q.**   BUT YOU PREVIOUSLY DID USE THOSE DEPTHS, AND WHAT I WANT

17:25  4   YOU TO AFFIRM -- I DON'T CARE ABOUT THOSE DEPTHS -- IS YOU HAVE

17:25  5   PREVIOUSLY STATED IN SOME OF YOUR PUBLISHED JOURNAL ARTICLES

17:25  6   THAT WASHINGTON GROUP'S EXCAVATIONS CONSISTENTLY ENCOUNTERED A

17:25  7   BURIED SWAMP, AND YOU'VE SPECIFICALLY ILLUSTRATED THAT WITH

17:25  8   THIS PHOTOGRAPH FROM THE MCDONOUGH MARINE BORROW PIT.

17:25  9        LET'S GO TO THE *ELECTRONIC JOURNAL OF GEOTECHNICAL*

17:25  10  *ENGINEERING*, AND WE WILL SHOW YOU, BECAUSE I HATE TO ASK YOU TO

17:25  11  REMEMBER EVERYTHING YOU HAVE PUBLISHED.  THIS IS JX-1401.

17:26  12        **MR. SMITH:**  CAN WE GO TO IMAGE 0017.

17:26  13        **THE COURT:**  WE ARE TALKING ABOUT SOMETHING ELSE HERE.

17:26  14        (DISCUSSION OFF THE RECORD.)

17:27  15  BY MR. SMITH:

17:27  16  **Q.**   DR. BEA, THIS IS A PAGE FROM YOUR PUBLICATION IN THE

17:27  17  *ELECTRONIC JOURNAL OF GEOTECHNICAL ENGINEERING* WHICH WAS

17:27  18  PUBLISHED IN 2008.

17:27  19  **A.**   YES, SIR.

17:27  20  **Q.**   DO YOU SEE AT THE TOP OF THAT PAGE --

17:27  21        **MR. SMITH:**  IF WE CAN BRING THAT UP A LITTLE BIT.

17:27  22  IT'S A LITTLE FUZZY.  THAT'S THE NEXT PAGE.

17:27  23  BY MR. SMITH:

17:28  24  **Q.**   AT THE TOP OF THAT PAGE, DO YOU SEE THE STATEMENT I

17:28  25  PREVIOUSLY QUOTED TO YOU EARLIER?

ROBERT G. BEA - CROSS

17:28 1    A.   YES, SIR.

17:28 2    Q.   THAT'S IMMEDIATELY ABOVE THE PHOTOGRAPH.

17:28 3         MR. SMITH:  IF WE CAN ZOOM OUT NOW AND SEE THE

17:28 4    PHOTOGRAPH THAT'S IMMEDIATELY ABOVE FIGURE 21.  IF WE CAN BLOW

17:28 5    UP THE LEGEND FOR FIGURE 21.

17:28 6    BY MR. SMITH:

17:28 7    Q.   DO YOU SEE THAT YOU HAVE IDENTIFIED THAT AS "BURIED

17:28 8    CYPRESS TREE STUMPS ENCOUNTERED IN BORROW PIT AT MCDONOUGH

17:28 9    MARINE"?

17:28 10   A.   CORRECT.

17:28 11        MR. SMITH:  IF WE CAN ZOOM OUT AND GO TO THE

17:28 12   PARAGRAPH IMMEDIATELY BELOW THAT, THE EFFECTS.

17:28 13   BY MR. SMITH:

17:28 14   Q.   "THE EFFECTS OF THESE SITE REMEDIATION ACTIVITIES CLEARLY

17:28 15   EXTENDED WELL BELOW THE SPECIFIED SOIL EXCAVATION LEVELS CITED

17:28 16   EARLIER...THUS INTERSECTING THE UNDERLYING MARSH DEPOSITS."

17:28 17        DO YOU SEE THAT, DR. BEA?

17:29 18   A.   YES, SIR.

17:29 19   Q.   SO YOU HAVE PREVIOUSLY STATED THAT THE EXCAVATIONS AT THE

17:29 20   MCDONOUGH MARINE BORROW PIT DID INTERSECT THE UNDERLYING MARSH

17:29 21   DEPOSITS, HAVEN'T YOU?

17:29 22   A.   YES.

17:29 23        MR. SMITH:  FINE.  I JUST HAVE ONE MORE AREA I WOULD

17:29 24   LIKE TO INQUIRE INTO, YOUR HONOR.

17:29 25        THE COURT:  YES, SIR.

*DAILY TRANSCRIPT*

**ROBERT G. BEA - CROSS**

17:29    1   **BY MR. SMITH:**

17:29    2   **Q.**   DR. BEA, YOU HAVE TESTIFIED ABOUT THE CONSTRUCTION AND THE

17:29    3   DESIGN OF THE FLOODWALL ADJACENT TO THE EBIA.  YOU WERE ASKED

17:29    4   ABOUT THAT TODAY, ABOUT THE SHEET PILING, WHERE IT CAME

17:29    5   TOGETHER AND WHETHER YOU WOULD CONSIDER THAT TO BE A DESIGN

17:30    6   FLAW OR NOT.

17:30    7   **A.**   YES, SIR.

17:30    8   **Q.**   YOU HAVE BEEN PREVIOUSLY ASKED UNDER OATH ABOUT WHETHER

17:30    9   YOU CONSIDERED THE FLOODWALL ALONG THE EBIA TO HAVE BEEN A

17:30   10   FLAWED DESIGN.  DO YOU RECALL THAT, DR. BEA?

17:30   11   **A.**   YES, SIR.

17:30   12   **Q.**   YOU TESTIFIED, DIDN'T YOU, IN THE *ROBINSON* LITIGATION

17:30   13   THAT, IN FACT, THE FAILURE TO EXTEND THE SHEET PILES DEEP

17:30   14   ENOUGH TO INTERSECT THE SWAMP MARSH LAYER WAS A DESIGN FLAW,

17:30   15   DIDN'T YOU?

17:30   16   **A.**   YES.

17:30   17   **Q.**   THAT WAS A DESIGN FLAW THAT GOES THROUGHOUT THE LIFE CYCLE

17:30   18   OF THIS WALL, NOT JUST IN RELATIONSHIP TO THE WORK DONE BY

17:30   19   WASHINGTON GROUP; ISN'T THAT TRUE?

17:30   20   **A.**   THAT'S CORRECT.

17:30   21       THOSE DESIGN FLAWS HAVE NO DIRECT BEARING ON MY

17:31   22   FORENSIC ENGINEERING ANALYSIS OF BREACH CAUSATION.  IN

17:31   23   ADDITION, THE EXTRA EFFORT THAT I MADE TO STUDY THE NEAR BREACH

17:31   24   SHOWS THAT EVEN THROUGH THE FULL KATRINA CONDITION, WITH THE

17:31   25   CONDITIONS AT THAT SITE, THE WALL STOOD; AND AT NORTH AND SOUTH

ROBERT G. BEA - CROSS

17:31  1    BREACH, DUE TO THEIR UNIQUE CHARACTERISTICS, IT DIDN'T STAND.

17:31  2    AND THE SHEET PILES ARE EFFECTIVELY THE SAME DEPTH AT ALL THREE

17:31  3    LOCATIONS.

17:31  4    Q.   WHEN YOU WERE PREVIOUSLY EXAMINED ABOUT THIS ISSUE, YOU

17:31  5    WERE -- YOU SPECIFICALLY CITED PLATE 28 IN DESIGN MEMORANDUM 3

17:32  6    AS ILLUSTRATING THE FLAWED DESIGN OF THE SHEET PILE AND

17:32  7    FLOODWALL ALONG THE EAST BANK INDUSTRIAL AREA.

17:32  8            DO YOU RECALL THAT?

17:32  9    A.   NO.  I WOULD NEED TO SEE THE CITED PLATE.

17:32  10           MR. SMITH:  LET'S GO TO JX-1370, AND LET'S START WITH

17:32  11   PAGE 141.  LET'S GO TO LINE 6 ON PAGE 141.  LINE 6 THROUGH 16,

17:33  12   PLEASE.

17:33  13   BY MR. SMITH:

17:33  14   Q.   I ASKED YOU, BACK IN NOVEMBER OF 2007:

17:33  15           "QUESTION:  ARE THERE ELEMENTS IN THIS DESIGN

17:33  16       MEMORANDUM THAT ARE INAPPROPRIATE FOR THE CONSTRUCTION OF

17:33  17       THE AUTHORIZED FLOOD CONTROL STRUCTURES UNDER THE LPV HPP?

17:34  18           "ANSWER:  WHAT DEFINITION ARE YOU USING FOR THE WORD

17:34  19       *INAPPROPRIATE*?"

17:34  20           SO I REFRAMED MY QUESTION AND ASKED IT THIS WAY:

17:34  21           "QUESTION:  ARE THERE ELEMENTS IN THIS DESIGN THAT

17:34  22       FELL BELOW THE STANDARD OF CARE FOR THE ENGINEERING OF A

17:34  23       FLOOD PROTECTION SYSTEM THAT WAS AUTHORIZED BY THE

17:34  24       LAKE PONTCHARTRAIN AND VICINITY LEGISLATION?"

17:34  25           MR. BRUNO:  YOUR HONOR, I HAVE AN OBJECTION, PLEASE.

ROBERT G. BEA - CROSS

17:34   1          **THE COURT:**  YES, SIR.

17:34   2          **MR. BRUNO:**  I DON'T KNOW WHAT DESIGN MEMO WE ARE

17:34   3   TALKING ABOUT, NOR DO I KNOW WHAT SECTION OF THE LEVEE.  DM3

17:34   4   COVERS A LEVEE FROM THE RIVER ALL THE WAY TO VIOLET.

17:34   5          I'M BEING HANDED SOMETHING WHICH IS -- NO, THIS

17:34   6   DOESN'T HELP ME.

17:34   7          THE DESIGN MEMORANDUM CLEARLY REFLECTS IN THE

17:34   8   BODY OF THE DOCUMENT -- IN FACT, THIS IS THE SAME DESIGN

17:35   9   MEMORANDUM WE USED IN *ROBINSON*, WHICH IS WHY INQUIRY WAS MADE

17:35  10   IN *ROBINSON*.  DM3 DESCRIBES THE CONSTRUCTION OF THE MRGO LEVEES

17:35  11   ALL ALONG THE MRGO.  SO I'M FRANKLY CURIOUS TO KNOW WHY A

17:35  12   QUESTION WOULD HAVE BEEN ASKED ABOUT THE IHNC, IN ANY CASE,

17:35  13   SINCE THE SUBJECT OF THE LITIGATION WAS THE MRGO LEVEE.

17:35  14          SO I THINK THERE'S A MASSIVE CONFUSION.  I HAVE

17:35  15   TO ALSO INTERPOSE THAT DR. BEA HAS OFFERED NO OPINION WITH

17:35  16   REGARD TO THE DESIGN APPROPRIATENESS OF THE IHNC LEVEE, NOR WAS

17:35  17   IT COVERED IN HIS DIRECT NOR WAS IT COVERED IN HIS REBUTTAL NOR

17:35  18   WAS IT COVERED BY ANYBODY ELSE IN THIS TRIAL.  AND THERE'S BEEN

17:35  19   NO OPINION OFFERED THAT THE DESIGN IS DEFECTIVE BY ANYBODY.  SO

17:35  20   I HAVE TO WONDER WHY --

17:35  21          **THE COURT:**  WE DID TALK ABOUT THE NORTH BREACH, THE

17:35  22   DESIGN AT THE NORTH BREACH.  MR. TREEBY DID QUESTION ABOUT

17:35  23   THAT.

17:35  24          **MR. BRUNO:**  THAT REGARDED THE CONNECTION.  AND NOW

17:36  25   I'M UNDERSTANDING WE ARE TALKING ABOUT SOMETHING ELSE.  AND I

ROBERT G. BEA - CROSS

17:36    1    KNOW THAT THIS QUESTION RELATED TO THE MRGO.

