**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, | § | |
| *Armstrong*, No. 10-866 | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' POST-TRIAL REPLY BRIEF**
**AND MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

INTRODUCTION.............................................................................................................................1

I.   The Corps satisfied the duty alleged by Plaintiffs (Pls. PTB, pp. 8-10, 16-24), but even if that duty was not satisfied, Plaintiffs' claims fundamentally arise out of flood control activity, rendering the United States immune under § 702c (Pls. PTB, pp. 25-33). ....................................... 6

II.  The FTCA's discretionary function exception bars Plaintiffs' claims.  No manual or policy mandated that the Corps do something that it failed to do with respect to the EBIA floodwall. (Pls. PTB, pp. 34, 38-40).  Whether to revisit the 1966 assessment, undertake a new assessment, or take additional remedial measures to ensure the EBIA floodwall retained its authorized flood protection are all choices that properly would have been guided by the social, economic, and political policies that animated the LPV flood-control project.  (Pls. PTB, pp. 34-50). ........................................................................................................................ 13

     A.   The manuals Plaintiffs cite do not supply any applicable mandatory directives.  (Pls. PTB, pp. 38-40)............................................................................................................... 15
     B.   Decisions on how to maintain the authorized flood protection are susceptible to policy analysis. (Pls. PTB, pp. 43-50)............................................................................................ 24

III. Plaintiffs have failed to prove negligence. (Pls. PTB, pp. 13-15, 25-31). ......................................... 30

IV.  Plaintiffs have failed to prove that their theory of causation more likely than not caused the EBIA floodwall failures.  (Pls. PTB, pp. 50-87). ......................................................................... 36

     A.   Pressure and flow cannot be decoupled.  (Pls. PTB, pp. 54-57, 60-61, 65-72). ..................... 37
     B.   Plaintiffs' near breach model does not corroborate their flawed breach modeling. (Pls. PTB, p. 70)................................................................................................................. 39
     C.   Piezometers installed at the EBIA Post-Katrina do not corroborate Plaintiffs' theory.  (Pls. PTB, pp. 67-69). .................................................................................................... 44
     D.   The EBIA floodwall elevation was lowest at the north and south breaches.......................... 46
     E.   Plaintiffs' criticisms of Defendants' testimony and opinions about the likely causes of the EBIA failures are unavailing and cannot serve as a substitute for Plaintiffs' failure to meet their burden of proof.  (Pls. PTB, pp. 72-87). .................................................................... 49

DAMAGES ......................................................................................................................... 57

CONCLUSION.................................................................................................................... 58

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Freeman v. United States*, 556 F.3d 326 (5th Cir. 2009)........................................................ 15

*In re Katrina Canal Breaches Consol. Litig.*,
    696 F. 3d 436 (5th Cir. 2012)................................................................ 6, 13, 25, 28

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) ................................................... 28, 29

*OSI, Inc. v. United States*, 285 F.3d 947 (11th Cir. 2002) ....................................................... 16

*Shansky v. United States*, 164 F.3d 688 (1st Cir. 1999).......................................................... 16

*United States v. Gaubert*, 499 U.S. 315 (1991) ................................................................. 28, 29

## FEDERAL STATUTES

Pub. L. No. 89-268, 79 Stat. 1073 (1965)............................................................................. 13, 25

33 C.F.R. § 208.10(a)(5) ............................................................................................................ 23

33 U.S.C.A. § 702c ........................................................................................................................ 6

## ENGINEERING MANUALS

ER 1110-2-1150: Engineering and Design for Civil Works Projects ................................... 17

EM 1110-2-1913: Design and Construction of Levees.............................................................. 19

EM 1110-2-2502: Retaining and Flood Walls............................................................................ 20

EM 1110-2-2504: Design of Sheet Pile Walls........................................................................... 20

EM 1110-2-5027: Confined Disposal of Dredged Material..................................................... 21

EM 1110-2-1901: Seepage Analysis and Control for Dams .................................................... 22

## INTRODUCTION

After years of litigation, including the *Barge* trial in which Dr. Bea testified that underseepage contributed to the EBIA floodwall breaches, Plaintiffs and Dr. Bea finally concede that underseepage—water flows and pressure transmitted under the floodwall through the clay foundation—played no causative role in the EBIA floodwall failures. (Pls. Post-Trial Brief ("PTB"), Doc. 21110, pp. 53-54). They had little choice but to do so, since the predominantly clay soils in the EBIA could not have conveyed significant flows of water under the floodwall during Katrina's 30-hour storm surge event. This admission should be sufficient *by itself* to enter judgment in favor of the Defendants.

Since Plaintiffs cannot link WGI's work to either underseepage or the land side soils that were significant in the EBIA floodwall failures, they conjured an unscientific scenario where the soils and activities in the EBIA and on the canal side might theoretically matter. But to prove their novel theory, Plaintiffs had to disregard accepted geotechnical principles and empirically verified soil properties to posit that hydraulic pressures are instantaneously transmitted without any flow of water, contrary to the equations that civil and geotechnical engineers use to model seepage and uplift problems. Preeminent geotechnical engineers in this case uniformly testified that Plaintiffs' causation theory cannot be squared with science or fact. These engineers explained how the EBIA floodwall failed using conservative and conventional scientific methods, empirical data, and measured soil properties. They confirmed that the soils that mattered were all on the land side of the floodwall, where WGI performed no work. Soils affected by WGI played no role in the EBIA floodwall failures.

In addition to its disregard for basic soil and fluid mechanics, Plaintiffs' post-trial brief is notable for what it does not and cannot explain.  Plaintiffs offer no credible explanation for why Dr. Bea's "self-reinforcing" near-breach scenario—the scenario that supposedly provided the "control" proving the alleged deleterious effects of excavations reaching the EBIA organic clay near the north and south breach sites—was modeled using different initial gradients and properties than were their north and south breach models. They have no evidence to rebut the fact that the "near breach" model *could not* have been a control because it included the borrow pit—the largest excavation undertaken in the EBIA—which not only reached the organic clay but was filled with water before Katrina's surge inundated the EBIA.   The only thing "self-reinforcing" about Plaintiffs' "near breach" model was how differently it was modeled compared to Dr. Bea's north and south breach models, models which themselves relied on unjustifiably high initial seepage gradients and indisputably ignored the field-tested and scientifically measured soil properties.

Plaintiffs also offered no evidence to substantiate their claim that soil conditions at the EBIA instantly reached steady state or steady flow conditions during Hurricane Katrina's short-term storm surge.  While a baseline steady state condition existed before Katrina's surge waters inundated the EBIA, owing to the naturally occurring presence of groundwater and changes in elevation between the canal side and the land side, that baseline condition showed minimal gradients, *i.e.*, negligible flow and uplift pressures across the entire area.  Once surge waters inundated the EBIA, the clay soils beneath *had* to undergo changes before a new equilibrium and steady state could be achieved.   In clay soils, these changes take far longer than the 30 hours that transpired before the breaches occurred.

In contrast to Dr. Bea, the licensed geotechnical engineers in this case uniformly explained that it would take months to years before steady state conditions would arise in these clayey soils following Katrina's surge.  This is how the laws of soil and fluid mechanics operate, and Plaintiffs agree with the science up to a point, *i.e.*, until it becomes necessary to tie WGI's activities to the land side soils of the EBIA floodwall.  Then, in Plaintiffs' world, accepted geotechnical principles must be abandoned, and hydraulic pressure changes on the land side occur instantaneously and without flow of water.  But Plaintiffs offered no evidence, other than Dr. Bea's say-so, that these changes could have occurred instantaneously, or that hydraulic pressures could be transmitted to the land side through this clay soil in the absence of flow.  It is no wonder that even Dr. Bea described the genesis of his theory as a "eureka moment," since his theory defies well-accepted and commonly understood geotechnical principles.

In addition to their inability to establish negligence or causation, Plaintiffs' efforts to overcome the government's immunity suffer from clear contradictions and depend on arguments that the Fifth Circuit has now rejected.  Plaintiffs offered no evidence to rebut or counter the fact that the geotechnical evaluations they claim were required were geotechnical evaluations of the floodwall itself, evaluations that are (and were) an integral part of the floodwall design process, triggering the government's immunity under the Flood Control Act and the FTCA's discretionary function exception.  They ignore that these very evaluations in fact were made as part of the EBIA floodwall's design and construction, and that because the clay soils in the EBIA floodwall foundation and land side governing the original seepage assessment remained unchanged since 1966, no competent geotechnical

evaluation performed at the time WGI conducted its canal side activities would have revealed any increased risk of seepage or uplift during a storm surge event.

Plaintiffs deliberately ignored this crucial evidence and fail to acknowledge that the only soils that mattered for geotechnical evaluations of the floodwall were in the foundation and on the land side, where WGI performed no work whatsoever.  They also ignored that the Corps and its personnel were well-apprised of the location of WGI's work and the nature of the soils in the EBIA floodwall foundation, and that this knowledge provided a sound basis for concluding that none of WGI's work would adversely impact the EBIA floodwall.

In addition, Plaintiffs altogether disregarded the trial testimony of their own expert, Dr. David Rogers, who conceded that the Corps's engineering manuals provide only guidance and do not mandate any particular actions be taken with respect to the design or maintenance of as-built flood control structures like the EBIA floodwall.  Most of the manuals cited by Plaintiffs apply to work other than that which as it issue in this case.  But even if it were assumed that they applied here, these manuals contain principles for engineers to consider depending on the site-specific conditions and circumstances.  They do not prescribe specific actions or mandate when and how the Corps performs seepage assessments at floodwalls or how seepage conditions should be controlled if they exist.

Tellingly, it was never disputed that seepage and stability evaluations were made, consistent with the design principles contained in those manuals, as part of the EBIA floodwall design.  Plaintiffs can only claim that the Corps was negligent in continuing to rely on its extensive experience and engineering judgment that the original floodwall design remained adequate.  This claim implicates the same flood control activities—seepage and

4

stability evaluations—that were performed in the original design-review process, and it is therefore barred by the Flood Control Act.

Moreover, even if there were evidence to support Plaintiffs' claim that a new assessment of the EBIA floodwall was warranted, which there was not, the Corps retained discretion to determine whether and to what extent any measures should be taken to ensure that the EBIA floodwall retained its authorized surge-fighting capability.  This discretion obtained in the original LPV authorization and remained in place through the life of the New Lock Replacement Project and WGI's remediation work on Task Order 26, which formed an integral part of the New Lock Project itself.  None of the manuals Plaintiffs have cited removed that discretion.  The evidence demonstrated that where new flood control structures were designed, the Corps completed the required geotechnical evaluations.  Where the existing floodwall was to remain in place, the Corps relied on the existing design analyses, which included all of the analyses that were required to assess the potential impact of WGI's work and confirm that the work would not adversely impact seepage conditions at the EBIA floodwall.

Because Plaintiffs cannot claim that the required seepage and stability analyses were not performed, they are forced to claim that the Corps should not have relied on the existing design.  But to impugn the Corps for relying on the existing design logically requires proof that the existing design was in some way deficient.  Plaintiffs understandably attempt to disavow any claim of design deficiency to avoid the government's Flood Control immunity.   This attempt is undermined by their own expert, however, because Dr. Bea expressly opined that the original design was deficient, and that

the design deficiency carried forward through the time that WGI performed its remediation work.

Based on the unchallenged testimony that only the previously-assessed clay soils in the EBIA floodwall foundation mattered for the purpose of evaluating seepage and uplift at the EBIA floodwall, Plaintiffs cannot avoid the obvious—that their claims directly implicate the Corps's EBIA floodwall design and the original design assessment that seepage and uplift would not threaten the floodwall during a short-term storm surge.  The Flood Control Act bars this claim.  Moreover, any abuse of the Corps's discretion in continuing to rely on the existing floodwall design—and there was none—would squarely be immunized by the FTCA's discretionary function exception.

**I.     The Corps satisfied the duty alleged by Plaintiffs (Pls. PTB, pp. 8-10, 16-24), but even if that duty was not satisfied, Plaintiffs' claims fundamentally arise out of flood control activity, rendering the United States immune under § 702c (Pls. PTB, pp. 25-33).**

Plaintiffs' post-trial briefing on the Flood Control Act immunity conferred by 33 U.S.C. § 702c consists of a single paragraph asserting that, because this Court once ruled that remediation of the EBIA "had nothing to do with drainage of the city or flood protection," § 702c cannot apply.  (Pls. PTB, p. 33; *see also id.* p. 3: "Flood control immunity is not available . . . because the negligent acts that caused Plaintiffs' damages were 'entirely extrinsic' to the LPV and any flood control activity.").  Tellingly, Plaintiffs make no attempt to square this conclusory assertion with the Fifth Circuit's recent opinion rejecting this categorical approach, albeit in *dicta*, in favor of a rule that immunizes the government for flood control activities even where the project at issue is not primarily or substantially related to flood control.  *In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 447 (5th Cir. 2012).

