UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * * * * * | CIVIL ACTION  NO. 05-4182 |
|  | * | SECTION "K" (2) |
| PERTAINS TO:  MRGO | * * | JUDGE DUVAL |
|  | * * | MAGISTRATE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*  \*

## WASHINGTON GROUP INTERNATIONAL, INC.'S RESPONSE

## TO PLAINTIFFS' POST-TRIAL BRIEF

William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
Maggie A. Broussard, 33033
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:   (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher N. Thatch
Julia L. Cronin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

*Attorneys for Washington Group International, Inc.*

Table of Contents

Page

Table of Authorities…………………………………………………………………………iv

I.   INTRODUCTION ...............................................................................................................1

II.  WGI OWED NO DUTY TO PLAINTIFFS WITH RESPECT TO THE HARM THEY
     SUFFERED AS A RESULT OF HURRICANE KATRINA ................................................2

     A. WGI Had No Duty To Plaintiffs Respecting Unknown And Attenuated Risks.................3

     B. WGI Had No Duty to Perform Geotechnical Evaluations of the EBIA's Levee and
        Floodwall..............................................................................................................6

        i. Plaintiffs Are Not Third-Party Beneficiaries of the Contract .........................................7

        ii. The Contract Did Not Obligate or Otherwise Provide for WGI to Conduct a
            Geotechnical Evaluation of the Levee and Floodwall ...................................................9

        iii. Plaintiffs Cite No Other Valid Source of a Duty for WGI to Conduct
             Geotechnical Evaluations of the Levee and Floodwall ...............................................12

     C. WGI Performed Its Duties Under Task Order 26 with Due Care.....................................13

        i. Piling extractions.............................................................................................13

        ii. River sand as backfill ......................................................................................14

        iii. Soil compaction to "existing density" & compaction testing ...................................15

        iv. The RECAP Criteria Document ....................................................................16

III. WGI HAS NOT LOST THE LEGAL BENEFITS OF THE GOVERNMENT CONTRACTOR
     DEFENSE OR LA. R.S. 9:2771 .....................................................................................17

     A. WGI Is Immune From Liability Pursuant to the Government Contractor Defense .........17

     B. WGI Is Immune From Liability Pursuant To La. R.S. 9:2771 .........................................19

IV.  WGI'S ENVIRONMENTAL REMEDIATION WAS NOT A CONTRIBUTING CAUSE OF
     THE TWO EBIA FLOODWALL BREACHES DURING KATRINA .....................................20

     A. Plaintiffs Cannot Prove their Case by Misrepresenting the Experts' Opinions and
        Creating False Dissension Among the Defense Experts...................................................21

     B. Dr. Bea's "Third Type Of Pressure" Is An Illegitimate Invention....................................22

        i. The Piezometer Readings Analyzed By Plaintiffs Are All Explained By Total
          Stress Changes Imposed By Floodwaters On The EBIA ...........................................23

        ii. Plaintiffs Now Discard Dr. Bea's Original Underseepage Causation .........................23

        iii. There Were No "Uplift Pressures" Without Flow On the Landside Of The
             EBIA Floodwall During The Katrina Storm Surge....................................................24

     C. Plaintiffs Misuse SEEP/W And SLOPE/W Analyses By Manipulation ..........................27

      i. Dr. Bea's Use Of Flow Analyses To Derive Pore Pressures Admits That Pore Pressure Transmission From Canal Side To Landside Requires Flow ......................28

      ii. Dr. Bea's Stability Analyses' Results Based On Mis-Conceived Pore Pressures Are Scientifically Indefensible...................................................................32

   D. Plaintiffs' "Corroborations" Do Not Support Dr. Bea's Flawed Failure Opinions ...........34

      i. Scientific Analyses Of Katrina Storm Surge Effects At The EBIA Require An Acknowledgement That Conditions Were Transient Not Steady ...........................34

      ii. Dr. Bea's Graphs of Piezometer Readings Do Not Corroborate Any Of His Unscientific Analyses...................................................................................36

      iii. Dr. Bea's So-Called "Near Breach Corroboration" Is Completely Unreliable ..........38

      iv. Defendants' Geotechnical Engineers Offer Science, Not Argument .........................40

      v. Dr. Bea Provided No Corroboration For His Flawed, Unscientific Analyses ............41

V.  DEFENDANTS' CAUSES OF FAILURE ARE SUPPORTED BY THE RECORD ................41

   A. The Only Qualified Waves Expert in this Case Opined that Waves *Were* Sufficient to Cause Overtopping at the EBIA Floodwall During Katrina ......................42

      i. Dr. Dalrymple's Wave Height Conclusions Are Correct And Are Endorsed by Dr Bea ..............................................................................................42

      ii. As A Result Of Diffraction, Not All Waves In The IHNC During Katrina Followed the Direction of the Wind.................................................................43

      iii. Waves that Impacted the EBIA Floodwall Doubled in Height...................................45

      iv. The Florida Avenue Bridge and Surekote Road did Not Diminish Wave Energy in Any Meaningful Way ...............................................................46

      v. Plaintiffs' "Reconstruction" of Overtopping Events is Erroneous................................47

   B. The Lowest Floodwall Elevations Contributed to the Failures ..........................................48

   C. Overtopping-Induced Scour Occurred During Katrina and Contributed to the North and South Breach .................................................................................49

      i. "Lack of Harmony" Between Drs. Marr and Silva Is Immaterial ...............................49

      ii. Plaintiffs' Attempts to Undermine Dr. Marr's Scour and Overtopping/Overturning Conclusions Are Without Merit .......................................50

      iii. Plaintiffs' Attacks on Dr. Silva's CWALSHT Model Are Equally Unavailing ..........52

      iv. There is No "Mystery" to the Stress Concentration at the North Breach....................53

VI. DAMAGES ..............................................................................................................54

   A. Cost of Repair Does Not Apply to Plaintiffs Armstrong, Holmes, and Livers.................54

   B. Plaintiffs' Experts Failed to Account for Other Sources of Plaintiffs' Damages ..............57

      i. Plaintiffs Admitted Previous Recovery for Wind and Rain Damage and Did Not Prove Absence of Wind and Rain Damage .........................................................57

      ii. Plaintiffs' Experts Did Not Establish that Damages from All Sources of
         Flooding Was the same as an IHNC-Only Scenario ...................................................58

   C. Plaintiffs Did Not Produce Any Evidence Related to Their Claims for Additional
      Living Expenses or Inconvenience.....................................................................................59

VII.    CONCLUSION ....................................................................................................................60

# TABLE OF AUTHORITIES

## CASES

*Aleutian Constructors v. United States*,
    24 Cl. Ct. 372 (Cl. Ct. 1991) ................................................................. 8

*Axis Surplus Insurance Co. v. Third Millennium Insurance & Finance Services, Inc.*, 781
    F.Supp.2d 320 (E.D. La. 2011) .............................................................. 7

*Banks v. New Orleans City*,
    620 F. Supp.2d 741 (E.D. La. 2009) ...................................................... 56

*Barabay Property Holding Corp. v. Boh Brothers Construction Co.*,
    991 So.2d 74 (La. Ct. App. 1 Cir 2008) .............................................. 19

*Baxt v. Liloia*,
    714 A.2d 271 (N.J. 1998) .............................................................. 13, 14

*Boyle v. United Technologies Corp.*,
    487 U.S. 500 (1988) ............................................................................ 18

*Bryson v. Tillinghast*,
    749 P.2d 110 (Okla. 1988) ................................................................ 12

*Edward R. Marden Corp. v. United States*,
    442 F.2d 364 (Ct. Cl. 1971) ................................................................. 8

*Emerson v. Empire Fire & Marine Insurance Co.*,
    393 So.2d 691 (La. 1981) .................................................................... 55

*Fortson v. Louisiana Power & Light Co.*,
    509 So.2d 743 (La. App. 3 Cir. 1987) ................................................. 55

*Grefer v. Alpha Technical*,
    901 So.2d 1117 (La. App. 4 Cir. 2005) ............................................... 56

*Hayward v. Carraway*,
    180 So.2d 758 (La. App 1 Cir. 1965) .................................................. 55

*In re Great Lakes Dredge & Dock Co.*,
    624 F.3d 201 (5th Cir. 2010) ................................................................. 3

*In re Katrina Canal Breaches*,
    647 F. Supp.2d 644 (E.D. La. 2009) .............................................. 59, 60

*In re Katrina Canal Breaches Litigation,*
    620 F.3d 455 (5th Cir. 2010)..................................................................... 18

*Joseph v. Hospital Serv. District No. 2 of the Parish of St. Mary,*
    939 So.2d 1206 (La. 2006) ............................................................. 7, 8, 9

*Kane Enterprises v. MacGregor (USA) Inc.,*
    322 F.3d 371 (5th Cir. 2003) ........................................................... 8

*Martin v. Safeco Insurance Co.,*
    No. 06-6889, 2007 WL. 2071662 (E.D. La. July 13, 2007)................................. 7

*Mayer v. McNair Transport,*
    384 So.2d 525 (La. App. 2  Cir. 1980) ................................................ 55

*O'Rear v. B.H.,*
    69 So.3d 106 (Ala. 2011) ............................................................ 13

*Pearce v. L.J. Earnest, Inc.,*
    411 So.2d 1276 (La. Ct. App. 3 Cir. 1982) ......................................... 19

*Roman Catholic Church v. Louisiana Gas Service Co*
    618 So.2d 874 (La. 1993) .......................................................... 54, 55

*Rando v. Anco Insulations Inc.,*
    16 So.3d 1065 (La. 2009) ........................................................... 3

*United States v. Seckinger,*
    397 U.S. 203 (1970) ................................................................ 8

*Wallace v. Texaco, Inc.,*
    681 F.2d 1088 (5th Cir. 1982) ...................................................... 8

*Wegner v. Lafayette Ins. Co.,*
    60 So.3d 1220 (La. 2011) .......................................................... 57

*Williams v. Certain Underwriters at Lloyd's of London,*
    398 F.App'x 44, (5th Cir. 2010) .................................................... 8

## STATUTES

Federal Rules of Civil Procedure 26(e) ............................................................................ 50

Federal Acquisition Regulations' Permits and Responsibilities Clause,
    42 C.F.R. § 52.236-7 ................................................................................................... 8

Louisiana Civil Code Articles 1978, 1981 ......................................................................... 7

La. R.S. 9:2771 ................................................................................................................. 19

## I.     INTRODUCTION

The time for debating a "prima facie case" (Pl. Br. 30)[1] is past.  At trial Plaintiffs had the burden to prove, by a preponderance of the evidence, that WGI breached a duty of care that it owed to Plaintiffs and that any such breach caused their harm.  Plaintiffs did not do so.  Plaintiffs' post-trial brief fails to show otherwise.  Remarkably, despite the Court's clear instructions, Plaintiffs failed to address in any way many of the questions the Court requested be included in the post-trial briefs.  Any attempt to address the questions in their response brief would circumvent the Court's directions, and WGI's right to respond, and should not be allowed.  Regardless, Plaintiffs' failure to include responses in its post-trial case-in-chief is telling.  The fact is that Plaintiffs cannot, even with the aid of the mischaracterizations and misrepresentations of evidence throughout their brief, provide a supportable basis on which to hold WGI liable for their claimed harms.

On the question of duty, Plaintiffs repeatedly assert but fail to prove any source of the duty they claim WGI owed.  Relying on the contract, Plaintiffs simply ignore its reality.  Both parties to it agree that WGI was not hired to perform geotechnical engineering services regarding the levees, which were uniquely within the Corps' expertise.  Plaintiffs' attempt to create a contrary impression from quotations out of context is not plausible.  If WGI were expected to do this, why did the Corps never provide WGI with its comprehensive 1966 analysis of the levees and floodwalls?  (WGI Br. 4-5)  Why did the Corps exclude WGI from meetings with its own geotechnical engineers to discuss the borrow pit?  (WGI Br. 8-9)  To support an interpretation contrary to that of the parties, Plaintiffs simply invent facts without evidence.  For example, Plaintiffs claim WGI "recommended performing a geotechnical analysis" in connection with its work (Pl. Br. 18), but none of the cited evidentiary sources, nor anything in the record, supports that statement, not even Plaintiffs' own

---

[1]   Plaintiffs' Post Trial Brief is sometimes referenced herein as "Pl. Br.".  Washington Group International, Inc.'s Post Trial Brief is sometimes referenced herein as "WGI Br.".

expert report which they cite.  This looseness with facts pervades Plaintiffs' brief.  Similarly, Plaintiffs have no basis to impose an extra-contractual duty on WGI.  They cite a vague and aspirational canon of ethics for engineers unrelated to the types of work done here or the types of dangers claimed.  No credible evidence was presented or cited as required by Louisiana law that a remediation contractor in WGI's position would have done differently than it did or could have anticipated the potential risks of underseepage (non-existent) and uplift pressures (unheard of as postulated by Plaintiffs).

Even if WGI did breach a duty to protect Plaintiffs against the particular harm they suffered, Plaintiffs have also failed to meet their burden of showing that WGI's environmental remediation work in the EBIA was a substantial cause of the two floodwall breaches that caused their harm.  The burden of this proof is on Plaintiffs.  WGI need not prove the cause of the levee's failure.  Yet not only did WGI rebut Plaintiffs' evidence on causation, but WGI also independently proved that other factors unrelated to its work were far more likely to have caused the levee breaches and consequent flooding.  Plaintiffs do virtually nothing to contradict the various structural defects that WGI proved at trial and did little to undercut the critical role of overtopping.  Instead they rely upon their lone causation expert, Dr. Bea, whose theories violate fundamental scientific principles and whose analyses ignore actual EBIA conditions.  Dr. Bea's work did not even constitute sound science, much less evidence supporting WGI's work as a substantial cause of the levee/floodwall failures.

## II.    WGI OWED NO DUTY TO PLAINTIFFS WITH RESPECT TO THE HARM THEY SUFFERED AS A RESULT OF HURRICANE KATRINA

With respect to duty and breach, WGI's opening brief emphasized three critical points:  first, WGI had no duty with respect to the alleged danger of underseepage or uplift pressures, which were unknown and not reasonably foreseeable by a prudent remediation contractor.  Second, the contract between WGI and the Corps defines the scope of WGI's duty on Task Order 26 and did not require

WGI to perform the geotechnical engineering analyses Plaintiffs claim it should have done.  Third, WGI must be judged against the standard of care applicable to a contractor performing demolition and remediation services, and WGI performed such services in the EBIA with due care.  Nothing in Plaintiffs' post-trial brief undercuts any of those points.

### A.  WGI Had No Duty To Plaintiffs Respecting Unknown And Attenuated Risks

As described in WGI's opening brief, Fifth Circuit precedent and Louisiana law limit WGI's duty by what dangers it knew about or could have reasonably foreseen.  *See, e.g., In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 212 (5th Cir. 2010) (holding that impact on levees and ensuing consequences were "beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers"); *Rando v. Anco Insulations Inc.*, 16 So.3d 1065, 1087 (La. 2009) (holding that whether duty extends to a certain type of harm "depends on whether [the defendant] knew or should have known of the dangers").  Plaintiffs failed to prove that WGI knew or should have known that its remediation work in the EBIA—conducted pursuant to plans developed with and approved by the Corps— posed an alleged increased risk of seepage or uplift pressures that could compromise the integrity of the floodwall during a hurricane.  (*See* WGI Br. 11-14)

Plaintiffs first argue that WGI's knowledge of a high water table in the EBIA,[2] coupled with recognition that "'there is a high probability that groundwater will be encountered' during excavation work,"[3] would cause "any reasonably prudent engineer" to know that the "soil layers were hydraulically charged, resulting in a greater response to pressure gradients."[4]  This argument fails for several reasons.  *First,* it sets the wrong standard.  WGI's conduct is measured by what a reasonable remediation contractor would do, not a "reasonably prudent engineer."  As explained in

---

[2]   Pl. Br. 13 & fns. 24-25 (citing Recommendation Rep. §§ 3.1.1.1, 4.1)).  Plaintiffs recognize of course, that WGI first learned about the high water table in the EBIA from reviewing a HTRW Assessment that the Corps New Orleans District prepared in connection with its overall evaluation of the Lock Replacement Project.  *See id.*; JX-00032-0013 (1997 Eval. Report, Vol. 5 of 9, App. C); *see also* Guillory Tr. 2393:15-23.

[3]   Pl. Br. 13 & fn. 26 (quoting JX -0066 (Recommendation Rep., § 5.13)).

[4]   Pl. Br. 13 & fn. 27 (citing JX-1414 (Bea Rebuttal Rep., ¶ 601234)).

WGI's opening brief, WGI's personnel were very competent and experienced contractors, but they were not engineers.  (WGI Br. 7, 16-17)

Second, the evidence does not even show what a "reasonably prudent engineer" would have known.  The cited opinion of Dr. Bea is that such information about the high water table would "give[] the **_geotechnical_** engineer" knowledge that the EBIA soils were somehow "hydraulically charged."[5]  But as all of the evidence presented at trial proves, WGI was not authorized to have, and did not have, any geotechnical engineer staffed on Task Order 26.[6]  Third, Plaintiffs' speculation about what an engineer would have concluded is contradicted by the record evidence.  Mr. Guillory and his HTRW team, consisting of at least three engineers, meticulously reviewed and commented on the Recommendation Report in outline, draft and final form.[7]  Given that not a single Corps engineer or, in Dr. Bacuta's case, geologist and geo-chemist, raised any concern about this high water table relative to the integrity of the floodwall shows, if nothing else, that WGI (who was not tasked with evaluating the levee/floodwall in the first place) was not remiss in failing to recognize this alleged warning sign.  Fourth, as discussed below and in WGI's opening brief with respect to causation, the existence of shallow groundwater in the EBIA (before, during and after WGI conducted its remediation activities) does not signal a problem, and would not raise any concerns because the levee and floodwall are "designed to have water against it.  That's the whole purpose of this structure."[8]

Plaintiffs next argue that a potentiometric surface map in WGI's August 2005 Groundwater

---

[5]   JX-1414 (Bea Rebuttal Rep., ¶ 60) (emphasis added).  As far as WGI can tell, "hydraulically charged soil" does not have any commonly-accepted engineering significance whatsoever.  There is no evidence cited in Plaintiffs' brief, other than a bald reference to Dr. Bea's expert report, to prove otherwise.

[6]   See infra Section II.B.ii, and WGI Br. 14-17.

[7]   JX-1230 (Cmt. Submittal on Outline for Rec. Rep.), JX-1232 (Cmt. Submittal for Draft Rec. Rep.), JX-1233 (Cmt. Submittal Draft Rev. B, Rec. Rep.).  As indicated in these Comment Submittals, the three Corps engineers that reviewed the Recommendation Report were Ms. Spadaro, Mr. Brouse and Mr. Guillory.  See Guillory Tr. 2530:7-11 (regarding G. Brouse); id., 2381:25-2382:2 (regarding J. Spadaro).

[8]   WGI Br. 66 (quoting Silva Tr. 3819:8-24).

