UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO            *Armstrong*, No. 10-866 | |

**ARMSTRONG PLAINTIFFS' POST TRIAL REPLY BRIEF**

## <u>TABLE OF CONTENTS</u>

I.     CAUSATION ............................................................................................................. 1

   A.  Defendants' Theories Of Failure Are Unsupported By Facts And Logic ......................... 8

II.    WGI FAILED TO FULFILL ITS DUTY UNDER LOUISIANA LAW ....................... 13

   A.  WGI Was An Architect - Engineer Contractor ................................................. 14

   B.  The Failure To Address The Transmission Of Hydraulic Pressures  Was Negligent ...... 18

   C.  The Necessity Of Timely Evaluations To Analyze Changing Conditions ...................... 20

III.   WGI IMMUNITY ................................................................................................... 24

   A.  Federal Government Contractor Immunity ...................................................... 24

   B.  State Law Duty ........................................................................................ 26

IV.   GOVERNMENT IMMUNITY ................................................................................. 27

   A.  The Flood Control Act Does Not Apply To Plaintiffs' Claims ...................................... 27

     i.  Defendants' Negligent Work On A Navigation Project Caused Plaintiffs' Damages... 27

     ii.  The Purported Floodwall "Deficiencies" Did Not Cause The North Breach Or The South Breach ............................................................................................ 28

   B.  The Government Fails Both Parts Of The Discretionary Function  Exception Test ........ 34

     i.  The Corps Was Required To Evaluate Its Excavations .................................................. 34

     ii.  The DFE Was Not Created To Shield Defendants' Monumental Engineering Mistakes 43

V.    DAMAGES ............................................................................................................ 47

   A.  Plaintiffs Are Entitled To Recover The Full Amount Of Damages Supported By The Evidence ................................................................................................ 48

     i.  Defense Experts Failed to Properly Consider Flood Damage Factors When Determining Damage to Plaintiffs' Homes ........................................................... 50

     ii.  Du Plessis' Reports Undervalue Plaintiffs' Property Damage Due To Flawed Methodology ............................................................................................ 54

   B.  *Roman Catholic* Allows Plaintiffs To Select Their Remedy ............................................. 54

    i.    Value Of Movable Property Should Not Be Depreciated................................................ 56

    ii.   Defendants Expert Opinion On Lost Contents Amounts To A Systematic Devaluation To Deprive Plaintiffs Of A Reasonable Recovery.......................................................... 57

C.    Inconvenience Damages Are Recoverable Regardless Of Proximity  To Property ......... 58

D.    The Government Is Not Entitled To An Offset For FEMA Or Road Home Payments.... 60

## TABLE OF AUTHORITIES

**Cases**

*Aetna Ins. Co. v. Palao*,
   263 So.2d 394 (La. App. 4th Cir. 1972) ................................................................. 56

*Alexander v. Qwik Change Car Center, Inc.*,
   352 So.2d 188 (La. 1977) ........................................................................................ 58

*Ayala v. United States*,
   980 F.2d 1342 (10th Cir. 1992) ............................................................................... 46

*Bagner v. United States*,
   428 F.Supp.2d 101 (N.D.N.Y. 2006) ....................................................................... 38

*Bailey v. McDonnell Douglas Corp.*,
   989 F.2d 794 (5th Cir. 1993) ................................................................................... 24

*Boyle v. United Technologies Corp.*,
   487 U.S. 500 (1988) ................................................................................................. 24

*Broome v. Gauthier*,
   443 So.2d 1127 (La. App. 4th Cir. 1983) ......................................................... 47, 59

*Brown v. Williams*,
   850 So.2d 1116 (La. App. 2 Cir. 2003) ................................................................... 56

*Carroll v. State Farm Ins. Co.*,
   427 So.2d 24 (La. App. 3d Cir. 1983) ..................................................................... 59

*Carter v. Gulf States Utilities Co.*,
   454 So.2d 817 (La. App. 1st Cir. 1984) .................................................................. 56

*Cestonaro v. United States*,
   211 F.3d 749 (3d Cir. 2000) .................................................................................... 34

*Childers v. Davis*,
   444 So.2d 692 (La. App. 5th Cir. 1984) .................................................................. 58

*Coleman v. Victor*,
   326 So.2d 344 (La. 1976) ........................................................................................ 47

*Collins v. City of Shreveport*,
   799 So.2d 630 (La. App. 2d Cir. 2001) ............................................................. 58, 60

*Cope v. Scott*,
   45 F.3d 445 (D.C. Cir. 1995) .................................................................................. 44

*Corbello v. Iowa Production*,
   850 So.2d 686 (La. 2003) ........................................................................................ 54

*Cormier v. Honiron Corp.*,
   771 So.2d 193 (La. App. 3d Cir. 2000) ................................................................... 14

*Davis v. Culpepper*,
  794 So.2d 683 (La. App. 2 Cir. 2001) ............................................................. 59, 60

*Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*,
  79 So.3d 246 (La. 2011) ...................................................................................... 55

*Emerson v. Empire Fire & Marine Ins. Co.*,
  393 So.2d 691 (La. 1981) ..................................................................................... 48

*First of Georgia Insurance Company v. Cohen*,
  398 So.2d 1209 (La. App. 4th Cir. 1981) ............................................................ 59

*Fontenot v. Magnolia Petroleum Co.*,
  80 So.2d 845 (La. 1955) ....................................................................................... 59

*Fortson v. Louisiana Power & Light Co.*,
  509 So.2d 743 (La. App. 3d Cir. 1987) ............................................................... 56

*Fox v. Bd. of Supervisors of Louisiana State University and Agric. and Mech. Coll.*,
  576 So.2d 978  (La. 1991) .................................................................................... 14

*Hogan Exploration v. Monroe Engineering Associates, Inc.*,
  430 So.2d 696 (La. App. 2d Cir. 1983) ............................................................... 14

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*,
  897 F.2d 626 (2d Cir. 1990) ................................................................................ 25

*In re Katrina Canal Breaches Litig.*,
  2011 WL 651946 (E.D. La. 2011) ....................................................................... 28

*In re Katrina Canal Breaches Litig.*,
  620 F.3d 455 (5th Cir. 2010) ......................................................................... 25, 26

*In re Katrina Canal Breaches Litig.*,
  627 F.Supp.2d 656 (E.D. La. 2009) ..................................................................... 44

*In re Katrina Canal Breaches Litig.*,
  647 F.Supp.2d 644 (E.D. La. 2009) ..................................................................... 60

*In re Katrina Canal Breaches Litig.*,
  696 F.3d 436  (5th Cir. 2012) .............................................................................. 27

*Indian Towing Co. v. United States*,
  350 U.S. 61 (1955)................................................................................................ 46

*J.B. LaHaye Farms v. La. Dept. of Highways*,
  377 So.2d 1286 (La. App. 3d Cir. 1979) ............................................................. 48

*J.L. Simmons Co. v. United States*,
  412 F.2d 1360 (Ct. Cl. 1969) .............................................................................. 25

*Kalmn, Inc. v. Empiregas Corp.*,
  406 So.2d 276 (La. App. 3d Cir. 1981) ............................................................... 56

*Maloney v. Oak Builder Inc.*,
  224 So.2d 161 (La. App. 4th Cir. 1969) .............................................................. 14

*Marlys Bear Medicine v. United States*,
   241 F.3d 1208 (9th Cir. 2001) ............................................................. 44, 46, 47

*Mossy Motors c. Sewerage and Water Bd.*,
   753 So.2d 269 (La. App. 4th Cir. 1999) ...................................................... 55

*National Union Fire Insurance v. United States*,
   115 F.3d 1415 (9th Cir. 1997) ................................................................ 45, 46

*New Orleans Unity Soc. of Practical Christianity v. Standard Roofing Co.*,
   224 So.2d 60 (La. App. 4 Cir.1969) ............................................................ 27

*Patton v. Precision Motors, Inc.*,
   352 So.2d (La. App. 1977) ........................................................................ 59

*Pollock v. Talco Midstream Assets, Ltd.*,
   70 So.3d 835 (La. App. 2d Cir. 2011) ......................................................... 59

*Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co.*,
   618 So.2d 874 (La. 1993) ..................................................................... 54, 55

*Servicios-Expoarma, C.A. c. Indus Mar. Carriers, Inc.*,
   135 F.3d 984 (5th Cir. 1998) ................................................................ 48, 49

*Terbush v. United States*,
   516 F.3d 1125 (9th Cir. 2008) .................................................................. 47

*United States v. Gaubert*,
   499 U.S. 315 (1991) ............................................................................ 43, 44

*United States v. Spearin*,
   248 U.S. 132 (1918) ............................................................................... 25

*Whisnant v. United States*,
   400 F.3d 1177 (9th Cir. 2005) .................................................................. 47

*Williams v. Gallagher Transfer & Storage Co., Ltd.*,
   170 La. 461 (1930) .................................................................................. 56

*Woodmen of the World Life Ins. Soc. v. Hymel*,
   610 So.2d 195 (La. App. 3 Cir. 1992) .......................................................... 47

**Statutes**

La. C.C. art. 2315 ........................................................................................ 14, 58

La. R.S. 9:2771 ................................................................................................. 26

**Treatises**

6 La. Civ. L. Treatise, Law of Obligations § 4.17 (2d ed.)................................ 55

**Regulations**

33 CFR § 208.10 ........................................................................................ 20, 39

## I.   CAUSATION

Section III.A of WGI's brief addresses soil properties and modeling in terms of causation.  Although it is nearly 30 pages long, it raises very few issues or arguments not already anticipated in Plaintiffs' initial post-trial brief (many were raised by WGI even before trial).  Several points do deserve attention or reiteration.

WGI's lengthy dissertation on compressibility (WGI Mem. at 27-38) and pore pressure (*i.e.*, "flow") (*id.* at 38-46) remains, as it was at trial, a highly sophisticated red herring.  WGI continues to focus on <u>flow</u> and <u>pore pressures due to flow</u> (Type 2 pressures in Plaintiffs' parlance), but that is not and was never the focus of Dr. Bea's causation opinions.  Dr. Bea never opined that underseepage, meaning flow of a molecule from the canal side to the land side, caused the failures; yet that remains the focus of the Defendants' attacks on Dr. Bea's opinions.  WGI says Dr. Bea has always meant underseepage (flow), but that once they called his bluff, he simply changed his verbiage from "underseepage" to "pressure."  (WGI Mem. at 32.)  Yet WGI's own brief cites Dr. Bea's testimony to the contrary: "We were not focused, actually, on $m_v$, but rather on an analytical process that would appropriately model steady flow conditions that met an incompressible soil and an incompressible fluid."  (WGI Mem. at 28 n.92.)

WGI attacks Dr. Bea because he did not "mention it [$m_v$] once in his original expert report in this case, nor do his litigation reports or publications regarding the EBIA floodwall failures ever mention it."  (WGI Mem. at 28.)  But this actually corroborates exactly what Dr. Bea said at trial and has said all along—this is a pressure transmission problem, not an underseepage/flow problem.  WGI accuses Dr. Bea of  "'eliminat[ing]' the term underseepage from his lexicon" as part of a "shifting theory," (WGI Mem. at 38-39), but its own accusation

regarding the absence of $m_v$ from his report and papers belies this "shifting theory" theme that WGI began pressing before trial and has pushed all the way through post-trial briefing.

WGI's brief crystallizes the fundamental question the Court faces on the soil dynamics/modeling issue—does Dr. Bea's steady flow model properly corroborate Plaintiffs' causation claim?  The Defendants' mountain of testimony regarding flow is conclusive if transient flow is the proper model.  But if it is not, then the testimony is irrelevant.  Dr. Silva's "flow simulator" decisively demonstrated that if steady flow conditions existed during the time of the storm, pressure transmission is powerful and instantaneous.[1]

Even WGI's brief concedes "that pressures can be relatively instantaneously transmitted laterally through fully saturated material if that material is as incompressible or more incompressible than water."  (WGI Mem. at 36.)  A soil at 200% saturation, which is two parts water and one part soil particles, when confined, is as incompressible as water because basically it is water.  WGI veers off course on this issue, mischaracterizing Dr. Bea's theory to say that all fully saturated soils (*i.e.*, 1/2 soil and 1/2 water) are incompressible.  (WGI Mem. at 30-32.)  That is not what Dr. Bea said.  He opined that high-water-content soils—even those that are soft and malleable in the hand—are incompressible when confined (just as the water constituting nearly all of the "soil" is incompressible when confined).  (*See* Pltfs. Mem. at 55-56.)  Dr. Silva's experiment confirmed as much.

WGI questions Dr. Bea's opinions because his original report treated the organic clay layer as if it were in a drained condition.  (WGI Mem. at 48.)  However, Dr. Bea eventually

---

[1] Even their brief concedes "that pressures can be relatively instantaneously transmitted laterally through fully saturated material if that material is as incompressible or more incompressible than water."  (WGI Mem. at 36.)  A soil at 200% saturation, which is two parts water and one part soil particles, when confined, is as incompressible as water because basically it *is* water.  *See also* Trial Tr. at 3735:23-3736:18 where Dr. Silva confirms that under steady flow conditions, any rise in pressure would communicate instantaneously.

modeled both drained and undrained conditions and reported and testified on both.[2]  Another red herring.

WGI would likewise lead the Court astray regarding Dr. Bea's "eureka" moment regarding piezometric pressures.  (WGI Mem. at 45.)  WGI seems to suggest that the piezometers would register a number that Dr. Bea could then (but did not) plug into SEEP/W to mimic what the piezometers recorded.  No witness for the Plaintiffs or Defendants suggested such a thing is possible.  Dr. Bea explained exactly what he did—he chose a compressibility figure for his modeling that would yield instantaneous transmission of pressure because that is what the piezometers demonstrated was occurring.[3]  That compressibility figure is consistent with the soil properties at the site as discussed extensively during trial and alluded to above.  (*See also* Pltfs. Mem. at 54-57, 67-69.)  Any model that fails to account for these piezometric results, including all of Defendants' flow modeling, is itself flawed—the classic error of confusing the map with the territory, *i.e.*, confusing a model of reality with reality itself.  Their flow models ignore the piezometric evidence of instantaneous pressure transmission and instead use an $m_v$ appropriate to measure the slow flow of water through the soil skeleton; they are then held up as proof that the piezometers were not reading lateral pressure and that water could not have flowed from canal side to land side in 30 hours.  Dr. Bea designed a model that accounted for the piezometric readings, which was consistent with the presence of high-water-content soils, which

---

[2] JX 01414 (Bea Rebuttal Rep.) at 19-20, 101-05 (concluding "The two different treatments of the shear strength [drained and undrained] result in very comparable IHNC surge elevations at failure.")

