# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | * |
| IN RE:  KATRINA CANAL BREACHES | * CIVIL ACTION |
| CONSOLIDATED LITIGATION | * |
| | * NO. 05-4182 |
| | * (AND CONSOLIDATED CASES) |
| PERTAINS TO:  MRGO | * |
| | * SECTION "K" (2) |
| FILED IN:  05-4181, 05-4182, 05-4191, 05-5237, 05- | * |
| 6069, 05-6073, 05-6314, 05-6324, 05-6327, 05-6359, | * JUDGE DUVAL |
| 06-0020, 06-0225, 06-0886, 06-1885, 06-2152, 06- | * |
| 2278, 06-2287, 06-2824, 06-4024, 06-4065, 06-4066, | * MAGISTRATE WILKINSON |
| 06-4389, 06-4634, 06-4931, 06-5032, 06-5155, 06- | * |
| 5159, 06-5161, 06-5162, 06-5260, 06-5308, 06-5771, | * |
| 06-5785, 06-5786, 06-5937, 06-8708, 06-9151, 07- | * |
| 0206, 07-0621, 07-1073, 07-1113, 07-1271, 07-1285, | * |
| 07-1286, 07-1349, 07-3173, 07-3500, 07-4386, 07- | * |
| 4391, 07-4392, 07-4550, 07-4555, 07-4562, 07-4837, | * |
| 07-4906, 07-4914, 07-4943, 07-4945, 07-4953, 07- | * |
| 4965, 07-4969, 07-4976, 07-4979, 07-4995, 07-5007, | * |
| 07-5011, 07-5012, 07-5013, 07-5016, 07-5020, 07- | * |
| 5021, 07-5022, 07-5040, 07-5067, 07-5074, 07-5096, | * |
| 07-5128, 07-5174, 07-5254, 07-5286, 07-5327, 07- | * |
| 5339, 07-5343, 07-5344, 07-5347, 07-5350, 07-5355, | * |
| 07-5356, 07-5366, 07-5375, 07-5397, 08-1151 | * |
| * * * * * * * * * * * * * * * * * * * * * * * * * | * |

# WASHINGTON GROUP INTERNATIONAL, INC.'S

# MEMORANDUM OF LAW

# IN SUPPORT OF

# MOTION FOR SUMMARY JUDGMENT

1126388v1

# TABLE OF CONTENTS

I.     SUMMARY BACKGROUND................................................................................1

II.    BASIS FOR SUMMARY JUDGMENT .............................................................4

III.   SUMMARY JUDGMENT STANDARD ...........................................................7

    A.    General Standard...................................................................................7

    B.    Plaintiffs Must Show More Than a Factual Dispute -- A "Genuine Dispute" Is Required ..........................................................................8

    C.    A Lack of Causation Proof Is Sufficient Basis for Summary Judgment ...............11

    D.    The Trial Record Is a Proper Basis for Summary Judgment .................................11

IV.   SCIENTIFICALLY PROVED CONDITIONS DURING KATRINA RENDER PLAINTIFFS' CAUSATION THEORIES WHOLLY UNAVAILING ..........................14

    A.    The Actual Physical Soil Properties of Permeability and Compressibility at the EBIA Scientifically Foreclose Plaintiffs' Only Causation Theories ............14

         1.    Plaintiffs' Computer Model SEEP/W Using Site-Specific Soils Properties, Instead of Plaintiffs' Erroneous Values, Disproved Plaintiffs' Causation Theory........................................................14

         2.    Plaintiffs' Only Scientific Stability Analysis Using Computer Model SLOPE/W, When Used With Proper Pore Pressure and Soil Strength Inputs, Disproved Plaintiffs Causation Theory .........................15

            a.    Plaintiffs' SLOPE/W Computer Model Used Excessive Pore Pressures Manufactured by Plaintiffs' Invalid Compressibility Values ($m_v$)......................................................16

            b.    The Use of Drained Strengths in Stability Analyses Misrepresented the Actual Conditions at the EBIA Floodwall ...............17

            c.    Plaintiffs' Theory of Instantaneous Pore Pressure Transmission Dependent upon Dilatational Wave Theory or the Decoupling of Pore Pressure From Flow Are Not Supported Scientifically..............................18

    B.    The Actual Excavations Performed By WGI in the EBIA Do Not Match Critical Excavation Assumptions in Plaintiffs' Causation Theories .....................19

            a.    Plaintiffs' Have No Reliable Data to Demonstrate That WGI's Work Made a Difference in The Vulnerability of the Floodwalls.......................20

            b.    The McDonough Marine Borrow Pit Excavation Proved Indisputably That WGI's Excavations in the EBIA Did Not Contribute to the Floodwall Failure ...............................21

1126388v1

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................8, 9

*Bach v. Trident S.S. Co.*, 920 F.2d 322 (5th Cir. 1991), *vacated*, 500 U.S.
  949 (1991), *reinstated on reh'g*, 947 F.2d 1290 (5th Cir. 1991)......................................11

*Barker v. Norman*, 651 F.2d 1107 (5th Cir. 1981) ........................................................................9

*Beiswenger Enterprises Corp. v. Carletta*, 46 F. Supp. 2d 1297 (M.D. Fla.
  1999) .......................................................................................................................................13

*Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22 (1st Cir. 1989) .................................................13

*Boykin v. Louisiana Transit Co.*, 707 So.2d 1225 (La. 1998) .......................................................5

*Bright v. GB Bioscience Inc.*, 305 F. App'x 197 (5th Cir. 2008) ...............................................10

*Cay v. State of Louisiana Dept. of Transp. & Dev.*, 631 So.2d 393 (La.
  1994) .........................................................................................................................................5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................8

*In re Chavin*, 150 F.3d 726 (7th Cir. 1998) ................................................................................11

*Deen v. Egleston*, 601 F.Supp. 2d 1331 (S.D. Ga. 2009), *rev'd on other
  grounds*, 597 F. 3d 1223 (11th Cir. 2010) ...........................................................................13

*Evans v. McKinney Marine, Inc.*, No. 96-0132, 1997 WL 79446 (E.D. La.
  Feb. 21, 1997), *aff'd*, 127 F.3d 34 (5th Cir. 1997) .............................................................11

*Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924
  (5th Cir. 2001) ........................................................................................................................8

*Fowler v. Roberts*, 556 So.2d 1 (La. 1989).................................................................................5

