UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION  PERTAINS TO: ARMSTRONG, C.A. NO. 10-866 | * <br> * CIVIL ACTION <br> * <br> * NO. 05-4182 <br> * <br> * SECTION "K" (2) <br> * <br> * JUDGE DUVAL <br> * <br> * MAGISTRATE JUDGE WILKINSON |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF MOTION OF THE UNITED STATES
AND WASHINGTON GROUP INTERNATIONAL, INC.
TO COMPEL PLAINTIFFS TO PAY THEIR OWN COSTS**

The judgment entered in this case dismissing the exemplar plaintiff claims against the United States and Washington Group International, Inc. (WGI) ordered the parties to bear their own costs.  Plaintiffs unjustifiably have failed and refused to pay part of the cost contracted by them in compliance with the Joint Soils Investigation ordered by the Court.  There is currently due and owing from plaintiffs to the boring and sampling contractor with which plaintiffs and defendants contracted the sum $30,861.80 for services performed by the contractor.  This Court has jurisdiction to enforce its judgment by compelling plaintiffs to pay the full share of costs contracted by them as part of the Joint Soils Investigation.  For the reasons set forth in this memorandum, the United States and WGI move the Court to compel plaintiffs to pay their own costs.

1130459v.1

I.   **PROCEDURAL STATUS AND JURISDICTION**

On April 12, 2013, the Court entered judgment in favor of the United States and WGI dismissing the claims of Kenneth and Jeanine Armstrong, Fred Holmes, the Succession of Ethel Coats, Alvin Livers and Clifford Washington "with each party to bear its/his/her own costs."  (Rec. Doc. 21173).  On May 10, 2013, plaintiffs' liaison counsel filed a Notice of Appeal (Rec. Doc. 21175) on behalf of the plaintiffs.  On June 21, 2013, the United States Fifth Circuit Court of Appeals dismissed plaintiffs' appeal as of June 13, 2013 for want of prosecution.  (Rec. Doc. 21184).  The judgment of April 12, 2013, including its directive to each party to pay its own costs, is final and subject to execution.

This motion by the United States and WGI, seeking an order compelling plaintiffs to pay their own costs, is in aid of execution of the judgment of the Court.  This Court has jurisdiction to enforce its own judgments.  *Ross v. Marshall,* 426 F.3d 745, 751 (5th Cir. 2005), *cert. denied,* 549 U.S. 1166 (2007); *Showtime/The Movie Channel, Inc. v. Covered Bridge Condominium Ass'n,* 895 F. 2d 711, 713 (11th Cir. 1990); A. Ides, The Authority of a Federal District Court to Proceed After a Notice of Appeal Has Been Filed, 143 F.R.D. 307, 309 (1992).

II.  **PLAINTIFFS REFUSED TO PAY COSTS CONTRACTED BY THEM PURSUANT TO THE COURT'S MARCH 17, 2011 ORDER DIRECTING THE PARTIES TO SELECT AND CONTRACT WITH A CONTRACTOR TO PROVIDE BORING AND SAMPLING SERVICES**

A.   **The Fugro Contract**

On March 17, 2011, Judge Duval entered a comprehensive scheduling order.  (Rec. Doc. 20200).  A prominent feature of the scheduling order was the directive to the parties to "agree upon a **boring and sampling contractor** and establish a **joint sampling and boring protocol** to allow each party to participate and share the data for testing."  *Id*. March 17, 2011 Scheduling Order at 6 (emphasis in original).  The parties settled quickly on the selection of a

contractor, which was a company known as Fugro Consultants, Inc. (Fugro). As the estimated costs of all the tests that all the parties cumulatively desired escalated, plaintiffs informed defendants that they did not wish to participate in all of the tests requested by all parties. After a number of conferences among counsel, at least one of which the Court joined, a cost-sharing and data-sharing formula was agreed upon. The parties thereupon entered into a four-party written contract among themselves and Fugro dated June 20, 2011. Exhibit 1 attached hereto.

The agreement with Fugro provided that the so-called "marsh" layer, which was the focus of interest of the experts, would be the subject of five field pumping tests. Exhibit 1 at 3, bullet point 8. Three of the five pumping sites were selected by plaintiffs and two were selected by defendants. At page 5 of the agreement, it was provided that reporting of data to the parties' experts would be:

> split into 2 separate reporting lines:  1)  all of the data and findings will be compiled for use by the DOJ/WGI experts, and 2) a portion of the data and findings will be compiled for use by the Plaintiffs Experts.

Exhibit 1, at 5 **Reporting**.

