UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | * <br> * <br> * <br> * | CIVIL ACTION <br><br> NO. 05-4182 |
| PERTAINS TO: ARMSTRONG,<br>C.A. NO. 10-866 | * <br> * <br> * <br> * <br> * | SECTION "K" (2) <br><br> JUDGE DUVAL <br><br> MAGISTRATE JUDGE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### REPLY MEMORANDUM IN SUPPORT OF THE
### MOTION OF UNITED STATES AND WASHINGTON GROUP
### INTERNATIONAL, INC. TO COMPEL PLAINTIFFS TO PAY THEIR OWN COSTS

The memorandum (Rec. Doc. 21190) filed by plaintiffs in opposition to the Motion of the United States of America (United States) and Washington Group International, Inc. (WGI) to Compel Plaintiffs to Pay Their Own Costs contains three principal arguments:

1. This Court lacks jurisdiction to decide the motion;

2. The United States and WGI lack standing to bring the motion; and

3. The plaintiffs at all times retained "the unfettered right to withdraw" from payment of their obligations pursuant to the Joint Soils Investigation ordered by the Court. Plaintiffs' Opposition at 2.

All three arguments were anticipated by the United States and WGI in their memorandum in support. Further reasons why plaintiffs' arguments lack merit are briefly clarified herein in response to several specific inaccuracies contained in plaintiffs' brief.

1132043v.1

## I. JURISDICTION

Plaintiffs argue that Fugro is merely a third party vendor in a dispute with plaintiffs on matters of no concern or interest either to the Court or to the defendants, the United States and WGI.

Plaintiffs ignore the Court's March 17, 2011 Scheduling Order that established its jurisdiction over the Joint Soils Investigation and all issues arising from it.  (Rec. Doc. 20200). The Court *ordered* the parties to jointly hire a contractor.  The Court obviously intended the parties to pay for the contractor's services in the proportions to which they agreed, assuming, of course, the contractor performed the services satisfactorily, which Fugro has done.  Fugro is not a mere third party vendor with which plaintiffs individually contracted and with which they now have a private dispute.  Fugro was jointly retained by the parties at the Court's instruction.  The Court could have chosen to retain Fugro, or some other qualified contractor of its choosing, as a Court-appointed expert.[1]

Plaintiffs attempt to draw a contrast between jurisdiction over a taxable costs dispute (which this is not) and the situation presented here is unavailing.  Had the Court retained Fugro as its own court-appointed expert, Fugro's compensation would have qualified as a taxable cost.  28 U.S.C. § 1920(6).  The Court could have taxed all of Fugro's costs for services to

---

[1] Fugro and its personnel certainly are "experts," *i.e.* persons possessing scientific, technical, or specialized knowledge, skill, and experience. Fed. R. Evid. 702.  The Court, obviously, with considerable prescience, wanted to avoid having two sets of sampling and boring data to which each party's geotechnical experts would refer.  By having one expert contractor, the Court intended to eliminate unnecessary conflicts on the validity of the sampling data.  The Court's plan worked in that regard.  Certainly, the Court did not anticipate that one of the parties would unjustifiably decline to pay its share of the sampling contractor's cost.  But, it certainly has jurisdiction to resolve the dispute, if necessary, engendered by a party's refusal to pay the expert sampling contractor that the Court directed the parties to agree upon and hire.

plaintiffs as the losing party. The Court did neither of those things. Instead of retaining a contractor itself, it ordered the parties "to meet and confer to agree upon a **boring and sampling contractor** and establish a **joint sampling and boring protocol**…." (Rec. Doc. 20200 at 6, *emphasis in original*) Then, in its judgment the Court did not tax or shift costs from prevailing to losing party. Rather, it ordered each party to bear its own costs. Having proceeded in the manner it chose, the Court in no way diminished or prejudiced its authority to adjudicate disputes arising out of its scheduling order and judgment. If plaintiffs' cannot justify their refusal to pay their share of Fugro's costs on the merits (which they cannot), they are in violation of the Court's scheduling order and judgment, which the Court has jurisdiction to enforce. Fugro is involved in this proceeding because of the Court's scheduling order. The Court has jurisdiction to protect Fugro's interests, which originated with the Court's own order.

