IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | (AND CONSOLIDATED CASES) |
| PERTAINS TO:  MRGO | * | |
| | * | SECTION "K" (2) |
| CASES NOS. 07-3173; 07-0621; 07-4906; | * | |
| 07-4914; 07-5022; 07-5074; 07-5096; 07-5128 | * | JUDGE DUVAL |
| and 07-5174 | * | |
| | * | MAGISTRATE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM SUBMITTED BY PLAINTIFFS IN OPPOSITION TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

NOW COME all the plaintiffs in Civil Actions Nos. 07-3173; 07-0621; 07-4906; 07-4914; 07-5022; 07-5074; 07-5096; 07-5128; and 07-5174 (collectively "Plaintiffs") through their respective undersigned counsel and file this opposition to the United States' Motion to Dismiss or, in the Alternative, for Summary Judgment (Case No. 05-4182, Doc. 21214).[1]

These cases involve **maritime** claims for damages caused by **dredging** activities conducted by the government in the MRGO.  The maritime claims are based on the Suits in Admiralty Act, 46 U.S.C. § 30901 *et. seq.*; the Public Vessel Act, 46 U.S.C. § 31101 *et. seq.*; the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § *et. seq.* and the Coastal Zone Management Act, 16 U.S.C. § 1451 *et. seq.*, among other applicable statutes.

---

[1] The Court-appointed Liaison Counsel, Mr. Joe Bruno, notified Plaintiffs that the Steering Committee did not intend to file an opposition to the government's motion and that anyone wishing to oppose it had to do it through his own counsel.

These cases are different than the *Robinson* case previously tried by the Court.  The *Robinson* plaintiffs relied on the choice made by the Corps of Engineers  ("Corps") between dredging or installation of foreshore protection.   They argued that the Corps was negligent in not installing foreshore protection instead of constantly dredging the MRGO.  *In re Katrina Canal Breaches Consolidated Litigation (Robinson)*, 647 F. Supp. 2d 644, 702 (E.D. La. 2009).  This Court agreed:  "This Court is utterly convinced that the Corps' failure to provide timely foreshore protection doomed the channel to grow to two or three times its design width and destroyed the banksí  " 647 F. Supp. 2d at 697.

In contrast, Plaintiffs here allege, in summary, that while performing maintenance **dredging** activities on the MRGO over many years, the Corps violated federal and Louisiana State **regulations** enacted specifically to regulate dredging activities in navigable waters, and that as a consequence of dredging in a manner prohibited by the regulations, they damaged the banks of the MRGO and caused the flooding.  Because the Corps is **required**  to follow the regulations, its dredging activities are not discretionary.[2]   *Indian Towing Company v. United States*, 350 U.S. 61 (1955); *Butler v. United States*, 726 F.2d 1057, 1063 (5th Cir. 1984) ("We agree with the district court that once these decisions [to dredge the Mississippi Sound for sand needed to repair the seawall's berm area], the Government was no longer exercising a discretionary function and was required to perform the related operational functions with reasonable due care."); *Bean Horizon Corporation v. Tennessee Gas Pipeline Company*, 1998 WL 113935 (E.D. La. 1998) (Clement, District J.) (Denying motion for summary judgment because "í  . no party disputes the fact that the Corps' initial decision to dredge fell within the discretionary function exceptioní   The issue is whether the Corps' subsequent actsí  . were also

---

[2] In the *Robinson* case tried before this Court, the plaintiffs alleged that the Corps violated NEPA regulations. Ultimately the Fifth Circuit held that the functions required by NEPA are discretionary.  In contrast, Plaintiffs here allege violations of dredging regulations, which are not discretionary.

covered by the exceptioní .   Acts involving mandatory compliance with a federal statute, regulation or policy, do not satisfy the discretionary function exception's requirement of judgment or choice.").

Plaintiffs do not oppose the dismissal of any claims included in these suits concerning the "outfall-canal" breaches at the London Avenue, Orleans Avenue and 17th Street canals.  (Gov't Brief, Sec. I at pp. 3-4).  Likewise, Plaintiffs do not oppose dismissal of any claims concerning work performed in the East Bank Industrial Area.  (Gov't Brief, Secs. III and IV at pp. 5-6).  Plaintiffs, however, strenuously oppose the arguments made by the government in Sections II, V and VI of its brief and urge the Court to deny the government's motion to the extent that it seeks dismissal of Plaintiffs' maritime claims related to the improper dredging of the MRGO.

Plaintiffs respectfully request an opportunity to develop and present their cases, which are based on theories different than those previously presented to the Court in other cases.

