MEMO –

ISSUES REGARDING DRDGING AND ENVIRONMENTAL COMPLIANCE

MISSISSIPPI RIVER GULF OUTLET

Prepared by: Abram J. "Nick" Nicholson, P.E.
November 1, 2007

The purpose of this paper is to address four specific questions or issues involved in the maintenance dredging of the Mississippi River Gulf Outlet channel. This navigation channel was constructed by the Corps of Engineers and has been maintained largely by contractors working under contract to the Corps of Engineers since the original construction was completed.

The author's qualifications
I am a registered Professional Engineer in Texas and Florida. During the more than 39 years of my career, I have been involved with approximately 110 dredging projects and first worked on hydrographic surveying in 1966 as a summer hire of the Corps of Engineers. My experience with dredging has involved every aspect of this work, including early planning, hydrographic surveys, feasibility studies, environmental investigations, construction documents, and construction inspection. I have previously performed evaluations of the efficacy of using various types of dredging equipment and understand the implications on the environment of the use of each type. I was a member of the committee that authored 40 CFR 230 and was on the committee that reviewed and commented on the regulations drafted by USEPA for Ocean Dumping.

I have worked as an expert witness on three cases involving coastal erosion, two of which involved lawsuits against the Federal government and one which involved a lawsuit against the State of Ohio. I was also responsible for initiation the Riverside Bayview case heard by the U. S. Supreme Court in 1982. I also served as an expert on that case, preparing arguments for the U.S. Attorneys. I have prepared or managed the preparation of environmental impact statements or assessments for more than 90 dredging projects. I am also familiar with modeling of hurricane surges and the design of hurricane protection levees as practiced by the Galveston District of the Corps of Engineers where I worked for approximately 8.5 years. In short, I have spent most of my working career on dredging and hurricane flood protection projects, including environmental issues and coastal erosion. Those are the issues involved in the MRGO lawsuit.

This paper addresses four specific issues as follow:

1. Specifications. Typically, the Corps of Engineers issues specifications and drawings for maintenance dredging of a navigation channel. Contractors bid on the work, and the lowest bid from a "responsible" contractor is usually accepted for the contract. The construction drawings show the required minimum lines and


EXHIBIT 1

grades that are to be dredged. (Dredging is essentially excavation under water.) The drawings show the plan view of the areas(s) to be dredged and provide cross sections showing the amount of sediment to be removed from the channel. The contractor is required to remove the materials to or below the specified limits of dredging. The limits of dredging typically include the minimum channel bottom depth, one or two feet of additional required dredging known as "Advance Maintenance," and usually one or two feet of what is called "Allowable Overdepth." A typical original construction document cross section is shown on Figure 1. The sketch is not to scale, but is representative of the concept of how the construction drawings show the work to be done. This sketch shows the slope required, the minimum bottom depth of the channel, the elevation of sediment in the channel, the required "Advance Maintenance," and the "Allowable Overdepth."

The purpose of Advance Maintenance is to ensure that the minimum stated channel depth is present until the next dredging, or essentially guaranteeing that the stated channel depth is available for navigation in spite of sedimentation over the intervening periods between maintenance dredging contracts. The Allowable Overdepth" is included to provide "fair" compensation to the contractor for the sediment he must remove below the Advance Maintenance depth in order to achieve the full Advance Maintenance depth throughout the area being dredged. This is done because dredging is somewhat inexact, meaning that it is very difficult for a dredge to control the exact depth to which it is cutting because of tides, waves, and the accuracy of the equipment to cut at a specific level. The contractor is paid for the volume he dredges down to the depth of the Allowable Overdepth, but no more. If the contractor accidentally dredges below the Allowable Overdepth, he receives no payment for that quantity of dredging.

Typically, the slope on either side of the channel does not allow for advance maintenance, since the tendency is for sediment to slide down the slope and collect at the bottom of the cut, which is also known as the "toe" of the slope. The slope cut does frequently allow for limited Allowable Overdepth.