17:36    2            **MR. TREEBY:**  IF YOUR HONOR PLEASE, NOT ONLY DID WE

17:36    3    TALK ABOUT DESIGN FLAWS AT THE NORTH BREACH, WE TALKED ABOUT

17:36    4    DESIGN FLAWS -- ABOUT THE LACK OF BACK SCOUR PROTECTION, DESIGN

17:36    5    FLAWS WITH REGARD TO THE STANDARD PROJECT HURRICANE.  THERE

17:36    6    WERE A LOT OF DESIGN FLAWS THAT WERE TALKED ABOUT.  I'M NOT

17:36    7    EVEN FAMILIAR WITH THE DOCUMENT THAT WE ARE TALKING ABOUT, SO I

17:36    8    JUST WANT TO MAKE THAT CLEAR, THOUGH WE DID TALK A LOT ABOUT

17:36    9    DESIGN FLAWS.

17:36   10            **MR. BRUNO:**  THEY MAY HAVE TALKED ABOUT THEM, BUT

17:36   11    THERE IS NOT AN EXPERT IN THIS CASE WHO HAS RENDERED AN EXPERT

17:36   12    OPINION THAT SAYS THAT IN THAT EXPERT'S OPINION THERE IS A

17:36   13    DEFECT IN THE DESIGN OF THE I-WALLS IN THIS CASE.  AND THAT IS

17:36   14    A REQUIREMENT OF THE CASE MANAGEMENT ORDER IN THIS CASE.

17:36   15            **THE COURT:**  I'M NOT SURE -- WE ARE TALKING ABOUT

17:36   16    DR. BEA, NOT ANY OTHER EXPERT, AND I DON'T WANT TO GET INTO IT.

17:36   17    THERE MAY BE SOME TESTIMONY, BUT IT WASN'T FROM DR. BEA IN THIS

17:37   18    CASE.

17:37   19            **MR. SMITH:**  I THINK IT WILL BE EVIDENT THAT

17:37   20    MR. BRUNO'S OBJECTION IS PREMATURE AND IS SPURRED BY HIS

17:37   21    CONFUSION RATHER THAN BY THE EVIDENCE, WHICH I'M --

17:37   22            **THE COURT:**  LET'S CLEAR IT UP, AND THE COURT WILL

17:37   23    DELAY RULING.

17:37   24            **MR. SMITH:**  IT WILL BE BEA EXHIBIT 5, I SAY, ON

17:37   25    PAGE 130.  CAN WE SHOW BEA EXHIBIT 5.

ROBERT G. BEA - CROSS

17:37  1           THE COURT:  WE ARE TRYING TO TALK --

17:37  2           MR. SMITH:  WE ARE TALKING ABOUT THE IHNC,

17:37  3  YOUR HONOR.

17:37  4           THE COURT:  I KNOW, BUT THE WORDS "THIS DESIGN" MAY

17:37  5  HAVE TO BE --

17:37  6           MR. SMITH:  LET'S GO BACK THEN.  LET'S GO BACK.

17:37  7           THE COURT:  SO WE HAVE TO DETERMINE WHAT "THIS

17:37  8  DESIGN" IS.

17:37  9           MR. SMITH:  LET'S GO BACK TO PAGE 130.  THERE IS

17:37  10  EXHIBIT 5, SO YOU CAN ALL SEE WHAT IT IS, DESIGN MEMORANDUM

17:37  11  NO. 3.  IT'S BEEN PREVIOUSLY DISCUSSED IN THIS CASE BY NUMEROUS

17:38  12  WITNESSES.  THIS IS WHAT WAS USED AS EXHIBIT 5.

17:38  13           IF WE CAN GO BACK -- NOW THAT WE HAVE

17:38  14  ESTABLISHED WHAT EXHIBIT 5 IS, LET'S GO BACK TO HIS TESTIMONY

17:38  15  ON NOVEMBER 19, 2007, JX-1370.  LET'S GO TO PAGE 130.  THIS

17:38  16  WILL BE BEA EXHIBIT 5.

17:38  17           THE WITNESS IS -- DR. BEA SAYS "THANK YOU."  AT

17:38  18  THE BOTTOM OF THE PAGE I ASKED HIM:

17:38  19           "QUESTION:  YOU PREVIOUSLY TESTIFIED TODAY, SIR, THAT

17:38  20      YOU CONSIDERED THIS INFORMATION IN PREPARING THE REPORT

17:38  21      FOR THE ATTORNEYS IN THIS CASE; IS THAT CORRECT?

17:38  22           "ANSWER:  THAT IS CORRECT.

17:38  23           "QUESTION:  DOES THIS DOCUMENT REFLECT THAT -- WE

17:38  24      HAVE PREVIOUSLY TALKED ABOUT NET LEVEE GRADES AND HOW THEY

17:39  25      ARE ESTABLISHED.

ROBERT G. BEA - CROSS

17:39   1         "ANSWER:  RIGHT.

17:39   2         "QUESTION:  DOES THIS DOCUMENT REFLECT THAT THE FLOOD

17:39   3     PROTECTION STRUCTURES WHICH YOU HAVE DENOMINATED EBSBS --

17:39   4         "ANSWER:  RIGHT.

17:39   5         "QUESTION:  -- OR THE NET LEVEE GRADES OR THE GRADES

17:39   6     FOR THOSE STRUCTURES WERE ESTABLISHED BASED UPON THE

17:39   7     RESULTS OF THE HYDRAULIC STUDIES USING HURRICANE

17:39   8     PARAMETERS THAT EXCEEDED THE STANDARD PROJECT HURRICANE?

17:39   9         "ANSWER:  NO."

17:39  10     SO I WITHDREW THAT QUESTION.  THAT'S JUST TO

17:39  11  ESTABLISH WHAT DOCUMENT WE'RE TALKING ABOUT.  DR. BEA HAD

17:39  12  LOOKED AT IT BEFORE THE DEPOSITION.  HE PREPARED TO ANSWER

17:39  13  QUESTIONS ABOUT THIS DOCUMENT PRIOR TO BEING EXAMINED ABOUT IT.

17:39  14         THERE'S A SERIES OF QUESTIONS ABOUT THIS EXHIBIT.

17:39  15  AND I WANT TO SKIP FORWARD NOW TO -- THERE'S A SERIES OF

17:40  16  QUESTIONS ABOUT STANDARD OF CARE, AND THEY ARE NOT PERTINENT,

17:40  17  AS MR. BRUNO SUGGESTED, BECAUSE THEY DEAL WITH THE MRGO.

17:40  18         BUT I ASKED HIM -- AS I SAID EARLIER ON PAGE 141:

17:40  19         "QUESTION:  ARE THERE ELEMENTS IN THIS DESIGN

17:40  20     MEMORANDUM THAT ARE INAPPROPRIATE FOR THE CONSTRUCTION OF

17:40  21     THE AUTHORIZED FLOOD CONTROL STRUCTURES UNDER THE LPV

17:40  22     HPP?"

17:40  23         I REFRAMED THE QUESTION IN TERMS OF STANDARD OF CARE:

17:40  24         "QUESTION:  ARE THERE ELEMENTS IN THIS DESIGN THAT

17:40  25     FELL BELOW THE STANDARD OF CARE FOR THE ENGINEERING OF A

ROBERT G. BEA - CROSS

17:40   1       FLOOD PROTECTION SYSTEM THAT WAS AUTHORIZED BY THE

17:40   2       LAKE PONTCHARTRAIN AND VICINITY LEGISLATION?"

17:40   3           THE WITNESS PAUSED TO THINK.  THERE WAS COLLOQUY

17:40   4   AMONG COUNSEL.  LET'S GO TO THE BOTTOM OF THE PAGE.

17:40   5           THEN WE GO TO THE NEXT PAGE.  THEN ON LINE 6 THE

17:40   6   WITNESS ASKS FOR THE QUESTION TO BE REPEATED, AND THE REQUESTED

17:41   7   QUESTION IS READ BACK.  THE WITNESS ANSWERED "YES."

17:41   8           THEN I SAID, ON LINE 20:

17:41   9           "QUESTION:  CAN YOU DIRECT ME, WHERE IN THIS DOCUMENT

17:41  10       ARE THOSE FLAWS TO BE FOUND?"

17:41  11           HE LISTS A NUMBER OF PLATES IN THIS DOCUMENT, AND IT

17:41  12   BEGINS WITH PLATES 60, 61, AND 83.

17:41  13           MR. BRUNO:  OBJECTION, BECAUSE WHETHER HE'S REFERRING

17:41  14   TO PLATES OR NOT, COUNSEL NEEDS TO HIGHLIGHT THE ANSWER WHERE

17:41  15   HE GIVES THE DESCRIPTION OF WHAT HE IS TALKING ABOUT WHEN HE

17:41  16   RESPONDS TO THE QUESTION.

17:41  17           IF I MAY, IT SAYS:  "THE ELEMENTS THAT ARE

17:41  18   ASSOCIATED WITH THE EBSB" -- WHICH, BY THE WAY, WE ALL RECALL

17:41  19   TO BE THE MRGO LEVEES -- "JUNCTURE TO THE WING WALLS OF THE

17:41  20   FLOOD PROTECTION STRUCTURES AT BAYOU BIENVENUE AND DUPRE AND

17:41  21   THE DEFINITIONS FOR THE CONSTRUCTION OF THE EBSB BETWEEN THOSE

17:42  22   TWO LOCATIONS ARISING USING IMPOUNDED DREDGE SPOIL."

17:42  23           THAT'S WHAT HE DESCRIBED IN ANSWER, WITH

17:42  24   RESPECT.

17:42  25           MR. SMITH:  AND THEN HE LISTS THE NUMBER OF PLATES:

ROBERT G. BEA - CROSS

17:42   1   PLATES 59, 60, 61, 63 -- GO TO THE NEXT PAGE, PAGE 143.  IT'S A

17:42   2   QUESTION BY THE -- I'M NOT SURE WHO THAT IS.

17:42   3              THEN THE WITNESS CONTINUES WITH ADDITIONAL

17:42   4   PLATES:  6, 26, 28, 29, 65.  THEN I GO ON WITH MY EXAMINATION

17:42   5   ON LINE 12:

17:42   6          **"QUESTION:**  THOSE ARE THE PLATE NUMBERS.

17:42   7          **"ANSWER:**  CORRECT.

17:42   8          **"QUESTION:**  CAN WE JUST GO THROUGH THEM THEN?

17:42   9          **"ANSWER:**  SURE.

17:42  10          **"QUESTION:**  AND YOU CAN TELL ME WHAT YOU FEEL --

17:42  11          **"ANSWER:**  WERE THE CONCERNS.

17:42  12          **"QUESTION:**  -- IS INADEQUATE, YES."

17:42  13              SO THEN WE DISCUSSED PLATE 26.  I DON'T WANT TO FOCUS

17:42  14   ON PLATE 26.  I WANT TO SKIP FORWARD TO WHERE HE DISCUSSES

17:43  15   PLATE 28, WHICH IS PERTINENT TO THIS CASE; NOT THE MRGO, THE

17:43  16   IHNC.  I WOULD LIKE TO DISPLAY, IF WE CAN, FOR THE COURT,

17:43  17   PLATE 28, WHICH HAS PREVIOUSLY BEEN SHOWN NUMEROUS TIMES IN

17:43  18   THIS CASE TO THIS COURT.

17:43  19              PLATE 28 IS JX-00004-0193.

17:43  20   **BY MR. SMITH:**

17:43  21   **Q.**   WE HAVE SEEN THIS MANY TIMES IN THIS CASE, HAVEN'T WE,

17:43  22   DR. BEA, IN THIS VERY CASE?

17:43  23   **A.**   YES, SIR.

17:43  24   **Q.**   BECAUSE THIS IS THE SOIL PROFILE AT THE EBIA, ISN'T IT?

17:43  25   **A.**   THIS IS A CONCEPTION OF THE SOIL PROFILE AS OF THIS TIME.

ROBERT G. BEA - CROSS

17:43   1   **Q.**   AS OF 1966, WHEN THEY WERE DESIGNING THIS LEVEE AND

17:43   2   FLOODWALL; ISN'T THAT CORRECT, SIR?

17:43   3   **A.**   THAT'S CORRECT.