The reason for Plaintiffs' omission in this regard is simple: Plaintiffs can no longer take cover from the government's § 702c immunity simply by claiming that Task Order 26 and WGI's remediation work did not specifically involve flood protection or flood control structures or projects. Without this categorical distinction, Plaintiffs' allegations and the evidence at trial make clear that their claims against the Corps all arise out of flood control activities—obligations pertaining to seepage and stability evaluations of the EBIA floodwall—regardless of the actual purpose of WGI's remediation work in the EBIA.

In fact, seepage and stability evaluations are hallmark components of the levee and floodwall design process. Plaintiffs' expert, Dr. Rogers, testified that the Corps's engineering manuals consider seepage control a "primary consideration of floodwall design," and certainly not a single expert that testified in this trial disagreed. (Rogers Tr. 661; JX-0040-0169). If there were any lingering doubt about the nexus between flood control structures and seepage and stability analyses, one need only look at the comprehensive and exhaustive seepage and stability analyses of the EBIA floodwall performed by the causation experts in this case.

At bottom, Plaintiffs' claims about the need for geotechnical floodwall evaluations while simultaneously claiming that WGI's remediation activities had nothing to do with flood control activities are facially contradictory. On the one hand, Plaintiffs claim that WGI's remediation activities, completed as part of the New Lock Replacement Project, had nothing to do with flood control activity. (Pls. PTB, p. 33). If this were true, there would be no need for seepage and stability evaluations of the adjacent levee and floodwall, since such evaluations are *only* required due to the proximity of the flood control structure. If seepage and stability evaluations are not required, the Corps could hardly be faulted for failing to

7

perform them, and judgment should immediately be entered for the United States. Plaintiffs surely would not have filed suit if they did not believe seepage and stability evaluations, *i.e.*, flood control activities, were implicated.

Hence, Plaintiffs allege that the Corps failed to perform seepage and stability evaluations to ensure that WGI's work did not "enhance the risk of flooding during hurricanes." (Pls. PTB, p. 21). This sounds like flood control activity because it is: these assessments plainly are flood control-related tasks, undertaken to ensure the integrity of the floodwall being evaluated. (*See* Rogers Tr. 573-74 (testifying that the reason the Corps evaluates excavations near a floodwall is to maintain the integrity of the flood protection system); *see also* USA PTB, pp. 78-79 n. 32 (collecting testimony of Dr. Grieshaber that the Corps evaluates work for adverse impacts on the ability of the floodwall to withstand the conditions it was designed to withstand)).

Plaintiffs repeat throughout their post-trial briefing that the Corps's *duty* was to evaluate WGI's work for potential impacts on the adjacent EBIA floodwall, in particular the potential for seepage and uplift. (*See, e.g.,* Pls. PTB, pp. 8-10, 18-19, 26-28, 30). Leaving aside for the moment that this duty, on its face, implicates flood control activity, Plaintiffs continue to ignore that this duty was met: the potential for seepage and uplift was evaluated at the time the EBIA floodwall was designed, and this evaluation remained valid unless and until WGI, or some other person or entity, disturbed the impermeable clay soils in the foundation and on the land side of the EBIA floodwall. (*See* GDM No.3, JX-0004-0114; Lucia Tr. 2927, 2932-34, 2974-75). Whether or not WGI's excavations had the potential to alter the original design assessments for seepage and uplift potential is only understood by revisiting and considering the design document to see whether the design conditions, in

particular the foundation soils, have been altered in any appreciable way.  Dr. Grieshaber's

testimony made this clear, as did Dr. Lucia's.  (USA PTB, pp. 78-79 n. 32; Lucia Tr. 2931-34;

DX-DM-1005-0032-33).  In other words, to evaluate whether WGI's work adversely

impacted the original assumptions about seepage and uplift, the Corps necessarily engaged

in quintessential flood control activity—revisiting or relying on the floodwall design itself.

Plaintiffs' allegations of negligence *cannot* be proved without examining the adequacy of

the Corps's original EBIA floodwall design.  The Flood Control Act bars these claims.

But even if the Flood Control Act did not apply, Plaintiffs' claims are still meritless.

No one disputes that the 1966 Design Memorandum for the EBIA floodwall evaluated the

potential for seepage and uplift pressures during a short-term storm surge event.  The

Corps's determination at that time was that seepage and uplift were unlikely to pose a

threat based on the clay foundation soils and the short-term duration of the anticipated

surge.  (JX-0004-0114).  Dr. Lucia extensively detailed for this Court the soundness of the

Corps's methodology and judgment based on the clay soil in the foundation and on the land

side and the short-term duration of the anticipated loading condition on the wall.  (*See* USA

PTB, pp. 113-16).  His testimony that the 1966 design assessment remained valid and

geotechnically sound through the time that WGI performed remediation activities in the

EBIA was never challenged.  In other words, the Corps relied on the seepage and uplift

assessments made when the EBIA floodwall was designed and constructed because WGI's

work, confined to the canal side, did not change the foundation and land side soils that

mattered.

Rather than address the substance of Dr. Lucia's testimony, Plaintiffs have instead

mischaracterized or seem otherwise confused about Dr. Lucia's testimony and what the

1966 Design Memorandum for the EBIA floodwall contained.  For example, Plaintiffs argue that the 1966 Design Memorandum could not have contained an acceptable geotechnical analysis because it "did not detail or address any of the proposed excavation of the massive contaminants and subsurface obstructions at Boland and Saucer Marine," was "never updated to account for the numerous unknown contaminants and obstructions that were subsequently discovered due to the prolific grid trenching that occurred throughout the entire EBIA," and was not "updated to account for the soil borings that were taken specifically characterize the geology of the EBIA on the very year the remediation project began."  (Pls. PTB, p. 47-48).

But contrary to Plaintiffs' misdirected focus on contaminants and obstructions, the geotechnical analyses material to this case are the stability and seepage assessments of the EBIA floodwall.  Those are the relevant analyses contained in the 1966 Design Memorandum, and as Dr. Lucia made clear, the assumptions and assessments made in 1966 remained valid at the time WGI planned and performed its work, including the removal of contaminants, obstructions, and grid trenching.  (Lucia Tr. 3007-08, 3026-27).

Put differently, Plaintiffs' premise—that the 1966 Design Memorandum needed to be updated—is false because none of WGI's work changed or altered the original design assessments and analyses.  The minimum control line for stability was not violated on the canal side of the floodwall, as WGI's work, including the grid trenching, took place more than 15 to 20 feet from the floodwall itself.  And with respect to seepage, WGI's work had no effect because the only soils that mattered—the clay soils in the foundation and on the land side of the floodwall—were not disturbed in any way.  (Lucia Tr. 3026-27).  Thus, none of the analyses in the 1966 Design Memorandum needed to be updated—WGI's work

*did not alter* the geotechnical evaluations material to the integrity of the floodwall against the design load condition:  a 13-foot storm surge on the face of the wall.

Nor are Plaintiffs correct that the MMG borings were relevant in any way to the 1966 Design Memorandum.  First, the MMG borings were not geotechnical borings and would not have been relied upon by geotechnical engineers to reliably classify soils for geotechnical engineering properties.  As was pointed out during trial, MMG relied on visual classifications only and did not perform any testing to obtain the kind of data, such as liquid limits or Atterberg limits, that could be used to properly classify the soils.  (Stark Tr. 3467-68).

But more importantly, all of the MMG borings were taken on the canal side of the floodwall and could not have mattered for purposes of analyzing seepage.  As Dr. Lucia explained, the soils that mattered for purposes of evaluating seepage were the foundation soils and the land side soils.  (Lucia Tr. 2927, 2932-34, 2974-75, 3026-27).  These soils—fat and organic clays—were the same soils in 1966 and 2005.  This fact—that the same soils were still there in 2005—is unassailable.  As Plaintiffs' expert Dr. Rogers explained, "The dirt's still there, it's the fundamental premise of [geotechnical engineering]."  (Rogers Tr. 632; *see also* Lucia Tr. 3026-27).

Compounding their error, Plaintiffs mistakenly assert the MMG borings revealed a "permeable" swamp/marsh layer roughly five feet closer to ground surface than the one portrayed in the 1966 Design Memorandum.  (Pls. PTB, p. 48).  The "swamp/marsh" Plaintiffs refer to is organic clay, the same organic clay that was assigned a low permeability of $10^{-5}$ cm/sec as a result of the joint soils exploration program.  (*See* Doc. 20920, p. 38 ¶ 87).  There were no permeable seams or layers at 5 to 6 feet below ground

surface, nor were there permeable layers or seams at 11 to 13 feet.  It bears repeating:  the same impermeable fat and organic clays that formed the basis for the Corps's seepage assessment in 1966 remained in place up to and through 2005.  (Rogers Tr. 632).

Plaintiffs make the self-evident assertion that the original EBIA floodwall design did not consider WGI's future work because this work had not occurred at the time the Design Memorandum was completed.  (Pls. PTB, pp. 36, 47).  Though true, this is beside the point.  The 1966 EBIA floodwall memorandum is significant because *in retrospect* it demonstrates that none of WGI's work could have diminished the stability or the seepage resistance of the EBIA floodwall.  The 1966 Design Memorandum explains *why* the Corps's engineering judgment in approving WGI's work in the EBIA was sound.

In sum, Plaintiffs allege negligence with respect to seepage and stability analyses.  These are, without a doubt, flood control activities.  Crucially, these flood control activities indisputably were undertaken and completed when the EBIA floodwall was designed and constructed.  When the Corps approved WGI's work, it relied on its judgment that WGI's work had no impact on the original seepage and stability assessments contained in the 1966 Design Memorandum.  Plaintiffs complain that no one "went to the drawer, dusted off the 34 year-old analysis, reviewed it, and declared that WGI's massive remediation project would not impact the floodwall protecting Plaintiffs' lives and property."  (Pls. PTB, p. 36).  But these contentions that the Corps negligently failed to ascertain the efficacy of its initial underseepage assessment lie beyond this Court's jurisdiction.  The Corps's reliance on the original design implicates the same flood control activities—seepage and stability assessments—that went into that design in the first place.  The Flood Control Act bars these claims.

II.   **The FTCA's discretionary function exception bars Plaintiffs' claims.  No manual or policy mandated that the Corps do something that it failed to do with respect to the EBIA floodwall.  (Pls. PTB, pp. 34, 38-40).  Whether to revisit the 1966 assessment, undertake a new assessment, or take additional remedial measures to ensure the EBIA floodwall retained its authorized flood protection are all choices that properly would have been guided by the social, economic, and political policies that animated the LPV flood-control project.  (Pls. PTB, pp. 34-50).**

The United States previously set forth the reasons that the FTCA's discretionary function exception bars Plaintiffs' claims in this case, particularly in light of the Fifth Circuit's recent decision in *In re Katrina Canal Breaches Litig.*, 696 F.3d 436 (5th Cir. 2012). (*See* United States Post Trial Briefing, Doc. 21111, at 85-97).  Those arguments need not be repeated here.  It is sufficient to point out that Plaintiffs do not attempt to distinguish this case from the Fifth Circuit's holding so much as to express their disagreement with the Fifth Circuit's reasoning.  They ask this Court, in essence, to disregard that reasoning and ignore the Corps's broad statutory discretion in how to achieve and maintain the authorized level of flood protection along the EBIA by focusing only on "scientific principles" contained in several engineering manuals.  (*See generally* Pls. PTB, pp. 33-34).

Plaintiffs' attempt to avoid the FTCA's discretionary function exception misses the mark in several ways.   Foremost, Plaintiffs wholly ignore that the EBIA floodwall design, which included the assessments of seepage and stability they claim were required, undoubtedly was the product of the Corps's discretion in determining how to achieve the level of flood protection authorized by Congress.  *See* Pub. L. No. 89- 268, 79 Stat. 1073, 1077 (1965).  The stability and seepage analyses contained in the 1966 Design Memorandum for the EBIA floodwall confirm that, based on the soil conditions and the anticipated hydraulic loading condition, the floodwall and levee was expected to remain

13

stable and resist seepage and uplift pressures during a short-term hurricane storm surge.
(JX-0004-0114).