Characterization/Monitoring Report (JX-01299) was an "early warning signal" that WGI's excavations had established direct hydraulic connections with the sandy shell fill under the Surekote Road overpass.[9]  That argument fares no better.  *First,* although the map indicates that—at least during the brief time the monitoring wells were active—shallow groundwater (elevation +2 feet) was flowing near the toe of the levee in the vicinity of the North breach,[10] as mentioned above, there has always been shallow groundwater at the toe of the levee.  Its existence, even if flowing toward the levee, does not indicate that the flood protection structure was performing unsatisfactorily or that it would perform unsatisfactorily during a hurricane.[11]  *Second*, the email chain between Richard Lesser of WGI and Lee Guillory and George Bacuta of the Corps discussing the Groundwater Report does not, as Plaintiffs claim, confirm WGI's "awareness of the hydraulic connection between the IHNC and EBIA" and its excavations impact on that connection.[12]  The author of the email himself, Dr. Bacuta, testified that there was <u>no</u> such connection because the "subsurface is largely clay material ... [with] very low permeability."[13]  Dr. Bacuta's testimony is consistent both with the reference materials that the Corps provided WGI about the geology at the EBIA,[14] and the photographs that WGI took during its remediation work.[15]  Moreover, his email does not state (nor is there any other evidence to prove) that the flow of the shallow groundwater

---

[9]  Pl. Br. 13 & fns. 27-28 (citing to Dr. Bea's opinion in his expert reports regarding WGI's 2005 Groundwater Monitoring Report (JX-1299)).  WGI undertook groundwater monitoring at the end of Task Order 26 to test for "residual contamination in the water."  This was a requirement of Louisiana's RECAP program.  *See* PX-4682-0074 to -0075 (Bacuta Dep. 192:5-23).

[10]  JX-1299-0007; Bea Tr. 1253:2-1254:11.

[11]  As Richard Varuso, a geotechnical engineer with Corps, explained:  "There's no inherent problem with having water – just water moving from one side of the flood control structure to the other.  I mean that's groundwater doing its thing. ...  That's not something that is going to destabilize the floodwall."  PX-4686-0049 (Varuso Dep. 217:7-20); Lucia Tr. 3021:10-16 (even under normal, non-construction conditions, "groundwater can flow from one side [of the floodwall] to the other.  Soil is a porous media, so [groundwater] can go anywhere").

[12]  Pl. Br. 13-14 (citing JX 1645).

[13]  PX-4682-0072 (Bacuta Dep. 182:10-18); *see id.* -0017 to -0018, -0051 (Bacuta Dep. 41:1-11, 117:17-118:08) (explaining that the groundwater in the EBIA is really a "perched aquifer," meaning its surrounded by clay).

[14]  *See* JX-0032-0023 (1997 HTRW Rep. 11); Guillory Tr. 2393:24-2394:22; *see also* JX-1299-0112 to -117 (Groundwater Monitoring Report) (containing lab results that indicate the soils in the EBIA have a very low permeability).

[15]  *See, e.g.,* JX-1332-0003, JX-1330-002 (photographs showing very minimal amounts of canal water coming into open excavations that were immediately adjacent to the canal); Guillory Tr. 2530:24-2532:13, 2653:10-2654:24.

had permanently shifted.[16]   Indeed, "given a rather flat gradient [in the EBIA], canal levels could go up, and it could make it appear that the flow is to the east towards the floodwall, the canal level could go down and the flow could go back;" the gravity of the moon also can affect groundwater flow from one direction to another.[17]   Therefore, as Dr. Lucia opined, "if a geotechnical engineer received an e-mail suggesting that groundwater flow at the site had possibly changed direction," that would not raise any kind of red flags, but instead would be consistent with normal conditions.[18]   Plaintiffs have failed to prove otherwise.

### B. WGI Had No Duty to Perform Geotechnical Evaluations of the EBIA's Levee and Floodwall

Given that WGI had no knowledge of the potential dangers of seepage or uplift pressures, Plaintiffs' argument depends on their claim that WGI nevertheless had an obligation to conduct a geotechnical evaluation of the levee and floodwall.   Neither WGI's contract with the Corps nor any of the extra-contractual sources that Plaintiffs cite imposed such a duty on WGI.   As explained in WGI's opening brief, the contract between WGI and the Corps defines the scope of WGI's duty on Task Order 26.   (*See* WGI Br. 14-17)   Plaintiffs do not for the most part dispute that, *see* Pl. Br. 22-24, but instead affirmatively rely on the contract to claim that they were third-party beneficiaries. Plaintiffs have not come close to establishing that they are third-party beneficiaries to the contract, but that is beside the point.   While the relevance of that contract-based idea is dubious, Plaintiffs' distortions of the record cannot obscure the fact that neither party to the contract required or expected WGI to perform a geotechnical analysis of the levees and floodwalls.

---

[16]   DX DM-0015-00124 (Silva Dem.) (noting that the contours on the map in WGI's Groundwater Monitoring Report show only "a snapshot in time – one set of readings and wells were abandoned"); Lucia Tr. 3014:5-8 (any impact to groundwater flow from WGI's excavations would be temporary); PX-4682-0076 (Bacuta Dep. 194:17-20) (admitting that he does not know whether the groundwater would later flow both ways).

[17]   Lucia Tr. 3013:16-3014:8, 3021:10-23.

[18]   Lucia Tr. 3022:7-19.

### i.  Plaintiffs Are Not Third-Party Beneficiaries of the Contract

Plaintiffs argue that WGI owed them a duty under its contract with the Corps because they are third-party beneficiaries of that contract.  (Pl. Br. 22-24 (incorporating by reference Doc. 20945, 36-41)).  This contract theory, of dubious value in a tort case, in any event fails for the simple reason that Plaintiffs do not qualify as third-party beneficiaries under Louisiana law.  To establish rights as a third-party beneficiary under what is known in Louisiana as a stipulation *pour autrui, see* La. Civ. Code. arts. 1978, 1981, the claimant must show that:  "(1) the stipulation for a third party is manifestly clear; (2) there is certainty as to the benefit provided the third party; and (3) the benefit is not a mere incident of the contract between the promisor and the promisee."  *Joseph v. Hosp. Serv. Dist. No. 2 of the Parish of St. Mary*, 939 So. 2d 1206, 1212 (La. 2006).  Plaintiffs have failed to meet that burden for two reasons.

*First*, Plaintiffs have failed to meet the "most basic" requirement that "the contract manifest[s] a *clear intention* to benefit the third party."  *Id.* (emphasis added).  Plaintiffs rely on Modification No. 5 to Task Order 26 ("the Modification"), which reads:  "Contractor shall ... be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence."[19]  Courts applying *Joseph*'s first criterion, however, have required a far higher degree of specificity in reference to particular third parties before finding that a contract creates a stipulation *pour autrui.  See Axis Surplus Ins. Co. v. Third Millennium Ins. & Fin. Servs., Inc.*, 781 F. Supp. 2d 320, 324-5 (E.D. La. 2011) (denying third-party beneficiary status to plaintiffs because insurance policy did not reference them by name as beneficiaries); *compare Martin v. Safeco Ins. Co.*, No. 06-6889, 2007 WL 2071662 at *2 (E.D. La. July 13, 2007) (first criterion is met because insurance contract "clear[ly] and unambiguous[ly]" provided for a benefit to "the borrower," *i.e.* the

---

[19]  JX 1244-0005, Mod. No. 5, ¶ 5.0; Pl. Trial Br. (Doc. No. 20945) 38-39 & fn. 155.

plaintiff).  Some case law indicates that "[t]he contract need not expressly identify the third person ... if the contract plainly contemplates a benefit to a third person," but a vague and unspecified reference to a category of parties or persons is insufficient.  *See Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 375-76 (5th Cir. 2003).  To hold otherwise would render *every* resident potentially impacted by work under the TERC a third-party beneficiary.  The Fifth Circuit, however, has already cautioned against "eras[ing] Louisiana's distinction between intended and incidental beneficiaries and ... creat[ing] dozens of third-party beneficiaries under the ... contract." *Id.* at 376.  Plaintiffs' theory would create tens if not hundreds of thousands of such beneficiaries.

In addition, the cited Modification, known as the Federal Acquisition Regulations' Permits and Responsibilities Clause, 42 C.F.R. § 52.236-7, is a legally required part of contracts between U.S. Government agencies and certain contractors.  Its "crucial function ... is allocation of risk" between the Government and its contractor.  *See Aleutian Constructors v. United States*, 24 Cl. Ct. 372, 389 (Cl. Ct. 1991) (citing *Edward R. Marden Corp. v. United States*, 442 F.2d 364, 368 (Ct. Cl. 1971)); *see also United States v. Seckinger*, 397 U.S. 203, 216 (1970) (construing an earlier version of the Permits and Responsibilities Clause as adopting comparative negligence principles). Such "boiler plate" provisions do not evidence an intent to confer beneficiary status on third parties. *See Wallace v. Texaco, Inc.*, 681 F.2d 1088, 1090 (5th Cir. 1982) (*per curiam*).  Plaintiffs' argument to the contrary impermissibly ignores the important background and context of the relevant sentence.  *Cf. Williams v. Certain Underwriters at Lloyd's of London*, 398 F.App'x 44, 48-49 (5th Cir. 2010) (*per curiam*) (declaring that, when viewed in context, language identified by plaintiffs as creating a stipulation *pour autrui* evidenced "no thought" of a benefit to plaintiffs).  Thus, the contract contains no "manifestly clear" stipulation of an intention to benefit plaintiffs, and Plaintiffs' third party argument fails for that reason.  *See Joseph*, 939 So. 2d at 1212.

Even if Plaintiffs were able to meet the first *Joseph* criterion, their argument for third-party beneficiary status would still fail, because the benefit claimed by them is "a mere incident of the contract." *Joseph*, 939 So. 2d at 1212.  Despite Plaintiffs' protestations to the contrary, "[n]ot every promise, performance of which may be advantageous to a third person, will create in him an actionable right." *Id.* at 1212-13 (internal quotation marks and citation omitted).  Plaintiffs here are no more the intended beneficiaries of the Corps' contract with WGI than a plaintiff property owner who sought damages allegedly resulting from breach of a contract between a water company and the City of Shreveport.  *See id.* at 1213 (citing *Allen & Currey Mfg. Co. v. Shreveport Waterworks Co.*, 37 So. 980 (1905)).  The *Joseph* court, summarizing the case's outcome, stated that "[t]he contract was between the city and the water company.  The plaintiff, as an inhabitant of the city, was an incidental beneficiary and as such had no right of action." *Id.*  Similarly, the City of Shreveport, this time (ironically) the plaintiff, could not recover based on harm suffered by Gulf Oil's failure to perform on its contract with the State of Louisiana.  *Id.* (citing *City of Shreveport v. Gulf Oil Corp.*, F. Supp. 1 (W.D. La. 1975)).  Although the contract provided "some benefit" to the City, the court determined that this benefit was incidental to the contract between the oil company and the State, rather than directly intended.  *See id.*  Here, as in those cases, Plaintiffs are at most incidental beneficiaries of a contract that had nothing to do with them.

### ii.  The Contract Did Not Obligate or Otherwise Provide for WGI to Conduct a Geotechnical Evaluation of the Levee and Floodwall

Plaintiffs' unsupported assertions and mischaracterizations of the record notwithstanding, there is absolutely no evidence that the contract required WGI to, or that the "Corps expected WGI" to, evaluate and advise it "about the potential effect or damage that its subterranean excavations could have on the floodwall."[20]  In fact, Mr. Guillory repeatedly testified to the contrary:  The Corps

---

[20]  Pl. Br. 11 & fns. 11-13; *see id.* 14-15, 22-24.

did *not* expect WGI to identify "data gaps" relating to the subsurface impacts an excavation might have on the floodwall (which the Corps already had addressed internally);[21] it did *not* expect WGI to have a geotechnical engineer design any of the RECAP excavations;[22] and it did *not* expect or authorize WGI to undertake any geotechnical stability or seepage analyses.[23] The plain language of the TERC,[24] Task Order 26,[25] and the Recommendation Report[26] also do not require WGI to undertake such geotechnical engineering services.

Instead, as previously detailed in WGI's opening brief, it was the Corps' responsibility, and specifically, Mr. Guillory and his team's responsibility, to determine whether and when to seek guidance from the Corps' Geotechnical Engineering Branch with respect to any subsurface impact WGI's work might have on the floodwall.[27] Moreover, with respect to any seepage concerns relative to the floodwall, Mr. Guillory testified that he did not believe any geotechnical engineering

---

[21] Guillory Tr. 2358:20-2359:9.

[22] Guillory Tr. 2509:17-2510:19.

[23] Guillory Tr. 2368:19-2369:12; 2566:23-2568:1; *see also* Rogers Tr. 707:20-25. Indeed, Mr. Guillory testified that he felt that the question of whether or not WGI's work could have a subsurface impact on the floodwall already had been considered by the Corps in connection with the evaluation of the overall lock replacement project. Guillory Tr. 2573:19-2574:1.

[24] *See* WGI Br. 5 fn. 20 (quoting JX-00048-0012, -0015 (TERC, §§ 2.4, 4)). Plaintiffs do not actually cite directly to the TERC in their brief. Instead, they pull a snippet of Dr. Sykora's testimony out of context (Pl. Br. 23 fn. 56), which merely confirms that the TERC states in Section 4.10: "The Contractor shall utilize a Project Geotechnical Engineer who will ensure that all geotechnical engineering support goals *specified in the delivery order* are attained." JX-00048-0019 (TERC, § 4.10) (emphasis added). They also ignore the introductory paragraph to Section 4, which clarifies: "The requirements for on-site and off-site personnel will differ for each project and shall be *specifically identified in individual Delivery Orders*." JX-00048-0015 (emphasis added); Roe Tr. 2284:2-2285:24.

[25] Guillory Tr. 2583:1-8. The plaintiffs' argument that the term "engineering services" in the Statement of Work for Task Order 26 could somehow require WGI to conduct a "geotechnical evaluation" regarding the impact of its work on the levee and floodwall, *see* Pl. Br. 12, 14, 23, is completely at odds with the record evidence. *See* WGI Br. 16-17 & fns. 55-63.

[26] Plaintiffs' claim (based on single, bullet-point reference to the term "geotechnical" in the Recommendation Report) that WGI somehow acknowledged that "geotechnical engineering should be an integral component" of its work is flatly contradicted by record. Pl. Br. 18 & fn. 39 (citing JX-01234). Rather, "geotechnical" is listed in the Report as one of nine "engineering details" to be included in the yet-to-be-drafted Project Work Plan (PWP). JX-01234-0041, -0042 (Rec. Rep., §§ 5.1.2.1, 5.1.2.1.5). Other engineering details, such as "mechanical/plumbing" and "fire protection" are also in the list, and like geotechnical engineering, are not even mentioned in the Corps-approved PWP. *See* JX-01252 (PWP); Roe Tr. 2299:15-2300:7, 2301:6-11, 2302:14-2303:7.

[27] *See* WGI Br. 6, 8-9, 17; Guillory Tr. 2510:9-20 ("If we felt that [an excavation] was a problem," I would go to the engineering department at the Corps and seek geotechnical input). Indeed, Mr. Guillory sought guidance from the Corps' geotechnical engineers on at least two occasions during Task Order 26. *See* JX-01238-0001 (Sept. 13, 2000 Email to Mr. Guillory regarding "geotech input" from J. Gately); JX-01285-0002 (Memo for Eng'g Div., Geotech Stability Analysis, Apr. 15, 2002, 2) (regarding stability concerns relating to the borrow pit and excavations under Surekote Road).

analyses were needed because:

> [T]hat issue had been adequately addressed and covered by the Corps of Engineers in prior documents, especially the 1997 Evaluation Report for the New Lock and Connection Channels ... . [And] [t]he EBIA site, as I testified yesterday, was composed of predominantly clay materials. I also had to rely on the design engineers that originally designed the Jourdan Avenue floodwall in the late 1960s. It was constructed in 1969 to '72 time frame. I relied on their design that the minus 8 NGVD sheet pile was adequate and properly designed to cut off seepage.[28]

This is not to deny, of course, that WGI was obligated to perform its excavation work safely. The Corps certainly asked WGI and its subcontractor MMG to "design safe excavations for the environmental remediation at specific boreholes so that the excavation equipment would not slide into the holes, and the natural angle of the holes of excavated soil would be stable ... for the duration that the hole was open."[29]  And, in designing these excavations, WGI "had to be cognizant" of the levee/floodwall.[30]  Such work can be described as "geotechnical" in a sense, but none of it required the expertise of a geotechnical engineer.[31]  In fact, with the exception of the Professional Engineer hired to design the temporary, braced excavations for the lift station and wedding cake structure,[32] the Corps did not request or authorize any licensed civil engineers from WGI, let alone more specialized geotechnical engineers, to work on Task Order 26 at all.[33]

---

[28] Guillory Tr. 2651:16-2652:4; *see also id.* 2573:19-2574:1.

[29] Guillory Tr. 2509:6-11.

[30] Guillory Tr. 2567:22-2568:12, 2572:9-20; *see* WGI Br. 12 & fn. 51 (describing some of the precautions WGI took when excavating near the floodwall). Mr. Guillory also expected WGI to immediately report any "geotechnical aspect" or other issue relating to Task Order 26 that "they felt as a ***contractor*** was important for [the Corps] to know," so that "***we [the Corps]*** could take further actions, further evaluation, et cetera." Guillory Tr. 2359:17-2360:9 (emphasis added). *Cf.* Pl. Br. 11 & fns. 11-13.

[31] Guillory Tr. 2509:17-2510:19. Nothing in the April 2002 email from Mr. Guillory to Mr. O'Conner reminding WGI to evaluate the "logistics, practicality, geotechnical stability and environmental requirements of each proposed RECAP excavation" says or implies otherwise. Pl. Br. 15 (quoting PX-0930). Moreover, the government's Trial Brief, which simply states "the Corps's role in the Task Order 26 EBIA *remediation project* was inspection, not engineering or design," is perfectly consistent with Mr. Guillory's testimony and this email. *See* Pl. Br. 15 fn. 36 (emphasis added); *id.*, 24 fn. 60. WGI was responsible for the design and engineering of the *remediation* project. But the Corps still maintained engineering responsibility for the levee and floodwall (as well as the overall lock replacement project), which, admittedly, were not part of WGI's scope of work. *See* Guillory Tr. 2358:20-2359:16.

[32] *See, e.g.,* JX-0058-0005 (Task Order 26 Mod. No. 10, SOW § 3.1).

[33] Roe Tr. 2284:24-2285:24, 2293:23-2294:3, 2299:2-14. *See* WGI Br. 15-17 (WGI cannot be held liable under Louisiana law for "'for failing to perform activities which it had no responsibility or authority to undertake'" and which it deliberately was not paid to undertake) (citation omitted). In fact, Dr. Lucia performed the seepage and stability analyses that the Corps

### iii. Plaintiffs Cite No Other Valid Source of a Duty for WGI to Conduct Geotechnical Evaluations of the Levee and Floodwall

Recognizing that the contract does not provide a sufficient link between WGI's duty to exercise reasonable care and the harm claimed here, Plaintiffs argue that other so-called "authoritative" sources, such as the Corps' own Engineer Manuals (EMs) and Engineer Regulations (ERs), required WGI to perform geotechnical engineering analyses related to the impact its remediation work might have on the levee and floodwall. (*See* Pl. Br. 38-40)  But both of the Plaintiffs' engineering experts concede that ERs and EMs do not apply to WGI unless they are expressly incorporated into its contract with the Corps.[34]  And, not surprisingly, *none* of the EMs or ERs that Plaintiffs reference (most of which relate to levees and floodwalls) are so incorporated.[35]

Plaintiffs also attempt to find a legally enforceable standard of care in the American Society of Civil Engineers' Code of Ethics.  The first canon of that code, Plaintiffs urge, "embodies the spirit of engineering: namely, engineers have a duty to undergo projects in such a way that does not put the public in danger." (Pl. Br. 18)  Left unaddressed is the question why WGI's personnel, none of whom were civil engineers, would be bound by the ASCE code or its accompanying spirit, given that none of its team were, as noted above, civil (or geotechnical) engineers.  In any case, this spirit, reminiscent of a doctor's Hippocratic Oath to "do no harm," cannot support the imposition of tort liability.  Time and again "it has been recognized that ethical standards are aspirational in nature and not enforceable by law." *Bryson v. Tillinghast*, 749 P.2d 110, 113-14 (Okla. 1988) (rejecting liability premised on doctor's perceived breach of the Hippocratic Oath and the Principles of

---

would have performed (using the information reasonably available at the time) and concluded that none of WGI's excavations would have been a problem. *See e.g. L*ucia Tr. 2939:20-2940:5, 2944:18-2946:15.