[3] WGI makes the bizarre assertion that the "most telling exchange" regarding the piezometers was that Dr. Bea described piezometer readings at the 17th Street Canal in response to a Court question regarding how they relate to causation.  (WGI Mem. at 52.)  Dr. Bea actually prepared slides discussing the 17th Street piezometers because that is when and where the "eureka" moment occurred regarding uplift pressures.  He then went on to discuss (with slides) the piezometer readings at the EBIA and to explain how all of it bears on causation.  If this is the "most telling exchange" in the record on piezometers, it strongly supports the Plaintiffs' position.

was corroborated by a similar experience on the 17th Street Canal, and which explains the failure, particularly in the absence of any realistic competing theory offered by Defendants.[4]

WGI refers to work done by its expert, Dr. Tim Stark, which purportedly calls Dr. Bea's modeling into question, (WGI Mem. at 29-30, 40-43), but the Court will recall the portion of Dr. Bea's redirect which demonstrated Dr. Stark's gross mischaracterization of Dr. Bea's modeling. In particular, Dr. Stark attacked Dr. Bea's modeling of his near breach scenario, trying to convince the Court that the near breach model was so flawed as to require the Court to discount the entirety of Dr. Bea's modeling, in particular JX-1393 - Bea Report, Appendix D, Figure 3 & Figure 15.  WGI's counsel even went so far as to impugn Dr. Bea as "cooking the books," with Dr. Stark continuing to imply that Dr. Bea improperly utilized computer modeling boundary conditions to achieve a desired result.[5]

However on Dr. Bea's redirect, the actual explanation provided clarification that Defendants cannot refute.  Dr. Bea's near-breach scenario presented varying studies to illustrate the effect of no penetration of the buried swamp marsh layer.  The figures for the boundary conditions of Case 1-1 were in blue, while the figures for the boundary conditions of Case 1-2 were in red, but it took a keen eye to see that the red overlaid the blue.  The import of this was that Dr. Stark's allegation that boundary conditions had been omitted was patently false.[6]

---

[4] WGI attacks Dr. Bea's piezometer opinions by pulling from a deposition that is not in evidence a point that was not discussed at trial.  (WGI Mem. at 51 n.187.)  In any event, Dr. Bea stated unequivocally under cross examination that the piezometric readings could not be accounted for by total stress pressures, as Defendants suggest, and the deposition testimony read by Mr. Treeby confirmed this always had been Dr. Bea's opinion.  (Trial Tr. at 959:245-961:6.)  Incidentally, Defendants also appear to have abandoned their "leaking piezometer" theory.

[5] Stark, 3437:8-15.

[6] Bea 4149:16-4153:6.

In Section III.B, WGI turns to the role of excavations in causation.  (WGI Mem. at 53-72.)  Again, although 20 pages long, it raises few issues that require new or additional response.  Some points are in order, however.

WGI's discussion of excavations begins by again assuming a world where the cause of the failures is a "meaningful increase in pore pressures due to flow" (WGI Mem. at 53-54) (emphasis added), although Plaintiffs have never made this claim.  In this world, Dr. Silva can opine that the effects of excavations extend only 16 feet in "a transient-flow process" (an opinion enunciated for the first time at trial and found nowhere in his report).[7]  This highlights: (1) that Dr. Silva did not model the Type 3 uplift pressures on which Dr. Bea opined (though he verified that Dr. Bea's outputs were accurate given his inputs[8]); and (2) that Dr. Silva knew at the time he chose the cross-sections on which his models are based that there would be no impacts from those modeled excavations because all are distant from the wall and he already had determined that "flow" would extend no more than 16 feet.  But it does not call into question Dr. Bea's conclusions regarding Type 3 uplift pressures.

WGI claims next that had there been any concern regarding pressure, it "promptly backfilled the complained-of excavations…to at least their preexisting condition."  (WGI Mem. at 54.)  It must make this claim because it concedes it "had a duty to backfill and compact excavations…."  (WGI Mem. at 18.)  But its own daily reports show an utter lack of care in backfilling and virtually no compaction.  As Dr. Bea explained, and as common sense dictates, unless you test the preexisting soil density, you cannot possibly know whether you have compacted to preexisting density; but WGI never performed such a test, though such a field test

---

[7] Silva 3770:8-16.

[8] Silva 3838:5-7.

is available.[9]  Dr. Bea also explained that you cannot achieve proper uniform compaction unless excavations are backfilled in lifts (layering and backfilling), which occurred in only a handful of instances.[10]  There is no evidence of any instruction to work crews on methods of compacting or testing compaction.  You certainly cannot achieve it by bucket-tamping or track walking with a bulldozer.

As to WGI's treatment of specific excavations, a few deserve mention.  First, WGI attaches and cites repeatedly to its Exhibit B, which purports to identify every excavation that pierced the swamp marsh layer.  Exhibit B is an improper summary exhibit submitted after the fact, containing interpretations of evidence (interpretations that misconstrue the evidence, that make questionable and erroneous assumptions, and that omit critical facts—all of which could be demonstrated readily through cross-examination had WGI presented such a summary through a witness or with any form of notice in accordance with the rule).  Plaintiffs object to Exhibit B and to any use of it by the Court as it is inaccurate and inappropriately tendered.

WGI says that "all grid trenches were backfilled and compacted to existing density." (WGI Mem. at 57.)  There is no evidence in this entire discovery or trial record to suggest what the original soil density was, how WGI might have achieved compaction to that density by track walking, or that it ever actually tested compaction.  The total absence of such evidence gives rise to a strong inference that none of this ever occurred despite the fact that grid trenches were dug just 50-60 feet directly in front of the future breach zones.[11]

WGI claims that milled asphalt was used to construct "temporary driveways" across the drainage ditch at Saucer Marine.  (WGI Mem. at 63-64.)  But its own QAR states plainly that

---

[9] Bea 1189:17-1191:11.

[10] Bea 1191:16-1193:8.

[11] Bea 1203:12-1204:13 (Saucer); 1206:14-24 (Boland).

WGI management "observed the D41P dozer backfilling the drainage ditch and capping the milled asphalt with previously staged borrow pit material."[12]  This grossly improper backfilling with a "highly permeable" material occurred within 60 feet of the floodwall.[13]  Despite the existence of more than 1000 QARs describing daily activities on the site, there is no mention of "temporary driveways" and no hint that this asphalt was removed once dumped in the ditch and capped with spoil.

The sewer line was just 75-80 feet from the floodwall and ran the entire length of the South Breach zone, with laterals running east and west.[14]  The sewer excavation plans specified a depth of 15 feet and no compaction other than track walking with a bulldozer.[15]  Yet WGI claims it backfilled the sewer trench "with clay in lifts."  (WGI Mem. at 66.)  This claim punctuates the importance of properly backfilling and compacting such a deep excavation so close to the wall; but the cross-examination of Mr. Guillory clearly established the virtual impossibility of his claim that WGI backfilled the trench in lifts each day.[16]

WGI labels "absurd" Dr. Bea's testimony that WGI's excavations moved the phreatic surface (groundwater) closer to the floodwall.  (WGI Mem. at 66.)  The Court need not rely on Dr. Bea, it need only read JX-1645—an email from a Corps environmental specialist stating that "the soil subsurface has been modified on account of excavation, removal, new fill" such that the groundwater flow had reversed and now "points to a flow away from the canal."[17]  This is

---

[12] Bea 1216:14-25.

[13] Bea 1217:2-12:18:5.

[14] Bea 1225:9-17.

[15] Bea 1226:2-21.

[16] Guillory 2616:22-2620:24.

[17] Bea 1255:21-1257:24.

corroborated by WGI's own 2005 groundwater monitoring characterization report depicting the "finger" of groundwater pointing directly to the North Breach zone.[18]

Finally, WGI attacks Dr. Bea's near-breach analysis by again insisting as it did at trial that Dr. Bea misled the Court in stating that the McDonough borrow pit did not pierce the swamp marsh layer whereas his earlier *Barge* testimony (to this Court) was to the contrary.  (WGI Mem. at 68.)  As Dr. Bea clarified, the swamp-marsh layer is <u>beneath</u> the cypress stumps depicted in the photo with which he was confronted.[19]  The photo corroborates Dr. Bea's opinion that the borrow pit did <u>not</u> pierce the swamp-marsh layer.  Yet again the Court need not rely solely on Dr. Bea's testimony in this regard.  Dr. Allen Marr's own painstaking cross section of the site clearly demonstrates that the borrow pit did not pierce the swamp-marsh layer, which lies deeper at McDonough than it does at Saucer and Boland.[20]  WGI claimed through Dr. Stark to have discovered discrepancies in Dr. Bea's modeling of the near breach, (WGI Mem. at 70), but as discussed above, Dr. Bea's redirect showed that Dr. Stark was being less than candid with the Court about Dr. Bea's models.

**A.  <u>Defendants' Theories Of Failure Are Unsupported By Facts And Logic</u>**

Defendants, as they have repeatedly in the past, make much of the size of Hurricane Katrina.  Their consistent refrain is that the storm overwhelmed the system.  The uncontroverted stipulated fact is that the breaching at the North end of the EBIA floodwall and at the South end of the EBIA floodwall occurred <u>before</u> surge overtopped any part of that floodwall.  The cold fact is that most of the I-wall breaching that occurred along the entire LPV system when

---

[18] JX 1299; Bea 1253:2-1254:11.

[19] Bea 4132:-4.1

[20] Bea 1140:8-18 (Bea relied upon Marr's cross section); Bea 1144:8-23 (Marr's cross-section shows the borrow pit "does not penetrate the upper organic clay" layer, *i.e.*, the swamp-marsh).

measured by linear foot occurred at the North and South Breaches.[21]  Although miles and miles of I-walls were subjected to Katrina's surge, the great majority of those walls did not fail.  There is no dispute that a great majority of all I-walls that did fail failed before the surge was high enough to overtop those walls.

Plaintiffs recognize that they bear the burden of demonstrating each element of their case. Plaintiffs respectfully suggest, however, that for the Court to ascertain whether Plaintiffs have met their burden, the Court can and should evaluate the cause of the North and South Breaches as proposed by the Defendants.  The degree to which a cause is a preponderant cause is, at the end of the day, a determination of the most likely cause of the failure.

The Defendants are not in agreement with regard to North Breach.  The government argues that the "north breach is readily explained by a combination of low global stability against shear failure and a structural failure in the connection of older, shorter sheet pile from the original 1969 construction to the newer, longer sheet pile installed during the 1982 construction of the Florida Avenue Complex and associated flood protection."  (USA Mem. at 37.)  WGI sees overtopping as the initiating cause.  (WGI Mem. at 81.)  The government has consistently argued that the entire EBIA is underlain by homogenous clay soils.  These soils, they say, are the same soils that existed in 1966 when the Corps analyzed those soils and determined they were well suited to their purpose.  Logic would suggest that whatever the shear strength of the soils at the North Breach, because the remaining 4,100 feet of the EBIA wall was underlain by the same soils which are, as asserted, homogenous, they should have had the same or similar shear strength.[22]  Dr. Brandon, the principal proponent of the shear strength cause of failure, based his

---

[21] *See* 1542E-0853, *et seq.* (IPET, Volume V: Technical Appendix).

[22] JX-01871 (Marr Report, Appendix G: Subsurface Profiles; JX-01869-0010 (Appendix E: Data Shift, Subsidence, Settlement, and Top of Wall, Figure E-7).

conclusions on a single cross section of the North Breach and a single cross section of the South Breach.[23]  Where are the studies for the other 3,400 feet?  Even Brandon says the use of one section per failure is not exact.[24]  The entire wall did not fail.  More importantly, the entire wall was subjected to the same lateral force brought to bear against that wall by rising water.  The government does not explain why the remaining 4,100 feet of EBIA wall did not fail due to the global instability.  Rather, Dr. Marr opines that a mysterious force brought 500,000 pounds of lateral pressure across the surface of the wall at the North Breach causing the wall to stretch and break.  There was no explanation offered at trial for the cause of this force, and there is very little said about it in Post-Trial Briefing.

The government, knowing that it cannot prove the cause of the force which stretched the sheet pile to the breaking point at the North Breach, takes the extraordinary step of attacking itself.  It argues that the Corps negligently designed, constructed and maintained the original I-wall at the North breach and/or those alterations to that location of the I-wall in 1982.  Curiously, they do not argue that any other part of the wall was defectively designed, constructed, or maintained.  It is difficult to understand how only part of a wall could be defectively designed.[25]

The Court, we trust, will forgive us for saying that this statement was particularly difficult to read and digest in view of the Corps' statements to the public and to Congress that the levees and floodwall performed as designed.  To date there have been <u>no</u> public statements and, perhaps more importantly, no admissions to Congress that the Corps is morally responsible for the failures at the EBIA.  Which then, is the truth?  The public statement or their argument to this Court?  There was not a single expert report submitted in this case by the government which

---

[23] JX-01836-0024 (Brandon Expert Report).

[24] JX-01836-0024 (Brandon Expert Report).

[25] These assertions—clearly made in the hope of invoking 702c—are detailed more thoroughly in the Government Immunity section, *infra*.

even suggested the walls were defective.  The government's position is a desperate attempt to avoid liability by explaining the cause of the failure as anything but the demolition and remediation work that it contracted with WGI to perform.  The fact is that the low levee crown— to the extent it even existed—was located behind what the government argues was the heartiest section of the EBIA floodwall, *i.e.*, where the 1966 wall was connected to the 1982 wall.  The government argues that this connection made the wall stiffer and stronger.  At the same time, the government argues that this strength became the wall's weakness simply because the shorter sheet pile wall moved.  The fact is that the entire EBIA floodwall moved.  In fact, in every location where the wall was found to be leaning to the landside, there would be a tension crack on the water side.[26]  The movement of the wall and the existence of tension cracks do not explain the North Breach.  The wall moved and there were lots of tension cracks along its entire length.