*Frakes v. Crete Carrier Corp.*, 579 F.3d 426 (5th Cir. 2009) .....................................................8

*Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528 (5th Cir.
  1994) .........................................................................................................................................8

*Improvement Co. v. Munson*, 14 Wall. 442 (1872).....................................................................8

*Matter of Ingram Towing Co.*, No. 93-3311, 1995 WL 601027 (E.D. La.
  Oct. 11, 1995) (Duval, J.) .....................................................................................................11

1126388v1

*Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306 (5th Cir. 1998) ................................................10

*Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408 (5th Cir. 1993) ...................................................13

*Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004) ............................................................11

*Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280 (S.D.N.Y. 1998) ......................................13

*Langston v. Johnson*, 478 F.2d 915 (D.C. Cir. 1973) .................................................................13

*Lasyone v. Kansas City Southern R.R.*, 786 So.2d 682 (La. 2001) ..............................................5

*Lemann v. Essen Lane Daiquiris, Inc.*, 923 So.2d 627 (La. 2006) ..............................................11

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ..........................................................9, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .....................................8

*Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006) ..............................................11

*Netecke v. State, through Dep't of Transp. & Dev.*, 747 So.2d 489 (La. 1999) ............................................................................................................................5

*Pierre v. Allstate Ins. Co.*, 242 So.2d 821 (La. 1970) ..................................................................5

*Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977) ....................................................11

*Rando v. Anco Insulations, Inc.*, 16 So.3d 1065 (La. 2009) ........................................................5

*Scott v. Harris*, 550 U.S. 372 (2007) ..........................................................................................9

*Seshadri v. Kasraian*, 130 F.3d 798 (7th Cir. 1997) .................................................................11

*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254 (5th Cir. 2002) ..................................................10

*Toston v. Parson,* 874 So.2d 791 (La. 2004) ...............................................................................5

*White v. Black & Decker (U.S.) Inc.*, No. Civ. A. 03-0874, 2004 WL 1373271 (E.D. La. June 16, 2004), *aff'd* 122 F. App'x 795 (5th Cir. 2005) ..........................................................................................................................10

*Wickware v. Thaler*, 404 F. App'x 856 (5th Cir. 2010) ..............................................................11

**Statutes**

Fed. R. Civ. P. 56(a) ....................................................................................................................7

Louisiana Civil Code Article 2315 ..............................................................................................11

1126388v1

**Other Authorities**

Advisory Committee Notes to the 2010 Amendments, Rule 56....................................................8

10 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2727,
    at 551 (1973) ...............................................................................................................9

# INTRODUCTION

## I.   SUMMARY BACKGROUND

In 1999 Washington Group International, Inc. ("WGI") was contracted by the United States Army Corps of Engineers ("USACE") to clear and environmentally remediate a thirty-two acre abandoned industrial site located in the path of a bypass channel necessitated by construction plans for a replacement lock connecting the Mississippi River to the Gulf Intracoastal Waterway east of New Orleans.[1]  This thirty-two acre site was known as the East Bank Industrial Area ("EBIA").[2]  The EBIA was bounded on the south by the Claiborne Avenue Bridge, on the north by the Florida Avenue Bridge, on the west by the Inner Harbor Navigational Canal ("IHNC"), and on the east by a levee and floodwall that was designed to protect the lower Ninth Ward of New Orleans.[3]

WGI's field work began in early January 2001,[4] was completed in May 2005,[5] and was accepted by the USACE on August 23, 2005[6] -- six days before Katrina devastated New Orleans, St. Bernard and Plaquemines Parishes, southeast Louisiana and southern Mississippi. WGI's work consisted of building and foundation demolition and removal, wharf and piling removal, removal of contaminated soils, as well as the excavation and removal of underground

---

[1]   Joint Pre-Trial Order (Doc. No. 20920) Uncontested Material Facts (hereinafter **"PTUMF"**) 59, p. 35; Statement of Material Facts (hereinafter "**SMF**") 1.

[2]   **PTUMF** 31. p. 32; **SMF** 2.

[3]   **PTUMF** 32, pp. 32-33; **SMF** 2.

[4]   **SMF** 3; Exhibit No. JX-0159 (QAR 1).  All Exhibit Nos. herein refer to the exhibits admitted at the exemplar trial, as referenced on the Final Master Exhibit List, (Doc. No. 21185). However the supporting documents for this Motion for Summary Judgment are attached as exhibits to the **SMF**, and are contained in the Manual Attachment referenced in the Notice of Manual Attachment.

[5]   **SMF** 3; Exhibit No. JX-1223 (QAR 1065).

[6]   **SMF** 4, citing Exhibit No. JX-1364 (Technical Completion Report).

debris, storage tanks and other potential obstructions to the planned bypass channel.[7]   WGI's work areas were named after six former industrial enterprises, running south to north: International Tank Terminals, Saucer Marine, Meyer Yacht, Indian Towing, McDonough Marine, and Boland Marine.[8]

Early on the morning of August 29, 2005, due to the effects of Katrina's unprecedented storm surge,[9] two breaches opened in the floodwall adjacent to the EBIA allowing massive floodwaters into the lower Ninth Ward of New Orleans and portions of St. Bernard Parish.  The South Breach, adjacent to Saucer Marine, resulted in a gap of 793 feet in length and the North Breach, adjacent to Boland Marine, resulted in a gap of 180 feet in length.[10] Temporary repairs commenced, but were not completed before further flooding occurred through the same breaches as a result of Hurricane Rita's remnants on September 25, 2005.

Numerous lawsuits ensued in state and federal court, some of them naming WGI. The state court cases were removed to this Court, and ultimately consolidated under an umbrella created by the judges of the Eastern District of Louisiana, before Section K (Judge Stanwood R. Duval, Jr.).  Seven Case Management Orders, and amendments, were issued by the Court to efficiently govern the various groups of cases.   Plaintiffs' Liaison Counsel and various committees were designated to promote the efficient conduct of discovery and motions in all of the related cases.  All plaintiffs' and defense counsel could participate in discovery as they saw fit, subject to the provisions of the operative case management orders.   Extensive initial disclosures were made by WGI and by the USACE.  All of the relevant documentation of WGI's

---

[7]   **PTUMF** 33, 60-64, pp. 33, 35-36; **SMF** 8, 9, 10.

[8]   **PTUMF** 34, p. 33; **SMF** 2.