The reporting of data would be primarily in electronic format via email and posted to an ftp site, the latter of which would be partitioned to accommodate the separate reporting lines. The part of the ftp site to which plaintiffs' experts were to have access would contain only the data for which plaintiffs agreed to pay. *Id.* The cost proposal attached to the contract confirms that plaintiffs were to receive reports for, and agreed to pay their share of, all five of the field permeability tests. Exhibit 1, Cost Proposal at 2-3 (Items Reported to Each Group, denoted by "yes" with respect to plaintiffs). The final data reports were to be distributed both electronically and in printed form. The final data report delivered to plaintiffs would

contain the subset of data for which they agreed to pay.  The final report delivered to defendants would contain everything.  Exhibit 1 at 6, **Reporting**.

### B.	The Pumping Test Protocol

Subsequent to the execution of the contract, the parties' experts agreed to a protocol for the conduct of the five pumping tests.  IHNC-EBIA Pump Test Protocol attached as Exhibit A to Rec. Doc. 20589 filed on 11/22/11.  A pumping test is designed to measure the volume and rate at which ground water will move through a particular soil layer by drawing the water toward the pump.  It is an important tool in assessing the permeability of the soil layer under observation.  A pumping test is preceded by development of the pumping well.  Pump Test Protocol at 4, section 4.3.  Pre-test development consists of several steps:

- First, a slug test[1] is performed "on each well following installation in accordance with either ASTM D4044-96 "Standard Test Method for (Field Procedure) for Instantaneous Change in Head (Slug) Tests for Determining Hydraulic Properties of Aquifers" or ASTM D7242-06 "Standard Practice for Field Pneumatic Slug (Instantaneous Change in Head) Tests to Determine Hydraulic Properties of Aquifers with Direct Push Ground Water Samplers";

- Following this initial slug test, "the Control Well and Observation Wells are developed *and then allowed to recover* such that the head in the well recovers to 90% of the displaced static level measured prior to the first slug test"; and

- After the well has been *allowed* to recover, a second slug test is performed.

Pump Test Protocol at 4-5 (emphasis added).  If the calculated hydraulic conductivity of the control well in the second slug test is within 30% of the first test ("30% repeatability"), the well is considered "adequately developed."  *Id*. at 5.

---

[1]  A "slug test" is described as a falling head or rising head permeability test performed in a standpipe piezometer or well in which the standpipe water level is quickly increased or decreased by the insertion or removal of a slug (a capped pipe or rod with a predetermined volume and sufficiently heavy to sink in the ground water).  Following the insertion or removal of the slug, the standpipe water level is monitored over time, and the results are used to calculate a "field permeability."

Significantly, the protocol provided that the preceding "well development procedures may need to be modified in the field with the consensus of the experts in order to meet schedule requirements." *Id*. The reason for providing for possible modification of the well development procedures was to respond precisely to the situation that occurred in this case. In low permeability soils like the so-called "marsh" layer, the time required for the recovery of the head in the well could take months between each slug test — far beyond the schedule established by the Court to prepare the case for trial. This does not mean that a pumping test of low permeability soil is invalid for lack of development. To the contrary, it means that the soil is impermeable and cannot conduct water fast enough to permit recovery within a period of days. It is not evidence of an improper test. It is evidence that the soil has a low permeability.

C. **Plaintiffs' Pumping Tests**

Plaintiffs originally selected three sites that they directed Fugro to prepare for pumping tests. The three sites were known as the Railroad Site, the School Site, and the South EBIA Site.

Preparatory work began at the Railroad Site in late July 2011. Problems were encountered immediately because the site was so full of debris that Fugro's drilling equipment could not penetrate the soil adequately to permit installation of the pumping well and control wells. Drilling and site work were suspended for several days in late July 2011 while the plaintiff and defense experts conferred. The communications among experts resulted in two emails from Dr. Francisco Silva-Tulla, WGI's lead expert, to plaintiffs' on-site experts, Dr. Rune Storesund and Dr. David Rogers. The first email was on July 28, 2011, the second on July 29, 2011. In both emails, Dr. Silva-Tulla suggested that the experts <u>not</u> instruct Fugro how to conduct its drilling operations, but rather leave that aspect of the procedure up to Fugro. On July 28, 2011, Dr. Rogers for plaintiffs concurred in Dr. Silva-Tulla's suggestion. Again on

July 29, 2011, Dr. Rogers for plaintiffs specifically agreed with Dr. Silva-Tulla's "reasoning" and his suggestion that Fugro be told that it "needs to select the best method to clear the debris . . . ." Emails of July 28–29, 2011 attached hereto *in globo* as Exhibit 2.