Plaintiffs argue that the General Conditions provision in Fugro's standard form contract referring disputes to the United States District Court for the Southern District of Texas divests this Court of its jurisdiction. For plaintiffs to contend now, that for this matter to be resolved, Fugro is required to sue plaintiffs in Texas is an affront to this Court. Plaintiffs have made no contention whatsoever that Fugro failed to perform the services, or that Fugro was, in any way, at fault in causing the plaintiffs to incur the charges allocated to them. Even with respect to the minor Railroad Site delay charge, plaintiffs now focus their contention for blame (unjustifiably) on defendants' experts, not Fugro. Plaintiffs do not seriously contend that Fugro should not to be paid. Their contention ultimately is that defendants should pay Fugro for the unpaid costs allocated by Fugro to plaintiffs.[2]

---

[2] This is not a dispute between plaintiffs and Fugro at all. Fugro is aware of this proceeding and has not objected to this Court's jurisdiction. Surely plaintiffs are not suggesting that this provision in Fugro's General Conditions was for plaintiffs' benefit.

This is a dispute between plaintiffs and defendants that should be decided by this Court; not a Texas court.

## II. STANDING

Plaintiffs argue that WGI and the United States are strangers to this dispute. Nothing could be more baseless. The two substantive contentions plaintiffs now make for why they should not pay Fugro both result, if justified (which they are not), in defendants' assumption of liability for the payment. As indicated above, plaintiffs now blame only the defendants for the Railroad Site delay. Also in their opposition, plaintiffs contend that they were free at any time to withdraw from paying for the pumping tests, *i.e.* "no pay, no play." If the tests proceeded, which they did with valid results, then according to plaintiffs, defendants nevertheless should assume the costs plaintiffs opted not to pay.

The standing of the United States and WGI to have this dispute resolved in this Court is manifest. The resolution of the dispute by this Court is indeed the only practical way that the Court's scheduling order directing the parties to hire a contractor can be fulfilled faithfully and in keeping with the Court's obvious assumption — that the contractor would be paid for its services by the parties in the proportion agreed to in the court-ordered agreement.

## III. PLAINTIFFS DID NOT HAVE THE RIGHT TO OPT OUT OF TESTS FOR WHICH THEY AGREED TO PAY.

Plaintiffs argue that Section 11 of the Agreement with Fugro entitled <u>Termination of Contract</u> permitted the plaintiffs to change their minds and opt out of any tests for which they previously agreed to pay. The obvious flaw in plaintiffs' argument is that Section 11 applies to termination of the entire agreement. By their action October 25, 2011, plaintiffs did not trigger Section 11 and they did not intend to. They couldn't. Their own pumping tests were still underway on October 25, 2011, when plaintiffs informed defendants that they had no intention of

paying their share of the defense pumping test costs. Ex. 3 to Defendants' Memorandum in Support, at 16. *See also* Ex. A attached hereto, email dated October 28, 2011 by Michael Alfortish of Fugro describing status of plaintiff and defense pumping tests on that date. Had plaintiffs terminated their participation in the entire agreement on October 25, 2011, they would have lost their own test results. Section 11 relating to Termination of the Contract is irrelevant to this dispute and in no way supports plaintiffs' argument.

There remains plaintiffs' basic argument in favor of their continuing, right to opt out of tests to which they previously agreed. The source of the claimed right is a mystery. The contract does not support it. Section 11 certainly does not.

Nor did plaintiffs make this illogical contention at the time they informed defendants of their refusal to pay for the tests. Plaintiffs' communications to defendants consisted primarily of an email by Tom Sims on October 25, 2011 and a letter by Joe Bruno on the same date. Ex. B attached hereto, email of Tom Sims dated October 25, 2011. Ex. C attached hereto, letter of Joe Bruno dated October 25, 2011.