## I.   INTRODUCTION.

Plaintiffs filed these suits to recover damages suffered after Hurricane Katrina made land fall on August 29, 2005, when various levee systems failed and flooding occurred as a result of **environmental damage to protective wetlands** caused by **maritime dredging activities** conducted by the government and its subcontractors in the Mississippi River Gulf Outlet (õMRGOö).[3/]

The government's maritime activities are described in the various complaints filed by the Plaintiffs, where Plaintiffs allege that the government and its subcontractors, using several

---

3/ In *Robinson* the Court found that due to damage to protective wetlands along the banks of the MRGO "more forceful attack on the Reach 2 levee during Katrina was created."  647 F. Supp. 2d at 671.  "Because of the increase in width of the MRGO, the 'fetch' grew which resulted in an increase in the intensity of the wave strength that attacked the MRGO Levee."  647 F.  Supp. 2d at 675.

vessels[4/], negligently performed **maintenance dredging** of the MRGO: "Until approximately 1978, the Corps of Engineers performed all or most of the dredging of the MRGO. After restrictions were imposed in 1993, the Corps of Engineers dredged the MRGO using primarily the Dredge Wheeler' . [which] is operated by the New Orleans District of the Corps of Engineers – ' " (Civil Action No. 07-5022; Complaint at ¶ 31)[5/] "From 1999 to 2004, the New Orleans District of the Corps of Engineers awarded 154 contracts to dredge 352,636,430 cubic yards of dredge material. Many of those contracts were awarded to the several dredging companies." (Civil Action No. 07-5022; Complaint at ¶ 33). "In addition to the dredging conducted by the Corps of Engineers, from 1993 to 2005 the following dredging companies dredged the following amounts of dredge material from the MRGO under contracts with Corps of Engineers: [the amounts are then listed in a chart]." (Civil Action No. 07-5022; Complaint at ¶ 33).

It has been clear for a long time that improperly-conducted dredging operations constitute negligence under maritime law. *Mansfield and Sons Co. v. The United States (The Oyster Cases),* 94 Ct. Cl. 397 (1941) ("Under these circumstances the use of a suction dredge in the channel of New Haven Harbor constituted negligence"); *Petrovich v. The Untied States*, 421 F.2d 1364, 1367 f.n. 6 (Ct. Cl. 1970) ("It has been held in certain circumstances that the use of the hydraulic dredge may be negligence"); The No. 6, 241 F. 69 (2nd Cir. 1917) ("The dredge was responsible only for negligence."); *Beacon Oyster G. v. United States*, 63 F. Supp. 761 (Ct. Cl. 1946) ("The character of the dredging operations, which of themselves constitute negligence' ").

---

4/ Hopper Dredges Newport and Bayport, Dredges Tom James, George D. Williams, II (a/k/a Geo D. Williams), Ouachita, Marion, Leonard M. Fisher, Everett Fisher, B. E. Lindholm, George D. Williams, BT 208 and Weeks 262, Spud Barge L-1101, Spud Barge L-1103, M/V Michael A, M/V Michael B and the government's Dredge Wheeler.

5/ The allegations in all the complaints are similar, if not identical.

Plaintiffs further allege that the **maintenance dredging** activities carried out by the government and its subcontractors have had the following effects:

### Environmental Effects

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes.  Since the construction of the MRGO, several basic impacts on the region have become evident.  These include wetland loss caused by excavation of the channel, soil erosion and shifts in habitat type because of increased salinity.  The New Orleans District of the Corps of Engineers believes that the loss of wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh.  More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered.  Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish, where the MRGO is perceived as a õsuperhighway for storm surgeö because of the channeløs susceptibility to inundation by tropical storms and hurricanes.
(Civil Action No. 07-5022; Complaint at ¶ 24).

### Prior Knowledge of Potential Harmful Effects

Before excavation of the MRGO, state and federal resource agencies expressed concern about the projectøs apparent lack of ecological consideration.  Hydrologic models predicted drastic salinity increases and an associated loss of interior marsh habitat.  Local concerns mounted as the projectøs õecological footprintö expanded and economic benefits failed to emerge.  Concerns expanded with a growing perception that the project had dramatically increased the regionøs vulnerability to hurricanes and tropical storms.  By the 1990øs, the project was widely characterized as an environmental disaster, although adverse environmental impacts from the MRGO were evident as early as the late 1960øs.  In March, 2000, the Environmental Subcommittee of the MRGO Policy Committee prepared a restoration/mitigation plan to address environmental impacts related to the construction, operation and maintenance of the MRGO.  (Civil Action No. 07-5022; Complaint at ¶ 25).

### Wetlands Provide Flood Protection

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters.  Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain.  This combined water storage and braking action lowers flood heights and reduces erosion.  The

holding capacity of wetlands helps control floods.   Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.  (Civil Action No. 07-5022; Complaint at ¶ 26).