2. It has long been the practice among dredgers that the slope can be cut using what is known as a "Box Cut." Box cutting means to dredge into the slope at the elevation of the channel bottom until the slope collapses because it becomes unstable. The Corps of Engineers has not normally prohibited the practice of box cutting on dredging projects, but neither does it typically allow it. Box cutting is done by dredgers because it is usually the most cost-effective way to achieve the contractually required slope of the channel side. The practice of box cutting is illustrated on Figure 1 and in more detail on Figure 2.



FIGURE 1

MRGO Box Cutting Practice Memo – Opinion of Impacts 3



FIGURE 2

THEORETICAL RESULT OF BOX CUTTING

Unfortunately, the practice of creating unstable slopes at the sides of the channel due to box cutting has contributed over the years to environmental degradation and to erosion of the slopes where the soils are easily erodible. The "Typical Original Construction" section shown on Figure 1 is an illustration of how most dredging construction documents are prepared. Also on Figure 1, in the cross section shown at "Typical Box Cut Practice," the dredge is used to cut horizontally into the bank along the indicated channel bottom line, and the resulting unstable mass of soil near the top falls down, creating some kind of slope. That slope does not necessarily match the slope shown on the construction documents. It typically requires the dredging of additional slope material than would otherwise be required to provide the required slope. It is, however, an economical way to do the job and get paid the maximum allowable amount for the work. Unfortunately, destabilizing the slope cannot be depended on to result in the desired slope as shown on the construction documents. This is particularly true in soft clay type sediments. It is also true in sands which will typically slump to their angle of internal repose, which probably will not match the contractually required slope. The concept of "Box Cutting" is perhaps better illustrated on Figure 2. The net effect is that, typically, more material is dredged than is necessary to create the contractually required slope.

Figure 3 illustrates what happens when sands are box cut. The contract documents typically require a slope that is less steep than the natural angle of repose. In this case, as shown on Figure 3, the box cut must extend well beyond the dredging limits in order to achieve the entire slope line required by the contract. Unfortunately, with the action of waves, tidal currents, and boat and ship wakes, the sand will not remain at the natural angle of repose. It will continue to slump as wave energy relocates the sand. This is illustrated in Figure 4, which shows how box cutting of sand accelerates widening of the top of the channel.

Clay materials, if soft, behave in a manner similar to sand. After the cut has been made and the soil has slumped to create an approximate slope, the slope continues to degrade in the zone where waves and currents are strong enough to erode the sediment. The difference is that this does not happen as fast as it does with sand. It does, however, continue to happen.



FIGURE 3

EFFECT OF BOX CUTTING ON SEDIMENT WITH A NATURAL ANGLE OF REPOSE



FIGURE 4

RESULT OF BOX CUTTING ON ADJACENT MARSHLANDS

The eventual result of this practice (box cutting) is the speeding up of widening of the open water area of the channel and loss of adjacent marshes and productive shallows, both of which are negative environmental impacts. This is illustrated in Figures 4 and 5. Obviously, the practice of Box Cutting is not the only cause of the loss of adjacent marshes and shallows, as ship wakes, wind driven waves, tidal currents, and general instability of softer soils all contribute to the adverse impacts. In the soft sediments of the Mississippi River delta, the actions of these factors are exacerbated because the soft sediments are also subsiding due to compression of the underlying soils. The result is that the slopes have quickly eroded away, leaving the top of the MRGO much wider than originally proposed. This is shown on Figure 5 which illustrates the original project authorized by Congress, what happens after a few years, and the long term situation of a very wide waterway. Box cutting of sands and soft materials accelerates this process. The result over the years since original construction has been the loss of thousands of acres of adjacent wetlands and productive shallows.

3. The Corps of Engineers specifications do not normally prohibit box cutting; nor do they usually specifically allow it. Technically, box cutting and allowing the slope to collapse is not dredging, since dredging is defined as removing materials from beneath the water and raising them above the water. However, the environmental impacts are the same as dredging with open water disposal, meaning that, in effect, box cutting involves causing materials excavated from beneath the water to be disposed onto the slope area previously dredged to the full channel depth. The specifications normally require the sediment to be discharged to a designated disposal site, usually offshore in an EPA approved location or onshore in a confined disposal site. In effect, while the contractor is not "dredging" when the box cutting results in a failed slope, he is creating what could be considered an unpermitted discharge of dredged materials. Under the law, the contractor is required to comply with the EPA and the Corps of Engineers regulations concerning the environment.