17:43   4   **Q.**   LET'S RETURN TO THE DEPOSITION, THEN.  NOW THAT WE HAVE

17:43   5   SEEN WHAT THE PLATE IS, WE HAVE ESTABLISHED, I HOPE TO

17:44   6   MR. BRUNO'S SATISFACTION, THAT THIS ISN'T ABOUT THE IHNC.

17:44   7   **A.**   MY RESPONSE AT THIS TIME IS FOCUSED ON REACH 2 AND NOT

17:44   8   FOCUSED ON REACH 1.

17:44   9   **Q.**   WELL, THIS IS NOT EITHER REACH 1 OR REACH 2.  THIS IS

17:44   10  PLATE 28.  SO LET'S GO TO PAGE 148 IN YOUR DEPOSITION, DR. BEA,

17:44   11  ON LINE 2:

17:44   12        "**QUESTION:**  OKAY.  THEN LET'S GO TO PLATE 28.  WHAT

17:44   13        IS THERE IN PLATE 28, DR. BEA, THAT INDICATES THE DESIGN

17:44   14        DID NOT COMPORT WITH THE APPLICABLE STANDARD OF CARE AT

17:44   15        THAT TIME?

17:44   16        "**ANSWER:**  SHOWN MIDWAY IN THE PLATE VERTICALLY ARE

17:44   17        MARSH LAYERS.

17:44   18        "**QUESTION:**  AT APPROXIMATELY MINUS 10 FEET MEAN SEA

17:44   19        LEVEL ELEVATION?

17:44   20        "**ANSWER:**  MINUS 10 TO MINUS 15.

17:44   21        "**QUESTION:**  AND WHY IS THAT?  WHY DOES THAT INDICATE

17:45   22        TO YOU THAT WOULD BE BELOW THE STANDARD OF CARE FOR THIS

17:45   23        DESIGN?

17:45   24        "**ANSWER:**  AT THAT TIME MARSH LAYERS WERE RECOGNIZED

17:45   25        TO BE POTENTIALLY VERY HIGHLY WATER CONDUCTIVE; AND GIVEN

ROBERT G. BEA - CROSS

17:45  1     THE POTENTIAL HIGH WATER CONDUCTIVE NATURE OF THE

17:45  2     MATERIAL, YOU WOULD WANT A WAY TO STOP THAT WATER FROM

17:45  3     EITHER WEAKENING THE SOIL, TRANSPORTING THE SOIL, OR

17:45  4     DEVELOPING HYDRAULIC UPLIFT FORCES THAT COULD DESTABILIZE

17:45  5     THE STRUCTURES.

17:45  6         "QUESTION:  THIS IS -- IF I UNDERSTAND PLATE 28, THIS

17:45  7     IS A GEOLOGIC PROFILE OF THE IHNC.  IS THAT CORRECT?

17:45  8         "ANSWER:  THAT'S CORRECT.

17:45  9         "QUESTION:  SO THIS WOULD BE IRRELEVANT TO THE

17:45  10    REACH 2 STRUCTURES --

17:45  11        "ANSWER:  CORRECT, CORRECT.

17:45  12        "QUESTION:  -- RIGHT?  IS IT YOUR OPINION THAT THIS

17:45  13    PROFILE SHOWS FOUNDATION CONDITIONS?

17:45  14        "ANSWER:  CORRECT.

17:45  15        "QUESTION:  AND SO IN YOUR OPINION, THE PROPOSED

17:46  16    LEVEE AND I-WALL CONSTRUCTION COULD NOT HAVE BEEN

17:46  17    CONSTRUCTED WITHOUT MODIFYING THE SUBSURFACE CONDITIONS OF

17:46  18    THE SOILS.

17:46  19        "ANSWER:  OR TAKING PROPER ACCOUNT OF IT.

17:46  20        "QUESTION:  AND HOW WOULD THAT TAKING ACCOUNT OF IT

17:46  21    BE EVIDENCED IN THESE DESIGNS?

17:46  22        "ANSWER:  THE ENGINEER WOULD NEED TO PERFORM SEEPAGE,

17:46  23    HYDRAULIC UPLIFT, AND STABILITY CALCULATIONS TO JUSTIFY

17:46  24    THE ACCEPTABILITY OF THE PROPOSED DESIGN.

17:46  25        "QUESTION:  WOULD THAT REQUIRE SOIL BORINGS?

ROBERT G. BEA - CROSS

17:46  1        **"ANSWER:**  YES, AND LABORATORY SOIL TESTING."

17:46  2            IS IT YOUR OPINION TODAY, DR. BEA, THAT THE DESIGN OF

17:46  3  THE IHNC LEVEE AND FLOODWALL WAS FLAWED FROM ITS INCEPTION?

17:47  4  **A.**   YES, THAT'S STILL MY OPINION.  THE WALL IS TRYING TO TELL

17:47  5  US THAT EVEN WITH ITS DEFECTS, AS DESIGNED IT SURVIVED

17:47  6  HURRICANE KATRINA.

17:47  7            IT WAS THE DEFECTS THAT WERE EMBEDDED SUBSEQUENT TO

17:47  8  ITS DESIGN THAT WERE THE CRITICAL FLAWS IN THE CAUSATION OF THE

17:47  9  NORTH BREACH AND SOUTH BREACH THAT DECIMATED THE LOWER NINTH

17:47 10  WARD.

17:47 11  **Q.**   DR. BEA, ISN'T IT TRUE THAT THE VERY CONDUCT THAT YOU SAY

17:47 12  THE CORPS OF ENGINEERS SHOULD HAVE UNDERTAKEN IN CONNECTION

17:47 13  WITH THE WORK TO BE PERFORMED BY WASHINGTON GROUP INTERNATIONAL

17:47 14  IS THE VERY CONDUCT THAT YOU CITE IN YOUR PRIOR DEPOSITION AS

17:48 15  HAVING NEGLIGENTLY BEEN NEGLECTED DURING THE DESIGN OF THIS

17:48 16  LEVEE AND FLOODWALL?

17:48 17  **A.**   I'M CONSISTENT, IF NOTHING ELSE, AND THE TESTIMONY SHOWS

17:48 18  THAT CONSISTENCY.

17:48 19  **Q.**   THE ANSWER TO THAT IS YES, THEN, I TAKE IT?

17:48 20  **A.**   MY ANSWER IS OUR STANDARD OF CARE IN ENGINEERING SAYS WE

17:48 21  NEED TO CONSIDER THE PRIMARY HAZARDS, THREATS THAT CONFRONT THE

17:48 22  STRUCTURES WE ARE GOING TO CONSTRUCT AND THAT THAT STANDARD OF

17:48 23  CARE DOES NOT DISAPPEAR WHEN A WALL IS CONSTRUCTED.  IT CARRIES

17:48 24  THROUGH THE OPERATION AND MAINTENANCE OF THE SYSTEM.

17:48 25            **MR. SMITH:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

ROBERT G. BEA - CROSS

17:49   1          **THE COURT:** THANK YOU, MR. SMITH.

17:49   2              ANY REDIRECT?

17:49   3          **MR. BRUNO:** YES, JUDGE.

17:49   4              **REDIRECT EXAMINATION**

17:49   5   **BY MR. BRUNO:**

17:49   6   **Q.** I JUST HAVE A FEW QUESTIONS, AND I AM EVEN MORE

17:49   7   DISCOMBOBULATED THAN MR. TREEBY.

17:49   8          FIRST OF ALL, IN FAIRNESS TO YOU, DR. BEA, IN YOUR

17:49   9   EXPERT REPORT YOU DO INDICATE AT PAGE 8, WHICH IS JX-0389-0009,

17:49   10  THAT YOU ARE A GEOTECHNICAL ENGINEER RETIRED.

17:49   11  **A.** YES, SIR.

17:49   12  **Q.** SECONDLY, WITH REGARD TO THE BUSINESS OF THE CONNECTION

17:49   13  BETWEEN -- THIS IS DX-DM-1006-0017, AND THIS IS FROM THE SLIDE

17:50   14  SHOW OF DR. MARR.  IT'S TAKEN BY DUNBAR BUT, TRUST ME, IT'S IN

17:50   15  THE SLIDE SHOW FROM DR. MARR.

17:50   16  **A.** YES.

17:50   17  **Q.** NOW, DO YOU SEE IN THIS PHOTOGRAPH THAT THERE IS A PIECE

17:50   18  OF BAR HERE AND HERE?

17:50   19  **A.** YES.

17:50   20  **Q.** AND THAT REBAR IS -- I CAN ONLY REFER TO MY EXPERIENCE IN

17:50   21  ADDING ON A SLAB TO MY HOUSE.  YOU DRILL A HOLE INTO THE SLAB,

17:50   22  YOU PUT THE REBAR IN THERE, AND THEN YOU POUR YOUR NEW CONCRETE

17:50   23  SECTION, AND THE TWO MELD TOGETHER.  CORRECT?  IS THAT WHAT WE

17:50   24  ARE SEEING HERE?

17:50   25  **A.** YES.  YOU DRILL A HOLE, AND YOU EFFECTIVELY HAVE TO GLUE

ROBERT G. BEA - REDIRECT

17:51  1   THE REINFORCING BAR IN THAT HOLE.

17:51  2   **Q.**   PRECISELY.  BUT THEN YOU POUR THE CONCRETE SLAB, AND THERE

17:51  3   IS A CONNECTION MADE BETWEEN THE OLD CONCRETE SLAB AND THE NEW

17:51  4   CONCRETE SLAB, RIGHT?

17:51  5   **A.**   YES, SIR.

17:51  6   **Q.**   THE POINT IS THAT THAT REBAR KEEPS THE WALL FROM MOVING.

17:51  7   **A.**   THAT'S CORRECT.

17:51  8   **Q.**   KEEPS IT FROM GOING UP AND DOWN, KEEPS IT FROM GOING BACK

17:51  9   AND FORTH, CORRECT?

17:51  10  **A.**   THAT'S CORRECT.

17:51  11  **Q.**   IN FACT, IF MR. TREEBY IS CORRECT THAT THERE'S THIS RUBBER

17:51  12  GASKET THING GOING ON THERE, THEN YOU COULD NEVER DEVELOP ANY

17:51  13  KIND OF TENSION -- ANY KIND OF CRACKING, AS HIS OWN EXPERTS OR

17:51  14  THE GOVERNMENT'S EXPERTS SUGGEST WAS THE BASIS OF THE

17:51  15  ORIGINATION OF THE FAILURE, RIGHT?

17:51  16  **A.**   THAT'S CORRECT.

17:51  17  **Q.**   AND THE BOOM -- BECAUSE YOU HAVE THIS RUBBER THING NOW,

17:51  18  THIS GASKET THING GOING ON.  SO THE ONLY PLACE WHERE THAT WALL

17:51  19  COULD HAVE BROKEN IS WHERE THE CONCRETE WAS PUT TOGETHER WITH

17:51  20  THIS REBAR, RIGHT?

17:51  21  **A.**   CORRECT.  AND THAT'S WHAT IT DID.

17:51  22  **Q.**   THAT'S ABOVE WHERE THE SHEET PILE IS, CORRECT?

17:51  23  **A.**   THAT'S CORRECT.

17:51  24  **Q.**   WE OPINED THAT THE BOOM THAT VILLAVASO HEARD WAS THE

17:52  25  BREAKING OF THIS CONCRETE, RIGHT?

Case 2:05-cv-04182-SRD-JCW   Document 21151   Filed 01/22/13   Page 135 of 160

## ROBERT G. BEA - REDIRECT

17:52  1    **A.**   YES.   AND THAT WAS ALSO REPORTED BY THE PEOPLE AT THE

17:52  2    LONDON AVENUE CANAL AS THOSE WALLS FAILED.

17:52  3    **Q.**   THE EXISTENCE OF THAT REBAR WOULD SUGGEST, WOULD IT NOT,

17:52  4    THAT IF ONE WALL IS GOING TO SINK, THE OTHER WALL IS GOING TO

17:52  5    SINK WITH IT, OR YOU'RE GOING TO SEE SOME STRESS THERE, RIGHT?

17:52  6    **A.**   YES, SIR.

17:52  7    **Q.**   WAS THERE ANY EVIDENCE OF THAT THAT YOU NOTED YOURSELF OR

17:52  8    HEARD FROM ANYBODY ELSE?