Thus, *any* potential impact on the stability or seepage resistance of that floodwall,
whether from excavations or removal of obstructions or contaminants, can only be
evaluated by reference to the geotechnical engineering assessments and decisions that the
Corps made when it designed that floodwall to withstand the authorized 13-foot design
storm surge condition back in 1966.  Plaintiffs act as though these design assessments
never existed, failing to even *reference* the authorizing statute for the EBIA floodwall
anywhere in their briefing.  But these assessments provide both the starting and end point
for understanding why WGI's work was unlikely to reduce the authorized level of
protection.

The magnitude of Plaintiffs' error in disregarding the statutory authorization for
designing the EBIA floodwall cannot be overstated.  *If* remedial measures should have been
taken to ensure that the floodwall retained the authorized level of protection, the Corps's
decisions necessarily would have implicated the same considerations and policies that
guided the original design, construction, and maintenance of the LPV levee and floodwall to
provide that authorized level of protection in the first place.  In other words, *if* remedial
measures were required, what measures to take, when to take them, and how to take them
would be susceptible to the same policy considerations that inhered in the design and
construction of the EBIA floodwall and the LPV project as a whole.

Assuming, for a moment, that there was any merit to Plaintiffs' contention that
WGI's excavations could have increased the risk for seepage and uplift on the land side of
the EBIA floodwall, any remedial measure, whether it be driving a deeper sheet pile or

recommending use of clay backfill, would directly implicate the Corps's discretionary

decisions about how to maintain the EBIA floodwall's authorized level of protection.  If

Plaintiffs' contention had any merit, and it does not, the challenged conduct would directly

implicate flood control design, *not* the environmental remediation project or lock

construction.

But rather than deal with the fact that their challenged conduct directly implicates

the Corps's flood control mission and the flood protection authorized by Congress,

Plaintiffs try to seek cover in the Corps's engineering design manuals—manuals that their

own expert conceded provide only engineering guidance, not engineering directives—to

claim that the Corps cannot avail itself of the discretionary function exception.  Reliance on

these manuals is misplaced because these manuals provide general principles and

guidance, not mandatory directives.  Tellingly, the Corps applied those principles when it

assessed seepage and uplift potential in designing the EBIA floodwall.  The fact remains

that, although Plaintiffs continue to claim that the Corps never performed geotechnical

evaluations to ensure that WGI's remediation work would not impact the floodwall, the

record clearly established that, if such a mandate existed, the Corps complied with that

mandate—just not in the manner that Plaintiffs think it should have been done.

### A.  The manuals plaintiffs cite do not supply any applicable mandatory directives.  (Pls. PTB, pp. 38-40).

Agency manuals that provide only objectives and principles for a government agent

to follow do not create mandatory directives sufficient to overcome the FTCA's

discretionary function exception.  *See Freeman v. United States*, 556 F.3d 326, 338-39 (5th

Cir. 2009) (noting that manuals that contain "generalized, precatory, or aspirational

language" are too general to prescribe specific courses of action for an agency or employee

to follow); *see also OSI, Inc. v. United States*, 285 F.3d 947, 951-52 (11th Cir. 2002) ("we hold that an agency manual which provides only objectives and principles for a government agent to follow does not create a mandatory directive which overcomes the discretionary  function exception to the FTCA."); *Shansky v. United States*, 164 F.3d 688, 691 (1st Cir. 1999) (holding that general statements in manuals regarding safety do not specifically prescribe particular safety measures to be employed in any particular place or at any particular facility but suggest that government employees must make discretionary judgments about how to concretely apply the general goals outline in the manual).

Plaintiffs make little to no attempt to show how or why any of the manuals or regulations they cite even applied to the conduct at issue, simply claiming in conclusory fashion that these manuals applied to "Defendants' conduct," mandated "an analysis" of WGI's remediation activities, and were ignored.  (Pls. PTB, p. 38).  As previously discussed, every engineering manual Plaintiffs have cited provides only "guidance for engineering analyses and decision."  (Rogers Tr. 654).   Even a cursory review of the manuals and regulations cited by Plaintiffs makes clear that these manuals do not prescribe specific and mandatory directives, just as their own expert testified.  They contain only principles for understanding the effects of seepage, how seepage may be evaluated, and how seepage might be accounted for if *design* evaluations reveal that seepage is likely to pose a problem. The Corps took account of all of these principles when it designed the EBIA floodwall. Application of these principles must be viewed through the lens of the Corps's discretionary authority to determine how to achieve the level of flood protection authorized by the original LPV legislation.  If these manuals are relevant to any issue in this

case, it is that negligence in floodwall and levee design are at the heart of Plaintiffs' claims in this case.

- ER 1110-2-1150: Engineering and Design for Civil Works Projects

The prefatory language to this regulation plainly states that it "provides guidance for developing and documenting quality engineering analyses and designs for projects and products on time and in accordance with project management policy for civil works activities." (JX-0044-0004 ¶ 1).  Indeed, several paragraphs later, it is emphasized again that "[t]his regulation provides policy guidance to be used with professional engineering judgement [sic] in the development of engineering products." (*Id.* ¶ 6).  The guidance provided is for the design of new projects, work to modify existing projects, and work for others.  (*Id.* ¶ 2).

As Lee Guillory testified, and as the record clearly reflects, the New Lock replacement project, at the time Katrina struck, had three Design Documentation Reports ("DDRs") associated with it, consistent with the policy guidance described in ER 1110-2-1150.  (Guillory Tr. 2350).  A DDR was prepared for the new flood protection, as well as for the new lock itself, both *new* civil works projects that would completed as part of the New Lock project.  (JX-0017 (DDR No.2, Lateral Flood Protection, JX-0018, Levees, Floodwalls, and Channels); JX-0019 (DDR No. 3, New Lock Foundation Report); *see also* DX-DM-1005-0014).  But as this Court heard, no *new* DDR was required for the existing EBIA floodwall that was to remain in place because all of the relevant geotechnical analyses and other considerations were already contained in the 1966 Design Memorandum and remained valid.  (Lucia Tr. 2916, 3026).

Moreover, Mr. Guillory explained that a separate DDR was not required for the work specifically undertaken in Task Order 26 because Task Order 26 was a preliminary contract for the New Lock replacement, which was covered by DDRs in its own right.  (Guillory Tr. 2350).  Those DDRs included DDR No. 1, Site Preparation and Demolition (JX-0009-0016); DDR No. 2, Lateral Flood Protection (JX-0017-0018); and DDR No. 3, New Lock Foundation Report (JX-0019).  The work on Task Order 26 was instead covered by other documents, including design criteria reports and the recommendation report, which served the same function as a DDR.  (Guillory Tr. 2350).

Thus, Plaintiffs' attempt to rely on ER 1110-2-1150 as a basis for nullifying the discretionary function exception fails on multiple counts.  Plaintiffs cannot establish that it applied.  Even if they could, the plain language of the regulation confers guidance only, and could not be used to supplant the Corps's judgment about when new seepage assessments of existing floodwalls must be performed or how they should be performed.

Most importantly, the geotechnical evaluations that Plaintiffs claim were required by ER 1110-2-1150—seepage assessments by which the impact of WGI's work on the adjacent floodwall could be known—were all completed and in existence.  The 1966 Design Memorandum for the EBIA floodwall, completed some 30 years before ER 1110-2-1150 was even published, provided all the necessary framework and analyses for evaluating the potential impact of WGI's work and understanding why that work would not imperil the EBIA floodwall in any way.  That Design Memorandum contained precisely what Plaintiffs contend 1110-2-1150 required.

Plaintiffs' complaint seems to be that there was no documented statement *declaring* that "WGI's massive remediation project would not impact the floodwall."  (Pls. PTB, p. 36).

But nothing in ER 1110-2-1150 or any other statute, regulation, or manual compelled to Corps to document its judgment in precisely the manner Plaintiffs claim, and for the reasons already set forth in the United States' Post-Trial briefing, the absence of a written statement documenting good engineering judgment does not mean that the Corps's judgment was not competently exercised or that they failed to do something that was required.  (*See* USA PTB, pp. 111-12; Lucia Tr. 2952-53, 3008-09).

The remainder of Plaintiffs' complaint—that the seepage assessment from 1966 could not plausibly have remained valid in light of "new" information—should be seen for what it is:  a claim that the EBIA floodwall design itself needed to be reassessed.  Even discounting the fact that the soil conditions that mattered for purposes of evaluating seepage were not changed by WGI's work, eliminating the need for a new seepage assessment, if Plaintiffs are correct that a new seepage assessment was warranted, their claims go to floodwall design and are clearly barred by the discretionary function exception and the Flood Control Act.

- EM 1110-2-1913: Design and Construction of Levees

Plaintiffs cite this manual for the proposition that seepage potential under a levee must be evaluated.  (Pls. PTB, p. 38).  No one disputes this principle, and it is clear that the Corps did evaluate seepage potential under the EBIA floodwall and levee when it was designed.  On its face, EM 1110-2-1913 presents "basic principles used in the design and construction of earthen levees."  (JX-0046-0011 ¶ 1-1).  Nothing in the manual is "intended to supplant the judgment of the design engineer on a particular project."  (*Id.* ¶ 1-4).  While this manual certainly sets forth good geotechnical engineering principles, it does not create

any specific, mandatory directives, let alone any directive that the Corps failed to follow when it designed and constructed the EBIA floodwall and levee.

- EM 1110-2-2502: Retaining and Flood Walls

This manual plainly states that it "provides guidance for the safe design and economical construction of retaining and floodwalls." (JX-0040-0003 ¶ 1). It sets forth geotechnical principles that no one disagrees with, *i.e.*, that water-retaining structures can be subject to underseepage and that seepage control is a "primary consideration" of flood wall design. (*Id.* 0169 ¶ 7-3). Unsurprisingly, the need for seepage control measures is "highly dependent on site-specific conditions, particularly the stratification and permeability of foundation materials." (*Id.*). The Corps's EBIA floodwall design considered these very things and determined that the foundation was impermeable and that seepage control was not necessary. WGI's canal side remediation activities did not alter the foundation conditions. Plaintiffs' reliance on this manual does not vitiate the discretionary function exception, but reinforces why it applies: the principles set forth in this manual deal with design, and the Corps's design decisions are protected by the discretionary function exception.

- EM 1110-2-2504: Design of Sheet Pile Walls

Like with the other manuals Plaintiffs cite, this manual provides "design guidance" for geotechnical and structural engineers. (JX-0042-0003 ¶ 1). It sets forth a principle that no one disagrees with: that in designing flood walls, "foundation underseepage conditions must . . . be assessed." (*Id.* 0016 ¶ 3-1a.). The manual instructs that seepage analyses should "consider the permeability of the surrounding soils," and that ultimately it is the designer's responsibility to determine whether the final design requires additional

analyses.  (*Id.* 0032 ¶ 4-5b.).  The Corps evaluated seepage based on the permeability of the foundation soils when designing the EBIA floodwall.  If Plaintiffs take issue with that analysis, they are again taking issue with the Corps's floodwall design.

- EM 1110-2-5027: Confined Disposal of Dredged Material

Again, this manual "provides guidance for planning, designing, constructing, operating, and managing dredged disposal areas."  (JX-0038-0003 ¶ 1).  On its face, it does not direct any specific actions and merely sets forth guiding principles for engineers to consider.  If Plaintiffs contend that this case involved the design of a dredged material retention dike, this manual clearly confers discretion on the Corps, stating that the "selection of a design and construction method are dependent on project constraints, foundation conditions, material availability, and availability of construction equipment. The final choice will be a selection among feasible alternatives."  (*Id.* 0090 ¶ 6-1b.).

Plaintiffs seem to suggest in citing this manual that the Corps should have engaged in more extensive field investigations because underseepage problems were "severe."  (Pls. PTB, p. 39).  But this is simply untrue.  The EBIA flood wall foundation was known to consist of fine-grained, impermeable clays not susceptible to seepage.  Indeed, EM 1110-2-5027 states that fine-grained, cohesive soils can be assumed to be essentially impervious in seepage analyses.  (JX-0038-0096, Table 6-4).  Plaintiffs' own expert, Dr. Rogers, agreed that fine-grained materials include clays, such as those in the foundation of the EBIA floodwall and levee.  (Rogers Tr. 646, 655).  Indeed, both Lee Guillory and Dr. George Bacuta, an integral member of Mr. Guillory's team and a professional geologist in the Corps's engineering division, understood that the EBIA area consisted predominantly of clay.  (Guillory Tr. 2380-81, 2396).  If the Corps's assumptions about the foundation of the

EBIA floodwall were incorrect, and reliance on the EBIA floodwall design misplaced, those errors inhered in the design of the floodwall itself.