[34]  Rogers Tr. 718:6-19; Bea Tr. 1059:3-8. *See* Sykora Tr. 3084:25-3085:7.  To avoid this result, at least for one of the ERs, Plaintiffs assert that paragraph 19.5 of WGI's contract with the Corps actually "imposes" ER 1110-2-1150 on WGI. Pl. Br. 23, fn. 57.  This is not true.  Paragraph 19.5 is a provision in the ER itself, not in any contract.  *See* JX-0044; *see also* JX-1708-0062 to -0068 (Sykora Rep. 54-58).

[35]  Tellingly, Plaintiffs primarily limit their discussion of these Engineer Regulations and Manuals to sections of the brief relating to the government. *See* Pl. Br. 34-43.

Medical Ethics); *see also O'Rear v. B.H.*, 69 So. 3d 106, 121 (Ala. 2011) (Murdock, J., concurring in result) (noting that "the rules of medical ethics that may be derived from the Hippocratic Oath or from rules promulgated by the American Medical Association — although they might provide a basis for sanctions by a licensing authority — are not *necessarily* rules that, if violated, give a patient a viable cause of action under Alabama law for medical malpractice").  This is true not simply for doctors but for other professionals as well.  *See Baxt v. Liloia*, 714 A.2d 271, 277 (N.J. 1998) (noting that state disciplinary codes for attorneys "are not designed to establish standards for civil liability").  Plaintiffs offer no legal authority to the contrary and more fundamentally offer no reason why WGI should be held to an aspirational code that by its terms does not even apply to its personnel.

### C. WGI Performed Its Duties Under Task Order 26 with Due Care

WGI's opening brief sets out in detail why the backfilling and compaction work it performed on Task Order 26 conformed to the standard of care of an environmental restoration contractor working for the Corps under similar circumstances.  (*See* WGI Br. 18-23)  The evidence in Plaintiffs' post-trial brief does not prove otherwise.  Indeed, other than their oft-repeated allegation that Defendants simply failed to "properly backfill and compact" numerous excavations in the EBIA, Plaintiffs do not explain precisely which excavations they are referring to, where they were located, how deep they were relative to the so-called "swamp-marsh" layer, and how they were backfilled and/or should have been backfilled given those considerations.[36]

### i. Piling extractions

For example, Plaintiffs twice allege that WGI was negligent in not backfilling certain excavations in the EBIA at all.  (Pl. Br. 2, 9)  Yet, Plaintiffs do not cite to any instances, and WGI is

---

[36]     Although the Court specifically requested the parties to "[d]etail which excavations penetrated into the swamp/marsh/organic clay layer," Order 5, ¶ C.11), plaintiffs neglected to do so.

not aware of any instances, where it left an excavation in the vicinity of the North or South breach open.  (WGI did not, of course, backfill the large excavation on Indian Towing or the McDonough borrow pit, but the floodwall on those sites did not breach.)  To the extent Plaintiffs are referring to on-shore or off-shore piling extractions, there is ample evidence in the record that any such voids would have closed up quickly on their own given the nature of the soil in the area and the methods by which they were extracted.[37]  Moreover, Plaintiffs have not shown that WGI's piling excavation work fell below the standard of care for a similarly-situated Corps contractor.  Indeed, WGI presented undisputed testimony at trial that another demolition contractor working for the Corps on the west bank of the IHNC (also in the vicinity of a floodwall) extracted many times the number of pilings that WGI extracted on Task Order 26 and that contractor did not backfill the piling voids.[38]

### ii. River sand as backfill

Next, Plaintiffs argue that WGI breached its duty of care because it used imported river sand to backfill unspecified excavations on the Boland Marine site.  (See, e.g., Pl. Br. 2, 9, 28)  No one disputes, however, that the Corps considered and expressly approved the source of the river sand WGI imported, as well as the exact locations where WGI used that sand as backfill.[39]  Critically, Mr. Guillory testified that he did not have any concerns with WGI using compacted river sand to

---

[37]   WGI Br., Ex. B (citing Silva Tr. 3742:7-3743:13; Guillory Tr. 2464:10-2465:3).  Moreover, WGI backfilled any visible voids from on-shore piling extractions in accordance with a Corps-approved work plan.  Sykora Tr. 3093:18-21; Sykora DX-DM-0008-040 (citing JX-01261-0020-21, Hamp's Work Plan); Guillory Tr. 2465:18-24; see also, e.g., JX-00265-0002 (QAR 107) (backfilling area where pilings extracted with "spoil").

[38]   Guillory Tr. 2434:4-23, 2466:14-25.  For the first time at trial, Dr. Rogers claimed that he erred during his deposition when he testified that off-shore piling voids in the EBIA would have closed up on their own relatively quickly after extraction. Rogers Tr. 723:10-724:13.  But even his new opinion does not change the conclusion that WGI acted with due care.  First, Dr. Rogers' only support for this 11th-hour change of opinion is a 2002 or 2003 paper (published after most of the pilings in the EBIA had been removed) about sediments in the San Francisco Bay, not in the IHNC.  Id. 724:15-24.  Second, Dr. Rogers admitted that before seeing this paper, he believed, and certainly the "[geotechnical engineering] profession generally used to believe" that such piling voids would have closed up by themselves in short order.  Id. 723:10-724:1. "[T]hat's how we've always been taught.  That's the general gist of the profession."  Id. 725:5-11.

[39]   Guillory Tr. 2461:4-9; DX-2661-0038 to -0039 (Guillory (30(b)(6) Dep. II 103:8-104:17); Bea Tr. 1051:11-15.  Plaintiffs argue that the Corps did not approve "reasonably precise specifications for composition of the offsite backfill material" on Task Order 26, despite its awareness of the potential consequences of using "poor backfill material" near a flood protection system, see Pl. Br. 28 & fn. 85 (citing, e.g., In re Katrina Canal Breaches Litg., 620 F.3d 455 (5th Cir. 2010)) (emphasis in original), but whether the specifications were precise has nothing to do with the appropriate standard of care.

backfill certain shallow excavations on Boland Marine, as it routinely is used as a sub-base for roads, commercial buildings and homes in Southern Louisiana, and it is an "excellent ... material for the future dredging of the two bypass channels."[40]   At the time, in fact, the Corps even used river sand as the core of some levees in the New Orleans area.[41]   Indeed, Plaintiffs' own standard-of care expert testified that as a general matter, there was nothing wrong with using river sand to backfill excavations in the EBIA.[42]   Dr. Rogers explained that a contractor could even use river sand "right out by the levee," as long as you had "the Geotechnical Branch's concurrence to do something like that."[43]   Thus WGI's use of compacted river sand for certain excavations on Boland which was specifically approved by the Owner (and the engineers responsible for ensuring the integrity of the levee/floodwall) demonstrably complied with the standard of care of a reasonable remediation contactor.[44]

### iii.  Soil compaction to "existing density" & compaction testing

Plaintiffs next argue that WGI failed to compact the backfill of unspecified excavations to "existing density" as the Corps Geotechnical Branch recommended to Mr. Guillory at the outset of the project.  (Pl. Br. 36 & fns. 106-107)  But as WGI thoroughly explained in its opening brief,

---

[40]   Guillory Tr. 2461:24-2462:7.

[41]   Guillory Tr. 2639:5-15.  *See id.* 2532:21-2533:25 (describing how the river sand was placed in lifts and compacted with the tracks of a bull dozer); Sykora 3103:18-3104:15; *see also* JX-1355-0010, JX1353-0006 (photographs of WGI compacting river sand in lifts).

[42]   Rogers Tr. 717:23-718:1, 742:19-743:2 ("[A] lot of times you know, you have to bring in the sand because it's easy – it's less compressible.  And if you want to have working surfaces . ...  that's just a reality. ").

[43]   Rogers Tr. 742:14-18 ("The farther away you get from the levee, the less concerned I or them [the Geotechnical Branch] would probably be ... .").  *See id.* 708:23-709:11 (agreeing that WGI was required to backfill the openings in the EBIA with "proper materials," which means "something that's approved by the Owner, the Corps of Engineers[;] ... . it needs to run up the flag of chain of command to get approved by everybody who's appropriate to approve it").

[44]   But even if the Corps should have told WGI to use a "clay liner" when backfilling with river sand within 100 feet of the floodwall, as Dr. Rogers implied (Rogers Tr. 743:3-14), the Corps' decision to approve WGI's use of such backfill on Task Order 26 was appropriate.  First, as Mr. Guillory testified, the transite excavations closest to Surekote Road on Boland Marine (approximately 60 feet from the floodwall) were only 18 to 24 inches deep, which was well above the elevation of floodwall's sheet pile tip.  Guillory Tr. 2463:5-11, 2536:13-19.  Second, to the extent river sand was used at all on Boland Marine within the 100 feet of the floodwall, the sand was placed in shallow excavations composed predominantly of low-permeability fat clays.  Thus, WGI essentially was putting the compacted river sand into a fully-lined "clay tub," Lucia Tr. 2952:4-5, exactly as Plaintiffs' standard-of-care expert suggests it should have been done.  *See* JX-1780-0045 to -0053 (Stark Rep.); Guillory Tr. 2536:16-2537:7.

Plaintiffs have not proven any such thing. (WGI Br. 18-19) In fact, Plaintiffs' own expert concedes that the density of the soils in the EBIA was very low, perhaps even as low as a 69 percent Proctor.[45] "If you take a dump truck of material and dump it on the ground, that's 69 percent."[46] Certainly, WGI's mechanical compaction, using the tracks of a dozer and/or the bucket of an excavator met or exceeded this low threshold.[47]

Nor have the plaintiffs proved that a similarly-situated remediation contractor should have conducted compaction testing in the EBIA, despite the Corps' reasoned instruction not to do so. (*See* WGI Br. 19-21) Plaintiffs' argument that simple "logic" dictates that Defendants should have performed compaction testing, (Pl. Br. 37) or that their expert believes WGI should have conducted compacting testing (when that expert has no experience working on a remediation project in Louisiana, let alone in the New Orleans District), is a far cry from the evidence required under the law.[48]

### iv.  The RECAP Criteria Document

Finally, Plaintiffs suggest that WGI breached its duty of care when it "mistakenly" reported in a RECAP Submittal Criteria Document that the floodwall's sheet pile reaches a depth of at least 25 feet, which "'would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft.'"[49] According to Plaintiffs, as a result of this passing reference to the sheet pile depth (in a paragraph entirely devoted to the appropriate classification of groundwater for

---

[45]  Rogers Tr. 749:18-19.

[46]  Sykora Tr. 3098:22-23.

[47]  WGI Br. 19. Moreover, as Dr. Sykora explained, "if they are taking the same material [*e.g.*, spoils] and putting it back and they end up with the same ground surface, they are compacting it back to the density that it started." Sykora Tr. 3098:2-5. "If that soil was compacted too loose, had it not been compacted properly, based on my experience, depressions would have formed. ... And I have not heard any testimony or read any documents to indicate that that occurred." *Id.* 3098:11-16.

[48]  *Id.*, 42 fn. 145 (citing Rogers Tr.). *Cf.* WGI Br. 21-22 (citing cases).

[49]  Pl. Br. 14 & fn. 32 (quoting PX-03652-004). The purpose of the RECAP Criteria Document was to "detail[] all the regulatory requirements ... from Louisiana DEQ standpoints or U.S. EPA standpoints to perform the environmental cleanup of the EBIA." Guillory Tr. 2524:20-24. The "water flow" referenced in the paragraph at issue in the RECAP document is shallow groundwater that was five feet deep or less. *See*  PX-03652-004; Guillory Tr. 2525:16-2526:19.

environmental purposes), the Corps Project Delivery Team "improperly convinced themselves there were no problems with IHNC water reaching the face of the floodwall because the floodwall sheet piling was deep enough to cut off any seepage flows." (Pl. Br. 14) Plaintiffs' argument is so absurd that they were not able to support it with even one citation to the record. The truth is, as Mr. Guillory testified, the Project Delivery Team knew at the time that the sheet pile tip of the floodwall extended down only to an elevation of -8 feet NGVD. "We should have caught" WGI's error and "corrected it at that time."[50] In any event, he explained, the exact depth of the floodwall was not pertinent to *WGI's* remediation efforts on Task Order 26.[51] The Corps did not provide WGI with the as-built drawings for the floodwall, and it certainly did not expect WGI to perform geotechnical analyses relating to the floodwall. (WGI Br. 4-5; *supra*, pp. 9-10) To the extent an excavation in the EBIA went deeper than -8 feet NGVD, Mr. Guillory testified: "it was not within Washington Group's responsibility to do anything-."[52]

### III.   WGI HAS NOT LOST THE LEGAL BENEFITS OF THE GOVERNMENT CONTRACTOR DEFENSE OR LA. R.S. 9:2771

#### A.  WGI Is Immune From Liability Pursuant to the Government Contractor Defense

Plaintiffs' brief relating to the Government Contractor Defense (GCD) merely refers to the decision of the United States Fifth Circuit Court of Appeals reversing the dismissal by the trial court of the action against WGI on motion for summary judgment and to the trial court's subsequent decision upon remand not to reexamine the GCD issue. (Doc. 20346) (Pl. Br. 31-32) Plaintiffs ignore the evidence admitted at trial, of which the Fifth Circuit could not have been aware, and which the trial court permitted WGI to proffer at trial.[53]

---

[50]   Guillory Tr. 2652:10-11; DX-1323-0098 to -0102 (indicating that Mr. Guillory and his team reviewed the Criteria Document).

[51]   Guillory Tr. 2528:21-2529:3.

[52]   Guillory Tr. 2529:4-18.

[53]   Sykora Tr. at 3141:21-3142:12.

Briefly, on the basis of the factual record compiled at the time of the motion for summary judgment, the Fifth Circuit concluded that WGI had a choice of backfill material and compaction methods, which rendered the contract specifications too imprecise for application of the GCD pursuant to the test set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988).[54]  At trial, plaintiffs' own standard of care expert, Dr. Rogers, testified that the standard applicable to an environmental remediation job was to backfill and compact replaced soil to a density equivalent to the existing and surrounding soil.[55]  Dr. Rogers conceded that proper backfill consists of material approved by the Corps.[56]  Finally, Dr. Rogers admitted that he was aware of no instance in which WGI used a type of backfill material or executed a method of compaction of which the Corps did not approve.[57]

Dr. Rogers had the impression that the Corps may not have communicated the standard for backfill and compaction, i.e. to the same density as existing soil, to WGI.[58]  But, the overwhelming weight of the evidence adduced at trial was to the contrary.[59]  The Corps specified and conveyed to WGI on multiple occasions that specific excavations were to be backfilled and compacted to the density of adjacent, existing soil using methods such as bucket-tamping in specified lifts or by track-walking over the backfilled areas with bulldozers.[60]  The preceding specifications, known as "method" specifications, are recognized alternatives to "performance" specifications, of which the Proctor test for quantifying density is an example.[61]  Method specifications are just as precise as performance specifications for the purpose of enabling the Corps to evaluate the contractor's

---

[54]  *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 464-65 (5th Cir. 2010).
[55]  Rogers Tr. at 714:16-18, 748:14-749:13; JX-1238-0001.
[56]  Rogers Tr. at 708:23-711:1.
[57]  Rogers Tr. at 762:8-17.
[58]  Rogers Tr. at 766:14-18.
[59]  Guillory Tr. at 2468:1-16, 2388:1-2389:2; Sykora Tr. at 3085:17-3086:8, 3089:2-3090:12; 3091:18-3093:17, 3097:15-22, 3098:2-3099:1.  *See also* WGI Br. 19, fns. 71-72.
[60]  *Id.*
[61]  Sykora Tr. at 3088:8-3089:1.

performance of the backfilling and compacting services required.  It is undisputed that the Corps accepted all backfill and compaction work performed by WGI and that no deficiencies in WGI's work were reported by the Corps.[62]

Upon consideration of the full record developed at trial, it is apparent that the specifications furnished by the Corps to WGI for backfilling and compaction services were in all respects "reasonably" precise and sufficient to exclude the exercise by WGI of choice with respect to performance of those services.  Accordingly, on the basis of all of the evidence admitted and proffered at trial, WGI submits that is entitled to the immunity afforded by the GCD.

### B.  WGI Is Immune From Liability Pursuant To La. R.S. 9:2771

Plaintiff's brief incorrectly states that WGI presented no evidence at the trial establishing the applicability of the state law immunity embodied in La. R.S. 9:2771.  (Pl. Br. 32-33)  La. R.S. 9:2771 codifies the unexceptional legal principle that a contractor is not liable for damage or injury caused by alleged defects in work undertaken by him due to any "fault or insufficiency of the plans or specifications," assuming, of course, he performs the work according to the plans and specifications with which he is furnished.  The principle embodied by La. R.S. 9:2771 is similar to the policy underlying the federal GCD.  All of the evidence admitted during trial supporting the GCD and the lack of any breach generally by WGI of any duty supports dismissal pursuant to La. R.S. 9:2771 of plaintiffs' actions against WGI based on claims that improper backfilling and compaction contributed to the failure of the EBIA floodwall.[63]

---

[62]  Sykora Tr. at 3103:5-11.

[63]  WGI Br. 23-24 collects the relevant Louisiana cases applying La. R.S. 9:2771.  An issue concerns whether a contractor whose work consists only of demolition or site-clearing services is entitled to the statutory safe harbor afforded by La. R.S. 9:2771.  The case of *Barabay Property Holding Corp. v. Boh Bros. Constr. Co.*, 991 So.2d 74, 80 (La. Ct. App. 1 Cir 2008) indicates that soil excavation does not constitute "work" pursuant to La. R.S. 9:2771. The earlier case of *Pearce v. L.J. Earnest, Inc.*, 411 So.2d 1276, 1280 (La. Ct. App. 3 Cir. 1982) holds to the contrary.  WGI submits that the policy of nonliability attaching to the work of a contractor who faithfully performs plans and specifications provided to him should apply equally to demolition and site-clearing work.

## IV.   WGI'S ENVIRONMENTAL REMEDIATION WAS NOT A CONTRIBUTING CAUSE OF THE TWO EBIA FLOODWALL BREACHES DURING KATRINA

Plaintiffs have not met their burden to prove by a preponderance of the evidence that WGI's environmental remediation work in the EBIA was a substantial cause of the two floodwall breaches which occurred as a result of Katrina.  Plaintiffs admit that the EBIA floodwaters' pore pressure due to total stress changes did not cause the breaches.  And Plaintiffs now admit that pore pressures due to flow did not cause them.  Faced with the inescapable scientific conclusion that WGI's work did not contribute to the breaches, Plaintiffs' counsel and their only causation expert, Dr. Bea, instead invented a third "type[] of pressure relevant to this case:...uplift pressures,"[64] which Dr. Bea had previously called "hydraulic conductivity pressure."  This separate third type of pressure is not found in any recognized expert source.[65]  In fact there is no mention of "three types of pressure" to be found in any of Dr. Bea's voluminous writings in this case.  Even Dr. Bea's rebuttal case testimony, relied on by counsel in writing their opening post-trial brief, is confusing and contradictory as to a third type of pressure.  First Dr. Bea described it as pressure "number 3", then he then changed his reference to "type 2 flow", and then he changed it to "pressure number 2".[66] Type 1, Type 2, and Type 3 pressures, as such, were first mentioned in Plaintiffs' opening brief.[67] Dr. Bea's opinion based on this novel and scientifically insupportable premise cannot support causation in this case.  Defendants' experts have provided the more plausible explanation. (*see infra*, at 41-54).