Dr. Silva, however, does not opine about the mysterious 500,000 pound force that allegedly tore the 1966 wall from the 1982 I-wall.  Rather, Dr. Silva agreed with Plaintiffs that there was absolutely no support for that hypothesis.  Indeed, Dr. Silva advanced a defective weld theory, obviously concluding that there would have been no separation of the sheet pile absent a tear because of the extreme forces needed to tear apart the welds and/or the sheet pile.  In fact, the photographs show that while there was a tear, the separation was at the joint between the piles.[27]  Unfortunately, there is no scientific evidence to support this tear theory as the cause of the breach.  Because of this, Dr. Silva chose to conclude something else initiated the breach.  Because something had to move the wall sufficiently to create this tear, overtopping had to be the cause.  The problem, as indicated above, is that the wall fell <u>before</u> surge overtopping could

---

[26] DX-DM-1006-0035 (Marr Trial Presentation).

[27] JX-01672-0071-73.

have occurred.  The only logical explanation is that, as Dr. Bea opined, the tear/breach was the result of uplift pressure.

As to the South Breach, both the government and WGI are in rare agreement ascribing the failure to overtopping although there is no agreement as to the timing of the South Breach. Once again, by stipulation, the South Breach occurred before surge overtopping began.

This brings us to the significance of waves, or the lack thereof, in the IHNC before the breaching.  Nothing in the Defendants' presentation at trial lacks credibility more than their brand new reliance on the existence of waves of sufficient height and ferocity to account for the formation of scour trenches of sufficient depth on the land side of the North and South Breaches.

As the government points out, the only expert to do any analysis of scour on the land side of the EBIA floodwalls was Dr. Marr.  At the time of his original report, Dr. Marr offered many pages in his report detailing exhaustively how he evaluated all of the possible theories for the failure of both the North and South Breaches.  In his original report, he disregarded waves for the reason that "waves are a small contributory factor but something…I normally would consider significant for this type of problem"[28]

Dr. Marr found himself in an embarrassing situation when at his deposition he opined that the South Breach occurred at 9:00 a.m., give or take one half hour, because this testimony starkly contrasted to the testimony of Dr. Dalrymple, who opined that the South Breach occurred at 6:45 a.m.[29]  Dr. Dalrymple had an equally perplexing problem as he had not performed any

---

[28] PX-4438-0037:9-12 (Marr Dep.)

[29] Defendants' response to the dilemma: the government says that Dr. Marr really did not do an estimate of the time of failure. (USA Mem. at 55.)  WGI says through Dr. Silva that no one can estimate the time of the South Breach (WGI Mem. at 91.)  The problem is that Dr. Marr did estimate based upon his analysis, the time it would have taken for the breach to have occurred and that was an hour and a half to two hours after the generally recognized time of failure of 7:00 a.m.

study of scour and had simply assumed that there were three foot waves in the IHNC as early as 3:00 a.m.

At trial, Plaintiffs demonstrated that Dr. Dalrymple did not make much of an evaluation of waves, having devoted only one paragraph of a 156-page report on the subject.  More troubling were his admissions that his statements regarding wave height in the lone paragraph regarding waves were, in fact, incorrect.  Once again, the cold hard fact is that Dr. Dalrymple and Dr. Marr constructed their entire theories about waves, the so-called analysis of those waves, and their slides presentation regarding waves between their respective depositions and trial testimony.  Dr. Dalrymple's analysis of waves, as depicted in his slides purporting to analyze scour, were constructed after his report and deposition.  Plaintiffs have no idea as to the basis or the nature of his analysis for the conclusion in his slides 29-35.  There is no premise.  There is no analysis.  There is simply a conclusion.  Dr. Dalrymple then stretches the limits of credibility by testifying that only waves which hit the wall at a 90 degree angle double in height; a height necessary to get them over the wall.  Diffraction—his explanation for getting the waves to turn toward the wall and away from the direction of the wind—at best might cause waves to hit the North Breach area at a 45 degree angle, but only after they broke on Surekote Road.  The refracted waves never reached the South Breach location.

## II.    WGI FAILED TO FULFILL ITS DUTY UNDER LOUISIANA LAW

WGI takes the position that it did not have a duty to perform any substantive engineering as it was simply a "demolition and environmental remediation contractor in the EBIA site." (WGI Mem. at 1.)  However, the documentary and testimonial evidence adduced at trial reveal this position to be untenable.

The Louisiana Civil Code provides that "[e]very act whatever of man that causes damage to another obliges him by those whose fault it happened to repair it."  La. C.C. art. 2315.  "A duty is defined as the obligation to conform to the standard of conduct associated with a reasonable man in like circumstances."  *Fox v. Bd. of Supervisors of Louisiana State University and Agric. and Mech. Coll.*, 576 So.2d 978, 981 (La. 1991).  It is well established in Louisiana that the general standard of care applicable to all professionals, including engineers, is that the services be performed "with the same degree of skill and care exercised by others in the same profession in the same general area."  *Hogan Exploration v. Monroe Engineering Associates, Inc*., 430 So.2d 696, 700 (La. App. 2d Cir. 1983); *Maloney v. Oak Builder Inc*., 224 So.2d 161, 168 (La. App. 4th Cir.1969), rev'd in part on other grounds, 235 So.2d 386 (La. 1970).  This duty extends to third parties, obligating a contractor to exercise ordinary care and refrain from creating hazardous conditions in the fulfillment of its contractual obligations.  *Cormier v. Honiron Corp*., 771 So.2d 193, 197 (La. App. 3d Cir. 2000).

### A.  **WGI Was An Architect - Engineer Contractor**

In order to secure the TERC contract from the Corps, WGI not only represented itself to have engineering experience to perform the tasks that would be required for complex environmental engineering projects, but also that WGI would have field personnel with sufficient experience and knowledge to notify the Corps if there was a situation in the field that the client should be made aware.[30]  WGI failed to fulfill even this basic tenet of the TERC contract.  The Total Environmental Remediation Contract ("TERC") was an Indefinite Delivery-Indefinite Quantity contract for the total remediation of HTRW (Hazardous, Toxic, and Radioactive Waste) projects/sites in support of various Corps customers.  The Corps designed this contract to provide

---

[30] WGI 30(b)(6)(Viegel) at 81:14-82:20.

14

the government with a continuity of personnel and <u>institutional knowledge</u> for developing streamlined and cost-effective remediations through the use of a single contractor.[31]

The specific requirements of each remedial action project would be described in an individual delivery order, later referred to as Task Orders.  Once the delivery order was placed, the contractor was expected to provide complete Architect-Engineering (A-E) services to support the implementation of the remedial action.[32]  The Contractor would be required to write and submit a Work Plan that would describe the Contractor's detailed approach for the performance of the Delivery Order, including the activities to be performed in the field.[33]

Per the TERC, the Corps issued a Statement of Work for the demolition and site preparation for the IHNC Lock Replacement Project on the EBIA adjacent to the Industrial Canal on June 1, 1999 to instigate Task Order 26.[34]  This Statement of Work set forth the project requirements that WGI would "furnish <u>all engineering services</u>, materials, supplies, labor, as required, in connection with the technical review of site documents ... associated with the demolition and remediation of the EBIA."[35]  In addition, WGI was to prepare a "comprehensive report recommending the scope and duration of the remediation and demolition that would be required, as well as any <u>data gaps</u> that may need to be filed by sampling <u>or other investigations</u>."[36]  Thus, it is clear that the Corps New Orleans District was relying upon the engineering expertise that helped WGI secure the TERC contract in the first place; and WGI knew that the Corps was "relying on [WGI's] professional judgment in terms of making the

---

[31] JX-00048-008, ¶ 1.

[32] JX-00048-012, ¶ 2.4.

[33] JX-00048-013, ¶ 3.

[34] JX-00049-003, ¶ 2.4.

[35] JX-00049-003, ¶ 3 (emphasis added).

[36] JX-00049-004, ¶ 3 (emphasis added).

recommendation for the type of work that ought to be done in order to accomplish the goal of the [project]."[37]

The general demolition work performed by WGI (removal of concrete slabs and above ground structures) did not necessarily involve substantial engineering skill.  In fact, James Montegut, the Corps' senior on-site employee, explained that "any caveman could do it."[38]  The specialized engineering expertise would be required once the more complex aspects of the project were addressed.  This need was clearly reflected in the Recommendation Report prepared by WGI.  On December 2, 1999, WGI produced its Recommendation Report for Demolition and Site Preparation Activities of the EBIA.[39]  This report was to present "recommendations regarding the scope and duration of the remediation/demolition activities" of the EBIA.[40]  This report in particular was designed to instruct the Corps about what needed to be done to prepare the EBIA for future activity associated with the lock replacement project.[41]

Due to the plethora of unknown conditions at the EBIA site, WGI understood that data gaps would need to be addressed as the project developed.  As such, the Recommendation Report committed WGI to the development of a number of work plans, including a Project Work Plan that would "provide guidance and requirements for technical field execution" of the project.[42]  The "systematic units of work that [would] be integrated into the overall project" were

---

[37] PX 4676-0017 & 0018 (Viegel 30(b)(6) Dep. Desig.) citing 50:20-51:18.

[38] PX-4685-0048 (Montegut Dep. Desig.) citing  89:7-25.

[39] JX-01234-0001.

[40] JX-01234-0015, § 1.0.

[41] JX-01234-0015, § 1.0.

[42] JX-01234-0040, § 5.1.2.

to include specific "engineering details," particularly those in geotechnical and geology/hydrology specializations.[43]

WGI did not provide specialized personnel to develop the Recommendation Report or subsequent work plans as suggested by the TERC.  WGI had no "understanding about the quality of the soils in Louisiana in or around bodies of water like…[IHNC]," yet assigned Dennis O'Connor (not an engineer) to perform a technical review of the site documents provided by the Corps and draft the Recommendation Report.[44]  WGI's failure to assign adequate personnel would prove disastrous.

Despite the substantial engineering challenges, the EBIA project in actuality "was fairly simplistic, the only way you could endanger the flood system [was] by some form of inappropriate excavation of inappropriate backfill."[45]  Yet these excavations and subsequent backfill were the "peculiarities and particular nuances of the site that the Corps expected WGI to advise it of any geotechnical issues that they encountered."[46]  This expectation was confirmed by the Corps' project manager Lee Guillory at trial, who clarified that "WGI was hired as an architectural engineering firm" and was expected to provide certain geotechnical engineering services.[47]  WGI was to "always…keep in mind and be cognizant of the flood protection structures."[48]

---

[43] JX-01234-0041-42, § 5.1.2.1.5.

[44] DX 2678-0029 & 0024 (Roe 30(b)(6) Dep. Desig.) citing 56:16-21, 43:7-13, 44:1-5; PX-4681-0007 (O'Conner Dep. Desig.) citing 16:19-21.

[45] PX 4675-0008 (Grieshaber II  30(b)(6) Dep. Desig.) citing 15:6-9.

[46] PX 4672-0070 (Guillory I  30(b)(6) Dep. Desig.) citing 150:21-151:12.

[47] Guillory 2566:7-13.

[48] Guillory 2572:2-17.

**B.  The Failure To Address The Transmission Of Hydraulic Pressures Was Negligent**

WGI admitted that it had no institutional knowledge of the unique soil conditions that were to be found in southeastern Louisiana.  The TERC, being a cost/plus contract, was substantially different than most other Corps contracts, which are firm/fixed price contracts.  In a firm/fixed price contract, the "Corps prepares documents for bid and the contractor ... prepares his price based upon those documents and his observance of the site."[49]  The plans and specifications put out by the Corps for firm/fixed price contracts "define the exact scope of work," and "assuming an engineering role ... is not the contractor's responsibility."[50]  The nature of the TERC's Indefinite Delivery-Indefinite Quantity type contract was quite the opposite, with WGI contractually undertaking the role of an architect - engineer contractor.

In addition, general knowledge of contractors engaged in subterranean excavations in the New Orleans metropolitan area mandates that the contractor must consider the effects of soil conditions on both the subsurface work being performed and the structures adjacent to the subsurface work.  As the court learned from Melvin McElwee, a Corps trained contractor that has qualified for 8A contracts in the New Orleans region, the contractor must be concerned about hydraulic pressures.  An understanding of these hydraulic pressures is part of the general sense of job responsibilities as a general contractor.[51]  Here, WGI was negligent both in failing to recognize the effect its subterranean work would have on the adjacent flood control structure and in failing to render professional information to the Corps as WGI's Recommendation Report indicated it would.

---

[49] McElwee 387:11-16.

[50] McElwee 387:17-20; 388:14-23.

[51] McElwee 391:23-392:6.

WGI recognized it had an obligation not to damage the levee or floodwall that was in the proximity of the work site, and realized that there was a potential for damage to a flood control structure caused by subsurface excavations near a floodwall.[52]  Nonetheless, WGI failed to recommend or undertake further investigation of this potential for harm, and did not feel it had an obligation to warn the government of the potential for harm because it assumed that the government was going to evaluate that potential for harm.[53]  WGI, by its own admission, was not evaluating the potential for underseepage, nor was it concerned about making sure that the Corps was either.  This assumption is anathema to even *de minimus* standards because WGI failed to confirm that the Corps was evaluating the proposed work to determine if it would damage the floodwall.[54]

WGI assumed that the Corps' site representative Jim Montegut was knowledgeable about the potential for excavations to affect the floodwall.[55]  However, Mr. Montegut had never studied the soil stratigraphy of the EBIA, did not know the depth of the sheet pile at the EBIA floodwall, and did not consider himself an expert in geotechnical issues such as foundations subsidence or seepage.[56]  Likewise, the Corps' quality assurance representatives for the project did not have the necessary qualifications to assess the potential for the deleterious effects of hydraulic pressures on the adjacent floodwall due to the technical nature of the project.[57]

---

[52] DX 2678-0071-72 (Roe 30(b)(6) Dep. Desig.) citing 168:20 -170:11.

[53] DX 2678-0072 (Roe 30(b)(6) Dep. Desig.) citing 170:1-10; PX 4677-0074-75 (Staggs 30(b)(6) Dep. Desig.) citing 192:5-19 & 194:21-195:16.