[9]   **PTUMF** 70, p. 36; **SMF** 5.

[10]   **PTUMF** 74 and 75, p. 37; **SMF** 6 (North breach) and 7 (South breach).

work held by the USACE was made available to all counsel in an established document repository in the Central Business District of New Orleans.  All of the documentation of WGI's work retained by WGI was also made available to all counsel pursuant to the Federal Rules of Civil Procedure and the operative Case Management Orders.   Document and deposition discovery was scheduled and accomplished pursuant to deadlines established by the Court.

WGI was dismissed by this Court from the consolidated litigation based on Government Contractor Immunity in December, 2008.  (Doc. No. 16723)  Upon appeal the United States Court of Appeals for the Fifth Circuit, reversed and remanded claims against WGI to this Court on September 14, 2010.  On March 17, 2011 the Court held a status conference concerning the establishment of a schedule for proceeding to a trial on the merits.

Prior to March of 2011 this Court had heard and decided numerous dispositive motions and had presided over bench trials of the *Robinson* case and an exemplar bench trial against Lafarge North America in the BARGE track, both involving claims for Katrina-related flood damages in the lower Ninth Ward and St. Bernard Parish.  At the March 17, 2011 status conference the Court determined that the only remaining issues related to the EBIA floodwall failures pertained to the alleged effects of WGI's remediation work on those failures.  These remaining issues were raised by the consolidated Plaintiffs' claims alleging that WGI's work in the EBIA "was a substantial cause of the North and South Breaches of the floodwalls that ran adjacent to that area and resulted in the cataclysmic inundation of the Lower Ninth Ward".  (Doc. No. 20200 at 1)  In the March 17, 2011 Minute Entry following the status conference the Court outlined the issues to be tried on behalf of three existing putative class representatives, Kenneth P. Armstrong, Jeannine B. Armstrong, and the heirs of Ethel Mae Coats and up to three additional exemplar plaintiffs to be selected by the parties.  The parties then agreed upon three

additional exemplar plaintiffs, Fred Holmes, Clifford Washington, and Alvin Livers, and those individuals then intervened into Case No. 05-4182, thus joining the Amended MRGO Master Consolidated Master Complaint[11] (Doc. No. 11471) pursuant to the Court's Order of Intervention.  (Doc. No. 20269)

In the March 17, 2011 Minute Entry further deadlines were established for any remaining discovery, geotechnical testing, and expert reports.  A trial date of July 16, 2012 was initially set for the exemplar plaintiffs' claims.  Continued from that date, the exemplar trial began on September 12, 2012 and concluded on October 3, 2012, pursuant to the terms of a Joint Pre-Trial Order.  (Doc. No. 20920)

After extensive post-trial briefing by Plaintiffs and Defendants the Court entered Findings of Fact and Conclusions of Law (hereinafter "**FFCL**") and a final Judgment dismissing Plaintiffs claims for failing to prove causation on April 12, 2013.  (Doc. Nos. 21172 and 21173)

## II.    BASIS FOR SUMMARY JUDGMENT

Duty-Risk analysis under applicable Louisiana law requires, as its initial inquiry, an assessment as to whether the complained of action or inaction was the cause-in-fact of the

---

[11]  It should be noted that the Amended MR-GO Master Consolidated Class Action Complaint into which the agreed exemplar plaintiffs intervened, superseded all of the class action complaints listed in the caption.  Neither the Amended MR-GO Master Consolidated Class Action, nor any class action superseded by it, has been certified by the Court.

Furthermore, the complaints other than class action complaints (listed in the caption and to which this Motion for Summary Judgment applies) allege the same bases for cause-in-fact alleged in the resulting Complaint and Pre-Trial Order governing the exemplar trial.  *E.g.*, Civil Action No. 07-4976, *Entercom Communications Corp. v. United States of America, Washington Group International, Inc., et al.*.  The similarity of the cause-in-fact allegations is evidenced by fn. 3, p. 5 in Appellants' Brief filed on behalf of Entercom and other similarly situated individual plaintiffs in Case No. 09-30449 (in the United States Court of Appeals for the Fifth Circuit) which states: "The allegations, claims, and language contained in Plaintiffs' individual Complaints are similar to the language found in the MR-GO Master Consolidated Class Action Complaint."

1126388v1

claimed damage or injury.[12]   "Cause-in-fact is usually a 'but for' inquiry which tests whether the injury would not have occurred but for the defendant's substandard conduct."[13]   "Whether an action is the cause-in-fact of the harm is essentially a factual determination that is usually left for the factfinder."[14]   Further, as a matter of Louisiana law, "[a] cause-in-fact determination is one of fact on which appellate courts must accord great deference to the trial court."[15]   This deference is particularly appropriate in a case such as this in which voluminous and complex expert evidence must be weighed in making a proper factual determination.

Lack of causation is the dispositive issue in all of the above-captioned Katrina cases filed against WGI, either as putative class action cases or as individual cases.  The issues and claims related to causation, as applied to WGI's work adjacent to the East Bank Industrial Area floodwall, were fully tried to the Court from September 12, 2012 through October 3, 2012. The Court's conclusions were definitive and are equally applicable to all of the claims contained in these cases against WGI.

The exemplar trial was held pursuant to the Court's March 17, 2011 order (Doc. No. 20200, at 4), on behalf of six (6) named plaintiffs.  The exemplar plaintiffs were approved by the Court to be Kenneth P. Armstrong, Jeannine Armstrong, the Succession of Ethel Mae Coats, Fred Holmes, Clifford Washington, and Alvin Livers ("Plaintiffs").  Following the sixteen (16) day exemplar trial, the Court ruled that "Plaintiffs Have Failed To Prove Causation".

---

[12]   *Toston v. Parson,* 874 So.2d 791, 799 (La. 2004); *Lasyone v. Kansas City Southern R.R.,,* 786 So.2d 682, 690-91 (La. 2001); *Netecke v. State, through Dep't of Transp. & Dev.*, 747 So.2d 489, 497 (La. 1999); *Cay v. State of Louisiana Dept. of Transp. & Dev.*, 631 So.2d 393, 395 (La. 1994); *Pierre v. Allstate Ins. Co.*, 242 So.2d 821 (La. 1970).

[13]   *Fowler v. Roberts*, 556 So.2d 1, 5 (La. 1989).