Shortly after the experts exchanged emails, Fugro continued to experience drilling difficulties, in consequence of which, plaintiffs abandoned the Railroad Site. Joint Pre-Trial Order at 37, stipulation 81 (Rec. Doc. 20920). No pumping test was ever completed or conducted there. Despite their paying for most of the costs allocated to them for Fugro's services at the unfortunate and abandoned Railroad Site, plaintiffs have unaccountably and unjustifiably asserted that $3,261.80 of costs incurred by Fugro and allocated to plaintiffs are attributable to delays at the Railroad Site caused by either Fugro or defendants' experts. Hence, they have refused to pay Fugro $3,261.80 for services performed and costs indisputably incurred by Fugro at the Railroad Site.

No doubt there were several days of delay experienced at the Railroad Site — a site selected by plaintiffs and so impossible to drill on that it had to be abandoned. The delays were not Fugro's fault, and certainly not defendants' fault. Moreover, plaintiffs' own experts concurred in precisely the approach that the parties should take in the dealing with the unfortunate choice that plaintiffs made. WGI and the United States paid Fugro for their share of costs and services expended by Fugro at the Railroad Site. Plaintiffs should be compelled to do the same.

### D. Plaintiffs' School Site and South EBIA Site

Site preparation work for the pumping wells at the plaintiffs' two remaining sites, the School Site and the South EBIA Site, began nearly simultaneously at the end of August 2011. Development and testing were completed at both sites by early November 2011. Ironically, but predictably, well development of the plaintiff-selected School Site and South EBIA Site was not

completed within the literal terms of the Pump Test Protocol. The protocol was modified, at the request of plaintiffs' experts, in order to allow the pumping tests to be completed within the court–mandated discovery schedule. Defendants' experts did not object to the modification of the well development procedure requested by plaintiffs' experts for the plaintiffs' well sites.

The pumping test results were furnished to plaintiffs' expert, Dr. David Rogers, who calculated the permeability of the "Swamp/Marsh" layer to have a value ranging from $10^{-4}$ to $10^{-6}$, "with a most likely value of $10^{-5}$." Expert Report of J. David Rogers, Ph.D. at 1, ¶ 5 (JX 2031).

### E. Defendants' Pumping Tests

The two pumping well sites selected by defendants were referred to as the EBIA North Site and the EBIA South Breach Site. The defense-selected sites were located on the canal side of the floodwall, inside the EBIA itself and along axes running from the canal to the locations of the North and South Breaches — the actual routes along which one would expect ground water to seep if propelled by the Katrina storm surge toward the levee at the North and South Breach locations.

Site work on the defense-selected sites began in September 2011. Defendants' pumping tests were scheduled by Fugro to begin on October 26, 2011. Fugro notified plaintiffs of the scheduled commencement of the defense pumping tests. The afternoon before, on October 25, 2011, just nine days before the court-ordered test completion deadline, plaintiffs' counsel informed defense counsel and Fugro's field supervisor that plaintiffs did not consider well development on the defense-selected sites to be completed in accordance with the Pump Test Protocol and that plaintiffs desired an extension of the discovery schedule to pursue additional well development. In addition, on October 25, plaintiffs expressed their intention not

to pay their contracted share of any further services rendered by Fugro pertaining to pumping tests at the defense-selected sites.

Defendants informed plaintiffs that literal completion with the Pump Test Protocol calling for multiple successive natural recoveries of the heads in the pumping wells, given the low permeability of the "marsh" layer, would require at least four months, which was far beyond any reasonable extension of the discovery schedule.  Defense experts also were of the opinion that the wells were adequately developed and that a modification of the literal provisions of the protocol was in order to comply with the court-ordered discovery schedule.

The controversy provoked by plaintiffs regarding the pumping tests at the defense-selected sites was followed by a motion filed with the Court by plaintiffs to extend the discovery schedule to accommodate additional well development.  The motion was scheduled for hearing before Magistrate Judge Wilkinson on November 30, 2011.  (Rec. Doc. 20578).  Briefs were filed by all parties explaining their respective positions on the issue of well development.  (Rec. Docs. 20550, 20588, 20589).  Meanwhile, the pumping tests at the defense-selected sites were completed in order to comply with the then-existing, court-ordered deadline of November 3, 2011.  Data from the tests was electronically reported by Fugro to both defense and plaintiff experts, as called for in the contract, notwithstanding plaintiffs' unilateral refusal to pay for their contracted share of the costs of the final phase of the test.