The principal concern expressed by Mr. Sims and Mr. Bruno was the defendants' contention that the defense pumping test wells were inadequately developed and that more time was needed to complete them. Both communications described the situation as an impasse because defendants' declined plaintiffs' suggestion to join with them in seeking from the Court an extension of the testing schedule deadlines to permit more well development. *See* Ex. D attached hereto, letter of William D. Treeby representing WGI dated October 25, 2011; and Ex. E attached hereto, letter of Robin Smith representing the United States dated October 26, 2011.

Defendants, of course, disagreed with plaintiffs' contentions regarding the lack of development of the wells and the need for an extension of the testing schedule. Nowhere is there

1132043v.1

a discussion or an assertion by plaintiffs that they had a right to opt out because they wanted to. Plaintiffs' professed ground, at the time, for declining to pay for their share of the testing costs was their substantive contention, from which they backed off one month later after having secured a six week discovery extension, that the defense pumping tests would be invalid without further development.

The selective "no pay, no play" argument that plaintiffs now invoke is obviously an afterthought that is without merit.  Plaintiffs' motive for the makeweight afterthought argument they advance now is obvious:  their substantive basis for refusing to pay for the defense pumping tests, i.e. inadequate well development, was undercut by later events, including their own stipulation to the results obtained by the pumping tests for which they now attempt to avoid payment.

Suppose plaintiffs retained, as they now claim, the right to opt out of any test at any time.  The Joint Soils Investigation would have been thrown into chaos and never completed. It is instructive that, despite a very difficult process, fraught with disagreements along the way, the parties mostly were able to work out their differences to produce a scientifically valid set of sampling data —- which is what the Court intended all along.  It's just that now, because of a stale substantive dispute involving the defense pumping tests, which was resolved in defendants' favor, an unfortunate decision by plaintiffs to refuse to pay their share of the costs has not been corrected by them to avoid the necessity of this Court's intervention to resolve this dispute.

Briefly on the Railroad Site, plaintiffs now argue that the delay was caused by defendants' refusal to accede to plaintiffs' initial suggestion that the rubble be cleared by use of a backhoe.  The emails describing the Railroad Site delay attached to defendants' memorandum in support are clear:  defendants' never objected to the use of a backhoe or any other method of

clearing the rubble.  Defendants simply objected to proceeding unscientifically and in haste without logging and measuring the elevation and concluding depth of the rubble layer, proposing a method for rubble removal that would satisfy these important issues.  Had the drilling of the well continued, which it did not, defense experts wanted to be sure that all layers, including the rubble, above the targeted organic clay layer were accurately logged and measured.  Plaintiffs' experts agreed with defendants' approach.  *See* Ex. 2 attached to Defendants' Memorandum in Support.  Defense experts were not to blame for any delay.

Dated:  July 12, 2013

Respectfully submitted,

*/s/    William D. Treeby*
William D. Treeby, La. Bar No. 12901
James C. Gulotta, Jr., La. Bar No. 6590
Heather S. Lonian, La. Bar No. 29956
Maggie A. Broussard, La. Bar No. 33033
    Of
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:  (504) 581-3200
Facsimile:   (504) 581-3361


Adrian Wager-Zito
Debra S. Clayman
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3891
Facsimile:  (202) 626-1700

***Attorneys for Washington Group International, Inc., a division of URS Corporation***

and

- 8 -

/s/ Robin Doyle Smith
ROBIN DOYLE SMITH
Senior Trial Counsel
Torts Branch, Civil Division
United States Department of Justice
Benjamin Franklin Station
P.O. Box 888
Washington, D.C.  20044
(202) 616-4289
(202) 616-5200 (fax)

*Attorney for the United States*


**CERTIFICATE OF SERVICE**

I hereby certify that the Reply Memorandum in Support of the Motion of United States and Washington Group International, Inc. to Compel Plaintiffs to Pay Their Own Costs, has been served upon all counsel of record by electronic notice via the Court's CM/ECF system this 12th day of July, 2013.

/s/ William D. Treeby

1132043v.1