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet.  The sides of the original channel were at a 25 degree angle.  Because the soft soils on the sides of the original channel would not stand up at such a steep angle, the soil began to slide or ӧslough-offӧ into the bottom of the channel.  This erosion process has continued over the years, and as a result, the channel is now over 2,000 feet wide at the surface.  This ӧsloughing-offӧ of the soft sides along the channel banks only partially explains why the MRGOӧs banks have eroded from 650 feet wide to over 2,000 feet wide today.  (Civil Action No. 07-5022; Complaint at ¶ 27).

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug.  This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks.  The MRGO has thus created an environmental disaster.  Tidal flows, and the wave action, suction, and propeller backwash from passing ships and other marine vessels erode the soil from the MRGO channel banks and it settles into the bottom of the channel.  (Civil Action No. 07-5022; Complaint at ¶ 28).

**Wetlands Destruction by Dredging**

Soil from the MRGOӧs banks which settles in the bottom of the channel impedes the movement of ships.  In order to maintain the depth of the channel to allow ships to pass, the Corps of Engineers, using its own fleet of dredge vessels and through maritime dredging contracts entered into with various dredging companies, which utilize similar dredging vessels, continuously dredge soil from the bottom and slope of the channel.  The Corps of Engineers use its vessels to dredge and then haul most of the dredged soil away and dump it into the Gulf of Mexico.  Some of the dredged soil is piled on spoil banks along the channel, but very little is used beneficially to restore the wetlands the channel has destroyed.  In fact, piling of dredged soil along spoil banks causes further damage to the wetlands behind the spoil banks.  (Civil Action No. 07-5022; Complaint at

¶ 29).

The Corps of Engineers does not mitigate or compensate for the damage it causes to the wetlands.  Each year, the United States of America pays several dredging companies, pursuant to maritime dredging contracts, about $22 million to dredge the MRGO channel and dump the soil (originally from St. Bernard Parish's wetlands) into the Gulf of Mexico. Making matters worse, the Corps of Engineers and its contractors do advance maintenance dredging to the channel, to a depth of 41 feet.  With each dredging, the MRGO channel grows wider and wider.  (Civil Action No. 07-5022; Complaint at ¶ 30).

The complaints set forth the role played by the government in causing the damage suffered by Plaintiffs:

The United States of America has no immunity for the damage caused to Plaintiffs.  The dredging work performed by the Corps of Engineers does not fall within governmental discretionary immunity **because it is regulated by dredging regulations** enacted by the Corps of Engineers and the State of Louisiana.  The Corps of Engineers was required to follow those regulations, but failed to do it.  (emphasis added).  (Civil Action No. 07-5022; Complaint at ¶ 24).

The Corps of Engineers failed to perform the dredging work with due care and are not entitled to assert any "due care" defense.   (Civil Action No. 07-5022; Complaint at ¶ 25).

The Corps of Engineers performed the dredging work in the MRGO negligently.   (Civil Action No. 07-5022; Complaint at ¶ 26).

The vessels used to dredge the MRGO were unseaworthy because they were not the correct type needed for the work in which they were involved, or lacked the proper equipment to conduct dredging operations in the MRGO without causing damage to the surrounding wetlands. Furthermore, the lack of proper control for the operations rendered the vessels unseaworthy.  (emphasis added).  (Civil Action No. 07-5022; Complaint at ¶ 27).

The Corps of Engineers failed to follow requirements of 33CFR Parts 335-38, particularly 33 CFR 336.1(c)(4) and 33 CFR 320.4(b) and Executive Order No. 11990 made applicable thereby.  (Civil Action No. 07-5022; Complaint at ¶ 28).

The Corps of Engineers deviated from and/or failed to execute the dredging activities in the manner required the Nationwide Permits,

specific permits, or general authorizations for dredging issued by or obtained by the Corps of Engineers pursuant to 33 CFR 337.5 and 338.2, and all other regulations that the Corps of Engineers were required to follow.  (Civil Action No. 07-5022; Complaint at ¶ 29).

The Corps of Engineers failed to follow Louisiana State dredging requirements (made applicable by 33 CFR 337.2), including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code related to dredging activities.  (Civil Action No. 07-5022; Complaint at ¶ 30).

The Corps of Engineers have performed "advance maintenance" and "over-depth" dredging of the MRGO, going beyond its authorized project depth.  The Corps of Engineers has also performed "over-width" dredging, also for advance maintenance purposes.  The Corps of Engineers also overcut the slope of the channel, based on the potential for undisturbed material to slough downward to the channel, and for other reasons, changing the designed slope of the channel's banks, thereby enlarging the design width of the channel, causing wetlands along the banks of the channel to erode, and causing the width of the channel to increase.  These activities by the Corps of Engineers constitute negligence and violate regulations enacted to control dredging activities.  (Civil Action No. 07-5022; Complaint at ¶ 31).