4. We understand that the design of the hurricane flood control levees protecting the New Orleans area are based on the modeling of surge tides done with the assumption that the offshore barrier islands and marshes are present. The islands and the marshes are nature's storm surge buffer, resulting in lower water levels from a given design hurricane than what would be the case if the marshes and islands are removed. The shallow water absorbs wave energy and reduces the height of the storm surge. With the continued subsidence of the marshes combined with the erosion of the marshes, including the widening of the MRGO, storm surge at the levees near New Orleans can increase in elevation above the originally calculated values. The large open water area of around a thousand feet in width of the MRGO allows higher energy levels to pass unimpeded through the marshes and islands to the flood protection levees, contributing to overtopping and failure of the levees.



FIGURE 5

5. In summary, box cutting is the most destructive method available for creating the required channel side lopes. It results in faster widening of the channels, destruction of larger areas of benthic habitat, higher turbidities, and removal of larger quantities of materials than would occur with the cutting of the slope to the required dimensions. It speeds up the loss of wetlands in the Mississippi River delta and contributes to the elevation of hurricane surge inland from the channel.

Data are not available to permit the accurate calculation of the amount of the increase in water levels from hurricane surge, so I have not attempted to do so. I fully believe the practice of box cutting the slopes on the MRGO did contribute to the flood elevations inland during Hurricane Katrina. How much that elevation was affected is, at present, an unknown.

In order to determine the actual impact of widening of the MRGO on flood elevations, a major effort will be required to accomplish modeling of the hydraulics so that "before and after" conditions can be evaluated. Estimating the actual effects of box cutting on the widening of the channel will also require a major effort in order to try to exclude the other factors and verify the approximate contribution of box cutting to accelerating the widening of the channel. This effort will require evaluation of all the surveys done since the MRGO was completed and all the dredging efforts undertaken over that same period. Once the required records and data are obtained, the work can be done. The Mississippi Delta area is one of the most evaluated and modeled hydraulic and sediment systems in the nation and that will help speed the evaluations along.

This is the Professional Opinion of:
Abram J. "Nick" Nicholson, P.E.
Collins Engineers, Inc.
November 1, 2007

Signed: Abram J. Nicholson

BECKY DRUMMOND
NOTARY PUBLIC
Bryan County, Georgia
My Commission Expires March 29, 2011

11/5/07

MRGO Box Cutting Practice Memo – Opinion of Impacts                    10



# Abram J. Nicholson, P.E.
Senior Marine Facilities Engineer

Mr. Nicholson is a senior coastal & marine facilities engineer with a great deal of experience in the planning, environmental permitting, design, construction and maintenance of port facilities, dredging of navigation channels, harbor structures, seawalls, breakwaters, and marinas. He has more than 38 years experience in dealing with such projects.

His experience with marine related projects includes many individual assignments in dredging and disposal including contaminated sediments, breakwaters, marinas, seawalls, port expansion programs, and environmental permitting for development bank funding approvals for marine facilities.

While serving as the Chief of the Environmental Resources Branch of the Detroit District of the Corps of Engineers from 1976 – 1980, he was responsible for the Environmental Impact Statements and Assessments as required for all federal and private dredging projects proposed in the Great Lakes area. Private projects were subject to the permitting requirements of the Clean water Act & Amendments, meaning that each was evaluated for water quality impacts before a recommendation would be made to issue or deny a permit application.

As head of a task force in Texas, he was responsible for the preparation of the EIS documents for all federal navigation channels on the Texas coast. During this time, he also served as a member of the committee that wrote the regulations for compliance with Section 404b of the Clean water Act & Amendments and the committee that provided official comments on the USEPA proposed rules for Ocean Dumping.