17:52  9    **A.**   NO, NO.

17:52  10   **Q.**   SO THIS IS THE BASIS UPON WHICH YOU CALLED INTO QUESTION

17:52  11   THE ACCURACY OF THE LEVEE BOARD MEASUREMENTS?

17:52  12   **A.**   CORRECT.

17:52  13   **Q.**   THANK YOU.

17:52  14            **MR. BRUNO:**   AND THIS IS ALREADY IN EVIDENCE,

17:52  15   YOUR HONOR.

17:52  16            NOW, WE HAVE TALKED ABOUT THIS BRIEFLY, AND THIS

17:52  17   IS -- AS I SUGGESTED TO YOUR HONOR, THIS IS EXTREMELY

17:52  18   TROUBLESOME, AND YOU WILL SEE THAT IT'S EVEN MORE TROUBLESOME

17:52  19   NOW THAN IT WAS BEFORE.

17:52  20            FIRST OF ALL, MR. TREEBY SHOWED US THIS DOCUMENT.

17:52  21   YOU WILL NOTE IT SAYS "JX-1393 BEA REPORT, APPENDIX D,

17:53  22   FIGURE 3."  I WILL SIMPLY SHARE WITH YOU --

17:53  23            **THE COURT:**   I THINK MR. SMITH SHOWED IT.

17:53  24            **MR. BRUNO:**   I'M SORRY, WRONG PERSON.

17:53  25            **THE COURT:**   IT WAS SHOWN TO HIM.

ROBERT G. BEA - REDIRECT

17:53    1            MR. BRUNO:  IT WAS SHOWN TO HIM BY MR. SMITH.

17:53    2                I JUST WANT TO MAKE THE POINT THAT THE SLIDE

17:53    3   SAID "APPENDIX D, FIGURE 15"; AND IF YOU GO TO DR. BEA'S

17:53    4   REPORT, YOU DON'T SEE THAT.

17:53    5   BY MR. BRUNO:

17:53    6   Q.   DO YOU.

17:53    7   A.   THAT'S CORRECT.

17:53    8   Q.   NOW, THE OTHER POINT THAT WAS ATTEMPTED TO HAVE BEEN MADE

17:53    9   BY MR. SMITH IS, IF YOU'VE GOT THOSE BLUE DOTS AND THEY STOP AT

17:53   10   THE NEAR BREACH -- AND FOR THE RECORD AS WELL AS FOR

17:53   11   COMPLETENESS, THIS IS FIGURE 15 OF APPENDIX D.

17:54   12                THOSE TWO ARE NOT THE SAME, ARE THEY?

17:54   13   A.   NO.

17:54   14   Q.   MR. SMITH ATTEMPTED TO MAKE THE POINT THAT THERE WERE

17:54   15   THESE DIFFERENCES IN THE BOUNDARY CONDITIONS AS REFLECTED BY

17:54   16   THIS WHAT THEY CALL A SCREENSHOT.  DO YOU REMEMBER THAT?

17:54   17   A.   YES, SIR.

17:54   18   Q.   HE POINTED OUT THAT THERE WERE NO BLUE DOTS WHERE MY

17:54   19   FINGERS ARE --

17:54   20   A.   YES, SIR.

17:54   21   Q.   -- RIGHT?  OKAY.  SOMEHOW OR ANOTHER, THAT WAS A

17:54   22   DIFFERENCE.

17:54   23                WELL, THEN I LOOKED AT WHAT MR. TREEBY SHOWED YOU,

17:54   24   AND I SEE THE BLUE DOTS.

17:54   25   A.   YES, SIR.

ROBERT G. BEA - REDIRECT

17:54   1   **Q.**   SO THERE ARE BOUNDARY CONDITIONS?

17:54   2   **A.**   YES, SIR.

17:54   3   **Q.**   IT GETS WORSE, BECAUSE WE PRINTED THE NO FAIL UPPER

17:54   4   CONDITION, AND DO YOU SEE THE BLUE DOTS ALL THE WAY TO THE WALL

17:55   5   AND UP THE WALL?

17:55   6   **A.**   YES, SIR.

17:55   7   **Q.**   IS THAT A BOUNDARY CONDITION?

17:55   8   **A.**   YES, SIR.

17:55   9   **Q.**   DO YOU SEE 16, THE LITTLE BOX THING, CULVERT, THERE'S NO

17:55   10   BOUNDARY CONDITIONS AT THE TOP?

17:55   11   **A.**   YES, SIR.

17:55   12   **Q.**   THEN WE PRINTED THE LOWER, THE NO FAIL SECTION, WHICH

17:55   13   SHOWS US ONCE AGAIN THE NICE BLUE DOTS THAT GO ALL THE WAY TO

17:55   14   THE WALL, UP THE WALL, THEY CONTINUE.

17:55   15        AND WHAT DO WE SEE HERE?  WE HAVE A BOUNDARY

17:55   16   CONDITION ACROSS THE TOP OF THE BOX, DON'T WE?

17:55   17   **A.**   YES.

17:55   18   **Q.**   FINALLY, TO ROUND IT OUT -- AND THIS IS THE BIG KILLER

17:55   19   HERE -- STARK.  SO THEN STARK TAKES THE STAND AND HE SAYS,

17:55   20   WELL, HOLY MOLY, WE HAVE A PROBLEM.

17:55   21        HE SAYS IN THE NEAR BREACH THERE'S A DIFFERENCE.  BUT

17:55   22   IN FACT, IN FACT, THE CASE 1-1 IS IN BLUE, THE CASE 1-2 IS IN

17:56   23   RED; AND IF YOU LOOK VERY CAREFULLY, YOU CAN SEE THAT THE RED

17:56   24   OVERLAYS THE BLUE.

17:56   25   **A.**   CORRECT.

ROBERT G. BEA - REDIRECT

17:56   1   **Q.**   ISN'T THAT A FACT, DR. BEA?

17:56   2   **A.**   YES, SIR.

17:56   3   **Q.**   SO INDEED AND IN FACT AND IN TRUTH, THE FAILURE TO INCLUDE

17:56   4   A BOUNDARY CONDITION OVER THE JOURDAN AVENUE CULVERT REVEALS

17:56   5   THE SAME RESULT, DOES IT NOT?

17:56   6   **A.**   YES, SIR.

17:56   7   **Q.**   AND WHAT'S EVEN MORE CURIOUS TO ME IS THAT WHEN DR. TIM

17:56   8   STARK WAS ON THE STAND, WE DIDN'T HEAR ABOUT ALL THIS BUSINESS

17:56   9   OF THE BOUNDARY CONDITIONS BEING DIFFERENT, DID WE?

17:56   10  **A.**   NO.

17:56   11  **Q.**   ONE WOULD PRESUME, SINCE HE WAS THE ONE THAT MADE THIS

17:56   12  ALLEGATION -- WHICH I WON'T GO INTO -- THAT HE WOULD HAVE GONE

17:56   13  INTO GREAT DETAIL TO DESCRIBE THE FACT THAT YOU HAD LEFT OUT

17:56   14  ALL THESE BOUNDARY CONDITIONS.  WOULDN'T YOU AGREE?

17:56   15  **A.**   YES.

17:56   16  **Q.**   DID HE?

17:56   17  **A.**   NO.

17:56   18  **Q.**   THE ONLY THING HE TALKED ABOUT WAS THIS DIFFERENCE IN

17:57   19  GRADIENTS.  AND HE HAS GOT IT DESCRIBED HERE ON THE PAPER.  AND

17:57   20  THEN AS A RESULT OF THAT TESTIMONY, I ASKED YOU THIS MORNING

17:57   21  WHETHER OR NOT THE DIFFERENCE IN GRADIENT WOULD MAKE A

17:57   22  DIFFERENCE.  YOU GAVE ME AN ANSWER; THE ANSWER IS NO.

17:57   23  **A.**   CORRECT.

17:57   24  **Q.**   SO THE BOTTOM LINE HERE IS, DID YOU OR DID YOU NOT MAKE

17:57   25  A -- WITHDRAW.  I'M GOING TOO QUICKLY.

**ROBERT G. BEA - REDIRECT**

17:57  1          IN FACT, THE CONCLUSIONS THAT YOU DREW FROM THE

17:57  2    COMPUTER MODEL RUNS WITH REGARD TO THE NO FAIL SECTION, DO THEY

17:57  3    INDICATE ANY DIFFERENCES BETWEEN THE TWO RUNS WHICH WOULD

17:57  4    SUGGEST THAT THE RESULTS SHOULD BE IGNORED OR INVALIDATED?

17:57  5    **A.**   NO.

17:57  6    **Q.**   THANK YOU.

17:57  7          NOW, DR. BEA, IN THE MRGO TRIAL YOU WILL RECALL THAT

17:57  8    THE GOVERNMENT AND THE PLAINTIFFS STIPULATED THAT THERE WERE NO

17:57  9    DEFECTS IN ANY OF LEVEES.  DO YOU RECALL THAT?

17:57  10   **A.**   YES, I DO.

17:57  11   **Q.**   I GUESS TIMES CHANGE.

17:58  12          WITH REGARD TO YOUR EVALUATION OF THE 1966 GEOLOGY,

17:58  13   IN FAIRNESS, YOU NOW KNOW MORE THAN YOU KNEW THEN; ISN'T THAT

17:58  14   TRUE?

17:58  15   **A.**   YES.

17:58  16   **Q.**   YOU KNOW -- IN FACT, IT'S BEEN -- WE HAVE ALL THIS

17:58  17   TESTIMONY IN THIS TRIAL THAT THERE WAS THIS BIG INVESTIGATION

17:58  18   IN 1966 WHICH RESULTED FROM A SEEPAGE EVALUATION WHICH THEN

17:58  19   TURNED INTO A PARAGRAPH IN THE DM3 WHICH SUGGESTED THAT THERE

17:58  20   WAS NO NEED TO DO ANY UNDERSEEPAGE BECAUSE THEY HAD CONCLUDED

17:58  21   THAT THERE WAS NO RISK OF UNDERSEEPAGE.  RIGHT?

17:58  22   **A.**   THAT'S CORRECT.

17:58  23   **Q.**   WE KNOW THAT NOW; WE DIDN'T KNOW THAT THEN.  CORRECT?

17:58  24   **A.**   CORRECT.

17:58  25   **Q.**   NOW, WE EVEN KNOW THAT OVER TIME WE HAVE GATHERED MORE

ROBERT G. BEA - REDIRECT

17:58  1   INFORMATION.  1980, FOR EXAMPLE, WE HAVE LEARNED THAT THEY GOT

17:58  2   MORE INFORMATION ABOUT THE SEEPAGE -- I'M SORRY, THE SILT LAYER

17:58  3   IN 1980.  AND, IN FACT, THEY RESPONDED APPROPRIATELY, DIDN'T

17:58  4   THEY?

17:58  5   A.   YES.

17:58  6   Q.   SO AS WE SIT HERE TODAY, IS IT YOUR CURRENT OPINION -- IF

17:59  7   YOU GO BACK IN TIME TO 1966, CONSIDERING WHAT THEY KNEW,

17:59  8   CONSIDERING WHAT THEY DID, CAN YOU SAY TODAY THAT IN 1966, BACK

17:59  9   THEN WHEN THIS LEVEE WAS DESIGNED, THAT THE LEVEE WAS

17:59  10  DEFECTIVELY DESIGNED?

17:59  11  A.   NO.

17:59  12  Q.   TODAY YOU CAN.

17:59  13  A.   RIGHT.

17:59  14  Q.   IN HINDSIGHT.

17:59  15  A.   THAT'S HINDSIGHT.

17:59  16  Q.   THAT'S 20/20, ISN'T IT?

17:59  17  A.   ALWAYS.

17:59  18  Q.   NOW, CAN YOU IDENTIFY A SINGLE EXPERT IN THIS CASE WHO HAS

17:59  19  OFFERED THE OPINION THAT THE EBIA FLOODWALLS WERE DEFECTIVELY

17:59  20  DESIGNED?

17:59  21  A.   NO.

17:59  22  Q.   I THINK WE HAVE NINE EXPERTS ON THIS THING.

17:59  23           THE COURT:  HE CAN'T, BUT YOU MAY BE ABLE TO, SIR.