- EM 1110-2-1901: Seepage Analysis and Control for Dams

It is not disputed that this case deals with hurricane protection levees, not dams. And as Plaintiffs' expert Dr. Rogers testified, seepage analyses for dams and hurricane levees differ because one of the primary factors in a seepage analyses is the duration that water is loaded against the face of the protection structure. (*See* Rogers Tr. 639). A different seepage analysis is used for a short-term loading condition, like that which occurs at a hurricane levee, than for a dam. (*Id.*). To that end, given the transient and short-term duration of storm surge loading on hurricane levees, the methods of analysis contemplated in EM 1110-2-1901 do not, strictly speaking, apply to the transient seepage conditions encountered at hurricane protection levees. (*See* JX-0037-0060 ¶ 4-1 ("Seepage as used in this manual is defined as the flow of water through homogenous saturated soil under steady-state conditions. . . . Thus transient conditions . . . are not considered for analysis.").

There is no dispute that the *effects* of seepage can be similar at levees and dams, and general principles for understanding how seepage occurs and can be controlled are contained in this manual. But Plaintiffs' reliance on EM 1110-2-1901 fares no better than their reliance on the other manuals because this manual presents nothing more than "design principles and guidance concerning seepage considerations for design of new dams and the evaluation of existing projects." (JX-0037-0004 ¶ 1). The Corps designed a hurricane protection levee and floodwall for short-term loading conditions, not a dam, at the EBIA. Regardless, if the Corps erred in its seepage assessment when designing that levee and floodwall, the error arose from design.

22

- 33 C.F.R. § 208.10: Local Flood Protection Works; Maintenance and Operation of Structures and Facilities

Plaintiffs claim that "CFR § 208.10 necessitated a geotechnical evaluation of the excavations' potential impact on the IHNC floodwall." (Pls. PTB, p. 40). For this proposition, they cite 33 C.F.R. § 208.10(a)(5) and state that Defendants' work was required to "be constructed in accordance with standard engineering practice" and that the District Engineer was required to determine that the work would "not adversely affect the functioning of the protective facilities." (*Id.*).

This regulation, as Mr. Colletti helpfully pointed out, deals primarily with the delegation of authority for operation and maintenance of completed flood protection works to the local levee district. (Colletti Tr. 292). It directs that completed flood protection structures and facilities be continuously maintained and operated "*as may be necessary* to obtain the maximum benefits." 33 C.F.R. § 208.10(a)(1) (emphasis supplied). Lest there be any doubt, the "maximum benefits" in this regulation refer to the completed flood protection structure continuing to function "as it was designed," *i.e.*, to withstand the authorized flood conditions that the structure was designed to withstand. (Colletti Tr. 288).

The provision that Plaintiffs cite, § 208.10(a)(5), reads as follows:

> No improvement shall be passed over, under, or through the walls, levees, improved channels or floodways, nor shall any excavation or construction be permitted within the limits of the project right-of-way, nor shall any change be made in any feature of the works without prior determination by the District Engineer or the Department of the Army or his authorized representative that such improvement, excavation, construction, or alteration will not adversely affect the functioning of the protective facilities. Such improvements or alterations as may be found desirable and permissible under the above determination shall be constructed in accordance with standard engineering practice.

23

Summarized, this provision states that if the Corps determines that the proposed work will not adversely affect the functioning of the protective facilities, *i.e.*, that the proposed work will not adversely affect the ability of the flood control structure to withstand the flood condition that it was authorized and designed to withstand, that work can proceed. The record in this case clearly established that the Corps made that determination when it approved WGI's work in the EBIA. WGI's work was not anticipated to adversely impact the stability of the floodwall or increase the risk of seepage during a 13-foot storm surge, the authorized design condition. The Corps's approval of WGI's work reflected this judgment.

Plaintiffs' real complaint is that the manner in which the Corps approved WGI's work was not documented. But nothing in this regulation states *how* the Corps must make this determination or what that determination must entail. There is no specific obligation to declare to the world the reasons why it was determined that WGI's work would not adversely impact the floodwall. It is sufficient that the work was approved, and as the record made clear, any decisions regarding how to achieve or maintain the authorized level of flood protection flow from the Corps's statutory discretion to determine how to design and construct the EBIA floodwall in the first place. Nothing in this regulation removes that discretion.

**B.   Decisions on how to maintain the authorized flood protection are susceptible to policy analysis.  (Pls. PTB, pp. 43-50).**

Plaintiffs continue to maintain the discretionary function exception cannot apply in this case because the conduct they claim the Corps should have engaged in—seepage assessments and remedial measures to prevent seepage and uplift pressures from undermining the EBIA floodwall—are scientific and technical matters not susceptible to

24

policy analysis of any kind.  The central flaw in Plaintiffs' argument is their continued

ignorance of, or indifference to, the statutory discretion afforded the Corps in determining

how to achieve and maintain the authorized level of flood protection at the EBIA as part of

the LPV project.

   The Fifth Circuit's recent decision clearly rejected the argument Plaintiffs make

here—that errors in scientific judgment automatically foreclose the government's

immunity under the discretionary function exception.  That is because, as the Fifth Circuit

recognized, when the government's discretion is grounded in the policy of the regulatory

regime, *i.e.*, where the government is afforded statutory discretion as to how to achieve and

maintain an authorized level of flood protection, decisions grounded in that statutory

regime are immune even if scientific principles are involved.  *In re Katrina Canal Breaches

Litig.*, 696 F.3d at 451.

   Plaintiffs refuse to acknowledge that the seepage assessments they claim should

have been performed and the remedial measures that they claim should have been taken

with respect to WGI's work directly implicate the Corps's statutory discretion to achieve an

authorized level of flood protection.  The LPV project legislation authorizing design and

construction of the EBIA floodwall plainly conferred discretion on the Corps in how to

achieve the authorized level of protection.  Pub. L. No. 89-268, 79 Stat. 1073, 1077 (1965).

How the Corps designed the EBIA floodwall to obtain the authorized level of protection is

necessarily the starting point for determining whether the Corps had discretion to decide

whether WGI's work would reduce the authorized level of protection and what remedial

measures, if any, should have been taken to prevent that reduction in protection.

In this case, the evidence was clear that WGI's work would *not* have been expected to change the Corps's design assessments regarding seepage and uplift pressures. (*See* Lucia Tr. 2921-23, 2931-32, 3007-08; DX-DM-1005-0032-33). Thus, Plaintiffs' premise— that a seepage assessment would have revealed an increased likelihood of seepage and uplift pressures as a result of WGI's work—is false from the start. The clay soils in the foundation and the on the land side of the EBIA floodwall were not altered by WGI's work. The Corps was well within its discretion, and did not abuse that discretion, when relying on the existing design assessment for seepage and uplift pressures. No further assessment was required for the Corps to satisfy itself that the authorized level of protection would continue to be met.

But Plaintiffs assume that had some additional assessment been done, the Corps would have been apprised that the original design assessment was no longer valid and remedial measures could have been taken.[1] Assuming for the sake of argument that this is true, any remedial measures that the Corps might have taken would not have been for the sake of the environmental remediation work being performed in preparation for the New Lock project. Any remedial measure would have been taken for the specific purpose of, and in the exercise of the Corps's discretion to achieve, the authorized level of flood protection

---

[1] Plaintiffs' assumption is demonstrably false based on standard geotechnical engineering practices that were, and still are, employed by geotechnical engineers in New Orleans and elsewhere. It must not be forgotten that Plaintiffs' dubious assumption is premised on Dr. Bea's "eureka" moment of "marrying" uplift pressures to an undrained stability analysis. (*See* USA PTB, pp. 58-59; Pls. PTB, p. 60). Dr. Bea admitted that adding uplift pressures in this way was an uncommon practice. (Bea Tr. 1089-90). In fact, if a proper undrained stability analysis is utilized, as is standard practice, these uplift pressures are already incorporated and adding them a second time violates basic geotechnical engineering principles. (*See* USA PTB, pp. 59-61). If Dr. Bea were correct, his "new" analysis would warrant re-writing geotechnical textbooks everywhere and could not have been the standard practice from 1999-2005.

for the nearby LPV floodwall.  The same policies that applied when designing and constructing that floodwall to an authorized level of protection surely apply when determining how best to ensure that the authorized level of protection continues to be met when certain design assumptions are changed.

For example, Plaintiffs complain that the use of clean river sand to backfill certain excavations after the clay borrow pit had been expended increased the risk for seepage and uplift at the EBIA floodwall.  But there is no evidence—none—that WGI's use of river sand instead of clay backfill would have made any difference in a seepage assessment at the EBIA floodwall.  The soils on the canal side were not relevant for assessing seepage and uplift.  (Lucia Tr. 2927, 2932-34, 2974-75).  Use of clean river sand comported with the purpose of Task Order 26 and the New Lock project, however, and its use was approved by the Corps.

Plaintiffs, nevertheless contend that clay backfill should have been used because it would have maintained the EBIA floodwall's authorized level of flood protection.  Even assuming, contrary to evidence, that Plaintiffs' premise might be true, the decisions and choices the Corps would have been required to make, armed with this new information, clearly implicate policy decisions about how to achieve and maintain the LPV floodwall's authorized level of protection.

For example, the Corps would have to determine whether use of clay backfill would be a cost chargeable to the LPV project or the New Lock project, whether there existed other feasible options to ensure that the EBIA floodwall's authorized protection would be kept intact, or whether the risk justified the use of any remedial measure at all.  Implicit in the discretion to decide what measures should be taken is the discretion to decide that no

27

additional measures be taken.  In this hypothetical scenario, it does not matter what the actual decisions are or how they are made.  The LPV project authorization granted the Corps discretion on how to achieve the authorized level of protection and these decisions are susceptible to policy analysis.  That is all that is required for the discretionary function exception to apply here.  *In re Katrina Canal Breaches Litig.*, 696 F.3d at 451.

Plaintiffs suggest that even if the Corps retained discretion to determine the manner and extent of the geotechnical evaluations or remedial measures required to achieve the authorized level of protection, once the Corps undertook the task, that task had to be performed non-negligently, and the discretionary function exception can no longer apply. (Pls. PTB, pp. 46-50).  Plaintiffs rely, as they have in the past, on a mischaracterization of the "unambiguous message of *Indian Towing*"—that the discretionary function exception does not apply to implementation of a government project.  (*Id.* p. 46 n.151, 50).  Plaintiffs refer to the case *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955), a case which did not address the FTCA's discretionary function exception and stands for the unremarkable and uncontested proposition that the liability of the United States under the FTCA, barring application of an exception preserving the government's immunity, depends on the existence of analogous private-person liability for similar conduct, not *identical* private-person conduct.  *See Indian Towing Co.*, 350 U.S. at 64-68.

Notably, in *Gaubert*, the Supreme Court reversed a decision of the Fifth Circuit for invoking *Indian Towing* to defeat the government's claim of immunity under the discretionary function exception.  *See United States v. Gaubert*, 499 U.S. 315, 321-22, 326 (1991).  Relying on *Indian Towing*, the Fifth Circuit in *Gaubert*, as Plaintiffs do here, attempted to draw a distinction between "policy decisions" and "operational actions," the

latter of which the Fifth Circuit believed fell outside of the discretionary function

exception's reach based on *Indian Towing*. *See Gaubert*, 499 U.S. at 321.

But as the Supreme Court ruled in *Gaubert*, its most recent pronouncement on the

FTCA's discretionary function exception, reliance on *Indian Towing* was misplaced.  The

United States never even claimed immunity under the discretionary function exception in

*Indian Towing*, instead arguing, unsuccessfully, that the conduct at issue there—

maintenance of a light in a lighthouse—was a "governmental function" for which there

existed no identical private party conduct, an entirely separate requirement for liability to

be imposed under the FTCA.  *See Gaubert*, 499 U.S. at 326.  Thus, the Supreme Court in

*Gaubert* unequivocally rejected the Fifth Circuit's reliance on *Indian Towing* to claim that

operational decisions fall outside the discretionary function's reach.  Instead, if the

operational actions or decisions are susceptible to the same policies grounded in the

statutory or regulatory regime that conferred discretion in the first place, those decisions

are immunized even when Plaintiffs allege the discretion was abused, *i.e.*, was negligently

exercised.  *Id.* at 324-26.

The United States is not contending here that the discretionary function exception

applies merely because the Corps was engaged in governmental functions.  The exception

applies because the decisions at issue here arise out of the Corps's authorized discretion as

to how to achieve and maintain the authorized level of flood protection.  Even if the Corps

*abused* that discretion, as Plaintiffs claim, by failing to use compacted clay as backfill in

certain excavations for the protection of the EBIA floodwall, the immunity applies because

any decision regarding the use or non-use of clay backfill to retain the EBIA's authorized

level of flood protection necessarily implicated the same policies undergirding the Corps's

discretion in how to obtain the authorized level of flood protection in the first place.