The term "uplift pressure" is certainly well known by geotechnical engineers, but only as

---

[64]  Pl. Br. 53.  All of Dr. Bea's flawed analyses have their root in his misconception that he could manufacture an inapplicable steady flow analysis by distorting compressibilities in a transient flow SEEP/W model.  WGI Br. 27-39.

[65]  Indeed, as the Court knows, Dr. Bea claimed that the only book he knew that used that term was one of three books he authored himself, entitled either "Load Engineering" or "Margins of Quality".  Bea Tr. at 905:10-906:11; JX-1414-0017, 0025; PX-04697-0037 (Bea 4/16/12 Dep. at 146:1-147:18).  Despite requests, that book was never produced.  Bea Tr. at 1056:18-1057:5.

[66]  Bea Tr. at 3939:17-18, 3940:24-3941:6.

[67]  Pl. Br. 53, subsection C, first paragraph, without citation to any evidence.

pore pressures acting upwards caused by one of two sources, total stress changes or flow.[68] Divorcing "uplift pressures" from either of those two sources is an invalid invention of Dr. Bea.[69] Plaintiffs do well to point to their analogy of the air hockey table.  (Pl. Br. 51)  It is true, of course, that when the power is on, the puck is supported on a cushion of air.  But block the intake of air into the table's pump, and the puck would drop.  Plaintiffs' idea that the puck could 'levitate' without that flow through a magical "conductivity pressure" has no basis in science or even in common sense. Without the *flow* of air through the system, there is nothing to transmit the "uplift pressure" to the puck.[70]  By the same token, without flow of water, there was nothing to transmit "uplift pressure" to the levees and floodwalls.[71]  Plaintiffs' theory of causation simply does not work.

### A. Plaintiffs Cannot Prove their Case by Misrepresenting the Experts' Opinions and Creating False Dissension Among the Defense Experts

Plaintiffs' general discussion of global and lateral stability failures is unremarkable, except for factual errors and faulty analogies.  (Pl. Br. 50-52)  As examples, Plaintiffs misstate the record by stating that "no one alleges [shear slide] here".  (Pl. Br. 51)  It is no surprise that Plaintiffs attempt to distance themselves from shear slide failure; the physical evidence shows that this did not occur during Katrina.[72]  Plaintiffs' problem, however, is that Dr. Bea in fact *does* claim there was a shear slide.[73]  Similarly, the citation to Dr. Marr's testimony (fn. 179) for the proposition that "<u>uplift</u>

---

[68]  Brandon Tr. at 3169:7-9, 3204:22-25, 3219:16-17.

[69]  Marr Tr. at 1940:15-20; Silva Tr. at 3840:11-24.

[70]  Dr. Bea's analogy of a blocking sled (Pl. Br., fn. 181), suffers from similar, but important fatal flaws to the air hockey analogy.  First, the blocking sled represents a perfectly rigid system, a condition that clearly did not exist at the EBIA during Katrina.  That alone makes Dr. Bea's analogy irrelevant.  Second, without the sky hook providing an external lifting force, and thus moving the weight of the coach from the blocking sled, the lateral movement of the sled would not be facilitated.  The sky hook must relieve the contact force between the sled and the ground (normal force to engineers) in order to reduce the frictional resistance between those contact surfaces.  In Dr. Bea's analogy, the sled represents one layer of soil, and the actual ground surface on which the sled moves represents another.  This sky hook external lifting force simply did not exist at the EBIA but constitutes a figment of Dr. Bea's imagination, just as he postulates non-existent pore pressures beneath the landside soils at the EBIA in order to force the conditions to adapt to his pre-conceived results.

[71]  When applied to soils, flow of water lifting the upper layer of soil is required for the pressure to have any deleterious effect.  Silva Tr. at 3821:13-3822:4.

[72]  Marr Tr. 2098:19-2099:5; Silva Tr. at 3771:1-3772:20.

[73]  Bea Tr. at 4007:15-23.

pressures threaten global stability" is in error.  The record citation (Pl. Br., fn. 179) does not support

that statement, and the statement does not in any way support Dr. Bea's theories.

Much of Plaintiffs' case, instead of scientifically linking WGI's work to the floodwall

failures, consists of a misguided attempt to depict Defendants' geotechnical engineering experts as

being arrayed against one another as to the actual cause of the floodwall failures.  (Pl. Br. 52-53)

Although this is patently false, it is beyond cavil that *all* of these expert scientists have testified that

Dr. Bea's opinions are not supported by any recognized geotechnical engineering principles.  Dr.

Marr's cited testimony concerns the "initiation" of the North Breach.  Dr. Marr did not testify, as

Plaintiffs represent, that wave overtopping scour did not contribute to the failure.[74]  Plaintiffs'

attempted over-simplification of the multiple contributors to the floodwall failures for the purpose

of creating a false picture of disharmony fails.  On the critical issue, that Dr. Bea's faulty pressure-

transmission-without-flow invention *cannot* explain the failure, all the qualified experts agree.[75]

### B.  Dr. Bea's "Third Type Of Pressure" Is An Illegitimate Invention

The third type of pressure described by counsel for the first time in their opening post-trial

brief, as something separate from pore pressure due to total stress change or flow, is an illegitimate

invention.  (Pl. Br. 53-57)  The only pressures Dr. Bea even attempted to determine scientifically

were from SEEP/W software model runs that were, by definition, pressures due to flow.  SEEP/W is

a *flow* analysis program.[76]  The only other potential source of increased pore pressures in the fully

saturated soils in this case, or recognized by geotechnical engineering, derives from changes in total

stress, e.g. the load of floodwater above the EBIA during Katrina's storm surge.  An "uplift

pressure" is a pore pressure acting upwards against a flow barrier, regardless of the cause of the

pore pressure, and not a "third type of pressure."  Since Plaintiffs agree that pore pressure increases

---

[74]  Marr Tr. at 1831:16-1832:4, 1913:20-1914:3, 1914:25-1915:10.

[75]  Silva Tr. at 3840:11-3841:3; Marr Tr. at 1935:25-1939:8, 1940:15-20, 1943:12-13; Brandon Tr. at 3230:10-21.

[76]  Silva Tr. at 3798:10-13.

due to total stress distribution and pore pressure increases due to flow were not causative, Plaintiffs attempt to prove that WGI's work contributed to the North and South Breaches must fail since there is no "third type of pressure".

### i. The Piezometer Readings Analyzed By Plaintiffs Are All Explained By Total Stress Changes Imposed By Floodwaters On The EBIA

There is now agreement that the weight of the waters on the EBIA soils, while causing virtually immediate increases in pore pressures, did not affect the stability of the floodwalls since the pore pressure increases were limited to the soils directly beneath the flood waters.  However Plaintiffs' suggestion that it is "mistaken" to suggest that total stress accounts for the PZ-3 piezometer readings during Ike and Gustav flies in the face of Dr. Bea's clear admissions at trial,[77] and in the portions of his pre-trial deposition used to keep him from equivocating on the stand during trial.[78]  Dr. Bea admitted "I think it is appropriately explained that way".[79]  All of the geotechnical experts agreed that this is the appropriate and correct explanation for the rising and falling piezometer readings during Ike and Gustav.[80]

### ii. Plaintiffs Now Discard Dr. Bea's Original Underseepage Causation

Plaintiffs' now agree with all the Defense geotechnical experts' opinions regarding pore pressures due to flow; such flow did not contribute to the floodwall failures.  (Pl. Br. 53-54)  However the first of several glaring misconceptions held by Plaintiffs about the significance of Dr. Silva's flow simulator becomes apparent.  Plaintiffs imply that the "second tube", being the four rigid cells manufactured from Plexiglas, demonstrated steady flow/steady state analysis (without

---

[77]   Bea Tr. at 4038:18-4039:4, 3939:17-21.

[78]   JX-1394-0051 to 0052 (Bea Dep. 3/27/12 at 204:21-205:20).

[79]   Bea Tr. at 959:24-961:3; JX-1394-0051 to 0052 (Bea Dep. 3/27/2012 at p. 204:21-205:20).  At his deposition, Dr. Bea added "with the exception of the differences in the pressures, the two peaks don't coincide in terms of their magnitude. It tells me that I'm experiencing losses as I communicate with the water on top of the EBIA site and the piezometer screens that are recording that response. So I have the equivalent of a frictional damping in pressure related to permeability."  This "exception", although difficult to understand, does not modify in any way Dr. Bea's admission in his deposition that the post-Katrina piezometer readings of PZ-3 can be explained solely by the effects of change in the total vertical stress.  *Id.*

[80]   Silva Tr. at 3823:12-25; Marr Tr. at 2179:9-2180:6; Brandon Tr. at 3256:21-3257:11.

flow).  That is false.[81]  ***Both flow simulators demonstrated pore pressure increases due to flow.***  The rigid system does not demonstrate some kind of steady flow/steady state condition ***without flow.***  The only difference in the two simulators was that the steady flow/steady state simulator was a rigid system and steady state ***flow*** was achieved almost instantly as would be the case in a rigid system.  But the EBIA clays, organic or otherwise, were not a rigid system.  On the other hand, the transient flow simulator was a deformable (compressible) system, and steady state flow took much longer to be established, just as was the case in the EBIA deformable (very compressible) clays.  The filmed flow demonstration provided confirms that flow was taking place in ***both*** simulators.

### iii. There Were No "Uplift Pressures" Without Flow On the Landside Of The EBIA Floodwall During The Katrina Storm Surge

The central flaw in Plaintiffs' claims that excavations in the EBIA contributed in any way to the North and South Breaches can be found in the mis-guided, unscientific opinions of Dr. Bea's newly invented "Uplift Pressures" without flow.  (Pl. Br. 54-57, fn. 197)  Those pressures do not exist.  Dr. Bea's brake analogy attempts to describe his invented pressure *sans* flow, but the analogy does not support any invention of pore pressure without flow.   The injection of the word "significant" in the analogy, to modify "flow" (Pl. Br. 54, last line), is ***significant***.  Plaintiffs and Dr. Bea thus admit that there must be flow even for the rigid braking system described in the analogy to work.  In order for the car to stop, the brake pad or the brake shoe has to move, and this movement requires flow of the brake fluid.  Without flow there is no braking force applied.  This is why Dr. Silva stated that without flow, no harm will result, even if one could magically develop the pressures that Dr. Bea incorrectly postulates.[82]

The references to Dr. Silva's declaration and his affirmation of that declaration regarding the approximate velocity of sound in saturated clays (Pl. Br. 55, 56, 66-67) do nothing to support Dr.

---

[81]  *See* fns. 97, 99, *infra.*
[82]  Silva Tr. at 3840:11-3841:3, 3821:15-3822:4.

Bea's invention of pore pressure transmission without flow.  Dr. Silva was simply agreeing to the obvious fact; if you measure P-Wave velocity (dilatational wave velocity) in saturated clays you get a value close to the velocity of sound in water.  That truth in no way confirms the incorrect mechanism that Dr. Bea postulates.  P-Wave velocity (dilatational wave velocity) was not involved with the Katrina storm surge.  Transmission of nearly instantaneous pressures away from the area loaded by the flood waters would either require a sudden event (explosion or earthquake), something known as an inertial force; or a completely rigid system such as Dr. Bea's braking system.[83]  Dr. Bea admitted that no such inertial forces were at work at the EBIA during the Katrina event.[84]  Dr. Bea's injection, during his rebuttal testimony, of Newton's Cradle to illustrate his invented pore pressure without flow, admits that such an effect requires a sudden (dynamic or inertial) event.[85]  Such a seismic shock, similar to devices or mechanisms used by geophysicists to investigate subsoil conditions, simply did not occur at the EBIA during Katrina.[86]  And if such a seismic shock did transmit instantaneous pore pressures, the seismic wave would have passed into infinity without damaging the levee or floodwall.[87]  As the joint soils investigation indicated, there was no rigid system (such as the Berea sandstone) in place of any of the clay soils involved in the EBIA levees.

Plaintiffs are correct that the organic clays that they call "the swamp marsh layer" in the EBIA were fully saturated.  (Pl. Br. 55)  Virtually all the clays in the EBIA were fully saturated.[88]  However, the statement (referencing fn. 203) that "Dr. Marr's demonstrative sample … was at 157%

---

[83]   Silva Tr. at 3821:3-8; Marr Tr. at 1936:24-1937:9; Bea Tr. at 938:8-15.

[84]   Bea Tr. at 4063:24-4064:24.

[85]   *See* Bea Tr. at 3945:8-22, 4062:6-4063:23.

[86]   Marr Tr. 1939:6-8.  As the Court knows, seismic testing for oil and gas exploration is common.

[87]   *See* Marr Tr. at 1937:5-12 ("That pressure wave would increase stresses in the ground, both total stress and pore pressure. There would be no change in strength, though, that happens from that. It's an instantaneous pulse that lasts for milliseconds that occurs in pressure wave transmission theory. There is no flow of water [that] occurs. There is no change in soil volume, which means there can be no change in soil strength. Inertial terms are involved.")

[88]   Silva Tr. at 3704:6-11; Marr Tr. at 2116:4-13; Stark Tr. at 3495:7-11; Brandon Tr. at 3277:16-18.

saturation" discloses a fundamental misunderstanding of soil properties. By definition soils **cannot** exceed 100% saturation. In fact, as the referenced testimony shows, Dr. Marr was speaking of 157% **water content,** not saturation. But this misstatement should not be dismissed as a simple typographical error. It reveals a fundamental misunderstanding of the role of water content in clay soils. As Dr. Marr's testimony goes on to state, water flows through this 157% water content clay "very, very slowly"[89], a proposition with which Plaintiffs and Dr. Bea apparently agree. Dr. Bea's fundamental mistakes are seen in his testimony that: "[i]f the water contents ... are of the order of 30%, it will be the soil structure that is transmitting pressure, and that's much less efficient at the transmission of pressure. So water **content** is crucial to understand pressure transmission."[90] Wrong -- it is the **degree of saturation** of soils not the **water content** of soils that results in an efficient transmission of pore pressures. Clay soil with **30%** water content that is fully saturated will respond virtually identically to a soil with **"157%"** water content that is fully saturated. It is the fact that the pores are completely filled with water that results in an efficient transmission of pore pressures. Dr. Silva testified, and the piezometer references evidence, that the load of water on top of the fully saturated clays in the EBIA is the explanation for the relatively immediate transmission of pore pressures through changes in vertical total stress.[91] All of the fully saturated soils beneath the load, without regard to water content percentages, would have responded in the same way during the undrained (no volume change) loading. Those increases of pore pressures do not transmit to the landside of the floodwall except by virtue of flow, which takes place very, very slowly in comparison to the 30 hour storm surge.[92] The suggestion that Dr. Silva "admitted in his declaration" that high water content results in efficient pore pressure transmission is understandably

---

[89] Marr Tr. at 1925:21-22.
[90] Bea Tr. at 1432:12-18. (Emphasis added)
[91] Silva Tr. at 3823:12-25.
[92] Silva Tr. 3757:17-3758:12; Stark Tr. at 3492:20-3493:5; Brandon Tr. at 3284:9-24.

without citation, since Dr. Silva said nothing of the kind.  Such an immediate transmission of pore pressures from canal side to landside would either require an inertial force or a completely rigid system.  Neither condition existed at the EBIA during Katrina.  If such a transmission was scientifically possible the "excavation" that would have caused failure would be the IHNC itself; it was the largest and deepest excavation that exposed the organic clay layer to water flow or pressure.[93]  Dr. Bea's lack of rational explanation about the canal itself providing the source of pore pressure transmission under his mis-guided theory was unpersuasive.[94]

### C.  Plaintiffs Misuse SEEP/W And SLOPE/W Analyses By Manipulation

Plaintiffs' confusion and misunderstanding of soil mechanics fundamentals are reflected again in their discussion of the only attempt Dr. Bea made to scientifically analyze, with the help of graduate student Mr. Cobos-Roa, the failures at the North and South Breaches.  (Pl. Br. 57-61)  The most significant flaw exposed by this discussion relates to the manner in which Dr. Bea manipulated the basic soil properties input to the flow analysis software to compute his preconceived pore pressures.  Without those fallacious pore pressures, computed using an incorrect model to provide the pressures he wanted at the time he wanted them by manipulating the soil properties,[95] his slope stability analyses would not have predicted floodwall failure by means of flow-induced pore pressure transmission.  Essentially Dr. Bea has been saying, by his multiple explanations for the genesis of his pore pressure values, "trust me, I am the expert, I know what I'm talking about".  That approach is not scientific, and as a result Plaintiffs have not carried their burden of proof that any work done by WGI contributed to the North and South Breaches.

---

[93]  Silva Tr. at 3817:18-3818:6.

[94]  Bea Tr. at 4050:8-4051:15.

[95]  Silva Tr. at 3799:11-3804:12; DX-02674-0090 to 0091 (Cobos-Roa Dep. at 198:1-199:22); JX-1394-0041 to 0042 (Bea. Dep. 3/27/12 at 164:15-165:6, Dr. Bea's first explanation); JX-1395-0055 to 56 (Bea 3/28/12 Dep. at 220:18-221:21, Dr. Bea's second explanation); PX-4697-0006 (Bea 4/16/12 Dep. at 23:3-7, Dr. Bea's third explanation, dilatational modulus); PX-4698.0-0007 (Bea 8/10/12 Dep. at 27:18-28:9, Dr. Bea's fourth explanation, "lost" parametric analyses); Bea Tr. at 945:4-948:17 (The lost parametric studies were deemed by the Court to have never been mentioned before the August 10, 2012 deposition of Dr. Bea.)

### i. Dr. Bea's Use Of Flow Analyses To Derive Pore Pressures Admits That Pore Pressure Transmission From Canal Side To Landside Requires Flow

Plaintiffs admit that both types of seepage analysis, transient and steady flow/state analysis, will indicate **both** pressure and flow.  (Pl. Br. 57-60)  This admission alone debunks Dr. Bea's sometimes-adopted-sometimes-not invention of a pore pressure transmission that does not result from total vertical stress and does not result from flow.[96]  Plaintiffs understand one of the two purposes of Dr. Silva's flow simulator -- to illustrate the differences between transient flow and steady flow.  Unfortunately Plaintiffs do not understand, or choose not to understand, the other, more significant purpose for the simulator, which was to demonstrate the differences between flow into and through an incompressible system (the four rigid cells) and flow into and through a compressible system (the four expandable cells).[97]  It is this latter purpose that describes what had to occur through the millions of cells in the clays of the EBIA; which replicates in miniature the error of Dr. Bea's manipulation of $m_v$ in his SEEP/W flow analysis.  When the EBIA soils are modeled as they really were, very compressible, the resulting correct pore pressures generated by SEEP/W pose no threat to the floodwall.[98]  Essentially, the steady flow simulator replicates the Berea sandstone, as well as the significant steady flow that would immediately develop if the EBIA soils had been made of material with that rigidity.[99]  And, as Dr. Silva testified, if the clays on both

---

[96]  As the Court recognized (*See* Lucia Tr. at 2955:1-3), Dr. Bea's position as to whether or not flow is involved in his invented theory is difficult to understand. *E.g.* JX-1394-0050 (Bea 3/27/12 Dep. at 197:16-18 "Q. So there's no flow, it's just pressure. A: That's Correct"); JX-1395-0042 (Bea 3/28/12 Dep. at 167:9-11 "Q: My question was, is there flow in what you are calling steady flow? A: Yes. There's transmission of fluid."); JX-1395-0043 (Bea 3/28/12 Dep. at 171:8-9 "I am not calculating flow. I'm calculating pressure."); Bea Tr. at 891:3-16 ("The phenomenon of pressure transmission and water quantity transmission or translation is inexorably linked together through the water.").