[54] PX 4677-0071 (Staggs 30(b)(6) Dep. Desig.) citing 183:14-19.

[55] PX 4677-0056 &57 (Staggs 30(b)(6) Dep. Desig.) citing 146:6-20.

[56] PX 4685-0027, 0028-29, 0042 (Montegut Dep. Desig.) citing 50:9-16, 77:16-22, 52:2-10.

[57] PX 4689-0014 - 15, 0029-30 (Clouatre Dep. Desig.) citing 55:13-25, 90:10-92:8.

Lee Guillory was neither a geotechnical engineer, nor an expert on underseepage issues.[58] For each of the project work plans that he signed off on and "approved," the Corps was not approving or agreeing that whatever work was done was not having any impact on the potential for underseepage to affect the floodwall.[59]

### C.  The Necessity Of Timely Evaluations To Analyze Changing Conditions

The viability of the flood control system is of paramount importance to the safety and well being of the citizens of the New Orleans metropolitan area.  Therefore, any subterranean work performed within a "critical distance" to that flood control structure must be evaluated for any impact that work may have on the structure.

As the owner of the floodwall at the EBIA, the Orleans Levee District ("OLD") has a vested interest in precluding any activity that would "threaten the physical integrity of the floodwall itself," including "any excavation too close to the wall" that "would lead to an undermining of the wall."[60]  This includes excavations to be done within a "specified distance from the levee…either 250 or 300 feet."[61]  At the EBIA, nearly all of the subterranean work would be taking place within the critical 300 foot area adjacent to the floodwall.

The Corps "oversee[s] the responsibilities of the levee district."[62]  The relationship between the OLD and the Corps is regulated by title 33 CFR 208.10, and specifies the general operation and maintenance requirements for the flood protection structure.  The OLD's

---

[58] Guillory 2562:10- 2563:13.

[59] Guillory 2553:2-18; *see also see also* PX 4673-0087-88 (Guillory II  30(b)(6) Dep. Desig.) citing 219:22- 221:13.

[60] Spencer 444:25-445:11.

[61] Spencer 445:12-446:16; JX 1940-0076.

[62] Colletti 292:1-4.

obligation is to operate, protect, and maintain the flood protection structure, and they do this through an active permit program and their inspection program.[63]

Clearly, the integrity of the flood protection structure is vitally important to the welfare of the community it is designed to protect.  It is equally clear that excavations in the vicinity of the flood control structure have the potential for undermining the structure.[64]  Because of this, the effect that an excavation in the vicinity of a flood protection structure "has to be evaluated."[65]  The Corps generally considers the area within 300 feet of the flood structure to be the critical area, thereby obligating the Corps to "evaluate" an excavation within that zone before it takes place.[66]

At trial, a distinction between work performed by a third party was made from work performed by, or on behalf of, the Corps.  Third parties are indisputably required to obtain a permit.  For a Corps-related project, there is still a requirement that an evaluation take place by the Corps' engineering department.[67]  As detailed by Richard Pinner, the head of the Corps' engineering department, the evaluation of these excavations will analyze local stability, global stability and underseepage."[68]

Whether prior evaluations remain valid can and should be the subject of concern.  Thus, the Corps can contract with a subcontractor to obtain a permit.[69]  At the time of the instigation of the EBIA project, the OLD had in place a publicized procedure that mandated permits for any

---

[63] Colletti 296:1-4.

[64] Colletti 300:16-23.

[65] Colletti 301:5-12.

[66] Colletti 303:6-11; 304:5-13.

[67] Colletti 309:11-25.

[68] PX 4687 (Pinner Dep. Desig.) citing 38:18-39:10; Colletti 310:17- 311:8.

[69] Colletti 329: 12-24.

excavations greater than 3 feet or the removal of underground storage tanks within 250 feet of the flood structure.[70]

Per the Corps' directive, WGI inquired about the need for a permit at the EBIA on November 7, 2000.  Steven Spencer, the OLD Chief Engineer who was responsible for the issuance of permits, interpreted this as a request for a permit.  In furtherance of his duties, Spencer directed WGI to forward copies of the letter and accompanying plans to Brian Keller in the Operations Division of Corps and the Louisiana Department of Transportation and Development ("LADOTD").

The LADOTD responded by producing a document to OLD entitled "Permit Request Form of No Objection," that was proffered with the condition that the "Levee District be notified upon completion of the demolition activity, so that an inspection and an approval of the levee condition be made."  Likewise, the Corps' Operations Division advised that it had "no objection to the [OLD's] issuance of a permit for the proposed work" provided that the work was accomplished in accordance with the information provided to it by letter from WGI dated January 17, 2001.  The Corps' Brian Keller asked that the OLD furnish it with "a copy of your permit" if OLD approved WGI's proposal. From evidence adduced at trial, the substantial excavations of the project, including the RECAP soil excavations, transite removal, and sewer line removal, and various other excavations greater then three feet, were evaluated.  Thus, it is clear that at the outset of the project, there was an expectation that a permit was necessary.

Thereafter on April 11, 2001, the OLD issued two unsigned permit forms to WGI that in the ordinary course of business were sent by regular U.S. mail, postage prepaid.  WGI has conceded that the unsigned permit was received and reviewed by legal counsel, who in turn

---

[70] JX 1940-0076.

advised WGI not to sign and return the permit.[71]  This permit form indicated that the OLD was

willing to grant permission to WGI as "Permitee" to perform work as specified in WGI's

November 7, 2000 letter, and that the provisions of the letters of no objection from the Corps and

LADOTD be strictly adhered to.  In addition, the permit required WGI, as the Permittee, to

defend and indemnify OLD from any liability associated with the proposed work.  This permit

would only have been valid for "one year from the date hereof" or from April 11, 2001.  As

specified by Mr. Spencer at trial, another permit would be required after one year.[72]  The purpose

of this one-year requirement should be clear: changing conditions mandate an evaluation to

address whether such changing conditions would impact the adjacent flood control structure.

Defense experts have opined that there was no need for additional analysis other than that

performed for the original 1966 Design Memorandum.  However, the EBIA project involved

innumerable excavations that were not previously presented to the floodwall designers.  These

excavations, whose depths penetrated the underlying marsh layer and far exceeded the adjacent

sheet pile depth, were never evaluated by WGI or the Corps, despite the need that such an

evaluation is standard Corps protocol.[73]

In the present case, the contract documents and factual record clearly establish that WGI

was retained as an architect-engineer contractor to fulfill obligations pursuant to the TERC

contract.  WGI's duty as an A-E type contractor mandated that it evaluate the potential for harm

to the floodwall due to the work it was performing, including the performance of geotechnical

evaluation of the effect of hydraulic pressures.  The Corps was obligated both to perform certain

tasks to meet the necessary criteria of the construction project <u>and</u> to meet additional criteria in

---

[71] DX 02678-0075 (Roe 30(b)(6) Dep. Desig.) citing 177:1-17.

[72] Spencer 476:15-477:7.

[73] Colletti 301:5-12; 309:10-310:4.

administering the contract.  Geotechnical analysis was required to understand the effects of groundwater migration, hydraulic pressures, and the deleterious effect of these geotechnical aspects exacerbated by improper excavation and backfill adjacent to the floodwall.  Both WGI and the Corps failed to ensure that this analysis was performed.  This neglect, along with the repeated failure to evaluate changing conditions, allowed institutional errors to propagate unchecked, ultimately contributing to the catastrophic failure of the EBIA floodwalls.

### III.   WGI IMMUNITY

#### A.  <u>Federal Government Contractor Immunity</u>

WGI can only avoid liability on state law claims under the government contractor defense only by showing the following:

> (1) that the United States government approved reasonably precise specifications;
>
> (2) that the product conformed to those specifications; and
>
> (3) the contractor must warn the United States government about dangers associated with the use of the product known to the manufacturer but not to the government.

*Boyle v. United Technologies Corp*., 487 U.S. 500, 512 (1988)

Because the government contractor defense is an affirmative defense, the burden is on the defendant to establish the conditions for application of the defense.  *Bailey v. McDonnell Douglas Corp*., 989 F.2d 794, 802 (5th Cir. 1993).  The "federal common law" defense identified as the governmental contractor defense allows for the displacement of state law only where a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law.  *Boyle*, 487 U.S. at 507.

When the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but also not contrary to any assumed under the contract, then a uniquely federal interest is not involved and the application of state law will not frustrate the specific

objectives of federal legislation.  Only when the state-imposed duty of care (that conduct that is the asserted basis of the contractor's liability) is precisely contrary to the duty imposed by the government contract should the contractor defense displace state law.  In essence, because the contractor could not comply with both its contractual obligations and the state prescribed duty of care, the contractor claims that "[t]he Government made me do it" and the immunity applies.  *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir.1990).

To handle the project at the EBIA, the Corps specifically intended that WGI would develop the specifications to fulfill the project's scope of work.  This made Task Order 26 a performance specifications contract, as opposed to a design specifications contract, a distinction clarified by the Court of Claims in disputes between the government and its contractors. Performance specifications contracts set forth an objective or standard to be achieved, leaving the contractor leeway in determining the manner in which to achieve the end result.  *J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1362 (Ct. Cl. 1969).  Design specifications contracts set forth in precise detail the materials to be employed and the manner in which the work is performed; detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced.  *United States v. Spearin*, 248 U.S. 132 (1918).

The Task Order 26 contract entrusted considerable discretion unto WGI to execute the contract as it saw fit, with minimal controls regulated primarily by cost saving concerns.  To qualify for immunity, WGI would have to meet the first prong of *Boyle*, which requires a showing that the government approved reasonably precise specifications.  That obligation entails a showing of "both the existence of reasonably precise specifications and the approval of those specifications by the government."  *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 461 (5th Cir. 2010).

First, WGI developed the scope of excavation through its testing protocol.  Thus, the extent of excavation would be imprecise.  Second, the type of backfill was equally imprecise, as WGI was free to use backfill throughout the site as it saw fit, whether it be from one of the on-site borrow pits (the composition of which was made up primarily of silts and clays with plant derived organics such as wood and peat throughout[74] or of sand from outside sources.  Finally, the method of compaction was imprecise.  This open ended design, as well as the Corps not being "even fully aware of the contents of the backfill material used to fill the holes it had created," further substantiate that the specifications were imprecise.  *Id.* at 462.

It is clear that any Corps' approval of WGI's plans involved only the approval of imprecise or general guidelines, with discretion over important design choices left to WGI.  By providing only general instructions regarding the extent of excavation, backfill composition, and compaction methods, the Corps ensured that WGI would have significant discretion over the design features of the EBIA project. As already addressed by the Fifth Circuit, "the exercise of that discretion by WGI is not protected by the GCI doctrine."  *Id.* at 464-65.

**B.  State Law Duty**

La. R.S. 9:2771 allows that "no contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications." In the present case, WGI made developed the plans by which the project would proceed.

Because the rationale supporting Article 9:2771 is that a contractor is not a guarantor of the sufficiency of the plans and specifications which another person draws, the benefits of this

---

[74] PX-0847-0008.

immunity cannot apply to WGI.  *See New Orleans Unity Soc. of Practical Christianity v. Standard Roofing Co.*, 224 So.2d 60 (La. App. 4 Cir.1969) app. denied 254 La. 811, 227 So.2d 146.

## IV.  GOVERNMENT IMMUNITY

### A.  <u>The Flood Control Act Does Not Apply To Plaintiffs' Claims</u>

#### i.  <u>Defendants' Negligent Work On A Navigation Project Caused Plaintiffs' Damages</u>

The government initially invites this Court once again to accept its overbroad definition of the Flood Control Act.  They contend that because floodwaters destroyed Plaintiffs' property, the government is immune under 702c, regardless of how or why the floodwaters were released. This Court has rejected this argument every single time it was presented during the entirety of the Katrina litigation.  Most recently, the Fifth Circuit also agreed by "reject[ing] the government's interpretation of the scope of Section 702c and conclud[ing], instead, that the United States enjoys immunity under that section only where damages result from waters released by flood-control activity or negligence therein."  *In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 446 (5th Cir. 2012).

Recognizing this Court will likely reject again their overbroad 702c interpretation, the government next attempts to rewrite Plaintiffs' complaint as suing for negligent flood control. They argue 702c's protection applies here because "flood control activity was at the core of Plaintiffs' allegations."  (USA Mem. at 77.)  This is, of course, patently false.  At no time have Plaintiffs ever contended that their damages resulted from any negligent flood control activity. When Katrina hit, Defendants were not working on the floodwall, or excavating and remediating the floodwall, or building or installing a new floodwall.  Rather, when Katrina hit, Defendants had just completed excavating and remediating the EBIA to make dredging the new, wider

27

shipping channel easier.  As this Court has already concluded, such conduct was for a navigation project wholly unrelated to any flood control activity.  *In re Katrina Canal Breaches Litig.*, 2011 WL 651946, *5 (E.D. La. 2011) (Rec. Doc. 20164).

The government also re-argues for 702c immunity because the lock replacement project was supposed to include installing new floodwalls at some unknown time in the future.  (USA Mem. at 81.)  The Court previously rejected this argument as well finding that it,

> [I]gnores the plain fact that there was no funding in place for the construction of these new floodwalls at the time that the EBIA remediation occurred and that the extant floodwalls were to provide all the hurricane flood protection available during the entire project construction and were not to be "selectively demolished" until, if ever, the new MRL levee/floodwall would be built to elevation of 22.4 feet NGVD.

*Id.* at *6; *see also id.* at *5 (the Corps had "obtained funding…to pursue only two phases [of the lock replacement project] prior to Hurricane Katrina," both of which had nothing to do with the new floodwall) (emphasis added).

The government has failed to offer any new evidence or argument why the Court should revisit its prior summary judgment ruling.  Thus, 702c immunity is not available here.