[14]   *Lasyone*, *supra* at 691 (citing *Boykin v. Louisiana Transit Co.*, 707 So.2d 1225, 1231 (La. 1998)); *see also Rando v. Anco Insulations, Inc.*, 16 So.3d 1065, 1087 (La. 2009).

[15]   *Cay*, *supra* at 398; *see also Lasyone, supra* at 688-689.

1126388v1

**(FFCL** at 34)  The exemplar trial was the culmination of more than six (6) years of exhaustive factual and expert discovery, much of which was directed to the issue of causation.

Based on the Court's meticulous analysis of testimony from a preeminent group of geotechnical and hydrological experts, the Court found "Plaintiffs' 'proof' of a hydraulic connection and the resulting 'uplift pressure' as a substantial cause of the North and South Breaches [to be] unavailing." (*Id.*)  "Simply put, Plaintiffs have not proven that it is more probable than not that the United States' and WGI's remediation activities, including excavation and backfill methods, created a 'hydrologically charged' condition such that uplift pressures were transmitted through clay soil without any appreciable flow of water to destabilize the floodwall causing its demise." (*Id.*)

No rational trier of fact, judge or jury, could conclude differently.  It is simply impossible for the Plaintiffs to scientifically prove that the work performed by WGI contributed to the failure of the East Bank Industrial Area ("EBIA") floodwall.  A thorough record of all WGI's work, consisting of a detailed daily record of WGI's work of remediation of the thirty-two acre EBIA site, was disclosed and investigated from late 2005 through the date the trial began in September 2012.

The issues relating to causation in each of these cases are matters of geotechnical engineering science.  Understanding this, and to promote efficiency in soils sampling and testing, the Court ordered a Joint Soils Investigation that was conducted during 2011 and 2012 utilizing the services of an agreed upon soils investigation firm.  This company executed a plan of boring, sampling and testing agreed upon by all parties' engineering experts.  Thereafter extensive expert reports related to causation were provided by Plaintiffs' experts and Defendants' experts, and ten

(10) expert depositions were taken, just related to causation.  There was thorough and detailed testimony by all parties' causation experts at trial.

The detailed daily documentation of the actual work performed by WGI, and supervised by the United States Corps of Engineers from 2000 through May, 2005 alleged by Plaintiffs to have caused the breaches in the EBIA floodwall was carefully and thoroughly reviewed by the experts for all parties.  All parties' experts provided extensive reports that were admitted into evidence.  The experts also testified, and were cross examined at trial.  The end result was a carefully considered and unassailable decision by the Court that the work alleged by Plaintiffs to have caused the floodwall failures did not make a substantial contribution to the breaches.

All of the developed facts, and consideration of all of the discovery and disclosures of WGI's work, support the Court's conclusion that WGI's work was not a cause-in-fact of the floodwall breaches and flooding of the lower Ninth Ward or St. Bernard Parish.  As a result the Court should enter summary judgment in favor of WGI on all the remaining claims and cases, and bring this lengthy umbrella proceeding to a close as regards WGI.

## ARGUMENT

**III.    SUMMARY JUDGMENT STANDARD**

 **A. General Standard**

When there is "no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law" summary judgment is proper.[16]  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported

---

[16] Fed. R. Civ. P. 56(a).

claims...."[17]  As a result, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue [18] for trial."[19]  Once the moving party has identified those portions of the record which it believes show the absence of a genuine dispute of material fact, the non-moving party must proffer sufficient evidence to show that a reasonable jury could find in its favor -- in other words that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."[20]  Just because there is "some evidence" favoring a non-moving party, summary judgment is not prevented if that evidence is not "of such a character that it would warrant the jury in finding a verdict in favor of that party."[21]

**B.    Plaintiffs Must Show More Than a Factual Dispute -- A "Genuine Dispute" Is Required**

Of course facts are often disputed in litigation, but, notwithstanding, the question is whether there is a "genuine dispute" as to any material fact.  If the evidence would not allow a

---

[17]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[18]  Although the 2010 revisions to Rule 56 changed the word "issue" to "dispute", the revision notes make it clear that the standard for granting a motion for summary judgment "remains unchanged".  It was determined that "'[d]ispute'" better reflects the focus of a summary judgment determination." Advisory Committee Notes to the 2010 Amendments, Rule 56.

[19]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations and internal quotation marks omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[20]  *Anderson*, 477 U.S. at 249-250, 252.  *See also Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 430-31 (5th Cir. 2009) ("[P]laintiff has the burden to put forth sufficient evidence to create a genuine dispute" as to a material fact); *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924, 928 (5th Cir. 2001) ("After a defendant properly moves for summary judgment, the non-movant plaintiff must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists on every element of a claim."); *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 531 (5th Cir. 1994) ("An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.").

[21]  *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872)).

reasonable jury to find for the non-moving party, as here, summary judgment is proper.[22]   The Supreme Court's cautionary instruction is applicable here:   "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[23]   Similarly, the Fifth Circuit, sitting *en banc*, has held that "summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[24]   Summary judgment is not prevented by "[e]vidence purporting to create doubts as to the facts that is too incredible to be accepted by reasonable minds…."[25]

These basic principles are particularly apt in this case.   Here, the overwhelming scientific evidence establishes as a matter of fact that the remediation work conducted by WGI could not have caused, and did not cause, either of the IHNC floodwall breaches.   Plaintiffs' "evidence" respecting cause-in-fact raises no genuine dispute because it contravenes the laws of physical science.   The actual physical data from the Joint Soils Investigation will not allow the conclusions reached by Plaintiffs causation expert as to causation.   As a result no reasonable jury could find in Plaintiffs favor.

Testimony that is equivocal, vague, or ill-supported such as that provided by Dr. Robert G. Bea in this case, the only causation testimony proffered despite extensive discovery to

---

[22]   *See id.* at 248-49.

[23]   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[24]   *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citation and internal quotation marks omitted).