At a conference with Judge Duval on November 10, 2011, the Judge indicated that he would be amenable to a six-week continuance of the trial date and a consequent six-week extension of the discovery schedule.  (Rec. Doc. 20576).  The issue of whether additional development of defendants' pumping wells requested by plaintiffs could be accomplished within six weeks was referred to Magistrate Judge Wilkinson.  *Id*.

On the eve of the November 30, 2011 hearing on plaintiffs' motion seeking additional well development, plaintiffs' counsel informed Magistrate Judge Wilkinson that they conceded that the "proposed additional pump testing can<u>not</u> be completed within the six-week extension period contemplated by Judge Duval's order."  (Rec. Doc. 20597) (emphasis by in original).  As a consequence, plaintiffs' motion for additional well development was dismissed as moot. *Id.*

The pumping test results recorded by Fugro in early November 2011 with respect to the defense-selected sites were duly reported by Fugro to plaintiffs' experts and plaintiffs' counsel in the final report delivered by Fugro to plaintiffs.  Geotechnical Data Report, March 2012, Fugro Report No. 04-57114007-2, attached hereto as Exhibit 3.

The results reported by Fugro for the defendants' pumping test sites were consistent with the results reported at plaintiffs' sites.  Plaintiff and defense experts stipulated in the Joint Pre-Trial Order submitted to the Court that:

> 87.  The best estimate permeability/hydraulic conductivity value for the EBIA organic clays [*i.e.* the so-called "marsh" layer], as *determined from all of the parties' tests conducted during the Joint Soils Investigation*, is $1 \times 10^{-5}$ cm/s.

(Rec. Doc. 20920 at 38) (emphasis added).

The stipulated permeability for the all-important, so-called "marsh" layer, or organic clay layer (as the experts and the Court later referred to it in accordance with ASTM nomenclature standards), was a fundamental building block supporting Judge Duval's Findings of Fact and Conclusions of Law.  In his opinion, Judge Duval concluded that water seepage through the clay layer during the Katrina surge could not have caused the EBIA levee failures because of the soil's low permeability.  (Rec. Doc 21172 at 24–25).

- 9 -

Of particular relevance to this motion is that, as a result of plaintiffs' unjustified, unilateral refusal to pay for its share of the final phase of the defense pumping tests, Fugro currently is owed $27,600.00 for Plaintiffs' share of the costs for those services.

### F. Status of Plaintiffs' Account with Fugro

At the conclusion of the performance of the contract, Fugro collected all costs, time records, and information on prior payments made by each of the parties. In June, 2012, Fugro prepared a spreadsheet showing all unpaid invoices, the remaining amounts due, each party's share, and the items of which it was aware were disputed. A copy of Fugro's June 23, 2012 spreadsheet is attached as Exhibit 4.

In the Disputed Amounts column, the items unpaid by plaintiffs are indicated and consist of the following:

| | |
|---|---|
| Disputed Pump Test Labor deducted from plaintiffs only | $27,600.00 |
| Disputed Third Party Excavation/Railroad Site deducted from plaintiffs only. | $   3,261.80 |
| Total Amount Disputed By Plaintiff | $30,861.80 |

The undisputed sum due from plaintiffs at the end of the Joint Soils Investigation totaled $185,115.94, which was paid by plaintiffs in July 2012. The balance owed by plaintiffs to Fugro consists of $30,861.80 and is composed of the portion of the defense pump site work for which plaintiffs refused to pay and a portion of the Railroad Site excavation cost for which plaintiffs also refused to pay. Defendants have paid their entire share of these soils investigation costs.

### III. ARGUMENT

#### A. Plaintiffs' Refusal to Pay Their Share of the Costs of the Defense Pumping Tests is Unjustified

In emails exchanged between plaintiff and defense counsel, and in conferences to try to resolve this dispute, plaintiffs have expressed the view that, notwithstanding the contract they entered with Fugro and the defendants to pay for certain services, plaintiffs remained free at any time to opt out from paying for the services for which they contracted. There are two defects in plaintiffs' position: first, the contract they entered has no provision for opting out, as if it were a Chinese restaurant menu; and second, that was not plaintiffs' position when they informed Fugro and defendants on October 25, 2011 of their refusal to pay for the remaining costs incurred for the pumping tests.