These allegations against the Corps in the conduct of its maintenance dredging operations are fully supported by an expert report, submitted in affidavit form by Abram J. "Nick" Nicholson, P.E., an eminently qualified engineer and expert in the field of dredging operations, who for sixteen years worked for the Corps in dredging operations.  *See* Exhibit "1" attached hereto.  Mr. Nicholson states in his report that "... box cutting [the method used by the government and its subcontractors to dredge the slopes on the MRGO] is **the most destructive method available for creating the required channel side slopes....   It speeds up the loss of wetlands in the Mississippi River delta and contributes to the elevation of hurricane surge inland from the cannel**."   According to Mr. Nicholson's report, "the practice of creating unstable slopes at the side of the channel due to box cutting has contributed over the years to environmental degradation and to erosion of the slopes where the soils are easily erodible."  "The

eventual result of this practice (box cutting) is the speeding up of widening of the open water area of the channel and loss of adjacent markers and productive shallows, both of which are negative environmental impacts."

## II. **ARGUMENT**.

### A.   **PLAINTIFFS' CLAIMS FOR DAMAGE CAUSED BY IMPROPER DREDGING OF THE MRGO ARE NOT BARRED BY THE FLOOD CONTROL ACT OR BY THE DISCRETIONARY FUNCTION EXCEPTION.**

#### a.   **The Flood Control Act**.

At p. 4 of its brief, the government incorrectly argues that Plaintiffs' claims are barred by Section 702c of the Flood Control Act, 33 U.S.C. § 702c.  The government's reliance on *Central Green v. United States*, 531 U.S. 425, 441 (2001) is misplaced.

In *In re Katrina Canal Breaches Consolidated Litigation (Robinson)*, 577 F. Supp. 2d 802, 827 (E.D. La. 2008), this Court granted summary judgment in plaintiffs' favor "reject[ing] the Corps' § 702c defense 'insofar as the United States may be found liable for damages caused by its negligence that are extraneous to the LPV.'"  Following trial the Court again addressed the issue and found the costs of foreshore protection were  to be charged to the MRGO project and were initially envisioned to protect the channel width and maintain navigability.  Thus this Court concluded that "the failures at issue here are extraneous to the LPV and are not subject to § 702 immunity."  *In re Katrina Canal Breaches Consolidated Litigation*, 647 F. Supp. 2d 644, 699 (E.D. La. 2009) (hereafter cited as "*Robinson Trial Opinion*").

On appeal, the Fifth Circuit reached a slightly different interpretation of Section 702c. Instead of a strictly categorical approach were immunity attaches only where a flood is caused by a **project** whose purpose is flood control, the Fifth Circuit recognized immunity for any flood-control **activity** conducted even in the context of a project that was not primarily or substantially

related to flood control.  The Court ruled that "the Corps chose to **dredge** MRGO to keep it navigable rather than promptly implement costier foreshore protection, which would have had the dual purpose of keeping MRGO navigable and protecting the levees." *In re Katrina Canal Breaches Litigation,* 696 F.3d 436, 447 (5th Cir. 2012).  The Court concluded that "[t]he **dredging of MRGO was not a flood control activity**, nor was MRGO so interconnected with the LPV as to make it part of the LPV.  Therefore, the flood waters that destroyed the plaintiffs' property were not released by any flood-control activity or negligence therein."  696 F.3d at 448.

Here, Plaintiffs allege that the damage to their property was caused by the improper **dredging of the MRGO**, which the Fifth Circuit has held is not a flood control **activity**.  Therefore, no immunity attaches under § 702c and the government's argument lacks merit.

### b.    Discretionary Function Exception.

At p. 4 of its brief the government also argues that the **design** and **construction** of the MRGO are shielded by the discretionary function exception.  Plaintiffs agree on that point.  But the government goes on to argue at pp. 4-5 that the Fifth Circuit also held the "MRGO's operation and maintenance were also shielded, because of 'the public policy character of the Corp's various decisions contributing to the delay in **armoring**' the channel."  That also may be true, but is not applicable here.  The reason is that the Fifth Circuit was addressing, not any claims of improper **dredging** in violation of dredging statutes, but the *Robinson* plaintiffs' claims that the government (1) had violated NEPA; (2) had a duty to **armor** MRGO; and (3) had delayed in **armoring** MRGO.  696 F.3d at 449-51.  Here in contrast, as explained above at pp. 2-8, the Plaintiffs allege that the government had a duty to follow, but instead violated the dredging regulations.   That issue has not been addressed by any court and Plaintiffs request an opportunity to develop their case.

       c.      **Regulations violated by the government**.