He has also worked in 16 foreign countries including the UAE (Abu Dhabi & Ruwais), Iraq, Ireland, Jordan, Jamaica, Thailand, Indonesia, Canada, China, South Korea, India, Bangladesh, Mexico, the Dominican Republic, The Philippines, and El Salvador. All of the projects in foreign countries involved marine facilities such as breakwaters, reclamation areas, navigation channels, marinas, and environmental protection. One recent project was the evaluation of what could be done in Aqaba, Jordan, to prevent the phosphate export facility from damaging the coral refs in the Red Sea as a means of protecting the tourism value of the area. He has worked on projects in 33 States and U.S. Territories including, Hawaii, Guam, Saipan, Northern Marianas Islands, and Puerto Rico.

**Education**
B.S., Civil Engineering, Lamar University, Beaumont, Texas, 1968

**Years of Experience**
39
(6 with Collins, 33 with others)

**Registrations & Training**
Professional Engineer
Florida, Texas

Open Water Diver
SSI# 563970024, DSCI # 4192

## WORK HISTORY

Collins Engineers, Inc., Nov. 2002 - Current
Foster Wheeler Environmental Corp. 2001 - 2002
Dames & Moore/URS Corporation, Principal Engineer, 1998 - 2001
Independent Consultant, 1995-1998
Black & Veatch, Manager of Marine Facilities Design Group 1980 - 1995
U.S. Army Corps of Engineers - 1964 - 1980



**Abram J. Nicholson, P.E.**
Senior Marine Facilities Engineer

## DREDGING AND DISPOSAL

### Current Projects

**Thunderbolt Harbor Condos, Thunderbolt, GA.** Hydraulic dredging of 13,000 CY of clay sediment from the Wilmington River near Savannah Georgia. Services include hydrographic surveys, design, sediment sampling and testing, and permitting.

**Savannah Bend Marina, Wilmington Island, GA.** Hydraulic dredging of 8,000 CY of clay sediment from the Wilmington River near Savannah, GA. Services included hydrographic surveying, design, sampling and testing, and permitting.

**Bahia Bleu Marina, Thunderbolt, GA.** Hydraulic dredging of 8,000 CY of clay sediment from the Wilmington River near Savannah, GA. Services included hydrographic surveying, design, sampling and testing, and permitting.

**Isle of Hope Dredging, GA.** Study of alternatives to dredge 200,000 CY of clay sediments from an existing creek. Primary problem is identification of useable disposal sites.

**River View Condos, Wilmington River, GA.** Assistance with permitting and dredging planning for a proposed new floating pier to serve a new set of condos along the river. Specifically, managing the sediment sampling and testing program and the evaluation of the data.

### Typical Completed Projects

**New Water Intake Pipelines and Shoreline Protection, Roi Namour Island, Kwajalein Atoll, Northern Mariana Islands. (2004)** Design of dual pipelines to take water from offshore in the Pacific Ocean waters and pass it through to the salt water pumping station that feeds the desalination plant for production of potable water. Includes design of pipeline installation through the surf zone and the installation of erosion control measures at the shoreline.

**USACOE, TERC Contract, PCB Cleanup, New Bedford Harbor, MA. (March 2001 - Oct. 2002)** Conceptual planning and estimating of a dredged sediment drying and transfer facility for shipping approximately 900,000 cubic yards of dried PCB laden sediment to a TSCA landfill. Services included preliminary design of the building, road and rail access, a barge loading facility, and the conveyors and hoppers required to handle the dried materials in the building. This facility was planned and estimated as a possible cost savings alternative to large Confined Dredged Material Disposal Sites in the harbor area. The project included transportation planning, dredging design, containment design, decontamination facilities, and rail storage for making up unit trains. The design allows for shipment of the dried sediment via truck, rail, or barge to a TSCA landfill.


COLLINS ENGINEERS INC

**Abram J. Nicholson, P.E.**
Senior Marine Facilities Engineer

**Port of Miami, Florida (2000 – 2001).** Management of $110 million redevelopment program for the port of Miami. Included dredging of berthing areas for two new berths for container ships. Worked with contractor to achieve goals.