17:59  24           MR. TREEBY:  THANK YOU.

       25

*DAILY TRANSCRIPT*

ROBERT G. BEA - REDIRECT

17:59    1    **BY MR. BRUNO:**

17:59    2    **Q.**   DID YOU READ ALL OF THE EXPERT OPINIONS?

17:59    3    **A.**   YES.

17:59    4    **Q.**   YOU READ THEM?

17:59    5    **A.**   YES.

17:59    6    **Q.**   WE ASKED YOU TO READ THEM.  WE PAID YOU TO READ THEM.

18:00    7    **A.**   YES.

18:00    8    **Q.**   I HOPE YOU READ THEM.

18:00    9    **A.**   YES.

18:00   10    **Q.**   IT COST ME A LOT OF MONEY.

18:00   11    **A.**   AND I COMMENTED ON ALL OF THEM.

18:00   12    **Q.**   DID YOU FIND IN YOUR READING, DESPITE WHAT ANYBODY MIGHT

18:00   13    ARGUE TO THE CONTRARY -- AND THAT'S IN YOUR OPINION; YOU READ

18:00   14    IT.

18:00   15          YOU READ THOSE OPINIONS.  DID YOU FIND IN THOSE

18:00   16    OPINIONS A LINE WHERE THE AUTHOR OF THE REPORT SAYS, "I THINK

18:00   17    THAT THE EBIA LEVEE WALLS ARE DEFECTIVELY DESIGNED"?

18:00   18    **A.**   NO EXPERT CONCLUDED THAT.

18:00   19    **Q.**   YOU DIDN'T SEE THAT.

18:00   20          DID YOU IN THIS CASE WRITE AN OPINION, IN THIS CASE

18:00   21    WRITE AN OPINION THAT YOU THOUGHT THAT THE I-WALLS IN THE EBIA

18:00   22    WERE DEFECTIVELY DESIGNED?

18:00   23    **A.**   NO.

18:00   24    **Q.**   IS IT YOUR OPINION TODAY -- WE COVERED THIS, BUT JUST FOR

18:00   25    COMPLETENESS -- THAT THE LONG SHEET -- PUTTING THOSE, IS THAT

ROBERT G. BEA - REDIRECT

| | | |
|---|---|---|
| 18:00 | 1 | DEFECTIVE DESIGN? |
| 18:00 | 2 | **A.**   NO.   THAT'S HOW THEY CONSTRUCTED IT. |
| 18:00 | 3 | **MR. BRUNO:**  YOUR HONOR, THIS IS THE ONLY QUESTION |

THAT I HAD BEFORE MR. ROBINSON GOT UP, SO WE HAVE TO CREDIT
HIM.

**BY MR. BRUNO:**

**Q.**   THE WAVES TO WHICH YOU REFERRED IN RESPONSE TO QUESTIONS
BY MR. TREEBY.

**A.**   YES, SIR.

**Q.**   IN WHAT DIRECTION WERE THOSE WAVES TRAVELING DURING THE
RELEVANT PERIODS OF TIME THAT WOULD IMPACT YOUR EXPERT OPINIONS
IN THE CASE?

**MR. TREEBY:**  THE SAME OBJECTION WE MADE BEFORE.  HE
NEVER QUALIFIED AS THIS, SO I WANT TO PRESERVE THAT OBJECTION.

**THE COURT:**  YES, IT'S PRESERVED.

**MR. BRUNO:**  NEVER QUALIFIED WHAT?  I'M SORRY.

**THE COURT:**  DON'T WORRY ABOUT IT.  OVERRULED.

**THE WITNESS:**  IN THE EARLY TIME FRAME, THE WINDS WERE
COMING FROM THE EAST AND BLOWING TO THE WEST.  AS THE STORM
APPROACHES NEW ORLEANS, THE WINDS SHIFT TO THE NORTH AND THEY
ARE BLOWING STRAIGHT DOWN ESSENTIALLY THE INDUSTRIAL CANAL.
AND THAT'S BEEN VALIDATED MULTIPLE TIMES WITH QUALIFIED
METEOROLOGIC AND OCEANOGRAPHIC MODELS AND PHOTOGRAPHIC EVIDENCE
PROVIDED BY THE LOCKMASTER.

ROBERT G. BEA - REDIRECT

18:02  1  **BY MR. BRUNO:**

18:02  2  **Q.**   MOST IMPORTANTLY, IN CONNECTION WITH THE --

18:02  3         **THE COURT:**  JUST A MINUTE.

18:02  4         **MR. TREEBY:**  I MUST ALSO OBJECT TO THE RESPONSIVENESS

18:02  5  BECAUSE NOW HE IS BRINGING UP STUDIES THAT ARE NOT IN THIS

18:02  6  CASE, NEVER BEEN REFERRED TO IN THIS CASE, TOTALLY

18:02  7  INAPPROPRIATE.

18:02  8         **MR. BRUNO:**  WELL, MR. TREEBY -- I FORGOT WHO ASKED

18:02  9  THE QUESTION -- SHOULD NOT HAVE ASKED HIM ABOUT WAVES.  BECAUSE

18:02  10  THEY BROUGHT UP THE SUBJECT OF WAVES, AND NOW THEY ARE STUCK

18:02  11  WITH IT.

18:02  12         **THE COURT:**  I DON'T KNOW IF THEY ARE STUCK WITH GREAT

18:02  13  EXPANSION, BUT I'M GOING TO LET THE ANSWER STAND AS IT IS.  WE

18:02  14  ARE NEAR THE END OF THIS TRIAL.

18:02  15  **BY MR. BRUNO:**

18:02  16  **Q.**   THE LAST QUESTION IS, DR. BEA:  WITH REGARD TO THOSE

18:02  17  WAVES, DID THOSE WAVES PLAY ANY ROLE IN CONNECTION WITH ANY OF

18:03  18  THE CONCLUSIONS THAT YOU DREW WITH REGARD TO THE CAUSATION OF

18:03  19  THE FAILURE OF THE NORTH OR SOUTH BREACH?

18:03  20  **A.**   NO.

18:03  21         **MR. BRUNO:**  YOUR HONOR, THANK YOU VERY MUCH FOR YOUR

18:03  22  GREAT, GREAT PATIENCE.  I WILL TAKE A LITTLE PERSONAL NOTE TO

18:03  23  SAY THANK YOU.  I HAVE SERVED AS YOUR LIAISON AT YOUR WILL AND

18:03  24  YOUR PLEASURE, AND IT HAS BEEN AN HONOR AND A PRIVILEGE TO

18:03  25  SERVE YOU, SIR.  THANK YOU.

| | | |
|---|---|---|
| 18:03 | 1 | **THE COURT:**  THANK YOU, SIR. |
| 18:03 | 2 | I ASSUME WE HAVE A LOT OF HOUSEKEEPING TO DO. |
| 18:03 | 3 | **MR. BRUNO:**  YES. |
| 18:03 | 4 | **THE COURT:**  I DON'T WANT ANYBODY TO BE SANDBAGGED |
| 18:03 | 5 | HERE.  THERE WERE SOME THINGS OPEN, AND I WANTED TO MAKE SURE |
| 18:03 | 6 | EVERYBODY GOT THEIR MOTIONS IN IF THEY WANT TO MAKE A RULE 52 |
| 18:03 | 7 | MOTION.  YOU MAY NOT. |
| 18:03 | 8 | **MR. TREEBY:**  I DON'T THINK IT'S GOING TO AFFECT WHAT |
| 18:03 | 9 | YOUR HONOR DOES. |
| 18:03 | 10 | **THE COURT:**  NO, IT WON'T.  I JUST WANTED TO MAKE |
| 18:03 | 11 | SURE.  YOUR HONOR IS GOING TO HAVE TO WRITE AN OPINION AND NOT |
| 18:04 | 12 | DICTATE FINDINGS OF FACT AND CONCLUSIONS OF LAW HERE. |
| 18:04 | 13 | **MR. TREEBY:**  ABSOLUTELY. |
| 18:04 | 14 | **THE COURT:**  SO I WILL DEFER IT. |
| 18:04 | 15 | **MR. BRUNO:**  I WANT TO MOVE INTO EVIDENCE, YOUR HONOR, |
| 18:04 | 16 | PX-04771, WHICH IS THE SCREENSHOT THAT WE TOOK, AND PX-04770, |
| 18:04 | 17 | WHICH IS THE SECOND SCREENSHOT WE TOOK FROM THE REFERENCE |
| 18:04 | 18 | MATERIALS. |
| 18:04 | 19 | THAT'S IN?  THAT'S IN? |
| 18:04 | 20 | THANK YOU, JUDGE. |
| 18:04 | 21 | **MR. TREEBY:**  IF YOUR HONOR PLEASE, I GUESS WE NEED TO |
| 18:04 | 22 | KNOW HOW YOU WANT TO HANDLE THE HOUSEKEEPING. |
| 18:04 | 23 | **THE COURT:**  LET IT BE ADMITTED. |
| 18:04 | 24 | I'LL LISTEN TO YOU AND SEE WHAT -- I'M |
| 18:04 | 25 | INTERESTED IN WHAT YOU THINK. |

18:04   1          **MR. TREEBY:**  LET ME GIVE YOU A SUMMARY OF WHAT I

18:04   2   UNDERSTAND TO BE THE CASE, AND I'M SURE I WILL BE CORRECTED IF

18:04   3   I'M WRONG.

18:04   4          THE ONES THAT I PERSONALLY KNOW ABOUT, WE HAD A

18:04   5   DISCUSSION AND OBJECTION -- EXCUSE ME.

18:04   6          **MR. BRUNO:**  MAY THE WITNESS BE EXCUSED?

18:04   7          **THE COURT:**  OH, EXCUSE ME.  DR. BEA, YOU CAN

18:04   8   CERTAINLY VERY CAREFULLY STEP DOWN.

18:05   9          **THE WITNESS:**  THANK YOU.

18:05   10          **THE COURT:**  IT HAS BEEN A LONG DAY.

18:05   11          **MR. TREEBY:**  THE ONLY TWO THINGS THAT PEOPLE --

18:05   12          **THE COURT:**  LET MR. TREEBY GO AHEAD.

18:05   13          **MR. TREEBY:**  THE ONLY TWO THINGS THAT I WANTED TO

18:05   14   BRING UP, AND THEN OTHERS WHO ARE FAR MORE KNOWLEDGEABLE ABOUT

18:05   15   THE EXHIBITS WILL DEAL WITH THE REST OF THEM, THERE WAS A

18:05   16   MOTION TO INTRODUCE ALL OF DR. BEA'S DEMONSTRATIVE SLIDES, HIS

18:05   17   WHOLE SLIDE SHOW.  AND WE HAVE AGREED THERE WERE ONLY TWO THAT

18:05   18   HAD ANY ISSUES WITH THEM, AND WE HAVE SOLVED THOSE ISSUES.  ONE

18:05   19   OF THEM YOUR HONOR RULED ON, AND THE OTHER ONE -- I SAY TWO OF

18:05   20   THEM; IT WAS ONE ISSUE ABOUT THE LIQUIDITY INDEX -- YOUR HONOR

18:05   21   RULED ON AND KEPT THEM OUT, AND WE HAVE AGREED ON THAT.

18:05   22          THE OTHER ONE WAS THERE WAS A REFERENCE TO AN EC

18:05   23   THAT HAD AN EM REFERENCE IN IT, AND OUR ONLY OBJECTION TO IT

18:05   24   WAS THAT WE WANTED THE WHOLE EM AND THE WHOLE EC IN, AND

18:06   25   COUNSEL HAS GRACIOUSLY AGREED TO THAT.  SO IT'S RESOLVED WITH

18:06  1    THAT.