**III.      Plaintiffs have failed to prove negligence. (Pls. PTB, pp. 13-15, 25-31).**

Plaintiffs' core allegation, as best as can be discerned from their briefing, is this:

> Had Defendants properly evaluated the impact their excavation, backfilling,
> and compaction actions could have on the adjacent floodwall, they would
> have verified the hydraulic connection between the IHNC and the subsurface
> deposits supporting the adjacent floodwall protecting Plaintiffs.  Had
> Defendants performed those analyses they could have taken appropriate
> measures to protect against the possibility of an increased surge in the IHNC
> transmitting seepage and uplift pressures through the swamp marsh layers
> and ultimately destabilizing the adjacent floodwall.

(Pls. PTB, p. 30).  Breaking this allegation into pieces, Plaintiffs claim that (1) there existed

a hydraulic connection between the IHNC and the EBIA soils; (2) a proper geotechnical

evaluation would have revealed an increased risk of seepage and uplift pressure under the

EBIA floodwall as a result of that connection; and (3) remedial measures should have been

taken to counteract this risk.

The evidence at trial, however, clearly demonstrated that every premise underlying

these allegations was unfounded.  To begin, the hydraulic connection between the IHNC

and the EBIA soils *always* existed.  It was a naturally occurring phenomenon—all soils in

the vicinity of the EBIA were in some way connected to the IHNC.  (*See* Marr Report, App. H,

JX-1872-0016-17).  There was a natural groundwater table at the EBIA that was influenced

by naturally occurring changes in the IHNC water elevation.  The groundwater flow at the

site was controlled by Darcy's law, and reflected both the low permeability of the soil and

the minimal gradients that existed on the site.  WGI and the Corps were well aware of it,

and as Dr. Lucia testified, knowledge of the groundwater conditions would not create any

cause for alarm or suggest an increased risk of seepage during a flood condition at the site.[2] (Lucia Tr. 3021-22).

Indeed, Dr. Marr and Dr. Stark both performed a baseline seepage analysis to determine what the naturally occurring gradients and flow conditions were at the EBIA before any flood waters began to rise on the site. Although a naturally occurring gradient existed because the groundwater table on the canal side is at a higher elevation than the groundwater table on the land side, the resulting flow and uplift pressure was minimal and negligible. (JX-1876-0007; JX-1877-0008; Stark Tr. 3419, 3451-52).

Plaintiffs nevertheless describe the EBIA soils as "hydraulically charged," suggesting that these soils were somehow poised to detonate or explode. (*See* Pls. PTB, p. 13). This fanciful assertion is simply untrue. There is no evidence that the groundwater conditions at the EBIA were indicative of an increased risk of seepage or uplift pressures during a storm surge. Gradients were minimal, flow was negligible, and as the evidence clearly demonstrated, rising surge waters during Hurricane Katrina did not have sufficient time to transmit anything more than *de minimis* quantities of flow and uplift pressure through the surrounding clay soils. (*See* USA PTB, pp. 31-37). Plaintiffs claim that the Corps had "certain knowledge" of the hydraulic connection between the IHNC and EBIA. (Pls. PTB, p. 15). This "certain knowledge" included the fact that the baseline seepage conditions at the EBIA were minimal, owing to the minimal gradient and the impermeable clay soils.

---

[2] Knowledge of the groundwater flow was relevant to the remediation project because groundwater could carry contaminants. But as Dr. George Bacuta testified, this concern was minimal at the EBIA, which was a "huge clay area" that acted to contain contaminants and restrict groundwater flow, preventing contaminants from migrating. (*See* DX-02666-0017, 37:09-38:06; *id.* 0019-20, 41:01-42:08).

On the issue of what a geotechnical evaluation of WGI's work would have revealed, Plaintiffs do not even attempt to grapple with Dr. Lucia's competent and credible expert testimony establishing that the Corps exercised reasonable judgment in allowing WGI's excavation and backfilling activity to proceed.  Plaintiffs proceed as though no trial testimony or evidence was ever received by this Court, claiming instead that a "*prima facie*" case of negligence was established because a lay person, applying nothing but common sense, would see that "Defendants were not at all interested in evaluating the potential for their massive excavations to undermine the IHNC floodwall.  All of the testimony was merely an attempt at explaining what they did not do but should have done." (*Id.* pp. 30-31).

In truth, Plaintiffs' conclusory statements reveal only that they are not at all interested in the explanation for why WGI's work posed no foreseeable threat of transmitting seepage and uplift pressure under the EBIA floodwall.  The evidence was clear and convincing:  the EBIA floodwall was built on an impermeable clay foundation through which no permeable layers existed.  (JX-0004-0114; Plate 28, JX-0004-0193; Lucia Tr. 2921-23).  The Corps's design of the EBIA floodwall acknowledged that fact and concluded that seepage and uplift were unlikely to occur during a short-term storm surge event.  (*Id.*).  The Corps's methodology for evaluating seepage and uplift, Lane's Weighted Creep Ratio, a method that Plaintiffs' own expert Dr. Rogers acknowledged was a reliable tool for evaluating seepage conditions along levees, looks solely at the soils in the foundation and on the land side of the floodwall.  (Lucia Tr. 2925-27, 2932-35, 2974-75; Rogers Tr. 633-34).  WGI's canal side excavations did not affect the clay foundation or land side clay soils that mattered in evaluating the risk for seepage and uplift.  Any competent geotechnical

engineer, knowing how Lane's Weighted Creep Ratio applies, would have quickly concluded that WGI's canal side remediation activities were unlikely to increase seepage or uplift pressure during a storm surge.  (Lucia Tr. 3007-10).

Resolving any doubt, Dr. Lucia proved the accuracy of this judgment by calculating the ratio for each WGI excavation and showing that as the distance from the floodwall increased, the likelihood for seepage and uplift decreased.  (DX-DM-1005-0032-33). Contrary to Plaintiffs' conclusory allegation, there was no increased possibility for transmission of seepage or uplift as a result of WGI's excavations.  No additional seepage control was required—the clay foundation provided all the seepage resistance necessary for a short-term storm surge loading event.

These facts, and the Corps's extensive knowledge of the EBIA clay soils, developed through many years of mapping and working in the New Orleans region, explains why not a single geotechnical engineer ever mentioned seepage as a potential problem.  To be sure, the Corps's geotechnical staff offered recommendations during Task Order 26—including recommendations to address the stability of the McDonough Marine borrow pit.  (DX-2260; Lucia Tr. 2919-20; Rogers Tr. 760-62).  The Corps's geotechnical staff even reviewed WGI's submissions for a permit request that turned out to be unnecessary.  (*See* USA PTB, pp. 107-10).  No red flags concerning the potential for seepage or uplift were ever raised, not because the Corps was unaware of or ignored the general principle that seepage and uplift can undermine floodwalls, but because WGI's work on the canal side of the EBIA floodwall did not alter the impermeable clay foundation soils that mattered for a seepage assessment.  As Dr. Lucia explained, the Corps's judgment that seepage and uplift were

unlikely to pose a problem was reasonable, both in 1966 and at the time WGI's excavations

were taking place:

> Q.      And you say, sir, the results of the Lane's Weighted Creep Ratio . . .
> confirm the judgments exercised by the Corps were reasonable.  What
> judgments there, sir?
> A.      The judgment that seepage was not a problem.
> Q.      The judgment back in 1966?
> A.      The judgment at any time these excavations were going on.  Because
> what I'm saying is that during the course of these events, you have engineers
> out there who are not raising a flag about seepage, who are not saying this is
> a problem.  And my contention is that this type of analysis, done all the time
> in Corps offices - - it's intuitive to a trained engineer. . . . And so in 1966, that
> the floodwall and levee system was designed, that any excavation that goes
> away from that [floodwall] is more safe . . . there's less probability of a
> seepage condition, either seepage coming up through and causing erosion or
> hydraulic pressures developing, the farther away we get.  So it's fair to say
> that an engineer out in the field has relied on the design, and that those
> considerations were made in the original design.

(Lucia Tr. 3007:9 – 3008:6).[3]

Reinforcing the point, Dr. Marr performed a seepage analysis using SEEP/W, the

same computer software that Plaintiffs used in their forensic modeling, removing *all* the

canal side soils and replacing them with pervious backfill.  For purposes of this computer

modeling, the foundation soils and the land side soils remained the same clay soils the

---

[3] Mr. Colletti confirmed the basic thrust of Dr. Lucia's testimony.  When asked about the Corps's obligation to evaluate excavations within 300 feet of a hurricane protection floodwall or levee, Mr. Colletti testified that the Corps's "engineering division has a lot of geotechnical information and geological information in the vicinities of lots of our federal projects, and they may already have that information available and have the knowledge to say, 'no need to make another evaluation.'"  (Colletti Tr. 303:18-24).  The Corps has built hundreds of miles of levees and floodwalls throughout the New Orleans area, and the site-specific conditions may vary, as Dr. Brandon helpfully pointed out during his presentation for this Court.  (Brandon Tr. 3176-77; DX-DM-1008-0023.1-12).  Had the EBIA floodwall been built on a foundation of sand, like the floodwalls at London Avenue, a different geotechnical evaluation or investigation might have been warranted.  Nevertheless, the EBIA floodwall was built on a foundation of impermeable clays, meaning that excavations on the canal side, even those within 300 feet of the floodwall, did not warrant a new seepage assessment.

floodwall was built upon.  Using a steady state model—modeling conditions more favorable for transmission of seepage and hydraulic uplift pressure than the actual transient seepage conditions that occurred during the hurricane—neither seepage nor uplift could be generated in the 30 hours that Katrina's storm surge loaded on the face of the floodwall. (DX-DM-1006-0071-75).  In other words, neither the type of backfill nor the compaction of that backfill mattered in assessing seepage under the EBIA floodwall.  (*See also* Lucia Tr. 2974-75 (testifying that because the soils that matter for evaluating seepage and uplift are on the protected side, the type of backfill used on the canal side would not impact the assessment).

Plaintiffs offer no evidence to rebut this convincing expert testimony.  They cannot, therefore, meet their burden of proving a geotechnical evaluation of WGI's excavations and backfilling would have revealed an increased possibility of seepage and uplift pressures during a hurricane storm surge.[4]  Consequently, Plaintiffs cannot demonstrate why any remedial measures were required or why any remedial action should have been taken. Plaintiffs, in other words, cannot prove the Corps committed negligence in allowing WGI's work to proceed.

---

[4] As noted above, the analysis Plaintiffs rely upon was the product of Dr. Bea's "eureka" moment of "marrying" uplift pressure to an undrained stability analysis contrary to accepted geotechnical engineering practice.  Such an "uncommon" analysis was not the standard of practice at the time WGI performed its work, nor is it standard practice now. The Corps could not, therefore, have breached the standard of care even if Dr. Bea's newly discovered methodology had a scientific basis.  This is because Dr. Bea's discovery did not occur until 2008, well after WGI's work was completed.  (*See supra* p. 26 n.1; USA PTB, pp. 117-18).

**IV.     Plaintiffs have failed to prove that their theory of causation more likely than not caused the EBIA floodwall failures.  (Pls. PTB, pp. 50-87).**

Plaintiffs and Dr. Bea finally have conceded that neither load-induced pore pressures nor flow-induced pore pressures were causes of the EBIA floodwall failures. (Pls. PTB, p. 53).  Thus, despite years of contending in this litigation that underseepage through permeable soils was responsible for the EBIA floodwall failures, Plaintiffs now agree that the EBIA floodwall, founded on impermeable clay soils, did not fail due to pervasive and massive underseepage during Hurricane Katrina.

Faced with no choice but to accept this scientific fact, Plaintiffs now propound a theory that runs contrary to accepted geotechnical engineering principles of soil and fluid mechanics—that uplift pressures were transmitted through clay soil without any appreciable flow of water to destabilize the EBIA floodwall, causing its demise.  (Pls. PTB, p. 54).

No less than four of this country's most preeminent geotechnical engineers testified that Plaintiffs' theory, the product of Dr. Bea's "eureka moment," did not comport with accepted soil and fluid mechanics or the measured properties of the soils that exist in the EBIA.  Rarely do experts in a single case apply such fundamentally different methods and scientific principles as occurred in this case.  But in this case, only one expert, Dr. Bea, proffered a theory that did not comport with science as the other experts understand and apply it.  Plaintiffs nevertheless ask this Court to accept Dr. Bea's theory, apparently on the basis of misplaced analogies like brake systems in cars or air hockey tables, as opposed to evidence and sound scientific principles as they are universally applied by competent geotechnical engineers in the field.