[97]  Although it is of little consequence to Plaintiffs' discussion of Dr. Silva's flow simulator, the statement that the steady flow simulator did not include the small orifices is simply false. Dr. Bea admitted they did.  Bea Tr. at 3940:24-25  Both the rigid system and the deformable (compressible) system had precisely the same size and number of orifices between each of the cells, and contrary to Dr. Bea's apparent misunderstanding, or mis-hearing of Dr. Silva's testimony, both systems began completely full of water, i.e. to replicate fully saturated soil cells. Silva Tr. at 3725:12-3726:12, 3729:7-12.

[98]  Silva Tr. at 3757:1-3758:3, 3790:3-3793:11; Marr Tr. at 1946:16-18.

[99]  DX-02723 (Video Of Flow Simulator - Time stamped 11 min. 15 sec. to 12 min. 0 sec.).

sides of the floodwall had instead been Berea sandstone, no breaching would have occurred.[100]

Plaintiffs assert that "the experts disagree over the time necessary to establish steady flow conditions at the EBIA" (Pl. Br. 58); in fact all of the experts, except Dr. Bea, agree that it would take approximately one year.  But again Dr. Bea's fallacy is contained within that very statement.  If there is pore-pressure transmission from one side of the floodwall to the other ***without flow***, why would Dr. Bea believe he needs to contend that it would ***not*** take a year for such conditions to exist?  Dr. Bea has admitted that steady flow conditions involve flow.[101]  Plaintiffs assert, contrary to the evidence, that Dr. Bea "looked at what happened based upon field observation and data and chose a model that captured" the field observations and data.  (Pl. Br. 58)  In fact Dr. Bea ***ignored*** the field observations and data collected by his own expert team -- instead substituting material soil properties that would produce the pore pressures he wanted.  Mr. Cobos-Roa testified that "instead of using site specific $m_v$ values [he] tweaked it and put an incompressible ... value into the program intentionally to get a certain response."[102]

Plaintiffs misrepresent the testimony stating that Defendants (Dr. Marr) failed to distinguish steady flow/state analyses from transient flow analyses.  (Pl. Br. 58 & fn. 218)  Similarly, the purported examples of a failure to distinguish proper from improper flow analyses attributed to Dr. Silva are patently untrue.  Of course Dr. Silva did not distinguish between Dr. Bea's invented, type 3 "uplift pressure" (pore pressure transmission without flow) and pore pressure transmission in a proper transient flow analysis -- because Dr. Bea's "Type 3" pressure does not exist.  Dr. Silva never characterized Dr. Bea's use of the impossible compressibility figure of **$1 \times 10^{-9}$** as a "parlor trick"; that characterization was from Plaintiffs.  Nevertheless, Plaintiffs' characterization of Dr. Bea's use of Berea-sandstone-compressibility for seepage analyses then substituting organic clay shear

---

[100] Silva Tr. at 3806:13-3807:5.

[101] JX-1395-0042 (Bea 3/28/12 Dep. at 167:9-11).

[102] DX-02674-0099 (Cobos-Roa Dep. at 214:22-215:2).

strengths for stability analyses as a "parlor trick" is apt.  It is only in the world of make believe that a "scientist" would, as Plaintiffs admit Dr. Bea did, treat "soft, high-water-content soils [as though they would] behave like sandstone in terms of compressibility".  (Pl. Br. 59)  Plaintiffs other experts, Dr. Rogers and Kevin Pope, by means of their pumping tests at Plaintiffs' chosen EBIA site, determined the ***actual site specific compressibilities*** analyzing these same "high-water-content" fully saturated soils for conditions similar to those during the Katrina storm surge.[103]  Dr. Bea failed to use those compressibilities.  There has not been, and cannot be, a proper scientific explanation for this manipulation of the actual soil properties in favor of the compressibility of Berea sandstone.

Dr. Stark's hypothetical testimony about treating fully saturated soils as relatively incompressible (in the context of total vertical stress (one dimensional)) is quoted and cited out of context.  (Pl. Br. 59, fn. 223)  Dr. Stark never testified that the actual soils in the EBIA were incompressible.  To the contrary, he repeatedly referred to the site specific compressibility of the levee fill as relatively very compressible.[104]  Dr. Bea's utilization of increases in pore pressures from piezometers, at the 17th Street Canal or from (PZ-3) can be explained, as he admitted, solely by the load of flood waters increasing the total vertical stress on the soils below.[105]

Plaintiffs' insist that "SEEP/W was the proper program for determining these pressures" -- setting up a straw man -- as though the far-more-eminently-qualified experts had disagreed with that assertion.  (Pl. Br. 59)  However, the adage "garbage in, garbage out" is apt here.  When SEEP/W is manipulated, as it was, by inputting totally improper geometries and invented soil properties, it will produce totally improper outputs of bogus pore pressures.  SEEP/W is a seepage program designed

---

[103] Bea Tr. at 925:11-20 ("Q: That actual **mv** derived from Dr. Rogers' and Kevin Pope's work on the South EBIA site is 2 times 10 to the minus 5, 1 over PSF; isn't that right? A: Correct, sir."); JX-1672-0078 (Silva Expert Rep. at 67, indicating that the storativity values obtained by Dr. Rogers and Mr. Pope from Plaintiffs' pumping tests produced an **m**v value of **2 x 10-5 1/psf**); Rogers Tr. at 698:17-699:25 (The Plaintiffs' experts computed a storage coefficient for the organic clay soils but were not asked to provide the values to Dr. Bea).

[104] Stark Tr. at 3421:7-10; JX-1780-0184, 0193 to 0201 (Stark Rep.).

[105] *See* fns. 77-79, *supra*.

to determine pressures **due to flow**.  It is not a stress distribution program capable of modeling an immediate response of pressures in a no flow condition.  The principal legitimate purpose of SEEP/W modeling in this case was to determine accurate pore pressure values to input to the SLOPE/W stability analyses.  If pore pressures are artificially created by incorrect soil properties, then the results of the stability analyses so accomplished are scientifically invalid.

WGI does not complain "that **had** Dr. Bea performed a transient flow analysis his inputs would have been wrong."  (Pl. Br. 59)  Dr. Bea **did** perform a transient flow analysis, and his inputs **were** wrong on many counts.  The protestation that "[h]e was not performing a transient flow analysis" is incorrect.[106]  Mr. Cobos-Roa admitted that the SEEP/W analysis method he selected was the transient analysis method.[107]  In fact, Mr. Cobos-Roa (at Dr. Bea's direction) could have but did not select the steady state method.[108]  And the argument that Dr. Silva's SEEP/W runs using Dr. Bea's improper, and impossible, inputs "verified" Dr. Bea's analyses, insults the readers' intelligence.  The computer must compute the same results given the same inputs.  That does not verify the inputs.

Finally, to the issue of Dr. Bea's claimed use of "steady flow analysis", which he did not perform, it should be noted that the only plausible way mathematically to have steady state flow conditions without flow – in a system subjected to a total head difference (as was the EBIA during the Katrina storm surge) – would be to substitute the value "**0.0**" for "**k**" in the following flow equation found as Equation 17.1 on p. 251 of *Soil Mechanics*, which is Darcy's Law.[109]

---

[106] DX-02674-0092 to 0093 (Cobos-Roa Dep. at 202:3-203:22); Bea Tr. at 888:2-5 ("Q: But you still thought it was important to have Diego Cobos-Roa do a transient flow analysis using a computer program known as SEEP/W? A: Correct."); Bea Tr. at 911:21-913:2; Silva Tr. at 3798:6-13.

[107] *Id.* It is undisputed that Mr. Cobos-Roa used the SEEP/W software to conduct transient flow analyses in connection with Dr. Bea's testimony in the *Barge* litigation, Dr. Bea's testimony in the *Robinson* case, and all of the papers that Dr. Bea and Mr. Cobos-Roa prepared in 2008 regarding the EBIA failures. Bea Tr. at 912:16-913:2.

[108] DX-02674-0106 (Cobos Roa Dep. at 227:22-228:1).

[109] DX-02715-0262.

$$Q = k \frac{h_3 - h_4}{L} = kiA$$

(17.1)
where

$Q$ = the rate of flow
$k$ = a constant, now known as Darcy's coefficient of permeability
$h_3$ = the height above datum which the water rose in a standpipe inserted in the entrance end of the filter bed [=Katrina storm surge height]
$h_4$ = the height above datum which the water rose in a standpipe inserted in the exit end of the filter bed [=landside water table elevation]
$L$ = the length of sample [distance between $h_3$ & $h_4$]
$A$ = the total inside cross-sectional area of the sample container [cross section of EBIA clay at the floodwall]

$i = \frac{h_3 - h_4}{L}$ , the gradient

**Equation 17.1, now known as Darcy's law, is one of the cornerstones of soil mechanics.**

Dr. Bea's concept of using a computer program (SEEP/W) based on Darcy's Law to produce pore pressures *without flow* is illustrative of his disregard of fundamental soil mechanics and flow-through-porous-media principles. One cannot scientifically use a flow-equation-based model to determine pore pressures *without flow*. That requires a stress distribution model.[110] And as Dr. Silva demonstrated, the increased pore pressures due to the change in total stress would be limited to the soils beneath the water load and the flow through these relatively impermeable, compressible soils, would result in virtually no pressure transmission toward the landside.[111]

### ii. Dr. Bea's Stability Analyses' Results Based On Mis-Conceived Pore Pressures Are Scientifically Indefensible

Plaintiffs admit: (1) that Dr. Bea's stability analyses use "the pressures generated by the SEEP/W analyses"; and, (2) that "[s]lope stability analyses depend heavily on the characterization of the relevant soils". (Pl. Br. 60) Item (1) is important because all of Dr. Bea's opinions as to factors of safety were based on significantly exaggerated pore pressures imported into SLOPE/W from his improper SEEP/W analyses. Item (2) is important because Dr. Bea did *not* characterize

---

[110] Silva Tr. at 3815:5-9; DX-02674-0129 (Cobos-Roa Dep. at 288:3-13).
[111] Silva Tr. at 3750:24-3751:12.

the "relevant soils" consistently.[112]  If Dr. Bea was going to use Berea sandstone compressibilities, consistency would require the use of Berea sandstone shear strengths in his SLOPE/W stability analyses.  It *was* a "parlor trick" to do otherwise.

Once again utilizing a straw man, Plaintiffs suggest that "[c]ontrary to Defendants' repeated suggestions, Dr. Bea ran his analyses for both drained and undrained conditions."  (Pl. Br. 60)  Defendants made no such suggestions.  Defendants' experts have instead consistently demonstrated that the conditions at the EBIA during the Katrina were undrained conditions and that Dr. Bea has not correctly or consistently analyzed those conditions.  (WGI Br. 46-50)

Plaintiffs argue that Dr. Bea's stability analyses showed, by modeling the so-called "near breach" location, "that *in the absence of hydraulic connections*, Type 1 total stress pressures were not significant on the protected side and the probability of lateral stability failure was less than 30% for peak surge elevation."  (Pl. Br. 61, emphasis added)  The admissions implied in this statement are that *if there were* what Plaintiffs call "hydraulic connections", Type 1 total stress pressures *would be* significant.  Plaintiffs admitted earlier, correctly, that these Type 1 pressures were not causative.  Plaintiffs then state without reference to the newly invented "Type 3" pressures that "the important causative pressures … required hydraulic connections".  (Pl. Br. 61)  It is difficult to remain consistent, or logical, when Plaintiffs' theory is unscientific.[113]

No matter which unscientific theory Dr. Bea relies upon, the postulation of "hydraulic connections" that "existed only because of poorly-backfilled excavations" has no factual or scientific merit.  *First*, there is no proof of any excavations that were not backfilled pursuant to USACE direction and inspection.[114]  All the significant excavations were backfilled with soils at

---

[112] Stark Tr. at 3433:14-3435:10; Brandon Tr. at 3191:4-3202:25.

[113] There were "hydraulic connections" as Plaintiffs define them, at the "Near Breach" site; but all the excavations at the North and South Breach sites were backfilled and compacted, hence no such "hydraulic connections".

[114] Rogers Tr. at 762:8-17; Sykora Tr. at 3103:5-11.

least as impermeable as the surrounding soils[115] and were compacted to the density of the surrounding soils.  (WGI Br. 18-19, fns. 71-72)  *Second*, as is explained in more detail in response to Plaintiffs' discussion of the "Near Breach Corroboration" (pp. 38-40 *infra*), the assumption that excavations in the McDonough Borrow Pit (so-called "near breach" location) did not penetrate the organic clay layer is simply not correct.  *Third*, Dr. Bea's newly-minted pressure transmission, Type 3 "uplift pressures", would transmit pressure without flow, so any hypothetical poorly backfilled excavations would not matter.

### D.  Plaintiffs' "Corroborations" Do Not Support Dr. Bea's Flawed Failure Opinions

Steady flow modeling, 17th Street piezometer readings, the so-called "near breach", and "forensics" at the EBIA post-Katrina do nothing whatsoever to support Dr. Bea's invented notion of a third type of pressure.  Repetition does not make it so.

### i.  Scientific Analyses Of Katrina Storm Surge Effects At The EBIA Require An Acknowledgement That Conditions Were Transient Not Steady

As indicated at p. 31 *supra*, what Dr. Bea directed Mr. Cobos-Roa to do, as his only attempt at a scientific basis to determine relevant pore pressures, was a ***transient flow*** analysis.  Dr. Bea's model did not use the steady flow method, and was not a steady state flow model.  Plaintiffs attempt to argue that steady flow conditions existed during the Katrina event and assert that: "Dr. Silva made clear that such conditions *might* exist, but he believed they would take many months to come about."  (Pl. Br. 66, emphasis added)  *First*, Dr. Silva did not ever use the words "such conditions ***might*** exist" with respect to Katrina storm surge effects.  What Dr. Silva and all the qualified geotechnical engineering experts said consistently was that soil will achieve steady flow conditions if you wait long enough.[116]  *Second*, it is not a question of these experts' "belief", but rather that it is

---

[115] Silva Tr. at 3744:8-12, 3745:9-15.

[116] Silva Tr. at 3728:11-12, 3737:11-16; Marr Tr. at 1930:18-1931:9; Brandon Tr. at 3207:15-20; Stark Tr. at 3416:25-3417:14.

clear from a century of geotechnical engineering experience and analyses that steady flow would have taken hundreds of times more than 30 hours, with flood waters remaining at maximum storm surge height, for steady flow conditions to develop.[117]

Plaintiffs admit that Dr. Silva's "ingenious" simulator accurately depicted the differences between steady flow and transient flow.  (Pl. Br. 66)  However, Plaintiffs do not understand, or choose to ignore, the flow simulator's demonstration of the difference between compressible soils' behavior (representing the compressible clays in the EBIA) and Dr. Bea's inapplicable rigid incompressible system.  Plaintiffs compound their misunderstanding by stating that the transient flow simulator had "air bags".  (*Id*)  Both systems were *void* of air, representing four fully saturated cells of soil in each simulator.[118]  Plaintiffs repeat Dr. Silva's testimony about dilational wave velocity (which cannot apply without dynamic or inertial forces that did not exist in the EBIA) and then illogically imply that steady flow conditions "may" exist as a result.  (Pl. Br. 66)  In fact, while it is true that the dilational velocity of water equals the dilational velocity of saturated soil (no matter its water content percentage), that does not imply that steady flow conditions exist simply because soils are fully saturated.  That is classic junk science.[119]

Plaintiffs' statement that Dr. Silva's "simulator "does not suggest which model is appropriate for the site conditions at the EBIA" again reflects Plaintiffs' misunderstanding of the simulator and the basic effects of compressibility on pore pressure and flow.  (Pl. Br. 67)  A proper flow evaluation cannot separate pore pressure from flow.  The transient simulator with its latex rubber cells simulates the EBIA compressible soils, not the invented incompressible soils utilized by Dr.

---

[117] Silva Tr. at 3737:11-14, 3758:4-12; Brandon Tr. at 3229:8-11, 3284:9-24; Marr Tr. at 1919:4-7; JX-1864-0062 (Marr Rep., p. 62); Lucia Tr. at 2940:18-25.

[118] Silva Tr. at 3726:2-12.

[119] Silva Tr. at 3704:16-3705:5, 3705:19-22, 3818:8-19; DX-02715-0402, Lambe & Whitman at 391, Chapter 26, opening paragraph, makes it clear that one does have transient flow conditions in fully saturated soils in situations such as the Katrina storm surge.

Bea.[120]   The steady flow simulator shows why Dr. Bea's incorrect use of incompressible soil properties in his SEEP/W flow analyses would produce erroneous pore pressures to insert into his SLOPE/W stability analyses to predict failure from seepage.[121]   SEEP/W deals with seepage and the pore pressures that accompany seepage (flow).[122]

Finally, Plaintiffs' unsupported, unscientific argument that steady flow conditions existed at the EBIA during Katrina urges that Defendants' modeling "ignores Dr. Bea's proffered cause [of failure]".  (Pl. Br. 67)  Dr. Silva did not "ignore" Dr. Bea's proffered cause of failure; rather he testified that Dr. Bea's "proffered" cause of failure was non-existent in the science of geotechnical engineering.[123]   Without flow in Dr. Bea's erroneously confected SEEP/W computer model runs there would have been no excess pore pressures to insert into his SLOPE/W model to predict floodwall failure.[124]

### ii. Dr. Bea's Graphs of Piezometer Readings Do Not Corroborate Any Of His Unscientific Analyses

These issues have been addressed at p. 23 *supra*.  Plaintiffs' arguments for this novel use of piezometers are unavailing.  (Pl. Br. 67-69)  In summary, as Dr. Bea admitted, the piezometer readings at the EBIA can be appropriately explained by the weight of the floodwaters during storm surges: "I think it is appropriately explained that way…."[125]   Although Dr. Bea's SEEP/W analyses of the 17th Street Canal are missing along with his alleged parametric analyses, and therefore cannot be evaluated, Dr. Bea and Dr. Rogers admitted that the conditions at the 17th Street Canal, including the permeabilities of the so-called "swamp-marsh" layer, were very different than those at the

---

[120] Silva Tr. at 3806:21-3807:8, 3723:11-3724:13, 3725:3-10, 3726:22-25, 3727:6-24, 3754:21-3755:1.
[121] Silva Tr. at 3806:21-3807:8.
[122] Silva Tr. at 3798:6-13.
[123] Silva Tr. at 3818:8-19.
[124] *See* Silva Tr. at 3841:10-3842:6.
[125] *Supra* at p. 23; Bea Tr. at 960:6-961:3; JX-1394-0051 to 0052 (Bea Dep. 3/27/2012 at 204:21-205:20).

EBIA.[126]

What Plaintiffs describe as "piezometric corroboration" is analogous to an attempt to corroborate the qualities of an apple by looking at the qualities of an orange.  The piezometers referenced by Dr. Bea measure total head, by which pore pressures, and changes in pore pressures, can be computed.[127]   As a result, when changes in total stress occurred at the EBIA during Hurricanes Gustav and Ike, piezometer PZ-3 reflected the corresponding changes in pore pressure.  On the other hand, SEEP/W can only compute pore pressures resulting from flow.  Changes in pore pressures from total stress changes cannot corroborate pore pressures resulting from flow -- they result from two different mechanisms.  The pore pressures computed from total stress changes at the EBIA do not require flow.  The pore pressures computed from a flow analysis, like SEEP/W, require flow.  When there is "no flow", as Dr. Bea now contends, the piezometer can only measure pore pressure changes resulting from changes in total stress -- in this case, the load of water on the EBIA.

Speaking to a question as to why he used the artificial **m$_v$** of **1X10$^{-9}$ 1/psf** instead of the higher value for the compressibility of water -- given the importance he placed on fully saturated soils -- Dr. Bea testified that "we in fact investigated that specific value [the compressibility of water] and also the 10 to the minus 9.  The 10 to the minus 9 *gave us the best agreement with the measured piezometer results.*"[128]   This testimony also reveals a fundamental misunderstanding of soil mechanics.  Any such "agreement" or "match" is completely artificial and without meaning.  This indicates that Dr. Bea's "parametric analyses" were to the response of total stress loading, not to the failure of the floodwall.