### ii.  The Purported Floodwall "Deficiencies" Did Not Cause The North Breach Or The South Breach

For the first time in more than six years of litigation, the government shifts blame for the North and South Breaches to a litany of newly minted "deficiencies" in the floodwall's design and construction.  (USA Mem. at 82-85.)  This Court should reject the government's self-serving 702c argument because it is made from whole cloth, sprung on Plaintiffs for the first time at trial.[75]  Nevertheless, the government's attempt to blame Plaintiffs' damages on a negligently designed and constructed floodwall still fails because the alleged defects either did not actually

---

[75] *See* colloquy with Judge Duval and counsel at 665:24-667:16; *see also* Bea 4155:2-4156:2.

exist, they could not have been accounted for at the time of the floodwall's design and construction, or they were not a substantial factor in causing either of the two breaches. Plaintiffs address each alleged defect in turn.

- Lower Levee Toe at the North Breach

The government first points to Dr. Brandon's trial testimony about how the levee toe on the protected side of the North Breach was purportedly constructed below design height.  (USA Mem. at 83.)  This testimony lacks any foundation and is an unsupported conclusion born on the witness stand as he failed to address how he modeled this alleged elevation difference to reach such a conclusion.  Indeed, Dr. Brandon could not have modeled any elevation change because his North Breach cross section—which he used for his North Breach stability analysis—does not show or indicate any elevation discrepancy between the levee toe on the canal and protected side.[76]  To substantiate such a claim, Dr. Brandon should have referred to the as-built survey that documented the as-constructed conditions immediately following construction.  He did not.  His report contains no topographic information or discussion of the as-built documentation.

When one does review the relevant documents, it is apparent the levee at the North Breach was built as designed.  The 1969 Floodwall Capping Plans reveals that the pre-levee construction ground elevations were approximately three feet below the target "finish" grades.[77] Thus, if no site work had been performed at the North Breach as part of the Chalmette Area Plan,[78] the maximum difference between existing ground elevation and design elevation would be about three feet.[79]  But a review of the sheets in the 1969 Floodwall Capping Plans bear the

---

[76] JX 1836-0010, Fig. 3 (Brandon Rep.) at 5, Fig. 3.

[77] JX 1698-0010 at Station 55+00 noting need for 2.9-3 feet of fill at elevations +0.0 and -1.0.

[78] PX 763.

[79] The 1969 plans indicate that the design elevation for the new levee is approximately El. +0 ft a distance of about 30-35 ft inside the protected side of the levee.  If the earthen levee had not been constructed as designed, the

note "As Constructed," implying that the target design grades were actually achieved.[80]  No deviations or alterations are noted in the plan set that indicate otherwise.

Topographic information presented in the 1980 Florida Avenue Complex Project show that ground surface elevations at a distance of about 30-35 feet inside the protected side of the levee are at approximately Elevation + 0 ft.[81]  This indicates that the design grades were achieved during initial construction of the levees.  It demonstrates that the site grades, at the time of this project in the early 1980s, were at or near the target design elevation for the Chalmette Area Plan.  Regardless, as discussed below, no elevation change (real or imagined), or any other so-called defect raised by Defendants, played any role in the two breaches.

- Gap Formation at the North Breach

The government then argues that a gap formation "indisputably factored heavily in the breach mechanism."  (USA Mem. at 83.)  This contention is meritless as even the government concedes that gap formation "was not understood as a failure mechanism at the time of design." (*Id.*)  Thus, the Corps cannot be blamed for failing to account for a phenomenon that did not even exist when they designed and installed the levee and floodwall.

- Joining of the 1980 Sheet Pile to the 1969 Sheet Pile at the North Breach

Next, the government posits that joining the longer 1982 sheet pile to the shorter 1969 sheet pile was an additional design flaws that caused the North Breach.  (USA Mem. at 83-84.) No one testified that deciding to join the two different length floodwalls was negligent.  Rather, the testimony focused on whether the method of joining the two walls was negligent.  And, the Defendants' own experts all testified unequivocally there was no negligence involved because

---

elevations in this region would be at elevation – 3 ft instead of the target design elevation of + 0 ft.  *See* JX 1698-0010.

[80] JX 1698.

[81] JX 6-0107, noting elevation levels in two foot increments from 0-10 feet at STA 0+26.69 W/L.

the weld joining the two sheet piles played no role in the floodwall's failure at the North Breach.[82]

- <u>Floodwall Elevations at the North Breach and South Breach</u>

The government then claims the floodwall's subsidence below design elevation was apparently a maintenance flaw that also caused the two breaches.  (USA Mem. at 84.)  As the story goes, the two breaches occurred "at the two lowest elevation points along the EBIA…[where] backside scour was likely greatest…."  (*Id.*)  Once again, the evidence reveals this contention to be false.

With respect to the North Breach, the government cites Dr. Dunbar's trial presentation to contend there were "massive scour trenches" on the landside of the North Breach because of this location's elevation.  (USA Mem. at 17.)  As Dr. Dunbar conceded, however, none of the photos in his presentation or his report showed any scour trench behind the North Breach.[83]  This is because a scour trench requires overtopping and both of the government's causation experts testified there was no overtopping before failure at the North Breach.[84]

Concerning the South Breach, as discussed in Plaintiffs' brief, even assuming Dr. Marr's estimated wall height at this location was accurate, the stipulated surge height of 12.3 feet at 7:00 a.m. would simply not create sufficient overtopping to "even scour away the grass on the backside of the floodwall."[85]

With respect to both breaches, Dr. Silva's testified that, as far as causation is concerned, any elevation difference was irrelevant:

---

[82] Marr 2119:11-18; Silva 3828:19-3829:3.

[83] Dunbar 1819:2-1820:19.

[84] Marr 2124:8-11 (overtopping did not cause North Breach); Brandon 3158:23-25 (North Breach occurred "prior to the water hitting the top of the wall."); JX 1836-0023 (Brandon Rep.) (same).

[85] Pre-Trial Order at 29; Bea 1289:7-12; *see also* Plaintiffs' Mem. at 79-81.

The maximum elevation of the storm surge was 14.2.  We can see here the elevation of the North Breach at 11.3 and at the South Breach at 12.3.  You know, as I mentioned -- and I'll mention in a bit -- **this difference turns out not to be -- was not important** because this -- **the structures failed when the floodwaters essentially reached the top**.  I mean **just as the water was overtopping, the structures failed**.[86]

- Failure to Include Erosion Protection and Deeper Sheet Piling at South Breach

The government also contends that the Corps' failure to include backside erosion protection and deeper sheet piling at the South Breach is a flood control flaw protected by 702c. (USA Mem. at 84.)  This argument is a red herring.  As the government admits, the levee and floodwall's design called for neither.  Even Dr. Silva made clear that, at the time the Corps constructed the EBIA floodwall, they were confident they designed the wall "with an ample level of safety and that they were never going to overtop it."[87]  In other words, they built it exactly as designed and, at no time, have Plaintiffs blamed a lack of overtopping protection or shallow sheet pile for the causing the South Breach.  And, the government concedes, as they must, that there is no way of knowing whether including backside scour protection and deeper sheet pile would have actually prevented the two failures.[88]

- Dr. Bea's Testimony About The EBIA Floodwall's Design

The government concludes their 702c argument by discussing how Dr. Bea purportedly testified the EBIA floodwall was negligently designed and that these design issues caused the two failures.  (USA Mem. at 84-85.)  An accurate review of Dr. Bea's testimony reveals the contrary.  Dr. Bea testified unequivocally that any purported design deficiencies were irrelevant to this case.

---

[86] Silva 3750:6-13 (emphasis added).

[87] Silva 3697:18-22.

[88] "The original authorized design contemplated neither, but had these measures been in place, the floodwall might have withstood Katrina's unprecedented storm surge."  USA Mem. at 84 (emphasis added).

Initially, the cited Dr. Bea testimony was clearly from the perspective of hindsight. In other words, it is very easy to look back forty years with the technology and knowledge we have today and say that the Corps should have done more; they should have driven the sheet pile down 1000 feet or built the floodwall 1000 feet high, but that is not the relevant analysis. The question is, with the technology and knowledge the Corps had <u>at that time</u>, did they negligently design and construct the EBIA floodwall. Of course, the answer is "no."

> Q.   So as we sit here today, is it your current opinion – if you go back in time to 1966, considering what they knew, considering what they did, **can you say today that in 1966, back then when this levee was designed, that the levee was defectively designed**?
> A.   **<u>No</u>**.
> Q.   Today you can.
> A.   Right.
> Q.   In hindsight.
> A.   That's hindsight.
> Q:   That's 20/20, isn't it?
> A:   Always.[89]

In true fashion, this is very same analysis that Dr. Silva engaged in when he testified about how the Corps built exactly what they designed, but that "in hindsight," they should have included erosion protection.[90]

Most importantly, though, Dr. Bea's testimony proves that even if the floodwall and levee were "defective," (*i.e.*, if we used today's engineering knowledge to comment on a forty-year-old design) such defects played absolutely no role whatsoever in either of the two breaches:

> Those design flaws **have no direct bearing on my forensic engineering analysis of breach causation**. In addition, the extra effort that I made to study the near breach shows that even through the full Katrina condition, with the conditions at that site, the wall stood; and at North and South Breach, due to their unique

---

[89] Bea 4154:6-17.

[90] Silva 3697:14-3698:12.

characteristics, it didn't stand.  And the sheet piles are effectively the same depth
at all three locations.[91]

The Corps built exactly what it was supposed to build, exactly as it was intended to be
built, and the floodwall "survived Hurricane Katrina…as designed."[92]  Accordingly, 702c
immunity is not available here.

### B.  The Government Fails Both Parts Of The Discretionary Function Exception Test

An important first step in the DFE analysis involves identifying the government conduct
that caused Plaintiffs' damages.  *Cestonaro v. United States*, 211 F.3d 749, 753-54 (3d Cir.
2000).  In yet another attempt to bring Plaintiffs' claims within the ambit of the DFE (and 702c)
the government frames the negligent conduct as "the Corps's failure to properly prosecute its
flood control design and maintenance responsibilities" as well as the failure to "redesign[] the
floodwall."  (USA Mem. at 89, 97.)  Plaintiffs allege no such thing.  The complained of conduct
is—and has always been—Defendants' negligent failure to perform a proper geotechnical
analysis of their EBIA excavations, coupled with their failure to properly backfill and compact
those excavations.  As will be discussed, the government's false premise infects their entire DFE
analysis because they focus only on things that should have been done to the floodwall as
opposed to things that should have been done to the excavations adjacent to the floodwall.

### i.  The Corps Was Required To Evaluate Its Excavations

Several sources mandated a proper geotechnical analysis as well as a proper backfill and
compaction protocol including the Corps' own policy, its own publications and regulations, and
standard engineering practices.  The government has failed to demonstrate that these mandates
did not apply here.

---

[91] Bea 4136:17-4137:3.

[92] Bea 4146:2-6.

- <u>300 Foot Evaluation Policy</u>

In an initial attempt to avoid the Corps' 300-foot evaluation policy, the government states that "no statute, regulation or policy compelled the Corps to undertake a new assessment of the existing EBIA flood control structure." (USA Mem. at 96.) This contention misses the mark. The issue is not about assessing the existing EBIA floodwall. The issue is about assessing excavations within 300 feet of the existing EBIA flood control structure and determining whether those excavations will harm it.

That aside, the government suggests that the Corps complied with its 300-foot policy first when engineering reviewed WGI's proposed work plans and then later when someone from the Corps' geotechnical division spent an hour reviewing WGI's permit application. (USA Mem. at 109.) To the extent these exhibits actually evince a geotechnical review, they fall woefully short of complying with the Corps' policy. Both "evaluations" were performed in 2000 when the EBIA project was just beginning and concerned only the work WGI initially believed was required. As the trial revealed, the work WGI expected to perform in 2000, compared to what it actually performed by the end of 2005, was dramatically different in terms of scope and magnitude. For example, the 2000 Project Work Plans predicted that the entire project would only take only 22 months.[93] It acknowledged that there were a substantial number of unknown subterraneous structures and obstructions that would require additional analysis.[94] The plans also projected digging down only three feet and excavating 9,807 cubic yards of soil at the

---

[93] JX 1252-0015 at 1.5 (WGI Project Work Plan 2000).

[94] JX 1252-0051-52 (WGI Project Work Plan 2000).

various contaminated areas throughout the entire EBIA.[95]  As the evidence showed, WGI ended

up excavating 110,739 cubic yards of soil[96] and digging down to at least 22 feet.[97]

As Mr. Colletti's testimony made clear, because this project was a "moving target," the

obligation to evaluate excavations within 300 feet of the floodwall did not stop in 2000, but

continued throughout the project's entire duration.[98]  Thus, any alleged geotechnical evaluation

that was performed in 2000 on WGI's preliminary proposed work did not excuse the failure to

evaluate the extensive additional work that it performed during the entire five-year project.

- Design Documentation Report

The government's initial contention that ER 1110-2-1150 is discretionary cannot be

squared with the regulation's plain language or the Corps' sworn testimony.  ER 1150 states that,

"ER's [sic] contain policy requirements for engineering management [and that] [a]ll ER

requirements will be considered mandatory unless otherwise indicated…."[99]  Mr. Grieshaber

testified on the Corps' behalf that engineering regulations "convey mandatory policy

requirements."[100]  The government then suggests that this regulation's requirements do not apply

here because Plaintiffs contend that the Corps should have created a new DDR.  (USA Mem. at

83, fn. 33.)  This is not Plaintiffs' contention.  Plaintiffs' contend that the Corps issued an

incomplete DDR because it failed to include several required elements.

---

[95] JX 1252-0052-54 (WGI Project Work Plan 2000).

[96] JX 1364-0040 at Table 1 (Tech. Completion Report 2005), noting removal of 186,872 total tons of material. Convert tons to cubic yards by assuming total density (soil plus inherent moisture) was approximately 125 pounds/ft^3, then 186,872 tons x (2000 lb/ton) x (ft^3/125lb) x (cy/27 ft^3) = 110,739 cubic yards.

[97] Guillory 2631:7-16.

[98] Colletti 341:10-342:3.

[99] JX 44-0026 at §19.1.1 (ER 1110-2-1150).

[100] PX 4675-0026 (Grieshaber 30(b)(b) Dep. Vol. II) citing 64:2-11.