[25]   *Barker v. Norman*, 651 F.2d 1107, 1127 (5th Cir. 1981) (quoting 10 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2727, at 551 (1973)).

support Plaintiffs' causation theories, cannot be relied upon to overcome summary judgment.[26]
In this case, the overwhelming scientific evidence based on actual data instead of "idealized"
data and based on soils data from the EBIA in the Joint Soils Investigation, rather than "pressure
data" from soil at the 17th Street Canal that was "substantially different"[27] renders Dr. Bea's
conclusions "suspect", "questionable", and "unconvincing".   This Court correctly found these
descriptives appropriate for Dr. Bea's conclusions.  (**FFCL** at pp. 32, 34)

        Plaintiffs' claims here necessarily implicate, and violate, complex but fundamental
scientific precepts.  Courts have routinely ignored evidence that is "unconvincing" as were Dr.
Bea's models here (**FFCL** at 32), based on "idealized excavations [that did not] comport[] with
or compare[] to the actual excavation."  (**FFCL** at 32-33)  "Evidence" based on data that is not
"reliable" and that would require the Court to make a "leap of faith" or that would require
assumptions based on contentions that are "ill-founded" and therefore "lack[] merit" must
similarly be discarded as failing to satisfy the requirement that there be a genuine dispute of
material fact.  The Plaintiffs case for a theory of "uplift pressures" based on Dr. Bea's testimony
were correctly found to be "not direct and quite circular."  (**FFCL** at 34)  Dr. Bea's use of
SEEP/W modeling utilizing values for a key scientific parameter (compressibility) that bore "no
relation to the field conditions" did not "constitute[] a valid scientific method."  (**FFCL** at 34)
Under these circumstances Plaintiffs' theories for floodwall failure were at variance with the laws

---

[26]  *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002); *see also Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 318 (5th Cir. 1998); *Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 203-04 (5th Cir. 2008); *White v. Black & Decker (U.S.) Inc.*, No. Civ. A. 03-0874, 2004 WL 1373271, at *9 (E.D. La. June 16, 2004), *aff'd* 122 F. App'x 795 (5th Cir. 2005).

[27]  **SMF** 33.

of nature and with the physical facts.  And, as such, the Court should, based on the record of the exemplar trial, find that such evidence is of no probative value.[28]

### C.   A Lack of Causation Proof Is Sufficient Basis for Summary Judgment

Under applicable Louisiana law a standard fault determination to impose liability requires a duty risk analysis applying Louisiana Civil Code Article 2315.  Application of that analysis requires that "the defendants' [allegedly] substandard conduct was a cause in fact of the plaintiff's injuries…."[29]  This absolutely essential component of liability, causation, was found to be missing in Plaintiffs' proof.  (**FFCL** at 34)  Courts have not hesitated to grant summary judgment in cases in which it is clear and without genuine dispute that a Defendant's actions were not the cause-in-fact of Plaintiffs' injuries.[30]  This is such a case.

### D.   The Trial Record Is a Proper Basis for Summary Judgment

In the exemplar trial Plaintiffs were represented by qualified Liaison Counsel, along with at least eleven other well-known and experienced law firms.[31]   As it relates to causation alone the Court was presented with and reviewed the testimony of four (4) fact

---

[28]   *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613-14 (M.D. La. 2006); *In re Chavin*, 150 F.3d 726, 729 (7th Cir. 1998); *see also, Wickware v. Thaler*, 404 F. App'x 856, 860 (5th Cir. 2010); *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997); *Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004).

[29]   *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So.2d 627, 633 (La. 2006).

[30]   *Little, supra* at 1075-78; *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991), *vacated*, 500 U.S. 949 (1991), *reinstated on reh'g*, 947 F.2d 1290 (5th Cir. 1991); *see also Ralston Purina Co., supra* at 729; *Matter of Ingram Towing Co.*, No. 93-3311, 1995 WL 601027 (E.D. La. Oct. 11, 1995) (Duval, J.); *Evans v. McKinney Marine, Inc.*, No. 96-0132, 1997 WL 79446 (E.D. La. Feb. 21, 1997), *aff'd*, 127 F.3d 34 (5th Cir. 1997); *Molden, supra* at 613-14.

[31]   *See* Joint Pre-Trial Order, pp. 1-2 (Doc. No. 20200).

1126388v1

witnesses by deposition or in person,[32] fifteen (15) expert reports,[33] thousands of pages of exhibits (including photographs) documenting the remediation work at issue, and the testimony of a total of ten (10) experts.[34]   The claims of six plaintiffs were considered, representing the entire geographic area claimed to have been flooded by the EBIA floodwall breaches.   The relevant sworn testimony and exhibits related to causation that was before the Court in the trial record is now properly before the Court in this motion for summary judgment against the remaining plaintiffs in the MRGO track of cases as Exhibits to and references in the accompanying Statement of Material Facts.[35]

    Courts routinely allow parties to rely on sworn testimony and other evidence from prior proceedings to support motions for summary judgment regardless of whether the party

---

[32] Dennis O'Conner, James Montegut, Phillip Staggs and Lee A. Guillory.

[33] These fifteen reports consist of Trial Exhibits JX-1672 and DX-02648 (Dr. Silva); JX-1708 and DX-02649 (Dr. Sykora); JX-1864, DX-02647, and PX-4721 (Dr. Marr); JX-1836 (Dr. Brandon); JX-1780 (Dr. Stark); JX-1777 (Dr. Lucia); JX-1781 (Dr. Dunbar); JX-1389, JX-1414, and DX-01625 (Dr. Bea); and, JX-2031 (Dr. Rogers).   In addition, there were a significant number of appendices to these expert reports introduced with other trial exhibit numbers.

[34] Francisco Silva-Tulla, Sc.D.; David Sykora, Ph.D.; William A. Marr, Ph.D.; Timothy Stark, Ph.D.; Thomas Brandon, Ph.D.; Patrick Lucia; Ph.D.; Joseph Dunbar, Ph.D.; Robert G. Bea, Ph.D.; David Rogers, Ph.D.; and Chad Morris.   The Court also reviewed the testimony of Diego Cobos-Roa (who did not purport to be an expert, but provided technical assistance to Dr. Bea).

[35] WGI is providing declarations from all of the expert witnesses who testified at trial for the defendants, confirming that if called to testify again, each witness would testify to the same effect.   These declarations are submitted as Exhibit 1 through Exhibit 7 to the **SMF**.   Each defense expert's testimony relevant to causation is attached to the **SMF** as Exhibit 1-A through Exhibit 7-A.   The direct testimony of each defense expert was submitted in the form of a summary direct presentation accompanied by a power-point presentation.   Each defense expert's power point presentation pertinent to Plaintiffs' failure to prove that WGI's work was the cause-in-fact of the North and South Breaches is attached to the **SMF** as Exhibit 1-B through Exhibit 7-B.   Each defense expert's reports are attached to the **SMF** as Exhibit 1-C through Exhibit 7-C.

opposing the evidence was involved in the prior proceeding.[36]  These principles have particularly logical application in the circumstances presented in this case because the remaining plaintiffs have identical interests to the six plaintiffs whose claims were at issue in the exemplar trial, and many of them were represented by the same group of lawyers.  Factual and expert discovery results were available to the counsel for all of the numerous plaintiffs whose claims are at issue in this motion for summary judgment.