Plaintiffs' expressed reason for declining to pay their share of the pumping test costs was based on their concern that the defense-selected wells were not adequately developed. If plaintiffs had prevailed in that position or, if indeed, the defense pumping test results were later shown to have been invalid for lack of development, plaintiffs' continued refusal to pay for their share of the costs might be justified. Neither turned out to be the case. Plaintiffs withdrew their motion for a further extension of the discovery schedule to accommodate additional development and the defense pumping test results were consistent with plaintiffs' results. The defense pumping test results, as well as all of the Joint Soils Investigation data, supported the parties' stipulation regarding the permeability of the clay layer. (Rec. Doc. 20920 at 38). That was the primary purpose of the Joint Soils Investigation ordered by Judge Duval.

However sincere plaintiffs' concerns regarding adequate well development might have been on October 25, 2011, as the pumping tests were about to begin, those concerns turned out to be unjustified. Plaintiffs' current and continued refusal to pay for their share of the cost of the pumping tests, which supported a fundamental finding of the Court in this case, is similarly unjustified.

### B. Plaintiffs' Refusal to Pay Their Share of the Railroad Site Excavation Costs is Unjustified

Plaintiffs' refusal to pay $3,261.80 remaining due on account of the abandoned Railroad Site can only be the result of plaintiffs' pique and frustration at the wasted resources devoted to that site. Everyone gets frustrated from time to time. But, there is no cause to blame either Fugro or the defendants for plaintiffs' own poor choice of a pumping well site. The record of events leading to the delay encountered at the Railroad Site and the eventual abandonment of it by plaintiffs is manifest. Neither Fugro, nor defendants were responsible for the delay or for any of the costs for which plaintiffs continue to refuse to pay. Plaintiffs should be ordered to pay Fugro the remaining $3,261.80 due on account of the abandoned Railroad Site excavation.

### C. What Interest Do Defendants Have in Plaintiffs' Refusal to Pay Fugro?

The plaintiffs' baseless excuses for refusing to pay Fugro create defendants' interest in this motion. Nearly all of the excuses plaintiffs have made for not paying Fugro, if valid (which clearly they are not), would lead to the assumption of the unpaid Fugro expenses by defendants. Plaintiffs have made this a dispute between themselves and defendants that can, and should be, resolved by the Court. Fugro rendered the services. Unless Fugro is found to be at fault for the delay of the Railroad Site, it should be paid for all of its services. Plaintiffs should be compelled to pay Fugro for its services. No part of the unpaid amounts should accrue to defendants.

1130459v.1

## IV.     CONCLUSION

Plaintiffs unaccountably and unjustifiably still owe the Joint Soils Investigation contractor, Fugro, $30,861.80.  Fugro's charges indisputably were incurred for services performed by it.  There is no doubt that the remaining charges have been allocated properly to plaintiffs.  Defendants have paid for their share of the costs at issue.  Plaintiffs are obligated to pay the amount remaining due by virtue of the March 17, 2011 Scheduling Order directing them to participate in the Joint Soils Investigation, by the contract they executed with Fugro and the defendants, and by the final judgment dismissing their case against defendants and ordering them to pay their own costs.  They now should be ordered specifically to pay the $30,861.80 remaining due to Fugro.  They have no justification for continuing to refuse to pay Fugro that sum.

Respectfully submitted,

Dated:  July 1, 2013

*/s/ James C. Gulotta, Jr.*
William D. Treeby, La. Bar No. 12901
James C. Gulotta, Jr., La. Bar No. 6590
Heather S. Lonian, La. Bar No. 29956
Maggie A. Broussard, La. Bar No. 33033
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:     (504) 581-3200
Facsimile:     (504) 581-3361

1130459v.1

        Adrian Wager-Zito
        Debra S. Clayman
        Christopher Thatch
        Julia Cronin
        Jones Day
        51 Louisiana Avenue, N.W.
        Washington, D.C. 20001-2113
        Telephone:    (202) 879-3939
        Facsimile:    (202) 626-1700

*Attorneys for Washington Group International, Inc.*


        */s/ Robin Doyle Smith*
        ROBIN DOYLE SMITH
        Senior Trial Counsel
        Torts Branch, Civil Division
        United States Department of Justice
        Benjamin Franklin Station
        P.O. Box 888
        Washington, D.C.  20044
        (202) 616-4289
        (202) 616-5200 (fax)

*Attorney for the United States*


## **CERTIFICATE OF SERVICE**

       I hereby certify that the preceding Memorandum in Support of the Motion of The United States and Washington Group International, Inc. to Compel Plaintiffs to Pay Their Own Costs has been served upon all counsel of record through the Court's CM/ECF electronic filing system, this 1st day of July, 2013.

                                  */s/ James C. Gulotta, Jr.*

1130459v.1