In the *Robinson Trial Opinion*, at p. 663, the Court stated:

> Apparently, in 1991, the State of Louisiana would not sign off on a Coastal Zone Management decision for marsh nourishment and restoration, because the plan did not address severe bank erosion failing a **guideline**. Instead, the state was insisting on stone dikes for protection. In its own discussion points as to why the banks should or should not be stabilized, the Corps listed as its second reason not to stabilize, "Corps (sic) long standing policy against repairing bank erosion." (emphasis added).

The Court did not explain the role of the Coastal Zone Management Act ("CZMA"), but its inclusion in the opinion shows that the CZMA is relevant. As explained below, the CZMA requires the Corps to follow federal and state dredging regulations.

Plaintiffs allege that in dredging the MRGO the government failed to follow rules and regulations specifically enacted to control dredging operations, as well as permits or authorizations issued pursuant to those rules or regulations authorizing the dredging of the MRGO. Furthermore, Plaintiffs allege that the government deviated from and/or failed to execute the dredging activities in the manner required by the Nationwide Permits, specific permits, or general authorizations for dredging applicable to dredging activities.

### i. *Corps' Dredging Regulations*

Dredging activities are highly regulated. The Clean Water Act ("CWA") prohibits the discharge of dredge or fill materials into waters of the Untied States unless authorized by a permit issued by the Corps pursuant to §404 of the CWA. *Resource Investments, Inc. v U.S. Army Corp of Engineers*, 151 F. 3d 1162 (9th Cir. 1998); *Orange Environment, Inc. v. County of Orange*, 811 F. Supp. 926 (S.D.N.Y. 1993); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515 (10th Cir. 1992) ("the Corps has a particular duty under the CWA to protect wetlands.").

In compliance with its duties under the CWA, the Corps has issued detailed regulations governing dredging activities.  33 CFR Parts 320, 322, 323, 325, 330, 335, 336, 337, 338.  Part 335 "prescribes the practices and procedures to be followed by the Corps to ensure compliance with the specific statutes governing Army Civil Works operations and maintenance projects involving the discharge of dredged or fill material"  "  33 CFR §335.1.  Parts 335 through 338 are applicable to the Corps "when undertaking operation and maintenance activities at Army Civil Works projects."  33 CFR §335.3.  Part 335.6 lists several  related laws and Executive Orders, including Section 307(c) of the Coastal Zone Management Act of 1976 (16 U.S.C. 1456 (c)), as amended, and Executive Order 11990, Protection of Wetlands, May 24, 1977 (42 FR 26961, May 25, 1977). 33 CFR §335.6.[6/]

Section 336.1(a) states that "[a]lthough the Corps does not process and issue permits for its own activity, the Corps authorizes its own discharges of dredge or fill material by applying all applicable substantive legal requirements"  "   37 CFR 336.1(a).      Furthermore, Section 376.1(a)(2) states that Section 307 of the Coastal Zone Management Act ("CZMA") requires the Corps to conduct its activities in a manner that is consistent with a Federally-approved state management plan to the maximum extent practicable.  33 CFR 336.1(a)(2).

Section 336.1(c)(4) states that "[m]ost wetland areas constitute a productive and valuable resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.  The district engineer will, therefore, follow the guidance in 33 CFR 320.4(b)

---

[6/]  In *Reed/Ackerson* the Limitation Petitioners convinced the Court that these dredging regulations apply only to the government but not to the government contractor doing the work for the government.  *See,* Doc. 3365 at p. 10.  Plaintiffs' expert, Mr. Nicholson, one of the authors of the government's dredging regulations, clearly states in his report at p. 8 that "the contractor is required to comply with EPA and the Corps of Engineers regulations concerning the environment."  The regulations certainly apply to the Corps.  *See,* Exhibit "2".

and EO 11990, dated May 24, 1977, when evaluating Corps operations and <u>maintenance</u> activities in wetlands.ö  33 CFR § 336.1(c)(4).

Section 336.1(c)(10) states that [d]istrict engineers will make all reasonable efforts to <u>comply</u> <u>with</u> í  . <u>Federally</u> <u>approved</u> <u>coastal</u> <u>zone</u> <u>programs</u>í  ö  33 CFR § 336.1(c)(10).