**SEMPRA Energy, LNG Terminal Feasibility Support Study 1999 – 2000**
Evaluation of alternate breakwater designs to support client decision regarding development of a new LNG terminal in Baja, Mexico, near Ensenada. Included wind field analysis, wave modeling, cost estimating, and research concerning weather data and recently developed unloading equipment. Alternatives evaluated included floated-in caissons for the berth, stone breakwater and pile supported pier, and a pier with no breakwater. This was an economic feasibility study.

**Three Forks Harbor Marina, Muskogee, Oklahoma (1999 – 2001)**
Planning, design and construction documents for a new marina on the McClellend-Kerr Water way (Arkansas River) in Oklahoma. The project is located on an undeveloped park area which is crossed by numerous utility lines including natural gas, high voltage transmission lines, water, and telephone service. Facility improvements include a Harbor Master's Office, dredging of the marina basin, all site development and utility systems, grading and drainage, parking lots, boat ramps, and an 84 inch diameter pipeline buried in the bottom of the harbor to provide for flushing of the harbor to maintain good water quality. The project also includes road design, floating piers, lighting, a sanitary waste pump-out station, a fueling station, service utilities to the boats, and extensive steel sheet pile bulkheads.

**Chittagong, Bangladesh, Container Terminal Environmental Study, 1997 – 1999**
Extended study of a proposed 365-acre container terminal at the mouth of the Karnafuli River. Prepared environmental impact assessment for the World Bank to gain approval of project funding. Project site is located adjacent to the Bay of Bengal and will include a shoreline revetment and offshore breakwater for sediment control. Dredging was designed for both providing vessel berthing depths along the wharf and for obtaining fill sand to build the site up above the 100 year flood elevation.

**Carrizo Reservoir Dredging, Puerto Rico (1993 – 1997)** Planning, permitting, formal environmental impact statement, design, and construction assistance for dredging 6 million cubic meters of sediment from a fresh water reservoir. Included design of 300 acres of leveed upland disposal sites in earthquake prone area. Performed for the Water and Sewer Authority of Puerto Rico. Total project cost was approximately $80 million.

**Dredge America (1976).** Served as the lead engineer for a small dredging company for a year. Preparing bids, obtaining permits and modifications to permits, calculating quantities for payment, designing disposal site dikes. Supervising dredging in the field.

**National Power, Vizag, India, Coal Terminal Feasibility Study, 1994.** Feasibility study of coal import terminal in India, including evaluation of alternate locations, piers, dredging, breakwaters, and environmental protection measures

Page 3



# COLLINS ENGINEERS INC

**Abram J. Nicholson, P.E.**
Senior Marine Facilities Engineer

**Vishakapatnam, India, Coal Terminal Feasibility Study, 1993** Feasibility study of coal import terminal in India, including evaluation of alternate locations, piers, dredging, breakwaters, and environmental protection measures

**Map Ta Phut Port Expansion, Thailand, 1992.** Prepared an Environmental Impact Assessment and Statement for the Asian Development Bank as a requirement for approval of funding of a proposed 6 square Km dredging/reclamation project with shore protection and breakwaters. The purpose of the project was to create a major port expansion. Issues resolved included shore erosion and accretion modeling.

**Kui Buri Coal Terminal, Thailand (1994)** Accomplished planning, preliminary designs, and cost estimating for alternative coal receiving pier locations in the Gulf of Thailand to be used for importing coal to a power station. Included Pier structures to 17 km in length, dredging of channels and turning basins, and construction of breakwaters. Performed for the Power Authority of Thailand.

**Pelee Island Barge Harbor, Pelee Island, Ontario, Canada, 1991** Responsible for design of new navigation channel, barge dock, harbor, and offshore breakwaters.