18:06  2            WE HAVE ASKED TO MOVE INTO EVIDENCE, AND WE

18:06  3    THINK IT WOULD BE HELPFUL TO THE COURT TO HAVE THE ENTIRE SLIDE

18:06  4    SHOW FOR DR. SILVA-TULLA MOVED IN.  THE PLAINTIFFS HAVE

18:06  5    OBJECTED TO 16 OF THE SLIDES.  I HAVE TABBED THE ONES WITH

18:06  6    NUMBERS ON THEM FOR A COPY FOR YOU TO LOOK AT AND MAKE A

18:06  7    JUDGMENT WHENEVER YOUR HONOR WANTS TO.  THEY OBJECT.  I WILL

18:06  8    LET THEM TALK ABOUT THEIR OBJECTION IF THEY WANT TO.  BUT I

18:06  9    JUST WANTED TO GIVE THE COURT THIS LIST OF THE ONES THEY OBJECT

18:06  10   TO, WHICH ARE 16 IN NUMBER.

18:06  11           MR. SCHULTZ:  THAT'S RIGHT, JUDGE.  FOR MY PART AT

18:06  12   LEAST, BOTH DR. MARR AND DR. SILVA, WE HAD ABOUT 10 TO

18:06  13   15 SLIDES OUT OF 130 OR SO IN EACH PRESENTATION EITHER THAT WE

18:06  14   FEEL ARE OVERLY ARGUMENTATIVE.  THEY COMMENT ON DR. BEA BEING

18:06  15   WRONG ABOUT CERTAIN ANALYSES, OR THEY ARE BRAND-NEW OPINIONS

18:06  16   THAT YOU WILL NOT FIND IN ANY REPORT IN THIS CASE.

18:06  17           WE WOULD SUGGEST, WITH THOSE OBJECTIONS IN MIND,

18:06  18   SUBMIT THE WHOLE THING TO CHAMBERS; AND WHILE YOU ARE GOING

18:07  19   THROUGH THIS, IF YOU FEEL LIKE THEY ARE HELPFUL AND THEY SHOULD

18:07  20   BE ADMITTED, IT'S LEFT TO YOUR DISCRETION.

18:07  21           THE COURT:  WHAT I'M GOING TO DO IS I'M GOING TO

18:07  22   ADMIT THEM AND NOTE YOUR OBJECTION.  I WOULD LIKE TO KNOW,

18:07  23   THOUGH, WHICH ONES YOU PARTICULARLY HAVE OBJECTED TO.  BUT IF I

18:07  24   CAN GET A LIST -- BUT I'M GOING TO ADMIT THEM ALL BECAUSE WE

18:07  25   TALKED ABOUT THEM.  THEY ARE IN EVIDENCE.  IT WOULD FACILITATE

18:07  1  THE COURT.

18:07  2  **MR. SCHULTZ:**  WOULD IT HELP, JUDGE -- I MEAN, I GUESS

18:07  3  WHAT I WOULD HAVE IN MIND IS, IN OUR POST-TRIAL BRIEFING WE

18:07  4  WILL JUST HAVE A PAGE THAT SAYS HERE ARE THE SLIDES WE OBJECT

18:07  5  TO.

18:07  6  **THE COURT:**  THAT WOULD HELP.  THAT WOULD HELP.

18:07  7  **MR. BRUNO:**  WE HAVE FOR YOU, UNFORTUNATELY, AFTER

18:07  8  GREAT ADIEU, OUR LITTLE CONCORDANCE BOOK WHICH ALLOWS YOU TO

18:07  9  IDENTIFY AN EXHIBIT FROM A DEPOSITION.  IT'S NOT GOING TO BE

18:07  10  OFFERED INTO EVIDENCE.  I THINK IT'S MORE IN THE NATURE OF A

18:07  11  HELP AID.  SO WE'LL JUST PRESENT THAT IN CHAMBERS TOMORROW.

18:07  12  **THE COURT:**  AND THE OTHER SIDE HAS SEEN THAT?

18:07  13  **MR. FARRELL:**  RIGHT.  WITH THE UNDERSTANDING THAT

18:07  14  IT'S NOT GOING TO BE MOVED INTO EVIDENCE --

18:08  15  **THE COURT:**  SIMPLY TO FACILITATE THE COURT IN

18:08  16  DECIDING AND WRITING THIS OPINION.

18:08  17  **MR. FARRELL:**  EXACTLY, YOUR HONOR.

18:08  18  CHRISTOPHER FARRELL FOR WASHINGTON GROUP.

18:08  19  **THE COURT:**  MR. FARRELL.

18:08  20  **MR. FARRELL:**  YOUR HONOR, AS BOTH MR. BRUNO AND

18:08  21  MR. TREEBY INDICATED, WE HAVE BEEN WORKING REALLY HARD BEHIND

18:08  22  THE SCENES TO TRY TO TAKE CARE OF THIS EXHIBIT CLEANUP.  AND AT

18:08  23  LEAST FOR WASHINGTON GROUP'S PART, I KNOW I HAVE BEEN WORKING

18:08  24  WITH MS. PURCHNER AND MR. WARREN ALL DAY.  I HAVE A DOCUMENT

18:08  25  HERE, A LIST OF ABOUT 30 EXHIBITS THAT WASHINGTON GROUP --

| | | |
|---|---|---|
| 18:08 | 1 | THEY'RE CATEGORY 2 EXHIBITS.  THERE ARE NO OBJECTIONS.  THE 1S |
| 18:08 | 2 | ARE ALL IN EVIDENCE. |
| 18:08 | 3 | **THE COURT:**  YES. |
| 18:08 | 4 | **MR. FARRELL:**  THESE ARE CATEGORY 2 EXHIBITS THAT |
| 18:08 | 5 | WASHINGTON GROUP HAS USED DURING THE COURSE OF THE TRIAL, AND |
| 18:08 | 6 | WE WOULD SEEK ADMISSION.  THESE HAVE NO OBJECTIONS FROM THE |
| 18:08 | 7 | PLAINTIFFS.  SO IF I CAN JUST GIVE THIS TO SHEENA. |
| 18:08 | 8 | **THE COURT:**  YOU MAY. |
| 18:08 | 9 | **MR. FARRELL:**  JOE, I HAVE GOT A LIST FOR YOU, TOO, IF |
| 18:08 | 10 | YOU WANT IT. |
| 18:09 | 11 | **THE COURT:**  YOU MAY.  THAT WOULD BE THE MOST |
| 18:09 | 12 | EFFICIENT WAY TO DO IT.  WE THANK YOU FOR ALL YOUR HARD WORK, |
| 18:09 | 13 | MR. FARRELL. |
| 18:09 | 14 | **MR. FARRELL:**  SURE.  THERE ARE A HANDFUL OF |
| 18:09 | 15 | ADDITIONAL CATEGORY 2 EXHIBITS TO WHICH THE PLAINTIFFS DO HAVE |
| 18:09 | 16 | OBJECTIONS.  I'M HAPPY TO MOVE THOSE IN HERE.  THEY'RE |
| 18:09 | 17 | OBJECTIONS NOW.  I'M NOT SURE IF THAT MAKES IT -- |
| 18:09 | 18 | **THE COURT:**  HOW MANY ARE THERE? |
| 18:09 | 19 | **MR. BRUNO:**  I HAVE TWO THINGS IN MY EAR.  I WAS |
| 18:09 | 20 | TRYING TO ASCERTAIN WHERE OUR LIST OF 2S ARE.  WE ARE GOING TO |
| 18:09 | 21 | PRESENT THE COURT WITH A LIST OF ALL OF THE EXHIBITS UNDER |
| 18:09 | 22 | 2 CATEGORY THAT WE MOVED IN THE COURT. |
| 18:09 | 23 | IS THAT RESOLVED? |
| 18:10 | 24 | **MR. SMITH:**  YOUR HONOR, I WOULD LIKE TO MOVE IN THE |
| 18:10 | 25 | EXHIBITS THAT I USED IN MY CROSS-EXAMINATION OF DR. BEA TODAY. |

18:10  1      **MR. SCHULTZ:**  WE WOULD HAVE AN OBJECTION TO THAT

18:10  2  HEARSAY DOCUMENT THAT NEVER GOT A NUMBER.  ARE YOU INCLUDING

18:10  3  THAT ONE, THE SCHOOL RECORDS?

18:10  4      **MR. SMITH:**  I'M GOING TO HAVE THAT MARKED, AND I WANT

18:10  5  TO MOVE THAT IN TOO.

18:10  6      **MR. SCHULTZ:**  WELL, NO --

18:10  7      **MR. SMITH:**  THE SAME THING AS THE ONE YOU

18:10  8  JUST SUBMITTED TO THE COURT.  YOU JUST MARKED ONE AND SUBMITTED

18:10  9  IT.  WE NEVER SAW THAT BEFORE.

18:10  10     **MR. BRUNO:**  NO, THE PROBLEM IS NOT THAT IT'S HEARSAY.

18:10  11     **MR. SCHULTZ:**  THE PROBLEM IS THIS IS HEARSAY, PURE

18:10  12  TEXTBOOK HEARSAY.

18:10  13     **THE COURT:**  WHICH ONE IS THAT?

18:10  14     **MR. SCHULTZ:**  IT'S REGARDING THE RECORDS OF ONE OF

18:10  15  THE PEOPLE WHO WORKS FOR GEOSTUDIOS THAT MR. SMITH TESTIFIED ON

18:10  16  AS TO THE PROVIDENCE, AND ALL THAT IS IS A HEARSAY DOCUMENT

18:11  17  INVOLVING --

18:11  18     **THE COURT:**  WE HAVE TO TAKE THESE UP EITHER ONE AT A

18:11  19  TIME OR -- WHY DON'T YOU MOVE THE ONES IN THAT ARE NOT

18:11  20  CONTROVERTED.  THEN WE'LL DECIDE HOW WE DO WITH THE ONES THAT

18:11  21  ARE CONTROVERTED.

18:11  22     **MR. SMITH:**  I'VE GOT A LIST.

18:11  23     **MR. FARRELL:**  ALL I'VE GOT LEFT ARE CONTROVERTED

18:11  24  ONES.

18:11  25     **THE COURT:**  MAYBE THE CONTROVERTED ONES -- I'M TRYING

18:11   1   TO DETERMINE WHAT'S THE MOST EFFICIENT WAY TO DO IT WHERE I CAN

18:11   2   MAKE -- I HATE FOR YOU TO DO ADDITIONAL BRIEFING OTHER THAN

18:11   3   WHAT YOU HAVE TO DO.

18:11   4            MR. BRUNO:  JUDGE, LET ME MAKE A SUGGESTION.

18:11   5            THE COURT:  THAT'S ONE OF THE PROBLEMS.  I DON'T LIKE

18:11   6   CATEGORIES BECAUSE I USUALLY -- IN EVERY CASE I HAVE EVER HAD,

18:11   7   I HAVE RULED IN LIMINE AFTER LOOKING MYSELF AT ALL OF THE

18:11   8   EXHIBITS BEFOREHAND.  BUT I AGREED TO THIS EVEN THOUGH IT WAS

18:11   9   MESSY.

18:11   10            MR. BRUNO:  WELL, LET ME SUGGEST THIS BECAUSE I DON'T

18:11   11   KNOW THAT IT'S THAT BIG A DEAL.  WHERE THE PARTIES HAVE AN

18:11   12   OBJECTION, WE SUBMIT TO YOU A SINGLE LIST -- FOR EXAMPLE, THE

18:12   13   PLAINTIFFS, THESE ARE THE 2S THAT I WANT TO MOVE IN; AND

18:12   14   THERE'S NO OBJECTION, JUST LIKE WE DID BEFORE, THEY'RE IN.

18:12   15            THESE ARE THE 2S TO WHICH THEY HAVE AN

18:12   16   OBJECTION.  THEY HAVE A COLUMN TO INDICATE THEIR OBJECTION; WE

18:12   17   INDICATE A RESPONSE, NO MORE THAN A COUPLE WORDS; AND WE GIVE

18:12   18   IT TO YOU, AND THEN YOU CAN USE A BALLPOINT PEN AND RULE ON IT.

18:12   19            THE COURT:  THAT MIGHT BE A REASONABLE WAY TO DO IT.

18:12   20            MR. BRUNO:  BUT I FRANKLY DON'T WANT TO WRITE A

18:12   21   THREE-PAGE BRIEF ON EACH ONE.

18:12   22            THE COURT:  I HAVE A MAJOR BRIEFING I'M GOING TO HAVE

18:12   23   TO LOOK AT IN THIS CASE.