36

The United States previously briefed for this Court how geotechnical engineers understand and apply soil and fluid mechanics in the field.  (*See generally* USA PTB, pp. 12-30).  These principles need not be repeated in full here.  The United States also previously briefed for this Court the many incredible assumptions that Plaintiffs had to make their theory appear plausible.  (*Id.* pp. 56-75).  Defendants' experts needed to assume none of these things:  they took the empirical and measured properties of the soils, applied accepted laws and principles of soil and fluid mechanics, and uniformly reached a simple, sound, and valid geotechnical engineering conclusion—that underseepage flows and pressures did not cause the EBIA floodwall to fail.  (*Id.* pp. 31-36).

Unable to rebut Defendants' sound geotechnical explanations for why their theory defies science, Plaintiffs spend much of their post-trial briefing attempting to find flaws with Defendants' explanations for what likely caused the floodwall fail.  Plaintiffs' attempts in this regard, however, only belie that they have no evidence to support their own theory. They cannot meet their burden of proof.

## A. Pressure and flow cannot be decoupled.  (Pls. PTB, pp. 54-57, 60-61, 65-72).

The main premise for Plaintiffs' theory is that uplift pressures do not depend on flow of water of any kind.  (Pls. PTB, p. 54).  Plaintiffs can offer no geotechnical support for this premise.  As Dr. Rogers, Plaintiffs' *own expert* testified, the equations for solving either steady state or transient flow conditions include both flow and pressure—they are not separable if the equation is being solved correctly.  (Rogers Tr. 729).  As Dr. Rogers conceded, flow and pressure are calculated together as a simple mathematical matter.  (*Id.* 729-30).

Defendants' experts completely agree.  As Dr. Marr testified, the very computer software that Plaintiffs used in this case, SEEP/W, "intimately couples pressure and flow." (Marr Tr. 1940).  "You *cannot* separate them."  (*Id.*) (emphasis supplied).  Dr. Silva explained further, SEEP/W is a "flow modeling program," and it is used to determine whether and if pressure, *resulting from flow*, can be transmitted from the canal side to the land side to affect the land side soil and the performance of the flood protection structure. (Sliva Tr. 3798).  Dr. Stark echoed the same principles, stating that "the only thing that transmits the pressure is the flow of water. . . . It cannot transmit the pressure without moving."  (Stark Tr. 3492-93).  Summing up the flaw in Plaintiffs' premise, Dr. Brandon succinctly testified that one must first perform a seepage analysis to quantify flow, and the results of that seepage analysis are what permits a geotechnical engineer to quantify uplift pressure—generated as a result of flow.  (Brandon Tr. 3169).  No flow, no uplift pressure.

Because uplift pressure without flow is facially contradictory in traditional and conventional geotechnical engineering, Plaintiffs attempt to validate their novel theory through a principle of instantaneous pressure wave transmission, otherwise known as the dilatational wave theory.  (Pls. PTB, p. 55).  But as Dr. Marr testified, this phenomenon has no applicability to solving levee and floodwall failures during hurricane storm surge events because, among other things, dilatational wave theory deals with explosive shock waves that do not result in soil volume changes that can change soil strength.  (Marr Tr. 1937-38). No geotechnical or geohydrology textbook teaches pressure wave theory for seepage issues in soils.  (*Id.* 1938).  And SEEP/W, the software Plaintiffs' purport to use to solve this pressure wave transmission problem, does not incorporate or allow for the inertial terms required to solve a pressure wave transmission event.  (*Id.* 1943).  Simply put, Plaintiffs'

theory of instantaneous uplift pressure through pressure wave transmission does not, as a matter of scientific principle, apply to the EBIA failures.

As if to reinforce the point, Plaintiffs suggest that "steady flow" was the appropriate method for analyzing transmission of pressure in this case. (Pls. PTB, pp. 65-67). Even assuming this were true, the equations used in steady flow or steady state seepage couple flow and pressure just like the equations for a transient seepage analysis. (Rogers Tr. 729). This is not a simple matter of one expert selecting a different, more appropriate model. Dr. Silva's flow simulator proved this very point: even in the "steady flow" simulator, where the plexiglass pipe served to minimize volume changes so that pressures and flow reached equilibrium and steady state quickly, the rise in pore pressure *only* occurred while flow was turned on. In other words, if the flow is shut off, pressure drops to zero. Plaintiffs ignore that water flowed through the steady flow simulator for the entire demonstration— without it, no pressure would have registered at all.

Thus, Plaintiffs' attempt to compare their uplift pressure theory to an air hockey table proves the implausibility of their theory rather than supporting it. (Pls. PTB, p. 51). In their own analogy, the air must be turned on, *i.e.*, flow, for uplift pressure to levitate the air hockey puck. Without flow, no uplift pressures occur. The same principle holds true with levees and floodwalls.

### B. Plaintiffs' near breach model does not corroborate their flawed breach modeling. (Pls. PTB, p. 70).

Plaintiffs insist that Dr. Bea's "near breach" model for the McDonough Marine site substantiates his explanation for the failures at the north and breach site. (Pls. PTB, p. 70). They insist, contrary to evidence, that Dr. Bea's "near breach" model was identical in all

respects to his north and south breach models save one:  the absence of any excavation reaching the organic clay.  (*Id.*).

Notably, Plaintiffs do not rely on Dr. Bea for their evidence that the borrow pit did not reach the organic clay.  This is unsurprising because Dr. Bea himself has admitted that the borrow pit *did* pierce the organic clay.  (Bea Tr. 4131-32, 4134-35).  Plaintiffs instead claim that Dr. Marr's "graphics" show that the borrow pit did not pierce the swamp-marsh, *i.e.*, the organic clay, citing to Dr. Marr's report, Appendix G, Figure G-2.  (Pls. PTB, p. 70 n. 285).  But Figure G-2 shows only a linear north to south interpretation of the canal side, beginning at the south corner of the EBIA and running due north.  It encompasses a narrow interpretation that does not capture the borrow pit in its entirety, only a narrow slice of it that is not reflective of its deepest contours or its full breadth and size—2.4 acres.  (*See* JX-1871-0009; Guillory Tr. 2399, 2401).

A more relevant, though still imperfect characterization of the depth of the borrow pit, can be found in Dr. Marr's interpretation of "EBIA Section #4," Fig. G-10, which depicted an east-west cross-section through a narrow swath of the McDonough borrow pit.  (*See id.* 0008 (depicting locations of Dr. Marr's east-west EBIA cross-sections), 0017(showing wide view of the east-west interpretation of EBIA Section #4)).  Although this cross-section again graphs only a two-dimensional linear snapshot that fails to encompass the full borrow pit area, it clearly shows that even at this single location the borrow pit indeed penetrated to the organic clay layer.  (*Id.* 0017).

In fact, Plaintiffs fail even to mention the critical fact that Dr. Bea himself admitted that the borrow pit penetrated the organic clay, both in the *Barge* trial before this Court and in published journals bearing his name.  (Bea Tr. 4131-32, 4134-35).  Dr. Stark

confirmed for this Court that the borrow pit reached depths of approximately 16 feet,

placing it squarely within the organic clay.  (*See* Stark Report, JX-1780-0102; Stark Tr.

3428).  The borrow pit was eventually filled with water, increasing the likelihood for

saturation of the underlying soils and increasing the risk that underseepage could

undermine the floodwall if those soils were susceptible to underseepage.  (JX-1780-0102-

03).

 Dr. Bea's modeling, however, suggested just the opposite.  Far from "self-

reinforcing" the conclusion that seepage-induced pressures caused the north and south

breaches, Dr. Bea's modeling begged the question why the McDonough Marine site,

containing the largest excavation by far to penetrate the organic clay (the borrow pit), an

excavation that was not even backfilled but filled with *water*, showed minimal seepage

effects using Dr. Bea's "steady flow" model and incompressible clay.

 Dr. Stark explained why.  First, Dr. Bea's models at McDonough Marine showed an

initial seepage gradient of *zero* (0) acting at the land side levee toe before any surge waters

began to rise in the EBIA.  (Stark Tr. 3431; JX-1393-0013, Fig. 16).  By contrast, Dr. Bea's

north and south breach models showed initial seepage gradients of 0.4 and 0.2,

respectively, *before* any surge waters began rising on the EBIA.  (Stark Tr. 3430-31; JX-

1393-0007, Fig. 7, JX-1393-0019, Fig. 26).  The implausibility of this scenario should be

manifest:  at McDonough Marine, where water was in contact with organic clay within 50

feet of the floodwall before surge waters even appeared, Dr. Bea's starting point was zero—

no seepage of any kind.  At the north and south breaches, where the closest water was the

IHNC, several hundred feet away, the starting point—the initial seepage condition—was

several orders of magnitude *higher*.  (Stark Tr. 3431).  There is no explanation for this

discrepancy and Plaintiffs offer none.  Whatever the initial gradient was at the land side levee toe before Katrina struck, that gradient should have been the same across the EBIA site.  If the initial gradient were going to be higher at *any* location, it would have been the area at McDonough Marine where the massive, water-filled borrow pit brought water into much closer proximity to the floodwall than at any other location.

But as Drs. Marr and Stark explained, they modeled the initial seepage conditions before a drop of surge waters ever appeared.  This is a necessary step in order to understand what effect rising surge waters have, *i.e.*, does the seepage gradient substantially change with the introduction of surge waters.  (Marr Report, JX-1864-0043-44; *see also* Stark Report, JX-1780-0232-33).  Minimal gradients existed at the EBIA before Katrina's surge waters arrived, including at the north and south breaches.  (JX-1864-0043-44; JX-1876-0007; JX-1877-0008; JX-1780-0232-33).  Tellingly, when Katrina's surge waters were added, no substantial changes in uplift pressures occurred at the land side levee toe.  (*Id.*).  This was true for the entire length of the EBIA floodwall—uplift pressures simply could not be generated in sufficient quantities on the land side to undermine the floodwall's global stability in 30 hours.

Compounding Dr. Bea's modeling errors, different boundary conditions and hydraulic conductivities were selected for the near breach than for the north and south breach models.  The impact of these inputs has already been detailed for this Court and need not be repeated because Plaintiffs do not attempt to justify Dr. Bea's use of inconsistent and varying boundary conditions.  (USA PTB, pp. 70-71).  They claim only that Dr. Bea's analyses were misinterpreted.  (Pls. PTB, p. 70).  But Plaintiffs do not explain what was misinterpreted, nor do they illuminate how or why the same Jourdan Avenue fill soils

would be modeled with different hydraulic conductivity values, particularly when only minor changes in that one parameter drastically affected the results. (*See* Stark Tr. 3429-30, 3433-35; DX-DM-1009-0045; *see also* United States PTB, pp. 69-71).

Indeed, if there is a pattern to Plaintiffs' purported justifications for Dr. Bea's modeling efforts in this case, it is that when field conditions could not be squared with Dr. Bea's conclusions, the conditions were simply changed in a manner that superficially might make his theory plausible. This was true for Dr. Bea's decision to model the organic clay as incompressible despite clear evidence of its compressibility. It was true of Dr. Bea's decision to model the organic clay in a drained condition instead of an undrained condition, despite clear evidence that undrained was the only appropriate choice and would have eliminated the need for a contrived seepage analysis altogether. And it was true of Dr. Bea's conclusion that steady flow conditions materialized almost instantaneously, despite clear evidence that seepage conditions were transient and could not reach steady state in 30 hours due to the measured material properties of the EBIA clays.

Finally, it cannot be overlooked that Plaintiffs offered no explanation in their briefing for why Dr. Bea chose to model the land side levee fill and near surface soils as fully saturated and incompressible soils in his breach modeling. Dr. Bea himself told this Court that partially saturated soils are compressible soils. (Bea Tr. 1019). This is true. And Dr. Stark testified that the levee fill material on the land side was located above the groundwater table, meaning that it was only partially saturated and, therefore, compressible. (Stark Tr. 3422). But that is not how Dr. Bea chose to model it. In fact, Dr. Bea assigned the land side levee fill and clays above the groundwater table a compressibility of *zero* (0), which translates to $1 \times 10^{-20}$ ft²/lb in the SEEP/W computer

program, far more incompressible even than the $10^{-9}$ ft$^2$/lb that Dr. Bea assigned the organic clays. (*Id.* 3420-21). There is no justification for modeling the land side clays this way, and tellingly, Plaintiffs offer none.