Plaintiffs' discussion of piezometer PZ-3's response to storm surge waters during Gustav and

---

[126] Bea Tr. at 950:10-951:9; Rogers Tr. at 690:19-692:11.
[127] Silva Tr. at 3711:5-3712:4.
[128] Bea Tr. at 927:18-22 (emphasis added).

Ike includes the comment that the EBIA surface was "riddled with excavations", implying that excavations somehow explain the piezometer readings and PZ-3's rapid response to the floodwaters. (Pl. Br. 68)  However, these excavations had been backfilled and compacted after Katrina, years before Gustav and Ike, and Dr. Bea has admitted that the response can be explained solely by the increased total stress from the waters loading the EBIA.  If no excavations ever took place the response would have been the same.[129]  Furthermore, the explanation for the lack of response in PZ-2 on the landside of the floodwall is similarly explained.  Of course PZ-2's readings would not increase -- there was no load of water above PZ-2 during Gustav and Ike.[130]

Plaintiffs set up still one more straw man when they state: "Defendants suggested that the Corps' piezometers were simply unreliable."  (Pl. Br. 69)  In fact Dr. Bea, in his original report,[131] suggested possible reliability issues with piezometer *readings*.  Standpipe piezometers cannot be completely sealed if they are to work properly.  If completely sealed there would be compression of a column of air in the piezometer by the rising water column.  A reliable reading would then require knowledge of the pressure in that column of air to accurately calculate, from the measurements of head, the correct pore pressures.[132]  Again, a piezometer simply measures the height of water in the standpipe, from time to time, and from those measurements pore pressures are calculated.  Similarly, if water has intruded into the standpipe through the vent the water height would be raised and the measurement distorted by adding such intrusion to water flowing through the filter at the bottom of the piezometer, resulting in a false computation of pore pressures.

### iii.  Dr. Bea's So-Called "Near Breach Corroboration" Is Completely Unreliable

Dr. Bea claims that his Near Breach analysis of the McDonough Marine site demonstrates

---

[129] *See* Marr Tr. at 2179:22-2180:6.
[130] Bea Tr. at 1339:18-25.
[131] JX-1392-0009, (Bea's Original Report).
[132] Silva Tr. at 3712:20-3713:9.

what the uplift pressures at the North and South breaches would have been if WGI had not excavated any holes that reached the organic clay layer.[133]  In its opening brief, WGI explained that this "Near Breach" model was fundamentally flawed because Dr. Bea:  (1) incorrectly assumed that no excavations on McDonough reached the organic clay layer; (2) inexplicably used different boundary conditions and permeability values for the Jourdan Avenue box culvert than were used for the North and South breach models; and (3) incorrectly modeled the "Near Breach" using a lower initial gradient than he used at the North Breach.  (WGI Br. 68-71)  As a result, the exit gradients and resulting factor of safety that Dr. Bea calculated for the "Near Breach" are wrong.  (*See id.* at 70-71)  And, if Dr. Bea corrected those errors, then his flawed model would have predicted failure at the "Near Breach".[134]

Plaintiffs' brief does not remedy any of these flaws.  *First*, they claim that Dr. Bea's assumption that the borrow pit on McDonough Marine did not reach the organic clay or "swamp-marsh layer" is consistent with a single cross-section in Dr. Marr's expert report.  (Pl. Br. 70 & fn. 285)  But that is irrelevant.  Because the borrow pit's 2.4-acre bottom is uneven, it is not surprising that in some locations, such as the location in Dr. Marr's cross-section, the pit's bottom does not reach the organic clay layer.  In other locations the borrow pit clearly did reach the organic clay layer.[135]  Dr. Bea has admitted as much on a number of occasions.  (WGI Br. 68-69 & fns. 306-07)  In any event, WGI also excavated an 18-foot deep area of contamination on McDonough Marine,[136] as well as numerous deep pilings.[137]  These features also reached the organic clay layer.

---

[133]  Bea Tr. at 1292:4-1293:3, 1293:23-1294:7.

[134]  Stark Tr. at 3435:11-3436:2.

[135]  Dr. Marr's Figure G-9 (JX-1871-0016) cross-section transects the borrow pit approximately 40 feet north of its southern extent.  The figure indicates that the organic clay layer at that location begins at -10 feet NAVD88(2004.65).  The maximum depth of the borrow pit, based on a July 2005 Wink Survey, was -11.4 feet NAVD88 (2004.65), which is more than a foot below the organic clay layer.  *See* JX-1674-0016 (Silva Rep., App. B, Fig. 13); WGI Br., Ex. 2.

[136]  JX-0119-0043 (McDonough Marine NFAATT, Table 2); *see* WGI Br. Ex. 2 (summarizing NFAATT excavations on McDonough that would have reached the organic clay layer).

[137]  JX-1674-0017 (Silva Rep., App. B, Fig. 14) (indicating removal of 30-foot and 43-foot long on-shore pilings at

*Second*, Plaintiffs attempt to negate Dr. Stark's testimony proving that Dr. Bea inexplicably used different parameters and inputs for the "Near Breach" model than he used for the North/South Breach models.[138]  But these explanations fail to save Dr. Bea's analyses.  For example, Plaintiffs point to Dr. Bea's testimony where he states that the reason he used a lower initial gradient at the "Near Breach" was based on no excavations in contact with the "swamp-marsh" layer on McDonough.[139]  That assumption is flat wrong.  *Finally*, Plaintiffs have no explanation for Dr. Bea's use of a different permeability value for the Jourdan Avenue culvert in his "Near Breach" model.  The inescapable conclusion is that his Near Breach analysis does not "corroborate" anything.

### iv.  Defendants' Geotechnical Engineers Offer Science, Not Argument

Plaintiffs' repeated use of the title "forensic" to enhance Dr. Bea's suspect qualifications for the scientific work required by this case is simply a misguided, argumentative attempt to impart validity by means of argument, rather than by means of science.  (Pl. Br. 71)  The reference to physicians and hypothetical sixth-sense-disease-diagnoses adds nothing to the issues facing the Court in this case.  Dr. Bea's self-described forensic signature photographs do not support his theories.  The referenced photograph (*id.* fn. 294) provides no evidence of lateral displacement of "blocks", and no such displaced blocks were ever identified at the EBIA during the numerous field inspections by many engineers and geologists.[140]  In fact that photograph shows uninterrupted straight lines near the landside levee toe, which Dr. Silva testified meant that there was no lateral displacement of blocks.[141]  What Dr. Bea references, in the form of puddles of undetermined depth,

---

McDonough Marine); Guillory Tr. at 2429:7-15 (describing off-shore pilings removed along bank line at McDonough Marine).

[138] Pl. Br. 70, fn. 289 (citing Bea Tr. at 4047:14-4049:2, 4149:16-4153:6).

[139] Bea Tr. at 4048:23-4049:2.

[140] Silva Tr. at 3771:1-25.

[141] Silva Tr. at 3772:1-17.

is simply an erosional feature caused by the inflow and outflow of waters from both Katrina and Rita.[142]  This photograph and others do however clearly show the effects of wave overtopping and surge overtopping scour.[143]

### v. Dr. Bea Provided No Corroboration For His Flawed, Unscientific Analyses

There is no scientific basis for Dr. Bea's opinions.  His latest iteration of what began, in ILIT, as underseepage flow, blowout, piping and heave has morphed into his invention of pore-pressure-transmission-without-flow, his "Third Type" of pore pressure.  The statement that Dr. Bea, "unlike the defense experts … did look to field measurements during the storm and to similar conditions in subsequent storms" is simply untrue on both counts.  (Pl. Br. 72)  Dr. Silva, and indeed the other defense experts, looked at all the field measurements at the EBIA soils, as well as the post-Katrina piezometers.  On the other hand Dr. Bea ignored the actual soil properties carefully determined by the Court-ordered joint soils investigation work, substituting his non-existent soil properties in order "intentionally to get a certain response."[144]  It is unacceptably unscientific to first assume the response and then calculate the means that will be required to provide that response.

## V.    DEFENDANTS' CAUSES OF FAILURE ARE SUPPORTED BY THE RECORD

As Plaintiffs admit, (Pl. Br. 72) they bear the burden of proving causation.  This Court must determine whether Dr. Bea's unscientific geotechnical opinions prove that WGI's work was a substantial cause of Plaintiffs' alleged damages, *not* whether the other potential modes of failure identified by the Defense experts caused the North and South Breaches.  Nevertheless, it is the Defense experts' failure modes (not Dr. Bea's) that are supported by the record.  (WGI Br. 72-104)  Some of those failure modes go unmentioned in Plaintiffs' brief, and for good reason.[145]  Other

---

[142]  Bea Tr. at 4009:10-15, 4010:3-5; Morris Tr. at 203:8-10; Bea Tr. at 1276:4-7.

[143]  Silva Tr. at 3761:22-3764:6, 3765:14-3766:25; DX DM-0015-0069 (Silva Dem.).

[144]  DX-02674-0099 (Cobos-Roa Dep. at 214:22-215:2).

[145]  Plaintiffs do not address the impact of the tension gap because Dr. Bea agrees that the gap played an important part in the

failure modes Plaintiffs attempt to discredit with misleading arguments and nonexistent facts, as explained below.  In all respects, Plaintiffs' arguments are without merit.  The Defense experts' modes of failure – although not determinative here – are the best explanation for why the breaches occurred.

### A. The Only Qualified Waves Expert in this Case Opined that Waves *Were* Sufficient to Cause Overtopping at the EBIA Floodwall During Katrina

Dr. Dalrymple demonstrated at trial that the waves in the IHNC were high enough between 3:00 and 4:00 a.m. on August 29, 2005, to begin overtopping the EBIA floodwall, and those wave heights increased throughout the morning.  (WGI Br. 81-90)  Plaintiffs offered no evidence to contradict this.  What is more, Dr. Bea, the only witness who spoke about waves for the Plaintiffs – although himself not an expert in the field – *agreed* with Dr. Dalrymple's conclusions about the wave heights.  (WGI Br. 86-90)  Based on these facts alone, Plaintiffs' attempts to undermine Dr. Dalrymple's wave overtopping opinions should be dismissed outright.  (*See* Pl. Br. 72-79)  As further support, WGI offers the following reasons why Plaintiffs' arguments – based entirely on misrepresentations of the record – should be rejected.

### i. Dr. Dalrymple's Wave Height Conclusions Are Correct And Are Endorsed by Dr Bea

Plaintiffs first suggest that "the record shows" Dr. Dalrymple's "estimate of wave height" at 3:00 a.m. on August 29 to be false, and that Dr. Dalrymple "admitted that his wave height estimate at 3:00 a.m. was incorrect."[146]  Dr. Dalrymple admitted no such thing.[147]  His testimony that waves

---

destabilization of the EBIA floodwall.  WGI Br. 76-78.  Similarly, Plaintiffs do not – and cannot – dispute that the EBIA floodwalls were not designed to withstand the overwhelming impact of the Katrina storm surge.  WGI Br. 72-76.

[146]  Pl. Br. 75 & fn. 311.  Elsewhere in their brief, Plaintiffs suggest that, "[i]n order for Dr. Dalrymple ... to explain that waves overtopped the wall ... the waves [must] be over three feet in height."  Pl. Br. 76.  This is not true.  By at least 4:00 a.m., some waves of less than three feet likely overtopped the floodwall, and many waves of less than three feet would have overtopped the wall after 4:00 a.m.  WGI Br. 88-89.

[147]  Plaintiffs attempt to manufacture an admission by citing to Dr. Dalrymple's testimony regarding a portion of his expert report, JX-01713-0011, that describes waves reaching three feet at 3:00 a.m. on August 29.  Pl. Br. 75.  But Dr. Dalrymple made clear that that portion of his report does not reflect his wave height estimate at 3:00 a.m.  Dalrymple Tr. at 2796:17-2797:12; *see also* JX-01713-0007 (Dalrymple Rep.) ("*Sometime after 3:00 am* in the morning of the 29th, waves began

in the IHNC reached a significant wave height of 1.13 feet at 3:00 a.m. is in agreement with Dr. Bea's wave height estimate at the same time.  (WGI Br. 87-88, 90)  In fact, *all* of Dr. Bea's and Dr. Dalrymple's significant wave heights are roughly the same.  (*Id.* 87-90)  Dr. Bea also agrees with Dr. Dalrymple that, to determine the maximum wave height (the highest waves in the sea system during a given period of time) from the significant wave height (the average of the top third highest waves in the sea system), one need only calculate the mathematical relationship that exists between the two.  (*Id.* 86)  This evidence is not in dispute.

Plaintiffs also criticize Dr. Dalrymple's reliance on William Villavasso's eyewitness testimony because Mr. Villavasso admittedly could not remember exactly when he first saw waves splashing over the EBIA floodwall.  (Pl. Br. 75)  But the exact timing is not important.  Mr. Villavasso said "over and over again" that the splashing occurred sometime after 3:00 a.m.[148] – just as Dr. Dalrymple testified at trial.[149]  This is consistent with Dr. Dalrymple's opinions, and Plaintiffs have no evidence to contradict him.

### ii. As A Result Of Diffraction, Not All Waves In The IHNC During Katrina Followed the Direction of the Wind

Next, Plaintiffs imply that Dr. Dalrymple's opinions are inaccurate because the STWAVE models in IPET – which Dr. Dalrymple relied on to conduct his analysis – assumed that winds at 5:30 a.m. were "aligned with the axis of the MRGO/GIWW-INHC [sic] intersection," whereas the parties in this case stipulated that the prevailing winds in the early morning of August 29 were out of the north/northeast.[150]

---

splashing over the IHNC walls near the Florida Avenue Bridge.") (emphasis added).

[148] Dalrymple Tr. at 2802:18-2803:3; *see also* DX-02667-0023 (Villavasso Dep. at 57:6-17).

[149] Dalrymple Tr. at 2747:17-2749:7.

[150] Pl. Br. 75-76.  Plaintiffs appear to suggest that, as a general matter, Dr. Dalrymple was misguided in relying on the STWAVE models to support his wave and overtopping opinions.  But Plaintiffs fail to mention that Dr. Bea relied on the very same information from the STWAVE models that Plaintiffs complain about in their brief.  *See* JX-01389-0022 to -0023 (Bea Rep.) (citing IPET); Bea Tr. at 4065:4-4067:9.  Plaintiffs acknowledge that IPET also relied on the results from the STWAVE models.  Pl. Br. 78.  As Dr. Dalrymple explained, the STWAVE models represent "the Corps's best effort at

As an initial matter, these two wind directions are not necessarily in conflict.  The STWAVE models assumed that the winds were "*relatively* well-aligned with the axis of the MRGO/GIWW,"[151] which Dr. Dalrymple explained likely meant that the winds were plus or minus 20 degrees from the MRGO/GIWW axis, and the axis is itself "a little bit north of east."[152]  As a result, the STWAVE model assumed that the winds were blowing "down the GIWW from the east to the west somewhere in that same direction,…[s]o *east, northeast*."[153]  Attachment C to Plaintiffs' brief, which purports to show wind directions during the morning of August 29, is in substantial agreement with Dr. Dalrymple's interpretation.[154]

Ultimately, however, Plaintiffs' complaint about wind direction is moot, because Dr. Dalrymple presented uncontroverted testimony that not all of the waves in the IHNC during the early morning hours of August 29 followed the direction of the wind.  (WGI Br. 83-85)  Rather, as waves traveled down the IHNC through the narrow and then considerably wider section of the canal at the location of the Florida Avenue Bridge, the waves radiated in many different directions – a phenomenon known as diffraction.  (*Id.* 84-85)  Some of these waves made contact with the floodwalls on either side of the IHNC and then reflected back across the canal, including from the west bank to the EBIA.  (*Id.* 82-83, 85)  Some waves collided with each other in the canal and joined forces to create even larger waves.[155]  In effect, the IHNC became "a reflective container [of] waves ... bouncing every which way."[156]  Plaintiffs presented no expert testimony to counter any of this evidence.

---

the time to predict what the wave heights were in the IHNC." Dalrymple Tr. at 2823:19-23.

[151] JX-02033-1814 (IPET) (emphasis added).

[152] Dalrymple Tr. at 2825:10-19.

[153] *Id.* at 2825:20-25 (emphasis added).

[154] Pl. Br. 4, Attachment C at 1, 2 & 4 (describing the various wind direction assumptions at 5:30 a.m. as follows: (1) IPET/STWAVE: "[F]rom 1:00 am – 6:00 am, the winds are aligned with the axis of the MRGO/GIWW, indicating winds *out of the E/NE – N/NE*"; (2) Parties' stipulations: "Between 4 – 7 AM, prevailing winds were *out of N/NE*"; (3) Dr. Dalrymple: "[W]inds near the MRGO Reach 2 levee were blowing to W/SW or *out of E/NE*.") (emphasis added).

[155] Dalrymple Tr. at 2744:12-21.

[156] *Id.* at 2817:13-18.

Elsewhere in their brief, Plaintiffs claim (without support) that "neither of the STWAVE models suggests that the waves were hitting the Lower 9th Ward east wall at all." (Pl. Br. 76)  In fact, IPET's description of the STWAVE model states the opposite,[157] as does the Plaintiffs' own brief.[158]  Citing Dr. Dalrymple's trial demonstrative, Plaintiffs also claim that "[b]ecause of the distance from the Florida Avenue Bridge, diffracted waves could not have reached the South Breach."[159]  But Dr. Dalrymple testified explicitly that diffracted waves *did* reach the South Breach.[160]  Plaintiffs' STWAVE- and wind-related arguments have no credibility.

### iii.  Waves that Impacted the EBIA Floodwall Doubled in Height

Dr. Dalrymple's testimony that waves doubled in height when they impacted the IHNC floodwalls – including the EBIA floodwall – was not challenged by any expert.[161]  Plaintiffs now contend that, "[i]n order for Dr. Dalrymple ... to explain that waves overtopped the wall ... the waves must strike the east wall at a 90° angle."[162]  Plaintiffs misrepresent Dr. Dalrymple's opinion. Dr. Dalrymple said he suspected the doubling effect would be the same if waves hit the floodwall at different angles.[163]  Nowhere has he expressed that waves double *only* when they impact a floodwall at a 90 degree angle.  Nor can Plaintiffs prove this proposition.

Regardless, Plaintiffs' argument implies that waves hitting the floodwall at anything other than a precise 90 degree angle have no effect on overtopping, which is absurd.  Even assuming, hypothetically, that a wave striking the wall at a 45 degree angle increases in height by only 50%,

---

[157] JX-02033-1814 (IPET) ("[T]he primary source of wave energy *incident upon the floodwalls* along the Lower Ninth Ward . . .") (emphasis added).

[158] Pl. Br. 76 ("The model described in IPET IV-226-227 estimated that the *wave height at the Lower 9th Ward floodwall* at 5:30 am were 2 to 3 feet.") (emphasis added).

[159] *Id.* 77 & fn.320 (citing DX-DM0006-0027 (Dalrymple Dem.)).

[160] Dalrymple Tr. at 2851:3-22.

[161] *See id.* at 2743:19-2744:14, 2744:22-2745:6.  Of course, Dr. Dalrymple has never opined that, upon impact, waves "splash[] to a height that is double the height of the *wall*," as Plaintiffs claim.  Pl. Br. at 77 (emphasis added).

[162] Pl. Br. 76.  Plaintiffs also claim that, "even with diffraction, [waves] would not hit the [] east wall at a 90° angle." *Id.* at 77.  Plaintiffs offer no support for this statement because none exists.