As Dr. Rogers explained, the DDR is a "cradle-to-grave document" that is "not finalized until after the completion of the construction work and the district engineer signs off on it."[101] As ER 1150 mandates, the DDR must contain "every piece of geotechnical investigation,"[102] including all previous studies.[103]  While the DDR contained a geotechnical analyses for the new floodwall, it failed to contain any discussion or reference to the purported geotechnical analysis contained in the 1966 DM 3—or any other purported geotechnical analysis for that matter.  The severity of this omission is emphasized by the fact that the DDR is "the most important document that [civil engineers produce] on large public civil works projects."[104]  Without inclusion of all geotechnical analyses of the EBIA in the DDR, an engineer (and his contractor) will not have access to information about the subject area in the event they undertake "remedial work or repair or build a new modification to it…."[105]

- Corps Manuals

With respect to the various Engineering Manuals, the government maintains these publications do not contain any mandatory requirements and are intended only to provide guidance to the engineers using them.  (USA Mem. at 89-90.)  According to the Corps, its Engineering Manuals "contain some <u>mandatory requirements</u> to ensure project safety and function" for engineering procedures and design standards as well as "policy standards for uniform engineering practice related to civil works projects."[106]  *See also Bagner v. United*

---

[101] Rogers 562:4-564:23; *see also* JX 44-0045 at §D-1.4 (ER 1110-2-1150).

[102] Rogers 564:6-23.

[103] Rogers 564:6-23; JX 44-0047 at §D-7.11 (ER 1110-2-1150).

[104] Rogers 563:8-14.

[105] Rogers 563:8-14.

[106] JX 44-0026 at §19.1.2 (ER 1110-2-1150) (emphasis added).

*States*, 428 F.Supp.2d 101, 104 (N.D.N.Y. 2006) (discussing how Corps manual contains both permissive and mandatory elements).

The government also misconstrues how Plaintiffs contend Defendants should have utilized these manuals.  Never have Plaintiffs alleged that these manuals required Defendants to "reassess the design of the EBIA floodwall or…reconstruct the floodwall with a deeper sheet pile."  (USA Mem. at 90.)  Rather, these manuals inform the reader of specific geotechnical issues that have the potential to impact an existing floodwall, as well as specific measures to take to make certain such impacts are minimized or do not otherwise occur.

For example, the manuals warn that "[w]ithout control," levees and floodwalls can be subjected to "excessive hydrostatic pressures"[107] and "water pressures and uplift forces…in excess of design assumptions and consequent structural instability…."[108]  Thus, "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be continuous from the inception of the project to final placement in operation."[109]  It also mandates that "for floodwalls, foundation underseepage conditions <u>must also be assessed</u>"[110] in order "<u>to prevent excessive uplift pressures</u> and piping through the foundation…."[111]

Nevertheless, even if this Court finds the manuals do not have any directives in them, and that they only provide guidance to the engineer, there is no evidence that any engineer actually consulted or read any of these manual.  Also, the information contained in these manuals is

---

[107] JX 46-0036 at §5-1 (EM 1110-2-1913).

[108] JX 40-0169 at §7-3 (EM 1110-2-2502).

[109] JX 42-0008 at §2-1 (EM 1110-2-2504).

[110] JX 42-0016 at §3-1*a* (EM 1110-2-2504).

[111] JX 37-0163 at §9-1 (EM 1110-2-1901).  While the government claims this Manual does not apply because it involves dams (USA Mem. at 90), the DDR for the Lock Replacement Project expressly incorporated the "geotechnical requirements" from a manual on the "Stability of Earth and Rockfill Dams."  *See* JX 17-0015 (DDR No. 2).

reflective of the standard of care in the industry, which at a minimum, the Corps and WGI were required to follow, but ultimately did not.

- Code of Federal Regulation 208.10

The government acknowledges that this CFR created a mandatory duty by requiring the "Corps retain responsibility for evaluating work within 300 feet of the centerline of a levee or floodwall to ensure that the work will not adversely impact the structure." (USA Mem. at 108.)[112] The government claims, however, that the Corps satisfied this obligation when it approved WGI's preliminary work plans. This is not correct. The mandates in this CFR sustained throughout the entire five-year project because there was work performed at the EBIA that was not in any preliminary work plan, and the CFR requires an evaluation and determination of whether that new work would harm they levee and floodwall. No such evaluation or determination was ever performed.

- Standard Engineering Practices

Lee Guillory testified that, with respect to the EBIA floodwall, that it was good engineering practice "to be cognizant of what's around you, and make sure you don't harm it."[113] Even WGI acknowledged that general construction knowledge provides that "holes near a levee might be a problem for the levee"[114] and that WGI had a duty to make sure its work would not damage the integrity of the adjacent flood control structure.[115] Then why did Defendants not follow standard engineering practices (or standard construction practices) by ignoring the impact their excavations could have on the floodwall? The answer begins with understanding the Defendants' perspective of the EBIA when they undertook Task Order 26.

---

[112] *See also* Colletti 346:6-14.

[113] Guillory 2572:2-17.

[114] PX 4677-0039 (Staggs 30(b)(6) Dep. Desig.) citing 101:15-23.

[115] PX 4677-0090 (Staggs 30(b)(6) Dep. Desig.) citing 282:20-283:2.

The EBIA was destined to be dredged (*i.e.*, removed) at some unknown time in the future. This fact resulted in Defendants treating it like an afterthought even though thousands of residents counted on and relied on the EBIA floodwall to protect their lives and property. As the government's expert, Dr. Lucia, described it, the EBIA was "not a site that's being excavated and recompacted in which we're going to build condominiums or something like this."[116] The obvious corollary being that had the EBIA been destined for something the Corps considered productive and high value (*e.g.*, condominiums), then Defendants would have given the requisite care and attention to their excavation and backfill protocols. That is an irresponsible perspective. Whether it is condominiums or a new shipping channel, the floodwall is going to remain, and needs to survive through however many named (and unnamed) hurricanes it was designed for.

With that background, Defendants' obligation to evaluate their excavations continued from the project's inception until the project was completed in 2005.[117] In an attempt to get around this fact, the government contends that the Corps satisfied this mandate by performing a geotechnical evaluation in 1966, and then later when it approved of WGI's proposed work plans in 2000.

With respect to the 1966 evaluation, the government had to show proof that someone actually read and relied on that document.[118] They cannot do this because no one at the Corps ever did.[119] Most tellingly, though, Mr. Guillory admitted that the 1966 evaluation was insufficient to cover deeper excavations.[120] With respect to approving the 2000 Project Work Plan, as discussed *supra*, whatever analysis occurred then concerned only proposed excavations

---

[116] Lucia 2985:19-2986:11.

[117] Colletti 341:10-343:7; Rogers 751:10-752:19.

[118] Colletti 302:24-304:13; 309:20-310:4; 311:9-16.

[119] Lucia 2963:21-24.

[120] Guillory 2359:17-24.

and failed to address the substantial amount of work that was either never detailed in the preliminary plans or went well beyond their scope.

Faced with the "troubling omission" of any other documented analysis beyond these two circumstances, the government surmises that the either the Corps must have performed evaluations for the duration of the five-year EBIA remediation (but not documented them), or that they were entirely unnecessary.  (USA Mem. at 111-12.)

Dr. Lucia's assertion that the Corps must have continued evaluating excavations during the entire project is unsupported speculation.  Mr. Guillory made it clear that the Corps only sought geotechnical assistance twice during the entire remediation.[121]  The contention that any other evaluation was unnecessary because the 1966 analysis was still valid is also not correct.  In support of this claim, the government states that "the foundation and landside soils where seepage paths would exit were all impervious clay soils."  (USA Mem. at 115) (emphasis added). Even the government's own soil expert, Dr. Dunbar, acknowledged there were permeable lenses of peat and silts running throughout the entire EBIA.  Indeed, a careful review of his presentation to the Court revealed that—beneath his incorrect color designations—the Corps' own stick logs show lenses of silt at both breach sites that Dr. Dunbar agreed were more permeable that clay.[122]

That Mr. Guillory "did not recall ever encountering a sandy or otherwise permeable layer of soil that would have given him pause" is also not surprising.  (USA Mem. at 116.)  First, he was not actually performing or participating in any of the remediation activities himself so it was impossible for him to have any firsthand knowledge of the type of soils that were actually

---

[121] Guillory 2575:1-6 (for the borrow pit and the Surekote Road work at McDonough Marine).

[122] DX DM 1004-0028-30 (Dunbar Demonstrative); Dunbar 1810:11-1813:1.  Even the Corps' own DDR No. 2 described the EBIA as having "poor soil conditions at the site."  JX 18-0018 at 2. "Foundation Recommendation."

encountered with each excavation.[123]   Second, even if he was actually performing and

participating in the remediation activities himself, he is admittedly not qualified to spot and

characterize permeable soils because he is not a geologist or a geotechnical engineer.[124]   Third,

to the extent Mr. Guillory was relying on George Bacuta as his "right hand man" on the project

to spot permeable soils,[125] such reliance is of no value because Dr. Bacuta did not review any

soil deeper than five feet,[126] and he was not acting as a geologist on the project.  Rather, Dr.

Bacuta was tasked solely with identifying contaminants, not permeable soils.[127]

    As Dr. Rogers made clear, while the EBIA is comprised primarily of clay, it is these

stringers and lenses of peat, silt and other pervious strata that Defendants should have been

concerned about—and thus undertaken to protect against—because these are the "weak links" in

the system that "transmit pore pressures" that ultimately "create levee failures."[128]

    Finally, because of the substantial number of unknowns a remediation project has,[129]

standard engineering practice requires that there be someone at the site with the ability to spot

potential geotechnical issues that may arise.  In fact, the Corps "fully expected that should any

geotechnical aspect of the TERC Task Order 26 came up…[WGI] would have immediately

alerted us to that situation so that we could take further actions, further evaluations, et cetera."[130]

---

[123] Guillory 2573:5-9.

[124] Guillory 2562:10-2563:2.

[125] Guillory 2396:8-25.

[126] DX 2666-0002 (Defendants' Bacuta Dep. Desig.) (Bacuta's work "involved identifying contaminants in shallow soils (5 feet deep or less) at the EBIA….")

[127] PX 4682-0058-59 (Plaintiffs' Bacuta Dep. Desig.) citing 140:19 to 142:03.

[128] Rogers 650:8-24; 678:21-679:6; 764:3-8.

[129] Guillory 2564:22-2565:4.

[130] Guillory 2359:17-2360:8; *see also* 2369:15-24 (Guillory "absolutely expected WGI to alert" the Corps of any concerns relative to whether their excavations would harm the floodwall.)

The government reiterated this position in their pre-trial brief.[131]  But WGI never did alert the Corps.[132]  Why?  Because WGI admits that it did not have a single person on the ground with the ability to spot any geotechnical issue that arose during this massive five-year remediation project.[133]  WGI thought the Corps was performing the required geotechnical analysis.[134]

In the end, standard engineering practice and common sense were ignored when no geotechnical analysis was performed because both Defendants thought the other was taking care of it when, in fact, no one did.

### ii.  <u>The DFE Was Not Created To Shield Defendants' Monumental Engineering Mistakes</u>

Assuming the government satisfies the first part of the DFE test, it can satisfy the second part if the decision making at issue is "susceptible to policy analysis."  *United States v. Gaubert*, 499 U.S. 315, 325 (1991).  In an attempt to make this showing, the government contends that "policy considerations abounded in deciding how best to proceed with all aspect of the LPV project."  (USA Mem. at 93.)  They emphasize the "'difficult decision'" the Corps was required to make concerning the various flood control structures built pursuant to the LPV.  (*Id.*)  But this is not the proper focus for this case because Plaintiffs are not challenging a single decision concerning any flood control structure.  The proper focus here is whether the decisions involving Defendants' excavations and backfill activities on a navigation project are susceptible to policy analysis.

Under *Gaubert* "the very existence" of a regulation allowing a government employee discretion "creates a strong presumption that a discretionary act authorized by the regulation

---

[131] "The Corps' role in the Task Order 26 EBIA remediation project was inspection, **not engineering** or design." USA Trial Brief at 39 (Doc. No. 20960) (emphasis added).

[132] Guillory 2369:15-24.

[133] PX 4677-0020-21 (Staggs 30(b)(6) Dep. Desig.) citing 56:9-24; 4677-0066 citing 173:9-21.

[134] PX 4677-0020-21 (Staggs 30(b)(6) Dep. Desig.) citing 56:9-24; 4677-0066 citing 173:9-21.

involves consideration of the same policies which led to the promulgation of the regulations."
499 U.S. 315, 324-25.  Plaintiffs can defeat that presumption, however, by showing the
government's actual decisions were not policy-based.  *Id.*

The government's policy argument here is flawed because it is based on "'mere
subjective statements'" without any "'reasonable support in the record for a court to find without
imposing its own conjecture that a decision was policy-based or susceptible to policy analysis.'"
*In re Katrina Canal Breaches Litig.*, 627 F.Supp.2d 656, 690-91 (E.D. La. 2009) (quoting
*Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1216-17 (9th Cir. 2001)).  In other
words, the government did not cite any trial or deposition testimony to buttress their claims that
the decisions to not perform a proper geotechnical analysis or to not properly backfill and
compact their excavations had any political, social, or economic basis.

As discussed above, there is no law, regulation, policy or otherwise that afforded the
Corps any discretion with respect to their excavation and backfill activities.  Even assuming the
LPV legislation—which did afford discretion on how to design and build flood control
structures—also somehow provided discretion on how the Corps could dig and backfill
excavations to make way for a shipping channel, the "[e]vidence of the actual decision[s]" made
by the Corps and WGI reveal that "the 'nature' of the decision[s]" did not implicate any policy
judgments.  *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995).[135]

With respect to the decisions made concerning the Corps' backfill operations, the
government has conceded that no policy judgments were involved because cost was not a

---

[135] As this Court has recognized, the government understandably frames every government decision as being
susceptible to policy analysis.  *In re Katrina Canal Breaches Litig.*, 627 F.Supp.2d at 695-96.  Surely every
conceivable decision is susceptible to such an analysis because one can always argue in hindsight that a government
actor did—or did not—do something because of hypothetical issues of cost, politics or other make believe social
factors.  Because of this tendency, courts should take a keen eye towards the actual decision making process
surrounding the complained of acts.  *Id.*

factor.[136]  The other decisions (or non-decisions) made concerning the evaluation of whether Defendants' excavations would harm the floodwall also have no policy basis.  For example, Mr. Colletti testified that, to comply with their policy of evaluating excavations within 300 feet of the floodwall, there had to be proof that the Corps actually consulted the 1966 DM 3.[137]  There is no evidence this was actually done.  Such a failure has no policy basis.  Indeed, none was even offered.