WGI's motion for summary judgment is based on the record established at the trial held from September 12, 2012 through October 3, 2012.  This motion does not ask or require the Court to make any credibility or other determinations that would be within the province of the finder of fact at a subsequent trial.  This is because, as referenced in the cases cited above at fns. 24 - 28, testimony that is contrary to the laws of science and nature, or will not support the inferences ascribed to it by the non-moving party, does not preclude summary judgment.  As a result, this Court is authorized to grant summary judgment if it determines that the only causation testimony that could be offered by plaintiffs is expert witness testimony that has been found to be: "unconvincing"; "suspect"; based on a "questionable" premise; "not direct and quite circular"; "bears no relation to the field conditions"; and, as a result, does not "constitute[] a valid scientific method."  (**FFCL** at 32, 34)  Simply stated, the Plaintiffs' in the exemplar trial failed to prove causation, and the remaining Plaintiffs cannot remedy that fatal

---

[36]   *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415, fn. 12 (5th Cir. 1993) (the court affirmed the district court's reliance upon sworn testimony from a prior trial, finding that "[i]t is well-settled that a certified transcript of a judicial proceeding may be considered on a motion for summary judgment") (citing *Langston v. Johnson*, 478 F.2d 915, 918 (D.C. Cir. 1973)); *see also Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989); *Deen v. Egleston*, 601 F.Supp. 2d 1331, 1335 (S.D. Ga. 2009) (use of depositions from another case were admissible in a summary judgment proceeding), *rev'd on other grounds*, 597 F. 3d 1223 (11th Cir. 2010); *Beiswenger Enterprises Corp. v. Carletta*, 46 F. Supp. 2d 1297, 1299 (M.D. Fla. 1999); *Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280, 284 (S.D.N.Y. 1998).

defect in their cases.   "[I]t is clear that it [the flooding] was not the result of the subject excavations performed by WGI under the complete supervision of the Corps."  (**FFCL** at 35) That is because the theories of the exemplar case, theories that were embraced by all of the claims in the cases that are the subject of this motion for summary judgment, were not, and cannot, be scientifically proved.[37]

## IV.   SCIENTIFICALLY PROVED CONDITIONS DURING KATRINA RENDER PLAINTIFFS' CAUSATION THEORIES WHOLLY UNAVAILING

Plaintiffs only evidence to prove "cause-in-fact" consists of opinions and testimony provided by their sole causation expert, Dr. Robert Glenn Bea supported by Diego Cobos-Roa, Chad Morris and David Rogers.   In the voluminous discovery conducted under this MRGO case umbrella directed to Plaintiffs' Liaison Counsel, Dr. Bea's opinions were the only opinions proffered or disclosed to support any theory by which WGI's work could have contributed causally to the failure of the EBIA floodwalls.   And, as was learned from his multiple reports, four days of deposition, and four days of trial testimony, Dr. Bea's opinions were based upon counterfactual assumptions and unscientific analyses.   These shortcomings were recognized and confirmed by this Court.

### A.   The Actual Physical Soil Properties of Permeability and Compressibility at the EBIA Scientifically Foreclose Plaintiffs' Only Causation Theories

**1.** Plaintiffs' Computer Model SEEP/W Using Site-Specific Soils Properties, Instead of Plaintiffs' Erroneous Values, Disproved Plaintiffs' Causation Theory

The facts are undisputed that the EBIA soils consisted of "predominantly fine-grained low permeability clays."[38]  (**FFCL** at 24)  As a result of the Joint Soils Investigation,

---

[37]  *See* fn. 11 *supra.*

[38]  **SMF** 13.

Plaintiffs' experts stipulated a permeability of **1 X 10$^{-5}$ cm/sec** for the relevant EBIA soils.[39] Confronted with "this inexorable fact" Dr. Bea and plaintiffs changed their previously espoused theories of underseepage flow under the floodwalls causing instability, to a theory of pore "pressure as the primary cause" of "uplift pressure and de-stabilization of the floodwall…."[40] (**FFCL** at 25)   Thus this Court correctly found that Plaintiffs' causation expert based his causation theory on what he called "the near-instantaneous transmission of pore pressures that occurs in the saturated high water-content soils of the EBIA."  (**FFCL** at 26)  To attempt to prove this hypothesis Dr. Bea used a computer model known as SEEP/W which computes flow and pressure based on data inputs of material soil properties and geometry of the features in the EBIA after WGI's remediation work had occurred.[41]  However, it is undisputed that Dr. Bea's use of this computer model, and the pore pressures it computed, were fatally flawed because the data input to the computer model for the critical parameter of **$m_v$** (compressibility) did not "jive with the actual soil that is present at the EBIA."  (**FFCL** at 29, fn. 8)  The compressibility (**$m_v$**) value used by Plaintiffs' causation expert for this critical computer model, essential to proving Plaintiffs' causation theory, was correctly found by the Court to be 30,000 times lower than the empirically proven value for **$m_v$** in the EBIA.[42]  (**FFCL** at 29)

> **2.** Plaintiffs' Only Scientific Stability Analysis Using Computer Model SLOPE/W, When Used With Proper Pore Pressure and Soil Strength Inputs, Disproved Plaintiffs Causation Theory

Plaintiffs utilized a computer model known as SLOPE/W in a manner which requires the input of pore pressures generated by Plaintiffs' SEEP/W computer model to perform

---

[39]  **PTUMF** 87, p. 38; **SMF** 11 and 12.

[40]  **SMF** 14, *see also* **SMF** 28.

[41]  **PTUMF** 88, p. 38; **SMF** 15 and 17.