Executive Order 11990 states that õin order to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands and to avoid direct or indirect support of <u>new</u> <u>construction</u> <u>in</u> <u>wetlands</u>í  . **Section 1.** (a) Each agency shall provide leadership and <u>shall</u> <u>take</u> <u>action</u> <u>to</u> <u>minimize</u> <u>the</u> <u>destruction,</u> <u>loss</u> <u>or</u> <u>degradation</u> <u>of</u> <u>wetlands</u>í    **Section 5.**  In carrying out the activities described in Section 1 of this Order, each agency <u>shall</u> consider factors relevant to a proposalǿs effect on the survival and quality of <u>wetlands</u>.   Among these factors are: (a) public health, safety, and welfare, including water supply, quality, recharge and discharge; pollution; <u>flood</u> <u>and</u> <u>storm</u> <u>hazards;</u> <u>and</u> <u>sediment</u> <u>erosion;</u>.....  **Section 7**. í  . (b)  The term <u>new</u> <u>construction</u>  shall includeí  . <u>dredging</u> [and] <u>channelizing</u>í  .ö

### ii.  Coastal Zone Management Act (“CZMA”)

Following the publication of the Stratton Commissionǿs report in 1969 entitled õOur Nation and the Sea,ö Congress enacted the CZMA in 1972, to, *inter alia*, õpreserve, protect, develop, and where possible, to restore or enhance, the resources of the Nationǿs coastal zone for this and succeeding generations.ö  16 U.S.C. §1452(1).  Congress also sought õto encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving full consideration to ecological, cultural, historic, and esthetic values as well as the needs for compatible economic development, í  to encourage the

participation and cooperation of the public, state and local governments, and interstate and other regional agencies, as well as of the Federal agencies having programs affecting the coastal zone,… . to encourage coordination and cooperation with an among the appropriate Federal, State, and local agencies, and international organizations where appropriate, in collection, analysis, synthesis, and dissemination of coastal management information, research results, and technical assistance, to support State and Federal regulation of land use practices affecting the coastal and ocean resources of the United States,… . and to respond to changing circumstances affecting the coastal environment and coastal resource management by encouraging States to consider such issues as ocean uses potentially affecting the coastal zone.ö *Id.*

Section 307(c)(1)(A) of the CZMA provides that õ[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone <u>shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs</u>.ö 16 U.S.C. §1456(c)(1)(A). State coastal management programs are comprehensive management plans that describe, *inter alia*, the authorities and enforceable policies of the management program, the boundaries of the Stateøs coastal zone, the organization of the management program, and related state coastal management concerns. *See* 15 U.S.C. §§ 1453(12), 1455(d).

### iii.  *The Louisiana Coastal Resources Program*

The Louisiana Legislature, in 1978, enacted the State and Local Coastal Resources Management Act (õSLCRMAö) (Act 361 of 1978, RS 49:214.21 *et seq.*), in order to balance conservation and development within Louisianaøs coastal zone.   Pursuant to the SLCRMA, in 1980, the Louisiana Department of Natural Resources (õLDNRö) adopted, and the Legislature and the Governor approved, the Louisiana Coastal Use Guidelines.

In August 1980, Louisiana's coastal zone management program, the Louisiana Coastal Resources Program ("LCRP"), was approved by the National Oceanic and Atmospheric Administration ("NOAA"), U.S. Department of Commerce, under section 306 of the CZMA, 16 U.S.C. §1455(d). The enforceable policies of the LCRP, as approved by NOAA, include, but are not limited to, the 94 Coastal Use Guidelines adopted by the State, as well as Articles IX, Section 1 of the Louisiana Constitution. These Coastal Use Guidelines identify a range of information that must be submitted for activities affecting the coastal zone, and they also list significant detrimental and adverse impacts that are to be avoided. In order for a proposed federal activity to be consistent with the LCRP, it must comply with *all* of the applicable Guidelines.

Coastal Use Guideline 1.6 identifies general information that must be considered when evaluating whether a proposed use is in compliance with the guidelines and therefore consistent to the maximum extent practicable with the enforceable policies. *See* LA. ADMIN. CODE tit. 43, §701.F. Information that must be considered under Guideline 1.6 includes, but is not limited to: elevation, soil, and water conditions and flood and storm hazard characteristics of site; among others.

Coastal Use Guideline 1.7 sets forth 21 categories of adverse impacts that must be avoided, and directs that uses and activities be planned, sited, designed, constructed, operated, and maintained to avoid such types of impacts to the maximum extent practicable. *See* LA. ADMIN. CODE tit. 43, §701.G. These include: adverse economic impacts on the locality of the use and affected governmental bodies; destruction or adverse alterations of streams, wetland, tidal passes, inshore waters and water-bottoms, beaches, dunes, barrier islands, and other natural biologically valuable areas or protective coastal features; fostering of detrimental secondary impacts in undisturbed or biologically highly productive wetland areas; detrimental changes in

15

existing salinity regimes; detrimental discharges of suspended solids into coastal waters, including turbidity resulting from dredging; adverse alteration or destruction of unique or valuable habitats, critical habitat for endangered species, important wildlife or fishery breeding or nursery areas, designated wildlife management or sanctuary areas, or forestlands; land loss, erosion and subsidence; adverse disruption of existing social patterns; adverse effects of cumulative impacts; adverse alteration or destruction of public parks, shoreline access points, public works, designated recreation areas, scenic rivers, or other areas of public use and concern; increases in the potential for flood, hurricane or other storm damage, or increases in the likelihood that damage will occur from such hazards.