**Two Naval Bases, Arabian Gulf 1986 – 1989** Responsible for environmental studies and preliminary design and bidding (turnkey) of marine facilities for a Naval forward operating base and a Naval shipyard including berthing for over 50 vessels, two graving docks, a lock, over 3 km of precast breakwaters, dockside craneways, over 2 km of piers, and shore protection systems. The project included construction of more than 5 square kilometers of lands in the open waters of the Arabian Gulf by installing stone breakwaters and filling by dredging. Confidential client.

**Duluth Ship Canal, Duluth, Minnesota, 1985 – 1986** Responsible for design of major rehabilitation of 90-year-old harbor entrance piers and breakwaters. This included power cable replacement.

**Keweenaw Waterway, Michigan (1985).** Responsible for design of repairs to channel bulkheads and a new 20 acre facility for containment of dredged mud, including a new dredge berth and offloading platform. Performed for the Detroit District Corps of Engineers.

**Green Bay Harbor Dredged Material Disposal Site Wisconsin (1984)** Responsible for design of 100-acre dredged mud containment facility in open waters of Green Bay including dredge berth, offloading platform, and access channels. The work also included a filtered discharge for pollution prevention. Performed for the Detroit District Corps of Engineers.

**Black River Canal, Port Huron, Michigan (1982)** Study and design of canal enlargement and addition of entrance breakwaters with sediment trap, including environmental assessment. Channel designed to meet needs of recreation vessels and relieve flooding. Client was The City of Huron, MI.



**Abram J. Nicholson, P.E.**
Senior Marine Facilities Engineer

**Bay City State Park Marina (1981)** Feasibility study of a marina on the shores of Lake Michigan. Project included analysis of littoral drift, economic justification, environmental impact assessment, hydrographic surveys, dredging of a navigation channel, and parallel breakwaters. Client was Bay County.

**Reservoir Dredging, Akron, Ohio (1985)** Feasibility study of dredging contaminated sediments from the city water supply lake to improve water quality. Client was The City of Akron, Ohio.

**Colorado River Channel Improvements, Matagorda Bay, Texas. 1971 – 1974** Responsible for planning of unique harbor entrance breakwaters utilizing a weir jetty and sedimentation trap to resolve extremely high shoaling rate problem.

**Brownsville Ship Channel Improvements, Texas (1972)** Responsible for planning and design of channel deepening and widening project, including turning basin enlargement and establishment of dredged material disposal sites. Economic justification for improvements was largely due to offshore oil platform production. Performed for the Galveston District Corps of Engineers.

**US Navy Magnetic Silencing Facility, Norfolk, Virginia (1989 – 1992)** Study, design, and construction management of magnetic silencing facility for the United States Navy. This included five types of submarine cables totaling over 40 miles in length which were installed in a dredged trench in the navigation channel and the installation of 80 magnetometers in fiberglass pipes driven into the sea floor at the bottom of the navigation channel. The project also included an offshore tower. Services included underwater construction inspection. Client was the Chesapeake Division, Naval Facilities Engineering Command

**Halla Engineers and Constructors, Mokpo Deepsea Container Port, Mokpo, South Korea (2000 – 2001)** This study evaluated previous planning and engineering completed for a major four-phase port development project with an estimated capital cost of nearly $1 billion. The study addressed the development of wharves, storage yards and landside access as well as site dredging and fill (reclamation) and a wharf to be constructed using floated in caissons. The work included due diligence issues such as cost estimate verification and design certification. The project was performed to assure potential investors that the costs and predicted performance were realistic.

**Port of Richmond Wharf Expansion, Virginia (1989 – 1992)** Responsible for planning, design, environmental assessment, and permit acquisition for a 1,200 foot wharf extension, primarily for the handling of containers. Included dredging, advice on container cranes, a turning basin expansion, disposal sites, container storage yard and equipment, spill containment, access road construction, rail extension, and all utility expansion. The wharf was designed as a gravity structure consisting of steel sheet pile cells approximately 67 feet in diameter. The work was performed for the Port Authority of Richmond.