18:12   24            SO WHERE ARE WE RIGHT NOW?

18:12   25            MR. BRUNO:  WHERE WE ARE NOW IS -- I'LL LET HIM.

*DAILY TRANSCRIPT*

18:12    1          **MR. FARRELL:**  YOUR HONOR, WE'VE HAVE MOVED IN -- FOR
18:12    2   WASHINGTON GROUP, WE HAVE MOVED IN ALL OF THE UNCONTESTED
18:12    3   CATEGORY 2S.
18:12    4          **THE COURT:**  THEY ARE ADMITTED.
18:12    5          **MR. FARRELL:**  THANK YOU.  THE REST THAT WE HAVE ARE,
18:12    6   LIKE I SAID, MAYBE A DOZEN CONTENDED -- OR HOTLY CONTESTED --
18:12    7   THANK YOU, IT'S BEEN A LONG DAY -- CONTESTED.  AND I AGREE,
18:12    8   MR. BRUNO'S SOLUTION SEEMS TO MAKE SENSE.  WE CAN GIVE YOU A
18:13    9   TABLE.  WE WANT TO MOVE THESE IN WITH THEIR OBJECTION.
18:13   10          **THE COURT:**  RIGHT.  WE WILL GIVE YOU SOME GUIDANCE IN
18:13   11   A MINUTE ENTRY AS TO WHEN THOSE SHOULD BE SUPPLIED.
18:13   12          **MR. FARRELL:**  PERFECT.  THAT WILL BE HELPFUL.
18:13   13          **THE COURT:**  MR. SMITH IS READY.  LET'S LET HIM GO.
18:13   14          **MR. SMITH:**  YOUR HONOR, I APOLOGIZE, BUT I DON'T KNOW
18:13   15   WHAT CATEGORY THESE EXHIBITS THAT I USED TODAY ARE IN.  BUT I
18:13   16   WOULD LIKE TO JUST READ THE LIST THAT I USED AND MOVE THEM IN,
18:13   17   AND THEN WE CAN PUT THEM ON THE TABLE IF THEY ARE OBJECTED TO.
18:13   18          **THE COURT:**  I THINK THE ONLY ONE YOU'RE OBJECTING TO
18:13   19   IS THE -- THE ONLY ONE YOU OBJECTED TO IS THE HEARSAY DOCUMENT?
18:13   20          **MR. SCHULTZ:**  THAT INVOLVES SOMEBODY'S PRIVATE SCHOOL
18:13   21   RECORDS.
18:13   22          **THE COURT:**  THE ALLEGED HEARSAY DOCUMENT.
18:13   23          **MR. BRUNO:**  THE OTHER ONE IS -- IT COMES FROM MY,
18:13   24   PERHAPS, CONFUSION BECAUSE I DON'T KNOW WHERE THE HECK IT COMES
18:13   25   FROM.  BUT IF YOU WANT TO GET THEM ALL, IT'S ALL THESE

| | | |
|---|---|---|
| 18:13 | 1 | SCREENSHOTS.  IF THEY GO IN, I GUESS -- MINE WENT IN.  I GUESS |
| 18:13 | 2 | HIS CAN GO IN. |
| 18:13 | 3 | **THE COURT:**  I THINK THEY HAVE TO. |
| 18:13 | 4 | **MR. BRUNO:**  THEY ALL GO IN.  WE CAN COMPARE AND |
| 18:13 | 5 | CONTRAST THEM. |
| 18:13 | 6 | **THE COURT:**  THAT'S RIGHT. |
| 18:14 | 7 | **MR. BRUNO:**  BILL HAS GOT SOME TOO. |
| 18:14 | 8 | **MR. TREEBY:**  THEY'RE ALREADY ENTERED. |
| 18:14 | 9 | **THE COURT:**  GO AHEAD, MR. SMITH. |
| 18:14 | 10 | **MR. SMITH:**  I WOULD LIKE TO MARK OR IDENTIFY -- I |
| 18:14 | 11 | PREVIOUSLY HANDED THIS UP WITHOUT ANY MARKING ON IT. |
| 18:14 | 12 | **THE COURT:**  YES, SIR. |
| 18:14 | 13 | **MR. SMITH:**  BUT THE SCREENSHOTS THAT I PREVIOUSLY |
| 18:14 | 14 | SUBMITTED, I WOULD LIKE TO MARK AS DEFENDANT'S EXHIBIT 2800, |
| 18:14 | 15 | DX. |
| 18:14 | 16 | **THE COURT:**  IN GLOBO. |
| 18:14 | 17 | **MR. SMITH:**  YEAH.  IT'S ABOUT FOUR PAGES. |
| 18:14 | 18 | **THE COURT:**  LET IT BE ADMITTED. |
| 18:14 | 19 | **MR. SMITH:**  THANK YOU. |
| 18:14 | 20 | THEN I AM GOING TO READ THE LIST OF THE OTHER |
| 18:14 | 21 | EXHIBITS THAT I REFERRED TO:  JX-1389, JX-1553, JX-1394, |
| 18:14 | 22 | JX-1551, JX-1393, JX-1395, JX-1392, DX-1625, JX-1379, DX-1589, |
| 18:15 | 23 | DX-206, DX-1589, JX-1401, JX-1370, DX-2727, JX-4-004, I THINK, |
| 18:16 | 24 | 004, I THINK.  JX-1370, AND JX-2389. |
| 18:16 | 25 | **THE COURT:**  THANK YOU, SIR. |

18:16   1                   ANY OBJECTION?

18:16   2                   IS ONE OF THOSE THE --

18:16   3          **MR. SMITH:**  NO, THAT DOES NOT INCLUDE THE GRUNAUER --

18:16   4          **THE COURT:**  ANY OBJECTION TO THE OTHER ONES?

18:16   5                   DO WE HAVE A LIST, MR. SMITH, WHERE WE WILL BE

18:16   6   ABLE TO KNOW WHICH ONES THOSE ARE?

18:16   7          **MR. SMITH:**  THOSE ARE ALL PREVIOUSLY STAMPED.  THOSE

18:16   8   ARE NOT NEW EXHIBITS.

18:16   9          **THE COURT:**  LET THEM BE ADMITTED.

18:16  10          **MR. MCCONNON:**  YOUR HONOR, GOOD EVENING.  JIM

18:16  11   MCCONNON FOR THE UNITED STATES.  WE NEED TO DO SOME ADDITIONAL

18:16  12   HOUSEKEEPING CHORES.

18:16  13                   FIRST OF ALL, THIS IS NOT REGARDING ADMISSION OF

18:16  14   EXHIBITS, RATHER TO CLARIFY THE RECORD.  THE MINUTE ENTRY OF

18:16  15   SEPTEMBER 24, 2012, WHICH IS DOCUMENT 21069, IN THAT DOCUMENT

18:17  16   THE COURT SAID THE PLAINTIFFS OFFER DR. MARR'S COMPLETE EXPERT

18:17  17   REPORT WITH ALL APPENDICES, SUPPLEMENTAL REPORTS, DR. BEA'S

18:17  18   REPORTS, THE ERRATA SHEET TO THE DEPOSITION, ADMITTED.

18:17  19                   THE RECORD IS UNCLEAR REGARDING DR. MARR'S

18:17  20   REPORTS, SO I WOULD LIKE TO MAKE SURE THAT FOR THE RECORD THEY

18:17  21   ARE CLEARLY DELINEATED.  DR. MARR'S EXPERT REPORT AND

18:17  22   APPENDICES START WITH JX-1864 AND RUN THROUGH JX-1885.  IN

18:17  23   ADDITION, DR. MARR'S REVISED EXPERT REPORT IS AT PX-4721.

18:18  24          **MR. BRUNO:**  I DO NOT RECALL.  DID YOU JUST READ A

18:18  25   MINUTE ENTRY THAT I --

18:18  1          **MR. MCCONNON:**  ADDITIONALLY, YOUR HONOR, THE

18:18  2  UNITED STATES NEEDS SOME CLARIFICATION.  WE HAVE, OF COURSE,

18:18  3  BEEN WORKING WITH THE PLAINTIFFS ALL DAY LONG REGARDING ANY

18:18  4  OBJECTIONS OR NO OBJECTIONS TO CERTAIN EXHIBITS REGARDING --

18:18  5  THEY ARE IN CATEGORY 2.  AND CONSIDERING WE ARE STILL WORKING

18:18  6  ON IT -- ALTHOUGH I CERTAINLY CAN GIVE YOU A LIST, ALTHOUGH WE

18:18  7  MIGHT SPEND HALF THE EVENING ARGUING ABOUT EACH OF THOSE --

18:18  8  IT'S MY UNDERSTANDING IS WE WILL CONTINUE TO WORK WITH THE

18:18  9  PLAINTIFFS TONIGHT.

18:18  10          WHEN WOULD YOU LIKE FOR US -- I'M NOT VERY CLEAR

18:18  11  ON THIS.  WHEN DO YOU WANT US TO GIVE THAT TO YOU?

18:18  12          **THE COURT:**  WELL, YOU KNOW, THAT'S WHY I WILL

18:18  13  NEVER -- WELL, I'M NOT GOING -- I'M NOT EVER GOING TO HAVE A

18:18  14  CATEGORY 2.  I NEVER HAD ONE BEFORE, AND IT WAS A HUGE MISTAKE

18:18  15  ON MY PART BECAUSE -- AND I WILL TAKE THE BLAME.

18:19  16          WELL, YOU KNOW, THE CASE IS KIND OF DONE, SO

18:19  17  WE --

18:19  18          **MR. MCCONNON:**  YOUR HONOR, THEN THE UNITED STATES IS

18:19  19  READY TO PROCEED, AND WE'LL JUST KNOCK THEM OUT.

18:19  20          **MR. TREEBY:**  CAN'T WE JUST DO THE SAME THING WE DID

18:19  21  WITH THE OTHERS, JUST GIVE THEM A LIST AND HAVE THAT SAVE

18:19  22  YOUR HONOR TIME?

18:19  23          **THE COURT:**  YEAH, THAT'S FINE.

18:19  24          **MR. BRUNO:**  THE JUDGE WILL ISSUE A MINUTE ENTRY AND

18:19  25  TELL US WHY --

```
18:19   1              THE COURT:  I'M GOING TO GIVE YOU A TIME.  IS A WEEK
18:19   2   ENOUGH TIME TO GET THIS DONE?
18:19   3              MR. MCCONNON:  THAT WILL BE FINE, YOUR HONOR.
18:19   4              THE COURT:  ALL RIGHT.  GOOD.
18:19   5              LET'S TALK NOW ABOUT SOMETHING.  I'M GOING TO
18:19   6   GIVE YOU A MINUTE ENTRY THAT'S GOING TO SET FORTH THE POINTS
18:19   7   I'M INTERESTED IN BRIEFING AND MAYBE THE METHODOLOGY.  IT'S NOT
18:19   8   AN ORDER.  IT'S SIMPLY A SUGGESTION, BECAUSE YOU HAVE TO WRITE
18:19   9   YOUR BRIEFS THE WAY YOU THINK YOU SHOULD.
18:19  10              OBVIOUSLY THE THING THAT -- CERTAINLY WE HAVE
18:20  11   NEGLIGENCE ISSUES, WE HAVE IMMUNITY ISSUES.  WE DON'T GET TO
18:20  12   THOSE IF I DECIDE THERE'S NO CAUSATION.  AND THE CAUSATION
18:20  13   ISSUE -- AND THEN, OF COURSE, DAMAGES, AND THERE ARE INNER
18:20  14   LAYERS IN ALL OF THAT.  I'M GOING TO SET FORTH THE THINGS THAT
18:20  15   I PARTICULARLY WOULD LIKE YOU TO HIGHLIGHT, THE ISSUES.  YOU
18:20  16   PROBABLY KNOW WHAT THEY ARE, BUT I'M GOING TO SET THEM HOW I
18:20  17   WOULD LIKE THEM LAID OUT WHERE IT'S BETTER UNDERSTANDABLE TO
18:20  18   ME.
18:20  19              LET'S TALK ABOUT PAGE LENGTH BECAUSE I'M GOING
18:20  20   TO SET ONE, AND I WOULD LIKE YOUR INPUT NOW.  OBVIOUSLY I'M
18:20  21   GOING TO BE LIBERAL ABOUT THAT WITH THIS KIND OF CASE.  BUT I
18:20  22   DO FIND THAT IF I GO -- IF I LET IT GO TOO LONG, WE MEANDER.
18:20  23   WE CAN'T HELP IT.  BUT YET IT HAS TO BE LONG ENOUGH FOR YOU TO
18:21  24   BE ABLE TO SET FORTH YOUR ARGUMENTS.
18:21  25              ANYBODY HAVE ANY SUGGESTIONS ABOUT THE PAGE
```