As Dr. Stark explained, however, by turning the partially saturated land side clays into incompressible materials—more incompressible than water or the Berea sandstone presented to this Court—Dr. Bea artificially trapped pressures on the land side and prevented them from dissipating, as they surely would have if those clays had been correctly modeled as partially saturated and compressible. (*Id.* 3423). In short, Dr. Bea conjured a scenario where significant uplift pressures could build and become trapped contrary to the site-specific, measured material properties of the land side soils. When Dr. Stark changed the compressibility of just the land side levee fill back to the site-specific value obtained from field testing, the uplift pressures all but disappeared. (*Id.* 3422-24).

Thus, the evidence at trial demonstrated that the only thing self-reinforcing about Dr. Bea's "near breach" model, or his north and south breach modeling for that matter, was that it is possible to obtain desired results by deliberately cherry-picking certain inputs and parameters, even if those inputs and parameters do not match field conditions. Plaintiffs blatantly and transparently disregarded the field conditions because accurately modeling the field conditions disproved their theory of the case.

### C. Piezometers installed at the EBIA Post-Katrina do not corroborate Plaintiffs' theory. (Pls. PTB, pp. 67-69).

Plaintiffs claim that Dr. Bea's instantaneous hydraulic pressure transmission theory is corroborated by piezometric data obtained from piezometers installed at the EBIA following Hurricane Katrina:

> Piezometric confirmation of Type 3 instantaneous uplift pressures corroborates Dr. Bea's opinions and defies any other explanation by defense experts. Piezometers measure pressure. In this instance, they measure pressure in the swamp-marsh layer in which they are buried.

(Pls. PTB, p. 67-59). Plaintiffs correctly assert that piezometers measure pressure. They are correct as well that, if the measuring sensor of the piezometer is located in a swamp-marsh, *i.e.*, organic clay layer, that piezometer measures pressure in the organic clay layer.

But Plaintiffs draw conclusions that, like much of their theory concerning the EBIA floodwall failures in this case, contradict basic principles of soil and fluid mechanics. A piezometer, as Dr. Silva testified, measures the increase in pore water pressure from the *total stress* of the load of water above the land surface and water table. (*See* Silva Tr. 3822-23). The piezometers Plaintiffs cite in this case, PZ-3 and PZ-6, were installed post-Katrina on the canal side of the EBIA floodwall, PZ-3 near the south breach, PZ-6 near the north breach.

All these piezometers showed was that when IHNC waters rose over the top of the EBIA, as would occur during a storm surge event, the weight of the water over the soils in the vicinity of the piezometer causes an increase in pore pressure that is immediately sensed by the piezometer. As Dr. Marr explained, "[i]f we go to basic fundamentals of soil mechanics, when I increase pressure—when I put water over the top of a body of soil that's saturated, the pore pressure immediately goes up, and that's what a piezometer reflects." (Marr Tr. 2180).

If this Court recalls, the phenomenon of pore pressures increasing in saturated clay soils when force is applied is a basic characteristic of clays that are "undrained." (*See generally* USA PTB, pp. 25-31). When a force is applied over clay soils in the EBIA, water in the pore spaces between the miniscule clay grains gets trapped, increasing pore pressures

that cannot dissipate during the time that the load remains in place.  (*Id.* 27-28; DX-DM-1008-0009; Silva Tr. 3700-01, 3705-08; Marr Tr. 1931).  This explains why the piezometers measure an immediate increase in pore pressures when surge waters begin to rise.  It also explains why PZ-2, installed on the land side near the south breach, registered no increased pore pressure:  no water rose over the top of the land side soils, so the soils were not subjected to increased total stress or weight and pore pressures did not increase.  It is total stress—a force that Plaintiffs admit was not causative—that causes the piezometers to react.  (Pls. PTB, p. 53).  Thus, the piezometer data does not support or corroborate Plaintiffs' theory at all.[5]

### D. The EBIA floodwall elevation was lowest at the north and south breaches.

The undisputed evidence at trial demonstrated that the EBIA floodwall had subsided over time.  That subsidence was documented by Orleans Levee District, which surveyed the floodwall three times, in 1991, 1996, and 1999.  (King Tr. 2657-60; JX-1924, 1925, 1926).  Using this survey data, Dr. Marr profiled the top-of-wall elevations for the entire EBIA floodwall, demonstrating that the EBIA floodwall elevation was lowest at the north breach site and second lowest at the south breach site.  (DX-DM-1006-0039; Marr Tr. 1862).  Mr. John King, who has worked at OLD since 1970, confirmed that Dr. Marr's profile accurately graphed the survey data.  (King Tr. 2660-62).  He further explained that several "bad shots" appeared in the data, either from human error or an instrumentation problem.  (*Id.* 2662-

---

[5] In addition, Plaintiffs claim that PZ-3, located near the south breach, registered an instant pore pressure response to rising waters because the EBIA was "riddled with excavations" that established a "hydraulic connection."  (Pls. PTB, p. 68-69).  But the evidence was clear that excavations at Saucer Marine, in the vicinity of the south breach area, were backfilled with native soils—impermeable clay.  (*See* Lucia Tr. 2917).  These clays would prevent a "hydraulic connection" in the sense that water could reach the piezometer's sensor.  Total stress, by contrast, readily explains why pore pressures would rise as water loaded upon the EBIA clays and exerted its weight vertically on the soil below.

64).  These aberrations aside, the survey data clearly showed that the EBIA floodwall elevation was in constant decline, subsiding and settling further where the clay foundation soils were softer and more compressible.  (*Id.* 2660; Marr Tr. 1862).

Unable to dispute the clear evidence that the EBIA floodwall elevation was lowest at the north and south breach sites, Plaintiffs claim only that the elevation data should not be "taken as gospel when modeling the flood protection structure."  (Pls. PTB, p. 80).  But there was no evidence that the floodwall elevations depicted on Dr. Marr's profile for the north and south breach sites were inaccurate, and Plaintiffs offer none.  Plaintiffs suggest only that IPET concluded that the floodwall elevation was a uniform 12.5 feet.  (*Id.* 79).  While true, this is irrelevant.  As Dr. Marr pointed out, IPET simply assumed a uniform elevation and did not appear to have the available survey data.  (Marr Tr. 1861).

Plaintiffs further suggest that the survey data showed inconsistent rates of subsidence where the 1966 floodwall joined the newer 1980 floodwall.  (Pls. PTB, p. 80).  But this is a supposition without evidentiary foundation since Plaintiffs declined to ask Dr. Marr whether, in fact, their interpretation of his profile was correct or even plausible.  The data points are plotted too closely together to know, one way or the other, whether Plaintiffs' interpretation is accurate without Dr. Marr's testimony.  Nevertheless, a review of Dr. Marr's profiles, found at Figures E-2 and E-7 of Appendix E to his expert report, does not reveal the discrepancy that Plaintiffs claim.  (*See* JX-1869-0006, 0010).  Regardless of the difficulty in ascertaining the subsidence rate of the newer floodwall from these profiles, Dr. Marr's graph indisputably showed that the EBIA floodwall was at its lowest elevation where the north breach occurred, and no contrary evidence was ever presented during trial.

Finally, Plaintiffs claim—incorrectly—that the old 1966 sheet pile and the new 1980 sheet pile were connected by a weld, making this location the least likely place for subsidence to have occurred. (Pls. PTB, p. 80). First, the old and new sheet piles were not connected by a weld, but rather by a ball and claw. (Marr Tr. 1906; DX-DM-1006-0060). The weld Plaintiffs refer to was a repair weld made only to the sheet pile of the older floodwall. (Silva Tr. 3824). Thus, contrary to Plaintiffs' claim, the ball and claw connection explains why the old floodwall could settle more than the new floodwall without breaking or tearing the connection between the two.

But Plaintiffs' misunderstanding of the connection between the old and new sheet piles aside, Plaintiffs seem confused about how subsidence and settlement occur. That the sheet piles were connected does not, as Plaintiffs presume, make it the least likely place for subsidence to have occurred. (Pls. PTB, p. 80). This is because subsidence is not the result of the sheeting "knifing" through the foundation soils. (Lucia Tr. 2678-79). It is the consolidation of the soft, compressible clay soils in the foundation that is responsible for the subsidence and settlement. (*Id.*; Marr Tr. 1862). The 1966 sheet pile was founded in softer, more compressible organic clay than the 1980 sheet pile, which was driven deeper, further explaining why slightly different settlement rates obtained.

The undisputed evidence showed that settlement and subsidence of the EBIA floodwall was greatest at the north breach, followed by the floodwall at the south breach. Dr. Marr's pictorial tour and diagrams confirmed that, where the floodwall was lower, scour trenches were deeper. (DX-DM-1006-0022-29, 30-37; Marr Tr. 1852-54). Plaintiffs' misunderstanding of the evidence does not change these incontrovertible facts.

48

**E.   Plaintiffs' criticisms of Defendants' testimony and opinions about the likely causes of the EBIA failures are unavailing and cannot serve as a substitute for Plaintiffs' failure to meet their burden of proof.  (Pls. PTB, pp. 72-87).**

Although Plaintiffs cannot adduce evidence to support their own theory of the EBIA floodwall failures—the theory that they have the burden of proving more likely than not caused the floodwall to fail if they are to prevail—they devote considerable effort searching for flaws in the Defendants' conclusions about the causes of the north and south breaches.

Before addressing the validity of Plaintiffs' criticisms, however, it bears repeating that Plaintiffs must prove *their* case to prevail—the Defendants have no burden of proof here.  The geotechnical testimony and opinions presented by the Defense experts first and foremost demonstrated how implausible Plaintiffs' theory was—how many assumptions must be made contrary to the measured properties of the soils and how many principles of soil and fluid mechanics must be bent or broken beyond recognition to make that theory remotely plausible.  There was *no* disagreement among the Defense experts on this point, and Plaintiffs do not suggest otherwise.

But in addition to carefully reviewing and explaining why Plaintiffs' theory was implausible, Defendants' geotechnical experts, applying geotechnical principles as they are commonly understood and applied in the field, offered a more likely and more defensible explanation for how the EBIA floodwall failed.  (*See* USA PTB, pp. 37-56).  It may not be possible to know with certitude every detail of what occurred on August 29, 2005.  There were no eyewitnesses, there were no sensors, there is no black box that recorded precisely the hydrodynamic conditions, the scour erosion, the timing of the breaches, or the manner in which the sheet piling arrived at its final resting point.  But there were physical observations, measured soil properties, and empirically derived principles of soil and fluid

mechanics by which geotechnical engineers could determine what *likely* occurred.  Even if this Court, despite the credible testimony and evidence offered, finds itself unpersuaded by Dr. Marr, Dr. Silva, and Dr. Brandon's efforts to explain the likely causes of the north and south breaches, there would *still* be no scientific or evidentiary basis for believing Dr. Bea's theory was plausible.  Plaintiffs, in other words, still could not prevail because casting doubt on the causation opinions of Drs. Marr, Silva, and Brandon cannot substitute for a failure to prove their own theory of the case.

Against this backdrop, Plaintiffs' criticisms, principally directed at Drs. Marr and Silva, are trivial at best.  For example, Plaintiffs criticize the scour modeling referenced by Dr. Marr in his report and testimony about the south breach.  (Pls. PTB, pp. 81-85).  But Plaintiffs fail to mention—in fact ignore—that Dr. Marr clearly testified that his scour model was "not critical to [his] opinions" about the cause of the south breach.  (Marr Tr. 1868).  His scour modeling efforts were intended and offered simply to give insight into the physics and the process of scour trench development, as well as the likely impact of land side flood water in limiting scour trench depth.  (*Id.*).

As Dr. Marr testified, the physical observations, photographs, and diagrams he presented to this Court regarding the observed and undisputed scour depths, the stresses on the concrete and rebar, and the correlation between lower floodwall elevations and deeper scour trenches were all the evidence required to convince him that overtopping and overturning were the likely cause and to perform the calculations.  (Marr Tr. 1864; DX-DM-1006-0007-12, 21-40; *see also* USA PTB, pp. 46-54).  Those calculations, taking appropriate account of wave overtopping, showed that without tailwater (land side flood water) to help stabilize the floodwall, overturning was likely when the scour trench reached

50

approximately 3.5 feet deep.  (Marr Tr. 1887; DX-DM-1006-0049).  Dr. Marr's scour

modeling did not form the basis for this conclusion.  And Plaintiffs have no answer for the

undisputed fact that Dr. Bea's own hand calculations verify the accuracy of Dr. Marr's

conclusion.  (DX-DM-1006-0050-51; Marr Tr. 1887-89).

Tellingly, Plaintiffs do not contest the irrefutable evidence of Dr. Bea's hand

calculations showing that the floodwall would likely overturn once the scour trench

reached a depth of 3 feet and surge waters rose to +12.5 feet, thereby confirming the

validity of Dr. Marr's opinion.  Indeed, in Dr. Bea's initial report in this case, he opined that

"available evidence indicates the South Breach developed *after* the Hurricane Katrina surge

in the IHNC *overtopped the floodwall.*"  (JX-1389-0105 ¶ 113) (emphasis supplied).