[163] Dalrymple Tr. at 2792:4-19, 2793:2-4 (emphasis added).

this would still be enough to overtop the wall at the North Breach by 4:00 a.m.[164]  And of course, at or near 5:00 a.m., when the IHNC water level reached 10.3 feet, the significant wave height reached 2.5 feet, and the maximum wave height reached 4.6 feet, considerable wave overtopping would have occurred even assuming, counterfactually, that the waves did not double at all.[165]  Simply put, Dr. Dalrymple determined that, as Katrina's wind and storm surge intensified over time, enough waves of sufficient height impacted the EBIA floodwall and doubled in height to produce the overtopping that occurred at the North and South Breach.  (WGI Br. 81-90)  Whether *all* the waves doubled in height makes no difference.

### iv. The Florida Avenue Bridge and Surekote Road did Not Diminish Wave Energy in Any Meaningful Way

Without citing any support at all, Plaintiffs also claim that Dr. Dalrymple failed to take "into consideration the effect of the Florida Avenue Bridge or Surekote Road when analyzing waves," and "[b]oth of these structures would have broken the waves upon impact."[166]  Plaintiffs' claims are simply untrue.  These two structures did not diminish waves in any meaningful way.

Regarding the Florida Avenue Bridge, Dr. Dalrymple made clear that, although the location of the bridge impacted wave *direction*, the bridge itself had little effect on the propagation of waves down the IHNC.[167]  Because of several factors – the immense amount of water, the porous structure of the bridge, water rushing under and over the bridge – only very short waves were damped out by the bridge.[168]  Most of the wave energy passed through it.

The effect of Surekote Road on waves was also insignificant.  As this Court is aware,

---

[164]  *See* DX DM-0006-0032 (Dalrymple Dem.) (a maximum wave of 3.2 feet is 1.6 feet above the 9.3 foot water level; if that wave increases by 50%, it is 2.4 feet above the water level, bringing the total water level (i.e., IHNC water level + wave height) to 11.7 feet).

[165]  *See id.* at -0033 (Dalrymple Dem.).

[166]  Pl. Br. 78.  Plaintiffs also claim, without support, that "[t]he computer models on which Dr. Dalrymple relied failed to take all relevant factors into consideration."  *Id.*  Leaving aside the fact that Plaintiffs fail to define "all relevant factors" with any specificity, their claim is unfounded.

[167]  WGI Br. 84; Dalrymple Tr. at 2742:25-2743:18, 2869:5-2870:9.

[168]  *Id.*

Surekote Road ran parallel to the EBIA floodwall on the canal side of the wall.  Where "the roadway [was] very close to the natural land level" – for instance, at the South Breach – the road would have had "no effect" on waves.[169]  Near the North Breach, the road rose gradually at the northernmost point of Boland Marine, passed over the floodwall, and turned west toward the IHNC.[170]  Dr. Dalrymple explained that, "as the roadway rises and then comes out of the water ... you would expect breaking ... on the road," but "in a surf zone kind of effect."[171]  As a result, the waves would continue propagating until they hit the wall, even after breaking on the road.[172]  Plaintiffs have presented no evidence that those waves – or, for that matter, *any* waves – would not have caused the overtopping that Dr. Dalrymple described at trial.

### v.  Plaintiffs' "Reconstruction" of Overtopping Events is Erroneous

In an attempt to round out their arguments, Plaintiffs "reconstruct" the timing of the wave heights and overtopping on the morning of August 29 as an apparent guide for the Court.[173]  But Plaintiffs' "reconstruction" relies solely on significant wave heights[174] despite Dr. Bea's admission that significant wave heights are *not* the highest wave heights in a sea state.[175]  By disregarding *maximum wave heights* in their "reconstruction," Plaintiffs have created an overtopping scenario that ignores the highest waves in the IHNC and therefore is not based in reality.  Thus, the "reconstruction" and Plaintiffs' conclusions drawn from it should be ignored.

To sum, Dr. Dalrymple is the only expert in this case qualified to opine on wave overtopping, and he testified that waves of increasing height and number overtopped the EBIA

---

[169] Dalrymple Tr. at 2873:22-2874:24.

[170] *See* JX-01364-0180 (Tech. Comp. Rep.); DX DM-0003 (Guillory Dem., "EBIA 2003").

[171] Dalrymple Tr. at 2874:21-24.

[172] *Id.* at 2846:22-2847:3.

[173] Pl. Br. 77-78 ("The circumstances are reconstructed as follows . . .").

[174] At each time period identified in Plaintiffs' "reconstruction," only the significant wave heights from Dr. Dalrymple's analysis are included.  Pl. Br. 77; *see* DX DM-0006-0031 to -0034 (Dalrymple Dem.).  There is no mention of maximum wave heights anywhere in the "reconstruction."

[175] Bea Tr. at 4066:16-19 ("Q. By definition, where a significant wave height is given, there will be waves larger than the significant wave height, including a maximum wave height; isn't that correct?  A. Right.").

floodwall at the North and South Breaches beginning between 3:00 a.m. and 4:00 a.m.  Plaintiffs' attempts to undermine Dr. Dalrymple's opinions are baseless.

### B.  The Lowest Floodwall Elevations Contributed to the Failures

Plaintiffs claim that the lowest elevation points at the EBIA floodwall were "irrelevant."  (Pl. Br. 79-81)   But Plaintiffs' argument is predicated on the unsupportable position that wave overtopping did not occur at all, and therefore *no* overtopping occurred before the floodwall failed.[176]   In reality, the floodwall experienced approximately three hours of wave overtopping *before* the failures occurred.[177]   Because wave overtopping began first, and continued for a longer period of time at the lowest (North Breach) and second lowest (South Breach) elevations in the floodwall, the Defense experts logically determined that the low elevations contributed to the failures.[178]

Faced with the reality of wave overtopping, Plaintiffs now suggest that the floodwall elevations cannot be true.  The most credible source for the floodwall elevations was proffered by the Defendants at trial – the surveyors themselves.  Although IPET found the floodwall elevations were higher, (*See* Pl. Br. 79) the evidence shows that IPET simply assumed the wall was the same elevation from north to south, without more.[179]   Likewise, and contrary to Plaintiffs' claims, the Defendants have never admitted that the OLD surveys are in error.[180]   Mr. King identified the North Breach as the lowest elevation in the floodwall and the South Breach as the second lowest elevation.

---

[176]   *See, e.g.*, *id.* 81 ("The bottom line is that there was no overtopping before failure.").

[177]   *See* Dalrymple Tr. 2747:2-2749:7 (wave overtopping began between 3:00 a.m. and 4:00 a.m.), 2866:7-2869:3 (North Breach occurred at roughly 6:00 a.m. and South Breach occurred at roughly 6:45 a.m., give or take 15-20 minutes); *see also* JX-01672-0067 (Silva Rep.).

[178]   WGI Br. 97-99.  Plaintiffs' attempt to explain away the floodwall elevations by piecing together surge rates and adjacent wall height differences is immaterial, because it too assumes that wave overtopping did not occur.  *See* Pl. Br. 81 ("[T]here is no mechanism of failure that does its damage within 30 minutes *because the wall failed before surge overtopping*.") (emphasis added).  As Dr. Silva explained regarding whether surge overtopping began just before or just after the failures: "Not that it would make much difference.  At that point, ... essentially all of the waves are coming over the wall anyway." Silva Tr. at  3830:6-18.

[179]   *See* Marr Tr. at 1861:9-17.

[180]   *See* Pl. Br. 79-80.  Mr. King's testimony regarding the occasional "bad shot" in the survey notes was not related to either of the lowest elevation points in the floodwall.  *See* King Tr. at 2664:11-24.

This evidence is unrebutted.[181]  In fact, because of persistent subsidence at the EBIA, the two lowest elevations were likely even *lower* when Katrina made landfall in 2005.[182]  These elevations contributed to the EBIA failures.

### C. Overtopping-Induced Scour Occurred During Katrina and Contributed to the North and South Breach

As WGI explained in its opening brief, the trial record demonstrates that scour trenches developed at the North and South Breach during Katrina as a result of overtopping, and those scour trenches contributed to the floodwall failures.  (WGI Br. 81-97)  Indeed, Plaintiffs' own expert, Dr. Bea, has testified that overtopping-induced scour was a "key mode of failure" at the South Breach.[183]  Plaintiffs' brief does nothing to change these facts.

### i.  "Lack of Harmony" Between Drs. Marr and Silva Is Immaterial

Plaintiffs spend considerable time highlighting the alleged "lack of harmony" between Drs. Silva's and Marr's North Breach overtopping opinions.[184]  To start, Plaintiffs' allegations are not true.  Plaintiffs state that, unlike Dr. Silva, Dr. Marr concluded that "overtopping played *absolutely no role*" in the North Breach.[185]  However, Dr. Marr concluded that, while structural failure initiated the breach (as well as the development of the tension gap on the canal side levee), overtopping-induced scour indeed contributed to the overall failure of the floodwall.[186]  Dr. Silva determined that a combination of structural failure due to faulty design and faulty construction, *and* overtopping

---

[181]  Plaintiffs' inability to understand floodwall construction might explain their failure to understand the consistent subsidence of the EBIA floodwall.  Plaintiffs argue that the old 1960s wall was "welded" to the 1980s wall, and therefore "is the least likely place for there to have been subsidence."  Pl. Br. 80.  First, the two walls were joined together by a sliding (or lineal) ball and socket, not welding.  *See* WGI Br. 99-100.  Second, the increased lateral stability of the 1980s wall would not make it less likely to subside; in fact, the wall's increased weight would likely *increase* its subsidence.  When obvious "bad shots" are accounted for, it is clear that both walls were steadily subsiding together.  *Compare* JX-01926-0013 (1991 Survey Notes, showing elevations in the area of the North Breach), *with* JX-01924-0006 (1996 Survey Notes, same), *and* JX-01925-0004 (1999 Survey Notes, same).

[182]  *See* King Tr. at 2660:15-18 ("Q. So those three surveys, '91, '96 and '99, show a constant decline in the floodwall's elevation at each survey station location in that period?  A. Yes, sir."); Silva Tr. at 3759:9-13.

[183]  DX-01590-0018 to -0019 (Bea *Barge* Tr. at 2617:11-2618:4); *see* Bea Tr. at 1425:2-1426:2.

[184]  Pl. Br. 84; *see id.* 62, 78, 86-87.

[185]  *Id.* 78 (emphasis added).

[186]  Marr. Tr. at 1831:16-1832:4, 1913:20-1914:3, 1914:25-1915:10.

(plus the gap), contributed to the North Breach.[187]

Notwithstanding Plaintiffs' misrepresentations, WGI acknowledges that differences existed amongst the Defense experts.  That should be no surprise, given what the Court recognized is a complex case with complex issues.[188]   But those differences do not disprove the Defendants' causation theories, or, more importantly, prove Plaintiffs' case.   Regarding the only causation question that is before this Court, the Defense experts are in *complete* agreement: Dr. Bea's unscientific opinions do *not* prove that WGI's work was a substantial cause of the North and South Breaches.[189]

### ii. Plaintiffs' Attempts to Undermine Dr. Marr's Scour and Overtopping/Overturning Conclusions Are Without Merit

At the heart of Plaintiffs' criticisms of Dr. Marr is his alleged failure to model the rate and depth of scour erosion at the EBIA landside levee with sufficient precision to prove that an overturning failure occurred at the South Breach.[190]   But Dr. Marr testified that obtaining such precision was not possible (or expected) considering the many unknown variables at play and "the complexity of trying to accurately forecast depth of scour."[191]   His scour model provided a picture of how scour trenches develop; it did not form the basis of his conclusions.[192]   Rather, the observed depth of the real-world scour trenches at the EBIA and the stability calculations based on those

---

[187]   Silva Tr. at 3759:14-3768:15.

[188]   Bea Tr. at 3994:11, 4170:21.

[189]   Silva Tr. at 3840:11-3841:3; Marr Tr. at 1935:25-1939:8, 1943:12-13; Brandon Tr. at 3230:10-21.

[190]   Pl. Br. 81-84.  Plaintiffs also go to great lengths to impugn Dr. Marr for alleged "inconsistencies in and between [his] reports" regarding wave heights and breach times.  Pl. Br. 73-74, 81-82.  But Dr. Marr was doing nothing more than what the Federal Rules of Civil Procedure required - supplement his report after discovering new information that rendered his opinion incomplete.  *See* Fed. R. Civ. P. 26(e).  As was clear from his testimony, Dr. Marr did not offer a new opinion. Marr Tr. 1967:8-1968:2, 2250:6-2251:16.  Moreover, the information in his supplemental report did not change his ultimate conclusions about the South Breach.  *Id.* 2248:13-2249:10, 2254:22-2255:1.  Plaintiffs' allegations are unfounded, and in any event, immaterial.

[191]   Marr. Tr. at 1851:4-24, 1854:15-18.  Plaintiffs claim that Dr. Silva "disavowed" Dr. Marr's scour model.  Pl. Br. at 62. But Dr. Silva simply agreed with Dr. Marr that there was "uncertainty" in the model.  Silva Tr. at 3911:22-3912:9, 3913:3-3914:2, 3914:15-21.  Neither expert believed the model could predict failure.

[192]   Marr Tr. at 2092:12-15, 2257:22-2258:6.

depths convinced Dr. Marr that an overturning failure occurred.[193]   Dr. Bea was similarly convinced:  As Dr. Marr demonstrated at trial, Dr. Bea's overtopping/overturning results for the South Breach *agree* with Dr. Marr's results.[194]

Because they wrongly believe that Dr. Marr's scour modeling is the lynchpin of his opinions (and because they ignore the uncontroverted evidence of wave overtopping), Plaintiffs' arguments fall flat.  As summarized below, those unsupported arguments should be rejected:

- Plaintiffs' suggestion that Dr. Marr's scour model shows tail water "would have reached a height sufficient to stop scour at about 9:00-9:15 am" (Pl. Br. 82) – *after* several hours of wave overtopping had already occurred – is irrelevant. Their suggestion that "the South Breach scour trench would not have reached [Dr. Marr's alleged scour depth] until 9:00 am" based on *surge* overtopping (*Id.* 83-84) – but discounting wave overtopping – is also irrelevant.

- Plaintiffs' statement that Dr. Marr "erroneously assume[d] ... highly erodible clay" in his analysis is flat wrong. (Pl.Br. 83) Dr. Marr considered less erodible *and* average erodible clays but concluded more erodible clays were most accurate based on the depth of scour at the EBIA, information obtained from the Corps, and extensive testing.[195]  Dr. Bea assumed clays of similar erodibility for the EBIA levees in his prior analyses.[196]

- Plaintiffs' claims regarding grass coverage on the landside levee are also wrong. (Pl. Br. 83) Dr. Marr considered grass in his analyses but determined it to be of secondary importance because grass would not protect the levee from erosion "as the water got higher and the waves got bigger and water started rushing over the top of the wall."[197]  Dr. Silva agreed.[198]  The EBIA levees are now equipped with concrete scour protection.

- There is absolutely no support for Plaintiffs' contention that Dr. Marr "used the wrong distance from the top of the wall to the levee crown in his model." (Pl. Br. 83) Dr. Marr confirmed the distance based on available survey data; although the distance varied at some points, the variations did not alter the scour depths enough to impact the analyses.[199]  Plaintiffs present no evidence of what the "correct" distance should be.

- Plaintiffs assail Dr. Marr's opinion regarding the post-Katrina position of the South Breach floodwall only because it is inconsistent with Dr. Bea's causation theories. (Pl. Br. 84) The

---

[193] *Id.* at 1864:6-13, 1887:1-19.

[194] *Id.* at 1887:15-1889:7; DX DM-1006-0049 to -0051 (Marr Dem.); DX-01625-0011, -0040 (Bea Supp. Rep.).

[195] Marr Tr. at 1864:21-1866:16, 2062:2-17.

[196] *Id.* at 1866:17-1867:14.  Plaintiffs suggest that, if Dr. Marr had used "the soils Dr. Bea found at the site," the depth of Dr. Marr's scour trenches would have reduced substantially.  Pl. Br. 83.  The samples Dr. Bea claimed to have found at the EBIA were silty liquid mixtures, not soils.  Marr Tr. at 1925:11-15; Silva Tr. at 3807:21-3809:3.  Those samples have no bearing on this case.

[197] Marr Tr. at 1836:19-1837:4; *see* Marr Tr. 2064:14-2065:19.

[198] Silva Tr. at 3829:4-15.

[199] Marr Tr. at 2011:17-2012:22; *see id.* at 1854:15-18 (noting that the scour analysis cannot give "a real precise number but a rough indicator to a foot or so" of depth of scour).

evidence is clear that, if Dr. Bea's alleged uplift pressures had occurred (which they did not), the levee would have been pushed east toward the landside with the floodwall – *and that did not happen in this case.*[200]

### iii. Plaintiffs' Attacks on Dr. Silva's CWALSHT Model Are Equally Unavailing

Plaintiffs also take issue with the scour trench dimensions in Dr. Silva's analysis that Plaintiffs claim were "modeled by" the CWALSHT program; in Plaintiffs' view, Dr. Silva concluded there were four-foot trenches at the EBIA *"[b]ecause* the wall fell."[201]  Plaintiffs have it backwards.  Dr. Silva personally observed the depth of the EBIA scour trenches after Katrina, he analyzed photographs of those trenches, and he was intimately familiar with the EBIA soils from his involvement with the 2011 Joint Soils Investigation.[202]  Based on the knowledge gained from *those* efforts, Dr. Silva determined there were trenches four to five feet deep at the EBIA during Katrina, and his CWALSHT analysis indicated that a four-foot trench would have destabilized the floodwall at the North and South Breach.[203]  This evidence is not disputed.

Contrary to Plaintiffs' assertions, Dr. Silva did *not* use CWALSHT to determine the depths of the trenches, or to create a minute-by-minute comparison of stability versus depth of trench.[204]  Such exactness was not necessary for his analysis, or, more importantly, even possible.[205]  Plaintiffs' attempts to undermine an analysis that they do not understand are not supported by the record and should be rejected, as summarized below:

- Plaintiffs suggest that Dr. Silva's analysis is flawed because "all of the scour trenches behind

---

[200]  Marr. Tr. at 2098:14-2099:5; Silva Tr. at 3773:2-15.

[201]  Pl. Br. at 61, 85 (emphasis added).  Plaintiffs' also claim that Dr. Silva's CWALSHT model is "disputed by Dr. Marr."  *Id.* 65.  There is no support in Plaintiffs' brief or in the record for this statement.

[202]  Silva Tr. at 3687:16-20, 3761:22-3762:18, 3917:8-14; DX DM-0015-0068 to -071 (Silva Dem.).

[203]  Silva Tr. at 3761:16-21, 3762:24-3763:5, 3766:10-25.  Dr. Silva also relied on Dr. Dalrymple for information regarding wave overtopping.  Plaintiffs' assertion that "Dr. Dalrymple's name does not appear anywhere in Dr. Silva's expert report ... or his CWALSHT modeling analysis," Pl. Br. 62, is false.  Dr. Silva acknowledged Dr. Dalrymple explicitly in the report and credited him with providing information regarding wave heights.  JX-01672-0067 (Silva Rep.).  Dr. Silva did not cite Dr. Dalrymple in connection with the CWALSHT model because CWALSHT does not consider waves.  Silva Tr. at 3917:15-20.

[204]  Silva Tr. at 3898:20-3899:5, 3901:5-13, 3908:19-21.