In a further attempt to invoke the DFE, the government once again likens this case to *National Union Fire Insurance v. United States*, 115 F.3d 1415 (9th Cir. 1997).  This case is nothing like *National Union*.  The government's first mistake is their assertion that the *National Union* plaintiffs and Plaintiffs here have a similar case theory: "the Corps 'was negligent in failing to discover the subsidence and in failing to do something about it.'"  (USA Mem. at 94) (quoting *National Union*, 115 F.3d at 1417).  Plaintiffs' theory has nothing to do with any failure to discover the floodwall's subsidence or a failure to do something about that subsidence.  Again, Plaintiffs contend Defendants' failed to perform a proper geotechnical analysis on their excavations and that Defendants failed to properly backfill and compact those excavations.

The next critical distinction with *National Union* and this case is that in *National Union* there was "[n]o regulation or policy [that] required the Corps to do something it failed to do.  No individual violated any specific regulation or policy."  *Id.* at 1421.  The repairs in *National Union* were not mandated by any specified plans or a detailed authorization; it was for the Corps to decide what to do.  *Id.*  Under such circumstances, it is not surprising the court would find that the DFE applied.  Here, however, there were several sources that required the Corps "to do

---

[136] J. Duval 759:8-12 ("Is anybody stating that the reason it wasn't compacted was because of money?  Is anybody taking that position?  MR. SMITH:  No, Your Honor.")

[137] Colletti 302:24-304:13; 309:20-310:4; 311:9-16.

something," which included evaluating their excavations and properly backfilling and compacting those excavation so as not to harm the floodwall. These mandates were ignored.

Another important distinction with *National Union* and our case is the decision-making process involved. In *National Union*, when the Corps discovered the breakwater was below design elevation, it was faced with a decision "to do nothing, raise the subsided portion of the breakwater back to fourteen feet, or await the results of an on-going study to decide whether to raise the breakwater in one larger project to 22 feet." *Id.* at 1417. The Corps decided to do nothing while they continued studying larger improvements in the future. *Id.*

Here, the government contends the Corps decided to actually do something. They argue the Corps decided to perform a geotechnical analysis of the EBIA as part of their 1966 DM 3. Assuming, *arguendo*, there were no mandates governing the Corps' activities and they had discretion to perform a geotechnical analysis (or raise the Redondo breakwater), because the Corps took affirmative action—as opposed to doing nothing while they continued designing the lock expansion project—the DFE case law throughout the county holds that once they undertook to actually perform a geotechnical analysis, they had to do so in a safe, non-negligent manner. *See Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955); *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1214-16 (9th Cir. 2001); *Ayala v. United States*, 980 F.2d 1342, 1349-50 (10th Cir. 1992). Put simply, *National Union* was about doing nothing, for which the court found the Corps had discretion. This case is about the Corps allegedly doing something (*i.e.*, a geotechnical evaluation), but doing it negligently, for which no discretion is available.

Finally, nothing in *National Union* suggests that the court meant to immunize the Corps from negligent decisions that are "purely scientific" as the ones here are. Any such reading of *National Union* would be foreclosed by subsequent Ninth Circuit decisions clearly establishing

that the DFE does *not* shield the United States from liability for errors of a scientific and technical nature.  *See*, *e.g.*, *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005); *Terbush v. United States*, 516 F.3d 1125, 1134 (9th Cir. 2008), *Bear Medicine*, 241 F.3d at 1214-16.

At bottom, what were Plaintiffs left with?  A massive remediation project involving deep excavations adjacent to a floodwall where both Defendants believe the other was providing the mandated engineering services, but in actual fact, no one was providing these services because there was not a single individual there from the Corps or WGI with the ability to spot a geotechnical issue and determine whether that issue would harm the floodwall.  Add to that, a backfill and compaction protocol that was completely ignored because one party was apparently not made aware of it—and failed to follow sound engineering and construction principles when that decision was left to their own devices—and the other party had no idea how to achieve the required compaction in the first place.

These negligent acts are not protected policy decisions.  It is inconceivable that when Congress created the Discretionary Function Exception to the Federal Tort Claims Act, it intended to shield from liability such simple, yet monumental, engineering misjudgments.  Accordingly, the DFE is not available.

## V.    DAMAGES

When determining damages under Louisiana law, there is no formula which can be applied with exactitude in the assessment of property damages.  Louisiana jurisprudence repeatedly recognizes that each case must rest on its own facts and circumstances as supported by proof in the record. *Woodmen of the World Life Ins. Soc. v. Hymel*, 610 So.2d 195, 199 (La. App. 3 Cir. 1992) citing *Coleman v. Victor*, 326 So.2d 344 (La. 1976); *Broome v. Gauthier*, 443

So.2d 1127 (La. App. 4th Cir. 1983), writ den., 445 So.2d 449 (La. 1984). Where there is a legal

right to recovery of damages but the amount cannot be exactly determined, the courts have

reasonable discretion to assess them based upon all the facts and circumstances of the particular

case. *Id*. citing *Emerson v. Empire Fire & Marine Ins. Co.*, 393 So.2d 691 (La. 1981); *J.B.*

*LaHaye Farms v. La. Dept. of Highways*, 377 So.2d 1286 (La. App. 3d Cir. 1979), writ den., 381

So.2d 1222 (La. 1980). Damages are approximated using flexible guides rather than arbitrary

formulae and aim to compensate the victim to the full extent of his loss and restore him to as

good a position as he held prior to the damage. *Roman Catholic*, *infra*. In contrast to the

straightforward approaches suggested by the Louisiana Supreme Court in cases such as *Roman*

*Catholic*, *infra*, Defendant repeatedly asks this Court to embark upon legal detours irrelevant to

this Court's determination of damages and apply rigid rules which unfairly minimize the

recovery to which Plaintiffs are entitled. Defendants' suggested approaches should be rejected in

favor of the flexible approaches which have always been the law of this state, including a

property owners' right to an election of damage remedies.

### A. Plaintiffs Are Entitled To Recover The Full Amount Of Damages Supported By The Evidence

A substantial amount of evidence has been presented before this Court in order to allow it

to make several crucial factual determinations. Among the issues to be decided by this Court are

the apportionment of fault between parties and appropriate measure of Plaintiffs' damages.

There is no statutory cap on damages operating in WGI's favor, nor is there any statutorily-

mandated method of calculating those damages. As a result, the language from *Servicios-*

*Expoarma, C.A. c. Indus Mar. Carriers, Inc*., 135 F.3d 984 (5th Cir. 1998) which Defendant

attempts to artificially graft onto these circumstances—that plaintiff must prove "that portion [of

damages] to which it is legally entitled"—has absolutely no relevance here. In this matter, there

is no statute limiting Plaintiffs damages and no statutorily-imposed, unit-specific measure of damages.  Thus, the recoverable scope of damages is all those which Plaintiffs' have sufficiently proven at trial.

In *Servicios*, the plaintiff filed suit under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300-1315 (1994).  Under this Act, the plaintiff was only entitled to recover damages actually sustained to cargo in each package, and the amount recoverable per package was limited to $500.00.  This limitation required the plaintiff to prove the damage sustained to each package so that the statutory-limitation of $500.00 could be applied.  Where the plaintiff introduced only an aggregate sum of damages and failed to show the amount of damage to each package, the Court found the plaintiff had failed to meet its burden under the COGSA. *Servicios*, 135 F.3d at 995.

Essentially, the question faced by the Court in *Servcios* was: with what specificity must a plaintiff prove damages when the substantive law governing his recovery imposes a unit-based limitation on that recovery.  Here, the substantive law on damages does not contemplate such restrictions or a unit-specific measure of damages.  Plaintiffs can indeed show an aggregate damages figure because, unlike *Servicios*, the full amount of Plaintiffs' damages is recoverable from WGI and not subject to statutory limitations.  This is a case about valuation, not limitation, especially considering the substantive law on damages which applies here.  In citing *Servicios*, Defendant asks this Court to impose a legal exercise where there is none.  Plaintiffs have proven their case, and it is now up to the fact finder to determine the fault attributable to WGI and its liability for damages stemming from its negligent conduct.

In order to assist the fact finder in this endeavor, Plaintiffs' experts detailed and distinguished the damages cause by flooding from the IHNC from those caused by other flood

sources.  One of the conclusions reached by Mr. Taylor was that the flooding caused by the

IHNC-only breach scenarios would have caused similar damages to the all-causes scenario.[138]

Contrary to Defendants' improper suggestion that the IHNC breaches alone caused all of the

damage to Plaintiffs' residences, Mr. Taylor assessed every scenario, including how the

Plaintiffs homes were affected by all water sources, including how Plaintiffs homes were

affected by IHNC-only flooding.  He concluded that the flood waters from the IHNC were

sufficient themselves to cause the damages Plaintiffs homes suffered because of the flood

damage factors of height and duration.[139]  Put simply, Mr. Taylor did segregate the damages, and

he found that the conclusion remained the same under either scenario.  Plaintiffs need not go any

further in their presentation of evidence.  A showing of aggregate damages, including the

specific damages caused by the flooding from the IHNC is sufficient, and the Court should find

what the evidence supports—that the entirety of Plaintiffs damages, as stated by John Crawford

and valuated by Scott Taylor, were caused by floodwaters from the IHNC.

### i.  Defense Experts Failed to Properly Consider Flood Damage Factors When Determining Damage to Plaintiffs' Homes

As detailed in Plaintiffs' Post Trial Brief, Plaintiffs' experts, John Crawford and Scott

Taylor, gave testimony at trial concerning flood damage factors of height and duration.[140]

Duration included not only the length of time the waters stagnated in the house but also the

length of time before Plaintiffs could return to their homes to mitigate the damages.  For those

who lived in and around the St. Bernard Polder there is little question that floodwaters remained

in the homes in this area for a prolonged period of time.  This common knowledge was

---

[138] Armstrong Plaintiffs' Post Trial Brief at 101-105 (Doc. No. 21110).101-105.

[139] Taylor 1538:6-14; 1539:4-8.

[140] Armstrong Plaintiffs' Post Trial Brief at 99-102 (Doc. No. 21110).

corroborated by Plaintiffs' testimony, the expert testimony of John Crawford[141] who lived blocks away from the area, and through photographic evidence testified to by Mr. Crawford.[142]  More importantly, in the hydrographic modeling scenarios attributable the IHNC, water remained in the homes for the twenty-four hour period included in the hydrographic evidence and appeared to remain in those homes subsequent to that amount of time.[143]  Although the height of the water reached in the homes and the length of time the water remained in the homes are important, the most significant flood damage factor in this flooding event was Plaintiffs' inability to return to their homes and stop the deterioration of their property, as described in detail by both John Crawford[144] and Scott Taylor.[145]

In comparison, defense experts did little or nothing to account for the damage caused by the duration flood factor.  For example, when asked why he disagreed with Plaintiffs' experts opinion that the Holmes and Armstrong residences would need total demolition, defense damages expert James Danner testified that he would not replace structural elements such as "wood framing, walls and ceiling and roof rafters, some sheeting and brick veneer all of these elements are relatively durable and can with-stand relatively long term exposure to moisture and wetting."[146]  Danner later stated that the floodwaters did not damage the wood in the Plaintiffs homes[147] that "even in durations of 10 to 14 days involve with this is not anywhere near the type of duration that you would expect to find damaged wood."[148]  This statement is directly

---

[141] Crawford 1463:9-16, D-Crawford 8, D-Crawford 9.

[142] Crawford 1667:21-1469:6.

[143] PX 4671-0004-0008 (Vriling Hydrographs).

[144] Crawford 1469:6-1470:5.

[145] Taylor 1518:1-3.

[146] Danner 3322:2-25.

[147] Danner 3376:4-7.

[148] Danner 3378:22-25.

contradicted in the FEMA Bulletin now in evidence.  That document details the need for flood

damage-resistant materials which are required in certain flood prone areas in order to comply

with National Flood Insurance Program (NFIP) regulations.  In doing so the Bulletin first lays

out certain definitions:

> "Flood [damage]-resistant material" is defined by the NFIP as "any building
> product [material, component or system] capable of withstanding direct and
> prolonged contact with floodwaters without sustaining significant damage."  The
> term "prolonged contact" means at least 72 hours.[149]

The FEMA Bulletin then gives a table of those building materials considered to be

acceptable and unacceptable based on their uses in the structure.[150]  In the table, all forms of

Oriented-Strand Board (OSB) are considered unacceptable.[151]  In other words this form of

sheathing is not able to withstand direct prolonged contact with floodwaters (such as occurred in

reference to Katrina flooding) without sustaining significant damage.  This is important because,

as Defense damages expert Jean-Prieur Du Plessis testified, if the sheathing is warped you would

have to replace the finishes as well.[152]

In addition, Mr. Danner did not consider damage caused by mold[153] other than—for

example while inspecting the Livers residence—to use his sense of smell some six years after the

catastrophe.[154]  Damage to the homes caused by mold and the need for mold remediation

measures was not considered by Mr. Du Plessis in his valuation of damages either.[155]

Furthermore, Mr. Danner did not properly consider damage to the homes caused by the

---

[149] PX-4764 (FEMA Technical Bulletin 2) at 4.

[150] PX-4764 (FEMA Technical Bulletin 2) at 9.

[151] OSB is the sheathing material used by JP Du Plessis throughout his valuation reports. Du Plessis 3583:21-3584:3, *see also* PX-4769 (excerpts from IICRC S500).

[152] Du Plessis 3583:21-3584:3; *see* PX-4769 (excerpts from IICRC S500).

[153] Danner 3385:13-23.

[154] Danner 3385:13-23.