[42]  **SMF** 18 and 19.

their stability analysis.[43]   The purpose of Plaintiffs' stability analysis was to determine the lateral stability, stability against shear failure, or slope stability of the EBIA floodwall under the demands placed on the floodwall by virtue of the Katrina storm surge.   Plaintiffs' theory of causation depended upon the input of appropriate pore pressures, instead of the erroneous pore pressures derived from the flawed SEEP/W analysis described above.[44]   Furthermore, Plaintiffs' causation expert erroneously utilized strengths and pore pressure for drained conditions with an effective stress analysis in performing his stability analysis, and in so doing misrepresented the strength of soil in a manner that mistakenly predicted failure under the 30-hour Katrina storm surge loading.[45]   There is no genuine dispute of a material fact that the proper conditions that should have been used to determine strength of soil in the EBIA during the 30-hour Katrina storm surge were undrained conditions which engineers normally (or most commonly) use in conjunction with a total stress analysis.[46]

    a.   Plaintiffs' SLOPE/W Computer Model Used Excessive Pore Pressures
         Manufactured by Plaintiffs' Invalid Compressibility Values ($m_v$)

One fundamental scientific error leads to another.   By using scientifically invalid values for compressibility ($m_v$) in his SEEP/W computer model, Plaintiffs' expert so distorted the resulting pore pressures produced by that model that use of those erroneous pore pressures in his SLOPE/W computer model provided a false prediction of slope stability failure (or shear failure) of the EBIA floodwall during the Katrina storm surge.[47]   As this Court found, a finder of fact

---

[43]   **PTUMF** 88, p. 38; **SMF** 20.

[44]   **SMF** 21.

[45]   **SMF** 22, 23, 24, 25, 26, 27.

[46]   **SMF** 23, 24, and 25 and references cited there.

[47]   **SMF** 47.

cannot reasonably "base a finding of causation using modeling that has used a value for the compressibility of the EBIA clay which is appropriate to that of sandstone."[48]  (**FFCL** at 35)

   b.   The Use of Drained Strengths in Stability Analyses Misrepresented the Actual Conditions at the EBIA Floodwall

No reasonable finder of fact could conclude that the appropriate soil strength in the fine-grained clay soils of the EBIA, supporting the levee and floodwall was its drained strength.  Dr. Bea ignored basic scientific principles by treating those soils as drained during the Katrina storm surge,[49] thus theoretically reducing their strength sufficiently to predict floodwall failure from the rising waters of the 30-hour storm surge of Katrina.  To the contrary is the overwhelming expert evidence available to the Court.  That evidence consists of the unanimous testimony of geotechnical scientists Dr. Francisco Silva-Tulla, Dr. W. Allen Marr, and Dr. Tom Brandon who have testified that the soil strength measurement should be accomplished using undrained conditions, generally evaluated by means of a total stress analysis.[50]  It would be a violation of basic science, and therefore beyond cavil, to consider the soil strength during the 30-hour storm surge as drained soil strength.  Because it violates basic scientific principles, Dr. Bea's testimony to the contrary does not create a genuine dispute of material fact.  As an example, the record will reflect the following conclusive testimony to that effect from Dr. Allen Marr:

> [W]hen we [are] talking about clays here in New Orleans, geotechnical engineers look at the characteristics of these clays, and know immediately that the -- for storm loading, the controlling strength is going to be the undrained shear strength. I think the illustration of that is as simple as when we were setting up the 2011 supplemental site investigation at which all those geotechnical engineers had an

---

[48]   **SMF** 18 and 19 and references cited there.

[49]   **SMF** 26.

[50]   **SMF** 23, 24, and 25 and references cited there.

opportunity to determine or to tell us which type of shear test to run, there was not a single request for a drained shear strength test. All the requests were for measurements to get the undrained shear strength of the soil. We had nine Ph.D.'s with backgrounds in geotechnical engineering. Not a single request for drain[ed] strength.[51]

There is no genuine dispute of material fact to challenge the proposition, as a matter of basic science, that the appropriate and controlling soil strength to be used in evaluating the slope stability of the levee and floodwall adjacent to the EBIA was the undrained shear strength. When that evaluation is done, it is clear that the work done by WGI in the EBIA did not provide a meaningful contribution to the failure of the floodwall during Katrina.

c. Plaintiffs' Theory of Instantaneous Pore Pressure Transmission Dependent upon Dilatational Wave Theory or the Decoupling of Pore Pressure From Flow Are Not Supported Scientifically

As discussed above, when faced with the actual soil properties of permeability and compressibility in the EBIA soils, Plaintiffs' theories shifted. The theory shift was from underseepage-induced failure[52] to an unproven and unscientific notion that Katrina's storm surge was a particular event resulting in lateral pore pressure transmission to areas remote from the floodwater's footprint, but without flow.[53] Without a dynamic event such as an explosion, the notion of decoupling pore pressure from flow is not scientifically supportable.[54] As this Court correctly found based on all the evidence, these theories were not scientifically supported.

---

[51]   Marr TT at 1899:2-15 (of course this included Plaintiffs' experts), Doc. No. 21137.

[52]   **SMF** 32 (by shifting theories, Plaintiffs' admitted as much); *supra* fn. 40.

[53]   **SMF** 29.

[54]   **SMF** 31. And also as this Court found, if there had been "explosive shock waves" at work, "that would increase stresses in the ground, both total stress and pore pressure; however, there would be no change in strength" of the soils. **FFCL** at 35 (*citing* Marr TT at 1936:3-1937:12).

(**FFCL** at 35)   Plaintiffs' attempt to prove cause-in-fact must fail for lack of scientific foundation.

### B.   The Actual Excavations Performed By WGI in the EBIA Do Not Match Critical Excavation Assumptions in Plaintiffs' Causation Theories

It is undisputed that Dr. Bea's attempt at a scientific basis to connect WGI's remediation work in the EBIA to the failure of the floodwall, and the resulting flooding of the lower Ninth Ward and upper St. Bernard Parish, completely ignored WGI's actual excavation work in favor of computer models using "idealized" excavations.[55]   A reasonable finder of fact cannot ignore what actually occurred in favor of geometries that never existed.