Coastal Use Guideline 1.9 states that ö[l]inear facilities (which are defined to be öthose uses and activities which result in creation of structures or works which are primarily linear in nature. Examples include pipelines, roads, canals, channels and power linesö) involving the use of dredging or filling shall be avoided in wetland and estuarine areas to the maximum extent practicableö; ö[l]inear facilities shall be of the minimum practical size and lengthö; ö[l]inear facilities involving dredging shall not traverse beaches, tidal powers, protective reefs, or other natural gulf shorelineí .ö; ö[l]inear facilities shall be planned, designed, located and built using the best practical techniques to minimize disruption of natural hydrologic and sediment transport patternsí   and to minimize adverse impacts on wetlandsö; ö[l]inear facilities shall be planned, designed, and built using the best practical techniques to prevent bank slumping and erosion, and salt water intrusion, and to minimize the potential for inland movement of storm generated surges.ö  *See* LA. ADMIN. CODE tit. 43, §707.

Coastal Use Guideline 1.10 states that ö[s]poil shall not be disposed of in a manner which could result in the impounding or draining of wetlandsí  ö; [s]poil shall not be disposed of on

marsh (defined as õwetlands subject to inundation in which the dominant vegetation consists of reeds, sedges, grasses, cattails, and other low growthö)í   to the maximum extent practicable; õ[s]poil disposal areas should be designed and constructed and <u>maintained</u> using the best practical techniques to retain the spoil at the site, reduce turbidity, and <u>reduce shoreline erosion</u> when appropriate.ö  *See* LA. ADMIN. CODE tit. 43, §707.

Article IX, Section 1 of the Louisiana Constitution, an enforceable policy of the LCRP provides, in part, that:  õ[t]he natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people.ö  LA. CONST. Art. IX, Sec. 1.

Thus, the Federal, State and Local rules and regulations, the Executive Order cited above and the Louisiana Constitution, specifically require the Corps to (1) <u>avoid damage to the wetlands</u>; (2) <u>prevent soil erosion</u> when conducting dredging operations; and (3) <u>avoid õincreases in the potential for flood, hurricanes or other storm damage, or increases in the likelihood that damage will occur from such hazards.</u>ö  The Corps violated these duties by dredging in a negligent manner that caused damage to wetlands adjoining the MRGO.

In *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003), the court explained that in admiralty a duty of care may be derived from (1) duly enacted laws, regulations and rules; (2) custom; or (3) the dictates of reasonableness and prudence:

> In order to prevail on a claim of maritime negligence a plaintiff must prove that there was: 1) a duty of care which obliges the person to conform to a certain standard of conduct; 2) a breach of that duty; 3) a reasonably close causal connection between the offending conduct and the resulting injury; and 4) actual loss, injury, or damages suffered by the Plaintiff.  1  Thomas Schoenbaum, *Admiralty and Maritime Law* § 5-2 at 170 (ed. 2001 (footnotes omitted).

Generally, in admiralty, the duty of care may be derived from: 1) duly enacted laws, regulations and rules; 2) custom; or 3) the dictates of reasonableness and prudence.  *See Pennsylvania R. Co. v. The Marie Leonhardt*, 202 F. Supp. 368, 375 (E.D. Pa. 1962), *aff'd*, 320 F.2d 262 (3d Cir. 1963).  Ultimately, the basic duty of care is reasonable care under the particular circumstances.  *Admiralty and Maritime Law, supra*, § 5-2 at 170.

Plaintiffs have properly asserted claims against the government due to its negligence.

None of those claims have been previously addressed by this Court.

**B.     DREDGING ACTIVITIES ARE NOT FLOOD CONTROL ACTIVITIES SUBJECT TO THE FLOOD CONTROL ACT AND ARE NOT DISCRETIONARY ACTIVITIES SUBJECT TO THE DISCRETIONARY EXCEPTION TO JURISDICTION.**

a.     <u>**This Court did not strike all admiralty claims against the government**</u>.

The government incorrectly states at p. 7 of its brief that "[t]his Court [previously] struck all admiralty claims against the United States, holding that the dredging claims in the master-action complaints were not **viable** under the Admiralty Extension Act."  This statement is true but is not a complete statement of what the Court said.