**Port of Sallisaw Port Industrial Park, Oklahoma (1998 – 1999)** Project Engineer for the development of an industrial port complex for the Cherokee Nation. Services include

Page 5



**Abram J. Nicholson, P.E.**
Senior Marine Facilities Engineer

coastal planning analysis, land use analysis, transportation access and environmental assessment. The project consists of 1,000 acres located along the Arkansas River that was formerly a regional recreation area. Plans include the development of both general cargo and bulk terminal facilities. Client is the Cherokee Nation.

**Coal Receiving Piers, Sumatra (1993 – 1994)** Planning and preliminary design and cost estimates for two coal receiving piers in the mouth of a river in Sumatra. Included channel and berth dredging. The piers would serve a coal-fired power plant. Performed for the Power Authority of Indonesia.

## PRIMARILY ENVIRONMENTAL PROJECTS

**Great Lakes Navigation Projects, Upper Four Great Lakes (1976 – 1980)**
Responsible for evaluation of environmental effects of all Federal projects in the Upper Great Lakes including over 75 harbor and channel projects plus numerous flood control projects and the four locks at Sault Ste. Marie, Michigan. Included planning of dredged material disposal sites and their environmental approvals. Performed for the Detroit District Corps of Engineers.

**EISs for Dredging of Federal Navigation Channels, Texas Gulf Coast. (1973 – 1976)**
Responsible for Environmental Impact Statements and approvals for maintenance dredging of all Federal navigation projects on the Texas Gulf Coast including planning of dredge material disposal sites for over 140 locations. Assessments completed covered over 700 miles of dredged channels, both inshore and offshore. Performed for the Galveston District Corps of Engineers.

**Participated in Establishing the Federal Environmental Protection Criteria for Dredging (1973 – 1974)** Member of the committee that authored 40 CFR 230. These are the environmental protection regulations dealing with dredging and filling of wetlands and waters of the United States. Also a member of the committee that established the Federal regulations covering Ocean Dumping.

**Highland Bayou Flood Control Project, Texas. (1972 – 1973)**
Project Engineer for design of a channel improvement (dredging) and diversion channel for floodwaters from a bayou in Galveston County, Texas. Project included numerous relocations of water and power lines and new bridges for the diversion channel.

**1994 – 1997 – Summer Hire with Corps of Engineers as Engineering Technician**

**Drafter for Civil Engineering (1994)** 3 months as a drafter drawing plans with ink on mylar for a flood control project in Houston, Texas.

**Foundations & Materials Lab Technician (1965)** 3 months working as a laboratory technician, opening, testing, and classifying soil samples.



# Abram J. Nicholson, P.E.
Senior Marine Facilities Engineer

**Hydrographic Survey Team Member (1966)** 3 months as a member of a hydrographic survey team on navigation projects in Texas.

**Construction Inspector (1967)** Inspected the construction of the high level bridge from Port Arthur, Texas, to Pleasure Island. The bridge is pile founded, 5,000 feet long, and has a vertical clearance of about 150 feet where it crosses the ship channel.

## PUBLICATIONS AND PRESENTATIONS

More than 100 Federal Environmental Impact Statements

2006 – ASCE/SEI annual conference in St. Louis – "Why Inspection of Highway Infrastructure is Critical to Public Safety."

2005 – IRPT Annual Meeting, New Orleans – "Changes in Port Security Programs for 2006"

1994 – ASCE Dredging Conference, "Developments in Environmental Regulations in Emerging Nations."

1992 – The Military Engineer, Article on submarine cable laying

1974 – Guest Lecturer at Texas A&M University, Annual short course on dredging. Presented paper on environmental requirements for dredging.

## PROFESSIONAL ACCOMPLISHMENTS

Expert Witness Services on three coastal erosion cases, two in Michigan and one in Ohio
Assisted in defense against suit for injunction to stop 8 million cubic yard dredging program, 1995, Puerto Rico

Prepared testimony for U.S. Attorneys in case heard by the U.S. Supreme Court in 1982; The Riverside-Bayview case.

## PROFESSIONAL AFFILIATIONS

Western Dredging Association
Society of American Military Engineers (SAME)
American Society of Civil Engineers