*DAILY TRANSCRIPT*

```
18:21    1   LIMIT?
18:21    2        MR. TREEBY:  IT WOULD HELP, I THINK, TO MAKE THAT
18:21    3   DECISION IF WE KNEW -- I DIDN'T KNOW WHERE YOU WERE HEADED, AND
18:21    4   I DIDN'T KNOW IF YOU WERE HEADED -- IF YOU WANTED EVERYTHING
18:21    5   BRIEFED AT ONE TIME?  OR DO YOU WANT CAUSATION BRIEFED FIRST
18:21    6   OR --
18:21    7        THE COURT:  NO, NO, NO, EVERYTHING BRIEFED AT ONE
18:21    8   TIME.
18:21    9        MR. TREEBY:  EVERYTHING AT ONE TIME?
18:21   10        THE COURT:  YEAH.
18:21   11        MR. BRUNO:  IS THERE A PAGE LIMIT -- HOW ABOUT THIS.
18:21   12   WHY DON'T WE START WITH YOUR UPPER LIMIT AND BACK IT UP.  HOW
18:21   13   ABOUT THE LOWER LIMIT?  CAN WE HAVE A RANGE?
18:21   14        MR. TREEBY:  YOUR HONOR, I'LL BE HONEST, I THINK IT'S
18:21   15   A HUNDRED PAGES BECAUSE --
18:21   16        THE COURT:  I AGREE.  I AGREE.
18:21   17        MR. TREEBY:  -- WE'VE GOT SO MANY ISSUES --
18:21   18        THE COURT:  ANOTHER THING I WANTED TO TALK ABOUT --
18:21   19   I'M GOING TO SAY 100.  YOU MIGHT AS WELL GET IT ALL THERE.  BUT
18:21   20   PROBABLY 125 PAGES.  I KNOW THAT'S NOT GOING TO HAPPEN IN MANY
18:22   21   OTHER COURTS.  BUT I KNOW THE ISSUES.  THEY'RE COMPLEX, AND I
18:22   22   WANT THEM WELL BRIEFED, AS I KNOW THEY WILL BE, BECAUSE I HAVE
18:22   23   DEALT WITH ALL OF YOU BEFORE AND THEY HAVE BEEN EXCELLENT.
18:22   24        HERE'S WHAT I'M THINKING, AND I'M TRYING TO
18:22   25   REMEMBER WHAT I DID IN THE *ROBINSON* CASE.  BET YOU MR. SMITH
```

18:22  1   AND MR. BRUNO REMEMBER.

18:22  2          **MR. TREEBY:**  MS. WAGER-ZITO HAS THIS TABLE.  SHE HAS

18:22  3   ANALYZED *ROBINSON* ON THIS POINT.

18:22  4               WHERE ARE YOU?

18:22  5          **MS. WAGER-ZITO:**  I'M HIDING OVER HERE.

18:22  6          **THE COURT:**  I'M THINKING ABOUT SIMULTANEOUS BRIEFS

18:22  7   AND SIMULTANEOUS REPLIES BECAUSE THEN IT'S FOREVER.

18:22  8          **MR. TREEBY:**  THAT'S NOT WHAT YOU DID BEFORE.

18:22  9          **MR. BRUNO:**  THAT'S WHAT WE DID IN *ROBINSON*.

18:22  10         **THE COURT:**  THAT IS WHAT WE DID IN *ROBINSON*.

18:22  11              SIMULTANEOUS BRIEFS ENABLES YOU EACH TO REPLY TO

18:22  12  THE OTHER.  OTHERWISE, THEN -- THE PLAINTIFFS ARE GOING TO GET

18:22  13  THE LAST REPLY THE OTHER WAY.  BECAUSE YOU ARE NOT GOING TO

18:22  14  KEEP FILING SUR-REPLIES.  IT DOESN'T WORK WELL.  IT DOESN'T

18:22  15  WORK WELL.

18:22  16              I'M GOING TO GET THE POINT.  BUT YOU WILL BE

18:23  17  ABLE TO LACERATE EACH OTHER'S BRIEFS, ORIGINAL BRIEFS, IN THE

18:23  18  SIMULTANEOUS REPLY BRIEF.  IT WORKS BETTER THAN PLAINTIFF, THEN

18:23  19  DEFENDANT, THEN PLAINTIFF, THEN DEFENDANT --

18:23  20         **MR. TREEBY:**  I WAS JUST HOPING TO GET A TWO-WEEK

18:23  21  VACATION, YOUR HONOR.  THAT'S ALL.

18:23  22         **THE COURT:**  I'M GOING TO GIVE YOU PLENTY OF TIME.

18:23  23              SPEAKING OF TIME, SINCE IT'S GOING TO BE A

18:23  24  SIMULTANEOUS BRIEF, WHAT TIME WOULD YOU LIKE?  I'M GOING TO BE

18:23  25  VERY UNDERSTANDING BECAUSE ALL OF YOU ARE ENTITLED TO A BREAK.

18:23    1       **MR. BRUNO:**  ARE YOU WANTING FINDINGS OF FACT AND

18:23    2  CONCLUSIONS OF LAW IN A SEPARATE DOCUMENT, OR CAN WE JUST DO

18:23    3  ONE BRIEF?

18:23    4       **MR. TREEBY:**  WE ALREADY DID THAT.

18:23    5       **THE COURT:**  I GOT THEM SUBMITTED.  FRANKLY, I DON'T

18:23    6  THINK WE NEED THEM AGAIN.

18:23    7       **MR. BRUNO:**  GREAT.

18:23    8       **THE COURT:**  UNLESS YOU WANT TO DO IT, I'M NOT GOING

18:23    9  TO ORDER IT.

18:23   10       **MR. TREEBY:**  WE ASK FOR 45 DAYS.

18:23   11       **THE COURT:**  THAT IS MORE THAN REASONABLE.  MORE THAN

18:23   12  REASONABLE.

18:24   13       **MR. SMITH:**  CAN WE BE A LITTLE LESS REASONABLE?

18:24   14       **THE COURT:**  HOW ABOUT 60?

18:24   15       **MR. BRUNO:**  THEY LET ME HANG IN THE WIND.

18:24   16       **THE COURT:**  I WANT TO BE ALIVE.  I HATE TO FOIST THIS

18:24   17  ON SOMEONE ELSE.  I THINK 60 DAYS FOR THE SIMULTANEOUS BRIEFS.

18:24   18  WE'LL PUT THAT IN THE MINUTE ENTRY, WHAT DAY IT WILL BE.  IT

18:24   19  GIVES YOU TIME TO --

18:24   20       **MS. WAGER-ZITO:**  AND THEN THE REPLY?

18:24   21       **THE COURT:**  THE REPLY, PROBABLY 30.  UNLESS YOU THINK

18:24   22  THAT'S TOO LONG.

18:24   23       **MR. TREEBY:**  WE'LL LET YOU LOOK AT THE HOLIDAY

18:24   24  SCHEDULE AND ADJUST THAT ACCORDINGLY.

18:24   25       **MS. WAGER-ZITO:**  I'LL WORK WITH IT.  I'LL MAKE IT

```
18:24   1   NICE, I PROMISE.
18:24   2           THE COURT:  RIGHT.  WE WILL LOOK AT THE HOLIDAY
18:24   3   SCHEDULE AND FACTOR THAT INTO THE REPLY.
18:25   4           MR. BRUNO:  WE HAVE A BROAD OUTLINE, JUDGE.
18:25   5   OBVIOUSLY YOU MAY WANT TO RETHINK THIS.  I THINK THAT WE HAVE A
18:25   6   GOOD FRAMEWORK.  WE ARE COMFORTABLE WITH THAT.
18:25   7           MR. SMITH:  CAN'T WE GET IT DONE BEFORE THANKSGIVING?
18:25   8           THE COURT:  NO.  I WOULD NOT EXPECT REPLIES, TO HAVE
18:25   9   THE CROSS PLEADING, UNLESS IT WOULD BE JOINT REPLIES.  WE'LL
18:25  10   SEE.  IF ONE PERSON MOVES AND I GRANT IT, I WILL GIVE IT TO THE
18:25  11   OTHER PERSON, BUT WE HAVE TO LET IT COME TO AN END EVENTUALLY.
18:25  12           MR. TREEBY:  I'M GOING TO MAKE A REQUEST, JUST
18:25  13   THINKING OF THE PEOPLE WHO HAVE TO DO MOST OF THIS WORK.  I GET
18:25  14   TO JUST KIND OF READ FINISHED PRODUCTS, AND THAT'S WONDERFUL.
18:25  15           IF IT'S AFTER THANKSGIVING, WHICH 60 DAYS WOULD
18:25  16   BE AFTER THANKSGIVING, WE ARE GOING TO HAVE THEM WORKING
18:25  17   THROUGHOUT THE THANKSGIVING HOLIDAYS.  I WOULD PREFER IF WE
18:25  18   COULD JUST HAVE IT MAYBE DUE THE DAY BEFORE THANKSGIVING, THE
18:25  19   FIRST BRIEFS.
18:25  20           THE COURT:  ALL RIGHT.  THAT'S FAIR.
18:25  21           MR. BRUNO:  OKAY.
18:25  22           THE COURT:  THAT'S FAIR.  LOOK, I WANT TO GIVE YOU
18:25  23   TIME TO DO THIS BECAUSE I THINK IT'S -- I'M THINKING OF MYSELF
18:26  24   HAVING TO WRITE THIS BRIEF, SO I ALWAYS PUT MYSELF -- WITH
18:26  25   HELP, OF COURSE -- AND TO ORGANIZE EVERYTHING AND TO GET ALL
```

*DAILY TRANSCRIPT*

18:26   1   THE FACTS COLLATED AND TO GO THROUGH THE FIRST DRAFT, SECOND

18:26   2   DRAFT, THIRD DRAFT, FOURTH DRAFT, TO MAKE IT INCISIVE WHERE

18:26   3   IT'S PERSUASIVE.  IT'S GOING TO TAKE A LITTLE WHILE BECAUSE YOU

18:26   4   HAVE A LOT OF STUFF HERE.

18:26   5             MR. BRUNO:  I THINK ROB HAS SOME --

18:26   6             THE COURT:  I WILL OBLIGE THAT REQUEST, MR. TREEBY.

18:26   7             MR. BRUNO:  UPDATE HARD COPIES.

18:26   8             MR. WARREN:  WHEN WOULD THE COURT LIKE US TO -- WE

18:26   9   HAVE WITHDRAWN SEVERAL EXHIBITS, AND WE NEED TO REPLACE SEVERAL

18:26   10  THAT HAVE PAGE NUMBERS MISSING.

18:26   11            THE COURT:  SHEENA AND JANET WILL BE IN CHARGE OF

18:26   12  THAT.  THAT GETS INTO LOGISTICS.

18:26   13            THIS DOESN'T HAVE TO BE ON THE RECORD.

18:26   14            MR. TREEBY:  IS THAT SOMETHING FOR TOMORROW PERHAPS?

18:26   15            (DISCUSSION OFF THE RECORD.)

18:29   16            (PROCEEDINGS ADJOURNED.)

18:29   17                        * * *

        18                       **CERTIFICATE**

        19        I, TONI DOYLE TUSA, CCR, FCRR, OFFICIAL COURT
            REPORTER FOR THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT
        20  OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE
            AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND
        21  UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE
            ABOVE-ENTITLED MATTER.

        22

        23

        24                        S/ TONI DOYLE TUSA
                                  TONI DOYLE TUSA, CCR, FCRR
        25                        OFFICIAL COURT REPORTER

*DAILY TRANSCRIPT*