Plaintiffs' criticisms of Dr. Marr's scour modeling, a non-essential ingredient to his opinions

in this case, ring hollow.

Instead, if there is anything to be gleaned from Plaintiffs' criticism of Dr. Marr's

scour modeling charts, it is that Plaintiffs mistakenly believe that those charts have some

kind of predictive value for correlating scour depths at particular times along the EBIA

floodwall.  (*See* Pls. PTB, pp. 81-82).  But Dr. Marr himself did not use his scour model for

this purpose, and does not believe that his scour model can be used for predictive purposes

in this case (*see* Marr Tr. 2092); therefore, it defies explanation why Plaintiffs persist in

assigning the model this unwarranted predictive attribute.  While it serves to deflect

attention away from the substantial shortcomings in their own case, it certainly does not

assist the trier of fact to mischaracterize the purpose of Dr. Marr's scour model.

Unable to refute that Dr. Marr's conclusions were verified by Dr. Bea himself,

Plaintiffs suggest that Dr. Marr improperly changed his opinions concerning the south

breach when he supplemented his expert report to reflect information obtained from Dr. Dalrymple—the only qualified wave expert to testify in this case—concerning wave heights in the IHNC. (Pls. PTB, pp. 73-74, 81-82). Plaintiffs ignore this Court's previous rejection of this baseless assertion. (*See* Doc. 21021, pp. 3-4). More to the point, Dr. Marr is not an expert on waves, and in his original report he specifically stated that "[s]ince the floodwalls at the EBIA site experienced wave overtopping during Hurricane Katrina, it can be assumed that omission of wave overtopping scour . . . would result in lower predicted scour depths than what actually developed at the floodwalls during the hurricane." (JX-1864-0101; Marr Tr. 1884-85). Supplied with qualified expert opinions from Dr. Dalrymple about what those wave heights were, Dr. Marr supplemented his original report to accurately reflect evidence that was otherwise outside his area of expertise. Far from reflecting some improper motive, Dr. Marr candidly admitted the limitations of his expertise and analysis and supplemented his report only after a qualified expert provided evidence of the IHNC wave heights.

Some of Plaintiffs' criticism is also directed at the timing of the south breach, which Plaintiffs claim cannot be squared with Dr. Marr's scour modeling. (Pls. PTB, pp. 81-83). Of course, Dr. Marr's scour modeling, by his own admission, cannot and should not be used to predict a time of failure. Moreover, as previously explained, Dr. Marr was not asked to determine the timing of the south breach. (Marr Tr. 1967). At the time of his deposition, when pressed about timing, Dr. Marr stated that his understanding, based on the work of others, was that the south breach occurred sometime between 7:00 a.m. and 9:00 a.m. That timing estimate is *identical* to what Dr. Bea opined in his expert report: "Results from my forensic engineering analyses indicate the South Breach fully developed between 7:00 and

9:00 AM." (JX-1389-0129 ¶ 123).  Dr. Bea's testimony at trial was startlingly more precise,

placing breach initiation between 7:00 and 7:15 a.m.  (Bea Tr. 1283).  But placing the time

of failure between 7:00 and 7:15 a.m. does not help Plaintiffs undermine Dr. Marr's

opinions because Dr. Marr specifically testified that if the south breach initiated at around

7:00 a.m.—a proposition he was willing to accept—his opinion that the breach was caused

by overtopping, scour, and overturning would not be affected.  (Marr Tr. 2254-55).

        At most, Plaintiffs' criticisms of the scour trench modeling amount to scattershot in

search of a target.  Drs. Marr and Silva performed calculations showing the scour depths at

which the EBIA floodwall was likely to lose stability and overturn.  (DX-DM-1006-0049;

Silva Tr. 3901).  The actual evidence that scour trenches reached this depth was not,

contrary to Plaintiffs' misguided belief, based on modeling or charts.  The basis for both Dr.

Marr and Dr. Silva's opinions that overturning was the cause of failure was their more than

70 years of collective geotechnical expertise and experience working with dams and levees

combined with the physical observations of the deep and pervasive scour trenches and

what remained of the floodwall and sheet piling.  They viewed physical evidence of stresses

in the concrete, the rebar, and the steel sheeting of the sheet piles themselves, stretched

and elongated well beyond their design.  They obtained field data showing that the

elevation of the floodwall was lowest at the two breach locations.  They observed aerial

photographs depicting the widening of the scour trenches approaching the lowest

elevations of the floodwall, and they confirmed that the scour trenches dug progressively

deeper as the floodwall elevation decreased, right up to the point at which the breaches

themselves occurred.  Their reasoned and measured opinions that the south breach most

likely was caused by overtopping and overturning speaks for itself, and at the very least, comports with soil and fluid mechanics and the measured properties of the EBIA soils.[6]

Dr. Brandon, whose opinions Plaintiffs do not challenge in any way, confirmed that scour of the land side soils was the likely cause even though he did not specifically analyze this mode of failure.  This is because, as Dr. Brandon testified, the south breach was not caused by underseepage, erosion, piping, or heave, nor was a shear failure implicated based on the shear strength of the soils with surge water at the top of the wall.  (Brandon Tr. 3159).  Overtopping was the only remaining plausible cause.  (*Id.*).  Activities on the canal side of the wall did not contribute to the failure.  (*Id.*).

With respect to the north breach, Plaintiffs again produced no evidence in support of their own theory, nor did they offer any reason to doubt Drs. Marr, Silva, Brandon, and Stark's uniform conclusion that seepage and uplift pressure had no causative role and WGI's canal side activities did not contribute to failure in any way.  Instead, Plaintiffs claim that "there exists a lack of harmony among the defense experts regarding the failure at the North Breach."  (Pls. PTB, p. 84).  Even if this were true, Plaintiffs' theory of failure would continue to remain implausible.  They cannot overcome this albatross merely by arguing that the Defendants' opinions "lacked harmony."

The reality is that the opinions of Drs. Marr, Silva, and Brandon exhibit more harmony than Plaintiffs want to believe.  Each concluded that the floodwall at the north

---

[6] Plaintiffs suggest, without evidence or proof of any kind, that only Dr. Bea provided a "proper explanation" for the final resting position of the south breach floodwall.  (Pls. PTB, p. 84).  Dr. Bea claimed at trial that this explanation could be found in his expert report.  (Bea Tr. 4004).  Having reviewed that expert report, Dr. Bea's explanation remains unknown.  Plaintiffs certainly have not explained what it is, nor does Dr. Bea's report shed light.   His trial testimony indicated only that he and another expert—in the *Barge* litigation—looked at this "key issue."  (Bea Tr. 4004).  What that explanation was will have to remain a mystery since Dr. Bea never explained it *in this case.*

breach began to destabilize before surge waters reached the top of the floodwall.  In Dr.

Marr and Dr. Brandon's opinion, this initial destabilization was the result of low shear

strength of the land side soils and the reduced height of the levee toe, an error in the

construction.  (Marr Tr. 1900-01; Brandon Tr. 3186-88).  The formation of the gap between

the canal side levee soils and the floodwall was an important contributor in both of their

analyses.  Plaintiffs, in fact, do not challenge Dr. Brandon's or Dr. Marr's opinions in this

regard.

     Dr. Silva also considered the gap an important component of the analysis.  The

difference between Dr. Silva's analysis and the analyses of Drs. Marr and Brandon was that,

in Dr. Silva's engineering judgment, the land side clay soils had a higher undrained shear

strength, providing more resistance against initiation of a shear failure.  (*Compare* Silva

Report, Appx. E, JX-1680-0034, Fig. E-44 (assigning undrained shear strength of 700 psf for

land side levee clay fill); Marr Report, Appx. N, JX-1878-0005-6, Figs. N-1-N-3 (assigning

undrained shear strength of 500 psf for land side levee clay fill); Brandon Tr. 3182

(assigning undrained shear strength of 500 psf for land side levee clay fill).  There was no

disagreement at all that instability began to manifest on the land side before surge waters

began free flowing over the wall.  The difference of opinion was in how and why that

instability occurred, with Dr. Silva attributing the instability to scour of the land side soils

from wave overtopping.

     It is worth noting that Dr. Silva did not disagree that undrained shear strengths

were the appropriate choice to analyze the EBIA floodwall failures.  But as Dr. Marr

explained, there are 13 different ways of measuring shear strength in soils, and the

compilation of test results showed a great deal of variance in measurements.  (Marr Tr.

1894).  Geotechnical engineers must interpret this data and apply engineering judgment to select the strength appropriate for modeling.  (*Id.*).  Interpretation and judgment of undrained shear strength test results is an area in which geotechnical engineers can, and do, reach different judgments without fundamentally altering the principles of soil and fluid mechanics.

In fact, as this Court heard, Dr. Bea assigned a lower undrained shear strength to the levee fill materials at the north breach than Dr. Brandon did.  But as Dr. Brandon explained, Dr. Bea's exercise of engineering judgment in choosing a lower undrained strength for that layer was not the reason Dr. Bea's analysis was unsound.  (Brandon Tr. 3182).  Dr. Brandon testified that the difference—342 psf in Dr. Bea's judgment and 500 psf in Dr. Brandon's judgment—was not "too far off."  (*Id.*).  Dr. Bea's analyses were unsound and invalid because, among other things, he assigned *drained* strengths to the organic clay without justification, contrary to the field conditions and contrary to the way geotechnical engineers model stability problems for short term loading conditions on clay soils.

Notably, Dr. Marr concluded that scour *did* occur at the north breach when the older sheet pile begin pulling away from the newer, more stable sheet pile, opening a gap between the two that allowed waters to rush through.  (Marr Tr. 1913).  That scour accelerated the demise of the flood wall by further destabilizing the land side support.  Most importantly, Dr. Marr concluded that, given the low elevation of the floodwall at the north breach, surge water eventually would have overtopped the wall, scoured the land side soils, and an overturning failure was inevitable.  (JX-1864-0085).

Thus, far from exhibiting a lack of "harmony," the manner in which Dr. Silva, Dr. Marr, and Dr. Brandon approached the north breach failure only emphasizes and

underscores how fundamentally different Dr. Bea's theory and methodology was in this case.  Dr. Silva, Dr. Marr, and Dr. Brandon (as well as Dr. Stark) all concluded that seepage and uplift pressure could not have been causative based on fundamental principles of soil and fluid mechanics.  When they turned their attention to the likely cause of the north breach, they analyzed the problem in the same way, but reached slightly different conclusions based on reasonable differences in engineering judgment about the undrained shear strength of the land side soils.  Reasonable engineering minds can differ on interpreting undrained shear strength test data without having to re-write laws of soil and fluid mechanics.

In any event, Plaintiffs' inconsequential criticisms of Defendants' opinions cannot change the fact that re-writing the laws of soil and fluid mechanics and ignoring the measured properties of the EBIA soils is precisely what this Court would have to do to rule in their favor.  They cannot meet their burden of proof any other way.  Consequently, Plaintiffs have failed to prove that *their* theory was more likely than not the cause of either breach, and for this reason, judgment must be entered in favor of the United States.

## DAMAGES

Because the United States is immune under the Flood Control Act and the FTCA's discretionary function exception, and because Plaintiffs have failed to prove that the Corps was negligent in approving WGI's canal side remediation activities or that those canal side remediation activities caused or contributed to the EBIA floodwall failures, Plaintiffs are not entitled to damages from the United States.  Should this Court nevertheless award damages, the United States adopts and incorporates by reference Defendant WGI's briefing

on the appropriate calculation of Plaintiffs' damages based on Louisiana law and the evidence at trial.

## CONCLUSION

For all of the reasons set forth above and in the United States' Post-Trial brief, this case must be dismissed because the United States is immune under both § 702c of the Flood Control Act and the FTCA's discretionary function exception. In the alternative, because Plaintiffs failed to prove that the Corps committed negligence in allowing WGI's remediation activities to proceed or that WGI's work caused or contributed to the EBIA floodwall's failures on August 29, 2005, judgment must be entered in favor of the United States.

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

JAMES G. TOUHEY, JR.
Acting Director, Torts Branch

RUPERT MITSCH
Assistant Director, Torts Branch

/s/ Conor Kells
CONOR KELLS
Trial Attorney, Torts Branch
ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch
JOHN A. WOODCOCK
JAMES F. MCCONNON, JR.
Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
Conor.Kells@usdoj.gov

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served upon all counsel of record by ECF.

/s/  Conor Kells