[205]  *Id.* at 3679:20-23, 3915:8-10; Silva Tr. at 3913:10-3914:2.

unfailed portions of the wall (which experienced hours more overtopping) would have vastly exceeded four feet had there been four-foot trenches at the breach points at the time of failure." (Pl. Br. 61-62) Plaintiffs are wrong.  As explained in WGI's opening brief, scour erosion at the unfailed portions of the EBIA floodwall was likely neutralized by a combination of lower canal waters at the time of failure (and therefore no overtopping) within 100-150 feet of the breaches, and by tailwater in the landside trenches at locations farther away from the breaches. (WGI Br. 92-94) Because of these phenomena, scour erosion at the unfailed portions of the wall would not have vastly exceeded four feet as Plaintiffs claim.[206]

- Plaintiffs also suggest that Dr. Silva erred when he used "the same undrained shear strength ($s_u$) for soils on both sides of the levee" in his CWALSHT model, even though he admits that "soils vary a lot." (Pl. Br. 63) But Dr. Silva's testimony regarding the general variability of soils had nothing to do with calculating factor of safety for floodwall failure in CWALSHT.[207]  And there is no evidence that using the same shear strength for the canal side and landside levee disrupted Dr. Silva's analysis in any way.

- The fact that the scour trenches in Dr. Silva's CWALSHT model were *wider* than the trenches at the EBIA during Katrina is a red herring. (Pl. Br. 64) As Dr. Silva explained, it is the *depth* of the trench that impacts factor of safety, not width; modeling narrower trenches would have had no impact on his results.[208]   Similarly, there is no evidence that including tailwater in his CWALSHT trenches "clearly would have influenced an overturning analysis." (Pl. Br. 64) First, water has zero shear strength and therefore does not have the same stabilizing effect as soil.[209] Second, and more importantly, no evidence exists to show that including water in those trenches would have changed Dr. Silva's results.[210]

### iv.  There is No "Mystery" to the Stress Concentration at the North Breach

Finally, Plaintiffs twice refer to a "mysterious" 500,000 pounds of pressure that, in Dr. Marr's opinion, contributed to the North Breach.  (Pl. Br. 78, 85)  This pressure is no mystery at all. Drs. Marr and Silva testified extensively about the intense horizontal forces that concentrated at the faulty transition between the 1960s and the 1980s floodwall sheetpiles during Katrina, and the experts explained how that stress concentration reinitiated a fracture through a faulty weld in a

---

[206] Notably, and contrary to Plaintiffs' assertion, Pl. Br. 65, tailwater would *not* have neutralized scour at or within 100-150 feet of the breaches, for reasons also explained in WGI's opening brief.  WGI Br. 93.

[207] *See* Silva Tr. at 3708:12-3710:11.  Dr. Silva's discussion with the Court related to the natural variability of laboratory samples (small volumes of soil) for shear strength testing, not to the characterization of soils in an engineering analysis or model (much larger soil volumes).

[208] Silva Tr. at 3901:14-17; *see also id.* 3897:13-3899:15 ("Q ... Is it your opinion in the real world that a scour trench that goes down five feet one foot wide on the back side of the wall gives you the same factor of safety as the scour trench that goes out ten feet from the wall?  A ... [I]t will give you the same factor of safety, yes.").

[209] Silva Tr. at 3903:22-3904:2.

[210] In fact, the record suggests that including water in the CWALSHT trenches would have had *no* effect on Dr. Silva's results. Dr Marr's overturning analysis considered the impact of water in the scour trench at the South Breach, and he concluded – like Dr. Silva – that a scour trench approximately four feet deep would have destabilized the floodwall.  *See* Marr Tr. at 1887:10-19; DX DM-1006-0049 (Marr Dem.).

1960s piling that was instrumental in causing the North Breach.  (WGI Br. 99-104)

Having performed none of their own analyses on the sheetpiles that were left over from the North Breach, Plaintiffs' only retort is to suggest that the pressure concentration somehow was not substantiated or verified.  (Pl. Br. 78, 85)  This is demonstrably false.  After extensive testing, expert consultants at Exponent determined that only a force exerting 500,000 pounds of pressure could have flattened the sheetpiles that were found at the North Breach after the storm.[211]  The Defense experts concluded that the combination of force from the storm surge along with the concentration of stress at the faulty transition created the pressure.[212]  Plaintiffs' claims regarding the "mystery" pressure should be rejected, along with all of Plaintiffs' other distortions of fact.  The Defense experts' modes of failure are supported by the record in this case and present the best explanation for why the North and South Breach occurred.

## VI.   DAMAGES

Plaintiffs have failed to prove the extent of damages they claim.  Mr. Taylor's estimates are inaccurate and lack adequate support from the evidence, as was more thoroughly described in WGI's opening brief.  (WGI Br. 105-108, 115-119)  If the Court finds liability, the more accurate estimates of Defendants' damages experts should apply.

### A.  Cost of Repair Does Not Apply to Plaintiffs Armstrong, Holmes, and Livers

In *Roman Catholic Church v. Louisiana Gas Service Co.*, itself, there was no dispute that the plaintiff still owned the damaged property and, in fact, had repaired it.  618 So.2d 874, 876 (La. 1993) ("The single issue presented is whether the lower courts erred in limiting plaintiffs' damages to replacement cost, less depreciation, rather than awarding the plaintiffs the full cost of restoration *that had been reasonably incurred*.") (emphasis added).  *Roman Catholic Church* was decided in

---

[211] Marr Tr. at 1908:21-1909:11.
[212] *Id.* at 1912:19-1913:2; Silva Tr. at 3766:10-14.

the context of widely prevalent rulings by courts in Louisiana and elsewhere in which recovery limits were applied, if the cost of repairing or restoring the property exceeded its value.  The Court overruled the prior limitations, in the circumstances described in the opinion, but did not suggest that it is appropriate to award full repair or restoration costs to a plaintiff who no longer owns the property.  The opening sentence in the Louisiana Supreme Court's opinion tellingly states:

> This case presents the question of what is the proper measure of damages when recovery is sought for the negligent damage to a building, *when the property can be repaired or restored*, the cost of replacing the property in its original condition is not disproportionate to the value of the property before the injury, there is reason personal to the owner for restoring the original condition and *the owner has, in fact, made repairs fully restoring the property*.

*Id.* at 875 (emphasis added).

Defendants do not deny that each of the Plaintiffs had a personal attachment to the residences they owned.  However, Plaintiffs Armstrong, Holmes, and Livers no longer own the properties at issue in this litigation[213] and, therefore, can no longer restore the properties.

Plaintiffs misstate the relevance of several cases in their brief.  (Pl. Br. 89, fn. 395)  None of the cases cited support the position that a plaintiff who no longer owns damaged immovable property is entitled to recover the full cost of restoration.  In two of the cited cases, the plaintiffs still owned the property and, in fact, restored it.  *Mayer v. McNair Transport*, 384 So.2d 525 (La. App. 2 Cir. 1980); *Hayward v. Carraway,* 180 So.2d 758 (La. App 1 Cir. 1965).  Two others involved movable property, not immovable property.  *Fortson v. Louisiana Power & Light Co.*, 509 So.2d 743 (La. App. 3 Cir. 1987); *Emerson v. Empire Fire & Marine Ins. Co.*, 393 So.2d 691 (La. 1981).

Without support, Plaintiffs state "Courts, moreover, have recognized a plaintiff's right to restoration/replacement value of the damaged property for 'personal reasons' where the plaintiff is prevented from restoring the property."  (Pl. Br. 89, fn. 395)  Plaintiffs make no direct citation for

---

[213] Armstrong Tr. at 1666:2-4; Holmes Tr. at 244:12-24; Livers Tr. at 58:6-8.

this statement.  Presumably, Plaintiffs are asserting that *Grefer v. Alpha Technical*, 901 So.2d 1117 (La. App. 4 Cir. 2005) supports their contention.  But the Louisiana Fourth Circuit Court of Appeals' decision is in direct opposition to Plaintiffs' statement.

In *Grefer*, plaintiffs sought restoration costs for immovable property affected by radioactive contamination.  The Court awarded the plaintiffs restoration costs when they demonstrated their intention to fully restore the property.  901 So.2d at 1141-42.  This intention was, in part, manifested by the plaintiffs' testimony that they could not use or sell the property if it was not restored.  *Id.*  The pertinent point is not that the plaintiffs may have sold the property at some time in the future, but that they would be required to restore the property in order to sell it.  Here, Plaintiffs were able to sell their properties in an unrestored condition to the Louisiana Road Home Corporation.  Even absent the availability of the Road Home Program, Mr. Truax's expert reports demonstrate that a market did exist for properties similarly damaged in the years following Hurricane Katrina.[214]

Further, the court in *Grefer* cited the instructions given to the jury regarding the award of restoration costs.  In part, the jury instructions read: "You may award plaintiffs' [sic] the cost to repair and restore the property if you find that plaintiffs intend to repair or restore it."  *Id.* at 1138.  The court found that "[t]his jury charge clearly sets forth the law as enunciated in *Roman Catholic Church* …."  *Id.*  The opinion in *Grefer* supports WGI's position rather than Plaintiffs'.[215]

---

[214] *See* JX-1762 (Truax Post-Katrina Appraisal re: Holmes); JX-1764 (Truax Post-Katrina Appraisal re: Armstrong); JX-1766 (Truax Post-Katrina Appraisal re: Livers).

[215] Plaintiffs also cite to *Banks v. New Orleans City*, 620 F.Supp. 2d 741 (E.D. La. 2009) to support their statement that Plaintiffs' personal reasons "protect [their] damages selection."  (Pl. Br. 89-90, fn 396)  In its holding, the court in *Banks* discussed both the plaintiffs' personal reasons and their testimony regarding their intent to repair the property.  *Id.* at 745.  The Plaintiffs in *Banks* still owned the property at issue in the litigation, unlike Plaintiffs Armstrong, Holmes, and Livers.

### B. Plaintiffs' Experts Failed to Account for Other Sources of Plaintiffs' Damages

#### i. Plaintiffs Admitted Previous Recovery for Wind and Rain Damage and Did Not Prove Absence of Wind and Rain Damage

Defendants properly introduced evidence and expert testimony related to the wind and rain damage to each of the Plaintiffs' residences.[216]  Both Mr. Crawford and Mr. Taylor testified that wind and rain damage were not part of their evaluation of damages.[217]  Neither testified that there was no evidence of wind and rain damage.  They simply stated it was beyond the scope of their report and did not attempt to assess damages caused by wind and rain.[218]  Mr. Taylor's method was to assume all elements of the residences were damaged by flood[219] — whether or not it was actually damaged and whether or not Mr. Crawford attributed the damage to flood in his reports.

Mr. Taylor's estimates also do not account for the amounts Plaintiffs received from their homeowners insurers for damages to Plaintiffs' roofs and fences.  Each Plaintiff testified that he received payments for wind and rain damage,[220] but Mr. Taylor treats these portions of Plaintiffs' properties as flood damage.[221]  By failing to consider wind and rain damage and Plaintiffs' recoveries for those damages, Mr. Taylor's estimates provide Plaintiffs with a double recovery for those portions of their residences.

As the Louisiana Supreme Court found in *Wegner v. Lafayette Ins. Co.*, a plaintiff may not recover more than the value of the property that has been lost.  60 So.3d 1220, 1236 (La. 2011).  This Court has correctly determined, just as in *Wegner*, that amounts a plaintiff previously recovered from their homeowner insurer for wind and rain damages are admissible evidence to

---

[216] Plaintiffs assert that rain associated with Katrina would not have flooded their residences.  (Pl. Br. 101)  WGI does not contend that any rain-induced flooding contributed substantially to the damage to Plaintiffs' residences.

[217] Crawford Tr. at 1489:1-3; Taylor Tr. at 1545:16-20, 1546:6-11.

[218] Crawford Tr. at 1504:4-9; Taylor Tr. at 1546:6-11.

[219] Taylor Tr. at 1541:24-1542:3, 1545:16-20.

[220] *See* Armstrong Tr. at 1649:11-19; Holmes Tr. at 238:12-14; Livers Tr. at 43:11-24; Washington Tr. at 496:20-499:2.

[221] *See* JX-1605-0004 to -0005, 0019 (Taylor Rev. Rep. Re: Armstrong); JX-1609-0005 to -0006 (Taylor Rev. Rep. Re: Coats); JX-1607-0020 to -0021 (Taylor Rev. Rep. Re: Holmes); JX-1611-0004 to -0005 (Taylor Rev. Rep. Re: Livers); and JX-1613-0017 (Taylor Rev. Rep. Re: Washington).

prove the extent of their damages.  The Court's admission of this evidence is appropriate.

### ii. Plaintiffs' Experts Did Not Establish that Damages from All Sources of Flooding Was the same as an IHNC-Only Scenario

The general opinions Plaintiffs attribute to Mr. Crawford apply only to an all-causes scenario of flooding.  (Pl. Br. 98)  Although Mr. Crawford testified regarding water heights in different scenarios,[222] he only considered the 10-day duration of the flooding in the actual all-causes scenario, which is irrelevant to the extent of damage caused by IHNC-only floodwaters.[223]

There is considerable agreement as to the height that the floodwaters reached at each of the Plaintiffs' properties.[224]  However, the relevant question is what damages resulted from the breaching of the EBIA floodwall.[225]  The damages assessed by Mr. Taylor — based on the premise that "Plaintiffs' homes were subject to high waters above floor" and "Plaintiffs' homes had prolonged contact with these flood waters" ( Pl. Br. 100) do not address this question.

Mr. Taylor merely testified that his opinions regarding damages would remain unchanged in an IHNC-only scenario, because of the duration of the flooding.[226]  However, his opinion regarding duration was based on the all-causes scenario,[227] which is irrelevant.  And his unchanged opinion is not supported by any analysis in his reports.[228]  Further, Mr. Taylor did not know how the duration of the floodwaters would have been altered in an IHNC-only scenario — the relevant hypothetical scenario in this litigation.[229]

In contrast, Defendants' expert, Mr. Danner, testified that the Coats, Livers, and Washington

---

[222] Crawford Tr. at 1474:25-1475:4, 1477:23-1478:1, 1480:9-13, 1483:2-5, 1485:25-1486:3.

[223] Crawford Tr. at 1461:23-25, 1467:16-20 (stating that floodwater from all sources was in the residences up to 10 days after the passage of Hurricane Katrina).

[224] Dalrymple Tr. at 2774:15-2776:2, 2779:4-9.

[225] Order of March 17, 2011, Rec. Doc. 20200 at pp. 2-3.

[226] Taylor Tr. at 1539:4-8.

[227] Taylor Tr. at 1574:25-1575:2

[228] Taylor Tr. at 1544:23-1545:12.

[229] Taylor Tr. at 1574:22-24.

residences would have experienced less damage in an IHNC-only scenario, in part, because the IHNC-only floodwaters would have receded relatively quickly to less destructive levels, particularly in the Coats residence.[230]   Both his reports and those of Mr. Du Plessis provide the court with a breakout of damages attributable to IHNC floodwaters,[231] while Mr. Taylor's reports do not.   The Plaintiffs provided no evidence, other than Mr. Taylor's unsubstantiated opinion, that the damages would have remained unchanged.

### C. Plaintiffs Did Not Produce Any Evidence Related to Their Claims for Additional Living Expenses or Inconvenience

The only evidence at trial regarding Plaintiffs' actual additional living expenses was presented by Defendants, through the testimony and reports of Mr. Karl Schneider.[232]   Plaintiffs claim that an Xactimate estimate of repair costs can be used to estimate additional living expenses. (Pl. Br. 107)  They cite no case that has found this method appropriate and err by stating that the Court previously approved this method for estimating additional living expenses.  (*Id.*)  The Court's opinion in *Robinson* stated that a percentage method had been accepted in estimating damages to contents, not additional living expenses. *In re Katrina Canal Breaches*, 647 F.Supp. 2d 644, 735 (E.D. La. 2009).

As Mr. Schneider testified, the twenty percent used by Mr. Taylor is common in the industry for underwriting purposes, but not for determining incurred expenses.[233]   Mr. Schneider's estimates

---

[230]   Danner Tr. at 3340:22-3343:20, 3345:1-3347:22; JX-1743-0002 to -0003 (Danner Sup. Rep. Re: Coats); JX-1735-0002 (Danner Sup. Rep. Re: Livers): JX-1739-0002 to -0003 (Danner Sup. Rep. Re: Washington).

[231]   *See* JX-1746 (Du Plessis Repair Cost Est. Armstrong); DX-2652 (Du Plessis Sup. Repair Cost Est. Coats); JX-1749 (Du Plessis Repair Cost Est. Holmes); DX-2654 (Du Plessis Sup. Repair Cost Est. Livers); DX-2656 (Du Plessis Sup. Repair Cost Est. Washington).

[232]   *See* JX-1756 (Schneider Rep. Re: Armstrong); JX-1757 (Schneider Rep. Re: Livers); JX-1758 (Schneider Rep. Re: Holmes); JX-1759 (Schneider Rep. Re: Coats).  WGI does not dispute recovery for *proven* additional living expenses when plaintiffs are displaced from their homes.  WGI notes that Plaintiffs cite the holding in *Wegner* as allowing recovery of $45,800 in additional living expenses by a family displaced after Hurricane Katrina.  (Pl. Br. 106)  This is misleading, since the lower court jury verdict awarding the insurance policy limits was vacated in its entirety by the Court's holding in *Wegner.*

[233]   Schneider Tr. at 3621:4-8.

are not "contrary to the bulk of the evidence," as asserted by the Plaintiffs.  (Pl. Br. 107)  His estimates are the only estimates supported by the evidence presented at trial.

Mr. Taylor's estimates are arbitrary.  While receipts are not the only method of proving additional living expenses, evidence is required.  An arbitrary calculation based on inflated repair costs is not the standard for determining additional living expenses and does not serve as adequate proof of those damages.

In addition, Plaintiffs have not proven the elements necessary to establish a claim for inconvenience under Louisiana law.  (WGI Br. 120)  If the Court finds that Plaintiffs are entitled to damages for inconvenience, the case law and circumstances of this case do not support the award requested by Plaintiffs.

Plaintiffs correctly state that Louisiana case law has not dealt with the Plaintiffs' type of loss, but this Court has.  The Court's holding in *Robinson* is most apposite.  If the Court should find that Plaintiffs are entitled to inconvenience damages, it should follow its own precedent and limit the award to $5,000.  *See In re Katrina Canal Breaches*, 647 F.Supp. 2d at 736 (E.D. La. 2009).

## VII.   CONCLUSION

For the reasons set out above and in WGI's opening brief, Plaintiffs fail on each element of their claims. Most fundamentally, there is no scientifically supportable evidence suggesting that WGI's work contributed to the levee failures, much less is there evidence or reason to impute to remediation contractors knowledge of risks that geotechnical experts have studied and debated in hindsight for the past seven years.  Whatever defects in design, maintenance or planning may have contributed to the levees' failures, they were beyond WGI's responsibility and unconnected to its work. Accordingly, this Court should grant judgment in its favor.

Dated January 23, 2013                                    Respectfully submitted,

| | |
|---|---|
| */s/Heather S. Lonian*<br>William D. Treeby, 12901<br>James C. Gulotta, Jr., 6590<br>Heather S. Lonian, 29956<br>Maggie A. Broussard, 33033<br>Of<br>STONE PIGMAN WALTHER WITTMANN L.L.C.<br>546 Carondelet Street<br>New Orleans, Louisiana  70130<br>Telephone:  (504) 581-3200<br>Facsimile:   (504) 581-3361<br><br>and | Adrian Wager-Zito<br>Debra S. Clayman<br>Christopher Thatch<br>Julia L. Cronin<br>JONES DAY<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001-2113<br>Telephone:  (202) 879-3891<br>Facsimile:  (202) 626-1700<br><br>Attorneys for Washington Group<br>International, Inc., a division of URS<br>Corporation |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Response To Plaintiffs' Post-Trial Brief on behalf of Washington Group International, Inc. has been served on all counsel of record by electronic notice via the Court's CM/ECF system this 23rd day of January, 2013.

*/s/Heather S. Lonian*