[155] Du Plessis 3580:15-16.

contaminated water which was in these homes for a prolonged period of time, other than

mentioning the need for decontaminating or cleaning the wood.[156]  He was not aware of the

classification of Category 3 level contamination of Katrina flood water.  As Defense damages

expert Karl Schneider agreed, Category 3 water is grossly contaminated and can contain

pathogenic, toxogenic or other harmful agents.[157]  Karl Schneider's testimony concerning the

level of contamination in the flood waters was corroborated in the FEMA Bulletin which

discussed absorption of contaminates into housing materials. A special category was created in

reference to the Katrina flooding event:

> Following Hurricane Katrina, FEMA deployed a mitigation assessment team
> (MAT) to find out how building materials performed after long-duration exposure
> (2 to 3 weeks) to floodwaters (FEMA 59).  The field survey revealed that some
> materials absorbed floodborne biological and chemical contaminants…[158]

Mr. Danner had no independent knowledge of the FEMA Bulletin nor did he consider the

level of contamination in his reports.

Damages expert J.P. Du Plessis testified that he relied completely on the Danner report's

conclusions as the scope of damages was concerned.[159]  He also admitted that if Danner's reports

were flawed, his reports would be flawed as well.[160]  Mr. Du Plessis also agreed that selective

demolition was generally more expensive then total demolition.[161] Clearly, by not properly

considering duration—both in terms of the length of time the water stagnated in the homes as

well as the length of time it took Plaintiffs' to return to their homes and mitigate the damages—

as well as his obvious fallacy relating to the length of time it takes for wood components to be

---

[156] Danner 3379:2-13.

[157] Schneider 3635:1-8.

[158] PX-4764 (FEMA Technical Bulletin 2) at 8.

[159] Du Plessis 3564:13-15.

[160] Du Plessis 3564:21-3565:1.

[161] Du Plessis 3583:10-12.

compromised, Mr. Danner's reports are substantially inaccurate.  Due to these failures the valuations of Mr. Du Plessis are undervalued concerning repair and replacement costs of Plaintiffs' homes.

### ii.   Du Plessis' Reports Undervalue Plaintiffs' Property Damage Due To Flawed Methodology

Damages expert J. P. Du Plessis, who valued the damages to Plaintiffs' homes, did not inspect the homes himself,[162] nor did he create his own scope.  He completely relied on the generalized scope given to him by Mr. Danner, which did not quantify the damages.  That is something Mr. Du Plessis had to do on his own.[163]  In addition, throughout his reports Mr. Du Plessis apportioned fault or gave percentages for wind and rain damage as opposed to flood damages.[164]  He did this even though he had not inspected the homes himself, and despite this determination of causation being outside of his area of expertise as a witness in this trial.  All such apportionment should be stricken or, at the least, given very little weight as to its value in determining damages.

### B.   *Roman Catholic* Allows Plaintiffs To Select Their Remedy

In discussing the Armstrong, Livers, and Holmes' election of remedies, Defendants again try to mold a legal detour into a straightforward analysis.  The edict of *Roman Catholic* and its progeny is clear: Plaintiffs may elect to receive the cost of restoring the property (as opposed to its diminution in value) where they have a reason personal to make such an election or there is a reason to believe that the plaintiff will, in fact, make the repairs.  *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co.*, 618 So.2d 874, 880 (La. 1993); *Corbello v. Iowa Production*, 850 So.2d 686 (La. 2003); *Mossy Motors c. Sewerage and Water*

---

[162] With one exception being the Coates' residence.

[163] Du Plessis 3564:16-20.

[164] Du Plessis 3578:12-3579:2.

*Bd.*, 753 So.2d 269 (La. App. 4th Cir. 1999) (emphasis added).[165]  *Roman Catholic* has not given

us a two prong test rather an either/or scenario.  Furthermore, nothing in the case law supports

embarking upon an examination of whether and when Plaintiffs could afford to make repairs or

elect to return (if in fact a reason personal is found to exist).   And, it must be remembered that

Louisiana law declares that damages are sustained at the time that the breach of contract or

wrongful act occurs, and its extent or magnitude is then and there determined.  *See* 6 La. Civ. L.

Treatise, Law of Obligations § 4.17 (2d ed.); *see also Eagle Pipe and Supply, Inc. v. Amerada

Hess Corp.*, 79 So.3d 246, 287 (La. 2011).  In other words, the court must examine the Plaintiffs'

position at the time they sustained the damage, and not the position they have now come to

occupy, with the goal of returning them to as good a position as they held prior to the damage.

*Roman Catholic*, *supra*.

Defendant focuses on Plaintiffs' alleged lack of intention or ability to make repairs at the

time of their depositions and at the time of trial, ignoring that Plaintiffs lacked the ability to make

that choice at the time that mattered—when the damages were sustained and in the months

following the catastrophic destruction of their property.  Plaintiffs were displaced from their

homes for months as a result of the flooding caused by WGI's negligence and could not

return.[166]  Defendant is not entitled to a windfall merely because their negligence so significantly

displaced Plaintiffs that they were subsequently forced to continue their lives elsewhere.  It is

clear from Plaintiffs' testimony that, at the time this damage occurred, they had personal reasons

to return and make repairs.[167]  Thus, the Louisiana Supreme Court provides them with the ability

---

[165] Armstrong Plaintiffs' Post Trial Brief at 97-100 (Doc. No. 21110).

[166] *Id.* at 90-97.

[167] *Id.*.

to elect restoration and/or repair costs as the measure of their damages.  *See Roman Catholic*, *supra*.

### i.   <u>Value Of Movable Property Should Not Be Depreciated</u>

Likewise, with movable property Plaintiffs are presented with a choice of remedies, and the Court is not required to consider depreciation in assessing damages to Plaintiffs' movable property.  *Fortson v. Louisiana Power & Light Co.*, 509 So.2d 743 (La. App. 3d Cir. 1987); *Carter v. Gulf States Utilities Co.*, 454 So.2d 817, 820 (La. App. 1st Cir. 1984); *Kalmn, Inc. v. Empiregas Corp.,* 406 So.2d 276 (La. App. 3d Cir. 1981); *see also Williams v. Gallagher Transfer & Storage Co., Ltd.*, 170 La. 461 (1930) (allowing recovery at the cost of replacement of a hand-carved bedroom set with no deduction for depreciation where there was no ascertainable market value).  The depreciation approach has also been rejected where the approach is impractical.  *Aetna Ins. Co. v. Palao*, 263 So.2d 394 (La. App. 4th Cir. 1972).

Under the circumstances, the depreciation approaches suggested by Defendants in this case are impractical and would render the Plaintiffs' property virtually worthless, as did the defendant's rejected approach in *Fortson*, *supra*.  It is certainly not a requirement that depreciation be applied, as Defendants erroneously suggest.  Furthermore, the *Brown* case cited in support of Defendants' erred rationale absolutely does not suggest that depreciation must be applied.  In fact, it recognizes that there are a variety of approaches to the valuation problem and specifically notes that depreciation was only applied because of the circumstances before the Court. *Brown v. Williams*, 850 So.2d 1116, 1124-25 (La. App. 2 Cir. 2003).  Certainly, the application of depreciation in this case would frustrate the civilian goals of fair and just compensation for damages caused by another.  For that reason, the depreciation approach should be rejected here.

### ii.  Defendants Expert Opinion On Lost Contents Amounts To A Systematic Devaluation To Deprive Plaintiffs Of A Reasonable Recovery

For purposes of valuating contents, WGI offered reports and testimony of damages expert Karl Schneider.  Mr. Schneider was given the list of contents and a number of other items such as insurance claims files, unrelated legal proceedings and client depositions.[168]  Generally, what Mr. Schneider did is take wind and rain insurance files, court proceedings, and possibly statements made by Plaintiffs concerning whether an item was damaged by wind and rain and then systematically redacted all of those items listed from the contents lists prepared by Plaintiffs' for Scott Taylor.[169]  Mr. Schneider made these redactions from his contents listing regardless of whether the homeowner received payment for the listed item from their wind and rain carrier.[170]  He also did this even though he knew that the homeowners were not present during Katrina or shortly thereafter at the time of the loss.[171]  In effect, at least with these redactions he made a causation determination based upon statements of non-experts regardless and without any causation or apportionment determination being made.  This, of course, goes beyond his area of expertise as a contents consultant and should not be considered in the Court's valuation of contents.

Next, Mr. Schneider took the redacted list and performed what he called a verification process of prices as given by the homeowners to Mr. Taylor.  This process entailed taking whatever items remained and finding a lower price for that item (in many cases a substantially

---

[168] Schneider 3597:8-18.

[169] Schneider 3624:20-25.

[170] Schneider 3625:11-3626:5 It should be noted that Mr. Schneider did not initially testified that he did attempt to verify that the homeowners did, in fact get paid for the wind and rain item.  He was reminded of his testimony given at deposition where he stated he broke out those items claimed for wind and rain regardless of whether the homeowner received payment for said item.

[171] Schneider 3625:7-10.

lower price).[172]  When asked if this so-called verification process was an industry standard, Mr. Schneider stated, "It's my standard."[173]

Mr. Schneider then took this diminished list with substantially lower prices for items not corroborated by Plaintiffs and applied a blanket fifty-percent depreciation on all contents.[174]  Mr. Schneider admitted that this fifty-percent depreciation figure was arbitrary and might be used simply as a ploy in an attempt to expedite a settlement or the negotiation of a claim.[175]

Mr. Taylor's methodology, as stated in Plaintiffs' Original Post-Trial Brief on Damages, is more reasonable than Mr. Schneider's systematic devaluation of Plaintiffs' contents in this case and, as such, should be used in helping this Court reach an appropriate award for lost contents.

### C.  Inconvenience Damages Are Recoverable Regardless Of Proximity To Property

Damages for aggravation and inconvenience are recoverable under La. C.C. art. 2315 where the action is one sounding in tort.  *Childers v. Davis*, 444 So.2d 692, 695 (La. App. 5th Cir. 1984); *see also Alexander v. Qwik Change Car Center, Inc.*, 352 So.2d 188 (La. 1977). Aggravation and inconvenience damages are contemplated as separate and distinct from damages for mental anguish.  *Collins v. City of Shreveport*, 799 So.2d 630, 634 (La. App. 2d Cir. 2001) (finding that plaintiffs were not entitled to mental anguish damages because they put on no evidence of "psychic" injury. However, compensation for the inconvenience which the plaintiffs suffered-and continue to suffer-as a result of the flood was appropriate.  Plaintiffs testified that, for financial reasons, they had not been able to remedy many of the problems caused by the

---

[172] Schneider 3629:10-13.

[173] Schneider 3628:3-12.

[174] Schneider 3630:21-3633:11.  It is significant that Mr. Schneider was unable to give any literature on how he derived his fifty percent depreciation factor.

[175] Schneider 3630:17-3633:8.

flooding.); *see also Davis v. Culpepper*, 794 So.2d 683 (La. App. 2 Cir. 2001); *Pollock v. Talco Midstream Assets, Ltd.*, 70 So.3d 835, 845-846 (La. App. 2d Cir. 2011); (awarding inconvenience damages for flooding to home which made access to home generally inconvenient and sometimes impossible); *Patton v. Precision Motors, Inc.*, 352 So.2d 341( La. App. 1977). Thus, damages for inconvenience are awardable even where Plaintiffs were not present at their property or situated nearby at the time floodwaters from the IHNC damaged their homes.

Defendants' attempt to impose a requirement that Plaintiffs must be "present or situated nearby at the time of the damage" as a preemptive bar to Plaintiffs' inconvenience damages. While a proximity rule has been established with respect to mental anguish damages, there is no indication that it was intended to extend to inconvenience damages.  In fact, of the cases upon which the *Napolitano* and *McDonald* cases cited by Defendant rely—*Fontenot v. Magnolia Petroleum Co.*, 80 So.2d 845 (La. 1955) and *Broome v. Gauthier*, 443 So.2d 1127 (La. App. 4th Cir. 1983)—neither supports a proximity requirement in order to recover inconvenience damages.  They do, however, impose this requirement with respect to mental anguish damages: "In sum, although mental anguish, pain, and suffering caused by loss of property is not usually compensable by an award of damages, damages may be awarded, as in this case, when an owner is present to see and experience the destruction of his property.  *Broome*, 442 So.2d citing *First of Georgia Insurance Company v. Cohen*, 398 So.2d 1209 (La. App. 4th Cir. 1981).  Other cases discussing this language limit it to mental anguish damages in the same fashion.  *See Carroll v. State Farm Ins. Co.*, 427 So.2d 24 (La. App. 3d Cir. 1983).  It seems this errant language cited by Defendant unintentionally blurred the distinction between mental anguish and inconvenience damages and should not be given consideration here.

Under *Collins* and *Davis*, *supra*, inconvenience damages should certainly be awarded where WGI's negligence deprived the Plaintiffs of the use of their property for a significant period of time.  Furthermore, implicit in this Court's ruling in *Robinson* was the understanding of the prevailing jurisprudence in which a clear distinction between damages for mental anguish and that of inconvenience is made.[176]  The testimony introduced at trial clearly supports a finding that Plaintiffs were substantially inconvenienced as a result of being displaced from their homes, and a judgment awarding inconvenience damages consistent with this Court's previous holding in *Robinson* should be issued.

**D.  The Government Is Not Entitled To An Offset For FEMA Or Road Home Payments**

The government argues that it is entitled to an offset for FEMA and LRHP monies received by Plaintiffs, claiming that if not given an offset, the Plaintiffs would effectively be paid twice by the government.  Plaintiffs disagree based on the subrogation agreement entered into by the individual Plaintiffs when they received the federal monies.  Should this court award an offset for federal monies, the government would be effectively be getting paid twice, once through the offset and again through the subrogation agreement.[177]  This Court ruled during trial that money received through the Louisiana Road Home Program will not be deducted from the Plaintiffs' recovery under the collateral source rule.[178]

---

[176] *In re Katrina Canal Breaches Litig.*, 647 F.Supp.2d 644 (E.D. La. 2009).  In *Robinson* damages for inconvenience were awarded to all plaintiffs including those not present in or around their homes at the time of the storm.

[177] Transcript 1671:11-18.

[178] Transcript 246:25-247:2.

Dated:  January 23, 2013

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

_____/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION**
**COMMITTEE**

Jonathan Andry (The Andry Law Group, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a true and correct copy of the foregoing was served upon all counsel of

record by ECF on January 23, 2013.

/s/ Joseph M. Bruno