There is no genuine dispute of material fact to overcome the proposition that proper computer modeling, using actual excavation geometries (and actual physical properties of soils) proved that WGI's work did not contribute to the floodwall failures.  As the Court correctly found "[n]o sufficient and clear explanation was ever given to the Court as to why the actual excavations were not modeled…."   (**FFCL** at 33)   In fact, given every opportunity and a prompting by the Court to provide an explanation for this failure, "Plaintiffs did not accept this invitation nor any of the other 10 points as to causation the Court mentioned."  (**FFCL** at 33, fn. 9)   There is no reason to believe that any Plaintiff in any of the remaining cases can do any better.  Competent Plaintiffs' Liaison Counsel, and many attorneys from prominent firms on the Plaintiffs' litigation team, by their own admission, worked tirelessly along with their experts for 7 years to attempt to prove that WGI's work did in fact contribute to causing the floodwall failures, but failed to do so.  Their failure was not for want of trying.  That failure was because

---

[55]   **SMF** 45.

WGI's work did not contribute to the breaches in the EBIA floodwall and levee.  No reasonable fact finder could conclude otherwise.

      a.   Plaintiffs' Have No Reliable Data to Demonstrate That WGI's Work Made a Difference in The Vulnerability of the Floodwalls

To avoid summary judgment, Plaintiffs must show a genuine dispute as to some **material** fact.  Despite repeated questions by the Court and defense counsel, Plaintiffs' and their causation expert did not demonstrate "what effect the [WGI's] excavations had on the stability of the EBIA floodwall at the three locations" they chose to model.  (**FFCL** at 33)   This determination could have, as the Court noted, been accomplished by simply modeling the EBIA **without any excavations** to see what different results Plaintiffs might obtain, instead of using the flawed modeling described above.[56]  Instead, Plaintiffs' expert characterized the floodwall adjacent to the largest excavation that was closest to the floodwall as what he called a "Near Breach" area.  Then Plaintiffs, and their expert, argued that this "Near Breach" area served as a "control",[57] on the factually erroneous premise that this large excavation -- the McDonough Marine borrow pit area -- was intentionally lined with clay.  As the Court correctly found, based on facts beyond genuine dispute, the premise was "ill-founded and any assumptions based on that belief are likewise lacking merit."  (**FFCL** at 33)[58]

---

[56]   **SMF** 46.

[57]   Bea TT at 1292:3-1293:3, *see contra* **SMF** 45 and 46.

[58]   *See also*, **SMF** 37

- 20 -

> b.  The McDonough Marine Borrow Pit Excavation Proved Indisputably That
> WGI's Excavations in the EBIA Did Not Contribute to the Floodwall Failure

The very fact that no breach occurred in the floodwall adjacent to the McDonough

Marine borrow pit,[59] the most extensive excavation performed by WGI, rendered any proof that

WGI's excavations were a contributing cause-in-fact to the breaches to be beyond reasonable

dispute.  Plaintiffs' causation expert recognized the obstacle created by the undisputed existence

of a large, deep, and unfilled excavation so near to the intact post-Katrina floodwall.   The

McDonough Marine borrow pit was 2.4 acres in size, it was not backfilled, and it was

intentionally breached during the remediation work to allow the IHNC waters permanently into

the excavation.[60]   In an effort to overcome what was an insurmountable impediment to his

causation theories, Plaintiffs' causation expert postulated, incorrectly, (1) that the borrow pit was

intentionally lined with clay and (2) that the borrow pit bottom did not penetrate a layer of soil

called the organic clay layer.  Neither assumption was true.  Although there was no reasonable

factual basis to distinguish between the soil properties related to water flow or seepage in the

organic clay layer and the other clay soils in the EBIA[61] the Court correctly found "[i]t is clear

that that layer was pierced in reality."[62]   And the Court also correctly found, based on numerous

record references that Plaintiffs' initial contention that a clay layer had been added to the borrow

---

[59]   **SMF** 39.

[60]   Guillory TT at 2398:18-21 and 2401:3-7, Doc. No. 21140; **SMF** 35, 36, 37, 38.

[61]   **SMF** 34 and references cited therein.

[62]   **SMF** 36; Silva TT at 3747:9-17, Doc. No. 21148; Stark TT at 3428:23-3429:5, Doc. No.
21146; Bea TT at 4131:20-4132:8, 4134:3-4135:22, Doc. No. 21151.

pit was "ill-founded" and without "merit."[63]  This "clay layer" contention appears to have been abandoned by Plaintiffs and their expert for good reason.[64]

Simply put, if WGI's excavations in the EBIA were the cause of floodwall failure, the failure would have been adjacent to the McDonough Marine borrow pit.  But the floodwall did not fail at that location.  No reasonable fact finder could find otherwise.  Cause-in-fact was not proved in the exemplar trial.  Beyond reasonable dispute Plaintiffs' causation expert, Dr. Bea, failed to prove that "a hydraulic connection and … resulting "uplift pressure" was "a substantial cause of the North and South Breaches…." (**FFCL** at 34)  The only testimony for causation was Dr. Bea's novel, un-scientific theory of excess pore pressure sufficient to destabilize the floodwall without significant flow.  This theory was disproved by compelling contrary expert evidence from at least six qualified geotechnical engineers.  Plaintiffs' causation theory was correctly determined by the Court to be "not direct and quite circular."  (**FFCL** at 34)

## CONCLUSION

The Court should enter summary judgment in favor of Washington Group International, Inc. on the claims of all remaining plaintiffs in all MR-GO Track cases.

---

[63]  **SMF** 37 and references cited there.

[64]  Similarly as the Court found, work was done throughout the EBIA included the extraction of lengthy pilings without any breaches at those locations.  **SMF** 10 and references cited there.

1126388v1

Dated:  July 1, 2013

Respectfully submitted,

*/s/Heather S. Lonian*
William D. Treeby, 12901
James C. Gulotta, Jr., 6590
Heather S. Lonian, 29956
Maggie A. Broussard, 33033
**Stone Pigman Walther Wittmann L.L.C.**
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:     (504) 581-3200
Facsimile:      (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Christopher Thatch
Julia Cronin
**Jones Day**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:     (202) 879-3939
Facsimile:      (202) 626-1700

*Attorneys for Washington Group*
*International, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Memorandum of Law in Support of Motion For Summary Judgment, and the accompanying Motion for Summary Judgment, Statement of Material Facts, Notice of Submission, Notice of Manual Attachment and the electronic manual attachment containing all the supporting documents cited in the Statement of Material Facts have been served upon Liaison Counsel by hand and upon all counsel of record through the Court's CM/ECF electronic filing system or by placing same in the United States mail, postage prepaid and properly addressed, this 1st day of July, 2013.

*/s/William D. Treeby*

1126388v1