In the Order issued by the Court August 29, 2007 (Doc. 7350) the Court actually stated:

Based on the foregoing review of both the Master Levee Complaint and the Master MRGO Complaint, the Court finds that **because there are no allegations** that (1) a vessel or vessels caused the damages complained of and (2) that the vessel(s) were owned or operationally controlled by the United States, there is no viable claim under the AEA, and thus, the **invocation** of admiralty jurisdiction is immaterial and can be dismissed' .

The Court, thus, struck the **allegations** of admiralty jurisdiction, but not the claims.

In contrast, here the Plaintiffs have alleged that (1) a vessel owned by the United States (the Dredge Wheeler) and other vessel working on its behalf, pursuant to dredging contracts with dredging contractors, caused the damage; and (2) that those vessels were either owned or

operationally controlled by the United States.   Thus clearly, the invocation of admiralty jurisdiction is proper.

Moreover, any allegations of the Master complaints do not affect these cases because the Master complaints specifically state they are only administrative devices that do not affect the rights or claims of the parties in the individual cases.

### b.   The discretionary function exception does not bar claims of dredging in violation of federal and State statutes and regulations.

At p. 7 of its brief, the government argues that the discretionary function exception bars Plaintiffs' claims even if they did support admiralty jurisdiction, because the discretionary function exception is implied in the Suits in Admiralty Act ["SAA"] and the Admiralty Extension Act ["AEA"].   The government states that "[t]he same lack of mandatory standards and policy-based discretion that precluded these claims under the FTCA precludes them under the [admiralty jurisdiction statues]."   This is not totally correct.   While it is true that the discretionary function exception is implied in the SAA and AEA, the Corps' dredging activities are highly regulated, as explained in much detail above, and thus are not discretionary.

In addition, the government's statement at p. 7 that "construction and maintenance have been held by this Court and the Court of Appeals to be discretionary functions" is not accurate. This Court correctly held that **construction** is not discretionary, but not maintenance.   And the Fifth Circuit held that the choice between dredging and foreshore protection was discretionary, but not that **dredging** is discretionary.   In fact, as explained in much detail above, the cases hold that once the government elects to dredge, it must do so with due care and must follow the regulations.

c.     **Plaintiffs' claims are not barred by the Flood Control Act.**

At p. 7, the government repeats the argument about the Flood Control Act made in Section II, p. 4 of its brief.  Plaintiffs have already addressed this argument above.  The Fifth Circuit held in this case that dredging is not a flood control activity barred by Section 702c.

C.     **THE GOVERNMENT HAS FAILED TO IDENTIFY ANY PLAINTIFF WHO FAILED TO EXHAUST ADMINISTRATIVE REMEDIES PRIOR TO FILING SUIT.**

The government states that "[a]pproximately 72,000 plaintiffs are before the Court in these cases.  Insofar as any of them failed to exhaust their administrative remedies prior to invoking the judicial process, their claims must be dismissed for lack of jurisdiction."  However, the government fails to identify any Plaintiff who falls in that category.  The government is required to make a showing that any Plaintiff did not follow the administrative requirement, but has failed to do so.

III. **CONCLUSION.**

These Plaintiffs have sat on the sidelines for eight years waiting for their day in Court.  Their claims should not be dismissed summarily without even giving them an opportunity to develop their cases and present evidence.  The Court should deny the government's motion.

WHEREFORE, Plaintiffs pray that the Court deny the government's motion.

Respectfully Submitted:

*s/Camilo K. Salas III*
CAMILO K. SALAS III (LSBA 11657)
SALAS & Co., L.C.
650 Poydras Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 799-3080
Facsimile: (504) 799-3085
E-Mail: csalas@salaslaw.com

Shirin E. Harrell (LSBA 27495)
Eric R. Nowak (LSBA 27025)
HARRELL & NOWAK, LLC
650 Poydras Street, Suite 2107
New Orleans, Louisiana 70130
Telephone: (504) 522-7885
Facsimile: (504) 528-3131

Daniel E. Becnel, Jr. (#2926)
Law Offices of Daniel E. Becnel, Jr.
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Telephone: 985-536-1186
Facsimile: 985-536-6445
E-mail: dbecnel@becnellaw.com

A. J. Rebennack (LSBA No. 18677)
2325 North Hullen, Suite 104
Metairie, Louisiana 70001
Telephone:  504-831-3325
Fax:  504-831-1203
E-Mail: aj@ajlawyer.net

**Attorneys for Plaintiffs**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on September 10, 2013,  I electronically filed the foregoing

with the Clerk of the United States District Court for the Eastern District of Louisiana using the

CM/ECF system which will send notification of such filing to all counsel of record.

<u>*s/Camilo K. Salas III*</u>

CAMILO K. SALAS III

21